*EXECUTION VERSION*

**LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT**

**AMONG**

**GRAMMER, INC.,**

**GRAMMER AG**

**AND**

**APC PARENT, LLC**

_____

Dated as of September 20, 2024

170999.00004/150266115v.9
NAI-1540708948v11

CONFIDENTIAL

FBG_CH1_00094023

**DEBTORS' EXHIBIT NO. 237**
**Page 1 of 104**

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................................... 5

 Section 1.1  Definitions ......................................................................................... 5

 Section 1.2  Other Defined Terms ........................................................................ 16

ARTICLE II PURCHASE AND SALE OF THE INTERESTS; CLOSING .............................. 18

 Section 2.1  Purchase and Sale of the Interests .................................................... 18

 Section 2.2  The Closing ....................................................................................... 18

 Section 2.3  Closing Deliveries ............................................................................ 18

 Section 2.4  Adjustments to Base Purchase Price ................................................ 19

 Section 2.5  Purchase Price Allocation ................................................................ 23

 Section 2.6  Withholding ...................................................................................... 24

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ...................... 24

 Section 3.1  Organization, Standing and Power ................................................... 24

 Section 3.2  Authority; Execution and Delivery; Enforceability .......................... 25

 Section 3.3  Purchased Entities ............................................................................ 25

 Section 3.4  No Conflicts; Consents; Governmental Authorization ..................... 25

 Section 3.5  Financial Statements ........................................................................ 26

 Section 3.6  Absence of Undisclosed Liabilities .................................................. 26

 Section 3.7  Absence of Changes or Events ......................................................... 26

 Section 3.8  Intellectual Property Rights. ............................................................. 27

 Section 3.9  Information Technology; Data Protection ......................................... 28

 Section 3.10  Real Property .................................................................................... 28

 Section 3.11  Material Contracts ............................................................................ 29

 Section 3.12  Compliance with Applicable Laws; Permits ..................................... 30

 Section 3.13  Environmental Matters ..................................................................... 31

 Section 3.14  Proceedings ...................................................................................... 31

 Section 3.15  Taxes ................................................................................................ 31

 Section 3.16  Labor Relations; Employees and Employee Benefit Plans ............... 32

 Section 3.17  Intercompany Agreements ................................................................ 34

 Section 3.18  Insurance .......................................................................................... 34

 Section 3.19  Customers and Suppliers .................................................................. 34

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094024

Section 3.20    Accounts Receivable..................................................35

Section 3.21    Product Warranty, Product Liabilities and Recalls............................35

Section 3.22    Brokers...........................................................35

Section 3.23    Bank Accounts.....................................................35

Section 3.24    Exclusivity of Representations and Warranties..............................35

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER.....................36

Section 4.1    Organization, Standing and Power...................................36

Section 4.2    Authority; Execution and Delivery; Enforceability.........................36

Section 4.3    No Conflicts; Consents; Governmental Authorization.....................36

Section 4.4    Sufficiency of Funds................................................36

Section 4.5    Proceedings.......................................................37

Section 4.6    Brokers...........................................................37

Section 4.7    Investigation......................................................37

Section 4.8    Securities Act.....................................................37

Section 4.9    Solvency..........................................................37

Section 4.10    Exclusivity of Representations and Warranties..............................38

Section 4.11    Acknowledgment of No Other Representations or Warranties..........38

ARTICLE V COVENANTS.............................................................39

Section 5.1    Confidentiality. ...................................................39

Section 5.2    Access to Information...............................................39

Section 5.3    Publicity.........................................................40

Section 5.4    Employee Matters..................................................40

Section 5.5    Payments from Third Parties........................................42

Section 5.6    Termination of Intercompany Balances...............................42

Section 5.7    Further Conveyances and Assumptions...............................43

Section 5.8    Acknowledgement of Pre-Closing Services............................43

Section 5.9    Additional Closing Payments........................................43

Section 5.10    Bulk Transfer Laws................................................43

Section 5.11    Excluded Employees and Excluded Assets............................43

Section 5.12    Guaranty.........................................................44

Section 5.13    Accounts Receivable...............................................44

Section 5.14    Computers and Servers.............................................44

2

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094025

ARTICLE VI CERTAIN TAX MATTERS ...................................................................... 44

Section 6.1        Cooperation and Exchange of Information......................................... 44

Section 6.2        Transfer Taxes .................................................................................... 45

Section 6.3        Tax Sharing Agreements..................................................................... 45

Section 6.4        Tax Treatment of Payments ................................................................ 46

Section 6.5        Pre-Closing Actions, Elections and Post-Closing Actions ................ 46

Section 6.6        Tax Returns......................................................................................... 46

Section 6.7        Controversies ...................................................................................... 47

Section 6.8        Refunds and Credits............................................................................ 48

ARTICLE VII GENERAL PROVISIONS ..................................................................... 48

Section 7.1        Entire Agreement ................................................................................ 48

Section 7.2        Survival................................................................................................ 48

Section 7.3        Assignment .......................................................................................... 49

Section 7.4        Amendments and Waivers ................................................................... 49

Section 7.5        No Third-Party Beneficiaries.............................................................. 49

Section 7.6        Notices ................................................................................................ 49

Section 7.7        Non-Recourse ..................................................................................... 50

Section 7.8        Releases............................................................................................... 50

Section 7.9        Specific Performance .......................................................................... 51

Section 7.10       Governing Law and Jurisdiction......................................................... 51

Section 7.11       Dispute Resolution.............................................................................. 52

Section 7.12       Waiver of Jury Trial............................................................................ 52

Section 7.13       Severability ......................................................................................... 53

Section 7.14       Counterparts; Language ...................................................................... 53

Section 7.15       Expenses ............................................................................................. 53

Section 7.16       Interpretation; Absence of Presumption ............................................ 53

Section 7.17       Waiver of Conflicts Regarding Representation; Nonassertion of
                   Attorney-Client Privilege.................................................................... 54

Section 7.18       Disclosure Schedules ......................................................................... 55

Section 7.19       Indemnification................................................................................... 55

3

170999.00004/150266115v.9

FBG_CH1_00094026

DEBTORS' EXHIBIT NO. 237
Page 4 of 104

<u>EXHIBITS</u>

Exhibit A      Form of Restrictive Covenants Agreement
Exhibit B      Form of Transition Services Agreement
Exhibit C      Form of IP License Agreement
Exhibit D      Purchaser Guaranty
Exhibit E      Allocation Schedule

4

170999.00004/150266115v.9

FBG_CH1_00094027

## LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT

This LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT, dated September 20, 2024 (this "***Agreement***"), is being entered into between Grammer, Inc., a Minnesota corporation ("***Seller***"), APC Parent, LLC, a Delaware limited liability company ("***Purchaser***") and, solely for the purposes of Section 7.19, Grammer AG, a German ktiengesellschaft ("***Parent***"). Seller, Parent and Purchaser are sometimes referred to in this Agreement individually as a "***Party***" and collectively as the "***Parties***."

WHEREAS, Seller owns all of the outstanding limited liability company interests (the "***Interests***") of Toledo Molding & Die, LLC, a Delaware limited liability company (the "***Company***");

WHEREAS, the Company, through itself and the other Purchased Entities, is engaged in, among other things, the Business (as defined herein); and

WHEREAS, Seller desires to sell, assign, transfer and deliver to Purchaser, and Purchaser desires to purchase, acquire and assume, from Seller the Interests upon the terms and subject to the conditions contained in this Agreement (the "***Transaction***").

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, on the terms and subject to the conditions of this Agreement, Seller and Purchaser, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  As used herein, the following terms have the meanings set forth below when capitalized:

"***Affiliate***" means, with respect to any Person, as of the time at which determination of affiliation is being made, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***"), as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.  For the avoidance of doubt, Seller and its respective Affiliates shall be deemed to be Affiliates of the Business and the Purchased Entities prior to Closing and shall not be deemed to be Affiliates of Purchaser or, from and after the Closing, of the Business or the Purchased Entities.

"***Anti-Corruption Laws***" means all Laws of the U.S. relating to the prevention of corruption and bribery, including the U.S. Foreign Corrupt Practices Act of 1977, as amended.

"***Approval***" means any approval, authorization or consent of, filing with, notification to, or granting or issuance of any approval, consent, license, order, Permit or waiver by any Person.

5

170999.00004/150266115v.9

CONFIDENTIAL                                                                     FBG_CH1_00094028

**DEBTORS' EXHIBIT NO. 237**
**Page 6 of 104**

"**_Base Purchase Price_**" means $40,000,000.

"**_Benefit Plan_**" means (a) each "employee benefit plan," as defined in Section 3(3) of ERISA (whether or not subject to ERISA), (b) each bonus, deferred compensation, pension, retirement, profit-sharing, thrift, savings, employee stock ownership, equity-based, other forms of incentive compensation, retention, severance or change-in-control plans, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, post-employment retirement benefits, welfare benefit plans, and (c) all other written, formal or informal plan, agreement, program, policy or other arrangement providing employee benefits or other fringe benefits entered into, maintained or contributed to by the Purchased Entities, Seller or their ERISA Affiliates as of the date hereof for the benefit of any of the Business Employees, excluding, in each case, (x) any multiemployer plan (as defined in Section 3(37) of ERISA) and (y) any plans, programs, policies, or arrangements to which contributions by an employer are mandated by a Governmental Entity or by Law.

"**_Business_**" means the manufacturing and distribution of engineered plastics injection and blow-molded products for automotive applications, including automotive HVAC ducts, fluid reservoirs, air induction and structural plastic components, sold to automotive OEMs and Tier I suppliers.

"**_Business Day_**" means any day, other than a Saturday, Sunday or day on which commercial banks are required or authorized to be closed in New York City, New York.

"**_Business Employee_**" means each individual who, as of immediately prior to the Closing, is employed by any Purchased Entity, including any individual who is on short-term or long-term disability or other leave of absence as of such time.

"**_Business Intellectual Property Rights_**" means all Intellectual Property Rights owned by the Purchased Entities.

"**_Business IT Assets_**" means the computer systems (including the computer software, firmware and hardware), telecommunications, networks, peripherals, platforms and other similar or related items of automated, computerized or software systems that are owned or operated by a Purchased Entity in connection with operating the Business.

"**_Business Material Adverse Effect_**" means any event, change, effect or development that is having, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Business, financial condition or results of operations of the Business, taken as a whole; provided that no such event, change, effect or development resulting or arising from or in connection with any of the following matters shall be deemed, either alone or in combination, to constitute or contribute to a Business Material Adverse Effect or otherwise be taken into account in determining whether a Business Material Adverse Effect has occurred or would reasonably be expected to occur: (a) the general conditions in the industries in which the Business operates, including competition in any of the geographic areas in which the Business operates; (b) political, economic, business, monetary, financial, securities, supply chain or capital or credit market conditions or trends (including inflation, deflation, or any changes in the rate of increase or decrease of inflation or deflation, interest or exchange rates or the price of commodities or raw

6

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094029

materials), including with respect to government spending, budgets and related matters or the development, continuation or worsening of supply chain disruptions; (c) geopolitical conditions, trade wars, tariffs or sanctions, any act of civil unrest, war, sabotage or terrorism (including by cyberattack or otherwise), including any geopolitical dispute and conflict between the Russian Federation and Ukraine or Israel and Hamas, and any evolution or worsening thereof, any outbreak or escalation of hostilities involving the United States or any other country or the declaration by the United States or any other country or jurisdiction of a national emergency or war and government shut down; (d) any natural or manmade disasters or weather developments, including earthquakes, hurricanes, tsunamis, typhoons, lightning, hail storms, blizzards, tornadoes, droughts, floods, cyclones, arctic frosts, mudslides and wildfires, acts of God, or any virus, pandemic (including COVID-19), epidemic or disease or similar force majeure events, including any material worsening of such conditions; (e) the failure of the financial or operating performance of the Business to meet internal, Purchaser or analyst projections, forecasts, milestones, estimates, guidance or budgets or financial or operating predictions of revenue, earnings, cash flow or cash position for any period (provided that this clause (e) shall not be construed as implying that Seller or any of its Affiliates is making any representation or warranty herein with respect to any internal, Purchaser or analyst projections, forecasts, milestones, estimates, guidance or budgets or financial or operating predictions of revenue, earnings, cash flow or cash position for any period and no such representations or warranties are being made) (provided further that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); (f) any action taken or omitted to be taken by or at the request or with the Consent of Purchaser; (g) the execution, announcement, pendency, performance or consummation of this Agreement and the other Transaction Documents, the Transaction, or the other transactions contemplated hereby or by any of the other Transaction Documents, or the identity of Purchaser or any of its Affiliates; (h) the failure of the U.S. federal government to adopt a budget for a fiscal year, the extension of any effective continuing resolution under which the U.S. federal government is operating, the shutdown of the U.S. federal government upon expiration of any continuing resolution or any delays or failure by the U.S. federal government to raise the U.S. debt ceiling; (i) changes in any Law (including any governmental or quasi-governmental action, including COVID-19 Measures, taken in connection with any virus, pandemic (including COVID-19), epidemic or disease or similar force majeure events, including any worsening of such conditions and the expiration or termination of any actions taken in response thereto, including the termination of any COVID-19 Measures), or changes in GAAP or other applicable accounting principles or standard or any interpretations thereof; or (j) the availability or cost of any financing of any kind to Purchaser or its Affiliates; provided, further, that any adverse events, changes, effects or developments resulting from the matters described in the foregoing clauses (a), (b) or (c) may be taken into account in determining whether a Business Material Adverse Effect has occurred or would reasonably be expected to occur to the extent, and only to the extent that they have a disproportionate effect on the Business in the aggregate relative to similarly situated businesses in the industries in which the Business operates (in which case only such incremental disproportionate impact may be taken into account in determining whether there has been a Business Material Adverse Effect).

"*CARES Act*" means the Coronavirus Aid, Relief, and Economic Security Act of 2020, as amended, and all regulations and guidance issued by any government entity with respect thereto.

"*Cash Amounts*" means, of any Person and as of any time, all unrestricted cash and cash equivalents, bank and other depositary accounts and safe deposit boxes, deposits in transit,

7

170999.00004/150266115v.9

FBG_CH1_00094030

outstanding checks, drafts, ACH transactions and wire transfers, demand accounts, certificates of deposit, time deposits, negotiable instruments, marketable securities, securities and brokerage accounts and other similar items, in each case of such Person as of such time, such amounts calculated in a manner consistent with the Transaction Accounting Principles and the Sample Closing Statement, provided that in no event shall Cash Amounts include (i) any Cash Amounts to the extent distributed by a Purchased Entity or used by a Purchased Entity to pay or reduce Transaction Expenses of Seller and the Purchased Entities or the Indebtedness of the Purchased Entities, in each case, after the Effective Time and prior to the Closing, or (ii) any Cash Amounts to the extent already included within the definition of Working Capital.

"*Closing Cash Amounts*" means an amount equal to the sum of the Cash Amounts of the Purchased Entities as of the Effective Time.

"*Closing Indebtedness*" means an amount equal to the sum of the Indebtedness of the Purchased Entities as of the Effective Time.

"*Closing Purchase Price*" means (a) the Base Purchase Price, *plus* (b) the Estimated Closing Cash Amounts, *plus* (c) the Estimated Working Capital Adjustment Amount (which may be a positive or negative number), *minus* (d) the Estimated Closing Indebtedness, *minus* (e) the Estimated Closing Transaction Expenses, and *minus* (f) the Deposit Cash Amount.

"*Closing Transaction Expenses*" means an amount equal to the sum of the Transaction Expenses of Seller and the Purchased Entities as of the Effective Time.

"*Closing Working Capital*" means the Working Capital as of the Effective Time.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collective Bargaining Agreement*" means each agreement listed in Section 3.16(k) of the Disclosure Schedules.

"*Commercial Tax Agreement*" means customary commercial agreements not primarily related to Taxes that contain agreements or arrangements relating to the apportionment, sharing, assignment or allocation of Taxes (such as financing agreements with Tax gross-up obligations or leases with Tax escalation provisions).

"*Consent*" means any consent, novation, license, Permit, Approval, certificate, certification, authorization, qualification, franchise, accreditation, waiver, declaration, filing, registration, notification or similar requirement, document or Judgment.

"*Contract*" means any agreement, contract, commitment, credit agreement, indenture, licenses, arrangement, instrument, guarantee, bid, order (including purchase orders), proposal, lease or sublease (whether real or personal property) or loan (excluding Permits), in each case, oral or written.

"*COVID-19*" means SARS-CoV-2 or COVID-19, and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

8

170999.00004/150266115v.9

CONFIDENTIAL                                                                          FBG_CH1_00094031

"***COVID-19 Measures***" means any quarantine, "shelter in place," "stay at home," workforce reduction, social or physical distancing, shutdown, closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any industry group, nationally or internationally recognized organization or any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19, including the CARES Act, Families First Act and American Rescue Plan Act of 2021, in each case as amended.

"***Data Protection Law***" means applicable Laws relating to the protection or processing of Personal Data, data privacy or cybersecurity in any relevant jurisdiction.

"***Deposit Cash Amount***" means $3,000,000, which amount reflects the cash deposit made by Purchaser to Seller in accordance with the Deposit Agreement, dated September 13, 2024, by and between Purchaser and Seller.

"***Disclosure Schedules***" means those certain Disclosure Schedules, dated as of the date hereof, provided by Seller to Purchaser.

"***Effective Time***" means 12:01 a.m. (Eastern Standard Time) on the Closing Date.

"***Environment***" means soil, surface waters, groundwater, land, stream sediments, surface or subsurface strata, ambient air or indoor air.

"***Environmental Claim***" means any written notice, claim, demand, action, suit, complaint or Proceeding by any Person alleging any actual or potential liability or violation under any Environmental Law.

"***Environmental Law***" means any Law relating to human health and safety (with respect to exposure to Hazardous Materials), public or workplace health and safety (with respect to exposure to Hazardous Materials) or protection of the Environment, Releases of Hazardous Materials, restoration of natural resources or injury to persons relating to exposure to any Hazardous Materials, that is in force and applicable to the operation of the Business.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"***ERISA Affiliate***" means any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with Seller or the Purchased Entities or (ii) which together with Seller or a Purchased Entity is treated as a single employer under Section 414(t) of the Code.

"***Fraud***" means with respect to the making of the representations and warranties expressly set forth in, as applicable, Article III (as modified by the Disclosure Schedules) or Article IV (a) a false representation of a fact made in such representations and warranties, (b) with actual knowledge after reasonable inquiry that such representation or warranty is false, (c) with the intention to induce such Party to whom such representation or warranty is made to rely upon such representation or warranty, (d) causing such Party to whom such representation or warranty is made, in justifiable reliance upon such false representation, to enter into this Agreement, and (e)

9

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094032

causing such Party to whom such representation or warranty is made to suffer Losses by reason of such reliance; provided, that in no event will "Fraud" include any claim for constructive fraud, reckless or negligent misrepresentation or omission, or any tort (including a claim for fraud based on recklessness or negligence).

"*GAAP*" means United States generally accepted accounting principles, consistently applied, in effect on the date hereof.

"*Governmental Entity*" means any local, state, national or supranational government or any arbitrator, court or tribunal of competent jurisdiction, or any non-governmental or quasi-governmental self-regulatory agency, or any other agency, commission, bureau, department, authority or other local, state, national or supranational governmental authority or instrumentality.

"*Hazardous Material*" means any pollutant, toxic substance including asbestos and asbestos-containing materials, hazardous waste, hazardous material, hazardous substance, contaminant, petroleum and petroleum-containing and petroleum-derived materials, infectious or medical wastes, radiation and radioactive materials, leaded paints, polychlorinated biphenyls, perfluoroalkyl and polyfluoroalkyl substances and any other similar substances or materials, in each case above as defined in, the subject of or which could give rise to liability under any Environmental Law.

"*Improvements*" means all appurtenances, buildings, fixed equipment, fixed machinery, fixtures, parking lots, roadways, sidings and structures situated on, in, under, over or forming part of, any real property.

"*Indebtedness*" means, without duplication, of any Person and as of any time, the aggregate amount of the following obligations of such Person as of such time, without duplication, in each case such amount calculated in a manner consistent with the Transaction Accounting Principles and the Sample Closing Statement: (a) (i) the outstanding principal amount of any indebtedness for borrowed money (including the current portion thereof) (other than trade payables arising in the ordinary course of business), including all accrued but unpaid interest thereon; (ii) the outstanding principal amount of all other obligations evidenced by bonds, debentures, notes or similar instruments of indebtedness (including a purchase money obligation), including all accrued but unpaid interest thereon; (iii) all direct obligations under letters of credit, bankers' acceptances, note purchase facilities or similar instruments, in each case solely to the extent drawn; (iv) all obligations under leases that have been or are required to be recorded as capital leases in accordance with GAAP; (v) all or any part of the deferred purchase price of property or services (other than accounts payable for inventories or trade payables in the ordinary course of business), including any "earn-out" or similar payments; (vi) Liabilities under interest rate swap, hedging or similar agreements; (vii) Liabilities under factoring or similar arrangements (whether or not recourse); or (viii) Liabilities for any deferred payroll Taxes (including those deferred in accordance with any Governmental Entity COVID-19 Measures, including the Payroll Tax Executive Order); or (b) any Liability of others described in the preceding clause (i-viii) that such Person has guaranteed, that is recourse to such Person or any of its assets or that is otherwise such Person's legal liability or that is secured in whole or in part by the assets of such Person. For purposes of this Agreement, "*Indebtedness*" (x) includes: (i) any and all accrued interest, success fees, prepayment premiums, make whole premiums or penalties and fees or expenses actually

10

170999.00004/150266115v.9

CONFIDENTIAL                                                                 FBG_CH1_00094033

incurred (including attorneys' fees) associated with the prepayment of any Indebtedness; (ii) all checks, money orders, drafts, wires or similar instruments issued, "cut" or sent by any Purchased Entity but uncashed or uncleared as of the Closing; (iii) cash, book or bank account overdrafts or negative balance cash accounts; and (iv) any and all amounts owed by a Purchased Entity to any of its Affiliates, including Seller or any of its respective Affiliates, other than another Purchased Entity; and (y) excludes (i) any Liability to the extent already included within the definition of Working Capital or Transaction Expenses, and (ii) intercompany amounts owed from one Purchased Entity to any other Purchased Entity.

"***Intellectual Property Rights***" means any and all common law or statutory rights anywhere in the world, including rights provided by international treaties and conventions, arising under or associated with: (a) patents, patent applications, statutory invention registrations, registered designs, formulae, algorithms, software, and similar or equivalent rights in inventions, discoveries and designs, whether or not patented or patentable ("***Patents***"); (b) trademarks, service marks, trade dress, trade names, logos and other designations of origin ("***Trademarks***"); (c) Internet domain names, uniform resource locators, internet protocol addresses, social media handles and other names, identifiers and locators associated with Internet addresses, sites and services; (d) copyrights and any other equivalent rights in works of authorship (including rights in software as a work of authorship) and any other related rights of authors ("***Copyrights***"); (e) trade secrets and industrial secret rights, and rights in know-how, data and confidential or proprietary business or technical information that derives independent economic value, whether actual or potential, from not being known to other persons ("***Trade Secrets***"); and (f) other similar or equivalent intellectual property rights anywhere in the world, and whether or not registered.

"***Intercompany Agreements***" means all Contracts in effect as of the date hereof that are between or among Seller or its Affiliates (other than the Purchased Entities) on the one hand, and any of the Purchased Entities, on the other hand, other than the Organizational Documents of the Purchased Entities.

"***IRS***" means the U.S. Internal Revenue Service.

"***Judgment***" means any permanent or preliminary injunction or other decree, order, judgment, writ, stipulation, decision, ruling, charge, award, temporary restraining order or similar determination of any of any Governmental Entity.

"***Knowledge of Seller***" means the actual knowledge of any Person listed in Section 1.1(a) of the Disclosure Schedules, in each case, after due inquiry and reasonable investigation.

"***Law***" means any common law, code, Judgment, law, ordinance, injunction, regulation, rule or statute of any Governmental Entity.

"***Liabilities***" means all assurances, commitments, debts, guarantees, liabilities and obligations of any kind, whether fixed or contingent, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, disputed or undisputed, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability).

11

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094034

"*__Lien__*" means any charge, easement, lien, mortgage, pledge, security interest, or similar encumbrance of any kind, other than restrictions on transfer arising under applicable securities Laws.

"*__Loss__*" means any Liabilities, losses, claims, damages (excluding punitive damages, except to the extent determined by a court of competent jurisdiction to be owed to a third party), actions, suits, proceedings, demands, fines, penalties, assessments, adjustments, deficiencies, Taxes, costs and expenses, including reasonable attorneys' fees and expenses, costs of investigation and defense and other costs and expenses incurred in the enforcing any right to indemnification hereunder.

"*__Material Customers__*" means the top ten customers (measured by dollar amount of revenue on a consolidated basis) of the Business and the dollar amount of each such customer's purchases from the Business on a consolidated basis for each of the years ended December 31, 2022 and December 31, 2023 and the five-month period ended May 31, 2024, as set forth on Section 1.1(b) of the Disclosure Schedules.

"*__Material Suppliers__*" means the top ten suppliers or vendors (measured by dollar amount of expenditures on a consolidated basis) of the Business and the dollar amount of the Business's purchases from each such supplier on a consolidated basis for each of the years ended December 31, 2022 and December 31, 2023 and the five-month period ended May 31, 2024, as set forth on Section 1.1(c) of the Disclosure Schedules.

"*__Organizational Documents__*" means, with respect to a Person, the certificate of incorporation or formation, bylaws or limited liability company agreement, or equivalent governing documents, as applicable, of such Person.

"*__Payroll Tax Executive Order__*" means the Presidential Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, as issued on August 8, 2020 and including any administrative or other guidance published with respect thereto by any government entity (including IRS Notice 2020-65).

"*__Permits__*" means any Approvals, authorizations, certificates, clearances, consents, licenses, permits, registrations, qualifications, certifications, franchises, or similar documents or authorities issued by any Governmental Entity.

"*__Permitted Liens__*" means the following Liens: (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate Proceedings, that may thereafter be paid without penalty or for which an adequate reserve has been established and reflected in the Business Financial Statements; (b) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens imposed by Law in the ordinary course of business, if the underlying obligations are not yet due and payable to the extent, if applicable, adequate reserves have been established and are reflected in the Business Financial Statements; (c) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security to the extent, if applicable, adequate reserves have been established and are reflected in the Business Financial Statements; (d) with

12

170999.00004/150266115v.9

CONFIDENTIAL

respect to any owned or leased real property of the Business or the Purchased Entities: (i) defects or imperfections of title; (ii) easements, declarations, covenants, rights-of-way, restrictions and other charges, instruments or encumbrances affecting title to real estate; (iii) zoning ordinances, variances, conditional use Permits and similar regulations, Permits, Approvals and conditions; (iv) Liens not created by Seller or any of its Affiliates that affect the underlying fee interest of any leased real property, including master leases or ground leases; and (v) Liens disclosed in the applicable title insurance policies or any schedules or other attachments thereto; provided that with respect to this clause (d), any such item, individually and in the aggregate, does not materially interfere with the ordinary conduct of the Business; (e) Liens set forth in the Organizational Documents of any Person; (f) Liens set forth on Section 1.1(d) of the Disclosure Schedules; and (g) Liens deemed to be created by any of the Transaction Documents.

"***Person***" means any individual, firm, corporation, limited liability company, partnership, trust, joint venture, Governmental Entity or other entity.

"***Personal Data***" means any information about an identifiable natural person that alone or in combination with other information identifies, or could be used to identify, a natural person, and includes information that is defined as "personal data," "personally identifiable information," "individually identifiable health information," "protected health information" or "personal information" under any applicable Data Protection Law and that is processed by or in the control of a Purchased Entity.

"***Post-Closing Tax Period***" means a taxable period beginning after the Closing Date, and with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"***Pre-Closing Tax Period***" means a taxable period ending on or prior to the Closing Date, and with respect to any Straddle Period, the portion of such Straddle Period beginning on or before and ending on and including the Closing Date.

"***Proceeding***" means any judicial, administrative or arbitral action, litigation, enforcement, proceeding, action or suit by or before any Governmental Entity.

"***Purchased Entities***" means the entities listed on Section 1.1(e) of the Disclosure Schedules.

"***Purchased Entity Benefit Plan***" means each Benefit Plan that is sponsored, maintained or contributed to solely by one or more Purchased Entities.

"***Purchased Entity Equity***" means the outstanding equity interests of the Purchased Entities.

"***Purchaser Fundamental Representations***" means the representations and warranties contained in Section 4.1 (Organization, Standing and Power), Section 4.2 (Authority; Execution and Delivery; Enforceability), and Section 4.6 (Brokers).

"***Registered Intellectual Property Rights***" means all of the following in any jurisdiction that are recognized by a Governmental Entity: (a) issued Patents and Patent applications, (b)

13

170999.00004/150266115v.9

CONFIDENTIAL                                                     FBG_CH1_00094036

registered Trademarks and applications to register Trademarks, and (c) registered Copyrights and applications for Copyright registration.

"***Release***" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, depositing or dumping on or into the Environment (including the abandonment or discarding of barrels, containers and other closed receptacles).

"***Representatives***" of a Person means any officer, director or employee of such Person or any investment banker, attorney, accountant or other advisor or representative of such Person.

"***Restrictive Covenants Agreement***" means the restrictive covenants agreement, dated as of the Closing Date, to be entered into by Seller and Purchaser, in the form of Exhibit A.

"***Retained Business***" means all businesses of Seller and its Affiliates other than the Business.

"***Securities Act***" means the U.S. Securities Act of 1933.

"***Seller Benefit Plan***" means each Benefit Plan that is not a Purchased Entity Benefit Plan.

"***Seller Fundamental Representations***" means the representations and warranties contained in Section 3.1 (Organization, Standing and Power), Section 3.2 (Authority; Execution and Delivery; Enforceability), Section 3.3 (Purchased Entities), and Section 3.22 (Brokers).

"***Seller Material Adverse Effect***" means a material adverse effect on the ability of Seller to consummate the Transaction.

"***Straddle Period***" means any taxable period beginning on or prior to the Closing Date and ending after the Closing Date.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company, branch or other entity whether incorporated or unincorporated, of which (a) such first Person directly or indirectly owns or controls at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions or (b) such first Person is a general partner or managing member.  For the avoidance of doubt, (x) prior to Closing, each Purchased Entity will be deemed to be a Subsidiary of Seller and (y) from and after the Closing, no Purchased Entity will be deemed to be a Subsidiary of Seller or any of its Affiliates.

"***Target Working Capital***" means $7,915,752.

"***Tax***" means (a) any local, state, provincial, federal or non-U.S. tax imposed by a Taxing Authority, including any net income, gross receipts, sales, use, *ad valorem*, value-added, goods and services, profits, license, withholding, payroll, employment, employer health, excise, premium, property, capital gains, transfer, escheat, stamp, environmental, alternative or add-on minimum, occupation, and franchise tax, and any other duty, assessment or governmental charge, together with any additional amount, interest and penalties imposed with respect to such amounts;

14

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094037

(b) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other Person; (c) any liability for the payment of any amounts as a result of being a party to any tax sharing or allocation agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person; and (d) any liability for the payment of any of the foregoing types by Contract, as a successor, transferee or otherwise.

"***Tax Matter***" means any (a) inquiries, audits, investigations, assessments, reassessments, actions or any other Tax Proceedings or similar events with respect to Taxes of the Company for which Seller may be required to reimburse or indemnify any Purchaser Indemnified Person pursuant to this Agreement, or (b) voluntary contact with any Taxing Authority relating to, or self-assessment of, Taxes of the Company for any Pre-Closing Tax Period.

"***Tax Proceeding***" means any audit, examination, contest or other Proceeding with or against any Taxing Authority.

"***Tax Return***" means any return, declaration, report, claim for refund or information return or statement required to be filed with any Taxing Authority relating to Taxes, including any amendment thereof.

"***Taxing Authority***" means any Governmental Entity responsible for the administration, determination, enforcement, assessment, collection or imposition of any Tax.

"***Technology***" means embodiments of Intellectual Property Rights, including in the form of documentation, data, databases, software and know-how and knowledge of employees relating to, embodying, or describing products, articles, apparatuses, devices, processes, methods, designs, formulae, recipes or other technical information.

"***Transaction Documents***" means this Agreement, the IP License Agreement, the Restrictive Covenants Agreement, the Transition Services Agreement and the Purchaser Guaranty.

"***Transaction Expenses***" means, without duplication, all fees, expenses and commissions incurred by, or on behalf of, or to be paid by, Seller or the Purchased Entities, to the extent such fees and expenses are on account of services provided by any third party to Seller or the Purchased Entities at or prior to the Closing and remain unpaid as of immediately prior to the Closing, in each case, in connection with the Transaction, any negotiation, preparation or execution of this Agreement or the performance or consummation of the Transaction or other transactions contemplated hereby, including (a) the fees, expenses and commissions of any financial advisor, law firm, accounting or audit firm, brokers, finders, consultants or similar third-parties, (b) any "phantom" equity or other incentive equity, discretionary, retention, sale, transition, transaction, or change in control bonuses or any other similar obligations or payments that are payable, pursuant to an obligation established prior to the Closing, and are triggered in whole or in part as a result of the transactions contemplated by this Agreement, by the Purchased Entities on or after the Closing Date (other than, for the avoidance of doubt, the Retention Agreements), and the

15

170999.00004/150266115v.9

CONFIDENTIAL                                                                 FBG_CH1_00094038

**DEBTORS' EXHIBIT NO. 237**
**Page 16 of 104**

employer portion of any related payroll Taxes, (c) any escrow fees, (d) 50% of the Transfer Taxes, and  (e) any severance payments or benefits owed by the Purchased Entities as a result of terminations of employment prior to the Closing, provided, that, for the avoidance of doubt, in no event shall "Transaction Expenses" include (i) any fees and expenses owed, paid or payable to any Person to the extent incurred at the direction of Purchaser or any of its Affiliates or otherwise relating to Purchaser's or any of its Affiliates' financing for the Transaction or other transactions contemplated hereby or any Indebtedness arranged by Purchaser or any of its Affiliates and (ii) any Liability to the extent included within the definition of Working Capital or Indebtedness.

"***Transfer Taxes***" means any local, county, state, provincial, federal, non-U.S. and other sales, use, transfer, excise, registration, franchise, sales, use, documentary, stamp, stamp duty, land, value added, goods and services, registration, recording, conveyance or similar Taxes and related fees and costs (including any penalties and interest) imposed on or payable in connection with the transactions contemplated by any Transaction Documents or the recording of any sale, transfer, conveyance, lease, sublease or assignment of property (or any interest therein) effected pursuant to or contemplated by any Transaction Documents.

"***Transition Services Agreement***" means the transition services agreement, dated as of the Closing Date, to be entered into by Seller (or its designee(s)) and Purchaser (or its designee(s)), in the form of Exhibit B.

"***Treasury Regulations***" means the final or temporary regulations that have been promulgated under the Code by the U.S. Department of the Treasury.

"***WARN***" means the Worker Adjustment Retraining and Notification Act, 29 U.S.C. Section 2101 *et seq.*

"***Working Capital***" means, as of any time, the net working capital of the Business calculated by subtracting (a) the sum of the amounts as of such time for the current liability line items shown on the Sample Closing Statement for the Business, from (b) the sum of the amounts as of such time for the current asset line items shown on the Sample Closing Statement for the Business, in each case calculated in a manner consistent with the Transaction Accounting Principles; provided that in no event shall Working Capital include any amount included within the definitions of Cash Amounts, Indebtedness or Transaction Expenses.

"***Working Capital Adjustment Amount***" means an amount, which may be positive, negative or zero, equal to (a) the Closing Working Capital *minus* (b) the Target Working Capital.

Section 1.2    Other Defined Terms.  In addition, the following terms shall have the meanings ascribed to them in the corresponding Section of this Agreement when capitalized:

| Term | Section |
| --- | --- |
| AAA | 7.11 |
| Agreement | Preamble |
| Allocation | 2.5(b) |
| Allocation Schedule | 2.5(a) |

16

170999.00004/150266115v.9

FBG_CH1_00094039

Business Financial Statements ................................................................... 3.5
Business Financial Statements Date .......................................................... 3.5
Business Leased Real Property ............................................................. 3.10(a)
Business Owned Real Property............................................................. 3.10(b)
Business Registered Intellectual Property Rights .................................. 3.8(a)
Claim Notice ......................................................................................... 7.19(e)
Closing ..................................................................................................... 2.2
Closing Date............................................................................................. 2.2
Closing Statement ................................................................................. 2.4(b)
Company ............................................................................................ Recitals
Confidentiality Agreement....................................................................... 5.1
control .............................................................. See definition of *Affiliate* 1.1
controlled by ..................................................... See definition of *Affiliate* 1.1
Copyrights...................................... See definition of *Intellectual Property Rights* 1.1
Current Representation ........................................................................ 7.17(a)
Designated Person............................................................................... 7.17(a)
Dispute ................................................................................................... 7.11
Dispute Notice ..................................................................................... 2.4(d)
Dispute Resolution Period ................................................................... 2.4(d)
Estimated Closing Cash Amounts ....................................................... 2.4(b)
Estimated Closing Indebtedness ......................................................... 2.4(b)
Estimated Closing Transaction Expenses ............................................ 2.4(b)
Estimated Working Capital Adjustment Amount ................................ 2.4(b)
Excluded Assets ................................................................................... 5.11(b)
Excluded Employees............................................................................ 5.11(a)
Fair Value................................................................................................ 4.9
Final Purchase Price............................................................................... 2.4f)
General Enforceability Exceptions .......................................................... 3.2
Guaranty................................................................................................. 5.12
Independent Accounting Firm ............................................................. 2.4(d)
Insurance Policies ................................................................................. 3.18
Interests.............................................................................................. Recitals
IP License Agreement...................................................................... 2.3(a)(iv)
Liability Claim...................................................................................... 7.19(e)
Material Contracts............................................................................... 3.11(a)
Mediation Request ................................................................................ 7.11
Non-Party Affiliate ................................................................................. 7.7
Notice Period ........................................................................................ 7.19(f)
Party ................................................................................................. Preamble
Patents............................................ See definition of *Intellectual Property Rights* 1.1
Post-Closing Representation................................................................. 7.17(a)
Post-Closing Statement....................................................................... 2.4(c)
Privileged Communications................................................................. 7.17(b)
Purchaser............................................................................................ Preamble
Purchaser Delivery Period ................................................................... 2.4(c)
Purchaser Guaranty............................................................................ 2.3(a)(v)

17

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094040

Purchaser Indemnified Persons.................................................................................7.19(a)
Purchaser's Allocation Notice ...................................................................................2.5(b)
Purchaser's Welfare Plans .........................................................................................5.4(c)
Recovery Proceeds.....................................................................................................7.19(d)
Retention Agreements................................................................................................5.4(g)
Sample Closing Statement .........................................................................................2.4(a)
Seller ..................................................................................................................... Preamble
Seller Allocation ........................................................................................................2.5(b)
Sellers' Welfare Plans................................................................................................5.4(c)
Third Party Claim ......................................................................................................7.19(e)
Trade Secrets.................................................... See definition of *Intellectual Property Rights* 1.1
Trademarks ..................................................... See definition of *Intellectual Property Rights* 1.1
Transaction.............................................................................................................. Recitals
Transaction Accounting Principles.............................................................................2.4(a)
Transfer Measures.................................................................................................... 5.4(f)
Transferred Business Employee ................................................................................5.4(a)
U.S. Transferred Business Employee .........................................................................5.4(a)
under common control with................................................See definition of *Affiliate* 1.1
Visa Employees ........................................................................................................ 5.4(f)
Visa Transfer Period ................................................................................................ 5.4(f)

# ARTICLE II
## PURCHASE AND SALE OF THE INTERESTS; CLOSING

Section 2.1    Purchase and Sale of the Interests.    On the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer and deliver to Purchaser, and Purchaser shall purchase from Seller, free and clear of all Liens (other than Permitted Liens), all of the Interests.

Section 2.2    The Closing. The closing of the Transaction (the "***Closing***") shall take place by means of a virtual closing through electronic exchange of documents and signatures (including by email) on the date hereof (the "***Closing Date***". Legal title, equitable title and risk of loss with respect to the Interests will be deemed transferred to or vested in Purchaser, and the transactions contemplated by this Agreement will be deemed effective for Tax, accounting and other computational purposes, and the Parties will treat the Closing as if it had occurred, as of the Effective Time.

Section 2.3    Closing Deliveries.

(a)    At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following:

(i)    payment, by wire transfer to the bank account designated in writing by Seller, of an amount in immediately available U.S. dollars equal to the Closing Purchase Price;

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094041

(ii)     a counterpart of the Restrictive Covenants Agreement, duly executed by Purchaser;

(iii)    a counterpart of the Transition Services Agreement, duly executed by Purchaser;

(iv)    a counterpart to the intellectual property license agreement (the "***IP License Agreement***"), by and between Seller and Purchaser, duly executed by Purchaser, in the form attached hereto as Exhibit C; and

(v)     the Guaranty (the "***Purchaser Guaranty***"), duly executed by First Brands Group, LLC, a Delaware limited liability company, in the form attached hereto as Exhibit D.

(b)     At the Closing, Seller shall deliver, or cause to be delivered by one of its Affiliates, to Purchaser the following:

(i)     a duly executed limited liability company interest power, effective as of the Closing Date, sufficient to transfer the Interests to Purchaser;

(ii)     a counterpart of the Restrictive Covenants Agreement, duly executed by Seller;

(iii)    a counterpart of the Transition Services Agreement, duly executed by Seller or one or more of its Affiliates;

(iv)    written evidence, reasonably satisfactory to Purchaser, that all Indebtedness and all security interests related thereto have been extinguished with no further obligations or Liabilities for any Purchased Entity;

(v)     a duly executed IRS Form W-9 for Seller, which shall be considered as a "certification of non-foreign status" for purposes of Treasury Regulation Section 1.1445-2(b)(2)(v); and a duly executed IRS Form W-9 for Seller; and

(vi)    a counterpart of the IP License Agreement, duly executed by Seller.

Section 2.4     Adjustments to Base Purchase Price.

(a)     Section 2.4(a) of the Disclosure Schedules sets forth a calculation of the Working Capital and Transaction Expenses of Seller and the Purchased Entities and the Cash Amounts and the Indebtedness of the Purchased Entities (the "***Sample Closing Statement***"), in each case, as of September 20, 2024, including the asset and Liability line items to be included in the calculation of Working Capital, applied on a basis consistent with the accounting principles, practices, procedures, methodologies and policies that were employed in preparing the Business Financial Statements (with consistent classifications, judgments, inclusions, exclusions and valuation and estimation methodologies), as modified by the accounting principles set forth on Section 2.4(a) of the Disclosure Schedules (collectively, the "***Transaction Accounting Principles***").

19

170999.00004/150266115v.9

   FBG_CH1_00094042

**DEBTORS' EXHIBIT NO. 237**
**Page 20 of 104**

(b)      At least four Business Days prior to the Closing Date, Seller has prepared and delivered to Purchaser a closing statement (the "***Closing Statement***") setting forth Seller's good-faith estimate of (i) the Closing Working Capital and the Working Capital Adjustment Amount (such estimate, the "***Estimated Working Capital Adjustment Amount***"), (ii) the Closing Cash Amounts (such estimate, the "***Estimated Closing Cash Amounts***"), (iii) the Closing Indebtedness (such estimate, the "***Estimated Closing Indebtedness***"), and (iv) the Closing Transaction Expenses (such estimate, the "***Estimated Closing Transaction Expenses***"). The Estimated Working Capital Adjustment Amount, the Estimated Closing Cash Amounts, the Estimated Closing Indebtedness and the Estimated Closing Transaction Expenses shall be used to calculate the Closing Purchase Price to be paid by Purchaser to Seller at the Closing.  The Closing Statement shall set forth the calculations of such amounts in a manner consistent with the Sample Closing Statement and be prepared in accordance with the Transaction Accounting Principles, including the use of the same line items and line item entries set forth on and used in the preparation of the Sample Closing Statement. Purchaser agrees that, following the Closing through the date that the Post-Closing Statement becomes final and binding in accordance with this Section 2.4, Purchaser will not take any actions with respect to any accounting books, records, policies or procedures on which the Sample Closing Statement or the Closing Statement is based, or on which the Post-Closing Statement is to be based, that are inconsistent with the ordinary course of the Business (or of Seller or any of its Affiliates with respect to the Business) prior to the Closing or that would impede or delay the final determination of the Post-Closing Statement.  Seller and Purchaser agree that (A) the sole purpose of the determination of the Closing Statement and the Post-Closing Statement is to adjust the Final Purchase Price so as to reflect the actual values of Working Capital, Cash Amounts, Indebtedness and Transaction Expenses as of the Effective Time and (B) such determination can be measured properly only if the calculation is done using the same Transaction Accounting Principles.

(c)      Within 90 days after the Closing Date (the "***Purchaser Delivery Period***"), Purchaser shall cause to be prepared and delivered to Seller a written statement (the "***Post-Closing Statement***"), setting forth Purchaser's calculation of the Closing Working Capital, Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness and the Closing Transaction Expenses. The Post-Closing Statement shall be prepared in accordance with the Transaction Accounting Principles, including the use of only the same line items and line item entries set forth on and used in the preparation of the Sample Closing Statement.  Seller and Purchaser agree that the purpose of preparing the Post-Closing Statement and determining the Closing Working Capital, the Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness and the Closing Transaction Expenses is to measure variations in the components taken into consideration in determining the estimates delivered pursuant to Section 2.4(b) compared to the actual values, and, without limiting the generality of the foregoing, such process is not intended to permit the introduction of accounting principles different from those described in the Transaction Accounting Principles.  If Purchaser fails to deliver the Post-Closing Statement in accordance with this Section 2.4(c) before the expiration of the Purchaser Delivery Period, then, at the election of Seller in its sole discretion and without prejudice to any and all other rights and remedies available to Seller, (i) (A) the Working Capital Adjustment Amount shall be deemed to equal the Estimated Working Capital Adjustment Amount, (B) the Closing Cash Amounts shall be deemed to equal the Estimated Closing Cash Amounts, (C) the Closing Indebtedness shall be deemed to equal the Estimated Closing Indebtedness, and (D) the Closing

20

170999.00004/150266115v.9

CONFIDENTIAL                                                                                                    FBG_CH1_00094043

Transaction Expenses shall be deemed to equal the Estimated Closing Transaction Expenses, and (ii) the Closing Statement will be deemed to be final and each item on the Closing Statement shall be deemed undisputed and shall be final, conclusive and binding on the Parties. For the avoidance of doubt, the delivery by Purchaser of the Post-Closing Statement following the Purchaser Delivery Period shall have no effect.

(d)      Within 45 days following receipt by Seller of the Post-Closing Statement, Seller shall deliver written notice to Purchaser of any dispute Seller has with respect to the preparation or content of the Post-Closing Statement (the "***Dispute Notice***"); <u>provided</u> that if Seller does not deliver any Dispute Notice to Purchaser within such 45-day period, the Post-Closing Statement will be final, conclusive and binding on the Parties, and if Seller delivers a Dispute Notice within such deadline, all items that are not disputed shall be deemed final, conclusive and binding on the Parties. The Dispute Notice shall set forth in reasonable detail the basis for any dispute included therein, the amounts involved and Seller's determination of the Closing Working Capital, the Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness and the Closing Transaction Expenses; <u>provided</u> that any dispute set forth in the Dispute Notice shall be limited to the determination of the Closing Working Capital, the Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness and the Closing Transaction Expenses. Upon receipt by Purchaser of a Dispute Notice, Purchaser and Seller shall negotiate in good faith to resolve any disputed items and amounts set forth therein, and each of Purchaser and Seller agrees that other than to the extent disputed in the Dispute Notice, the Post-Closing Statement will be final, conclusive and binding on the Parties. If Purchaser and Seller, such good faith effort notwithstanding, fail to resolve any such dispute within 15 Business Days following receipt by Purchaser of the Dispute Notice (the "***Dispute Resolution Period***"), then Purchaser and Seller jointly shall engage, within 10 Business Days following the expiration of the Dispute Resolution Period, an internationally recognized accounting firm selected jointly by Seller and Purchaser (the "***Independent Accounting Firm***") to resolve any such dispute (and only such unresolved disputes in the Dispute Notice). As promptly as practicable, and in any event not more than 15 days following the engagement of the Independent Accounting Firm, Purchaser and Seller shall each prepare and submit a presentation detailing each Party's complete statement of proposed resolution of each issue still in dispute to the Independent Accounting Firm. Purchaser and Seller shall cause the Independent Accounting Firm to, as soon as practicable after the submission of the presentations described in the immediately preceding sentence and in any event not more than 30 days following submission by the Parties of such presentations to the Independent Accounting Firm, make a final determination, binding on the Parties, of the appropriate amount of each of the line items that remain in dispute as indicated in the Dispute Notice. With respect to each disputed line item, such determination, if not in accordance with the position of either Seller or Purchaser, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by Purchaser or Seller, as applicable, in the Post-Closing Statement or Dispute Notice, as applicable. The Independent Accounting Firm shall act as an expert and not as an arbitrator and the scope of the disputes to be resolved by the Independent Accounting Firm shall be limited to whether any determination of the Closing Working Capital, the Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness and the Closing Transaction Expenses was properly calculated in accordance with the Transaction Accounting Principles, and the Independent Accounting Firm is not to make any other determination, including any determination as to whether GAAP was followed, to the extent GAAP is inconsistent with the Transaction

21

170999.00004/150266115v.9

CONFIDENTIAL                                                                                    FBG_CH1_00094044

Accounting Principles.  All submissions to the Independent Accounting Firm shall be subject to Rule 408 of the Federal Rules of Evidence and similar state Law analogues. The Parties hereto agree that they will not (and will direct their Affiliates and Representatives to not to) have any ex parte communications (orally or in writing) with the Independent Accounting Firm regarding this matter except as explicitly permitted in any engagement letter executed by the Parties and the Independent Accounting Firm. The fees, expenses and costs of the Independent Accounting Firm will be borne by Seller, on the one hand, and Purchaser, on the other hand, in inverse proportion to their relative success in the dispute as determined by the Independent Accounting Firm; provided that any initial engagement fees owed to the Independent Accounting Firm will be initially paid 50% by Seller and 50% by Purchaser.  For example, should the aggregate items in dispute total $1,000 and the Independent Accounting Firm award $600 in favor of Seller's position, Purchaser would pay 60% of the costs of the Independent Accounting Firm's review and Seller would pay 40% of the costs of the Independent Accounting Firm's review.  All determinations made by the Independent Accounting Firm, and the Post-Closing Statement, as modified by the Independent Accounting Firm, will be final, conclusive and binding on the Parties in the absence of fraud or manifest error. The Parties acknowledge and agree that the adjustment procedures set forth in this Section 2.4 are not intended to permit the introduction of different judgments, accounting methods, policies, practices, procedures, classifications, valuation practices or estimation methodologies for the purpose of determining the Final Purchase Price.  The Post-Closing Statement will exclude the impact of any decisions made by Purchaser following the Closing and not reflect changes in assets or Liabilities as a result of purchase accounting adjustments.

(e)     Subject to Section 6.1(b), for purposes of complying with the terms set forth in this Section 2.4, from and after the Closing, Seller and Purchaser shall reasonably cooperate with and make available to each other, the Independent Accounting Firm and each of their respective Representatives all information, records, data and working papers, in each case to the extent related to the Closing Working Capital, the Closing Cash Amounts, the Closing Indebtedness or the Closing Transaction Expenses, and shall permit access to their respective personnel, as may be reasonably required in connection with the preparation, analysis and review of the Post-Closing Statement and the resolution of any disputes thereunder.

(f)     The "***Final Purchase Price***" means the Base Purchase Price, *plus* (i) the Closing Cash Amounts, *plus* (ii) the Working Capital Adjustment Amount (which may be a positive or negative number or zero), *minus* (iii) the Closing Indebtedness, and (iv) *minus* the Closing Transaction Expenses, in the case of each of clauses (i), (ii), (iii) and (iv), as finally determined pursuant to Section 2.4.

(g)     If the Closing Purchase Price exceeds the Final Purchase Price, then Seller shall pay or cause to be paid an amount in cash equal to such excess to Purchaser by wire transfer of immediately available funds to an account designated in writing by Purchaser to Seller.  If the Final Purchase Price exceeds the Closing Purchase Price, then Purchaser shall pay or cause to be paid an amount in cash equal to such excess to Seller by wire transfer of immediately available funds to an account designated in writing by Seller to Purchaser.  If the Closing Purchase Price is equal to the Final Purchase Price, then neither Seller nor Purchaser will be required to pay any additional amount in cash to the other Party in respect thereof.  Any such payment pursuant to this

22

170999.00004/150266115v.9

FBG_CH1_00094045

**DEBTORS' EXHIBIT NO. 237**
**Page 23 of 104**

Section 2.4(g) is to be made within five Business Days of the date on which the Final Purchase Price is finally determined pursuant to this Section 2.4.

(h)      The process set forth in this Section 2.4 shall be the sole and exclusive remedy of the Parties and their respective Affiliates for any disputes related to the Closing Working Capital, the Working Capital Adjustment Amount, the Closing Cash Amounts, the Closing Indebtedness, the Closing Transaction Expenses and any related adjustments to the Closing Purchase Price or the Final Purchase Price and the calculations and amounts on which they are based or set forth in the related statements and notices delivered in connection therewith.

(i)      Any payments made pursuant to this Section 2.4 shall be treated as an adjustment to the Final Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

Section 2.5      Purchase Price Allocation.

(a)      Seller and Purchaser agree to allocate and, as applicable, to cause their relevant Affiliates to allocate, the Final Purchase Price and any other items that are treated as additional consideration for Tax purposes among the assets of the Company in accordance with Exhibit E attached hereto (the "***Allocation Schedule***").

(b)      No later than 90 days after the date on which the Final Purchase Price is finally determined, Seller shall deliver to Purchaser a proposed allocation of the Final Purchase Price and any other items that are treated as additional consideration for U.S. income Tax purposes among the assets of the Company determined in a manner consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder, any other relevant provisions of applicable Law, and the Allocation Schedule ("***Seller Allocation***").  If Purchaser disagrees with the Seller Allocation, Purchaser may, within 30 days after receipt of the Seller Allocation, deliver a notice ("***Purchaser's Allocation Notice***") to Seller to such effect, specifying those items as to which Purchaser disagrees and setting forth Purchaser's proposed allocation. If the Purchaser's Allocation Notice is duly delivered, Seller and Purchaser shall, during the 30 days immediately following such delivery, use commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine the allocation of the Final Purchase Price and any other items that are treated as additional consideration for U.S. income Tax purposes.  Notwithstanding any other provision in this Agreement to the contrary, if Seller and Purchaser are unable to resolve any such dispute within the 30-day period following the delivery of the Purchaser's Allocation Notice, then Seller and Purchaser shall each be entitled to use its own allocation with respect to the items in dispute; provided that Purchaser and Seller shall each be bound by the Allocation Schedule and any item on the Seller Allocation not in dispute. If Purchaser does not provide a Purchaser's Allocation Notice, the Seller Allocation, as adjusted pursuant to any agreement between Seller and Purchaser, or with respect to Agreed Items (the "***Allocation***") shall be conclusive and binding on the Parties.  The Allocation shall be adjusted, as necessary, to reflect any subsequent adjustments to the Final Purchase Price and any other amounts treated as consideration for U.S. income Tax purposes.  Any such adjustment shall be allocated to Seller or its relevant Affiliates to which such adjustment is attributable.

(c)      Neither Seller nor Purchaser shall (and they shall cause their respective Affiliates not to) take any position for income Tax purposes inconsistent with the Allocation on any Tax

23

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094046

Return (including any IRS Form 8594) or in any Tax Proceeding or otherwise, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any analogous provision of state, local or non-U.S. Law).

Section 2.6    Withholding.  Purchaser will be entitled to withhold any and all amounts from the Base Purchase Price, as the case may be, equal to any withholding Tax owed to any Taxing Authority as a result of the transactions contemplated by this Agreement to the extent required under applicable Law; provided, however, if Purchaser determines that an amount is required to be withheld with respect to any amounts payable (other than as compensation), at least five days prior to the date the applicable payment is scheduled to be made, Purchaser will provide Seller with written notice of its intent to deduct, which notice will include a copy of the calculation of the amount to be deducted and a reference to the applicable provision of Law pursuant to which such deduction is required, and Purchaser will reasonably cooperate with Seller to eliminate or reduce the basis for such withholding (including providing Seller with a reasonable opportunity to provide forms or other evidence that would exempt such amounts from withholding). Any amounts paid to or for the benefit of any Person pursuant to the terms of this Agreement that constitute wages or compensation subject to employment or withholding Tax may be paid to the appropriate entity, which will in turn pay the applicable Person such amounts (less applicable withholding, payroll, social security, unemployment or similar Taxes, which will be timely deposited with the appropriate Governmental Entity in accordance with applicable Law).  Any amounts withheld hereunder and so timely deposited with the appropriate Governmental Entity will be treated as having been paid to the Person on behalf of whom such withholding was made.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in, or qualified by any matter set forth in, the Disclosure Schedules (it being agreed that the disclosure of any matter in any Section in the Disclosure Schedules shall be deemed to have been disclosed in any other Section in the Disclosure Schedules to which the applicability of such disclosure is reasonably apparent on the face of such disclosure), the Seller hereby represents and warrants to Purchaser as of the date hereof as follows:

Section 3.1    Organization, Standing and Power.  Seller is duly incorporated, validly existing and, to the extent such concept is applicable in the relevant jurisdiction, in good standing or duly registered under the Laws of Minnesota, and is duly authorized, qualified or licensed to do business as a foreign business and in good standing in each of the jurisdictions where Seller is required to be so qualified, except as would not have a Seller Material Adverse Effect.  Each Purchased Entity is duly formed, organized or incorporated, validly existing and, to the extent such concept is applicable in the relevant jurisdiction, in good standing or duly registered under the Laws of its jurisdiction of formation, organization or incorporation, as applicable, each Purchased Entity is duly authorized, qualified or licensed to do business as a foreign business and in good standing in each of the jurisdictions set forth on Section 3.1 of the Disclosure Schedules, which are the only jurisdictions in which such Purchased Entity is required to be so qualified, except as would not have a material effect on the Business, taken as a whole, and each Purchased Entity has all necessary organizational power and authority to carry on the Business as presently conducted, except as would not have a material effect on the Business, taken as a whole.

24

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094047

Section 3.2     Authority; Execution and Delivery; Enforceability.  Seller has all requisite power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and to consummate the Transaction and the other transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and each other Transaction Document to which it is a party and the consummation by Seller of the Transaction and the other transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action of Seller, and no further Approvals or written Consents on the part of Seller is or will be required in connection with the transactions contemplated by this Agreement or any other Transaction Document.  Seller has duly executed and delivered this Agreement, and assuming due authorization, execution and delivery by Purchaser, this Agreement will constitute Seller's valid and binding obligation, enforceable against Seller in accordance with its terms, subject to the effect of any Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting the enforcement of creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law) (collectively, the "***General Enforceability Exceptions***").

Section 3.3     Purchased Entities.  Except as set forth on Section 3.3 of the Disclosure Schedules, all of the Purchased Entity Equity has been (a) duly authorized and validly issued and is fully paid and non-assessable and is held of record by Seller or the Company in all cases, free and clear of all Liens, other than Permitted Liens, and (b) have been issued in compliance with all applicable Laws, including securities Laws, and all applicable Contracts. The Purchased Entity Equity collectively constitutes all of the issued and outstanding equity interests of the Purchased Entities. There are no outstanding options, warrants, calls, purchase rights, subscription rights, exchange rights or other similar rights, convertible securities, agreements or commitments of any kind pursuant to which any of the Purchased Entities is or may become obligated to (x) issue, transfer, sell or otherwise dispose of any of its equity interests, or (y) redeem, purchase or otherwise acquire any outstanding Purchased Entity Equity, as applicable. Except as set forth on Section 3.3 of the Disclosure Schedules, as of the date hereof, there are no Contracts relating to the issuance, sale, transfer or voting of any equity securities or other securities (including debt securities) of any Purchased Entity.

Section 3.4     No Conflicts; Consents; Governmental Authorization.  Except as set forth in Section 3.4 of the Disclosure Schedules, the execution and delivery by Seller of this Agreement does not, and the execution by Seller of the other Transaction Documents to which it is a party will not, and the consummation of the Transaction and the other transactions contemplated hereby and thereby and compliance by Seller with the terms hereof and thereof will not, conflict with, or result in any violation of, breach or default (with or without notice or lapse of time, or both) under, or give rise to (or otherwise give any Person additional rights, including to compensation) a right of termination, cancellation or acceleration of any obligation under, or result in the creation of any Lien (other than Permitted Liens) upon any assets of Seller or any Purchased Entity under, any provision of (a) the Organizational Documents of Seller or any Purchased Entity, (b) any Judgment, Permit or Law applicable to Seller or any Purchased Entity, or (c) any Material Contract, except in each case of clauses (b) and (c), as would not have a material effect on the Business, taken as a whole.  No Consent or Approval of any Governmental Entity is required to be obtained or made by or with respect to Seller or any Purchased Entity in connection with Seller's execution,

25

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094048

delivery and performance of this Agreement, the other Transaction Documents or the consummation of the Transaction and the other transactions contemplated hereby or thereby.

Section 3.5    Financial Statements.  Section 3.5 of the Disclosure Schedules sets forth true, correct and complete copies of the Purchased Entities' audited annual consolidated income statement and balance sheet for 12 month period ended December 31, 2022 and December 31, 2023 and the Purchased Entities' unaudited consolidated income statement and balance sheet for the six month period ended June 30, 2024 (such date, the "***Business Financial Statements Date***"), and such financial statements, collectively and together with the notes and schedules thereto, if any, the "***Business Financial Statements***").  The Business Financial Statements (a) fairly present, in all material respects, the financial position of the Purchased Entities as of their respective dates, and (b) have been prepared from the books and records of the Purchased Entities (which are, to the Knowledge of Seller, accurate and complete in all material respects and contain no material inaccuracies or discrepancies of any kind) and in accordance with GAAP in all material respects (except, in each case, (i) as noted therein and (ii) as subject to normal year-end adjustments); provided, however, that the Business Financial Statements and the foregoing representations and warranties are qualified by the fact that (A) the Purchased Entities have not operated on a separate stand-alone basis and has historically been reported within Seller's or its Affiliates' combined financial statements, (B) the Business Financial Statements may not necessarily be indicative of the results that the Purchased Entities would have achieved had they operated on a separate stand-alone basis, and (C) the Business Financial Statements may assume certain allocated charges and credits which do not necessarily reflect amounts that would have resulted from arm's-length transactions or that the Purchased Entities would have incurred on a stand-alone basis.  There are no significant deficiencies or material weaknesses in the design or operation of the Company's or any other Purchased Entities' internal controls that adversely affect the ability of the Company or any other Purchased Entity to record, process, summarize and report financial information, and the Company's or any other Purchased Entities' internal controls and procedures are sufficient to ensure that the Business Financial Statements fairly represent, in all material respects, the financial position of the Purchased Entities as of their respective dates.  There is no outstanding, nor has there been in the past three years any, written, or to the Knowledge of Seller, verbal, allegation of, fraud or financial improprieties that involves preparation of the Business Financial Statements.

Section 3.6    Absence of Undisclosed Liabilities. No Purchased Entity has any Liabilities of a type required to be recorded or reflected on a balance sheet under GAAP, except (a) Liabilities that are accrued and adequately reserved against in the Business Financial Statements, (b) Liabilities which have arisen since December 31, 2023 that were incurred in the ordinary course of business (none of which is a liability for breach of contract, breach of warranty, tort, infringement or violation of Law), (c) Liabilities disclosed in the Disclosure Schedules, (d) Liabilities included in Closing Working Capital or the Working Capital Adjustment Amount, Closing Indebtedness or Closing Transaction Expenses, (e) Liabilities for Taxes that are accrued and adequately reserved against in the Business Financial Statements, (f) Liabilities incurred under this Agreement or the other Transaction Documents, or (g) Liabilities that, individually or in the aggregate, would not be material to the Business, taken as a whole.

Section 3.7    Absence of Changes or Events.  Since the Business Financial Statements Date until the date hereof, except in connection with, or in preparation for, the Transaction and the other transactions contemplated by this Agreement or the other Transaction Documents, (a) each

26

170999.00004/150266115v.9

CONFIDENTIAL                                                                 FBG_CH1_00094049

Purchased Entity has conducted its business and operations in the ordinary course of business consistent with past practice in all material respects and (b) there has been no Business Material Adverse Effect.

Section 3.8    Intellectual Property Rights.

(a)    Section 3.8(a) of the Disclosure Schedules lists all Registered Intellectual Property Rights included in the Business Intellectual Property Rights, as of the date hereof (the "***Business Registered Intellectual Property Rights***").    Except as would not have a material effect on the Business, taken as a whole, each item of the Business Registered Intellectual Property Rights is subsisting and, to the Knowledge of Seller, not invalid or unenforceable.

(b)    Except as would not have a material effect on the Business taken as a whole, none of the Purchased Entities has: (i) received written information or written notice within the five-year period prior to the date hereof (A) that the Business Intellectual Property Rights are subject to any Judgment adversely affecting the use thereof or rights thereto by the Company or any other Purchased Entity, or of any opposition or cancellation Proceeding pending against the Purchased Entities concerning the ownership, validity, or enforceability of any Business Registered Intellectual Property Rights, or (B) alleging that the possession or use of any of the Business Intellectual Property Rights infringes, misappropriates or otherwise violates the Intellectual Property Rights of any other Person; and (ii) within the five-year period prior to the date hereof, made any written allegation against a third party of any infringement, misappropriation or other violation of any Business Intellectual Property Rights.

(c)    To the Knowledge of Seller, the Business Intellectual Property Rights include all of the Intellectual Property Rights necessary to conduct the Business in all material respects in the manner conducted as of the date hereof after taking into account Intellectual Property Rights that are generally commercially available through third party licenses, except as would not have a material effect on the Business taken as a whole.

(d)    Except as would not have a material effect on the Business taken as a whole, to the Knowledge of Seller, the conduct of the Business as currently conducted does not infringe, misappropriate or otherwise violate any material Intellectual Property Rights of any third party.

(e)    To the Knowledge of Seller, the Purchased Entities own the entire right, title and interest in the Business Intellectual Property Rights, including but not limited to the Intellectual Property Rights developed on behalf of the Purchased Entities by all current and former officers and employees of, and consultants and independent contractors to, the Purchased Entities, whether by operation of law or assignment, and no current or former officer or employee of, or consultant or independent contractor to, the Purchased Entities is asserting or, to the Knowledge of Seller, has grounds to assert any right, title or interest to any of the Business Intellectual Property Rights.

(f)    The Purchased Entities have taken commercially reasonable measures designed to protect and maintain the confidentiality of Trade Secrets that are material to the Business, and, to the Knowledge of Seller, there have been no material unauthorized uses or disclosures of any such Trade Secrets.

27

170999.00004/150266115v.9

CONFIDENTIAL                                                                                          FBG_CH1_00094050

Section 3.9    Information Technology; Data Protection.

(a)    The Business IT Assets operate and perform substantially as needed by the Purchased Entities to conduct the Business as conducted as of the date hereof, except as would not have a material effect on the Business, taken as a whole.  During the five-year period immediately prior to the date hereof, to the Knowledge of Seller, there have not been any vulnerabilities or defects that resulted in any security breaches or unauthorized access or other security access incidents affecting the Business IT Assets requiring notification to any Person or Governmental Entity under applicable Data Protection Laws, except as would not have a material effect on the Business, taken as a whole.  To the Knowledge of Seller, except as would not have a material effect on the Business, taken as a whole, the Business IT Assets do not contain any virus, spyware, malware, worm, Trojan horse, or other technology, disabling codes or instructions, or other similar code or software routines or components that are designed or intended to (i) delete, disable, interfere with, perform unauthorized modifications to, or provide unauthorized access to any data of the Business, Personal Data or the Business IT Assets, or (ii) modify, damage or destroy the Business IT Assets.

(b)    Except as would not have a material effect on the Business taken as a whole, (i) to the Knowledge of Seller, the Purchased Entities have implemented policies that are compliant with all applicable Data Protection Laws, as well as implemented legally required policies and procedures, relating to privacy, data protection and the collection, retention, protection, transfer, use and processing of Personal Data to the Business, (ii) none of the Purchased Entities has, during the three-year period immediately prior to the date hereof, received any written notice from any applicable Governmental Entity against any Purchased Entity alleging a violation of any Data Protection Laws by any Purchased Entity, nor has any Purchased Entity been threatened in writing to be charged with any such violation by any Governmental Entity, and (iii) the Purchased Entities have (A) taken appropriate actions (including implementing reasonable technical, physical or administrative safeguards) to protect Personal Data in their possession or under their control against any unauthorized use, access or disclosure and (B) to the Knowledge of Seller, entered into written agreements with third-party service providers, outsourcers, processors or other third parties who process, store or otherwise handle Personal Data for or on behalf of the Purchased Entities that obligate such Persons to comply with applicable Data Protection Laws and to take steps to protect and secure Personal Data from unauthorized use, access, modification or disclosure.

Section 3.10    Real Property.

(a)    Section 3.10(a) of the Disclosure Schedules sets forth all of the real property leased by the Purchased Entities (together with all buildings, structures, fixtures and Improvements located thereon, the "***Business Leased Real Property***") including the address thereof. A true, correct and complete copy (or if oral, then a written description thereof) of each such lease, license or occupancy agreement, and any amendments thereto, with respect to the Business Leased Real Property has been delivered to the Purchaser, and no changes have been made to any such document since the date of delivery to Purchaser.  The Business Leased Real Property represents all leases and subleases covering leased or subleased real property used in the Business.  With respect to the Business Leased Real Property, (i) the Purchased Entities have valid title to the leasehold estate (as lessee), free and clear of all Liens, other than Permitted Liens, and (ii) each

28

170999.00004/150266115v.9

FBG_CH1_00094051

lease for the Business Leased Real Property is in full force and effect and is binding and enforceable in accordance with its terms, subject to the General Enforceability Exceptions.

(b)     The Purchased Entities have good and marketable fee title to the real property set forth in Section 3.10(b) of the Disclosure Schedules (the "***Business Owned Real Property***"), free and clear of all Liens, other than Permitted Liens.

(c)     No Purchased Entity has leased or sublet (as lessor or sublessor), and no Person (other than a Purchased Entity) is in possession of, any of the Real Property.

(d)     Except as would not have a material effect on the Business, taken as a whole, there is no pending or threatened, in writing, condemnation, expropriation, special assessment, zoning change, eminent domain or similar Proceedings affecting all or any portion of the Business Leased Real Property or the Business Owned Real Property, and no Purchased Entity has received any written notice of any such Proceeding, and, to the Knowledge of Seller, no such Proceeding is contemplated.

(e)     The Business Leased Real Property and the Business Owned Real Property, taken as a whole, are in all material respects in commercially reasonable working condition and repair (subject to normal wear and tear) necessary to conduct the Business in the same manner in all material respects as currently conducted by the Purchased Entities.

Section 3.11    Material Contracts.

(a)     Section 3.11 of the Disclosure Schedules sets forth all of the following Contracts to which a Purchased Entity is a party or by which any of them is bound as of the date hereof, other than Benefit Plans (collectively, the "***Material Contracts***"):

(i)      any Contract with a Material Customer;

(ii)     any Contract with a Material Supplier;

(iii)    any Contract containing any future capital expenditure obligations of the Purchased Entities or providing for the purchase, maintenance or acquisition, or the sale or furnishing, of materials, supplies, merchandise, equipment or services (including computer hardware, software, online hosting arrangements or other property or services), in each case, that requires any Purchased Entity to make, or entitles a Purchased Entity to receive, payments in excess of $250,000;

(iv)    any Contract that is an equity joint venture, partnership or other similar agreement between a Purchased Entity and a third party;

(v)     any Contract pertaining to the lease of any personal property;

(vi)    any Contract pursuant to which (A) any Purchased Entity licenses from a third party Intellectual Property Rights (other than any generally commercially available software or software-as-a-service), or (B) a third party licenses from any Purchased Entity any Business Intellectual Property Rights (other than licenses granted in the ordinary

29

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094052

course of business, including in connection with the sale or licensing of any products or services), in each case of clauses (A) and (B) that involve aggregate payments in excess of $250,000 per year;

(vii)    any Contract relating to Indebtedness in excess of $250,000 with respect to which a Purchased Entity is an obligor;

(viii)   any Contract relating to the acquisition or disposition of any Person or business (whether by merger, sale of stock, sale of assets or otherwise) entered into within the past five years;

(ix)    any written Contract for the employment of any officer, individual employee or other Person providing for base salary in excess of $150,000 per year;

(x)    any Contract with a Governmental Entity; and

(xi)    any Contract that (A) prohibits in any material respect a Purchased Entity from (i) engaging or competing with any Person or in a particular geographic area or market during any time period, or (ii) hiring or soliciting for employment any Person; (B) contains "most favored nation" pricing terms or grants any right of first offer or right of first refusal, or similar preferential right to purchase or acquire, or (C) contains "take or pay" or "requirements" terms.

(b)    Other than expirations or non-renewals following the date hereof in accordance with the terms of the applicable Material Contract each Material Contract is in full force and effect and is valid, binding and enforceable with respect to the Purchased Entity party thereto, and to the Knowledge of Seller, each of the other parties thereto in accordance with its terms, in each case, subject to the General Enforceability Exceptions.  No Purchased Entity, nor to the Knowledge of Seller, any other party to a Material Contract, is in material breach or violation of, or material default under, any Material Contract and no event has occurred that with or without notice or lapse of time or both would constitute a material violation, breach or default (whether by lapse of time or notice or both) or give any other Person the right to declare a default or exercise any remedy under or to accelerate the maturity of or to cancel, terminate or modify, any Material Contract.  To the Knowledge of Seller, no party to any Material Contract has threatened to terminate, cancel or not renew any Material Contract.  Prior to the execution of this Agreement, the Company has made available to Purchaser true and correct copies of each Material Contract.

Section 3.12    Compliance with Applicable Laws; Permits.

(a)    Except as provided on Section 3.12(a) of the Disclosure Schedules, each Purchased Entity is, and during the five-year period prior to the Closing Date has been, in compliance, in all material respects, with all applicable Laws (including Anti-Corruption Laws) and Judgments applicable to the conduct of the Business. No Purchased Entity has received any written notification or communication from any Governmental Entity or any other Person regarding any actual, alleged, possible or potential violation of, or failure to comply with, or liability under, any Law or Judgment, as applicable to the conduct of the Business, except in each case as would not reasonably be expected to have a material effect on the Business, taken as a whole.

30

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094053

(b)      Section 3.12(b) of the Disclosure Schedules sets forth a true, correct and complete list and description of all Permits issued to or held by any Purchased Entity in connection with the Business.  Each Purchased Entity is, and during the five-year period prior to the Closing Date has been, in compliance, in all material respects, with the terms of such Permits, and all such Permits are in full force and effect.  There is no pending or, to the Knowledge of Seller, threatened termination, expiration or revocation of any such Permits.  Other than the Permits set forth on Section 3.12(b) of the Disclosure Schedules, there are no other Permits that are necessary or required for the conduct of the Business or the ownership or use of the assets or properties of any Purchased Entity, except as would not be reasonably expected to have a material effect on the Business, taken as a whole.  During the three-year period prior to the Closing, no Purchased Entity has received any written notice from any Governmental Entity that such Purchased Entity's properties, facilities, equipment, operations or business procedures or practices fails to comply with any such Permit, except as would not reasonably be expected to have a material effect on the Business, taken as a whole.

Section 3.13    Environmental Matters.   Except as provided on Section 3.13 of the Disclosure Schedules: (a) each Purchased Entity is and has for the past five years been in material compliance with all applicable Environmental Laws; (b) each Purchased Entity possesses and has possessed for the past five years or has submitted a timely application for all Permits required for its operation of the Business under applicable Environmental Laws, and for the past five years has been in material compliance with the terms of such Permits; (c) no Purchased Entity is subject to any Judgment with outstanding obligations relating to Environmental Laws or pending Environmental Claim or has received written notice of any currently threatened Environmental Claim; (d) no Purchased Entity has by Contract assumed or provided an indemnity with respect to any material Liability of any other Person under Environmental Laws; (e) there has been no Release of any Hazardous Material at, from, on or under the Business Leased Real Property, the Business Owned Real Property or any real property formerly owned, leased or otherwise operated by any Purchased Entity, that currently requires investigation, assessment, cleanup or remediation by any Purchased Entity pursuant to any Environmental Law; and (f) to the Knowledge of the Seller, there are no underground tanks or appurtenant piping containing any Hazardous Material, regardless of their use or purpose, whether active or abandoned, at the Business Leased Real Property or the Business Owned Real Property.

Section 3.14    Proceedings.   Other than as set forth on Section 3.14 of the Disclosure Schedules, there are no Proceedings pending or, to the Knowledge of Seller, threatened in writing, against Seller or any Purchased Entity.  There is no instance in which Seller or any Purchased Entity is, or during the five-year period prior to the Closing Date has been, (a) subject to any unsatisfied Judgment or (b) a party or, to the Knowledge of Seller, threatened in writing to be made a party to any Proceedings.

Section 3.15    Taxes.  (a) all Tax Returns required to be filed by the Purchased Entities have been timely filed (taking into account extensions) and all such Tax returns are true and correct in all material respects; (b) all Taxes of the Purchased Entities (whether or not shown to be due on such Tax Returns) have been duly and timely paid by the due date thereof; (c) there is no Tax Proceeding with respect to any Taxes of the Purchased Entities that is pending or being threatened in writing; (d) since the date two-years prior to the date hereof, no Purchased Entity has been a "distributing corporation" or a "controlled corporation" in a distribution intended to qualify under

31

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094054

Section 355(a) of the Code; (e) the Purchased Entities have not participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4; (f) the Purchased Entities have not waived or extended any statute of limitations in respect of Taxes or agreed to the extension of time with respect to a Tax assessment or deficiency; (g) the Purchased Entities have not (1) elected to defer the payment of any "applicable employment taxes" (as defined in Section 2302(d)(1) of the CARES Act) pursuant to Section 2302 of the CARES Act, (2) claimed any "employee retention credit" pursuant to Section 2301 of the CARES Act or (3) deferred employee employment taxes pursuant to the Payroll Tax Executive Order; (h) no claim has been made by a Taxing Authority in a jurisdiction where the Purchased Entities do not file Tax Returns that the Purchased Entities are or may be subject to taxation by, or required to file Tax Returns in, that jurisdiction; (i) there are no Liens with respect to Taxes upon the Purchased Entity Equity other than for current Taxes not yet due and payable; (j) the Purchased Entities have deducted, withheld and timely paid to the appropriate Governmental Authority all Taxes required to be deducted, withheld or paid in connection with amounts paid or owing to any employee, independent contractor, creditor, equity holder or other Person, they have complied with all reporting and recordkeeping requirements relating to such Taxes (including, without limitation, the timely filing and delivery of all IRS Forms W-2 and 1099 with respect thereto); (k) the Purchased Entities have complied with their obligations to collect and remit to the proper Governmental Authorities all sales, use, value-added and similar Taxes pursuant to applicable Law, or have properly maintained all documentation necessary to establish any exemptions therefrom; (l) the Purchased Entities have not engaged in a trade or business in any country other than the country in which it was established, or have (and have ever had) a permanent establishment in any country other than the country in which it is established; (m) the Purchased Entities have each complied in all material respects with all transfer pricing rules (including maintaining appropriate documentation for all transfer pricing agreements for purposes of Section 482 of the Code (or any similar provision of non-U.S. Laws)); (n) the Company is classified as a disregarded entity for U.S. federal income Tax purposes; (o) at all times TMD Mexico LLC has been classified as a disregarded entity for U.S. federal income Tax purposes; (p) at all times TMD International Holdings LLC has been classified as a disregarded entity for U.S. federal income Tax purposes; and (q) at all times Toledo Molding de Mexico SRL de CV has been classified as a disregarded entity for U.S. federal income Tax purposes.

Section 3.16    Labor Relations; Employees and Employee Benefit Plans.

(a)    Each material Seller Benefit Plan is listed on Section 3.16(a)(i) of the Disclosure Schedules, and Seller has made available to Purchaser true and correct copies of the summary plan description for each such Seller Benefit Plan (if applicable).  Each material Purchased Entity Benefit Plan in effect as of the date hereof is listed on Section 3.16(a)(ii) of the Disclosure Schedules, and Seller has made available to Purchaser true and correct copies of each such material Purchased Entity Benefit Plan (provided that agreements with individual Business Employees may be provided on an anonymized basis and templates may be provided in lieu of copies of individual agreements that conform to such templates).

(b)    Except as would not have a material adverse effect on the Business, taken as a whole, all Benefit Plans have been maintained and administered in compliance with their terms and applicable requirements of Law.

32

170999.00004/150266115v.9

FBG_CH1_00094055

(c)      Each Benefit Plan intended to be qualified under Section 401(a) of the Code and each trust intended to qualify under Section 501(a) of the Code has obtained a favorable determination notification, advisory and/or opinion letter, as applicable, as to its qualified status (or the qualified status of the master or prototype form on which it is established) from the IRS, and no amendment to such Benefit Plan has been adopted since the date of such letter covering such Benefit Plan that would adversely affect such favorable determination.

(d)      No material plan maintained, sponsored, contributed to or required to be contributed to by a Purchased Entity, Seller or any of their respective ERISA Affiliates, is (i) a "multiemployer plan" as defined in Section 3(37) of ERISA, (ii) a plan subject to Title IV of ERISA, or (iii) a plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA, in each case, except as would not result in Liability of the Purchased Entities or Purchaser after the Closing.

(e)      Except as would not have a material adverse effect on the Business taken as a whole, all contributions, reserves or premium payments required to have been made or accrued, or that are due, as of the date hereof to or with respect to the Benefit Plans have been timely made or accrued.

(f)      There are no pending or, to the Knowledge of Seller, threatened  Proceedings with respect to any Benefit Plans (other than routine claims for benefits by participants and beneficiaries incurred in the ordinary course) or the assets or any fiduciary thereof (in that Person's capacity as a fiduciary of such Benefit Plan) that, in either case, would reasonably be expected to result in any material adverse effect on the Business taken as a whole. Except as would not have a material adverse effect on the Business, taken as a whole, there are no audits, inquiries or Proceedings pending or, to the Knowledge of Seller, threatened by the IRS, U.S. Department of Labor, or other Governmental Entity with respect to any Purchased Entity Benefit Plan.

(g)      The execution of this Agreement and the consummation of the transactions contemplated by this Agreement (alone or together with any other event which, standing alone, would not by itself trigger such entitlement or acceleration) will not (i) entitle any Business Employee to any payment, forgiveness of indebtedness, vesting, distribution, or increase in benefits under or with respect to any Benefit Plan, (ii) otherwise trigger any acceleration (of vesting or payment of benefits or otherwise) under or with respect to any Benefit Plan, or (iii) trigger any obligation to fund any Purchased Entity Benefit Plan.

(h)      There is no Contract, plan or arrangement covering any Business Employee, that, individually or collectively, could give rise to the payment as a result of the transactions contemplated by this Agreement of any amount that would not be deductible by a Purchased Entity or Seller by reason of Section 280G of the Code.

(i)      Except as would not have a material adverse effect on the Business taken as a whole, during the three-year period immediately prior to the date hereof, there have been no material strikes, industrial or similar action, or lockouts by any Business Employee.

(j)      Section 3.16(j) of the Disclosure Schedules sets forth a true and correct list of each Business Employee as of the date hereof, with the following information as applicable: (i)

33

170999.00004/150266115v.9

**DEBTORS' EXHIBIT NO. 237**
**Page 34 of 104**

employee identification number, (ii) title or position, (iii) classification as exempt or nonexempt under the federal Fair Labor Standards Act and equivalent state or provincial wage and hour Laws (in each case, if applicable), (iv) annual base salary, (v) the identity of the employer, (vi) location of employment, and (vii) hire date.

(k)    Except as set forth on Section 3.16(k) of the Disclosure Schedules, Seller, the Purchased Entities and their Affiliates are not party to any Collective Bargaining Agreement regarding the Business Employees. There is no call for strikes, strikes, work stoppages, union organization efforts or Proceedings pending or threatened, or reasonably anticipated by Seller (with respect to the Business).

(l)    Except as would not have a material adverse effect on the Business, taken as a whole, during the five-year period immediately prior to the date hereof, there have been no Proceedings against Seller or any Purchased Entity pending, or to the Knowledge of Seller, threatened to be brought or filed, by or with any Governmental Entity in connection with the employment or termination of employment of any Business Employee relating to unfair labor practices, employment discrimination, harassment, retaliation, leave, accommodation, minimum wages, overtime compensation, equal pay, or any other hiring, employment, or employment termination related matter arising under applicable Laws.

Section 3.17    Intercompany Agreements.    Other than the Transaction Documents and except as provided in Section 3.17 of the Disclosure Schedules, all Intercompany Agreements have been terminated, amended or assigned or a third party thereto has executed and delivered a release, in each case, without further payment or performance, such that no Purchased Entity shall have any further obligations or Liabilities therefor or thereunder and such contract shall cease to have any further force and effect with respect to the Purchased Entities.

Section 3.18    Insurance.    Section 3.18 of the Disclosure Schedules sets forth a true, correct and complete list and brief description (including the name of each policy, lead carrier and term) of all insurance policies owned or maintained by any Purchased Entity or under which any Purchased Entity is a party, a named insured or otherwise the beneficiary of coverage (collectively, the "***Insurance Policies***").   With respect to each Insurance Policy:  (a) the Insurance Policy is in full force and effect, (b) all premiums due with respect to the Insurance Policy have been timely paid in full, such applicable Purchased Entity is in material compliance with the terms and provisions thereof and such policies will continue to be in full force and effect until the Closing (or if such policies are canceled or lapse prior to the Closing, renewals or replacements thereof will be entered into in the ordinary course of business to the extent available on commercially reasonable terms), (c) there is no material claim with respect to the Business as to which coverage has been denied and (d) no Purchased Entity has received any written communication threatening termination of any Insurance Policy, or pending material premium increase with respect to the Insurance Policies.

Section 3.19    Customers and Suppliers.

(a)    No Purchased Entity has received written notice from any Material Customer that it intends to terminate or reduce materially its business with any Purchased Entity from the levels achieved during the year-ended December 31, 2023.  During the past three years, no Purchased

34

170999.00004/150266115v.9

Entity has received written notice of any material claim, dispute, controversy or materially adverse price change with respect to any Material Customer.

(b)      No Purchased Entity has received written notice from any Material Supplier that it intends to terminate or reduce materially its business with any Purchased Entity from the levels achieved during the year-ended December 31, 2023.  During the past three years, no Purchased Entity has received written notice of any material claim, dispute, controversy or materially adverse price change with respect to any Material Supplier.  No supplier to the Purchased Entities represents a sole source of supply for goods and services used in the conduct of the business by such Person.

Section 3.20    Accounts Receivable.  All accounts receivable of the Purchased Entities represent sales actually made or services actually performed in the ordinary course of business, or valid claims as to which full performance has been rendered, and have been calculated in accordance with GAAP.  No material claims, defenses, offsetting claims or adjustments with respect to any accounts receivable are pending or, to the Knowledge of Seller, threatened, relating to the amount or validity of such account receivable. There has been no deduction, provision of free goods or services, discounts or other deferred price of quantity adjustment with respect to the accounts receivable of the Purchased Entities.

Section 3.21    Product Warranty, Product Liabilities and Recalls.  For the past three years, (a) there have been no recalls of any of the products sold, manufactured, designed, packaged, distributed, leased, provided or otherwise delivered by any Purchased Entity with respect to the Business, and (b) the Purchased Entities have not changed the scope of their contractual obligations for standard warranties with respect to the return, repair or replacement of products manufactured or sold in the Business.  Section 3.21 of the Disclosure Schedules sets forth the aggregate annual cost to the Business of performing product warranty obligations for the 12 month period ended December 31, 2022 and December 31, 2023 and for the 6 month period ended June 30, 2024.

Section 3.22    Brokers.  Other than Angle Advisors, LLC, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transaction and the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company, the Purchased Entities and any of their Affiliates.

Section 3.23    Bank Accounts.  Section 3.23 of the Disclosure Schedules sets forth a true, correct and complete list of:  (a) the name and address of each bank or financial institution with which any Purchased Entities have an account or safe deposit box, the account number for each such account and the name of each Person authorized to draw thereon or have access thereto; and (b) the name of each Person holding a power of attorney for each account or safe deposit box.

Section 3.24    Exclusivity of Representations and Warranties.  Except as expressly set forth in this Article III, neither Seller, nor the Company nor any of their Affiliates nor any of their respective Representatives has made, or is making, any representation or warranty, whether express or implied, whatsoever to Purchaser or any of its Affiliates or their respective Representatives and neither the Company nor any of its Affiliates nor any of their respective Representatives shall be liable in respect of the accuracy or completeness of any information

35

170999.00004/150266115v.9

(including any projections on the future performance of the Purchased Entities) provided to Purchaser or any of its Affiliates, or any of their respective Representatives.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as of the date hereof as follows:

Section 4.1    Organization, Standing and Power.  Purchaser is duly organized, validly existing and in good standing under the Laws of the jurisdiction in which it is organized and has all necessary organizational power and authority to carry on its business as presently conducted.

Section 4.2    Authority; Execution and Delivery; Enforceability.   Purchaser has all requisite power and authority to execute and deliver this Agreement and each other Transaction Document to which it is a party and to consummate the Transaction and the other transactions contemplated hereby and thereby.  The execution and delivery by Purchaser of this Agreement and each other Transaction Document to which it is a party and the consummation by Purchaser of the Transaction and the other transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action of Purchaser.  Purchaser has duly executed and delivered this Agreement, and assuming due authorization, execution and delivery by Seller, this Agreement will constitute Purchaser's valid and binding obligation, enforceable against Purchaser in accordance with its terms, subject to the General Enforceability Exceptions.

Section 4.3    No Conflicts; Consents; Governmental Authorization.  The execution and delivery by Purchaser of this Agreement does not, and the execution by Purchaser or its Affiliates (if applicable) of the other Transaction Documents will not, and the consummation of the Transaction and the other transactions contemplated hereby and thereby and compliance by Purchaser with the terms hereof and thereof will not, conflict with, or result in any violation of, breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation under, or result in the creation of any Lien (other than Permitted Liens) upon any of the properties or assets of Purchaser or any of its Affiliates under, any provision of (a) the Organizational Documents of Purchaser or its Affiliates, (b) any Judgment or Law applicable to Purchaser or its Affiliates, or the properties or assets of Purchaser or its Affiliates, or (c) any material Contract of Purchaser, except, in each case of clauses (b) and (c), for any such items that would not, individually or in the aggregate, prevent or delay the ability of Purchaser or its Affiliates to consummate the Transaction and the other transactions contemplated hereby.  No Approval of any Governmental Entity is required to be obtained or made by or with respect to Purchaser in connection with the execution, delivery and performance of this Agreement, the other Transaction Documents or the consummation of the Transaction and the other transactions contemplated hereby or thereby.

Section 4.4    Sufficiency of Funds.  Purchaser has available to it as of the date hereof funds sufficient to enable Purchaser to satisfy all of its obligations under this Agreement and the other Transaction Documents, including payment of the Closing Purchase Price and any adjustments thereto contemplated by Section 2.4(g), and any fees and expenses of or payable by Purchaser or any Affiliate of Purchaser, as and when contemplated by this Agreement or any other Transaction Document.  In no event shall the receipt or availability of any funds or financing by

36

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094059

Purchaser or any Affiliate of Purchaser or any other financing or other transactions be a condition to any of Purchaser's obligations under, or contemplated by, this Agreement.

Section 4.5    Proceedings.   There are no Proceedings pending or, to the knowledge of Purchaser, threatened in writing, against Purchaser that would reasonably be expected to materially delay or impede the ability of Purchaser to perform its obligations under this Agreement.

Section 4.6    Brokers.   No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Transaction and the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser.

Section 4.7    Investigation.   Purchaser has such knowledge and experience in financial and business matters, and is capable of evaluating the merits and risks of the Transaction and the other transactions contemplated by this Agreement and the Transaction Documents.  Purchaser confirms that Seller has made available to Purchaser and its Affiliates and Representatives the opportunity to ask questions of the officers and management of Seller or its Affiliates and the Business, as well as access to the documents, information and records of or with respect to the Purchased Entities and the Business and to acquire additional information about the Business and financial condition of the Business.  Purchaser confirms that it has made a satisfactory independent investigation, analysis and evaluation of the Purchased Entities and the Business.

Section 4.8    Securities Act.   Purchaser is acquiring the Purchased Entity Equity solely for the purpose of investment and not with a view to, or for sale in connection with, any distribution, resale or other transfer thereof in violation of the Securities Act. Purchaser acknowledges that the Purchased Entity Equity is not registered under the Securities Act, any applicable state securities Laws or any applicable federal or other securities Laws, and that the Purchased Entity Equity may not be sold or otherwise transferred except pursuant to the registration provisions of the Securities Act and applicable state and federal and other securities Laws or pursuant to applicable exemptions therefrom.  Purchaser has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Entity Equity and is capable of bearing the economic risks of such investment. Except for the representations and warranties expressly set forth in Article III, Purchaser has independently evaluated the merits and risks of its decision to enter into this Agreement, is consummating the transactions contemplated by this Agreement with a full understanding, based exclusively on its own independent review, of all of the terms, conditions and risks and willingly assumes those terms, conditions and risks, and disclaims reliance on any representations or warranties, either expressed or implied, by or on behalf of Seller, the Company or any of their Affiliates apart from those in Article III. Except for the representations and warranties expressly set forth in Article III, Purchaser is not relying on any advice provided by Seller, the Company or any of their Affiliates with respect to the Purchased Entity Equity.

Section 4.9    Solvency.   No transfer of property is being made, and no obligation is being incurred in connection with the Transaction with the intent to hinder, delay or defraud either present or future creditors of Purchaser and its Affiliates (including the Purchased Entities). Immediately after giving effect to the consummation of the Transaction (including any financings being entered into in connection therewith):

37

170999.00004/150266115v.9

(a)     the Fair Value of the assets of Purchaser and its Affiliates (including the Purchased Entities), taken as a whole, shall be greater than the total amount of the Liabilities (including all Liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed) of Purchaser and its Affiliates (including the Purchased Entities), taken as a whole;

(b)     Purchaser and its Affiliates (including the Purchased Entities), taken as a whole, shall be able to pay their debts and obligations in the ordinary course of business as they become due; and

(c)     Purchaser and its Affiliates (including the Purchased Entities), taken as a whole, shall have adequate capital to carry on their businesses and all businesses in which they are about to engage.

For purposes of this Section 4.9, "*Fair Value*" means the amount at which the assets (both tangible and intangible), in their entirety, of Purchaser and its Affiliates (including the Purchased Entities) would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

Section 4.10    Exclusivity of Representations and Warranties. Except as expressly set forth in this Article IV, neither Purchaser nor any of its Affiliates, nor any of their respective Representatives has made, or is making, any representation or warranty, whether express or implied, whatsoever to Seller or any of its Affiliates or their respective Representatives and neither Purchaser nor any of its Affiliates, nor any of their respective Representatives shall be liable in respect of the accuracy or completeness of any information provided to Seller or any of its Affiliates, or any of their respective Representatives.

Section 4.11    Acknowledgment of No Other Representations or Warranties.

(a)     Purchaser acknowledges and agrees that, except for the representations and warranties specifically and expressly contained in Article III as modified by the Disclosure Schedules, neither Seller, the Company nor any of their Affiliates, Representatives or any other Person makes any express or implied representation or warranty with respect to the Purchased Entities or the Business or with respect to any other information provided, or made available, to Purchaser or any of its Affiliates or Representatives in connection with the transactions contemplated hereby and by the other Transaction Documents.  Purchaser acknowledges and agrees that neither Seller, the Company nor any of their Affiliates, Representatives or any other Person will have, or be subject to, any Liability or other obligation to Purchaser, its Affiliates or Representatives or any other Person resulting from the sale, purchase and assumption of the Purchased Entities or the Business to or by Purchaser or its Affiliates, including under the Federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq. and other Environmental Laws, or Purchaser's use of, or the use by any of Purchaser's Affiliates or Representatives, of any information, including information, documents, projections, forecasts, business plans or other material (including any Information (as defined in the Confidentiality Agreement)) made available to Purchaser, its Affiliates or Representatives in any virtual data room, confidential information memorandum or presentations, management

38

170999.00004/150266115v.9

CONFIDENTIAL

presentations, offering materials, site tours or visits, diligence calls or meetings or any documents prepared by, or on behalf of, Seller, the Company or any of their Affiliates or Representatives, or Purchaser or its Affiliates or Representatives or any of Purchaser's potential financing sources in connection with Purchaser's financing activities with respect to the transactions contemplated by this Agreement. Purchaser acknowledges and agrees that it is not relying on any representation or warranty of Seller, the Company or any of their Affiliates or Representatives or any other Person, other than those representations and warranties specifically and expressly set forth in Article III as modified by the Disclosure Schedules. Purchaser acknowledges and agrees that each of Seller, the Company and their Affiliates disclaims any and all representations and warranties, whether express or implied, except for the representations and warranties specifically and expressly contained in Article III as modified by the Disclosure Schedules.

(b)      Purchaser acknowledges that neither Seller, the Company nor any of their Affiliates or Representatives has made any warranty, express or implied, as to the prospects of the Purchased Entities or the Business or their profitability for Purchaser, or with respect to any forecasts, projections or business plans or other information (including any Information (as defined in the Confidentiality Agreement)) delivered to Purchaser or any of its Affiliates or Representatives in connection with Purchaser's review of the Purchased Entities  and Business and the negotiation and execution of this Agreement, including as to the accuracy or completeness thereof or the reasonableness of any assumptions underlying any such forecasts, projections or business plans or other information.

(c)      Purchaser acknowledges that, should the Closing occur, Purchaser shall acquire the assets and properties of the Purchased Entities with only the representations and warranties provided in Article III.

**ARTICLE V**
**COVENANTS**

Section 5.1      Confidentiality.      Purchaser acknowledges that the information being provided to it in connection with the Transaction and the other transactions contemplated hereby is subject to the terms of that certain confidentiality agreement between Angle Advisors, LLC and Purchaser, dated February 16, 2024 (including any clean team agreement entered into in connection therewith, the "***Confidentiality Agreement***"), the terms of which are incorporated herein by reference in their entirety. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business.

Section 5.2      Access to Information.

(a)      At and after the Closing (except to the extent relating to Tax matters (access, cooperation and procedures with respect to which are governed exclusively by ARTICLE VI)), Purchaser shall, and shall cause its Affiliates to, afford Seller, its Affiliates and their respective Representatives, during normal business hours, upon reasonable notice, access to the properties, books, Contracts, records and employees of the Business and the Purchased Entities to the extent that such access may be reasonably requested in good by faith Seller and occurring without interruption to the Business, including in connection with financial statements, reporting

39

CONFIDENTIAL

FBG_CH1_00094062

**DEBTORS' EXHIBIT NO. 237**
**Page 40 of 104**

obligations, defense of claims and compliance with applicable Laws; provided that nothing in this Agreement shall limit any of Seller's or any of its Affiliates' rights of discovery.

(b)     Except for Tax Returns and other documents governed by ARTICLE VI, Purchaser agrees to hold all the books and records of the Business existing on the Closing Date and not to destroy or dispose of any thereof for a period of 7 years from the Closing Date, and thereafter, if it desires to destroy or dispose of such books and records, to offer first in writing at least 60 days prior to such destruction or disposition to surrender them to Seller.

(c)     Seller may (i) erase any and all data and/or software from the Business IT Assets to the extent necessary to prevent unauthorized access to the information technology systems and Technology of the Retained Businesses from and after the Closing and (ii) take any other measures with respect to the Business IT Assets reasonably necessary to ensure that the transfer of the Business IT Assets to Purchaser complies with applicable Laws (including applicable Data Protection Laws).

Section 5.3     Publicity.  No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement in respect of this Agreement or the transactions contemplated by this Agreement, except as may be required by Law or stock exchange rules, in which case the Party required to publish such press release or public announcement shall (i) disclose no more information than is specifically required by applicable Law or stock exchange rules, (ii) use commercially reasonable efforts to obtain assurances from the applicable Governmental Entity that such disclosed information will be afforded confidential treatment, and (iii) use reasonable efforts to provide the other Party a reasonable opportunity to comment on such press release or public announcement in advance of such publication.

Section 5.4     Employee Matters.

(a)     Treatment of Business Employees.  Each Business Employee who is employed by a Purchased Entity as of immediately prior to the Closing will be referred to herein as a "***Transferred Business Employee***."  Each Transferred Business Employee who is based in the U.S. is referred to as a "***U.S. Transferred Business Employee***."

(b)     Collective Bargaining Agreements.  Purchaser recognizes that the Collective Bargaining Agreements remain in effect and govern the terms and conditions of employment of those employees of the Purchased Entities covered by such Collective Bargaining Agreements.

(c)     Benefit Plan Coverage.  Except as provided in the Transition Services Agreement, coverage for all Transferred Business Employees and their respective dependents under the Seller Benefit Plans that are health or welfare Benefit Plans within the meaning of Section 3(1) of ERISA (the "***Sellers' Welfare Plans***") and under all Seller Benefit Plans will cease to be effective as of the Closing Date.  The plans sponsored by Purchaser or its Affiliates (including the Purchased Entities after the Closing, if any) that are welfare Benefit Plans within the meaning of Section 3(1) of ERISA (the "***Purchaser's Welfare Plans***") will provide coverage and benefits for all Transferred Business  Employees and their respective eligible spouses and dependents and such Purchaser's Welfare Plans shall be established and effective as of the November 1, 2024, in accordance with the terms of such Purchaser's Welfare Plans.  Purchaser and its Affiliates

40

170999.00004/150266115v.9

(including the Purchased Entities after the Closing, as applicable) and Purchaser's Welfare Plans will be liable for all claims of any Transferred Business Employees and their respective eligible spouses and dependents incurred on or after the November 1, 2024.  Sellers will retain responsibility and liability for all claims of the Transferred Business Employees incurred on or before the Closing Date and to the extent provided in the Transition Services Agreement, before November 1, 2024; provided that Purchaser shall retain responsibility and liability for all claims of Transferred Business Employees and any other participant covered by a Purchased Entity Benefit Plan, if any, whether incurred before, on, or after the November 1, 2024.  For purposes of this Section 5.4(c), a claim will be deemed "incurred" on the date that the event that gives rise to the claim occurs (for purposes of life insurance, severance, sickness, accident and disability programs) or on the date that the service was rendered or the supply was purchased (for purposes of health care programs).

(d)     WARN and Corresponding State Laws. Purchaser shall be solely responsible for and agrees to indemnify, hold harmless and, at the option of Seller, to defend Seller and its Affiliates from and against any Liability under WARN or any similar state Law, to any Business Employee who is found to have suffered an "employment loss" under WARN on or after the Closing Date as a result of the actions of Purchaser or any of its Affiliates, and any and all other Liabilities, including attorneys' fees, arising out of or resulting from actions Purchaser or any of its Affiliates, or their failure to serve sufficient notice pursuant to WARN or any similar state Law.

(e)     U.S. COBRA Continuation Coverage.  Seller shall have the sole responsibility prior to, on, and after the November 1, 2024, for providing "continuation coverage" benefits and for compliance with Section 4980B of the Code and Sections 601-608 of ERISA, in each case, with respect to all Business Employees located in the U.S. and "qualified beneficiaries" of such Business Employees, for whom a "qualifying event" occurred or occurs prior to November 1, 2024. Purchaser or its Affiliates (including, after the Closing, the Purchased Entities) shall have the sole responsibility on and after November 1, 2024, for providing "continuation coverage" benefits and for compliance with Section 4980B of the Code and Sections 601-608 of ERISA, in each case with respect to all U.S. Transferred Business Employees and "qualified beneficiaries" of U.S. Transferred Employees, for whom a "qualifying event" occurred or occurs on or after November 1, 2024.  The terms "continuation coverage," "qualified beneficiaries" and "qualifying event" will have the meanings ascribed to them under Section 4980B of the Code and Sections 601-608 of ERISA.

(f)     Visa Employees. Prior to the Closing, Seller shall use commercially reasonable efforts to transfer the employment of the Business Employees listed on Section 5.4(f) of the Disclosure Schedules who are, as of the date of this Agreement, working in the United States pursuant to a visa or similar authorization (collectively the "***Visa Employees***" and each a "***Visa Employee***") to Seller or any of its Affiliates (other than a Purchased Entity) (the "***Transfer Measures***"). If such Transfer Measures are not completed as of the Closing Date, each Visa Employee for which the Transfer Measures are not completed will remain an employee of the applicable Purchased Entity until such Transfer Measures are completed (the "***Visa Transfer Period***"). During the Visa Transfer Period, Purchaser and the applicable Purchased Entities will reasonably cooperate with Seller to complete the Transfer Measures, and the Purchaser shall cause the Purchased Entities to not terminate the employment of any Visa Employee other than at the request of Seller. The completion of the Transfer Measures will not, in any way, be limited by the

41

170999.00004/150266115v.9

FBG_CH1_00094064

**DEBTORS' EXHIBIT NO. 237**
**Page 42 of 104**

Restrictive Covenants Agreement or any other non-compete or non-solicitation agreement among the Parties.

(g)    Retention Bonuses. Seller shall retain the liabilities associated with the agreements listed Section 5.4(g) of the Disclosure Schedules (the "**_Retention Agreements_**") and shall pay any amounts due under the Retention Agreements in December 2024.  Provided that Seller transfers any amounts due under the Retention Agreements, including the employer portion of any related payroll Taxes, to Purchaser in advance, Purchaser shall, or shall cause the applicable Purchased Entity to, facilitate the payment of the amounts due under the Retention Agreements to the applicable Transferred Business Employee through Purchaser's, or the applicable Purchased Entity's, payroll system, including remitting the Tax withholding and payroll Taxes to the appropriate Tax authority.

(h)    No Third-Party Rights.  This Section 5.4 will not create any third-party beneficiary rights, express or implied, and will not be enforceable by any current or former employee of Seller, Purchaser or their Affiliates, or by any other Person who is not a party to this Agreement.  This Section 5.4 will not be deemed to be an establishment of or amendment to any employee Benefit Plan.  No term of this Agreement will be deemed to create any Contract with any employee or to give any employee the right to be retained in the employment of Seller or any of its Affiliates, or, after the Closing, Purchaser or any of its Affiliates, or to interfere with the rights of Seller or any of its Affiliates or, after the Closing, Purchaser or any of its Affiliates, to terminate the employment of any employee at any time or for any reason.

Section 5.5    Payments from Third Parties.

(a)    Seller shall, or shall cause its applicable Affiliate to, promptly pay or deliver to Purchaser (or Purchaser's designated Affiliate) any monies or checks that are in respect of the Business that have been delivered to Seller or any of its Affiliates following the Closing, including any monies or checks sent by customers, suppliers or other contracting parties in respect of the Business.

(b)    Purchaser shall, or shall cause its applicable Affiliate to, promptly pay or deliver to Seller (or its designated Affiliate) any monies or checks that have been sent to Purchaser or any of its Affiliates after the Closing to the extent such monies or checks are in respect of a Retained Business.

Section 5.6    Termination of Intercompany Balances.  Immediately prior to the Closing (or prior thereto, if so determined by Seller), all intercompany balances and accounts (other than intercompany balances and accounts reflected in the Closing Working Capital, Closing Indebtedness or Closing Transaction Expenses) between Seller and any of its Affiliates (other than the Purchased Entities), on the one hand, and the Purchased Entities, on the other hand, shall be settled or otherwise eliminated in such a manner as Seller shall determine in its sole discretion (including, if so determined by Seller, by Seller or any of its Affiliates removing from any Purchased Entity any or all Cash Amounts or funds from cash pools by means of dividends, distributions, contributions, the creation or repayment or refinancing of intercompany debt, increasing or decreasing of cash pool balances or otherwise).  Intercompany balances and accounts

170999.00004/150266115v.9

CONFIDENTIAL                                                                                      FBG_CH1_00094065

solely among any of the Purchased Entities shall not be affected by the above provisions of this Section 5.6.

Section 5.7    Further Conveyances and Assumptions.  From time to time following the Closing, Seller and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their respective successors and assigns, the assumption of the Liabilities intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transaction.

Section 5.8    Acknowledgement of Pre-Closing Services.  Purchaser acknowledges that Seller and its Affiliates provided various services, rights and support to the Business, and those services, rights and support will not continue after the Closing Date, provided, however, certain services, rights and support will be provided to the Business by Seller and its Affiliates to extent expressly provided in the Transition Services Agreement.

Section 5.9    Additional Closing Payments.  At the Closing (or immediately after the Closing), Purchaser will pay, or will cause the applicable Purchased Entities to pay, the Estimated Closing Transaction Expenses in cash to the Persons entitled thereto pursuant to written instructions delivered to Purchaser by Seller prior to the Closing Date.

Section 5.10    Bulk Transfer Laws.  The Parties hereby waive compliance with any bulk transfer Laws applicable to the transactions contemplated by this Agreement.

Section 5.11    Excluded Employees and Excluded Assets.

(a)    The Parties acknowledge that Seller, or the applicable Purchased Entity, transferred the employment of each individual set forth on Section 5.11(a) of the Disclosure Schedules (the "***Excluded Employees***") to Seller or one of its Affiliates (other than a Purchased Entity) prior to the Closing.  The Parties acknowledge and agree that the Excluded Employees will have access to their offices and other premises at the Business Owned Real Property and the Business Leased Real Property until Seller is able to relocate such Excluded Employees to new offices.  Seller will complete the relocation of such Excluded Employees within 5 Business Days after the Closing Date; provided, that the Excluded Employees will be able to collect their files and other physical documentation related to the Retained Business for 20 days after the Closing Date.

(b)    The Parties acknowledge and agree that as soon as reasonably practicable Seller shall transfer, assign and convey the assets set forth on Section 5.11(b) of the Disclosure Schedules (the "***Excluded Assets***") to Seller or one of its Affiliates.  Purchaser hereby consents to such actions, and will provide assistance, as reasonably requested by Seller, in connection with such transfers to the extent occurring after the Closing; provided, that all such transfers will be made (i) at Seller's sole cost and expense and (ii) in a time and manner reasonably acceptable to Purchaser. Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or

43

170999.00004/150266115v.9

FBG_CH1_00094066

convey the Excluded Assets to Purchaser, and Seller will retain all right, title and interest to, in and under the Excluded Assets.

Section 5.12   Guaranty.   Seller and Purchaser shall each use their commercially reasonable efforts to cause the guarantees set forth on Section 5.12 of the Disclosure Schedules to be terminated within 90 days following the Closing (each, a "**_Guaranty_**"). If any Guaranty is not terminated, Purchaser and its Affiliates shall indemnify and hold harmless Seller and its Affiliates for any Losses related to such Guaranty that arise after the Closing, solely to the extent such Losses are not the primary result of any action or omission by Seller or its Affiliates. Without limiting the foregoing, neither Purchaser nor any of its Affiliates shall extend or renew the lease for the Business Leased Real Property located at 11 East Park Drive, Fayetteville, Tennessee 38334 unless, prior to or concurrently with such extension or renewal, Purchaser or one of its Affiliates is substituted in all respects for the Seller guarantor under the Guaranty.

Section 5.13   Accounts Receivable.   Notwithstanding anything to the contrary in this Agreement, Seller shall have the sole and exclusive right to receive payment for the first $12,000,000 of accounts receivable of the Company that the Company or any of its Affiliates receive after the Closing. Purchaser shall use, and shall cause its Affiliates to use, commercially reasonable efforts to collect all of the Company's accounts receivable as soon as practicable after the Closing, and Purchaser shall promptly forward to Seller any payments or proceeds received by the Company or any of its Affiliates in respect of any accounts receivable of the Company that they receive after the Closing.

Section 5.14   Computers and Servers.   The Parties acknowledge and agree that the Excluded Employees use laptop computers and have access to network servers that are leased by the Company. The Excluded Employees will have access to such computers and network servers after the Closing; _provided_, that Seller will reimburse Purchaser for any costs incurred in connection with the lease payment for the computers and network servers to the extent retained or used by the Excluded Employees; _provided_, _further_, that Seller will instruct the Excluded Employees not to access any Business information contained on such network servers and Seller and Purchaser will cooperate in good faith to, as soon as practicable after the Closing, (a) separate any Business information that is commingled with Retained Business Information such that Purchaser receives all Business information and Seller receives all Retained Business information and (b) determine and implement firewalls or other applications sufficient to prevent Excluded Employee's access to Business information and Business Employee's access to Retained Business information.

## ARTICLE VI
## CERTAIN TAX MATTERS

Section 6.1   Cooperation and Exchange of Information.

(a)     From and after the Closing, each Party shall, and shall cause its Affiliates to, provide to the other Party such cooperation, documentation and information relating to the Purchased Entities as either of them may reasonably request in (i) filing or amending any Tax Return, (ii) determining a Liability for Taxes or a right to refund of Taxes, or (iii) conducting any Tax Proceeding. Such cooperation and information shall include providing copies of all relevant

44

170999.00004/150266115v.9

CONFIDENTIAL                                                                                          FBG_CH1_00094067

portions of relevant Tax Returns, together with all relevant portions of relevant accompanying schedules and relevant work papers, relevant documents relating to rulings or other determinations by Taxing Authorities and relevant records concerning the ownership and Tax basis of property and other information, which any party hereto (or any of their respective Affiliates) may possess.

(b)     Notwithstanding anything to the contrary in this Agreement, neither Purchaser nor any of its Affiliates will be entitled to review any income Tax Return of Seller or any of Seller's respective Affiliates (other than the Tax Returns that relate solely to any of the Purchased Entities to the extent not included in a consolidated, combined, unitary or similar group Tax Return with an Affiliate of Seller that is not a Purchased Entity) or any work papers related thereto. Notwithstanding the foregoing, Seller shall (and shall cause its Affiliates to) reasonably cooperate with requests from Purchaser or its Affiliates for Tax-related information that may be included in such Tax Returns that is reasonably requested by Purchaser or its Affiliates in connection with Purchaser's acquisition of the Purchased Entities.

(c)     Each Party shall retain all Tax Returns, schedules and work papers and all material records and other documents relating to Tax matters of the Purchased Entities for their respective Tax periods ending on or prior to the Closing Date until the later of (i) the expiration of the statute of limitations for the Tax periods to which the Tax Returns and other documents relate or (ii) eight years following the due date (without extension) for such Tax Returns. Thereafter, the Party holding such Tax Returns or other documents may dispose of them after offering the other Party reasonable notice and opportunity to take possession of such Tax Returns and other documents at such other Party's own expense.

Section 6.2     <u>Transfer Taxes</u>. Each amount stated as payable by Purchaser under or pursuant to this Agreement is exclusive of Transfer Taxes. Notwithstanding anything to the contrary in this Agreement, any Transfer Taxes and the costs of preparing and filing Tax Returns in respect of any such Transfer Taxes, will be borne and paid one-half by Purchaser and one-half by Seller. The Party responsible under applicable Law for filing the Tax Returns with respect to any such Transfer Taxes shall prepare and timely file such Tax Returns (and Purchaser shall timely provide payment of such Transfer Taxes, if any payment is due) and promptly provide a copy of such Tax Return to the other party. Seller and Purchaser shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes; <u>provided</u> that, notwithstanding any of the foregoing, neither Seller nor any of its Affiliates shall be required to file any claim for exemption or exclusion from the application or imposition of Transfer Taxes, or any claim for any reduction thereof, if Seller determines in its sole discretion that the filing of such claim or any related action would have an adverse effect on Seller or any of its Affiliates.

Section 6.3     <u>Tax Sharing Agreements</u>. On or before the Closing Date, the rights and obligations of the Purchased Entities pursuant to all Tax sharing agreements or arrangements (other than this Agreement), if any, to which any of the Purchased Entities, on the one hand, and Seller or any of its Affiliates, on the other hand, are parties, shall terminate, and neither Seller nor any of its Affiliates, on the one hand, nor any of the Purchased Entities, on the other hand, shall have any rights or obligations to each other after the Closing in respect of such agreements or arrangements.

45

170999.00004/150266115v.9

CONFIDENTIAL                                                                 FBG_CH1_00094068

**DEBTORS' EXHIBIT NO. 237**
**Page 46 of 104**

Section 6.4    Tax Treatment of Payments.   Except to the extent otherwise required pursuant to a "determination" (within the meaning of Section 1313(a) of the Code or any similar provision of state, local or non-U.S. Law), Seller, Purchaser and their respective Affiliates shall treat any and all payments under Section 2.4 as an adjustment to the Final Purchase Price for Tax purposes.

Section 6.5    Pre-Closing Actions, Elections and Post-Closing Actions.

(a)    Purchaser shall not (i) make, and shall cause its Affiliates (including the Purchased Entities) not to make, any election with respect to any Purchased Entity (including any entity classification election pursuant to Treasury Regulations Section 301.7701-3), or change any method of Tax accounting or any Tax accounting period of any Purchased Entity, which election or change would be effective on or prior to the Closing Date, (ii) take, and shall cause its Affiliates (including the Purchased Entities) not to take, any action or engage in any transaction that would reasonably be expected to increase any Tax liability required to be reflected as a reserve or Liability in Working Capital (or otherwise require any Tax liability to be reflected as a reserve or Liability in Working Capital that would not otherwise be required to be so reflected), (iii) take, and shall cause its Affiliates (including the Purchased Entities) not to take, any action or engage in any transaction outside the ordinary course of business after the Closing to the extent such action or transaction could reasonably be expected to cause any Taxes of the Purchased Entities (or with respect to earnings of the Purchased Entities) to be allocated from any Post-Closing Tax Period to any Pre-Closing Tax Period, (iv) take any action on the Closing Date after the Closing outside the ordinary course of business with respect to the Business or the Purchased Entities, or (v) unless otherwise required by applicable Law to reflect a determination within the meaning of Section 1313(a) of the Code, amend, refile, revoke or otherwise modify any Tax Return or Tax, if such action would reasonably be expected to result in Seller or any of its Affiliates incurring a Liability for Taxes that would not otherwise be so incurred.  Notwithstanding anything in this Agreement, Seller acknowledges and agrees that Purchaser may make an election under Section 338(g) of the Code with respect to Toledo Molding de Mexico SRL de CV.

Section 6.6    Tax Returns.

(a)    Except as otherwise provided in Section 6.6(b), all Tax Returns of the Purchased Entities for any Pre-Closing Tax Period ending on or before the Closing Date that are due after the Closing Date and any Straddle Period will be prepared and filed (or will be caused to be prepared and filed) by Purchaser when due (after taking into account timely filed extensions) in accordance with all applicable Laws.  Purchaser shall provide a copy of each such Tax Return to Seller for its review and comment at least 30 calendar days prior to the due date thereof (or within such other reasonable time as may be applicable if the due date for filing any such Tax Return is within 30 calendar days following the Closing Date).  Seller shall deliver its comments, if any, to any such Tax Return to Purchaser no later than 10 calendar days prior to the due date of such Tax Return (or within such other reasonable time as may be applicable if the due date for filing any such Tax Return is within 30 calendar days following the Closing Date), and Purchaser shall accept all reasonable written comments of Seller with respect to such Tax Returns prior to filing such Tax Returns.  Purchaser shall timely file all Tax Returns prepared by Purchaser pursuant to this Section 6.6(a).

46

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094069

(b)      All consolidated, combined, unitary or other similar group Tax Returns that include any of the Purchased Entities and Seller or any of its Affiliates (other than the Purchased Entities) for any Straddle Period will be prepared (or will be caused to be prepared) by Seller prior to the due date (after taking into account timely filed extensions) in accordance with all applicable Laws. Seller shall provide only a pro-forma schedule of the portion of such Tax Return that pertains to the Purchased Entities included in such Tax Return, to Purchaser for review no later than 30 calendar days prior to the due date thereof (or within such other reasonable time as may be applicable if the due date for filing any such Tax Return is within 30 calendar days following the Closing Date). Purchaser shall deliver its comments, if any, to any such Tax Return to Seller no later than 10 calendar days prior to the due date of such Tax Return (or within such other reasonable time as may be applicable if the due date for filing any such Tax Return is within thirty 30 calendar days following the Closing Date), and Seller shall consider in good faith all reasonable written comments of Purchaser with respect to such Tax Returns prior to the due date for filing such Tax Returns. Seller shall timely file all Tax Returns prepared by Seller pursuant to this Section 6.6(b).

(c)      In order to apportion any Taxes relating to a Straddle Period, the portion of any Taxes that are allocable to the Pre-Closing Tax Period shall be: (i) in the case of Taxes that are imposed on a periodic basis (and not based on invoices, receipts, sales or payments), deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending on (and including) the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period and (ii) in the case of Taxes not described in clause (i) above (including income Taxes and sale, gross receipts and other similar Taxes imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), deemed equal to the amount that would be payable if the taxable year or period ended and the books closed at the close of the Closing Date (and for such purpose, the taxable period of any Purchased Entity that is a partnership or other pass-through entity or a controlled foreign corporation within the meaning of Section 957 of the Code shall be deemed to terminate at such time); provided, that, exemptions, allowances or deductions that are calculated on an annual basis shall be allocated between the period ending on and including the Closing Date and the period beginning after the Closing Date in proportion to the number of days in each period.

Section 6.7      Controversies. Notwithstanding Section 7.19, this Section 6.7 shall control any audits, inquiries, examinations, assessments, Tax Proceedings or similar events with respect to Taxes of any Purchased Entity.  Purchaser shall promptly notify Seller:  (a) upon receipt by Purchaser or any Affiliate of Purchaser of any notice of any Tax Matter from any Taxing Authority; or (b) prior to Purchaser or any Purchased Entity initiating any Tax Matter with any Taxing Authority.  Seller may, at Sellers' expense, participate in and, upon written notice to Purchaser, assume the defense of any such Tax Matter; provided, however, that the failure to provide such notice with respect to clause (a) of this Section 6.7 shall not affect Purchaser's right to indemnification under Section 7.19(a) except to the extent Sellers' defense of such matter is demonstrably prejudiced by such failure; provided further that the failure to provide such notice with respect to clause (b) of this Section 6.7 shall negate Purchaser's right to indemnification under Section 7.19(a) with respect to Tax liabilities resulting from any such voluntary contact.  If Seller assumes such defense, then Seller shall have the authority, with respect to such Tax Matter, to represent the interests of any Purchased Entity before the relevant Taxing Authority and Seller shall have the right to control the defense, compromise or other resolution of such Tax Matter,

47

170999.00004/150266115v.9

subject to the limitations contained herein, including responding to inquiries, and contesting, defending against and resolving any assessment for additional Taxes or notice of Tax deficiency or other adjustment of Taxes of, or relating to, such Tax Matter.  Purchaser shall have the right (but not the duty) to participate in the defense of such Tax Matter and to employ counsel, solely at its own expense, separate from the counsel employed by Seller.  Seller shall not enter into any settlement of or otherwise compromise any such Tax Matter to the extent that it adversely affects the Tax liability of Purchaser, any Purchased Entity or any Affiliate of the foregoing for a Post-Closing Tax Period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.  If Seller has assumed such defense, then Seller shall keep Purchaser informed with respect to the status and nature of such Tax Matter and shall, in good faith, allow Purchaser to consult with Seller regarding the conduct of or positions taken in any such Tax Matter.  With respect to any Tax Matter for which Seller has not assumed such defense, Purchaser shall control such Tax Matter, at Purchaser's expense, and Purchaser shall not enter into any settlement of or otherwise compromise any such Tax Matter to the extent that it adversely affects the Tax liability of Seller, any Purchased Entity or any Affiliate of the foregoing for a Pre-Closing Tax Period without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

Section 6.8    Refunds and Credits.  Any Tax refund received by Purchaser or any of the Acquired Companies (or any of their respective Affiliates), and any amounts credited against any Tax to which Purchaser or any of the Purchased Entities (or any of their respective Affiliates) shall become entitled, which refund or credit relates to any Pre-Closing Tax Period shall be for the account of Seller, and Purchaser shall pay, or cause to be paid, to Seller an amount equal to such refund or credit.

## ARTICLE VII
## GENERAL PROVISIONS

Section 7.1    Entire Agreement.  This Agreement and the other Transaction Documents, and the Schedules and Exhibits hereto and thereto, and the Confidentiality Agreement, along with the Disclosure Schedules, constitute the entire agreement and understanding among the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter.  No Party shall be liable or bound to the other Party in any manner by any representations, warranties or covenants relating to such subject matter, except as specifically set forth herein and therein.  In the event of a conflict between the terms of this Agreement and the terms of any Transaction Document, the terms of this Agreement shall control.

Section 7.2    Survival.  The representations and warranties of Seller and Purchaser contained in this Agreement shall not survive the Closing, provided, however, that each of the representations and warranties of Seller and Purchaser contained in this Agreement will survive the Closing to the extent necessary to preserve any claim for Fraud, which the Parties hereby acknowledge and agree will survive the Closing in accordance with applicable Law.  No covenant or agreement contained herein that is to be performed on or prior to the Closing shall survive the Closing.  Any covenant or agreement contemplated to be performed, in whole or in part, after the Closing shall survive the Closing in accordance with its terms.

48

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094071

Section 7.3    Assignment.  Neither this Agreement nor any of the rights and obligations hereunder may be directly or indirectly pledged, assigned or transferred by either party (whether by operation of Law or otherwise) without the prior written Consent of the other Party. Notwithstanding the foregoing, Purchaser may, without the Consent of Seller, assign its rights and obligations under this Agreement (a) to any lender of Purchaser or any of its Affiliates for collateral security purposes, (b) to any purchaser of all or substantially all of the assets of Purchaser or any of its Affiliates or (c) to any of its Affiliates.  Any attempted pledge, assignment or transfer in violation of this Section 7.3 shall be null and void *ab initio*.  Subject to the three preceding sentences, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 7.4    Amendments and Waivers.  This Agreement may not be amended or otherwise modified, except by an instrument in writing signed on behalf of each of the Parties.  By an instrument in writing, Purchaser, on the one hand, or Seller, on the other hand, may waive compliance by the other with any term or provision of this Agreement that the other Party was or is obligated to comply with or perform.  The waiver by any Party of a breach of any term or provision of this Agreement shall not be construed as a waiver, or estoppel with respect to, any subsequent breach.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 7.5    No Third-Party Beneficiaries.  This Agreement, together with the other Transaction Documents and the Exhibits and Schedules hereto and thereto are not intended to confer in or on behalf of any Person not a party to this Agreement (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

Section 7.6    Notices.  All notices and other communications to be given to any Party shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier, electronic mail or overnight courier (providing proof of delivery), and shall be directed to the addresses set forth below (or at such other address as such Party shall designate by like notice):

(i)    if to Purchaser,

Shekhar Kumar
c/o First Brands Group
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention:  Legal Department
Email:  legalcontracts@firstbrandsgroup.com

(ii)    if to Seller,

GRAMMER, Inc.
1475 Technology Drive, Building J, Suite A
Troy, Michigan 48083

49

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094072

Attention: Justin Cousino
Email: justin.cousino@grammer.com

if to Parent,

GRAMMER AG
Grammer-Allee 2
92289 Ursensollen
Germany
Attention: Eva Meichsner
Email: Eva.Meichsner@grammer.com

with a copy, in each case, (which shall not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, OH 44114
Attention:  Benjamin Stulberg
Email:      blstulberg@jonesday.com

Section 7.7    Non-Recourse.  All Proceedings at Law or in equity, or arbitration or administrative or other Proceedings by or before any Governmental Entity (whether in contract or in tort, in Law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against Persons that are expressly identified as Parties, and then only with respect to the specific obligations set forth herein with respect to the applicable Persons.  No Person who is not a Party to this Agreement, including any Affiliate or other Representative of any Party ("***Non-Party Affiliate***"), shall have any liability for any Liabilities arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution, and each Party waives and releases all such Liabilities against any Non-Party Affiliate.  In the event that any provision of this Agreement provides that a Party shall cause its Affiliates or Representatives to take any action (or refrain from taking any action) or otherwise purports to be binding on such party's Affiliates or Representatives, such Party shall be liable for any breach of such provision by any such Affiliate or Representative.

Section 7.8    Releases.

(a)    Except to the extent provided to the contrary in this Section 7.8(a), effective as of the Closing, Purchaser, on behalf of itself and its Affiliates, including the Purchased Entities, hereby releases Seller and each of its Affiliates (and their respective officers, directors and employees, acting in their capacities as such) from any Liability, obligation or responsibility to any of them for any and all past actions or failures to take action prior to the Closing directly or indirectly relating to or arising out of the Business, the Retained Businesses, or the operations and ownership of the Purchased Entities prior to the Closing, except for any obligation pursuant to the provisions of this Agreement or the other Transaction Documents.

50

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094073

(b)     Except to the extent provided to the contrary in this Section 7.8(b), effective as of the Closing, Seller, on behalf of itself and its Affiliates, hereby releases the Purchased Entities (and their respective officers, directors and employees, acting in their capacities as such) from any liability, obligation or responsibility to any of them for any and all past actions or failures to take action prior to the Closing directly or indirectly relating to or arising out of the Business, the Retained Businesses, or the operations or ownership of the Purchased Entities prior to the Closing, except for any obligation pursuant to the provisions of this Agreement (including, but not limited to, Section 7.19) or the other Transaction Documents.

Section 7.9     Specific Performance.  The Parties agree that irreparable damage, for which monetary damages (even if available) would not be an adequate remedy, would occur in the event that a Party does not perform any provision of this Agreement in accordance with its specified terms or otherwise breach such provisions.  Accordingly, the Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof without proof of actual damages or the inadequacy of monetary relief, in addition to any other remedy to which such Party is entitled in Law or in equity.  Each Party agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Any Party seeking an injunction or injunctions to prevent breaches or threatened breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such remedy.  The foregoing is in addition to any other remedy to which any Party is entitled at Law, in equity or otherwise, including monetary damages.  It is explicitly agreed that each Party shall have the right to an injunction, specific performance or other equitable remedies in connection with enforcing the other Party's obligations under this Agreement in accordance with the terms and conditions set forth herein.

Section 7.10    Governing Law and Jurisdiction.  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.  In addition, each Party (a) submits to the personal jurisdiction of the United States Court of Chancery of the State of Delaware (or if jurisdiction is not available in such court, then in the United States District Court for the District of Delaware or, if jurisdiction is not available in such court, then in the Superior Court of the State of Delaware), in the event that any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the Transaction or the other transactions contemplated hereby, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any Proceeding relating to this Agreement or the Transaction or the other transactions contemplated hereby in any court other than the Court of Chancery of the State of Delaware (or if jurisdiction is not available in such court, then in the United States District Court for the District of Delaware or, if jurisdiction is not available in such court, then in the Superior Court of the State of Delaware), which shall be the exclusive jurisdiction and venue for any such Proceeding.  Each Party agrees that service of process upon such Party in any such Proceeding shall be effective if notice is given in accordance with Section 7.6.

51

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094074

Section 7.11   Dispute Resolution.  Prior to and as a condition of either Party's filing of any Proceeding in state or federal court in accordance with Section 7.10 to resolve any and all disputes, claims or controversies arising out of or relating in any way to this Agreement or the Transaction or the other transactions contemplated hereby (a "***Dispute***"), the Parties shall, within three Business Days following receipt of the written request of a Party desiring to file any such Proceeding (the "***Mediation Request***"), submit the Dispute to the American Arbitration Association ("***AAA***") to be mediated under its Commercial Mediation Procedures.  The Mediation Request shall describe in reasonable detail the subject of the Dispute and the relief requested.  The mediation shall be held in Detroit, Michigan or such other place as the Parties may mutually agree in writing.  The Parties shall have 15 calendar days from receipt of a Mediation Request to select a mediator from the AAA National Roster of Mediators.  The Parties shall cooperate with AAA and with one another in selecting a mediator and in scheduling the mediation proceedings.  If no mediator has been agreed upon and selected by the Parties within 15 calendar days of receipt of a Mediation Request, then any Party may request (on written notice to the other Party) that AAA appoint a mediator from the AAA National Roster of Mediators.  The Parties agree that they will participate in the mediation in good faith and that they will share equally in its costs.  If the Dispute has not been resolved within 30 calendar days after the appointment of a mediator, or within such longer period as the Parties may agree to in writing, either Party may commence a Proceeding in accordance with Section 7.10; provided, however, that (i) if one Party fails to participate in the mediation, the other Party may commence a Proceeding in accordance with Section 7.10 prior to the expiration of the time periods set forth above, and (ii) notwithstanding anything to the contrary set forth herein, any Party may commence a Proceeding at any time in accordance with Section 7.10 solely to pursue any provisional injunctive, specific performance or other equitable remedy in accordance with Section 7.9 in the event such Party is being threatened with imminent irreparable harm.

Section 7.12   Waiver of Jury Trial.  EACH PARTY TO THIS AGREEMENT WAIVES TRIAL BY JURY IN ANY PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION PROCEDURE BROUGHT BY OR AGAINST EITHER OF THEM AGAINST OR BY THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE ADMINISTRATION THEREOF OR THE TRANSACTION OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE ADMINISTRATION THEREOF OR THE TRANSACTION OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN.  NO PARTY HERETO WILL SEEK TO CONSOLIDATE ANY SUCH PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EACH PARTY TO THIS AGREEMENT CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT OR INSTRUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 7.12. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER

52

170999.00004/150266115v.9

CONFIDENTIAL

FBG_CH1_00094075

PARTY THAT THE PROVISIONS OF THIS <u>SECTION 7.12</u> WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

Section 7.13   <u>Severability</u>.   If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the Transaction and the other transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Transaction and the other transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

Section 7.14   <u>Counterparts; Language</u>.  This Agreement may be executed in two or more counterparts, all of which shall be considered an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more such counterparts have been signed by each Party and delivered (by facsimile, email or otherwise) to the other Party.  Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" format, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signatures.

Section 7.15   <u>Expenses</u>.  Whether or not the Closing takes place, and except as expressly set forth otherwise in this Agreement, all costs, fees and expenses incurred in connection with this Agreement, the Transaction and the other transactions contemplated hereby shall be paid by the Party incurring such expense.

Section 7.16   <u>Interpretation; Absence of Presumption</u>.  It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants and agreements contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy between the Parties as to whether any obligation, item or matter not described in this Agreement or included or not included in the Disclosure Schedules is or is not material for purposes of this Agreement.  Nothing herein (for the avoidance of doubt, including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceeding, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or any Law. For the purposes of this Agreement: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms Article, Section, Exhibit and Schedule are references to the Articles, Sections, Exhibits and Schedules to this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto and the words "date hereof" refer to the date of this Agreement; (d) references to "$" mean U.S. dollars; (e) the word "including" and

53

170999.00004/150266115v.9

words of similar import when used in this Agreement and the Transaction Documents mean "including, without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (i) Seller and Purchaser have each participated in the negotiation and drafting of this Agreement and the other Transaction Documents and if an ambiguity or question of interpretation should arise, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement or the other Transaction Documents; (j) a reference to any Person includes such Person's successors and permitted assigns; (k) any reference to "days" means calendar days unless Business Days are expressly specified; (l) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (m) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (n) any reference to a Law means such Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (o) any reference to a Contract or instrument means such Contract or instrument as amended, supplemented and modified from time to time.

Section 7.17   <u>Waiver of Conflicts Regarding Representation; Nonassertion of Attorney-Client Privilege</u>.

(a)   Purchaser waives and will not assert, and agrees to cause its Affiliates, including, from and following the Closing, the Purchased Entities, to waive and not assert, any conflict of interest arising out of or relating to the representation, after the Closing (the "***Post-Closing Representation***"), of Seller or any of its Affiliates, or any shareholder, officer, employee or director of Seller or any of its Affiliates (any such Person, a "***Designated Person***"), in any matter involving this Agreement, the other Transaction Documents or any other agreements, the Transaction or any other transactions contemplated hereby or thereby, by any legal counsel currently representing any Designated Person in connection with this Agreement, the other Transaction Documents or any other agreements, the Transaction or any other transactions contemplated hereby or thereby, including Jones Day (any such representation, the "***Current Representation***").

(b)   Purchaser waives and will not assert, and agrees to cause its Affiliates, including, from and following the Closing, the Purchased Entities, to waive and not assert, any attorney-client or other applicable legal privilege or protection with respect to any communication between any legal counsel and any Designated Person (including with respect to any communication occurring at or prior to the Closing, the Business) concerning the Current Representation (the "***Privileged Communications***") or in connection with any Post-Closing Representation, including in connection with a dispute with Purchaser or its Affiliates (including, following the Closing, any Purchased Entity), it being the intention of the Parties that all such rights to such attorney-client and other applicable legal privilege or protection and to control such attorney-client and other applicable legal privilege or protection shall be retained by Seller and its Affiliates and that Seller,

54

170999.00004/150266115v.9

CONFIDENTIAL                                                                     FBG_CH1_00094077

and not Purchaser or its Affiliates or the Purchased Entities, shall have the sole right to decide whether or not to waive any attorney-client or other applicable legal privilege or protection. Accordingly, from and after Closing, none of Purchaser or its Affiliates, including the Purchased Entities, shall have any access to any such communications or to the files of the Current Representation, all of which shall be and remain the property of Seller and not of Purchaser or their Affiliates, including the Purchased Entities, or to internal counsel relating to such engagement, and none of Purchaser or its Affiliates, including, following the Closing, the Purchased Entities, or any Person acting or purporting to act on their behalf shall seek to obtain the same by any process on the grounds that the privilege and protection attaching to such communications and files belongs to Purchaser or its Affiliates, including, following the Closing, the Purchased Entities, or does not belong to Seller.  Notwithstanding the foregoing, in the event that a dispute arises between Purchaser or its Affiliates, including, following the Closing, the Purchased Entities, on the one hand, and a third party other than Seller or its Affiliates, on the other hand, Purchaser or its Affiliates, including, following the Closing, the Purchased Entities, may seek to prevent the disclosure of the Privileged Communications to such third party and request that Seller not permit such disclosure, and Seller shall consider such request in good faith.

Section 7.18   Disclosure Schedules.  The Disclosure Schedules, and all schedules and attachments attached thereto, and all Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement and Section 7.16 shall apply to the Disclosure Schedules.  Any information, item or other disclosure set forth in any Section of the Disclosure Schedules shall be deemed to be disclosed with respect to the corresponding Section of this Agreement and to any other Section of this Agreement (or to have been set forth in any other Section of the Disclosure Schedules), if the relevance of such disclosure to such other Section is reasonably apparent on its face, notwithstanding the omission of a reference or a cross-reference with respect thereto and notwithstanding any reference to a Section of the Disclosure Schedules in such Section of this Agreement.  Disclosure of any fact or item in the Disclosure Schedules shall not necessarily mean that such fact or item is material and shall not affect the interpretation of such term for the purposes of this Agreement.  It may be that certain facts and items disclosed in the Disclosure Schedules are not material and are not required to be disclosed pursuant to the terms of this Agreement. Such facts and items are being disclosed for informational purposes only. No disclosure in the Disclosure Schedules relating to a possible breach or violation of any Contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. The Disclosure Schedules are not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller or the Company, except to the extent expressly provided in Article III, as applicable, and shall not be deemed to expand in any way the scope or effect of any of such representations or warranties expressly provided in Article III, as applicable.

Section 7.19   Indemnification.

(a)   Subject to this Section 7.19, Parent and Seller agree to jointly and severally indemnify and hold Purchaser and its Affiliates and each of their respective owners, officers, directors, managers, members, employees, agents and representatives (collectively, the "***Purchaser Indemnified Persons***") harmless from and against any and all Losses that any

55

170999.00004/150266115v.9

FBG_CH1_00094078

Purchaser Indemnified Person actually suffers or incurs arising out of, based upon, relating to or resulting from (i) all Taxes (or the nonpayment thereof) of any Purchased Entity for any Pre-Closing Tax Period; (ii) all Taxes of any member of an affiliated, combined or unitary group of which any Purchased Entity is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar state, local or foreign Law; (iii) any and all Taxes of any Person (other than a Purchased Entity) imposed on such Purchased Entity as a transferee or successor, by contract other than any Commercial Tax Agreement or pursuant to any Law, which Taxes relate to an event or transaction occurring on or before the Closing Date; (iv) the Excluded Employees and Excluded Assets; and (v) the matters set forth on Section 7.19(a) of the Disclosure Schedules.

(b)     The right for a Purchaser Indemnified Person to seek indemnification in accordance with this Section 7.19, will survive for the shorter of (i) six years from the Closing Date or (ii) 60 days after the expiration of any applicable statute of limitations for the underlying claim (including any suspension, waiver or extension thereof). Any claim for indemnification not made by Purchaser on or prior to the date of termination set forth in this Section 7.19(b) will be irrevocably and unconditionally released and waived.

(c)     The liability of Parent and Seller in respect of claims of the Purchaser Indemnified Persons under Section 7.19(a) shall not exceed, in the aggregate, the Final Purchase Price.

(d)     The amount of any Losses for which indemnification is provided under Section 7.19(a) will be computed net of any insurance proceeds actually paid to the Purchaser Indemnified Persons in connection with such Losses, minus the aggregate cost of pursuing any related insurance claims including any out-of-pocket expenses and attorneys' and other professional fees and expenses incurred relating to the recovery of such insurance proceeds and any related increases in insurance premiums or other chargebacks ("***Recovery Proceeds***"). If a Purchaser Indemnified Person receives Recovery Proceeds in connection with Losses for which it has received indemnification, Purchaser will refund to Seller the amount of such Recovery Proceeds when received, up to the amount of indemnification received. The Parties agree that any indemnification payments made pursuant to this Agreement shall be treated for tax purposes as an adjustment to the Final Purchase Price, unless otherwise required by applicable Law.

(e)     If there occurs an event which Purchaser asserts is an indemnifiable event pursuant to Section 7.19(a), Purchaser shall promptly notify Seller, which notice shall specify the nature and basis of such claim and the amount thereof, to the extent known (a "***Liability Claim***"). If such event involves any claim or the commencement of any Proceeding by a third Person (a "***Third Party Claim***"), Purchaser will give Seller prompt written notice of such claim or the commencement of such Proceeding (the "***Claim Notice***"), which Claim Notice shall describe the nature and basis of such claim and the amount thereof, to the extent known, and shall be accompanied by copies of all relevant documentation with respect to such claim, including any summons, complaint or other pleadings that may have been served, any written demand or any other relevant document or instrument; provided, however, that the failure to provide such prompt notice will not relieve Seller or Parent of its obligations hereunder except to the extent such failure materially prejudices Seller or Parent, as applicable, hereunder.

56

170999.00004/150266115v.9

CONFIDENTIAL                                                                                 FBG_CH1_00094079

**DEBTORS' EXHIBIT NO. 237**
**Page 57 of 104**

(f)      Seller or Parent shall promptly, but no later than 30 days from the receipt of the Claim Notice (the "***Notice Period***") notify the Purchaser Indemnified Person: (i) with respect to a direct claim by the Purchaser Indemnified Person against Seller or Parent, whether or not Seller and Parent dispute the their liability to the Purchaser Indemnified Person hereunder with respect to such Liability Claim; and (ii) with respect to a Third Party Claim, whether or not Seller and Parent desire, at their sole cost and expense, to defend against such Liability Claim, provided that the Purchaser Indemnified Person is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading and to take any other action which the Purchaser Indemnified Person shall deem necessary or appropriate to protect the Purchaser Indemnified Person's interests. With respect to the 30-day period following a Claim Notice, the Purchaser Indemnified Person shall allow Seller, Parent and their professional advisors to reasonably investigate the matter or circumstance alleged to give rise to the Liability Claim, and whether and to what extent any amount is payable in respect of the Liability Claim.

(g)      In the case of a Third Party Claim, if Seller or Parent notifies the Purchaser Indemnified Person within the Notice Period that Seller or Parent desires to defend the Purchaser Indemnified Person against such Liability Claim, except as hereinafter provided, Seller or Parent shall have the right to defend against, negotiate, settle or otherwise deal with any such Liability Claim; provided, that (i) the defense of such Liability Claim by Seller or Parent will not, in the reasonable judgment of the Purchaser Indemnified Person, have a material adverse effect on the Purchaser Indemnified Person (other than as a result of money damages), (ii) the Liability Claim does not seek an injunction or other equitable relief, (iii) the Liability Claim does not include criminal charges, (iv) Seller and Parent both expressly agree in writing to be responsible for defending against such Liability Claim, and (v) unless the Purchaser Indemnified Person otherwise agrees in writing, neither Seller not Parent may settle any matter (in whole or in part) unless such settlement includes a complete and unconditional release of all Purchaser Indemnified Persons.

(h)      If Seller and Parent fail to give notice to the Purchaser Indemnified Person during the Notice Period that either one of them will defend against a Liability Claim in connection with a Third Party Claim, then the Purchaser Indemnified Person, without waiving any rights against Seller and Parent, may defend against any such Liability Claim at its sole cost and expense, and if it is ultimately determined that the Indemnifying Party is responsible therefor under this Section 7.19, then the Purchaser Indemnified Person shall be entitled to recover from Seller and Parent the amount of any settlement or judgment; provided, however, that if the Purchaser Indemnified Person has assumed the defense pursuant to Section 7.19, the Purchaser Indemnified Person shall not agree to any settlement without the written consent of Seller and Parent (which consent shall not be unreasonably withheld or delayed).

(i)      Notwithstanding anything in this Section 7.19 to the contrary, the Purchaser Indemnified Persons shall not be entitled to be compensated more than once by Parent and Seller for the same Loss.

(j)      No Purchaser Indemnified Person shall be entitled to recover any indemnification payment or other amounts due from Seller or Parent under this Section 7.19 by retaining and setting off the amounts (whether or not such amounts are liquidated or reduced to judgment) against any amounts due or to become due under this Agreement or under any document delivered pursuant hereto or in connection herewith, including any Transaction Document.

57

170999.00004/150266115v.9

CONFIDENTIAL                                                          FBG_CH1_00094080

(k)     The Parties shall reasonably cooperate with each other with respect to resolving any claim or liability with respect to which Seller is obligated, or allegedly obligated, to indemnify a Purchaser Indemnified Person under this Agreement, including by making all commercially reasonable efforts to mitigate or resolve any such claim or liability in accordance with applicable Law.

(l)     Subject to Section 2.4, the indemnification provided in this Section 7.19, subject to the limitations set forth herein, will be the sole and exclusive post-Closing remedy available to the Purchaser Indemnified Persons in connection with any Losses arising out of or resulting from this Agreement, the transactions contemplated hereby or Purchaser's ownership or operation of the Purchased Entities, whether based in contract or tort (including negligence) or otherwise predicated on common law standards, strict liability or otherwise; provided, however, that neither the provisions of this Section 7.19(l) nor any other provision of this Agreement will prevent or limit a cause of action at Law or in equity (a) for Fraud, (b) under Section 7.9 to obtain an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, or (c) in connection with any other Transaction Document.

*[Remainder of page intentionally left blank]*

58

170999.00004/150266115v.9

CONFIDENTIAL                                                                                 FBG_CH1_00094081

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

SELLER:

**GRAMMER, INC**

By: _____
Name: Guoqiang Li
Title:   President


By: _____
Name: Bogang Cai
Title:   Vice President


*[Signatures continue on the following page.]*


*[Signature Page to Limited Liability Company Interest Purchase Agreement]*

CONFIDENTIAL

FBG_CH1_00094082

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

SELLER:

GRAMMER, INC.

By: _____
Name: Guoqiang Li
Title:   President


By: _____
Name: Bogang Cai
Title:   Vice President


*[Signatures continue on the following page.]*


*[Signature Page to Limited Liability Company Interest Purchase Agreement]*

CONFIDENTIAL

FBG_CH1_00094083

**PARENT:**

**GRAMMER AG**

By: _____
Name: Jens Oehlenschlaeger
Title:   Chief Executive Officer

By: _____
Name: Jurate Keblyte
Title:   Chief Financial Officer

*[Signatures continue on the following page.]*

*[Signature Page to Limited Liability Company Purchase Agreement]*

CONFIDENTIAL

FBG_CH1_00094084

**PURCHASER:**

**APC PARENT, LLC**

By: _Michael Baker_
Name: Michael Baker
Title: Chief Corporate Strategy Officer

[*Signature Page to Limited Liability Company Interest Purchase Agreement*]

CONFIDENTIAL                                                                                      FBG_CH1_00094085

**DEBTORS' EXHIBIT NO. 237**
**Page 63 of 104**

## **Exhibit A**

Form of Restrictive Covenants Agreement

CONFIDENTIAL

FBG_CH1_00094086

*Execution Version*

## RESTRICTIVE COVENANTS AGREEMENT

This **RESTRICTIVE COVENANTS AGREEMENT** (this "*Agreement*"), dated as of September 20, 2024 (the "*Effective Date*"), is made and entered into by and among APC Parent, LLC, a Delaware limited liability company ("*Buyer*") and Grammer, Inc., a Minnesota corporation (the "*Restricted Party*"). The Buyer and the Restricted Party are sometimes referred to in this Agreement collectively as the "*Parties*" or individually as a "*Party*".

### RECITALS

A.      This Agreement is being entered into in connection with that certain Limited Liability Company Interest Purchase Agreement, dated as of September 20, 2024 (as amended, modified or supplemented from time to time, the "*Purchase Agreement*"), by and among the Parties hereto and others, pursuant to which Buyer is purchasing all of the outstanding limited liability company interests of Toledo Molding & Die, LLC, a Delaware limited liability company (including any Subsidiary of Toledo Molding & Die, LLC, the "*Acquired Company*"). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

B.      The Restricted Party, as the Seller, stands to substantially benefit from the Buyer's performance of its obligations under, and consummation of the transactions contemplated by, the Purchase Agreement.

C.      To induce the Buyer to enter into and perform the transactions contemplated by the Purchase Agreement, the Restricted Party has agreed to execute this Agreement for the benefit of the Buyer and its Affiliates.

D.      Capitalized terms used in this Agreement and not otherwise defined herein have the meanings given to them in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      **Acknowledgements and Agreements**.  The Restricted Party acknowledges and agrees that, in connection with the operation and ownership of the Business (as defined below) prior to the Effective Date, the Restricted Party was brought into frequent contact, either in person, by telephone or through the mails, with existing and prospective customers of the Acquired Company or the Business.  The Restricted Party also agrees that trade secrets and other confidential business and professional information of the Acquired Company, as more fully described in **Section 6**, have been developed by the Acquired Company through substantial expenditures of time, effort and money, and constitute valuable and unique property of the Acquired Company.  The Restricted Party further understands and agrees that, in view of the foregoing, the Buyer has a legitimate business interest that make it necessary for the protection of the Business that the Restricted Party does not compete with the Buyer, or any of its respective Affiliates (including the Acquired Company) for a reasonable period after the Effective Date, as further provided in this Agreement.

2.      **Covenants Not to Compete**.

(a)      <u>Non-Competition</u>.  During the period beginning on the Effective Date and ending on the five-year anniversary of the Effective Date (such period, the "*Restricted Period*"), the

1

CONFIDENTIAL                                                                FBG_CH1_00094087

**DEBTORS' EXHIBIT NO. 237**
**Page 65 of 104**

Restricted Party will not, directly or indirectly, and will cause the Restricted Party's Affiliates not to, directly or indirectly:

(i)     enter into, engage in, consult, manage or otherwise participate in the operation of any business that competes with the Business within the Restricted Territory (as defined below);

(ii)     solicit customers, suppliers, business, patronage or orders for, or sell, any products or services in competition with, or for, any business, wherever located, that competes with the Business within the Restricted Territory;

(iii)     divert, entice or otherwise take away, or attempt to divert, entice or otherwise take away, any business, patronage, orders or any existing customers of the Acquired Company; or

(iv)     promote or assist, financially or otherwise, any Person engaged in any business that competes with the Business within the Restricted Territory.

(b)     <u>Activities of the Restricted Party</u>. For the purposes of this **Section 2** and **Section 3**, but without limitation hereof, the Restricted Party will be in violation hereof if the Restricted Party engages in any or all of the activities set forth herein directly on the Restricted Party's own account, or indirectly as a stockholder, member, owner, partner, joint venturer, lender, financing source, guarantor, agent or consultant of any Person; except, <u>that</u>, nothing contained in this **Section 2(b)** will prohibit the Restricted Party or any of the Restricted Party's Affiliates from acquiring or holding at any one time a passive investment of less than 2% of the outstanding shares of capital stock of any publicly traded corporation that may compete with the Buyer or the Business within the Restricted Territory.

(c)     <u>The Buyer</u>. For purposes of this **Section 2** and **Section 3**, **Section 4** and **Section 5**, the Buyer include any and all direct and indirect subsidiaries, parents, Affiliates or related companies of the Buyer, including the Acquired Company.

(d)     <u>Restricted Territory</u>.   For the purposes of this Agreement, the "***Restricted Territory***" means: (i) the United States of America; and (ii) Mexico.

(e)     <u>Business</u>. For purposes of this Agreement, "***Business***" means the manufacturing and distribution of engineered plastics injection and blow-molded products for automotive applications with respect to automotive blow molded HVAC ducts and fluid reservoirs, sold to automotive OEMs and Tier I suppliers; <u>provided</u>, that nothing in this Agreement will prevent the Restricted Party or its Affiliates from (i) manufacturing and distributing engineered plastics injection and blow-molded products for automotive applications with respect to interior products, including panels, consoles, dash components, plastic injection molding, hard plastics and trim components or (ii) distributing fluid reservoirs that have been already sourced or are currently being manufactured as of the Effective Date.

3.     **Non-Solicitation**. The Restricted Party will not, and will cause the Restricted Party's Affiliates not to, directly or indirectly, during the Restricted Period solicit for employment or hire any of the employees of the Acquired Company employed by the Acquired Company as of the Effective Date; <u>provided</u>, <u>however</u>, nothing in this Section 3 will prohibit a Restricted Party or any Affiliate of such Restricted Party from hiring any Person who (a) responds to a general solicitation or posted open position not targeted at any such Persons or (b) whose employment with the Acquired Company was terminated

2

NAI-1540978920v4

CONFIDENTIAL

FBG_CH1_00094088

three months prior to any such solicitation or hiring. The Restricted Party acknowledges that this covenant is necessary to enable the Buyer and the Acquired Company to maintain a stable workforce and remain in business.

4. **Non-Disparagement**. The Restricted Party will not, and will cause the Restricted Party's Affiliates not to, in any manner, directly or indirectly, orally or otherwise, during the Restricted Period, disparage or damage, or engage in conduct that could disparage or damage, the reputation, goodwill or standing in the community of the Buyer or any of its respective Affiliates (including the Acquired Company), employees, officers, directors or managers.

5. **Confidentiality**. The Restricted Party will, and will cause the Restricted Party's Affiliates to, keep in strict confidence, and will not, and will cause the Restricted Party's Affiliates not to, directly or indirectly, during the Restricted Period, disclose, furnish, disseminate, make available or use any trade secrets or other intellectual property or confidential business, proprietary and technical information of the Acquired Company, whatever its nature and form and without limitation as to when or how such information was acquired. Such confidential information includes the unique selling and servicing methods, training, service and business manuals, promotional materials, training courses and other training and instructional materials, manufacturing and distribution processes, engineering methods, vendor and product information, customer and prospective customer lists, other customer and prospective customer information and other business information and know-how of the Acquired Company. The Restricted Party specifically acknowledges that all such confidential information, whether reduced to writing or maintained on any form of electronic media and whether compiled by the Acquired Company or the Restricted Party, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, that reasonable efforts have been made by the Buyer, the Acquired Company and the Restricted Party to maintain the secrecy of such information, that such information is the sole property of the Buyer and the Acquired Company, and that any retention and use of such information by the Restricted Party will constitute a misappropriation of the Buyer's trade secrets.

6. **Relief**. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Parties in accordance with their specific terms, or were otherwise breached, and that any threatened or actual breach of the provisions of this Agreement would result in irreparable injury to the Buyer and that remedy at law alone would be an inadequate remedy for such breach. It is accordingly agreed that the Buyer will be entitled to (a) specific performance of this Agreement by the Restricted Party and other equitable relief as remedies for such threatened or actual breach of this Agreement by the Restricted Party, (b) both temporary and permanent injunctive relief (to the extent permitted by law) to prevent threatened or actual breaches of this Agreement by the Restricted Party, (c) enforce specifically the terms and provisions hereof, and that this will include the right of the Buyer to cause the Restricted Party to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and applicable laws, in each case of clauses (a)-(c), without the requirement of posting a bond or other security as a prerequisite to obtaining equitable relief. Such remedies will, however, be cumulative and not exclusive and will be in addition to any other remedies which any Party may have under this Agreement or otherwise. Each of the Parties hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, and (ii) any requirement under any law to post a bond or other security as a prerequisite to obtaining equitable relief.

7. **Reasonableness**. The Restricted Party acknowledges that the Restricted Party's obligations under this Agreement are reasonable in the context of the nature of the Business and the competitive injuries likely to be sustained by the Buyer if the Restricted Party was to violate such obligations. The Restricted Party further acknowledges that this Agreement is made in consideration of,

3

NAI-1540978920v4

FBG_CH1_00094089

and is adequately supported by, the agreement of the Buyer to perform its obligations under the Purchase Agreement and by other consideration, which the Restricted Party acknowledges constitutes good, valuable and sufficient consideration.

8.      **No Assignment; Successors and Assigns**.  No Party may assign its rights and obligations under this Agreement without the prior written consent of the Buyer, in the case of the Restricted Party, or the Restricted Party, in the case of Buyer.  Notwithstanding the foregoing, the Buyer may, without the consent of the Restricted Party, assign its rights and obligations under this Agreement (a) to any lender of the Buyer or any of its Affiliates for collateral security purposes, (b) to any purchaser of all or substantially all of the assets of the Buyer or any of its Affiliates or (c) to any of its Affiliates.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns.

9.      **Headings**.  The headings contained in this Agreement are included for purposes of convenience only and do not affect the meaning or interpretation of this Agreement.

10.     **Integration, Modification and Waiver**.  This Agreement and the Purchase Agreement, together with the schedules, exhibits, annexes and certificates or other instruments delivered hereunder and thereunder, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior understandings of the Parties.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by the Buyer and the Restricted Party.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the Restricted Party, in the case of a waiver by the Restricted Party, or the Buyer, in the case of a waiver by the Buyer.

11.     **Construction**.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, then this Agreement will be construed as drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Unless otherwise indicated to the contrary herein by the context or use thereof:  (a) any reference to any federal, state, local or foreign statute or law will be deemed also to refer to all rules and regulations promulgated thereunder; (b) all references to the preamble, recitals, Sections, Articles, Schedules, exhibits or annexes are to the preamble, recitals, Sections, Articles, Schedules, exhibits or annexes of or to this Agreement; (c) the words "herein", "hereto", "hereof" and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; (d) masculine gender will also include the feminine and neutral genders, and vice versa; (e) words importing the singular will also include the plural, and vice versa; (f) the words "include", "including" and "or" will mean without limitation by reason of enumeration; and (g) all references to "$" or dollar amounts are to lawful currency of the United States of America.

12.     **Severability**.  Any term or provision of this Agreement that is adjudged invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is adjudged so broad as to be unenforceable, such provision will be interpreted to be only as broad as is enforceable.

13.     **Notices**.  Any notice or other communication required, permitted or provided for herein or given hereunder to any Party must be in writing and (a) sent by electronic mail, (b) delivered in person, (c) mailed by first class registered or certified mail, postage prepaid, or (d) sent by Federal Express or other overnight courier of national reputation, addressed as follows:

4

NAI-1540978920v4

CONFIDENTIAL                                                                                 FBG_CH1_00094090

    (i)     If to the Restricted Party:

Grammer, Inc.
1475 Technology Drive
Building J, Suite A
Troy, MI 48983
Attention: Legal Department
Email: justin.cousino@grammer.com

with a copy to:

Jones Day
901 Lakeside Avenue
Cleveland, OH 44114
Attention: Benjamin Stulberg
Email: blstulberg@jonesday.com

    (ii)    If to the Buyer:

Shekhar Kumar
c/o First Brands Group
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Legal Department
Email: legalcontracts@firstbrandsgroup.com

or to such other address with respect to a party as such party notifies the other parties in writing as above provided. Each such notice or communication will be effective (A) if given by electronic mail, when electronic evidence of transmission is received, (B) if given in person, upon delivery or refusal of delivery, (C) if given by registered or certified mail, five Business Days after being sent, or (D) if given by Federal Express or other overnight courier, one Business Day after being dispatched.

14.     **Third Party Beneficiaries**. Each Party intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any Person other than the Parties; provided, however, that the Parties hereby acknowledge and agree that each Affiliate of the Buyer is an express third party beneficiary of this Agreement and is entitled to enforce the this Agreement as if such Affiliate were a direct party hereto.

15.     **Governing Law**. This Agreement will be governed by and construed and enforced in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.

16.     **Consent to Jurisdiction and Service of Process**. The Parties submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or, if the Delaware Court of Chancery declines to accept jurisdiction over a particular matter, then any state or federal court within the State of Delaware) in respect of the interpretation and enforcement of the provisions of this Agreement and waive, and will not assert, any defense in any Proceeding for the interpretation or enforcement of this Agreement, that they are not subject to the courts' jurisdiction or that the Proceeding may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts or that their respective property is exempt or immune from execution, that the Proceeding is brought in an inconvenient forum or that the venue of the Proceeding is improper. Service

5

NAI-1540978920v4

CONFIDENTIAL

FBG_CH1_00094091

of process with respect thereto may be made upon the Parties by mailing a copy thereof by registered or certified mail, postage prepaid, to that Party at the applicable address provided in **Section 13**.

       17.     **Waiver of Jury Trial**. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

       18.     **Further Assurances**. From and after the Effective Date, at the request of a Party, each other Party will execute and deliver, or cause to be executed and delivered, to the requesting Party such instruments or other documents to such Party in addition to those required by this Agreement, as such Party may reasonably request, in order to implement the transactions contemplated by this Agreement.

       19.     **Counterparts; Electronic Delivery**. This Agreement may be executed in separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Delivery of an executed signature page to this Agreement by electronic transmission (including documents in Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Agreement.

**[Signature Pages Follow]**

6

NAI-1540978920v4

CONFIDENTIAL

FBG_CH1_00094092

IN WITNESS WHEREOF, the Parties have duly executed this Agreement, or have caused this Agreement to be duly executed, as of the date first written above.

**APC PARENT, LLC**


By: _____

Name: Michael Baker

Title: Chief Corporate Strategy Officer

[Signature Page to Restrictive Covenants Agreement]

CONFIDENTIAL                                                            FBG_CH1_00094093

**THE RESTRICTED PARTY**:

**GRAMMER, INC.**


By: _____
Name: Guoqiang Li
Title:   President



By: _____
Name: Bogang Cai
Title:   Vice President


[Signature Page to Restrictive Covenants Agreement]

CONFIDENTIAL                                                    FBG_CH1_00094094

**Exhibit B**

Form of Transition Services Agreement

CONFIDENTIAL

FBG_CH1_00094095

*Execution Version*

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of September 20, 2024 (the "Closing Date"), is made by and between Grammer, Inc., a Minnesota corporation ("Seller") and APC Parent, LLC, a Delaware limited liability company ("Purchaser"). Seller and Purchaser are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein without definition shall have the respective meaning given to such terms in the Purchase Agreement (as defined below).

## RECITALS:

1.     Seller, Purchaser and Parent (as defined therein) have entered into that certain Limited Liability Company Purchase Agreement (the "Purchase Agreement"), dated as of the Closing Date, pursuant to which, among other things, Seller desires to sell, assign, transfer and deliver to Purchaser, and Purchaser desires to purchase, acquire and assume, from Seller the Interests.

2.     The Parties desire to enter into this Agreement to set forth the terms and conditions under which Seller or its applicable Affiliates will provide, or cause to be provided, certain transition services to Purchaser or its applicable Affiliates following the Closing Date and Purchaser or its applicable Affiliates will provide, or cause to be provided, certain transition services to Seller or its applicable Affiliates following the Closing Date.

3.     The Purchase Agreement provides that, in connection with the consummation of the transactions contemplated thereby, the Parties will enter into this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## INTERPRETIVE MATTERS

1.1     Interpretation; Absence of Presumption.  For the purposes of this Agreement: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms Article, Section, Exhibit and Schedule are references to the Articles, Sections, Exhibits and Schedules to this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto and the words "date hereof" refer to the date of this Agreement; (d) references to "$" mean U.S. dollars; (e) the word "including" and words of similar import when used in this Agreement and the Transaction Documents mean "including, without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (i) Seller and Purchaser have each participated in the negotiation and drafting of this Agreement and if an

1

NAI-1540275737v4

FBG_CH1_00094096

ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any of the provisions in this Agreement; (j) a reference to any Person includes such Person's successors and permitted assigns; (k) any reference to "days" means calendar days unless Business Days are expressly specified; (l) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (m) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (n) any reference to a Law means such Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (o) any reference to a Contract or instrument means such Contract or instrument as amended, supplemented and modified from time to time.

## ARTICLE II

## THE SERVICES

2.1     <u>The Services</u>.  Subject to the terms and conditions of this Agreement, (a) from the date of this Agreement until the expiration of the applicable service period set forth on <u>Schedule I</u> or earlier termination in accordance with this Agreement, Seller or its applicable Affiliates will provide, or cause to be provided in accordance with <u>Section 2.5</u>, to Purchaser and its Affiliates, the services specifically set forth on <u>Schedule I</u> attached to this Agreement and incorporated herein by reference and all other activities ancillary thereto that are not described on such Schedule but which are required for the proper performance or delivery of such services, and (b) from the date of this Agreement until the expiration of the applicable service period set forth on <u>Schedule II</u> or earlier termination in accordance with this Agreement, Purchaser and its Affiliates will provide, or cause to be provided in accordance with <u>Section 2.5</u>, to Seller and its Affiliates, the services specifically set forth on <u>Schedule II</u> attached to this Agreement and incorporated herein by reference and all other activities ancillary thereto that are not described on such Schedule but which are required for the proper performance or delivery of such services ((a) and (b), collectively, the "<u>Services</u>", and <u>Schedule I</u> and <u>Schedule II</u>, collectively, the "<u>Services Schedules</u>"). A Party that is obligated to provide or cause to be provided, a Service to another Party or its applicable Affiliates under this Agreement is referred to herein, with respect to such Service and such other Party or its applicable Affiliates, as a "<u>Provider</u>." Any Person that is entitled to receive a Service from a Provider under this Agreement is referred to herein, with respect to such Service and such Provider, as a "<u>Recipient</u>."

2.2     <u>Access; Cooperation and Assistance</u>.

(a)     <u>Access</u>.  Recipients will provide, and will cause the other Recipients to provide, to the Affiliates, directors, officers, managers, employees, agents, representatives, successors, assigns, accountants and advisors (collectively, "<u>Representatives</u>") of Provider (i) all information and materials necessary to enable the Providers to provide the applicable Services to the Recipients and (ii) access to the premises, facilities, assets and personnel of the Recipients to the extent reasonably necessary for Provider to fulfill its obligations under this Agreement;

2

CONFIDENTIAL                                                    FBG_CH1_00094097

provided, that such access (A) will remain subject to the confidentiality and systems access provisions set forth in Article V and (B) will occur during regular business hours unless otherwise reasonably required for the performance of the Services at issue.

(b)      Cooperation and Assistance.  Recipient shall, and shall cause the other Recipients to, provide all reasonable cooperation and assistance reasonably required by the Providers (including any Subcontractors) to enable them to provide the Services to the Recipients and comply with this Agreement. Notwithstanding the foregoing provision of this Section 2.2(b), Provider's obligations to provide the Services are conditional upon the Recipients providing such cooperation and assistance to the extent necessary to enable the applicable Provider to provide the Services. During the term of this Agreement, Provider shall use commercially reasonable efforts to make available, during normal business hours and upon reasonable prior written request, its and the other Provider's employees providing the applicable Services for reasonable consultation with the applicable Recipient so long as such consultation does not unreasonably interfere with the normal operations of the applicable Provider.

2.3      Transitional Nature of the Services.  The Parties acknowledge the transitional nature of the Services. Accordingly, as promptly as practicable following the execution of this Agreement, each Party will use its commercially reasonable efforts to make a transition of each Service to its own internal organization or to a third party provider.

2.4      Subcontractors.  Provider shall not delegate or subcontract to any Person, or utilize any Provider, contractor, consultant, or other Person (each, a "Subcontractor") in connection with, its performance of any Service without Recipient's prior written consent (which consent shall not be unreasonably withheld); provided that, Provider may continue to delegate, subcontract to, or utilize any Subcontractor in connection with its performance of a Service to the extent such Service was delegated, or subcontracted to such Subcontractor, or such Subcontractor was utilized to provide such Service, to the Business, as of immediately prior to the date of the Purchase Agreement and the Closing Date or the date such Service was last provided to Recipient if earlier. Provider and its Affiliates acknowledge that notwithstanding any delegation or subcontracting of, or utilization of any Subcontractor in connection with, any of its performance under this Agreement to any Person, Provider shall remain fully responsible and liable for the provision of the Services and its Affiliates' and such Subcontractor's compliance with the terms and conditions of this Agreement (including the standards of performance set forth herein), and any act or omission (including any breach of this Agreement) by any of its Affiliates or such Subcontractor (as if they were the Provider hereunder) shall constitute an act or omission (or breach, if applicable) under this Agreement by Provider.

2.5      Nature of Relationship.  Each Party, on its behalf and on behalf of its Affiliates, acknowledge and agree that this Agreement does not create a fiduciary relationship, partnership, joint venture or relationships of trust or agency between the Parties and that all Services are provided by the Providers solely as independent contractors. Any employees of any Provider (collectively, the "Service Personnel") performing the Services under this Agreement will remain employees of such Provider, and will not be deemed to be employees of any Recipient for any purpose. The Providers will be solely responsible for the supervision and control of the Service Personnel and for payment of compensation to the Service Personnel. Each Provider assumes full responsibility for payment of all federal, state and local Taxes or contributions imposed or required

3

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094098

under unemployment insurance, social security and income Tax Laws with respect to its Service Personnel.

2.6     Limitations on the Provision of Services. Notwithstanding anything to the contrary set forth herein:

(a)     In providing the Services, at no time will any data network of any Recipient be connected to any data network of any Provider or any of its Affiliates without the prior written consent of Seller and Purchaser, and Seller and Purchaser will have sole control of any connection mechanism between such data networks unless the Parties expressly agree otherwise in writing.

(b)     No Party shall be obligated to provide, or to cause any other Provider or the respective Representatives of such Party and the other Providers to provide, and none of the information or Services provided shall be construed to provide, any legal, financial, accounting or Tax advice to the other Party or any other Recipient as part of or in connection with the Services provided hereunder or otherwise.

(c)     Either Party may, with respect to any part of the Services affected by a change in any Law that makes the provision of all or a portion of the Services illegal or otherwise prohibited, terminate that part of the Services. For the avoidance of doubt, no Party shall be obligated to provide or procure the provision of, or cause any Provider or their respective Representatives to provide or procure the provision of, any Services to the extent the provision of such Services would violate any Law.

2.7     Intellectual Property.

(a)     Nothing set forth in this Agreement shall or is intended to transfer or assign any Intellectual Property Rights from one Party or any of its Affiliates to the other. Except as expressly provided for under the terms of the Purchase Agreement and the other Transaction Documents, each Party acknowledges, for itself and on behalf of its Affiliates, that neither Party nor any of its Affiliates shall acquire any right, title or interest (except for the express license rights set forth in Section 2.7(b)) in any Intellectual Property Rights or other Technology which are owned or licensed by the other Party or its Affiliates. Recipient shall not remove or alter any copyright, trademark, confidentiality or other proprietary notices that appear on any Intellectual Property Rights or other Technology owned or licensed by any Provider, its Affiliates or third-party service providers and Recipient shall not reproduce any such notices on any and all copies thereof.  Recipient shall not attempt to decompile or reverse engineer copies of any software owned or licensed by any Provider, that is provided in object code form only, and each Recipient shall promptly notify the applicable Provider of any such attempt, regardless of whether by such Recipient or any third party, of which such Recipient becomes aware.

(b)     Without affecting the rights and obligations of the Parties in the Purchase Agreement and the other Transaction Documents, with respect to each of the Services: each Party (on behalf of itself and each of its applicable Affiliates) hereby grants to the other Party and its applicable Affiliates, and such other Party (on behalf of itself and its Affiliates) hereby accepts, a nonexclusive, nontransferable (subject to Section 7.6), worldwide right, as applicable for the

4

NAI-1540275737v4

CONFIDENTIAL

duration of the Services as set forth on the applicable Schedule to use the Intellectual Property Rights owned by such Party (or its applicable Affiliate) only to the extent necessary and for the sole purpose of receiving the Services under this Agreement, and not for any other purpose.

(c)     Provider acknowledges and agrees that Recipient shall own all right, title, and interest in and to all Recipient Data (as defined below) (including all Intellectual Property Rights therein and thereto). Provider hereby assigns to Recipient all right, title, and interest in and to all Recipient Data. "Recipient Data" means all data or information of any of the Recipient or its business that is collected, processed, generated, calculated, derived, stored by or on behalf of, or transmitted to or for, Provider in connection with this Agreement (including the receipt or use of any Service).

2.8     Force Majeure.  Except as to payments required under this Agreement, if any default or delay occurs which prevents or materially impairs a Party's performance and is due to a cause beyond the Party's reasonable control, and provided that the default or delay is not caused by or the fault of such Party and such failure or delay cannot reasonably be circumvented through the use of alternate sources, workaround plans or other means (including by invoking any business continuity or disaster recovery plans in place), including to an act of God, flood, fire, explosion, earthquake, casualty, accident, war, revolution, civil commotion, pandemic, blockade or embargo, injunction, Law, or proclamation (any of the foregoing, a "Force Majeure Event"), the affected Party will promptly notify the other Party in writing of such Force Majeure Event and will use commercially reasonable efforts to resume performance under this Agreement as soon as possible. No Party will be liable to any other Party for any Loss if and to the extent (and for so long as) due to such Force Majeure Event so preventing or impairing such Party's performance hereunder, and Recipient's obligation to pay any costs, fees, or amounts hereunder shall be waived, in each case, for such time as Provider's performance is prevented or impaired because of a Force Majeure Event.

2.9     Right to Change Practices; Maintenance.  Each Party acknowledges and agrees that the provision of the Services is subject to any upgrades, changes and modifications (including in the manner and timing of performance) that such Party (or any other Provider or their respective Subcontractors, as the case may be) may implement to its information technology or other services that are performed for itself or any of its Affiliates. Nothing herein shall prohibit a Party from making such changes as it deems necessary or appropriate in its sole discretion (including upgrading or changing technology, software or information systems used by it in connection with this Agreement and replacing third-party Providers) and applying such changes, to the extent applicable, to the Services. Notwithstanding any of the foregoing, nothing in this Agreement shall require a Party to modify or change any of its information technology or other services in order to provide the Services. A Party may, in its reasonable discretion, suspend the provision of Services (or any part thereof) for reasons of preventative or emergency maintenance with respect to the information technology or computer systems.

2.10     Third Party Consents.  Provider's obligation to provide the Services shall be subject to the existing (as of the Closing Date) third-party contractual obligations (including all licenses with third parties), prohibitions or restrictions applicable to the Services. This Agreement shall not obligate any of the Providers to violate any such obligation, prohibition or restriction; provided, however, that Provider shall (and shall cause the other Providers to) reasonably cooperate to obtain

5

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094100

a modification to such obligation, prohibition or restriction or otherwise reasonably accommodate the Recipients to allow the Recipients to receive the benefit of the impacted Service. In addition, and without prejudice to the foregoing, if any Provider is only permitted under the terms of any existing (as of the Closing Date) contract, prohibition or restriction to carry out any of the Services, as applicable, if it first obtains a Third Party Consent:

   (a) Purchaser may seek to obtain (and Seller shall and cause the Providers to cooperate with Purchaser in obtaining) such Third Party Consent for the applicable Provider at Purchaser's cost (or reimburse the applicable Provider for the costs of such Third Party Consent to the extent incurred by the applicable Provider);

   (b) Seller's obligations to provide all Services to the Recipients that require such Third Party Consent shall be conditional upon the applicable Provider first receiving such Third Party Consent, and this Agreement shall not obligate Seller to provide any such Services unless and until such Third Party Consent has been obtained; and

   (c) the Providers shall not have any obligation to incur any costs or expenses or pay any fees or other amounts in connection with the obtaining of any such Third Party Consent.

  2.11 <u>Transition Manager</u>. Each of Seller and Purchaser shall, within five days after the Closing Date, appoint a transition manager (each, a "<u>Transition Manager</u>") who shall serve as the primary point of contact for each of Seller and Purchaser with respect to the administration of this Agreement and any dispute resolution procedures arising in connection with this Agreement.

ARTICLE III

COMPENSATION

  3.1 <u>Terms of Payment and Related Matters</u>. As consideration for the provision of the Services, each Party (as Recipient) shall or shall cause the applicable Recipients to pay to the applicable Provider the amount specified for each Service as set forth in the applicable Services Schedule (or with respect to Omitted Services, the amount as determined in accordance with this Agreement). In addition to such amounts, in the event that Provider incurs out-of-pocket expenses whether in connection with the provision of Services or the early termination of Services pursuant to <u>Section 4.2</u>, Recipient will reimburse Provider for all such expenses. The Parties acknowledge and agree that Provider may incur certain costs and expenses in connection with the termination of certain Services, whether or not the Services are terminated early. To the extent Provider incurs any such costs and expenses, they will be included as out-of-pocket expenses to be reimbursed by Recipient to Provider. The Parties also acknowledge and agree that its usage of the Services may result in the Providers incurring costs and expenses in any month that exceed the amount of any fixed monthly fee set forth on the Services Schedules. To the extent that any Provider so incurs costs and expenses during any month that exceed the fixed monthly fee for a Service set forth on <u>Schedule I</u> as a result of the Recipient's usage of such Service, Purchaser agrees to reimburse Purchaser for the amount that such costs and expenses exceed the fixed monthly fee.

  3.2 <u>Taxes</u>. Except with respect to Taxes relating to the Service Personnel described in <u>Section 2.5</u>, Recipient will be responsible for Taxes imposed or assessed as a result of the provision

6

NAI-1540275737v4

of Services by Provider, and shall promptly reimburse Provider upon reasonable receipt of evidence that Provider paid any such Taxes.

3.3     Payments on Behalf of Recipient.  Notwithstanding anything to the contrary in this Agreement, to the extent the provision of any Service requires a Provider to deliver funds to any Person on behalf of Recipient (including payroll, expense reimbursement and allowance Services) the amount to be delivered shall be paid by Recipient to Provider at least three Business Days prior to the date the applicable Service will be provided (for avoidance of doubt, Provider's failure to timely perform any Service as a result of Recipient's failure to timely pay amounts contemplated hereby shall not be a breach of this Agreement by Provider).

3.4     No Right to Set-Off or Withholding.  Each Party will pay the full amounts of, and will not set-off, counterclaim or otherwise withhold from, all amounts, fees, costs and expenses owed to the other Party under this Agreement with respect to the Services, including those amounts set forth in Section 3.1 and Section 3.2, or owed under the Purchase Agreement. If any applicable Law requires the deduction or withholding of any Tax from any such payment by such Party or one of its Affiliates, then such Party or its applicable Affiliate (a) shall be entitled to make such deduction or withholding, (b) shall timely pay the full amount deducted or withheld to the relevant taxing authority in accordance with applicable Law and (c) shall increase the amounts payable to the such Party of such payment such that such Party receives an amount equal to the sum it would have received had no such deduction or withholding been made.

3.5     Invoices.  Provider will deliver invoices to Recipient as soon as practicable after the end of every month during the term of this Agreement setting forth, in reasonable detail, the amounts owed by Recipient to Provider under this Agreement for the prior month, including the fees set forth on the Services Schedules and any out-of-pocket expenses reimbursable according to this Agreement that were incurred by Provider during such month. Recipient shall pay, or shall cause to be paid, all amounts shown to be due on such invoice to Provider or its designee within 15 days after the date of delivery of such invoice, unless Recipient reasonably disputes in good faith any amounts set forth in such invoice. In the event of an invoice dispute, Recipient shall deliver a written statement to Provider prior to the date payment is due on the disputed invoice listing all disputed items and providing a reasonably detailed description of each disputed item, which disputed item(s) shall be resolved in good faith between the Parties in accordance with Section 7.1 and the other terms of this Agreement. Amounts not so disputed shall be deemed accepted and shall be paid, notwithstanding disputes on other items, within the period set forth in this Section 3.5.


ARTICLE IV

TERM; TERMINATION

4.1     Term.  The term of this Agreement will commence on the Closing Date and will, unless terminated earlier in accordance with Section 4.2, continue until the close of business on the last date set forth in the Services Schedules (as extended).

7

CONFIDENTIAL

FBG_CH1_00094102

4.2     Termination.  All or any part of any Services may be terminated by Recipient, in its sole discretion, at any time during the term of this Agreement by furnishing 30 days' prior written notice to the Provider, which such written notice shall specify (a) the Service (or portion thereof) being terminated and (b) the date on which the Service (or portion thereof) will be terminated. If Provider is in material breach of any of its obligations under this Agreement and Provider does not cure such breach within 30 days after receiving written notice thereof from Recipient, Recipient may terminate in whole or in part the provision of Services to such Party as Recipient pursuant to this Agreement immediately by providing written notice of termination to Provider, provided, however, that if Recipient, with respect to any Service, is in material breach of this Agreement, Provider's obligations to provide such Service is excused and Provider may suspend such Service until Recipient cures its material breach. Either Party may terminate this Agreement in whole or in part upon prior written notice to the other Party if (x) such non-terminating Party fails to pay the terminating Party the portion of an invoiced amount due and payable under Section 3.1 and Section 3.2 not reasonably and in good faith disputed by such non-terminating Party (provided that such non-terminating Party provides detail supporting why it reasonably disputes any portion of an invoiced amount) or indemnify the terminating Party pursuant to Section 6.2(b), (y) the terminating Party provides the non-terminating Party with a written notice of such failure (which shall include specific details of such failure and an express written statement that such the terminating Party intends to terminate this Agreement unless such failure is remedied within 30 days after the date on which the non-terminating Party receives such notice), and (z) the non-terminating Party fails to pay such undisputed invoiced amount or indemnify the terminating Party pursuant to Section 6.2(b) within 30 days after the date on which the non-terminating Party receives such notice. In addition, either Party may terminate this Agreement by written notice effective immediately by mutual written consent of the Parties.

4.3     Effect of Expiration or Termination.  In the event of any termination of this Agreement or any Service pursuant to the terms hereof, Provider shall be entitled to all outstanding amounts due from Recipient for the Services rendered prior to the effective date of such termination. Notwithstanding anything to the contrary in this Agreement, the provisions of Articles V, VI and VII will survive any expiration or termination of this Agreement and Recipient will remain obligated for all amounts owed under Section 3.1 and Section 3.2 in respect of Services that were provided hereunder prior to the expiration or termination of this Agreement or the early termination of any particular Service pursuant to Section 2.1.

ARTICLE V

CONFIDENTIAL INFORMATION; SYSTEMS; DATA PROTECTION

5.1     Treatment of Confidential Information.  Each Party will, and will cause its Affiliates and its and their respective Representatives to, keep confidential and not disclose any and all data, materials, intellectual property, Personal Data or other information of the other Party that would reasonably be expected to be confidential or proprietary based on the substance of the information or the context in which it is disclosed ("Confidential Information"); provided, however, that that each Party may disclose Confidential Information of the other Party, to the extent not prohibited by applicable Law: (a) to its Representatives on a need-to-know basis in connection with the performance of such Party's obligations under this Agreement; (b) in any report, statement, testimony or other submission required to be made to any Governmental Entity

8

NAI-1540275737v4

FBG_CH1_00094103

having jurisdiction over the disclosing Party; or (c) in order to comply with applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing Party in the course of any litigation, investigation or administrative proceeding. In the event that a Party becomes legally compelled (based on advice of counsel) by deposition, interrogatory, request for documents subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information of the other Party, such disclosing Party shall (to the extent permitted by Law) provide the other Party with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other Party (at such other Party's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege. In the event that such protective order or other similar remedy is not obtained, the disclosing Party shall furnish only that portion of the Confidential Information that is required to be disclosed by Law (based on advice of counsel), and shall exercise its commercially reasonable efforts (at such other Party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information. For the avoidance of doubt, and notwithstanding anything in this Article V to the contrary, all Personal Data must only be disclosed or used in a manner that is consistent with applicable Laws.

      5.2    Systems.

      (a)    If Service Personnel receive access to a Recipient's computer facilities, system(s), networks (voice or data), servers, or software (collectively, the "Recipient's Systems") in connection with performance of the Services, each Provider will ensure that its Service Personnel comply with all system security policies, procedures, and requirements that may be agreed to in writing and in advance by such Recipient and the Provider from time to time (the "Recipient's Security Regulations"). The Providers will use commercially reasonable efforts to prevent the unauthorized access, destruction, alteration, or loss of information contained in the Recipient's Systems by any Service Personnel. The Providers will immediately notify Purchaser of any discovery that any (i) Service Personnel has sought to circumvent or has circumvented the Recipient's Security Regulations, (ii) unauthorized Person has accessed the Recipient's Systems, or (iii) Service Personnel has engaged in activities that have led or may lead to the unauthorized access, destruction or alteration or loss of data, information or software in the Recipient's Systems. Upon the occurrence of such an incident described in the preceding sentence, at the Recipient's request, (A) the applicable Service Personnel's access to the Recipient's Systems will be terminated, to the extent feasible, and (B) the applicable Provider will reasonably cooperate with any investigation by such Recipient regarding such incident.

      (b)    If personnel of any Recipient receive access to a Provider's computer facilities, system(s), networks (voice or data), servers, or software, including facilities, system(s), networks (voice or data), servers, software, or other related infrastructure shared by any Provider and any Recipient (collectively, the "Provider's Systems") in connection with the Services, the Recipients will ensure that such personnel comply with all system security policies, procedures, and requirements that may be provided in advance by such Provider to the Recipient in writing from time to time (the "Provider's Security Regulations"). Recipient will use commercially reasonable efforts to prevent the unauthorized access, destruction, alteration, or loss of information contained in the Provider's Systems by any Recipient personnel. Recipient will immediately notify Provider of any discovery that any (i) Recipient personnel has sought to

9

NAI-1540275737v4

circumvent or has circumvented the Provider's Security Regulations, (ii) unauthorized Person has accessed the Provider's Systems, (iii) Recipient personnel has engaged in activities that have led or may lead to the unauthorized access, destruction or alteration or loss of data, information or software in the Provider's Systems, or (iv) Recipient personnel has accessed any Provider's Systems or other data or information of any Provider that is unrelated to the provision and receipt of Services hereunder ("Data Security Incident on Provider's Systems"). Upon the occurrence of such Data Security Incident on Provider's Systems, Provider, in its sole discretion, may: (A) terminate the applicable Recipient personnel's access to the Provider's Systems or other data or information of any Provider, to the extent feasible, and (B) terminate the Service related to the Data Security Incident on Provider's Systems. Recipient will reasonably cooperate with any investigation by such Provider regarding such incident.

(c)     Provider will have no obligation to, and the Services do not include any obligation to, set up, prepare, update, maintain or otherwise assist any Recipient with any Recipient's Systems.

(d)     To the extent that any Recipient data is combined or comingled with such other data and information of Provider during the provision or receipt of the Services, the Parties will discuss and use good faith efforts to implement measures to protect and maintain the ongoing confidentiality of such data, which may include additional "clean team" safeguards.

5.3     Data Protection.   Where, in connection with this Agreement, a Party or any of its Affiliates has access to any data, information or record that is processed in connection with the Services relating to an identified or identifiable natural person of the other Party or any of its Affiliates ("Personal Data"), each Party agrees to (and to cause its respective Affiliates to) with respect to such Personal Data:

(a)     comply with applicable data protection Laws;

(b)     ensure that any Person that it authorizes to process Personal Data (including its staff, subcontractors and Representatives) is subject to a duty of confidentiality (whether a contractual or a statutory duty);

(c)     implement appropriate and commercially reasonable technical and organizational measures designed to protect Personal Data and designed to ensure a level of security appropriate to the risk presented by processing the Personal Data and designed to protect against unauthorized or unlawful processing and against accidental loss, destruction, damage, alteration or disclosure of the Personal Data;

(d)     to the extent required by applicable Law, notify the other Party in a reasonable time period if it receives a request from a Person to exercise any of such Person's rights under applicable data protection Laws. The Recipient will be responsible for responding to such a request in accordance with applicable Law. The Provider will provide commercially reasonable assistance, as needed, to enable the Recipient to respond to the request. Recipient will cover Provider's reasonable expenses, including the time expended by its employees, in complying with such requests;

10

NAI-1540275737v4

CONFIDENTIAL

(e)     to the extent required by applicable Law, maintain security incident management policies and procedures and notify the other Party without undue delay upon becoming aware of a data security incident that results in the loss or unauthorized disclosure of the Personal Data under its direct control due to some fault of the Party; and

(f)     securely delete or securely return all Personal Data of the other Party if requested when the Services terminate in accordance with this Agreement, unless otherwise required by applicable Law.

Further, Recipient agrees it will transfer any Personal Data under an appropriate data transfer arrangement where required by applicable Law or regulation, and Recipient agrees that Provider may appoint and use sub-processors to process the Personal Data in connection with the Services.

ARTICLE VI

QUALITY OF SERVICES; INDEMNIFICATION; LIMITATIONS ON LIABILITY

6.1     Quality of Services.  Each Party, on its behalf and on behalf of its Affiliates, acknowledges and agrees that the Parties, in their capacity as Providers, are not in the business of providing services to third parties and are entering into this Agreement as an accommodation to Recipient and the other Recipients in connection with the Purchase Agreement.  Provider agrees to (and will cause any other Providers to) perform the Services at substantially the same levels, volume and scope and in substantially the same manner as performed for the Business immediately prior to the Closing Date, except to the extent that this Agreement (including the Schedules hereto) states that the Services will be provided at reduced levels or that the applicable Provider is restricted by an existing contract with a third party or by Law.  No Provider shall be under any obligation to perform any Services at a level, volume and scope greater or in an manner substantially different than what it performed for the Business immediately prior to the Closing Date.  In the event there is any restriction on a Provider by an existing contract with a third party or by Law that would restrict the standard of care applicable to delivery of the Services to be provided by such Provider to the Recipient, the applicable Provider shall use its commercially reasonable efforts in good faith to provide such Services in a manner as closely as possible to the standards described in this Section 6.1. Recipient, on its behalf and on behalf of its Affiliates, acknowledges and agrees that, except as expressly set forth in this Section 6.1, neither Provider nor any other Provider makes any representations and warranties of any kind, implied or expressed, with respect to the Services, including any warranty of merchantability or fitness for a particular purpose, which are all specifically disclaimed.

6.2     Indemnification.

(a)     Subject to Section 6.3, except for the amounts, Tax, cost and expense allocations expressly set forth in other provisions of this Agreement, each Provider hereby agrees to indemnify, defend and hold harmless each applicable Recipient and its Affiliates and Representatives from and against any and all Losses arising from, relating to or in connection with (i) the gross negligence, fraud, willful misconduct, or breach of Section 5.1 by such Provider in connection with the provision of the applicable Services, or (ii) the breach by Provider of any

11

NAI-1540275737v4

CONFIDENTIAL                                                  FBG_CH1_00094106

representation, warranty, covenant or agreement contained in this Agreement, except in each case to the extent that such Losses arise out of, relate to or are a consequence of Recipient's or its Affiliates' or Representatives' gross negligence, fraud or willful misconduct or breach of any representations, warranty, covenant or agreement contained in this Agreement.

(b)     Subject to Section 6.3, except for the amounts, Tax, cost and expense allocations expressly set forth in other provisions of this Agreement, each Recipient hereby agrees to indemnify, defend and hold harmless each applicable Provider and its Affiliates and Representatives from and against any and all Losses arising from, relating to or in connection with (i) the gross negligence, fraud, willful misconduct, violation of Law or breach of Section 5.1 by such Recipient in connection with receipt of the applicable Services, (ii) the breach by such Recipient of any representation, warranty, covenant or agreement contained in this Agreement, or (iii) the provision of any Services by such Provider and its Affiliates and Representatives hereunder, or any use of such Service by the Recipient, any of its Affiliates or any other Person, except in each case to the extent that such Losses arise out of, relate to or are a consequence of the applicable Provider or its Affiliates' or Representatives' gross negligence, fraud or willful misconduct or breach of any representations, warranty, covenant or agreement contained in this Agreement.

6.3     Limitations on Damages. Except with respect to breaches of Section 5.1 and the other Liability Exceptions, notwithstanding anything to the contrary in this Agreement or at law, in equity or otherwise, no Party shall be liable to any other Person for any losses arising out of this Agreement or the Services for punitive, indirect, or consequential damages (including loss of profits or diminution in value) however caused, under any theory of liability except to the extent any such damages are awarded by a court of competent jurisdiction to a third party. Except for amounts payable pursuant to Section 4.3, Article III, or breaches of Section 5.1 or in connection with any Liability Exception, in no event will a Party's or its Affiliates' maximum aggregate liability for any and all claims arising out of or in connection with this Agreement, whether such liability arises from any claim based upon contract, warranty, tort, failure of essential purpose, trade usage or otherwise, exceed the aggregate amount of fees actually received by such Party (as a Provider) and its Affiliates under this Agreement in respect of the particular Services giving rise to such claim. "Liability Exception" means a Party's or its Affiliates' fraud, gross negligence, willful misconduct or intentional breach of this Agreement, in each case, in providing Services.

ARTICLE VII

MISCELLANEOUS

7.1     Dispute Resolution.  Prior to and as a condition of either Party's filing of any Proceeding in state or federal court in accordance with Section 7.2 below to resolve any and all Disputes, the Parties shall, within three Business Days following receipt of the written Mediation Request, submit the Dispute to the AAA to be mediated under its Commercial Mediation Procedures. The Mediation Request shall describe in reasonable detail the subject of the Dispute and the relief requested. The mediation shall be held in Detroit, Michigan or such other place as the Parties may mutually agree in writing. The Parties shall have 15 calendar days from receipt of a Mediation Request to select a mediator from the AAA National Roster of Mediators. The Parties shall cooperate with AAA and with one another in selecting a mediator and in scheduling the

12

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094107

mediation proceedings. If no mediator has been agreed upon and selected by the Parties within 15 calendar days of receipt of a Mediation Request, then any Party may request (on written notice to the other Party) that AAA appoint a mediator from the AAA National Roster of Mediators. The Parties agree that they will participate in the mediation in good faith and that they will share equally in its costs. If the Dispute has not been resolved within 30 calendar days after the appointment of a mediator, or within such longer period as the Parties may agree to in writing, either Party may commence a Proceeding in accordance with Section 7.2; provided, however, that (a) if one Party fails to participate in the mediation, the other Party may commence a Proceeding in accordance with Section 7.2 prior to the expiration of the time periods set forth above, and (b) notwithstanding anything to the contrary set forth herein, any Party may commence a Proceeding at any time in accordance with Section 7.2 solely to pursue any provisional injunctive, specific performance or other equitable remedy in accordance with Section 7.9 in the event such Party is being threatened with imminent irreparable harm.

7.2     Governing Law and Jurisdiction; Waiver of Jury Trial.

(a)     This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In addition, each Party (i) submits to the personal jurisdiction of the United States Court of Chancery of the State of Delaware (or if jurisdiction is not available in such court, then in the United States District Court for the District of Delaware or, if jurisdiction is not available in such court, then in the Superior Court of the State of Delaware), in the event that any dispute (whether in contract, tort or otherwise) arises out of this Agreement or the Transaction or the other transactions contemplated hereby, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any Proceeding relating to this Agreement or the Transaction or the other transactions contemplated hereby in any court other than the Court of Chancery of the State of Delaware (or if jurisdiction is not available in such court, then in the United States District Court for the District of Delaware or, if jurisdiction is not available in such court, then in the Superior Court of the State of Delaware), which shall be the exclusive jurisdiction and venue for any such Proceeding. Each Party agrees that service of process upon such Party in any such Proceeding shall be effective if notice is given in accordance with Section 7.5.

(b)     EACH PARTY TO THIS AGREEMENT WAIVES TRIAL BY JURY IN ANY PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION PROCEDURE BROUGHT BY OR AGAINST EITHER OF THEM AGAINST OR BY THE OTHER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE ADMINISTRATION THEREOF OR THE TRANSACTION OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. NO PARTY TO THIS AGREEMENT SHALL SEEK A JURY TRIAL IN ANY PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEDURE BASED UPON, OR ARISING OUT OF, THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE ADMINISTRATION THEREOF OR THE

13

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094108

TRANSACTION OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. NO PARTY HERETO WILL SEEK TO CONSOLIDATE ANY SUCH PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EACH PARTY TO THIS AGREEMENT CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT OR INSTRUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 7.2(B). NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION 7.2(B) WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

7.3     Entire Agreement.  This Agreement (including the Schedules hereto) constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter. In the event of a conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control. The Schedules to this Agreement is an integral part of this Agreement and is hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in the Schedules to this Agreement but not otherwise defined therein will have the meanings set forth in this Agreement.  In the event of any ambiguity or conflict between this Agreement an the Schedules, the terms and conditions of this Agreement shall control.

7.4     Amendments and Waivers.  This Agreement may not be amended or otherwise modified, except by an instrument in writing signed on behalf of each of the Parties. By an instrument in writing, Seller, on the one hand, or Purchaser, on the other hand, may waive compliance by the other with any term or provision of this Agreement that the other Party was or is obligated to comply with or perform. The waiver by any Party of a breach of any term or provision of this Agreement shall not be construed as a waiver, or estoppel with respect to, any subsequent breach. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

7.5     Notices.  All notices and other communications to be given to any Party shall be sufficiently given for all purposes hereunder if in writing and delivered by hand, courier, electronic mail or overnight courier (providing proof of delivery), and shall be directed to the addresses set forth below (or at such other address as such Party shall designate by like notice):

If to Seller:

Grammer, Inc.
1475 Technology Drive
Building J, Suite A
Troy, MI 48083
Attention: Legal Department
Email: justin.cousino@grammer.com

with a copy (which shall not constitute notice) to:

14

NAI-1540275737v4

FBG_CH1_00094109

**DEBTORS' EXHIBIT NO. 237**
**Page 87 of 104**

Jones Day
901 Lakeside Avenue
Cleveland, OH 44114
Attention: Benjamin Stulberg
Email: blstulberg@jonesday.com

And, if to Purchaser, to:

Shekhar Kumar
c/o First Brands Group
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention:  Legal Department
Email:  legalcontracts@firstbrandsgroup.com

7.6     Assignment.   Neither this Agreement nor any of the rights and obligations hereunder may be directly or indirectly pledged, assigned or transferred by either party (whether by operation of Law or otherwise) without the prior written consent of the other Party. Any attempted pledge, assignment or transfer in violation of this Section 7.6 shall be null and void ab initio. Subject to the two preceding sentences, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any Person, other than the Parties, any rights or remedies under or by reason of this Agreement; provided, however, that either Party may assign this Agreement, and any or all rights or obligations under this Agreement, to any of its Affiliates without the prior written consent of the other Party. No such assignment will release the assigning party from any liability under this Agreement.

7.7     Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be considered an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more such counterparts have been signed by each Party and delivered (by facsimile, email or otherwise) to the other Party. Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" format, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signatures.

7.8     Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the Transaction and the other transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Transaction and the other transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094110

7.9     Specific Performance.   Provider assumes an independent obligation to continue performance of Provider's obligations under this Agreement in all respects regardless of a dispute that may arise between Parties. Provider acknowledges that Recipient will be irreparably harmed and that there will be no adequate remedy at Law for any violation or threatened violation by Provider of any of the covenants or agreements contained in this Agreement. It is accordingly agreed that, in addition to any other remedies which may be available upon the breach of any such covenants or agreements, Recipient shall be entitled to equitable relief, without the proof of actual damages, including an injunction or injunctions or orders for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which it is entitled at Law or in equity as a remedy for any such breach or threatened breach. Provider agrees that Recipient shall not be required to (and Provider waives any right it may have to require Recipient to) obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 7.9. The Parties agree and acknowledge that time is of the essence with respect to Provider's performance of the Services.

7.10     Purchase Agreement.   Nothing contained herein is intended to modify, limit, or otherwise affect the representations, warranties, covenants, agreements, liabilities, and indemnifications contained in the Purchase Agreement, and such representations, warranties, covenants, agreements, liabilities, and indemnifications shall remain in full force and effect in accordance with the terms of the Purchase Agreement.

*[Remainder of this Page Intentionally Left Blank; Signature Page Follows]*

16

NAI-1540275737v4

CONFIDENTIAL

FBG_CH1_00094111

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.


**GRAMMER, INC.**


By: _____
Name: Guoqiang Li
Title:  President


By: _____
Name: Bogang Cai
Title:  Vice President


*[Signature Page to Transition Services Agreement]*

CONFIDENTIAL                                                    FBG_CH1_00094112

**PURCHASER:**

**APC PARENT, LLC**


By: _____
Name: Michael Baker
Title: Chief Corporate Strategy Officer

[*Signature Page to Transition Services Agreement*]

FBG_CH1_00094113

**<u>Exhibit C</u>**

Form of IP License Agreement

CONFIDENTIAL

FBG_CH1_00094114

*Execution Version*

# IP LICENSE AGREEMENT

This IP LICENSE AGREEMENT (this "***Agreement***") has been entered into as of September 20, 2024 (the "***Effective Date***") by and between Grammer, Inc., a Minnesota corporation ("***Seller***") and APC Parent, LLC, a Delaware limited liability company ("***Purchaser***"). Seller and Purchaser are sometimes referred to in this Agreement individually as a "***Party***" and collectively as the "***Parties***."

## INTRODUCTION

Reference is made to that certain Limited Liability Company Interest Purchase Agreement, dated as of the Effective Date hereof, by and among the Seller, Purchaser, and the other parties named therein (the "***Purchase Agreement***"), under which, among other things, the Parties have agreed to enter into this Agreement.

Seller and Purchaser agree that this Agreement is the IP License Agreement as defined in Section 2.3(a)(iv) of the Purchase Agreement.

In consideration of the representations, warranties, covenants and agreements contained in this Agreement and the Purchase Agreement, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1. DEFINITIONS

Capitalized terms used but not otherwise defined in this Agreement shall have their respective meanings as set forth in the Purchase Agreement. The following terms shall have the meanings indicated for the purposes of this Agreement:

"**Improvement**" shall mean any modification of or improvement or enhancement to the technology that is the subject of the Licensed Patents.

"**Licensed Patents**" shall mean the Patents listed below on Schedule I of this Agreement and the Patents that issue from such patent applications, including reissues, continuations, divisionals, re-examinations, renewals and extensions of the foregoing.

"**Licensed Products**" shall mean any products developed, manufactured, or commercialized by or on behalf of Purchaser or its Affiliates that would otherwise infringe one or more of claims to the Licensed Patents, absent this Agreement.

## 2. LICENSE GRANT TO PURCHASER

2.1     <u>License Grant</u>.   Seller hereby grants to Purchaser an exclusive, worldwide, irrevocable, royalty-free license to the Licensed Patents to make, use, sell, and import the Licensed Products in connection with the conduct of Purchaser's business. Purchaser may sublicense the Licensed Patents and Licensed Products to third parties, including but not limited to, its Affiliates and third-party toll producers for the limited purpose of making, using, selling, and importing the

CONFIDENTIAL                                                       FBG_CH1_00094115

**DEBTORS' EXHIBIT NO. 237**
**Page 93 of 104**

Licensed Patents and/or the Licensed Products in connection with the conduct of Purchaser's business.

2.2     Reservation of Rights.  Except as expressly provided under Section 2.1, all right, title and interest in and to the Licensed Patents shall remain solely and exclusively with Seller. Nothing contained in this Agreement shall be construed as conferring by implication, acquiescence, or estoppel any right or license upon Purchaser not provided under Section 2.1.

2.3     Improvements. All right, title, and interest in any Improvement conceived, made, or reduced to practice by Purchaser during the Term of this Agreement, and all of Purchaser's patents and patent applications claiming any such Improvements, will as between the Parties, remain the sole and exclusive property of Purchaser.

## 3.  RESTRICTIONS; PROTECTION; LIMITATIONS

3.1     Protection of Licensed Patents. Purchaser shall not, shall not attempt to, and shall not permit any third party to: (a) except as expressly permitted under Section 2.1, sublicense, lease, loan, sell, resell, market, transfer, rent, disclose, or distribute the Licensed Patents to any third party, (b) except as expressly permitted under Section 2.1, make any use of or perform any acts with respect to the Licensed Patents, or (c) file any application for any of the Licensed Patents.

3.2     Maintenance Fees. Seller agrees to pay maintenance fees and any annuities, whether for applications or patents for the Licensed Patents.

3.3     Notice of Infringement. The Parties will provide notice to each other in a reasonable time of any actual or suspected infringement of the Licensed Patents by a third party.

3.4     Enforcements. Seller shall prosecute, enforce, and defend the Licensed Patents, including without limitation against invalidity challenges and infringement matters, at its sole discretion, or as reasonably requested by Purchaser, each at its sole cost and expense (collectively referred to as "**_Enforcement_**"). Notwithstanding the foregoing, (i) Purchaser will provide any reasonably requested assistance with respect to such Enforcement, at its reasonable expense and (ii) further, as reasonably requested by Seller, Purchaser will agree to be joined in any such Enforcement action, to the extent necessary to maintain infringement on damages claims, at Seller's sole cost and expense. Purchaser shall have the right to retain its own counsel in such actions, at Purchaser's sole cost and expense.

3.5     Warranties. Seller represents and warrants: (i) it is the sole and exclusive owner of the entire right, title, and interest in and to the Licensed Patents; (ii) it has, and throughout the Term will retain, the right to grant the license granted to Purchaser hereunder, and neither it, nor its Affiliates have granted, or are under any obligation to grant, to any third party any license, lien, option, encumbrance, or other contingent or non-contingent right, title, or interest in or to the Licensed Patents that conflicts with the rights and licenses granted to Purchaser hereunder; and (iii) the Licensed Patents do not infringe the intellectual property rights of any third party, there is no settled, pending, or threatened litigation, claim, or proceeding alleging that any Licensed Patent right is invalid or unenforceable (including any interference, nullity, opposition, inter partes, or post-grant review or similar invalidity or patentability proceedings before the United States Patent

CONFIDENTIAL                                                                 FBG_CH1_00094116

and Trademark Office or any foreign patent office), and it has no knowledge of any factual, legal, or other reasonable basis for any such litigation, claim, or proceeding.

## 4. TERM

4.1     Term. The term of this Agreement shall commence on the Effective Date and shall continue until the last valid claim of the Licensed Patents has expired, unless earlier terminated upon mutual written agreement by the Parties.

## 5. INDEMNITY

5.1     Indemnity.  The Parties shall indemnify, defend and hold each other and their Affiliates harmless against any and all Losses, claims, actions, causes of action, Liabilities, demands, fines, judgements, damages and expenses suffered or incurred by a Party or its Affiliates in connection with any breach of this Agreement by the other Party.

## 6. MISCELLANEOUS

6.1     No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

6.2     Succession and Assignment. Seller may assign its rights and obligations under this Agreement to any third party in connection with the sale or transfer of a Licensed Patent from Seller to such third party.  Purchaser may not assign, directly or indirectly, any of its rights or delegate any of its obligations under this Agreement without Seller's prior written consent (which shall not be unreasonably withheld, conditioned or delayed) and any attempt to do so shall be void. Notwithstanding the foregoing, Purchaser may freely assign any or all of its rights or obligations under this Agreement to its Affiliate, any surviving corporation with or into which Purchaser may merge or consolidate, or an entity to which Purchaser transfers all, or substantially all, of its business and assets. Without limiting the foregoing, this Agreement shall be binding upon each Party's permitted successors and assigns.

6.3     Incorporation by Reference. Sections 7.1 (Entire Agreement), 7.4 (Amendments and Waivers), 7.5 (No Third-Party Beneficiaries), 7.6 (Notices), 7.10 (Governing Law and Jurisdiction), 7.11 (Dispute Resolution), 7.13 (Severability), 7.14 (Counterparts; Language), and 7.15 (Expenses) of the Purchase Agreement are incorporated herein by reference such that any reference to the Purchase Agreement in such provisions shall instead mean this Agreement.

*[Signature page follows]*

CONFIDENTIAL                                                                          FBG_CH1_00094117

IN WITNESS WHEREOF, each of Seller and Purchaser has caused this Agreement to be executed by a duly authorized officer as of the Effective Date.

**SELLER:**

**GRAMMER, INC.**


By: _____
Name: Guoqiang Li
Title:   President


By: _____
Name: Bogang Cai
Title:   Vice President


*[Signatures continue on the following page.]*


*[Signature Page to IP License Agreement]*


CONFIDENTIAL                                      FBG_CH1_00094118

**DEBTORS' EXHIBIT NO. 237**
**Page 96 of 104**

**PURCHASER:**

**APC PARENT, LLC**


By: _____
Name: Michael Baker
Title: Chief Corporate Strategy Officer

[*Signature Page to IP License Agreement*]

CONFIDENTIAL                                                                FBG_CH1_00094119

Schedule I

| Title | Owner | Jurisdiction | Status | Application No. & Date | Publication / Grant No. & Date |
|---|---|---|---|---|---|
| BACKMOLDING OF AN INSERTS MADE FROM A REINFORCED THERMOPLASTIC AND A FABRIC | Grammer, Inc. | International Application (European Patent Office) | ACTIVE | PCT/US20/42332 07/16/2020 | Publication No. - WO/2021/011774<br><br>Publication Date - 01/21/2021<br><br>(Relating to Patent No. 20210016519) |
| REINFORCED THERMOPLASTIC AND FABRIC INJECTION OVERMOLDING | Grammer, Inc. | United States | ACTIVE | 16/931,000 07/16/2020 | Publication No. - 20210016519<br><br>Publication Date - 01/21/2021 |
| REINFORCED THERMOPLASTIC AND FABRIC INJECTION OVERMOLDING | Grammer, Inc. | United States | ACTIVE | 20200931000 07/16/2020 | Grant No. - 11639036<br><br>Grant Date - 05/02/2023 |

[*Schedule I to IP License Agreement*]

CONFIDENTIAL

FBG_CH1_00094120

**Exhibit D**

Purchaser Guaranty

CONFIDENTIAL                                                                                     FBG_CH1_00094121

*Execution Version*

## GUARANTY

This Guaranty (this "***Guaranty***") is made as of September 20, 2024 (the "***Closing Date***"), by First Brands Group, LLC, a Delaware limited liability company ("***Guarantor***"), in favor of Grammer, Inc., a Minnesota corporation ("***Seller***"). Capitalized terms used but not defined in this Guaranty will have the meanings ascribed to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, Seller and APC Parent, LLC, a Delaware limited liability company ("***Purchaser***") have entered into a Limited Liability Company Interest Purchase Agreement dated as of the Closing Date (the "***Purchase Agreement***"), pursuant to which Purchaser has agreed to purchase from Seller all of the outstanding limited liability company interests of Toledo Molding & Die, LLC, a Delaware limited liability company (the "***Company***"), subject to the terms and conditions set forth therein;

WHEREAS, as an inducement to Seller to enter into the Purchase Agreement and consummate the transactions contemplated thereby, Guarantor has agreed to execute and deliver this Guaranty to Seller; and

WHEREAS, Guarantor will derive substantial benefit from the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

## AGREEMENT

1. Guaranty.

   (a) Guarantor hereby unconditionally and irrevocably guarantees to Seller the full and punctual payment and performance by Purchaser of all of its obligations under the Purchase Agreement, including, without limitation, the payment of the purchase price and any obligations therein (collectively, the "***Obligations***"). This Guaranty is a guaranty of payment and performance and not of collection, and the Obligations shall not be released, discharged, mitigated, impaired or affected by:

   i. any lack or limitation of status or power, or other such circumstance, including any dissolution, insolvency, bankruptcy, liquidation, winding-up or other proceeding relating to Purchaser;

   ii. any change in the name, control, objects, business, assets, capital structure, or constitution of Purchaser;

   iii. any extensions of time or indulgences which Seller or any of its Affiliates may extend to or make with Purchaser in respect of the performance of the Obligations;

   iv. any amendment, variation, modification, supplement or replacement of this Guaranty or the Purchase Agreement (except to the extent that such amendment, variation, modification, supplement or replacement affects the Obligations); and

   v. the occurrence of any change in the Laws of any jurisdiction or by any present or future action of any Governmental Entity amending, varying, reducing or otherwise affecting, or purporting to amend, vary, reduce or otherwise affect, any of the Obligations.

170999.00004/150578756v.4

CONFIDENTIAL

FBG_CH1_00094122

**DEBTORS' EXHIBIT NO. 237**
**Page 100 of 104**

      (b) Guarantor hereby waives, for the benefit of Seller, any right to require Seller, as a condition of performance by Guarantor of the Obligations, to proceed against Purchaser or pursue any other remedy whatsoever.

      2.   Assignment. This Guaranty shall be binding upon and inure to the benefit of Guarantor and Seller and their respective successors and assigns. No party may assign or transfer any of its rights or obligations under this Guaranty without the prior written consent of the other party.

      3.   Governing Law. This Guaranty shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its principles of conflicts of laws.

      4.   Jurisdiction. Guarantor hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware for any action or proceeding arising out of or relating to this Guaranty, and waives any objection to venue or convenience of forum.

      5.   Severability. If any provision of this Guaranty is held to be invalid, illegal, or unenforceable in any respect, such provision shall be modified or severed to the extent necessary to make it valid, legal, and enforceable, and the remaining provisions of this Guaranty shall remain in full force and effect.

      6.   Entire Agreement. This Guaranty and the Purchase Agreement constitute the entire agreement between Guarantor and Seller with respect to the subject matter hereof, and supersede all prior or contemporaneous agreements, understandings, or representations, whether written or oral.

      7.   Amendments. This Guaranty may not be amended, modified, or waived except by a written instrument signed by Guarantor and Seller.

*[Remainder of page intentionally left blank]*

CONFIDENTIAL

FBG_CH1_00094123

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first written above.

GUARANTOR:

FIRST BRANDS GROUP, LLC


By: _____
Name: Michael Baker
Title: Chief Corporate Strategy Officer

CONFIDENTIAL                                    FBG_CH1_00094124

*Execution Version*

**EXHIBIT E**

**Allocation Schedule**

Pursuant to Section 2.5 of the Agreement, the Parties agree to the allocation of the Final Purchase Price (including any assumed liabilities and capitalized costs) among the assets of the Company and any applicable state, local and non-U.S. income Tax Law in accordance with their respective fair market values as set forth in the following methodology:

| Asset Category | Asset Class | Allocation Methodology |
|---|---|---|
| Cash (cash, demand deposits, etc.) | I | Fair market value, equal to the actual balance on the books of the Company on the Closing Date, if any, which is expected to equal the amount, if any, reflected for such assets in the calculation of Cash Amounts as finally determined pursuant to the Agreement. |
| Accounts Receivable (accounts receivables, mortgages, etc.) | III | Fair market value, equal to the accounts receivable (not reduced for any payables) included in the determination of Closing Working Capital, or to the extent not reflected in Closing Working Capital, the book value as of the Closing Date. |
| Inventory (inventory, etc.) | IV | Fair market value, equal to the book value on the Closing Date. |
| Plant & Equipment | V | Fair market value, equal to the book value on the Closing Date. |
| Real Property & Land | V | Fair market value, equal to the appraised value, and if no appraisal is completed or available, it should then equal book value as of the Closing Date. |
| Toledo Molding de Mexico S.R.L de C.V. Stock | V | Fair market value of the shares of stock, equal to $5,867,627. |
| Prepaid Amounts and Other Class V Assets (assets other than Class I, II, III, IV, VI or VII, not separately listed for Class V) | V | Fair market value, equal to the book value on the Closing Date. |
| Section 197 intangibles, other than goodwill and going concern value | VI | Fair market value, equal to the residual amount after the allocation to Class I through Class V, not to exceed the book value on the Closing Date. |

NAI-1540860753v3

CONFIDENTIAL

FBG_CH1_00094125

| Asset Category | Asset Class | Allocation Methodology |
|---|---|---|
| Goodwill and Going Concern Value | VII | Fair market value, equal to the residual amount after the allocation to Class I through Class VI assets. |

The Parties agree that no amount shall be allocated to any restrictive covenants contemplated in the Agreement (or any other Transaction Documents).

NAI-1540860753v3

CONFIDENTIAL

FBG_CH1_00094126