EXECUTION VERSION

**AGREEMENT AND PLAN OF MERGER,**

dated as of November 22, 2023

among

HOPKINS ACQUISITION, INC.,

ONCAP INVESTMENT PARTNERS III, L.P.,

FIRST BRANDS GROUP, LLC

and

WEEKEND MERGER SUB, INC.

39329697.7

CONFIDENTIAL

FBG_CH1_00094127

**DEBTORS' EXHIBIT NO. 238**
**Page 1 of 133**

## TABLE OF CONTENTS

| | | Page |
|---|---|---|

ARTICLE I DEFINITIONS ...................................................................................................11

    1.1     Definitions .............................................................................................11

ARTICLE II THE TRANSACTIONS.......................................................................................24

    2.1     The Merger ...........................................................................................24
    2.2     Closing..................................................................................................24
    2.3     Effective Time and Effects of the Merger ...........................................25
    2.4     The Surviving Corporation. ..................................................................25
    2.5     Conversion of Shares in the Merger .....................................................25
    2.6     Treatment of Options............................................................................26
    2.7     Dissenting Shares..................................................................................27
    2.8     Closing of the Company's Transfer Books ...........................................27
    2.9     No Liability............................................................................................27
    2.10    Payments; Exchange of Certificates and Letter of Transmittals .........28
    2.11    Other Payments....................................................................................28
    2.12    Closing Deliveries. ...............................................................................29
    2.13    Merger Consideration Adjustment .......................................................30

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE COMPANY..................35

    3.1     Existence and Power.............................................................................35
    3.2     Authorization ........................................................................................35
    3.3     Enforceability .......................................................................................35
    3.4     Governmental and Third Party Authorizations.....................................36
    3.5     Noncontravention ..................................................................................36
    3.6     Capitalization; Subsidiaries. .................................................................36
    3.7     Financial Statements; Undisclosed Liabilities.......................................37
    3.8     Absence of Certain Changes..................................................................38
    3.9     Material Contracts. ...............................................................................41
    3.10    Material Customers and Suppliers........................................................43
    3.11    Suits .....................................................................................................43
    3.12    Compliance with Laws; Permits; Product Liability...............................44
    3.13    Title to Assets ......................................................................................45
    3.14    Intellectual Property; Information Technology; Privacy and Security...............45
    3.15    Insurance..............................................................................................48
    3.16    Real Property .......................................................................................48
    3.17    Employees.............................................................................................49
    3.18    Benefit Matters. ...................................................................................51
    3.19    Environmental Matters. ........................................................................54
    3.20    Taxes....................................................................................................55
    3.21    Brokers.................................................................................................57
    3.22    Affiliate Transactions ...........................................................................57
    3.23    Corporate Controls................................................................................57
    3.24    Accounting Controls..............................................................................58

- i -

39329697.7

CONFIDENTIAL

FBG_CH1_00094128

**TABLE OF CONTENTS**
(continued)

Page

3.25 Bank Accounts ................................................................................................58
3.26 Inventories ......................................................................................................58

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER AND
MERGER SUB ................................................................................................59
4.1 Existence and Power .......................................................................................59
4.2 Authorization ..................................................................................................59
4.3 Enforceability .................................................................................................59
4.4 Governmental and Third Party Authorizations ..............................................59
4.5 Noncontravention ...........................................................................................59
4.6 Litigation ........................................................................................................60
4.7 Brokers ...........................................................................................................60
4.8 Investment Representations ............................................................................60
4.9 Financing and Solvency ..................................................................................60

ARTICLE V COVENANTS OF THE COMPANY AND STOCKHOLDERS .........................61
5.1 Conduct of Business. ......................................................................................61
5.2 Stockholder Consent .......................................................................................63
5.3 No Solicitations ..............................................................................................63

ARTICLE VI COVENANTS OF BUYER .................................................................................63
6.1 Access to Books and Records .........................................................................63
6.2 Indemnification; Directors and Officers Insurance ........................................63
6.3 Releases ..........................................................................................................64
6.4 No Additional Representations ........................................................................65
6.5 R&W Policy ....................................................................................................65
6.6 Communications Prior to Closing ...................................................................66

ARTICLE VII COVENANTS OF BUYER AND THE COMPANY .........................................66
7.1 Confidentiality; Public Announcements. ........................................................66
7.2 Tax Matters .....................................................................................................67
7.3 Employees .......................................................................................................69
7.4 Section 280G ..................................................................................................69

ARTICLE VIII CONDITIONS TO CLOSING; TERMINATION .............................................70
8.1 Conditions to Obligation of Buyer and Merger Sub .......................................70
8.2 Conditions to Obligation of the Company ......................................................71
8.3 Frustration of Closing Conditions ..................................................................72
8.4 Waiver of Conditions ......................................................................................72
8.5 Termination .....................................................................................................72
8.6 Effect of Termination. ....................................................................................73

ARTICLE IX NO SURVIVAL ..................................................................................................73

39329697.7

CONFIDENTIAL                                                                                      FBG_CH1_00094129

**DEBTORS' EXHIBIT NO. 238**
**Page 3 of 133**

**TABLE OF CONTENTS**
(continued)

Page

9.1     Non-Survival of Representations and Warranties, Covenants and
        Agreements ...................................................................................................73

ARTICLE X SELLER REPRESENTATIVE ............................................................74

10.1    Seller Representative. .......................................................................................74
10.2    Exculpation. ......................................................................................................76
10.3    Indemnification..................................................................................................76
10.4    Reliance by Buyer.............................................................................................77
10.5    Expense Holdback Amount ..............................................................................77

ARTICLE XI MISCELLANEOUS...............................................................................78

11.1    Notices ...............................................................................................................78
11.2    Amendments and Waivers.................................................................................79
11.3    Expenses ............................................................................................................79
11.4    Successors and Assigns .....................................................................................79
11.5    Governing Law ..................................................................................................80
11.6    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial.....................80
11.7    Counterparts.......................................................................................................80
11.8    No Third Party Beneficiaries ............................................................................81
11.9    Entire Agreement...............................................................................................81
11.10   Disclosure Schedules .........................................................................................81
11.11   Captions .............................................................................................................81
11.12   Remedies; Specific Performance.......................................................................81
11.13   Severability........................................................................................................82
11.14   Interpretation......................................................................................................82
11.15   Privilege; Conflicts of Interest..........................................................................83
11.16   No Recourse Against Nonparty Affiliates.........................................................84
11.17   Prevailing Party .................................................................................................84

- iii -

39329697.7

CONFIDENTIAL

FBG_CH1_00094130

**EXHIBITS**

Exhibit A   –   Accounting Principles; Example Calculations

Exhibit B   –   Form of Escrow Agreement

Exhibit C   –   Form of Letter of Transmittal

Exhibit D   –   Form of Joinder Agreement

Exhibit E   –   Form of Certificate of Merger

- 4 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094131

| Defined Terms | Sections |
|---|---|
| 409A Plan | Section 3.18(k) |
| Accounting Principles. | Section 1.1 |
| Acquired Companies | Section 1.1 |
| Acquisition Proposal | Section 1.1 |
| Adjusted Adjustment Amount | Section 1.1 |
| Adjusted Closing Cash | Section 2.13(b) |
| Adjusted Closing Indebtedness | Section 2.13(b) |
| Adjusted Closing Net Working Capital | Section 2.13(b) |
| Adjusted Transaction Expenses | Section 2.13(b) |
| Adjustment Escrow Account | Section 2.11(d) |
| Adjustment Escrow Amount | Section 1.1 |
| Adjustment Time | Section 1.1 |
| Advisory Services Fee Letter | Section 1.1 |
| Affiliate | Section 1.1 |
| Agreement | Preamble |
| Ancillary Documents | Section 1.1 |
| Audited Financial Statements | Section 3.7(a)(i) |
| Base Merger Consideration | Section 1.1 |
| Books and Records | Section 1.1 |
| Business Day | Section 1.1 |
| Buyer | Preamble |
| Buyer Adjustment Amount | Section 2.13(d) |
| Buyer Fundamental Representations | Section 1.1 |
| Buyer Released Claims | Section 6.3(a) |
| Buyer Released Parties | Section 6.3(a) |
| Buyer Releasing Parties | Section 6.3(a) |
| Cash and Cash Equivalents | Section 1.1 |
| CERCLA | Section 1.1 |
| Certificate of Incorporation | Section 1.1 |
| Certificate of Merger | Section 2.3 |
| Claim | Section 6.3(a) |
| Closing | Section 2.2 |
| Closing Balance Sheet | Section 2.13(b) |
| Closing Cash | Section 1.1 |
| Closing Date | Section 2.2 |
| Closing Date Payoff Indebtedness | Section 1.1 |
| Closing Indebtedness | Section 1.1 |
| Closing Merger Consideration | Section 1.1 |
| Closing Net Working Capital | Section 1.1 |
| Closing Per Share Merger Consideration | Section 1.1 |
| Closing Statement | Section 2.13(b) |
| Closing Transaction Expenses | Section 1.1 |
| Code | Section 1.1 |

39329697.7

CONFIDENTIAL

FBG_CH1_00094132

**DEBTORS' EXHIBIT NO. 238**
**Page 6 of 133**

## TABLE OF CONTENTS
(continued)

| | Page |
|---|---|
| Common Equivalent Share | Section 1.1 |
| Common Equivalents Outstanding | Section 1.1 |
| Common Price Per Share | Section 1.1 |
| Company | Preamble |
| Company Common Share | Section 1.1 |
| Company Fundamental Representations | Section 1.1 |
| Company IT Systems | Section 1.1 |
| Company's Knowledge | Section 1.1 |
| Confidential Information | Section 1.1 |
| Confidentiality Agreement | Section 1.1 |
| Contract | Section 1.1 |
| Covered Party | Section 6.2(a) |
| COVID-19 Measures | Section 1.1 |
| COVID-19 Pandemic | Section 1.1 |
| Data | Section 3.14(j) |
| Data Room | Section 1.1 |
| Determination Date | Section 2.13(c) |
| DGCL | Section 1.1 |
| Disclosure Schedules | Section 1.1 |
| Dissenting Shares | Section 2.7 |
| D&O Insurance | Section 6.2(b) |
| DOL | Section 3.17(c) |
| Effective Time | Section 2.3 |
| Employee Plan | Section 1.1 |
| Engaged Investment Professional | Section 7.1(b) |
| Environmental Laws | Section 1.1 |
| Equitable Exceptions | Section 3.3 |
| Equity Securities | Section 1.1 |
| ERISA | Section 1.1 |
| ERISA Affiliate | Section 1.1 |
| Escrow Agent | Section 1.1 |
| Escrow Agreement | Section 1.1 |
| Estimated Adjustment Amount | Section 1.1 |
| Estimated Closing Balance Sheet | Section 2.13(a) |
| Estimated Closing Cash | Section 2.13(a) |
| Estimated Closing Indebtedness | Section 2.13(a) |
| Estimated Closing Statement | Section 2.13(a) |
| Estimated Net Working Capital | Section 2.13(a) |
| Estimated Transaction Expenses | Section 2.13(a) |
| Expense Holdback Amount | Section 1.1 |
| Expense Holdback Distribution | Section 10.5 |
| Final Closing Cash | Section 2.13(c) |
| Final Closing Indebtedness | Section 2.13(c) |
| Final Closing Net Working Capital | Section 2.13(c) |
| Final Merger Consideration | Section 2.13(c) |

- 6 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094133

**TABLE OF CONTENTS**
(continued)

Page

Final Transaction Expenses .................................................................Section 2.13(c)
Financial Statements.............................................................................Section 3.7(a)
Fraud ......................................................................................................Section 1.1
Fundamental Representations ...............................................................Section 1.1
Future Merger Consideration Distribution Amounts ...........................Section 1.1
GAAP.....................................................................................................Section 1.1
Governmental Entity .............................................................................Section 1.1
Hazardous Substances...........................................................................Section 1.1
Health Care Laws .................................................................................Section 3.18(j)
HSR Act ................................................................................................Section 1.1
Improvements.........................................................................................Section 1.1
Income Tax Return................................................................................Section 1.1
Income Taxes ........................................................................................Section 1.1
Indebtedness...........................................................................................Section 1.1
Independent Accountant.........................................................................Section 1.1
Insurance Policies.................................................................................Section 3.15
Intellectual Property .............................................................................Section 1.1
Joinder Agreement ................................................................................Section 1.1
Law.........................................................................................................Section 1.1
Leased Real Property............................................................................Section 3.16(b)
Letter of Transmittal .............................................................................Section 1.1
Lien ........................................................................................................Section 1.1
Material Adverse Effect ........................................................................Section 1.1
Material Contract ..................................................................................Section 1.1
Material Customer.................................................................................Section 1.1
Material IP Agreements.........................................................................Section 3.14(c)
Material Supplier...................................................................................Section 1.1
Merger....................................................................................................Recitals
Merger Consideration............................................................................Section 1.1
Merger Recommendation Statement......................................................Section 1.1
Merger Sub.............................................................................................Preamble
Multiemployer Plan...............................................................................Section 1.1
Most Recent Company Balance Sheet....................................................Section 3.7(a)(ii)
Net Working Capital .............................................................................Section 1.1
Nonparty Affiliates................................................................................Section 11.16
Non-PII...................................................................................................Section 3.14(j)
Notice of Objection................................................................................Section 2.13(c)
ONCAP Sellers .....................................................................................Section 1.1
Open Source Software...........................................................................Section 1.1
Option.....................................................................................................Section 1.1
Option Consideration ............................................................................Section 1.1
Option Holder........................................................................................Section 1.1
Option Plan............................................................................................Section 1.1
Order .....................................................................................................Section 1.1
Organizational Documents.....................................................................Section 1.1

39329697.7

CONFIDENTIAL

FBG_CH1_00094134

**DEBTORS' EXHIBIT NO. 238**
**Page 8 of 133**

**TABLE OF CONTENTS**
(continued)

Page

Owned Intellectual Property ........................................................Section 1.1
Owned Real Property....................................................................Section 3.16(a)
Permit ..........................................................................................Section 1.1
Permitted Liens ...........................................................................Section 1.1
Per Share Adjustment Escrow Amount.......................................Section 1.1
Per Share Expense Holdback Amount .........................................Section 1.1
Per Share Merger Consideration .................................................Section 1.1
Person...........................................................................................Section 1.1
PII ................................................................................................Section 3.14(j)
Phantom Option ..........................................................................Section 1.1
Pre-Closing Tax Period................................................................Section 1.1
Privacy Policy...............................................................................Section 3.14(j)
Pro Rata Share.............................................................................Section 1.1
Portfolio Company ......................................................................Section 7.1(b)
Pre-Closing Tax Period Return ...................................................Section 7.3(d)
Pro Rata Share.............................................................................Section 1.1
Qualifying Option........................................................................Section 2.6(a)
Real Property ...............................................................................Section 3.16(b)
Real Property Leases ...................................................................Section 3.9(a)(ii)
Real Property Lease.....................................................................Section 3.16(b)
Registered Owned Intellectual Property......................................Section 3.14(b)
Related Group..............................................................................Section 3.22(a)
Release .........................................................................................Section 1.1
Representatives ............................................................................Section 1.1
Requisite Stockholders Consent...................................................Section 5.2
R&W Policy..................................................................................Section 6.5
Second Request ...........................................................................Section 7.02(b)(iii)
Securities Act ..............................................................................Section 4.8
Securityholders Agreement..........................................................Section 1.1
Seller Releasing Parties ...............................................................Section 6.3(b)
Seller Released Claims .................................................................Section 6.3(b)
Seller Released Parties .................................................................Section 6.3(b)
Seller Representative....................................................................Preamble
Service Provider...........................................................................Section 1.1
Share............................................................................................Section 1.1
Specified Business Conduct Laws ...............................................Section 1.1
Stockholders................................................................................Section 1.1
Straddle Period............................................................................Section 1.1
Subsidiary or Subsidiaries...........................................................Section 1.1
Suit ..............................................................................................Section 1.1
Surviving Corporation.................................................................Section 2.1
Target Net Working Capital........................................................Section 1.1
Tax or Taxes................................................................................Section 1.1
Tax Returns .................................................................................Section 1.1
Transaction Deductions...............................................................Section 1.1

- 8 -

39329697.7

**TABLE OF CONTENTS**
(continued)

|  |  |
|---|---|
| Transaction Expenses | Section 1.1 |
| Transfer Taxes | Section 1.1 |
| Treasury Regulations | Section 1.1 |
| U.S. or United States | Section 1.1 |
| Unaudited Financial Statements | Section 3.7(a)(ii) |
| Union | Section 3.17(a) |
| Unresolved Item | Section 2.13(c) |
| Waivers | Section 7.4 |
| WARN Act | Section 3.17(a) |

- 9 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094136

**DEBTORS' EXHIBIT NO. 238**
**Page 10 of 133**

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (the "**Agreement**"), dated as of November 22, 2023, is by and among Hopkins Acquisition, Inc., a Delaware corporation (the "**Company**"), First Brands Group, LLC, a Delaware limited liability company ("**Buyer**"), Weekend Merger Sub, Inc., a Delaware corporation ("**Merger Sub**"), and ONCAP Investment Partners III, L.P., an Ontario limited partnership, solely in its capacity as the representative of the Stockholders as designated pursuant to Section 10.1 hereof ("**Seller Representative**").

### RECITALS

1.      Buyer, Merger Sub and the Company desire to enter into this Agreement pursuant to which Merger Sub, a wholly-owned subsidiary of Buyer, will merge with and into the Company (the "**Merger**") so that the Company will continue as the surviving corporation of the Merger and will become a wholly-owned subsidiary of Buyer.

2.      Each of the respective boards of directors of the Company, Buyer and Merger Sub have approved this Agreement and the transactions contemplated hereby, including the Merger and the board of directors of the Company has approved the adoption of this Agreement by the Stockholders (as defined herein) in accordance with the DGCL (as defined herein).

3.      The board of directors of the Company has recommended that the Stockholders vote in favor of the adoption of this Agreement, and it is anticipated that the ONCAP Sellers (as defined herein) will execute and deliver the Requisite Stockholders Consent (as defined herein) within twenty-four (24) hours of the execution and delivery of this Agreement by the parties hereto.

### AGREEMENTS

In consideration of the foregoing premises and the respective representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1      Definitions. When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"**Accounting Principles**" means, collectively, (i) GAAP consistently applied, (ii) the accounting rules, methodologies and adjustments used by the Company in past practice, and (iii) the accounting rules, methodologies and adjustments reflected on Exhibit A; provided that in the case of a conflict between the foregoing, the accounting rules, methodologies and adjustments used by the Company in past practice shall control over GAAP, and the accounting rules, methodologies and adjustments reflected on Exhibit A shall control over both GAAP and past practice.

"**Acquired Companies**" means the Company and its Subsidiaries.

39329697.7

CONFIDENTIAL                                                                 FBG_CH1_00094137

"**Acquisition Proposal**" means any offer or proposal for, or any indication of interest in, any of the following (other than the Merger): (i) any direct or indirect acquisition or purchase of more than ten percent (10%) of the equity interests of an Acquired Company or all or substantially all of assets of any Acquired Companies; (ii) any merger, consolidation or other business combination relating to the Acquired Companies; or (iii) any recapitalization, reorganization or any other extraordinary business transaction involving or otherwise relating to the Acquired Companies.

"**Adjusted Adjustment Amount**" means: (i) the amount of Adjusted Closing Cash; *plus* (ii) the amount, if any, by which Adjusted Closing Net Working Capital exceeds the Target Net Working Capital; *minus* (iii) the amount, if any, by which Adjusted Closing Net Working Capital falls short of the Target Net Working Capital; *minus* (iv) the amount of Adjusted Closing Indebtedness; *minus* (v) the amount of Adjusted Transaction Expenses. For the avoidance of doubt, the Adjusted Adjustment Amount may be positive or negative.

"**Adjustment Escrow Amount**" means an amount equal to $2,000,000.

"**Adjustment Time**" means 11:59 p.m. New York, New York time on the day immediately prior to the Closing Date.

"**Advisory Services Fee Letter**" means that certain Amended and Restated Advisory Services Fee Letter Agreement dated July 1, 2018, addressed to Hopkins Acquisition, Inc. from ONCAP Management Partners, L.P., an Ontario, Canada limited partnership.

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" means the other agreements, instruments and documents delivered at or prior to the Closing pursuant to this Agreement, including the Letters of Transmittal, Joinder Agreements and Escrow Agreement.

"**Base Merger Consideration**" means $335,000,000.

"**Books and Records**" means books of account, general, financial and operating records, invoices and other documents, records and files of the Acquired Companies, in each case of the foregoing, represented, maintained or stored in any medium (whether tangible or intangible).

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York or Toronto, Ontario are authorized or required by Law to close.

"**Buyer Fundamental Representations**" means the representations and warranties set forth in Sections 4.1 (Existence and Power), 4.2 (Authorization), 4.3 (Enforceability) and 4.6 (Brokers).

39329697.7

CONFIDENTIAL

FBG_CH1_00094138

**DEBTORS' EXHIBIT NO. 238**
**Page 12 of 133**

"**Cash and Cash Equivalents**" means the cash and cash equivalents of the Acquired Companies as of any date required to be reflected as cash and cash equivalents on a consolidated balance sheet of the Acquired Companies as of such date prepared in accordance with GAAP. Cash and Cash Equivalents shall include checks and drafts received by the Acquired Companies as of the Adjustment Time but not yet cleared as of the Adjustment Time. An example calculation of Cash and Cash Equivalents is set forth on Exhibit A.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, dated as of May 23, 2011, as amended.

"**Closing Cash**" means all Cash and Cash Equivalents of the Acquired Companies as of the Adjustment Time, calculated without giving effect to any of the transactions contemplated by this Agreement to the extent occurring at or following the Closing; provided that Closing Cash shall (i) be increased by any Cash and Cash Equivalents received by the Acquired Companies after the Adjustment Time but prior to Closing as a result of the incurrence of Indebtedness of the Acquired Companies that is taken into account in Closing Indebtedness, (ii) be decreased by any Cash and Cash Equivalents used by the Acquired Companies to pay any Transaction Expenses after the Adjustment Time but prior to Closing, and (iii) be calculated in accordance with the Accounting Principles.

"**Closing Date Payoff Indebtedness**" means all Indebtedness of the Acquired Companies of the types identified in items (a), (b) and (c) of the definition of Indebtedness and, with respect to such items (a), (b) and (c), any accrued and unpaid interest, fees and other expenses owed with respect to the foregoing, including, but not limited to, prepayment penalties, in each case as of immediately prior to the Closing.

"**Closing Indebtedness**" means all outstanding Indebtedness of the Acquired Companies as of immediately prior to the Closing calculated without giving effect to any financing or refinancing arrangements entered into at any time by Buyer or any other transaction entered into by Buyer in connection with the consummation of the transactions contemplated by this Agreement; provided that Closing Indebtedness shall be (i) increased by any Indebtedness of the Acquired Companies that is repaid after the Adjustment Time but prior to Closing from Cash and Cash Equivalents of the Acquired Companies that were taken into account in Closing Cash and (ii) calculated in accordance with the Accounting Principles.

"**Closing Merger Consideration**" means the Base Merger Consideration, *plus*, if the Estimated Adjustment Amount is positive, the Estimated Adjustment Amount or *minus*, if the Estimated Adjustment Amount is negative, the absolute value of the Estimated Adjustment Amount.

"**Closing Net Working Capital**" means the Net Working Capital, as of the Adjustment Time, calculated without giving effect to any of the transactions contemplated by this Agreement.

"**Closing Per Share Merger Consideration**" means, with respect to each Company Common Share, the Common Price Per Share *minus* (i) the Per Share Expense Holdback Amount *minus* (ii) the Per Share Adjustment Escrow Amount.

- 12 -

39329697.7

"**Closing Transaction Expenses**" means all unpaid Transaction Expenses as of immediately prior to the Closing.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Common Equivalent Share**" means each Company Common Share issued and outstanding immediately prior to the Effective Time including all Company Common Shares issuable upon exercise in full of all Qualifying Options (including, in the case of the Phantom Options, the number of Company Common Shares that would have been issued upon exercise in full of all Phantom Options had the Phantom Options been Options granted under the Option Plan).

"**Common Equivalents Outstanding**" means the aggregate number of Company Common Shares issued and outstanding immediately prior to the Effective Time including all Company Common Shares issuable upon exercise in full of all Qualifying Options (including, in the case of the Phantom Options, the number of Company Common Shares that would have been issued upon exercise in full of all Phantom Options had the Phantom Options been Options granted under the Option Plan).

"**Common Price Per Share**" means an amount equal to the quotient obtained by dividing (i) the sum of (x) the Closing Merger Consideration and (y) the aggregate exercise price that would be due and payable upon exercise in full of all Qualifying Options, by (ii) the Common Equivalents Outstanding.

"**Company Common Share**" means a share of the Company's common stock, $0.01 par value per share.

"**Company Fundamental Representations**" means the representations and warranties set forth in <u>Sections 3.1</u> (Existence and Power), <u>3.2</u> (Authorization), <u>3.3</u> (Enforceability), <u>3.6</u> (Capitalization; Subsidiaries) and <u>3.21</u> (Brokers).

"**Company IT Systems**" means the computer, information technology, and data processing systems, facilities and services used by an Acquired Company in the conduct of its business, including all software, computer systems, programs, hardware, firmware, networks, interfaces, software engines, databases, operating systems, websites, website content, equipment, platforms and related systems and services.

"**Company's Knowledge**" or any similar phrase means the actual knowledge, after reasonable investigation, of Brad Kraft and Jim Daniel.

"**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of any Acquired Company, including all information of a confidential or proprietary nature concerning finances, customer information, supplier information, products, services, prices, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property, designs,

- 13 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094140

specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Confidential Information shall not include any information that (i) is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of the Seller or any of its Affiliates in breach of Section 7.1(a) or (ii) becomes available to Seller or any of its Affiliates on a non-confidential basis from a source other than Buyer, its Affiliates or any of its or their representatives.

"**Confidentiality Agreement**" means that certain confidentiality agreement, dated as of July 20, 2023, by and between First Brands Group LLC and Hopkins Manufacturing Corporation.

"**Contract**" means any agreement, contract, deed, indenture, note, mortgage, bond, lease, sublease, license, sublicense or other legally enforceable commitment, promise, undertaking, obligation, arrangement, instrument or understanding (whether written or oral) or other arrangement that is binding under applicable Law.

"**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar Law, directive, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to the COVID-19 Pandemic and any evolutions or mutations thereof or related or associated epidemic, plague, pandemic or outbreak of illness or public health event.

"**COVID-19 Pandemic**" means SARS-CoV-2 or COVID-19 and any evolutions or mutations thereof and which was declared a pandemic on March 11, 2020, by the World Health Organization.

"**Data Room**" means the electronic data room for "Project Weekend" run by Datasite.

"**DGCL**" means the Delaware General Corporation Law, as amended from time to time.

"**Disclosure Schedules**" means the disclosure schedules delivered by the Company to the Buyer concurrently with the execution of this Agreement.

"**Employee Plan**" means (a) each "employee benefit plan," and/or "employee pension benefit plan" as defined in Sections 3(2) or 3(3) of ERISA (whether or not subject to ERISA) or any similar plan subject to Laws of a jurisdiction outside of the United States, and (b) any other defined-benefit, pension, defined-contribution, retirement, supplemental retirement, excess benefit, profit sharing, trusts, any plan subject to Title IV of ERISA, medical, dental, vision, life, disability, accident, cafeteria, flexible spending, health savings, adoption/dependent, employee assistance, tuition, wellness, workers' compensation, retiree medical, retiree life or other retiree benefit, other welfare, fringe, incentive equity, incentive compensation, phantom equity, equity purchase (or other equity, equity-like or equity-based), bonus, commission, compensation, employment agreement, offer letter, consulting, contractor, advisor or other service agreement, separation, termination, severance, transition, retention, change-in-control, transaction, tax gross-up, deferred compensation, vacation, sick leave or other paid time off, and/or other employee benefit or compensation plan, program, policy, commitment, understanding, arrangement and/or

- 14 -

39329697.7

FBG_CH1_00094141

**DEBTORS' EXHIBIT NO. 238**
**Page 15 of 133**

agreement or the like, in each case whether formal or informal, whether or not set forth in writing, whether covering one Person or more than one Person, and whether or not subject to any of the provisions of ERISA, in all events which is or has been sponsored, administered, offered, maintained or contributed to (or required to be contributed to) by any Acquired Company or any ERISA Affiliate for the benefit of any current or former employees, consultants, contractors, officers, managers, shareholders, members, or directors (or the spouses, beneficiaries or other dependents thereof), or to which (or under which) any Acquired Company has, or could reasonably expect to have any direct or indirect liability (actual or contingent) or obligation.

"**Environmental Laws**" means any Law relating to: (a) Releases or threatened Releases of Hazardous Substances or materials containing Hazardous Substances; (b) the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Substances or materials containing Hazardous Substances; (c) pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise Hazardous Substances, wastes or materials; or (d) protection of the environment, health, safety or natural resources.

"**Equity Securities**" means, with respect to any Person, (a) any capital stock, partnership or membership interest, units of participation or other similar interest (however designated) in such Person and (b) any option (including any Option), warrant, purchase right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including any interest, the value of which is in any way based on, linked to or derived from any interest described in (a), including stock appreciation, phantom stock, profit participation or other similar rights).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person, trade or business (whether or not incorporated) that, at the relevant time, is or could be treated together with any Acquired Company as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means Citibank, N.A.

"**Escrow Agreement**" means the escrow agreement, to be entered into in connection with the Closing, by and among Buyer, the Company, Seller Representative and the Escrow Agent in the form of Exhibit B.

"**Estimated Adjustment Amount**" means (i) Estimated Closing Cash, *plus* (ii) the amount, if any, by which Estimated Net Working Capital exceeds the Target Net Working Capital, *minus* (iii) the amount, if any, by which Estimated Net Working Capital falls short of the Target Net Working Capital, *minus* (iv) Estimated Closing Indebtedness, *minus* (v) Estimated Transaction Expenses. For the avoidance of doubt, the Estimated Adjustment Amount may be positive or negative.

"**Expense Holdback Amount**" means an amount equal to $2,000,000.

"**Fraud**" means an actual and intentional fraud committed by a party to this Agreement with respect to the representations and warranties set forth in Article III or Article IV of this

- 15 -

39329697.7

CONFIDENTIAL                    FBG_CH1_00094142

Agreement, as applicable, or in any of the Ancillary Documents, with specific intent to deceive and mislead another party hereto and to induce such party to enter into this Agreement; provided that, such actual and intentional fraud of such party shall only be deemed to exist if (x) in the case of Buyer, a director or senior management officer of such party or (y) in the case of the Company, a person listed in the definition of Company's Knowledge, in each case, had actual knowledge (as opposed to any claim based on constructive knowledge, negligent or reckless misrepresentation or similar theory) of the breach of the applicable representation or warranty when such representation or warranty was made, with a specific intention to induce the party to whom such representation was made to act or refrain from acting in reliance upon it and causing that party to rely thereon and causing such party to suffer damage by reason of such reliance. A claim for Fraud may only be made against the party to this Agreement committing such Fraud.

"**Fundamental Representations**" means, collectively, the Buyer Fundamental Representations and the Company Fundamental Representations.

"**Future Merger Consideration Distribution Amounts**" means any amounts to be distributed to the Stockholders and/or Option Holders following the Closing (i) pursuant to the Escrow Agreement, (ii) pursuant to Section 2.13(e), (iii) pursuant to Section 2.13(f), (iv) pursuant to Section 7.2(b), and/or (v) in connection with any Expense Holdback Distributions.

"**GAAP**" means United States generally accepted accounting principles, consistently applied and as in effect on the date hereof.

"**Governmental Entity**" means any United States, foreign, international, multinational, federal, state, provincial, municipal or local entity or body exercising executive, legislative, judicial, regulatory or administrative functions of governmental or quasi-governmental authority of any nature, including any department, governmental division, instrumentality, court, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof.

"**Hazardous Substances**" means: (a) those substances defined in or regulated under the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Air Act, and their applicable state counterparts, as each may be amended from time to time, and all regulations promulgated thereunder; (b) petroleum and petroleum products, including crude oil and any fractions thereof; (c) natural gas, synthetic gas, and any mixtures thereof; (d) lead, polychlorinated biphenyls, asbestos and radon; (e) any other pollutant or contaminant; and (f) any substance, material or waste regulated by any Governmental Entity pursuant to any Environmental Law.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

39329697.7

CONFIDENTIAL

FBG_CH1_00094143

**DEBTORS' EXHIBIT NO. 238**
**Page 17 of 133**

"**Improvements**" means all buildings, structures, fixtures, building systems and equipment, and all components thereof (including the roof, foundation and structural elements), included in the Leased Real Property.

"**Income Tax Return**" means any Tax Return for Income Taxes.

"**Income Taxes**" means Taxes imposed on or measured by net income.

"**Indebtedness**" means, without duplication, any of the following: (a) any indebtedness for borrowed money; (b) any obligations evidenced by bonds, debentures, notes or other similar instruments; (c) the drawn portion of any letter of credit, banker's acceptance or similar credit transactions; (d) all obligations that are required to be classified and accounted for as a capital lease obligation under the Accounting Principles; (e) amounts owing under the Advisory Services Fee Letter; (f) any guaranty of any of the foregoing; (g) any accrued and unpaid interest, fees and other expenses owed with respect to the foregoing, including, but not limited to, prepayment penalties; and (h) aggregate accrued and unpaid Income Taxes for all Pre-Closing Tax Periods (allocated with respect to a Straddle Period in accordance with Section 7.2(a) and net of any unpaid or unutilized refund of or credit against Income Taxes to which the Acquired Companies are entitled), which amount may be negative in the aggregate or in respect of any jurisdiction. Notwithstanding the foregoing, Indebtedness shall not include obligations under that certain Amended and Restated Lease Agreement, dated February 5, 2015, by and between Store Capital Acquisitions, LLC and Hopkins Manufacturing Corporation, or any undrawn letters of credit, surety bonds, banker's acceptance and similar instruments, or any indebtedness incurred by, on behalf of or at the direction of, Buyer, Merger Sub or any of their Affiliates in connection with the transactions contemplated by this Agreement. Notwithstanding the foregoing, Indebtedness shall exclude any liability or obligation constituting Transaction Expenses or taken into account in Net Working Capital or any liability between or among the Acquired Companies. An example calculation of Indebtedness as of July 31, 2023 is set forth on Exhibit A. Notwithstanding the foregoing, and for the avoidance of doubt, "Indebtedness" shall not include any operating lease obligations, as such term was understood under GAAP as of December 31, 2018, of any Acquired Company.

"**Independent Accountant**" means a nationally recognized accounting firm mutually agreed upon by Buyer and the Seller Representative.

"**Intellectual Property**" means, collectively, all United States and foreign: (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all letters patent and pending applications (including provisional patent applications) for patents and all reissues, reexaminations, divisions, continuations, continuations-in-part and extensions thereof; (b) registered and unregistered trademarks, service marks, trade names, trade dress, Internet domain names, and other indicia of origin, all goodwill associated with any of the foregoing, and all applications, registrations, and renewals in connection with any of the foregoing; (c) published and unpublished works of authorship (including databases and software), and all applications, registrations and renewals in connection therewith; (d) mask works and all applications, registrations, and renewals in connection therewith; (e) trade secrets and confidential business information (including confidential ideas, research and development, know how, methods, formulas, compositions, manufacturing and production processes and

- 17 -

39329697.7

FBG_CH1_00094144

techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); and (f) recognized intellectual property rights of any other kind.

"**Joinder Agreement**" means a joinder to this Agreement substantially in the form of Exhibit D.

"**Law**" means any United States, foreign international, multinational, federal, state, provincial, municipal and local laws (including common law), statute, acts, derivatives, treaties, decrees, codes, ordinance, rule, regulation, orders or regulatory guidance of any Governmental Entity.

"**Letter of Transmittal**" means a letter of transmittal substantially in the form of Exhibit C.

"**Lien**" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation or any other similar encumbrance in respect of such property or asset. For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws and any terms and conditions of any Organizational Document of any Acquired Company.

"**Material Adverse Effect**" means any event, change, condition (financial or otherwise), occurrence, development, state of facts, circumstance or effect, that, when considered either individually or in the aggregate together with any other event, change, condition, occurrence, development, state of facts, circumstance or effect with respect to which such phrase is used in this Agreement, has had or would reasonably be expected to have a material adverse effect on (i) the business, assets, properties, condition (financial or otherwise) or operations of the Acquired Companies, taken as a whole or (ii) the ability of the Company to consummate the transactions contemplated hereby; provided that no event, change, condition, occurrence, development, state of facts, circumstance or effect arising from or relating to the following shall be taken into account in determining whether there is a Material Adverse Effect pursuant to clause (i) above: (a) general business, industry or economic conditions; (b) local, regional, national or international political or social conditions, including the engagement (whether new or continuing) by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or escalation of any military or terrorist attack (including any internet or "cyber" attack or hacking), any natural or man-made disaster, weather-related event, earthquake, hurricane, tornado, fire or acts of God, any pandemic (including with respect to the COVID-19 Pandemic), epidemic, outbreak and, in each case, the impact thereof, any worsening of such conditions; (c) changes in financial, banking, or securities markets (including any disruption thereof, any decline in the price of any security or any market index and any increased cost, or decreased availability, of capital or pricing or terms related to any financing for any of the transactions contemplated by this Agreement); (d) any failure, in and of itself, of any Acquired Company to meet any projections, budgets, forecasts (it being understood that the facts and circumstances giving rise to such failure may be deemed to constitute, and may be taken into account in determining whether there has been a Material Adverse Effect), revenue or earnings predictions (or other similar forward looking statements); (e) changes in GAAP occurring after the date hereof, (f) changes in Laws occurring after the date hereof; (g) the taking of any action, or failures to take action, or such other changes or events, in each case, which

- 18 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094145

Buyer has requested or to which it has consented in writing (including via e-mail) or which actions are expressly required by this Agreement; (h) the permitted announcement (in accordance with Section 7.1) or negotiation, execution, delivery, pendency or performance of the transactions contemplated by this Agreement or the identity of the parties to this Agreement and their respective Affiliates, including any termination of reduction in or similar negative impact on relationships, contractual or otherwise, with any customers, suppliers, licensors, referral sources, payors, employees or contractors of the Acquired Companies due to the announcement or pendency of the transactions contemplated by this Agreement or the identity of the parties to this Agreement and their respective Affiliates; (i) any actions or omissions by Buyer or any of its Affiliates; and (j) any matter disclosed in the Disclosure Schedule, except to the extent that any event, change, condition, occurrence, development, state of facts, circumstance or effect occurring following the date hereof results in a material worsening of such matter. Notwithstanding the foregoing, in each of the cases specified in clauses (a), (b), (c), (e) and (f) above, an event, change, condition (financial or otherwise), occurrence, development, state of facts, circumstance or effect shall be taken into account in determining whether there is a Material Adverse Effect pursuant to clause (i) above, if such event, change, condition, occurrence, development, state of facts, circumstance or effect has or would reasonably be expected to have a disproportionate effect on the Acquired Companies, taken as a whole, relative to the other companies in the industries in which any of the Acquired Companies operate.

"**Material Contract**" means any of the Contracts listed or required to be listed on Schedule 3.9(a).

"**Material Customer**" means any of the customers listed or required to be listed on Schedule 3.10(a).

"**Material Supplier**" means any of the suppliers and vendors listed or required to be listed on Schedule 3.10(b).

"**Merger Consideration**" means the Closing Merger Consideration, as adjusted in accordance with Section 2.13.

"**Merger Recommendation Statement**" means a statement approved by the board of directors of the Company (i) that this Agreement and the transactions contemplated hereby, including the Merger, are fair to, and in the best interests of, the Stockholders, (ii) recommending that the Stockholders adopt this Agreement and (iii) containing all information required pursuant to Section 262 of the DGCL necessary for a Stockholder to determine whether to exercise rights pursuant thereto and to commence the twenty (20)-day period set forth in Section 262 of the DGCL.

"**Multiemployer Plan**" means any plan that is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA or Section 414(f) of the Code.

"**Net Working Capital**" means (i) the sum of the current assets of the Acquired Companies, minus (ii) the sum of the current liabilities of the Acquired Companies, in each case subject to the adjustments set forth in, and calculated in accordance with, the Accounting Principles. An example calculation of Net Working Capital is set forth on Exhibit A.

- 19 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094146

"**ONCAP Sellers**" means ONEX Corporation, a corporation formed in Ontario, New PCO II Investments Ltd., a corporation formed in Ontario, ONCAP III LP, a limited partnership formed in Ontario, ONCAP III (Canada) LP, a limited partnership formed in Ontario, and ONEX Parallel (ONCAP) III LP, a limited partnership formed in Ontario.

"**Open Source Software**" means any software or similar subject matter that is distributed under an open source software license approved by the Open Source Initiative or Free Software Foundation.

"**Option**" means each outstanding option to purchase one or more Company Common Shares pursuant to the Option Plan.

"**Option Consideration**" means, with respect to each Qualifying Option, a cash amount equal to the excess of (a) the product of (i) the number of Company Common Shares issuable upon exercise in full of such Qualifying Option (or, in respect of Qualifying Options that are Phantom Options, the number of Company Common Shares that would have been issued upon exercise in full of such Phantom Options had such Phantom Options been Options granted under the Option Plan) and (ii) the Closing Per Share Merger Consideration over (b) the aggregate exercise price that would be required to be paid upon exercise in full of such Qualifying Option.

"**Option Holder**" means each holder of one or more Options or Phantom Options prior to the Effective Time.

"**Option Plan**" means the Hopkins Acquisition, Inc. Amended and Restated Stock Incentive Plan, as in effect from time to time prior to the Effective Time.

"**Order**" means any award, injunction, judgment, decree, order, determination, writ, stipulation, settlement, administration or compliance order, assessment or arbitration, ruling, subpoena or verdict or other decision issued, promulgated or entered by or with any Governmental Entity of competent jurisdiction.

"**Organizational Documents**" means, with respect to any entity, the certificate of incorporation, articles of incorporation, by laws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"**Owned Intellectual Property**" means all Intellectual Property owned or purported to be owned by any Acquired Company.

"**Permit**" means any material authorization, approval, consent, certificate, license, permit or franchise of or from any Governmental Entity.

"**Permitted Liens**" means (a) Liens for Taxes that are not yet due and payable, or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP, (b) statutory Liens of landlords and workers', carriers', materialmen's, suppliers' and mechanics' or other like Liens incurred in the ordinary course of business, (c) Liens that will be released prior to or as of the Closing, (d) Liens created

- 20 -

39329697.7

FBG_CH1_00094147

by or through Buyer, (e) Liens in respect of any obligations as lessee under capitalized leases (as such term was understood prior to January 1, 2019), and (f) Liens set forth on <u>Schedule 1.1(b)</u>.

"**Per Share Adjustment Escrow Amount**" means an amount equal to the quotient obtained by dividing (i) the Adjustment Escrow Amount, by (ii) the Common Equivalents Outstanding.

"**Per Share Expense Holdback Amount**" means an amount equal to the quotient obtained by dividing (i) the Expense Holdback Amount, by (ii) the Common Equivalents Outstanding.

"**Per Share Merger Consideration**" means the Closing Per Share Merger Consideration, as adjusted in accordance with <u>Section 2.13</u> on a per share basis.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"**Phantom Option**" means each outstanding cash-settled phantom stock option granted by the Company pursuant to the applicable Cash-Settled Phantom Stock Option Agreement.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

"**Pro Rata Share**" means, with respect to each Stockholder and/or Option Holder, an amount equal to (a) all Common Equivalent Shares held by such Person immediately prior to the Effective Time divided by (b) the Common Equivalents Outstanding.

"**Release**" has the meaning set forth in Section 101(22) of CERCLA (42 U.S.C. § 9601(22)), but not subject to the exceptions in Subsections (A) and (D) of 42 U.S.C. § 9601(22).

"**Representatives**" of any Person shall mean the directors, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person.

"**Securityholders Agreement**" means that certain Stockholders' Agreement of the Company, dated as of March 2, 2015, as it may be amended from time to time, by and among the Company and the Stockholders party thereto.

"**Service Provider**" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of the Acquired Companies.

"**Share**" means an outstanding share of the Company's common stock.

"**Specified Business Conduct Laws**" means (i) the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act of 2010, the Canadian Corruption of Foreign Public Officials Act, the Prevention of Corruption Act, 1988, all Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions and all other applicable Laws relating to bribery, corruption, kick-backs or other improper or unlawful

- 21 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094148

payments (regardless of the form, whether in money, property, services or otherwise), (ii) all Laws imposing trade sanctions on any Person, including, all Laws administered by the U.S. Treasury Department Office of Foreign Assets Control, all sanctions Laws or embargos imposed or administered by the U.S. Department of State, the United Nations Security Council, Her Majesty's Treasury or the European Union and all anti-boycott or anti-embargo Laws, (iii) all Laws relating to the import, export, re-export, transfer of information, data, goods, and technology, including the Export Administration Regulations administered by the U.S. Department of Commerce and the International Traffic in Arms Regulations administered by the U.S. Department of State, (iv) all anti-money laundering Laws (including related to recordkeeping and reporting requirements), including the U.S. Currency and Foreign Transaction Reporting Act of 1970, the U.S. Money Laundering Control Act of 1986, the Canadian Proceeds of Crime (Money Laundering) and Terrorist Financing Act, the UK Proceeds of Crime Act of 2002, the UK Terrorism Act of 2000 and the Prevention of Money Laundering Act, 2002 and (v) such other Laws relating to unlawful payments, the establishment or maintenance of unlawful or unrecorded funds, false or fictitious book entries, racketeering activities, unlawful rebates and influence payments.

"**Stockholders**" means the holders of Shares (excluding Shares issuable upon exercise of an Option) prior to the Effective Time.

"**Straddle Period**" means any Tax period beginning on or before the Closing Date and ending after the Closing Date.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries) owns, directly or indirectly, more than 50% of the capital stock or other equity interests the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"**Suit**" means any action, suit litigation, charge, filed complaint, proceeding (including any arbitration, mediation or other dispute resolution proceeding), audit, Order, investigation, inspection, examination, written claim, cause of action, demand, citation, summons, subpoena or hearing of any nature (whether civil, criminal, administrative, investigative and whether in Law or in equity).

"**Target Net Working Capital**" means $95,000,000.

"**Tax**" or "**Taxes**" means all U.S. federal, state, and local or non-U.S. income, profits, franchise, gross receipts, environmental, customs duty, capital stock, stamp, license, payroll, sales, employment, use, personal and real property, withholding, excise, production, transfer, registration, alternative minimum, value added, social security, occupancy, or other taxes of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

- 22 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094149

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Deductions**" means all Tax deductions available to the Acquired Companies as a result of the repayment of Indebtedness, the payment of the amounts owed with respect to Qualifying Options, and the payment of Transaction Expenses (assuming, in each case, the applicable Acquired Company will make the election under IRS Revenue Procedure 2011-29 to apply the seventy percent (70%) safe harbor to any "success based fee").

"**Transaction Expenses**" means (i) those certain transaction bonuses in the amounts set forth on Schedule 1.1(c), (ii) the employer portion of any applicable Taxes relating to the Option Consideration and any Future Merger Consideration Distribution Amounts paid to Option Holders pursuant to clauses (i), (ii), or (iii) thereof, but for the avoidance of doubt, the Option Consideration shall not constitute a Transaction Expense and (iii) all of the fees and expenses (including all fees, expenses, disbursements and other similar amounts payable to attorneys, financial advisors or accountants) incurred by the Acquired Companies prior to the Closing in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement which are unpaid as of immediately prior to the Closing, including fifty percent (50%) of all fees payable to the Escrow Agent. Transaction Expenses shall not include any item of Indebtedness or any liability taken into account in Closing Net Working Capital.

"**Transfer Taxes**" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"**Treasury Regulations**" means United States Treasury regulations promulgated under the Code.

"**U.S.**" or "**United States**" means the United States of America.

## ARTICLE II
## THE TRANSACTIONS

2.1    The Merger. On the terms and subject to the conditions set forth herein and in accordance with the DGCL, Merger Sub shall be merged with and into the Company at the Effective Time, and the separate existence of Merger Sub shall thereupon cease, and the Company shall continue as the surviving corporation and wholly-owned subsidiary of Buyer (the "**Surviving Corporation**").

2.2    Closing. Subject to the terms and conditions contained in this Agreement, the Merger and the other transactions contemplated by this Agreement shall take place remotely via the electronic exchange of the applicable documents and signatures (the "**Closing**"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in Sections 8.1 and 8.2 (except those conditions that by their nature are to be satisfied by the delivery of documents or the taking of actions at the Closing, but subject to the satisfaction or waiver (by the party entitled to the benefits of such conditions) at the Closing of such conditions) have been satisfied or waived in writing by the party entitled to the benefit of the

- 23 -

39329697.7

FBG_CH1_00094150

same, at 9:00 a.m., New York, New York time, or at such other place, date and time as the parties shall mutually agree in writing (the date on which the Closing occurs, the "**Closing Date**").

2.3     Effective Time and Effects of the Merger. At the Closing, the parties hereto shall file with the Secretary of State of the State of Delaware a certificate of merger substantially in the form of Exhibit E (the "**Certificate of Merger**") executed in accordance with the relevant provisions of the DGCL. The Merger shall become effective at such time as the Certificate of Merger is accepted by such Secretary of State, or at such other time as Buyer and the Company shall agree in writing and specify in the Certificate of Merger (the time the Merger becomes effective being the "**Effective Time**"). The Merger shall have the effects set forth therein and in the applicable provisions of the DGCL (including Section 259 of the DGCL).

2.4     The Surviving Corporation.

(a)     Certificate of Incorporation. The certificate of incorporation of Merger Sub as in effect as of immediately prior to the Effective Time shall be the certificate of incorporation of the Surviving Corporation immediately after the consummation of the Merger (except that the name of the Surviving Corporation shall be "Hopkins Acquisition, Inc.") and until thereafter changed or amended as provided therein or by applicable Law.

(b)     By-Laws. The by-laws of Merger Sub as in effect as of immediately prior to the Effective Time shall be the by-laws of the Surviving Corporation (except that the title thereof shall read "By-laws of Hopkins Acquisition, Inc.") immediately after the consummation of the Merger and until thereafter changed or amended as provided therein or by applicable Law.

(c)     Directors. The directors of Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, until the earlier of their resignation, death, incapacity or removal or until their respective successors are duly elected and qualified, as the case may be.

(d)     Officers. The officers of Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Corporation, until the earlier of their resignation, death, incapacity or removal or until their respective successors are duly elected or appointed and qualified, as the case may be.

2.5     Conversion of Shares in the Merger. Subject to the provisions of this Article II, at the Effective Time, by virtue of the Merger and without any further action on the part of the Buyer and the Merger Sub (or their respective stockholders) or the Company, any of the Stockholders or any other third party:

(a)     Each Company Common Share issued and outstanding immediately prior to the Effective Time (excluding Dissenting Shares) will, by virtue of the Merger and without any action on the part of the holder thereof, be converted solely into the right to receive, following the delivery of a duly executed and properly completed Letter of Transmittal in accordance with Section 2.10, (i) the Closing Per Share Merger Consideration and (ii) a contingent right to receive its Pro Rata Share of Future Merger Consideration Distribution Amounts, if any. As of the Effective Time, all Company Common Shares shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each former holder thereof shall

- 24 -

39329697.7

cease to have any rights with respect thereto, except the right to receive the consideration provided for in this Section 2.5(a) or, with respect to Dissenting Shares, the right to receive the consideration provided for in Section 2.7.

(b)    Each share of common stock of the Merger Sub issued and outstanding immediately prior to the Effective Time will be converted into one share of common stock of the Surviving Corporation.

2.6    Treatment of Options. Subject to the provisions of this Article II, at the Effective Time, by virtue of the Merger and without any further action on the part of the Buyer or the Merger Sub (or their respective stockholders) or the Company, any of the Option Holders or any other third party:

(a)    Each vested Option (including any Option that vests as a result of the consummation of the transactions contemplated hereby) and each Phantom Option, in each case that is outstanding and unexercised immediately prior to the Effective Time and that has a per-share exercise price that is less than the Closing Per Share Merger Consideration (each such Option and Phantom Option, a "**Qualifying Option**") will be cancelled or deemed exercised (in the case of Phantom Options), and, in consideration for such cancellation or deemed exercise (as applicable), the Company will pay to the Option Holder thereof an amount equal to the Option Consideration (such payment to be net of any applicable withholding Tax), and such Option Holder shall have no further rights with respect to such Qualifying Option other than a contingent right to receive its Pro Rata Share of Future Merger Consideration Distribution Amounts, if any. Payment of the Option Consideration will be made pursuant to Section 2.11, and any adjustments thereto and any Expense Holdback Distribution payments made pursuant to this Section 2.6(a) shall be made on substantially the same schedule (taking into account the time needed to make such payments through the Company's payroll system) and under the same terms and conditions as apply to such payments as made to Stockholders, but in any event in compliance with Treasury Regulation 1.409A-3(i)(5)(iv) and not later than five years after the Closing Date. All amounts paid pursuant to this Section 2.6(a) or otherwise pursuant to this Agreement to any Option Holder in respect of any Qualifying Options formerly held by such Option Holder shall be paid to the applicable Option Holder as follows: (x) for Option Holders who are or were employees of an Acquired Company, through the Company's payroll or (y) for non-employee Option Holders, by the Company as an account payable, in each case subject to applicable Tax withholdings and deductions.

(b)    Each Option and Phantom Option outstanding immediately prior to the Effective Time that is not a Qualifying Option shall automatically terminate and be cancelled for no consideration, and the applicable Option Holder shall have no further rights with respect thereto.

2.7    Dissenting Shares. Shares which are issued and outstanding immediately prior to the Effective Time and which are held by a Stockholder who has not voted such shares in favor of or consented in writing to, the Merger and who has properly exercised appraisal rights in the manner provided by Section 262 of the DGCL (such Shares being referred to collectively as the "**Dissenting Shares**" until such time as such holder fails to perfect or otherwise loses such holder's appraisal rights under the DGCL with respect to such Shares) shall not be converted into a right to

- 25 -

39329697.7

CONFIDENTIAL                                                       FBG_CH1_00094152

**DEBTORS' EXHIBIT NO. 238**
**Page 26 of 133**

receive the portion of the Merger Consideration, if any, payable with respect to such Shares pursuant to Section 2.5, unless and until the Effective Time has occurred and the holder of such Dissenting Shares becomes ineligible for such appraisal rights for any of the reasons described in clauses (a) through (c) of the proviso contained in the immediately following sentence of this Section 2.7, and the holders of Dissenting Shares shall be entitled only to such rights as are granted by Section 262 of the DGCL. Each holder of Dissenting Shares who becomes entitled to payment for such shares pursuant to Section 262 of the DGCL shall receive payment therefor from the Buyer or the Surviving Corporation in accordance with the DGCL; provided, however, that (a) if any such holder of Dissenting Shares shall have failed to establish entitlement to appraisal rights as provided in Section 262 of the DGCL, (b) if any such holder of Dissenting Shares shall have effectively withdrawn or failed to perfect its demand for appraisal of such shares or otherwise lost or failed to be entitled for any reason to the right to appraisal and payment for shares under Section 262 of the DGCL or (c) if neither any holder of Dissenting Shares nor the Surviving Corporation shall have filed a petition demanding a determination of the value of all Dissenting Shares within the time provided in Section 262 of the DGCL, such holder shall forfeit the right to appraisal of such Shares and each such Share shall automatically be deemed to have converted into and represent only the right to receive the portion of the Merger Consideration, if any, otherwise payable with respect to such Shares pursuant to Section 2.5, without interest thereon. The Company will give Buyer prompt written notice of any demands received by the Company for appraisal of Shares, withdrawals of such demands and any other instrument served pursuant to the DGCL and received by the Company relating to stockholders' rights of appraisal.  Prior to the Closing, the Company will not release such stockholders from, or take other actions that render ineffective, contractual waivers that stockholders of the Company have granted regarding appraisal rights that would apply to the Merger.  No party will make any payment with respect to, or settle or offer to settle, any such demand for payment except with the prior written consent of Buyer.

2.8     Closing of the Company's Transfer Books. At the Effective Time, holders of Shares that were outstanding immediately prior to the Effective Time shall cease to have any rights as stockholders of the Company, and instead shall have the right to receive a portion of the Merger Consideration as set forth in this Agreement (or, if applicable, appraisal rights) and the stock transfer books of the Company shall be closed with respect to all Shares outstanding immediately prior to the Effective Time. No further transfer of any Share shall be made on such stock transfer books after the Effective Time.

2.9     No Liability. Notwithstanding anything to the contrary in this Article II, none of the Seller Representative, the Buyer, the Surviving Corporation or any other party to this Agreement shall be liable to any Person for any amount properly paid to a public official pursuant to any applicable abandoned property, escheat or similar law. If any certificate representing any share of any class of capital stock of the Company that is to be converted into the right to receive Merger Consideration has not been surrendered by the date on which such property would otherwise escheat to or become the property of any Governmental Entity, the Merger Consideration otherwise payable, to the extent permitted by applicable Law, shall become the property of the Buyer, free and clear of all Liens or other claims or interests of any Person previously entitled thereto.

2.10    Payments; Exchange of Certificates and Letter of Transmittals . As promptly as practicable following the date hereof, the Company shall deliver to each Stockholder (i) a Letter

- 26 -

39329697.7

CONFIDENTIAL                                                                                     FBG_CH1_00094153

of Transmittal together with the Merger Recommendation Statement, (ii) a Joinder Agreement and (iii) instructions for use in effecting the surrender of Shares in exchange for the applicable portion of Merger Consideration pursuant to Section 2.5; provided that to the extent this Agreement and/or any Ancillary Document is contemplated to be delivered with the foregoing, such agreements may be redacted as the Company determines is reasonably necessary or desirable to prevent disclosure of information of a confidential or sensitive nature. The Company shall use commercially reasonable efforts to cause each Stockholder to deliver to the Company a duly completed Letter of Transmittal and duly executed Joinder Agreement as promptly as practicable. No interest shall be paid or shall accrue on any cash payable upon delivery of a Letter of Transmittal.

(a)     In furtherance and not in limitation of the foregoing, prior to receiving any portion of the Merger Consideration, each Stockholder shall be required to deliver to the Company a properly completed and duly executed Letter of Transmittal.

(b)     Upon delivery of such Letter of Transmittal, the holder of such Share shall be entitled to receive in exchange therefor the consideration set forth above in Section 2.5, inclusive of the contingent right to receive, if and when payable, such holder's Pro Rata Share of any Future Merger Consideration Distribution Amounts.

(c)     If any portion of the aggregate consideration to be paid as set forth in this Agreement is to be paid to a Person other than the Person in whose name the Share so surrendered is registered, it shall be a condition of exchange that (x) that the Person requesting such exchange shall pay any transfer or other Taxes required by reason of the exchange to a Person other than the registered holder of such Share or establish to the reasonable satisfaction of the Company that such Tax has been paid or is not applicable, and (y) such Person execute and deliver to Buyer and the Company a certificate containing an appropriate representation regarding ownership, authority and title to such Shares.

2.11    Other Payments.

(a)     At the Closing, the Buyer shall deposit, or cause to be deposited, (i) with the Company, for further payment to the Stockholders in accordance with this Article II, the portion of the Closing Merger Consideration payable to such Stockholders and (ii) with the Company, for further payment to the Option Holders in accordance with Section 2.6 and this Article II, the portion of the Closing Merger Consideration payable to such Option Holders (net of all applicable withholding and deductions).  For the avoidance of doubt, the amount of the aggregate Closing Merger Consideration to be deposited by the Buyer pursuant to this Section 2.11(a) shall be calculated net of the Adjustment Escrow Amount and the Expense Holdback Amount, the payments of which are set forth Section 2.11(d) and 2.11(e) below.

(b)     At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the amounts reflected in the payoff letters described in Section 2.12(a)(iii) to the lenders in accordance with wiring instructions provided to the Buyer no less than three (3) Business Days prior to the Closing Date.

(c)     At the Closing, the Buyer shall pay, or cause to be paid, on behalf of the Acquired Companies, the Transaction Expenses to the obligees thereof in accordance with wiring

- 27 -

39329697.7

CONFIDENTIAL                                                                    FBG_CH1_00094154

instructions provided to the Buyer no less than three (3) Business Days prior to the Closing Date (it being understood and agreed that applicable Taxes will be paid or withheld at the time and in the manner required by applicable Law). For the avoidance of doubt, the portion of Transaction Expenses described in clause (ii) of the definition thereof applicable to the Option Consideration and the Adjustment Escrow Amount shall be paid to the Company at the Closing for further payment in accordance with the Code.

(d)     At the Closing, the Buyer shall deposit, or cause to be deposited, with the Escrow Agent, the Adjustment Escrow Amount by wire transfer of immediately available funds to be held in escrow in a separate account of the Escrow Agent (the "**Adjustment Escrow Account**") and disbursed by the Escrow Agent in accordance with the terms and provisions of the Escrow Agreement.

(e)     At the Closing, the Buyer shall deposit, or cause to be deposited, on behalf of the Stockholders and the Option Holders, the Expense Holdback Amount by wire transfer of immediately available funds to the account designated by the Seller Representative no less than three (3) Business Days prior to the Closing Date.

(f)     Promptly following the Closing, Buyer shall cause the Surviving Company or an Affiliate thereof to make the payments set forth on Schedule 1.1(d) to the Persons specified in Schedule 1.1(d) through the Company's payroll system.

2.12    Closing Deliveries.

(a)     Deliveries to Buyer. At the Closing, the Company shall deliver or caused to be delivered to Buyer the following:

(i)     a copy of the resolution of the Company's board of directors, certified by an authorized officer of the Company as having been duly and validly adopted and being in full force and effect as of the Closing Date, authorizing the execution and delivery of this Agreement and performance by the Company of the transactions contemplated hereby;

(ii)     a copy of the written consent of the Stockholders pursuant to Section 228 of the DGCL providing the Requisite Stockholders Consent certified by an authorized officer of the Company as having been duly and validly adopted and being in full force and effect as of the Closing Date;

(iii)     a payoff letter and related Lien release documentation, in each case, customary in form and substance, from each holder of Closing Date Payoff Indebtedness, indicating that upon payment of a specified amount, such Indebtedness shall be paid in full, and all associated Liens shall be released (other than Permitted Liens);

(iv)     the Company Closing Certificate;

(v)     evidence that, effective as of the Closing, the Advisory Services Fee Letter shall be terminated and of no further force and effect; and

- 28 -

39329697.7

FBG_CH1_00094155

(vi)    a signature page to the Escrow Agreement duly executed by each of the Company and Seller Representative and simultaneously delivered to the Escrow Agent.

(b)    Deliveries to the Company. At the Closing, Buyer shall deliver or cause to be delivered to the Company the following:

(i)    a copy of the resolution of each of Buyer's and Merger Sub's governing body, certified by an authorized officer of Buyer and Merger Sub, as applicable, as having been duly and validly adopted and being in full force and effect as of the Closing Date, authorizing the execution and delivery of this Agreement and performance by Buyer and Merger Sub, as applicable, of the transactions contemplated hereby;

(ii)    the Buyer Closing Certificate; and

(iii)    a signature page to the Escrow Agreement duly executed by the Buyer and simultaneously delivered to the Escrow Agent.

2.13    Merger Consideration Adjustment. (a) No later than two (2) Business Days prior to the Closing Date, the Company shall prepare in good faith and deliver to Buyer a written certificate duly executed by an authorized officer of the Company (the "**Estimated Closing Statement**") setting forth (i) an estimated unaudited consolidated balance sheet of the Acquired Companies as of the Adjustment Time (the "**Estimated Closing Balance Sheet**"), (ii) its good faith estimate of (A) Closing Net Working Capital ("**Estimated Net Working Capital**"), (B) the Closing Cash ("**Estimated Closing Cash**"), (C) the Closing Indebtedness (the "**Estimated Closing Indebtedness**"), (D) the Transaction Expenses (the "**Estimated Transaction Expenses**"), and (E) the Estimated Adjustment Amount based thereon, and (iii) based on the foregoing calculations, the Company's good faith calculation of the Closing Merger Consideration, together with reasonable supporting detail for each component thereof. The Estimated Closing Statement and the components thereof shall be prepared in accordance with the Accounting Principles. From and after delivery of the Estimated Closing Statement, upon Buyer's reasonable request, the Company shall in good faith discuss with Buyer the Estimated Closing Statement, the calculations therein and the documentation related thereto, and shall provide Buyer and its Representatives, upon Buyer's reasonable request and solely for the purpose of verifying the Estimated Closing Statement, with reasonable access to (i) the Books and Records of the Acquired Companies (ii) financial information of the Acquired Companies and (iii) employees of the Acquired Companies involved in the preparation of the Estimated Closing Statement, in each case, used in calculating the amounts contained in such Estimated Closing Statement or otherwise useful to verify the amounts thereof. The Company shall consider in good faith any reasonable comments made by Buyer on the Estimated Closing Statement prior to the Closing; provided that, the failure of the Company to implement any comments made by Buyer shall not delay or otherwise prevent the Closing, and, to the extent of any good faith dispute regarding Buyer's comments, the Company's calculation shall prevail for the purposes of the Estimated Closing Statement and the determination of the Estimated Adjustment Amount. To the extent the Company agrees to any such revisions, the Company shall deliver to Buyer a revised Estimated Closing Statement reflecting such revisions, which revised Estimated Closing Statement shall (x) be deemed to have

- 29 -

39329697.7

been delivered at the time the Company delivered the initial Estimated Closing Statement and (y) be used for purposes of determining any items set forth therein at the Closing.

(b)      On or before the date that is ninety (90) calendar days following the Closing Date, the Surviving Corporation or its designee shall prepare, or cause to be prepared in good faith, and deliver, or cause to be delivered, to the Seller Representative a written certificate duly executed by an authorized officer of the Surviving Corporation (the "**Closing Statement**") setting forth (i) an unaudited consolidated balance sheet of the Acquired Companies as of the Adjustment Time (the "**Closing Balance Sheet**"), (ii) a calculation of (A) Closing Net Working Capital ("**Adjusted Closing Net Working Capital**"), (B) the Closing Cash ("**Adjusted Closing Cash**"), (C) the Closing Indebtedness (the "**Adjusted Closing Indebtedness**"), (D) the Transaction Expenses ("**Adjusted Transaction Expenses**"), and (E) the Adjusted Adjustment Amount based thereon, and (iii) based on the foregoing, Buyer's good faith calculation of the Merger Consideration, together with reasonable supporting detail for each component thereof and any information that the Seller Representative has reasonably requested to verify the amounts reflected in the Closing Statement. The Closing Balance Sheet and the components thereof shall be prepared in accordance with the Accounting Principles. Buyer agrees that the purpose of preparing the Closing Statement and determining the Adjusted Closing Net Working Capital, the Adjusted Closing Cash, the Adjusted Closing Indebtedness and the Adjusted Transaction Expenses is to measure changes or differences in Closing Net Working Capital, Closing Cash, Closing Indebtedness and Transaction Expenses as compared to Estimated Net Working Capital, Estimated Closing Cash, Estimated Closing Indebtedness and Estimated Transaction Expenses. Such calculations are not intended to permit the introduction of different components, judgments, accounting methods, policies, principles, practices, procedures, classifications or estimation methodologies as compared with the Accounting Principles for the purpose of preparing the Closing Statement or determining the Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness and Adjusted Transaction Expenses from the components, judgments, accounting methods, policies, principles, practices, procedures, classifications or estimation methodologies that are referenced in the Accounting Principles or to take into account any events, conditions or developments occurring after Closing with respect to any such calculations, components, judgments, accounting methods, policies, principles, practices, procedures, classifications or estimation methodologies. The parties hereto agree that the Closing Statement shall entirely disregard (i) any and all effects which arise at or following the Closing on the assets or liabilities of the Acquired Companies of any financing or refinancing arrangements entered into at any time by Buyer or any other transaction entered into by Buyer in connection with the consummation of the transactions contemplated by this Agreement, and (ii) any of the plans, transactions, or changes occurring at or following the Closing that Buyer (or the Acquired Companies) intends (or intend) to initiate or make or cause to be initiated or made at or after the consummation of the Closing with respect to the Acquired Companies or their respective businesses or assets, or any facts or circumstances that are unique or particular to Buyer or any of its assets or liabilities. If no Closing Statement is delivered by 11:59 p.m. New York, New York time on the ninetieth (90th) day following the Closing Date, the Estimated Closing Statement shall, absent mathematical or manifest error, be deemed final, binding and conclusive for all purposes hereunder.

(c)      From the delivery of the Closing Statement until the determination of Final Closing Net Working Capital, Final Closing Cash, Final Closing Indebtedness, Final Transaction Expenses and, based on the foregoing, Final Merger Consideration, in accordance with this

- 30 -

39329697.7

FBG_CH1_00094157

Section 2.13(c), Buyer will cause the Acquired Companies to provide the Seller Representative and its Representatives, upon Seller Representative's reasonable request with reasonable access to (i) the Books and Records of the Acquired Companies, (ii) financial information, as of the Closing Date, of the Acquired Companies, and (iii) employees of the Acquired Companies involved in the preparation of the Closing Statement, in each case, used in calculating the amounts contained in such Estimated Closing Statement or otherwise useful to verify the amounts thereof. The Seller Representative may dispute the calculation of Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness or Adjusted Transaction Expenses by notifying Buyer of such disagreement in writing, setting forth in reasonable detail the particulars of such disagreement, including Seller Representative's final calculations of the disputed items and amounts contained in the Closing Statement (a "**Notice of Objection**"), within thirty (30) calendar days after Seller Representative's receipt of the Closing Statement. To the extent not disputed in the Notice of Objection, the Seller Representative (on behalf of the Stockholders and Option Holders) shall be deemed to have agreed with Buyer's calculation of all other items and amounts contained in the Closing Statement upon delivery of the Notice of Objection and such calculations shall be final, binding and conclusive for all purposes hereunder. In the event that the Seller Representative does not provide a Notice of Objection within such thirty (30) calendar day period, Seller Representative (on behalf of the Stockholders and Option Holders) shall be deemed to have accepted the Closing Statement delivered by Buyer and Buyer's calculations of Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness and Adjusted Transaction Expenses contained therein, which shall then be final, binding and conclusive for all purposes hereunder. In the event any Notice of Objection is timely provided, Buyer and the Seller Representative shall negotiate in good faith for a period of thirty (30) calendar days (or such longer period as they may agree in writing) to resolve any disagreements set forth in the Notice of Objection. If Buyer and the Seller Representative are unable to resolve such items in dispute (the "**Unresolved Items**") by the end of such period, then the Seller Representative and Buyer will submit to the Independent Accountant the Unresolved Items. For the avoidance of doubt, the Independent Accountant shall only resolve the Unresolved Items and not any disagreements that have been resolved by the parties, and shall act as an expert and not an arbitrator. Buyer and the Seller Representative shall instruct the Independent Accountant to determine as promptly as practicable, and in any event within thirty (30) calendar days of the date on which such dispute is referred to the Independent Accountant, based solely on the provisions of this Agreement and the written presentations by the Seller Representative and Buyer, and not on an independent review, whether and to what extent (if any) the calculations of Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness and/or Adjusted Transaction Expenses require adjustment; provided, however, that in resolving any Unresolved Item, the Independent Accountant (A) may not assign a value to any item greater than the greatest value for such item claimed by Buyer or the Seller Representative or less than the smallest value for such item claimed by either Buyer or the Seller Representative and (B) may not take oral testimony from the parties hereto or any other Person. The fees and expenses of the Independent Accountant shall be allocated between the parties based upon the percentage which the portion of the contested amount not awarded to each party bears to the amount actually contested by such party. The Seller Representative and Buyer shall submit simultaneous briefs to the Independent Accountant (with the Independent Accountant to provide a copy to the other party or parties only following receipt of both parties' submissions) setting forth their respective positions regarding the Unresolved Items, and not later than fifteen (15) days after the submission of such briefs, the Seller

- 31 -

39329697.7

FBG_CH1_00094158

Representative and Buyer shall submit simultaneous reply briefs (with the Independent Accountant to provide a copy to the other party or parties only following receipt of both parties' submissions). If an additional briefing, a hearing or other information is required by the Independent Accountant, the Independent Accountant shall give notice thereof to the parties as soon as practicable before the expiration of such 15-day period, and the parties shall promptly respond with a view to minimizing any delay in the decision date. No party shall be permitted to communicate with the Independent Accountant other than as expressly set forth herein, and no *ex parte* communications with the Independent Accountant shall be permitted in any event, in each case, with respect to any matter contemplated by this Agreement. The determination of the Independent Accountant shall be set forth in a written statement delivered to the Seller Representative and Buyer and shall be final, conclusive and binding on the parties. The date on which Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness, and Adjusted Transaction Expenses is finally determined in accordance with this Section 2.13(c) is hereinafter referred to as the "**Determination Date**." The Adjusted Closing Net Working Capital, Adjusted Closing Cash, Adjusted Closing Indebtedness, and Adjusted Transaction Expenses, each as finally determined in accordance with this Section 2.13(c), shall be referred to as the "**Final Closing Net Working Capital**," "**Final Closing Cash**", "**Final Closing Indebtedness**", and "**Final Transaction Expenses**", respectively, and **"Final Merger Consideration,"** shall mean the Merger Consideration re-calculated to give effect thereto.

(d)     If the Final Merger Consideration, as finally determined pursuant to this Section 2.13, is less than the Closing Merger Consideration (the amount of such deficit, the "**Buyer Adjustment Amount")**, then within five (5) Business Days following the Determination Date, (i) the Buyer and the Seller Representative shall deliver a joint written instruction to the Escrow Agent instructing it to disburse the funds in the Adjustment Escrow Account as follows: (A) to the Buyer, the lesser of the Buyer Adjustment Amount and all of the funds in the Adjustment Escrow Account, (B) to the Seller Representative the Pro Rata Share of the amount of the funds remaining in the Adjustment Escrow Account following the distribution in clause (A), if any, allocable to the ONCAP Sellers and Penfund Capital Fund III Limited Partnership Equity ("**Penfund**"), and (C) to the Company, the amount of the funds remaining in the Adjustment Escrow Account following the distributions in clauses (A) and (B), if any, for further payment to the Stockholders (other than the ONCAP Sellers and Penfund) and the Option Holders (net of any applicable withholding Taxes) and (ii) if the funds in the Adjustment Escrow Account are less than the Buyer Adjustment Amount, the Seller Representative shall pay such shortfall to the Buyer by wire transfer of immediately available funds to the account designated by the Buyer (and for the avoidance of doubt, such amount shall be recoverable by the Seller Representative from the Expense Holdback Amount).  With respect to any amounts payable to Option Holders pursuant to this Section 2.13(d), such amounts shall be paid to the Company for further payment to each Option Holder in accordance with the last sentence of Section 2.6(a).

(e)     If the Final Merger Consideration, as finally determined pursuant to this Section 2.13, is greater than the Closing Merger Consideration (the amount of such excess, the "**Seller Adjustment Amount")**, then within five (5) Business Days following the Determination Date, (i) the Buyer shall (X) pay or cause to be paid, to the Seller Representative the Pro Rata Share of the Seller Adjustment Amount allocable to the ONCAP Sellers and Penfund, and (Y) deposit, or cause to be deposited, with the Company the remaining portion of the Seller Adjustment Amount for further payment to the Stockholders (other than the ONCAP Sellers and

39329697.7

CONFIDENTIAL

FBG_CH1_00094159

Penfund) and the Option Holders (net of any applicable withholding Taxes) and (ii) the Buyer and the Seller Representative shall deliver a joint written instruction to the Escrow Agent instructing it to disburse all of the funds in the Adjustment Escrow Account as follows: (I) to the Seller Representative, the Pro Rata Share of the funds in the Adjustment Escrow Account allocable to the ONCAP Sellers and Penfund and (II) to the Company, the remaining portion of the funds in the Adjustment Escrow Account for further payment to the Stockholders (other than the ONCAP Sellers and Penfund) and the Option Holders (net of any applicable withholding Taxes).  With respect to any amounts payable to Option Holders pursuant to this Section 2.13(e), such amounts shall be paid to the Company for further payment to each Option Holder in accordance with the last sentence of Section 2.6(a).

(f)     If the Final Merger Consideration, as finally determined pursuant to this Section 2.13, is equal to the Closing Merger Consideration, then no adjustment shall be made to the Merger Consideration pursuant to this Section 2.13 and, within five (5) Business Days following the Determination Date, the Buyer and the Seller Representative shall deliver a joint written instruction to the Escrow Agent instructing it to disburse all of the funds in the Adjustment Escrow Account as follows (i) to the Seller Representative the Pro Rata Share of the amount of the funds in the Adjustment Escrow Account allocable to the ONCAP Sellers and Penfund and (ii) to the Company, the remaining portion of the funds in the Adjustment Escrow Account for further payment to the Stockholders (other than the ONCAP Sellers and Penfund) and the Option Holders (net of any applicable withholding Taxes). With respect to any amounts payable to Option Holders pursuant to this Section 2.13(f), such amounts shall be paid to the Company for further payment to each Option Holder in accordance with the last sentence of Section 2.6(a).

(g)     The parties agree and acknowledge that any payment pursuant to Sections 2.13(d) or 2.13(e) will be treated by the parties as an adjustment to the purchase price for Tax purposes, to the extent permitted by Law.

(h)     Notwithstanding anything to the contrary contained herein, the process set forth in this Section 2.13 shall, except in the case of Fraud, be the sole and exclusive remedy of the parties hereto for any disputes related to items required to be included or reflected in the calculation of Net Working Capital, Cash and Cash Equivalents, Indebtedness and Transaction Expenses.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Disclosure Schedules, the Company hereby represents and warrants to Buyer as follows:

3.1     Existence and Power. The Company is a corporation duly formed, validly existing and in good standing under the Laws of its jurisdiction of incorporation and its Subsidiaries are duly formed, validly existing and in good standing under the Laws of their respective jurisdictions of organization. Each Acquired Company has all corporate power and authority required to own, lease and operate its properties and to carry on its business as presently conducted, and is duly qualified to transact business as a foreign corporation and is in good standing as a foreign corporation authorized to transact business in each jurisdiction in which it conducts material

- 33 -

39329697.7

FBG_CH1_00094160

business where the nature of the business conducted or properties owned therein requires such qualification. The Company has delivered or made available to Buyer true and correct copies of the Organizational Documents of each Acquired Company as in effect on the date hereof

3.2     Authorization. The execution, delivery, and performance by the Company of this Agreement and the consummation of the transactions contemplated hereby (a) are within the Company's corporate powers and authority, and (b) have been duly authorized by all necessary corporate action on the part of the Company, and no other procedures on the part of the Company are necessary to authorize entry into this Agreement or the consummation of the transactions contemplated thereby, other than obtaining the Requisite Stockholders Consent. Without limiting the generality of the foregoing, the Company's board of directors has, by written consent without a meeting, determined that (1) the Merger is fair and in the best interests of the Company and its Stockholders and (2) adopted and approved this Agreement and declared its advisability in accordance with the DGCL.

3.3     Enforceability. This Agreement and the other Ancillary Documents to which any Acquired Company is a party have been duly executed and validly delivered by each such Acquired Company and constitutes a valid and legally binding obligation of each such Acquired Company, enforceable against each such Acquired Company in accordance with its terms, except (a) as enforcement may be limited by: applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (b) insofar as the availability of equitable remedies may be limited by applicable Law (the exceptions (a) and (b) collectively, the "**Equitable Exceptions**"). The Requisite Stockholders Consent is the only vote or consent of the holders of any class of Equity Securities of any Acquired Company necessary under the Organizational Documents of the Acquired Companies and the DGCL to approve the Merger and the transactions contemplated hereby.

3.4     Governmental and Third Party Authorizations. Except as set forth on Schedule 3.4, and except for (a) applicable requirements under "blue sky" Laws of various states and (b) assuming all filings required under the HSR Act are made and any waiting periods thereunder have expired or been terminated, no consent, license, approval or authorization of, declaration or notice to, or filing or registration with, any Governmental Entity, any party to a Material Contract or any other Person is required to be made or obtained by any Acquired Company in connection with the execution, delivery and performance by the Company of this Agreement or any Ancillary Documents to which any Acquired Company is a party, or the consummation by the Company of the transactions contemplated hereby or thereby, except in each case for such consents or approvals (x) the failure of which to obtain would not reasonably be expected to be materially adverse to the Acquired Companies taken as a whole or (y) that would arise as a result of the business or activities in which Buyer is or proposes to be engaged or as a result of any acts or omissions by, or any facts pertaining to, Buyer.

3.5     Noncontravention. Except as set forth on Schedule 3.5 and except for (a) applicable requirements under "blue sky" Laws of various states and (b) assuming all filings required under the HSR Act are made and any waiting periods thereunder have expired or been terminated, the execution, delivery and performance by the Company of this Agreement and any Ancillary Documents to which it is a party does not, and the consummation of the transactions contemplated hereby and thereby will not, (i) violate the Organizational Documents of any Acquired Company,

- 34 -

39329697.7

FBG_CH1_00094161

(ii) conflict with or violate any Law applicable to any Acquired Company, (iii) conflict with, or result in a breach of any of the terms or provisions of, constitute (with or without notice or lapse of time or both) a default under, or give rise to any right of payment, termination, cancellation, modification or acceleration of any right or obligation of any Acquired Company, or to a loss of any benefit to which any Acquired Company is entitled, under any Material Contract binding upon any Acquired Company or any of their respective assets or properties, or (iv) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of any Acquired Company or give to any other Person any interest or right in any property of any Acquired Company, except, in the case of clauses (iii) and (iv), for such violations, defaults or impositions (x) that would not reasonably be expected to be materially adverse to the Acquired Companies taken as a whole or (y) that would arise as a result of the business or activities in which Buyer is or proposes to be engaged or as a result of any acts or omissions by, or any facts pertaining to, Buyer.

3.6     Capitalization; Subsidiaries.

(a)     Schedule 3.6(a) sets forth the entire authorized Equity Securities of the Company and a complete and correct list as of the date hereof of (i) the issued and outstanding Equity Securities of the Company, including the name of the record owners thereof and the number of Equity Securities held thereby, (ii) the name of the record owner of all issued and outstanding Equity Securities of each Acquired Company (other than the Company), (iii) all holders of outstanding Options, including the grant date, per-share exercise price, vested status and number of Shares subject to each such Option and (iv) all holders of outstanding Phantom Options, including the grant date, per-share exercise price, vested status and number of Shares with respect to which the cash-settled Phantom Option is exercisable. All of the outstanding Equity Securities of each Acquired Company have been duly authorized, and are validly issued, fully paid and non-assessable and have not been issued in violation of any preemptive rights of any Stockholder, Option Holder or any other Person.  Except as set forth in Schedule 3.6(a), there are no outstanding or authorized Equity Securities of any Acquired Company. Except as set forth on Schedule 3.6(a), there are no Contracts (including any options, warrants or similar agreements) obligating any Acquired Company to issue, sell, repurchase, redeem or otherwise acquire any Equity Securities. Except as set forth on Schedule 3.6(a), there are no Contracts obligating any Acquired Company with respect to any stock appreciation, phantom stock or similar arrangements.

(b)     Schedule 3.6(b) sets forth the jurisdiction of organization of each Subsidiary of the Company. The Company owns, directly or indirectly, 100% of the outstanding Equity Securities of each such Subsidiary, free and clear of all Liens (other than Permitted Liens). Except as set forth on Schedule 3.6(b), no Acquired Company has any Subsidiaries nor does it own Equity Securities in any Person.

(c)     Except as set forth on Schedule 3.6(c), no Acquired Company is party to any stockholder agreement or other similar agreement with respect to the voting or transfer of any of its Equity Securities.

3.7     Financial Statements; Undisclosed Liabilities.

(a)     Schedule 3.7(a) contains complete and correct copies of the following financial statements (collectively, the "**Financial Statements**"):

- 35 -

39329697.7

CONFIDENTIAL                                                                FBG_CH1_00094162

(i)      The audited consolidated balance sheets of the Acquired Companies as of December 31, 2020, December 31, 2021 and December 31, 2022, and, in each case, the related audited consolidated statements of income, cash flows and stockholders' equity for each such year then ended (the "**Audited Financial Statements**"); and

(ii)      The unaudited consolidated balance sheet of the Acquired Companies as of May 31, 2023 (the "**Most Recent Company Balance Sheet**") and the related statements of income, cash flows and stockholders' equity for the five-month period then ended (the "**Unaudited Financial Statements**").

(b)      Each of the Financial Statements is derived from the Books and Records of the Acquired Companies and presents fairly, in all material respects, the consolidated financial position of the Acquired Companies at the dates thereof and the consolidated results of operations and cash flows of the Acquired Companies for the periods then ended, as applicable, in accordance with GAAP, applied on a consistent basis throughout the periods covered thereby, except (i) as may be stated in the notes thereto, (ii) that the Unaudited Financial Statements are subject to year-end adjustments and lack the footnote disclosure otherwise required by GAAP and (iii) as set forth on Schedule 3.7(b).

(c)      The accounts receivable reflected on the Most Recent Company Balance Sheet have arisen from bona fide arms' length transactions entered into by the Acquired Companies involving the sale of goods in the ordinary course of business consistent with past practice in all material respects.  The reserve for bad debts shown on the Most Recent Company Balance Sheet or, with respect to accounts receivable arising after the date of the Most Recent Company Balance Sheet, on the accounting records of the Acquired Companies, has been determined in accordance with GAAP, subject to normal year-end adjustments and the absence of disclosures normally made in footnotes to the Audited Financial Statements. To the Company's Knowledge, there are no material contests, claims, counterclaims, rights of set off or other defenses with respect to the accounts and notes receivable reflected on the Financial Statements that are not adequately reserved for with an offsetting other current liability provision consistent with past practice. The Acquired Companies have no security arrangements or collateral securing the repayment or satisfaction of receivables of the Acquired Companies.  There has been no change since the date of the Most Recent Company Balance Sheet in the amount or aging of the accounts receivable, unbilled invoices, or other debts due to the Acquired Companies, or the reserves with respect thereto, or accounts payable of the Acquired Companies, which would reasonably be expected to have a Material Adverse Effect.

(d)      The Acquired Companies do not have any liabilities that are of the type that would be set forth on a consolidated balance sheet of the Acquired Companies prepared in accordance with GAAP, other than those (i) reflected in, reserved against or otherwise described in the Financial Statements or the notes thereto (or, in the case of the Unaudited Financial Statements, those which would be reflected in year-end adjustments) or (ii) incurred in the ordinary course of business consistent with past practice since the date of the Most Recent Company Balance Sheet (none of which relates to a breach of Contract, breach of warranty, tort, or the infringement or violation of any Law) or (iii) that, individually or in the aggregate, do not and would not reasonably be likely to be materially adverse to the Acquired Companies, taken as a whole.

- 36 -

39329697.7

FBG_CH1_00094163

3.8     Absence of Certain Changes. As of the date hereof except as disclosed in Schedule 3.8, since the date of the Most Recent Company Balance Sheet:

(a)     the Acquired Companies have conducted their business only in the ordinary course of business consistent with past practice;

(b)     there has not been any effect, change, condition, event, fact, circumstance or development that has had, or would reasonably be expected to have, a Material Adverse Effect;

(c)     no Acquired Company has effected any merger, amalgamation, consolidation, share exchange, reorganization or similar business combination with any other Person, or acquired any business or Person by any other manner, in a single transaction or a series of related transactions, or entered into any binding Contract, letter of intent or similar arrangement with respect to the foregoing;

(d)     no Acquired Company has (i) sold, leased, licensed, encumbered, transferred, assigned, sublicensed, conveyed or otherwise disposed of, any of its material properties or assets (whether tangible or intangible), including any of the Company's Subsidiaries, other than sales of inventory in the ordinary course of business, or (ii) created any Lien (other than a Permitted Lien) on any material property or assets, other than in the ordinary course of business consistent with past practice;

(e)     no Acquired Company has adopted any plan of complete or partial liquidation or dissolution, or filed any petition in bankruptcy under any provisions of federal or state bankruptcy Law, or consented to the filing of any bankruptcy petition against it under any similar Law, or entered into any restructuring or reorganization;

(f)     no Acquired Company has entered into, amended or terminated any Material Contract;

(g)     no Acquired Company has entered into, renewed, extended or modified any Real Property Lease (as defined below) or acquired any real property;

(h)     no Acquired Company has cancelled, compromised, waived, or released any material right or claim in excess of $250,000;

(i)     no Acquired Company has failed to maintain, or allowed to lapse, any material insurance policy;

(j)     no Acquired Company has entered into a new line of business;

(k)     no Acquired Company has entered into any material Contract or transaction between any Acquired Company, on the one hand, and any officer, director, manager, equityholder or beneficiary of any Acquired Company (or any Affiliate thereof other than another Acquired Company), on the other hand, other than employment agreements, and no Acquired Company has paid, discharged or satisfied any material liability in connection with any such Contract or transaction, other than with respect to employment agreements;

- 37 -

39329697.7

FBG_CH1_00094164

(l)      no Acquired Company has (i) sold, transferred, assigned, abandoned, leased, permitted to lapse, or otherwise disposed of, or granted any material license or sublicense of, any rights under or with respect to any material Intellectual Property or (ii) acquired or licensed from any Person any rights to any material Intellectual Property, in each case other than in the ordinary course of business consistent with past practice;

(m)      no Acquired Company has (i) incurred or guaranteed any material Indebtedness (other than draws under a revolving line of credit in the ordinary course of business consistent with past practice) or (ii) made any loan to any Person other than to any employee for normal travel and expense advances;

(n)      no Acquired Company has made or authorized any change in any Organizational Document of any Acquired Company;

(o)      no Acquired Company has issued, sold, pledged, transferred, assigned, encumbered or otherwise disposed of, or changed any rights with respect to, or increased or decreased the authorized amount of, or authorized or proposed the issuance, sale, pledge, transfer, assignment, encumbrance or disposal of, or change of any rights with respect to, or increase or decrease of the authorized amount of, (i) any of its Equity Securities, or securities convertible into or exchangeable for any such Equity Securities, or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its Equity Securities or (ii) any other securities in respect of, in lieu of, or in substitution for any Equity Securities of the Acquired Companies outstanding on the date hereof, excluding, however, any grants of Options identified on Schedule 3.6(a);

(p)      no Acquired Company has redeemed, purchased or otherwise acquired, or made or declared any dividends or distributions in respect of, any outstanding Equity Securities of the Company or any of the Company's Subsidiaries;

(q)      no Acquired Company has effected any recapitalization, reclassification, stock split, combination or like change in its capitalization, or amended the terms of any of its outstanding securities;

(r)      no Acquired Company has made or committed to make any capital expenditures or capital additions or improvements in excess of $300,000 individually or $2,000,000 in the aggregate;

(s)      no Acquired Company has experienced any material damage, destruction, or loss (whether or not covered by insurance) to any of its tangible property outside of the ordinary course of business consistent with past practice;

(t)      no Acquired Company has written down the value of any work-in-process, or written off as uncollectible any notes or client accounts receivable, except write-downs and write-offs in the ordinary course of business consistent with past practice, none of which individually or in the aggregate, were material to any Acquired Company;

(u)      no Acquired Company has (i) made any increase in the wages, salaries or cash bonuses of any of its employees in an amount exceeding the greater of $50,000 or 25% of the

- 38 -

39329697.7

employee's existing wages, salaries or cash bonuses (as applicable), or (ii) adopted or materially amended any Employee Plan or collective bargaining agreement or terminated any collective bargaining agreement or any arrangement that would be an Employee Plan if in effect on the date hereof, in each case, except as may be required by any Law, Employee Plan terms or Contract;

      (v)     no Acquired Company has made any bonus or profit sharing distribution;

      (w)     no Acquired Company has entered into any employment or exclusive consulting agreement which (i) is not cancelable by such Acquired Company without penalty or other financial obligation within thirty (30) days or (ii) provides for compensation in excess of $100,000 per annum;

      (x)     no Acquired Company has announced or implemented any employee layoffs, plant closings, furloughs, salary or wage reductions, work schedule changes or other actions that could implicate the WARN Act, or any other reduction-in-force, early retirement program, or other voluntary or involuntary employment termination program;

      (y)     no Acquired Company has recognized any labor union, works council, or other labor organization or group of employees for purposes of collective bargaining or as the representative for any employees;

      (z)     no Acquired Company has terminated any officer, employee or exclusive consultant whose annual base salary or annual consulting fee (as applicable) exceeds $100,000;

      (aa)     no Acquired Company has commenced any Suit or settled or otherwise compromised any pending or threatened Suit;

      (bb)     there has not been any change in any method of accounting or accounting practice of any Acquired Company, except as required by applicable Law or as disclosed in the notes to the Financial Statements;

      (cc)     no Acquired Company has (i) made, changed or rescinded any material election relating to Taxes, (ii) settled or compromised any material Tax claim, (iii) filed any material Tax return inconsistent with past practice, (iv) filed any amended material Tax return, or entered into any ruling request, closing agreement or similar agreement with respect to material Taxes, (v) surrendered any right to claim a refund of material Taxes, (vi) consented to any extension or waiver of the limitation period applicable to any material Tax claim or assessment, or (vii) failed to pay any material Taxes that became due and payable (including any material estimated Tax payments); and

      (dd)     no Acquired Company has legally obligated itself to do any of the foregoing.

- 39 -

39329697.7

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 238**
**Page 40 of 133**

3.9     Material Contracts.

(a)     Schedule 3.9(a) contains a list as of the date hereof of each Contract pursuant to which any Acquired Company has any executory rights or obligations that:

(i)     resulted in an aggregate payment of $500,000 or more to or from an Acquired Company in the twelve (12) months ended December 31, 2022;

(ii)     is a Real Property Lease;

(iii)     grants to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any material assets of any Acquired Company, provides for any "most favored nation" terms, or establishes an exclusive sale or purchase obligation with respect to any product or service;

(iv)     creates a partnership or joint venture or similar business arrangement, or that involves a sharing of profits with, or relates to the investment in, any other Person (other than expense advances to employees in the ordinary course of business consistent with past practice);

(v)     is an agreement with any officer or employee of any Acquired Company that (A) provides for total annual compensation (including any potential bonus or potential commission) in excess of $250,000; or (B) provides for any termination or severance benefits, or similar termination penalty or cost for the payment of severance;

(vi)     provides for a retention bonus, change in control bonus, accelerated vesting or any other amount or benefit to any Person that will or may become payable as a result of any of the transactions contemplated by this Agreement;

(vii)     is a collective bargaining agreement;

(viii)     restricts any Acquired Company from engaging, or competing with any Person, in any line of business in any geographic area;

(ix)     limits the freedom of any Acquired Company to solicit for employment or hire any individual, other than non-disclosure agreements entered into in the ordinary course of business;

(x)     is a Material IP Agreement;

(xi)     is with an Affiliate of any Acquired Company (other than another Acquired Company) or any officer, director, manager, equityholder or beneficiary of any Acquired Company (or any Affiliate thereof), excluding employment contracts entered into in the ordinary course of business consistent with past practice;

(xii)     is with any Governmental Entity;

- 40 -

39329697.7

FBG_CH1_00094167

(xiii)   relates to the acquisition or disposition of any business (whether by merger, consolidation, business combination, sale of capital stock, sale of assets or otherwise), which such acquisition was consummated after January 1, 2018;

(xiv)   relates to any resolution or settlement of any actual or threatened Suit under which any of the Acquired Companies has continuing obligations to make any payments in excess of $500,000;

(xv)   relates to Indebtedness or the grant of a Lien on any asset of the Acquired Companies other than Permitted Liens; or

(xvi)   requires capital expenditures in excess of $300,000 annually or $1,000,000 in the aggregate.

(b)   Except as disclosed in Schedule 3.9(b), each Material Contract is in full force and effect and is a legal, valid and binding obligation of the applicable Acquired Company, and to the Company's Knowledge, each other party to such Material Contract, and is enforceable against the applicable Acquired Company, as the case may be, and to the Company's Knowledge, each other party to such Material Contract in accordance with its terms, except, in each case, as enforcement may be limited by the Equitable Exceptions. None of the Acquired Companies, or to the Company's Knowledge, any other party, is in material default under or in material breach or violation of a Material Contract, and, to the Company's Knowledge, there are no outstanding claims of breach or indemnification or notice of default or termination of any Material Contract. No occurrence, condition, act or event has occurred on or prior to the date hereof that (with or without notice, lapse of time or both) would constitute a material breach or material default by any Acquired Company or, to the Company's Knowledge, any other party, under any Material Contract.

(c)   The Company has made available to Buyer a true and correct copy of each written Material Contract as of the date hereof (subject to customary redactions of pricing information and similar terms), together with all amendments, schedules, exhibits, annexes and supplements thereto.

3.10   Material Customers and Suppliers.

(a)   Schedule 3.10(a) lists the names of the twenty (20) largest customers of the Acquired Companies on the basis of revenues for products or services provided by the Acquired Companies for (i) the twelve-month period ended December 31, 2022 and (ii) the five-month period ended the date of the Most Recent Company Balance Sheet, in each case, showing the total revenues from each such customer during each such applicable period. Each of the customers listed on Schedule 3.10(a) was (A) a customer of the Acquired Companies during the applicable period and (B) was in material compliance with such Acquired Company's ordinary course payment collection procedures during such period. The Acquired Companies have not received any written (or, to the Company's Knowledge, oral) notice that any Material Customer (1) has materially reduced or will materially reduce, the use of products or services of the Company or (2) has sought to materially reduce the price it will pay for products or services of the Company, including in each case as a result of this Agreement, the Ancillary Documents, or the transactions contemplated

- 41 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094168

hereby or thereby, in each case, outside of the ordinary course of business, and no Material Customer has notified any Acquired Company in writing of any material warranty, liability or other Contract claim.

(b)     Schedule 3.10(b) lists the names of the twenty (20) largest vendors and suppliers of the Acquired Companies on the basis of expenditures for products or services made by the Acquired Companies for (i) the twelve-month period ended December 31, 2022 and (ii) the five-month period ended the date of the Most Recent Company Balance Sheet, in each case, in each case, showing the total expenditures to each such vendor or supplier during the applicable period. The Acquired Companies have not received any written (or, to the Company's Knowledge, oral) notice that any Material Supplier (A) has materially reduced or will materially reduce, supply of its products or services to the Acquired Companies or (B) has sought to materially increase the price it will charge for products or services, including in each case as a result of this Agreement, the Ancillary Documents, or the transactions contemplated hereby or thereby, in each case, outside of the ordinary course of business, and no Material Supplier has notified any Acquired Company in writing of any material warranty, liability or other Contract claim.

3.11    Suits. Except as set forth on Schedule 3.11, since January 1, 2021 there have not been: (a) any material Suits pending or, to the Company's Knowledge, threatened against any Acquired Company or any of their respective officers and directors in connection with their service to the Acquired Companies, assets, properties or businesses; (b) any Suits pending in which any of the Acquired Companies is the plaintiff or claimant; or (c) any Orders to which any Acquired Company is subject, or any unsatisfied judgments, penalties or awards against or affecting any Acquired Company or any of their respective properties or assets. Except as set forth on Schedule 3.11, there are no settlement agreements or similar written agreements with any Person under which any of the Acquired Companies has continuing obligations to make any payments in excess of $500,000, or that include provisions restricting the business activities of the Acquired Companies (excluding confidentiality obligations).

3.12    Compliance with Laws; Permits; Product Liability.

(a)     None of the Acquired Companies is in violation in any material respect of any Law in any material respect to which it is subject or the requirements or limitations of any material Permit necessary for the ownership of its assets or the operation of its business. Except as set forth on Schedule 3.12(a), none of the Acquired Companies has since January 1, 2021 received written (or to the Company's Knowledge, oral) notice from any Governmental Entity of any violation or alleged violation by it of any Law to which it is subject or the requirements or limitations of any material Permit necessary for the ownership of its assets or the operation of its business, nor are any of the Acquired Companies under investigation by any Governmental Entity with respect to any such violations or alleged violations.

(b)     Schedule 3.12(b) contains a list as of the date hereof of all material Permits held by any Acquired Company, listed out by site location. Each Acquired Company has all material Permits necessary for the lawful conduct of the Acquired Companies' businesses as presently conducted and the lawful ownership of its properties and assets except where the failure to hold such Permits would not reasonably be expected to be material to any of the respective businesses of the Acquired Companies. All such Permits are in full force and effect, and there has

- 42 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094169

occurred no default under any Permit by any Acquired Company, except as would not reasonably be expected, individually or in the aggregate, to be materially adverse to any of the respective businesses of the Acquired Companies. All material fees and charges with respect to such Permits as of the date hereof have been paid in full, except where the failure to make such payments would not, individually or in the aggregate, reasonably be expected to be materially adverse to the Acquired Companies, taken as a whole.

(c)     Except as set forth on Schedule 3.12(c), none of the Acquired Companies has received written notice of any civil, criminal or administrative actions, Suits, violations, demand letters, statements, citations or decisions by any Governmental Entity stating that any of the products of the Acquired Companies are defective in any material respect, are unsafe or fail to meet any standards promulgated by any applicable Laws, Permits or Governmental Entities in any material respect.

(d)     Except as set forth on Schedule 3.12(d), none of the products of the Acquired Companies have been the subject of any market withdrawal, recall or similar action required by any Governmental Entity or undertaken by any of the Acquired Companies on a voluntary basis for reasons relating to product safety. Except as set forth on Schedule 3.12(d), no Governmental Entity has commenced or, to the Company's Knowledge, threatened in writing to initiate any recall or requested the recall or return, as applicable, of any of the products of the Acquired Companies for reasons relating to safety. Except as set forth on Schedule 3.12(d), the Acquired Companies have not made any modification to any of the products of the Acquired Companies in direct response to any warranty, product liability, regulatory or other claims concerning alleged hazards or defects in such products.

(e)     There have been no Suits against or involving any of the Acquired Companies arising out of an injury to any Person or property relating to any of the products of the Acquired Companies or any alleged failure to warn or any alleged breach of warranties for any of the products of the Acquired Companies.

(f)     Each of the Acquired Companies conducts commercially reasonable due diligence of its suppliers to ensure that the suppliers comply with applicable Laws in all material respects.

3.13     Title to Assets. The Acquired Companies have good and valid title to, or a valid and enforceable leasehold interest in, all of their respective material assets, including all of the material assets reflected on the audited consolidated balance sheets as of December 31, 2022 or acquired since December 31, 2022, except for immaterial assets sold or otherwise disposed of since December 31, 2022 in the ordinary course of business consistent with past practice. None of the material assets owned or leased by the Acquired Companies are subject to any Liens, other than Permitted Liens. Such assets comprise all of the assets necessary for the Acquired Companies to conduct their business as is presently conducted in all material respects. Except as described on Schedule 3.13, the properties, plants, equipment and other tangible assets of the Acquired Companies, whether owned or otherwise contracted for by the Acquired Companies, are in a state of good maintenance and repair, taken as a whole, for their current use (subject to ordinary course wear and tear and routine maintenance and repair).

- 43 -

39329697.7

3.14    Intellectual Property; Information Technology; Privacy and Security.

(a)    Except as set forth in Schedule 3.14(a) the Acquired Companies own and possess all right, title and interest, free and clear or all Liens (other than license agreements executed in the ordinary course of business and Permitted Liens), in all Owned Intellectual Property and have a valid and enforceable license to use all of the other material Intellectual Property necessary for the conduct of the Acquired Companies' business as presently conducted.

(b)    Schedule 3.14(b)(i) contains a list as of the date hereof (specifying the owner thereof and the registration or application number if applicable) of all patented or registered Owned Intellectual Property, and all applications therefor (collectively, "**Registered Owned Intellectual Property**"). Except as otherwise set forth on Schedule 3.14(b)(i),(i) the material Registered Owned Intellectual Property is valid, subsisting and enforceable, (ii) all application, registration, renewal, and maintenance fees in respect of the material Registered Owned Intellectual Property which were due prior to the date hereof have been duly paid, and (iii) all necessary documents and certificates in connection with such material Registered Owned Intellectual Property have been filed with the relevant Intellectual Property authorities in the United States or other jurisdictions where the business of the Acquired Companies is conducted for the purposes of maintaining the registrations and applications of material Registered Owned Intellectual Property

(c)    Schedule 3.14(c) contains a list as of the date hereof of all Contracts pursuant to which Intellectual Property material to the operation of an Acquired Company's business is (i) licensed to such Acquired Company (excluding generally commercially available, off the shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements), or (ii) licensed by such Acquired Company to any third party (excluding non-exclusive licenses granted in the ordinary course of business) collectively, the "**Material IP Agreements**"). For the avoidance of doubt, "licensed" Intellectual Property, as referred to in this Section, includes without limitation Intellectual Property provided pursuant to a software-as-service, platform-as-a-service, infrastructure-as-a-service, or similar model.

(d)    Except as set forth on Schedule 3.14(d), (i) none of the Acquired Companies is, and there are no pending or, to the Company's Knowledge, threatened Suits alleging that any of the Acquired Companies is, infringing, misappropriating or otherwise violating the Intellectual Property of any other Person in any material respect, and (ii) to the Company's Knowledge as of the date hereof no other Person is infringing, misappropriating or otherwise violating the Owned Intellectual Property in any material respect.

(e)    Except as set forth on Schedule 3.14(e), each Acquired Company has taken commercially reasonable steps to protect the Intellectual Property material to the operation of its business, including confidential information and trade secrets. Without limiting the generality of the foregoing: (i) all Owned Intellectual Property that is material to the business of an Acquired Company and derives independent economic value, actual or potential, from not being generally known to the public or to other Persons who can obtain economic value from its disclosure or use has been maintained in confidence in accordance with protection procedures that are adequate for protection and in accordance with procedures customarily used in the industry to protect rights of like importance; (ii) all Owned Intellectual Property not acquired from another Person was either

- 44 -

39329697.7

CONFIDENTIAL                                                                    FBG_CH1_00094171

developed (A) by employees of an Acquired Company within the scope of such employee's employment duties, (B) by independent contractors as "works-made-for-hire," as that term is defined under Section 101 of the United States Copyright Act, 17 U.S.C. § 101, pursuant to a written agreement or (C) by third parties, and all such employees, independent contractors and other third parties have assigned all of their rights therein to an Acquired Company; and (iii) no former or present employees, officers or directors of the Company retain any rights of ownership in or use of any Owned Intellectual Property, and no employees or third parties who have developed or participated in the development of Owned Intellectual Property have any claims to any rights therein.

(f)       No material Owned Intellectual Property contains Open Source Software that is licensed under any terms that impose a requirement or condition: (A) that Owned Intellectual Property be disclosed or distributed in source code form; (B) that Owned Intellectual Property be licensed for making modifications or derivative works; or (C) that Owned Intellectual Property be redistributable at no or nominal charge.

(g)       No source code for any Owned Intellectual Property has been delivered or licensed by an Acquired Company to any escrow agent. No Acquired Company is under an obligation to deliver or license the source code for any Owned Intellectual Property to any escrow agent, whether now or with the passage of time or the occurrence of any particular event or circumstance.

(h)       All Company IT Systems are either owned by, or properly licensed or leased to an Acquired Company for use in the operation of its business. The Company IT Systems currently used by the Acquired Companies constitute materially all the information and communications technology reasonably necessary to carry on the business of the Acquired Companies as currently conducted. All Company IT Systems have been properly maintained by technically competent personnel in all material respects, in accordance with standards set by the manufacturers or otherwise in accordance with generally accepted standards in the industry of the Acquired Companies, to ensure proper operation, monitoring and use. The Company IT Systems are in good working condition to effectively perform all information technology operations necessary to conduct the business of the Acquired Companies and do not, to the Company's Knowledge, contain any material defects, bugs or errors. The consummation of the transactions contemplated by this Agreement will not impair or interrupt (i) any Acquired Company's access to and use of, or its right to access and use, the Company IT Systems or (ii) to the extent applicable, any Acquired Company's customers' authorized access to and use of the Company IT Systems. To the Company's Knowledge, during the past three (3) years, there (A) have been no material unauthorized intrusions or breaches of security with respect to the Company IT Systems, (B) has not been any malfunction of the Company IT Systems and (C) has been no unplanned downtime or material service interruption with respect to the Company IT Systems. The Company IT Systems do not contain any "back door," "drop dead device," "time bomb," "Trojan horse," "virus" or "worm" (as such terms are commonly understood in the software industry).

(i)       The Acquired Companies have taken commercially reasonable steps in accordance with generally accepted industry standards to secure the Company IT Systems from unauthorized access or use by any Person and to promote the continued, uninterrupted and error-free operation of the Company IT Systems. The Acquired Companies have taken commercially

- 45 -

39329697.7

reasonable steps to provide for the back-up of data and information critical to the conduct of their business in a commercially reasonable attempt to avoid material disruption to, or interruption in, the conduct of such business. Each Acquired Company has established and is in compliance with its written information security, business continuity and disaster recovery programs that are reasonably designed to: (i) implement and monitor administrative, technical and physical safeguards designed to safeguard the security, confidentiality and integrity of all Company systems and data; and (ii) comply with applicable Laws.

(j) All information or data of any kind possessed by an Acquired Company, including but not limited to, personally identifiable information collected from any source, including consumers ("**PII**"), aggregate or anonymous information collected from any source, including consumers ("**Non-PII**") and employee data, whether collected online or offline (collectively, "**Data**"), has been collected, by such Acquired Company, and is being maintained, stored, processed and used by the Acquired Companies, in each case, in material compliance with all applicable Laws. Each Acquired Company's collection, maintenance, transmission, transfer, use, disclosure, storage, disposal and security of Data complies in all material respects with (i) contracts or agreements to which any Acquired Company is a party that govern that Data and (ii) every privacy policy adopted by an Acquired Company and currently effective (each a "**Privacy Policy**"). Each Acquired Company has stored and maintained all Data in a reasonably secure manner, using reasonable physical and technical measures, reasonably designed to ensure the integrity and security of the Data and reasonably designed to prevent material loss, alteration, corruption, misuse and unauthorized access to such Data. To the Company's Knowledge, during the past three (3) years, there has been no unauthorized use, access to, acquisition or disclosure of any Data. No Acquired Company has received any written claims, notices or complaints from any Person regarding unauthorized use, access to, acquisition or disclosure of any Data. No Acquired Company has received any written notice from a Governmental Entity or consumer advocacy organization challenging, questioning or inquiring about its or any other Acquired Company's Data collection or usage practices.

3.15 <u>Insurance</u>. <u>Schedule 3.15</u> sets forth a list (including the names of the insurers, the names of the Persons to whom such insurance policies have been issued and the expiration dates thereof), as of the date hereof of each insurance policy, bond, workers' compensation and other insurance risk arrangement (the "**Insurance Policies**") currently in effect to which an Acquired Company is a party or a named insured. With respect to each such Insurance Policy, except as set forth on <u>Schedule 3.15</u>, as of the date hereof: (i) the Insurance Policy is valid and binding; (ii) the Insurance Policy is in full force and effect and will be in full force and effect immediately following the consummation of the transactions contemplated by this Agreement; and (iii) all premiums with respect thereto covering all current periods have been paid to the extent due. Since the commencement of the respective current terms of the Insurance Policies, no Acquired Company or, to the Company's Knowledge, the Person to whom such policy has been issued, has received either (A) a written notice that would reasonably be expected to be followed by a written notice of cancellation or non-renewal of any Insurance Policy, (B) a written notice of a premium increase or alteration of coverage under any Insurance Policy or (C) a written notice that any insurer under any Insurance Policy is denying liability with respect to a claim thereunder. Since January 1, 2022, the Acquired Companies have not been refused any insurance, nor have they

- 46 -

39329697.7

**DEBTORS' EXHIBIT NO. 238**
**Page 47 of 133**

suffered an involuntary cancellation of any insurance policy relating to their business. Except as set forth on Schedule 3.15, no claim is currently pending under any Insurance Policy.

        3.16    Real Property.

        (a)    Schedule 3.16(a) contains a list of each parcel of real property owned by an Acquired Company (the "**Owned Real Property**").

        (b)    Schedule 3.16(b) contains a true and complete list of each parcel of real property leased, subleased (either as a sublandlord or subtenant), licensed or otherwise occupied by the Company (the "**Leased Real Property**" and, together with the Owned Real Property, the "**Real Property**"). The Company has made available to the Buyer true and complete copies of each of the written leases, subleases, licenses, concessions and other agreements, including, but not limited to, amendments, extensions, supplements and modifications thereto with respect to each Leased Real Property (each, a "**Real Property Lease**").

        (c)    Subject to the respective terms and conditions in the Real Property Leases, the Acquired Companies are the sole legal and equitable holders of the leasehold interests in the Leased Real Property and possess good and valid, indefeasible title thereto, free and clear of all Liens (other than Permitted Liens).

        (d)    With respect to each parcel of Leased Real Property: (i) no Acquired Company has received written notice of any pending or threatened condemnation proceedings, suits or administrative actions relating to any such parcel; (ii) the operation of the Leased Real Property in the manner in which it is now operated complies with the terms and conditions of the respective Real Property Leases in all material respects; (iii) all Improvements on any such parcel are in suitable operating condition, ordinary wear and tear excepted, and are supplied with utilities necessary for the operation of the business as currently conducted at such facilities; (iv) the Acquired Companies have not received any notice of any special tax, levy or assessment for benefits or betterments that affect any parcel of Leased Real Property that is the responsibility of any Acquired Company; and (v) there are no third parties (other than the Acquired Companies) in possession of any such parcel, and there are no Contracts granting to any third party or parties the rights of use or occupancy of any such parcel.

        (e)    The Real Property constitutes all of the real property occupied or operated by any Acquired Company in connection with their business. With respect to each parcel of Owned Real Property: (i) no Acquired Company has received written notice of any condemnation proceedings, suits or administrative actions relating to any such parcel; (ii) the operation of the Owned Real Property in the manner in which it is now operated complies with the terms and conditions of applicable Law in all material respects; (iii) all Improvements on any such parcel are in suitable operating condition, ordinary wear and tear excepted, and are supplied with utilities necessary for the operation of the business as currently conducted at such facilities; (iv) the Acquired Companies have not received any notice of any special tax, levy or assessment for benefits or betterments that affect any parcel of Owned Real Property that is the responsibility of any Acquired Company; and (v) there are no Contracts to which any Acquired Company is a party granting to any third party the right of use or occupancy of any portion of the parcels of the Owned

- 47 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094174

Real Property. No Acquired Company is a party to any Contract to purchase any real property or interest therein.

3.17    Employees.

(a)    No employee of any Acquired Company is represented by any labor organization, union, or other similar employee organization ("**Union**"), nor is any Acquired Company, or has any Acquired Company been, party to a collective bargaining Contract or other legally binding commitment with any trade union or employee organization or group in respect of or affecting employees, and no such Contract is currently being negotiated by any Acquired Company. No Acquired Company has recognized any Union or entered into any collective bargaining agreement, and there is no Union organizational activity or other concerted activity, slowdowns or stoppages pending or, to the Company's Knowledge, threatened against any Acquired Company involving any employee of any Acquired Company. No Acquired Company has taken any action that would constitute a mass layoff or plant closing under the federal Worker Adjustment and Retraining Notification Act of 1988 (the "**WARN Act**") or similar state Law within ninety (90) days prior to the date hereof, and no Acquired Company has violated the WARN Act, or any similar state, local and foreign Laws related to plant closings, relocations, mass layoffs and employment losses.

(b)    There are no pending or, to the Company's Knowledge, threatened picketing actions, strikes, boycotts, slowdowns, work stoppages, lockouts, arbitrations, material grievances, material disputes or other material job actions involving any employee of any Acquired Company. There is no claim or grievance, nor any arbitration proceeding, arising out of or under any collective bargaining Contract pending against any Acquired Company, and to the Company's Knowledge, no such claim or grievance has been threatened.

(c)    Except as disclosed in Schedule 3.17(c) there are no complaints, charges or claims against any Acquired Company pending or, to the Company's Knowledge, threatened with any Governmental Entity, arbitrator or court based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment or failure to employ by any Acquired Company of any individual. There is no Suit pending or, to the Company's Knowledge, threatened between any Acquired Company and any employees or former employees, or any current or former independent contractors, of any Acquired Company, agents or former agents of any Acquired Company, job applicants or any association or group of any employees of any Acquired Company, nor is there any basis for any such Suit. There is no unfair labor practice charge or complaint currently pending against any Acquired Company with respect to or relating to any of its employees before the National Labor Relations Board or any other agency having jurisdiction over such matters, and no charges or complaints are currently pending against any Acquired Company before the Equal Employment Opportunity Commission or any state or local agency having responsibility for the prevention of unlawful employment practices.  There is no Suit pending before the U.S. Office of Contract Compliance Programs, the Wage and Hour Division of the U.S. Department of Labor (the "**DOL**") or any other office of the DOL or any other governmental agency or authority relating to any employee or former employee of any Acquired Company. No state or federal wage and hour enforcement agency investigations have been made of any Acquired Company in the last three (3) years that remain outstanding as of the date hereof, and no claims or charges relating to wage and hour issues are pending or, to the Company's

- 48 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094175

Knowledge, threatened against any Acquired Company. No Acquired Company is bound by any consent decree or settlement agreement relating to employment decisions or relations with its employees, independent contractors or applicants for employment. No investigations by the United States Occupational Safety and Health Administration, or a similar state or local agency, have been made of any Acquired Company in the past three (3) years.

(d)     Each Acquired Company is in compliance in all material respects with all Laws relating to the employment of labor, including those relating to classification, wages, hours, the Fair Labor Standards Act and all applicable state and local Laws and Orders relating to wages or hours, the terms and conditions of employment, the Worker Adjustment and Retraining Notification Act, collective bargaining, discrimination, civil rights, affirmative action, immigration, safety and health, COVID-19, paid sick leave, employment contracts, anti-harassment, or workers' compensation. Any Person who has been treated as an independent contractor by any Acquired Company within the past three (3) years has been classified properly as an independent contractor under all applicable Laws. No Acquired Company is delinquent (after giving effect to any grace period or extension) in any payments to any employees for any wages, salaries, commissions, bonuses, accrued or vested vacation pay, or any tax or penalty for failure to comply with any Law relating to employment or labor, or other direct compensation for any services performed for any Acquired Company.

(e)     Except as set forth in Schedule 3.17(e), the employment of all employees of each Acquired Company is terminable at will. The Company has made available accurate copies of all current employment agreements, employee manuals and handbooks relating to the employment of employees of any Acquired Company.

(f)     To the Company's Knowledge: (i) no officer or key employee of any Acquired Company intends to terminate his or her employment; (ii) no officer or key employee of any Acquired Company has received an offer to join a business that may be competitive with the business of such Acquired Company; and (iii) no officer or key employee of any Acquired Company is a party to or is bound by any confidentiality agreement, noncompetition agreement or other Contract (with any Person) that may have an adverse effect on (A) the performance by such officer or key employee of any of his or her duties or responsibilities as an officer or key employee of the Acquired Companies, as applicable, or (B) the business of any Acquired Company.

(g)     Except as set forth in Schedule 3.17(g), no allegations of sexual harassment or misconduct, or discrimination or harassment on the basis of any category protected by applicable Law, have been made in writing against any current or former officer, employee or director of any Acquired Company (or against any current or former independent contractor), in each case in connection with or arising out of services performed for or on behalf of any Acquired Company, and no Acquired Company is, or in the last three (3) years has been, (i) a party to a settlement agreement with a current or former officer, employee, director or independent contractor that involves allegations relating to sexual harassment or misconduct, or discrimination or harassment on the basis of any category protected by applicable Law or (ii) involved in a Suit related to the foregoing, in each case, which remains outstanding as of the date hereof.

(h)     Schedule 3.17(h) is an accurate and complete list showing: (w) the (i) names,  (ii) positions,  (iii) locations,  (iv) overtime  classification,  (v) employment  status

- 49 -

CONFIDENTIAL

FBG_CH1_00094176

(active/inactive) and (vi) employing entity, of all current employees and individual independent contractors (including individuals operating through a company entity they own) of each Acquired Company, and (x) the names of all former employees, if any, of any Acquired Company who are receiving or entitled to receive any (1) COBRA continuation coverage, their coverage start date, enrolled benefits (e.g., medical, vision, dental, and/or health FSA) and coverage tier (e.g., single, single + spouse, single + child(ren), or single + family), and qualifying events, or (2) any life insurance benefits. No Acquired Company has, because of previous commitments with respect to its employees, established any legally binding rights on the part of any of its employees to additional compensation with respect to any period after the Closing Date (other than wage increases in the ordinary course of business or pursuant to any Employee Plan).

3.18    Benefit Matters.

(a)    Schedule 3.18(a) attached hereto contains a complete and accurate list as of the date hereof of all material Employee Plans. No Acquired Company nor any ERISA Affiliate has made any legally binding commitment to establish, cause to exist, adopt or enter into any new Employee Plan nor to suspend, terminate, amend or modify the terms of any Employee Plan. No Employee Plan covers any employees, officers, directors, consultants or contractors, or other individual service provider who provide services primarily outside of the United States.

(b)    With respect to each Employee Plan, the Company has made available to Buyer a true, correct and complete copy of each of the following, to the extent applicable: (i) including all adoption agreements and/or amendments thereto and all related trust documents (and including the plan document and the currently effective summary plan description, together with the summaries of material modifications thereto), and a description of any Employee Plan that has not been reduced to writing; (ii) a copy of the most recent annual report (Form Series 5500 and all schedules and financial statements attached thereto), if any, required under ERISA or the Code, for the three (3) most recent plan years; (iii) if such Employee Plan is subject to the minimum funding standards of Section 302 of ERISA, the three (3) most recent annual and periodic accountings of such Employee Plan's assets; (iv) the most recent determination or opinion letter issued by the Internal Revenue Service; (v) if such Employee Plan is funded through a trust or any third party funding vehicle, an accurate and complete copy of the trust or other funding agreement (including all amendments thereto) and accurate and complete copies of the three (3) most recent financial statements thereof; (vi) accurate and complete copies of all insurance Contracts relating to such Employee Plan, including stop-loss agreements if applicable (vii) all material correspondence, if any, to or from any Governmental Entity relating to such Employee Plan in the past three (3) years; (viii) all written results of all required compliance and/or nondiscrimination tests, if any, required under the Code for such Employee Plan, for the three (3) most recent plan years; and (ix) all current employee handbooks, manuals, and policies.

(c)    No Employee Plan is, and no Acquired Company nor any ERISA Affiliate (nor any predecessor of any such entity) maintains, sponsors, participates in, establishes, administers, contributes to or is required to contribute to, or in any way has (nor do any circumstances exist that would reasonably be expected to result in) any liability (whether on account of an ERISA Affiliate or otherwise), directly or indirectly, actual or contingent, with respect to any plan that is or was: (i) subject to Section 302 or Title IV of ERISA or Section 412, 430 or 4971 of the Code or a "defined benefit plan" within the meaning of Section 414(j) of the

- 50 -

39329697.7

CONFIDENTIAL
FBG_CH1_00094177

Code or Section 3(35) of ERISA; (ii) a Multiemployer Plan; (iii) a plan that has two (2) or more contributing sponsors at least two of whom are not under common control, within the meaning of Section 4063 of ERISA, or maintained by more than one employer (within the meaning of Section 413(c) of the Code or as subject to Sections 4063 and 4064 of ERISA); (iv) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); or (v) a plan maintained in connection with any trust described in Section 501(c)(9) of the Code or a voluntary employees' beneficiary association under Section 501(a)(9) of the Code; nor does any Acquired Company or any ERISA Affiliate have any current or potential obligations or liabilities, including withdrawal, reorganization or successor liabilities, regarding any such plan.

(d) Each Employee Plan (and each related trust, insurance Contract or fund) is and in the last three (3) years has been, in all material respects, established, funded, operated, administered and maintained, in form and operation, in accordance with its terms and applicable Law, including ERISA and the Code. The Acquired Companies have in all material respects, performed all obligations required to be performed by it under, is not in any respect in default under or in violation of, and, to the Company's Knowledge, no default or violation by any such entity or any other party to any of the Employee Plans has occurred. No Acquired Company nor, to the Company's Knowledge, any "party in interest" or "disqualified person" has engaged in a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code (and not otherwise exempt under Section 408 of ERISA and regulatory guidance thereunder) with respect to any Employee Plan. None of the Acquired Companies are (or could reasonably be) subject to any liability or penalty under Sections 4971 through 4980, 6721 or 6722 of the Code or Title I of ERISA with respect to any Employee Plans or any civil penalty arising under Sections 409, 502(i) or 502(l) of ERISA, and no fact, event or condition exists which could give rise to any such liability. To the Company's Knowledge, no fiduciary (within the meaning of Section 3(21) of ERISA) has breached any fiduciary duty with respect to an Employee Plan or otherwise has had, has (or could reasonably expect to have) any liability (direct or indirect) in connection with acts taken (or the failure to act) with respect to the administration or investment of the assets of any Employee Plan.

(e) Each Employee Plan intended to be a "qualified plan" within the meaning of Section 401(a) of the Code, and its related trust, is and has at all times since its adoption been, so qualified (or exempt, as applicable) and has been issued a current favorable determination or opinion letter issued by the Internal Revenue Service to the effect that such Employee Plan does so qualify and that its trust is so exempt under Section 501(a) of the Code, and such determination or opinion letter has not been revoked, and no event, facts or circumstances have occurred with respect to the operation of any such Employee Plan which have (or could reasonably be expected to have) a material adverse impact on the qualified status or exemption of, or could result in the imposition of any material liability, penalty or tax under ERISA or the Code upon, any such Employee Plan.

(f) No Employee Plan, and none of the Acquired Companies, promises or provides, nor has made any written commitments or representation to provide, and no such entity has any obligation to so provide, any medical, health, life, accident, disability or other retiree welfare benefits (whether insured or self-insured) to or with respect to any Person for any reason following the termination of employment or service, as applicable, other than as required under Section 4980B of the Code and Section 601 of ERISA, or similar state Law.

- 51 -

39329697.7

FBG_CH1_00094178

**DEBTORS' EXHIBIT NO. 238**
**Page 52 of 133**

(g)     All payments required to be made, paid or accrued by the Acquired Companies under, or with respect to, any Employee Plan or applicable Law (including all contributions, expenses, distributions, reimbursements, premium payments or intercompany charges) have been timely made or paid or, for any such payments that are not yet due, properly accrued and reflected in the most recent consolidated balance sheet prior to the date hereof, in each case on or before their due dates, including extensions thereof, and in accordance with the provisions of each of the Employee Plans, applicable Law and GAAP.

(h)     There are no pending nor, to the Company's Knowledge, are there any threatened Suits against, relating to, or involving any Employee Plan or the assets of any of the trusts under such Employee Plans (other than routine benefits claims in the ordinary course), nor to the Company's Knowledge, is there pending or threatened any audit or investigation of or relating to any Employee Plan or fiduciary by the IRS, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other Governmental Entity.  To the Company's Knowledge, no facts, events or conditions exist that could reasonably form the basis for any such Suits nor for any such audit, investigation, or similar undertaking.

(i)     Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby (either alone or in combination with another event, whether continent or otherwise) will: (i) entitle any individual service provider to any benefit, payment or other entitlement, cancellation of indebtedness, severance, or increase in compensation or benefits otherwise payable (including in amount or value) under any Employee Plan or other Contract, agreement or arrangement with respect to which the Acquired Companies may have any liability; (ii) result in the acceleration (or other change in timing) of payment, funding, vesting or other entitlement under any Employee Plan or other Contract, plan or agreement; (iii) result in an obligation to fund (or acceleration or other change in funding amounts or timing) or otherwise set aside assets to secure to any extent any of the obligations under any Employee Plan; or (iv) result in any "excess parachute payment" under Section 280G of the Code being paid by the Acquired Companies to any individual service provider. No Employee Plan, individually or collectively, will or could reasonably result in the payment of any amount that would not be deductible under Section 280G of the Code as a result of the consummation of the transactions contemplated hereby. If applicable, the Company has made available to Buyer true and complete copies of any Section 280G calculations prepared (whether or not final) with respect to any "disqualified individual" in connection with the transactions.

(j)     Each Employee Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA is, and in the last three (3) years has been, established, maintained and administered in compliance (in form and operation) in all material respects with the requirements of the Patient Protection and Affordable Care Act, the American Rescue Plan Act of 2021, the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152 and all agency or regulatory guidance thereunder (collectively, the "**Health Care Laws**") including all notice and coverage requirements, and each Acquired Company offers (and has offered at all relevant times) minimum essential health coverage, satisfying the affordability and minimum value requirements, to their full time employees (as defined by the Health Care Laws) sufficient to prevent liability for assessable payments.

- 52 -

39329697.7

(k)     Each Employee Plan, Contract, agreement, or other compensation arrangement of the Acquired Companies that provides (in part or in whole) deferred compensation within the meaning of Section 409A of the Code ("**409A Plan**") is, and in the last three (3) years has been, administered, written, executed, and operated in compliance (in form and practice) in all material respects with Section 409A of the Code and the regulations thereunder. No Acquired Company has made any promises, commitments, or written representation to, and does not have any obligation to make any payment to (including any Tax gross-up, "make whole" or other payment) or otherwise reimburse or indemnify any Person for any payment or tax incurred including, without limitation, pursuant to Section 409A or Section 280G of the Code as a result of the imposition of the excise taxes required by Section 4999 of the Code.

3.19    Environmental Matters.

(a)     Except as set forth on Schedule 3.19(a), (i) each Acquired Company is, and during the past five (5) years has been, in compliance with all applicable Environmental Laws in all material respects, (ii) no Acquired Company has received any written (or, to the Company's Knowledge, oral) notice or other written communication with respect to its business or Real Property from any Governmental Entity or other third party alleging that such Acquired Company is not in compliance with any Environmental Law, or requesting information pursuant to any Environmental Law, and (iii) to the Company's Knowledge, there has been no (and the Acquired Companies are not actually, or to the Company's Knowledge, allegedly liable for any) Release or threatened Release of a Hazardous Substance, and no Acquired Company has received any written (or, to the Company's Knowledge, oral) notice that any such Real Property (including soil or subsurface strata, groundwater, surface water bodies or drainage ways, and ground waters thereof, buildings and other structures located thereon) currently or formerly owned, leased or operated by the Acquired Companies or any predecessor company has been contaminated with any Hazardous Substance, which would reasonably be expected to result in a Suit against, or a violation of Environmental Law or term of any environmental Permit by, any Acquired Company. No Acquired Company has been subject to or, to the Company's Knowledge, threatened with, any governmental or citizen enforcement action with respect to any Environmental Law.

(b)     Each Acquired Company has obtained and is in material compliance with all environmental Permits (each of which is disclosed in Schedule 3.19(b)) necessary for the ownership, lease, operation or use of the business or assets of such Acquired Company. No underground improvement, including any treatment or storage tank or water, gas or oil well, is or, to the Company's Knowledge, has been located on any properties owned, leased or operated by the Acquired Companies or any predecessor company.

(c)     The Acquired Companies have made available to the Buyer any and all environmental reports, studies, audit, records, sampling data, site assessments and other similar documents with respect to the business or assets of the Acquired Companies or any real property in the possession or control of the Acquired Companies.

3.20    Taxes.

(a)     All income and other material Tax Returns required to be filed by the Acquired Companies have been timely and duly filed with the appropriate taxing authorities, and

- 53 -

39329697.7

all such Tax Returns are true, complete and correct in all material respects. Each Acquired Company has paid all material Taxes it is required to pay (whether or not reflected on such Tax Returns).

(b)     Each Acquired Company has withheld and paid over all material Taxes required to have been withheld and paid over in connection with amounts paid or owing to any employee, independent contractor, or other third party.

(c)     No Acquired Company currently is the beneficiary of any extension of time within which to file any material Tax Return, other than any extension obtained in the ordinary course of business.

(d)     No written claim has been made within the past five (5) years by an authority in a jurisdiction where an Acquired Company does not file Tax Returns that such Acquired Company is or may be subject to taxation by that jurisdiction. No Acquired Company has a permanent establishment (within the meaning of an applicable Tax treaty) or fixed place of business in any country other than the country of its formation.

(e)     There are no material Liens for Taxes (other than Permitted Liens) upon any of the assets of the Acquired Companies.

(f)     No Acquired Company has waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to a material Tax assessment or deficiency, in each case, that is currently effective.

(g)     No Acquired Company is a party to any material Tax allocation or sharing agreement, other than pursuant to an agreement entered into in the ordinary course of business and the primary purpose of which is unrelated to Tax.

(h)     No Acquired Company will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any Tax period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting or use of an improper method of accounting for a Tax period ending on or prior to the Closing Date;

(ii)     "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or non-U.S. Income Tax law) executed on or prior to the Closing Date;

(iii)     deferred inter-company gain or excess loss account described in U.S. Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local, or non-U.S. income Tax law) in connection with a transaction consummated prior to the Closing;

(iv)     installment sale or open transaction made on or prior to the Closing Date;

- 54 -

39329697.7

CONFIDENTIAL                                                    FBG_CH1_00094181

(v)      prepaid amount received on or prior to the Closing Date; or

(vi)     interest held in a "controlled foreign corporation" (as that term is defined in Section 957 of the Code) pursuant to Section 951, 951A or 965 of the Code.

(i)      Within the past two (2) years, no Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 of the Code.

(j)      No Acquired Company is or has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and U.S. Treasury Regulation section 1.6011-4(b)(2).

(k)      Any material related party transactions subject to Section 482 of the Code (or any corresponding or similar provision of applicable Law) conducted by the Acquired Companies have been on an arms-length basis in accordance with Section 482 of the Code or, to the extent applicable, any corresponding or similar provision of applicable Law.

(l)      No Acquired Company has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(m)      Since its formation, the Company has been treated and taxed as a C corporation within the meaning of Section 1361(a)(2) of the Code for U.S. federal, state, and local income tax purposes and will continue to be so treated until the Closing. Since their respective formations, all of the Subsidiaries of the Company have been classified as corporations for U.S. federal, state, and local income tax purposes and will continue to be so treated until the Closing.

(n)      The Company is not and has not been a member of an affiliated, combined, consolidated or unitary Tax group for purposes of filing any Tax Return (other than such group of which the Company is or was a common parent).

(o)      No examination of any material return of any Acquired Company is currently in progress, and no Acquired Company has received written notice of any material proposed audit or examination.

(p)      The Acquired Companies have delivered to Buyer correct and complete copies of all federal, state, local and foreign Tax Returns for all taxable periods beginning on or after January 1, 2020.

(q)      The Acquired Companies have collected all material sales, use, goods and services or other commodity Taxes required to be collected and remitted the same to the appropriate Governmental Entity within the prescribed time periods.

(r)      The Taxes of the Acquired Companies for the Taxable period (or portion thereof) ending on the Closing Date do not materially exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) on the Closing Balance Sheet.

- 55 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094182

3.21   <u>Brokers</u>. Except for Jefferies LLC and Lincoln International LLC, no investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of any Acquired Company who is entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from any Acquired Company in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

3.22   <u>Affiliate Transactions</u>.

(a)   Except as set forth in <u>Schedule 3.22(a)</u>, none of the Acquired Companies' directors, managers, officers, employees or, to the Company's Knowledge, Stockholders, Option Holders (or any directors, managers, officers, equityholders or employees of any such Stockholder or Option Holder), or any of their respective Affiliates or immediate family members (such Persons, collectively, the "**Related Group**"):

(i)   are involved in any business arrangement or relationship with any Acquired Company other than the ownership of the Company Common Shares and Options (as the case may be), and employment arrangements and severance arrangements entered into in the ordinary course of business consistent with past practice;

(ii)   own, or have any interests or rights in, directly or indirectly, in whole or in part, any material tangible or material intangible property or assets (including, but not limited to Intellectual Property), used or licensed by any Acquired Company in the conduct of their business or otherwise, other than immaterial personal items owned and used by employees at their work stations; or

(iii)   owe any material amount to, any Acquired Company, except for claims in the ordinary course of business for accrued vacation pay, accrued benefits under Employee Plans and unreimbursed business expenses.

(b)   All material indebtedness of any member of the Related Group owing to any Acquired Company has been repaid in full, other than routine travel expense advances in the ordinary course of business and consistent in amount with past practice.

3.23   <u>Corporate Controls</u>. The Acquired Companies maintain commercially reasonable policies and procedures consistent with other similarly situated companies in the industries in which the Acquired Companies operate reasonably designed to ensure material compliance with all applicable Specified Business Conduct Laws. No Acquired Company nor, to the Company's Knowledge, any officer, director, manager, authorized agent, employee, consultant or any other Person acting on behalf of any Acquired Company, has, directly or indirectly: (i) materially violated any applicable Specified Business Conduct Law; (ii) corruptly offered, paid, promised to pay, authorized the payment of, received, or solicited anything of material value, directly or indirectly, to any Person, including any government official, to obtain or retain business or an improper business advantage; (iii) to the Company's Knowledge, been the subject of any investigation, inquiry or enforcement proceedings under applicable Specified Business Conduct Laws (including any internal investigations or investigations by a Governmental Entity) or received any written (or, to the Company's Knowledge, oral) notice, request, or subpoena related to any applicable Specified Business Conduct Laws; or (iv) engaged in any transaction or direct

- 56 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094183

or indirect dealings with (A) any Person that is on the list of Specially Designated Nationals and Blocked Persons published by U.S. Treasury Department Office of Foreign Assets Control, the European Union or any equivalent list of sanctioned persons issued by the U.S. Department of State or other relevant Governmental Entity or is otherwise subject to sanctions under any Specified Business Conduct Law or (B) any country or territory that is subject to country-wide or territory-wide sanctions under any Specified Business Conduct Law or any Person that is located in or organized under the Laws of any such country or territory. No Acquired Company has participated in any illegal boycott of its actual customers.

3.24    Accounting Controls. The Acquired Companies maintain a system of internal accounting controls consistent with other similarly situated companies in the industries in which the Acquired Companies operate which are designed to provide commercially reasonable assurances that (i) transactions are executed in accordance with its management's general or specific authorization and (ii) transactions are recorded in conformity with the Accounting Principles and applicable Law. Since January 1, 2021, no Acquired Company or, to the Company's Knowledge, any of their respective directors, officers, managers, members, auditors or independent accountants has received written notice of (A) any material weakness or significant deficiency regarding the accounting or auditing practices, procedures or methods of such Acquired Company or its internal accounting controls or (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the preparation of financial statements or internal controls over financial reporting of such Acquired Company.

3.25    Bank Accounts. Set forth in Schedule 3.25 is an accurate and complete list showing the name and account information for, each bank in which any Acquired Company has an account, credit line or safe deposit box and the names of all Persons authorized to draw thereon or to have access thereto.

3.26    Inventories. Subject to reserves or adjustments for obsolete, damaged inventory, excess inventory, slow-moving inventory, spoilage and inventory obsolescence, the items of inventory of the Acquired Companies (a) are in good and marketable condition in all material respects, (b) consist of products of quality and quantity commercially usable and salable at not materially less than cost in the ordinary course of business consistent with past practice, (c) were acquired and have been maintained in all material respects accordance with the regular business practices of the Acquired Companies in the ordinary course of business consistent with past practice, (d) consist of items of a quality and quantity substantially usable or saleable in all material respects in the ordinary course of business, and (e) are valued in accordance with GAAP. The quantities of all inventory of the Acquired Companies constitute sufficient quantities to conduct

- 57 -

CONFIDENTIAL

FBG_CH1_00094184

the business of the Acquired Companies in the ordinary course of business consistent with past practice in all material respects as of the date hereof.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER AND MERGER SUB

Buyer and Merger Sub hereby jointly and severally represent and warrant to the Company as follows:

4.1     Existence and Power. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2     Authorization. The execution, delivery, and performance by Buyer and Merger Sub of this Agreement and the consummation of the transactions contemplated hereby (a) are within each of Buyer's and Merger Sub's corporate powers and (b) have been duly authorized by all necessary corporate action on the part of each of Buyer and Merger Sub.

4.3     Enforceability. This Agreement has been duly executed and delivered by each of Buyer and Merger Sub and constitutes a valid and legally binding obligation of each of Buyer and Merger Sub, enforceable against Buyer and Merger Sub, respectively, in accordance with its terms, except as enforcement may be limited by the Equitable Exceptions.

4.4     Governmental and Third Party Authorizations. Except as set forth on Schedule 4.4, and except for (a) applicable requirements under "blue sky" Laws of various states and (b) assuming all filings required under the HSR Act are made and any waiting periods thereunder have expired or been terminated, no material consent, approval or authorization of declaration to or filing or registration with, any Governmental Entity, or any other party to a material Contract to which Buyer or Merger Sub is a party, is required to be made or obtained by Buyer or Merger Sub in connection with the execution, delivery and performance by either Buyer or Merger Sub of this Agreement or the consummation by Buyer or Merger Sub of the transactions contemplated hereby, except for such consents or approvals the failure of which to obtain would not reasonably be expected to materially adversely affect or delay the ability of Buyer or Merger Sub to consummate the transactions contemplated by this Agreement.

4.5     Noncontravention. Except as set forth on Schedule 4.5 and except for (a) applicable requirements under "blue sky" Laws of various states and (b) assuming all filings required under the HSR Act are made and any waiting periods thereunder have expired or been terminated, the execution, delivery and performance by each of Buyer and Merger Sub of this Agreement, and the consummation of the transactions contemplated hereby, will not (i) violate the Organizational Documents of Buyer or Merger Sub, (ii) violate any Law applicable to Buyer or Merger Sub or any of their respective properties, (iii) conflict with, or result in a breach of any of the terms or provisions of, constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or Merger Sub under any material Contract binding upon Buyer or Merger Sub, or (iv) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Buyer or Merger Sub, except for such violations, defaults or impositions that would

- 58 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094185

not reasonably be expected to materially adversely affect or delay the ability of Buyer or Merger Sub to consummate the transactions contemplated by this Agreement.

4.6     Litigation. There are no Suits or Orders pending or, to Buyer's knowledge, threatened against Buyer or its Affiliates or Merger Sub that would reasonably be expected to materially adversely affect or delay the ability of Buyer or Merger Sub to consummate the transactions contemplated by this Agreement.

4.7     Brokers. No investment banker, broker, finder or other intermediary has been retained by or is authorized to act on behalf of Buyer or Merger Sub who is entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.8     Investment Representations. Each of Buyer and Merger Sub acknowledges that it is relying solely on its own investigation and analysis and the express representations and warranties of the Company set forth in Article III in entering into the transactions contemplated hereby. Buyer and Merger Sub have been afforded adequate access to the Books and Records, facilities and personnel of the Acquired Companies for purposes of conducting a due diligence investigation and have so conducted a satisfactory due diligence investigation of the Acquired Companies. Each of Buyer and Merger Sub will be purchasing the Equity Securities of each Acquired Company for the purpose of investment and not with a view to, or for resale in connection with, the distribution thereof in violation of applicable federal, state or provincial securities Laws. Each of Buyer and Merger Sub acknowledges that the sale of the Equity Securities of each Acquired Company hereunder has not been registered under the Securities Act of 1933 (the "**Securities Act**") or any other securities Laws, and that the Equity Securities of each Acquired Company may not be sold, transferred, offered for sale, pledged, hypothecated, or otherwise disposed of without registration under the Securities Act, pursuant to an exemption from the Securities Act or in a transaction not subject thereto. Buyer represents that it is an "Accredited Investor" as that term is defined in Rule 501 of Regulation D of the Securities Act. Notwithstanding the foregoing, nothing in this Section 4.8 shall limit, waive or negate Buyer's, the Surviving Corporation's or any of their respective Affiliates' claims, rights or remedies in respect of Fraud.

4.9     Financing and Solvency.

(a)     Financing. Buyer and Merger Sub at the Closing will have sufficient available cash to consummate the transactions contemplated by this Agreement, including payment of the consideration payable pursuant to Article II.

(b)     Solvency. Immediately following the Closing, Buyer and, assuming the accuracy of the representations and warranties made by the Company herein, the Acquired Companies shall: (i) be able to pay their respective debts as they become due; (ii) own property that has a fair saleable value greater than the amounts required to pay their respective debts (including a reasonable estimate of the amount of all contingent liabilities); and (iii) have adequate capital to carry on their respective businesses. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of the Buyer or the Acquired Companies.

- 59 -

39329697.7

CONFIDENTIAL                                                  FBG_CH1_00094186

## ARTICLE V
## COVENANTS OF THE COMPANY AND STOCKHOLDERS

      5.1    Conduct of Business.

      (a)    Except (i) as set forth on Schedule 5.1, (ii) as contemplated by this Agreement, (iii) as required by Law or (iv) as Buyer may otherwise consent to in writing (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing, the Company shall, and shall cause each other Acquired Company to conduct its business in the ordinary course of business consistent with past practice in all material respects; provided, however, that no action by the Acquired Companies with respect to matters specifically addressed by any provision of Section 5.1(b) shall be deemed a breach of this Section 5.1(a), unless such action constitutes a breach of such provision of Section 5.1(b).

      (b)    Without limiting the foregoing, and subject to clauses (i) through (v) of Section 5.1(a), none of the Acquired Companies will:

      (i)    effect any merger, amalgamation, consolidation, share exchange, reorganization or similar business combination with any other Person, or acquire any business or Person by any other manner, in a single transaction or a series of related transactions, or enter into any binding Contract, letter of intent or similar arrangement with respect to the foregoing;

      (ii)    adopt any plan of complete or partial liquidation or dissolution, or enter into any restructuring or reorganization;

      (iii)    (A) sell, lease, transfer, assign, sublicense, convey or otherwise dispose of, any of its material property or assets (whether tangible or intangible), including any of the Company's Subsidiaries, other than sales of inventory in the ordinary course of business, or (B) create any Lien (other than a Permitted Lien) on any material property or assets, other than in the ordinary course of business consistent with past practice;

      (iv)    grant any material license or sublicense of any rights under or with respect to any Intellectual Property other than in the ordinary course of business consistent with past practice;

      (v)    make or authorize any change in any Organizational Document of any of Acquired Company;

      (vi)    issue, sell, pledge, transfer, assign, encumber or otherwise dispose of, redeem, purchase or otherwise acquire (A) any of its Equity Securities, or securities convertible into or exchangeable for any such Equity Securities, or grant any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its Equity Securities or (B) any other securities in respect of, in lieu of, or in substitution for any Equity Securities of the Acquired Companies outstanding on the date hereof, excluding, however, any issuances of Equity Securities to any Option Holder upon exercise of a vested Option outstanding on the date hereof;

39329697.7

CONFIDENTIAL

FBG_CH1_00094187

(vii)   effect any recapitalization, reclassification, stock split, combination or like change in its capitalization, or amend the terms of any of its outstanding securities;

(viii)   make or commit to make any capital expenditures or capital additions or improvements in excess of $300,000;

(ix)   (A) increase the base compensation of any of its employees, other than salaried non-exempt and hourly employees in the ordinary course of business or (B) terminate or materially amend any Employee Plan or collective bargaining agreement or enter into any collective bargaining agreement or any arrangement that would be an Employee Plan if in effect on the date hereof, in each case, except as may be required by any Law, Employee Plan terms or Contract;

(x)   settle or compromise any pending or threatened proceeding or any claim or claims for, or that would result in a loss of revenue of, an amount that could, individually or in the aggregate, reasonably be expected to be greater than $500,000 or involves non-monetary relief;

(xi)   make any material Tax election if the effect of such election would be to increase the Tax liability of any of the Acquired Companies in Tax periods beginning after the Closing Date;

(xii)   fail to maintain, or allow to lapse, any material insurance policy;

(xiii)   enter into any material Contract or material transaction between any Acquired Company, on the one hand, and any officer, director, manager, equityholder or beneficiary of any Acquired Company (or any Affiliate thereof other than another Acquired Company), on the other hand or pay, discharge or satisfy any material liability in connection with any such Contract or transaction;

(xiv)   sell, transfer, assign, abandon, lease, permit to lapse, or otherwise dispose of, or grant any license or sublicense of, any rights under or with respect to any material Intellectual Property, other than in the ordinary course of business consistent with past practice;

(xv)   (A) incur or guarantee any material Indebtedness (other than draws under a revolving line of credit in the ordinary course of business consistent with past practice) or (B) make any material loan to any Person other than to an employee for normal travel and expense advances;

(xvi)   Change any method of accounting or accounting practice of any Acquired Company, except as required by applicable law or GAAP;

(xvii)   terminate any Material Contract (other than upon any expiration of the term of any Material Contract), materially amend any Material Contract or enter into any Contract that would be a Material Contract if such Contract was in effect on the date hereof in each case; or

(xviii)   legally obligate itself to do any of the foregoing.

- 61 -

39329697.7

CONFIDENTIAL                                                                        FBG_CH1_00094188

5.2    Stockholder Consent. Within twenty-four (24) hours of the execution of this Agreement, the Company shall (a) obtain the written consent of the holders of a majority of the Company Common Shares, voting as a single class and in accordance with Section 228 of the DGCL, pursuant to which such Stockholders approve the transactions contemplated by this Agreement, including the Merger (the "**Requisite Stockholders Consent**"), and (b) deliver to the Buyer written evidence of the duly executed Requisite Stockholders Consent certified by an authorized officer of the Company.

5.3    No Solicitations. From the date hereof until the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Seller Representative shall not, directly or indirectly, initiate, solicit or encourage any inquiries or the making or implementation of any Acquisition Proposal.

## ARTICLE VI
## COVENANTS OF BUYER

6.1    Access to Books and Records. Buyer shall maintain until the seventh (7th) anniversary of the Closing Date all Books and Records relating to any Acquired Company or any asset or liability of any Acquired Company prior to the Closing in substantially the manner such Books and Records are maintained immediately prior to the Closing Date; provided, however, that Buyer may dispose of such Books and Records in the ordinary course of the Acquired Companies' business, consistent with Buyer's existing records retention policies so long as Buyer first offers to turn over possession thereof to the Seller Representative by written notice given to the Seller Representative at least sixty (60) days prior to the proposed date of such disposition or destruction.  After the Closing, in connection with (a) the preparation or filing of any Tax Return relating to the Pre-Closing Tax Periods or to verify any transaction-related Tax refunds or Transaction Deductions, (b) any proposed audit or examination related to the foregoing or (c) any Suit involving or among the parties or their respective Affiliates, and subject to reasonable confidentiality restrictions and agreements as the Buyer may require, Buyer shall provide Seller Representative and its Representatives with access, upon prior reasonable written request, during regular business hours, to (i) the officers and employees of the Acquired Companies and (ii) the Books and Records in Buyer's control as of such time, but, in each case, only to the extent relating to the assets, liabilities or business of any Acquired Company prior to the Closing, and Seller Representative and its Representatives shall have the right to make copies of such books and records at its sole cost; provided, however, that no Person shall be required to provide any (i) information constituting a trade secret, including economic data and customer information or (ii) access or information that would result in a violation of any applicable Laws or would jeopardize applicable attorney-client privilege.

6.2    Indemnification; Directors and Officers Insurance.

(a)    For a period of not less than six (6) years from and after the Closing Date, the Organizational Documents of each Acquired Company shall contain provisions no less favorable with respect to indemnification, advancement of expenses and exculpation of current or former directors and officers of any Acquired Company (each, a "**Covered Party**") than are set forth in their respective Organizational Documents as of the date hereof with respect to periods prior to the Closing. Any indemnification agreements with Covered Parties in respect of their

- 62 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094189

service as a director or officer of any Acquired Company in existence on the date of this Agreement shall remain effective, without any further action, and shall survive the Closing and continue in full force and effect in accordance with their terms.

(b)     On or prior to the Closing Date, the Company shall obtain, or cause the Acquired Companies to obtain, a non-cancelable run-off insurance policy for directors' and officers' liability, for a period of six (6) years after the Closing Date to provide insurance coverage for the directors and officers of the Acquired Companies for events, acts or omissions occurring on or prior to the Closing Date (the "**D&O Insurance**"). Buyer shall cause any Acquired Company, as applicable, to maintain the D&O Insurance in full force and effect, and continue to honor the obligations thereunder. Buyer shall not, and shall cause the Acquired Companies to not, cancel or change the D&O Insurance in any respect that would be adverse to the Covered Parties. The cost of the D&O Insurance shall be borne by the Stockholders.

(c)     In the event Buyer or any Acquired Company (i) consolidates with or merges into any other Person and shall not be the continuing entity after such consolidation or merger and the continuing entity does not otherwise assume or succeed to the obligations under this Section 6.2 by operation of Law or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that such applicable successors and assigns of such assets, as the case may be, shall succeed to the obligations set forth in this Section 6.2.

(d)     Each Covered Party and each other Person who was prior to the Closing Date covered by the Acquired Companies' existing D&O Insurance shall be third party beneficiaries of this Section 6.2. The provisions of this Section 6.2 are intended to be for the benefit of each such Person and their heirs. The obligations under this Section 6.2 shall not be terminated or modified in such a manner as to adversely affect any such Person without their written consent.

6.3     Releases.

(a)     Except as otherwise provided in this Agreement, effective as of, and subject to the occurrence of, the Closing, Buyer, on behalf of Buyer and the Acquired Companies and their respective Affiliates, successors and assigns (collectively, the "**Buyer Releasing Parties**"), forever waives, releases, remises and discharges the Seller Representative, the Stockholders, the Option Holders and their respective Affiliates, and their respective current and former equityholders, directors, officers, employees, successors and assigns (collectively, the "**Buyer Released Parties**") from any actions, causes of action (at law or in equity), claims, demands, damages, judgments, debts, dues and suits of every kind, nature and description whatsoever ("**Claim**") that such Buyer Releasing Parties may currently have, or may have in the future, in any way relating to the Buyer Released Parties' ownership of Equity Securities in the Acquired Companies (in their capacity as holders thereof) arising on or prior to the Closing Date (so long as the events giving rise to such Claim occurred on or prior to the Closing) (collectively, the "**Buyer Released Claims**"). Notwithstanding the foregoing, nothing contained in this Section 6.3(a) shall release any Buyer Released Party from such Buyer Released Party's obligations and liabilities arising (i) under, or permitted by any commercial agreement in effect as of the Closing Date between the Company, on the one hand, and any Buyer Released Party, on the other hand, (ii) in connection with such Buyer Released Party's employment with any Acquired Company or

- 63 -

39329697.7

FBG_CH1_00094190

(iii) under this Agreement or any of the Ancillary Documents or in the case of such Buyer Released Party's Fraud.

(b)      Except as otherwise provided in this Agreement, effective as of, and subject to the occurrence of, the Closing, the Seller Representative, on behalf of the Stockholders and Option Holders and their respective Affiliates, and their respective current and former equityholders, directors, officers, employees, successors and assigns (collectively, the "**Seller Releasing Parties**"), forever waives, releases, remises and discharges Buyer, the Acquired Companies and their respective Affiliates, successors and assigns (collectively, the "**Seller Released Parties**") from any Claims that such Seller Releasing Parties may currently have, or may have in the future, in any way relating to their ownership of Equity Securities in the Acquired Companies (in their capacity as holders thereof) arising on or prior to the Closing Date (so long as the events giving rise to such Claim occurred on or prior to the Closing) (collectively, the "**Seller Released Claims**"). Notwithstanding the foregoing, nothing contained in this Section 6.3(b) shall release any Seller Released Party from such Seller Released Party's obligations and liabilities arising (i) under, or permitted by any commercial agreement in effect as of the Closing Date between the Company, on the one hand, and any Seller Released Party, on the other hand, (ii) in connection with such Seller Released Party's employment with any Acquired Company or (iii) under this Agreement or any of the Ancillary Documents or in the case of such Seller Released Party's Fraud.

6.4      No Additional Representations. Notwithstanding anything to the contrary contained herein, Buyer and Merger Sub acknowledge and agree that, except for the representations and warranties made by the Company in Article III of this Agreement (as qualified by the Disclosure Schedules), the Ancillary Documents (including, for the avoidance of doubt, the Letters of Transmittal) and any other document or certificate delivered in connection herewith or therewith, none of Seller Representative, the Acquired Companies or the Nonparty Affiliates has made or is making, and Buyer, its Affiliates (including Merger Sub) and their respective Representatives have not relied, are not relying and will not rely on, any representation or warranty, express or implied, at law or in equity, with respect to (a) any Stockholder, Option Holder or any Acquired Company, (b) their respective businesses, assets, liabilities, operations, prospects, or condition (financial or otherwise), merchantability, suitability, including with respect to fitness for a particular purpose of any assets, the nature or extent of any liabilities and the effective or the success of any operations, (c) the transactions contemplated hereby, (d) the accuracy or completeness of any information regarding any of the foregoing, or (e) any such other representations or warranties including with respect to (i) any confidential information memorandum, management presentation, projections, budgets or any other information, document or material made available to Buyer, its Affiliates (including Merger Sub) or any of their respective Representatives in "data rooms" and online "data sites," management presentations or any in any other form, and (ii) any Person providing any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in Article III of this Agreement.  Notwithstanding the foregoing, nothing contained in this Section 6.4 shall limit, waive or negate Buyer's, the Surviving Corporation's or any of their respective Affiliates' claims, rights or remedies in respect of Fraud.

6.5      R&W Policy. If Buyer obtains an insurance policy in connection with the representations and warranties set forth in Article III of this Agreement or in any Joinder

- 64 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094191

Agreement or Letter of Transmittal (a "R&W Policy"), (a) such R&W Policy shall expressly provide that the insurer or insurers issuing such policy shall have no right, and, except in the case of any claims arising out of or relating to Fraud, waive any right, of subrogation, contribution or otherwise against the Stockholders and Option Holders based upon, arising out of, or in any way connected to this Agreement and the transactions contemplated hereby, or by such R&W Policy (b) the Stockholders and Option Holders shall be intended third party beneficiaries under any R&W Policy of such provisions and waivers, and (c) Buyer and its Affiliates shall not amend, waive, modify or otherwise revise such provisions or waivers in any R&W Policy.

6.6     Communications Prior to Closing. Prior to the Closing, the Buyer and its Affiliates (directly or indirectly) may only contact and communicate with the employees, lenders, customers, dealers, service providers, suppliers of any Acquired Company in connection with the consummation of the transactions contemplated hereby after prior consultation with and written approval of Seller Representative.

## ARTICLE VII
## COVENANTS OF BUYER AND THE COMPANY

7.1     Confidentiality; Public Announcements.

(a)     The Confidentiality Agreement shall terminate as of the Closing. If for any reason this Agreement is terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms; provided that notwithstanding anything contained in this Agreement or the Confidentiality Agreement to the contrary, the Confidentiality Agreement shall be deemed to be amended such that the term of the Confidentiality Agreement and each provision thereunder (including, for the avoidance of doubt, any provisions that provide for a shorter term) shall be extended to the date that is three (3) years after the date this Agreement is terminated. From and after the Closing: (i) the Stockholders and the Option Holders, on the one hand, and Buyer and Merger Sub, on the other hand, shall, and shall cause their respective Affiliates to, and shall use commercially reasonable efforts to cause their respective Representatives to, maintain in confidence this Agreement and any written, oral or other information related to the negotiation hereof and thereof, (ii) the Stockholders and the Option Holders shall, and shall cause their respective Affiliates to, and shall use commercially reasonable efforts to cause their respective Representatives to, maintain in confidence any written, oral or other Confidential Information obtained by virtue of the Stockholders' ownership of the Acquired Companies or the Option Holders ownership of Options or Phantom Options (as applicable) prior to the Closing and (iii) the Buyer and Merger Sub shall, and shall cause their respective Affiliates to, and shall use commercially reasonable efforts to cause their respective Representatives to, maintain in confidence any written, oral or other information of or relating to the Stockholders, the Option Holders or their respective Affiliates obtained by virtue of the Buyer's ownership of the Acquired Companies from and after the Closing, except, in each case, to the extent that the applicable party is required to disclose such information by judicial or administrative process or pursuant to applicable Law or such information can be shown to have been in the public domain other than due to a breach by the applicable party of this Section 7.1(a) or as is contemplated by this Agreement or the Ancillary Agreements in connection with the consummation of the transactions contemplated hereby or thereby; provided, further, that (x) such obligation to keep any such information in confidence shall be satisfied if the applicable Person

- 65 -

39329697.7

CONFIDENTIAL                                                      FBG_CH1_00094192

exercises at least the same care with respect to such information as it would take to preserve the confidentiality of its own similar information, (y) the foregoing restrictions shall not restrict the use of any such information by any such Person in connection with the enforcement of rights or defense of claims arising out of or relating to this Agreement or any documents required to be delivered hereunder and (z) the foregoing shall not restrict disclosures of information made by or on behalf of a party or its Affiliates or successors, on the one hand, to its direct and indirect investors and potential investors, Affiliates, financing sources, counsel, accountants, consultants and others, on the other hand (so long as, in each case, such disclosure has a valid business purpose and is effected in a manner consistent with private equity practices).

(b)     Buyer acknowledges and agrees that certain of the Representatives of the ONCAP Sellers may serve as directors/managers, officers and consultants (each such person, an "**Engaged Investment Professional**") of one or more direct or indirect Affiliates or portfolio companies of Affiliates of the ONCAP Sellers or of investment funds managed by Affiliates of the ONCAP Sellers (each a "**Portfolio Company**"), and no such Affiliate or Portfolio Company shall be deemed to have received any written, oral or other information relating to the Acquired Companies or be acting on behalf of an ONCAP Seller solely due to the dual role of any Engaged Investment Professional, so long as such Engaged Investment Professional does not actually disclose or make available any written, oral or other information relating to the Acquired Companies to such Affiliate or Portfolio Company.

(c)     From and after the date hereof, no party will issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other parties hereto; provided, however, that nothing herein will prohibit any party from issuing or causing publication of any such press release or public announcement to the extent that such disclosure is, upon advice of counsel, required by applicable Law or stock exchange regulations applicable to such party or its Affiliates, in which case the party making such determination will, if practicable in the circumstances, use reasonable efforts to allow the other parties reasonable time to comment on such release or announcement in advance of its issuance; provided, further, that the foregoing shall not restrict disclosures of information made by or on behalf of a party or its Affiliates or successors, on the one hand, to its direct and indirect investors and potential investors, Affiliates, financing sources, counsel, accountants, consultants and others, on the other hand (so long as, in each case, such disclosure has a valid business purpose and is effected in a manner consistent with private equity practices); provided that, other than in the case of any such disclosure to an Affiliate, investor, potential investor or third-party advisor of an ONCAP Seller, no such disclosure shall include the identity of the Buyer or its Affiliates or the economic terms of this Agreement or the other documentation related hereto. Notwithstanding the foregoing, a party or its respective Affiliates or successors may issue press releases, make web postings or other public announcements that otherwise do not include information which was not included in any press releases or announcements made in accordance with the first sentence of this Section 7.1(c) (if any).

7.2     Tax Matters.

(a)     Allocation of Straddle Period Tax Liability. For all purposes under this Agreement, in the case of any Straddle Period, the portion of Taxes (or any Tax refund and amount

- 66 -

39329697.7

**DEBTORS' EXHIBIT NO. 238**
**Page 67 of 133**

credited against any Tax) that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of property Taxes and other Taxes imposed on a periodic basis without regard to income, gross receipts, activities or sales, deemed to be the amount of such Taxes (or Tax refund or amount credited against Tax) for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of such Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period; and (ii) in the case of all other Taxes, determined based on an interim closing of the books as of the close of business on the Closing Date, except that exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing, shall be allocated on a per diem basis, unless otherwise required by applicable Law.

(b)      Tax Refunds. Subject to the terms of this Section 7.2, any cash Tax refunds that are received by Buyer, any Acquired Company or any of their respective Affiliates, and any credits that actually reduce any cash Tax otherwise then payable by such Persons, (in each case, including any interest thereon paid by the applicable Governmental Entity and net of any Taxes owed by Buyer, any Acquired Company or any of their respective Affiliates in connection with the receipt of such refunds) that relate to any Pre-Closing Tax Period for the Acquired Companies (such refunds or credits, "**Pre-Closing Tax Refunds**") shall be for the account of the Stockholders and the Option Holders, and, subject to Section 7.2(b) and Article II, Buyer shall pay over to the Company such Pre-Closing Tax Refunds, as an adjustment to the Merger Consideration, which amount shall be applied (i) for further distribution to the Stockholders and Option Holders (net of any applicable withholding taxes, and net of the employer portion of any payroll Taxes required to be paid by the Company in connection with the payments to the Option Holders pursuant to this clause (i) that represent compensation under the Code), within fifteen (15) days after receipt or utilization thereof, provided that the portion of any such amount payable to the Option Holders shall be paid to the Company for further payment to each Option Holder in accordance with the last sentence of Section 2.6(a).  Buyer shall request (or shall cause to be requested) a refund (rather than a credit against future Taxes) with respect to all Pre-Closing Tax Periods for the Acquired Companies and shall take all commercially reasonable steps required to apply for and obtain any Tax refund described in this Section 7.2(b), including using all available procedures. None of the Acquired Companies will waive any carryback of any net operating loss, capital loss or credit arising in or attributable to a Pre-Closing Tax Period.  Notwithstanding anything to the contrary in this Section 7.2(b), Pre-Closing Tax Refunds shall not include, and Buyer shall not be required pursuant to this Section 7.2(b) to pay over to the Company, any amounts that are included (and solely to the extent such amounts are included) in the calculation of the Final Closing Indebtedness or the Final Closing Net Working Capital.

(c)      Tax Benefits.  Buyer and its Affiliates shall cause all Transaction Deductions to be reflected in a Pre-Closing Tax Period (including, for the avoidance of doubt, the portion of any Straddle Period ending on the Closing Date) and carried back to any other Pre-Closing Tax Period pursuant to Section 7.2(b), in each case, to the fullest extent permitted by applicable Law.

(d)      Tax Returns.  Buyer and its Affiliates shall cause each Acquired Company to prepare and timely file all Tax Returns that are filed by or with respect to the Acquired Companies after the Closing.  Each such Tax Return that relates to a Pre-Closing Tax Period (a

- 67 -

39329697.7

"Pre-Closing Tax Period Return") shall be prepared in a manner consistent with Section 7.3(c) and past practice, expect as otherwise required by applicable Law. Buyer and its Affiliates shall furnish a draft copy of each Pre-Closing Tax Period Return to Seller Representative for review and comment no later than thirty (30) days before the due date for filing such Tax Return (including extensions thereof) and shall consider in good faith any reasonable comments provided by Seller Representative with respect to such Pre-Closing Tax Period Return prior to filing such Pre-Closing Tax Period Return.

(e)     Transfer Taxes. All Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement shall be borne fifty percent (50%) by the Buyer and fifty percent (50%) by the ONCAP Sellers.

7.3     Employees.

(a)     Subject to Section 7.3(b), nothing in this Agreement will (a) create a Contract between the Buyer or, after the Closing Date, any Acquired Company, on the one hand, and any Service Provider, on the other hand, (b) be construed as a guarantee of continued employment or engagement of any Service Provider, (c) be construed so as to prohibit the Buyer or any Acquired Company from having the right to terminate the employment or engagement of any Service Provider, (d) require or be construed to require the Buyer, any Affiliate of the Buyer or any Acquired Company to provide any employee benefit plan or non-cash compensation (including retirement benefits, health or welfare benefits, equity-based compensation, or severance) to any Person, (e) prevent the Buyer or any Acquired Company from amending or terminating any Employee Plan in accordance with its terms, or (f) be construed as an amendment to any Employee Plan. Notwithstanding anything in this Agreement to the contrary, (i) no Service Provider may rely on this Agreement as the basis for any breach of contract claim against the Buyer or an Acquired Company and (ii) the Buyer and its Affiliates will have the sole discretion and authority to interpret their respective employee benefit and compensation plans, Contracts, arrangements and programs in accordance with their terms and applicable Law.

(b)     For a period of twelve (12) months following the Closing Date, Buyer shall maintain and abide by, or shall cause its Affiliates to maintain and abide by, the Company's severance policy as in effect as of the date hereof.

(c)     The provisions of this Section 7.3 are solely for the benefit of the parties to the Agreement, and no Person shall be regarded for any purpose as a third-party beneficiary of the Agreement, and no provision of this Section 7.3 shall create such rights in any Person. Subject to Section 7.4(a), no provision of this Agreement shall (i) guarantee employment for any period of time or preclude the ability of Buyer to terminate the employment of any employee of the Company at any time and for any reason, (ii) require Buyer to continue any Employee Plans or other employee benefit plans or prevent the amendment, modification or termination thereof after the Effective Time or (iii) amend any Employee Plans or other employee benefit plans.

7.4     Section 280G. Prior to the Closing Date, and at least one day after having obtained any executed Waivers (as defined below) that may be entered into in connection with the transactions contemplated by this Agreement, the Company shall solicit the approval of its

- 68 -

39329697.7

FBG_CH1_00094195

Stockholders, to the extent and in the manner required under Section 280G of the Code, for all payments (including benefits and vesting) that the Company determines in good faith could, in the absence of such Stockholder approval, constitute "parachute payments" within the meaning of Section 280G of the Code; provided that as a condition to the Company's satisfaction of its obligations hereunder, Buyer shall be required to have timely disclosed to the Company the existence and terms of any such payments negotiated or controlled by Buyer. Prior to soliciting such Stockholder approval, the Company shall solicit waivers ("**Waivers**") from the anticipated recipients of such payments, such that unless such payments are approved by the Stockholders to the extent and in the manner required under Section 280G of the Code, the Company shall not be required to make such payments. All calculations and documentation prepared by the Company in connection with this Section 7.4 shall be provided to Buyer in advance of their distribution for Buyer's approval.

## ARTICLE VIII
## CONDITIONS TO CLOSING; TERMINATION

8.1     Conditions to Obligation of Buyer and Merger Sub. The obligation of Buyer and Merger Sub to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver, in writing, by Buyer) of each of the following conditions at or prior to the Closing:

(a)     Each of the representations and warranties of the Company set forth in Article III (other than the Company Fundamental Representations) shall be true and correct at and as of the date hereof and at and as of the Closing Date with the same force and effect as though made at and as of the Closing Date (other than such representations and warranties that refer specifically to an earlier date, which representations and warranties shall have been true and correct as of such earlier date), without taking into account any qualifications or limitations as to "materiality," "Material Adverse Effect" or other words of similar import contained therein (including with respect to any applicable definitions contained therein, but not including (i) where any such provision requires disclosure of lists of items of a material nature (i.e., Material Contracts) or above a specified threshold in which case such qualifications or limitations shall not be deleted or (ii) for purposes of the representations and warranties set forth in Section 3.7(b) and Section 3.8(b)), except where the failure of any such representation or warranty to be so true and correct has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     Each of the Company Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date with the same force and effect as though made at and as of the Closing Date (other than such representations and warranties that refer specifically to an earlier date, which representations and warranties shall have been true and correct in all respects as of such earlier date) other than, in respect of the first sentence of Section 3.6(a), for *de minimis* inaccuracies contained therein.

(c)     The Company and Seller Representative shall have performed or complied in all material respects with all agreements, obligations and covenants required by this Agreement to be performed or complied with by the Company and/or Seller Representative at or prior to the Closing.

- 69 -

39329697.7

CONFIDENTIAL                                                                FBG_CH1_00094196

(d)      Buyer shall have received a certificate dated the Closing Date duly executed by an authorized officer of the Company in his or her capacity as such (and not in his or her individual capacity) to the effect that the conditions set forth in Sections 8.1(a), 8.1(b), 8.1(c) and 8.1(f) have been satisfied (the "**Company Closing Certificate**").

(e)      No Law or Order precluding or permanently restraining, enjoining or otherwise prohibiting any of the parties hereto from consummating the transactions contemplated hereby shall be in effect and no action shall be pending that seeks on any grounds to restrain, enjoin or hinder the consummation of the transaction contemplated hereby.

(f)      No Material Adverse Effect shall have occurred since the date hereof.

8.2      Conditions to Obligation of the Company. The obligation of the Company to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver, in writing, by the Company; provided, that a written waiver by Seller Representative shall also be deemed to constitute a waiver by the Company) of each of the following conditions at or prior to the Closing:

(a)      Each of the representations and warranties of Buyer set forth in Article IV other than the Buyer Fundamental Representations shall be true and correct at and as of the date hereof and at and as of the Closing Date with the same force and effect as though made at and as of the Closing Date (other than such representations and warranties that refer specifically to an earlier date, which representations and warranties shall have been true and correct as of such earlier date), without taking into account any materiality qualification contained in such representation and warranty, except where the failure of any such representation or warranty to be so true and correct has not materially and adversely affected the ability of Buyer to consummate the transactions contemplated by this Agreement.

(b)      Each of the Buyer Fundamental Representations shall be true and correct at and as of the date hereof and at and as of Closing Date with the same force and effect as though made at and as of the Closing Date (other than such representations and warranties that refer specifically to an earlier date, which representations and warranties shall have been true and correct as of such earlier date).

(c)      Buyer shall have performed or complied in all material respects with all agreements, obligations and covenants required by this Agreement to be performed or complied with by Buyer at or prior to the Closing.

(d)      Seller Representative shall have received a certificate dated the Closing Date duly executed by an authorized officer of Buyer in his or her capacity as such (and not in his or her individual capacity) to the effect that the conditions set forth in Sections 8.2(a), 8.2(b) and 8.2(c) have been satisfied (the "**Buyer Closing Certificate**").

(e)      No Law or Order precluding or permanently restraining, enjoining or otherwise prohibiting any of the parties hereto from consummating the transactions contemplated hereby shall be in effect or in force and no action shall be pending that seeks on any grounds to restrain, enjoin or hinder the consummation of the transaction contemplated hereby.

39329697.7

CONFIDENTIAL

FBG_CH1_00094197

8.3     Frustration of Closing Conditions. None of the Buyer, Merger Sub, the Company or Seller Representative may rely on or assert the failure of any condition set forth in this Article VIII if such failure results from or was the proximate cause of such party's failure to comply with or perform any of its obligations under any provision of this Agreement.

8.4     Waiver of Conditions. All conditions set forth in this Article VIII will be deemed to have been satisfied or waived if the Closing occurs.

8.5     Termination. This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely:

(a)     by the mutual written consent of the Company and Buyer;

(b)     by either the Company or Buyer, by written notice to the other, if (i) an Order restraining, enjoining or otherwise prohibiting any of the parties hereto from consummating the transactions contemplated hereby is in effect and such Order has become final and non-appealable and (ii) the terminating party has not materially breached any provision of this Agreement;

(c)     by either the Company or Buyer, by written notice to the other, if (i) the Closing shall not have occurred on or before the date which is sixty (60) days following the date hereof (the "**Outside Date**") and (ii) the terminating party has not materially breached any provision of this Agreement;

(d)     by Buyer, by written notice to the Company, if (i) a breach of or failure to perform any representation, warranty, covenant or agreement on the part of the Company or Seller Representative set forth in this Agreement shall have occurred, or any such representation or warranty shall have become untrue or inaccurate, which such breach or failure to perform or untruth or inaccuracy (x) is incapable of being cured prior to the Outside Date or, if capable of being cured, is not cured within ten (10) Business Days following the Company's receipt of written notice of such breach (or, if earlier, by the Outside Date) and (y) would result in one or more of the conditions set forth in Section 8.1 not being satisfied as of the Closing (assuming the occurrence thereof) and (ii) Buyer has not materially breached any provision of this Agreement in a manner such that the conditions set forth in Section 8.2(a), Section 8.2(b) or Section 8.2(c) would not be satisfied at the Closing (assuming the occurrence thereof);

(e)     by the Company, by written notice to Buyer, if (i) a breach of or failure to perform any representation, warranty, covenant or agreement on the part of Buyer or Merger Sub set forth in this Agreement shall have occurred, or any such representation or warranty shall have become untrue or inaccurate, which such breach or failure to perform or untruth or inaccuracy (x) is incapable of being cured prior to the Outside Date or, if capable of being cured, is not cured within ten (10) Business Days following Buyer's receipt of written notice of such breach (or, if earlier, by the Outside Date) and (y) would result in one or more of the conditions set forth in Section 8.2 not being satisfied as of the Closing (assuming the occurrence thereof) and (ii) each of the Company and Seller Representative has not materially breached any provision of this Agreement in such a manner that the conditions set forth in Section 8.1(a), Section 8.1(b), or Section 8.1(c) would not be satisfied at the Closing (assuming the occurrence thereof); and

- 71 -

39329697.7

**DEBTORS' EXHIBIT NO. 238**
**Page 72 of 133**

(f)      by Buyer, upon written notice to the Company, if the Company has not delivered a duly executed copy of the Requisite Stockholders Consent to Buyer within twenty-four (24) hours of the execution of this Agreement.

8.6      Effect of Termination. If this Agreement is validly terminated in accordance with Section 8.5, this Agreement shall become void and of no further force and effect and neither any party hereto nor their respective Affiliates and Representatives shall have any liability in respect of a termination of this Agreement other than liability for Fraud occurring prior to such termination; provided, however, that (i) this Section 8.6 and Section 7.1 (Confidentiality; Public Announcements), Article X (Seller Representative) and Article XI (Miscellaneous) shall survive any such termination and (ii) no such termination shall relieve any party hereto from liability for damages resulting from Fraud or Willful Breach of this Agreement occurring prior to such termination. For purposes of this Agreement, "Willful Breach" shall mean a material breach of, or material failure to perform any of the covenants or other agreements contained in, this Agreement that is a consequence of an act or failure to act by the breaching or non-performing party with actual knowledge that such party's act or failure to act would, or would reasonably be expected to, result in or constitute such breach of or such failure of performance under this Agreement; provided that, without limiting the meaning of Willful Breach, the parties hereto acknowledge and agree that Failure to Close shall constitute a Willful Breach of this Agreement.  For purposes of this Section 8.6, "Failure to Close" shall mean the failure by the Buyer or the Company to consummate the Merger and the transactions contemplated hereby on or prior to the fifth (5th) Business Day following such party's receipt of written notice from the Buyer or the Company, as applicable, confirming that (i) all of the applicable conditions to the Closing set forth in Section 8.1 (Conditions to Obligation of Buyer and Merger Sub) and Section 8.2 (Conditions to Obligation of the Company) have been satisfied or waived (except for those conditions that by their nature are to be satisfied at the Closing, which conditions would be capable of being satisfied at the time of such failure to consummate the Merger) and (ii) such other party is ready, willing and able to consummate the Merger and the transactions contemplated hereby.  In the event of termination of this Agreement, and regardless of the reason for the termination, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms and any such termination of this Agreement shall not amend, modify, release, waive or otherwise limit any rights or obligations under the Confidentiality Agreement, except as set forth in Section 7.1(a).

## ARTICLE IX
## NO SURVIVAL

9.1      Non-Survival of Representations and Warranties, Covenants and Agreements. Each of the representations and warranties, and each of the covenants and agreements that are required to be performed prior to the consummation of the Closing, in each case, contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate and be of no further force or effect upon consummation of the Closing (it being understood and agreed that the Acquired Companies are being acquired by Buyer on an "as is where is basis" and as such, none of Buyer or its Representatives shall have recourse against any Stockholders, Option Holders or any of their respective Affiliates under this Agreement following the consummation of the Closing for any breach of or inaccuracy in any such representation or warranty or any breach or nonfulfillment of covenant, condition or agreement required to be performed or fulfilled prior to the consummation of the Closing).  Notwithstanding the foregoing, nothing in this Section 9.1

- 72 -

39329697.7

FBG_CH1_00094199

shall limit, waive or negate Buyer's, the Surviving Corporation's or any of their respective Affiliates' claims, rights or remedies in respect of Fraud. Each covenant and agreement contained in this Agreement and in any certificate delivered hereunder that requires performance after the Closing shall expressly survive the Closing in accordance with its terms until fully performed or satisfied or, if no performance is specified, for the full period of the applicable statute of limitations.

## ARTICLE X
## SELLER REPRESENTATIVE

10.1    Seller Representative.

(a)    Appointment. ONCAP Investment Partners III, L.P. is hereby authorized, appointed and empowered to serve as the representative of each Stockholder and Option Holder with respect to the matters contemplated by this Agreement and all Ancillary Documents with respect to any Stockholder and Option Holder, with full power of substitution. Such appointment is not as an agent but as a term of the transactions contemplated by this Agreement and all Ancillary Documents and accordingly such appointment is irrevocable by action of any Stockholder or Option Holder. Seller Representative's obligations in connection with the transactions contemplated by this Agreement shall be limited to those expressly set forth herein and in the Ancillary Documents, as applicable. For the avoidance of doubt, and notwithstanding anything to the contrary contained herein or otherwise, if the Closing occurs, Seller Representative shall have no authority to act on behalf of any Acquired Company following the Closing.

(b)    Authority. Seller Representative, in its capacity as such, shall have the authority to act for and on behalf of each Acquired Company (solely prior to Closing), each Stockholder and each Option Holder, including the full power and authority on such party's behalf (i) to consummate or cause the consummation of the transactions contemplated herein, (ii) to pay such party's expenses incurred in connection with the negotiation and performance of this Agreement (whether incurred before, on or after the date hereof), (iii) to make any determinations and settle any matters in connection with the adjustments contemplated by Section 2.13, (iv) to determine the amount of the Expense Holdback Amount (provided such amount does not exceed $2,000,000), (v) to hold and distribute any funds with respect to the Expense Holdback Amount or payable by or on behalf of Buyer hereunder which are for the account of the Stockholders and Option Holders or which are released from the Adjustment Escrow Account for the benefit of the Stockholders or Option Holders, (vi) to deduct and/or hold back any funds which may be payable to any Stockholder or Option Holder pursuant to the terms of this Agreement or the Escrow Agreement in order to pay any amount which may be payable by such Stockholder or Option Holder hereunder, (vii) to defend, resolve or settle any claim with respect to this Agreement or the transactions contemplated hereby, (viii) to take all other actions which may be taken by or on behalf of such party in connection with this Agreement or any Ancillary Document and all amendments to such agreements, (ix) to execute any agreements, documents, certificates or other instruments pursuant to such agreements, (x) to retain funds for reasonably anticipated expenses and liabilities, (xi) to negotiate with Buyer and Merger Sub and their Subsidiaries and deal with Buyer and the continuing entity under this Agreement or any Ancillary Document, (xii) to waive any inaccuracies in the representations or warranties of Buyer or Merger Sub contained in this Agreement or in any document delivered by Buyer or Merger Sub pursuant hereto and (xiii) to do

- 73 -

39329697.7

FBG_CH1_00094200

each and every act and exercise any and all rights of such party, which such party or parties collectively are permitted or required to do or exercise under this Agreement, including engaging counsel, accountants or other Representatives in connection with the foregoing matters. Each Stockholder and Option Holder further agrees that Seller Representative shall be entitled to cause the Escrow Agent to pay over to Seller Representative, from the amounts then held by the Escrow Agent, the amount of any fees or expenses for which Seller Representative is entitled to reimbursement pursuant to this Agreement or any other amount payable by such Stockholder or Option Holder hereunder. A decision, act, consent or instruction of the Seller Representative shall constitute a decision for all Stockholders and Option Holders, and shall be final, binding and conclusive upon all Stockholders and Option Holders, the Buyer and its Affiliates, including the Acquired Companies following the Effective Time, and their respective officers, employees, equityholders, partners and Representatives may fully rely upon any such decision, act, consent or instruction of the Seller Representative as being the decision, act, consent or instruction of every Stockholder and Option Holder.  Seller Representative shall be entitled to receive all notices or documents given or to be given to the Seller Representative pursuant hereto or in connection herewith or therewith and to receive and accept services of legal process in connection with any suit or proceeding arising under this Agreement and any Ancillary Document. Any notice to Seller Representative, delivered in the manner provided in Section 11.1, shall be deemed to be notice to any or all Acquired Companies (solely prior to Closing), Stockholders and Option Holders, as the case may be, for the purposes of this Agreement and any Ancillary Document.

(c)     Resignation or Removal of Seller Representative. Seller Representative may be removed by the Stockholders and Option Holders at any time upon the vote of the Persons who were the holders of a majority of the Common Equivalents Outstanding as of immediately prior to the Effective Time and the receipt of written notice of such removal by Buyer. Subject to the appointment and acceptance of a successor Seller Representative as provided below and the receipt of written notice thereof by Buyer, Seller Representative may resign at any time thirty (30) days after giving notice thereof to the Stockholders and Option Holders. Upon any such removal or resignation, the Stockholders and Option Holders may appoint a successor Seller Representative by a vote of the Persons who were the holders of a majority of the Common Equivalents Outstanding as of immediately prior to the Effective Time. If no successor Seller Representative shall have been appointed by the Stockholders and Option Holders and accepted such appointment within twenty (20) days after the retiring Seller Representative's giving of notice of resignation or the Stockholders' and Option Holders' removal of Seller Representative, then the retiring or removed Seller Representative may, on behalf of the Stockholders and Option Holders, appoint a successor. Upon the acceptance of any appointment as Seller Representative hereunder and the receipt of written notice thereof by Buyer, such successor Seller Representative shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Seller Representative, and the retiring or removed Seller Representative shall be discharged from its duties and obligations hereunder. Any such successor Seller Representative must be reasonably satisfactory to Buyer and Buyer's consent (which shall not be unreasonably withheld, delayed or conditioned) is required prior to the appointment of any successor. After any retiring or removed Seller Representative's resignation or removal, as applicable, hereunder as Seller Representative, the provisions of Sections 10.1(d), 10.2 and 10.3 shall continue in effect for such retiring Seller Representative's benefit in respect of any actions taken or omitted to be taken by it while it was acting as Seller Representative.

- 74 -

39329697.7

FBG_CH1_00094201

**DEBTORS' EXHIBIT NO. 238**
**Page 75 of 133**

(d)     Reimbursement. Each Stockholder and Option Holder shall be liable severally, but not jointly, based on its Pro Rata Share for the reimbursement of any expenses (including reasonable attorneys' fees and expenses) paid or incurred by Seller Representative in connection with the performance of his obligations as Seller Representative. Notwithstanding anything to the contrary contained herein, Seller Representative shall be entitled to set off any reimbursement obligation owed under this Section 10.1(d) by any Stockholder and Option Holder against any amounts such Stockholder or Option Holder is entitled to receive from the Expense Holdback Amount and/or the Adjustment Escrow Amount or from any amounts to be paid pursuant to Section 7.2.

10.2    Exculpation.

(a)     The Acquired Companies, Stockholders and Option Holders acknowledge and agree that Seller Representative has been engaged in his capacity as such solely as an independent contractor and that the Seller Representative's obligations are contractual in nature only as expressly set forth in this Agreement (and subject to all limitations contained herein). Accordingly, the Acquired Companies, Stockholders and Option Holders disclaim any intention to impose any duties (including any fiduciary duty) by virtue of the engagement Seller Representative contemplated by this Agreement. To the extent that, at law or in equity, Seller Representative in its capacity as such has any duty (including any fiduciary duty) to any Acquired Company, Stockholder or Option Holder, all such duties are hereby eliminated, and each of the Acquired Companies, Stockholders and Option Holders hereby waives such duties (including any fiduciary duties), to the fullest extent permitted by Law. Seller Representative shall not incur any liability to any other Person in any way relating to or arising out of his appointment hereunder, the performance of his duties hereunder or any of his omissions or actions with respect thereto, including by virtue of the failure or refusal of Seller Representative for any reason to consummate the transactions contemplated hereby, in each case, except to the extent finally determined by a court of competent jurisdiction (not subject to further appeal) to have resulted directly and exclusively from Seller Representative's intentional fraud or willful misconduct.

(b)     Seller Representative shall have no obligations to make any payments, including on behalf of any Stockholder, Option Holder or any other Person, other than the distributions of the consideration for the transactions contemplated by this Agreement actually received by Seller Representative, if any, in accordance with the terms hereof.

(c)     Each Stockholder and Option Holder agrees that Torys LLP has acted as counsel for the Acquired Companies, Seller Representative and the ONCAP Sellers, and no other Stockholder, Option Holder or Person, in connection with this Agreement.

10.3    Indemnification. Each Stockholder and Option Holder shall severally, but not jointly, based on its Pro Rata Share, indemnify and hold harmless, Seller Representative from any and all losses, liabilities and expenses (including the reasonable fees and expenses of counsel) arising out of or in connection with Seller Representative's execution and performance (solely in his capacity as Seller Representative) of this Agreement and the Ancillary Documents, except for intentional fraud or willful misconduct by Seller Representative. This indemnification will survive the termination of this Agreement or the consummation of the Closing, as applicable, indefinitely. Notwithstanding anything to the contrary contained herein, Seller Representative shall be entitled

- 75 -

39329697.7

                                                                 FBG_CH1_00094202

**DEBTORS' EXHIBIT NO. 238**
**Page 76 of 133**

to set off any indemnification obligation owed under this <u>Section 10.3</u> by any Stockholder or Option Holder against any amounts such Stockholder or Option Holder is entitled to receive from the Expense Holdback Amount and/or the Adjustment Escrow Amount.

10.4    <u>Reliance by Buyer</u>. Buyer and its Affiliates, including the Acquired Companies following the Effective Time, and their respective officers, directors, employees, equityholders, partners and Representatives shall be entitled to rely upon any decision, action, consent or other instruction taken, made or delivered and any agreements or amendments entered into, or other information provided by Seller Representative in its capacity as such, and shall have no liability or obligation to any Stockholder or Option Holder or any other Person as a result of any such reliance.  None of Buyer or any of its Affiliates, including the Acquired Companies following the Effective Time, shall have any liability or obligation to any Person, including the Stockholders and Option Holders, for any losses, damages, liabilities, costs or expenses arising from or relating to (a) the failure of, or errors made by, Seller Representative to make payments or transfer funds to the Stockholders or Option Holders or any other Person, or (b) errors, omissions, or inaccuracies in the calculations of the portion of any amounts payable to any Stockholder or Option Holder made by Seller Representative.

10.5    <u>Expense Holdback Amount</u>. The Expense Holdback Amount shall be held by Seller Representative as a fund from which Seller Representative shall, in its sole discretion, (i) reimburse itself for or pay directly any out-of-pocket fees, expenses or costs it incurs in performing its duties and obligations under this Agreement and the other Ancillary Documents, including out-of-pocket fees and expenses incurred pursuant to the procedures and provisions set forth herein and legal and consultant fees, expenses and costs for reviewing, analyzing and defending any claim or process arising under or pursuant to this Agreement or any Ancillary Document and/or (ii) satisfy any other obligation or liability of any Stockholder or Option Holder under this Agreement or any Ancillary Document as set forth herein (provide that, for the avoidance of doubt, Seller Representative shall be entitled to do so in its sole discretion and shall have no obligation to satisfy any other obligation or liability of any Stockholder or Option Holder in priority to the items in clause (i) above or at all). Each Stockholder and Option Holder acknowledges that Seller Representative will not be liable for any loss of principal of the Expense Holdback Amount other than as a result of Seller Representative's intentional fraud or willful misconduct. At such time as Seller Representative deems appropriate in its sole discretion, Seller Representative shall pay to each Stockholder and holder of Qualifying Options his, her or its Pro Rata Share of all or any portion of the Expense Holdback Amount, which shall be calculated net of the Pro Rata Share allocable to each Stockholder and holder of Qualifying Options of the employer portion of any payroll Taxes required to be paid by the Company in connection with the payments to the Option Holders that represent compensation under the Code (an "**Expense Holdback Distribution**"). The Seller Representative shall pay to the Company (a) the portion of the Expense Holdback Distribution allocable to the holders of Qualifying Options, for further payment to the applicable Option Holder (net of applicable withholding) and (b) an amount equal to the employer portion of any payroll Taxes required to be paid by the Company in connection with such payments that represent compensation under the Code, to the Company and netted from the Expense Holdback Amount pursuant to the previous sentence.  With respect to any amounts

- 76 -

39329697.7

CONFIDENTIAL                                                                                                      FBG_CH1_00094203

payable to Option Holders pursuant to this Section 10.5, such amount shall be paid to the Company for further payment to each Option Holder in accordance with the last sentence of Section 2.6(a).

## ARTICLE XI
## MISCELLANEOUS

11.1   Notices. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private overnight courier for next-day business delivery as established by the sender by evidence obtained from the courier, (c) on the date sent by attachment to e-mail in portable document format, with non-automatic confirmation of receipt, if sent prior to 8:00 p.m. New York, New York time, or if sent later, then on the next Business Day, or (d) on the fifth (5th) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

If to Buyer, Merger Sub or, following the Closing, any Acquired Company, to:

> c/o First Brands Group, LLC
> 127 Public Square, Suite 5300,
> Cleveland, Ohio 44114
> Attention:     Shekhar Kumar
>
> Email:          shekhar.kumar@firstbrands
>                 group.com

If to the Company (prior to the Closing), to:

> Hopkins Acquisition, Inc.
> 428 Peyton Street, P.O. Box 1157
> Emporia, Kansas 66801
> Attention: Bradley T. Kraft
> Email: brad.kraft@hopkinsmfg.com

With a required copy (which shall not constitute notice) to:

> Torys LLP
> 1114 Avenue of the Americas, 23rd Floor
> New York, New York 10036.7703
> Attention: Stefan Stauder; Meghan McKeever
> Email: spstauder@torys.com;
> mmckeever@torys.com

- 77 -

39329697.7

CONFIDENTIAL                                                          FBG_CH1_00094204

If to Seller Representative, to:

> ONCAP Investment Partners III, L.P.
> 161 Bay Street, Suite 4900
> Toronto, Ontario, M5J 2S1
> Attn: Stefan Bars
> Email: sbars@oncap.com

With a required copy (which shall not constitute notice) to:

> Torys LLP
> 1114 Avenue of the Americas, 23rd Floor
> New York, New York 10036.7703
> Attention: Stefan Stauder; Meghan McKeever
> Email: spstauder@torys.com;
> mmckeever@torys.com

or to such other address or to the attention of such Person or Persons as the recipient party has specified by prior written notice to the sending party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

11.2    <u>Amendments and Waivers</u>. Any provision of this Agreement may be amended or waived if and only if such amendment or waiver is in writing and is signed, in the case of an amendment, by Buyer and the Seller Representative, or in the case of a waiver, by the party against whom the waiver is to be effective. No failure or delay by any party hereto in exercising any right or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

11.3    <u>Expenses</u>. Except as otherwise expressly provided in this Agreement, each party shall bear its own costs and expenses in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the transactions contemplated by this Agreement are consummated.

11.4    <u>Successors and Assigns</u>. This Agreement may not be assigned by any party hereto without the prior written consent of the other parties hereto, except that Buyer or the Surviving Corporation (following the Closing) may assign this Agreement or any of its rights or obligations hereunder, without the consent of any other party, to (a) any of its or any Acquired Company's lenders as collateral security or (b) any Affiliate of Buyer or the Surviving Corporation (<u>provided</u> that Buyer or the Surviving Corporation, as the case may be, shall remain liable for any obligations hereunder that are assigned to an Affiliate of Buyer). Subject to the foregoing, all of the terms and

- 78 -

39329697.7

CONFIDENTIAL                                                      FBG_CH1_00094205

provisions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

11.5 Governing Law. This Agreement, the Ancillary Documents, any Schedules hereto and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate hereto or thereto, or the negotiation, execution or performance hereof or thereof (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

11.6 Consent to Jurisdiction; Service of Process; Waiver of Jury Trial. Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action, the United States District Court for the District of Delaware, and each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action or other proceeding. A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such courts, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.7 Counterparts. This Agreement may be executed in counterparts (which such counterparts may be executed on signature pages exchanged by electronic mail), and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other parties hereto. The parties hereto agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents executed and delivered concurrently with the execution and delivery of this Agreement or executed and delivered at the Closing, may be effected by means of an exchange of facsimile signatures or other electronic delivery.

39329697.7

CONFIDENTIAL

FBG_CH1_00094206

11.8     No Third Party Beneficiaries. Other than Sections 6.2, 11.15 and 11.16, which are intended to benefit and may also be enforced by the Covered Parties, Torys LLP, and the Nonparty Affiliates, as applicable, no provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

11.9     Entire Agreement. This Agreement, the Confidentiality Agreement, the Ancillary Documents, and any Schedules hereto set forth the entire understanding of the parties hereto with respect to the transactions contemplated by this Agreement. All Schedules, including any Disclosure Schedules, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein. Any and all previous agreements and understandings between or among the parties hereto regarding the subject matter of this Agreement, the Ancillary Documents and any Schedules hereto, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

11.10    Disclosure Schedules. Except as otherwise provided in the Disclosure Schedules, all capitalized terms used therein shall have the meanings assigned to them in this Agreement. Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed. No disclosure made in the Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material, is or is not in excess of a dollar or other threshold or would otherwise be required to be disclosed, for purposes of this Agreement. Information disclosed in any Disclosure Schedule will qualify any representation, warranty, covenant or agreement in this Agreement to the extent the relevance or applicability of the information disclosed to any such representation, warranty, covenant or agreement, notwithstanding the absence of a reference or cross-reference to such representation, warranty, covenant or agreement on any such Disclosure Schedule or the absence of a reference or cross-reference to such Disclosure Schedule in such representation, warranty, covenant or agreement is reasonably apparent on its face. No disclosure in the Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

11.11    Captions. All captions contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

11.12    Remedies; Specific Performance.

(a)     The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by them in accordance with the terms hereof or were otherwise breached and that each party hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions hereof and to specific performance of the terms hereof (including to enforce compliance with the covenants and obligations under this Agreement, which includes the obligation to consummate the Closing in the circumstances set forth in Section 2.2), in addition to any other remedy at law or equity.

- 80 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094207

(b)      Each of the parties hereto hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such parties under this Agreement. Each of the parties hereto hereby waives (i) any defense in any action for specific performance that a remedy at law would be adequate and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

11.13   Severability. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.14   Interpretation. The parties hereto have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof. The parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof and each of the parties agrees that no party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Suit among any of the foregoing. For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) all accounting terms used and not defined herein have the respective meanings given to them under GAAP; (g) any reference in this Agreement to "$" or dollars shall mean U.S. dollars; (h) an item shall be considered "made available", "delivered" or "provided" (or terms of similar import) to Buyer, to the extent such phrases appear in this Agreement, only if the Company has made a true, accurate and complete copy of such document (together with all amendments, supplements or other modifications thereto or waivers thereof) available to Buyer in the Data Room at least one (1) Business Day prior to the date of this Agreement and remained available in the Data Room through the Closing; (i) any reference in this Agreement to a Law shall refer to any such Law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, including all rules and regulations promulgated thereunder; (j) unless the context of this Agreement otherwise requires, references to statutes shall include all rules and regulations promulgated thereunder; and (k) all calculations of a number of dollars shall be rounded to the nearest whole number of cents, as applicable, with 0.5 rounded up to the next whole cent, as applicable (aggregating all payments to be made to any Person prior to such rounding). When calculating the period of time before which, within which or following

- 81 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094208

**DEBTORS' EXHIBIT NO. 238**
**Page 82 of 133**

which any act is to be done or step taken pursuant to this Agreement, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

11.15   Privilege; Conflicts of Interest.

(a)     Buyer: (i) acknowledges that Torys LLP has represented the Acquired Companies (prior to Closing) and Seller Representative in connection with the transactions provided for herein and agrees that after the Closing, the Acquired Companies will not (and the Buyer will cause the Acquired Companies not to) access or use any privileged communications with, and work product of, Torys LLP in the possession of the Acquired Companies as of the Closing, as they relate to this Agreement, the Ancillary Documents, the transactions contemplated hereby and thereby, and the preparation and negotiation hereof and thereof together with all written or other materials consisting of, containing, summarizing or embodying such privileged communications and work product; (ii) agrees that the intent and effect of this provision is to grant Seller Representative control over the exercise of the attorney-client privilege held by any Acquired Company in respect of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, and the preparation and negotiation hereof and thereof together with all written or other materials consisting of, containing, summarizing or embodying such privileged communications and work product; and (iii) agrees that after the Closing, the Acquired Companies will not (and Buyer will cause the Acquired Companies not to) assert (except in the event of a post-Closing dispute with a Person that is not Seller Representative or any Stockholder or Option Holder or any of their respective Affiliates) or knowingly waive the attorney-client privilege belonging to any Acquired Company, if any, or disclose the content of privileged communications or work product related to such privilege to any Person with the intention of or knowingly waiving the attorney-client privilege to which the communications or work product is subject, without the express written consent of Seller Representative. The parties hereto acknowledge and agree that such privileged communications and work product do not include communications between the Acquired Companies, on the one hand, and Torys LLP, on the other hand, relating to the general business matters of the Acquired Companies.

(b)     The parties hereto further intend that Seller Representative, Stockholders and Option Holders shall have the right, should they so choose, to have the benefit of representation by Torys LLP in connection with post-Closing matters concerning this Agreement, any Ancillary Document and the transactions contemplated hereunder and thereunder. Accordingly, the parties hereto agree that this Agreement will (i) confirm that each party understands the risks associated with potential conflicts of interest and that the parties hereto have alternatives to waiving the potential conflict (including refusing to waive the potential conflict or declining to engage in the matter giving rise to the potential conflict), and (ii) that the parties hereto consent to Torys LLP's representation, if requested, of Seller Representative and/or one or more Stockholders and/or Option Holders in connection with matters relating to this Agreement, the Ancillary Documents and/or the transactions contemplated hereunder and/or thereunder, and waive any conflicts of interest which do or may exist as a result of such representations, including in connection with any litigation or adversarial proceeding which may arise involving the parties hereto, or any of them, regarding this Agreement, the Ancillary Documents and the transactions contemplated hereunder and thereunder.

- 82 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094209

11.16   <u>No Recourse Against Nonparty Affiliates</u>. Notwithstanding anything to the contrary contained herein, except with respect to claims based on Fraud, no Stockholder, Option Holder or Affiliate of an Acquired Company and no current or former Representative of any Acquired Company or any such Stockholder or Option Holder or Affiliate of an Acquired Company in their capacity as such (collectively, the "**Nonparty Affiliates**") shall have any liability of any nature to the Buyer and its Affiliates, including the Acquired Companies following the Effective Time, and their respective officers, directors, employees, equityholders, partners and Representatives or any other Person with respect to the breach by the Company of any representation, warranty, covenant or agreement contained in this Agreement or any Ancillary Document or any other matter relating to the transactions contemplated by this Agreement or any Ancillary Document.

11.17   <u>Prevailing Party</u>. In the event of any Suit in connection with this Agreement or any Ancillary Document, the prevailing party in any such Suit shall be entitled to recover from the other party its costs and expenses incurred in connection with investigating, preparing, prosecuting, determining and/or settling such Suit, including, without limitation, reasonable legal fees and expenses.

[*Signature page follows*]

- 83 -

39329697.7

CONFIDENTIAL

FBG_CH1_00094210

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**COMPANY:**

HOPKINS ACQUISITION, INC.

By: _____ *Bradley T. Kraft*
Name:  Bradley T. Kraft
Title:   President & Chief Executive Officer

[Signature Page to Agreement and Plan of Merger]

CONFIDENTIAL

**BUYER:**

FIRST BRANDS GROUP, LLC

By: _____

Name:  Michael Baker

Title:   Chief Corporate Strategy Officer and Secretary

[Signature Page to Agreement and Plan of Merger]

CONFIDENTIAL

FBG_CH1_00094212

**DEBTORS' EXHIBIT NO. 238**
**Page 86 of 133**

**MERGER SUB:**

WEEKEND MERGER SUB, INC.

By: _____

Name:  Michael Baker

Title:  Chief Corporate Strategy Officer and Secretary

[Signature Page to Agreement and Plan of Merger]

CONFIDENTIAL                                          FBG_CH1_00094213

**DEBTORS' EXHIBIT NO. 238**
**Page 87 of 133**

**SELLER REPRESENTATIVE:**

ONCAP INVESTMENT PARTNERS III, L.P.
By: ONCAP Investment Partners III Inc., its
general partner

By: _____
       *D. Michael Lay*
Name: D. Michael Lay
Title:   President

[Signature Page to Agreement and Plan of Merger]

CONFIDENTIAL

FBG_CH1_00094214

**DEBTORS' EXHIBIT NO. 238**
**Page 88 of 133**

## EXHIBIT A

## Accounting Principles

### General

1. References to GAAP and GAAP accounting standards shall mean GAAP as applied in the preparation of the Annual Financial Statements, excluding the impact of ASC 842 accounting for leases (and for the avoidance of doubt, not the Interim Period Financial Statements),

2. all leases shall be classified as operating leases and the impact of ASC 842 accounting for leases shall be excluded,

3. all normal year-end accounting entries shall be made consistent with the Company's past practice and all errors and omissions shall be corrected,

4. no reserves or other accruals shall be increased, decreased, created or eliminated other than as a result of events occurring in the underlying business and consistent with the Company's past practice,

5. for purposes of calculating the accrued liability or any claim for a refund of Income Taxes, the Company shall treat the day immediately prior to the Closing Date as the last day of its taxable year,

6. the definitional adjustments outlined below and illustrated on Schedules 1 through Schedule 3 (including the accompanying notes) shall be given effect,

7. no change in accounting principles and practices shall be made from those described above, including with respect to the nature or classification of accounts, and

8. Figures are presented in thousands of U.S. dollars unless explicitly stated otherwise.

### Net Working Capital

I.   Current assets shall include, without limitation, the following:

1. accounts receivable, which shall be determined consistent with the Company's past practice,

2. inventory, which shall be determined consistent with the Company's past practice,

3. prepaid expenses, which shall be determined consistent with the Company's past practice, and

4. other current assets, which shall be determined consistent with the Company's past practice;

39347853.8

CONFIDENTIAL                                                  FBG_CH1_00094215

- 2 -

5. provided that "current assets" shall not include:

    a. Cash and Cash Equivalents,

    b. amounts due from Affiliates, or

    c. Income Tax assets (current or deferred).

II. Current liabilities shall include, without limitation, the following:

1. accounts payable, which shall be determined consistent with the Company's past practice, and

2. other current liabilities, which shall be determined consistent with the Company's past practice;

3. provided that "current liabilities" shall not include:

    a. Indebtedness,

    b. Transaction Expenses,

    c. lease obligations,

    d. deferred rent,

    e. amounts due to Affiliates, or

    f. Income Tax liabilities (current or deferred).

## Indebtedness

I. Without limiting the generality of the last sentence of the defined term "Indebtedness", Indebtedness shall exclude operating lease liabilities recorded in Current Portion of Cap Lease – account # 22016 and Long-Term Portion of Cap Financial Lease – account #22525.

II. For purposes of calculating Closing Indebtedness, Income Taxes payable shall be reduced by any Tax deductions available to the Acquired Companies for U.S. federal, state and local income tax purposes.

Illustrative calculations of Net Working Capital, Cash and Cash Equivalents, and Indebtedness as of July 31, 2023 are attached as Schedule 1 through Schedule 3 hereto.

39347853.8

CONFIDENTIAL

FBG_CH1_00094216

Schedule 1: Illustrative Net Working Capital Calculation

| Currency: US$ 000 | Notes | Jul23 |
|---|---|---|
| *Working capital:* | | |
| Cash | | 1,779 |
| Accounts receivable[1] | | 38,507 |
| Inventories, Net | | 96,753 |
| Prepaid Expenses | | 2,590 |
| **Current assets** | | **139,630** |
| Accounts Payable | | 15,545 |
| Liabilities Federal Income Taxes | | (989) |
| Current Portion of LT Debt | | 3,000 |
| Other Liabilities | | 23,457 |
| Working Capital Loan | | 15,511 |
| **Current liabilities** | | **56,525** |
| **Reported NWC** | | **83,105** |
| *Definitional adjustments:* | | |
| Cash | A | (1,779) |
| Liabilities Federal Income Taxes | A | (989) |
| Current Portion of LT Debt | A | 3,000 |
| Working Capital Loan | A | 15,511 |
| Intercompany balances | B | 16 |
| Income tax assets | A | (344) |
| Accrued Interest ~Scotiabank | A | 1,246 |
| Management fees | C | 535 |
| Outstanding checks | D | -- |
| Derivative asset, net | E | (687) |
| Non-recurring items | F | 200 |
| Lumax contingent payment | G | -- |
| Accrued Moving Expense | H | 40 |
| Stale accruals | I | 108 |
| Voluntary contributions | J | 5 |
| **Total definitional adjustments** | | **16,863** |
| **Net Working Capital** | | **99,967** |
| **Target Net Working Capital** | | **82,216** |
| **Working capital surplus (payment to seller)** | | **17,751** |

**Note 1** - Referred to as "Trade Receivables, Net" in the internal financial statements of the Company

Additional account level details for the illustrative Net Working Capital Calculation above have been included as a separate exhibit in Excel format.

**Note A:** Definitional adjustments to exclude items contemplated within Indebtedness from Net Working Capital, including cash, income tax liabilities and assets, current portion of long-term debt, working capital loans and accrued interest.

**Note B:** Definitional adjustment to exclude intercompany balances from Net Working Capital.

**Note C:** Definitional adjustment to exclude financial sponsor accrual from current liabilities and Net Working Capital.

**Note D:** Definitional adjustment to exclude outstanding checks from accounts payable and Net Working Capital, which have been included within the definition of Cash and Cash Equivalents.

**Note E:** Definitional adjustment to exclude derivative assets and liabilities from Net Working Capital.

39347853.8

CONFIDENTIAL

FBG_CH1_00094217

- 4 -

**Note F:** Definitional adjustment to exclude (i) grants received from the Kansas Department of Commerce and (ii) to exclude Payroll tax deferral (CARES Act) from current liabilities and Net Working Capital.

**Note G:** Definitional adjustment to exclude contingent payments relating to the acquisition of Lumax from Net Working Capital.

**Note H:** Definitional adjustment to remove accruals relating to moving expenses from Net Working Capital

**Note I:** Definitional adjustment to exclude stale accruals relating to distribution center consolidation and for the acquisition of Bell Automotive Products from Net Working Capital.

**Note J:** Definitional adjustment to exclude accruals for voluntary contributions commitments to the City of Emporia, Kansas.

39347853.8

CONFIDENTIAL

FBG_CH1_00094218

Schedule 2: Illustrative Cash and Cash Equivalents Calculation

| Cash and Cash Equivalents | | As at |
|---|---|---|
| Currency: $ 000 | Account | Jul23 |
| Petty Cash China Office | 11000 | 5 |
| Petty Cash | 11001 | 1 |
| Lyon County State Bank | 11002 | 4 |
| Wells Fargo | 11003 | - |
| USBank- Medical Acct | 11004 | 1 |
| USD CIBC | 11010 | 46 |
| USD CIBC interim cash | 11011 | (1) |
| CAD CIBC | 11012 | 300 |
| CAD CIBC Interim | 11013 | (32) |
| CAD CIBC 20-68516 | 11014 | - |
| AZ Cash | 11018 | - |
| AZ Cash Interim | 11019 | - |
| US Bank Cash | 11020 | 1,443 |
| USBank - Interim Cash | 11025 | (3) |
| Banorte Pesos | 11028 | 13 |
| Banorte Pesos | 11029 | - |
| Banorte Dollars | 11030 | 2 |
| Banorte Dollars Checks | 11031 | - |
| **Cash and Cash Equivalents** | | **1,779** |

39347853.8

CONFIDENTIAL

FBG_CH1_00094219

- 6 -

Schedule 3: Illustrative Indebtedness Calculation

| Indebtedness Currency: $ 000 | Account | As at Jul23 |
|---|---|---|
| Long Term Note A | 22500 | (127,068) |
| Current Portion LT Debt | 22012 | (3,000) |
| Term loans | | (130,068) |
| Note Payable -Short Term | 22010 | (14,000) |
| Canada Revolver | 22011 | (1,511) |
| Revolving credit facility | | (15,511) |
| **Indebtedness, reported** | | **(145,580)** |
| *Definitional adjustments:* | | |
| Non Current Income Tax Payable | 22603 | (543) |
| Accrued Income Tax | 22600 | 998 |
| IETU por Pagar | 22602 | (9) |
| Other-Receivables Taxes | 11153 | 344 |
| Income tax liabilities (assets) | | 789 |
| Accrued Interest | 22104 | (1,246) |
| Management fees | 22115 | (535) |
| Derivative asset | 11300 | 719 |
| Other Accrued Liabilities | 22007 | (32) |
| Derivative asset, net | | 687 |
| Kansas Dept of Commerce incentive | 22508 | (200) |
| Voluntary contributions | 22505 | (5) |
| **Definitional adjustments** | | **(509)** |
| **Indebtedness** | | **(146,089)** |

39347853.8

CONFIDENTIAL

FBG_CH1_00094220

**Final Form**

## EXHIBIT B

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT is entered into as of [■], 2023 (this "Agreement") by and among ONCAP Investment Partners III, L.P., an Ontario limited partnership ("Seller Representative"), First Brands Group, LLC, a Delaware corporation ("Buyer," and together with Seller Representative, sometimes referred to individually as "Party" and collectively as the "Parties"), and Citibank, N.A. (the "Escrow Agent").

WHEREAS, pursuant to that certain Agreement and Plan of Merger, dated as of November 22, 2023 (as amended, modified, supplemented, or restated from time to time, the "Merger Agreement"), by and among Hopkins Acquisition, Inc., a Delaware corporation, Buyer, [Merger Sub], a Delaware corporation, and Seller Representative, solely in its capacity as the representative of the Stockholders, the Parties have agreed to establish an escrow arrangement for the purposes set forth therein;

WHEREAS, pursuant to the Merger Agreement, Buyer is required to deposit into the segregated escrow account established by the Escrow Agent hereunder to hold in the Adjustment Escrow Account (as defined below) an aggregate amount in cash equal to the applicable Adjustment Escrow Amount (as defined below) and wishes such deposits to be subject to the terms and conditions set forth herein and in the Merger Agreement;

WHEREAS, pursuant to Section 2.11(d) of the Merger Agreement, Buyer shall deposit, or shall cause to be deposited, with the Escrow Agent an aggregate amount in cash equal to $2,000,000 (the "Adjustment Escrow Amount"), by wire transfer of immediately available funds, to be deposited by the Escrow Agent into the segregated escrow account established by the Escrow Agent in respect of the Adjustment Escrow Amount (the "Adjustment Escrow Account") to be held and distributed in accordance with the terms and subject to the conditions set forth herein and in the Merger Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.    **Appointment**.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as Escrow Agent in accordance with the terms and conditions set forth herein.

2.    **Funds**.  Pursuant to Section 2.11(d) of the Merger Agreement, promptly upon the execution and delivery of this Agreement, Buyer shall deliver, or shall cause to be delivered, to the Escrow Agent the Adjustment Escrow Amount to be held in the Adjustment Escrow Account.  The Adjustment Escrow Amount shall (i) not be subject to set off by the Escrow Agent or any of its affiliates, (ii) not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto and (iii) be held and disbursed solely for the purposes and in accordance with the terms of this Agreement.  For greater certainty, all interest, dividends, gains and other income, if any, shall be retained by the Escrow Agent and reinvested in

39650715.3

the Adjustment Escrow Account and shall become part of the Escrow Fund (as defined below), and shall be disbursed as part of the Escrow Fund in accordance with the terms and conditions of this Agreement.

3. **Investment of Funds**.

(a) The Escrow Agent shall hold the Adjustment Escrow Amount and the proceeds thereof (the "Escrow Fund") in a "noninterest-bearing deposit account" insured up to the applicable limits by the Federal Deposit Insurance Corporation (the "FDIC"). The Escrow Fund shall at all times remain available for distribution in accordance with Section 4 below.

(b) The Parties agree that Buyer shall be treated as the owner of the Escrow Fund for income tax purposes and will report all income, if any, that is earned on, or derived from, the Escrow Fund as the income of Buyer in the taxable year in which income is properly includable. The Parties shall provide a duly completed and executed Internal Revenue Service ("IRS") Form W-9 or Form W-8 to the Escrow Agent on or before execution of this Agreement. Buyer shall be responsible for paying taxes (including any penalties and interest thereon) on all income earned on the Escrow Fund and for filing all necessary tax returns with respect to such income, in each case, as required by applicable law. The Escrow Agent shall not have any obligation to file or prepare any tax returns or to prepare any other reports for any taxing authorities concerning the matters covered by this Agreement, except as required by law; provided that for each tax year in which income (if any) is earned on the Escrow Fund, the Escrow Agent shall timely prepare and promptly deliver an IRS Form 1099 (or other appropriate form) with respect to Buyer. For the avoidance of doubt, the Escrow Agent shall be responsible for income reporting to the IRS with respect to income (if any) earned on the Escrow Fund and for other information return reporting as required by applicable law.

(c) The Escrow Agent will send account statements to each of the Parties on a monthly basis reflecting activity (including a list of all investments) with respect to the Escrow Fund for the preceding month.

(d) The Adjustment Escrow Account shall automatically terminate upon the payment in full by the Escrow Agent of the Escrow Fund as directed herein.

4. **Disposition.** The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Fund as provided in, this Section 4 as follows:

(a) Agreed Distribution of the Escrow Fund. In accordance with Section 2.13 of the Merger Agreement, the Parties may at any time jointly deliver to the Escrow Agent a joint written instruction in substantially the form of Exhibit A attached hereto (each, a "Joint Release Notice") instructing the Escrow Agent to distribute all or a portion of the Escrow Fund, executed by each Party as evidenced

2

39650715.3

CONFIDENTIAL

FBG_CH1_00094222

by the signatures of one of the persons listed as such Party's authorized representatives on Schedule 1 attached hereto (each such person, an "Authorized Representative"). Within two (2) days (not including a Saturday, a Sunday or other day on which the banks in Chicago, Illinois, New York, New York or Toronto, Ontario are authorized or required by law to be closed, each such day, a "Business Day") after the date on which the Escrow Agent receives an executed Joint Release Notice in respect of the Adjustment Escrow Account, the Escrow Agent shall disburse from the Adjustment Escrow Account, by wire transfer of immediately available funds, the amount set forth in the Joint Release Notice to the persons or accounts designated on such Joint Release Notice.

(b)     Disbursements Following Judgments. At any time, either Party may deliver to the Escrow Agent a certified copy of a final non-appealable judgment of a court of competent jurisdiction (a "Judgment") awarding amounts to be paid out of the Adjustment Escrow Account to Buyer or Seller Representative, as applicable. On the fifth (5th) Business Day after receipt of such Judgment, the Escrow Agent shall disburse the amounts required to be paid by such Judgment from the Adjustment Escrow Account and to the recipient specified in such Judgment. Any Judgment presented to the Escrow Agent by either Party shall be accompanied by a cover letter signed by an Authorized Representative for such Party (with a copy sent simultaneously to the other Party) containing appropriate payment instructions to be utilized by the Escrow Agent.

5.     **Escrow Agent**. The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to fiduciary duties, shall be implied. The Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement between the Parties, including, without limitation, the Merger Agreement; nor shall the Escrow Agent be required to determine if any Party has complied with any such other agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of the Escrow Agent; provided, however, as between the Parties, the Merger Agreement shall control the actions of the Parties. The Escrow Agent may conclusively rely upon any Joint Release Notice or Judgment delivered to it by any Party without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any Judgment delivered in accordance with Section 9 hereof reasonably believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and the Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such Joint Release Notice or Judgment. The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. In the event the Escrow Agent receives instructions, claims or demands from any Party which conflict with the provisions of this Agreement, or if the Escrow Agent receives conflicting instructions from the Parties, the Escrow Agent shall be entitled either to (a) refrain from taking any action until it shall be given a Joint Release Notice which eliminates such conflict or by a Judgment or (b) file an action in interpleader. The Escrow Agent shall have no duty to solicit any payments that may be due to it or to the

3

39650715.3

CONFIDENTIAL

FBG_CH1_00094223

Adjustment Escrow Account, including, without limitation, any Adjustment Escrow Amount. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent shall not be responsible for or under, or chargeable with knowledge of, the terms and conditions of any other agreement, instrument or document executed between/among the parties hereto, except as may be specifically provided in this Agreement. This Agreement sets forth all of the obligations of the Escrow Agent, and no additional obligations shall be implied from the terms of this Agreement or any other agreement, instrument or document. The Escrow Agent hereby agrees and covenants with Buyer and Seller Representative that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Fund to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

6.      **Resignation and Removal; Succession**. The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect. The Parties, acting jointly, may remove the Escrow Agent at any time, with or without cause, by giving the Escrow Agent thirty (30) calendar days' advance notice in writing signed by both Parties. The Escrow Agent's sole responsibility after such thirty (30) calendar day notice period expires shall be to hold the Escrow Fund (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed jointly by the Parties, or such other person designated in writing by the Parties, or in accordance with the directions of a Judgment, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. If, prior to the effective resignation or removal date, the Parties have failed to appoint a successor escrow agent, or to instruct the Escrow Agent in writing to deliver the Escrow Fund to another person as provided above, at any time on or after the effective resignation or removal date, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief. Any appointment of a successor escrow agent shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of the Escrow Agent. Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without any further act.

7.      **Compensation**. The Parties jointly and severally agree to pay the Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing by each of the Parties, shall be as described in <u>Schedule 2</u> attached hereto; <u>provided</u> that Buyer, on the one hand, and Seller Representative, on the other hand, hereby agree between themselves to pay fifty percent (50%) of any such expenses. Each of the Parties, jointly and severally, agrees to reimburse the Escrow Agent on demand for any reasonable, documented, out-of-pocket legal fees, disbursements and expenses incurred or made by it in connection with performance of this Agreement and in

4

39650715.3

addition, the Escrow Agent shall have the right to reimburse itself for such fees, disbursements and expenses from the property held in escrow hereunder; provided that Buyer, on the one hand, and Seller Representative, on the other hand, hereby agree between themselves to each pay fifty percent (50%) of such fees, disbursements and expenses. Escrow Agent shall notify Buyer and Seller Representative prior to any disbursement from the Escrow Fund to itself in respect of any compensation or reimbursement hereunder and shall furnish Buyer and Seller Representative copies of related invoices and other statements.

8.    **Indemnification and Reimbursement**.   The Parties agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse the Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the reasonable and documented out of pocket fees and reasonable and documented out of pocket expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Agent Losses"), arising out of or in connection with (a) the Escrow Agent's performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Agent Losses are determined by a court of competent jurisdiction through a final order to have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee; or (b) the Escrow Agent's following any instructions or directions in good faith, whether joint or singular, from the Parties received in accordance with this Agreement that the Escrow Agent reasonably believes in good faith to be genuine, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. Notwithstanding anything to the contrary contained herein, Buyer, on the one hand, and Seller Representative, on the other hand, hereby agree solely as between themselves to each pay fifty percent (50%) of any obligation for indemnification under this Section 8; provided that if the actions of any Party are determined by a court of competent jurisdiction through a final order to have been the cause of any Agent Losses of the Escrow Agent resulting in such payment obligations, such Party shall be responsible for all of such payment obligations; provided, further, that if no such determination is made and, either Buyer, on the one hand, or Seller Representative, on the other hand, is required to pay to the Escrow Agent more than such Party's share of the costs and expenses under this Section 8 or Section 7, then the underpaying Party will reimburse the overpaying Party for such excess. The obligations set forth in this Section 8 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

9.    **Notices**.  All communications hereunder shall be in writing or set forth in a signed PDF attached to an email, and all instructions from a Party or the Parties to the Escrow Agent shall be executed by an Authorized Representative, and shall be deemed to be delivered in accordance with the terms of this Agreement (a) on the day of delivery, if delivered by email and written confirmation of receipt is obtained promptly after completion of transmission or (b) when actually received, if delivered by hand, by certified mail return receipt requested, or by courier or express delivery service (with receipt showing signature) to the appropriate email address or notice address set forth for each party hereto as follows:

If to Buyer:

5

39650715.3

CONFIDENTIAL                                                    FBG_CH1_00094225

**DEBTORS' EXHIBIT NO. 238**
**Page 99 of 133**

Weekend Merger Sub, Inc.
c/o First Brands Group, LLC
127 Public Square, Suite 5300, Cleveland, Ohio 44114
Attention:    Shekhar Kumar
                Senior Vice President – M&A
Email:        shekhar.kumar@firstbrandsgroup.com

If to Seller Representative, to:

ONCAP Investment Partners III, L.P.
161 Bay Street, Suite 4900
Toronto, Ontario, M5J 2S1
Attn: Stefan Bars

Email: sbars@oncap.com
With a required copy (which shall not constitute notice) to:

Torys LLP
1114 Avenue of the Americas, 23rd Floor
New York, New York 10036.7703
Attention: Stefan Stauder;
            Meghan McKeever
Email: spstauder@torys.com
        mmckeever@torys.com

If to the Escrow Agent:

Citibank, N.A.
Citi Private Bank
388 Greenwich St., 29th Floor
New York, NY 10013
Attention: John P. Howard / Anabelle Roa
Phone:        (212) 783-7109 / (212) 783-7021
Facsimile:    (212) 783-7131
E-mail:       john.p.howard@citi.com / anabelle.roa@citi.com

Any party may provide notice per this Section 9 of any change in address or Authorized Representative as appropriate.  If transfer instructions for any Escrow Fund are given, whether in writing, by email or otherwise in accordance with this Agreement, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to any of the Authorized Representatives, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.  If the Escrow Agent is unable to verify the instructions,

6

39650715.3

CONFIDENTIAL

FBG_CH1_00094226

or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of applicable Party, actually received by the Escrow Agent.

10. **Compliance with Court Orders**. In the event that the Escrow Fund shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such court orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, provided that the Escrow Agent shall, to the extent legally permissible, provide a written notice thereof to the Parties as soon as reasonably practicable and in the event that the Escrow Agent obeys or complies with any such court order it shall not be liable to any of the Parties or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

11. **Termination**. This Agreement and the duties of the Escrow Agent hereunder shall terminate on the first to occur of (a) when all of the Escrow Fund have been paid to the persons entitled to receive such funds in accordance with Section 4 hereof or (b) upon delivery to the Escrow Agent of a written notice of termination executed jointly by Buyer and Seller Representative after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

12. **Miscellaneous**.

(a) The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and each of the Parties. No waiver of any provision of this Agreement will be valid unless the waiver is in writing and signed by the waiving parties. The failure of a party at any time to require performance of any provision of this Agreement will not affect such party's rights at a later time to enforce such provision. No waiver by any party of any breach of this Agreement will be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other breach.

(b) Except as otherwise provided herein, neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior consent of the Escrow Agent and the other Party. To comply with federal law, including the USA PATRIOT Act (as defined below), assignees shall provide to the Escrow Agent the appropriate IRS Form W-9 or W-8, as applicable, and such other forms and documentation that the Escrow Agent may reasonably request for purposes of identification and authorization to act. In no event shall the Escrow Agent be obligated hereunder to (i) make any payments from the Escrow Funds directly to any assignee of Buyer of any rights under this Agreement, or (ii) obey any written instructions delivered pursuant hereto from any assignee of any rights under this Agreement, unless, in the case of clauses (i) and (ii), such assignee has become a Party to this Agreement.

39650715.3

CONFIDENTIAL                                                                       FBG_CH1_00094227

(c)     Solely as between the Parties, in the event of any conflict between this Agreement and the Merger Agreement, the provisions of the Merger Agreement shall govern.

(d)     This Agreement shall be governed by and construed under the laws of the State of Delaware.  Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware.  To the extent that in any jurisdiction either Party or the Escrow Agent may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party or the Escrow Agent shall not claim, and hereby irrevocably waives, such immunity.

(e)     None of Buyer, Seller Representative or the Escrow Agent shall be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, the unavailability of the Federal Reserve Bank wire services or any electronic communication facility, or other causes reasonably beyond its control.

(f)     This Agreement and any written joint instructions from the Parties, may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable.  All signatures of the parties to this Agreement may be transmitted by facsimile (or other electronic method), and such facsimile (or electronic copy) will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

(g)     This Agreement and the Merger Agreement taken together shall constitute the entire agreement among the Parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements (whether written or oral and whether express or implied) by or among the Parties hereto to the extent related to the subject matter of this Agreement.  Notwithstanding any provision of this Agreement, including this subsection (g), purporting to incorporate the Merger Agreement or any other agreement or document contemplated thereby by reference, the Escrow Agent shall not be bound by nor charged with knowledge of the terms, provisions, meanings, definitions, or other matters contained in any document or agreement unless it has executed the same.  The terms and conditions of this Agreement will control the actions, duties, and obligations of Escrow Agent.

(h)     If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any

8

39650715.3

CONFIDENTIAL

FBG_CH1_00094228

such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

(i)      Nothing in this Agreement, whether express or implied, shall be construed to give to any person, other than the Escrow Agent and the Parties and their respective successors and permitted assigns, any legal or equitable right, remedy, interest or claim under or in respect of the Escrow Fund or this Agreement.

(j)      Waiver of Jury Trial.   EACH PARTY AND THE ESCROW AGENT WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE RESPECTING ANY MATTER ARISING UNDER THIS AGREEMENT.

(k)      No printed or other material in any language, including prospectuses, notices, reports, and promotional material that mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any of the Parties, or on such Party's behalf, without the prior written consent of the Escrow Agent.

(l)      Patriot Act Disclosure.    Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it.   Accordingly, each of the Parties acknowledges that Section 326 of the USA PATRIOT Act and the Escrow Agent's internal policies require the Escrow Agent to follow reasonable procedures to verify the identity including without limitation name, address and organizational documents ("Identifying Information").   The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such Identifying Information required as a condition of opening an account with or using any service provided by the Escrow Agent.

(m)      Use of Electronic Records and Signatures.    As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, Escrow Agent shall be indemnified and held harmless from any Agent Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any

39650715.3

CONFIDENTIAL

FBG_CH1_00094229

electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

(n)     Return of Funds. If the Escrow Agent releases any funds, including but not limited to the Escrow Amount or any portion of it, to a Party and subsequently determines, in its sole discretion, that the payment or any portion of it was made in error, the Party shall, upon notice, promptly refund the erroneous payment. Any such erroneous payment by the Escrow Agent, and the Party's return thereof to the Escrow Agent, shall not affect any obligation or right of either the Escrow Agent or the Parties. Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any erroneous payment.

(o)     Sanctions. None of the Parties or any of their parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of any Party, the affiliates of the Parties or any of their subsidiaries, will, directly or indirectly, use any part of any proceeds or lend, contribute, or otherwise make available such Escrow Funds in any manner that would result in a violation by any person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

*[Signature Page Follows]*

10

39650715.3

FBG_CH1_00094230

 **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**BUYER**:

First Brands Group, LLC


By:_____
Name:
Title:

*[Signature Page to Escrow Agreement]*

CONFIDENTIAL                                        FBG_CH1_00094231

**DEBTORS' EXHIBIT NO. 238**
**Page 105 of 133**

**SELLER REPRESENTATIVE**:

ONCAP INVESTMENT PARTNERS III, L.P.

By:_____
Name:
Title:

*[Signature Page to Escrow Agreement]*

CONFIDENTIAL                                    FBG_CH1_00094232

**ESCROW AGENT**:

CITIBANK, N.A.


By:_____
Name:
Title:

*[Signature Page to Escrow Agreement]*

CONFIDENTIAL                                                          FBG_CH1_00094233

SCHEDULE 1
AUTHORIZED REPRESENTATIVES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and Seller Representative and are authorized to initiate and approve transactions of all types for the Adjustment Escrow Account established under this Agreement, on behalf of Buyer and Seller Representative.  The below listed persons (at least two individuals) have also been designated "Call Back Authorized Individuals" and will be notified by the Escrow Agent upon the release of any Escrow Fund from the Adjustment Escrow Account unless an original "Standing or Predefined Instruction" letter is on file with the Escrow Agent.

For Buyer:

|   | Name | Business Telephone Numbers | Signature |
|---|------|---------------------------|-----------|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

For Seller Representative:

|   | Name | Business Telephone Numbers | Signature |
|---|------|---------------------------|-----------|
| 1. | _____ | _____ | _____ |
| 2. | _____ | _____ | _____ |
| 3. | _____ | _____ | _____ |

All instructions, including, but not limited to, funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of each Party.

39650715.3

CONFIDENTIAL                                                                                    FBG_CH1_00094234

SCHEDULE 2
SCHEDULE OF ESCROW AGENT FEES

**Acceptance Fee**
To cover the acceptance of the escrow agency appointment, the study of this Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: WAIVED**

**Administration Fee**
The annual administration fee covers maintenance of the Adjustment Escrow Account including safekeeping of assets in the Adjustment Escrow Account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of this Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of this Agreement. Fee is based on the Adjustment Escrow Amount being deposited in a non-interest bearing deposit account, insured by the FDIC to the applicable limits:

**Fee: WAIVED**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the Parties for each calendar year:

**Fee: WAIVED**

**Transaction Fees**
To oversee all required disbursements or release of property from the Adjustment Escrow Account to any Party (or their designee, as permitted under the Agreement), including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of this Agreement:

**Fee: WAIVED**

**Other Fees**
Material amendments to this Agreement: additional fee(s), if any, to be discussed at time of amendment.

39650715.3

CONFIDENTIAL                                                     FBG_CH1_00094235

## EXHIBIT A

## FORM OF JOINT RELEASE NOTICE

To: Citibank, N.A.,
as Escrow Agent
388 Greenwich Street, 29th Floor
New York, NY  10013
Attention:      John P. Howard / Anabelle Roa
E-mail:          john.p.howard@citi.com / anabelle.roa@citi.com

This certificate is issued as of the ____ day of _____, ___, pursuant to Section 4(a) ofthat certain Escrow Agreement dated as of [●], 2023 (the "Escrow Agreement") by and among First Brands Group, LLC ("Buyer"), ONCAP Investment Partners III, L.P., an Ontario limited partnership ("Seller Representative" and together, with Buyer, the "Parties"), and Citibank, N.A. (the "Escrow Agent"). Capitalized terms herein shall have the meaning ascribed to them in the Escrow Agreement.

The Parties jointly instruct the Escrow Agent to pay to [Buyer / Seller Representative] an amount equal to $_____ out of the Adjustment Escrow Account, by wire transfer to:

[Insert wire instructions]

Each of the undersigned hereby represents and warrants that it has been authorized to execute this certificate.  This certificate may be signed in counterparts.

**SELLER REPRESENTATIVE**:                    **BUYER**:

ONCAP INVESTMENT PARTNERS III,               FIRST BRANDS GROUP, LLC
L.P.

                                             By:_____
                                             Name:
By:_____            Title:
Name:
Title:

39650715.3

CONFIDENTIAL                                             FBG_CH1_00094236

**Final Form**

# EXHIBIT C

## LETTER OF TRANSMITTAL

**With respect to Shares of Capital Stock of**

## HOPKINS ACQUISITION, INC.

*By Mail, Overnight Courier or Hand Delivery:*

Hopkins Acquisition, Inc.
428 Peyton Street, P.O. Box 1157
Emporia, Kansas 66801
Attention: Jim Daniel

*Telephone Assistance:*
1+ (620) 342-7320

**Please read this Letter of Transmittal carefully. This Letter of Transmittal should be completed and signed in the space provided in Box D below and hand-delivered or sent by overnight courier or registered mail, return receipt requested and insured, to the address set forth above, with the completed and signed enclosed Internal Revenue Service ("IRS") Form W-9 (or the appropriate IRS Form W-8 if you are a non-U.S. holder), to be surrendered in connection with the transactions contemplated by the Merger Agreement (as defined below).**

1

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094237

Ladies and Gentlemen:

This Letter of Transmittal is being delivered in connection with the merger (the "**Merger**") of Weekend Merger Sub, Inc., a Delaware corporation ("**Merger Sub**"), with and into Hopkins Acquisition, Inc., a Delaware corporation (the "**Company**"), pursuant to the Agreement and Plan of Merger, dated as of November 22, 2023 (the "**Merger Agreement**"), by and among the Company, First Brands Group, LLC, a Delaware limited liability company ("**Buyer**"), Merger Sub, and, solely in its capacity as the representative of the Stockholders (as defined in the Merger Agreement) as designated pursuant to Section 10.1 of the Merger Agreement, ONCAP Investment Partners III, L.P. (the "**Seller Representative**"). The undersigned surrenders herewith the shares of capital stock of the Company set forth in Box A (the "**Shares**") below in exchange for the consideration, net of any applicable withholding taxes permitted under the Merger Agreement ("**Merger Consideration**"), that is payable to the undersigned pursuant to the Merger Agreement. Capitalized terms used but not defined in this Letter of Transmittal shall have the meanings set forth in the Merger Agreement.  In the case of any inconsistency between this Letter of Transmittal and the Merger Agreement (including the schedules and exhibits thereto), the Merger Agreement will control.

The Merger Agreement has been adopted and approved by all necessary action on the part of the Company and its stockholders. **YOU ARE NOT BEING ASKED HEREBY TO VOTE ON, OR CONSENT TO, ANY OF THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT**.

Section 1: Representations and Warranties.  In connection with the surrender of the Shares set forth in Box A below, the undersigned represents and warrants to Buyer that as of the date hereof:

(i)     the undersigned is the sole record and beneficial owner of the Shares, has good and valid title to the Shares, free of any and all encumbrances and any other restrictions on transfer other than such encumbrances and restrictions on transfer contained in the Securityholders Agreement, the agreement(s) under which the undersigned acquired his/her/its Shares, and any restrictions of general applicability on transfer under federal or state securities Laws, and has all requisite right, power, authority and, if applicable, legal capacity to execute and deliver this Letter of Transmittal, and to perform its obligations hereunder, and no other act or proceeding on the part of the undersigned is necessary to authorize the execution, delivery or performance by the undersigned of this Letter of Transmittal, including the delivery and surrender of the certificate(s) representing the Shares, free and clear of any and all encumbrances and any other restrictions on transfer, other than such encumbrances and restrictions on transfer contained in the Securityholders Agreement, the agreement(s) under which the undersigned acquired his/her/its Shares, and any restrictions of general applicability on transfer under federal or state securities Laws;

(ii)    the undersigned owns no shares of the Company other than (a) the Shares that will be surrendered pursuant to this Letter of Transmittal or (b) Qualifying Options, if any and except as set forth in the Securityholders Agreement, there are no offers, options, warrants, rights, agreements or commitments of any kind granted by or to the undersigned relating to the issuance, conversion, registration, voting, sale or transfer of any of the Shares held by the undersigned;

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094238

(iii)   if the undersigned is a legal entity, the undersigned is duly organized, validly existing, and is in good standing under the laws of the jurisdiction of its formation or incorporation, as applicable;

(iv)   this Letter of Transmittal has been duly executed and delivered and constitutes a valid and legally binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms, except (a) as enforcement may be limited by: applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (b) insofar as the availability of equitable remedies may be limited by applicable Law;

(v)   the execution, delivery and performance of this Letter of Transmittal by the undersigned will not: (a) if the undersigned is not a natural person, violate the organizational documents of the undersigned; (b) violate any contract to which the undersigned is a party or by which the undersigned is bound; or (c) violate any law or any judgment, decree, order, regulation or rule of any court or other Governmental Entity applicable to the undersigned or the undersigned's properties or assets; and

(vi)   the undersigned is a party to the Securityholders Agreement, and the Securityholders Agreement is the legal, valid and binding obligation of the undersigned, enforceable against it in accordance with its terms, except (a) as enforcement may be limited by: applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (b) insofar as the availability of equitable remedies may be limited by applicable Law.

The representations and warranties contained in this Letter of Transmittal and in any certificate delivered pursuant to this Letter of Transmittal shall terminate and be of no further force or effect upon consummation of the Closing and none of Buyer or its Representatives shall have recourse against the Stockholder or any of its Affiliates under this Letter of Transmittal following the consummation of the Closing for any breach of or inaccuracy in any such representation or warranty.

Section 2: <u>Acknowledgments and/or Agreements</u>.   In addition, the undersigned acknowledges and agrees to the following:

(i)   the undersigned hereby acknowledges that his, her or its right to receive the applicable portion of the Merger Consideration with respect to the undersigned's Shares, if any, in accordance with the terms of the Merger Agreement, is contingent upon the completion of the Merger pursuant to the Merger Agreement.   In the event the Merger is not consummated or the Merger Agreement is validly terminated pursuant to its terms, the undersigned acknowledges that the Shares will not be converted and the undersigned will not have any further rights to receive a portion of the Merger Consideration.   The undersigned acknowledges that the payment of any amounts to the account designated by the undersigned (whether under the Merger Agreement, Escrow Agreement, or otherwise) per this Letter of Transmittal and wire transfer instructions shall constitute payment to and, upon delivery to such account, payment received by the undersigned.

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094239

(ii)    upon the terms and subject to the conditions set forth in the Merger Agreement, each Share will be converted into the right to receive a portion of the Merger Consideration in accordance with the Merger Agreement;

(iii)    the consideration paid or payable in exchange for the Shares pursuant to the Merger Agreement is in full satisfaction of all rights pertaining to the Shares;

(iv)    the irrevocable appointment of ONCAP Investment Partners III, L.P. (including its successors and replacements) as the Seller Representative under the Merger Agreement with full power and authority on the undersigned's behalf to consummate or cause the consummation of the transactions contemplated therein, including all other actions as more fully set forth in Section 10.1 of the Merger Agreement;

(v)    the undersigned will, upon reasonable request, execute any additional documents necessary to complete the surrender and exchange of his, her or its Shares;

(vi)    the undersigned agrees that all authority conferred or agreed to be conferred in this Letter of Transmittal shall be binding upon the undersigned and the undersigned's heirs, successors, assigns, executors, administrators and legal representatives to the extent permitted by law and shall not be affected by, and shall survive, the undersigned's liquidation, dissolution, death or other inability to act;

(vii)    the undersigned forever waives all dissenters' rights, appraisal rights or similar rights under applicable law with respect to any Shares owned by the undersigned and withdraws all written objections to the Merger and/or demands for appraisal, if any, with respect to the shares of any Shares owned by the undersigned;

(viii)    a portion of the Merger Consideration to be paid to the undersigned in respect of the Shares and/or, if applicable, Options will be withheld and deposited into the Adjustment Escrow Account to be utilized pursuant to the terms of the Merger Agreement in the event of any post-closing purchase price adjustments in accordance with the terms of the Merger Agreement and the Escrow Agreement and approves of and consents to the terms of the Merger Agreement relating to any post-closing purchase price adjustments and acknowledges that pursuant to the Merger Agreement, it may not ultimately receive all or any of the amounts deposited into the Adjustment Escrow Account in respect of the Company Common Shares, Options and any other company equity surrendered herewith;

(ix)    a portion of the Merger Consideration to be paid to the undersigned in respect of the Shares and/or, if applicable, Options will be withheld by the Seller Representative pursuant to the terms of the Merger Agreement as the Expense Holdback Amount, which is a fund from which Seller Representative shall, in its sole discretion, (i) reimburse itself for or pay directly any out-of-pocket fees, expenses or costs it incurs in performing its duties and obligations under the Merger Agreement and the other Ancillary Documents, including out-of-pocket fees and expenses incurred pursuant to the procedures and provisions set forth therein and legal and consultant fees, expenses and costs for reviewing, analyzing and defending any claim or process arising under or pursuant to the Merger Agreement or any Ancillary Document and/or (ii) satisfy any other obligation or liability of any

38872-2007 39653739.6

Stockholder or Option Holder under the Merger Agreement or any Ancillary Document as set forth therein;

(x)     acknowledges that the receipt of Merger Consideration will be subject to the adjustment provisions of the Merger Agreement and will be paid without interest and less any required withholding taxes (including non-U.S. taxes);  and

(xi)    acknowledges that the undersigned has consulted, or had the opportunity to consult, with its legal counsel or other advisors with respect to, and fully understands the meaning and intent of, this Letter of Transmittal, including, but not limited to, the final and binding effect of this Letter of Transmittal, the Merger Agreement, the surrender of the Shares, and the representations, warranties, acknowledgments and appointments contained herein.

Section 3: Other Terms and Provisions.

All authority conferred or agreed to be conferred in this Letter of Transmittal shall be binding upon the successors, assigns, heirs, executors, administrators and legal representatives of the undersigned and shall not be affected by, and shall survive, the death or incapacity of the undersigned.  The surrender of the Shares hereby is irrevocable.

**The undersigned understands that delivery of a check or wire transfer (if applicable) for cash payment to which the undersigned is entitled under the Merger Agreement shall be made in accordance with Section 2.10 of the Merger Agreement.**

This Letter of Transmittal hereto and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate hereto or thereto, or the negotiation, execution or performance hereof or thereof (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action, the United States District Court for the District of Delaware, and each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action or other proceeding. A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such courts, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each party further agrees

38872-2007 39653739.6

CONFIDENTIAL                                                                                         FBG_CH1_00094241

that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094242

| BOX A | DESCRIPTION OF SHARES SURRENDERED | |
|---|---|---|
| **Name(s) and Address of Registered Stockholder(s)** *If there is any error in the name or address shown below, please make the necessary corrections.* | **Class and Number of Shares:** *Please fill in. Attach separate schedule if needed.* | |
| | Class of Shares | Number of Shares |
| | | |
| | | |
| | | |
| | | |
| | **TOTAL UNITS** | |

| BOX B   SPECIAL PAYMENT INSTRUCTIONS | BOX C   SPECIAL DELIVERY INSTRUCTIONS |
|---|---|
| Fill in **ONLY** if the check or wire transfer (if applicable) for cash to be received by the undersigned is to be issued in a name **OTHER** than the name appearing in Box A above. *(Unless otherwise indicated in Box C, such check (if applicable) will be mailed to the address indicated below.)*  *(See Instruction below.)*  Name: _____  Address:  _____  _____  Tax Identification/Social Security Number _____ | Fill in **ONLY** if the check or wire transfer (if applicable) for cash to be received by the undersigned is to be sent to an address **OTHER** than to the address appearing in Box A or B.  Name: _____  Address:  _____  _____  _____ |

| BOX D   SIGNATURE | BOX E   WIRE TRANSFER INSTRUCTIONS |
|---|---|
| Complete the enclosed IRS Form W-9 or appropriate IRS Form W-8.  If signature is by an agent, attorney, administrator, executor, guardian, trustee or others acting in a fiduciary or representative capacity, or by an officer of a corporation on behalf of the corporation, please set forth full title and furnish appropriate supporting evidence. *(See Instructions below.)*  _____  Signature of Registered Stockholder(s)  _____  Printed Name of Registered Stockholder(s)  _____  Title, if any  Date: _____   Phone No: _____  Email Address (optional): _____  Taxpayer Identification or Social Security Number: _____ | To be completed **ONLY** if you desire funds to be delivered to you by wire transfer. A $50.00 wiring fee will be deducted from your total payment.  Bank Name:  _____  Bank Telephone Number:  _____  Account Name:  _____  Account Number:  _____  Routing Number:  _____ |

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094243

## INSTRUCTIONS

A holder of Shares will not receive the portion of the Merger Consideration payable in exchange for such Stockholder's Shares until this Letter of Transmittal (properly filled in, dated and signed) is received by the Company at the address set forth on the cover page of this Letter of Transmittal.  No interest will accrue on any amounts due.

1.  <u>Delivery of Letter of Transmittal and Joinder Agreement</u>.  This Letter of Transmittal, properly completed and duly executed, together with any other documents required by this Letter of Transmittal, should be delivered to the Company at the address set forth on the cover page of this Letter of Transmittal.  The method of delivery of this Letter of Transmittal and any other required documents is at the election and risk of the owner. The delivery of this Letter of Transmittal to an address other than as set forth in the instructions herewith does not constitute a valid delivery. We request that you also return the Joinder Agreement attached hereto as Exhibit A to the Company together with your Letter of Transmittal at the address set forth on the cover page of this Letter of Transmittal.

2.  <u>Defects or Irregularities</u>.  In the event that the Company determines that any Letter of Transmittal does not appear to have been properly completed or executed, or any other irregularity in connection with the surrender of Shares appears to exist, the Buyer or the Company at Buyer's direction may reasonably request the Stockholder to provide any missing or incomplete information.  The Company reserves the right to reject all incomplete or irregular presentations directly to the Stockholder.  A surrender will not be deemed to have been made until all irregularities have been cured or waived.

3.  <u>Inadequate Space</u>.  If the space provided herein is inadequate, the information requested should be listed on a separate schedule attached hereto.

4.  **If the Shares surrendered hereby are owned of record by two or more joint owners, all such owners must sign this Letter of Transmittal.**

5.  **If this Letter of Transmittal is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation or others acting in a fiduciary or representative capacity, such persons should so indicate when signing, and evidence satisfactory to the Company of his or her authority to so act must be submitted.**

6.  **The Company will not exchange any Shares until all instructions herein are complied with.**

7.  <u>Special Delivery Instructions</u>.  Indicate the name and address of the person(s) to whom the check comprising the Merger Consideration are to be sent if different from the name and address of the person(s) signing this Letter of Transmittal.

8.  <u>Information and Additional Copies</u>.  Information and additional copies of this Letter of Transmittal may be obtained from the Company by writing to the address above or calling the Company at 1+ (620) 342-7320.

9.  <u>Important U.S. Tax Information</u>.  Under U.S. federal income tax laws, the Company may be required to withhold a portion of payments made to certain Stockholders pursuant to the Merger. To prevent backup withholding, each Stockholder that is a U.S. Person (as defined below) is generally required to notify the Company of such Stockholder's current U.S. taxpayer identification number ("**TIN**") by completing and delivering a properly executed IRS Form W-9 and certifying on such form, under penalties of perjury, that: (1) such TIN is correct; (2) such Stockholder is not subject to backup withholding because (i) such Stockholder is exempt from backup withholding, (ii) such Stockholder has not been notified by the IRS that such Stockholder is subject to backup withholding as a result of a failure to report all interest or dividends or (iii) the IRS has notified such Stockholder that such Stockholder is no longer subject to backup withholding; and (3) such Stockholder is a U.S. Person. The TIN is generally the U.S. social security number or the U.S. federal employer identification number of the U.S. Person. If you do not

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094244

have a TIN, you should consult the instructions to IRS Form W-9 for information on applying for a TIN, write "Applied For" in the space for the TIN in Part 1 of IRS Form W-9 and sign and date IRS Form W-9. If you write "Applied For" in the space for the TIN and the Company is not provided with a TIN by the time of payment, the Company will withhold a portion of the payment made to you until a TIN is provided. Certain U.S. Persons (including certain corporations) are exempt from backup withholding and reporting requirements. Such exempt Stockholders should indicate their exempt status by entering in the correct "Exempt payee code" on line 4 in IRS Form W-9. A Stockholder that is not a U.S. Person should submit an appropriate and properly completed applicable IRS Form W-8, a copy of which may be obtained at the IRS website (www.irs.gov), in order to avoid backup withholding. Such Stockholders should consult a tax advisor to determine which Form W-8 is appropriate.

You are a "U.S. Person" if you are, for U.S. federal income tax purposes: (1) an individual citizen or a resident of the United States (including a U.S. resident alien); (2) a corporation, company, or association created or organized in the United States or under the laws of the United States (or any state thereof, including the District of Columbia); (3) an estate whose income is subject to U.S. federal income tax regardless of its source; (4) a trust (i) if a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person; or (5) a partnership, limited liability company or other entity classified as a partnership for U.S. federal income tax purposes that is created or organized in the United States or under the laws of the United States (or any state thereof, including the District of Columbia).

If the correct TIN is not provided or if any other information is not correctly provided, payments made with respect to the Shares may be subject to backup withholding and may be subject to penalties. Backup withholding is not an additional tax. Amounts withheld are creditable against the Stockholder's regular U.S. federal income tax liability, and any amount over-withheld generally will be refundable to such Stockholder if such Stockholder properly files a U.S. federal income tax return in a timely manner. Each Stockholder is urged to consult his or her own tax advisor to determine whether, in connection with the Merger, such Stockholder is exempt from backup withholding and information reporting.

**Failure to provide the required information on the IRS Form W-9 (or to provide an IRS Form W-8, as applicable) may subject a U.S. Stockholder to penalties imposed by the IRS, backup withholding at the applicable statutory rate on all or a portion of any payment received pursuant to the Merger. Serious penalties may be imposed for providing false information. Each Stockholder is urged to consult his, her or its own tax advisor to determine whether such Stockholder is required to furnish an IRS Form W-9, is required to furnish an applicable IRS Form W-8 or is exempt from backup withholding.**

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094245

**Exhibit A**

**Joinder Agreement**

See attached.

38872-2007 39653739.6

CONFIDENTIAL

FBG_CH1_00094246

**Final Form**

**EXHIBIT D**

**JOINDER AGREEMENT**

THIS JOINDER AGREEMENT, effective as of [■], 2023 (this "Agreement"), is entered into by and among First Brands Group LLC, a Delaware limited liability company (the "Buyer"), Hopkins Acquisition, Inc., a Delaware corporation (the "Company"), and the undersigned holder (the "Stockholder" and together with the Buyer and the Company, the "Parties") of the shares of capital stock of the Company set forth on Exhibit A hereto (the "Subject Stock"). Capitalized terms used but not defined herein are used as they are defined in the Merger Agreement (as defined below).

RECITALS

A.      The Stockholder owns beneficially and of record the Subject Stock.

B.      Subject to the satisfaction or waiver of the terms and conditions of the Agreement and Plan of Merger, dated as of November 22, 2023, by and among Buyer, the Company, ONCAP Investment Partners III, L.P., and Weekend Merger Sub, Inc. ("Merger Sub") (as amended or modified, the "Merger Agreement"), Merger Sub will be merged with and into the Company (the "Merger"), with the Company continuing as the surviving corporation of the Merger and a wholly-owned subsidiary of Buyer.

C.      The Stockholder believes that the terms of the Merger and the Merger Agreement are fair and that it is in the Stockholder's best interest as a holder of the Subject Stock that the Mergers and other transactions contemplated by the Merger Agreement (collectively, the "Transactions") be consummated.

AGREEMENT

NOW, THEREFORE, in consideration of the promises and the covenants and agreements set forth below, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      No Transfer of Subject Stock.

(a)      From and after the date hereof until the Expiration Time (as defined herein), the Stockholder shall not cause or permit any Transfer (as defined below) of any of the Subject Stock or enter into any agreement, option or arrangement with respect to a Transfer of any of the Subject Stock.  For purposes hereof, a Person shall be deemed to have effected a "Transfer" of Subject Stock if such Person, directly or indirectly: (i) sells, pledges, grants an option with respect to, transfers, assigns, or otherwise disposes of such securities, or any interest in such securities; or (ii) enters into an agreement or commitment providing for the sale of, pledge of, grant of an option with respect to, transfer of or disposition of such shares or any interest therein.  For purposes hereof, any Transfer or attempted Transfer of any Subject Stock in violation of any provision of this Agreement shall be void *ab initio* and of no force or effect, and the Company shall not record such Transfer on its books or treat any purported transferee of such Subject Stock as the owner of such Subject Stock for any purpose. As used herein, the term "Expiration Time" shall mean the

39655435.2

CONFIDENTIAL                                                      FBG_CH1_00094247

earliest of (A) the Effective Time, (B) the date and time of the termination of the Merger Agreement in accordance with the provisions of Section 8.5 of the Merger Agreement, and (C) the termination of this Agreement by mutual written consent of the Parties.

2.     No Solicitations. From the date hereof until the Expiration Time, the Stockholder shall not, and shall cause its Affiliates and its representatives and any other Person acting on its behalf to not, directly or indirectly, initiate, solicit, encourage, enter into, conduct, participate or continue in any negotiations or inquiries or the making or implementation of any Acquisition Proposal.

3.     Representations and Warranties of the Stockholder. The Stockholder hereby represents and agrees.

(a)     If the Stockholder is an entity, such Stockholder is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation or incorporation, as applicable.  The Stockholder has the requisite corporate, company, partnership or other power and authority, or, if a natural person, the capacity, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to comply with the terms hereof.

(b)     This Joinder Agreement has been duly executed and delivered and constitutes a valid and legally binding obligation of the undersigned, enforceable against the Stockholder in accordance with its terms, except (i) as enforcement may be limited by: applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (ii) insofar as the availability of equitable remedies may be limited by applicable Law.

(c)     The execution, delivery and performance of this Joinder Agreement by the Stockholder will not: (i) if the undersigned is not a natural person, violate the organizational documents of the undersigned; or (ii) violate any law or any judgment, decree, order, regulation or rule of any court or other Governmental Entity applicable to the undersigned or the Stockholder's properties or assets.

(d)     The Stockholder acknowledges receipt of the Merger Agreement and represents that he, she or it has had (i) the opportunity to review, and has read, reviewed and understands, the terms and conditions of the Merger Agreement, and (ii) the opportunity to review and discuss the Merger Agreement and this Agreement with his, her or its own advisors and legal counsel.

Notwithstanding anything in this Agreement to the contrary: (A) the Stockholder makes no agreement or understanding herein in any capacity other than in Stockholder's capacity as a record holder and beneficial owner of the Subject Stock, and not in such Stockholder's capacity as a director, officer or employee of the Company and (B) nothing herein will be construed to limit or affect any action or inaction by the Stockholder or any representative of the Stockholder, as applicable, serving on the board of directors of the Company or as an officer or fiduciary of the Company, acting in such person's capacity as a director, officer, employee or fiduciary of the Company.

2

39655435.2

CONFIDENTIAL

FBG_CH1_00094248

4.      Joinder to Merger Agreement and Additional Acknowledgements.

(a)      Stockholder has received and reviewed the Merger Agreement and consents to and agrees to be subject to and be bound by and comply with the terms and conditions of the Merger Agreement applicable to Stockholders as if the undersigned had signed the Merger Agreement as a party thereto, including, without limitation, (i) the consideration provisions set forth in Article II of the Merger Agreement, (ii) the applicable provisions referring to the Escrow Agreement in the form attached as Exhibit B to the Merger Agreement, by and among Buyer, the Seller Representative and Citibank, N.A., as escrow agent, (iii) the provisions set forth in Section 10.1 of the Merger Agreement, including the irrevocable appointment of ONCAP Investment Partners III, L.P. (including its successors and replacements) as the Seller Representative under the Merger Agreement to, among other things, act for and on behalf of Stockholder and withhold the Expense Holdback Amount in accordance with the Merger Agreement and (iv) the provisions set forth in Section 7.1 (Confidentiality; Public Announcements) of the Merger Agreement.

(b)      Stockholder agrees and acknowledges that upon the terms and subject to the conditions set forth in the Merger Agreement, each Company Common Share will be converted into the right to receive a portion of the Merger Consideration in accordance with the Merger Agreement.

(c)      Stockholder agrees and acknowledges that the consideration paid or payable in exchange for the Subject Shares pursuant to the Merger Agreement is in full satisfaction of all rights pertaining to the Subject Shares.

(d)      Sections 11.2 (Amendments and Waivers), 11.4 (Successors and Assigns), 11.5 (Governing Law), 11.6 (Consent to Jurisdiction; Service of Process; Waiver of Jury Trial), 11.9 (Entire Agreement), 11.12 (Remedies; Specific Performance) and 11.13 (Severability) of the Merger Agreement shall apply to this Joinder Agreement *mutatis mutandis*.

(e)      All representations and warranties of the undersigned contained herein shall survive the execution and delivery of this Joinder Agreement and the consummation of the Closing until the first anniversary of the Closing Date.

(f)      Each of the undersigned's agreements, acknowledgements, consents, representations and warranties contained in this Joinder Agreement are an integral part of transactions contemplated by the Merger Agreement.

5.      Effectiveness; Termination. For the avoidance of doubt, the Stockholder's obligations hereunder are contingent upon the execution and delivery of the Merger Agreement by the Company, Buyer, Merger Sub and the Seller Representative. This Agreement shall terminate automatically upon valid termination of the Merger Agreement in accordance with the provisions of Section 8.5 of the Merger Agreement.

6.      Dissenters' Rights.  During the term of this Agreement, the Stockholder hereby, to the extent permitted by law, irrevocably and unconditionally waives and agrees not to exercise and to prevent the exercise of any dissenters' or appraisal rights and any similar rights (including any notice requirements related thereto) with respect to any Subject Stock, which may

3

39655435.2

CONFIDENTIAL                                          FBG_CH1_00094249

arise in connection with the Merger (including, without limitation, under Section 262 of the General Corporation Law of the State of Delaware).

7.     Notices.  Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private overnight courier for next-day business delivery as established by the sender by evidence obtained from the courier, (c) on the date sent by attachment to e-mail in portable document format, with non-automatic confirmation of receipt, if sent prior to 8:00 p.m. New York, New York time, or if sent later, then on the next Business Day, or (d) on the fifth (5th) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

TO STOCKHOLDER:

To the address set forth on Exhibit A.

TO BUYER or COMPANY (AFTER CLOSING):

Weekend Merger Sub, Inc.
c/o First Brands Group, LLC
127 Public Square, Suite 5300, Cleveland, Ohio 44114
Attention:     Shekhar Kumar, Senior Vice President – M&A
Email: shekhar.kumar@firstbrandsgroup.com


TO COMPANY (PRIOR TO CLOSING):

Hopkins Acquisition, Inc.
428 Peyton Street, P.O. Box 1157
Emporia, Kansas 66801
Attention: Bradley T. Kraft
Email: brad.kraft@hopkinsmfg.com

with a copy (which shall not constitute notice)
to:

Torys LLP
1114 Avenue of the Americas, 23rd Floor
New York, New York 10036
Attention: Stefan Stauder; Meghan McKeever
Email: spstauder@torys.com;
mmckeever@torys.com

8.     Section Headings.  The article, section and paragraph headings and table of contents contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.Counterparts.  This Agreement may be

4

39655435.2

FBG_CH1_00094250

**DEBTORS' EXHIBIT NO. 238**
**Page 124 of 133**

executed and delivered in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same agreement.

[*Remainder of page intentionally left blank; Signature page follows*]

5

39655435.2

CONFIDENTIAL

FBG_CH1_00094251

The Parties have caused this Joinder Agreement to be executed as of the date first above written.

STOCKHOLDER

_____
Name:

[Signature Page - Joinder Agreement]

CONFIDENTIAL                                                              FBG_CH1_00094252

**DEBTORS' EXHIBIT NO. 238**
**Page 126 of 133**

HOPKINS ACQUISITION, INC.


By:_____
Name:
Title:

[Signature Page - Joinder Agreement]

CONFIDENTIAL                                                                 FBG_CH1_00094253

FIRST BRANDS GROUP, LLC


By:_____
Name:
Title:

[Signature Page - Joinder Agreement]

CONFIDENTIAL                                                      FBG_CH1_00094254

EXHIBIT A

| Name and Address of Stockholder | Subject Stock | |
|---|---|---|
| [●] | Class of Shares | Number of Shares |
| | [●] | [●] |

39655435.2

CONFIDENTIAL

FBG_CH1_00094255

**DEBTORS' EXHIBIT NO. 238**
**Page 129 of 133**

<u>EXHIBIT B</u>

**FORM OF MERGER AGREEMENT**

**(Attached.)**

39655435.2

CONFIDENTIAL

FBG_CH1_00094256

**Final Form**

## Exhibit E

CERTIFICATE OF MERGER

OF

**WEEKEND MERGER SUB, INC.**
a Delaware corporation,

WITH AND INTO

**HOPKINS ACQUISITION, INC,**
a Delaware corporation

[■], 2023

Pursuant to Section 251 of the General Corporation Law of the State of Delaware ("DGCL"), as amended, the undersigned hereby certifies relating to the merger (the "Merger") of Weekend Merger Sub, Inc., a Delaware corporation (the "Disappearing Corporation"), with and into Hopkins Acquisition, Inc., a Delaware corporation (the "Surviving Corporation," and together with the Disappearing Corporation, collectively, the "Constituent Companies"), with the Surviving Corporation remaining as the surviving corporation of the Merger:

FIRST:  The names and states of formation of the Constituent Companies are:

| Name | State of Formation |
|---|---|
| Weekend Merger Sub, Inc. | Delaware |
| Hopkins Acquisition, Inc. | Delaware |

SECOND:  An Agreement and Plan of Merger, dated as of November 22, 2023 (the "Merger Agreement"), by and among the Surviving Corporation, First Brands Group, LLC, a Delaware limited liability company ("Buyer"), the Disappearing Corporation, and ONCAP Investment Partners III, L.P., an Ontario limited partnership, solely in its capacity as the representative of the stockholders of the Surviving Corporation prior to the Merger, has been approved, adopted, certified, executed and acknowledged by the Constituent Companies in accordance with Section 251 and Section 228 of the DGCL.

THIRD:  Immediately following the Merger, the name of the Surviving Corporation shall be "Hopkins Acquisition, Inc.".

FOURTH:  The certificate of incorporation of the Disappearing Corporation in effect immediately prior to the effective time of the Merger shall be the certificate of incorporation of the Surviving Corporation.

39712549.3

CONFIDENTIAL

FBG_CH1_00094257

FIFTH:  The Merger shall become effective upon filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

SIXTH:  An executed copy of the Merger Agreement is on file at the office of the Surviving Corporation at:

Hopkins Acquisition, Inc.
428 Peyton Street, P.O. Box 1157
Emporia, Kansas 66801

SEVENTH:  A copy of the Merger Agreement will be furnished by the Surviving Corporation, on request and without cost, to any member of either of the Constituent Companies.

\*   \*   \*   \*   \*

39712549.3

CONFIDENTIAL

FBG_CH1_00094258

IN WITNESS WHEREOF, the Surviving Corporation has caused this Certificate of Merger to be signed by an authorized officer as of the date first written above.

HOPKINS ACQUISITION, INC.
a Delaware corporation

By: _____
Name:
Title:

*Signature Page to Certificate of Merger*

39712549.3

CONFIDENTIAL

FBG_CH1_00094259

**DEBTORS' EXHIBIT NO. 238**
**Page 133 of 133**