*Execution Version*

STOCK PURCHASE AGREEMENT

dated as of May 15, 2024

by and among

LUMILEDS HOLDING B.V.,

LAMPS HOLDING B.V.,

and

FIRST BRANDS GROUP, LLC

CONFIDENTIAL

FBG_CH1_00094260

DEBTORS' EXHIBIT NO. 239
Page 1 of 193

## TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE ..................................................................................... 1

    1.1    Purchase and Sale ........................................................................... 1
    1.2    Purchase Price ................................................................................. 2
    1.3    Determination of Estimated Purchase Price .................................. 2
    1.4    Execution of the Notary Letter ...................................................... 2
    1.5    Closing Date Payments ................................................................... 2
    1.6    Purchase Price Adjustment ............................................................ 3
    1.7    Purchase Price Settlement .............................................................. 3
    1.8    Escrow Accounts ............................................................................ 4

ARTICLE II CLOSING AND CLOSING DATE DELIVERIES ......................................... 4

    2.1    Closing ............................................................................................ 4
    2.2    Closing Deliverables of Seller ....................................................... 5
    2.3    Closing Deliverables of Purchaser ................................................ 7
    2.4    Closing Actions .............................................................................. 8
    2.5    Notary Actions ............................................................................... 8
    2.6    Cooperation .................................................................................... 9
    2.7    Withholding Rights ........................................................................ 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ......................... 9

    3.1    Organization and Qualification ..................................................... 9
    3.2    Authority ........................................................................................ 9
    3.3    No Violations and Consents ......................................................... 10
    3.4    Ownership of Shares .................................................................... 10
    3.5    Litigation ...................................................................................... 11
    3.6    Brokers ......................................................................................... 11
    3.7    Acknowledgement of No Other Representations or Warranties ......................... 11

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER REGARDING
           THE COMPANY ............................................................................. 11

    4.1    Organization and Qualification; Subsidiaries .............................. 11
    4.2    Capitalization ............................................................................... 12
    4.3    Authority ...................................................................................... 14
    4.4    No Violation and Consents .......................................................... 14
    4.5    Affiliate Contracts ....................................................................... 15
    4.6    Title to Assets; Sufficiency of Assets ......................................... 15
    4.7    Litigation and Compliance with Laws ........................................ 16
    4.8    Anti-Bribery and Corruption ....................................................... 16
    4.9    Sanctions and Export Controls Laws ........................................... 17
    4.10    Intellectual Property .................................................................... 17
    4.11    Privacy, Data Protection and Information Technology ................ 18
    4.12    Contracts. ..................................................................................... 19
    4.13    Financial Statements and Related Matters. .................................. 21
    4.14    Subsequent Events ....................................................................... 22

i

1607904589.12

CONFIDENTIAL

FBG_CH1_00094261

**DEBTORS' EXHIBIT NO. 239**
**Page 2 of 193**

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| 4.15 | Insurance | 23 |
| 4.16 | Licenses and Permits | 23 |
| 4.17 | Environmental Matters | 23 |
| 4.18 | Tax Matters. | 24 |
| 4.19 | Labor and Employee Benefits | 26 |
| 4.20 | Real Property | 30 |
| 4.21 | Suppliers; Customers | 31 |
| 4.22 | Product and Service Warranty and Liability; Safety | 32 |
| 4.23 | Inventory | 33 |
| 4.24 | Accounts Payable, Accounts Receivable | 33 |
| 4.25 | Brokers | 34 |
| 4.26 | Acknowledgement of No Other Representations or Warranties | 34 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER | | 35 |
| 5.1 | Organization | 35 |
| 5.2 | Authority | 35 |
| 5.3 | No Violations and Consents | 35 |
| 5.4 | Litigation | 36 |
| 5.5 | Sufficient Funds. | 36 |
| 5.6 | Anti-Money Laundering and Sanctions. | 36 |
| 5.7 | Investment Intention | 36 |
| 5.8 | Brokers | 36 |
| 5.9 | Acknowledgement of No Other Representations or Warranties | 37 |
| ARTICLE VI COVENANTS | | 38 |
| 6.1 | Conduct of Business by the Company Pending the Sale | 38 |
| 6.2 | Access to Information | 41 |
| 6.3 | Appropriate Action; Consents; Filings. | 42 |
| 6.4 | Directors & Officers Indemnification and Insurance | 44 |
| 6.5 | Employee Benefit Matters | 45 |
| 6.6 | Intercompany Accounts and Affiliate Contracts | 45 |
| 6.7 | Tax Matters. | 45 |
| 6.8 | Reorganization | 48 |
| 6.9 | Wrong Pocket | 49 |
| 6.10 | Restrictive Covenants | 50 |
| 6.11 | Further Assurances | 51 |
| 6.12 | Interim Period Agreement | 51 |
| 6.13 | Seller Corporate Approvals | 52 |
| 6.14 | Korean Tax Refund | 52 |
| 6.15 | Claims Under Seller Insurance Policies | 52 |
| ARTICLE VII CONDITIONS TO THE SALE | | 53 |
| 7.1 | Conditions to Obligations of Each Party to Effect the Sale | 53 |
| 7.2 | Additional Conditions to Obligations of Purchaser | 53 |

1607904589.12

CONFIDENTIAL

FBG_CH1_00094262

**DEBTORS' EXHIBIT NO. 239**
**Page 3 of 193**

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| 7.3 | Additional Conditions to Obligations of Seller | 54 |
| **ARTICLE VIII TERMINATION** | | 54 |
| 8.1 | Termination | 54 |
| 8.2 | Effect of Termination | 55 |
| **ARTICLE IX NO SURVIVAL** | | 58 |
| 9.1 | No Survival | 58 |
| **ARTICLE X GENERAL PROVISIONS** | | 58 |
| 10.1 | Cost and Expenses | 58 |
| 10.2 | Amendment, Modification and Waiver | 58 |
| 10.3 | Savings Clause | 58 |
| 10.4 | Entire Agreement | 59 |
| 10.5 | Assignment; Successors and Assigns | 59 |
| 10.6 | Parties in Interest | 59 |
| 10.7 | Mutual Drafting; Interpretation; Headings; Disclosure Schedules | 60 |
| 10.8 | Notary | 61 |
| 10.9 | Governing Law | 61 |
| 10.10 | Venue | 61 |
| 10.11 | Waiver of Jury Trial and Certain Damages | 62 |
| 10.12 | Notices | 62 |
| 10.13 | Public Announcements | 64 |
| 10.14 | Counterparts | 64 |
| 10.15 | Specific Performance | 64 |
| 10.16 | Legal Representation | 64 |
| 10.17 | Limitation on Recourse | 66 |
| 10.18 | Release | 66 |

Annex I – Defined Terms
Exhibit A – Plan of Reorganization
Exhibit B – Illustrative Calculations
Exhibit C – Form of Escrow Agreement
Exhibit D – Form of Notary Letter
Exhibit E – Form of Deed of Transfer
Exhibit F – Voting Agreement
Exhibit G – MSA-Related Assets

1607904589.12

CONFIDENTIAL

FBG_CH1_00094263

**DEBTORS' EXHIBIT NO. 239**
**Page 4 of 193**

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement, dated as of May 15, 2024 (this "Agreement"), is entered into by and among Lumileds Holding B.V., a Dutch private limited company ("Seller"), Lamps Holding B.V., a Dutch private limited company (the "Company"), and First Brands Group, LLC, a Delaware limited liability company ("Purchaser").

### RECITALS:

**WHEREAS**, Seller owns all of the issued and outstanding shares, nominal value €1 per share, of the Company (the "Shares");

**WHEREAS**, prior to the Closing, Seller shall consummate the Reorganization in accordance with the terms set forth on Exhibit A which shall have the effect of transferring the ownership and operation of the Business from certain Affiliates of Seller and the Company to the Company;

**WHEREAS**, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, all of Seller's right, title and interest in and to the Shares, on the terms and subject to the conditions hereinafter set forth;

**WHEREAS**, unless otherwise expressly provided, each defined term shall have the meaning given thereto in Annex I;

**WHEREAS**, prior to entry into this Agreement, Seller has obtained irrevocable voting agreements, each of which is substantially in accordance with the form attached hereto as Exhibit F (each, a "Voting Agreement") from the owners of depositary receipts for shares of Aegletes which in the aggregate are sufficient to satisfy the Required Stockholder Approval; and

**WHEREAS**, each of the parties hereto desires to make certain representations, warranties, covenants and agreements in connection with the Sale and also to prescribe various conditions to the Sale.

**NOW, THEREFORE**, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the parties hereto hereby agree as follows:

### AGREEMENT

### ARTICLE I
### PURCHASE AND SALE

1.1   Purchase and Sale.  On and subject to the terms and conditions of this Agreement, at the Closing, Purchaser agrees to purchase from Seller, and Seller agrees to sell, assign and transfer to Purchaser for the consideration specified in Section 1.2, all of Seller's right, title and interest in and to the Shares, free and clear of all Liens (other than any (a) transfer and other restrictions under applicable foreign, federal and state securities Laws or transfer restrictions

1607904589.12

FBG_CH1_00094264

expressly set forth in the Company's Organizational Documents and (b) Liens created by or through Purchaser or its Affiliates (excluding the Company and its Subsidiaries)) (the "Sale").

1.2     Purchase Price.  The aggregate purchase price to be paid by Purchaser to or for the account of Seller in consideration for the purchase of the Shares (the "Purchase Price") shall equal (a) two-hundred and thirty-eight million dollars ($238,000,000), *plus* (b) the amount, if any, by which Cash exceeds the Target Closing Date Cash, *minus* (c) the amount, if any, by which the Target Closing Date Cash exceeds Cash, *minus* (d) Closing Date Indebtedness, *minus* (e) the amount, if any, by which the Target Working Capital exceeds the Closing Date Working Capital, *plus* (f) the amount, if any, by which the Closing Date Working Capital exceeds the Target Working Capital, *minus* (g) the Seller Transaction Expenses and *plus* (h) the Specified Expenses, solely to the extent that any such Specified Expenses have been paid by Seller, the Company or any of its Subsidiaries or any of their respective Affiliates at or prior to the Closing.  The Purchase Price shall be payable at Closing in accordance with Section 1.3, subject to adjustment in accordance with Section 1.6.

1.3     Determination of Estimated Purchase Price.  Not less than five (5) Business Days prior to the Closing Date, Seller shall deliver to Purchaser a statement ("Estimated Closing Balance Sheet") which sets forth Seller's (a) good faith estimate of (i) Cash, (ii) the Closing Date Indebtedness, (iii) the Closing Date Working Capital, (iv) the Seller Transaction Expenses, and (v) the Specified Expenses to the extent paid by Seller, the Company or any of its Subsidiaries or any of their respective Affiliates at or prior to the Closing, and (b) after taking into account the determinations set forth in clause (a) hereof, the calculation of the Purchase Price based thereon (the "Estimated Purchase Price").  In preparing the Estimated Closing Balance Sheet and the calculation of Estimated Purchase Price, the Cash, Closing Date Indebtedness, and the Closing Date Working Capital shall be construed in accordance with the illustrative calculations set forth on Exhibit B (as may be modified and mutually agreed by the parties hereto from and after the date hereof but prior to Closing, the "Illustrative Calculation"). From the delivery of the Estimated Closing Balance Sheet until Closing, Seller shall, subject to reasonably advance written request (email being sufficient), provide Purchaser and its Representatives with reasonable access during normal business hours, to the appropriate personnel of the Company, its Subsidiaries and Affiliates and the financial statements, worksheets and other documentation used to determine the Estimated Closing Balance Sheet and the Estimated Purchase Price and shall consider in good faith items in the Estimated Closing Balance Sheet which Purchaser disputes no later than two (2) Business Days prior to the Closing; provided, that if the parties cannot agree upon any such disputed items by the Closing Date, then the Estimated Closing Balance Sheet as proposed by Seller shall control for purposes of Closing.

1.4     Execution of the Notary Letter.  Not later than two (2) Business Days prior to Closing, the relevant parties shall execute the Notary Letter to confirm the flow of funds at Closing.

1.5     Closing Date Payments.

(a)     One (1) Business Day prior to the Closing, Purchaser shall make (or cause to be made) payment in an amount equal to (i) the Estimated Purchase Price *minus* (ii) the Escrow Amount (the Estimated Purchase Price after deduction of the Escrow Amount, the "Closing

2

FBG_CH1_00094265

Payment") by wire transfer of immediately available funds to the Notary Account in accordance with the Notary Letter.

(b)     One (1) Business Day prior to the Closing, Purchaser shall make (or cause to be made) payment to the Escrow Agent an amount in cash equal to the Escrow Amount, paid in accordance with the Escrow Agreement.

(c)     Following the Closing, Purchaser or Seller, as appropriate, shall make the payment, if any, required by Section 1.7.

(d)     On the Closing Date, the parties shall procure that the Notary shall hold and release the Closing Payment in accordance with the Notary Letter.

1.6     Purchase Price Adjustment.

(a)     As promptly as possible and in any event within ninety (90) days following the Closing Date, Deloitte Touche Tohmatsu LLC (together with its Affiliates, "Deloitte"), shall independently prepare and deliver to Purchaser and Seller a statement (the "Final Closing Statement") which sets forth Deloitte's good faith calculations of (i) Cash, (ii) Closing Date Indebtedness, (iii) Closing Date Working Capital, (iv) Seller Transaction Expenses, (v) Specified Expenses to the extent paid by Seller, the Company or any of its Subsidiaries or any of their respective Affiliates at or prior to the Closing, and (vi) after taking into account the adjustments set forth in preceding portions of clause (a) hereof, the calculation of the Purchase Price based thereon, in each case, prepared in accordance with Section 1.6(c). The Final Closing Statement will be based exclusively on the facts and circumstances as they exist as of the Reference Time, after giving effect to the Reorganization.

(b)     Absent fraud or manifest error, (i) the Final Closing Statement delivered by Deloitte pursuant to Section 1.6(a) shall be conclusive, final, nonappealable, incontestable by, and binding upon Seller and Purchaser and each of their respective Affiliates, successors and permitted assignees for all purposes, and shall not be subject to collateral attack for any reason, and (ii) the calculations of Cash, Closing Date Indebtedness, Closing Date Working Capital, Seller Transaction Expenses and Specified Expenses to the extent paid by Seller, the Company or any of its Subsidiaries or any of their respective Affiliates at or prior to the Closing shall be as set forth in the Final Closing Statement delivered by Deloitte pursuant to Section 1.6(a). Any fees and expenses of Deloitte incurred in preparing and delivering the Final Closing Statement pursuant to this Section 1.6 shall be borne equally by Purchaser and Seller.

(c)     In preparing the Final Closing Statement, Cash, Closing Date Indebtedness and the Closing Date Working Capital shall be construed in accordance with the illustrative calculations set forth in the Illustrative Calculation.

1.7     Purchase Price Settlement. No later than five (5) Business Days after the Purchase Price has been finally determined pursuant to Section 1.6 (the "Final Purchase Price") the following payments (if any) shall be made, by wire transfer of immediately available funds to the account (or accountants) specified in writing by Seller or Purchaser, as applicable:

3

CONFIDENTIAL

FBG_CH1_00094266

(a)     In the event the Final Purchase Price *minus* the Escrow Amount is equal to or exceeds the Closing Payment (such excess amount, the "Seller Adjustment Amount"), then within five (5) Business Days of such determination (i) Seller and Purchaser will provide joint written instructions to the Escrow Agent instructing the Escrow Agent to release the funds in the Escrow Account for distribution to Seller and (ii) to the extent the Seller Adjustment Amount exceeds the funds in the Escrow Account, Purchaser will pay such excess to Seller in accordance with instructions provided by Seller without further inquiry.  Payment of the Seller Adjustment Amount, if any, in accordance with the instructions provided by the Seller will constitute full satisfaction of any obligation of Purchaser to make such payment to Seller.

(b)     In the event the Closing Payment exceeds the Final Purchase Price *minus* the Escrow Amount (such excess amount, the "Purchaser Adjustment Amount"), then within five (5) Business Days or such determination, (i) Seller and Purchaser will provide joint written instructions to the Escrow Agent within five Business Days of such determination instructing the Escrow Agent to release to Purchaser from the funds in the Escrow Account an amount equal to the Purchaser Adjustment Amount (with the remainder of the funds in the Escrow Account, if any, to be released by the Escrow Agent to Seller) and (ii) to the extent the Purchaser Adjustment Amount exceeds the amount of the funds in the Escrow Account, Seller will pay, or cause to be paid, to Purchaser an amount equal to such excess by wire transfer of immediately available funds in accordance with instructions provided by Purchaser without further inquiry.  Payment of the Purchaser Adjustment Amount, if any, in accordance with the instructions provided by Purchaser will constitute full satisfaction of any obligation of Seller to make such payment to Purchaser.

(c)     Any payment made by either party or in accordance with instructions from Seller or Purchaser, as applicable, for distribution to Seller or Purchaser, as applicable, in accordance with Section 1.7 will constitute full satisfaction of any obligation of the parties to make such payment to Seller or Purchaser, as applicable, and neither Seller nor Purchaser nor any of their respective Affiliates will have any Liability with respect to any subsequent distribution of the Estimated Purchase Price or the Final Purchase Price.

(d)     For Tax purposes, any amounts paid pursuant to Section 1.7 shall be treated as an adjustment to the Purchase Price to the extent permitted by applicable Law.

1.8     Escrow Accounts.  The Escrow Account will be available to satisfy any amounts owed between Seller and Purchaser pursuant to Section 1.7.  All costs and fees associated with the Escrow Account and payable to the Escrow Agent will be split equally between Seller, on the one hand, and Purchaser, on the other hand.

**ARTICLE II**
**CLOSING AND CLOSING DATE DELIVERIES**

2.1     Closing.  The term "Closing" as used herein shall refer to the actual conveyance, transfer, assignment and delivery of the Shares to Purchaser in exchange for the Estimated Purchase Price delivered to Seller pursuant to Section 1.5(a).  The Closing shall take place electronically or at the offices of DLA Piper LLP (US) in New York, New York at 10:00 am, New York City time, on the third (3rd) Business Day following the satisfaction or waiver of all conditions to the obligations of Seller and Purchaser to consummate the transactions contemplated

4

hereby (other than conditions with respect to actions Seller or Purchaser will take at the Closing itself) or at such other place and time as is mutually agreed to in writing by Seller and Purchaser; provided, however, that in the event that the Closing would occur by the terms of this Section 2.1 within seven (7) days of the end of any calendar month, the parties hereto shall use commercially reasonable efforts, to the extent practicable, to effect the Closing on the last day of such calendar month (the "Closing Date").

2.2     Closing Deliverables of Seller.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

(a)     A certificate signed on behalf of (i) Seller, by an authorized representative of Seller, dated as of the Closing Date, stating that the conditions set forth in Section 7.2(a) and Section 7.2(b) as they relate to the representations, warranties and covenants of Seller have been satisfied and (ii) the Company, by an authorized representative of the Company, dated as of the Closing Date, stating that the conditions set forth in Section 7.2(a) and Section 7.2(b) as they relate to the representations, warranties and covenants of the Company have been satisfied;

(b)     Certified copies of extracts of Seller's and the Company's registration with KvK Certificates from the Dutch Trade Register, in each case, as of a date not earlier than five (5) days prior to the Closing Date;

(c)     Duly executed resignation and release letter(s) from each of the directors and officers (or equivalents) of the Company and each of its Subsidiaries, with such resignations to be effective as of the Closing, in a form reasonably acceptable to Purchaser;

(d)     Copies of all resolutions of the directors or shareholders of the Company or relevant Subsidiaries (as applicable): (i) accepting the resignations referred to in Section 2.2(c), (ii) granting such directors and officers discharge for the performance of their duties as director or officer, as applicable and to the extent possible under applicable Laws, and (iii) if required by the applicable Organizational Documents, appointing Persons nominated by Purchaser as replacement directors and officers (or equivalents) of the Company or relevant Subsidiary, making filings with the designated authorities and updating corporate registers in relation to the appointment of directors;

(e)     A copy of the updated register of directors of the Company and each of its Subsidiaries (to the extent applicable) reflecting the resignation of directors and officers (or equivalents) of the Company or relevant Subsidiaries and (if relevant) the appointment of such Persons nominated by the Purchaser as replacement directors and officers (or equivalents) of the Company or relevant Subsidiary, in each case certified to be a true copy by a director of the Company or each relevant Subsidiary;

(f)     The consents, authorizations and approvals of the Governmental Authorities and other Persons required (i) as set forth in Section 4.4(b) of the Disclosure Schedules and (ii) in connection with the assignment or sublicensing of rights under the Material Company Intellectual Property Contracts;

5

(g)      Electronic copies of all documents and materials contained in the electronic data room hosted by the Company in connection with the transactions contemplated by this Agreement;

(h)      Payoff letters, drafts of which shall have been delivered to Purchaser at least two (2) Business Days prior to the Closing, executed by the lenders and other financing sources of the Company and its Subsidiaries, including those Persons set forth on Section 2.2(h) of the Disclosure Schedules setting forth all amounts necessary to be paid to repay in full any Closing Date Indebtedness for borrowed money and any necessary UCC authorizations or other releases as may be reasonably required to evidence the satisfaction of or release from such Closing Date Indebtedness;

(i)      A counterpart of the Transition Services Agreements, duly executed by each of Seller and the Company or their designees agreed upon by the parties;

(j)      Evidence reasonably satisfactory to Purchaser of the terminations described in Section 6.6;

(k)      At least five (5) Business Days prior to Closing, a final statement of the Seller Transaction Expenses, including the identities, amounts and wire details for each such recipient thereof;

(l)      Certificates of good standing (or equivalent evidence thereof) with respect to each Subsidiary of the Company, dated within five (5) Business Days of the Closing Date;

(m)      The Escrow Agreement, duly executed by Seller and the Escrow Agent;

(n)      The Deloitte Engagement Letter, duly executed by Deloitte and Seller;

(o)      The Supply Agreements, duly executed by Seller or Lumileds (Jiaxing) Technology Co. Ltd., as applicable;

(p)      The Long Term Agreements, duly executed by Seller or its designee agreed upon by the parties;

(q)      The Shared Services Agreement, duly executed by Seller or its designee agreed upon by the parties; and

(r)      The documentation reasonably required in order to satisfy the condition set forth in Section 7.1(c), including any documentation reasonably required to consummate the Reorganization;

(s)      With respect to Lumileds (Thailand) Co., Ltd.:

(i)      Certified copies of all resolutions of the directors and shareholders of Lumileds (Thailand) Co., Ltd.: (i) acknowledging the resignation of Thanapong Longpong, (ii) granting such directors and officers discharge for the performance of their duties as director or officer, (iii) appointing Persons nominated by the Purchaser as replacement directors and officers

6

FBG_CH1_00094269

of Lumileds (Thailand) Co., Ltd.; (iv) the amendment to the authorized directors and authority to sign of the directors of Lumileds (Thailand) Co., Ltd., as the Purchaser may direct; (v) the change of bank signatory in relation to the bank accounts of Lumileds (Thailand) Co., Ltd., as the Purchaser may direct; (vi) the revocation of all existing power of attorneys; and (vii) any other matters as may be reasonably requested by the Purchaser;

(ii)      The applications and all necessary supporting documents for registration of the following matters in respect of Lumileds (Thailand) Co., Ltd. with the Department of Business Development, the Ministry of Commerce of Thailand, duly signed by the authorized director(s) of Lumileds (Thailand) Co., Ltd.:

(A)      the resignations of the resigning director(s) referred to in Section 2.2(s)(i);

(B)      the appointments of each of the Persons nominated by the Purchaser as replacement directors and officers of Lumileds (Thailand) Co., Ltd.; and

(t)      the amendment to the authorized directors or the authority to sign of the directors of Lumileds (Thailand) Co., Ltd., as Purchaser may direct;

(u)      A counterpart of the Master Services Agreement, duly executed by Seller or its designee agreed upon by the parties; and

(v)      Such other documents and instruments as Purchaser may reasonably request prior to Closing to consummate the transactions contemplated hereby.

2.3      Closing Deliverables of Purchaser.   At or prior to the Closing, as applicable, Purchaser shall deliver or cause to be delivered to Seller:

(a)      The payments to be delivered by Purchaser (or on behalf of Purchaser) to Seller or to the applicable recipients thereof pursuant to Section 1.5(d) (and shall have made the requisite payments in accordance with Section 1.5(a) and Section 1.5(b));

(b)      A certificate signed on behalf of Purchaser by an authorized officer of Purchaser, dated as of the Closing Date, stating that the conditions set forth in Section 7.3(a) and Section 7.3(b) as they relate to the representations, warranties and covenants of Purchaser have been satisfied;

(c)      A counterpart of the Transition Services Agreements, duly executed by Purchaser;

(d)      The Escrow Agreement, duly executed by Purchaser and the Escrow Agent;

(e)      The Deloitte Engagement Letter, duly executed by Purchaser;

(f)      A counterpart of the Master Services Agreement, duly executed by Purchaser;

7

CONFIDENTIAL

FBG_CH1_00094270

(g)     The Supply Agreements, duly executed by Lumileds Germany GmbH, Lumileds Poland S.A. or the Company, as applicable;

(h)     The Long Term Agreements, duly executed by the Company or its Subsidiaries or their designees agreed upon by the parties;

(i)     The Shared Services Agreement, duly executed by the Company or its designee as agreed upon by the parties;

(j)     The documentation reasonably required in order to satisfy the condition set forth in Section 7.1(c), including any documentation reasonably required to consummate the Reorganization; and

(k)     Such other documents and instruments as Seller may reasonably request prior to Closing to consummate the transactions contemplated hereby.

2.4     Closing Actions.  At the Closing, Seller and Purchaser shall, and Seller shall procure that the Company and each of its Subsidiaries shall, ensure the following actions are taken in the following sequence:

(a)     the Company shall deliver to the Notary the original shareholders' register of the Company;

(b)     Seller, Purchaser and the Company shall - where applicable - deliver to the Notary an executed and, to the extent required by the Notary, legalized and apostilled, Power of Attorney to execute the Deed of Transfer, and any other documentation the Notary requires pursuant to the applicable Laws for preventing money laundering and financing of terrorism (*Wet ter voorkoming van witwassen en financieren van terrorisme)* or DLA Piper Nederland and in addition with respect to the Company post-Closing any and all information required to register the ultimate beneficial owners (UBO) of the Company with the Dutch UBO-register;

(c)     Seller shall transfer the Shares to Purchaser, Purchaser shall accept the transfer, and Seller shall procure that the Company acknowledges this transfer, the foregoing to be effected by execution of the Deed of Transfer by Seller, Purchaser and the Company before the Notary; and

(d)     the Notary shall update the original shareholders' register of the Company and deliver the same to the Company and Purchaser.

2.5     Notary Actions.  On the first (1st) Business Day following the Closing Date, the Notary shall, in accordance with the Notary Letter:

(a)     transfer an amount equal to the Closing Payment by wire transfer of immediately available funds to the bank accounts designated by Seller in accordance with the Notary Letter; and

(b)     register the transfer of the Shares and the change of directors of the Company detailed in Section 2.2 with the Dutch Trade Register.

8

2.6    Cooperation.  Seller and Purchaser shall, on reasonable request, on and after the Closing Date, cooperate with one another by furnishing any additional information, executing and delivering any additional documents or instruments and doing any and all such other things as may be reasonably required by the parties to consummate or otherwise implement the transactions contemplated by this Agreement.

2.7    Withholding Rights.  Purchaser and its Affiliates shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the Purchase Price otherwise payable or deliverable to any Person in connection with the transactions contemplated by this Agreement such amounts as Purchaser is required to deduct and withhold with respect to the making of such payment under the Code, or any provision of state, local or non-U.S. Tax Law; provided, however, that if the applicable withholding agent intends to deduct or withhold any Taxes pursuant to this Section 2.7, then (a) prior to making any such deduction or withholding, such withholding agent shall use commercially reasonable efforts to give the Person with respect to which such withholding is being made advance notice of its intention to make, and the basis for, any such deduction or withholding and (b) such withholding agent shall cooperate in good faith with each such affected Person to obtain reduction or relief from such deduction or withholding.  Any amount deducted and withheld in accordance with this Section 2.7 shall be timely remitted to the relevant Governmental Authority in accordance with applicable Law. To the extent that such amounts are so withheld and timely remitted by Purchaser, such withheld and deducted amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing as follows:

3.1    Organization and Qualification.  Seller is an entity as set forth in the preamble hereof and is duly organized and validly existing. Seller, to the extent applicable, is in good standing (or the equivalent thereof) under the Laws of its jurisdiction of formation or organization. Seller has the requisite power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Seller to consummate the transactions contemplated hereby.  Seller has furnished to Purchaser true, correct and complete and correct copies of its Organizational Documents as currently in effect and all such Organizational Documents are (i) located at the premises of the Company or the relevant Subsidiary or (ii) have been provided to Purchaser. Seller is not in violation of any material provision of such Organizational Documents.

3.2    Authority.  Subject to receipt of the Required Stockholder Approval, Seller (a) has the respective right and power to enter into, and perform its obligations under, this Agreement and each other agreement delivered in connection herewith to which it is a party and (b) has taken all requisite organizational action necessary to authorize (i) the execution, delivery and performance of this Agreement and each such other agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Sale and other transactions contemplated by this

9

**DEBTORS' EXHIBIT NO. 239**
**Page 13 of 193**

Agreement and each such other agreement delivered in connection herewith to which it is a party. This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery of this Agreement by each other party hereto, is binding upon, and legally enforceable against, Seller in accordance with its terms, except as such enforceability may be subject to, and limited by, applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, receivership and similar Laws affecting the enforcement of creditors' rights generally, and general equitable principles (regardless of whether enforceability is considered a proceeding at law or in equity) (the "Bankruptcy and Equity Exception").

3.3     No Violations and Consents.

(a)     None of the execution, delivery or performance of this Agreement by Seller or the consummation by Seller of the transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the Organizational Documents of Seller, subject to receipt of the Required Stockholder Approval, (ii) assuming that all consents, approvals and authorizations described in Section 3.3(b) have been obtained and all filings and notifications described in Section 3.3(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law applicable to Seller, or any of its properties or assets, or (iii) require any consent, notice or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, modification, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien upon any of the respective properties or assets (including rights) of Seller pursuant to, any Contract to which Seller is a party (or by which any of their respective properties or assets (including rights) are bound), except, with respect to clauses (ii) and (iii) of this Section 3.3(a), as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Seller to consummate the transactions contemplated hereby.

(b)     None of the execution, delivery or performance of this Agreement by Seller or the consummation by Seller of the transactions contemplated by this Agreement will require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority with respect to Seller or any of its respective properties or assets, other than (i) such filings as may be required in connection with the payment of any transfer taxes, gain taxes, or stamp duties, (ii) compliance with any applicable requirements of any Antitrust Law or FDI Laws including the DPA, (iii) compliance with, and such filings, consents, approvals, authorizations or registrations as set forth on Section 4.4(b) of the Disclosure Schedules, (iv) compliance with applicable foreign, federal or state securities or "blue sky" Laws and (v) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Seller to consummate the transactions contemplated hereby.

3.4     Ownership of Shares.  Seller is the record owner of, and has good, valid and marketable title to, 100% of the Shares (which constitute all of the issued and outstanding equity interests of the Company), as set forth on Section 3.4 of the Disclosure Schedules, and, except as

10

CONFIDENTIAL                                    FBG_CH1_00094273

set forth on <u>Section 3.4</u> of the Disclosure Schedules and any transfer and other restrictions under applicable foreign, federal and state securities Laws or transfer restrictions expressly set forth in the Company's Organizational Documents, such Shares will be conveyed at Closing free and clear of any Liens.  Upon transfer of such Shares to Purchaser at the Closing in accordance with this Agreement, Purchaser will own such Shares free and clear of any Liens except for any (a) transfer and other restrictions under applicable foreign, federal and state securities Laws and (b) Liens created by or through Purchaser or its Affiliates (excluding the Company and its Subsidiaries).

3.5     <u>Litigation</u>.  There is no Action to which Seller or any of its Affiliates is a party pending or, to the Knowledge of the Company, threatened against Seller or any of its Affiliates that would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.  Neither Seller nor any of its Affiliates is subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

3.6     <u>Brokers</u>.  Except as set forth on <u>Section 3.6</u> of the Disclosure Schedules (all of which shall be paid in full by Seller or an Affiliate thereof at or prior to Closing without liability to Purchaser, the Company or any of the Company's Subsidiaries), Seller has no liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

3.7     <u>Acknowledgement of No Other Representations or Warranties</u>.  Seller acknowledges and agrees that, on behalf of itself, (a) except for the representations and warranties contained in <u>Article V</u>, neither Purchaser nor any of its Affiliates or Representatives makes or has made, nor is Seller relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied, concerning Purchaser or any of its businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects or the transactions contemplated by this Agreement, and (b) Purchaser, its Affiliates and each of their respective Representatives hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Purchaser or any of its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any Representative of Purchaser or its Affiliates) except for the representations and warranties expressly set forth in <u>Article V</u>.  Notwithstanding the foregoing, Seller, the Company and Purchaser retain all of their respective rights and remedies with respect to claims based on Fraud.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER REGARDING THE COMPANY

Except as set forth in the Disclosure Schedules, Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing as follows:

4.1     <u>Organization and Qualification; Subsidiaries</u>.

(a)     The Company is a Dutch private company with limited liability (*besloten vennootschap*) duly formed, validly existing. The Company, to the extent applicable, is in good

11

standing (or the equivalent thereof) under the Laws of the Netherlands. Each Subsidiary of the Company is, or if not in existence as of the date hereof will be, after giving effect to the Reorganization, a legal entity duly formed or organized, validly existing and in good standing, as applicable, under the Laws of the jurisdiction of its formation or organization.

(b)　　The Company and each of its Subsidiaries have, or if not in existence as of the date hereof will have following the Reorganization Completion and at the Closing, full requisite corporate or other legal entity, as the case may be, power and authority to own, lease, use and operate their respective properties and assets and to carry on the Business under applicable Law, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect. The Company and each of its Subsidiaries is duly licensed, registered and qualified to do business and is in good standing (or if not in existence as of the date hereof, will be so duly qualified and in good standing following the Reorganization Completion and at the Closing) in each jurisdiction where the ownership, leasing or operation of its properties or assets or the conduct of the Business requires or, as of the Reorganization Completion or at the Closing, will require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect.

(c)　　The Company has made available to Purchaser true, correct and complete copies of its and each of its Subsidiaries' Organizational Documents as in effect as of the date hereof and together with all amendments and modifications thereto. Each such Organizational Document is in full force and effect, and neither the Company nor any of its Subsidiaries is in violation of any of the material provisions of their respective Organizational Documents.

(d)　　The Company is duly registered with the Dutch Trade Register. The extracts of the Dutch Trade Register are attached to the Disclosure Schedules.

(e)　　The articles of association of the Company attached to the Disclosure Schedules, are the articles of association as currently in force. No decision has been taken, nor has any resolution been adopted by the general meeting of shareholders, to amend the articles of association of the Company.

(f)　　The shareholders' registers of the Company is up to date.

(g)　　No decision has been taken to dissolve or liquidate the Company.

(h)　　Neither the Company nor any of its Subsidiaries are insolvent or have been declared bankrupt.

4.2　　Capitalization.

(a)　　The Shares constitute all of the issued and outstanding equity interests of the Company. All of the Shares were duly authorized, validly issued, are fully paid, nonassessable and are free of preemptive and similar rights. No Shares were issued in violation of any applicable

12

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　FBG_CH1_00094275

Laws, any Contract, arrangement or commitment to which the Company or Seller is a party to or bound by, or any preemptive or similar rights of any Person.

(b)     Except as set forth in any of the Company's Organizational Documents or as set forth in Section 4.2(b) of the Disclosure Schedules or with respect to the sale and purchase of shares among Seller and its Affiliates as expressly contemplated by the Reorganization, there are no (i) equity interests or other securities of the Company or any of its Subsidiaries, authorized, issued or outstanding, (ii) outstanding securities of the Company or any of its Subsidiaries convertible into or exchangeable for one or more shares of capital stock of, or other equity or voting interests in, the Company or any of its Subsidiaries, (iii) options, warrants or other rights or securities issued or granted by the Company or any of its Subsidiaries relating to or based on the value of the equity securities of the Company or any of its Subsidiaries, (iv) Contracts that are binding on the Company or any of its Subsidiaries that obligate the Company or any of its Subsidiaries to issue, acquire or sell, redeem, exchange or convert any capital stock of, or other equity interests in, the Company or any of its Subsidiaries or (v) outstanding restricted shares, restricted share units, stock appreciation rights, performance shares, performance units, deferred stock units, contingent value rights, "phantom" stock or similar rights issued or granted by the Company or any of its Subsidiaries that are linked to the value of its Shares.  There are no outstanding contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem, exchange, convert or otherwise acquire or sell any shares of capital stock of the Company or any of its Subsidiaries.

(c)     Section 4.2(c) of the Disclosure Schedules sets forth (after giving effect to the Reorganization Completion) a true, correct and complete list of each Subsidiary of the Company, together with its jurisdiction of organization or formation and the ownership interest (and percentage interest) of the Company or one or more of its Subsidiaries and any other Person, as applicable, in such Subsidiary.  Except as set forth in Section 4.2(c) of the Disclosure Schedules, following the Reorganization Completion and at the Closing, the Company or one or more of its Subsidiaries will own, directly or indirectly, all of the issued and outstanding equity interests of each of the Company's Subsidiaries, free and clear of any Liens except for transfer and other restrictions under applicable federal and state securities Laws, and all of such outstanding shares of stock or other equity securities have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive and similar rights.

(d)     Except as set forth in Section 4.2(d) of the Disclosure Schedules, neither the Company nor any of its Subsidiaries is a party to any Contract with respect to the voting of, that restricts the transfer of or that provides registration rights in respect of, any shares of capital stock or other voting securities or equity interests of the Company or any of its Subsidiaries.

(e)     The Company does not hold shares in its own capital.

(f)     Except as set forth in Section 4.2(c) of the Disclosure Schedules, neither the Company nor any Subsidiary of the Company owns, directly or indirectly, any equity interest in any other Person.

(g)     No depository receipts have been issued in respect of the Shares.

13

CONFIDENTIAL                                                                FBG_CH1_00094276

4.3     Authority.  Subject to receipt of the Required Stockholder Approval, the Company and each of its Subsidiaries (as applicable) (a) has the respective right and power to enter into, and perform its obligations under, each agreement delivered in connection herewith to which it is a party and (b) has taken all requisite action to authorize (i) the execution, delivery and performance of each such agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Sale and other transactions contemplated by this Agreement and each such other agreement delivered in connection herewith to which it is a party.  Each agreement delivered in connection herewith to which the Company is a party is duly executed by the Company and, assuming the due authorization, execution and delivery of such agreements by each other party thereto, is binding upon, and legally enforceable against, the Company in accordance with its terms, subject to the Bankruptcy and Equity Exception.

4.4     No Violation and Consents.

(a)     Except as set forth in Section 4.4(a) of the Disclosure Schedules, the consummation by the Company and each of its Subsidiaries (as applicable) of the transactions contemplated by this Agreement will not: (i) (x) conflict with or violate any material provision of the Company's Organizational Documents, or (y) conflict with or violate any material provision of the Organizational Documents of any Subsidiary of the Company; (ii) assuming that all consents, approvals and authorizations described in Section 4.4(b) have been obtained and all filings and notifications described in Section 4.4(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate (in any material respect) any Law applicable to the Company or any of its Subsidiaries, or any of their respective properties or assets; or (iii) require any consent, notice or approval under, violate, conflict with, result in any breach (in any material respect) of or any loss of any material benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, modification, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien upon any of the respective properties or assets (including rights) of the Company or any of its Subsidiaries, pursuant to, any material Contract to which the Company or any of its Subsidiaries is a party (or by which any of their respective properties or assets (including rights) are bound) or any material Permit held by the Company or any of its Subsidiaries.

(b)     The consummation by the Company and each of its Subsidiaries (as applicable) of the transactions contemplated by this Agreement will not require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority with respect to the Company or any of its Subsidiaries or any of their respective properties or assets, other than (i) such filings as may be required in connection with the payment of any transfer taxes, gain taxes, or stamp duties, (ii) compliance with any applicable requirements of Antitrust Laws or FDI Laws including the DPA, (iii) such filings, consents, approvals, authorizations or registrations as set forth on Section 4.4(b) of the Disclosure Schedules, (iv) compliance with applicable foreign, federal or state securities or "blue sky" Laws and (v) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, reasonably be expected to be material to the Company or any of its Subsidiaries.

14

     FBG_CH1_00094277

**DEBTORS' EXHIBIT NO. 239**
**Page 18 of 193**

4.5     Affiliate Contracts.  Except as set forth in Section 4.5 of the Disclosure Schedules, following the Reorganization Completion and at the Closing, neither the Company nor any of its Subsidiaries will be a party to any Contract with any of Seller, any Affiliate of Seller, or any of the Company's or its Subsidiaries' respective directors, officers or Affiliates, except for Contracts providing for employment and benefit arrangements, including employment agreements, incentive compensation and equity arrangements.

4.6     Title to Assets; Sufficiency of Assets.  Following the Reorganization Completion and at the Closing, the Company and its Subsidiaries shall have good and valid title to, or hold pursuant to valid and enforceable leases or subleases, all of the personal, tangible and intangible properties and assets reflected on the balance sheet included in the Financial Statements as being owned by the Company and its Subsidiaries (or if acquired after the date of the Financial Statements that, had they been acquired on or before such date and owned as of such date, would reasonably and in good faith have been reflected on the Financial Statements if prepared in accordance with IFRS applied on a consistent basis, subject to any disposition of such assets after the date of the Financial Statements), free and clear of all Liens (other than Permitted Liens).  Since the date of the most recent Financial Statements, neither the Company nor any of its Subsidiaries has sold, transferred or disposed of any assets used in or required or necessary for the ownership and operation of the Business in the manner presently operated, in each instance, other than sales of inventory in the Ordinary Course or as contemplated by the Reorganization.  Following the Reorganization Completion and at the Closing, the assets owned, leased or licensed by the Company, the Company's rights under the Company Material Contracts and the licenses and permits set forth in Section 4.16 of the Disclosure Schedules, and the services to be rendered pursuant to the Transition Services Agreements and the Master Services Agreement from and after the Closing, constitute all of the assets, properties, contract rights, licenses and services, in each case, whether tangible or intangible, that are reasonably necessary for the Company to operate the Business in substantially the same manner as such operations were previously conducted, are presently conducted and as currently proposed to be conducted.  All such properties and assets of the Company and its Subsidiaries constitute in all material respects, all of the assets and properties that are used by or otherwise related to the Business conducted by the Company and its Subsidiaries.  Taking into account the services to be provided pursuant to the Transition Services Agreements and the Master Services Agreement from and after the Reorganization Completion and the Closing, at the Closing neither Seller nor any of its Affiliates will own, lease or license any material property or asset that is (a) used by or otherwise related to the Business or (b) necessary for the Company and its Subsidiaries to own, operate and conduct the Business from and after the Closing Date in a manner that is consistent in all material respects with the manner in which the Business is owned, operated and conducted by Seller and its Affiliates, including the Company and its Subsidiaries, on the date hereof.  Following the Reorganization Completion and at the Closing, the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Company and its Subsidiaries are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  Taking into account the services to be provided pursuant to the Transition Services Agreements and Master Services Agreement from and after the Closing, at the Closing, the Business shall be conducted only through the Company and its Subsidiaries.

15

FBG_CH1_00094278

4.7     Litigation and Compliance with Laws.  Except as set forth in Section 4.7 of the Disclosure Schedules:

(a)     There are no outstanding Actions or Orders with respect to the Business or all or any portion of the Real Property and there have been no such Actions or Orders since January 1, 2021.  There is no Action to which the Business or the Company or any of its Subsidiaries is a party pending or, to the Knowledge of the Company, threatened seeking to prevent, hinder, modify, delay or challenge the Sale or any of the other transactions contemplated by this Agreement.

(b)     There are no Actions pending or, to the Knowledge of the Company, threatened against the Business, the Company or any of its Subsidiaries with respect to this Agreement or in connection with the transactions contemplated hereby.

(c)     The Company and each of its Subsidiaries has complied, at all times since January 1, 2021, and is now complying, in each case in all material respects, with all Laws applicable to it or the Business or its properties or assets.

4.8     Anti-Bribery and Corruption.  Except as set forth in Section 4.8 of the Disclosure Schedules, neither the Company, any of the Company's Subsidiaries, nor, to the Knowledge of the Company, any of their respective Affiliates, directors, officers, employees, agents or any other Person acting on their behalf either in connection with the business or dealings of the Company, any of its Subsidiaries or the Business, or in connection with the transactions contemplated under this Agreement:

(a)     have taken any action, directly or indirectly, which would, or might reasonably be expected to, expose the Company or any of its Subsidiaries to a violation of the Anti-Bribery Laws;

(b)     have paid, offered, promised or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:

(i)     influencing any act or decision of such Government Official(s) in their official capacity or inducing such Government Official(s) to do or omit to do any act in violation of their lawful duty in order to assist the Company, any of its Subsidiaries, the Business or any other Person in obtaining or retaining business, or directing business to any third party,

(ii)     securing an improper advantage;

(iii)     inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity to assist the Company, any of its Subsidiaries, the Business or any other Person in obtaining or retaining business, or directing business to any third party;

(iv)     providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s); or

16

CONFIDENTIAL

FBG_CH1_00094279

(c)     have otherwise made any bribe, payoff, influence payment, kickback, or other unlawful payment to any Person, regardless of form, whether in money, property, or services, to obtain or retain business or to obtain any improper advantage.

4.9     <u>Sanctions and Export Controls Laws</u>.  Except as set forth in <u>Section 4.9</u> of the Disclosure Schedules, neither the Company, any of its Subsidiaries, nor, to the Knowledge of the Company, any of their respective Affiliates, directors, officers, employees, agents or any other Persons acting on their behalf either in connection with the business or dealings of the Company, any of its Subsidiaries or the Business, or in connection with the transactions contemplated by this Agreement:

(a)     is a Sanctioned Person; or

(b)     has taken any action, directly or indirectly, which would, or might reasonably be expected to, expose the Company or its Subsidiaries to a violation of Sanctions or Export Control Laws or designation as a Sanctioned Person.

4.10     <u>Intellectual Property</u>.

(a)     Set forth on <u>Section 4.10(a)</u> of the Disclosure Schedules is a true, correct and complete list of all Company Intellectual Property that is Registered Intellectual Property that is and, following the Reorganization Completion and at the Closing will be, owned by the Company or one of its Subsidiaries which has not otherwise lapsed, been abandoned, expired or been cancelled ("<u>Company Registered Intellectual Property</u>").  All assignments and other instruments necessary to establish, record, and perfect Company's ownership interest in the Company Registered Intellectual Property, along with all required fees and necessary steps, have been or will be, upon the consummation of the Reorganization in accordance with the terms hereof, executed, filed, paid and performed, as the case may be with the relevant Governmental Authorities and authorized registrars.

(b)     The Company and its Subsidiaries currently, and following the Reorganization Completion and at the Closing (i) will collectively own, license, sublicense or otherwise have the right to use all Intellectual Property Rights that are reasonably necessary for or material to the conduct of the Business, and (ii) are the sole and exclusive legal and beneficial owners of all right, title and interest in all Intellectual Property owned or purported to be owned by the Company and its Subsidiaries, free and clear of all Liens.

(c)     Each item of Company Registered Intellectual Property (other than pending applications for Company Registered Intellectual Property) is subsisting (or in the case of pending applications, applied for), and, to the Company's Knowledge, the Intellectual Property Rights owned by the Company or any of its Subsidiaries (the "<u>Company Intellectual Property</u>") is, and following the Reorganization Completion and at the Closing will be, valid and enforceable.

(d)     The Business does not infringe, dilute, violate, or misappropriate and has not since January 1, 2021 infringed, diluted, violated or misappropriated the Intellectual Property Rights of any third party, except as would not be material to the Company and its Subsidiaries (taken as a whole).  No Action has been filed against the Business or the Company or any of its Subsidiaries as of the date hereof that alleges the Business or the Company or any of its

17

Subsidiaries infringes, dilutes, violates or misappropriates the Intellectual Property Rights of any third party, that, if true, would be material to the Company and its Subsidiaries (taken as a whole).

(e)     Except as set forth in <u>Section 4.10(e)</u> of the Disclosure Schedules, to the Company's Knowledge, no Person is misappropriating, infringing, diluting or violating any Company Intellectual Property or has since January 1, 2021 infringed, diluted, violated or misappropriated any Company Intellectual Property in any material respect.

(f)     Seller, the Company and its Subsidiaries and their respective Affiliates have acted in a commercially reasonable and prudent manner with respect to the protection and preservation of Company Intellectual Property (including, the confidentiality of Trade Secrets (such as Source Code)).

4.11    <u>Privacy, Data Protection and Information Technology</u>.

(a)     Except as set forth on <u>Section 4.11(a)</u> of the Disclosure Schedules, with regard to the Business, each of Seller, the Company and its Subsidiaries, and each of their respective Affiliates have taken reasonable security measures designed to protect the IT Systems used in connection with the ownership and operation of the Business against intrusion. Except as set forth on <u>Section 4.11</u> of the Disclosure Schedules, to the Company's Knowledge, since January 1, 2021, (i) the IT Systems used in connection with the ownership and operation of the Business have not suffered a material failure or substandard performance, and (ii) there have not been any material security breaches relating to the IT Systems used in connection with the ownership and operation of the Business that have resulted in a third Person obtaining unauthorized access to any material confidential information, proprietary information or personal data that, in the case of personal data solely, required the Company to notify any Person of such incident. Seller, the Company and its Subsidiaries, and each of their respective Affiliates are and have been since January 1, 2021 in compliance in all material respects with any Laws and publicly posted policies and notices relating to personal data that are relevant to the Business (collectively, "Privacy Laws").

(b)     Except as set forth on <u>Section 4.11(b)</u> of the Disclosure Schedules or as to be provided pursuant to the Transition Services Agreements, to the Company's Knowledge, the IT Systems that will be owned and operated by the Company and its Subsidiaries following Reorganization Completion and at the Closing are adequate, in all material respects, for the ownership and operation of the Business in the same manner as which the Business is currently operated. Sellers (including, the Company and its Subsidiaries) and its Affiliates have taken commercially reasonable steps to protect their IT Systems under their control and used in the operation of the Business against cyberattacks and other malicious acts, to provide for the back-up and recovery of material data and have security incident and disaster recovery plans and procedures with respect to such systems necessary for the ownership and operation of the Business.

(c)     No Source Code included in Company Intellectual Property is subject to any "copyleft" or other obligation or condition that requires, or conditions the use or distribution of any Source Code on the disclosure, licensing, distribution or granting or forbearance of other rights to the Source Code included in Company Intellectual Property.

18

FBG_CH1_00094281

4.12   Contracts.

(a)   Section 4.12(a) of the Disclosure Schedules sets forth a true, correct and complete list, and the Company has made available to Purchaser true, correct and complete copies, in each case as of the date hereof, of each Contract and all amendments and modifications thereto to which at Closing, the Company or any of its Subsidiaries will be a party or by which it is bound or to which any of their respective assets are subject that:

(i)   pertain to a partnership, joint venture, teaming arrangement or other similar arrangement in which the Company or any of its Subsidiaries participates as a partner, member or joint venturer or otherwise involves a sharing of profits, losses, costs or Liabilities by the Company or any of its Subsidiaries with any other Person;

(ii)   (A) pursuant to which the Company or any of its Subsidiaries or any of their respective Affiliates spent, in the aggregate, more than $1,000,000 with respect to any such agreement or Contract during the fiscal year ended December 31, 2022 in connection with the ownership and operation of the Business or (B) with any of the Material Suppliers;

(iii)   (A) generated more than $1,000,000 in revenues for the Company or any of its Subsidiaries or any of their respective Affiliates in the fiscal year ended December 31, 2022 in connection with the ownership and operation of the Business, (B) is reasonably expected to generate more than $1,000,000 in revenues for the Company or any of its Subsidiaries in the fiscal year from and after the consummation of the Reorganization or (C) with any of the Material Customers;

(iv)   (A) restrict the development, manufacture, marketing, distribution or sale of any products or services of the Company, (B) restrict or prohibit the transaction of business with any other Person by the Company, (C) restrict or limit the entering into any market or line of business by the Company or any of its employees, (D) provide for "most favored nation" pricing terms or similar rights in favor of a third party or (E) grant to another Person exclusive rights with respect to any products, services or territory;

(v)   is a broker, distributor, dealer, manufacturer's representative, sales representative, franchise, agency, sales promotion, market research, marketing consulting or advertising or similar Contracts;

(vi)   relate to the creation, incurrence, assumption or guarantee of Indebtedness in excess of $1,000,000 (individually or in the aggregate), whether unsecured or secured;

(vii)   contain a put, call or similar right pursuant to which the Company or any of its Subsidiaries could be required to purchase or sell, as applicable, any equity interests of any Person or assets;

(viii)   require the Company to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(ix)   is a Tax Sharing Agreement;

19

(x)     relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any Owned Real Property (whether by merger, sale of stock, sale of assets or otherwise);

(xi)     pursuant to which the Company or any of its Subsidiaries obtain or grant or, after giving effect to the Reorganization, shall obtain or grant, any licenses or other rights, or otherwise be restricted in any material respects, with respect to material Intellectual Property used in the Business (each such Contract, a "Material Company Intellectual Property Contract");

(xii)    after giving effect to the Reorganization, pursuant to which the Company or any of its Subsidiaries, as applicable, shall have agreed to provide any third party with access to Source Code for any Software owned or licensed by the Company or any of its Subsidiaries, or otherwise grants a license to such Source Code, for the benefit of a third party;

(xiii)   requires, or after giving effect to the Reorganization will require, the Company or any of its Subsidiaries to provide any funds to or make any investment in (in each case, in the form of a loan, capital contribution or similar transaction) any of the Company's Subsidiaries or other Person in excess of $1,000,000;

(xiv)   grants any rights of first refusal, rights of first negotiation or other similar rights to any Person with respect to the sale of any material business or assets of the Company and its Subsidiaries, taken as whole;

(xv)    relates to a leasehold, subleasehold interest in, or other right of occupancy with respect to, any Leased Real Property (including all Lease Documents);

(xvi)   is a collective bargaining agreement with any labor union or association, works council agreement, employee representative agreement or similar;

(xvii)  is a Senior Manager Employment Contract;

(xviii) is a Contract under which the Company has made an advance or loan to any current or former director, officer, employee or Affiliate thereof;

(xix)   grants any Person a material Lien on all or any part of the material tangible assets or properties of the Company or any of its Subsidiaries, other than Liens which will be released at or prior to the Closing and Permitted Liens;

(xx)    relates to material Intellectual Property Rights that will not be owned by the Company or any of its Subsidiaries following the Reorganization Completion and which, as of the date hereof, is used in connection with the ownership and operation of the Business, other than off-the-shelf software licenses or any non-exclusive licenses entered into in the Ordinary Course;

(xxi)   are with any Governmental Authority;

20

CONFIDENTIAL

FBG_CH1_00094283

(xxii)   after giving effect to the Reorganization, is between or among the Company or its Subsidiaries, on the one hand, and Seller or any Affiliate of Seller (other than the Company), on the other hand;

(xxiii)   is a power of attorney currently in effect and outstanding; or

(xxiv)   is otherwise a Contract as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would reasonably be expected to have a Material Adverse Effect.

Each Contract of a type described in clause (a) of this Section 4.12 is referred to herein as a "Company Material Contract."

(b)      Neither the Company nor any of its Subsidiaries nor any of their Affiliates is in (or has received any written claim of) breach of or default under the terms of any Company Material Contract, and, to the Knowledge of the Company, no event has occurred that with notice or lapse of time or both would constitute a breach or default thereunder by the Company or any of its Subsidiaries or any of their Affiliates, where such breach or default would, individually or in the aggregate, be material to the Company or any of its Subsidiaries.  To the Knowledge of the Company, no other party to any Company Material Contract (i) is in breach of or default under any material terms of any Company Material Contract; (ii) has provided any notice of default, termination, suspension, revocation or cancellation or is likely to terminate or curtail its relationship or dealings with the Company or any of its Subsidiaries, whether pursuant to a non-renewal or termination of any Contract or otherwise; (iii) has provided any written material complaint to the Company or any of its Subsidiaries or Seller regarding any services provided by or on behalf of the Company or any of its Subsidiaries under a Company Material Contract or (iv) intends to cancel or materially modify the terms of a Company Material Contract.  Except as set forth on Section 4.12(b) of the Disclosure Schedules, since January 1, 2021, no Material Customer or Material Supplier has materially reduced or otherwise materially modified its relationship or dealings with the Company or any of its Subsidiaries.  As of the date of this Agreement, each Company Material Contract is a valid and binding agreement of the Company or a Subsidiary or either of their respective Affiliates, as applicable, and, to the Knowledge of the Company, the other parties thereto, and is in full force and effect, subject to the Bankruptcy and Equity Exception.

4.13    Financial Statements and Related Matters.

(a)      Section 4.13 of the Disclosure Schedules contains copies of (i) the unaudited balance sheet, statement of income and changes in stockholders' equity and cash flows of the Company and its consolidated Subsidiaries as of and for the fiscal years ended December 31, 2023 (the "Most Recent Fiscal Year End") and December 31, 2022, in each instance, as if the Reorganization had occurred in advance of such applicable period, and (ii) the unaudited statement of income prepared by the management team of the Company with respect to the Company and its consolidated Subsidiaries for the three-month period ended March 31, 2024 (collectively, the "Financial Statements"). The Financial Statements have been prepared in accordance with IFRS. The Financial Statements do not misstate the consolidated financial position and results of operations of the Company (in each instance, as if the Reorganization had occurred in advance of

21

such applicable period) at the dates and for the periods indicated therein and are consistent with the books and records of the Company (except as expressly noted therein).

(b)     The Company has no liabilities, obligations, debts or commitments of any nature whatsoever, asserted or unasserted, known or unknown, fixed, absolute or contingent, accrued or unaccrued, matured or unmatured, direct or indirect, liquidated or unliquidated or otherwise (collectively, "Liabilities"), except (i) those which are adequately reflected or reserved against in the Financial Statements as of the Most Recent Fiscal Year End, (ii) those which have been incurred in the Ordinary Course since the Most Recent Fiscal Year End or (iii) those which are set forth on Section 4.13 of the Disclosure Schedules, which in each case of (i) and (ii), do not relate to a breach of Contract, a breach of warranty, a tort, an infringement, a violation of Law or an environmental Liability and are not, individually or in the aggregate, material in amount.

(c)     The books of account and other financial records of the Company and its Subsidiaries (i) have been maintained consistent with IFRS (and any other applicable legal and accounting requirements) and the Company and its Subsidiaries' practices for the period ending on the day prior to the Closing Date, using the same practices and procedures, with consistent classifications, judgments, estimations and other methodologies (including judgments as to loss and gain contingencies and materiality determinations) as used in such prior period and (ii) are in all material respects complete and correct and have been maintained in accordance with good business practice, including that the books and records reflect only actual transactions.  The Company and its Subsidiaries maintain a system of accounting controls sufficient to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in conformity with IFRS, and fairly and accurately present in all material respects results of operations and cash flows.  Neither Seller nor the Company or any of its Subsidiaries has identified or been made aware of (a) any significant deficiency or material weakness in the system of internal accounting controls utilized by the Company or any of its Subsidiaries or (b) any allegations or determinations of fraud, whether or not material, that involves the Company or any of its Subsidiaries' management or other employees who had a role in the preparation of the Financial Statements, or the internal accounting controls utilized in the Business, in each case during the last three (3) years.

4.14    Subsequent Events.  Since the Most Recent Fiscal Year End, except as otherwise set forth on Section 4.14 of the Disclosure Schedules (in each instance, as if the Reorganization had occurred in advance of the Most Recent Fiscal Year End):

(a)     The Business has been conducted and carried on only in the Ordinary Course;

(b)     There has been no event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(c)     Neither the Company nor any of its Subsidiaries nor any of their respective Affiliates has delayed or postponed the payment of accounts payable or other liabilities beyond their due date or accelerated the collection of any accounts receivable except in the Ordinary Course, in each instance, in connection with the ownership and operation of the Business;

22

CONFIDENTIAL                                                           FBG_CH1_00094285

(d)     Neither the Company nor any of its Subsidiaries nor any of their respective Affiliates have entered into, terminated or relinquished any rights under any Company Material Contract except in the Ordinary Course, in each instance, in connection with the ownership and operation of the Business;

(e)     Neither the Company nor any of their respective Affiliates has materially changed any accounting systems, policies, principles or practices (including any change in depreciation or amortization policies or rates) that in any material way affects the ownership and operation of the Business; and

(f)     Neither the Company nor any of its Subsidiaries have agreed to do any of foregoing.

4.15    Insurance.  Section 4.15 of the Disclosure Schedules sets forth and describes, prior to giving effect to the Reorganization, all policies of insurance and self-insurance arrangements which are currently maintained by or on behalf of the Company and its Subsidiaries or any of their Affiliates, with respect to the ownership and operation of the Business or the Real Property (the "Insurance Policies"). Each such policy of insurance is in full force and effect in accordance with its terms.  Neither Seller nor any of its Affiliates (including the Company) has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of the Insurance Policies.  All premiums due on the Insurance Policies have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy.  All the Insurance Policies (a) are valid and binding in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage.  None of Seller or any of its Affiliates (including the Company) is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any Insurance Policy.  The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Business and are sufficient for compliance with all applicable Laws and Contracts to which the Company is a party or by which it is bound.  Section 4.15 of the Disclosure Schedules sets forth any pending insurance claims under such Insurance Policies that have been denied insurance coverage or in respect of which there is an outstanding reservation of rights.

4.16    Licenses and Permits.  Section 4.16 of the Disclosure Schedules sets forth a true, correct and complete list of all material licenses, franchises, permits, operating authorities, state operating licenses or registrations and other interstate, intrastate, national or foreign regulatory licenses and other Governmental Authority authorizations held by the Company or any of its Subsidiaries or any of their Affiliates, after giving effect to the Reorganization, which represent all Permits necessary for the ownership and operation of the Business, including the current use and operation of the Business at the Real Property (collectively, "Permits").  The Permits are valid and in effect and neither the Company nor any of its Subsidiaries nor any of their respective Affiliates has received any written notice that any Governmental Authority intends to cancel, terminate or not renew any of the same.  The Company and its Subsidiaries are in compliance with the terms of the Permits in all material respects.

4.17    Environmental Matters.  Except as set forth on Section 4.15 of the Disclosure Schedules:

23

CONFIDENTIAL

FBG_CH1_00094286

(a)     The Company and each of its Subsidiaries and their respective Affiliates and the Business are, and for the past three (3) years have been, in compliance in all material respects with those Environmental Laws applicable to their respective operations in connection with the ownership and operation of the Business (including possessing and complying with any Environmental Permits required for their respective operations), and neither the Business, the Company nor any of its Subsidiaries nor any of their respective Affiliates has received any written notice, demand, letter or claim (that remains unresolved), or is subject to any pending or to the Knowledge of the Company, threatened Action, alleging that the Business or the Company or its Subsidiaries or such Affiliate (with respect to the ownership and operation of the Business) are in violation (in any material respect) of, or subject to material liability under, any Environmental Law.

(b)     Neither the Company nor any of its Subsidiaries nor any of their respective Affiliates has, within the past three (3) years (or earlier to the extent unresolved), received any written notice, demand or claim alleging liability on the part of the Business, the Company or any of its Subsidiaries or any such Affiliates as a result of a Release of Hazardous Substances in connection with the ownership and operation of the Business and neither the Business, the Company nor any of its Subsidiaries nor any of their respective Affiliates (in connection with the ownership and operation of the Business) has been responsible for the handling, manufacture, sale, distribution, transportation, storage, disposal or permitting the disposal, Release of, or exposure of any Person to, Hazardous Substances (including any products containing or emitting Hazardous Substances), including at, on or under any of the Owned Real Property or Leased Real Property, in each case, so as to give rise to a material liability under Environmental Laws on the part of the Business, the Company or any of its Subsidiaries.

(c)     Neither the Business nor the Company nor any of its Subsidiaries or their respective Affiliates (in connection with the ownership and operation of the Business) has assumed, undertaken, or provided an indemnity with respect to, any material liability of another Person under Environmental Laws.

(d)     Seller, the Company and its Subsidiaries have provided to Purchaser all final and non-privileged environmental reports, audits and assessments and other material environmental, health and safety documents, materially bearing on material liabilities of the Business or the Company and its Affiliates (in connection with the ownership and operation of the Business), in each case that are in their possession or under their reasonable control.

4.18    Tax Matters. Except as set forth on Section 4.18 of the Disclosure Schedules:

(a)     The Company and each of its Subsidiaries (i) has timely filed (taking into account any valid extension of time within which to file) all income and other material Tax Returns required to be filed by or with respect to it and all such filed Tax Returns are true, complete and accurate in all material respects, and (ii) has timely paid all material Taxes (whether or not shown on any Tax Return) to the extent due and payable before the Settlement Date, and all other unpaid accrued Taxes have been adequately provided for in the Financial Statements.

(b)     All material Taxes which the Company or any of its Subsidiaries has been required by law to withhold or to collect for payment from amounts owing to any employee,

24

FBG_CH1_00094287

independent contractor, creditor, equity holder or third party have been duly withheld and collected and have been paid to the appropriate Governmental Authority, to the extent due and payable, and have each complied in all material respects with all Tax information reporting provisions of all applicable Laws.

(c)     There are no Liens upon any property or assets of the Company or its Subsidiaries related to material Taxes, except for Permitted Liens.

(d)     There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection of assessment or reassessment of, Taxes due from the Company or any of its Subsidiaries for any taxable period and no request for any such waiver or extension is currently pending (other than any extension of the time to file a Tax Return obtained in the ordinary course of business).

(e)     There is no Action pending with respect to material Taxes imposed on, or material Tax matters relating to, the Company or any of its Subsidiaries, and neither the Company nor any of its Subsidiaries have been notified in writing that a taxing authority intends to commence any such Action, investigation, audit, examination, or assessment, and no claim in writing has been made by any Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that it is or may be subject to taxation by that jurisdiction, and all deficiencies for Taxes asserted or assessed in writing against the Company or any of its Subsidiaries have been fully and timely paid or settled.

(f)     Neither the Company nor any of its Subsidiaries is subject to taxation in any country, other than the country in which it was organized, by virtue of having a permanent establishment (within the meaning of an applicable income Tax treaty) or other fixed place of business in such other country.

(g)     Neither the Company nor any of its Subsidiaries has (i) participated in any "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2) (or any similar provision of state, local or foreign Tax Law) or (ii) taken any reporting position on a Tax Return, which reporting position (A) if not sustained would be reasonably likely, absent disclosure, to give rise to a penalty for substantial understatement of U.S. federal income Tax under Section 6662 of the Code (or any similar provision of state, local or non-U.S. Tax Law) and (B) has not adequately been disclosed on such Tax Return in accordance with Section 6662(d)(2)(B) of the Code (or any similar provision of state, local or non-U.S. Tax Law).

(h)     Neither the Company nor any of its Subsidiaries is a party to or bound by any Tax Sharing Agreement.

(i)     Neither the Company nor any of its Subsidiaries is or has been a member of an "affiliated group" (within the meaning of Section 1504(a) of the Code) filing a consolidated federal income Tax Return (or any similar state, local or non-U.S. filing group), and neither the Company nor any of its Subsidiaries has any liability for Taxes of any Person, other than members of any such group, under Treasury Regulation Section 1.1502-6, Treasury Regulation Section 1.1502-78 or any similar provision of state, local or non-U.S. Tax Law, as a transferee or successor, by contract or otherwise.

25

CONFIDENTIAL

FBG_CH1_00094288

(j)      Neither the Company nor any of its Subsidiaries has been a "distributing corporation" or a "controlled corporation" (within the meaning of Section 355(a)(1)(A) of the Code) in a distribution of shares intended to qualify in whole or in part for tax-free treatment under Section 355 of the Code or so much of Code Section 356 as relates to Code Section 355 (or any similar provisions of state, local or non-U.S. Law) (i) in the two (2) years prior to the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with this acquisition.

(k)      Neither the Company nor any of its Subsidiaries will be required to include in a taxable period ending after the Closing Date any material taxable income attributable to income that accrued in a taxable period prior to the Closing Date but was not recognized for Tax purposes in such prior taxable period (or to exclude from taxable income in a taxable period ending after the Closing Date any material deduction the recognition of which was accelerated from such taxable period to a taxable period prior to the Closing Date) as a result of (i) any installment sale or open transaction disposition made prior to the Closing, (ii) any change in method of accounting, or use of an improper method of accounting, with respect to a Pre-Closing Tax Period, (iii) any "closing agreement" within the meaning of Section 7121 of the Code (or any similar agreement under state, local or non-U.S. Law) executed prior to the Closing or (iv) any prepaid amount received or deferred revenue accrued outside of the Ordinary Course prior to the Closing.

(l)      The Company and each of its Subsidiaries have properly and timely documented their transfer pricing methodologies in material compliance with Sections 482 and 6662 of the Code (and any related sections), the Treasury Regulations promulgated thereunder and any comparable provisions of state, local or non-U.S. Tax Law.

(m)      Neither the Company nor any of its Subsidiaries has been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

4.19    Labor and Employee Benefits.

(a)      Seller has made available to Purchaser a complete and accurate list as of April 26, 2024 including the following information for each Company Employee: (i) employee name and ID; (ii) current employing entity; (iii) proposed employing entity; (iv) date of hire/continuous employment; (v) job title; (vi) exempt or non-exempt status (if applicable); (vii) base salary or wage rate; (viii) target bonus or incentive compensation information; (ix) visa status (if applicable); (x) status (i.e. active or inactive and, if inactive, the type of leave and estimated duration); (xi) annual leave entitlement and (xii) job location.  Set forth on Section 4.19(a) of the Disclosure Schedules is a list of all Company Service Providers and for each Company Service Provider: such Company Service Provider's (i) date of engagement; (ii) nature of services; (iii) work location; (iv) current remuneration terms; and (v) total remuneration paid in calendar year 2023. Each Company Employee is wholly or primarily assigned to the Business and there are no individuals who are not Company Employees who are wholly or primarily assigned to the Business. Each Company Service Provider has been properly classified as an independent contractor or agency worker in accordance with applicable Laws and no Company Service

26

Provider has a legal right or claim to be classified as an employee of the Company or its Subsidiaries.

(b)     Except as set forth on <u>Section 4.19(b)</u> of the Disclosure Schedules, no Company Employee or Company Service Provider is represented by any labor union, labor organization, works council or other employee representative body, and neither the Company nor any of its Subsidiaries is or has been a party to any collective bargaining agreement, works council agreement or any similar Contract, agreement or arrangement.  Neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby will (either alone or in combination with any other event) result in or give rise to any obligation to notify, inform, consult with or obtain the consent or approval of any Company Employee, union, labor organization, works council or other employee representative.

(c)     During the prior three (3) years, there have been no strikes, labor disputes, work stoppages, requests for representation, pickets, work slow-downs due to labor disagreements or any Actions or arbitrations that involve the labor or employment relations of the Company or any of its Subsidiaries, and no such matters are pending.  During the prior three (3) years, there has been no unfair labor practice charge or complaint pending before any applicable Governmental Authority relating to any Company Employee, Company Service Provider, former employee or former company service provider.  Except as set forth on <u>Section 4.19(c)</u> of the Disclosure Schedules, no labor organization or Company Employee has made a demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Company, threatened to be brought or filed, with the U.S. National Labor Relations Board or any other labor-related Governmental Authority.

(d)     With respect to the operation of the Business, Seller and each of its Affiliates (including the Company and its Subsidiaries) has (i) been in material compliance with all applicable Laws relating to employment, employment practices and labor, including, without limitation, all applicable Laws relating to wages, hours, overtime compensation, collective bargaining, works councils, information and consultation, employment discrimination, harassment, retaliation, safety and health, equal employment opportunities, fair employment practices, disability rights or benefits, immigration, Form I-9 requirements (including mandatory E-Verify obligations), holiday pay, employee and independent contractor classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, workers' compensation, leaves of absence, paid sick leave, and unemployment insurance; and (ii) withheld all Taxes required to have been withheld or collected and paid in connection with any amounts paid or owing to any Company Employee, former employee, Company Service Provider or former company service provider, and complied in all material respects with all associated reporting requirements under applicable Law.

(e)     Except as set forth on <u>Section 4.19(e)</u> of the Disclosure Schedules, there are no complaints, charges or claims against Seller or any of its Affiliates (including the Company and its Subsidiaries) pending or, to the Knowledge of the Company, threatened to be brought or filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment, engagement or termination of any Company Employee, former employee, Company Service Provider or former company service provider.  Neither the

27

CONFIDENTIAL

FBG_CH1_00094290

Company nor any of its Subsidiaries has taken any action that would constitute a "collective redundancy" under applicable Law or a "mass layoff" or "plant closing" within the meaning of the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act"), or any similar foreign, state or local statute, rule or regulation, nor has any such mass layoff or plant closing with respect to any Company Employees been planned or announced. The Company and its Subsidiaries have complied with all applicable Law in relation to any "collective redundancy" or "mass layoff". Neither the Company nor any of its Subsidiaries has incurred any liability under the WARN Act or any similar foreign, state, or local statute, rule or regulation that remains unsatisfied.

(f)      (i) No Company Employee, former employee, Company Service Provider or former service provider has made, and, to the Knowledge of the Company, there are no facts that would reasonably be expected to result in, any allegation of harassment (including harassment on the basis of sex, gender or race) or employment discrimination against Seller or any of its Affiliates (including the Company and its Subsidiaries), or against any Company Employee, former employee, Company Service Provider or former service provider; and (ii) neither Seller nor any of its Affiliates (including the Company and its Subsidiaries) has entered into any settlement agreements related to allegations of harassment (including harassment on the basis of sex, gender or race) or employment discrimination. Neither the Company nor any of its Subsidiaries has any liability (accrued, contingent or otherwise) with respect to any acts of harassment (including but not limited to harassment on the basis of sex/gender or race), sexual misconduct or employment discrimination involving any Company Employee or former employee, or any Company Service Provider or former company service provider.

(g)      To the Company's Knowledge, (i) no Senior Manager has any plans to terminate his, her or their employment or relationship with the Business and (ii) there are no agreements between any Company Employee and any other Person which would restrict, in any manner, such Company Employee's ability to perform services for the Company, Purchaser or any of their respective Affiliates following the Closing or the right of any of them to compete with any Person or the right of any of them to sell to or purchase from any other Person.

(h)      With respect to each Benefit Plan, the Company has made available to Purchaser a true, correct and complete copy of: (i) each such Benefit Plan and all amendments thereto; (ii) each trust, insurance or material administrative services agreement relating to each such Benefit Plan; (iii) the most recent summary plan description of each such Benefit Plan and any summaries of material modifications thereto, if applicable; and (iv) the most recent determination, advisory or opinion letter, if applicable, issued by the U.S. Internal Revenue Service (the "IRS") with respect to any Benefit Plan intended to be qualified under Section 401(a) of the Code. Section 4.19(h) of the Disclosure Schedules sets forth a true, complete and accurate list of all Benefit Plans and separately identifies each Company Benefit Plan and each Seller Benefit Plan.

(i)      Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable and current determination letter from the IRS, or with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that each such Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from U.S. federal income Taxes under Sections 401(a) and 501(a), respectively, of the

28

Code, and, to the Company's Knowledge, no event has occurred and no condition exists that would be reasonably likely to adversely affect or result in the revocation of any such determination or cause the imposition of any material liability, penalty or Tax under ERISA or the Code with respect to such determination.

(j)     Except as provided in Section 4.19(j) of the Disclosure Schedules, (i) each Benefit Plan has been established, maintained, funded and administered in compliance in all material respects with its terms and all applicable Laws, including, without limitation, ERISA and the Code; and (ii) there are no Actions, investigations, or audits (except for routine claims for benefits) pending, or to the Company's Knowledge, threatened with respect to any Benefit Plan. Following the Closing, neither Purchaser nor the Company nor any of its or their respective Affiliates shall have any liability in respect of any Seller Benefit Plan.

(k)     With respect to each Benefit Plan, all contributions, distributions, reimbursements and premium payments that are due have been timely made in all material respects in accordance with the terms of such Benefit Plan and in compliance with the requirements of applicable Law.

(l)     Except as provided in Section 4.19(l) of the Disclosure Schedules, no Benefit Plan provides for post-employment or retiree health benefits, except to the extent required by applicable Laws.  Neither of the Company nor, to the Company's Knowledge, any ERISA Affiliate or fiduciary has any liability for breach of fiduciary duty or any other failure to comply with the requirements of ERISA, the Code or any other applicable Laws in connection with the administration or investment of the assets of any Benefit Plan.

(m)     Except as provided in Section 4.19(m) of the Disclosure Schedules, no Benefit Plan is and neither the Company nor any ERISA Affiliate has any liability with respect to (i) a "defined benefit plan" (within the meaning of Section 3(35) of ERISA, whether or not subject to ERISA), or any other plan, program or arrangement subject to Title IV of ERISA; or (ii) a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).  No Benefit Plan is, and the Company has no liability with respect to, a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA).

(n)     Each Benefit Plan subject to Section 409A of the Code has been operated and administered in compliance in all material respects with and is in written form in compliance in all material respects with Section 409A of the Code and any applicable regulatory guidance promulgated thereunder.  Neither the Company nor any of its Subsidiaries has any obligation to gross-up, indemnify, reimburse or otherwise make whole any individual for any Tax or related interest or penalties incurred by such individual, including under Sections 409A or 4999 of the Code.

(o)     Except as set forth in Section 4.19(o) of the Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (whether alone or in connection with any other event) result in or cause: (i) any Company Employee or Company Service Provider to become entitled to severance pay or any other payment; (ii) the accelerated vesting, funding or delivery of any payment or benefit or increase the amount of compensation or benefit due to any Company

29

FBG_CH1_00094292

Employee or Company Service Provider; (iii) limit or restrict the right of the Company or any of its Subsidiaries to merge, amend, or terminate any Company Benefit Plan; (iv) reduce or extend the notice period applicable to any Company Employee or Company Service Provider, or (v) result in any forgiveness of indebtedness.  Seller has made available to Purchaser an up-to-date copy of each policy or document providing for payments or benefits on termination of employment by reason of redundancy and severance payments or benefits which exceed entitlements for Company Employees under applicable Law and if no such policies or documents exist, a description of the custom and practice that applies to Company Employees.

(p)     Neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in or cause any payment or benefit to any Person that would not be deductible under Section 280G of the Code or that would be subject to excise Tax under Section 4999 of the Code.

(q)     Each Benefit Plan that is subject to the Laws of a jurisdiction outside of the United States or that covers any Company Employee or Company Service Provider residing and working outside the United States (a "Foreign Benefit Plan"), that is required to be registered or approved by any Governmental Authority has been so registered and approved and has been maintained in good standing with applicable requirements of Law, and, if intended to qualify for special Tax treatment, has so qualified for special Tax treatment.  No Foreign Benefit Plan is a defined benefit plan (as defined in ERISA, whether or not subject to ERISA), seniority premium, termination indemnity, provident fund, gratuity or similar plan or arrangement or has any material unfunded or underfunded liabilities.  All Foreign Benefit Plans that are required to be funded, are fully funded, and adequate reserves have been established with respect to any Foreign Benefit Plan that is not required to be funded.

4.20    Real Property.

(a)     Section 4.20(a) of the Disclosure Schedules lists the common street address for all real property which the Company or any Subsidiary will own good and marketable fee simple (or local equivalent) title to, following the Reorganization Completion and at the Closing (the "Owned Real Property") in each case free and clear of all Liens, other than Permitted Liens. Ownership of all such Owned Real Property has been, and after the Reorganization Completion and at the Closing will be, duly registered in accordance with applicable Law in favor of the Company or such Subsidiary.  Neither the Company nor any Subsidiary (i) owns any real property other than the Owned Real Property or (ii) has granted any outstanding options or rights of first refusal to purchase any such Owned Real Property, or any portion thereof or interest therein.  True, correct and complete copies of all deeds, title policies, title reports and other ownership documentation and surveys (if any) that are in Seller's possession or control and cover any of the Owned Real Property have been made available to Purchaser.

(b)     Section 4.20(b) of the Disclosure Schedules lists the common street address for all real property in which the Company or any Subsidiary will hold a leasehold or subleasehold interest or other right of occupancy following the Reorganization Completion and at the Closing (the "Leased Real Property" and together with the Owned Real Property, collectively, the "Real Property") and lists the Contract pursuant to which each such interest or right exists (including

30

**DEBTORS' EXHIBIT NO. 239**
**Page 34 of 193**

each amendment, modification, extension, assignment and guaranty related thereto) (collectively, the "Lease Documents").  The Company or a Subsidiary holds, and following the Reorganization Completion and at the Closing will hold, a valid leasehold or subleasehold interest or other right of occupancy in all Leased Real Property in each case free and clear of all Liens, other than Permitted Liens.  The Real Property constitutes all real property interests owned or leased by the Company or any Subsidiary.  Except as set forth on Section 4.20(b) of the Disclosure Schedule, no person is in possession of the Real Property other than the Company or any Subsidiary.  True, correct and complete copies of all Lease Documents have been made available to Purchaser.

(c)      There are no Actions, including any condemnation or rezoning proceedings pending or, to the Knowledge of the Company, threatened with respect to the Real Property or any portion thereof, or any sale or other disposition in lieu of condemnation.

(d)      Except as set forth on Section 4.20(d) of the Disclosure Schedules, (i) with respect to the Owned Real Property, all buildings and other improvements, and all fixtures located on the Owned Real Property, including all mechanical, electrical and other systems are and (ii) with respect to the Leased Real Property, to the Knowledge of the Company, all buildings and other improvements, and all fixtures located on the Leased Real Property, including all mechanicals, electrical and other systems are: (y) in good operating condition in all material respects and in a state of good and working maintenance and repair in all material respects, ordinary wear and tear excepted and having regard to the use and age of such buildings, improvements, fixtures and systems, and (z) are in all material respects adequate for use in the operation of the Business as currently conducted.  To the Knowledge of the Company, none of such buildings and other improvements encroaches onto any adjoining property owned by others or public rights of way, or violates any building set-back lines that would, individually or in the aggregate, reasonably be expected to cause a Material Adverse Effect.  To the Knowledge of the Company, each Real Property has direct access to a public street or road adjoining such property.

(e)      The Real Property is adequately serviced by all utilities sufficient to operate the Business as currently conducted thereon.

(f)      No Company or Subsidiary has received written notice of any assessments for public improvements currently affecting or pending against any Owned Real Property, and, to the Knowledge of the Company, there are no assessable public improvements which have been ordered by any Governmental Authority to be made, and which have not heretofore been assessed.

(g)      Lumileds Poland SA, a wholly-owned Subsidiary of the Company after giving effect to the Reorganization in accordance with the terms hereof, is not an owner or perpetual usufructuary of any agricultural real estate and Lumileds Poland SA is not an owner, perpetual usufructuary or lessee of any real estate located in seaports.

4.21    Suppliers; Customers.

(a)      Suppliers.  Section 4.21(a) of the Disclosure Schedules sets forth the ten (10) largest suppliers of the Business (based on dollar amounts of products and services supplied to the Business) (the "Material Suppliers") for the twelve months ended December 31, 2023, and the amounts for which such Material Suppliers invoiced the Company and its Subsidiaries during

31

FBG_CH1_00094294

such period.  Except as set forth in Section 4.21(a) of the Disclosure Schedules, (i) all Material Suppliers continue to be suppliers of the Business; (ii) neither the Company nor any of its Subsidiaries have received any written notice, nor does the Company otherwise have Knowledge, that any Material Supplier will reduce materially its business with the Business from the levels achieved during the twelve months ended December 31, 2023; (iii) no Material Supplier has terminated its relationship with the Business or, to the Company's Knowledge, threatened to do so; and (iv) neither the Company nor any of its Subsidiaries nor any of their Affiliates is involved in any material claim, dispute or controversy with any Material Supplier with respect to the ownership and operation of the Business.

(b)     Customers.  Section 4.21(b) of the Disclosure Schedules sets forth the ten (10) largest customers of the Business (based on dollar amounts of the Company Products purchased from the Business) (the "Material Customers") for the twelve months ended December 31, 2023, and the amounts for which the Business invoiced such Material Customers during such period.   Except as set forth in Section 4.21(b) of the Disclosure Schedules; (i) all Material Customers continue to be customers of the Business; (ii) neither the Company nor any of its Subsidiaries have received any written notice, nor does the Company otherwise have Knowledge, that any Material Customer will reduce materially or has threatened to reduce its business with the Business from the levels achieved during the twelve months ended December 31, 2023; (iii) no Material Customer has terminated its relationship with the Business or, to the Company's Knowledge, threatened to do so; and (iv) neither the Company or any of its Subsidiaries nor any of their Affiliates is involved in any material claim, dispute, disagreement or controversy with any Material Customer with respect to the ownership and operation of the Business.

4.22     Product and Service Warranty and Liability; Safety.

(a)     To the Knowledge of the Company, since January 1, 2021, except as set forth on Section 4.22 of the Disclosure Schedules, (i) there has been no pattern of defects in the design, construction, manufacture, packaging or labeling of any product to be distributed by Company or any of its Subsidiaries with respect to the Business and (ii) each product to be sold by Company or any of its Subsidiaries with respect to the Business that is currently being used has been designed, constructed, manufactured, packaged, installed and labeled in compliance in all material respects with all applicable Laws, and neither Company nor any of its Subsidiaries has received any written notice (or to the Knowledge of the Company, oral notice) of any alleged material noncompliance with any such applicable Law, and (iii) no product to be designed, manufactured, sold, leased, or delivered by the Company or any of its Subsidiaries with respect to the Business is subject to any guaranty, warranty, or other indemnity or similar liability beyond the applicable standard terms and conditions of the provision of services, or sale or lease of equipment.

(b)     To the Knowledge of the Company, except as set forth on Section 4.22 of the Disclosure Schedules, there is no reasonable indication for any present or future Action against the Company or any of its Subsidiaries giving rise to any Liability arising out of or relating to (i) any defect or other deficiency (whether of design, materials, workmanship, labelling instructions or otherwise) with respect to any product or service to be distributed, provided or sold by the Company or any of its Subsidiaries with respect to the Business, (ii) any material product liability or material warranty claims relating to the Business or (iii) any injury to individuals or property as

32

FBG_CH1_00094295

a result of the ownership, possession or use of any the products or services to be distributed, provided or sold by the Company or any of its Subsidiaries with respect to the Business. Neither the Company nor any of its Subsidiaries has been required to file, and has not filed, a notification or other report with any Governmental Authority concerning actual or potential hazards with respect to any of the products to be sold by or services to be provided by Company or any of its Subsidiaries with respect to the Business.

(c)     Section 4.22(c) of the Disclosure Schedules sets forth, since January 1, 2021, (i) an accurate description of any claim made or threatened in writing to the Company or any of its Subsidiaries and that remains unresolved alleging deficiencies in the quality of products or services to be provided by the Company or any of its Subsidiaries with respect to the Business, in respect of which an amount with respect to such claim, individually or in the aggregate, exceeds $1,000,000 and would reasonably be expected to be payable to any customer of the Business to resolve such claim and (ii) an accurate list of any credits for alleged deficiencies in the quality of services to be provided by the Company or any of its Subsidiaries with respect to the Business, on an individual basis, issued by the Company or any of its Subsidiaries to any customer of the Business in the last three years in excess of $1,000,000 (excluding any administrative or billing credits).

(d)     Except as would not reasonably be expected to be material to the Company and its Subsidiaries, individually or in the aggregate, there have been no product recalls, withdrawals or seizures with respect to any products to be manufactured, sold or delivered by the Company or any of its Subsidiaries with respect to the Business in the conduct of the Business.

4.23     Inventory. All inventory of the Company and its Subsidiaries with respect to the Business (the "Inventory") is merchantable and fit for the purpose for which such Inventory was procured or manufactured and conforms in all material respects with all applicable specifications and warranties. All Inventory consists of a quality and quantity usable and saleable (and if saleable, is saleable at values not less than the book value amounts thereof (except to the extent adequately reserved in the Financial Statements)) in the Ordinary Course consistent with past practice (but in any event within twelve (12) months following the Closing), except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established and reflected on the Financial Statements (and such reserves have been calculated in a manner consistent with the Company and its Subsidiaries' past custom and practice) (the "Inventory Exceptions"). None of the Inventory is obsolete, damaged, defective or slow-moving, subject only to the Inventory Exceptions. Except as set forth on Section 4.23 of the Disclosure Schedules or as subject to factoring arrangements, after giving effect to the Reorganization and at Closing, all Inventory will be owned by the Company or one of its Subsidiaries, and is free and clear of all Liens (other than Permitted Liens), and no Inventory will be held on a consignment basis.

4.24     Accounts Payable, Accounts Receivable.

(a)     All of the accounts receivable, accounts payable and accrued Liabilities, in each case reflected in Financial Statements or incurred since the date of the interim balance sheet, have arisen from bona fide transactions in the Ordinary Course (and relate solely to sales of goods or services to customers of the Company and its Subsidiaries, none of whom are Seller or any

33

FBG_CH1_00094296

Affiliates of the Company, its Subsidiaries or Seller) and have been reduced by sufficient reserves, in accordance with IFRS, for bad debts, returns, allowances and customer promotional allowances reflected on the Financial Statements.  All of the accounts and notes receivable of the Company and its Subsidiaries are, in the aggregate, collectible in full, net of the reserve therefor, in the Ordinary Course.  Except for factoring arrangements, no counter claims, defenses, offsetting claims or adjustments with respect to the accounts or notes receivable of the Company and its Subsidiaries are pending or threatened that would be material to the Company as a whole.

(b)     To the Company's Knowledge, there is no contest, claim, defense, or right of setoff (i) with any obligor of any of the accounts receivable; or (ii) as to the amount or validity of such accounts receivable.

(c)     Since the Most Recent Fiscal Year End, neither the Company nor any of its Subsidiaries or Affiliates has (i) collected its accounts receivable other than in the Ordinary Course; (ii) accelerated or otherwise altered its collection practices; or (iii) written off or written down any of its accounts receivable, in each instance, with respect to the ownership and operation of the Business.

(d)     The Company and each of its Subsidiaries and Affiliates has paid its accounts payable in the Ordinary Course.

4.25     Brokers.  Except as set forth in Section 4.25 of the Disclosure Schedules (all of which shall be paid by Seller or an Affiliate thereof at or prior to Closing without liability to Purchaser), the Company has no liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

4.26     Acknowledgement of No Other Representations or Warranties.  The Company acknowledges and agrees that, (i) except for the representations and warranties contained in Article V, neither Purchaser nor any of its Affiliates or Representatives makes or has made, nor is the Company relying on, and expressly disclaims any reliance on, any representation or warranty, either express or implied, concerning Purchaser or any of its businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise) or prospects or the transactions contemplated by this Agreement, and (ii) Purchaser hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Purchaser or any of its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Company by any Representative of Purchaser) except for the representations and warranties expressly set forth in Article V.  Subject to all of the foregoing provisions of this Section, each of Seller, the Company and Purchaser retain all of their respective rights and remedies with respect to claims based on Fraud.

34

FBG_CH1_00094297

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Company and Seller as of the date hereof and as of the Closing as follows:

5.1     Organization.  Purchaser is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization.  Purchaser has the requisite power and authority to own, lease and operate its properties and assets and to carry on its business as it is now being conducted, except where the failure to have such power and authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

5.2     Authority.  Purchaser (a) has the respective right and power to enter into, and perform its obligations under, this Agreement and each other agreement delivered in connection herewith to which it is a party and (b) has taken all requisite action to authorize (i) the execution, delivery and performance of this Agreement and each such other agreement delivered in connection herewith to which it is a party and (ii) the consummation of the Sale and other transactions contemplated by this Agreement and each such other agreement delivered in connection herewith to which it is a party.  This Agreement has been duly executed and delivered by Purchaser and, assuming the due authorization, execution and delivery of this Agreement by each other parties hereto, is binding upon, and legally enforceable against, Purchaser in accordance with its terms, subject to the Bankruptcy and Equity Exception.

5.3     No Violations and Consents.

(a)     None of the execution, delivery or performance of this Agreement by Purchaser or the consummation by Purchaser of the transactions contemplated by this Agreement will: (i) conflict with or violate any provision of the charter, bylaws or any equivalent organizational or governing documents of Purchaser; (ii) assuming that all consents, approvals and authorizations described in Section 5.3(b) have been obtained and all filings and notifications described in Section 5.3(b) have been made and any waiting periods thereunder have terminated or expired, conflict with or violate any Law applicable to Purchaser or any of its properties or assets; or (iii) require any consent or approval under, violate, conflict with, result in any breach of or any loss of any benefit under, or constitute a default under (with or without notice or lapse of time, or both), or result in termination or give to others any right of termination, vesting, amendment, acceleration, cancellation, purchase or sale of, or result in the triggering of any payment or in the creation of a Lien upon any of the properties or assets of Purchaser pursuant to, any Contract to which Purchaser is a party (or by which any of its properties or assets is bound) or any Permit held by it except, with respect to clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     None of the execution, delivery or performance of this Agreement by Purchaser or the consummation by Purchaser of the transactions contemplated by this Agreement will require (with or without notice or lapse of time, or both) any consent, approval, authorization or permit of, or filing or registration with or notification to, any Governmental Authority, other

35

CONFIDENTIAL                                                          FBG_CH1_00094298

than (i) such filings as may be required in connection with the payment of any transfer and gain Taxes, (ii) compliance with any applicable requirements of Antitrust Laws or FDI Laws including the DPA, (iii) compliance with, and such filings, consents, approvals, authorizations or registrations as set forth on Section 5.3(b) of the Disclosure Schedules and (iv) where the failure to obtain such consents, approvals, authorizations or permits of, or to make such filings, registrations with or notifications to, any Governmental Authority would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

5.4     Litigation.  As of the date hereof, there is no Action to which Purchaser or any of its Subsidiaries is a party pending or, to the Knowledge of Purchaser, threatened against Purchaser or any of its Subsidiaries that would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.  As of the date hereof, neither Purchaser nor any of its Subsidiaries are subject to any outstanding Order that, individually or in the aggregate, would reasonably be expected to prevent or materially delay the consummation of the transactions contemplated hereby.

5.5     Sufficient Funds.  Purchaser will have at Closing sufficient available cash on hand necessary to make the Closing Payment and pay an amount in cash equal to the Escrow Amount, each as contemplated by this Agreement.  The obligations of Purchaser under this Agreement are not subject to any conditions regarding Purchaser's or its Affiliates', or any other Person's ability to obtain financing for the consummation of the transactions contemplated by this Agreement.

5.6     Anti-Money Laundering and Sanctions.

(a)     To the Knowledge of Purchaser, none of the funds Purchaser will use to pay the Purchase Price constitutes funds obtained, directly or indirectly, in violation of applicable Anti-Money Laundering Laws.  For purposes of this Agreement, "Anti-Money Laundering Laws" shall mean all Laws related to money laundering and terrorist financing, including the Currency and Foreign Transactions Reporting Act of 1970 (31 U.S.C. Section 5211 et. seq., otherwise known as the Bank Secrecy Act), as amended by the USA PATRIOT Act of 2001, Pub. L. No. 107-56, and the Anti-Money Laundering Act of 2020, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(b)     Purchaser is not a Sanctioned Person.

5.7     Investment Intention.  Purchaser is acquiring the Shares for its own account, for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act, or any applicable state or foreign securities Laws. Purchaser understands that the Shares have not been registered under the Securities Act, or any applicable state or foreign securities Law, and cannot be sold unless subsequently registered under the Securities Act or applicable foreign securities Laws or pursuant to an applicable exemption therefrom and pursuant to state securities Laws, as applicable.

5.8     Brokers.  Purchaser has not entered into any agreement or arrangement entitling any broker, finder, investment banker or financial advisor to any broker's or finder's fee or

CONFIDENTIAL

FBG_CH1_00094299

commission in connection with the transactions contemplated by this Agreement for which the Company, Seller or their Affiliates would be responsible.

5.9     Acknowledgement of No Other Representations or Warranties.

(a)     Purchaser has conducted its own independent investigation, verification, review, and analysis of the businesses, operations, results of operations, financial condition, assets, liabilities, and prospects of the Company and its Subsidiaries, to the extent necessary and appropriate for Purchaser to make a fully informed decision with respect to whether to enter into this Agreement and to consummate the transactions contemplated by this Agreement. Purchaser acknowledges and agrees that it and its Affiliates and Representatives have been provided with all access that it needs or has requested to the personnel, properties, and records of the Company and its Subsidiaries and that such access was sufficient to allow Purchaser to conduct and complete a comprehensive investigation, verification, review, and analysis of the Company and its Subsidiaries before Closing.

(b)     Purchaser acknowledges and agrees that, except for the representations and warranties contained in Article III, Article IV and any other ancillary agreements executed in connection herewith, (i) neither Seller, the Company, the Subsidiaries of the Company, nor any of their respective Affiliates or Representatives makes or has made, nor is Purchaser relying on, and Purchaser expressly disclaims any reliance on, any representation or warranty, either express or implied, of any kind whatsoever, including without limitation any representation or warranty concerning (x) Seller, the Company, or any of its Subsidiaries; (y) any of Seller's, the Company's, or any of their Subsidiaries' respective businesses, operations, assets, liabilities, results of operations, condition (financial or otherwise), or prospects; or (z) the transactions contemplated by this Agreement, and (ii) except with respect to claims based on Fraud, Seller, the Company, the Subsidiaries of the Company and each of their respective Affiliates and Representatives hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information communicated, or furnished (orally or in writing) by Seller, the Company, the Subsidiaries of the Company and each of their respective Affiliates and Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any Representative of Seller, the Company or any of their respective Subsidiaries or Affiliates).

(c)     Without limiting the generality of clauses (a) and (b) above, Purchaser acknowledges and agrees that (i) in connection with its investigation of the Company and its Subsidiaries, Purchaser has received from or on behalf of Seller and the Company certain projections, including projected statements of operating revenues and income from operations of the Company and its Subsidiaries and certain business plan information of the Company and its Subsidiaries, (ii) there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, and that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy and completeness of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), (iii) neither Seller nor the Company (nor any of their Subsidiaries, Affiliates, or Representatives) make any representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates,

37

FBG_CH1_00094300

projections and forecasts), and Purchaser has not relied thereon, and (iv) except with respect to claims based on Fraud, Purchaser will have no claim against Seller, the Company or any other Person with respect thereto.

(d)     Notwithstanding the foregoing provisions of this Section 5.9, each of Seller, the Company, and Purchaser retains all of its rights and remedies with respect to claims based on Fraud.

## ARTICLE VI
## COVENANTS

6.1     Conduct of Business by the Company Pending the Sale.  Seller and the Company agree that, between the date of this Agreement and the Closing, except as set forth in Section 6.1 of the Disclosure Schedules, as expressly required by any other provision of this Agreement (including to the extent required to effectuate the Reorganization as contemplated hereunder), as required by and in accordance with the terms and conditions of any Contract entered into on or before the date hereof by Seller, the Company or any of their respective Subsidiaries or any Affiliate thereof with regard to the operation of the Business (which Contracts have been made available to Purchaser), or as required by applicable Law or by any Governmental Authority of competent jurisdiction, unless Purchaser shall otherwise agree in writing (which agreement shall not be unreasonably withheld, delayed or conditioned), the Company shall, and shall cause each of its respective Subsidiaries and Affiliates to conduct the Business in all material respects in the Ordinary Course.  Without limiting the foregoing, except as set forth in Section 6.1 of the Disclosure Schedules, as expressly required by any other provision of this Agreement (including to the extent required to effectuate the Reorganization as contemplated hereunder), as required by and in accordance with the terms and conditions of any Contract entered into on or before the date hereof by Seller, the Company or any of their respective Subsidiaries or any Affiliate thereof with regard to the Business (which have been made available to Purchaser), or as required by applicable Law, or by any Governmental Authority of competent jurisdiction, the Company shall not, and shall cause each of its Subsidiaries not to, between the date of this Agreement and the Closing, as applicable:

(a)     cause the Company or any of the Subsidiaries to amend their respective Organizational Documents, except for non-material amendments made solely for administrative purposes;

(b)     issue or dispose of or authorize the issuance or disposition of any equity securities or equity-based awards in the Company or any of its Subsidiaries, or securities convertible into, or exchangeable or exercisable for, any such equity securities or awards, or any rights of any kind to acquire any such equity securities or such convertible or exchangeable securities;

(c)     (i) sell, pledge, dispose of, transfer, lease, license or encumber (except for Permitted Liens) any personal property, equipment or assets (except as set forth in clause (ii) below) of the Company or any of its Subsidiaries (or any of their respective Affiliates used solely in connection with the ownership and operation of the Business) with a value or purchase price in excess of $500,000 individually or $500,000 in the aggregate or (ii) sell, pledge, dispose of,

38

CONFIDENTIAL

transfer, lease, license or create or impose any Liens (other than Permitted Liens) on any assets or property with a value or purchase price in excess of $500,000 individually or $500,000 in the aggregate except for in connection with the incurrence of any Indebtedness for borrowed money permitted to be incurred by the Company or its Subsidiaries pursuant to Section 6.1;

(d)  declare, set aside, make or pay any dividend or other distribution with respect to the capital stock or equity interests of the Company or any of its Subsidiaries, except for (i) cash dividends, or (ii) dividends paid by a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary of the Company;

(e)  reclassify, combine, split, subdivide or amend the terms of, or redeem, purchase or otherwise acquire, directly or indirectly, any of its equity securities or any options, warrants, securities or other rights exercisable for or convertible into any such equity securities;

(f)  merge or consolidate the Company or any of its Subsidiaries with any Person or adopt a plan of complete or partial liquidation or resolutions providing for a complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries (except for a merger of one or more wholly-owned Subsidiaries with or into one or more other wholly-owned Subsidiaries);

(g)  acquire (including by merger, consolidation or acquisition of stock or assets) any interest in any Person (or equity interests thereof) or acquire in a single transaction or a series of related transactions, any assets, real property, personal property, equipment, business or other rights (whether by merger, stock purchase, asset purchase or otherwise), with a purchase price in excess of $500,000 individually or $500,000 in the aggregate except for acquisitions of inventory, personal property, equipment and vehicles having a value of not more than $500,000;

(h)  (i) incur, assume, refinance or guarantee any Indebtedness for borrowed money (except Indebtedness from the Company or one or its wholly-owned Subsidiaries to one or more of its wholly-owned Subsidiaries) or issue any debt securities, or assume or guarantee any Indebtedness for borrowed money of any Person, in any such case in excess of $1,000,000 in the aggregate or (ii) prepay, refinance or amend any Indebtedness, except for mandatory payments under the terms of any other Indebtedness of the Company or its Subsidiaries (following the Reorganization) and, in either case, for factored trade receivables;

(i)  make any loans, advances or capital contributions to, or investments in, any other Person (other than to any wholly-owned Subsidiary) that would reasonably be expected to affect the Company or any of its Subsidiaries following Closing;

(j)  (i) grant any equity or equity-based compensation or award to any Company Employee or Company Service Provider; (ii) establish, adopt, amend, modify or terminate any Company Benefit Plan; or (iii) increase the level of compensation, bonuses or benefits payable or to become payable to any Company Employee or Company Service Provider, other than normal merit increases in base compensation and employee health and welfare benefits made in the Ordinary Course, as provided in written Contracts or as required by applicable Law;

(k)  (i) hire, employ, engage or terminate any Company Employee or Company Service Provider with an annual salary or payments due (as applicable) above $75,000,

39

(ii) terminate any Senior Manager, (iii) transfer the employment of any Company Employee from the Company or its Subsidiaries or (iv) transfer the employment of any individual who is not a Company Employee from Seller or its Affiliates to the Company or its Subsidiaries;

(l)       enter into, establish, adopt, extend, amend, modify or terminate any collective bargaining agreement, works council agreement or other Contract with any labor union, labor organization, works council or other employee representative body, or recognize any labor union or labor organization as the bargaining representative for any Company Employees or Company Service Providers;

(m)      enter into any new Contract that, if entered into prior to the date of this Agreement, would have been required to be listed in Section 4.12(a) of the Disclosure Schedules as a Company Material Contract, amend in any material respect, fail to renew or terminate any Company Material Contract;

(n)       make any material change in accounting policies or procedures, other than as required by IFRS, applicable Law or any Governmental Authority of competent jurisdiction;

(o)       except as set forth in Section 6.1(o) of the Disclosure Schedules, make or commit to make any capital expenditures or enter into any Contract for any renovation, construction or capital expenditure; provided, however, that notwithstanding the foregoing, the Company and its Subsidiaries shall be permitted to make (i) Emergency Capital Expenditures in any amount not exceeding $500,000 individually or $1,000,000 in the aggregate and (ii) capital expenditures in any amount not exceeding $1,000,000 in the aggregate for all projects of the Company and its Subsidiaries disclosed in writing to Purchaser;

(p)       sell, assign, transfer, cancel, lapse, encumber, dedicate to the public, or license any material Company Intellectual Property, or permit the lapse of any right, title or interest to any material Company Intellectual Property, including any material Registered Intellectual Property, other than non-exclusive licenses granted by the Company or its Subsidiary in the Ordinary Course or terminate, cancel or amend any Material Company Intellectual Property Contract;

(q)       amend, modify or terminate, or allow to lapse, any material Permit required to be listed in Section 4.16 of the Disclosure Schedules;

(r)       modify, terminate, reduce the coverage maintained under, or otherwise adversely affect the Company's or any of its Subsidiary's rights to make any claim under any policy of insurance disclosed in Section 4.15 of the Disclosure Schedules;

(s)       enter into a new line of business or agree to restrict the business of the Company or any of its Subsidiaries in any respect (other than customary non-disclosure agreements in the Ordinary Course);

(t)       delay or postpone the payment of accounts payable or other liabilities beyond their due date or accelerate the collection of any accounts receivable except in the Ordinary Course, in each instance, in connection with the ownership and operation of the Business;

40

FBG_CH1_00094303

**DEBTORS' EXHIBIT NO. 239**
**Page 44 of 193**

(u)      settle any Action with respect to the Business if such settlement would require any payment by Company or any of its Subsidiaries an amount in excess of $250,000 individually or $250,000 in the aggregate, or would obligate Company or any of its Subsidiaries to take any material action with respect to the Business, or impose any material restrictions on the Business;

(v)      (i) make, change or revoke any material Tax election, (ii) file any amended income or other material Tax Return, (iii) settle or compromise any material Tax liability, (iv) surrender any right to claim a material Tax refund, (v) waive or extend any statute of limitations relating to any material Tax or Tax Return, (vi) enter into any voluntary disclosure agreement or program with any Governmental Authority relating to any material Taxes, (vii) enter into any "closing agreement" as described in Section 7121 of the Code (or any similar agreement under state, local or foreign Law) with respect to a material Tax liability or (viii) change any Tax accounting period or any method of Tax accounting;

(w)      amend or otherwise revise the Reorganization, as contemplated by Exhibit A; or

(x)      authorize or enter into any Contract to do any of the foregoing.

Nothing contained in this Agreement shall give Purchaser, directly or indirectly, the right to control or direct the operations of the Company prior to the Closing.  Prior to the Closing, the Company its Subsidiaries and their respective Affiliates shall exercise, consistent with the terms and conditions of this Agreement, complete unilateral control and supervision over the Business.

6.2      Access to Information.  From the date of this Agreement to the Closing, Seller and the Company shall, and shall cause each of the Company's Subsidiaries to: (a) provide to Purchaser and its Representatives reasonable access during normal business hours in such a manner as not to interfere unreasonably with the operation of the Business, upon reasonable prior written notice to the Company, to the officers, employees, properties, offices and other facilities of the Company and its Subsidiaries and, to the extent any of the foregoing is used in connection with the operation of the Business, Seller and each of its Affiliates, and to the books and records thereof; and (b) furnish promptly such information concerning the business, properties, Contracts, assets and liabilities of the Company and its Subsidiaries and, to the extent any of the foregoing is used in connection with the operation of the Business or the Reorganization (including, copies of all file histories, documents, certificates, office actions, correspondence, assignments, and other instruments relating to the Company Registered Intellectual Property), Seller and each of its Affiliates, in each case as Purchaser or its Representatives may reasonably request; provided, however, that (x) if the parties are in an adversarial relationship in litigation or arbitration, the access provided by this Section 6.2 will be subject to applicable rules relating to discovery; and (y) neither Seller nor the Company shall be required to (or to cause any of its Subsidiaries or Affiliates to) afford such access or furnish such information to the extent that Seller and the Company believe in good faith that doing so would: (i) result in the loss of attorney-client privilege; (ii) violate any obligations of Seller, the Company or any of the Subsidiaries or Affiliates of the Company with respect to confidentiality to any third party or otherwise breach, contravene or violate any then effective Contract to which Seller, the Company or any of the Subsidiaries or Affiliates of the Company is party; or (iii) breach, contravene or violate any applicable Law

41

FBG_CH1_00094304

(including any Antitrust Law or FDI Law) (<u>provided</u> that the Company shall use commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in the events set out in clauses (i) through (iii)).  Notwithstanding any of the foregoing, and subject to this Section 6.2, Seller shall, and shall cause each of the Company's Subsidiaries, to provide Purchaser and its Representatives access no later than five days from the date of this Agreement to all Company facilities, properties, employees, and officers, and to the books and records and other environmental, health and safety documents, for the purpose of conducting an environmental, health and safety site assessment and limited compliance evaluation. Purchaser shall, and shall cause each of its Subsidiaries and its and their respective Representatives to, hold all information provided or furnished pursuant to this <u>Section 6.2</u> confidential in accordance with the terms of the Confidentiality Agreement.  During any visit to the business or property sites of the Company or any of its Subsidiaries or Affiliates, Purchaser shall, and shall cause its Representatives accessing such properties to, comply with all applicable Laws and all of the Company's and its Subsidiaries' and Affiliates' written bona fide safety and security procedures provided to Purchaser in advance of such visit.   No investigation under this <u>Section 6.2</u> or otherwise shall affect any of the representations, warranties, covenants or agreements of Seller or the Company or any condition to the obligations of the parties hereto under this Agreement.  For a period of seven years following the Closing Date (or longer if required by applicable Law), Purchaser shall, and shall cause the Company and its Subsidiaries to, preserve and keep the records held by them relating to pre-Closing time periods and relating to the respective businesses of the Company and its Subsidiaries and shall make such records (or copies) at reasonable times and upon reasonable advance notice, to Seller, its Affiliates and its Representatives as may be reasonably requested by such Person in connection with any audit, accounting, tax or other similar need related to or in connection with Seller's prior ownership of the Company and its Subsidiaries.

      6.3     <u>Appropriate Action; Consents; Filings</u>.

      (a)     Subject to the terms and conditions of this Agreement, each party shall use its commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated hereby and to cause the conditions set forth in <u>Article VII</u> to be satisfied as promptly as practicable, including using their respective commercially reasonable efforts to (i) promptly obtain all actions or non-actions, consents, Permits, waivers, approvals, authorizations and Orders from Governmental Entities necessary or advisable in connection with the consummation of the transactions contemplated hereby, including under FDI Laws, (ii) as promptly as reasonably practicable, make and not withdraw (without Seller's consent) all registrations and filings with any Governmental Authority necessary or advisable in connection with the consummation of the transactions contemplated by this Agreement, and promptly make any further filings pursuant thereto that may be necessary or advisable, (iii) defend all lawsuits or other legal, regulatory, administrative or other proceedings to which it or any of its Affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect to each such lawsuit or other proceeding, (iv) seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the parties to consummate the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect thereto, (v) seek to resolve any objection or assertion by any Governmental Authority challenging this Agreement or

42

FBG_CH1_00094305

the transactions contemplated hereby; and (vi) execute and deliver any additional instruments necessary to consummate the transactions contemplated hereby.

(b)    Notwithstanding anything to the contrary set forth in this Agreement, and in furtherance and not in limitation of the foregoing, Purchaser shall use commercially reasonable efforts to (i) resolve, avoid or eliminate impediments or objections, if any, that may be asserted with respect to the transactions contemplated hereby under any Antitrust Law or FDI Law, or (ii) avoid the entry of, effect the dissolution of, and have vacated, lifted, reversed or overturned, any Order that would prevent, prohibit, restrict or delay the consummation of the transactions contemplated hereby so as to enable the parties hereto to close the transactions contemplated hereby expeditiously (but in no event after the Outside Date).  In no event shall the use of 'commercially reasonable efforts' pursuant to the immediately preceding sentence require Purchaser to (i) propose, negotiate, commit to and effect, by consent decree, hold separate orders or otherwise, the sale, divesture, disposition, or license of any assets, properties, businesses, products, product lines, rights, or services of Purchaser, its Subsidiaries or Affiliates, or the Company or its Subsidiaries or any interest or interests therein, and (ii) otherwise take or commit to take actions that after the Closing Date would limit Purchaser's or the Company's freedom of action with respect to, or its or their ability to retain, one or more of the assets, properties, businesses, product lines, or services of Purchaser, its Subsidiaries or Affiliates, or the Company, or its Subsidiaries or any interest or interests therein.

(c)    Without limiting the generality of the foregoing, each party hereto shall, subject to applicable Law: (i) respond as promptly as reasonably practicable to any inquiries received from, and supply as promptly as reasonably practicable any additional information or documentation that may be requested by any Governmental Authority with respect to the transactions contemplated by this Agreement, (ii) promptly notify the other party of any material communication between that party and any Governmental Authority in respect of any filings, investigation, inquiry or other proceeding relating to the transactions and of any material communication received or given in connection with any proceeding by a private party relating to the transactions, (iii) discuss with and permit the other party (and its counsel) to review in advance, and consider in good faith the other party's reasonable comments in connection with, any proposed filing or communication to any Governmental Authority or, in connection with any proceeding by a private party to any other Person, relating to any filing, investigation, inquiry or other proceeding in connection with the transactions contemplated by this Agreement, (iv) not participate or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Authority in respect of any filings, investigation or inquiry relating to any filing, investigation, inquiry, or other proceeding in connection with this Agreement or the transactions contemplated by this Agreement unless it consults with the other party in advance and, unless prohibited by such Governmental Authority, gives the other party the opportunity to attend and participate in such meeting, telephone call or discussion, and (v) furnish the other party promptly with copies of all correspondence, filings and communications relating to any filing, investigation, inquiry or other proceeding pursuant to any Antitrust Law or FDI Law between them and their Affiliates and their respective Representatives on the one hand, and any Governmental Authority or members of their respective staffs on the other hand, with respect to this Agreement or the transactions contemplated hereby.

43

CONFIDENTIAL

(d)     Each party agrees to promptly notify the other party (and in any event within two (2) Business Days) of any event, fact or circumstance of which such first party becomes aware that could reasonably be expected to result in the failure of a condition set forth in Article VII to be satisfied prior to the Closing Date and, if such condition is curable, to allow the applicable party a reasonable opportunity to satisfy such condition.

6.4     Directors & Officers Indemnification and Insurance.

(a)     Insurance.  At the Closing, and at Purchaser's sole cost and expense, Seller shall cause the Company to obtain and fully pay the premium for an insurance and indemnification policy that provides coverage for a period of six (6) years from and after the Closing for events occurring prior to the Closing (the "D&O Insurance") that is no less favorable in the aggregate to the intended beneficiaries thereof than the Company's or its Subsidiaries' existing directors' and officers' liability insurance policy.

(b)     Successors.   In the event the Company or Purchaser or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then and in either such case, proper provisions shall be made so that the successors, assigns or transferees of the Company or Purchaser shall assume the obligations set forth in this Section 6.4.

(c)     Benefit.  The provisions of this Section 6.4 are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party, his or her heirs, executors or administrators and his or her Representatives, shall be binding on all successors and assigns of the parties hereto and shall not be amended in a manner that is adverse to any Indemnified Parties (including their successors, assigns and heirs) without the consent of the Indemnified Party (including the successors, assigns and heirs) affected thereby.

(d)     Survival of Indemnification.  For a period of not less than six (6) years from the Closing, the Company and its Subsidiaries (as applicable) shall provide to each current or former director or officer (or equivalent) of the Company or any of its Subsidiaries and each fiduciary under benefit plans of the Company or any of its Subsidiaries (each an "Indemnified Party" and collectively, the "Indemnified Parties") the same rights to exculpation, indemnification and advancement of expenses as provided to the Indemnified Parties under the provisions of the Company's and its Subsidiaries' Organizational Documents as in effect immediately prior to the Closing and Company's and its Subsidiaries' Organizational Documents shall not contain any provisions contradictory to such rights.

(e)     Non-Exclusivity.  The provisions of this Section 6.4 are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.  Nothing in this Agreement, including this Section 6.4, is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Company, any of its Subsidiaries or the Indemnified Parties, it being understood and agreed that the indemnification provided for in this Section 6.4 is not prior to, or in substitution for, any such claims under any such policies.

CONFIDENTIAL

FBG_CH1_00094307

6.5     Employee Benefit Matters.  From and after the Closing and for a period of twelve (12) months following the Closing, Purchaser and its Affiliates (including the Company and its Subsidiaries) shall use commercially reasonable efforts to comply in all material respects with any obligations arising under applicable Law or Contract governing the maintenance or continued provision of employee benefits under the Benefit Plans.  Nothing contained in this Section 6.5 or elsewhere in this Agreement, express or implied, shall confer upon any current or former employee, director, manager, officer or consultant of the Company or any of its Subsidiaries any right to continued employment or service (or resumed employment or service) subsequent to the Closing or any third-party beneficiary rights under this Agreement.  Nothing in this Section 6.5 or elsewhere in this Agreement, express or implied, shall be deemed an amendment of any plan providing benefits to any Company Employee.

6.6     Intercompany Accounts and Affiliate Contracts.  Seller shall use commercially reasonable efforts to cause all Intercompany Accounts and all Contracts between Seller or any of its Affiliates (excluding the Company or any of the Company's Subsidiaries after giving effect to the Reorganization), on the one hand, and the Company or any of its Subsidiaries (after giving effect to the Reorganization) on the other hand, relating to the Business to be settled or terminated, as applicable, prior to Closing; provided, however, to the extent that any such Intercompany Accounts or Contracts cannot be settled or terminated, as applicable, prior to Closing, Purchaser and Seller shall effectuate the payment in full of such amounts in immediately available funds or termination of such Contracts, as applicable, as promptly as practicable following Closing.

6.7     Tax Matters.

(a)     Transfer Taxes.  The parties shall cooperate to timely prepare, execute and file, or cause to be timely prepared, executed and filed, all Tax Returns, questionnaires, applications or other documents regarding any real property transfer, sales, use, transfer, value added, stock transfer and stamp Taxes, any transfer, recording, registration and other fees and any similar Taxes which, in each case, become payable in connection with any transaction contemplated by this Agreement, the ancillary agreements and the other transactions contemplated hereby and thereby (together, with any related interests, penalties or additions to Tax, the "Transfer Taxes").  All such Transfer Taxes attributable to the Reorganization shall be paid by Seller.  From and after the Closing, all other Transfer Taxes shall be paid 50% by Purchaser and 50% by Seller.

(b)     Straddle Periods.  For purposes of this Agreement, in the case of any Taxes that are imposed on a periodic basis and payable for a Straddle Period, the portion of such Tax which relates to the portion of such Straddle Period ending on the close of business on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income, receipts, sales, use, or payroll, be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction (A) the numerator of which is the number of calendar days in the Straddle Period ending on the Closing Date and (B) the denominator of which is the number of calendar days in the entire Straddle Period and (ii) in the case of any Tax based upon or related to income, receipts, sales, or payroll, be deemed equal to the amount which would be payable if the relevant Straddle Period ended as of the close of business on the Closing Date.

(c)     Preparation of Tax Returns.  Purchaser shall prepare (or cause to be prepared) and timely file all Tax Returns of the Company or any of its Subsidiaries required to be

45

filed with any Governmental Authority after the Closing Date and shall pay (or cause to be paid) any Taxes due in respect of such Tax Returns. In the case of Tax Returns that are filed with respect to a Pre-Closing Tax Period (or portion thereof), Purchaser shall prepare such Tax Return in a manner consistent with past practice, except as otherwise required by applicable Law, and shall deliver a draft of any such Tax Return to Seller for its review and approval (not to be unreasonably withheld, conditioned or delayed) at least fifteen (15) Business Days prior to the date such Tax Return is required to be filed. If Seller objects, Seller shall provide such objection in writing to Purchaser within ten (10) Business Days of receipt of any such Tax Return, and Purchaser shall incorporate any reasonable comments received from Seller, Purchaser and Seller shall cooperate in good faith to resolve any remaining disagreement, and Purchaser shall not file any such Tax Return without the prior written consent of the Seller (which shall not be unreasonably withheld, conditioned, or delayed). With respect to any Tax Return filed with respect to any Pre-Closing Tax Period (whether such Tax Return was filed prior to or after the Closing Date), Seller shall be responsible for the Pre-Closing Taxes due in respect of such Tax Return to the extent that the aggregate amount of Pre-Closing Taxes due in respect of such Tax Returns exceeds the aggregate amount of Taxes previously included in Closing Working Capital and Indebtedness with respect thereto. Purchaser shall notify Seller of any amounts due from Seller in respect of any such Tax Return no later than ten days prior to the date on which such Tax Return is due (or promptly following such Tax being subsequently imposed, in the case of Tax Returns filed prior to the Closing Date), and Seller shall remit such payment to Purchaser no later than five days prior to the date such Tax Return is due (or within ten days following Purchaser providing notice of such Tax being imposed, in the case of a Tax Return filed prior to the Closing Date).

(d)     <u>Conduct of Tax Audits</u>.

(i)     If Purchaser, the Company or any of its Subsidiaries receives any letter, enquiry, notice, demand, determination, assessment or other document, or a Governmental Authority takes any action, in each case, with respect to a Pre-Closing Tax Period (the "<u>Tax Audit</u>"), or if any such entity is, or becomes, aware of any fact which affects, or which may affect, any assessment which may give rise to Adverse Consequences related to any Tax Audit, Purchaser shall, or shall procure that the Company or any of its Subsidiaries shall, notify Seller of the relevant facts as soon as practicable and in any case within ten (10) days of receipt thereof.

(ii)     On the giving of a notice referred to in <u>Section 6.7(d)(i)</u>, and to the extent the Tax Audit relates solely to Taxes for which (i) Seller or any of its direct or indirect beneficial owners would be liable under applicable Law, or (ii) a claim against Seller would be available under this Agreement, Seller shall be entitled to elect the conduct of any such Tax Audit at its own expense. If Seller makes such an election, Seller shall be entitled to resist such Tax Audit in the name of the Company or its Subsidiary and have the conduct of any objection, appeal, dispute, compromise or defense of the Tax Audit and of any incidental negotiations relating to them, but Purchaser shall have the right to participate in such Tax Audit at its own expense, Seller shall share all material correspondence regarding such Tax Audit with Purchaser, and Seller shall not settle, compromise or concede any portion of such Tax Audit that is reasonably likely to affect the Tax liability of the Company or any of its Subsidiaries for any taxable period (or portion thereof) beginning after the Closing Date without the consent of Purchaser, which consent shall not be unreasonably withheld, delayed or conditioned. Purchaser shall control the conduct of any other Tax Audit not otherwise described in this Section 6.7(d)(ii).

46

<b>DEBTORS' EXHIBIT NO. 239</b><br><b>Page 50 of 193</b>

(e)     Tax Cooperation.  Seller and Purchaser agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) in its possession and assistance relating to the Company and its Subsidiaries as is reasonably requested for the filing of any Tax Return and the preparation, prosecution, defense or conduct of any Tax Audit.  Seller and Purchaser shall reasonably cooperate with each other in the conduct of any Tax Audit or other proceeding involving or otherwise relating to the Company or its Subsidiaries (or their income or assets) with respect to Tax and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this section.  Any information obtained under this section shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or in the conduct of a Tax Audit or other Tax proceeding.

(f)     Tax Sharing Agreements.  Before or as of the Closing, Seller shall terminate (or partially terminate, as applicable) all Tax Sharing Agreements to which the Company or any of its Subsidiaries is a party.  Seller and its Affiliates shall not take any action with respect to Taxes after the Closing, without Purchaser's written consent (not to be unreasonably withheld, conditioned or delayed), that could reasonably be expected to give rise to Adverse Consequences with respect to the Company or any of its Subsidiaries.

(g)     Tax Elections.  Notwithstanding anything in this Agreement to the contrary, Purchaser shall have sole discretion to make any election under Section 338 or 336 of the Code (or any similar provision under state, local or non-U.S. Law) (a "Tax Election") with respect to Purchaser's acquisition of the Company or any of its Subsidiaries and Seller shall reasonably cooperate with Purchaser in making any such election. Prior to making any Tax Election, Purchaser shall notify Seller of Purchaser's intention to make a Tax Election.  Purchaser shall prepare and deliver to Seller a draft allocation of the portion of the Purchase Price (as finally determined pursuant to Section 1.6) that is allocable to the Company and/or the Subsidiaries, as applicable, to which such Tax Election relates (the "Tax Election Purchase Price Allocation") for Seller's review and comment. If Purchaser and Seller cannot agree on the Tax Election Purchase Price Allocation, Purchaser and Seller shall submit such calculations to an internationally recognized independent accounting firm jointly selected by Seller and Purchaser (the "Independent Auditor") to resolve their dispute in the manner provided by Section 1.6(b). The fees, costs and expenses of the Independent Auditor shall be allocated to and borne 50% by Purchaser and 50% by Seller. If Seller or any of its direct or indirect beneficial owners incurs any increased Tax liability or cost resulting from a Tax Election as compared to such Tax liability or costs that the Seller or any of its direct or indirect beneficial owners would have incurred if the Tax Election was not made (the "Increased Tax Liability"), Purchaser shall reimburse Seller or Seller's direct or indirect beneficial owners, as applicable, on an after-tax basis for such Increased Tax Liability. Within thirty (30) days following the final determination of the Tax Election Purchase Price Allocation, Seller will deliver to Purchaser a calculation of the Increased Tax Liability, if any, that would result to Seller or its direct or indirect beneficial owners if Purchaser were to make a Tax Election along with any information reasonably necessary for Purchaser to review such calculations, including any information reasonably requested by Purchaser to review such calculations.  If the Purchaser and Seller cannot agree on the Increased Tax Liability, the parties shall submit such calculations to the Independent Auditor for resolution in accordance with the procedures set forth in Section 1.6(b).  The fees, costs and expenses of the Independent Auditor shall be borne 50% by the Purchaser and 50% by the Seller. Seller and Purchaser will file all

47

FBG_CH1_00094310

federal, state, local and non-U.S. Tax Returns and any documents required to effect the Tax Election in accordance with the Tax Election Purchase Price Allocation.  Seller and Purchaser will not take, cause or permit to be taken, any action in connection with the filing of any Tax Return on behalf of the Company or any of its Subsidiaries, Seller, Purchaser or their Affiliates which would be inconsistent with the Tax Election or the Tax Election Purchase Price Allocation.

(h)     Post-Closing Actions.  Without the prior consent of Sellers (not to be unreasonably withheld, conditioned or delayed), Purchaser shall not, and Purchaser shall not permit any of its Affiliates or the Company or any of its Subsidiaries to: (i) except as permitted under Section 6.7(c), file, amend or modify any Tax Return of the Company or any of its Subsidiaries for or with respect to any Pre-Closing Tax Period; (ii) extend the applicable statute of limitations for any Tax Return or Taxes of the Company or any of its Subsidiaries for or with respect to any Pre-Closing Tax Period; (iii) except for any Tax Election made in accordance with Section 6.7(g), file, amend or revoke any Tax election with respect to the Company or any of its Subsidiaries for or with respect to any Pre-Closing Tax Period; (iv) enter into any closing agreement within the meaning of Section 7121 of the Code with a Tax Authority relating to any Tax Return or Taxes of the Company or any of its Subsidiaries for or with respect to any Pre-Closing Tax Period; (v) make any voluntary disclosure to or contact with any Tax Authority regarding any Tax Return or Taxes of the Company or any of its Subsidiaries for or with respect to any Pre-Closing Tax Period; (vii) surrender any right to a Tax Refund of the Company or any of its Subsidiaries attributable to a Pre-Closing Tax Period; or (viii) take any action on the Closing Date after the Closing that is outside of the ordinary course of business of the Company or any of it Subsidiaries and not expressly contemplated by this Agreement, in each case, to the extent such action could reasonably be expected to increase a material Tax obligation of Seller or any material U.S. Tax obligation of Seller's direct or indirect owners under Section 951 or Section 951A of the Code or increase an indemnification obligation of Seller pursuant to this Agreement.

(i)     Tax Refunds.  Any actual cash refund, or credit in lieu of a refund that actually reduces Taxes otherwise due (in each case, determined on a "with and without" basis), in respect of Taxes of the Company or any of its Subsidiaries with respect to any Pre-Closing Tax Period that is received by Purchaser, any of its Affiliates, or the Company or any of its Subsidiaries after the Closing from a Tax Authority (each, a "Tax Refund") shall be for the account of Seller, and Purchaser shall pay over (or cause to be paid over) any such Tax Refund, net of costs and expenses incurred to obtain such Tax Refund (and net of any outstanding unpaid amounts due by Seller with respect to Taxes under Section 6.7(c)), within thirty (30) days after the receipt thereof (or, in the case of any credit claimed in lieu of a refund of Taxes, within thirty (30) days upon filing the Tax Return claiming such credit as an offset to Taxes otherwise payable) by Purchaser, any of its Affiliates, or the Company or any of its Subsidiaries by wire transfer of immediately available funds to Seller.  Seller shall return any such Tax Refunds subsequently denied, reversed or otherwise invalidated within thirty (30) days of being provided by Purchaser with notice thereof.

6.8     Reorganization. The Company shall effectuate the Reorganization in all material respects in accordance with the steps plan attached hereto as Exhibit A.  Seller shall keep Purchaser reasonably informed with respect to the Reorganization and provide reasonable consultation rights with respect thereto. Without limiting the foregoing in any way, Seller shall (a) provide Purchaser with copies of any material documentation required to effect the Reorganization at least five (5) Business Days prior to execution of such documentation and implementation of the Reorganization

48

FBG_CH1_00094311

step contemplated by such documentation, and (b) incorporate reasonable comments from Purchaser prior to any such execution and implementation so long as such comments are provided prior to the date Seller proposes such documentation will be executed and such Reorganization step will be implemented. Seller shall bear any and all costs and expenses necessary to effectuate the Reorganization (including stamp duty, filing fees and expenses, and legal and other professional advisors fees). If Purchaser remits payments for any such costs and expenses, then within five (5) Business Days of request from Purchaser, Seller will reimburse Purchaser via wire transfer of immediately available funds to an account (or accounts) designated by Purchaser. Seller shall retain and, if applicable, assume, and shall fully pay, perform, satisfy and discharge when due, any and all Liabilities resulting from, relating to or arising out of the Reorganization, and regardless of whether such Liabilities arise prior to, on or after the Closing (including any Tax liabilities of the Company or its Subsidiaries that (i) result from the Reorganization or (ii) relate to assets or operations (or income or gains arising therefrom) transferred out of the Company or its Subsidiaries pursuant to the Reorganization that are unrelated to the Business) (collectively, "Retained Reorganization Liabilities"). Seller shall indemnify, defend and hold harmless Purchaser and its Affiliates and each of their respective Representatives (each, an "Indemnified Person") from and against any and all losses, damages, claims, demands, liabilities, Taxes (other than any Transfer Taxes paid by Seller under Section 6.7(a) or to the extent any such Taxes were taken into account in the calculation of Indebtedness as Pre-Closing Income Taxes), awards, settlements, assessments, judgments, fines, penalties, and costs and expenses (including counsel and advisor fees and costs of investigation) suffered, paid or incurred by any such Indemnified Person resulting from, relating to or arising out of the Retained Reorganization Liabilities. Notwithstanding anything contained herein to the contrary, except (a) in the case of Fraud or (b) for any Tax liabilities of the Company or its Subsidiaries that (x) result from the Reorganization or (y) relate to assets or operations (or income or gains arising therefrom) transferred out of the Company or its Subsidiaries pursuant to the Reorganization that are unrelated to the Business, in no instance shall Seller have any obligation to indemnify, defend or hold harmless any Indemnified Person for any Retained Reorganization Liabilities pursuant to this Section 6.8 for any amounts in excess of $239,000,000 in the aggregate (when taken together with any other Retained Reorganization Liabilities for which an indemnification claim has been paid to any Indemnified Person hereunder). Seller's obligation to indemnify, defend, and hold harmless the Indemnified Persons pursuant to this Section 6.8 shall survive the Closing indefinitely and without time limit. The parties intend and agree that the survival of Seller's indemnification obligations stated above in this Section 6.8 will apply notwithstanding the six year general statute of limitations applicable to a claim for breach of contract pursuant to Section 213(2) of the New York Civil Practice Law and Rules.

6.9     Wrong Pocket.  In the event that after the Closing, Seller or any of its Affiliates receives any payment related to the Business, Seller agrees to use commercially reasonable efforts to remit any such payment within five (5) business days (or cause to be remitted within five (5) business days) such funds to Purchaser, but in any event such funds shall be remitted to Purchaser as soon as possible thereafter.  In the event that Purchaser or any of its Affiliates receives any payment related to products or services provided or sold by Seller or any of its Affiliates (excluding the Company and its Subsidiaries), Purchaser agrees to use commercially reasonable efforts to remit any such payment within five (5) business days (or cause to be remitted within five (5) business days) such funds to Seller, but in any event such funds shall be remitted to Seller as soon as possible thereafter.

CONFIDENTIAL

FBG_CH1_00094312

6.10    Restrictive Covenants. Subject in all instances to Section 6.10(e), in order to induce Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, and to allow Purchaser to obtain the full benefit of the Shares, the Company and its Subsidiaries, the Business and the goodwill related thereto, and in consideration of the benefits to Seller in connection with the consummation of the transactions contemplated by this Agreement, Seller agrees to the provisions set forth in this Section 6.10.

(a)    From the Closing Date until the fifth anniversary of the Closing Date, Seller will not directly or indirectly (including through any Affiliate (after giving effect to the Reorganization)) (i) compete with or assist others in competing with any Person that competes with the Company or any of its Subsidiaries in connection with the Business; (ii) engage in, invest in or have any interest in any Person (or any division or business segment thereof) that competes with the Company or any of its Subsidiaries in connection with the Business; (iii) create or distribute tools/methodologies or work-arounds to the assets of the Business; or (iv) interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company or any of its Subsidiaries, on the one hand, and customers or suppliers of the Company or any of its Subsidiaries, on the other hand, in each case to the extent related to the Business or (v) cause, induce or encourage any known material actual or prospective client, customer, supplier or licensor of the Company or any of its Subsidiaries to the extent related to the Business, or any other Person who has a material business relationship with the company or any of its Subsidiaries to the extent related to the Business, to terminate or materially modify any such actual or known prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, no more than five percent (5%) of the outstanding stock or other equity interests of or in any publicly traded corporation or other business enterprise that engages in the foregoing activities; provided that such ownership therein is solely as a passive investor.

(b)    Except as otherwise agreed by the parties, from the Closing Date until the fifth anniversary of the Closing Date, (i) none of Seller or its Affiliates (after giving effect to the Reorganization) shall solicit for employment or hire (as an employee, consultant or otherwise) any director, officer or employee of the Company or any Subsidiary thereof (after giving effect to the Reorganization) and (ii) none of the Company and its Subsidiaries (after giving effect to the Reorganization) shall solicit for employment or hire (as an employee, consultant or otherwise) any director, officer or employee of Seller or any Subsidiary thereof (after giving effect to the Reorganization). Notwithstanding the foregoing, this Section 6.10(b) shall not restrict an individual's right of employment, nor does it restrict general, customary employment advertisements and recruiting efforts (and employment stemming therefrom) that are not targeted at, as applicable, Company Restricted Individuals or Seller Restricted Individuals.

(c)    From and after the date hereof (including following the Closing), none of Seller or its Affiliates (after giving effect to the Reorganization) shall make any public false, defamatory or disparaging statements about Purchaser, the Company or any of the Company's Subsidiaries (after giving effect to the Reorganization). Nothing in this Section 6.10(c) shall restrict any party hereto from complying with any applicable Law or regulation or a valid order of a court of competent jurisdiction or an authorized Governmental Authority, nor shall it restrict any party hereto from making any statement in a bona fide claim or action filed against another party hereto.

50

CONFIDENTIAL

FBG_CH1_00094313

(d)      If, at any time of enforcement of the covenants contained in this Section 6.10 (the "Restrictive Covenants"), a court holds that the duration, scope or area restrictions stated herein are unreasonable under the circumstances then existing, the parties hereto agree that the maximum duration, scope or area reasonable under such circumstances will be substituted for the stated duration, scope or area and that the court will be allowed an directed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by applicable Law.  Each party has consulted with legal counsel regarding the Restrictive Covenants and based on such consultation has determined and hereby acknowledges that the Restrictive Covenants are reasonable in terms of duration, scope and areas restrictions and are necessary to protect the goodwill of the Business, the Company and its Subsidiaries (after giving effect to the Reorganization).

(e)      Notwithstanding anything contained herein to the contrary, in the event that Seller or (following the consummation of the Reorganization) any of its Subsidiaries is, directly or indirectly, sold to, purchased by, merged into or otherwise acquired by an unaffiliated-third party (each such event, a "Subsequent Sale Transaction"), then the restrictions otherwise set forth in Sections 6.10(a) – (c) shall, effective as of the date that is two years from and after the closing of such Subsequent Sale Transaction, immediately cease to apply to the Seller or such other Subsidiary party to such Sale Transaction and any Affiliate thereof that is transferred as part of such Sale Transaction.

6.11    Further Assurances.  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement (including, the Reorganization). Seller shall be responsible for the costs and expenses of the registration of any Company Registered Intellectual Property transferred in connection with the transactions contemplated by this Agreement with the relevant Governmental Authorities.

6.12    Interim Period Agreement.

(a)      From and after the date of this Agreement but prior to the Closing, Seller and Purchaser shall agree upon an agreement between such parties relating to any business, operations, revenue, assets, liabilities or Persons that are transferred to the Company as part of the Reorganization but are subsequently intended by the parties (as described on Exhibit G) to be transferred back to Seller and its Affiliates following such time (such agreement, in form and substance reasonably acceptable to Purchaser and Seller, the "Master Services Agreement").

(b)      From and after the date of this Agreement but prior to the Closing, Seller and Purchaser shall agree upon an agreement between such parties (or their respective designees agreed by the parties) relating to the sharing of services related to contracts to be shared or otherwise split between Seller and its Affiliates, on the one hand, and the Company and its Subsidiaries, on the other hand (such agreement, in form and substance reasonably acceptable to Purchaser and Seller, the "Shared Services Agreement").

(c)      From and after the date of this Agreement but prior to the Closing, Seller and Purchaser shall agree upon the Transition Services Agreements, the Long Term Agreements,

**DEBTORS' EXHIBIT NO. 239**
**Page 55 of 193**

the Supply Agreements and any other agreements between such parties relating to other documentation expressly contemplated in Section 2.2(v), in form and substance reasonably acceptable to Purchaser and Seller.

(d)     From and after the date of this Agreement but prior to the Closing, Seller and Purchaser shall agree upon the Escrow Agreement, in form and substance reasonably acceptable to Purchaser and Seller.

(e)     From and after the date of this Agreement but prior to the Closing, Seller and Purchaser shall agree upon the Deloitte Engagement Letter, in form and substance reasonably acceptable to Purchaser and Seller.

6.13     Seller Corporate Approvals. As soon as reasonably practicable following the date of this Agreement, Seller shall procure that (a) a meeting of holders of DRs is convened to enable the DR holders to vote on the Sale, and (b) the general meeting of Aegletes B.V. shall vote on the approval of the Sale.

6.14     Korean Tax Refund. When Lumileds Korea Ltd. ("Lumileds Korea") actually receives or realizes a Tax Refund, or if Purchaser or its Affiliates become aware of facts or circumstances that could reasonably result in a right to a Tax Refund for Lumileds Korea in respect of the outcome of the pending case in Busan High Court, 2023Nu22627, Revocation of Disposition Imposing Customs Duty (such pending case, the "Korean Court Case") (the "Korean Tax Refund"), then the Purchaser shall (i) promptly notify Seller of the Korean Tax Refund, and will take, or will procure that its Affiliates take, all necessary actions reasonably requested by the Seller to obtain the Korean Tax Refund keeping Seller reasonably informed of the progress of such actions, and (ii) not later than thirty (30) days following the receipt of the Korean Tax Refund, Purchaser shall pay to Seller the amount of the Korean Tax Refund net of costs and expenses incurred to obtain the Korean Tax Refund by way of an adjustment of the Purchase Price. The Purchaser shall keep the Seller promptly informed of and consult with Seller with respect to all material developments in relation to the Korean Tax Refund. Seller shall return any Korean Tax Refunds subsequently denied, reversed or otherwise invalidated within thirty (30) days of being provided by Purchaser with notice thereof.

6.15     Claims Under Seller Insurance Policies. After the Closing, the Company and each of its Subsidiaries shall have the right to assert Pre-Closing Insurance Claims and Seller and its Affiliates shall have the right to participate with the Company and its Subsidiaries to resolve Pre-Closing Insurance Claims under the applicable Insurance Policies up to the full extent of the applicable and then-remaining available limits of liability of such Insurance Policy, but solely to the extent that such policies provided coverage for the Company or any of its Subsidiaries therefor as of immediately prior to the Closing. The Company shall have primary control over those Pre-Closing Insurance Claims for which it bears the underlying loss, subject to the terms and conditions of the relevant Insurance Policy governing such control. If the Company or any of its Subsidiaries is unable to assert a Pre-Closing Insurance Claim because it is no longer an "insured" or "additional insured" under an applicable Insurance Policy, then Seller or its Affiliates shall, to the extent permitted by applicable Law and the terms of such Insurance Policy, assert such claim in its own name and deliver, as promptly as reasonably practicable, the proceeds from such claim to the Company or the applicable Subsidiary of the Company.

52

FBG_CH1_00094315

## ARTICLE VII
## CONDITIONS TO THE SALE

7.1     Conditions to Obligations of Each Party to Effect the Sale.   The respective obligations of each party hereto to effect the Sale shall be subject to the satisfaction or waiver (where permitted) at or prior to the Closing of each of the following conditions:

(a)     No Injunction.   No Governmental Authority of competent jurisdiction shall have issued any Order that is in effect, and no Law shall have been enacted or promulgated, that renders the Sale illegal or prohibits, enjoins, restrains or otherwise prevents or delays the Sale.

(b)     Antitrust Law Approval.   The waiting period (and any extensions thereof) applicable to the consummation of the transactions contemplated hereby pursuant to Antitrust Laws shall have expired or been earlier terminated.

(c)     Reorganization.   The Reorganization shall have been consummated in all material respects at the times set forth and in accordance with the steps plan attached hereto as Exhibit A.

7.2     Additional Conditions to Obligations of Purchaser.   The obligations of Purchaser to effect the Sale at the Closing are also subject to the satisfaction or waiver by Purchaser of each of the following additional conditions:

(a)     Representations and Warranties.   (i) Each of the representations and warranties of Seller contained in this Agreement (except for the representations and warranties of Seller set forth in the first three sentences of Sections 3.1, 3.2, 3.4, 3.6, the first two sentences of 4.1(a), 4.2(a), 4.2(b), 4.3, 4.14(b), 4.21 and 4.25) shall be true, correct and complete in all material respects as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date); (ii) the representations and warranties of Seller set forth in Sections 3.1, 3.2, 3.4, 3.6, 4.1(a), 4.2(a), 4.2(b) and 4.3 shall be true, correct and complete in all respects (other than *de minimis* inaccuracies) as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date); and (iii) the representations and warranties of Company set forth in Section 4.14(b) shall be true, correct and complete in all respects as of the Closing Date.

(b)     Agreements and Covenants.   Seller and the Company shall have performed or complied in all material respects with all agreements and covenants required of them by this Agreement to be performed or complied with by them on or prior to the Closing.

(c)     All Necessary Documents.   Purchaser shall have received those documents to be delivered pursuant to Section 2.2.

(d)     No Material Adverse Effect.   Since the date of this Agreement, there shall not have occurred any change, event, state of facts or development that has resulted in or would reasonably be expected to result in a Material Adverse Effect.

53

CONFIDENTIAL

FBG_CH1_00094316

7.3     Additional Conditions to Obligations of Seller.  The obligations of Seller to effect the Sale at the Closing is also subject to the satisfaction or waiver by Seller of each of the following additional conditions:

(a)     Representations and Warranties.  (i) Each of the representations and warranties of Purchaser contained in this Agreement (except for the representations and warranties of Purchaser set forth in Sections 5.1, 5.2, and 5.8,) shall be true, correct and complete in all material respects as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date); and (ii) the representations and warranties of Purchaser set forth in Sections 5.1, 5.2, and 5.8 shall be true, correct and complete in all respects (other than *de minimis* inaccuracies) as of the Closing Date, as though made on and as of such date (except to the extent expressly made as of a specific date, in which case as of such specific date).

(b)     Agreements and Covenants.  Purchaser shall have performed or complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing.

(c)     All Necessary Documents.  Seller shall have received those documents to be delivered pursuant to Section 2.3.

(d)     Seller Corporate Approvals. Each of the meeting of holders of Drs and the general meeting of Aegletes B.V. shall have approved the Sale, and such approvals shall be in full force and effect at the Closing.

**ARTICLE VIII**
**TERMINATION**

8.1     Termination.  This Agreement may be terminated at any time prior to the Closing only as follows:

(a)     Purchaser and Seller may terminate this Agreement by mutual written consent;

(b)     By Seller, on the one hand, or Purchaser, on the other hand, by written notice to the other, if the Closing shall not have occurred on or before August 13, 2024 (as extended by this Section 8.1(b), the "Outside Date"); provided, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to Seller, if Seller, or to Purchaser, if Purchaser, as applicable, has breached in any material respect its obligations under this Agreement in any manner that shall have caused the failure of the Closing to have occurred on or before such date; provided, further, that, if on the date that would have been the Outside Date the conditions set forth in Section 7.1(b) or Section 7.1(c) are the only conditions in Article VII (except for those conditions that by their terms are to be satisfied at the Closing) that shall not have been satisfied or waived on or before such date, then Purchaser or Seller may extend the Outside Date to November 12, 2024 by providing the other party a written notice of such extension on or before the Outside Date as determined without such extension, in which case the Outside Date shall be deemed for all purposes to be such later date;

54

CONFIDENTIAL                                                                 FBG_CH1_00094317

(c)     By Seller, on the one hand, or Purchaser, on the other hand, by written notice to the other, if any Governmental Authority of competent jurisdiction shall have issued any Order permanently enjoining, restraining or prohibiting the Sale, and such Order shall have become final and non-appealable, if applicable; provided, that the right to terminate this Agreement under this Section 8.1(c) shall not be available to Seller, if Seller's, or to Purchaser, if Purchaser's, as applicable, breach in any material respect of its obligations under this Agreement has been the principal cause of, or principally resulted in, such Order, restraint or prohibition;

(d)     By Purchaser, by written notice to Seller, if Seller has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.2(a) or Section 7.2(b) would be incapable of being satisfied and cannot be cured or has not been cured, by the earlier of thirty (30) days following receipt by Seller of written notice of such breach or failure to perform, or the Outside Date; provided, however, that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 8.1(d) if Purchaser has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.3(a) or Section 7.3(b) would be incapable of being satisfied and cannot be cured or has not been cured, by the earlier of thirty (30) days following receipt by Purchaser of written notice of such breach or failure to perform, or the Outside Date;

(e)     By Seller, by written notice to Purchaser, if Purchaser has breached or failed to perform any of its representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.3(a) or Section 7.3(b) would be incapable of being satisfied and cannot be cured or has not been cured, by the earlier of thirty (30) days following receipt by Purchaser of written notice of such breach or failure to perform, or the Outside Date; provided, however, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 8.1(e) if Seller or the Company has breached or failed to perform any of their representations, warranties, covenants or agreements contained in this Agreement, in any case, such that a condition contained in Section 7.2(a) or Section 7.2(b) would be incapable of being satisfied and cannot be cured or has not been cured, by the earlier of thirty (30) days following receipt by Seller of written notice of such breach or failure to perform, or the Outside Date; or

(f)     By Purchaser if the Required Stockholder Approval is not obtained by the Outside Date.

8.2     Effect of Termination.

(a)     In the event of termination of this Agreement by either Seller, on the one hand, or Purchaser, on the other hand, as provided in Section 8.1, this Agreement shall forthwith become void and there shall be no liability or obligation on the part the Purchaser Parties or Seller Parties or their respective Representatives, in either case, relating to, based on or arising under or out of this Agreement, the transactions contemplated hereby or the subject matter hereof (including the negotiation and performance of this Agreement), in each case whether based on Contract, tort, equity or strict liability, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any Laws or otherwise and whether by or through attempted piercing of the corporate veil, by or through any claim by or on behalf of a party hereto or another Person or

55

DEBTORS' EXHIBIT NO. 239
Page 59 of 193

otherwise, except (i) with respect to Annex I, this Section 8.2, and Article X (and such provisions shall remain in full force and effect following such termination including the obligations, if any, to pay the Purchaser Termination Fee or any other amounts), (ii) the Confidentiality Agreement shall continue in full force and effect in accordance with its terms, and (iii) except as set forth in this Section 8.2, such termination shall not relieve any party from liability for Fraud or any Willful Breach prior to the date of such termination.  For purposes of this Agreement, "Willful Breach" means a material breach or failure to perform that is a consequence of an act or omission by a party with actual knowledge, or knowledge that a Person acting reasonably under the circumstances should have, that such party's act or omission would, or would be reasonably expected to, result in a failure of the conditions set forth in Section 7.1, Section 7.2 or Section 7.3 to be satisfied.

(b)    In the event that this Agreement is terminated by Seller pursuant to Section 8.1(e) solely to the extent of any Fraud or a Willful Breach of any of Purchaser's representations, warranties or covenants, Purchaser shall pay to Seller a termination payment of $16,730,000 in cash (the "Purchaser Termination Fee") by wire transfer of immediately available funds no later than two (2) Business Days after the date of such termination or failure to consummate the Closing (it being understood that in no event shall Purchaser be required to pay the Purchaser Termination Fee on more than one occasion).  In the event that Seller shall receive full payment of the Purchaser Termination Fee pursuant to this Section 8.2(b), together with reimbursement of any applicable expenses pursuant to Section 8.2(d), the receipt by Seller of the Purchaser Termination Fee together with such other amounts pursuant to Section 8.2(d) shall be deemed to be liquidated damages for any and all Adverse Consequences suffered or incurred by Seller or any other Seller Party in connection with this Agreement, the transactions contemplated hereby and thereby (and the abandonment or termination thereof) or any matter forming the basis for such termination, and neither Seller nor any other Seller Party shall be entitled to bring or maintain any Action against Purchaser or any other Purchaser Party arising out of or in connection with this Agreement, any of the transactions contemplated hereby or thereby (or the abandonment or termination thereof) or any matters forming the basis for such termination.  For the avoidance of doubt, (i) Seller shall only be entitled to pursue the Purchaser Termination Fee following a valid termination expressly described in this Section 8.2(b), (ii) in the event the Purchaser Termination Fee is paid to Seller pursuant hereto, payment of the Purchaser Termination Fee (which, for the avoidance of doubt, shall be payable to Seller solely in the circumstances described in this Section 8.2(b)), shall be the sole and exclusive remedy (whether at Law or in equity, whether in contract or in tort or otherwise) of Seller and its Affiliates against Purchaser or any of its former, current or future general or limited partners, stockholders, financing sources, managers, members, directors, officers or Affiliates for any and all losses, damages, fees costs and expenses suffered as a result of the failure of the transactions contemplated hereby to be consummated or for a breach or failure to perform hereunder or otherwise relating to or arising out of this Agreement or the transactions contemplated hereby, and upon payment of such amount, none of the foregoing persons shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated hereby and (iii) under no circumstances shall Seller be permitted or entitled to receive both a grant of specific performance (which may only be sought pursuant to Section 10.15 prior to the valid termination of this Agreement) and payment of the Purchaser Termination Fee.

(c)    In the event that this Agreement is terminated by Purchaser pursuant to Section 8.1(d) solely to the extent of any Fraud or a Willful Breach of any of Seller's or Company's representations, warranties or covenants, (ii) by Purchaser pursuant to Section 8.1(f) or (iii) by

56

FBG_CH1_00094319

either Seller or Purchaser pursuant to Section 8.1(b) if at such time the condition set forth in Section 7.1(c) has not been satisfied, Seller shall pay to Purchaser a termination payment of $16,730,000 in cash (the "Seller Termination Fee") by wire transfer of immediately available funds no later than two (2) Business Days after the date of such termination or failure to consummate the Closing (it being understood that in no event shall Seller be required to pay the Seller Termination Fee on more than one occasion). In the event that Purchaser shall receive full payment of the Seller Termination Fee pursuant to this Section 8.2(c), together with reimbursement of any applicable expenses pursuant to Section 8.2(d), the receipt by Purchaser of the Seller Termination Fee together with such other amounts pursuant to Section 8.2(d) shall be deemed to be liquidated damages for any and all Adverse Consequences suffered or incurred by Purchaser or any other Purchaser Party in connection with this Agreement, the transactions contemplated hereby and thereby (and the abandonment or termination thereof) or any matter forming the basis for such termination, and neither Purchaser nor any other Purchaser Party shall be entitled to bring or maintain any Action against Seller or any other Seller Party arising out of or in connection with this Agreement, any of the transactions contemplated hereby or thereby (or the abandonment or termination thereof) or any matters forming the basis for such termination. For the avoidance of doubt, (i) Purchaser shall only be entitled to pursue the Seller Termination Fee following a valid termination expressly described in this Section 8.2(c), (ii) in the event the Seller Termination Fee is paid to Purchaser pursuant hereto, payment of the Seller Termination Fee (which, for the avoidance of doubt, shall be payable to Purchaser solely in the circumstances described in this Section 8.2(c)), shall be the sole and exclusive remedy (whether at Law or in equity, whether in contract or in tort or otherwise) of Purchaser and its Affiliates against Seller or any of its former, current or future general or limited partners, stockholders, financing sources, managers, members, directors, officers or Affiliates for any and all losses, damages, fees costs and expenses suffered as a result of the failure of the transactions contemplated hereby to be consummated or for a breach or failure to perform hereunder or otherwise relating to or arising out of this Agreement or the transactions contemplated hereby, and upon payment of such amount, none of the foregoing persons shall have any further Liability relating to or arising out of this Agreement or the transactions contemplated hereby and (iii) under no circumstances shall Purchaser be permitted or entitled to receive both a grant of specific performance (which may only be sought pursuant to Section 10.15 prior to the valid termination of this Agreement) and payment of the Seller Termination Fee.

(d)     Each of the parties hereto acknowledges that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, and that without these agreements, the other parties would not enter into this Agreement; accordingly, if Seller or Purchaser, as the case may be, fails to promptly pay (or cause to be paid) in full the amount due pursuant to this Section 8.2, and, in order to obtain such payment, Seller or Purchaser, as the case may be, commences an Action which results in a judgment against the other party or parties, as applicable, for the payment set forth in this Section 8.2, such paying party or parties, as applicable, shall pay the other party's or parties', as applicable, reasonable and documented costs and expenses (including reasonable and documented attorneys' fees) in connection with such suit, together with interest on such amount at the prime rate as published in the *Wall Street Journal* in effect on the date such payment was required to be made through the date of payment.

57

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 239**
**Page 61 of 193**

## ARTICLE IX
## NO SURVIVAL

9.1     No Survival.  The representations and warranties contained in this Agreement or any certificate, agreement or instrument furnished or to be furnished to Purchaser at the Closing pursuant to this Agreement shall not survive the Closing and shall terminate on the Closing Date, and Seller Parties shall have no obligation for indemnification hereunder or other liability to Purchaser with respect to any claim for breach of any representation or warranty contained in this Agreement or other agreement or instrument delivered by Seller, the Company or their Subsidiaries at the Closing shall provide the sole and exclusive remedy available to Purchaser; provided, however, that notwithstanding the foregoing, this Section 9.1 shall not limit (a) a claim or remedy of any party for a matter arising out of Fraud; or (b) for any Purchase Price adjustment under Section 1.7 (which adjustment shall be handled exclusively pursuant to the terms of Section 1.7).   All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing Date shall survive in accordance with their terms.

## ARTICLE X
## GENERAL PROVISIONS

10.1     Cost and Expenses.  Purchaser will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the purchase of the Shares and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein); and Seller will pay its own costs and expenses (including attorneys' fees, accountants' fees and other professional fees and expenses) in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the sale of the Shares and the other transactions contemplated by this Agreement (except as otherwise specifically provided for herein). For the avoidance of doubt, notwithstanding anything contained in this Agreement, Seller shall pay any and all costs and expenses associated with the Reorganization and Purchaser shall pay for all Specified Expenses.

10.2     Amendment, Modification and Waiver.   This Agreement may be amended, modified or supplemented at any time only by written agreement signed by the parties hereto, and any failure of Seller or the Company to comply with any term or provision of this Agreement may be waived by Purchaser, and any failure of Purchaser to comply with any term or provisions of this Agreement may be waived by Seller or the Company, at any time by an instrument in writing signed by or on behalf of such other party, but such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to comply.

10.3     Savings Clause.  If any provision hereof shall be held invalid or unenforceable by any court of competent jurisdiction or as a result of future legislative action, such holding or action shall be strictly construed and shall not affect the validity or effect of any other provision hereof. Upon such declaration that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement, as needed, so as to effect the original intent of the parties as closely as possible in a mutually

58

acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

10.4    Entire Agreement.   This Agreement (together with the Annexes, Exhibits, Disclosure Schedules and the other documents delivered pursuant hereto) and the Confidentiality Agreement constitute the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

10.5    Assignment; Successors and Assigns.  The respective rights and obligations of the parties hereto shall not be assignable without the prior written consent of the other parties; provided, however, that Purchaser may (i) designate, by written notice to Seller, a wholly-owned direct or indirect Subsidiary to purchase all of the Shares at the Closing and (ii) pledge as security for any financing or assign to any lender as collateral security any of its rights under this Agreement, in whole or in part, in each case without the prior written consent of the other parties; provided, further, that any such designation shall not impede or delay the consummation of the transactions contemplated by this Agreement and shall not affect the obligations of Purchaser hereunder.  Any assignment or transfer in violation of the preceding sentence shall be void.  In the event of any such assignment, the term "Purchaser" as used in this Agreement shall be deemed to refer to each such Affiliate of Purchaser where reference is made to actions to be taken with respect to the Sale and shall be deemed to include both Purchaser and each such Affiliate where appropriate.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.

10.6    Parties in Interest.  Except for: (a) Section 6.4, which shall be for the benefit of each Indemnified Party, his or her heirs, executors or administrators and his or her Representatives, (b) Section 10.16, which shall be for the benefit of the Seller's Prior Counsel, (c) Section 10.17, which shall be for the benefit of the Non-Party Affiliates and (d) Section 10.18 which shall be for the benefit of the Purchaser Released Parties and Seller Released Parties, each of which is hereby intended to be an express third-party beneficiary thereof, the parties hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other parties hereto, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person, other than the parties hereto, any rights or remedies hereunder, including, the right to rely upon the representations and warranties set forth herein.   The parties hereto further agree that the rights of third-party beneficiaries under Section 6.4, Section 10.16 and Section 10.17 shall not arise unless and until the Closing occurs.  The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto.  Any inaccuracies in such representations and warranties may be subject to waiver by the parties hereto in accordance with Section 10.2 without notice or liability to any other Person.  In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the Knowledge of any of the parties hereto. Consequently, Persons, other than the parties hereto, may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

59

CONFIDENTIAL

FBG_CH1_00094322

10.7    Mutual Drafting; Interpretation; Headings; Disclosure Schedules.

(a)    Each party hereto has participated in the drafting of this Agreement, which each party acknowledges is the result of extensive negotiations between the parties. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision. For purposes of this Agreement, whenever the context requires: (i) the singular number shall include the plural, and vice versa; (ii) the masculine gender shall include the feminine and neuter genders; (iii) the feminine gender shall include the masculine and neuter genders; and (iv) the neuter gender shall include masculine and feminine genders. As used in this Agreement, the words "include" and "including," and words of similar meaning, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation." Except as otherwise indicated, all references in this Agreement to "Sections," "Annexes" and "Exhibits," are intended to refer to Sections of this Agreement and the Annexes and Exhibits to this Agreement. All references in this Agreement to "$" are intended to refer to U.S. dollars. The term "or" shall not be deemed to be exclusive. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. References herein to "as of the date hereof," "as of the date of this Agreement" or words of similar import shall be deemed to mean "as of immediately prior to the execution and delivery of this Agreement." The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever this Agreement refers to a number of days, such number refers to calendar days unless Business Days are specified. When calculating the period of time before which, within which or following which any action must be taken hereunder, the date that is the reference date in calculating such period will be excluded. The terms from or through any date mean from and including or through and including, respectively, such date. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. Any references to "the transactions contemplated by this Agreement" (or phrases of similar import) include the Reorganization.

(b)    The information in the Disclosure Schedules constitutes (i) exceptions or qualifications to representations, warranties, covenants and obligations of Seller and the Company as set forth in this Agreement or (ii) descriptions or lists of assets and liabilities and other items referred to in this Agreement. Any disclosure made in any Schedule to this Agreement shall be deemed to be disclosures made with respect to all representations, warranties and Schedules contained in this Agreement, regardless of whether or not a specific cross-reference is made thereto if the relevance of such disclosure to such other representations, warranties and Schedules is readily apparent on its face. The Disclosure Schedules shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, or required to be disclosed by, Seller or the Company. Seller and the Company may, at their option, include in the Disclosure Schedules items that are not material, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms (including Material Adverse Effect) for purposes of this Agreement. No disclosure on the Disclosure Schedules relating to a possible breach or violation of any Contract or Law shall be construed as an admission or indication that a

60

FBG_CH1_00094323

breach or violation exists or has actually occurred. The Disclosure Schedules constitute a part of this Agreement and are incorporated into this Agreement for all purposes as if fully set forth herein. Capitalized terms used in the Disclosure Schedules that are not defined therein shall have the meanings given them in this Agreement.

(c)     The words "made available to Purchaser" and words of similar import refer to documents which have been posted to the electronic data room hosted by the Company in connection with the transactions contemplated by this Agreement as of 12:01 a.m. Eastern Time at least three (3) days immediately preceding the date hereof.

(d)     Capitalized terms used herein but not otherwise defined shall have the meaning given thereto in <u>Annex I</u>.

10.8    <u>Notary</u>. The Purchaser is aware that the Notary is a civil law notary working at DLA Piper Nederland, the firm that advises Seller in respect of the matters set out in this Agreement. With reference to the Code of Conduct (*Verordening beroeps en gedragsregels*) established by the Royal Notarial Professional Organization (*Koninklijke Notariële Beroepsorganisatie*), the parties hereby acknowledge and confirm that:

(a)     the Notary shall execute any and all deeds related to this Agreement; and

(b)     Seller is assisted and represented by DLA Piper Nederland in relation to this agreement and any other agreements that may be concluded, or disputes that may arise, in connection with it.

10.9    <u>Governing Law</u>. The validity, interpretation and effect of this Agreement shall be governed exclusively by the Laws of the State of New York, excluding the "conflict of laws" rules thereof.

10.10   <u>Venue</u>. Each of the parties irrevocably agrees that any legal Action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement (including claims asserted for breach of contract, tort, or otherwise and regardless of whether such claims arise in law or in equity) must be brought by any other party or its successors or assigns in any state or federal court in the State of New York, and in each case any appellate courts therefrom, and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally. Each of the parties agrees not to commence any Action, suit, or proceeding arising out of or related to this Agreement or any of the transactions contemplated by this Agreement except in the courts described above in New York, except for Actions in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court in New York as described herein. Each of the parties further agrees that notice as provided herein shall constitute sufficient service of process and the parties further waive any argument that such service is insufficient. Each of the parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any Action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in

61

FBG_CH1_00094324

such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) that (i) the Action in any such court is brought in an inconvenient forum, (ii) the venue of such Action is improper, or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

10.11   Waiver of Jury Trial and Certain Damages. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THE FOREGOING WAIVER, (III) IT MAKES THE FOREGOING WAIVER VOLUNTARILY, AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11.

10.12   Notices.

(a)     All notices, requests, demands and other communications under this Agreement shall be in writing and delivered in person, or sent by e-mail or sent by reputable overnight delivery service and properly addressed as follows:

If to the Company:

Lamps Holding B.V.
The legal department
Attention: Julia Talke
p/a
Philipsstraße 8,
52068 Aachen, Germany

with a copy to (for information purposes only):

Lamps Holding B.V.
Attention: Vincent Ranic
Email: vincent.ranic@lumileds.com
p/a
8 Rue de Saint Cloud
92150 Suresnes, France

If to Seller:

62

FBG_CH1_00094325

Lumileds Holding B.V.
The legal department
Attn. Mark de Jong
Evert van de Beekstraat 1, The Base, Tower B5, unit 107
1118CL Schiphol

with a copy to (for information purposes only):

DLA Piper LLP (US)
444 West Lake Street
Chicago, Illinois 60606-0089
Attention:  Richard Chesley
Email: richard.chesley@us.dlapiper.com

and

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Attention:  Christopher P. Giordano; Jon Venick
Email: christopher.giordano@us.dlapiper.com;
jon.venick@us.dlapiper.com

If to Purchaser:

c/o First Brands Group, LLC
127 Public Square Suite 5300
Cleveland, Ohio 44114
Attention:  Shekhar Kumar
Email:  shekhar.kumar@firstbrandsgroup.com

with a copy to (for information purposes only):

Clifford Chance US LLP
Texas Tower, 845 Texas Ave Suite 3930,
Houston, TX 77002
Attention:  Alexandra Wilde
Email:  alexandra.wilde@cliffordchance.com

(b)      Any party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

(c)      All notices and other communications required or permitted under this Agreement shall be deemed to be duly given (i) when delivered in person, (ii) on the date received, if sent by a nationally recognized delivery or courier service, (iii) upon confirmation of receipt or automatically generated notice of receipt in the case of electronic mail (to the extent that no

63

FBG_CH1_00094326

"bounce back" or similar message indicating non-delivery is received with respect thereto) or (iv) upon the earlier of confirmed receipt and the fifth (5th) Business Day following the date of mailing if sent by registered or certified mail, return receipt requested, postage prepaid and addressed as above.

10.13   Public Announcements.  The initial press release issued by the parties concerning this Agreement and the transactions contemplated hereby shall be in a form agreed to by Purchaser and Seller and thereafter the parties shall consult with each other (and obtain the other party's prior consent) before issuing any press release or otherwise making any public statements with respect to the transactions contemplated by this Agreement, in each case except (a) as may be required by applicable Law, stock exchange rule or regulation, or court process if the party issuing such press release or other public statement has, to the extent practicable, provided the other party with an opportunity to review and comment, (b) any disclosure made by Seller, the Company or any of their Subsidiaries to its lenders, stockholders, employees, customers, suppliers and other business relations to the extent Seller, the Company or any of their Subsidiaries reasonably determines in good faith that such disclosure is necessary or advisable and (c) any press release or other public statement that is consistent in all material respects with previous press releases, public disclosures or public statements made by a party hereto in accordance with this Agreement, in each case under this clause (c) to the extent such disclosure is still accurate.

10.14   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.  A copy transmitted via facsimile or e-mail as a portable document format (.pdf) of this Agreement, bearing the signature of any party shall be deemed to be of the same legal force and effect as an original of this Agreement bearing such signature(s) as originally written of such one or more parties.

10.15   Specific Performance.  Each party hereto agrees that irreparable damage would occur to a party if any provision of this Agreement were breached or not performed by the other party in accordance with the terms hereof.  It is accordingly agreed that, prior to the valid termination hereof, each party hereto shall be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement by the other party hereto and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy, at law or in equity, to which it is entitled.  Each party further agrees that (a) no such party will oppose the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that the other party has an adequate remedy at law or that an award of specific performance is not an appropriate remedy for any reason at law or equity and (b) no other party or any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 10.15, and each party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

10.16   Legal Representation.

(a)       Purchaser (on behalf of itself and its Subsidiaries including, from and after the Closing, the Company) covenants and agrees that, following the Closing, DLA Piper LLP (US) ("Seller's Prior Counsel") may serve as counsel to Seller and its respective Affiliates in connection

64

FBG_CH1_00094327

with any matters arising under or related to this Agreement or the transactions contemplated by this Agreement, including with respect to any litigation, claim or obligation arising out of or related to this Agreement or the transactions contemplated by this Agreement. Purchaser (on behalf of itself and its Subsidiaries including, from and after the Closing, the Company) hereby irrevocably (i) waives any claim it has or may have that Seller's Prior Counsel has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) covenants and agrees that, in the event that a dispute arises after the Closing between Purchaser, the Company or any of its Subsidiaries, on the one hand, and Seller or any of its Affiliates, on the other hand, Seller's Prior Counsel may represent Seller or any of Seller's Affiliates in such dispute even though the interests of such Person(s) may be directly adverse to Purchaser, the Company or its Subsidiaries not withstanding any prior representation or engagement of Seller's Prior Counsel.

(b)     All communications between direct and indirect holders of Shares, the Company, its Subsidiaries and their respective Affiliates, on the one hand, and Seller's Prior Counsel, on the other hand, related to the transactions contemplated by this Agreement shall be deemed to be attorney-client confidences that belong solely to the direct and indirect holders of Shares and their respective Affiliates (the "Seller Pre-Closing Communications"). Accordingly, Purchaser shall not, and shall not permit the Company or any of its Subsidiaries, to have access to any Seller Pre-Closing Communications or to the files of Seller's Prior Counsel relating to such engagement from and after the Closing, and all books, records and other materials of the Company and its Subsidiaries in any medium (including electronic copies) containing or reflecting any of the Seller Pre-Closing Communications or the work product of Seller's Prior Counsel with respect thereto, including any related summaries, drafts or analyses, and all rights with respect to any of the foregoing, are hereby assigned and transferred to Seller effective as of the Closing (the "Seller Privileged Materials"). The Seller Privileged Materials shall be excluded from the transfer contemplated by this Agreement and shall be distributed to Seller immediately prior to Closing with no copies thereof retained by the Company, its Subsidiaries, Purchaser or its Affiliates or its or their respective Representatives. From and after the Closing, Purchaser, its Affiliates, the Company, its Subsidiaries, and its and their respective Representatives shall not access or in any way, directly or indirectly, use or rely upon any Seller Privileged Materials. To the extent that the Seller Privileged Materials are not delivered to Seller, Purchaser and the Company agree not to assert a waiver of any applicable privilege or protection, and will deliver all such Seller Privileged Materials to Seller promptly upon discovery thereof, without retaining copies thereof. Without limiting the generality of the foregoing, from and after the Closing, (a) the direct and indirect holders of Shares and their respective Affiliates (excluding the Company and its Subsidiaries) shall be the sole holders of the attorney-client privilege with respect to the Seller Privileged Materials, and neither the Company nor its Subsidiaries shall be a holder thereof, (b) to the extent that files of Seller's Prior Counsel in respect of Seller Privileged Materials constitute property of the applicable client, only the direct and indirect holders of Shares and their respective Affiliates (excluding the Company and any of its Subsidiaries) shall hold such property rights and (c) Seller's Prior Counsel shall have no duty whatsoever to reveal or disclose any Seller Privileged Materials to the Company or its Subsidiaries by reason of any attorney-client relationship among Seller's Prior Counsel and the Company and its Subsidiaries or otherwise. Each of Purchaser and the Company hereby acknowledge and confirm that it has had the opportunity to review and obtain adequate information regarding the significance and risks of the waivers and other terms and conditions of this Section 10.16, including the opportunity to discuss with counsel such matters and reasonable alternatives to such terms. This Section 10.16 is for the benefit of Seller, each

65

                                                                      FBG_CH1_00094328

other direct or indirect holder of Shares and Seller's Prior Counsel, and Seller, each such other direct or indirect holder of Shares and Seller's Prior Counsel is an intended third-party beneficiary of this Section 10.16.  This Section 10.16 shall be irrevocable, and no term of this Section 10.16 may be amended, waived or modified, without the prior written consent of Seller and Seller's Prior Counsel.  The covenants and obligations set forth in this Section 10.16 shall survive for ten (10) years following the Closing Date.

10.17  Limitation on Recourse.  This Agreement may only be enforced against, and all claims or causes of action (whether in Contract, in tort, at law, in equity or otherwise) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution, termination, performance or non-performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as parties hereto (but only to the extent of the specific obligations of such parties set forth herein).  No Person who is not a named party to this Agreement, including any past, present or future officer, director, employee, agent, general or limited partner, manager, management company, member, stockholder, equity holder, controlling Person, Representative or Affiliate, or any heir, executor, administrator, successor or assign of any of the foregoing, of any named party to this Agreement ("Non-Party Affiliates"), shall have any liability (whether in Contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any liability based on, in respect of, by reason of, arising under, out of, in connection with, or related in any manner to this Agreement.

10.18  Release.

(a)      Effective as of the Closing (but only if the Closing actually occurs), Purchaser, on behalf of itself and each of its Subsidiaries (including the Company and each of its Subsidiaries from and after the Reorganization) and each of its past, present or future officers, directors, employees, agents, general or limited partners, managers, the Company's management, members, stockholders, equity holders, controlling Persons, Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "Purchaser Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges Seller and its Affiliates (excluding the Company and its Subsidiaries from and after the Reorganization), and each of the foregoing's respective past, present or future officers, directors, employees, agents, general or limited partners, managers, the Company's management, members, stockholders, equity holders, controlling Persons, Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "Seller Released Parties") of and from any and all Actions, causes of action, judgments, duties, debts, dues, accounts, bonds, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon Contract, tort, contribution or otherwise) which the Purchaser Releasing Parties may have against each of Seller Released Parties, now or in the future, in each case with respect to the ownership of the Company and its Subsidiaries, or in respect of any cause, matter or thing relating to the Company and its Subsidiaries or any actions taken or failed to be taken by any of Seller Released Parties in any capacity related to the Company or its Subsidiaries occurring or arising on or prior to the Closing Date, but only to the extent that such cause, matter or thing does not otherwise constitute Fraud.  Notwithstanding the foregoing, nothing in this Section 10.18 shall release any claims arising from the rights or

66

FBG_CH1_00094329

obligations of any Person under this Agreement, the Escrow Agreement, the Transition Services Agreements or the Master Services Agreement or any definitive agreement entered into to effect the Reorganization.

(b)      Effective as of the Closing (but only if the Closing actually occurs), Seller, on behalf of itself and each of its Affiliates (excluding the Company and each of its Subsidiaries from and after the Reorganization) and each of its past, present or future officers, directors, employees, agents, general or limited partners, managers, the Company's management, members, stockholders, equity holders, controlling Persons, Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "Seller Releasing Parties"), hereby irrevocably and unconditionally releases and forever discharges Purchaser, Company and their Affiliates (including the Company and its Subsidiaries from and after the Reorganization), and each of the foregoing's respective past, present or future officers, directors, employees, agents, general or limited partners, managers, members, stockholders, equity holders, controlling Persons, Representatives or Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing (collectively, the "Purchaser Released Parties") of and from any and all Actions, causes of action, judgments, duties, debts, dues, accounts, bonds, Contracts and covenants (whether express or implied), and claims and demands whatsoever whether in law or in equity (whether based upon Contract, tort, contribution or otherwise) which Seller Releasing Parties may have against each of the Purchaser Released Parties, now or in the future, in each case with respect to the ownership of the Company and its Subsidiaries, or in respect of any cause, matter or thing relating to the Company and its Subsidiaries or any actions taken or failed to be taken by any of the Purchaser Released Parties in any capacity related to the Company or its Subsidiaries occurring or arising on or prior to the Closing Date, but only to the extent that such cause, matter or thing does not otherwise constitute Fraud.  Notwithstanding the foregoing, nothing in this Section 10.18 shall release any claims arising from the rights or obligations of any Person under this Agreement, the Escrow Agreement, the Transition Services Agreements or the Master Services Agreement or any definitive agreement entered into to effect the Reorganization.

*[Signature Page Follows]*

67

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized all as of the date first written above.

**LUMILEDS HOLDING B.V.**

DocuSigned by:

By: _____
25C898B4EB9445U
ON BEHALF OF AEGLETES B.V.
Name: Stephen Townsend Barlow
Title: Executive Director


**LAMPS HOLDING B.V.**

DocuSigned by:

By: _____
25C898B4EB9445U
ON BEHALF OF AEGLETES B.V.
Name: Stephen Townsend Barlow
Title: Executive Director

*[Signature Page to Stock Purchase Agreement]*

CONFIDENTIAL                                                FBG_CH1_00094331

**FIRST BRANDS GROUP, LLC**

By: _____
   Name: Michael Baker
   Title: Chief Corporate Strategy Officer and
      Secretary

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL                                            FBG_CH1_00094332

## ANNEX I

## DEFINITIONS

For purposes of this Agreement:

"Action" means any action, administrative enforcement, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, investigation, audit, assessment, examination, review, inquiry or other proceeding commenced, brought, or heard by or before any Governmental Authority.

"Adverse Consequences" means all Actions, Orders, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, Taxes, Liens and losses (including costs of investigation, all reasonable accounting, consultant and attorneys' fees, court costs, costs of expert witnesses and other expenses relating to any of the foregoing).

"Aegletes" means Aegletes B.V., an entity domiciled in the Netherlands and the ultimate parent company of Seller.

"Affiliate" means as to any Person, any other Person which, directly or indirectly, is controlled by, controls, or is under common control with, such first-mentioned Person.

"Agreement" has the meaning set forth in the caption.

"Anti-Money Laundering Laws" has the meaning set forth in Section 5.6(a).

"Antitrust Laws" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Clayton Act, as amended, and any applicable foreign antitrust Laws and all other applicable Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Bankruptcy and Equity Exception" has the meaning set forth in Section 3.2.

"Benefit Plan" means (a) any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (b) any "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), and (c) any other plan, agreement, policy or arrangement providing for employment (but excluding offer letters on substantially the form made available to Purchaser without change of control, severance or prior notice provisions), profit-sharing, incentive compensation, deferred compensation, vacation, other paid time-off, health or welfare benefits, sick pay, pension, retirement benefits, severance benefits, termination benefits, change of control or retention pay or benefits, stock options, stock purchase, phantom stock, equity-based incentive compensation or other compensation or employee benefits, in each case of such (a)-(c), which covers any Company Employee or any Company Service Provider and is sponsored, maintained or contributed to by Seller, the Company or any of their respective ERISA Affiliates, or with respect to which the Company or any of its Subsidiaries has or may reasonably be expected to have any liability, other than any plan, agreement, policy or

1607904589.12

CONFIDENTIAL                                                FBG_CH1_00094333

arrangement that is required to be maintained by applicable Law or that is sponsored in whole or in part by any Governmental Authority.

"Business" means the "Lights and Automotive and accessories" business conducted by Aegletes and its Subsidiaries as of immediately prior to the consummation of the Reorganization.

"Business Day" means any day, except for a Saturday or Sunday or a day on which banks are required or authorized by Law to close in New York, New York.

"Cash" means, without duplication, all cash, cash equivalents (including, for the avoidance of doubt, any cash held within China or Brazil which is subject to regulatory or tax constraints, any Intercompany Accounts Receivable, any security deposits, bonds or other similar instruments serving as collateral with respect to any property or assets leased by the Company or any of its Subsidiaries, and any deposits or reserves associated with any self-insurance, including but not limited to any deposits or reserves associated with any workers compensation policies or claims) and marketable securities held by the Company or any of its Subsidiaries (after giving effect to the Reorganization), and calculated as of the Reference Time. "Cash" shall (i) be calculated net of issued but uncleared checks, drafts and overdrafts as of the Reference Time, (ii) include checks and other wire transfers and drafts deposited for the account of the Company or any of its Subsidiaries as of the Reference Time, (iii) not include any amount taken into account in the calculation of Closing Date Working Capital, and (iv) shall be calculated consistent with the Illustrative Calculation and shall include any items included in Cash and exclude any items excluded from Cash consistent with the Illustrative Calculation.

"Closing" has the meaning set forth in Section 2.1.

"Closing Date" has the meaning set forth in Section 2.1.

"Closing Date Indebtedness" means the aggregate amount of Indebtedness calculated as of the Reference Time (except with respect to the LTCI Payment, which shall be calculated as of the date paid); provided, however, that Closing Date Indebtedness shall not include (a) any amount taken into account in the calculation of Closing Date Working Capital, (b) any Specified Expenses or (c) any Seller Transaction Expenses.

"Closing Date Working Capital" means the Working Capital calculated as of the Reference Time.

"Closing Payment" has the meaning set forth in Section 1.5(a).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the caption.

"Company Benefit Plan" means each Benefit Plan (a) sponsored or maintained solely by the Company or any of its Subsidiaries or (b) entered into solely between the Company (or any Subsidiary thereof) and any Company Employee or Company Service Provider.

1607904589.12

FBG_CH1_00094334

"Company Employee" means each current employee who is or was employed by, or who provides or has provided services to, the Company or any of its Subsidiaries.

"Company Intellectual Property" means all of the Intellectual Property Rights owned by the Company or any of its Subsidiaries after giving effect to the Reorganization.

"Company Material Contract" has the meaning set forth in Section 4.12(a).

"Company Products" means any and all products and services that currently are marketed, offered, sold, licensed, provided or distributed by the Company or any of its Subsidiaries or any of their respective Affiliates, in each instance, with regard to the Business.

"Company Registered Intellectual Property" has the meaning set forth in Section 4.10(a).

"Company Service Provider" means any current consultant, independent contractor or other service provider who is classified by the Company or any of its Subsidiaries as other than an employee, or compensated other than through wages paid by payroll, and is, as of immediately prior to the Closing, engaged by, or providing services to, the Company or any of its Subsidiaries.

"Company's Knowledge" or "Knowledge of the Company" or similar phrase means the actual (but not constructive or imputed) knowledge of Steve Barlow, Tom Constantino and Alex Klein, in each case, without independent investigation.

"Confidentiality Agreement" means the Confidentiality Agreement dated as of October 23, 2023, by and between Purchaser and Seller.

"Contract" means, with respect to any Person, any legally binding contract, subcontract, agreement, deed, mortgage, lease, license, purchase order, commitment, arrangement or undertaking, written or oral.

"control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, by Contract or otherwise.

"Deloitte Engagement Letter" means that certain engagement letter to be mutually agreed to from and after the date hereof but prior to Closing by and among Purchaser, Seller and Deloitte with respect to the matters contemplated by Section 1.6, in form and substance satisfactory to Purchaser, Seller and Deloitte.

"D&O Insurance" has the meaning set forth in Section 6.4(a).

"Deed of Transfer" means the notarial deed of transfer of the Shares, substantially in the form attached hereto as Exhibit E.

"Disclosure Schedules" means the disclosure schedules delivered concurrently with the execution of this Agreement.

1607904589.12

CONFIDENTIAL

FBG_CH1_00094335

"DLA Piper Nederland" means DLA Piper Nederland N.V. at Prinses Amaliaplein 3 (1077 XS) Amsterdam, the Netherlands.

"DPA" means Section 721 of the Defense Production Act of 1950, as amended (codified at 50 U.S.C. § 4565).

"DRs" means the meeting of holders of depositary receipts issued for shares in the capital of Aegletes B.V.

"Dutch Trade Register" means the trade register of the Dutch Chamber of Commerce (*Kamer van Koophandel*).

"Environment" means soil, land surface or subsurface strata, waters (including, navigable waters, oceans, streams, ponds, reservoirs, drainage basins, wetlands, surface or ground water), sediments, ambient air (including indoor), noise, plant life, animal life, and all other environmental media or natural resources.

"Emergency" means any actual event or occurrence that could not be reasonably anticipated and involving a reasonably probable likelihood of material physical injury, casualty loss, significant monetary damages or loss of a material economic or commercial right or opportunity; provided that any such event or occurrence shall immediately cease to be an Emergency at such time that Seller reasonably could have informed Purchaser and sought approval for expenditures in connection therewith from Purchaser.

"Emergency Capital Expenditures" means capital expenditures which are reasonably necessary to be expended in order to mitigate or remedy an Emergency within 48 hours of the occurrence of the applicable event or occurrence that constitutes the applicable Emergency.

"Environmental Laws" means any and all applicable Laws, Permits, approvals, authorizations and other requirements having the force and effect of Law, whether local, state, territorial or national, in force and effect as of the Closing Date and relating to: (i) emissions, discharges, spills, releases or threatened releases of Hazardous Materials; (ii) the use, treatment, storage, disposal, handling, manufacturing, distribution, marketing, sale, transportation or shipment of Hazardous Materials; (iii) the regulation of storage tanks; or (iv) relating to pollution or the protection of human health or safety (concerning exposure to Hazardous Materials), or the Environment.

"Environmental Permits" means any Permit required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and the regulations promulgated thereunder.

"ERISA Affiliate" means a trade or business that (a) is treated as a single employer with the Company under Sections 414 (b), (c), (m) or (o) of the Code or (b) is under common control with the Company within the meaning of Section 4001 of ERISA.

1607904589.12

CONFIDENTIAL

FBG_CH1_00094336

"Escrow Account" means the escrow account with the Escrow Agent for the Escrow Amount.

"Escrow Agent" means U.S. Bank National Association.

"Escrow Agreement" means that certain escrow agreement, to be mutually agreed to from and after the date hereof but prior to Closing by and among Purchaser, Seller and the Escrow Agent and attached hereto as Exhibit C.

"Escrow Amount" means an amount equal to $2,390,000, to be held by the Escrow Agent pursuant to the terms of the Escrow Agreement.

"Estimated Closing Balance Sheet" has the meaning set forth in Section 1.3.

"Estimated Purchase Price" has the meaning set forth in Section 1.3.

"Export Control Laws" means any and all Laws which have as a purpose or effect of restricting or controlling the export, re-export, transfer or access of controlled or sensitive information, commodities, software, technology or services between or within one or more countries and their nationals, including the Export Administration Regulations administered by the US Department of Commerce's Bureau of Industry and Security that regulates the export and re-export of commodities, software, and technology.

"FDI Laws" means (i) any Law pertaining to foreign direct investment and (ii) any other Laws that are designed or intended to prohibit, restrict or regulate investment in equities, securities, entities, assets, land or interests.

"Final Closing Statement" has the meaning set forth in Section 1.6(a).

"Final Purchase Price" has the meaning set forth in Section 1.7.

"Financial Statements" has the meaning set forth in Section 4.13.

"Foreign Benefit Plan" has the meaning set forth in Section 4.19(p).

"Fraud" means common law fraud involving an actual and intentional misrepresentation of a material existing fact by a party as to one or more of that party's express representations and warranties contained in Articles III, IV, or V (as applicable to such party) that (a) was material and made with actual knowledge that such misrepresentation was false, and (b) was actually false when made, and (c) was made with the express intention that the defrauded party rely on that false representation, and (d) upon which the defrauded party justifiably relied, (e) to its detriment, resulting in direct and actual quantifiable damages, but excluding consequential, punitive, special, indirect, reputational, rescissionary, or other damages.

"Government Official" means (a) an employee, officer or representative of, or any individual otherwise acting in an official capacity for or on behalf of a Governmental Entity, (b) a legislative, administrative, or judicial official, regardless of whether elected or appointed, (c) a candidate for political office, (d) an individual who holds any other official, ceremonial, or other

1607904589.12

FBG_CH1_00094337

appointed or inherited position with a government or any of its agencies, or (e) an officer or employee of a supra-national organization (e.g., World Bank, United Nations, International Monetary Fund, OECD).

"Governmental Authority" means the government of the United States or any foreign country or any state or political subdivision or regulatory authority thereof and any agency, commission, bureau, department, authority, court, arbitrator, arbitration tribunal, tribal government or authority, or other entity, body, instrumentality or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including non-governmental and quasi-governmental entities, quasi-governmental self-regulatory agencies, or instrumentalities established to perform such functions.

"Governmental Entity" means a (a) Governmental Authority, (b) a government-owned/government-controlled association, organization, business, or enterprise, or (c) a political party.

"Hazardous Material" means (i) all substances, wastes, pollutants, contaminants and materials (collectively, "Hazardous Substances") regulated, defined or designated as hazardous, extremely or imminently hazardous, dangerous or toxic, under Environmental Laws, (ii) petroleum and petroleum products and by products including crude oil and any fractions thereof; and (iii) radon, radioactive substances, asbestos, urea formaldehyde, per- and polyfluoroalkyl substances, toxic mold, and polychlorinated biphenyls.

"Hazardous Substances" has the meaning set forth in clause (i) of the definition of Hazardous Material.

"IFRS" means the International Financial Reporting Standards or International Accounting Standards issued or adopted by the International Accounting Standards Board (or a predecessor body), and interpretations issued by the IFRS Interpretations Committee (or a predecessor body).

"Income Taxes" means any Tax measured by reference to net income or profit, including any franchise Taxes imposed on such basis in lieu thereof.

"Indebtedness" means, as to the Company and its Subsidiaries (after giving effect to the Reorganization), without duplication, all (a) all indebtedness for borrowed money, or issued in substitution for or exchange of indebtedness for borrowed money, or for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligatory or otherwise (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but in relation to contingent liabilities only to the extent called upon at the Reference Time), including the current portion of such indebtedness, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) all capital lease obligations, (d) all obligations under conditional sale or other title retention agreements, (e) all "cut" but un-cashed checks or any overdrafts outstanding as of the Closing Date, (f) any indebtedness secured by a Lien on a Person's assets, (g) any Intercompany Accounts Payable, (h) any payment obligation under any interest rate swap agreement, forward rate agreement, interest rate cap or collar agreement, derivative or hedging instruments or other financial agreement or similar arrangement, (i) all unpaid profit sharing liabilities, (j) (i) severance

1607904589.12

CONFIDENTIAL

FBG_CH1_00094338

obligations, (ii) obligations in respect of unpaid deferred compensation, (iii) obligations with respect to any unfunded or underfunded employee benefit plan (including any payments due and payable in July 2024 in connection with the 2022 Long Term Cash Incentive (LTCI) Plan, regardless of whether such payment is an obligation of the Company or its Subsidiaries but solely to the extent that such amounts are paid or payable by the Company or its Subsidiaries (the aggregate of such amounts, if any, the "LTCI Payment"), and (iv) any unpaid bonuses with respect to any calendar year prior to 2024 and the pro rata portion, assuming bonuses are accrued on a daily basis and assuming a 365-day calendar year, of any unpaid bonuses with respect to calendar year 2024, in each case of such (i) through (iv), together with the employer portion of any Taxes payable with respect thereto, (k) all obligations for declared but unpaid dividends or other similar distributions, (k) any accrued interest on any of the foregoing, (l) any prepayment or other similar fees, expenses or penalties on or relating to the repayment or assumption of any of the foregoing, (m) fifty percent (50%) of the total factored trade receivables held by the Company or any of its Subsidiaries (after giving effect to the Reorganization) calculated as of the Reference Time and consistent with the Illustrative Calculation, (n) all guarantees of any of the items set forth in clauses (a) - (m) above but only to the extent called upon as at the Reference Time, and (o) any costs, fees or expenses incurred by Seller or the Company related directly to the transactions contemplated hereby (including the preparation and negotiation of this Agreement) which, are payable by the Company and its Subsidiaries (after giving effect to the Reorganization) after the Closing, and (q) all Pre-Closing Income Taxes.  For the avoidance of doubt, "Indebtedness" shall not include factored trade receivables except as described in the foregoing clause (m) (as the full amount of factored receivables shall be included in Working Capital) or any amounts payable pursuant to Section 6.8.

"Indemnified Party" or "Indemnified Parties" has the meaning set forth in Section 6.4(d).

"Independent Auditor" has the meaning set forth in Section 6.7(g).

"Intellectual Property" and "Intellectual Property Rights" means any and all statutory or common-law rights to the extent protectable by applicable Law throughout the world in, arising out of, or associated with any of the following: (i) all patents and utility models and applications therefor (including provisional applications) and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations in part thereof (collectively, "Patents"); (ii) all Trade Secrets and similar rights in confidential information, know-how, and materials; (iii) copyrights and all other rights corresponding thereto in any works of authorship, including Software (collectively, "Copyrights"); (iv) all trademark rights and similar rights in trade names, logos, trademarks and service marks together with all of the goodwill associated with the foregoing (collectively, "Trademarks"); (v) all rights in databases and data collections (including knowledge databases, customer lists and customer databases); (vi) all rights to Uniform Resource Locators, Web site addresses and domain names; and (vii) any registrations of or applications to register any of the foregoing.

"Intercompany Accounts Payable" means all amounts as of immediately prior to the Closing owing by, on the one hand, the Company and its Subsidiaries to, on the other hand, the Seller and its Affiliates (other than the Company and any of the Company's Subsidiaries) in each instance after giving effect to the Reorganization and calculated consistent with the Illustrative Calculation.

1607904589.12

CONFIDENTIAL

FBG_CH1_00094339

"Intercompany Accounts Receivable" means all amounts as of immediately prior to the Closing owing by, on the one hand, the Seller and its Affiliates (other than the Company and any of the Company's Subsidiaries) to, on the other hand, the Company and its Subsidiaries, in each instance after giving effect to the Reorganization and calculated consistent with the Illustrative Calculation

"Inventory" has the meaning set forth in Section 4.23.

"Inventory Exceptions" has the meaning set forth in Section 4.23.

"IRS" has the meaning set forth in Section 4.19(h).

"IT Systems" means computer systems, servers, network equipment, Software for electronic data processing, recordkeeping, account management, and inventory management.

"Law" means any law, statute, code, regulation, ordinance, rule, common law, Order or governmental requirement enacted, promulgated, entered into, agreed, imposed or enforced by any Governmental Authority.

"Lease Documents" has the meaning set forth in Section 4.20(b).

"Leased Real Property" has the meaning set forth in Section 4.20(b).

"Liabilities" has the meaning set forth in Section 4.13(b).

"Lien" means any mortgage, lien, charge, restriction pledge, security interest, option, lease or sublease, claim, right of any third party, condition, right of first refusal, right of first offer, right-of-way, easement, building or use restriction, conditional sales agreement, encroachment, encumbrance or other charges, rights of others or any other restrictions of any kind or nature.

"Long Term Agreement" means each of (i) that certain Long Term Service Level Agreement for Application Lab Shanghai, (ii) that certain Long Term Service Level Agreement for Application Lab Aachen, (iii) that certain Long Term Agreement for Packaging for Luxeongo, (iv) that certain Long Term Agreement for Regulatory Affairs and (v) that certain Long Term Agreement for Aachen Warehouse.

"LTCI Payment" has the meaning set forth in the definition of Indebtedness.

"Material Adverse Effect" means any change, event, state of facts or development that has had or would reasonably be expected to have a material adverse effect on (a) the business, financial condition, assets or continuing results of operations of the Company and its Subsidiaries (after giving effect to the Reorganization), taken as a whole; or (b) the ability of Seller or the Company to consummate the transactions contemplated hereby; provided, however, that no change, event, state of facts or development related to, resulting from or attributable to any of the following shall be deemed to be or taken into account in determining whether there has been or will be, a "Material Adverse Effect": (a) the negotiation, execution, announcement, pendency or performance of this Agreement or the transactions contemplated hereby, including (i) the identity of Purchaser, Seller or any of their respective Affiliates, (ii) by reason of any communication by Purchaser or any of

1607904589.12

CONFIDENTIAL                                                    FBG_CH1_00094340

its Affiliates regarding the plans or intentions of Purchaser or its Affiliates with respect to the conduct of the business of the Company and its Subsidiaries following the Closing, (iii) the failure to obtain any third-party consent in connection with the transactions contemplated hereby and (iv) the impact of any of the foregoing on any relationships with customers, suppliers, vendors, business partners, employees or any other Person, (b) any change, event or development in or affecting financial, economic, social or political conditions generally or the securities, credit or financial markets in general, including interest rates or exchange rates, or any changes therein, in the United States or other countries in which the Company or any of its Subsidiaries (after giving effect to the Reorganization) conduct operations or any change, event or development generally affecting the industries in which the Company and its Subsidiaries (after giving effect to the Reorganization) operate, (c) any adoption, implementation, proposal or change in any applicable Law or IFRS or interpretation of any of the foregoing, (d) any action taken or not taken to which Purchaser has consented in writing, (e) any action permitted to be taken or omitted pursuant to this Agreement or taken with Purchaser's consent or not taken because Purchaser did not give its consent, (f) any actions taken by or on behalf of Purchaser or any of its Affiliates or Representatives, (g) the failure of the Company or any of its Subsidiaries (after giving effect to the Reorganization) or Affiliates on an individual or aggregate basis to meet any internal or public projections, budgets, forecasts or estimates of revenues, earnings or other financial results for any period ending on or after the date of this Agreement; provided, however, that this clause (g) shall not be construed as implying that the Company or Seller is making any representation or warranty with respect to any internal or public projections, budgets, forecasts or estimates of revenues, earnings or other financial results for any period, (h) the commencement, occurrence, continuation or escalation of any war, armed hostilities or acts of terrorism, or (i) the existence, occurrence or continuation of any force majeure events, including any earthquakes, floods, hurricanes, tropical storms, fires or other natural disasters or any national, international or regional calamity; provided, further, that any change, event, state of facts or development referred to in clauses (b), (c), (h) and (i) shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur solely to the extent that such change, event, state of facts or development has a material disproportionate effect on the Company and its Subsidiaries (after giving effect to the Reorganization) compared to other participants in the industries in which the Company and its Subsidiaries (after giving effect to the Reorganization) conduct business.

"Material Company Intellectual Property Contract" has the meaning set forth in Section 4.12(a)(xi).

"Material Customers" has the meaning set forth in Section 4.21(b).

"Material Suppliers" has the meaning set forth in Section 4.21(a).

"Most Recent Fiscal Year End" has the meaning set forth in Section 4.13(a).

"Non-Party Affiliates" has the meaning set forth in Section 10.17.

"Notary" means a civil law notary of DLA Piper Nederland or substitute in office.

"Notary Account" means such account as specified in the Notary Letter.

1607904589.12

"Notary Letter" means the notary letter setting out the closing mechanics and flow of funds at the Closing as prepared by the Notary and attached hereto as Exhibit D.

"Object Code" means computer Software in binary form that is intended to be directly executable by a computer after suitable processing and linking but without the intervening steps of compilation or assembly.

"OFAC" means U.S. Department of the Treasury Office of Foreign Assets Control.

"Order" means any decree, order, judgment, writ, award, injunction, stipulation or consent of or by, or settlement agreement with, a Governmental Authority.

"Ordinary Course" means the ordinary course of business of the Business, consistent with past practice and custom.

"Organizational Documents" means the articles of incorporation, articles or certificate of incorporation, articles of association, bylaws, articles or certificate of formation, operating agreement, memorandum of association, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto, as applicable.

"Outside Date" has the meaning set forth in Section 8.1(b).

"Owned Real Property" has the meaning set forth in Section 4.20(a).

"parties" shall mean Purchaser, the Company and Seller, and each individually shall be referred to as a "party".

"Permit" has the meaning set forth in Section 4.16.

"Permitted Liens" means (a) Liens for Taxes, assessments or other charges imposed by Governmental Authorities not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceeding and for which adequate reserves have been established on the Financial Statements in accordance with IFRS, (b) mechanic's, workmen's, repairmen's, carrier's, warehousemen's or other like Liens arising or incurred in the Ordinary Course for amounts not yet due and payable or the amount or validity of which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the Financial Statements in accordance with IFRS, (c) other than with respect to Owned Real Property, Liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the Ordinary Course consistent with past practice which are not, individually or in the aggregate, material to the business of the Company, (d) zoning, entitlement, building and other generally applicable land use and environmental restrictions by a Governmental Authority, which are not violated by the current use or occupancy of the Real Property or the operation of the Business thereon, (e) Liens created by Purchaser or any of its successors or assigns (f) any transfer or other restrictions under applicable federal and state securities Laws and (g) easements, rights-of-way, encroachments, covenants, conditions and restrictions, incurred or suffered in the Ordinary Course to the extent they do not (and would not)

1607904589.12

FBG_CH1_00094342

individually, or in the aggregate, reasonably be expected to materially interfere with the present use of such property or result in any material impediment to the use, operation or intended development of the subject property; and (h) liens of landlords under any Lease Documents.

"Person" means any natural person, corporation, limited liability company, partnership, firm, joint venture, joint-stock company, trust, association, unincorporated entity or organization of any kind, Governmental Authority or other entity of any kind.

"Power of Attorney" means a power of attorney authorizing the execution of the Deed of Transfer, in customary form to be proposed by the Notary.

"Pre-Closing Income Taxes" means an amount equal to the sum of all accrued but unpaid Income Taxes of the Company and its Subsidiaries for any Pre-Closing Tax Period (taking into account the Reorganization and, including for such purposes, any estimated Taxes of the Company and its Subsidiaries with respect to Taxes attributable to post-Closing Reorganization steps), determined: (i) in accordance with Section 6.7(b), the accounting methodology and the past practices of the Company or applicable Subsidiary to the extent permitted by applicable Law at a "more likely than not" or greater level of comfort; (ii) by excluding any Taxes attributable to any action taken at the direction of Purchaser or any of its Affiliates (including the Company and its Subsidiaries) after the Closing outside the Ordinary Course, and any financing, refinancing or debt payoff arrangements entered into at any time by or at the direction of Purchaser or any of its Affiliates in connection with the transactions contemplated by this Agreement (if any); (iii) by taking into account any estimated Income Tax payments that have the effect of actually reducing Income Taxes; (iv) by excluding any Taxes resulting solely from a Tax Election; (v) by taking into account any deductions or similar Tax benefits arising from or attributable to the payment of the Seller Transaction Expenses or Indebtedness that have the effect of actually reducing Income Taxes; and (v) without regard to any deferred Tax assets or deferred Tax liabilities.

"Pre-Closing Insurance Claim" means any (a) claim made against the Company or any of its Subsidiaries and reported to the applicable insurer(s) at or prior to the Closing in respect of an act or omission occurring at or prior to the Closing that results in a Liability under a "claims-made-based" Insurance Policy or any extended reporting period thereof or (b) Action (whether made prior to, at or following the Closing) in respect of a Liability occurring at or prior to the Closing under an "occurrence-based" Insurance Policy.

"Pre-Closing Taxes" means Taxes of the Company or its Subsidiaries for any Pre-Closing Tax Period.

"Pre-Closing Tax Period" means any taxable period (or portion thereof) that ends on or before the Closing Date and the portion through the end of the Closing Date of any Straddle Period.

"Privacy Laws" has the meaning set forth in Section 4.11(a).

"Purchase Price" has the meaning set forth in Section 1.2.

"Purchaser" has the meaning set forth in the caption.

"Purchaser Adjustment Amount" has the meaning set forth in Section 1.7(b).

1607904589.12

CONFIDENTIAL                                                                 FBG_CH1_00094343

"Purchaser's Knowledge" or "Knowledge of Purchaser" or similar phrase means the actual (but not constructive or imputed) knowledge of Steve Graham and Michael Baker, in each case, without independent investigation.

"Purchaser Parties" means, collectively, Purchaser and any of its former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders, Affiliates, successors or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, stockholders, Affiliate, successor or assignee of any of the foregoing.

"Purchaser Released Parties" has the meaning set forth in Section 10.18(b).

"Purchaser Releasing Parties" has the meaning set forth in Section 10.18(a).

"Purchaser Termination Fee" has the meaning set forth in Section 8.2(b).

"Real Property" has the meaning set forth in Section 4.20(a).

"Reference Time" means 9:59 a.m. on the Closing Date.

"Registered Intellectual Property" means all United States, international and foreign: (i) Patents; (ii) Trademarks; (iii) Copyrights; and (iv) any other Intellectual Property Rights, in each case, that are the subject of a pending application, certificate, registration or other document issued, filed with, or recorded by any state, government or other public legal authority.

"Release" means releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping.

"Reorganization" means the actions detailed in Exhibit A hereto.

"Reorganization Completion" means the completion of all actions and other steps required to give effect to the Reorganization in accordance with terms of this Agreement (including Section 6.7(g)).

"Reorganization Documents" has the meaning set forth in Section 6.7(g).

"Representatives" means, with respect to any Person, the directors, officers, employees, advisors (including investment bankers, financial advisors, legal counsel, accountants and consultants), financing sources and other agents and representatives of such Person and its Affiliates.

"Required Stockholder Approval" means the prior approval of (i) the DRs and (ii) the general meeting of Aegletes B.V., in each instance, from the holders of DRs representing in the aggregate more than the requisite percentage of the voting rights that can be exercised in such meeting of holders of DRs and such general meeting, respectively, have entered into irrevocable undertakings with Aegletes B.V. to approve the Sale;

"Retained Reorganization Liabilities" has the meaning set forth in Section 6.7(g).

1607904589.12

"Sale" has the meaning set forth in Section 1.1.

"Sanctioned Country" means any country or territory that is the subject or target of comprehensive country-wide or territory-wide Sanctions, at the time of this Agreement being the Crimea, Donetsk People's Republic and Luhansk People's Republic regions of Ukraine, Cuba, Iran, North Korea and Syria.

"Sanctioned Person" means a Person that is (i) the government of a Sanctioned Country, (ii) a Person that is designated on any Sanctions-related list of designated or sanctioned Persons, (iii) 50% or more directly or indirectly owned by or controlled (as such term is defined and construed under applicable Sanctions) directly or indirectly by any of the foregoing, or (iv) the subject or target of any Sanctions.

"Sanctions" means any economic or financial sanctions, trade embargoes or similar restrictive measures imposed, administered or enforced by the United States government, including OFAC, or any other applicable similar Laws or measures imposed, administered or enforced by any other relevant sanctions authority.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller" has the meaning set forth in the caption.

"Seller Adjustment Amount" has the meaning set forth in Section 1.7(a).

"Seller Benefit Plan" means any Benefit Plan that is not a Company Benefit Plan.

"Seller Parties" means, collectively, Seller and any of its former, current or future directors, officers, employees, agents, general or limited partners, managers, members, equityholders, Affiliates, successors or assignees or any former, current or future director, officer, employee, agent, general or limited partner, manager, member, equityholder, Affiliate, successor or assignee of any of the foregoing.

"Seller Pre-Closing Communications" has the meaning set forth in Section 10.16(b).

"Seller Privileged Materials" has the meaning set forth in Section 10.16(b).

"Seller Released Parties" has the meaning set forth in Section 10.18(a).

"Seller Releasing Parties" has the meaning set forth in Section 10.18(b).

"Seller Termination Fee" has the meaning set forth in Section 8.2(c).

"Seller Transaction Expenses" means, without duplication, as of immediately prior to the Closing and solely to the extent not paid by or on behalf of Seller or the Company or prior to the Closing, (i) all third party fees, costs and expenses relating to this Agreement and the transactions contemplated hereby that are incurred at or prior to the Closing (unless incurred by Purchaser or any of its Subsidiaries from after the Closing (prior to the consummation of the transactions

1607904589.12

FBG_CH1_00094345

contemplated hereby)) and are payable by the Company or any of its Affiliates to any financial advisor, broker or finder or to any attorney, accountant, consultant, notary or other professional that rendered services in connection with this Agreement and the transactions contemplated hereby, (ii) fifty percent (50%) of any costs, fees or expenses required to be paid by any party hereto with respect to any FDI Laws or Antitrust Laws, in each instance, in connection with the matters set forth herein, and (iii) the amount of any retention bonus, change of control payment, transaction bonus, discretionary bonus or other similar payment that is or becomes payable to any current or former employee or other service provider of the Business solely as a result of the consummation of the transactions contemplated by this Agreement, including the employer portion of any payroll or employment Taxes associated with the foregoing.

"Seller's Prior Counsel" has the meaning set forth in Section 10.16(a).

"Senior Manager" means members of the Company's management team.

"Senior Manager Employment Contract" means the employment contract for any member of the Company's management team.

"Settlement Date" means the date on which the Final Closing Statement is finally determined pursuant to Section 1.6.

"Shared Services Agreement" has the meaning set forth in Section 6.12(b).

"Shares" has the meaning set forth in the Recitals.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, program interfaces, models and methodologies, whether in Source Code or Object Code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and (iv) all user documentation, including user manuals and training materials, relating to any of the foregoing.

"Source Code" means computer Software and code, in form other than Object Code or machine readable form, including related programmer comments and annotations, help text, data and data structures, instructions and procedural, object-oriented and other code, which may be printed out or displayed in human readable form.

"Specified Expenses" means (i) fifty percent (50%) of any costs, fees or expenses required to be paid by any party hereto with respect to any FDI Laws or Antitrust Laws, in each instance, in connection with the matters set forth herein and (ii) any and all costs, fees, expenses and premiums necessary to obtain the D&O Insurance pursuant to Section 6.4(a).

"Straddle Period" means any taxable period that includes (but does not end on) the Closing Date.

"Subsidiary" of any Person means another Person (a) at least 50% of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is owned or controlled directly or

1607904589.12

DEBTORS' EXHIBIT NO. 239
Page 87 of 193

indirectly by such first Person or by one or more of its Subsidiaries or (b) of which such first Person or one of its Subsidiaries serves as a general partner (in the case of a partnership) or a manager or managing member (in the case of a limited liability company) or similar function.  For the purposes hereof, "Subsidiaries" of the Company at any given time shall expressly include any Person that would be a Subsidiary of the Company assuming the Reorganization has been completed in accordance with the terms hereof.

"Supply Agreements" means each of (i) that certain Supply Agreement, by and between Lumileds Holding B.V. and Lumileds Germany GmbH, (ii) that certain Supply Agreement, by and between Lumileds Holding B.V. and Lumileds Poland S.A., (iii) that certain Supply Agreement, by and between Lumileds Holding B.V. and Lumileds Poland S.A., and (iv) that certain Supply Agreement, by and between Lamps Holding B.V. and Lumileds (Jiaxing) Technology Co. Ltd.

"Target Closing Date Cash" means $18,000,000.

"Target Working Capital" means $81,900,000.

"Tax Authority" means any Governmental Entity, domestic or foreign, responsible for the imposition, enforcement, determination, assessment or collection of any Tax or for the administration of any Law relating to any Tax.

"Tax Election" has the meaning set forth in Section 6.7(g).

"Tax Election Purchase Price Allocation" has the meaning set forth in Section 6.7(g).

"Tax Return" means any return, report, election, disclosure or similar statement filed or required to be filed with or supplied to any Tax Authority with respect to any Tax, including any information return, claim for refund, or declaration of estimated Tax and including, in each case, any schedule or attachment thereto or amendment thereof.

"Tax Sharing Agreement" means any agreement relating to the sharing, allocation or indemnification of Taxes, or any similar agreement, contract or arrangement, other than such an agreement or arrangement exclusively between or among the Company and its Subsidiaries or an agreement or arrangement entered into in the ordinary course of business the primary purpose of which does not relate to Taxes.

"Tax Refund" means a refund, rebate or repayment in respect of Tax.

"Taxes" means all federal, state, local, non-U.S. and other taxes, charges, fees, duties (including custom duties), imposts, levies, or other assessments or similar governmental charges, including net income, gross income, capital gains, gross receipts, net receipts, gross proceeds, net proceeds, ad valorem, profits, real property, personal property (whether tangible or intangible), premium, windfall profits, transfer, registration, alternative, add-on minimum, gaming, sales, use, franchise, capital, excise, estimated, value added, stamp, lease, transfer, occupational, equalization, license, payroll, employment, environmental, disability, severance, withholding, unemployment, minimum alternative tax, equalization levy, tax collection at source, goods and services tax, tax credits or other taxes, charges or fees assessed by any Governmental Authority, including any interest, fines, assessments, penalties, or additions to tax attributable thereto.

1607904589.12

CONFIDENTIAL

"Trade Secrets" means, where protectable as a trade secret by applicable Law, any and all inventions (whether or not patentable, reduced to practice or made the subject of a pending patent application), invention disclosures and improvements, all proprietary information, know-how and technology, confidential or proprietary information and all documentation therefor.

"Transfer Taxes" has the meaning set forth in Section 6.7(a).

"Transition Services Agreement" means that certain transition services agreement as mutually agreed to by the Seller and Purchaser between the date hereof and the Closing Date, including with respect to the annexes, exhibits and schedules thereto, and to be entered into at the Closing by and among Seller, the Company and Purchaser.

"WARN Act" has the meaning set forth in Section 4.19(e).

"Willful Breach" has the meaning set forth in Section 8.2(a).

"Working Capital" means, as of the Reference Time, the current assets minus the current liabilities of the Company, calculated consistent with the Illustrative Calculation and determined in accordance with and shall include any items required to be included in Working Capital and exclude any items required to be excluded from Working Capital consistent with the Illustrative Calculation; *provided*, for the avoidance of doubt, Working Capital shall be calculated without giving effect to the transactions pursuant to this Agreement other than the Reorganization.

1607904589.12

CONFIDENTIAL

FBG_CH1_00094348

## EXHIBIT A

### Reorganization Steps Plan

(*See Attached.*)

Exh. A-1

CONFIDENTIAL                                                                 FBG_CH1_00094349

Exhibit A – Reorganization Steps Plan
(Brazil)

| ID | Description | | Type | Status | | | | Comments | # |
|---|---|---|---|---|---|---|---|---|---|
| BRA 1 | Lumileds International BV transfers the <1% of the quotas in Lumileds Iluminaçao Brasil Ltda to New Netherlands LampsCo BV against cash. | Both | Milestone | normal | Yes | No | No | | 1723 |
| BRA 1.1.1 | Draft Quota Purchase Agreement | | Activity | completed | | | | | |
| BRA 1.1.2 | Execution of the Quota Purchase Agreement | | Deliverable | normal | | No | No | | 2967 |
| BRA 1.2 | Lumileds to appoint Legal Representative | | Activity | completed | | No | No | | 2968 |
| BRA 1.3 | All documents issued abroad must be legalized and apostilled before being sent to DL BR (see comments) | | Activity | normal | | No | No | Articles of Association of Lamps Holding BV - Articles of Association Lumileds of International BV  - Power of Attorney.<br><br>The coporate document of the foreign quota holders shall indicate the entity's basic corporate information, such as: (i) corporate name; (ii) headquarters address; (iii) shareholders; and (iv) legal representatives. | 3003 |
| BRA 1.4.1 | Draft Power of Attorney to be granted by New Netherlands LampsCo BV to an individual resident in Brazil to act as its local attorney-in-fact | | Activity | completed | | No | No | | 3682 |
| BRA 1.4.2 | Execution of the Power of Attorney by New Netherlands LampsCo BV | | Deliverable | normal | | No | No | | 3004 |
| BRA 1.4.3a | Documents to be sworn translated into Portuguese and registered before Registry of Deeds and Documents in Brazil (see comments) | | Activity | normal | | | | Articles of Association of Lamps Holding BV - Articles of Association Lumileds of International BV  - Power of Attorney. | |
| BRA 1.4.4a | Apply for Brazilian Tax ID for New Netherlands LampsCo BV | | Activity | normal | | No | No | | 3605 |
| BRA 1.5.1 | Draft Amendment Articles of Association of Lumileds Iluminaçao Brasil Ltda. | | Activity | completed | | No | No | | 3683 |
| BRA 1.5.2 | Execution Amendment Articles of Association of Lumileds Iluminaçao Brasil Ltda. | | Milestone | normal | | No | No | | 3005 |
| BRA 1.6 | Registration of the Amendment Articles of Association of Lumileds Iluminaçao Brasil Ltda. before the Board of Trade of São Paulo | | | | | | | | |
| BRA 1.7 | Disclose of New Netherlands LampsCo BV's full corporate structure offshore up to the ultimate individual beneficiary(ies) (UBO) to the Brazilian Federal Revenue Office | | | | | | | | |
| BRA 1.8 | Registration of New Netherlands LampsCo BV with the Non-Resident Declaration Register (*Cadastro Declaratório de Não Residente – CDNR*) before the Central Bank of Brazil | | | | | | | | |
| BRA 2 | Lumileds Holding BV transfers the >99% of the quotas in Lumileds Iluminaçao Brasil Ltda to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | Yes | No | No | | 1722 |
| BRA 2.1.1 | Draft Contribution Agreement | | | | | No | No | | 3681 |
| BRA 2.1.2 | Execution Contribution Agreement | | Deliverable | normal | | No | No | | 3006 |
| BRA 2.2 | All documents issued abroad must be legalized and apostilled before being sent to DL BR (see comments) | | Activity | normal | | No | No | Articles of Association of Lamps Holding BV - Articles of Association Lumileds of International BV  - Power of Attorney.<br><br>The coporate document of the foreign quotaholders shall indicate the entity's basic corporate information, such as: (i) corporate name; (ii) headquarters address; (iii) shareholders; and (iv) legal representatives. | 3007 |
| BRA 2.3.1 | Draft Power of Attorney to be granted by Lamps Holding BV to an individual resident in Brazil to act as its local attorney-in-fact | | | | | | | | |
| BRA 2.3.2 | Execution of the Power of Attorney by Lamps Holding BV | | | | | | | | |
| BRA 2.3.3 | Documents to be sworn translated into Portuguese and registered before Registry of Deeds and Documents in Brazil (see comments) | | | | | | | | |
| BRA 2.3.4 | Apply for Brazilian Tax ID for Lamps Holding BV | | Milestone | normal | | No | No | | 3008 |
| BRA 2.4 | Execution of the Power of Attorney by Lamps Holding BV | | Activity | normal | | No | No | | 3009 |
| BRA 2.5 | Documents to be sworn translated into Portuguese and registered before Registry of Deeds and Documents in Brazil (see comments) | | Activity | normal | | No | No | Articles of Association of Lamps Holding BV - Articles of Association Lumileds of International BV  - Power of Attorney. | 3010 |
| BRA 2.6 | Execution Amendment Articles of Association of Lumileds Iluminaçao Brasil Ltda. (see BRA 1.5.2 and comments) | | Milestone | normal | | No | No | The two steps outlined in this tab (i.e., (i) transfer of quotas by Lumileds International BV to New Netherlands LampsCo BV against cash, and (ii) transfer of quotas by Lumileds Holding BV to Lamps Holding BV by way of a capital contribution) can be implemented concurrently and on the same date under a single AoA or subsequently and under two different AoAs. In any event, it is worth clarifying that the AoA(s) shall be executed by the legal representatives of all its quotaholders and must be registered before the local Board of Trade so as to produce effects before third parties. | 3008 |
| BRA 2.7 | Registration of the Amendment Articles of Association of Lumileds Iluminaçao Brasil Ltda. before the Board of Trade of São Paulo (see BRA 1.6) | | | | | | | | |
| BRA 2.8 | Disclose of New Netherlands LampsCo BV's full corporate structure offshore up to the ultimate individual beneficiary(ies) (UBO) to the Brazilian Federal Revenue Office | | | | | | | | |
| BRA 2.9 | Registration of New Netherlands LampsCo BV with the Non-Resident Declaration Register (*Cadastro Declaratório de Não Residente – CDNR*) before the Central Bank of Brazil. | | | | | | | | |
| BRA 3 | Transfer of 1 FTE to third party contractor (Adecco) | Both | Milestone | normal | Yes | No | | | 1733 |

Exh. A-2

FBG_CH1_00094350

**DEBTORS' EXHIBIT NO. 239**
**Page 91 of 193**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CAN 0 | STEP 0: Lumileds to check corporate structure chart | | | completed | | | No | No | 1721 |
| CAN 0.1 | Determine current shareholder registration | Lunar | Milestone | completed | Yes | | No | No | 1721 |
| CAN 0.1 | Check whether Lumileds Holding BV or Lumileds Subholding BV holds Lumileds Canada shares | | | completed | | | No | No | 2993 |
| CAN 1 | STEP 1: Lumileds Subholding BV transfers 100% of the shares in Lumileds Canada Inc. to Lumileds Holding BV by way of a capital contribution. | Both | Milestone | normal | Yes | | No | No | 1720 |
| CAN 1.01 | Draft Contribution Agreement | | Activity | normal | | | | | |
| CAN 1.02 | Execute Contribution Agreement | | Activity | normal | | | No | No | 3621 |
| CAN 1.1.1 | Draft Application from Lumileds BV to transfer 120,000 Common shares of Lumileds Canada to Lumileds Holding BV | | Activity | completed | | | No | No | 3614 |
| CAN 1.1.2 | Application from Lumileds BV to transfer 120,000 Common shares of Lumileds Canada to Lumileds Holding BV | | Deliverable | normal | | | No | No | 2994 |
| CAN 1.2.1 | Draft Directors' resolution of Lumileds Canada approving share transfer, cancelling old share certificate(s) and issuing new share certificate. | | Activity | completed | | | No | No | 3615 |
| CAN 1.2.2 | Directors' resolution of Lumileds Canada approving share transfer, cancelling old share certifiate(s) and issuing new share certificate. | | Deliverable | normal | | | No | No | 2995 |
| CAN 1.3.1 | Draft Stock transfer with respect to Common shares to be transferred to Lumileds Holding BV. | | Activity | completed | | | No | No | 3617 |
| CAN 1.3.2 | Stock transfer with respect to Common shares to be transferred to Lumileds Holding BV. | | Deliverable | normal | | | No | No | 2996 |
| CAN 1.4.1 | Draft New share certificate for 120,000 Common shares of Lumileds Canada issued to Lumileds Holding BV. | | Activity | completed | | | No | No | 3619 |
| CAN 1.4.2 | New share certificate for 120,000 Common shares of Lumileds Canada issued to Lumileds Holding BV. | | Deliverable | normal | | | No | No | 2997 |
| CAN 2 | STEP 2: Lumileds Holding BV transfers 100% of the shares in Lumileds Canada Inc. to LampsHolding BV by way of a capital contribution. | | Milestone | normal | | | | | |
| CAN 2.01 | Draft Contribution Agreement | | Activity | normal | | | | | |
| CAN 2.02 | Execute Contribution Agreement | | Deliverable | normal | | | No | No | 3622 |
| CAN 2.1.1 | Draft Application from Lumileds BV to transfer 120,000 Common shares of Lumileds Canada to Lamp BV | | Activity | completed | | | No | No | 3613 |
| CAN 2.1.2 | Application from Lumileds BV to transfer 120,000 Common shares of Lumileds Canada to Lamp BV | | Deliverable | normal | | | No | No | 3607 |
| CAN 2.2.1 | Draft Directors' resolution of Lumileds Canada approving share transfer, cancelling old share certificate(s) and issuing new share certificate. | | Activity | completed | | | No | No | 3616 |
| CAN 2.2.2 | Directors' resolution of Lumileds Canada approving share transfer, cancelling old share certifiate(s) and issuing new share certificate. | | Deliverable | normal | | | No | No | 3608 |
| CAN 2.3.1 | Draft Stock transfer with respect to Common shares to be transferred to Lamp BV. | | Activity | completed | | | No | No | 3618 |
| CAN 2.3.2 | Stock transfer with respect to Common shares to be transferred to Lamp BV. | | Deliverable | normal | | | No | No | 3609 |
| CAN 2.4.1 | Draft New share certificate for 120,000 Common shares of Lumileds Canada issued to Lamp BV. | | Activity | completed | | | No | No | 3620 |
| CAN 2.4.2 | New share certificate for 120,000 Common shares of Lumileds Canada issued to Lamp BV. | | Deliverable | normal | | | No | No | 3610 |

Exh. A-3

Exhibit A – Reorganization Steps Plan
(China)

| ID | Name | Entity | Task Type | Status | Critical path | Netting in-scope Activity | IPO Demerger? Commitment | IPO Demerger? Dismissal | Dependency Comment | Comments | # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CHN 0 | Branch office Shanghai - required for Liberty FTEs | Liberty | Milestone | normal | Yes | No | No | No | | | 1517 |
| CHN 1 | Step 1: Lumileds International BV will sell the shares in Lumileds Hubei to Lamps Holding BV against a receivable (CHN Receivable) | Liberty | Milestone | normal | | | | | | | |
| CHN 1.1 | Preparation and negotiation of equity purchase agreement. | Both | Activity | completed | | | | | | | |
| CHN 1.1d | Registration and filing of change of shareholder of Lumileds Hubei with local government authorities of Songzi, Hubei. | | Milestone | normal | | | | | | | |
| CHN 1.2 | Consideration/Value of the shares in Lumileds Hubei | | Milestone | normal | | | | | | | |
| CHN 1.3 | Preparation of legalization + apostille PoA and extract Lamps Holding BV | Lunar | | completed | | | No | No | | | 3649 |
| CHN 1.4 | Provide Fangda with PoA and extract | | | completed | | | No | No | | | 3650 |
| CHN 1.5 | Sign equity transfer agreement | Both | Milestone | normal | | | | | | | |
| CHN 2 | Step 2: The Lamps Business will be sold and transferred from (Lumileds Jiaxing - if any) and Lumileds Shanghai to Lumileds Hubei against cash payment | Both | Milestone | normal | | | | | | | |
| CHN 2.1 | Transfer of employees to branch office (preparation of tripartite employee transfer agreements) | Both | Milestone | undefined | | | | | | | |
| CHN 2.2 | Transfer of contracts / consent statements (preparation of contract assignment agreements/consent statements) | Both | Milestone | normal | | | | | | | |
| CHN 2.3 | Valuation of the assets/liabilities to be available (preparation of the asset and liability transfer agreement) | Both | Milestone | normal | | | | | | | |
| CHN 2.4 | Cash to be available at Lumileds Hubei | Both | Milestone | undefined | | | Yes | No | | | 2276 |
| CHN 3 | Step 3: China Receivable will be eliminated by transferring the receivable to Lamps Holding BV through a dividend distribution and a capital contribution. | Both | Milestone | normal | No | No | No | No | | Timing to be aligned with IC settlement plan | 796 |
| CHN 3.1 | Balance sheet test and liquidity test to be performed by Lumileds Holding (sufficient distribuable reserves) | Lunar | Activity | normal | | | | | | | |

Exh. A-4

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 239**
**Page 93 of 193**

FBG_CH1_00094352

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FR 1 | Step 1: Lumileds Holding BV transfers 100% of the shares in Lumileds Commercial France to Leuco Holding by way of a capital contribution. | Both | Milestone | normal | Yes | | No | No | | 1719 |
| FR 1.1 | Awaiting DLA if release pledge agreement is desired | Both | Milestone | normal | Yes | | No | No | DLA to seek confirmation re the possibilities of release of the pledge | 2831 |
| FR 1.2 | Review share transfer order as sent by Evi per e-mail on 4 April 2024 | Both | | completed | | | No | No | | 2832 |
| FR 1.4 | Draft contribution agreement | Both | Deliverable | normal | | | | | | |
| FR 1.5 | Execute contribution agreement and transfer of the share transfer order | Both | | undefined | | | No | No | | 2833 |
| FR 1.6 | Draft share transfer form to be signed by the transferor and the transferee and countersigned by Lumileds Commercial France. | Both | Deliverable | undefined | | | | | | |
| FR 1.7 | Execute share transfer form | Both | | undefined | | | | | | |
| FR 1.8 | Update share ledger and shareholders account | Both | | undefined | | | No | No | | 2834 |

Exh. A-5

CONFIDENTIAL

FBG_CH1_00094353

| ID | Description | | | | | | | | | Comments | Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GER 0 | Duc of mration business Aachen in site | Lunar | Milestone | normal | | | | No | No | | |
| GER 0.1 | VAT registration by Lumileds Aachen | Lunar | Milestone | normal | | | | No | No | | 2700 |
| GER 0.10 | i2open (Zollsoftware) registration by Lumileds Aachen (to checked whether Lumileds Aachen GmbH can get a user account under Lumileds Germany GmbH | Lunar | Milestone | undefined | | | | | | | |
| GER 0.11 | Economic Operators Registration and Identification Number (EORI) by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.12 | Economic Operators Registration and Identification Number (EORI) for UK business by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.2 | Trade registration by Lumileds Aachen | Lunar | Milestone | normal | | | | No | No | | 2701 |
| GER 0.3 | Payroll tax and social security registration by Lumileds Aachen | Lunar | Milestone | normal | | | | No | No | | 2702 |
| GER 0.4 | Notification of commencement of commercial activity by Lumileds Aachen | Lunar | Milestone | normal | | | | No | No | | 2703 |
| GER 0.5 | Gewerbeanmeldung by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.6 | Known consignee registration (Bekannter Versender) by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.7 | AEO Customs Office registration by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.8 | Authorized Consignee Customs Office registration by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 0.9 | Creation of deferment account (Zollaufschubkonto) by Lumileds Aachen | Lunar | Milestone | undefined | | | | | | | |
| GER 1 | STEP 1: Lumileds Germany GmbH transfers 100% of the shares in Lumileds USA (Holding) Corp. (and its subsidiaries) to Lumileds Holding BV | Both | Milestone | normal | | | | | | | |
| GER 1.0 | Inform economic committee (Wirtschaftsausschuss) on the transaction | | | | | | | | | Generally, during the planning stage before decision on the sale of shares is (officially) made. However, no veto/blocking right, but administrative fines up to EUR 10,000 which in practice are often ignored since this fine is rather low and confidentiality is often key. | |
| GER 1.1 | Value of the shares in Lumileds USA | Both | Milestone | normal | | | Yes | No | | | 1731 |
| Ger 1.2 | Mintz to draft share transfer agreement | Both | Milestone | completed | | | No | No | | | 2771 |
| GER 1.2 | Mintz to provide DT NL with required documentation regarding share transfer and to complete share transfer | Both | Milestone | completed | | | No | No | | | 2775 |
| GER 1.3 | Execute share transfer agreement | | | | | | | | | | |
| GER 2 | STEP 2: Lumileds Germany GmbH transfers 100% of the shares in Lumileds Aachen GmbH to Lumileds Holding BV in exchange for cash. | Both | Milestone | normal | Yes | No | No | No | | | 800 |
| GER 2.0 | Inform economic committee (Wirtschaftsausschuss) on the transaction | | | | | | | | | Generally, during the planning stage before decision on the sale of shares is (officially) made. However, no veto/blocking right, but administrative fines up to EUR 10,000 which in practice are often ignored since this fine is rather low and confidentiality is often key. | |
| GER 2.1 | Value of the shares in Lumileds Aachen GmbH | Both | Milestone | normal | Yes | | Yes | No | | | 2590 |
| GER 2.2 | Execute PoA Lumileds Germany GmbH | Both | Milestone | normal | | | | | | | |
| GER 2.3 | Execute PoA Lumileds Holding BV (PoA shall include (i) certification of signature (Unterschriftsbeglaubigung), (ii) certificate of authorization (Vertretungsbescheinigung) and (iii) apostille) | Both | Milestone | normal | | | | | | | |
| GER 2.4 | Provide KYC documentation notary Lumileds Germanh GmbH | Both | Milestone | completed | | | No | No | | | 2697 |
| GER 2.5 | Provide KYC documentation notary Lumileds Holding B.V. | Both | Milestone | completed | | | No | No | | | 2698 |
| GER 2.6 | Draft share purchase and transfer agreement | Both | Milestone | normal | | | | | | | |
| GER 2.7 | Execute share purchase and transfer agreement | Both | Milestone | normal | | | | | | Notarization required in front of a German notary | |
| GER 2.8 | Update list of shareholders of Lumileds Aachen GmbH | Both | Milestone | normal | | | | | | | |
| GER 3 | STEP 3: Lumileds Germany GmbH transfers the LED Business to Lumileds Aachen GmbH by means of an asset deal | Both | Milestone | normal | No | No | No | No | | | 801 |
| GER 3.0 | Inform economic committee (Wirtschaftsausschuss) on the transaction | | | | | | | | | Generally, during the planning stage before decision on the transfer of the business is (officially) made. However, no veto/blocking right, but administrative fines up to EUR 10,000 which in practice are often ignored since this fine is rather low and confidentiality is often key. | |
| GER 3.1 | Draft shareholders Lumileds Germany GmbH resolution approving the transaction and granting right of multiple representation to the managing director and execution of shareholders' resolution | Both | Milestone | completed | | | No | No | | | 2761 |
| GER 3.2 | Draft shareholders Lumileds Aachen GmbH resolution approving the transaction and granting right of multiple representation to the managing director and execution of shareholders' resolution | | | | | | | | | | |
| GER 3.3 | Resolution of Lumileds Germany GmbH's supervisory board approving the transaction? | | | | | | | | | We have requested, but not yet received, the rules of procedure for the supervisory board. Therefore, we are not able to assess any consent requirements. | |
| GER 3.4 | Provide DT Germany with detailed asset list (including contracts) | Both | Milestone | normal | | | | | | | |
| GER 3.5 | Provide DT Germany with employee information regarding transfer of employees | Both | Milestone | normal | | | | | | | |
| GER 3.6 | value of asset/liabilities transfer | Both | Milestone | normal | | | | | | | |
| GER 3.7 | Draft APA | Both | Milestone | completed | | | No | No | | | 2763 |
| GER 3.8 | Involving the Works Council | Both | Milestone | alert | | | | | | | |
| GER 3.8a | Inform the Works Council on the transfer | | | | | | | | | | |
| GER 3.8b | Negotiate and execute reconciliation of interest (ROI) and social plan (SP) employees | | | | | | | | | | |
| GER 3.8c | Execution of ROI and SP: TUPE letters and/or tripartite agreements with individual | | | | | | | | | | |
| GER 3.9 | Execute APA | Both | Milestone | normal | | | No | No | | | 2764 |
| GER 4 | STEP 4: Lumileds Germany GmbH transfers the Germany Receivable to Lumileds Holding BV via a debt repayment as part of the pre-closing financing settlement plan | Both | Milestone | normal | Yes | | No | No | | | 802 |
| GER 4.1 | Execute PoA Lumileds Germany GmbH | | | | | | | | | | |

Exh: A-6

CONFIDENTIAL

FBG_CH1_00094354

| Ref. No. | Name | Entity | Task Type | Status | Confirmation | Signing or Closing activity | Tax Related Interim Document | Tax Related Interim Document | Implementation Comment | Comment | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GER 4.2 | Execute PoA Lumileds Holding BV | | | | | | | | | | |
| GER 4.3 | Draft receivable transfer agreement | Both | Milestone | normal | | | No | No | | | 2765 |
| GER 4.4 | Execute receivable transfer agreement | | | | | | | | | German capital maintenance provisions (sections 30 et seq. German Act on Limited Liability Companies) to be complied with. | |
| GER 5 | STEP 5: Lumileds Holding BV transfers 100% of the shares in Lumileds Germany GmbH to Lamps Holding BV | Liberty | Milestone | normal | Yes | Yes | No | No | | | 1260 |
| GER 5.1 | Draft contribution agreement | Both | Milestone | completed | | | Yes | No | | | 2766 |
| GER 5.2 | Inform economic committee (Wirtschaftsausschuss) on the transaction | | | | | | | | | Generally, during the planning stage before the decision on the change of control regarding the shareholder is made. However, no veto/blocking right, but administrative fines up to EUR 10,000 which in practice are often ignored since this fine is rather low and confidentiality is often key. | |
| GER 5.3 | Execute PoA by Lumileds Holding BV | Both | Milestone | normal | | | | | | | |
| GER 5.4 | Execute PoA by Lamps Holding BV | Both | Milestone | normal | | | | | | | |
| GER 5.5 | Provide KYC documentation Lamps Holding B.V. | Both | Milestone | alert | | | No | No | | | 2769 |
| GER 5.6 | Draft share transfer deed | Both | Milestone | undefined | | | No | No | | | 2770 |
| GER 5.7 | Draft corporate resolutions Lumileds Holding B.V. | Both | Milestone | undefined | | | No | No | | | 2772 |
| GER 5.8 | Draft corporate resolutions Lamps Holding B.V. | Both | Milestone | undefined | | | No | No | | | 2773 |
| GER 5.9 | Execute corporate resolutions Lumileds Holding B.V. | | | | | | | | | | |
| GER 5.10 | Execute corporate resolutions Lamps Holding B.V. | | | | | | | | | | |
| GER 5.11 | Execute contribution agreement | Both | Milestone | | | | | | | | |
| GER 5.12 | Execute share transfer deed | Both | Milestone | normal | | | | | | Notarization required in front of a German notary. | |
| GER 5.13 | Update list of shareholders of Lumileds Germany GmbH | Both | Milestone | undefined | | | No | No | | | 2774 |
| GER 6 | Finance team LL to provide Deloitte Legal with GAAP balance sheet to decide whether loan settlement is possible | Both | | normal | | | No | No | | | 3648 |

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 239**
**Page 96 of 193**

FBG_CH1_00094355

| Ref No. | Action | Entity | Task Type | Status | Critical Path | Regulatory Consent Required | Step Requires (of) Regulatory Filing | Step Requires Notification Filing | Comments | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| HK 1 | Lumileds Holding BV transfers 100% of the shares in Lumileds Hong Kong Co., Ltd.(" **Lumileds HK**") to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | Yes | No | No | No | | 1238 |
| HK 1.1 | copy of the latest register of members | | | completed | | | No | No | | 3353 |
| HK 1.2 | copy of the latest register of directors | | | normal | | | No | No | | 3354 |
| HK 1.3 | copy of the share certificates of 100% shares in Lumileds HK owned by Lumileds Holding BV which are subject to share transfer | | | normal | | | No | No | | 3355 |
| HK 1.4 | Confirmation that there is no restriction against the transfer of 100% shares in Lumileds from Lumileds Holding BV to Lamps Holding BV | | | normal | | | No | No | | 3356 |
| HK 1.5 | Board resolution of Lumileds Holding BV for approving, among others, the share transfer and the execution and delivery of the share transfer documents | | | normal | | | No | No | | 3358 |
| HK 1.6 | Board resolution of Lumileds HK to approve, among others, (i) the share transfer, (ii) the registration of Lamps Holding BV as a member of Lumileds HK (subject to receiving the properly stamped transfer documents), (iii) the cancellation of the existing share certificate(s) in the name of Lumileds Holding BV, (iv) the issuance of new share certificate(s) in the name of Lamps Holding BV and (v) the execution and delivery of the share transfer documents | | | normal | | | No | No | | 3360 |
| HK 1.7 | Board resolutions of Lamps Holding HV approving, among others, the share transfer and the execution and delivery of the share transfer documents | | | normal | | | No | No | | |
| HK 1.8 | Intra-group share transfer agreement duly executed by Lumileds Holding BV and Lamps Holding BV | | | normal | | | No | No | | 3359 |
| HK 1.9 | Instrument of transfer duly executed by Lumileds Holding BV and Lamps Holding BV | | | normal | | | No | No | To be signed in wet-ink. Originals to be sent to HK for stamping. | 3361 |
| HK 1.10 | Bought and sold notes duly executed by Lumileds Holding BV and Lamps Holding BV | | | normal | | | No | No | Orginials are duly signed, will be sent to HK | 3362 |
| HK 1.11 | Submission of the required supporting documents and information to the Stamp Office of the Hong Kong Inland Revenue Department ("**Stamp Office**") for the adjudication of stamp duty payable on the share transfer and the stamping of the duly executed instrument of transfer and bought and sold notes. In addition to the originals of the instrument of transfer and the bought and sold notes, the supporting documents to be submitted to the Stamp Office include, among others: | | | normal | | | No | No | | |
| HK 1.11.1 | (a) Copy of the latest annual return (Form NAR1) filed by Lumileds HK with the HK Companies Registry | | | alert | | | No | No | | |
| HK 1.11.2 | (b) Copy of the latest Return of Allotment (Form NSC1) filed with the HK Companies Registry for increase of share capital which is not reflected in the articles of association or annual return of Lumileds HK | | | normal | | | No | No | | |
| HK 1.11.3 | (c) Certified true copy of the duly executed intra-group share transfer agreement | | | normal | | | No | No | | |
| HK 1.11.4 | (d) a statement/ letter on whether Lumileds HK or its subsidiary(ies) (if any) has acquired any investments, landed property or rights to acquire landed property | | | completed | | | No | No | Whether Lumileds HK or its subsidiary(ies) (if any) has acquired any investments, landed properties or rights to acquire landed property and, if so, with a completed Schedule of Landed Properties (if applicable) | |
| HK 1.11.5 | (e) the latest audited accounts of Lumileds HK and its subsidiary(ies) (if no consolidated accounts are prepared) | | | alert | | | No | No | Prepared by Deloitte HK and expected to be finalized on April 26, 2024. | 3363 |
| HK 1.11.6 | (f) the original certified management accounts of Lumileds HK and its subsidiary(ies) | | | alert | | | No | No | (if no consolidated accounts are prepared) from the end date of the latest audited accounts prepared up to a date within 3 months before the date of transfer, if the audited accounts are not prepared up to a date within 6 months before the date of transfer | |
| HK 1.11.7 | (g) a certified copy of the resolution of meetings of directors for dividends paid or payable, if any, after the end date of the latest audited accounts and specify the date on which members of Lumileds HK were entitled to the dividends | | | normal | | | No | No | | |
| HK 1.12 | Following determination by the Stamp Office of the stamp duty payable on the share transfer, the stamp duty shall be paid in accordance with the instructions by the Stamp Office. | | | normal | | | No | No | | 3364 |
| HK 1.13 | Stamped transfer documents to be provided to Lumileds HK/ Company secretary of Lumileds HK. | | | normal | | | No | No | | |
| HK 1.14 | Cancellation of original share certificate(s) representing 100% of the shares in Lumileds HK owned by Lumileds Holding BV | | | normal | | | No | No | The existing share certificate(s) in the name of Lumileds Holding BV should only be cancelled after stamp duty is duly paid. | 3365 |
| HK 1.15 | Issurance of new share certificate(s) representing 100% of the shares in Lumileds HK owned by Lamps Holding BV | | | normal | | | No | No | The new share certificate(s) in the name of Lamps Holding BV should only be issued after stamp duty is duly paid. | 3366 |
| HK 1.16 | Update register of members of Lumileds HK to reflect Lamps Holding BV as the sole member of Lumileds HK | | | normal | | | No | No | The register of members of Lumileds HK should only be updated after stamp duty is duly paid. | 3367 |
| HK 2 | Lumileds Singapore Pte. Ltd. transfers 2 FTE to SG Lamps Rep office directed by Lumileds Hong Kong Co. Ltd. | Both | Milestone | normal | Yes | Yes | No | No | | 1240 |
| HK 2.1 | Termination of the existing employment contracts of the 2 FTEs with Lumileds Singapore Pte. Ltd. | | | normal | | | No | No | | |
| HK 2.2 | Entering into of new employment contracts by the 2 FTEs with Lumileds HK to commence employment under the SG Lamps Rep office directed by Lumileds HK | | | | | | No | No | | |

Exh. A-8

CONFIDENTIAL

FBG_CH1_00094356

| Item Num. | Name | Both / PW / Lunar | Task Type | Status | Critical Task? | Critical Path? | Dependency On | Dependency Comment | Comment | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| IND 1 | STEP 1: Lumileds Holding BV and Lumileds International BV incorporate New India LEDCo. | Lunar | Milestone | caution | | | | | | |
| IND 1.1 | Lumileds Holding BV and Lumileds International BV to pass a board resolution authorising for: <br><br>(a) incorporation of New India LEDCo.; <br>(b) authorising a representative for the signing of documents; <br>(c) the proposed authorized share capital of New India LEDCo.; <br>(d) the proposed paid up share capital of New India LEDCo.;and <br>(e) the proposed number of shares to be subscribed by each shareholder. | | Activity | | | | | | The board resolutions passed by Lumileds Holding BV and Lumileds International BV have to be notarised and apostilled and filed as an annexure to the form / application filed for the reservation of the name with the relevant Registrar of Companies (ROC) | |
| IND 1.2 | PAN/TAN registration automatically as part of the incorporation of India New LEDCo | | Activity | normal | | | No | No | | | 1734 |
| IND 1.4 | Professional tax registration by India New LEDCo | | Activity | normal | | | No | No | | | 1737 |
| IND 1.5 | Special valuation branch license obtained by India New LEDCo | | Activity | normal | | | No | No | | | 1738 |
| IND 1.6 | Letter of undertaking to be obtained by India New LEDCo | | Activity | normal | | | No | No | | | 1739 |
| IND 1.7 | Legal Metrology certificate to be obtained by India New LEDCo | | Activity | normal | | | No | No | | | 1740 |
| IND 1.8 | EPR certificate to be obtained by India New LEDCo | | Activity | normal | | | No | No | | | 1741 |
| IND 1.9 | Automotive Industry standards certificate to be obtained by India New LEDCo | | Activity | normal | | | | | | | |
| IND 1.9a | MSDS | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3550 |
| IND 1.9b | Technical Write Up | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3551 |
| IND 1.9c | PB Bond | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3552 |
| IND 1.9d | RCMC | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3553 |
| IND 1.9e | DGFT License | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3554 |
| IND 1.9f | Port Registration | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3555 |
| IND 1.9g | ICEGATE Registration | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3556 |
| IND 1.9h | EFT Mandate | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3557 |
| IND 1.9i | Brand Owner Certificate | | | normal | | | No | No | | Expected lead time to be confirmed by Amrith (Lumileds India) | 3558 |
| IND 1.10 | Provident Fund registration by India New LEDCo (in case of more >20 employees) | Both | Activity | normal | Yes | No | No | No | Provident Fund registration: Employer registration within 30 days after attaining threshold of >20 employees | | 827 |
| IND 1.15 | Client to finalize the registered office address of India New LEDCo | Both | Activity | normal | | | | | | | |
| IND 1.16 | Execution of lease/ leave and license agreement for the registered office of India New LEDCo | | | | | | | | | | |
| IND 1.16 | Application for availability of name | Both | Activity | completed | | | | | | | |
| IND 1.17 | Preparing draft documents in connection to the incorporation of India New LEDCo | | Activity | alert | | | No | No | depending on approval of name | | 2738 |
| IND 1.18 | Lumileds team to review the incorporation documents and get back with their comments on the same | | Activity | normal | | | No | No | | | 2739 |
| IND 1.19 | Obtaining name approval from ROC | | Activity | caution | | | No | No | | | 2740 |
| IND 1.20 | Receiving notarized, apostilled duly signed documents | | Activity | caution | | | No | No | | Receiving apostilled documentation in US will take approx. 3 weeks. | 2742 |
| IND 1.2a | GST registration by India New LEDCo | | Activity | normal | | | No | No | | | 1735 |
| IND 1.2b | Importer and exporter code (IEC) registration by India New LEDCo | | Activity | normal | | | No | No | | | 1735 |
| IND 1.2a | Assistance in preparation and filing of incorporation documents online with MCA (including PAN & TAN) | | Activity | normal | | | No | No | | | 2743 |
| IND 1.2a | Payment of registration fees & stamp duty | | Activity | normal | | | No | No | | | 2744 |
| IND 1.2a | Follow-up, scrutiny by MCA and providing response with the same | | Activity | normal | | | No | No | | | 2745 |
| IND 1.2a | Incorporation of India New LEDCo | | Milestone | caution | | | No | No | | | 2746 |
| IND 1.2a | Client to finalize the bank in which proposed company would like to open a bank account, | | Activity | normal | | | No | No | | To discuss and shortlist first statutory auditor which India New LEDCo would like to appoint (subject to approval of the board of director of the proposed company) | 2747 |
| IND 1.2a | To hold the first board meeting of India New LEDCo and pass board resolution for the following: (see comments) | | Activity | normal | | | No | No | | - Appointment of First statutory auditor of the Company (to hold office till conclusion of First Annual General Meeting) (Alternatively shareholders of the Company are require to appoint first auditors within 90 days. If statutory auditor appointed in fir | 2748 |
| IND 1.2a | To open bank account | | Activity | normal | | | No | No | | | 2749 |
| IND 1.2a | Entity User and Business User registration of India New LEDCo on FIRMS Portal of RBI | | Activity | normal | | | No | No | | | 2750 |
| IND 1.2a | To receive initial share subscription money from subscribers of MOA | | Activity | normal | | | No | No | | | 2751 |
| IND 1.2a | To convene second board meeting and pass board resolution for allotment of shares to the subscribers of MOA | | Activity | normal | | | No | No | | | 2752 |
| IND 1.2a | Shops and establishment license request by India New LEDCo | | Activity | normal | | | No | No | | | 1736 |
| IND 1.2a | To file Form INC-20A (Declaration for commencement of business with MCA) | | Activity | normal | | | No | No | | To be filed within 180 days of the date of incorporation post-filing of Form INC-22 (Intimation of the registered office of the Company). | 2753 |
| IND 1.2a | To file Form INC-22 (Intimation for registered office address of India New LEDCo) | | Activity | normal | | | No | No | | To be filed within 30 days of incorporation of India New LEDCo. | 2754 |
| IND 1.2a | To make stamp duty payment on allotment of shares and issue share certificates to the shareholders of India New LEDCo | | Activity | normal | | | No | No | | | 2755 |
| IND 1.2a | Filing of Form FC-GPR | | Activity | normal | | | No | No | | | 2756 |
| IND 1.2a | To maintain statutory registers | | Activity | normal | | | No | No | | | 2757 |
| IND 1.2a | Registration and generation of user id and password for new company on various government portal viz. income tax e-filing portal, Traces, Reporting portal etc. | | Activity | normal | | | No | No | | | 2758 |
| IND 1.2a | STEP 2: India New LedCo will purchase the assets and liabilities (but not yet transfers) within Lumileds India Private Limited, related to the LED Business. | | Milestone | normal | | | No | No | | | 2759 |
| IND 1.2a | Identify transfer LED business including of the following: (see comments) | | Activity | normal | | | No | No | | o Assets and liabilities o Licenses, permits etc. to undertake/continue business operation, o Leasehold/office premises, if any o Employees/Staff o Contracts o List of movable and immovable assets, if any etc.<br><br>Modality of delivery of assets, transfer terms and timelines would depend on the nature of assets identified in this step -- for e.g. whether it involves physical delivery of fixed assets, novation of contracts / leases, resign and rehire of employees etc. | 2835 |

Exh. A-9

CONFIDENTIAL

DEBTORS' EXHIBIT NO. 239
Page 98 of 193

FBG_CH1_00094357

| | | | | | | |
|---|---|---|---|---|---|---|
| IND 1.2a | Enabling / setting of Business Transfer Agreement (BTA) and definitive documents for slump sale | Activity | normal | No | No | | 2836 |
| IND 1.2a | Obtaining inputs from Deloitte NL/client on BTA | Activity | normal | No | No | | 2837 |
| IND 1.2a | Reviewing the draft BTA from tax, TP & indirect tax perspective - Finalizing of BTA | Activity | normal | No | No | As per the Income tax provisions, Fair Market Value (FMV) of the LED business to be determined in accordance with rule 11UAE of the Income-tax Rules, 1962. | 2838 |
| IND 1.2a | Obtain and review of valuation report for business to be transferred from tax and regulatory laws. | Activity | normal | No | No | | 2839 |
| IND 1.2a | Finalize the valuation of the undertaking to be sold along with the consideration for business transfer | Activity | normal | No | No | | 2840 |
| IND 1.2a | Application to be filed with the Income-tax department under section 281 of the Income-tax Act for obtaining a no objection / clearance certificate | Activity | normal | No | No | | 2841 |
| IND 1.2a | Follow-up / liaise with the Income-tax department and obtain clearance certificate from Income-tax department under section 281 of the Income-tax Act | Activity | normal | No | No | | 2842 |
| IND 1.2a | Advising on whether the proposed transaction would qualify as a 'slump sale' from direct tax perspective | Activity | normal | No | No | | 2843 |
| IND 1.2a | Draft the notice to convene a Board meeting of Transferor to approve the proposed slump sale to Transferee. | Activity | normal | No | No | | 2844 |
| IND 1.2a | Lumileds India and New Co. to hold the Board meeting | Activity | normal | No | No | to consider valuation report, approve slump sale of LED business, authorize Director/ signatories for taking steps in relation to execution of the BTA | 2845 |
| IND 1.2a | Computation of capital gains tax on slump sale in the hands of Lumileds India including review of Form 3CEA | Activity | normal | No | No | | 2846 |
| IND 1.2a | Stamping and execution of BTA - conditions to be specified (if any) | Activity | normal | No | No | | 2847 |
| IND 1.2a | Payment of consideration by Transferee to Transferor | Activity | normal | No | No | Including assistance in compliances to be undertaken by New Co. including withholding tax implications (if any) at the time of discharge of consideration to Lumileds India | 2848 |
| IND 1.2a | Transferee (i.e. New Co.) to obtain Purchase Price Allocation (PPA) Report - | Activity | normal | No | No | PPA report will enable Transferee to record assets acquired in its books and also be used for tax purposes (for claiming tax depreciation) | 2849 |
| IND 1.2a | Evaluate the requirement to file application/obtain changes for below matters: see comments | Activity | normal | No | No | (a) Change of name in the licenses, permits, registrations, etc. (b) Intimation to vendors, customers and amendment to their contracts. (c) New employment letter to employees/ staff of Transferor (d) Changes in bank accounts/signatories, etc. (f) Lease agreement etc. (g) Assignment of loan arrangement with Bank/others and for receivables/payables with debtors/creditors, if any | 2850 |
| IND 1.2a | Advising on the treatment of Input Tax Credit (ITC) in case of slump sale of a particular segment of a business including computation and filling of ITC-02 under GST Act | Activity | normal | No | No | | 2851 |
| IND 1.2a | Step 1: Transfer of shares in Lumileds India Private Limited to Lamps Holding BV and minority share to Lamps Netherlands B.V | Milestone | normal | No | No | | 2852 |
| IND 1.2a | To obtain valuation report for transfer of shares to determine fair value for transfer of shares | Activity | normal | No | No | | 2854 |
| IND 1.2a | Lumileds Holding BV and Lumileds International Holding BV ("Sellers") and Lamps Holding BV and Lamps Netherlands BV ("Buyers") to mutually determine purchase consideration for the transfer of shares basis valuation report | Activity | normal | No | No | To execute a short form share purchase agreement to record the action items set out here for the transfer of shares of Lumileds India Private Limited between (a) Lumileds International Holding BV to Lamps Netherlands BV for cash; and (b) Lumileds Holding BV to Lamps Holding BV. | 2855 |
| IND 1.2a | Sellers and Buyers to pass board resolution and obtain necessary approvals-, including umbrella resolutions for entire Reorganization transaction. | Activity | normal | No | No | (if required as per applicable laws) for: -Sell/ Acquisition of shares of New Co as the case may be. | |
| IND 1.2a | Obtain Director Identification Number (DIN) and Digital Signature Certificate (DSC) of the Buyer's nominee directors proposed to be appointed on the board of Lumileds India (if not available) | | | | | Every person who is intended to be appointed as a director is mandatorily required to obtain DIN. As such, Nichi will be required to make an application to the (Indian) Ministry of Corporate Affairs to obtain DIN (if not available). <br><br> The proposed directors of the NewCo are: Alexander Dijk; Amrith Prabhu; and Vivek Kumar <br> The directors have applied for DSC where necessary. Additionally, Amrith and Vivek have submitted their PAN registration to Deloitte India. Alexander has completed the necessary documentation indicating that he does not possess a PAN. | |
| IND 1.2a | To pay applicable stamp duty on transfer of shares on Form SH-4 | Activity | normal | No | No | | 2857 |
| IND 1.2a | Execution of share transfer deed in Form SH-4 and relevant documents | Activity | normal | No | No | | 2858 |
| IND 1.2a | Remittance of consideration by Lumileds International Holding BV to Lamps Netherlands BV | Activity | normal | No | No | | 2859 |
| IND 1.2a | Form SH-4 to be submitted to New Co along with share certificate for transfer of shares | Activity | normal | No | No | | 2860 |
| IND 1.2a | New Co to send Notice of Board Meeting for approving the share transfer | Activity | normal | No | No | In addition to the agenda to be tabled at the board meeting of Lumileds India Private Limited for approval of the share transfer between Sellers and Buyers, the agenda in relation to the acceptance of the resignation of existing directors and appointment of nominee directors to be appointed by the Buyers (if proposed) shall also be tabled. | 2861 |
| IND 1.2a | New co to convene board meeting to approve the share transfer and duly executed and stamped share transfer form (SH-4) | Activity | normal | No | No | | 2862 |
| IND 1.2a | To endorse share certificate evidencing the shares transferred in the name of the Buyers and issue the endorsed certificate thereof | Activity | normal | No | No | | 2863 |
| IND 1.2a | To update register of members and share transfer | Activity | normal | No | No | | 2864 |
| IND 1.2a | Lumileds India Private Limited to file Form MGT-6 with the relevant Registrar of Companies (ROC) with respect to the nominal shareholding to be held by Lamps Netherlands B.V | | | | | | Form MGT-6 is required to be filed by Lumileds India Private Limited post receipt of declaration of beneficial interest from Lamps Netherlands BV (registered owner) in Form MGT-4 and Lamps Holding BV (beneficial owner) in Form MGT-5. | |
| IND 1.2a | Computation of capital gains tax (CGT) in the hands of Lumileds Netherlands and corresponding withholding tax implications thereon in the hands of Lamps Holding BV | | | | | | |
| IND 1.2a | Undertaking the applicable compliances for Lumileds Holding BV and Lumileds International BV: | Activity | normal | No | No | Obtaining PAN | |
| IND 1.2a | Undertaking the applicable compliances for Lamps Holding BV: | Activity | normal | No | No | | 2868 |
| IND 1.2a | Assistance in preparation and filing of Form 15CA | Activity | normal | No | No | | 2869 |
| IND 1.2a | File intimation regarding change of any details furnished at the time of registration under the Employees' State Insurance Act 1948. | Lumileds India Private Limited | Activity | | | In the event the proposed transaction entails any change in the particulars furnished at the time of registration, the same will have to be notified to the appropriate regional / branch authority within 14 days of the occurrence of such change. Details of which can be confirmed by the local team of Lumileds India Private Limited. | |

Exh. A-10

DEBTORS' EXHIBIT NO. 239
Page 99 of 193

| Step Plan Name | Entity / Tax Type | Name | Effect Date | Relates to Parent Entity | Tax Department Department Class | Dependency Comment | Comment | Type |
|---|---|---|---|---|---|---|---|---|
| IND 1.2a  File intimation regarding change of any details furnished at the time of registration under the applicable shops and establishment statute. | Lumileds India Private Limited | Activity | | | | | Any change in details furnished at the time of registration, such as details of persons occupying positions of management, is required to be intimated to the concerned authority post facto, within the timeline prescribed under the relevant state-specific shops and establishment statute.<br><br>Since the registered office of Lumileds India Private Limited is located in Gurugram, Haryana, the provisions of the Punjab Shops and Commercial Establishments Act 1958 (as applicable to Haryana) ("**Haryana S&E Act**") will be applicable.<br><br>Accordingly, in the event the proposed transaction involves any changes to the details provided at the time of registration, the same may have to be notified to the appropriate authority within 7 days of the occurrence of such change. Details of which can be confirmed by the local team of Lumileds India Private Limited. | |
| IND 1.2a  File notice in 'Form B' regarding change in particulars under the Payment of Gratuity Act 1972. | Lumileds India Private Limited | Activity | | | | | A notice in Form 'B' shall be submitted by the employer to the controlling authority of the area within 30 days of any change in the name, address, employer or nature of business.<br><br>Accordingly, in the event the proposed transaction entails any changes to the particulars mentioned above, the same may have to be notified by Lumileds India Private Limited to the controlling authority within the prescribed timelines. Details of which can be confirmed by the local team of Lumileds India Private Limited. | |
| IND 1.2a  File intimation of change of ownership under the Employees' Provident Fund and Miscellaneous Provisions Act 1952 | Lumileds India Private Limited | Activity | | | | | In the event, the proposed transaction entails any change in directors, partners, managers or any other person or persons who have the ultimate control over the affairs of an establishment, the same may have to be notified to the Regional Provident Fund Commissioner with 15 days of the occurrence of such change. Details of which can be confirmed by the local team of Lumileds India Private Limited. | |
| IND 1.2a  R TSA Exit | | Milestone | undefined | | No | No | | 2870 |

Exh. A-11

CONFIDENTIAL

FBG_CH1_00094359

| Task No. | Name | Entity | Task Type | Status | Critical path? | Signing to closing activity | Yes/consented to if achieved | Yes/consented to if achieved | Dependency Comment | Comments | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ITA 1 | Lumileds Holding BV transfers 100% of the shares in Lumileds Italy SRL to Lamps Holding BV by way of a capital contribution | Both | Milestone | normal | No | | No | No | | | 1728 |
| ITA 1.1 | Provide notary with KYC doc | Both | | normal | | | No | No | | | 3279 |
| ITA 1.1.1 | Draft PoAs | Both | | completed | | | No | No | | | 3646 |
| ITA 1.1.2. | Execute PoAs | Both | | normal | | | No | No | | | 3647 |
| ITA 1.2 | Draft share capital contribution agreement | Both | | normal | | | No | No | | | 3280 |
| ITA 1.3 | Draft capital contribution | Both | | completed | | | No | No | | | 3281 |
| ITA 1.4 | The share contribution agreement – certified by a Dutch notary [and apostilled – TBV with Italian notary] – shall be delivered to the Italian notary | | | | | | | | | | |
| ITA 1.5 | A sworn translation of such share contribution agreement into Italian shall be prepared | | | | | | | | | | |
| ITA 1.6 | Filing minutes (*verbale di deposito*) shall be executed before the Italian notary | | | | | | | | | | |
| ITA 1.7 | Such filing minutes (*verbale di deposito*) shall be filed and registered with the Companies Register | | | | | | | | | The filing minutes (*verbale di deposito*) shall be filed with the Companies' Register within 45 days following notarization of the Dutch capital contribution notarial deed | | |
| ITA 2 | Registration of Lunar Rep office under Lumileds Aachen GmbH for 2 Lunar FTE | Lunar | Milestone | normal | No | | No | No | | | 1729 |

CONFIDENTIAL

FBG_CH1_00094360

| Step/ID | Name | Entity | Task Type | Status | Critical Path | Critical Body | The Remediation(s) of Dependent | The Remediation(s) of Dependent | Regulatory Consent | Comments | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JAP 1 | STEP 1: Lumileds Holding BV incorporates New Japan LEDCo Ltd. | Both | Milestone | normal | Yes | No | No | No | | | 807 |
| JAP 1.1 | Provide director information for New Japan LedCo | Lunar | Activity | completed | | | No | No | | | 2648 |
| JAP 1.1 | Affidavit regarding Lumileds Holding BV, as a member of Newco | | Activity | completed | | | | | | | |
| JAP 1.2 | Signature certificate of Representative(s) of Lumileds Holding BV who is the signatory of the Affidavit above | | Activity | completed | | | No | No | | [DTLJ: This is covered by 1.1 Affidavit so we do not need it.] | 3220 |
| JAP 1.3 | Articles of Incorporation of Newco | | Activity | completed | | | | | | | |
| JAP 1.4 | Decision by members to determine Head Office and Stated Capital and appoint the Executive Manager (by Member of Newco (i.e., Lumileds Holdings BV) ) | | Activity | completed | | | No | No | | Head office - TBC if sublease falls under R-TSA | 3222 |
| JAP 1.5 | Acceptance of Office of Executive Manager (i.e., the officer to perform duties of the managing member (who is a legal entity, not natural person) of Newco) | | Activity | normal | | | No | No | | | 3223 |
| JAP 1.6 | Receipt of the Capital Contribution | | Activity | normal | | | No | No | | | 3224 |
| JAP 1.7 | Power of Attorney (from the Newco to JP for company registration) | | Activity | completed | | | No | No | | | 3225 |
| JAP 1.8 | Seal Registration Form (for Company Seal of Newco) | | Activity | completed | | | No | No | | | 3226 |
| JAP 1.9 | Guarantee Letter for certifing the seal of Executive Manager | | Activity | completed | | | No | No | | | 3227 |
| JAP 1.10 | Seal Card Request Form | | Activity | alert | | | No | No | | | 3228 |
| JAP 1.11 | Application Form for commercial registration | | Activity | normal | | | No | No | | | 3229 |
| JAP 1.12 | (If applicable) pre-notification for acquisition of membership interest under FEFTA | | Activity | alert | | | | | | | |
| JAP 1.13 | Post-notification for acquisition of membership interest under FEFTA | | Activity | normal | | | | | | | |
| JAP 1.14 | Various tax related notifications by New Japan LEDCo | | Activity | normal | | | | | | Various tax related notifications by New Japan LEDCo, timelines varying (not urgent in context of Day1 and due dates defer per notification/registration)<br>1. Notification of incorporation of company<br>2. Application for Blue Form Return<br>3. Application for Special Provision for Extension of the Due Date for Filing a Final Tax Return(both national tax and local tax purposes)<br>4. Application for Special Provision for Extension of the Due Date for Filing a Consumption Tax Return<br>5. Application form to be registered as a Qualified Invoice Issuer for Consumption tax purpose<br>6. Application form for Income Tax Convention<br>7. Notification of Establishment/Relocation/Closure of a Salary-Paying Office). | |
| JAP 1.14a | Application form for the election of becoming a taxpayer for Consumption tax (VAT) purpose | | | undefined | | | | | | | |
| JAP 1.15 | New Japan LEDCo to obtain import / export license - to verified whether import/export license is required | | | normal | | | | | | | |
| JAP 2 | STEP 2: Lumileds Japan Ltd. sells (but not yet transfers) the LED Business to New Japan LEDCo by means of an asset deal. The consideration will be due at signing | Both | Milestone | normal | Yes | No | No | No | | | 808 |
| JAP 2.1 | Business Transfer Agreement  (which will include the agreement to transfer employment contracts with related employees) | | Milestone | normal | | | No | No | | | 3232 |
| JAP 2.2 | Unanimous consent of executive members of Newco (i.e., Lumileds Holding BV) (for approval of acquisition of business) | | Activity | normal | | | No | No | | | 3233 |
| JAP 2.3 | Unanimous consent of the executive members of Lumileds Japan (i.e., Lumileds Holding BV) (for approval of the business transfer) | | Activity | normal | | | No | No | | | 3234 |
| JAP 2.4 | Consent of the counterparties of the agreements which will be transferred to Newco | | Activity | normal | | | No | No | | | 3235 |
| JAP 2.5 | Consent of the employees which will be transferred to Newco | | Activity | normal | | | No | No | | | 3236 |
| JAP 2.6 | (Recommended) Prior consultation with the employees<br>(If applicable) application for registration of transferring the owned real proprties | | Activity | normal | | | No | No | | | 3237 |
| JAP 2.7 | (If applicable) documents for transferring/newly obtaining necessary business licenses/permits for engaging in LED business | | Activity | normal | | | No | No | | | 3238 |
| JAP 2.8 | (If applicable) application for registration of transferring the registered IPs (e.g. trademarks registrd in Japan) | | Activity | normal | | | No | No | | | 3239 |
| JAP 2.9 | (If applicable) Transfer of any other registrables assets (such as company cars) | | | | | | | | | | |
| JAP 2.10 | (If applicable) pre-notification for acquisition of business under FEFTA (to be analysed and confirmed by the seller which entities to file, potentially by both Newco and Limileds Holdings BV) | | Activity | normal | | | No | No | | | 3240 |
| JAP 2.11 | Post-notification for acquisition of business under FEFTA | | Activity | normal | | | No | No | | | 3241 |
| JAP 3 | STEP 3: Lumileds Japan Ltd. transfers the Japan Receivable 1 to Lumileds Holding BV via debt repayment (or in case not possible via a dividend distribution) | Both | Milestone | normal | Yes | No | No | No | | Timing to be aligned with IC settlement plan | 809 |
| JAP 3.1 | [Settlement agreement] | | Activity | normal | | | No | No | | | 3242 |
| JAP 3.2 | Decision of managing member of Lumileds Japan | | Activity | normal | | | No | No | | | 3243 |
| JAP 3.3 | Consent of Newco with certification of date (kakutei hiduke) | | Activity | normal | | | No | No | | | 3244 |
| JAP 4 | STEP 4: Lumileds Holding BV transfers 100% of the shares in Lumileds Japan Ltd. to Lamps Holding BV. | Both | Milestone | normal | Yes | | No | No | | | 811 |
| JAP 4.1 | Membership interest transfer agreement | | Activity | normal | | | No | No | | | 3263 |
| JAP 4.2 | Unanimous consent of members of Lumileds Japan  (for the (i) transfer of membership interest and (ii) amendment to its articles of incorporation to reflect the change in members) | | Activity | normal | | | No | No | | | 3264 |
| JAP 4.3 | Amended articles of incorporation of Lumileds Japan | | Activity | normal | | | No | No | | | 3265 |
| JAP 4.4 | Affidavit regarding Lamps Holding BV, as a new member of Newco | | Activity | normal | | | No | No | | (containing infromation such as address, representative(s), appointment of Executive Manager, and relevant attachments (e.g., business register) ) | 3266 |
| JAP 4.5 | Signature certificate of Representative(s) of Lamps Holding BV who is the signatory of the Affidavit above | | Activity | normal | | | No | No | | | 3267 |
| JAP 4.6 | Acceptance of Office of Executive Manager for new managing member of Lumileds Japan (i.e., Lamps Holding BV) | | Activity | normal | | | No | No | | | 3268 |
| JAP 4.7 | Decision by member to appoint the Executive Manager of the member (i.e., Lamps Holdings BV) ) | | | | | | | | | | |
| JAP 4.8 | Power of Attorney from the Newco to JP for company registration | | Activity | normal | | | No | No | | | 3269 |
| JAP 4.9 | Notification regarding Company Seal of Lumileds Japan | | Activity | normal | | | No | No | | | 3270 |
| JAP 4.10 | Guarantee Letter for certifing the seal of Executive Manager | | Activity | normal | | | No | No | | | 3271 |
| JAP 4.11 | Approval of Transfer of Membership Interest with certification of date (kakutei hiduke) (by Lumileds Japan) | | Activity | normal | | | No | No | | | 3272 |
| JAP 4.12 | Application Form for commercial registration | | Activity | normal | | | No | No | | | 3273 |
| JAP 4.13 | Resolution for approving the transfer of the membership interest  (Lumileds Holding BV) | | Activity | normal | | | No | No | | | 3274 |

CONFIDENTIAL

FBG_CH1_00094361

| Ref No. | Name | Entity | Task Type | Status | Critical Path | Owner 1 Subsequent step | The Dependency(s) if Condition | Tax Dependency(s) if Condition | Dependency Comment | Comments | PID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| JAP 4.14 | Resolution for approving the acquisition of the membership interest  (Lamps Holding BV) | | Activity | normal | | | No | No | | | 3275 |
| JAP 4.15 | (If applicable) pre-notification for acquisition of membership interest under FEFTA | | Activity | normal | | | No | No | | | 3276 |
| JAP 4.16 | Post-notification for acquisition of membership interest under FEFTA | | Activity | normal | | | No | No | | | 3277 |
| JAP 5 | STEP 5: The Japan Receivable 2 is eliminated by transferring it from Lumileds Holding BV to Lamps Holding BV by way of a capital contribution. | Both | Milestone | undefined | Yes | | No | No | | | 1474 |
| JAP 5.1 | Draft Dutch share premium contribution agreement | | | | | | | | | | |
| JAP 5.1 | Execute Draft share premium contribution agreement | | | | | | | | | | |
| JAP 6 | R-TSA Exit | Both | Milestone | normal | | | No | No | | To be updated | 2688 |

Exh. A-14

CONFIDENTIAL

FBG_CH1_00094362

| SK # | Step | Lunar | Milestone | Start | Col | Col | No | No | Notes | Ref |
|---|---|---|---|---|---|---|---|---|---|---|
| | Step 1: Lumileds incorporates a new company in Korea (New Korea LEDCo), in the form of a corporation | Lunar | Milestone | start | | | No | No | Timing should be [illegible] | [illegible] |
| SK 1.1 | Prepare incorporation documents | | | completed | | | | | | |
| SK 1.2 | Preparation of internal corporate approvals | | | completed | | | | | | |
| SK 1.3 | Foreign investment declaration to be filed by New Korea LEDCo | | | completed | | | No | No | Foreign direct investment declaration filed on 15 April 2024 | 2873 |
| SK 1.4 | Corporate registration to be filed by New Korea LEDCo | | | normal | | | No | No | | 2874 |
| SK 1.5 | Tax registrations (VAT, CIT, Payroll and social security) to be filed by New Korea LEDCo | | | normal | | | No | No | VAT registration should be in place prior to asset sale | 2875 |
| SK 1.6 | Customer ID (import/export) application by New Korea LEDCo | | | normal | | | | | | |
| SK 2 | Step 2: Lumileds Korea Ltd. sells (but not yet transfers) the LED Business to New Korea LEDCo. | Both | Milestone | normal | | | | | | |
| SK 2.1 | Transfer of FTE's / consent for transfer | | | normal | | | | | | |
| SK 2.2 | Transfer of contracts | | | normal | | | No | No | | 2880 |
| SK 2.2 | Business Transfer Agreement | | | normal | | | | | | |
| SK 2.3 | Value of transferring assets/liabilities | | | normal | | | Yes | No | | 2881 |
| SK 2.3 | Notice of convocation of Board meeting or Waiver of notice of convocation of Board meeting of Lumileds Korea Ltd. | | | normal | | | | | | |
| SK 2.4 | Minutes of Board meeting of Lumileds Korea Ltd. | | | normal | | | | | | |
| SK 2.5 | Notice of convocation of Board meeting or Waiver of notice of convocation of Board meeting of New Korea LEDCo | | | normal | | | | | | |
| SK 2.6 | Minutes of Board meeting of New Korea LEDCo | | | normal | | | | | | |
| SK 2.7 | Notice of convocation of Shareholders' meeeting and Consent to shorten notice period of Shareholders' meeting of Lumileds Korea Ltd. | | | normal | | | | | | |
| SK 2.8 | Minutes of Shareholders' meeting of Lumileds Korea Ltd. | | | normal | | | | | | |
| SK 2.9 | Notice of convocation of Shareholders' meeeting and Consent to shorten notice period of Shareholders' meeting of New Korea LEDCo | | | normal | | | | | | |
| SK 2.10 | Minutes of Shareholders' meeting of New Korea LEDCo | | | normal | | | No | No | | 3023 |
| SK 2.11 | Notice of Transfer of Personal Information and Notice | | | normal | | | | | | |
| SK 2.12 | Consent to Assignment of Contracts/ Consent to Assignment of Claims/ Consent to Assumption of Obligations/Consent to Assignment of Contracts/Required documents to transfer Permits and Licenses, etc. | | | normal | | | No | No | | 3025 |
| SK 2.13 | Employment transfer agreement | | | normal | | | No | No | | 3026 |
| SK 3 | Step 3: Lumileds Korea Ltd. transfers the Korea Receivable 1 to Lumileds Holding BV via debt repayment as part of the pre-closing financing settlement plan. | Lunar | Milestone | normal | | | | | | |
| SK 3.1 | Review of the repayment with respect to any legal/regulatory issues from a Korean law perspective | | | normal | | | | | | |
| SK 3.2 | Obtain approval from the Bank of Korea with respect the assigning the Korea Receivable 1 to Lumileds Holding BV and eliminating (i.e., offsetting) the debt repayment obligation, which approval must be obtained prior to entering into written agreement in connection with the assignment of the Korea Receivable 1. | | | | | | | | | |
| SK 4 | Step 4: Lumileds Holding BV transfers 100% of the shares in Lumileds Korea Ltd. to Lamps Holding BV. The consideration remains outstanding resulting in a receivable from | Both | Milestone | normal | | | | | | |
| SK 4.1 | value of shares in Lumileds Korea required for transfer of the shares | | | normal | | | Yes | No | | 2882 |
| SK 4.1 | Review of the capital contribution with respect to any legal/regulatory issues from a Korean law perspective | | | normal | | | | | | |
| SK 4.3 | Review of the share sale for any filing obligations (including antitrust filing) from a Korean law perspective | | | normal | | | | | | |
| SK 4.4 | Lamps Holding BV to file a modification report with respect to the existing foreign direct investment report and foreign-invested enterprise report of Lumileds Korea Ltd. to reflect the change in the shareholder | | | | | | | | | |
| SK 5 | Step 5: The Korea Receivable 2 is eliminated by transferring it from Lumileds Holding BV to Lamps Holding BV by way of a capital contribution. | Lunar | Milestone | undefined | | | | | | |
| SK 5.1 | Review of the capital contribution with respect to any legal/regulatory issues from a Korean law perspective | | | normal | | | | | | |
| SK 6 | R-TSA Exit | Both | Milestone | normal | | | No | No | Timing to be updated | 2989 |

Exh. A-15

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 239**
**Page 104 of 193**

FBG_CH1_00094363

| Full Ref | Name | Entity/Jurisdiction | Type | Status | Critical Path Activity | | | Comments / ID |
|---|---|---|---|---|---|---|---|---|
| MEX 0.1 | Locating the physical share certificates | | Activity | completed | | No | No | 3602 |
| MEX 0.2 | Locating the physical corporate books | | Activity | normal | | No | No | 3603 |
| MEX 1 | STEP 1: Lumileds International BV transfers <1% of the shares in Altilon de Mexico SA de CV to New Netherlands LampsCo BV against cash. | Both | Milestone | normal | | | | |
| MEX 1.1.1 | Draft Contribution Agreement | | Activity | completed | | No | No | 3674 |
| MEX 1.1.2 | Execution of Contribution Agreement | Both | Deliverable | normal | | | | |
| MEX 1.2.1 | Draft Share Transfer Agreement | | Activity | completed | | No | No | 3675 |
| MEX 1.2.2 | Execution of Share Transfer Agreement | | Deliverable | normal | | | | |
| MEX 1.3.1 | Draft Unanimous Resolutions of Altilon de México SA de CV | | Activity | completed | | No | No | 3676 |
| MEX 1.3.2 | Execution of Unanimous Resolutions of Altilon de México SA de CV | | Deliverable | normal | | | | |
| MEX 1.4 | Endorsement of the shares and issuance of the new ones | | Deliverable | normal | | No | No | 2981 |
| MEX 1.5 | Provide DL MX with the Corporate Books | | Activity | normal | | | | |
| MEX 1.6 | Update the Corporate Books | | Milestone | normal | | No | No | 2983 |
| MEX 1.7 | Notice before the electronic system of the Ministry of Economy updating the capital structure of Antilon de México, S.A. de C.V. | | Activity | normal | | | | |
| MEX 1.8 | Notice before the Mexican Tax Authorty ("SAT") notifying the change of the shareholders of Antilon de México, S.A. de C.V. | | Activity | normal | | | | |
| MEX 1.9 | If the value of the share transfer is greater than 20 million pesos, file of the quarterly economic report before the National Registry of Foreign Investments ("RNIE"). | | Activity | normal | | | | |
| MEX 2 | STEP 2: Lumileds Holding BV transfers >99% of the shares in Altilon de Mexico SA de CV to Lamps Holding BV by way of a capital contribution | | Milestone | normal | | | | |
| MEX 2.1 | Appointment of legal representative by Lumileds Holding | | Deliverable | normal | | | | |
| MEX 2.2.1 | Draft Share Contribution Agreement | | Activity | completed | | No | No | 3677 |
| MEX 2.2.2 | Execution of Share Contribution Agreement | | Deliverable | normal | | | | |
| MEX 2.3.1 | Draft Share Transfer Agreement | | Activity | completed | | No | No | 3678 |
| MEX 2.3.2 | Execution of Share Transfer Agreement | | Deliverable | normal | | | | |
| MEX 2.4.1 | Draft Unanimous Resolutions of Altilon de México SA de CV | | Activity | completed | | No | No | 3679 |
| MEX 2.4.2 | Execution of Unanimous Resolutions of Altilon de México SA de CV | | Deliverable | normal | | | | |
| MEX 2.5 | Endorsement of the shares and issuance of the new ones | | Deliverable | normal | | No | No | 2991 |
| MEX 2.6 | Provide DL MX with the Corporate Books | | Activity | normal | | | | |
| MEX 2.7 | Update the Coprorate Books | | Milestone | normal | | No | No | 2987 |
| MEX 2.8 | Notice before the electronic system of the Ministry of Economy updating the capital structure of Antilon de México, S.A. de C.V. | | Activity | normal | | | | |
| MEX 2.9 | Notice before the Mexican Tax Authorty ("SAT") notifying the change of the shareholders of Antilon de México, S.A. de C.V. | | Activity | normal | | | | |
| MEX 2.10 | If the value of the share transfer is greater than 20 million pesos, file of the quarterly economic report before the National Registry of Foreign Investments ("RNIE"). | | Activity | normal | | | | |

CONFIDENTIAL

FBG_CH1_00094364

| ID | Description | Entity | Type | Status | | | | | # |
|---|---|---|---|---|---|---|---|---|---|
| NL 0 | Step 0: Incorporation of Lamps Holding BV | Liberty | Milestone | completed | | | | | |
| NL 1 | STEP 1: Lamps Holding BV incorporates New Netherlands LampsCo BV including two registrations 1.5/1.6 | Both | Milestone | normal | | | | | |
| NL 1.1 | Director details to be provided to Deloitte Legal central team | Liberty | Activity | completed | | | | | |
| NL 1.1.2 | Approval Mark to execute the deed of incorporation | Both | Milestone | normal | | | No | No | 3645 |
| NL 1.2 | Execution of the notarial deed of incorporation by a Dutch notary | Both | Activity | normal | | | No | No | 2885 |
| NL 1.3 | Registration with trade register | Both | Activity | normal | | | No | No | 2886 |
| NL 1.4 | Preparation of a shareholders' register | Both | Activity | normal | | | No | No | 2887 |
| NL 1.5 | Registration for VAT purposes by New Netherlands LampsCo | Both | Activity | undefined | | | | | |
| NL 1.6. | Employers notification by New Netherlands LampsCo | Both | Activity | undefined | | | | | |
| | Personal data cards for the directors and power of attorney for Lamp Holding B.V. as incorporator | | | | | | | | |
| NL 2 | STEP 2: Lumileds Netherlands BV transfers the Lamps Business to New Netherlands LampsCo BV by means of an asset deal. The consideration remains outstanding ("Netherlands Receivable"). | Both | Milestone | normal | | | | | |
| NL 2.1 | Contract transfers | Both | Milestone | normal | Yes | Yes | No | No | 2415 |
| NL 2.1 | Draft APA | Both | Activity | completed | | | No | No | 2891 |
| NL 2.1.1 | Review APA by Lumileds | Both | Activity | normal | | | No | No | 3588 |
| NL 2.2 | Transfer of employees | Both | Milestone | normal | Yes | Yes | Yes | No | 2416 |
| NL 2.2 | Provide detailed asset list | Both | Milestone | alert | | | No | No | 3382 |
| NL 2.3 | Value of assets/liabilities required for APA | Both | Milestone | normal | Yes | | Yes | No | 2417 |
| NL 2.3 | Draft corporate resolutions Lumileds Netherlands BV and New Netherlands LampsCo | | Activity | undefined | | | No | No | 3385 |
| NL 2.4 | Execute APA | Both | Activity | normal | | | No | No | 3384 |
| NL 3 | STEP 3: Lumileds Netherlands BV transfers the Netherlands Receivable to Lumileds Holding BV by way of a dividend distribution. | Both | Milestone | normal | Yes | | No | No | 1687 |
| NL 3.1 | Draft distribution agreement | Both | Milestone | undefined | | | No | No | 2890 |
| NL 3.2 | Draft corporate resolutions Lumileds Netherlands BV | Both | Activity | undefined | | | No | No | 3381 |
| NL 3.3 | draft corporate resolutions Lumileds Holding BV | Both | Activity | undefined | | | No | No | 3383 |
| NL 4 | STEP 4: Lumileds Holding BV transfers the Netherlands Receivable to Lamps Holding BV and subsequently from Lamps Holding BV to New Netherlands LampsCo BV by way of a capital contribution | Both | Milestone | normal | | | No | No | 1688 |
| NL 4.1 | Draft contribution agreement | Both | Activity | completed | | | No | No | 3386 |
| NL 4.2 | Draft corporate resolutions Lumileds Netherlands BV | Both | Activity | normal | | | No | No | 3387 |
| NL 4.3 | draft corporate resolutions New Netherlands LampsCo | Both | Activity | normal | | | No | No | 3388 |

CONFIDENTIAL

FBG_CH1_00094365

| POL # | Step 0: Check Pre-emption right of the Polish National Agricultural Support Center | Liberty | Milestone | alert | Yes | | No | No | | 1711 |
|---|---|---|---|---|---|---|---|---|---|---|
| POL 0.1 | Deloitte Poland to check pre-emption right documentation | | | normal | | | No | No | | 3298 |
| POL 0.2 | Consent to transfer of the pledged shares/negative pledge waiver | | | normal | | | No | No | | 3298 |
| POL 0.3 | Consent of Siemens Finance sp. z o.o. for the transfer of shares under the debt subordination agreement | | | normal | | | | | | |
| POL 0.4 | [Consents under any other agreements TBC] | | | | | | | | | |
| POL 1 | Step 1: Contribution of Lumileds Holding's shares in Lumileds Poland to Lamps Holding BV | Both | Milestone | normal | | | | | | |
| POL 1.1 | PoA to represent Lumileds before Polish registry court | | | normal | | | No | No | | 1712 |
| POL 1.2 | KYC/AML checks of Lamps Holding BV in the brokerage house | | | | | | | | | |
| POL 1.3 | Draft Agreement concerning transfer of shares concluded between Lumileds holding BV and Lamps Holding BV | | | normal | Yes | | No | No | | 1713 |
| POL 1.4 | Notices and consents required for the transfer of shares required in accordance with the statute. | | | normal | Yes | | No | No | | 1714 |
| POL 1.5 | Execution of the Agreement concerning transfer of shares concluded between Lumileds holding BV and Lamps Holding BV | | | | | | | | | |
| POL 1.6 | Notice of dominance relationship from Lamps Holding BV to the Client. | | | normal | | | No | No | | 3299 |
| POL 1.7 | Aplication to the brokerage house to register Lamps Holding BV as a new sole shareholder | | | | | | | | | |
| POL 1.8 | Execution of additional documents necessary to be submitted to the National Court Register (data of the sole shareholder, information on the address for service of persons authorized to appoint the management board) | | | | | | | | | |
| POL 1.9 | Application to register transfer of shares in the Polish National Court Register. | | | undefined | | | No | No | | 3300 |
| POL 1.10 | Update of the central register of beneficial owners [TBC if applicable] | | | | | | | | | |
| POL 2 | Registration of Lunar Rep office under Lumileds Netherlands BV for 3 Lunar FTE | | Milestone | normal | | | No | No | | 3301 |

Exh. A-18

CONFIDENTIAL

FBG_CH1_00094366

Exhibit A – Reorganization Steps Plan
(Singapore)

| Ref No | Step | Entity | Task Type | Status | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SG 1 | STEP 1: Lumileds Hong Kong Co. Ltd. establishes Singapore Branch office | | Milestone | normal | | | | | | | |
| SG 1.1 | (If not already done so) Engage corporate secretary firm to assist with Singapore branch establishment and guide Lumileds through establishment process (including the steps in 1.2 to 1.3 below) | | | normal | | | | | | | |
| SG 1.2 | Submit application to reserve proposed name of the Singapore Lamps Branch office through Bizfile, and obtain approval from the Accounting and Corporate Regulatory Authority (ACRA) for such name | | Activity | normal | | | | | | | ACRA's processing time for a name application is usually within a day unless the application is referred to a referral authority, in which case, the processing time may take up to 14 days to 2 months from the application date.  If the application is approved, the name will be reserved for a period of 120 days from the application date. |
| SG 1.3 | Submit "Registration of Branch of Foreign Company" e-form with the ACRA.<br><br>In relation to such registration submission, certain documents / information will need to be lodged with ACRA, including: | | Activity | normal | | | | | | | |
| SG 1.3.1 | Certified true copy of the Certificate of Incorporation of Lumileds Hong Kong, duly certified by an official holding an office corresponding to that of the Registrar of Companies in the country of incorporation of the foreign company* | | | | | | | | | | |
| SG 1.3.2 | Certified true copy of the Memorandum & Articles of Association of Lumileds Hong Kong* | | | | | | | | | | |
| SG 1.3.3 | List of directors with requisite particulars, including residential address | | | | | | | | | | |
| SG 1.3.4 | Notice containing the names, nationalities, identification particulars and residential addresses of persons appointed as authorized representatives. | | | | | | | | | | Authorized representatives need to be natural persons resident in Singapore. |
| SG 1.3.5 | Consent statement from Lumileds Hong Kong confirming that authorised representatives have consented to act as such | | | | | | | | | | |
| SG 1.3.6 | Notice of the situation of its registered office in Singapore | | | | | | | | | | |
| SG 1.3.7 | Notice containing the registration number indicated on Lumileds Hong Kong's Certificate of Incorporation, a description of the business carried on by the foreign company, the type of legal form of the foreign company and the latest audited financial statements of its head office | | | | | | | | | | |
| SG 1.4 | Central Provident Fund (CPF) Registration | | | normal | | | | | | | |
| SG 1.5 | Direct Debit Authorisation (DDA) application | | | normal | | | No | No | | | "eGIRO Participating Banks<br>Client to apply DDA via CPF website and the authorized signatory is to approve the application in the bank portal within 48 hours<br><br>Non-eGIRO Participating Banks<br>Client will need to submit the hardcopy DDA form and processing time might take up to 21 working days" |
| SG 1.6 | Inland Revenue Authority of Singapore (IRAS) – Registration for Auto-Inclusion Scheme (AIS) | | | normal | | | | | | | |
| SG 2 | STEP 1: Lumileds Singapore Pte. Ltd. transfers 2 FTE to SG Lamps Branch office directed by Lumileds Hong Kong Co. Ltd. | | | normal | | | No | No | | | 3296 |
| SG 2.1 | Prepare and execute tripartite novation agreement** to transfer employees*** | | | normal | | | | | | | To be entered into amongst old employer, new employer and employee. |

* Certification of the relevant document must be done within a period of four months preceding the day on which such documents are lodged with the ACRA.

** **Note:** We assume that none of the FTEs being transferred are covered under any collective bargaining agreement or trade union arrangements etc.

*** **Note:** If the FTEs being transferred hold work passes, these passes will need to be re-applied for by their new employer (Singapore Lamps Branch office). This is typically handled by the new employer's Human Resources function. If there are indeed such work pass holders, then note that their employment transfer cannot take effect until their work passes (with the new employer) are approved.

Exh. A-19

CONFIDENTIAL

FBG_CH1_00094367

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SPA 1 | Lumileds Holding BV transfers 100% of the shares in Lumileds Luxeon de Iberia SL to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | na | na | na | | 1718 |
| SPA 1.1 | Draft PoA granted by Lamps Holding | Both | | completed | | No | No | | 3634 |
| SPA 1.1.1 | Await Deloitte Spain whether certificate of notary regarding PoA is sufficient | | | normal | | No | No | Any foreign PoA to be used in Spain shall be certified by a notary and docketed with the Hague Apostille. | 3643 |
| SPA 1.2 | Draft public deed declaring the change of sole shareholder of Lumileds Spain | Both | | completed | | No | No | | 3635 |
| SPA 1.3 | Execute PoA in public deed | Both | | normal | | No | No | | 3636 |
| SPA 1.4 | Draft and execute certificate declaring the new sole shareholder | Both | | normal | | No | No | | 3637 |
| SPA 1.5 | Notarise the certificate mentioned in step 1.2 above declaring the new shareholder by executing the public deed set out in step 1.2 above | Both | | normal | | | | | |
| SPA 1.6 | Update the Shareholders' Registry Book of Lumileds Spain | Both | | normal | | No | No | | 3641 |
| SPA 1.7 | Prepare and file form D1B with the Spanish Foreign Investment Authorities to declare the divestiture of Lumileds Holding in Lumileds Spain | Both | | normal | | No | No | | 3638 |
| SPA 1.8 | Prepare and file form D1A with the Spanish Foreign Investment Authorities to declare the investment of Lamps Holding in Lumileds Spain | Both | | normal | | No | No | | 3639 |
| SPA 1.9 | File the public deed declaring the change of sole shareholder with the Commercial Registry of Madrid, for its registration | Both | | normal | | No | No | | 3640 |
| SPA 1.10 | Legalization of the updated Shareholders' Registry Book of Lumileds Spain with the Commercial Registry of Madrid | Both | | normal | | No | No | | 3642 |
| SPA 2 | Registration of Lunar Rep office under Lumileds Aachen GmbH for 2 Lunar FTE | Lunar | Milestone | normal | | | | | |

Exh. A-20

CONFIDENTIAL

FBG_CH1_00094368

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SWE 1 | Lumileds Holding BV transfers 100% of the shares in Lumileds Sweden AB to Lamps Holding BV by way of a capital contribution. | Bank | Milestone | normal | No | | No | No | 1714 |
| SWE 1.1 | Provide DT Sweden with required information according to provided IRL | Liberty | | completed | | | | |
| SWE 1.2 | Draft board miniutes | Liberty | | completed | | No | No | 2974 |
| SWE 1.3 | Draft contribution agreement | Liberty | | completed | | No | No | 2975 |
| SWE 1.4 | Execute contribution agreement | Liberty | | normal | | No | No | 2976 |
| SWE 1.5 | Update of the share register of Lumileds Sweden AB | Liberty | | undefined | | No | No | 2977 |

Exh. A-21

CONFIDENTIAL

FBG_CH1_00094369

| Step ID | Task | Both | Item Tag | Status | Document | Execution Version Available | PDF Version For Engrossment Available | Waived Execution Pending Execution | Comments | ID |
|---|---|---|---|---|---|---|---|---|---|---|
| TWN 1 | STEP 1: Lumileds International BV transfers 100% of the shares in Lumileds Taiwan Co. Ltd. to Lamps Holding BV. The consideration remains outstanding resulting in a receivable. | Both | Milestone | alert | Yes | No | No | No | DIR approval (which was obtained on 2 May 2024) | 1141 |
| TWN 1.1.1 | Draft Power of Attorney for Lamps Holding to authorize L&L as its agent to file the application of DIR registration. | | Activity | completed | | No | No | | | 3623 |
| TWN 1.1.2 | Execute Power of Attorney for Lamps Holding to authorize L&L as its agent to file the DIR application | | Deliverable | completed | | No | No | | | 3624 |
| TWN 1.2.1 | Draft Joint Authorization Letter for Lumileds International and Lamps Holding | | Activity | completed | | No | No | | | 3625 |
| TWN 1.2.2 | Execute Joint Authorization Letter for Lumileds International and Lamps Holding | | Deliverable | completed | | No | No | | | 3626 |
| TWN 1.3.1 | Deliver Shareholding structure/Certificate of Incorporation | | Activity | completed | | | | | | |
| TWN 1.4.1 | Draft declaration of no PRC foreign investor | | Activity | completed | | No | No | | | 3632 |
| TWN 1.4.2 | Execute declaration of no PRC foreign investor | | Deliverable | completed | | No | No | | | 3633 |
| TWN 1.5.1 | Draft Share Purchase Agreement | | Activity | completed | | | | | | |
| TWN 1.5.2 | Execute Share Purchase Agreement | | Deliverable | completed | | No | No | | | 3629 |
| TWN 1.6 | Share Certificates of Lumileds Taiwan to be transferred | | Milestone | normal | | No | No | | | 3630 |
| TWN 1.7 | Obtain DIR approval | | Activity | completed | | No | No | | Share certificates including chops are delivered and ready for closing | 3631 |
| TWN 1.8 | Delivery of the physical share certificates duly endorsed by Lumileds Holding BV and Lamps Holding BV | | Activity | normal | | | | | | |
| TWN 1.9 | Payment form/receipt of securities transaction at 0.3% of the transfer value stipulated by tax authorities | | Activity | normal | | No | No | | | |
| TWN 1.10 | Stamp the chops of Lumileds International BV, Lumileds Holding BV and Lumileds Taiwan on the reverse sides of the share certificates for endorsement for the share transfer. | | Activity | normal | | | | | | |
| TWN 1.11 | Update of the shareholder roster of Lumileds Taiwan | | Deliverable | normal | | | | | | |
| TWN 2 | STEP 2: The Taiwan receivable is transferred from Lumileds International BV to Lumileds Holding BV by way of a dividend distribution. | Both | Milestone | normal | | No | No | | Timing to be aligned with IC settlement plan | 1142 |
| TWN 2.1 | Management board resolution Lumileds International B.V. | | | | | | | | | |
| TWN 2.2 | Shareholder's resolution Lumileds International B.V. | | | | | | | | | |
| TWN 3 | STEP 3: The Taiwan receivable is eliminated by transferring it from Lumileds Holding BV to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | | No | No | | Timing to be aligned with IC settlement plan | 1143 |
| TWN 3.1 | Draft Dutch share premium contribution agreement. | | | | | | | | | |
| TWN 3.2 | Execute Dutch share premium contribution agreement. | | | | | | | | | |
| TWN 4 | STEP 4: Establish Taiwan Rep Office | Both | Milestone | normal | | | | | Form of entity to be discussed by local counsel. | |
| TWN 5 | STEP 5: transfer of Lumi Employees* | Both | Milestone | normal | | | | | | |
| TWN 5.1 | In the case of employment transfer, obtain consent from 7 FTE, including execution of any reasonably necessary or desirable agreements | | | | | | | | | |
| TWN 5.2 | In the case of employment termination (or refusal of transfer), draft and execute an employment termination letter and pay any related severance or termination payment (as required). | | | | | | | | | |
| TWN 5.3 | Corporate registration amendments are being made to ensure compliance with local legislation | | | | | | | | | |

CONFIDENTIAL

FBG_CH1_00094370

| Ref No. | Name | Entity | Task Type | Status | Critical Path | Board % Voting Secured | Shareholder Approval % Secured | Third Party Consents % Secured | Regulatory Approvals Required | Doc ID |
|---|---|---|---|---|---|---|---|---|---|---|
| THA 1 | Lumileds International BV transfers the 61% of the shares in Lumileds (Thailand) Co. Ltd. to New Netherlands LampsCo BV against cash | Both | Milestone | normal | | | | | | |
| THA 1.1 | Prepare orginial share certificates | | | | | | | | | |
| THA 1.2 | Draft a share transfer instrument | | Activity | | | | | | | |
| THA 1.3 | Draft a new share certificate issued in the name of New Netherlands LampsCo B.V. | | Activity | | | | | | | |
| THA 1.4 | Execute the share transfer instrument with its duplicate duly affixed with the stamp duties | | Deliverable | | | | | | | |
| THA 1.5 | Prepare an updated share register book of Lumileds TH showing New Netherlands LampsCo B.V. as a shareholder of the respective transfer share | | Activity & Deliverable | normal | | | | | | |
| THA 1.6 | Cancel the original existing share certificate issued in the name of Lumileds International B.V. | | Activity & Deliverable | | | | | | | |
| THA 1.7 | Issue and deliver the original new share certificate issued in the name of New Netherlands LampsCo B.V. duly affixed with the stamp duties | | Activity & Deliverable | | | | | | | |
| THA 2 | Lumileds Holding BV transfers the >99% of the shares in Lumileds (Thailand) Co. Ltd. to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | | | | | | |
| THA 2.1 | Draft a share transfer instrument | | Activity | | | | | | | |
| THA 2.2 | Draft a new share certificate issued in the name of Lamps Holding B.V. | | Activity | | | | | | | |
| THA 2.3 | Execute the share transfer instrument with its duplicate duly affixed with the stamp duties | | Deliverable | | | | | | | |
| THA 2.4 | Prepare an updated share register book of Lumileds TH showing Lamps Holding B.V. as a shareholder of the respective transfer shares | | Activity & Deliverable | normal | | | | | | |
| THA 2.5 | Cancel the original existing share certificate issued in the name of Lumileds Holding B.V. | | Activity & Deliverable | | | | | | | |
| THA 2.6 | Issue and deliver the original new share certificate issued in the name of Lamps Holding B.V. duly affixed with the stamp duties | | Activity & Deliverable | | | | | | | |
| THA 2.7 | File an updated list of shareholders of Lumileds TH (Form BorOrJor. 5) with the Department of Business Development, the Ministry of Commerce of Thailand | | Activity & Deliverable | normal | | | No | No | | |
| THA 2.8 | Certified Company Affidavit of Lumileds TH (Latest version) | | Deliverable | normal | | | No | No | | 3286 |
| THA 2.9 | Memorandum of Association and Articles of Association of Lumileds TH (unless these documents which were shared with us on 5 March 2024 are the latest version) | | Deliverable | normal | | | No | No | | 3288 |
| THA 2.10 | Provide all up-to-date books and records, certificates of incorporation, and company seals of Lumileds TH, at the premise of Lumileds TH | | Deliverable | | | | | | | |
| THA 3 | Registration of Lunar Rep office under New Japan LedCo and under Singapore Lunar entity (for timing reasons registration will be both under ) for 1 Lunar FTE* | Lunar | Milestone | normal | | | | | | |
| | *Setting up Rep office for Lunar FTE is under review | | | | | | | | | |
| | in case of the employment transfer | | | | | | | | | |
| THA 3.1 | Draft a tri-party agreement entered into between Lumileds TH as the existing employer, [New Japan LEDCo] as the new employer, and the employee | | Activity | | | | | | | |
| THA 3.2 | Execute the tri-party agreement entered into between Lumileds TH as the existing employer, [New Japan LEDCo] as the new employer, and the employee | | Activity & Deliverable | | | | | | | |
| | in case of the employment termination | | | | | | | | | |
| THA 3.3 | Draft an employment termination letter (to be signed and acknowledged by the dismissed employee) | | Activity | | | | | | | |
| THA 3.4 | Execute the employment termination letter (to be signed and acknowledged by the dismissed employee) | | Activity & Deliverable | | | | | | | |

Exh. A-23

CONFIDENTIAL

FBG_CH1_00094371

| Item No. | Name | Entity | Task Type | Status | Start Date | Business Day/Closing Activity | SOS Dependency(G)? | Tax Dependency(G)? | Dependency Comment | Comments | ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| US 0.1 | Sales and use tax registration | | | normal | | | | | | | |
| US 0.2 | Sales and use tax registration | | | normal | | | | | | Registration is for 40+ various states | |
| US 0.3 | Property tax registration | | | normal | | | | | | | |
| US 0.4 | Ohio Commercial activity tax registration | | | normal | | | | | | Lumileds Delaware LLC to be registered to do business in Ohio and Michigan | |
| US 0.5 | Payroll registration | | | normal | | | No | No | | Jody to add start/due date | 2918 |
| US 0.6 | Employer Identification number request | | | normal | | | No | No | | Jody to add start/due date | 2919 |
| US 0.7 | Importer of record Lumileds Delaware | | | completed | | | No | No | | Import of Record is established for Lumileds Delaware | 2920 |
| US 0.8 | Customs Trade partnership against Terrorism program registration | | | normal | | | | | | | |
| US 0.9 | State Business Registrations | | | normal | | | | | | | |
| US 1 | STEP 1: Lamps Holding BV incorporates New Lamps US HoldCo, regarded a US C corporation | Liberty | Milestone | normal | | | | | | | |
| US 1.1 | Lumileds to appoint who will serve as director and officers of NewCo | | Activity | normal | | | No | No | | | 2897 |
| US 1.2.1 | Draft Certificate of Incorporation of New Lamps US HoldCo | | Activity | completed | | | No | No | | | 3660 |
| US 1.2.2 | Execute Certificate of Incorporation of New Lamps US HoldCo | | Deliverable | normal | | | | | | | |
| US 1.3 | Draft Bylaws of New Lamps US HoldCo | | Deliverable | normal | | | | | | | |
| US 1.4.1a | Draft Initial Incorporator Action | | Activity | completed | | | No | No | | | 3661 |
| US 1.4.1b | Draft Initial Incorporator Action | | Activity | completed | | | No | No | | | 3662 |
| US 1.4.2a | Execution Initial Incorporator Action | | Deliverable | normal | | | | | | | |
| US 1.4.2b | Execution Resignation Letter of the Incorporator | | Deliverable | normal | | | | | | | |
| US 1.5.1 | Draft Initial Action of the BoD | | Activity | completed | | | No | No | | | 3663 |
| US 1.5.2 | Execution Initial Action of the BoD | | Deliverable | normal | | | No | No | | | 2902 |
| US 1.6.1 | Draft Subscription Agreement | | Activity | completed | | | No | No | | | 3664 |
| US 1.6.2 | Execution Subscription Agreement | | Deliverable | normal | | | | | | | |
| US 1.7.1 | Draft Federal tax identification number: Filing form SS-4 with IRS | | Activity | completed | | | No | No | | | 3665 |
| US 1.7.2 | Federal tax identification number: Filing form SS-4 with IRS | | Deliverable | normal | | | | | | | |
| US 2 | STEP 2: Lumileds LLC transfers the Lamps Business to Lumileds Delaware LLC by way of an asset contribution. | Both | Milestone | normal | | | | | | | |
| US 2.01 | Determine assets to be transferred | | | normal | | | | | | | |
| US 2.1.1 | Draft Asset Transfer Agreement | | Activity | completed | | | No | No | | | 3666 |
| US 2.1.2 | Execution Asset Transfer Agreement | | Deliverable | normal | | | | | | | |
| US 2.2.1 | Draft Joint Written Consent of BoD Lumileds LLC and Sole Stockholder Lumileds USA (Holding) Corp | | Activity | completed | | | No | No | | | 3667 |
| US 2.2.2 | Execution Joint Written Consent of BoD Lumileds LLC and Sole Stockholder Lumileds USA (Holding) Corp | | Deliverable | normal | | | No | No | | | 2908 |
| US 2.3.1 | Draft Joint Written Consent of BoD LL Delaware LLC and Sole Stockholder Lumileds LLC | | Activity | completed | | | No | No | | | 3668 |
| US 2.3.2 | Execution Joint Written Consent of BoD LL Delaware LLC and Sole Stockholder Lumileds LLC | | Deliverable | normal | | | No | No | | | 2909 |
| US 3 | STEP 3: Lumileds LLC transfers 100% of the shares in Lumileds Delaware LLC to Lumileds Holding BV in exchange for a partial repayment of its intercompany accounts payable to Lumileds Holding BV. | Both | Milestone | normal | | | | | | There is no US real property or under market leases. | |
| US 3.1.1 | Draft Stock Purchase Agreement | | Activity | completed | | | No | No | | | 3669 |
| US 3.1.2 | Execution Stock Purchase Agreement | | Deliverable | normal | | | | | | | |
| US 3.2.1 | Draft Joint Written Consent of BoD Lumileds LLC and Sole Stockholder Lumileds USA (Holding) Corp | | Activity | completed | | | No | No | | | 3670 |
| US 3.2.2 | Execution Joint Written Consent of BoD Lumileds LLC and Sole Stockholder Lumileds USA (Holding) Corp | | Deliverable | normal | | | No | No | | | 2911 |
| US 4 | STEP 4: Lumileds Holding BV transfers 100% of the shares in Lumileds Delaware LLC to Lamps Holding BV by way of a capital contribution. | Both | Milestone | normal | | | | | | | |
| US 4.1.1 | Draft Equity Contribution Agreement | | Activity | completed | | | No | No | | | 3671 |
| US 4.1.2 | Execution Equity Contribution Agreement | | Deliverable | normal | | | No | No | | | 2912 |
| US 5 | STEP 5: Lamps Holding BV transfers 100% of the shares in Lumileds Delaware LLC to New Lamps US HoldCo by way of a capital contribution. | Liberty | Milestone | undefined | | | | | | Step 5 should occur immediately after Step 4 (i.e., same day) to avoid Lamps Holding BV having any US effectively connected income and US corporate tax obligation. | |
| US 5.1.1 | Draft Equity Contribution Agreement | | Activity | completed | | | No | No | | | 3672 |
| US 5.1.2 | Execution Equity Contribution Agreement | | Deliverable | normal | | | | | | | |
| US 5.2.1 | Draft Joint Written Consent of BoD New Lamps US HoldCo and Sole Stockholder Lumileds Holding BV | | Activity | completed | | | No | No | | | 3673 |
| US 5.2.2 | Execution Joint Written Consent of BoD New Lamps US HoldCo and Sole Stockholder Lumileds Holding BV | | Deliverable | normal | | | | | | | |

Exh. A-24

CONFIDENTIAL

FBG_CH1_00094372

**EXHIBIT B**

**Illustrative Calculations**

(*See Attached.*)

Exh. B-1

CONFIDENTIAL                                                                                                           FBG_CH1_00094373

**DEBTORS' EXHIBIT NO. 239**
**Page 114 of 193**

Exhibit B – Illustrative Calculations
(Working Capital)

**NWC adjustments - LampsCo**

| £m | Dec23 |
|---|---|
| Inventory | 77.8 |
| Trade receivables | 40.2 |
| Trade payables | (39.9) |
| Trade working capital | 78.1 |
| Other receivables | 5.3 |
| Other payables | (46.7) |
| Taxes and social securities | 0.4 |
| Other working capital | (41.0) |
| **Reported NWC** | **37.1** |
| *VDD adjustments* | |
| 2) ARP | 0.1 |
| 5) Non-operational personnel expenses | - |
| 13) Out-of-period accruals / provisions | - |
| 14) Factoring impact | 37.0 |
| 15) Compensation reversal | 0.9 |
| 16) NOW repayment | 1.1 |
| 18) CIT | 1.6 |
| 19) Interest | 0.4 |
| 20) Lease liabilities | 3.7 |
| 21) Customs deposit | - |
| 22) Operational provisions | (3.0) |
| 23) Cash deposit | (3.1) |
| 24) Suppliers payment terms | (1.7) |
| Subtotal VDD adjustments | 36.9 |
| **VDD adjusted NWC** | **74.0** |
| *CT adjustments* | |
| 25) Balance sheet clean-up | 0.6 |
| 26) Jubilee | - |
| 27) Vitrite | - |
| 28) Sitronic | - |
| 29) Audit accrual | (0.2) |
| Subtotal CT adjustments | 0.4 |
| **CT adjusted NWC** | **74.4** |

Exh. B-2

CONFIDENTIAL

FBG_CH1_00094374

Exhibit B – Illustrative Calculations
(Indebtedness)

**Indebtedness and Cash - LampsCo**

| Item | ($m) |
|---|---|
| Reported Cash | 18.1 |
| Reported Debt | (5.6) |
| | |
| **Other Debt-Like Items** | |
| NOW Repayment | (1.1) |
| CIT | (1.6) |
| Unpaid Interest | (0.4) |
| Cash Deposit | 3.1 |
| Supplier Prepayment | 1.7 |
| Guarantee Deposits | 2.8 |
| Lease Liability | (3.7) |
| Aachen Redesign Project (ARP) | (0.1) |
| Termination Benefit Provisions | (1.5) |
| Pension | (3.3) |
| Factoring Impact | 18.5 |

Exh. B-3

CONFIDENTIAL

FBG_CH1_00094375

Exhibit B – Illustrative Calculations
(3.6.8 Monthly carve-out BS)

**Monthly balance sheet (carve-out reported) – LampsCo**

| $m | Jan23 | Feb23 | Mar23 | Apr23 | May23 | Jun23 | Jul23 | Aug23 | Sep23 | Oct23 | Nov23 | Dec23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tangible fixed assets | 49.2 | 46.6 | 47.0 | 46.6 | 44.4 | 43.6 | 43.0 | 40.4 | 39.0 | 38.1 | 38.3 | 37.7 |
| Intangible fixed assets | 75.2 | 70.9 | 70.5 | 69.5 | 65.6 | 64.4 | 62.6 | 59.7 | 56.3 | 54.4 | 54.4 | 52.9 |
| Financial fixed assets | 4.1 | 4.0 | 4.0 | 4.3 | 4.1 | 4.0 | 4.0 | 3.5 | 4.4 | 4.6 | 4.6 | 3.5 |
| **Fixed assets** | **128.5** | **121.5** | **121.5** | **120.4** | **114.1** | **112.0** | **109.7** | **103.7** | **99.8** | **97.2** | **97.4** | **94.0** |
| Inventory | 88.2 | 86.5 | 85.5 | 89.1 | 90.0 | 85.8 | 87.4 | 88.1 | 81.8 | 78.8 | 81.4 | 77.8 |
| Trade receivables | 39.9 | 36.9 | 42.0 | 44.9 | 39.7 | 44.8 | 39.8 | 37.7 | 39.5 | 43.8 | 40.4 | 40.2 |
| Trade payables | (43.0) | (40.0) | (39.8) | (38.7) | (37.6) | (35.6) | (35.0) | (33.7) | (33.1) | (35.5) | (36.0) | (39.9) |
| Trade working capital | 85.1 | 83.4 | 87.8 | 95.3 | 92.1 | 95.0 | 92.2 | 92.0 | 88.1 | 87.1 | 85.8 | 78.1 |
| Other receivables | 0.1 | 4.7 | 5.8 | 5.2 | 4.1 | 4.7 | 5.3 | 5.0 | 5.2 | 4.7 | 5.6 | 5.3 |
| Other payables | (42.3) | (41.5) | (41.5) | (43.6) | (41.4) | (43.0) | (41.4) | (42.3) | (42.2) | (43.3) | (46.4) | (46.7) |
| Taxes and social securities | 5.7 | 6.0 | 3.1 | 4.3 | 4.6 | 3.8 | 5.3 | 3.3 | 0.9 | 8.9 | 10.3 | 0.4 |
| Other working capital | (36.5) | (30.8) | (32.6) | (34.0) | (32.7) | (34.6) | (30.8) | (34.0) | (36.1) | (29.8) | (30.6) | (41.0) |
| **Net working capital** | **48.6** | **52.7** | **55.2** | **61.2** | **59.4** | **60.4** | **61.3** | **58.0** | **52.1** | **57.3** | **55.2** | **37.1** |
| Assets classified as held for sale | - | - | - | - | - | - | - | - | - | - | - | - |
| **Capital employed** | **177.1** | **174.2** | **176.6** | **181.6** | **173.5** | **172.4** | **171.1** | **161.6** | **151.8** | **154.5** | **152.6** | **131.1** |
| Equity | (783.4) | (789.9) | (793.1) | (792.4) | (802.4) | (786.6) | (792.6) | (798.9) | (801.9) | (778.0) | (770.1) | (583.2) |
| Lumileds investment and ICA | 962.8 | 962.2 | 967.8 | 970.4 | 971.8 | 960.5 | 963.8 | 959.3 | 948.8 | 929.5 | 921.2 | 717.5 |
| **Owners' net investment** | **179.5** | **172.4** | **174.7** | **178.0** | **169.3** | **173.9** | **171.2** | **160.4** | **146.9** | **151.6** | **151.2** | **134.3** |
| **Provisions** | **17.6** | **18.2** | **21.9** | **22.2** | **20.9** | **19.5** | **20.6** | **20.1** | **18.4** | **17.3** | **17.4** | **15.2** |
| **Deferred taxes** | **(8.2)** | **(8.0)** | **(9.5)** | **(9.3)** | **(8.8)** | **(10.3)** | **(10.0)** | **(9.7)** | **(4.2)** | **(4.5)** | **(4.9)** | **(6.0)** |
| **Net debt / (cash)** | **(11.8)** | **(8.3)** | **(10.5)** | **(9.3)** | **(8.0)** | **(10.6)** | **(10.7)** | **(9.2)** | **(9.3)** | **(9.9)** | **(11.1)** | **(12.4)** |
| **Funding** | **177.1** | **174.2** | **176.6** | **181.6** | **173.5** | **172.4** | **171.1** | **161.6** | **151.8** | **154.5** | **152.6** | **131.1** |

Exh. B-4

CONFIDENTIAL

FBG_CH1_00094376

## **EXHIBIT C**

### **Form of Escrow Agreement**

(*See Attached.*)

Exh. C-1

CONFIDENTIAL

FBG_CH1_00094377

Exhibit C – Form of Escrow Agreement

**FORM OF ESCROW AGREEMENT**

THIS ESCROW AGREEMENT, dated effective as of [•], 2024 ("Agreement"), is by and among First Brands Group, LLC, a Delaware limited liability company ("Purchaser"), Lumileds Holding B.V., a Dutch private limited company ("Seller"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as escrow agent hereunder ("Escrow Agent").

**BACKGROUND**

A.      Purchaser, Seller and the Company have entered into a Stock Purchase Agreement (the "Underlying Agreement"), dated as of [•], 2024, pursuant to which Purchaser is purchasing all of Seller's right, title and interest in and to the Shares.  The Underlying Agreement provides that Purchaser shall deposit on behalf of Seller the Escrow Funds (defined below) in a segregated escrow account to be held by Escrow Agent for the purpose of satisfying any amounts owed between Seller and Purchaser pursuant to Section 1.7 of the Underlying Agreement.

B.      Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and any earnings thereon in accordance with the terms of this Agreement.

C.      Purchaser has appointed one or more Purchaser Representatives (as defined below) to represent Purchaser, and Seller has appointed one or more Seller Representatives (as defined below) to represent Seller, in each case for all purposes in connection with the funds to be deposited with Escrow Agent and this Agreement.

D.      Purchaser and Seller acknowledge that (i) Escrow Agent is not a party to and has no duties or obligations under the Underlying Agreement, (ii) all references in this Agreement to the Underlying Agreement are solely for the convenience of Purchaser and Seller, and (iii) Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      Definitions.  Solely as between Purchaser and Seller, capitalized terms used in this Agreement that are not otherwise defined have the meanings given to them in the Underlying Agreement.  The following terms shall have the following meanings when used herein:

"Business Day" means any day, other than a Saturday, Sunday or legal holiday, on which Escrow Agent at its location identified in Section 14 is open to the public for general banking purposes.

"Escrow Funds" means the funds deposited with Escrow Agent pursuant to Section 3, together with any interest and other income thereon.

"Escrow Period" means the period commencing on the date hereof and ending five (5) Business Days (as such term is defined in the Underlying Agreement) after the Seller Adjustment

Exh. C-2

CONFIDENTIAL                                                  FBG_CH1_00094378

Exhibit C – Form of Escrow Agreement

Amount or Purchaser Adjustment Amount, as the case may be, has been determined pursuant to Section 1.7 of the Underlying Agreement, unless earlier terminated pursuant to this Agreement.

"Final Order" means a final order of a court of competent jurisdiction (an "Order"), which Order is delivered to Escrow Agent accompanied by a written instruction from Purchaser or Seller to effectuate such Order and confirming that such Order is final and issued by a court of competent jurisdiction, and Escrow Agent shall be entitled to conclusively rely upon any such confirmation and instruction and shall have no responsibility to determine the validity of the Order to which such confirmation and instruction refers.

"Indemnified Party" has the meaning set forth in Section 10.

"Joint Written Direction" means a written direction executed by a Purchaser Representative and a Seller Representative, delivered to Escrow Agent in accordance with Section 14 and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Agreement.

"Person" means any natural person, corporation, limited liability company, partnership, firm, joint venture, joint-stock company, trust, association, unincorporated entity or organization of any kind, Governmental Authority or other entity of any kind.

"Purchaser Representative" means the person(s) so designated on Schedule C hereto or any other person designated in a writing signed by Purchaser and delivered to Escrow Agent and a Seller Representative in accordance with the notice provisions of this Agreement, to act as Purchaser's representative under this Agreement.

"Seller Representative" means the person(s) so designated on Schedule C hereto or any other person designated in a writing signed by Seller and delivered to Escrow Agent and a Purchaser Representative in accordance with the notice provisions of this Agreement, to act as Seller's representative under this Agreement.

2.     Appointment of and Acceptance by Escrow Agent.  Purchaser and Seller hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 3, shall hold, invest and disburse the Escrow Funds in accordance with this Agreement.

3.     Deposit of Escrow Funds.  Simultaneously with the execution and delivery of this Agreement, Purchaser will transfer the initial Escrow Funds in the amount of $[2,390,000], by wire transfer of immediately available funds, to an account designated by Escrow Agent.  The Escrow Funds shall remain uninvested except as provided in Section 6.  Escrow Agent shall not commingle the Escrow Funds with any other accounts.  The Escrow Funds shall be held as an escrow fund and, subject to Section 5 and Section 11, shall not be subject to any encumbrance, attachment, trustee process or any other judicial process of any creditor of any Person and shall be used solely for the purpose set forth in this Agreement.  It is the intention of the parties hereto that this Escrow Agreement create a true escrow and that Escrow Agent, Purchaser and Seller have no ownership of, or rights in, the Escrow Funds, other than Escrow Agent's rights to the Escrow Property as set forth in Section 5 and Section 11 and Purchaser's and Seller's respective contractual rights to receive distributions of Escrow Funds, under the circumstances specified in Section 4.

Exh. C-3

CONFIDENTIAL

FBG_CH1_00094379

Exhibit C – Form of Escrow Agreement

4.        Disbursements of Escrow Funds.

(a)        Escrow Agent shall disburse Escrow Funds at any time and from time to time, within two Business Days after receipt of, and in accordance with, a Joint Written Direction substantially in the form of Attachment 1 hereto and received by Escrow Agent as set forth in Section 14.  Such Joint Written Direction must contain complete payment instructions, including funds transfer instructions or an address to which a check should be sent.

(b)        Upon the expiration of the Escrow Period, Escrow Agent shall   distribute (i) to Seller an amount equal to the Seller Adjustment Amount or (ii) to Purchaser an amount equal to the Purchaser Adjustment Amount, as the case may be, in each case pursuant to Section 1.7 of the Underlying Agreement.

Seller acknowledges that Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Seller:

Bank Name: _____
Bank Address: _____
ABA No.: _____
Account Name: _____
Account No.: _____

Purchaser acknowledges that Escrow Agent is authorized to use the following funds transfer instructions to disburse any funds due to Purchaser:

Bank Name: _____
Bank Address: _____
ABA No.: _____
Account Name: _____
Account No.: _____

(c)        Prior to any disbursement, Escrow Agent must receive reasonable identifying information regarding the recipient so that Escrow Agent is able to comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("IRS") Form W-9 or Form W-8, as applicable.  All disbursements of Escrow Funds shall be subject to the fees and claims of the Indemnified Parties pursuant to Section 11.

(d)        Purchaser and Seller may each deliver written notice to Escrow Agent in accordance with Section 14 changing their respective funds transfer instructions, which notice will be effective only upon receipt by Escrow Agent and after Escrow Agent has had reasonable time to act upon such notice.

5.        Conflict, Disagreement or Dispute.  If any conflict, disagreement or dispute arises between, among, or involving any of the parties hereto concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Agreement, or Escrow Agent is in doubt as to the action to be taken hereunder, Escrow Agent may, at its option, retain the Escrow Funds until Escrow Agent (a) receives a written agreement executed by each of the parties

Exh. C-4

CONFIDENTIAL

FBG_CH1_00094380

Exhibit C – Form of Escrow Agreement

involved in such disagreement or dispute directing delivery of the Escrow Funds, (b) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitrators' award or decision directing delivery of the Escrow Funds, or (c) files an interpleader action in any court of competent jurisdiction and pays into such court, for holding and disposition by such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to or incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  Escrow Agent shall be entitled to act on any such agreement, court order or arbitrator's award or decision without further question, inquiry, or consent, and Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such agreement, court order or arbitrator's award or decision. Escrow Agent shall have no liability to Purchaser or Seller for retaining the Escrow Funds in accordance with this Section 5, specifically including any liability or claimed liability that may arise due to any delay in any other action required or requested of Escrow Agent that results from such suspension or disbursement.

6.      Investment of Funds.

(a)      Based upon Purchaser's and Seller's prior review of investment alternatives, in the absence of further specific written direction to the contrary at any time that an investment decision must be made, Escrow Agent is directed to invest and reinvest the Escrow Funds in the investment identified in Schedule A.  If applicable, Purchaser and Seller acknowledge receipt from Escrow Agent of a current copy of the prospectus for the investment identified in Schedule A.  Purchaser and Seller may deliver to Escrow Agent a Joint Written Direction changing the investment of the Escrow Funds, upon which direction Escrow Agent may conclusively rely without inquiry or investigation; provided, however, that Purchaser and Seller warrant that no investment or reinvestment direction shall be given except in the following:  (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United States of America; (b) U.S.  dollar denominated deposit accounts and certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which are either (i) insured by the Federal Deposit Insurance Corporation ("FDIC") up to FDIC limits, or (ii) with U.S.  domestic commercial banks which have a rating on their short-term certificates of deposit on the date of purchase of at least "A-1" by S&P or "P-1" by Moody's (ratings on holding companies are not considered as the rating of the bank); or (c) money market funds, including funds managed by Escrow Agent or any of its affiliates; provided further, however, that Escrow Agent will not be required to invest in investments that Escrow Agent determines are not consistent with Escrow Agent's policies or practices.  Purchaser and Seller recognize and agree that Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of Escrow Funds or the purchase or disposition of any investment and Escrow Agent shall not have any liability for any loss in an investment made pursuant to the terms of this Agreement.  In its capacity as escrow agent hereunder, Escrow Agent has no responsibility whatsoever to determine the market or other value of any investment and makes no representation or warranty as to the accuracy of any such valuations.  To the extent applicable regulations grant rights to receive brokerage confirmations for certain security transactions, Purchaser and Seller waive delivery of such confirmations.

Exh. C-5

CONFIDENTIAL

FBG_CH1_00094381

(b)      All investments shall be made in the name of Escrow Agent.  Escrow Agent may, without notice to Purchaser and Seller, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder and shall not be liable for any loss, cost or penalty resulting from any sale or liquidation of any such investment. All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds.  With respect to any Escrow Funds or investment instruction received by Escrow Agent after 11:00 a.m., U.S. Central Time, Escrow Agent shall not be required to invest applicable funds until the next Business Day.  Receipt of the Escrow Funds and investment and reinvestment of the Escrow Funds shall be confirmed by Escrow Agent by an account statement.  In addition, Escrow Agent will make available monthly statements to the parties setting forth the activity in the Escrow Fund.

7.      Tax Reporting.

(a)      Solely for all federal, state, local and foreign tax reporting purposes, all interest or other income earned from the investment of the Escrow Fund in any calendar year shall be allocated to and reported by Purchaser.  Unless and until any of the Escrow Fund is distributed to the Escrow Participants, the Escrow Fund shall be considered as owned by Purchaser for all federal, state and local tax purposes.  [On the date that is 45 days after the end of each calendar quarter, Escrow Agent shall distribute to Purchaser, without any requirement that a claim be made by Purchaser, from the Escrow Fund an amount equal to [21]% of the interest and other income received or accrued by the Escrow Fund during such calendar quarter.]  Escrow Agent shall have no responsibility for the tax consequences of this Agreement and Purchaser and Seller shall consult with independent counsel concerning any and all tax matters. To the extent that Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Funds, Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  Purchaser and Seller each shall severally and not jointly indemnify, defend and hold Escrow Agent harmless from and against 50% of any tax, late payment, interest, penalty or other reasonable out-of-pocket cost or expense that may be assessed against Escrow Agent on or with respect to the Escrow Funds and the investment thereof (not otherwise satisfied with Escrow Property pursuant to the prior sentence), unless such tax, late payment, interest, penalty or other expense is directly caused by (i) Escrow Agent's unexcused failure to comply with unambiguous joint instructions from Purchaser and Seller as authorized under this Agreement (except if such failure is in compliance with or authorized under Section 4, Section 5, Section 6, Section 7, Section 8, Section 11 or Section 13 or such failure was due to any action of Purchaser or Seller, including but not limited to the provision of further notices, demands or instructions to Escrow Agent), (ii) Escrow Agent's unexcused failure to perform its unambiguous obligations under this Agreement, or (iii) the gross negligence or willful misconduct of Escrow Agent.

(b)      With respect to payment to Purchaser under this Agreement, Purchaser agrees to (a) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Agreement and (b) request and direct Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations.

Exh. C-6

CONFIDENTIAL                                                    FBG_CH1_00094382

Exhibit C – Form of Escrow Agreement

(c)     With respect to payments to Seller under this Agreement, Seller agrees to (i) assume all obligations imposed now or hereafter by any applicable tax law or regulation and (ii) request and direct Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations.

(d)     Except as otherwise agreed by Escrow Agent in writing, Escrow Agent has no tax reporting or withholding obligation except with respect to Form 1099-B reporting on payments of gross proceeds under Internal Revenue Code Section 6045 and Form 1099 and Form 1042-S reporting with respect to investment income earned on the Escrow Funds, if any.  To the extent that U.S. federal imputed interest regulations apply, Purchaser and Seller shall, no later than five Business Days after the effective date of this Agreement, so inform Escrow Agent, provide Escrow Agent with all imputed interest calculations and direct Escrow Agent to disburse imputed interest amounts as Purchaser and Seller deem appropriate.  Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information.  Purchaser and Seller each shall provide Escrow Agent a properly completed IRS Form W-9 or Form W-8, as applicable.  If requested tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the Internal Revenue Code and U.S. Treasury regulations promulgated thereunder.

8.     Resignation or Removal of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving 30 days' prior written notice to Purchaser and Seller specifying a date when such resignation shall take effect and, after the date of such resignation notice, notwithstanding any other provision of this Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent.  Escrow Agent may be removed at any time by Purchaser and Seller giving at least 30 days' prior written notice to Escrow Agent specifying the date when such removal shall take effect.  Subject to Section 5, the resigning Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the resigning Escrow Agent deems advisable.  After any resigning Escrow Agent's resignation or removal, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Agreement.

9.     Duties and Liability of Escrow Agent.

(a)     Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied.  Escrow Agent has no fiduciary or discretionary duties of any kind.  Escrow Agent's permissive rights shall not be construed as duties.  Escrow Agent has no liability under and no duty to inquire as to the provisions of any document other than this Agreement, including without limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to Escrow Agent.  Escrow Agent's sole responsibility is to hold the Escrow Funds in accordance with Escrow Agent's customary practices and disbursement thereof in accordance with the terms of this Agreement.  Escrow Agent shall not be responsible for or have any duty to make any calculations under this Agreement, or to determine

Exh. C-7

FBG_CH1_00094383

Exhibit C – Form of Escrow Agreement

when any calculation required under the provisions of this Agreement should be made, how it should be made or what it should be, or to confirm or verify any such calculation. Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. This Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to any applicable provision of this Agreement, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Agreement or the Escrow Funds.

(b)      Escrow Agent shall not be liable for any action taken or omitted by it in good faith, except to the extent that a court of competent jurisdiction determines, in a determination that is not subject to appeal or the deadlines for the appeal of which have expired, that (i) Escrow Agent's unexcused failure to comply with unambiguous joint instructions from Purchaser and Seller as authorized under this Agreement (except if such failure is in compliance with or authorized under Section 4, Section 5, Section 6, Section 7, Section 8, Section 11 or Section 13 or such failure was due to any action of Purchaser or Seller, including but not limited to the provision of further notices, demands or instructions to Escrow Agent) caused any loss to Purchaser or Seller, (ii) Escrow Agent's unexcused failure to perform its unambiguous obligations under this Agreement caused any loss to Purchaser or Seller, or (iii) Escrow Agent's gross negligence or willful misconduct caused any loss to Purchaser or Seller. Escrow Agent may retain and act hereunder through agents, and shall remain responsible for the acts or omissions of any such agent retained by Escrow Agent, except that Escrow Agent shall have no responsibility for the acts or omissions of any agent that is retained in good faith by Escrow Agent to perform general and administrative services that are incidental to the services to be provided by Escrow Agent hereunder.

(c)      Escrow Agent may rely upon the due execution, validity and effectiveness of, and the truth and accuracy of any information contained in, any notice, instruction, request or other instrument that Escrow Agent believes to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for (i) acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document believed by Escrow Agent to have been created by or on behalf of Purchaser or Seller, (ii) indirect, special, consequential or punitive damages of any kind or lost profits damages, even if Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action, or (iii) any amount greater than the value of the Escrow Funds as valued upon deposit with Escrow Agent.

(d)      Escrow Agent shall not be responsible for delays or failures in performance resulting from acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental actions, fire, communication line failures, computer viruses, attacks or intrusions, power failures, earthquakes or any other circumstance beyond its control. Escrow Agent shall not be obligated to take any legal action in connection with the Escrow Funds, this Agreement or the Underlying Agreement or to appear in, prosecute or defend any such legal action or to take any other action that in Escrow Agent's sole judgment may expose it to potential expense or liability. Purchaser and Seller are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state. Escrow Agent shall have no liability to Purchaser or Seller, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Funds escheat by operation of law.

Exh. C-8

CONFIDENTIAL

FBG_CH1_00094384

Exhibit C – Form of Escrow Agreement

(e)     Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving this Agreement.  Any action taken by Escrow Agent in good faith in accordance with the advice of such counsel shall be deemed for all purposes of this Agreement to be an action taken without gross negligence or willful misconduct.  The cost of such counsel shall be a Loss that is indemnifiable in accordance with Section 10.

(f)     Purchaser and Seller agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder.

(g)     When any action is provided for herein to be done on or by a specified date that falls on a day other than a Business Day, such action may be performed on the following Business Day.

(h)     If any portion of the Escrow Funds is at any time attached, garnished or levied upon, or otherwise subject to any writ, order, decree or process of any court of the United States of America or any of its constituent states, or in case disbursement of Escrow Funds is stayed or enjoined by any order of any court of the United States of America or any of its constituent states, Escrow Agent is authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders, decrees or process so entered or issued, including but not limited to those which it is advised by legal counsel of its own choosing is binding upon it; and if Escrow Agent relies upon or complies with any such writ, order, decree or process, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even if such order is reversed, modified, annulled, set aside or vacated.

(i)     Subject to law, Escrow Agent and any stockholder, director, officer or employee of Escrow Agent may buy, sell and deal in any of the securities of any other party hereto and contract and lend money to any other party hereto and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for any other party hereto or for any other person or entity.

(j)     In the event instructions, including funds transfer instructions, address change or change in contact information are given to Escrow Agent (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, Escrow Agent is authorized but shall not be required to seek confirmation of such instructions by telephone call-back to any person designated by the instructing party on Schedule C hereto, and Escrow Agent may rely upon the confirmation of anyone purporting to be the person so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes.  If Escrow Agent is unable to contact any of the designated representatives identified in Schedule C, Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more executive officers of Purchaser or Seller, as the case may be, having the titles of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer or President, as Escrow Agent may select.  Purchaser and Seller agree that Escrow Agent may at its option record any telephone calls made

Exh. C-9

CONFIDENTIAL

FBG_CH1_00094385

pursuant to this Section.  Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Purchaser or Seller to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank, even when its use may result in a person other than the intended beneficiary being paid, or the transfer of funds to a bank other than the intended beneficiary's bank or intermediary bank.  Purchaser and Seller acknowledge that these optional security procedures are commercially reasonable.

10.    Indemnification of Escrow Agent.  Purchaser and Seller each shall severally and not jointly indemnify and hold harmless Escrow Agent and each director, officer, employee and affiliate of Escrow Agent (each, an "Indemnified Party") against 50% of any and all claims (whether asserted or commenced by Purchaser, Seller or any other person or entity and whether or not valid), actions, proceedings, losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without limitation reasonable attorneys' fees, costs and expenses) (collectively, "Losses") arising from this Agreement or Escrow Agent's actions or omissions hereunder, except to the extent such Losses are finally determined by a court of competent jurisdiction, which determination is not subject to appeal or the deadlines for the appeal of which have expired, to have been directly caused by (a) Escrow Agent's unexcused failure to comply with unambiguous joint instructions from Purchaser and Seller as authorized under this Agreement (except if such failure is in compliance with or authorized under Section 4, Section 5, Section 6, Section 7, Section 8, Section 11 or Section 13 or such failure was due to any action of Purchaser or Seller, including but not limited to the provision of further notices, demands or instructions to Escrow Agent), (b) Escrow Agent's unexcused failure to perform its unambiguous obligations under this Agreement, or (c) the gross negligence or willful misconduct of such Indemnified Party. Losses shall include all costs, including without limitation reasonable attorneys' fees, incurred by such Indemnified Party in connection with the enforcement of Purchaser's and Seller's obligations hereunder.  Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it.  The obligations of Purchaser and Seller under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.

11.    Compensation of Escrow Agent.

(a)    [Fees and Expenses.  Purchaser and Seller each shall be liable severally for 50% of Escrow Agent's fees and expenses in connection with its services in accordance with Schedule B attached hereto.  The obligations of Purchaser and Seller under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.][1]

(b)    Security and Offset.  Purchaser and Seller hereby grant to Escrow Agent and the Indemnified Parties a first priority security interest in, lien upon and right of offset against and deduction from the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient to cover such compensation and reimbursement, Purchaser and Seller each shall be liable severally for 50% of such compensation and reimbursement.

_____

[1] **Note to US Bank**: Since the fees are waived, please confirm whether Schedule B may be deleted.

Exh. C-10

CONFIDENTIAL                                                                FBG_CH1_00094386

Exhibit C – Form of Escrow Agreement

12. <u>Representations and Warranties</u>. Purchaser and Seller each respectively, severally and not jointly make the following representations and warranties regarding itself to Escrow Agent:

(a)     It has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and this Agreement has been duly approved by all necessary action on its part and constitutes its valid and binding agreement enforceable in accordance with its terms;

(b)     Each of the applicable persons designated on Schedule C attached hereto has been duly appointed or authorized to act as its authorized representative hereunder and individually has full power and authority on its behalf to execute and deliver any instruction or direction, to amend, modify or waive any provision of this Agreement and to take any and all other actions as its authorized representative under this Agreement, and no change in designation of such authorized representatives shall be effective until written notice of such change is delivered to each other party to this Agreement pursuant to Section 15 and Escrow Agent has had reasonable time to act upon it;

(c)     No printed or other material in any language, including any prospectus, notice, report, and promotional material that mentions "U.S. Bank" or any of its affiliates by name or the rights, powers, or duties of Escrow Agent under this Agreement will be issued by any other parties hereto, or on such party's behalf, without the prior written consent of Escrow Agent, except as required by law or stock exchange rules;

(d)     It will not claim any immunity from jurisdiction of any court, suit or legal process, whether from service of notice, injunction, attachment, execution or enforcement of any judgment or otherwise; and

(e)     There is no security interest in the Escrow Funds or any part thereof and no financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

13. <u>Identifying Information</u>. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust or other legal entity, Escrow Agent requires documentation to verify its formation and existence as a legal entity. Escrow Agent may require financial statements, licenses or identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation. Purchaser and Seller agree to provide all information requested by Escrow Agent in connection with any legislation or regulation to which Escrow Agent is subject, in a timely manner. Escrow Agent's appointment and acceptance of its duties under this Agreement is contingent upon verification of all regulatory requirements applicable to Purchaser, Seller and any of their permitted assigns, including successful completion of a final background check. These conditions include, without limitation, requirements under the USA PATRIOT Act, the USA FREEDOM Act, the Bank Secrecy Act, and the U.S. Department of the Treasury Office of Foreign Assets Control. If these conditions are not

Exh. C-11

CONFIDENTIAL

FBG_CH1_00094387

Exhibit C – Form of Escrow Agreement

met, Escrow Agent may at its option promptly terminate this Agreement in whole or in part, or refuse any otherwise permitted assignment by Purchaser or Seller, without any liability or incurring any additional costs.

14.     Notices.   All notices, approvals, consents, requests and other communications hereunder must be in writing (provided that any communication sent to Escrow Agent hereunder must be in the form of a manually signed document or electronic copy thereof), in English, and may only be delivered (a) by personal delivery, or (b) by globally recognized courier service, or (c) via facsimile transmission, with confirmed receipt or (d) via email by way of a PDF attachment thereto.   Any such notice, delivery or communication to Purchaser or Seller will be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of a globally recognized express delivery service, on the Business Day that receipt by the addressee is confirmed under the service's systems, (iii) in the case of facsimile, on the Business Day after the day that the party giving notice receives electronic confirmation of sending from the sending facsimile machine, and (iv) in the case of email, on the Business Day after the date that the recipient, by return email or notice delivered by other method provided for in this Section, acknowledges having received that email (with an automatically generated receipt or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section). Any such notice, delivery or communication to Escrow Agent shall be effective only upon actual receipt, which receipt Escrow Agent shall confirm promptly upon request.   Such notices may only be sent to the applicable party or parties at the address specified below:

If to Purchaser or Purchaser Representative, at:

> c/o First Brands Group, LLC
> 127 Public Square Suite 5300
> Cleveland, Ohio 44114
> Attention:  Shekhar Kumar
> Email:  shekhar.kumar@firstbrandsgroup.com

> with a copy to:

> Clifford Chance US LLP
> Texas Tower, 845 Texas Ave Suite 3930,
> Houston, TX 77002
> Attention:  Alexandra Wilde
> Email:  alexandra.wilde@cliffordchance.com

If to Seller or Seller Representative, at:

> _____
> _____
> _____
> Telephone: _____
> E-mail: _____

> with a copy to:

Exh. C-12

CONFIDENTIAL

FBG_CH1_00094388

Exhibit C – Form of Escrow Agreement

DLA Piper LLP (US)
444 West Lake Street
Chicago, Illinois 60606-0089
Attention:  Richard Chesley
Email: richard.chesley@us.dlapiper.com

and

DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Attention:  Christopher P. Giordano; Jon Venick
Email: christopher.giordano@us.dlapiper.com;
jon.venick@us.dlapiper.com

If to Escrow Agent, at:    U.S.  Bank National Association, as Escrow Agent
ATTN:  Global Corporate Trust Services
Address:  _____
Telephone:  _____
Facsimile:  _____
E-mail:  _____

and to:

U.S.  Bank National Association
ATTN:  _____
Trust Finance Management

_____
_____

Telephone:  _____
Facsimile:  _____
E-mail:  _____

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received.  Purchaser and Seller agree to assume all risks arising out of the use of electronic methods to submit instructions and directions to Escrow Agent, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

      15.     Amendment and Assignment.  None of the terms or conditions of this Agreement may be changed, waived, modified, discharged, terminated or varied in any manner whatsoever unless in writing duly signed by each party to this Agreement.  No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  No party may assign this Agreement or any of its rights or obligations hereunder without the written consent of the other parties, provided that if Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this

Exh. C-13

CONFIDENTIAL

FBG_CH1_00094389

Exhibit C – Form of Escrow Agreement

Agreement) to, another entity, the successor or transferee entity without any further act shall be the successor Escrow Agent.

16.    Governing Law. The validity, interpretation and effect of this Agreement shall be governed exclusively by the Laws of the State of New York, excluding the "conflict of laws" rules thereof.

17.    Venue. Each of the parties hereto irrevocably agrees that any legal Action arising out of or relating to this Agreement or any of the transactions contemplated by this Agreement (including claims asserted for breach of contract, tort, or otherwise and regardless of whether such claims arise in law or in equity) must be brought by any other party or its successors or assigns in any state or federal court in the State of New York, and in each case any appellate courts therefrom, and each of the parties hereto hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally. Each of the parties hereto agree not to commence any Action, suit, or proceeding arising out of or related to this Agreement or any of the transactions contemplated by this Agreement except in the courts described above in New York, except for Actions in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any such court in New York as described herein. Each of the parties hereto further agrees that notice as provided herein shall constitute sufficient service of process and the parties hereto further waive any argument that such service is insufficient. Each of the parties hereto hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any Action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in New York as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) that (i) the Action in any such court is brought in an inconvenient forum, (ii) the venue of such Action is improper, or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

18.    Entire Agreement, No Third Party Beneficiaries. This Agreement constitutes the entire agreement between the signatory parties hereto relating to the holding, investment and disbursement of Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to Escrow Funds. This Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction. To the extent any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. The Section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement. Nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than the signatory parties hereto and the Indemnified Parties any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

*[Signature Page Follows]*

Exh. C-14

CONFIDENTIAL

FBG_CH1_00094390

Exhibit C – Form of Escrow Agreement

The parties hereto have caused this Agreement to be executed as of the date first above written.

**First Brands Group, LLC**
**as Purchaser**

By: _____
Name: _____
Title: _____


**Lumileds Holdings B.V.**
**as Seller**

By: _____
Name: _____
Title: _____


**U.S.  BANK NATIONAL ASSOCIATION**
**as Escrow Agent**

By: _____
Name: _____
Title: _____

[*Signature Page to Escrow Agreement*]
Exh. C-15

CONFIDENTIAL                                                 FBG_CH1_00094391

Exhibit C – Form of Escrow Agreement

SCHEDULE A

U.S. BANK NATIONAL ASSOCIATION
INVESTMENT AUTHORIZATION FORM

U.S.  BANK MONEY MARKET DEPOSIT ACCOUNT

**Description and Terms**

The U.S.  Bank Money Market Deposit Account is a U.S.  Bank National Association ("U.S.  Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other corporate trust customers of U.S.  Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S.  Bank uses the daily balance method to calculate interest on this account (actual/365 or 366).  This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account.  Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S.  Bank as agent for its corporate trust customers.  U.S. Bank's Corporate Trust Services Escrow Group performs all account deposits and withdrawals. Deposit accounts are FDIC insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

U.S.  BANK IS NOT REQUIRED TO REGISTER AS A MUNICIPAL ADVISOR WITH THE SECURITIES AND EXCHANGE COMMISSION FOR PURPOSES OF COMPLYING WITH THE DODD-FRANK WALL STREET REFORM & CONSUMER PROTECTION ACT. INVESTMENT ADVICE, IF NEEDED, SHOULD BE OBTAINED FROM YOUR FINANCIAL ADVISOR.

**Automatic Authorization**

In the absence of specific written direction to the contrary to the extent and as authorized in the applicable escrow agreement, U.S.  Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S.  Bank Money Market Deposit Account.  The customer(s) confirm that the U.S.  Bank Money Market Deposit Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of permissible alternate instructions.

Exh. C-16

NAI-1503824463v7
09/25/18

CONFIDENTIAL

FBG_CH1_00094392

Exhibit C – Form of Escrow Agreement

## SCHEDULE B

### [Schedule of Fees for Services as Escrow Agent]

Exh. C-17

NAI-1503824463v7
09/25/18

CONFIDENTIAL                                                                      FBG_CH1_00094393

Exhibit C – Form of Escrow Agreement

## SCHEDULE C

Each of the following person(s) is a **Purchaser Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Purchaser's behalf (only one signature required):

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

If only one person is identified above, the following person is authorized for call-back confirmations:

| Name | Telephone Number |
|------|------------------|

Each of the following person(s) is a **Seller Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Seller's behalf (only one signature required):

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

| Name | Specimen signature | Telephone No. |
|------|-------------------|---------------|

If only one person is identified above, the following person is authorized for call-back confirmations:

| Name | Telephone Number |
|------|------------------|

Exh. C-18

NAI-1503824463v7
09/25/18

CONFIDENTIAL                                                 FBG_CH1_00094394

**DEBTORS' EXHIBIT NO. 239**
**Page 135 of 193**

Exhibit C – Form of Escrow Agreement

ATTACHMENT 1

FORM OF JOINT WRITTEN DIRECTION

**[To be completed on closing]**

U.S. Bank National Association, as Escrow Agent
ATTN: Global Corporate Trust Services
Address: _____

RE: ESCROW AGREEMENT made and entered into as of [     ] by and among [          ] ("Purchaser"), [     ] ("Seller") and U.S. Bank National Association, in its capacity as escrow agent (the "Escrow Agent").

Pursuant to Section 4 of the above-referenced Escrow Agreement, Purchaser and Seller hereby instruct Escrow Agent to disburse the amount of [$_____] from the Escrow Account to [Purchaser][Seller], as provided below:

| Purchaser | Seller |
|---|---|
| Bank Name: _____ | Bank Name: _____ |
| Bank Address: _____ | Bank Address: _____ |
| ABA No.: _____ | ABA No.: _____ |
| Account Name: _____ | Account Name: _____ |
| Account No.: _____ | Account No.: _____ |

**[Purchaser]**

By: _____
Name:
Date: _____

**[Seller]**

By: _____
Name:
Date: _____

Exh. C-19

NAI-1503824463v7
09/25/18

CONFIDENTIAL                                                FBG_CH1_00094395

**EXHIBIT D**

**Form of Notary Letter**

(*See Attached.*)

Exh. D-1

CONFIDENTIAL

FBG_CH1_00094396

Exhibit D - Form of Notary Letter



**DLA Piper Nederland N.V.**
Prinses Amaliaplein 3
1077 XS Amsterdam
P.O. Box 75258
1070 AG Amsterdam
The Netherlands

**T** +31(0)20 541 9888

**E** manon.denboer@dlapiper.com
**E** emiel.scheffe@dlapiper.com

## FORM OF NOTARY LETTER

| | | | | |
|---|---|---|---|---|
| **To:** | **The Addressees (as listed in Schedule 1 – Part A)** | **Our Ref:** | | Project Liberty 11010267-1 |

**M.Y.H.J. den Boer**
*Civil-law Notary*

[date]

**RE:** **PAYMENT INSTRUCTIONS IN RESPECT OF THE COMPLETION OF PROJECT LIBERTY**

Ladies and gentlemen,

I am as Dutch civil-law notary (*notaris*) of DLA Piper Nederland N.V. ("**DLA Piper**") instructed to execute the Deed of Transfer of Share (as defined below) on [date] (the "**Completion Date**") in relation to Project Liberty (the "**Transaction**"). Acting as such (the "**Notary**") in this letter ("**Notary Letter**") I refer to:

**1.** **Addressees and advisors**

The addressees listed in **Schedule 1 - Part A**, hereinafter separately also referred to as an "**Addressee**" and collectively also referred to as: the "**Addressees**".

The notifications under this Notary Letter shall be sent to all Addressees, with the advisors listed in **Schedule 1 - Part B**, copied in.

advocaten
notarissen
belastingadviseurs

**DLA Piper Nederland N.V.** is registered with the Trade Register of the Chamber of Commerce under number 34207878.

**DLA Piper Nederland N.V.** is part of DLA Piper, an international legal practice.

**NL switchboard:**
+31 (0)20 541 9888

Exh. D-2

FBG_CH1_00094397

**DEBTORS' EXHIBIT NO. 239**
**Page 138 of 193**

2.      **Introduction**

2.1     Reference is made to:

2.1.1      the Stock Purchase Agreement, dated [●] 2024, regarding the purchase of the sole share in the capital of Lamps Holding B.V. (the "**Company**") from the Seller by the Purchaser (the "**SPA**");

2.1.2      the draft notarial deed of transfer of the sole share in the capital of the Company with reference number MDB/JEF/11010267-1/13670080, to be executed on the Completion Date, by which deed the Seller transfers its sole share in the capital of the Company to the Purchaser (the "**Deed of Transfer of Share**"); and

2.1.3      the ultimate beneficial owner statements and such other KYC and source of funds documentation to be obtained from the Seller, the Purchaser and other parties designated by the Notary on the basis of the Dutch Anti-Money Laundering and Anti-Terrorist Financing Act (*Wwft*) and the Directive (EU) 2015/849 as prescribed by, and in form and substance to the satisfaction of, the Notary (the "**Wwft Documentation**").

2.2     Capitalised terms used in this Notary Letter but not defined herein will have the same meaning as ascribed to these terms in the SPA unless explicitly stated otherwise. The word "Clause" refers to a clause in this Notary Letter.

3.      **SPA Amounts and Closing Payments**

3.1     Reference is made to the Estimated Closing Balance Sheet as defined in clause 1.3 of the SPA and to clause 1.5 of the SPA, in which clause reference is made to the Closing Payment as set forth in **Schedule 2 - Part A (SPA Amount)**.

I have been advised that I may expect to receive the amounts as set forth in **Schedule 2 - Part B**, by no later than 16.00 hrs CEST on the last business day in Amsterdam prior to the Completion Date (with value date on the same day or earlier) in the following USD bank account of the DLA Piper Amsterdam notaries, with ING Bank N.V., Amstelplein 1, 1096 HA, Amsterdam, the Netherlands:

Exh. D-3

CONFIDENTIAL                                                                              FBG_CH1_00094398

| Bank account (the "Notary's Bank Account"). |
| --- |
| **USD bank account**: IBAN account number: NL86INGB0020031300 and BIC code: INGBNL2A, account name "*Derdengld Notariaat DLA USD*" |

All amounts transferred to the Notary's Bank Account pursuant to this Notary Letter are hereinafter collectively referred to as: "**Closing Amounts**".

3.2   All payments of Closing Amounts transferred to the Notary's Bank Account shall be made without any (further) deduction or set-off of any amounts (e.g. related costs, fees, charges, duties or otherwise) unless explicitly stipulated otherwise in this Notary Letter.

3.3   The acceptance by the Notary of payments of Closing Amounts transferred to the Notary's Bank Account is subject to receipt by the Notary of the relevant Wwft Documentation of the transferor(s) of the Closing Amounts.

3.4   Upon receipt and acceptance by the Notary of the Closing Amounts, I shall confirm per e-mail receipt and acceptance hereof to the Addressees in the form of **Schedule 3** (the "**DLA Confirmation of Receipt of Closing Amounts**").

**4.   Actions to be undertaken on the Completion Date**

4.1   I have been advised that I may expect to receive before or on the Completion Date:

(a)   a copy of the SPA, duly executed by all relevant parties;

(b)   the originals or a copy of all relevant powers of attorney and resolutions required for the execution of the Deed of Transfer of Share, duly executed by all relevant parties;

(c)   the complete and up to date original shareholders' register of the Company;

(d)   from the Seller and the Purchaser (or the respective attorney on behalf of such party) a confirmation that all conditions under the SPA to be fulfilled prior to the execution of the Deed of Transfer of Share have been duly satisfied or waived and

Exh. D-4

CONFIDENTIAL

FBG_CH1_00094399

that the Notary can proceed with the execution of the Deed of Transfer of Share, in the form of **Schedule 4** (the **"Parties' Confirmation"**);

(e)    the Wwft Documentation, to the extent not already received by the Notary pursuant to Clause 3.3.

4.2    On the Completion Date, I, acting as Notary, shall perform a first notarial insolvency research with regard to Dutch parties to the Deed of Transfer of Share through an online search of the Central Insolvency Register of the courts in the Netherlands (*Centraal Insolventieregister*) and an online search of the section on EU Registrations of the Central Insolvency Register (*Centraal Insolventieregister – EU Registratie*).

4.3    After issuance of the DLA Confirmation of Receipt of Closing Amounts, receipt of all documents referred to in Clause 4.1, and the first notarial insolvency research as referred to in Clause 4.2 confirming that:

4.3.1    neither an online search of the Central Insolvency Register of the courts in the Netherlands performed by me, acting as Notary, revealed any information which would point to a Dutch party to the Deed of Transfer of Share, declared bankrupt, granted suspension of payments or granted a debt rescheduling scheme; nor

4.3.2    an online search of the section on EU Registrations of the Central Insolvency Register performed by me, acting as Notary, revealed any information which would point to any of the insolvency proceedings listed in Annex A, as amended, to Council Regulation (EU) No. 2015/848 of 20 May 2015 on Insolvency Proceedings, declared applicable to a Dutch party to the Deed of Transfer of Share by a court in one of the member states of the EU (with the exception of Denmark), other than the Netherlands,

I, acting as Notary, shall execute the following step (the **"Completion Step"**):

| Completion Step: | |
|---|---|
| 1. | Execution of the Deed of Transfer of Share |

Exh. D-5

CONFIDENTIAL

FBG_CH1_00094400

**DEBTORS' EXHIBIT NO. 239**
**Page 141 of 193**

4.4     Immediately after execution of the above Completion Step, I shall send a confirmation by e-mail to the Addressees that the Completion Step has been executed, in the form of **Schedule 5** (the "**DLA Confirmation of Completion Step**").

5.      **Entitlement to funds**

5.1     With effect from the point in time of receipt of the Closing Amounts, but subject to the remaining provisions hereof, I shall (until the Effective Time as defined below) hold the Closing Amounts in the Notary's Bank Account for the account of the parties and for the amounts as set forth in **Schedule 2 - Part B**.

5.2     With effect from the point in time of execution of the Deed of Transfer of Share (the "**Effective Time**"), but subject to the remaining provisions of this Notary Letter including the completion of the researches with an assenting outcome as referred to in paragraph 6, I shall hold the Closing Amounts in the Notary's Bank Account for the account of the parties and for the amounts as set forth in Schedule 2 - Part C.

5.3

5.4     If I receive into the Notary's Bank Account more than the total amount of the Closing Amounts, I shall hold the excess amount for the account (and to the order) of the relevant party from which the excess amount was received and repay the excess amount into the accounts from which it was transferred.

5.5

5.6     In the event that positive interest is accrued in respect of (part of) the Closing Amounts, such interest will be for the account of the person on whose behalf such amount is being held and for as long as it is held on such person's behalf and shall be paid to such person as soon as possible, taking into account that any accrued positive interest may only be made available by ING Bank N.V. to the Notary after a period of time following Completion, notwithstanding Clauses 7.1 and 7.2. Any costs, fees, charges or duties shall be invoiced or deducted, as the case may be, for the account of the person for which they accrue or will accrue, notwithstanding Clauses 7.1 and 7.2.

Exh. D-6

CONFIDENTIAL

FBG_CH1_00094401

**6.** **Payments out**

6.1 On the first business day in Amsterdam, the Netherlands, after the execution of the Completion Step at my discretion at any time between 9.00 hrs and 13.00 hrs CEST, I, acting as Notary, shall perform the notarial insolvency research with regard to the Dutch parties to the Deed of Transfer of Share through an online search of the Central Insolvency Register of the courts in the Netherlands and an online search of the section on EU Registrations of the Central Insolvency Register.

6.2 Immediately after a notarial insolvency research confirming that:

6.2.1 neither an online search of the Central Insolvency Register of the courts in the Netherlands performed by me, acting as Notary, revealed any information which would point to a Dutch party to the Deed of Transfer of Share, declared bankrupt, granted suspension of payments or granted a debt rescheduling scheme; nor

6.2.2 an online search of the section on EU Registrations of the Central Insolvency Register performed by me, acting as Notary, revealed any information which would point to any of the insolvency proceedings listed in Annex A, as amended, to Council Regulation (EU) No. 2015/848 of 20 May 2015 on Insolvency Proceedings having been declared applicable to a Dutch party to the Deed of Transfer of Share by a court in one of the member states of the EU (with the exception of Denmark), other than the Netherlands,

I, acting as Notary, shall make the payments to the recipients and for the amounts as described in **Schedule 2 – Part C**, and I shall confirm the same by e-mail to the Addressees, in the form of **Schedule 6** (the "**DLA Confirmation of Payments**").

**7.** **Lapse and remedy**

7.1 In the event that the DLA Confirmation of Payments has not been issued before the end of day on the third business day in Amsterdam, the Netherlands after the Completion Date (the "**Long Stop Date**"), or such other date as will be agreed and confirmed in writing (e-mail) by me and the Addressees, I shall hold the respective parts of the Closing Amounts for the account of the parties on whose behalf the respective parts of the Closing Amounts were transferred to the Notary's Bank Account, and shall, without the need for any further

Exh. D-7

CONFIDENTIAL

instructions from any party, give the instruction to immediately repay the respective parts of the Closing Amounts into the accounts from which it was transferred, subject to Clause 7.2.

7.2     In the event that the DLA Confirmation of Payments has not been issued before the end of the Long Stop Date, or such other date as will be agreed and confirmed in writing (e-mail) by me and the Addressees, but the Completion Step has already been executed, the Addressees will first carry out any remedial step or action required to ensure that the Completion Step is reversed or rectified in any other manner, with a view to putting all parties in the same position as they were in prior to the Completion Step, before I give the instruction to repay the respective parts of the Closing Amounts into the accounts from which it was transferred.

**8.      Miscellaneous**

8.1     Each of the Addressees to this Notary Letter explicitly waives any right or claim it might have to allege that any part of the Closing Amounts is to be applied in any manner other than strictly in accordance with the provisions of this Notary Letter.

8.2     Each of the Addressees to this Notary Letter agrees that neither the Notary nor DLA Piper or any persons associated with DLA Piper (the **"DLA Piper Associates"**) shall be held liable to any person for any delay in payments of or shortfall in the Closing Amounts, or any part thereof, or other loss, cost or liability in respect of the operation of this Notary Letter (including without limitation in respect of any loss, cost or liability caused by the act, omission, fraud, delay, negligence, insolvency (including bankruptcy, reorganisation, moratorium or similar), default or customer due diligence measures of any bank, financial institution or other person or the directors, officers, employees, agents or representatives of any of the foregoing) unless such liability arises as a result of gross negligence, fraud or wilful misconduct on the part of the Notary, DLA Piper or the DLA Piper Associates.

8.3     The Addressees recognize that a bankruptcy, a suspension of payments, a debt rescheduling scheme and any other insolvency proceedings as referred to in Clauses 4.3 and 6.2 as well as similar proceedings under the laws of any other relevant jurisdiction, could affect the validity, binding effect or enforceability of the Completion Step and/or related steps thereto. The Addressees explicitly accept that risk and shall neither hold the Notary nor DLA Piper or the DLA Piper Associates liable for the consequences of that risk. The Addressees also recognize that the notarial insolvency research as described in Clauses 4.3 and 6.2 only

Exh. D-8

CONFIDENTIAL                                                                 FBG_CH1_00094403

provides non-conclusive evidence with respect to Dutch parties and other parties with a branch in the Netherlands.

8.4     The Addressees also recognize that in respect of a Dutch party a bankruptcy, a suspension of payments, a debt rescheduling scheme as referred to in Clauses 4.3 and 6.2 could still be declared and registered with retroactive effect. Such bankruptcy, suspension of payments or debt rescheduling scheme could affect the validity, binding effect or enforceability of the Completion Step and/or related steps thereto. This risk may be mitigated by (i) execution of this Notary Letter by a Dutch party prior to the Completion Date, (ii) payment of the Closing Amounts by a Dutch party into the Notary's Bank Account prior to the Completion Date, and (iii) payments from the Notary's Bank Account to the relevant recipients not earlier than the first business day after the execution of the Completion Step. To the extent that this Notary Letter deviates from the aforementioned mitigating measures, the Addressees explicitly accept that risk and shall neither hold the Notary nor DLA Piper or the DLA Piper Associates liable for the consequences of that risk.

8.5     Each Addressee declares that it is not subject to a bankruptcy, a suspension of payments, a debt rescheduling scheme or any other insolvency proceedings as referred to in Clauses 4.3 and 6.2 or a similar proceeding under the laws of any other relevant jurisdiction, and to its best knowledge no initiating actions thereto have been undertaken nor has it any reason to expect the same.

8.6     Furthermore, each of the Addressees agrees to indemnify the Notary, DLA Piper and the DLA Piper Associates and to hold the Notary, DLA Piper and the DLA Piper Associates harmless from and against any and all liability to any person that may arise as result of the operation of this Notary Letter and unless such liability arises as a result of gross negligence, fraud or wilful misconduct on the part of the Notary, DLA Piper or the DLA Piper Associates.

8.7     The Addressees acknowledge and expressly agree that:

a.      the Notary has no obligation to investigate any circumstances which could affect the validity of any legal act pursuant to the Completion Step and/or the making or receipt of any payment other than the notarial insolvency research, as described in Clauses 4.3.1, 4.3.2, 6.2.1 and 6.2.2;

Exh. D-9

CONFIDENTIAL                                                                    FBG_CH1_00094404

b.     the Notary has no obligation other than to execute the Deed of Transfer of Share, to perform the notarial insolvency research, as described in Clauses 4.3.1, 4.3.2, 6.2.1 and 6.2.2; and to effect the payment instructions in accordance with this Notary Letter;

c.     the Notary has no obligation to convert any amount in any currency into another currency;

d.     with reference to the Rules of Professional Conduct (*Verordening beroeps- en gedragsregels*) of the Royal Dutch Organisation of Civil Law Notaries (*Koninklijke Notariële Beroepsorganisatie*): (i) the Notary is a civil-law notary affiliated with DLA Piper; (ii) DLA Piper acts as an advisor to the Seller in relation to the Transaction; and (iii) is and remains authorised to act - upon instructions thereto - as advisor to the Seller in the event of any dispute relating to the Transaction;

e.     the Terms of Business of DLA Piper, of which each Addressee acknowledges to have received a copy in the form of **Schedule 7**, are applicable to the services rendered by the Notary pursuant to this Notary Letter and to supplemental and further assignments of the Addressees in relation to this Notary Letter; and

f.     where this Notary Letter refers to the Notary or to "I" or "me", this shall include the assigned civil-law notary (*toegevoegd notaris*) or the substitute (*waarnemer*) of the Notary appointed in accordance with the applicable provisions of Dutch law regarding the notarial profession (*Wet op het notarisambt*) or any other civil law notary associated with DLA Piper.

8.8     The Addressees hereby confirm and agree that their respective confirmations and other notices may be provided to the Notary by way of executed counterpart signature pages and/or by e-mail exchange (provided the attachments are readable PDF files) and that the Notary may send his/her confirmations and other notices to each of them in the same manner. The Addressees confirm and agree that the Notary may rely on the face of the documents, confirmations and other notices provided to him/her, which he/she reasonably assumes to originate from and to have been duly executed by the relevant parties, without further investigation.

Exh. D-10

CONFIDENTIAL

FBG_CH1_00094405

8.9     Amendments to this Notary Letter shall only be effective if made in writing and signed by me, Notary, and by or on behalf of all Addressees.

8.10    The rights and obligations of the Addressees under this Notary Letter are personal and may not be assigned or otherwise transferred.

8.11    This Notary Letter shall be governed exclusively by Dutch law. All disputes arising in connection with this Notary Letter, including disputes concerning the existence and validity thereof, shall be resolved by the competent courts in Amsterdam, the Netherlands.

Please confirm your agreement to the above arrangements of this Notary Letter by signing and dating the acknowledgement below and by returning the same to me.

*[signature pages following]*

Exh. D-11

CONFIDENTIAL

FBG_CH1_00094406

**DEBTORS' EXHIBIT NO. 239**
**Page 147 of 193**

Yours sincerely,

_____

**M.Y.H.J. den Boer**

*Civil-law Notary*

Exh. D-12

CONFIDENTIAL

FBG_CH1_00094407

**DEBTORS' EXHIBIT NO. 239**
**Page 148 of 193**

**IN AGREEMENT OF THE ABOVE**

**Seller:**

_____

| | |
|---|---|
| On behalf of: | **Lumileds Holding B.V.** |
| Name: | Aegletes B.V. |
| Title: | (individually authorized) managing director |
| On behalf of: | Aegletes B.V. |
| Name: | [•] |
| Title: | (individually authorized) executive director |
| Date: | |

Exh. D-13

CONFIDENTIAL

FBG_CH1_00094408

**IN AGREEMENT OF THE ABOVE**

**Purchaser:**

_____

On behalf of:      **First Brands Group, LLC**
Name:            [●]
Title:            [●]
Date:            [●]

Exh. D-14

CONFIDENTIAL                    FBG_CH1_00094409

### Schedule 1 - Part A
### Addressees

1. **Lumileds Holding B.V.**

   Attn:      [●]

   E-mail:    [●]

   Attn:      [●]

   E-mail:    [●]

   (the "**Seller**")

2. **First Brands Group, LLC**

   Attn:      [●]

   E-mail:    [●]

   Attn:      [●]

   E-mail:    [●]

   (the "**Purchaser**")

Exh. D-15

CONFIDENTIAL

FBG_CH1_00094410

## Schedule 1 - Part B
### Advisors

a. **DLA Piper**

| | |
|---|---|
| Attn: | Jon Venick |
| E-mail: | Jon.Venick@us.dlapiper.com |
| Attn: | Jasmine Judge |
| E-mail: | jasmine.judge@us.dlapiper.com |
| Attn: | Andrew Rivera |
| E-mail: | andrew.rivera@us.dlapiper.com |

b. **Clifford Chance**

| | |
|---|---|
| Attn: | [●] |
| E-mail: | [●] |
| Attn: | [●] |
| E-mail: | [●] |

Exh. D-16

CONFIDENTIAL

FBG_CH1_00094411

**Schedule 2**

*(Excel with Schedule 2 Part A, B and C to be attached)*

Exh. D-17

CONFIDENTIAL

FBG_CH1_00094412

**<u>Schedule 3</u>**
**DLA Confirmation of Receipt of Closing Amounts**

I hereby confirm in accordance with Clause 3.4 of the Notary Letter the receipt and acceptance of the Closing Amounts in Project Liberty.

Yours sincerely,

_____

**M.Y.H.J. den Boer**

*Civil-law Notary*

Exh. D-18

CONFIDENTIAL

FBG_CH1_00094413

**Schedule 4**
**Parties' Confirmation**


The Seller and the Purchaser (or the respective attorney on behalf of such party) hereby confirm in accordance with Clause 4.1(d) of the Notary Letter that all conditions under the SPA to be fulfilled prior to the execution of the Deed of Transfer of Share have been duly satisfied or waived and that the Notary can proceed with the execution of the Deed of Transfer of Share.

**Seller:**


_____

On behalf of:  **Lumileds Holding B.V.**

Name:          Aegletes B.V.

Title:         (individually authorized) managing director

On behalf of:  Aegletes B.V.

Name:          [●]

Title:         (individually authorized) executive director

Date:

**Purchaser:**


_____

On behalf of:  **First Brands Group, LLC**

Name:          [●]

Title:         [●]

Date:          [●]


Exh. D-19

CONFIDENTIAL

FBG_CH1_00094414

## Schedule 5
## DLA Confirmation of Completion Step

I hereby confirm in accordance with clause 4.4 of the Notary Letter that the Completion Step has been executed.


Yours sincerely,


_____

**M.Y.H.J. den Boer**

*Civil-law Notary*

Exh. D-20

CONFIDENTIAL

FBG_CH1_00094415

**DEBTORS' EXHIBIT NO. 239**
**Page 156 of 193**

**Schedule 6**
**DLA Confirmation of Payments**

I hereby confirm in accordance with Clause 6.2 of the Notary Letter that we have made the payments out to the recipients and for the amounts as described in Schedule 2 – Part C of the Notary Letter.

Yours sincerely,

_____

**M.Y.H.J. den Boer**

*Civil-law Notary*

Exh. D-21

CONFIDENTIAL

FBG_CH1_00094416

**Schedule 7**

*(Terms of Business DLA Piper Nederland N.V. to be attached)*

Exh. D-22

CONFIDENTIAL                                                     FBG_CH1_00094417

**EXHIBIT E**

**Form of Deed of Transfer**

(*See Attached.*)

Exh. E-1

CONFIDENTIAL                                                                FBG_CH1_00094418

- 1 -

Exhibit E – Form of Deed of Transfer



MDB/JEF/11010267-1/13670080

**DRAFT DATED 30 APRIL 2024**
**FOR DISCUSSION PURPOSES ONLY**

**FORM OF TRANSFER OF SHARE**
**LAMPS HOLDING B.V.**

Today, the [*] day of [*] two thousand and twenty-four, appeared before me, Maria Yvonne Hillegonda Johanna den Boer, civil-law notary in Amsterdam, the Netherlands: [*],
acting in this matter pursuant to a written power of attorney granted by:

1.  **Lumileds Holding B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), with corporate seat in Amsterdam, the Netherlands, and office address at Evert van de Beekstraat 1, The Base, Tower B5 unit 107, 1118 CL Schiphol, registered with the Trade Register under number 61778737;
    hereinafter referred to as: the "**Seller**";

2.  **First Brands Group, LLC**, a company organized under the laws of the state of Delaware, United States of America, with registered office address at [*], United States of America, registered with the Secretary of State of Delaware under number 3042303,
    hereinafter referred to as: the "**Purchaser**";

3.  **Lamps Holding B.V.**, a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), with corporate seat in Amsterdam, the Netherlands, and office address at Evert van de Beekstraat 1, The Base, Tower B5 unit 107, 1118 CL Schiphol, registered with the Trade Register under number 92277489,
    hereinafter referred to as: the "**Company**".

Acting in said capacity, the person appearing declared the following:

**STOCK PURCHASE AGREEMENT AND SHARE**

By written stock purchase agreement, dated the [*] day of [*] two thousand and twenty-four, hereinafter referred to as: the "**Stock Purchase Agreement**", the Seller has agreed to sell to the Purchaser and the Purchaser has agreed to purchase from the Seller, the sole

Exh. E-2

CONFIDENTIAL

FBG_CH1_00094419

- 2 -

Exhibit E – Form of Deed of Transfer



share issued, outstanding and paid-up in the capital of the Company, being one (1) share, having a nominal value of one euro (EUR 1.00), numbered 1, hereinafter referred to as: the "**Share**".

A copy of the Stock Purchase Agreement is attached to this deed.

**SHARE PURCHASE**

To the extent that the Stock Purchase Agreement would not constitute a valid legal basis (*geldige titel*) for the transfer of the Share under Dutch civil law, the Seller hereby sells the Share to the Purchaser and the Purchaser hereby purchases the Share from the Seller and the Seller and the Purchaser hereby agree that the Seller shall transfer the Share to the Purchaser and that the Purchaser shall accept such Share from the Seller, in implementation of and subject to the terms and conditions of the Stock Purchase Agreement.

**PREVIOUS ACQUISITION OF SHARE**

The Seller acquired the Share by the Company's issue and placement with the Seller by the deed of incorporation of the Company executed before Anke Folmer, assigned civil-law notary, authorized to execute deeds in the protocol of Laurens Willem Kelterman, civil-law notary in Amsterdam, the Netherlands, on the fifteenth day of December two thousand twenty-three.

**TRANSFER**

In order to comply with the transfer obligations arising from the Stock Purchase Agreement and this deed, the Seller hereby transfers the Share to the Purchaser, who hereby accepts this transfer.

**PAYMENT OF PURCHASE PRICE**

- The Purchase Price (as defined in Article 1.2 of the Stock Purchase agreement) for the Share amounts to [*] United States dollar (USD [*]), the Purchaser and the Seller having taken due notice thereof.
- The Closing Payment (as defined in Article 1.5 of the Stock Purchase Agreement) amounts to [*] United States dollar (USD [*]), hereinafter referred to as: the "**Completion Amount**".
- The Purchaser has paid the Completion Amount by transfer thereof to the USD third party account of the civil law notaries of DLA Piper Nederland N.V. at ING Bank with international bank account number NL86INGB0020031300, BIC code INGBNL2A and account name "*Derdengld Notariaat DLA USD*".
- The undersigned civil law notary is hereby irrevocably authorised to transfer the Completion Amount on the first business day following the execution of this deed in

Exh. E-3

CONFIDENTIAL

FBG_CH1_00094420



accordance with the instructions a provided in the notary letter dated the [*] day of [*] two thousand and twenty-four, a copy of which is attached to this deed.

- Consequently, the Seller hereby grants the Purchaser discharge in respect of payment of the Completion Amount.

## TRANSFER RESTRICTIONS

The articles of association of the Company do not limit the transfer of the Share within the meaning of article 2:195 of the Dutch Civil Code, the Share is thus freely transferable.

## ADDITIONAL PROVISIONS

1. The Share including all rights and obligations attached thereto, will be for the account and risk of the Purchaser as of today.

2. Inasmuch as this deed does not deviate from the Stock Purchase Agreement, the parties shall be bound by the provisions of the Stock Purchase Agreement, on the understanding that they are no longer able to invoke any possible conditions subsequent regarding the purchase, sale and transfer of the Share, while the conditions precedent regarding the purchase, sale and transfer of the Share are deemed to have been fulfilled or waived.

## ACKNOWLEDGEMENT

The Company declares to have taken due notice of the transfer of the Share in this deed and to acknowledge said transfer. The Company shall record this transfer without any delay in its shareholders' register and shall record the Purchaser as the sole shareholder of the Company with the Dutch Commercial Register (*Handelsregister*).

## INTERDISCIPLINARY COOPERATION

## ADVISOR SELLER

With respect to the Rules of Professional Conduct (*Verordening beroeps- en gedragsregels*) of the Royal Dutch Organisation of Civil Law Notaries (*Koninklijke Notariële Beroepsorganisatie*) all parties expressly state to agree that:

a. the undersigned civil-law notary executes this deed, though being a civil-law notary affiliated with DLA Piper Nederland N.V.;

b. DLA Piper Nederland N.V. acts as advisor of the Seller in relation to this deed or agreements pursuant hereto; and

c. DLA Piper Nederland N.V. possibly acts as advisor of the Seller in the event that any disputes arise from this deed or agreements pursuant hereto.

## POWER OF ATTORNEY

The person appearing has been authorised by three (3) written powers of attorney attached (in copy) to this deed.

## END

The person appearing is known to me, civil-law notary.

This deed was executed in Amsterdam, the Netherlands, on the date stated at the beginning

Exh. E-4

- 4 -

Exhibit E – Form of Deed of Transfer



of this deed.

The summarised contents of this deed were stated and explained to the person appearing. All parties were informed of the consequences of the contents of this deed. The person appearing declared to dispense with a full reading of the deed, to have taken due note of the content of the deed well before its execution and to agree with its content. Immediately following the limited reading, this deed was signed by the person appearing and by me, civil-law notary.

Exh. E-5

CONFIDENTIAL

FBG_CH1_00094422

**DEBTORS' EXHIBIT NO. 239**
**Page 163 of 193**

**EXHIBIT F**

**Voting Agreement**

(*See Attached.*)

Exh. F-1

CONFIDENTIAL                                    FBG_CH1_00094423



Anchorage Capital Group, L.L.C.
6ᵗʰ Floor
New York, NY 10012
Tel  212 432 4600
Fax  212 432 4601

(for purposes of this letter agreement Anchorage Capital Group LLC[1] is referred to, jointly with the entities, funds, and other persons directly or indirectly controlled, managed or majority owned by Anchorage Capital Group, L.L.C. or Anchorage Capital Advisors, L.P., collectively as the "**DR Holder**")

To: Aegletes B.V.
Attn. Board of Directors
Evert van de Beekstraat 1, The Base, Tower B5 unit 107
1118 CL Schiphol
The Netherlands

New York, New York,
April 23, 2024

Dear Board of Directors,

**Re: Proposed sale of Lamps Holding B.V.**

We refer to our previous discussions regarding a contemplated sale and transfer of all of the issued and outstanding shares in the capital of Lamps Holding B.V. (the "**Company**") by Lumileds Holding B.V. (the "**Seller**"), each of which is an indirectly wholly owned subsidiary of Aegletes B.V. ("**Aegletes**"), to the Purchaser (as defined in the Agreement) (such contemplated sale and transfer, the "**Potential Transaction**"). All of the issued and outstanding shares in the capital of Aegletes are held by Stichting Administratiekantoor Aegletes ("**STAK**"), which has issued depositary receipts for such shares ("**DRs**") to certain holders. The Potential Transaction is subject to DR-holder approval. This letter sets out our agreement in relation thereto.

1. **The Potential Transaction**

We understand that the Aegletes and its affiliates are in discussions with the Purchaser regarding the Potential Transaction that would, if entered into, reflect the following terms in all material respects:

1.1 <u>Purchase Price</u>

As more thoroughly described in the draft stock purchase agreement, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Agreement**"), subject to the terms and conditions set forth in the attached draft Agreement in all material respects, at the closing of the Potential Transaction, the Seller will sell to the Purchaser all of the issued and outstanding share capital of the Company, in exchange for the Purchase Price (as defined therein).

1.2 <u>Conditions</u>

Prior to reaching agreement on the Potential Transaction, Aegletes and the Purchaser would in any case require receiving signed irrevocable undertakings to agree to approve the Potential Transaction from DR holders representing, in aggregate, at least the majority of the issued and outstanding DRs and related voting rights.

1.3 <u>Stock Purchase Agreement</u>

The Purchaser intends to seek agreement with the seller of the Company with the aim of entering into a final Agreement in relation to the Potential Transaction, which may be amended as a

CONFIDENTIAL

FBG_CH1_00094424

result of ongoing discussions between the parties, as soon as reasonably practicable on or after the date of this agreement. However, for the avoidance of doubt, this agreement does not in any way constitute an agreement by Aegletes or the Purchaser (or any of their respective affiliates) to actually enter into the Potential Transaction or to reach agreement on any terms of an Agreement.

**2.**      **Irrevocable undertaking**

2.1     The DR Holder presently holds 2,394,254 (two million three hundred and ninety-four thousand two hundred and fifty-four) DRs (the "**Committed DRs**"), representing approximately 24.18% (twenty-four and eighteen/hundredth percent) of the issued and outstanding DRs. We irrevocably undertake to and agree with Aegletes:

(a)      to vote (i) our Committed DRs and (ii) any and all additional DRs that the DR Holder will hold or be authorized to vote on after the date hereof (and, in each case, (x) instruct STAK or (y) at the request of Aegletes, request a power of attorney from STAK, to vote on the shares in the capital of Aegletes for which such Committed DRs and additional DRs have been issued, from time to time) in favor of any resolution at any general meeting of Aegletes or meeting of holders of DRs approving, or otherwise related to, the Potential Transaction;

(b)      to take such further action as could reasonably be expected from the DR Holder to support the completion of the Potential Transaction; and

(c)      not take any action or make any public announcement or statement that may prejudice or frustrate the Potential Transaction.

2.2     We hereby represent and warrant to Aegletes that, on the date hereof:

(a)      we are, directly or indirectly, the legal holders and owners of the Committed DRs;

(b)      the Committed DRs comprise all of the DRs in which we hold a direct or indirect interest;

(c)      we have not entered into any agreement to offer, sell or transfer the Committed DRs to any party; and

(d)      there are no, and on the date of approval of the Potential Transaction there will be no, restrictions or limitations pertaining to our ability to exercise the voting rights attached to the Committed DRs (or, as proxy holder, on the underlying shares in the capital of Aegletes) to approve the Potential Transaction.

**3.**      **Lock-up and standstill; confidentiality**

3.1     We will not, directly or indirectly, offer, sell, lend, deposit, mortgage, pledge, grant a right of usufruct, create liens over, charge, assign, contract to sell, sell any option or contract to purchase, grant (whether by way of warrant, convertible or exchangeable security or otherwise) any option to subscribe for, acquire or purchase any security issued by, or voting rights in,

Exh. F-3

CONFIDENTIAL

FBG_CH1_00094425

Aegletes or STAK, or otherwise transfer or dispose of any securities issued by, or voting rights in, Aegletes or STAK.

3.2 We will not accept any offer in respect of the Committed DRs or any additional DRs that we will hold after the date hereof (whether it is conditional or unconditional and irrespective of the means by which it is to be implemented).

3.3 We will not agree or publicly announce or state our intention to do any of the foregoing.

**4. Termination rights**

4.1 Any party to this agreement may by written notice to the other party terminate this agreement if:

(a) no Agreement is entered into within 4 weeks after the date of this agreement; or

(b) the Agreement is terminated in accordance with its terms without completion of the Potential Transaction having occurred.

4.2 This agreement automatically terminates upon completion of the Potential Transaction (i.e., the transfer of all issued and outstanding shares in the Company to the Purchaser or its designee).

4.3 Any termination pursuant to paragraph 4.1 or 4.2 does not affect paragraphs 5, 6 and 7 of this agreement, which will continue to apply in full force and effect, nor any rights that accrued under this agreement before the termination.

**5. Compliance**

5.1 We acknowledge and agree that the information we receive or have received in connection with the Potential Transaction or this agreement may qualify as "material non-public information," "price-sensitive information" or "inside information" under applicable securities laws and regulations and as a result thereof we may be prohibited from executing, effecting or recommending any transaction involving financial instruments or rights thereto issued by the Company, Aegletes, STAK or any of their respective affiliates.

5.2 We undertake and warrant to Aegletes that we are fully aware of and shall fully comply with all applicable laws relevant to the possession, use or disclosure of material non-public information, price-sensitive information or inside information.

**6. Confidentiality**

6.1 Save as required by applicable law or regulation or any competent court, arbitral tribunal or regulatory authority, we will not disclose to any person the fact that we have entered into this agreement, or any of its terms, conditions or other facts communicated to us in connection therewith. Any confidentiality agreement between the parties hereto prior to the date hereof (the "**NDA**") remains valid and binding in accordance with its terms.

6.2 We agree that (a) the Purchaser is notified of the existence and content of this agreement and that it may receive a copy of this agreement upon its request, and (b) any announcements as

made by the Purchaser, the Company, Aegletes, STAK or any of their respective affiliates may incorporate a reference to us and may disclose the existence and content of this agreement.

7.  **Miscellaneous**

7.1   No party may assign any of its rights or transfer any of the obligations under this agreement without the prior written consent of the other party, provided that Aegletes may assign its rights under this agreement to any of its affiliates and by any such affiliates to any other affiliates of Aegletes, such assignment hereby being agreed in advance.

7.2   This agreement is without prejudice to any relevant legal and regulatory provisions in the United States or other relevant jurisdictions regarding, *inter alia*, notification of securities transactions and market abuse rules and regulations that may apply to us.

7.3   Any costs incurred by either party in connection with the preparation for or performance of obligations under this agreement shall be for its own account.

7.4   Except where the context expressly provides otherwise, this agreement contains no stipulations benefiting third parties (*derdenbedingen*). The terms of this agreement may be enforced only by a party to this agreement or a party's permitted assigns or successors and not any third party.

7.5   This agreement and the documents referred to in it contain the whole agreement between you and us in relation to its subject matter and supersede all previous related agreements, whether oral or in writing, between you and us, provided that the NDA (if any) remains valid and binding in accordance with its terms.

7.6   This agreement and any contractual or non-contractual obligations arising out of or in connection with it, shall be governed by and are to be construed in accordance with the laws of the Netherlands. Any power of attorney or other document executed in connection with this agreement or the transactions provided for in this agreement shall also be governed by and construed in accordance with the laws of the Netherlands.

7.7   Any dispute arising out of or in connection with this agreement (including any dispute concerning its existence, its validity or any non-contractual obligation) shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**"). The arbitral tribunal shall be composed of three arbitrators, appointed in accordance with the Rules. The place of arbitration will be New York, New York, United States of America. The language of the proceedings will be English. The arbitral award will be final and binding. This paragraph shall also apply to disputes arising out of or in connection with agreements which are expressly connected with this agreement, unless the relevant agreement expressly provides otherwise. Consolidation of arbitral proceedings with other proceedings as provided for in the Rules is excluded.

7.8   For the avoidance of doubt, references herein to "we" or "us" are to the DR Holder, and references herein to "you" are to Aegletes, unless the context requires otherwise.

CONFIDENTIAL                                                                      FBG_CH1_00094427

Any and all of the above is hereby agreed and accepted by:

Yours sincerely,

Anchorage Capital Advisors, L.P. on behalf of its affiliates and its affiliates' managed entities

By: _Robert Dunleavy_
Name: Robert Dunleavy
Title: Chief Operating Officer

Anchorage Capital Group, L.L.C. on behalf of its managed entities

By: _Robert Dunleavy_
Name: Robert Dunleavy
Title: Chief Operating Officer

**Aegletes B.V.**
By: Steve Barlow
Title: Chief Executive Officer
Date: April 24, 2024

Exh. F-6

CONFIDENTIAL

FBG_CH1_00094428

**EXHIBIT A**

**STOCK PURCHASE AGREEMENT**

Exh. F-7

CONFIDENTIAL

FBG_CH1_00094429

Cerberus Capital Management, L.P.
875 Third Avenue
New York, NY 10022

**STRICTLY CONFIDENTIAL**
*DRAFT – April 23, 2024*

(for purposes of this letter agreement Cerberus Capital Management L.P.[1] is referred to, jointly with the entities, funds, and other persons directly or indirectly controlled, managed or majority owned by Cerberus Capital Management L.P., as the "**DR Holder**")

To:     Aegletes B.V.
        Attn. Board of Directors
        Evert van de Beekstraat 1, The Base, Tower B5 unit 107
        1118 CL Schiphol
        The Netherlands

April 24, 2024

Dear Board of Directors,

**Re: Proposed sale of Lamps Holding B.V.**

We refer to our previous discussions regarding a contemplated sale and transfer of all of the issued and outstanding shares in the capital of Lamps Holding B.V. (the "**Company**") by Lumileds Holding B.V. (the "**Seller**"), each of which is an indirectly wholly owned subsidiary of Aegletes B.V. ("**Aegletes**"), to the Purchaser (as defined in the Agreement) (such contemplated sale and transfer, the "**Potential Transaction**"). All of the issued and outstanding shares in the capital of Aegletes are held by Stichting Administratiekantoor Aegletes ("**STAK**"), which has issued depositary receipts for such shares ("**DRs**") to certain holders. The Potential Transaction is subject to DR-holder approval. This letter sets out our agreement in relation thereto.

1.      **The Potential Transaction**

We understand that the Aegletes and its affiliates are in discussions with the Purchaser regarding the Potential Transaction that would, if entered into, reflect the following terms in all material respects:

1.1     Purchase Price

        As more thoroughly described in the draft stock purchase agreement, a copy of which is attached hereto as Exhibit A (the "**Agreement**"), subject to the terms and conditions set forth in the attached draft Agreement in all material respects, at the closing of the Potential Transaction, the Seller will sell to the Purchaser all of the issued and outstanding share capital of the Company, in exchange for the Purchase Price (as defined therein).

1.2     Conditions

        Prior to reaching agreement on the Potential Transaction, Aegletes and the Purchaser would in any case require receiving signed irrevocable undertakings to agree to approve the Potential Transaction from DR holders representing, in aggregate, at least the majority of the issued and outstanding DRs and related voting rights.

Exh. F-8

CONFIDENTIAL

FBG_CH1_00094430

1.3     Stock Purchase Agreement

The Purchaser intends to seek agreement with the seller of the Company with the aim of entering into a final Agreement in relation to the Potential Transaction, which may be amended as a result of ongoing discussions between the parties, as soon as reasonably practicable on or after the date of this agreement. However, for the avoidance of doubt, this agreement does not in any way constitute an agreement by Aegletes or the Purchaser (or any of their respective affiliates) to actually enter into the Potential Transaction or to reach agreement on any terms of an Agreement.

## 2.     Irrevocable undertaking

2.1     The DR Holder presently holds 769,695 (seven hundred and sixty-nine thousand six hundred and ninety-five) DRs (the "**Committed DRs**"), representing approximately 7.77% (seven and seventy-seven/hundredth percent) of the issued and outstanding DRs. We irrevocably undertake to and agree with Aegletes:

(a)     to vote (i) our Committed DRs and (ii) any and all additional DRs that the DR Holder will hold or be authorized to vote on after the date hereof (and, in each case, (x) instruct STAK or (y) at the request of Aegletes, request a power of attorney from STAK, to vote on the shares in the capital of Aegletes for which such Committed DRs and additional DRs have been issued, from time to time) in favor of any resolution at any general meeting of Aegletes or meeting of holders of DRs approving, or otherwise related to, the Potential Transaction;

(b)     to take such further action as could reasonably be expected from the DR Holder to support the completion of the Potential Transaction; and

(c)     not take any action or make any public announcement or statement that may prejudice or frustrate the Potential Transaction.

2.2     We hereby represent and warrant to Aegletes that, on the date hereof:

(a)     we are, directly or indirectly, the legal holders and owners of the Committed DRs;

(b)     the Committed DRs comprise all of the DRs in which we hold a direct or indirect interest;

(c)     we have not entered into any agreement to offer, sell or transfer the Committed DRs to any party; and

(d)     there are no, and on the date of approval of the Potential Transaction there will be no, restrictions or limitations pertaining to our ability to exercise the voting rights attached to the Committed DRs (or, as proxy holder, on the underlying shares in the capital of Aegletes) to approve the Potential Transaction.

CONFIDENTIAL

FBG_CH1_00094431

**3. Lock-up and standstill; confidentiality**

3.1 We will not, directly or indirectly, offer, sell, lend, deposit, mortgage, pledge, grant a right of usufruct, create liens over, charge, assign, contract to sell, sell any option or contract to purchase, grant (whether by way of warrant, convertible or exchangeable security or otherwise) any option to subscribe for, acquire or purchase any security issued by, or voting rights in, Aegletes or STAK, or otherwise transfer or dispose of any securities issued by, or voting rights in, Aegletes or STAK.

3.2 We will not accept any offer in respect of the Committed DRs or any additional DRs that we will hold after the date hereof (whether it is conditional or unconditional and irrespective of the means by which it is to be implemented).

3.3 We will not agree or publicly announce or state our intention to do any of the foregoing.

**4. Termination rights**

4.1 Any party to this agreement may by written notice to the other party terminate this agreement if:

(a) no Agreement is entered into within 4 weeks after the date of this agreement; or

(b) the Agreement is terminated in accordance with its terms without completion of the Potential Transaction having occurred.

4.2 This agreement automatically terminates upon completion of the Potential Transaction (i.e., the transfer of all issued and outstanding shares in the Company to the Purchaser or its designee).

4.3 Any termination pursuant to paragraph 4.1 or 4.2 does not affect paragraphs 5, 6 and 7 of this agreement, which will continue to apply in full force and effect, nor any rights that accrued under this agreement before the termination.

**5. Compliance**

5.1 We acknowledge and agree that the information we receive or have received in connection with the Potential Transaction or this agreement may qualify as "material non-public information," "price-sensitive information" or "inside information" under applicable securities laws and regulations and as a result thereof we may be prohibited from executing, effecting or recommending any transaction involving financial instruments or rights thereto issued by the Company, Aegletes, STAK or any of their respective affiliates.

5.2 We undertake and warrant to Aegletes that we are fully aware of and shall fully comply with all applicable laws relevant to the possession, use or disclosure of material non-public information, price-sensitive information or inside information.

**6. Confidentiality**

6.1 Save as required by applicable law or regulation or any competent court, arbitral tribunal or regulatory authority, we will not disclose to any person the fact that we have entered into this

CONFIDENTIAL                                                                 FBG_CH1_00094432

agreement, or any of its terms, conditions or other facts communicated to us in connection therewith.  Any confidentiality agreement between the parties hereto prior to the date hereof (the "NDA") remains valid and binding in accordance with its terms.

6.2     We agree that (a) the Purchaser is notified of the existence and content of this agreement and that it may receive a copy of this agreement upon its request, and (b) any announcements as made by the Purchaser, the Company, Aegletes, STAK or any of their respective affiliates may incorporate a reference to us and may disclose the existence and content of this agreement.

## 7.     Miscellaneous

7.1     No party may assign any of its rights or transfer any of the obligations under this agreement without the prior written consent of the other party, provided that Aegletes may assign its rights under this agreement to any of its affiliates and by any such affiliates to any other affiliates of Aegletes, such assignment hereby being agreed in advance.

7.2     This agreement is without prejudice to any relevant legal and regulatory provisions in the United States or other relevant jurisdictions regarding, *inter alia*, notification of securities transactions and market abuse rules and regulations that may apply to us.

7.3     Any costs incurred by either party in connection with the preparation for or performance of obligations under this agreement shall be for its own account.

7.4     Except where the context expressly provides otherwise, this agreement contains no stipulations benefiting third parties (*derdenbedingen*).  The terms of this agreement may be enforced only by a party to this agreement or a party's permitted assigns or successors and not any third party.

7.5     This agreement and the documents referred to in it contain the whole agreement between you and us in relation to its subject matter and supersede all previous related agreements, whether oral or in writing, between you and us, provided that the NDA (if any) remains valid and binding in accordance with its terms.

7.6     This agreement and any contractual or non-contractual obligations arising out of or in connection with it, shall be governed by and are to be construed in accordance with the laws of the Netherlands.  Any power of attorney or other document executed in connection with this agreement or the transactions provided for in this agreement shall also be governed by and construed in accordance with the laws of the Netherlands.

7.7     Any dispute arising out of or in connection with this agreement (including any dispute concerning its existence, its validity or any non-contractual obligation) shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules").  The arbitral tribunal shall be composed of three arbitrators, appointed in accordance with the Rules.  The place of arbitration will be New York, New York, United States of America.  The language of the proceedings will be English.  The arbitral award will be final and binding.  This paragraph shall also apply to disputes arising out of or in connection with agreements which are expressly connected with this agreement, unless the relevant

CONFIDENTIAL

FBG_CH1_00094433

agreement expressly provides otherwise. Consolidation of arbitral proceedings with other proceedings as provided for in the Rules is excluded.

7.8     For the avoidance of doubt, references herein to "we" or "us" are to the DR Holder, and references herein to "you" are to Aegletes, unless the context requires otherwise.

CONFIDENTIAL

FBG_CH1_00094434

**DEBTORS' EXHIBIT NO. 239**
**Page 175 of 193**

Any and all of the above is hereby agreed and accepted by:

Yours sincerely,

*Alex Benjamin (Apr 24, 2024 16:59 EDT)*

**Cerberus Capital Management L.P.**
By: Alexander Benjamin
Title: Authorized Signatory
Date: 4/24/2024

Agreed and acknowledged:

**Aegletes B.V.**
By: Steve Barlow
Title: CEO
Date: April 24, 2024

Exh. F-13

CONFIDENTIAL

FBG_CH1_00094435

**DEBTORS' EXHIBIT NO. 239**
**Page 176 of 193**

# EXHIBIT A

## STOCK PURCHASE AGREEMENT

CONFIDENTIAL                                                  FBG_CH1_00094436

**DEBTORS' EXHIBIT NO. 239**
**Page 177 of 193**

**Nut Tree Capital Management, LP**

**STRICTLY CONFIDENTIAL**

(for purposes of this letter agreement Nut Tree Capital Management L.P.[1] is referred to, jointly with the entities, funds, and other persons directly or indirectly controlled, managed or majority owned by Nut Tree Capital Management L.P., as the "**DR Holder**")

To:  Aegletes B.V.
Attn. Board of Directors
Evert van de Beekstraat 1, The Base, Tower B5 unit 107
1118 CL Schiphol
The Netherlands

New York, NY, April 23, 2024

Dear Board of Directors,

**Re: Proposed sale of Lamps Holding B.V.**

We refer to our previous discussions regarding a contemplated sale and transfer of all of the issued and outstanding shares in the capital of Lamps Holding B.V. (the "**Company**") by Lumileds Holding B.V. (the "**Seller**"), each of which is an indirectly wholly owned subsidiary of Aegletes B.V. ("**Aegletes**"), to the Purchaser (as defined in the Agreement) (such contemplated sale and transfer, the "**Potential Transaction**"). All of the issued and outstanding shares in the capital of Aegletes are held by Stichting Administratiekantoor Aegletes ("**STAK**"), which has issued depositary receipts for such shares ("**DRs**") to certain holders. The Potential Transaction is subject to DR-holder approval. This letter sets out our agreement in relation thereto.

1.    **The Potential Transaction**

We understand that the Aegletes and its affiliates are in discussions with the Purchaser regarding the Potential Transaction that would, if entered into, reflect the following terms in all material respects:

1.1    Purchase Price

As more thoroughly described in the draft stock purchase agreement, a copy of which is attached hereto as Exhibit A (the "**Agreement**"), subject to the terms and conditions set forth in the attached draft Agreement in all material respects, at the closing of the Potential Transaction, the Seller will sell to the Purchaser all of the issued and outstanding share capital of the Company, in exchange for the Purchase Price (as defined therein).

1.2    Conditions

Prior to reaching agreement on the Potential Transaction, Aegletes and the Purchaser would in any case require receiving signed irrevocable undertakings to agree to approve the Potential Transaction from DR holders representing, in aggregate, at least the majority of the issued and outstanding DRs and related voting rights.

1.3    Stock Purchase Agreement

The Purchaser intends to seek agreement with the seller of the Company with the aim of entering into a final Agreement in relation to the Potential Transaction, which may be amended as a

---

[1]    Note to Draft: Nut Tree to confirm legal entity.

CONFIDENTIAL

FBG_CH1_00094437

**Nut Tree Capital Management, LP**

result of ongoing discussions between the parties, as soon as reasonably practicable on or after the date of this agreement. However, for the avoidance of doubt, this agreement does not in any way constitute an agreement by Aegletes or the Purchaser (or any of their respective affiliates) to actually enter into the Potential Transaction or to reach agreement on any terms of an Agreement.

2.    **Irrevocable undertaking**

2.1    The DR Holder presently holds 1,261,226 (one million two hundred and sixty-one thousand two hundred and twenty-six) DRs (the "**Committed DRs**"), representing approximately 12.74% (twelve and seventy-four/hundredth percent) of the issued and outstanding DRs. We irrevocably undertake to and agree with Aegletes:

   (a)    to vote (i) our Committed DRs and (ii) any and all additional DRs that the DR Holder will hold or be authorized to vote on after the date hereof (and, in each case, (x) instruct STAK or (y) at the request of Aegletes, request a power of attorney from STAK, to vote on the shares in the capital of Aegletes for which such Committed DRs and additional DRs have been issued, from time to time) in favor of any resolution at any general meeting of Aegletes or meeting of holders of DRs approving, or otherwise related to, the Potential Transaction;

   (b)    to take such further action as could reasonably be expected from the DR Holder to support the completion of the Potential Transaction; and

   (c)    not take any action or make any public announcement or statement that may prejudice or frustrate the Potential Transaction.

2.2    We hereby represent and warrant to Aegletes that, on the date hereof:

   (a)    we are, directly or indirectly, the legal holders and owners of the Committed DRs;

   (b)    the Committed DRs comprise all of the DRs in which we hold a direct or indirect interest;

   (c)    we have not entered into any agreement to offer, sell or transfer the Committed DRs to any party; and

   (d)    there are no, and on the date of approval of the Potential Transaction there will be no, restrictions or limitations pertaining to our ability to exercise the voting rights attached to the Committed DRs (or, as proxy holder, on the underlying shares in the capital of Aegletes) to approve the Potential Transaction.

3.    **Lock-up and standstill; confidentiality**

3.1    We will not, directly or indirectly, offer, sell, lend, deposit, mortgage, pledge, grant a right of usufruct, create liens over, charge, assign, contract to sell, sell any option or contract to purchase, grant (whether by way of warrant, convertible or exchangeable security or otherwise) any option to subscribe for, acquire or purchase any security issued by, or voting rights in,

CONFIDENTIAL                                                                   FBG_CH1_00094438

**DEBTORS' EXHIBIT NO. 239**
**Page 179 of 193**

**Nut Tree Capital Management, LP**

Aegletes or STAK, or otherwise transfer or dispose of any securities issued by, or voting rights in, Aegletes or STAK.

3.2 We will not accept any offer in respect of the Committed DRs or any additional DRs that we will hold after the date hereof (whether it is conditional or unconditional and irrespective of the means by which it is to be implemented).

3.3 We will not agree or publicly announce or state our intention to do any of the foregoing.

**4. Termination rights**

4.1 Any party to this agreement may by written notice to the other party terminate this agreement if:

(a)    no Agreement is entered into within 4 weeks after the date of this agreement; or

(b)    the Agreement is terminated in accordance with its terms without completion of the Potential Transaction having occurred.

4.2 This agreement automatically terminates upon completion of the Potential Transaction (i.e., the transfer of all issued and outstanding shares in the Company to the Purchaser or its designee).

4.3 Any termination pursuant to paragraph 4.1 or 4.2 does not affect paragraphs 5, 6 and 7 of this agreement, which will continue to apply in full force and effect, nor any rights that accrued under this agreement before the termination.

**5. Compliance**

5.1 We acknowledge and agree that the information we receive or have received in connection with the Potential Transaction or this agreement may qualify as "material non-public information," "price-sensitive information" or "inside information" under applicable securities laws and regulations and as a result thereof we may be prohibited from executing, effecting or recommending any transaction involving financial instruments or rights thereto issued by the Company, Aegletes, STAK or any of their respective affiliates.

5.2 We undertake and warrant to Aegletes that we are fully aware of and shall fully comply with all applicable laws relevant to the possession, use or disclosure of material non-public information, price-sensitive information or inside information.

**6. Confidentiality**

6.1 Save as required by applicable law or regulation or any competent court, arbitral tribunal or regulatory authority, we will not disclose to any person the fact that we have entered into this agreement, or any of its terms, conditions or other facts communicated to us in connection therewith. Any confidentiality agreement between the parties hereto prior to the date hereof (the "NDA") remains valid and binding in accordance with its terms.

6.2 We agree that (a) the Purchaser is notified of the existence and content of this agreement and that it may receive a copy of this agreement upon its request, and (b) any announcements as

CONFIDENTIAL

FBG_CH1_00094439

**DEBTORS' EXHIBIT NO. 239**
**Page 180 of 193**

**Nut Tree Capital Management, LP**

made by the Purchaser, the Company, Aegletes, STAK or any of their respective affiliates may incorporate a reference to us and may disclose the existence and content of this agreement.

7.    **Miscellaneous**

7.1    No party may assign any of its rights or transfer any of the obligations under this agreement without the prior written consent of the other party, provided that Aegletes may assign its rights under this agreement to any of its affiliates and by any such affiliates to any other affiliates of Aegletes, such assignment hereby being agreed in advance.

7.2    This agreement is without prejudice to any relevant legal and regulatory provisions in the United States or other relevant jurisdictions regarding, *inter alia*, notification of securities transactions and market abuse rules and regulations that may apply to us.

7.3    Any costs incurred by either party in connection with the preparation for or performance of obligations under this agreement shall be for its own account.

7.4    Except where the context expressly provides otherwise, this agreement contains no stipulations benefiting third parties (*derdenbedingen*).  The terms of this agreement may be enforced only by a party to this agreement or a party's permitted assigns or successors and not any third party.

7.5    This agreement and the documents referred to in it contain the whole agreement between you and us in relation to its subject matter and supersede all previous related agreements, whether oral or in writing, between you and us, provided that the NDA (if any) remains valid and binding in accordance with its terms.

7.6    This agreement and any contractual or non-contractual obligations arising out of or in connection with it, shall be governed by and are to be construed in accordance with the laws of the Netherlands.  Any power of attorney or other document executed in connection with this agreement or the transactions provided for in this agreement shall also be governed by and construed in accordance with the laws of the Netherlands.

7.7    Any dispute arising out of or in connection with this agreement (including any dispute concerning its existence, its validity or any non-contractual obligation) shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**").  The arbitral tribunal shall be composed of three arbitrators, appointed in accordance with the Rules.  The place of arbitration will be New York, New York, United States of America.  The language of the proceedings will be English.  The arbitral award will be final and binding.  This paragraph shall also apply to disputes arising out of or in connection with agreements which are expressly connected with this agreement, unless the relevant agreement expressly provides otherwise.  Consolidation of arbitral proceedings with other proceedings as provided for in the Rules is excluded.

7.8    For the avoidance of doubt, references herein to "we" or "us" are to the DR Holder, and references herein to "you" are to Aegletes, unless the context requires otherwise.

CONFIDENTIAL

FBG_CH1_00094440

**Nut Tree Capital Management, LP**

Any and all of the above is hereby agreed and accepted by:

Yours sincerely,

**Nut Tree Master Fund, LP, and
Nut Tree Drawdown Master Fund, LP**

**By:** Nut Tree Capital Management LP, as investment advisor

By:

Name:  Ben Dominguez
Title:   COO
Date:    April 23, 2024

Agreed and acknowledged:

**Aegletes B.V.**
By:  Steve Barlow
Title: Chief Executive Officer
Date: April 24, 2024

Exh. F-19

CONFIDENTIAL

FBG_CH1_00094441

**DEBTORS' EXHIBIT NO. 239
Page 182 of 193**

**Nut Tree Capital Management, LP**

**EXHIBIT A**

**STOCK PURCHASE AGREEMENT**

Exh. F-20

CONFIDENTIAL

FBG_CH1_00094442

**DEBTORS' EXHIBIT NO. 239**
**Page 183 of 193**



(for purposes of this letter agreement Nuveen Asset Management, LLC. is referred to, jointly with the entities, funds, and other persons directly or indirectly controlled, managed or majority owned by Nuveen Asset Management, LLC, as the "**DR Holder**")

To:     Aegletes B.V.
        Attn. Board of Directors
        Evert van de Beekstraat 1, The Base, Tower B5 unit 107
        1118 CL Schiphol
        The Netherlands

New York, NY, U.S.A, 24 April, 2024

Dear Board of Directors,

**Re: Proposed sale of Lamps Holding B.V.**

We refer to our previous discussions regarding a contemplated sale and transfer of all of the issued and outstanding shares in the capital of Lamps Holding B.V. (the "**Company**") by Lumileds Holding B.V. (the "**Seller**"), each of which is an indirectly wholly owned subsidiary of Aegletes B.V. ("**Aegletes**"), to the Purchaser (as defined in the Agreement) (such contemplated sale and transfer, the "**Potential Transaction**"). All of the issued and outstanding shares in the capital of Aegletes are held by Stichting Administratiekantoor Aegletes ("**STAK**"), which has issued depositary receipts for such shares ("**DRs**") to certain holders. The Potential Transaction is subject to DR-holder approval. This letter sets out our agreement in relation thereto.

## 1.     The Potential Transaction

We understand that the Aegletes and its affiliates are in discussions with the Purchaser regarding the Potential Transaction that would, if entered into, reflect the following terms in all material respects:

1.1     Purchase Price

As more thoroughly described in the draft stock purchase agreement, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Agreement**"), subject to the terms and conditions set forth in the attached draft Agreement in all material respects, at the closing of the Potential Transaction, the Seller will sell to the Purchaser all of the issued and outstanding share capital of the Company, in exchange for the Purchase Price (as defined therein).

1.2     Conditions

Prior to reaching agreement on the Potential Transaction, Aegletes and the Purchaser would in any case require receiving signed irrevocable undertakings to agree to approve the Potential Transaction from DR holders representing, in aggregate, at least the majority of the issued and outstanding DRs and related voting rights.

1.3     Stock Purchase Agreement

The Purchaser intends to seek agreement with the seller of the Company with the aim of entering into a final Agreement in relation to the Potential Transaction, which may be amended as a result of ongoing discussions between the parties, as soon as reasonably practicable on or after

CONFIDENTIAL

FBG_CH1_00094443

the date of this agreement. However, for the avoidance of doubt, this agreement does not in any way constitute an agreement by Aegletes or the Purchaser (or any of their respective affiliates) to actually enter into the Potential Transaction or to reach agreement on any terms of an Agreement.

## 2. Irrevocable undertaking

2.1 The DR Holder presently holds 942,233 (nine hundred and forty-two thousand two hundred and thirty-three) DRs (the "**Committed DRs**"), representing approximately 9.52% (nine and fifty-two/hundredth percent) of the issued and outstanding DRs. We irrevocably undertake to and agree with Aegletes:

(a) to vote (i) our Committed DRs and (ii) any and all additional DRs that the DR Holder will hold or be authorized to vote on after the date hereof (and, in each case, (x) instruct STAK or (y) at the request of Aegletes, request a power of attorney from STAK, to vote on the shares in the capital of Aegletes for which such Committed DRs and additional DRs have been issued, from time to time) in favor of any resolution at any general meeting of Aegletes or meeting of holders of DRs approving, or otherwise related to, the Potential Transaction;

(b) to take such further action as could reasonably be expected from the DR Holder to support the completion of the Potential Transaction; and

(c) not take any action or make any public announcement or statement that may prejudice or frustrate the Potential Transaction.

2.2 We hereby represent and warrant to Aegletes that, on the date hereof:

(a) we are, directly or indirectly, the legal holders and owners of the Committed DRs;

(b) the Committed DRs comprise all of the DRs in which we hold a direct or indirect interest;

(c) we have not entered into any agreement to offer, sell or transfer the Committed DRs to any party; and

(d) there are no, and on the date of approval of the Potential Transaction there will be no, restrictions or limitations pertaining to our ability to exercise the voting rights attached to the Committed DRs (or, as proxy holder, on the underlying shares in the capital of Aegletes) to approve the Potential Transaction.

## 3. Lock-up and standstill; confidentiality

3.1 We will not, directly or indirectly, offer, sell, lend, deposit, mortgage, pledge, grant a right of usufruct, create liens over, charge, assign, contract to sell, sell any option or contract to purchase, grant (whether by way of warrant, convertible or exchangeable security or otherwise) any option to subscribe for, acquire or purchase any security issued by, or voting rights in,

CONFIDENTIAL                                                                    FBG_CH1_00094444

Aegletes or STAK, or otherwise transfer or dispose of any securities issued by, or voting rights in, Aegletes or STAK.

3.2     We will not accept any offer in respect of the Committed DRs or any additional DRs that we will hold after the date hereof (whether it is conditional or unconditional and irrespective of the means by which it is to be implemented).

3.3     We will not agree or publicly announce or state our intention to do any of the foregoing.

**4.     Termination rights**

4.1     Any party to this agreement may by written notice to the other party terminate this agreement if:

(a)     no Agreement is entered into within 4 weeks after the date of this agreement; or

(b)     the Agreement is terminated in accordance with its terms without completion of the Potential Transaction having occurred.

4.2     This agreement automatically terminates upon completion of the Potential Transaction (i.e., the transfer of all issued and outstanding shares in the Company to the Purchaser or its designee).

4.3     Any termination pursuant to paragraph 4.1 or 4.2 does not affect paragraphs 5, 6 and 7 of this agreement, which will continue to apply in full force and effect, nor any rights that accrued under this agreement before the termination.

**5.     Compliance**

5.1     We acknowledge and agree that the information we receive or have received in connection with the Potential Transaction or this agreement may qualify as "material non-public information," "price-sensitive information" or "inside information" under applicable securities laws and regulations and as a result thereof we may be prohibited from executing, effecting or recommending any transaction involving financial instruments or rights thereto issued by the Company, Aegletes, STAK or any of their respective affiliates.

5.2     We undertake and warrant to Aegletes that we are fully aware of and shall fully comply with all applicable laws relevant to the possession, use or disclosure of material non-public information, price-sensitive information or inside information.

**6.     Confidentiality**

6.1     Save as required by applicable law or regulation or any competent court, arbitral tribunal or regulatory authority, we will not disclose to any person the fact that we have entered into this agreement, or any of its terms, conditions or other facts communicated to us in connection therewith.  Any confidentiality agreement between the parties hereto prior to the date hereof (the "**NDA**") remains valid and binding in accordance with its terms.

6.2     We agree that (a) the Purchaser is notified of the existence and content of this agreement and that it may receive a copy of this agreement upon its request, and (b) any announcements as

CONFIDENTIAL

FBG_CH1_00094445

**DEBTORS' EXHIBIT NO. 239**
**Page 186 of 193**

made by the Purchaser, the Company, Aegletes, STAK or any of their respective affiliates may incorporate a reference to us and may disclose the existence and content of this agreement.

7.    **Miscellaneous**

7.1    No party may assign any of its rights or transfer any of the obligations under this agreement without the prior written consent of the other party, provided that Aegletes may assign its rights under this agreement to any of its affiliates and by any such affiliates to any other affiliates of Aegletes, such assignment hereby being agreed in advance.

7.2    This agreement is without prejudice to any relevant legal and regulatory provisions in the United States or other relevant jurisdictions regarding, *inter alia*, notification of securities transactions and market abuse rules and regulations that may apply to us.

7.3    Any costs incurred by either party in connection with the preparation for or performance of obligations under this agreement shall be for its own account.

7.4    Except where the context expressly provides otherwise, this agreement contains no stipulations benefiting third parties (*derdenbedingen*). The terms of this agreement may be enforced only by a party to this agreement or a party's permitted assigns or successors and not any third party.

7.5    This agreement and the documents referred to in it contain the whole agreement between you and us in relation to its subject matter and supersede all previous related agreements, whether oral or in writing, between you and us, provided that the NDA (if any) remains valid and binding in accordance with its terms.

7.6    This agreement and any contractual or non-contractual obligations arising out of or in connection with it, shall be governed by and are to be construed in accordance with the laws of the Netherlands. Any power of attorney or other document executed in connection with this agreement or the transactions provided for in this agreement shall also be governed by and construed in accordance with the laws of the Netherlands.

7.7    Any dispute arising out of or in connection with this agreement (including any dispute concerning its existence, its validity or any non-contractual obligation) shall be settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**"). The arbitral tribunal shall be composed of three arbitrators, appointed in accordance with the Rules. The place of arbitration will be New York, New York, United States of America. The language of the proceedings will be English. The arbitral award will be final and binding. This paragraph shall also apply to disputes arising out of or in connection with agreements which are expressly connected with this agreement, unless the relevant agreement expressly provides otherwise. Consolidation of arbitral proceedings with other proceedings as provided for in the Rules is excluded.

7.8    For the avoidance of doubt, references herein to "we" or "us" are to the DR Holder, and references herein to "you" are to Aegletes, unless the context requires otherwise.

CONFIDENTIAL

FBG_CH1_00094446

Any and all of the above is hereby agreed and accepted by:

Yours sincerely,

**Nuveen Asset Management, LLC**
By: Jennifer Johnson
Title: Managing Director, Associate General Counsel
Date: April 24, 2024


Agreed and acknowledged:

**Aegletes B.V.**
By: Steve Barlow
Title: Chief Executive Officer
Date: April 24, 2024

CONFIDENTIAL

FBG_CH1_00094447

**EXHIBIT A**

**STOCK PURCHASE AGREEMENT**

Exh. F-26
Confidential (C)

CONFIDENTIAL

FBG_CH1_00094448

**EXHIBIT G**

**MSA-Related Assets**

(*See Attached.*)

Exh. G-1

CONFIDENTIAL
FBG_CH1_00094449

**Current view as of 3/5**
Subject to ongoing refinement

CUTOVER PER COUNTRY



# Country specifics

| | | Rep/branch office | Share structure | APA | Assets | Direct shipment | Cutover accounting 1 June | Secondary cutover | Comments |
|---|---|---|---|---|---|---|---|---|---|
| **100% Liberty transfer as of Day 1** | | | | | | | | | |
| Countries that will transfer on June 1 | China | | SPA | Yes | NWC & PPE | | Yes | | Incl. Jiaxing to Hubei |
| | USA | | SPA/CA (Shares) | No>CA | NWC & PPE | Sender (delayed) | Yes | | |
| | Netherlands | | | Yes | NWC & PPE | | Yes | | |
| | Sweden | | CA (Shares) | No | | | No - Share transfer only | | |
| | Canada | | CA (Shares) | No | | | No - Share transfer only | | |
| | Malaysia | | | No | | | No – dedicated LED | | |
| | Australia | Branch Liberty (HK) | | No | | | | | Transfer follows HK |
| | Indonesia | Branch Liberty (HK) | | No | | | | | |
| | UK | Branch Liberty (SW) | | No | | | | | |
| | Finland | Branch Liberty (SW) | | No | | | | | Transfer follows SW |
| | Denmark | Rep Liberty (SW) | | No | | | | | |
| | Brazil | | CA (Shares) & SPA | No | | | No - Share transfer only | | Custom FTE approach |
| | Phospor (DE) | | | Yes | PPE & NWC | | Yes | | Phospor to Aachen GmbH |
| | LUXEON Go (DE/PL) | | | Yes | PPE | | Yes | | LUXEON Go to Aachen GmbH |
| **Delayed transfer** | | | | | | | | | |
| At June 1: Legal/tax[1] FTE[2] Operational[3] | Germany | | CA (Shares) & SPA | Yes | NWC & Other | Sender (delayed) | Yes | Yes (OEM) | Cutover scope per cutover moment to be defined |
| | Poland | | CA (Shares) | Yes | NWC | Yes** | Yes | Yes | Custom FTE approach |
| | France | | CA (Shares) | Yes | AR/cust. contracts | Yes** | | Yes | No Lunar FTE transfer |
| | Mexico | | CA (Shares) & SPA | Yes | AR/Lunar inventory | Yes* | | | Direct Shipment set-up |
| | Hong Kong | | CA (Shares) | Yes | PPE & NWC | Yes* | | Yes | Direct Shipment set-up |
| At June 1: Legal/tax[1] FTE[2] Operational[3] | Japan | | SPA | Yes | NWC & FTE | | | Yes | Pending contract splits |
| | Korea | | SPA | Yes | NWC & FTE | | | Yes | Pending contract splits |
| At June 1: Legal/tax[1] FTE[2] Operational[3] | Singapore | Branch Liberty (HK) | | Yes | FTE | | | No - Share transfer only | Pending branch office set-up |
| | India | | SPA | Yes | NWC & FTE & PPE | | | Yes | Pending tax registrations |
| | Taiwan | | SPA | Yes | NWC & FTE | | | Yes | Pending LE incorporation |
| | Spain | Rep Lunar (DE - Aachen) | CA (Shares) | Yes | NWC & FTE | Yes** | | Yes | Pending tax registrations |
| | Thailand | Rep Lunar (JP) | CA (Shares) & SPA | Yes | NWC & FTE | Yes* | | Yes | Pending rep office set-up |
| | Italy | Rep Lunar (DE - Aachen) | CA (Shares) | Yes | NWC & FTE | Yes** | | Yes | Pending tax registrations |

**Legend**

LED Aachen R-TSA countries, delayed due to operational OEM customer transfer timelines

Unique case (DE & PL) with 2 cutover moments – outlined on subsequent page

Notes) 1: Legal entity incorporated; 2: FTE transferred to the final receiving entity for set country; 3: Commercial + supply chain + Goods Flow

*Commercial flow via US, direct shipment from Penang; ** Commercial flow via Aachen, direct shipment from Aachen

CA = Contribution Agreement

Cut-over planning

Exh. C-2

CUTOVER PER COUNTRY

Based on preliminary IFRS BS
positions as of Dec23

**LUMILEDS**

# Lunar assets that transfer with Liberty on Day 1 and need to be transferred back when MSA ends

| Delayed countries | Sales | FTE related liabilities | Manuf. & R&D, AP |
|---|---|---|---|
| Scope | AR, Finished goods, Rebates | Accruals, other liabilities | PPE, Raw materials, AP |
| Germany* | Y | N/a | N/a |
| Poland* | Y | N/a | N/a |
| France | Y | N/a | N/a |
| Mexico | Y | N/a | N/a |
| Hong Kong | Y | N/a | Y |
| Japan | Y | Y | N/a |
| Korea | Y | Y | N/a |
| Singapore | Y | Y | N/a |
| India | Y | Y | Y |
| Taiwan | Y | Y | N/a |
| Spain | Y | Y | N/a |
| Thailand | Y | Y | N/a |
| Italy | Y | Y | N/a |

At June 1:
Legal/tax
FTE
Operational

*Phospor & LUXEON Go assets are included in June 1 cutover, not included in Germany and Poland in this overview

Cut-over planning

Exh. C-3

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 239**
**Page 192 of 193**

FBG_CH1_00094451

CUTOVER PER COUNTRY

**Indicative**
Subject to further validation



# Indicative timeline delayed cutovers per countries

| Activity | Month | May | Jun | Jul | Aug | Sep | Oct | GTM |
|---|---|---|---|---|---|---|---|---|
| Plan A countries | | | | | | | | |
| Plan B1 countries | | | | | | | | |
| Germany* | | | | | Customs registrations  OEM contracts split | | | Lunar: Direct export DE |
| Poland* | | | | | Customs registrations  OEM contracts split | | | Lunar: Direct export DE |
| France | | | | | Customs registrations  OEM contracts split | | | Lunar: Direct export DE |
| Mexico | | | | | | Direct shipment set up | | Lunar: Off shore |
| Hong Kong | | | | | | | To Lunar Taiwan LE | Lunar: Off shore |
| Plan B2 countries | | | | | | | | |
| Japan | | | OEM contract split | | | | | Both on shore |
| Korea | | | OEM contract split | | | | | Both on shore |
| Plan B3 countries | | Tax registrations | | | | | | |
| Singapore | | Liberty branch set up | | | | Tax registrations | | Liberty: Off shore |
| India | | Lunar LE Inc. | Tax registrations | Bank account set up | | | | Both on shore |
| Taiwan | | | | | | | Lunar Taiwan LE Inc.  Split 3PL warehouse contract | Both on shore |
| Spain | | | Rep Lunar | | Customs registrations  OEM contracts split | | | Lunar: Direct export DE |
| Thailand | | Lunar distributor live | | Rep Lunar | | | | Lunar: Distributor + rep office |
| Italy | | | Rep Lunar | | Customs registrations  OEM contracts split | | | Lunar: Direct export DE |

Signing

Cutover

Shares / Assets cutover

Expected FTE cutover

Cut-over planning

*Phospor & LUXEON Go assets are included in "Plan A countries", not included in Germany and Poland

Exh. C-4

**DEBTORS' EXHIBIT NO. 239**
**Page 193 of 193**