Execution version

Agreement on Sale and Purchase of Shares

entered into by and between

# Winning Group a.s.

as the Seller, of the one part

and

# Horizon International Holdings LLC

as the Purchaser, of the other part

dated 10 May 2024

CONFIDENTIAL

FBG_CH1_00094453

**DEBTORS' EXHIBIT NO. 240**
**Page 1 of 142**

TABLE OF CONTENTS

1.   DEFINITIONS AND INTERPRETATION OF THE AGREEMENT.........................................................3

2.   SUBJECT MATTER OF THE AGREEMENT ...........................................................................................11

3.   PURCHASE PRICE ....................................................................................................................................11

4.   CLOSING.....................................................................................................................................................13

5.   REPRESENTATIONS AND WARRANTIES OF THE PARTIES ........................................................15

6.   LIABILITY OF THE PARTIES FOR BREACH OF REPRESENTATIONS AND WARRANTIES 17

7.   LEAKAGE.....................................................................................................................................................18

8.   SPECIFIC INDEMNITIES .........................................................................................................................19

9.   OTHER COVENANTS ................................................................................................................................20

10.  TERMINATION ..........................................................................................................................................21

11.  GOVERNING LAW; DISPUTE RESOLUTION .....................................................................................22

12.  NOTICES......................................................................................................................................................22

13.  CONFIDENTIALITY AND PUBLICITY .................................................................................................23

14.  FINAL PROVISIONS .................................................................................................................................23

CONFIDENTIAL

FBG_CH1_00094454

## AGREEMENT ON SALE AND PURCHASE OF SHARES

entered into pursuant to the provisions of Section 1746 (2) of Act No. 89/2012 Coll., the Civil Code
(the "**Agreement**")

**THE PARTIES**

(1)   **Winning Group a.s.**

a company duly organised and validly existing in accordance with the laws of the Czech Republic,
having its registered office at Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic,
ID No.: 06794050, entered in the Commercial Register kept by the Regional Court in Brno,
Section B, File 7911 (the "**Seller**")

and

(2)   **Horizon International Holdings LLC**

a company duly organised and validly existing in accordance with the laws of the State of
Delaware, having its address for service at 838 Walker Road, Suite 21-2, Dover, Zip Code 19904,
Delaware, the United States of America and having its business address at 127 Public Square,
Suite 5300, Cleveland, Zip code 44114, Ohio, the United States of America, registered under
Delaware File Number 5711460 (the "**Purchaser**")

(the Seller and the Purchaser are hereinafter referred to jointly as the "**Parties**" and each
individually as the "**Party**")

**RECITALS**

(A)   Winning Plastics a.s. is joint-stock company duly organised and validly existing in accordance
with the laws of the Czech Republic, having its registered office at Křižíkova 2960/72, Královo
Pole, 612 00 Brno, Czech Republic, ID No.: 14293480, entered in the Commercial Register kept
by the Regional Court in Brno Section B, File 8682 (the "**Company**"). The Company is pursuing
business in particular in the area of surface-treated plastic parts primarily for automobiles, trucks
and industrial applications (the "**Business Activity**").

(B)   Company is the sole owner of Ownership Interest 1, Ownership Interest 2, Ownership Interest 3,
Ownership Interest 4 and Ownership Interest 5 (as defined in Article 1.1).

(C)   Seller is the owner of the Sale Shares (as defined in Article 1.1).

(D)   The Seller wishes to sell the Sale Shares (as defined below) to the Purchaser under the conditions
set out in this Agreement, and the Purchaser wishes to purchase the Sale Shares from the Seller
under the conditions set out in this Agreement.

In light of the foregoing, the Parties agree as follows:

**1.    DEFINITIONS AND INTERPRETATION OF THE AGREEMENT**

1.1   Unless defined otherwise in this Agreement, the capitalised terms as used in this Agreement
(including the Annexes hereto) shall have the meanings defined below

"**Affiliate**" means, with respect to any person, any entity controlled or influenced by, controlling
or influencing, or being under common control or influence with, such person.

"**Agreed Form** means, in relation to any document, the form of that document which is initialled
for the purposes of identification by or on behalf of the Seller and the Purchaser, whether prior



3 / 26

FBG_CH1_00094455

**DEBTORS' EXHIBIT NO. 240**
**Page 3 of 142**

Execution version

to, on or after the date of this agreement, with any changes as the Seller and Purchaser may agree before Completion;

"**Agreement**" has the meaning defined in the heading of this Agreement.

"**APA Bolta**" means the asset deal agreement entered into – *inter alia* – between Subsidiary 1 and Volker Böhm in his capacity as insolvency administrator (*Insolvenzverwalter*) over the assets of BOLTA-WERKE Gesellschaft mit beschränkter Haftung, Diepersdorf and Bolta-Bundle GmbH, Leinburg, dated 9 June 2022 (registry of deeds nr. R 2055/2022 of the notary Dr. Michael Reindl).

"**APA Linden/SMK**" means the asset deal agreement entered into between – *inter alia* – Subsidiary 2 and Subsidiary 3 as purchasers and Dr. Brero Alexander Rau in his capacity as insolvency administrator (*Insolvenzverwalter*) over the assets of Linden GmbH, Herford and Sächsische Metall- und Kunststoffveredlungs GmbH, Oberlungwitz, dated 17 December 2021 (roll of deeds nr. 1606/2021 K of the notary Dr. Marcus Kämpfer).

"**Base Purchase Price**" means EUR 30.000.000 (thirty million euro)

"**Break up fee**" means EUR 500.000 (five hundred thousand euro)

"**Breach of the Seller's Representations**" has the meaning defined in Article 6.1.

"**Business Activity**" has the meaning defined in Recital (A).

"**Civil Code**" means Act No. 89/2012 Coll., the Civil Code, as amended.

"**Commerz Real Mobilienleasing**" means Commerz Real Mobilienleasing GmbH, a private limited liability company (*Gesellschaft mit beschränkter Haftung*) with its registered seat in Düsseldorf, Germany, registered with the commercial register (*Handelsregister*) at the local court (*Amtsgericht*) of Düsseldorf, Germany, under docket number HRB 31415.

"**Company**" has the meaning set out in Recital (A).

"**Companies Act**" means Act No. 90/2012 Coll., on Business Companies and Cooperatives (the Companies Act), as amended.

"**Company's Accounts**" means the audited financial reports (balance sheet and profit and loss account) of the Company, including any notes thereto.

"**Confidential Information**" has the meaning defined in Article 13.1.

"**CZ GAAP**" means the principles and standards set out in Czech Act No. 563/1991 Coll., on Accounting, as amended, and the implementing regulations to said Act, as well as any and all other directives and other rules issued by the Czech Chamber of Auditors applied consistently with the past practice of the Company and relevant Annexes of this Agreement (to the extent that such past practice is compliant with Law).

"**Disclosed Information**" means all information and documents disclosed to the Purchaser or its advisors accurately, fully and fairly (i.e. in a manner which enables the Purchaser and its advisors to identify and understand the relevant matter and its significance) via a virtual data room hosted at connect.cliffordchance.com prior to 30 April 2024, 12:00 p.m. CEST.

"**Dispute**" has the meaning defined in Article 11.2.

"**Due Diligence**" means the legal, financial, accounting, tax and technical review of Target Companies performed by the Purchaser.

"**Completion**" means the performance, in accordance with this agreement, of the obligations described in Article 4.

"**Estimated Financial Statements**" means Financial Statements of Target Companies as at 30 April 2024 prepared in good faith by the Seller to calculate Estimated Total Purchase Price and attached to the SPA as <u>Annex 1</u>.



4 / 26

CONFIDENTIAL

FBG_CH1_00094456

**"Estimated Net Cash"** means Net Cash of Target Companies as at 30 April 2024 prepared in good faith by the Seller based on Estimated Financial Statements to calculate Estimated Total Purchase Price at Completion.

**"Estimated Net Debt"** means Net Debt of Target Companies as at 30 April 2024 prepared in good faith by the Seller based on Estimated Financial Statements to calculate Estimated Total Purchase Price at Completion.

**"Estimated Total Purchase Price"** or **"ETPP"** means EUR 8.877.265,51.

**"Estimated Working Capital Adjustment"** means Working Capital Adjustment as at 30 April 2024 prepared in good faith by the Seller based on Estimated Financial Statements to calculate the Estimated Total Purchase Price at Completion.

**"Expert"** means company Deloitte / PWC / EY /KPMG or comparable professional services firm on which Seller and Buyer agree.

**"Facilities Agreement 1"** means Facilities Agreement up to EUR 27,750,000 dated 30 August 2022 concluded between &T BANKA, a.s., J&T Mezzanine, a.s., Subsidiary 1 and Winning IP Diepersdorf GmbH, a private limited liability company (Gesellschaft mit beschränkter Haftung) with its registered seat at Industriestraße 22, 91227 Leinburg, OT Diepersdorf, Germany, registered with the commercial register (Handelsregister) at the local court (Amtsgericht) of Nürnberg, Germany, under docket number HRB 40763.

**"Facilities Agreement 2"** means Facilities Agreement dated 30 June 2022 EUR 7,000,000 Credit Facilities concluded between Raiffeisenbank, LINDEN, Subsidiary 2, Subsidiary 3, Winning IP Lüdenscheid GmbH, a private limited liability company (Gesellschaft mit beschränkter Haftung) with its registered seat at Kalver Straße 26, 58515 Lüdenscheid, Germany, registered with the commercial register (Handelsregister) at the local court (Amtsgericht) of Iserlohn, Germany, under docket number HRB 10258 and Winning IP Oberlungwitz GmbH, a private limited liability company (Gesellschaft mit beschränkter Haftung) with its registered seat at Hofer Straße 96-98, 09353 Oberlungwitz, Germany, registered with the commercial register (Handelsregister) at the local court (Amtsgericht) of Chemnitz, Germany, under docket number HRB 34798.

**"Facilities Agreements"** means the Facilities Agreement 1 and the Facilities Agreement 2 and a **"Facilities Agreement"** means any of them.

**"Final Net Cash"** means Net Cash of Target Companies as at 30 April 2024 prepared by the Purchaser based on Interim Financial Statements to calculate Total Purchase Price at Completion.

**"Final Net Debt"** means Net Debt of Target Companies as at 30 April 2024 prepared by the Purchaser based on Interim Financial Statements to calculate Total Purchase Price at Completion.

**"Final Working Capital Adjustment"** means Working Capital Adjustment as at 30 April 2024 prepared by the Purchaser based on Interim Financial Statements to calculate the Total Purchase Price at Completion.

**"Financial Statements"** means the unaudited financial reports (balance sheet and profit and loss account) of the Target Companies.

**"Global Release Agreement"** means the Global Release Agreement to be entered into between the Subsidiary 1, Winning IP Diepersdorf GmbH, the Company, Winning Industrial Property a.s., the Seller, J&T BANKA, a.s. and J&T Mezzanine, a.s. around the date of this Agreement.

**"IG Loan Agreement"** means Loan Agreement dated 26 April 2022 for a binding line of credit up to an amount of CZK 1,000,000,000 concluded between, amongst others, the Seller, Subsidiary 2 and Subsidiary 3.

**"Intellectual Property"** means trademarks, inventions, patents, utility designs, industrial designs, registered corporate name, unregistered designation, copyrighted work and copyright, domain names, databases, designation of origin and geographical designations, know-how, trade secret and any other intangible assets and rights in intangible assets, industrial and intellectual property,



**5 / 26**

registered or unregistered, and including applications and applications for registration of such rights and any and all other rights and forms of protection having equivalent or similar effect anywhere around the world.

"**Interim Financial Statements**" means aggregated financial statements of the Company prepared from Individual Financial Statements of the Company and each Subsidiary prepared in accordance with past practice as presented in Annex 1 and CZ GAAP as at 30 April 2024.

"**J&T BANKA, a.s.**" means J&T BANKA, a.s. with its reagistered seat at Sokolovská 700/113a, Karlín, Prague 8, Postal Code 186 00, Identification No. 471 15 378, registered in the Commercial Register maintained by the Municipal Court in Prague, Section B 1731

"**J&T Mezzanine, a.s.**" means J&T Mezzanine, a.s. with its reagistered seat at Sokolovská 700/113a, Karlín, Prague 8, Postal Code 186 00, Identification No. 066 05 991, registered in the Commercial Register maintained by the Municipal Court in Prague, Section B 23005

"**Net Cash**" means Cash and Receivables towards the Seller and its subsidiaries outside of the Target Companies as per Interim Financial Statements and calculated based on specific accounting procedures presented in Annex 2.

"**Net Debt**" means the aggregate net debt of the Target Companies, being

    (a)  Bank loans, plus

    (b)  Hire-Purchase Agreements, plus

    (c)  Liabilities towards the Seller and its subsidiaries outside of the Target Companies

    based on Interim Financial Statements and calculated based on specific accounting

    procedures presented in Annex 2.

"**Sale Shares**" means all the issued ordinary registered shares in the Company represented by the registered share certificates Nos. 1 to 20 in the Company, each having a par value of CZK 100.000, equivalent to fully paid-up contribution to the Company's registered capital in the amount of CZK 2.000.000 and equivalent to a (i) share in voting rights in the amount of 100% and (ii) share in profits in the amount of 100%.

"**Ownership Interest 1**" means all shares in the nominal amount of EUR 1.00 each with serial numbers 1 – 25,000 in the shareholders list dated 5 September 2022 uploaded into the commercial register of Subsidiary 1's registered capital in the amount of EUR 25,000, but in any case all shares issued by Subsidiary 1.

"**Ownership Interest 2**" means all shares in the nominal amount of EUR 1.00 each with serial numbers 1 – 25,000 in the shareholders list dated 16 August 2022 uploaded into the commercial register of Subsidiary 2's registered capital in the amount of EUR 25,000, but in any case all shares issued by Subsidiary 2.

"**Ownership Interest 3**" means all shares in the nominal amount of EUR 1.00 each with serial numbers 1 – 25,000 in the shareholders list dated 5 September 2022 uploaded into the commercial register of Subsidiary 3's registered capital in the amount of EUR 25,000, but in any case all shares issued by Subsidiary 3.

"**Ownership Interest 4**" means one fully paid business share in the nominal amount of CZK 200,000 corresponding to Subsidiary 4's registered capital in the amount of CZK 200,000, but in any case all shares issued by Subsidiary 4.

"**Ownership Interest 5**" means all shares in the nominal amount of EUR 1.00 each with serial numbers 1 – 25,000 in the shareholders list dated 13 June 2023 uploaded into the commercial register of Subsidiary 5's registered capital in the amount of EUR 25,000, but in any case all shares issued by Subsidiary 5."

"**Ownership Interests**" means Ownership Interest 1, Ownership Interest 2, Ownership Interest 3, Ownership Interest 4 and Ownership Interest 5.



**6 / 26**

CONFIDENTIAL

FBG_CH1_00094458

"**Parent Guarantees of the Seller**" means parent guarantees provided by the Seller for fulfilment of obligations of Target Companies in favour of Commerz Real Mobilienleasing issued by the Seller.

"**Parent Guarantee of the Purchaser**" means parent guarantee provided by the Purchaser in favour of the Seller according to Art. 5.3 lit. e) of this Agreement.

"**Parties**" and "**Party**" has the meaning defined in the heading of this Agreement.

"**Pay-off Amount 1**" means EUR 3.727.618,33 to be paid to the Seller per Pay-Off Letter 1 corresponding to the obligations of Subsidiaries and Company to the Seller and its Affiliates (other than Target Companies) so any obligations of Subsidiaries and Company to the Seller and its Affiliates (other than Target Companies) with exclusion of Real Estate Lease Agreements shall cease to exist at the Completion.

"**Pay-off Letter 1**" means the pay-off letter issued by Seller and its relevant Affiliates in a form agreed between the Seller and the Purchaser specifying the Pay-off Amount 1 at Completion.

"**Pay-off Amount 2**" means EUR 14.410.008,83 to be paid to the J&T BANKA, a.s. per Pay-Off Letter 2 corresponding to the obligations of Subsidiaries and Company to the J&T BANKA, a.s. so any obligations of Subsidiaries and Company to the J&T BANKA, a.s. shall cease to exist at the Completion.

"**Pay-off Letter 2**" means the pay-off letter issued by J&T BANKA, a.s. in a form agreed between the Sellers and the Purchaser (i) evidencing the consent of J&T BANKA, a.s. to the transaction pursuant to this Agreement; (ii) containing the form of waivers of all Third Party Rights and guarantees established in connection with the Facilities Agreement 1 to be issued by J&T BANKA, a.s. in accordance with this Agreement; and (iii) containing the form of release of the Target Companies from all obligations under the Facilities Agreement 1 or any other document executed by the Target Companies in connection with the Facilities Agreement 1 to be issued by J&T BANKA, a.s. in accordance with this Agreement; and (iv) specifying the Pay-off Amount 2 at Completion.

"**Pay-off Amount 3**" means EUR 3.549.027,37 to be paid to the Raiffeisenbank per Pay-Off Letter 3 corresponding to the obligations of Subsidiaries and Company to the Raiffeisenbank so any obligations of Subsidiaries and Company to the Raiffeisenbank shall cease to exist at the Completion.

"**Pay-off Letter 3**" means the pay-off letter issued by Raiffeisenbank in a form agreed between the Sellers and the Purchaser (i) evidencing the consent of Raiffeisenbank to the transaction pursuant to this Agreement; (ii) containing the form of waivers of all Third Party Rights and guarantees established in connection with the Facilities Agreement 2 to be issued by Raiffeisenbank in accordance with this Agreement; and (iii) containing the form of release of the Target Companies from all obligations under the Facilities Agreement 2 or any other document executed by the Target Companies in connection with the Facilities Agreement 2 to be issued by Raiffeisenbank in accordance with this Agreement; and (iv) specifying the Pay-off Amount 3 at Completion.

"**Public Information**" means the data in relation to the Target Companies which can be obtained from an extract from the Land Register, data from the Commercial Register of the Company /public registers of legal entities, and documents deposited in the collection of documents of a public register.

"**Purchaser**" has the meaning defined in the heading of this Agreement.

"**Purchaser's Representations**" has the meaning defined in Article 5.2.

"**Raiffeisenbank**" means Raiffeisenbank a.s. with its registered seat at Praha 4, Hvězdova 1716/2b, PSČ 14078, Identification No. 492 40 901, registered in the Commercial Register maintained by the Municipal Court in Prague, Section B 2051



7 / 26

CONFIDENTIAL

FBG_CH1_00094459

"**Real Estate Lease Agreements**" means (i) real estate lease agreement concluded on 15. September 2022 as amended between Subsidiary 1 and Winning IP Diepersdorf GmbH with seat at Industriestraße 22, 91227 Leinburg, OT Diepersdorf, Germany, (ii) real estate lease agreement concluded on 22. April 2022 as amended between Subsidiary 2 and Winning IP Lüdenscheid GmbH with seat at Kalver Straße 26, 58515 Lüdenscheid, Germany, (iii) real estate lease agreement concluded on 22. April 2022 as amended between Subsidiary 3 and Winning IP Oberlungwitz GmbH with seat at Hofer Straße 96-98, 09353 Oberlungwitz, Germany and sublease agreement to be concluded between Subsidiary 4 and IP Hustopeče

"**Receivables**" means any and all receivables of the Company as specified in the Accounts or in the Company's Accounts.

"**Repayment Confirmation 1**" means a confirmation of repayment of all debts owed by the Target Companies to the Seller and its Affiliates, substantially in the form set out in the Pay-off Letter 1.

"**Repayment Confirmation 2**" means a confirmation of repayment of all debts owed by the Target Companies to the J&T BANKA, a.s., substantially in the form set out in the Pay-off Letter 2.

"**Repayment Confirmation 3**" means a confirmation of repayment of all debts owed by the Target Companies to the Raiffeisenbank, substantially in the form set out in the Pay-off Letter 3.

"**Seller**" has the meaning defined in the heading of this Agreement.

"**Seller's Representations**" has the meaning defined in Article 5.1.

"**Signing Date**" means the date of execution of this Agreement by all Parties.

"**Subsidiaries**" means Subsidiary 1, Subsidiary 2, Subsidiary 3, Subsidiary 4 and Subsidiary 5.

"**Subsidiary 1**" means company Winning Plastics - Diepersdorf GmbH, a private limited liability company (*Gesellschaft mit beschränkter Haftung*) with its registered seat at Leinburg, OT Diepersdorf, Germany and business address at Industriestraße 22, 91227 Leinburg, OT Diepersdorf, Germany, registered with the commercial register (*Handelsregister*) at the local court (*Amtsgericht*) of Nürnberg, Germany, under docket number HRB 40825.

"**Subsidiary 2**" means company Winning Plastics - Linden GmbH, a private limited liability company (*Gesellschaft mit beschränkter Haftung*) with its registered seat at Lüdenscheid, Germany and business address at Kalver Straße 26, 58515 Lüdenscheid, Germany, registered with the commercial register (*Handelsregister*) at the local court (*Amtsgericht*) of Iserlohn, Germany, under docket number HRB 10343.

"**Subsidiary 3**" means company Winning Plastics - SMK GmbH, a private limited liability company (*Gesellschaft mit beschränkter Haftung*) with its registered seat at Oberlungwitz, Germany and business address at Hofer Straße 96-98, 09353 Oberlungwitz, Germany, registered with the commercial register (*Handelsregister*) at the local court (*Amtsgericht*) of Chemnitz, Germany, under docket number HRB 34810.

"**Subsidiary 4**" means company LINDEN s.r.o., a private limited liability company (společnost s ručením omezeným) with its registered seat at Žižkova 750/40, 693 01 Hustopeče, Czech Republic, ID.Nr. (*IČO*) 26292904 registered with the commercial register (*Obchodní rejstřík*) at the regional court (*Krajský soud*) in Brno, Czech Republic, under docket number C 42285.

"**Subsidiary 5** means company Winning Plastics Germany 1 GmbH, a private limited liability company (*Gesellschaft mit beschränkter Haftung*) with its registered seat at Leinburg, OT Diepersdorf, Germany and business address at Industriestraße 22, 91227 Leinburg, OT Diepersdorf, Germany, registered with the commercial register (*Handelsregister*) at the local court (*Amtsgericht*) of München, Germany, under docket number HRB 284249.

"**Target Companies**" means the Company and the Subsidiaries and a "**Target Company**" means any of them.

CONFIDENTIAL

FBG_CH1_00094460

"**Taxes**" means all forms of taxation, taxes, fees, levies and social security and health insurance charges, whether direct or indirect, including in particular corporate income tax, personal income tax (mainly wage withholding tax), withholding taxes, tax security, value added tax, customs duties, excise duties, inheritance tax, gift tax, real estate transfer tax and other transfer taxes, real estate tax, road tax and other property taxes, environmental taxes and other fees, including the payments on the basis of security for unpaid tax and/or types of taxes or levies payable under any applicable national, regional or local law or regulation, together with any related interest, penalties, surcharges or fines and other sanctions or additional charges.

"**Third Party Rights**" means any mortgage, pledge, lien, assignment by way of security, option, right of pre-emption, lease or any other right held, or claim that could be raised, by a third party, and including in particular any lien on thing, arrangements of lien creditors in respect of the order of liens, released lien or change of lien, consent to establish/register lien on property in favour of a third party, right of retention, transfer of rights as security, any other security, prohibition of alienation of or encumbrance on a thing, prohibition to establish a lien, preferential right to some other proprietary right, preferential right to establish proprietary right for another party, note of disputability, right of option, pre-emptive right or any other ancillary arrangement in the purchase agreement (including such arrangements as may be agreed without any connection with the purchase agreement) or other acquisition rights, property rights, easement, right of construction, precarium, loan, right of use, tenancy law, right to lease, license right, right to management, including management of assets through a trust fund, waiver of the right to claim compensation for damage incurred on the land or any other Third Party Rights and claims that might be asserted by any third party and also contracts, agreements or any other arrangements, legal transactions, facts or decisions on the basis of which such Third Party Rights might arise, and including any further motions for the registration of such Third Party Rights into public directories, public registers, the register of pledges or any other lists, records or registers of property or persons kept under a special legal regulation.

"**Total Purchase Price**" has the meaning defined in Article 3.1.

"**Transaction Documentation**" means jointly this Agreement, as well as any other related documents executed by the Parties to this Agreement.

"**Working Capital**" the aggregate working capital of the Target Companies, being:

    (d)   Inventories, plus

    (e)   Receivables, plus

    (f)   Other Assets, less

    (g)   Provisions, less

    (h)   Trade payables, less

    (i)   Other Liabilities,

based on Interim Financial Statements and calculated based on specific accounting procedures presented in Annex 3. For avoidance of doubt, Working Capital exclude items considered in Net Debt or Net Cash.

"**Working Capital Adjustment**" means Working Capital minus EUR 20.000.000.

1.2    The interpretation of this Agreement shall be based on the following rules:

    (a)   References to "**Articles**" and "**Annexes**" shall be construed as references to the relevant Articles of and Annexes to this Agreement.

    (b)   References to a "**person**" or a "**party**" shall be construed so as to include any individual, legal entity, trust fund, company, silent partnership, government, state, agency of a state, joint venture, plant, association or society (whether or not having a separate legal personality).

9 / 26

CONFIDENTIAL

FBG_CH1_00094461

**DEBTORS' EXHIBIT NO. 240**
**Page 9 of 142**

(c)  References to a "**contract**" shall be construed so as to apply to any contract or agreement, including all subsequent modifications and amendments, and including annexes, business conditions, other indirect contractual arrangements and regardless of the manner and form of their execution.

(d)  Unless expressly stated to the contrary in this Agreement, references to "**material**" or "**substantial**" payment, settlement, compensation, damage, loss, profit, lost profit, revenues, lost revenues, decrease in asset value, adverse effects, adverse changes or similar events or circumstances or, as the case may be, series of such events or circumstances, or documents or information, shall be construed as a reference to any payment, settlement, compensation, damage, loss, profit, lost profit, revenue, lost revenue, decrease in asset value, adverse effect, adverse change or similar event or circumstance, or a document or information, which in the aggregate monetary equivalent corresponds in any individual case to at least EUR 200.000.

(e)  The term "**control**" shall be construed within the meaning of Section 74 et seq. of the Companies Act, and the term "**influence**" shall be construed within the meaning of Section 71 et seq. of the Companies Act.

(f)  References to "**in the ordinary course of business**" shall be construed in connection with the Company and/or the relevant Subsidiary so as to refer to the ordinary business of the Company and/or the relevant Subsidiary as it has been normally carried on from the Signing Date and/or as its pursuit was planned in the business plan of the Company and/or the relevant Subsidiary for the accounting period starting January1, 2023.

(g)  References to "**business days**" shall be construed as references to any day, other than Saturday, Sunday and a public holiday pursuant to the current Czech legal regulations.

(h)  The terms defined in this Agreement in plural shall have the same meaning in the singular, and *vice versa.*

(i)  The phrase "**to the Seller's knowledge**" or "**to the Seller's best knowledge**" shall be construed as encompassing any and all information, knowledge and facts regarding the economic, financial, accounting, environmental and legal matters of the Company and Subsidiaries, which the Seller, as the sole owner of the Company possess in relation to the Company and the Subsidiaries or which they should have using the care and diligence of a prudent manager within the meaning of Section 5 of the Civil Code as at the date of execution of the Agreement after having duly and fully questioned the members of the executive bodies of the Company and the Subsidiaries;

(j)  The provision of Section 556 (2) of the Civil Code shall not apply.

(k)  Due to the fact that this Agreement is the result of extensive negotiations between the Parties, none of the articles and none of the terms used in the article concerned will be attributed to any of the Parties as a Party who was the first to use it during negotiations. The provision of Section 557 of the Civil Code shall not apply.

(l)  In addition to the provisions of the legislation, the use of which is expressly excluded in this Agreement, for the purposes of this Agreement, other provisions of legal regulations shall not apply, to the extent they are replaced by different covenants of the Parties under this Agreement.

(m)  Commercial practices provisions shall not apply to the interpretation of this Agreement.

(n)  References to "**damage**" mean (i) always references to damage to property (in Czech "*újma na jmění*") (loss, in Czech "*škoda*") within the meaning of Section 2894 (1) of the Civil Code and also (ii) references to non-proprietary damage (in Czech "*nemajetková újma*") within the meaning of Section 2894 (2) of the Civil Code, only in cases where the liability for the compensation for non-proprietary damage is stipulated separately by the Civil Code or another legal regulation.

10 / 26

CONFIDENTIAL

FBG_CH1_00094462

(o) References to "**procure**" or "**ensure**", when used to express a person's obligation to procure or ensure that a third party will or will not act in a certain manner, refers to the relevant person's obligation to pay any damages arising in the event that the third person does not perform what has been agreed, pursuant to the second sentence of Section 1769 of the Civil Code.

(p) Neither the Total Purchase Price, nor any portion thereof is provided as an earnest payment (in Czech "*závdavek*").

(q) The headings used in this Agreement are inserted for reference only and shall be irrelevant for the interpretation of this Agreement.

## 2.    SUBJECT MATTER OF THE AGREEMENT

2.1    On the terms set out in this Agreement Seller agrees to sell and transfer the Sale Shares on the Signing Date to the Purchaser free and clear of any Third Party Rights, with all the rights and obligations attaching to the Sale Shares, and the Purchaser agrees to purchase and acquire/take over the Sale Share into the Purchaser's ownership from Seller; the Sale Shares will be transferred to the Purchaser by the endorsement in accordance with this Agreement and upon their delivery of the Sale Shares by Seller to the Purchaser. The transfer of Sale Shares shall take effect vis-à-vis the Company upon the presentation of the Sale Shares to the Company.

2.2    In the manner and subject to the conditions set out in this Agreement, the Purchaser will pay the Total Purchase Price for the Sale Shares in accordance with Article 3 of this Agreement.

2.3    The Parties acknowledge that the general purpose of this Agreement is the acquisition by the Purchaser of a 100% participation in the Company, and thus the Purchaser is not interested in a partial performance of this Agreement. If the Seller fails to sell and transfer to the Purchaser all the Sale Shares or transfer only a part of the Sale Shares in accordance with this Agreement, the Purchaser shall not be obliged to purchase and acquire only part of the Sale Shares.

2.4    In the event that any portion of the Seller's commitment to transfer the Sale Shares to the Purchaser becomes impossible, the obligation pursuant to this Agreement will be extinguished in its entirety.

## 3.    PURCHASE PRICE

3.1    Total Purchase Price will be determined using the procedure and conditions set out in Article 3.3, provided that the purchase price so determined and possibly subsequently adjusted will be the total purchase price for the Sale Shares (the "**Total Purchase Price**"or "**TPP**").

3.2    The Seller hereby declares that the Estimated Total Purchase Price was determined in good faith as follows:

ETPP = Base Purchase Price plus Estimated Net Cash minus Estimated Net Debt plus Estimated Working Capital Adjustment.

ETPP corresponds to EUR 8.877.265,51

3.3    The Purchaser shall, within twenty business days after Completion, prepare and deliver to the Seller a report on the final Total Purchase Price that will be determined after Completion as follows:

TPP = Base Purchase Price plus Final Net Cash minus Final Net Debt plus Final Working Capital Adjustment.

The Total Purchase Price report will be drawn up on the basis of the Interim Financial Statements prepared by the Company as of Completion.

Only material or substantial discrepancies between ETPP and TPP shall affect already realised payments.

**11 / 26**

CONFIDENTIAL                                                                    FBG_CH1_00094463

Execution version

Should the Purchaser fail to provide report on the final Total Purchase Price within twenty business days after Completion the Estimated Total Purchase Price shall automatically become Total Purchase Price unless Seller raise Notice of Objection (see below) within twenty five business days after Completion. In such a case the below described procedure after raising of Notice of Objection shall apply.

(a)   If the Seller fails to raise any objections against the calculation of the Total Purchase Price by a notice of objection that shall include disputed items and justification of the objections raised (the "**Notice of Objection**") and that shall be delivered to the Purchaser within ten business days following the receipt of the Total Purchase Price report by the Seller, the calculation of the Total Purchase Price performed by the Purchaser shall be deemed tacitly accepted by the Seller after the expiry of such time limit and shall be binding upon the Parties. The Purchaser shall ensure that after Completion the Seller and their advisors and representatives have for the purpose of preparation of the Notice of Objection access to the accounting records of the Target Companies to the extent that is necessary to review the merits of the calculation of the Total Purchase Price.

(b)   In the event that the Seller delivers to the Purchaser the Notice of Objection within the time limit specified in lit. (a) above and the Parties do not agree on the determination of the Total Purchase Price within five business days following the delivery of such Notice of Objection to the Purchaser, the Seller agrees to submit within ten business days after such date its reasoned written counterproposal to determine the Total Purchase Price to the Purchaser and the Expert. The Expert will review it and determine the amount of the Total Purchase Price in twenty business days. If the Seller fails to submit its reasoned counterproposal within the aforementioned time limit, the calculation of the Total Purchase Price performed by the Purchaser shall be deemed tacitly accepted by the Seller after the expiry of such time limit and shall be binding upon the Parties.

(c)   The Expert will hand down its decision pursuant to Article (b) above together with its reasoning within twenty business days after the submission of the Seller's counterproposal for the calculation of the Total Purchase Price to the Expert. The decision may involve the acceptance of the proposal of any of the Parties or establishing any new amount of the Total Purchase Price which, however, must be in the range between individual proposals of the Parties and respect the principles and procedures for calculating the Total Purchase Price defined in this Agreement. The Expert's delay in completing the decision under this Article shall not render such decision invalid. The Expert's decision on determining the amount of the Total Purchase Price shall be final and binding upon the Parties. Expenses associated with the Expert's activities shall be borne by Party which proposed Total Purchase Price more different from the Total Purchase Price determined by Expert.

(d)   If pursuant to the final and binding determination of the Total Purchase Price under the preceding provisions of this Agreement:

(e)   the Total Purchase Price is lower than the Estimated Total Purchase Price, the Seller shall pay to the Purchaser the resulting difference within five business days after the date of the final and binding determination of the Total Purchase Price to such bank account as notified by the Purchaser;

(f)   the Total Purchase Price exceeds the Estimated Total Purchase Price, the Purchaser agrees to pay to the Seller the resulting difference within five business days after the final and binding determination of the Total Purchase Price, so that the Purchaser will pay the difference to the bank account no. IBAN: CZ53 5800 0000 0025 0009 8429, BIC (Swift): JTBPCZPP or other bank account of Seller notified by the Seller.

12 / 26

CONFIDENTIAL

FBG_CH1_00094464

Execution version

**4.    CLOSING**

**4.1**    Completion shall take place at the offices of Seller at Křižíkova 72, 612 00, Brno, immediately following the execution of this Agreement.

**4.2**    The Parties agree to use their respective best efforts to ensure that the individual steps of the closing of the transaction as described in Articles 4.3 below are taken immediately one after the to effectuate the Completion.

**4.3**    The Seller and Purchaser shall take the respective following legal and factual action:

(a)    The Seller delivering evidence that the Seller is authorised to effect the transactions contemplated by this Agreement in particular but not limited to the execution of the endorsement and transfer of the Sale Shares to the Purchaser and other steps and actions to occur on Completion;

(b)    The Purchaser delivering evidence that the Purchaser is authorised to effect the transactions contemplated by this Agreement;

(c)    The Seller to endorse the Sale Shares in favour of the Purchaser on its back with the following endorsement, duly signed by the Seller: "*Za Winning Group a.s., se sidlem Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic, identifikační číslo 06794050 (jako Převodce) na řad Horizon International Holdings LLC, společnosti s adresou pro doručování 838 Walker Road, Suite 21-2, Dover, PSČ 19904, Delaware, Spojené státy americké a obchodní adresou 127 Public Square, Suite 5300, Cleveland, 44114, Ohio, Spojené státy americké, registrované ve státě Delaware pod číslem 5711460 (jako Nabyvatele). V Brně, dne 10. května 2024, za Winning Group a.s., [signature], Sebasitan Peter Wagner, předseda představenstva*", and signs the handover protocol regarding the Sale Shares, the Seller will keep the Sale Shares and the hand over protocol;

(d)    The Seller delivering the original Pay-off Letter 1;

(e)    The Seller delivering the original Pay-off Letter 2;

(f)    The Seller delivering the original Pay-off Letter 3;

(g)    The Purchaser to pay or procuring the payment made on its behalf Pay-off Amount 1 to the bank account number specified in the Pay-off Letter 1;

(h)    The Purchaser to pay or procuring the payment made on its behalf Pay-off Amount 2 to the bank account number specified in the Pay-off Letter 2;

(i)    The Purchaser to pay or procuring the payment made on its behalf Pay-off Amount 3 to the bank accounts specified in the Pay-off Letter 3;

(j)    The Purchaser to pay or procuring the payment made on its behalf the Estimated Total Purchase Price to the Seller' bank account no. IBAN: CZ53 5800 0000 0025 0009 8429, BIC (Swift): JTBPCZPP;

(k)    The Seller as the sole shareholder of the Company (i) adopts a new full wording of the Company's articles of association (in Czech: stanovy) in a form provided by the Purchaser at least two business days before Completion (subject to any changes requested by the notary) and (ii) recalls the current members of the statutory body of the Company and ensures recall of Mr. Sebastian Wagner, born on 3 June 1985, residing at Zell am Harmersbach from the position of CEO of all Subsidiaries and recall of Mr. Petr Šerák, born on 29 February 1984, residing at Řípská 1457/17a, Slatina, 627 00 Brno and Šimon Pavlas, born 11 February 1968, residing at Budišov 56, 675 03 from the position of CEO of Subsidiary 4 and ensures appointment of Mr. Shekhar Kumar, born on 16 November 1984, residing at 126 Hauxhurst Ave, Weehawken, NJ 07086, the United States of America, Mr. Stephen Graham, born on 24 December 1957, residing at 4492 Rock Ridge LN, Akron, OH 44333, the United



13 / 26

CONFIDENTIAL

FBG_CH1_00094465

**DEBTORS' EXHIBIT NO. 240**
**Page 13 of 142**

Execution version

States of America, and Michael Baker, born on 9 July 1972, residing at 32 Regency PL, Weehawken, NJ 07086, the United States of America, as members of the statutory body of the Company and as the members of the statutory bodies of all the Subsidiaries;

(l)   All Purchaser's payments stipulated in paragraphs (g) to (j) credited to the relevant bank accounts;

(m)   The Seller hands over to the Purchaser and Purchaser accepts from Seller the Sale Shares and the Seller and the Purchaser shall execute (i) a hand-over protocol confirming the transfer of the ownership right to the Sale Shares from the Seller to the Purchaser; and (ii) a confirmation of the transfer of the ownership right to the Sale Shares from the Seller to the Purchaser (with notarized signature(s) of the Purchaser);

(n)   The Seller shall deliver to the Purchaser the original (or verified copy) of the fully executed Repayment Confirmation 1;

(o)   The Seller shall deliver to the Purchaser the scan of the fully executed Repayment Confirmation 2;

(p)   The Seller shall deliver to the Purchaser the scan of the fully executed Repayment Confirmation 3;

(q)   The Seller to procure that the amount of EUR 7,500,000 is deposited on the Cash Collateral Account (as such term is defined in the Global Release Agreement) in accordance with the Global Release Agreement; and

(r)   The Parties sign the Closing Confirmation confirming all the closing steps and actions set out in this Article 4.3 of the Agreement have been fulfilled.

4.4   Should the provisions of Articles 4.3 fail to be fulfilled on the Signing Date in any respect material to a Party, this Party will not be obliged to complete the transaction and may by a written notice with immediate effect:

(a)   postpone the closing of the transaction to five business day after the Signing Date, provided that the adjourned meeting will be governed, *mutatis mutandis*, by the provisions of Article 4.3 adjusted as appropriate or necessary, and/or

(b)   without prejudice to the rights of a Party under this Agreement, proceed, as far as practicable, with the transactions contemplated by this Agreement; and

should the transaction fail to be closed at the next following adjourned meeting concerning the completion of the transaction, adjourned in accordance with Article (a), by reason of a breach of the obligations specified in Article 4.3, the other Party rescind this Agreement. The breaching party shall be obliged to pay Break up Fee within 5 (five) business days from the date of adjourned meeting concerning the completion of the transaction.

4.5   Within 25 business days after Completion, the Purchaser undertakes to procure the Company files a motion for a change of shareholder with the Commercial Register, change in members of current statutory body of the Company, changes the corporate name of the Company and Subsidiaries so it does not contain "Winning".

4.6   The Seller shall procure that J&T BANKA, a.s. and Raiffeisenbank will deliver to the Purchaser the following documents at Completion or no later than one business day after Completion:

(a)   the executed confirmations of termination and/or waivers by (i) J&T BANKA, a.s. of all Third Party Rights and guarantees established in connection with the Facilities Agreement 1, in the form set out in the Pay-off Letter 2; and (ii) Raiffeisenbank of all Third Party Rights and guarantees established in connection with the Facilities Agreement 2, in the form set out in the Pay-off Letter 3;

(b)   the executed deeds of release by (i) J&T BANKA, a.s. of the Target Companies from all obligations under the Facilities Agreement 1 or any other document executed by



14 / 26

FBG_CH1_00094466

the Target Companies in connection with the Facilities Agreement 1, in the form set out in the Pay-off Letter 2; and (ii) Raiffeisenbank of the Target Companies from all obligations under the Facilities Agreement 2 or any other document executed by the Target Companies in connection with the Facilities Agreement 2, in the form set out in the Pay-off Letter 3; and

(c) the original (or verified copy) of the fully executed Repayment Confirmation 2 and the fully executed Repayment Confirmation 3.

## 5. REPRESENTATIONS AND WARRANTIES OF THE PARTIES

5.1 The Seller hereby represents and warrants to the Purchaser that, as at the Signing Date, (i) the Seller and the persons acting on its behalf have the power (a) to execute this Agreement and all other agreements to be concluded in connection with this Agreement (b) to perform its obligations under this Agreement and all other agreements to be concluded in connection with this Agreement and (c) to consummate the transactions contemplated in this Agreement and all other agreements to be concluded in connection with this Agreement (ii) the Seller is the sole owner of the Sale Shares and the Sale Shares have been validly issued and are fully paid up and not repaid, and the Sale Shares are not subject to Third Parties Rights (iii) the Company is the sole owner of Ownership Interest 1, Ownership Interest 2, Ownership Interest 3, Ownership Interest 4 and Ownership Interest 5, which have all been validly issued and are fully paid up and Ownership Interest 1, Ownership Interest 2, Ownership Interest 3, Ownership Interest 4 and Ownership Interest 5 are not subject to Third Parties Rights , (iv) the Seller did not enter into any agreement corresponding to this Agreement, (v) the Seller has not (a) been declared bankrupt, (b) become insolvent, (c) declared a moratorium or been unable to pay its/his debts as they become due or (d) entered into bankruptcy, settlement, execution proceedings, enforcement of any judicial decision or any similar proceedings in any jurisdiction that might influence its capacity to fulfill its obligations hereunder, (vi) the Seller represents that the conclusion of this Agreement and any other documents related to this Agreement shall not constitute a breach of any legal regulation, contractual or other obligation, (vii) each Target Company does in all material respects comply with applicable data protection legislation, including: (a) the data protection principles established under each legislation in which the Target Companies operate; and (b) requests from data subjects for access to data held by it and (viii) (a) each Target Company has always paid, withheld or transferred all Taxes when due, (b) all Taxes filings that each Target Company was obliged to have been filed until the date hereof have been filed completely, in a timely manner and with a correct content, (c) each Target Company has retained and holds all documents the retention and holding of which is mandatory for Taxes purposes, and it has documented all acts which are relevant for Taxes purposes and in particular all transfer prices in the scope required. The Seller hereby represents and warrants to the Purchaser that  all of the representations and warranties contained in this Article are true, correct and complete, (ix) all members of statutory body of the Company were in relation to the function as member of statutory body of Company reimbursed and they will not request any additional payment towards Company, and (x) Mr .Sebastian Wagner, born 3.6.1985, residing at Zell am Harmersbach was in relation to the function as a member of statutory body of the Subsidiaries reimbursed and he will not request any additional payment towards Subsidiaries (the "**Seller's Representations**"). The Seller acknowledges that the Purchaser enters into the transaction contemplated by this Agreement in reliance on the Seller's Representations.   The Purchaser agrees and acknowledges that the Seller's Representations are the only and exclusive representations and warranties given by the Seller under this Agreement and in relation to the transfer of the Sale Shares and with respect to the Target Companies.

5.2 The Purchaser hereby represents and warrants to the Seller that, as at the Signing Date, (i) the Due Diligence was executed in the scope as requested by the Purchaser and there are not any issues, documents, decisions or any other thing missing which could have impact on the decision of the Purchaser to acquire the Company, (ii) Purchaser checked the obligation of reporting of acquirement of Target Companies by the respective office for the protection of competition /

CONFIDENTIAL

FBG_CH1_00094467

Execution version

foreign direct investment control and take-over any and all responsibilities related with breach of obligation to report the acquirement of Company and Target Companies (iii) the Purchaser and the persons acting on its behalf have the power (a) to execute this Agreement and all other agreements to be concluded in connection with this Agreement (b) to perform its obligations under this Agreement and all other agreements to be concluded in connection with this Agreement and (c) to consummate the transactions contemplated in this Agreement and all other agreements to be concluded in connection with this Agreement. This Agreement and all other agreements to be concluded in connection with this Agreement, once they have been duly executed with signatures thereon of all of their signatories, shall constitute binding, legal and valid obligations of the Purchaser enforceable against the same in accordance with their terms and these declarations, (iv) The Purchaser has not (a) been declared bankrupt, (b) become insolvent, (c) declared a moratorium or been unable to pay its/his debts as they become due or (d) entered into bankruptcy, settlement, execution proceedings, enforcement of any judicial decision or any similar proceedings in any jurisdiction that might influence its capacity to fulfil its obligations hereunder, and (v) the Purchaser is aware of potential consequences of Mr. Šimon Pavlas´ recall. All of the representations and warranties contained in this Article are true, correct and complete (the "**Purchaser's Representations**"). The Purchaser acknowledges that the Seller enters the transaction contemplated by this Agreement in reliance on the Purchaser's Representations.

5.3    The Purchaser further represent and warrants to the Seller that:

a)    the Purchaser has carried out the due diligence of the Target Companies in the extent to which a prudent purchaser considering buying the Sale Shares would have normally effected and has made its own independent evaluation of the Target Company and the Sale Shares and the financial condition and affairs and creditworthiness of the Target Company with professional care. The Purchaser confirms that during due diligence it had sufficient access to the Disclosed information, other information relating to the Target Company, its activities, status and assets, as well as documentation and personnel of the Target Company, including its management and key employees, and that the Purchaser had the opportunity to obtain all the information it considered to be important from the point of view of its decision to enter into the Agreement and to acquire the Sale Shares;

b)    the Purchaser is not aware of any facts or matters which could reasonably be expected to give rise to a claim being made against any Seller for any Breach of the Seller's Representations;

c)    At the Completion, the Purchaser will have adequate resources, including equity and financial resources, to perform all of its obligations under the Transaction documentation and current obligations of the Target Companies;

d)    Without undue delay after Completion, the Purchaser will contact Commerz Real Mobilienleasing and ensures the Parent Guarantee of the Seller will not be applied and the above-mentioned companies issue confirmation that the Seller is released from its obligations arising from the Parent Guarantee of the Seller on or before 31 July 2024;

e)    The Purchaser hereby provides irrevocable and first call Parent Guarantee of the Purchaser in favour of the Seller that he will without further reimburse the Seller all damage incurred by the application of Parent Guarantees of the Seller from Commerz Real Mobilienleasing up to EUR 2.500.000 or such higher amount arising from the breach of obligations of the Target Companies post-Completion.

5.4    At the request of the Seller the Purchaser shall ensure, to the extent permissible, that the Target Companies provide assistance and transfer all information needed for preparation of year-end financial statements and audit procedures relating to the subsidiaries of the Seller and Target Companies to the Seller.

5.5    At the request of the Purchaser the Seller shall ensure, to the extent permissible, that the subsidiaries of the Seller provide assistance and transfer all information needed for preparation of year-end financial statements and audit procedures relating to the Target Companies, including any and all actions relating to the settlement, assignment of receivables and repayment of

CONFIDENTIAL

FBG_CH1_00094468

intragroup debts in accordance with Pay-off letter 1.

5.6     The Seller and the Purchaser shall cooperate in good faith to agree the manner, form and timing of the transfer and/or assignment of the lease contract with option to purchase the lease object ("**Lease Contract with Option**") entered into between the Subsidiary 4 and Kétó Property, s.r.o., a private limited liability company with its registered seat at Hvězdova 1716/2b, Nusle, 140 00 Praha 4, Czech Republic, ID. No. (IČO) 081 16 130 registered with the Commercial Register maintained by the Municipal Court in Prague, Czech Republic, under file number C 312652 ("**Kétó property**"), dated 25 June 2020 ("**Option Agreement Assignment**"), from the Subsidiary 4 to Winning IP Hustopeče s.r.o. a private limited liability company with its registered seat at Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic, ID.Nr. (IČO) 081 16 130 registered with the commercial register (Obchodní rejstřík) at the Regional Court in Brno, Czech Republic, under docket number C 139212 ("**IP Hustopeče**"). Each Party shall, and the Purchaser shall ensure that the Subsidiary 4 will, and the Seller shall ensure that IP Hustopeče will, provide the other Party with such cooperation as is reasonably necessary for the purpose of implementing the Option Agreement Assignment. The Seller shall ensure that IP Hustopeče will, and the Purchaser shall ensure that the Subsidiary 4 will enter into a sublease agreement for the use of premises owned by Kétó property, the form of which is attached as Annex Nr. 6 to this Agreement (the "**Sublease Agreement**"), immediately following the completion of the Option Agreement Assignment. The Parties hereby acknowledge and agree that the implementation of the Option Agreement Assignment is conditional upon Kétó property having granted its written consent with conclusion of the Sublease Agreement.

6.     **LIABILITY OF THE PARTIES FOR BREACH OF REPRESENTATIONS AND WARRANTIES**

6.1     The Parties acknowledge and agree that any potential breach of the Seller's Representations, in particular if any of the Seller's Representations is found to be false, incorrect or incomplete (the "**Breach of the Seller's Representations**") the Seller shall pay to the Purchaser an amount necessary to put the Purchaser and/or the Company, as applicable, into the position which would have existed had the Breach of the Seller's Representations not occurred, including, but not limited to, any losses (both foreseeable and not foreseeable and irrespective of fault) of the Purchaser and/or the Company including actual loss, and all reasonable and evidenced costs and expenses, including reasonable legal fees, experts' fees and consultants' fees and all reasonable and evidenced costs and expenses incurred by the Purchaser and/or the Company in connection with the Breach of the Seller's Representations (including in connection with making and enforcing a claim for Breach of the Seller's Representations and curing the circumstances that gave rise to the Breach of the Seller's Representations) up to (i) in relation to warranties in 5.1 (i) – (vi) the amount of the Total Purchase Price and in relation to remaining warranties the Seller's liability under this Agreement will be limited 10% of Total Purchase Price received by Seller.

6.2     The Parties hereby agree that unless otherwise provided in this Agreement or another written arrangement between the Parties, the Purchaser shall not be entitled to raise any other legal claims in the event of Breach of the Seller's Representations, in particular to demand damages, rescission from this Agreement or removal of the defect in case of Breach of the Seller's Representations. Any potential Breach of the Seller's Representations shall be taken into account in the calculation of Total Purchase Price.

6.3     The afore mentioned limitation referred to in Article 6.1 shall not apply to any damage caused deliberately or by gross negligence.

6.4     The Seller's Representations shall not be deemed to be false, incorrect or incomplete if referring to any fact or circumstance that is (i) stated in this Agreement, (ii) is Public Information or (iii) is Disclosed information.

6.5     The provisions of Section 1921, Section 1922, Section 1923, Section 2101, Section 2106, Section 2107, Section 2110, Section 2111 and Section 2112 of the Civil Code will not be used and are replaced with the covenants set out in this Agreement.

**17 / 26**

CONFIDENTIAL                                                    FBG_CH1_00094469

**6.6** The Purchaser hereby agrees to ensure that neither the Company nor the Subsidiaries will not raise any claims against members of statutory body of the Company and Subsidiaries after the Completion in relation to the performance of their duties in the capacity of members of the elected bodies of the Company or Subsidiaries in the period prior to the Completion. If, according to a final court decision constituting a payment obligation for members of the elected bodies of the Company or Subsidiaries with respect to the Company or Subsidiaries in connection with the performance of their duties in office before the Completion, a member of the Company's elected bodies is required to perform in favour of the Company or Subsidiaries, the Purchaser agrees to compensate the relevant member of the elected bodies of the Company or Subsidiaries for whatever has been performed by such member of the elected bodies of the Company or Subsidiaries based on the above final court decision, due to a breach of the Purchaser's obligation pursuant to the first sentence of this Article. The Purchaser shall compensate a member of elected bodies of the Company or Subsidiaries for his performance pursuant to this Article within ten days after the delivery of a written notice from the Seller.

**6.7** The Purchaser hereby declares that his obligation mentioned in Article 6.6 shall be transferred also to the legal successors of Purchaser. Should the Purchaser breach this obligation, the Purchaser shall be obliged to reimburse the members of statutory body of the Company and Subsidiaries in full.

**6.8** The Purchaser hereby declares that in case of breach of obligations of Target Companies (except for breach occurring pre-Completion) to fulfil their obligation towards Commerz Real Mobilienleasing, the Purchaser shall be obliged to pay to the Seller contracting penalty corresponding to the amount paid by the Seller to the mentioned companies due to breach of Purchaser's obligation up to EUR 2.500.000.

**6.9** The Purchaser hereby declares that as of the Completion the Seller shall in maximum possible extent be released from any liabilities provided as a secure in favour of Company and Subsidiaries and the Purchaser takes-over in maximum possible extent and accepts all such liabilities, including provision of Parent Guarantee of the Purchaser. The release and take-over of liabilities shall be taken in into account in the calculation of Total Purchase Price.

## 7.   LEAKAGE

**7.1** The Seller covenants and undertakes to the Purchaser that in the period from (and excluding) 30 April 2024 up to (and including) the Completion:

a) no dividend or other distribution of profits or assets has been paid or made by any Target Company and the supreme body of any Target Company has not decided on the distribution of any dividends or other distribution of profits or assets;

b) no payments have been made (or future benefits granted) by or on behalf of any Target Company to or for the benefit of the Seller or any of its connected persons;

c) no shares or shareholding interests in any Target Company has been repurchased from the Seller or any of its connected persons;

d) no amounts owed to any Target Company (as the lender) by the Seller or any of its connected persons have been waived, relaxed, discounted or forgiven, whereby payment of Pay-off Amount 1 is foreseen and accepted;

e) no assets, rights or other benefits have been transferred by any Target Company to the Seller or any of its connected persons;

f) no liabilities have been assumed or incurred (or any indemnity given in respect thereof) by any Target Company for the benefit of the Seller or any of its connected persons;

g) no Third Party Right has been created over any of the assets of any Target Company in favour of or for the benefit of the Seller or any of its connected persons;

18 / 26

**DEBTORS' EXHIBIT NO. 240**
**Page 18 of 142**

h) no assets or services have been purchased from the Seller or any of its connected persons other than on arm's length terms;

i) no management, monitoring or other shareholder or directors' fees or bonuses or payments of a similar nature have been paid by or on behalf of any Target Company to or for the benefit of the Seller or any of its connected persons;

j) no Target Company has amended the terms of its borrowing or indebtedness in the nature of borrowing owed by it to the Seller or any of its connected persons to the benefit of the Seller or any of its connected persons, whereby payment of Pay-off Amount 1 is foreseen and accepted;

k) no steps have been taken which have or will have a detrimental effect on the business or the financial position of any Target Company;

l) no agreements, understandings or arrangements have been entered into whereby the person directly benefiting from any of the matters referred to in paragraphs a) to k) confers (directly or indirectly) a benefit on the Seller or any of its connected persons, whereby new amendments to the Real Estate Lease Agreements rectifying the lease term were accepted by the Purchaser; and

m) neither the Seller, nor any of its connected persons have agreed or committed to do any of the things set out in paragraphs a) to l) (inclusive) above,

and for the purposes of this Article 7.1, a reference to the Seller or to any of its connected persons shall include a reference to (i) a subsidiary undertaking or parent undertaking of the Seller or a subsidiary undertaking of a parent undertaking of the Seller, excluding the Target Companies; and (ii) any director, officer, employee, adviser, agent or former director, former officer, former employee, former adviser, former agent of the Seller or any its connected persons.

7.2 Subject always to Completion having taken place, in the event of any breach of Article 7.1, the Seller shall indemnify, and keep indemnified, the Purchaser against and pay to the Purchaser on demand an amount equal to: (i) 100% of the value of the benefit received (directly or indirectly) by the Seller or any of its connected persons as a result of such breach (including any tax paid or incurred in connection with such breach); and (ii) such other losses and reasonable expenses (including any appropriately documented legal and other advisor fees) incurred by the Purchaser in recovering such amount (including any tax paid and/or incurred in connection therewith). The Seller is not liable to make a payment under this Article 7.2 unless the Purchaser has notified the Seller of the breach of Article 7.1 by the date of the final and binding determination of the Total Purchase Price pursuant to Article 3.3.

7.3 Save as provided in Article 7.2, the liability of the Seller under this Article 7 shall not be limited, restricted or excluded in any respect by any provision of this Agreement.

## 8. SPECIFIC INDEMNITIES

8.1 Subject always to Completion having taken place, the Seller shall indemnify and keep indemnified the Purchaser and the Target Companies on demand against:

a) any cost, loss or liability (including all reasonable legal and other professional fees and expenses) incurred by the Purchaser or the Subsidiary 4 as a result of or in connection with the Option Agreement Assignment and/or early termination of the Sublease Agreement and/or any restriction (temporary or permanent) of access to and/or use of the premises under the Sublease Agreement whereby the payments to the Kétó Property realized under Lease Contract with Option by Subsidiary 4 shall not be judged as loss; and/or

b) any cost, loss or liability (including all reasonable legal and other professional fees and expenses) incurred by the Purchaser or any Target Company in connection with or as a result of (i) any Target Company not being released from all obligations under the Facilities Agreements or any other document executed by the Target Companies in connection with the Facilities Agreements as of Completion; and/or (ii) any Third Party Right or guarantee

19 / 26

**DEBTORS' EXHIBIT NO. 240**
**Page 19 of 142**

established by any Target Company in connection with the Facilities Agreements not being terminated and/or waived as of Completion; and/or

c) any cost, loss or liability (including all reasonable legal and other professional fees and expenses) incurred by the Purchaser or Subsidiaries 1-3 in connection with claims from Third Party Rights existing prior to closing of APA Bolta or APA Linden/SMK; in particular, the Seller will provide adequate replacement (in kind) or damages for any asset set out to be acquired under APA Bolta or APA Linden/SMK which is rightfully claimed by a third party subject to such prior Third Party Right; and/or

d) any cost, loss or liability (including all reasonable legal and other professional fees and expenses) incurred by the Purchaser or Subsidiaries 1-3 resulting from incorrect entries into the commercial register of any of Subsidiaries 1-3, especially the incorrect (remaining) registration of Dennis Günther as managing director (*Geschäftsführer*) of Subsidiary 3

(the "**Indemnity Claims**").

8.2 Notwithstanding anything to the contrary in this Agreement the Seller's liability for the Indemnity Claims shall not be limited or excluded as set out in Article 6 with the intention that the Purchaser and the Target Companies shall be entitled to recover on a EUR for EUR basis in respect of any loss suffered or incurred to maximum amount equalling to 100% of the TPP, although the Purchaser may not recover from the Seller under this Agreement more than once in respect of the same loss suffered or incurred. No qualifications or limitations in respect of knowledge, disclosure or materiality shall apply for the purposes of the Indemnity Claims. This provision shall cease to exist after 3 years from conclusion of this Agreement.

## 9. OTHER COVENANTS

9.1 The Seller undertakes that it shall not and shall procure that none of its Affiliates shall:

(a) For a period of two years from Completion be concerned in any business carrying on business in the Czech Republic and Germany which is competitive or likely to be competitive with any of the businesses carried on by the Company or any of its Subsidiaries at Completion with exception of activities (undertaken as of Completion) of current companies from the group of the Seller;

(b) for a period of two years from Completion and except on behalf of the Company or its Subsidiaries canvass or solicit orders for goods of a similar type to those being manufactured or dealt in or for services similar to those being provided by any Target Company at Completion from any person who is at Completion or has been at any time within the two years prior to Completion a customer of a Target Company;

(c) for a period of two years from Completion induce or attempt to induce any supplier of a Target Company to cease to supply, or to restrict or vary the terms of supply, to that Target Company;

(d) for a period of two years from Completion induce or attempt to induce any director or senior employee of a Target Company to leave the employment of that Target Company;

(e) make use of or (except as required by law or any competent regulatory body) disclose or divulge to any third party any information of a secret or confidential nature relating to the business or affairs of any Target Company or its customers or suppliers; or

(f) use or (insofar as it can reasonably do so) allow to be used (except by the Target Companies) any trade name used by a Target Company at Completion or any other name intended or likely to be confused with such a trade name.

9.2 For the purposes of this:

(a) the Seller is concerned in a business if it carries it on as principal or agent or if:

**20 / 26**

(i)   it is a partner, director, employee, secondee, consultant or agent in, of or to any person who carries on the business; or

(ii)  it has any direct or indirect financial interest (as shareholder or otherwise) in any person who carries on the business; or

(iii) it is a partner, director, employee, secondee, consultant or agent in, of or to any person who has a direct or indirect financial interest (as shareholder or otherwise) in any person who carried on the business,

disregarding any financial interest of a person in securities which are listed or traded on any generally recognised market if that person, the Seller and any person connected with it (the **Investors**) are together interested in securities which amount to less than five per cent. Of the issued securities of that class and which, in all circumstances, carry less than five per cent. Of the voting rights (if any) attaching to the issued securities of that class, and provided that none of the Investors is involved in the management of the business of the issuer of the securities or of any person connected with it other than by the exercise of voting rights attaching to the securities; and

(b)  references to a Target Company include its successors in business.

9.3   The Seller acknowledges that the above provisions of this clause are no more extensive than is reasonable to protect the Purchaser as the purchaser of the Sale Shares.

9.4   Seller will not and shall procure that none of its Affiliates will, directly or indirectly, make, publish, or communicate any statements or representations that are disparaging, derogatory, or defamatory of any Target Company or any of their respective officers, directors, employees, agents, affiliates, products, services, or reputation, or that could reasonably be expected to adversely affect the goodwill, business, or reputation of any Target Company or any of their respective officers, directors, employees, agents, or affiliates. Seller further agrees to refrain from taking any action or making any statement that could interfere with or impair the relationship between any Target Company and any of their respective customers, suppliers, partners, or other business associates.

9.5   The Seller hereby confirms that after payment of the Pay-Off Amount there will be no further obligations of Company towards the Seller and its subsidiaries other than Target Companies. With effect from Completion, the Seller acting severally shall, and shall severally procure that each of its Affiliates and  members of statutory body of the Company, and Mr .Sebastian Wagner shall, release and discharge each Target Company from any and all liabilities or obligations to the Seller or its respective Affiliates and the Seller waives, and shall procure that its Affiliates shall waive, any and all claims (in the absence of fraud) it has or may have against any Target Company, except of Real Estate Lease Agreements.

## 10.   TERMINATION

10.1  Rescission of this Agreement or any other unilateral termination of this Agreement is acceptable only for any of the reasons stated in this Agreement. The Parties agree that application of any non-mandatory provisions of the Civil Code governing the right of notice, rescission or any other unilateral termination of a contract is precluded by this reference. The provisions of Section 1977 to Section 1980, Section 2002(1), first sentence, and Section 2003(1) of the Civil Code will not apply and are replaced with the covenants set out in this Agreement.

10.2  The Purchaser may rescind this Agreement if a situation referred to in Article 4.4(b) above occurs.

10.3  The Seller may rescind this Agreement if an event described in Article 4.4(b) occurs.

10.4  Rescission of this Agreement must be made in writing and shall enter into effect on the date of its delivery to the intended recipient Party. As of the effective date of the rescission, any and all rights and obligations of the Parties under this Agreement shall cease to exist. The Parties agree that should this Agreement be cancelled by a rescission notice, they shall settle their mutual obligations within fifteen business days after the effective date of the rescission and, in particular,



21 / 26

CONFIDENTIAL

FBG_CH1_00094473

Execution version

shall return to each other within said period of time all that they have performed or provided to each other prior to the rescission of this Agreement.

10.5   Rescission of this Agreement shall not affect the rights resulting from Article 11. Rescission of this Agreement, or its repudiation for any other reason, shall not affect the obligations of the Parties in respect of Confidential Information as specified in Article 13.1, which will remain in force until all of the Confidential Information has become publicly available other than as a result of a breach of Article 13.1.

## 11.   GOVERNING LAW; DISPUTE RESOLUTION

11.1   This Agreement and any and all amendments hereto shall be governed by and construed in accordance with the laws of the Czech Republic.

11.2   The Parties agree to use their best efforts to settle any dispute arisen under or in connection with this Agreement and/or the Transaction Documentation (the "**Dispute**") amicably.

11.3   If the Parties fail to resolve a Dispute amicably, the Dispute, including the issues of validity, interpretation, settlement or termination of the rights stemming from this Agreement or the Transaction Documentation, shall be referred to a Czech court having the subject-matter jurisdiction. For such a case the Parties agreed the local jurisdiction in Brno.

## 12.   NOTICES

12.1   Unless expressly stipulated otherwise in this Agreement, the communications exchanged between the Parties, in particular any notices or other communications required under this Agreement and/or the Transaction Documentation, shall be in writing in the English language and shall be delivered to the other Party at the following addresses and numbers solely (i) by hand delivery, (ii) by registered letter sent by a recognised mail provider, (iii) by a courier service provider enabling confirmation of delivery, or (iv) via email and followed by one of the methods referred to under (i) to (iii).

12.2   Mailing address of Seller:

| | |
|---|---|
| Company: | Winning Group a.s. |
| Attention: | Mr. Sebastian Wagner |
| Address: | Křižíkova 2960/72, Královo Pole, 612 00 Brno |
| E-mail: | sebastian.wagner@be-winning.com |
| Country: | Czech Republic |

with CC to:

| | |
|---|---|
| Attention: | Mr. Martin Drahotský |
| Address: | Křižíkova 2960/72, Královo Pole, 612 00 Brno |
| E-mail: | martin.drahotsky@be-winning.com |
| Country: | Czech Republic |

12.3   Mailing address of the Purchaser:

| | |
|---|---|
| Company: | Horizon International Holdings LLC |
| Attention: | Legal Department |
| Address: | 127 Public Square, Suite 5300, Cleveland, Ohio 44114 |
| Country: | United States |

With CC to:

| | |
|---|---|
| E-mail: | legalcontracts@firstbrandsgroup.com |



22 / 26

CONFIDENTIAL

FBG_CH1_00094474

**12.4** A Party shall notify the other Party without undue delay of any change of the facts contained in Articles 12.2 or 12.3 and any other change in its mailing address/change in the address of the registered office or the place of residence, respectively by a registered letter signed by its executive body, or a member thereof, and sent to the address specified in Article 12.2 or 12.3 (as such address may be duly changed from time to time).

## 13. CONFIDENTIALITY AND PUBLICITY

**13.1** None of the Parties shall provide any third party with any information about the terms and conditions of this Agreement and the associated negotiations and the Seller shall treat as strictly confidential and not disclose or use any information relating to the identity of the Purchaser, and information relating to the Company following Completion and any other information relating to the assets, liabilities, business, financial or other affairs (including future plans and targets) of the Target Companies or the Purchaser, ("**Confidential Information**") without the prior written consent of such other Parties, except for (i) its consultants bound by the confidentiality obligation in a similar scope, (ii) relevant state and other administrative authorities and courts where the Parties are required under generally applicable legal regulations to provide the authorities with such information, or (iii) information that is or will become publicly available other than as a result of a breach of this Agreement.

**13.2** None of the Parties shall make any public statement and shall not provide any information to the public regarding the existence or the subject matter of this Agreement without the prior written consent of the other Parties. The provision in the preceding sentence does not apply to any public statements made or information disclosed in accordance with applicable laws or based on the lawful request of any governmental authority, court or administrative authority, or in compliance with the trading rules of any relevant regulated securities market, if the Party required to make such a public statement or to disclose such information informs the other Parties as soon as possible before complying with such an obligation.

## 14. FINAL PROVISIONS

**14.1** Any payment by the Seller to the Purchaser in relation to any Indemnity Claim or any claim under Articles 6.1 or 7.2 will, to the greatest extent possible, have effect as a reduction to the Total Purchase Price.

**14.2** Any and all payments to be made under this Agreement shall be effected by bank transfer to the relevant bank accounts. Any payment to be made by either Party shall be made in full without any set-off, restriction or condition (whether for, or on account of, any counterclaim or otherwise) and without, and free and clear of, any deduction or withholding whatsoever (save only as required by applicable law). If any deductions or withholdings are required by law to be made from any of the sums payable under this Agreement, the payer shall be obliged to pay to the recipient such sum as will, after such deductions or withholdings have been made, leave the recipient with the same amount as it would have been entitled to receive in the absence of any such requirement to make any such deductions or withholdings.

**14.3** Unless expressly stated otherwise, each Party shall bear its own costs incurred in connection with or as a result of the performance of its obligations ensuing from or relating to this Agreement.

**14.4** None of the Parties may assign, transfer or pledge this Agreement or the Transaction Documentation, or any of its rights, obligations, debts, receivables or claims arising from this Agreement or the Transaction Documentation, without the prior written consent of the other Party.

**14.5** Unless this Agreement expressly stipulates otherwise, in the event that any amount in one currency is to be converted into other currency to enable a Party to duly perform its obligations under this Agreement, the Parties agree to use an exchange rate announced by the Czech National Bank as at the first day of the calendar month in which such conversion occurs.

**14.6** If any provision of this Agreement is found by any competent court or other authority to be invalid, ineffective or unenforceable, such provision shall be deemed to be deleted from this



**23 / 26**

**DEBTORS' EXHIBIT NO. 240**
**Page 23 of 142**

Agreement and the remaining provisions of this Agreement shall remain in full force and effect, if it may be assumed that the Parties would enter into this Agreement even without such provision, had they recognized its apparent, invalid or unenforceable nature in time (severability provision). In such an event, the Parties shall execute without undue delay amendments to this Agreement necessary in order to achieve the same or, if not possible, the closest possible effect to that of the respective invalid, ineffective or unenforceable provision.

14.7 The Parties for the purposes of this Agreement assume the risk of a change in circumstances. Provisions of Section 1765 to Section 1767 and Section 1788 (2) of the Civil Code shall not apply.

14.8 This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes any and all previous agreements between the Parties relating to the subject matter hereof.

14.9 This Agreement enters into force and effect as of the Signing Date.

14.10 Provision of Section 1740 (3) of the Civil Code shall not apply to this Agreement or execution of an amendment to it.

14.11 This Agreement will only be concluded if the proposal is accepted by all Parties set out in the heading of this draft.

14.12 This Agreement has been executed in two identical counterparts in the English language. Each Party shall receive one counterpart hereof.

14.13 This Agreement will be executed in writing. Furthermore, the Parties expressly agree that this Agreement may be amended or cancelled only in writing and no changes shall be effective unless made in the form of numbered amendments.

14.14 The Annexes referred to throughout this Agreement, a list of which in enclosed hereto, form an integral part hereof.

CONFIDENTIAL

FBG_CH1_00094476

**DEBTORS' EXHIBIT NO. 240**
**Page 24 of 142**

Execution version

## LIST OF ANNEXES

| | |
|---|---|
| Annex 1 | Estimated Financial Statements |
| Annex 2 | Net Debt Calculation |
| Annex 3 | Working Capital calculation |
| Annex 4 | List of disclosed information |
| Annex 5 | USB with disclosed information |
| Annex 6 | Sublease agreement |

25 / 26

CONFIDENTIAL

FBG_CH1_00094477

Execution version

## SIGNATURE PAGE

The Parties hereby expressly acknowledge that they enter into this Agreement as their free will and deed, in witness whereof they attach their respective signatures hereunto.

| Seller | Purchaser |
|---|---|
| At: Brno | At: Brno |
| Date: 10 May 2024 | Date: 10 May 2024 |
| | |
| Name: Sebastian Peter Wagner | Name: Tomáš Procházka |
| Title: Chairman of the Board of Directors | Title: on the basis of power of attorney |

26 / 26

CONFIDENTIAL

FBG_CH1_00094478

PLNÁ MOC

POWER OF ATTORNEY

Horizon International Holdings LLC, společnost založená a existující podle právního řádu státu Delaware, Spojené státy americké, se sídlem 2711 Centerville Road, Suite 400, Wilmington, 19808, Delaware, Spojené státy americké a obchodní adresou 127 Public Square, Suite 5300, Cleveland, 44114, Ohio, Spojené státy americké, registrovaná ve státě Delaware pod číslem 5711460 (dále jen "Zmocnitel"),

Horizon International Holdings LLC, a company incorporated under the laws of the State of Delaware, United States of America, with its registered office at 2711 Centerville Road, Suite 400, Wilmington, 19808, Delaware, United States of America, and with its business address at 127 Public Square, Suite 5300, Cleveland, 44114, Ohio, United States of America, registered under Delaware File Number 5711460 (the "Principal"),

tímto zmocňuje:

hereby appoints:

Mgr. Davida Koláčka, LL.M., advokáta, se sídlem Jungmannova 745/24, 110 00 Praha 1, Česká republika, zapsaného Českou advokátní komorou pod ev. č. 04611;

Mr. David Koláček, an *advokát*, whose registered office is at Jungmannova 745/24, 110 00 Prague 1, Czech Republic, registered by the Czech Bar Association under no. 04611;

Mgr. Michala Jaška, LL.M., advokáta, se sídlem Jungmannova 745/24, 110 00 Praha 1, Česká republika, zapsaného Českou advokátní komorou pod ev. č. 11422; a

Mr. Michal Jašek, an *advokát*, whose registered office is at Jungmannova 745/24, 110 00 Prague 1, Czech Republic, registered by the Czech Bar Association under no. 11422; and

Mgr. Tomáše Procházku, advokáta, se sídlem Jungmannova 745/24, 110 00 Praha 1, Česká republika, zapsaného Českou advokátní komorou pod ev. č. 19234,

Mr. Tomáš Procházka, an *advokát*, whose registered office is at Jungmannova 745/24, 110 00 Prague 1, Czech Republic, registered by the Czech Bar Association under no. 19234,

každého samostatně

each individually

(každý z nich dále jen "Zmocněnec"), aby:

(each of them the "Attorney"), to:

aby zastupoval a jednal jménem Zmocnitele v souvislosti s následující transakcí (dále jen "Transakce"):

to represent and act on behalf of the Principal with regard to the following transaction (the "Transaction"):

uzavření Smlouvy o prodeji a koupi akcií, týkající se prodeje a koupě 100 % akcií ve společnosti **Winning Plastics a.s.**, založené a existující podle práva České republiky, se sídlem Křižíkova 2960/72, Královo Pole,

execution of the Agreement on Sale and Purchase of Shares, relating to the sale and purchase of 100% of shares in the company **Winning Plastics a.s.**, incorporated and existing under the

24010086779-v2

~ 1 ~

80-41074412

CONFIDENTIAL

FBG_CH1_00094479

612 00 Brno, Česká republika, identifikační číslo 142 93 480, zapsané v obchodním rejstříku vedeném Krajským soudem v Brně, spisová značka B 8682, která má být uzavřena mezi Zmocnitelem, jako kupujícím a nabyvatelem, a společností **Winning Group a.s.**, založenou a existující podle práva České republiky, se sídlem Křižíkova 2960/72, Královo Pole, 612 00 Brno, Česká republika, identifikační číslo 067 94 050, zapsané v obchodním rejstříku vedeném Krajským soudem v Brně, spisová značka B 7911, jako prodávajícím a převodcem,

(dále jen "SPA", přičemž tento výraz zahrnuje také jakékoli pozdější změněné a doplněné verze SPA), včetně všech příloh;

a činil za něj, nikoliv však výlučně, veškerá jednání uvedená níže:

1.  podepsal a uzavřel za Zmocnitele SPA, včetně všech příloh;

2.  podepsal a uzavřel za Zmocnitele jakékoli další smlouvy, dodatky, smlouvy o převodu, certifikáty, souhlasy, prohlášení, potvrzení, žádosti, oznámení, předávací protokoly či jiné dokumenty předjímané, zmíněné anebo související s SPA (SPA a jiné smlouvy nebo dokumenty související s SPA dále společně jako **"Transakční dokumentace"**), a zastupoval Zmocnitele při veškerých jednáních souvisejících s vypořádáním Transakční dokumentace;

laws of the Czech Republic, with its registered office at Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic, identification number 142 93 480, registered in the Commercial Register maintained by the Regional Court in Brno, file no. B 8682, to be entered into between the Principal, as a buyer and transferee, and the company **Winning Group a.s.**, incorporated and existing under the laws of the Czech Republic, with its registered office at Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic, identification number 067 94 050, registered in the Commercial Register maintained by the Regional Court in Brno, file no. B 7911, as a seller and transferor,

(the "SPA" which shall include any subsequent amended versions thereof), including any and all schedules thereto;

to conduct on its behalf, including but not limited to, all acts specified below:

1.  to sign and execute on behalf of the Principal the SPA, including any and all schedules thereto;

2.  to sign and execute on behalf of the Principal any other agreements, amendments, transfer agreements, certificates, consents, declarations, confirmations, requests, notifications, hand over protocols or other documents that are contemplated by, referred to in and/or related to the SPA (the SPA and other agreements or documents relating to the SPA together the **"Transaction Documentation"**), and act on behalf of the Principal with respect to all actions related to

24010086779-v2

- 2 -

80-41074412

CONFIDENTIAL

FBG_CH1_00094480

the completion of the Transaction Documentation;

3. převzal a předal jakékoliv dokumenty související s Transakcí;

3. to take over and hand over any documents related to the Transaction;

4. podepsal a uzavřel veškeré další listiny, jež Zmocněnec bude podle svého uvážení považovat za nutné či vhodné v souvislosti s uskutečněním Transakce; a

4. to execute all such other documents as the Attorney may in his discretion consider necessary or desirable in connection with the consummation of the Transaction; and

5. uskutečnil veškerá další jednání, jež Zmocněnec bude podle svého uvážení považovat za nutná či vhodná v souvislosti s uskutečněním Transakce.

5. to do all other acts and things as the Attorney may in his discretion consider necessary or desirable in connection with the consummation of the Transaction.

Zmocněnec je dále zmocněn k uskutečnění veškerých dalších úkonů či jednání, jež Zmocněnec bude podle svého uvážení považovat za nutné či vhodné v souvislosti s výše uvedenými zmocněními.

The Attorney is further authorised to do all other acts and things as the Attorney may in its discretion consider necessary or desirable in connection with the above authorisations.

Tuto plnou moc je nutno vykládat co nejšířeji tak, aby bylo vždy možno dosáhnout právního a ekonomického účelu zmocnění uvedeného výše.

This power of attorney shall be interpreted as broadly as possible, so that the legal and economic purpose of the authorization set out above can always be achieved.

Zmocněnec je oprávněn udělit substituční plnou moc jinému advokátovi či advokátnímu koncipientovi v rozsahu stanoveném příslušnými předpisy, jakož i další plnou moc jiné osobě.

The Attorney is authorised to grant a substitute power of attorney to another *advokát* or *advokátní koncipient* to the extent permitted by applicable law as well as a further power of attorney to another person.

Zmocnitel se tímto:

The Principal hereby:

1. zavazuje nahradit Zmocněnci veškerou újmu (majetkovou i nemajetkovou) a veškeré náklady, které Zmocněnci mohou vzniknout, a odškodnit Zmocněnce proti všem nárokům, které vůči němu mohou být vzneseny, v souvislosti s výkonem jakéhokoliv oprávnění, ke

1. undertakes to indemnify the Attorney and keep the Attorney harmless against any and all damages (both monetary and non-monetary) and costs, which the Attorney may incur as a result of performance of any of the powers conferred, or purported to be conferred, on the

24010086779-v2

- 3 -

80-41074412

CONFIDENTIAL

FBG_CH1_00094481

**DEBTORS' EXHIBIT NO. 240**
**Page 29 of 142**

kterému byl (nebo zdánlivě byl) zmocněn touto plnou mocí; a

2. vzdává jakéhokoli svého nároku vůči Zmocněnci podle § 2950 zákona č. 89/2012 Sb., občanský zákoník, v platném znění,

vyjma případů, kdy Zmocněnec způsobí újmu úmyslně nebo z hrubé nedbalosti.

Tato plná moc se řídí českým právem.

Tato plná moc je sepsána v českém a anglickém jazyce; v případě rozporů mezi oběma jazykovými verzemi má přednost verze česká.

Attorney by this power of attorney; and

2. waives any of its claims against the Attorney under Section 2950 of Act No. 89/2012 Coll., the Civil Code, as amended,

save for the Attorney acting with gross negligence or caused by the Attorney intentionally.

This power of attorney is governed by Czech law.

This power of attorney is made in the Czech and English languages. In the event of any discrepancies between these two language versions, the Czech version prevails.

V / *In* New York, NY dne / *on* April 26, 2024

Za / *For and on behalf of*
**Horizon International Holdings LLC**


Jméno / *Name*: Michael Baker

Funkce / *Position*: Chief Corporate Strategy Officer and Secretary

24010086779-v2                                        – 4 –                                        80-41074412

CONFIDENTIAL                                        FBG_CH1_00094482

Case 25-90399    Document 3644-5    Filed in TXSB on 08/12/26    Page 31 of 142

FBG_CH1_00094483

DEBTORS' EXHIBIT NO. 240
Page 31 of 142

CONFIDENTIAL

## ANNEX 1          ESTIMATED FINANCIAL STATEMENTS

| EUR | Winning Plastics a.s. | Winning Plastics - Diepersdorf GmbH | Winning Plastics - Linden GmbH | Winning Plastics - SMK GmbH | LINDEN s.r.o. | Winning Plastics Germany 1 GmbH | Aggregated |
|---|---|---|---|---|---|---|---|
| TOTAL ASSETS | 11.744.471,02 | 40.503.993,64 | 5.375.189,53 | 3.313.460,07 | 6.295.524,11 | 22.650,81 | 67.255.289,18 |
| A. Stock subscription receivable | | | | | | | 0 |
| 353000 Receivables for subscribed registered capital | | | | | | | 0 |
| B. Fixed assets | 9.552.126,86 | 7.453.953,00 | 622.412,79 | 312.996,34 | 1.274.140,71 | | 19.215.629,70 |
| B.I. Intangible fixed assets | | 290.323,00 | 43.320,86 | | 26.261,60 | | 359.905,46 |
| B.I.1. Development | | | | | | | 0 |
| 012000 Research and development | | | | | | | 0 |
| 072000 Amortisation - research and development | | | | | | | 0 |
| B.I.2. Intellectual property rights | | | 43.320,86 | | 26.261,60 | | 69582,46 |
| B.I.2.1. Software | | | 43.320,86 | | 26.261,60 | | 69582,46 |
| 013000 Software | | | 43.320,86 | | 178.778,83 | | 222099,69 |
| 002700 EDV-Software | | | 43.320,86 | | | | 43320,86 |
| 013000 Software | | | | | 170.056,82 | | 170056,82 |
| 013100 Personální Software | | | | | 8.722,01 | | 8722,01 |
| 073000 Amortisation - Software | | | | | -152.517,23 | | -152517,23 |

FBG_CH1_00094484

| | | |
|---|---|---|
| 073000 Oprávky k softwaru | -152.517,23 | -152517,23 |
| 091000 Adjustment to intangibles | | 0 |
| B.I.2.2. Other intellectual property rights | | 0 |
| 014000 Patents, rights and royalties | | 0 |
| 074000 Amortization - patents, rights and royalties | | 0 |
| B.I.3. Goodwill | | 0 |
| B.I.4. Other intangible fixed assets | 290.323,00 | 290.323,00 |
| 019000 Other intangible fixed assets | 467.766,25 | 467.766,25 |
| 019000 Jiný dl. NM | | 0 |
| 35000 Konzessionen, Gewerbl. Schutzr. u. ähnliche Werte | 364.674,58 | 364.674,58 |
| BG: I. Intangible assets | | 0 |
| 37000 Firmenwert | 103.091,67 | 103.091,67 |
| 079000 Amortisation - Other intangible fixed assets | -177.443,25 | -177.443,25 |
| 079000 Oprávky k jinému dlouho. NM | | 0 |
| 35010 Wertberichtigung Konzess., Gew. Schutzrechte | -161.116,58 | -161.116,58 |
| 37010 Wertberichtigung Firmenwert | -16.326,67 | -16.326,67 |
| B.I.5. Advance payments for intangible fixed assets and intangible fixed assets under construction | | 0 |
| B.I.5.1. Advance payments for intangible fixed assets | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 32 of 142

CONFIDENTIAL

FBG_CH1_00094485

| | | | | | |
|---|---|---|---|---|---|
| 051000 Advance payments for intangible fixed assets | | | | | 0 |
| 095051 Adjustment to advance payments for intangibles | | | | | 0 |
| B.I.5.2. Intangible fixed assets under construction | | | | | 0 |
| 041000 Intangible fixed assets under construction | | | | | 0 |
| 093041 Adjustment to intangibles in progress | | | | | 0 |
| B.II. Tangible fixed assets | 7.163.630,00 | 579.091,93 | 282.771,64 | 452.512,56 | 8.478.006,13 |
| B.II.1. Land and buildings | 21.385,00 | | 322,00 | 45.373,45 | 67.080,45 |
| B.II.1.1. Land | | | | | 0 |
| 031000 Land | | | | | 0 |
| B.II.1.2. Buildings | 21.385,00 | | 322,00 | 45.373,45 | 67.080,45 |
| 021000 Buildings | 22.644,13 | | 322,00 | 64.018,97 | 86.985,10 |
| 021000 Stavby | | | | 64.018,97 | 64018,97 |
| 002425 Außenanlage Oberlungwitz | | | 322,00 | | 322 |
| 400 Gebäude | 22.644,13 | | | | 22.644,13 |
| 081000 Depreciation - Buildings | -1.259,13 | | | -18.645,52 | -19.904,65 |
| 081000 Oprávky ke stavbám | | | | -18.645,52 | -18645,52 |
| 410 wertberichtigung Gebäude | -1.259,13 | | | | -1.259,13 |
| B.II.2. Plant and equipment | 7.104.685,00 | 579.091,93 | 225.963,72 | 314.990,50 | 8.224.731,15 |

DEBTORS' EXHIBIT NO. 240
Page 33 of 142

CONFIDENTIAL

FBG_CH1_00094486

| | | | | | |
|---|---|---|---|---|---|
| **022000 Machines and equipment** | **9.672.740,13** | **579.091,93** | **225.963,72** | **1.689.481,51** | **12.167.277,29** |
| 020003 Maschinen d. Materialbearbeit. | | | 172.772,00 | | 172772 |
| 020005 sonstige Anlagen u. Maschinen | | | | | 0 |
| 022010 SMV a soubory MV - stroje | | | | 520.412,17 | 520412,17 |
| 022020 SMV - odd. horké ražby | | | | 11.420,67 | 11420,67 |
| 022030 Samostatné mov.věci - šablony | | | | 359.828,93 | 359828,93 |
| 022400 SMV a soubory MV - lisování | | | | 797.819,74 | 797819,74 |
| 030910 LKW | | | 19.684,00 | | 19684 |
| 040001 Lager-Transportanlagen | | | 377,00 | | 377 |
| 040002 Werkstätteneinrichtungen | | | 151,00 | | 151 |
| 040003 Prüf-u. Messmittel | | | 2.115,00 | | 2115 |
| 040630 Schränke, Regale etc. | | | 6.859,88 | | 6859,88 |
| 040640 Gabelstapler + Hubwagen | | | 4.465,00 | | 4465 |
| 041800 Büromöbel | | | 1.027,00 | | 1027 |
| 041820 EDV-Anlagen | | | 18.512,84 | | 18512,84 |
| 042980 GWG | | | | | 0 |
| 10100 Maschinen, maschinelle Anlagen | 6.957.022,65 | | | | 6.957.022,65 |
| 20000 Fuhrpark | 51.680,67 | | | | 51.680,67 |
| 20000 Technische Anlagen und Maschin | | 455.876,90 | | | 455876,9 |
| 20200 Betriebsausstattung | 1.437.153,14 | | | | 1.437.153,14 |

DEBTORS' EXHIBIT NO. 240
Page 34 of 142

CONFIDENTIAL

FBG_CH1_00094487

| | | | |
|---|---|---|---|
| 20400 Geschäftsausstattung | 214.479,57 | | 214.479,57 |
| 20600 Werkzeuge | 203.804,10 | | 203.804,10 |
| 20700 Lackieraufnahmen | 8.600,00 | | 8.600,00 |
| 20900 Festwerte | 800.000,00 | | 800.000,00 |
| 28000 Betriebsvorrichtungen | 3.375,10 | | 3375,1 |
| 40000 Betriebsausstattung | 79.078,49 | | 79078,49 |
| 41000 Geschäftsausstattung | 20.168,23 | | 20168,23 |
| 42000 Büroeinrichtung | 2.643,64 | | 2643,64 |
| 44000 Werkzeuge | -0,28 | | -0,28 |
| 48500 Sammelposten | -4.212,82 | | -4212,82 |
| 48600 Sammel GWG 1 | 7.890,68 | | 7890,68 |
| 49010 Verrechnung Anlagenabgang | | | 0 |
| 49920 Verrechnung Anlagenzugang | 14.271,99 | | 14271,99 |
| 082000 Depreciation - Machines and Equipment | -2.568.055,13 | -1.374.491,01 | -3.942.546,14 |
| 082000 Oprávky k SMV | | -1.014.662,08 | -1014662,08 |
| 082010 Oprávky - šablony | | -359.828,93 | -359828,93 |
| 10110 Wertberichtigung Maschinen | -1.953.038,65 | | -1.953.038,65 |
| 20010 Wertberichtigung Fuhrpark | -10.767,67 | | -10.767,67 |
| 20210 Wertberichtigung Betriebsausstattung | -478.536,14 | | -478.536,14 |
| 20410 Wertberichtigung Geschäftsausstattung | -53.921,57 | | -53.921,57 |

CONFIDENTIAL

FBG_CH1_00094488

| | | | |
|---|---|---|---|
| 20610 Wertberichtigung Werkzeuge | -65.341,10 | | -65.341,10 |
| 20710 Wertberichtigung Lackieraufnahmen | -6.450,00 | | -6.450,00 |
| 092000 Adjustment to tangibles | | | 0 |
| B.II.3. Adjustments to acquired fixed assets | | | 0 |
| B.II.4. Other intangible fixed assets | 35.565,00 | 75.661,65 | 111.226,65 |
| B.II.4.1. Cultivated areas | | | 0 |
| B.II.4.2. Adult livestock | | | 0 |
| B.II.4.3. Other tangible fixed assets | 35.565,00 | 75.661,65 | 111.226,65 |
| 029000 Other tangible fixed assets | 50.494,40 | 91.697,00 | 142.191,40 |
| 029000 Jiný dl.HM+TZ k pronaj.majeku | | 91.697,00 | 91697 |
| 20600 GEBÄUDE PPA kum Afa | | | 0 |
| 30300 GWG > 250 EUR und >= 1000 EUR ab 2008 | 50.494,40 | | 50.494,40 |
| BG: II. Fixed assets | | | 0 |
| 089000 Depreciation - other tangibles | -14.929,40 | -16.035,35 | -30.964,75 |
| 089000 Oprávky k jinému dl.majetku | | -16.035,35 | -16035,35 |
| 30310 Wertberichtigung GWG >150 <=1000 EUR | -14.929,40 | | -14.929,40 |
| 032000 Works of art and collections | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 36 of 142

CONFIDENTIAL

FBG_CH1_00094489

| | | | | |
|---|---|---|---|---|
| B.II.5. Advance payments for tangible fixed assets and tangible fixed assets under construction | | 1.995,00 | 56.485,92 | 16.486,96 | **74.967,88** |
| B.II.5.1. Advance payments for tangible fixed assets | | | | | **0** |
| 052000 Advance payments for tangible fixed assets | | | | | **0** |
| 095052 Adjustment to advance payments for tangibles | | | | | **0** |
| B.II.5.2. Tangible fixed assets under construction | | 1.995,00 | 56.485,92 | 16.486,96 | **74.967,88** |
| 042000 Tangible fixed assets under construction | | 1.995,00 | 56.485,92 | 16.486,96 | **74.967,88** |
| 020900 Anlagen im Báu | | | 56.484,92 | | **56484,92** |
| 021310 maschinengebundene Werkzeuge | | | 1,00 | | **1** |
| 042000 Nedokončený DHM | | | | | **0** |
| 042200 Nedokončený DHM-výstavba haly | | | | | **0** |
| 042400 Nedokončený DHM - lisování | | | | 16.486,96 | **16486,96** |
| 40100 Anlagen im Bau | | 1.995,00 | | | **1.995,00** |
| 40900 Verrechnung Anlagenzugang | | | | | **0** |
| 094042 Adjustment to tangibles in progress | | | | | **0** |
| B.III. Long-term investments | 9.552.126,86 | | 30.223,70 | 795.366,55 | **10377717,11** |
| B.III.1. Equity investments - group undertakings | 9.552.126,86 | | 30.223,70 | -29.516,95 | **9552833,61** |
| 061000 Equity investments – group undertakings | 9.552.126,86 | | | | **9552126,86** |
| 061041 Podíly – ovládaná nebo ovládající osoba LDE | 54.885,40 | | | | **54885,4** |

**DEBTORS' EXHIBIT NO. 240**
**Page 37 of 142**

CONFIDENTIAL

| Account | | | Total |
|---|---|---|---|
| 061041 Podíly – ovládaná nebo ovládající osoba Winning Plastics - Linden GmbH | | | 0 |
| 061042 Podíly – ovládaná nebo ovládající osoba SMK | 566.404,86 | | 566404,86 |
| 061042 Podíly – ovládaná nebo ovládající osoba Winning Plastics - SMK GmbH | | | 0 |
| 061043 Podíly – ovládaná nebo ovládající osoba LCZ | 3.309.140,49 | | 3309140,49 |
| 061043 Podíly – ovládaná nebo ovládající osoba Linden s.r.o. | | | 0 |
| 061044 Podíly – ovládaná nebo ovládající osoba Winning Germany 7 | | | 0 |
| 061044 Podíly – ovládaná nebo ovládající osoba WPD | 5.590.447,64 | | 5590447,64 |
| 061045 Podíly – ovládaná nebo ovládající osoba WP1 | 27.296,68 | | 27296,68 |
| 061046 Podíly – ovládaná nebo ovládající osoba BAT team s.r.o. | 3.951,79 | | 3951,79 |
| BG: III. Financial assets | | | 0 |
| 096000 Adjustment to long term financial assets | 30.223,70 | -29.516,95 | 706,75 |
| 095000 Opr.pol.k posk.zálo.dlouh.maje | | -29.516,95 | -29516,95 |
| 096000 Aktive Rechnungsabgrenzung | 30.223,70 | | 30223,7 |
| B.III.2. Loans - group undertakings | | | 0 |
| B.III.3. Equity investments - associated companies | | | 0 |
| B.III.4. Loans - associated companies | | | 0 |
| B.III.5. Other long-term securities and equity investments | | | 0 |

FBG_CH1_00094490

DEBTORS' EXHIBIT NO. 240
Page 38 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 39 of 142

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| B.III.6. Loans- other | | | | | | | 0 |
| B.III.7. Other long-term investments | | | | | 824.883,50 | | 824883,5 |
| B.III.7.1. Other long-term investments | | | | | | | 0 |
| B.III.7.2. Advance payments for long-term investments | | | | | 824.883,50 | | 824883,5 |
| 053000 Advance payments for long-term investments | | | | | 824.883,50 | | 824883,5 |
| 052000 Poskytnuté zálohy na DHM | | | | | 972.140,73 | | 972140,73 |
| 052100 Poskyt. zálohy na DHM-mim.spl. | | | | | -147.257,23 | | -147257,23 |
| Equity method | | | | | | | 0 |
| B.IV. Active consolidation difference (Goodwill) | | | | | 1,00 | | 1 |
| 015010 Goodwill | | | | | 1,00 | | 1 |
| 010000 Goodwill | | | | | 1,00 | | 1 |
| B.V. Passive consolidation difference | | | | | | | 0 |
| 015020 Badwill | | | | | | | 0 |
| C. Current assets | 2.192.344,16 | 32.654.212,24 | 4.673.358,07 | 3.000.463,73 | 4.982.223,64 | 22.650,81 | 47.525.252,65 |
| C.I. Inventories | | 22.368.052,75 | 2.466.904,01 | 861.487,54 | 1.845.879,31 | | 27.542.323,61 |
| C.I.1. Raw materials | | 6.600.966,26 | 1.330.436,60 | 815.605,56 | 675.567,85 | | 9.422.576,27 |
| 112000 Raw materials | | 7.506.892,79 | 1.479.153,51 | 815.605,56 | 870.318,56 | | 10.671.970,42 |
| 0322250 Rohstoffe f. Prod./DU | | | | | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 39 of 142

CONFIDENTIAL

| Account | | | |
|---|---|---|---|
| 0379000 Verbindlichkeiten aus Konsilager-Entnahme | | | 0 |
| 112000 Materiál | | 824.367,90 | 824367,9 |
| 112010 VPN na materiál (přepravné) | | 9.592,99 | 9592,99 |
| 112999 Materiáln - manuální účet | | 36.357,67 | 36357,67 |
| 119000 Materiál na cestě | | | 0 |
| 300000 Rohstoffe Spritz | 1.271.985,02 | | 1.271.985,02 |
| 300200 Bestand Verpackung | | 2.247,14 | 2247,14 |
| 300900 Bestand Beistellteile | | 3.998,93 | 3998,93 |
| 301200 Rohstoffe Lackiererei / Druckerei | 130.637,40 | | 130.637,40 |
| 301500 Rohstoffe Abwasser | 14.614,91 | | 14.614,91 |
| 301600 Rohstoffe Galvanik 3 | | | 0 |
| 301600 Rohstoffe Galvanik 4 | 163.803,07 | | 163.803,07 |
| 301900 Rohstoffe Zulieferer | 769.171,30 | | 769.171,30 |
| 302600 Anlagenbestand Galvanik 3 | | | 0 |
| 302700 Anlagenbestand Galvanik 4 | 2.512.542,54 | | 2.512.542,54 |
| 303000 Bestand Chemikalinen/Anoden | | 721.752,39 | 721752,39 |
| 303100 Innenverpackung | 811.565,70 | | 811.565,70 |
| 303200 Außenverpackung | 280.080,38 | | 280.080,38 |
| 304000 Bestand Gestelle | | 40.333,26 | 40333,26 |

FBG_CH1_00094492

DEBTORS' EXHIBIT NO. 240
Page 40 of 142

CONFIDENTIAL

FBG_CH1_00094493

| | | | |
|---|---|---|---|
| 308000 Gottmadingen Rohstoffe Galvanik | -29.431,84 | | -29.431,84 |
| 308100 Gottmadingen Rohstoffe Folien | 2.472,00 | | 2.472,00 |
| 308300 Gottmadingen Verpackung | 1.435,80 | | 1.435,80 |
| 308800 Gottmadingen Hilfs- und Betriebsstoffe | 59.807,36 | | 59.807,36 |
| 309100 Rohstoffe Gütersloh | 100.380,04 | | 100.380,04 |
| 320000 Bestand Instandhaltungsmaterial | 1.417.829,11 | | 1.417.829,11 |
| 397000 Rohstoffe (Bestand) | | 574.798,53 | 574798,53 |
| 397030 Hilfs- und Betriebsstoffe (Bes | | 904.354,98 | 904354,98 |
| 708000 Bestand unfertige Erzeugnisse | | 47.273,84 | 47273,84 |
| BG: Raw Materials and Supplies | | | 0 |
| 151000 Advance payments for raw material | -905.926,53 | | -905.926,53 |
| 159021 Geleistete Anzahlungen Erwerberkonto | | | 0 |
| BG: Advance payments for inventories | | | 0 |
| 151000 gel. Anzahlg. Werkzeugkosten | | | 0 |
| 151070 gel. Anzahlg. WKZ-HeiForm | | | 0 |
| 197000 Erhaltene Anzahlungen | -1.054.522,10 | | -1.054.522,10 |
| 159020 Geleistete Anzahlungen ohne VSt-Abzug | 148.595,57 | | 148.595,57 |
| 191000 Adjustment - Raw materials | -148.716,91 | -194.750,71 | -343.467,62 |

**DEBTORS' EXHIBIT NO. 240**
**Page 41 of 142**

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 191000 Opravná položka k materiálu | | | -194.750,71 | **-194750,71** |
| 397090 Roh-, Hilfs- und Betriebsstoff | | -148.716,91 | | **-148716,91** |
| 112300 Raw materials - tooling | | | | **0** |
| 191300 Adjustment – Raw materials - tooling | | | | **0** |
| C.I.2. Work-in-progress and semi-finished products | 11.636.175,92 | 1.126.111,50 | 1.007.027,30 | **13.769.314,72** |
| 121000 Work-in-progress | 7.195.236,36 | 1.500.280,21 | 1.396.126,71 | **10.091.643,28** |
| 121000 Nedokončená výroba - série | | | 38.929,95 | **38929,95** |
| 121900 Bestand AIU_Fremdleistung | | | 988,38 | **988,38** |
| 121901 Zwischenkont AIU_Fremdleistung | | | -988,38 | **-988,38** |
| 122000 Polotovary | | | 1.349.076,96 | **1349076,96** |
| 122999 Polotovary - manuální účet | | | 8.119,80 | **8119,8** |
| 700100 Auflösung Abgrenzung Versicherungen | | | | **0** |
| 700100 Halbfertigfabrikate | 7.128.270,16 | | | **7.128.270,16** |
| 700200 Halbfertigfabrikate Gottmadingen | 66.966,20 | | | **66.966,20** |
| 705000 Unfertige Erzeugnisse (Bestand | | 683.520,00 | | **683520** |
| 708000 AIU Serie | | -1.030.532,74 | | **-1030532,74** |
| 709500 AIU Projekt | | 1.856.072,95 | | **1856072,95** |
| 709520 AIU Werkzeuge - Kunden | | -8.780,00 | | **-8780** |
| BG: Work in Process | | | | **0** |

FBG_CH1_00094494

**DEBTORS' EXHIBIT NO. 240**
**Page 42 of 142**

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 43 of 142

FBG_CH1_00094495

DEBTORS' EXHIBIT NO. 240
Page 43 of 142

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 192000 Adjustment - Work-in-progress | | -374.168,71 | | -409.548,86 | -783.717,57 |
| 193000 Opravná pol. k polotovarům VV | | | | -409.548,86 | -409548,86 |
| 705010 Unfertige Erzeugnisse (Bestand Wertberichtigung | | | | | 0 |
| 705010 Unfertige Erzeugnisse (Bestand | | -374.168,71 | | | -374168,71 |
| 121300 Work-in-progress - tooling | | 4.440.939,56 | | 20.449,45 | 4.461.389,01 |
| 121200 Nedokončená výroba . nástroje | | | | 20.449,45 | 20449,45 |
| 700300 Halbfertige Werkzeuge | | 4.440.939,56 | | | 4.440.939,56 |
| 192300 Adjustment - Work-in-progress - tooling | | | | | 0 |
| 700310 Wertberichtigung halbfertige Werkzeuge | | | | | 0 |
| C.I.3. Finished goods and goods for resale | 4.130.910,57 | 10.355,91 | 45.881,98 | 163.284,16 | 4.350.432,62 |
| C.I.3.1. Finished goods | 4.130.910,57 | 10.355,91 | 45.881,98 | 163.284,16 | 4.350.432,62 |
| 123000 Finished goods | 4.130.910,57 | 119.132,30 | 45.881,98 | 196.166,69 | 4.492.091,54 |
| 123000 Výrobky | | | | 202.373,89 | 202373,89 |
| 123999 Výrobky - manuální účet | | | | -6.207,20 | -6207,2 |
| 711000 Fertige Erzeugnisse | | 119.132,30 | | | 119132,3 |
| 709000 Bestand Erzeugnisse | | | 45.881,98 | | 45881,98 |
| 710100 Fertigfabrikate | 4.061.342,57 | | | | 4.061.342,57 |
| 710200 Fertigfabrikate Gottmadingen | 69.568,00 | | | | 69.568,00 |

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 44 of 142

FBG_CH1_00094496

| | | | | | |
|---|---|---|---|---|---|
| 700999 Übernahme Vorräte Kaufpreis | | | | | 0 |
| BG: Finished goods and merchandise | | | | | 0 |
| 194000 Adjustment - Finished goods | | -108.776,39 | | -32.882,53 | **-141658,92** |
| 194000 Opravná položka k výrobkům | | | | -32.882,53 | **-32882,53** |
| 711010 Fertige Erzeugnisse Wertberich | | -108.776,39 | | | **-108776,39** |
| 123300 Finished goods - tooling | | | | | 0 |
| 194300 Adjustment - Finished goods - tooling | | | | | 0 |
| C.I.3.2. Goods for resale | | | | | 0 |
| 132000 Goods for resale | | | | | 0 |
| 153000 Advance payments for goods for resale | | | | | 0 |
| 196000 Adjustment - Goods for resale | | | | | 0 |
| C.I.4. Young and other livestock | | | | | 0 |
| C.I.5. Advance payments for inventories | | | | | 0 |
| C.II. Receivables | 2.184.571,67 | 7.066.949,84 | 1.695.586,37 | 1.444.133,45 | 2.856.989,21 | **15.248.230,54** |
| C.II.1. Long-term trade receivables | | | | | 0 |
| 311010 Trade receivables - External - LT 1-5 years | | | | | 0 |
| 391111 Adjustment - Trade Receivables - External - LT (related to 311) | | | | | 0 |
| 311020 Trade receivables - External - LT over 5 years | | | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 44 of 142

CONFIDENTIAL

FBG_CH1_00094497

**DEBTORS' EXHIBIT NO. 240**
**Page 45 of 142**

| | | | | | |
|---|---|---|---|---|---|
| C.II.2. Other long-term receivables | 8.606,91 | | | | 8.606,91 |
| 314010 Advances paid - LT 1-5 years | | | | | 0 |
| 378010 Other receivables - External - LT | | | | | 0 |
| 481000 Deferred tax receivable | 8.606,91 | | | | 8.606,91 |
| Saldowechsel zwischen '481 Deferred tax receivable' und '481 Deferred tax liability' | 8.606,91 | | | | 8.606,91 |
| 391141 Adjustment - Advances - LT (related to 314) | | | | | 0 |
| 391781 Adjustment - Other receivables - LT (related to 378) | | | | | 0 |
| 314020 Advances paid - LT over 5 years | | | | | 0 |
| C.II.3. Short-term trade receivables | 7.778.209,73 | 309.959,70 | 343.953,95 | 1.499.018,56 | 9.931.141,94 |
| 311000 Trade receivables - External - ST | 7.778.209,73 | 309.959,70 | 370.113,95 | 1.495.439,13 | 9.953.722,51 |
| 099800 EWB auf Forderungen asu LuL | | -56.171,64 | | | -56171,64 |
| 122000 Sonstige Forderungen aus LL | | | | | 0 |
| 140000 Forderungen Inland | 8.543.578,95 | 304.995,87 | 322.376,82 | | 9.170.951,64 |
| 140001 Ford. Inl gg IV - aus Treuhandk | | | | | 0 |
| 140010 Ford. VU Organschaft | | | 5.712,00 | | 5712 |
| 140010 Forderungen EU | | 174.091,08 | | | 174091,08 |
| 140020 Forderungen Drittland | | 134.219,40 | | | 134219,4 |
| 140030 Ware geliefert nicht fakturier | | 32.473,77 | | | 32473,77 |

CONFIDENTIAL

FBG_CH1_00094498

| | | |
|---|---|---|
| 140090 Abrechnungskonto 580-DFB | | 0 |
| 140091 TBAG Inanspruchnahme | 192.601,04 | 192601,04 |
| 140092 Factoringkonto TBAG | -472.448,84 | -472448,84 |
| 140095 Angekaufter Bestand 582-DFB | | 0 |
| 140099 Korrekturkonto Forderungen Inland | | 0 |
| 140100 Forderungen EU | 2.399.760,56 | 2.399.760,56 |
| 140199 Korrekturkonto Forderungen EU | | 0 |
| 140200 Forderungen Drittland | 741.229,83 | 741.229,83 |
| 140200 Forderungen EG | 42.025,13 | 42025,13 |
| 140299 Korrekturkonto Forderungen Drittland | | 0 |
| 140300 Forderungen Werkzeuge Inland | 154.176,40 | 154.176,40 |
| 140399 Korrekturkonto Forderungen Werkzeuge Inland | | 0 |
| 140400 Forderungen Werkzeuge EU | 280.206,33 | 280.206,33 |
| 140500 Forderungen Werkzeuge Drittland | 872.421,91 | 872.421,91 |
| 140600 Forderungen TP- Amortisation | -512.920,72 | -512.920,72 |
| 140999 Zwischenkonto Ford.Insolvenz | | 0 |
| 142000 Erwartete Forderungen | 199,02 | 199,02 |
| 143000 Forderungskonto Targo Debitoren | | 0 |
| 145010 TBAG Inanspruchnahme | -9.252.807,47 | -9.252.807,47 |

DEBTORS' EXHIBIT NO. 240
**Page 46 of 142**

CONFIDENTIAL

FBG_CH1_00094499

| | | | |
|---|---|---|---|
| 145030 Zahlungseingang Verrechnungskonto | 1.688.903,94 | | **1.688.903,94** |
| 159100 Forderungen gem. BilRUG (Bezug UE) | 2.863.660,00 | | **2.863.660,00** |
| 160180 Debitorische Kreditoren | | | **0** |
| 311100 Pohledávky tuzemsko | | 34.615,55 | **34615,55** |
| 311200 Pohledávky EU | | 1.214.678,95 | **1214678,95** |
| 311300 Pohledávky třetí země | | 163.212,99 | **163212,99** |
| 311446 IC Pohledávky spoj.os. - HERO | | | **0** |
| 311446 Pohledávky spoj.os. - HERO | | 2.690,27 | **2690,27** |
| 311500 Nevyfakturované dodávky | | 40.320,17 | **40320,17** |
| 311700 Pohledávky - SMK - insolvence | | 39.921,20 | **39921,2** |
| 5100505 Einzelwertberichtigung zu Forderungen | | | **0** |
| 999010 Ausgebuchten Forderungen Insol | | | **0** |
| BG: Trade accounts receivable | | | **0** |
| 391110 Adjustment - Trade Receivables - External - ST (related to 311) | -26.300,00 | -12.075,96 | **-38375,96** |
| 091100 Einzel-Wertber. auf Ford. | -26.300,00 | | **-26300** |
| 391000 Opravná položka k pohled.nedaň | | -12.075,96 | **-12075,96** |
| 391010 IC_Opr. pol. k pohled.ned.351 | | | **0** |
| 391100 Opravná položka k pohled.daňov | | | **0** |

**DEBTORS' EXHIBIT NO. 240**
**Page 47 of 142**

CONFIDENTIAL

FBG_CH1_00094500

| | | | | | |
|---|---|---|---|---|---|
| 70100 Einzelwertberichtigung | | | | | 0 |
| 391000 Adjustment – UNCATEGORIZED Receivables | | | -2.200,00 | | -2200 |
| 091000 Pauschal-Wertber. auf Ford. | | | -2.200,00 | | -2200 |
| 311030 Trade receivables – External - Retention | | | | | 0 |
| 314000 Advances paid – ST | | | 2.340,00 | 15.655,39 | 17995,39 |
| 1525 Kautionen | | | | | 0 |
| 152700 Kaution Halle - LZ +1 Jahr | | | 2.340,00 | | 2340 |
| 314000 Poskytnuté zálohy | | | | 340,22 | 340,22 |
| 314100 Poskytnuté prov. zálohy - tuz. - krátkodobé- nedaňové | | | | | 0 |
| 314100 Zálohy - zaměstnanci | | | | 4.839,48 | 4839,48 |
| 314101 Zálohy - zaměstnanci mzdy | | | | 62,16 | 62,16 |
| 314150 Zálohy na energii | | | | 10.413,53 | 10413,53 |
| 314200 Provozní zálohy | | | | | 0 |
| 398000 Receivables from construction association | | | | | 0 |
| C.II.4. Other short-term receivables | 3.196,19 | 1.019.113,44 | 153.195,68 | -890,00 | 87.089,23 | 1.261.704,54 |
| C.II.4.1. Social security and health insurance | | | | | 0 |
| C.II.4.2. Tax receivables | 3.196,19 | | 23.124,04 | | 89.597,35 | 115917,58 |
| 341000 Income tax receivable | 1.153,92 | | | | 1153,92 |
| BG: Current income tax assets | | | | | 0 |

**DEBTORS' EXHIBIT NO. 240**
**Page 48 of 142**

CONFIDENTIAL

CONFIDENTIAL

FBG_CH1_00094501

DEBTORS' EXHIBIT NO. 240
Page 49 of 142

| | | | | | |
|---|---|---|---|---|---|
| Saldowechsel zwischen '341000 Income tax receivable' und '2. Tax provisions' | 1.153,92 | | | | | 1153,92 |
| 342000 Employee income tax receivable | | | | | 1.211,97 | 1211,97 |
| Saldowechsel zwischen '342 Employee income tax receivable' und '342 Employee income tax liability' | | | | | 1.211,97 | 1211,97 |
| 343000 VAT Receivable | 2.042,27 | | | | 88.385,38 | 90427,65 |
| Saldowechsel zwischen '343 VAT Receivable' und '343 VAT Liability' | 2.042,27 | | | | 88.385,38 | 90427,65 |
| 345000 Other taxes receivable | | | 23.124,04 | | | 23124,04 |
| Saldowechsel zwischen '345 Other tax receivable' und '345 Other tax liabilities' | | | 23.124,04 | | | 23124,04 |
| 346000 Subsidies - Receivables | | | | | | 0 |
| C.II.4.3. Short-term advances paid | | | | | | 0 |
| 391140 Adjustment - Advances - ST (related to 314) | | | | | | 0 |
| C.II.4.4. Estimated receivables | | | | | | 0 |
| 388000 Estimated receivables | | | | | | 0 |
| 388010 Očekávané rozdíly-dobropisy | | | | | | 0 |
| 388100 Dohadné účty aktivní | | | | | | 0 |
| C.II.4.5. Other receivables | | 1.019.113,44 | 130.071,64 | -890,00 | -2.508,12 | 1.145.786,96 |
| 335000 Employees - Receivables | | 5.628,82 | | | -2.508,12 | 3.120,70 |

| | | | | |
|---|---|---|---|---|
| 063000 Personal Darlehen | | | | 0 |
| 151000 Lohnvorschüsse | -1.024,89 | | | -1.024,89 |
| 152000 Gehaltsvorschüsse | 5.503,71 | | | 5.503,71 |
| 154000 Reisevorschüsse | 1.150,00 | | | 1.150,00 |
| 158000 Vorschuß Lohn | | | | 0 |
| 335000 Pohledávky za zaměstnanci | | -1.195,73 | | -1195,73 |
| 335001 Pohledávky za zam.-kredit-oběd | | | | 0 |
| 335100 Pohled. za zaměstnanci-exekuce | | -1.312,39 | | -1312,39 |
| 378000 Other receivables – External – ST | 1.013.484,62 | 130.071,64 | -890,00 | 1.142.666,26 |
| 120020 Treuhand 587-DFB | | | | 0 |
| 120021 Treuhand DFB Insolvenz | | | | 0 |
| 127600 Treuhandkonto DFB | | | | 0 |
| 141000 Forderg.Insolvenz Spitzarbrech | | | | 0 |
| 150000 sonst. Forderungen | | 9.000,00 | | 9000 |
| 150000 sonstige Forderungen | | | -890,00 | -890 |
| 150140 Kautionen Miete | | 30.739,95 | | 30739,95 |
| 150160 Kaufpreiseinbehalt TBAG | | 82.229,37 | | 82229,37 |
| 150170 Sperrkonto 585-DFB | | | | 0 |
| 151310 Factoring Forderungen angek. | | | | 0 |

FBG_CH1_00094502

CONFIDENTIAL

FBG_CH1_00094503

| | | |
|---|---|---|
| 151410 Sperrkonto Deutsche Factoring | | 0 |
| 153000 gezahlte Vorschüsse | 6.875,50 | 6875,5 |
| 155000 Kautionen | 5.287,00 | 5.287,00 |
| 159000 Sonstige Forderungen | 706.831,31 | 706.831,31 |
| 159030 sonstige Forderungen Insolvenzverwaltung | 256.038,27 | 256.038,27 |
| 159099 Debitorische Kreditoren | | 0 |
| 159810 V.-Kto. Deutsche Factoring | | 0 |
| 173000 Durchgangskonto | 44.053,53 | 44.053,53 |
| 193000 Verbindlichkeiten Krankenkassen (+) | 1.274,51 | 1.274,51 |
| 378300 Jiné pohledávky-DFB/Blokační ú | | 0 |
| 709900 Bestand Zwischenkonto | 1.226,82 | 1226,82 |
| BG: Other assets, prepayments | | 0 |
| 378400 Other receivables – Factoring | | 0 |
| 373000 Receivables from fixed term operations | | 0 |
| 373000 Pohled.a záv.z termínov.operac | -67.756,01 | -67756,01 |
| Saldowechsel zwischen '373000 Receivables from fixed term operations' und '373000 Receivables from fixed term operations (1)' | 67.756,01 | 67756,01 |
| 391780 Adjustment – Other receivables – ST (related to 378) | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 51 of 142

CONFIDENTIAL

| | | | | | | 378999 Debt Consolidation |
|---|---|---|---|---|---|---|
| C.II.5. Intercompany receivables | 2.181.375,48 | -1.738.980,24 | 1.232.430,99 | 1.101.069,50 | 1.270.881,42 | 0 |
| C.II.5.1. Trade receivables | 1.863.990,46 | -1.738.980,24 | 565.525,02 | 531.717,63 | 880.049,57 | 4.046.777,15 |
| 311100 Trade receivables | 1.863.990,46 | -1.738.980,24 | 565.525,02 | 531.717,63 | 880.049,57 | 2.102.302,44 |
| - Intercompany - ST | 1.863.990,46 | -1.738.980,24 | 565.525,02 | 531.717,63 | 880.049,57 | 2.102.302,44 |
| 140020 Ford. VU Inland | | | | | | |
| 140020 Ford. VU Inland | | | | 65.454,65 | | 65454,65 |
| Linden GmbH — 140030 Forderungen | | | | | | 0 |
| Inland WP Diepersd — 140030 Forderungen | | | | 342.111,49 | | 342111,49 |
| WPD — 140220 Ford. VU EG | | | | | | 0 |
| 140220 Ford. VU EG - IC | | | | | | 0 |
| Linden a.s. — 140220 Ford. VU EG | | | | 63.451,34 | | 63451,34 |
| Linden s.r.o. — 140221 Ford. VU EG - IC | | | | | | 0 |
| WP a.s. — 140221 Ford. VU EG - IC | | | | 10.915,60 | | 10915,6 |
| Winning Plastics a.s. — 141040 Ford. IC | | -1.811.567,00 | | | | -1.811.567,00 |
| 141041 Ford. IC | | | | | | |
| Winning Plastics Linden GmbH — 141043 Ford. IC | | 45.258,08 | | | | 45.258,08 |
| Winning Linden s.r.o. — 141054 Ford. IC | | 27.328,68 | | | | 27.328,68 |
| Winning Deutschland GmbH — 147030 Forderungen | | | | | | 0 |
| LuL LCZ — 147030 Forderungen | | | 190.107,60 | | | 190107,6 |
| LuL WP Diepersdorf | | | 375.417,42 | | | 375417,42 |
| 159300 V-Kto. Winning — IP | | | | 50.784,55 | | 50784,55 |

| Label | | Value 1 | Value 2 | Total |
|---|---|---|---|---|
| 159535 V-Kto. SMK | 170095 Inter Company | | -1.000,00 | -1000 |
| Winning IP Diepersdorf | 311041 Odběratelé - | 6.259,43 | | 6259,43 |
| LDE | 311041 Odběratelé - | | | 0 |
| Winning Plastics - Linden GmbH | 311042 Odběratelé - | 1.157,51 | | 1157,51 |
| SMK | 311042 Odběratelé - | | | 0 |
| Winning Plastics - SMK GmbH | 311042 Odběratelé - | | | 0 |
| LCZ | 311043 Odběratelé - | 14.221,39 | | 14221,39 |
| Winning Plastics - Linden s.r.o. | 311043 Odběratelé - | | | 0 |
| WPD | 311044 IC Pohledávky | | 627.660,70 | 627660,7 |
| Winning Plastics - Diepersdorf GmbH | 311044 Odběratelé - | | | 0 |
| WPD | 311044 Odběratelé - | 1.864.971,02 | | 1864971,02 |
| přecenění WPD | 311045 Pohledávky - | | | 0 |
| WPD | 311045 Odběratelé - | | | 0 |
| Winning Deutschland GmbH | 311054 Odběratelé - | | | 0 |
| IPLDE | 311091 Odběratelé - | | | 0 |
| Winning IP Lüdenscheid GmbH | 311091 Odběratelé, | | | 0 |
| IPSMK | 311092 Odběratelé - | | | 0 |
| Winning IP Oberlungwitz GmbH | 311092 Odběratelé - | | | 0 |
| IPD | 311095 Odběratelé - | -22.618,89 | | -22618,89 |
| Winning IP Diepersdorf GmbH | 311095 Odběratelé - | | | 0 |

CONFIDENTIAL

FBG_CH1_00094505

| | | | | | |
|---|---|---|---|---|---|
| 311440 IC Pohledávky Linden GmbH | | | | 250.530,50 | **250530,5** |
| 311443 IC Pohledávky spoj.os. - SMK | | | | 1.858,37 | **1858,37** |
| BG: Receivables from affiliated companies | | | | | **0** |
| 311110 Trade receivables - Intercompany - LT 1-5 years | | | | | **0** |
| 311120 Trade receivables - Intercompany - LT over 5 years | | | | | **0** |
| C.II.5.2. Other receivables | 317.385,02 | 666.905,97 | 569.351,87 | 390.831,85 | **1944474,71** |
| 351100 Receivables - Intercompany - Loans | 282.743,45 | 666.905,97 | 569.351,87 | 390.831,85 | **1909833,14** |
| 068000 Darlehn Winning Plastics a.s. | | | 569.351,87 | | **569351,87** |
| 159500 V-Kto Linden | | | | | **0** |
| 163055 Darlehen Winning IP | | 666.905,97 | | | **666905,97** |
| 351000 Pohl.ovládající a řídící osob | | | | | **0** |
| 351040 Pohledávky - Winning Plastics a.s. (dříve WIP) | | | | | **0** |
| 351041 Pohledávky - LDE | 252.678,25 | | | | **252678,25** |
| 351041 Pohledávky - ovládaná nebo ovládající osoba - LDE | | | | | **0** |
| 351041 Pohledávky - ovládaná nebo ovládající osoba - Winning Plastics - Linden GmbH | | | | | **0** |
| 351042 Pohledávky - ovládaná nebo ovládající osoba - Winning Plastics - SMK GmbH | | | | | **0** |
| 351044 Pohledávky - ovládaná nebo ovládající osoba - Winning Germany 7 GmbH | | | | | **0** |

FBG_CH1_00094506

**DEBTORS' EXHIBIT NO. 240**
**Page 54 of 142**

CONFIDENTIAL

| | | |
|---|---|---|
| 351046 Pohledávky - BAT Team | 30.065,20 | **30065,2** |
| 351050 Pohledávky - ovládaná nebo ovládající osoba - WG | | **0** |
| 351050 Pohledávky - ovládaná nebo ovládající osoba - Winning Group a.s. | | **0** |
| 351050 Pohledávky - WG | | **0** |
| 378400 IC_zápujčky WP Linden GmbH | 390.831,85 | **390831,85** |
| 378600 IC_zápujčky Winning Group | | **0** |
| **352000 Receivables - Intercompany - Loan Interests** | **23.523,02** | **23523,02** |
| 352040 IC_WPI_Pohledávky-podstat.vliv | | **0** |
| 352041 Pohledávky - LDE | 23.523,02 | **23523,02** |
| 352041 Pohledávky - Winning Plastics - Linden GmbH | | **0** |
| 352042 Pohledávky - SMK | | **0** |
| 352042 Pohledávky - Winning Plastics - SMK GmbH | | **0** |
| 352050 IC_WG_Pohledávky-podstat.vliv | | **0** |
| 352050 Pohledávky - WG | | **0** |
| **354000 Receivables - Intercompany - Dividends and Advances for dividends** | | **0** |
| **343100 VAT - IC tax group receivable** | **11.118,55** | **11118,55** |
| Saldowechsel zwischen '343100 VAT - IC tax group | 11.118,55 | 11118,55 |

FBG_CH1_00094507

DEBTORS' EXHIBIT NO. 240
Page 55 of 142

CONFIDENTIAL

receivable' und '343100 VAT – IC tax group'

| | | | | | | |
|---|---|---|---|---|---|---|
| C.III. Short-term financial assets | | | | | | 0 |
| C.III.1. Equity investments – group undertakings | | | | | | 0 |
| C.III.2. Other short-term financial assets | | | | | | 0 |
| C.IV. Cash | 7.772,49 | 3.219.209,65 | 510.867,69 | 694.842,74 | 279.355,12 | 22.650,81 | 4.734.698,50 |
| C.IV.1. Cash in hand | | 6.890,47 | 955,72 | 1.221,38 | 5.064,89 | | 14.132,46 |
| 211000 Cash in hand | | 6.890,47 | 955,72 | 1.221,38 | 5.064,89 | | 14.132,46 |
| 100000 GMBH W/EIGENKAPITAL | | | | | | | 0 |
| 100000 Kasse | | 1.420,55 | 955,72 | | | | 2.376,27 |
| 100020 Kasse SMK | | | | | | | 0 |
| 100030 Kasse Winning | | | | 1.221,38 | | | 1221,38 |
| 100100 Kasse Gütersloh | | 2.191,26 | | | | | 2.191,26 |
| 100300 Kasse Gottmadingen | | 3.278,66 | | | | | 3.278,66 |
| 101020 Kasse Fremdwährung China Yen | | | | | | | 0 |
| 160020 Verb. LuL IC WP Linden GmbH | | | | | | | 0 |
| 211000 Pokladna CZK | | | | | 1.187,87 | | 1187,87 |
| 211100 Pokladna EURO | | | | | 3.819,29 | | 3819,29 |
| 211200 Pokladna GBP | | | | | 57,73 | | 57,73 |
| 213000 Valuables | | | | | | | 0 |
| C.IV.2. Bank accounts | 7.772,49 | 3.212.319,18 | 509.911,97 | 693.621,36 | 274.290,23 | 22.650,81 | 4.720.566,04 |

FBG_CH1_00094508

DEBTORS' EXHIBIT NO. 240
Page 56 of 142

CONFIDENTIAL

FBG_CH1_00094509

| | Col1 | Col2 | Col3 | Col4 | Col5 | Col6 | Total |
|---|---|---|---|---|---|---|---|
| 221000 Bank accounts | 7.772,49 | 3.213.819,18 | 509.911,97 | 693.621,36 | 274.290,23 | 22.650,81 | **4.722.066,**04 |
| 110200 Commerzbank EUR Factoring | | | | | | | 0 |
| 110300 Commerzbank EUR | | 3.167.139,84 | | | | | **3.167.139,84** |
| 111000 Commerzbank USD | | 46.679,34 | | | | | **46.679,34** |
| 120030 National-Bank Essen | | | | | | | 0 |
| 120032 National-Bank Essen v. IV | | | | | | | 0 |
| 120034 Nationalbank AG_THK_Winning | | | | | | | 0 |
| 120036 Sparkasse Remscheid Winning | | | 484.939,03 | | | | **484939,03** |
| 120042 Sparkasse Remscheid verpf. | | | 24.972,94 | | | | **24972,94** |
| 1200 Bank | | | | | | | 0 |
| 121100 Sparkasse Chemnitz Winning | | | | 693.621,36 | | | **693621,36** |
| 123800 National-Bank Aktiengesellsch | | | | | | | 0 |
| 123900 National Bank TK Verbindl. | | | | | | | 0 |
| 124100 Volksbank SMK | | | | | | | 0 |
| 124300 National-Bank TK Umlaufv. | | | | | | | 0 |
| 124500 National-Bank TK Winning | | | | | | | 0 |
| 170000 Inter Company Winning Plastics | | | | | | | 0 |
| 221100 CZK, ČSOB, 217788273/0300, běžný | 3.657,27 | | | | | | **3657,27** |
| 221100 Účet u KB, CZK | | | | | 49.276,25 | | **49276,25** |

DEBTORS' EXHIBIT NO. 240
Page 57 of 142

CONFIDENTIAL

| Account | | |
|---|---|---|
| 221200 EUR, ČSOB, 1017573803/0300, běžný | 4.115,22 | 4115,22 |
| 221200 Účet u KB, EUR | 62.154,95 | 62154,95 |
| 221300 Účet u Commerzbank | | 0 |
| 221310 Účet u Commerzbank - EUR | | 0 |
| 221400 Účet u Raiffeisenbank - CZK | 11.115,95 | 11115,95 |
| 221401 Účet u Raiffeisenbank -M- CZK | 24,94 | 24,94 |
| 221410 Účet u Raiffeisenbank - EUR | 151.718,14 | 151718,14 |
| 221411 Účet u RB - čerpání Kontokoren | | 0 |
| 221500 Fact. postoupený účet COBA | | 0 |
| 221510 Fact. vázaný účet COBA/Treuhan | | 0 |
| Bank | 22.650,81 | 22650,81 |
| BG: III. Cash and cash equivalents | | 0 |
| 261000 Cash in transit | -1.500,00 | -1.500,00 |
| 102000 Zahlungen unterwegs | | 0 |
| 110202 Commerzbank Überweisung Factoring | | 0 |
| 110302 Commerzbank Überweisung | -1.500,00 | -1.500,00 |
| 111002 Commerzbank USD Überweisung Factoring | | 0 |
| 120010 ZE Zwischekonto CoBa Lüdensche | | 0 |
| 120031 Masch. ZV National-Bank Essen | | 0 |

FBG_CH1_00094510

DEBTORS' EXHIBIT NO. 240
Page 58 of 142

CONFIDENTIAL

FBG_CH1_00094511

| | | | | |
|---|---|---|---|---|
| 120037 Masch. ZV Sparkasse Remscheid | | | | 0 |
| 120041 Masch. ZV Oberbank AG | | | | 0 |
| 120100 Geldtransit | | | | 0 |
| 136000 Geldtransit | | | | 0 |
| 261000 Peníze na cestě | | | | 0 |
| 261001 Peníze na cestě - LGL rozdíly | | | | 0 |
| 261010 Peníze na cestě Účet KB,a.s. | | | | 0 |
| 261040 Peníze na cestě Účet COM-EUR | | | | 0 |
| 261070 Peníze na cestě Účet RB - CZK | | | | 0 |
| 261080 Peníze na cestě Účet RB-EUR | | | | 0 |
| 261100 Peníze na cestě | | | | 0 |
| 63050 Maschineller ZV HVB | | | | 0 |
| **D. Prepaid expenses and accrued income** | **395.828,40** | **79.418,67** | **39.159,76** | **514.406,83** |
| D.1. Prepaid expenses | 395.828,40 | 79.418,67 | 39.159,76 | 514.406,83 |
| 381000 Deferred expenses (expense of following year) | 395.828,40 | 79.418,67 | 39.159,76 | 514.406,83 |
| 381000 Náklady příštích období | | | 13.406,15 | 13406,15 |
| 381400 NPO - leasing auta | | | 99,70 | 99,7 |
| 381402 NPO - leasing stroje | | | 25.653,91 | 25653,91 |
| 80100 akt. RA Vorauszahlung Versicherungsprämien | -74.034,86 | | | -74.034,86 |
| 80300 akt. RA Vorauszahlung Beiträge | 50.222,34 | | | 50.222,34 |

DEBTORS' EXHIBIT NO. 240
Page 59 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 60 of 142

FBG_CH1_00094512

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 80400 akt. RA Vorauszahlung Mieten | 1.777,00 | | | | | | **1.777,00** |
| 80500 akt. RA sonstige Vorauszahlungen | 167.442,28 | | | | | | **167.442,28** |
| 80800 akt. RA Vorauszahlung Zinsen | 183.019,92 | | | | | | **183.019,92** |
| 81000 akt. RA Vorauszahlung Leasing Folgejahr | 67.401,72 | | | | | | **67.401,72** |
| 89000 DRESDNER BANK AG | | | | | | | 0 |
| 89040 DRESDNER BANK AG RS DOLLAR KTO. | | | | | | | 0 |
| 98000 Aktive RAP | | | 79.418,67 | | | | **79418,67** |
| D.2. Complex prepaid expenses | | | | | | | 0 |
| D.3. Accrued revenues | | | | | | | 0 |
| 385000 Unbilled revenue (invoice to be issued in following year) | | | | | | | 0 |
| 385000 Příjmy příštích období | | | | | | | 0 |
| TOTAL EQUITY & LIABILITIES | 11.744.471,02 | 40.503.993,64 | 5.375.189,53 | 3.313.460,07 | 6.295.524,13 | 22.650,81 | 67.255.289,20 |
| **A. Equity** | **9.816.936,12** | **2.680.687,43** | **100.709,20** | **1.515.702,20** | **3.941.973,46** | **22.650,81** | **18.078.659,22** |
| A.I. Basic capital | 77.051,78 | 25.000,00 | 25.000,00 | 25.000,00 | 8.208,50 | 25.000,00 | **185.260,28** |
| A.I.1. Registered capital | 77.051,78 | 25.000,00 | 25.000,00 | 25.000,00 | 8.208,50 | 25.000,00 | 185.260,28 |
| 411000 Registered capital | 77.051,78 | 25.000,00 | 25.000,00 | 25.000,00 | 8.208,50 | 25.000,00 | **185.260,28** |
| 081000 Stammkapital | | | | 25.000,00 | | | 25000 |
| 200010 Stammkapital | | | | | | | 0 |
| 411050 Základní kapitál – WG | 79.035,76 | | | | | | 79035,76 |

DEBTORS' EXHIBIT NO. 240
Page 60 of 142

CONFIDENTIAL

| | Col1 | Col2 | Col3 | Total |
|---|---|---|---|---|
| 411050 Základní kapitál - Winning Group a.s. | -1.983,98 | | | -1983,98 |
| 411110 Základní kapitál | | | 8.208,50 | 8208,5 |
| 80040 Stammkapital WPL | | 25.000,00 | | 25000 |
| 910000 Stammkapital | 25.000,00 | | | 25.000,00 |
| BG: I. Subscribed capital | | | | 0 |
| Gezeichnetes Kapital | | | 25.000,00 | 25000 |
| A.I.2. Own shares/ownership interests (-) | | | | 0 |
| A.I.3. Changes in registered capital | | | | 0 |
| A.II. Share premium and capital funds | 9.324.982,20 | | 3.012.001,79 | 12336983,99 |
| A.II.1. Premium | | | | 0 |
| A.II.2. Capital contributions | 9.324.982,20 | | 3.012.001,79 | 12336983,99 |
| A.II.2.1. Other capital contributions | | | 3.196.224,09 | 3196224,09 |
| 413000 Capital contribution outside Registered capital | | | 3.196.224,09 | 3196224,09 |
| 413000 Ostatní kapitálové fondy | | | 3.196.224,09 | 3196224,09 |
| BG: II. Capital reserves | | | | 0 |
| A.II.2.2. Revaluation of assets and liabilities (+/-) | 9.324.982,20 | | -184.222,30 | 9140759,9 |
| 414000 Revaluation of assets and liabilities | 9.325.835,31 | | | 9325835,31 |
| 414043 Oceňovací rozdíly LCZ | 3.191.250,74 | | | 3191250,74 |
| 414041 Oceňovací rozdíly LDE | 30.325,03 | | | 30325,03 |

FBG_CH1_00094513

DEBTORS' EXHIBIT NO. 240
Page 61 of 142

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 414042 Oceňovací rozdíly SMK | 541.844,50 | | 541844,5 |
| 414044 Oceňovací rozdíly Diepersdorf | | | 0 |
| 414044 Oceňovací rozdíly WPD | 5.562.415,04 | | 5562415,04 |
| **414998 FX revaluation of capital** | **1.983,98** | **-119.034,44** | **-117050,46** |
| Delta-Währung zu '411050 Základní kapitál – Winning Group a.s.' | 1.983,98 | | 1983,98 |
| Delta-Währung zu '081000 Stammkapital' | | | 0 |
| Delta-Währung zu '200010 Stammkapital' | | | 0 |
| Delta-Währung zu '411110 Základní kapitál' | | -304,92 | -304,92 |
| Delta-Währung zu '80040 Stammkapital WPL' | | | 0 |
| Delta-Währung zu '910000 Stammkapital' | | | 0 |
| Delta-Währung zu '413000 Ostatní kapitálové fondy' | | -118.729,52 | -118729,52 |
| **414999 FX revaluation of foreign entities** | **-2.837,09** | **-65.187,86** | **-68024,95** |
| Rounding errors from currency conversion | -0,03 | -0,01 | -0,04 |
| Delta-Währung zu '429000 Neuhrazená ztráta minulých let' | | -64.983,40 | -64983,4 |
| Delta-Währung zu '429100 Neuhrazená ztráta minulých let' | 669,69 | | 669,69 |
| Delta-Währung zu '431100 Výsledek hospodaření ve schvalovacím řízení' | -3.639,72 | | -3639,72 |

DEBTORS' EXHIBIT NO. 240
Page 62 of 142

FBG_CH1_00094514

CONFIDENTIAL

| | | | | | | |
|---|---|---|---|---|---|---|
| Delta-Währung zu 'Net income/net loss for the financial year (from P&L)' | -15.049,43 | | | | -125.086,17 | **-140135,6** |
| Delta-Währung zu 'Storno profit/loss' | 15.182,40 | | | | 124.881,72 | **140064,12** |
| A.II.2.3. Revaluation reserve on transformations (+/-) | | | | | | **0** |
| 418000 Other revaluation on equity | | | | | | **0** |
| A.III. Reserves from profit | | | | | 69.693,64 | **69693,64** |
| A.III.1. Other reserve funds | | | | | 69.693,64 | **69693,64** |
| 421000 Other reserve funds | | | | | 69.693,64 | **69693,64** |
| 427000 Ostatní fondy | | | | | 69.693,64 | **69693,64** |
| A.III.2. Statutory and other funds | | | | | | **0** |
| A.IV. Earnings brought forward | 206.925,76 | 4.567.211,07 | 114.059,55 | 1.423.582,76 | 1.036.338,67 | **7.348.117,81** |
| A.IV.1. Retained profits (+/-) | 206.925,76 | 4.567.211,07 | 114.059,55 | 1.423.582,76 | 1.036.338,67 | **7.348.117,81** |
| 428000 Retained earnings | 206.925,76 | 4.567.211,07 | 114.059,55 | 1.423.582,76 | 1.036.338,67 | **7.348.117,81** |
| 428000 Nerozdělený zisk minulých let | | | | | 998.176,79 | **998176,79** |
| Delta-Währung zu '428000 Nerozdělený zisk minulých let' | | | | | -26.821,52 | **-26821,52** |
| 429000 Neuhrazená ztráta minulých let | | | | | 64.983,40 | **64983,4** |
| 429100 Neuhrazená ztráta minulých let | -10.759,58 | | | | | **-10759,58** |
| 428 Nerozdělený zisk minulých let | 7.301,36 | | | | 47.383,50 | **54684,86** |
| Delta-Währung zu '428 Nerozdělený zisk minulých let' | -7.301,36 | | | | -47.383,50 | **-54684,86** |

FBG_CH1_00094515

DEBTORS' EXHIBIT NO. 240
Page 63 of 142

CONFIDENTIAL

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 431100 Výsledek hospodaření ve schvalovacím řízení | 217.685,34 | | | | | | **217685,34** |
| 431020 VH ve schvalovacím řízení | | | | | -33.791,79 | | **-33791,79** |
| Delta-Währung zu '431020 VH ve schvalovacím řízení' | | | | | 33.791,79 | | **33791,79** |
| 86000 Gewinn-/Verlustvortrag | | 114.059,55 | | | | | **114059,55** |
| Delta-Währung zu '86000 Gewinn-/Verlustvortrag' | | | | | | | **0** |
| 080001 Jahresergebnis (Bilanz) | | | | 1.423.582,76 | | | **1423582,76** |
| Delta-Währung zu '080001 Jahresergebnis (Bilanz)' | | | | | | | **0** |
| 080002 Jahresergebnis (GuV) | | | | | | | **0** |
| Delta-Währung zu '080002 Jahresergebnis (GuV)' | | | | | | | **0** |
| BG: III. Cumulative profit brought forward | | | | | | | **0** |
| 930000 Abschlusskonto GuV | | 4.567.211,07 | | | | | **4.567.211,07** |
| Delta-Währung zu '930000 Abschlusskonto GuV' | | | | | | | **0** |
| 428998 Retained earnings - elimination of Dividends | | | | | | | **0** |
| A.IV.2. Other retained earnings (+/-) | | | | | | | **0** |
| 426000 Other retained earnings of previous years | | | | | | | **0** |
| A.V. Earnings for the accounting period excl. minority shares | -9.892,74 | -1.911.523,64 | -38.350,35 | 67.119,44 | 33.599,98 | -2.349,19 | **-1.861.396,50** |
| 431000 Profit (loss) for the current period | -9.892,74 | -1.911.523,64 | -38.350,35 | 67.119,44 | 33.599,98 | -2.349,19 | **-1.861.396,50** |
| Net income from P/L | -9.892,74 | -1.911.523,64 | -38.350,35 | 67.119,44 | 33.599,98 | -2.349,19 | **-1.861.396,50** |

FBG_CH1_00094516

**DEBTORS' EXHIBIT NO. 240**
**Page 64 of 142**

CONFIDENTIAL

Case 25-90399    Document 3644-5    Filed in TXSB on 08/12/26    Page 65 of 142

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net income/net loss for the financial year (from P&L) | 209.245,38 | 2.416.158,43 | 75.709,20 | 1.431.573,20 | 2.883.762,57 | -2.349,19 | 7.014.099,59 |
| Storno profit/loss | -219.138,12 | -4.327.682,07 | -114.059,55 | -1.364.453,76 | -2.850.162,59 | | -8.875.496,09 |
| A.VI. Approved decision on advances for profit distribution (-) | 217.869,12 | | | | -217.869,12 | | 0 |
| 432000 Advance profit distribution | 217.869,12 | | | | -217.869,12 | | 0 |
| 432000 Rozh.o zálohách na podíl na zi | | | | | -217.869,12 | | -217869,12 |
| 432043 Zálohy na podílu na zisku - LCZ | 217.869,12 | | | | | | 217869,12 |
| Income / loss from equity method consolidation | | | | | | | 0 |
| A.VII. Consolidated reserve funds | | | | | | | 0 |
| B. + C. Provisions and liabilities | 1.927.534,90 | 37.823.306,21 | 5.274.480,33 | 1.797.757,87 | 2.347.796,15 | | 49.170.875,46 |
| B. Provisions | | 4.001.396,37 | 235.889,06 | 891.676,31 | 407.104,10 | | 5.536.065,84 |
| B.1. Provision for pensions and other similar payables | | | | | | | 0 |
| 459100 Provision – Employee bonuses and rewards | | | | | | | 0 |
| BG: I. Provision for pensions and similar obligations | | | | | | | 0 |
| 459200 Provision – Pensions and other similar payables | | | | | | | 0 |
| 459300 Provision – Untaken vacation | | | | | | | 0 |
| B.2. Income tax provision | | 1.961.249,49 | 74.891,06 | 546.646,31 | 123.718,23 | | 2.706.505,09 |
| 341000 Income tax | -1.153,92 | | | | -43.521,04 | | -44674,96 |
| 341000 Daň z příjmu | | | | | -43.521,04 | | -43521,04 |
| 341100 Daň z příjmu | -1.153,92 | | | | | | -1153,92 |

FBG_CH1_00094517

DEBTORS' EXHIBIT NO. 240
Page 65 of 142

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 453000 Income tax provision | 1.961.249,49 | 74.891,06 | 546.646,31 | 167.239,27 | **2.750.026,13** |
| 093000 KöSt-Rückstellungen | | | 298.820,31 | | 298820,31 |
| 093100 GewSt-Rückstellung | | | 247.826,00 | | 247826 |
| 453000 Rezervy na daň z příjmů | | | | 167.239,27 | 167239,27 |
| 90600 Rückstellung Steuern | 1.961.249,49 | | | | **1.961.249,49** |
| 95700 Gewerbesteuerrückstellung | | 44.500,82 | | | 44500,82 |
| 96300 Körperschaftsteuerrückstellung | | 30.390,24 | | | 30390,24 |
| BG: II. Tax provisions | | | | | 0 |
| Saldowechsel zwischen '2. Tax provisions' und '341000 Income tax receivable' | 1.153,92 | | | | 1153,92 |
| B.3. Tax-deductible provisions | | | | | 0 |
| B.4. Other provisions | 2.040.146,88 | 160.998,00 | 345.030,00 | 283.385,87 | **2.829.560,75** |
| 459000 Provision - Other | 2.040.146,88 | 160.998,00 | 345.030,00 | 283.385,87 | **2.829.560,75** |
| 094000 sonst. Rückstellungen | | | 238.110,00 | | 238110 |
| 094100 Rückstellung Urlaub | | | 22.500,00 | | 22500 |
| 094200 Rückstellung Tantieme | | | 20.000,00 | | 20000 |
| 094300 Rückstellung Zeitkonten | | | 16.820,00 | | 16820 |
| 094500 Rückstellung Ber.gen. | | | 8.000,00 | | 8000 |
| 094650 Rückstellung Weihnachtsgeld | | | 27.900,00 | | 27900 |

FBG_CH1_00094518

DEBTORS' EXHIBIT NO. 240
Page 66 of 142

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 094700 Weihnachtsgeld Geh. incl. AGA | | 11.700,00 | 11700 |
| 094800 Rückstellung Vorräte | | | 0 |
| 097100 Rückstellung sonstige Personal | | | 0 |
| 459000 Ostatní rezervy | | 283.385,87 | 283385,87 |
| 90800 Rückstellung sonstige | 2.040.146,88 | | 2.040.146,88 |
| 95000 Pensionsrückstellung | | | 0 |
| 96510 Rückstellung Urlaub | | 12.000,00 | 12000 |
| 96520 Rückstellung Überstunden | | | 0 |
| 96530 Rückstellung Weihnachtsgeld | | 24.000,00 | 24000 |
| 96550 Rückstellung Tantieme | | 31.348,00 | 31348 |
| 96560 Rückstellung Abfindungen | | -20.250,00 | -20250 |
| 96570 Rückstellung BG+SB-Abgabe | | 24.900,00 | 24900 |
| 96600 Rückstellung Aufbewahrung | | 5.000,00 | 5000 |
| 97000 Rückstellung Sonstige | | | 0 |
| 97010 Rückstellung Rechts-u.Beratung | | | 0 |
| 97090 Rückstellung ausst. Rechnungen | | 60.000,00 | 60000 |
| 97400 Rückstellung Gewährleistungen | | | 0 |
| 97500 Rückstellung ausst. Gutschrift | | | 0 |
| 97700 Rückstellung Abschluss- und Pr | | 24.000,00 | 24000 |

FBG_CH1_00094519

DEBTORS' EXHIBIT NO. 240
Page 67 of 142

CONFIDENTIAL

| | Col1 | Col2 | Col3 | Col4 | Col5 | Total |
|---|---|---|---|---|---|---|
| BG: III. Other provisions | | | | | | 0 |
| 459400 Provision - Restructuring | | | | | | 0 |
| 459500 Provision - Warranties | | | | | | 0 |
| 459600 Provision - Loss making contracts | | | | | | 0 |
| 459700 Provision - law suits | | | | | | 0 |
| 459800 Provision - unfinished construction contracts | | | | | | 0 |
| C. Liabilities | 1.927.534,90 | 33.821.909,84 | 5.038.591,27 | 906.081,56 | 1.940.692,05 | 43.634.809,62 |
| C.I. Amounts owed to credit institutions | | 16.094.532,94 | 2.907.803,49 | 91.805,64 | 540.894,33 | 19.635.036,40 |
| C.I.1. Long-term owed to credit institutions | | | | | | 0 |
| C.I.1.1. CAPEX | | | | | | 0 |
| 231310 Loans from credit institutions - CAPEX - LT | | | | | | 0 |
| 160620 Verbindlichkeiten Darlehen RLZ 1-5 Jahre | | | | | | 0 |
| C.I.1.2. Operating loans | | | | | | 0 |
| 231010 Loans from credit institutions - (not Fixed Assets) - LT | | | | | | 0 |
| C.I.1.3. Other loans | | | | | | 0 |
| 231210 Loans from credit institutions - Overdraft - LT | | | | | | 0 |
| C.I.2. Short-term owed to credit institutions | | 16.094.532,94 | 2.907.803,49 | 91.805,64 | 540.894,33 | 19.635.036,40 |

FBG_CH1_00094520

CONFIDENTIAL

DEBTORS' EXHIBIT NO. 240
Page 68 of 142

| | | | | | |
|---|---|---|---|---|---|
| C.I.2.1. CAPEX | 2.135.072,21 | | | 57.113,77 | **2.192.185,98** |
| 231300 Loans from credit institutions - CAPEX - ST | **2.135.072,21** | | | **57.113,77** | **2.192.185,98** |
| 160600 Verbindlichkeiten Darlehen | 2.135.072,21 | | | | 2.135.072,21 |
| 160699 Korrekturkonto Verbindlichkeiten Darlehen | | | | | 0 |
| 461000 Bankovní úvěry-UniCredit | | | | 9.977,83 | 9977,83 |
| 461020 Bankovní úvěry-Raiff.B.-Stroje | | | | 35.583,03 | 35583,03 |
| 461100 Bankovní úvěry-Raiff.B.-Auta | | | | 11.552,91 | 11552,91 |
| BG: II. Payables from finance lease, CAPEX loans, Mietkauf | | | | | 0 |
| C.I.2.2. Operating loans | 7.181.827,00 | 2.907.803,49 | 91.805,64 | 483.780,56 | **10.665.216,69** |
| 231000 Loans from credit institutions - (not Fixed Assets) - ST | **7.181.827,00** | **2.907.803,49** | **91.805,64** | **483.780,56** | **10.665.216,69** |
| 110800 Rücklage für Ersatzbeschaffung | | | | | 0 |
| 120038 Raiffeisenban a.s. | | 2.907.803,49 | | | 2907803,49 |
| 121010 J&T Mezzanine (Facility A/B 2) | 2.277.165,00 | | | | 2.277.165,00 |
| 121010 PENSIONEN ZAHLG. GE RS | | | | | 0 |
| 121020 J&T Loan 7 Mio. (Facility A/B 1) | 4.904.662,00 | | | | 4.904.662,00 |
| 121020 PENSIONEN ZAHLG. LE RS | | | | | 0 |
| 121200 Raiffeisenbank Winning | | | 91.805,64 | | 91805,64 |

FBG_CH1_00094521

DEBTORS' EXHIBIT NO. 240
Page 69 of 142

CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| 231000 Krátkodobé bankovní úvěry | | | | | 0 |
| 249000 Fact. zúčtovací účet/Abrechnun | | | | | 0 |
| 249101 K nákupu určené pohledávky | | | | | 0 |
| 249102 Nenakoupené pohledávky | | | | | 0 |
| 461010 Bankovní úvěry-Raiff.B.- IC | | | | 483.780,56 | 483780,56 |
| BG: I. Liabilities to banks | | | | | 0 |
| C.I.2.3. Other loans | 6.777.633,73 | | | | 6.777.633,73 |
| 231200 Loans from credit institutions - Overdraft - ST | 6.777.633,73 | | | | 6.777.633,73 |
| 110800 J&T Banka a.s. CZ13 5800 0000 0025 0010 3902 | 6.777.633,73 | | | | 6.777.633,73 |
| C.II. Trade and other liabilities | 1.927.534,90 | 17.727.376,90 | 2.130.787,78 | 814.275,92 | 1.399.797,72 | 23.999.773,22 |
| C.II.1. Long-term trade liabilities | | | | | 0 |
| 321020 Trade payables - External - LT over 5 years | | | | | 0 |
| 321010 Trade payables - External - LT 1-5 years | | | | | 0 |
| C.II.2. Other long-term liabilities | | | | | 0 |
| 324020 Advances received - LT over 5 years | | | | | 0 |
| 324010 Advances received - LT 1-5 years | | | | | 0 |
| 379010 Other payables - External - LT | | | | | 0 |
| 379210 Loan from minor lenders - LT | | | | | 0 |

FBG_CH1_00094522

DEBTORS' EXHIBIT NO. 240
Page 70 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 71 of 142

FBG_CH1_00094523

| Account | | | | | | Total |
|---|---|---|---|---|---|---|
| **481000 Deferred tax liability** | | | | | | **0** |
| 80900 Latente Steuern | -8.606,91 | | | | | **-8.606,91** |
| Saldowechsel zwischen '481 Deferred tax liability' und '481 Deferred tax receivable' | 8.606,91 | | | | | **8.606,91** |
| C.II.3. Short-term trade liabilities | 24,174,49 | 10.675.711,10 | 617.422,15 | 220.274,47 | 536.068,68 | **12.073.650,89** |
| **321000 Trade payables - External - ST** | 24.174,49 | 10.675.711,10 | 617.422,15 | 220.274,47 | 536.068,68 | **12.073.650,89** |
| 0160000 VERBINDLICHKEITEN FREMDE | | | | | | **0** |
| 123800 National-Bank Aktiengesellsch _ Insolvenzverwalter | | | | | | **0** |
| 160000 Verb. LuL Inland | | | | 220.171,23 | | **220171,23** |
| 160000 Verbind. LuL Inland | | | 549.730,53 | | | **549730,53** |
| 160000 Verbindlichkeiten Inland | | 8.453.179,44 | | | | **8.453.179,44** |
| 160001 Unterw.bef. Verbind. Inl. | | | -110.680,81 | | | **-110680,81** |
| 160002 Verb. gg. Insolvenzverwalter | | | | | | **0** |
| 160003 Rechnungseingang Inland | | | -280.013,99 | | | **-280013,99** |
| 160005 Erhalt. Anz. Insolvenzverw. | | | 422.347,77 | | | **422347,77** |
| 160010 Verbind. LuL EU | | | 31.057,70 | | | **31057,7** |
| 160011 Unterw.bef. Verbind. EU | | | -8.084,44 | | | **-8084,44** |
| 160013 Rechnungseingang EU | | | -9.081,65 | | | **-9081,65** |
| 160020 Verbind. LuL Drittland | | | 4.300,00 | | | **4300** |

DEBTORS' EXHIBIT NO. 240
Page 71 of 142

CONFIDENTIAL

| Konto | | |
|---|---|---|
| 160099 Korrekturkonto Verbindlichkeiten Inland | | 0 |
| 160100 Kursanpassung Verbindlichkeiten für Quartale | | 0 |
| 160100 Verb. IuI. Drittland | | 0 |
| 160100 | 672.359,49 | 672.359,49 |
| Verbindlichkeiten EU 160199 Korrekturkonto | | 0 |
| Verbindlichkeiten EU 160200 | | 0 |
| 160200 Verb. IuI. EG | | 103,24 |
| Verbindlichkeiten Drittland 160299 Korrekturkonto | 103,24 | 0 |
| Verbindlichkeiten Drittland 160300 | | 0 |
| Verbindlichkeiten Werkzeuge Inland 160400 | 1.449.551,87 | 1.449.551,87 |
| Verbindlichkeiten Werkzeuge EU 160500 | 25.620,30 | 25.620,30 |
| Verbindlichkeiten Werkzeuge Drittland | 75.000,00 | 75.000,00 |
| 160999 Zwischenkonto Drittland | | 0 |
| Verb.Insolvenz 163060 Verbind. IuI. | | 0 |
| HeRo 163070 Verbind. IuI. | | 0 |
| HeiForm | -11.250,00 | -11250 |
| 163073 Rechnungseingang HeiForm | 106.618,48 | 106618,48 |
| HKT 165040 Verbind. IuI. | -11.360,72 | -11360,72 |
| 165043 Rechnungseingang HKT | -65.887,72 | -65887,72 |
| 170000 Sonstige Verbindlichkeiten | | |

CONFIDENTIAL

FBG_CH1_00094525

| | | |
|---|---:|---:|
| 170010 Sonst. Verbl. Insolv. Vw. | -273,00 | **-273** |
| 321100 Dodavatelé - tuzemsko - krátkodobé záv. | 24.174,49 | **24174,49** |
| 321100 Závazky tuzemsko | 332.565,67 | **332565,67** |
| 321101 závazky na cestě tuzemsko | 3,81 | **3,81** |
| 321200 Dodavatelé - zahraničí - krátkodobé záv. | | **0** |
| 321200 Závazky EU | 139.166,92 | **139166,92** |
| 321201 Závazky na cestě EU | 6,73 | **6,73** |
| 321500 Závazky třetí země | | **0** |
| 321622 IC Záv. Heinze Gruppe GmbH | | **0** |
| 321624 IC Záv.spoj.os. Heinze Kunssto | | **0** |
| 321628 IC Záv.spoj.os. HeRo | | **0** |
| 321628 Záv. HeRo | 2.678,44 | **2678,44** |
| 321700 Záv. SMK - insolvence | 59.094,25 | **59094,25** |
| 325200 Ostatní závazky-penzijní připo | 2.422,45 | **2422,45** |
| 325300 Ostatní závazky-Kooperativa | 130,41 | **130,41** |
| BG: III. Trade payables w/o finance lease | | **0** |
| 321030 Trade payables – External - Retention | | **0** |
| 324000 Advances received - ST | | **0** |
| 171010 erhalt.Anzahl. EU | | **0** |

**DEBTORS' EXHIBIT NO. 240**
**Page 73 of 142**

CONFIDENTIAL

FBG_CH1_00094526

| | | | | | |
|---|---|---|---|---|---|
| 398000 Payables from construction association | | | | | 0 |
| C.II.4. Other short-term liabilities | 2.673.560,78 | 323.715,44 | 567.930,36 | 528.122,26 | 4.093.328,84 |
| C.II.4.1. Short-term advances received | | | | | 0 |
| C.II.4.2. Payables to employees | 1.440.290,38 | -36.896,67 | 240.193,20 | 188.547,99 | 1.832.134,90 |
| 331000 Employees - Payables | 1.440.290,38 | -36.896,67 | 240.193,20 | 188.547,99 | 1.832.134,90 |
| 120510 Verbindlichkeiten Lohn/Gehalt | | | 240.193,20 | | 240193,2 |
| 161100 Verbindlichkeiten Mitarbeiter | 1.548,19 | | | | 1.548,19 |
| 161199 Korrekturkonto Verbindlichkeiten Mitarbeiter | | | | | 0 |
| 173000 Darlehen Sona Autocomp Germany | | | | | 0 |
| 174000 Verbind. Lohn/Gehalt | | -36.003,85 | | | -36003,85 |
| 174005 Verbind. Bikeleasing | | -892,82 | | | -892,82 |
| 190100 Verbindlichkeiten Löhne | 1.415.766,12 | | | | 1.415.766,12 |
| 190200 Verbindlichkeiten Gehälter | -1.980,75 | | | | -1.980,75 |
| 192000 Verbindlichkeiten vermögensw. Leistungen | 7.909,93 | | | | 7.909,93 |
| 192500 Verbindlichkeiten betriebl. Altervorsorge | 17.046,89 | | | | 17.046,89 |
| 331000 Zaměstnanci | | | | 188.547,99 | 188547,99 |
| 333000 Ostatní závazky vůči zaměstn. | | | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 74 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 75 of 142

FBG_CH1_00094527

| | | | | |
|---|---|---|---|---|
| C.II.4.3. Social security and health insurance liabilities | 17.519,43 | -22.002,77 | 97.158,59 | **92675,25** |
| 336000 Social security and health insurance payable | 17.519,43 | -22.002,77 | 97.158,59 | **92675,25** |
| 152000 Ford. SozVers. AufwendAusgleic | -8.939,12 | | | -8939,12 |
| 153500 Ford. Arbeitsamt KUG u.Land. | | -17.982,92 | | -17982,92 |
| 174200 Verbind. Sozialversicherung | -7.522,30 | | | -7522,3 |
| 174205 AOK Nordwest | 25.484,88 | | | 25484,88 |
| 174207 AOK Rheinland/Hamburg | 2.407,68 | | | 2407,68 |
| 174209 EK Barmer GEK (1) | | | | 0 |
| 174211 BKK SBK | | | | 0 |
| 174213 BKK Euregio | | | | 0 |
| 174215 IKK Südwest | 591,23 | | | 591,23 |
| 174219 IKK Classic | 5.497,06 | | | 5497,06 |
| 174220 EK KKH Kaufmännische | | | | 0 |
| 174221 BKK Viactic | | | | **0** |
| 174800 ZV Spesen | | | | 0 |
| 188202 Verb. KK Techniker Krankenk. | | -18,07 | | -18,07 |
| 188203 Verb. KK BEK/GEK | | 41,08 | | 41,08 |
| 188204 Verb. KK DAK/Gesundheit | | -184,01 | | -184,01 |
| 188208 Verb. KKH | | -55,58 | | -55,58 |
| 188209 Verb. Hanseatische KK | | 81,24 | | 81,24 |

DEBTORS' EXHIBIT NO. 240
Page 75 of 142

CONFIDENTIAL

FBG_CH1_00094528

| | | | | | |
|---|---|---|---|---|---|
| 188210 Verb. KK IKK | | | 450,52 | | 450,52 |
| 188235 Verb. KK Bundesknappschaft | | | -86,26 | | -86,26 |
| 188240 Verb. AOK plus Sachsen | | | -5.819,42 | | -5819,42 |
| 188292 Verb. BKK firmus | | | | | 0 |
| 188300 Verb. Direktversicherungen | | | 1.570,65 | | 1570,65 |
| 193000 Verbindlichkeiten Krankenkassen | | | | | 0 |
| 336110 Zdravotní pojištění | | | | 28.902,47 | 28902,47 |
| 336210 Sociální pojištění | | | | 68.256,12 | 68256,12 |
| C.II.4.4. Tax liabilities and subsidies | 567.280,45 | 110.628,22 | 258.771,08 | | 936.679,75 |
| 342000 Employee income tax | 330.320,89 | 29.963,72 | 49.418,42 | | 409.703,03 |
| 174100 Verbind. FA-Lohnsteuer | | 29.963,72 | | | 29963,72 |
| 188100 Verb. Finanzamt aus LohnSt | | | 49.418,42 | | 49418,42 |
| 190600 Verbindlichkeiten Lohnsteuer | 330.320,89 | | | | 330.320,89 |
| 342100 Daň z P ze závislé činnosti | | | | -1.211,97 | -1211,97 |
| 342200 Daň z P zvláštní sazba | | | | | 0 |
| Saldowechsel zwischen '342 Employee income tax liability' und '342 Employee income tax receivable' | | | | 1.211,97 | 1211,97 |
| 343000 VAT | 224.821,03 | 80.664,50 | 206.725,28 | | 512.210,81 |
| 0180000 SO.VERB.a.UST Jahresabschluss | | | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 76 of 142

CONFIDENTIAL

FBG_CH1_00094529

| Account | | | |
|---|---|---|---|
| 154200 Vorsteuer 19% EU-Erwerb CZ | -40.369,29 | | **-40369,29** |
| 157050 EG Vorsteuer | | -578,77 | **-578,77** |
| 157100 Vorsteuer 7% | -16.248,55 | | **-16248,55** |
| 157200 VorSt 7 % | | -13.352,73 | **-13352,73** |
| 157401 n. n. abziehbare Vorsteuer | | | **0** |
| 157410 Vorsteuer 19% EU-Erwerb | -1.018.770,65 | | **-1018770,65** |
| 157600 Vorsteuer 19% | -2.605.558,92 | | **-2605558,92** |
| 157700 VorSt 19 % | | -1.386.910,86 | **-1386910,86** |
| 157700 Vorsteuer 19% (13b UStG) | -5.189,85 | | **-5189,85** |
| 157702 VSt § 13 b UStG | | -698.830,50 | **-698830,5** |
| 157710 Vorsteuer 19% (13b UStG) | -2.320,70 | | **-2320,7** |
| 158800 bezahlte Einfuhr-Umsatzsteuer | | -12.754,04 | **-12754,04** |
| 177410 Mehrwertsteuer 19% EU-Erwerb W | 1.018.770,65 | | **1018770,65** |
| 177600 Mehrwertsteuer 19% | 2.417.377,85 | | **2417377,85** |
| 178000 Vorauszahlung USt | 326.642,41 | | **326642,41** |
| 178700 Mehrwertsteuer 19% (13b UStG) | 4.010,85 | | **4010,85** |
| 178710 Mehrwertsteuer 19% (13b UStG) | 2.320,70 | | **2320,7** |
| 180000 Vorsteuer | | | **0** |
| 180100 Einfuhr-Umsatzsteuer | | | **0** |

**DEBTORS' EXHIBIT NO. 240**
**Page 77 of 142**

CONFIDENTIAL

| Account | | | |
|---|---|---|---|
| 180200 Vorsteuer aus innergemeinschaftlichem Erwerb | | | 0 |
| 181000 Ausgangssteuer | | | 0 |
| 181200 Ausgangssteuer aus innergemeinschaftlichem Erwerb | | | 0 |
| 184000 USt-Zahlungskonto | 224.821,03 | | **224.821,03** |
| 187700 USt 19 % | | 4.129.281,59 | **4129281,59** |
| 187702 USt § 13 b UStG | | 698.830,50 | **698830,5** |
| 187950 Umsatzsteuervorauszahlung | | -2.665.980,56 | **-2665980,56** |
| 187990 Verbindl. aus USt-Voranmeldgn. | | 157.020,65 | **157020,65** |
| 343110 DPH nárok tuzemsko sníž.sazba | | -1.518,90 | **-1518,9** |
| 343115 DPH nárok tuzemsk.sníž.sazba 2 | | | **0** |
| 343120 DPH nárok tuzemsk.základ.sazba | | -177.301,45 | **-177301,45** |
| 343121 DPH 21% vstup | -2.042,27 | | **-2042,27** |
| 343140 DPH nárok EU r.ch.zboží zákl.s | | -356.872,58 | **-356872,58** |
| 343145 DPH nárok EU r.ch.služb.zákl.s | | -53.251,78 | **-53251,78** |
| 343220 DPH odvod tuzemsk.základ.sazba | | 40.053,78 | **40053,78** |
| 343221 DPH 21% výstup | | | **0** |
| 343240 DPH odvod EU r.ch.zboží zákl.s | | 356.872,58 | **356872,58** |
| 343245 DPH odvod EU r.ch.služb.zákl.s | | 53.251,78 | **53251,78** |

FBG_CH1_00094530

**DEBTORS' EXHIBIT NO. 240**
**Page 78 of 142**

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 79 of 142

| | | | | | |
|---|---|---|---|---|---|
| 343310 DPH úhrady | | | 50.381,19 | | 50381,19 |
| 343340 DPH nárok 3.země R.CH.základ.s | | | -41,73 | | -41,73 |
| 343440 DPH odvod 3.země R.CH.základ.s | | | 41,73 | | 41,73 |
| Saldowechsel zwischen '343 VAT Liability' und '343 VAT Receivable' | 2.042,27 | | 88.385,38 | | 90427,65 |
| **345000 Other taxes** | **12.138,53** | | **2.627,38** | | **14.765,91** |
| 158800 Einfuhrumsatzsteuer | | -497,44 | | | -497,44 |
| 174010 Verbind. TicketPlus-edenred | | 3.473,40 | | | 3473,4 |
| 174050 Forderung KUG L&G | | -26.100,00 | | | -26100 |
| 187050 Erwerbsteuer | | | 578,77 | | 578,77 |
| 188500 Verb. VL | | | 2.012,25 | | 2012,25 |
| 188600 Verb. Bundesknappschaft | | | 36,36 | | 36,36 |
| 190700 Verbindlichkeiten Soli-Zuschlag | 9.953,60 | | | | 9.953,60 |
| 190800 Verbindlichkeiten Kirchensteuer | 2.184,93 | | | | 2.184,93 |
| 345000 Ostatní daně a poplatky | | | | | 0 |
| Saldowechsel zwischen '345 Other tax liabilities' und '345 Other tax receivable' | | 23.124,04 | | | 23124,04 |
| **346000 Subsidies** | | | | | **0** |
| C.II.4.5. Estimated payables | 547.069,73 | 232.464,46 | 68.062,65 | 173.344,38 | **1.020.941,22** |
| **389000 Estimated payables** | **547.069,73** | **232.464,46** | **68.062,65** | **173.344,38** | **1.020.941,22** |

DEBTORS' EXHIBIT NO. 240
Page 79 of 142

FBG_CH1_00094531

CONFIDENTIAL

| Account | | | | | Total |
|---|---|---|---|---|---|
| 159000 durchlaufende Posten | | | | | 0 |
| 159001 durchl. Posten Triton | | | | | 0 |
| 160100 Ausst. Rechn. | | 232.464,46 | | | **232464,46** |
| 389000 Dohadné účty pasivní | | | | 47.070,76 | **47070,76** |
| 389010 Očekávané rozdíly-vrubopisy | | | | | 0 |
| 389999 DOHAD Others | | | | 126.273,62 | **126273,62** |
| 395401 Nepřiřazená faktura - opravy | | | | | 0 |
| 399997 Zwischenkto. Bestand | | | 69.060,59 | | **69060,59** |
| 399998 n.n.zugeord.Eingangsrechnungen | | | -218.248,09 | | **-218248,09** |
| 399999 Verb. aus n.n. ber. Wareneing. | | | 219.086,89 | | **219086,89** |
| 82600 Abgrenzung Personalnebenkosten | 567.467,00 | | | | **567.467,00** |
| 83000 Abgrenzung Zinsen | 15.000,00 | | | | **15.000,00** |
| 889099 Zwischenkonto Kosten | | | -1.836,74 | | **-1836,74** |
| 89000 Abgrenzung sonstige | 1.356.966,94 | | | | **1.356.966,94** |
| 89010 Abgrenzung Controlling sonstige | -427.918,24 | | | | **-427.918,24** |
| 89030 Abgrenzung Controlling Projekte | -964.445,97 | | | | **-964.445,97** |
| 89040 Abgrenzung Controlling Kundenboni | | | | | 0 |
| 89060 Abgrenzung Controlling Intercompany | | | | | 0 |
| C.II.4.6. Other payables | 118.920,22 | | 22.906,20 | 69.071,30 | **210.897,72** |

DEBTORS' EXHIBIT NO. 240
Page 80 of 142

FBG_CH1_00094532

CONFIDENTIAL

| Account | | | | Total |
|---|---|---|---|---|
| 365000 Other payables to shareholders | | | | 0 |
| 373000 Payables from fixed term operations | | | 67.756,01 | 67756,01 |
| Saldowechsel zwischen '373000 Receivables from fixed term operations (1)' und '373000 Receivables from fixed term operations' | | | 67.756,01 | 67756,01 |
| 379000 Other payables - External - ST | 118.920,22 | 22.906,20 | 1.315,29 | 143.141,71 |
| 180000 sonst. Verbindlichkeiten | | 24.012,90 | | 24012,9 |
| 181000 erhaltene Anzahlungen | | -1.106,70 | | -1106,7 |
| 181600 USt TP-Amortisation | -81.894,91 | | | -81.894,91 |
| 188400 Verb. Pfändungen Arbeitnehmer | | | | 0 |
| 199000 Sonstige Verbindlichkeiten | | | | 0 |
| 199000 TECHN. KONTO GESCHäFTSBEREICHE | | | | 0 |
| 199010 Sonstige Verbindlichkeiten Insolvenzverwaltung | 157.089,45 | | | 157.089,45 |
| 199099 Kreditorische Debitoren | | | | 0 |
| 199100 Sonstige Verbindlichkeiten Erwerberabrechnung | 43.725,68 | | | 43.725,68 |
| 199200 Verbindlichkeiten Kaufpreis | | | | 0 |
| 379100 Jiné závazky-krátkodobé | | | | 0 |
| 395300 Dohad.ú. Materiál bez faktury | | | 1.315,29 | 1315,29 |

FBG_CH1_00094533

DEBTORS' EXHIBIT NO. 240
Page 81 of 142

CONFIDENTIAL

| | | | | | | |
|---|---|---|---|---|---|---|
| 395400 Nepřiřazená faktura | | | | | | 0 |
| 999020 Ausgebuchten Verbindl.Insolv | | | | | | 0 |
| BG: V. Other Liabilities | | | | | | 0 |
| 379200 Loan from minor lenders - ST | | | | | | 0 |
| 379400 Other payables - Factoring | | | | | | 0 |
| 379999 Debt Consolidation (-) | | | | | | 0 |
| 473000 Issued bonds | | | | | | 0 |
| 375000 Receivables from issued bonds | | | | | | 0 |
| C.II.5. Intercompany liabilities | 1.903.360,41 | 4.378.105,02 | 1.189.650,19 | 26.071,09 | 335.606,78 | 7.832.793,49 |
| C.II.5.1. Trade liabilities | 13.840,65 | 1.184.985,37 | 510.009,49 | 26.071,09 | 335.606,78 | 2.070.513,38 |
| 321100 Trade payables - Intercompany - ST | 13.840,65 | 1.184.985,37 | 510.009,49 | 26.071,09 | 335.606,78 | 2.070.513,38 |
| 160010 Verb. LuL VU Organschaft | | | | | | 0 |
| 160020 Verb. LuL VU Inland | | | | | | 0 |
| 160220 Verb. LuL IC Linden s.r.o. | | | | 24.764,67 | | 24764,67 |
| 160220 Verb. LuL VU EG | | | | | | 0 |
| 160221 Verb. LuL IC Winning Plast.a.s | | | | 1.155,00 | | 1155 |
| 160221 Verb. LuL Winning Plastics a.s | | | | | | 0 |
| 160223 Verb. LuL IC WPD | | | | | | 0 |

FBG_CH1_00094534

DEBTORS' EXHIBIT NO. 240
Page 82 of 142

CONFIDENTIAL

FBG_CH1_00094535

| | | |
|---|---:|---:|
| 160224 Verb. LuL IC | | |
| Winning SW Hold. | 151,42 | 151,42 |
| 161040 Verb. IC | | |
| Winnning Plastics a.s. | 63.317,23 | 63.317,23 |
| 161041 Verb. IC | | |
| Winnning Plastics Linden GmbH | 374.953,32 | 374.953,32 |
| 161042 Verb. IC | | |
| Winnning Plastics SMK GmbH | 342.111,49 | 342.111,49 |
| 161043 Verb. IC | | |
| Winnning Plastics Linden s.r.o. | 616.668,72 | 616.668,72 |
| 161049 Verb. IC | | |
| Winnning SW Holding s.r.o. | 2.458,42 | 2.458,42 |
| 161051 Verb. IC | | |
| Winnning Management s.r.o. | | 0 |
| 161053 Verb. IC | | |
| Winnning Steel s.r.o. | | 0 |
| 161090 Verb. IC | | |
| Winnning IP a.s. | | 0 |
| 161095 Verb. IC | | |
| Winnning IP Diepersdorf GmbH | -214.523,81 | -214.523,81 |
| 163030 Verbind. LuL | | |
| LCZ | 250.481,98 | 250481,98 |
| 163033 | | |
| Rechnungseingang LCZ | | 0 |
| 163040 Verbind. LuL | | |
| Winning IP CZ | | 0 |
| 163050 Verbind. LuL | | |
| SMK | 66.107,60 | 66107,6 |
| 163053 | | |
| Rechnungseingang SMK | -10.478,95 | -10478,95 |
| 163080 Verbind. LuL | | |
| WIP LDE | 30.188,77 | 30188,77 |
| 163090 Verbind. LuL | | |
| Win as | 1.575,00 | 1575 |
| 163100 Verbind. LuL | | |
| Winning Group a.s | 126.736,29 | 126736,29 |

**DEBTORS' EXHIBIT NO. 240**
**Page 83 of 142**

CONFIDENTIAL

FBG_CH1_00094536

| Account | | | |
|---|---|---|---|
| 163110 Verbind. LuL Winning Managemen | | | **0** |
| 163120 Verbind. LuL WP Diepersdorf | | 45.258,08 | **45258,08** |
| 163130 Verbind. Winning SW Holding | | 140,72 | **140,72** |
| 321022 Dodavatelé - WA | | | **0** |
| 321030 Dodavatelé - CoFo | | | **0** |
| 321030 Dodavatelé - Winning CoFo a.s. | | | **0** |
| 321042 Dodavatelé - SMK | 10.939,33 | | **10939,33** |
| 321044 IC Závazky WPD | | 30.375,95 | **30375,95** |
| 321045 IC Závazky WPD-přecenění | | | **0** |
| 321050 Dodavatelé - WG | 2.836,91 | | **2836,91** |
| 321050 Dodavatelé - Winning Group a.s. | | | **0** |
| 321051 Dodavatelé - Winning Management s.r.o. | | | **0** |
| 321051 Dodavatelé - WM | | | **0** |
| 321059 Dodavatelé - GASTRO | 64,41 | | **64,41** |
| 321059 Dodavatelé - Winning Gastro s.r.o. | | | **0** |
| 321091 Dodavatelé - Winning IP Lüdenscheid | | | **0** |
| 321092 Dodavatelé - Winning IP Oberlungwitz | | | **0** |
| 321095 Dodavatelé - IPD | | | **0** |

**DEBTORS' EXHIBIT NO. 240**
**Page 84 of 142**

CONFIDENTIAL

FBG_CH1_00094537

| | | | | |
|---|---|---|---|---|
| 321095 Dodavatelé - Winning IP Diepersdorf | | | | 0 |
| 321600 IC Závazky Linden GmbH | | | 189.638,21 | **189638,21** |
| 321602 IC Záv. Winning Group a.s. | | | 49.740,97 | **49740,97** |
| 321604 IC Záv. Winning Management s.r | | | | **0** |
| 321606 IC Záv. Winning Plastics a.s. | | | 2.463,84 | **2463,84** |
| 321608 IC Záv. Winning Steel s.r.o. | | | | 0 |
| 321610 IC Záv. Winning PS - stavební | | | | 0 |
| 321620 IC Záv.spoj.os.-SMK | | | 63.387,81 | **63387,81** |
| 321622 Záv. Heinze Gruppe GmbH | | | | 0 |
| 321632 IC Záv. Winning Industrial Pro | | | | 0 |
| 321638 IC Záv. Winning Group přeceněn | | | | 0 |
| 321639 IC Záv. Winning Plastics přece | | | | 0 |
| 389044 IC-Dohadné účty pasivní_WPD | | | | 0 |
| BG: IV. Payables to affiliated company | | | | 0 |
| 321110 Trade payables - Intercompany - LT 1-5 years | | | | 0 |
| 321120 Trade payables - Intercompany - LT over 5 years | | | | 0 |
| C.II.5.2. Other liabilities | 1.889.519,76 | 3.193.119,65 | 679.640,70 | **5.762.280,11** |
| 343100 VAT - IC tax group | | | | 0 |

**DEBTORS' EXHIBIT NO. 240**
**Page 85 of 142**

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 343050 DPH povinnost - zúčtování s WG | -11.118,55 | | | -11118,55 |
| 343051 DPH povinnost - zúčtování s Winning Management s.r.o. | | | | 0 |
| 343051 DPH povinnost - zúčtování s WM | | | | 0 |
| Saldowechsel zwischen '343100 VAT - IC tax group' und '343100 VAT - IC tax group receivable' | 11.118,55 | | | 11118,55 |
| **361100 Payables - Intercompany - Loans** | **1.867.330,35** | **2.999.215,65** | **652.129,70** | **5.518.675,70** |
| 120150 Darlehen Winning Group a.s. | | 2.637.507,00 | | 2.637.507,00 |
| 159537 Verb.Gesellschafterdarlehen | | | | 0 |
| 161050 Verb. IC Winnning Group a.s. | | 361.708,65 | | 361.708,65 |
| 163034 Darlehen LCZ | | | 400.000,00 | 400000 |
| 163054 Darlehen SMK | | | | 0 |
| 165046 Darlehen I Winning Grroup a.s | | | | 0 |
| 165046 Darlehen I Winning Plastics a.s | | | 252.129,70 | 252129,7 |
| 361042 Dluhy - SMK | 570.589,35 | | | 570589,35 |
| 361050 Dluhy - ovládaná nebo ovládající osoba - WG | 1.296.741,00 | | | 1296741 |
| 361050 Dluhy - ovládaná nebo ovládající osoba - Winning Group a.s. | | | | 0 |
| 379046 Jiné dluhy - BAT team s.r.o. | | | | 0 |
| 379090 Jiné dluhy - Winning Industrial Property a.s. | | | | 0 |

FBG_CH1_00094538

DEBTORS' EXHIBIT NO. 240
Page 86 of 142

CONFIDENTIAL

FBG_CH1_00094539

| | | | | |
|---|---|---|---|---|
| 362000 Payables - Intercompany - Loan Interests | 22.189,41 | 193.904,00 | 27.511,00 | 243.604,41 |
| 163091 IC Zinsverbindlichkeiten Winning Plastics | | | 27.511,00 | 27511 |
| 170050 Inter Company Winning Group a.s. | | 193.904,00 | | 193.904,00 |
| 362050 Dluhy - WG | 18.748,31 | | | 18748,31 |
| 362050 Dluhy - Winning Group a.s. | | | | 0 |
| 362090 Dluhy - IP | 3.441,10 | | | 3441,1 |
| 362090 Dluhy - Winning Industrial Property a.s. | | | | 0 |
| 364000 Payables - Intercompany – Dividends and Advances for dividends | | | | 0 |
| D. Accruals | | | 5.754,52 | 5754,52 |
| D.1. Accrued expenses | | | 5.754,52 | 5754,52 |
| 383000 Accrued expenses (to be paid in following year) | | | 5.754,52 | 5754,52 |
| 383000 Výdaje příštich období | | | 5.754,52 | 5754,52 |
| D.2. Deferred revenues | | | | 0 |
| 384000 Deferred revenues (revenue of following year) | | | | 0 |
| 459050 Rezerva na výr. náklady-nást | | | | 0 |
| E. Minority capital | | | | 0 |
| E.I. Minority basic capital | | | | 0 |
| 411999 Minority registered capital | | | | 0 |

DEBTORS' EXHIBIT NO. 240
Page 87 of 142

CONFIDENTIAL

FBG_CH1_00094540



| | |
|---|---|
| E.II. Minority capital funds | 0 |
| 413999 Minority capital funds | 0 |
| E.III. Minority funds created from profit, including retained earnings | 0 |
| 428999 Minority retained earnings | 0 |
| E.IV. Minority earnings from current accounting period | 0 |
| 431999 Minority current profit/loss | 0 |

DEBTORS' EXHIBIT NO. 240
Page 88 of 142

CONFIDENTIAL

FBG_CH1_00094541

**ANNEX 2**  NET DEBT CALCULATION

| EUR | Balance Sheet based on Estimated Financial Statements | Estimated April adjustments | Estimated Balance Sheet |
|---|---|---|---|
| Irrelevant | Fixed assets | 19.215.629,70 | | 19.215.629,70 |
| Working capital | Inventory | 27.542.323,61 | | 27.542.323,61 |
| Working capital | Receivables | 9.931.141,94 | | 9.931.141,94 |
| Working capital | Other assets | 1.270.311,45 | | 1.270.311,45 |
| Working capital | Prepaid expenses | 514.406,83 | | 514.406,83 |
| Working capital | IC receivable within Plastics | 3.310.521,77 | | 3.310.521,77 |
| Net cash | IC receivables vs. WG | 736.255,38 | | 736.255,38 |
| Net cash | Cash | 4.734.698,50 | 308.224,97 | 5.042.923,47 |
| | Total assets | 67.255.289,18 | 308.224,97 | 67.563.514,15 |
| | | | | |
| Irrelevant | Equity | 18.078.659,22 | 14.236,01 | 18.092.895,23 |
| Working capital | Trade payables | 12.073.650,89 | | 12.073.650,89 |
| Working capital | Other liabilities | 4.093.328,84 | | 4.093.328,84 |
| Working capital | Provisions | 5.536.065,84 | | 5.536.065,84 |
| Net debt | Debt | 19.635.036,40 | 341.534,41 | 19.976.570,81 |
| Working capital | IC liabilities within Plastics | 3.321.374,33 | | 3.321.374,33 |
| Net debt | IC liabilities vs. WG | 4.511.419,16 - | 47.545,45 | 4.463.873,71 |
| Working capital | Deferrals | 5.754,52 | | 5.754,52 |
| | Total liabilities and equity | 67.255.289,20 | 308.224,97 | 67.563.514,17 |

| | | |
|---|---|---|
| **Estimated Normalised Working Capital** | | **17.538.531,18** |
| | | |
| Base Purchase Price | | 30.000.000,00 |
| Estimated Net Debt | | - 19.976.570,81 |
| Estimated Net Cash | | 5.042.923,47 |
| Pay-off Amount 1 | | - 3.727.618,33 |
| Estimated Working Capital Adjustment | | - 2.461.468,82 |
| **Estimated Total Purchase Price** | | **8.877.265,51** |

**DEBTORS' EXHIBIT NO. 240**
**Page 89 of 142**



CONFIDENTIAL

FBG_CH1_00094542

FBG_CH1_00094543

DEBTORS' EXHIBIT NO. 240
Page 91 of 142

CONFIDENTIAL

**ANNEX 3**          **WORKING CAPITAL CALCULATION**

| | EUR | Balance Sheet based on Estimated Financial Statements | Estimated April adjustments | Estimated Balance Sheet |
|---|---|---|---|---|
| Irrelevant | Fixed assets | 19.215.629,70 | | 19.215.629,70 |
| Working capital | Inventory | 27.542.323,61 | | 27.542.323,61 |
| Working capital | Receivables | 9.931.141,94 | | 9.931.141,94 |
| Working capital | Other assets | 1.270.311,45 | | 1.270.311,45 |
| Working capital | Prepaid expenses | 514.406,83 | | 514.406,83 |
| Working capital | IC receivable within Plastics | 3.310.521,77 | | 3.310.521,77 |
| Net cash | IC receivables vs. WG | 736.255,38 | | 736.255,38 |
| Net cash | Cash | 4.734.698,50 | 308.224,97 | 5.042.923,47 |
| | Total assets | 67.255.289,18 | 308.224,97 | 67.563.514,15 |
| | | | | |
| Irrelevant | Equity | 18.078.659,22 | 14.236,01 | 18.092.895,23 |
| Working capital | Trade payables | 12.073.650,89 | | 12.073.650,89 |
| Working capital | Other liabilities | 4.093.328,84 | | 4.093.328,84 |
| Working capital | Provisions | 5.536.065,84 | | 5.536.065,84 |
| Net debt | Debt | 19.635.036,40 | 341.534,41 | 19.976.570,81 |
| Working capital | IC liabilities within Plastics | 3.321.374,33 | | 3.321.374,33 |
| Net debt | IC liabilities vs. WG | 4.511.419,16  - | 47.545,45 | 4.463.873,71 |
| Working capital | Deferrals | 5.754,52 | | 5.754,52 |
| | Total liabilities and equity | 67.255.289,20 | 308.224,97 | 67.563.514,17 |

| | |
|---|---|
| **Estimated Normalised Working Capital** | **17.538.531,18** |
| | |
| Base Purchase Price | 30.000.000,00 |
| Estimated Net Debt | - 19.976.570,81 |
| Estimated Net Cash | 5.042.923,47 |
| Pay-off Amount 1 | - 3.727.618,33 |
| Estimated Working Capital Adjustment | - 2.461.468,82 |
| **Estimated Total Purchase Price** | **8.877.265,51** |

CONFIDENTIAL

FBG_CH1_00094544

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 93 of 142

FBG_CH1_00094545

## ANNEX 4      LIST OF DISCLOSED INFORMATION

| | | |
|---|---|---|
| E-Mail from 26.04.2024 | Legal DD request list.xlsx | .xlsx |
| E-Mail from 26.04.2024 | Winning Plastics - QA Tracker(24010057246.2)_JL_v2.xlsx | .xlsx |
| 1. Corporate | 1.4 Empty.txt | .txt |
| 1. Corporate | Blitz 21-296_780-2021.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+List_of_shareholders__entry_in_the_register_folde-20240419104945.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+List_of_shareholders__entry_in_the_register_folde-20240419105038.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Partnership_agreement_-_articles_-_statute_of_09-0-20240419104553.pdf | .pdf |
| 1. Corporate | SPA Winning Plastics - Linden_161{2}2022 (ID 3329436).pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+CD-20240419104407.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Partnership_agreement_-_articles_-_statute_of_13-0-20240419094719.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Report_-_decision_-_record_dated_06-12-2021-20240419105743.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Report_-_decision_-_record_dated_11-01-2022-20240419105654.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Report_-_decision_-_record_dated_13-04-2022-20240419105534.pdf | .pdf |
| 1. Corporate | NW-Iserlohn_HRB_10343+Report_-_decision_-_record_dated_17-12-2021-20240419105815.pdf | .pdf |
| 1. Corporate | 1606_2021 K Angebot.pdf | .pdf |
| 1. Corporate | Annahme UR Nr 1633_2021_K.pdf | .pdf |
| 1. Corporate | K 1602 - 2021 Bezugsurkunde (ID 2894599).pdf | .pdf |
| 1. Corporate | FW_ Linden acquisition docs.msg | .msg |
| 1. Corporate | zakladatelska_listina.pdf | .pdf |
| 1. Corporate | prokuristi.pdf | .pdf |
| 1. Corporate | vymena_jednatel_2022.pdf | .pdf |
| 1. Corporate | ZL_2020.pdf | .pdf |
| 1. Corporate | Blitz 21-300_782-2021.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+List_of_shareholders__entry_in_the_register_folde-20240419094911.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+List_of_shareholders__entry_in_the_register_folde-20240419114727.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+List_of_shareholders__entry_in_the_register_folde-20240419115657.pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 93 of 142

CONFIDENTIAL

FBG_CH1_00094546

| | | |
|---|---|---|
| 1. Corporate | SN-Chemnitz_HRB_34810+List_of_shareholders__entry_in_the_register_folde-20240419115816.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+Partnership_agreement_-_articles_-_statute_of_09-0-20240419114327.pdf | .pdf |
| 1. Corporate | SPA Winning Plastics - SMK_162(2)2022 (ID 3329471).pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+CD-20240419113107.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+Partnership_agreement_-_articles_-_statute_of_23-0-20240419094845.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+Report_-_decision_-_record_dated_06-12-2021-20240419121947.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+Report_-_decision_-_record_dated_11-01-2022-20240419121913.pdf | .pdf |
| 1. Corporate | SN-Chemnitz_HRB_34810+Report_-_decision_-_record_dated_23-02-2022-20240419121814.pdf | .pdf |
| 1. Corporate | 1003-2022 K.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+List_of_shareholders__entry_in_the_register_folde-20240419095900.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+List_of_shareholders__entry_in_the_register_folde-20240419095931.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+Partnership_agreement_-_articles_-_statute_of_13-0-20240419095352.pdf | .pdf |
| 1. Corporate | SPA Blitz 22-629 (ID 3223425).pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+CD-20240419095027.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+Partnership_agreement_-_articles_-_statute_of_12-0-20240419094353.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+Report_-_decision_-_record_dated_07-03-2022-20240419104214.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+Report_-_decision_-_record_dated_12-09-2022-20240419103958.pdf | .pdf |
| 1. Corporate | BY-Nürnberg_HRB_40825+Report_-_decision_-_record_dated_14-07-2022-20240419104056.pdf | .pdf |
| 1. Corporate | 10252882180_3_Nachtrag zum Kaufvertrag_Anmerkungen DL 2022-07-26 (ID 3837666)- signed.pdf | .pdf |
| 1. Corporate | Abtretungsvertrag BW-Immaterielle Vermögensgegenstände_executed.pdf | .pdf |
| 1. Corporate | Notarial Deed Part 1 (ID 3672380).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 10 (ID 3941428).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 11 (ID 3941429).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 12 (ID 3941433).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 13 (ID 3941435).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 14 (ID 3941436).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 15 (ID 3941437).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 16 (ID 3941439).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 17 (ID 3941440).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 2 (ID 3672384).pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 94 of 142

CONFIDENTIAL

FBG_CH1_00094547

| 1. Corporate | Notarial Deed Part 3 (ID 3672388).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 4 (ID 3672389).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 5 (ID 3672393).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 6 (ID 3672395).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 7 (ID 3672449).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 8 (ID 3941605).pdf | .pdf |
| 1. Corporate | Notarial Deed Part 9 (ID 3941427).pdf | .pdf |
| 1. Corporate | Vollzugsprotokoll Änderungsvereinbarung_Project Rhapsody executed(37376018.1).pdf | .pdf |
| 1. Corporate | Übereignungsvertrag BB-Sachanlagen BB-Inventar executed.pdf | .pdf |
| 1. Corporate | Übereignungsvertrag BW-Sachanlagen BW-Inventar_unterzeichnet Winning Group_executed.pdf | .pdf |
| 1. Corporate | BY-München_HRB_284249+List_of_shareholders__entry_in_the_register_folde-20240423110827.pdf | .pdf |
| 1. Corporate | BY-München_HRB_284249+Partnership_agreement_-_articles_-_statute_of_02-0-20240423111017.pdf | .pdf |
| 1. Corporate | UVZ 100{2}2023 (ID 5211708).pdf | .pdf |
| 1. Corporate | BY-München_HRB_284249+CD-20240423110610.pdf | .pdf |
| 1. Corporate | BY-München_HRB_284249+Partnership_agreement_-_articles_-_statute_of_10-0-20240423110727.pdf | .pdf |
| 1. Corporate | UVZ 102{2}2023 (ID 5211728).pdf | .pdf |
| 1. Corporate | 20240424_Akcie_Winning Plastics.docx | .docx |
| 1. Corporate | stanovy.pdf | .pdf |
| 1. Corporate | ofch_firma.pdf | .pdf |
| 1. Corporate | statutar.pdf | .pdf |
| 1. Corporate | zivnosti.pdf | .pdf |
| 2. Commercial | Other entities.txt | .txt |
| 2. Commercial | betriebsordnung-fremdfirmen_vers5.pdf | .pdf |
| 2. Commercial | code-of-conduct-fur-lieferanten-31.01.2023.pdf | .pdf |
| 2. Commercial | einkaufsbedingungen_en_winning-plastics-diepersdorf-gmbh_version-d_31.01.2023.pdf | .pdf |
| 2. Commercial | it-sicherheitsleitlinie-fur-lieferanten-der-winning-plastics-gmbh-31.01.2023.pdf | .pdf |
| 2. Commercial | Code-of-Conduct-Winning-Group-new_rev_DRM_MJ-06132023-x_CS_PROOF_DRM_EN-formatovano-09.08.2023-CEO-podpis.pdf | .pdf |
| 2. Commercial | general-terms-and-conditions-of-purchase-winning-plastics-1.09.2022.pdf | .pdf |
| 2. Commercial | lieferantenselbstauskunft_en-31.01.2023-xlsx.xlsx | .xlsx |
| 2. Commercial | rmi_cmrt_6.22.xlsx | .xlsx |

DEBTORS' EXHIBIT NO. 240
Page 95 of 142

CONFIDENTIAL

FBG_CH1_00094548

| 2. Commercial | 2024.04.18 TOP5 supplier 2023_Plastics_updated.xlsx | .xlsx |
| 2. Commercial | Ergänzung_Liefer_und_Dienstleistungsvertrag_1 (1).pdf | .pdf |
| 2. Commercial | Ergänzung_Liefer_und_Dienstleistungsvertrag_2 (2).pdf | .pdf |
| 2. Commercial | Liefer- und Dienstleistungsvertrag.pdf | .pdf |
| 2. Commercial | 2024-01_Preistabellen Winning AÜ__Colieferanten - Preistabelle blanko.pdf | .pdf |
| 2. Commercial | 2024-01_Preistabellen Winning AÜ__Randstad - Preistabelle blanko.pdf | .pdf |
| 2. Commercial | AG_LTL_07.08.2023_verhandelt.pdf | .pdf |
| 2. Commercial | Inhousevertrag.pdf | .pdf |
| 2. Commercial | IN_LTL_07.08.2023_WV-verhandelt.pdf | .pdf |
| 2. Commercial | Liefervertrag Winning Plastics_Mac Dermid Enthone.pdf | .pdf |
| 2. Commercial | Mastervertrag.pdf | .pdf |
| 2. Commercial | RV Spritzguss_Vogel Kunststofftechnik GmbH_20130913.pdf | .pdf |
| 2. Commercial | RV_Version_A_T.Bangemann GmbH_20191030.pdf | .pdf |
| 2. Commercial | 20220127 Winning_Linden Trade Agreement_signed_redacted.pdf | .pdf |
| 2. Commercial | 20220203 Trade Agreement (all signatures)_redacted.pdf | .pdf |
| 2. Commercial | 220830_Trade Agreement_FINAL_SIGNED_redacted.pdf | .pdf |
| 2. Commercial | Finale Version Trade Agreement Winning Group (part 1) - unterzeichnet_redacted.pdf | .pdf |
| 2. Commercial | TA DAF_redacted.pdf | .pdf |
| 2. Commercial | TA_Mercedes Benz_redacted.pdf | .pdf |
| 2. Commercial | Winnig TA Audi VW_redacted.pdf | .pdf |
| 2. Commercial | Smlouva o úvěru - intragroup ENG.pdf | .pdf |
| 2. Commercial | Vertrag LDE_LCZ_2022.pdf | .pdf |
| 2. Commercial | LINDEN.pdf | .pdf |
| 2. Commercial | Winning Plastics - Diepersdorf GmbH.pdf | .pdf |
| 2. Commercial | Winning Plastics - Linden GmbH.pdf | .pdf |
| 2. Commercial | Winning Plastics - SMK GmbH.pdf | .pdf |
| 2. Commercial | No other entities have defaulting counterparties.txt | .txt |
| 2. Commercial | SMK.txt | .txt |
| 3. Intellectual Property | 3.2 Empty.txt | .txt |

DEBTORS' EXHIBIT NO. 240
Page 96 of 142

CONFIDENTIAL

FBG_CH1_00094549

| | | |
|---|---|---|
| 3. Intellectual Property | 3.4 Empty.txt | .txt |
| 3. Intellectual Property | IP acquired by Winning Plastics - Linden GmbH.pdf | .pdf |
| 3. Intellectual Property | IP acquired by Winning Plastics - SMK GmbH.pdf | .pdf |
| 3. Intellectual Property | Abtretungsvertrag BW-Immaterielle Vermögensgegenstände_executed.pdf | .pdf |
| 3. Intellectual Property | PAT_1020181200285_2024-04-19.pdf | .pdf |
| 3. Intellectual Property | PAT_1020211026830_2024-04-19.pdf | .pdf |
| 3. Intellectual Property | PAT_2020180067369_2024-04-19.pdf | .pdf |
| 3. Intellectual Property | PAT_2020201046977_2024-04-19.pdf | .pdf |
| 3. Intellectual Property | PAT_2020210043985_2024-04-19.pdf | .pdf |
| 4. IT | 4.1 Empty.txt | .txt |
| 4. IT | Potential TSA software.txt | .txt |
| 5. Data Protection | Personal data protection policy.pdf | .pdf |
| 6. Employment | 6.3 Empty.txt | .txt |
| 6. Employment | 6.7 Empty.txt | .txt |
| 6. Employment | Potential employee TSA.txt | .txt |
| 6. Employment | SKM_C25824042609400.pdf | .pdf |
| 6. Employment | Michael`s Schmidht  contract.pdf | .pdf |
| 6. Employment | Prac_smlouva_Serak.pdf | .pdf |
| 6. Employment | Rücknagel contract.pdf | .pdf |
| 6. Employment | Winning Plastics - Geschäftsführerdienstvertrag.pdf | .pdf |
| 6. Employment | 001 Vertragsvorlage_ AV Winning_ohne Kommentare.docx | .docx |
| 6. Employment | A_AV_angestellt_unbefristet_2022-09.rtf | .rtf |

DEBTORS' EXHIBIT NO. 240
Page 97 of 142

CONFIDENTIAL

FBG_CH1_00094550

| | | |
|---|---|---|
| 6. Employment | C_AV_außertariflich_2023-03.rtf | .rtf |
| 6. Employment | E_AV_gewerblich_befristet_2022-09.rtf | .rtf |
| 6. Employment | Pracovni smlouva _UA.doc | .doc |
| 6. Employment | Vzor_administrativa.doc | .doc |
| 6. Employment | Vzor_administrativa_vedouci.doc | .doc |
| 6. Employment | Vzor_delnici.doc | .doc |
| 6. Employment | WPL_Muster_Angestellte.docx | .docx |
| 6. Employment | WPL_Muster_Gewerblich.docx | .docx |
| 6. Employment | 6.3. Employee representative bodies_Linden.docx | .docx |
| 6. Employment | Pracovni smlouva _UA.doc | .doc |
| 6. Employment | Vzor_administrativa.doc | .doc |
| 6. Employment | Vzor_administrativa_vedouci.doc | .doc |
| 6. Employment | Vzor_delnici.doc | .doc |
| 6. Employment | 6.3. Employee representative bodies_SMK.docx | .docx |
| 6. Employment | 6.3. Employee representative bodies_Diepersdorf.docx | .docx |
| 6. Employment | Arbeitsschune_2024.pdf | .pdf |
| 6. Employment | Arbeitszeit_NEU.pdf | .pdf |
| 6. Employment | Betriebliche Altersvorsorge_2023.pdf | .pdf |
| 6. Employment | BV-Arbeitgeberzuschuss_Fitness_05_2015.pdf | .pdf |
| 6. Employment | BV_Arbeitzeit_Arbeitszeitkonto_2024.pdf | .pdf |
| 6. Employment | BV_Arbeitzeit_Mobiles_Arbeiten_Flexibel_Arbeitsfenster.pdf | .pdf |
| 6. Employment | Jubiläum_NEU.pdf | .pdf |
| 6. Employment | Rauchen_A.pdf | .pdf |
| 6. Employment | Rufbereitschaft_.pdf | .pdf |
| 6. Employment | WPL_Aushang_Drogen_Alkohol und Cannabis_Verbot_09.04.2024.docx | .docx |
| 6. Employment | WPL_Drogen_Alkohol und Cannabis_Verbot_BV_1_04.04.2024.docx | .docx |
| 6. Employment | BV Arbeitszeit.pdf | .pdf |
| 6. Employment | BV Einsatz und Vergütung von Routinearbeiten am Wochenende ab 01.04.2015.pdf | .pdf |
| 6. Employment | BV Gewährung von Sonderurlaub am 24.12. und 31.12..pdf | .pdf |
| 6. Employment | BV Kurzarbeit 01.03.2024_31.05.2024.pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 98 of 142

CONFIDENTIAL

FBG_CH1_00094551

| | | |
|---|---|---|
| 6. Employment | BV Regelung der Rufbereitschaft - Ergänzungsvereinbarung ab 01.04.2015.pdf | .pdf |
| 6. Employment | BV Regelung der Rufbereitschaft.pdf | .pdf |
| 6. Employment | BV Urlaub, Sonderurlaub, Jubiläumsprämien, Zuschläge - Änderungsvereinbarung.pdf | .pdf |
| 6. Employment | BV Urlaubsrahmenplanung 2024.pdf | .pdf |
| 6. Employment | BV Weihnachtsgeld.pdf | .pdf |
| 6. Employment | BV Zahlung eines zusätzlichen Urlaubsgeldes.pdf | .pdf |
| 6. Employment | BV zur Lohngruppensystematik.pdf | .pdf |
| 6. Employment | BV Zusatzschichten (Mehrarbeit) am Wochenende ab 01.04.2015.pdf | .pdf |
| 6. Employment | BV über zusätzliche Kurzpausen, Regelung der Umzieh- und Übergabezeiten sowie Raucherregelung - Anlage 1.pdf | .pdf |
| 6. Employment | BV über zusätzliche Kurzpausen, Regelung der Umzieh- und Übergabezeiten sowie Raucherregelung.pdf | .pdf |
| 6. Employment | Richtlinien Personalgespräche - Krankenrückkehrgespräche.pdf | .pdf |
| 6. Employment | Richtlinien zur Ankündigung von Betriebsratstätigkeiten und zur Abmeldung von BR-Mitgliedern.pdf | .pdf |
| 6. Employment | Vereinbarung zur Ankündigung von Betriebsratstätigkeiten und zur Abmeldung der Betriebsratsmitglieder.pdf | .pdf |
| 6. Employment | Vereinbarung zur Arbeitszeit_37,5_h_Woche 2022.pdf | .pdf |
| 6. Employment | Altersfreizeit_20230701.pdf | .pdf |
| 6. Employment | Betriebsordnung_groß_2009.pdf | .pdf |
| 6. Employment | Betriebsvereinbarung Zuschläge.pdf | .pdf |
| 6. Employment | Betriebsvereinbarung_betriebl_Eingliederungsmanagement_unterschrieben.pdf | .pdf |
| 6. Employment | BV Homeoffice 20200225 unterschrieben.pdf | .pdf |
| 6. Employment | BV_Arbeitsverhinderung 2004.pdf | .pdf |
| 6. Employment | BV_Arbeitszeitkonto Angestellte.pdf | .pdf |
| 6. Employment | BV_Ausbildungsübernahme_ab_06_2023.pdf | .pdf |
| 6. Employment | 6.4. Collective bargaining agreements_Linden.docx | .docx |
| 6. Employment | LAB IV Linden GmbH - Interessenausgleich (2021-12-28) (ID 2923527).PDF | .PDF |
| 6. Employment | LAB IV Linden GmbH - Sozialplan (2021-12-28) (ID 2923528).PDF | .PDF |
| 6. Employment | LAB IV Linden GmbH - Transfersozialplan (2021-12-28) (ID 2923623).PDF | .PDF |
| 6. Employment | LINDEN_Kolektivní smlouva 2024.pdf | .pdf |
| 6. Employment | 6.4. Collective bargaining agreements_SMK.docx | .docx |
| 6. Employment | SMK_Interessenausgleich (ID 2931023).pdf | .pdf |
| 6. Employment | SMK_Sozialplan (ID 2931020).pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 99 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 100 of 142

| | | |
|---|---|---|
| 6. Employment | SMK_Transfersozialplan (ID 2931022).pdf | .pdf |
| 6. Employment | 6.4. Collective bargaining agreements_Diepersdorf.docx | .docx |
| 6. Employment | 8. BW_Collective labor agreement 2009 (ID 3279303).pdf | .pdf |
| 6. Employment | BOLTA WERKE GmbH_Insolvenzsozialplan_§ 123 InsO_geschwärzt_2022_04_28 (ID 3524501).pdf | .pdf |
| 6. Employment | BOLTA WERKE GmbH_Interessenausgleich_§ 125 InsO_geschwärzt_2022_04_28 (ID 3524400).pdf | .pdf |
| 6. Employment | BOLTA-WERKE_Insolvenzsozialplan_unterzeichnet_geschwärzt_2022_05_31 (ID 3636561).pdf | .pdf |
| 6. Employment | BOLTA-WERKE_Interessenausgleich_unterzeichnet_geschwärzt_2022_05_31 (ID 3636555).pdf | .pdf |
| 6. Employment | BV Jubiläum (ID 3106479).pdf | .pdf |
| 6. Employment | freistellungserklarung-zum-mindestlohngesetz_en-31.01.2023.pdf | .pdf |
| 6. Employment | Tarifvertrag Winning_IGBCE final_unterschrieben.pdf | .pdf |
| 6. Employment | headcount summary plastics.xlsx | .xlsx |
| 6. Employment | 801125639_59595992_1_5004494_0_AÜV.pdf | .pdf |
| 6. Employment | Ceník 2021.pdf | .pdf |
| 6. Employment | Rámcová smlouva o poskytování služeb 2020.pdf | .pdf |
| 6. Employment | Rámcová smlouva_12.10.2023.pdf | .pdf |
| 6. Employment | 200902 Nutzungsvereinbarung elektronische Signatur Bolta.pdf | .pdf |
| 6. Employment | Ergänzung zur Zentralen Rahmenvereinbarung.pdf | .pdf |
| 6. Employment | Inhousevertrag.pdf | .pdf |
| 6. Employment | Mastervertrag.pdf | .pdf |
| 6. Employment | PV Vertrag.pdf | .pdf |
| 6. Employment | Zentraler RV - Bolta.pdf | .pdf |
| 6. Employment | Überlassungsvereinbarung.pdf | .pdf |
| 6. Employment | AC 2024-04.pdf | .pdf |
| 6. Employment | AT 2024-04.pdf | .pdf |
| 6. Employment | BS 2024-04.pdf | .pdf |
| 6. Employment | Currently empty.txt | .txt |
| 6. Employment | HH 2024-04.pdf | .pdf |
| 6. Employment | OI 2024-04.pdf | .pdf |
| 6. Employment | VG 2024-05.pdf | .pdf |
| 6. Employment | WPD HR Summary -April new.xlsx | .xlsx |

FBG_CH1_00094552

DEBTORS' EXHIBIT NO. 240
Page 100 of 142

CONFIDENTIAL

FBG_CH1_00094553

| 6. Employment | YA 2024-04.pdf | .pdf |
| 6. Employment | ZM 2024-05.pdf | .pdf |
| 6. Employment | 6.6. Proceedings_Linden.docx | .docx |
| 6. Employment | 6.6. Proceedings_SMK.docx | .docx |
| 6. Employment | doc038326202404261026 42.pdf | .pdf |
| 6. Employment | doc0383272024042610 2707.pdf | .pdf |
| 6. Employment | anzeige-kug_2024_03_14_unterschrieben.pdf | .pdf |
| 6. Employment | Bewilligung_25.03.2024.pdf | .pdf |
| 7. Real estate | 7.1 Empty.txt | .txt |
| 7. Real estate | Linden Lüdenscheid_Rent Contract.pdf | .pdf |
| 7. Real estate | Nachtrag_Triple Net Mietvertrag_Lüdenscheid.pdf | .pdf |
| 7. Real estate | Nachtrag_Triple Net Mietvertrag_Lüdenscheid.docx | .docx |
| 7. Real estate | 20240419_Mietvertrag_LINDEN_v2.docx | .docx |
| 7. Real estate | Hustopece comment.txt | .txt |
| 7. Real estate | Smlouva o Leasingu_Leasingvertrag.pdf | .pdf |
| 7. Real estate | Mietvertrag_Winning IP Oberlungwitz GmbH.pdf | .pdf |
| 7. Real estate | Nachtrag_Triple Net Mietvertrag_Oberlungwitz.docx | .docx |
| 7. Real estate | Nachtrag_Triple Net Mietvertrag_Oberlungwitz_signed.pdf | .pdf |
| 7. Real estate | 2 Nachtrag_Mietvertrag_Gottmadingen_Haller_10.05.2023.pdf | .pdf |
| 7. Real estate | 20220822_Allround Handels GmbH.pdf | .pdf |
| 7. Real estate | Hotter_Vertrag über Einlagerung von Waren-Betriebsmitteln Fa. Hotter.pdf | .pdf |
| 7. Real estate | Llegat und Co GmbH Vertrag über Einlagerung von Waren-Betriebsmitteln.pdf | .pdf |
| 7. Real estate | Messerer_Vertrag über Einlagerung_Messerer_23.05.2023.pdf | .pdf |
| 7. Real estate | Mietvertrag Gottmadingen ab 01082015.pdf | .pdf |
| 7. Real estate | Preiserhöhung 2023_Allround_04.11.2022.pdf | .pdf |
| 7. Real estate | Regler_Mietvertrag_Ausbildungszentrum_20231026.pdf | .pdf |
| 7. Real estate | Winning Plastics Diepersdorf Mietvertrag.pdf | .pdf |
| 7. Real estate | Zeising_Unterzeichneter Mietvertrag für Teilfläche Halle Diepersdorf.pdf | .pdf |
| 7. Real estate | # 2703 MV  HUECK Gütersloh Produktionshalle + Lagerhalle.pdf | .pdf |
| 7. Real estate | 19.12.03_Vereinbarungen Vertragsübernahme MV Lagerflächen und Nachträge HUECK Gütersloh.pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 101 of 142

CONFIDENTIAL

| | | |
|---|---|---|
| 7. Real estate | 19.12.03_Vereinbarungen Vertragsübernahme u. Nachträge HUECK Gütersloh.pdf | .pdf |
| 7. Real estate | BA-Lageplan-500 Bolta Güterloh rot eingezeichnet.pdf | .pdf |
| 7. Real estate | BA-Lageplan-500.pdf | .pdf |
| 7. Real estate | Kataster-1000.pdf | .pdf |
| 8. Environmental | 8.1 Empty.txt | .txt |
| 8. Environmental | PN_ENV_001 - Provozní řád ZZO - Lakovací box Walther.docx | .docx |
| 8. Environmental | Rozhodnutí o povolení Walther + plyn. kotle De Ditrich_12-2020.pdf | .pdf |
| 8. Environmental | T 028-5-2023-el - Walther.pdf | .pdf |
| 8. Environmental | 2011-09-27 LDS_Bescheid_C44-8823-14-31_immssionsschutzrechtl_Gen_KA1u2.pdf | .pdf |
| 8. Environmental | 2014-05-08 LDS_Bescheid_C41-8952.40-1-51_wrG_Indirekteinleitung_Galv-Abwasser_WAD.pdf | .pdf |
| 8. Environmental | 2014-08-07 WAD_Abwassereinleitungsvertrag_VA_2013_0046.pdf | .pdf |
| 8. Environmental | 2015-09-17 LDS_Bescheid_C44-8831-694-2_Umbau_Heizung_BHKW_neu.pdf | .pdf |
| 8. Environmental | 2018-08-13 LDS_wrE_C41-8952-40-1-34_rev1.pdf | .pdf |
| 8. Environmental | 2020-12-15 BSM_Feuerstättenbescheid.pdf | .pdf |
| 8. Environmental | 2020-12-15 LDS_Information_C40-8603-1486-42_Befristung_Neuerteilung_u_rückwirkende_Änd_wrE.pdf | .pdf |
| 8. Environmental | 2022-08-15_LDS_Bescheid_C41-8618-261-3_Änderung_wrG_Indirekteinleitung_Galv-Abwasser.pdf | .pdf |
| 8. Environmental | 2024-01-24 LDS_Stellungnahme_44-8431-691-4 Überprüfung gemäß § 14 der 42. BImSchV.pdf | .pdf |
| 8. Environmental | 2011-08-11_A_12_LRA_Bescheid_BImSchG - copia.pdf | .pdf |
| 8. Environmental | 2012-03-27_Genehmigung GV Paul_BImSchG - copia.pdf | .pdf |
| 8. Environmental | 2015-09-04_GV Paul_Erweiterung Chrom(III).pdf | .pdf |
| 8. Environmental | 2016-12-09_Genehmigung GV PAUL_BImSchG_Erweiterung Chemisch Nickel_LRA - copia.pdf | .pdf |
| 8. Environmental | V23_Bericht_Sanierung Jan-Juni21.pdf | .pdf |
| 8. Environmental | 231214_Besprechungsptotokoll_PFAS-Leinburg_MK.pdf | .pdf |
| 8. Environmental | 828059 - 2_Memo_Prüfung_Haftung_Umweltrecht_V001_16.02.2024.pdf | .pdf |
| 8. Environmental | Memo_Prüfung_Haftung_Umweltrecht_17.04.2024.pdf | .pdf |
| 8. Environmental | 2011-08-11_A_12_LRA_Bescheid_BImSchG - copia.pdf | .pdf |
| 8. Environmental | 2011-09-27 LDS_Bescheid_C44-8823-14-31_immssionsschutzrechtl_Gen_KA1u2.pdf | .pdf |
| 8. Environmental | 2012-03-27_Genehmigung GV Paul_BImSchG - copia.pdf | .pdf |
| 8. Environmental | 2012-06-21_Emissionsmessungen Paul_LGA_120322 vom 15.10.2012.pdf | .pdf |
| 8. Environmental | 2014-05-08 LDS_Bescheid_C41-8952.40-1-61_wrG_Indirekteinleitung_Galv-Abwasser_WAD.pdf | .pdf |

FBG_CH1_00094554

DEBTORS' EXHIBIT NO. 240
Page 102 of 142

CONFIDENTIAL

FBG_CH1_00094555

| | | |
|---|---|---|
| 8. Environmental | 2014-08-07 WAD_Abwassereinleitungsvertrag_VA_2013_0046.pdf | .pdf |
| 8. Environmental | 2015-06-24_Emissionsmessungen Paul_LGA_150288 vom 27.11.2015.pdf | .pdf |
| 8. Environmental | 2015-09-04_GV Paul_Erweiterung Chrom(III).pdf | .pdf |
| 8. Environmental | 2015-09-17 LDS_Bescheid_C44-8831-694-2_Umbau_Heizung_BHKW.pdf | .pdf |
| 8. Environmental | 2015-10-29_Emissionsmessungen EQ 2 Cr(VI)_LGA_150398 vom 30.05.2016.pdf | .pdf |
| 8. Environmental | 2016-08-07_Emissionsmessungen EQ 2 Cr(III) über Cr(VI) und Cr(ges)_LGA_160323a vom 31.10.2016.pdf | .pdf |
| 8. Environmental | 2016-08-23_Gutachten Chem. Ni, NH3_LGA_160028 vom 18.10.2016.pdf | .pdf |
| 8. Environmental | 2016-12-09_Genehmigung GV PAUL_BImSchG_Erweiterung Chemisch Nickel_LRA - copia.pdf | .pdf |
| 8. Environmental | 2017-09-15_Emissionsmessungen Paul_LGA_170227 vom 02.01.2018.pdf | .pdf |
| 8. Environmental | 2018-07-19_Emissionsmessungen Paul_DEKRA_555010361.2-01 vom 04.10.2018.pdf | .pdf |
| 8. Environmental | 2018-07-19_Emissionsmessungen Paul_Messergebnisse.pdf | .pdf |
| 8. Environmental | 2018-08-13 LDS_wrE_C41-8952-40-1-34_rev1.pdf | .pdf |
| 8. Environmental | 2020-12-15 BSM_Feuerstättenbescheid.pdf | .pdf |
| 8. Environmental | 2020-12-15 LDS_Information_C40-8603-1486-42_Befristung_Neuerteilung_u_rückwirkende_Änd_wrE.pdf | .pdf |
| 8. Environmental | 2021-08-17_Emissionsmessungen Paul_LGA vom 17.05.2022.pdf | .pdf |
| 8. Environmental | 2022-06-30 bis 2022-10-09_Messbericht Arbeitsplatzmessungen Paul_Aneco.pdf | .pdf |
| 8. Environmental | 2022-08-15_LDS_Bescheid_C41-8618-261-3_Änderung_wrG_Indirekteinleitung_Galv-Abwasser.pdf | .pdf |
| 8. Environmental | 2023-05-02 LDS_Feststellung_C41-8618-259-15_Bewertung_Abwasserjahresbericht_2022.pdf | .pdf |
| 8. Environmental | 2023-10-25 bis 2023-10-28_Messbericht Arbeitsplatzmessungen Paul_Aneco.pdf | .pdf |
| 8. Environmental | 2024-01-03 LDS_Stellungnahme_44-8431-692-2_Bericht_Emissionsmessung_2023_AWA.pdf | .pdf |
| 8. Environmental | 2024-01-09 LDS_Stellungnahme_44-8431-692-2_Bericht_Emissionsmessung_2023_Heizkessel_I_und_II.pdf | .pdf |
| 8. Environmental | 2024-01-09 LDS_Stellungnahme_44-8431-692-2_Bericht_Emissionsmessung_2023_KA1.pdf | .pdf |
| 8. Environmental | 2024-01-18 LDS_Anordnung_44-8431-693-1_Emissionsbegrenzung_Formaldehyd_BHKW_Abgas.pdf | .pdf |
| 8. Environmental | 2024-01-24 LDS_Stellungnahme_44-8431-691-4 Überprüfung gemäß § 14 der 42. BImSchV.pdf | .pdf |
| 8. Environmental | 2024-02-19 Laborergebnis Kühlwasser SMK.pdf | .pdf |
| 8. Environmental | 2024-04-18 Kurzübersicht_Emissionsmessungen_SMK.pdf | .pdf |
| 8. Environmental | Analysenwerte 2024 Indirekteinleitung.xls | .xls |
| 8. Environmental | Analysenwerte 2024.xlsx | .xlsx |
| 8. Environmental | Export_Genehmigungen_2024-04-18_14_48_52.xlsx | .xlsx |
| 9. Finance | Interco Loans.xlsx | .xlsx |

DEBTORS' EXHIBIT NO. 240
Page 103 of 142

CONFIDENTIAL

FBG_CH1_00094556

| | | |
|---|---|---|
| 9. Finance | Smlouva o úvěru - intragroup ENG.pdf | .pdf |
| 9. Finance | WPD IC Loan.pdf | .pdf |
| 9. Finance | LINDEN s.r.o._Raiffeisenbank, a.s._Facilities Agreement_Execution version_ENG_20220630.pdf | .pdf |
| 9. Finance | SKM_C250i22111510420.pdf | .pdf |
| 9. Finance | 26. Smlouva 3810658 Laser.pdf | .pdf |
| 9. Finance | 27. Sml. o fin.leasingu č. 11012437_19 MINI.pdf | .pdf |
| 9. Finance | 28. Sml.o fin. leasingu 11016454_22 Jeřáb.pdf | .pdf |
| 9. Finance | 30. Leasingová smlouva 3903246 nýtovačka.pdf | .pdf |
| 9. Finance | 31. Leas.smlouva 3102316 nýtovačka II.pdf | .pdf |
| 9. Finance | 32. Leasingová smlouva č. 3002374 vstřikolis.pdf | .pdf |
| 9. Finance | 7. Leasingová smlouva č.1905348  Scala.pdf | .pdf |
| 9. Finance | 8. LS_2905192 CSOB Citroen.pdf | .pdf |
| 9. Finance | Leasing_2024 - přehled k 19_4_2024.xlsx | .xlsx |
| 9. Finance | 1539_001.pdf | .pdf |
| 9. Finance | 1540_001.pdf | .pdf |
| 9. Finance | 1541_001.pdf | .pdf |
| 9. Finance | 1542_001.pdf | .pdf |
| 9. Finance | 20220916 Winning UPDATED guarantee Winning Group a.s. incl. hire-purchase-contracts.pdf | .pdf |
| 9. Finance | CP 2(a)_J&T_Winning Bolta - Facilities Agreement - 2022 (EN).PDF | .PDF |
| 9. Finance | CP 5(d)_J&T_Winning Bolta - Equity Upside Undertaking - 2022 (EN).PDF | .PDF |
| 9. Finance | Note.txt | .txt |
| 9. Finance | 2012347 - Vertrag.pdf | .pdf |
| 9. Finance | 2012350 - Vertrag.pdf | .pdf |
| 9. Finance | 2012351 - Vertrag.pdf | .pdf |
| 9. Finance | 2012352 - Vertrag.pdf | .pdf |
| 9. Finance | 2012353 - Vertrag.pdf | .pdf |
| 9. Finance | 2012354 - Vertrag.pdf | .pdf |
| 9. Finance | 2012356 - Vertrag.pdf | .pdf |
| 9. Finance | 2012360 - Vertrag.pdf | .pdf |
| 9. Finance | 2012361 - Vertrag.pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 104 of 142

CONFIDENTIAL

Case 25-90399   Document 3644-5   Filed in TXSB on 08/12/26   Page 105 of 142

| 9. Finance | 2012362 - AGB MK.pdf | .pdf |
| 9. Finance | 2012362 - Vertrag.pdf | .pdf |
| 9. Finance | 2012363 - Vertrag.pdf | .pdf |
| 9. Finance | 2012364 - Vertrag.pdf | .pdf |
| 9. Finance | 2012366 - Vertrag.pdf | .pdf |
| 9. Finance | 2012367 - Vertrag.pdf | .pdf |
| 9. Finance | 2012368 - Vertrag.pdf | .pdf |
| 9. Finance | 2012369 - Vertrag.pdf | .pdf |
| 9. Finance | 2012370 - AGB MK.pdf | .pdf |
| 9. Finance | 2012370 - Vertrag.pdf | .pdf |
| 9. Finance | 2012994 220919 2060090.pdf | .pdf |
| 9. Finance | 2012994 220919 2060091.pdf | .pdf |
| 9. Finance | 2012994 220919 2060117.pdf | .pdf |
| 9. Finance | 2012994 220919 2060120.pdf | .pdf |
| 9. Finance | 2012994 220919 2060141.pdf | .pdf |
| 9. Finance | 2012994 220919 2060147.pdf | .pdf |
| 9. Finance | 2012994 220919 2060160.pdf | .pdf |
| 9. Finance | 2012994 220919 2060162.pdf | .pdf |
| 9. Finance | 2012994 220919 2060183.pdf | .pdf |
| 9. Finance | 2012994 220919 2060186.pdf | .pdf |
| 9. Finance | 2012994 220919 2060218.pdf | .pdf |
| 9. Finance | 2012994 220919 2060222.pdf | .pdf |
| 9. Finance | 2012994 220919 2060256.pdf | .pdf |
| 9. Finance | 2012994 220919 2060262.pdf | .pdf |
| 9. Finance | 2012994 220919 2060295.pdf | .pdf |
| 9. Finance | 2012994 220919 2060297.pdf | .pdf |
| 9. Finance | 2012994 220919 2060327.pdf | .pdf |
| 9. Finance | 2012994 220919 2060329.pdf | .pdf |
| 9. Finance | 2012994 220920 2060430.pdf | .pdf |
| 9. Finance | 2012994 220920 2060453.pdf | .pdf |

FBG_CH1_00094557

DEBTORS' EXHIBIT NO. 240
Page 105 of 142

CONFIDENTIAL

FBG_CH1_00094558

| | | |
|---|---|---|
| 9. Finance | 2012994 220920 2060456.pdf | .pdf |
| 9. Finance | 2012994 220920 2060457.pdf | .pdf |
| 9. Finance | 2012994 220920 2060538.pdf | .pdf |
| 9. Finance | 2012994 220920 2060540.pdf | .pdf |
| 9. Finance | 2012994 220920 2060546.pdf | .pdf |
| 9. Finance | 2012994 220920 2060549.pdf | .pdf |
| 9. Finance | 2012994 220920 2060588.pdf | .pdf |
| 9. Finance | 2012994 220920 2060594.pdf | .pdf |
| 9. Finance | 2012994 220920 2060611.pdf | .pdf |
| 9. Finance | 2012994 220920 2060620.pdf | .pdf |
| 9. Finance | 2012994 220920 2060635.pdf | .pdf |
| 9. Finance | 2012994 220920 2060650.pdf | .pdf |
| 9. Finance | 2012994 220920 2060652.pdf | .pdf |
| 9. Finance | 2012994 220920 2060653.pdf | .pdf |
| 9. Finance | 2012994 220920 2060659.pdf | .pdf |
| 9. Finance | 2012994 220920 2060660.pdf | .pdf |
| 9. Finance | 2012994 220920 2060661.pdf | .pdf |
| 9. Finance | 2012994 220920 2060662.pdf | .pdf |
| 9. Finance | 2012994 220920 2060665.pdf | .pdf |
| 9. Finance | 2012994 220920 2060671.pdf | .pdf |
| 9. Finance | 20220927_set_documents_resolution_garantie_contracts_updated.pdf | .pdf |
| 9. Finance | Abrechnung 10042858.pdf | .pdf |
| 9. Finance | Abrechnung 10042859.pdf | .pdf |
| 9. Finance | Abrechnung 10042860.pdf | .pdf |
| 9. Finance | Gegenzeichnung 10042857-860.pdf | .pdf |
| 9. Finance | Mietkaufvertrag mit ZV gebraucht 10042857.pdf | .pdf |
| 9. Finance | Mietkaufvertrag mit ZV gebraucht 10042858.pdf | .pdf |
| 9. Finance | Mietkaufvertrag mit ZV gebraucht 10042859.pdf | .pdf |
| 9. Finance | Mietkaufvertrag mit ZV gebraucht 10042860.pdf | .pdf |
| 9. Finance | ZT 10042858.pdf | .pdf |

DEBTORS' EXHIBIT NO. 240
Page 106 of 142

CONFIDENTIAL

| 9. Finance | ZT 10042859.pdf | .pdf |
|---|---|---|
| 9. Finance | ZT 10042860.pdf | .pdf |
| 9. Finance | Bestätigung der wirtschaftlich Berechtigten-signed.pdf | .pdf |
| 9. Finance | Kaufoption-signed.pdf | .pdf |
| 9. Finance | LV mit Anlage und AGB-signed.pdf | .pdf |
| 9. Finance | SEPA Firmenmandat-signed.pdf | .pdf |
| 9. Finance | Versicherungsbestätigung.pdf | .pdf |
| 9. Finance | Winning Group Linden.pdf | .pdf |
| 9. Finance | Winning Plastics - Linden GmbH 1 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - Linden GmbH 2 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - Linden GmbH 3 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - Linden GmbH 4 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - Linden GmbH 5 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - SMK GmbH 1 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - SMK GmbH 2 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - SMK GmbH 3 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - SMK GmbH 4 - signed.pdf | .pdf |
| 9. Finance | Winning Plastics - Diepersdorf GmbH.pdf | .pdf |
| 9. Finance | 20220916 Winning UPDATED guarantee Winning Group a.s. incl mtg-purchase contracts.pdf | .pdf |
| 9. Finance | Financial Guarantee Agreement_Winning Group a.s._Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | SKM_C250i21115110420.pdf | .pdf |
| 9. Finance | Agreement on Pledge of Bank Account Receivables_LINDEN s.r.o._Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | Agreement on Pledge of Bank Account Receivables_Winning IP Lüdenscheid GmbH_Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | Agreement on Pledge of Bank Account Receivables_Winning IP Oberlungwitz GmbH_Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | Agreement on Pledge of Bank Account Receivables_Winning Plastics_Linden GmbH_Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | Agreement on Pledge of Bank Account Receivables_Winning Plastics - SMK GmbH_Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | Agreement on Security Assignment of Trade Receivables under Commercial Contracts_LINDEN s.r.o._Raiffeisenbank, a.s._20220711.pdf | .pdf |
| 9. Finance | CP 2(b)_J&T_Winning Bolta - Subordination Agreement - 2022 (EN).PDF | .PDF |

CONFIDENTIAL

FBG_CH1_00094559

| | | |
|---|---|---|
| 9. Finance | CP 2(d)_J&T_Winning Bolta - Czech law Bank Accounts Receivables Pledge Agreement (Borrower A) - 2022 (EN) (notarized).PDF | .PDF |
| 9. Finance | CP 2(d)_J&T_Winning Bolta - Czech law Bank Accounts Receivables Pledge Agreement (Borrower B) - 2022 (EN) (notarized).PDF | .PDF |
| 9. Finance | Subordination Agreement_Raiffeisenbank, a.s.,_20220711.pdf | .pdf |
| 9. Finance | 230123 Daily Stock ReportV.xlsx | .xlsx |
| 9. Finance | J&T - Winning Bolta - Accounts Pledge Agreement - Executed Version.pdf | .pdf |
| 9. Finance | J&T - Winning Bolta - Global Assignment Agreement - Executed Version.pdf | .pdf |
| 9. Finance | J&T - Winning Bolta - IP Rights Pledge Agreement - Executed Version.PDF | .PDF |
| 9. Finance | J&T - Winning Bolta - Security Purpose Agreement - Executed Version.pdf | .pdf |
| 9. Finance | J&T - Winning Bolta - Security Transfer Agreement - Executed Version.PDF | .PDF |
| 9. Finance | K1375-2022.pdf | .pdf |
| 9. Finance | WIP Fix assets 30.11.2022.xlsx | .xlsx |
| 9. Finance | WP-D Fix assets 30.11.2022.xlsx | .xlsx |
| 10. Litigation | Empty.txt | .txt |
| 11. Compliance | 11.3 - 11.5 Empty.txt | .txt |
| 11. Compliance | 2023-07-05-smk-oberlungwitz-information-der-offentlichkeit.pdf | .pdf |
| 11. Compliance | 2024-03_sicherheitsinformationen-fur-anwohner_winning-plastics-diepersdorf-gmbh.pdf | .pdf |
| 11. Compliance | Code-of-Conduct-Winning-Group-new_rev_DRM_MJ-06132023-x_CS_PROOF_DRM_EN-formatovano-09.08.2023-CEO-podpis.pdf | .pdf |
| 11. Compliance | Company-policy-Winning-Group.pdf | .pdf |
| 11. Compliance | w-plastics-intertek-iatf-1_en.pdf | .pdf |
| 11. Compliance | AR_CA_TISAX_Linden_2023.pdf | .pdf |
| 11. Compliance | ISO9001 Gottmadingen EN.pdf | .pdf |
| 11. Compliance | W-Plastics ISO 14001 2015 EMS_2023_en.pdf | .pdf |
| 11. Compliance | W-Plastics ISO 50001 2018 EnMS_2023_en.pdf | .pdf |
| 11. Compliance | W-Plastics ISO 9001 2015 QMS_2023_en.pdf | .pdf |

FBG_CH1_00094560

DEBTORS' EXHIBIT NO. 240
Page 108 of 142

CONFIDENTIAL

ANNEX 6

## Commercial Lease Agreement

(hereinafter referred to as the "**Agreement**")

between

1.   **Winning IP Hustopeče s.r.o.**, a company incorporated and existing under Czech law, with its registered office in Křižíkova 2960/72, Královo Pole, 612 00 Brno, Czech Republic, identification no. 215 09 727, registered in the Commercial Register maintained by the Regional Court in Brno under file no. C 139212

— "**Landlord**" —

2.   **LINDEN s.r.o.**, a company incorporated and existing under Czech law, with its registered office in Žižkova 750/40, 693 01 Hustopeče, Czech Republic, identification no. 262 92 904, registered in the Commercial Register maintained by the Regional Court in Brno under file no. C 42285

— "**Tenant**" —

— Landlord and Tenant hereinafter collectively referred to as the "**Parties**" and individually also the "**Party**" —

CONFIDENTIAL

FBG_CH1_00094561

# Table of contents

1. The Preamble ...................................................................................................3

2. Leased object ...................................................................................................5

3. Purpose of use, permits, changes to the Purpose of use, protection against competition ........................................................................................................6

4. Start of rental, handover, handover protocol, rental period ...........................7

5. Rent..................................................................................................................8

6. Operating costs ...............................................................................................9

7. Rent Adjustment/ Value Preservation...........................................................11

8. Rental security ...............................................................................................12

9. Maintenance, services and Repairs, Cosmetic repairs.................................12

10. Heating system, hot water supply .................................................................15

11. Duty to notify, duty to ensure safety and liability .........................................15

12. Subletting, transfer of use to third parties....................................................18

13. Structural changes by the Landlord after the start of the lease....................19

14. Structural changes by the Tenant.................................................................20

15. Entering the Property.....................................................................................21

16. Advertising Equipment ..................................................................................22

17. Landlord's lien...............................................................................................22

18. Termination....................................................................................................23

19. Obligations at the end of the lease...............................................................23

20. Insurance.......................................................................................................25

21. Sale of the Property.......................................................................................26

22. Obligation to provide information ..................................................................26

23. (Partial) Loss of the Property........................................................................26

24. Majority of persons .......................................................................................27

25. Governing law and dispute resolution ..........................................................27

CONFIDENTIAL

FBG_CH1_00094562

26. Severability, continuing effect, entirety of Agreement and modifications..................27

27. Interpretation..........................................................................................................29

28. Others.....................................................................................................................30

29. Binding effect, validity and force ...........................................................................30

3

CONFIDENTIAL

FBG_CH1_00094563

The Landlord is entitled to conclude this Agreement on the basis of:

(A)   the leasing agreement dated 18. 6. 2020 between Kétó Property, s.r.o., a company incorporated and existing under Czech law, with its registered office in Hvězdova 1716/2b, Nusle, 140 00 Prague 4, Czech Republic, identification no. 081 16 130, registered in the Commercial Register maintained by the Municipal Court in Prague under file no. C 312652 hereinafter referred to as the "**Owner**"), as lessor, and the Landlord, as lessee; and

(B)   consent of the Owner with the conclusion of this Agreement and the lease of the Property to the Tenant granted by the Owner on [●];

which entitle the Landlord to lease the following properties in the Hustopeče cadastral area to the Tenant (including all buildings located on the below plots of land, whether forming their part or not):

Plot. No. 982/19

Plot. No 982/22;

Plot. No. 982/26

Plot. No. 982/53

Plot. No. 982/55

Plot. No. 982/56

Plot. No. 982/57

Plot. No. 982/58

Plot. No. 982/60

Plot. No. 982/61

Plot. No. 982/62

Plot. No. 982/83

Plot. No. 982/84

Plot. No. 982/85

4

CONFIDENTIAL

FBG_CH1_00094564

Plot. No. 982/90

Plot. No. 982/106

Plot. No. 982/107

Plot. No. 982/108

Plot. No. 982/111

Plot. No 982/123, and

Plot. No. 982/156

(hereinafter also referred to as the "**Property**"). The Property includes administrative buildings, factory halls, bridges and parking lots (hereinafter collectively **referred to as** the "**Building**").

(C)   The Landlord intends to sublet the entire Property and Building to the Tenant. The Tenant intends to use the Property for the production and refinement of metal and plastic parts as well as the refinement of such parts, including their assembly and distribution.

(D)   The Parties agree that the Tenant shall be entitled and obliged to use and maintain the Property within the scope of the agreed purpose of use as an owner and to bear the costs incurred for this. This was taken into account when calculating the rent.

That said, with the Preamble forming part of the Agreement at the request of the Parties, the Parties agree on what follows:

1.    **Leased object**

1.1   The Landlord sublets to the Tenant the Property specified in the Preamble in 0 consisting, in particular, of plots of land and buildings with a total size of approx. 19,811 m² as determined in the land register (hereinafter collectively referred to as the "**Leased object**" or the "**Rental space**").

1.2   The Parties agree that the exact size of the Property is not the basis for the business or calculation of the agreed Rent.

5

FBG_CH1_00094565

1.3   The Tenant is aware of the location and condition of the Property. The Tenant expressly acknowledges this condition as being in accordance with the Agreement and free of defects.

1.4   Furnishings and operational facilities are expressly not rented out. These are the Property of the Tenant. Insofar as the site plan shows furnishings and operational facilities, these are for illustrative purposes only. The site plan is included in this Agreement, attached as **Schedule 2**.

1.5   The Tenant is aware that indoor temperatures of over 26 degrees Celsius can occur due to seasonal factors. This circumstance was taken into account when calculating the agreed Rent. If such temperature occurs, this does not constitute a defect in the Property that entitles the Tenant to assert claims of any kind, insofar as the Landlord is not obliged to provide full air conditioning under this Agreement.

1.6   The Tenant is aware of the encumbrances mentioned in the land register. The encumbrances, including the exercise of the aforementioned rights by the entitled third parties, do not constitute a defect of the Leased object and will be accepted by the Tenant and tolerated without compensation.

2.   **Purpose of use, permits, changes to the Purpose of use, protection against competition**

2.1   The Property is sublet for the manufacture and finishing of metal and plastic parts as well as the refinement of such parts, including their assembly and distribution. In principle, parking spaces available on the Property may only be used for parking vehicles, but not for car washes or as permanent storage areas (hereinafter also referred to as the **"Purpose of use"**).

2.2   If the establishment or operation of the Tenant in the Property requires official or other permits or concessions, the cause of which lies in the person or business of the Tenant, the Tenant must obtain the necessary permits or concessions at his own expense and risk. The Tenant is responsible for bringing about the approval requirements and for fulfilling any conditions and other ancillary provisions in the sense described above. Noise protection, environmental and fire protection regulations must be complied with

6



CONFIDENTIAL

FBG_CH1_00094566

by the Tenant. If the necessary permits or concessions are refused or withdrawn, the Tenant has no claims against the Landlord. The Landlord must comply with public/official requirements, orders or approvals that are based exclusively on the general condition and/or location of the Property.

2.3   Changes to the Purpose of use require the prior written consent of the Landlord, which may only be withheld or delayed for good cause. Any declarations of consent by the Landlord will always be granted, even if this is not expressly stated in the declaration of consent, subject to any necessary official approval for the change of use, the procurement of which the Tenant is obliged to obtain at his own expense and risk. Before carrying out the change of use, the Tenant must prove to the Landlord in writing that either the necessary official approvals have been obtained or that the intended change of use is permissible without a permit.

2.4   The Landlord only grants the Tenant the protection against competition inherent in the Agreement. Otherwise, the Landlord does not grant any protection against competition. The Tenant's competitors are third parties that manufacture and distribute metal and plastic products.

3.   **Start of rental, handover, handover protocol, rental period**

3.1   The lease under this Agreement begins on [1 September 2024] (hereinafter also referred to as the **"Start of the lease"**).

3.2   The Landlord has handed over the Property to the Tenant leaseon [*]. On the day of handover, the Parties have drawn up a handover protocol signed by both Parties, in which the number of keys/code cards handed over to the Tenant, the meter readings and any defects of the Property have been recorded. Insofar as no defects are listed in the handover protocol, the Tenant acknowledges the condition of the Property as being in accordance with the Agreement by signing the handover protocol, with the exception of hidden defects. The handover protocol shall be attached to this Agreement as **Schedule 1**.

3.3   The Tenant shall, provided that the use of the Leased object is not disturbed beyond necessary extent, tolerate any work to remedy defects recorded in the handover protocol

7

FBG_CH1_00094567

or the execution of remaining work even after handover and, if necessary, cooperate in this (e.g. by granting access to the Property). An assertion of claims of any kind by the Tenant due to the execution of defect elimination or residual work is excluded.

3.4     The Parties agree on a fixed initial term of the lease of approx. **11 years until 30 April 2035** (hereinafter also referred to as the **"Fixed term"**).

3.5     The Parties agree that the Tenant shall have the right to request an extension of the lease under these terms and conditions for a further five years beyond the Fixed term (hereinafter referred to as the **"Option Right"**). The Landlord must be notified in writing of the exercise of the Option Right no later than six months before the expiry of the Fixed term or an option period.

3.6     Any notice of termination must be in writing. The timeliness of the termination does not depend on its dispatch, but on receipt by the other Party.

## 4.     Rent

4.1     The monthly rent is subject to the regulation in Article 6 (Rent adjustment/value protection) and taking into account the fact that the Tenant also bears all costs of Maintenance and Repair of the Property - from the start of the lease for the Property as a whole **EUR 20,000** (in total, the **"Rent"**) plus VAT.

4.2     The Rent is considered to be value-secured in accordance with Article 6.

4.3     The Rent is to be paid monthly in advance, no later than the third working day of the current month, to an account to be designated by the Landlord. For the punctuality of the payments, it is not the dispatch that matters, but the crediting of the money.

4.4     In the event of default of payment, the Landlord is entitled to claim the statutory default interest, unless the Tenant can prove that no or significantly lower costs have been incurred.

4.5     If the Tenant is in arrears with the payment of the Rent, incoming payments are to be offset against the oldest interest and costs, then against Operating costs, then heating costs, then against the other ancillary costs and then against the Rent, unless a repayment provision is made.

8



CONFIDENTIAL

FBG_CH1_00094568

5.     **Operating costs**

5.1    In addition to the Rent, the Tenant bears all operating and ancillary costs of the Property (hereinafter referred to collectively as "**Operating costs**"), insofar as they are incurred.

5.2    In particular, Operating costs include:

    5.2.1    all Operating costs in the version in force from time to time, which was originally drawn up for residential leases and is therefore to be interpreted broadly according to the Parties' understanding,

    5.2.2    the costs of cleaning, Maintenance, services and Repair of the Property as well as the costs of Cosmetic repairs to the Property,

    5.2.3    the costs of technical Property management,

    5.2.4    the costs of commercial Property management.

5.3    With regard to the Operating costs referred to in Articles 6.2.3 and 6.2.4, the apportionment of the costs for technical and commercial management is limited to a total of 2 % per calendar year of the costs actually incurred.

5.4    Otherwise, the Operating costs are to be borne by the Tenant regardless of whether and to what extent the Tenant actually uses the Property.

5.5    If new public charges are introduced or new ones are created that have not already been set out in Article 5.2, Operating costs that are economically related to the management of the Property (hereinafter collectively referred to as the "**New Cost Elements**" or if existing, i.e. contractually agreed cost types increase (e.g. Property tax increase), these can be apportioned by the Landlord from the time they arise and appropriate advance payments can be determined. However, the apportionment of new cost types is limited to 10% of the contractually agreed annual Operating costs incurred in each case. Insofar as increases in Operating costs are caused by the Tenant's operation or by structural changes initiated by the Tenant (e.g. increase in insurance premiums), the increase can be passed on in full to the Tenant, regardless of the restriction of the above sentence.

9



CONFIDENTIAL                                                FBG_CH1_00094569

**DEBTORS' EXHIBIT NO. 240**
**Page 117 of 142**

5.6     The Tenant is aware that the final amount of Property tax may only be determined retroactively in a few years due to the Property tax reform. Therefore, the Landlord is entitled to make a provision for the expected subsequent recovery amounts as part of the Operating cost statement. As soon as the notices of subsequent assessment of the Property tax are available, the increase amounts are allocated to the calendar years specified in the Property tax assessments and offset against the provisions created as part of the Operating cost statement. If the provisions were too low or too high, the difference will be collected or paid out by the Landlord; In this respect, a reservation in the utility bill is not required.

5.7     From the statement of Operating costs in accordance with Article 5.2 only the Operating costs that can be passed on to the Tenant; on the other hand, this does not give rise to any claim on the part of the Tenant against the Landlord that all the above-mentioned installations, facilities, etc. are available and that the services on which the Operating costs are based are provided. Whether and to what extent these services are provided is determined by the Landlord – unless expressly deviated provisions are made in the Agreement in compliance with the statutory provisions. The Landlord reserves the right to apportion all apportionable Operating costs in accordance with Article 5.2 even if they have not arisen for a long time or have not been redistributed for a long time.

5.8     The Landlord decides at his dutiful discretion which type of energy the heating should be operated with. The legal regulations must be complied with. In the event that the Landlord provides the heat and hot water supply via its own central heating system at the beginning of the lease, he is also entitled to switch to commercial heat and hot water supply during the lease. In this case, the Tenant must bear all costs of the commercial supply of heating and hot water. The heating season usually starts on October 1 and ends on April 30 of each year. The Landlord decides on deviations at its reasonable discretion. In all other respects, reference is made to the provisions of Article 9.

5.9     The Operating costs are to be paid by the Tenant as follows:

5.9.1   As far as possible, the Operating costs are settled by the Tenant directly with the service companies. This applies in particular to Operating costs for water, wastewater (excluding surface/rainwater), electricity, gas, emission measurement, chimney sweeps, waste disposal and cleaning within the Property. At the

10

request of the Landlord, the Tenant is also obliged to conclude a contract with a third party for the independent supply of heat and hot water.

5.9.2    If it is not possible for the Tenant to settle the Operating costs directly, he will reimburse them to the Landlord upon proof.

6.    **Rent Adjustment/ Value Preservation**

6.1    In determining the amount of the Rent, the Parties proceeded on the assumption that the cost of living in the Czech Republic would remain essentially unchanged. in the Parties have agreed on indexation of the Rent under Article 4.1 as follows:

6.2    If the index level of the consumer price index officially determined and published by the Czech Statistical Office (base 100 = 2020) changes upwards or downwards compared to the index level at the beginning of the rental period or the last Rent adjustment, the Rent automatically changes in the same percentage ratio, without the need for a Rent change declaration by the Landlord or the Tenant. The change does not take place monthly, but only twice a year, on January 1st and July 1st of each year.

6.3    The regulation in Article 6.2 is applicable repeatedly on the basis of the previous Rent adjustment if the conditions described above are met.

6.4    If the consumer price index for the Czech Republic is changed to a new base year or is discontinued in the future, the rebased index or the successor index published by the Czech Statistical Office or any successor organisation will automatically replace it from the date of publication. If this is not published, both Parties will jointly set a different cost of living index, as close as possible to the previously applicable index, which will then be applied to the following Rent adjustments retroactively from the level applicable to the last Rent adjustment.

6.5    The Parties assume that the value protection clause agreed above is permissible and effective. If the above agreement is ineffective, loses its effectiveness in the future, or if the agreed cost of living index is no longer determined, the Parties are obliged to conclude a new value protection agreement that can be approved or does not require approval, which is as economically equivalent as possible to the above.

11

FBG_CH1_00094571

7.      **Rental security**

7.1     At the request of the Landlord, the Tenant will provide a deposit of six (6) Rents plus VAT. The Landlord may satisfy himself from the deposit for claims that he has obtained against the Tenant during or after the end of the rental period in connection with the Agreement. If the deposit is used, the Tenant is obliged to immediately top it up to the agreed amount.

7.2     The deposit is to be paid in the form of a transfer to the Landlord's deposit account no. [●] with the [●]. Any interest rate increases the security and the Tenant is entitled to it after the termination of the lease.

7.3     The Tenant may, at its option during-the Fixed Term (as may be extended hereunder), also provide the security in the form of a co-obligation on the part of the owner of the Tenant (provided that the Tenant has sufficient creditworthiness) or an irrevocable, un-conditional, joint and several bank guarantee, which excludes the right to deposit or the defence of voidability and set-off or advance action.

7.4     The Landlord must return the deposit thirty days after the return of the Property in ac-cordance with the Agreement and the full settlement of any claims, but not before the expiry of two months after the Landlord's final statement of Operating and ancillary costs. If necessary, a partial return must be made.

8.      **Maintenance, services and Repairs, Cosmetic repairs**

8.1     The following definitions apply to this Agreement:

8.1.1   For the purposes of this Agreement, **"Roof"** means the roof structure with the roofing and the associated gutters, including front roofs, side roofs and glass roofs.

8.1.2   **"Compartment"** means the load-bearing parts of the building (all foundations, load-bearing walls, columns, pillars and floor slabs; without plaster and without wall coverings), all stairs (without coverings), the façade together with façade cladding, chimneys as well as all supply and disposal lines of the central tech-

12

nical systems located in the walls and ceilings, including the entire piping system from/to the outlet from the Compartment, whereby the relevant interface is the exit from the shaft. The Compartment does not include the inside of the windows, interior doors, the inside of the exterior doors and sun protection/shading on the outside or inside.

8.1.3   "**Maintenance**" within the meaning of this Agreement includes the periodic inspections of operational readiness and operational safety and the associated adjustment by a specialist. Maintenance includes the measures that must be carried out in order to maintain the intended use, in order to properly monitor, remedy or prevent the occurrence of structural and other defects caused by wear and tear, ageing and exposure to weathering.

8.1.4   "**Repair**" within the meaning of this Agreement includes repairs and replacements, insofar as these do not fall under the term Maintenance.

8.1.5   For the purposes of this lease, "**Cosmetic repairs**" include, in particular, the painting of walls, ceilings, radiators, cladding, built-in wardrobes, interior and exterior doors, as well as the cleaning and renewal of wall and ceiling cladding.

8.2   The Tenant is responsible for the Maintenance, services and Repair of the Roof and Compartment of the Property. The costs for this are borne by the Tenant.

8.3   The Tenant is obliged to treat the Property with care. The Tenant shall ensure adequate cleaning, ventilation, heating and lighting in the Property, insofar as he has influence on this.

8.4   The Tenant assumes – subject to the provisions in Articles 8.4.3 i.e. cleaning Maintenance, services and Repair of:

8.4.1   the entire leased object and the installations, facilities and features located inside the leased object as well as the installations exclusively serving or supplying the leased object (including the inlets and outlets to the supply and disposal facilities from/to the entrance into the Compartment, the relevant interface being the entry into the shaft) and the doors, windows together with frames and

13



window glass as well as movable awnings and blinds, insofar as these are not provided by the Landlord in accordance with Article 8.2 to be carried out,

8.4.2   the installations brought into the Property by the Tenant or at his instigation, and

8.4.3   advertising equipment used exclusively by the Tenant or installed by him or at his instigation.

at the Tenant's own expense, insofar as the measures required in each case are prompted by the use of the Rental object or are attributable to the Tenant's area of risk. Exempt from the Tenant's obligation to carry out Repairs in accordance with this Article 8.4 further include (i) damages/defects for which the Landlord is entitled to enforceable claims against third parties, (ii) initial defects and (iii) defects/damages caused by third parties for the conduct of which the Tenant is not responsible; the Tenant is responsible for persons who are present in the Property with his permission (in particular employees, collaborators, service providers, suppliers, subtenants and customers). This was taken into account when calculating the Rent.

8.5   At the beginning of the lease, the Property was handed over to the Tenant in an unrenovated condition. The Tenant was granted a Rent reduction for this. The Tenant is therefore responsible for the professional carrying out of the Cosmetic repairs, provided that the degree of wear and tear requires them and that they have been caused by the rental use. The Cosmetic repairs are due if and to the extent that a renovation is necessary according to the condition of the respective parts of the Property. As is customary in the industry, Cosmetic repairs will usually be required at intervals of about five years. The deadlines apply from the handover of the Property to the Tenant and, in the further course of the lease, from the last execution by the Tenant. Landlord and Tenant are free to prove that the Cosmetic repairs are necessary before or after the expiry of the deadlines due to the degree of wear and tear. Before the end of the lease, the Tenant must make up for any Cosmetic repairs that are due in good time so that the Property can be returned professionally renovated. At the end of the lease, the Tenant does not have to carry out any Cosmetic repairs that would not be necessary if the lease were to continue. It is clarified that the Landlord does not owe any Cosmetic repairs.

14

CONFIDENTIAL

8.6    In addition to the Cosmetic repairs, the Tenant is also expressly responsible for the cleaning and Maintenance of the floor covering in the rooms of the Property, if the degree of wear and tear so requires. If the degree of wear and tear requires renewal, the Tenant will take over the renovation in a comparable type, quality and colour at his own expense. This was taken into account when calculating the Rent.

8.7    The work owed by the Tenant under this Agreement must be carried out professionally; the execution of the work must be proven to the Landlord after it has been carried out on request by handing over verifiable documentation/Maintenance protocols.

8.8    If the Tenant fulfils his obligations under this Article 8 even within a reasonable grace period set by the Landlord or not in accordance with the Agreement, the Landlord may carry out the necessary work at the expense of the Tenant or have it carried out. If there is imminent danger, each Party is entitled and obliged to take measures to secure or eliminate the danger, insofar as this is possible and reasonable for it.

9.    **Heating system, hot water supply**

9.1    Heating/replacement heating cannot be demanded in the event of disruptions, force majeure, official orders or other impossibility of performance, unless the impossibility is due to intent or gross negligence on the part of the Landlord. In all other respects, reference is made to the provision in Article 10.8.

9.2    The costs of an interim reading at the end of the lease are borne by the Tenant. Likewise, the Tenant bears the change of user fee when moving in and out.

10.    **Duty to notify, duty to ensure safety and liability**

10.1   The Tenant must notify the Landlord in writing of any damage to or to the Property, including the Roof and Compartment, as well as the failure of any measuring equipment, immediately after becoming aware of it. The Tenant is liable for any damage caused by a delay in the notification. In the event of imminent danger, the notification must be made as quickly as possible, and the Tenant is obliged to take the necessary measures to protect the Landlord from damage.

15

CONFIDENTIAL

10.2   The Tenant shall be liable to the Landlord for all damages caused in and/or to the Property by him or by persons who are present in the Property with his permission (in particular employees, collaborators, service providers, suppliers, subtenants or customers). For reasons of proximity, the Tenant bears the burden of proof that existing damage to and/or to the Property was not caused by the Tenant or by persons who were present in the Property with his permission.

10.3   The Landlord's strict liability for defects existing at the time of conclusion of the Agreement and/or when handing over the Property to the Tenant is excluded. This does not apply to fraudulently concealed defects for which the Landlord is liable within the legal framework.

10.4   The Landlord shall not be liable for any damage caused by the Tenant to the goods, furnishings, data, etc. belonging to him, regardless of the nature, origin, duration and extent of the effects, unless the Landlord has caused the damage intentionally or through gross negligence.

10.5   Insofar as the Landlord is required to represent the Owner according to this Agreement, the Landlord shall:

10.5.1   in the event of a breach of essential contractual obligations under this Agreement (so-called cardinal obligations, i.e. obligations the fulfilment of which is essential for the proper execution of the Agreement in the first place and on the observance of which the contractual partner regularly relies and may rely), to be responsible for intent and negligence (including on the part of his legal representative or vicarious agent) in accordance with the statutory provisions;

10.5.2   in the event of injury to life, limb or health or in the event of the assurance of a certain characteristic of the Property, to be responsible for intent and negligence (including on the part of its legal representative or vicarious agent) in accordance with the statutory provisions;

10.5.3   otherwise only to be held responsible for gross negligence and intent (including on the part of its legal representatives or vicarious agents), unless a certain characteristic of the Property is guaranteed and/or the damage falls under the risk

16

of the Landlord covered by the building liability insurance. However, for damages that fall under the Landlord's risk covered by the building liability insurance, the Landlord's liability is limited to the amount of the sum insured in individual cases. The Landlord is only liable for damages in excess of the sum insured in the event of gross negligence or intent.

10.6   Except in the cases referred to in Articles 10.5.1 and 10.5.2 and in cases where a certain characteristic of the Property is guaranteed and/or the damage falls under the Landlord's risk covered by the building liability insurance, the Landlord's liability is also limited to the foreseeable, typically occurring damage. In the event of slight negligence, the liability of the Landlord – except in the cases referred to in Articles 10.5.1 and 10.5.2 and in cases where a certain characteristic of the Property is guaranteed and/or the damage falls under the Landlord's risk covered by the building liability insurance – limited to compensation for direct damage, i.e. compensation for indirect damages, such as loss of profit, is excluded in this case.

10.7   Claims of the Tenant against the Landlord due to impairments of the use of the Property due to external circumstances such as traffic diversions, excavations, road closures, noise, odour and dust nuisances, over which the Landlord has no influence, are excluded.

10.8   If and to the extent that the Landlord provides water, district heating, gas and electricity from the supply networks of utility companies, the Tenant will not assert any further claims for damages in the event of liability of the Landlord in the event of service disruptions than the Landlord is entitled to against the respective utility company under the relevant provisions. The Tenant must immediately notify the Landlord and directly of the supplying utility company in writing of any damage.

10.9   The information in an energy performance certificate for the Property that is not part of this Agreement shall not be considered as a quality agreement in relation to the Property.

10.10  From the beginning of the rental period, the Tenant assumes the obligation to ensure the safety of traffic in the Property and in the access area to the Property. The Tenant must ensure that escape routes of sufficient width can be used without hindrance within the Property. The emergency exits must be kept clear. The applicable fire protection regulations must be observed. The safety devices installed for fire protection may not be

17

CONFIDENTIAL                                                    FBG_CH1_00094577

changed without the prior written consent of the Landlord. The Tenant shall indemnify the Landlord against claims arising from the breach of the Tenant's duty to ensure the safety of traffic, unless the damage resulting from the breach of the duty to ensure the safety of traffic is due to the fact that the Landlord has not immediately remedied structural defects reported to him by the Tenant.

11.   **Subletting, transfer of use to third parties**

11.1   A subletting or other transfer of use of the Property or parts thereof is only permitted if the Landlord expressly agrees to the subletting or other transfer of use in writing in advance. For this purpose, the Tenant is obliged to provide the Landlord in advance with the information required by the Landlord for the decision-making process regarding the person of the third party, its business, its creditworthiness and the use of the Property planned by the third party. In any case, the Tenant shall continue to be liable for the fulfilment of all obligations arising from this Agreement, in particular the obligations set out in Article 5 above.

11.2   The Landlord may only refuse or revoke his consent for good cause. In particular, good cause is given if:

11.2.1   there are reasonable doubts as to whether the third party will be able to fulfil its contractual obligations in the long term, in particular the obligation to pay the sublease,

11.2.2   the third party shall not lease the Property in accordance with the provisions of this Agreement, in particular not for the Purpose of use of the Property agreed on in Article 2.1, or

11.2.3   if the Landlord would not be able to fulfil any obligations towards other third parties.

11.3   The Landlord permits the Tenant to transfer the Property in whole or in part to a company affiliated with the Tenant, in particular to sublet it.

18

CONFIDENTIAL

FBG_CH1_00094578

11.4   If the Landlord has not given his consent or if the Tenant uses the Property in breach of this Agreement, the Landlord may demand that the Tenant terminate the subtenant's sublease without notice with immediate effect. A corresponding reason for termination must be agreed under this Agreement.

11.5   In order to secure the Landlord's claims under this Agreement, the Tenant assigns all claims together with liens and other securities to which he is currently or in the future entitled against the third party to the Landlord, who accepts the assignment, in the event of subletting. The Tenant remains entitled to collect and realise the receivables against the third party in his own name as long as the Tenant fulfils his obligations towards the Landlord arising from and in connection with this Agreement. If the Tenant fails to comply with his obligations, the Landlord is entitled to disclose the assignment to the third party after prior notice to the Tenant and to collect the sublease or other contractual claims directly. The Landlord may request that the assignment of security be recorded separately in a separate document setting out the claims.

11.6   Without the prior express written consent of the Landlord, the Tenant is not permitted to allow the subtenant to sublet further.

11.7   The Tenant's special right of termination is excluded if the Landlord refuses to consent to the subletting because of a reason that is personal to the subtenant or for another reason that is important for the Landlord.

12.   **Structural changes by the Landlord after the start of the lease**

12.1   The Landlord may make changes and Repairs that become necessary for the Maintenance or expansion of the Property or to avert imminent dangers or to eliminate damage or due to changes in the disposal of the Property, even without the consent of the Tenant.

12.2   Article 12.1 also applies to measures that are not necessary but expedient, in particular those that serve to modernise the Property or bring about a better economic utilisation of the lease as a whole.

12.3   The Tenant must keep the relevant areas of the Property accessible; it shall not impede or delay the implementation of the measures. The Landlord shall inform the Tenant in

19



CONFIDENTIAL

FBG_CH1_00094579

advance before such measures are taken, insofar as they are not carried out due to imminent danger. In case the Landlord carries out his right Article 12.1 or 12.1, the Tenant shall, at the request of the Landlord, temporarily remove any equipment with which he has provided the Property. Reimbursement of costs or damages of any kind are excluded if it is a necessary measure within the meaning of Article 12.1.

12.4   To the extent that the Tenant does not comply with the Articles 12.1 and 12.1, he cannot reduce the Rent, exercise a right of retention, or claim damages. However, the Tenant may reduce the Rent if the agreed use of the Property is significantly impaired by the above measures.

12.5   The Tenant is obliged to bear the surcharges and Operating cost allocations resulting from the measures. In addition, the Tenant undertakes to bear an annual Rent increase of [●] % of the costs incurred for the Property (on a pro rata basis) for modernisation measures. The new Rent is due at the beginning of the month following the Landlord's statement.

13.   **Structural changes by the Tenant**

13.1   Significant structural changes (e.g. structural changes associated with interventions in the statics) in and to the Property (hereinafter referred to as the **"Tenant work"** may only be made with the prior written consent of the Landlord. The Tenant must submit to the Landlord the plans and plans necessary for the implementation of the Tenant work, together with the request for consent. However, the Landlord's consent to the Tenant's work does not in any case lead to any liability on the part of the Landlord for the planning or execution of the Tenant work, for which the Tenant alone is liable (Article 18.5).

13.2   The Tenant must obtain the necessary official permits (in particular building permits) for all Tenant's work at his own risk and expense. Prior to carrying out the Tenant's work, the Tenant must prove that either the necessary official permits have been definitively granted or that official approvals are not required. Any declarations of consent by the Landlord will always be granted, even if this is not expressly stipulated in the declaration of consent, subject to the admissibility of the Tenant's work under (construction) law and subject to any necessary official approvals.

20

CONFIDENTIAL                                                                                FBG_CH1_00094580

13.3 The Tenant is obliged to comply with any official orders and requirements in connection with Tenant's work at his own expense and risk. All Tenant's work must be carried out professionally, in compliance with all relevant regulations and standards, according to the current state of the art and in compliance with the generally accepted rules of technology, which must be proven to the Landlord at the request of the Tenant in each case.

13.4 The Tenant bears the risk and all costs arising from the Tenant's works (including the costs of applying for permits and renewing revision plans) and is obliged to indemnify the Landlord against any negative consequences related to the Tenant's works upon first request. Any alterations, additions or installations, installations or other structural changes carried out in the course of the Tenant's work are to be maintained, maintained and repaired by the Tenant at his own expense and risk.

13.5 The Tenant shall be liable for all damages incurred in connection with the Tenant's work and/or the operation of the facilities created or arranged by him, and shall indemnify the Landlord against all claims by third parties without restriction. The Tenant must notify the Landlord in writing of any intended changes in or to the Property and, in particular, any change in the hazard assessment within the meaning of the fire insurance regulations. If, due to changes, surcharges are levied on the Landlord's insurance premiums, the Tenant must reimburse the Landlord for the amount in question on request.

## 14. Entering the Property

14.1 The Landlord or his agents may enter the Property, even accompanied by other persons, at reasonable intervals and with timely notice during normal Operating hours in order to check the condition of the Property, to read the measuring equipment or for other legitimate reasons.

14.2 In the event of imminent danger, the Landlord may also enter the Property without prior notice or in the absence of the Tenant. The Tenant must ensure that the Property can also be entered in his absence in the event of imminent danger (e.g. by depositing a key with the security service/caretaker). He is liable for all damages caused by the prevention of access.

21



CONFIDENTIAL

FBG_CH1_00094581

14.3 The Landlord undertakes to maintain absolute secrecy against anyone about all matters and processes that come to his attention within the scope of his right of entry and not to pass on any protected information to third parties.

## 15. Advertising Equipment

15.1 The Tenant may only attach and maintain neon signs, billboards, signs and other advertising installations (hereinafter collectively referred to as the "**Advertising equipment**") on the building and/or on the Leased object with the prior consent of the Landlord, insofar as this is permitted by the official regulations and any necessary official approval has been obtained. Any necessary official permits must be obtained by the Tenant himself at his own expense and risk; all requirements are to be fulfilled by him at his own expense. The Tenant must prove to the Landlord without being asked to do so that the necessary official permits have been obtained or that no permit is required. The Landlord assumes no liability for the admissibility of Advertising equipment.

15.2 The Landlord may only refuse consent for good cause. In particular, good cause exists if the necessary official approval for the Advertising equipment is not available or cannot be proven.

15.3 Advertising equipment must not disturb or interfere with third parties (in particular neighbours). The installation, procurement, installation, Maintenance, services and Repair, traffic safety obligation and removal of Advertising equipment is carried out by the Tenant at his own expense and risk. The rules laid down in 13.3 until 13.5 shall apply mutatis mutandis.

15.4 At the end of the lease, the Advertising equipment installed by the Tenant must be removed at the Tenant's own expense and restored to its original condition. The provisions in Article 18.6 further draws the procedure.

## 16. Landlord's lien

The Tenant declares that the items brought by him into the Property are his free property and are not attached or pledged, with the exception of (i) customary reservations of title, encumbrances, pledges or other security interests in favour of suppliers, craftsmen, etc.,

22

(ii) security interests that are usually granted to banks and other financial institutions with regard to liabilities, and (iii) legally regulated security interests of the tax authorities or other public bodies.

17. **Termination**

17.1   The Parties expressly agreed that during the Fixed term, taking into account the nature of this lease, the termination of this lease for grounds not expressly set out in this Agreement is excluded and the Parties expressly exclude any statutory grounds set forth in legislation that would allow for the termination of this Agreement before the expiry of the Fixed term by notice of termination, withdrawal or otherwise.

17.2   In case of provision of rent security in the form of a cash deposit under Article 7.1 the Landlord is entitled to terminate this Agreement by written notice with 60 business days termination period in the case (i) the Tenant is in delay with payment of Rent for more than 30 days following the receipt of a written request for remedy from the Landlord, (ii) the Tenant is using the Building in contrary to its occupancy permit for more than 30 days following the receipt of a written request for remedy from the Landlord, (iii) the Tenant fails to top up the security amount in the form of a cash deposit under Article 7.1 (after it has been used by the Landlord in accordance with this Agreement) for more than 30 days following the receipt of a written request for remedy from the Landlord.

17.3   In case the rent security was replaced by co-obligation of the owner of Tenant the above mentioned termination period shall be reduced to 30 business days.

17.4   The Tenant is entitled to terminate this Agreement by written notice with 30 business days termination period in the case the use of the Leased object for the Purpose of use is restricted and the Landlord fails to provide full remedy for more than 30 days following the receipt of a written request for remedy from the Tenant.

18. **Obligations at the end of the lease**

18.1   The Property must be returned completely vacated and cleaned in accordance with the Agreement on a date announced with reasonable notice, but no later than the last day of the rental period. The Property is in conformity with the Agreement within the meaning

23

CONFIDENTIAL                                                   FBG_CH1_00094583

of Article 18.1 if the Tenant fulfils his obligations and has fully complied with Articles 18.1 to 18.6.

18.2   The Tenant must return all keys and/or code cards given to him at the beginning of the rental period, including those procured by the Tenant himself. In the event of culpable loss of keys and/or code cards, the Tenant must reimburse the Landlord for the costs of new locks, keys and code cards, insofar as the replacement of the locking system is necessary, i.e. unless it can be assumed that misuse of the unreleased key/lost code card is excluded.

18.3   At the end of the lease, the Tenant is obliged to clean the Property free of any damage caused by the Tenant or attributable to him (Article 10.2). The Parties make it clear that wear and tear and ageing of the Property in accordance with the Agreement does not constitute damage and cannot be remedied by the Tenant.

18.4   In accordance with Article 8, due Maintenance, Repairs, services, Cosmetic repairs and replacements are to be carried out by the Tenant at the latest before the return of the Property, unless the new Tenant assumes them at his own expense - without taking them into account in the rental price - or reimburses the previous Tenant for these costs. Landlord and Tenant are free to prove that the Cosmetic repairs would have become necessary before or only after the expiry of the deadlines due to the degree of wear and tear of the Property, so that the standard periods are shortened or extended accordingly.

18.5   [Tenant's work, equipment/accessories installed by the Tenant and other fixtures and fittings are to be removed at the request of the Landlord at the end of the lease and the handover condition is to be restored - subject to the wear and tear and aging of the Property in accordance with the Agreement.] However, the Landlord may demand that the Tenant's facilities and installations be left in the Property at the end of this Agreement if the Landlord pays the Tenant as much as corresponds to the current value – taking into account economic wear and tear and technical progress – and the Tenant has no legitimate interest in the removal of the equipment or installation. The Tenant and the Landlord must declare such equipment or installation in advance so that agreements can be made before the eviction.

24



CONFIDENTIAL

FBG_CH1_00094584

18.6 The Tenant shall remove the Advertising equipment installed by the Tenant or at the Tenant's instigation at his own expense and – subject to wear and tear and ageing in accordance with the Agreement – restore the Property to its original condition.

18.7 The Parties will record the condition of the Property together in a return protocol.

18.8 If the Tenant does not comply with the above obligations by the end of the sublease and also within a one-time reasonable grace period set by the Landlord thereafter, the Landlord may, without the need for a further grace period, refuse to take back the Property and/or have the necessary work carried out at the expense of the Tenant, in particular items that are left behind in the Property without the Landlord's consent,  at the expense of the Tenant. Until the condition in accordance with the Agreement has been restored, the Tenant remains obliged to pay compensation for use, the amount of which is at least equal to the Rent plus the advance payments for Operating costs. This does not apply if only a small number of items have been left behind, which can be removed without considerable effort.

19. **Insurance**

19.1 The Landlord is obliged to maintain business facilities insurance and Property and building fire insurance for the Property, as well as sufficient insurance against fire, storm and tap water damage and Property and building liability insurance in the usual amount. He is entitled to pass on the insurance premiums to the Tenant as part of the Operating costs.

19.2 The Tenant is obliged to take out business liability insurance as well as insurance against damage and loss of objects brought in, even if the objects brought in become an essential part of the building as fixtures, with appropriate cover also for the benefit of the Landlord and to maintain it during the term of the Agreement.

19.3 The following waiver is agreed between the Tenant and the Landlord in order to exclude recourse claims in connection with insurance policies concluded: The Parties mutually waive claims for compensation for all future damages, insofar as they are covered by their own insurance policies, to the extent that compensation payments are actually and definitively provided under the insurance contracts. This waiver of liability applies to

25

CONFIDENTIAL

FBG_CH1_00094585

any kind of damage causation, with the exception of your own intentional or grossly negligent act or omission.

20. **Sale of the Property**

20.1   The Tenant expressly agrees to a transfer of this lease to a future purchaser of the Property. In addition, the Landlord is entitled, and the Tenant hereby gives his consent, to transfer the lease even before a future purchaser is entered in the land register as the new owner, but not before the same is registered as the person entitled to relinquish the lease. At the request of the Landlord, the Tenant undertakes to conclude a corresponding tri-partite formal addendum to this Agreement. At the time of the transfer of the lease, the purchaser enters into the Agreement in place of the Landlord and the Landlord with-draws from the Agreement with all rights and obligations.

20.2   If, in the event of the sale of the Property, the purchaser fails to fulfil his obligations towards the Tenant, the liability of the Landlord, according to which the Landlord is liable for the damage to be compensated by the purchaser, is excluded in the same way as a guarantor who waives the plea of pre-action.

20.3   In the event of the sale of the Property, the Landlord is entitled to request the Tenant for a declaration of completeness, enclosing a list of documents of this Agreement. The Tenant is then obliged to inform in writing within four weeks whether the Landlord's list is complete and factually correct.

21. **Obligation to provide information**

At the request of the Landlord, the Tenant must provide information about his financial situation and provide a profit and loss account, balance sheet and cash flow statement for the current year as well as planning for the remaining and the following year.

22. **(Partial) Loss of the Property**

If, due to a circumstance for which neither Party is responsible, all or a substantial part of the Property is destroyed or perished, both Parties may terminate the lease with effect

26

CONFIDENTIAL

FBG_CH1_00094586

from the date of destruction of the Property, regardless of whether the Property is rebuilt at a later date or not.

23.     **Majority of persons**

23.1    Notices from the Landlord to the Tenant and/or from the Tenant to the Landlord are deemed to have been received by the Tenant/Landlord if they were received at the Tenant's/Landlord's registered address.

23.2    The Tenant undertakes to notify the Landlord immediately in writing of any change in his business address, any change in the personal composition of his representative bodies and any intended change in his legal form.

24.     **Governing law and dispute resolution**

24.1    This Agreement and any disputes arising under this Agreement shall be governed by the laws of the Czech Republic.

24.2    The Parties expressly agree that, to the maximum extent permitted by the mandatory provisions of applicable law, their contractual relationship as established by this Agreement shall not be subject to the provisions of Section 557; Section 1764 et seq.;Section 1899; Section 2000; Section 2050; Section 2223; Section 2303 through 2305; Section 2308; Section 2310 through 2312 of the Civil Code.

24.3    Any disputes arising out of this Agreement shall be subject to negotiation between the Parties. If, in spite of making all reasonable efforts, the Parties fail to resolve the dispute within five (5) days from the date on which it originated, then any such dispute arising from or in connection with this Agreement or in connection with any breach of this Agreement shall be finally settled in front of the ordinary competent Czech court.

25.     **Severability, continuing effect, entirety of Agreement and modifications**

25.1    Should one or more provisions of this Agreement be or become void, invalid or unenforceable in whole or in part, the remainder of this Agreement shall nevertheless remain valid, effective and enforceable to the maximum extent permitted by law. The Parties hereby undertake to replace any invalid, ineffective or unenforceable provisions with

27

FBG_CH1_00094587

new provisions, the meaning and purpose of which shall be as close as possible to the provisions declared to be invalid, ineffective or unenforceable. The same applies in the event that the Agreement proves to be incomplete.

25.2    Irrespective of this Agreement being terminated, any outstanding rights and claims (and any obligations in connection with these outstanding rights and claims) under this Agreement shall remain in full force and effect and shall survive any such expiration or early termination of this Agreement.

25.3    This Agreement contains the entire agreement of the Parties and no other verbal or written agreements otherwise governing the subject matter of this Agreement exist; if any such agreements did previously exist, they shall hereby be cancelled and replaced by this Agreement. Any change to, amendment of or disengagement from this Agreement (in whole or in part) must be made in writing and signed by both Parties. In particular, verbal agreements by telephone, but also other communication by e-mail or correspondence, are not sufficient for the cancellation or amendment of the Agreement. Any agreement that does not satisfy the special written form requirement under this paragraph shall be null and void. As a precautionary measure, it is clarified that the above does not apply to unilateral declarations of intent requiring receipt (e.g. termination).

25.4    The following schedules are part of this Agreement:

| Schedule 1 | Completion Protocol |
|---|---|
| Schedule 2 | Site plan |

To the extent that individual provisions or provisions contained in the above-mentioned schedules conflict with individual provisions set out in Articles 1 to 23, the provisions set out in Articles 1 to 23 take precedence. In all other respects, the provisions are to be understood as complementary.

25.5    The Parties are obliged to take all necessary actions and make declarations at any time and without delay in order to comply with the statutory requirement of written form and/or to (re)establish the necessary requirements. In particular, the Parties are obliged to establish a firm link between all addenda to this Agreement, and this Agreement itself

28

CONFIDENTIAL                                                      FBG_CH1_00094588

(including all annexes), if this has not been done. In any case, a firm connection is established if the individual documents can only be separated again if they are damaged; in particular, a mere bracketing of the document is not sufficient. The Parties make it clear that, on the basis of this paragraph, neither of the Parties is prevented from terminating the lease due to a possible formal invalidity of this Agreement, unless otherwise provided for in good faith in the individual case. A purchaser of the Property shall not be bound by the provisions of this paragraph. In the event of the sale of the Property, the Tenant is also no longer bound by the provisions of this paragraph.

26.   **Interpretation**

The headings in this Agreement are for orientation and convenience of reference only and shall not in any way define, limit or describe the scope of this Agreement or the intention of any of its provisions. Where appropriate in this Agreement, words denoting the singular shall include the plural, and vice versa, and words denoting the masculine gender shall include the feminine and neuter genders. Reference made to any law shall include reference to such law as amended, re-enacted, or replaced from time to time in the future (whether before or after the date of execution of this Agreement) and shall include any decree, regulation or other subordinate legislation adopted on the basis of such law.

26.1   Currency Conversions

Should any amount payable under this Agreement be stated in EUR for the purposes hereof and should such sum be paid in CZK under this Agreement or vice versa, the amount in CZK or EUR shall be established using the current CZK/EUR exchange rate published by the Landlord's bank on the day the relevant invoice is issued or, if such invoice is not issued on time, the current CZK/EUR exchange rate published by the Landlord's bank as at the due date of such sum, unless this Agreement stipulates otherwise. Commencing the date on which EUR becomes the lawful currency (legal tender) in the Czech Republic, all payment obligations under this Agreement shall be performed in EUR based on the exchange rate determined pursuant to applicable legislation. Until such time that the Czech Republic adopts EUR as its lawful currency (legal tender), the VAT rates pursuant to the VAT Act shall remain applicable.

29



CONFIDENTIAL

FBG_CH1_00094589

27. **Others**

The Parties confirm that they held an equal position in the negotiations regarding this Agreement and that neither of them acted as if it were a weaker party. The Parties assure one another that they consider the provisions contained in this Agreement to have been made in good faith on both sides and to be in accordance with basic morality. In entering into this Agreement, the Parties are aware of the possibility of future changes in the market conditions of their field of business and confirm that such changes represent a business risk related to their business, which they bear alone; the Parties agree and consider it fair that they shall be unable to make any claims against the other Party on account of any such changes.

28. **Binding effect, validity and force**

28.1   This Agreement shall bind and entitle the Landlord and the Tenant and their respective legal successors and permitted assignees.

28.2   This Agreement becomes valid and effective on the date on which it is signed by the Parties.

*/SIGNATURES OF THE PARTIES FOLLOW ON THE NEXT PAGE/*

30

CONFIDENTIAL

FBG_CH1_00094590

ANNEX 6

For **Winning IP Hustopeče s.r.o.**

In _____ on _____ 2024

_____

Name: Sebastian Peter Wagner

Position: Managing Director

For **LINDEN s.r.o.**

In _____ on _____ 2024

_____

Name:

Position: Managing Director



CONFIDENTIAL

FBG_CH1_00094591

## SCHEDULE 1

### COMPLETION PROTOCOL

32

CONFIDENTIAL

FBG_CH1_00094592

## SCHEDULE 2

### SITE PLAN

33

CONFIDENTIAL

FBG_CH1_00094593

CONFIDENTIAL

FBG_CH1_00094594

**DEBTORS' EXHIBIT NO. 240**
**Page 142 of 142**