*Execution Version*

STOCK PURCHASE AGREEMENT

by and among

FIRST BRANDS GROUP, LLC,

CARDONE HOLDCO, LP

AND

CARDONE INDUSTRIES, INC.

Dated as of June 30, 2023

*This document is not intended to create nor shall it be deemed to create a legally binding or enforceable offer or agreement of any type or nature, unless and until agreed to and duly executed and delivered by the Parties.*

CONFIDENTIAL

FBG_CH1_00094595

DEBTORS' EXHIBIT NO. 241
Page 1 of 104

## TABLE OF CONTENTS

Page

ARTICLE I THE TRANSACTION ..................................................................................................1
    Section 1.1        Transaction.............................................................................. 1
    Section 1.2        Purchase Price ....................................................................... 1
    Section 1.3        Closing Date Statement......................................................... 2
    Section 1.4        Closing Date Payments.......................................................... 2

ARTICLE  II  REPRESENTATIONS  AND  WARRANTIES  RELATING  TO  THE
        COMPANY ..................................................................................................2
    Section 2.1        Organization.......................................................................... 2
    Section 2.2        Authorization ........................................................................ 2
    Section 2.3        Capitalization; Subsidiaries .................................................. 3
    Section 2.4        Consents and Approvals; No Violations................................ 3
    Section 2.5        Financial Statements ............................................................. 4
    Section 2.6        No Undisclosed Liabilities.................................................... 4
    Section 2.7        Absence of Certain Changes ................................................. 5
    Section 2.8        Real Estate ............................................................................ 5
    Section 2.9        Intellectual Property.............................................................. 6
    Section 2.10       Litigation; Compliance with Laws........................................ 7
    Section 2.11       Company Material Contracts ................................................. 8
    Section 2.12       Tax Returns; Taxes ............................................................... 8
    Section 2.13       Environmental Matters.......................................................... 10
    Section 2.14       Licenses and Permits............................................................ 11
    Section 2.15       Company Plans ...................................................................... 11
    Section 2.16       Labor Relationships .............................................................. 13
    Section 2.17       Certain Fees .......................................................................... 14
    Section 2.18       Insurance Policies ................................................................. 14
    Section 2.19       Related Party Transactions ................................................... 15
    Section 2.20       Customers and Suppliers....................................................... 15
    Section 2.21       Accounts and Notes Receivable; Accounts Payable.............. 16
    Section 2.22       Inventory............................................................................... 16
    Section 2.23       Assets.................................................................................... 16
    Section 2.24       Bank Accounts...................................................................... 16
    Section 2.25       Products................................................................................. 16
    Section 2.26       Anti-Money Laundering ....................................................... 17
    Section 2.27       Anticorruption; Improper Payments ..................................... 17
    Section 2.28       International Trade Laws ....................................................... 18
    Section 2.29       No Other Representations or Warranties ............................... 18

ARTICLE III REPRESENTATIONS AND WARRANTIES RELATING TO SELLER............19
    Section 3.1        Organization.......................................................................... 19
    Section 3.2        Authorization ........................................................................ 19
    Section 3.3        Consents and Approvals; No Violations................................ 19
    Section 3.4        Ownership of the Company Stock ......................................... 20

CONFIDENTIAL

Section 3.5        Certain Fees ................................................................................. 20
Section 3.6        No Other Representations or Warranties .................................... 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 20
Section 4.1        Organization .................................................................................. 20
Section 4.2        Authorization ................................................................................ 20
Section 4.3        Consents and Approvals; No Violations ...................................... 21
Section 4.4        Litigation ....................................................................................... 21
Section 4.5        Available Funds ............................................................................ 21
Section 4.6        Solvency ........................................................................................ 21
Section 4.7        Certain Fees .................................................................................. 21
Section 4.8        Independent Investigation; No Reliance ...................................... 22

ARTICLE V POST-CLOSING COVENANTS ....................................................................... 22
Section 5.1        Public Announcements ................................................................. 22
Section 5.2        Tax Matters ................................................................................... 23
Section 5.3        Directors' and Officers' Insurance ............................................... 24
Section 5.4        Release .......................................................................................... 25
Section 5.5        Books and Records ....................................................................... 25
Section 5.6        Amendments to Transition Services Agreement ......................... 26
Section 5.7        Payroll Payments .......................................................................... 26
Section 5.8        Existing Policies ........................................................................... 26
Section 5.9        Further Assurances ....................................................................... 26

ARTICLE VI CLOSING .......................................................................................................... 27
Section 6.1        Closing .......................................................................................... 27
Section 6.2        Deliveries by Seller ...................................................................... 27
Section 6.3        Delivery of Company Stock .......................................................... 27
Section 6.4        Deliveries by Buyer ...................................................................... 27

ARTICLE VII SURVIVAL ...................................................................................................... 27
Section 7.1        No Survival of Representations, Warranties and Covenants ....... 27
Section 7.2        Representation and Warranty Insurance ...................................... 28

ARTICLE VIII MISCELLANEOUS ....................................................................................... 28
Section 8.1        Fees and Expenses ....................................................................... 28
Section 8.2        Notices .......................................................................................... 28
Section 8.3        Severability ................................................................................... 29
Section 8.4        Binding Effect; Assignment .......................................................... 29
Section 8.5        No Third Party Beneficiaries ....................................................... 30
Section 8.6        Section Headings .......................................................................... 30
Section 8.7        Consent to Jurisdiction, Etc. ....................................................... 30
Section 8.8        Entire Agreement .......................................................................... 30
Section 8.9        Governing Law ............................................................................. 31
Section 8.10       Specific Performance ................................................................... 31
Section 8.11       Counterparts; Confidentiality ...................................................... 31
Section 8.12       Amendment; Modification ............................................................ 31

CONFIDENTIAL                                                                                    FBG_CH1_00094597

**DEBTORS' EXHIBIT NO. 241**
**Page 3 of 104**

Section 8.13   Time of Essence ....................................................................................... 31
Section 8.14   Schedules ................................................................................................. 31
Section 8.15   Conflict Waiver ....................................................................................... 32
Section 8.16   No Recourse ............................................................................................ 32
Section 8.17   Construction ............................................................................................ 33

-iii-

CONFIDENTIAL

FBG_CH1_00094598

## LIST OF EXHIBITS

Exhibit A          Definitions
Exhibit B          Closing Date Statement
Exhibit C          Transition Services Agreement

CONFIDENTIAL                                                                FBG_CH1_00094599

## STOCK PURCHASE AGREEMENT

This **STOCK PURCHASE AGREEMENT**, dated June 30, 2023 (this "Agreement"), is made and entered into by and among First Brands Group, LLC, a Delaware limited liability company ("Buyer"), Cardone Holdco LP, a Delaware limited partnership ("Seller"), and Cardone Industries, Inc., a Delaware corporation (the "Company").  Buyer, Seller and the Company are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties". Capitalized terms used in this Agreement shall have the meanings ascribed to them in Exhibit A attached hereto.

### RECITALS

**WHEREAS**, Seller owns 100% of the issued outstanding capital stock of the Company (the "Company Stock");

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title and interest in and to the Company Stock upon the terms and subject to the conditions set forth herein;

**WHEREAS**, immediately prior to the Closing, the Company distributed 100% of the equity interests of Rotomaster to Seller in redemption of a portion of the shares of the Company Stock held by Seller (the "Pre-Closing Redemption");

**WHEREAS**, the respective governing bodies of Buyer, the Company and Seller have approved this Agreement and the transactions contemplated hereby, in each case, upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the Parties desire to make certain representations, warranties, covenants and other agreements in connection with the foregoing and also prescribe certain conditions to the transactions contemplated hereby.

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth in this Agreement, and intending to be legally bound hereby, each Party hereby agrees:

### ARTICLE I
### THE TRANSACTION

Section 1.1    Transaction.  Upon the terms and subject to the conditions set forth in this Agreement and on the basis of the representations, warranties, covenants and agreements contained in this Agreement, upon the receipt of the Closing Purchase Price, Seller will sell, convey, transfer, assign and deliver to Buyer, and Buyer will purchase from Seller, all of Seller's right, title and interest in and to the Company Stock.

Section 1.2    Purchase Price.  The aggregate cash amount to be paid by Buyer at the Closing (the "Closing Purchase Price") will be an amount equal to (a) the Base Purchase Price,

-1-

FBG_CH1_00094600

*plus* (b) the Closing Company Cash, *minus* (c) the Closing Indebtedness, *minus* (d) the Closing Company Transaction Expenses.

Section 1.3     Closing Date Statement.  The Company has prepared and delivered to Buyer a statement attached as Exhibit B hereto (the "Closing Date Statement") setting forth the Company's good faith calculation of (a) the Closing Company Cash, (b) by lender, the Closing Indebtedness, (c) by payee, the Closing Company Transaction Expenses, and (d) the resulting calculation of the Closing Purchase Price.

Section 1.4     Closing Date Payments.  At the Closing, Buyer will pay, in cash by wire transfer of immediately available funds, the following amounts:

(a)     to Seller, an amount equal to the Closing Purchase Price;

(b)     [reserved];

(c)     on behalf of Seller, to such account or accounts as set forth in the Payoff Letters, the Paid Indebtedness; and

(d)     on behalf of Seller, to such account or accounts as the Seller has specified to Buyer in writing, the Closing Company Transaction Expenses.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANY

Subject to the terms, conditions and limitations set forth in this Agreement, and except as set forth in the Schedules, Seller hereby represents and warrants to Buyer as of the date hereof:

Section 2.1     Organization.  Each Group Company (a) is a limited liability company, corporation, or other entity duly incorporated or organized, validly existing and in good standing under the Laws of its respective jurisdiction of incorporation or organization, which is listed on Schedule 2.1, and (b) has all requisite power and authority to own, lease and operate its properties and to carry on, in all material respects, its businesses as conducted on the date hereof.  Each Group Company is duly qualified or registered as a foreign entity to transact business under the Laws of each jurisdiction where the character of its activities or the location of the properties owned or leased by it requires such qualification or registration, except where the failure of such qualification or registration would not, individually or in the aggregate, be material to the Group Companies taken as a whole.  Complete and correct copies of the Organizational Documents of each Group Company, and all amendments thereto, have been made available to Buyer.  None of the Group Companies is in material violation of any of the provisions of its Organizational Documents. The stock certificate books and stock transfer ledgers of each Group Company previously made available to Buyer are true, complete and accurate in all material respects.

Section 2.2     Authorization.  The Company has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by the Company and, when duly authorized and executed by all other Parties, constitutes

-2-

the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 2.3    Capitalization; Subsidiaries.

(a)    The Company Stock represents all of the equity interests of the Company.  Except as set forth on Schedule 2.3(a), all of the issued and outstanding equity interests of the Company are duly authorized, validly issued, fully paid and non-assessable, and free of preemptive or similar rights.

(b)    There are no (i) outstanding warrants, options, rights, agreements, convertible or exchangeable securities or other commitments pursuant to which the Company is or may become obligated to issue, sell, purchase, return or redeem any issued equity interests of the Company, (ii) outstanding or authorized appreciation, phantom interests, profit participations, or similar rights with respect to the Company, or (iii) voting trusts, proxies or other agreements or undertakings with respect to the voting of the issued equity interests of the Company.

(c)    Except as set forth on Schedule 2.3(c), all of the outstanding equity securities of each Company Subsidiary are validly issued and free of preemptive rights and are owned by the Company, whether directly or indirectly, free and clear of all Liens (other than Permitted Liens). There are no outstanding warrants, options, rights, agreements, convertible or exchangeable securities or other commitments pursuant to which the Company or any Company Subsidiary is or may become obligated to issue, sell, purchase, return or redeem any issued equity interests of any Company Subsidiary.

(d)    Except as set forth on Schedule 2.3(d), other than the Company's interest in the Company Subsidiaries and Rotomaster, the Company does not hold, directly or indirectly, any equity, partnership or joint venture interest in any Person.

(e)    No Group Company has violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its equity interests or any warrants, options or other rights to acquire its equity securities.  No equity interests of any Group Company are subject to, nor have been issued in violation of, preemptive or similar rights.  There are no accrued but unpaid dividends payable by the Company on any equity interests of the Company.

Section 2.4    Consents and Approvals; No Violations.  Except as set forth on Schedule 2.4 or as becomes applicable as a result of the business or activities in which Buyer or its Affiliates is or proposes to be engaged or as a result of any acts or omissions by, or the status of or facts pertaining to, Buyer or its Affiliates, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by the Company do not and will not (a) violate the provisions of the Organizational Documents of any Group Company, (b) violate any Law to which any Group Company is subject, (c) require the Company to obtain any consent or approval, or give any notice to, or make any filing with any Governmental Entity on or prior to the Closing Date, (d) result in a breach of, give rise to any right of termination, cancellation or acceleration under, or require the consent of any third party to any Company Material Contract, or

-3-

FBG_CH1_00094602

(e) result in the creation or imposition of any Lien upon the Company Stock or the assets of the Group Companies, excluding from the foregoing clauses (b), (c), (d) and (e) any consent, approval, notice or filing the absence of which, and any violation, breach, or right of termination, cancellation or acceleration the existence of which, or the creation or imposition of any Lien which, would not be material to the Group Companies taken as a whole or materially and adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement.

Section 2.5    Financial Statements.

(a)    The Company has made available to Buyer copies of the audited consolidated balance sheet of the Company for the fiscal years ended December 31, 2020, 2021 and 2022, and the related audited consolidated statements of comprehensive income, stockholder's equity and cash flows of the Company, together with all related notes and schedules thereto, accompanied by the report thereon of the Company's independent auditors (collectively referred to as the "Financial Statements"), and the unaudited consolidated balance sheet of the Company as of May 31, 2023 (the "Interim Balance Sheet") and the related unaudited consolidated statements of operations and cash flows of the Company for the 5-month period then ended (together with the Interim Balance Sheet, the "Interim Financial Statements"). The Financial Statements and the Interim Financial Statements (i) have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto) and (ii) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of the Group Companies as of the respective dates thereof and for the respective periods indicated therein, except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes.

(b)    Except as set forth in Schedule 2.5(b), the Group Companies have established and maintained and, for the past three (3) years, have maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Group Companies and (ii) that (A) all transactions are executed in accordance with management's general or specific authorizations; and (B) all transactions are recorded when and as necessary to permit preparation of financial statements in conformity with GAAP.

(c)    The Group Companies have established and maintained and, for the past three (3) years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Group Companies (including any deficiencies or weaknesses in the design or operation of the Group Companies' internal controls and any fraud that involves management or other Service Providers of any Group Company) is made known to the Company's management by others within the Company and disclosed to the Company's board of directors and outside auditors.

Section 2.6    No Undisclosed Liabilities. Except as set forth in the Interim Balance Sheet or Schedule 2.6, to the Knowledge of the Company, the Company does not have any liabilities or obligations of the type required to be disclosed in the Interim Balance Sheet in accordance with GAAP, except for liabilities and obligations (a) incurred since the Balance Sheet Date in the Ordinary Course, (b) that arise under any Company Material Contract (other than liabilities relating to any breach), (c) incurred since the Balance Sheet Date pursuant to or in connection with

-4-

this Agreement or the transactions contemplated hereby, (d) disclosed in this Agreement (or its Schedules), or (e) which would not reasonably be expected to, individually or in the aggregate, be material to the Group Companies taken as a whole.

Section 2.7    Absence of Certain Changes.  Except as set forth on Schedule 2.7, since the Balance Sheet Date:

(a)    the Group Companies have conducted their business in all material respects in the Ordinary Course;

(b)    there has been no Material Adverse Effect;

(c)    there has been no casualty, loss, damage or destruction of any property that is material to the Group Companies and that is not covered by insurance, subject to any retentions, deductibles or similar items; and

(d)    there has been no material change in the accounting methods or practices of any Group Company or any change in depreciation or amortization policies or rates theretofore adopted by the Group Companies other than as required by GAAP.

Section 2.8    Real Estate.

(a)    No Group Company owns any real property.

(b)    Schedule 2.8(b) lists the street address of real property leased or subleased by any Group Company (each, a "Leased Real Property" and collectively, the "Leased Real Properties"), and sets forth the name of the landlord and the name of the entity holding such leasehold interest.

(c)    True, correct and complete copies of all leases and amendments thereto with respect to the Leased Real Properties (individually, a "Lease" and collectively, the "Leases") have been made available to Buyer.

(d)    The leasehold interests of the Group Companies in the Leased Real Properties constitute all of the real property leased in connection with the business of the Group Companies.

(e)    Except as set forth on Schedule 2.8(e), with respect to each Leased Real Property: (i) the Lease for such Leased Real Property is legal, valid, binding, enforceable and in full force and effect in all material respects in accordance with its respective terms with respect to the applicable Group Company, and, to the Knowledge of the Company, the other party thereto, assuming the due authorization, execution and delivery by such other party, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity; (ii) no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute a material breach or material default under such Lease on the part of the applicable Group Company, nor, to the Knowledge of the Company, on the part of the other party thereto; (iii) no Group Company owes any brokerage commissions or finder's fees with respect to such Lease; and (iv) no Group Company has subleased, licensed or otherwise granted any Person the

CONFIDENTIAL

FBG_CH1_00094604

right to use or occupy such Leased Real Property (or any portion thereof) that is the subject matter of such Lease.

(f)     The Leased Real Property is sufficient for the operation of the business of the Group Companies as currently conducted and intended to be conducted.   No Group Company has received any notice from any insurance company or board of fire underwriters of any defects or inadequacies that could adversely affect the insurability of any Leased Real Property or requesting the performance of any material work or alteration with respect to any Leased Real Property.   To the Knowlede of the Company, there is no pending or threatened condemnation, expropriation or other governmental taking of any part or interest in any Leased Real Property.   To the Knowledge of the Company, the current and intended use and occupancy of the Leased Real Property and the operation of the Group Companies' businesses as currently conducted and intended to be conducted thereon do not violate any applicable zoning Law, easement, covenant, condition, restriction or similar provision in any instrument of record affecting the Leased Real Property.   To the Knowledge of the Company, no fact or condition exists that could result in the termination or impairment of presently available access from adjoining public or private streets or ways or in the discontinuation of presently available sewer, water, electric, gas, telephone or other utilities or services for any Leased Real Property.

Section 2.9     Intellectual Property.

(a)     Schedule 2.9(a) contains a true, correct and complete list of all of the following Intellectual Property: (i) all registered trademarks and pending trademark applications owned by the Group Companies, including, as appropriate, registration and application dates and numbers; (ii) all registered copyrights owned by the Group Companies; (iii) all domain names owned by the Group Companies; (iv) all registered patents and pending applications owned by the Group Companies; and (v) all material Company Software (indicating for each of (i) through (iv) the Group Company that owns or holds such Intellectual Property, applicable jurisdiction, registration number (if registered), applicable number, date issues (if issued) and date filed).   Collectively, the items listed on Schedule 2.9(a) represent the "Company Intellectual Property".

(b)     Except as set forth on Schedule 2.9(b): (i) a Group Company possesses all right, title and interest in the Company Intellectual Property, free and clear of all Liens (other than Permitted Liens); (ii) there are no judgments finding any of the Company Intellectual Property to be invalid or unenforceable; (iii) there are no proceedings pending or, to the Knowledge of the Company, threatened, that challenge the validity, use, ownership, or enforceability of the Company Intellectual Property; and (iv) the maintenance fees necessary to maintain the Company Intellectual Property through the Closing Date have been paid.

(c)     Schedule 2.9(c) sets forth a listing of all material Intellectual Property licenses granted by or to any Group Company, including software material to the Group Companies, other than commercially available, off-the-shelf computer software programs.

(d)     Except as set forth on Schedule 2.9(d): (i) to the Knowledge of the Company, neither the use of the Intellectual Property as currently used by the Group Companies in the conduct of their business, nor the conduct of their business as presently conducted, infringes, misappropriates or violates the rights of any Person in any Intellectual Property in a manner that

-6-

CONFIDENTIAL                                                                                    FBG_CH1_00094605

**DEBTORS' EXHIBIT NO. 241**
**Page 11 of 104**

would reasonably be expected to be material to the Group Companies; and (ii) no Group Company has received any written notice in the past three (3) years alleging any of the same.

(e)     Except as set forth on Schedule 2.9(e): (i) there are no claims, proceedings, actions, suits, hearings, arbitrations, investigations, charges, complaints, demands or similar actions currently pending or threatened, or that have been brought within the last three (3) years, by any Group Company against any Person alleging infringement, misappropriation, or violation of any Company Intellectual Property; and (ii) to the Knowledge of the Company, no Person is currently infringing upon, misappropriating, or otherwise violating any of the Company Intellectual Property.

(f)     Each Group Company owns, or is authorized to use pursuant to valid written license, all Intellectual Property necessary for the conduct of the business of such Group Company.

(g)     No Group Company is in breach or default in the performance of any material term or condition contained in any Company Material Contract pursuant to which any Group Company is licensed to use any material Intellectual Property, nor, to the Knowledge of the Company, has an event occurred that with notice or lapse of time would constitute such a breach or default by a Group Company.

(h)     The Company has commercially reasonable safeguards in place to protect Personal Data in any Group Company's possession or control from unauthorized access by third persons. To the Knowledge of the Company, for the three (3) years prior to the date hereof, no person or entity has made any illegal or unauthorized use of Personal Data that was collected by or on behalf of the Group Companies and is in the possession or control of the Group Companies.  To the Knowledge of the Company, no Group Company is currently under any investigation by any state, federal, or foreign jurisdiction regarding its protection, storage, use, and disclosure of Personal Data.  In the past year, to the Knowledge of the Company, there have been no breaches in security for the information technologies systems used by the Group Companies that have resulted in the loss or unauthorized access, disclosure or use of any Personal Data, which would, individually or in the aggregate, be material the Group Companies.

Section 2.10    Litigation; Compliance with Laws.

(a)     Except as set forth on Schedule 2.10(a): (i) there is no investigation or review pending or, to the Knowledge of the Company, threatened by any Governmental Entity with respect to the Group Companies; (ii) there are no actions, suits, proceedings, arbitrations or mediations pending or, to the Knowledge of the Company, currently threatened, against the Group Companies or any of their respective properties at Law or in equity; and (iii) no Group Company is subject to any order of any Governmental Entity.  For any actions, suits, proceedings, arbitrations or mediations set forth on Schedule 2.10(a), the Company has provided or made available to Buyer true and complete copies of all pleadings, correspondence and other material documents relating to such actions, suits, proceedings, arbitrations or mediations.

(b)     Except as set forth on Schedule 2.10(b)(i), each Group Company is in compliance in all material respects with all Laws applicable to it or its business, properties or assets and at all times in the past five (5) years, each Group Company has complied in all material respects with

-7-

FBG_CH1_00094606

all Laws applicable to it or its business, properties or assets.  Further, except as set forth on Schedule 2.10(b)(ii), no Group Company has received during the past five (5) years, any notice or other communication from any Governmental Entity or any other Person that any Group Company is not in compliance in any material respect with any applicable Law.

Section 2.11   Company Material Contracts.

(a)   Schedule 2.11(a) sets forth a true, correct and complete list of the Company Material Contracts.

(b)   Each of the Company Material Contracts (except those that are cancelled, rescinded or terminated after the date hereof in accordance with their terms) is in full force and effect in all material respects in accordance with its terms with respect to the applicable Group Company, and, to the Knowledge of the Company, the other party thereto, assuming the due authorization, execution and delivery by such other party, subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general principles of equity.  To the Knowledge of the Company, there does not exist under any Company Material Contract any event of default or event or condition that constitutes a violation, breach or event of default thereunder on the part of the applicable Group Company.  True, complete and accurate copies of each Company Material Contract, together with all modifications and amendments thereto, have previously been delivered or made available to Buyer.  Since December 31, 2022, no Group Company has received any notice or communication regarding any violation or breach of, or default under any such Company Material Contract.  Except as set forth on Schedule 2.11(b), no Group Company has been notified by any counterparty to any such Company Material Contract that such counterparty is terminating, modifying, repudiating or rescinding, or intends to terminate, modify, repudiate or rescind such Company Material Contract.

Section 2.12   Tax Returns; Taxes.  Except as otherwise disclosed on Schedule 2.12:

(a)   Each Group Company has timely and properly filed all Tax Returns required to be filed by it, taking into account any valid extension of time to file.  All such Tax Returns are accurate and complete in all material respects.  Each Group Company has timely and properly paid all Taxes required to be paid by it or with respect to its assets, whether or not shown on such Tax Returns.

(b)   All Tax deficiencies that have been claimed, proposed, or asserted by any Governmental Entity against any Group Company have been fully paid or finally settled.

(c)   No Tax audits or administrative or judicial proceedings in respect of Taxes are being conducted with respect to any Group Company.  No Group Company has received from any Governmental Entity any (i) written notice indicating an intent to open an audit or other review with respect to Taxes, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax.  No Group Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect. No Group Company is currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax.

CONFIDENTIAL

FBG_CH1_00094607

(d)      No claim has ever been made by an authority in a jurisdiction where any Group Company does not file Tax Returns that such Group Company may be subject to taxation by that jurisdiction.  Schedule 2.12(d) of the Disclosure Schedules sets forth each jurisdiction in which each Group Company files Tax Returns or pays Taxes.

(e)      There are no Liens on any of the assets of the Group Companies that arose in connection with any failure (or alleged failure) to pay any Tax.

(f)      Each Group Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any current or former Service Provider, equity interest holder, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  To the Knowledge of the Company, each Group Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(g)      No Group Company is party to any Tax allocation, Tax sharing, or Tax distribution agreement or arrangement.

(h)      No Group Company (i) has ever been a member of an Affiliated Group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes (other than a group the common parent of which was the Company), (ii) has any liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by any contract, or otherwise, or (iii) has ever been a party to any joint venture, partnership, or other arrangement that is treated as a partnership for Tax purposes.

(i)      No Group Company has ever been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(j)      Each Group Company has timely and properly collected all sales, use, value-added, and similar Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Entity.  Each Group Company has properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes on sales or similar transaction as to which it would otherwise have been obligated to collect or withhold Taxes.

(k)      The aggregate unpaid Taxes of the Group Companies (a) did not, as of the Balance Sheet Date, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet and (b) do not exceed that reserve as adjusted for the passage of time through the end of the Closing Date in accordance with the past custom and practice of the Company in preparing its Financial Statements.

(l)      No Group Company has ever participated in any "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code or Treasury Regulation Section 1.6011-4(b).

-9-

(m)     No Group Company has requested or received a ruling from any Governmental Entity or signed any binding agreement with any Governmental Entity that might impact the amount of Tax due from the Buyer or its Affiliates (including following the Closing, for the avoidance of doubt, the Group Companies) after the Closing Date.

(n)     Neither the Buyer nor any of its Affiliates (including following the Closing, for the avoidance of doubt, the Group Companies) will be required to include any item of income in, or exclude any deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting or use of a cash or improper method of accounting for a taxable period ending on or prior to the Closing Date with respect to any Group Company; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax Law) executed on or prior to the Closing Date; (iii) intercompany transactions as described in Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of state, local or foreign income Tax Law) or excess loss account described in Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of state, local or foreign income Tax Law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date by any Group Company; (v) prepaid amount or deposit received on or prior to the Closing Date by any Group Company; or (vi) interest held by any Group Company in a CFC on or before the Closing Date pursuant to Sections 951, 951A, or 965 of the Code. No Group Company is required to include any amount in income pursuant to Section 965 of the Code or pay any installment of the "net tax liability" described in Section 965(h)(1) of the Code.

(o)     No Group Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(p)     The Group Companies have complied in all material respects with all applicable transfer pricing Laws.

(q)     Each Group Company has been resident in its jurisdiction of incorporation for Tax purposes and has not, at any time, been treated as a resident of or as having a permanent establishment or other fixed place of business in any other jurisdiction.

Section 2.13    Environmental Matters.  The Group Companies possess all Environmental Permits required by Environmental Laws for the conduct of their respective businesses, except where failure to possess such Environmental Permit would not reasonably be expected to be material to the Group Companies.  The Group Companies are in compliance with all Environmental Laws and Environmental Permits, except for matters that have been resolved or for non-compliance that would not reasonably be expected to be material to the Group Companies. No written notice under any Environmental Law has been received from any Governmental Entity by any Group Company that is currently outstanding concerning the Release or possible Release of Hazardous Substances.  To the Knowledge of the Company, there are no Hazardous Substances present in, at, under, about or migrating to or from, any (i) Leased Real Property, (ii) real property formerly owned, leased, or used by any Group Company or any of its predecessors, or (iii) any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Substance on behalf of any Group Company or any of its predecessors that could reasonably be

-10-

CONFIDENTIAL

expected to give rise to, result in, or serve as a basis for losses to the Group Companies under Environmental Laws. To the Knowledge of the Company, no current facts, circumstances, or conditions exist with respect to any Group Company, their respective businesses, the Leased Real Property, or any formerly owned, leased, or operated real property that would result, individually or in the aggregate, in any Group Company's incurring material losses or material, unbudgeted capital expenditures to achieve or maintain compliance under Environmental Laws, including Licenses required under Environmental Laws. The Company has provided Buyer with true, complete and accurate copies of all material environmental assessment reports, health and safety audits, and reports of investigations with respect to the Group Companies or the Leased Real Property in the Company's possession or control.

Section 2.14    Licenses and Permits.  Schedule 2.14 sets forth a true, correct and complete list of all material Licenses held by the Group Companies, true and complete copies of which, to the extent applicable, have been provided to or made available to Buyer. The Group Companies own or possess all Licenses that are necessary to enable them to carry on their respective operations as presently conducted, except, in each case, where the failure to own or possess any such License would not reasonably be expected to be material to the Group Companies. Each Group Company complies in all material respects, and has in the past five (5) years complied in all material respects, with all such Licenses, and no Group Company has received during the past five (5) years any notice or other communication from any Governmental Entity or any other Person that any Group Company is not in compliance in any material respect with any such License or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such License. All such Licenses are, and immediately following the Closing will be, valid and in full force and effect on terms identical in all material respects to those under which, immediately prior to the Closing (and as of the date of this Agreement), the Group Companies hold such Licenses.

Section 2.15    Company Plans.

(a)    Schedule 2.15(a)(i) sets forth a true, correct and complete list of each material "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA")), and any equity option, severance, change-in-control, bonus, deferred compensation or pension plan or program, in each case, for the benefit of any current officer or employee of the Group Companies (i) that is maintained or contributed to by any Group Company, and (ii) as to which any Group Company has any material liability, contingent or otherwise (all such plans and programs, the "Company Plans"). With respect to each such Company Plan, the Company has provided or made available to Buyer a true, correct and complete copy thereof and, to the extent applicable, a true, correct and complete copy of (A) any related trust agreement, (B) the most recent governmental determination or tax approval letter, (C) the most recent summary plan description, (D) the most recent Form 5500 and attached schedules, and (E) the most recent actuarial valuation reports. Each Company Plan that is subject to any Laws of a jurisdiction outside the United States is separately set forth on Schedule 2.15(a)(ii).

(b)    Each Company Plan is established, maintained, funded and administered in all material respects in accordance with its terms and in compliance with applicable Law, including ERISA and the Code. Each Company Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified, except for such matters which would not reasonably be

-11-

FBG_CH1_00094610

expected to cause the loss of such qualification or to result in any material cost to correct to avoid the loss of such qualification.

(c)     Except as set forth on <u>Schedule 2.15(c)</u>, no Company Plan is subject to Title IV of ERISA or is a defined benefit pension plan, and the Company does not have any liability, whether or not assessed, under Title IV of ERISA or Section 412 of the Code.  The Company has no obligation to any "multiple employer plans" as defined in Section 413(c) of the Code or "multiple employer welfare arrangements" within the meaning of Section 3(40) of ERISA.

(d)     No Company Plan, or trustee or administrator thereof has, to the Knowledge of the Company, engaged in any non-except "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) to which Section 406 of ERISA or Section 4975 of the Code applies and which could subject any such Company Plan or trustee or administration thereof to a material Tax or penalty on prohibited transactions imposed by Section 4975 of the Code.

(e)     Each Company Plan is and has been, in all material respects, established and administered in accordance with its terms and in compliance with applicable Law.

(f)     Each Company Plan that is a welfare plan complies and has complied in all material respects with the legally required provisions of the Patient Protection and Affordable Care Act of 2010, as amended, and all regulations and other guidance of any Governmental Entity thereunder.

(g)     Except as would not reasonably be expected to result in material liabilities to any Group Company, there is no pending action that has been asserted or instituted with respect to any Company Plan other than routine claims for benefits, and to the Knowledge of the Company, no such action has been threatened.

(h)     No Company Plan is under audit or investigation by, or is the subject of a Proceeding with respect to, any Governmental Authority, including the Internal Revneue Service, the Department of Labor or the Pension Benefit Guaranty Corporation.

(i)     None of the Company Plans provides for post-retiree health, welfare or life insurance benefits or coverage for any participant or any beneficiary of a participant, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or similar state Law.

(j)     No Group Company maintains any obligations to gross-up or reimburse any individual for any tax or related interest or penalties incurred by such individual, including under Sections 409A of the Code or 4999 of the Code or otherwise. Each Company Plan which is a "nonqualified deferred compensation plan" subject to Section 409A of the Code and the regulations and other guidance issued thereunder ("<u>Section 409A</u>") has been established, operated and maintained in compliance with Section 409A.

(k)     Except as set forth on <u>Schedule 2.15(k)</u> or as otherwise contemplated by this Agreement, neither the execution and delivery of this Agreement nor the approval or consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any current or former employee or director of the Group Companies under any Company

-12-

CONFIDENTIAL

FBG_CH1_00094611

Plan, (ii) materially increase any payments or benefits payable under any Company Plan, (iii) result in the acceleration of the time of payment, funding or vesting of any payments or benefits under any Company Plan, (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

Section 2.16    Labor Relationships.

(a)    Except as otherwise disclosed on Schedule 2.16(a): (a) no Group Company is party to any operative collective bargaining agreement covering any of the Group Companies' employees with any labor union or similar organization; (b) to the Knowledge of the Company, no union organization campaign is in progress or has occurred in the past five (5) years with respect to any employee or group of employees of the Group Companies; and (c) no labor dispute, walk out, strike, hand billing, picketing, or work stoppage involving the employees of the Group Companies is in progress or has occurred in the past five (5) years. The Group Companies are not subject to any charge, demand, petition or representation proceeding seeking to compel, require or demand any of them to bargain with any labor union or labor organization. To the Knowledge of the Company, no labor union has requested or is seeking to represent any Service Provider. There is no pending, or to the Knowledge of the Company, threatened unfair labor practice charge against any of the Group Companies before the National Labor Relations Board and, to the Knowledge of the Company, no basis for any such charge exists. No Group Company is or has been a party to or otherwise bound by any order relating to employees or employment practices, and there are no Governmental Entity conciliation agreements, noncompliance findings or audits pending or in effect with respect to employees or employment practices of any Group Company.

(b)    To the Knowledge of the Company, each current and former employee of the Group Companies that has been classified as exempt from overtime requirements was in fact exempt from overtime requirements at all times so classified. To the Knowledge of the Company, each current and former Service Provider who has not been classified as an employee of the Group Companies was in fact not an employee of the Group Companies at all times so classified. The Group Companies have complied in all material respects with all Laws relating to their current and former non-employee Service Providers. The Group Companies have complied in all material respects with all Laws relating to their employees including all applicable Laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, including (i) Title VII of the Civil Rights Act of 1964, as amended, (ii) the Equal Pay Act of 1967, as amended, (iii) the Age Discrimination in Employment Act of 1967, as amended, (iv) the Americans with Disabilities Act, as amended, (v) the Fair Labor Standards Act, as amended, and (vi) Laws relating to employment and employment practices, terms and conditions of employment, wages, hours, collective bargaining and the payment and withholding of Taxes or other sums as required by the appropriate Governmental Entity and has withheld and paid to the appropriate Governmental Entity or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from current and former employees, and there are no material arrearages or delinquencies in the payment of wages, salaries, commissions, bonuses or other direct compensation, in each such case, and the related rules and regulations adopted by those federal agencies responsible for the administration of such Laws.

-13-

(c)     There is no pending or, to the Knowledge of the Company, threatened claims against or investigations involving, any of the Group Companies (including workers' compensation claims and claims or suits for contribution to, or indemnification of, third parties, occupational health and safety, environmental, consumer protection or equal employment matters) for injury, sickness, disease, discrimination, death or termination of employment services of any current or former Service Providers or other employment matter, other than as set forth on Schedule 2.16(c).

(d)     The Group Companies have no obligation to increase the compensation or benefits presently being paid or provided or hereafter payable or to be provided to current or former Service Providers.  There is not due or owing to any current or former Service Provider any sick pay, severance pay, compensable time or pay, including salary, commission and bonuses, personal time or pay or vacation time or vacation pay attributable to service rendered on or prior to the date hereof, other than as set forth on Schedule 2.16(d).

(e)     All current employees of the Group Companies have provided the Group Companies with sufficient evidence that each such Person is a citizen of, or is authorized to be employed in, the United States and the Group Companies are in compliance in all material respects with all Laws relating to immigration and the employment of Persons who are not United States citizens.

(f)     The Company has provided to Buyer true, correct and complete copies of all current employee manuals and handbooks, disclosure materials, policy statements and other materials of the Group Companies relating to the employment of employees, as well as all affirmative action plans and material correspondence with any Governmental Entity during the last three (3) years relating to affirmative action plans or other employment-related matters (e.g., OFCCP compliance evaluations, closure letters and conciliation agreements).

(g)     During the last three (3) years, none of the Group Companies has received any written notice alleging that any Service Providers of the Group Companies are in violation of any non-compete, non-solicitation, non-disclosure or confidentiality Contracts in connection with the business and related activities of the Group Companies.

Section 2.17    Certain Fees.  Except as set forth on Schedule 2.17, the Company has not, directly or indirectly, entered into any agreement with any Person that would obligate the Company to pay any commission, brokerage fee or "finder's fee" in connection with the transactions contemplated by this Agreement.

Section 2.18    Insurance Policies.  Schedule 2.18 contains a true, correct and complete list of all material insurance policies carried by or for the benefit of the Group Companies (the "Insurance Policies").  Other than the directors and officers liability insurance policy maintained by Seller and/or its Affiliates with respect to the directors and officers of the Group Companies, true, complete and accurate copies of all such Insurance Policies have been provided or made available to Buyer.  All such Insurance Policies are in full force and effect in all material respects and shall be maintained by the applicable Group Company in full force and effect in all material respects as they apply to any matter, action or event relating to the Group Companies occurring through the Closing Date.  The Group Companies are current in all premiums or other payments

-14-

FBG_CH1_00094613

due under the Insurance Policies and have otherwise complied in all material respects with all of their obligations under each Insurance Policy. The Group Companies have given timely notice to the applicable insurer of all material claims that may be insured thereby under any Insurance Policy. During the past three (3) years, no Group Company has been refused any insurance by, nor has coverage been limited by, any insurance carrier with which any Group Company has carried insurance or any other insurance carrier to which any Group Company has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy. No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of any Group Company.

Section 2.19  Related Party Transactions.  Except for employment relationships and compensation, benefits, travel advances and employee loans or as disclosed on Schedule 2.19, (a) in the last three (3) years, no Group Company is or has been a party to any material Contract with any Related Party of (i) any Group Company or (ii) Seller; and (b) no Related Party of any Group Company or Seller (i) has any direct or indirect interest in any asset used in or otherwise relating to any Group Company or their business, (ii) is indebted to any Group Company, (iii) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving any Group Company, (iv) is competing, directly or indirectly, with any Group Company, (v) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in any vendor, supplier or customer of any Group Company or is any way associated with or involved in the business of the Group Companies, (vi) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to any Group Company, or (vii) has any claim or right against any Group Company (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director).  No Group Company shares any facilities or equipment with any Related Party, and no Group Company purchases or provides assets or services for any business conducted by any Related Party.  For the past five (5) years there has not been, and there is not currently, pending, or, to the Knowledge of the Company, threatened, any proceeding or action against any current or former Related Party with respect to which a Group Company has an indemnification obligation.

Section 2.20  Customers and Suppliers.

(a)  Schedule 2.20(a)(i) sets forth a list of the 10 largest customers (consolidating into a single customer all affiliated customers) of the Group Companies, taken as a whole, by the aggregate dollar value of sales by the Group Companies, taken as a whole, during the 12-month period ended May 31, 2023 (each, a "Top Customer"). Except as set forth on Schedule 2.20(a)(ii), no Group Company has received any written notice that any Top Customer intends to terminate or materially and adversely modify the amount, frequency or terms of the business such Top Customer conducts with any Group Company.

(b)  Schedule 2.20(b)(i) sets forth a list of the 10 largest suppliers of the Group Companies, taken as a whole, by the aggregate dollar value of purchases by the Group Companies, taken as a whole, during the 12-month period ended May 31, 2023 (each, a "Top Supplier"). Except as set forth on Schedule 2.20(b)(ii), no Group Company has received any written notice

-15-

CONFIDENTIAL

FBG_CH1_00094614

that any Top Supplier intends to terminate or materially and adversely modify the amount, frequency or terms of the business such Top Supplier conducts with any Group Company.

Section 2.21    Accounts and Notes Receivable; Accounts Payable.  All accounts and notes, and other receivables of the Group Companies are reflected properly on their books and records, are valid receivables arising from bona fide transactions entered into by a Group Company involving the sale of goods or the rendering of services in the ordinary course of business subject to no setoffs or counterclaims, and are current and collectible subject to the reserve for bad debts set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Group Companies.  The accounts payable and accruals of the Group Companies have arisen in bona fide arm's-length transactions in the ordinary course of business, and each Group Company has been paying its accounts payable consistently in accordance with terms agreed upon with its supplier.

Section 2.22    Inventory.   The finished goods inventory of the Group Companies is merchantable and fit for the purpose for which it was procured or manufactured.  All such inventory is owned by the Group Companies free and clear of any Liens (other than Permitted Liens), and no inventory is held on a consignment basis.

Section 2.23    Assets.

(a)    The Group Companies own, and immediately following the Closing will continue to own, good and marketable title to, or a leasehold interest or other valid right to use, all of the tangible and intangible assets and property used or held in connection with their businesses (the "Assets"), free and clear of any and all Liens (other than Permitted Liens).  The tangible and intangible assets and property to which the Group Companies have good and marketable title to, or a valid right to use, are all the assets and property that are necessary to enable the businesses of the Group Companies to be conducted immediately after the Closing in the same manner as the businesses of the Group Companies have been conducted since the Balance Sheet Date.

(b)    All material items of tangible personal property owned or leased by any Group Company are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are presently being used.  Except as set forth on Schedule 2.22(b), none of the personal or movable property constituting Assets is located other than at the Leased Real Property.

Section 2.24    Bank Accounts.  Schedule 2.24 is a true, complete and accurate list of each bank or financial institution in which any Group Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

Section 2.25    Products.  All products manufactured, sold or delivered by any Group Company have been in material conformity with all applicable warranties, and, to the Knowledge of the Company, no Group Company has any liability for replacement thereof or other damages in connection therewith in excess of any warranty reserve established with respect thereto on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the

-16-

FBG_CH1_00094615

past custom and practice of the Group Companies.  No products manufactured, sold or delivered by any Group Company are subject to any guaranty, warranty or other indemnity beyond the applicable terms and conditions of sale with respect thereto.  No Group Company received any notice of any claims for, and to the Knowledge of the Company there is no reasonable basis for, any extraordinary product recalls, returns, warranty obligations or service calls relating to any of its products or services.  Except as set forth on Schedule 2.25, no Group Company has had during the past three (3) years or has any liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any products manufactured, sold or delivered by any Group Company or with respect to any services rendered by any Group Company.

Section 2.26    Anti-Money Laundering.  The Group Companies have in place, adhere to and maintain (and for the past five years, have had in place, adhered to and maintained) policies and procedures designed to ensure at all times compliance in all material respects with all anti-money laundering Laws and guidelines applicable to the Group Companies, and no action, suit proceeding or investigation by or before any Governmental Entity against or affecting any Group Company, any assets or properties of any Group Company with respect to any such Laws or guidelines is pending or, to the Knowledge of the Company, threatened.

Section 2.27    Anticorruption; Improper Payments.  None of the Group Companies, nor any Seller, nor any officer, director, agent, manager, employee, or, to the Knowledge of the Company, any other Person authorized to act on behalf of any of the Group Companies or any Seller, has, directly or indirectly, taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of payment, directly or indirectly, of any money or anything of value (including any gift, sample, rebate, travel, meal and lodging expense, entertainment, service, equipment, debt forgiveness, donation, grant or other thing of value, however characterized) to any officer or employee of a Governmental Entity, any Person acting for or on behalf of any Governmental Entity, any political party or official thereof and any candidate for political office (each, a "Government Official") or any Person to secure any improper advantage or to obtain or retain business that would cause any Group Company or Seller to be in violation of Improper Payment Laws.  Each Group Company complies, and has at all times complied, with all Improper Payment Laws.  Without limiting the generality of the foregoing, (a) none of the Group Companies nor any Seller has violated or is in violation in any material respect of the U.S. Anti-Kickback Statute (42 U.S.C. Section 1302a-7(b)), the Federal False Claims Act (31 U.S.C. Sections 3729, et seq.) or any related or similar Law and (b) there has been no use or authorization of money or anything of value relating to any unlawful payment or secret or unrecorded fund or any false or fictitious entries made in the books and records of any Group Company relating to the same.  None of the Group Companies, nor any Seller, nor any of their respective Affiliates or Persons acting on their behalf have received any notice or communication from any Person that alleges, nor been involved in any internal investigation involving any allegations relating to potential violation of any Improper Payment Laws or other applicable Law, nor have received a request for information from any Governmental Entity regarding Improper Payment Laws.  None of the Group Companies, nor any Seller nor, to the Knowledge of the Company, any officer, director, manager, employee, attorney, accountant, consultant, financial advisor or other agent of either Company or any Seller, has employed or retained, directly or indirectly, a Government Official or a family member of a

-17-

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 241**
**Page 22 of 104**

Government Official.  No Government Official has, directly or indirectly, the right of control over, or any beneficial interest in any Group Company.

Section 2.28    International Trade Laws.  The Group Companies have, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in accordance with all applicable International Trade Laws in all material respects.  Without limiting the foregoing:

(a)    the Group Companies have obtained, and are in compliance in all material respects with, all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Entity required for (i) the export and re-export of products, services, Company Software and technologies and (ii) releases of technologies and Company Software to foreign nationals located in the United States and abroad ("Export Approvals");

(b)    there are no pending or, to the Knowledge of the Company, threatened claims against any Group Company with respect to such Export Approvals;

(c)    to the Knowledge of the Company, there are no actions, conditions or circumstances pertaining to the Group Companies' import or export transactions that may give rise to any future claims;

(d)    to the Knowledge of the Company, no Export Approvals with respect to the transactions contemplated hereby are required;

(e)    none of the Group Companies, their Affiliates, their respective directors or officers, nor, to the Knowledge of the Company, any employees or agents of the foregoing, is a Sanctions Target;

(f)    since January 1, 2018, no Group Company has received written notice to the effect that a Governmental Entity claimed or alleged that any Group Company was not in compliance with International Trade Laws; and

(g)    neither the Group Companies nor any of their Affiliates has made any voluntary disclosures to, or has been subject to any fines, penalties or sanctions from, any Governmental Entity regarding any past violations of International Trade Laws.

Section 2.29    No Other Representations or Warranties.  Except for the representations and warranties contained in Article II and Article III (as modified by the Schedules hereto), none of Seller, any Group Company or any other Person makes any other express or implied representation or warranty with respect to Seller, the Group Companies or the transactions contemplated by this Agreement, and Seller and the Company disclaim any and all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Seller, the Company or any of their respective Affiliates).  Neither Seller nor the Company make any representation or warranty to Buyer regarding the probable success or future profitability of the Group Companies.  Except as

-18-

CONFIDENTIAL

FBG_CH1_00094617

expressly set forth in Article II and Article III (as modified by the Schedules hereto), the condition of the assets of the Group Companies shall be "as is" and "where is" and neither Seller nor the Company make any warranty of merchantability, suitability, fitness for a particular purpose or quality with respect to any of the assets of any Group Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  It is understood that any Due Diligence Materials (as defined in Section 4.8(a)) made available to Buyer or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, constitute or contain representations or warranties of Seller, the Company or their respective Affiliates or Representatives.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES RELATING TO SELLER**

Subject to the terms, conditions and limitations set forth in this Agreement, and except as set forth in the Schedules, Seller represents and warrants to Buyer as of the date hereof:

Section 3.1    Organization.  Seller is duly organized and validly existing under the Laws of the State of Delaware and has all requisite power and authority to conduct its business as conducted on the date hereof.

Section 3.2    Authorization.  Seller has the requisite power and authority under Seller's Organizational Documents and the Laws of its jurisdiction of formation to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by Seller and, when duly authorized, executed and delivered by all other Parties, constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 3.3    Consents and Approvals; No Violations.  Except as set forth on Schedule 3.3 or as becomes applicable as a result of the business or activities in which Buyer or its Affiliates is or proposes to be engaged or as a result of any acts or omissions by, or the status of or facts pertaining to, Buyer or its Affiliates, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Seller do not and will not (a) violate the provisions of the Organizational Documents of Seller, (b) violate any Law to which Seller is subject, (c) require Seller to obtain any consent or approval, or give any notice to, or make any filing with, any Governmental Entity on or prior to the Closing Date, or (d) result in a breach of, give rise to any right of termination, cancellation or acceleration under, or require the consent of any third party to, any Contract to which Seller is a party, excluding from the foregoing clauses (b), (c), and (d) any consent, approval, notice or filing, the absence of which, and any violation, breach, or right of termination, cancellation or acceleration the existence of which, would not materially impair or delay Seller from consummating the transactions contemplated by this

-19-

CONFIDENTIAL                                                                    FBG_CH1_00094618

Agreement or otherwise prevent Seller from performing in all material respects its obligations hereunder.

Section 3.4     Ownership of the Company Stock.  Seller owns the Company Stock free and clear of all Liens (other than Permitted Liens and applicable federal and state securities law restrictions on transfer).

Section 3.5     Certain Fees.  Except as set forth on Schedule 3.5, Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Company to pay any commission, brokerage fee or "finder's fee" in connection with the transactions contemplated by this Agreement.

Section 3.6     No Other Representations or Warranties.  Except for the representations and warranties contained in Article II and Article III (as modified by the Schedules hereto), none of Seller, any Group Company or any other Person makes any other express or implied representation or warranty with respect to Seller, the Group Companies or the transactions contemplated by this Agreement, and Seller and the Company disclaim any and all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Affiliates or Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of Seller, the Company or any of their respective Affiliates).  Neither Seller nor the Company make any representation or warranty to Buyer regarding the probable success or future profitability of the Group Companies.  Except as expressly set forth in Article II and Article III (as modified by the Schedules hereto), the condition of the assets of the Group Companies shall be "as is" and "where is" and neither Seller nor the Company make any warranty of merchantability, suitability, fitness for a particular purpose or quality with respect to any of the assets of any Group Company or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  It is understood that any Due Diligence Materials (as defined in Section 4.8(a)) made available to Buyer or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, constitute or contain representations or warranties of Seller, the Company or their respective Affiliates or Representatives.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller and the Company as of the date hereof:

Section 4.1     Organization.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.

Section 4.2     Authorization.  Buyer has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by Buyer and, when duly authorized, executed and delivered by all other Parties,

-20-

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 241**
**Page 25 of 104**

constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of courts in granting equitable remedies.

Section 4.3    Consents and Approvals; No Violations.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Buyer do not and will not (a) violate the provisions of the Organizational Documents of Buyer, (b) violate any Law to which Buyer is subject, (c) require Buyer to obtain any consent or approval, or give any notice to, or make any filing with, any Governmental Entity on or prior to the Closing Date, or (d) result in a breach of, give rise to any right of termination, cancellation or acceleration under, or require the consent of any third party to, any note, mortgage, guarantee, license, agreement, lease or other contract instrument or obligation to which Buyer is a party or by which Buyer or any of its assets may be bound.

Section 4.4    Litigation.  There is no claim, action, suit, proceeding or governmental investigation pending or, to the knowledge of Buyer, threatened against Buyer, by or before any Governmental Entity or by any third party which challenges the validity of this Agreement or which would be reasonably likely to material impair or delay Buyer from consummating the transactions contemplated by this Agreement or otherwise prevent Buyer from performing in all material respects its obligations hereunder.

Section 4.5    Available Funds.  Buyer currently has sufficient immediately available funds to pay in full the amounts required to be paid hereunder at Closing, to pay all related fees and expenses in connection with this Agreement and the transactions contemplated hereby and to otherwise consummate the transactions contemplated hereby.  The obligations of Buyer under this Agreement are not subject to any conditions regarding Buyer's or its Affiliates' or any other Person's ability to obtain financing for the consummation of the transactions contemplated by this Agreement.

Section 4.6    Solvency.  Immediately after giving effect to the transactions contemplated by this Agreement, each of Buyer and its Subsidiaries, including the Group Companies, shall be solvent and shall (a) be able to pay the debts and liabilities of Buyer and the Group Companies as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of any of Buyer and its Subsidiaries, including the Group Companies.  In connection with the transactions contemplated by this Agreement, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.7    Certain Fees.  Except as set forth on Schedule 4.7, none of Buyer or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would

-21-

FBG_CH1_00094620

obligate Seller or the Company to pay any commission, brokerage fee or "finder's fee" in connection with the transactions contemplated by this Agreement.

Section 4.8    Independent Investigation; No Reliance.  Buyer has conducted its own independent investigation, verification, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, technology and prospects of the Group Companies, which investigation, review and analysis was conducted by Buyer and its Affiliates and, to the extent Buyer deemed appropriate, by Buyer's Representatives.  Buyer acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises and records of the Group Companies for such purpose.  In entering into this Agreement, Buyer acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations or opinions of the Group Companies or any of the Group Companies' Representatives (except the specific representations and warranties set forth in Article II and Article III), and Buyer acknowledges and agrees, to the fullest extent permitted by Law, that:

(a)    none of Seller, any Group Company or any of their respective directors, officers, equityholders, members, employees, Affiliates, controlling Persons, agents, advisors or Representatives makes or has made any oral or written representation or warranty, either express or implied, as to the accuracy or completeness of any of the information set forth in management presentations relating to the Group Companies made available to Buyer, its Affiliates or its Representatives in materials made available in any "data room" (virtual or otherwise), including any cost estimates delivered or made available, financial projections or other projections, in presentations by the management of the Group Companies, in "break-out" discussions, in responses to questions submitted by or on behalf of Buyer, its Affiliates or its Representatives, whether orally or in writing, in materials prepared by or on behalf of the Company, or in any other form (such information, collectively, "Due Diligence Materials"); and

(b)    none of Seller, any Group Company or any of their respective directors, officers, employees, equityholders, members, Affiliates, controlling Persons, agents, advisors, Representatives or any other Person shall have any liability or responsibility whatsoever to Buyer or its respective directors, officers, employees, Affiliates, controlling Persons, agents or Representatives on any basis (including in contract or tort, under federal or state securities Laws or otherwise), based upon any information provided or made available, or statements made (including set forth in management summaries relating to the Company provided to Buyer, in materials furnished in the Company's data site (virtual or otherwise), in presentations by the Company's management or otherwise), to Buyer or its directors, officers, employees, Affiliates, controlling Persons, advisors, agents or Representatives (or any omissions therefrom).

**ARTICLE V**
**POST-CLOSING COVENANTS**

Section 5.1    Public Announcements.  Except as otherwise required by Law or the rules or regulations of any applicable stock exchange, none of the Parties shall, and each Party shall cause its Affiliates not to, make or issue any public announcement or press release to the general public with respect to this Agreement or the transactions contemplated by this Agreement without the prior written consent of the other Parties, as determined by each such Party in its sole

-22-

CONFIDENTIAL                                                      FBG_CH1_00094621

disceration.  Notwithstanding the foregoing, the Parties acknowledge and agree that Seller and its direct and indirect equityholders that are financial sponsors will be permitted (a) to disclose to their respective and prospective members, limited partners and stockholders (who may disclose to their direct and indirect investors) the fact that the Closing has occurred, the consideration paid hereunder, other items directly relating to such consideration and other types of information that are customary for private equity funds or other institutional investors to provide to their respective and prospective members, limited partners and stockholders, and (b) to disclose in connection with normal fund raising and related marketing or informational or reporting activities, including on their websites and in their marketing materials, the consideration paid in respect of the Closing (but not the identity of Buyer or its Affiliates) and any information previously provided as part of a press release or public announcement issued or made pursuant to this Section 5.1, which disclosure may be accompanied by the logo of the Company.

Section 5.2    Tax Matters.

(a)    Tax Returns.  Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Group Companies required to be filed after the Closing Date (taking into account any applicable extensions) with respect to any Pre-Closing Tax Period.

(b)    Certain Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement shall be paid one-half by Buyer and one-half by Seller when due.  Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(c)    Preservation of Records.  Except as otherwise provided in this Agreement, Buyer agrees that it shall, and it shall cause the Group Companies to, (i) preserve and keep the records (including all Tax and accounting records) of the Group Companies for a period of seven (7) years from the Closing, or for any longer periods as may be required by any Governmental Entity or ongoing litigation, and (ii) make such records, and any employees of the Group Companies who assisted in the preparation of such records, available to Seller as may be required by Seller.  If Buyer or any Group Company wishes to destroy such records after the time specified above, Buyer shall first give sixty (60) days' prior written notice to Seller, and Seller shall have the right at its option and expense, upon prior written notice given to Buyer within that sixty (60)-day period, to take possession of the records within ninety (90) days after the date of Seller's notice to Buyer.

(d)    Allocation of Tax Liability.  For all purposes under this Agreement (including the determination of Taxes under clause (f) of the definition of "Indebtedness"), in the case of any Tax for a Straddle Period, the portion of such Tax attributable to the Pre-Closing Tax Period shall (i) in the case of any real property, personal property, ad valorem or other similar Tax imposed on a periodic basis, be deemed to be the amount of such Tax for the entire Straddle Period *multiplied by* a fraction the numerator of which is the number of days in the portion of the Straddle Period ending on the end of the Closing Date and the denominator of which is the number of days in the entire Straddle Period, (ii) in the case of any Tax based upon or related to income, sales, payroll, or receipts, be deemed equal to the amount which would be payable if the relevant taxable period

-23-

FBG_CH1_00094622

ended on the end of the Closing Date, and (iii) in the case of any Tax imposed with respect to an interest in an entity treated as a CFC, partnership, or disregarded entity for purposes of the Code, be determined as if the taxable year of such CFC, partnership, or disregarded entity ended on the end of the Closing Date.

(e)     Elections and Other Matters.  From and after the Closing Date, Buyer shall not, and shall cause the Group Companies not to, without the prior written consent of Seller (which may, in its sole and absolute discretion, withhold such consent), make, cause or permit to be made any Tax election or adopt or change any method of accounting, or engage in any transactions or amend any Tax Return, in each case that may affect Taxes for any Pre-Closing Tax Period of any Group Company or otherwise affect the liability of Seller.

(f)     Tax Treatment.  The Parties intend that the Pre-Closing Redemption and the sale of the Company Stock pursuant to this Agreement be treated, consistent with *Zenz v. Quinlivan*, 213 F.2d 914 (6th Cir. 1954), as a single integrated transaction for U.S. federal (and all applicable state and local) income tax purposes, such that Seller is treated as surrendering a portion of its shares of the Company's common stock in the Pre-Closing Redemption in a transaction qualifying for sale or exchange treatment under Section 302(b) of the Code (the "Intended Tax Treatment"). The Parties shall not take any position on any Tax Return or in any Tax proceeding that is inconsistent with the Intended Tax Treatment, unless otherwise required pursuant to a final "determination" within the meaning of Section 1313(a) of the Code.

Section 5.3     Directors' and Officers' Insurance.

(a)     Buyer agrees to cause the Group Companies to ensure, and the Company immediately following the Closing agrees to ensure, that all rights to indemnification now existing in favor of any individual who, at or prior to the Closing, was a director, officer, employee or agent of any Group Company or who, at the request of any such Group Company, served as a director, officer, member, contractor, agent, trustee or fiduciary of, or otherwise provided services to, another corporation, partnership, professional entity, joint venture, industry association, trust, pension or other employee benefit plan or enterprise (collectively, with such individual's heirs, executors or administrators, the "Indemnified Persons") as provided in the respective Organizational Documents and indemnification agreements to which a Group Company is a party or bound, shall survive the Closing and shall continue in full force and effect for a period of not less than six (6) years from the Closing Date and/or indemnification agreements and the provisions with respect to indemnification and limitations on liability set forth in such Organizational Documents shall not be amended, repealed or otherwise modified; *provided*, that in the event any claim or claims are asserted or made within such six (6) year period, all rights to indemnification in respect of any such claim or claims shall continue until final disposition of any and all such claims.

(b)     Notwithstanding any other provisions hereof, the obligations of Buyer and the Company contained in this Section 5.3 shall be binding upon the successors and assigns of Buyer and the Company.  In the event Buyer or the Company, or any of their respective successors or assigns, (i) consolidates with or merges into any other Person, or (ii) transfers all or substantially all of its properties or assets to any Person, then, and in each case, proper provision shall be made so that the successors and assigns of Buyer or the Company, as the case may be, honor the

-24-

CONFIDENTIAL

FBG_CH1_00094623

indemnification and other obligations set forth in this Section 5.3 contemporaneously with the closing of any such consolidation, merger or transfer.

(c)     The obligations of Buyer and the Company under this Section 5.3 (i) are intended to be for the benefit of, and will be enforceable by, each Indemnified Person and its heirs, executors and personal and legal representatives, (ii) shall survive the Closing, and (iii) shall not be terminated or modified in such a manner as to affect adversely any Indemnified Person to whom this Section 5.3 applies without the written consent of such affected Indemnified Person (it being expressly agreed that the Indemnified Persons to whom this Section 5.3 applies shall be third party beneficiaries of this Section 5.3, each of whom may enforce the provisions of this Section 5.3).

(d)     Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to any Group Company or any of their respective directors or officers, it being understood and agreed that the indemnification provided for in this Section 5.3 is not prior to or in substitution for any such claims under such policies.

Section 5.4     Release.  Effective as of the Closing, each of Buyer and the Company, on behalf of itself and its past, present or future successors, assigns, employees, agents, equityholders, partners, Affiliates, and representatives (including their past, present or future officers and directors) (the "Releasors") hereby irrevocably and unconditionally, other than in the case of Fraud, releases, acquits, and forever discharges Seller, each of their respective Affiliates, and each individual who was a director, manager, officer, employee, or agent of Seller or a Group Company, of and from any and all actions, suits, claims, causes of action, damages, accounts, liabilities, and obligations (including attorneys' fees) held by any Releasor, whether known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative, to the extent arising out of or relating to Seller's direct or indirect ownership of the Company or such director's, manager's, officer's, employee's, or agent's service as a director, manager, officer, employee, or agent of Seller or a Group Company, except for any of the foregoing set forth in, pursuant to, or arising out of this Agreement or the transactions contemplated hereby.

Section 5.5     Books and Records.  Seller and its Affiliates shall have the right to retain (a) copies of all books and records and all Tax Returns and other information and documents relating to Tax matters of the Group Companies, in each case, relating to periods ending on or prior to the Closing Date, including (i) as required by any Governmental Entity, including any applicable Law or regulatory request, or any document retention policies and procedures of Seller or its Affiliates or (ii) as may be necessary for Seller and its Affiliates to perform their respective obligations pursuant to this Agreement and the transactions contemplated hereby, in each case subject to compliance in all material respects with applicable Laws; and (b) all data room materials, copies of bids and all books and records (including any financial analysis relating to such bids) prepared in connection with the transactions contemplated hereby, including (i) any books and records that may be relevant in connection with the defense of disputes arising under this Agreement, or (ii) financial information and all other accounting books and records prepared or

-25-

CONFIDENTIAL     FBG_CH1_00094624

used in connection with the preparation of financial statements of Seller or any of the Group Companies.

Section 5.6    Amendments to Transition Services Agreement. Buyer and the Company will use their good faith efforts to cooperate with Rotomaster Sub, Rotomaster, Rotomaster HoldCo and the Rotomaster Purchaser in connection with the negotiation, execution and any modification required in connection with the Transition Services Agreement, including negotiations relating to the provision of a service or multiple services not reflected in the Transition Services Agreement. Buyer and the Company shall act in good faith and use commercially reasonable efforts to execute, and deliver to Rotomaster, Rotomaster Sub and Rotomaser HoldCo, all documents reasonably necessary to amend the Transition Services Agreement for the Company's provision of services to Rotomaster or its subsidiaries.

Section 5.7    Payroll Payments. The Company shall, and the Buyer shall cause the Company to, pay the Transaction Bonuses to the persons entitled to such Transaction Bonuses through the Company's payroll on the first payroll date following the Closing Date.

Section 5.8    Existing Policies. Buyer will cause the Company to (a) maintain in full force and effect its existing insurance policies as of the Closing Date (the "Existing Policies"), including the timely payment of all premiums and other payments due thereunder, and (b) continue to specifically identify and include Rotomaster as a named insured under the Existing Policies, in each case, until the earlier of (i) such time as Rotomaster has been sold to the Rotomaster Purchaser and (ii) Rotomaster has procured its own stand-alone insurance policies and provided notice in writing to Buyer of the same. Further, Buyer will cause the Company to reasonably assist and cooperate with Rotomaster to the extent required in connection with any coverage claims or requests for benefits by Rotomaster under the Existing Policies and in complying with all policy terms and conditions for pursuit and collection of such claims or benefits, including the provision of such information as is reasonably necessary in order to permit Rotomaster to pursue and collect such claims or benefits as Rotomaster reasonably deems appropriate."

Section 5.9    Further Assurances. Each of the Parties shall execute and deliver, or shall cause to be executed and delivered, such documents and other instruments and shall take, or shall cause to be taken, such further actions as may be reasonably required (a) to carry out the provisions of this Agreement and (b) to give effect to the transactions contemplated hereby, including any requirements of any Governmental Entity; *provided*, *however*, that Seller and its Affiliates shall not be required or obligated to participate in any claim, action, suit or other proceeding, whether administrative or judicial, instituted (or threatened to be instituted) by any Governmental Entity or private party challenging the transactions contemplated hereby, or any investigation by any Governmental Entity regarding the transactions contemplated hereby, and neither Seller nor any of its Affiliates shall have any liability to Buyer or any of its Affiliates, and Buyer and its Affiliates shall be solely responsible for, and shall promptly reimburse Seller and its Affiliates for, any losses, liabilities, costs and expenses, with respect to or as a result of the same (including, for the

CONFIDENTIAL

FBG_CH1_00094625

avoidance of doubt, any judgment, decree, order or other result of any such investigation, claim, action, suit or proceeding).

## ARTICLE VI
## CLOSING

Section 6.1    Closing.  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the date of this Agreement.  The date of the Closing shall be referred to herein as the "Closing Date".  The Closing shall take place at the offices of King & Spalding LLP located at 1185 Avenue of the Americas, 34th Floor, New York, New York 10036, at 10:00 a.m. Eastern time, or remotely by electronic delivery.

Section 6.2    Deliveries by Seller.  At the Closing, Seller will deliver or cause to be delivered to Buyer (unless delivered previously) the following:

(a)    [reserved];

(b)    the Payoff Letters;

(c)    an IRS Form W-9, duly executed by Seller;

(d)    [reserved]; and

(e)    any other document required to be delivered by Seller or the Company at Closing pursuant to this Agreement.

Section 6.3    Delivery of Company Stock.  Upon the receipt of the Closing Purchase Price, Seller will deliver or cause to be delivered to Buyer each certificate representing the Company Stock (or a duly executed affidavit of loss with respect thereto), together with a duly executed assignment thereof.

Section 6.4    Deliveries by Buyer.  At the Closing, Buyer will deliver or cause to be delivered to Seller the following:

(a)    [reserved]; and

(b)    any other document required to be delivered by Buyer at Closing pursuant to this Agreement.

## ARTICLE VII
## SURVIVAL

Section 7.1    No Survival of Representations, Warranties and Covenants.    All representations, warranties, covenants and agreements contained in this Agreement or any other agreement or certificate delivered pursuant to this Agreement will not survive beyond the Closing such that no claim for breach of any such representation, warranty covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity and

-27-

FBG_CH1_00094626

whether made prior to or after the Closing with respect thereto) may be brought, and there will be no liability in respect thereof, whether such liability has accrued prior to, on or after the Closing, except that any covenant or agreement contained in this Agreement which by its terms is to be performed following the Closing shall in respect of performance after Closing survive in accordance with the term of its performance and then terminate. All representations and warranties set forth in this Agreement are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting, and no Person or party is relying on, the truth or accuracy of any factual statements contained in any representation and warranty set forth in this Agreement, rather the parties have agreed that should any representations and warranties of any party prove inaccurate, the other party shall have the specific remedies herein specified as the exclusive remedy therefor. Notwithstanding anything to the contrary set forth in this Agreement, nothing in this Agreement shall be deemed to constitute a waiver of claims for Fraud.

Section 7.2    Representation and Warranty Insurance. Buyer may obtain representation and warranty insurance with respect to this Agreement ("R&W Insurance Policy"). If Buyer obtains the R&W Insurance Policy, Buyer shall (a) present a copy of the R&W Insurance Policy to Seller and (b) ensure that the R&W Insurance Policy includes terms to the effect that the insurer of such policy (i) waives its rights to bring any claim against Seller or any of its Nonparty Affiliates by way of subrogation, claim for contribution or otherwise, and (ii) will ensure that such terms are held by Buyer in trust for Seller. If obtained, the R&W Insurance Policy shall provide that no insurer or Person claiming through an insurer in relation to the R&W Insurance Policy is permitted to bring any claim against Seller or any of its Nonparty Affiliates by way of subrogation, claim for contribution or otherwise. Buyer may not amend, modify or otherwise change, terminate or waive the above-referenced subrogation provision or otherwise amend, modify or change, terminate or waive the R&W Insurance Policy in a manner that would be adverse in any material respect to Seller or any of its Nonparty Affiliates.

**ARTICLE VIII**
**MISCELLANEOUS**

Section 8.1    Fees and Expenses. Except as otherwise expressly provided herein, (a) Buyer shall pay its own fees, costs and expenses incurred in connection herewith and the transactions contemplated hereby, including the fees, costs and expenses of its financial advisors, accountants and counsel and the costs of obtaining the R&W Insurance Policy and (b) the Company Transaction Expenses shall be paid by the Company and deducted from the Closing Purchase Price pursuant to Section 1.2,.

Section 8.2    Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person or by e-mail, (b) on the next Business Day when sent by overnight courier, or (c) on the second succeeding Business Day when sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the respective Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

-28-

**DEBTORS' EXHIBIT NO. 241**
**Page 33 of 104**

If to Buyer or the Company (after the Closing) to:

> First Brands Group, LLC
> 127 Public Square, Suite 5300
> Cleveland, Ohio 44114
> Attention: Stephen Graham and Shekhar Kumar
> Steve.graham@firstbrandsgroup.com
> Shekhar.kumar@firstbrandsgroup.com

If to Seller to:

> Cardone Holdco LP
> c/o Brookfield Asset Management
> Brookfield Place New York
> 250 Vesey Street, 15th Floor
> New York, New York 10281
> Attention: Rachel Arnett
> Email: rachel.arnett@brookfield.com

with a copy (which shall not constitute notice) to:

> King & Spalding LLP
> 1180 Peachtree Street, N.E.
> Atlanta, Georgia 30309-3521
> Attention: Raymond E. Baltz, Jr.; Michelle Stewart
> E-mail: rbaltz@kslaw.com; mstewart@kslaw.com

Section 8.3    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party, but this Agreement shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the court or other tribunal making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the fullest extent possible.

Section 8.4    Binding Effect; Assignment.  This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, including by operation of law, by any Party without the prior written consent of the other Parties; *provided*, that (i) Seller shall be permitted, without the consent of any other party hereto, to assign this Agreement and its rights, interests and obligations hereunder to any of Affiliates and (ii) Buyer shall be permitted, without the consent of any other party hereto, to make a collateral assignment to any lender (or agent

-29-

FBG_CH1_00094628

**DEBTORS' EXHIBIT NO. 241**
**Page 34 of 104**

thereof) providing debt financing in connection with the transactions contemplated by this Agreement; *provided*, *further*, notwithstanding any such assignment, Buyer shall remain responsible for all of its obligations pursuant to this Agreement.

Section 8.5     No Third Party Beneficiaries.  Except as otherwise provided in Section 5.3, this Agreement is exclusively for the benefit of the Parties and their respective successors and permitted assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right.

Section 8.6     Section Headings.  The Article and Section headings contained in this Agreement are exclusively for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 8.7     Consent to Jurisdiction, Etc.  Each Party hereby irrevocably agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.  During the period in which a Legal Dispute that is filed in accordance with this Section 8.7 is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject to the personal jurisdiction thereof, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum, or (e) the venue of such action, suit or proceeding is improper.  A final judgment in any action, suit or proceeding described in this Section 8.7 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM RELATING THERETO.  IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  FURTHERMORE, NO PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

Section 8.8     Entire Agreement.  This Agreement (including the Schedules and Exhibits attached hereto), the Confidentiality Agreement and the other documents delivered in writing pursuant to, or jointly by each of the Parties hereto in connection with (and substantially

-30-

FBG_CH1_00094629

contemporaneously with the delivery of) this Agreement constitute the entire agreement among the Parties with respect to the subject matter of this Agreement and supersede all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement. Each Party acknowledges and agrees that, in entering into this Agreement, such Party has not relied on any promises or assurances, written or oral, that are not reflected in this Agreement (including the Schedules and Exhibits attached hereto), the Confidentiality Agreement and the other documents delivered pursuant to, or jointly by each of the Parties hereto in connection with (and substantially contemporaneously with the delivery of) this Agreement.

Section 8.9     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters, including matters of validity, construction, effect, performance and remedies.

Section 8.10    Specific Performance.  The Parties acknowledge and affirm that in the event of a breach of this Agreement by any Party, money damages (even if available) may not be an adequate remedy.  Accordingly, the Parties agree that such non-breaching Party shall have the right, in addition to any other rights and remedies existing in their favor at law or in equity, to seek to enforce their rights and the other Party's obligations hereunder by an action or actions for specific performance, injunctive or other equitable relief (without posting of bond or other security), including any order, injunction or decree sought by Seller or the Company to cause Buyer to perform its agreements and covenants contained in this Agreement.  Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

Section 8.11    Counterparts; Confidentiality.   This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by e-mail (including any electronic signature) shall be as effective as delivery of a manually executed counterpart of the Agreement.  This Agreement and its terms shall be subject to the terms of the Confidentiality Agreement.

Section 8.12    Amendment; Modification.  This Agreement may be amended, modified or supplemented at any time only by written agreement of the Parties.

Section 8.13    Time of Essence.  With regard to all dates and time periods set forth in this Agreement, time is of the essence.

Section 8.14    Schedules.  Disclosure of any fact or item in any Schedule hereto referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to every other Section in this Agreement in respect of which the applicability of such disclosure is reasonably apparent.  The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any Schedules hereto is not intended to imply that such amounts, or higher or lower amounts or the items so included or other items, are or are not material, and no Party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, items or

-31-

FBG_CH1_00094630

matter not described herein or included in a Schedule is or is not material for purposes of this Agreement.

Section 8.15   Conflict Waiver.  King & Spalding LLP (the "Seller Firm") has represented the Company and Seller.  All Parties recognize the commonality of interest that exists and will continue to exist until Closing, and the Parties agree that such commonality of interest should continue to be recognized after the Closing.  Specifically, Buyer agrees that (a) it shall not, and shall not cause the Company or any Affiliate of the Company to, seek to have the Seller Firm disqualified from representing Seller or Seller's Affiliates in connection with any dispute that may arise between such Parties and Buyer or the Company in connection with this Agreement or the transactions contemplated by this Agreement, (b) in connection with any such dispute, Seller or its Affiliates involved in such dispute (and not Buyer or the Company) will have the right to decide whether or not to waive the attorney-client privilege that may apply to any communications between the Company and the Seller Firm that occurred prior to the Closing, and (c) it irrevocably waives and agrees not to assert, and agrees to cause its Affiliates (including after the Closing, the Group Companies) to irrevocably waive and not to assert after Closing, any conflict of interest arising from or in connection with the Seller Firm's prior representation of the Group Companies and the Seller Firm's representation of Seller, its Affiliates and their respective Representatives and equityholders, or any of them, prior to and after Closing.  Buyer further agrees that, as to all communications among the Seller Firm, Seller or a Group Company that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the expectation of client confidence belongs to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer or any Group Company.  Notwithstanding the foregoing, in the event that a dispute arises between Buyer, any Group Company or a third party other than a party to this Agreement after the Closing, the Group Companies may assert the attorney-client privilege to prevent disclosure of confidential communications by the Seller Firm or Seller to such third party; *provided*, *however*, that no Group Company may waive such privilege without the prior written consent of Seller.

Section 8.16   No Recourse.  Except as set forth in the Confidentiality Agreement, all claims, obligations, liabilities, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and such representations and warranties are those solely of) a Party and then only with respect to the specific obligations set forth herein with respect to such Party.  No Person who is not a Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, and any financial advisor or lender to, any of the foregoing (collectively, the "Nonparty Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance, or breach (other than as set forth in the Confidentiality Agreement), and, to the maximum extent permitted by Laws, each Party hereby waives and

-32-

CONFIDENTIAL                                                                        FBG_CH1_00094631

releases all such liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Without limiting the foregoing, to the maximum extent permitted by Laws, (a) each Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Party or otherwise impose liability of a Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and (b) each Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 8.17   Construction.

(a)      Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, and references to the singular include the plural; (ii) references to one gender include the other gender; (iii) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; (iv) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (v) the terms "day" and "days" mean and refer to calendar day(s); (vi) the terms "year" and "years" mean and refer to calendar year(s); and (vii) the word "or" shall be disjunctive and not exclusive.

(b)      Unless otherwise set forth in this Agreement, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof, and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law, as amended, modified, supplemented or succeeded from time to time and in effect on the date hereof. All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified.

(c)      Any documents and agreements which have been posted to the virtual data room entitled "Project Cardone VDR" as of the date of this Agreement will be deemed to have been "delivered," "provided," "furnished" or "made available" (or any phrase of similar import) to Buyer by Seller and the Company.

(d)      With respect to the determination of any period of time, unless otherwise set forth in this Agreement, the word "from" means "from and including" and the word "to" means "to but excluding" and if the last day of such period is a non-Business Day, the period in question will end at the end of the next succeeding Business Day.

(e)      This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

[Signatures follow on next page.]

-33-

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first above written.

**BUYER:**

FIRST BRANDS GROUP, LLC

By:_____

      Name:  Shekhar Kumar

      Title:   Authorized Signatory

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL

FBG_CH1_00094633

**SELLER:**

CARDONE HOLDCO, LP

By: Cardone Holdco GP, LLC
Its; General Partner

By: _____
    Name: Rachel Arnett
    Title: Authorized Signatory

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL

FBG_CH1_00094634

**DEBTORS' EXHIBIT NO. 241**
**Page 40 of 104**

**COMPANY:**

CARDONE INDUSTRIES, INC.

By:_____

Name: Michael Carr
Title: Chief Executive Officer

[Signature Page to Stock Purchase Agreement]

CONFIDENTIAL                                                    FBG_CH1_00094635

## EXHIBIT A

## DEFINITIONS

For purposes of this Agreement, each of the following terms (including the singular and plural thereof, as applicable) shall have the meaning set forth below:

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by, or under common control with, such specified Person.

"Affiliated Group" means an affiliated group as defined in Section 1504 of the Code (or analogous combied, consolidated or unitary group defined under state, local or foreign income Tax Law).

"Balance Sheet Date" means the date of the Interim Balance Sheet.

"Base Purchase Price" means $125,000,000.

"Business Day" means any day except Saturday, Sunday or any days on which banks are generally not open for business in New York, New York.

"CFC" means a "controlled foreign corporation" (as that term is defined in Section 957 of the Code).

"Closing Indebtedness" means the aggregate amount of Indebtedness of the Group Companies as of the Closing.

"Closing Company Cash" means the aggregate amount of Company Cash as of the Closing.

"Closing Company Transaction Expenses" means the aggregate amount of the Company Transaction Expenses as of the Closing.

"Code" means the United States Internal Revenue Code of 1986.

"Company Cash" means the cash, cash equivalents, checks received but not cleared, deposits in transit, drafts received or deposited, and cash security deposits and other cash collateral posted with vendors, landlords and other parties of the Group Companies, less the amount of cash necessary to satisfy all outstanding checks issued by a Group Company that have not cleared at the applicable time of determination; provided that in no event shall Company Cash include any funds held in a suspension account with Citizens Bank, N.A. or one of its Affiliates.

"Company Material Contracts" means the following Contracts to which any Group Company is a party (other than the Company Plans set forth on Schedule 2.15(a)): (a) all Contracts that individually involve payments to or from any Group Company, collectively, in excess of $500,000 on an annual basis; (b) any employment Contract with any employee of any Group

A-1

CONFIDENTIAL

Company that is not terminable at-will (other than standard employee confidentiality or non-disclosure agreements); (c) all bonds, debentures, notes, loans, credit or loan agreements or loan commitments, mortgages, indentures or other contracts relating to the borrowing of money; (d) all Leases; (e) other leases or licenses (other than the Leases) involving any properties or assets (whether real, personal or mixed, tangible or intangible) involving an annual commitment or payment of more than $500,000 individually by any Group Company; (f) any Contract that materially restricts the Company or its Subsidiaries from competing with or engaging in any business activity or soliciting for employment, hiring or employing any Person; (g) any Contract to acquire or dispose (by merger, purchase or sale of assets or stock or otherwise) of material assets, as to which the Company or a Subsidiary has continuing material obligations or material rights; (h) any Contract concerning a joint venture, strategic alliance, collaboration or partnership agreements, or the sharing of profits; (i) any Contract with a Governmental Entity; (j) any Contract that contains any indexed pricing, "most-favored nation" pricing or similar pricing terms or provisions regarding minimum volumes; (k) any Contract that contains material ongoing indemnification obligations of the Company or a Subsidiary; (l) any Contract pursuant to which a Group Company leases, is licensed or otherwise authorized to use or otherwise commercialize or exploit any Intellectual Property of any other Person or which otherwise affects the ability of a Group Company to use, commercialize or otherwise exploit any Company Intellectual Property (including a covenant not to sue) material to its business as currently conducted (excluding "off the shelf" software and other immaterial licenses); (m) any Contract pursuant to which a Group Company licenses or otherwise authorizes another Person to use, distribute, sell, resell or incorporate any Company Intellectual Property; (n) any collective bargaining agreement with any labor union or similar organization; or (o) any Contract that grants any Person other than a Group Company any rights of first refusal, rights of first negotiation or similar rights.

"Company Software" means any software, other than "off the shelf" software, owned by a Group Company to which it has rights to the source code.

"Company Subsidiary" means any Subsidiary of the Company (which, for the avoidance of doubt, does not include Rotomaster).

"Company Transaction Expenses" means (i) the fees, costs and expenses of Seller or the Group Companies incurred or payable in connection with the auction process and the preparation, negotiation and execution of this Agreement and the consummation of the transactions contemplated hereby, including any such legal, accounting, transaction, closing and investment banking fees, costs and expenses; (ii) [reserved]; and (iii) any transaction bonuses, severance or similar payments or benefits that are due to any current or former employee, officer, director or manager of any Group Company as a result of and in connection with the consummation of the transactions contemplated hereby, whether or not pursuant to any agreement entered into by any Group Company prior to the Closing (excluding "double trigger" change of control payments and any other such payments made due to actions of Buyer or its Affiliates following the Closing Date), including the employer portion of any payroll or similar Taxes payable in connection with the foregoing, in each case to the extent not paid at or prior to the Closing by Seller or the Group Companies.

"Confidentiality Agreement" means that certain confidentiality agreement by and between the Company and Buyer, dated March 20, 2023, as amended.

A-2-

CONFIDENTIAL

FBG_CH1_00094637

"Contract" means any legally enforceable agreement to which any Group Company is a party and is bound.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions thereof.

"COVID-19 Measures" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, order, action, directive, guidelines or recommendations by any Governmental Entity in connection with or in response to COVID-19, including the Coronavirus Aid, Relief, and Economic Security Act (CARES).

"Environmental Laws" means all material federal, state and local Laws relating to protection of the environment, including surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or ambient air, pollution control and Hazardous Substances.

"Environmental Permits" means all material Licenses applicable to any Group Company issued pursuant to Environmental Laws.

"Fraud" means willful and knowing fraud committed with the intent to deceive that constitutes common law fraud under the laws of the State of Delaware with respect to each of the Party's respective representations and warranties expressly set forth in Articles II, III and IV of this Agreement.  For the avoidance of doubt, "Fraud" does not include any claim for equitable fraud, promissory fraud, unfair dealings fraud, or any torts based on negligence or recklessness.

"GAAP" means generally accepted accounting principles in the United States as applied consistently with the past practices of the Company in the preparation of the year-end audited financial statements.

"Governmental Entity" means any federal, state or local government, any political subdivision thereof or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency.

"Group Companies" means, collectively, the Company and each of the Company Subsidiaries (which, for the avoidance of doubt, does not include Rotomaster).

"Hazardous Substance" means any waste, pollutant, contaminant, hazardous substance, toxic or corrosive substance, hazardous waste, special waste, industrial substance, by-product, process-intermediate product or waste, petroleum or petroleum-derived substance or waste, chemical liquids or solids, liquid or gaseous products, or any constituent of any such substance or waste, the use, handling or disposal of which by the Group Companies is governed by or subject to applicable Law.

"Improper Payment Laws" means the United States Foreign Corrupt Practices Act of 1977, any legislation implementing the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Official in International Business Transactions, and any other applicable Law regarding anti-bribery or illegal payments or gratuities.

A-3-

FBG_CH1_00094638

"Indebtedness" means, without duplication, with respect to any Person, all obligations (including all obligations in respect of principal, accrued interest, penalties, breakage costs, fees and premiums) of such Person: (a) for borrowed money; (b) evidenced by notes, bonds, debentures, hedging or swap arrangements or similar contracts or instruments; (c) for the deferred purchase price of assets, property, goods or services (other than trade payables, or accruals incurred in the Ordinary Course) and with respect to any conditional sale, title retention, consignment or similar arrangements; (d) by which such Person assured a creditor against loss, including letters of credit and bankers' acceptances, in each case to the extent drawn upon or payable and not contingent; (e) in respect of any interest rate, currency hedging agreement or other similar instrument; (f) any accrued and unpaid income Taxes of the Group Companies for Pre-Closing Tax Periods (determined in accordance with past practice of the Group Companies and, in the case of any Straddle Period, in accordance with Section 5.2(d)); and (g) in the nature of guarantees of the obligations described in clauses (a) through (e) above of any other Person, in each case excluding intercompany indebtedness. "Indebtedness" shall not include any deferred revenue or rent.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) trademarks and Internet domain names, Internet websites and URLs; (b) patents and patent applications; (c) copyrights and copyrightable works; (d) registrations and applications for any of the foregoing; (e) trade secrets and confidential information; (f) the Company Software; and (g) any goodwill associated with each of the foregoing.

"International Trade Laws" means any applicable (a) Sanctions, (b) U.S. export control Laws (including the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended), the Export Administration Regulations (15 CFR §§ 730-774, as amended)) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws, (c) Laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, (d) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury and (e) export, import and customs Laws of other countries in which the Group Companies have conducted and/or currently conduct business.

"Knowledge of the Company" means the actual knowledge of Mike Carr, Andrew Labady, George Dunham and Joe Salvia.

"Law" means any statutes, rules, codes, regulations, ordinances or orders of, or issued by, applicable Governmental Entities.

"Legal Dispute" means any action, suit or proceeding between or among any of the Parties arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

"Licenses" means all licenses, permits (including environmental, construction and operation permits) and certificates issued by any Governmental Entity.

A-4-

CONFIDENTIAL

FBG_CH1_00094639

"Liens" means mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances.

"Material Adverse Effect" means any change, development or occurrence that is or would reasonably be expected to be materially adverse to the business, financial condition or results of operations of the Group Companies, taken as a whole; *provided*, that the term "Material Adverse Effect" shall not include any change, development or occurrence to the extent caused by: (a) changes or proposed changes in laws, regulations or interpretations thereof or decisions by courts or any Governmental Entity; (b) changes or proposed changes in GAAP; (c) actions or omissions of Seller or the Group Companies taken with the consent of Buyer pursuant to this Agreement; (d) actions or omissions of Seller or the Group Companies in contemplation of the transactions contemplated by this Agreement or as expressly permitted by this Agreement or the documents entered into pursuant hereto; (e) actions or omissions of Buyer and its Affiliates; (f) general economic conditions, including changes in the credit, debt, financial, capital or reinsurance markets (including changes in interest or exchange rates, prices of any security or market index or any disruption of such markets), in each case, in the United States or anywhere else in the world; (g) events or conditions generally affecting the industries in which the Group Companies operate; (h) global, national or regional political conditions, including national or international hostilities, acts of terror or acts of war, sabotage or terrorism (including cyberterrorism) or military actions or any escalation or worsening of any hostilities, acts of war, sabotage or terrorism (including cyberterrorism)  or military actions; (i) pandemics (including the novel strain of coronavirus (SARS-Cov-2) and its disease commonly known as COVID-19 (including any and all additional strains, variations or mutations thereof) or any Law enacted or imposed by any Governmental Entity in response thereto or in connection therewith or effects thereof), earthquakes, hurricanes, tornados or other natural disasters; (j) the announcement of this Agreement or the transactions contemplated hereby or the identity of Buyer in connection with the transactions contemplated hereby; (k) any matter set forth in the Schedules; (l) the failure by Seller or any Group Company to take any action that is prohibited by this Agreement; (m) any change or prospective change in any Group Company's credit ratings; or (n) any failure to meet any projections, forecasts, guidance, estimates, milestones, budgets or financial or operating predictions of revenue, earnings, cash flow or cash position; *provided*, that the matters described in clauses (f), (g), (h) and (i) shall be included in the term "Material Adverse Effect" only to the extent any such matter has a disproportionate, materially adverse impact on the business, assets, financial condition or results of operations of the Group Companies, taken as a whole, relative to other participants in the same business as the Group Companies.

"Ordinary Course" means the ordinary course of business, consistent with recent past custom and practice, including, for the avoidance of doubt, recent past practice in light of COVID-19 and as reasonably necessary or appropriate in connection with any COVID-19 Measures.

"Organizational Documents" means, as applicable, (a) the certificate of incorporation or formation, (b) bylaws, (c) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person, (d) any limited liability company operating agreement, partnership agreement or other similar governing document, and (e) any amendment to any of the foregoing.

A-5-

CONFIDENTIAL

FBG_CH1_00094640

"Paid Indebtedness" means the Indebtedness of the type set forth in clauses (a) and (b) of the definition of "Indebtedness".

"Payoff Letters" means the payoff letters from each lender of Paid Indebtedness evidencing the aggregate amount of such Paid Indebtedness outstanding as of the Closing Date and an agreement that, if such aggregate amount so identified is paid to such lender on the Closing Date, such Paid Indebtedness shall be repaid in full and that all Liens (except for Permitted Liens) affecting any real or personal property of the Company will be released.

"Permitted Liens" means: (a) Liens for Taxes not yet due and payable or that are being contested in good faith; (b) statutory Liens of landlords with respect to Leased Real Properties; (c) Liens of carriers, warehousemen, mechanics, materialmen, and repairmen incurred in the Ordinary Course and not yet delinquent; (d) in the case of Leased Real Property, (i) zoning, building, or other land use restrictions regulating the use or occupancy of Leased Real Property or the activities conducted thereon which are imposed by any Governmental Entity having jurisdiction over such Leased Real Property, and (ii) covenants, rights of way, encumbrances, easements and other similar matters of record affecting title to a Leased Real Property, in each case, none of which, individually or in the aggregate, interfere in any material respect with the present use of or occupancy of the affected parcel by the applicable Group Company; (e) Liens securing the Indebtedness of Seller or any Group Company; (f) in the case of Intellectual Property, third party license agreements entered into in the Ordinary Course; and (g) Liens incurred in connection with capital lease obligations of Seller or the Group Companies.

"Person" means any individual, partnership, joint venture, corporation, trust, limited liability company, unincorporated organization or other entity or any Governmental Entity.

"Personal Data" means all data relating to one or more individual(s) that is personally identifying (i.e., data that identifies an individual or, in combination with any other information or data available to the Group Companies, is capable of identifying an individual).

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date, and the portion of a Straddle Period ending on the Closing Date.

"Related Party" means each officer or director of a Group Company, each family member of an any officer or director of a Group Company, each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing (other than a Group Company).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, dumping or disposing into the environment.

"Representatives" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives.

"Rotomaster" means 1137602 B. C. Unlimited Liability Company, a British Columbia unlimited liability company, and its Subsidiaries.

"Rotomaster HoldCo" means Rotomaster Holdings LLC, a Delaware limited liability company.

A-6-

CONFIDENTIAL                                                    FBG_CH1_00094641

"Rotomaster Purchaser" means a Person or group of Persons that purchases 100% of the issued and outstanding voting equity securities of Rotomaster from the Company pursuant to a purchase agreement to be entered into after the date of this Agreement.

"Rotomaster Sub" means ADP Distributors Inc., a British Columbia corporation.

"Sanctions" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by U.S. Governmental Authorities (including the Office of Foreign Assets Control ("OFAC"), the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, His Majesty's Treasury or any other relevant Governmental Entity.

"Sanctions Target" means any Person: (a) that is the subject or target of any Sanctions; (b) named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority; (c) located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (including the Crimea region of Ukraine, Iran, North Korea, Syria and, prior to January 17, 2017, Sudan); or (d) owned or controlled by any such Person or Persons described in the foregoing clauses (a)-(c).

"Schedules" means the disclosure schedules to this Agreement.

"Service Provider" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of the Group Companies.

"Straddle Period" means a taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" or "Subsidiaries" means any Person of which the Company (or other specified Person) shall own directly or indirectly through a Subsidiary, a nominee arrangement or otherwise at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or otherwise have the power to elect a majority of the board of directors or similar governing body; *provided*, *however*, that for purposes hereof, Rotomaster will not be considered a Subsidiary of the Company.

"Tax Return" means any report, return, declaration, claim for refund or information return or statement required to be supplied to a Governmental Entity in connection with Taxes.

"Taxes" means all federal, state, local or non-U.S. taxes, including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, disability, stamp, transfer, registration, sales, use, excise, gross receipts, value-added and all other taxes of any kind, and any charges, interest or penalties imposed by any Governmental Entity with respect to any taxes.

A-7-

CONFIDENTIAL

"Transaction Bonuses" means the (i) awards set forth on Exhibit B to the Cardone Industries, Inc. Executive Long-Term Incentive Program and (ii) amounts set forth in the award letters under the 2023 Cardone Industries, Inc. Retention Bonus Award Program, as set forth on Schedule 2.15(a).

"Transition Services Agreement" means that certain Transition Services Agreement dated as of the date hereof between the Company and ADP Distributors, Inc., a which is attached hereto as Exhibit C.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code.

A-8-

CONFIDENTIAL

FBG_CH1_00094643

Additionally, each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Agreement | Preamble |
| Buyer | Preamble |
| Closing | Section 6.1 |
| Closing Date | Section 6.1 |
| Closing Date Statement | Section 1.3 |
| Closing Purchase Price | Section 1.2 |
| Company | Preamble |
| Company Intellectual Property | Section 2.9(a) |
| Company Plans | Section 2.15(a) |
| Company Stock | Recitals |
| Due Diligence Materials | Section 4.8(a) |
| ERISA | Section 2.15(a) |
| Existing Policies | Section 5.8 |
| Export Approvals | Section 2.28(a) |
| Financial Statements | Section 2.5 |
| Firm | Section 8.15 |
| Government Official | Section 2.27 |
| Indemnified Persons | Section 5.3(a) |
| Insurance Policies | Section 2.18 |
| Intended Tax Treatment | Section 5.2(f) |
| Interim Balance Sheet | Section 2.5 |
| Interim Financial Statements | Section 2.5 |
| Lease | Section 2.8(c) |
| Leased Real Properties | Section 2.8(b) |
| Leased Real Property | Section 2.8(b) |
| Nonparty Affiliates | Section 8.16 |
| Parties | Preamble |
| Party | Preamble |
| Pre-Closing Redemption | Recitals |
| Pre-Closing Tax Returns | Section 5.2(a) |
| R&W Insurance Policy | Section 7.2 |
| Releasors | Section 5.4 |
| Section 409A | Section 2.15(j) |
| Seller | Preamble |
| Top Customer | Section 2.20(a) |
| Top Supplier | Section 2.20(b) |

A-9-

CONFIDENTIAL

FBG_CH1_00094644

**EXHIBIT B**
**Closing Date Statement**


[See Attached]


B-1


CONFIDENTIAL                                                                     FBG_CH1_00094645

*Execution Version*

# CLOSING DATE STATEMENT
## June 30, 2023

The undersigned, being the duly elected, qualified and acting Chief Executive Officer of Cardone Industries, Inc., a Delaware corporation (the "Company"), on behalf of the Company, and not in any personal capacity, hereby certifies to the following:

Attached as Exhibit A is the Closing Date Statement, setting forth the Company's good faith calculation of (a) the Estimated Company Cash, (b) by lender, the Estimated Closing Indebtedness, (c) by payee, the Estimated Company Transaction Expenses, and (d) the resulting calculation of the Closing Purchase Price, delivered pursuant to Section 1.3 of that certain Stock Purchase Agreement (the "Agreement"), dated as of June 30, 2023, by and among First Brands Group, LLC, a Delaware limited liability company, Cardone Holdco LP, a Delaware limited partnership, and the Company. Capitalized terms not herein defined have the meanings ascribed to such terms in the Agreement.

*[Signature Page to follow]*

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned has signed this Closing Date Statement as of the date first set forth above.

**CARDONE INDUSTRIES, INC.**

By: _____
Name: Michael Carr
Title: Chief Executive Officer

[Signature Page to Closing Date Statement]

CONFIDENTIAL                                                    FBG_CH1_00094647

**Exhibit A**

**Closing Date Statement**

[Attached]

CONFIDENTIAL                                                          FBG_CH1_00094648

**Cardone Industries**
**Closing Funds Flow**
**Schedule A - Estimated Purchase Price Statement**
**($ USD)**
**6/30/2023**

| | Amount | Document Reference / Notes | Funds Flow Sched. |
|---|---|---|---|
| (a) Base Purchase Price | $125,000,000.00 | SPA Section 1.2 | |
| Plus: (b) Estimated Closing Cash | $11,094,287.79 | SPA Section 1.3 (a) | B - Estimated Cash |
| Minus: (c) Estimated Closing Transaction Expenses | ($14,155,575.64) | SPA Section 1.3 (c) | C - Estimated Transaction Expenses |
| Minus: (d) Estimated Closing Indebtedness | ($89,826,758.97) | SPA Section 1.3 (b) | D - Estimated Indebtedness |
| **Equals: Closing Purchase Price** | **$32,111,953.18** | SPA Section 1.3 (d) | |
| Minus: Cash collateralization and other related | ($4,800,000.00) | | E - Cash collateralization etc |
| **Equals: Residual Proceeds Available for DB Term Loan Repayment** | **$27,311,953.18** | | |

CONFIDENTIAL

FBG_CH1_00094649

**Cardone Industries**
**Closing Funds Flow**
Schedule B - Estimated Closing Cash
**($ USD)**
**6/30/2023**

| Account Number | Account Name | Estimated Amount on 6/30/2023 |
|---|---|---|
| 6310135647 | Cardone Industries Inc Operating Ac | $10,185,558.50 |
| 4000013159 | 1137602-CAD | $23,766.12 |
| 4669270101 | Cardone Industries Inc | $14,058.10 |
| 4669296101 | Cardone Industries ULC | $92,482.64 |
| 014818655048126900 | CDM | $397,302.62 |
| 014818655043880000 | Tridonex | $381,119.82 |
| **Total Estimated Closing Cash** | | **$11,094,287.79** |

CONFIDENTIAL

FBG_CH1_00094650

**Cardone Industries**
**Closing Funds Flow**
**Schedule C - Estimated Closing Transaction Expenses**
**($ USD)**
**6/30/2023**

| | Entity | Notes / Commentary | Amount |
|---|---|---|---|
| 1 | Houlihan Lokey Capital, Inc. | Banking Advisory Fees and Expenses | $2,512,438.69 |
| 2 | King & Spalding LLP | Company Counsel | $3,422,215.88 |
| 3 | Weil, Gotshal & Manges LLP | Anti-Trust Fees | $309,512.07 |
| 4 | Weil, Gotshal & Manges LLP | Restructuring Fees | $762,950.92 |
| 5 | White & Case LLP | Mexican Counsel - Third Lien | $73,364.80 |
| 6 | Blake, Cassels & Graydon LLP | Canadian Fees - Period Ended May 3 | $15,134.30 |
| 7 | Blake, Cassels & Graydon LLP | Canadian Fees - Period Ended June 27 | $11,558.72 |
| 8 | Ernst & Young Global Limited | BF Tax Advisor | $262,066.00 |
| 9 | Ernst & Young US LLP | Section 382 Analysis | $97,705.00 |
| 10 | Cardone Retention | Employee Payments | $2,318,774.42 |
| 11 | Cardone LTIP | Employee Payments | $3,800,000.00 |
| 12 | Winston & Strawn LLP | Citizens ABL Fees | $205,000.00 |
| 13 | Hoskin & Harcourt LLP | Citizens ABL Fees | $26,500.00 |
| 14 | Nader Hayaux & Goebel, S.C. | Citizens ABL Fees | $26,000.00 |
| 15 | White & Case LLP | Third Lien Financing Fees (Mexico) | $68,364.80 |
| 16 | Arnold & Porter Kaye Scholer LLP | DB Term Loan Advisory Fees | $36,490.04 |
| 17 | Wilmington Trust, N.A. | DB Term Loan Amendment Fee | $2,500.00 |
| 18 | White & Case LLP | DB Professional Fees | $205,000.00 |
| **Total Estimated Transaction Expenses** | | | **$14,155,575.64** |

CONFIDENTIAL

FBG_CH1_00094651

**Cardone Industries**
**Closing Funds Flow**
Schedule D - Estimated Closing Indebtedness
**($ USD)**
**6/30/2023**

| | Amount |
|---|---|
| **Citizens Financial Group, Inc. - ABL Paydown** | |
| Principal Outstanding | $86,458,939.71 |
| Interest Outstanding | $714,455.53 |
| Unused Line Fee | $20,197.46 |
| First Amendment Continuing Commitment Fee | $172,500.00 |
| Repayment Fee Payable under Section 3.11 of the Credit Agreement | $862,500.00 |
| **Total** | **$88,228,592.70** |
| | |
| **Wilmington Trust, N.A. - DB Term Loan** | |
| Quarterly Interest Payment on DB Loan | $1,598,166.27 |
| **Total** | **$1,598,166.27** |
| | |
| **Total Debt** | **$89,826,758.97** |
| | |
| **Total Estimated Closing Indebtedness** | **$89,826,758.97** |

CONFIDENTIAL

FBG_CH1_00094652

**EXHIBIT C**
**Transition Services Agreement**

[See Attached]

C-1

CONFIDENTIAL                                                    FBG_CH1_00094653

*Execution Version*

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated as of June 30, 2023 (the "Effective Date"), is made by and among Cardone Industries, Inc., a Delaware corporation ("Provider"), Rotomaster Holdings LLC, a Delaware limited liability company ("Roto HoldCo") and ADP Distributors Inc., a British Columbia corporation ("Recipient", each of Provider, Roto HoldCo and Recipient is individually referred to herein as a "Party," and collectively, the "Parties"). All capitalized words and terms used herein and not otherwise defined herein shall have the meanings ascribed to them in that certain Stock Purchase Agreement, dated as of June 30, 2023, by and between Provider, Cardone Holdco LP, a Delaware limited partnership ("Seller") and First Brands Group, LLC, a Delaware limited liability company ("Buyer") (the "Purchase Agreement").

## W I T N E S S E T H:

WHEREAS, Provider, Buyer and Seller have entered into the Purchase Agreement, pursuant to which Seller sold to Buyer, and Buyer purchased from Seller, the Company Stock, and as a result thereof, Buyer is the direct equityholder of Provider (the "Cardone Sale");

WHEREAS, immediately prior to the effectiveness of the Cardone Sale, (i) Provider distributed 100% of the voting equity interests of Recipient (the "Roto Interests") to Seller in a partial redemption of shares of Company Stock then held by Seller (the "Roto Spinoff") and (ii) immediately after the Roto Spinoff, Seller contributed the Roto Interests to Roto HoldCo (the "Contribution" and together with the Roto Spinoff, collectively the "Reorganization");

WHEREAS, the Reorganization was carried out in contemplation of the sale of Recipient to Rotomaster Purchaser (the date of the consummation of such sale, the "Roto Closing Date");

WHERAS, for purposes of this Agreement the "Business" means the business carried on by Recipient and its subsidiaries consisting of the manufacturing and distribution of new and remanufactured turbochargers and fuel injectors and the components to support turbocharger and fuel injector manufacturing and remanufacturing systems and other activities incidental or related thereto; and

WHEREAS, in order to provide for an efficient and orderly transition of ownership and management of the Business, the Parties deem it to be appropriate and in the best interests of the Parties and have agreed that Provider will provide, or cause one or more of its Affiliates to provide, certain transitional services to Recipient, on the terms and conditions set forth herein on an interim basis after the date hereof.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

CONFIDENTIAL

FBG_CH1_00094654

1.      Services.

(a)     Provider shall, or shall cause one or more of its Affiliates to, subject to the terms and provisions of this Agreement, provide to Recipient those services described on Annex A and Annex B hereto for the term applicable to such services as provided in Section 2(a) (the "Services").

(b)     Notwithstanding the foregoing, in the event that Recipient determines that there are additional services that Provider or its Affiliates have historically provided to Recipient, in the twelve (12)-month period immediately prior to Closing, in connection with the Business that are not included in the Services, Recipient may reasonably request such Services.  Provider and Recipient shall act in good faith to amend Annex A and Annex B, as applicable, to add such services to the Services, including the additional fees for such services, on the terms and conditions set forth in this Agreement.

(c)     The Party providing such Service, including any Affiliates of such Party, shall be referred to herein as a "Service Provider."

(d)     Each of the Parties hereby acknowledges that it shall have no right under this Agreement to offset any amounts owed (or to become due and owing) to another Party, whether under this Agreement or under any other contract or written agreement between or among the Parties and their respective affiliates, or otherwise, against any other amount owed (or to become due and owing) to it by another Party.

2.      Term.  Subject to Section 6(a), Provider shall perform (a) those Services set forth on Annex A from the Effective Date until the earlier of (i) the Roto Closing Date and (ii) December 31, 2023, unless a shorter term with respect to a specific Service is set forth on Annex A and (b) those Services set forth on Annex B from the Roto Closing Date until the date that is 90 days after the Roto Closing Date, unless a shorter term with respect to a specific Service is set forth on Annex B. For the avoidance of doubt, in the event the Roto Closing Date has not occurred on or prior to December 31, 2023, this Agreement shall terminate and no services shall be required to be provided by Provider pursuant to Annex B hereto.  Subject to the immediately preceding sentence, the term of this Agreement will begin on the Effective Date and continue for so long as any Services are required to be performed in accordance with the first sentence of this Section 2 (such time period, the "Term").

3.      Consideration.  Recipient shall pay, or cause to be paid, and Provider shall accept, as consideration for the Services to be rendered hereunder the fees set forth on Annex A and Annex B, as applicable.  Recipient shall reimburse Provider for all reasonable and necessary out-of-pocket costs and expenses (including postage and other delivery costs, telephone and similar expenses) and any third party software or consent fees, in each case, incurred by Provider in connection with the provision of the Services, including with respect to the wind down of the Services, or paid by Provider on behalf of Recipient.

4.      Payment Terms.

(a)     Except as it relates to any payments relating to Protected Employees (which are addressed in clause (d) below), Provider shall submit in writing to Recipient, no more

2

CONFIDENTIAL

FBG_CH1_00094655

than once per month, one or more invoices covering its fees for the Services rendered by Provider during such billing period. The invoices shall contain a summary description of the Services rendered and the method of calculating the invoiced fees. Recipient shall pay, or cause to be paid, such fees, in full, within 20 days after receipt of the invoice.

(b)     Any amount not paid by Recipient when due under this Agreement shall be subject to a late payment fee computed at a rate equal to one percent per month. Recipient agrees to pay Provider's reasonable attorneys' fees and other costs incurred in collection of any amount owed to Provider hereunder and not paid when due. Notwithstanding anything to the contrary contained in this Agreement, if Recipient fails to make a payment when due hereunder, and such failure continues for a period of ten days following delivery of notice to Recipient of such failure, Provider shall have the right to cease provision of all Services until such overdue payment (and any applicable late payment fees accrued with respect thereto) is paid in full. Such right of Provider hereunder shall not in any manner limit or prejudice any of Provider's other rights or remedies in the event of Provider's failure to make payments when due hereunder.

(c)     If any Service that has a flat monthly fee (as set forth on Annex A or Annex B) is terminated pursuant to the terms of this Agreement prior to a month-end, the fee for such Service will be an amount equal to the fee listed in Annex A or Annex B, as applicable, pro-rated based on the number of days in such month prior to the effectiveness of such termination; provided, however, that if the effectiveness of such termination is on or after the fifteenth (15th) day of the month, the fee for such Service shall not be pro-rated and shall be the full monthly fee listed in Annex A or Annex B, as applicable.

(d)     With respect to any reimbursement relating to a Protected Employee as set forth in Section 5(a) below, substantially concurrently with Provider's submission of the same to its payroll processor, Provider shall submit in writing to Recipient the amount of salary for the applicable pay period arising from and after Recipient elects not to consent to termination of a particular Protected Employee that is to be paid to each such Protected Employee, and Recipient shall pay or cause to be paid, such amounts, in full, within ten (10) Business Days of receipt of such invoice.

(e)     Recipient shall be responsible for any payments to the applicable Commercial Insurer under such Commercial Insurance Policy relating to its claims submissions from and after the Closing, and shall reimburse Provider for any deductibles and other chargeback amounts, fees, costs and expenses incurred by Provider to the extent resulting from any access to, or any claims made by Recipient under, any such Commercial Insurance Policy from and after the Closing, including any allocated claims expenses and claim handling fees. For purposes of this Section 4(e), (i) "Commercial Insurer" shall mean the insuring entity issuing and/or subscribing to one or more Commercial Insurance Policies and (ii) "Commercial Insurance Policies" shall mean all insurance policies of Cardone Industries, Inc. retained by Provider pursuant to Section 5.8 of the SPA.

3

CONFIDENTIAL                                                   FBG_CH1_00094656

5.       Terms for Provision of Services.

(a)       Standard of Care.   Provider shall provide the Services to Recipient exercising the same degree of care, priority and diligence as had been provided by Provider to the Business in the six (6)-month period immediately prior to Closing (the "Standard of Care"). During the Term, the Provider shall not terminate, and shall use its reasonable best efforts to retain, the employees set forth on Schedule 1 of this Agreement (the "Protected Employees"); *provided* that Provider may terminate a Protected Employee if (i) Provider delivers 5 Business Days' prior written notice to Recipient of its intention to terminate such Protected Employee (an "Employee Termination Notice") and (ii) Recipient consents to the termination of such Protected Employee (*provided* that Recipient shall  be deemed to have consented to such termination if it does not provide a notice of non-consent within five Business Days of receiving such Employee Termination Notice). If after receipt of an Employee Termination Notice from Provider in accordance with the foregoing sentence, Recipient does not consent to the termination contemplated by the Employee Termination Notice, then thereafter Recipient shall reimburse Provider for the reasonable salary actually paid by the Provider (along with the employer portion of any payroll taxes related thereto) to such Protected Employee in accordance with Section 4(d) above.

(b)       Cooperation.   Each Party shall, in a timely manner, take all such actions as may be reasonably necessary or desirable in order to enable or assist the other Party in the provision of the Services, including providing necessary information and specific written authorizations and consents, and the Service Provider shall be relieved of its obligations hereunder to the extent that, and only for so long as, the other Party's failure to take any such action renders performance by the Service Provider of such obligations unlawful or impractical.

(c)       Limitation on Services.   Provider shall not be required to expand its facilities, incur new long-term capital expenses or employ additional personnel in order to provide the Services.  Furthermore, Provider shall not be obligated to provide Services hereunder that are greater in nature and scope than the Services historically provided to the Business prior to the date hereof, except as specifically provided in Section 1(b) or on Annex A or Annex B (as each may be amended).

(d)       Personnel; Third Parties.  Subject to Section 5(a), in providing the Services, Provider, as it deems necessary or appropriate in its reasonable discretion, may use its personnel and/or employ the services of third parties to the extent such third-party services are reasonably necessary for the efficient performance of any of the Services.

(e)       Right to Determine Priority.  If there is an unavoidable conflict between the immediate needs of the Parties as to the use of or access to a particular Service, the Service Provider shall have the right to establish reasonable priorities, at particular times and under particular circumstances, as between each Party.  In any such situation, the Service Provider shall provide notice to the other Party of the establishment of such priorities at the earliest practicable time.

4

FBG_CH1_00094657

6.      Early Termination of Services.

(a)      Each Party acknowledges that the primary purpose of this Agreement is for Provider to provide the Services on an interim basis until Rotomaster Purchaser can perform the Services for itself. Accordingly, Rotomaster Purchaser shall use its commercially reasonable efforts to make or obtain such approvals, permits and licenses, and implement such systems, as shall be necessary for Rotomaster Purchaser to provide the Services for itself as promptly as practicable.

(b)      At any time, and from time to time, Recipient may, upon at least 30 days prior written notice to Provider, specify any Services it no longer requires (a "Recipient Cut-Off Notice"). Recipient shall have no obligation to pay for the Services specified in the Recipient Cut-Off Notice from and after the effective date of such Recipient Cut-Off Notice. A Recipient Cut-Off Notice shall be irrevocable, and, accordingly, from and after the effective date of a Recipient Cut-Off Notice, Provider will no longer have any obligation to provide to Recipient the Services covered by such Recipient Cut-Off Notice.

(c)      The Parties agree that if any Service is dependent on one or more of the other Services, then such dependent Services may only be terminated simultaneously and not on an individual basis.

7.      Coordinators.

(a)      Each Party shall appoint a person or persons who shall be available to receive communications and coordinate responses to questions and concerns of the other Party with respect to this Agreement or the Services, including billing and operational matters (each a "Coordinator" and, collectively, the "Coordinators"). The initial Coordinator(s) for each Party are set forth on Annex C hereto. Either Party may replace its Coordinator(s) at any time by providing notice in accordance with Section 12.

(b)      Each Party's Coordinators shall meet (either in person or via teleconference or videoconference) with each other as often as reasonably necessary in an effort to resolve disputes without the necessity of any formal proceeding relating thereto. If such Coordinators do not resolve a dispute within fifteen (15) days following a Coordinator's receipt of a written notice from any of the other Party's Coordinators indicating a dispute, and the period is not extended by mutual written consent, the Parties shall promptly escalate such dispute to the appropriate senior executive of each Party to attempt to resolve such dispute through good faith discussions. Only if the appropriate senior executives fail to promptly resolve such dispute within fifteen (15) days of such escalation may a Party initiate a formal proceeding as permitted by this Agreement in accordance with Section 15. The foregoing requirements and limitations shall not, however, prevent a Party from (i) seeking injunctive relief, or (ii) terminating this Agreement (in whole or in part) in accordance with Section 9.

8.      Independent Contractor. Each Party shall be an independent contractor in the performance of its obligations hereunder and shall have no authority to bind the other or its affiliates with respect to third parties.

CONFIDENTIAL

FBG_CH1_00094658

9.      Termination.

(a)      This Agreement shall terminate on the last date for which Services are to be performed as set forth in Section 2, but may be terminated earlier:

(i)      Upon the mutual written agreement of the Parties;

(ii)      By Provider for material breach of any of the terms hereof by Provider if the breach is not cured within ten business days after written notice of breach is delivered to Provider;

(iii)      By Provider for material breach of any of the terms hereof by Recipient if the breach is not cured within ten business days after written notice of breach is delivered to Recipient; or

(iv)      By either Provider or Recipient forthwith, upon written notice to Provider or Recipient, as the case may be, if Provider, on the one hand, or Recipient, on the other hand, as the case may be, shall become insolvent or shall make an assignment for the benefit of creditors, or shall be placed in receivership, reorganization, liquidation or bankruptcy and such proceeding is not dismissed within 60 days after the filing or shall file a petition in bankruptcy or take any corporate action for its winding up or dissolution.

(b)      The termination of this Agreement shall be without prejudice to any rights and obligations of the Parties that have vested prior to the effective date of such termination, including the right to receive payment for Services provided prior to termination.

(c)      If Provider is prevented from or delayed in complying with any of the terms or provisions of this Agreement by reason of fire, flood, storm, strike, lockout or other labor trouble or shortage, delays by unaffiliated suppliers or carriers, shortages of fuel, power, raw materials or components, any law, order, proclamation, regulation, ordinance, demand, seizure or requirement of any Governmental Entity, riot, civil commotion, war, rebellion, acts of terrorism, nuclear accident, other acts of God, acts, omissions, or delays in acting by any governmental or military authority (each, a "Force Majeure"), then (a) Provider shall use commercially reasonable efforts to provide the Services affected by the Force Majeure (the "Affected Services") in an alternative method, and (b) if there is no such commercially reasonable alternative method, upon written notice to Recipient, the Affected Services will be suspended to the extent affected by the Force Majeure during the period of such Force Majeure and Provider will have no liability to Recipient in connection with the Affected Services to the extent affected by the Force Majeure.  If the Force Majeure in question prevails for a continuous period in excess of three (3) months after the date on which the Force Majeure begins, Recipient shall be entitled to give notice to Provider to terminate the Affected Services.  The notice to terminate must specify the termination date, which must be not less than ten days after the date on which the notice to terminate is given.  Once a notice to terminate has been validly given, the Affected Services will terminate on the termination date set out in the notice.  Neither Party shall have any liability to the other

6

in respect of termination of the Affected Services due to Force Majeure, but rights and liabilities which have accrued prior to termination shall subsist.

10.    Indemnification; Limitation of Liability.

(a)    Provider shall not have liability to Recipient in connection with the provision of Services except to the extent such Services were provided in breach of the Standard of Care set forth in Section 5(a).  In such case, at the option of Recipient (which shall be Recipient's sole and exclusive remedy with respect to such breach), Provider shall either:

(i)    perform again the particular Service performed in breach of the Standard of Care at no cost to Recipient; or

(ii)    give Recipient a refund of the portion of the Service fee attributable to the cost of performance of the Service provided in breach of the Standard of Care.

(b)    Recipient shall indemnify, defend and hold harmless Provider and its Affiliates (collectively, the "Provider Indemnified Parties") from and against all liabilities, obligations and damages paid, suffered or incurred by the Provider Indemnified Parties resulting from, arising out of, based upon or otherwise in respect of (i) any breach of any covenant, warranty or agreement made or to be performed by Recipient pursuant to this Agreement and (ii) third party claims as a result of Provider's performance of the Services, other than liabilities, obligations or damages resulting from willful misconduct or gross negligence by Provider, its agents, or employees.

(c)    The provisions of this Section 10 shall be the exclusive remedy of the Parties against any other Party with respect to matters arising under or in connection with this Agreement or the Services.  In no event shall Provider, on the one hand, or Recipient, on the other hand, be liable to the other Party in connection with this Agreement for any indirect, special or consequential damage or for any loss of profits or other economic damages.

(d)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, PROVIDER SPECIFICALLY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ARISING BY OPERATION OF LAW OR OTHERWISE, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS OF THE RAW MATERIALS, SERVICES OR PRODUCED PRODUCT FOR A PARTICULAR PURPOSE, PRODUCT CONDITION OR QUALITY, OR TRADE USAGE OR DEALING. IT IS RECIPIENT'S SOLE RESPONSIBILITY TO DETERMINE THE SUITABILITY OF THE SERVICES AND ANY PRODUCED PRODUCTS FOR RECIPIENT'S CONTEMPLATED USE.

11.    Binding Effect; Assignment. This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder

7

shall be assigned, directly or indirectly, including by operation of Law, by any Party without the prior written consent of the other Parties.

12.    Notices and Invoices.    All notices, requests, demands, waivers and other communications (other than invoices) required or permitted to be given under this Agreement shall be in writing and shall be given by any of the following methods: (a) personal delivery; (b) registered or certified mail, postage prepaid, return receipt requested; (c) overnight mail; or (d) email transmission.  Notices shall be sent to the appropriate Party at its address given below (or at such other address for such Party as shall be specified by notice given hereunder):

if to Recipient or Roto HoldCo, to:

Cardone Holdco LP
c/o Brookfield Asset Management
Brookfield Place New York
250 Vesey Street, 15th Floor
New York, New York 10281
Attention: Rachel Arnett
Email: rachel.arnett@brookfield.com

and a copy (which shall not constitute notice) to:

King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Attention: Raymond E. Baltz, Jr.; Michelle Stewart
Email: rbaltz@kslaw.com; mstewart@kslaw.com

if to Provider, to:

First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention:  Stephen Graham and Shekhar Kumar
Steve.graham@firstbrandsgroup.com
Shekhar.kumar@firstbrandsgroup.com

All such notices, requests, demands, waivers and communications shall be deemed received upon (i) actual receipt thereof by the addressee, (ii) actual delivery thereof to the appropriate address or (iii) refusal of the addressee to accept delivery thereof.

13.    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party, but this Agreement shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein. Upon such determination

8

FBG_CH1_00094661

that any term or other provision is invalid, illegal or unenforceable, the court or other tribunal making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the fullest extent possible.

14.    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware (regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters, including matters of validity, construction, effect, performance and remedies.

15.    Consent to Jurisdiction.  Each Party hereby irrevocably agrees that any Legal Dispute shall be brought only in the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Legal Dispute and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Legal Dispute in any such court or that any such Legal Dispute that is brought in any such court has been brought in an inconvenient forum.  During the period a Legal Dispute that is filed in accordance with this Section 15 is pending before a court, all Actions with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject thereto, (b) such Legal Dispute may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such Legal Dispute is brought in an inconvenient forum or (e) the venue of Legal Dispute is improper. A final judgment in any Legal Dispute described in this Section 15 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.

16.    Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH ANY MATTER WHICH IS THE SUBJECT OF THIS AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.  IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHERMORE, NO PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

17.    Amendment; Modification.  This Agreement (including any annexes, exhibits or schedules hereto) may be amended, modified or supplemented at any time only by written agreement of the Parties.

CONFIDENTIAL
FBG_CH1_00094662

18.     Confidentiality.  Each Party shall keep confidential the annexes to this Agreement and all information received from the other Party regarding the Services, including any information received with respect to the Provider or Recipient, and use such information only for the purposes set forth in this Agreement unless otherwise agreed to in writing by the Party from which such information was received.  In the event a Party is required by any court or legislative or administrative body (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation demand or similar process) to disclose any confidential information provided pursuant to this Agreement, the Party shall provide the other Party with prompt notice of such requirement in order to afford the other Party an opportunity to seek an appropriate protective order or other remedy.  However, if the other Party is unable to obtain or does not seek such protective order and the Party required to disclose the confidential information is, in the opinion of its counsel, legally compelled to disclose such confidential information, disclosure of such information may be made without liability under this Agreement.  The covenants in this Section 18 shall survive any termination of this Agreement for a period of three (3) years from the date such termination becomes effective.

19.     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by email transmission shall be as effective as delivery of a manually executed counterpart of the Agreement.

20.     Headings.  The heading references contained in this Agreement are exclusively for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

21.     Time is of Essence.  With regard to all dates and time periods set forth in this Agreement, time is of the essence.

22.     Construction.  Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular and references to the singular include the plural, (ii) references to one gender include the other gender, (iii) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (iv) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (v) the terms "day" and "days" mean and refer to calendar day(s) and (vi) the terms "year" and "years" mean and refer to calendar year(s).

23.     Provisions Unaffected.  Nothing contained in this Agreement shall affect the rights and obligations of Provider, Seller or Buyer pursuant to the Purchase Agreement.

*[Signatures follow on next page.]*

10

FBG_CH1_00094663

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the date set forth above.

**PROVIDER**:

CARDONE INDUSTRIES, INC.

By:_____
    Name: Michael Carr
    Title: Chief Executive Officer

*(Signature Page to Transition Services Agreement)*

CONFIDENTIAL                                                              FBG_CH1_00094664

**RECIPIENT**:

ADP DISTRIBUTORS INC.


By:_____
       Name: Michael Carr
       Title: President

*(Signature Page to Transition Services Agreement)*

CONFIDENTIAL

FBG_CH1_00094665

**ROTO HOLDCO**:

ROTOMASTER HOLDINGS LLC


By: _____
      Name: Rachel Arnett
      Title: Vice President

*(Signature Page to Transition Services Agreement)*

CONFIDENTIAL

FBG_CH1_00094666

## Schedule 1

*Required Employees*

| Number | First Name | Last Name |
|--------|-----------|-----------|
| 1 | Michael | Carr |
| 2 | Andrew | Labady |
| 3 | Jessica | Cicali |
| 4 | George | Dunham |
| 5 | Ravi | Kurumety |
| 6 | Timothy | Mcclave |
| 7 | Mark | Mooberry |
| 8 | William | Spears |
| 9 | George | Knecht |
| 10 | William | Mercer Jr |
| 11 | Ronald | Elahi |
| 12 | Paul | Miller |
| 13 | Larry | Stamps |
| 14 | Joseph | Salvia |
| 15 | Patricia | Taylor |
| 16 | Jason | Volpe |
| 17 | Kara | Forwood |
| 18 | Jordan | Mulligan |
| 19 | Brandon | Wise |
| 20 | Mark | Neaves |

Schedule 1

CONFIDENTIAL

FBG_CH1_00094667

## Annex A

### Description of Services

*See attached.*

#       #       #

A-1

CONFIDENTIAL                                                                 FBG_CH1_00094668

Annex A

**STRICTLY CONFIDENTIAL**
Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized


**<u>Annex A</u>**
**Description of Services[1]**


| 1. Commercial |
|---|

**Working Assumptions:**
- Recipient will wind down the re-manufacturing of its existing product line of turbos and actuators (the "<u>Products</u>") pursuant to the terms set forth in Section 5 of this <u>Annex A</u>.
- Regarding service levels, Provider will be re-manufacturing the Products according to Recipient's forecasts and Provider will not be liable for any customer-imposed service level fines.
- Current sales and order receiving process for Recipient's orders will continue.


| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 1.1 | **Fill Rate Fine Disputing**<br>One-time transfer of knowledge concerning fill rate fine dispute, including but not limited to the following:<br>• Fine notification<br>• Backup data retrieval and preparation<br>• Corresponding analysis (PO late delivery analysis, order fill analysis, fine analysis)<br>• Dispute file preparation and submission | $600 | **To be completed within 90 following the Effective Date** | **United States / Canada** |
| 1.2 | **Channel Management Activities**<br>Until Recipient can stand-up their own distribution network, Provider will continue to provide the following channel management related activities:<br>• Pull open orders<br>• Pull backorder report<br>• Order release | $500 | **Timing subject to completion of Service 2.1** | **United States / Canada** |

---

[1] The Parties agree that on and after September 30, 2023, the dollar amounts set forth in each "Monthly Service Fee" column of this <u>Annex A</u> shall automatically be deemed increased by 25%.

CONFIDENTIAL

FBG_CH1_00094669

Annex A

**STRICTLY CONFIDENTIAL**
Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| | | | | |
|---|---|---|---|---|
| | • Maintain and update cross reference | | | |
| 1.3 | **Catalog Support**<br>Provider will support in one-time transition of the following catalog services:<br>• OE Research<br>• Vehicles in Operation (VIO) Research<br>• PIES/ACES Database Management<br>• Competitive Interchanges | **$500** | **To be completed within 90 following the Effective Date** | **United States / Canada** |

| 2. Distribution & Warehousing |
|---|

**Working Assumptions:**
- Recipient will provide a 3rd party freight billing account number for shipment of any special order freight (shipments which need to be shipped parcel or air instead of full truckload or LTL) so it is paid directly by the applicable customer or Recipient, not the Provider.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 2.1 | **Distribution and Warehousing Services**<br>Continue to provide distribution and logistics services related to the Recipient's Products flowing to/from the Provider's Dallas, Texas facility. Services include:<br>• Through 3PL Provider, provide transportation services and ship-to-delivery process for Recipient shipments of Products using Provider's global logistics network, other than hazardous waste(s). Product will flow to and from the Dallas, Texas facility.<br>• Through 3PLProvider, provide shipment transit time delivery upgrades to Recipient, based on transportation rates, carrier performance and customer delivery requirements.<br>• Provide reporting logistics loss or damage incidents for Recipient's shipments. Provider will coordinate when requested by Recipient, return shipments that are tendered by Recipient or Recipient customers and are to be returned to designated points of return.<br>• Provide existing logistics centers services and handle Product flow into the logistics centers. | **$34,200**<br><br>**Plus, $8.00 per unit for outbound freight** | | **United States / Canada** |

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| | | | |
|---|---|---|---|
| <ul><li>Execute logistics services for peak volume management. This includes communication with Recipient internal departments (re-manufacturing operations, customer fulfillment, etc.), daily calls, escalations, recovery plans, root cause and correction plans, charters, etc.</li><li>Provide Recipient with routing recommendations to assist recipient in translating customer service requirements into logistics requirements.</li><li>Collection of accounts receivable from the shipment of parts to a Provider turbo customer and remittance of 5% commission of the Net Rebuild Billings to Recipient.</li></ul>Provide continued management of physical warehousing support services related to Recipient's Products stored at the Provider's Dallas, Texas facility. Services include:<ul><li>Provide management of physical warehouse facility in Dallas, Texas.</li><li>Run inspections, analysis, and approval of received Products in line with existing guidelines. Monitoring 3PL activities as applicable.</li><li>Receive Product from Mesa, Arizona and put away into stock locations.</li><li>Provide preparation of Products for packing in line with existing Provider guidelines.</li><li>Provide cross-dock services, as needed.</li><li>FIFO inventory practices for inbound PO level.</li><li>Include continued access to Dallas warehouse for retaining confirmation samples for record keeping purposes. Recipient will continue to be charged directly for the Dallas facility.</li><li>Support for Product quality assessment and remediation (as needed).</li><li>Management and monitoring of inventory accuracy, including reconciliation of WMS and ERP systems.</li><li>Provide space for Recipient, marketing materials or fixtures & furniture storage at the Distribution Center on courtesy base for non-commercial merchandises.</li></ul>Provide continued system maintenance and access to Recipient information stored in Provider's WMS system management. Services include:<ul><li>Provide support for customer and vendor master data management.</li><li>Support inventory accuracy within the system using practices and policies in place prior to the transaction/closing date. Quantities are verified with System-stated quantities and adjustments are made if warranted.</li><li>Provide system reports and extracts, as needed.</li></ul> | | | |

FBG_CH1_00094671

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| 2.2 | **Distribution and Re-Manufacturing Wind-down Transition Services**<br><br>Support the transition to new warehousing & re-manufacturing facilities (if any):<br><br>• Provide necessary picking, packaging, and shipping of any remaining conveying inventory and equipment from Philadelphia and Dallas facilities at the conclusion of the term of this Agreement. | **$50 Per Hour** | | **United States /<br>Canada** |

### 3. Finance & Accounting

**Working Assumptions:**
- Sage system is owned and operated by Recipient and will be conveyed as part of the transaction and contains the necessary Recipient financial data.
- Vehicle lease agreements executed under Provider's name will be transferred to Recipient or purchased outright by Recipient.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 3.1 | **Corporate Accounting Services**<br><br>Provide management, oversight and knowledge to support the Recipient's day to day corporate accounting related activities (e.g., treasury support including calculation of borrowing base, preparing and submitting tax filings, monthly general ledger posting and closing activities, account reconciliations, and reporting, revenue accounting, cost accounting, accounts payable, accounts receivables and working capital reconciliation for turbos sold through Provider after July 1, 2023). | **$125 Per Hour** | | **United States /<br>Canada** |
| 3.2 | **Additional Services:**<br><br>• Expense management, including T&E approval, administration services and access to Provider's instance of Concur. | **$125 Per Hour** | | **United States /<br>Canada** |

### 4. Information Technology

**Working Assumptions:**
- Recipient currently has a full time IT associate and a part-time contractor that are expected to continue supporting the Recipient after the Closing Date.
- Recipient currently has its own network and is expected to continue to maintain it after the Closing Date.
- IT equipment (e.g., PCs, laptops, printers, scanners, telephone, network, servers) located at the Recipient's facilities will be the responsibility of Recipient.
- IT related services currently being paid for by the Recipient will continue to be the Recipient's responsibility after the Closing Date.

CONFIDENTIAL

FBG_CH1_00094672

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 4.1 | **Active Directory and Email Services**<br><br>Provide continued email access for employees that are conveying as part of transaction. Specific services include:<br><br>• Manage and maintain Microsoft Active Directory logical network and email software to enable Recipient to send and receive messages, files, calendars, contacts, and tasks.<br>• Provide services within the scope and capabilities of the Microsoft O365 licensing agreement.<br>  o Supply 100 MB for storage of messages, files, calendars, contacts, and tasks per mailbox (additional storage available for additional costs).<br>  o Administer public folders and distribution lists.<br>  o Provide Internet access to email messages, files, calendars, contacts, and tasks via Webmail application<br>  o Secure email using anti-virus and spam filters built into Microsoft 0365.<br>  o Perform daily email back-ups and complete application and data restoration in case of catastrophic systems failure.<br>  o Offer automatic email archival when required for regulatory or legal compliance needs.<br>  o Support instant messaging and messenger services that are included as part of the standard image.<br><br>Provide e-mail forwarding support post-cutover. | **$7,100** | | **United States / Canada** |
| 4.2 | **Help Desk Tools**<br><br>Provide continued desktop and helpdesk access and coverage under the Provider's ServiceNow help desk contract. | **Included in Service Fee for Service 4.1** | | **United States / Canada** |
| 4.3 | **IT Applications**<br><br>Provide continued access to the following applications:<br><br>• Rotomaster.com (BigCommerce & Plug-ins)<br>• SmartSheet<br>• SentinelOne<br>• Intune<br><br>Note that ServiceNow, Microsoft Office 365 and Microsoft Teams are covered under Section 4.1 and 4.2 of this Annex A. | **Included in Service Fee for Service 4.1** | | **United States / Canada** |

CONFIDENTIAL

FBG_CH1_00094673

Annex A

**STRICTLY CONFIDENTIAL**
Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| 5. Provider Product Re-manufacturing Operations |
| --- |

**Working Assumptions:**

- Recipient will wind down the remanufacturing of turbos, continue to re-manufacture the actuator Products and begin the transition to Recipient.
- Provider will continue to transact and service its turbocharger accounts just as it currently is doing and will work to transition all accounts over to Recipient within a 30-45 day period.
- Provider will continue re-manufacturing Products to support Recipient and Provider sales of Products until Recipient can stand up re-manufacturing operations for actuators which will begin, but not be completed, during the term of this Agreement.
- Actuator re-manufacturing will take ~90 days to transition to Mesa due to specialized knowledge and also to allow conveying specialized equipment to be physically delivered and installed at Mesa.
- The Services described below in Section 5.1 and Section 5.2 of this Annex A shall be governed by and subject to the terms and provisions set forth on Annex D of this Agreement.
- For the services described in Section 5.3 of this Annex A below, the assumption is that there is no sales support for existing Recipient accounts.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
| --- | --- | --- | --- | --- |
| 5.1 | **Provider Turbo Re-Manufacturing**<br><br>Provider to provide continued turbo re-manufacturing services for Recipient's Products produced at the Provider's Philadelphia, Pennsylvania facility as a contract re-manufacturer.<br><br>Assumptions on the service level include the following:<br><br>• Provider will produce up to 15 turbos per day.<br><br>• Provider will deliver turbos ordered by Recipient to end customers within 30 calendar days of sales order receipt. | **$220 Per Unit** | | **United States / Canada** |
| 5.2 | **Provider Actuator Re-Manufacturing**<br><br>Provider to provide continued actuator re-manufacturing services for Recipient's Products, which are produced at the Providers Philadelphia, Pennsylvania facility as a contract re-manufacturer.<br><br>Assumptions on the service level include the following:<br><br>• Provider will produce up to 35 actuators per day.<br><br>• Provider will deliver turbos ordered by Recipient to end customers within 30 calendar days of sales order receipt. | **$100 Per Unit** | | **United States / Canada** |
| 5.3 | **Storage** | **$39,358** | | **United States / Canada** |

CONFIDENTIAL

FBG_CH1_00094674

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| | | | | |
|---|---|---|---|---|
| | Provider to store Recipient owned cores, raw materials, work in process, finished goods and equipment. | | | |
| 5.4 | **Sales Operations For Conveying Provider Turbo & Actuator Business**<br><br>Provider agrees to perform the following services related to conveying Provider Product sales:<br><br>• Provide existing sales order information systems and processes, including billing and accounts receivable.<br>• Provide related Customer & Tech Services team member support.<br>• Notify Provider's customers of the acquisition and initiate contract transition or separation for customers with contracts. | $40,000<br><br>**(to be a one-time payment, payable upon completion of conveying Provider Product sales, not a monthly service fee)** | | **United States / Canada** |

| 6. Sales & Operations Planning |
|---|
| **Working Assumptions:**<br>• Services can be transitioned to Recipient within 2 – 3 weeks. |

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 6.1 | **Sales & Operations Planning**<br><br>Provide continued S&OP services related to Recipient's Products and conveying Provider's Products produced at the Provider's Philadelphia, Pennsylvania facility.<br><br>Provider agrees to perform the following services:<br><br>• Facilitate monthly S&OP activities to identify inventory constraints for FG and Cores.<br>  ▪ Forecast evaluation and validation by SKU (monthly).<br>    o Forecast to be reviewed/ updated by Recipient's Product Management and Sales for alignment/approval by ME.<br>    o Provider's customer forecast reviewed/updated by Provider's Product Management and Sales to be layered for alignment/approval by ME.<br>• Model demand, core availability and inventory for production/purchase requirements (monthly).<br>    o Triggered at the beginning of each period based on updated forecast (complete by week 1 of current period).<br>    o Production planning proposal for following 3-month period approved (complete by week 2 of current period). | $3,250 | | **United States / Canada** |

**DEBTORS' EXHIBIT NO. 241**
**Page 81 of 104**

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| | | | | |
|---|---|---|---|---|
| | o    Evaluate Core and Raw Material shortfall for purchase planning based on longest lead time to support approved demand forecast. (Complete by week 3 of period).<br>• Generate monthly/weekly SKU level production requirements for handoff to Production Planner.<br>▪    Establish monthly inventory ROP and Safety Stock levels to align with forecasted demand for Retail/Traditional customer segments. (weekly)<br>▪    SKU level plans by location. (Mesa and Philadelphia - weekly)<br>     o    Raw Material validation for production plans occurs in each location to support weekly production plan.<br>▪    Transfer Finished Good Inventory to Distribution hub (weekly).<br>▪    Actuator Inventory transferred through PO process to Mesa (as production is completed). | | | |

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

**7. Other**

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 7.1 | **Knowledge Transfer**<br><br>Provide access to Provider personnel for transfer of knowledge needed to assume transition services performed by or on behalf of Provider. Specific areas include the following:<br><br>• Existing employee knowledge from non-transferring employees to in-perimeter employees / new hires.<br><br>• Key customer relationships knowledge and history.<br><br>• Key supplier relationships knowledge and history.<br><br>• Key tools and templates used to operate and run day-to-day operations.<br><br>• Other types of key knowledge and history relevant to Recipient's business. | $125 Per Hour | | United States / Canada |
| 7.2 | **Transition Support**<br><br>At the Recipient's request, provide migration and separation support to enable the Recipient to operate independently from the Provider. Specific support includes:<br><br>• Use reasonable efforts to assist Recipient in transitioning all in-scope services to complete ownership, independent operation and control by Recipient or Recipient's designated agent(s).<br><br>• Provider shall provide information and assistance to Recipient or designated agents of Recipient as necessary to accomplish the successful transfer of work and support responsibilities described in this Annex A from Provider to Recipient or Recipient's service provider. | $125 Per Hour | | United States / Canada |
| 7.3 | **Human Resources:**<br><br>*Benefit Plans*<br>• During the Benefits Service Period, Recipient Employees will remain eligible for or continue to participate in the Provider benefit plans for or in which such Recipient Employees were eligible or participating immediately prior to the date of this Agreement (the "Cardone Benefit Plans"), subject to the terms and conditions of such Cardone Benefit Plans; provided, however, that Provider will not modify, cancel, amend, or terminate any such Cardone Benefit Plans (other than as required under applicable Law) or change the compensation of any Recipient Employee during the Benefits Service Period. | $125 Per Hour | From the Effective Date until the earlier of (i) the date the new Recipient benefit plans are established and (ii) the date that is 6 Months after the Effective | United States / Canada |

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

| | | | | |
|---|---|---|---|---|
| | • Provider will provide continuation coverage to Recipient Employees (and their covered dependents) under the applicable Cardone Benefit Plans with respect to all "qualifying events" under COBRA that occur during the Benefits Service Period.<br>• Recipient will be responsible for providing (or causing to be provided) COBRA continuation coverage to Recipient Employees (and their covered dependents) with respect to all "qualifying events" under COBRA that occur following the end of the Benefits Service Period.<br>• Provider will be solely responsible for providing all necessary materials (e.g., election notices, etc.) to Recipient Employees during the Benefits Service Period to provide COBRA coverage under the Cardone Benefit Plans during the Benefits Service Period.<br>• Provider will cooperate with Recipient to share, retain and maintain data and records that are necessary or appropriate for enrolling Recipient Employees in the new Recipient Benefit Plans immediately following the end of the Benefits Service Period.<br><br>***Benefit Plan Payment Procedures***<br>• Provider will invoice Recipient on a monthly basis in advance of the covered month, and Recipient will pay Provider the invoiced amount.<br>• Provider will provide back-up documentation with respect to each invoice as may reasonably be requested by Recipient.<br>• Recipient will reimburse Provider for all costs incurred by Provider from any third parties for any special reports or files requested by Recipient with respect to the benefit coverage during the Benefits Service Period and transition following the Benefits Service Period; provided, however, that Provider will obtain approval of Recipient prior to incurring such costs.<br>• Recipient will reimburse Provider for costs associated with producing and mailing the annual Form 1095 statements to the Recipient Employees for the Benefits Service Period; provided, however, that Provider will obtain approval of Recipient prior to incurring such costs.<br><br>***Administration***<br>• Provider will preserve employee records, provide copies of employee files to Recipient, and provide general support to bring in any necessary historical data from Provider's systems into Recipient's systems as necessary.<br>• Provider and Recipient will cooperate with each other, and work together, with respect to employee and compensation matters and administrative during the Benefits Service Period. | | **Date ("Benefits Service Period").** | |
| 7.4 | **Legal, Regulatory, and Compliance**<br><br>• Contracting support (e.g., vendor contracts, supply agreements, customer contracts, contract separation, contract compliance) | **$125 Per Hour** | | **United States / Canada** |

CONFIDENTIAL

FBG_CH1_00094678

Annex A

**STRICTLY CONFIDENTIAL**

Draft Scope of Services Under Internal Review - Full Schedule to be Agreed and Finalized

|  |  |  |  |  |
|---|---|---|---|---|
| | • Litigation related administrative services | | | |
| 7.5 | **Affiliate Reporting Obligations**<br><br>• At Recipient's reasonable request from time to time, provide necessary information to allow affiliates of HoldCo to comply with their reporting requirements | **$125 Per Hour** | | **United States / Canada** |

**DEBTORS' EXHIBIT NO. 241**
**Page 85 of 104**

FBG_CH1_00094679

**Annex B**

**Description of Services**

*See attached.*

\#       \#       \#

B-1

CONFIDENTIAL                                                    FBG_CH1_00094680

Annex B

**STRICTLY CONFIDENTIAL**

**Annex B**
**Description of Services[1]**

*Services*

| **1. Commercial** |
| --- |
| **Working Assumptions:** <br>• Recipient will wind down the manufacturing of its existing product line of turbos and actuators (the "Products") pursuant to the terms set forth in Section 5 of this Annex A. <br>• Regarding service levels, Provider will be re-manufacturing the Products according to Recipient's forecasts and Provider will not be liable for any customer-imposed service level fines. <br>• Current sales and order receiving process for Recipient's orders will continue. |

| *ID* | *Description of Service* | *Monthly Service Fee* | *Term of Service* | *Service Location* |
| --- | --- | --- | --- | --- |
| 1.1 | **Fill Rate Fine Disputing** <br>One-time transfer of knowledge concerning fill rate fine dispute, including but not limited to the following: <br>• Fine notification <br>• Backup data retrieval and preparation <br>• Corresponding analysis (PO late delivery analysis, order fill analysis, fine analysis) <br>• Dispute file preparation and submission | $600 | 1 Month | United States / Canada |
| 1.2 | **Channel Management Activities** <br>Until Recipient can stand-up their own distribution network, Provider will continue to provide the following channel management related activities: <br>• Pull open orders <br>• Pull backorder report <br>• Order release <br>• Maintain and update cross reference | $500 | 3 Months <br><br>**This Service is dependent on Service 2.1** | United States / Canada |

---

[1] The Parties agree that if the Roto Closing Date occurs on or after October 1, 2023, then the dollar amounts set forth in each "Monthly Service Fee" column of this Annex B shall automatically be deemed increased by 25%.

Annex B

**STRICTLY CONFIDENTIAL**

| 1.3 | Catalog Support<br>Provider will support in one-time transition of the following catalog services:<br><br>• OE Research<br>• Vehicles in Operation (VIO) Research<br>• PIES/ACES Database Management<br>• Competitive Interchanges | $500 | 2 Months | United States /<br>Canada |
|---|---|---|---|---|

**2. Distribution & Warehousing**

**Working Assumptions:**
- Rotomaster Purchaser will provide a 3rd party freight billing account number for shipment of any special-order freight (shipments which need to be shipped parcel or air instead of full truckload or LTL) so it is paid directly by the applicable customer or Rotomaster Purchaser, not the Provider.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 2.1 | **Distribution and Warehousing Services**<br>Continue to provide distribution and logistics services related to the Recipient's Products flowing to/from the Provider's Dallas, Texas facility. Services include:<br><br>• Through 3PL Provider, provide transportation services and ship-to-delivery process for Recipient shipments of Products using Provider's global logistics network, other than hazardous waste(s).  Product will flow to and from the Dallas, Texas facility.<br>• Through 3PLProvider, provide shipment transit time delivery upgrades to Recipient, based on transportation rates, carrier performance and customer delivery requirements.<br>• Provide reporting logistics loss or damage incidents for Recipient's shipments. Provider will coordinate when requested by Recipient, return shipments that are tendered by Recipient or Recipient customers and are to be returned to designated points of return.<br>• Provide existing logistics centers services and handle Product flow into the logistics centers.<br>• Execute logistics services for peak volume management. This includes communication with Recipient internal departments (re-manufacturing operations, customer fulfillment, etc.), daily calls, escalations, recovery plans, root cause and correction plans, charters, etc. | $34,200<br><br>Plus, $8.00 per unit for outbound freight | 3 Months | United States /<br>Canada |

Annex B

**STRICTLY CONFIDENTIAL**

| | | | | |
|---|---|---|---|---|
| | <ul><li>Provide Recipient with routing recommendations to assist recipient in translating customer service requirements into logistics requirements.</li><li>Collection of accounts receivable from the shipment of parts to a Provider turbo customer and remittance of 5% commission of the Net Rebuild Billings to Recipient.</li></ul>Provide continued management of physical warehousing support services related to Recipient's Products stored at the Provider's Dallas, Texas facility. Services include:<ul><li>Provide management of physical warehouse facility in Dallas, Texas.</li><li>Run inspections, analysis, and approval of received Products in line with existing guidelines. Monitoring 3PL activities as applicable.</li><li>Receive Product from Mesa, Arizona and put away into stock locations.</li><li>Provide preparation of Products for packing in line with existing Provider guidelines.</li><li>Provide cross-dock services, as needed.</li><li>FIFO inventory practices for inbound PO level.</li><li>Include continued access to Dallas warehouse for retaining confirmation samples for record keeping purposes. Recipient will continue to be charged directly for the Dallas facility.</li><li>Support for Product quality assessment and remediation (as needed).</li><li>Management and monitoring of inventory accuracy, including reconciliation of WMS and ERP systems.</li><li>Provide space for Recipient, marketing materials or fixtures & furniture storage at the Distribution Center on courtesy base for non-commercial merchandises.</li></ul>Provide continued system maintenance and access to Recipient information stored in Provider's WMS system management. Services include:<ul><li>Provide support for customer and vendor master data management.</li><li>Support inventory accuracy within the system using practices and policies in place prior to the transaction/closing date. Quantities are verified with System-stated quantities and adjustments are made if warranted.</li><li>Provide system reports and extracts, as needed.</li></ul> | | | |
| 2.2 | **Distribution and Re-Manufacturing Wind-down Transition Services**<br><br>Support the transition to the Rotomaster Purchaser's warehousing & re-manufacturing facilities: | **$50 Per Hour** | **One-Time Service to be completed by the end of the Term for Service 2.1** | **United States / Canada** |

**DEBTORS' EXHIBIT NO. 241**
**Page 89 of 104**

Annex B

**STRICTLY CONFIDENTIAL**

| | | | |
|---|---|---|---|
| • Provide necessary picking, packaging, and shipping of any remaining conveying inventory and equipment from Philadelphia and Dallas facilities at the conclusion of the Term. | | | |

**3. Finance & Accounting**

**Working Assumptions:**
- Sage system is owned and operated by Recipient and will be conveyed as part of the transaction and contains the necessary Recipient financial data.
- Recipient will be removed from Provider's insurance policies at Closing (as applicable).
- Vehicle lease agreements executed under Provider's name will be transferred to Recipient or purchased outright by Recipient.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 3.1 | **Corporate Accounting Services**<br>Provide management, oversight and knowledge to support the Recipient's day to day corporate accounting related activities (e.g., treasury support including calculation of borrowing base, preparing and submitting tax filings, monthly general ledger posting and closing activities, account reconciliations, and reporting, revenue accounting, cost accounting, accounts payable, accounts receivables and working capital reconciliation for turbos sold through Provider after July 1, 2023). | **$125 Per Hour** | **1 Month** | **United States / Canada** |

**DEBTORS' EXHIBIT NO. 241**
**Page 90 of 104**

FBG_CH1_00094684

Annex B

**STRICTLY CONFIDENTIAL**

| 4. Information Technology | | | | |
|---|---|---|---|---|
| **Working Assumptions:** | | | | |

- Recipient currently has a full time IT associate and a part-time contractor that are expected to continue supporting the Recipient after the Closing Date.
- Recipient currently has its own network and is expected to continue to maintain it after the Closing Date.
- IT equipment (e.g., PCs, laptops, printers, scanners, telephone, network, servers) located at the Recipient's facilities will be the responsibility of Recipient.
- IT related services currently being paid for by the Recipient will continue to be the Recipient's responsibility after the Closing Date.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 4.1 | **Active Directory and Email Services**<br>Provide continued email access for employees that are conveying as part of transaction. Specific services include:<br><br>• Manage and maintain Microsoft Active Directory logical network and email software to enable Recipient to send and receive messages, files, calendars, contacts, and tasks.<br>• Provide services within the scope and capabilities of the Microsoft O365 licensing agreement.<br>   o Supply 100 MB for storage of messages, files, calendars, contacts, and tasks per mailbox (additional storage available for additional costs).<br>   o Administer public folders and distribution lists.<br>   o Provide Internet access to email messages, files, calendars, contacts, and tasks via Webmail application<br>   o Secure email using anti-virus and spam filters built into Microsoft 0365.<br>   o Perform daily email back-ups and complete application and data restoration in case of catastrophic systems failure.<br>   o Offer automatic email archival when required for regulatory or legal compliance needs.<br>   o Support instant messaging and messenger services that are included as part of the standard image.<br><br>Provide e-mail forwarding support post-cutover. | $7,100 | 3 Months | United States / Canada |
| 4.2 | **Help Desk Tools**<br>Provide continued desktop and helpdesk access and coverage under the Provider's ServiceNow help desk contract to the extent the Rotomaster Purchaser is unable to execute a new contract or leverage their existing help desk support services by the Closing Date. | **Included in Service Fee for Service 4.1** | 3 Months | United States / Canada |

**DEBTORS' EXHIBIT NO. 241**
**Page 91 of 104**

FBG_CH1_00094685

Annex B

**STRICTLY CONFIDENTIAL**

| 4.3 | IT Applications<br><br>Provide continued access to the following applications to the extent the Rotomaster Purchaser is unable to execute a new contract or leverage their existing applications by the Closing Date.<br><br>• Rotomaster.com (BigCommerce & Plug-ins)<br>• SmartSheet<br>• SentinelOne<br>• Intune<br><br>Note that ServiceNow, Microsoft Office 365 and Microsoft Teams are covered under Section 4.1 and 4.2 of this <u>Annex B</u>. | Included in Service Fee for Service 4.1 | 3 Months | United States / Canada |
|---|---|---|---|---|

| **5. Provider Product Re-manufacturing Operations** |
|---|

**Working Assumptions:**
- Recipient will wind down the remanufacturing of turbos, continue to re-manufacture the actuator Products and begin the transition to Recipient.
- Provider will continue to transact and service its turbocharger accounts just as it currently is doing and will work to transition all accounts over to Recipient within a 30-45 day period.
- Provider will continue re-manufacturing Products to support Recipient and Provider sales of Products until Recipient can stand up re-manufacturing operations.
- Actuator re-manufacturing will take ~90 days to transition to Mesa due to specialized knowledge which the Rotomaster Purchaser's team must be trained on and also to allow conveying specialized equipment to be physically delivered and installed at Mesa.
- The Services described below in Section 5.1 and Section 5.2 of this <u>Annex B</u> shall be governed by and subject to the terms and provisions set forth on <u>Annex D</u> of this Agreement.
- For the services described in Section 5.3 of this <u>Annex B</u> below, the assumption is that there is no sales support for existing Recipient accounts.

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 5.1 | **Provider Turbo Re-Manufacturing**<br><br>Provider to provide continued turbo re-manufacturing services for Recipient's Products produced at the Provider's Philadelphia, Pennsylvania facility as a contract re-manufacturer.<br><br>Recipient agrees to perform the following services:<br><br>• Hire incremental team members and allow Provider's employees to train production team members on the production process to absorb ~15 turbos per day of production within 30 days of Closing.<br><br>Assumptions on the service level include the following:<br><br>• Provider will produce up to 15 turbos per day. | $220 Per Unit | 1 Month | United States / Canada |

**DEBTORS' EXHIBIT NO. 241**
**Page 92 of 104**

FBG_CH1_00094686

Annex B

**STRICTLY CONFIDENTIAL**

| | | | | |
|---|---|---|---|---|
| | • Provider will deliver turbos ordered by Recipient to end customers within 30 calendar days of sales order receipt. | | | |
| 5.2 | **Provider Actuator Re-Manufacturing**<br><br>Provider to provide continued actuator re-manufacturing services for Recipient's Products, which are produced at the Providers Philadelphia, Pennsylvania facility as a contract re-manufacturer.<br><br>Recipient agrees to perform the following services:<br><br>• Hire incremental team members and allow Provider's employees to train production team members on the production process to absorb 35 actuators per day of production within 90 days of Closing.<br><br>Assumptions on the service level include the following:<br><br>• Provider will produce up to 35 actuators per day.<br>• Provider will deliver turbos ordered by Recipient to end customers within 30 calendar days of sales order receipt. | $100 Per Unit | 3 Months | United States / Canada |
| 5.3 | **Storage**<br><br>Provider to store Recipient owned cores, raw materials, work in process, finished goods and equipment. | $39,358 | 3 Months | United States / Canada |
| 5.4 | **Sales Operations For Conveying Provider Turbo & Actuator Business**<br><br>Provider agrees to perform the following services related to conveying Provider Product sales:<br><br>• Provide existing sales order information systems and processes, including billing and accounts receivable.<br>• Provide related Customer & Tech Services team member support.<br>• Notify Provider's customers of the acquisition and initiate contract transition or separation for customers with contracts. | $40,000 | 1 Month<br><br>(to be a one-time payment, payable upon completion of conveying Provider Product sales, not a monthly service fee) | United States / Canada |

| *6. Sales & Operations Planning* |
|---|
| **Working Assumptions:**<br>• Services can be transitioned to Recipient within 2 – 3 weeks. |

**DEBTORS' EXHIBIT NO. 241**
**Page 93 of 104**

Annex B

**STRICTLY CONFIDENTIAL**

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|---|---|---|---|---|
| 6.1 | **Sales & Operations Planning**<br><br>Provide continued S&OP services related to Recipient's Products and conveying Provider's Products produced at the Provider's Philadelphia, Pennsylvania facility.<br><br>Provider agrees to perform the following services:<br><br>• Facilitate monthly S&OP activities to identify inventory constraints for FG and Cores.<br>  ▪ Forecast evaluation and validation by SKU (monthly).<br>    ○ Forecast to be reviewed/ updated by Recipient's Product Management and Sales for alignment/approval by ME.<br>    ○ Provider's customer forecast reviewed/updated by Provider's Product Management and Sales to be layered for alignment/approval by ME.<br>• Model demand, core availability and inventory for production/purchase requirements (monthly).<br>    ○ Triggered at the beginning of each period based on updated forecast (complete by week 1 of current period).<br>    ○ Production planning proposal for following 3-month period approved (complete by week 2 of current period).<br>    ○ Evaluate Core and Raw Material shortfall for purchase planning based on longest lead time to support approved demand forecast. (Complete by week 3 of period).<br>• Generate monthly/weekly SKU level production requirements for handoff to Production Planner.<br>  ▪ Establish monthly inventory ROP and Safety Stock levels to align with forecasted demand for Retail/Traditional customer segments. (weekly)<br>  ▪ SKU level plans by location. (Mesa and Philadelphia - weekly)<br>    ○ Raw Material validation for production plans occurs in each location to support weekly production plan.<br>  ▪ Transfer Finished Good Inventory to Distribution hub (weekly).<br>  ▪ Actuator Inventory transferred through PO process to Mesa (as production is completed). | $3,250 | 1 Month | United States / Canada |

**DEBTORS' EXHIBIT NO. 241**
**Page 94 of 104**

Annex B

**STRICTLY CONFIDENTIAL**

**7. Other**

| ID | Description of Service | Monthly Service Fee | Term of Service | Service Location |
|----|------------------------|---------------------|-----------------|------------------|
| 7.1 | **Knowledge Transfer**<br><br>Provide access to Provider personnel for transfer of knowledge needed for Rotomaster Purchaser to assume transition services performed by or on behalf of Provider. Specific areas include the following:<br><br>• Existing employee knowledge from non-transferring employees to in-perimeter employees / new hires.<br><br>• Key customer relationships knowledge and history.<br><br>• Key supplier relationships knowledge and history.<br><br>• Key tools and templates used to operate and run day-to-day operations.<br><br>• Other types of key knowledge and history relevant to Recipient's business. | $125 Per Hour | 3 Months | United States / Canada |
| 7.2 | **Transition Support**<br><br>At the Rotomaster Purchaser's request, provide migration and separation support to enable the Recipient to operate independently from the Provider. Specific support includes:<br><br>• Use reasonable efforts to assist Recipient in transitioning all in-scope services to complete ownership, independent operation and control by Rotomaster Purchaser or Rotomaster Purchaser's designated agent(s).<br><br>• Provider shall provide information and assistance to Rotomaster Purchaser or designated agents of Rotomaster Purchaser as necessary to accomplish the successful transfer of work and support responsibilities described in this Annex A from Provider to Rotomaster Purchaser or Rotomaster Purchaser's service provider. | $125 Per Hour | 3 Months | United States / Canada |
| 7.4 | **Affiliate Reporting Obligations**<br><br>• At Recipient's reasonable request from time to time, Provider will provide all necessary information to allow affiliates of HoldCo to comply with their reporting requirements | $125 Per Hour | | United States / Canada |

CONFIDENTIAL

FBG_CH1_00094689

Annex B

**STRICTLY CONFIDENTIAL**

*Excluded Services*

*The Parties acknowledge and agree that this <u>Annex B</u> enumerates categories of Services to be provided by Provider, and that to the extent <u>Annex B</u> does not enumerate a specific service it is reasonably assumed that the Provider will not provide that service after the Roto Closing Date unless otherwise agreed on in accordance with <u>Section 1(b)</u> of this Agreement. For avoidance of doubt, the Services will specifically exclude, the following:*

1. **Commercial:**
   - *All Product Management and New Part Number Introduction*
   - *Pricing*
   - *Category Management*
   - *Corporate Marketing*
   - *Tech Services*
   - *Product Images*
   - *AAPEX Show – booth reservation, booth design and prep*
   - *Rotomaster.com updates and SEO support*

2. **Distribution & Warehousing**
   - *Freight scheduling and payment for special-order freight (shipments which need to be shipped parcel or air instead of full truckload or LTL).*

3. **Finance & Accounting:**
   - *Risk Management: Property, casualty, and financial insurance programs.*
   - *Treasury Operations: Bank accounts or cash management in non-Provider accounts.*
   - *Treasury Support: Manage ABL and calculate borrowing base weekly, set payment plan and budgets, approve payment runs, insurance renewal, and cash management.*
   - *Corporate Finance: All corporate finance services (e.g., capital structure, investing, borrowing). The existing ABL will not be available post-Closing.*
   - *Customer Financial Services: Credit applications, setting of credit limits, credit analysis and scoring.*
   - *Customer Financial Services: Collection services for contracts that are assigned or new contracts.*
   - *Customer and Vendor Financial Services: A/R and A/P support.*
   - *Transferring the Recipient's books and records from Sage to a separate general ledger or reporting system, including providing any type of recommendations on integrating with the Rotomaster Purchaser's system.*
   - *Preparing and submitting tax filings (federal, state, sales, etc.).*
   - *Expense management, including T&E approval, administration services and access to Provider's instance of Concur.*
   - *Rotomaster Purchaser will perform their own accounting and month-end close process in Sage. Current Provider oversight will not continue post-Closing.*

4. **Information Technology:**
   - *Management and maintenance of Rotomaster Purchaser's dedicated systems, applications, network, and infrastructure.*
   - *Access to Provider systems, applications, network, and infrastructure, unless specifically noted in this <u>Annex A</u>.*
   - *Development of new applications and major enhancements to existing applications and SharePoint sites.*
   - *Renegotiation of vendor contracts or license agreements on behalf of Rotomaster Purchaser.*
   - *Management of Rotomaster Purchaser software licenses.*
   - *Service support of mobile/cellular devices will not be provided which is consistent with historical practices.*
   - *End user training on Rotomaster Purchaser's systems.*
   - *Internet, data, and telecom services.*

Annex B

**STRICTLY CONFIDENTIAL**

5.  **Turbo & Actuator Operations:**
    - *Procurement related activities.*

6.  **Sales & Operations Planning:**

7.  **Human Resources:**
    - *Participation in the bonus and long-term incentive plans, 401(k) plan participation, deferred compensation programs, health & welfare benefit plans, talent programs, and global wellbeing programs*
    - *Headcount forecasting / planning*
    - *Learning content development*
    - *Leadership development programs (administration)*
    - *University relations*
    - *Employee assistance programs*
    - *Payroll services*
    - *Health & welfare benefits administration*
    - *Talent management and acquisition related activities*
    - *Unemployment insurance services*
    - *HRIS system access*

8.  **Legal, Regulatory, and Compliance:**
    - *Legal advice and Compliance support (e.g., Advertising and Marketing, Domestic and International Trademark Portfolio, International Matters, Corporate Governance, Compliance, and State Filings, Federal Trade Commission and Labeling Services, Other Regulatory Matters, Insurance / Broker, Labor and Employment, Ethics and other similar matters, California Consumer Privacy Act, Historical Claims, Import / Export compliance and regulatory matters)*
    - *Contracting support (e.g., vendor contracts, supply agreements, customer contracts, contract separation, contract compliance)*
    - *Litigation related services*

## Annex C

### Coordinators

- **Provider:** [●][1]

- **Recipient:** Garrett Wiebe

- **Roto HoldCo:** Tim DeSanta

#     #     #

---

[1] To be appointed by Provider after the Effective Date.

C-1

**<u>Annex D</u>**

**Re-Manufacturing Provisions**

[Attached]

\#        \#        \#

D-1

CONFIDENTIAL                                                           FBG_CH1_00094693

**Annex D**

**Re-Manufacturing Provisions**

The Parties hereby agree that the Services described in 5.1 and 5.2 of <u>Annex A</u> (the "<u>Re-Manufacturing Services</u>") shall be governed by, and subject to, the terms and conditions in this <u>Annex D</u>. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

WHEREAS, Recipient wishes to engage Provider to provide the Re-Manufacturing Services to re-manufacture its existing product line of turbos and actuators (the "<u>Products</u>"); and

WHEREAS, Provider is willing to provide the Re-Manufacturing Services subject to the terms and conditions hereof.

NOW, THEREFORE, in consideration of the mutual covenants contained in the Agreement and herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      <u>Interpretation</u>. In this <u>Annex D</u>, unless the context otherwise requires:

(a)     "<u>Delivery</u>" has the meaning set forth in <u>Section 2</u> and "<u>Deliver</u>" and "<u>Delivered</u>" shall have correlative meanings.

(b)     "<u>Intellectual Property</u>" means all of the following in any jurisdiction throughout the world: (a) trademarks and internet domain names, internet websites and URLs; (b) patents and patent applications; (c) copyrights and copyrightable works; (d) registrations and applications for any of the foregoing; (e) trade secrets and confidential information; (f) any software, other than "off the shelf" software owned by a Person to which it has rights to the source code; and (g) any goodwill associated with each of the foregoing.

(c)     "<u>Product(s)</u>" has the meaning set forth in the Recitals.

(d)     "<u>Product Trademarks</u>" means the registered or unregistered trademarks, logos, trade names, trade dress and other marks that relate to any of the Products.

(e)     "<u>Re-Manufacturing Services</u>" has the meaning set forth in the Preamble.

(f)     "<u>Technology</u>" means any methods, techniques, discoveries, formulae, formulations, technical and product specifications, equipment, descriptions, plans, layouts, drawings, computer programs, assembly, quality control, installation and operating procedures, operating manuals, technical and marketing information, designs, data, know-how and other information.

2.      <u>Delivery and Risk of Loss</u>. The Products shall be deemed to be delivered ("<u>Delivery</u>") and risk of loss shall pass when the Products are delivered to Recipient. Prior to Delivery, Provider shall be solely liable and responsible for loss or damage to any Products while such Products are in Provider's possession or control at Provider's facilities other than (a) loss of the Products

CONFIDENTIAL

FBG_CH1_00094694

resulting from earthquake, flooding, lightning, hurricane, tornado/wind or other act of God event or (b) to the extent such loss or damage results from the gross negligence of Recipient and its Affiliates.

3.      Intellectual Property and Product Trademarks. Provider hereby grants to Recipient for the term of the Agreement a nonexclusive, nontransferable, royalty-free, terminable, revocable right and license to use, display and reproduce the Product Trademarks licensed or owned and controlled by Provider, solely in connection with the Re-Manufacturing Services and for no other purpose. Provider hereby grants to Recipient for the term of the Agreement a nonexclusive, nontransferable, royalty free, terminable, revocable right and license to use the Technology and the other Intellectual Property (other than any Product Trademarks) owned and controlled by Provider, solely in connection with the Re-Manufacturing Services and for no other purpose.  Recipient hereby acknowledges and agrees that all rights in and to the Product Trademarks, Provider's Technology and other Intellectual Property shall, as between the Parties, remain at all times the sole and exclusive property of Provider and that other than the nonexclusive limited right and license granted to Recipient pursuant to this Section 3, Recipient shall not have any right, title or interest therein or thereto.  Recipient shall use commercially reasonable efforts to comply with the standards established by Provider and provided to Recipient with respect to the form of the Product Trademarks, their usage, and the underlying goods or services and Recipient's use of the Product Trademarks shall be subject to Provider's right to request specimens, inspect and to otherwise exercise quality control.  All use of the Product Trademarks, and the goodwill associated therewith, shall inure to the benefit of Provider.

4.      Conflicts. In connection with the Re-Manufacturing Services, to the event of any variation or inconsistency between any provision of this Annex D and any provision of the Agreement, the provision contained in this Annex D shall govern.

[Signature page follows.]

2

**PROVIDER**:

CARDONE INDUSTRIES, INC.

By:_____
      Name: Michael Carr
      Title: Chief Executive Officer

*[Signature Page to Annex D to the Transition Services Agreement]*

CONFIDENTIAL

FBG_CH1_00094696

**DEBTORS' EXHIBIT NO. 241**
**Page 102 of 104**

**RECIPIENT**:

ADP DISTRIBUTORS INC.

By:_____

      Name: Michael Carr
      Title: President

*[Signature Page to Annex D to the Transition Services Agreement]*

CONFIDENTIAL

FBG_CH1_00094697

**DEBTORS' EXHIBIT NO. 241**
**Page 103 of 104**

**ROTO HOLDCO**:

ROTOMASTER HOLDINGS LLC

By: _Rachel M Arnett_
    Name: Rachel Arnett
    Title: Vice President

*[Signature Page to Annex D to the Transition Services Agreement]*

CONFIDENTIAL

FBG_CH1_00094698

**DEBTORS' EXHIBIT NO. 241**
**Page 104 of 104**