**Revenue Based Payment Agreement**

This agreement (this "**Agreement**"), dated June 30, 2023 is by and between First Brands Group, LLC ("**FBG**"), First Brands Group Intermediate, LLC ("**FBG Intermediate**" and together with FBG, collectively the "**FBG Group**"), Cardone Holdco, LP (the "**LP**") and Cardone Industries, Inc. (the "**Company**"). FBG, FBG Intermediate, LP and the Company are sometimes referred to in this Agreement as a "**Party**" and collectively as the "**Parties**." The purpose of this Agreement is to establish the mechanism for determining the annual amount payable from the FBG Group to the LP based on the Net North American Brake and Remanufacturing Sales Revenue (as defined herein). Reference is made to that certain Stock Purchase Agreement by and among FBG, LP and the Company, dated as of June 30, 2023 (the "**SPA**").  Capitalized terms used but not otherwise defined in this Agreement shall have the meaning assigned to them in the SPA.

SECTION 1.1.   For purposes of this Agreement, each of the following terms shall have the meaning set forth below:

(a)   "**2025 Payment Amount**" means an amount equal to the sum of (A) the product of (x) one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2024 and ending June 30, 2025 (the "**2025 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2025 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that (1) the 2025 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount and (2) the 2025 Payment shall also include the Deferred Net Working Capital Amount.

(b)   "**2026 Payment Amount**"  means an amount equal to the sum of (A) the product of (x) one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2025 and ending June 30, 2026 (the "**2026 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2026 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that the 2026 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount.

(c)   "**2027 Payment Amount**" means an amount equal to the sum of (A) the product of (x) one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2026 and ending June 30, 2027 (the "**2027 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2027 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that the 2027 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount.

CONFIDENTIAL

FBG_CH1_00094699

**DEBTORS' EXHIBIT NO. 242**
**Page 1 of 14**

(d)     "**2028 Payment Amount**" means an amount equal to the sum of (A) the product of (x) one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2027 and ending June 30, 2028 (the "**2028 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2028 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that the 2028 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount.

(e)     "**2029 Payment Amount**" means an amount equal to the sum of (A) the product of (x) one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2028 and ending June 30, 2029 (the "**2029 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2029 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that the 2029 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount.

(f)     "**2030 Payment Amount**" means an amount equal to the sum of (A) the product of (x)  one percent (1.00%) *multiplied by* (y) the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 12 month period commencing July 1, 2029 and ending June 30, 2030 (the "**2030 Payment Period**"), not to exceed one billion two hundred million dollars ($1,200,000,000), *plus* (B) the product of (x) three percent (3.00%) *multiplied by* (y) the amount by which the aggregate amount of the Net North American Brake and Remanufacturing Sales Revenue for the 2030 Payment Period exceeds one billion two hundred million dollars ($1,200,000,000); *provided* that the 2030 Payment Amount shall not, in any event, be less than the Minimum Payment Amount or exceed the Maximum Payment Amount.

(g)     "**Accounting Firm**" means a nationally recognized accounting firm independent of FBG and LP mutually selected by FBG and LP.

(h)     "**Brakes Business**" means the manufacturing (and re-manufacturing), distribution, and sale of brake part components and systems (including, but not limited to) brake hardware kits, brake lines and tubing, boosters and pumps as presently conducted by FBG and its Affiliates as of the date hereof and as conducted by FBG and its Affiliates (including the Company and its Subsidiaries) from the date hereof through the end of the Payment Periods in accordance herewith.

(i)     "**Business**" means the Brakes Business and the Remanufacturing Business.

(j)     "**Commercially Reasonable Manner**" means (A) providing the Business with a level of administrative, maintenance and marketing support that is the greater of the support (x) being provided to the Business by FBG and its Affiliates (including the Company) as of the Closing Date or (y) consistent with the support required by the Business during the Payment Periods; (B) providing the Business with sufficient funding or access to funding to enable the

CONFIDENTIAL                                                FBG_CH1_00094700

Business to continue to make available its products to current and/or new customers in the Ordinary Course; and (C) pursuing such market opportunities to expand the Business' products and services as a prudent business would undertake.

(k)    "**Creditworthy Affiliate**" means an Affiliate of FBG that, from the date of the applicable transaction contemplated by Section 1.6 through June 30, 2030, has sufficient assets and capital to satisfy all payment obligations of the FBG Group provided for in this Agreement; provided that First Brands Group Holdings, LLC shall not be a Creditworthy Affiliate.

(l)    "**Deferred Net Working Capital Amount**" means $10,000,000.

(m)    "**Maximum Payment Amount**" means $25,000,000.

(n)    "**Minimum Payment Amount**" means $7,000,000.

(o)    "**Net North American Brake and Remanufacturing Sales Revenue**" means all revenue generated from Sales in North America by the Business, calculated using the Net Sales Price.

(p)    "**Net Sales Price**" means the net sales price as determined in accordance with the Payment Accounting Principles.

(q)    "**Payment Accounting Principles**" means, with respect to the calculation of any amount under this Agreement, that such amount was calculated in accordance with GAAP, applied in a manner consistent with the methodology applied in the audited financial statements of FBG for the fiscal year ended December 31, 2022.

(r)    "**Payment Amount**" means any of the 2025 Payment Amount, 2026 Payment Amount, 2027 Payment Amount, 2028 Payment Amount, 2029 Payment Amount, and 2030 Payment Amount, as applicable.

(s)    "**Payment Period**" means any of the 2025 Payment Period, 2026 Payment Period, 2027 Payment Period, 2028 Payment Period, 2029 Payment Period or 2030 Payment Period (collectively, the "**Payment Periods**").

(t)    "**Remanufacturing Business**" means the business as currently conducted by the Company and its Subsidiaries (other than Rotomaster) as of the date hereof and as such business continues to be conducted by FBG, the Company and their Affiliates from the date hereof through the end of the Payment Periods in accordance herewith.

(u)    "**Sale**" means the later of the date upon which (A) there is either a transfer of possession or title from the owner of the goods to any other person, (B) the date upon which the owner of the goods invoices any person or (C) the date upon which the owner receives full payment for such goods.

(v)    "**Total Maximum Payment Amount**" means $150,000,000.

3

FBG_CH1_00094701

(w)    "**True-Up Amount**" means, if (A) the Payment Amount for any applicable Payment Period would be an amount greater than the Maximum Payment Amount but for the application of the Maximum Payment Amount and (B) the Payment Amount paid to the LP with respect to any preceding Payment Period was an amount less than the Maximum Payment Amount, an amount equal to the excess of the Payment Amount for the applicable Payment Period over the Maximum Payment Amount up to an amount equal to (x) the aggregate Maximum Payment Amount for all of the preceding Payment Periods *minus* (y) the aggregate Payment Amount paid to the LP for all of the preceding Payment Periods (for example, if the 2025 Payment Amount was $21,000,000 and the 2026 Payment Amount would be $27,000,000 but for application of the Maximum Payment Amount, FBG shall pay to the LP $25,000,000 with respect to the 2026 Payment Period and $2,000,000 as a true-up payment for the 2025 Payment Period).

**SECTION 1.2.**    In calculating the Net North American Brake and Remanufacturing Sales Revenue, all currencies other than United States dollars will be converted into United States dollars using the exchange rate utilized by the Company in its hedging transactions at the time of such determination (or if no such hedging arrangements are in place, at the then prevailing exchange rate at the time of such determination).

**SECTION 1.3.    Payment Statement**.

(a)    Not later than 120 days following the last day of each applicable Payment Period, FBG shall prepare and deliver to the LP a written statement, prepared in accordance with the Payment Accounting Principles (each an "**Payment Statement**") setting forth in reasonable detail FBG's calculation of the Net North American Brake and Remanufacturing Sales Revenue for the applicable Payment Period and the resulting Payment Amount for such Payment Period and if applicable, the True-Up Amount for such Payment Period, in each case, as set forth in this Agreement.  For purposes of each Payment Statement, FBG shall calculate the respective Payment Amount for the applicable Payment Period without regard to the Maximum Payment Amount. Upon receipt of a Payment Statement, the LP and its accountants and representatives will be given reasonable access upon reasonable notice to FBG's, the Company's and its Subsidiaries' books, records, workpapers and personnel during business hours (including any books, records or other information required to be maintained pursuant to Section 1.8(b)) for the purpose of not only verifying the Net North American Brake and Remanufacturing Sales Revenue for the Payment Period to which such Payment Statement relates but also confirming the compliance of the FBG Group, the Company and their respective Affiliates with Section 1.5 and Section 1.8. If following the receipt of a Payment Statement for any Payment Period the proposed Payment Amount in that Payment Statement (excluding, for the avoidance of doubt, the Deferred Net Working Capital Amount and any True-Up Amount) is less than the applicable amount for such Payment Period set forth on Annex I hereto, then upon LP's request FBG shall be obligated to make its representatives reasonably available to a representative of LP to discuss and review the audited financial statements of FBG for the fiscal year ending within the applicable Payment Period and the unaudited financial statements of FBG for the interim quarters ending within the applicable Payment Period; *provided*, that such discussions be subject to a customary non-disclosure agreement reasonably acceptable to FBG LP's representative, and the 30-day time period for the Payment Protest Deadline shall not begin until such time as the LP's representative has received reasonable access to FBG.

4

CONFIDENTIAL                                                                                    FBG_CH1_00094702

(b)      Prior to the date which is 30 days after FBG's delivery of a Payment Statement to the LP (the "**Payment Protest Deadline**"), and subject to extension pursuant to clause (C) of Section 1.3(a), the LP may deliver written notice to FBG (a "**Payment Protest Notice**") setting forth any objections which the LP may have to such Payment Statement.  The sole permissible grounds for objection in a Payment Protest Notice shall be that the Net North American Brake and Remanufacturing Sales Revenue and/or the Payment Amount and/or the True-Up Amount set forth on such Payment Statement were not calculated in accordance with their respective definitions and/or the Payment Accounting Principles (for the avoidance of doubt, the provisions of this sentence shall in no way limit the LP's right or ability to bring a claim or action against FBG with respect to a breach, or alleged breach, of FBG's covenants and obligations under this Agreement).  The Payment Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the LP's determination of the Net North American Brake and Remanufacturing Sales Revenue and the resulting Payment Amount, and, if applicable, the True-Up Amount.  If a Payment Protest Notice is not delivered prior to the Payment Protest Deadline, the Net North American Brake and Remanufacturing Sales Revenue and the resulting Payment Amount, and, if applicable, the True-Up Amount, as set forth on such Payment Statement shall be final, binding and non-appealable by the LP.  If a Payment Protest Notice is delivered prior to the Payment Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by the LP.

(c)      FBG and the LP shall confer and attempt to resolve any disagreement with respect to a Payment Statement within 30 days following FBG's receipt of the Payment Protest Notice.  If FBG and the LP are unable to resolve any such disagreement within such 30-day period, then any matters that remain in dispute will be referred to the Accounting Firm, which will be instructed to determine the amounts in dispute within 45 days after such referral.  The determination by the Accounting Firm of the amounts in dispute shall be based solely on presentations by FBG and the LP, and shall not involve the Accounting Firm's independent review.  Any determination by the Accounting Firm shall not be outside the range defined by the respective amounts in such Payment Statement proposed by FBG and the LP's proposed adjustments thereto set forth in the Payment Protest Notice, and absent manifest mathematical error such determination shall be final, conclusive, binding and non-appealable.  Each of FBG and the LP shall execute and deliver a customary engagement letter as may be requested by the Accounting Firm, and each of FBG, on the one hand, and the LP on the other hand, shall bear that percentage of the fees and expenses of the Accounting Firm equal to the proportion (expressed as a percentage and determined by the Accounting Firm) of the dollar value of the disputed amounts determined in favor of the other party by the Accounting Firm; *provided* that, the LP's portion of any such fees and expenses shall be deducted from the Payment Amount for the Payment Period applicable to such dispute.

SECTION 1.4.    No later than five Business Days following the earlier of (i) the date on which a Payment Statement becomes final, conclusive, binding and non-appealable in accordance with Section 1.3, or (ii) the date of an Acceleration Event (an "**Payment Determination Date**"), the FBG Group shall pay or cause the Company to pay to the LP the applicable Payment Amount or the Acceleration Payment, as applicable.   Subject to Section 1.9 of this Agreement and the last sentence of this Section 1.4, after taking into account any True-Up Amounts, in no event shall the FBG Group pay to the LP pursuant to this Agreement any amount in excess of the Total Maximum Payment Amount plus the Deferred Net Working Capital.

5

**DEBTORS' EXHIBIT NO. 242**
**Page 5 of 14**

Notwithstanding anything herein to the contrary, if (A) FBG does not make an Acceleration Payment when due, or (B)(x) FBG does not make a Payment Amount when due, (y) LP provides written notice to FBG of FBG's non-payment, and (z) FBG has not made the full amount of such Payment Amount within three Business Days after receipt of LP's written notice, then such overdue amount will bear interest monthly at a rate equal to 15% per annum (computed on the basis of a 365-day year for the actual number of days elapsed) from the date of such non-payment until such payment is paid in full (provided that in no event will the interest payable herein exceed the maximum amount permitted under applicable Law).

SECTION 1.5.   From the Closing through June 30, 2030, none of the FBG Group, the Company or any of their Affiliates shall, directly or indirectly, take any action or fail to take any action, that is aimed at or has the purpose or effect of (A) decreasing the Net North American Brake and Remanufacturing Sales Revenue or any of the Payment Amounts, (B) delaying, deferring, hindering, or preventing the receipt, collection or recognition of any Sales or Net North American Brake and Remanufacturing Sales Revenue, or (C) diverting any Sales away from North America or the Business, in each case in any Earnout Period.  From the Closing through June 30, 2030, the FBG Group, the Company and their respective Affiliates shall do the following in the Ordinary Course: (x) transfer possession or title of goods to customers, (y) send invoices, and (z) collect payments for goods or services sold. The FBG Group will, and will cause its Affiliates to, act in good faith in the exercise of its power, authority and control of the Business.

SECTION 1.6.   Notwithstanding any other provisions of this Agreement, in the event that at any time prior to June 30, 2030, (A) there occurs a liquidation or dissolution of any member of the FBG Group, the Company, or any of their respective Affiliates that conducts the Business or any member of the FBG Group, the Company, or any of their respective Affiliates that conducts the Business becomes insolvent or is subject to a voluntary or involuntary bankruptcy petition, (B) there occurs a sale, exclusive license or other transfer of (x) more than 50% of the consolidated assets of any member of the FBG Group, the Company, or any of their respective Affiliates that conducts the Business or (y) the Business, in each case, to a Person or group of Persons that is not a Creditworthy Affiliate of the FBG Group in one or a series of transactions, (C) there occurs a merger, reorganization, consolidation or share exchange in which the outstanding shares of capital stock, equity securities or voting securities of any member of the FBG Group, the Company or any of their respective Affiliates that conducts the Business are cancelled, converted into or exchanged for a different kind of securities of the successor entity and the successor entity is not a Creditworthy Affiliate of the FBG Group, (D) there occurs an acquisition of a majority of the outstanding capital stock, equity securities or voting securities of any member of the FBG Group, the Company or any of their respective Affiliates that conducts the Business by a Person or group of Persons that is not a Creditworthy Affiliate of the FBG Group, (E) the FBG Group fails to pay the full amount of any Payment Amount to LP when due or (F) FBG elects, in its sole discretion, to accelerate the payment of the Maximum Payment Amount (each of clauses (A)–(F), an "**Acceleration Event**"), then an amount equal to the difference of (x) the Total Maximum Payment Amount plus the Deferred Net Working Capital Amount *minus* (y) the sum of any Payment Amounts paid prior to such Acceleration Event (the "**Acceleration Payment**") shall become due and payable by the FBG Group pursuant to Section 1.4.

SECTION 1.7.   Subject to Section 1.5 and Section 1.8 of this Agreement, FBG's right to control the Company and its Subsidiaries shall not be restricted in any respect, including

CONFIDENTIAL

FBG_CH1_00094704

the hiring or termination of employees or other service providers; the license of Intellectual Property; the offering or ceasing to offer particular products or services; the incurrence of expenses and requiring compliance with FBG's and its Affiliates' internal controls, corporate governance policies and procedures, legal and regulatory compliance standards and consumer data guidelines and privacy rules and regulations.

SECTION 1.8.   From the Closing Date through June 30, 2030, FBG covenants and agrees:

(a)   to act in good faith and operate the Business in a Commercially Reasonable Manner;

(b)   to maintain separate books and records for the Business and operate the Business in a manner that enables it to calculate the Net North American Brake and Remanufacturing Sales Revenue for each applicable Payment Period and deliver each Payment Statement as required by this Agreement; and

(c)   to provide written notice to LP of any material disposition of any business or assets that would constitute a part of the Business within 10 Business Days' following the closing of any such disposition.

SECTION 1.9.   In the event of litigation relating to this Agreement, the prevailing party (as determined by a court of competent jurisdiction) shall be entitled to reimbursement by the non-prevailing party of its reasonable attorneys' fees and costs incurred in connection with such litigation.

SECTION 1.10.   Notwithstanding anything to the contrary contained in this Agreement, FBG and FBG Intermediate each acknowledges and agrees that the payment obligations of the FBG Group provided for in this Agreement are both joint and several.

SECTION 1.11.   All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered in person or by e-mail, (b) on the next Business Day when sent by overnight courier, or (c) on the second succeeding Business Day when sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the respective Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to any member of the FBG Group or the Company (after the Closing) to:

First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attention: Stephen Graham and Shekhar Kumar
Steve.graham@firstbrandsgroup.com
Shekhar.kumar@firstbrandsgroup.com

7

CONFIDENTIAL                                        FBG_CH1_00094705

If to LP to:

> Cardone Holdco LP
> c/o Brookfield Asset Management
> Brookfield Place New York
> 250 Vesey Street, 15th Floor
> New York, New York 10281
> Attention: Rachel Arnett
> Email: rachel.arnett@brookfield.com

with a copy (which shall not constitute notice) to:

> King & Spalding LLP
> 1180 Peachtree Street, N.E.
> Atlanta, Georgia 30309-3521
> Attention:  Raymond E. Baltz, Jr.; Michelle Stewart
> E-mail:  rbaltz@kslaw.com; mstewart@kslaw.com

**SECTION 1.12.**  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party, but this Agreement shall be construed as if such invalid or illegal or unenforceable provision had never been contained herein.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the court or other tribunal making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the fullest extent possible.

**SECTION 1.13.**  This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, including by operation of law, by any Party without the prior written consent of the other Parties; *provided*, that (i) LP shall be permitted, without the consent of any other party hereto, to assign this Agreement and its rights, interests and obligations hereunder to any of its Affiliates and (ii) FBG shall be permitted, without the consent of any other party hereto, to make a collateral assignment to any lender (or agent thereof) providing debt financing in connection with the transactions contemplated by this Agreement; *provided, further*, notwithstanding any such assignment, FBG shall remain responsible for all of its obligations pursuant to this Agreement.

**SECTION 1.14.**  This Agreement is exclusively for the benefit of the Parties and their respective successors and permitted assigns, and this Agreement shall not be deemed to

8

CONFIDENTIAL

confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right.

SECTION 1.15.   Each Party hereby irrevocably agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the courts of the State of Delaware or the federal courts located in the State of Delaware, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.   During the period in which a Legal Dispute that is filed in accordance with this Section 1.15 is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.   Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject to the personal jurisdiction thereof, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum, or (e) the venue of such action, suit or proceeding is improper.   A final judgment in any action, suit or proceeding described in this Section 1.15 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIMS OR COUNTERCLAIMS ASSERTED IN ANY LEGAL DISPUTE RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FOR ANY COUNTERCLAIM RELATING THERETO.   IF THE SUBJECT MATTER OF ANY SUCH LEGAL DISPUTE IS ONE IN WHICH THE WAIVER OF JURY TRIAL IS PROHIBITED, NO PARTY SHALL ASSERT IN SUCH LEGAL DISPUTE A NONCOMPULSORY COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. FURTHERMORE, NO PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH LEGAL DISPUTE WITH A SEPARATE ACTION OR OTHER LEGAL PROCEEDING IN WHICH A JURY TRIAL CANNOT BE WAIVED.

SECTION 1.16.   This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters, including matters of validity, construction, effect, performance and remedies

SECTION 1.17.   The Parties acknowledge and affirm that in the event of a breach of this Agreement by any Party, money damages (even if available) may not be an adequate remedy.   Accordingly, the Parties agree that such non-breaching Party shall have the right, in addition to any other rights and remedies existing in their favor at law or in equity, to seek to enforce their rights and the other Party's obligations hereunder by an action or actions for specific performance, injunctive or other equitable relief (without posting of bond or other security), including any order, injunction or decree sought by LP or the Company to cause any member of the FBG Group to perform its agreements and covenants contained in this Agreement.   Each Party

CONFIDENTIAL

FBG_CH1_00094707

**DEBTORS' EXHIBIT NO. 242**
**Page 9 of 14**

further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement

**SECTION 1.18.**   This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.   Delivery of an executed counterpart of a signature page to this Agreement by e-mail (including any electronic signature) shall be as effective as delivery of a manually executed counterpart of the Agreement.   This Agreement and its terms shall be subject to the terms of the Confidentiality Agreement.

**SECTION 1.19.**   This Agreement may be amended, modified or supplemented at any time only by written agreement of the Parties.

**SECTION 1.20.**

(a)      Unless the context of this Agreement otherwise clearly requires, (i) references to the plural include the singular, and references to the singular include the plural; (ii) references to one gender include the other gender; (iii) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; (iv) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (v) the terms "day" and "days" mean and refer to calendar day(s); (vi) the terms "year" and "years" mean and refer to calendar year(s); and (vii) the word "or" shall be disjunctive and not exclusive.

(b)      Unless otherwise set forth in this Agreement, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof, and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law, as amended, modified, supplemented or succeeded from time to time and in effect on the date hereof.   All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules of this Agreement, unless otherwise specified.

(c)      With respect to the determination of any period of time, unless otherwise set forth in this Agreement, the word "from" means "from and including" and the word "to" means "to but excluding" and if the last day of such period is a non-Business Day, the period in question will end at the end of the next succeeding Business Day.

(d)      This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

[Signatures follow on next page.]

10

CONFIDENTIAL                                                                    FBG_CH1_00094708

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first above written.

<div style="margin-left: 40%;">

**FBG:**

FIRST BRANDS GROUP, LLC

By: _____
      Name:  Shekhar Kumar
      Title:   Authorized Signatory

**FBG INTERMEDIATE:**

FIRST BRANDS GROUP INTERMEDIATE, LLC

By: _____
      Name:  Shekhar Kumar
      Title:   Authorized Signatory

</div>

[Signature Page to Revenue Based Payment Agreement]

CONFIDENTIAL

FBG_CH1_00094709

**LP:**

CARDONE HOLDCO, LP

By: Cardone Holdco GP, LLC
Its; General Partner

By_____
      Name: Rachel Arnett
      Title: Authorized Signatory

[Signature Page to Revenue Based Payment Agreement]

CONFIDENTIAL

FBG_CH1_00094710

**COMPANY:**

CARDONE INDUSTRIES, INC.

By:_____
       Name: Michael Carr
       Title: Chief Executive Officer

[Signature Page to Revenue Based Payment Agreement]

CONFIDENTIAL                                                       FBG_CH1_00094711

**Annex I**

Projected Payments

|  | Payment Period | | | | | |
|---|---|---|---|---|---|---|
|  | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
| Payment Amount | $24.1M | $25.0M | $25.0M | $25.0M | $25.0M | $25.0M |
| True-Up | N/A | $0.9M | N/A | N/A | N/A | N/A |
| Total | $24.1M | $25.9M | $25.0M | $25.0M | $25.0M | $25.0M |

CONFIDENTIAL

FBG_CH1_00094712