EXECUTION VERSION

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

FIRST BRANDS GROUP, LLC,

VIPER ACQUISITION, LLC

QUALITOR ACQUISITION HOLDINGS, INC.,

QUALITOR HOLDINGS LLC, AS THE EQUITYHOLDER REPRESENTATIVE

and

QUALITOR HOLDINGS LLC, AS THE PRINCIPAL SELLER

———————————————————

DATED AS OF JULY 29, 2022

———————————————————

CONFIDENTIAL

FBG_CH1_00094713

**DEBTORS' EXHIBIT NO. 243**
**Page 1 of 129**

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS...................................................................................................1
    1.1     Definitions ....................................................................................................1
    1.2     Other Capitalized Terms............................................................................12
    1.3     Interpretive Provisions...............................................................................14

ARTICLE 2 THE MERGER ...............................................................................................16
    2.1     Merger........................................................................................................16
    2.2     Effective Time ...........................................................................................16
    2.3     Effects of the Merger ................................................................................16
    2.4     Merger Consideration ................................................................................17
    2.5     Effect on Capital Stock .............................................................................18
    2.6     Book-Entry Shares.....................................................................................19
    2.7     Appraisal Rights; Requisite Stockholder Approval...................................19
    2.8     Conversion of Company Options. ..............................................................20
    2.9     Transactions to be Effected ......................................................................21
    2.10    Pre-Closing Statement; Closing Merger Consideration Adjustment.........22
    2.11    Termination of Company Option Plan .......................................................26
    2.12    Withholding Rights....................................................................................26

ARTICLE 3 THE CLOSING ..............................................................................................26
    3.1     Closing; Closing Date................................................................................26

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE COMPANY.........27
    4.1     Organization and Qualification.................................................................27
    4.2     Capitalization of the Company ..................................................................27
    4.3     Subsidiaries................................................................................................28
    4.4     Binding Obligation ....................................................................................29
    4.5     No Defaults or Conflicts............................................................................29
    4.6     No Governmental Authorization Required................................................30
    4.7     Financial Statements .................................................................................30
    4.8     Intellectual Property..................................................................................31
    4.9     Compliance with Laws .............................................................................32
    4.10    Corrupt Practices; Trade Control Laws ....................................................32
    4.11    Material Contracts ....................................................................................32
    4.12    Litigation...................................................................................................34
    4.13    Taxes.........................................................................................................34
    4.14    Permits......................................................................................................36
    4.15    Employee Benefit Plans.............................................................................36
    4.16    Labor Relations.........................................................................................37
    4.17    Environmental Compliance .......................................................................38
    4.18    Insurance...................................................................................................38
    4.19    Real Property ............................................................................................39
    4.20    Affiliate Transactions ...............................................................................39

i

CONFIDENTIAL

FBG_CH1_00094714

**DEBTORS' EXHIBIT NO. 243**
**Page 2 of 129**

4.21    Absence of Material Adverse Effect.................................................................40
4.22    Brokers..............................................................................................................40
4.23    Product Liability ..............................................................................................40
4.24    Exclusivity of Representations ........................................................................40
4.25    Material Relationships .....................................................................................40

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PARENT AND
             MERGER SUB.......................................................................................41
5.1     Organization .....................................................................................................41
5.2     Binding Obligation ..........................................................................................41
5.3     No Defaults or Conflicts..................................................................................42
5.4     No Authorization or Consents Required..........................................................42
5.5     Brokers..............................................................................................................42
5.6     Sufficient Funds...............................................................................................43
5.7     Litigation; Relations ........................................................................................43
5.8     Solvency ...........................................................................................................43
5.9     Parent's and Merger Sub's Reliance.................................................................43
5.10    Investment Purpose...........................................................................................44
5.11    Exclusivity of Representations .........................................................................45

ARTICLE 6 COVENANTS .....................................................................................................45
6.1     Conduct of Business of the Company .............................................................45
6.2     Access to Information; Confidentiality; Public Announcements .............47
6.3     Filings and Authorizations; Consummation ...................................................49
6.4     Resignations.....................................................................................................51
6.5     Employee Matters.............................................................................................51
6.6     Further Assurances ..........................................................................................52
6.7     Officer and Director Indemnification and Insurance...............................53
6.8     Termination of Affiliate Obligations ..............................................................55
6.9     Exclusivity .......................................................................................................55
6.10    Waiver of Conflicts Regarding Representation ..........................................55
6.11    Access to Books and Records...........................................................................56
6.12    Frustration of Closing Conditions ..................................................................57
6.13    R&W Insurance Policy.....................................................................................57
6.14    Tax Matters ......................................................................................................57
6.15    Names Following Closing ................................................................................58
6.16    Intercompany Receivables...............................................................................59
6.17    Restrictive Covenants ......................................................................................59
6.18    Consents............................................................................................................59

ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT
             AND MERGER SUB ............................................................................59
7.1     Representations and Warranties Accurate .......................................................59
7.2     Performance......................................................................................................60
7.3     No MAE.............................................................................................................60
7.4     Officer's Certificate .........................................................................................60
7.5     HSR Act............................................................................................................60

ii

**DEBTORS' EXHIBIT NO. 243**
**Page 3 of 129**

| | | | |
|---|---|---|---|
| 7.6 | No Legal Restraints | ....................... | 60 |
| 7.7 | Written Consent | ....................... | 60 |

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY ....................... 61

| | | | |
|---|---|---|---|
| 8.1 | Representations and Warranties Accurate | ....................... | 61 |
| 8.2 | Performance | ....................... | 61 |
| 8.3 | Officer Certificate | ....................... | 61 |
| 8.4 | Written Consent: The Company shall have obtained the Written Consent. | ....................... | 61 |
| 8.5 | HSR Act | ....................... | 61 |
| 8.6 | No Legal Restraints | ....................... | 61 |

ARTICLE 9 TERMINATION ....................... 62

| | | | |
|---|---|---|---|
| 9.1 | Termination | ....................... | 62 |
| 9.2 | Effect of Termination | ....................... | 63 |

ARTICLE 10 MISCELLANEOUS ....................... 64

| | | | |
|---|---|---|---|
| 10.1 | No Survival | ....................... | 64 |
| 10.2 | Expenses | ....................... | 65 |
| 10.3 | Amendment | ....................... | 65 |
| 10.4 | Entire Agreement | ....................... | 65 |
| 10.5 | Headings | ....................... | 65 |
| 10.6 | Notices | ....................... | 65 |
| 10.7 | Exhibits and Schedules | ....................... | 66 |
| 10.8 | Waiver | ....................... | 66 |
| 10.9 | Binding Effect; Assignment | ....................... | 67 |
| 10.10 | No Third Party Beneficiary | ....................... | 67 |
| 10.11 | Counterparts | ....................... | 67 |
| 10.12 | Release | ....................... | 67 |
| 10.13 | Governing Law and Jurisdiction | ....................... | 68 |
| 10.14 | Consent to Jurisdiction and Service of Process | ....................... | 68 |
| 10.15 | WAIVER OF JURY TRIAL | ....................... | 69 |
| 10.16 | Conveyance Taxes | ....................... | 69 |
| 10.17 | Specific Performance | ....................... | 69 |
| 10.18 | Non-Recourse | ....................... | 70 |
| 10.19 | Severability | ....................... | 71 |
| 10.20 | Equityholder Representative | ....................... | 71 |

CONFIDENTIAL

FBG_CH1_00094716

**DEBTORS' EXHIBIT NO. 243**
**Page 4 of 129**

## <u>EXHIBITS; SCHEDULES</u>

Exhibit A     Current Assets and Current Liabilities
Exhibit B     Balance Sheet Rules
Exhibit C     Form of Escrow Agreement
Exhibit D     Certificate of Merger
Exhibit E     Letter of Transmittal
Exhibit F     Reserved
Exhibit G     Restrictive Covenants

CONFIDENTIAL

FBG_CH1_00094717

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (the "Agreement"), dated as of July 29, 2022, by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Viper Acquisition, LLC, a Delaware limited liability company and wholly owned subsidiary of Parent ("Merger Sub"), Qualitor Acquisition Holdings Inc., a Delaware corporation (the "Company") Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative") and, solely for the purposes of Section 6.15 and Section 9.2(b), Qualitor Holdings LLC, a Delaware limited liability company (the "Principal Seller").

## RECITALS

WHEREAS, Parent wishes to acquire the Company by effecting a merger of Merger Sub with and into the Company, with the Company being the Surviving Corporation (as defined below) (the "Merger");

WHEREAS, the respective governing bodies of Parent, Merger Sub and the Company have approved and declared advisable this Agreement and the Merger upon the terms and conditions set forth in this Agreement; and

WHEREAS, promptly following the execution and delivery of this Agreement, the Company will obtain and deliver to Parent a true and correct copy of an irrevocable written consent of the stockholders of the Company who collectively own a majority of the voting power of the outstanding shares of Company Stock (as defined below) adopting this Agreement and approving and consenting to the Merger and the consummation of the transactions contemplated hereby (the "Written Consent"), in accordance with the DGCL (as defined below), the Company's certificate of incorporation (the "Company Certificate of Incorporation"), and the Company's bylaws (the "Company Bylaws"), in each case as in effect as of the date hereof.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions.  The following terms, whenever used herein, shall have the following meanings for all purposes of this Agreement.

"Accounting Methodology" means the accounting principles, methods and practices, in each case, calculated in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting principles, methods and practices utilized in preparing the Audited Balance Sheet, applied on a consistent basis.

CONFIDENTIAL

FBG_CH1_00094718

"Action" means any action, claim, suit, arbitration, mediation or other proceeding, in each case before any Governmental Authority, whether civil, criminal, administrative or otherwise, in law or in equity.

"Acquired Companies" means, collectively, the Company and each of its direct and indirect Subsidiaries, and "Acquired Company" means each of the foregoing individually.

"Affiliate" means as to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person.  For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by ownership of voting stock, by Contract or otherwise; provided, that no portfolio company of any investment fund affiliated with or managed by Wellspring Capital Management Group LLC shall be deemed to be an Affiliate of the Company or any Equityholder hereunder.

"Affiliate Agreements" has the meaning set forth in Section 4.20.

"Agent" has the meaning set forth in the definition of Credit Agreement.

"Alternative Transaction" has the meaning set forth in Section 6.9.

"Antitrust Laws" means the HSR Act, the Sherman Antitrust Act of 1890, the Clayton Antitrust Act of 1914, the Federal Trade Commission Act of 1914, and any other United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization, restraint of trade or lessening of competition through merger or acquisition.

"Audited Balance Sheet" has the meaning as set forth in the definition of Financial Statements.

"Audited Financial Statements" has the meaning as set forth in the definition of Financial Statements.

"Balance Sheet Rules" means, collectively, the Accounting Methodology and the rules set forth on Exhibit B attached hereto; provided that in the event of any conflict between the Accounting Methodology and the rules set forth on Exhibit B, the rules set forth on Exhibit B shall apply.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by Law or executive order to close.

2

FBG_CH1_00094719

"Business Systems" means all software, computer hardware, communications, networks, platforms, servers and computer systems that are owned or used by the Company or any Company Subsidiary in the conduct of their business.

"CARES Act" means (i) the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136) and any administrative or other guidance published with respect thereto by any Governmental Authority (including IRS Notices 2020-22 and 2020-65), or any other Law or executive order or executive memorandum (including the Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, dated August 8, 2020) intended to address the consequences of COVID-19 (in each case, including any comparable provisions of state, local or non-U.S. Law and including any related or similar orders or declarations from any Governmental Authority) and (ii) any extension of, amendment, supplement, correction, revision or similar treatment to any provision of the CARES Act contained in the Consolidated Appropriations Act, 2021, H.R. 133.

"Closing Cash" means all cash and cash equivalents (including bank account balances, marketable securities and any received and uncleared checks, wires or drafts and net of any issued and uncleared checks, wires or drafts) of the Company Group in excess of $20,000,000 in the aggregate, determined on a consolidated basis as of the Closing without giving effect to the transaction contemplated by this Agreement, in accordance with the Balance Sheet Rules.

"Closing Indebtedness" means the amount of Indebtedness of the Company Group determined on a consolidated basis as of immediately prior to the Closing without giving effect to the transactions contemplated by this Agreement, determined in accordance with the Balance Sheet Rules.

"Closing Working Capital" means the Working Capital as of the Reference Time without giving effect to the transactions contemplated by this Agreement, determined in accordance with the Balance Sheet Rules.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Expenses" means the legal, accounting, financial advisory, and other advisory, transaction or consulting fees and expenses incurred by the Company or any Company Subsidiary in connection with the transactions contemplated by this Agreement, including transaction bonuses, change-in-control payments or other similar amounts payable by the Company or any Company Subsidiary to any director, manager, officer or employee of, or consultant to, the Company or any Company Subsidiary conditioned solely on the consummation of the transactions contemplated by this Agreement, in each case, to the extent not paid at or prior to the Closing.

"Company Fundamental Representations" mean the representations and warranties of the Company contained in Section 4.1 (Organization and Qualification), Section 4.2 (Capitalization of the Company), Section 4.4 (Binding Obligation) and Section 4.22 (Brokers).

3

CONFIDENTIAL

FBG_CH1_00094720

"Company Group" means the Company and the Company Subsidiaries.

"Company Option" means any option to purchase shares of Company Stock pursuant to the Company Option Plan, whether or not vested or exercisable, that is outstanding immediately prior to the Closing.

"Company Option Plan" means the Qualitor Acquisition Holdings Inc. Stock Option Plan, as amended and restated, effective as of June 23, 2021.

"Company Stock" means the shares of common stock of the Company.

"Contract" means any legally binding contract, agreement, license, sublicense, lease, sublease, conditional sales contract, mortgage, sales or purchase order, commitment, arrangement, undertaking or understanding.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any action or inaction by the Company Group or any third party in response to COVID-19, including any workforce reduction or its or their compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any industry group or any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with, related to, or in response to COVID-19, including the CARES Act and the Families First Act or any other disaster plan of the Company Group or any change in applicable Laws related to, in connection with or in response to COVID-19.

"Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of October 19, 2016, by and among, *inter alia,* Qualitor, Inc., Transportation Aftermarket Enterprise, LLC, International Brake Industries, Inc. and Pylon, collectively, as borrowers, the other credit parties from time to time party thereto, the lenders from time to time party thereto and Antares Capital LP, as agent (the "Agent"), as further amended, restated, supplemented or otherwise modified from time to time.

"Credit Agreement Payoff Amount" means the amount of outstanding principal and accrued but unpaid interest, fees and other amounts payable (including any prepayment penalties, if any) on the Closing Date under the Credit Agreement.

"Current Assets" means, as of any date, the consolidated current assets of the Company and the Company Subsidiaries, which current assets shall include only the line items set forth on Exhibit A, attached hereto under the heading "Current Assets" and no other assets.  For the avoidance of doubt, Current Assets shall exclude deferred Tax assets, the Intercompany Receivables, to the extent distributed in accordance with Section 6.16, and income Tax assets and Closing Cash.

4

CONFIDENTIAL

FBG_CH1_00094721

"Current Liabilities" means, as of any date, the consolidated current liabilities of the Company and the Company Subsidiaries, which current liabilities shall include only the line items set forth on Exhibit A, attached hereto under the heading "Current Liabilities" and no other liabilities. For the avoidance of doubt, Current Liabilities shall exclude deferred Tax liabilities and income Tax liabilities, all liabilities related to Company Expenses and Closing Indebtedness.

"date hereof" and "date of this Agreement" means the date first written above.

"Effect" shall have the meaning as set forth in the definition of Material Adverse Effect.

"Encumbrance" means any and all liens, encumbrances, charges, mortgages, options, pledges, assessments, restrictions on transfer, security interests, hypothecations, easements, rights-of-way, claims or other similar encumbrances.

"Environmental Laws" means any applicable United States Law (with respect to any policy, to the extent such policy is binding on the applicable Governmental Authority) including any judicial or administrative order, consent, decree or judgment relating to pollution or protection of the Environment health, safety, natural resources or Hazardous Materials.

"Environmental Permits" means any permit, approval, identification number, license or other authorization required under or issued pursuant to any applicable Environmental Law.

"Equityholder Representative Reserve Amount" means $1,000,000.

"Equityholders" means, collectively, the Stockholders and the holders of Company Options.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means the escrow agreement in substantially the form attached hereto as Exhibit C.

"Exercise Price" means the exercise price applicable to a Company Option as of the Effective Time pursuant to the terms of the Company Option Plan and the applicable option grant certificate for the holder of such Company Option.

"Financial Statements" means (i) the audited consolidated balance sheet of the Company Group (the "Audited Balance Sheet"), and the related statements of operations and comprehensive loss, stockholders' equity and cash flows of the Company Group for the year ended December 31, 2021, together with the notes and schedules

5

CONFIDENTIAL

FBG_CH1_00094722

thereto (the "Audited Financial Statements") and (ii) the unaudited consolidated balance sheet of the Company Group as of June 30, 2022 (the "Interim Balance Sheet") and the related consolidated statements of operations and comprehensive loss, stockholders' equity and cash flows of the Company Group for the six (6) months then ended (the "Unaudited Financial Statements").

"Foreign Corrupt Practices Act" means the Foreign Corrupt Practices Act of 1977.

"Fraud" means, with respect to a party to this Agreement, the actual and knowing common law fraud (and not negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence) by such party with respect to the making of a representation or warranty by such party set forth in this Agreement (as qualified by the Disclosure Schedules) with the specific intent to induce another party to enter into this Agreement that was material to the claiming party's decision to enter into this Agreement and upon which the claiming party justifiably relied, in each case, as determined in a non-appealable final determination of a court of competent jurisdiction. For the avoidance of doubt, nothing in this Agreement shall, or is intended to, reduce Parent's burden of proof or pleading for any claim based upon Fraud, or to restrict the scope of the disclaimers or acknowledgements of non-reliance by Parent set forth in Section 4.24 and Section 5.11.

"Fully Diluted Company Stock" means the sum of (i) the total number of outstanding shares of Company Stock as of immediately prior to the Effective Time plus (ii) the total number of shares of Company Stock issuable upon the exercise in full of all Vested Options.

"GAAP" means United States generally accepted accounting principles in effect and applied consistently throughout the periods involved.

"Governmental Authority" means any nation or government, any state, province or other political subdivision thereof, exercising executive, legislative, judicial, regulatory or administration functions of or pertaining to government, or any government authority, commission or instrumentality of the United States of America, any foreign government, any state of the United States of America, or any municipality or other political subdivision thereof, and any court or tribunal of competent jurisdiction.

"Hazardous Material" means any material or substance that is regulated or the basis for liability under Environmental Law, including any asbestos, polychlorinated biphenyls, petroleum, or petroleum byproducts or breakdown products or toxic mold.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means, of any Person, without duplication, (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money (including indebtedness outstanding under the Credit Agreement), (ii) amounts owing as deferred purchase price for the

6

FBG_CH1_00094723

acquisition of a business, including all seller notes and "earn-out" payments, (iii) indebtedness evidenced by any note, bond, debenture, mortgage, deed of trust or other debt instrument or debt security, (iv) obligations under any performance bond or letter of credit, but only to the extent drawn or called as of immediately prior to the Closing, (v) capital or finance lease obligations as determined in accordance with the Balance Sheet Rules, (vi) guarantees with respect to any indebtedness of any other Person of a type described in clauses (i) through (v) above, but only to the extent currently due and owing without recourse against such other Person, and (vii) for clauses (i) through (iv) above, all principal and accrued interest thereon, if any, and any termination fees, prepayment penalties, make-whole payments, commitment, breakage and other fees associated with the repayment of such Indebtedness on the Closing Date to the extent such Indebtedness is repaid on the Closing Date.  For the avoidance of doubt and notwithstanding the foregoing, Indebtedness of the Company and Company Subsidiaries shall not include (A) any obligations under any performance bond or letter of credit to the extent undrawn or uncalled as of the applicable measurement time, (B) any Indebtedness included in the calculation of Current Liabilities in the determination of Closing Working Capital, (C) any intercompany Indebtedness between the Company and the Company Subsidiaries, (D) any Indebtedness incurred by Parent and its Affiliates (and assumed by the Company or any Company Subsidiary) on or before the Closing, (E) any endorsement of negotiable instruments for collection in the ordinary course of business, (F) any deferred revenue, (G) all liabilities under any agreement between the Company or any Company Subsidiary, on one hand, and Parent or any of its Affiliates, on the other hand, (H) all liabilities under any interest rate, currency, material or other hedging arrangements or arrangements of the Company or any Company Subsidiary in the ordinary course of business, (I) liabilities related to Company Expenses or (J) any obligations under operating leases classified as determined in accordance with the Balance Sheet Rules.

"Intellectual Property" means all patents and patent applications; trademarks and service marks, trade names, trade dress and other similar designations of origin including registrations and applications thereof, together with the goodwill associated with any of the foregoing ("Marks"); URLs and Internet domain names; copyrights, including registrations and applications for registration thereof; computer software programs; industrial designs; inventions, proprietary know-how; confidential business information; trade secrets and other intellectual property.

"Intercompany Receivables" means those receivables of the Company set forth on Schedule 1.1(c) of the Disclosure Schedule.

"Interim Balance Sheet" shall have the meaning as set forth in the definition of Financial Statements.

"IRS" means the United States Internal Revenue Service.

"Knowledge Individuals" means the individuals listed on Section 1.1(a)(i) of the Disclosure Schedule (and, for purposes of Section 4.25, also the individuals listed on Section 1.1(a)(ii) of the Disclosure Schedule.

7

CONFIDENTIAL

FBG_CH1_00094724

"knowledge of the Company" or any similar phrase means the actual knowledge of the Knowledge Individuals assuming the reasonable discharge of their duties in the ordinary course.

"Law(s)" means any law, statute, regulation, code, ordinance, policy, rule or other requirement of any Governmental Authority.

"Major Relationships" has the meaning set forth in Section 4.25.

"Material Adverse Effect" means any change, event, circumstance, effect, development, condition or occurrence (each, an "Effect") which, individually or together with any other Effects, (x) has had a material adverse effect on the business, results of operations or assets of the Company and the Company Subsidiaries, taken as a whole or (y) with respect to use in Article IV, would, or would reasonably be excepted to, prevent or materially impair the Company from consummating the transactions contemplated by this Agreement; provided, however, that no Effect resulting from or arising out of any of the following, either alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a "Material Adverse Effect": (i) Effects that generally affect the industries or segments in which the Company or the Company Subsidiaries operate (including legal and regulatory changes), (ii) general economic, social or political conditions (or changes therein), (iii) Effects affecting financial, credit or capital markets in the United States or in any other country or region in the world, including changes in interest rates or foreign exchange rates; (iv) Effects caused by or resulting from an occurrence, outbreak or escalation or worsening of hostilities, acts of terrorism, military action, war, cyberattacks, political instability or other national or international calamity, crisis or emergency, an act of God, flood, hurricane, earthquake or other natural disaster or force majeure event or any governmental or other response to any of the foregoing, in each case whether or not involving the United States, (v) Effects arising from changes in GAAP or Laws or the interpretation or enforcement thereof, (vi) Effects relating to the announcement of the execution of this Agreement or the transactions contemplated hereby or as a result of the identity of Parent or its Affiliates, including a loss or threatened loss or suspension of, or reduction of relationships with, any customers, suppliers, vendors, distributors, landlord, licensors, employees or other business relations (except if Section 5.7 is true and correct then this clause (vi) shall not apply to Effects relating to a Major Relationship providing written notice that it intends to terminate, or is terminating, its commercial relationship with the Company as a result of the identity of Parent), (vii) Effects resulting from actions that are contemplated by this Agreement and taken by the Company or the Company Subsidiaries or any actions taken by the Company or the Company Subsidiaries consented to in writing or requested in writing by Parent, (viii) Effects relating to adverse changes in commodities or raw materials prices (including gas, oil and their derivatives), (ix) the failure of the Company to meet any internal or industry business plans, estimates, expectations, forecasts, projections or budgets for any period (but not the Effects underlying such failure to the extent such Effects would otherwise constitute a Material Adverse Effect under this definition, to the extent such Effect is not otherwise excluded under this definition of Material Adverse Effect), (x) conditions or effects relating to any work stoppage, labor strike, slowdown or other material labor dispute, disruption or

8

FBG_CH1_00094725

shortage involving employees or independent contractors of the Company or the Company Subsidiaries or any of their respective suppliers or customers, (xi) any breach of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby by Parent or its Affiliates or (xii) conditions or effects relating to any epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or COVID-19 Measures or any change in COVID-19 Measures or Protest Events (including any Protest Measures); except that "Material Adverse Effect" shall include any Effects arising out of or attributable to the matters described in clauses (i) through (v) above to the extent the Company and the Company Subsidiaries, taken as a whole, are materially disproportionately affected relative to other participants in the industries in which the Company or the Company Subsidiaries operate taken as a whole.

"OFAC" means any Sanctions administered by the United States Treasury Department's Office of Foreign Assets Control.

"Parent Fundamental Representations" means the representations and warranties of Parent contained in Section 5.1 (Organization), Section 5.2 (Binding Obligation) and Section 5.5 (Brokers).

"Party" or "Parties" means the Company, the Equityholder Representative and Parent.

"Payoff Letter" has the meaning set forth in Section 7.7(i).

"Per Share Price" means an amount equal to the quotient determined by dividing (a) the sum of (i) the Closing Merger Consideration plus (ii) the aggregate Exercise Price that would be payable by all holders of Vested Options by (b) the Fully Diluted Company Stock.

"Performance-Based Options" means Company Options that are not Time-Based Options.

"Permitted Encumbrances" means (i) Encumbrances securing the obligations of the Company and Company Subsidiaries under the Credit Agreement (which Encumbrances shall be terminated and released on the Closing Date); (ii) Encumbrances disclosed in the Financial Statements or any schedules to this Agreement; (iii) Encumbrances for Taxes, assessments and other government charges not yet due and payable or which are being contested in good faith by appropriate proceedings; (iv) mechanics', workmen's, repairmen's, warehousemen's, carriers' or other like Encumbrances arising in the ordinary course of business of the Company and the Company Subsidiaries which are not yet due and payable or which are being contested in good faith by appropriate proceedings; (v) Encumbrances relating to the transferability of securities under applicable securities Laws; (vi) Encumbrances securing rental payments under capitalized leases provided that such lien is limited to the property that is the subject of such capital lease; (vii) Encumbrances in favor of the lessors under the Leases, or encumbering the fee or any superior leasehold interest in the Real Property; (viii) Encumbrances that arise under building codes or zoning, land use and other similar Laws

9

CONFIDENTIAL

FBG_CH1_00094726

which are not violated in any material respect by the present use of the applicable real property, (ix) imperfections or defects of title, easements, covenants, rights-of-way and other Encumbrances, whether recorded or referred to in an applicable lease or unrecorded, that were not incurred in connection with Indebtedness and which do not, individually or in the aggregate materially detract from the current use of the applicable Real Property, (x) licenses of Intellectual Property rights; (xi) in the case of the Real Property, leases or subleases to third parties, to the extent listed in Section 4.19 of the Disclosure Schedules, (xii) any right, title or interest of a lessor, sublessor or licensor under any of the Leases entered into in the ordinary course of business (xiii) reserved, and (xiv) the Encumbrances set forth in Section 1.1(b) of the Disclosure Schedules.

"Person" means any individual, corporation (including any not for profit corporation), general or limited partnership, limited liability partnership, joint venture, estate, trust, firm, company (including any limited liability company or joint stock company), association, organization, entity or Governmental Authority.

"Personal Data" means information that identifies, relates to, describes, or can  reasonably be linked to a particular individual.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date.

"Principal Seller Marks" means the corporate names of Principal Seller or any of its Affiliates (other than the Company) and any Marks, whether or not registered, in any jurisdiction, of or used by the Principal Seller or any of its Affiliates (other than the Company).

"Pro Rata Percentage" means, with respect to each Equityholder as of any date of determination, a fraction, expressed as a percentage, (a) the numerator of which is the portion of the Closing Merger Consideration payable to each such Equityholder at Closing (provided, that for the holders of the Options, the numerator shall include the amount equal to the product of Exercise Price multiplied by the number of shares of Company Stock underlying such Vested Options held by such person), and (b) the denominator of which is the Closing Merger Consideration.

"Pylon" means Pylon Manufacturing Corp., an indirect, wholly-owned subsidiary of the Company.

"Reference Time" means 11:59 p.m. Eastern Time, on the date immediately prior to the Closing Date.

"Representatives" means, with respect to any Person, any director, officer, manager, agent, employee, general partner, limited partner, member, stockholder, advisor (including legal counsel and accountants) or representative of such Person.

"Sanctions" means United States sanctions or sanctions in any other jurisdiction in which the Company and the Company Subsidiaries have material business operations or arrangements.

10

CONFIDENTIAL

"SDN List" means OFAC's Specifically Designated Nationals and Blocked Persons List.

"Solvent" means, with respect to any Person, that as of the date of determination, both (a) (i) the sum of such Person's debts (including contingent liabilities) does not exceed the present fair saleable value of such Person's present assets, (ii) such Person's capital is not unreasonably small in relation to its business as contemplated on the Closing Date or with respect to any transaction contemplated to be undertaken after the Closing Date, and (iii) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it shall incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (b) such Person is "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and Laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified AT Letter" means a pre-consummation letter from the Federal Trade Commission or United States Department of Justice in similar form to that set forth in its blog post dated August 3, 2021 and posted at this link: https://www.ftc.gov/system/files/attachments/blog_posts/Adjusting%20merger%20revie w%20to%20deal%20with%20the%20surge%20in%20merger%20filings/sample_pre-consummation_warning_letter.pdf.

"Stockholders" means the holders of Company Stock, in their capacity as such.

"Stockholders Agreement" means that certain Stockholders Agreement (as amended), dated as of October 31, 2014, by and among Wellspring Capital Partners V, L.P., Wellspring Capital Partners V (Parallel), L.P., the Company and the Stockholders named therein or joined thereto.

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to a specified Person, any corporation, partnership, limited liability company, limited liability partnership, joint venture or other legal entity of which the specified Person (either alone and/or through and/or together with any other Subsidiary) owns, directly or indirectly, more than 50% of the voting stock or other equity or partnership interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body, of such legal entity or of which the specified Person controls the management.

11

CONFIDENTIAL

FBG_CH1_00094728

"Tax" or "Taxes" means all federal, state, county, local, municipal, foreign and other taxes, assessments, duties or similar charges, including all interest, penalties and additions imposed with respect to such amounts, imposed by any Governmental Authority.

"Tax Returns" means any report, declaration, return, information return, claim for refund, election, disclosure, estimate or statement required to be supplied to a Governmental Authority in connection with Taxes, including any schedule or attachment thereto.

"Time-Based Options" means Company Options that vest solely based on the passage of time and service.

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"Unaudited Financial Statements" has the meaning set forth in the definition of Financial Statements.

"Willful Breach" means a material breach that is a consequence of an act or omission knowingly undertaken or omitted by the breaching Party with the intent of causing a breach of this Agreement.

"Working Capital" means, at any time, all Current Assets as of such time minus all Current Liabilities as of such time.

"Working Capital Overage" shall exist when (and shall be equal to the amount by which) the Closing Working Capital exceeds the Working Capital Target.

"Working Capital Target" means negative $46,964,000.  For the avoidance of doubt, the Working Capital Target is a negative number.

"Working Capital Underage" shall exist when (and shall be equal to the amount by which) the Working Capital Target exceeds the Closing Working Capital.

1.2 Other Capitalized Terms.  The following terms shall have the meanings specified in the indicated section of this Agreement:

| Term | Section |
| --- | --- |
| Accounting Firm | 2.10(c) |
| Agreement | Preamble |
| Avalon L/C | 6.6(b) |
| Book-Entry Shares | 2.6(a)(i) |
| Certificate of Merger | 2.2 |
| Closing | 3.1 |
| Closing Date | 3.1 |

12

CONFIDENTIAL

FBG_CH1_00094729

| Term | Section |
|------|---------|
| Closing Statement | 2.10(a) |
| Company | Preamble |
| Company Bylaws | Recitals |
| Company Certificate of Incorporation | Recitals |
| Company Plans | 4.15(a) |
| Company Subsidiaries | 4.3(a) |
| Company Subsidiary | 4.3(a) |
| Confidentiality Agreement | 6.2(b) |
| Continuing Employees | 6.5(a) |
| D&O Indemnified Parties | 6.7(a) |
| Data Room | 1.3(s) |
| Designated Counsel | 6.10(a) |
| DGCL | 2.1 |
| DLLCA | 2.1 |
| Disclosure Schedules | 4 |
| Dissenting Shares | 2.7 |
| Dykema | 6.10(a) |
| Effective Time | 2.2 |
| Equitable Exceptions | 4.4(a) |
| Equityholder Adjustment Amount | 2.10(e)(i)(A) |
| Equityholder Released Parties | 10.12 |
| Equityholder Representative | Preamble |
| Equityholder Representative Parties | 10.20(f) |
| Escrow Account | 2.9(c) |
| Escrow Amount | 2.9(c) |
| Evaluation Material | 6.2(b) |
| Excluded Arrangements | 4.20 |
| Excluded Shares | 2.5(b) |
| Final Merger Consideration | 2.4(a)(iv)(E) |
| IBI | 6.6(b) |
| Insurance Policies | 4.18 |
| Leased Real Property | 4.19 |
| Leases | 4.19 |
| Letter of Transmittal | 2.6(a)(i) |
| Material Contracts | 4.11(n) |
| Merger | Recitals |
| Merger Sub | Preamble |
| Multiemployer Plan | 4.15(c) |
| Notice of Disagreement | 2.10(c) |
| Owned Real Property | 4.19 |
| Parent | Preamble |
| Parent Adjustment Amount | 2.10(e)(ii)(A) |
| Paul, Weiss | 6.10(a) |
| Permits | 4.14 |
| Pre-Closing Tax Refund | 6.14(a) |

13

CONFIDENTIAL

FBG_CH1_00094730

**DEBTORS' EXHIBIT NO. 243**
**Page 18 of 129**

| Term | Section |
|------|---------|
| Principal Seller | Preamble |
| Protest Event | 6.1 |
| Protest Measures | 6.1 |
| R&W Insurance Fees | 6.13 |
| R&W Insurance Policy | 6.13 |
| Real Property | 4.19 |
| Related Parties | 10.18 |
| Released Matters | 10.12 |
| Releasing Parties | 10.12(d) |
| Restated Charter | 2.3(b) |
| Sanctions | 4.10(b) |
| SDN List | 4.10(b) |
| Securities Act | 5.10 |
| Statement | 2.10(b) |
| Surviving Bylaws | 2.3(c) |
| Surviving Corporation | 2.1 |
| Termination Date | 9.1(e) |
| Vested Options | 2.8(a) |
| Wellspring Parties | 6.10(a) |
| Written Consent | Recitals |

1.3     Interpretive Provisions.  Unless the express context otherwise requires:

(a)     the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)     terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c)     the terms "Dollars" and "$" mean United States Dollars;

(d)     references herein to a specific Section, Subsection, Recital, Disclosure Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Disclosure Schedules or Exhibits of this Agreement;

(e)     wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(f)     references herein to any gender shall include each other gender;

(g)     references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns;

14

FBG_CH1_00094731

**DEBTORS' EXHIBIT NO. 243**
**Page 19 of 129**

provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(h)      references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity;

(i)      references herein to any Contract (including this Agreement) (i) mean such Contract as amended, supplemented or modified from time to time in accordance with the terms thereof, and to the extent applicable, hereof, (ii) includes and incorporates all exhibits, schedules and other attachments thereto and (iii) includes all documents, instruments and agreements issued or executed in replacement thereof;

(j)      with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(k)      any reference to "day" or "days" means calendar day(s) unless Business Days are expressly specified;

(l)      references herein to any Law or any license mean such Law or license as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time prior to the Closing Date;

(m)      references herein to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder;

(n)      if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day;

(o)      the word "or" is disjunctive but not exclusive;

(p)      reference to "written" or "in writing" include in electronic form;

(q)      any reference to "year" or "years" means calendar year(s), unless otherwise specified;

(r)      the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if";

(s)      references to documents or materials "provided" or "made available" to Parent or similar phrases shall mean such documents or other materials were (i) present (and available for viewing by Parent and its Representatives) in the virtual data room for "Project Viper" hosted by Data Site (the "Data Room") or (ii) provided to

15

CONFIDENTIAL

Parent or its Representatives via email, in each case for purposes of the transactions contemplated by this Agreement at least one day prior to the date of this Agreement;

(t)      time is of the essence in the performance of the Parties' respective obligations contained herein; and

(u)      except where the context  requires otherwise, references to "ordinary course" shall refer to the ordinary course of business of the Company Group, consistent with past practice, subject to applicable Law and taking into account commercially reasonable actions taken in response to any political conditions, social or public health conditions or calamities or other force majeure events that are generally consistent with those taken by other participants in the industry or businesses in the geographies in which the Company Group conduct their business.

The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE 2

## THE MERGER

2.1      Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the General Corporation Law of the State of Delaware (the "DGCL") and the Delaware Limited Liability Company Act (the "DLLCA"), at the Effective Time, (a) Merger Sub shall be merged with and into the Company, (b) the separate corporate existence of Merger Sub shall cease and the Company shall continue its corporate existence under Delaware law as the surviving corporation in the Merger (the "Surviving Corporation") and (c) the Surviving Corporation shall become a wholly owned subsidiary of Parent.

2.2      Effective Time.  At the Closing, Parent and the Company shall cause a certificate of merger substantially in the form of Exhibit D hereto (the "Certificate of Merger") to be executed, signed, acknowledged and filed with the Secretary of State of the State of Delaware as provided in Section 251 of the DGCL and Section 264 of the DLLCA and make all other filings or recordings required by Delaware law in order to effect the Merger.  The Merger shall become effective when the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such other subsequent date or time as Parent and the Company may agree and specify in the Certificate of Merger in accordance with the DGCL and the DLLCA (the "Effective Time").

2.3      Effects of the Merger.

16

CONFIDENTIAL

FBG_CH1_00094733

(a)     General Effects.  At the Effective Time, subject to Section 7.10, the Merger shall have the effects set forth in this Agreement and the applicable provisions of the DGCL, including Section 259, and the DLLCA, including Section 264.

(b)     Certificate of Incorporation.  At the Effective Time, the certificate of incorporation of the Company in effect immediately prior to the Effective Time shall be the Company's certificate of incorporation as in effect on the date hereof, and as so amended and restated shall be, from and after the Effective Time, the certificate of incorporation of the Surviving Corporation (the "Restated Charter") until, subject to Section 6.7 (Officer and Director Indemnification and Insurance), duly amended or repealed in accordance with the provisions thereof and of applicable Law.

(c)     Bylaws.  The bylaws of the Company in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation (the "Surviving Bylaws") from and after the Effective Time until, subject to Section 6.7 (Officer and Director Indemnification and Insurance), duly amended or repealed in accordance with the provisions thereof and of the Restated Charter and applicable Law.

(d)     Directors.  The Parties shall take all necessary action so that the directors of Merger Sub immediately prior to the Effective Time shall be, from and after the Effective Time, the only directors of the Surviving Corporation until their successors are duly elected and qualified or until their earlier death, resignation or removal in accordance with the Restated Charter, the Surviving Bylaws and the DGCL.

(e)     Officers.  The officers of the Company immediately prior to the Effective Time shall be, from and after the Effective Time, the officers of the Surviving Corporation until their successors are duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the Restated Charter, the Surviving Bylaws and the DGCL.

2.4     Merger Consideration.

(a)     The "Closing Merger Consideration" shall be calculated using the amounts set forth in Section 2.10(a) and shall be equal to:

(i)     $200,000,000,

(ii)    plus the Working Capital Overage, if any,

(iii)   plus Closing Cash,

(iv)    minus the sum of:

(A)     the amount of Closing Indebtedness;

(B)     the amount of Company Expenses;

(C)     the Working Capital Underage, if any;

17

FBG_CH1_00094734

(D)     the Escrow Amount; and

(E)     the Equityholder Representative Reserve Amount.

The Closing Merger Consideration shall be subject to adjustment following the Closing pursuant to Section 2.10 hereof (the Closing Merger Consideration as adjusted in accordance with Section 2.10, the "Final Merger Consideration").

2.5     Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of Parent, Merger Sub, the Company or the holders of any equity securities of Merger Sub or the Company:

(a)     Conversion of Merger Sub Equity Interests.  All of the limited liability company interests of Merger Sub outstanding as of immediately prior to the Effective Time, shall be converted into and become one fully paid and non-assessable share of common stock, par value $0.01 per share, of the Surviving Corporation.

(b)     Cancellation of Treasury Stock and Parent-Owned Stock. Each share of Company Stock owned by Parent, Merger Sub or the Company or any other direct or indirect wholly owned Subsidiary thereof, in each case as of immediately prior to the Effective Time (collectively, the "Excluded Shares"), shall be cancelled and cease to exist, and no cash or other consideration shall be delivered or deliverable in exchange therefor.

(c)     Conversion of Company Stock.  Except for the Excluded Shares and any Dissenting Shares, each share of Company Stock that is issued and outstanding immediately prior to the Effective Time shall be converted into a right to receive (i) at the Closing, an amount in cash (without interest) equal to the Per Share Price, (ii) following the Closing, in each case of the following clauses (x) and (y), if and to the extent applicable, such share of Company Stock's portion of (x) proceeds from the Escrow Account as provided in the Escrow Agreement and the applicable provisions of this Agreement and (y) the amount that the Final Merger Consideration exceeds the Closing Merger Consideration, and (iii) following the Closing, if and to the extent applicable, such share of Company Stock's portion of the balance of the Equityholder Representative Reserve Amount pursuant to Section 10.20 (Equityholder Representative).

(d)     Equitable Adjustment.  If at any time during the period between the date of this Agreement and the Effective Time, any change in the number of shares of Company Stock shall occur as a result of any stock split (including a reverse stock split) or combination, or any stock dividend or stock distribution (including any dividend or distribution of securities convertible into or exchangeable for shares of Company Stock) is declared with a record date during such period, then the allocation of the Closing Merger Consideration and the Pro Rata Percentages and amounts payable pursuant to Section 2.10 (Closing Merger Consideration Adjustment) shall be equitably adjusted by the Equityholder Representative to reflect such change.

18

**DEBTORS' EXHIBIT NO. 243**
**Page 23 of 129**

2.6    Book-Entry Shares.

(a)    Payment Procedures.

(i)    Letter of Transmittal.  Promptly following entry into this Agreement, the Company shall mail (electronically or otherwise) to each holder of record (as of immediately prior to the Effective Time) of shares of Company Stock converted pursuant to Sections 2.5(c) (Conversion of Company Stock), (A) a letter of transmittal in the form attached hereto as Exhibit E (a "Letter of Transmittal") and (B) instructions for surrendering any such uncertificated shares of Company Stock ("Book-Entry Shares") in exchange for the portion of the Closing Merger Consideration payable in respect of the number of shares formerly evidenced by such Book-Entry Shares.

(ii)    Surrender of Company Stock.  Upon surrender of a Book-Entry Share for cancellation to the Company, together with a duly executed Letter of Transmittal, the holder of such Book-Entry Share shall be entitled to receive the amount set forth in Section 2.5(c)(i) (Conversion of Company Stock) in respect of each shares so held, which Parent shall pay to such holder at the Closing; provided, that a Stockholder may submit its Letter of Transmittal to the Surviving Corporation following the Effective Time and Parent shall make (or cause to be made) the payment described in Section 2.5(c)(i) (Conversion of Company Stock) as promptly as practicable thereafter (and in no event later than three (3) Business Days after receipt thereof).  Any Book-Entry Shares so surrendered shall be cancelled at the Closing.  No interest shall accrue or be paid on any amount payable upon surrender of Book-Entry Shares.

(b)    No Further Transfers.  At the Effective Time, the stock transfer books of the Company shall be closed and there shall be no further registration of transfers of shares of Company Stock that were outstanding immediately prior to the Effective Time.

2.7    Appraisal Rights; Requisite Stockholder Approval.  Notwithstanding anything in this Agreement to the contrary, each share of Company Stock that is issued and outstanding immediately prior to the Effective Time and that is owned by a Stockholder who is entitled to and has properly exercised and perfected appraisal rights under Section 262 of the DGCL (the "Dissenting Shares") shall not be converted into or exchangeable for the right to receive the applicable consideration set forth in Sections 2.5 (Effect on Capital Stock), 2.9 (Transactions to be Effected at the Closing) and 2.10 (Pre-Closing Statement; Closing Merger Consideration Adjustment), but shall instead entitle the holder thereof only to such rights as are provided to a holder of Dissenting Shares pursuant to Section 262 of the DGCL; provided, however, that if such Stockholder fails to perfect or effectively withdraws or loses the right to appraisal under the DGCL, each share of Company Stock held by such Stockholder immediately prior to the Effective Time shall thereupon be deemed to have been converted into and to have become exchangeable for, as of the Effective Time, the right to receive the applicable consideration set forth in Sections 2.5 (Effect on Capital Stock), 2.9 (Transactions to be Effected at the Closing) and 2.10 (Pre-Closing Statement; Closing

CONFIDENTIAL

FBG_CH1_00094736

Merger Consideration Adjustment) (without interest), and such share of Company Stock shall no longer be a Dissenting Share.  The Surviving Corporation shall provide to those Stockholders who did not execute the Written Consent the notice required by Section 228(e) of the DGCL and all information with respect to appraisal rights required by Section 262(d)(2) of the DGCL.

2.8     Conversion of Company Options.

(a)     As of the Effective Time, each Company Option shall, except as otherwise contemplated by Section 2.8(b), to the extent vested (in accordance with the terms of the Company Option Plan and the applicable option award agreement, including any vesting as a result of satisfying performance conditions in connection with the transactions contemplated by this Agreement) (the vested portion of each such Company Option, the "Vested Option" and collectively, the "Vested Options") and without any action on the part of the Company, Parent, the Surviving Corporation, the holder thereof or any other Person, be cancelled and converted into the right to receive, (i) at the Closing, the product of (x) the excess, if any, of the Per Share Price over the Exercise Price, multiplied by (y) the number of shares of Company Stock underlying such Vested Option, (ii) following the Closing, in each case of the following clauses (A) and (B), if and to the extent applicable, such portion to which such holder becomes entitled in respect of such Vested Option of (A) the proceeds from the Escrow Account as provided in the Escrow Agreement and the applicable provisions of this Agreement and (B) the amount that the Final Merger Consideration exceeds the Closing Merger Consideration, and (iii) following the Closing, if and to the extent applicable, such Vested Option's portion of the balance of the Equityholder Representative Reserve Amount pursuant to Section 10.20 (Equityholder Representative).

(b)     As of the Effective Time, each Performance-Based Option that is not a Vested Option (due to not becoming vested in connection with the transactions contemplated hereby or otherwise) and each Company Option (whether vested or unvested) for which the Exercise Price exceeds the Per Share Price shall, without any action on the part of the Company, Parent, the Surviving Corporation, the holder thereof or any other Person, be forfeited and cancelled without any consideration being paid in respect thereof.

(c)     As promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter), Parent shall cause the Surviving Corporation to pay through its payroll system to each applicable holder of a Vested Option, the amount due and payable to such holder pursuant to Section 2.8(a) (Conversion of Company Options) in respect of such Vested Option, less applicable Taxes and withholding.

(d)     As promptly as practicable following the receipt by the Surviving Corporation of any funds pursuant to Sections 2.10(e) (Closing Merger Consideration Adjustment) and 10.20 (Equityholder Representative) (and in no event later than three (3) Business Days thereafter), Parent shall cause the Surviving Corporation to pay through its payroll system to each applicable holder of a Vested

20

FBG_CH1_00094737

Option, the amount due and payable to such holder pursuant to <u>Section 2.8(a)</u> (Conversion of Company Options) in respect of such Vested Option, less applicable Taxes and withholding.

(e)     Notwithstanding the foregoing, if any such payment owed to a holder of Vested Options pursuant to <u>Section 2.8(a)</u>, cannot be made through the Surviving Corporation or any of its Subsidiaries' payroll systems or payroll providers, then the Surviving Corporation shall issue, or shall cause any of its Subsidiaries to issue, a check for such payment to such holder, which check shall be sent by overnight courier to such holder as promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter).

2.9     <u>Transactions to be Effected</u>.  At the Closing, the following transactions shall be effected by the Parties:

(a)     Subject to <u>Section 2.6(a)(ii)</u> (Surrender of Company Stock), Parent shall pay, or shall cause Merger Sub or the Surviving Corporation to pay, to each Stockholder by wire transfer of immediately available funds according to the wire instructions set forth in such holder's duly executed and delivered Letter of Transmittal, an amount equal to the aggregate amounts payable pursuant to <u>Section 2.5(c)</u> (Conversion of Company Stock).

(b)     Parent shall deliver on behalf of the Company (or applicable Company Subsidiary), to each Person or Persons to whom any portion of the Credit Agreement Payoff Amount by wire transfer of immediately available funds to such bank account designated in each of the Payoff Letter.

(c)     Parent shall deliver to the Escrow Agent, for deposit in an escrow account (the "<u>Escrow Account</u>") $1,500,000 (together with any interest accrued thereon, the "<u>Escrow Amount</u>"), to be held by the Escrow Agent in the Escrow Account and distributed by the Escrow Agent in accordance with the terms of the Escrow Agreement and the applicable provisions of this Agreement.

(d)     Parent shall deliver to the Company (or such other Person designated by the Company) by wire transfer of immediately available funds to such bank account designated in writing by the Company (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount sufficient to pay the Company Expenses and the Company shall promptly pay any unpaid Company Expenses from such amounts.

(e)     Parent shall deliver to the Equityholder Representative by wire transfer of immediately available funds to such bank account designated in writing by the Equityholder Representative (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount equal to the Equityholder Representative Reserve Amount.

(f)     Parent shall deliver the Escrow Agreement duly executed by Parent and the Escrow Agent.  The Company shall deliver, or cause to be delivered to

21

FBG_CH1_00094738

Parent, the Escrow Agreement, duly executed by the Equityholder Representative and the Escrow Agent.

(g)     The Company shall deliver, or cause to be delivered to Parent, an executed payoff letter in customary form in respect of the Credit Agreement Payoff Amount, which payoff letter (the "Payoff Letter") shall specify the aggregate amounts required to be paid to satisfy all obligations thereunder, as applicable, and shall provide for the release (subject to the payment thereof at the Effective Time) of all liens and other security over the properties and assets of the Acquired Companies securing all such obligations (other than in respect of any existing letters of credit that will either rolled into or back-stopped by letter(s) of credit issued at the request of Parent or cash collateralized by Parent) and, as promptly as possible following the Effective Time if not delivered prior to such time, the applicable termination instruments or release filings of all such liens securing such Indebtedness, in form and substance reasonably satisfactory to Parent and the Company.

(h)     The Company shall deliver, or cause to be delivered to Parent, resignations in customary form reasonably acceptable to Parent and the Company from each of the officers and directors of each the Company designated in writing by Parent at least ten (10) Business Days prior to the Closing Date.

For the avoidance of doubt, in no event shall the aggregate amounts paid under Sections 2.9(a) through 2.9(e) exceed the Closing Merger Consideration (without taking into account any adjustments to Closing Merger Consideration following Closing).

2.10    Pre-Closing Statement; Closing Merger Consideration Adjustment.

(a)     At least one (1) Business Day prior to the Closing Date, the Company shall deliver (or has delivered) to Parent a statement (the "Closing Statement") setting forth (x) the Company's good faith estimate of (i) Closing Working Capital and the resulting Working Capital Overage or Working Capital Underage, (ii) Closing Cash, (iii) the amount of Closing Indebtedness, (iv) the Company Expenses and (v) the Closing Merger Consideration calculated in accordance with Section 2.4(a), in each case of the foregoing clauses (i), (ii) and (iii), prepared in accordance with the Balance Sheet Rules and (y) the resulting amount of the Closing Merger Consideration to be paid to each Equityholder (which shall, for the avoidance of doubt, in the aggregate, equal the Closing Merger Consideration).

(b)     Within sixty (60) days after the Closing Date, Parent shall deliver to the Equityholder Representative a statement (the "Statement"), setting forth Parent's good faith determination of (i) Closing Working Capital and the resulting Working Capital Overage or Working Capital Underage, (ii) Closing Cash, (iii) the amount of Closing Indebtedness, (iv) the Company Expenses and (v) the Closing Merger Consideration calculated in accordance with Section 2.4(a), using the amounts of Working Capital Overage or Working Capital Underage, Closing Cash, Closing Indebtedness, the Company Expenses as set forth in the Statement, as applicable, instead of the estimated amounts for each such item set forth in the Closing Statement used in

22

FBG_CH1_00094739

calculating the Closing Merger Consideration, in each case of the foregoing clauses (i), (ii) and (iii), prepared in accordance with the Balance Sheet Rules, and including reasonably supporting detail of all of the foregoing. Parent shall not amend, supplement or modify the Statement following its delivery to the Equityholder Representative. Parent and the Equityholder Representative acknowledge that no adjustments shall be made to the Working Capital Target. Once Parent has delivered the Statement, the Statement shall be deemed irrevocable by Parent for purposes of the calculation of the Final Merger Consideration, and Parent shall be foreclosed and barred in all respects from amending, supplementing or modifying the Statement and related calculations following delivery to the Equityholder Representative; provided, that the Statement may be revised in accordance with Section 2.10(c).

(c)     The Statement shall become final and binding upon the Parties on the sixtieth (60th) day following the date on which the Statement was delivered to the Equityholder Representative, unless the Equityholder Representative delivers a written notice of its disagreement with the Statement (a "Notice of Disagreement") to Parent prior to such date. The sole permissible grounds for objection shall be that Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and/or Final Merger Consideration was not calculated in accordance with this Agreement. The Notice of Disagreement shall specify in reasonable detail any contested amounts and the basis therefor and,to the extent known, shall set forth the Equityholder Representative's determination of Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and Final Merger Consideration, as applicable. The failure of the Equityholder Representative to deliver such Notice of Disagreement within the time period prescribed above will constitute the Equityholder Representative's acceptance as final of Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and Final Merger Consideration as set forth on the Statement. If a Notice of Disagreement is received by Parent in a timely manner, then the Statement (as revised in accordance with this sentence) shall become final and binding upon the Equityholder Representative and Parent on the earlier of (A) the date the Equityholder Representative and Parent resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement and (B) the date any disputed matters are finally resolved in writing by the Accounting Firm. During the fourteen (14)-day period following the delivery of a Notice of Disagreement, the Equityholder Representative and Parent shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement. If at the end of such fourteen (14)-day period the Equityholder Representative and Parent have not resolved in writing the matters specified in the Notice of Disagreement, the Equityholder Representative and Parent shall submit to an independent accounting firm (the "Accounting Firm") for arbitration, in accordance with the standards set forth in this Section 2.10, only matters that remain in dispute. The Accounting Firm shall be FTI Consulting, Inc. or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by the Equityholder Representative and Parent in writing. The Equityholder Representative and Parent shall use reasonable efforts to cause the Accounting Firm to render a written decision resolving the matters submitted to the Accounting Firm within thirty (30) days

23

FBG_CH1_00094740

of the receipt of such submission.  The scope of the disputes to be resolved by the Accounting Firm shall be limited to correcting mathematical errors and determining whether the items in dispute were determined in accordance with the Balance Sheet Rules, and the Accounting Firm is not to make any other determination, including any determination as to whether the Working Capital Target, Closing Working Capital, Closing Cash or the Closing Indebtedness are correct.  The Accounting Firm's decision shall be based solely on written submissions by the Equityholder Representative and Parent and their respective Representatives and not by independent review and shall be final and binding on all of the Parties.  The Accounting Firm may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value for such item claimed by either Party.  Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced.  The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.10 shall be borne pro rata as between the Equityholders, on the one hand, and Parent, on the other hand, in proportion to the final allocation made by such Accounting Firm of the disputed items weighted in relation to the claims made by the Equityholder Representative and Parent, such that the prevailing Party pays the lesser proportion of such fees, costs and expenses.

(d)    The Final Merger Consideration shall be calculated in accordance with Section 2.4(a), using the amounts of Working Capital Overage or Working Capital Underage (as applicable), Closing Cash, Closing Indebtedness and the Company Expenses, in each case as finally agreed or determined in accordance with Section 2.10(c).

(e)    No later than five (5) Business Days after the Final Merger Consideration is determined:

(i)    If the Final Merger Consideration as determined pursuant to the foregoing clause (c) exceeds the Closing Merger Consideration:

(A)    the purchase price shall be increased (any such increase, the "Equityholder Adjustment Amount") by such amount of excess;

(B)    Parent shall pay the Equityholder Adjustment Amount to each of the Stockholders (in accordance with the payment instructions set forth in each Stockholder's Letter of Transmittal) and the Company (for the benefit of the holders of Company Options in accordance with Section 2.8(c) (Conversion of Options)), in each case, based on the applicable Pro Rata Percentages; and

(C)    Parent and the Equityholder Representative shall provide a joint written instruction to the Escrow Agent to release the Escrow Amount to each of the Stockholders (in accordance with the payment instructions set forth in each Stockholder's Letter of Transmittal) and the Company (for the benefit of the holders of Company Options in

24

CONFIDENTIAL

FBG_CH1_00094741

accordance with Section 2.8(c) (Conversion of Options)), in each case, based on the applicable Pro Rata Percentages.

(ii)     If the Closing Merger Consideration exceeds the Final Merger Consideration as determined pursuant to the foregoing clause (c):

(A)     the merger consideration shall be decreased (any such decrease, the "Parent Adjustment Amount") by such amount of excess; and

(B)     Parent and the Equityholder Representative shall provide joint written instructions to the Escrow Agent to release Parent Adjustment Amount to Parent solely and exclusively from the Escrow Account (up to a maximum amount equal to the then-remaining Escrow Amount, plus any interest accrued thereon in the Escrow Account) and to release any portion of the Escrow Amount remaining following such payment to Parent to the Stockholders (in accordance with the payment instructions set forth in each Stockholder's Letter of Transmittal) and the Company (for the benefit of the holders of Company Options in accordance with Section 2.8(c) (Conversion of Options)), in each case, based on the applicable Pro Rata Percentages.

Upon payment of the amounts provided in this Section 2.10(e), none of the Parties may make or assert any claim under this Section 2.10.

(f)     Following the Closing, and until the Statement has been finalized in accordance with this Section 2.10, any actions taken by Parent with respect to the accounting books and records of the Company and the Company Subsidiaries (or the items reflected thereon) solely with respect to items on which the Statement is to be based that are inconsistent with the past practices of the Company and the Company Subsidiaries shall be disregarded for purposes of determining such Statement and calculating the Final Merger Consideration.  No actions taken by Parent on its own behalf or on behalf of the Company or the Company Subsidiaries, on or following the Closing Date shall be given effect for purposes of determining the Closing Working Capital, Closing Cash, Closing Indebtedness or Company Expenses.  During the period of time from and after the Closing Date through the final determination and payment of Closing Working Capital, Closing Cash, Closing Indebtedness and Company Expenses in accordance with this Section 2.10, Parent shall afford, and shall cause the Company and the Company Subsidiaries to afford, to the Equityholder Representative and any accountants, counsel or financial advisers retained by the Equityholder Representative in connection with the review of the Statement in accordance with this Section 2.10, direct access during normal business hours upon reasonable advance notice to all the properties, books, Contracts, personnel, Representatives (including the Company's accountants) and records of the Company, the Company Subsidiaries and such Representatives (including the work papers of the Company's accountants) relevant to the review of the Statement and Parent's determination of Closing Working Capital, Closing Cash, Closing Indebtedness and Company Expenses in accordance with this Section 2.10; provided, that

25

FBG_CH1_00094742

such access may be limited to the extent the Company determines in good faith, in light of COVID-19 or COVID-19 Measures, that such access would jeopardize the health and safety of any employee of the Company or the Company Subsidiaries, as applicable; provided, further, that the Company and its Subsidiaries shall use commercially reasonable efforts to provide such access in a manner that is not prohibited due to any COVID-19 Measures.

2.11    Termination of Company Option Plan.  Prior to the Closing, the Company shall use commercially reasonable efforts to terminate the Company Option Plan effective as of the Closing.  All participants in the Company Option Plan shall receive payments due and owing to such participants as provided in this Agreement.

2.12    Withholding Rights.  Each of Parent and the Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable state, local or foreign Tax Law.  To the extent that amounts are so withheld by Parent or the Surviving Corporation, as the case may be, such withheld amounts (a) shall be remitted by Parent or the Surviving Corporation, as applicable, to the applicable Governmental Authority and (b) to the extent properly remitted as provided in clause (a), shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect of which such deduction and withholding was made by Parent or the Surviving Corporation, as the case may be. Parent shall use commercially reasonable efforts to provide Equityholder Representative with written notice of any expected deduction or withholding at least ten (10) Business Days prior to the Closing Date, and the parties hereto shall cooperate in good faith to minimize the amount of any such deduction or withholding to the extent permitted under applicable Law.

ARTICLE 3

THE CLOSING

3.1    Closing; Closing Date.  Unless this Agreement is earlier terminated pursuant to Section 9.1, subject to the satisfaction of the conditions set forth in Article 7 and Article 8 (or to the extent permitted by applicable Law, the waiver thereof by the party entitled to waive that condition) the closing of the Merger (the "Closing") shall take place on the Business Day that all of the conditions to the Closing set forth in Articles 7 and 8 (other than those conditions which, by their terms, are to be satisfied or waived at the Closing) shall have been satisfied or waived by the Party entitled to waive the same, or at such other time and date that the Equityholder Representative and Parent may agree in writing. The date upon which the Closing occurs is referred to herein as the "Closing Date".

26

FBG_CH1_00094743

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedules delivered by the Company to Parent on the date hereof concurrently with the execution of this Agreement (the "Disclosure Schedules"), the Company represents and warrants to Parent and Merger Sub as follows:

4.1    Organization and Qualification.  The Company is a corporation, duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  Each Company Subsidiary is duly formed, validly existing and in good standing under the Laws of the relevant jurisdiction of its incorporation or organization, as applicable.  The Company and each Company Subsidiary have all requisite organizational power and authority to own, lease and operate their respective properties and carry on their business as presently owned or conducted, except where the failure to be so incorporated or organized, existing and in good standing or to have such power or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth in Section 4.1 of the Disclosure Schedules, the Company and each Company Subsidiary is qualified, licensed or registered to transact business as a foreign corporation and is in good standing (or the equivalent thereof) in each jurisdiction in which the ownership or lease of property or the conduct of their business requires such qualification, license or registration, except where the failure to be so qualified, licensed or registered or in good standing (or the equivalent thereof) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2    Capitalization of the Company.

(a)    Section 4.2(a) of the Disclosure Schedules sets forth a complete and accurate list of the authorized, issued and outstanding equity securities of the Company as of the date hereof.  Except as set forth in Section 4.2(a) of the Disclosure Schedules, as of the date hereof, there are no other equity securities of the Company authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), calls or commitments of any character whatsoever, relating to the equity securities of, or other equity or voting interest in, the Company, to which the Company is a party or is bound requiring the issuance, delivery or sale of equity securities of the Company.  Except as set forth in Section 4.2(a) of the Disclosure Schedules, as of the date hereof, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, the Company to which the Company is a party or is bound.  The Company has no authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the members of the Company on any matter. There are no Contracts to which the Company is a party or by which it is bound to (i)

27

                                                    FBG_CH1_00094744

**DEBTORS' EXHIBIT NO. 243**
**Page 32 of 129**

repurchase, redeem or otherwise acquire any equity securities of, or other equity or voting interest in, the Company or (ii) vote or dispose of any equity securities of, or other equity or voting interest in, the Company.  Except as set forth in the Stockholders Agreement, there are no irrevocable proxies and no voting agreements with respect to any equity securities of, or other equity or voting interest in, the Company.

(b)      All of the issued and outstanding shares of Company Stock of the Company as of the date hereof are duly authorized, validly issued and free of any preemptive rights in respect thereto and free and clear of all security interests, liens, claims, pledges, options, rights of first refusal, agreements, limitations on the Company's or any Subsidiary's voting rights, charges and other encumbrances of any nature whatsoever other than in connection with the Stockholders Agreement or under applicable securities Law or Permitted Encumbrances.

    4.3    <u>Subsidiaries</u>.

(a)      <u>Section 4.3(a)</u> of the Disclosure Schedules sets forth a complete and accurate list as of the date hereof of the name and jurisdiction of each Subsidiary of the Company (each a "<u>Company Subsidiary</u>," and collectively, the "<u>Company Subsidiaries</u>") and the authorized, issued and outstanding equity interests of each Company Subsidiary.  Each of the outstanding equity securities of each Company Subsidiary is duly authorized, validly issued and, except as set forth in <u>Section 4.3(a)</u> of the Disclosure Schedules, is directly owned of record by the Company or a Company Subsidiary, free and clear of any Encumbrances other than (i) Permitted Encumbrances, (ii) Encumbrances on transfer imposed under applicable securities Law and (iii) Encumbrances created by Parent or its Affiliates.  There are no other equity securities of any Company Subsidiary authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), stock appreciation rights, calls or commitments of any character whatsoever to which any Company Subsidiary is a party or may be bound requiring the issuance, delivery or sale of equity securities of any Company Subsidiary.  There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, any Company Subsidiary to which a Company Subsidiary is bound.  No Company Subsidiary has any authorized or outstanding bonds, debentures, notes or other indebtedness, the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equity holders of such Company Subsidiary on any matter.  There are no Contracts to which the Company or any Company Subsidiary is a party or by which the Company or any Company Subsidiary is bound to (i) repurchase, redeem or otherwise acquire any shares of the capital stock, or other equity or voting interest in, any Company Subsidiary or (ii) vote or dispose of any shares of the capital stock, or other equity or voting interest in, any Company Subsidiary.  There are no irrevocable proxies and no voting agreements with respect to any shares of the capital stock of, or other equity or voting interest in, any Company Subsidiary.

28

CONFIDENTIAL

FBG_CH1_00094745

(b)     Neither the Company nor any Company Subsidiary owns, directly or indirectly, any capital stock of, or equity ownership or voting interest in, any Person (other than a Company Subsidiary).

(c)     The Company has delivered to Parent true and correct copies of the certificate of incorporation and bylaws or equivalent organizational documents for the Company and each Company Subsidiary as in effect on the date hereof.

4.4     Binding Obligation.  Each of the Company and the Equityholder Representative has all requisite corporate authority and power to execute, deliver and, subject to receipt of the Written Consent, perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all required corporate action (other than the Written Consent) on the part of the Company and the Equityholder Representative and, other than the Written Consent, no other corporate proceedings on the part of the Company or the Equityholder Representative are necessary to authorize this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Company and the Equityholder Representative and, assuming that this Agreement constitutes the legal, valid and binding obligation of Parent and Merger Sub, constitutes the legal, valid and binding obligation of the Company and the Equityholder Representative, enforceable against each of the Company and the Equityholder Representative in accordance with its terms, except to the extent that the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws from time to time in effect affecting generally the enforcement of creditors' rights and remedies; and (b) general principles of equity (collectively, the "Equitable Exceptions").  The Company has delivered to Parent true and correct copies of the certificate of incorporation and articles of incorporation for the Company as in effect on the date hereof.

4.5     No Defaults or Conflicts.  The execution and delivery of this Agreement and, assuming receipt of the Written Consent, the consummation of the transactions contemplated hereby by the Company and performance by the Company of its obligations hereunder (a) does not result in any violation of the certificate of incorporation or bylaws (or other comparable organizational documents) of the Company or any Company Subsidiary; (b) except as set forth in Section 4.5 of the Disclosure Schedules, does not conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under any Material Contract or material Lease; and (c) assuming all filings required by the Antitrust Laws and all filings and consents necessary for the consummation of the transactions contemplated hereby as set forth in Section 4.6 of the Disclosure Schedules shall have been, as relevant, obtained or made and assuming the truth and accuracy of Parent representations and warranties in Article 5, does not violate in any material respect any existing applicable Law, judgment, order or decree of any Governmental Authority having jurisdiction over the Company, any Company Subsidiary or any of their respective properties; provided, however, that no

29

CONFIDENTIAL

FBG_CH1_00094746

representation or warranty is made in the foregoing clauses (b) or (c) with respect to matters that would not have a Material Adverse Effect.

4.6     No Governmental Authorization Required.  Assuming the truth and accuracy of Parent representations and warranties in Article 5, except for applicable requirements of Antitrust Laws or as otherwise set forth in Section 4.6 of the Disclosure Schedules, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority will be required to be obtained or made by the Company or any Company Subsidiary in connection with the due execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby; provided, however, that no representation and warranty is made with respect to authorizations, approvals, notices or filings with any Governmental Authority that, if not obtained or made, would not have a Material Adverse Effect.

4.7     Financial Statements.

(a)     The consolidated balance sheets included in the Financial Statements fairly present, in all material respects, the consolidated financial position of the Company and the Company Subsidiaries as of their respective dates, and the other related statements included in the Financial Statements fairly present, in all material respects, the results of their consolidated operations and cash flows for the periods indicated, in each case in accordance with GAAP consistently applied in all material respects, with only such deviations from such accounting principles and/or their consistent application as are referred to in the notes to the Financial Statements and subject, in the case of the Unaudited Financial Statements, to normal year-end audit adjustments and the absence of related notes.  The Financial Statements, including the footnotes thereto, have been prepared from the books and records of the Company and the Company Subsidiaries and have been prepared in accordance with GAAP consistently applied.

(b)     Except (i)  for liabilities incurred in the ordinary course of business, since the date of the Interim Balance Sheet, (iii) for liabilities incurred in connection with this Agreement and the transactions contemplated hereby and (iv) as would not have a Material Adverse Effect, the Company and the Company Subsidiaries do not have any liabilities and obligations (whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent) of a type that are required by GAAP to be reflected or reserved against in a balance sheet of the Company and the Company Subsidiaries.

(c)     Except as set forth in the Audited Financial Statements, as of the date hereof, neither the Company nor any Company Subsidiary maintains any material undisclosed "off-balance sheet arrangement" within the meaning of Item 303 of Regulation S-K of the Securities and Exchange Commission.

(d)     There are no distributions which have accrued or been declared but are unpaid on the Company Stock.

30

CONFIDENTIAL

FBG_CH1_00094747

4.8     Intellectual Property.

(a)     As of the date hereof, Section 4.8(a) of the Disclosure Schedules sets forth all material Intellectual Property owned by the Company or any Company Subsidiary that is registered, issued or subject to a pending application for registration or issuance in the United States Patent and Trademark Office or the United States Copyright Office.

(b)     Except as set forth in Section 4.8(b) of the Disclosure Schedules, the Company or a Company Subsidiary, as applicable, owns, is licensed to use or otherwise has the right to use all Intellectual Property material to the operation of the business of the Company and the Company Subsidiaries, taken as a whole, as of the date hereof, free and clear of any Encumbrances other than Permitted Encumbrances, except as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(c)     Except as set forth in Section 4.8(c) of the Disclosure Schedules, neither the validity of, nor the Company's or the applicable Company Subsidiary's title to, any material Intellectual Property owned by the Company or any Company Subsidiary is being challenged in any litigation to which the Company or a Company Subsidiary is a party, nor has the Company or any Company Subsidiary received any written notices of infringement or misappropriation from any third party with respect to the Company's use of any material Intellectual Property used in its business, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(d)     Except as set forth in Section 4.8(d) of the Disclosure Schedules, to the knowledge of the Company, (i) no Person is infringing upon, misappropriating or otherwise violating any of the Intellectual Property owned by the Company or any Company Subsidiary and (ii) the conduct of the business of the Company and the Company Subsidiaries as currently conducted does not infringe upon, misappropriate or otherwise violate any Intellectual Property right of any third party, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(e) Except as would not reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole, the Company and the Company Subsidiaries: (i) own, lease, license or otherwise have the legal right to use all Business Systems, and such Business Systems are sufficient in all material respects for the immediate needs of the business of the Company and the Company Subsidiaries as currently conducted; (ii) maintain commercially reasonable data security, disaster recovery and business continuity plans, and, to the knowledge of the Company, in the last 12 months there has not been any material failure with respect to any of the Business Systems or any event resulting in unauthorized access to or use of Personal Data; (iii) have taken commercially reasonable actions to protect the Personal Data in the custody or control of the Company and the Company Subsidiaries; (iv) have not received any

31

FBG_CH1_00094748

**DEBTORS' EXHIBIT NO. 243**
**Page 36 of 129**

written complaints from any material customers related to any malicious code or other technical deficiencies; and (v) are in compliance in all material respects with all applicable Laws regarding the collection, use, processing and protection of Personal Data.

4.9     Compliance with Laws.  The business of the Company and the Company Subsidiaries, taken as a whole, is not being conducted, and has not in the past three (3) years been conducted, in violation of any applicable Laws, except such violations that would not have a Material Adverse Effect.  During the past three (3) years, no member of the Company Group has received written notice from any Governmental Authority asserting that the Company or any Company Subsidiary is in violation of any Law, except such violations that would not have a Material Adverse Effect.  No representation or warranty is given under this Section 4.9 with respect to Taxes, ERISA, labor or employment or Environmental Laws, which matters are covered exclusively under Sections 4.13, 4.15, 4.16 and 4.17, respectively.

4.10     Corrupt Practices; Trade Control Laws.

(a)     During the past three (3) years, no Governmental Authority has notified the Company or any Company Subsidiary in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act.  Neither the Company nor any Company Subsidiary has been since the date that was three (3) years prior to the date hereof until the date hereof under any administrative, civil or criminal investigation or indictment and are not party to any action involving alleged false statements, false claims or other improprieties relating to the Company's or any Company Subsidiary's compliance with the Foreign Corrupt Practices Act.

(b)     Neither the Company nor any Company Subsidiary is nor, to the knowledge of the Company, is any director or officer of either the Company nor any Company Subsidiary, the target of Sanctions, including OFAC or the United States State Department.  To the knowledge of the Company, neither the Company nor any Company Subsidiary conducts any business or has for the past three (3) years conducted any business with any Person that is the target of Sanctions as of the date of this Agreement, including any Person that appears on the SDN List. For the purposes of this Section, the term "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings.

4.11     Material Contracts.  Section 4.11 of the Disclosure Schedules lists or describes, as of the date hereof, all written Contracts (other than Company Plans, Leases and purchase orders) to which the Company or any Company Subsidiary is a party or to which their respective assets, property or business are bound or subject, in each case, as of the date hereof, which falls within any of the following categories:

(a)     any Contracts pursuant to which the Company or any Company Subsidiary has made payments to a vendor or a supplier of more than

32

$1,000,000 in the aggregate in the twelve (12) calendar months ended December 31, 2021;

(b)      any Contracts pursuant to which the Company or any Company Subsidiary received payments from a customer of more than $1,000,000 in the twelve (12) calendar months ended December 31, 2021;

(c)      any Contracts (A) for Indebtedness for borrowed money in excess of $2,500,000 (other than: (i) any Indebtedness to be repaid at Closing under Section 2.10 or (ii) Permitted Encumbrances) or (B) granting any Encumbrance (other than Permitted Encumbrances) upon the Company Stock or any material assets or properties of the Company or any Company Subsidiary (taken as a whole);

(d)      any Contracts establishing a partnership or joint venture or similar arrangement;

(e)      any Contracts that constitute a license pursuant to which the Company or any Company Subsidiary (i) is authorized to use any third-party Intellectual Property that is material to the business of the Company and the Company Subsidiaries, excluding any "off-the-shelf" or other software generally commercially available on standard terms and conditions, or (ii) authorizes any third party to use on an exclusive basis any Intellectual Property owned by the Company or any Company Subsidiary that is material to the business of the Company and the Company Subsidiaries;

(f)      any lease or similar Contract under which the Company or any Company Subsidiary is a lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any third party involving payments by the Company or any Company Subsidiary of more than $500,000 on an annual basis (unless terminable without payment or penalty upon no more than ninety (90) calendar days' notice);

(g)      any Contracts or instruments which restrict the Company or any Company Subsidiary from engaging in any aspect of its business anywhere in the world, or establish an exclusive sale or purchase obligation with respect to any Person, product or in any geographic location or during any material period of time;

(h)      any Contracts that contain a right of first refusal, first offer or first negotiation;

(i)      any Contracts that are employment, severance, retention, consulting or separation Contracts with any current officer, director or employee of the Company receiving an annual base salary in excess of $500,000; and

(j)      any Contracts that with any Governmental Authority and material to the business of the Company and the Company Subsidiaries

CONFIDENTIAL                                                                 FBG_CH1_00094750

(k)     any Contracts that require the Company to pay, or entitle the Company to receive, in the aggregate, $2,500,000 or more in any one (1) year;

(l)     any Contracts for acquisitions or dispositions (by merger, purchase or sale of assets or stock or otherwise) of a material business line, as to which the Company has continuing material obligations or material rights;

(m)     any Contracts that contain any fixed or indexed pricing, "most-favored nation" pricing or similar pricing terms or provisions regarding minimum volumes, volume discounts, or rebates, in each case, which is material to the Company and its Subsidiaries, taken as a whole; or

(n)     any collective bargaining agreements (collectively, the Contracts listed in Section 4.11 of the Disclosure Schedules are referred to herein as the "Material Contracts").

With respect to all Material Contracts, as of the date hereof, neither the Company, any Company Subsidiary nor, to the knowledge of the Company, any other party to any such Contract is in material breach thereof or default thereunder and, to the knowledge of the Company, there does not exist under any Material Contract any event which, with the giving of notice or the lapse of time, would constitute such a material breach or default by the Company, any Company Subsidiary or, as of the date hereof and to the knowledge of the Company, any other party to such Material Contract, in each case except for such breaches, defaults and events as to which requisite waivers or consents have been obtained or that would not have a Material Adverse Effect. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, as of the date of this Agreement, to the knowledge of the Company, (x) each of the Material Contracts is in full force and effect, is valid and enforceable in accordance with its terms and (y) the Company has not been notified by any counterparty to any Material Contract that such counterparty is terminating or intends to terminate such Material Contract that has not been rescinded.

4.12     Litigation.  Except as set forth in Section 4.12 of the Disclosure Schedules:

(a)     As of the date hereof, there are no Actions pending, or to the knowledge of the Company, in the past three (3) years there have been no Action threatened in writing by, against or involving the Company or any Company Subsidiary, or any material portion of their respective assets, operations or business that would have a Material Adverse Effect.

(b)     Neither the Company nor any Company Subsidiary is subject to any material unsatisfied order, judgment, injunction, ruling, decision, award or decree of any Governmental Authority.

4.13     Taxes.  Except as set forth in Section 4.13 of the Disclosure Schedules:

34

FBG_CH1_00094751

(a)     All income Tax returns and other material Tax Returns required to be filed by or with respect to the Company or any Company Subsidiary have been timely (within any applicable extension periods) filed, and all such Tax Returns were true, complete and correct in all material respects when filed.

(b)     The Company and the Company Subsidiaries have fully and timely paid all material amounts Taxes required to be paid by the Company or any Company Subsidiary or with respect to its assets, whether or not shown on such Tax Returns referred to in Section 4.13(a).  No Tax deficiencies for a material amount of Taxes that remain unpaid have been asserted in writing against the Company.

(c)     All material deficiencies for Taxes asserted or assessed in writing against the Company or the Company Subsidiaries have been fully and timely (within any applicable extension periods) paid, settled or properly reflected in the Financial Statements.

(d)     There are no material Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the assets of the Company or any Company Subsidiary.

(e)     No material audit is pending or, to the knowledge of the Company, threatened in writing with respect to any Taxes due from or with respect to the Company or any Company Subsidiary.  No written claim has been made against the Company or any Company Subsidiary by a Governmental Authority in a jurisdiction where the Company or any Company Subsidiary does not file Tax Returns that the Company or such Company Subsidiary is or may be subject to taxation by that jurisdiction.

(f)     There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from the Company or any Company Subsidiary for any taxable period and no request for any such waiver or extension is currently pending.

(g)     Neither the Company nor any Company Subsidiary has participated in any listed transaction within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

(h)     Neither the Company nor any Company Subsidiary has executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of state, local or foreign Tax Law, and neither the Company nor any Company Subsidiary is subject to any private letter ruling of the IRS or comparable ruling of any other Governmental Authority.

(i)     The Company and the Company Subsidiaries (A) have not been a member of an affiliated group or filed or been included in a combined, consolidated or unitary income Tax Return, other than the affiliated group of which the Company is the parent, and (B) have no liability for Taxes of another Person under Section 1.1502-6 of the

35

Treasury Regulations (or any similar provision of state, local or foreign Law) or as a successor or transferee.

(j)    The Company and the Company Subsidiaries have not deferred the employer's share of any "applicable employment taxes" under Section 2302 of the CARES Act.

(k)    This Section 4.13 constitutes the exclusive representations and warranties of the Company with respect to Taxes.  No representation or warranty contained in this Section 4.13 shall be deemed to apply with respect to any taxable period (or portion thereof) after the Closing Date.

4.14    Permits.  The Company and each Company Subsidiary have, as of the date hereof, all material authorizations, registrations, qualifications, certificates, licenses, permits and rights issued by a Governmental Authority necessary for the lawful conduct of the Company's and each Company Subsidiary's businesses as conducted as of the date of this Agreement (collectively, "Permits").  All such Permits are in full force and effect and neither the Company nor any Company Subsidiary is in default under any Permit, in each case, except as would not have a Material Adverse Effect.

4.15    Employee Benefit Plans.

(a)    Section 4.15(a) of the Disclosure Schedules contains a true and complete list of each material written "employee benefit plan" (within the meaning of Section 3(3) of ERISA), stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation, profit sharing, pension, retirement and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA under which any employee or former employee of the Company or any Company Subsidiary has any present or future right to material benefits and under which the Company or any Company Subsidiary has any present or future material liability (other than any Multiemployer Plans).  All such plans, agreements, programs, policies and arrangements shall be collectively referred to as the "Company Plans."

(b)    With respect to each Company Plan, the Company has made available to Parent a current copy (or, to the extent no such copy exists, a description) thereof and, to the extent applicable:  (i) any related trust agreement; (ii) the most recent IRS determination letter or opinion letter; (iii) the most recent summary plan description; and (iv) for the most recent plan year (A) the Form 5500 and attached schedules and (B) audited financial statements.

(c)    Neither the Company nor any Company Subsidiary contributes to or has any liability under any "multiemployer plan" as defined in Section 3(37) of ERISA (a "Multiemployer Plan").

(d)    (i) Each Company Plan has been established and administered in accordance with its terms, and in compliance with the applicable provisions of ERISA, the Code and other applicable Laws, except as would not have a

36

**DEBTORS' EXHIBIT NO. 243**
**Page 41 of 129**

Material Adverse Effect; and (ii) each Company Plan that is intended to be qualified within the meaning of Code Section 401(a) has received a favorable determination letter from the IRS as to its qualification, and to the knowledge of the Company, nothing has occurred that could reasonably be expected to cause the loss of such qualification.

(e)   Neither the Company nor any Company Subsidiary have any obligation or commitment to "gross up" any Person with respect to Taxes under Section 409A or 4999 of the Code;

(f)   Except as set forth in <u>Section 4.15(f)</u> of the Disclosure Schedules, none of the Company Plans are subject to Title IV of ERISA.

(g)   Except as set forth in <u>Section 4.15(g)</u> of the Disclosure Schedules, neither the Company's execution of, nor the performance of the transactions contemplated by this Agreement will either alone or in connection with any other event(s) (i) result in any payment becoming due to any current or former employee, of the Company or any Company Subsidiary, (ii) materially increase any amount of compensation or benefits otherwise payable under any Company Plan, (iii) result in the acceleration of the time of payment under any Company Plan or (iv) result in any payment that could, individually or in combination with any other payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code.

(h)   With respect to any Company Plan, no Actions (other than routine claims for benefits in the ordinary course) are pending or, to the knowledge of the Company, threatened in writing, except, in each case, as would not have a Material Adverse Effect.

4.16   <u>Labor Relations</u>.

(a)   Except as would not result in a Material Adverse Effect in the last two (2) years, (i) neither the Company nor any of the Company Subsidiaries have experienced any work stoppage, labor strike or other material labor dispute or claim of unfair labor practices, (ii) the Company and the Company Subsidiaries are and have been in compliance in all material respects with all applicable Laws respecting employment practices, including provisions thereof related to terms and conditions of employment, immigration, labor relations, and wages and hours, and are not engaged in any unfair labor practice, (iii) there is no unfair labor practice, charge or complaint against the Company or any of the Company Subsidiaries pending before the National Labor Relations Board or any similar state agency and (iv) to the knowledge of the Company, no organizational effort is or has been underway or threatened by or on behalf of any labor organization with respect to employees of the Company or any of the Company Subsidiaries.

(b)   Neither the Company nor any Company Subsidiary is a party to or bound by any collective bargaining agreement or relationship with any labor organization.

37

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 243**
**Page 42 of 129**

4.17   Environmental Compliance.  Except as set forth in Section 4.17 of the Disclosure Schedules:

(a)   The Company and the Company Subsidiaries are and, except for any noncompliance that has been fully and finally resolved, in the past three (3) years have been, in compliance with all applicable Environmental Laws, except such violations that would not have a Material Adverse Effect.

(b)   The Company and the Company Subsidiaries, as applicable, have obtained and are in compliance in all respects with all Environmental Permits required under Environmental Laws (i) for the conduct of the business of the Company and the Company Subsidiaries as currently conducted and (ii) to occupy the Owned Real Property and the Leased Real Property, except as would not have a Material Adverse Effect.  All such Environmental Permits are in full force and effect, and neither the Company nor any Company Subsidiary has received any written notice from any Governmental Authorities relating to the revocation or modification in any material respect of any such Environmental Permit.

(c)   There are no Actions pursuant to any Environmental Law pending or, to the knowledge of the Company, threatened in writing, against the Company or any Company Subsidiary relating to: (i) the operations of the Company and the Company Subsidiaries; (ii) the Owned Real Property; or (iii) the Leased Real Property, except as would not have a Material Adverse Effect.

(d)   To the knowledge of the Company, there has been no release or disposal of any Hazardous Materials (i) in, on or under any of the Owned Real Property or (ii) in, on or under any of the Leased Real Property, in a condition that requires investigation or remediation pursuant to any Environmental Law.  The Company has made available to Parent copies of any and all material environmental assessments or audit reports or other similar studies or analyses generated within the past two (2) years, and all material Environmental Permits, in the possession of the Company or any Company Subsidiary that relate to the properties or assets of the Company or any Company Subsidiary.

(e)   (i) The representations and warranties contained in this Section 4.17 are the only representations and warranties being made by the Company and the Company Subsidiaries in respect of Environmental Laws and in respect of any environmental or occupational health or safety matter (to the extent it relates to exposure to Hazardous Materials), including natural resources, related in any way to the Company or the Company Subsidiaries, including the properties or assets of the Company, or to this Agreement or its subject matter; and (ii) no other representation or warranty of the Company or the Company Subsidiaries contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made in respect thereof.

4.18   Insurance.  All material insurance policies (the "Insurance Policies") with respect to the properties, assets or business of the Company and the

38

CONFIDENTIAL                                                       FBG_CH1_00094755

Company Subsidiaries are in full force and effect and all premiums due and payable thereon have been paid in accordance with the terms thereof.  As of the date hereof, neither the Company nor any Company Subsidiary has received either a written notice of cancellation or non-renewal of any Insurance Policy.  During the past three (3) years, timely notice has been given to the insurer of all material claims that may be insured thereby under any Insurance Policy, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  During the past three (3) years, no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.19    Real Property.

(a)    Section 4.19(a) of the Disclosure Schedules contains a list as of the date hereof of (i) each parcel of real property owned by the Company or any Company Subsidiary (the "Owned Real Property"), (ii) all real property leased or subleased by the Company and the Company Subsidiaries as lessee or sublessee for which the annual rent exceeds $1,000,000 (the "Leased Real Property", together with the Owned Real Property, the "Real Property") and (iii) all leases or subleases of the Real Property under which the Company or any of the Company Subsidiaries leases or subleases the Real Property, as the same may have been amended, supplemented or otherwise modified from time to time (the "Leases").  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) the Company or the applicable Company Subsidiary has good and marketable fee simple, or local equivalent, title to the Owned Real Property and a valid leasehold interest in the Leased Real Property and (y), in each case, (i) is free and clear of all Encumbrances other than Permitted Encumbrances, (ii) is neither subject to any governmental decree or order to be sold nor is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor, nor, to the knowledge of the Company, has any such condemnation, expropriation or taking been proposed.  With respect to the Leases, all such Leases are, to the knowledge of the Company, in full force and effect, are valid and effective in accordance with their respective terms, and neither the Company nor any Company Subsidiary has received written notice that it is in breach or default under any Lease nor, to the knowledge of the Company, any other party to any Lease is in breach thereof or default thereunder and there does not exist under any Lease any event which, with the giving of notice or the lapse of time or both, would reasonably be expected to constitute such a material breach or default by the Company, any Company Subsidiary or, to the knowledge of the Company, any other party to such Lease, in each case except for such breaches and defaults as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.20    Affiliate Transactions.  Except for (i) employment relationships and compensation, benefits, travel advances and employee loans in the ordinary course of business, (ii) indemnity arrangements (the foregoing clauses (i) and (ii) collectively, the "Excluded Arrangements"), or (iii) as disclosed in Section 4.20 of the Disclosure

39

CONFIDENTIAL                                          FBG_CH1_00094756

Schedules, neither the Company nor any Company Subsidiary is a party to any agreement with, or involving the making of any payment or transfer of assets to, the Principal Seller, or any stockholder, officer, member, Affiliate (other than the Company and the Company Subsidiaries), partner or director of the Principal Seller (collectively, the "Affiliate Agreements").

4.21    Absence of Material Adverse Effect.  During the period from the date of the Interim Balance Sheet to the date of this Agreement, there has been no Material Adverse Effect.

4.22    Brokers.  Except as set forth in Section 4.22 of the Disclosure Schedules or for those that will be a Company Expense, no broker, finder or similar intermediary has acted for or on behalf of the Company or any Company Subsidiary in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with the Company or any Company Subsidiary or any action taken by them.

4.23    Product Liability.  Except as set forth in Section 4.23 of the Disclosure Schedules, there is no existing or, to the knowledge of the Company, threatened in writing product liability, warranty or other similar claim against the Company or otherwise alleging that any product of the Company is defective or fails to meet any product or service warranties or guaranties, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company and the Company Subsidiaries, taken as a whole.

4.24    Exclusivity of Representations.  The representations and warranties made by the Company in this Article 4 are the exclusive representations and warranties made by or concerning the Company or any Company Subsidiary.  Except as otherwise expressly set forth in this Article 4, (a) the Company expressly disclaims any representations or warranties or any kind or nature, express or implied, whether written or oral, as to the condition, value or quality of any business or assets of any member of the Company Group, and (b) the Company specifically disclaims any representation or warranty of merchantability, usage, suitability or fitness for any particular purpose with respect to the assets of any member of the Company Group, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that except for the representations set forth in Article 4 such subject assets are "as is, where is" on the Closing Date, and in their present condition, and Parent and its Affiliates shall rely on their own examination and investigation thereof.  No member of the Company Group is, directly or indirectly, making any representations or warranties regarding the pro forma financial information, financial projections or other forward-looking statements of the Company or any Company Subsidiary.

4.25    Material Relationships.  Since December 31, 2021 until the date of this Agreement, none of Costco Wholesale Corporation, Wal-Mart Stores, Inc., Toyota Motor Sales, U.S.A., Inc or Michelin Lifestyle Limited (the "Major Relationships") (a) has cancelled, terminated, failed to renew or otherwise materially and adversely

40

CONFIDENTIAL

FBG_CH1_00094757

modified, or, to the knowledge of the Company, has provided written or oral notice threatening that such Major Relationship intends to cancel, terminate or otherwise materially and adversely modify, (i) any Contract between such Major Relationship and any member of the Company Group or (ii) its commercial relationship with any member of the Company Group after Closing, in each case, that has not been rescinded, (b) to the knowledge of the Company, has provided written or oral notice stating that such Major Relationship will not renew any Contract between such Major Relationship and any member of the Company Group after Closing or will materially limit its purchase of, or cease to purchase, material goods or services from the Company Group as a result of the Closing or (c) to the knowledge of the Company, has provided written or oral notice stating that such Major Relationship will discontinue its commercial relationship with the Company Group as a result of the Closing.  As of the date of this Agreement, no member of the Company Group is actively involved in any material claim, dispute or controversy with any Major Relationship other than in the ordinary course of business.  As of the date of this Agreement, with respect to all Contracts with the Major Relationships, neither the applicable member of the Company Group nor, to the knowledge of the Company, any Major Relationship is in material breach thereof or default thereunder and there does not exist under any such Contract any event which, with the giving of notice or the lapse of time, would constitute such a material breach or default by the applicable member of the Company Group or, to the knowledge of the Company,  the Major Relationships. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, as of the date of this Agreement, to the knowledge of the Company, each of the Contracts with the Major Relationships is in full force and effect and is valid and enforceable in accordance with its terms.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Parent and Merger Sub, jointly and severally, represent and warrant to the Company as follows:

5.1     Organization.  Parent is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Merger Sub is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  Each of Parent and Merger Sub have the requisite limited liability company power and authority to own its properties and carry on its business in all material respects as presently owned or conducted, except where the failure to be so organized, existing and in good standing or to have such power or authority would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability, as applicable, to effect the transactions contemplated hereby.

5.2     Binding Obligation.  Each of Parent and Merger Sub has all requisite limited liability company authority and power to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the consummation of the transactions contemplated hereby have been

41

CONFIDENTIAL                                   FBG_CH1_00094758

duly and validly authorized by all necessary limited liability company action on the part of Parent and Merger Sub, and by Parent as the sole stockholder of Merger Sub, and no other action or proceedings on the part of Parent or Merger Sub are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Parent or Merger Sub. This Agreement has been duly executed and delivered by Parent and Merger Sub and, assuming that this Agreement constitutes the legal, valid and binding obligations of the Company, constitute the legal, valid and binding obligations of Parent and Merger Sub, enforceable against Parent and Merger Sub in accordance with its terms, except to the extent that the enforceability thereof may be limited by the Equitable Exceptions.

      5.3    <u>No Defaults or Conflicts</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Parent and Merger Sub and the performance by Parent and Merger Sub of their respective obligations hereunder (a) do not result in any violation of the organizational documents of either Parent or Merger Sub, and (b) do not conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under any indenture, mortgage or loan or any other agreement or instrument to which Parent or Merger Sub is a party or by which Parent or Merger Sub is bound or to which its properties may be subject, and (c) assuming all filings and consents necessary for the consummation of the transactions contemplated hereby as set forth on <u>Section 5.4</u> of the Disclosure Schedules shall have been, as relevant, obtained or made do not violate any existing applicable Law, judgment, order or decree or any Governmental Authority having jurisdiction over Parent or Merger Sub or any of their respective properties; <u>provided</u>, <u>however</u>, that no representation or warranty is made in the foregoing clauses (b) or (c) with respect to matters that would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.

      5.4    <u>No Authorization or Consents Required</u>. Other than as listed in <u>Section 5.4</u> of the Disclosure Schedules, and the applicable requirements of Antitrust Laws, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person will be required to be obtained or made by Parent or Merger Sub in connection with the due execution, delivery and performance by Parent or Merger Sub of this Agreement and the consummation by Parent or Merger Sub of the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that no representation and warranty is made with respect to authorizations, approvals, notices or filings with any Governmental Authority that, if not obtained or made, would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.

      5.5    <u>Brokers</u>. No broker, finder or similar intermediary has acted for or on behalf of Parent or Merger Sub in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with Parent or Merger Sub or any action taken by Parent or Merger Sub.

42

FBG_CH1_00094759

5.6     Sufficient Funds.  As of the date of this Agreement, Parent and Merger Sub have, and as of the Closing Date, Parent and Merger Sub will have, sufficient net cash proceeds in immediately available funds to pay all amounts payable by it pursuant to Article 2, all of its fees and expenses in order to consummate the transactions contemplated by this Agreement and all other payment obligations hereunder.  For the avoidance of doubt, Parent and Merger Sub acknowledge that Parent's and Merger Sub's obligations to consummate the transactions contemplated by this Agreement on the terms set forth herein are not conditioned upon Parent or Merger Sub obtaining financing for or in connection with the transactions contemplated by this Agreement.  Parent and Merger Sub confirm that it is not a condition to Closing or any of its other obligations under this Agreement that Parent or Merger Sub obtain financing for or in connection with the transactions contemplated by this Agreement.

5.7     Litigation; Relations.  There is no Action pending or, to the knowledge of Parent, threatened against Parent or Merger Sub or any material portion of its properties or assets with respect to which there is a substantial possibility of a determination which questions the validity or legality of this Agreement or the transactions contemplated hereby or which seeks to prevent the transactions contemplated hereby or otherwise would reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.  Parent is not aware of any fact or circumstance that would reasonably be expected to result in, any Major Relationship adversely changing, and has no reason to believe that any Major Relationship would adversely change, its commercial relationship with the Company Group as a result of the transactions contemplated by this Agreement.  Neither Parent nor any of its Affiliates is actively involved in any claim, dispute or controversy with any Major Relationship or any of their respective Affiliates.  With respect to all Contracts between Parent or any of its Affiliates, on the one hand, and the Major Relationships or any of their respective Affiliates on the other hand, none of Parent, its Affiliates, any Major Relationship or any of their respective Affiliates is in material breach thereof or default thereunder and there does not exist under any such Contract any event which, with the giving of notice or the lapse of time, would constitute such a material breach or default by the applicable party to such Contract.

5.8     Solvency.  Assuming the accuracy of the representations and warranties set forth in Article 4 in all material respects such that the condition set forth in Section 7.1 is satisfied, immediately after giving effect to the transactions contemplated by this Agreement (including any financing in connection with the Closing), Parent, the Surviving Corporation and each of their Subsidiaries (including the Company and its Subsidiaries) will be Solvent.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Parent, the Surviving Corporation, the Company or their Subsidiaries.

5.9     Parent's and Merger Sub's Reliance.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates, acknowledges that it and its Representatives have been permitted full and complete access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries

43

FBG_CH1_00094760

thereof) and other properties and assets of the Company and the Company Subsidiaries that it and its Representatives have desired or requested to see or review, and that it and its Representatives have had a full opportunity to meet with the officers and employees of the Company and the Company Subsidiaries to discuss the business of the Company and the Company Subsidiaries.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges that neither the Company nor any other Person has made any representation or warranty, expressed or implied, as to the accuracy or completeness of any information regarding the Company Stock, the Company and the Company Subsidiaries furnished or made available to Parent, Merger Sub, each of their respective Affiliates or any of their Representatives, except as expressly set forth in Article 4 of this Agreement, and neither the Equityholders nor any other Person (including any officer, director, member or partner of the Equityholders) shall have or be subject to any liability to Parent, Merger Sub, each of their respective Affiliates or any other Person, resulting from Parent's use of any information, documents or material made available to Parent in the Data Room, management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges and agrees that, should the Closing occur, Parent shall acquire the Company and the Company Subsidiaries without any representation or warranty as to merchantability or fitness for any particular purpose of their respective assets, in an "as is" condition and on a "where is" basis, except as otherwise expressly represented or warranted in Article 4 of this Agreement; provided, however, that nothing in this Section 5.9 is intended to limit or modify the representations and warranties contained in Article 4.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges and agrees that, except for the representations and warranties contained in Article 4, none of the Company, the Equityholders or any other Person has made, and Parent, Merger Sub or any of their respective Affiliates have not relied on any other express or implied representation or warranty by or on behalf of the Company, the Equityholders or any other Person.  Each of Parent, Merger Sub on behalf of themselves or any of their respective Affiliates, acknowledges that none of the Company, the Equityholders nor any other Person, directly or indirectly, has made, and Parent, Merger Sub and each of their respective Affiliates have not relied on, any representation or warranty regarding the pro forma financial information, financial projections or other forward-looking statements of the Company or any Company Subsidiary, and Parent and Merger Sub will make no claim (and will cause each of their respective Affiliate to make no claim) with respect thereto.

   5.10 Investment Purpose.  Parent and Merger Sub will be purchasing the Company Stock for the purpose of investment and not with a view to, or for resale in connection with, the distribution thereof in violation of applicable federal, state or provincial securities Laws.  Each of Parent and Merger Sub acknowledges and agrees that the sale of the Company Stock hereunder has not been registered under the Securities Act of 1933 (the "Securities Act") or any state securities Laws, and that the Company Stock may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act, pursuant to an exemption from the Securities Act or in a transaction not subject thereto.  Parent represents that it is an

44

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 243**
**Page 49 of 129**

"Accredited Investor" as that term is defined in Rule 501 of Regulation D of the Securities Act.

5.11     Exclusivity of Representations.  The representations and warranties made by Parent and Merger Sub in this Article 5 are the exclusive representations and warranties made by Parent and Merger Sub.  Parent and Merger Sub hereby disclaim any other express or implied representations or warranties, except as expressly set forth in any other written agreement with an Affiliate of any such Person.

ARTICLE 6

COVENANTS

6.1     Conduct of Business of the Company.  Except (A) as contemplated by this Agreement, (B) as required by applicable Law, (C) in response to any protests, riots, demonstrations or public disorders or any escalation or worsening of protests, riots, demonstrations or public disorders (a "Protest Event") (including any temporary closures of any leased property and including compliance with any curfew, closure, shut down, directive, order, policy, guidance or recommendation by any Governmental Authority or any disaster plan of the Company Group or any change in applicable Laws related to, arising from or as a result of such Protest Event ("Protest Measures")), (D) any COVID-19 Measures or (E) as otherwise set forth in Section 6.1 of the Disclosure Schedules, during the period from the date of this Agreement to the earlier of the Closing Date and the termination of this Agreement in accordance with Article 9, the Company shall use commercially reasonable efforts to, and shall cause the Company Subsidiaries to, use commercially reasonable efforts to conduct their respective business and operations in the ordinary course in all material respects (it being understood that failure to take any action that would be prohibited by any of clauses (a) through (k) of this Section 6.1 shall not, in any event, constitute a breach of the obligations set forth in this sentence to conduct business and operations in the ordinary course).  Without limiting the generality of the foregoing, except as contemplated by this Agreement, as required by applicable Law, any Protest Measures, COVID-19 Measures or as otherwise set forth in Section 6.1 of the Disclosure Schedules, during the period from the date of this Agreement to the earlier of the Closing Date and the termination of this Agreement in accordance with Article 9, without the prior written consent of Parent (which consent shall not be unreasonably withheld or delayed), the Company shall not, and shall cause the Company Subsidiaries not to, take any of the following actions:

(a)     issue, sell, transfer, dispose of, encumber (other than Permitted Encumbrances), alter, modify or pledge, or authorize or propose the issuance, sale, transfer, disposition, encumbrance (other than Permitted Encumbrances), alteration, modification or pledge of (i) the Company Stock, additional shares of capital stock of any class of the Company (including the Company Stock) or any Company Subsidiary, or securities convertible into or exchangeable for any such shares, or any rights, warrants or options to acquire any such shares or other convertible securities of the Company or any Company Subsidiary or (ii) any other securities in respect of, in lieu of, or in substitution for shares of capital stock of the Company (including the Company Stock) or any

45

FBG_CH1_00094762

Company Subsidiary outstanding on the date hereof, in each case of (i) and (ii), other than Company Stock in connection with the exercise of Company Options;

(b)      redeem, purchase or otherwise acquire any outstanding shares of the capital stock of the Company except for any redemption, purchase or acquisition in connection with the departure of any employee of the Company or any Company Subsidiary or in furtherance of the transactions contemplated hereby; provided that nothing in this Agreement shall restrict the Company or any Company Subsidiary from declaring or paying any cash dividend or making any other cash distribution to the Equityholders prior to the Closing Date;

(c)      adopt any amendment to the certificate of incorporation or bylaws (or other comparable organizational documents) of the Company or any Company Subsidiary or alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure  or ownership of the Company or any of its Subsidiaries, or create or form any Subsidiary, in each case, that would be materially adverse to Parent;

(d)      (i) increase in any material manner the rate or terms of compensation or benefits of any of its directors, officers or employees, except as may be required under existing employment agreements or arrangements or such increases as are granted in the ordinary course of business, (ii) pay or agree to pay any pension, retirement allowance or other employee benefit not contemplated by any Company Plan to any director, officer or employee, whether past or present, other than in the ordinary course of business, as required by the terms of a Company Plan or as required by Law or (iii) enter into, adopt or amend any employment, bonus, severance or retirement contract or adopt any employee benefit plan, in each case other than in the ordinary course of business or as required by Law or if such payment would otherwise be included in the Company Expense;

(e)      except (A) in the ordinary course of business, (B) for sales of obsolete assets or assets with de minimis or no book value and (C) for sales of inventory, sell, lease, transfer or otherwise dispose of, any material property or assets;

(f)      make any loans, advances or capital contributions in excess of $2,000,000 in the aggregate, or $1,000,000 individually, except advances (i) to any member of the Company or a Company Subsidiary that will be repaid at or prior to Closing or (ii) for travel and other normal business expenses to officers and employees in the ordinary course of business;

(g)      materially amend, become subject to, or terminate any Material Contract (other than (x) bidding for and entering into Contracts with customers or suppliers in the ordinary course of business, (y) terminations of Contracts as a result of the expiration of the term of such Contracts or breach by any counterparty of such Contracts and (z) renewals of Contracts in the ordinary course of business);

46

CONFIDENTIAL

FBG_CH1_00094763

(h)      acquire any business or Person, by merger or consolidation or by any other manner, in a single transaction or a series of related transactions;

(i)      make any material change in any method of accounting or auditing practice other than those required by GAAP;

(j)      make or change any material Tax election, file any material amended Tax Return, change any Tax accounting period or settle any material Tax claim relating to the Company or any of the Company Subsidiaries;

(k)      effect any recapitalization, reclassification, stock split, reverse stock split or like change in the capitalization of the Company;

(l)      pay, discharge, satisfy, settle or otherwise compromise any Proceeding or waive, assign or release any material rights or claims in excess of $500,000;

(m)      commence a lawsuit other than (i) in the ordinary course of business or (ii) for a breach of this Agreement or in connection with the transactions contemplated hereby;

(n)      terminate, amend or fail to renew or preserve any (i) material Permit or (ii) registration or application for any material Intellectual Property, except in the ordinary course of business;

(o)      commence any proceeding for any voluntary liquidation, dissolution, or winding up of the Company or any of its material Subsidiaries, including initiating any bankruptcy proceedings on their behalf; or

(p)      agree in writing to take any of the foregoing actions.

Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement (A) will give Parent, directly or indirectly, rights to control or direct the business or operations of the Company and the Company Subsidiaries prior to the Closing or (B) shall operate to prevent or restrict any act or omission by the Company or the Company Subsidiaries the taking of which is required by applicable Law or any Contract or Company Plan by which the Company or any Company Subsidiary is bound as of the date hereof.  Prior to the Closing, the Company and the Company Subsidiary will exercise, consistent with the terms and conditions of this Agreement, control of their business and operations.

6.2      Access to Information; Confidentiality; Public Announcements.

(a)      During the period from the date of this Agreement to the earlier of the Closing Date and the termination of the Agreement in accordance with Article 9, the Company shall give Parent and its authorized Representatives reasonable access during normal business hours to all books, records, offices and other facilities and properties of the Company and each Company Subsidiary as Parent, or its authorized

47

FBG_CH1_00094764

Representatives may from time to time reasonably request; provided, however, that (A) any such access shall be conducted in a manner not to interfere with the businesses or operations of the Company and the Company Subsidiaries, (B) such access may be limited to the extent the Company and the Company determines in good faith, in light of COVID-19 or COVID-19 Measures, that such access would jeopardize the health and safety of any employee of the Company or the Company Subsidiaries, as applicable, and (C) Parent shall not conduct any invasive sampling or testing of building materials or the environment with respect to the Real Property. Notwithstanding anything to the contrary in this Agreement, neither the Company nor any Company Subsidiary shall be required to disclose any information to Parent, or its authorized Representatives, if doing so could (i) violate any agreement or any Law to which the Company or any Company Subsidiary is a party or to which the Company or any Company Subsidiary are subject or (ii) compromise any privilege; provided that the Company and its Subsidiaries shall use commercially reasonable efforts to provide such access in a manner that does not result in a waiver of such privilege or protection, does not violate such Law or agreement or is not prohibited due to any COVID-19 Measures.

(b)       Any information provided to or obtained by Parent or its authorized Representatives pursuant to paragraph (a) above shall be "Evaluation Material" (herein referred to as "Evaluation Material") as defined in the Confidentiality Agreement, dated as of October 19, 2021, by and between First Brands Group, LLC and Sawaya Partners, LLC (the "Confidentiality Agreement"), and shall be held by Parent in accordance with and be subject to the terms of the Confidentiality Agreement. Notwithstanding anything to the contrary herein, the terms and provisions of the Confidentiality Agreement shall survive the termination of this Agreement in accordance with the terms therein; provided, that, the term thereof shall be extended to a date eighteen (18) months following such termination. In the event of the termination of this Agreement for any reason, Parent shall comply with the terms and provisions of the Confidentiality Agreement, including returning or destroying all Evaluation Material and the non-soliciting of employees of the Company and the Company Subsidiaries. The Confidentiality Agreement shall terminate on the Closing Date.

(c)       No Party will issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties; provided, however, that nothing herein will prohibit any Party from issuing or causing publication of any such press release or public announcement to the extent that such disclosure is, upon advice of counsel, required by Law, in which case the Party making such determination will, if practicable in the circumstances, use commercially reasonable efforts to allow the other Parties reasonable time to comment on such release or announcement in advance of its issuance; and provided, further, that nothing herein shall prohibit any Equityholder or any of its direct and indirect parent entities and Affiliates from disclosing the terms and status of this Agreement or the transactions contemplated hereby to their respective Affiliates, shareholders, limited partners, members, lenders and prospective limited partners, members or lenders.

48

FBG_CH1_00094765

(d)      During the period from the date of this Agreement to the earlier of the Closing Date and the termination of the Agreement in accordance with Article 9, (i) the Company shall promptly inform Parent of any material written or oral communication from any Major Relationship relating to this Agreement upon there existing to the knowledge of the Company, and (ii) the Company will provide Parent with copies of any such material written communication in the possession of the Knowledge Individuals (to the extent there is) and a summary of any such material oral communication; provided, however, that materials may be redacted as necessary to (x) comply with contractual arrangements and (y) address reasonable attorney-client or other privilege or confidentiality concerns.

(e)      Without limiting the generality of this Section 6.2, Parent and the Merger Sub each hereby agrees that from the date hereof until the Closing Date, it is not authorized to, and shall not (and shall cause all of its representatives and Affiliates not to) contact or communicate with the employees, customers, providers, service providers or suppliers of any Company Group (including the Major Relationships) without the prior written approval of Wellspring Parties; provided, however, that this Section 6.2(e) shall not prohibit any contacts or communications by Parent or the Parent's representatives with the customers, providers, service providers or suppliers of any member of the Company Group in the ordinary course of business unrelated to the transactions contemplated hereby, provided that such contacts shall not include any discussion, communication or information exchange regarding the transactions contemplated by this Agreement.

6.3      Filings and Authorizations; Consummation.

(a)      The Company and Parent each acknowledge that they have caused to be filed with the appropriate Governmental Authority all applicable and appropriate notification and report forms and accompanying materials due from each of the Company and Parent under the HSR Act with respect to the transactions contemplated hereby.  None of the Equityholders, the Company, the Company Subsidiaries or their respective officers, directors or employees shall be required to execute or enter into or perform any action or agreement pursuant to this Section 6.3 that is not contingent upon the Closing.

(b)      The Company and Parent, as promptly as practicable, shall make, or cause to be made, all other filings and submissions under Law applicable to it, or to its Subsidiaries and Affiliates, as may be required for it to consummate the transactions contemplated herein and use its commercially reasonable efforts (which shall not require a Party to make any payment or concession to any Person in connection with obtaining such Person's consent) to obtain, or cause to be obtained, all other authorizations, approvals, consents and waivers from all Persons and Governmental Authorities necessary to be obtained by it, or its Subsidiaries or Affiliates, in order for it to consummate such transactions.  Parent shall not (i) consent to any voluntary extension of any statutory deadline or waiting period, (ii) pull and refile any filing made under the HSR Act, or any other Antitrust Law or (iii) consent to any other voluntary delay of the consummation of the transactions contemplated by this Agreement at the behest of any

49

FBG_CH1_00094766

Governmental Authority, in each case, without the prior written consent of the Company, which consent shall not be unreasonably withheld. Parent acknowledges that certain consents and waivers with respect to the transactions contemplated by this Agreement may be required from parties to Contracts to which the Company or a Company Subsidiary is a party and that such consents and waivers have not been and may not be obtained.

(c)  The Company and Parent shall coordinate and cooperate with one another in exchanging and providing such information to each other and in making the filings and requests referred to in paragraph (b) above. The Parties shall supply such reasonable assistance as may be reasonably requested by any other Party in connection with the foregoing.

(d)  Notwithstanding anything to the contrary in this Agreement, Parent shall, and shall cause its Affiliates to, use commercially reasonable efforts to take any and all such action necessary, proper or advisable to consummate the transactions contemplated in this Agreement by Termination Date, provided that nothing in this Section 6.3 or elsewhere in this Agreement shall require Parent or its Affiliates to, (i) propose, negotiate, offer to commit or effect, by order, consent decree, hold separate order, trust, or otherwise, the sale, divestiture, license, disposition or hold separate of such assets, businesses, product lines, equity interests, properties or services of Parent or the Company, or any of their respective Subsidiaries or Affiliates, or otherwise offer to take or offer to commit to take any action that limits Parent's freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, product lines, equity interests, properties or services of Parent or its Subsidiaries or Affiliates or of the Company, any Company Subsidiary or their respective affiliates; (ii) terminate, relinquish, modify or waive any existing relationships, ventures, contractual rights, obligations or other arrangements of Parent or the Company, or any of their respective Subsidiaries or Affiliates; or (iii) defend through litigation any Action, or order by any Governmental Authority or private party, challenging the transactions contemplated hereby.

(e)  Each of Parent, on the one hand, and the Company, on the other hand shall promptly inform the other of any material communication from the Federal Trade Commission, the Department of Justice or any other Governmental Authority regarding any of the transactions contemplated by this Agreement. Each of Parent or Company (including their respective Affiliates or Subsidiaries) will provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement; provided, however, that materials may be redacted as necessary to (i) comply with contractual arrangements and (ii) address reasonable attorney-client or other privilege or confidentiality concerns. If any Party or any Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to the transactions contemplated by this Agreement, then such Party will endeavor to use reasonable best efforts to make, or cause to be made, as soon as reasonably practicable and after

50

FBG_CH1_00094767

consultation with the Equityholder Representative (in the case of Parent) and Parent and the Equityholder Representative (in all other cases), an appropriate response to such request. Parent will advise the Company promptly in respect of any understandings, undertakings or agreements (oral or written) which Parent proposes to make or enter into with the Federal Trade Commission, the Department of Justice or any other Governmental Authority in connection with the transactions contemplated by this Agreement, and give the Company the opportunity to attend and participate at any meetings with respect thereto. None of Parent or Company (including their respective Affiliates or Subsidiaries) will agree to participate in any substantive meeting, telephone call or discussion with a Governmental Authority in respect of any submissions, filings, investigation (including any settlement of the investigation), litigation or other inquiry or Action relating to the matters that are the subject of this Agreement unless it consults with the other parties in advance and, except as may be prohibited by a Governmental Authority or by any Law, will permit authorized representatives of the other parties to be present at each substantive meeting, telephone call or discussion.

(f)     Parent shall not, and shall cause its Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in or otherwise make any investment in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire or make any investment in any assets, or agree to a commercial or strategic relationship with any Person, if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger, consolidation, investment or commercial or strategic relationship would reasonably be expected to, and actually does, (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or order of any Governmental Authority necessary to consummate the transactions contemplated hereby or the expiration or termination of any applicable waiting period, (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated hereby, (iii) materially delay the consummation of the transactions contemplated hereby or (iv) increase the risk of any Major Relationship changing its commercial relationship with the Company Group.

6.4     Resignations. The Company shall cause to be delivered to Parent on the Closing Date such resignations of members of the Board of Directors and officers of the Company and each Company Subsidiary which have been requested in writing by Parent at least five (5) Business Days prior to the Closing, such resignations to be effective concurrently with the Closing.

6.5     Employee Matters.

(a)     For the period beginning as of the Closing through (and including) December 31, 2022 or the date of termination, if earlier, Parent shall provide, or shall cause the Surviving Corporation and each Company Subsidiary to provide to employees of the Surviving Corporation or any Company Subsidiary who remain employed after the Closing (collectively, the "Continuing Employees") and whose terms and conditions of employment were not, and do not become, subject to a collective

51

FBG_CH1_00094768

bargaining agreement: (i) base salary or base wages that are no less favorable than those provided to each such Continuing Employee immediately prior to the Closing, (ii) target incentive opportunities (excluding retention, change in control and equity-based compensation), if any, that are no less favorable than those provided to each such Continuing Employee immediately prior to the Closing and (iii) employee benefits that are no less favorable in the aggregate to those provided to each such Continuing Employee immediately prior to the Closing; provided, however, that except as otherwise set forth in any Contract (other than this Agreement) with any employee of the Surviving Corporation or any Company Subsidiary or applicable Law, nothing herein shall preclude Parent, the Surviving Corporation or any Company Subsidiary from terminating the employment of any employee at any time on or after the Closing.

(b)     Parent shall, and shall cause, service rendered by Continuing Employees prior to the Closing Date to be taken into account for all purposes, including participation, coverage, vesting and level of benefits, as applicable, under all employee benefit plans, programs, policies and arrangements of Parent and its Subsidiaries (including the Surviving Corporation and each Company Subsidiary) from and after the Closing Date, to the same extent as such service was taken into account under corresponding plans of the Surviving Corporation and each Company Subsidiary for such purposes; provided, however, that nothing herein shall result in the duplication of any benefits for the same period of service.  Without limiting the foregoing, employees of the Surviving Corporation and each Company Subsidiary will not be subject to any pre-existing condition or limitation under any health or welfare plan of Parent or its Subsidiaries (including the Surviving Corporation and each Company Subsidiary) for any condition for which such employee would have been entitled to coverage under the corresponding plan of the Company and each Company Subsidiary in which such employee participated immediately prior to the Closing Date.  Parent shall, and shall cause, such employees to be given credit under such plans for co-payments made, and deductibles satisfied, prior to the Closing Date.

(c)     Nothing in this Agreement shall (i) be treated as an amendment, modification or creation of any employee benefit plan, program, policy, practice, agreement or arrangement, including of any Company Plan, (ii) create any right or benefit in any Person, other than the signatories of this Agreement, (iii) guarantee employment of any employee for any period of time after the Closing or preclude the ability of Parent or any of its Affiliates (including, for the avoidance of doubt, the Company and each Company Subsidiary) to terminate the employment of any employee or (iv) create a binding employment agreement with any employee.

6.6     Further Assurances.

(a)     From the date hereof until the earlier of the Closing Date and the termination of this Agreement in accordance with Article 9, each of the Parties shall execute such documents and perform such further acts as may be reasonably required to carry out the provisions hereof and the actions contemplated hereby.  Except where a different standard is expressly contemplated by this Agreement, each Party shall, on or prior to the Closing Date, use its commercially reasonable efforts to fulfill or obtain

52

FBG_CH1_00094769

the fulfillment of the conditions precedent to the consummation of the transactions contemplated hereby, including the execution and delivery of any documents, certificates, instruments or other papers that are reasonably required for the consummation of the transactions contemplated hereby.

(b)     Parent shall, to the extent not effected at or prior to the Closing, (x) arrange for a substitute letter of credit, surety bond or other similar credit support as promptly as reasonably practicable after the Closing to replace the outstanding letter of credit in respect of the Avalon L/C related to Pylon and (y) reimburse the Company (in any event no later than 10 Business Days following the replacement or, if applicable, cancellation of the Avalon L/C) for the amount of the Avalon L/C related to Pylon that was previously cash collateralized in the amount of $105,000, plus the reasonable costs and expenses in connection with maintaining such Avalon L/C related to Pylon. Without duplication of the foregoing clause (y), Parent shall promptly (and in no event later than 10 Business Days after written request therefor from the Principal Seller), reimburse the Principal Seller in full for Avalon L/C liabilities related to Pylon to the extent that the Avalon L/C is called upon and the Principal Seller or any of its Affiliates makes any cash payment or incurs any liability in connection therewith.  "Avalon L/C" means that certain Letter of Credit in the original face of amount of $500,000, of which $100,000 relates to Pylon, issued by CIBC Bank USA, as letter of credit issuer for the benefit of Avalon Risk Management Insurance Agency, LLC. The Company previously caused the Avalon L/C to be cash collateralized in an amount equal to $525,000 (105% of the undrawn face amount thereof), which such amount is allocated to support (w) Pylon in the amount of $105,000 (105% of the $100,000 Avalon L/C related to Pylon) and (x) International Brake Industries, Inc. ("IBI") in the amount of $420,000 (105% of the $400,000 Avalon L/C related to IBI).

6.7     Officer and Director Indemnification and Insurance.

(a)     Parent agrees that all rights to indemnification and exculpation from liability for acts or omissions occurring on or prior to the Effective Time now existing in favor of the current or former directors, managers, officers or employees of the Company and the Company Subsidiaries and each Person who served, at the request of any member of the Company Group, as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (collectively the "D&O Indemnified Parties"), as provided in the respective organizational documents or in indemnification agreements in effect as of the date hereof, shall survive the Effective Time and shall continue in full force and effect in accordance with their respective terms for a period of not less than six years after the Closing Date.  To the maximum extent permitted by applicable Law, such indemnification shall be mandatory rather than permissive, and the Company Group shall advance expenses in connection with such indemnification as provided in the Company Group's organizational documents or other applicable agreements (such advancement also being mandatory rather than permissible).  The indemnification, advancement of expenses and exculpation provisions of the Company Group's organizational documents shall not be amended, repealed or otherwise modified after the Closing in any manner that would adversely affect the rights thereunder of individuals

53

FBG_CH1_00094770

who, as of the date hereof and prior to the Closing, were directors, officers, employees or agents of the Company Group, unless such modification is required by applicable Law, it being the intent of the Parties that the current and former directors, managers, officers and employees of the Company and the Company Subsidiaries and other indemnified Persons shall continue to be entitled to such exculpation and indemnification (including with respect to advancement of expenses) to the full extent of applicable Law.

(b)     On the Closing Date, Parent shall pay for a non-cancelable run-off insurance policy of not less than the existing coverage amount, for a period of six (6) years after the Closing Date to provide insurance coverage for events, acts or omissions occurring on or prior to the Closing Date for all persons who were directors, managers or officers of the Company or any Company Subsidiary on or prior to the Closing Date, which policy shall contain terms and conditions no less favorable to the insured persons than the directors', managers' or officers' liability coverage presently maintained by the Company.

(c)     Parent hereby acknowledges that the D&O Indemnified Parties may have certain rights to indemnification, advancement of expenses or insurance provided by other Persons.  Parent hereby agrees that (i) Parent and the Company Group are the indemnitors of first resort (i.e., its obligations to the D&O Indemnified Parties are primary and any obligation of such other Persons to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any such D&O Indemnified Party are secondary), (ii) Parent and the Company Group shall be required to advance the full amount of expenses incurred by any such D&O Indemnified Party and shall be liable for the full indemnifiable amounts, without regard to any rights any such D&O Indemnified Party may have against any such other Person and (iii) Parent (on behalf of itself and following the Closing, the Company Group) irrevocably waives, relinquishes and releases such other Persons from any and all claims against any such other Persons for contribution, subrogation or any other recovery of any kind in respect thereof.  Parent further agrees that no advancement or payment by any of such other Persons on behalf of any such D&O Indemnified Party with respect to any claim for which such D&O Indemnified Party has sought indemnification from Parent shall affect the foregoing and such other Persons shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such D&O Indemnified Party against Parent.  Parent shall advance, and cause to be paid all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any D&O Indemnified Party in enforcing the indemnity and other obligations provided in this Section 6.7.

(d)     The covenants contained in this Section 6.7 are intended to be for the benefit of, and shall be enforceable by, each of the D&O Indemnified Parties and their respective heirs and legal representatives and shall not be deemed exclusive of any other rights to which such D&O Indemnified Parties are entitled, whether pursuant to Law, Contract or otherwise.  In the event that Parent or the Company (following the Closing) or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its

54

FBG_CH1_00094771

properties and assets to any Person, then, and in each such case, Parent shall take all necessary action so that the successors or assigns of Parent or the Company (following the Closing), as the case may be, shall succeed to the obligations set forth in this Section 6.7.

6.8     Termination of Affiliate Obligations.  On or before the Closing Date, except for Excluded Arrangements or as set forth in Section 6.8 of the Disclosure Schedules hereto, this Agreement and any ancillary agreements contemplated herein, all Affiliate Agreements shall be terminated.

6.9     Exclusivity.  Until the earlier of the Closing and such time as this Agreement is terminated in accordance with Article 9, except for the transactions contemplated by this Agreement, the Equityholders shall not, and shall cause the Company, the Company Subsidiaries, and their respective Representatives not to, directly or indirectly, solicit, encourage or enter into any negotiation, discussion, Contract or instrument, with any Person other than Parent and its Affiliates, with respect to the sale of the Company Stock or all or substantially all the assets of the Company and the Company Subsidiaries, or any merger, recapitalization or similar transaction with respect to the Company and the Company Subsidiaries or their respective businesses (an "Alternative Transaction") or furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person (other than Parent and its Affiliates) to do or seek to do any of the foregoing.  With respect to the Persons with whom information has been shared relating to an Alternative Transaction, the Company shall use its commercially reasonable efforts to obtain the return or destruction of, in accordance with the terms of any applicable confidentiality agreement, any confidential information previously furnished to any such Person by the Company or any of its representatives.

6.10    Waiver of Conflicts Regarding Representation.

(a)     Recognizing that Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Dykema Gossett PLLC ("Dykema" and collectively, the "Designated Counsel") have acted as legal counsel to Wellspring Capital Partners V, L.P. and Wellspring Capital Partners V (Offshore), their respective Affiliates and their respective Representatives (collectively, the "Wellspring Parties"), and may be deemed to have acted as legal counsel to the Company and the Company Subsidiaries prior to the Closing, and that the Designated Counsel intends to act as legal counsel to the Wellspring Parties after the Closing, (i) Parent shall not, or shall cause the Company Group to, seek to have the Designated Counsel disqualified from representing the Wellspring Parties in connection with any dispute that may arise between the Wellspring Parties and Parent or the Company in connection with this Agreement or the transactions contemplated hereby and the Company hereby waives, on its own behalf and agrees to cause its Affiliates to waive, any conflicts that may arise in connection with the Designated Counsel representing the Wellspring Parties after the Closing and (ii) in connection with any such dispute relating to this Agreement or the transactions contemplated hereby that may arise between the Wellspring Parties, on the one hand, and Parent or the Company, on the other hand, the Wellspring Parties involved in such dispute (and not Parent or the

55

FBG_CH1_00094772

Company) will have the right to decide whether or not to waive the attorney-client privilege that may apply to any communications between the Company, and of the Company Subsidiaries and the Designated Counsel that occurred before the Closing in connection with this Agreement and the transactions contemplated hereby and (iii) in the event that a dispute arises between or among any of Parent or any of its Affiliates (including, after the Closing, the Company and the Company Subsidiaries) and any Wellspring Parties (including, prior to the Closing, the Company and the Company Subsidiaries), Parent, the Company and each of the other Parties hereby agree that the Designated Counsel may represent Wellspring Parties in such dispute even though the interests of Wellspring Parties may be directly adverse to Parent or its Affiliates (including, after the Closing, the Company or the Company Subsidiaries), and even though the Designated Counsel may have represented the Company or the Company Subsidiaries in a matter substantially related to such dispute, or may be handling ongoing matters for Wellspring Parties, Parent and, after the Closing, the Company, waive, on behalf of themselves and each of their respective Affiliates, any conflict of interest in connection with such representation by the Designated Counsel.

(b)      Parent, Merger Sub and, after the Closing, the Surviving Corporation, further agree that, as to all communications in any form or format whatsoever between or among the Designated Counsel, the Company and/or the Company Subsidiaries, and all attorney work product that relates in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong solely to the Wellspring Parties and shall solely be controlled by Wellspring Parties and shall not pass to or be claimed by Parent, or, after the Closing, the Company or any of the Company Subsidiaries.  The Parties agree to take, and to cause their respective Affiliates to take, all steps necessary to implement the intent of this Section 6.10.  Parent acknowledges, on behalf of itself and, after the Closing, the Surviving Corporation and the Company Subsidiaries and any of their respective Affiliates, that each has had the opportunity to discuss and obtain adequate information concerning the significance and material risks of, and reasonable available alternatives to, the waivers, permissions and other provisions of this Agreement, including the opportunity to consult with counsel other than the Designated Counsel.  This Section 6.10 is for the benefit of the Designated Counsel and the Wellspring Parties (including its partners and employees), which is an intended third-party beneficiary of this Section 6.10.

6.11   Access to Books and Records. From and after the Closing until the fifth (5th) anniversary hereof, Parent shall, and shall cause the Company Group to, provide the Equityholders, the Wellspring Parties and their authorized Representatives with reasonable access (for the purpose of examining and copying), upon reasonable advanced written notice to the Parent, during normal business hours, to the books and records of the Company Group for any reasonable business purpose with respect to periods prior to the Closing Date and not unreasonably interfere with the ongoing operations of Parent and its Subsidiaries. No party shall be required to provide access to books and records pursuant to this Section to the extent such access, would (i) violate any fiduciary duty, confidentiality obligation, agreement or any Law to which the Parent or any of its Affiliates is a party or to which the Parent or any of its Affiliates is subject, (ii)

56

FBG_CH1_00094773

jeopardize any attorney-client or legal privilege or (iii) reasonably be prohibited by or inadvisable due to COVID-19 or any COVID-19 Measures; provided that the Parent or any of its Affiliates shall use commercially reasonable efforts to provide such access in a manner that does not result in a waiver of such privilege or protection, does not violate such Law or agreement or is not prohibited due to any COVID-19 Measures, as applicable.  Unless otherwise consented to in writing by the Equityholder Representative, Parent shall not permit the Company Group, for a period of five (5) years following the Closing Date, to destroy or otherwise dispose of any books and records of the Company Group, or any portions thereof, relating to periods prior to the Closing Date without first giving reasonable prior written notice to the Equityholder Representative and offering to surrender to the Equityholder Representative such books and records or such portions thereof.  This Section 6.11 is for the benefit of the Wellspring Parties (including its partners and employees), which is an intended third-party beneficiary of this Section 6.11.

6.12    Frustration of Closing Conditions.  Notwithstanding anything to the contrary set forth in this Agreement, including in Article 7 or Article 8, Parent may not rely on the failure of any condition set forth in Article 7 (Conditions Precedent to Obligations of Parent and Merger Sub) to be satisfied if such failure was caused by the failure of Parent or Merger Sub, as applicable, to perform any of its obligations under this Agreement.  Notwithstanding anything to the contrary set forth in this Agreement, including in Article 7 or Article 8, neither the Company nor any Equityholder may rely on the failure of any condition set forth in Article 8 (Conditions Precedent to Obligations of the Company) to be satisfied if such failure was caused by the Company's or such Equityholder's failure to perform any of their respective obligations under this Agreement.

6.13    R&W Insurance Policy.  Prior to the Closing, Parent will provide to the Company a true and complete copy of the buyer-side representation and warranty insurance policy, to be issued at Closing in the name of and for the benefit of Parent, on substantially the terms previously disclosed (the "R&W Insurance Policy"). All premiums, underwriting fees, brokers' commissions and other costs and expenses related to the R&W Insurance Policy (collectively, the "R&W Insurance Fees") shall be borne solely by Parent, and Parent shall promptly pay all such R&W Insurance Fees required for the full term of the R&W Insurance Policy and comply in all material respects with all of its obligations under the R&W Insurance Policy.  Parent shall ensure that the R&W Insurance Policy expressly waives any claims of subrogation against the Equityholders and any of the Equityholder Released Parties, other than any claim for Fraud, and Parent shall not permit any amendment to the R&W Insurance Policy that would be adverse to the Equityholders without the prior written consent of the Equityholder Representative. The Equityholders and the Equityholder Released Parties shall be express third-party beneficiaries of the provisions and limitations described in this Section 6.13.

6.14    Tax Matters.

(a)    Pre-Closing Tax Refunds.  Except to the extent included as a Tax asset or Tax refund in Closing Working Capital as finally determined hereunder, any

57

FBG_CH1_00094774

Tax refund of the Company or any Company Subsidiary with respect to a Pre-Closing Tax Period (a "Pre-Closing Tax Refund") shall be for the sole benefit of the Equityholders. Parent shall pay to Equityholders, in accordance with payment instructions provided by the Equityholders, the amount of such Pre-Closing Tax Refund, within five days of the date of receipt of the Pre-Closing Tax Refund or the filing of any Tax Return utilizing such Pre-Closing Tax Refund (in the form of a credit or offset to Taxes otherwise payable), as applicable.  Parent and its Affiliates shall, and shall cause the Company or any Company Subsidiary to promptly take all reasonable actions (including those actions reasonably requested by the Equityholders) to file for and obtain any Pre-Closing Tax Refund.

(b)    Cooperation.

(i)    Parent, on the one hand, and the Equityholder Representative, on the other hand, shall cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful in connection with any audit, examination, litigation or other proceeding with respect to the income Tax Returns of the Company for any Pre-Closing Tax Period or Straddle Period.

(c)    Parent shall not make any election under Section 338 of the Code (or any comparable election under state, local or foreign Law) with respect to the acquisition of the Company or any Company Subsidiary.

(d)    It is the intention of the Parties to treat any additional payments made with respect to Section 2.10(e) of this Agreement as an adjustment to the purchase price for all federal, state, local and foreign Tax purposes, and the parties agree to file their Tax Returns accordingly, except as otherwise required by a change in applicable law or a final determination.  Any payments paid under this Agreement to the shares of the Company shall be treated as purchase price for US federal income tax purposes.

(e)    The Parties acknowledge and agree that the payments made pursuant to Section 2.4 and Section 2.10 shall be taxable transactions governed by Section 1001 of the Code (and analogous provisions of applicable state and local law) effective as of the Effective Time.

6.15    Names Following Closing.

(a)    Parent is not purchasing, acquiring or otherwise obtaining any right, title or interest in any Principal Seller Marks, except for the limited right to use such Principal Seller Marks as expressly set forth in this Section 6.15. Neither Parent nor any of its Affiliates or Subsidiaries shall seek to register in any jurisdiction any Principal Seller Mark, or any other mark that is confusingly similar to a Principal Seller Mark, or to contest the use, ownership, validity or enforceability of any Principal Seller Mark.  To the extent that the Company has any rights in, or license with respect to, any Principal Seller Mark, pursuant to any Contract or otherwise, such rights and licenses shall automatically

58

CONFIDENTIAL

FBG_CH1_00094775

terminate at the Closing without recourse, and Parent shall cause Company to take all necessary action to cause such termination.

(b)     Except as otherwise provided in this Section 6.15, Parent shall and shall cause the Company to (i) cease and discontinue all uses of the Principal Seller Marks as soon as reasonably practicable following the Closing (ii) not expressly, or by implication, do business as or represent themselves as the Principal Seller or an Affiliate of the Principal Seller and (iii) use commercially reasonable efforts to cause the third-party agents using the Principal Seller Marks to cease use of the Principal Seller Marks within five (5) Business Days of the Closing Date.  As promptly as practicable after the Closing Date, and in any event no later than five (5) Business Days after the Closing Date, Parent shall take all requisite corporate actions, make all filings, pay all requisite fees and take all other actions reasonably necessary to change the legal names, corporate names and business names of the Company and apply for their organizational documents and business registration certificate or licenses, as applicable, to be amended to remove any reference to the Principal Seller Marks, in all jurisdictions, and shall promptly take any and all follow-up actions that may be required or reasonably requested by any Governmental Authority to effect such changes as soon as practicable.

6.16     Intercompany Receivables.  On or prior to the Closing and subject to applicable Law, the Intercompany Receivables shall be distributed by the Company.

6.17     Restrictive Covenants.  The covenants set forth on Exhibit G are incorporated herein by reference.

6.18     Consents.  The Company shall, and shall cause each Company Subsidiary to, use commercially reasonable efforts, and upon the request of the Company, Parent shall use commercially reasonable efforts to cooperate with the Company Group, to obtain the consents, approvals or waivers to consummate the transactions contemplated hereby with respect to the Contracts requested by Parent and listed on Section 6.18 of the Disclosure Schedules; provided, however, that no party shall pay any funds, commence or participate in any litigation or offer or grant any accommodation (financial or otherwise) to any third party in connection with the obligations described in this Section 6.18.  For the avoidance of doubt, the failure to obtain any such consent shall not in and of itself result in a failure of any condition to Closing set forth in this Agreement.

ARTICLE 7

CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT AND MERGER SUB

The obligations of Parent and Merger Sub under this Agreement shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by Parent:

7.1     Representations and Warranties Accurate.  Each of the (a) representations and warranties contained in Section 4.2, shall be true and correct in all

CONFIDENTIAL

FBG_CH1_00094776

**DEBTORS' EXHIBIT NO. 243**
**Page 64 of 129**

respects (except for such failures to be true and correct that are de minimis) on and as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date), (b) Company Fundamental Representations (other Section 4.2) shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date) and (c) remaining representations and warranties of the Company contained in Article 4 shall be true and correct, in each case on and as of the Closing Date as though made on and as of the Closing Date and without giving effect to any materiality or "Material Adverse Effect" qualifications therein (other than in the definition of "Material Contract") (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date); provided, however, that clause (c) of this condition shall be considered satisfied unless the failure of such a representation or warranty to be true and correct, has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

7.2    Performance.  The Company shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed and complied with by them prior to or on the Closing Date.

7.3    No MAE  Since the date of this Agreement, no Material Adverse Effect shall have occurred.

7.4    Officer's Certificate.  The Company shall have delivered to Parent a certificate, signed by an officer of the Company, dated as of the Closing Date, certifying the matters set forth in Sections 7.1, 7.2 and 7.3.

7.5    HSR Act.  All waiting periods under the HSR Act applicable to the consummation of the transactions contemplated by this Agreement (and any customary timing agreement with any Governmental Authority to toll, stay, or extend any such waiting period, or to delay or not to consummate the transactions contemplated by this Agreement) shall have expired or been terminated.  For the avoidance of doubt, the receipt of a Specified AT Letter by Parent or the Company shall not be a basis for concluding that any closing condition is not satisfied for purposes of this Section 7.5.

7.6    No Legal Restraints. No Law shall have been entered or be in effect following the date of this Agreement, that would prevent the consummation of any of the transactions contemplated hereby, declare unlawful any of the transactions contemplated hereby or cause any of the transactions contemplated hereby to be rescinded following consummation.  For the avoidance of doubt, the receipt of a Specified AT Letter by Parent or the Company shall not be a basis for concluding that any closing condition is not satisfied for purposes of this Section 7.6.

7.7    Written Consent. The Company shall have obtained the Written Consent.

CONFIDENTIAL                                                                FBG_CH1_00094777

ARTICLE 8

CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY

The obligation of the Company to effect the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing Date, of all of the following conditions, any one or more of which may be waived by the Equityholder Representative:

8.1     Representations and Warranties Accurate.  Each of the (a) Parent Fundamental Representations shall be true and correct in all material respects and (b) remaining representations and warranties of Parent and Merger Sub contained in Article 5 shall be true and correct, in each case on and as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties expressly stated to relate to an earlier date, in which case, as of such earlier date); provided, however, that clause (b) of this condition shall be considered satisfied unless the failure of such representations or warranties to be true and correct, individually or in the aggregate, would not reasonably be expected to prevent or delay the ability of Parent to consummate the transactions contemplated hereby.

8.2     Performance.  Each Parent and Merger Sub shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed and complied with by it prior to or on the Closing Date.

8.3     Officer Certificate.  Parent shall have delivered to the Company a certificate, signed by an executive officer of Parent, dated as of the Closing Date, certifying the matters set forth in Sections 8.1 and 8.2.

8.4     Written Consent: The Company shall have obtained the Written Consent.

8.5     HSR Act.  All waiting periods under the HSR Act applicable to the consummation of the transactions contemplated by this Agreement (and any customary timing agreement with any Governmental Authority to toll, stay, or extend any such waiting period, or to delay or not to consummate the transactions contemplated by this Agreement) shall have expired or been terminated.  For the avoidance of doubt, the receipt of a Specified AT Letter by Parent or the Company shall not be a basis for concluding that any closing condition is not satisfied for purposes of this Section 8.4.

8.6     No Legal Restraints. No Law shall have been entered or be in effect following the date of this Agreement, that would prevent the consummation of any of the transactions contemplated hereby, declare unlawful any of the transactions contemplated hereby or cause any of the transactions contemplated hereby to be rescinded following consummation.

61

CONFIDENTIAL                                                                    FBG_CH1_00094778

ARTICLE 9

TERMINATION

9.1     Termination.  This Agreement may be terminated on or prior to the Effective Time as follows:

(a)     Parent and the Equityholder Representative may terminate this Agreement by mutual written consent at any time prior to the Effective Time;

(b)     Parent may terminate this Agreement (if neither Parent nor Merger Sub is then in breach of its representations, warranties, covenants or agreements under this Agreement so as to cause any of the conditions set forth in Sections 8.1 or 8.2 not to be satisfied), upon written notice to the Equityholder Representative, if there has been a violation, breach or inaccuracy of any representation, warranty, covenant or agreement of the Company contained in this Agreement, which violation, breach or inaccuracy would cause any of the conditions set forth in Sections 7.1 or 7.2 not to be satisfied (treating such time as if it were the Closing for purposes of this Section 9.1(b)), and such violation, breach or inaccuracy has not been waived by Parent or cured by the Company, as applicable, within the earlier of (x) the Termination Date and (y) 20 Business Days after receipt by the Company or the Equityholder Representative, as applicable, of written notice thereof from Parent or is not capable of being cured prior to the Termination Date;

(c)     The Equityholder Representative may terminate this Agreement (if the Company is not then in breach of its representations, warranties, covenants or agreements under this Agreement so as to cause any of the conditions set forth in Sections 7.1 or 7.2 not to be satisfied), upon written notice to Parent, if there has been a violation, breach or inaccuracy of any representation, warranty, agreement or covenant of Parent or Merger Sub contained in this Agreement, which violation, breach or inaccuracy would cause any of the conditions set forth in Sections 8.1 or 8.2, not to be satisfied (treating such time as if it were the Closing for purposes of this Section 9.1(c)), and such violation, breach or inaccuracy has not been waived by the Equityholder Representative or cured by Parent within the earlier of (x) the Termination Date or (y) 20 Business Days after receipt by Parent of written notice thereof from the Equityholder Representative or is not capable of being cured prior to the Termination Date;

(d)     [Reserved];

(e)     Either Parent or the Equityholder Representative may terminate this Agreement if the Closing Date shall not have occurred on or before July 30, 2022 (the "Termination Date"); provided, however, that (i) the terminating Party is not in material breach of any representation, warranty, covenant or other agreement contained herein at the time of such termination so as to cause (x) in the case that Parent is the terminating Party, any of the conditions set forth in Sections 8.1 or 8.2 not to be satisfied and (y) in the case that the Equityholder Representative is the terminating Party, any of the conditions set forth in Sections 7.1 or 7.2 not to be satisfied and (ii) this

62

Section 9.1(e) shall not be available to any Party during the pendency of any Action by the other Party for specific performance of this Agreement as provided by Section 12.16;

(f)     The Equityholder Representative may terminate this Agreement, if (i) the Closing shall not have occurred on or before the date required by Section 3.1 (Closing; Closing Date), (ii) all of the conditions to Closing set forth in Article 7 have been satisfied at the time of such termination if the Closing were held at the time of such termination (other than conditions that, either (A) by their nature, are to be satisfied at the Closing (and which are, at the time of termination of this Agreement, capable of being satisfied if the Closing were to occur at such time) or (B) the failure of which to be satisfied is attributable to a breach by Parent of its representations, warranties, covenants or agreements contained in this Agreement), (iii) the Equityholder Representative has notified Parent in writing that the Company is ready, willing and able to effect the Closing at the time of termination or within two (2) Business Days thereafter; and (iv) Parent fails to consummate the Closing on the earlier of the Termination Date or the second (2nd) Business Day following the date of delivery of such written notification by the Equityholder Representative; or

(g)     Either Parent or the Equityholder Representative may terminate this Agreement if the consummation of the transactions contemplated hereby would violate any nonappealable final Order of any Governmental Authority having competent jurisdiction; provided, however, that (i) the terminating Party is not in material breach of any representation, warranty, covenant or other agreement contained herein at the time of such termination so as to cause (x) in the case that Parent is the terminating Party, any of the conditions set forth in Sections 8.1 or 8.2 not to be satisfied and (y) in the case that the Equityholder Representative is the terminating Party, any of the conditions set forth in Sections 7.1 or 7.2 not to be satisfied and (ii) this Section 9.1(g) shall not be available to any Party during the pendency of any Action by the other Party for specific performance of this Agreement as provided by Section 12.16.

In the event of termination pursuant to this Section 9.1, written notice thereof (describing in reasonable detail the basis therefor) shall forthwith be delivered to the other Parties.

9.2     Effect of Termination.

(a)     If this Agreement is terminated by the Parties in accordance with Section 9.1 hereof, this Agreement shall become void and of no further force and effect and there shall be no liability on the part of any Party to any other Party, except that (i) the provisions of this Section 9.2 (Effect of Termination), Section 6.2(b) (Confidentiality) and Article 10 (Miscellaneous) shall remain in full force and effect and (ii) termination shall not preclude any Party from suing and recovering from any other Party for any Willful Breach of this Agreement prior to such termination or Fraud. The Confidentiality Agreement and the Specified AT Letter shall survive any termination of this Agreement in accordance with its terms and nothing in this Section 9.2 shall be construed to discharge or relieve any party to the Confidentiality Agreement or the Specified AT Letter or any of its obligations thereunder; provided, that notwithstanding

63

FBG_CH1_00094780

the terms of the Confidentiality Agreement or Specified AT Letter, as applicable, the terms of such agreements shall be extended by an additional one (1) year.

(b)    It is acknowledged that the Equityholders are intended third-party beneficiaries of the obligations of Parent and Merger Sub under this Agreement.  The Equityholders shall be entitled to sue, and recover from, Parent damages arising from or relating to Parent and/or Merger Sub's Fraud or Willful Breach of this Agreement, which shall take into account the consideration (including the premium paid) that would have otherwise been payable to the Equityholders, as applicable, pursuant to this Agreement and the loss of value of the Company.

ARTICLE 10

MISCELLANEOUS

10.1    No Survival.  The Parties, intending to modify any applicable statute of limitations, agree that (a) none of the representations and warranties of the Company contained in Article 4 and of Parent and Merger Sub contained in Article 5, and in any certificate or Letter of Transmittal delivered pursuant to this Agreement shall survive the Effective Time and all rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at law or in equity) with respect thereto shall terminate at the Effective Time and (b) none of the covenants of the Parties set forth in this Agreement shall survive the Effective Time and all rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at law or in equity) with respect thereto shall terminate at the Effective Time, except that Section 2.10 (Purchase Price Adjustment), Section 6.2(c) (Public Announcements), Section 6.7 (Officer and Director Indemnification and Insurance), Section 6.11 (Access to Books and Records), Section 6.13 (R&W Insurance Policy), Article 10 (Miscellaneous) and any other covenants requiring performance after the Effective Time (including Section 6.17) or which otherwise expressly by their terms survive the Effective Time shall survive in accordance with their terms only for such period as shall be required for the applicable Party to complete the performance required thereby.  Notwithstanding anything to the contrary herein, except for the covenants specifically referenced above in this Section 10.1 and any other covenants requiring performance after the Effective Time or which otherwise expressly by their terms survive the Effective Time, no Party (or any officer, agent, employee, direct or indirect holder of any equity interest or securities, or Affiliates of any Party) shall have any liability hereunder after the Effective Time (and this sentence is intended to benefit each such Person, whether or not a party to this Agreement). PARENT, ON BEHALF OF ITSELF AND ITS AFFILIATES, SUCCESSORS AND PERMITTED ASSIGNS, EXPRESSLY WAIVES ALL RIGHTS AFFORDED BY ANY STATUTE THAT LIMITS THE EFFECT OF A RELEASE WITH RESPECT TO UNKNOWN CLAIMS. PARENT UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND WAIVER OF STATUTORY PROTECTION AGAINST A RELEASE OF UNKNOWN CLAIMS. PARENT ACKNOWLEDGES AND AGREES THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT. PARENT FURTHER EXPRESSLY WAIVES ALL RIGHTS TO CLAIM OR SEEK RESCISSION OF THE

64

FBG_CH1_00094781

TRANSACTIONS CONTEMPLATED HEREIN OR HEREBY. Notwithstanding the foregoing, (A) this Section 10.1 shall not interfere with or impede the operation of Section 2.4, (B) this Section 10.1 shall not limit the ability of any Party to seek specific performance in accordance with Section 10.17 and (C) Parent shall have the right to maintain or recover its actual damages (excluding any consequential, special, punitive or exemplary damages, any damages based on diminution of value, multiple of profits or cash flows, lost profits or similar theories or any other non-out-of-pocket damages), to the extent arising from Fraud; provided, that any such right to pursue any action or claim arising from Fraud shall be subject to, and governed by, the disclaimers and acknowledgments of non-reliance contained in Section 4.24 and Section 5.11 of this Agreement.

10.2    Expenses.  Except as expressly provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

10.3    Amendment.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

10.4    Entire Agreement.  This Agreement including the Disclosure Schedules and Exhibits attached hereto which are deemed for all purposes to be part of this Agreement, and the other documents, delivered pursuant to this Agreement and the Confidentiality Agreement, contain all of the terms, conditions and representations and warranties agreed upon or made by the Parties relating to the subject matter of this Agreement and the businesses and operations of the Company and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the Parties or their Representatives, oral or written, respecting such subject matter.

10.5    Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties.

10.6    Notices.  Any notice or other communication required or permitted under this Agreement shall be deemed to have been duly given and made if (i) in writing and served by personal delivery upon the Party for whom it is intended, (ii) if delivered by electronic mail with receipt confirmed (including by receipt of confirmatory electronic mail from the recipient or (iii) if delivered by certified mail, registered mail, courier service, return-receipt received to the Party at the address set forth below, with copies sent to the Persons indicated:

If, to the Equityholder Representative or, prior to the Closing, the Company or the Company Subsidiaries:

        c/o Wellspring Capital Management LLC
        605 Third Avenue, 44th Floor
        New York, NY 10158
        Attention:  William Byers

65

CONFIDENTIAL

Sarah Mudho

Email:      wbyers@wellspringcapital.com
            smudho@wellspringcapital.com

With a copy to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention:  Angelo Bonvino, Esq.
            Michael Vogel, Esq.
Email:      abonvino@paulweiss.com
            mvogel@paulweiss.com


If to Parent or, after the Closing, to the Surviving Corporation or the Company Subsidiaries:

First Brands Group, LLC
127 Public Square, Suite 5300
Cleveland, Ohio 44114
Attn:  Edward James, Executive Vice President
Email:      ed.james@firstbrandsgroup.com

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this <u>Section 10.6</u>.

    10.7   <u>Exhibits and Schedules</u>.

    (a)   Any matter, information or item disclosed in the Disclosure Schedules delivered under any specific representation, warranty or covenant or Disclosure Schedule number hereof, or in the Data Room, shall be deemed to have been disclosed for all purposes of this Agreement in response to every representation, warranty or covenant in this Agreement in respect of which such disclosure is reasonably apparent on its face.  The inclusion of any matter, information or item in any Disclosure Schedule to this Agreement shall not be deemed to constitute an admission of any liability by the Company to any third party or otherwise imply that any such matter, information or item is material or creates a measure for materiality for the purposes of this Agreement, or that the disclosure of such matter, information or item means that such matter, information or item is required to be disclosed by this Agreement.

    (b)   The Disclosure Schedules and Exhibits hereto are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

    10.8   <u>Waiver</u>.  Waiver of any term or condition of this Agreement by any Party shall only be effective if in writing and shall not be construed as a waiver of

66

CONFIDENTIAL

any subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.

10.9    Binding Effect; Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted successors and assigns.  No Party may assign or delegate, by operation of Law or otherwise, all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other Parties, which any such Party may withhold in its absolute discretion.  Any purported assignment without such prior written consents shall be void.

10.10   No Third Party Beneficiary.  Nothing in this Agreement shall confer any rights, remedies or claims upon any Person or entity not a Party or a permitted assignee of a Party, except (a) for the current and former officers, directors and employees of the Company as set forth in Section 6.7, Article 10 and Section 10.12, (b) the Related Parties as set forth in Section 10.18, (c) the Designated Counsel as set forth in Section 6.10 and (d) the Equityholders as set forth in Section 9.2.

10.11   Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

10.12   Release.  If the Closing occurs, except in the case of Fraud and as provided in Section 2.10 and Article 10, each of Parent and Merger Sub agree (and, from and after the Closing, Parent shall cause the Surviving Corporation and each Company Subsidiary to agree) that the Equityholders, any of their Related Parties and any of their respective Representatives, including current or former officers and directors, members, managers or Representatives of the Company or any Company Subsidiary or any of their respective Related Parties (the "Equityholder Released Parties"), shall have no liability or responsibility to Parent, Merger Sub, the Surviving Corporation or any Company Subsidiary for (and Parent hereby unconditionally releases (and from and after the Closing shall cause the Surviving Corporation and each Company Subsidiary to unconditionally release) such Persons from) any obligations or liability (collectively, the "Released Matters"):

(a)    arising out of, or relating to, the organization, management or operation of the businesses of the Company or any Company Subsidiary relating to any matter, occurrence, action or activity on or prior to the Closing Date;

(b)    relating to this Agreement and the transactions contemplated hereby or any agreement between the Company or any Affiliate of Parent, except for covenants and agreements which contemplate performance after the Closing or otherwise expressly by their terms survive the Closing, each of which will survive in accordance with its terms;

(c)    arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement

67

FBG_CH1_00094784

contained in this Agreement, the Disclosure Schedules and Exhibits hereto or in any certificate contemplated hereby and delivered in connection herewith, except with respect to the covenants and agreements which contemplate performance after the Closing or otherwise expressly by their terms survive the Closing, each of which will survive in accordance with its terms; or

(d)     relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Company and the Company Subsidiaries, including the Evaluation Material.

The foregoing releases extend to any and all claims of any nature whatsoever, whether known, unknown or capable or incapable of being known as of the Effective Time or thereafter, and includes any and all claims, actions, demands, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, Contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, affirmative defenses, demands and other obligations or liabilities whatsoever, in law or equity. As of the Effective Time, each of Parent, the Company and their respective Affiliates (the "Releasing Parties") hereby irrevocably agrees to refrain from, directly or indirectly, asserting, commencing, instituting or causing to be commenced, any Action, of any kind against any applicable Equityholder Released Party, based upon any matter purported to be released hereby and the Company shall indemnify and hold harmless the Equityholder Released Parties from any third party claims relating to, or arising from, the Released Matters. The Releasing Parties (in their respective capacities as such) hereby explicitly waive all rights with respect to the foregoing releases under the provisions of Section 1542 of the California Civil Code, which section provides in pertinent part: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." The Releasing Parties (in their respective capacities as such) agree that no provision of Section 1542 of the California Civil Code shall affect the validity or scope of any other aspect of the foregoing releases. The Releasing Parties (in their respective capacities as such) hereby expressly waive any and all rights with respect to the foregoing releases which they may have under any other provision of state or federal Law providing the same or similar effect.

10.13   <u>Governing Law and Jurisdiction</u>. This Agreement and any claim or controversy hereunder shall be governed by and construed in accordance with the Laws of the State of New York without giving effect to the principles of conflict of laws thereof.

10.14   <u>Consent to Jurisdiction and Service of Process</u>. Any legal action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby may only be instituted in any state or federal court in New York, New York, and each Party waives any objection which such Party may now or hereafter

68

CONFIDENTIAL

FBG_CH1_00094785

have to the laying of the venue of any such action, suit or proceeding, and irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding.

10.15   WAIVER OF JURY TRIAL.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16   Conveyance Taxes.  Parent  agrees to pay all sales, use, value added, transfer, stamp, registration, documentary, excise, real property transfer or gains, or similar Taxes incurred as a result of the transactions contemplated by this Agreement; provided that 50% of any such Taxes shall constitute Transaction Expenses.  Parent agrees to file, with the reasonable cooperation of the Equityholder Representative, any related Tax Returns, and the Equityholder Representative and Parent agree to jointly file all required change of ownership and similar statements.

10.17   Specific Performance.

(a)      The Parties agree that (i) irreparable damage would occur in the event that the provisions of this Agreement or obligations, undertakings, covenants or agreements of the Parties were not performed in accordance with their specific terms or were otherwise breached and (ii) money damages, even if available, would not be an adequate remedy for any such failure to perform or any breach of this Agreement. Accordingly, it is agreed that the Parties shall be entitled to an injunction or injunctions to enforce specifically the terms and provisions hereof in any court specified in Section 10.13 (Governing Law; Jurisdiction) without proof of actual damages, this being in addition to any other remedy to which they are entitled at law or in equity.  Without limitation of the foregoing, the Parties hereby further acknowledge and agree that prior to the Closing, the Equityholder Representative or the Company shall be entitled to seek specific performance to enforce specifically the terms and provisions of, and to prevent or cure breaches of the covenants required to be performed by Parent and Merger Sub under this Agreement (including Section 6.3 (Filings and Authorizations; Consummation), and including to cause Parent to consummate the Closing and to make the payments contemplated by this Agreement, including Section 2.9 (Transactions to be Effected at the Closing)) in addition to any other remedy to which the Company are entitled at law or in equity, including the Equityholder Representatives right to terminate this Agreement pursuant to Article 9 (Termination).

69

CONFIDENTIAL                                                                    FBG_CH1_00094786

(b)      Each Party agrees that it will not oppose (and hereby waives any defense in any action for) the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (i) the other parties have an adequate remedy at law or (ii) an award of specific performance or other equitable remedy is not an appropriate remedy for any reason at law, equity or otherwise.  Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement when available pursuant to the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)      If the Company and/or the Equityholder Representative brings an action for specific performance pursuant to this Section 10.17, and a court rules that Parent breached this Agreement in connection with its failure to effect the Closing in accordance with this Agreement, but such court declines to enforce specifically the obligations of Parent to effect the Closing in accordance with this Agreement, then, in addition to the right of the Equityholder Representative and the Company to terminate this Agreement pursuant to Section 9.1 (Termination), the Equityholder Representative (on behalf of the Equityholders) and the Company shall be entitled to pursue all applicable remedies at law, and Parent shall pay the Equityholder Representative's, the Equityholders', the Company's and the Company Subsidiaries' costs and expenses (including attorneys' fees) in connection with all actions to seek specific performance of Parent's obligations pursuant to this Agreement and all actions to collect such costs or expenses.  For the avoidance of doubt, in no event shall the exercise of the Equityholder Representative's (on behalf of the Equityholders) or the Company's right to seek specific performance pursuant to this Section 10.17 reduce, restrict or otherwise limit the Equityholder Representative's and the Company's rights to terminate this Agreement pursuant to Section 9.1 (Termination) and/or pursue all applicable remedies at law. To the extent the Equityholder Representative or the Company brings any Action to enforce specifically the performance of the terms and provisions of this Agreement when expressly available to such party pursuant to the terms of this Agreement, the Termination Date shall automatically be extended by such time period established by the court presiding over such Action.

10.18   Non-Recourse.  Notwithstanding anything to the contrary herein, except as set forth in the Confidentiality Agreement, (i) this Agreement may be enforced only against, and any Action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may be brought only against, the entities that are expressly named as Parties and then only with respect to the specific obligations set forth herein with respect to such Party and (ii) with respect to each Party, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, agent, attorney, advisor, lender or Representative or Affiliate of such named Party or any of its Affiliates (other than such named Party) (the "Related Parties"), shall have any liability (whether in contract or tort, at law or in equity or otherwise, or based upon any theory that seeks to impose liability of a Party against its owners or Affiliates) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of such named Party or for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby, except for claims against Related Parties of Parent

70

FBG_CH1_00094787

**DEBTORS' EXHIBIT NO. 243**
**Page 75 of 129**

in accordance with the terms of any written agreement with such Person. The provisions of this Section 10.18 are intended to be for the benefit of, and enforceable by the Related Parties and each such Person shall be a third-party beneficiary of this Section 10.18. This Section 10.18 shall be binding on all successors and assigns of the Company.

10.19   Severability. If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party; provided, that the economic and legal substance of the transactions contemplated hereby shall be deemed to be affected in any manner materially adverse to the parties hereto if Section 10.18 is invalid, void or incapable of being enforced. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

10.20   Equityholder Representative.

(a)      Each Equityholder, on behalf of such Equityholder and such Equityholder's successors, heirs and permitted assigns, hereby irrevocably appoints the Equityholder Representative as such Equityholder's true and lawful attorney-in-fact and agent, with full powers of substitution and resubstitution, in such Equityholder's name, place and stead, in any and all capacities, in connection with the transactions contemplated by this Agreement, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with the sale of such Equityholder's Equity as fully to all intents and purposes as such Equityholder might or could do in person, including the full power and authority: (i) to consummate the transactions to be consummated by the Equityholders under this Agreement, (ii) to disburse any funds received hereunder or under the Escrow Agreement to the Equityholders, (iii) to agree to resolution of all claims and disputes hereunder or thereunder, (iv) to retain legal counsel and other professional services, at the expense of the Equityholders, in connection with the performance by the Equityholder Representative of this Agreement, (v) to make any amendments to this Agreement on behalf of the Equityholders and decisions with respect to the determination of any amounts under Section 2.10, (vi) to determine whether the conditions to Closing in Article 7 have been satisfied and supervising the Closing, including waiving any condition, as determined by the Equityholder Representative, in its sole discretion, (vii) to take any action that may be necessary or desirable, as determined by the Equityholder Representative, in its sole discretion, in connection with the termination of this Agreement in accordance with Article 10, (viii) to take any and all actions that may be necessary or desirable, as determined by the Equityholder Representative, in its sole discretion, in connection with the amendment of this Agreement in accordance with Section 10.3, (ix) to accept notices on behalf of the Equityholders in accordance with Section 10.6, (x) to execute and deliver, on behalf of the Equityholders, any and all

71

FBG_CH1_00094788

notices, documents or certificates to be executed by the Equityholders, in connection with this Agreement and the transactions contemplated hereby, (xi) to grant any consent, waiver or approval on behalf of the Equityholders under this Agreement and (xii) to make any determination and take any action relating to Taxes.

(b)     The appointment of the Equityholder Representative as the attorney-in-fact for the Equityholders as set forth in this Section 10.20 and all authority hereby conferred are granted and conferred in consideration of the interest of the other Equityholders, is therefore coupled with an interest and is and will be irrevocable and will neither be terminated nor otherwise affected by any act of any Equityholder or by operation of law, whether by the death, dissolution, liquidation, incapacity or incompetence of such Equityholder or by the occurrence of any other event.  If, after the execution of this Agreement, any Equityholder dies, dissolves or liquidates or becomes incapacitated or incompetent, the Equityholder Representative is nevertheless authorized, empowered and directed to act in accordance with this Section 10.20 as if that death, dissolution, liquidation, incapacity or incompetency had not occurred and regardless of notice thereof.  In the event that Qualitor Holdings, LLC ceases to be the Equityholder Representative for any reason, each Equityholder agrees that Wellspring Capital Partners V, L.P. is solely authorized to irrevocably constitute and appoint a replacement Equityholder Representative.

(c)     The Equityholder Representative shall have no liability to Parent for any default under this Agreement by any other Equityholder.  Except for Fraud on its part, the Equityholder Representative shall have no liability to any other Equityholder under this Agreement for any action or omission by the Equityholder Representative on behalf of the other Equityholders.

(d)     As contemplated by Section 2.9, each party hereto agrees that the Equityholder Representative shall be paid, at the Closing, an amount equal to the Equityholder Representative Reserve Amount, which shall serve to pay for the out-of-pocket fees, costs and expenses of the Equityholder Representative incurred (at the discretion of the Equityholder Representative) in connection with the performance of its duties and obligations under this Agreement, including any fees due to the Accounting Firm pursuant to Section 2.10.  If the Equityholder Representative incurs any out-of-pocket fees, costs and expenses in excess of the Equityholder Representative Reserve Amount, the Equityholder Representative shall be reimbursed for such fees, costs and expenses by the Equityholders in accordance with their respective Pro Rata Percentage upon demand, or in the Equityholder Representative's discretion, by deducting any such amounts due to the Equityholder Representative from amounts otherwise distributable to the Equityholders from the Escrow Amount.

(e)     The Equityholder Representative Reserve Amount shall be retained by the Equityholder Representative until such time as the Equityholder Representative shall determine, and, subject to the terms of this Agreement, the balance of the Equityholder Representative Reserve Amount, if any, shall be delivered by the Equityholder Representative to (i) each of the Stockholders (in accordance with the payment instructions set forth in each Stockholder's Letter of Transmittal) and (ii) the

72

Company (for the benefit of the holders of Options), in each case, based on applicable Pro Rata Percentages, by wire transfer of immediately available funds.  The Equityholders (except for the Equityholder Representative) shall not receive interest or other earnings on the Equityholder Representative Reserve Amount and irrevocably transfer and assign to Equityholder Representative any ownership right that they may otherwise have had in any such interest or earnings.  The Equityholder Representative will not be liable for any loss of principal of the Equityholder Representative Reserve Amount other than as a result of its bad faith or willful misconduct.

(f)      In dealing with this Agreement and in exercising or failing to exercise all or any of the powers conferred upon the Equityholder Representative hereunder, the Equityholder Representative will not assume any, and will incur no, responsibility or liability whatsoever to any Equityholder by reason of any error in judgment or other act or omission performed or omitted hereunder or in connection with this Agreement.  Each Equityholder, severally in accordance with its Pro Rata Percentage, agrees to indemnify the Equityholder Representative, its successors, assigns, Representatives and Affiliates (the "Equityholder Representative Parties") and to hold the Equityholder Representative Parties harmless from and against and pay any and all losses or expenses incurred by the Equityholder Representative and arising out of or in connection with the duties as Equityholder Representative, including the reasonable costs and expenses incurred by the Equityholder Representative in defending against any claim or Liability in connection with this Agreement.

(g)      Parent shall be entitled to rely (without investigation) on and have no liability to any Equityholder or any other Person for, any action taken by the Equityholder Representative as being taken by the Equityholder Representative for it and on behalf of each of the Equityholders, and fully authorized by each Equityholder.  Each Equityholder hereby agrees that for any Actions arising under this Agreement or any other agreement entered into in connection with this Agreement, such Equityholder may be served legal process by registered mail to the address set forth in Section 10.6 for the Equityholder Representative and that service in such manner shall be adequate, and such Equityholder shall not assert any defense or claim that service in such manner was not adequate or sufficient in any court in any jurisdiction.

[Remainder of page intentionally left blank]

73

CONFIDENTIAL

FBG_CH1_00094790

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

EQUITYHOLDER REPRESENTATIVE

QUALITOR HOLDINGS, LLC

By: _____
Name: Gary Cohen
Title: President

Signature Page – Merger Agreement

CONFIDENTIAL

FBG_CH1_00094791

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

COMPANY:

QUALITOR ACQUISITION HOLDINGS INC.

By: _____

Name:  Michael Fretwell
Title:   President

Signature Page – Merger Agreement

CONFIDENTIAL

FBG_CH1_00094792

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

PRINCIPAL SELLER

QUALITOR HOLDINGS, LLC

By: _____

Name:  Gary Cohen

Title:  President

Signature Page – Merger Agreement

CONFIDENTIAL

FBG_CH1_00094793

**DEBTORS' EXHIBIT NO. 243**
**Page 81 of 129**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**PARENT:**

FIRST BRANDS GROUP, LLC

By: _____
    Name:  Edward James
    Title:   Executive Vice President

Signature Page – Merger Agreement

CONFIDENTIAL

**MERGER SUB:**

VIPER ACQUISITION, LLC

By: _____
      Name:  Edward James
      Title:    Executive Vice President

Signature Page – Merger Agreement

CONFIDENTIAL

FBG_CH1_00094795

**Exhibit A**

Current Assets and Current Liabilities

(See attached.)

Exhibit A– Page 1

CONFIDENTIAL                                                                 FBG_CH1_00094796

**EXHIBIT A - Illustrative net working capital calculation as of April 30, 2022**

| (in $'000s) | Account | As of April 30, 2022 Reported | Adjustments | Adjusted | Comments |
|---|---|---|---|---|---|
| Cash (All Accounts) | 101 | 3,626 | (3,626) | - | *Exclude Closing Cash (BS rule 2a)* |
| Cash Investments | 102 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Marketable Securities | 103 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Notes Receivable (S.T.) | 104 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Cash and cash equivalents | | 3,626 | (3,626) | - | |
| QVC - QTR Vehicle Comp. | 1200 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| ANS - Anstro | 1201 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| IBI - International Brake | 1202 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| PYL - Pylon | 1203 | 1,173 | (1,173) | - | *Exclude intercompany assets (BS rule 2e)* |
| HBD - BLD Heavy Duty | 1204 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| EBC - BLD Engine Contr. | 1206 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| MCG - McGuane | 1207 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| GUN - Gunn Metal | 1208 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| TAE - TAE Global | 1209 | - | - | - | *Exclude intercompany assets (BS rule 2e)* |
| Tooling | 109 | - | - | - | |
| Retainages | 110 | - | - | - | |
| Dividends & Interest | 111 | - | - | - | |
| Other | 112 | 1,058 | 790 | 1,848 | *Exclude corporate entity Current Assets (BS rule 2f). Adjustment also represents updated duty drawback receivable (BS rule 3).* |
| Unbilled Tooling | 116 | - | - | - | |
| Def. Inc. Taxes Curr. | 120 | - | - | - | *Exclude income-tax related assets (BS rule 2b)* |
| Prepaid Insurance | 122 | 146 | - | 146 | |
| Prepaid Taxes | 123 | 1,126 | (1,126) | - | *Exclude income-tax related assets (BS rule 2b)* |
| Prepaid Other | 124 | 1,161 | (57) | 1,104 | *Exclude corporate entity Current Assets (BS rule 2f)* |
| Prepaid expenses | | 3,491 | (393) | 3,099 | |
| Current assets | | 7,118 | (4,019) | 3,099 | |
| Trade Accounts Payable | 203 | 34,065 | (1,061) | 33,004 | *Exclude Closing Cash - removes outstanding checks recorded in AP (BS rule 2a). Exclude corporate entity Current Liabilities (BS rule fe).* |
| QVC - QTR Vehicle Comp. | 1214 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| ANS - Anstro | 1215 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| IBI - International Brake | 1216 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| PYL - Pylon | 1217 | 1,173 | (1,173) | - | *Exclude intercompany liabilities (BS rule 2e)* |
| HBD - BLD Heavy Duty | 1218 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| EBC - BLD Engine Contr. | 1220 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| MCG - McGuane | 1221 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| GUN - Gunn Metal | 1222 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| TAE - TAE Global | 1223 | - | - | - | *Exclude intercompany liabilities (BS rule 2e)* |
| Intercompany Pay. Trade | 204 | 1,173 | (1,173) | - | |
| Withheld Taxes | 205 | 17 | - | 17 | |
| Other Withholdings | 206 | 11 | (0) | 11 | *Exclude corporate entity Current Liabilities (BS rule 2f)* |
| Accounts payable | 207 | 35,266 | (2,235) | 33,032 | |
| Income Taxes Payable | 210 | - | - | - | *Exclude income-tax related liabilities (BS rule 2b)* |
| Sal., Wages, Comm | 211 | 165 | - | 165 | |
| Vac., Hol., Bonus | 212 | 1,243 | (326) | 917 | *Exclude corporate entity Current Liabilities (BS rule 2f)* |
| Pens. & Prof. Sharing | 213 | 111 | - | 111 | |
| Prop., P.R., Other Tax | 214 | 524 | - | 524 | |
| Interest | 215 | 351 | (351) | - | *Exclude Indebtedness - accrued interest (BS rule 2c)* |
| Dividends Pay. | 216 | - | - | - | |
| Workers' Comp. | 217 | - | - | - | |
| Other | 218 | 9,884 | (457) | 9,427 | *Exclude corporate entity Current Liabilities (BS rule 2f)* |
| Accrued expenses | 207 | 12,278 | (1,133) | 11,145 | |
| Revolver Payable | 201 | 19,500 | (19,500) | - | *Exclude Indebtedness - revolver payable (BS rule 2c)* |
| Current liabilities | | 67,044 | (22,868) | 44,176 | |
| **Working capital** | | **(59,927)** | **18,849** | **(41,078)** | |
| Working capital target | | | | (46,964) | |
| Due to (from) seller | | | | 5,886 | |

Note: This exhibit sets forth an illustrative calculation of Working Capital for the purposes of the closing statement as though the Closing Date had occurred on April 30, 2022 using the methodology presented herein and is attached to the Agreement for illustrative purposes only.

CONFIDENTIAL

FBG_CH1_00094797

**Exhibit B**

Balance Sheet Rules

(See attached.)

Exhibit B – Page 1

CONFIDENTIAL

FBG_CH1_00094798

## EXHIBIT B

## BALANCE SHEET RULES

1.  The Closing Working Capital shall be prepared in accordance with:
    a.  the specific principles, policies, practices, procedures, definitions, methods, classifications, judgments, assumptions, techniques, elections, inclusions, exclusions and valuation and estimation methodologies set forth below in paragraphs 2 through 11;
    b.  to the extent not otherwise addressed in clause (a), the Accounting Methodology.
2.  Working Capital shall exclude the following items, regardless of whether they represent Current Assets or Current Liabilities under GAAP:
    a.  Closing Cash;
    b.  Any assets or liabilities related to any federal, state or other income-based taxes, including but not limited to: deferred tax assets and deferred tax liabilities;
    c.  Any items included in Indebtedness and Company Expenses;
    d.  Net receivables and net inventories. For the avoidance of doubt, working capital will include other receivables account 112.
    e.  All intercompany assets and liabilities;
    f.  All Current Assets and Current Liabilities included within the corporate entity of TAE, LLC except for prepaid insurance related to Company insurance policies and trade accounts payable related to liabilities incurred during the normal course of business and not included in Indebtedness or Company Expenses. For the avoidance of doubt, Closing Working Capital will include Current Assets and Current Liabilities from Pylon Manufacturing Corp., Qualitor Automotive UK Ltd. and Qualitor Automotive Trading Company Ltd. ; and
    g.  Any purchase accounting adjustments or current assets or current liabilities that result from the transactions contemplated by the Agreement, including those arising from Accounting Standards Codification section 805 (i.e. Business Combinations).
3.  The duty drawback receivable will reflect the Company Group's expected collectible refund net of any related consulting fees on the Closing Date.
4.  No new class or classes of liabilities, asset reserves or valuation allowances shall be introduced in the calculation of Closing Working Capital that are not set forth in Exhibit A.
5.  The Closing Statement shall be based on the facts and circumstances as they exist at the Reference Time and shall exclude the effect of any act, decision, change in circumstances or other event or development arising or occurring thereafter (including on the Closing Date).
6.  Closing Working Capital shall not take into account the funds flow or cash flows arising from this Agreement.

CONFIDENTIAL                                                   FBG_CH1_00094799

7. The provisions of this Exhibit B shall be interpreted to avoid double counting (whether positive or negative) of any item to be included in Closing Cash, Closing Working Capital, Closing Indebtedness, and Company Expenses.

8. Exhibit A sets forth an illustrative calculation of Closing Working Capital for the purposes of the Closing Statement as though the Closing Date had occurred on April 30, 2022, using the Balance Sheet Rules and is attached to the Agreement for illustrative purposes only.

CONFIDENTIAL

FBG_CH1_00094800

**Exhibit C**

Form of Escrow Agreement

Exhibit C – Page 1

CONFIDENTIAL                                                         FBG_CH1_00094801

## ESCROW AGREEMENT

This ESCROW AGREEMENT is entered into as of July 29, 2022 (this "Agreement"), by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative", and, together with Parent, sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Underlying Agreement (as defined below).

**WHEREAS**, pursuant to that certain Agreement and Plan of Merger, dated as of July 29, 2022 (as amended, modified, supplemented or restated from time to time, the "Underlying Agreement"), by and among the Parties and the other parties thereto, the Parties have agreed to establish an escrow arrangement for the purposes set forth therein;

**WHEREAS**, Parent is required to deposit into a segregated escrow account established by the Escrow Agent hereunder to hold in the Escrow Funds (as hereinafter defined) an aggregate amount in cash equal to the Escrow Amount (as hereinafter defined) and wishes such deposit to be subject to the terms and conditions set forth herein and in the Underlying Agreement; and

**WHEREAS**, pursuant to Section 2.9(c) of the Underlying Agreement, on the date hereof, Parent shall deliver to the Escrow Agent an aggregate amount in cash equal to One Million Five Hundred Thousand Dollars ($1,500,000) (together with any interest accrued thereon) (the "Escrow Amount"), by wire transfer of immediately available funds, to be deposited by the Escrow Agent into the segregated escrow account established by the Escrow Agent hereunder (the "Escrow Account") to be held and distributed in accordance with the terms and subject to the conditions set forth herein and in the Underlying Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties and the Escrow Agent agree as follows:

1.      **Appointment**.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Fund**.  Upon the Closing, Parent shall deliver, or shall cause to be delivered, to the Escrow Agent the Escrow Amount to be held in the Escrow Account.  The Escrow Amount shall (i) not be subject to set off by the Escrow Agent or any of its affiliates, (ii) not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto and (iii) be held and disbursed solely for the purposes and in accordance with the terms of this Agreement.  For greater certainty, all interest, dividends, gains and other income, if any, shall be retained by the Escrow Agent and reinvested in the Escrow Funds (as defined below) and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.      **Investment of Funds**.

(a)      The Escrow Agent shall hold the Escrow Amount and shall invest and reinvest the Escrow Amount and the proceeds thereof (the "Escrow Funds") in either of the following: (1) an "interest bearing deposit" of Citibank N.A, insured up to the applicable limits by the Federal Deposit Insurance Corporation (the "FDIC") (the Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties), or (2) a "noninterest-bearing deposit

CONFIDENTIAL

FBG_CH1_00094802

account" insured up to the applicable limits by the FDIC or similar investment offered by the Escrow Agent; provided, that a third investment may be specified jointly by Parent and the Equityholder Representative in writing if such investment is reasonably acceptable to the Escrow Agent. In the absence of such joint written instructions from Parent and the Equityholder Representative, the Escrow Funds shall be invested in option (2) as listed herein. Interest bearing deposit accounts have rates of interest that may vary from time to time based upon market conditions. The Parties recognize and agree that instructions to make any other investment (an "Alternative Investment"), must be in writing and executed by an Authorized Representative (as defined in Section 4 below) of each of Parent and the Equityholder Representative, and shall specify the type and identity of the investments to be purchased and/or sold but shall only be permitted if the Escrow Agent can accommodate such Alternative Investment. The Escrow Agent shall have no obligation to invest or reinvest the Escrow Funds held in the Escrow Account on the same Business Day if all or a portion of the Escrow Funds is deposited with the Escrow Agent after 12:00 p.m. New York City time, in which case the Escrow Agent shall invest or reinvest such Escrow Funds held in such Escrow Account(s) on the immediately following Business Day. Requests or instructions received after 12:00 p.m. New York City time by the Escrow Agent to liquidate all or any portion of the investments made with respect to the Escrow Amount will be treated as if received on the following Business Day in New York. The Escrow Agent is hereby authorized to execute purchases and sales of investments through the facilities of its own trading or capital markets operations or those of any affiliated entity. The Escrow Agent or any of its affiliates may receive reasonable compensation with respect to any Alternative Investment directed hereunder including, without limitation, charging any applicable agency fee in connection with each transaction. The Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of monies held in the Escrow Account or the purchase, sale, retention or other disposition of any investment described herein. Market values, exchange rates and other valuation information (including, without limitation, market value, current value or notional value) of any Alternative Investment furnished in any report or statement may be obtained from third party sources and is furnished for the exclusive use of the Parties. The Escrow Agent has no responsibility whatsoever to determine the market value or other value of any Alternative Investment and makes no representation or warranty, express or implied, as to the accuracy of any such valuations or that any values necessarily reflect the proceeds that may be received on the sale of an Alternative Investment. The Escrow Agent shall have the right to liquidate any investments held in order to provide funds necessary to make required payments under this Agreement. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)     The Parties acknowledge that non-deposit investment products are not obligations of, or guaranteed by, Citibank/Citigroup or any of its affiliates, are not FDIC insured and are subject to investment risks, including the possible loss of principal amount invested. Only deposits in the United States are subject to FDIC insurance. The Escrow Agent is authorized, for any securities at any time held hereunder, to register such securities in the name of its nominee(s) or the nominees of any securities depository, and such nominee(s) may sign the name of any Party to whom or to which such securities belong and guarantee such signature in order to transfer securities or certify ownership thereof to tax or other governmental authorities.

(c)     The Parties agree that (i) Parent shall be treated as the owner of the Escrow Funds for income tax purposes, (ii) each of the Parties will file all tax returns and otherwise take all tax positions in a manner consistent with such treatment, and (iii) Parent will report all income, if any, that is earned on, or derived from, the Escrow Funds as the income of Parent in the taxable year in which income is properly includable. Parent has provided a duly executed and completed IRS Form W-9 to the Escrow Agent upon execution of this Agreement. Parent shall be responsible for paying taxes (including any interest, penalties and additions to tax thereon) on all income earned on the Escrow Funds and for filing all necessary tax returns with respect to such income. For each tax year in which income is earned on the Escrow Funds, the Escrow Agent shall timely prepare and promptly deliver a Form 1099 and any other information returns as required by applicable Law. The Escrow Agent shall comply with any information reporting and tax

2

FBG_CH1_00094803

withholding requirements under applicable Law with respect to any income earned on the Escrow Funds, any imputed interest income pursuant to Section 483 of the Internal Revenue Code of 1986, as amended (or any corresponding provision of non-U.S., state, or local Law), or otherwise in respect of the Escrowed Funds (or any distributions thereof).

(d)      All investments of the Escrow Funds shall be registered and held in the name of the Escrow Agent, as the Escrow Agent for the Parties.  The Escrow Agent will send account statements to the Parties on a monthly basis reflecting activity (including a list of all investments) with respect to the Escrow Funds for the preceding month.  Although each of the Parties recognize that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Parties hereby agree that confirmations of permitted investment transactions are not required to be issued by the Escrow Agent for each month in which a monthly account statement is rendered.  The Parties agree to notify the Escrow Agent of any errors, delays or other problems within thirty (30) calendar days after receiving notification that a transaction has been executed, but the failure to so notify the Escrow Agent will not constitute waiver of any such error, delay or other problem.  If it is determined that any transaction was delayed or erroneously executed as a result of the Escrow Agent's error, the Escrow Agent's sole obligation is to pay or refund such amount as may be required by applicable law.  In no event shall the Escrow Agent be responsible for any incidental or consequential damages or expenses in connection with the instructions of the Parties with respect to the investments of the Escrow Funds.  Any claim for interest payable will be at the Escrow Agent's published savings account rate in effect in New York, New York.

(e)      The Escrow Account shall automatically terminate upon the payment in full by the Escrow Agent of the Escrow Funds as directed herein.  This Agreement and the duties of the Escrow Agent shall automatically terminate upon (a) the payment in full by the Escrow Agent of all Escrow Funds as directed herein, or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by Parent and the Equityholder Representative.

4.      **Disposition**.

(a)      Parent and the Equityholder Representative may at any time jointly deliver to the Escrow Agent a certificate in substantially the form of Exhibit A attached hereto (each, a "Joint Release Notice") instructing the Escrow Agent to distribute all or a portion of the Escrow Amount, executed by each Party as evidenced by the signatures of one of the persons listed as such Party's authorized representatives on Schedule 1 attached hereto (each such person, an "Authorized Representative").  Within two (2) Business Days after the date on which the Escrow Agent receives an executed Joint Release Notice, the Escrow Agent shall disburse the portion of the relevant Escrow Amount set forth in the Joint Release Notice, by wire transfer of immediately available funds to the persons or accounts designated on such Joint Release Notice.  The Escrow Agent shall be entitled to conclusively rely on such Joint Release Notice.  As used in this Agreement "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are authorized or required by Law or executive order to close.  Without limiting any other provision hereof, Parent and the Equityholder Representative agree to deliver all other Joint Release Notices pursuant to and when and as required by the Underlying Agreement.

(b)      In the event that Parent or the Equityholder Representative (a "Claiming Party") absent a Joint Release Notice in resolution of such a claim or dispute, (i) submits to the Escrow Agent and the other Party a written notice stating that the Equityholder Representative is entitled to any payment from the Escrow Funds pursuant to the Underlying Agreement, and (ii) thereafter or simultaneously delivers to the Escrow Agent and the other Party a copy of a final, non-appealable order or judgment of a court of competent jurisdiction (a "Court Order") directing delivery of the relevant Escrow Funds or any portion thereof (any such amount, the "Court Ordered Amount") to the Equityholder Representative, the Escrow Agent shall disburse from the Escrow Funds, to the Equityholder Representative, within three (3) Business

3

Days following receipt of such Court Order, an amount equal to the Court Ordered Amount, as provided in such Court Order; provided, that any such Court Order is also accompanied by a certificate of such Claiming Party signed by an Authorized Representative thereof certifying that such Court Order is final, non-appealable and from a court of competent jurisdiction (a "Court Order Certificate"). The Escrow Agent shall be entitled to conclusively rely upon a Court Order and Court Order Certificate, and shall act on such Court Order and Court Order Certificate without further question. Any Court Order presented to the Escrow Agent by either Party shall contain a cover signed by an Authorized Representative for such Party and shall contain appropriate payment instructions to be utilized by the Escrow Agent.

(c)     The Escrow Agent is expressly forbidden from following any instruction as to the distribution of the Escrow Amount other than those delivered in accordance with this Section 4.

5.      **Escrow Agent**.  The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including, without limitation, any fiduciary duty, shall be implied.  The Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement between the Parties, including, without limitation, the Underlying Agreement, nor shall the Escrow Agent be required to determine if any Party has complied with any other agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of the Escrow Agent; provided, however, as between the Parties, to the extent there is any conflict between this Agreement and the Underlying Agreement, the Underlying Agreement shall control the actions of the Parties.  The Escrow Agent may conclusively rely upon any instructions, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing delivered to it by any Party without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order delivered in accordance with Section 9 hereof believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and the Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith, except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to any Party.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through any of its affiliates or agents.  In the event the Escrow Agent receives instructions, claims or demands from any Party hereto which conflict with the provisions of this Agreement, or if the Escrow Agent receives conflicting instructions from the Parties, the Escrow Agent shall be entitled either to (a) refrain from taking any action until it shall be given a joint written direction executed by an Authorized Representative of Parent and the Equityholder Representative which eliminates such conflict or by a final court order or (b) file an action in interpleader.  The Escrow Agent shall have no duty to solicit any payments that may be due to it or to the Escrow Funds, including, without limitation, the Escrow Amount nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.  ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting in accordance with the opinion and instructions of such counsel, except to the extent that such loss results, in whole or in part, from the Escrow Agent's fraud, willful misconduct or gross negligence as adjudicated by a court of competent jurisdiction. The Escrow Agent shall not be responsible for or under, or chargeable with knowledge of, the terms and

4

FBG_CH1_00094805

conditions of any other agreement, instrument or document executed between/among the Parties, except as may be specifically provided in this Agreement. This Agreement sets forth all of the obligations of the Escrow Agent, and no additional obligations shall be implied from the terms of this Agreement or any other agreement, instrument or document.

6.      **Resignation and Removal; Succession**. The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties. The Parties may remove the Escrow Agent at any time, with or without cause, by giving the Escrow Agent thirty (30) calendar days advance notice in writing signed by all the Parties. The Escrow Agent's sole responsibility after such thirty (30) calendar day notice period expires shall be to hold the Escrow Funds (without any obligation to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed by the Parties, or such other Person designated in writing by the Parties, or in accordance with the directions of a final court order, at which time of delivery, the Escrow Agent's obligations hereunder shall cease and terminate. If, prior to the effective resignation or removal date, the Parties have failed to appoint a successor escrow agent, or to instruct the Escrow Agent in writing to deliver the Escrow Funds to another Person as provided above, at any time on or after the effective resignation or removal date, the Escrow Agent may interplead the Escrow Funds with a court of competent jurisdiction. Any appointment of a successor escrow agent shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of the Escrow Agent. The Escrow Agent shall deliver the Escrow Funds to any appointed successor escrow agent, at which time the Escrow Agent's obligations under this Agreement shall cease and terminate. Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without any further act.

7.      **Compensation**. The Parties jointly and severally agree to pay the Escrow Agent upon execution of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in Schedule 2 attached hereto; provided, that each of Parent and the Equityholder Representative hereby agrees between themselves to pay fifty percent (50%) of any such expenses. Each of the Parties, jointly and severally, agree to reimburse the Escrow Agent on demand for such actual and documented legal fees, disbursements and expenses reasonably incurred by the Escrow Agent in the performance of its services hereunder; provided, that each of Parent and the Equityholder Representative hereby agrees between themselves to pay fifty percent (50%) of any such fees, disbursements and expenses.

8.      **Indemnification and Reimbursement**. The Parties agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse the Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the reasonable and documented out of pocket fees and reasonable and documented out of pocket expenses of outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Losses"), arising out of or in connection with (a) the Escrow Agent's performance of this Agreement, except to the extent that such Losses are determined by a court of competent jurisdiction through a final order to have been caused by the fraud, gross negligence, or willful misconduct of such Indemnitee; and (b) the Escrow Agent's following any instructions or directions in good faith, whether joint or singular, from the Parties received in accordance with this Agreement that the Escrow Agent reasonably believes in good faith to be genuine, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. Parent, on the one hand, and the Equityholder Representative, on the other hand, hereby agree between themselves to pay fifty percent (50%) of any such indemnification claims; provided, further, that if the actions of any such Party are determined by a court of competent jurisdiction through a final order to have been the cause of any Losses

5

FBG_CH1_00094806

**DEBTORS' EXHIBIT NO. 243**
**Page 94 of 129**

of the Escrow Agent resulting in such payment obligations, such Party shall be responsible for all of such payment obligations; provided, further, that if either Parent or the Equityholder Representative is required to pay to the Escrow Agent more than such Party's share of the costs and expenses under this Section 8 or Section 7 hereof, then the underpaying Party will reimburse the overpaying Party for such excess. The obligations set forth in this Section 8 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

9.      **Notices**.  All communications hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions from a Party or the Parties to the Escrow Agent shall be executed by an Authorized Representative, and shall be deemed to be delivered in accordance with the terms of this Agreement (a) on the first Business Day following the day of delivery by email, if delivered by email or (b) when actually received, if delivered by hand against receipt, by certified mail return receipt requested, or by courier or express delivery service (with receipt showing signature) to the appropriate email address or notice address set forth for each Party hereto as follows:

If to Parent:

> c/o First Brands Group, LLC
> 127 Public Square, Suite 5300, Cleveland, Ohio, 44114
> Attention:   Edward James, Executive Vice President
> E-mail:      ed.james@firstbrandsgroup.com

If to the Equityholder Representative:

> c/o Wellspring Capital Management LLC
> 605 Third Avenue, 44th Floor
> New York,  NY 10158
> Attention: William Byers
>                  Sarah Mudho
> E-Mail:      wbyers@wellspringcapital.com
>                  smudho@wellspringcapital.com

With a copy (which shall not constitute notice) to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York  10019-6064
> Attention:   Angelo Bonvino; Michael Vogel
> E-mail:      abonvino@paulweiss.com;
>                  mvogel@paulweiss.com

If to the Escrow Agent:

> Citibank, N.A.
> c/o Citi Private Bank
> Preferred Custody Services
> 388 Greenwich Street, 29th Floor
> New York, NY 10013
> Attention:   Kerry McDonough, Director
> Telephone: (212) 783-7110
> E-mail:      kerry.mcdonough@citi.com

Any party to this Agreement may provide notice per this Section 9 of any change in address or Authorized Representative, as appropriate.  If funds transfer instructions for the Escrow Funds are given, whether in writing or otherwise in accordance with this Agreement, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to any of the Authorized Representatives, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the Person or Persons so designated.  To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs.

CONFIDENTIAL                                                           FBG_CH1_00094807

If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The Persons and telephone numbers for call backs may be changed only in writing actually received by the Escrow Agent.

10.    **Compliance with Court Orders**.  In the event that any of the Escrow Funds shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such court orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such court order it shall not be liable to any of the Parties or to any other Person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

11.    **Miscellaneous.**

(a)    The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing signed by the Escrow Agent and the Parties.  No waiver of any provision of this Agreement will be valid unless the waiver is in writing and signed by the waiving parties.  The failure of a party at any time to require performance of any provision of this Agreement will not affect such party's rights at a later time to enforce such provision.  No waiver by any party of any breach of this Agreement will be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other breach.

(b)    Except as otherwise provided herein, neither this Agreement nor any right or interest hereunder may be assigned by any Party without the prior written consent of the Escrow Agent and the other Parties; provided, that Parent may collaterally assign Parent's interest under this Agreement to any lenders or any agent acting on behalf of lenders to Parent or its affiliates and therefore Parent may direct payments to which Parent is entitled under this Agreement to such lenders or any agent acting on behalf of lenders to Parent or its affiliates.  The Escrow Agent may not assign this Agreement except in connection with its resignation or removal in accordance with Section 6 hereof.  To comply with Federal Law, including the USA PATRIOT Act (as defined below) requirements, assignees shall provide to the Escrow Agent the appropriate Form W-9 or W-8 as applicable and such other forms and documentation that the Escrow Agent may reasonably request to verify identification and authorization to act.

(c)    This Agreement shall be governed by and construed under the laws of the State of Delaware without regard to the laws of any other jurisdiction that may govern under the applicable principles of choice of law or conflicts of law.  Each Party and the Escrow Agent irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the jurisdiction of the courts located in the State of Delaware.  To the extent that in any jurisdiction any Party or the Escrow Agent may now or hereafter be entitled to claim for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, such Party or the Escrow Agent shall not claim, and hereby irrevocably waives, such immunity.  Each party to this Agreement agrees that service of summons and complaint or any other process that might be served in any action or legal proceeding may be made on such party by sending or delivering a copy of the process to the party to be served at the address of the party and in the manner provided for the giving of notices in Section 9.  Nothing in this Section 11(c), however, shall affect the right of any Party or the Escrow Agent to serve legal process in any other manner permitted by law.

(d)    None of Parent, the Equityholder Representative and the Escrow Agent shall be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or

7

FBG_CH1_00094808

transmission failure, the unavailability of the Federal Reserve Bank wire services or any electronic communication facility or other causes reasonably beyond its control.

(e) This Agreement and any Joint Release Notice may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. All signatures of the Parties may be transmitted by electronic method, and such electronic copy will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.

(f) This Agreement and the Underlying Agreement taken together shall constitute the entire agreement among the Parties with respect to the subject matter of this Agreement and supersede all prior agreements (whether written or oral and whether express or implied) by or among the Parties to the extent related to the subject matter of this Agreement. Notwithstanding any provision of this Agreement, including this subjection (f), purporting to incorporate the Underlying Agreement or any other agreement or document contemplated thereby by reference, the Escrow Agent shall not be bound by nor charged with knowledge of the terms, provisions, meanings, definitions, or other matters contained in any document or agreement unless it has signed and executed the same. The terms and conditions of this Agreement will control the actions, duties, and obligations of Escrow Agent.

(g) If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

(h) Nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Escrow Agent and the Parties and their respective successors and permitted assigns any legal or equitable right, remedy, interest or claim under or in respect of the Escrow Funds or this Agreement.

(i) Waiver of Jury Trial. EACH PARTY AND THE ESCROW AGENT WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE RESPECTING ANY MATTER ARISING UNDER THIS AGREEMENT.

(j) No printed or other material in any language, including prospectuses, notices, reports, and promotional material that mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any of the Parties, or on such Party's behalf, without the prior written consent of the Escrow Agent.

(k) Patriot Act Disclosure. Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's internal policies require the Escrow Agent to follow reasonable procedures to verify the identity including, without limitation, name, address and organizational documents ("Identifying Information"). The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such Identifying Information required as a condition of opening an account with or using any service provided by the Escrow Agent.

8

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 243**
**Page 97 of 129**

(l)      Use of Electronic Records and Signatures. As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, Escrow Agent shall be indemnified and held harmless from any Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

(m)      Return of Funds.  If the Escrow Agent releases any funds, including but not limited to the Escrow Funds or any portion of it, to a Party and the Escrow Agent determines in good faith, that the payment or any portion of it was not made accurately and in accordance with the Joint Release Instruction or Final Determination, the Escrow Agent shall promptly notify in writing each Party, and the Party that received any erroneous payment shall, upon such written notice, promptly refund the erroneous payment; provided that such written notice from the Escrow Agent shall be received no later than 30 days after the release of such erroneous payment to such Party.  Any such erroneous payment by the Escrow Agent, and the Party's return thereof to the Escrow Agent, shall not affect any other obligation or right of either the Escrow Agent or the Parties under this Agreement. Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any such erroneous payment.

[*Signature Pages Follow*]

CONFIDENTIAL

FBG_CH1_00094810

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth above.

**PARENT:**

FIRST BRANDS GROUP, LLC

By: _____
         Name:
         Title:

*[Signature Page to Escrow Agreement]*

CONFIDENTIAL

FBG_CH1_00094811

**DEBTORS' EXHIBIT NO. 243**
**Page 99 of 129**

**EQUITYHOLDER REPRESENTATIVE:**

QUALITOR HOLDINGS LLC


By: _____
       Name: Gary Cohen
       Title:  President

[*Signature Page to Escrow Agreement*]

CONFIDENTIAL                                                                                   FBG_CH1_00094812

**ESCROW AGENT:**

CITIBANK, N.A.

By: _____
      Name:
      Title:

[*Signature Page to Escrow Agreement*]

CONFIDENTIAL

FBG_CH1_00094813

**SCHEDULE 1**

AUTHORIZED REPRESENTATIVES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Parent or the Equityholder Representative, as indicated, and who are authorized to initiate and approve transactions of all types for the Escrow Account established under this Agreement, on behalf of Parent or the Equityholder Representative, as indicated.  The below listed persons (at least two individuals for each of Parent and the Equityholder Representative) have also been designated "Call Back Authorized Individuals" and will be notified by the Escrow Agent upon the release of Escrow Funds from the Escrow Account.

For Parent:

| Name | Business Telephone Numbers | Signature |
|---|---|---|
| 1.  [_] | [_] | |
| 2.  [_] | [_] | |

For the Equityholder Representative:

| Name | Business Telephone Numbers | Signature |
|---|---|---|
| 1.  [_] | [_] | |
| 2.  [_] | [_] | |

All instructions, including, but not limited to, funds transfer instructions set forth in a PDF attached to an email, must include the signature of the Authorized Representative authorizing said funds transfer on behalf of each Party.

CONFIDENTIAL

FBG_CH1_00094814

**SCHEDULE 2**
<u>SCHEDULE OF ESCROW AGENT FEES</u>

<u>Acceptance Fee</u>

To cover the acceptance of the escrow agency appointment, the study of this Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: Waived**

<u>Administration Fee</u>

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the Escrow Account and normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Escrow Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Escrow Agreement. Fee is based on Escrow Amount being deposited in a noninterest bearing deposit account, FDIC insured to the applicable limits.

**Fee: Waived**

<u>Tax Preparation Fee</u>

To cover preparation and mailing of Forms 1099-INT, if applicable for the Parties for each calendar year:

**Fee: Waived**

<u>Transaction Fees</u>

To oversee all required disbursements or release of property from the Escrow Account to any Party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Escrow Agreement:

**Fee: Waived**

<u>Other Fees</u>

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

CONFIDENTIAL

FBG_CH1_00094815

**EXHIBIT A**

FORM OF JOINT RELEASE NOTICE

To: Citibank, N.A.,
as Escrow Agent
388 Greenwich St., 29th Floor
New York, New York 10013
Attn: Kerry McDonough, Director


This certificate is issued as of the ___ day of _____, ____, pursuant to Section 4(a) of that certain Escrow Agreement dated as of [●], 2022 (the "Escrow Agreement") by and among [●], a [●] ("Parent"), [●] (the "Equityholder Representative"), and Citibank, N.A (the "Escrow Agent"). Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Escrow Agreement.

The parties to this certificate jointly instruct the Escrow Agent to pay to [Parent/the Equityholder Representative] an amount equal to $_____ out of the Escrow Account, by wire transfer to:

[*Insert wire instructions*]

Each of the undersigned hereby represents and warrants that such Person has been authorized to execute this certificate. This certificate may be signed in counterparts.

[*Signature Pages Follow*]

CONFIDENTIAL                                                                                    FBG_CH1_00094816

**PARENT**:

[●]


By: _____
Name: _____
Title: _____

CONFIDENTIAL                                                                       FBG_CH1_00094817

**EQUITYHOLDER REPRESENTATIVE:**

[●]


By: _____
Name: _____
Title: _____

CONFIDENTIAL

FBG_CH1_00094818

**Exhibit D**

Certificate of Merger

Exhibit D – Page 1

CONFIDENTIAL

FBG_CH1_00094819

# CERTIFICATE OF MERGER OF

## VIPER ACQUISITION, LLC

### (a Delaware limited liability company)

### WITH AND INTO

## QUALITOR ACQUISITION HOLDINGS INC.

### (a Delaware corporation)

Pursuant to Title 8, Section 264 of the General Corporation Law of the State of Delaware (the "DGCL") and Section 18-209 of the Delaware Limited Liability Act (the "LLCA"), Qualitor Acquisition Holdings Inc., a Delaware corporation (the "Company"), in connection with the merger of Viper Acquisition, LLC, a Delaware limited liability company ("Merger Sub"), with and into the Company (the "Merger"), does hereby certify that:

FIRST: The name and state of incorporation of each of the constituent entities of the Merger (the "Constituent Entities") is as follows:

(i)     Viper Acquisition, LLC, a limited liability company formed under the laws of the State of Delaware; and

(ii)    Qualitor Acquisition Holdings Inc., a corporation incorporated under the laws of the State of Delaware.

SECOND: The Agreement and Plan of Merger, dated as of July 29, 2022, by and among the Company, Merger Sub, First Brands Group, LLC, a Delaware limited liability company, and Qualitor Holdings LLC, solely in its capacity as the representative of the stockholders of the Company (the "Agreement and Plan of Merger"), setting forth the terms and conditions of the Merger, has been approved, adopted, executed and acknowledged by each of the Constituent Entities in accordance with the provisions of Section 264 of the DGCL and Section 18-209 of the LLCA, as applicable.

THIRD: Pursuant to the Agreement and Plan of Merger, Merger Sub shall be merged with and into the Company and the Company shall be the surviving corporation in the Merger (the "Surviving Corporation"), whose name following the Merger shall be Viper Acquisition, Inc.

FOURTH: The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

CONFIDENTIAL

FBG_CH1_00094820

FIFTH:  The executed Agreement and Plan of Merger is on file at the principal place of business of the Surviving Corporation.  The address of the principal place of business of the Surviving Corporation is c/o 127 Public Square, Suite 5300, Cleveland, Ohio 44114.

SIXTH:  A copy of the Agreement and Plan of Merger will be furnished by the Surviving Corporation on request, without cost, to any stockholder of any constituent corporation or member of any constituent limited liability company.

SEVENTH: The Certificate of Incorporation of the Surviving Corporation shall be its Certificate of Incorporation

[*The remainder of this page is intentionally left blank.*]

CONFIDENTIAL

FBG_CH1_00094821

IN WITNESS WHEREOF, the undersigned corporation has caused this Certificate of Merger to be duly executed by its authorized officer.

Dated: _____, 2022

Qualitor Acquisition Holdings Inc.

By: _____
Name: Michael Fretwell
Title: President

[*Signature Page to the Certificate of Merger*]

CONFIDENTIAL                                                                    FBG_CH1_00094822

**Exhibit E**

Letter of Transmittal

Exhibit E – Page 1

CONFIDENTIAL                                                                    FBG_CH1_00094823

# LETTER OF TRANSMITTAL AND WAIVER OF APPRAISAL RIGHTS

## For Shares of Common Stock of
## Qualitor Acquisition Holdings Inc.

Pursuant to the Agreement and Plan of Merger, dated as of _____, 2022

---

THIS LETTER OF TRANSMITTAL SHOULD BE COMPLETED, SIGNED, AND SENT TO THE COMPANY [CARE OF THE PERSON NAMED BELOW]

---

*By electronic mail, mail, hand or overnight delivery to:*
Qualitor Acquisition Holdings Inc.
1840 McCullough Road
Lima, OH 45801
Attention: Teresa Holden
Telephone: (419) 993-8128
E-mail: tholden@qualitorinc.com

*With a copy to the Equityholder Representative*:
Qualitor Holdings LLC
c/o Wellspring Capital Management LLC
605 Third Avenue, 44th Floor
New York, NY 10158
Attention: Sarah Mudho
E-mail: smudho@wellspringcapital.com

*With a copy to Paul, Weiss:*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Robert Balis, Esq., Teodora Stanoeva
Email: rbalis@paulweiss.com
tstanoeva@paulweiss.com

| Stockholder | DESCRIPTION OF COMMON SHARES SURRENDERED |
|---|---|
| | # of Common Shares |
| | |
| | |
| **TOTAL:** | |

This Letter of Transmittal and Waiver of Appraisal Rights ("Letter of Transmittal") should be completed by holders of common stock (collectively, the "Stockholders") of Qualitor Acquisition Holdings Inc., a Delaware corporation (the "Company"), receiving Final Merger Consideration and the Asset Adjustment, as applicable.

**PLEASE READ THE ACCOMPANYING INSTRUCTIONS CAREFULLY.**

CONFIDENTIAL                                                     FBG_CH1_00094824

1.  **The Merger Agreement; Appointment of Equityholder Representative**.  This Letter of Transmittal is delivered pursuant to the Agreement and Plan of Merger, dated as of _____, 2022 (the "Merger Agreement"), by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Viper Acquisition, LLC, a Delaware limited liability company and wholly-owned subsidiary of Parent ("Merger Sub"), the Company, Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative"), and, solely for the purposes of Section 6.15 of the Merger Agreement (*Names Following Closing*), Qualitor Holdings LLC, a Delaware limited liability company.  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement.  At the Effective Time, each issued and outstanding share of common stock, par value $0.01 per share, of the Company (each, a "Common Share" and collectively, the "Common Shares"), except for the Excluded Shares and any Dissenting Shares, will be converted automatically into the right to receive from Parent (or on behalf of Parent) (i) at the Closing, an amount in cash (without interest) equal to the Per Share Price, (ii) following the Closing, in each case of the following clauses (x) and (y), if and to the extent applicable, such Common Share's portion of (x) the proceeds from the Escrow Account, if any, as provided in the Escrow Agreement and the applicable provisions of the Merger Agreement and any other agreement entered into with any Affiliate of Parent and (y) the amount that the Final Merger Consideration exceeds the Closing Merger Consideration, if any, and (iii) following the Closing, if and to the extent applicable, such Common Share's portion of the balance of the Equityholder Representative Reserve Amount pursuant to Section 10.20(e) of the Merger Agreement (*Equityholder Representative*), in each case subject to Section 2.12 of the Merger Agreement (*Withholding Rights*) (clauses (ii) and (iii), together with the Asset Adjustment, the "Post-Closing Payments").  In addition, each Equityholder will be entitled to its portion of the amounts by which accounts receivable and inventory exceeded the estimate thereof in connection with the Closing (the "Asset Adjustment").  The Per Share Price in respect of each Common Share will be payable, without interest, to the applicable Stockholder upon the surrender pursuant to Section 2.6 of the Merger Agreement (*Surrender of Book-Entry Shares*) of the Book-Entry Share formerly representing such Common Share.  This Letter of Transmittal is the means by which you (the undersigned) can claim the cash consideration you are entitled to receive under the Merger Agreement for your Common Shares.  A Stockholder may submit its Letter of Transmittal to the Company (or the Surviving Corporation in accordance with Section 2.6(a)(ii) of the Merger Agreement (*Surrender of Company Stock*)) following the Effective Time and Parent shall make (or cause to be made) the payment described in this paragraph, as applicable, as promptly as practicable thereafter (and in no event later than three (3) Business Days after receipt thereof; provided that, for the avoidance of doubt, any Stockholder that submits its Letter of Transmittal prior to the Closing shall receive its cash consideration at the Closing).

The undersigned acknowledges and agrees to be subject to the terms and conditions of the (i) Merger Agreement, including, without limitation, the (a) appointment of the Equityholder Representative in Section 10.20 of the Merger Agreement (*Equityholder Representative*) (and that such appointment shall apply *mutatis mutandis* for the Asset Adjustment), (b) rights, powers and duties of the Equityholder Representative pursuant to Section 10.20 of the Merger Agreement (*Equityholder Representative*), and (c) reservation and disbursement of the Equityholder Representative Reserve Amount pursuant to Sections 10.20(d) and (e) of the Merger Agreement (*Equityholder Representative*) and (ii) Escrow Agreement (together with the Merger Agreement, the "Transaction Documents"), including the deposit with the Escrow Agent of the Escrow Amount for the purpose of securing any adjustments to the Closing Merger Consideration pursuant to Section 2.10 of the Merger Agreement (*Pre-Closing Statement; Closing Merger Consideration Adjustment*) and any Asset Adjustment, as applicable.  In furtherance of the foregoing, the undersigned hereby irrevocably appoints the Equityholder Representative as the undersigned's true and lawful agent and attorney-in-fact, with full power of substitution, with full power and authority to act for and on behalf of the undersigned for all purposes set forth in Section 10.20 of the Merger Agreement (*Equityholder Representative*). The appointment of the Equityholder Representative as the undersigned's attorney-in-fact revokes any power of attorney heretofore granted that authorized any other person or persons to act as agent and to represent the undersigned in a manner inconsistent with the rights and obligations of the Equityholder Representative set forth in Section 10.20 of the Merger Agreement (*Equityholder Representative*). The appointment of the Equityholder Representative as attorney-in-fact pursuant hereto is coupled with an interest and is irrevocable. The undersigned hereby acknowledges and agrees to, without limitation, the provisions of Section 10.20(c) of the Merger Agreement (*Equityholder Representative*). The Equityholder Representative may rely on the provisions of this Letter of Transmittal.

2.  **Delivery of Letter of Transmittal**.  The undersigned is delivering this Letter of Transmittal in respect of the Common Shares surrendered with this Letter of Transmittal (such surrendered Common Shares, the "Surrendered Shares"), pursuant to Section 2.6(a) of the Merger Agreement (*Surrender of Book-Entry Shares*), for the right to receive in exchange therefor the applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable, and, until the undersigned properly delivers this Letter of Transmittal to the Company as contemplated hereby, each such Common Share shall be deemed at all times after the Effective Time to be cancelled, no longer outstanding and represent only the right to receive upon such surrender the Final Merger Consideration and the Asset Adjustment, as applicable, to

CONFIDENTIAL

FBG_CH1_00094825

which the holder of such Common Share is entitled pursuant to Article II of the Merger Agreement (including for the avoidance of doubt, such Common Share's portion of any release by the Escrow Agent of all or a portion of the Escrow Amount pursuant to Section 2.10 of the Merger Agreement (*Pre-Closing Statement; Closing Merger Consideration Adjustment*) and the Asset Adjustment). The execution and delivery of this Letter of Transmittal is a condition to receiving the undersigned's applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable. The undersigned understands that surrender of the Surrendered Shares will not be made in acceptable form until receipt by the Company of this Letter of Transmittal, duly completed and signed, together with all signature pages included herewith. All questions as to validity, form and eligibility of the Surrendered Securities hereby will be determined by the mutual agreement of the Company and the Equityholder Representative and such determination shall be final and binding. Accordingly, the undersigned consents to, approves and raises no objection against, and has no rights to dissent or seek appraisal with respect to the Merger. The undersigned hereby agrees, upon request of the Company, to execute any additional documents necessary or desirable to complete the surrender and exchange of the Surrendered Shares.

3.   **Options**. The undersigned understands that this Letter of Transmittal and the other related documents referred to above are not applicable to Options. If the undersigned holds Options, the undersigned has been or will be provided with separate materials regarding such Options.

4.   **Tax**.   The undersigned further understands that he, she or it is solely responsible for the payment of any applicable U.S. federal, state, local and non-U.S. taxes imposed on the undersigned attributable to the payment of the applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable, to the undersigned. The undersigned acknowledges that the Merger generally will be a taxable event to the Stockholders of the Company in 2022 even if a Stockholder neglects to return this Letter of Transmittal.

**EACH OF THE COMPANY'S STOCKHOLDERS IS URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE MERGER IN LIGHT OF HIS, HER OR ITS OWN PARTICULAR CIRCUMSTANCES.**

5.   **Representations and Warranties**. The undersigned hereby makes the following representations and warranties; provided that the undersigned makes no representations or warranties relating to any written agreement between the Company and Parent (or any of its Affiliates) other than the Merger Agreement. The undersigned hereby acknowledges receipt of a copy of the Merger Agreement and a notice pursuant to Section 228(e) of the General Corporation Law of the State of Delaware (the "DGCL"), which was previously sent to the undersigned if the undersigned did not execute a written consent of the stockholders of the Company adopting the Merger Agreement and approving and consenting to a merger of Merger Sub with and into the Company, with the Company being the surviving corporation, and the consummation of the transactions contemplated thereby. The undersigned hereby acknowledges and agrees that he, she or it (a) has received and reviewed this Letter of Transmittal and the Merger Agreement, (b) has had an opportunity to obtain the advice of counsel prior to executing this Letter of Transmittal, (c) fully understands and accepts all of the provisions hereof and of the Merger Agreement, (d) other than such Stockholder's right to receive his, her or its portion of the Final Merger Consideration and the Asset Adjustment, as applicable, shall have no further rights arising out of any Common Shares and upon completion of the Merger, such Common Shares shall be automatically cancelled and no longer outstanding without no further action required on the part of the undersigned, and (e) has relied solely and completely upon its own judgment in executing this Letter of Transmittal. The undersigned is an individual, a trust or is a partnership, limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation or incorporation, as applicable. The undersigned is the record and beneficial owner of, and has good and valid title to, the Surrendered Shares, free and clear of all Encumbrances and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Surrendered Shares), other than (x) generally applicable transfer restrictions under the Securities Act, (y) Encumbrances arising under that certain Stockholders Agreement, dated as of October 31, 2014, by and among the Company and the other parties thereto and (z) Encumbrances that would not reasonably be expected, individually or in the aggregate, to impair the undersigned's ability to effect the transactions contemplated hereby and, in the case of (z), which will be released as of or prior to the Closing. Other than the Surrendered Shares and Options, if any, the undersigned does not directly or indirectly own or have any right to any capital stock, limited liability company interest, option, warrant, call, commitment, subscription, unit appreciation right or other equity or similar interest in, or any interest convertible into or exchangeable for, any time, any capital stock, limited liability company interest, option, warrant, call, commitment, subscription, unit appreciation rights or other equity or similar interest in the Company. The execution and delivery of this Letter of Transmittal by the undersigned (and, if applicable, his or her spouse) does not, and the performance by the undersigned (and, if applicable, his or her spouse) of the undersigned's obligations hereunder will not (i) result in any violation of any existing applicable Law or any order, judgment, injunction, ruling, decision, award or decree of any Governmental Authority to which the undersigned is a party or by which any of the undersigned's assets is bound, (ii) if the undersigned is not an individual,

CONFIDENTIAL

FBG_CH1_00094826

result in any violation of the organizational documents of the undersigned, (iii) require any consent that has not been obtained or other action (including notice or payment) that has not been taken by any Person or the undersigned's Surrendered Shares) or (iv) result in the imposition of any material Encumbrance (other than a Permitted Encumbrance) upon the undersigned's Surrendered Shares, in each case of (i), (iii) and (iv), except those that would not reasonably be expected, individually or in the aggregate, to materially impair the undersigned's ability to effect the transactions contemplated hereby. The undersigned has the legal capacity and all requisite power and authority to execute and deliver this Letter of Transmittal and to perform his, her or its obligations hereunder and to consummate the transactions contemplated hereby, and if the undersigned is a trust or other entity, the execution, delivery and performance by the undersigned of this Letter of Transmittal has been duly authorized by all necessary action on the part of the undersigned and its trustee(s) and beneficiaries, board of directors or similar applicable governing body. This Letter of Transmittal has been duly executed and delivered by the undersigned and constitutes a valid and binding agreement of the undersigned, enforceable against the undersigned in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies. If the undersigned is married, and any of the Surrendered Shares constitute community property under applicable Law and spousal or other approval is required for this Letter of Transmittal to be valid and binding and for the representations and warranties made herein to be true, then a spousal consent has been duly and validly executed and delivered by the relevant spouse and constitutes a valid and legally binding obligation of such spouse, except to the extent that enforceability may be limited by applicable bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies. If the undersigned is a trust or other entity, the undersigned is duly incorporated or organized, validly existing and in good standing under the applicable Laws of its respective jurisdiction of incorporation or organization. The undersigned is not a party to any proxy, voting trust, equity agreement or other agreement or understanding in effect with respect to the voting or transfer of any of the Surrendered Shares, other than the Stockholders Agreement. The undersigned has not incurred any liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by the Merger Agreement for which the Company, the Company Subsidiaries, Parent or the other Stockholders could become liable or obligated that is not a Transaction Expense. The undersigned acknowledges and agrees that such payments received by the undersigned in accordance with the Merger Agreement satisfies all obligations to the undersigned pertaining to the Surrendered Stock.

6. **Waiver of Appraisal Rights**. Completion, execution and delivery of this Letter of Transmittal with respect to the Common Shares constitutes an unconditional and irrevocable waiver by the undersigned of any (i) appraisal or dissenters' rights with respect to such Common Shares under Section 262 of the DGCL and other applicable Law or regulation granting the undersigned the right to have their Common Shares appraised in connection with the Merger, whether or not the undersigned has previously made a written demand upon the Company, the Surviving Corporation, Parent or Merger Sub and otherwise complied with the appraisal rights provisions of the DGCL and (ii) rights to otherwise dissent from the Merger Agreement and any other agreements contemplated thereby and the transactions contemplated thereby.

7. **Binding Effect**. This Letter of Transmittal shall remain in full force and effect notwithstanding the death or incapacity of one or more of the undersigned (if an individual), and this Letter of Transmittal shall be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the undersigned.

8. **Severability**. If any provision of this Letter of Transmittal is declared invalid or unenforceable by a court having competent jurisdiction, it is agreed that the same shall endure except for the part declared invalid or unenforceable which shall instead be enforced to the maximum extent permitted under applicable Laws.

9. **Escrow**. The undersigned hereby acknowledges that at the Closing (i) $1,500,000 ("Escrow Amount") of the Closing Merger Consideration shall be delivered to the Escrow Agent to be held in an escrow account to satisfy amounts payable to Parent, if any, pursuant to Section 2.10 of the Merger Agreement (*Pre-Closing Statement; Closing Merger Consideration Adjustment*) or such other written agreement entered into by the Company and Parent or any of its Affiliates, and shall be available as recourse for any amounts payable to Parent pursuant to Section 2.10 of the Merger Agreement (*Closing Merger Consideration Adjustment*) or as expressly set forth in another written agreement entered into by the Company and Parent or any of its Affiliates, and the undersigned shall only receive distributions with respect to the Escrow Amount if and to the extent the undersigned is entitled to receive such distributions in accordance with the terms of the Merger Agreement, the Escrow Agreement and such other written agreement and (ii) $1,000,000 (the "Equityholder Representative Reserve Amount") shall be paid to the Equityholder Representative, which shall serve to pay for any amounts owed by the Equityholders and the out-of-pocket fees, costs and expenses of the Equityholder Representative incurred (at the discretion of the Equityholder Representative) in connection with the performance of its duties and obligations under this Letter of Transmittal and the Merger Agreement and the undersigned shall only receive

FBG_CH1_00094827

distributions with respect to the Equityholder Representative Reserve Amount if and to the extent that the undersigned is entitled to receive such distributions in accordance with the terms of the Merger Agreement.

10. **Headings.** The headings contained in this Letter of Transmittal and the Merger Agreement are intended solely for convenience and shall not affect the rights of any parties thereto.

11. **Amendment; Governing Law; Waiver of Jury Trial.** This Letter of Transmittal may not be changed except in a writing signed by the person(s) against whose interest such change shall operate. This Letter of Transmittal shall be governed by and construed under the laws of the State of Delaware without regard to principles of conflicts of law. Section 10.15 of the Merger Agreement is incorporated herein by reference and shall apply to this Letter of Transmittal *mutatis mutandis*.

12. **Waiver of Conflict.** The undersigned hereby acknowledges and agrees to the following: (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("PWRW&G") is representing the Company in connection with the Merger Agreement and the documents and transactions contemplated thereby and is not representing the undersigned unless otherwise agreed in writing by PWRW&G; (b) PWRW&G is representing Qualitor Holdings, LLC as the Equityholder Representative with respect to the provisions relating to the Equityholder Representative in the Merger Agreement and is not representing the undersigned unless otherwise agreed in writing by PWRW&G, and (c) PWRW&G is representing the Wellspring Parties in connection with the Merger Agreement and is not representing the undersigned unless otherwise agreed in writing by PWRW&G.

13. **Conversion.** ALL SURRENDERED SHARES HELD BY YOU WILL AUTOMATICALLY BE CONVERTED INTO THE RIGHT TO RECEIVE THE APPLICABLE PORTION OF THE FINAL MERGER CONSIDERATION SET FORTH IN THE MERGER AGREEMENT AND THE ASSET ADJUSTMENT AT THE EFFECTIVE TIME.

14. **Termination of Representations and Warranties.** The representations and warranties of the Stockholder set forth herein shall terminate and not survive the date of the execution of this Letter of Transmittal by the Stockholder, except nothing shall limit any right of the Parent to bring any actions or proceedings in respect of a claim of actual and knowing common law fraud (and not negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence) made by the undersigned with respect to making any representation or warranty contained herein with the specific intent to induce another party to enter into the Merger Agreement that was material to the claiming party's decision to enter into this Agreement and upon which the claiming party justifiably relied, in each case, as determined in a non-appealable final determination of a court of competent jurisdiction ("Fraud") against the Person that committed Fraud in connection with this Letter of Transmittal or the Merger and the transactions contemplated hereby or thereby shall not be limited. It is the express intent that if the survival period of the representation and warranties is shorter than the statute of limitations that would otherwise apply, then, by contract, the applicable statute of limitations shall be reduced to the survival period contemplated hereby.

15. **Confidentiality.** During the period from the Closing until the third anniversary of the Closing, the undersigned shall not and shall instruct its Representatives not to, directly or indirectly, without the prior written consent of Parent, disclose to any third party (other than each other and their respective Representatives) any confidential information with respect to the Company and the Company Subsidiaries or their business; provided that, the foregoing restriction shall not (a) apply to any information (i) that was, is or becomes generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 15) or (ii) that was, is or becomes available to the undersigned and its Affiliates or their respective Representatives from a third party that was not known by the applicable recipient to be bound by a confidentiality agreement or other applicable contractual, legal or fiduciary obligation of confidentiality with respect to such information or was or is generated independently by the undersigned and its Affiliates or their respective Representatives without reference to or use of such information and without violation of this Section 15, or (b) prohibit any disclosure (i) to the undersigned's Affiliates or any Representatives of the undersigned or its Affiliates, (ii) required or requested by applicable Law so long as, the undersigned discloses only that information that the undersigned determines (with the advice of counsel) is required by such applicable Law to be disclosed and uses commercially reasonable efforts to preserve the confidentiality of such information, including by, at Parent's written request, reasonably cooperating with Parent for Parent to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information (at Parent's sole cost and expense), (iii) necessary to be made in connection with the enforcement of any right or remedy relating to any of the Transaction Documents or the transactions contemplated thereby, (iv) to direct and indirect existing and potential investors in the undersigned who are subject to customary confidentiality obligations with respect to confidential information they receive, or (v) in the performance of authorized employment duties in the undersigned's capacity as an employee of Parent or any of its Subsidiaries. The undersigned

CONFIDENTIAL

FBG_CH1_00094828

agrees not to make any public release or announcement concerning the transactions contemplated hereby without the prior consent of Parent, the Company and the Equityholder Representative.

16.

## WAIVER OF APPRAISAL RIGHTS

THE UNDERSIGNED ACKNOWLEDGES AND AGREES THAT, IF IT IS ENTITLED TO EXERCISE APPRAISAL OF ITS SURRENDERED SHARES PURSUANT TO THE DGCL, SUBMISSION OF THIS LETTER OF TRANSMITTAL TO THE COMPANY WILL CONSTITUTE AN UNCONDITIONAL AND IRREVOCABLE WAIVER OF ITS RIGHT TO DEMAND APPRAISAL OF ITS SURRENDERED SHARES INCLUDING ANY APPRAISAL OR SIMILAR RIGHTS IN CONNECTION WITH THE MERGER PURSUANT TO THE PROVISIONS OF THE DGCL.

Please note that if the Merger is not consummated, this Letter of Transmittal will be returned to you, and this Letter of Transmittal will be void and of no force and effect.

CONFIDENTIAL

FBG_CH1_00094829

# THE FOLLOWING INSTRUCTIONS MUST BE FOLLOWED:

1.    <u>Delivery of Letter of Transmittal and Common Shares</u>.  In order for you to make an effective surrender of Surrendered Shares and be entitled to receive the applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable, you must deliver to the Company your Letter of Transmittal, the other signed and completed pages included herewith.

**The method of delivery of Surrendered Shares and other documents is at the election and risk of the transmitting Stockholder.  In order to protect against loss, if delivery is made by mail, registered mail with return receipt requested, properly insured, is recommended.**

2.    <u>Signatures</u>.  If you are the person whose name appears on the Surrendered Shares, sign this Letter of Transmittal exactly as your name appears on such Surrendered Shares, as the signature must correspond exactly with the name written on the face of the Surrendered Shares without alteration or any change whatsoever.  If any Surrendered Shares are registered in the name of two or more Stockholders, each person named on the Surrendered Shares must sign this Letter of Transmittal.  If an executor, administrator, trustee, guardian, attorney-in-fact, corporate officer or other person acting in a fiduciary or representative capacity signs the Letter of Transmittal, such person should indicate his or her full title when signing and must provide appropriate evidence of authority to act in such capacity with a signed copy of this Letter of Transmittal.  If additional documentation is required, you will be so advised.

3.    <u>Examination of Documentation</u>.  The Company shall examine this Letter of Transmittal, the U.S. Internal Revenue Service ("<u>IRS</u>") Form W-9 or an applicable Form W-8 to be provided pursuant to <u>Section 5</u> below, as appropriate, and all other documents referenced in this Letter of Transmittal (collectively, the "<u>Stockholder Exchange Documents</u>") delivered or mailed to the Company in connection with the surrender of Surrendered Shares by you to ascertain whether they have been completed and executed in accordance with the instructions set forth in this Letter of Transmittal.  In the event the Company determines that any Stockholder Exchange Documents do not appear to have been properly completed or executed, or that any other irregularity in connection with the surrender appears to exist, the Company will promptly follow, where possible, its regular procedures to attempt to cause such irregularity to be corrected and shall be entitled to consult with Parent and the Company for further instructions.  Stockholders may be contacted by the Company and be requested to provide any missing or incomplete information. A surrender will not be deemed to have been made until all irregularities have been cured or waived.

4.    <u>Additional Copies</u>.  Additional copies of this Letter of Transmittal may be obtained from the Company at the address listed on the face hereof.

5.    <u>IRS Forms</u>.  If you are a U.S. Person (as defined below), you must provide the Company with a correct Taxpayer Identification Number (generally, your Employer Identification Number or Social Security Number) on the IRS Form W-9 which is attached hereto and certify whether you are subject to backup withholding in accordance with the instructions to the IRS Form W-9.  If you are not a U.S. Person (a "<u>Non-U.S. Person</u>"), you must complete and deliver an applicable IRS Form W-8 certifying your status as a Non-U.S. Person.  Such IRS Forms W-8 can be obtained from the Company or the Internal Revenue Service (<u>www.irs.gov/formspubs/index.html</u>). **Failure to provide the information on the IRS Form W-9 or applicable IRS Form W-8 may subject you to 24% federal backup withholding on any payments of the applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable, to you.**  Backup withholding is not an additional tax. Rather, the amount of tax withheld will be applied against the U.S. federal income tax liability of a person subject to backup withholding, and if withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is furnished to the IRS in a timely manner.

For purposes of these instructions, a "U.S. Person" is (i) an individual who is a citizen or resident alien of the United States, (ii) a corporation (including an entity taxable as a corporation) or partnership (including an entity or arrangement taxable as a partnership) created under the laws of the United States or of any political subdivision thereof, (iii) an estate the income of which is subject to United States federal income tax regardless of its source or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

CONFIDENTIAL

FBG_CH1_00094830

**Important:  This Letter of Transmittal, appropriately completed and signed, and all other required documents identified herein, must be received by the Company before any payment of the applicable portion of the Final Merger Consideration and the Asset Adjustment, as applicable, can be made to you.**

---

### ALL STOCKHOLDERS MUST SIGN
### IN THE SPACE PROVIDED BELOW
#### (See Instruction 2)

By signing below, the undersigned agrees to be bound by the provisions contained in this Letter of Transmittal

........................................................................................................................................

........................................................................................................................................

Signature(s) of Stockholders(s)

(Must be signed by the Stockholder(s) exactly as name(s) appear(s) on the Surrendered Shares.)

Dated........................................................................................................................

Name(s) ....................................................................................................................

........................................................................................................................................
(Please Print)

Title of Signing Party (if entity, trustee or other authorized party)..................................

........................................................................................................................................

Home or Business Address.................................................................................................

........................................................................................................................................
                                                                                                    (Zip Code)
Home or Business Telephone Number ...............................................................................
(Include Area Code)

Tax Identification No. (Employer Identification No. or
Social Security No.).............................................................................................................
     (Complete Accompanying Form W-9 or Applicable Form W-8, As Applicable)

To receive payment via wire transfer provide wire transfer instructions below:

Bank:

ABA Number:

Account Number:

Account Name:

Attention:

---

CONFIDENTIAL                                                              FBG_CH1_00094831

| Form **W-9** | **Request for Taxpayer** | Give Form to the |
|---|---|---|
| (Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Identification Number and Certification**<br>► Go to *www.irs.gov/FormW9* for instructions and the latest information. | requester. Do not<br>send to the IRS. |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC    ☐ C Corporation    ☐ S Corporation    ☐ Partnership    ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

**6** City, state, and ZIP code

**7** List account number(s) here (optional)

*(left margin: Print or type. See Specific Instructions on page 3.)*

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

Employer identification number

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**    Signature of U.S. person ▶      Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X      Form **W-9** (Rev. 10-2018)

Form W-9 (Rev. 10-2018)                                                                                                       Page **2**

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting*, later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships*, earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

CONFIDENTIAL

FBG_CH1_00094833

**DEBTORS' EXHIBIT NO. 243**
**Page 121 of 129**

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

CONFIDENTIAL                                FBG_CH1_00094834

Form W-9 (Rev. 10-2018) Page **4**

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for... | THEN the payment is exempt for... |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

**Line 5**

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

**Line 6**

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see How to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See What Name and Number To Give the Requester, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at www.SSA.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/Businesses and clicking on Employer Identification Number (EIN) under Starting a Business. Go to www.irs.gov/Forms to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to www.irs.gov/OrderForms to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see Exempt payee code, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

CONFIDENTIAL

FBG_CH1_00094835

Form W-9 (Rev. 10-2018)                                                                Page 5

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor[4] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see *Special rules for partnerships*, earlier.

**\*Note:** The grantor also must provide a Form W-9 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:
* Protect your SSN,
* Ensure your employer is protecting your SSN, and
* Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

CONFIDENTIAL         FBG_CH1_00094836

**Exhibit F**

[Reserved]

Exhibit F – Page 1

CONFIDENTIAL

FBG_CH1_00094837

**Exhibit G**

Restrictive Covenants

CONFIDENTIAL   FBG_CH1_00094838

**Pylon – Merger Agreement**

**Exhibit H**

1.      For a period commencing at Closing and expiring on the date that is thirty-six (36) months following the Closing Date (the "Restriction Period"), the Principal Seller agrees that it will not, and will cause its Subsidiaries (collectively, the "Restricted Persons") not to, directly or indirectly, distribute, manufacture, market or sell the Products in any the Restricted Territory, other than pursuant to arrangements with Parent or any of its Subsidiaries; provided, however, this Exhibit H shall not apply in respect of:

a.   any Restricted Persons, investing or holding publicly traded securities of any Person engaged in a business which distributes or sells the Products as conducted as of immediately prior to Closing, to the extent such investment or holding is on a passive basis and does not, directly or indirectly, confer on any Restricted Person 5% or more of the voting power of such Person; or

b.   any Restricted Person, hereafter acquiring or investing in any Person or business ("Acquired Business") which distributes or sells the Products ("Acquired Competitive Operations") (and thereafter engaging in providing, performing, rendering or selling any such product or service of such Acquired Business); provided that (i) each of the Restricted Persons shall prohibit access to, and use its reasonable best efforts to not otherwise make available, any Evaluation Material to employees or consultants of the Acquired Competitive Operations who exercise decision making authority over pricing, costs, margins or staffing or service levels with respect to bids or requests for proposals for products in competition with the Products and (ii) within nine (9) months following the closing of the acquisition of such Acquired Competitive Operations either (A) consolidated revenues attributable to the Acquired Competitive Operations for the trailing twelve (12) months account for less than the greater of (x) 15% percent compared with the Acquired Business' consolidated annual revenues for its most recent fiscal year ended prior to the date of such closing and (y) $30,000,000 or (B) if the foregoing clause (A) is not satisfied, but the Acquired Competitive Operations are not the principal business or operation of the applicable Acquired Business, within twelve (12) months after the consummation of the acquisition of the Acquired Competitive Operations (subject to automatic extension until five (5) Business Days following receipt of all regulatory approvals if a definitive agreement was executed in such twelve (12) month period), such Restricted Persons has, upon terms and conditions and at a price determined by the Principal Seller in its sole discretion, divested that portion of the Acquired Competitive Operations for which consolidated revenues attributable thereto for the trailing twelve (12) months exceed the greater of (x) 15% percent compared with the Acquired Business' consolidated annual revenues for its most recent fiscal year ended prior to the date of such closing and (y) $30,000,000;

c.   any equity securities in any Person owned through any Benefit Plan sponsored or maintained by the Company or any of the Restricted Persons (which, Equity Securities were, for the avoidance of doubt, not acquired to facilitate a strategic acquisition by the Company or a Restricted Person).

"Product" means windshield wiper blades primarily marketed for use with cars, trucks and SUVs.

CONFIDENTIAL                                                            FBG_CH1_00094839

"Restricted Territory" means any country in which the Company Group sold or distributed Products as of the date of this Agreement.

2.      During the Restricted Period, the Restricted Persons will not, directly or indirectly, solicit any customer, vendor, contractor or supplier of the Company Group (solely as it relates to manufacture, distribution or sale of the Products) to terminate, diminish or materially interfere with his, her or its relationship with the Company Group.

3.      During the Restricted Period, the Restricted Persons will not, directly or indirectly, solicit for employment or engagement as an independent contractor or hire or engage, or attempt to hire or engage, any individual listed on Annex A attached hereto; provided, however, that (a) nothing herein shall prohibit the Restricted Persons, (x) from conducting any general solicitation for employees (including through the use of employment agencies or the placing of an advertisement) which the Principal Seller did not specifically target at any individual listed on Annex A or (y) from soliciting, engaging or hiring any person who has been terminated by the Company or any of its Subsidiaries no less than six (6) months prior to the solicitation, engagement or hiring of such person and (b) the provisions of this Section 3 shall not apply with respect to board membership (or membership on any similar body) of any individual listed on Annex A.

4.      During the Restricted Period, the Restricted Persons shall direct officers and senior executives not to make any public statement or communication which is materially false or disparaging with respect to the business of Company Group; provided, that nothing herein shall prohibit any person (i) from testifying truthfully under oath or making any truthful statement or communication in response to any request or requirement by Law, by court order or by a self-regulatory organization or in connection with enforcing any Restricted Peron's rights or remedies, as applicable, under this Agreement or any agreements contemplated by the Agreement or (ii) making any public statement or communication in connection with any commercial relationship between Parent and its Affiliates on the one hand and the Restricted Persons on the other hand, entered into after the date hereof.

5.      Notwithstanding anything contained herein to the contrary, this Exhibit H shall not be applicable to the acquiring or surviving (or ultimate parent) entity resulting from a Change of Control; provided, that no such Change of Control transaction may be structured in a manner solely to avoid the obligations of this Exhibit H.  For avoidance of doubt, if any Restricted Person sells to a Person any portion of its or such Restricted Person's respective businesses (whether by means of acquisition, asset purchase, merger, consolidation, similar business combination or otherwise), the restrictions contained in this Exhibit H shall not prohibit such sale and shall not apply to any such Person or such Person's Affiliates. For the avoidance of doubt, subject to this paragraph 5, the provisions of this Exhibit H shall remain in full force and effect following such transaction solely with respect to the Restricted Persons.

"Change of Control" means the merger, acquisition, reorganization, consolidation or business combination of the Company with or by a bona fide third party in which the shareholders of the Company immediately prior to such transaction (in such capacity) would own, in the aggregate, less than 60% of the total combined voting power of all classes of capital stock of the acquiring or surviving (or ultimate parent) entity normally entitled to vote for the election of directors of the acquiring or surviving (or ultimate parent) entity.

4861-5316-0229.2

CONFIDENTIAL

FBG_CH1_00094840

<u>Annex A</u>

Restricted Individuals

1. Mike Fretwell

2. Steve Harris

3. Will Young

CONFIDENTIAL                                                                    FBG_CH1_00094841

**DEBTORS' EXHIBIT NO. 243**
**Page 129 of 129**