FINAL

SECURITIES PURCHASE AGREEMENT

AMONG

JASPER ACQUISITION CORP.

*as the Buyer*

JASPER RUBBER PRODUCTS, INC.,

*as the Company*

and

JASPER RUBBER PRODUCTS, INC. EMPLOYEE STOCK OWNERSHIP TRUST

*as the Seller*

Dated as of January 5, 2024

CONFIDENTIAL

FBG_CH1_00094842

**DEBTORS' EXHIBIT NO. 244**
**Page 1 of 64**

**TABLE OF CONTENTS**

Page

**ARTICLE I**    **DEFINITIONS** .................................................................................. 1

Section 1.1    Certain Defined Terms.................................................................... 1

Section 1.2    Table of Definitions ..................................................................... 12

**ARTICLE II**    **PURCHASE AND SALE; CLOSING**........................................... 14

Section 2.1    Purchase and Sale ........................................................................ 14

Section 2.2    Purchase Price.............................................................................. 14

Section 2.3    Closing ......................................................................................... 14

Section 2.4    Delivery of Closing Estimates ..................................................... 14

Section 2.5    Seller and Company Closing Deliverables ................................... 14

Section 2.6    Buyer Closing Deliverables ......................................................... 16

Section 2.7    Payments at Closing..................................................................... 16

Section 2.8    Post-Closing Adjustment ............................................................. 17

Section 2.9    Withholding .................................................................................. 18

Section 2.10   Life Insurance Proceeds............................................................... 18

**ARTICLE III**    **REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS** ..................................................................... 19

Section 3.1    Authorization ............................................................................... 19

Section 3.2    No Violation.................................................................................. 19

Section 3.3    Consents and Approvals ............................................................... 19

Section 3.4    Title to Securities ......................................................................... 19

Section 3.5    Litigation...................................................................................... 19

Section 3.6    No Brokers or Finders.................................................................. 20

Section 3.7    Organization. ............................................................................... 20

Section 3.8    Fairness Opinion. ......................................................................... 20

**ARTICLE IV**    **REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COMPANY** .................................................................... 20

Section 4.1    Organization and Qualification; Authorization ........................... 20

Section 4.2    No Violation.................................................................................. 21

Section 4.3    Consents and Approvals ............................................................... 21

Section 4.4    Capitalization ............................................................................... 21

Section 4.5    Financial Statements; Accounting and Internal Controls ............. 22

Section 4.6    Absence of Undisclosed Liabilities .............................................. 22

i

CONFIDENTIAL

FBG_CH1_00094843

## TABLE OF CONTENTS

**Page**

Section 4.7    Accounts and Notes Receivable; Accounts Payable................................. 23

Section 4.8    Inventory ............................................................................................. 23

Section 4.9    Absence of Changes or Events ............................................................ 23

Section 4.10   Assets ................................................................................................. 23

Section 4.11   Proprietary Rights .............................................................................. 23

Section 4.12   Contracts ............................................................................................ 26

Section 4.13   Litigation............................................................................................. 27

Section 4.14   Compliance with Laws ....................................................................... 28

Section 4.15   Licenses and Permits.......................................................................... 28

Section 4.16   Health, Safety and Environment ........................................................ 28

Section 4.17   Taxes .................................................................................................. 29

Section 4.18   Employee Benefit Plans...................................................................... 32

Section 4.19   Employees; Labor Relations ............................................................... 35

Section 4.20   Related Party Transactions ................................................................. 37

Section 4.21   Real Property ...................................................................................... 38

Section 4.22   Suppliers and Customers..................................................................... 38

Section 4.23   Insurance Policies ............................................................................... 39

Section 4.24   Bank Accounts .................................................................................... 39

Section 4.25   Trade Names; Business Locations ...................................................... 39

Section 4.26   Products............................................................................................... 39

Section 4.27   Anti-Money Laundering ..................................................................... 40

Section 4.28   Anticorruption; Improper Payments ................................................... 40

Section 4.29   International Trade Laws ..................................................................... 40

Section 4.30   No Brokers or Finders......................................................................... 41

Section 4.31   Disclosure .......................................................................................... 41

**ARTICLE V        REPRESENTATIONS AND WARRANTIES OF THE BUYER ........... 41**

Section 5.1    Organization; Authorization ............................................................... 41

Section 5.2    No Violation........................................................................................ 42

Section 5.3    Consents and Approvals ...................................................................... 42

Section 5.4    Litigation............................................................................................. 42

Section 5.5    Investment Intent ................................................................................ 42

ii

CONFIDENTIAL

FBG_CH1_00094844

**DEBTORS' EXHIBIT NO. 244**
**Page 3 of 64**

**TABLE OF CONTENTS**

Page

Section 5.6     No Brokers or Finders ................................................................................ 42

**ARTICLE VII     OTHER COVENANTS AND AGREEMENTS** ..................................... **42**

Section 7.1     Restrictive Covenants ............................................................................... 42

Section 7.2     Agreements Regarding Tax Matters .......................................................... 43

Section 7.3     Employee Matters .................................................................................... 45

Section 7.4     Further Assurances ................................................................................... 46

Section 7.5     Intercompany Arrangements ..................................................................... 46

Section 7.6     Public Announcements .............................................................................. 46

Section 7.7     ESOP Matters. ......................................................................................... 46

**ARTICLE X** ................................................................................................ **47**

Section 10.1     Survival ................................................................................................. 47

Section 10.2     Indemnification by the Seller ................................................................. 47

Section 10.3     Indemnification by the Buyer ................................................................. 48

Section 10.4     Indemnification Procedure ..................................................................... 48

Section 10.5     Certain Limitations ............................................................................... 49

Section 10.6     Materiality Qualifiers ............................................................................ 50

Section 10.7     Indemnification as Sole Remedy ............................................................ 50

Section 10.8     Investigation .......................................................................................... 50

Section 10.9     Satisfaction of Indemnification Claims ................................................... 50

Section 10.10   Waiver of Contribution .......................................................................... 50

Section 10.11   Tax Treatment of Payments .................................................................... 50

**ARTICLE XI     MISCELLANEOUS** ................................................................ **51**

Section 11.1     Notices ................................................................................................... 51

Section 11.2     Expenses ................................................................................................ 51

Section 11.3     Entire Agreement ................................................................................... 52

Section 11.4     No Third-Party Beneficiaries .................................................................. 52

Section 11.5     Assignments ........................................................................................... 52

Section 11.6     Amendment; Waiver ............................................................................... 52

Section 11.7     Agreement Controls ............................................................................... 52

Section 11.8     Severability ............................................................................................ 52

iii

CONFIDENTIAL

FBG_CH1_00094845

## TABLE OF CONTENTS

Page

Section 11.9    Governing Law ....................................................................... 53

Section 11.10  Consent to Jurisdiction; Service of Process; Waiver of Jury Trial .......... 53

Section 11.11  Admissibility into Evidence........................................................ 53

Section 11.12  Specific Performance ............................................................... 54

Section 11.13  Other Remedies...................................................................... 54

Section 11.14  No Recourse Against the Buyer Affiliates............................................ 54

Section 11.15  Rules of Construction .............................................................. 54

Section 11.16  Counterparts; Deliveries ........................................................... 55

iv

CONFIDENTIAL

FBG_CH1_00094846

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "**Agreement**"), dated as of January 5, 2024, is among JASPER ACQUISITION CORP., a Delaware corporation (the "**Buyer**"), JASPER RUBBER PRODUCTS, INC., an Indiana corporation (the "**Company**"), the Jasper Rubber Products, Inc. Employee Stock Ownership Trust (the "**Trust**"), which implements and forms a part of the Jasper Rubber Products, Inc. Employee Stock Ownership Plan (the "**Plan**", and together with the Trust, collectively, the "**ESOP**" or the "**Seller**").

## RECITALS

A.      The Seller owns all outstanding shares of capital stock of the Company (the "**Securities**").

B.      The Seller desires to sell the Securities to the Buyer, and the Buyer desires to purchase the Securities from the Seller, free and clear of any and all Liens.

C.      The Company has appointed Farmers National Bank of Danville, not in any individual, corporate or banking capacity, but solely as trustee of the Trust, to serve as the independent, discretionary trustee (the "**ESOP Trustee**") of the Trust.

D.      The Trustee has reviewed the terms and conditions of the transactions contemplated by this Agreement, and has independently determined, in its best business judgment and good faith, that (i) the terms and conditions of the transactions contemplated by this Agreement are fair to the participants of the ESOP (the "**ESOP Participants**") from a financial point of view, and (ii) the execution, delivery and performance of this Agreement is in the best interests of the Participants.

## AGREEMENT

In consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1      Certain Defined Terms**.  For purposes of this Agreement:

"**Acquisition Proposal**" means any offer, proposal or indication of interest (other than an offer, proposal or indication of interest by the Buyer or its Affiliates) contemplating or otherwise relating to any transaction or series of related transactions involving any:

(a)      merger, consolidation, share exchange, business combination, issuance of securities, direct or indirect acquisition of securities, recapitalization, tender offer, exchange offer or other similar transaction in which: (i) a Person or "group" (as defined in the Securities Exchange Act of 1934, as amended and the rules promulgated thereunder) of Persons directly or indirectly acquires beneficial or record ownership of securities representing more than 15% of the outstanding shares of any class of voting securities of the Company; or (ii) the Company issues securities representing more than 15% of the outstanding shares of any class of voting securities of the Company;

(b)      sale, lease, license, exchange, transfer, acquisition or disposition of any assets that constitute or account for: (i) 15% or more of the consolidated net revenues of the Company, consolidated net income of the Company or consolidated book value of the Company; or (ii) 15% or more of the fair market value of the assets of the Company; or

1

CONFIDENTIAL

(c)      liquidation or dissolution of the Company.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person.  As used herein, the term "control" means (a) the power to vote at least 10% of the voting power of a Person, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law).

"**Affordable Care Act**" means the Patient Protection & Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, as amended and as interpreted in applicable administrative guidance and the rules and regulations issued thereunder.

"**Ancillary Agreements**" means the Escrow Agreement.

"**Applicable Rate**" means the prime rate of interest reported from time to time by the Wall Street Journal *plus* 2.00% per annum.

"**Balance Sheet Date**" means October 31, 2023.

"**Base Purchase Price**" means $40,000,000.

"**Business**" means any business engaged in by the Company and any presently contemplated expansions or extensions thereof.

"**Business Day**" means a day other than Saturday, Sunday or any other day on which banks in Ohio and/or Indiana are required or authorized to be closed.

"**Buyer Indemnified Parties**" means, the Buyer, the Company and the Buyer's other Affiliates and their respective equity holders, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents.

"**Calculation Time**" means 11:59 p.m., Eastern time, on the day immediately prior to the Closing Date.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act.

"**Cash**" means the aggregate amount of all cash and cash equivalents of the Company (including marketable securities, short term investments, liquid instruments, petty cash, deposits in transit to the extent there has been a reduction of receivables on account therefor, the amount of any received and uncleared checks, wires or drafts, and reduced by the amount of any issued but uncleared checks, wires or drafts).

"**Closing Date Cash**" means the Cash other than (a) Cash held outside the U.S. that would be subject to taxation or limitation in the event such Cash is transferred into the U.S. and (b) Cash restricted from use except for a contractually specified purpose or used as collateral for, or otherwise to provide credit support for, any liabilities of any Person under any letter of credit or other Contract, in each case of the Company as of the Calculation Time and determined in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting methods, principles, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the determination of the current assets or current liabilities, as applicable, in the preparation of the Balance Sheet.

2

CONFIDENTIAL

FBG_CH1_00094848

"**Closing Date Indebtedness**" means the Indebtedness of the Company as of immediately prior to the Closing.

"**Closing Date Indebtedness Schedule**" means a written schedule, in form and substance reasonably satisfactory to the Buyer, setting forth (a) the name of each holder of Closing Date Indebtedness(other than any Closing Date Indebtedness set forth in clauses (n) and (o) of Indebtedness), (b) the amount due to such holder as set forth in the applicable Payoff Letter and (c) such holder's bank account information as set forth in the applicable Payoff Letter, delivered to the Buyer in accordance with Section 2.5(f).

"**Closing Date Seller Transaction Expenses**" means the Seller Transaction Expenses that remain outstanding as of immediately prior to the Closing (but calculated assuming that the Closing has occurred such that any Seller Transaction Expenses triggered by the Closing are included in the Closing Date Seller Transaction Expenses).

"**Closing Date Seller Transaction Expenses Schedule**" means a written schedule, in form and substance reasonably satisfactory to the Buyer, setting forth (a) the name of each Closing Date Seller Transaction Expense payee, (b) the amount due to such payee as set forth in the applicable invoice and (c) such payee's bank account information as set forth in the applicable invoice, delivered to the Buyer in accordance with Section 2.5(g).

"**COBRA**" means Section 4980B of the Code and Part 6 of Title I of ERISA (or any successor provisions thereto) and the rules and regulations promulgated thereunder.

"**COBRA Coverage**" means continuation of group health plan coverage required under COBRA.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract or other agreement or understanding with a labor union or labor organization or other employee representative.

"**Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of the Company or its respective customers, suppliers, distributors or other business relations, including all information concerning finances, customer information, supplier information, products, services, prices, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications and other confidential intellectual property, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Confidential Information shall not include any information that is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of the Seller or any of its Affiliates.

"**Contracts**" means all contracts, agreements, licenses, indentures, notes, bonds, instruments, leases, mortgages, sales orders, purchase orders, arrangements, commitments, obligations and other understandings or undertakings of any nature, in any case whether written or oral, as well as any bids or proposals which if accepted would result in a binding contract, and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

"**Employee Pension Benefit Plan**" means an "employee pension benefit plan" (as defined in Section 3(2) of ERISA whether or not subject to ERISA).

3

CONFIDENTIAL

FBG_CH1_00094849

"**Employee Welfare Benefit Plan**" means an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA whether or not subject to ERISA).

"**Environmental and Safety Requirements**" means any Law that is related to (a) pollution, contamination, cleanup, preservation, protection, reclamation or remediation of the environment, (b) health or safety, (c) the Release or threatened Release of any Hazardous Material, including investigation, study, assessment, testing, monitoring, containment, removal, remediation, response, cleanup, abatement, prevention, control or regulation of such Release or threatened Release, or (d) the management of any Hazardous Material, including the manufacture, generation, formulation, processing, labeling, use, treatment, handling, storage, disposal, transportation, distribution, re-use, recycling or reclamation of any Hazardous Material; and includes, but is not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6091 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Clean Water Act (33 U.S.C. § 7401 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.) and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.).

"**Equity Securities**" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests, partnership interests or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations issued thereunder.

"**ERISA Affiliate**" means the Company, the Seller and any other Person who constitutes or has constituted all or part of a controlled group or had been or is under common control with, or whose employees were or are treated as employed by the Company or the Seller, under Section 414 of the Code or Section 3(40)(B)(ii) or 4001(b) of ERISA.

"**ESOP**" means as set forth in the Preamble.

"**ESOP Advisor**" means Acclaro Valuation Advisors, the ESOP's independent financial advisor meeting the requirements of Section 401(a)(28)(C) of the Code that has been duly engaged by the ESOP Trustee on behalf of the ESOP in connection with the transactions contemplated by this Agreement.

"**ESOP Amendment**" means the amendment to the ESOP effective as of the Closing Date and contingent upon the Closing, in a form reasonably acceptable to the Buyer, providing for the following: (a) full vesting of all ESOP Participants, (b) conversion of the ESOP to a profit sharing plan, (c) eliminating the right of any ESOP Participant to receive a distribution in a form other than cash, (d) that no additional Company employees will become ESOP Participants in the ESOP, (e) that no further Company contributions will be made to the ESOP, and (f) terminating the ESOP effective immediately after the Closing; provided, however, the ESOP will remain in existence (albeit frozen) until the completion of the winding down of the ESOP and ESOP account balances are distributed.

"**ESOP Fairness Opinion**" means an opinion from the ESOP Advisor, dated as of the Closing Date, concluding that (a) the consideration that the ESOP shall receive for the Securities pursuant to this Agreement is not less than fair market value as that term is defined under Section 3(18)(B) of ERISA and (b) the transactions contemplated by this Agreement, taken as a whole, are fair to the ESOP from a financial point of view.

"**ESOP Participants**" means as set forth in the Recitals.

4

CONFIDENTIAL

"**ESOP Trustee**" means as set forth in the Recitals.

"**ESOP Trustee Certificate**" means a certificate, in a form reasonably acceptable to the Buyer, setting forth the Trustee's determination (acting in its capacity as a discretionary Trustee without direction by the Company or other Person) that: (a) the Purchase Price is not less than "adequate consideration" as that term is defined under Section 3(18) of ERISA, (b) the transactions contemplated by this Agreement, taken as a whole, are fair to the ESOP from a financial point of view, (c) the transactions contemplated by this Agreement are prudent and in the best interest of the participants and beneficiaries of the ESOP, (d) the consummation of the transactions contemplated hereby will not constitute a non-exempt "prohibited transaction" under ERISA or the Code or result in the imposition of any tax under Section 4975 of the Code, and (e) the Trustee has duly adopted and authorized the transactions contemplated by this Agreement.

"**Event**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"**Fundamental Representations**" means, collectively, the representations and warranties contained in in Section 3.1 (Authorization), Section 3.2 (No Violation), Section 3.4 (Title to Securities), Section 3.6 (No Brokers or Finders), Section 4.1 (Organization and Qualification; Authorization), Section 4.2 (No Violation), Section 4.4 (Capitalization), Section 4.10(a) (Assets), Section 4.30 (No Brokers or Finders), Section 5.1 (Organization; Authorization), Section 5.2 (No Violation) and Section 5.66 (No Brokers or Finders).

"**GAAP**" means U.S. generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession that are applicable to the circumstances from time to time.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations and submissions in connection with the transactions contemplated under this Agreement or any Ancillary Agreement, as required under any applicable Law and (b) consents, Permits or Orders from a Governmental Authority required to be obtained or made by the Seller, the Company or the Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the Ancillary Agreements and consummate the transactions contemplated under this Agreement or the Ancillary Agreements.

"**Government Official**" means, collectively, any officer or employee of a Governmental Authority, any Person acting for or on behalf of any Governmental Authority, any political party or official thereof and any candidate for political office.

"**Hazardous Material**" means (a) hazardous substances, as defined by the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (b) hazardous wastes, as defined by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., (c) petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure, (d) radioactive material, including any source, special nuclear, or by-product material as defined in 42 U.S.C. § 2011 et seq., (e) asbestos that is friable or could reasonably be likely to become friable, (f) polychlorinated biphenyls, (g) microbial matter, biological toxins, mycotoxins, mold or mold spores and

5

FBG_CH1_00094851

(h) other material, substance or waste to which liability or standards of conduct may be imposed, or which requires or may require investigation, under any applicable Environmental and Safety Requirements.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1986, as amended and the rules and regulations issued thereunder.

"**Improper Payment Laws**" means the United States Foreign Corrupt Practices Act of 1977, any legislation implementing the Organisation for Economic Cooperation and Development Convention on Combating Bribery of Foreign Official in International Business Transactions, and any other applicable Law regarding anti-bribery or illegal payments or gratuities.

"**Income Tax Liability**" means, with respect to any jurisdiction, an amount equal to the liability for Income Taxes of the Company unpaid as of the Closing Date that are first due after the Closing Date with respect to such jurisdiction computed for each Pre-Closing Tax Period.

"**Income Tax Liability Accrual**" means an amount equal to the sum of (a) an amount (which amount shall not be less than zero for any taxpayer in any jurisdiction for any taxable period or portion thereof) equal to the sum of the Income Tax Liability separately calculated for (i) each jurisdiction in which the Company filed an Income Tax Return for the last Tax year for which an Income Tax Return was due in such jurisdiction (taking into account any applicable extensions) and (ii) each jurisdiction in which the Company commenced activities after the end of such Tax year, and (b) an amount equal to the product of (i) 28% and (ii) any amounts not included in taxable income in Pre-Closing Tax Periods by the Company pursuant to Rev. Proc. 2004-34 or Section 451(c) of the Code. The Income Tax Liability Accrual shall (y) include any Taxes payable by the Company with respect to any income included pursuant to Section 965 of the Code and (z) be determined by including in income for Pre-Closing Tax Periods any income includable by the Company pursuant to Sections 951 and 951A of the Code with respect to Pre-Closing Tax Periods (determined, in the case of any CFC giving rise to such income whose taxable year includes but does not end on the Closing Date, as if such taxable year ended on the Closing Date without offsetting such income for such taxable year by any loss or other Tax attribute from a Pre-Closing Tax Period except to the extent such loss or other Tax attribute is available in taxable periods (or portions thereof) beginning after the Closing Date).

"**Income Tax Return**" means a Tax Return filed or required to be filed in connection with the determination, assessment or collection of any Income Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Income Tax.

"**Income Taxes**" means Taxes (a) imposed on, or with reference to, net income or gross receipts, or (b) imposed on, or with reference to, multiple bases including net income or gross receipts.

"**Indebtedness**" means, with respect to the Company, at any date, (a) all obligations for borrowed money or extensions of credit, (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, commercial paper or debt securities, (c) all obligations under swaps, hedges, caps, collars, options, futures or similar instruments, (d) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and accrued expenses incurred in the ordinary course of business and reflected as accounts payable or accrued expenses in the Net Working Capital as finally determined pursuant to Section 2.8), including earnouts, payments under non-compete agreements and seller notes, (e) all obligations created or arising under any conditional sale or other title retention agreement, (f) all obligations secured by a Lien, (g) all obligations under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (h) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit, (i) all obligations of any Person other than another Company which are directly or indirectly guaranteed by the Company or in respect of which the Company has otherwise assured an obligee against loss, (j) all interest, principal, prepayment penalties, premiums,

6

FBG_CH1_00094852

**DEBTORS' EXHIBIT NO. 244**
**Page 11 of 64**

fees or expenses due or owing in respect of any item listed in clauses (a) through (i) above, (k) all obligations with respect to any Employee Benefit Plan that is not funded in accordance with ERISA, (l) all obligations with respect to any salary, bonus, deferred compensation or other compensation of any kind earned by any current or former employee for, or any contribution obligation to any Employee Benefit Plan with respect to, any period or portion of any period ending on or prior to the Closing Date and all Taxes that are payable by the Company in connection with or as a result of the payment of such obligations, (m) an amount equal to all customer deposits and all obligations with respect to deferred revenue determined in accordance with GAAP, (n) the Income Tax Liability Accrual, and (o) any "applicable employment taxes" (as defined in Section 2302 of the CARES Act) unpaid as of the Closing Date that would have been due on or before the Closing Date but for Section 2302(a)(1) of the CARES Act.

"**Intellectual Property**" means, collectively, in the United States and all countries or jurisdictions foreign thereto, (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all Patents, (b) all Trademarks, all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (c) all moral rights, copyrights and other rights in any work of authorship, compilation, derivative work or mask work and all applications, registrations, and renewals in connection therewith, (d) all trade secrets and confidential business information (including confidential ideas, research and development, know-how, methods, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (e) Software, (f) all other proprietary and intellectual property rights, (g) all copies and tangible embodiments of any of the foregoing (in whatever form or medium), (h) the exclusive right to display, perform, reproduce, make, use, sell, distribute, import, export and create derivative works or improvements based on any of the foregoing and (i) all income, royalties, damages and payments related to any of the foregoing (including damages and payments for past, present or future infringements, misappropriations or other conflicts with any intellectual property), and the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any intellectual property.

"**International Trade Laws**" means any applicable (a) Sanctions, (b) U.S. export control Laws (including the International Traffic in Arms Regulations (22 CFR §§ 120-130, as amended), the Export Administration Regulations (15 CFR §§ 730-774, as amended) and any regulation, order, or directive promulgated, issued or enforced pursuant to such laws, (c) laws pertaining to imports and customs, including those administered by the Bureau of Customs and Border Protection in the U.S. Department of Homeland Security (and any successor thereof) and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, (d) the anti-boycott laws administered by the U.S. Department of Commerce and the U.S. Department of the Treasury and (e) export, import and customs Laws of other countries in which the Company has conducted and/or currently conduct business.

"**IRS**" means the U.S. Internal Revenue Service.

"**Knowledge**" means, when referring to the "knowledge" of the Company or the Seller, or any similar phrase or qualification based on knowledge of the Company or the Seller, (a) the actual knowledge of any officer, director and/or manager of the Company or the Seller and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" means the common law of any state or other jurisdiction, or any provision of any foreign, federal, state or local law, statute, code, rule, regulation, Order, certification standard, accreditation standard, Permit, judgment, regulatory code of practice, statutory guidance, injunction, decree or other decision of any court or other tribunal or Governmental Authority.

CONFIDENTIAL                                                                                   FBG_CH1_00094853

"**Liabilities**" means any Indebtedness, liabilities, demands, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted, fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort based on negligence or strict liability and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto, and however arising and including all fees, costs and expenses related thereto.

"**Liens**" means all liens, security interests, claims, mortgages, deeds of trust, preemptive rights, leases, charges, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions, pledges, assessments, covenants, burdens and other encumbrances of every kind, including restrictions on voting or use.

"**Losses**" means any and all Liabilities, losses, damages, judgments, awards, settlements, royalties, diminution in value, interest, penalties, fines, Taxes (outside the ordinary course of business), demands, Proceedings, claims, deficiencies, costs and expenses of any kind (including reasonable fees and expenses of attorneys, accountants and other experts paid in connection with the investigation or defense of any of the foregoing or any Proceeding relating to any of the foregoing).

"**Material Adverse Effect**" means (a) any Event that, individually or in combination with any other Events, has had or could reasonably be expected to have a material adverse effect on the business, condition (financial or otherwise), assets, liabilities, results of operation or prospects of the Company taken as a whole, whether or not foreseeable and whether or not durationally significant, <u>provided</u> that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred: (i) changes in general economic conditions, or (ii) acts of terrorism, armed hostilities or war, except, with respect to clauses (i) and (ii), to the extent that the Company is disproportionately impacted by such Events in comparison to others in the industry in which they operate, (b) any Event that prevents or materially delays, or could be reasonably expected to prevent or materially delay, consummation of the transactions contemplated hereby or the performance by the Company or the Seller of any of their material obligations under this Agreement or any of the Ancillary Agreements, or (c) any Event that materially impairs, or could reasonably be expected to impair, the ability of the Company to continue operating the Business after the Closing in substantially the same manner as it was operated immediately prior to the date of this Agreement.

"**Multiemployer Plan**" means a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA whether or not subject to ERISA.

"**Multiple Employer Plan**" means a "multiple employer plan" within the meaning of ERISA Section 4063 or 4064 or Code Section 413(c) whether or not subject to ERISA

"**Multiple Employer Welfare Arrangement**" means a "multiple employer welfare arrangement" within the meaning of ERISA Section 3(40) whether or not subject to ERISA.

"**Net Working Capital**" means the difference, as of the Calculation Time, between (a) those assets that should be reflected as current assets on a consolidated balance sheet of the Company and (b) those liabilities that should be reflected as current liabilities on a consolidated balance sheet of the Company, in each case, (i) prepared in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting methods, principles, policies, practices and procedures, with consistent classifications, judgments and estimation methodology, as were used in the determination of the current assets or current liabilities, as applicable, in the preparation of the Balance Sheet and (ii) excluding any assets or liabilities with respect to Cash, Indebtedness, Seller Transaction Expenses or Income Taxes.

8

FBG_CH1_00094854

**DEBTORS' EXHIBIT NO. 244**
**Page 13 of 64**

"**Net Working Capital Target**" means $12,825,407.00.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, of any Governmental Authority.

"**Party**" means any party to this Agreement.

"**Patents**" means all letters patent and pending applications for patents of the United States and all countries and jurisdictions foreign thereto and all reissues, reexamined patents, divisions, continuations, continuations-in-part, revisions, and extensions thereof.

"**Permits**" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"**Permitted Lien**" means (a) Liens for Taxes not yet due and payable, or for Taxes being contested in good faith by appropriate proceedings as set forth on Schedule Section 1.1(b) of the Disclosure Schedules and for which appropriate reserves have been accrued for in the Net Working Capital as of the Closing Date, (b) statutory Liens of landlords for amounts not yet due and payable, (c) Liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for amounts not yet due and payable, (d) Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, (e) in the case of the Securities, restrictions arising under applicable securities Laws, but in each such case excluding any Lien with respect to any Employee Benefit Plan, and (f) in the case of the Assets, (i) the lien of current ad valorem real estate taxes and assessments not yet due and payable; (ii) all easements, covenants, conditions, restrictions, highways and rights-of-way, if any, of record affecting the Real Property; (iii) all municipal, county and state zoning laws and other ordinances, regulations and restrictions, including statutes and other laws of governmental authorities applicable to and enforceable against the Real Property; (iv) all building and use restrictions of record, if any, affecting the Real Property; and (v) those exceptions and encumbrances on the title to the Real Property set forth in any title commitment obtained by Buyer (or which would have been on such a title commitment if such had been obtained by Buyer).

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, firm or other entity or any Governmental Authority.

"**Plan**" means as set forth in the Preamble.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period including and ending on the end of the Closing Date.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Purchase Price Adjustment**" means the amount obtained by subtracting (a) the amount of the Closing Payment as determined pursuant to Section 2.7, from (b) the amount that the Closing Payment would have been had it been calculated using the amounts of the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the Net Working Capital as finally determined pursuant to Section 2.8.

CONFIDENTIAL

FBG_CH1_00094855

"**Related Party**" means the Seller, each officer or director of the Company, each family member of any director or officer of the Company, each trust for the benefit of any of the foregoing, and each Affiliate of any of the foregoing (other than the Company).

"**Related Party Transaction**" means any Contract or transaction between the Company, on the one hand, and any Related Party, on the other hand.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the indoor or outdoor environment.

"**Sanctions**" means economic or financial sanctions, requirements or trade embargoes imposed, administered or enforced from time to time by U.S. Governmental Authorities (including the Office of Foreign Assets Control ("**OFAC**"), the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority.

"**Sanctions Target**" means any Person: (a) that is the subject or target of any Sanctions; (b) named in any Sanctions-related list maintained by the U.S. Department of State; the U.S. Department of Commerce, including the Bureau of Industry and Security's Entity List and Denied Persons List; or the U.S. Department of the Treasury, including the OFAC Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identifications List, and the Foreign Sanctions Evaders List; or any similar list maintained by the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant Governmental Authority; (c) located, organized or resident in a country, territory or geographical region which is itself the subject or target of any territory-wide Sanctions (including the Crimea region of Ukraine, Cuba, Iran, North Korea, Syria and, prior to January 17, 2017, Sudan); or (d) owned or controlled by any such Person or Persons described in the foregoing clauses (a)-(c).

"**Seller Certificate**" means a certificate in form and substance reasonably satisfactory to the Buyer, dated as of the Closing Date and duly executed and delivered by the Seller and the Company, certifying (a) as to the accuracy of the representations and warranties set forth in Article III and Article IV of this Agreement, and (b) that attached thereto are (i) true, complete and accurate copies of the organizational documents of the Company (and the certificate of incorporation or comparable organizational document of the Company shall also be certified as of a recent date by the Secretary of State or comparable Governmental Authority of its jurisdiction of organization), (ii) a true, complete and accurate copy of resolutions duly adopted by the Seller, which authorize and approve the execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements to which the Seller is a party and (iii) a true, complete and accurate copy of resolutions duly adopted by the board of directors (or comparable governing body) of the Company which authorize and approve the execution, delivery and performance by the Company of this Agreement and each Ancillary Agreement to which the Company is a party.

"**Seller Indemnified Parties**" means the Seller, the ESOP Trustee and the equity holders, officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents of the Seller and the Company.

"**Seller and Company Required Consents**" means, collectively, all consents of any Persons listed on Schedule Section 1.1(c) of the Disclosure Schedules.

"**Seller Taxes**" means any Taxes (a) imposed on the Seller for any taxable period, (b) imposed on or with respect to the Company or its assets or operations for any Pre-Closing Tax Period, (c) imposed in connection with the transactions contemplated by this Agreement (including any Transfer Taxes), (d) of any Person other than the Company imposed on the Company as a result of being a member of any

10

FBG_CH1_00094856

**DEBTORS' EXHIBIT NO. 244**
**Page 15 of 64**

Affiliated Group on or before the Closing Date pursuant to Treasury Regulation Section 1.1502-6 or any similar state, local, or foreign Law, (e) imposed on the Buyer as a transferee or successor of the Seller, (f) imposed on income of the Company from Pre-Closing Tax Periods includible by Buyer or any of its Affiliates pursuant to Sections 951, 951A or 965 of the Code (assuming for this purpose that the taxable year of any CFC that includes the Closing Date ends on the end of the Closing Date), or (g) of any Person for which the Company becomes liable as a transferee or successor, by Contract (including any Tax sharing, Tax indemnity, or Tax allocation agreement or any other express or implied agreement to indemnify any other Person for Taxes), pursuant to any law, or otherwise, to the extent such Taxes relate to an event or transaction occurring on or before the Closing Date.

"**Seller Transaction Expenses**" means (a) all of the fees, costs and expenses incurred by the Seller or Company in connection with the transactions contemplated by this Agreement or any Ancillary Agreement or any transaction or series of transactions similar to such transactions, including all fees, costs and expenses payable to attorneys, financial advisors, accountants, consultants or other advisors, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker, including Forvis Capital Advisors, (b) all payments by the Seller or Company to obtain any third party consent required under any Contract in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement, and (c) all obligations that arise in whole or in part as a result of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement, under any Contract or Employee Benefit Plan in effect on or before the Closing Date, including all change of control, severance, retention, stock appreciation, phantom stock or similar obligations or any other accelerations of or increases in rights or benefits, and all Taxes that are payable in connection with or as a result of the satisfaction of such obligations or in connection with the cash-out of any options.

"**Service Provider**" means each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of the Company.

"**Software**" means all websites, computer software and firmware (including source code, executable code, data, databases, user interfaces and related documentation).

"**Straddle Period**" means any taxable period that begins on or before and ends after the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or shall have the right or sufficient voting interests to designate or elect either (i) a majority of the Persons serving as managers or (ii) the sole manager, managing director or general partner of such entity.

"**Tax**" means (a) any and all multi-national, U.S. federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, ad valorem, capital stock,

11

FBG_CH1_00094857

social security, unemployment, disability, payroll, license, employee or other withholding, composite, healthcare, escheat or unclaimed property (whether or not considered a tax under applicable Law) or other tax of any kind whatsoever, including any interest, penalties or additions to Tax, any penalties resulting from any failure to file or timely file a Tax Return, or additional amounts in respect of the foregoing; (b) liability for the payment of any amounts of the type described in clause (a) above of another Person arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (c) liability for the payment of any amounts of the type described in clause (a) above of another Person as a result of any transferee or secondary liability or any liability assumed by Contract, Law, or otherwise.

"**Tax Returns**" means returns, declarations, reports, notices, forms, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, and including for the avoidance of doubt all Forms 1099, FinCEN Form 114, Form TD F 90-22.1 and any predecessor or successor forms thereto) filed or required to be filed with any Governmental Authority, or maintained by any Person, or required to be maintained by any Person, in connection with the determination, assessment or collection of any Tax of any party or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"**Title IV Plan**" means an employee benefit plan subject to Section 302 or Title IV of ERISA or Code Section 412, 413, or 430.

"**Trademarks**" means, in the United States and all countries and jurisdictions foreign thereto, registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, registered trade names and unregistered trade names, corporate names, fictitious names, registered trade dress and unregistered trade dress, logos, slogans, Internet domain names, rights in telephone numbers, and other indicia of source, origin, endorsement, sponsorship or certification, together with all translations, adaptations, derivations, combinations and renewals thereof.

"**Treasury Regulations**" means the Treasury Regulations promulgated under the Code.

"**Trust**" means as set forth in the Preamble.

"**U.S.**" or "**United States**" means the United States of America.

"**VEBA**" means a "voluntary employees' beneficiary association" within the meaning of Code Section 501(c)(9).

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, as amended and any similar Law.

**Section 1.2**     **Table of Definitions**.  The following terms have the meanings set forth in the locations in this Agreement referenced below:

| Term | Location |
|---|---|
| Accountant | Section 2.8(c) |
| Agreement | Preamble |
| AJCA | Section 4.17(r) |
| Assets | Section 4.10(a) |
| Balance Sheet | Section 4.5(a)(ii) |
| Basket Amount | Section 10.5(a) |
| Buyer | Preamble |
| Buyer Closing Deliverables | "Section 2.5(r) |

12

Cap ........................................................................................................................ Section 10.5(c)
CFC ..................................................................................................................... Section 4.17(p)
Closing .................................................................................................................... Section 2.3
Closing Date .............................................................................................................. Section 2.3
Closing Payment .................................................................................................... Section 2.7(a)
Closing Statement .................................................................................................. Section 2.8(a)
Company ..................................................................................................................... Preamble
Company Intellectual Property ............................................................................... Section 4.11(c)
Disclosure Schedules ................................................................................................ Article IV
Election Forms ...................................................................................................... Section 7.2(g)
Employee Benefit Plan ........................................................................................... Section 4.18(a)
Employee Benefit Plans .......................................................................................... Section 4.18(a)
Escrow Agent ......................................................................................................... Section 2.7(c)
Escrow Agreement ................................................................................................. Section 2.7(c)
Escrow Funds ........................................................................................................ Section 2.7(c)
Estimated Closing Date Cash .................................................................................... Section 2.4
Estimated Closing Date Indebtedness ......................................................................... Section 2.4
Estimated Closing Date Seller Transaction Expenses .................................................... Section 2.4
Estimated Closing Statement ..................................................................................... Section 2.4
Estimated Net Working Capital .................................................................................. Section 2.4
Export Approvals ...................................................................................................... Section 4.23
Financial Statements ............................................................................................... Section 4.5(a)
Immaterial Software License ................................................................................... Section 4.11(c)
Indemnified Party ................................................................................................... Section 10.4(a)
Indemnifying Party ................................................................................................. Section 10.4(a)
Indemnity Escrow Amount ...................................................................................... Section 2.7(c)
Indemnity Escrow Funds ......................................................................................... Section 2.7(c)
Insurance Policies ..................................................................................................... Section 4.23
Leased Real Property .............................................................................................. Section 4.21(b)
Material Adverse Effect .............................................................................................. Section 1.1
Nonqualified Deferred Compensation Plan ................................................................ Section 4.17(r)
Owned Real Property .............................................................................................. Section 4.21(a)
Payoff Letters ........................................................................................................ Section 2.5(d)
Pre-Closing Tax Period .......................................................................................... Section 7.2(a)(i)
Privacy Requirements ............................................................................................. Section 4.11(c)
Protest Deadline ..................................................................................................... Section 2.8(b)
Protest Notice ........................................................................................................ Section 2.8(b)
Purchase Price .......................................................................................................... Section 2.2
Purchase Price Adjustment Escrow Amount .............................................................. Section 2.7(c)
Purchase Price Adjustment Escrow Funds ................................................................. Section 2.7(c)
Purchase Price Allocation Statement ....................................................................... Section 7.2(h)
Real Property ........................................................................................................ Section 4.21(b)
Real Property Leases .............................................................................................. Section 4.12(e)
Securities ................................................................................................................... Recitals
Seller and Company Closing Deliverables .................................................................... Section 2.5
Straddle Tax Returns ............................................................................................ Section 7.2(a)(ii)
Systems ................................................................................................................. Section 4.11(c)
Tail Policies ........................................................................................................... Section 2.5(r)
Third Party Claim .................................................................................................. Section 10.4(a)
Top Customer ........................................................................................................ Section 4.22(b)
Top Supplier .......................................................................................................... Section 4.22(a)
Transfer Taxes ....................................................................................................... Section 7.2(e)

13

CONFIDENTIAL

FBG_CH1_00094859

## ARTICLE II
## PURCHASE AND SALE; CLOSING

**Section 2.1** **Purchase and Sale**.  On the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to the Buyer all right, title and interest in the Securities free and clear of all Liens, and the Buyer shall purchase, accept delivery of and acquire from the Seller all right, title and interest in the Securities free and clear of all Liens.

**Section 2.2** **Purchase Price**.  The aggregate purchase price to be paid by the Buyer for the Securities (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of the following:

(a) the Base Purchase Price;

(b) *plus* the Closing Date Cash;

(c) *minus* the Closing Date Indebtedness;

(d) *plus* the amount, if any, by which the Net Working Capital is greater than the Net Working Capital Target;

(e) *minus* the amount, if any, by which the Net Working Capital is less than the Net Working Capital Target; and

(f) *minus* the Closing Date Seller Transaction Expenses.

**Section 2.3** **Closing**.  The closing of the purchase and sale of the Securities and the other transactions contemplated by this Agreement (the "**Closing**") shall be effected simultaneously with the execution and delivery of this Agreement via electronic mail in either case at 9:00 a.m. Eastern Time on the date hereof, or at such other time and place as the parties hereto may agree in writing.  The date on which the Closing occurs is referred to herein as the "**Closing Date**."

**Section 2.4** **Delivery of Closing Estimates**.  At least two days before the Closing Date, the Company shall prepare and deliver to the Buyer a written statement (the "**Estimated Closing Statement**") setting forth good faith estimates of (a) the Net Working Capital (the "**Estimated Net Working Capital**"), (b) the Closing Date Cash (the "**Estimated Closing Date Cash**"), (c) the Closing Date Indebtedness (which shall include all amounts set forth in the Payoff Letters) (the "**Estimated Closing Date Indebtedness**") and (d) the Closing Date Seller Transaction Expenses (which shall include all amounts set forth in invoices from the respective payees) (the "**Estimated Closing Date Seller Transaction Expenses**"), together with a calculation of the Closing Payment, in each case, with reasonable supporting or underlying documentation used in the preparation thereof.  The Company shall make available such personnel as are reasonably necessary to assist the Buyer in its review of such estimates, and the Estimated Closing Statement shall be reasonably acceptable to the Buyer, Seller and Company.  The calculation of the Net Working Capital in the Estimated Closing Statement required under this Section 2.4 and the Closing Statement required under Section 2.8(a) shall include the line items included in the methodology set forth on Schedule Section 2.4 of the Disclosure Schedules.  The Estimated Closing Statement also shall attach (i) the Payoff Letters in respect of all amounts owed by the Company under any credit facilities or indebtedness for borrowed money and (ii) invoices from the respective payees representing Closing Date Seller Transaction Expenses.

**Section 2.5** **Seller and Company Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, the Seller and the Company, as applicable, shall deliver

14

FBG_CH1_00094860

or cause to be delivered to the Buyer each of the following documents and instruments (collectively, the "**Seller and Company Closing Deliverables**"):

(a)     original certificates representing the Securities to the extent they are certificated, stock powers or assignments evidencing the conveyance of the Securities duly executed in blank, and any other transfer instruments required to validly transfer title in and to the Securities from the Seller to the Buyer (or to the Buyer's designee or designees, if so elected by the Buyer) in form and substance reasonably satisfactory to the Buyer;

(b)     the Escrow Agreement, duly executed by the Seller and the Escrow Agent;

(c)     the Company Certificate, duly executed by the Company;

(d)     a counterpart of each Ancillary Agreement to which the Seller or the Company is a party, duly executed by the Seller;

(e)     executed payoff letters for the Indebtedness of the Company listed on the Closing Date Indebtedness Schedule to the extent provided by the lienholder, in form and substance reasonably acceptable to the Buyer, which include a per diem interest amount and an authorization to file all UCC termination statements and releases necessary to evidence satisfaction and termination of such Indebtedness and to enable the release of any Liens relating thereto upon payment of such Indebtedness, along with wire transfer instructions and a duly executed IRS Form W-9 or W-8BEN, as applicable, for each holder of such Indebtedness (collectively, the "**Payoff Letters**");

(f)     the Closing Date Indebtedness Schedule;

(g)     the Closing Date Seller Transaction Expenses Schedule;

(h)     an IRS Form W-9 for the Seller and the Company, duly executed by the Seller or the Company, respectively, with IRS Form W-9 provided by Seller shall be treated as satisfying the certification of Non-Foreign Status requirement as set forth in Section 1.1445-2(b)(2)(v) of the Treasury Regulations;

(i)     all Seller and Company Required Consents;

(j)     the minute book, stock ledgers and stock records or comparable records of the Company;

(k)     a certificate of good standing (or applicable equivalent) from the Secretary of State (or other applicable Governmental Authority) of the Company's jurisdiction of organization and each jurisdiction in which the Company is qualified to conduct business as a foreign corporation, in each case dated no more than five days before the Closing Date and certifying as to the good standing (or applicable equivalent) of the Company in such jurisdiction;

(l)     the Election Forms as duly executed by the Company and the Seller; as applicable;

(m)     [reserved];

(n)     customary real property deliveries, including landlord estoppels and access agreements and subordination, non-disturbance and attornment agreements, in form and substance reasonably acceptable to the Buyer;

15

**DEBTORS' EXHIBIT NO. 244**
**Page 20 of 64**

(o)    written resignations in form and substance reasonably acceptable to the Buyer effective as of the Closing from each officer and director of each of the Company;

(p)    [reserved];

(q)    evidence of termination of all agreements (if any) regarding voting, transfer or other arrangements related to the Securities that are in effect prior to the Closing, in each case in form and substance reasonably acceptable to the Buyer;

(r)    evidence that the applicable Company has obtained irrevocable "tail" insurance policies (the "**Tail Policies**") with respect to fiduciary and employment practices liability for a period of six years, in each case in form and substance reasonably acceptable to the Buyer;

(s)    evidence of termination of all existing private equity advisory, management or similar agreements (in each case in form and substance reasonably acceptable to the Buyer);

(t)    the executed Fairness Opinion, ESOP Amendment and ESOP Trustee Certificates; and

(u)    all other instruments and documents reasonably requested by the Buyer.

**Section 2.6    Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, at or before the Closing, the Buyer shall deliver or cause to be delivered to the Seller (or the ESOP Trustee on behalf of the Seller) a counterpart to this Agreement and to each Ancillary Agreement to which the Buyer is a party, in each case, duly executed by the Buyer and the Closing Payment (collectively, the "**Buyer Closing Deliverables**").

**Section 2.7    Payments at Closing**.  At the Closing, the Buyer shall:

(a)    pay or cause to be paid to the Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Seller not less than two days prior the Closing Date, a cash amount equal to the sum of the following (the "**Closing Payment**"):

(i)    the Base Purchase Price;

(ii)    *plus* the Estimated Closing Date Cash;

(iii)    *minus* the Estimated Closing Date Indebtedness;

(iv)    *plus* the amount, if any, by which the Estimated Net Working Capital exceeds the Net Working Capital Target;

(v)    *minus* the amount, if any, by which the Estimated Net Working Capital is less than the Net Working Capital Target;

(vi)    *minus* the Estimated Closing Date Seller Transaction Expenses;

(vii)    *minus* the Purchase Price Adjustment Escrow Amount;

(viii)    *minus* the Indemnity Escrow Amount;

(b)    pay or cause to be paid, on behalf and for the account of the Company and the Seller, (i) the amounts set forth in the Payoff Letters delivered pursuant to Section 2.5(e), which amounts

16

CONFIDENTIAL

FBG_CH1_00094862

shall be included in the Estimated Closing Date Indebtedness, by wire transfer of immediately available funds to the accounts of the applicable lenders or other parties as set forth in the Payoff Letters and (ii) the Estimated Closing Date Seller Transaction Expenses by wire transfer of immediately available funds to the applicable recipients thereof as set forth on the Estimated Closing Statement; and

(c)    deposit or cause to be deposited (i) an amount equal to $1,000,000 (the "**Purchase Price Adjustment Escrow Amount**," and such funds *plus* all income accrued thereon, the "**Purchase Price Adjustment Escrow Funds**") and (ii) an amount equal to $500,000 (the "**Indemnity Escrow Amount**" and such funds *plus* all income accrued thereon, the "**Indemnity Escrow Funds**"), with KeyBank National Association, as escrow agent (the "**Escrow Agent**").  The Purchase Price Adjustment Escrow Funds and the Indemnity Escrow Funds (together, the "**Escrow Funds**") shall be maintained by the Escrow Agent in one escrow account to be held as segregated funds to secure the Seller's obligations under of this Agreement and shall be administered and payable in accordance with this Agreement and an escrow agreement by and among the Seller, the Buyer and the Escrow Agent dated as of the date hereof (the "**Escrow Agreement**").

(d)    deposit or cause to be deposited an amount equal to $25,000 (the "ESOP Holdback") with Ziemer, Stayman, Weitzel & Shoulders, LLP to be held in its client escrow account for the payment of fees and expenses for the ESOP termination filing with the IRS and the winding up of the ESOP, such funds to be disbursed upon approval of the Trustee.

**Section 2.8    Post-Closing Adjustment**.

(a)    Closing Statement.  No later than 90 days after the Closing Date, the Buyer or its representatives shall prepare and deliver to the ESOP Trustee a written statement (the "**Closing Statement**"), setting forth the Buyer's calculation of (i) the Net Working Capital, (ii) the Closing Date Cash, (iii) the Closing Date Indebtedness and (iv) the Closing Date Seller Transaction Expenses, together with a calculation of the resulting Purchase Price Adjustment, if any.  Upon receipt of the Closing Statement, the ESOP Trustee and its accountants will be given reasonable access upon reasonable notice to the Company' relevant books, records, workpapers and personnel during business hours for the purpose of verifying the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses.

(b)    Protest Notice.  Prior to the date which is 30 days after the Buyer's delivery of the Closing Statement (the "**Protest Deadline**"), the ESOP Trustee may deliver written notice to the Buyer (the "**Protest Notice**") setting forth any objections which the ESOP Trustee may have to the Closing Statement. The Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the ESOP Trustee's determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any.  If a Protest Notice is not delivered prior to the Protest Deadline, the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any, as set forth on the Closing Statement shall be final, binding and non-appealable by the ESOP Trustee or the Seller.  If a Protest Notice is delivered prior to the Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by the ESOP Trustee or the Seller.

(c)    Resolution of the Protest.  The Buyer and the ESOP Trustee shall confer and attempt to resolve any disagreement with respect to the Closing Statement within 15 days following the Buyer's receipt of the Protest Notice.  If the Buyer and the ESOP Trustee are unable to resolve any such disagreement within such 15 day period, then any matters that remain in dispute will be referred to PriceWaterhouseCoopers International Limited (the "**Accountant**"), which will be instructed to determine the amounts in dispute within 30 days after such referral.  The determination by the Accountant of the

17

FBG_CH1_00094863

amounts in dispute shall be based solely on presentations by the Buyer and the ESOP Trustee, and shall not involve the Accountant's independent review. Any determination by the Accountant shall not be outside the range defined by the respective amounts in the Closing Statement proposed by the Buyer and the ESOP Trustee's proposed adjustments thereto set forth in the Protest Notice, and absent manifest mathematical error such determination shall be final, binding and non-appealable. Each of the Buyer and the ESOP Trustee shall execute and deliver a customary engagement letter as may be requested by the Accountant, and each of the Buyer, on the one hand, and the Seller on the other hand, shall bear one-half of the fees and expenses of the Accountant. The Seller's one half of such fees shall be paid by a withdrawal from the Purchase Price Adjustment Escrow Funds, and if there are not sufficient funds in the Purchase Price Adjustment Escrow to pay such fees, such fees shall be paid out of the Indemnity Escrow to the extent of available funds therein.

(d)     Purchase Price Adjustment. Within 10 days of the final determination of the Net Working Capital, the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses pursuant to this Section 2.8:

(i)     If the Purchase Price Adjustment is a negative number, then the Buyer shall deliver written notice to the Escrow Agent and the ESOP Trustee specifying such amount, and the Escrow Agent shall pay the amount of the Purchase Price Adjustment out of the Purchase Price Adjustment Escrow Funds to the Buyer in accordance with the terms of the Escrow Agreement. Any recovery by Buyer of any negative balance in the Purchase Price Adjustment shall be limited to the amount of the Purchase Price Adjustment Escrow Funds. In the event the Purchase Price Adjustment Escrow Funds exceed the amount of the Purchase Price Adjustment, then the Escrow Agent, after paying the amount of the Purchase Price Adjustment to the Buyer as provided herein, shall pay the remaining amount of the Purchase Adjustment Escrow Funds to the Seller; or

(ii)     If the Purchase Price Adjustment is a positive number, then (A) the Buyer shall deliver written notice to the Escrow Agent and the ESOP Trustee specifying such amount, and the Buyer shall pay or cause the Company to pay to the Seller an amount equal to the amount by which the Purchase Price Adjustment exceeds the amount held in the Purchase Price Adjustment Escrow Fund and (B) the Escrow Agent shall pay all funds in the Purchase Price Adjustment Escrow Fund to the Seller.

**Section 2.9     Withholding**. Notwithstanding anything to the contrary in this Agreement, the Buyer, the Company, the Escrow Agent, the Seller, and their designees, will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. Upon Closing (and thereafter as required by law or as requested by the Buyer), each person entitled to payment under this Agreement shall provide an IRS Form W-9 or applicable IRS Form W-8. Any payments under this Agreement to employees or other current or former service providers that are treated as compensation or wages for Tax purposes shall be made through the Company's payroll system.

**Section 2.10     Life Insurance Proceeds**. Immediately prior to Closing, the Company terminated that certain Allianz Life Insurance Policy on the life of Douglas Mathias and owned by the Company, being policy #60049294 issued by Allianz Life Insurance Company of North America (the "Policy"). Notwithstanding anything contained herein to the contrary, the Buyer acknowledges and agrees that (i) the proceeds arising out of the termination of the Policy will not be received until post-closing, (ii) such proceeds are the sole property of the Seller, and (iii) such proceeds, upon receipt by Buyer shall be immediately transferred to the Seller using the same wiring instructions used by Buyer to transmit the Purchase Price hereunder.

18

CONFIDENTIAL

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLER

The Seller hereby represents and warrants to the Buyer as of the date hereof and as of the Closing as follows:

Section 3.1     Authorization. The Seller has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Ancillary Agreements to which the Seller is a party, the performance by the Seller of its obligations hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized. This Agreement and the Ancillary Agreements to which the Seller is a party have been duly executed and delivered by the Seller and constitute the legal, valid and binding obligation of the Seller, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 3.2     No Violation. The execution, delivery and performance by the Seller of this Agreement and the Ancillary Agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby will not:

(a)     if the Seller is an entity, violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of the Seller;

(b)     violate, contravene or conflict with any Law or Order; or

(c)     contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an Event which would, or could reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, withdrawal, suspension, cancellation or termination under, or in any manner release any party thereto from any obligation under, or otherwise affect any rights of the Seller under, any Contract or other instrument or obligation of any kind or nature, in any case whether written or oral, by which the Seller or any of its assets may be bound or affected.

Section 3.3     Consents and Approvals. Except as set forth on Schedule 3.3 of the Disclosure Schedules, no consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by the Seller in connection with the authorization, execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby and thereby.

Section 3.4     Title to Securities. The Seller is the record owner and the ESOP Participants are the beneficial owners of all of the Securities in the ESOP, with good title, free and clear of any and all Liens. The Seller has the power and authority to sell, transfer, assign and deliver the Securities in the ESOP to Buyer, the delivery of which will convey good and marketable title to such Securities, free and clear of any and all Liens.

Section 3.5     Litigation. There are no Proceedings pending or, to the Seller's knowledge, threatened against or affecting the Seller or the Company that seek to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby or under any Ancillary Agreement.

19

CONFIDENTIAL                                                    FBG_CH1_00094865

**Section 3.6**     <u>**No Brokers or Finders**</u>.  Neither the Seller nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**Section 3.7**     <u>**Organization**</u>.  The ESOP Trustee is a trust company organized, validly existing and in good standing under the applicable Laws of the Commonwealth of Kentucky.  The ESOP Trustee is (a) the duly appointed independent trustee of the ESOP, with the power and authority to act on its behalf, (b) a fiduciary of the ESOP, as described in Section 3(21)(A) of ERISA, (c) independent of all parties to this Agreement, and (d) vested with the authority to act on behalf of the ESOP to the extent specified in the ESOP.  The ESOP Trustee's due diligence review of the transactions contemplated by this Agreement, and the ESOP Trustee's selection of the ESOP Advisor, has been completed in a manner consistent with the terms of ERISA, the engagement letters between the ESOP Trustee and the Company, and any applicable settlement agreements entered into by the Department of Labor of the United States and the ESOP Trustee.

**Section 3.8**     <u>**Fairness Opinion**</u>.  The Seller has received, and has provided a copy to Buyer of, the ESOP Fairness Opinion.

## ARTICLE IV.  REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COMPANY

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), the Company represents and warrants to the Buyer as of the date hereof and as of the Closing as follows:

**Section 4.1**     <u>**Organization and Qualification; Authorization**</u>.

(a)     The Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, which jurisdiction is listed on <u>Section 4.1</u> of the Disclosure Schedules, and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  The Company is duly qualified or otherwise authorized as a foreign entity to transact business in each jurisdiction listed on <u>Section 4.1</u> of the Disclosure Schedules, which are all of the jurisdictions in which the nature of such Person's business or assets requires such Person to so qualify.  Complete and correct copies of the charter documents, bylaws or similar organizational documents of the Company and all amendments thereto have been made available to the Buyer.  The Company is not in violation of any of the provisions of its charter documents, bylaws or similar organizational documents.  The minute books and resolutions of the Company previously made available to the Buyer contain true, complete and accurate records of all meetings and accurately reflect in all material respects all corporate action of the equity holders and board of directors (including committees thereof) of the Company.  The stock certificate books and stock transfer ledgers of the Company previously made available to the Buyer are true, complete and accurate in all material respects.  The Company has no Subsidiaries.

(b)     The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Ancillary Agreements to which the Company is party, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby and thereby have been duly authorized.  This Agreement has been, and the Ancillary

20

Agreements to which the Company is party will be, duly executed and delivered by the Company and constitute the legal, valid and binding obligation of the Company, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 4.2    No Violation.**  Except as set forth on Schedule Section 4.2 of the Disclosure Schedules, the execution, delivery and performance by the Seller and the Company of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby will not:

(a)    violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of the Company;

(b)    violate, contravene or conflict with any resolution adopted by the Company's board of directors or stockholders;

(c)    violate, contravene or conflict with any Law or Order;

(d)    contravene, conflict with, result in the violation or breach of any of the terms or conditions of, or constitute (with or without notice or lapse of time or both) a default under or an event which would, or could reasonably be expected to give rise to, any right of notice, modification, acceleration, payment, suspension, withdrawal, cancellation or termination under, or except as set forth on Schedule 4.2(d) of the Disclosure Schedules, in any manner release any party thereto from any obligation under, or otherwise affect any rights of the Company under, any Contract or Permit; or

(e)    result in the creation or imposition of any Lien upon any Securities or any Assets.

**Section 4.3    Consents and Approvals.**  Except as set forth on Schedule Section 4.3 of the Disclosure Schedules, no consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by the Company in connection with the authorization, execution, delivery and performance by the Company of this Agreement or any Ancillary Agreement, or the consummation of the transactions contemplated hereby and thereby.

**Section 4.4    Capitalization.**  Schedule Section 4.4(a) of the Disclosure Schedules sets forth the entire authorized Equity Securities of the Company and a complete and correct list of the issued and outstanding Equity Securities of the Company, including the name of the record and beneficial owner thereof and the number of Equity Securities held thereby.  All of the outstanding Equity Securities of the Company has been duly authorized, validly issued and are fully paid and non-assessable.  Except as set forth on Schedule Section 4.4(b) of the Disclosure Schedules, the Company has no outstanding Equity Securities or other securities directly or indirectly convertible into or exchangeable for its Equity Securities, the Company has no outstanding agreements, options, warrants or rights to directly or indirectly subscribe for or purchase, or that directly or indirectly require it to issue, transfer or sell, its Equity Securities or any securities directly or indirectly convertible into or exchangeable for its Equity Securities, and there are no agreements containing profit participation or phantom equity features with respect to the Company other than documents related to the ESOP Trust and participants in the ESOP.  Except as set forth on Schedule Section 4.4(c) of the Disclosure Schedules, the Company does not own or otherwise hold, directly or indirectly, any stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person.  The Company is not subject to any obligation (contingent or otherwise) to redeem, repurchase or otherwise acquire or retire any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities.  Except as set forth on Schedule Section 4.4(d) of the Disclosure Schedules,

21

FBG_CH1_00094867

there are no voting agreements, voting trusts or other agreements, commitments or understandings with respect to the voting or transfer of Equity Securities or other securities of the Company. The Company has not violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities. No Equity Securities of the Company are subject to, nor have been issued in violation of, preemptive or similar rights. There are no accrued but unpaid dividends payable by the Company on any Equity Securities of the Company.

Section 4.5     **Financial Statements; Accounting and Internal Controls**.

(a)     The Company has provided to Buyer copies of the following financial statements of the Company (collectively, the "**Financial Statements**"):

(i)     the audited consolidated balance sheets of the Company as of December 31, 2020, 2021 and 2022 and the related audited statements of operations, changes in stockholders' equity and cash flows for each of the years then ended; and

(ii)     the unaudited consolidated balance sheet of the Company as of the Balance Sheet Date (the "**Balance Sheet**"), and the related unaudited statements of operations, changes in stockholders' equity and cash flows for the ten month period then ended.

(b)     The Financial Statements (including the notes thereto) (i) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except that the interim Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes required by GAAP, (ii) present fairly the assets, liabilities and financial condition of the Company as of such dates and the results of operations of Company for such periods, and (iii) are consistent with the books and records of the Company (which books and records are correct and complete in all material respects). Since December 31, 2022, there has been no change in any accounting principles, policies, methods or practices, including any change with respect to reserves (whether for bad debt, contingent liabilities or otherwise) of the Company.

(c)     The Company has established and maintained and, for the past five years, have maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Company and (ii) that (A) all transactions are executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(d)     The Company has established and maintained and, for the past five years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Company (including any deficiencies or weaknesses in the design or operation of the Company' internal controls and any fraud that involves management or other Service Providers of the Company) is made known to the Company's management by others within the Company and disclosed to the Company's board of directors and outside auditors. The Company has provided to the Buyer a summary of any of the foregoing disclosures made to the Company's board of directors or outside auditors.

Section 4.6     **Absence of Undisclosed Liabilities**. Except as set forth on Schedule 4.6 of the Disclosure Schedules, the Company does not have any Liabilities, except (a) as and to the extent

22

specifically accrued for or reserved against in the Balance Sheet, (b) Liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business consistent with past practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law), (c) executory obligations under Contracts (other than Liabilities relating to any breach, or any fact or circumstance that, with notice, lapse of time or both, would result in a breach, thereof by the Company) and (d) Liabilities specifically set forth on Schedule Section 4.6 of the Disclosure Schedules.

Section 4.7     **Accounts and Notes Receivable; Accounts Payable**.   Except as set forth on Schedule 4.7 of the Disclosure Schedules, all accounts and notes, and other receivables of the Company are reflected properly on their books and records and arise from bona fide transactions entered into by the Company involving the sale of goods or the rendering of services in the ordinary course of business subject to no setoffs or counterclaims.   Schedule Section 4.7 of the Disclosure Schedules sets forth the aging of accounts receivable of the Company as of the Audit Date. The accounts payable and accruals of the Company have arisen in bona fide arm's-length transactions in the ordinary course of business, and the Company has been paying its accounts payable as and when due subject to any bona fide disputes, if any.

Section 4.8     **Inventory**.  The inventory of the Company is merchantable and fit for the purpose for which it was procured or manufactured, and is not slow-moving, obsolete, damaged, or defective, subject to the reserve for inventory write-down set forth on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company, except, in each case, as would not be material to the Company.  All such inventory is owned by the Company free and clear of any Liens (other than Permitted Liens), and except as set forth on Schedule 4.8 of the Disclosure Schedules no inventory is held on a consignment basis.

Section 4.9     **Absence of Changes or Events**.  Except as disclosed in the applicable subsection of Schedule Section 4.9 of the Disclosure Schedules, since December 31, 2022 (the "**Audit Date**"), (a) each of the Company has conducted its business only in the ordinary course consistent with past practice, (b) no Event has occurred that, individually or in combination with any other Events, has had or could reasonably be expected to have Material Adverse Effect and (c) the Company has not suffered any loss, damage, destruction or other casualty affecting any of its material properties or assets, whether or not covered by insurance.

Section 4.10     **Assets**.

(a)     The Company owns, and immediately following the Closing will continue to own, good and marketable title to, or a valid right to use, all of the tangible assets and property used or held in connection with their businesses (the "**Assets**"), free and clear of any and all Liens (other than Permitted Liens).  The tangible assets and property to which the Company has good and marketable title to, or a valid right to use, are all the assets and property that are necessary to enable the businesses of the Company to be conducted immediately after the Closing in the same manner as the businesses of the Company have been conducted since the Audit Date.

(b)     All material items of tangible personal property owned or leased by the Company are in good operating condition and repair, ordinary wear and tear excepted, and are suitable for the purposes for which they are presently being used.  None of the personal or movable property constituting Assets is located other than at the Real Property.

Section 4.11     **Proprietary Rights**.

(a)     Schedule Section 4.11(a) of the Disclosure Schedules contains a true, complete and accurate description and list of all (i) patented or registered Intellectual Property owned or held by or

23

FBG_CH1_00094869

exclusively licensed to the Company, (ii) pending patent applications and applications for other registrations of Intellectual Property owned or held by or exclusively licensed to the Company, and (iii) any unregistered Trademark or copyright that is owned or held by or exclusively licensed to the Company and material to the conduct of the Company's business as presently conducted or contemplated by the Company as of the date hereof to be conducted (indicating for each of (i) and (ii) the Company that owns or holds such Intellectual Property or an exclusive license thereto, applicable jurisdiction, registration number (if registered), application number, date issued (if issued) and dated filed).

(b)        Schedule Section 4.11(b)(i) of the Disclosure Schedules contains a true, complete and accurate list of all Intellectual Property licensed to the Company (excluding generally commercially available, off the shelf software programs licensed to the Company pursuant to a shrink-wrap or "click to accept" agreements with a replacement cost and/or annual license fee of less than $10,000 (an "**Immaterial Software License**")) and any license or other agreement relating thereto.  Schedule Section 4.11(b)(ii) of the Disclosure Schedules contains a true, complete and accurate list of all Intellectual Property licensed by the Company to any Person other than the Company and any license or other agreement relating thereto. The consummation of the transactions contemplated by this Agreement and the Ancillary Agreement will not (i) impair any rights of the Company under, or cause the Company to be in violation of or default under, any Contract under which it has the right to use or otherwise commercialize or exploit in any way any Intellectual Property of any Person, (ii) give rise to any termination or modification of, or entitle any other party to terminate or modify, any such Contract, or (iii) require the payment of (or increase the amount of) any royalties, fees, or other consideration with respect to the Company's use or exploitation of any Intellectual Property of any Person.

(c)        The Company exclusively owns and possesses all right, title and interest in and to, or has the right under a valid and enforceable license set forth on Schedule Section 4.11(b)(i) of the Disclosure Schedules, (or under a valid and enforceable Immaterial Software License) to use and otherwise commercialize or exploit, all Intellectual Property necessary for or used or otherwise commercialized or exploited in the operation of its businesses as presently conducted and as presently proposed to be conducted, free and clear of all Liens (collectively for all Company, the "**Company Intellectual Property**").  To the Knowledge of the Company, none of the Company Intellectual Property owned by or exclusively licensed to or purported to be owned by or exclusively licensed to the Company is invalid or unenforceable in whole or in part.  No loss or expiration of any of the Company Intellectual Property is pending, reasonably foreseeable or, to the Knowledge of the Company, threatened, except for patents expiring at the end of their statutory term.  The Company has taken all action necessary or reasonably advisable, performed all customary or prudent acts, recorded or filed all documents and paid all fees and Taxes (to the extent applicable) required or reasonably advisable to protect and maintain in full force and effect the Company Intellectual Property.  Without limiting the generality of the foregoing, (i) the Company has to the extent possible filed all affidavits or other documents regarding its registered Trademarks that are required or useful to render such Trademarks incontestable or otherwise enhance the scope or strength thereof and (ii) all assignments and exclusive licenses of any Intellectual Property to the Company have been timely and properly recorded with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or other appropriate agency to the extent required or reasonably advisable.  Except as set forth on Schedule 4.11(c) of the Disclosure Schedules, each current or former employee of the Company has executed a valid and enforceable written agreement assigning to the Company ownership of all rights in any Intellectual Property developed by such Service Provider, solely or jointly with others, in the course and scope of his or her employment or engagement by the Company.  Except as specified on Schedule Section 4.11(c) of the Disclosure Schedules, the Seller does not own or hold any Intellectual Property that is used, commercialized or exploited in any way by the Company.

(d)        Except as set forth on Schedule Section 4.11(d) of the Disclosure Schedules, (i) there have been no claims made or threatened against the Company asserting the invalidity, misuse or unenforceability of the Company Intellectual Property or challenging the Company's ownership of

24

FBG_CH1_00094870

Intellectual Property owned or purported to be owned by the Company or right to use, commercialize or exploit any other Company Intellectual Property, in either case free and clear of Liens, and there is no basis for any such claim, (ii) the Company has not received during the past five years any notices of, and, to the Knowledge of the Company, there are no facts which indicate a likelihood of, any direct, vicarious, indirect, contributory or other infringement, violation or misappropriation by the Company of any Intellectual Property (including any cease-and-desist letters or demands or offers to license any Intellectual Property from any other Person), (iii) to the Knowledge of the Company, the conduct of the Company' respective businesses as previously conducted has not infringed, misappropriated or violated, and as presently conducted or presently proposed to be conducted by the Company as of the date hereof does not and will not infringe, misappropriate or violate, any Intellectual Property of any other Person, whether directly, vicariously, indirectly, contributorily or otherwise, and (iv) to the Knowledge of the Company, no Company Intellectual Property has been infringed, misappropriated or violated by any other Person.

(e)     Except as set forth on Schedule Section 4.11(e) of the Disclosure Schedules, the Company does not use or distribute any Software that is subject to an "open source", "copyleft" or other similar type of license, including any license that is approved by the Open Source Initiative or that would or could require the disclosure of (or grant any person the right to receive) any source code or impose limitations on the right of the Company to require payment of license or other fees in connection with the distribution of such Software.

(f)     The computer systems, including the Software, hardware and networks (collectively, the "**Systems**"), currently used by the Company are sufficient for the current needs of the businesses of the Company, including as to capacity and ability to process current peak volumes in a timely manner.  In the past twelve months, to the Knowledge of the Company, there have been no viruses in, or failures, breakdowns, or continued substandard performance of, any Systems that has caused the substantial disruption or interruption in or to the use of such Systems by the Company or the conduct of their businesses.

(g)     Each privacy policy or other policy or terms published by the Company that relates to private or personally identifiable information and the date that it was published or otherwise in effect has been delivered or made available to the Buyer.  The Company is in compliance in all material respects with all applicable Laws, rules and regulations, its own published privacy policies, terms of use and other terms or policies, and to the Knowledge of the Company, any third party privacy policies, terms of use or other terms or policies binding on the Company with respect to data security, required notifications of breaches or suspected breaches of such security, the privacy of Service Provider, users, visitors and customers, or the collection, use, storage, distribution, handling, processing, transfer or disclosure (whether electronically or in any other medium) of any personally identifiable or private information (collectively, the "**Privacy Requirements**").  No claims are currently pending or, to the Knowledge of the Company, are threatened against the Company by any Person alleging a violation of any Privacy Requirements.  The execution and delivery of this Agreement and the Ancillary Agreements, the performance by the Seller and the Company of their respective obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby (i) will comply with all applicable Privacy Requirements, (ii) will not impair any rights of, or impose any obligations or restrictions on, the Company with respect to any use, disclosure, commercialization or exploitation of, or otherwise relating to, any personally identifiable or private information or other data or (iii) will not give rise to any right on the part of any Person to impair any such rights or impose any such obligations or restrictions.  Neither the Company, nor to the Knowledge of the Company, anyone acting on behalf of the Company, and to the Knowledge of the Company, no software tool created or used by or on behalf of the Company, has used false log-on credentials with respect to any third-party website or other false representation or statement to obtain any personally identifiable or private information or other data.  The Company has not received a complaint or been the subject of any Proceeding in the past five years or to the Knowledge of the Company, investigation regarding its collection, use or disclosure of personally identifiable or private information or other data or its privacy or data security

25

FBG_CH1_00094871

policies, practices or activities.  To the Knowledge of the Company, (i) the Company has adequate security measures in place to protect personally identifiable and private information and other data in its possession, custody or control, and (ii) the Company has not experienced any breach of security or unauthorized access by any third party to personally identifiable or private information or other data in the Company's possession, custody or control.  For purposes hereof, information in the Company's possession, custody or control includes information stored for the Company by any service provider or vendor.

        **Section 4.12**    <u>**Contracts**</u>.  <u>Schedule Section 4.12</u> of the Disclosure Schedules contains a true, complete and accurate list (by reference to the applicable subsection hereof) as of the date of this Agreement of:

        (a)     each Contract that requires the Company to pay, or entitles the Company to receive, or could result in obligations of the Company in the amount of, in the aggregate, $500,000 or more in any 12-month period;

        (b)     each Contract that restricts the Company or any of its present or future Affiliates from competing with or engaging in any business activity anywhere in the world or soliciting for employment, hiring or employing any Person;

        (c)     each Contract to acquire or dispose (by merger, purchase or sale of assets or stock or otherwise) of material assets, as to which the Company has continuing material obligations or material rights;

        (d)     each Contract concerning a joint venture, strategic alliance, collaboration or partnership agreements, or the sharing of profits;

        (e)     each Contract whereby the Company leases, subleases, licenses, or otherwise holds any rights to use or occupy any interest in real property (the "**Real Property Leases**");

        (f)     each Contract with respect to Indebtedness (provided that such list shall only contain references to the primary agreement with respect to each item of Indebtedness);

        (g)     each Contract with any Governmental Authority;

        (h)     each Contract pursuant to which the Company leases, is licensed or otherwise authorized to use or otherwise commercialize or exploit any Intellectual Property of any other Person or which otherwise affects the ability of the Company to use, commercialize or otherwise exploit the Company Intellectual Property (including a covenant not to sue) material to its business as currently conducted (excluding Immaterial Software Licenses);

        (i)     [reserved];

        (j)     each Contract that contains any fixed or indexed pricing, "most-favored nation" pricing or similar pricing terms or provisions regarding minimum volumes, volume discounts, or rebates;

        (k)     each Collective Bargaining Agreement;

        (l)     each Contract with respect to bonus or other incentive compensation, deferred compensation, equity purchase or award, salary continuation, pension, profit sharing or retirement plan, or any other Employee Benefit Plan or arrangement;

        (m)     each Contract with any current Service Provider as well as each Contract with any firm or other organization providing commission or sales-based services to the Company;

26

CONFIDENTIAL

FBG_CH1_00094872

(n)     each Contract with any firm or other organization that provided commission or sales-based services to the Company under which the Company has any Liability or other obligation;

(o)     each Contract with a Related Party;

(p)     each Contract that is not terminable by the Company with notice of 90 days or less without penalty;

(q)     each Contract that grants any Person other than the Company any rights of first refusal, rights of first negotiation or similar rights; and

(r)     each Contract not made in the ordinary course of business consistent with past practice or that is otherwise material.

True, complete and accurate copies of the Contracts listed or required to be listed on Schedule Section 4.12 of the Disclosure Schedules, together with all modifications and amendments thereto, have previously been delivered or made available to the Buyer, or, to the extent any of such Contracts are oral, Schedule Section 4.12 of the Disclosure Schedules contains a description of the material terms thereof. Each such Contract is in full force and effect, is valid, binding and enforceable against the Company, and to the Knowledge of the Company, against the other party thereto, in accordance with its terms (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies), and to the Knowledge of the Company, is not subject to any claims, charges, set-offs or valid affirmative defenses. Except as set forth on Schedule Section 4.12 of the Disclosure Schedules, the Company is not in material breach or material default, nor has any event occurred which with the giving of notice or the passage of time or both would constitute a material breach or material default by the Company of, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any obligation under, any such Contract and, to the Knowledge of the Company, except as set forth on Schedule 4.12 of the Disclosure Schedules, no other party is in breach or default, and no event has occurred which with the giving of notice or the passage of time or both would constitute a breach or default by any other party, or which would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by the Company under, or in any manner release any party thereto from any obligation under, any such Contract. Since December 31, 2022, the Company has not received in the past five years any, written or, to the Knowledge of the Company, oral notice or communication regarding any violation or breach of, or default under any such Contract. Neither the Seller nor the Company has been notified in writing, or to the Knowledge of the Company, orally by any counterparty to any such Contract that such counterparty is terminating, modifying, repudiating or rescinding, or intends to terminate, modify, repudiate or rescind such Contract.

**Section 4.13     Litigation**.  Except as set forth on Schedule Section 4.13(a) of the Disclosure Schedules, there are no Proceedings pending or, to the Knowledge of the Company, threatened against the Company or any of the current or former officers, directors or employees of the Company related to the Company or its operations or current or former Service Providers, nor, to the Knowledge of Company, is there any reasonable basis for any such Proceeding. Except as set forth on Schedule Section 4.13(b) of the Disclosure Schedules, there are no Proceedings pending or threatened by the Company. For any Proceedings identified on Schedule Section 4.13(a) and Section 4.13(b) of the Disclosure Schedules that remain pending as of the date hereof, (i) the Company has provided or made available to the Buyer true, complete and accurate copies of all pleadings, correspondence and other material documents relating to each such Proceeding, (ii) no such Proceeding could reasonably be expected to be material to the Company, and (iii) the Company will have paid before the Closing, all fees and expenses of counsel and other representatives of the Company incurred on or before the Closing Date in connection with such Proceeding. Schedule Section 4.13(c) of the Disclosure Schedules sets forth a complete and correct list and description

27

of all Proceedings made, filed or otherwise initiated in connection with the Company or any of the current or former Service Providers of the Company related to the Company or its assets or operations that has been resolved in the past five years. Schedule Section 4.13(d) of the Disclosure Schedules sets forth any Order to which the Company is subject.

Section 4.14    **Compliance with Laws**.  Except as set forth on Schedule Section 4.14 of the Disclosure Schedules, the Company complies, and has complied during the past five years, in all material respects with all Laws in connection with the conduct, ownership, use, occupancy or operation of its business and the Assets, and the Company has not received during the past five years, nor to the Knowledge of the Company, is there any basis for, any notice or other communication from any Governmental Authority or any other Person that the Company is not in compliance in any material respect with any Law.

Section 4.15    **Licenses and Permits**.  Except as set forth on Schedule Section 4.15 of the Disclosure Schedules, the Company holds, and has at all times held, and immediately following the Closing will hold, all Permits necessary for the conduct, ownership, use, occupancy or operation of its businesses or the Assets.  The Company complies, and has at all times complied, in all material respects with all such Permits, and the Company has not received during the past five years any notice or other communication from any Governmental Authority or any other Person that the Company is not in compliance in any material respect with any such Permit or of any actual or possible revocation, withdrawal, suspension, cancellation, termination or material modification of any such Permit.  All such Permits are identified on Schedule Section 4.15 of the Disclosure Schedules, including their respective dates of issuance and expiration, and true, complete and accurate copies thereof have been provided or made available to the Buyer.  All such Permits are, and immediately following the Closing will be, valid and in full force and effect on terms identical in all material respects to those under which, immediately before the Closing (and as of the date of this Agreement), the Company hold such Permits.

Section 4.16    **Health, Safety and Environment**.

(a)     The Company is and has been in compliance in all material respects with all Environmental and Safety Requirements.

(b)     The Company has obtained, maintains, and complies in all material respects with all Permits required under Environmental and Safety Requirements to operate its business, and no Proceeding is pending, or to the Knowledge of the Company, threatened, to revoke, modify, or terminate any Permit required under Environmental and Safety Requirements.

(c)     Except to the extent shown in any environmental assessment obtained by the Buyer or provided to Buyer by the Company, to the Knowledge of the Company, there are no Hazardous Materials present in, at, under, about or migrating to or from, in violation of applicable Environmental and Safety Requirements, any (i) Owned Real Property or Leased Real Property, (ii) real property formerly owned, leased, or used by the Company, or (iii) to the Knowledge of the Company, any property to which any Person has, at any time, transported, treated, stored or disposed of Hazardous Material on behalf of the Company or any of its predecessors that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to the Company under Environmental and Safety Requirements.

(d)     Except as set forth on Schedule 4.16(d) or in the Phase I and Phase II environmental assessments provided to Buyer, the Company has not been subject to, nor has received any notice of, any Proceeding related to the Release of Hazardous Materials or noncompliance with or Liabilities under Environmental and Safety Requirements.

(e)     Except as set forth on Schedule 4.16(e), the Company does not have any contractual indemnity obligation to any third party with respect to Environmental and Safety Requirements.

28

FBG_CH1_00094874

(f)     To the Knowledge of the Company, no underground storage tanks or related piping are located on, under, or at any Owned Real Property or Leased Real Property, and the Company has not removed or caused any such tank or piping to be removed in the past 10 years, nor, to the Knowledge of the Company, has there been any such removal from any Owned Real Property or Leased Real Property or any former operating location that could reasonably be expected to give rise to, result in, or serve as a basis for Losses to the Company under Environmental and Safety Requirements.

(g)     To the Knowledge of the Company, no current facts, circumstances, or conditions exist with respect to the Company, their respective businesses, the Owned Real Property, the Leased Real Property, or any formerly owned, leased, or operated real property that would result, individually or in the aggregate, in the Company's incurring material Losses or material, unbudgeted capital expenditures to achieve or maintain compliance under Environmental and Safety Requirements, including Permits required under Environmental and Safety Requirements.

(h)     The Company has provided the Buyer with true, complete and accurate copies of all material environmental assessment reports, health and safety audits, and reports of investigations with respect to the Company, the Owned Real Property, or the Leased Real Property in the Company's possession or control.

(i)     Prior to the Closing Date, the transactions contemplated by this Agreement do not require, under any Environmental and Safety Requirements, the consent of, or filings with, any Governmental Authority with jurisdiction over the Company, the Owned Real Property, or Leased Real Property.

**Section 4.17     Taxes**.

(a)     The Company has timely and properly filed all Tax Returns required to be filed by it, taking into account any valid extension of time to file. All such Tax Returns are accurate and complete. The Company has timely and properly paid all Taxes required to be paid by it or with respect to its assets, whether or not shown on such Tax Returns.

(b)     All Tax deficiencies that have been claimed, proposed, or asserted by any Governmental Authority against the Company have been fully paid or finally settled.

(c)     No Tax audits or administrative or judicial Tax Proceedings are being conducted with respect to the Company. The Company has not received during the past five years from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review with respect to Taxes, (ii) written request for information related to Tax matters, or (iii) written notice of deficiency or proposed adjustment for any amount of Tax. The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency that, in either case, remains in effect. The Company is not currently the beneficiary of any extension of time within which to file any Tax Return or pay any Tax.

(d)     No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company may be subject to taxation by that jurisdiction. Section 4.17(d) of the Disclosure Schedules sets forth each jurisdiction in which the Company is required to file Tax Returns or pay Taxes.

(e)     There are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax.

29

(f)     The Company has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any current or former Service Provider, equity interest holder, or other third party, and all IRS Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  The Company has consistently treated any workers that it treats as independent contractors (and any similarly situated workers) as independent contractors for purposes of Section 530 of the Revenue Act of 1978.

(g)     The Company is not party to any Tax allocation, Tax sharing, or Tax distribution agreement or arrangement.

(h)     The Company (i) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes (other than a group the common parent of which was the Company), (ii) has any liability for the Taxes of any Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by any contract, or otherwise, or (iii) has ever been a party to any joint venture, partnership, or other arrangement that is treated as a partnership for Tax purposes.

(i)     The Company has ever been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(j)     None of the assets of the Company are "section 197(f)(9) intangibles" (as defined in Treasury Regulation Section 1.197-2(h)(1)(i) and assuming for this purpose that the transition period ends on August 10, 1993.

(k)     The Company has timely and properly collected all sales, use, value-added, and similar Taxes required to be collected, and has remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authority.  The Company has properly requested, received and retained all necessary exemption certificates and other documentation supporting any claimed exemption or waiver of Taxes on sales or similar transaction as to which it would otherwise have been obligated to collect or withhold Taxes.

(l)     The aggregate unpaid Taxes of the Company (a) did not, as of the Balance Sheet Date, exceed the reserve for Tax liability (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet and (b) do not exceed that reserve as adjusted for the passage of time through the end of the Closing Date in accordance with the past custom and practice of the Company in preparing its Financial Statements. The unpaid Income Taxes of the Company for all Pre-Closing Tax Periods shall not exceed the Income Tax Liability Accrual.

(m)     There is no agreement, plan, arrangement or other contract (including this Agreement or the arrangements contemplated thereby) covering any employee or independent contractor or former employee or independent contractor of any of the Company that, considered individually or considered collectively with any other such contracts, will, or could reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G or Section 162 of the Code as a result of the transactions contemplated by this Agreement.  The Company is not a party to any contract, nor does it have any obligation (current or contingent), to compensate any individual for excise taxes paid pursuant to Section 4999 of the Code.

(n)     The Company has not participated in any "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code or Treasury Regulation Section 1.6011-4(b).

30

FBG_CH1_00094876

**DEBTORS' EXHIBIT NO. 244**
**Page 35 of 64**

(o)     The Company has not requested or received a ruling from any Governmental Authority or signed any binding agreement with any Governmental Authority that might impact the amount of Tax due from the Buyer or its Affiliates (including following the Closing, for the avoidance of doubt, the Company) after the Closing Date.

(p)     Except as set forth on Schedule 4.17(p), neither the Buyer nor any of its Affiliates (including following the Closing, for the avoidance of doubt, the Company) will be required to include any item of income in, or exclude any deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting or use of a cash or improper method of accounting for a taxable period ending on or prior to the Closing Date with respect to the Company; (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Income Tax Law) executed on or prior to the Closing Date; (iii) intercompany transactions as described in Treasury Regulation Section 1.1502-13 (or any corresponding or similar provision of state, local or foreign Income Tax Law) or excess loss account described in Treasury Regulation Section 1.1502-19 (or any corresponding or similar provision of state, local or foreign Income Tax Law); (iv) installment sale or open transaction disposition made on or prior to the Closing Date by the Company; (v) prepaid amount or deposit received on or prior to the Closing Date by the Company; (vi) interest held by the Company in a "controlled foreign corporation" (as that term is defined in Section 957 of the Code) (a "**CFC**") on or before the Closing Date pursuant to Sections 951, 951A, or 965 of the Code; (vii) "minimum gain chargeback" provision applicable to the Company with respect to "minimum gain" for periods (or portions of periods) ending on or prior to the Closing Date pursuant to Subchapter K of the Code; or (ix) debt instrument held by the Company on or before the Closing Date that was acquired with "original issue discount" as defined in Section 1273(a) of the Code or is subject to the rules set forth in Section 1276 of the Code.  The Company is not required to include any amount in income pursuant to Section 965 of the Code or pay any installment of the "net tax liability" described in Section 965(h)(1) of the Code.

(q)     The Company has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(r)     Each Employee Benefit Plan that is a "non-qualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code (a "**Nonqualified Deferred Compensation Plan**") and any award thereunder, in each case that is subject to Section 409A of the Code has been administered and drafted or amended, in such a manner so that the additional tax described in Section 409A(1)(B) of the Code will not be assessed against any individual participating in any such non-qualified deferred compensation plan with respect to benefits due or accruing thereunder.  No Employee Benefit Plan that would have been a Nonqualified Deferred Compensation Plan subject to Section 409A of the Code but for the effective date provisions that are applicable to Section 409A of the Code, as set forth in Section 885(d) of the American Jobs Creation Act of 2004, as amended (the "**AJCA**"), has been "materially modified" within the meaning of Section 885(d)(2)(B) of the AJCA after October 3, 2004.  Each Nonqualified Deferred Compensation Plan has been or will be timely amended, as needed, to comply with Section 409A of the Code.

(s)     Since the Audit Date, the Company has been properly treated and qualified as an "S corporation" within the meaning of Section 1361(a)(1) of the Code and any similar provision of applicable state or local Law.

(t)     The Company has not deferred the inclusion of any amounts in taxable income pursuant to IRS Revenue Procedure 2004-34, Treasury Regulations Section 1.451-5, Sections 451(c), 455, 456 or 460 of the Code, or any corresponding or similar provision of Law (irrespective of whether or not such deferral is elective).

31

FBG_CH1_00094877

(u)     [Reserved].

(v)     All material transactions or arrangements made by the Company with any other Person have in all material respects been made on arm's length terms, and the processes by which prices and terms have been arrived at have, in each case, been documented in accordance with all applicable Laws, including Code Section 482 and any equivalent provision under any state, local, or non-U.S. Law.

(w)     The Company does not have any net operating losses or other tax attributes presently subject to limitation under Sections 382, 383, 384 or the federal consolidated return regulations (or any corresponding or similar provision of state, local or foreign income Tax Law).

(x)     The Company has been resident in its jurisdiction of incorporation for Tax purposes and has not, at any time, been treated as a resident of or as having a permanent establishment or other fixed place of business in any other jurisdiction.

**Section 4.18**     **Employee Benefit Plans**.

(a)     Except as set forth on Schedule Section 4.18(a) of the Disclosure Schedules, neither the Company nor any ERISA Affiliate have ever maintained, sponsored, adopted, made contributions to or obligated itself to make contributions to or to pay any benefits or grant rights under or with respect to, or has any other Liability with respect to, any Employee Pension Benefit Plan , Employee Welfare Benefit Plan, Multiemployer Plan, Multiple Employer Plan, Multiple Employer Welfare Arrangement, Title IV Plan, pension plan, plan of deferred compensation, medical plan, life insurance plan, long-term disability plan, dental plan, or other plan, program, arrangement or trust, personnel policy (including vacation time, holiday pay, sick leave, other forms of paid time off, bonus programs, moving or other expense reimbursement or payment programs), excess benefit plan, bonus or incentive plan (including stock options, restricted stock, stock bonus and deferred bonus plans), severance agreement, salary reduction agreement, change-if-control agreement, employment agreement, consulting agreement or any other benefit, program or Contract, whether or not written or pursuant to a Collective Bargaining Agreement, (each an "**Employee Benefit Plan**," and collectively, the "**Employee Benefit Plans**"). No Employee Benefit Plan that provides severance benefits is subject to ERISA.

(b)     Except as set forth on Schedule 4.18(b) of the Disclosure Schedules, neither the Company nor any ERISA Affiliate has at any time participated in or made contributions to or has had any other Liability or potential Liability with respect to a plan which is or was (i) a Multiemployer Plan, (ii) a Multiple Employer Plan, (iii) a Multiple Employer Welfare Arrangement (or other plan, program, arrangement or trust providing for or funding the welfare of any of the employees or former employees or beneficiaries thereof of the Company), (iv) a Title IV Plan (including under Section 4204 of ERISA), (v) a VEBA, or (vi) any Employee Benefit Plan in which stock of the Company or any ERISA Affiliate is or was held as a plan asset.  There are, and have been, no ERISA Affiliates.

(c)     Each Employee Benefit Plan that is intended to be "qualified" under Section 401(a) of the Code has received a determination from the IRS that such Employee Benefit Plan is so qualified and to the Company' Knowledge, there are no facts or circumstances that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan.

(d)     Each Employee Benefit Plan has been and is operated and funded in such a manner as to qualify, where appropriate, for both federal and state purposes, for Income Tax exclusions to its participants, Tax-exempt income for its funding vehicle, and the allowance of deductions and credits with respect to contributions thereto.

32

(e)      There are no Proceedings pending, or to the Company' Knowledge, threatened against, by or with respect to any Employee Benefit Plan, or the assets, sponsor, plan administrator, or fiduciaries thereof (other than routine claims for benefits for which plan administrative review procedures have not been exhausted and for which any Liability is the sole responsibility of an insurance company), and there are no facts to the Company' Knowledge which could give rise to any material Liability or Proceeding against any Employee Benefit Plan, plan sponsor, fiduciary or plan administrator or other Person dealing with any Employee Benefit Plan or the assets thereof.

(f)      No Employee Benefit Plan is under audit or investigation by, or is the subject of a Proceeding with respect to, any Governmental Authority, including the IRS, the Department of Labor or the Pension Benefit Guaranty Corporation.

(g)      Each of the Employee Benefit Plans and all related trusts, insurance contracts and funds have been maintained, funded and administered in compliance with their terms and the terms of any applicable Collective Bargaining Agreement, and in compliance with the applicable provisions of ERISA, the Code, and any other applicable Law.  With respect to each Employee Benefit Plan, all required payments, premiums, contributions, distributions or reimbursements for all periods ending prior to or as of the date hereof have been timely made or properly accrued and all required payments, premiums, contributions, distributions or reimbursements for all periods between the date hereof and the Closing Date will have been timely made or properly accrued.

(h)      Neither the Company, nor to the Knowledge of the Company, (i) any other "disqualified person" (within the meaning of Section 4975 of the Code) nor (ii) any "party in interest" (within the meaning of Section 3(14) of ERISA) has engaged in any nonexempt "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to any of the Employee Benefit Plans which could subject any such Employee Benefit Plans, the Company or any current or former Service Provider of the Company to any liability or any penalty or tax under ERISA or the Code. Neither the Company nor to the Knowledge of the Company, any other Person has engaged in any transaction with respect to any Employee Benefit Plan that could subject the Employee Benefit Plans, the Company or any other Person to any Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law with respect to the Company's Employee Benefit Plans.

(i)      Each Employee Benefit Plan that is subject to COBRA and/or the requirements of HIPAA, and/or the requirements of the Affordable Care Act has been administered in compliance with such Laws, and none of the Employee Benefit Plans nor the Company has any Liability under any such Law. No Employee Benefit Plan provides post-retirement medical or life or other welfare benefits to any current or future retired or terminated employee (or any dependent thereof) of the Company other than as required pursuant to COBRA, the full cost of which is paid by the participant.  With respect to each Employee Benefit Plan that is an Employee Welfare Benefit Plan, all claims are (i) insured pursuant to a contract of insurance whereby the insurance company bears any risk of loss with respect to such claims, (ii) covered under a contract with a health maintenance organization, pursuant to which the health maintenance organization bears the liability for claims and there are no provisions for retroactive premium adjustments, or (iii) reflected as a liability or accrued for on the Financial Statements.  Schedule Section 4.18(i) of the Disclosure Schedules sets forth a true, correct, and complete list of all individuals who are receiving COBRA Coverage or who have incurred a "qualifying event" within the meaning of Section 4980B of the Code, but have not yet elected COBRA Coverage, the date and description of the qualifying event that triggered entitlement to COBRA Coverage, the name of the Employee Benefit Plans in which they participated that are subject to COBRA, and the expected date of termination of COBRA Coverage.

(j)      No Employee Benefit Plan has been acquired by the Company as a result of any merger or acquisition.

33

CONFIDENTIAL                                    FBG_CH1_00094879

**DEBTORS' EXHIBIT NO. 244**
**Page 38 of 64**

(k)     With respect to each Employee Benefit Plan, the Company has provided the Buyer true, complete and correct copies of (to the extent applicable):  (i) all documents pursuant to which the Employee Benefit Plan is or has been maintained, funded and administered (including the plan and trust documents, any amendments thereto, the summary plan descriptions, any summaries of material modifications and any insurance contracts or service provider agreements, custodial agreements, insurance policies, investment management agreements, administrative agreements and similar agreements and any amendments thereto); (ii) the three most recent annual reports, actuarial reports and/or financial reports; (iii) the three most recent annual reports (IRS Form 5500 series) filed with the United States Department of Labor (with all applicable attachments); (iv) the most recent determination letter, if any, received from the IRS; (v) any communication to or from any Governmental Authority or to or from any Employee Benefit Plan participant, including a written description of any oral communication; and (vi)  any notes or minutes of any meeting of any fiduciary, administrative, or other committee.  The Company has provided to Seller all copies of ESOP fairness opinions received by the ESOP or the Company.

(l)     All required reports with respect to each Employee Benefit Plan have been timely and accurately filed with all Government Authorities, including the IRS, the United States Department of Labor and the Pension Benefit Guaranty Corporation and, as appropriate, provided to participants in the Employee Benefit Plan.

(m)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement will (either alone or in conjunction with any event) (i) result in an "excess parachute payment" (within the meaning of Section 280G of the Code or any corresponding provision of state, local or foreign Law) becoming due to any current or former Service Provider, (ii) increase any benefits otherwise payable under any Employee Benefit Plan, (iii) result in any acceleration of the time of funding, payment or vesting of any such benefits, (iv) result in any Liability to the Buyer or the Company under any Employee Benefit Plan or agreement with any current or former Service Provider, or (v) require any notification or consultation with any union, works council, employee representative or other labor organization.  The Company does not have any obligation to "gross up" or otherwise compensate any current or former Service Provider or other Person because of the imposition of any tax on a payment to such Person.

(n)     No communication or disclosure has been made that, at the time made, did not accurately reflect the terms and operations of any Employee Benefit Plan.

(o)     The Company has, for purposes of each relevant Employee Benefit Plan, correctly classified its current and former Service Providers as common law employees, leased employees, independent contractors or agents of the Company and no Person has been an active participant in any Employee Benefit Plan subject to ERISA who was not a common law employee of the Company (or a beneficiary thereof) at the time of participation (other than with respect to continuation coverage mandated by COBRA).

(p)     Except as set forth on Schedule 4.18(p) of the Disclosure Schedules, no Employee Benefit Plan has been the subject of any correction procedure, including the Employee Plan Compliance Resolution System (EPCRS), the Delinquent Filer Voluntary Compliance Program or the Voluntary Fiduciary Correction Program.

(q)     Except as set forth on Schedule Section 4.18(q) of the Disclosure Schedules, there has been no amendment to, written interpretation of or announcement (whether or not written) by the Company or any of the Company relating to, or change in employee participation or coverage under, any Employee Benefit Plan, or other fact or circumstance that would increase materially the expense of maintaining such Employee Benefit Plan above the level of the expense incurred in respect thereof for the fiscal year ended prior to the date hereof.

CONFIDENTIAL                                                                    FBG_CH1_00094880

(r)     None of the Employee Benefit Plans are subject to any Laws of a jurisdiction outside the United States and the Company does not have any plan or commitment to establish any new Employee Benefit Plan or to modify any Employee Benefit Plan other than as contemplated by this Agreement.

(s)     Each Employee Benefit Plan may be terminated without Liability to the Company other than ordinary administrative expenses typically associated with such a termination.

(t)     Any notices required by ERISA or the Code or any other applicable Law with respect to the Employee Benefit Plans, including but not limited to any notices required by Section 204(h), Section 606 or Section 4043 of ERISA or Section 4980B of the Code, have been timely provided in the manner required under applicable Law.

(u)     Without limiting the foregoing, the ESOP constitutes an "employee stock ownership plan" within the meaning of Section 4975(e)(7) of the Code and Section 407(d)(6) of ERISA. Nothing has occurred that could adversely affect the status of the ESOP as a qualified plan or employee stock ownership plan. The ESOP has never failed to satisfy any requirement of Section 409(p) of the Code. The Securities in the Trust constitute "employer securities" within the meaning of Section 409(l) of the Code and "qualifying employer securities" within the meaning of Section 4975(e)(8) of the Code and section 407(d)(5) of ERISA. Each acquisition of the Securities by Trust and any other qualifying employer securities by the ESOP from any "party in interest" within the meaning of Section 3(14) of ERISA qualified as exempt prohibited transaction under Section 408(e) of ERISA and complied with all fiduciary standards of Part 4 of Title I of ERISA. All redemptions of qualifying employer securities by the Company were purchased at not less than fair market value. Each loan obtained by the ESOP to purchase qualifying employer securities at all times qualified as an exempt loan under Section 4975(d)(3) of the Code and Section 408(b)(3) of ERISA and the regulations thereunder. The Fairness Opinion and Advisor satisfy all of the requirements of Section 401(a)(28) of the Code and Proposed DOL Regulation 2510-3(18). All of the information provided by, or on behalf of, the Company either to the Trustee or the Advisor in connection with the consummation of the transactions hereby was true and accurate in all material respects and there was not any failure by, or on behalf of, the Company to disclose any material information to the Trustee or the Advisor. No aspect of the transactions contemplated by this Agreement, individually or in the aggregate, (i) constitutes a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or (ii) breaches any of the fiduciary responsibility standards imposed by Section 404 of ERISA. The Company has complied with all ESOP participant voting rights in accordance with Section 409(e) of the Code and other applicable Laws.

Section 4.19     **Employees; Labor Relations**.

(a)     Schedule Section 4.19(a) of the Disclosure Schedules lists each of the Company's employees as of December 15, 2023 (except that vacation/sick pay for such employees shall be determined as of December 22, 2023), setting forth the (i) the name, identification number, job title and current annual salary and other compensation payable by the Company to such Persons as of the date hereof, (ii) the profit sharing, bonus or other form of additional compensation paid or payable by the Company to or for the benefit of each such Person for the current fiscal year and any amounts owed in future fiscal years, (iii) any and all loans outstanding from the Company to any such Person, (iv) leave status (including type of leave), and expected date of return for non-disability related leaves and expiration dates for disability-related leaves, (v) whether such individual is exempt or non-exempt from overtime requirements, (vi) date of hire, (vii) base compensation rate, and commission, bonus or other incentive-based compensation (and the target bonus or other incentive-based compensation if a target exists and the range of such bonus or other incentive-based compensation) and whether such Person is retained on a salaried basis or on an hourly, piecework or other non-salaried basis, and if so, the particulars of such non-salaried basis, (viii) principal place of work, (ix) annual vacation entitlement, amount of accrued and unused vacation (as of the Closing

35

FBG_CH1_00094881

Date in the ordinary course of business consistent with past practice (and the dollar value of such vacation), (x) the amount of sick leave credited to such Person as of the date hereof in the ordinary course of business consistent with past practice (and the dollar value of such sick leave).

(b)    Except as set forth on Schedule 4.19(b) of the Disclosure Schedules, since the Audit Date, no current employee of the Company has given notice of his or her intent to terminate such employment and no notice of termination has been given to any employee by the Company. Each current employee of the Company is an "at-will" employee who can be terminated at any time for any reason without any monetary or obligations on the part of the Company.  No current employee of the Company is subject to any disciplinary action or on a performance improvement plan or similar action.  There will not been any "employment losses" or "layoffs" (as defined in the WARN Act) or similar event during the 90 days prior to the Closing Date that, when aggregated with enough similar other events, could result in any obligation on behalf of any of any of the Company under the WARN Act.

(c)    Except as set forth on Schedule 4.19(c) of the Disclosure Schedules, the Company is not a party to or obligated with respect to any Collective Bargaining Agreement or any employee benefits provided for by any such agreement.  No strike or union organizational activity or other similar occurrence (whether or not resolved) has occurred at any time during the past five years or is pending or threatened against the Company.  The Company is not subject to any charge, demand, petition or representation proceeding seeking to compel, require or demand any of them to bargain with any labor union or labor organization. To the Knowledge of the Company, no labor union has requested or is seeking to represent any Service Provider.  There is no pending or, to the Knowledge of the Company, threatened labor dispute, strike or lockout involving any of the Company. Except as set forth on Schedule 4.19(c) of the Disclosure Schedules, there is no pending, or to the Knowledge of the Company, threatened unfair labor practice charge against any of the Company before the National Labor Relations Board and, to the Knowledge of the Company, no basis for any such charge exists.  The Company is not or has not been a party to or otherwise bound by any Order relating to employees or employment practices, and there are no Governmental Authority conciliation agreements, noncompliance findings or audits pending or in effect with respect to employees or employment practices of the Company.

(d)    Each current and former employee of the Company that has been classified as exempt from overtime requirements was in fact exempt from overtime requirements at all times so classified, in all material respects.  Each current and former Service Provider who has not been classified as an employee of the Company was in fact not an employee of the Company at all times so classified, except as would not be material.  The Company has no material financial obligation to any former Service Provider.  The Company is not subject to any contractual obligation to rehire any former Service Provider or to refrain from disparaging any current or former Service Provider.  Except as set forth on Schedule 4.19(d) of the Disclosure Schedules, the Company has complied, in all material respects, with all Laws relating to their current and former non-employee Service Providers.  Except as set forth on Schedule 4.19(d) of the Disclosure Schedules, the Company has complied, in all material respects, with all Laws relating to their employees including all applicable Laws respecting employment and employment practices, terms and conditions of employment, and wages and hours, including (i) Title VII of the Civil Rights Act of 1964, as amended, (ii) the Equal Pay Act of 1967, as amended, (iii) the Age Discrimination in Employment Act of 1967, as amended, (iv) the Americans with Disabilities Act, as amended, (v) the Fair Labor Standards Act, as amended, and (vi) Laws relating to employment and employment practices, terms and conditions of employment, wages, hours, collective bargaining and the payment and withholding of Taxes or other sums as required by the appropriate Governmental Authority and has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from current and former employees, and there are no material arrearages or delinquencies in the payment of wages, salaries, commissions, bonuses or other direct compensation, in each such case, and the related rules and regulations adopted by those federal agencies responsible for the administration of such Laws.

CONFIDENTIAL                                                      FBG_CH1_00094882

(e)     Except as set forth on Schedule 4.19(e) of the Disclosure Schedules, there is no material Liability of, or pending or, to the Knowledge of the Company, threatened claims against, or investigations involving, any of the Company (including workers' compensation claims and claims or suits for contribution to, or indemnification of, third parties, occupational health and safety, environmental, consumer protection or equal employment matters) for injury, sickness, disease, discrimination, death or termination of employment services of any current or former Service Providers or other employment matter.

(f)     Except for the agreements and Contracts listed on Schedule Section 4.19(f) of the Disclosure Schedules (true, correct and complete copies of which agreements and contracts have been previously delivered to the Buyer or, in the case of oral agreements, descriptions of which are set forth on Schedule Section 4.19(f) of the Disclosure Schedules), there are no other current Contracts, agreements or arrangements between the Company and any current Service Provider.  The Company has no obligation to increase the compensation or benefits presently being paid or provided or hereafter payable or to be provided to current or former Service Providers.  There is not due or owing to any current or former Service Provider any sick pay, severance pay, compensable time or pay, including, but not limited to, salary, commission and bonuses, personal time or pay or vacation time or vacation pay attributable to service rendered on or prior to the date hereof, other than as set forth on Schedule Section 4.19(f) of the Disclosure Schedules.

(g)     The Company has provided to the Buyer true, correct and complete copies of all employee manuals and handbooks, disclosure materials, policy statements and other materials of the Company within the last five years relating to the employment of  employees, as well as all affirmative action plans and material correspondence with any Governmental Authority during the last five years relating to affirmative action plans or other employment-related matters (e.g., OFCCP compliance evaluations, closure letters and conciliation agreements).

(h)     Except as set forth on Schedule 4.19(h) of the Disclosure Schedules, the Company do not utilize the services of any professional employer organization (PEO), staffing agency, or loan-out agency or any entity that provides temporary or long-term staffing services.  Except as set forth on Schedule 4.19(h) of the Disclosure Schedules, each Person who provides employment-related services to the Company is employed by the Company.

(i)     To the Knowledge of the Company, none of the Service Providers of the Company are subject to any non-compete, non-solicitation, non-disclosure, confidentiality, employment, consulting or similar Contracts in conflict with the business and related activities of the Company.  The Company has not received during the past five years any notice alleging that any violation of any such Contracts has occurred.

**Section 4.20     Related Party Transactions**.  No Related Party (a) has any direct or indirect interest in any asset used in or otherwise relating to the Company or their businesses, (b) is indebted to the Company, (c) has entered into, or has had any direct or indirect financial interest in, any Contract, transaction or business dealing involving the Company, (d) is competing, directly or indirectly, with the Company, (e) is a member, manager, director, officer or employee of, or consultant to, or owns, directly or indirectly, any interest in, any vendor, supplier or customer of the Company, or is in any way associated with or involved in the business of the Company (except in his or her official capacity as a director, officer or employee of the Company, as the case may be), (f) has any interest in or has filed any application with respect to any Intellectual Property, which arises out of or relates to the Company, or (g) has any claim or right against the Company (other than rights to receive compensation for, or expense reimbursement in connection with, services performed as an employee or director).  The Company does not share any facilities or equipment with any Related Party, and the Company does not purchase or provide assets or services for any business conducted by any Related Party.  For the past five years there has not been, and there is not

37

FBG_CH1_00094883

currently, pending, or, to the Knowledge of the Company, threatened, any Proceeding against any current or former Related Party with respect to which the Company has an indemnification obligation.

Section 4.21 **Real Property**.

(a) Schedule Section 4.21(a) of the Disclosure Schedules sets forth a complete list, including an address and description, of all real property owned in fee by the Company (the "**Owned Real Property**"). With respect to Owned Real Property of the Company: (i) the Company has good and marketable indefeasible fee simple title, free and clear of all Liens except Permitted Liens; (ii) the Company has not leased, licensed or otherwise granted to any Person the right to use or occupy the Owned Real Property or any portion thereof; and (iii) there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property or any portion thereof or interest therein.

(b) Schedule Section 4.21(b) of the Disclosure Schedules sets forth a complete list, including an address of each leasehold or subleasehold estate or other right to use or occupy any interest in real property held by the Company (the "**Leased Real Property**" and, together with Owned Real Property, the "**Real Property**") and the Real Property Leases (including all amendments, guaranties and other agreements with respect thereto) relating to each such Leased Real Property. With respect to each Leased Real Property: (i) the Company's possession and quiet enjoyment under the applicable Real Property Lease has not been disturbed; (ii) except as set forth on Schedule 4.21(b) of the Disclosure Schedules, the Company has not subleased, licensed or otherwise granted any person the right to use or occupy any Leased Real Property or any portion thereof; and (iii) there are no special, general or other assessments pending against the Company or affecting any Leased Real Property that would be payable by the lessee thereof.

(c) The Real Property comprises all of the real property that is used in or otherwise related to the businesses of the Company. The Real Property is in good condition and repair (ordinary wear and tear excepted) and is sufficient for the operation of the businesses of the Company as currently conducted and intended to be conducted by the Company as of the date hereof. The Company has not received during the past five years any notice from any insurance company or board of fire underwriters of any defects or inadequacies that could adversely affect the insurability of any Real Property or requesting the performance of any material work or alteration with respect to any Real Property. There is no pending or threatened condemnation, expropriation or other governmental taking of any part or interest in any Owned Real Property or, to the Company's Knowledge, Leased Real Property. The current and intended use and occupancy of the Real Property and the operation of the Company' businesses as currently conducted and intended to be conducted thereon by the Company as of the date hereof do not violate any applicable zoning Law, easement, covenant, condition, restriction or similar provision in any instrument of record affecting the Owned Real Property, or to the Company's Knowledge, the Leased Real Property. No fact or condition exists that could result in the termination or impairment of presently available access from adjoining public or private streets or ways or in the discontinuation of presently available sewer, water, electric, gas, telephone or other utilities or services for any Owned Real Property, or to the Company's Knowledge, Leased Real Property.

Section 4.22 **Suppliers and Customers**.

(a) Schedule Section 4.22(a) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 20 largest suppliers to the Company, taken as a whole, (excluding utilities) by the aggregate dollar value of purchases by the Company, taken as a whole, during the twelve month period ended October 31, 2023 (each a "**Top Supplier**") and (ii) with respect to each Top Supplier such aggregate dollar value of purchases. Since the Audit Date, Top Supplier has terminated or materially adversely modified the amount, frequency or terms of the business such Top Supplier conducts with the Company. Since October 31, 2023, the Company has not received any notice, nor does the Company have any Knowledge, that any Top Supplier intends to terminate or adversely modify the amount, frequency or terms

CONFIDENTIAL

FBG_CH1_00094884

of the business such Top Supplier conducts with the Company. The Company does not have any outstanding material dispute with a Top Supplier, and the Company has no Knowledge of any material dissatisfaction on the part of any Top Supplier.

(b)     Schedule Section 4.22(b) of the Disclosure Schedules contains a true, complete and accurate list of (i) the 20 largest customers (consolidating into a single customer all affiliated customers) of the Company, taken as a whole, by the aggregate dollar value of sales by the Company, taken as a whole, during the twelve month period ended October 31, 2023 (each a "**Top Customer**") and (ii) with respect to each Top Customer, the aggregate dollar value of such sales. Since the Audit Date, no Top Customer has terminated or materially adversely modified the amount, frequency or terms of the business such Top Customer conducts with the Company. Since October 31, 2023, the Company has not received any notice, nor does the Company have any Knowledge, that any such Top Customer intends to terminate or adversely modify the amount, frequency or terms of the business such Top Customer conducts with the Company. The Company does not have any outstanding material dispute with a Top Customer, and the Company has no Knowledge of any material dissatisfaction on the part of any Top Customer.

Section 4.23     **Insurance Policies**. Schedule Section 4.23 of the Disclosure Schedules contains a true, complete and accurate list of all insurance policies to which the Company is a party or which provide coverage to or for the benefit of or with respect to the Company or any Service Provider in his or her capacity as such (the "**Insurance Policies**"), indicating in each case the type of coverage, name of the insured, the insurer, the expiration date of each policy and the amount of coverage. True, complete and accurate copies of all such Insurance Policies have been provided or made available to the Buyer. Each Insurance Policy is in full force and effect and shall remain in full force and effect in accordance with its terms until the Closing, to the Knowledge of the Company is provided by a financially solvent carrier and has not been subject to any lapse in coverage. The Company is current in all premiums or other payments due under the Insurance Policies and have otherwise complied in all material respects with all of their obligations under each Insurance Policy. The Company has given timely notice to the insurer of all material claims that may be insured thereby under any Insurance Policy. During the past three years, the Company has not been refused any insurance by, nor has coverage been limited by, any insurance carrier with which the Company has carried insurance or any other insurance carrier to which the Company has applied for insurance, and no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy. No Insurance Policy provides for any retrospective premium adjustment or other experience based liability on the part of the Company.

Section 4.24     **Bank Accounts**. Schedule Section 4.24 of the Disclosure Schedules is a true, complete and accurate list of each bank or financial institution in which the Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto.

Section 4.25     **Trade Names; Business Locations**. Schedule Section 4.25 of the Disclosure Schedules sets forth all fictitious or trade names that the Company has been known as or used and all offices or places of business the Company has used, in each case, in the past five years. The Company is not the surviving corporation of a merger or consolidation.

Section 4.26     **Products**. All products manufactured, sold or delivered by the Company have been in conformity with all applicable warranties in all material respects, and to the Knowledge of the Company, the Company does not have any Liability for replacement thereof or other damages in connection therewith in excess of any warranty reserve established with respect thereto on the Balance Sheet as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company. No products manufactured, sold or delivered by the Company are subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale with respect

39

FBG_CH1_00094885

**DEBTORS' EXHIBIT NO. 244**
**Page 44 of 64**

thereto which, in each case, have been made available to the Buyer.  The Company has not received during the past five years any notice of any claims for, and to the Company's Knowledge there is no reasonable basis for, any extraordinary product recalls, returns, warranty obligations or service calls relating to any of its products or services.  The Company has not had or to the Knowledge of the Company, does not have any Liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any products manufactured, sold or delivered by the Company or with respect to any services rendered by the Company.

**Section 4.27** **Anti-Money Laundering**.  Except as set forth on <u>Schedule 4.27</u> of the Disclosure Schedules, the Company has in place, adheres to and maintains (and for the past five years, has had in place, adhered to and maintained) policies and procedures designed to ensure at all times compliance in all material respects with all anti-money laundering Laws and guidelines applicable to the Company, and no Proceeding by or before any Governmental Authority against or affecting the Company, any assets or properties of the Company with respect to any such Laws or guidelines is pending or, to the Knowledge of the Company, threatened.

**Section 4.28** **Anticorruption; Improper Payments**.   Neither the Company, nor to the Knowledge of the Company, any officer, director, agent, manager, employee, or, to the Knowledge of the Company, any other Person authorized to act on behalf of any of the Company, has, directly or indirectly, taken any act in furtherance of an offer, payment, promise to pay, authorization, or ratification of payment, directly or indirectly, of any money or anything of value (including any gift, sample, rebate, travel, meal and lodging expense, entertainment, service, equipment, debt forgiveness, donation, grant or other thing of value, however characterized) to any Government Official or any Person to secure any improper advantage or to obtain or retain business that would cause the Company or the Seller to be in violation of Improper Payment Laws.  The Company complies, and has at all times complied, with all Improper Payment Laws.  Without limiting the generality of the foregoing, (a) the Company has not violated or is in violation in any material respect of the U.S. Anti-Kickback Statute (42 U.S.C. Section 1302a-7(b)), the Federal False Claims Act (31 U.S.C. Sections 3729, et seq.) or any related or similar Law and (b) there has been no use or authorization of money or anything of value relating to any unlawful payment or secret or unrecorded fund or any false or fictitious entries made in the books and records of the Company relating to the same.  Neither the Company, nor any of its Affiliates or Persons acting on its behalf have received any notice or communication from any Person that alleges, nor been involved in any internal investigation involving any allegations relating to potential violation of any Improper Payment Laws or other applicable Law, nor have received a request for information from any Governmental Authority regarding Improper Payment Laws.  Neither the Company, nor, to the Knowledge of the Company, any officer, director, manager, employee, attorney, accountant, consultant, financial advisor or other agent of the Company, has employed or retained, directly or indirectly, a Government Official or a family member of a Government Official.   To the Knowledge of the Company, no Government Official has, directly or indirectly, the right of control over, or any beneficial interest in the Company.

**Section 4.29** **International Trade Laws**.  The Company has, at all times as to which the applicable statute of limitations has not yet expired, conducted their transactions in all material respects in accordance with all applicable International Trade Laws.  Without limiting the foregoing:

(a) the Company has obtained, and are in compliance with, all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Authority required for (i) the export and re-export of products, services, Software and technologies and (ii) releases of technologies and Software to foreign nationals located in the United States and abroad ("**Export Approvals**");

(b) there are no pending or, to the Knowledge of the Company, threatened claims against the Company with respect to such Export Approvals;

40

FBG_CH1_00094886

**DEBTORS' EXHIBIT NO. 244**
**Page 45 of 64**

(c)     to the Knowledge of the Company, there are no actions, conditions or circumstances pertaining to the Company' import or export transactions that may give rise to any future claims;

(d)     to the Knowledge of the Company, no Export Approvals with respect to the transactions contemplated hereby are required;

(e)     to the Knowledge of the Company, none of the Company, its Affiliates, its respective directors or officers, nor, to the Knowledge of the Company, any employees or agents of the foregoing, is a Sanctions Target;

(f)     since January 1, 2019, the Company has not received within the past five years written notice to the effect that a Governmental Authority claimed or alleged that the Company was not in compliance with International Trade Laws; and

(g)     neither the Company nor any of its Affiliates has made any voluntary disclosures to, or has been subject to any fines, penalties or sanctions from, any Governmental Authority regarding any past violations of International Trade Laws.

**Section 4.30     No Brokers or Finders**.  Except with respect to Forvis Capital Advisors, whose fees and expenses shall constitute a Seller Transaction Expense, none of the Seller, the Company or any of their respective Affiliates has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**Section 4.31     Disclosure**.  None of the representations and warranties contained in this Article 3.8, the information contained in the Exhibits and Disclosure Schedules attached hereto and the written statements, documents, certificates or other items prepared and supplied to the Buyer or its Affiliates by or on behalf of the Company or the Seller in connection with the transaction contemplated hereby, contain any untrue statement of a material fact or omit a material fact necessary to make each statement contained herein or therein, in light of the circumstances in which they were made, not misleading.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents and warrants to the Seller as of the date hereof and as of the Closing as follows:

**Section 5.1     Organization; Authorization**.

(a)     The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted. The Buyer has full right, power, capacity and authority to execute and deliver this Agreement and each of the Ancillary Agreements to be executed and delivered thereby, to consummate the transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and thereof.  The execution, delivery and performance by the Buyer of this Agreement and each of the Ancillary Agreements to which the Buyer is a party have been duly and properly authorized by all requisite action in accordance with applicable Law and with the organizational documents of the Buyer.  This Agreement and each of the Ancillary Agreements to which the Buyer is a party have been duly executed and delivered by the Buyer and constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer

41

CONFIDENTIAL

FBG_CH1_00094887

in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 5.2    **No Violation**.  The execution, delivery and performance by the Buyer of this Agreement and the Ancillary Agreements to which it is a party and the consummation by the Buyer of the transactions contemplated hereby and thereby will not:

(a)    violate, contravene or conflict with any Law; or

(b)    violate, contravene or conflict with any provision of the charter documents, bylaws, operating agreement or similar organizational documents of the Buyer.

Section 5.3    **Consents and Approvals**.  No consent, approval, Order or authorization of, or registration, declaration or filing with, or notice to, any Governmental Authority or other Person is required to be made or obtained by the Buyer in connection with the authorization, execution, delivery and performance by the Buyer of this Agreement and the Ancillary Agreements to which the Buyer is a party, or the consummation by the Buyer of the transactions contemplated hereby and thereby.

Section 5.4    **Litigation**.  There are no Proceedings pending, or to the knowledge of the Buyer, threatened against the Buyer, or any assets, properties or rights of the Buyer, that questions or challenges the validity of this Agreement or the Ancillary Agreements, nor any action taken or to be taken by the Buyer pursuant hereto or thereto or in connection with the transactions contemplated hereby or thereby, and the Buyer does not know of any such Proceeding that may be asserted.

Section 5.5    **Investment Intent**.  The Buyer is acquiring the Securities for its own account for investment purposes only and not with a view to distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended.

Section 5.6    **No Brokers or Finders**.  None of the Buyer or any Affiliate thereof has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement or any Ancillary Agreement.

**ARTICLE VI**
**[RESERVED]**

**ARTICLE VII**
**OTHER COVENANTS AND AGREEMENTS**

Section 7.1    **Restrictive Covenants**.

(a)    Confidentiality.  For a period of five years following the Closing Date, the Seller shall not, and the Seller shall cause its Affiliates not to, use or disclose or convey to any third party, any Confidential Information; provided, however, that the Seller or its Affiliates may furnish such portion (and only such portion) of the Confidential Information as the Seller or such Affiliate reasonably determines it is legally obligated to disclose if: (A) (i) it receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority; (ii) to the extent not inconsistent with such request or applicable Law, it notifies the Buyer of the existence, terms and circumstances surrounding such request and consults with the Buyer on the advisability of taking steps available under applicable Law to resist or narrow such request; and (iii) at the sole expense of Buyer, it exercises its reasonable best efforts to obtain an Order or other reliable assurance

42

FBG_CH1_00094888

that confidential treatment will be accorded to the disclosed Confidential Information; or (B) disclosure of such Confidential Information is required to prevent the Seller or such Affiliate from being held in contempt or becoming subject to any other penalty under applicable Law or is required by applicable Law.

(b)     Acknowledgements; Remedies.  The Seller acknowledges and agrees that (i) the covenants and agreements set forth in this Section 7.1 were a material inducement to the Buyer to enter into this Agreement and to perform its obligations hereunder, (ii) the Buyer and its stakeholders would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Parties if the Seller or any of its Affiliates breached any provisions of this Section 7.1, (iii) any breach of any provisions of this Section 7.1 by the Seller or its Affiliates could result in a significant loss of goodwill by the Buyer and the Company, (iv) the Purchase Price is sufficient consideration to make the covenants and agreements set forth herein enforceable, (v) if the Seller is an individual, the covenants set forth in this Section 7.1 will not interfere with their ability to earn a living, (vi) the length of time, scope and geographic coverage of the covenants set forth in this Section 7.1 is reasonable given the benefits the Seller will directly or indirectly receive hereunder, (vii) the Seller is familiar with all the restrictive covenants contained in this Section 7.1 and is fully aware of its obligations hereunder, and (viii) the Seller will not challenge the reasonableness of the time, scope, geographic coverage or other provisions of this Section 7.1 in any Proceeding, regardless of who initiates such Proceeding.  The Seller further acknowledges and agrees that irreparable injury may result to the Buyer if the Seller or any of its Affiliates breaches any of the terms of this Section 7.1, and that in the event of an actual or threatened breach by the Seller or any of its Affiliates of any of the provisions contained in this Section 7.1, the Buyer might have no adequate remedy at Law.  The Seller accordingly agrees that in the event of any actual or threatened breach by the Seller or any of its Affiliates of any of the provisions contained in this Section 7.1, the Buyer shall be entitled to seek injunctive and other equitable relief without (A) posting any bond or other security, (B) proving actual damages and (C) showing that monetary damages are an inadequate remedy.  Nothing contained herein shall be construed as prohibiting the Buyer from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove.  The Seller shall cause its Affiliates to comply with this Section 7.1, and shall be liable for any breach by any of its Affiliates of this Section 7.1.  In the event of a breach or violation by the Seller or any of its Affiliates of this Section 7.1, the Restricted Period with respect to the Seller shall be extended by a period of time equal to the period of time during which such Person violates the terms of this Section 7.1.

**Section 7.2     Agreements Regarding Tax Matters.**

(a)     Preparation and Filing of Tax Returns.

(i)     The Company shall timely prepare or cause to be prepared and file or cause to be filed, at the Company's expense, all Income Tax Returns of the Company for any Pre-Closing Tax Period (other than any Straddle Period) which are first due (taking into account any applicable extensions) after the Closing Date (each, a "**Seller Return**").  All Seller Returns shall be prepared in accordance with applicable Law and the Company's past practice (provided that such past practice is consistent with applicable Law).  The Company shall provide each Seller Return to the Buyer and Seller for review and comment no later than 30 days before the due date of such Seller Return; provided, however, that if the Company fails to provide any Seller Return to the Buyer and Seller as set forth in this Section 7.2(a)(i), the Buyer shall prepare and file such Tax Return.  If the Seller and the Buyer are unable to resolve any dispute regarding any Seller Return within 15 days after the Company submits such Tax Return to the Buyer and Seller, the dispute shall be resolved by the Accountant in the same manner as disputes are intended to be resolved pursuant to Section 2.8(c).  The Seller shall pay to the Buyer an amount equal to all Seller Taxes shown as due on any Seller Return at least 10 days before the date on which the Buyer or any of the Company would be required to pay such Taxes; provided, however, the sole source of such payments shall be the Indemnity Escrow Funds, and any obligations to make such payments shall expire on the nine month anniversary of the Closing Date.

43

CONFIDENTIAL                                                                                   FBG_CH1_00094889

**DEBTORS' EXHIBIT NO. 244**
**Page 48 of 64**

(ii)     The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of the Company required to be filed after the Closing Date (taking into account any applicable extensions) with respect to any Pre-Closing Tax Period which are not Seller Returns (each, a "**Buyer Return**"). The Buyer shall permit the Seller to review and comment on each Buyer Return that is an Income Tax Return prior to filing. The Seller shall pay to the Buyer an amount equal to all Seller Taxes due with any Buyer Return at least 10 days before the date on which the Buyer or any of the Company would be required to pay such Taxes; provided, however, the sole source of such payments shall be the Indemnity Escrow Funds, and any obligations to make such payments shall expire on the nine month anniversary of the Closing Date. If the Seller and the Buyer are unable to resolve any dispute regarding any Buyer Return within 15 days after the Buyer submits such Tax Return to the Seller, the dispute shall be resolved by the Accountant in the same manner as disputes are intended to be resolved pursuant to Section 2.8(c). The Seller shall pay to the Buyer an amount equal to all Seller Taxes shown as due on any Buyer Return at least 10 days before the date on which the Buyer or any of the Company would be required to pay such Taxes; provided, however, the sole source of such payments shall be the Indemnity Escrow Funds, and any obligations to make such payments shall expire on the nine month anniversary of the Closing Date.

(b)     Allocation of Tax Liability. For all purposes under this Agreement (including the determination of Seller Taxes), in the case of any Tax for a Straddle Period, the portion of such Tax attributable to the Pre-Closing Tax Period shall (i) in the case of any real property, personal property, ad valorem or other similar Tax imposed on a periodic basis, be deemed to be the amount of such Tax for the entire Straddle Period *multiplied by* a fraction the numerator of which is the number of days in the portion of the Straddle Period ending on the end of the Closing Date and the denominator of which is the number of days in the entire Straddle Period and such Taxes shall be prorated as of Closing, and (ii) in the case of any Tax based upon or related to sales, payroll, or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended on the end of the Closing Date; provided, however, the sole source of such payments shall be the Indemnity Escrow Funds, and any obligations to make such payments shall expire on the nine month anniversary of the Closing Date.

(c)     Cooperation on Tax Matters. The Buyer, the Company and the Seller shall cooperate fully, as and to the extent reasonably requested by the other party (and at the requesting party's expense), in connection with the filing of Tax Returns of the Company and any audit, litigation or other Proceeding with respect to Taxes of the Company; provided, however, the Seller shall bear no expense related to any audit. Such cooperation shall include the retention and (upon the other party's request and at its expense) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(d)     Tax Sharing Agreements. The Seller shall cause all Tax sharing, Tax indemnification, or Tax distribution agreements to which the Company, on the one hand, and the Seller or any of its Affiliates (other than the Company) on the other hand, are parties (excluding this Agreement) to be terminated as of 12:01 a.m. local time on the Closing Date and the Company to not be bound thereby or have any Liability thereunder with respect to any taxable period.

(e)     Transfer Taxes, Etc. All transfer, documentary, sales, use, registration, stamp and other similar Taxes and fees (including any penalties and interest thereon), but excluding for the avoidance of doubt any Income Taxes, incurred in connection with the transactions contemplated by this Agreement (together, "**Transfer Taxes**") shall be paid by the Buyer when due, and the Buyer shall file all necessary Tax Returns and other documentation with respect to such Transfer Taxes. If required by applicable Law, the Buyer shall, and shall cause the Company and its Affiliates (if applicable) to, join in the execution of any such Tax Returns and other documentation.

44

FBG_CH1_00094890

**DEBTORS' EXHIBIT NO. 244**
**Page 49 of 64**

(f)     Tax Controversies.  The Buyer shall give prompt notice to the Seller of the assertion of any claim or commencement of any Proceeding by a Governmental Authority with respect to any Tax liability of any of the Company for which the Seller is responsible under this Agreement (each, a "**Tax Claim**"); provided, however, that the failure to give such prompt notice shall not affect the Seller's indemnification obligations under this Agreement except to the extent the Seller is materially prejudiced thereby.  The Seller shall be liable for any Losses resulting from any Tax Claim, whether or not such Tax Claim results in any adjustment to the Company' liability for Taxes; provided, however, the sole source of such payments shall be in the Indemnity Escrow Funds, and any obligations to make such payments shall expire on the nine month anniversary of the Closing Date.

(g)     Section 338(h)(10) Election; IRS Form 8023.  The Buyer, the Company and the Seller agree to make an election under Section 338(h)(10) of the Code and Section 1.338(h)(10)-1 of the Treasury Regulations on IRS Form 8023 and any comparable elections available under state or local Tax Law in respect of the purchase of the Securities (the "**Election Forms**") and the Company and the Seller shall deliver to the Buyer the Election Forms at Closing.  Buyer shall file all Election Forms and shall provide proof of filing to Seller.

(h)     Purchase Price Allocation; IRS Form 8883.  No later than 90 days after the Closing Statement is finally determined pursuant to Section 2.8, the Buyer shall prepare and deliver to the Seller a statement setting forth the allocation of the Purchase Price relating to the Securities, plus any related assumed liabilities and other amounts as required by applicable Tax law, among the assets of the Company, which allocation shall be made in accordance with Sections 338 and 1060 of the Code and the applicable Treasury Regulations (the "**Purchase Price Allocation Statement**").  The Buyer, the Company and the Seller and their respective Affiliates shall report, act and file all Tax Returns (including Internal Revenue Service Form 8883), if any, in all respects and for all purposes consistent with the Purchase Price Allocation Statement as finally determined, as well as any amendments to such Tax Returns required with respect to any adjustment to the Purchase Price.  None of the Buyer, the Company and the Seller or any of their respective Affiliates shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the information set forth on the Purchase Price Allocation Statement, unless required to do so by applicable Law; provided, however, that (i) Buyer's cost for the assets that it is deemed to acquire may differ from the total amount allocated hereunder to reflect the inclusion in the total cost of items (for example, capitalized acquisition costs) not included in the total amount so allocated, and (ii) the amount realized by the Seller may differ from the total amount allocated hereunder to reflect transaction costs that reduce the amount realized for federal Income Tax purposes.  In the event that an adjustment to the Purchase Price shall require the preparation of revised Purchase Price Allocation Statement, such revised Purchase Price Allocation Statement shall be prepared and finalized in a manner consistent with this Section 7.2(h).

(i)     Intended Income Tax Treatment.  The Buyer, the Company and the Seller agree that the purchase and sale of the Securities pursuant to this Agreement will be treated for federal and applicable state and local Income Tax purposes as the purchase and sale of undivided interests in the underlying assets of the Company and assumption for Tax purposes of allocable liabilities of the Company attributable to the Securities in a taxable transaction governed by Section 1001 of the Code.

**Section 7.3     Employee Matters**.  Nothing in this Agreement will (a) create a Contract between the Buyer or, after the Effective Time, the Company, on the one hand, and any Service Provider, on the other hand, (b) be construed as a guarantee of continued employment or engagement of any Service Provider, (c) be construed so as to prohibit the Buyer or the Company from having the right to terminate the employment or engagement of any Service Provider, (d) require or be construed to require the Buyer, any Affiliate of the Buyer or the Company to provide any employee benefit plan or non-cash compensation (including retirement benefits, health or welfare benefits, equity-based compensation, or severance) to any Person, (e) prevent the Buyer or the Company from amending or terminating any Employee Benefit Plan in accordance with its terms, or (f) be construed as an amendment to any Employee Benefit Plan.

45

FBG_CH1_00094891

Notwithstanding anything in this Agreement to the contrary, (i) no Service Provider may rely on this Agreement as the basis for any breach of contract claim against the Buyer or the Company and (ii) the Buyer and its Affiliates will have the sole discretion and authority to interpret their respective employee benefit and compensation plans, Contracts, arrangements and programs in accordance with their terms and applicable Law.

Section 7.4    **Further Assurances**.  Each of the Parties agrees that subsequent to the Closing, upon the reasonable request of any other Party from time to time, it shall execute and deliver, or cause to be executed and delivered, such further instruments and take such other actions as may be necessary or desirable to carry out the transactions contemplated by this Agreement and the Ancillary Agreements (including cooperating with the other Parties to obtain any consent, approval or authorization necessary or desirable to preserve for the Company any rights or benefits under any lease, license, commitment or other Contract to which the Company is a party that was not obtained prior to the Closing) or to vest, perfect or confirm ownership by the Buyer of the Securities.

Section 7.5    **Intercompany Arrangements**.    Except as set forth on Schedule 7.5 of the Disclosure Schedules, all intercompany and intracompany accounts or Contracts between any of the Company, on the one hand, and the Seller and its Affiliates (other than the Company), on the other hand, shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, immediately prior to the Closing.  For the avoidance of doubt, this Section 7.5 shall not require the cancellation of any liabilities owed by Buyer to the Company existing prior to the Closing.

Section 7.6    **Public Announcements**.

(a)    No Party shall issue or cause the publication of any press release or other public announcement relating to this Agreement, any Ancillary Agreement or the transactions contemplated hereby or thereby (whether before or after the Closing) without the prior written consent of the Buyer and the Representative except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise the Buyer and the Representative before making such disclosure).

(b)    No Party shall make publicly available this Agreement or any Ancillary Agreement (or any portion of this Agreement or any Ancillary Agreement) (whether before or after the Closing) without the prior written consent of the Buyer and the Representative, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable efforts to advise the Buyer and the Representative before making such disclosure and, upon the request of the Buyer or the Representative, the Parties will work together in good faith to agree and pursue appropriate confidential treatment requests with respect to this Agreement or such Ancillary Agreements).  This Section 7.6(b) shall not apply to disclosures by a Party to its officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents for the purpose of obtaining advice in connection with the transactions contemplated hereunder, it being understood that such officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents will be informed of the confidential nature of this Agreement, the Ancillary Agreements and the  transactions contemplated hereby and thereby and will be directed to treat such information as confidential in accordance with the terms of this Agreement.

Section 7.7    **ESOP Matters**.    Termination of ESOP.    The ESOP will be terminated immediately following the Closing pursuant to the ESOP Amendment.

46

FBG_CH1_00094892

**ARTICLE VIII**
**[RESERVED]**

**ARTICLE IX**
**[RESERVED]**

**ARTICLE X**

**Section 10.1**     <u>Survival</u>.

(a)     The representations, warranties, covenants and agreements contained herein shall survive the Closing for a period of nine (9) months after the Closing Date. The indemnification obligations under <u>Section 10.2</u> and <u>Section 10.3</u> with respect to breaches of representations, warranties, covenants, or agreements contained in this Agreement, the Ancillary Agreements or any schedule, certificate or other document pursuant hereto or thereto shall survive the Closing and continue until the date that is nine months after the Closing Date.

(b)     Notwithstanding anything to the contrary contained herein, if written notice of any claim for indemnification hereunder has been delivered in accordance herewith prior to the expiration of the applicable period set forth above, the indemnification obligations shall continue with respect to such claim until the final resolution and satisfaction of such claim in accordance with the provisions of this <u>Article X</u>, and the Indemnifying Party shall indemnify the Indemnified Party for all Losses incurred in respect of such claim (subject to the Basket, Cap and any other limitations herein), regardless of when such Losses are incurred.

**Section 10.2**     <u>Indemnification by the Seller</u>.

(a)     From and after the Closing, and subject to the terms of this Agreement, the Seller agrees to indemnify, defend and hold harmless the Buyer Indemnified Parties from and against, and pay or reimburse the Buyer Indemnified Parties for, any and all Losses relating to, imposed upon, suffered or incurred by any Buyer Indemnified Party by reason of, resulting from or arising out of:

(i)     any inaccuracy in or breach of any of the representations or warranties of the Company contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto;

(ii)     any breach by the Company of any of its covenants or agreements contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto;

(iii)     the amount of any Closing Date Indebtedness that was not taken into account in calculating the Closing Payment made pursuant to <u>Section 2.7(a)</u> or the Purchase Price Adjustment, if any, made pursuant to <u>Section 2.8</u>;

(iv)     the amount of any Seller Transaction Expenses charged to the Company, the Buyer or any of their Affiliates that was not taken into account in calculating the Closing Payment made pursuant to <u>Section 2.7(a)</u> or the Purchase Price Adjustment, if any, made pursuant to <u>Section 2.8</u>;

(v)     any Seller Taxes; and

(vi)     any of the matters set forth on the <u>Specific Indemnity Schedule</u>.

47

CONFIDENTIAL

(b)      From and after the Closing, and subject to the terms of this Agreement, the Seller, severally and not jointly, agrees to indemnify, defend and hold harmless the Buyer Indemnified Parties from and against, and pay or reimburse the Buyer Indemnified Parties for, any and all Losses relating to, imposed upon, suffered or incurred by any Buyer Indemnified Party by reason of, resulting from or arising out of:

(i)      any inaccuracy in or breach of any of the representations or warranties of the Seller contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto; and

(ii)      a breach by the Seller of any of its covenants or agreements contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto.

**Section 10.3      Indemnification by the Buyer**.  From and after the Closing, and subject to the terms of this Agreement, the Buyer agrees to indemnify, defend and hold harmless the Seller Indemnified Parties from and against, and pay or reimburse the Seller Indemnified Parties for, any and all Losses relating to, imposed upon, suffered or incurred by any Seller Indemnified Party by reason of, resulting from or arising out of:

(a)      any inaccuracy in or breach of any of the representations and warranties of the Buyer contained in this Agreement, any Ancillary Agreement or any schedule, certificate or other document delivered pursuant hereto or thereto; and

(b)      a breach by the Buyer of any of its covenants or agreements contained in this Agreement, any Ancillary Agreements or any schedule, certificate or other document delivered pursuant hereto or thereto.

**Section 10.4      Indemnification Procedure**.

(a)      In the event that any Person entitled to indemnification under this Agreement (an "**Indemnified Party**") receives notice of the assertion of any claim or of the commencement of any Proceeding by any Person who is not a Party or an Affiliate of a Party (a "**Third Party Claim**") against such Indemnified Party, with respect to which a Party is or may be required to provide indemnification under this Agreement (an "**Indemnifying Party**"), the Indemnified Party shall give written notice regarding such Third Party Claim to the Indemnifying Party within 30 days after learning of such Third Party Claim, provided that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Article X except to the extent (and only to the extent) that the Indemnifying Party is materially prejudiced by reason of such failure, and will not relieve such Indemnifying Party from any other obligation that it may have to an Indemnified Party other than under this Article X.

(b)      The indemnification required hereunder in respect of a Third Party Claim shall be made by prompt payment by the Indemnifying Party of the amount of actual Losses in connection therewith, as and when bills are received by the Indemnifying Party or within 10 days following the Indemnifying Party's receipt of notice that Losses have been incurred; provided, however, any such payment and any expenses arising out of such payments shall be subject to the Basket and Cap and neither Seller nor its Affiliates shall have any obligation therefor after the Indemnity Escrow Funds are released or to the extent such payments exceed the amount of the remaining Indemnity Escrow Funds.

(c)      Notwithstanding the provisions of Section 11.10, each Indemnifying Party hereby consents to the nonexclusive jurisdiction of any court in which a Proceeding in respect of a Third Party Claim is brought against any Indemnified Party for purposes of any claim that an Indemnified Party may

48

**DEBTORS' EXHIBIT NO. 244**
**Page 53 of 64**

have under this Agreement with respect to such Proceeding or the matters alleged therein and agrees that process may be served on each Indemnifying Party with respect to such claim anywhere.

(d)     The Indemnifying Party shall not be entitled to require that any Proceeding be made or brought against any other Person before a Proceeding is brought or claim is made against it hereunder by the Indemnified Party.

(e)     In the event any Indemnified Party has a claim against any Indemnifying Party hereunder that does not involve a Third Party Claim being asserted against or sought to be collected from such Indemnified Party, the Indemnified Party shall deliver notice of such claim with reasonable promptness to the Indemnifying Party, provided that the failure to so notify an Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Article X except to the extent (and only to the extent) that the Indemnifying Party is materially prejudiced by reason of such failure, and will not relieve such Indemnifying Party from any other obligation that it may have to an Indemnified Party other than under this Article X.  If the Indemnifying Party does not notify the Indemnified Party within 10 days following its receipt of such notice that the Indemnifying Party disputes its Liability to the Indemnified Party hereunder, such claim specified by the Indemnified Party in such notice shall be conclusively deemed a Liability of the Indemnifying Party hereunder and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand subject to the Basket and Cap and neither Seller nor its affiliates shall have any obligation therefor after the Indemnity Escrow Funds are released or to the extent such payments exceed the amount of the remaining Indemnity Escrow Funds.

(f)     If the Indemnifying Party agrees that it has an indemnification obligation under this Article X but asserts that it is obligated to pay a lesser amount than that claimed by the Indemnified Party, the Indemnifying Party shall pay such lesser amount promptly to the Indemnified Party, without prejudice to or waiver of the Indemnified Party's claim for the difference; provided, however, any such payment and any expenses arising out of such payments shall be subject to the Basket and Cap and neither Seller nor its Affiliates shall have any obligation therefor after the Indemnity Escrow Funds are released or to the extent such payments exceed the amount of the remaining Indemnity Escrow Funds.

**Section 10.5     Certain Limitations**.

(a)     Basket for Losses of the Buyer Indemnified Parties.  The Seller shall not be liable under Section 10.2(a)(i) unless the aggregate Losses incurred by the Buyer Indemnified Parties with respect to all matters for which indemnification is to be provided under Section 10.2(a)(i) exceed $250,000 (the "**Basket Amount**").  If and when such Basket Amount is met, then the Seller will be liable under Section 10.2(a)(i) for all such Losses from the first dollar thereof.  In no event shall an Indemnifying Party have liability to the Indemnified Party for any consequential, special, incidental, punitive or exemplary damages, except to the extent any such damages would otherwise be recoverable under applicable Law in an action for breach of contract or any such damages that are recovered against an Indemnified Party in respect of a Third Party Claim.

(b)     Basket for Losses of the Seller Indemnified Parties.  The Buyer shall not be liable under Section 10.3(a) unless the aggregate Losses incurred by the Seller Indemnified Parties with respect to all matters for which indemnification is to be provided under Section 10.3(a) exceed the Basket Amount.  If and when such Basket Amount is met, then the Buyer shall be liable under Section 10.3(a) for all such Losses from the first dollar thereof.

(c)     Cap on Losses of the Buyer Indemnified Parties.  The aggregate amount required to be paid by the Seller under Section 10.2(a)(i) shall not exceed the amounts held in the Indemnity Escrow Funds (the "**Cap**").

49

CONFIDENTIAL

FBG_CH1_00094895

**DEBTORS' EXHIBIT NO. 244**
**Page 54 of 64**

(d)     Cap on Losses of the Seller Indemnified Parties. The aggregate amount required to be paid by Buyer under Section 10.3(a) shall not exceed the Cap.

**Section 10.6     Materiality Qualifiers**. Notwithstanding anything to the contrary contained herein, for purposes of determining the amount of Losses arising from such a breach for which the Buyer Indemnified Parties or the Seller Indemnified Parties are entitled to indemnification under this Agreement and (c) whether the Basket Amount has been exceeded, each such representation and warranty shall be read without giving effect to any qualification that is based on materiality, including the words "material," "Material Adverse Effect," "in any material respect" and other uses of the word "material" or words of similar meaning (and shall be treated as if such words were deleted from such representation or warranty).

**Section 10.7     Indemnification as Sole Remedy**. Following the Closing, except as set forth in Section 2.8, the indemnification provided for in this Article X shall be the sole and exclusive remedy and recourse for any breach of this Agreement and any payments required to be made by Seller hereunder.  For the avoidance of doubt, notwithstanding anything contained herein to the contrary, in no event shall the liability of the Seller under Section 10.2 or any other provision of this Agreement (other than Section 2.8 which liability shall be limited in the aggregate to the amount of the Purchase Price Adjustment Escrow Funds) exceed the amount of the Indemnity Escrow Funds, and on the nine month anniversary of the Closing Date, the Seller shall have no further liability to the Buyer hereunder for any reason except for any claims made prior to the nine month anniversary of the Closing Date and then only to the extent of any remaining balance of the Indemnity Escrow Funds.  Such limitations shall apply to any amounts due from Seller hereunder, including, without limitation, payments, fees, expenses, costs, attorneys' fees and accountant fees.

**Section 10.8     Investigation**. Notwithstanding anything to the contrary contained herein, if the transactions contemplated hereby are consummated, the Buyer Indemnified Parties expressly reserve the right to seek indemnity or other remedy for any Losses arising out of or relating to any breach of any representation, warranty or covenant contained herein, notwithstanding (a) any investigation by, disclosure to or knowledge of the Buyer or any of its Affiliates or the directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of the Buyer or any of its Affiliates in respect of any fact or circumstances that reveals the occurrence of any such breach, whether before or after the execution and delivery hereof, or (b) the Buyer's waiver of any condition to the Closing or participation in the Closing.

**Section 10.9     Satisfaction of Indemnification Claims**. The Buyer Indemnified Parties shall be limited to seeking satisfaction of indemnification claims from the Indemnity Escrow Fund pursuant to the Escrow Agreement and shall not be permitted to seek indemnification directly from the Seller.

**Section 10.10   Waiver of Contribution**. The Seller hereby irrevocably waives and releases any right of contribution, subrogation or any similar right against any Buyer Indemnified Party in respect of matters that are or may become the subject of claims for indemnification hereunder and any indemnification payments that the Seller may, at any time, be required to make to any Buyer Indemnified Party pursuant to this Agreement, whether directly or indirectly through its interest in the Indemnity Escrow Fund.

**Section 10.11   Tax Treatment of Payments**. All indemnification payments made pursuant to this Agreement shall be treated by the Buyer, the Seller and its respective Affiliates, to the extent permitted by Law, as an adjustment to the Purchase Price for Income Tax purposes.

50

                                              FBG_CH1_00094896

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1 <u>Notices</u>. All notices and other communications made pursuant to or under this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when transmitted by facsimile or electronic mail if such transmission occurs on a Business Day before 5:00 p.m. Eastern time, or the next succeeding Business Day if such transmission occurs at any other time, (c) one Business Day after deposit with a nationally recognized overnight courier service, or (d) three Business Days after the mailing if sent by registered or certified mail, postage prepaid, return receipt requested. All notices and other communications under this Agreement shall be delivered to the addresses set forth below, or such other address as such Party may have given to the other Parties by notice pursuant to this <u>Section 11.1</u> (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

| | |
|---|---|
| If to the Seller, to the Representative: | Jasper Rubber Products, Inc. Employee Stock Ownership Trust<br>1010 W. 1st Avenue<br>Jasper, Indiana 47546<br>Facsimile: _____<br>E-Mail: dmathias@jasperrubber.com<br>Attention: Douglas Mathias |
| with a copy to (which shall not constitute notice): | Ziemer, Stayman, Weitzel & Shoulders, LLP<br>20 NW 1st Street, 9th Floor<br>Evansville, Indiana 47708<br>Facsimile: 812/421-5089<br>E-Mail: shardy@zsws.com<br>Attention: Sarah Link Hardy |
| And: | Stoll Keenan Ogden PLLC<br>400 West Market Street<br>Suite 2700<br>Louisville, Kentucky 40202<br>Facsimile: 502/627-8771<br>E-Mail: sharon.mattingly@skofirm.com<br>Attention: Sharon A. Mattingly |
| If to the Buyer: | Jasper Acquisition Corp.<br>c/o First Brands Group<br>127 Public Square, Suite 5300<br>Cleveland, Ohio 44114<br>E-Mail: legalcontracts@firstbrandsgroup.com<br>Attention: Legal Department |

Section 11.2 <u>Expenses</u>. Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated, <u>provided</u> that, if the Closing occurs, the Seller Transaction Expenses shall be borne and paid as provided in this Agreement. In the event of termination of this Agreement, the obligation of each Party to pay its own expenses will be subject to any rights of such Party arising from a breach of this Agreement by the other.

51

CONFIDENTIAL

FBG_CH1_00094897

Section 11.3    <u>Entire Agreement</u>. All references in this Agreement or the Ancillary Agreements to this Agreement shall include all Exhibits and Schedules hereto. This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties relating to the subject matter hereof and thereof and supersede all prior agreements or understandings between the Parties with respect to such subject matter. Notwithstanding any oral agreement or course of conduct of the Parties or their respective officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

Section 11.4    <u>No Third-Party Beneficiaries</u>. This Agreement shall inure exclusively to the benefit of and be binding upon the Parties, any Person entitled to indemnification under Article X with respect to the provisions therein, and their respective successors, permitted assigns, executors and legal representatives. Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns, any Person entitled to indemnification under Article X with respect to the provisions therein) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.5    <u>Assignments</u>. This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party, by operation of Law or otherwise, without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall or is intended to limit the ability of the Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of the Seller to (a) any Affiliate of the Buyer, (b) any direct or indirect purchaser of all or substantially all of the assets of the Company, or (c) any lender to the Buyer and/or the Company as security for borrowings. Any attempted assignment in violation of this Section 11.5 shall be void *ab initio*.

Section 11.6    <u>Amendment; Waiver</u>. This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of the Buyer and the Representative. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 11.7    <u>Agreement Controls</u>. In the event that a provision of any Ancillary Agreement is inconsistent with, conflicts with or contradicts any term of this Agreement, the terms of this Agreement shall prevail.

Section 11.8    <u>Severability</u>. If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

52

**Section 11.9**    **Governing Law**.  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, inducement to enter and/or performance of this Agreement (whether related to breach of contract, tortious conduct or otherwise and whether now existing or hereafter arising) shall be governed by, the internal Laws of the State of Indiana, without giving effect to any Law that would cause the Laws of any jurisdiction other than the State of Indiana to be applied.  The Seller shall cause the Seller Indemnified Parties, and the Buyer shall cause the Buyer Indemnified Parties, to comply with the foregoing as though such Indemnified Parties were a Party to this Agreement.

<b>Section 11.10    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial</b>.

(a)    Each Party agrees that any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the state courts of Indiana in Dubois County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding, the United States District Court for the Southern District of Indiana, and each of the Parties hereby submits to the exclusive jurisdiction of such courts for itself and with respect to its property, generally and unconditionally, for the purpose of any such Proceeding.  A final judgment in any such Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party agrees not to commence any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby except in the courts described above (other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Indiana as described above), irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum or does not have jurisdiction over any Party.

(b)    Each Party agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address (or in the case of the Seller, the Representative's address) set forth herein shall be effective service of process for any such Proceeding.

(c)    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.  EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 11.10.

**Section 11.11**    **Admissibility into Evidence**.  All offers of compromise or settlement among the Parties or their officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors or other agents in connection with the attempted resolution of any dispute under this Agreement shall be deemed to have been delivered in furtherance of a settlement and shall be exempt from discovery

53

CONFIDENTIAL     FBG_CH1_00094899

and production and shall not be admissible in evidence (whether as an admission or otherwise) in any Proceeding for the resolution of such dispute.

Section 11.12     **Specific Performance**. The Parties agree that irreparable damage could occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each of the Parties shall be entitled to seek to enforce specifically the provisions of this Agreement, including seeking an injunction or injunctions to prevent breaches or threatened breaches of this Agreement, in any court designated to resolve disputes concerning this Agreement (or, if such court lacks subject matter jurisdiction, in any appropriate state or federal court), this being in addition to any other remedy to which such Party is entitled at Law or in equity. Each Party further agrees not to assert and waives any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

Section 11.13     **Other Remedies**. Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or at Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

Section 11.14     **No Recourse Against the Buyer Affiliates**. Notwithstanding anything in this Agreement or in any other document delivered pursuant to this Agreement to the contrary, the Buyer's obligations under this Agreement may only be enforced against, and any Proceeding for breach of this Agreement by the Buyer, may only be made against the entity that is expressly identified herein as the "Buyer," and no Affiliate of the Buyer shall have any Liability for any breach of this Agreement. Neither the Company nor the Seller shall have any right of recovery in respect hereof against any Affiliate of the Buyer, whether by or through attempted piercing of the corporate or limited liability company veil, including through any Proceeding by or on behalf of the Company or the Seller against any Affiliate of the Buyer seeking the enforcement of any judgment, fine or penalty or by virtue of any applicable Law, or otherwise.

Section 11.15     **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a)     all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)     each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP;

(c)     unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(d)     whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(e)     the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(f)     references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and

54

     FBG_CH1_00094900

**DEBTORS' EXHIBIT NO. 244**
**Page 59 of 64**

regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      the subject headings of Articles and Sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions;

(j)      (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, and (ii) the term "any" means "any and all";

(k)      (i) references to "days" means calendar days unless Business Days are expressly specified and (ii) references to "$" mean U.S. dollars;

(l)      the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(m)      all uses of "written" contained in Articles III, 3.8 and V shall be deemed to include information transmitted via e-mail, facsimile or other electronic transmission;

(n)      any drafts of this Agreement or any Ancillary Agreement circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any Ancillary Agreement, and each of the Parties agrees that no Party, Indemnifying Party or Indemnified Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)      the Parties have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Ancillary Agreements shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any Ancillary Agreement and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 11.16   **Counterparts; Deliveries**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, the Ancillary Agreements and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto,

CONFIDENTIAL

to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party to any such agreement or instrument shall raise the use of electronic transmission or a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission or a facsimile machine as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

[*The remainder of this page is intentionally left blank.*]

CONFIDENTIAL

FBG_CH1_00094902

**DEBTORS' EXHIBIT NO. 244**
**Page 61 of 64**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**BUYER:**

**JASPER ACQUISITION CORP.**

By: _____

Name: Stephen Graham

Its: Chief Financial Officer

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                                      FBG_CH1_00094903

**DEBTORS' EXHIBIT NO. 244**
**Page 62 of 64**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

JASPER RUBBER PRODUCTS, INC.

_Douglas Mathias_

Douglas Mathias, President


SELLER:

JASPER RUBBER PRODUCTS, INC. EMPLOYEE
STOCK OWNERSHIP TRUST

Farmers National Bank of Danville, as
Trustee of the Jasper Rubber Products, Inc.
Employee Stock Ownership Trust, solely in its trustee
capacity and not in its individual capacity


By:_____
    Rick Cash, Trust Officer

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL

FBG_CH1_00094904

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

JASPER RUBBER PRODUCTS, INC.

_____
Douglas Mathias, President


SELLER:

JASPER RUBBER PRODUCTS, INC. EMPLOYEE
STOCK OWNERSHIP TRUST

Farmers National Bank of Danville, as
Trustee of the Jasper Rubber Products, Inc.
Employee Stock Ownership Trust, solely in its trustee
capacity and not in its individual capacity

By: _____
Rick Cash, Trust Officer


(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                  FBG_CH1_00094905