*Execution Version*

**SECURITIES PURCHASE AGREEMENT**

by and among

**CARTER CARBURETOR HOLDINGS, LLC,**

**WALBRO TOPCO LLC**

**AND**

**WALBRO MIDCO LLC**

and

*Solely for purposes of Section 7.4 and ARTICLE XI:*

**CARTER CARBURETOR, LLC**

**FIRST BRANDS GROUP, LLC**

**WALBRO CO. LTD.**

**WALBRO TOPCO LLC**

**WALBRO HOLDINGS LP**

**LCP WALBRO SPV, LP**

**and**

**NOVA GP INVESTMENTS XIV LP**

Dated as of January 26, 2024

4515621.9 035696-0006-000
US-DOCS\147430618.9

CONFIDENTIAL                                                                                                    FBG_CH1_00094906

## TABLE OF CONTENTS

**Page**

**ARTICLE I      DEFINITIONS** ...................................................................................**4**

    Section 1.1      Certain Defined Terms ........................................................4

    Section 1.2      Table of Definitions ..........................................................10

**ARTICLE II      PURCHASE AND SALE; CLOSING** ......................................................**11**

    Section 2.1      Purchase and Sale .............................................................11

    Section 2.2      Purchase Price....................................................................11

    Section 2.3      Closing................................................................................11

    Section 2.4      Delivery of Closing Estimates ..........................................11

    Section 2.5      Seller Closing Deliverables ...............................................12

    Section 2.6      Buyer Closing Deliverables...............................................12

    Section 2.7      Payments at Closing ..........................................................13

    Section 2.8      Post-Closing Adjustment...................................................13

    Section 2.9      Withholding........................................................................15

**ARTICLE III      REPRESENTATIONS AND WARRANTIES WITH RESPECT
TO SELLER**..............................................................................................**15**

    Section 3.1      Power and Authorization ...................................................15

    Section 3.2      No Violation .......................................................................15

    Section 3.3      Title to Securities...............................................................15

    Section 3.4      No Brokers or Finders .......................................................16

**ARTICLE IV      REPRESENTATIONS AND WARRANTIES WITH RESPECT
TO THE ACQUIRED COMPANIES**...................................................**16**

    Section 4.1      Organization and Qualification; Authorization .................16

    Section 4.2      No Violation .......................................................................16

    Section 4.3      Capitalization.....................................................................17

    Section 4.4      Financial Statements; Accounting and Internal Controls ........................17

    Section 4.5      Absence of Undisclosed Liabilities ...................................18

    Section 4.6      No Brokers or Finders .......................................................18

**ARTICLE V      REPRESENTATIONS AND WARRANTIES OF BUYER** .....................**18**

    Section 5.1      Organization; Authorization...............................................18

    Section 5.2      No Violation .......................................................................19

    Section 5.3      Investment Intent................................................................19

    Section 5.4      No Brokers or Finders .......................................................19

i

4515621.9 035696-0006-000

CONFIDENTIAL                                                          FBG_CH1_00094907

Case 25-90399   Document 3644-10   Filed in TXSB on 08/12/26   Page 3 of 92

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 5.5 | No Outside Reliance; Acknowledgement by Buyer. | 19 |
| **ARTICLE VI** | **RESERVED.** | **20** |
| **ARTICLE VII** | **OTHER COVENANTS AND AGREEMENTS** | **20** |
| Section 7.1 | Agreements Regarding Tax Matters | 20 |
| Section 7.2 | Further Assurances | 20 |
| Section 7.3 | Intracompany Arrangements | 21 |
| Section 7.4 | General Release | 21 |
| Section 7.5 | Restrictive Covenants. | 22 |
| Section 7.6 | Section 280G | 23 |
| Section 7.7 | Directors and Officers. | 23 |
| Section 7.8 | Public Announcements | 24 |
| Section 7.9 | Payment Direction | 24 |
| **ARTICLE VIII** | **RESERVED.** | **24** |
| **ARTICLE IX** | **RESERVED.** | **24** |
| **ARTICLE X** | **RESERVED.** | **25** |
| **ARTICLE XI** | **MISCELLANEOUS** | **25** |
| Section 11.1 | Non-survival | 25 |
| Section 11.2 | Notices | 25 |
| Section 11.3 | Expenses | 26 |
| Section 11.4 | Entire Agreement | 26 |
| Section 11.5 | No Third-Party Beneficiaries | 26 |
| Section 11.6 | Assignments | 26 |
| Section 11.7 | Amendment; Waiver | 26 |
| Section 11.8 | Agreement Controls | 27 |
| Section 11.9 | Severability | 27 |
| Section 11.10 | Governing Law | 27 |
| Section 11.11 | Consent to Jurisdiction; Service of Process; Waiver of Jury Trial | 27 |
| Section 11.12 | Specific Performance | 28 |
| Section 11.13 | Other Remedies | 28 |
| Section 11.14 | No Recourse Against Affiliates | 28 |
| Section 11.15 | Rules of Construction | 28 |

ii

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094908

**DEBTORS' EXHIBIT NO. 245**
**Page 3 of 92**

## TABLE OF CONTENTS

**Page**

Section 11.16  Counterparts; Deliveries ...........................................................................30

Section 11.17  Legal Representation ................................................................................30

iii

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094909

**DEBTORS' EXHIBIT NO. 245**
**Page 4 of 92**

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "**Agreement**"), dated as of January 26, 2024, is among Carter Carburetor Holdings, LLC, a Delaware limited liability company ( "**Buyer**" ), Walbro Topco LLC, a Delaware limited liability company ("**Seller**"), Walbro Midco LLC, a Delaware limited liability company (the "**Company**") and, solely for purposes of Section 7.4 and ARTICLE XI, Carter Carburetor, LLC, a Delaware limited liability company ("**Carter**"), First Brands Group, LLC, a Delaware limited liability company ("**First Brands**"), Walbro Co. Ltd., a Japanese joint stock company (*kabushiki kaisha*) ("**Carter Japan**" and collectively with Carter and First Brands, the "**Carter Releasing Parties**"), Walbro Holdings LP, a Cayman Islands limited partnership ("**Walbro Holdings**"), LCP Walbro SPV, LP, a Cayman Islands limited partnership ("**Landon**") and Nova GP Investments XIV LP, a Scottish limited partnership ("**Nova**" and collectively with Walbro Holdings and Landon, the "**Walbro Releasing Parties**").

## RECITALS

A.      WHEREAS, Seller owns, beneficially and of record, all of the issued and outstanding equity interests in the Company.

B.      WHEREAS, subject to the terms and conditions set forth herein, upon the execution and delivery of this Agreement, Buyer will acquire one hundred percent (100%) of the issued and outstanding Equity Securities of the Company (the "**Securities**") from Seller, in exchange for the payment by Buyer to Seller of an amount equal to the Purchase Price.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1    Certain Defined Terms**.  For purposes of this Agreement:

"**Accounting Principles**" means the principles, practices and methodologies utilized in the Estimated Closing Statement attached hereto as Exhibit A and GAAP; provided that to the extent there is inconsistency between principles, practices and methodologies utilized in the Estimated Closing Statement and GAAP, the Estimated Closing Statement shall control.

"**Acquired Companies**" means, collectively, the Company and each of its direct and indirect Subsidiaries, and "**Acquired Company**" means each of such entities individually.

"**Acquired Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of any Acquired Company, including all financial information, customer and supplier contact information, prices, internal practices, forecasts, business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Notwithstanding the foregoing, "Acquired Confidential Information"

4

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094910

shall not include any information that (a) is Seller Confidential Information, (b) is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of any party hereto or any of its Affiliates; (c) is or was or becomes available to any party hereto on a nonconfidential basis from a source other than another party to this Agreement, provided that such source is not, to the knowledge of such party, bound by a confidentiality agreement with such other party, or is under another contractual, legal or fiduciary obligation to, such other party; or (d) has been or is independently developed by such party or its representatives without the use of Acquired Confidential Information or in violation of the terms of this Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. As used herein, the term "control" means (a) the power to vote at least 10% of the voting power of a Person, or (b) the possession, directly or indirectly, of any other power to direct or cause the direction of the management and policies of such a Person, whether through ownership of voting securities, by contract or otherwise.

"**Affiliated Group**" means an affiliated group as defined in Section 1504 of the Code (or analogous combined, consolidated or unitary group defined under state, local or non-U.S. income Tax Law).

"**Balance Sheet Date**" means September 30, 2023.

"**Base Purchase Price**" means $110,000,000.

"**Briggs & Stratton Contract**" means that certain Supply Agreement, dated as of June 26, 2018, by and between Briggs & Stratton Corporation and Walbro LLC, as amended.

"**Business**" means the business as currently conducted by the Fuel Systems Division of the Acquired Companies, including the business of developing, manufacturing, trading, and supplying end-to-end fuel systems, fuel tanks, fuel pump assemblies, vapor separator assemblies, and other fuel-related solutions.

"**Business Day**" means a day other than Saturday, Sunday or any other day on which banks in Ohio or Boston, Massachusetts are required or authorized to be closed.

"**Buyer Certificate**" means a certificate in form and substance reasonably satisfactory to Seller, dated as of the Closing Date and duly executed and delivered by Buyer and each of the Carter Releasing Parties, certifying that attached thereto are true, complete and accurate copies of resolutions duly adopted by the board of directors (or comparable governing body) of Buyer and each Carter Releasing Party and, if applicable, their respective requisite equityholders, which authorize and approve the execution, delivery and performance by Buyer and each Carter Releasing Party, as applicable, of this Agreement.

"**Calculation Time**" means 11:59 p.m., Eastern time, on the day immediately prior to the Closing Date.

"**Cash**" means the aggregate amount of all cash and cash equivalents of the Acquired Companies (including marketable securities, short term investments, liquid instruments, petty cash, deposits in transit to the extent there has been a reduction of receivables on account therefor, the amount of any received and uncleared checks, wires or drafts, and reduced by the amount of any issued but uncleared checks, wires or drafts).

"**Claim**" means, with respect to any Person or Persons, any and all charges, complaints, claims, liens, demands, causes of action, acts, actions, proceedings, contracts, controversies, agreements, promises,

5

4515621.9 035696-0006-000

FBG_CH1_00094911

representations, counterclaims, obligations, damages, and liabilities, of every kind, or any combination of the same, of any nature and description whatsoever, known or unknown, suspected or unsuspected, contingent or certain, such Person or Persons has had in the past, or now has up to and including immediately prior to the Closing.

"**Closing Date Cash**" means the Cash other than (a) with respect to Cash held outside the U.S., any amounts that would be required to repatriate such cash into the U.S. in excess of $500,000 and (b) Cash restricted from use except for a contractually specified purpose or used as collateral for, or otherwise to provide credit support for, any liabilities of any Person under any letter of credit or other Contract (other than, for the avoidance of doubt, any Contract associated with Closing Date Indebtedness), in each case of the Acquired Companies as of the Calculation Time and determined in accordance with the Accounting Principles.

"**Closing Date Indebtedness**" means the Indebtedness of the Acquired Companies as of immediately prior to the Closing. For purposes of this Agreement and solely to avoid any double counting or duplication, any amounts to the extent actually taken into account in (i) the calculation of Closing Date Indebtedness will not be included in the calculation of Seller Transaction Expenses and (ii) the calculation of Seller Transaction Expenses will not be included in the calculation of Closing Date Indebtedness.

"**Closing Date Seller Transaction Expenses**" means the Seller Transaction Expenses as of immediately prior to the Closing (but calculated assuming that the Closing has occurred such that any Seller Transaction Expenses triggered by the Closing are included in the Closing Date Seller Transaction Expenses).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all legally binding contracts, agreements, licenses, indentures, notes, bonds, instruments, leases, mortgages, sales orders, purchase orders, arrangements, commitments, obligations and other understandings or undertakings of any nature, in any case whether written or oral, and all amendments, restatements, supplements or other modifications thereto or waivers thereunder.

"**Dispute**" means the dispute that is the subject of certain litigation pending in the Delaware Court of Chancery captioned <u>Walbro LLC v. Carter and Walbro Co. Ltd.</u>, C.A. No 2023-1072-KSJM.

"**Employee Benefit Plan**" means an "employee pension benefit plan" (as defined in Section 3(2) of ERISA whether or not subject to ERISA) or an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA whether or not subject to ERISA).

"**Equity Securities**" means, if a Person is a corporation, shares of capital stock of such corporation and, if a Person is a form of entity other than a corporation, ownership interests in such form of entity, whether membership interests, partnership interests or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"**Event**" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"**Final Purchase Price**" means the Purchase Price as finally determined in accordance with <u>Section 2.8</u>.

6

4515621.9 035696-0006-000

FBG_CH1_00094912

"**Fraud**" means a claim by a party hereto for an intentional misrepresentation or omission of a material fact which is (a) false and known by the party making such misrepresentation or omission to be false, (b) made for the purpose of inducing such party to rely on such misrepresentation or omission and (c) is actually relied upon by such party, in each case, solely with respect to the making by a party of any of the representations and warranties contained in Article III, Article IV, Article V, Section 7.4 or any certificate delivered pursuant to this Agreement; provided that, for the avoidance of doubt, "Fraud" shall not include any claim based on constructive knowledge, negligent misrepresentation, recklessness or similar theory.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, official, body or other instrumentality of the United States, any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Indebtedness**" means, without duplication, with respect to each Acquired Company, as of the date of determination, (a) all obligations for borrowed money or extensions of credit (other than obligations for borrowed money among the Acquired Companies), (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, commercial paper or debt securities, (c) all obligations under swaps, hedges, caps, collars, options, futures or similar instruments, (d) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and accrued expenses incurred in the ordinary course of business), including earnouts, payments under non-compete agreements and seller notes, (e) all obligations created or arising under any conditional sale or other title retention agreement, (f) all obligations secured by a Lien, (g) all obligations under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases (other than, for the avoidance of doubt, any real property lease (e.g., the leases set forth on Schedule 1.1)); (h) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit that are drawn and have not been repaid, (i) all obligations of any Person other than another Acquired Company which are directly or indirectly guaranteed by such Acquired Company or in respect of which such Acquired Company has otherwise assured an obligation against loss, and (j) all interest, principal, prepayment penalties, premiums, fees or expenses due or owing in respect of any item listed in clauses (a) through (i) above.  For the avoidance of doubt, Indebtedness shall not include any Liabilities owed to Buyer or any of its Affiliates.

"**IRS**" means the U.S. Internal Revenue Service.

"**Kohler Contract**" means that certain Supply and Purchase Agreement, dated as of March 31, 2023, by and between Kohler Co. and Walbro LLC, as amended.

"**Law**" means the common law of any state or other jurisdiction, or any provision of any non-U.S., federal, state or local law, statute, code, rule, regulation, Order, certification standard, accreditation standard, Permit, regulatory code of practice, statutory guidance or other decision of any court or other tribunal or Governmental Authority.

"**Legacy Customers**" means, collectively, the following customers of the Business: (i) Husqvarna AB; (ii) Andreas Stihl G & Co. KG; (iii) Kohler Company; (iv) Kawasaki Motors Manufacturing Corp.; (v) BRP US Inc., BRP-Rotax GmbH & Co KG and Bombardier Recreational Products Inc.; (vi) Briggs and Stratton Corporation; and (vii) Textron Specialized Vehicles, Inc.

"**Liabilities**" means any liabilities, demands, commitments or obligations of any nature whatsoever, whether accrued or unaccrued, absolute or contingent, direct or indirect, asserted or unasserted,

7

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094913

fixed or unfixed, known or unknown, choate or inchoate, perfected or unperfected, liquidated or unliquidated, secured or unsecured, or otherwise, whether due or to become due, whether arising out of any Contract or tort based on negligence or strict liability and whether or not the same would be required by GAAP to be stated in financial statements or disclosed in the notes thereto, and however arising and including all fees, costs and expenses related thereto.

"**Liens**" means all liens, security interests, claims, mortgages, deeds of trust, preemptive rights, leases, charges, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions, pledges, assessments, covenants, burdens and other encumbrances of every kind, including restrictions on voting or use.

"**Management Services Agreement**" means that certain agreement dated as of October 27, 2021, by and among the Company, Nova Capital Management Limited, a company registered in England & Wales, Landon Capital Partners, LLC, a Delaware limited liability company, and Walbro LLC, as amended, supplemented or otherwise modified through the Closing Date.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, of any Governmental Authority.

"**Party**" means any party to this Agreement.

"**Permits**" means permits, licenses, registrations, consents, certificates, grants, waivers, qualifications, approvals and all other authorizations by or of Governmental Authorities.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated association, corporation, firm or other entity or any Governmental Authority.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity, by or before a Governmental Authority.

"**Purchase Price Adjustment**" means, (a) if the Final Purchase Price exceeds the Estimated Purchase Price, the amount by which the Final Purchase Price exceeds the Estimated Purchase Price and (b) if the Estimated Purchase Price exceeds the Final Purchase Price, the amount by which the Final Purchase Price is less than Estimated Purchase Price.

"**Seller Certificate**" means a certificate in form and substance reasonably satisfactory to Buyer, dated as of the Closing Date and duly executed and delivered by Seller and Walbro Holdings, certifying that attached thereto are (a) true, complete and accurate copies of the organizational documents of each Acquired Company, (b) true, complete and accurate copies of resolutions duly adopted by the board of directors (or comparable governing body) of Seller and Walbro Holdings, which authorize and approve the execution, delivery and performance by Seller and Walbro Holdings, as applicable, of this Agreement and (c) a true, complete and accurate copy of resolutions duly adopted by the manager of the Company, which authorize and approve the execution, delivery and performance by the Company of this Agreement.

"**Seller Confidential Information**" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, of Seller or its Affiliates (other than any Acquired Company), including all financial information, information regarding the corporate structure of Seller and such Affiliates, customer and supplier contact information, prices,

8

4515621.9 035696-0006-000

internal practices, forecasts, business, marketing, development, sales and other commercial strategies, unpatented inventions, ideas, methods and discoveries, trade secrets, know-how, unpublished patent applications, designs, specifications, documentation, components, source code, object code, schematics, drawings, protocols and processes. Notwithstanding the foregoing, "Seller Confidential Information" shall not include any information that (a) is Acquired Confidential Information, (b) is or becomes generally known to and available for use by the public other than as a result of any acts or omissions of any party hereto or any of its Affiliates; (c) is, was or becomes available to any party hereto on a nonconfidential basis from a source other than another party to this Agreement, provided that such source is not, to the knowledge of such party, bound by a confidentiality agreement with such other party, or is under another contractual, legal or fiduciary obligation to, such other party; or (d) has been or is independently developed by such party or its representatives without the use of Confidential Information or in violation of the terms of this Agreement.

"**Seller Transaction Expenses**" means, without duplication, (a) all of the fees, costs and expenses incurred by Seller or any Acquired Company in connection with the transactions contemplated by this Agreement or any transaction or series of transactions similar to such transactions, including all fees, costs and expenses payable to attorneys, financial advisors, accountants, consultants or other advisors, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker engaged by any Acquired Company and (b) any change in control, retention, transaction or severance payments that become payable to any director, manager, officer, employee or individual consultant of any Acquired Company solely as a result of the transactions contemplated by this Agreement (but excluding any such payments pursuant to "double trigger" arrangements or other similar arrangements, in each case, resulting in payments or benefits provided upon a termination of service upon or following the consummation of the Closing), and the employer share of withholding taxes payable in connection with any such payments. For purposes of this Agreement and solely to avoid any double counting or duplication, any amounts to the extent actually taken into account in (i) the calculation of Closing Date Indebtedness will not be included in the calculation of Seller Transaction Expenses and (ii) the calculation of Seller Transaction Expenses will not be included in the calculation of the calculation of Closing Date Indebtedness.

"**Service Provider**" means each director, officer, employee, manager or independent contractor, of any of the Acquired Companies.

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses, or shall have the right or sufficient voting interests to designate or elect either (i) a majority of the Persons serving as managers or (ii) the sole manager, managing director or general partner of such entity.

"**Tax**" means (a) any and all U.S. federal, state, local, or non-U.S. income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, entertainment, amusement, severance, stamp, occupation, premium, windfall profit,

9

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094915

environmental, customs, duties, real property, personal property, ad valorem, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, composite, healthcare, or other tax of any kind whatsoever, including any interest, penalties or additions to Tax, any penalties resulting from any failure to file or timely file a Tax Return, or additional amounts in respect of the foregoing; (b) liability for the payment of any amounts of the type described in clause (a) above of another Person arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto); and (c) liability for the payment of any amounts of the type described in clause (a) above of another Person as a result of any transferee or secondary liability or any liability assumed by Contract (other than by reason of any customary provisions in a commercial Contract the primary purpose of which is unrelated to Taxes) or applicable Law.

"**Tax Returns**" means returns, declarations, reports, notices, forms, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, and including for the avoidance of doubt all Forms 1099, FinCEN Form 114, Form TD F 90-22.1 and any predecessor or successor forms thereto) filed or required to be filed with any Governmental Authority, in connection with the determination, assessment or collection of any Tax of any party or the administration of any Laws, regulations or administrative requirements relating to any Tax.

"**Textron Contract**" means that certain Manufacturing and Supply Agreement, dated as of December 5, 2018, by and between Textron Specialized Vehicles Inc. and Walbro LLC, as amended.

"**Treasury Regulations**" means the Treasury Regulations promulgated from time to time under the Code (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"**U.S.**" or "**United States**" means the United States of America.

"**Walbro LLC**" means Walbro LLC, a Delaware limited liability company.

**Section 1.2**     **Table of Definitions**.   The following terms have the meanings set forth in the locations in this Agreement referenced below:

Term .......................................................................................................................................Location
Accountant .....................................................................................................................Section 2.8(c)
Agreement .............................................................................................................................Preamble
Balance Sheet ...............................................................................................................Section 4.4(a)(ii)
Buyer Releasees................................................................................................................ Section 7.4
Buyer Releasing Parties...................................................................................................... Section 7.4
Closing..............................................................................................................................Section 2.3
Closing Date ......................................................................................................................Section 2.3
Closing Date Payoff Amount............................................................................................. Section 2.4
Closing Payments ..............................................................................................................Section 2.7
Closing Statement ...........................................................................................................Section 2.8(a)
Estimated Closing Date Cash ............................................................................................ Section 2.4
Estimated Closing Date Indebtedness ................................................................................Section 2.4
Estimated Closing Date Seller Transaction Expenses.......................................................Section 2.4
Estimated Closing Statement............................................................................................. Section 2.4
Estimated Purchase Price ................................................................................................Section 2.7(a)
Financial Statements .......................................................................................................Section 4.4(a)

10

4515621.9 035696-0006-000

FBG_CH1_00094916

Non-Party Affiliate .................................................................................................... Section 11.14
Payoff Letters ............................................................................................................ Section 2.5(c)
Protest Deadline ........................................................................................................ Section 2.8(b)
Protest Notice ............................................................................................................ Section 2.8(b)
Purchase Price ........................................................................................................... Section 2.2
Seller Closing Deliverables ....................................................................................... Section 2.5
Seller Group .............................................................................................................. Section 11.17
Seller Releasees ........................................................................................................ Section 7.4
Seller Releasing Parties ............................................................................................ Section 7.4
Transfer Taxes ........................................................................................................... Section 7.1(c)

**ARTICLE II**
**PURCHASE AND SALE; CLOSING**

Section 2.1      **Purchase and Sale**.  On the terms and conditions set forth in this Agreement, at the Closing, (a) Seller shall and hereby does sell, assign, transfer, convey and deliver to Buyer all right, title and interest in the Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws) in exchange for payment of the Purchase Price in accordance with this Agreement and (b) and Buyer shall and hereby does purchase, accept delivery of and acquire from Seller all right, title and interest in the Securities, free and clear of all Liens (other than Liens arising in connection with applicable securities Laws) in exchange for payment of the Purchase Price in accordance with this Agreement.

Section 2.2      **Purchase Price**.  The aggregate purchase price to be paid by Buyer for the Securities (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of the following:

(a)      the Base Purchase Price;

(b)      *plus* the Closing Date Cash;

(c)      *minus* the Closing Date Indebtedness;

(d)      *minus* the Closing Date Seller Transaction Expenses.

Section 2.3      **Closing**.  The closing of the purchase and sale of the Securities and the other transactions contemplated by this Agreement (the "**Closing**") shall be effected simultaneously with the execution and delivery of this Agreement via electronic mail, in either case, at 10:00 a.m. Eastern Time on the date hereof, or at such other time and place as the parties hereto may agree in writing.  The date on which the Closing occurs is referred to herein as the "**Closing Date**."

Section 2.4      **Delivery of Closing Estimates**.  At least three Business Days before the Closing Date, Seller shall prepare and deliver to Buyer a written statement (the "**Estimated Closing Statement**") setting forth good faith estimates of (a) the Closing Date Cash (such estimate, the "**Estimated Closing Date Cash**"), (b) the Closing Date Indebtedness (such estimate, the "**Estimated Closing Date Indebtedness**") and the portion of the Estimated Closing Date Indebtedness to be paid out in connection with Closing (the "**Closing Date Payoff Amount**") (which shall include all amounts to be paid off and the respective payees and which, for clarity, will include all Estimated Closing Date Indebtedness other than obligations outstanding under certain equipment leases), (c) the Closing Date Seller Transaction Expenses (which shall include all amounts set forth in invoices from the respective payees) (such estimate, the "**Estimated Closing Date Seller Transaction Expenses**"), together with a calculation of the Closing Payment, in each

11

4515621.9 035696-0006-000

FBG_CH1_00094917

case, with reasonable supporting or underlying documentation used in the preparation thereof. The Acquired Companies shall make available such personnel as are reasonably necessary to assist Buyer in its review of such estimates, and the Estimated Closing Statement shall be reasonably acceptable to Buyer. The Estimated Closing Statement also shall attach (i) the Payoff Letters and (ii) invoices from the respective payees representing Closing Date Seller Transaction Expenses.

**Section 2.5** **Seller Closing Deliverables**. In addition to the other requirements set forth in this Agreement, at or before the Closing, Seller shall deliver or cause to be delivered to Buyer each of the following documents and instruments (collectively, the "**Seller Closing Deliverables**"):

(a) the Seller Certificate, duly executed by Seller and Walbro Holdings;

(b) an executed payoff letter for the repayment of the Indebtedness of the Acquired Companies set forth on Schedule 2.5(b), in form and substance reasonably acceptable to Buyer, which will include a per diem interest amount and an authorization to file all UCC termination statements and releases necessary to enable, upon the occurrence of the Closing, the release of any Liens in favor of the holders of such Indebtedness, such that Seller's representation and warranty set forth in the second sentence of Section 3.4 will be true and accurate, along with wire transfer instructions and a duly executed IRS Form W-9 or applicable version of IRS Form W-8, as applicable, for each holder of such Indebtedness (collectively, the "**Payoff Letters**");

(c) a certificate in accordance with Treasury Regulation Section 1.1445-2(c)(3) and 1.897-2(h), duly executed by WEM US Co., together with written authorization for Buyer to deliver such certification to the IRS on behalf of WEM US. Co. after the Closing;

(d) a certificate of good standing from the Secretary of State of the State of Delaware, dated no more than ten days before the Closing Date and certifying as to the good standing of the Company in Delaware;

(e) written resignations in form and substance reasonably acceptable to Buyer effective as of the Closing from each officer and director of each of the Acquired Companies;

(f) evidence of termination of all the agreements set forth on Schedule 2.5(f), in each case, solely with respect to the Acquired Companies, and in form and substance reasonably acceptable to Buyer;

(g) a letter agreement terminating the Management Services Agreement and acknowledging that no fees or other payments are due thereunder from any of the Acquired Companies, executed by each of the Service Providers (as defined therein).

**Section 2.6** **Buyer Closing Deliverables**. In addition to the other requirements set forth in this Agreement, at or before the Closing, Buyer shall deliver or cause to be delivered to Seller each of the following documents and instruments (collectively, the "**Buyer Closing Deliverables**"):

(a) the Buyer Certificate, duly executed by Buyer and each Carter Releasing Party; and

(b) a certificate of good standing from the Secretary of State of the Delaware, dated no more than ten days prior to the Closing Date and certifying to the good standing of Buyer and each Carter Releasing Party, other than Carter Japan, in Delaware.

12

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094918

Section 2.7       Payments at Closing. At the Closing, Buyer shall pay or cause to be paid by wire transfer of immediately available funds the following payments (collectively, the "**Closing Payments**"):

(a)       to Seller, an amount equal to the Base Purchase Price, *plus* the Estimated Closing Date Cash, *minus* the Estimated Closing Date Indebtedness, *minus* the Estimated Closing Date Seller Transaction Expenses (such resulting amount, the "**Estimated Purchase Price**") to the accounts set forth in the Estimated Closing Statement;

(b)       the Estimated Closing Date Seller Transaction Expenses, (A) in respect of, among other payments, compensatory payments to employees of the Acquired Companies, to Walbro LLC, which Buyer will cause to be paid in the amounts set forth on the Estimated Closing Statement to the designated recipients thereof through a special payroll as soon as reasonably practicable following the Closing Date (but in no event more than seven (7) days after the Closing Date) and (B) with respect to payments to be made to third-party Service Providers, to the accounts and in the amounts set forth on the Estimated Closing Statement; and

(c)       to the applicable recipients thereof and in the respective amounts and to the accounts set forth on the Estimated Closing Statement, an aggregate amount equal to the Closing Date Payoff Amount.

Section 2.8       Post-Closing Adjustment.

(a)       Closing Statement.  No later than 30 days after the Closing Date, Buyer or its representatives shall prepare and deliver to Seller a written statement (the "**Closing Statement**"), setting forth Buyer's calculation of (i) the Closing Date Cash, (ii) the Closing Date Indebtedness and (iii) the Closing Date Seller Transaction Expenses, together with a calculation of the resulting Purchase Price and Purchase Price Adjustment, if any; provided, that (I) except as set forth in clause (II), the Closing Statement shall be prepared using the Accounting Principles and be based solely on facts and circumstances as they exist prior to the Closing, and shall exclude the effect of any fact, event, change, circumstance, act or decision occurring on or after the Closing Date (including any changes in applicable Law) and (II) (aa) the Closing Statement shall not give effect to the consummation of the transactions contemplated hereby, including any payments of cash in respect of the Purchase Price or any financing transactions in connection therewith or, after the Calculation Time, any other action or omission by Buyer or any Acquired Company that is not in the ordinary course of business consistent with past practice, (bb) the treatment of leases as capital leases or operating leases shall be identical to their treatment in the Estimated Closing Statement and (cc) the Closing Statement shall not reflect any expense or liability for which Buyer is responsible under this Agreement.  Upon receipt of the Closing Statement, Seller and its accountants will be given reasonable access upon reasonable notice to the Acquired Companies' relevant books, records, workpapers and personnel during business hours for the purpose of verifying the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses. Following the Closing, Buyer shall provide Seller and its representatives timely reasonable access to the records, properties, personnel and (subject to the execution of customary work paper access letters if requested) auditors of Buyer and Acquired Companies relating to the preparation of the Closing Statement and shall cause the personnel of Buyer and Acquired Companies to cooperate with Seller in connection with its review of the Closing Statement.

(b)       Protest Notice.  Prior to the date which is 30 days after Buyer's delivery of the Closing Statement in accordance with this Agreement (the "**Protest Deadline**"), Seller may deliver written notice to Buyer (the "**Protest Notice**") setting forth any objections which Seller may have to the Closing Statement.  The Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth Seller's determination of the Closing Date Cash, the

13

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094919

Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any. If a Protest Notice is not delivered prior to the Protest Deadline, the Closing Date Cash, the Closing Date Indebtedness, the Closing Date Seller Transaction Expenses and the resulting Purchase Price Adjustment, if any, as set forth on the Closing Statement shall be final, binding and non-appealable by Seller. If a Protest Notice is delivered prior to the Protest Deadline, any such amounts not disputed therein shall be final, binding and non-appealable by Seller.

(c)     Resolution of the Protest. Buyer and Seller shall confer and use reasonable best efforts to resolve any disagreement with respect to the Closing Statement within 30 days following Buyer's receipt of the Protest Notice. If Buyer and Seller are unable to resolve any such disagreement within such 30 day period, then any amounts that remain in dispute will be referred to one of (i) Deloitte LLP, (ii) PwC, LLC, (iii) EY LLP or (iv) KPMG LLP, as mutually agreed to by the parties (the "**Accountant**"), which will be instructed to determine the amounts in dispute within 45 days after such referral, including a report setting forth the Accountant's basis for its determination. In making such determination, the Accountant shall act as an expert and not an arbitrator, and shall rely on the Accounting Principles. The Accountant will consider and opine only on the items disputed by the parties. The determination by the Accountant of the amounts in dispute shall be based solely on presentations by Buyer and Seller, and shall not involve the Accountant's independent review. Any determination by the Accountant shall not be outside the range defined by the respective amounts in the Closing Statement proposed by Buyer's and Seller's proposed adjustments thereto set forth in the Protest Notice, and absent fraud or manifest error such determination shall be final, binding and non-appealable. Each of Buyer and Seller shall execute and deliver a customary engagement letter as may be requested by the Accountant, and each of Buyer, on the one hand, and Seller on the other hand, shall bear one-half of the fees and expenses of the Accountant. Other than the fees of the Accountant, Buyer and Seller shall each pay their own fees and expenses. The fees, costs and expenses of the Accountant shall be allocated to and borne by Buyer and Seller based on the inverse of the percentage that the Accountant determination (before such allocation) bears to the total amount of the amounts in dispute. For example, should the amounts in dispute total in amount to one thousand dollars ($1,000) and the Accountant awards six hundred dollars ($600) in favor of Seller's position, sixty percent (60%) of the costs of its review would be borne by Buyer and forty percent (40%) of the costs would be borne by Seller.

(d)     Purchase Price Adjustment. Within five (5) Business Days following the final determination of the Closing Date Cash, the Closing Date Indebtedness and the Closing Date Seller Transaction Expenses pursuant to this Section 2.8:

(i)     If the Estimated Purchase Price exceeds the Final Purchase Price and the Purchase Price Adjustment is greater than zero, then Seller shall pay or cause to be paid to Buyer, by wire transfer of immediately available funds to the account(s) directed in writing by Buyer, an amount equal to the Purchase Price Adjustment; or

(ii)     If the Final Purchase Price exceeds the Estimated Purchase Price and the Purchase Price Adjustment is greater than zero, Buyer shall pay or cause to be paid to Seller, by wire transfer of immediately available funds to the account(s) directed in writing by Seller, an amount equal to the Purchase Price Adjustment.

For the avoidance of doubt, if the Estimated Purchase Price equals the Final Purchase Price, no payment to Buyer or Seller shall be due under this Section 2.8.

(e)     Any payments made pursuant to this Section 2.8 shall be deemed by all Parties as an adjustment to the Purchase Price for all Tax purposes unless otherwise required by applicable Law.

14

4515621.9 035696-0006-000

CONFIDENTIAL                                                        FBG_CH1_00094920

Section 2.9 **Withholding**. Notwithstanding anything to the contrary in this Agreement, Buyer, the Acquired Companies, Seller, and their designees, as applicable, will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. In the event that any of Buyer, the Acquired Companies, Seller, or any of their designees, as applicable, determines that deduction and withholding is required in connection with amounts payable pursuant to this Agreement (other than payments treated as compensation or wages for Tax purposes), Buyer, the Acquired Companies, Seller, or any of their designees, as applicable, will use reasonable best efforts to provide advance notice to such Person of such determination and the parties shall cooperate in good faith to reduce or eliminate any such deduction and withholding to the extent permitted under applicable Law. To the extent that any such amounts are so deducted and withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made. Upon Closing (and thereafter as required by applicable Law), each person entitled to payment under this Agreement shall provide an IRS Form W-9 or applicable version of IRS Form W-8, as applicable. Any payments under this Agreement to employees or other current or former service providers that are treated as compensation or wages for Tax purposes shall be made through the applicable Acquired Company's payroll system.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES WITH RESPECT TO SELLER

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing as follows:

Section 3.1 **Power and Authorization**. Seller has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized. This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 3.2 **No Violation**. The execution, delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby will not:

(a) violate, contravene, or conflict with any provision of the charter documents, bylaws or similar organizational documents of such Seller; or

(b) violate, contravene or conflict with any applicable Law or Order.

Section 3.3 **Title to Securities**. Seller has the sole voting power and sole power of disposition with respect to all of the Securities with no limitations, qualifications or restrictions on such rights and powers. Upon payment of the Purchase Price in accordance with this Agreement, the Securities owned by Seller will be transferred to Buyer, as applicable, pursuant to this Agreement free and clear of any Liens. Seller is not subject to any agreements, arrangements, options, warrants, calls, rights, commitments or other restrictions relating to the sale, transfer, purchase, redemption or voting of its Securities.

15

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094921

**Section 3.4**        **No Brokers or Finders**.  Neither Seller nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE ACQUIRED COMPANIES**

Except as set forth in the corresponding sections or subsections of the Disclosure Schedules, Seller represents and warrants to Buyer as of the date hereof and as of the Closing as follows:

**Section 4.1**        **Organization and Qualification; Authorization**.

(a)        Each Acquired Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation, which jurisdiction is listed on Schedule 4.1 of the Disclosure Schedules, and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  Complete and correct copies of the charter documents, bylaws or similar organizational documents of each Acquired Company and all amendments thereto have been made available to Buyer.  None of the Acquired Companies is in violation of any of the provisions of its charter documents, bylaws or similar organizational documents.  The minute books and resolutions of each Acquired Company previously made available to Buyer contain true, complete and accurate records of all meetings and accurately reflect in all material respects all corporate action of the equityholders and board of directors (including committees thereof) of such Acquired Company.  The stock certificate books and stock transfer ledgers of each Acquired Company previously made available to Buyer are true, complete and accurate in all material respects.

(b)        The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement, the performance by the Company of its obligations hereunder and thereunder and the consummation by the Company of the transactions contemplated hereby have been duly authorized.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

**Section 4.2**        **No Violation**.  Except as set forth on Schedule 4.2 of the Disclosure Schedules, the execution, delivery and performance by Seller and the Acquired Companies of this Agreement, and the consummation of the transactions contemplated hereby and thereby will not:

(a)        violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of any Acquired Company;

(b)        violate, contravene or conflict with any resolution adopted by any Acquired Company's board of directors (or comparable governing body) or equityholders;

(c)        violate, contravene or conflict with any applicable Law or Order; or

(d)        except as set forth on Schedule 4.2 of the Disclosure Schedules, result in the creation or imposition of any Lien upon any Securities (other than liens imposed by applicable securities Laws).

16

4515621.9 035696-0006-000

**Section 4.3** **Capitalization**. Schedule 4.3 of the Disclosure Schedules sets forth the entire authorized Equity Securities of each Acquired Company and a complete and correct list of the issued and outstanding Equity Securities of each Acquired Company, including the name of the record and beneficial owner thereof and the number of Equity Securities held thereby. All of the outstanding Equity Securities of each Acquired Company have been duly authorized, validly issued and are fully paid and non-assessable (as applicable). Except as set forth on Schedule 4.3 of the Disclosure Schedules, no Acquired Company has any outstanding Equity Securities or other securities directly or indirectly convertible into or exchangeable for its Equity Securities, no Acquired Company has any outstanding agreements, options, warrants or rights to directly or indirectly subscribe for or purchase, or that directly or indirectly require it to issue, transfer or sell, its Equity Securities or any securities directly or indirectly convertible into or exchangeable for its Equity Securities, and there are no agreements containing profit participation or phantom equity features with respect to any Acquired Company. Except for the direct and indirect Subsidiaries of each Acquired Company, no Acquired Company owns or otherwise holds, directly or indirectly, any stock, membership interest, partnership interest, joint venture interest or other equity interest in any Person. No Acquired Company is subject to any obligation (contingent or otherwise) to redeem, repurchase or otherwise acquire or retire any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities. Except as set forth on Schedule 4.3 of the Disclosure Schedules, there are no voting agreements, voting trusts or other agreements, commitments or understandings with respect to the voting or transfer of Equity Securities or other securities of any Acquired Company. All of the outstanding Equity Securities of each of the Subsidiaries of each Acquired Company are owned by an Acquired Company or another Subsidiary of an Acquired Company free and clear of all Liens (other than Liens arising in connection with applicable securities Laws). No Acquired Company has violated any applicable federal or state securities Laws in connection with the offer, sale or issuance of any of its Equity Securities or any warrants, options or other rights to acquire its Equity Securities. No Equity Securities of any Acquired Company are subject to, nor have been issued in violation of, preemptive or similar rights. There are no accrued but unpaid dividends payable by any Acquired Company on any Equity Securities of such Acquired Company.

**Section 4.4** **Financial Statements; Accounting and Internal Controls**.

(a) Attached hereto as Exhibit B are copies of the following financial statements (collectively, the "**Financial Statements**"):

(i) The audited consolidated balance sheets of the Company and its Subsidiaries as of December 31, 2022, and the related statements of operations for the year then ended; and

(ii) the unaudited consolidated balance sheet of the Business as of the Balance Sheet Date (the "**Balance Sheet**"), and the related unaudited income statements and statements of operations for the nine (9) month period then ended.

(b) Except for the exceptions set forth on Schedule 4.4(b) of the Disclosure Schedules, the Financial Statements (including the notes thereto) (i) have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except that the interim Financial Statements are subject to normal year-end adjustments (which will not be material individually or in the aggregate) and lack footnotes required by GAAP, (ii) present fairly the assets, liabilities and financial condition of the Business as of such dates and the results of operations of the Business for such periods, and (iii) are consistent with the books and records of the Acquired Companies (which books and records are correct and complete in all material respects). Since December 31, 2022, there has been no change in any accounting principles, policies, methods or practices, including any change with respect to reserves (whether for bad debt, contingent liabilities or otherwise) of the Business.

17

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094923

(c)        The Business has established and, for the past three years, has maintained in all material respects, a system of internal accounting controls sufficient to reasonably ensure (i) the reliability of financial reporting and the preparation of the financial statements of the Business and (ii) that (A) all transactions are executed in accordance with management's general or specific authorizations; (B) all transactions are recorded when and as necessary to maintain asset accountability and to permit preparation of financial statements in conformity with GAAP applied using the same accounting practices, policies, principles and methodologies, with consistent classifications, judgments and valuation and estimation accrual methodologies, used in the preparation of the Financial Statements; and (C) all accounts, notes and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(d)        The Business has established and maintained and, for the past three years, have maintained in all material respects, disclosure controls sufficient to reasonably ensure that material information relating to the Business (including any deficiencies or weaknesses in the design or operation of the Business's internal controls and any fraud that involves management or other Service Providers of any Acquired Company) is made known to the Business's management by others within the Business.

(e)        Since September 29, 2023, except as set forth on Schedule 4.4(e) the Acquired Companies have conducted the Business in the ordinary course and, without limiting the foregoing, (i) no material amendments or other material changes to any Contracts between any of the Acquired Companies and Legacy Customers have been entered into or made, (ii) Walbro LLC provided notice of termination of the Kohler Contract on or before December 15, 2023, and (iii) Walbro LLC has not renewed or otherwise extended the Textron Contract or Briggs & Stratton Contract, and any renegotiations relating to any material customer Contracts have been and are occurring in good faith.

Section 4.5        **Absence of Undisclosed Liabilities**.  No Acquired Company has any Liabilities, except (a) as and to the extent specifically accrued for or reserved against in the Balance Sheet, (b) Liabilities which have arisen after the date of the Balance Sheet in the ordinary course of business consistent with past practice (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement or violation of Law), (c) executory obligations under Contracts (other than Liabilities relating to any breach, or any fact or circumstance that, with notice, lapse of time or both, would result in a breach, thereof by any Acquired Company) and (d) Liabilities specifically set forth on Schedule 4.5 of the Disclosure Schedules.

Section 4.6        **No Brokers or Finders**.  None of Seller, the Acquired Companies or any of their respective Affiliates has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing as follows:

Section 5.1        **Organization; Authorization**.

(a)        Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite power and authority to own, lease and operate its assets, properties and business and to carry on its business as now being conducted.  Buyer has full right, power, capacity and authority to execute and deliver this Agreement to be executed and delivered thereby, to consummate the transactions contemplated hereby and thereby and to comply with

18

CONFIDENTIAL

the terms, conditions and provisions hereof.  The execution, delivery and performance by Buyer of this Agreement have been duly and properly authorized by all requisite action in accordance with applicable Law and with the organizational documents of Buyer.  This Agreement have been duly executed and delivered by Buyer and constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

Section 5.2     **No Violation**.  The execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the transactions contemplated hereby will not:

(a)     violate, contravene or conflict with any Law; or

(b)     violate, contravene or conflict with any provision of the charter documents, bylaws or similar organizational documents of Buyer.

Section 5.3     **Investment Intent**.  Buyer is acquiring the Securities for its own account for investment purposes only and not with a view to distribution with the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended.

Section 5.4     **No Brokers or Finders**.  Neither Buyer nor any of its Affiliates has retained any broker or finder, made any statement or representation to any Person that would entitle such Person to, or agreed to pay, any broker's, finder's or similar fees or commissions in connection with the transactions contemplated by this Agreement.

Section 5.5     **No Outside Reliance; Acknowledgement by Buyer**.

(a)     Notwithstanding anything contained in this Article V or any other provision hereof, Buyer acknowledges and agrees that none of the Acquired Companies, Seller or any of their respective Affiliates, nor any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, has made, or is making, any representation or warranty whatsoever, oral or written, express or implied (and none of Buyer or any of its Affiliates or their respective directors, officers, employees, stockholders, partners, members, agents or representatives has relied on any representation, warranty or statement of any kind by any Acquired Company, Seller or any of their respective Affiliates or any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing), beyond those expressly given in Article III or Article IV including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any of the assets of the Acquired Companies. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions or other materials (including any such materials contained in any "data room" or reviewed by Buyer or any of its Affiliates, or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives) or management presentations or due diligence discussions that have been or shall hereafter be provided to or engaged in with by Buyer or any of its Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives, are not and will not be deemed to be representations or warranties of the Acquired Companies, Seller or any of their respective Affiliates or any of the respective directors, officers, employees, stockholders, partners, members, agents or representatives of the foregoing, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing, except as may be expressly set forth in Article III or Article IV. Buyer understands and agrees that any inventory, equipment, vehicles, assets, properties and business of the Acquired Companies are furnished "as is",

19

4515621.9 035696-0006-000

FBG_CH1_00094925

"where is" with all faults and without any other representation or warranty of any nature whatsoever, in each case subject only to the representations and warranties contained in Article III or Article IV.

(b)   BUYER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY THE ACQUIRED COMPANIES AND SELLER IN ARTICLE III AND ARTICLE IV CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE ACQUIRED COMPANIES AND SELLER TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY. BUYER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED (INCLUDING ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OF THE ACQUIRED COMPANIES) ARE SPECIFICALLY AND EXPRESSLY DISCLAIMED BY THE ACQUIRED COMPANIES AND SELLER. FOR THE AVOIDANCE OF DOUBT, AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NOTHING IN THIS SECTION 5.5 SHALL PREVENT ANY PARTY HERETO FROM BRINGING A CLAIM FOR FRAUD.

**ARTICLE VI**
**[RESERVED]**

**ARTICLE VII**
**OTHER COVENANTS AND AGREEMENTS**

**Section 7.1**      **Agreements Regarding Tax Matters**.

(a)      Cooperation on Tax Matters.  Buyer, the Acquired Companies, and Seller shall cooperate reasonably and in good faith, as and to the extent reasonably requested by any other party (and at the requesting party's expense), in connection with the filing of Tax Returns of the Acquired Companies and any audit, litigation or other Proceeding with respect to Taxes of the Acquired Companies.  Such cooperation shall include the retention and (upon the other party's reasonable request and at its expense) the provision of records and information which are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Any information obtained under this Section 7.1(a) shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund of Tax or in conducting an audit or other Proceeding relating to Tax.

(b)      Tax Sharing Agreements.  Seller shall cause all Tax sharing, Tax indemnification, or Tax distribution agreements to which any Acquired Company, on the one hand, and Seller or any of its Affiliates (other than an Acquired Company) on the other hand, are parties (excluding this Agreement) to be terminated as of 12:01 a.m. local time on the Closing Date and the Acquired Companies to not be bound thereby or have any Liability thereunder with respect to any taxable period.

(c)      Transfer Taxes, Etc.  All transfer, documentary, sales, use, registration, stamp and other similar Taxes and fees (including any penalties and interest thereon) (together, "**Transfer Taxes**") shall be paid by Buyer when due, and Buyer shall file all necessary Tax Returns and other documentation with respect to such Transfer Taxes.  If required by applicable Law, Seller shall, and shall cause their Affiliates (if applicable) to, join in the execution of any such Tax Returns and other documentation.

**Section 7.2**      **Further Assurances**.  Each of the Parties agrees that subsequent to the Closing, upon the reasonable request of any other Party from time to time, it shall execute and deliver, or cause to

20

4515621.9 035696-0006-000

FBG_CH1_00094926

be executed and delivered, such further instruments and take such other actions as may be necessary or desirable to carry out the transactions contemplated by this Agreement, or to vest, perfect or confirm ownership by Buyer of the Securities. Without limiting the foregoing, Seller agrees that upon Buyer's request within 12 months following the Closing, Seller shall use commercially reasonable efforts to facilitate the termination of any agreements between any of the Acquired Companies and Seller or any of its Affiliates.

**Section 7.3** **Intracompany Arrangements**.   Each of the intracompany accounts or Contracts between any of the Acquired Companies, on the one hand, and Seller or any of its Affiliates (other than an Acquired Company) on the other hand, shall be cancelled without any consideration or further liability to any party and without the need for any further documentation, effective immediately prior to the Closing.

**Section 7.4** **General Release**.

(a)    Effective upon the Closing (including the delivery of the Securities to Buyer and the payment of the Closing Payments in accordance with Section 2.7), Seller and the Walbro Releasing Parties, on behalf of themselves and their respective Affiliates (other than any portfolio company, as such term is understood in the private equity industry, of such Walbro Releasing Party (other than the Acquired Companies)), successors, assigns and any other Person that may claim by, through or under Seller or any such Walbro Releasing Party (collectively, the "**Seller Releasing Parties**"), each hereby (i) irrevocably and unconditionally waives, releases, acquits and forever discharges Buyer and each Acquired Company and each of their respective current or former officers, directors, equityholders, partners, attorneys, agents, employees, representatives, predecessors in interest, subsidiaries, Affiliates, insurers, successors, and assigns, and each of them (collectively, the "**Buyer Releasees**"), separately, from any and all Claims of the Seller Releasing Parties, including but not limited to those which are in any way related to the facts, matters, and transactions related to the Dispute or the Seller's ownership of the Securities and (ii) agrees that no Seller Releasing Party will bring or voluntarily participate in or assist any Proceeding that relates to any matter released pursuant to this Section 7.4, except to the extent specifically required by Law or legal process.  Notwithstanding the foregoing, the Seller Releasing Parties do not waive or release any rights based upon, arising out of or relating to this Agreement.

(b)    Effective upon the Closing (including the delivery of the Securities to Buyer and the payment of the Closing Payments in accordance with Section 2.7), Buyer and the Carter Releasing Parties, on behalf of themselves and their respective Affiliates (including the Acquired Companies as of immediately following Closing), successors, assigns and any other Person that may claim by, through or under Buyer or any such Carter Releasing Party (collectively, the "**Buyer Releasing Parties**"), each hereby (i) irrevocably and unconditionally waives, releases, acquits and forever discharges Seller and each of its current or former officers, directors, equityholders, partners, attorneys, agents, employees, representatives, predecessors in interest, subsidiaries, Affiliates, insurers, successors, and assigns, and each of them (collectively, the "**Seller Releasees**"), separately, from any and all Claims of the Buyer Releasing Parties, including but not limited to those which are in any way related to the facts, matters, and transactions related to the Dispute or the ownership of Buyer, Carter Japan or any of their respective Subsidiaries and (ii) agrees that no Buyer Releasing Party will bring or voluntarily participate in or assist any Proceeding that relates to any matter released pursuant to this Section 7.4, except to the extent specifically required by Law or legal process.  Notwithstanding the foregoing, the Buyer Releasing Parties do not waive or release any rights based upon, arising out of or relating to this Agreement.

(c)    Because the release of this Agreement specifically covers all known and unknown Claims except for those based upon, arising out of or relating to this Agreement, each Buyer Releasing

21

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094927

Party and Seller Releasing Party expressly waives its rights under Section 1542 of the California Civil Code, and any similar laws of purpose or effect from other jurisdictions, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

EACH BUYER RELEASING PARTY AND SELLER RELEASING PARTY HEREBY EXPRESSLY WAIVES ANY RIGHTS THAT IT MAY HAVE THEREUNDER AS WELL AS UNDER OTHER STATUTES OR COMMON LAW PRINCIPLES, WHETHER UNDER ANY STATE'S LAW, FEDERAL LAW, OR OTHERWISE, OF SIMILAR EFFECT.

(d)      Nothing contained in this Section 7.4 shall constitute or be construed to constitute an admission of wrongdoing or liability by any of the Parties or the validity of any claim or allegation, asserted or unasserted (including in connection with the Dispute). The Claims being released herein are presently owned solely by the Parties and such Claims have not been sold, pledged, assigned or otherwise transferred to any other Person.  For the avoidance of doubt, this Agreement is intended to be a final and complete settlement of Claims and obligations between the Parties described herein as covered in this Agreement.

**Section 7.5      Restrictive Covenants**.

(a)      Confidentiality.

(i)      For a period of five years following the Closing Date, Seller shall not, and Seller shall direct its Affiliates not to, use or disclose or convey to any third party, any Acquired Confidential Information and the content of any settlement discussions related to the Dispute; provided, however, that Seller or its Affiliates may furnish such portion (and only such portion) of the Acquired Confidential Information: (i) as may be required by applicable Law, Order or rule (including, without limitation, the rules of securities exchange or any industry or self-regulatory body) (provided that Seller or such Affiliate promptly notifies Buyer of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure (other than in connection with an audit or review by a Governmental Authority in the ordinary course of business or in connection with ordinary course filings)); (ii) to its representatives on a need to know basis, subject to confidentiality obligations substantially similar to, or greater than, those contained herein; (iii) to enforce its rights under this Agreement or otherwise and Buyer or its Affiliates (including the Acquired Companies following Closing); and (iv) to any current or prospective Affiliate, partner, member, stockholder, limited partner, investor or wholly owned Subsidiary of Seller or such Affiliate in the ordinary course of business (provided that Seller or such Affiliate informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information).

(ii)      For a period of five years following the Closing Date, Buyer shall not, and Buyer shall direct its Affiliates (including the Acquired Companies following the Closing) not to, use or disclose or convey to any third party, any Seller Confidential Information and the content of any settlement discussions related to the Dispute; provided, however, that Buyer or its Affiliates may furnish such portion (and only such portion) of such Seller Confidential Information: (i) as may be required by applicable Law, Order or rule (including, without limitation, the rules of securities exchange or any industry or self-regulatory body) (provided that Buyer or such Affiliate promptly notifies Seller of such disclosure and takes

22

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094928

reasonable steps to minimize the extent of any such required disclosure (other than in connection with an audit or review by a Governmental Authority in the ordinary course of business or in connection with ordinary course filings)); (ii) to its representatives on a need to know basis, subject to confidentiality obligations substantially similar to, or greater than, those contained herein; (iii) to enforce its rights under this Agreement or otherwise against Seller or its Affiliates; or (iv) to any current or prospective Affiliate, partner, member, stockholder, limited partner, investor or wholly owned Subsidiary of Buyer or such Affiliate in the ordinary course of business (provided that Buyer or such Affiliate informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information).

(b)     Non-Disparagement. Seller and Buyer agree that neither of them nor any of their respective Affiliates shall, at any time hereafter, make any defamatory, derogatory or disparaging statements or communications (whether written or oral) regarding the other Party or any of its Affiliates, including any of their respective products or services, other than truthful statements made (i) in connection with any then pending or threatened Proceeding or as otherwise required by applicable Law; (ii) to enforce this Agreement or any other Contract; or (iii) to Governmental Authorities about possible violations of Law, in each case in good faith.

Section 7.6     Section 280G.  The Acquired Companies shall each, prior to the Closing, (a) use reasonable best efforts to obtain waivers of any "excess parachute payment" (within the meaning of Section 280G) from each Person who has a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement that would be deemed to constitute "excess parachute payments" (within the meaning of Code Section 280G excluding any payments to be made at the direction of Buyer), and (b) solicit the approval of the stockholders of each of the Acquired Companies, as applicable, in a manner that complies with Code Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated by this Agreement, be deemed to constitute "excess parachute payments."  To the extent required to comply with the provisions of the preceding sentence, the Acquired Companies shall deliver, among other items, to their respective stockholders, as applicable, a disclosure statement intended to satisfy the stockholder approval requirements of Section 280G(b)(5)(B) of the Code.  The form of waiver, solicitation of approval, and disclosure materials shall be subject to the reasonable prior review of Buyer, which shall not to be unreasonably conditioned or delayed.

Section 7.7     Directors and Officers.

(a)     Following the Closing, Seller will reasonably cooperate with Buyer and the Acquired Companies to make all necessary filings, and deliver all necessary notices, to effect the resignations of the directors and officers who executed and delivered a letter of resignation at Closing pursuant to Section 2.5(e), and Buyer will use commercially reasonable efforts to effect their removal in a timely fashion following the Closing.

(b)     Prior to the Closing, the Company shall obtain a prepaid directors' and officers' liability insurance policy or policies (i.e., "tail coverage") (the "**D&O Insurance**") which policies provide the present and former managers and officers of the Acquired Companies with continuous coverage for an aggregate period of not less than six (6) years following the Closing Date with coverage in amount and scope at least as favorable as the Acquired Companies' existing coverage, with respect to claims arising from facts or events that occurred on or before the Closing Date, including with respect to the transactions contemplated by this Agreement. The premiums for such prepaid policy shall be borne in full by the Seller as a Seller Transaction Expense and such prepaid policies shall be non-cancelable. Buyer shall, and shall cause the Acquired Companies to, maintain such policy or policies in full force and effect, and continue to honor the obligations thereunder, during the period for which it has been prepaid.

23

4515621.9 035696-0006-000

FBG_CH1_00094929

**Section 7.8**        **Public Announcements**.

(a)        No Party shall issue or cause the publication of any press release or other public announcement relating to this Agreement or the transactions contemplated hereby (whether before or after the Closing) without the prior written consent of Buyer and Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its reasonable best efforts to advise Buyer and Seller before making such disclosure); provided that, nothing herein shall prevent (i) the Buyer or its Affiliates from acknowledging that any such entity owns or is affiliated with the Acquired Companies if asked by a third party and (ii) the Seller or its Affiliates from acknowledging that any such entity has no direct or indirect interest in the Acquired Companies if asked by a third party.

(b)        No Party shall make publicly available this Agreement (or any portion of this Agreement) (whether before or after the Closing) without the prior written consent of Buyer and Seller, except as any Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by applicable rules of any stock exchange or quotation system on which such Party or its Affiliates lists or trades securities (in which case the disclosing Party will use its commercially reasonable efforts to advise Buyer and Seller before making such disclosure and, upon the request of Buyer or Seller, the Parties will work together in good faith to agree and pursue appropriate confidential treatment requests with respect to this Agreement, at the sole cost of the party requesting such treatment). This Section 7.8 shall not apply to or restrict disclosure by a Party (i) to its officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents for the purpose of obtaining advice in connection with the transactions contemplated hereunder, it being understood that such officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors, and other agents will be informed of the confidential nature of this Agreement and the transactions contemplated hereby and will be directed to treat such information as confidential in accordance with the terms of this Agreement, (ii) to its direct or indirect members, holders of Equity Securities or limited partners and their respective Affiliates or (iii) in connection with any private equity fundraising activities by such party or its indirect members, holders of Equity Securities or limited partners or their respective Affiliates.

**Section 7.9**        **Payment Direction**.  Solely for administrative convenience and for no other purpose (including the calculation of Purchase Price, Closing Date Indebtedness, Closing Date Seller Transaction Expenses or any similar terms or figures), Buyer shall apply a portion of the Closing Date Cash equal to $3,000,000 (the "**Excess Cash Amount**") held by the Acquired Companies as of the Closing to the payment of compensatory payments to employees of the Acquired Companies in accordance with Section 2.7(b)(A) in lieu of including such Excess Cash Amount in the amount to be wired to Walbro LLC under Section 2.7(b)(A). For the avoidance of doubt, in no event shall anything in this Section 7.9 relieve the Buyer of its obligation to cause the full amounts of the compensatory payments to be made to employees of the Acquired Companies (as set forth in the Estimated Closing Statement) in accordance with Section 2.7(b)(A).  The Parties agree that failure to make such payments to the employees would be a failure to pay consideration to the Seller for the Securities hereunder.

**ARTICLE VIII**
**[RESERVED]**

**ARTICLE IX**
**[RESERVED]**

24

4515621.9 035696-0006-000

CONFIDENTIAL                                                                                   FBG_CH1_00094930

**ARTICLE X**
**[RESERVED]**

**ARTICLE XI**
**MISCELLANEOUS**

Section 11.1     <u>Non-survival</u>. Except as set forth in the following sentence, the representations, warranties, covenants and agreements of Buyer, Seller and the Acquired Companies contained in this Agreement or in any certificate delivered in connection herewith will not survive beyond the Closing, such that no claim for breach of any such representation or warranty may be brought after the Closing with respect thereto against Buyer, the Acquired Companies or Seller, and there will be no Liability in respect thereof. Notwithstanding the foregoing, the parties acknowledge and agree that the preceding sentence shall not apply to any claims arising out of or relating to (a) any breaches of any covenants or agreements set forth in this Agreement that are required, by their terms, to be performed or complied with after the Closing or (b) Fraud. Each of Buyer, Seller and the Acquired Companies acknowledge and agree that neither such party nor any other Person may avoid such limitation on Liability by (x) seeking damages for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby waived or (y) asserting or threatening any claim against any Person that is not a party hereto (or a successor to a party hereto) for breaches of the representations and warranties contained in this Agreement.

Section 11.2     <u>Notices</u>. All notices and other communications made pursuant to or under this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when transmitted by facsimile or electronic mail if such transmission occurs on a Business Day before 5:00 p.m. Eastern time, or the next succeeding Business Day if such transmission occurs at any other time, (c) one Business Day after deposit with a nationally recognized overnight courier service, or (d) three Business Days after the mailing if sent by registered or certified mail, postage prepaid, return receipt requested.  All notices and other communications under this Agreement shall be delivered to the addresses set forth below, or such other address as such Party may have given to the other Parties by notice pursuant to this <u>Section 11.2</u> (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).

| | |
|---|---|
| If to Seller: | Walbro Topco LLC |
| | c/o Landon Capital Partners LLC |
| | 21 Custom House Street, Suite 700, |
| | Boston, Massachusetts 02110 |
| | Attention:  Christopher P. Sullivan |
| | Email:      csullivan@landoncapital.com |
| | |
| with a copy to (which shall not constitute notice but shall be required for notice): | Latham & Watkins LLP |
| | 200 Clarendon Street |
| | Boston, Massachusetts 02116 |
| | Attention:  Ryan McCarthy; Elizabeth M. Slawsby |
| | Email:      ryan.mccarthy@lw.com; |
| | elizabeth.slawsby@lw.com |
| | |
| If to Buyer: | Carter Carburetor Holdings, LLC |
| | 127 Public Square, Suite 5300 |
| | Cleveland, Ohio 44114 |
| | Attention:  Legal Department |
| | Email:      shekhar.kumar@firstbrandsgroup.com |

25

4515621.9 035696-0006-000

FBG_CH1_00094931

with a copy to (which        Davis + Gilbert LLP
shall not constitute notice   1675 Broadway
but shall be required for notice):   New York, New York 10019
                             Attention:  Marc Rogers
                             Email:       mrogers@dglaw.com

**Section 11.3**    **Expenses**.  Except as otherwise provided herein, all fees and expenses incurred in connection with or related to this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such fees or expenses, whether or not such transactions are consummated; provided that, if the Closing occurs, the Seller Transaction Expenses shall be borne and paid as provided in this Agreement.

**Section 11.4**    **Entire Agreement**.  All references in this Agreement to this Agreement shall include all Exhibits and Schedules hereto. This Agreement constitutes the entire agreement of the Parties relating to the subject matter hereof and supersedes all prior agreements or understandings between the Parties with respect to such subject matter.  Notwithstanding any oral agreement or course of conduct of the Parties or their respective officers, directors, managers, employees, attorneys, accountants, consultants, financial advisors and other agents to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each of the Parties.

**Section 11.5**    **No Third-Party Beneficiaries**.  This Agreement shall inure exclusively to the benefit of and be binding upon the Parties and each Buyer Releasee and Seller Releasee with respect to the provisions of Section 7.34, and their respective successors, permitted assigns, executors and legal representatives.  Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns and each Buyer Releasee and Seller Releasee with respect to the provisions of Section 7.34) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**Section 11.6**    **Assignments**.  This Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, but will not be assignable or delegable by any Party, by operation of Law or otherwise, without the prior written consent of the other Parties; provided, however, that nothing in this Agreement shall or is intended to limit the ability of Buyer to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of Seller to (a) any Affiliate of Buyer, (b) any direct or indirect purchaser of all or substantially all of the assets of the Acquired Companies, (c) any lender to Buyer and/or any Acquired Company as security for borrowings, or (d) any Person to the extent any such assignment would not reasonably be expected to have an adverse Tax impact on Seller.  Any attempted assignment in violation of this Section 11.6 shall be void *ab initio*; provided, further, that nothing in this Agreement shall or is intended to limit the ability of Seller to assign its rights or delegate its responsibilities, liabilities and obligations under this Agreement, in whole or in part, without the consent of Buyer to (a) any Affiliate of Seller, or (b) any lender to Seller (or any Affiliate of Seller) as security for borrowings.

**Section 11.7**    **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and Seller.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance

26

4515621.9 035696-0006-000

CONFIDENTIAL                                                    FBG_CH1_00094932

with the terms hereof.  Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 11.8    **Agreement Controls**.  In the event that a provision of any Ancillary Agreement is inconsistent with, conflicts with or contradicts any term of this Agreement, the terms of this Agreement shall prevail.

Section 11.9    **Severability**.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 11.10    **Governing Law**.  This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation, inducement to enter and/or performance of this Agreement (whether related to breach of contract, tortious conduct or otherwise and whether now existing or hereafter arising) shall be governed by, the internal Laws of the State of Delaware, without giving effect to any Law that would cause the Laws of any jurisdiction other than the State of Delaware to be applied.

Section 11.11    **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.

(a)    Each Party agrees that any Proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Proceeding, the United States District Court for the District of Delaware, and each of the Parties hereby submits to the exclusive jurisdiction of such courts for itself and with respect to its property, generally and unconditionally, for the purpose of any such Proceeding.  A final judgment in any such Proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party agrees not to commence any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby except in the courts described above (other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described above), irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum or does not have jurisdiction over any Party.

(b)    Each Party agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address (or in the case of Seller, Seller's address) set forth herein shall be effective service of process for any such Proceeding.

(c)    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE

4515621.9 035696-0006-000

CONFIDENTIAL                                                                                       FBG_CH1_00094933

NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.11</u>.

Section 11.12     **Specific Performance**.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each of the Parties shall be entitled to enforce specifically the provisions of this Agreement, including obtaining an injunction or injunctions to prevent breaches or threatened breaches of this Agreement, in any court designated to resolve disputes concerning this Agreement (or, if such court lacks subject matter jurisdiction, in any appropriate state or federal court), this being in addition to any other remedy to which such Party is entitled at Law or in equity.  Each Party further agrees not to assert and waives (a) any defense in any action for specific performance that a remedy at Law would be adequate and (b) any requirement under any Law to post security or provide indemnity as a prerequisite to obtaining equitable relief.

Section 11.13     **Other Remedies**.  Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or at Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

Section 11.14     **No Recourse Against Affiliates**.  Notwithstanding any other provision of this Agreement, except to the extent otherwise agreed in writing, no claim (whether at law or in equity, whether in contract, tort, statute or otherwise) may be asserted by the Acquired Companies, Seller, Buyer, any Affiliate of any of the foregoing (including, with respect to a Buyer, from and after the Closing, any Acquired Company) or any Person claiming by, through or for the benefit of any of them, against any Person who is not party to this Agreement, including any equityholders, partners, members, controlling persons, directors, managers, officers, employees, incorporators, managers, agents, representatives, or Affiliates of Buyer, any Acquired Company, or Seller or the heirs, executors, administrators, successors or assigns of any of the foregoing (or any Affiliate of any of the foregoing) that is not a party to this Agreement (each a "**Non-Party Affiliate**") with respect to matters arising in whole or in part out of, related to, based on, or in connection with the Business, the Acquired Companies, this Agreement or their subject matter or the transactions contemplated hereby or with respect to any actual or alleged inaccuracies, misstatements or omissions with respect to information furnished by or on behalf of the Acquired Companies or any Non-Party Affiliate in any way concerning the Business, the Acquired Companies, this Agreement or its subject matter or the transactions contemplated hereby.

Section 11.15     **Rules of Construction**.  The following rules of construction shall govern the interpretation of this Agreement:

(a)     all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

28

4515621.9 035696-0006-000

CONFIDENTIAL                                                                                               FBG_CH1_00094934

(b)      each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP;

(c)      unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(d)      whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(e)      the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(f)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two days after a triggering event and such event occurs on a Tuesday, then the action must be taken on or prior to Thursday); to the extent any such period is measured in Business Days, if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      the subject headings of Articles and Sections of this Agreement are included for purposes of convenience of reference only and shall not affect the construction or interpretation of any of its provisions;

(j)      (i) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all", and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)      (i) references to "days" means calendar days unless Business Days are expressly specified and (ii) references to "$" mean U.S. dollars;

(l)      the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(m)      all uses of "written" contained in Articles III, IV and V shall be deemed to include information transmitted via e-mail, facsimile or other electronic transmission;

29

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094935

(n)     for purposes of Article IV, information shall be deemed to have been "made available" to Buyer only if such information was posted to the electronic data room maintained by Latham & Watkins LLP or emailed to the legal advisors of Buyer or its Affiliates (including Davis+Gilbert LLP and Quinn Emanuel Urquhart & Sullivan, LLP) in a manner accessible and reviewable by Buyer at least one day prior to the date of this Agreement;

(o)     any drafts of this Agreement  circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(p)     the Parties have participated jointly in the negotiation and drafting of this Agreement; in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 11.16     **Counterparts; Deliveries**.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of electronic transmission of .pdf files or other image files via e-mail, cloud-based transfer or file transfer protocol, or use of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  No party to any such agreement or instrument shall raise the use of electronic transmission or a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic transmission or a facsimile machine as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

Section 11.17     **Legal Representation**.  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, managers, members, partners, officers, employees and Affiliates, that Latham & Watkins LLP is serving as counsel to Seller, and may serve as counsel to Seller and each of its Affiliates (individually and collectively, the "**Seller Group**"), on the one hand, and the Company and the other Acquired Companies, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the Dispute prior to Closing and the consummation of the transactions contemplated hereby, and that following the Closing and the consummation of the transactions contemplated hereby, Latham & Watkins LLP (or any successor) may serve as counsel to Seller Group (which will no longer include the Acquired Companies) or any partner, member, director, manager, officer, employee or Affiliate of Seller Group (which will no longer include the Acquired Companies), in connection with any litigation, claim or obligation arising out of or relating to this Agreement, the transactions contemplated by this Agreement or the Dispute notwithstanding such representation.  Each of the parties hereto consents to such representation by Latham & Watkins LLP of the Seller Group and waives any conflict of interest arising therefrom, and each of such parties shall cause any Affiliate thereof to consent to waive any conflict of interest arising from such representation.  In addition, all communications involving attorney-client confidences between the Seller and its Affiliates which pertain directly to the negotiation, documentation and consummation of the transactions contemplated hereby or the Dispute shall be deemed to be attorney-client confidences that belong solely to Seller and its Affiliates (and not the Company or any other Acquired Company).  Accordingly, neither the Company nor any other Acquired Company shall have access to any such communications, or to the files

30

4515621.9 035696-0006-000

of Latham & Watkins LLP relating to such engagement, whether or not the Closing shall have occurred. Without limiting the generality of the foregoing, upon and after the Closing, (a) the Seller and its Affiliates (and not the Company or any other Acquired Company) shall be the sole holders of the attorney-client privilege with respect to such engagement, and neither the Company nor any other Acquired Company shall be a holder thereof, (b) to the extent that files of Latham & Watkins LLP in respect of such engagement constitute property of the client, only the Seller and its Affiliates (and not the Company or any other Acquired Company) shall hold such property rights, and (c) Latham & Watkins LLP shall have no duty whatsoever to reveal or disclose any such attorney-client communications or files to the Company or any other Acquired Company by reason of any attorney-client relationship between Latham & Watkins LLP and the Company or such other Acquired Company.

[*The remainder of this page is intentionally left blank.*]

31

4515621.9 035696-0006-000

CONFIDENTIAL

FBG_CH1_00094937

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

COMPANY:

**WALBRO MIDCO LLC**

By: _____

Name:   Christopher P. Sullivan

Its:       President

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                                                   FBG_CH1_00094938

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

**WALBRO TOPCO LLC**

By: _____

Name: Christopher P. Sullivan

Its: President

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                                FBG_CH1_00094939

**DEBTORS' EXHIBIT NO. 245**
**Page 34 of 92**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

WALBRO RELEASING PARTIES:

**WALBRO HOLDINGS LP**

By: LCP Walbro GP, LLC
Its: General Partner

By: _____
Name:   Christopher P. Sullivan
Its:       President

**LCP WALBRO SPV, LP**

By: LCP General Partner (Cayman), Ltd.
Its: General Partner

By: _____
Name:   Christopher P. Sullivan
Its:       President

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL   FBG_CH1_00094940

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**WALBRO RELEASING PARTIES**:

**NOVA GP INVESTMENTS XIV LP**

By: Nova (GP) Scotland Limited
Its: General Partner

By: _David Williamson_ _____
Name:   David Williamson
Its:      Director

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                                  FBG_CH1_00094941

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**BUYER:**

**CARTER CARBURETOR HOLDINGS, LLC**

By:   _____
Name:   Michael Baker
Its:   Chief Corporate Strategy Officer and Secretary

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL

FBG_CH1_00094942

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

CARTER RELEASING PARTIES:

**CARTER CARBURETOR, LLC**

By: _____
Name:   Michael Baker
Its:        Chief Corporate Strategy Officer and Secretary

**FIRST BRANDS GROUP, LLC**

By: _____
Name:   Michael Baker
Its:        Chief Corporate Strategy Officer and Secretary

**WALBRO CO. LTD.**

By: _____
Name:   Michael Baker
Its:        Representative Director

(Signature Page to Securities Purchase Agreement)

CONFIDENTIAL                                              FBG_CH1_00094943

**Exhibit A**

Estimated Closing Statement

4515621.9 035696-0006-000

CONFIDENTIAL                                                                    FBG_CH1_00094944

| Estimated Closing Indebtedness | Amount |
|---|---|
| (a) all obligations for borrowed money or extensions of credit | $10,067,388. |
| (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, commercial paper or debt securities | $0. |
| (c) all obligations under swaps, hedges, caps, collars, options, futures or similar instruments | $0. |
| (d) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and accrued expenses incurred in the ordinary course of business), including earnouts, payments under non-compete agreements and seller notes, | $0. |
| (e) all obligations created or arising under any conditional sale or other title retention agreement | $0. |
| (f) all obligations secured by a Lien | $0. |
| (g) all obligations under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases (other than, for the avoidance of doubt, any operating leases) | $112,841. |
| (h) all obligations in respect of bankers' acceptances, surety bonds, performance bonds or letters of credit | $0. |
| (i) all obligations of any Person other than another Acquired Company which are directly or indirectly guaranteed by such Acquired Company or in respect of which such Acquired Company has otherwise assured an obligation against loss | $0. |
| (j) all interest, principal, prepayment penalties, premiums, fees or expenses due or owing in respect of any item listed in clauses (a) through (i) above | $0. |
| **Total** | **$10,180,229.** |

CONFIDENTIAL

FBG_CH1_00094945

Project FS

| Estimated Closing Cash | |
|---|---|
| Estimated Cash Balance as of Closing | $6,028,900 |
| With respect to Cash held outside the U.S., any amounts that would be required to repatriate such cash into the U.S. in excess of $500,000 | $-- |
| Cash restricted from use except for a contractually specified purpose or used as collateral for, or otherwise to provide credit support for, any liabilities of any Person under any letter of credit or other Contract | ($30,681) |
| Estimated Closing Cash | $5,998,219 |

CONFIDENTIAL

FBG_CH1_00094946

Project FS
Outgoing Wires (First Brands)
Actual

**FUNDING OUTFLOWS**

| Payee | Description | Wired Amount | Sub Total | Bank Name | Bank Address | ABA / Swift | Account Name | Account # | Reference Memo | Fed Ref |
|---|---|---|---|---|---|---|---|---|---|---|
| **Buyer Wires** | | | | | | | | | | |
| Walbro | Bonuses | $4,769,887.21 | | JPMorgan Chase | 383 Madison Avenue New York, NY 10179 | 021000021 | Walbro LLC | 778728995 | Alamo | |
| JPM | Revolver Pay Down | $10,067,388.81 | | JPMorgan Chase Bank NA | 383 Madison Avenue New York, NY 10179 | 021000021 | | 9008113381C7476 | WALBRO MIDCO LLC | |
| A&M | 280G | $60,433.00 | | Wells Fargo | | 1210000248 | | 2000018590500 | Ref # 845766A-002 | |
| FTI | Walbro image/marketing consultation | $73,156.00 | | Bank of America, N.A. | New York, NY 10001 | 026009593 | FTI Consulting (SC) inc. | 003930633120 | | |
| Weerawong | Thai Diligence | $901.05 | | Bangkok Bank Public Company Limited (Siam Squarre Branch) | 394 Rama I Road, Wangmai Sub-district, Pathumwan District, Bangkok 10330 Thailand | BKKBTHBK | Weerawong, Chinnavat and Partners Ltd | 152-4-78821-1 | | |
| Holland & Knight LLP | JPM Advisor | $40,549.50 | | | | 121000248 | | 2090002390441 | 088499.01463 (WALBRO MIDCO LLC) | |
| Willis Towers Watson Northeast, Inc | D&O tail | $95,976.00 | | JP Morgan Chase Bank | 4 New York Plaza, New York, NY 10015 | 021000021 | Willis Towers Watson Northeast, Inc | 144810563 | | |
| Latham & Watkins | Deal Counsel | $3,600,000.00 | | Citibank N.A | One Penn's Way New Castle, DE 19720 | 0311-00209 | Latham & Watkins LLP | 3911-7003 | 071158-0004 | |
| RAM LLP | Delaware Counsel | $212,343.52 | | WSFS Bank | 500 Delaware Ave, Wilmington, DE 19801 | 031100102 | Ross Aronstam & Moritz LLP | 211207394 | Walbro - Statement 21780 | |
| **Proceeds** | | | | | | | | | | |
| Landon | Proceeds | $86,611,473.76 | | Manufacturers & Traders Trust C | Buffalo, NY | 022000046 | Landon Capital Partners LLC | 6500275878 | Walbro | |
| Nova | Proceeds | $7,353,269.15 | | Lloyds Bank Plc | 25 Gresham Street, London EC2V 7HN England | LOYDGB21F09 | Nova Cap GP Inv XIV LP | 11999281 | | |
| **Total Outgoing Wires** | | $112,885,378.00 | | | | | | | | |

CONFIDENTIAL

**DEBTORS' EXHIBIT NO. 245**
**Page 42 of 92**

FBG_CH1_00094947

| | Mike Coyle | Shane Griffin | | Chris Quick |
|---|---|---|---|---|
| Aggregate Bonus Payment | $4,009,262.60 | $939,164.42 | | $2,228,123.86 |

| | | | | |
|---|---|---|---|---|
| Income to Date | $13,516.00 | $12,249.60 | | |
| SS Threshold based on income to date | $155,084.00 | $156,350.40 | | |
| **Employer Portion of Payroll Taxes** | | | | |
| Social Security | $9,615.21 | $9,693.72 | CPP | $2,676.00 |
| Medicare (1.45% of total bonus) | $58,134.31 | $13,617.88 | EI | $641.45 |
| | $4,077,012.12 | $962,476.03 | | $2,231,441.31 |

| Transaction Expense Total (including employer portion of taxes) |
|---|
| $7,270,929.46 |

CONFIDENTIAL

FBG_CH1_00094948

| Employee Name (Last Suffix, First MI) | | Employee Number | Current Job | Original Hire | Pay Group | Work Location | Hourly/Salaried | Full/Part Time | Historical Job | Employer Portion of Payroll | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cabral, Alejandro | $2,500.00 | 103655 | Sr. Controller | 12/04/2023 | Exempt BiWeekly | Grand Rapids - No Loc Tax | Salaried | Full Time | Sr. Controller | $ | 191.25 | $ | 2,691.25 |
| Saganski, Joseph M. | $2,500.00 | 103620 | General Mgr WGR | 09/11/2023 | Exempt BiWeekly | Grand Rapids - No Loc Tax | Salaried | Full Time | General Mgr WGR | $ | 191.25 | $ | 2,691.25 |
| Balzeski, Reed A. | $2,500.00 | 103600 | Technician | 07/31/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Lee, Bertram | $2,500.00 | 103598 | Technician | 07/31/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Vander Welde, Jerry | $2,500.00 | 103599 | Technician | 07/31/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Beachy, Bryan | $2,500.00 | 103592 | Designer | 07/17/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Designer | $ | 191.25 | $ | 2,691.25 |
| Bos, Alexander J. | $2,500.00 | 103595 | Maintenance Technician | 07/17/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Maintenance Technician | $ | 191.25 | $ | 2,691.25 |
| Bland, KeJuan | $2,500.00 | 103594 | General Labor | 07/14/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Wright, Euniq | $2,500.00 | 103593 | General Labor | 07/14/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Kalinowski, Scott | $2,500.00 | 103586 | Production Leader I | 07/10/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ | 2,691.25 |
| Gebrehiwot, Natsnet | $2,500.00 | 103567 | General Labor | 06/05/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Rutebuka, Ahadi | $2,500.00 | 103566 | General Labor | 06/05/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Warda, Adam S. | $2,500.00 | 103562 | Production Manager | 05/22/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Manager | $ | 191.25 | $ | 2,691.25 |
| Millsap, Carlos S. | $2,500.00 | 103561 | Ship/Rec Administrator | 05/11/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Sr. Dept. Coordinator | $ | 191.25 | $ | 2,691.25 |
| Solgat, Logan | $2,500.00 | 103559 | Controls Engineer | 05/08/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | | $ | 191.25 | $ | 2,691.25 |
| Klco, Andrew | $2,500.00 | 103553 | Program Manager II | 05/01/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Program Manager II | $ | 191.25 | $ | 2,691.25 |
| Ramirez, Jayden | $2,500.00 | 103552 | General Labor | 05/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Mendoza Ramos, Seydi | $2,500.00 | 103550 | General Labor | 04/24/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Pablo Ramirez, Teresa | $2,500.00 | 103551 | General Labor | 04/24/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Jones I, Lacy G. | $2,500.00 | 103533 | Production Leader I | 03/20/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Production Leader I | $ | 191.25 | $ | 2,691.25 |
| Anderson, Christina M. | $2,500.00 | 103528 | QA QC Engineer II | 03/06/2023 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Engineer II | $ | 191.25 | $ | 2,691.25 |
| Kelley, Donte | $2,500.00 | 103524 | Line Leader | 02/20/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Lemus, Mayra | $2,500.00 | 103523 | Inventory Cycle Counter | 02/20/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Inventory Cycle Counter | $ | 191.25 | $ | 2,691.25 |
| Bouwhuis, Jeremy R. | $2,500.00 | 103508 | Program Manager II | 01/23/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Program Manager II | $ | 191.25 | $ | 2,691.25 |
| Bland, RaeGenea D. | $2,500.00 | 103500 | Planner Scheduler II | 01/03/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Planner Scheduler II | $ | 191.25 | $ | 2,691.25 |
| Wellman, Benjamin R. | $2,500.00 | 103495 | Manufacturing Engineer I | 01/03/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Manufacturing Engineer I | $ | 191.25 | $ | 2,691.25 |
| Amattous, Lahcen | $2,500.00 | 103488 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Armstrong, Charles | $2,500.00 | 103470 | Line Leader | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Ayala, Jose | $2,500.00 | 103476 | Technician | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Baweja, Edward | $2,500.00 | 103463 | Line Leader | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Bennett, Edward | $2,500.00 | 103475 | Sr. Technician | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ | 2,691.25 |
| Billings, Kenneth | $2,500.00 | 103491 | Ship/Rec Administrator | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Ship/Rec Administrator | $ | 191.25 | $ | 2,691.25 |
| Blakeslee, David | $2,500.00 | 103494 | Production Maintenance | 01/01/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Production Maintenance | $ | 191.25 | $ | 2,691.25 |
| Choyce, Cynthia | $2,500.00 | 103479 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Cornelius, Andrew | $2,500.00 | 103472 | Maintenance Technician | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Maintenance Technician | $ | 191.25 | $ | 2,691.25 |
| Gough, Rachel | $2,500.00 | 103480 | Technician | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Graham, Veronica | $2,500.00 | 103458 | Production Superintendent | 01/01/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Production Superintendent | $ | 191.25 | $ | 2,691.25 |
| Green, Trisha | $2,500.00 | 103487 | Technician | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Johnson, Linda | $2,500.00 | 103464 | Production Leader I | 01/01/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Production Leader I | $ | 191.25 | $ | 2,691.25 |
| Kaleta, Matthew | $2,500.00 | 103460 | Line Leader | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Kyi, Hsar-Paw | $2,500.00 | 103466 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Le, Dai | $2,500.00 | 103483 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Longdile Jr., Arthur | $2,500.00 | 103471 | MFG Engineer III | 01/01/2023 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | MFG Engineer III | $ | 191.25 | $ | 2,691.25 |
| Lopez, Roberto | $2,500.00 | 103468 | Line Leader | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Luk, Simon | $2,500.00 | 103462 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Preciado II, Miguel | $2,500.00 | 103484 | Production Maintenance | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Production Maintenance | $ | 191.25 | $ | 2,691.25 |
| Rangel, Rebecca | $2,500.00 | 103459 | Inspection | 01/01/2023 | Grand Rapids Hourly | Grand Rapids - No Loc Tax | Hourly | Full Time | Inspection | $ | 191.25 | $ | 2,691.25 |
| Sheffer, Donald | $2,500.00 | 103490 | Sr. Dept. Coordinator | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Sr. Dept. Coordinator | $ | 191.25 | $ | 2,691.25 |
| Swift, Mason | $2,500.00 | 103493 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Vite, Kathie | $2,500.00 | 103469 | General Labor | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | General Labor | $ | 191.25 | $ | 2,691.25 |
| Wade, Fernando O. | $2,500.00 | 103474 | Production Maintenance | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Production Maintenance | $ | 191.25 | $ | 2,691.25 |
| Warren, Mignon | $2,500.00 | 103499 | Line Leader | 01/01/2023 | Grand Rapids Hourly | Grand Rapids | Hourly | Full Time | Line Leader | $ | 191.25 | $ | 2,691.25 |
| Clark, Andrew C. | $2,500.00 | 103451 | Sales Manager | 11/15/2022 | Exempt BiWeekly | Grand Rapids | Salaried | Full Time | Sales Manager | $ | 191.25 | $ | 2,691.25 |
| Ashimi, Abayomi | $2,500.00 | 103433 | Production Manager | 10/03/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Manager | $ | 191.25 | $ | 2,691.25 |
| Koon III, Richard E. | $2,500.00 | 103427 | Production Leader I | 09/28/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ | 2,691.25 |
| LaPratt, Brian D. | $2,500.00 | 103416 | Technician | 09/06/2022 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Talaski, Blake | $2,500.00 | 103406 | Manufacturing Engineer II | 08/22/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Manufacturing Engineer II | $ | 191.25 | $ | 2,691.25 |
| Jozwiak, Christina | $2,500.00 | 103398 | Sr. HR Representative II | 08/01/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. HR Representative II | $ | 191.25 | $ | 2,691.25 |
| Karas, Jason | $2,500.00 | 103357 | Technician | 05/13/2022 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Arebalo, Christopher | $2,500.00 | 103328 | Technician | 03/07/2022 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Hessler, Jordan | $2,500.00 | 103315 | HR Representative I | 02/21/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | HR Representative I | $ | 191.25 | $ | 2,691.25 |
| Tennant, Katilyn R. | $2,500.00 | 103316 | Safety & Training Spec | 02/21/2022 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Safety & Training Spec | $ | 191.25 | $ | 2,691.25 |
| Clements, Paul | $2,500.00 | 103281 | Maintenance Technician | 11/23/2021 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Maintenance Technician | $ | 191.25 | $ | 2,691.25 |
| Werner III, Arthur J. | $2,500.00 | 103207 | Sr. Buyer I | 07/12/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Buyer I | $ | 191.25 | $ | 2,691.25 |
| Mault, Thomas | $2,500.00 | 103201 | SR MFG ENGR III | 06/28/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | SR MFG ENGR III | $ | 191.25 | $ | 2,691.25 |
| Salcido, Abbey | $2,500.00 | 103181 | HR Representative I | 05/24/2021 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | INTERN | $ | 191.25 | $ | 2,691.25 |
| Roth, Dylan A. | $2,500.00 | 103162 | Manufacturing Engineer I | 05/03/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Manufacturing Engineer I | $ | 191.25 | $ | 2,691.25 |
| Saylor, Jonathan | $2,500.00 | 103153 | Sr. Engineering Manager | 04/28/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Engineering Manager | $ | 191.25 | $ | 2,691.25 |
| Nugent, Kristina | $2,500.00 | 103152 | Controller | 04/19/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Controller | $ | 191.25 | $ | 2,691.25 |
| Heckman, Brandon | $2,500.00 | 103134 | Business Analyst | 03/29/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Business Analyst | $ | 191.25 | $ | 2,691.25 |
| Peters, Sherry S. | $2,500.00 | 103135 | Customer Svc Rep | 03/29/2021 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Customer Svc Rep | $ | 191.25 | $ | 2,691.25 |
| Buchanan, Jason | $2,500.00 | 103116 | Engineering Director | 02/26/2021 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineering Director | $ | 191.25 | $ | 2,691.25 |
| Miller, Raymond | $2,500.00 | 103093 | Technician | 01/11/2021 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Lawson, John T. | $2,500.00 | 103090 | Technician | 01/04/2021 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Mester, Katelynne | $2,500.00 | 103056 | Technician | 10/16/2020 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Wruble, Tristan | $2,500.00 | 103051 | Sr. Technician | 09/28/2020 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Duda, Alexis | $2,500.00 | 103048 | HR Manager II | 09/14/2020 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | HR Manager II | $ | 191.25 | $ | 2,691.25 |
| Colson, Shawn M. | $2,500.00 | 103047 | IT Manager I | 09/08/2020 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | IT Manager I | $ | 191.25 | $ | 2,691.25 |
| Braun, Joseph | $2,500.00 | 103015 | Sr. Technician | 07/06/2020 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ | 2,691.25 |
| Grifka, Ian | $2,500.00 | 103002 | Technician | 10/28/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Jeffrey, Richard | $2,500.00 | 103001 | Technician | 10/14/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Burkland, Christopher A. | $2,500.00 | 102993 | QA QC Manager II | 09/23/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Manager II | $ | 191.25 | $ | 2,691.25 |
| Sommerfield II, Ricky | $2,500.00 | 102987 | Technician | 09/09/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Fair, Marcus | $2,500.00 | 102942 | QA QC Engineer I | 06/26/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Engineer I | $ | 191.25 | $ | 2,691.25 |
| Wendling, Nicholas | $2,500.00 | 102935 | Assoc. Program Manager I | 06/14/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Program Manager 1 | $ | 191.25 | $ | 2,691.25 |
| Rychlewski, Steven | $2,500.00 | 102924 | Technician | 05/28/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Walker, Jonathan | $2,500.00 | 102920 | Engineer I | 05/20/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineer I | $ | 191.25 | $ | 2,691.25 |
| Schornack, Alex | $2,500.00 | 102907 | QA QC Engineer I | 05/14/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Engineer I | $ | 191.25 | $ | 2,691.25 |
| McClanahan, Ryan | $2,500.00 | 102904 | Sr. Technician | 04/15/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ | 2,691.25 |
| Kanaby, Matthew | $2,500.00 | 102896 | Technician | 04/08/2019 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ | 2,691.25 |
| Mills, Kelli L. | $2,500.00 | 102856 | Sr. Dept. Coordinator | 02/25/2019 | Non Exempt Biweekly | Tucson Headquarters | Hourly | Full Time | Sr. Dept. Coordinator | $ | 191.25 | $ | 2,691.25 |
| Maikrzek, Jeffery | $2,500.00 | 102847 | Program Manager 1 | 02/04/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Program Manager 1 | $ | 191.25 | $ | 2,691.25 |
| Severance, Logan D. | $2,500.00 | 102844 | IT Analyst I | 01/21/2019 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | IT Analyst I | $ | 191.25 | $ | 2,691.25 |
| Fuelleman, David | $2,500.00 | 102826 | Gen Mgr Cass City | 12/03/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Gen Mgr Cass City | $ | 191.25 | $ | 2,691.25 |
| MacPhee, Karen | $2,500.00 | 102814 | Production Control Mgr | 11/12/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Control Mgr | $ | 191.25 | $ | 2,691.25 |
| Simms, Matthew | $2,500.00 | 102801 | Senior VP of Operations | 09/24/2018 | Exempt BiWeekly | Tucson Headquarters | Salaried | Full Time | Senior VP of Operations | $ | 191.25 | $ | 2,691.25 |
| Marco, Tammy L. | $2,500.00 | 102769 | Purchasing Supervisor | 07/30/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Purchasing Supervisor | $ | 191.25 | $ | 2,691.25 |

CONFIDENTIAL

FBG_CH1_00094949

| Employee Name (Last Suffix, First MI) | | Employee Number | Current Job | Original Hire | Pay Group | Work Location | Hourly/Salaried | Full/Part Time | Historical Job | ployer Portion of Payroll | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gorkowski, Tyler | $2,500.00 | 102732 | Sales Representative I | 06/04/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sales Representative I | $ | 191.25 | $ 2,691.25 |
| Yageman, Allan | $2,500.00 | 102681 | QA QC Manager I | 02/26/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Manager I | $ | 191.25 | $ 2,691.25 |
| Smith, Kevin | $2,500.00 | 102664 | Manufacturing Engineer I | 02/05/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Manufacturing Engineer I | $ | 191.25 | $ 2,691.25 |
| Martell, Shawn | $2,500.00 | 102660 | Technical Specialist I | 01/19/2018 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Technical Specialist I | $ | 191.25 | $ 2,691.25 |
| Lefler, Brandon | $2,500.00 | 102649 | Technician | 12/11/2017 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Childs, Justin | $2,500.00 | 102648 | Sr. Technician | 12/04/2017 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Eberlein, Kyle J. | $2,500.00 | 102615 | Technician | 06/22/2017 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Ploch, Shane | $2,500.00 | 102602 | Technician | 05/01/2017 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Calugaru, Paul | $2,500.00 | 102578 | Materials Manager I | 02/06/2017 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Materials Manager I | $ | 191.25 | $ 2,691.25 |
| Williamson, Carla | $2,500.00 | 102577 | Cost Accountant | 02/06/2017 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Cost Accountant | $ | 191.25 | $ 2,691.25 |
| Daul, Alan | $2,500.00 | 102570 | Sr. Sales Manager | 01/16/2017 | Exempt BiWeekly | North Carolina | Salaried | Full Time | Sr. Sales Manager | $ | 191.25 | $ 2,691.25 |
| VanSipe, Elizabeth | $2,500.00 | 102569 | Engineer I | 01/03/2017 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineer I | $ | 191.25 | $ 2,691.25 |
| Carr, Jacob C. | $2,500.00 | 102566 | Technical Specialist I | 12/12/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Technical Specialist I | $ | 191.25 | $ 2,691.25 |
| Bragg, Adam | $2,500.00 | 102551 | Technician | 09/23/2016 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Peyerk, Angela | $2,500.00 | 102534 | Technician | 09/19/2016 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Felice, Frank | $2,500.00 | 102507 | Technical Specialist I | 08/29/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Technical Specialist I | $ | 191.25 | $ 2,691.25 |
| May, David | $2,500.00 | 102509 | Manufacturing Engineer I | 08/29/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Manufacturing Engineer I | $ | 191.25 | $ 2,691.25 |
| LeValley, Timothy A. | $2,500.00 | 102487 | Technician | 08/08/2016 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Muscott, Brandon | $2,500.00 | 102476 | Sr. Buyer I | 08/01/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Buyer I | $ | 191.25 | $ 2,691.25 |
| Schooley, Steven | $2,500.00 | 102460 | Project Engineer I | 06/20/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Project Engineer I | $ | 191.25 | $ 2,691.25 |
| Mikulak, Jacob | $2,500.00 | 102452 | Engineer II | 06/10/2016 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineer II | $ | 191.25 | $ 2,691.25 |
| Davis, Brian | $2,500.00 | 102379 | QA QC Supervisor | 12/01/2014 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | QA QC Supervisor | $ | 191.25 | $ 2,691.25 |
| Easlick, Gary | $2,500.00 | 102362 | Technician | 09/17/2014 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| Verhines, Paul V. | $2,500.00 | 102318 | Engineer II | 05/09/2014 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineer II | $ | 191.25 | $ 2,691.25 |
| Johnson, Mark | $2,500.00 | 102309 | Sr. Technician | 03/24/2014 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Armstead, Ed | $2,500.00 | 102223 | Production Leader I | 05/10/2013 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ 2,691.25 |
| Horne, Michele | $2,500.00 | 102221 | Buyer 1 | 05/03/2013 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Buyer 1 | $ | 191.25 | $ 2,691.25 |
| Burcham, Robert | $2,500.00 | 102199 | Customer Svc Rep | 01/02/2013 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Customer Svc Rep | $ | 191.25 | $ 2,691.25 |
| Osterbeck, Alex M. | $2,500.00 | 102188 | Technician | 07/10/2012 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Technician | $ | 191.25 | $ 2,691.25 |
| German, Jake D. | $2,500.00 | 102187 | Sr. Technician | 06/14/2012 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Kurtansky, Justin | $2,500.00 | 102119 | Sr. Technician | 10/18/2011 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Mulhall, Nancy | $2,500.00 | 102117 | Payroll and Benefits Mgr | 09/26/2011 | Exempt BiWeekly | Tucson Headquarters | Salaried | Full Time | Payroll Manager | $ | 191.25 | $ 2,691.25 |
| Craig, Michael C. | $2,500.00 | 102063 | Production Leader I | 03/14/2011 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ 2,691.25 |
| Tietz, Brian | $2,500.00 | 102057 | Project Engineer II | 02/28/2011 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Project Engineer II | $ | 191.25 | $ 2,691.25 |
| Millett, Joseph | $2,500.00 | 102046 | Sr. Program Manager 3 | 02/07/2011 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Program Manager 3 | $ | 191.25 | $ 2,691.25 |
| Hodgkinson, Corey J. | $2,500.00 | 102025 | Sr. Technician | 11/08/2010 | Non Exempt Biweekly | Global Technology Group | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Osterbeck, Richard H. | $2,500.00 | 102022 | Sr. Technician | 10/18/2010 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Simmons, Jeremy L. | $2,500.00 | 102015 | Mfg. Eng. Manager II | 07/26/2010 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Mfg. Eng. Manager II | $ | 191.25 | $ 2,691.25 |
| Bruman, Steven L. | $2,500.00 | 101998 | Sr. Mfg. Engineer I | 07/30/2009 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Mfg. Engineer I | $ | 191.25 | $ 2,691.25 |
| Atkinson, Barry L. | $2,500.00 | 101994 | Financial Analyst II | 10/13/2008 | Non Exempt Biweekly | Walbro Cass City | Hourly | Part Time | Financial Analyst II | $ | 191.25 | $ 2,691.25 |
| Ramirez, Constantino | $2,500.00 | 102381 | IT Manager, Global IT | 06/30/2008 | Exempt BiWeekly | Tucson Headquarters | Salaried | Full Time | IT Manager, Global IT | $ | 191.25 | $ 2,691.25 |
| Adams, Tamara A. | $2,500.00 | 101983 | Finance Manager I | 08/13/2007 | Exempt BiWeekly | Tucson Headquarters | Salaried | Full Time | Finance Manager I | $ | 191.25 | $ 2,691.25 |
| Goniwiecha, Michael J. | $2,500.00 | 101915 | Manufacturing Engineer II | 04/24/2006 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Manufacturing Engineer II | $ | 191.25 | $ 2,691.25 |
| Matuszak, Michael | $2,500.00 | 101894 | Production Manager | 01/31/2006 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Manager | $ | 191.25 | $ 2,691.25 |
| Fisch, Elton J. | $2,500.00 | 101852 | Engineering Technical Dir | 09/06/2005 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Engineering Director | $ | 191.25 | $ 2,691.25 |
| Sauber, Patricia A. | $2,500.00 | 101840 | Global Shared Svc Manager | 06/20/2005 | Exempt BiWeekly | Tucson Headquarters | Salaried | Full Time | Global Shared Svc Manager | $ | 191.25 | $ 2,691.25 |
| Randall, Larry | $2,500.00 | 5161 | Production Leader I | 09/08/2004 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ 2,691.25 |
| Salowitz, Douglas W. | $2,500.00 | 101797 | Principal Engineer | 06/21/2004 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Principal Engineer | $ | 191.25 | $ 2,691.25 |
| Ahern, David | $2,500.00 | 101690 | Technical Specialist III | 04/02/2002 | Exempt BiWeekly | Global Technology Group | Salaried | Full Time | Technical Specialist III | $ | 191.25 | $ 2,691.25 |
| Merchant, Daniel | $2,500.00 | 101539 | Technical Specialist II | 02/01/1999 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Technical Specialist II | $ | 191.25 | $ 2,691.25 |
| Salcido, Richard J. | $2,500.00 | 1083 | Sr. Project Engineer I | 10/14/1998 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Project Engineer I | $ | 191.25 | $ 2,691.25 |
| Gangler, Bryan | $2,500.00 | 101514 | Project Engineer I | 08/10/1998 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Project Engineer I | $ | 191.25 | $ 2,691.25 |
| Learman, Paul S. | $2,500.00 | 101388 | Sr. Project Engineer I | 07/08/1996 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Project Engineer I | $ | 191.25 | $ 2,691.25 |
| LaMarr Jr, Gerald J. | $2,500.00 | 101358 | Program Director | 10/30/1995 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Program Director | $ | 191.25 | $ 2,691.25 |
| Britt, Paul R. | $2,500.00 | 4750 | Sr. Technician | 08/23/1993 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Dennis, Laura | $2,500.00 | 101243 | Production Doc Ctr Coord | 12/31/1992 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Exec Asst-Sales Admin | $ | 191.25 | $ 2,691.25 |
| Pattullo, George M. | $2,500.00 | 100941 | IP Administrator | 10/03/1988 | Exempt BiWeekly | Global Technology Group | Salaried | Full Time | Sr. Engineering Manager | $ | 191.25 | $ 2,691.25 |
| Ellicott, Lesa A. | $2,500.00 | 1045 | Sr. Financial Analyst | 08/21/1987 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Financial Analyst | $ | 191.25 | $ 2,691.25 |
| Burns, Gary | $2,500.00 | 101463 | Sr. Project Engineer I | 09/15/1986 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Sr. Project Engineer I | $ | 191.25 | $ 2,691.25 |
| Lefler, Sherry | $2,500.00 | 4428 | Production Leader I | 10/24/1985 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Leader I | $ | 191.25 | $ 2,691.25 |
| Wilder, Dave | $2,500.00 | 4366 | Production Control Coord | 06/24/1985 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Production Control Coord | $ | 191.25 | $ 2,691.25 |
| Spry, Joan K. | $2,500.00 | 101654 | Technical Specialist II | 01/14/1985 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | Technical Specialist II | $ | 191.25 | $ 2,691.25 |
| Ruticoski, Jeffery | $2,500.00 | 4246 | Sr. Technician | 08/16/1983 | Non Exempt Biweekly | Walbro Cass City | Hourly | Full Time | Sr. Technician | $ | 191.25 | $ 2,691.25 |
| Altizer, Jennifer | $2,500.00 | 101680 | SR Cust Srvc Supervisor | 02/22/1982 | Exempt BiWeekly | Walbro Cass City | Salaried | Full Time | SR Cust Srvc Supervisor | $ | 191.25 | $ 2,691.25 |
| Tamaoki, Masao | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Kojima, Tetuji | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Iwasaki, Isao | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Suzuki, Darioku | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Sato, Tetsuya | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Horikawa, Takashi | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Kumagai, Naoya | $2,500.00 | | | | | Walbro Japan | | | | $ | 191.25 | $ 2,691.25 |
| Bunjong Jantayotee | $1,500.00 | | General Manager | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Savitri Pondet | $1,500.00 | | Senior Financial Analyst | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Chitrada Boonyaratananusorn | $1,500.00 | | ACCT SPVR | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Rungnapa Nuntabut | $1,500.00 | | ACCT1 | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Jarisak Chotirak | $1,500.00 | | Manufacturing Manager1 | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Bunpot Srimawong | $1,500.00 | | Manufacturing Engineer | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Sutthiwat Jongprongklang | $1,500.00 | | Facility Supervisor | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Bandit Unsansuk | $1,500.00 | | TECH SPEC1 | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Orapin Thaisong | $1,500.00 | | SR BUYER2 | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Nachapim Buddee | $1,500.00 | | BOI Staff | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Rattikal Tangtong | $1,500.00 | | TECH SPEC1 | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Prarinya Moonsuth | $1,500.00 | | Quality Engineer | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Sirikorn Kamrangval | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Pongton Suebjakitn | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Supansa Noon | $1,500.00 | | Inspector | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Suwanan Phonkham | $1,500.00 | | Inspector | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Anutawan Kaewmanee | $1,500.00 | | Inspector | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Tanawan Chiengthong | $1,500.00 | | AC Master Scheduler | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Sujitra Wananwong | $1,500.00 | | Sub-Leader | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Nutchada Chanpate | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Duannapa Dinchan | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Supattra Aekuan | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Pornthep Thongkang | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Aekkarach Nareumal | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Niran Seechalee | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |
| Worached Choodtaisong | $1,500.00 | | Operator | | | Walbro Thailand | | | | $ | 114.75 | $ 1,614.75 |

FBG_CH1_00094950

| mployee Name (Last Suffix, First MI) | Employee Numbe | Current Job | Original Hire | Pay Group | Work Location | Hourly/Salaried | Full/Part Time | Historical Job | ployer Portion of Payroll | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Surasri Netseangsee | $1,500.00 | Operator | | | Walbro Thailand | | | | $ 114.75 | $ 1,614.75 |
| Siri Nuekman | $1,500.00 | Operator | | | Walbro Thailand | | | | $ 114.75 | $ 1,614.75 |
| Junpen Mankongthongjaroen | $1,500.00 | Sr Accountance | | | Walbro Thailand | | | | $ 114.75 | $ 1,614.75 |
| | $463,500.00 | | | | | | | | | |
| | $500,000.00 | | | | | | | | | $ 498,957.75 |
| | $36,500.00 | $ 215.98 | | | | | | | | |

**Exhibit B**

Financial Statements

4515621.9 035696-0006-000

CONFIDENTIAL                                                                                                          FBG_CH1_00094952

*Exhibit B*
*Financial Statements*

# Walbro Topco LLC

Consolidated Financial Report
December 31, 2022

CONFIDENTIAL

FBG_CH1_00094953

**Contents**

| | |
|---|---|
| Independent auditor's report | 1-2 |

Financial statements

| | |
|---|---|
| Consolidated balance sheets | 3-4 |
| Consolidated statements of operations and comprehensive income (loss) | 5 |
| Consolidated statements of members' equity (deficit) | 6 |
| Consolidated statements of cash flows | 7-8 |
| Notes to consolidated financial statements | 9-40 |

CONFIDENTIAL

FBG_CH1_00094954



RSM US LLP

**Independent Auditor's Report**

Board of Managers
Walbro Topco LLC and Subsidiaries

**Opinion**
We have audited the consolidated financial statements of Walbro Topco LLC and its subsidiaries (the Company), which comprise the consolidated balance sheet as of December 31, 2022, and the related consolidated statements of operations and comprehensive income (loss), members' equity and cash flows for the year then ended, and the related notes to the consolidated financial statements (collectively, the financial statements).

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Basis for Opinion**
We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of the Company and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Other Matter**
The financial statements of the Company as of December 31, 2021, and for the period from inception (July 21, 2021) through December 31, 2021, were audited by other auditors, whose report dated June 22, 2022, expressed an unmodified opinion on those statements.

**Emphasis of Matter**
As discussed in Note 3 to the consolidated financial statements, in 2022, the Company adopted new accounting guidance for its leases under Financial Accounting Standard Board's Accounting Standards Codification Topic 842, Leases. Our opinion is not modified with respect to this matter.

**Responsibilities of Management for the Financial Statements**
Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date that the financial statements are issued or available to be issued.

THE POWER OF BEING UNDERSTOOD
AUDIT | TAX | CONSULTING

1

RSM US LLP is the U.S. member firm of RSM International, a global network of independent audit, tax, and consulting firms. Visit rsmus.com/aboutus for more information regarding RSM US LLP and RSM International.

FBG_CH1_00094955

**Auditor's Responsibilities for the Audit of the Financial Statements**
Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

*RSM US LLP*

Phoenix, Arizona
April 25, 2022

2

CONFIDENTIAL                                                                                 FBG_CH1_00094956

**Walbro Topco LLC**

**Consolidated Balance Sheets**
**December 31, 2022 and 2021**
**(In Thousands)**

|  | 2022 | 2021 |
|---|---|---|
| **Assets** | | |
| | | |
| Current assets: | | |
| Cash and cash equivalents | $ 10,128 | $ 6,787 |
| Trade receivables, less allowances of $368 and $47 at December 31, 2022 and 2021, respectively | 42,247 | 34,558 |
| Customer notes receivable | 1,410 | 1,794 |
| Inventories, net | 37,645 | 35,912 |
| Prepaid expenses and other current assets | 5,653 | 5,928 |
| Derivative assets | 18,434 | 984 |
| **Total current assets** | 115,517 | 85,963 |
| | | |
| Property, plant and equipment, net | 62,130 | 59,571 |
| Operating lease ROU asset | 4,150 | - |
| Intangible assets, net | 7,325 | 6,740 |
| Goodwill, net | 6,181 | 6,208 |
| Other assets | 382 | 619 |
| **Total assets** | $ 195,685 | $ 159,101 |

See notes to consolidated financial statements.

3

CONFIDENTIAL

FBG_CH1_00094957

|  | | 2022 | | 2021 |
|---|---|---|---|---|
| **Liabilities and Members' Equity** | | | | |
| | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | **27,884** | $ | 26,772 |
| Supplier notes payable | | **5,677** | | 8,716 |
| Accrued warranty | | **1,036** | | 414 |
| Derivative liability | | **18,510** | | 985 |
| Accrued income taxes | | **3,129** | | 2,229 |
| Other accrued expenses | | **15,397** | | 12,304 |
| Short-term borrowings | | **6,000** | | 2,500 |
| Current portion of long-term debt | | **3,183** | | 1,820 |
| Short-term operating lease obligation | | **839** | | - |
| Short-term finance lease obligation | | **545** | | 259 |
| **Total current liabilities** | | **82,200** | | 55,999 |
| | | | | |
| Long-term debt, net of current portion | | **62,921** | | 66,315 |
| Long-term operating lease obligation, net of current portion | | **3,092** | | - |
| Long-term finance lease obligations, net of current portion | | **9,746** | | 3,109 |
| Pension obligations | | **2,015** | | 2,286 |
| Deferred tax liabilities, net | | **1,212** | | 665 |
| Other long-term liabilities | | **330** | | 348 |
| **Total liabilities** | | **161,516** | | 128,722 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Members' equity: | | | | |
| Members' capital; zero par value, 42,250 units authorized; | | | | |
| 42,250 units issued and outstanding at December 31, 2022 and 2021 | | **42,250** | | 42,250 |
| Accumulated deficit | | **(12,268)** | | (12,114) |
| Accumulated other comprehensive income | | **4,187** | | 243 |
| **Total members' equity** | | **34,169** | | 30,379 |
| | | | | |
| **Total liabilities and members' equity** | $ | **195,685** | $ | 159,101 |

4

CONFIDENTIAL

FBG_CH1_00094958

**Walbro Topco LLC**

**Consolidated Statements of Operations and Comprehensive Income (Loss)**
**Year Ended December 31, 2022 and Period From Inception (July 21, 2021) Through**
  **December 31, 2021**
**(In Thousands)**

|  | 2022 | 2021 |
|---|---|---|
| Net sales | $ 241,996 | $ 40,529 |
| Cost of sales | 193,601 | 38,056 |
| **Gross profit** | **48,395** | 2,473 |
| Selling, general and administrative expenses | 39,277 | 14,568 |
| **Income (loss) from operations** | **9,118** | (12,095) |
| Other expense: | | |
| Interest expense | **(3,429)** | (377) |
| Impairment on patent | **(141)** | (59) |
| Impairment on software development | - | (120) |
| Other compensation costs | **(31)** | 5 |
| **Total other expense** | **(3,601)** | (551) |
| **Income (loss) before income tax (expense) benefit** | **5,517** | (12,646) |
| Income tax (expense) benefit | **(5,671)** | 532 |
| **Net loss** | **(154)** | (12,114) |
| Other comprehensive income: | | |
| Foreign currency translation adjustments | **3,866** | 121 |
| Unrecognized pension benefit, net of tax of $3 and $37, respectively | **78** | 122 |
| **Comprehensive income (loss)** | $ **3,790** | $ (11,871) |

See notes to consolidated financial statements.

5

CONFIDENTIAL

FBG_CH1_00094959

CONFIDENTIAL

**Walbro Topco LLC**

**Consolidated Statements of Members' Equity**
**Year Ended December 31, 2022 and Period From Inception (July 21, 2021) Through December 31, 2021**
**(In Thousands)**

| | Class A Units | Class B Units | Members' Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| Balance, July 21, 2021 | - | - | $ - | $ - | $ - | $ - |
| Issuance of member units | 40,982 | 1,268 | 42,250 | - | - | 42,250 |
| Net loss | - | - | - | (12,114) | - | (12,114) |
| Foreign currency translation adjustments | - | - | - | - | 121 | 121 |
| Unrecognized pension benefit, net of tax expense of $37 | - | - | - | - | 122 | 122 |
| Balance, December 31, 2021 | 40,982 | 1,268 | 42,250 | (12,114) | 243 | 30,379 |
| Net loss | - | - | - | (154) | - | (154) |
| Foreign currency translation adjustments | - | - | - | - | 3,866 | 3,866 |
| Unrecognized pension benefit, net of tax expense of $3 | - | - | - | - | 78 | 78 |
| **Balance, December 31, 2022** | **40,982** | **1,268** | **$ 42,250** | **$ (12,268)** | **$ 4,187** | **$ 34,169** |

See notes to consolidated financial statements.

DEBTORS' EXHIBIT NO. 245
Page 55 of 92

FBG_CH1_00094960

6

**Walbro Topco LLC**

**Consolidated Statements of Cash Flows**
**Year Ended December 31, 2022 and Period From Inception (July 21, 2021) Through**
**  December 31, 2021**
**(In Thousands)**

|  | **2022** | 2021 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (154) | $ (12,114) |
| Adjustments to reconcile net loss to net cash provided by | | |
| (used in) operating activities: | | |
| Depreciation | 10,527 | 1,741 |
| Amortization of intangibles and other assets | 1,577 | 213 |
| Noncash financing costs and accretion included in interest expense | 3,411 | 379 |
| Loss on disposal of fixed assets | 107 | 55 |
| Deferred income taxes | 252 | (1,553) |
| Impairment of intangible assets | 141 | 179 |
| Unrealized foreign exchange gain on long-term debt | - | 54 |
| Settlement of asset retirement obligation | (48) | - |
| Change in operating lease ROU asset and liabilities | 3 | - |
| Changes in operating assets and liabilities: | | |
| Trade receivables | (1,483) | 3,137 |
| Inventories | (1,017) | 3,400 |
| Prepaid expenses and other current assets | (21,346) | (842) |
| Other long-term assets | (245) | (95) |
| Accounts payable and accrued expenses | 17,429 | (4,931) |
| Other long-term liabilities | 156 | 45 |
| **Net cash provided by (used in) operating activities** | 9,310 | (10,332) |
| | | |
| Cash flows from investing activities: | | |
| Cash paid for acquisition of Cascade Engineering | (6,804) | - |
| Cash paid for acquisition of Walbro Co. Ltd., net of cash acquired | - | (92,035) |
| Additions to property, plant and equipment, net of grant received of $1,500 | (6,480) | (1,603) |
| **Net cash used in investing activities** | (13,284) | (93,638) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from borrowings of short-term revolver | 7,700 | 2,500 |
| Payments on short-term revolver | (4,200) | - |
| Proceeds from borrowings of long-term debt | - | 66,250 |
| Principal payments on long-term debt | (1,800) | - |
| Payment on deferred financing charges | - | (722) |
| Proceeds from issuance of member units | - | 42,250 |
| Payments on finance leases | (297) | (78) |
| **Net cash provided by financing activities** | 1,403 | 110,200 |
| | | |
| Effect of exchange rate changes on cash | 5,912 | 557 |
| | | |
| **Net increase in cash and cash equivalents** | 3,341 | 6,787 |
| | | |
| Cash and cash equivalents, beginning of period | 6,787 | - |
| | | |
| Cash and cash equivalents, end of period | $ 10,128 | $ 6,787 |

(Continued)

7

CONFIDENTIAL

FBG_CH1_00094961

**DEBTORS' EXHIBIT NO. 245**
**Page 56 of 92**

**Walbro Topco LLC**

**Consolidated Statements of Cash Flows (Continued)**
**Year Ended December 31, 2022 and Period From Inception (July 21, 2021) Through**
**December 31, 2021**
**(In Thousands)**

|  | 2022 | 2021 |
|---|---|---|
| Noncash investing and financing activities: | | |
| Property, plant and equipment | $ 7,300 | $ - |
| Short-term finance lease obligation | $ 253 | $ - |
| Long-term finance lease obligation | $ 7,001 | $ - |
| Supplemental disclosures of cash flow information: | | |
| Interest paid | $ 2,515 | $ 46 |
| Income taxes paid (net of refunds of $396 and $19, respectively) | $ 1,862 | $ 1,130 |
| Cash paid for amounts included in measurement of lease liabilities: | | |
| Operating cash outflows—payments on operating leases | $ 1,173 | $ - |
| Operating cash outflows—payments on finance leases | $ 255 | $ - |
| Financing cash outflows—payments on finance leases | $ 297 | $ - |

See notes to consolidated financial statements.

8

CONFIDENTIAL

FBG_CH1_00094962

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 1.     Company Operations**

Walbro Topco LLC is a Delaware limited liability company and has one subsidiary, Walbro Midco LLC. Walbro Midco LLC, a Delaware limited liability company, has two subsidiaries: WEM US Co and Walbro Co. Ltd. WEM US Co has one subsidiary: Walbro LLC; and Walbro Co., Ltd. has one subsidiary: Walbro International Holdings B.V., which has five subsidiaries: Walbro Suisse Group GmbH, Walbro (Thailand) Co. Ltd.; Walbro Italy S.r.L., Walbro Los Mochis S. de R.I. de C.V. and Walbro (Tianjin) Industries Co. Ltd. On July 21, 2021, Landon Walbro SPV, L.P. and Nova Capital GP Investments XIV L.P., formed Walbro Holdings L.P. and its subsidiaries: including Walbro US Holdings, Inc., and Walbro Japan Holdings, G.K. Walbro Japan Holdings G.K. was formed to acquire 100% of the outstanding shares of Walbro Co. Ltd. Walbro US Holdings, Inc. was formed to acquire 100% of the outstanding shares of WEM US Co., which subsequently merged into WEM US Co.

On October 28, 2021, Walbro Midco LLC, a Delaware limited liability company, completed the acquisition of WEM US Co and its subsidiary and Walbro Co., Ltd., a Japanese joint stock company (kabushiki kaisha), and its subsidiaries, at which time the Company commenced operations. These consolidated financial statements of Walbro Topco LLC include the operations of Walbro Midco LLC and its wholly owned subsidiaries from the date of acquisition.

On November 12, 2022, Walbro LLC, completed the acquisition of certain assets and liabilities of Cascade Engineering "South Plant" Facility in Grand Rapids, Michigan. The acquisition provides for an expansion of the Company's plastic molding technology.

Walbro Topco LLC and its subsidiaries (referred to collectively as Walbro or the Company) are global market providers in engine management and fuel systems for the Outdoor Power Equipment, Recreational, Marine, and Personal Transportation markets, and a supplier of high-pressure aluminum die casting to various industries. Walbro manufactures carburetors, electronic fuel injection systems, ignition systems, fuel tanks, fuel pumps, valves and fuel storage and distribution systems, and offers value-added machining, electronics and assembly capabilities.

**Note 2.     Basis of Presentation**

The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America (U.S. GAAP).

**Note 3.     Summary of Significant Accounting Policies**

**Principles of consolidation:** These consolidated financial statements include the accounts of Walbro Topco LLC and its wholly owned subsidiaries as of and for the year ended December 31, 2022; and as of December 31, 2021, and for the period from inception (July 21, 2021) through December 31, 2021. All significant intercompany accounts and transactions have been eliminated in consolidation.

**Use of estimates:** The preparation of the accompanying consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of these consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates include the fair value measurement of the business combination, which includes the fair value of intangible assets and goodwill and useful lives; depreciation and amortization associated with property, plant and equipment; inventory reserves; and pension obligation. Management reviews its estimates on an ongoing basis using currently available information. Changes in facts and circumstances may result in revised estimates, and actual results could differ materially from those estimates.

CONFIDENTIAL                                                  FBG_CH1_00094963

**DEBTORS' EXHIBIT NO. 245**
**Page 58 of 92**

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements
(In Thousands)**

### Note 3.    Summary of Significant Accounting Policies (Continued)

**Fair value measurements of financial instruments:** Certain disclosures are required related to fair value measurements in accordance with U.S. GAAP. The Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 820, Fair Value Measurement, defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. It also establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

**Level 1:**  This level consists of observable inputs such as quoted prices in active markets.

**Level 2:**  This level consists of inputs, other than the quoted prices in active markets, that are observable either directly or indirectly.

**Level 3:**  This level consists of unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

The Company's assets and liabilities measured at fair value on a recurring basis consist primarily of derivative financial instruments used to hedge foreign currency risk.

The carrying value of short-term borrowings approximates their fair value at December 31, 2022, based on its 2023 maturity, the Company's current incremental borrowing rate and other terms available for similar types of borrowing arrangements. The carrying value of long-term borrowings approximates its fair value at December 31, 2022, based on the instrument's variable interest rate.

**Cash and cash equivalents:** Cash equivalents consist of highly liquid investments that are convertible into cash and have an original maturity of three months or less at time of purchase. The Company maintains cash deposits with financial institutions that may exceed federally insured limits in the United States. In addition, significant portions of the cash balances are in countries that do not have government-insured accounts or deposits. As of December 31, 2022 and 2021, the Company held uninsured cash deposits with financial institutions of $8,991 and $5,884, respectively.

Included in cash are collateral deposits of $0 and $2 at December 31, 2022 and 2021, respectively, representing guarantees for currency hedging contracts. At both December 31, 2022 and 2021, the Company had $30 in a certificate of deposit held by the State of Michigan as financial assurance related to the ongoing monitoring of ground pollution testing at the Walbro Cass City facility. The obligation has been recorded in the accompanying consolidated balance sheets under other accrued expenses.

**Trade receivables and allowance for doubtful accounts:** Trade receivables are recorded net of an allowance for expected losses. The allowance is estimated from historical experience in conjunction with a review of the customer's ability to meet its financial obligations to the Company, and the length of time any trade receivables are past due. The Company extends credit to substantially all of its customers and does not generally require collateral for its trade receivables.

**Customer notes receivable:** Pursuant to common practices in Japan and in agreement with its customers, the Company converts a portion of trade accounts receivable to short-term non-interest-bearing notes receivable (customer notes receivable) that mature in approximately 120 days. The Company enters into factoring agreements to sell, without recourse, notes receivable to a financial institution. Under the current terms of the factoring agreement, the Company receives payment from the financial institution in approximately 40 days.

10

FBG_CH1_00094964

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

---

Note 3.    Summary of Significant Accounting Policies (Continued)

**Pre-production tooling:** The Company enters into contractual agreements with certain customers for tooling. All such tooling contracts relate to parts that the Company supplies to customers under supply agreements. Tooling costs are capitalized in prepaid expenses and other current assets in the Company's accompanying consolidated balance sheets as customer reimbursable tooling contracts are separate from standard production contracts. The Company records a reserve against the contractual agreements when they are identified as resulting in a projected loss. The Company expenses costs on all pre-production tooling contracts whose life is less than one year and for which reimbursement is not contractually guaranteed by the customer or for which the customer has not provided a noncancelable right to use the tooling.

At December 31, 2022 and 2021, tooling costs of $1,817 and $1,532, respectively, were included in prepaid expenses and other current assets in the accompanying consolidated balance sheets.

**Inventories:** The Company values its inventories at lower of cost or net realizable value with cost determined on a standard cost basis that approximates the first-in, first-out (FIFO) method. Finished goods and work-in-process inventories include material, labor and manufacturing overhead costs, such as labor, depreciation, freight, utilities and maintenance. The Company's policy is to reduce inventories by an allowance for excess and obsolete inventories. The allowance is based on management's review of on-hand inventories compared to estimated future sales and usage.

**Property, plant and equipment:** Long-lived assets, such as property, plant and equipment, acquired through business combinations are recorded at their fair values on the date of acquisition or at cost for assets acquired after such dates, less accumulated depreciation and amortization.

The Company provides for depreciation using the straight-line method over the estimated useful lives of the assets. Amortization of leasehold improvements is recorded using the straight-line method over the shorter of the useful lives or the expected lease term. Property, plant and equipment are evaluated for impairment when events and circumstances indicate that the assets may be impaired and the undiscounted cash flows to be generated by those assets are less than their carrying value. If the estimated undiscounted cash flows are less than the carrying value of the assets, the assets are written down to their fair value.

The following are the estimated useful lives the Company uses for major categories of property, plant and equipment:

|  | Years |
|---|---|
| Buildings and improvements | 35-40 |
| Leasehold improvements | 2-18 |
| Machinery and equipment | 3-15 |
| Tooling | 1-5 |

**Goodwill and intangible assets:** The Company accounts for acquisitions under the acquisition method of accounting in accordance with ASC 805, Business Combinations. Identifiable intangible assets that are separable from goodwill and have determinable useful lives are valued separately and amortized over their estimated useful lives.

11

CONFIDENTIAL

FBG_CH1_00094965

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 3.    Summary of Significant Accounting Policies (Continued)**

Goodwill represents the excess of the purchase price over the estimated fair value of net assets acquired in a business combination. The Company has elected to adopt the accounting alternative as its accounting policy for goodwill. As such, the Company amortizes goodwill on a straight-line basis over a 10-year period. Also pursuant to the accounting alternative, the Company will test its goodwill for impairment only upon the occurrence of an event or circumstance that may indicate the fair value of the consolidated entity is less than its carrying amount. Intangible assets consist of developed technology, customer relationships and trade names. The Company accounts for goodwill and intangible assets in accordance with ASC 350, Intangibles, Goodwill and Other.

Trade name intangible assets are not amortized, but rather tested for impairment annually, or more frequently, if events and circumstances indicate the trade name may be impaired. The Company had no impairment charge for goodwill or the trade name intangible assets for the year ended December 31, 2022, or the period from inception (July 21, 2021) through December 31, 2021.

All other intangible assets have finite lives and are amortized over their estimated useful lives. Amortization of intangible assets is expensed to match the period in which future cash flows associated with each asset is expected to be generated. Finite-lived intangible assets are evaluated for impairment when events and circumstances indicate that the assets may be impaired and the undiscounted cash flows to be generated by those assets are less than their carrying value. If the estimated undiscounted cash flows are less than the carrying value of the assets, the assets are written down to their fair value.

The Company believes patent application costs meet the definition of an asset and have future economic benefit. The Company reviews patent application costs on a semiannual basis to determine if the assets may be impaired. Amortization of patents was $96 and $15 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively, and is recorded as amortization of intangibles and other assets in the accompanying consolidated statements of operations and comprehensive income (loss). The Company recognized patent application impairment charges of $141 and $59 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively. See Note 8 for additional information on patent application costs.

**Deferred financing costs and debt discounts:** Costs incurred to obtain long-term financing arrangements are capitalized and amortized over the life of the related debt obligation to approximate the effective interest method.

Fees associated with financing agreements, net of accumulated amortization, totaled $603 and $722 at December 31, 2022 and 2021, respectively. The related amortization expense, recorded as interest expense in the accompanying consolidated statements of operations and comprehensive income (loss), was $119 and $0 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Supplier notes payable:** Pursuant to standard business practices in Japan and in agreement with its suppliers, the Company converts a portion of accounts payable to short-term non-interest-bearing notes payable (supplier notes payable) that mature in approximately 120 days.

**Self-insurance:** The Company was self-insured for certain medical benefits in the United States for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021. The Company elected to invest in stop loss insurance, designed to limit the Company's liability to a predetermined amount for each covered individual in the plan per year and in aggregate. Self-insurance liabilities are determined based on claims filed and an estimate of claims incurred but not yet reported.

12

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

---

### Note 3.    Summary of Significant Accounting Policies (Continued)

The Company's medical benefits in locations outside of the United States were primarily funded through government-sponsored programs for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021.

**Warranty costs:** The Company warrants its products against defects in design, materials and workmanship generally for a period of one year. Estimated future warranty costs are accrued in the period in which the related revenue is recognized.

**Foreign currency:** Foreign currency transactions and translation are accounted for in accordance with ASC 830, Foreign Currency Matters. The functional currency for Walbro Topco LLC is the U.S. Dollar (USD). The functional currency for Walbro's subsidiaries is their local currency. For presentation purposes, the reporting currency is the USD.

For translation of its subsidiaries operating in a non-USD-denominated currency, assets and liabilities are translated to the USD at the exchange rate set by published sources on the last day of the year. The accompanying consolidated statements of operations and comprehensive income (loss) and consolidated statements of cash flows are translated at the weighted-average exchange rate for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021. The resulting translation adjustment is included as a part of other comprehensive income in the accompanying consolidated statements of operations and comprehensive income (loss).

Transaction gains and losses that arise from exchange rate fluctuations on transactions denominated in a currency other than the functional currency and the remeasurement of intercompany accounts not considered to be of a long-term nature are included as net gains or losses in the results of operations as incurred. Walbro had foreign currency losses recorded in cost of sales of $5,830 and $280 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Derivatives:** Derivative instruments are accounted for in accordance with ASC 815, Derivatives and Hedging, which requires that all derivative instruments be recognized in the accompanying consolidated financial statements at fair value. The Company has entered into several financial instruments to hedge risk related to production expenses incurred in Mexican Pesos (PSO), China Renminbi (RMB), Japanese Yen (JPY) and in Thai Baht (THB). These instruments include forward contracts, collars and options and are considered cash flow hedges.

The Company has elected not to apply hedge accounting for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021.

The Company only enters into transactions that it believes will be highly effective at offsetting the underlying economic risk. The changes in fair value of derivative instruments are reported in cost of sales in the accompanying consolidated financial statements of operations and comprehensive income based on the nature of the related expense. It is the Company's policy to classify all of its derivative instruments for cash flow purposes as operating activities in the accompanying consolidated statements of cash flows. The Company's cash flow hedges mature by December 2023. See Note 22 for additional information on derivatives.

13

CONFIDENTIAL

FBG_CH1_00094967

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

---

### Note 3.    Summary of Significant Accounting Policies (Continued)

**Asset retirement obligation:** Asset retirement obligations (AROs) are legal obligations associated with the retirement of long-lived assets or expiration of long-term leases. These liabilities are initially recorded at fair value and the related asset retirement costs are capitalized. Asset retirement costs are depreciated on a straight-line basis over the estimated useful life or lease term of the related asset. Subsequent to initial recognition, the Company records period-to-period changes in the ARO liability resulting from the passage of time or revisions to either the timing or amount of the original estimate of undiscounted cash flows in cost of sales or selling, general and administrative expenses in the consolidated statements of operations and comprehensive income (loss) based on the nature of the related expense.

**Research and development costs:** Research and development costs are expensed as incurred and are included in selling, general and administrative expenses in the accompanying consolidated statements of operations and comprehensive income (loss). These costs amounted to $1,391 and $231 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Software development costs:** The Company is developing a software diagnostic tool that will be sold with its low-cost electronic fuel injection module and an embedded software that will be included in its products. In accordance with ASC 985, Software, the Company capitalizes certain software development costs once technological feasibility has been established. Software costs that do not meet the technological feasibility requirements are expensed immediately. Capitalized software costs are included in other assets in the accompanying consolidated balance sheets. The Company had capitalized software development costs of $334 and $523 as of December 31, 2022 and 2021, respectively.

The Company expenses capitalized software costs into cost of sales based on the greater of the following: (1) the ratio of current gross revenues for a product to the total of current and anticipated future gross revenues for that product; or (2) the straight-line method over the remaining estimated economic life of the product including the period being reported on. Software development costs are evaluated for impairment when events and circumstances indicate that the assets may be impaired. See Note 8 for additional information regarding software development costs.

**Income taxes:** The Company uses the asset and liability method of accounting for income taxes, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the accompanying consolidated financial statements. The Company defers income taxes for all temporary differences between pretax financial and taxable income and between the book basis and tax basis of assets and liabilities.

Deferred taxes reflect the estimated tax effect of accumulated temporary differences between assets and liabilities for financial reporting purposes and assets and liabilities as measured by tax laws and regulations in the respective countries of operation.

The Company measures and discloses uncertain tax positions that the Company has taken or expects to take in its income tax returns. The Company recognizes uncertain tax positions in its consolidated financial statements when it is more likely than not that the position will not be sustained upon examination by taxing authorities. Recognition of changes in uncertain tax positions are reflected as a component of income tax expense (benefit).

CONFIDENTIAL
FBG_CH1_00094968

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

### Note 3.     Summary of Significant Accounting Policies (Continued)

**Restrictions on retained earnings:** Under the provisions of the Civil and Commercial Code in Thailand, the Company is required to set aside as legal reserve at least 5% of its net income at each dividend declaration until the reserve reaches 10% of authorized capital. The reserve is not available for dividend distribution. The Company already appropriated retained earnings as legal reserve amounting to 1,700 THB ($55 USD), equivalent to 10% of the authorized capital.

In China, the Company is required to set aside as legal reserve 10% of its net income at each dividend declaration until the reserve reaches 10% of authorized capital. The reserve is not available for dividend distribution. As of December 31, 2022 and 2021, the Company had appropriated 5,734 RMB ($857 USD) and 3,457 RMB ($543 USD), respectively, in a common reserve fund.

In Mexico, the net income for the year is subject to the resolutions of the General Meeting of Shareholders, as provided by statute and the General Corporations Law, which states that, in case of profit, 5% from profit should be added to the legal reserve, until such reserve equals 20% of capital stock. The legal reserve fund was established on September 23, 2022. As of December 31, 2022, the Company had appropriated $4,377 PSO ($224 USD), in a common reserve fund.

**Recently adopted accounting pronouncements:** In June 2022, the FASB issued Accounting Standards Update (ASU) 2022-06, *Reference Rate Reform (Topic 848): Deferral of the Sunset Date of Topic 848,* to defer the sunset date of Topic 848 from December 31, 2022 to December 31, 2024, to align with the intended cessation date of the overnight 1-, 3-, 6- and 12-month tenors of the London Interbank Offered Rate (LIBOR) of June 30, 2023.

The standard did not have an impact on the Company's financial position, results of operations, and cash flows for the period through December 31, 2022.

In February 2016, the FASB issued ASC Topic 842, Leases, to increase transparency and comparability among organizations related to their leasing arrangements. The update requires lessees to recognize most leases on their balance sheets as a right-of-use (ROU) asset representing the right to use an underlying asset and a lease liability representing the obligation to make lease payments over the lease term, measured on a discounted basis. Topic 842 also requires additional disclosure of key quantitative and qualitative information for leasing arrangements. Similar to the previous lease guidance, the update retains a distinction between finance leases (similar to capital leases in Topic 840, Leases) and operating leases, with classification affecting the pattern of expense recognition in the income statement. The Company adopted Topic 842 on January 1, 2022, using the optional transition method to the modified retrospective approach, which eliminates the requirement to restate the prior-period financial statements. Under this transition provision, the Company has applied Topic 842 to reporting periods beginning on January 1, 2022, while prior periods continue to be reported and disclosed in accordance with the Company's historical accounting treatment under ASC Topic 840, Leases.

The Company elected the "package of practical expedients" under the transition guidance within Topic 842, in which the Company does not reassess (1) the historical lease classification, (2) whether any existing contracts at transition are or contain leases or (3) the initial direct costs for any existing leases. The Company has elected to use hindsight in determining the lease term and in assessing impairment of the Company's ROU assets.

15

FBG_CH1_00094969

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements
(In Thousands)**

### Note 3.    Summary of Significant Accounting Policies (Continued)

The Company determines if an arrangement is or contains a lease at inception, which is the date on which the terms of the contract are agreed to, and the agreement creates enforceable rights and obligations. A contract is or contains a lease when (i) explicitly or implicitly identified assets have been deployed in the contract and (ii) the Company obtains substantially all of the economic benefits from the use of that underlying asset and directs how and for what purpose the asset is used during the term of the contract. The Company also considers whether its service arrangements include the right to control the use of an asset.

The Company made an accounting policy election available under Topic 842 not to recognize ROU assets and lease liabilities for leases with a term of 12 months or less. For all other leases, ROU assets and lease liabilities are measured based on the present value of future lease payments over the lease term at the commencement date of the lease (or January 1, 2022, for existing leases upon the adoption of Topic 842). The ROU assets also include any initial direct costs incurred and lease payments made at or before the commencement date and are reduced by any lease incentives. To determine the present value of lease payments, the Company made an accounting policy election available to nonpublic companies to utilize a risk-free borrowing rate, which is aligned with the lease term at the lease commencement date (or remaining term for leases existing upon the adoption of Topic 842).

Future lease payments may include fixed rent escalation clauses or payments that depend on an index (such as the consumer price index), which is initially measured using the index or rate at lease commencement. Subsequent changes of an index and other periodic market-rate adjustments to base rent are recorded in variable lease expense in the period incurred. Residual value guarantees or payments for terminating the lease are included in the lease payments only when it is probable they will be incurred.

The Company has made an accounting policy election to account for lease and nonlease components in its contracts as a single lease component for its real estate, vehicle and equipment asset classes. The nonlease components typically represent additional services transferred to the Company, such as common area maintenance for real estate, which are variable in nature and recorded in variable lease expense in the period incurred.

Adoption of Topic 842 resulted in the recording of additional ROU assets and lease liabilities related to the Company's operating leases of approximately $5,062 and $5,093, respectively, at January 1, 2022. The adoption did not result in changes to the Company's finance leases. The adoption of the new lease standard did not materially impact consolidated net earnings or consolidated cash flows.

See Note 14 for additional information on leases.

**New accounting pronouncements not yet adopted:** In April 2022, the FASB issued ASU 2022-04, *Liabilities—Supplier Finance Programs (Subtopic 405-50): Disclosure of Supplier Finance Program Obligations*. The amendments in the update require that a buyer in a supplier finance program disclose sufficient information about the program to allow a user of the financial statements to understand the program's nature, activity during the period, changes from period to period, and potential magnitude. The Update is effective for fiscal years beginning after December 15, 2022, and interim periods within fiscal years beginning after December 15, 2023. Management is currently evaluating the effect that implementation of the standard and related ASUs will have on the Company's consolidated financial statements.

CONFIDENTIAL                                                                                      FBG_CH1_00094970

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

### Note 3.       Summary of Significant Accounting Policies (Continued)

In December 2019, the FASB issued ASU 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes,* which remove a number of exceptions, including the exception to the incremental approach for intraperiod tax allocation when there is a loss from continuing operations and income or a gain from other items, the exception to the requirement to recognize a deferred tax liability for equity method investments when a foreign subsidiary becomes an equity method investment, the exception to the ability not to recognize a deferred tax liability for a foreign subsidiary when a foreign equity method investment becomes a subsidiary, the exception to the general methodology for calculating income taxes in an interim period when a year-to-date loss exceeds the anticipated loss for the year. The Update is effective for fiscal years beginning after December 15, 2021, and interim periods within fiscal years beginning after December 15, 2022. The Company is currently assessing the impact of this standard on the Company's financial position, results of operations, and cash flows.

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, which applies primarily to the Company's accounts receivable impairment loss allowances. The guidance provides a revised model whereby the current expected credit losses are used to compute impairment of financial instruments. The new model requires evaluation of historical experience and various current and expected factors, which may affect the estimated amount of losses and requires determination of whether the affected financial instruments should be grouped in units of account. This standard is effective for private entities for annual periods beginning after December 15, 2022. The Company is currently assessing the impact of this standard on the Company's financial position, results of operations, and cash flows.

In November 2019 and March 2020, the FASB issued ASU 2019-10, *Financial Instruments – Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842) Effective Dates, and ASU 2020-03, Codification Improvements to Financial Instruments,* which makes narrow-scope improvements to various aspects of the financial instruments guidance, including the current expected credit losses (CECL) standard issued in 2016. This standard is effective for private entities for fiscal years ending after December 15, 2022. The Company is currently assessing the impact of this standard on the Company's financial position, results of operations, and cash flows.

### Note 4.       Business Combinations

**Cascade Engineering acquisition**: On November 12, 2022, Walbro LLC completed the acquisition of certain assets and liabilities of Cascade Engineering, Inc. Cascade Engineering is a leading manufacturer specializing in large tonnage plastic injection molding and provides services to a broad diversity of markets including automotive, environmental services, and polymer compounding. The strategic acquisition provides for an expansion of the Company's plastic molding technology, which will enlarge its product offerings, provide further vertical integration, and create synergies with existing customers and add new customers.

The total purchase price was $6,804. The purchase price was paid in cash and was funded by a draw on the Company's revolving credit facility. The amount of transaction-related costs included in selling, general and administrative expenses was $329.

The Acquisition was accounted for using the purchase method of accounting in accordance with ASC 805, Business Combinations. Assets acquired and liabilities assumed were recorded as of the acquisition date at their respective fair values. The excess of the purchase price over the tangible assets, identifiable intangible assets and assumed liabilities was recorded as goodwill. The results of operations and the estimated fair values of the acquired assets and liabilities have been included in the accompanying consolidated financial statements as of or from the date of the Acquisition.

17

FBG_CH1_00094971

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

### Note 4.     Business Combinations (Continued)

The following table summarizes the purchase price allocation of the Acquisition to the estimated fair values of the assets acquired and liabilities assumed at the date of the Acquisition. The balances are preliminary as the Company continues to work through working capital adjustments as permitted in the Asset Purchase Agreement.

| | | |
|---|---:|---:|
| Accounts receivable | $ | 3,304 |
| Inventory | | 1,987 |
| Property, plant and equipment | | 1,018 |
| Right-of-use finance lease asset | | 7,300 |
| Intangible assets | | 1,500 |
| Other assets | | 378 |
| Total assets | | 15,487 |
| | | |
| Accounts payable | | (1,052) |
| Accrued expenses | | (943) |
| Right-of-use finance lease liability | | (7,300) |
| Total liabilities | | (9,295) |
| | | |
| Goodwill | | 612 |
| Final purchase price | $ | 6,804 |

The Company has elected to apply Topic 805, Business Combinations: Accounting for Identifiable Intangible Assets in a Business Combination. Under the accounting alternative, a private company that elects the accounting alternative to recognize or otherwise consider the fair value of intangible assets as a result of any in-scope transactions should no longer recognize separately from goodwill (1) customer-related intangible assets unless they are capable of being sold or licensed independently from the other assets of the business and (2) noncompetition agreements. As such, the value of these assets have been subsumed into goodwill.

Of the total purchase price, $1,500 was allocated to intangible assets. The definite-lived intangible assets are being amortized on an accelerated basis over their respective estimated useful lives. Goodwill will be amortized over a period of 10 years for book purposes and is expected to not be deductible for tax purposes.

| | Estimated Useful Life | Gross Carrying Amount | |
|---|---:|---:|---:|
| Intangible assets subject to amortization: | | | |
| Developed technology | 2 | $ | 200 |
| In-process technology | 11 | | 1,300 |
| Total | | $ | 1,500 |

The weighted-average amortization period of intangible asset subject to amortization is 10 years.

18

CONFIDENTIAL

FBG_CH1_00094972

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 4.    Business Combinations (Continued)**

**Walbro Co. Ltd. acquisition:** On October 28, 2021, Landon Walbro SPV, L.P. (Landon) and Nova Capital GP Investments XIV L.P., (Nova) completed the acquisition of Walbro Topco LLC and its wholly owned subsidiaries. Landon acquired 40,982 Class A units and Nova acquired 1,268 Class B units of Walbro Holdings LP. The Class A and Class B units are pari-passu basis on a pro rata basis in the event of distribution with the terms of the distribution to the holders of Class A units and Class B units outlined in the Limited Partnership Agreement.

The total purchase price was $100,192 per the Share Purchase Agreement. The amount of acquisition-related costs were $8,310, of which $7,588 were expensed and included in selling, general and administrative expenses in the accompanying consolidated statement of operations and comprehensive income (loss). Deferred financing fees and debt-related costs of $722 were capitalized.

Upon close of the acquisition, the Company repaid outstanding third-party liability of $43,413 with Sumitomo Mitsui Banking Corporation and entered into a $66,250 credit facility with JP Morgan Chase Bank, N.A., Citizens Bank, N.A. and Eagle Bank.

All stock options and stock appreciation rights of Walbro Co., Ltd. were fully vested and terminated on the acquisition date without consideration or liability to the Company.

The Acquisition was accounted for using the purchase method of accounting in accordance with ASC 805, Business Combinations. Assets acquired and liabilities assumed were recorded as of the acquisition date at their respective fair values. The excess of the purchase price over the tangible assets, identifiable intangible assets and assumed liabilities was recorded as goodwill. The results of operations and the estimated fair values of the acquired assets and liabilities have been included in the accompanying consolidated financial statements as of or from the date of the Acquisition.

The following table summarizes the purchase price allocation of the Acquisition to the estimated fair values of the assets acquired and liabilities assumed at the date of the Acquisition:

| | | |
|---|---|---:|
| Cash | $ | 8,157 |
| Accounts receivable | | 41,899 |
| Inventory | | 39,415 |
| Property, plant and equipment | | 60,149 |
| Intangible assets | | 7,476 |
| Other assets | | 4,235 |
| Total assets | | 161,331 |
| | | |
| Accounts payable | | (39,461) |
| Accrued expenses | | (12,984) |
| Pension obligations | | (2,408) |
| Deferred taxes | | (3,880) |
| Other liabilities | | (8,720) |
| Total liabilities | | (67,453) |
| | | |
| Goodwill | | 6,314 |
| Final purchase price | $ | 100,192 |

19

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

Note 4.     **Business Combination (Continued)**

Goodwill totaling $6,314 was determined based on the residual differences between fair value of consideration transferred and the fair value assigned to tangible and intangible assets and liabilities. Goodwill consists of intangible assets that do not qualify for separate recognition, such as the assembled workforce. Of the total purchase price, approximately $700 was allocated to trade name assets with an indefinite life and $6,776 was allocated to intangible assets. The definite-lived intangible assets are being amortized on an accelerated basis over their respective estimated useful lives. The goodwill resulting from the Acquisition is not-deductible for tax purposes.

| | Estimated Useful Life | Gross Carrying Amount |
|---|---|---|
| Intangible assets subject to amortization: | | |
| Patents | Various | $ 1,880 |
| Software | 5 | 676 |
| Technology | 20 | 1,320 |
| Customer relationships | 25 | 2,600 |
| Favorable lease | 10 | 300 |
| | | 6,776 |
| Intangible assets not subject to amortization: | | |
| Trade names | | 700 |
| Total | | $ 7,476 |

The weighted-average amortization period of intangible asset subject to amortization is 21 years. The weighted-average amortization period of patents is 17 years.

Note 5.     **Inventories**

Inventories consist of the following:

| | 2022 | 2021 |
|---|---|---|
| Raw materials | $ 24,159 | $ 18,254 |
| Work in process | 3,403 | 4,441 |
| Finished goods | 13,846 | 13,988 |
| Total | 41,408 | 36,683 |
| Less valuation reserves | (3,763) | (771) |
| Total inventories | $ 37,645 | $ 35,912 |

20

CONFIDENTIAL

FBG_CH1_00094974

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 6.      Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

|  | 2022 |  | 2021 |
|---|---|---|---|
| Prepaid expenses | $    2,332 | $ | 1,727 |
| Value-added tax receivable | 1,273 | | 2,458 |
| Prepaid customer tooling, net of reserve | 1,817 | | 1,532 |
| Other | 231 | | 211 |
| Total prepaid expenses and other current assets | $    5,653 | $ | 5,928 |

**Note 7.      Property, Plant and Equipment**

Property, plant and equipment consists of the following:

|  | 2022 |  | 2021 |
|---|---|---|---|
| Land | $    1,617 | $ | 1,812 |
| Buildings and improvements | 24,337 | | 14,490 |
| Machinery and equipment | 44,183 | | 32,367 |
| Tooling | 1,774 | | 1,172 |
| Construction in progress (cost to complete of approximately $1,421) | 2,351 | | 11,471 |
| Total | 74,262 | | 61,312 |
| Less accumulated deprecation | (12,132) | | (1,741) |
| Total property, plant and equipment | $    62,130 | $ | 59,571 |

Upon retirement, replacement or sale, gains or losses are included in the accompanying consolidated statements of operations and comprehensive income (loss). The costs of major refurbishments and improvements to machinery and equipment and Company-owned tools utilized in the manufacturing process are capitalized in property, plant and equipment and depreciated over their remaining useful lives.

Depreciation expense related to property, plant and equipment was $10,527 and $1,741 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

No impairment loss was required for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021.

21

CONFIDENTIAL

FBG_CH1_00094975

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

### Note 8.     Intangible Assets and Other Assets

Intangible assets consist of the following:

| | 2022 | | | | |
|---|---|---|---|---|---|
| | Estimated Useful Life (Years) | Gross Carrying Amount | Accumulated Amortization and Impairment | FX Translation | Net |
| Amortized: | | | | | |
| Technology—patent appreciation costs | Various | $    2,229 | $    (311) | $    - | $    1,918 |
| Technology | Various | 2,300 | (110) | - | 2,190 |
| Technology—non-U.S. | 20 | 406 | (47) | 38 | 397 |
| Customer relationships | 25 | 900 | (80) | - | 820 |
| Customer relationships—non-U.S. | 25 | 1,328 | (124) | 126 | 1,330 |
| Total amortized | | 7,163 | (672) | 164 | 6,655 |
| Unamortized: | | | | | |
| Trade name | | 500 | - | - | 500 |
| Trade name—non-U.S. | | 200 | - | (30) | 170 |
| Total unamortized | | 700 | - | (30) | 670 |
| Total intangible assets | | $    7,863 | $    (672) | $    134 | $    7,325 |

| | 2021 | | | | |
|---|---|---|---|---|---|
| | Estimated Useful Life (Years) | Gross Carrying Amount | Accumulated Amortization and Impairment | FX Translation | Net |
| Amortized: | | | | | |
| Technology—patent appreciation costs | Various | $    1,977 | $    (74) | $    - | $    1,903 |
| Technology | 20 | 800 | (13) | - | 787 |
| Technology—non-U.S. | 20 | 520 | (8) | (4) | 508 |
| Customer relationships | 25 | 900 | (11) | - | 889 |
| Customer relationships—non-U.S. | 25 | 1,700 | (22) | (13) | 1,665 |
| Favorable lease—non-U.S. | 10 | 300 | (5) | (5) | 290 |
| Total amortized | | 6,197 | (133) | (22) | 6,042 |
| Unamortized: | | | | | |
| Trade name | | 500 | - | - | 500 |
| Trade name—non-U.S. | | 200 | - | (2) | 198 |
| Total unamortized | | 700 | - | (2) | 698 |
| Total intangible assets | | $    6,897 | $    (133) | $    (24) | $    6,740 |

Amortization of intangible assets was $416 and $74 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

Estimated future amortization expense of intangible assets with finite lives is as follows:

Years ending December 31:

| | |
|---|---|
| 2023 | $    633 |
| 2024 | 632 |
| 2025 | 543 |
| 2026 | 510 |
| 2027 | 478 |
| Thereafter | 3,859 |
| Total | $    6,655 |

22

CONFIDENTIAL

FBG_CH1_00094976

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 8.     Intangible Assets and Other Assets (Continued)**

The following is a reconciliation of the changes in the Company's capitalized software development costs:

|  | 2022 | 2021 |
|---|---|---|
| Software development costs, beginning of period | $       523 | $       676 |
| Additions | - | - |
| Amortization expense | (189) | (33) |
| Impairment | - | (120) |
| Software development costs, end of period | $       334 | $       523 |

Accumulated amortization of software development costs were $222 and $33 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Note 9.     Goodwill**

The following is a reconciliation of the changes in the Company's goodwill:

|  | 2022 | 2021 |
|---|---|---|
| Goodwill, beginning of period | $     6,208 | $     6,314 |
| Addition of goodwill due to acquisition | 612 | - |
| Amortization expense | (639) | (106) |
| Goodwill, end of period | $     6,181 | $     6,208 |

**Note 10.   Accrued Warranty**

The Company provides product warranties to its customers. At times, certain products may be rejected by the customer within the established warranty period. If it is determined that the product failure is the result of the engineering design or manufacturing process, the Company may provide reimbursement to the customer for their associated costs and may also incur internal costs through repair, rework or replacement of the defective product.

The following is a reconciliation of the changes in the Company's accrued warranty:

|  | 2022 | 2021 |
|---|---|---|
| Accrued warranty, beginning of period | $       414 | $       423 |
| Claims paid | (521) | (210) |
| Provision for warranties | 1,144 | 200 |
| Currency translation | (1) | 1 |
| Accrued warranty, end of period | $     1,036 | $       414 |

23

CONFIDENTIAL                                                                                      FBG_CH1_00094977

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

### Note 11.    Other Accrued Expenses

Other accrued expenses consist of the following:

|  | 2022 | 2021 |
|---|---|---|
| Payroll, payroll taxes and benefits | $ 8,027 | $ 8,198 |
| Contract liabilities | 5,637 | 2,858 |
| Accrued interest | 869 | 338 |
| Accrued other taxes | 156 | 135 |
| Other | 708 | 775 |
| Total other accrued expenses | $ 15,397 | $ 12,304 |

### Note 12.    Short-Term Borrowings

On October 28, 2021, the Company entered into a long-term credit agreement (the Credit Agreement) with JP Morgan Chase Bank, N.A., Citizens Bank, N.A. and Eagle Bank (the Lenders). Under the terms of the Credit Agreement, the Company has a revolving credit and term loan. See Note 13 for additional information on the term loans.

The short-term borrowing outstanding consists of the following:

|  | 2022 | 2021 |
|---|---|---|
| Revolving credit facilities with maximum combined credit available of $10,000 USD, with an effective interest rate of 7.03% and stated rate of 6.81% at December 31, 2022 | $ 6,000 | $ 2,500 |
| Short-term borrowings | $ 6,000 | $ 2,500 |

### Note 13.    Long-Term Debt

On October 28, 2021, the Company entered into the Credit Agreement with JP Morgan Chase Bank, N.A., Citizens Bank, N.A. and Eagle Bank. Under the terms of the Credit Agreement, the Company has revolving credit and term loans with varying interest rates based on the net leverage ratio, interest rate election period and Eurocurrency spread. The Credit Agreement is secured by substantially all of the assets of the Company.

On May 26, 2022, the Lenders approved a limited consent and waiver to extend the deadline for delivery of the Company's consolidated financial statements for its fiscal year ended December 31, 2021, and related compliance certificate.

On November 14, 2022, the Lenders granted a limited consent to approve the acquisition of the net assets of Cascade Engineering, Inc. and waive certain financial covenants immediately after the acquisition.

The Company was in compliance, or has received a waiver, with its financial covenants at December 31, 2022 and 2021.

24

FBG_CH1_00094978

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 13.    Long-Term Debt (Continued)**

The long-term debt outstanding consists of the following:

|  | 2022 | 2021 |
|---|---|---|
| Term loan with original principal amount of $66,250 under the Credit Agreement, due in quarterly principal installment of $414 from March 2023 through September 2023 and $1,656 from December 2023 through September 2025 and $2,484 from December 2025 through September 2026 with the remaining outstanding principal balance due on October 27, 2026. The effective interest rate was 7.10% and the stated rate was 6.88% at December 31, 2022. Secured by substantially all asset of the Company. | $       64,595 | $       66,250 |
| Government loan with original principal amount of 281,100 JPY. Interest payments are due monthly. Payments on the principal balance commence July 22 through to maturity May 15, 2030. The effective interest rate was 0.51% and the stated rate was 0.51% at December 31, 2022. | 2,113 | 2,607 |
| Long-term debt | 66,708 | 68,857 |
| Less unamortized discount and debt issuance costs | (604) | (722) |
| Total | 66,104 | 68,135 |
| Less current portion | (3,183) | (1,820) |
| Total long-term debt | $       62,921 | $       66,315 |

Aggregate maturities of long-term debt obligations are as follows:

| Years ending December 31: |  |
|---|---|
| 2023 | $       3,183 |
| 2024 | 6,909 |
| 2025 | 7,737 |
| 2026 | 47,901 |
| 2027 | 284 |
| Thereafter | 694 |
| Total | $       66,708 |

**Note 14.    Leases**

The Company has determined that arrangements where the Company has the right to control the use of an identified asset for a period of time in exchange for consideration contains a lease. The right to control the use of an identified asset exists when the Company has the right to obtain substantially all of the economic benefits from use of the identified asset and has the right to direct the use of the identified asset.

25

CONFIDENTIAL

FBG_CH1_00094979

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 14.    Leases (Continued)**

Operating lease cost is recognized on a straight-line basis over the lease term. Finance lease cost is recognized as a combination of the amortization expense for the ROU assets and interest expense for the outstanding lease liabilities, and results in a front-loaded expense pattern over the lease term. The components of lease expense are as follows for the year ended December 31, 2022:

| | | |
|---|---|---|
| Operating lease cost | $ | 1,210 |
| Finance lease cost—amortization of right-of-use assets | | 409 |
| Finance lease cost—interest on lease liabilities | | 255 |
| Variable lease cost | | 93 |
| Total lease cost | $ | 1,967 |

The lease payment related to the Mexico plant is subject to an annual increase in line with the Indice Nacional de Precios al Consumidor (INPC). The lease liability is not remeasured as a result of changes in the INPC. The changes are treated as variable lease payments and recognized in the period in which the obligation for those payments was incurred.

**Operating leases:** The Company leases a portion of its equipment and facilities under operating leases, which expire at various times through 2031.

ROU operating leases consist of:

| | | 2022 |
|---|---|---|
| Machinery and equipment | $ | 20 |
| Building | | 4,130 |
| | $ | 4,150 |

Future undiscounted cash flows for each of the next five years and thereafter and a reconciliation to the lease liabilities recognized on the consolidated balance sheet are as follows as of December 31, 2022:

| Years ending December 31: | | |
|---|---|---|
| 2023 | $ | 967 |
| 2024 | | 832 |
| 2025 | | 503 |
| 2026 | | 439 |
| 2027 | | 407 |
| Thereafter | | 1,568 |
| Total lease payments | | 4,716 |
| Less imputed interest | | (785) |
| Total present value of lease liabilities | $ | 3,931 |

Operating lease cost included in selling, general and administrative expense in the accompanying consolidated statements of operations and comprehensive income (loss) was $1,210 and $199 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively. Operating lease payments recognized in the consolidated statement of cash flows as operating activities was $1,173. The weighted-average discount rate was 4.13%. The weighted-average lease term was 6.85 years.

26

FBG_CH1_00094980

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 14.    Leases (Continued)**

**Finance leases:** Certain contracts for the use of equipment and facilities meet the criteria for finance lease treatment under ASC 842, Leases. These leases contain a terminal rental premium in which ownership transfers to the Company for a nominal payment at the end of the lease term, or the present value of the lease payments is substantially all of the fair market value of the asset. Therefore, these leases are accounted for as finance lease obligations at inception and recorded in property, plant and equipment in the accompanying consolidated balance sheets at the lower of fair market value or the present value of future lease payments. The assets are amortized on a straight-line basis over the lease term.

Amortization of finance leases recognized in the consolidated statement of operations and comprehensive income was $407. Finance lease payments recognized as operating cash flows was $255. Finance lease payments recognized as financing cash flows was $297. Interest expense on finance lease liabilities recognized in the consolidated statement of operations and comprehensive income was $255.

The weighted average discount rate was 6.80%. The weight average lease term was 8.91 years.

Assets included in property, plant and equipment subject to finance leases consist of the following:

|  | 2022 | 2021 |
|---|---|---|
| Machinery and equipment | $ 61 | $ - |
| Building | 10,585 | 3,409 |
| Less accumulated amortization | (486) | (59) |
|  | $ 10,160 | $ 3,350 |

The accumulated amortization amount shown above is included in the accumulated depreciation amount shown on Note 7 to these consolidated financial statements.

Minimum future lease payments for assets subject to finance leases are as follows:

| Years ending December 31: | |
|---|---|
| 2023 | $ 1,025 |
| 2024 | 1,021 |
| 2025 | 1,036 |
| 2026 | 1,048 |
| 2027 | 1,065 |
| Thereafter | 8,540 |
| Total payments | 13,735 |
| Less interest | (3,444) |
| Principal portion of finance lease obligations | 10,291 |
| Less current portion of finance lease obligations | (545) |
| Finance lease obligation, net of current portion | $ 9,746 |

27

FBG_CH1_00094981

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 15.     Asset Retirement Obligation**

The Company records the fair value of liabilities for AROs when there is a legal obligation associated with the retirement of an asset. In connection with the Company's operating lease of manufacturing space in Thailand and office space in Japan, certain leasehold improvements were made to the space that the Company is obligated to remove upon lease termination to restore the space to its original condition. The Company also incurred an ARO related to the manufacturing facility in Michigan for cleanup costs associated with a production line. The AROs are included in other long-term liabilities in the accompanying consolidated balance sheets.

The following is a reconciliation of the changes in the asset retirement obligation:

|  | 2022 | 2021 |
|---|---|---|
| Asset retirement obligation, beginning of period | $         300 | $         303 |
| Currency translation | (18) | (3) |
| Asset retirement obligation, end of period | $         282 | $         300 |

**Note 16.     Employee Benefit Plans**

The Company provides eligible U.S. employees with a 401(k) defined contribution plan (the Plan). Under the provisions of the Plan, participants may direct the Company to defer and contribute to the Plan a portion of their compensation, subject to Internal Revenue Code limitations. Contributions are matched by the Company at 50% of employee contributions up to a maximum of 3% of the employee's annual compensation. The Plan also requires employer nonelective contributions for union employees, which are based on either (a) $0.45 per hour (up to 1,976 service hours); or (b) 3% of compensation based on the employee start date. The Company also contributes to a defined contribution plan established for its Japan employees. The amount of contribution is based on length of service and employee classification. All contributions vest immediately in both plans. Defined contribution plan expense included in selling, general and administrative expenses in the accompanying consolidated statements of operations and comprehensive income (loss) is $2,016 and $391 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

The Company has defined benefit plans covering hourly union employees at its Cass City, Michigan plant (the U.S. Plan) and employees at its Walbro Thailand plant (the Non-U.S. Plan). The U.S. Plan provides fixed benefits based on years of service. No new entrants are allowed in the U.S. Plan, and benefit service was frozen as of July 5, 2009. There were 31 and 33 bargaining unit employees in the U.S. Plan at December 31, 2022 and 2021, respectively. There were 400 and 415 employees in the Non-U.S. Plan at December 31, 2022 and 2021, respectively. No employer contributions were made to the U.S. and Non-U.S. Plan for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021.

The service cost component is reported in selling, general and administrative expenses in the accompanying consolidated statements of operations and comprehensive income (loss), the same line item as other compensation costs arising from services rendered by the pertinent employees during the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021. Other components of net benefit cost are presented in the consolidated statements of operations and comprehensive income (loss) separately from the service cost component in other compensation costs.

28

CONFIDENTIAL

FBG_CH1_00094982

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 16.    Employee Benefit Plans (Continued)**

Pension expense relating to the U.S. Plan is composed of the following:

|  | 2022 | 2021 |
|---|---|---|
| Interest cost | $ 298 | $ 50 |
| Expected return on plan assets | (430) | (75) |
| Plan fees | 137 | 12 |
| Net periodic benefit expense | $ 5 | $ (13) |

The Company uses December 31 as a measurement date for valuation of plan assets and benefit obligations. Information regarding the obligations and funded status of the U.S. Plan are as follows:

|  | 2022 | 2021 |
|---|---|---|
| Projected benefit obligation, beginning of period | $ 11,460 | $ 11,708 |
| Interest cost | 298 | 50 |
| Actuarial gain | (2,472) | (205) |
| Benefit payments | (586) | (99) |
| Expenses paid by plan | (161) | (6) |
| Plan fees | 137 | 12 |
| Projected benefit obligation, end of period | 8,676 | 11,460 |
|  |  |  |
| Fair value of plan assets, beginning of period | 10,517 | 10,594 |
| Actual return on plan assets | (2,030) | 28 |
| Expenses paid by plan | (161) | (6) |
| Benefit payments | (586) | (99) |
| Fair value of plan assets, end of period | 7,740 | 10,517 |
|  |  |  |
| Fair value of plan assets | 7,740 | 10,517 |
| Projected and accumulated benefit obligation | 8,676 | 11,460 |
| Plan assets less than benefit obligation (unfunded) | $ (936) | $ (943) |

Weighted-average assumptions used to determine benefit obligations and the net periodic benefit cost for the U.S. Plan are as follows:

|  | 2022 | 2021 |
|---|---|---|
| Discount rates for benefit obligations | 5.20 % | 2.70 % |
| Discount rates for net period benefit cost | 2.70 % | 2.55 % |
| Expected long-term return on plan assets | 4.25 % | 4.25 % |

The plan assets for the U.S. Plan are invested with the objective of being able to meet current and future payment needs while maximizing total investment returns within constraints of prudent portfolio risk and diversification.

29

CONFIDENTIAL

FBG_CH1_00094983

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 16.    Employee Benefit Plans (Continued)**

The composition of the assets of the U.S. Plan is as follows:

|  | 2022 | 2021 |
|---|---|---|
| Short-term fund | 2.20 % | 2.00 % |
| Equity securities | 26.60 % | 24.60 % |
| Bond mutual funds | 71.20 % | 73.40 % |
|  | 100.00 % | 100.00 % |

The following tables set forth by level, within the fair value hierarchy, the U.S. Plan assets at fair value:

| | 2022 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Equity securities | $ 2,057 | $ - | $ - | $ 2,057 |
| Bond mutual funds | 5,510 | - | - | 5,510 |
| Total investments, in the fair value hierarchy | 7,567 | - | - | 7,567 |
| Common collective trusts, at net asset value (1) | - | - | - | 172 |
| Total investments, at fair value | $ 7,567 | $ - | $ - | $ 7,739 |

| | 2021 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| Equity securities | $ 2,580 | $ - | $ - | $ 2,580 |
| Bond mutual funds | 7,722 | - | - | 7,722 |
| Total investments, in the fair value hierarchy | 10,302 | - | - | 10,302 |
| Common collective trusts, at net asset value (1) | - | - | - | 214 |
| Total investments, at fair value | $ 10,302 | $ - | $ - | $ 10,516 |

(1)  Certain investments that are measured at contract value or the net asset value per share (or its equivalent) have not been classified in the fair value hierarchy. The fair value amounts presented in this table are intended to permit reconciliation of the fair value hierarchy to the amounts presented in the accompanying consolidated balance sheet.

30

CONFIDENTIAL

FBG_CH1_00094984

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 16.    Employee Benefit Plans (Continued)**

The Company did not hold any cash or receivable plan assets as of December 31, 2022 and 2021. The following benefit payments for the U.S. Plan are expected to be paid through 2030:

| Years ending December 31: | | |
|---|---|---|
| 2023 | $ | 665 |
| 2024 | | 685 |
| 2025 | | 685 |
| 2026 | | 684 |
| 2027 | | 688 |
| Thereafter | | 3,310 |
| Total | $ | 6,717 |

Pension expense relating to the Non-U.S. Plan is composed of the following:

| | | 2022 | | 2021 |
|---|---|---|---|---|
| Interest cost | $ | 32 | $ | 5 |
| Service cost | | 115 | | 21 |
| Amortization of prior service costs | | 12 | | 2 |
| Net periodic benefit expense | $ | 159 | $ | 28 |

As of December 31, 2022 and 2021, there were no assets held by the Non-U.S. Plan. The Company uses a December 31 measurement date for valuation of benefit obligations. Information regarding the obligations of the Non-U.S. Plan are as follows:

| | | 2022 | | 2021 |
|---|---|---|---|---|
| Projected benefit obligation, beginning of period | $ | 1,307 | $ | 1,294 |
| Interest cost | | 32 | | 5 |
| Plan amendments | | 34 | | - |
| Actuarial loss (gain) | | (107) | | - |
| Exchange rate changes | | (47) | | (13) |
| Service cost | | 115 | | 21 |
| Projected benefit obligation, end of period | $ | 1,334 | $ | 1,307 |

Weighted-average assumptions used to determine benefit obligations and the net periodic benefit cost for the Non-U.S. Plan are as follows:

| | 2022 | 2021 |
|---|---|---|
| Discount rates for benefit obligations | 3.70 % | 2.53 % |
| Discount rates for net period benefit cost | 2.53 % | 2.53 % |
| Rates of compensation increase for benefit obligations | 4.00 % | 4.00 % |
| Rates of compensation increase for net periodic benefit cost | 4.00 % | 4.00 % |

31

CONFIDENTIAL

FBG_CH1_00094985

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements
(In Thousands)**

**Note 16.    Employee Benefit Plans (Continued)**

Long-term pension obligations included in the accompanying consolidated balance sheets consist of the following:

|  | 2022 | 2021 |
|---|---|---|
| U.S. Plan | $      (936) | $      (943) |
| Non-U.S. Plan | (1,334) | (1,308) |
| Other postemployment benefits, U.S. and non-U.S. | (45) | (35) |
| Total | (2,315) | (2,286) |
| Less current portion included in other accrued expenses | 300 | - |
| Long-term pension obligation | $   (2,015) | $   (2,286) |

Amounts recognized in other comprehensive income (OCI) in the accompanying consolidated statements of operations and comprehensive income consist of the following:

|  | 2022 | 2021 |
|---|---|---|
| Net income, net of tax | $      77 | $      122 |

The total amount expected to be amortized from accumulated other comprehensive income (AOCI) into net periodic pension cost over the next year is $15 for estimated prior service costs.

**Note 17.    Related-Party Transactions**

The Company pays a quarterly management fee to Landon Capital Partners, LLC and Nova Capital Management Limited. These fees are structured to cover the advisory services provided in the areas of operational management, strategic planning, corporate governance, financing and acquisition matters. The total amount expensed included in selling, general and administrative expenses in the accompanying consolidated statements of operations and comprehensive income (loss) was $751 and $132 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Note 18.    Income Taxes**

The Company is taxable in multiple jurisdictions. The provision for income taxes included in the accompanying consolidated statements of operations and comprehensive income (loss) represents U.S. federal income tax, the national income taxes of other countries and the state/provincial income taxes of the Company and its subsidiaries.

32

CONFIDENTIAL

FBG_CH1_00094986

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 18.    Income Taxes (Continued)**

The components of the Company's provision for income taxes are as follows:

|  | 2022 | | 2021 | |
|---|---|---|---|---|
| Expense summary: | | | | |
| Current (expense) benefit: | | | | |
| Federal | $ | 425 | $ | – |
| State | | (132) | | 56 |
| Foreign | | (5,815) | | (1,089) |
| Total | | (5,522) | | (1,033) |
| | | | | |
| Deferred (expense) benefit: | | | | |
| Federal | | 131 | | 949 |
| State | | (291) | | 94 |
| Foreign | | 11 | | 522 |
| Total | | (149) | | 1,565 |
| | | | | |
| Total expense: | | | | |
| Federal | | 556 | | 949 |
| State | | (423) | | 150 |
| Foreign | | (5,804) | | (567) |
| Total | $ | (5,671) | $ | 532 |

33

CONFIDENTIAL

FBG_CH1_00094987

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 18.     Income Taxes (Continued)**

Deferred tax assets and liabilities consist of the following as of December 31:

| | 2022 | 2021 |
|---|---|---|
| Deferred tax assets: | | |
| Inventory | $ 1,884 | $ 1,706 |
| Accruals | 1,416 | 938 |
| Pension | 272 | 371 |
| Lease obligation | 1,493 | - |
| Capitalized R&E | 1,405 | - |
| Net operating losses | 2,632 | 2,510 |
| Tax credits | 1,068 | 1,101 |
| OCI —pension | 16 | 21 |
| Leases | 520 | - |
| Other DTA | 3,105 | 1,633 |
| Deferred tax assets | 13,811 | 8,280 |
| | | |
| Deferred tax liabilities: | | |
| Other DTL | (1,382) | (1,223) |
| Foreign currency valuation | (895) | (161) |
| Intangible assets | (1,589) | (1,780) |
| Property, plant and equipment | (6,206) | (4,028) |
| ROU lease | (1,493) | - |
| Leases | - | (660) |
| Valuation allowance | (3,458) | (1,093) |
| Deferred tax liabilities | (15,023) | (8,945) |
| Total net deferred tax liabilities | $ (1,212) | $ (665) |

The Company's effective tax rate of 101.5% differed from the federal statutory tax rate of 21% primarily due to foreign rate differentials, valuation allowance, nondeductible transaction costs and state taxes.

The change in the valuation allowance of $2,365 relates to U.S. deferred tax assets and was primarily driven by the inability to use income from the future reversals of existing taxable temporary differences as a source of income to support certain deferred tax assets.

As of December 31, 2022, the Company has federal and state net operating loss carryforwards of approximately $12,531 and $2,582, respectively. $1,803 and $38 of the federal and state net operating loss carryforwards, respectively, begin to expire in 2032 for federal purposes and 2023 for state purposes. Per the Tax Cut and Jobs Act (TCJA), $5,061 of the federal net operating loss carryforwards do not expire and will be subject to 80% limitation in future years. The Company has federal business interest expense limitation carryforwards of $2,458, which can be carried forward indefinitely. Utilization of certain carryforwards may be subject to an annual limitation due to the ownership change limitations provided by sections 382 and 383 of the Internal Revenue Code of 1986, as amended, and similar state provisions. The annual limitation may result in the expiration of a portion of these tax attributes before utilization.

34

FBG_CH1_00094988

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

---

**Note 18.    Income Taxes (Continued)**

As of December 31, 2022, the Company has U.S. foreign tax credit carryovers of $572 and U.S. research and development credit carryovers of $496, which begin to expire in 2023 and 2027, respectively.

Under ASC 740-10, Income Taxes, the tax benefit from an uncertain tax position may be recognized only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities. The determination is based on the technical merits of the position and presumes that each uncertain tax position will be examined by the relevant taxing authority that has full knowledge of all relevant information. As of December 31, 2022, the Company has no uncertain tax positions.

Enacted as part of the TCJA in 2017, companies are required to capitalize and amortize research and experimental expenditures for tax years beginning after December 31, 2021. Domestic research and experimental expenditures must be capitalized and amortized over five years and foreign expenditures over 15 years. As a result, in the current year the company has added back current year expenditures of $7,000 and recorded a deferred tax asset that will be amortized over five years.

Per U.S. statute of limitations, the last three years of the Company's federal income tax returns and up to the last four years of certain state income returns remain subject to examination by the Internal Revenue Service and various state tax authorities. The Company's net operating loss carryforwards for years ended December 31, 2012, and thereafter remain subject to examination by the United States and certain states. The statute of limitations for examination in other countries varies from three to 10 years.

**Note 19.    Revenue Recognition From Contracts With Customers**

The Company manufactures and sells customized products, primarily to Original Equipment Manufacturers (OEMs). Although the Company may enter into long-term supply arrangements with its major customers, the prices and volumes are not fixed over the life of the arrangements, and a contract does not exist for purposes of applying ASC 606, Revenue from Contracts with Customers, until volumes are contractually known. Revenue is recognized when performance obligations under the terms of a contract are satisfied, which generally occurs with the transfer of control of the Company's products. For most of the Company's products, transfer of control occurs upon shipment or delivery; however, a limited number of customer arrangements for highly customized products with no alternative use provide the Company with an enforceable right to payment. As a result, for these arrangements, revenue is recognized as goods are produced or over time. An adjustment, using the input method to reflect the Company's performance to date, is made to recognize revenue from these arrangements by examining work-in progress and finished goods inventory and estimating a profit margin.

The Company measures revenue at the amount of consideration it expects to receive in exchange for transferring the goods. Sales, value added and other taxes concurrent with revenue-producing activities are excluded from revenue. The Company has a limited number of arrangements with customers where the price paid by the customer is dependent on the volume of product purchased over the term of the arrangement. In other arrangements, the Company provides a rebate to customers based on the volume of products purchased during the course of the arrangement. The Company estimates the volumes to be sold over the term of the arrangement and recognizes revenue based on the estimated amount of consideration to be received from these arrangements. As a result of these arrangements, the Company has recognized a contra receivable of $553 and $1,472 at December 31, 2022 and 2021, respectively. These amounts are reflected in trade receivables, less allowance in our accompanying consolidated balance sheets. The Company estimates expected returns based on historical return activity and adjusts the level of consideration for the estimated effect of returns. Historically, returns have not been material.

35

FBG_CH1_00094989

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 19.    Revenue Recognition From Contracts With Customers (Continued)**

The Company's payment terms with customers are customary and vary by customer and geography but typically range from 30 to 90 days. We have evaluated the terms of our arrangements and determined that they do not contain significant financing components. The Company provides limited warranties on some of its products. Provisions for estimated expenses related to product warranty are made at the time products are sold.

**Disaggregation of revenue (point in time vs. over time):** In the following tables, revenue is disaggregated by region, by point in time and over time recognition:

|  | 2022 | | |
|---|---|---|---|
|  | Over Time Recognition | Point in Time Recognition | Total |
| North America | $ 78,045 | $ 48,892 | $ 126,937 |
| Asia | 11,407 | 73,682 | 85,089 |
| Europe | 15,257 | 14,713 | 29,970 |
| Total | $ 104,709 | $ 137,287 | $ 241,996 |

|  | 2021 | | |
|---|---|---|---|
|  | Over Time Recognition | Point in Time Recognition | Total |
| North America | $ 10,655 | $ 6,166 | $ 16,821 |
| Asia | 1,656 | 15,819 | 17,475 |
| Europe | 2,862 | 3,371 | 6,233 |
| Total | $ 15,173 | $ 25,356 | $ 40,529 |

**Contract balances:** Contract assets relate to the Company's rights to consideration for work completed but not billed at the reporting date on production parts. The contract assets are reclassified into the trade receivables balance when the rights to receive payments become unconditional. There have been no impairment losses recognized related to contract assets arising from the Company's contracts with customers. Certain contracts have resulted in receipt of consideration in advance of fulfilling the performance obligations. The amounts received have been classified as contract liabilities.

As of December 31, 2022, and 2021, the Company had contract assets totaling $117 and $160, respectively, which are included in prepaid expenses and other current assets in the accompanying consolidated balance sheets. As of December 31, 2022, and 2021, the Company had contract liabilities totaling $5,638 and $2,858, respectively, which are included in other accrued expenses in the accompanying consolidated balance sheets.

**Contract costs:** Shipping and handling costs associated with outbound freight after control over a product has transferred to a customer are accounted for as a fulfillment cost and are included in cost of sales. Fulfillment costs are $1,384 and $355 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

36

CONFIDENTIAL

FBG_CH1_00094990

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 20.   Concentrations of Risk**

Walbro's revenues resulted primarily from sales of components and systems for the global off-road and nonautomotive small engine market to original equipment manufacturers. The concentration of net sales is presented below:

| | 2022 | |
| --- | --- | --- |
| | Net Sales | Accounts Receivable |
| Customer A | 16.9 % | 21.2 % |
| Customer B | 12.2 % | 13.9 % |
| Customer C | 7.7 % | 5.3 % |
| Customer D | 9.2 % | 6.8 % |

| | 2021 | |
| --- | --- | --- |
| | Net Sales | Accounts Receivable |
| Customer A | 13.3 % | 4.3 % |
| Customer B | 7.4 % | 15.1 % |
| Customer C | 11.1 % | 16.6 % |
| Customer D | 8.3 % | 12.8 % |

The following tables show geographic information:

| | 2022 | |
| --- | --- | --- |
| | Net Sales | Long-Lived Tangible Assets |
| North America | $   126,937 | $   44,010 |
| Asia | 85,089 | 18,120 |
| Europe | 29,970 | - |
| Total | $   241,996 | $   62,130 |

| | 2021 | |
| --- | --- | --- |
| | Net Sales | Long-Lived Tangible Assets |
| North America | $   16,821 | $   37,766 |
| Asia | 17,475 | 21,805 |
| Europe | 6,233 | - |
| Total | $   40,529 | $   59,571 |

The Company assesses credit risk on a customer-by-customer basis and undertakes activities to mitigate any significant risk.

37

CONFIDENTIAL

FBG_CH1_00094991

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements
(In Thousands)**

**Note 21.    Commitments and Contingencies**

The Company is party to various claims and litigation arising in the normal course of its business.

In 2018, a former employee of Walbro LLC filed an action in Federal District Court against Walbro LLC alleging among other things age discrimination. The District Court issued summary judgment in favor of Walbro LLC. The plaintiff appealed the decision to the Federal 6th Circuit Court of Appeals who reversed the summary judgment in favor of Walbro LLC and sent the case back to the district court for trial. The trial date has been pushed back several times. The matter is tentatively scheduled for trial to occur sometime in the final quarter of 2023.

In September 2020, Walbro LLC joined an action as a plaintiff, one of a few thousand plaintiffs, in the United States Court of International Trade filed in the United States. In this case, the plaintiffs challenge the legality of Section 301 retaliatory tariffs imposed by the President of the United States on Chinese goods appearing on Lists 3 and 4A of the announced retaliatory measures. If the plaintiffs are successful, the plaintiffs would receive a refund of the tariffs imposed on the imported goods.

The Company cannot provide any assurance as to the ultimate outcome or that an adverse resolution of the abovementioned cases would not have a material adverse effect on its financial position, results of operations, or cash flows.

**Note 22.    Derivative Instruments**

**Income effect of derivative instruments:** Gains and losses on currency hedge derivatives are recognized in cost of sales in the accompanying consolidated statements of operations and comprehensive income (loss) as the Company has elected to not apply hedge accounting. Losses recognized directly in income on currency hedge derivatives in the consolidated statement of operations and comprehensive income (loss) was $472 and $84 for the year ended December 31, 2022, and the period from inception (July 21, 2021) through December 31, 2021, respectively.

**Balance sheet effect of derivative instruments:** The following tables summarize the estimated fair value of derivative financial instruments:

| | 2022 | | |
| --- | --- | --- | --- |
| | Notional Amount | Fair Value of Assets | Fair Value of Liabilities |
| Derivatives not designated as hedging instruments: | | | |
| Foreign exchange contracts: | | | |
| Mexican peso | $ 5,681 | $ 5,556 | $ 5,265 |
| Japanese yen | 5,413 | 5,299 | 5,642 |
| Chinese yuan | 5,158 | 5,242 | 5,331 |
| Thai baht | 4,132 | 2,337 | 2,272 |
| Total | $ 20,384 | $ 18,434 | $ 18,510 |

38

CONFIDENTIAL

FBG_CH1_00094992

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 22.   Derivative Instruments (Continued)**

| | 2021 | | |
| --- | --- | --- | --- |
| | Notional Amount | Fair Value of Assets | Fair Value of Liabilities |
| Derivatives not designated as hedging instruments: | | | |
| Foreign exchange contracts: | | | |
| Mexican peso | $ 990 | $ 984 | $ 985 |
| Total | $ 990 | $ 984 | $ 985 |

The following tables set forth by level, within the fair value hierarchy, the assets and liabilities measured at fair value on a recurring basis:

| | 2022 | | |
| --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 |
| Derivative asset | $ - | $ 18,434 | $ - |
| Total assets | $ - | $ 18,434 | $ - |
| Derivative liability | $ - | $ 18,510 | $ - |
| Total liabilities | $ - | $ 18,510 | $ - |

| | 2021 | | |
| --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 |
| Derivative asset | $ - | $ 984 | $ - |
| Total assets | $ - | $ 984 | $ - |
| Derivative liability | $ - | $ 985 | $ - |
| Total liabilities | $ - | $ 985 | $ - |

Walbro's derivatives are over-the-counter customized derivative transactions and are not exchange-traded. The discount rate used in estimating fair value is the relevant secured overnight financing rate (SOFR) plus an adjustment for nonperformance risk.

39

CONFIDENTIAL

FBG_CH1_00094993

**Walbro Topco LLC**

**Notes to Consolidated Financial Statements**
**(In Thousands)**

**Note 23.     Accumulated Other Comprehensive Income (Loss)**

The following table summarizes the changes in balances of each component of AOCI, net of tax:

| | Foreign Currency Translation Items | Derivative Financial Instruments | Defined Benefit Pension Items | Total |
|---|---|---|---|---|
| Balance, July 21, 2021 | $ - | $ - | $ - | $ - |
| Other comprehensive income, before reclassifications | 121 | - | 135 | 256 |
| Amounts reclassified from AOCI | - | - | (13) | (13) |
| Net current-period other comprehensive income | 121 | - | 122 | 243 |
| Balance, December 31, 2021 | 121 | - | 122 | 243 |
| Other comprehensive income, before reclassifications | 3,866 | - | 93 | 3,959 |
| Amounts reclassified from AOCI | - | - | (15) | (15) |
| Net current-period other comprehensive income | 3,866 | - | 78 | 3,944 |
| Balance, December 31, 2022 | $ 3,987 | $ - | $ 200 | $ 4,187 |

As of December 31, 2022 and 2021, no significant amounts were reclassified out of the components of AOCI into net income.

**Note 24.     Liquidity Bonus**

On August 24, 2022, the Company adopted a Liquidity Bonus Plan.

Under the terms of the Liquidity Bonus Plan, the Company shall pay the holder an amount equal to their interest in the Liquidity Event.

The Liquidity Bonus vests over a three-year period starting from October 27, 2021, or immediately upon a change of control of a business unit of the Company, provided that the holder's continuous services have not terminated prior to the consummation of a change of control. The Liquidity Bonus Plan expires on August 25, 2029. As of December 31, 2022, the performance conditions were not met; consequently, no compensation expense has been recognized for the year ended December 31, 2022.

**Note 25.     Government Grant**

The Company received a cash grant in the amount of $1,500 from the Michigan Economic Development Corporation for the purpose of funding certain capital expenditures. The grant has been recognized by reducing the cost of the capital expenditures and the reduction to the cost of the assets is recognized over the useful life of the assets as reduced depreciation expense within the consolidated statement of operations and comprehensive income.

**Note 26.     Subsequent Events**

The Company evaluated subsequent events through April 25, 2023, the date these consolidated financial statements were available to be issued. There were no material subsequent events that required recognition or additional disclosure in these consolidated financial statements.

40

FBG_CH1_00094994

**SUMMARY BALANCE SHEET**

| | 12/31/2022 | 9/30/2023 |
|---|---|---|
| **Assets** | | |
| Cash | $ 376 | $ 376 |
| Accounts Receivable, net | 25,614 | 28,086 |
| Inventory | 15,871 | 18,464 |
| Prepaid Expenses | 2,769 | 962 |
| **Total Current Assets** | **44,630** | **47,888** |
| Property and Equipment, net | 38,399 | 37,167 |
| **Total Noncurrent Assets** | **38,399** | **37,167** |
| **Total Assets** | **$ 83,029** | **$ 85,055** |
| **Liabilities & Equity** | | |
| Accounts Payable | $ 15,464 | $ 13,611 |
| Accrued Warranties | 948 | 1,485 |
| Accrued Wages | 3,641 | 3,577 |
| Other Accrued Expenses | 4,788 | 4,623 |
| Accrued Short Term Pension Obligation | 300 | 75 |
| Intercompany Related Parties | 950 | 24,089 |
| Short Term Lease Obligation | 676 | 681 |
| **Total Current Liabilities** | **26,767** | **48,140** |
| ROU Finance Lease Obligations | 7,870 | 7,640 |
| Pension Obligation | 668 | 932 |
| LT Operating Lease Obligation | 69 | 69 |
| Asset Retirement Obligation | 98 | 97 |
| **Total Noncurrent Liabilities** | **8,705** | **8,738** |
| **Total Liabilities** | **35,472** | **56,879** |
| **Equity** | **47,558** | **28,176** |
| **Total Liabilities & Equity** | **$ 83,029** | **$ 85,055** |

Check: $ - $ -
Source:

Notes | Comments:

CONFIDENTIAL

FBG_CH1_00094995

## FINANCIAL SNAPSHOT

**FINANCIAL SNAP SHOT**

| | CY 12/31/2022 | LTM 9/30/2023 | Variance \| Growth 2022 to LTM 2023 | |
|---|---|---|---|---|
| **AS REPORTED:** | | | | |
| Revenues | $ 111,437 | $ 138,453 | +$27,017 | +24.2% |
| Gross Profit | $ 19,319 | $ 25,397 | +$6,079 | +31.5% |
| *GP %* | *17.3%* | *18.3%* | | |
| EBITDA | $ 10,891 | $ 14,417 | +$3,526 | +32.4% |
| *Margin %* | *9.8%* | *10.4%* | | |
| | | | | |
| **AS ADJUSTED:** | | | | |
| Revenues | $ 111,437 | $ 138,453 | +$27,017 | +24.2% |
| Gross Profit | $ 23,088 | $ 29,464 | +$6,376 | +27.6% |
| *GP %* | *20.7%* | *21.3%* | | |
| EBITDA | $ 10,891 | $ 14,322 | +$3,431 | +31.5% |
| *Margin %* | *9.8%* | *10.3%* | | |

**ADJUSTED SUMMARY INCOME STATEMENTS**

| | CY 2022 | | | | LTM 9/2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | As Reported | ITDA | Adjustments | Adjusted | As Reported | ITDA | Adjustments | Adjusted |
| Net Sales | $ 111,437 | $ - | $ - | $ 111,437 | $ 138,453 | $ - | $ - | $ 138,453 |
| Cost of Sales | 92,118 | (3,769) | - | 88,349 | 113,056 | (4,067) | - | 108,990 |
| Gross Profit | 19,319 | 3,769 | - | 23,088 | 25,397 | 4,067 | - | 29,464 |
| *GP %* | *17.3%* | | | *20.7%* | *18.3%* | | | *21.3%* |
| Operating Expenses | 12,302 | (105) | - | 12,197 | 15,237 | (190) | 95 | 15,141 |
| Net Income | 7,017 | 3,874 | - | 10,891 | 10,160 | 4,257 | (95) | 14,322 |
| Depreciation & Amortization | 3,874 | (3,874) | - | - | 4,257 | (4,257) | - | - |
| **EBITDA** | $ 10,891 | $ - | $ - | $ 10,891 | $ 14,417 | $ - | $ (95) | $ 14,322 |
| *EBITDA %* | *9.8%* | | | *9.8%* | *10.4%* | | | *10.3%* |

- The above schedules are discussed in further detail in the QoE Analysis section of this report.

- ITDA = Interest, Income Taxes, Depreciation, and Amortization.

# EBITDA TO FREE CASH FLOW

| EBITDA TO FREE CASH FLOW | CY 12/31/2022 | LTM 9/30/2023 |
|---|---|---|
| EBITDA, diligence adjusted | $ 10,891 | $ 14,322 |
| **Changes in Adjusted NWC Balances:** | | |
| Accounts Receivable, net | (13,761) | (12,091) |
| Inventory | (3,475) | (4,745) |
| Prepaid Expenses | (955) | 295 |
| Accounts Payable | 5,589 | 2,079 |
| Accrued Warranties | 597 | 972 |
| Accrued Wages | (684) | (1,143) |
| Other Accrued Expenses | 1,936 | 2,962 |
| Accrued Short Term Pension Obligation | 300 | 75 |
| **Investing activities:** | | |
| Capital Expenditures | (2,988) | (2,087) |
| Proceeds from Sale of PP&E | - | - |
| **Unlevered Free Cash Flows ("UFCF")** | $ (2,551) | $ 639 |
| *UFCF % of Diligence Adjusted EBITDA* | -23% | 4% |

▪ Unlevered free cash flows represented (27%) and (1%) of normalized EBITDA for CY 2022 and LTM 9/30/2023, respectively.

▪ Note that certain balance sheet balances, such as A/R, inventory, and A/P, were estimated prior to 10/31/2023, as previously mentioned in this report.

▪ Due to the Grand Rapids acquisition, the changes in NWC account balances from 2021 to 2022 and 9/30/2022 to 9/30/2023 may be inaccurate, as November 2022 and prior periods do not include any of the NWC balances for Grand Rapids.

**DEBTORS' EXHIBIT NO. 245**
**Page 92 of 92**

FBG_CH1_00094997