*CONFIDENTIAL*
*EXECUTION VERSION*

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

FIRST BRANDS GROUP, LLC,

VIPER ACQUISITION II, LLC,

TAE BRAKES, LLC,

QUALITOR HOLDINGS LLC, AS THE EQUITYHOLDER REPRESENTATIVE

and

QUALITOR HOLDINGS LLC, AS THE PRINCIPAL SELLER

_____

DATED AS OF DECEMBER 30, 2022

_____

CONFIDENTIAL

FBG_CH1_00095002

**TABLE OF CONTENTS**

**Page**

ARTICLE 1 DEFINITIONS.................................................................................................1
    1.1    Definitions ...............................................................................................1
    1.2    Other Capitalized Terms..........................................................................12
    1.3    Interpretive Provisions............................................................................13

ARTICLE 2 THE MERGER .............................................................................................15
    2.1    Merger......................................................................................................15
    2.2    Effective Time .........................................................................................16
    2.3    Effects of the Merger ...............................................................................16
    2.4    2022 July Promissory Notes Cash Payoff Amount ..................................17
    2.5    Effect on Units.........................................................................................17
    2.6    Book-Entry Units .....................................................................................18
    2.7    Cancellation of Company Options; Payment of Transaction
            Bonuses....................................................................................................18
    2.8    Transactions to be Effected at the Closing ..............................................19
    2.9    Pre-Closing Statement; 2022 July Promissory Notes Cash Payoff
            Amount Adjustment.................................................................................20
    2.10   Termination of Company Option Plan .....................................................24
    2.11   Withholding Rights..................................................................................24

ARTICLE 3 THE CLOSING .............................................................................................24
    3.1    Closing; Closing Date...............................................................................24

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE COMPANY.........24
    4.1    Organization and Qualification................................................................25
    4.2    Capitalization of the Company .................................................................25
    4.3    Subsidiaries..............................................................................................26
    4.4    Binding Obligation ..................................................................................27
    4.5    No Defaults or Conflicts...........................................................................27
    4.6    No Governmental Authorization Required...............................................27
    4.7    Financial Statements................................................................................28
    4.8    Intellectual Property.................................................................................28
    4.9    Compliance with Laws ............................................................................29
    4.10   Corrupt Practices; Trade Control Laws ....................................................30
    4.11   Material Contracts ...................................................................................30
    4.12   Litigation.................................................................................................32
    4.13   Taxes.......................................................................................................32
    4.14   Permits ....................................................................................................33
    4.15   Employee Benefit Plans...........................................................................34
    4.16   Labor Relations.......................................................................................35
    4.17   Environmental Compliance .....................................................................36
    4.18   Insurance.................................................................................................37
    4.19   Real Property ...........................................................................................37

i

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095003

**DEBTORS' EXHIBIT NO. 247**
**Page 2 of 104**

4.20    Affiliate Transactions .................................................................38
4.21    Absence of Material Adverse Effect.........................................38
4.22    Brokers.......................................................................................38
4.23    Product Liability ........................................................................38
4.24    Receivables................................................................................38
4.25    Intercompany Receivables.........................................................39
4.26    Exclusivity of Representations ..................................................39

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PARENT AND
            MERGER SUB................................................................................39
5.1     Organization ..............................................................................39
5.2     Binding Obligation ....................................................................39
5.3     No Defaults or Conflicts............................................................40
5.4     No Authorization or Consents Required....................................40
5.5     Brokers.......................................................................................40
5.6     Sufficient Funds.........................................................................41
5.7     Litigation....................................................................................41
5.8     Solvency .....................................................................................41
5.9     Parent's and Merger Sub's Reliance..........................................41
5.10    Investment Purpose....................................................................42
5.11    Exclusivity of Representations ..................................................42

ARTICLE 6 COVENANTS .................................................................................43
6.1     Public Announcements; Confidentiality....................................43
6.2     Resignations...............................................................................43
6.3     Employee Matters ......................................................................43
6.4     Officer and Director Indemnification and Insurance................44
6.5     Termination of Affiliate Obligations ........................................46
6.6     Waiver of Conflicts Regarding Representation .........................46
6.7     Access to Books and Records....................................................47
6.8     R&W Insurance Policy ..............................................................47
6.9     Tax Matters................................................................................48
6.10    Names Following Closing ..........................................................48
6.11    Restrictive Covenants ................................................................49

ARTICLE 7 MISCELLANEOUS .........................................................................49
7.1     No Survival.................................................................................49
7.2     Expenses ....................................................................................50
7.3     Amendment.................................................................................50
7.4     Entire Agreement.......................................................................50
7.5     Headings .....................................................................................51
7.6     Notices .......................................................................................51
7.7     Exhibits and Schedules..............................................................52
7.8     Waiver.........................................................................................52
7.9     Binding Effect; Assignment ......................................................52
7.10    No Third Party Beneficiary .......................................................52
7.11    Counterparts...............................................................................52

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095004

**DEBTORS' EXHIBIT NO. 247**
**Page 3 of 104**

7.12    Release ...........................................................................................................52
7.13    Governing Law and Jurisdiction....................................................................54
7.14    Consent to Jurisdiction and Service of Process .........................................54
7.15    WAIVER OF JURY TRIAL ........................................................................54
7.16    Conveyance Taxes .........................................................................................54
7.17    Specific Performance.....................................................................................55
7.18    Non-Recourse ................................................................................................55
7.19    Severability....................................................................................................55
7.20    Equityholder Representative..........................................................................56

iii

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095005

<u>EXHIBITS; SCHEDULES</u>

| | |
|---|---|
| Exhibit A | Balance Sheet Rules |
| Exhibit B | Current Assets and Current Liabilities |
| Exhibit C | Option Cancellation and Transaction Bonus Agreement |
| Exhibit D | Certificate of Merger |
| Exhibit E | Letter of Transmittal |
| Exhibit F | [Reserved] |
| Exhibit G | Restrictive Covenants |

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095006

**AGREEMENT AND PLAN OF MERGER**

AGREEMENT AND PLAN OF MERGER (the "Agreement"), dated as of December 30, 2022, by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Viper Acquisition II, LLC, a Delaware limited liability company and wholly owned subsidiary of Parent ("Merger Sub"), TAE Brakes, LLC, a Delaware limited liability company (the "Company"), Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative") and, solely for the purposes of Section 6.11, Qualitor Holdings LLC, a Delaware limited liability company (the "Principal Seller").

RECITALS

WHEREAS, Parent wishes to acquire the Company by effecting a merger of Merger Sub with and into the Company, with the Company being the Surviving Company (as defined below) (the "Merger");

WHEREAS, the respective governing bodies of Parent, Merger Sub and the Company have approved and declared advisable this Agreement and the Merger upon the terms and conditions set forth in this Agreement;

WHEREAS, concurrently with the execution of this Agreement, each holder of Company Options has entered into an Option Cancellation Agreement, effective as of the Effective Time, pursuant to which all Company Options held by each such holder of Company Options shall automatically terminate and be cancelled in exchange for the payment of the Transaction Bonus; and

WHEREAS, immediately prior to the occurrence of the Closing, the Company will obtain and deliver to Parent a true and correct copy of an irrevocable written consent of the members of the Company who collectively own a majority of the voting power of the outstanding Company Units (as defined below) adopting this Agreement and approving and consenting to the Merger and the consummation of the transactions contemplated hereby (the "Written Consent"), in accordance with the DLLCA (as defined below), the Company's certificate of formation (the "Company Certificate of Formation"), and the Company's limited liability company agreement (the "Company LLCA"), in each case as in effect as of the date hereof.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1

DEFINITIONS

1.1    Definitions.  The following terms, whenever used herein, shall have the following meanings for all purposes of this Agreement.

CONFIDENTIAL                                            FBG_CH1_00095007

**DEBTORS' EXHIBIT NO. 247**
**Page 6 of 104**

"2022 July Noteholders" means the holders of the 2022 July Promissory Notes.

"2022 July Promissory Notes" means that certain (i) Promissory Note, dated as of July 29, 2022, pursuant to which the Company promised to pay Qualitor and (ii) the Promissory Note, dated as of July 29, 2022, pursuant to which the Company promised to pay Paul Johnson.

"2022 November/December Promissory Notes" means, collectively, (i) that certain Promissory Note, dated as of November 17, 2022, in the principal amount of $1,000,000, (ii) that certain Promissory Note, dated as of December 6, 2022, in the principal amount of $1,000,000 and (iii) that certain Promissory Note, dated as of December 14, 2022, in the principal amount of $1,000,000, in each case, pursuant to which the Company promised to pay Qualitor.

"2022 November/December Promissory Note Payoff Amount" means the amount of outstanding principal and accrued but unpaid interest, fees and other amounts payable on the Closing Date under the 2022 November/December Promissory Notes.

"Accounting Methodology" means the accounting principles, methods and practices, in each case, calculated in accordance with GAAP using, to the extent in accordance with GAAP, the same accounting principles, methods and practices utilized in preparing the Audited Balance Sheet, applied on a consistent basis.

"Action" means any action, claim, suit, arbitration, mediation or other proceeding, in each case before any Governmental Authority, whether civil, criminal, administrative or otherwise, in law or in equity.

"Affiliate" means as to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person.  For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by ownership of voting stock, by Contract or otherwise; provided, that no portfolio company of any investment fund affiliated with or managed by Wellspring Capital Management Group LLC shall be deemed to be an Affiliate of the Company or any Equityholder hereunder.

"Affiliate Agreements" has the meaning set forth in Section 4.20.

"Audited Balance Sheet" has the meaning as set forth in the definition of Financial Statements.

"Audited Financial Statements" has the meaning as set forth in the definition of Financial Statements.

"Balance Sheet Rules" means, collectively, the Accounting Methodology and the rules set forth on Exhibit A attached hereto; provided that in the event of any

2

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095008

conflict between the Accounting Methodology and the rules set forth on <u>Exhibit B</u>, the rules set forth on <u>Exhibit A</u> shall apply.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by Law or executive order to close.

"<u>Business Systems</u>" means all software, computer hardware, communications, networks, platforms, servers and computer systems that are owned or used by the Company or any Company Subsidiary in the conduct of their business.

"<u>CARES Act</u>" means (i) the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136) and any administrative or other guidance published with respect thereto by any Governmental Authority (including IRS Notices 2020-22 and 2020-65), or any other Law or executive order or executive memorandum (including the Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, dated August 8, 2020) intended to address the consequences of COVID-19 (in each case, including any comparable provisions of state, local or non-U.S. Law and including any related or similar orders or declarations from any Governmental Authority) and (ii) any extension of, amendment, supplement, correction, revision or similar treatment to any provision of the CARES Act contained in the Consolidated Appropriations Act, 2021, H.R. 133.

"<u>Class A Units</u>" has the meaning set forth in the Company LLCA.

"<u>Class B Units</u>" has the meaning set forth in the Company LLCA.

"<u>Closing Cash</u>" means all cash and cash equivalents (including bank account balances, marketable securities and any received and uncleared checks, wires or drafts and net of any issued and uncleared checks, wires or drafts) of the Company Group, determined on a consolidated basis as of the Reference Time in accordance with the Balance Sheet Rules.

"<u>Closing Indebtedness</u>" means the amount of Indebtedness of the Company Group determined on a consolidated basis as of immediately prior to the Closing without giving effect to the transactions contemplated by this Agreement, determined in accordance with the Balance Sheet Rules.

"<u>Closing Working Capital</u>" means the Working Capital as of the Reference Time without giving effect to the transactions contemplated by this Agreement, determined in accordance with the Balance Sheet Rules.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

3

4859-7917-7283.2

**DEBTORS' EXHIBIT NO. 247**
**Page 8 of 104**

"Company Expenses" means the legal, accounting, financial advisory, and other advisory, transaction or consulting fees and expenses incurred by the Company or any Company Subsidiary in connection with the transactions contemplated by this Agreement, including change-in-control payments or other similar amounts payable by the Company or any Company Subsidiary to any director, manager, officer or employee of, or consultant to, the Company or any Company Subsidiary conditioned solely on the consummation of the transactions contemplated by this Agreement, in each case, to the extent not paid at or prior to the Closing.

"Company Group" means the Company and the Company Subsidiaries.

"Company Option" means any option to purchase Class B Units pursuant to the Company Option Plan, whether or not vested or exercisable, that is outstanding immediately prior to the Closing.

"Company Option Plan" means the TAE Brakes, LLC Option Plan.

"Company Units" means the Class A Units and the Class B Units of the Company.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of December 22, 2021, by and between Parent and International Brake Industries, Inc.

"Contract" means any legally binding contract, agreement, license, sublicense, lease, sublease, conditional sales contract, mortgage, sales or purchase order, commitment, arrangement, undertaking or understanding.

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions, variations or mutations thereof or related or associated epidemics, pandemic or disease outbreaks.

"COVID-19 Measures" means any action or inaction by the Company Group or any third party in response to COVID-19, including any workforce reduction or its or their compliance with any quarantine, "shelter in place," "stay at home," social distancing, shut down, closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any industry group or any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with, related to, or in response to COVID-19, including the CARES Act and the Families First Act or any other disaster plan of the Company Group or any change in applicable Laws related to, in connection with or in response to COVID-19.

"Current Assets" means, as of any date, the consolidated current assets of the Company and the Company Subsidiaries, which current assets shall include only the line items set forth on Exhibit B, attached hereto under the heading "Current Assets" and no other assets.  For the avoidance of doubt, Current Assets shall (x) exclude deferred

4

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095010

Tax assets, income Tax assets and Closing Cash, and (y) include all inventory held by the Company as of the Reference Time.

"Current Liabilities" means, as of any date, the consolidated current liabilities of the Company and the Company Subsidiaries, which current liabilities shall include only the line items set forth on Exhibit B, attached hereto under the heading "Current Liabilities" and no other liabilities. For the avoidance of doubt, Current Liabilities shall exclude deferred Tax liabilities, income Tax liabilities, Tax liabilities associated with any affiliate of the Company, including any sales agreement entered into with such affiliate, other than the Company and the Company Subsidiaries (notwithstanding that such affiliate may have previously been a Company Subsidiary, including at the Reference Time), and all liabilities related to Company Expenses, Closing Indebtedness and the 2022 July Promissory Notes.

"date hereof" and "date of this Agreement" means the date first written above.

"Effect" shall have the meaning as set forth in the definition of Material Adverse Effect.

"Encumbrance" means any and all liens, encumbrances, charges, mortgages, options, pledges, assessments, restrictions on transfer, security interests, hypothecations, easements, rights-of-way, claims or other similar encumbrances.

"Environmental Laws" means any applicable Law including any judicial or administrative order, consent, decree or judgment relating to pollution or protection of the Environment health, safety, natural resources or Hazardous Materials.

"Environmental Permits" means any permit, approval, identification number, license or other authorization required under or issued pursuant to any applicable Environmental Law.

"Equityholder Representative Reserve Amount" means $1,000,000.

"Factor" means White Oak Commercial Finance, LLC.

"Factoring Agreement" means that certain Factoring Agreement, dated as of December 10, 2021, by and between the Company and Factor.

"Factoring Agreement Payoff Amount" means the amount of outstanding principal and accrued but unpaid interest, fees and other amounts payable (including any prepayment penalties, if any) on the Closing Date under the Factoring Agreement.

"Equityholders" means a holder of Company Units, in their capacity as such.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095011

"ERISA Affiliate" means, with respect to any Person, any other Person required to be treated as a single employer with the first Person under Section 414 of the Code.

"Financial Statements" means (i) the audited consolidated balance sheet of the Company Group (the "Audited Balance Sheet"), and the related statements of operations and comprehensive loss, equityholders' equity and cash flows of the Company Group for the year ended December 31, 2021, together with the notes and schedules thereto (the "Audited Financial Statements") and (ii) the unaudited consolidated balance sheet of the Company Group as of September 30, 2022 (the "Interim Balance Sheet") and the related consolidated statements of operations and comprehensive loss, equityholders' equity and cash flows of the Company Group for the six (6) months then ended (the "Unaudited Financial Statements").

"Foreign Corrupt Practices Act" means the Foreign Corrupt Practices Act of 1977.

"Fraud" means, with respect to a party to this Agreement, the actual and knowing common law fraud (and not negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence) by such party with respect to the making of a representation or warranty by such party set forth in this Agreement (as qualified by the Disclosure Schedules) with the specific intent to induce another party to enter into this Agreement that was material to the claiming party's decision to enter into this Agreement and upon which the claiming party justifiably relied.  No party to this Agreement shall have liability for Fraud unless it has been determined in a non-appealable final determination of a court of competent jurisdiction.  For the avoidance of doubt, nothing in this Agreement shall, or is intended to, reduce Parent's burden of proof or pleading for any claim based upon Fraud, or to restrict the scope of the disclaimers or acknowledgements of non-reliance by Parent set forth in Section 4.26 and Section 5.11.

"Fully Diluted Company Units" means the total number of outstanding Company Units as of immediately prior to the Effective Time.

"GAAP" means United States generally accepted accounting principles in effect and applied consistently throughout the periods involved.

"Governmental Authority" means any nation or government, any state, province or other political subdivision thereof, exercising executive, legislative, judicial, regulatory or administration functions of or pertaining to government, or any government authority, commission or instrumentality of the United States of America, any foreign government, any state of the United States of America, or any municipality or other political subdivision thereof, and any court or tribunal of competent jurisdiction.

"Hazardous Material" means any material or substance that is regulated or the basis for liability under Environmental Law, including any asbestos, polychlorinated biphenyls, petroleum, or petroleum byproducts or breakdown products or toxic mold.

6

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095012

"Indebtedness" means, of any Person, without duplication, (i) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (ii) amounts owing as deferred purchase price for the acquisition of a business, including all seller notes and "earn-out" payments, (iii) indebtedness evidenced by any note, bond, debenture, mortgage, deed of trust or other debt instrument or debt security, including the 2022 November/December Promissory Notes, the Factoring Agreement and any other factoring agreement, (iv) obligations under any performance bond or letter of credit, but only to the extent drawn or called as of immediately prior to the Closing, (v) capital or finance lease obligations as determined in accordance with the Balance Sheet Rules, (vi) Transaction Bonuses (together with the employer portion of any Taxes required to be paid in connection therewith), (vii) guarantees with respect to any indebtedness of any other Person of a type described in clauses (i) through (vi) above, but only to the extent currently due and owing without recourse against such other Person, (viii) an amount equal to $508,000 in respect of the underfunding of Company's and the Company Subsidiaries' defined benefits plan and (ix) for clauses (i) through (viii) above, all principal and accrued interest thereon, if any, and any termination fees, prepayment penalties, make-whole payments, commitment, breakage and other fees associated with the repayment of such Indebtedness on the Closing Date to the extent such Indebtedness is repaid on the Closing Date.  For the avoidance of doubt and notwithstanding the foregoing, Indebtedness of the Company and Company Subsidiaries shall not include (A) any obligations under any performance bond or letter of credit to the extent undrawn or uncalled as of the applicable measurement time, (B) any Indebtedness included in the calculation of Current Liabilities in the determination of Closing Working Capital, (C) any intercompany Indebtedness between the Company and the Company Subsidiaries, (D) any Indebtedness incurred by Parent and its Affiliates (and assumed by the Company or any Company Subsidiary) on or before the Closing, (E) any endorsement of negotiable instruments for collection in the ordinary course of business, (F) any deferred revenue, (G) all liabilities under any agreement between the Company or any Company Subsidiary, on one hand, and Parent or any of its Affiliates, on the other hand, (H) all liabilities under any interest rate, currency, material or other hedging arrangements or arrangements of the Company or any Company Subsidiary in the ordinary course of business, (I) liabilities related to Company Expenses (J) any obligations under operating leases classified or determined in accordance with the Balance Sheet Rules, or (K) any amounts payable under the 2022 July Promissory Notes.

"Intellectual Property" means all patents and patent applications; trademarks and service marks, trade names, trade dress and other similar designations of origin including registrations and applications thereof, together with the goodwill associated with any of the foregoing ("Marks"); URLs and Internet domain names; copyrights, including registrations and applications for registration thereof; computer software programs; industrial designs; inventions, proprietary know-how; confidential business information; trade secrets and other intellectual property.

"Interim Balance Sheet" shall have the meaning as set forth in the definition of Financial Statements.

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095013

"IRS" means the United States Internal Revenue Service.

"Knowledge Individuals" means the individuals listed on Section 1.1(a) of the Disclosure Schedule.

"knowledge of the Company" or any similar phrase means the actual knowledge of the Knowledge Individuals assuming the reasonable discharge of their duties in the ordinary course.

"Law(s)" means any law, statute, regulation, code, ordinance, rule or other requirement of any Governmental Authority.

"Material Adverse Effect" means any change, event, circumstance, effect, development, condition or occurrence (each, an "Effect") which, individually or together with any other Effects, (x) has had a material adverse effect on the business, results of operations or assets of the Company and the Company Subsidiaries, taken as a whole or (y) with respect to use in Article 4, would, or would reasonably be excepted to, prevent or materially impair the Company from consummating the transactions contemplated by this Agreement; provided, however, that no Effect resulting from or arising out of any of the following, either alone or in combination, shall be deemed to constitute, or be taken into account in determining whether there has been, a "Material Adverse Effect": (i) Effects that generally affect the industries or segments in which the Company or the Company Subsidiaries operate (including legal and regulatory changes), (ii) general economic, social or political conditions (or changes therein), (iii) Effects affecting financial, credit or capital markets in the United States or in any other country or region in the world, including changes in interest rates or foreign exchange rates; (iv) Effects caused by or resulting from an occurrence, outbreak or escalation or worsening of hostilities, acts of terrorism, military action, war, cyberattacks, political instability or other national or international calamity, crisis or emergency, an act of God, flood, hurricane, earthquake or other natural disaster or force majeure event or any governmental or other response to any of the foregoing, in each case whether or not involving the United States, (v) Effects arising from changes in GAAP or Laws or the interpretation or enforcement thereof, (vi) Effects relating to the announcement of the execution of this Agreement or the transactions contemplated hereby or as a result of the identity of Parent or its Affiliates, including a loss or threatened loss or suspension of, or reduction of relationships with, any customers, suppliers, vendors, distributors, landlord, licensors, employees or other business relations, (vii) Effects resulting from actions that are contemplated by this Agreement and taken by the Company or the Company Subsidiaries or any actions taken by the Company or the Company Subsidiaries consented to in writing or requested in writing by Parent, (viii) Effects relating to adverse changes in commodities or raw materials prices (including gas, oil and their derivatives), (ix) the failure of the Company to meet any internal or industry business plans, estimates, expectations, forecasts, projections or budgets for any period (but not the Effects underlying such failure to the extent such Effects would otherwise constitute a Material Adverse Effect under this definition, to the extent such Effect is not otherwise excluded under this definition of Material Adverse Effect), (x) conditions or effects relating to any work stoppage, labor strike, slowdown or other material labor dispute, disruption or shortage involving

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095014

**DEBTORS' EXHIBIT NO. 247**
**Page 13 of 104**

employees or independent contractors of the Company or the Company Subsidiaries or any of their respective suppliers or customers, (xi) any breach of this Agreement or any other agreement entered into in connection with the transactions contemplated hereby by Parent or its Affiliates or (xii) conditions or effects relating to any epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or COVID-19 Measures or any change in COVID-19 Measures or Protest Events (including any Protest Measures); except that "Material Adverse Effect" shall include any Effects arising out of or attributable to the matters described in clauses (i) through (v) above to the extent the Company and the Company Subsidiaries, taken as a whole, are materially disproportionately affected relative to other participants in the industries in which the Company or the Company Subsidiaries operate taken as a whole.

"OFAC" means any Sanctions administered by the United States Treasury Department's Office of Foreign Assets Control.

"Option Cancellation Agreement" means an Option Cancellation and Transaction Bonus Agreement in the form attached hereto as Exhibit C.

"Parent Fundamental Representations" means the representations and warranties of Parent contained in Section 5.1 (Organization), Section 5.2 (Binding Obligation) and Section 5.5 (Brokers).

"Party" or "Parties" means the Company, the Equityholder Representative and Parent.

"Pension Plan" means an employee benefit plan subject to Section 302 or Title IV of ERISA or Code Sections 412, 413 or 430, but excluding any Multiemployer Plans.

"Permitted Encumbrances" means (i) Encumbrances disclosed in the Financial Statements or any schedules to this Agreement; (ii) Encumbrances for Taxes, assessments and other government charges not yet due and payable or which are being contested in good faith by appropriate proceedings; (iii) mechanics', workmen's, repairmen's, warehousemen's, carriers' or other like Encumbrances arising in the ordinary course of business of the Company and the Company Subsidiaries which are not yet due and payable or which are being contested in good faith by appropriate proceedings; (iv) Encumbrances relating to the transferability of securities under applicable securities Laws; (v) Encumbrances securing rental payments under capitalized leases provided that such lien is limited to the property that is the subject of such capital lease; (vi) Encumbrances in favor of the lessors under the Leases, or encumbering the fee or any superior leasehold interest in the Real Property; (vii) Encumbrances that arise under building codes or zoning, land use and other similar Laws which are not violated in any material respect by the present use of the applicable real property, (viii) imperfections or defects of title, easements, covenants, rights-of-way and other Encumbrances, whether recorded or referred to in an applicable lease or unrecorded, that were not incurred in connection with Indebtedness and which do not, individually or in the aggregate materially detract from the current use of the applicable Real Property, (ix)

9

4859-7917-7283.2

FBG_CH1_00095015

licenses of Intellectual Property rights; (x) in the case of the Real Property, leases or subleases to third parties, to the extent listed in Section 4.19 of the Disclosure Schedules, (xi) any right, title or interest of a lessor, sublessor or licensor under any of the Leases entered into in the ordinary course of business (xii) reserved, and (xiii) the Encumbrances set forth in Section 1.1(b) of the Disclosure Schedules.

"Person" means any individual, corporation (including any not for profit corporation), general or limited partnership, limited liability partnership, joint venture, estate, trust, firm, company (including any limited liability company or joint stock company), association, organization, entity or Governmental Authority.

"Personal Data" means information that identifies, relates to, describes, or can reasonably be linked to a particular individual.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date.

"Principal Seller Marks" means the corporate names of Principal Seller or any of its Affiliates (other than the Company) and any Marks, whether or not registered, in any jurisdiction, of or used by the Principal Seller or any of its Affiliates (other than the Company).

"Pro Rata Equity Percentage" means, with respect to each Equityholder, a fraction, expressed as a percentage, (a) the numerator of which is the number of Company Units owned by the Equityholder immediately prior to the Closing, and (b) the denominator of which is the total number of Company Units issued and outstanding immediately prior to the Closing.

"Qualitor" means Qualitor Holdings LLC.

"Reference Time" means 11:59 p.m. Eastern Time, on the date immediately prior to the Closing Date.

"Representatives" means, with respect to any Person, any director, officer, manager, agent, employee, general partner, limited partner, member, stockholder, advisor (including legal counsel and accountants) or representative of such Person.

"Sanctions" means United States sanctions or sanctions in any other jurisdiction in which the Company and the Company Subsidiaries have material business operations or arrangements.

"SDN List" means OFAC's Specifically Designated Nationals and Blocked Persons List.

"Solvent" means, with respect to any Person, that as of the date of determination, both (a) (i) the sum of such Person's debts (including contingent liabilities) does not exceed the present fair saleable value of such Person's present assets, (ii) such Person's capital is not unreasonably small in relation to its business as

10

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095016

contemplated on the Closing Date or with respect to any transaction contemplated to be undertaken after the Closing Date, and (iii) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it shall incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise); and (b) such Person is "solvent" within the meaning given that term and similar terms under the Bankruptcy Code and Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified AT Letter" means a pre-consummation letter from the Federal Trade Commission or United States Department of Justice in similar form to that set forth in its blog post dated August 3, 2021 and posted at this link: https://www.ftc.gov/system/files/attachments/blog_posts/Adjusting%20merger%20revie w%20to%20deal%20with%20the%20surge%20in%20merger%20filings/sample_pre-consummation_warning_letter.pdf.

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to a specified Person, any corporation, partnership, limited liability company, limited liability partnership, joint venture or other legal entity of which the specified Person (either alone and/or through and/or together with any other Subsidiary) owns, directly or indirectly, more than 50% of the voting stock or other equity or partnership interests the holders of which are generally entitled to vote for the election of the board of directors or other governing body, of such legal entity or of which the specified Person controls the management.

"Tax" or "Taxes" means all federal, state, county, local, municipal, foreign and other taxes, assessments, duties or similar charges, including all interest, penalties and additions imposed with respect to such amounts, imposed by any Governmental Authority.

"Tax Returns" means any report, declaration, return, information return, claim for refund, election, disclosure, estimate or statement required to be supplied to a Governmental Authority in connection with Taxes, including any schedule or attachment thereto.

"Transaction Bonus" means the transaction bonus payable to a holder of Company Options as consideration for the cancellation of such Company Options in accordance with and pursuant to the terms of an Option Cancellation Agreement with such holder of Company Options, as set forth on (and in the amounts set forth on) Schedule 4.2(a).  The Transaction Bonus payable to each holder of Company Options are collectively referred to herein as the "Transaction Bonuses."

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095017

"Treasury Regulations" means the Treasury regulations promulgated under the Code.

"Unaudited Financial Statements" has the meaning set forth in the definition of Financial Statements.

"Willful Breach" means a material breach that is a consequence of an act or omission knowingly undertaken or omitted by the breaching Party with the intent of causing a breach of this Agreement.

"Working Capital" means, at any time, all Current Assets as of the Reference Time minus all Current Liabilities as of the Reference Time.

"Working Capital Overage" shall exist when (and shall be equal to the amount by which) the Closing Working Capital exceeds the Working Capital Target.

"Working Capital Target" means $32,636,354.

"Working Capital Underage" shall exist when (and shall be equal to the amount by which) the Working Capital Target exceeds the Closing Working Capital.

1.2     Other Capitalized Terms.  The following terms shall have the meanings specified in the indicated section of this Agreement:

| Term | Section |
| --- | --- |
| Accounting Firm | 2.9(c) |
| Agreement | Preamble |
| Book-Entry Units | 2.6(a)(i) |
| Certificate of Merger | 2.2 |
| Closing | 3.1 |
| Closing Date | 3.1 |
| Closing Statement | 2.9(a) |
| Company | Preamble |
| Company Certificate of Formation | Recitals |
| Company LLCA | Recitals |
| Company Plans | 4.15(a) |
| Company Subsidiaries | 4.3(a) |
| Company Subsidiary | 4.3(a) |
| Continuing Employees | 6.3(a) |
| D&O Indemnified Parties | 6.4(a) |
| Data Room | 1.3(s) |
| Designated Counsel | 6.6(a) |
| DLLCA | 2.1 |
| Disclosure Schedules | 4 |
| Dykema | 6.6(a) |
| Effective Time | 2.2 |

12

4859-7917-7283.2

FBG_CH1_00095018

DEBTORS' EXHIBIT NO. 247
Page 17 of 104

| Term | Section |
|---|---|
| Equitable Exceptions | 4.4(a) |
| Equityholder Released Parties | 0 |
| Equityholder Representative | Preamble |
| Equityholder Representative Parties | 7.20(f) |
| Evaluation Material | 6.1(a) |
| Excluded Arrangements | 4.20 |
| Excluded Units | 2.5(b) |
| Final 2022 July Promissory Notes Cash Payoff Amount | 2.4(d)(v) |
| Insurance Policies | 4.18 |
| Leased Real Property | 4.19 |
| Leases | 4.19 |
| Letter of Transmittal | 2.6(a)(i) |
| Material Contracts | 4.11(m) |
| Merger | Recitals |
| Merger Sub | Preamble |
| Multiemployer Plan | 4.15(c) |
| Notice of Disagreement | 2.9(c) |
| Owned Real Property | 4.19 |
| Parent | Preamble |
| Parent Adjustment Amount | 2.9(e)(ii) |
| Paul, Weiss | 6.6(a) |
| Permits | 4.14 |
| Pre-Closing Tax Refund | 6.9(a) |
| Principal Seller | Preamble |
| Protest Event | 6.1 |
| Protest Measures | 6.1 |
| R&W Insurance Policy | 6.8 |
| Real Property | 4.19 |
| Related Parties | 7.18 |
| Released Matters | 0 |
| Releasing Parties | 7.12(d) |
| Restated Certificate | 2.3(b) |
| Sanctions | 4.10(b) |
| SDN List | 4.10(b) |
| Securities Act | 5.10 |
| Statement | 2.9(b) |
| Surviving Company | 2.1 |
| Surviving LLCA | 2.3(c) |
| Vested Options | 2.7(b) |
| Wellspring Parties | 6.6(a) |
| Written Consent | Recitals |

1.3     Interpretive Provisions.  Unless the express context otherwise requires:

4859-7917-7283.2

CONFIDENTIAL                                    FBG_CH1_00095019

(a)     the words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b)     terms defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(c)     the terms "Dollars" and "$" mean United States Dollars;

(d)     references herein to a specific Section, Subsection, Recital, Disclosure Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Disclosure Schedules or Exhibits of this Agreement;

(e)     wherever the word "include," "includes," or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(f)     references herein to any gender shall include each other gender;

(g)     references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(h)     references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity;

(i)     references herein to any Contract (including this Agreement) (i) mean such Contract as amended, supplemented or modified from time to time in accordance with the terms thereof, and to the extent applicable, hereof, (ii) includes and incorporates all exhibits, schedules and other attachments thereto and (iii) includes all documents, instruments and agreements issued or executed in replacement thereof;

(j)     with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(k)     any reference to "day" or "days" means calendar day(s) unless Business Days are expressly specified;

(l)     references herein to any Law or any license mean such Law or license as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time prior to the Closing Date;

(m)     references herein to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder;

14

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095020

(n)　　if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day;

(o)　　the word "or" is disjunctive but not exclusive;

(p)　　reference to "written" or "in writing" include in electronic form;

(q)　　any reference to "year" or "years" means calendar year(s), unless otherwise specified;

(r)　　the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if";

(s)　　references to documents or materials "provided" or "made available" to Parent or similar phrases shall mean such documents or other materials were (i) present (and available for viewing by Parent and its Representatives) in the virtual data room for "Project Viper II" hosted by Data Site (the "Data Room") or (ii) provided to Parent or its Representatives via email, in each case for purposes of the transactions contemplated by this Agreement at least one day prior to the date of this Agreement;

(t)　　time is of the essence in the performance of the Parties' respective obligations contained herein; and

(u)　　except where the context requires otherwise, references to "ordinary course" shall refer to the ordinary course of business of the Company Group, consistent with past practice, subject to applicable Law and taking into account commercially reasonable actions taken in response to any political conditions, social or public health conditions or calamities or other force majeure events that are generally consistent with those taken by other participants in the industry or businesses in the geographies in which the Company Group conduct their business.

The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

## ARTICLE 2

## THE MERGER

2.1　　Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the Delaware Limited Liability Company Act (the "DLLCA"), at the Effective Time, (a) Merger Sub shall be merged with and into the Company, (b) the separate corporate existence of Merger Sub shall cease and the

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095021

Company shall continue its corporate existence under Delaware law as the surviving limited liability company in the Merger (the "Surviving Company") and (c) the Surviving Company shall become a wholly owned subsidiary of Parent.

2.2     Effective Time.  At the Closing, Parent and the Company shall cause a certificate of merger substantially in the form of Exhibit D hereto (the "Certificate of Merger") to be executed, signed, acknowledged and filed with the Secretary of State of the State of Delaware as provided in Section 18-209 of the DLLCA and make all other filings or recordings required by Delaware law in order to effect the Merger.  The Merger shall become effective when the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such other subsequent date or time as Parent and the Company may agree and specify in the Certificate of Merger in accordance with the DLLCA (the "Effective Time").

2.3     Effects of the Merger.

(a)     General Effects.  At the Effective Time, the Merger shall have the effects set forth in this Agreement and the applicable provisions of the DLLCA, including Section 18-209.

(b)     Certificate of Formation.  At the Effective Time, the certificate of formation of the Company in effect immediately prior to the Effective Time shall be the Company's certificate of formation as in effect on the date hereof and shall be, from and after the Effective Time, the certificate of formation of the Surviving Company (the "Restated Certificate") until, subject to Section 7.7 (Officer and Director Indemnification and Insurance), duly amended or repealed in accordance with the provisions thereof and of applicable Law.

(c)     Limited Liability Company Agreement.  The limited liability company agreement of Merger Sub in effect immediately prior to the Effective Time shall be the limited liability company agreement of the Surviving Company (the "Surviving LLCA") from and after the Effective Time until, subject to Section 6.4 (Officer and Director Indemnification and Insurance), duly amended or repealed in accordance with the provisions thereof and of the Restated Certificate and applicable Law.

(d)     Directors.  The Parties shall take all necessary action so that the directors of Merger Sub immediately prior to the Effective Time shall be, from and after the Effective Time, the only directors of the Surviving Company until their successors are duly elected and qualified or until their earlier death, resignation or removal in accordance with the Restated Certificate, the Surviving LLCA and the DLLCA.

(e)     Officers.  The officers of the Company immediately prior to the Effective Time shall be, from and after the Effective Time, the officers of the Surviving Company until their successors are duly elected or appointed and qualified or

16

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095022

**DEBTORS' EXHIBIT NO. 247**
**Page 21 of 104**

until their earlier death, resignation or removal in accordance with the Restated Certificate, the Surviving LLCA and the DLLCA.

2.4    2022 July Promissory Notes Cash Payoff Amount.  The "2022 July Promissory Notes Cash Payoff Amount" shall be calculated using the amounts set forth in Section 2.9(a) and shall be equal to:

    (a)    $15,000,000,

    (b)    plus the Working Capital Overage, if any,

    (c)    plus Closing Cash,

    (d)    minus the sum of:

        (i)    the amount of Closing Indebtedness;

        (ii)    the amount of Company Expenses;

        (iii)    the Working Capital Underage, if any;

        (iv)    the aggregate Merger Consideration payable with respect to Company Units under Section 2.5(c)(i); and

        (v)    the Equityholder Representative Reserve Amount.

The 2022 July Promissory Notes Cash Payoff Amount shall be subject to adjustment following the Closing pursuant to Section 2.9 hereof (the 2022 July Promissory Notes Cash Payoff Amount as adjusted in accordance with Section 2.9, the "Final 2022 July Promissory Notes Cash Payoff Amount").

2.5    Effect on Units.  At the Effective Time, by virtue of the Merger and without any action on the part of Parent, Merger Sub, the Company or the holders of any equity securities of Merger Sub or the Company:

    (a)    Conversion of Merger Sub Equity Interests.  All of the membership interests of Merger Sub outstanding as of immediately prior to the Effective Time shall be converted into and become one fully paid and non-assessable membership interest of the Surviving Company.

    (b)    Cancellation of Treasury Units and Parent-Owned Units. Each Company Unit owned by Parent, Merger Sub or the Company or any other direct or indirect wholly owned Subsidiary thereof, in each case as of immediately prior to the Effective Time (collectively, the "Excluded Units"), shall be cancelled and cease to exist, and no cash or other consideration shall be delivered or deliverable in exchange therefor.

    (c)    Conversion of Company Units.  Except for the Excluded Units, each Company Unit that is issued and outstanding immediately prior to the

17

4859-7917-7283.2

FBG_CH1_00095023

Effective Time shall be converted into a right to receive (i) $0.01 per Company Unit, (ii) the Payoff Adjustment Amount, if any (clauses (i) and (ii) together, the "Merger Consideration"), and (iii) a portion of the balance (if any) of the Equityholder Representative Reserve Amount pursuant to Section 7.20.

      2.6    Book-Entry Units.

      (a)    Payment Procedures.

      (i)    Letter of Transmittal.  Prior to or promptly following the date hereof, the Company (or the Surviving Company) shall mail (electronically or otherwise) to each holder of record (as of immediately prior to the Effective Time) of Company Units converted pursuant to Sections 2.5(c) (Conversion of Company Units), (A) a letter of transmittal in the form attached hereto as Exhibit E (a "Letter of Transmittal") and (B) instructions for surrendering any such uncertificated Company Units ("Book-Entry Unit") in exchange for the Merger Consideration payable in respect of the number of units formerly evidenced by such Book-Entry Units.

      (ii)    Surrender of Company Units.  Upon surrender at or prior to Closing of a Book-Entry Unit for cancellation to the Company, together with a duly executed Letter of Transmittal, the holder of such Book-Entry Units shall be entitled to receive the amount set forth in Section 2.5(c)(i) (Conversion of Company Units) in respect of each Book-Entry Unit so held, which Parent shall pay to such holder at the Closing; provided, that an Equityholder may submit its Letter of Transmittal to the Surviving Company following the Effective Time and Parent shall make (or cause to be made) the payment described in Section 2.5(c)(i) (Conversion of Company Units) as promptly as practicable thereafter (and in no event later than three (3) Business Days after receipt thereof).  Any Book-Entry Units so surrendered shall be cancelled as of the Closing.  No interest shall accrue or be paid on any amount payable upon surrender of Book-Entry Units.

      (b)    No Further Transfers.  At the Effective Time, the unit transfer books of the Company shall be closed and there shall be no further registration of transfers of Company Units that were outstanding immediately prior to the Effective Time.

      2.7    Cancellation of Company Options; Payment of Transaction Bonuses.

      (a)    As of the Effective Time, in accordance with the terms of the Option Cancellation Agreement with each holder of Company Options, each Company Option outstanding immediately prior to the Effective Time, whether vested or unvested or "in-the-money" or "out-of-the-money," shall without any further action on the part of the Company, Parent, the Surviving Company or the holder of such Company Options, automatically terminate and be cancelled without any further liability to the Company in exchange for the right of the holder thereof to receive the Transaction Bonus specified in such holder's Option Cancellation Agreement, less applicable Taxes and

18

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095024

withholding.  Upon the cancellation of the Company Options, each such individual shall cease to have any rights with respect thereto, except the right to receive the Transaction Bonus pursuant to the terms of his or her Option Cancellation Agreement.

(b)      As promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter), Parent shall cause the Surviving Company (i) to pay through its payroll system to each applicable former holder of Company Options, the amount due and payable to such holder pursuant to Section 2.7(a) (Cancellation of Company Options; Payment of Transaction Bonuses) in respect of such cancelled Company Options, less applicable Taxes and withholding and (ii) to pay any applicable Taxes and withholding to the applicable Governmental Authority.

(c)      Notwithstanding the foregoing, if any such payment owed to a former holder of Company Options pursuant to Section 2.7(a), cannot be made through the Surviving Company or any of its Subsidiaries' payroll systems or payroll providers, then the Surviving Company shall (i) issue, or shall cause any of its Subsidiaries to issue, a check for such payment (less applicable Taxes and withholding) to such holder, which check shall be sent by overnight courier to such holder as promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter) and (ii) pay, or shall cause an applicable Subsidiary to pay, any applicable Taxes and withholding to the relevant Governmental Authority.

2.8     Transactions to be Effected at the Closing.  At the Closing, the following transactions shall be effected by the Parties:

(a)      (i) Parent shall deliver to the Company by wire transfer of immediately available funds to such bank account designated in writing by the Company (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount equal to the Factoring Agreement Payoff Amount and (ii) immediately following receipt of such amount the Company shall pay the Factoring Agreement Payoff Amount to the Factor under the Factoring Agreement in accordance with the applicable terms of the Factoring Agreement.

(b)      Parent shall deliver to the Company (or such other Person designated by the Company) by wire transfer of immediately available funds to such bank account designated in writing by the Company (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount sufficient to pay the Company Expenses and the Company shall promptly pay any unpaid Company Expenses from such amounts.

(c)      (i) Parent shall deliver to the Company by wire transfer of immediately available funds to such bank account designated in writing by the Company (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount equal to the 2022 November/December Promissory Note Payoff Amount and (ii) immediately following receipt of such amount the Company shall pay the 2022 November/December Promissory Note Payoff Amount to Qualitor in accordance with the

19

4859-7917-7283.2

applicable terms of the 2022 November/December Promissory Notes, and Qualitor shall deliver to Parent reasonable evidence of cancellation of the 2022 November/December Promissory Notes.

(d)    (i) Parent shall deliver to the Company by wire transfer of immediately available funds to such bank account designated in writing by the Company (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount equal to the 2022 July Promissory Notes Cash Payoff Amount and (ii) immediately following receipt of such amount the Company shall pay the 2022 July Promissory Notes Cash Payoff Amount to the 2022 July Noteholders in accordance with the applicable terms of their respective 2022 July Promissory Notes (pro rata based on the amounts outstanding), and the 2022 July Noteholders shall deliver to Parent reasonable evidence of cancellation of the 2022 July Promissory Notes.

(e)    Subject to Section 2.6(a)(ii) (Surrender of Company Units), Parent shall pay to each Equityholder who has duly executed and delivered a Letter of Transmittal prior to Closing by wire transfer of immediately available funds according to the wire instructions set forth in such Letter of Transmittal, an amount equal to the aggregate amount payable pursuant to Section 2.5(c)(i) (Conversion of Company Units).

(f)    Parent shall deliver to the Equityholder Representative by wire transfer of immediately available funds to such bank account designated in writing by the Equityholder Representative (such designation to be made at least two (2) Business Days prior to the Closing Date) an amount equal to the Equityholder Representative Reserve Amount.

(g)    The Company shall deliver, or cause to be delivered to Parent, resignations in customary form reasonably acceptable to Parent and the Company from each of the officers and directors of each the Company designated in writing by Parent at least ten (10) Business Days prior to the Closing Date.

(h)    The Company shall deliver, or cause to be delivered to Parent, resolutions of IBI MX in customary form reasonably acceptable to Parent including (i) the resignation and release of current board of directors and (ii) revoking of current powers of attorney including, the powers of attorney contained in (x) public deed number 2,763 dated November 15, 2019, granted by Mr. José Alejandro Treviño Cano, notary public number 98 of Monterrey, Nuevo León and (y) public deed number 4,353 dated July 28, 2021 granted by Mr. José Alejandro Treviño Cano, notary public number 98 of Monterrey, Nuevo León.

2.9    Pre-Closing Statement; 2022 July Promissory Notes Cash Payoff Amount Adjustment.

(a)    At least three (3) Business Days prior to the Closing Date, the Company shall deliver to Parent a statement (the "Closing Statement") setting forth (x) the Company's good faith estimate of (i) Closing Working Capital and the resulting Working Capital Overage or Working Capital Underage, (ii) Closing Cash, (iii) the

20

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095026

amount of Closing Indebtedness, (iv) the Company Expenses and (v) the 2022 July Promissory Notes Cash Payoff Amount calculated in accordance with Section 0, in each case of the foregoing clauses (i), (ii) and (iii), prepared in accordance with the Balance Sheet Rules and (y) the resulting amount of the 2022 July Promissory Notes Cash Payoff Amount to be paid to each 2022 July Noteholder (which shall, for the avoidance of doubt, in the aggregate, equal the 2022 July Promissory Notes Cash Payoff Amount).

(b)      Within ninety (90) days after the Closing Date, Parent shall deliver to the Equityholder Representative a statement (the "Statement"), setting forth Parent's good faith determination of (i) Closing Working Capital and the resulting Working Capital Overage or Working Capital Underage, (ii) Closing Cash, (iii) the amount of Closing Indebtedness, (iv) the Company Expenses and (v) the 2022 July Promissory Notes Cash Payoff Amount calculated in accordance with Section 0, using the amounts of Working Capital Overage or Working Capital Underage, Closing Cash, Closing Indebtedness, the Company Expenses as set forth in the Statement, as applicable, instead of the estimated amounts for each such item set forth in the Closing Statement used in calculating the 2022 July Promissory Notes Cash Payoff Amount estimated at Closing, in each case of the foregoing clauses (i), (ii) and (iii), prepared in accordance with the Balance Sheet Rules, and including reasonably supporting detail of all of the foregoing.  Parent shall not amend, supplement or modify the Statement following its delivery to the Equityholder Representative.  Parent and the Equityholder Representative acknowledge that no adjustments shall be made to the Working Capital Target.  Once Parent has delivered the Statement, the Statement shall be deemed irrevocable by Parent for purposes of the calculation of the Final 2022 July Promissory Notes Cash Payoff Amount, and Parent shall be foreclosed and barred in all respects from amending, supplementing or modifying the Statement and related calculations following delivery to the Equityholder Representative; provided, that the Statement may be revised in accordance with Section 2.9(c).

(c)      The Statement shall become final and binding upon the Parties on the sixtieth (60th) day following the date on which the Statement was delivered to the Equityholder Representative, unless the Equityholder Representative delivers a written notice of its disagreement with the Statement (a "Notice of Disagreement") to Parent prior to such date.  The sole permissible grounds for objection shall be that Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and/or Final 2022 July Promissory Notes Cash Payoff Amount was not calculated in accordance with this Agreement.  The Notice of Disagreement shall specify in reasonable detail any contested amounts and the basis therefor and to the extent known, shall set forth the Equityholder Representative's determination of Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and Final 2022 July Promissory Notes Cash Payoff Amount, as applicable.  The failure of the Equityholder Representative to deliver such Notice of Disagreement within the time period prescribed above will constitute the Equityholder Representative's acceptance as final of Closing Cash, Working Capital Overage, Working Capital Underage, Closing Indebtedness, Company Expenses and Final 2022 July Promissory Notes Cash Payoff Amount as set forth on the Statement.  If a Notice of Disagreement is received by Parent in a timely manner, then the Statement (as

21

4859-7917-7283.2

FBG_CH1_00095027

revised in accordance with this sentence) shall become final and binding upon the Equityholder Representative and Parent on the earlier of (A) the date the Equityholder Representative and Parent resolve in writing any differences they have with respect to the matters specified in the Notice of Disagreement and (B) the date any disputed matters are finally resolved in writing by the Accounting Firm.  During the fourteen (14)-day period following the delivery of a Notice of Disagreement, the Equityholder Representative and Parent shall seek in good faith to resolve in writing any differences that they may have with respect to the matters specified in the Notice of Disagreement.  If at the end of such fourteen (14)-day period the Equityholder Representative and Parent have not resolved in writing the matters specified in the Notice of Disagreement, the Equityholder Representative and Parent shall submit to an independent accounting firm (the "Accounting Firm") for arbitration, in accordance with the standards set forth in this Section 2.9, only matters that remain in dispute.  The Accounting Firm shall be FTI Consulting, Inc. or, if such firm is unable or unwilling to act, such other nationally recognized independent public accounting firm as shall be agreed upon by the Equityholder Representative and Parent in writing.  The Equityholder Representative and Parent shall use reasonable efforts to cause the Accounting Firm to render a written decision resolving the matters submitted to the Accounting Firm within thirty (30) days of the receipt of such submission.  The scope of the disputes to be resolved by the Accounting Firm shall be limited to correcting mathematical errors and determining whether the items in dispute were determined in accordance with the Balance Sheet Rules, and the Accounting Firm is not to make any other determination, including any determination as to whether the Working Capital Target, Closing Working Capital, Closing Cash, Company Expenses or the Closing Indebtedness are correct.  The Accounting Firm's decision shall be based solely on written submissions by the Equityholder Representative and Parent and their respective Representatives and not by independent review and shall be final and binding on all of the Parties.  The Accounting Firm may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value for such item claimed by either Party. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced. The fees and expenses of the Accounting Firm incurred pursuant to this Section 2.9 shall be borne pro rata as between the Equityholders, on the one hand, and Parent, on the other hand, in proportion to the final allocation made by such Accounting Firm of the disputed items weighted in relation to the claims made by the Equityholder Representative and Parent, such that the prevailing Party pays the lesser proportion of such fees, costs and expenses.

(d)     The Final 2022 July Promissory Notes Cash Payoff Amount shall be calculated in accordance with Section 0, using the amounts of Working Capital Overage or Working Capital Underage (as applicable), Closing Cash, Closing Indebtedness and the Company Expenses, in each case as finally agreed or determined in accordance with this Section 2.9(c).

(e)     No later than five (5) Business Days after the Final 2022 July Promissory Notes Cash Payoff Amount is determined:

22

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095028

(i)     If the Final 2022 July Promissory Notes Cash Payoff Amount as determined pursuant to the foregoing clause (d) exceeds the 2022 July Promissory Notes Cash Payoff Amount estimated at Closing:

(A)     the purchase price shall be increased (any such increase not to exceed an absolute value of $5,000,000, the "Payoff Adjustment Amount") by such amount of excess;

(B)     Parent shall pay the Payoff Adjustment Amount to each of the Equityholders (in accordance with the payment instructions set forth in each Equityholder's Letter of Transmittal) based on the applicable Pro Rata Equity Percentages; and

(ii)     If the 2022 July Promissory Notes Cash Payoff Amount estimated at Closing exceeds the Final 2022 July Promissory Notes Cash Payoff Amount as determined pursuant to the foregoing clause (d), the 2022 July Promissory Notes Cash Payoff Amount shall be decreased (any such decrease not to exceed an absolute value of $5,000,000, the "Parent Adjustment Amount") by such amount of excess.

Upon payment of the amounts provided in this Section 2.9(e), none of the Parties may make or assert any claim under this Section 2.9.

(f)     Following the Closing, and until the Statement has been finalized in accordance with this Section 2.9, any actions taken by Parent with respect to the accounting books and records of the Company and the Company Subsidiaries (or the items reflected thereon) solely with respect to items on which the Statement is to be based that are inconsistent with the past practices of the Company and the Company Subsidiaries shall be disregarded for purposes of determining such Statement and calculating the Final 2022 July Promissory Notes Cash Payoff Amount.  No actions taken by Parent on its own behalf or on behalf of the Company or the Company Subsidiaries, on or following the Closing Date shall be given effect for purposes of determining the Closing Working Capital, Closing Cash, Closing Indebtedness or Company Expenses. During the period of time from and after the Closing Date through the final determination and payment of Closing Working Capital, Closing Cash, Closing Indebtedness and Company Expenses in accordance with this Section 2.9, Parent shall afford, and shall cause the Company and the Company Subsidiaries to afford, to the Equityholder Representative and any accountants, counsel or financial advisers retained by the Equityholder Representative in connection with the review of the Statement in accordance with this Section 2.9, direct access during normal business hours upon reasonable advance notice to all the properties, books, Contracts, personnel, Representatives (including the Company's accountants) and records of the Company, the Company Subsidiaries and such Representatives (including the work papers of the Company's accountants) relevant to the review of the Statement and Parent's determination of Closing Working Capital, Closing Cash, Closing Indebtedness and Company Expenses in accordance with this Section 2.9; provided, that such access may be limited to the extent the Company determines in good faith, in light of COVID-19 or

23

4859-7917-7283.2

FBG_CH1_00095029

COVID-19 Measures, that such access would jeopardize the health and safety of any employee of the Company or the Company Subsidiaries, as applicable; provided, further, that the Company and its Subsidiaries shall use commercially reasonable efforts to provide such access in a manner that is not prohibited due to any COVID-19 Measures.

2.10    Termination of Company Option Plan.  The Company shall terminate the Company Option Plan effective as of the Closing.  All participants in the Company Option Plan shall receive payments due and owing to such participants as provided in this Agreement and the Option Cancellation Agreements.

2.11    Withholding Rights.  Each of Parent and the Surviving Company shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable state, local or foreign Tax Law.  To the extent that amounts are so withheld by Parent or the Surviving Company, as the case may be, such withheld amounts (a) shall be remitted by Parent or the Surviving Company, as applicable, to the applicable Governmental Authority and (b) to the extent properly remitted as provided in clause (a), shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect of which such deduction and withholding was made by Parent or the Surviving Company, as the case may be. Parent shall use commercially reasonable efforts to provide Equityholder Representative with written notice of any expected deduction or withholding at least ten (10) Business Days prior to the Closing Date, and the parties hereto shall cooperate in good faith to minimize the amount of any such deduction or withholding to the extent permitted under applicable Law.  For the avoidance of doubt, Parent and the Surviving Company (a) shall withhold, or shall cause to be withheld, any Taxes required to be withheld with respect to the Transaction Bonuses or other compensatory payments and (b) shall remit, or cause to be remitted, such withheld amounts to the applicable Governmental Authority.

ARTICLE 3

THE CLOSING

3.1    Closing; Closing Date.  The closing of the Merger (the "Closing") shall take place simultaneously with the execution and delivery of this Agreement on the date hereof, or at such other time and date that the Equityholder Representative and Parent may agree in writing. The date upon which the Closing occurs is referred to herein as the "Closing Date".

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the disclosure schedules delivered by the Company to Parent on the date hereof concurrently with the execution of this Agreement (the

24

4859-7917-7283.2

CONFIDENTIAL                                              FBG_CH1_00095030

"Disclosure Schedules"), the Company represents and warrants to Parent and Merger Sub as follows:

4.1     Organization and Qualification.  The Company is a limited liability company, duly formed, validly existing and in good standing under the Laws of the State of Delaware.  Each Company Subsidiary is duly formed, validly existing and in good standing under the Laws of the relevant jurisdiction of its incorporation or organization, as applicable.  The Company and each Company Subsidiary have all requisite organizational power and authority to own, lease and operate their respective properties and carry on their business as presently owned or conducted, except where the failure to be so incorporated or organized, existing and in good standing or to have such power or authority would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth in Section 4.1 of the Disclosure Schedules, the Company and each Company Subsidiary is qualified, licensed or registered to transact business as a foreign corporation and is in good standing (or the equivalent thereof) in each jurisdiction in which the ownership or lease of property or the conduct of their business requires such qualification, license or registration, except where the failure to be so qualified, licensed or registered or in good standing (or the equivalent thereof) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.2     Capitalization of the Company.

(a)     Section 4.2(a) of the Disclosure Schedules sets forth a complete and accurate list of the issued and outstanding equity securities of the Company as of the date hereof.  Except as set forth in Section 4.2(a) of the Disclosure Schedules, as of the date hereof, there are no other equity securities of the Company authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), calls or commitments of any character whatsoever, relating to the equity securities of, or other equity or voting interest in, the Company, to which the Company is a party or is bound requiring the issuance, delivery or sale of equity securities of the Company.  Except as set forth in Section 4.2(a) of the Disclosure Schedules, as of the date hereof, there are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, the Company to which the Company is a party or is bound. The Company has no authorized or outstanding bonds, debentures, notes or other indebtedness the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the members of the Company on any matter.  There are no Contracts to which the Company is a party or by which it is bound to (i) repurchase, redeem or otherwise acquire any equity securities of, or other equity or voting interest in, the Company or (ii) vote or dispose of any equity securities of, or other equity or voting interest in, the Company.  Except as set forth in the Company LLCA, there are no irrevocable proxies and no voting agreements with respect to any equity securities of, or other equity or voting interest in, the Company.  Schedule 4.2(a) sets forth the Transaction Bonus payable to each holder of Company Options.

25

4859-7917-7283.2

FBG_CH1_00095031

(b)     All of the issued and outstanding shares of Company Units of the Company as of the date hereof are duly authorized, validly issued and free of any preemptive rights in respect thereto and free and clear of all security interests, liens, claims, pledges, options, rights of first refusal, agreements, limitations on the Company's or any Subsidiary's voting rights, charges and other encumbrances of any nature whatsoever other than in connection with the Company LLCA or under applicable securities Law or Permitted Encumbrances.

4.3     Subsidiaries.

(a)     Section 4.3(a) of the Disclosure Schedules sets forth a complete and accurate list as of the date hereof of the name and jurisdiction of each Subsidiary of the Company (each a "Company Subsidiary," and collectively, the "Company Subsidiaries") and the authorized, issued and outstanding equity interests of each Company Subsidiary.  Each of the outstanding equity securities of each Company Subsidiary is duly authorized, validly issued and, except as set forth in Section 4.3(a) of the Disclosure Schedules, is directly owned of record by the Company or a Company Subsidiary, free and clear of any Encumbrances other than (i) Permitted Encumbrances, (ii) Encumbrances on transfer imposed under applicable securities Law and (iii) Encumbrances created by Parent or its Affiliates.  There are no other equity securities of any Company Subsidiary authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), stock appreciation rights, calls or commitments of any character whatsoever to which any Company Subsidiary is a party or may be bound requiring the issuance, delivery or sale of equity securities of any Company Subsidiary.  There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, any Company Subsidiary to which a Company Subsidiary is bound.  No Company Subsidiary has any authorized or outstanding bonds, debentures, notes or other indebtedness, the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equity holders of such Company Subsidiary on any matter.  There are no Contracts to which the Company or any Company Subsidiary is a party or by which the Company or any Company Subsidiary is bound to (i) repurchase, redeem or otherwise acquire any shares of the capital stock, or other equity or voting interest in, any Company Subsidiary or (ii) vote or dispose of any shares of the capital stock, or other equity or voting interest in, any Company Subsidiary.  There are no irrevocable proxies and no voting agreements with respect to any shares of the capital stock of, or other equity or voting interest in, any Company Subsidiary.

(b)     Neither the Company nor any Company Subsidiary owns, directly or indirectly, any capital stock of, or equity ownership or voting interest in, any Person (other than a Company Subsidiary).

(c)     The Company has delivered to Parent true and correct copies of the certificate of incorporation and bylaws or equivalent organizational

26

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095032

documents for the Company and each Company Subsidiary as in effect on the date hereof.

4.4     Binding Obligation.  The Company has all requisite company authority and power to execute, deliver and, subject to receipt of the Written Consent, perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all required corporate action (other than the Written Consent) on the part of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly executed and delivered by the Company and the Equityholder Representative and, assuming that this Agreement constitutes the legal, valid and binding obligation of Parent and Merger Sub, constitutes the legal, valid and binding obligation of the Company and the Equityholder Representative, enforceable against each of the Company and the Equityholder Representative in accordance with its terms, except to the extent that the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws from time to time in effect affecting generally the enforcement of creditors' rights and remedies; and (b) general principles of equity (collectively, the "Equitable Exceptions").  The Company has delivered to Parent true and correct copies of the Certificate of Formation and the Company LLCA as in effect on the date hereof.

4.5     No Defaults or Conflicts.  The execution and delivery of this Agreement and, assuming receipt of the Written Consent, the consummation of the transactions contemplated hereby by the Company and performance by the Company of its obligations hereunder (a) does not result in any violation of the certificate of incorporation or bylaws (or other comparable organizational documents) of the Company or any Company Subsidiary; (b) except as set forth in Section 4.5 of the Disclosure Schedules, does not conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under any Material Contract or material Lease; and (c) assuming all filings and consents necessary for the consummation of the transactions contemplated hereby as set forth in Section 4.6 of the Disclosure Schedules shall have been, as relevant, obtained or made and assuming the truth and accuracy of Parent representations and warranties in Article 5, does not violate in any material respect any existing applicable Law, judgment, order or decree of any Governmental Authority having jurisdiction over the Company, any Company Subsidiary or any of their respective properties; provided, however, that no representation or warranty is made in the foregoing clauses (b) or (c) with respect to matters that would not have a Material Adverse Effect.

4.6     No Governmental Authorization Required.  Assuming the truth and accuracy of Parent representations and warranties in Article 5, except as otherwise set forth in Section 4.6 of the Disclosure Schedules, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority will be required to be obtained or made by the Company or any Company Subsidiary in connection with the due execution, delivery and performance by the Company of this Agreement and the

27

4859-7917-7283.2

FBG_CH1_00095033

consummation by the Company of the transactions contemplated hereby; provided, however, that no representation and warranty is made with respect to authorizations, approvals, notices or filings with any Governmental Authority that, if not obtained or made, would not have a Material Adverse Effect.

4.7     Financial Statements.

(a)     The consolidated balance sheets included in the Financial Statements fairly present, in all material respects, the consolidated financial position of the Company and the Company Subsidiaries as of their respective dates, and the other related statements included in the Financial Statements fairly present, in all material respects, the results of their consolidated operations and cash flows for the periods indicated, in each case in accordance with GAAP consistently applied in all material respects, with only such deviations from such accounting principles and/or their consistent application as are referred to in the notes to the Financial Statements and subject, in the case of the Unaudited Financial Statements, to normal year-end audit adjustments and the absence of related notes.  The Financial Statements, including the footnotes thereto, have been prepared from the books and records of the Company and the Company Subsidiaries and have been prepared in accordance with GAAP consistently applied.

(b)     Except (i) as set forth in Section 4.7(b) of the Disclosure Schedules or the Financial Statements, (ii) for liabilities incurred in the ordinary course of business, since the date of the Interim Balance Sheet, (iii) for liabilities incurred in connection with this Agreement and the transactions contemplated hereby and (iv) as would not have a Material Adverse Effect, the Company and the Company Subsidiaries do not have any liabilities and obligations (whether known or unknown, asserted or unasserted, accrued or unaccrued, absolute or contingent) of a type that are required by GAAP to be reflected or reserved against in a balance sheet of the Company and the Company Subsidiaries.

(c)     Except as set forth in the Audited Financial Statements, as of the date hereof, neither the Company nor any Company Subsidiary maintains any material undisclosed "off-balance sheet arrangement" within the meaning of Item 303 of Regulation S-K of the Securities and Exchange Commission.

(d)     Except as set forth on Section 4.7(d) of the Disclosure Schedule, there are no distributions which have accrued or been declared but are unpaid on the Company Units.

4.8     Intellectual Property.

(a)     As of the date hereof, Section 4.8(a) of the Disclosure Schedules sets forth all material Intellectual Property owned by the Company or any Company Subsidiary that is registered, issued or subject to a pending application for registration or issuance in the United States Patent and Trademark Office or the United States Copyright Office or any similar or equivalent foreign office or agency.

28

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095034

(b)    Except as set forth in <u>Section 4.8(b)</u> of the Disclosure Schedules, the Company or a Company Subsidiary, as applicable, owns, is licensed to use or otherwise has the right to use all Intellectual Property material to the operation of the business of the Company and the Company Subsidiaries, taken as a whole, as of the date hereof, free and clear of any Encumbrances other than Permitted Encumbrances, except as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(c)    Except as set forth in <u>Section 4.8(c)</u> of the Disclosure Schedules, neither the validity of, nor the Company's or the applicable Company Subsidiary's title to, any material Intellectual Property owned by the Company or any Company Subsidiary is being challenged in any litigation to which the Company or a Company Subsidiary is a party, nor has the Company or any Company Subsidiary received any written notices of infringement or misappropriation from any third party with respect to the Company's use of any material Intellectual Property used in its business, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(d)    Except as set forth in <u>Section 4.8(d)</u> of the Disclosure Schedules, to the knowledge of the Company, (i) no Person is infringing upon, misappropriating or otherwise violating any of the Intellectual Property owned by the Company or any Company Subsidiary and (ii) the conduct of the business of the Company and the Company Subsidiaries as currently conducted does not infringe upon, misappropriate or otherwise violate any Intellectual Property right of any third party, except, in each case, as would not, individually or in the aggregate, reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole.

(e) Except as would not reasonably be expected to be material to the Company and the Company Subsidiaries, taken as a whole, the Company and the Company Subsidiaries: (i) own, lease, license or otherwise have the legal right to use all Business Systems, and such Business Systems are sufficient in all material respects for the immediate needs of the business of the Company and the Company Subsidiaries as currently conducted; (ii) maintain commercially reasonable data security, disaster recovery and business continuity plans, and, to the knowledge of the Company, in the last 12 months there has not been any material failure with respect to any of the Business Systems or any event resulting in unauthorized access to or use of Personal Data; (iii) have taken commercially reasonable actions to protect the Personal Data in the custody or control of the Company and the Company Subsidiaries; (iv) have not received any written complaints from any material customers related to any malicious code or other technical deficiencies; and (v) are in compliance in all material respects with all applicable Laws regarding the collection, use, processing and protection of Personal Data.

4.9    <u>Compliance with Laws</u>.  The business of the Company and the Company Subsidiaries, taken as a whole, is not being conducted, and has not in the past three (3) years been conducted, in violation of any applicable Laws, except such

29

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095035

violations that would not have a Material Adverse Effect.  During the past three (3) years, no member of the Company Group has received written notice from any Governmental Authority asserting that the Company or any Company Subsidiary is in violation of any Law, except such violations that would not have a Material Adverse Effect.  No representation or warranty is given under this Section 4.9 with respect to Taxes, ERISA, labor or employment or Environmental Laws, which matters are covered exclusively under Sections 4.13, 4.15, 4.16 and 4.17, respectively.

4.10    Corrupt Practices; Trade Control Laws.

(a)    During the past three (3) years, no Governmental Authority has notified the Company or any Company Subsidiary in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act or any other applicable foreign anti-corruption Laws.  Neither the Company nor any Company Subsidiary has been since the date that was three (3) years prior to the date hereof until the date hereof under any administrative, civil or criminal investigation or indictment and are not party to any action involving alleged false statements, false claims or other improprieties relating to the Company's or any Company Subsidiary's compliance with the Foreign Corrupt Practices Act or any other applicable foreign anti-corruption Laws.

(b)    Neither the Company nor any Company Subsidiary is nor, to the knowledge of the Company, is any director or officer of either the Company nor any Company Subsidiary, the target of Sanctions, including OFAC or the United States State Department.  To the knowledge of the Company, neither the Company nor any Company Subsidiary conducts any business or has for the past three (3) years conducted any business with any Person that is the target of Sanctions as of the date of this Agreement, including any Person that appears on the SDN List. For the purposes of this Section, the term "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings.

4.11    Material Contracts.  Section 4.11 of the Disclosure Schedules lists or describes, as of the date hereof, all written Contracts (other than Company Plans, Leases and purchase orders) to which the Company or any Company Subsidiary is a party or to which their respective assets, property or business are bound or subject, in each case, as of the date hereof, which falls within any of the following categories:

(a)    any Contracts pursuant to which the Company or any Company Subsidiary has made payments to a vendor or a supplier of more than $1,000,000 in the aggregate in the twelve (12) calendar months ended December 31, 2021;

(b)    any Contracts pursuant to which the Company or any Company Subsidiary received payments from a customer of more than $1,000,000 in the twelve (12) calendar months ended December 31, 2021;

30

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095036

(c)      any Contracts (A) for Indebtedness for borrowed money in excess of $1,000,000 (other than: (i) any Indebtedness to be repaid at Closing under Section 2.9 or (ii) Permitted Encumbrances) or (B) granting any Encumbrance (other than Permitted Encumbrances) upon the Company Units or any material assets or properties of the Company or any Company Subsidiary (taken as a whole);

(d)      any Contracts establishing a partnership or joint venture or similar arrangement;

(e)      any Contracts that constitute a license pursuant to which the Company or any Company Subsidiary (i) is authorized to use any third-party Intellectual Property that is material to the business of the Company and the Company Subsidiaries, excluding any "off-the-shelf" or other software generally commercially available on standard terms and conditions, or (ii) authorizes any third party to use on an exclusive basis any Intellectual Property owned by the Company or any Company Subsidiary that is material to the business of the Company and the Company Subsidiaries;

(f)      any lease or similar Contract under which the Company or any Company Subsidiary is a lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any third party involving payments by the Company or any Company Subsidiary of more than $500,000 on an annual basis (unless terminable without payment or penalty upon no more than ninety (90) calendar days' notice);

(g)      any Contracts or instruments which restrict the Company or any Company Subsidiary from engaging in any aspect of its business anywhere in the world, or establish an exclusive sale or purchase obligation with respect to any Person, product or in any geographic location or during any material period of time;

(h)      any Contracts that contain a right of first refusal, first offer or first negotiation;

(i)      any Contracts that are employment, severance, retention, consulting or separation Contracts with any current officer, director or employee of the Company receiving an annual base salary in excess of $500,000;

(j)      any Contracts that expressly require the Company to pay, or expressly entitle the Company to receive, in the aggregate $1,000,000 or more in any one (1) fiscal year;

(k)      any Contracts for acquisitions or dispositions (by merger, purchase or sale of assets or stock or otherwise) of a material business line, as to which the Company has continuing material obligations or material rights;

(l)      any Contracts that contain any fixed or indexed pricing, "most-favored nation" pricing or similar pricing terms or provisions regarding minimum

31

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095037

volumes, volume discounts, or rebates, in each case, which is material to the Company and its Subsidiaries, taken as a whole; or

(m)     any Contracts that with any Governmental Authority and material to the business of the Company and the Company Subsidiaries (collectively, the Contracts listed in Section 4.11 of the Disclosure Schedules are referred to herein as the "Material Contracts").

With respect to all Material Contracts, as of the date hereof, neither the Company, any Company Subsidiary nor, to the knowledge of the Company, any other party to any such Contract is in material breach thereof or default thereunder and, to the knowledge of the Company, there does not exist under any Material Contract any event which, with the giving of notice or the lapse of time, would constitute such a material breach or default by the Company, any Company Subsidiary or, as of the date hereof and to the knowledge of the Company, any other party to such Material Contract, in each case except for such breaches, defaults and events as to which requisite waivers or consents have been obtained or that would not have a Material Adverse Effect.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, as of the date of this Agreement, to the knowledge of the Company, (x) each of the Material Contracts is in full force and effect, is valid and enforceable in accordance with its terms and (y) the Company has not been notified by any counterparty to any Material Contract that such counterparty is terminating or intends to terminate such Material Contract that has not been rescinded.

4.12     Litigation.  Except as set forth in Section 4.12 of the Disclosure Schedules:

(a)     As of the date hereof, there are no Actions pending, or to the knowledge of the Company, in the past three (3) years there have been no Action threatened in writing by, against or involving the Company or any Company Subsidiary, or any material portion of their respective assets, operations or business that would have a Material Adverse Effect.

(b)     Neither the Company nor any Company Subsidiary is subject to any material unsatisfied order, judgment, injunction, ruling, decision, award or decree of any Governmental Authority.

4.13     Taxes.  Except as set forth in Section 4.13 of the Disclosure Schedules:

(a)     All income Tax returns and other material Tax Returns required to be filed by or with respect to the Company or any Company Subsidiary have been timely (within any applicable extension periods) filed, and all such Tax Returns were true, complete and correct in all material respects when filed.

(b)     The Company and the Company Subsidiaries have fully and timely paid all material amounts Taxes required to be paid by the Company or any Company Subsidiary or with respect to its assets, whether or not shown on such Tax

32

4859-7917-7283.2

FBG_CH1_00095038

Returns referred to in Section 4.13(a). No Tax deficiencies for a material amount of Taxes that remain unpaid have been asserted in writing against the Company.

(c)     All material deficiencies for Taxes asserted or assessed in writing against the Company or the Company Subsidiaries have been fully and timely (within any applicable extension periods) paid, settled or properly reflected in the Financial Statements.

(d)     There are no material Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the assets of the Company or any Company Subsidiary.

(e)     No material audit is pending or, to the knowledge of the Company, threatened in writing with respect to any Taxes due from or with respect to the Company or any Company Subsidiary. No written claim has been made against the Company or any Company Subsidiary by a Governmental Authority in a jurisdiction where the Company or any Company Subsidiary does not file Tax Returns that the Company or such Company Subsidiary is or may be subject to taxation by that jurisdiction.

(f)     There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from the Company or any Company Subsidiary for any taxable period and no request for any such waiver or extension is currently pending.

(g)     Neither the Company nor any Company Subsidiary has participated in any listed transaction within the meaning of Treasury Regulations Section 1.6011-4(b)(2).

(h)     The Company and the Company Subsidiaries have not deferred the employer's share of any "applicable employment taxes" under Section 2302 of the CARES Act.

(i)     The Company has elected to be treated as an association taxable as a corporation for federal income Tax purposes.

(j)     This Section 4.13 constitutes the exclusive representations and warranties of the Company with respect to Taxes. No representation or warranty contained in this Section 4.13 shall be deemed to apply with respect to any taxable period (or portion thereof) after the Closing Date.

4.14    Permits. The Company and each Company Subsidiary have, as of the date hereof, all material authorizations, registrations, qualifications, certificates, licenses, permits and rights issued by a Governmental Authority necessary for the lawful conduct of the Company's and each Company Subsidiary's businesses as conducted as of the date of this Agreement (collectively, "Permits"). All such Permits are in full force

33

4859-7917-7283.2

FBG_CH1_00095039

and effect and neither the Company nor any Company Subsidiary is in default under any Permit, in each case, except as would not have a Material Adverse Effect.

4.15    Employee Benefit Plans.

(a)    Section 4.15(a) of the Disclosure Schedules contains a true and complete list of each material "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and each stock or equity interest purchase, stock or other equity interest option, stock or other equity interest-based, severance, retention, employment, change-in-control, health, vision, dental, flexible spending, health reimbursement, transportation, dependent care, adoption assistance, cafeteria, disability, life, accidence, collective bargaining, bonus, incentive, deferred compensation, cash balance, money purchase profit sharing, pension, retirement, material fringe benefit, and all other material employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA under which any employee or former employee of the Company or any of its ERISA Affiliates has any present or future right to benefits under which the Company or any ERISA Affiliate has any known, unknown, actual or contingent liability (other than any Multiemployer Plans).  All such plans, agreements, programs, policies and arrangements shall be collectively referred to as the "Company Plans."

(b)    With respect to each material Company Plan, the Company has made available to Parent a current copy (or, to the extent no such copy exists, a written description) and, to the extent applicable:  (i) any related trust agreement; (ii) the most recent IRS determination letter or opinion letter; (iii) the most recent summary plan description and summaries of material modifications; (iv) for the most recent plan year (A) the Form 5500 and attachments, (B) audited financial statements and (C) actuarial valuation report; and (v) copies of all material notices, letters or other correspondence to or from the Internal Revenue Service, Department of Labor or Pension Benefit Guaranty Corporation relating such Company Plan.

(c)    Neither the Company nor any ERISA Affiliate of the Company contributes to, or has in the last dix (6) years ever contributed to, or has any known, unknown, actual or contingent liability under, any "multiemployer plan" as defined in Section 3(37) of ERISA (a "Multiemployer Plan").

(d)    (i) Each Company Plan has been established and administered materially in accordance with its terms, and materially in compliance with the applicable provisions of ERISA, the Code and other applicable Laws; and (ii) each Company Plan that is intended to be qualified within the meaning of Code Section 401(a) is qualified, has received a favorable determination or opinion letter from the IRS as to its qualification upon which it may rely (or such Company Plan is a prototype plan that is entitled to rely on an opinion letter issued by the IRS to the prototype plan sponsor regarding qualification of the form of the prototype plan), and, to the knowledge of the Company, nothing has occurred that could reasonably be expected to cause the loss of such qualification.

34

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095040

(e)      Neither the Company nor any Company Subsidiary have any obligation or commitment to "gross up" any Person with respect to Taxes under Section 409A or 4999 of the Code or any other applicable Laws.

(f)      Except as set forth in Section 4.15(f) of the Disclosure Schedules, none of the Company Plans are Pension Plans and neither the Company nor any ERISA Affiliate of the Company has any actual or contingent liability with respect to any Pension Plans.  Except as set forth in Section 4.15(f) of the Disclosure Schedules, neither the Company nor, to the knowledge of the Company, any of its ERISA Affiliates have:  (i) failed to timely pay premiums to the Pension Benefit Guaranty Corporation with respect to a Company Plan which is a Pension Plan; (ii) failed to satisfy the minimum funding standards under ERISA or the Code, or otherwise make timely contributions, in respect of any Company Plan which is a Pension Plan; (iii) withdrawn from any Multiemployer Plan; (iv) engaged in any transaction which would give rise to liability under Section 4069 or Section 4212(c) of ERISA; (iv) been subject to an actual or constructive lien, either directly or indirectly, in favor of the Pension Benefit Guaranty Corporation; (v) experienced a partial termination or complete termination of any Company Plan which is a Pension Plan; or (vi) experienced a "reportable event" (within the meaning of Title IV of ERISA) in respect of any Company Plan which is a Pension Plan.  To the knowledge of the Company, the Company and its ERISA Affiliates are not subject to any material Tax liability or any material penalty under Sections 4971 through 4980H of the Code or Title I of ERISA.

(g)      Except as set forth in Section 4.15(g) of the Disclosure Schedules, neither the Company's execution of, nor the performance of the transactions contemplated by this Agreement will either alone or in connection with any other event(s) (i) result in any payment becoming due to any current or former employee, of the Company or any Company Subsidiary, (ii) materially increase any amount of compensation or benefits otherwise payable under any Company Plan, (iii) result in the acceleration of the time of payment under any Company Plan or (iv) result in any payment that could, individually or in combination with any other payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code.

(h)      With respect to any Company Plan, no Actions (other than routine claims for benefits in the ordinary course) are pending or, to the knowledge of the Company, threatened. Neither the Company nor, to the knowledge of the Company, any of its ERISA Affiliates have engaged in a material non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code with respect to a Company Plan.  All workforce members of the Company and the Company Subsidiaries have been appropriately categorized as employees or independent contractors for purposes of eligibility to participate in, and accrue benefits under, the Company Plans.

4.16    Labor Relations.

(a)      Except as set forth on Section 4.16 of the Disclosure Schedule and would not result in a Material Adverse Effect in the last two (2) years, (i)

35

4859-7917-7283.2

neither the Company nor any of the Company Subsidiaries have experienced any work stoppage, labor strike or other material labor dispute or claim of unfair labor practices, (ii) the Company and the Company Subsidiaries are and have been in compliance in all material respects with all applicable Laws respecting employment practices, including provisions thereof related to terms and conditions of employment, immigration, labor relations, and wages and hours, and are not engaged in any unfair labor practice, (iii) there is no unfair labor practice, charge or complaint against the Company or any of the Company Subsidiaries pending before the National Labor Relations Board or any similar state agency or agency of a foreign Governmental Authority and (iv) to the knowledge of the Company, no organizational effort is or has been underway or threatened by or on behalf of any labor organization with respect to employees of the Company or any of the Company Subsidiaries.

(b)     Neither the Company nor any Company Subsidiary is a party to or bound by any collective bargaining agreement or relationship with any labor organization.

4.17    Environmental Compliance.  Except as set forth in Section 4.17 of the Disclosure Schedules:

(a)     The Company and the Company Subsidiaries are and, except for any noncompliance that has been fully and finally resolved, in the past three (3) years have been, in compliance with all applicable Environmental Laws, except such violations that would not have a Material Adverse Effect.

(b)     The Company and the Company Subsidiaries, as applicable, have obtained and are in compliance in all respects with all Environmental Permits required under Environmental Laws (i) for the conduct of the business of the Company and the Company Subsidiaries as currently conducted and (ii) to occupy the Owned Real Property and the Leased Real Property, except as would not have a Material Adverse Effect.  All such Environmental Permits are in full force and effect, and neither the Company nor any Company Subsidiary has received any written notice from any Governmental Authorities relating to the revocation or modification in any material respect of any such Environmental Permit.

(c)     There are no Actions pursuant to any Environmental Law pending or, to the knowledge of the Company, threatened in writing, against the Company or any Company Subsidiary relating to: (i) the operations of the Company and the Company Subsidiaries; (ii) the Owned Real Property; or (iii) the Leased Real Property, except as would not have a Material Adverse Effect.

(d)     To the knowledge of the Company, there has been no release or disposal of any Hazardous Materials (i) in, on or under any of the Owned Real Property or (ii) in, on or under any of the Leased Real Property, in a condition that requires investigation or remediation pursuant to any Environmental Law.  The Company has made available to Parent copies of any and all material environmental assessments or audit reports or other similar studies or analyses generated within the past two (2) years,

36

4859-7917-7283.2

FBG_CH1_00095042

and all material Environmental Permits, in the possession of the Company or any Company Subsidiary that relate to the properties or assets of the Company or any Company Subsidiary.

(e)     (i) The representations and warranties contained in this Section 4.17 are the only representations and warranties being made by the Company and the Company Subsidiaries in respect of Environmental Laws and in respect of any environmental or occupational health or safety matter (to the extent it relates to exposure to Hazardous Materials), including natural resources, related in any way to the Company or the Company Subsidiaries, including the properties or assets of the Company, or to this Agreement or its subject matter; and (ii) no other representation or warranty of the Company or the Company Subsidiaries contained in this Agreement shall apply to any such matters and no other representation or warranty, express or implied, is being made in respect thereof.

4.18     Insurance. All material insurance policies (the "Insurance Policies") with respect to the properties, assets or business of the Company and the Company Subsidiaries are in full force and effect and all premiums due and payable thereon have been paid in accordance with the terms thereof. As of the date hereof, neither the Company nor any Company Subsidiary has received either a written notice of cancellation or non-renewal of any Insurance Policy. During the past three (3) years, timely notice has been given to the insurer of all material claims that may be insured thereby under any Insurance Policy, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. During the past three (3) years, no insurer has issued a reservation of rights or denial of coverage for claims or incidents which could give rise to a claim under any Insurance Policy, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.19     Real Property. Section 4.19 of the Disclosure Schedules contains a list as of the date hereof of (i) each parcel of real property owned by the Company or any Company Subsidiary (the "Owned Real Property"), (ii) all real property leased or subleased by the Company and the Company Subsidiaries as lessee or sublessee for which the annual rent exceeds $1,000,000 (the "Leased Real Property", together with the Owned Real Property, the "Real Property") and (iii) all leases or subleases of the Real Property under which the Company or any of the Company Subsidiaries leases or subleases the Real Property, as the same may have been amended, supplemented or otherwise modified from time to time (the "Leases"). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (x) the Company or the applicable Company Subsidiary has good and marketable fee simple, or local equivalent, title to the Owned Real Property and a valid leasehold interest in the Leased Real Property and (y), in each case, (i) is free and clear of all Encumbrances other than Permitted Encumbrances, (ii) is neither subject to any governmental decree or order to be sold nor is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor, nor, to the knowledge of the Company, has any such condemnation, expropriation or taking been proposed. With respect to the Leases, all such Leases are, to the knowledge of the Company, in full force

37

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095043

and effect, are valid and effective in accordance with their respective terms, and neither the Company nor any Company Subsidiary has received written notice that it is in breach or default under any Lease nor, to the knowledge of the Company, any other party to any Lease is in breach thereof or default thereunder and there does not exist under any Lease any event which, with the giving of notice or the lapse of time or both, would reasonably be expected to constitute such a material breach or default by the Company, any Company Subsidiary or, to the knowledge of the Company, any other party to such Lease, in each case except for such breaches and defaults as to which requisite waivers or consents have been obtained or which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.20     Affiliate Transactions.  Except for (i) employment relationships and compensation, benefits, travel advances and employee loans in the ordinary course of business, (ii) indemnity arrangements (the foregoing clauses (i) and (ii) collectively, the "Excluded Arrangements"), or (iii) as disclosed in Section 4.20 of the Disclosure Schedules, neither the Company nor any Company Subsidiary is a party to any agreement with, or involving the making of any payment or transfer of assets to, the Principal Seller, or any stockholder, officer, member, Affiliate (other than the Company and the Company Subsidiaries), partner or director of the Principal Seller (collectively, the "Affiliate Agreements").

4.21     Absence of Material Adverse Effect.  During the period from the date of the Interim Balance Sheet to the date of this Agreement, there has been no Material Adverse Effect.

4.22     Brokers.  Except as set forth in Section 4.22 of the Disclosure Schedules or for those that will be a Company Expense, no broker, finder or similar intermediary has acted for or on behalf of the Company or any Company Subsidiary in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with the Company or any Company Subsidiary or any action taken by them.

4.23     Product Liability.  Except as set forth in Section 4.23 of the Disclosure Schedules, there is no existing or, to the knowledge of the Company, threatened in writing product liability, warranty or other similar claim against the Company or otherwise alleging that any product of the Company is defective or fails to meet any product or service warranties or guaranties, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Company and the Company Subsidiaries, taken as a whole.

4.24     Receivables.  As of the date of the Interim Balance Sheet, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, all of the accounts and notes receivable of the Company and the Company Subsidiaries are reflected properly according to GAAP on the Company Financial Statements and on the Books and Records and represent valid obligations

38

4859-7917-7283.2

FBG_CH1_00095044

arising from sales actually made or services actually performed in the ordinary course of business.

4.25    Intercompany Receivables. Except as set forth in Section 4.25 of the Disclosure Schedules, there are no existing intercompany receivables owed to the Company or any Company Subsidiary on the Closing Date.

4.26    Exclusivity of Representations. The representations and warranties made by the Company in this Article 4 are the exclusive representations and warranties made by or concerning the Company or any Company Subsidiary. Except as otherwise expressly set forth in this Article 4, (a) the Company expressly disclaims any representations or warranties or any kind or nature, express or implied, whether written or oral, as to the condition, value or quality of any business or assets of any member of the Company Group, and (b) the Company specifically disclaims any representation or warranty of merchantability, usage, suitability or fitness for any particular purpose with respect to the assets of any member of the Company Group, any part thereof, the workmanship thereof, and the absence of any defects therein, whether latent or patent, it being understood that except for the representations set forth in Article 4 such subject assets are "as is, where is" on the Closing Date, and in their present condition, and Parent and its Affiliates shall rely on their own examination and investigation thereof. No member of the Company Group is, directly or indirectly, making any representations or warranties regarding the pro forma financial information, financial projections or other forward-looking statements of the Company or any Company Subsidiary.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Parent and Merger Sub, jointly and severally, represent and warrant to the Company as follows:

5.1    Organization. Parent is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Merger Sub is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware. Each of Parent and Merger Sub have the requisite limited liability company power and authority to own its properties and carry on its business in all material respects as presently owned or conducted, except where the failure to be so organized, existing and in good standing or to have such power or authority would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability, as applicable, to effect the transactions contemplated hereby.

5.2    Binding Obligation. Each of Parent and Merger Sub has all requisite limited liability company authority and power to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action on the part

39

4859-7917-7283.2

of Parent and Merger Sub, and by Parent as the sole stockholder of Merger Sub, and no other action or proceedings on the part of Parent or Merger Sub are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Parent or Merger Sub.  This Agreement has been duly executed and delivered by Parent and Merger Sub and, assuming that this Agreement constitutes the legal, valid and binding obligations of the Company, constitute the legal, valid and binding obligations of Parent and Merger Sub, enforceable against Parent and Merger Sub in accordance with its terms, except to the extent that the enforceability thereof may be limited by the Equitable Exceptions.

       5.3     No Defaults or Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Parent and Merger Sub and the performance by Parent and Merger Sub of their respective obligations hereunder (a) do not result in any violation of the organizational documents of either Parent or Merger Sub, and (b)  do not conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under any indenture, mortgage or loan or any other agreement or instrument to which Parent or Merger Sub is a party or by which Parent or Merger Sub is bound or to which its properties may be subject, and (c) assuming all filings and consents necessary for the consummation of the transactions contemplated hereby as set forth on Section 5.4 of the Disclosure Schedules shall have been, as relevant, obtained or made do not violate any existing applicable Law, judgment, order or decree or any Governmental Authority having jurisdiction over Parent or Merger Sub or any of their respective properties; provided, however, that no representation or warranty is made in the foregoing clauses (b) or (c) with respect to matters that would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.

       5.4     No Authorization or Consents Required.  Other than as listed in Section 5.4 of the Disclosure Schedules, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person will be required to be obtained or made by Parent or Merger Sub in connection with the due execution, delivery and performance by Parent or Merger Sub of this Agreement and the consummation by Parent or Merger Sub of the transactions contemplated hereby; provided, however, that no representation and warranty is made with respect to authorizations, approvals, notices or filings with any Governmental Authority that, if not obtained or made, would not reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.

       5.5     Brokers.  No broker, finder or similar intermediary has acted for or on behalf of Parent or Merger Sub in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with Parent or Merger Sub or any action taken by Parent or Merger Sub.

40

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095046

5.6     Sufficient Funds. As of the date of this Agreement, Parent and Merger Sub have, and as of the Closing Date, Parent and Merger Sub will have, sufficient net cash proceeds in immediately available funds to pay all amounts payable by it pursuant to Article 2, all of its fees and expenses in order to consummate the transactions contemplated by this Agreement and all other payment obligations hereunder. For the avoidance of doubt, Parent and Merger Sub acknowledge that Parent's and Merger Sub's obligations to consummate the transactions contemplated by this Agreement on the terms set forth herein are not conditioned upon Parent or Merger Sub obtaining financing for or in connection with the transactions contemplated by this Agreement. Parent and Merger Sub confirm that it is not a condition to Closing or any of its other obligations under this Agreement that Parent or Merger Sub obtain financing for or in connection with the transactions contemplated by this Agreement.

5.7     Litigation. There is no Action pending or, to the knowledge of Parent, threatened against Parent or Merger Sub or any material portion of its properties or assets with respect to which there is a substantial possibility of a determination which questions the validity or legality of this Agreement or the transactions contemplated hereby or which seeks to prevent the transactions contemplated hereby or otherwise would reasonably be expected, individually or in the aggregate, to materially impair Parent's or Merger Sub's ability to effect the transactions contemplated hereby.

5.8     Solvency. Assuming the accuracy of the representations and warranties set forth in Article 4 in all material respects, immediately after giving effect to the transactions contemplated by this Agreement (including any financing in connection with the Closing), Parent, the Surviving Company and each of their Subsidiaries (including the Company and its Subsidiaries) will be Solvent. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Parent, the Surviving Company, the Company or their Subsidiaries.

5.9     Parent's and Merger Sub's Reliance. Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates, acknowledges that it and its Representatives have been permitted full and complete access to the books and records, facilities, equipment, Tax Returns, Contracts, insurance policies (or summaries thereof) and other properties and assets of the Company and the Company Subsidiaries that it and its Representatives have desired or requested to see or review, and that it and its Representatives have had a full opportunity to meet with the officers and employees of the Company and the Company Subsidiaries to discuss the business of the Company and the Company Subsidiaries. Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges that neither the Company nor any other Person has made any representation or warranty, expressed or implied, as to the accuracy or completeness of any information regarding the Company Units, the Company and the Company Subsidiaries furnished or made available to Parent, Merger Sub, each of their respective Affiliates or any of their Representatives, except as expressly set forth in Article 4 of this Agreement, and neither the Equityholders nor any other Person (including any officer, director, member or partner of the Equityholders) shall have or be subject to any liability to Parent, Merger Sub, each of their respective Affiliates or any

41

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095047

other Person, resulting from Parent's use of any information, documents or material made available to Parent in the Data Room, management presentations, due diligence or in any other form in expectation of the transactions contemplated hereby.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges and agrees that, should the Closing occur, Parent shall acquire the Company and the Company Subsidiaries without any representation or warranty as to merchantability or fitness for any particular purpose of their respective assets, in an "as is" condition and on a "where is" basis, except as otherwise expressly represented or warranted in Article 4 of this Agreement; provided, however, that nothing in this Section 5.9 is intended to limit or modify the representations and warranties contained in Article 4.  Each of Parent, Merger Sub on behalf of themselves and each of their respective Affiliates acknowledges and agrees that, except for the representations and warranties contained in Article 4, none of the Company, the Equityholders or any other Person has made, and Parent, Merger Sub or any of their respective Affiliates have not relied on any other express or implied representation or warranty by or on behalf of the Company, the Equityholders or any other Person.  Each of Parent, Merger Sub on behalf of themselves or any of their respective Affiliates, acknowledges that none of the Company, the Equityholders nor any other Person, directly or indirectly, has made, and Parent, Merger Sub and each of their respective Affiliates have not relied on, any representation or warranty regarding the pro forma financial information, financial projections or other forward-looking statements of the Company or any Company Subsidiary, and Parent and Merger Sub will make no claim (and will cause each of their respective Affiliate to make no claim) with respect thereto.

5.10   Investment Purpose.  Parent and Merger Sub will be purchasing the Company Units for the purpose of investment and not with a view to, or for resale in connection with, the distribution thereof in violation of applicable federal, state or provincial securities Laws.  Each of Parent and Merger Sub acknowledges and agrees that the sale of the Company Units hereunder has not been registered under the Securities Act of 1933 (the "Securities Act") or any state securities Laws, and that the Company Units may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act, pursuant to an exemption from the Securities Act or in a transaction not subject thereto.  Parent represents that it is an "Accredited Investor" as that term is defined in Rule 501 of Regulation D of the Securities Act.

5.11   Exclusivity of Representations.  The representations and warranties made by Parent and Merger Sub in this Article 5 are the exclusive representations and warranties made by Parent and Merger Sub.  Parent and Merger Sub hereby disclaim any other express or implied representations or warranties, except as expressly set forth in any other written agreement with an Affiliate of such Person.

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095048

ARTICLE 6

COVENANTS

6.1     Public Announcements; Confidentiality.

(a)     No Party will issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties; provided, however, that nothing herein will prohibit any Party from issuing or causing publication of any such press release or public announcement to the extent that such disclosure is, upon advice of counsel, required by Law, in which case the Party making such determination will, if practicable in the circumstances, use commercially reasonable efforts to allow the other Parties reasonable time to comment on such release or announcement in advance of its issuance; and provided, further, that nothing herein shall prohibit any Equityholder or any of its direct and indirect parent entities and Affiliates from disclosing the terms and status of this Agreement or the transactions contemplated hereby to their respective Affiliates, shareholders, limited partners, members, lenders and prospective limited partners, members or lenders.

(b)     The Confidentiality Agreement shall terminate on the Closing Date.

6.2     Resignations.  The Company shall cause to be delivered to Parent on the Closing Date such resignations of members of the Board of Directors and officers of the Company and each Company Subsidiary which have been requested in writing by Parent at least five (5) Business Days prior to the Closing, such resignations to be effective concurrently with the Closing.

6.3     Employee Matters.

(a)     For the period beginning as of the Closing and ending on the first (1st) anniversary of the Closing or the date of termination, if earlier, Parent shall provide, or shall cause the Surviving Company and each Company Subsidiary to provide to employees of the Surviving Company or any Company Subsidiary who remain employed after the Closing (collectively, the "Continuing Employees") and whose terms and conditions of employment were not, and do not become, subject to a collective bargaining agreement: (i) base salary or base wages that are no less favorable than those provided to similarly situated-employees of Parent, (ii) target incentive opportunities (excluding retention, change in control and equity-based compensation), if any, that are no less favorable than those provided to similarly-situated employees of Parent and (iii) employee benefits that are no less favorable in the aggregate to those provided to similarly-situated employees of Parent; provided, however, that except as otherwise set forth in any Contract (other than this Agreement) with any employee of the Surviving Company or any Company Subsidiary or applicable Law, nothing herein shall preclude Parent, the Surviving Company or any Company Subsidiary from terminating the employment of any employee at any time on or after the Closing.

43

4859-7917-7283.2

FBG_CH1_00095049

**DEBTORS' EXHIBIT NO. 247**
**Page 48 of 104**

(b)      Parent shall, and shall cause, service rendered by Continuing Employees prior to the Closing Date to be taken into account for all purposes. including participation, coverage, vesting and level of benefits, as applicable, under all employee benefit plans, programs, policies and arrangements of Parent and its Subsidiaries (including the Surviving Company and each Company Subsidiary) from and after the Closing Date, to the same extent as such service was taken into account under corresponding plans of the Surviving Company and each Company Subsidiary for such purposes; provided, however, that nothing herein shall result in the duplication of any benefits for the same period of service.  Without limiting the foregoing, employees of the Surviving Company and each Company Subsidiary will not be subject to any pre-existing condition or limitation under any health or welfare plan of Parent or its Subsidiaries (including the Surviving Company and each Company Subsidiary) for any condition for which such employee would have been entitled to coverage under the corresponding plan of the Company and each Company Subsidiary in which such employee participated immediately prior to the Closing Date.  Parent shall, and shall cause, such employees to be given credit under such plans for co-payments made, and deductibles satisfied, prior to the Closing Date.

(c)      Nothing in this Agreement shall (i) be treated as an amendment, modification or creation of any employee benefit plan, program, policy, practice, agreement or arrangement, including of any Company Plan, (ii) create any right or benefit in any Person, other than the signatories of this Agreement, (iii) guarantee employment of any employee for any period of time after the Closing or preclude the ability of Parent or any of its Affiliates (including, for the avoidance of doubt, the Company and each Company Subsidiary) to terminate the employment of any employee or (iv) create a binding employment agreement with any employee.

6.4      Officer and Director Indemnification and Insurance.

(a)      Parent agrees that all rights to indemnification and exculpation from liability for acts or omissions occurring on or prior to the Effective Time now existing in favor of the current or former directors, managers, officers or employees of the Company and the Company Subsidiaries and each Person who served, at the request of any member of the Company Group, as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (collectively the "D&O Indemnified Parties"), as provided in the respective organizational documents or in indemnification agreements in effect as of the date hereof, shall survive the Effective Time and shall continue in full force and effect in accordance with their respective terms for a period of not less than six years after the Closing Date.  To the maximum extent permitted by applicable Law, such indemnification shall be mandatory rather than permissive, and the Company Group shall advance expenses in connection with such indemnification as provided in the Company Group's organizational documents or other applicable agreements (such advancement also being mandatory rather than permissible).  The indemnification, advancement of expenses and exculpation provisions of the Company Group's organizational documents shall not be amended, repealed or otherwise modified after the Closing in any manner that would adversely affect the rights thereunder of individuals

44

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095050

who, as of the date hereof, were directors, officers, employees or agents of the Company Group, unless such modification is required by applicable Law, it being the intent of the Parties that the current and former directors, managers, officers and employees of the Company and the Company Subsidiaries and other indemnified Persons shall continue to be entitled to such exculpation and indemnification (including with respect to advancement of expenses) to the full extent of applicable Law.

(b)     On the Closing Date, Parent shall pay for a non-cancelable run-off insurance policy of not less than the existing coverage amount, for a period of six (6) years after the Closing Date to provide insurance coverage for events, acts or omissions occurring on or prior to the Closing Date for all persons who were directors, managers or officers of the Company or any Company Subsidiary on or prior to the Closing Date, which policy shall contain terms and conditions no less favorable to the insured persons than the directors', managers' or officers' liability coverage presently maintained by the Company.

(c)     Parent hereby acknowledges that the D&O Indemnified Parties may have certain rights to indemnification, advancement of expenses or insurance provided by other Persons.  Parent hereby agrees that (i) Parent and the Company Group are the indemnitors of first resort (i.e., its obligations to the D&O Indemnified Parties are primary and any obligation of such other Persons to advance expenses or to provide indemnification for the same expenses or liabilities incurred by any such D&O Indemnified Party are secondary), (ii) Parent and the Company Group shall be required to advance the full amount of expenses incurred by any such D&O Indemnified Party and shall be liable for the full indemnifiable amounts, without regard to any rights any such D&O Indemnified Party may have against any such other Person and (iii) Parent (on behalf of itself and following the Closing, the Company Group) irrevocably waives, relinquishes and releases such other Persons from any and all claims against any such other Persons for contribution, subrogation or any other recovery of any kind in respect thereof.  Parent further agrees that no advancement or payment by any of such other Persons on behalf of any such D&O Indemnified Party with respect to any claim for which such D&O Indemnified Party has sought indemnification from Parent shall affect the foregoing and such other Persons shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such D&O Indemnified Party against Parent.  Parent shall advance, and cause to be paid all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any D&O Indemnified Party in enforcing the indemnity and other obligations provided in this Section 6.4.

(d)     The covenants contained in this Section 6.4 are intended to be for the benefit of, and shall be enforceable by, each of the D&O Indemnified Parties and their respective heirs and legal representatives and shall not be deemed exclusive of any other rights to which such D&O Indemnified Parties are entitled, whether pursuant to Law, Contract or otherwise.  In the event that Parent or the Company (following the Closing) or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving company or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its

45

4859-7917-7283.2

**DEBTORS' EXHIBIT NO. 247**
**Page 50 of 104**

properties and assets to any Person, then, and in each such case, Parent shall take all necessary action so that the successors or assigns of Parent or the Company (following the Closing), as the case may be, shall succeed to the obligations set forth in this Section 6.4.

6.5     Termination of Affiliate Obligations.  On or before the Closing Date, except for Excluded Arrangements or as set forth in Section 6.5 of the Disclosure Schedules hereto, this Agreement and any ancillary agreements contemplated herein, all Affiliate Agreements shall be terminated; provided, that, the 2022 November/December Promissory Notes and the 2022 July Promissory Notes shall only terminate following settlement in full pursuant to Section 2.8.

6.6     Waiver of Conflicts Regarding Representation.

(a)     Recognizing that Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Dykema Gossett PLLC ("Dykema" and collectively, the "Designated Counsel") have acted as legal counsel to Wellspring Capital Partners V, L.P. and Wellspring Capital Partners V (Offshore), their respective Affiliates and their respective Representatives (collectively, the "Wellspring Parties"), and may be deemed to have acted as legal counsel to the Company and the Company Subsidiaries prior to the Closing, and that the Designated Counsel intends to act as legal counsel to the Wellspring Parties after the Closing, (i) Parent shall not, or shall cause the Company Group to, seek to have the Designated Counsel disqualified from representing the Wellspring Parties in connection with any dispute that may arise between the Wellspring Parties and Parent or the Company in connection with this Agreement or the transactions contemplated hereby and the Company hereby waives, on its own behalf and agrees to cause its Affiliates to waive, any conflicts that may arise in connection with the Designated Counsel representing the Wellspring Parties after the Closing and (ii) in connection with any such dispute relating to this Agreement or the transactions contemplated hereby that may arise between the Wellspring Parties, on the one hand, and Parent or the Company, on the other hand, the Wellspring Parties involved in such dispute (and not Parent or the Company) will have the right to decide whether or not to waive the attorney-client privilege that may apply to any communications between the Company, and of the Company Subsidiaries and the Designated Counsel that occurred before the Closing in connection with this Agreement and the transactions contemplated hereby and (iii) in the event that a dispute arises between or among any of Parent or any of its Affiliates (including, after the Closing, the Company and the Company Subsidiaries) and any Wellspring Parties (including, prior to the Closing, the Company and the Company Subsidiaries), Parent, the Company and each of the other Parties hereby agree that the Designated Counsel may represent Wellspring Parties in such dispute even though the interests of Wellspring Parties may be directly adverse to Parent or its Affiliates (including, after the Closing, the Company or the Company Subsidiaries), and even though the Designated Counsel may have represented the Company or the Company Subsidiaries in a matter substantially related to such dispute, or may be handling ongoing matters for Wellspring Parties, Parent and, after the Closing, the Company, waive, on behalf of themselves and each of their respective Affiliates, any conflict of interest in connection with such representation by the Designated Counsel.

46

4859-7917-7283.2

CONFIDENTIAL                                                          FBG_CH1_00095052

(b)      Parent, Merger Sub and, after the Closing, the Surviving Company, further agree that, as to all communications in any form or format whatsoever between or among the Designated Counsel, the Company and/or the Company Subsidiaries, and all attorney work product that relates in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong solely to the Wellspring Parties and shall solely be controlled by Wellspring Parties and shall not pass to or be claimed by Parent, or, after the Closing, the Company or any of the Company Subsidiaries.  The Parties agree to take, and to cause their respective Affiliates to take, all steps necessary to implement the intent of this Section 6.6.  Parent acknowledges, on behalf of itself and, after the Closing, the Surviving Company and the Company Subsidiaries and any of their respective Affiliates, that each has had the opportunity to discuss and obtain adequate information concerning the significance and material risks of, and reasonable available alternatives to, the waivers, permissions and other provisions of this Agreement, including the opportunity to consult with counsel other than the Designated Counsel.  This Section 6.6 is for the benefit of the Designated Counsel and the Wellspring Parties (including its partners and employees), which is an intended third-party beneficiary of this Section 6.6.

6.7      Access to Books and Records.  From and after the Closing until the fifth (5th) anniversary hereof, Parent shall, and shall cause the Company Group to, provide the Equityholders, the Wellspring Parties and their authorized Representatives with reasonable access (for the purpose of examining and copying), upon reasonable advanced written notice to the Parent, during normal business hours, to the books and records of the Company Group for any reasonable business purpose with respect to periods prior to the Closing Date and not unreasonably interfere with the ongoing operations of Parent and its Subsidiaries. No party shall be required to provide access to books and records pursuant to this Section to the extent such access, would (i) violate any fiduciary duty, confidentiality obligation, agreement or any Law to which the Parent or any of its Affiliates is a party or to which the Parent or any of its Affiliates is subject, (ii) jeopardize any attorney-client or legal privilege or (iii) reasonably be prohibited by or inadvisable due to COVID-19 or any COVID-19 Measures; provided that the Parent or any of its Affiliates shall use commercially reasonable efforts to provide such access in a manner that does not result in a waiver of such privilege or protection, does not violate such Law or agreement or is not prohibited due to any COVID-19 Measures, as applicable.  Unless otherwise consented to in writing by the Equityholder Representative, Parent shall not permit the Company Group, for a period of five (5) years following the Closing Date, to destroy or otherwise dispose of any books and records of the Company Group, or any portions thereof, relating to periods prior to the Closing Date without first giving reasonable prior written notice to the Equityholder Representative and offering to surrender to the Equityholder Representative such books and records or such portions thereof.  This Section 6.7 is for the benefit of the Wellspring Parties (including its partners and employees), which is an intended third-party beneficiary of this Section 6.7.

6.8      R&W Insurance Policy.  In the event that following the Closing Parent elects to purchase a buyer-side representation and warranty insurance policy (the "R&W Insurance Policy"), Parent shall provide to the Equityholder Representative a true

47

4859-7917-7283.2

                                                                          FBG_CH1_00095053

and complete copy of the R&W Insurance Policy and Parent shall ensure that the R&W Insurance Policy expressly waives any claims of subrogation against the Equityholders and any of the Equityholder Released Parties, other than any claim for Fraud, and Parent shall not permit any amendment to the R&W Insurance Policy that would be adverse to the Equityholders without the prior written consent of the Equityholder Representative. The Equityholders and the Equityholder Released Parties shall be express third-party beneficiaries of the provisions and limitations described in this Section **Error! Reference source not found.**.

6.9     Tax Matters.

(a)     Pre-Closing Tax Refunds.  Except to the extent included as a Tax asset or Tax refund in Closing Working Capital as finally determined hereunder, any Tax refund of the Company or any Company Subsidiary with respect to a Pre-Closing Tax Period (a "Pre-Closing Tax Refund") shall be for the sole benefit of the Equityholders. Parent shall pay to Equityholders, in accordance with payment instructions provided by the Equityholders, the amount of such Pre-Closing Tax Refund, within five days of the date of receipt of the Pre-Closing Tax Refund or the filing of any Tax Return utilizing such Pre-Closing Tax Refund (in the form of a credit or offset to Taxes otherwise payable), as applicable.  Parent and its Affiliates shall, and shall cause the Company or any Company Subsidiary to promptly take all reasonable actions (including those actions reasonably requested by the Equityholders) to file for and obtain any Pre-Closing Tax Refund.

(b)     Cooperation.

(i)     Parent, on the one hand, and the Equityholder Representative, on the other hand, shall cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful in connection with any audit, examination, litigation or other proceeding with respect to the income Tax Returns of (i) the Company and (ii) any former Subsidiary of the Company owned by the Equityholders after the Closing, in each case, for any Pre-Closing Tax Period or Straddle Period.

(c)     Parent shall not make any election under Section 338 of the Code (or any comparable election under state, local or foreign Law) with respect to the acquisition of the Company or any Company Subsidiary.

(d)     It is the intention of the Parties to treat any additional payments made with respect to Section 2.9(e) of this Agreement as an adjustment to the purchase price for all federal, state, local and foreign Tax purposes, and the parties agree to file their Tax Returns accordingly, except as otherwise required by a change in applicable law or a final determination.

6.10     Names Following Closing.

(a)     Parent is not purchasing, acquiring or otherwise obtaining any right, title or interest in any Principal Seller Marks, except for the limited right to use

48

4859-7917-7283.2

FBG_CH1_00095054

such Principal Seller Marks as expressly set forth in this Section 6.10. Neither Parent nor any of its Affiliates or Subsidiaries shall seek to register in any jurisdiction any Principal Seller Mark, or any other mark that is confusingly similar to a Principal Seller Mark, or to contest the use, ownership, validity or enforceability of any Principal Seller Mark. To the extent that the Company has any rights in, or license with respect to, any Principal Seller Mark, pursuant to any Contract or otherwise, such rights and licenses shall automatically terminate at the Closing without recourse, and Parent shall cause Company to take all necessary action to cause such termination.

(b)      Except as otherwise provided in this Section 6.10, Parent shall and shall cause the Company to (i) cease and discontinue all uses of the Principal Seller Marks as soon as reasonably practicable following the Closing, (ii) not expressly, or by implication, do business as or represent themselves as the Principal Seller or an Affiliate of the Principal Seller and (iii) use commercially reasonable efforts to cause the third-party agents using the Principal Seller Marks to cease use of the Principal Seller Marks within five (5) Business Days of the Closing Date. As promptly as practicable after the Closing Date, and in any event no later than five (5) Business Days after the Closing Date, Parent shall take all requisite corporate actions, make all filings, pay all requisite fees and take all other actions reasonably necessary to change the legal names, corporate names and business names of the Company and apply for their organizational documents and business registration certificate or licenses, as applicable, to be amended to remove any reference to the Principal Seller Marks, in all jurisdictions, and shall promptly take any and all follow-up actions that may be required or reasonably requested by any Governmental Authority to effect such changes as soon as practicable.

6.11    Restrictive Covenants. The covenants set forth on Exhibit G are incorporated herein by reference.

ARTICLE 7

MISCELLANEOUS

7.1    No Survival. The Parties, intending to modify any applicable statute of limitations, agree that (a) none of the representations and warranties of the Company contained in Article 4 and in any certificate or Letter of Transmittal delivered pursuant to this Agreement shall survive the Effective Time and all rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at law or in equity) with respect thereto shall terminate at the Effective Time and (b) none of the covenants of the Parties set forth in this Agreement shall survive the Effective Time and all rights, claims and causes of action (whether in contract or in tort or otherwise, or whether at law or in equity) with respect thereto shall terminate at the Effective Time, except that Section 2.8(a) (Transactions to be Effected at the Closing), Section 2.8(c) (Transactions to be Effected at the Closing), Section 2.8(d) (Transactions to be Effected at the Closing), Section 2.9 (Purchase Price Adjustment), Section 6.1(a) (Public Announcements), Section 6.4 (Officer and Director Indemnification and Insurance), Section 6.7 (Access to Books and Records), Section 6.8(R&W Insurance Policy), Article 7 (Miscellaneous) and any other covenants requiring performance after the

49

4859-7917-7283.2

FBG_CH1_00095055

Effective Time or which otherwise expressly by their terms survive the Effective Time shall survive in accordance with their terms only for such period as shall be required for the applicable Party to complete the performance required thereby.  Notwithstanding anything to the contrary herein, except for the covenants specifically referenced above in this Section 7.1 and any other covenants requiring performance after the Effective Time or which otherwise expressly by their terms survive the Effective Time, no Party (or any officer, agent, employee, direct or indirect holder of any equity interest or securities, or Affiliates of any Party) shall have any liability hereunder after the Effective Time (and this sentence is intended to benefit each such Person, whether or not a party to this Agreement).  PARENT, ON BEHALF OF ITSELF AND ITS AFFILIATES, SUCCESSORS AND PERMITTED ASSIGNS, EXPRESSLY WAIVES ALL RIGHTS AFFORDED BY ANY STATUTE THAT LIMITS THE EFFECT OF A RELEASE WITH RESPECT TO UNKNOWN CLAIMS. PARENT UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND WAIVER OF STATUTORY PROTECTION AGAINST A RELEASE OF UNKNOWN CLAIMS. PARENT ACKNOWLEDGES AND AGREES THAT THIS WAIVER IS AN ESSENTIAL AND MATERIAL TERM OF THIS AGREEMENT. PARENT FURTHER EXPRESSLY WAIVES ALL RIGHTS TO CLAIM OR SEEK RESCISSION OF THE TRANSACTIONS CONTEMPLATED HEREIN OR HEREBY. Notwithstanding the foregoing, (A) this Section 7.1 shall not interfere with or impede the operation of Section 2.4 or Section 2.9, (B) this Section 7.1 shall not limit the ability of any Party to seek specific performance in accordance with Section 7.17 and (C) Parent shall have the right to maintain or recover its actual damages (excluding any consequential, special, punitive or exemplary damages, any damages based on diminution of value, multiple of profits or cash flows, lost profits or similar theories or any other non-out-of-pocket damages), to the extent arising from Fraud; provided, that any such right to pursue any action or claim arising from Fraud shall be subject to, and governed by, the disclaimers and acknowledgments of non-reliance contained in Section 4.26 and Section 5.11 of this Agreement.

> 7.2     Expenses.  Except as expressly provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

> 7.3     Amendment.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

> 7.4     Entire Agreement.  This Agreement including the Disclosure Schedules and Exhibits attached hereto which are deemed for all purposes to be part of this Agreement, and the other documents, delivered pursuant to this Agreement and the Confidentiality Agreement, contain all of the terms, conditions and representations and warranties agreed upon or made by the Parties relating to the subject matter of this Agreement and the businesses and operations of the Company and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the Parties or their Representatives, oral or written, respecting such subject matter.

50

4859-7917-7283.2

FBG_CH1_00095056

       7.5     Headings. The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties.

       7.6     Notices. Any notice or other communication required or permitted under this Agreement shall be deemed to have been duly given and made if (i) in writing and served by personal delivery upon the Party for whom it is intended, (ii) if delivered by electronic mail with receipt confirmed (including by receipt of confirmatory electronic mail from the recipient or (iii) if delivered by certified mail, registered mail, courier service, return-receipt received to the Party at the address set forth below, with copies sent to the Persons indicated:

       If, to the Equityholder Representative:

> c/o Wellspring Capital Management LLC
> 605 Third Avenue, 44th Floor
> New York, NY 10158
> Attention:  William Byers
>            Sarah Mudho
> Email:      wbyers@wellspringcapital.com
>            smudho@wellspringcapital.com

       With a copy to (which shall not constitute notice):

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, New York 10019-6064
> Attention:  Angelo Bonvino, Esq.
>            Michael Vogel, Esq.
> Email:      abonvino@paulweiss.com
>            mvogel@paulweiss.com

       If to Parent or, after the Closing, to the Surviving Company or the Company Subsidiaries:

> First Brands Group, LLC
> 127 Public Square, Suite 5300
> Cleveland, Ohio 44114
> Attention:  Michael Baker, Chief Corporate Strategy Officer
> Email:  michael.baker@firstbrandsgroup.com

Such addresses may be changed, from time to time, by means of a notice given in the manner provided in this Section 7.6.

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095057

7.7     Exhibits and Schedules.

(a)     Any matter, information or item disclosed in the Disclosure Schedules delivered under any specific representation, warranty or covenant or Disclosure Schedule number hereof, or in the Data Room, shall be deemed to have been disclosed for all purposes of this Agreement in response to every representation, warranty or covenant in this Agreement in respect of which such disclosure is reasonably apparent on its face.  The inclusion of any matter, information or item in any Disclosure Schedule to this Agreement shall not be deemed to constitute an admission of any liability by the Company to any third party or otherwise imply that any such matter, information or item is material or creates a measure for materiality for the purposes of this Agreement, or that the disclosure of such matter, information or item means that such matter, information or item is required to be disclosed by this Agreement.

(b)     The Disclosure Schedules and Exhibits hereto are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.

7.8     Waiver.  Waiver of any term or condition of this Agreement by any Party shall only be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.

7.9     Binding Effect; Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and their permitted successors and assigns.  No Party may assign or delegate, by operation of Law or otherwise, all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other Parties, which any such Party may withhold in its absolute discretion; provided, that, for the avoidance of doubt, the Equityholders may assign their right to payment of the Payoff Adjustment Amount, if any, and the Equityholder Representative Reserve Amount to any designee specified by them in writing.  Any purported assignment without such prior written consents shall be void.

7.10    No Third Party Beneficiary.  Nothing in this Agreement shall confer any rights, remedies or claims upon any Person or entity not a Party or a permitted assignee of a Party, except (a) for the current and former officers, directors and employees of the Company as set forth in Section 6.4, Article 7 and Section 7.12, (b) the Related Parties as set forth in Section 7.18, (c) the Designated Counsel as set forth in Section 6.6 and (d) the Equityholders as set forth in the last sentence of Section **Error! Reference source not found.**.

7.11    Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

52

4859-7917-7283.2

                                          FBG_CH1_00095058

**DEBTORS' EXHIBIT NO. 247**
**Page 57 of 104**

7.12    Release.  If the Closing occurs, except in the case of Fraud and as provided in Section 2.9 and Article 7, each of Parent and Merger Sub agree (and, from and after the Closing, Parent shall cause the Surviving Company and each Company Subsidiary to agree) that the Equityholders, any of their Related Parties and any of their respective Representatives, including current or former officers and directors, members, managers or Representatives of the Company or any Company Subsidiary or any of their respective Related Parties (the "Equityholder Released Parties"), shall have no liability or responsibility to Parent, Merger Sub, the Surviving Company or any Company Subsidiary for (and Parent hereby unconditionally releases (and from and after the Closing shall cause the Surviving Company and each Company Subsidiary to unconditionally release) such Persons from) any obligations or liability (collectively, the "Released Matters"):

(a)    arising out of, or relating to, the organization, management or operation of the businesses of the Company or any Company Subsidiary relating to any matter, occurrence, action or activity on or prior to the Closing Date;

(b)    relating to this Agreement and the transactions contemplated hereby or any agreement between the Company or any Affiliate of Parent , except for covenants and agreements which contemplate performance after the Closing or otherwise expressly by their terms survive the Closing, each of which will survive in accordance with its terms;

(c)    arising out of or due to any inaccuracy or breach of any representation or warranty or the breach of any covenant, undertaking or other agreement contained in this Agreement, the Disclosure Schedules and Exhibits hereto or in any certificate contemplated hereby and delivered in connection herewith, except with respect to the covenants and agreements which contemplate performance after the Closing or otherwise expressly by their terms survive the Closing, each of which will survive in accordance with its terms; or

(d)    relating to any information (whether written or oral), documents or materials furnished by or on behalf of the Company and the Company Subsidiaries, including the Evaluation Material.

The foregoing releases extend to any and all claims of any nature whatsoever, whether known, unknown or capable or incapable of being known as of the Effective Time or thereafter, and includes any and all claims, actions, demands, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, Contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, expenses, executions, affirmative defenses, demands and other obligations or liabilities whatsoever, in law or equity.  As of the Effective Time, each of Parent, the Company and their respective Affiliates (the "Releasing Parties") hereby irrevocably agrees to refrain from, directly or indirectly, asserting, commencing, instituting or causing to be commenced, any Action, of any kind against any applicable Equityholder Released Party, based upon any matter purported to be released hereby and the Company shall indemnify and hold harmless the Equityholder Released Parties from any third party

53

4859-7917-7283.2

FBG_CH1_00095059

**DEBTORS' EXHIBIT NO. 247**
**Page 58 of 104**

claims relating to, or arising from, the Released Matters.  The Releasing Parties (in their respective capacities as such) hereby explicitly waive all rights with respect to the foregoing releases under the provisions of Section 1542 of the California Civil Code, which section provides in pertinent part:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."  The Releasing Parties (in their respective capacities as such) agree that no provision of Section 1542 of the California Civil Code shall affect the validity or scope of any other aspect of the foregoing releases.  The Releasing Parties (in their respective capacities as such) hereby expressly waive any and all rights with respect to the foregoing releases which they may have under any other provision of state or federal Law providing the same or similar effect.

       7.13    Governing Law and Jurisdiction.  This Agreement and any claim or controversy hereunder shall be governed by and construed in accordance with the Laws of the State of New York without giving effect to the principles of conflict of laws thereof.

       7.14    Consent to Jurisdiction and Service of Process.  Any legal action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby may only be instituted in any state or federal court in New York, New York, and each Party waives any objection which such Party may now or hereafter have to the laying of the venue of any such action, suit or proceeding, and irrevocably submits to the jurisdiction of any such court in any such action, suit or proceeding.

       7.15    WAIVER OF JURY TRIAL.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

       7.16    Conveyance Taxes.  Parent  agrees to pay all sales, use, value added, transfer, stamp, registration, documentary, excise, real property transfer or gains, or similar Taxes incurred as a result of the transactions contemplated by this Agreement ("Transfer Taxes"); provided that 50% of any such Taxes shall constitute Transaction Expenses.  Parent agrees to file, with the reasonable cooperation of the Equityholder

54

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095060

Representative, any related Tax Returns, and the Equityholder Representative and Parent agree to jointly file all required change of ownership and similar statements.

7.17    Specific Performance.

(a)    The Parties agree that (i) irreparable damage would occur in the event that the provisions of this Agreement or obligations, undertakings, covenants or agreements of the Parties were not performed in accordance with their specific terms or were otherwise breached and (ii) money damages, even if available, would not be an adequate remedy for any such failure to perform or any breach of this Agreement. Accordingly, it is agreed that the Parties shall be entitled to an injunction or injunctions to enforce specifically the terms and provisions hereof in any court specified in Section 7.13 (Governing Law; Jurisdiction) without proof of actual damages, this being in addition to any other remedy to which they are entitled at law or in equity.

(b)    Each Party agrees that it will not oppose (and hereby waives any defense in any action for) the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (i) the other parties have an adequate remedy at law or (ii) an award of specific performance or other equitable remedy is not an appropriate remedy for any reason at law, equity or otherwise. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement when available pursuant to the terms of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

7.18    Non-Recourse. Notwithstanding anything to the contrary herein, except as set forth in the Confidentiality Agreement, (i) this Agreement may be enforced only against, and any Action based upon, arising out of, or related to this Agreement or the transactions contemplated hereby may be brought only against, the entities that are expressly named as Parties and then only with respect to the specific obligations set forth herein with respect to such Party and (ii) with respect to each Party, no past, present or future director, officer, employee, incorporator, member, partner, shareholder, agent, attorney, advisor, lender or Representative or Affiliate of such named Party or any of its Affiliates (other than such named Party) (the "Related Parties"), shall have any liability (whether in contract or tort, at law or in equity or otherwise, or based upon any theory that seeks to impose liability of a Party against its owners or Affiliates) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of such named Party or for any claim based on, arising out of, or related to this Agreement or the transactions contemplated hereby, except for claims against Related Parties of Parent in accordance with the terms of any written agreement with such Person. The provisions of this Section 7.18 are intended to be for the benefit of, and enforceable by the Related Parties and each such Person shall be a third-party beneficiary of this Section 7.18. This Section 7.18 shall be binding on all successors and assigns of the Company.

7.19    Severability. If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and

55

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095061

restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party; provided, that the economic and legal substance of the transactions contemplated hereby shall be deemed to be affected in any manner materially adverse to the parties hereto if Section 7.18 is invalid, void or incapable of being enforced.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

7.20    Equityholder Representative.

(a)    Each Equityholder, on behalf of such Equityholder and such Equityholder's successors, heirs and permitted assigns, hereby irrevocably appoints the Equityholder Representative as such Equityholder's true and lawful attorney-in-fact and agent, with full powers of substitution and resubstitution, in such Equityholder's name, place and stead, in any and all capacities, in connection with the transactions contemplated by this Agreement, granting unto said attorney-in-fact and agent, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with the sale of such Equityholder's Equity as fully to all intents and purposes as such Equityholder might or could do in person, including the full power and authority:  (i) to consummate the transactions to be consummated by the Equityholders under this Agreement, (ii) to agree to resolution of all claims and disputes hereunder or thereunder, (iii) to retain legal counsel and other professional services, at the expense of the Equityholders, in connection with the performance by the Equityholder Representative of this Agreement, (iv) to make any amendments to this Agreement on behalf of the Equityholders and decisions with respect to the determination of any amounts under Section 2.9, (v) to determine whether the conditions to have been satisfied and supervising the Closing, including waiving any condition, as determined by the Equityholder Representative, in its sole discretion, (vi) to take any action that may be necessary or desirable, as determined by the Equityholder Representative, in its sole discretion, in connection with the termination of this Agreement in accordance with Article 7, (vii) to take any and all actions that may be necessary or desirable, as determined by the Equityholder Representative, in its sole discretion, in connection with the amendment of this Agreement in accordance with Section 7.3, (viii) to accept notices on behalf of the Equityholders in accordance with Section 7.6, (ix) to execute and deliver, on behalf of the Equityholders, any and all notices, documents or certificates to be executed by the Equityholders, in connection with this Agreement and the transactions contemplated hereby, (x) to grant any consent, waiver or approval on behalf of the Equityholders under this Agreement and (xi) to make any determination and take any action relating to Taxes.

(b)    The appointment of the Equityholder Representative as the attorney-in-fact for the Equityholders as set forth in this Section 7.20 and all authority hereby conferred are granted and conferred in consideration of the interest of the other Equityholders, is therefore coupled with an interest and is and will be irrevocable and

56

4859-7917-7283.2

FBG_CH1_00095062

**DEBTORS' EXHIBIT NO. 247**
**Page 61 of 104**

will neither be terminated nor otherwise affected by any act of any Equityholder or by operation of law, whether by the death, dissolution, liquidation, incapacity or incompetence of such Equityholder or by the occurrence of any other event.  If, after the execution of this Agreement, any Equityholder dies, dissolves or liquidates or becomes incapacitated or incompetent, the Equityholder Representative is nevertheless authorized, empowered and directed to act in accordance with this Section 7.20 as if that death, dissolution, liquidation, incapacity or incompetency had not occurred and regardless of notice thereof.  In the event that Qualitor Holdings LLC ceases to be the Equityholder Representative for any reason, each Equityholder agrees that Wellspring Capital Partners V, L.P. is solely authorized to irrevocably constitute and appoint a replacement Equityholder Representative.

(c)     The Equityholder Representative shall have no liability to Parent for any default under this Agreement by any other Equityholder.  Except for Fraud on its part, the Equityholder Representative shall have no liability to any other Equityholder under this Agreement for any action or omission by the Equityholder Representative on behalf of the other Equityholders.

(d)     As contemplated by Section 2.8, each party hereto agrees that the Equityholder Representative shall be paid, at the Closing, an amount equal to the Equityholder Representative Reserve Amount, which shall serve to pay for the out-of-pocket fees, costs and expenses of the Equityholder Representative incurred (at the discretion of the Equityholder Representative) in connection with the performance of its duties and obligations under this Agreement, including any fees due to the Accounting Firm pursuant to Section 2.9.  If the Equityholder Representative incurs any out-of-pocket fees, costs and expenses in excess of the Equityholder Representative Reserve Amount, the Equityholder Representative shall be reimbursed for such fees, costs and expenses by the Equityholders in accordance with their respective Pro Rata Equity Percentage upon demand.

(e)     The Equityholder Representative Reserve Amount shall be retained by the Equityholder Representative until such time as the Equityholder Representative shall determine, and, subject to the terms of this Agreement, the balance of the Equityholder Representative Reserve Amount, if any, shall be delivered by the Equityholder Representative to each of the Equityholders (in accordance with the payment instructions set forth in each Equityholder's Letter of Transmittal or as otherwise directed by the Equityholders) based on applicable Pro Rata Equity Percentages, by wire transfer of immediately available funds.  The Equityholders (except for the Equityholder Representative) shall not receive interest or other earnings on the Equityholder Representative Reserve Amount and irrevocably transfer and assign to Equityholder Representative any ownership right that they may otherwise have had in any such interest or earnings.  The Equityholder Representative will not be liable for any loss of principal of the Equityholder Representative Reserve Amount other than as a result of its bad faith or willful misconduct.

(f)     In dealing with this Agreement and in exercising or failing to exercise all or any of the powers conferred upon the Equityholder Representative

57

4859-7917-7283.2

FBG_CH1_00095063

hereunder, the Equityholder Representative will not assume any, and will incur no, responsibility or liability whatsoever to any Equityholder by reason of any error in judgment or other act or omission performed or omitted hereunder or in connection with this Agreement.  Each Equityholder, severally in accordance with its Pro Rata Equity Percentage, agrees to indemnify the Equityholder Representative, its successors, assigns, Representatives and Affiliates (the "Equityholder Representative Parties") and to hold the Equityholder Representative Parties harmless from and against and pay any and all losses or expenses incurred by the Equityholder Representative and arising out of or in connection with the duties as Equityholder Representative, including the reasonable costs and expenses incurred by the Equityholder Representative in defending against any claim or Liability in connection with this Agreement.

(g)     Parent shall be entitled to rely (without investigation) on and have no liability to any Equityholder or any other Person for, any action taken by the Equityholder Representative as being taken by the Equityholder Representative for it and on behalf of each of the Equityholders, and fully authorized by each Equityholder.  Each Equityholder hereby agrees that for any Actions arising under this Agreement or any other agreement entered into in connection with this Agreement, such Equityholder may be served legal process by registered mail to the address set forth in Section 7.6 for the Equityholder Representative and that service in such manner shall be adequate, and such Equityholder shall not assert any defense or claim that service in such manner was not adequate or sufficient in any court in any jurisdiction.

[Remainder of page intentionally left blank]

58

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095064

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**PARENT:**

FIRST BRANDS GROUP, LLC

By: _____
        Name:  Michael Baker
        Title:    Chief Corporate Strategy Officer

*[Signature Page to Merger Agreement]*

CONFIDENTIAL

FBG_CH1_00095065

**MERGER SUB:**

VIPER ACQUISITION II, LLC

By: _____
    Name:  Michael Baker
    Title:    Chief Corporate Strategy Officer

Signature Page – Merger Agreement

CONFIDENTIAL                                                                    FBG_CH1_00095066

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

COMPANY:

TAE BRAKES, LLC

By: _____

Name:  Shaun Mayfield
Title:    President

*[Signature Page to Merger Agreement]*

CONFIDENTIAL

FBG_CH1_00095067

**DEBTORS' EXHIBIT NO. 247**
**Page 66 of 104**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

EQUITYHOLDER REPRESENTATIVE:

QUALITOR HOLDINGS LLC

By: _____

Name: Gary Cohen
Title: President

*[Signature Page to Merger Agreement]*

CONFIDENTIAL

FBG_CH1_00095068

**DEBTORS' EXHIBIT NO. 247**
**Page 67 of 104**

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

**PRINCIPAL SELLER (solely for the purposes of <u>Section 6.11</u>)**

QUALITOR HOLDINGS LLC

By: _____

Name:  Gary Cohen
Title:    President

*[Signature Page to Merger Agreement]*

CONFIDENTIAL                                                                       FBG_CH1_00095069

**Exhibit A**

Balance Sheet Rules

(See attached.)

Exhibit A– Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095070

**EXHIBIT A**

**BALANCE SHEET RULES**

1.  The Closing Working Capital shall be prepared in accordance with:
    a.  the specific principles, policies, practices, procedures, definitions, methods, classifications, judgments, assumptions, techniques, elections, inclusions, exclusions and valuation and estimation methodologies set forth below in paragraphs 2 through 9;
    b.  to the extent not otherwise addressed in clause (a) above, the accounting principles, policies, practices, procedures, definitions, methods, classifications, judgments, assumptions, techniques, elections, inclusions, exclusions and valuation and estimation methodologies used in the preparation of the Interim Balance Sheet; and
    c.  to the extent not otherwise addressed in clauses (a) and (b) above, GAAP.

    In the event of any discrepancy, clause (a) of this paragraph 1 shall take precedence over (b) and (c), and clause (b) shall take precedence over clause (c).

2.  Working capital shall exclude the following items, regardless of whether they represent current assets or current liabilities under GAAP:
    a.  Closing Cash;
    b.  Any assets or liabilities related to any federal, state or other income-based taxes, including but not limited to: deferred tax assets and deferred tax liabilities;
    c.  Any items included in Indebtedness and Company Expenses;
    d.  All intercompany assets or liabilities;
    e.  Prepaid expenses recorded in accounts 205012 and 205016 on the Home Office balance sheet related to audit and tax preparation fees recorded;
    f.  Any purchase accounting adjustments or current assets or current liabilities that result from the transactions contemplated by the Agreement; and
    g.  The effect of change of control or ownership of the Company Group and will not take into account the effects of any post-Closing reorganizations or the post-Closing intentions or obligations of the Company Group, including those arising from Accounting Standards Codification section 805 (i.e., Business Combinations).
3.  Duty drawback and VAT receivables included in Closing Working Capital shall be calculated using the same methodology used by the Company in preparation of the Audited Financial Statements.
4.  The contra-asset balance related to the Company's factoring arrangement recorded in account 108 shall be excluded from Closing Working Capital and included as Indebtedness.

CONFIDENTIAL

FBG_CH1_00095071

5.  No new class or classes of assets, liabilities, asset reserves or valuation allowances shall be introduced in the calculation of Closing Working Capital that are not set forth in the Exhibit A. Assets or liabilities that have been classified as long-term assets or long-term liabilities on the Interim Balance Sheet (and comparable assets and liabilities arising after the Interim Balance Sheet Date) shall not be classified as current assets or current liabilities for any reason, other than in the ordinary course of business consist with past practice as a result of the passage of time. Additionally, there shall be no additional provision or accrual or increase in any existing provision or accrual or the elimination of provision or accrual or a decrease in any existing provision or accrual included in the Interim Balance Sheet except to the extent new facts or events have arisen on or before the date upon which the Buyer delivers the Closing Statement to the Seller that, applying the same management judgment, policies, procedures, methods, assumptions and estimation methodologies would justify such a provision, accrual or increase or the elimination of such a provision, accrual or decrease. For the avoidance of doubt, to the extent any new general ledger line items are created between the Interim Balance Sheet Date and the Reference Time, the amounts therein will be allocated to a general ledger line item existing as of the Interim Balance Sheet Date which is closest in nature and classification to the new general ledger line item and included in Working Capital.

6.  The Closing Statement shall be based on the facts and circumstances as they exist at the Reference Time and shall exclude the effect of any act, decision, change in circumstances or other event or development arising or occurring thereafter (including on the Closing Date).

7.  Closing Working Capital shall not take into account the funds flow or cash flows arising from this Agreement.

8.  The provisions of this exhibit shall be interpreted to avoid double counting (whether positive or negative) of any item to be included in Closing Cash, Closing Working Capital, Indebtedness, and Company Expenses.

9.  Exhibit B to this Agreement sets forth an illustrative calculation of Closing Working Capital for the purposes of the Closing Statement as though the Closing Date had occurred on October 31, 2022 using the Balance Sheet Rules and is attached to the Agreement for illustrative purposes only.

CONFIDENTIAL

FBG_CH1_00095072

**Exhibit B**

Current Assets and Current Liabilities

(See attached.)

Exhibit B – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095073

EXHIBIT 8 - Illustrative net working capital calculation as of October 31, 2022

As of October 31, 2022

| (in $'000s) | Account | Reported | Adjustments | Adjusted | Comments |
|---|---|---|---|---|---|
| Cash (All Accounts) | 101 | 2,315 | (2,315) | - | *Exclude Closing Cash (BS rule 2a)* |
| Cash Investments | 102 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Marketable Securities | 103 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Notes Receivable (S.T.) | 104 | - | - | - | *Exclude Closing Cash (BS rule 2a)* |
| Cash and cash equivalents | | 2,315 | (2,315) | - | |
| Trade Accts. Receivable | 106 | 11,930 | - | 11,930 | |
| QVC - QTR Vehicle Comp. | 1200 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| ANS - Anstro | 1201 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| IBI - International Brake | 1202 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| PYL - Pylon | 1203 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| HBD - BLD Heavy Duty | 1204 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| EBC - BLD Engine Contr. | 1206 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| MCG - McGuane | 1207 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| GUN - Gunn Metal | 1208 | - | - | - | *Exclude intercompany assets (BS rule 2d)* |
| TAE - TAE Global | 1209 | 56 | (56) | - | *Exclude intercompany assets (BS rule 2d)* |
| Interco Receivable Trade | | 56 | (56) | - | |
| A/R factoring contra-asset | 108 | (2,566) | 2,566 | - | *Removes AR factoring contra asset (BS rule 4)* |
| Tooling | 109 | - | - | - | |
| Retainages | 110 | - | - | - | |
| Dividends & Interest | 111 | - | - | - | |
| Other | 112 | 8,537 | - | 8,537 | *Exclude Current Assets associated with South Bend exit cost (BS rule 2e)* |
| Allowance | 113 | (208) | - | (208) | |
| Accounts receivable | | 17,749 | 2,510 | 20,260 | |
| Material | 1301 | 26,658 | - | 26,658 | |
| Direct Labor | 1302 | - | - | - | |
| Overhead | 1303 | - | - | - | |
| Overhead Percentage | 1304 | - | - | - | |
| RAW & PURCH | | 26,658 | - | 26,658 | |
| Material | 1308 | 3 | - | 3 | |
| Direct Labor | 1309 | 0 | - | 0 | |
| Overhead | 1310 | 2 | - | 2 | |
| Overhead Percentage | 1311 | - | - | - | |
| WIP | | 5 | - | 5 | |
| Material | 1315 | 3,875 | - | 3,875 | |
| Direct Labor | 1316 | 206 | - | 206 | |
| Overhead | 1317 | 939 | - | 939 | |
| Overhead Percentage | 1318 | - | - | - | |
| FG & CONSIGNED | | 5,021 | - | 5,021 | |
| Inventory Reserves | 1327 | (1,570) | - | (1,570) | |
| Inventory | | 30,114 | - | 30,114 | |
| Unbilled Tooling | 116 | - | - | - | |
| Def. Inc. Taxes Curr. | 120 | - | - | - | *Exclude income-tax related assets (BS rule 2b)* |
| Prepaid Insurance | 122 | 198 | - | 198 | |
| Prepaid Taxes | 123 | 8 | (8) | - | *Exclude income-tax related assets (BS rule 2b)* |
| Prepaid Other | 124 | 548 | (85) | 463 | *Exclude income-tax related assets (BS rule 2b)* |
| Prepaid expenses | | 754 | (93) | 661 | |
| Current assets | | 50,933 | 102 | 51,035 | |
| Trade Accounts Payable | 203 | 14,032 | (811) | 13,221 | *Exclude Closing Cash - removes outstanding checks recorded in AP (BS rule 2a)* |
| QVC - QTR Vehicle Comp. | 1214 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| ANS - Anstro | 1215 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| IBI - International Brake | 1216 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| PYL - Pylon | 1217 | 1 | (1) | - | *Exclude intercompany liabilities (BS rule 2d)* |
| HBD - BLD Heavy Duty | 1218 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| EBC - BLD Engine Contr. | 1220 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| MCG - McGuane | 1221 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| GUN - Gunn Metal | 1222 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| TAE - TAE Global | 1223 | - | - | - | *Exclude intercompany liabilities (BS rule 2d)* |
| Intercompany Pay. Trade | | 1 | (1) | - | |
| Withheld Taxes | 205 | 63 | - | 63 | |
| Other Withholdings | 206 | 6 | - | 6 | |
| Accounts payable | | 14,102 | (812) | 13,290 | |
| Income Taxes Payable | 210 | 2 | (2) | - | *Exclude income-tax related liabilities (BS rule 2b)* |
| Sal., Wages, Comm | 211 | 222 | - | 222 | |
| Vac., Hol., Bonus | 212 | 571 | (437) | 135 | *Exclude Indebtedness - US and Corporate bonus accrual (BS rule 2c)* |
| Pens. & Prof. Sharing | 213 | 99 | - | 99 | *Exclude Indebtedness - FY21 US profit sharing accrual (BS rule 2c)* |
| Prop., P.R., Other Tax | 214 | 60 | - | 60 | |
| Interest | 215 | 372 | (372) | - | *Exclude Indebtedness - accrued interest (BS rule 2c)* |
| Dividends Pay. | 216 | - | - | - | |
| Workers' Comp. | 217 | 6 | - | 6 | |
| Other | 218 | 3,616 | (153) | 3,463 | *Exclude Indebtedness - management fees (rule 2c), and audit and tax prep fees (BS rule 2e)* |
| Accrued expenses | | 4,947 | (963) | 3,983 | |
| Current liabilities | | 19,049 | (1,775) | 17,273 | |
| **Working capital** | | **31,884** | **1,877** | **33,762** | |
| **Working capital target** | | | | **30,441** | |
| **Due to (from) seller** | | | | **3,321** | |

Note: This exhibit sets forth an illustrative calculation of Working Capital for the purposes of the closing statement as though the Closing Date had occurred on October 31, 2022 using the methodology presented herein and is attached to the Agreement for illustrative purposes only.

CONFIDENTIAL

FBG_CH1_00095074

**Exhibit C**

Option Cancellation and Transaction Bonus Agreement

Exhibit C – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095075

**DEBTORS' EXHIBIT NO. 247**
**Page 74 of 104**

**FINAL FORM**

## OPTION CANCELLATION AND TRANSACTION BONUS AGREEMENT

THIS OPTION CANCELLATION AND TRANSACTION BONUS AGREEMENT (this "Agreement") is made and entered into as of December 30, 2022, by and among the undersigned option holder (the "Participant"), and TAE Brakes, LLC, a Delaware limited liability company (the "Company").

RECITALS

A.      The Company will, contemporaneously with the execution of this Agreement, enter into the Agreement and Plan of Merger, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Merger Agreement"), by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Viper Acquisition II, LLC, a Delaware limited liability company and wholly owned subsidiary of Parent ("Merger Sub"), the Company, Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative") and, solely for the purposes of Section 6.11, Qualitor Holdings LLC, a Delaware limited liability company (the "Principal Seller"). Capitalized terms used and not otherwise defined in this Agreement shall have the respective meanings set forth in the Merger Agreement.

B.      The Participant holds the options (the "Options") set forth on Schedule A hereto to purchase Class B Units pursuant to one or more Option Agreements, by and between the Company and the Participant (together, the "Option Agreements") granted under the Company Option Plan.

C.      As a condition to the Participant's receipt of the Transaction Bonus (as defined below), the Company is requiring that each holder of Options enter into this Agreement.

AGREEMENT

In consideration of the foregoing and the mutual covenants contained herein, the Transaction Bonus, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by and between the parties hereto as follows:

1.      Option Cancellation.  The Participant acknowledges and agrees that (a) Schedule A contains a complete list of all Options held by the Participant and (b) at the Effective Time, the Options held by the Participant, whether vested or unvested or "in-the-money" or "out-of-the-money," and all of the Participant's rights and interests in and to such Options and under the Option Agreements shall be cancelled in exchange for the right to receive the Transaction Bonus. Upon cancellation of the Options at the Effective Time, the Participant shall relinquish all of such Participant's rights and interests with respect to such Options and the Class B Units underlying such Options (but not, for the avoidance of doubt, the right to receive the Transaction Bonus).

2.      Transaction Bonus.  As an inducement to the Participant's agreement to the cancellation and termination of the Options, the Company agrees to pay the Participant a one-time special transaction bonus in the amount set forth on the signature page to this Agreement (the "Transaction Bonus").  The Transaction Bonus, less applicable Taxes and withholding, will be paid by the Company through its payroll system or payroll provider as promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter) and the

CONFIDENTIAL                                                                                    FBG_CH1_00095076

Company shall pay any such deducted Taxes and withholding to the applicable Governmental Authority.  Notwithstanding the foregoing, if any such payment owed to the Participant, cannot be made through the Company or any of its Subsidiaries' payroll systems or payroll providers, then the Company shall (i) issue, or shall cause any of its Subsidiaries to issue, a check for such payment (less applicable Taxes and withholding) to the Participant, which check shall be sent by overnight courier to the Participant as promptly as practicable following the Effective Time (and in no event later than three (3) Business Days thereafter) and (ii) pay, or shall cause an applicable Subsidiary to pay, any applicable deducted Taxes and withholding to the relevant Governmental Authority.

3.     Effectiveness.  This Agreement shall become effective, binding, and irrevocable upon the Effective Time.  If the Merger Agreement is terminated prior to the Effective Time, this Agreement shall terminate without any further action of the parties hereto and shall become null and void and no party shall have any liability hereunder with respect to the provisions contained herein.

4.     Further Assurances.  Each party to this Agreement acknowledges and agrees that he or it will perform all such further acts and execute and deliver all such further documents as may be reasonably required in connection with the consummation of the transactions contemplated hereby in accordance with the terms of this Agreement.

5.     Representations and Warranties.  The Participant hereby represents and warrants as follows:

(a)  The Participant has all requisite authority and power to execute, deliver and perform this Agreement, to perform his or her obligations hereunder and to consummate the transactions contemplated hereby.

(b)  This Agreement has been duly executed and delivered by the Participant and constitutes the legal, valid and binding obligation of the Participant, enforceable against the Participant in accordance with its terms, except to the extent that the enforceability thereof may be limited by:  (i) applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar Laws from time to time in effect affecting generally the enforcement of creditors' rights and remedies; and (ii) general principles of equity.

(c)  As of immediately prior to the Effective Time, the Participant will have good and valid title to the Options listed on Schedule A hereto, in each case free and clear of all Encumbrances.

(d)  The Participant is not a party to any option, warrant, purchase right, or other contract that would require the Participant to sell, transfer, or otherwise dispose of any of the Options held by the Participant (other than this Agreement).

(e)  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by the Participant, and performance by the Participant of its obligations hereunder (i) do not conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under any agreement or

2

CONFIDENTIAL                                                     FBG_CH1_00095077

instrument to which the Participant is a party or by which it is bound or to which its properties are subject and (ii) do not violate any existing applicable Law, judgment, order or decree of any Governmental Authority having jurisdiction over the Participant or any of its properties.

(f) No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority will be required to be obtained or made by the Participant in connection with the due execution, delivery and performance by the Participant of this Agreement and the consummation by the Participant of the transactions contemplated hereby.

(g) There is no Action pending or threatened against the Participant, by or before any Governmental Authority which seeks to prevent the Participant from consummating the transactions contemplated by this Agreement or otherwise, individually or in the aggregate, materially impair the Participant's ability to effect the transactions contemplated hereby.

6. <u>General Release of Claims</u>.  For and in consideration of the Transaction Bonus, the Participant, on behalf of himself or herself and his or her heirs, legal representatives, successors and assigns, and all persons and entities claiming by, through, or under any of them, jointly and severally ("<u>Related Persons</u>"), hereby (a) forever and irrevocably releases, discharges and agrees to hold harmless the Company and its respective, parents, subsidiaries and affiliates, including each of their respective officers, directors, managers, members, shareholders, successors, predecessors, assigns, principals, employees, agents, attorneys and representatives (collectively, the "<u>Released Parties</u>") from any and all claims, demands, proceedings, agreements (express or implied), rights, obligations, liabilities and causes of action whatsoever, whether known or unknown, whether arising under common law, in equity or under statute, which Participant or any Related Persons now has, has ever had or may hereafter have against the Released Parties arising out of the Options (including, the cancellation of the Options as set forth herein), other than  the right to be paid the Transaction Bonus in accordance with the terms hereof; (b) agrees that this Agreement shall be binding on the Participant, all Related Persons, and all persons claiming any right, benefit, or interest with respect to the cancelled Options and shall inure to the benefit of the Released Parties and their successors and assigns; and (c) acknowledges and agrees that from and after the Effective Time: (i) the Options set forth on <u>Schedule A</u> hereto shall be cancelled and no longer of any force or effect and (ii) all of the Participant's rights and claims in respect of such Options shall terminate and be null and void in all respects.  Participant expressly acknowledges that this general release includes, but is not limited to, the release of any tort or contract claims, arbitration claims, and claims under any law relating to the matters described in this Section 6.

7.      <u>Notices</u>.  Any notice or other communication hereunder shall be made (a) from the Company to the Participant at his address on file with the Company or (b) from the Participant to the Company at its business address.

8.      <u>Entire Agreement</u>.  The recitals set forth above are included in and make up a part of this Agreement.  This Agreement and the Merger Agreement embody the complete agreement

3

CONFIDENTIAL

FBG_CH1_00095078

and understanding among the parties hereto and supersede and preempt any prior understandings, agreements, or representations by or among the parties hereto, written or oral, that may have related to the subject matter hereof in any way.  Notwithstanding the foregoing, to the extent that any provision of this Agreement conflicts with or differs from any provision of the Merger Agreement, the provisions of the Merger Agreement shall prevail and govern for all purposes and in all respects.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.      Amendment.  This Agreement may not be modified, amended, supplemented, canceled, or discharged, except by written instrument executed by the Participant and the Company.

10.      Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.  This Agreement, and any and all rights, duties, and obligations hereunder, shall not be assigned, transferred, delegated, or sublicensed by the Participant without the prior written consent of the Company.

11.      GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL.

(a) THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY HEREUNDER SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

(b) THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE CHANCERY COURT OF THE STATE OF DELAWARE, NEW CASTLE COUNTY, OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE AFFAIRS OF THE COMPANY.  TO THE FULLEST EXTENT THEY MAY EFFECTIVELY DO SO UNDER APPLICABLE LAW, THE PARTIES HERETO IRREVOCABLY WAIVE AND AGREE NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, ANY CLAIM THAT THEY ARE NOT SUBJECT TO THE JURISDICTION OF ANY SUCH COURT, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.  EACH

CONFIDENTIAL                                             FBG_CH1_00095079

PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS <u>SECTION 11</u> (GOVERNING LAW) CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 11</u> (GOVERNING LAW) WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts (including by means of facsimile and electronically transmitted portable document format (pdf) signature pages), each of which shall be an original but all of which together shall constitute one and the same instrument.

[<i>Signature page follows</i>]

5

CONFIDENTIAL                                                   FBG_CH1_00095080

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the date first set forth above.

PARTICIPANT:

_____
Name:

Transaction Bonus Amount:  $_____

Address:

_____
_____
_____

*[Signature Page to Option Cancellation and Transaction Bonus Agreement]*

CONFIDENTIAL

FBG_CH1_00095081

COMPANY:

**TAE BRAKES, LLC**


By:  _____

Name:

Title:

*[Signature Page to Option Cancellation and Transaction Bonus Agreement]*

CONFIDENTIAL

FBG_CH1_00095082

<u>SCHEDULE A</u>

**Participant:**

## OPTIONS

| Grant Date | Per Class B Unit Exercise Price | Number of Options Outstanding |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**DEBTORS' EXHIBIT NO. 247**
**Page 82 of 104**

**Exhibit D**

Certificate of Merger

Exhibit D – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095084

## CERTIFICATE OF MERGER OF

## VIPER ACQUISITION II, LLC

**(a Delaware limited liability company)**

## WITH AND INTO

## TAE Brakes, LLC

**(a Delaware limited liability company)**

Pursuant to Section 18-209 of the Delaware Limited Liability Act (the "LLCA"), TAE Brakes, LLC, a Delaware limited liability company (the "Company"), in connection with the merger of Viper Acquisition II, LLC, a Delaware limited liability company ("Merger Sub"), with and into the Company (the "Merger"), does hereby certify that:

FIRST: The name and state of formation of each of the constituent limited liability companies of the Merger (the "Constituent Limited Liability Companies") is as follows:

(i)     Viper Acquisition II, LLC, a limited liability company formed under the laws of the State of Delaware; and

(ii)    TAE Brakes, LLC, a limited liability company formed under the laws of the State of Delaware.

SECOND: The Agreement and Plan of Merger, dated as of December 30, 2022, by and among the Company, Merger Sub, First Brands Group, LLC, a Delaware limited liability company, and Qualitor Holdings LLC, solely in its capacity as the representative of the equityholders of the Company (the "Agreement and Plan of Merger"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Constituent Limited Liability Companies in accordance with the provisions of Section 18-209 of the LLCA.

THIRD: Pursuant to the Agreement and Plan of Merger, Merger Sub shall be merged with and into the Company and the Company shall be the surviving limited liability company in the Merger (the "Surviving Limited Liability Company"), whose name following the Merger shall be TAE Brakes, LLC.

FOURTH: The Certificate of Formation of the Surviving Limited Liability Company shall be its Certificate of Formation.

Doc#: US1:16696683v6

CONFIDENTIAL

FBG_CH1_00095085

FIFTH:  The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

SIXTH:  The executed Agreement and Plan of Merger is on file at the principal place of business of the Surviving Limited Liability Company.  The address of the principal place of business of the Surviving Limited Liability Company is c/o 127 Public Square, Suite 5300, Cleveland, Ohio 44114.

SEVENTH: A copy of the Agreement and Plan of Merger will be furnished by the Surviving Limited Liability Company on request, without cost, to any member of the Constituent Limited Liability Companies.

[*The remainder of this page is intentionally left blank.*]

Doc#: US1:16696683v6

CONFIDENTIAL

FBG_CH1_00095086

**DEBTORS' EXHIBIT NO. 247**
**Page 85 of 104**

IN  WITNESS  WHEREOF,  said Surviving Limited Liability Company  has  caused  this Certificate  of Merger to be signed by an authorized person.

Dated: _____, 2022

TAE Brakes, LLC


By:    _____
        Name:
        Title:

*[Signature Page to the Certificate of Merger]*

CONFIDENTIAL

FBG_CH1_00095087

**Exhibit E**

Letter of Transmittal

Exhibit E – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095088

**DEBTORS' EXHIBIT NO. 247**
**Page 87 of 104**

*FINAL FORM*

# LETTER OF TRANSMITTAL

## For Membership Interests of
## TAE Brakes, LLC

Pursuant to the Agreement and Plan of Merger, dated as of _____, 2022

> THIS LETTER OF TRANSMITTAL SHOULD BE COMPLETED, SIGNED, AND SENT TO THE COMPANY [CARE OF THE PERSON NAMED BELOW]

*By electronic mail, mail, hand or overnight delivery to:*
TAE Brakes, LLC
1840 McCullough Road
Lima, OH 45801
Attention: Teresa Holden
Telephone: (419) 993-8128
E-mail:  tholden@qualitorinc.com

*With a copy to the Equityholder Representative*:
Qualitor Holdings LLC
c/o Wellspring Capital Management LLC
605 Third Avenue, 44th Floor
New York, NY 10158
Attention: Sarah Mudho
E-mail: smudho@wellspringcapital.com

*With a copy to Paul, Weiss:*
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attention: Robert Balis, Esq., Brooke Hensley, Esq.
Email: rbalis@paulweiss.com, bhensley@paulweiss.com

| Equityholder | DESCRIPTION OF MEMBERSHIP INTERESTS SURRENDERED |
|---|---|
| | # of Membership Interests |
| | |
| | |
| **TOTAL:** | |

This Letter of Transmittal ("Letter of Transmittal") should be completed by holders of Membership Interests (collectively, the "Equityholders") of TAE Brakes, LLC, a Delaware limited liability company (the "Company"), receiving (i) $0.01 per Membership Interest, (ii) if applicable, the Equityholder's pro rata share of the Payoff Adjustment Amount, and (iii) if applicable, the Equityholder's pro rata share of the Equityholder Representation Reserve Amount.

**PLEASE READ THE ACCOMPANYING INSTRUCTIONS CAREFULLY.**

Doc#: US1:16696684v11

CONFIDENTIAL

FBG_CH1_00095089

1.  **The Merger Agreement; Appointment of Equityholder Representative**. This Letter of Transmittal is delivered pursuant to the Agreement and Plan of Merger, dated as of _____, 2022 (the "Merger Agreement"), by and among First Brands Group, LLC, a Delaware limited liability company ("Parent"), Viper Acquisition II, LLC, a Delaware limited liability company and wholly-owned subsidiary of Parent ("Merger Sub"), the Company, Qualitor Holdings LLC, a Delaware limited liability company, solely in its capacity as the representative of the Equityholders (the "Equityholder Representative"), and, Qualitor Holdings LLC, a Delaware limited liability company, as principal seller. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Merger Agreement. At the Effective Time, each issued and outstanding Class A Unit and Class B Unit (each, a "Membership Interest" and collectively, the "Membership Interests"), except for the Excluded Units, will be converted automatically into the right to receive from Parent (or on behalf of Parent) (i) at the Closing, $0.01 per Membership Interest, (ii) following the Closing, if and to the extent applicable, the Equityholder's pro rata share of the Payoff Adjustment Amount, pursuant to Section 2.9 of the Merger Agreement (*Pre-Closing Statement; 2022 July Promissory Notes Cash Payoff Amount Adjustment*), and (iii) following the closing, if and to the extent applicable, the Equityholders' pro rata share of the Equityholder Representative Reserve Amount, pursuant to Section 7.20 of the Merger Agreement (*Equityholder Representative*) (collectively, the "Per Membership Interest Price" and clauses (ii) and (iii), the "Post-Closing Payment"). The Per Membership Interest Price in respect of each Membership Interest will be payable, without interest, to the applicable Equityholder upon the surrender pursuant to Section 2.6 of the Merger Agreement (*Book-Entry Units*) of the Book-Entry Unit formerly representing such Membership Interest. This Letter of Transmittal is the means by which you (the undersigned) can claim the cash consideration you are entitled to receive under the Merger Agreement for your Membership Interests. An Equityholder may submit its Letter of Transmittal to the Company (or the Surviving Company in accordance with Section 2.6(a)(ii) of the Merger Agreement (*Surrender of Company Units*)) following the Effective Time and Parent shall make (or cause to be made) the payment described in clause (i) of this paragraph, as applicable, as promptly as practicable thereafter (and in no event later than three (3) Business Days after receipt thereof; provided that, for the avoidance of doubt, any Equityholder that submits its Letter of Transmittal prior to the Closing shall receive its cash consideration pursuant to clause (i) of this paragraph at the Closing).

The undersigned acknowledges and agrees to be subject to the terms and conditions of the Merger Agreement, including, without limitation, the (a) appointment of the Equityholder Representative in Section 7.20 of the Merger Agreement (*Equityholder Representative*), (b) rights, powers and duties of the Equityholder Representative pursuant to Section 7.20 of the Merger Agreement (*Equityholder Representative*) and any other agreement entered into in connection therewith, and (c) reservation and disbursement of the Equityholder Representative Reserve Amount pursuant to Section 7.20 of the Merger Agreement (*Equityholder Representative*). The undersigned further agrees to assign its right to the proceeds from the Post-Closing Payment, if any, to Qualitor Inventory Holdings, LLC ("Inventory Holdings"). In furtherance of the foregoing, the undersigned hereby irrevocably appoints the Equityholder Representative as the undersigned's true and lawful agent and attorney-in-fact, with full power of substitution, with full power and authority to act for and on behalf of the undersigned for all purposes set forth in Section 7.20 of the Merger Agreement (*Equityholder Representative*) and the immediately forgoing sentence. The appointment of the Equityholder Representative as the undersigned's attorney-in-fact revokes any power of attorney heretofore granted that authorized any other person or persons to act as agent and to represent the undersigned in a manner inconsistent with the rights and obligations of the Equityholder Representative set forth in Section 7.20 of the Merger Agreement (*Equityholder Representative*). The appointment of the Equityholder Representative as attorney-in-fact pursuant hereto is coupled with an interest and is irrevocable. The undersigned hereby acknowledges and agrees to, without limitation, the provisions of Section 7.20 of the Merger Agreement (*Equityholder Representative*). The Equityholder Representative and Inventory Holdings may rely on the provisions of this Letter of Transmittal.

2.  **Delivery of Letter of Transmittal**. The undersigned is delivering this Letter of Transmittal in respect of the Membership Interests surrendered with this Letter of Transmittal (such surrendered Membership Interests, the "Surrendered Membership Interests"), pursuant to Section 2.6(a)(ii) of the Merger Agreement (*Surrender of Company Units*), for the right to receive in exchange therefor the Per Membership Interest Price and, until the undersigned properly delivers this Letter of Transmittal to the Company as contemplated hereby, each such Membership Interest shall be deemed at all times after the Effective Time to be cancelled, no longer outstanding and represent only the right to receive upon such surrender the Per Membership Interest Price. The execution and delivery of this Letter of Transmittal is a condition to receiving the undersigned's Per Membership Interest Price. The undersigned understands that by delivering this Letter of Transmittal it is assigning its right to the proceeds from the Post-Closing Payment, if any, to Inventory Holdings. The undersigned understands that surrender of the Surrendered Membership Interests will not be made in acceptable form until receipt by the Company of this Letter of Transmittal, duly completed and signed, together with all signature pages included herewith. All questions as to validity, form and eligibility of the Surrendered Securities hereby will be determined by the mutual agreement of Parent, the Company and the Equityholder Representative and such

4894-4956-3461.2

CONFIDENTIAL

FBG_CH1_00095090

determination shall be final and binding.  Accordingly, the undersigned consents to, approves and raises no objection against, and has no rights to dissent or seek appraisal with respect to the Merger.  The undersigned hereby agrees, upon request of the Company, to execute any additional documents necessary or desirable to complete the surrender and exchange of the Surrendered Membership Interests.

3. **Options**. The undersigned understands that this Letter of Transmittal and the other related documents referred to above are not applicable to Options. If the undersigned holds Options, the undersigned has been or will be provided with separate materials regarding such Options.

4. **Tax**.  The undersigned further understands that he, she or it is solely responsible for the payment of any applicable U.S. federal, state, local and non-U.S. taxes imposed on the undersigned attributable to the Per Membership Interest Price.  The undersigned acknowledges that the Merger generally will be a taxable event to the Equityholders of the Company in 2022 even if a Equityholder neglects to return this Letter of Transmittal.

**EACH OF THE COMPANY'S EQUITYHOLDERS IS URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE MERGER IN LIGHT OF HIS, HER OR ITS OWN PARTICULAR CIRCUMSTANCES.**

5. **Representations and Warranties**. The undersigned hereby makes the following representations and warranties; provided that the undersigned makes no representations or warranties relating to any written agreement between the Company and Parent (or any of its Affiliates) other than the Merger Agreement.  The undersigned hereby acknowledges receipt of a copy of the Merger Agreement. The undersigned hereby acknowledges and agrees that he, she or it (a) has received and reviewed this Letter of Transmittal and the Merger Agreement, (b) has had an opportunity to obtain the advice of counsel prior to executing this Letter of Transmittal, (c) fully understands and accepts all of the provisions hereof and of the Merger Agreement, (d) other than such Equityholder's right to receive the Per Membership Interest Price, shall have no further rights arising out of any Membership Interests and upon completion of the Merger, such Membership Interests shall be automatically cancelled and no longer outstanding with no further action required on the part of the undersigned, and (e) has relied solely and completely upon its own judgment in executing this Letter of Transmittal. The undersigned is an individual, a trust or is a partnership, limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation or incorporation, as applicable. The undersigned is the record and beneficial owner of, and has good and valid title to, the Surrendered Membership Interests, free and clear of all Encumbrances and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such Surrendered Membership Interests), other than (x) generally applicable transfer restrictions under the Securities Act, (y) Encumbrances arising under that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of June 23, 2021, by and among the Company and the other parties thereto (the "LLC Agreement") and (z) Encumbrances that would not reasonably be expected, individually or in the aggregate to impair the undersigned's ability to effect the transactions contemplated hereby and, in the case of (z) which shall be released as of or prior to the Closing. Other than the Surrendered Membership Interests and Options, if any, the undersigned does not directly or indirectly own or have any right to any capital stock, limited liability company interest, option, warrant, call, commitment, subscription, unit appreciation right or other equity or similar interest in, or any interest convertible into or exchangeable for, any time, any capital stock, limited liability company interest, option, warrant, call, commitment, subscription, unit appreciation rights or other equity or similar interest in the Company. The execution and delivery of this Letter of Transmittal by the undersigned (and, if applicable, his or her spouse) does not, and the performance by the undersigned (and, if applicable, his or her spouse) of the undersigned's obligations hereunder will not (i) result in any violation of any existing applicable Law or any order, judgment, injunction, ruling, decision, award or decree of any Governmental Authority to which the undersigned is a party or by which any of the undersigned's assets is bound, (ii) if the undersigned is not an individual, result in any violation of the organizational documents of the undersigned, (iii) require any consent that has not been obtained or other action (including notice or payment) that has not been taken by any Person concerning the undersigned's Surrendered Membership Interests) or (iv) result in the imposition of any material Encumbrance (other than a Permitted Encumbrance) upon the undersigned's Surrendered Membership Interests, in each case of (i), (iii) and (iv), except those that would not reasonably be expected, individually or in the aggregate, to materially impair the undersigned's ability to effect the transactions contemplated hereby. The undersigned has the legal capacity and all requisite power and authority to execute and deliver this Letter of Transmittal and to perform his, her or its obligations hereunder and to consummate the transactions contemplated hereby, and if the undersigned is a trust or other entity, the execution, delivery and performance by the undersigned of this Letter of Transmittal has been duly authorized by all necessary action on the part of the undersigned and its trustee(s) and beneficiaries, board of directors or similar applicable governing body.  This Letter of Transmittal has been duly executed and delivered by the undersigned and constitutes a valid and binding agreement of the undersigned, enforceable against the undersigned in accordance with its terms, except to the extent that enforceability

4894-4956-3461.2

CONFIDENTIAL                                                                 FBG_CH1_00095091

may be limited by applicable bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies. If the undersigned is married, and any of the Surrendered Membership Interests constitute community property under applicable Law and spousal or other approval is required for this Letter of Transmittal to be valid and binding and for the representations and warranties made herein to be true, then a spousal consent has been duly and validly executed and delivered by the relevant spouse and constitutes a valid and legally binding obligation of such spouse, except to the extent that enforceability may be limited by applicable bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies. If the undersigned is a trust or other entity, the undersigned is duly incorporated or organized, validly existing and in good standing under the applicable Laws of its respective jurisdiction of incorporation or organization. The undersigned is not a party to any proxy, voting trust, equity agreement or other agreement or understanding in effect with respect to the voting or transfer of any of the Surrendered Membership Interests, other than the LLC Agreement. The undersigned has not incurred any liability to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by the Merger Agreement for which the Company, the Company Subsidiaries, Parent or the other Equityholders could become liable or obligated that is not a Transaction Expense. The undersigned acknowledges and agrees that payment of the Per Membership Interest Price in accordance with the Merger Agreement satisfies all obligations to the undersigned pertaining to the Surrendered Membership Interests.

6. **Binding Effect**. This Letter of Transmittal shall remain in full force and effect notwithstanding the death or incapacity of one or more of the undersigned (if an individual), and this Letter of Transmittal shall be binding upon the heirs, executors, administrators, personal representatives, successors and assigns of the undersigned.

7. **Severability**. If any provision of this Letter of Transmittal is declared invalid or unenforceable by a court having competent jurisdiction, it is agreed that the same shall endure except for the part declared invalid or unenforceable which shall instead be enforced to the maximum extent permitted under applicable Laws.

8. **Equityholder Representative Reserve Amount**. The undersigned hereby acknowledges that at the Closing $1,000,000 (the "Equityholder Representative Reserve Amount") shall be paid to the Equityholder Representative, which shall serve to pay for any amounts owed by the Equityholders and the out-of-pocket fees, costs and expenses of the Equityholder Representative incurred (at the discretion of the Equityholder Representative) in connection with the performance of its duties and obligations under this Letter of Transmittal and the Merger Agreement and the undersigned shall only receive distributions with respect to the Equityholder Representative Reserve Amount if and to the extent that the undersigned is entitled to receive such distributions in accordance with the terms of the Merger Agreement. The undersigned agrees to assign any distributions in respect of the Equityholder Representative Reserve Amount, if any, to Inventory Holdings.

9. **Headings.** The headings contained in this Letter of Transmittal and the Merger Agreement are intended solely for convenience and shall not affect the rights of any parties thereto.

10. **Amendment; Governing Law; Waiver of Jury Trial**. This Letter of Transmittal may not be changed except in a writing signed by the person(s) against whose interest such change shall operate. This Letter of Transmittal shall be governed by and construed under the laws of the State of Delaware without regard to principles of conflicts of law. Section 7.15 of the Merger Agreement is incorporated herein by reference and shall apply to this Letter of Transmittal *mutatis mutandis*.

11. **Waiver of Conflict**. The undersigned hereby acknowledges and agrees to the following: (a) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("PWRW&G") is representing the Company in connection with the Merger Agreement and the documents and transactions contemplated thereby and is not representing the undersigned unless otherwise agreed in writing by PWRW&G; (b) PWRW&G is representing Qualitor Holdings LLC as the Equityholder Representative with respect to the provisions relating to the Equityholder Representative in the Merger Agreement and is not representing the undersigned unless otherwise agreed in writing by PWRW&G, and (c) PWRW&G is representing the Wellspring Parties in connection with the Merger Agreement and is not representing the undersigned unless otherwise agreed in writing by PWRW&G.

12. **Conversion**. ALL SURRENDERED MEMBERSHIP INTERESTS HELD BY YOU WILL AUTOMATICALLY BE CONVERTED INTO THE RIGHT TO RECEIVE THE PER MEMBERSHIP INTEREST PRICE.

4894-4956-3461.2

CONFIDENTIAL                                                                                      FBG_CH1_00095092

13. **Termination of Representations and Warranties**. The representations and warranties of the Equityholder set forth herein shall terminate and not survive the date of the execution of this Letter of Transmittal by the Equityholder, except nothing shall limit any right of the Parent to bring any actions or proceedings in respect of a claim of actual and knowing common law fraud (and not negligent misrepresentation or omission, or any form of fraud based on recklessness or negligence) made by the undersigned with respect to making any representation or warranty contained herein with the specific intent to induce another party to enter into the Merger Agreement that was material to the claiming party's decision to enter into this Agreement and upon which the claiming party justifiably relied, in each case, as determined in a non-appealable final determination of a court of competent jurisdiction ("Fraud") against the Person that committed Fraud in connection with this Letter of Transmittal or the Merger and the transactions contemplated hereby or thereby shall not be limited. It is the express intent that if the survival period of the representation and warranties is shorter than the statute of limitations that would otherwise apply, then, by contract, the applicable statute of limitations shall be reduced to the survival period contemplated hereby.

14. **Confidentiality**. During the period from the Closing until the third anniversary of the Closing, the undersigned shall not and shall instruct its Representatives not to, directly or indirectly, without the prior written consent of Parent, disclose to any third party (other than each other and their respective Representatives) any confidential information with respect to the Company and the Company Subsidiaries or their business; provided that, the foregoing restriction shall not (a) apply to any information (i) that was, is or becomes generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 15) or (ii) that was, is or becomes available to the undersigned and its Affiliates or their respective Representatives from a third party that was not known by the applicable recipient to be bound by a confidentiality agreement or other applicable contractual, legal or fiduciary obligation of confidentiality with respect to such information or was or is generated independently by the undersigned and its Affiliates or their respective Representatives without reference to or use of such information and without violation of this Section 15, or (b) prohibit any disclosure (i) to the undersigned's Affiliates or any Representatives of the undersigned or its Affiliates, (ii) required or requested by applicable Law so long as, the undersigned discloses only that information that the undersigned determines (with the advice of counsel) is required by such applicable Law to be disclosed and uses commercially reasonable efforts to preserve the confidentiality of such information, including by, at Parent's written request, reasonably cooperating with Parent for Parent to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information (at Parent's sole cost and expense), (iii) necessary to be made in connection with the enforcement of any right or remedy relating to the Merger Agreement or the transactions contemplated thereby, (iv) of return on investment to direct and indirect existing and potential investors in the undersigned who are subject to customary confidentiality obligations with respect to confidential information they receive, or (v) in the performance of authorized employment duties in the undersigned's capacity as an employee of Parent or any of its Subsidiaries. The undersigned agrees not to make any public release or announcement concerning the transactions contemplated hereby without the prior consent of Parent, the Company and the Equityholder Representative.

15. **Assignment.** The Equityholder hereby assigns its right to the Post-Closing Payment proceeds, if any, to Inventory Holdings. Inventory Holdings is a third party beneficiary of this Section 15.[1]

Please note that if the Merger is not consummated, this Letter of Transmittal will be returned to you, and this Letter of Transmittal will be void and of no force and effect.

---

[1] **Note to Draft**: To be further confirmed in LLC joinder.
4894-4956-3461.2

CONFIDENTIAL                                                       FBG_CH1_00095093

**DEBTORS' EXHIBIT NO. 247**
**Page 92 of 104**

# THE FOLLOWING INSTRUCTIONS MUST BE FOLLOWED:

1.    Delivery of Letter of Transmittal and Membership Interests.  In order for you to make an effective surrender of Surrendered Membership Interests and be entitled to receive the Per Membership Interest Price, you must deliver to the Company your Letter of Transmittal together with the other signed and completed pages included herewith.

**The method of delivery of Surrendered Membership Interests and other documents is at the election and risk of the transmitting Equityholder.  In order to protect against loss, if delivery is made by mail, registered mail with return receipt requested, properly insured, is recommended.**

2.    Signatures.  If you are the person whose name appears on the Company's equity ownership records, sign this Letter of Transmittal exactly as your name appears in such records, as the signature must correspond exactly with the name in such records without alteration or any change whatsoever.  If any Surrendered Membership Interests are registered in the name of two or more Equityholders, each person named on the Company's equity ownership records must sign this Letter of Transmittal.  If an executor, administrator, trustee, guardian, attorney-in-fact, corporate officer or other person acting in a fiduciary or representative capacity signs the Letter of Transmittal, such person should indicate his or her full title when signing and must provide appropriate evidence of authority to act in such capacity with a signed copy of this Letter of Transmittal.  If additional documentation is required, you will be so advised.

3.    Examination of Documentation.  The Company shall examine this Letter of Transmittal, the U.S. Internal Revenue Service ("IRS") Form W-9 or an applicable Form W-8 to be provided pursuant to Section 5 below, as appropriate, and all other documents referenced in this Letter of Transmittal (collectively, the "Equityholder Exchange Documents") delivered or mailed to the Company in connection with the surrender of Surrendered Membership Interests by you to ascertain whether they have been completed and executed in accordance with the instructions set forth in this Letter of Transmittal.  In the event the Company determines that any Equityholder Exchange Documents do not appear to have been properly completed or executed, or that any other irregularity in connection with the surrender appears to exist, the Company will promptly follow, where possible, its regular procedures to attempt to cause such irregularity to be corrected and shall consult with Parent for further instructions.  Equityholders may be contacted by the Company and be requested to provide any missing or incomplete information. A surrender will not be deemed to have been made until all irregularities have been cured or waived.

4.    Additional Copies.  Additional copies of this Letter of Transmittal may be obtained from the Company at the address listed on the face hereof.

5.    IRS Forms.  If you are a U.S. Person (as defined below), you must provide the Company with a correct Taxpayer Identification Number (generally, your Employer Identification Number or Social Security Number) on the IRS Form W-9 which is attached hereto and certify whether you are subject to backup withholding in accordance with the instructions to the IRS Form W-9.  If you are not a U.S. Person (a "Non-U.S. Person"), you must complete and deliver an applicable IRS Form W-8 certifying your status as a Non-U.S. Person.  Such IRS Forms W-8 can be obtained from the Company or the Internal Revenue Service (www.irs.gov/formspubs/index.html). **Failure to provide the information on the IRS Form W-9 or applicable IRS Form W-8 may subject you to 24% federal backup withholding on any payments of the Per Membership Interest Price to you.**  Backup withholding is not an additional tax. Rather, the amount of tax withheld will be applied against the U.S. federal income tax liability of a person subject to backup withholding, and if withholding results in an overpayment of taxes, a refund may be obtained, provided that the required information is furnished to the IRS in a timely manner.

For purposes of these instructions, a "U.S. Person" is (i) an individual who is a citizen or resident alien of the United States, (ii) a corporation (including an entity taxable as a corporation) or partnership (including an entity or arrangement taxable as a partnership) created under the laws of the United States or of any political subdivision thereof, (iii) an estate the income of which is subject to United States federal income tax regardless of its source or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

4894-4956-3461.2

CONFIDENTIAL                                                                                           FBG_CH1_00095094

**Important:  This Letter of Transmittal, appropriately completed and signed, and all other required documents identified herein, must be received by the Company before the Per Membership Interest Price can be distributed to you.**

---

### ALL EQUITYHOLDERS MUST SIGN
### IN THE SPACE PROVIDED BELOW
#### (See Instruction 2)

By signing below, the undersigned agrees to be bound by the provisions contained in this Letter of Transmittal

.............................................................................................................................................

.............................................................................................................................................

Signature(s) of Equityholders(s)

(Must be signed by the Equityholder(s) exactly as name(s) appear(s) on the Company's equity ownership records.)

Dated ......................................................................................................................................

Name(s) ..................................................................................................................................

.............................................................................................................................................

(Please Print)

Title of Signing Party (if entity, trustee or other authorized party) ...................................

.............................................................................................................................................

Home or Business Address...................................................................................................

.............................................................................................................................................

(Zip Code)

Home or Business Telephone Number .................................................................................

(Include Area Code)

Tax Identification No. (Employer Identification No. or
Social Security No.)..............................................................................................................

(Complete Accompanying Form W-9 or Applicable Form W-8, As Applicable)

To receive payment via wire transfer provide wire transfer instructions below:

Bank:

ABA Number:

Account Number:

Account Name:

Attention:

---

4894-4956-3461.2

CONFIDENTIAL                                                                                   FBG_CH1_00095095

**Form W-9**
(Rev. October 2018)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer
Identification Number and Certification**

▶ Go to *www.irs.gov/FormW9* for instructions and the latest information.

Give Form to the
requester. Do not
send to the IRS.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.) See instructions.

6 City, state, and ZIP code

Requester's name and address (optional)

7 List account number(s) here (optional)

Print or type.
See **Specific Instructions** on page 3.

**Part I**   **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

or

Employer identification number

| | | – | | | | | | | |

**Part II**   **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**   Signature of U.S. person ▶                 Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

4894-4956-3461.2

Form W-9 (Rev. 10-2018)                                                                                                    Page **2**

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting*, later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code*, later, and the separate instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships*, earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code*, later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

4894-4956-3461.2

CONFIDENTIAL                                                                                       FBG_CH1_00095097

Form W-9 (Rev. 10-2018)

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

a. **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**Note: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

b. **Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade, or "doing business as" (DBA) name on line 2.

c. **Partnership, LLC that is not a single-member LLC, C corporation, or S corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

d. **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

e. **Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purposes. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1—An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2—The United States or any of its agencies or instrumentalities

3—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4—A foreign government or any of its political subdivisions, agencies, or instrumentalities

5—A corporation

6—A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7—A futures commission merchant registered with the Commodity Futures Trading Commission

8—A real estate investment trust

9—An entity registered at all times during the tax year under the Investment Company Act of 1940

10—A common trust fund operated by a bank under section 584(a)

11—A financial institution

12—A middleman known in the investment community as a nominee or custodian

13—A trust exempt from tax under section 664 or described in section 4947

4894-4956-3461.2

FBG_CH1_00095098

Form W-9 (Rev. 10-2018)                                                                                                                                Page **4**

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5[2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A—An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B—The United States or any of its agencies or instrumentalities

C—A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D—A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i)

E—A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F—A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G—A real estate investment trust

H—A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I—A common trust fund as defined in section 584(a)

J—A bank as defined in section 581

K—A broker

L—A trust exempt from tax under section 664 or described in section 4947(a)(1)

M—A tax exempt trust under a section 403(b) plan or section 457(g) plan

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

## Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

## Line 6

Enter your city, state, and ZIP code.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at www.SSA.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/Businesses and clicking on Employer Identification Number (EIN) under Starting a Business. Go to www.irs.gov/Forms to view, download, or print Form W-7 and/or Form SS-4.  Or, you can go to www.irs.gov/OrderForms to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code*, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

4894-4956-3461.2

CONFIDENTIAL

FBG_CH1_00095099

Form W-9 (Rev. 10-2018)

Page 5

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A)) | The grantor[4] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity[4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulations section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also see Special rules for partnerships, earlier.

**\*Note:** The grantor also must provide a Form W-9 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

4894-4956-3461.2

CONFIDENTIAL

FBG_CH1_00095100

**Exhibit F**

[Reserved]

Exhibit F – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095101

**DEBTORS' EXHIBIT NO. 247**
**Page 100 of 104**

**Exhibit G**

Restrictive Covenants

Exhibit G – Page 1

4859-7917-7283.2

CONFIDENTIAL

FBG_CH1_00095102

**TAE Brakes – Merger Agreement**

**Exhibit G**

1.      For a period commencing at Closing and expiring on the date that is thirty-six (36) months following the Closing Date (the "Restriction Period"), the Principal Seller agrees that it will not, and will cause its Subsidiaries (collectively, the "Restricted Persons") not to, directly or indirectly, distribute, manufacture, market or sell the Products in any the Restricted Territory (as defined below), other than pursuant to arrangements with Parent or any of its Subsidiaries; provided, however, this Exhibit G shall not apply in respect of:

a.   any Restricted Persons, investing or holding publicly traded securities of any Person engaged in a business which distributes or sells the Products as conducted as of immediately prior to Closing, to the extent such investment or holding is on a passive basis and does not, directly or indirectly, confer on any Restricted Person 5% or more of the voting power of such Person; or

b.   any Restricted Person, hereafter acquiring or investing in any Person or business ("Acquired Business") which distributes or sells the Products (as defined below) ("Acquired Competitive Operations") (and thereafter engaging in providing, performing, rendering or selling any such product or service of such Acquired Business); provided, however,  that within nine (9) months following the closing of the acquisition of such Acquired Competitive Operations either (A) consolidated revenues attributable to the Acquired Competitive Operations for the trailing twelve (12) months account for less than the greater of (x) 15% percent compared with the Acquired Business' consolidated annual revenues for its most recent fiscal year ended prior to the date of such closing and (y) $30,000,000 or (B) if the foregoing clause (A) is not satisfied, but the Acquired Competitive Operations are not the principal business or operation of the applicable Acquired Business, within twelve (12) months after the consummation of the acquisition of the Acquired Competitive Operations (subject to automatic extension until five (5) Business Days following receipt of all regulatory approvals if a definitive agreement was executed in such twelve (12) month period), such Restricted Persons has, upon terms and conditions and at a price determined by the Principal Seller in its sole discretion, divested that portion of the Acquired Competitive Operations for which consolidated revenues attributable thereto for the trailing twelve (12) months exceed the greater of (x) 15% percent compared with the Acquired Business' consolidated annual revenues for its most recent fiscal year ended prior to the date of such closing and (y) $30,000,000;

c.   any equity securities in any Person owned through any employee benefit plan sponsored or maintained by the Company or any of the Restricted Persons (which, Equity Securities were, for the avoidance of doubt, not acquired to facilitate a strategic acquisition by the Company or a Restricted Person).

"Product" means brake hardware primarily marketed for use with cars, trucks and SUVs.

"Restricted Territory" means any country in which the Company Group sold or distributed Products as of the date of this Agreement.

2.      During the Restricted Period, the Restricted Persons will not, directly or indirectly, solicit any customer, vendor, contractor or supplier of the Company Group (solely as it relates to manufacture,

CONFIDENTIAL

FBG_CH1_00095103

distribution or sale of the Products) to terminate, diminish or materially interfere with his, her or its relationship with the Company Group.

3. During the Restricted Period, the Restricted Persons will not, directly or indirectly, solicit for employment or engagement as an independent contractor or hire or engage, or attempt to hire or engage, any individual listed on Annex A attached hereto; provided, however, that (a) nothing herein shall prohibit the Restricted Persons, (x) from conducting any general solicitation for employees (including through the use of employment agencies or the placing of an advertisement) which the Principal Seller did not specifically target at any individual listed on Annex A or (y) from soliciting, engaging or hiring any person who has been terminated by the Company or any of its Subsidiaries no less than six (6) months prior to the solicitation, engagement or hiring of such person and (b) the provisions of this Section 3 shall not apply with respect to board membership (or membership on any similar body) of any individual listed on Annex A.

4. During the Restricted Period, the Restricted Persons shall direct officers and senior executives not to make any public statement or communication which is materially false or disparaging with respect to the business of Company Group; provided, however, that nothing herein shall prohibit any person (i) from testifying truthfully under oath or making any truthful statement or communication in response to any request or requirement by Law, by court order or by a self-regulatory organization or in connection with enforcing any Restricted Person's rights or remedies, as applicable, under this Agreement or any agreements contemplated by the Agreement or (ii) making any public statement or communication in connection with any commercial relationship between Parent and its Affiliates on the one hand and the Restricted Persons on the other hand, entered into after the date hereof.

5. Notwithstanding anything contained herein to the contrary, this Exhibit G shall not be applicable to the acquiring or surviving (or ultimate parent) entity resulting from a Change of Control (as defined below); provided, however, that no such Change of Control transaction may be structured in a manner solely to avoid the obligations of this Exhibit G. For avoidance of doubt, if any Restricted Person sells to a Person any portion of its or such Restricted Person's respective businesses (whether by means of acquisition, asset purchase, merger, consolidation, similar business combination or otherwise), the restrictions contained in this Exhibit G shall not prohibit such sale and shall not apply to any such Person or such Person's Affiliates. For the avoidance of doubt, subject to this paragraph 5, the provisions of this Exhibit G shall remain in full force and effect following such transaction solely with respect to the Restricted Persons.

"Change of Control" means the merger, acquisition, reorganization, consolidation or business combination of the Company with or by a bona fide third party in which the shareholders of the Company immediately prior to such transaction (in such capacity) would own, in the aggregate, less than 60% of the total combined voting power of all classes of capital stock of the acquiring or surviving (or ultimate parent) entity normally entitled to vote for the election of directors of the acquiring or surviving (or ultimate parent) entity.

Doc#: US1:16696685v4

CONFIDENTIAL

FBG_CH1_00095104

**DEBTORS' EXHIBIT NO. 247**
**Page 103 of 104**

<u>Annex A</u>

Restricted Individuals

1.  Shaun Mayfield

CONFIDENTIAL                                                      FBG_CH1_00095105