**EXHIBIT D**

**(July 29 Transcript)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| | ) CASE NO: 25-90399-cml |
| FIRST BRANDS GROUP LLC, | ) Houston, Texas |
| Debtor. | ) Wednesday, July 29, 2026 |
| | ) 9:38 a.m. to 6:38 p.m. |

TESTIMONY OF CHARLES MOORE

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:
SUNNY SINGH
MATTHEW BARR
KEVIN BOSTEL
ROBERT BEREZIN
THEODORE E. TSEKERIDES
CHRISTINE CALABRESE
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

CLIFFORD W. CARLSON
Weil, Gotshal & Manges LLP
700 Louisiana Street, Ste 3700
Houston, TX 77022

For Retiree Committee:
MARK D. SHERRILL
Chamberlain Hrdlicka
1200 Smith Street, Ste 1400
Houston, TX 77002

For Committee:
KENNETH AULET
MICHAEL WINOGRAD
JASNOOR HUNDAL
Brown Rudnick
7 Times Square
New York, NY 10036

| | |
|---|---|
| For LAM Parties: | EMIL A. KLEINHAUS<br>Wachtell Lipton Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019 |
| | MICHAEL H. CASSEL<br>Wachtell Lipton Rosen & Katz<br>51 West 52nd Street<br>New York, Ny 10019 |
| For Katsumi: | RICHARD A. STIEGLITZ<br>Mayer Brown<br>1221 Avenue of the Americas<br>New York, NY 10020 |
| | SEAN T. SCOTT<br>Mayer Brown<br>71 South Wacker Drive<br>Chicago, IL 60606 |
| | CHARLES S. KELLEY<br>Mayer Brown<br>700 Louisiana Street, Ste 3500<br>Houston, TX 77002 |
| For Onset: | LISA LAUKITIS<br>Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001 |
| | ERIN DEXTER<br>Milbank LLP<br>1101 New York Avenue NW<br>Washington, DC 20005 |
| For Evolution entities: | MICHAEL DUKE<br>Elsberg Baker & Maruri<br>350 Fifth Avenue, 38th Floor<br>New York, NY 10118 |
| For Carnaby II and Carnaby III: | ALLAN S. BRILLIANT<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036 |

| | |
|---|---|
| For Patrick James and James defendants: | JAMES C. TECCE<br>ANIL MAKHIJANI<br>Quinn Emanuel Urquhart & Sullivan LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010 |
| | ERICA S. WEISGERBER<br>Debevoise & Plimpton LLP<br>66 Hudson Boulevard East<br>New York, NY 10001 |
| | MATTHEW D. SARONSON<br>Debevoise & Plimpton LLP<br>28 Tudor Street<br>London EC4Y 0AY<br>United Kingdom |
| For Aequum Financial II, LLC: | MATTHEW E. KASLOW<br>Blank Rome LLP<br>130 North 18th Street<br>Philadelphia, PA 19103 |
| For U.S. Trustee: | VIANEY GARZA<br>Office of the U.S. Trustee<br>515 Rusk Street, Ste 3516<br>Houston, TX 77002 |
| Also Present: | GARY MENNIT<br>JAMES TEECE<br>ALEX ORCHOWSKI |
| Court Reporter: | J. HERZ |
| Courtroom Deputy: | J. HERZ |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

INDEX

| DEBTORS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHARLES MOORE | 6 | 106 | 260 | |

| EXHIBITS | RECEIVED |
|---|---|
| Exhibit 230 | 36 |
| Exhibit 75 | 71 |
| Exhibit 76 | 90 |
| Exhibit 94 | 98 |
| Exhibit 73 | 100 |
| ECF 3470-1 | 132 |
| Exhibits 1-8, 10-32 | 148 |
| Exhibits 51-62 | 148 |
| LAM Exhibit 18 | 158 |
| LAM Exhibit 22 | 160 |
| Exhibits 9, 11, 25 | 180 |
| ECF 3356-6 | 228 |
| ECF 3356-7 | 228 |
| ECF 3356-8 | 228 |
| ECF 3422-4 | 262 |
| ECF 3442-26 | 254 |
| ECF 3442-27 | 254 |
| ECF 3442-28 f | 254 |
| ECF 3442-29 | 254 |
| ECF 3442-30 | 254 |

ECF 3429 262

ECF 3551 303

HOUSTON, TEXAS; WEDNESDAY, JULY 29, 2026; 9:26 AM

(Call to Order)

CONTINUED DIRECT EXAMINATION OF CHARLES MOORE

BY MR. BEREZIN:

Q Mr. Moore, do you still have Exhibit 235? That was the demonstrative on the transfer.

A I do.

Q I just have a few follow-up questions about this document. When did you first review the transfer amounts that are listed on Exhibit 235?

A This would have been in the two weeks or so prior to my declaration being filed on July 14th.

Q And can you just remind the Court the context of who provided this to you and the -- well, first, who provided it to you?

A This was an initial draft was developed by my colleagues at A&M.

Q And I think you testified yesterday about how it was prepared. To confirm, were you familiar with how this document was prepared?

A Yes.

Q And you told us about that yesterday?

A I did.

Q All right. Now, to what extent did you consider the information reflected on Debtor's Exhibit 235, these

groupings and the -- specifically the transfer amounts that are shown in the context of your role as the CEO of First Brands?
A This was part of the overall analysis that I was doing about the business and the business plan and certainly the transfers of cash that went out from the Debtor entities during this time period was relevant as I evaluated not only the business but also the path forward here exiting Chapter 11.
Q And I assume you also reviewed it in connection with your declaration?
A I did.
Q Okay. In terms of these transfer amounts, were they derived from the Debtor's books and records?
A They were.
Q Okay. Is there any aspect of these figures, and you went through the sources yesterday, that did not come from the Debtor's records?
A No.
Q Okay. So, when --
MR. KELLEY: I'm going to have to object, Your Honor. Yesterday we heard ad nauseum where these came from bank records that they obtained from banks and what they went through. I think we need a foundation as to how those became the Debtor's books and records.

THE COURT: Are you talking about the bank records?

MR. KELLEY: Yes. They get them from a third party. I don't know how you characterize them as the Debtor's books and records.

MR. BEREZIN: Okay. They're bank records -- well, let me ask the witness.

BY MR. BEREZIN:

Q Are these bank records of third parties or of the Debtors and their affiliates?

A They are the bank records of the Debtors and the Debtor's affiliates.

Q And how did the Debtors obtain these bank records reflecting information concerning the Debtor's bank accounts?

A Just to clarify, as you just indicated, these are all Debtor and affiliate bank accounts. So, they are accounts owned by the Debtor. The Debtor is entitled to the statements. To the extent that the statements didn't already or weren't already in the possession of the Debtor, we obtained them from banks.

Q And with respect to the supply chain programs, was -- were these figures derived from a record kept by the Debtors?

A Yes.

MR. BEREZIN: Therefore, Your Honor, with that foundation, I think that he can testify that these are the Debtor's business records.

THE COURT: You may proceed.

MR. KELLEY: We have no objection to him testifying as long as he accurately calls them the bank records when they are.

THE COURT: All right. Ask questions and someone can object, then I'll make the call. Keep going. And I understand the point.

BY MR. BEREZIN:

Q So, once you reviewed these as CEO, did you draw any conclusions from them in your capacity as such?

A The primary conclusion was just as it relates to the amount of the transfers that went out under these three columns with different time periods.

Q And those would include the transfers that are listed under the AR factoring, ARF program for Leucadia and Katsumi that are shown for the 90-day period and then for the full period totaling $15 billion and some?

A That's correct.

Q And the same is true of the supply chain programs, the transfers listed for the 90-day period and then for the period that you identified yesterday starting in 2023 for 4.6 billion and some more?

A Correct.
Q And it's also true for Onset that this reflected the amount of the transfers for the 90-day period, also a one-year period, and the full period, which totals about 2.3 billion and then some. Is that correct?
A Correct.
Q And then there are transfers to the insiders. These transfers are identified of the 90-day period, the one-year period, and then the full period, and the full period amounts to about $988 million plus some. Is that correct?
A Correct. I would just note that for the second row on the insiders, the full period includes just one year. So, the one year is --
Q I see.
A -- the same as the full year period or full period.
Q So, in other words, the 90-day number is included as part of the 537 number?
A What I was referring to is on the insiders line where the one-year transfers were 23 million and change, the full period includes only one year for those parties.
Q Understood. Understood. And for the other category, you reviewed the figures listed for the 90-day period and then for the full period amounting to close to -- well, 1.9 billion.
A And change, yes.

Q And the total that you reviewed for the 90-day period of 1.8 billion and the total for one year of 1.5 billion and the full period of 25 billion, those are all figures you reviewed?

A Yes.

Q And what conclusions did you draw about these figures in terms of the Debtor's business going forward and its prospects?

A The -- there was a substantial amount of cash going out the door. However, it certainly seemed to me that the company had really a tremendous need for cash during this time period, was obtaining a substantial amount of cash coming in from a variety of sources in order to be able to make the $25 billion in transfers that are listed here in the demonstrative.

Q In summary, what you saw from your -- the investigation that was done, did you draw conclusions, sort of a summary conclusions, of what that investigation really showed about the Debtor's pre-petition activity?

MS. DEXTER: Your Honor, objection, that it goes beyond Rule 701 that can be (indiscernible) by the witness.

THE COURT: I need to hear it first. I don't -- I don't whether he -- know where he's going with this.

MR. BEREZIN: It's going to be very high level.

THE COURT: If it's -- if it's just kind of

business stuff, I'll allow it, but we'll see where they go.

THE WITNESS: Could you please repeat the question?

MR. BEREZIN: Sure.

BY MR. BEREZIN:

Q Could you summarize just at a high level, based on the investigation of the pre-petition activities, if you yourself reached conclusions about the state of those activities and how they would affect the Debtor going forward?

A Yes. The primary item that, well, one of the primary items that stuck out is the amount of cash coming in from these different sources that didn't really relate to the operation of the business. It was a variety of inflows related to obtaining funding through, as we talked about yesterday, a whole set of means.

But the Debtors were taking in cash from a significant number of sources in excess, well in excess, of the revenue that was being produced from sales to customers.

MS. DEXTER: Your Honor, I would object and move to strike that. I think Mr. Moore just testified that the cash coming in wasn't related to business activities, and I'm not certain how he would know that in his role as a post-petition CEO when he was not there for the petition period.

THE COURT: Why don't you ask him?

MR. BEREZIN: I'm sorry?

THE COURT: Why don't you ask him, Mr. Berezin?

BY MR. BEREZIN:

Q Yeah, what is the basis for your understanding?

A This is, again --

MS. DEXTER: Your Honor, objection to the question was unclear.

BY MR. BEREZIN:

Q What is your basis for understanding, your understanding, concerning the testimony you just gave concerning the ability of the legitimate business to provide and service this amount of cash?

MS. DEXTER: Objection to legitimate business.

THE COURT: Overruled.

THE WITNESS: As I indicated yesterday, one of the first activities that had to be undertaken is an assessment of the viability of the business. Is there a business that is generating cash flow? In order to do that, a very important part of the analysis is the review of historical performance.

And so, I reviewed and my team reviewed historical cash flows, and that is a very important part of this schedule here and the evaluation of the business.

MR. BEREZIN: Thank you.

BY MR. BEREZIN:

Q Mr. Moore, did you have occasion to review -- well, withdrawn. We'll -- why don't we come back to that? Let's go to cover at least a part of 1129(a)(11), see if we can get some of that done before the court needs to break. The -- could you just back up and describe for the Court what your involvement was in determining whether it was reasonable or not to believe that this liquidating plan can ultimately satisfy the conditions for effectiveness, specifically related to administrative, the payment of administrative claims in full in cash and full priority claims be paid in full in cash within the required time period?

A First is my understanding of the need to have those expenses or those claims, I should say, the administrative and priority claims paid in full. In order to do that, we first worked on an estimate of what the amount of administrative and priority claims would be. There was an entire process that was undertaken to do that.

And then using those amounts, looking at the waterfall from the litigation trust and the amounts of proceeds that would need to come in in order to satisfy those claims based on the estimate of the amounts.

Q So, let's focus on the estimate of administrative and priority claims, just high level. First of all, what was

your involvement in that effort?
A I had heavy involvement in that effort. We have been estimating claims throughout this entire time period, going back to even just before the petition date as part of some of the first day motions that were filed where the Debtor sought relief, such as critical vendor and other -- seeking authority to pay other pre-petition amounts.
So, all the way back to prior to the petition date, I was intimately involved in reviewing these numbers. Throughout the case, we have, and I specifically, have looked at accounts payable information.
I have been intimately involved in all of the cash forecast development where projected expenses were developed as well as sources of those cash or the needs. And then on top of that, as we got further along and came closer to putting a plan on file and then eventually putting a plan on file, continuing those analyses, but adding even more rigor to those to develop the best estimate of administrative and priority claims that we come up with.
Q So, focusing first on the administrative expense claims, can you -- and the 502(b)(9) claims, can you describe how those -- how -- what was the process methodology that you utilized to estimate the, let's just start with the administrative expense claims?
MR. MENNITT: Objection, Your Honor. I think this

calls for expert testimony on an area the witness is not an expert in.

MR. BEREZIN: The witness has already established the factual knowledge to provide him with the foundation to provide this testimony. I think this is -- would be the type of testimony permitted as lay opinion, given his position as former CRO, all of his experience as a CRO, and then his experience and position as CEO, specifically, as he -- as he just testified, extensive involvement in these types of estimates that underlie the estimates here.

THE COURT: Can you ask the precise question again?

MR. BEREZIN: I was just going to ask him how the estimate of administrative expense claims was developed.

THE COURT: I think that's a fair question, how the estimate was done.

MR. MENNITT: Your Honor if I could just clarify my objection.

THE COURT: Yes, of course.

MR. MENNITT: So, the administrative expense numbers that they're using are as of July 6th, and they're assuming that they're going to be able to disallow some of them, and that -- and they're assuming what will happen in the future because there's been no bar date.

And so that's the nature of my objection. He's

really offering a legal conclusion as to what's going to happen with all that.

THE COURT: I think as of right now, we're just at how did he develop the admin claims, and we'll take it one step at a time.

THE WITNESS: I'd like to start with the 503(b)(9), if we could, Mr. Berezin.

MR. BEREZIN: Absolutely.

BY MR. BEREZIN:

Q How was the estimate for the 503(b)(9) claims developed?

A Prior to the petition date, as part of our first day motions, we estimated what the amount of goods received in the 20 days prior to the petition date may be, and that was -- the amount was $45 million.

In the ordinary course of a Chapter 11, we track very closely any payments going out the door pursuant to first day relief. And so, throughout this process, we've paid approximately $7 million in 503(b)(9) claims.

And so, taking the original $45 million estimate and subtracting from that the $7 million that had been paid, that resulted in $38 million remaining.

Q And is that the Debtor's estimate of the 503(b)(9) claims?

A Yes.

Q And how did you develop the estimate for the administrative expense claims?
A For the administrative expense claims the, similarly, we, being the Debtors and specifically the A&M team, track all vendor invoices and payments. There's been an entire vendor management team that's been in place since the time of the filing. We believe that we have very good records as it relates to all of the outstanding post-petition accounts payable.
And so that amount serves as the basis for the Debtor's estimate of administrative claims, and specifically that amount is approximately $147 million.
Q Are there other components of the administrative expense claim or the 503(b)(9) claim estimate?
A Yes.
Q Can you explain what that other element is?
A The other item, just to provide even further cushion, we do believe that there's cushion in the $38 million number that I mentioned, as well as the $147 million number. But then on top of that, we added a further 20 percent cushion, which is approximately $37 million on top of the sum of 38 million and 147 million.
Q And so, for my benefit, what does that add up to?
A All in between the 38 million, the 147 million, and the $37 million additional cushion or contingency, it's $222

million.

Q And can you explain the reasons for the 20 percent cushion that was added?

MR. MENNITT: Objection, Your Honor. Again, for the witness to say how he came up with this cushion means that he's making -- drawing a legal conclusion about what's going to happen with administrative expense claims.

THE COURT: I'll overrule that. I don't think that's a legal conclusion. It's just saying you added 20 percent, why'd you do it?

MR. BEREZIN: Yeah, that's the question.

THE COURT: I'll overrule. You can answer.

MR. BEREZIN: Thank you, Your Honor.

THE WITNESS: Recognizing that there has not been a bar date, but having confidence in the numbers that we're using, I felt that it was appropriate to add some level of cushion onto it. And so, a decision was made, and certainly I was behind this decision, to add an additional 20 percent contingency on top of those estimates.

MR. BEREZIN: So, thank you, Mr. Moore.

BY MR. BEREZIN:

Q So, can we talk about how -- to what extent were filed administrative expense claims considered?

A This is an important part of the analysis that was done. There were a number of data points that were utilized

as part of this estimate. And so, there are claims that have been filed, both 503(b)(9) claims, as well as other claims.

And on the administrative side, we have both proof of claim forms that have been filed, but other parties have filed motions with the Court related to what they believe are administrative claims.

All of those items, so the proofs of claim that have been filed, as well as other filed claims were taken into account as data points as part of this analysis.

Q And just to clarify, I'm assuming that -- first of all, what is the date as of -- this analysis reflects, or the results of the analysis reflects your estimate as of a certain date. Which date is that?

A We have done this analysis multiple times, but I believe the most recent claims register information that was utilized was as of July 6, 2026.

Q Okay. So as of that time, you are -- you just referenced filed administrative claims as well as motions. How -- and you said they were utilized as data points?

A Yes.

Q Can you explain how they were used?

A It is important to understand what parties have filed as we evaluate the adequacy of our estimate. And certainly, with the many, many Chapter 11 cases that I've been in, I

know that claims that are filed are not always valid or accurate. And so, I asked my team to review this claim information.

Q And do you recall the amount of proofs of claim of -- well, of both administrative claims and priority claims? Do you recall the amount?

A I don't recall the exact amount for either of those. The process that we utilized, though, was to take the claim amounts and identify the obvious issues, duplicate claims, things that were just on their face, clearly issues, to be able to narrow those down.

Q Does it refresh your recollection that there was about 103 million of filed proofs of claim asserting 503(b)(9) claims by -- as of the July 6th date?

A That's correct.

Q Okay. And do you recall what that -- the process of looking at some of those claims for, I guess, low-hanging fruit, what resulted from that analysis?

A I think that is a good description because, again, this was really more of just on the face, are any of these claims invalid? And the result of that is to narrow down the amount of 503(b)(9) claims to about $11 or $12 million.

Q And on the administrative expense claim side and the priority claims that were filed on the docket as of July 6th, does it refresh your -- first of all, do you recall

what number, dollar amount, those claims added up to on their face?
A I don't recall the exact amount, but just to complete my previous response, so the $11 or $12 million would be compared to the 38 plus almost an additional $8 million of contingency. So that $11 or $12 million is compared to almost $46 million that we've included in our estimate for the 503(b)(9) claims.
Q I see. So how did you account for, just to be specific, how did you account for that $11 million, or did you view it as already with -- represented by or captured by your estimate?
A It was already captured by our estimate.
Q Okay. And just similar questions, does it refresh your recollection that the filed proofs of claim asserting a priority or administrative expense claim on the docket as of the July 6th date were about asserted amounts about $63 million?
A That sounds about right.
Q And can you just explain how -- what your evaluation was of those claims and how it fit into your overall estimate?
A This was a similar exercise in terms of just looking at the, I'll use your expression, the low-hanging fruit, to reduce those amounts. And this one was -- essentially, what

we got down to is looking at our $147 million estimate, recognizing that some of those claims that have been filed, whether it's through a proof of claim or through a motion, there are disputes over those amounts.

So, setting aside those disputes, looking at the amounts that remain, and then understanding or confirming that those amounts that remain are well within, in fact, well below what we've included in our estimate.

Q Okay. Let's turn -- you may have covered, just to make sure, have you also covered the 503(b)(9) file claims that were on the docket or in the claims registered by July 6th?

A Yes.

Q Okay. That's what I thought. I just wanted to make sure. Okay. So, after July 6th, in this period leading up to the confirmation date, can you tell us whether you're aware of additional motions or other asserted administrative expense claims or 503(b)(9) claims that have been filed?

A I don't know of total amounts. I know one motion was filed, I think it was last Friday, by GLAS, the administrative agent for the Carnaby II and Carnaby III financings with CarVal. So that was filed. I don't know if there were other ones filed on top of that.

Q And has -- are you familiar with whether an analysis has been done, at least a preliminary analysis of that GLAS claim?

A Yes.

Q And what was your role in that?

A This involved, number one, getting an understanding of what was being asserted and then discussing it with both my team as well as Weil.

Q And can you tell me how that amount or that claim affects your estimate if it does?

MR. MENNITT: Objection, Your Honor. It calls for a legal conclusion. I think what they're asking is what the witness thinks that claim will ultimately be allowed at.

THE COURT: I don't think that was the question, but Mr. Berezin maybe you can clarify what the question is.

MR. BEREZIN: Sure.

BY MR. BEREZIN:

Q Without delving in any way into legal conclusions or assumptions or anything else, just from a business perspective, how do you evaluate that claim specifically as it relates to whether this estimate that you've testified to is still adequate?

MR. MENNITT: Objection, Your Honor. Again, the witness testified the basis for his understanding on that, this includes conversations with Weil.

MR. BEREZIN: I don't believe that the witness testified to that.

THE COURT: Yeah, I don't --

MR. BEREZIN: I'm not asking for that.

MR. MENNITT: He said he worked with his team and with Weil.

MR. BEREZIN: And I'm asking for only the business understanding, not his discussions with Weil.

MR. MENNITT: I don't see -- Your Honor, with all due respect, I don't see how the witness can possibly separate that.

THE COURT: Let's find out if he can. Can you separate? Can you answer the question without providing an understanding?

THE WITNESS: I can, Your Honor.

THE COURT: Let's hear it. I'll allow it. We'll see where it goes. But if it opens doors, it opens doors.

BY MR. BEREZIN:

Q Could you then answer the question without reference at all to any legal discussions and just focus on your business understanding of whether that filed claim by GLAS impacts the validity of your estimate for administrative expense claims?

A There are disputes related to this collateral that I have been aware of since the petition date. The claims that CarVal is asserting in this collateral, I'm well aware of how this collateral moves through the various steps for the inventory to be completed, how it moves from Mexico to the

United States.

This is all information that I spend time and have spent time with a couple of individuals on my team throughout this entire case, both back when adequate protection stipulations were being negotiated, as well as getting into the January time period when production was ceasing and inventory stopped moving.

So just from a business standpoint, working specifically with the A&M team, it starts with my understanding of not only the product flow, but the nature of the disputes that exist in claims that parties have asserted.

Q And based on that understanding, were you able to determine if your estimate remains, in your view, a reliable one?

A Yes.

Q And what is your response?

A That the estimate of the administrative claims that we have made remains reliable.

Q Okay. Are you aware of any other claims, be they on the claims register or in motions, that would, again, impact, affect the reliability of the estimate that you've given for administrative expense claims and for 503(b)(9) claims since the July 6th time period?

A No.

Q So, let's turn to priority claims and the priority claims reconciliation process. So, first of all, can you provide your -- describe your involvement in the, ultimately, the estimate that was derived with respect to the priority claims?
A These relate to priority tax claims, and I've been involved in discussions with tax colleagues of mine, going back actually even prior to the petition date, as estimates were developed for potential tax payments.
And then there has been a significant amount of activity throughout the last almost 10 months or approximately 10 months related to taxes.
Q And so as to priority proofs of claim, how -- what information was considered or data considered to determine what the existing proofs of claims had been filed on a claims register?
A I'll actually start with the analysis that the Debtors did. Again, based on all of this tax information, we believe that there's approximately $65 million that may be priority tax claims. Similar to what we did with the 503(b)(9) and admin claims, we added a 20 percent contingency to that to take up the total amount to 78 million.
So that is the Debtors' estimate of priority tax claims. Similar to the administrative expenses, using as a

data point, we looked at what proofs of claim had been filed and did analysis on those.

Q Can you describe that analysis?

A Similar to what I see in many cases, the proofs of claim seem to be placeholder claim filings without any sort of substance behind them at all. And so it was, again, important for us to look at that. There was no new information, however, as part of the proofs of claim that would cause us to revisit the $65 million plus 20 percent contingency.

Q Okay. And is the same true for any motions that had been filed, if any, for priority claims? Go ahead.

A Yes.

Q Can you just briefly describe what the process was to review those priority claims in order to make that determination?

A Going back to my previous response, there has been a lot of time spent on taxes. And this is all sorts of taxes. So, it can include federal income taxes, income or taxes related to other jurisdictions, local taxes. So, there's been a lot of time spent estimating what the potential tax liability may be and what priority tax claims may exist.

So that was a very extensive and ongoing effort that served as the basis for coming up with the estimate.

Q So, does that take into account all of the information

you looked at to develop the estimate of priority claims up to that July 6th period?

A It does.

Q Okay. So, since July 6th, has any information come to light that's just, let's start with just relevant to the priority claims estimate?

A Not that I'm aware of.

Q Okay. So, do you continue to view that estimate as reliable?

A I do.

Q Now, I just note with post-petition administrative expense claims there is no bar date in this case. I think you may have testified to that yesterday.

A Correct.

Q And for focusing, first of all, on 503(b)(9), have you -- have you considered what 503(b)(9) claims might be filed in the future and the likelihood of that --

A I have.

Q -- based on your understanding of the business?

A I have.

Q Can you explain?

A We are now -- the petitions were filed at the end of September so we're basically 10 months, almost exactly, away from the petition date. There were significant negotiations going on with vendors starting just prior to the petition

date, but certainly over the several months following that while the operating units were still going.

And so, in that regard, I expect that most parties that will assert 503(b)(9) claims have had a long time to be able to do that. And as I mentioned, once you take out the facially deficient proofs of claim, the amount that we're left with is fairly small at this point.

It still could be the case that someone could file a claim but in light of the fact that, again, these discussions are going on 10 months old and there are no more operating businesses at all, so the Debtors are not receiving any product from any supplier at all anymore, it certainly seems to me that there is a good chance that there may not be any more 503(b)(9) claims filed.

Q And with respect to administrative expense claims, I understand that the business operations have ceased, but what about the payables that may or I'm sure did arise since the period, let's say, from January until all operations shut down? Could those vendors come forward with significant administrative expense claims?

A We have been operating on a cash-in-advance or cash-on-delivery basis with almost all of our vendors for a long time now. So, these are vendors of goods and services.

The budgets that we put together, the cash forecasts, and the funding that we get essentially operate on the

assumption that we have to pay immediately for any goods and services that we receive.

The $147 million estimate of unpaid post-petition accounts payable, we've run this number multiple times. The number does not seem to be changing. So, in addition to there being an underlying assumption in our cash forecasts that we're going to be operating on a COD or CIA basis, the numbers seem to suggest that's how we have been operating as well.

And so, from that standpoint, I don't expect that there is going to be any additional expenses incurred, leading to post-petition payables or administrative claims that aren't paid immediately.

Q Thank you.

MR. BEREZIN: Your Honor, this may be a good breaking point.

THE COURT: Okay. Why don't we take it's 10:18, do you want to come back at 10:30?

MR. BEREZIN: I'm sorry, I forgot, Your Honor. When is your -- I think, is that at noon?

THE COURT: No, I think I'm good today at noon.

MR. BEREZIN: Okay.

THE COURT: It's tomorrow.

MR. BEREZIN: Okay.

THE COURT: Yeah, tomorrow we'll start at 10:00

a.m. and then I have stuff at noon. But today, noon is just noon.

MR. BEREZIN: Okay, great. So, 15 minutes would be great, I'm sure.

THE COURT: All right. It's 10:20, why don't we start at 10:35? Thank you.

MR. BEREZIN: Okay.

THE COURT: All right. I'll remind you; you're still under oath.

THE WITNESS: Yes, sir.

THE COURT: (Indiscernible) statement.

THE WITNESS: Understood.

THE COURT: All righty. I am going to leave my coffee up here.

(Recess)

THE COURT: Okay. We are back on the record in First Brands. Mr. Moore, you're still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: My camera is turned on. Mr. Berezin.

MR. BEREZIN: Yes, Your Honor.

THE COURT: You may proceed.

MR. BEREZIN: Thank you, Your Honor.

BY MR. BEREZIN:

Q Mr. Moore, have you had the opportunity to review First Brands Group's pre-petition audited financial statements?

A I have.
Q Do you recall whether -- which years you were able to review?
A I think I reviewed four years. The last year that was prepared was for the year that ended around December 31st of 2024. The fiscal year end is slightly off from the calendar year end, so probably '24, '23, '22, and '21.
Q And can you explain the reasons why you reviewed those financials?
A The -- it's a pretty typical step that I do when I get involved in a matter. I request financial statements where available in audit report so I can review the financials, review the footnotes, understand not only the business but any items that are contained in those financial statements.
Q And during the course of your engagement with -- at First Brands and specifically after you became CEO, did you have occasion to re-review those financial statements?
A I have not reviewed them recently, but certainly at various times I may have gone back to them.
Q And when you reviewed them, did you find anything unusual in your review?
MS. DEXTER: Objection, Your Honor. We're beyond the scope of permissible opinion testimony by this lay witness.
MR. DUKE: I'll also add an objection to, again,

testifying to the content, which I believe is what this question is calling for. If he wants to put -- if we wants to have that document in, he should put it in.

MR. BEREZIN: Happy to cure that one, Your Honor.

THE COURT: Huh?

MR. BEREZIN: I have the --

THE COURT: Yeah, I know. I do think he can't testify about any document that's not in evidence, but if you want to proceed with that, we can go with that.

MR. BEREZIN: Okay.

THE COURT: I'll see where it goes.

MR. DUKE: Thank you, Your Honor.

MR. BEREZIN: May we approach?

THE COURT: Yes.

MR. BEREZIN: So just housekeeping while we're passing these around. So, this -- the next two exhibits, it's actually one exhibit, Exhibit 230. It was on our exhibit list and is on our exhibit list, but it was for some reason not properly uploaded. So, we're having that put on the docket. Just so for the record, I will identify it as Debtor's Exhibit 230. It has bates numbers of FBU_CHI_0010357323845 And we will be looking at just two of those audited financial statements.

The first is the -- includes the year ending 2023. For the record, that's at FBG_CH1_00103804200103845. And

then for 2024, it's FBG_CH1_0010363323678.

(Debtor's Exhibit 230 marked for identification.)

BY MR. BEREZIN:

Q Mr. Moore, do you recognize what's been marked as Debtor's Exhibit 230 and specifically the excerpts that have been provided to you?

A Yes.

Q And can you identify what those are for the record?

A This is the audit report for the year ended December 28, 2024, which also includes the information for the year ended December 30, 2023.

Q And are these the company's records, their financial statements?

A Yes.

MR. BEREZIN: Your Honor, we would offer the -- First Brands' financial statement at Defendant's Exhibit 230. Not for the truth of what's asserted, but rather that they are the company's audited financials.

THE COURT: Any objection?

MR. DUKE: I just I don't believe we have them. I have 2022 and 2023, do we have 2024 as well? Just 2020 --

UNIDENTIFIED SPEAKER 1: This is 2023.

MR. DUKE: Okay, I see.

UNIDENTIFIED SPEAKER 1: We're getting more printed.

MR. DUKE: Understood. I saw this is 2024 and 2023. Understood.

THE COURT: Okay.

MR. BEREZIN: So, you have you have what you need?

MR. DUKE: Yeah, I think we have it. This is 230. The one you just introduced.

MR. BEREZIN: Yes, 230. Okay.

THE COURT: Okay, it's admitted, Debtor 230 is admitted.

(Debtor's Exhibit 230 entered into evidence.)

MR. BEREZIN: Okay.

BY MR. BEREZIN:

Q So, my question to you, Mr. Moore, is based on your review, did you notice anything unusual about the financial statements that are in front of you?

MS. DEXTER: Your Honor, I object. Unusual is a conclusion by this lay witness for a period before he was the interim CEO of First Brands. That requires a judgment call to be made using his experience that Your Honor has ruled that he can't.

MR. BEREZIN: He was CRO at the time he reviewed them and then he testified that he went back and had an opportunity to look at them again as CEO. So, in both capacities, we believe --

THE COURT: I'll allow the -- I'll allow the

answer, but we'll see where it goes. We may cross into the land. We may not get into the land. But did something strike him as unusual, I don't think he's -- I think it's -- I'll allow it.

BY MR. BEREZIN:

Q Okay, so please answer the question if you can.

A One of the items that was noteworthy is just on the company's balance sheet the -- it was especially relevant around the time of the filing and shortly thereafter. The capital structure that was disclosed as part of the filing certainly was different than what the company's balance sheet presented in this audit report.

Q Anything else?

A There are a variety of things that I would have expected to be in here in the notes that I did not see in the notes. And I believe that one of those items relates to the existence of the special purpose entities.

Q And are you referring to the Onset entity?

A Yes.

Q And why would you have expected to see that?

A Based on how those three SPVs operated. So, this is Carnaby Inventory I, Carnaby Inventory IIII, and Carnaby FA, that at a minimum there would be disclosure.

But it seemed to me, just based on my knowledge of accounting standards, that they may need to be consolidated.

MS. DEXTER: Your Honor, I move to strike that last answer (indiscernible).

THE COURT: The last portion will be stricken, but I think he can testify that he didn't see it there and he found it odd that it wasn't mentioned. I think that's -- it's just not there if we flip through it. So, I think that works, but I'll strike the conclusion that was reached on consolidation issues. You may continue.

MR. BEREZIN: Thank you, Your Honor.

BY MR. BEREZIN:

Q And did you, in your review, notice any inconsistencies within the balance sheet, for example, and the operating income or the statement of cash flows?

A Yes. So, the balance sheet displays total assets of nearly 7.9 billion, and there is a member's deficit, meaning that the liabilities exceed the assets. And this is just on the face of the balance sheet that is presented here in this audit report.

Q Can you clarify what year you're looking at?

A Yes, the -- this is for the year ended December 28, 2024. Total assets are 7,800 --

THE COURT: Hold on. Can you give me a second to get there?

THE WITNESS: Yes.

THE COURT: What page are you on?

THE WITNESS: This is on Page 6 of the 2024 audit report.
THE COURT: Do I have 2024?
MR. BEREZIN: I hope you do, Your Honor.
THE COURT: All right, just give me a second.
MR. BEREZIN: Take your time, Your Honor.
THE COURT: Okay, thank you.
THE WITNESS: On Page 6, total assets for December 28, or as of December 28, 2024, are 7,888,147,000. The total liabilities are greater than that. And so, the second line to the bottom is the total member's deficit, which is 349,309,000.
BY MR. BEREZIN:
Q And in lay terms, what does that mean?
A This means that the liabilities exceed the assets of the business.
Q By about how much?
A By nearly $350 million.
Q Were there any other items you noticed between the balance sheet or the income statement or the cash flows that sort of jumped out at you?
A Yes, on the income statement. So, this is on Page 7 of the 2024 audit report there is a loss shown for that year of approximately $28 million.
Q And why did that catch your attention?

A That is, when we look at the comprehensive loss here, that is also noteworthy because there is a loss that exists rather than comprehensive income.

Similarly, on the statement of cash flow, which is on Page 9, there are different categories of cash here. It displays positive cash flow from operations and then a substantial amount of new cash coming in from financing activities. Overall, the change in cash is approximately $25 million for that year.

Q And can you explain why that jumped out at you?

A The business was taking in more money in terms of borrowings on long-term debt, a substantial amount, almost $1.6 billion. And that was just based on the liabilities reflected on the balance sheet, which is a substantial amount of money and in excess of the amount of the business acquisitions that were done.

Q Is there anything else that struck you as unusual?

A As we got more and more into the adjustment files that I identified yesterday, which included bridges from reported financials to back to the original transactions, it certainly was noteworthy in terms of what was in the audit report versus what was contained in the bridge files.

Q Thank you.

MR. BEREZIN: Your Honor, may we approach the bench, if you'd like a copy, and the witness as well?

THE COURT: Okay. Thank you.

BY MR. BEREZIN:

Q Mr. Moore, I put before you what's been marked as Debtor's Exhibit 75. And I'd ask you first if you recognize this document.

A I --

MR. CASSEL: Objection, you answer that.

MR. BEREZIN: I haven't even gotten it yet, give me a second.

THE WITNESS: I do.

MR. BEREZIN: Okay.

BY MR. BEREZIN:

Q Without getting into the contents, can you just identify what it is?

A This is a chain of emails. So, there are two emails. The first one originates from an individual with Leucadia on Friday, January 13, 2023, to Ed James. And there are a couple of people copied from, I believe, Leucadia, even though they have Jeffrey's email domain addresses.

And then a reply from Ed James on Saturday, January 14, 2023, to the same individuals.

(Debtor's Exhibit 75 marked for identification.)

MR. CASSEL: Okay, the objection is he has no personal knowledge of any of this.

THE COURT: I think he's just identifying --

MR. BEREZIN: So far, we just identified.

THE COURT: -- what it is at this point. We haven't gotten there yet.

MR. BEREZIN: I'm about to get there. Your Honor, the Debtors seek to enter Defendant's Exhibit 75 as a document that evidences knowledge, and not for the truth of the matter asserted, and believe it's admissible, therefore is non-hearsay.

MR. CASSEL: Objection.

THE COURT: Admissible under what rule, just so we're clear?

MR. BEREZIN: It is admissible under -- bear with me for a moment.

THE COURT: Or which exception to the hearsay rule or are you saying it's just non-hearsay? I just want to -- just so that they can respond accurately.

MR. BEREZIN: I had it, Your Honor, all ready. Bear with me for one second. I got it, Your Honor. Yes, please. All right. Your Honor, 801(d)(2), effect on the listener.

THE COURT: You said 801(d)(2)?

MR. BEREZIN: Yes, Your Honor.

MR. CASSEL: So, Your Honor, I guess Mr. Kelley can make that objection. I guess I can't if he's saying it's a statement of an opposing party, but any of the other

objectors can stand up. 801(d)(2) relates to an opposing party statement. I guess I technically am, but --

THE COURT: Yep.

MR. KELLEY: But I lodged objections to these correspondence and I'm happy to take on that objection as well if Your Honor's (indiscernible).

MR. BEREZIN: I also believe effect on the listener or knowledge applies. But I am still searching for that rule, which has escaped me.

THE COURT: We're talking 801, like, D as in dog, too, correct?

MR. BEREZIN: Yes, Your Honor.

THE COURT: Okay.

MR. KELLEY: What's that?

THE COURT: No, no, I was just clarifying the rule. I wanted to make sure. All right, let me hear the response.

MR. CASSEL: I'm not sure it's being offered against me. To the extent it is Mr. Kelley can make the same objections.

THE COURT: Okay.

MR. KELLEY: I -- the exception that was identified is that the basis for it being offered is against a party. This isn't an admission of party opponent issue in a litigation. We've heard ad nauseum from the Debtors

they're not looking to litigate each of these claims. They are offering it for a different purpose, which is to support their claim. This is not being offered in some way, shape, or form against a single party.

And every other party at this table has the same substantive opposition to its admission. So that exception would not apply to it. In addition, I'll wait and respond if the Debtors make their articulation of what they're contending the notice issue is, but I'm going to reserve until I hear exactly what they say.

THE COURT: Why don't you just finish with all of them, and then they can respond all at once? I just don't -- I'd rather just do it all at once.

MR. KELLEY: Yes.

THE COURT: So, you're saying 801(d)(2) does not apply in a contested matter when there's not a statement against interest?

MR. KELLEY: This exception specifically doesn't apply in this particular proceeding given the posture of the person.

THE COURT: Right, that's what I'm saying, because it's a contested matter not involved -- not the actual litigation.

MR. KELLEY: Involving multiple opposed parties. But they're not really offering it to try to prove something

as to Leucadia specifically. They're trying to put it in for the purposes of trying to support the act, as Your Honor used the phrase earlier, the aggregation of claims in the trust. And that's a different purpose.

And fundamentally, on the notice issue, if you're going to give a document to a witness and say, can you prove its receipt or its delivery, which is the only purpose for notice, then they can't rely on its content. It might as well be a blank content.

But that's not what they're doing. They're going to say, you're going to get notice of the substance within it, which is what the hearsay rule prevents.

THE COURT: All right, Mr. Berezin.

MR. BEREZIN: Yeah, Your Honor. So, we offer it both. I think that in a circumstance here, where you have a party, Leucadia, actively arguing against an opposing confirmation on the grounds that they did or did not have notice of certain facts, that the admission against interest rule does apply, number one.

And number two, the rule is that I was -- escaped me, was 801, FRE 801(c). Documents --

THE COURT: Hold on, you added one there. I didn't know about the C. I thought we were going under 801(d)(2).

MR. BEREZIN: I was hopefully clear that I was --

THE COURT: No, no, I wasn't. I was taking notes here.

MR. BEREZIN: Okay, sorry about that. Yeah, so 801(c), documents and statements offered to prove a party's knowledge or notice is not hearsay because they are -- they are not offered to prove the truth of the matter asserted, and that would be why we are offering this document.

MR. CASSEL: And so, Your Honor, on that point, Mr. Moore was not a party to this conversation. He doesn't have personal knowledge of it. As far as I can tell, this was provided to him by other people, and so there's a double hearsay problem, which is, where did he get this email?

MR. KELLEY: And I have a separate argument, which is, it's being used in a record against me and against Onset and against (indiscernible) and against --

THE COURT: How is it being used, just so I'm clear -- and maybe I don't -- you would know better than I would, so I shouldn't -- I think that's an unfair question for me to ask you. I don't see your client on it. That's what made me think, I don't know how it's being used against you.

MR. KELLEY: The purpose for which it's being offered, Your Honor, is only relevant if they're attempting to use it to bootstrap in what the bundle of claims in the litigation trust is worth or somehow to serve a foundation

for that. We are on the record of having opposed almost every aspect of that litigation trust.

So, if they're using it as evidence in support of an issue, we're clearly on record objecting to it.

THE COURT: So, let me -- let me give you a -- let me give you a -- there's a party named here who filed an objection to the very confirmation hearing that we are, right?

And so, now we have a confirmation hearing where they're objecting on very points on the motion that appeared through counsel. So how is it not a -- how do I not admit it under 801(d)(2) as an --

MR. KELLEY: As a -- sorry?

THE COURT: Under 801(d)(2). How do I not admit it as a -- as a non-party statement when that very party has filed an objection to the very confirmation hearing?

MR. KELLEY: That's what the hearsay rule is intended to protect, Your Honor.

THE COURT: I'm not talking about intent. I'm talking about text.

MR. KELLEY: The text of it expressly says --

THE COURT: Let's go to the rule and read it.

MR. KELLEY: Right.

THE COURT: Let's not argue words, let's just argue the actual words.

MR. KELLEY: Thank you, Your Honor. Happy to do it.

THE COURT: I feel better with words sometimes.

MR. KELLEY: The statement is offered against an opposing party. This is not being proffered against them. It's being used as a basis for an attempt to admit it. If you're saying that their objection, Your Honor, is specifically what they're going to be using it against --

THE COURT: I don't know what they're using it for against. That's what I'm saying. The question is it being -- the statement is offered against a party opponent, right, that's what the text says.

So, we're reading beyond what the words say. That's where I'm going.

MR. KELLEY: And --

THE COURT: Now, I think a better argument, or a different argument, I should say, is that there's a person named here. There are folks named here who are copied on this, who are named on this email that aren't here.

MR. CASSEL: And --

THE COURT: So maybe the top portion comes in, but maybe the bottom doesn't.

MR. CASSEL: Well, and they then have to satisfy A, B, C, D, or E, as I understand it, even if you were to get past the introductory --

THE COURT: Oh, I'm with you.

MR. CASSEL: They're going to have to establish the individual representative's capacity or was manifested or adopted to be true, was made by a person whom the party authorized to make the statement, was made by the party's agent or employee, in a matter within the scope of that relationship, and while it existed or was made by the party's co-conspirators during and in furtherance of the conspiracy.

So, I haven't heard anything that's been laid that establishes any one of those exceptions.

MR. CASSEL: And, Your Honor, I'll just say the top email is an email from Mr. Ed James to individuals at Leucadia, if this is authentic and all that, and that certainly is not a statement about us.

THE COURT: That's what I'm saying, right?

MR. CASSEL: Yeah.

THE COURT: Well, the problem is he's not a party opponent.

MR. BEREZIN: We're not seeking to omit that portion of the exhibit, Your Honor, if that helps.

THE COURT: So, what I'm trying -- in other words, that can't --

MR. BEREZIN: What we're seeking to --

THE COURT: Hold on a second.

MR. BEREZIN: -- just to be --

THE COURT: Hold on a second.

MR. BEREZIN: Sorry, Your Honor.

THE COURT: I'm just looking at text. It's a party opponent. I don't have a -- just you have to identify the party opponent, or you're going to have to tell me 801(c)(2) works, and then it works. And I'm not just following -- I'm just taking it one step at a time.

MR. BEREZIN: Your Honor, we seek to introduce --

THE COURT: Which email -- which email are you using?

MR. BEREZIN: Yes, Your Honor.

THE COURT: Then tell me the basis.

MR. BEREZIN: Okay.

THE COURT: So, 801(d)(2) is not going to work as to the top email or the email under that because I don't have a party opponent. And I know that that individual is named in other litigation, and that person is not, to my knowledge, standing up opposing plan confirmation.

MR. BEREZIN: Under --

THE COURT: Unless they're here and they filed an objection.

MR. BEREZIN: Understood, Your Honor. So, if I may, Debtor's Exhibit 75 is sought to be admitted solely with respect to the email that is sent by Leucadia.

THE COURT: Hold on, which one? On Page 1 or Page 2?

MR. BEREZIN: It's on Page 2.

THE COURT: From that individual to these individuals.

MR. BEREZIN: Within Jeffries, which is an affiliate of Leucadia. And that's the party opponent. And the focus of all the questions I had was on that second page, content of the second page.

MR. CASSEL: In that case, Your Honor, I'm not sure what the bottom email -- they wanted -- just so I'm clear, they want to admit the email asking questions? That's the request?

THE COURT: I don't know, that's what I'm trying --

MR. BEREZIN: Well, we seek to admit --

THE COURT: I'm just trying to -- I'm just trying crystallize it so that we can --

MR. KELLEY: Your Honor, I didn't fully understand Debtor's statement. Are they saying they only need the bottom email and don't need the top one?

THE COURT: I'm trying to -- that's what I'm trying to find out.

MR. KELLEY: I thought that's what they said.

THE COURT: That's what I'm trying to find out.

MR. BEREZIN: Yes, Your Honor. We're seeking to introduce the email that is slightly on the end of the first page, running over to the second page, against a party opponent. And that's the portion of this document we're seeking to admit at this -- at this juncture.

MR. CASSEL: Your Honor, I think we probably should take a break to look at how the party opponent rule works in this context. I agree that I may be a party opponent, but the issue -- the matter at issue, what they're trying to use this for, and this is from their declaration, but they're trying to show the element of the case they're trying to meet is the plan is feasible because they have lots of --

THE COURT: Yeah, but that's what I'm saying. I don't want to do this while the witness is here and --

MR. CASSEL: Yeah, it might be better for us to take five or ten and look at -- and look at the issue of how --

THE COURT: And I can --

MR. BEREZIN: And Your Honor --

THE COURT: I'm more than happy -- I'm more than happy to do that because I'll need to -- I want to look at the rule again. But what I am trying to establish on the record is exactly which email you want to get in, what the basis for it is, what the objection is.

So, if you're going 801(d)(2) -- if you're going 801(c). If you're going 801, excuse me, (d)(2), if you're going 801(c), if you're going whatever it is, I just want to know so that then we can have a clean record as to what it is that you're moving in and why, and why you think it's either hearsay or not hearsay, what the objection are -- what the objection is or what they are, and then I can then rule.

MR. KELLEY: I'm not sure still I fully understand the Debtor's position.

THE COURT: No, that's what I'm saying. I want to start with Debtor's position. What email are you trying to get in, what rule you're going under, and then you all can understand it. Just do it all at once.

MR. BEREZIN: Thank you, Your Honor.

THE COURT: That way, when I think about it, I'm thinking about the right thing. All right, Mr. Berezin, there is an email, it's two pages.

MR. BEREZIN: Yes.

THE COURT: There's a top portion of it, and then there seems to be another email from what I would call a Jeffries individual to two people -- to a different set of folks or to a set of folks. Are you looking for just that bottom portion with the stuff on Page 2?

MR. BEREZIN: That's correct, Your Honor. It's

right there.

THE COURT: And you're saying it's an exception to hearsay or non-hearsay, and the rule that you're citing is what?

MR. BEREZIN: It's --

THE COURT: And then I'll let them respond.

MR. BEREZIN: Sure. It's non-hearsay under 801(d)(2). The statement is being offered against an opposing party, here Leucadia, and that statement was made by an individual --

THE COURT: No, no, no, I just -- I just want rule.

MR. BEREZIN: Okay, 2(a).

THE COURT: 801(d)(2)(a)? No, 801(d)(2).

MR. BEREZIN: 801(d)(2).

THE COURT: Okay.

MR. BEREZIN: And --

THE COURT: No, what is the --

MR. BEREZIN: Yes.

THE COURT: Oh, so you're using the A because it's in the disjunctive is what you're saying.

MR. BEREZIN: It is in the disjunctive.

THE COURT: It's A, B, C, D, or E, so you don't have to qualify all of them. Okay, 801(d)(2)(a).

MR. BEREZIN: And also, C would also apply as

well, but as an alternative. And so would D as an alternative. We're not utilizing E.

THE COURT: Hold on. I just want to make sure that I'm -- I was writing it down. A and C, 801(d)(2)(a) and C?

MR. BEREZIN: A, C, and D.

THE COURT: A, C, and D. And it is -- and the party opponent that you're identifying is Leucadia?

MR. BEREZIN: Leucadia, yes.

THE COURT: Okay.

MR. BEREZIN: Leucadia Asset Management. And --

THE COURT: Okay.

MR. BEREZIN: -- we are also offering this email under 801(c) on the grounds that it is a statement of a party -- of a party's knowledge or notice and therefore is within an exception to the hearsay rule.

THE COURT: 801(c)? Are you sure about that? You may be -- you may be citing a different rule.

MR. BEREZIN: I thought it was 801(c). Let me just double check, Your Honor.

THE COURT: 801(c) defines what hearsay is.

MR. BEREZIN: That's unhelpful. Sorry, Your Honor, I believe 801(c) is actually correct in that it is not offered for the truth. So, it defines hearsay, and courts have --

THE COURT: But you're saying it's not hearsay in other words?

MR. BEREZIN: Yes, that was my mistake. They're both non-hearsay, and the reason this one under 801(c), it doesn't meet the definition. I apologize, I --

THE COURT: No, no, no. We're on the same page.

MR. BEREZIN: Okay. And there's case law that testimony offered to prove that a party had knowledge or notice is not hearsay because the value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay. And that's In re Morrison, 555 F.3d 473 at 483 --

THE COURT: Can you give me the case again?

MR. BEREZIN: Yes, Your Honor. It's --

THE COURT: And the statement for the case. What do you think it says?

MR. BEREZIN: I believe it says testimony offered to prove that the party had knowledge or notice is not hearsay because the value of the statement does not rest upon the declarant's credibility and, therefore, is not subject to attack as hearsay.

THE COURT: The value of the statement is not what?

MR. BEREZIN: The value of the statement does not rest upon the --

THE COURT: Does not rest upon.

MR. BEREZIN: Yes, the declarant's credibility and, therefore, is not subject to attack as hearsay.

THE COURT: And the case you're citing is what?

MR. BEREZIN: That is In re Morrison, 555 F.3d 473, and that is picking up a quote and statement at 483. That is the (5th Cir. 2009) and it is quoting an earlier fifth circuit case.

THE COURT: Okay. Right now, I think we have a, at least for me, I'm comfortable that I understand exactly what's being asked. So, what are the objections?

MR. KELLEY: I still have one question, Your Honor.

THE COURT: Okay.

MR. KELLEY: If they're only offering the bottom one, then can't we sever them and offer only the bottom one?

THE COURT: I think that is entirely possible.

MR. KELLEY: Because that may impact whether or not I elect to object.

THE COURT: My understanding is they're only offering the bottom, so the top one wouldn't --

MR. KELLEY: It doesn't meet any of these issues, so I --

THE COURT: Yeah. I'm sure there's a way to do that. Go ahead.

MR. CASSEL: So, if I could respond to --

THE COURT: Yeah, no, no, no, I still wanted to hear it. I just wanted to make sure that Mr. Kelley before the kind of the foundational question before we got to the objections. Do I just -- my understanding it's just the bottom. And if I admit it, I'm only going to admit the bottom portion. And there's a way to -- there's a way to kind of reupload this is the admit the one that got admitted.

MR. KELLEY: Black out or --

THE COURT: Yep.

MR. BEREZIN: We could -- we could black it out.

THE COURT: Yeah. I was going to say white out. I've gotten old, but you know what I mean.

MR. BEREZIN: May I have a moment, Your Honor?

THE COURT: Yeah. Yeah, of course. But I know you still want to object. But why don't you state -- why doesn't Leucadia state its objection?

MR. CASSEL: Yeah. So, Your Honor, if this was a criminal case. And if this is a criminal case and there were --

THE COURT: Huh?

MR. CASSEL: If this was a criminal case and there were three defendants and one of them confesses, confession is not normally admissible against the other two. That's

not -- that's not -- you can't -- you can't use one person's confession against the others unless you can prove like it was a co-conspiracy. But absent meeting the co-conspiracy rule, you can't do that.

What the -- what the goal that they're trying to do here is prove up the value of -- the contested element where this is going is they're attempting to prove that they have the litigation trust assets are valuable. Which is a merits determination they're trying to make not only against us, but against every other party at this table.

And so, the problem with this, and it's going to be a continuing issue, is I can't be bound, for example, if Mr. Patrick James made a statement. You know, he's an opposing party. He's objecting. Did I get bound by what Patrick James says in an email that's admissible against me?

And so that's the broader issue that's presented on this 801(d) issue. And I don't think it works to say that because one opposing party, when we are jointly, we have independent interests, we collectively oppose the plan, but on many different grounds. I don't think it's fair to say that any person who shows up and objects then opens the door to admissibility for all sorts of other statements that I may have nothing -- had absolutely nothing to do with.

And so, Mr. Kelley's objected on the 801(d) ground. And so that issue -- even though I'm probably not

the right vehicle for this particular email, there are people who have standing and have made that objection. So that's one point.

With respect to the 801(c) issue that's been presented, I still don't think we've heard how Mr. Moore has personal knowledge of any of this. And whether it's hearsay or not, that's -- he still has to be a competent witness to testify about the contents of the conversation. He hasn't testified to how he has any knowledge of this whatsoever.

So, it's got to be based on his personal knowledge as a fact witness. And to the extent the bottom email, I'm not sure what -- I think there's a relevance problem at that point. Like the fact that someone asked questions. I'm not sure what that goes to. Without the top -- the only reason they're trying to get this in is to get the top email.

So those are --

THE COURT: But we would black out the top one.

MR. CASSEL: And but if -- and if the ground is an effect on the listener, then the bottom email is not a statement from -- there is no effect on the listener, that's the first statement in this apparent email chain. So those are the objections.

MR. BEREZIN: Could I respond briefly, Your Honor?

THE COURT: Yeah, no, no, no, of course.

MR. KELLEY: For what it's worth, I'm not going to

replicate what he says.

THE COURT: Understood.

MR. KELLEY: Ditto.

MR. BEREZIN: So, a couple things. First of all, we're in a confirmation hearing. We're offering all of this solely to prove feasibility. All of the parties' rights are reserved on the merits of this lawsuit. Every single one of these objections is asserting hearsay when we're not, we've already represented, we're not asserting any of this for the truth, simply to establish that we have a basis for, in order to prove to you that we have and should be allowed to proceed towards -- to get confirmed and to proceed towards an effective date.

So, no one is bound by any of this, as the Court made very clear. As far as the personal knowledge goes, this email was reviewed. The witness has already testified to this. Reviewed, and it, on its face, is what it purports to be. This is not a difficult one. No one is standing up here and asserting that Keith Donde didn't include these questions to an affiliate at Jeffries or that they didn't then forward that to Ed James or that Ed James didn't respond.

I mean, these are very clear, and these are also documents from First Brands. So, we have the CEO of the company testifying about a document produced from First

Brands and First Brands Systems. It's clearly authentic.

And, if -- I mean, confirmation of -- we would never be able to litigate and confirm a plan in any bankruptcy if we needed to bring in multiple people for every single issue, particularly in light of what this is being offered for and why.

So, I do believe that the party-opponent rules, the plain language applies. It doesn't say except when it applies to other people. Documents come into evidence. They're in evidence. And we have a way to get this document in evidence. And for the top half, we also have -- we believe we could lay the foundation --

THE COURT: Hold on. I want to take it one step at a time. You told me just about the bottom. Are you going to try to then separately move the top one in?

MR. BEREZIN: Well, let's -- let me say this, Your Honor. We reserve the right to come back with a different witness.

THE COURT: Well, of course you do.

MR. BEREZIN: Okay. So, I just don't want to waive that. But for purposes of this whole discussion, we've taken so much of the Court's time over, we're at this point seeking only to admit the bottom half, subject to reservation of rights to come back with a different witness to try to get in the rest.

THE COURT: All right.

MR. TEECE: Your Honor, just one point of clarification. Debtors referred to this person as the CEO of the company. That's not correct.

MR. BEREZIN: Interim CEO. I was referring to him.

MR. TEECE: No. I'm sorry. Okay. I thought you were talking about the former CEO.

MR. BEREZIN: No, no. I was speaking to --

MR. TEECE: Ted James is not the former CEO. No. Understood. I was not making that if I -- if I was unclear. I was referring to Mr. Moore.

MR. TEECE: Sorry to interrupt.

MR. CASSEL: So, Your Honor, just to cite authority for the proposition that in a multi-party civil case, 801(d)(2) evidence is only visible against the declarant party opponent, Walsh v. McCain Foods Limited, 81 F.3d 722.

THE COURT: Hold on. Slow down. 81 F.3d?

MR. CASSEL: 722. 726 to 27, (7th Cir. 1996).

THE COURT: When the (indiscernible) is in a multi-party litigation.

MR. CASSEL: This is a multi-party litigation. Whether or not it would be admissible against my client, it's certainly not admissible against the rest of the table.

And so, I wanted to make that point.

THE COURT: Kind of as a -- kind of as a broader point that as we go, are there dots?

MR. CASSEL: Right.

THE COURT: Yeah.

MR. CASSEL: That's the broader point.

MR. KELLEY: You look like you're reflecting, so I don't want to interrupt.

THE COURT: No, no, no. I'm just making sure my notes are good. I probably need to just take 10 minutes and go back and look at these cases real quick and just give you an answer.

MR. KELLEY: And that's what I was looking at, was that on multi-party disputes, there's not even a one-on-one dispute. It's not like they're filing a claim against six defendants, and they have a claim against LAM, and they want to use it for that purpose. They're using it for an issue of the plan, not a singular issue focused against LAM.

So even in a multi-party dispute, even if you were somehow to allow it in, Your Honor, you'd have to put such a limiter on it as to how it's going to be used only against LAM, I would suggest we should step back and say, in that case, what's the relevance of it? And that's the issue that gets layered on.

THE COURT: Okay. I probably should go look at

these cases that you've all cited. I don't want to rule without reading the cases. How many -- it sounds like this is going to go on, so I ought to take my time and just give you one ruling that would probably apply generally. How many of these do you think you have?

MR. KELLEY: For my own admissions type argument?

THE COURT: Just how many emails are they going to try to do this? I'm just thinking if I need to just rule on this specifically or think more broadly to give guidance.

MR. KELLEY: There may be other objections on different documents, but I understand you're trying to efficiently deal with one issue here.

THE COURT: But be thinking about the others while I read them, just so I can be aware and not take 10 minutes every time.

MR. BEREZIN: There are others, Your Honor. So, I think three or four others. Potentially fewer, but --

THE COURT: Are there any other topics that you're going to cover?

MR. BEREZIN: There are --

THE COURT: I can take a break now or I can think about this over the, you know, over the lunch break, and then we can kind of pick these up, and I can think about them. It's just I don't want you to go out of order. If you want a ruling now, just give me 10 minutes, I can go

back and read the cases.

MR. BEREZIN: That would be fine, I think, for us, Your Honor.

THE COURT: Which one? I gave you two options.

MR. BEREZIN: To give -- to give the you said 10 minutes.

THE COURT: Yeah, like don't --

MR. BEREZIN: I think --

THE COURT: -- judge 10 minutes, but I think I can -- I've got the case, I just -- I pulled -- well, we've pulled the cases, I just need to go back and read about them, and I've heard the arguments of the parties, so I just need to analyze it and see it. How much more do you think you have, just from a --

MR. BEREZIN: So, hard to say exactly for objections and what have you, but let's say two hours.

THE COURT: With Moore?

MR. BEREZIN: With Moore, assuming --

THE COURT: More direct?

MR. BEREZIN: I'm assuming objections to some of the last pieces. If we didn't have that, it would be an hour and 15 minutes, but I'm just building in.

THE COURT: No, I'm just thinking, before we break for noon, why don't we just talk housekeeping, and I can -- I probably need to think dates and where we go. That's the

only reason. I want you to take your time. This is important stuff, so just give me 10 minutes and let me see where we are.

MS. DEXTER: May I briefly?

THE COURT: Yep.

MS. DEXTER: If you're going to make a ruling that applies broadly to all the parties, I would like to join the objection and just mention that this may require some document by document analysis. I just want to be very clear that without a statement from First Brands, I don't believe there can be an effect on the listener exception to the hearsay rule, or to take it out of the hearsay rule.

And furthermore, if the statement of First Brands is being offered, I don't think that works either, because First Brands is not a party opponent here.

THE COURT: My understanding is I'm looking at party opponent in 801(c)(2).

MR. KELLEY: And on the party opponent issue, one of the parties flagged for me, so I'm going to give this to you to evaluate when you're taking your 10 minutes. This particular email is loaded with questions, not statements. So, Your Honor will have to evaluate if these are, in fact, statements that are being used against them versus questions, which I would argue semantically matters.

THE COURT: All right. Yes, sir.

MR. MENNITT: Your Honor, Gary Mennitt, Dechert, for the Carnaby II and Carnaby III lenders. I just want to make clear; I think it's already clear, but everyone at the counsel table obviously objects.

THE COURT: Yes, everyone's --

MR. MENNITT: Thank you.

THE COURT: Who said bankruptcy judges don't do evidence stuff, right? Give me 10 minutes. I'll give you an answer. And we'll keep this moving.

(Recess)

THE COURT: Just pull the -- get the exhibit next to me here so I can --

MR. KELLEY: Your Honor, I apologize for this. I made an argument at the end that I didn't direct you to the rule and I should have directed --

THE COURT: It's too late for all that. Here comes the ruling.

MR. KELLEY: Got it.

THE COURT: All righty. We're talking about -- was Debtor's Exhibit 75?

MR. BEREZIN: It is, Your Honor.

THE COURT: Okay. It's -- I'm only going to focus on the -- on the lower portion of the exhibit. So, I'm not going to talk about the top portion. The exhibit, looking at it, I'm going to describe it consists of, you know, it's

like nine numbered questions directed to First Brands about certain inventory and accounts receivable together with a question and a request for kind of an on-site visit.

A question is not an assertion, I would note. Those portions of the exhibit to me assert nothing. They're not offered for the truth of any matter asserted. I don't think they meet the definition of a hearsay under 801(c)(2). They're received as to all parties. And they show what they say, and it is what it is.

I think that rule is consistent with the Morrison case, 555 F.3d 473 (5th Cir. 2009) case. You know, the Court of Appeals, as was noted, held that a testimony offered to prove that a party had knowledge or notice isn't hearsay because the value of the statement does not rest upon the declarant's credibility, therefore not subject to attack as hearsay.

I find nothing in there that's offered to prove that something was incorrect or that the Debtor knew it was incorrect. Not offered to prove anything about -- I do know that the -- that there are some -- well, I'll leave it there. I would note, I don't think those questions contain assertions, right?

MR. BEREZIN: I'm sorry, Your Honor.

THE COURT: I don't think the nine questions contain kind of -- they're questions, they're not asserting

anything for the truth of the matter. They're diligence questions, right? So let me just -- let me just keep going through.

So, I do think the exhibit also kind of contains some statements afterwards that one could read as -- about assertions. And I think offered against the LAM parties, they are statements of opposing parties under 801(d)(2) and not hearsay. Right? I'm looking at the signature block, the electronic domain, who they copied. 801(d)(2) excludes statements from hearsay only when it's offered against the opposing party.

The Walsh v. McCain case that was given to me, 801 F.3d 722 (7th Cir. 1996) case, is actually quoting Wright and Miller, right, for the proposition that it's only when an admission is offered against the party who has made that it comes with the exception for admissions of a party opponent.

And I think under Rule 105, and I'm going to do this under Rule 105, I'm going to restrict the assertive portions to their proper scope. So, this is only -- those statements are only received against the LAM parties themselves and not received against Katsumi, Onset, Evolution, Carnaby, the James Defendants, or anybody else.

And I'm not going to consider them bearing on them as anyone else. I think that's consistent with the rules.

And, again, I'm not adjudicating merits of litigation, and none of this is going to be binding on any party.

I am saying it's 801(c)(2) portions of it work and the other portion works. Any assertive statements in there are effective against LAM only, and for that exists Rule 105, a limited ruling against one party. So that's the Court's ruling. Everybody's rights are reserved. If you have eight minutes of questions, you're all -- you're all for it. Why don't we just get to these questions here and then talk housekeeping?

(Debtor's Exhibit 75 entered into evidence.)

MS. DEXTER: One clarification, Your Honor. The -- your ruling, I believe, discussed the statements in the email above the bottom email, and those are statements of the experts.

THE COURT: I meant to only talk about the bottom stuff, and by that I meant, like, one could read it as, you know, who sent the email and what the signature block was. That's what I'm referring to. To the extent that those are kind of assertive statements, I think, to the extent one can even consider them, I'm not talking about the top portion at all. That's a whole different ball game.

I'm only referring to bottom stuff. To the extent someone's making a statement after that, and it shows a signature block and that kind of stuff to the extent one was

going to get that far into the weeds. I think it's all 801(c)(2).

But to the extent, you know, it's a -- it is, and somebody disagrees with me, I still think 801(d)(2) applies, but only against the LAM parties and not against any other party, and I think I can do that under Rule 105. So, if this comes in, and I am admitting it, you know, you're going to have to black it out, but use the version that, you know, even if it's uploaded, no one can see that version of the blackout.

MR. BEREZIN: Your Honor, in light of the 801(c) ruling, (c)2 ruling, we do believe that the top portion qualifies for the same reason. It's certainly not offered for the truth of the matter. It goes to the knowledge of the LAM parties with respect to how those questions were responded to, and we offer it as such under 801(c)(2).

THE COURT: So, we did this entire exercise and then talk about one and then the other? Is that what we just did?

MR. BEREZIN: Well, I think the same rationale applies.

THE COURT: I know, but --

MR. BEREZIN: All right.

MR. KELLEY: There's a completely different set of arguments on that, as I know you recognize, Your Honor, so.

MR. BEREZIN: I don't believe there are.

THE COURT: All right, just make your arguments, I'm going to have to think about it. I didn't think about it, I was entirely focused on one portion of it.

MR. KELLEY: I'm having trouble hearing you, Your Honor.

THE COURT: No, no, no, that's a fair point. I said I was entirely focused on one bottom portion and not the top portion, and I knew people reserved the right to come back. I didn't know it was going to be about 30 seconds after I ruled on the bottom portion. That's my --

MR. BEREZIN: I apologize, Your Honor. I was caught up in the party opponent and meant and intended to extend the argument, but I said what I said.

THE COURT: Yep, why don't you make the argument? The parties can tell me, otherwise we can break, and then we can -- I can think about it. Because I think there are different -- there are -- I think the bottom portion I can kind of say it's 801(c)(2), but if you're getting into email blocks and stuff like that as assertions, you know, who sent it, I think that's a different deal. The top one does have assertions, and I'd have to think about it differently than the bottom portion of it.

So why don't you tell me what it is, I'll rule right afterwards, and then we'll break for lunch and I'll

tell you the answer. But I'm going to have to think about it because there are assertions, and I thought the nine questions had no assertions. I don't --

MR. BEREZIN: So, on the -- one the assertions, whether it's an assertion, I'm just for a moment talking about the back half, whether those are assertions or not, we're offering them to show knowledge that -- and Mr. Moore will provide some gloss to understand why we believe this shows and demonstrates knowledge in certain respects, these questions.

And so that testimony I intended to pursue, and he -- I would do the same thing with the top portion in terms of the, you know, the response, again, not for the truth of any of it, but just the manner in which Mr. James, on behalf of First Brands, responded to Jeffrey's, to those requests for diligence.

We believe that getting the information that the response itself, not its truth, but it's the response, which was essentially a rebuff --

THE COURT: Right, I think you're -- yeah, but I think you're going too far. I think you can establish that he received it. That somebody received it, but if you want to get into the truth of the matter asserted therein, it seemed like that's where you were headed.

MR. BEREZIN: I'm not, Your Honor. So, what the

only basis that we would be offering this document for, the top portion of the document, and indeed the bottom aside from the -- aside from the -- let me just focus on the top portion for a moment.

The only reason we would be offering it is not for hearsay, not for the truth of the matter asserted, but rather that Katsumi -- sorry, withdrawn there. That the LAM parties had information about how the First Brands entities responded to their diligence questions. That is the basis that we would be offering this document. Not because what he said was true, but rather what he -- but rather what the effect would be.

THE COURT: You said that it -- I think I heard you say that it was going to respond to how First Brands responded to the diligence?

MR. BEREZIN: That the LAM parties are receiving a response, and they now have that knowledge of how he responded. It's like a verbal act. How he responded. They asked for diligence, and he responded in the way that he did, which was --

THE COURT: But --

MR. BEREZIN: So, they have that knowledge.

THE COURT: But I think it's -- let me just kind of get my questions out, because I think it's being offered to show, I think you said, kind of how the Debtors

responded, but I don't think how the Debtors responded is in the email.

I think it's kind of demonstrated by the email but not stated in the email how the Debtors are going to respond. And so, I think you're trying to -- I think we're -- like I said, it's a response, right? So, I think if you want to offer it to say LAM parties got it, I think that's fair. But beyond that, I'm not comfortable.

MR. BEREZIN: We understand Your Honor.

MR. DUKE: Your Honor.

THE COURT: I think -- yeah, go ahead. And I don't -- but again, I don't -- I'm saying I think this is just -- go ahead. Go ahead, Mr. Duke, I should think about this a little bit.

MR. DUKE: Just separate from that, I heard Mr. Berezin say that they're going to have a gloss on the -- on the knowledge of the parties based on this email. I don't know how to describe that as anything other than expert testimony or opinion testimony. That shouldn't be allowed.

So that's even -- regardless of what happens with this document, that type of testimony should not come in.

MR. TEECE: Your Honor, if I may, that was consistent with what I was going to object to, which is, as you recall yesterday, I raised this objection of people who don't have personal knowledge, reading, testifying as to

emails sent by others. That was my first response.

The second, Your Honor, is I respectfully submit that it is being submitted for the truth in matters asserted because the LAM parties are not on that email, the one that they want introduced.

So, what else could it be made for other than for the truth in matters asserted, which is that this was a -- I understand this is part of a red flag (indiscernible). So, I think if they're not on the email, then it is being offered for the truth in matters asserted.

MR. CASSEL: And Your Honor, just for the record, my objection is, with respect to this witness, the document itself is still hearsay, the witness has not established personal knowledge. That's the objection.

MR. KELLEY: This is -- a couple comments, Your Honor. One, in support of similar objections, this is not a percipient witness who was even at the Debtor's business when they came on.

And I just heard questions articulated by Mr. Berezin that suggest they're going to ask this witness to then characterize what is in this email.

THE COURT: Hold on, wait, wait. I just don't think we've gotten there yet. I'm trying to just deal with what's on --

MR. KELLEY: I hear you, Your Honor, but the

context in which it's offered was just revealed, and so I at least have to lodge that objection.

THE COURT: Yeah, I get --

MR. KELLEY: The other issue that Mr. Berezin raised, I think he read to you from a fifth circuit decision. And it was on the very notice issue. And it is also the context and author and the way it's put together doesn't suggest or raise the question that cross-examination is needed because of the veracity of the statement.

I think you can't take that out of context, and with all due respect to counsel for the party in the room, we've heard ad nauseum testimony from the witness about what occurred pre-petition and who were the center of what they've alleged is misconduct. This is one of the individuals, and they're trying to use the substance of what the individual said in a context against these other parties.

So, it is at its core hearsay, it's not a notice issue.

THE COURT: Mr. Berezin?

MR. BEREZIN: Yes, Your Honor. So, again, we're not using this email for anything other than knowledge. And questioning is not required to admit the document. If I ask a question and there's an objection lodged, Your Honor can --

THE COURT: Yeah. So, --

MR. BEREZIN: -- rule on that.

THE COURT: -- I think it's going to -- I think it can come in under 801(c)(2). But if you try to get into questions about what it says or what it's supposed to mean, I'm going to shut it down. I'm just telling you now.

MR. KELLEY: But 801(c)(2), Your Honor --

THE COURT: That's my ruling.

MR. KELLEY: 801(c) --

THE COURT: Everybody's rights are reserved. That's the ruling. That's the ruling. You can get your objection.

MR. KELLEY: I'm not arguing against the ruling.

THE COURT: You are but go ahead. That's why you said but.

MR. KELLEY: 801(c)(2), Your Honor, is not allowing the content it's allowing the notice in. So, does that mean in Your Honor --

THE COURT: I'm saying I'm allowing it for a receipt. There was an email that got received.

MR. KELLEY: Not the content, okay.

THE COURT: And if he tries to get into what this -- what this means, that's -- I don't know what you meant by gloss. So, I think gloss is, you're entitled to define it on your own terms. But, you know, if you can't -- well, I

don't think you -- on the basis that I've admitted it, I don't think you can go in and say this shows X.

MR. KELLEY: That was my question, Your Honor. Thank you.

MR. BEREZIN: I understand, Your Honor.

THE COURT: And if you want to try to do that, you're going to have to try to get it in another way. If you just want to get it in, there was an email that went from A to B. And that's the reply that was sent to the other email. I -- that works.

If you're trying to get it in for any other purpose, you're going to have to give me another purpose and go there.

MR. BEREZIN: Your Honor let's just stick with offering it in the manner I described. And I don't intend to ask further questions. So as long as it's admitted, the document, Debtor's Exhibit 75, I think we can move on.

THE COURT: And we should probably move on to lunch then. But before we do, realistically, and I really want input from all the -- from all the parties here, realistically, what can we accomplish today? And what do we need to try to accomplish tomorrow? What do you think we can get?

MR. BEREZIN: So, I think with this ruling, we can move briskly and finish the direct hopefully within an hour,

maybe more quickly. Hope springs eternal and then I think it's a question for the other side.

MS. DEXTER: Yes, Your Honor. Erin Dexter from Milbank (indiscernible). The parties sitting at this table have been attempting to coordinate so we don't duplicate any cross-questions. I can't commit to --

THE COURT: Yeah, no, I know.

MS. DEXTER: But we have made efforts to try to ensure that we are splitting up topics and we'll proceed efficiently with the Court's time.

THE COURT: Do you think we can finish with Moore today?

MS. DEXTER: I think we can make a good old college drive.

MR. KELLEY: No, Your Honor. Sorry. I don't think we will.

THE COURT: So, what I'm trying to figure out is I only want to go, like, burn the oil if it makes sense to do so. Can the parties just talk about realistically what kind of -- how many days you think you're really going to need to kind of finish? I just don't have a sense of it.

But to realistically pick dates, I want to -- I want to keep working and I want to keep doing what we have to do. But I'm just in terms of there are other like a Chapter 15 filed or something, you know, like yesterday.

And so now, like, that's going to take, you know, and I'm trying to -- I want to block off dates to get to where we are, and I want to just be realistic about what they are.

And we can work late, but I don't -- I want to be realistic about other folks coming in and other witnesses and closings and things of that nature. Plus, you know, we've been going for quite a while, so I can't require you all to coordinate and do this. And there could be other things that come up and then redirect.

And so, I -- let's just -- what I would ask is just the parties just give it some thought. You don't have to give me an answer, like, right after lunch, but just start talking about what it is. And I will start looking at my calendar as well. I don't think anybody --

MR. BEREZIN: If I could just respond.

MR. KELLEY: Right and we are trying to coordinate.

THE COURT: Yeah, I appreciate it. I mean, but, like, with the Debtors as well, just to kind of figure out, like, realistically --

MR. BEREZIN: Our issue, Your Honor, is it's really a matter of urgency for us to try to finish this week. And we'll do everything we can to do that. We have -- we'll try to finish Mr. Moore as quickly as possible.

Then we have Mr. Kirschner, depending on the Court's ruling there.

And then a Kroll witness, which I think is going to go in by declaration. And I think I saw some cross, but I imagine that's not going to take very long. So, we would really like to get --

THE COURT: No, no, no, I'm --

MR. BEREZIN: -- if possible.

THE COURT: And I want to. I want to. I just want to be realistic about kind of -- I'd like to finish Moore today if we can, I think, at a minimum. And just to really get that done. By no means am I saying we should find dates and push this out for a couple of weeks. What I am saying is I need to start blocking, realistically, in terms of what you're going to do.

How much -- by coordinating, we finish with Moore. If you finish with Moore, let's just say by 2:00 as we come back at 1:00 and you're done, I'm making something up by 2:15, you know, that's six hours.

You know, if we allocated six hours of cross and then some other time, maybe we can get done with him. I'm willing to do it. But I just -- you all -- you all have a much better sense of what we're doing.

MS. DEXTER: Your Honor, I think we can commit to proceed as efficiently as we can. We've been coordinating.

We've been -- we won't duplicate topics, but we're listening to one another. We'll edit. We'll move expeditiously. I can't promise we can get it done in six hours.

THE COURT: No, no, no. I'm not -- I'm not -- I'm just saying let's just -- that ought to be the goal, to maybe get really close.

MS. DEXTER: Yes. Yes, Your Honor.

THE COURT: Yes, sir.

UNIDENTIFIED SPEAKER 2: Your Honor, can I ask you a question? And I've been sitting on this all day. Assuming we get through Moore today, we do whatever we do with Kirschner tomorrow, were you anticipating closings tomorrow? And I'm just trying selfishly to manage my schedule. I'm sure other people are too.

And I will mention that getting full records of testimony, full transcripts, would probably be of value. I know you're going to kill me for that because you guys want to get it done quickly. But I also know that you had mentioned the 7th, I believe, yesterday. I could be messing up the date. It was whatever.

THE COURT: I want to keep pushing ahead. But I know that there's another witness that may get called, and I'm trying to factor that in as well. And I don't know how long that witness is going to take or not -- take or not take. So, I want to keep pressing.

MR. KELLEY: And if I may clarify, you mentioned something about we've --

THE COURT: I think you mentioned that you may be calling a witness, right?

MR. KELLEY: We designated a number of witnesses, and we have deposition testimony. And we have -- we are in the process of compiling all the parties' designations to give Your Honor one document to read because I think you said you'd rather read it than hear them.

THE COURT: Yeah.

MR. KELLEY: We've received no objections to them, so I'm -- we're going to file them tonight.

THE COURT: Are you planning on --

MR. KELLEY: A compiled version. And we've gotten no cross designations. I thought we might get them last night, so --

THE COURT: Are you --

MR. KELLEY: -- when we give them to you --

THE COURT: Are you still calling that witness the --

MR. KELLEY: If we give you the designations and they come in as, I don't know that there's going to be a live witness we're going to call.

THE COURT: Okay. Okay.

MR. KELLEY: That's what I'm trying to work

towards, which is we're trying -- we're going to give you excerpts of testimony. Everyone filed their deposition excerpts. We've taken ourselves to compile them. We're going to give you, so you only -- you don't have to look at the same transcript three different times. We're going to try to give you something you can just read through where the excerpts are cut out.

MR. BEREZIN: You obviously reserve the right to object (indiscernible).

THE COURT: No, no, no, understood. I am --

MR. KELLEY: But we will file that probably by this evening, Your Honor.

THE COURT: Okay.

MR. KELLEY: Is our game plan, so that you will have that. And if that goes as expected, you know, obviously we reserve the right if someone says something that we didn't know they were going to say from the stand that we need to now supplement, we'll do that.

THE COURT: Got it.

MR. KELLEY: But we're going to work as a team.

THE COURT: I was factoring in that other witness, so that may be -- that may work. Maybe we -- maybe we do keep cranking. Okay, Mr. Barr.

MR. BARR: Thank you, Your Honor. Matt Barr of Weil Gotshal on behalf of the Debtors. At the risk of

getting kicked by certain people, we've been talking about what might make sense for Your Honor to consider.

We would like to close the record this week with respect to evidence. There's lots of reasons, including the potential delays and costs associated with that to the estate, which if you need evidence of that, we're happy to put that on.

And then we would assume, or we assumed, and please tell us if we're wrong, that you were going to ask then people to file motions with respect to the record, whether people needed to strike evidence or you needed to rule on those types of items.

All of that would have been done prior to August 7th, which is the date I think you threw out. And then we would come back for August 7th closing arguments.

THE COURT: I did it to myself, didn't I?

MR. BARR: Sorry about that. You know we like to listen, so.

THE COURT: All right, if we can finish this week, close the record, do closings on the 7th, I think that just makes the most sense and the parties are open to it, that works for me. If we did the 7th, I'll talk to Rosario and we'll talk about blocking out a window of time to get that done. But I'll let the parties marinate on whether that makes, you know, whether that works and we'll continue with

Moore.

But the goal today should be undoubtedly let's press to see if we can -- I don't want to rush anyone, but the marching orders, we'll see if we can finish with Mr. Moore and then take up Mr. Kirschner tomorrow and the Kroll individual and see if we can get done with that on Thursday.

MR. BEREZIN: Thank you, Your Honor.

THE COURT: All right. But if anyone objects to kind of this August 7th closing, then you know what I would ask is maybe before the end of the day you let me know your concerns so that we can take that up. Okay? Thank you.

MS. DEXTER: Thank you.

THE COURT: Hold on, folks. What time should we come back? It's going to be -- it takes a while to get out, doesn't it? Let's do 1:30.

MR. KELLEY: 1:30.

THE COURT: 1:30.

(Recess)

All right, let's see. Good afternoon. This is Judge Lopez back on the record for the afternoon session. First, Mr. Moore, I remind you that you're still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Continuing with direct examination, Mr. Berezin, good afternoon. You may continue.

MR. BEREZIN: Thank you, Your Honor. May I

approach the witness and give him an exhibit?

THE COURT: Yes.

BY MR. BEREZIN:

Q Mr. Moore, I've handed you what's been marked as Debtor's Exhibit 76. Can you identify this document?

A This is a string of emails that begin with the email that we discussed earlier from Keith Dondle at Leucadia, Friday, January 13, 2023, and then a series of follow-on emails building off of that.

Q And is this email printout from First Brands Group Systems?

A Yes.

MR. BEREZIN: Your Honor, the Debtors offer Defendant's Exhibit 76 on 801(c)(2) grounds, not for the truth of the matter, and we will not be asking further questions about it.

(Debtor's Exhibit 76 marked for identification.)

THE COURT: Okay.

MR. CASSEL: Just to preserve the same objection as before, but this is consistent with Your Honor -- with your (indiscernible).

THE COURT: Okay. I will admit it on 801(c)(2) grounds. Everybody's rights are preserved.

(Debtor's Exhibit 76 admitted into evidence.)

MR. KELLEY: Thank you, Your Honor. Just I always

try to clarify on the ruling, it's the limited offering that you described before lunch, the same?

THE COURT: Yes, that's exactly right. It still applies to the same. Yes, thank you very much.

BY MR. BEREZIN:

Q Mr. Moore, while you were CEO of First Brands, did you receive reports about a supply chain platform named Prime Revenue?

A Yes.

Q And who did -- from whom did you receive those reports? In what context?

A I received reports from multiple parties. Probably the person that communicated the most information to me was Ms. Carrie Palin.

Q And did you consider that information in the context of your role as CEO of First Brands?

A I did.

Q Okay. And did you -- what did you -- did you consider the information to be -- can you describe whether you considered the information to be important?

A I did. The payments out to suppliers are a critical element of the company's cash flow. In understanding that the company had supply chain facilities, I was looking to understand how much the company was paying to its suppliers, either directly or through supply chain financing, comparing

the outstanding payables balance on its balance sheet with information about the supply chain financing facilities.
Q And the information specific to Prime Revenue, can you tell us whether that information in particular was important to you?
A It was very important to me. I recall Ms. Palin contacting me immediately after an interview that she had with a First Brands employee regarding information that was exchanged between Prime Revenue and First Brands.
Q So, what is it about that information you received that you thought was important within the role of First Brands CEO?
MR. KELLEY: Given the witness's prior response, this necessarily call for hearsay.
THE COURT: All right.
MR. BEREZIN: I think it's the results of an investigation as CEO that he considered personally.
THE COURT: That was a long question. It may have been talking about two different things. Can you ask it again?
MR. BEREZIN: Sure.
BY MR. BEREZIN:
Q The information that you received concerning Prime Revenue, was that information important to you as CEO of First Brands?

MR. KELLEY: So, before he answers, Your Honor, the prior question was where did you get the information? Carrie Palin interviewed a First Brands employee --

THE COURT: Yeah, I understand.

MR. KELLEY: -- finished the interview and passed on me, so it's hearsay within hearsay being passed to him.

THE COURT: Yeah, I think this question works.

MR. BEREZIN: Okay.

THE COURT: It was a long one, that's why I thought it was asking a couple of things and from a couple of different ways. So, I think the last question I'm going to take is withdrawn in this question is -- I'll accept.

THE WITNESS: Do you mind repeating the question, please?

BY MR. BEREZIN:

Q I'll probably muddle it up again. The information you received concerning Prime Revenue, to what extent do you believe that information to be important as CEO of First Brands?

A It was important to me as I looked to get a better understanding of payments out to suppliers, and this was critically important information for distinguishing the amount of payables that the company had and the amount of cash that it had received related to supplier payables.

Q And did you -- let me -- withdrawn. And did you

receive information that you believe was important in your role as CEO regarding potential fabrication of supply chain invoices?

MR. KELLEY: Your Honor, I think the substance of that calls for the hearsay.

MR. TEECE: Your Honor, I'd also -- it has a factual predicate in it as well regarding fabrication. I'd take an issue with that.

THE COURT: You did use the word fabrication.

MR. BEREZIN: I'll withdraw the question.

MR. TEECE: Thank you.

MR. BEREZIN: Let me try it again.

MR. KELLEY: If it's an answer about whether it's important or whether -- but if we're getting into the substance of the communications, that's the hearsay that I --

THE COURT: I understand.

MR. BEREZIN: We'll move on, Your Honor. Your Honor, may I approach?

THE COURT: Okay.

THE COURT: Thank you.

BY MR. BEREZIN:

Q Mr. Moore, I've handed you what's been marked as Debtor's Exhibit 94. Do you recognize this document?

A I do.

Q What is it?
A This is communication from Katsumi to First Brands.
Q And did this document come from FBG's systems?
A Yes.

MR. BEREZIN: Your Honor, the Debtors offer Exhibit 94, again, under 801(c)(2). We do not intend to ask further questions about it from this witness, unless subject, obviously, cross.

(Debtor's Exhibit 94 marked for identification.)

MR. KELLEY: I'm going to object that it's hearsay grounds, Your Honor. I think they need to -- I think every day in this case I've stood up since first day and said I represent Katsumi Servicing. We put on our exhibit list the transaction documents that show that the purchaser, the entity that engaged with the Debtors, an entity called CARS.

And Katsumi Servicing is the special servicer for that entity. That's not who is on this email. There's a number of objections that flow from that, but why don't I start there? Your Honor, this is a substantive issue. You can take a look at Debtor's Exhibit 26, 27, 28, 29, or 30, which are all of the transaction documents that reflect CARS is the counterparty and Katsumi Servicing is the special servicer. That's not -- this is not Katsumi Servicing.

THE COURT: Then what's your objection if it's not Katsumi Servicing?

MR. KELLEY: It's hearsay, Your Honor, and I don't know on what basis it's noticing a party who's not an adverse party.

THE COURT: Okay.

MR. KELLEY: So, whether they're looking at --

THE COURT: I'm just making sure I'm understanding what it is. Because it's not your -- what you're saying is it's not your client.

MR. KELLEY: Correct.

THE COURT: Okay, so then what's your objection?

MR. KELLEY: This is hearsay.

THE COURT: Okay.

MR. KELLEY: And they've raised two arguments, and I heard the -- they're attempting to raise notice, and notice of an entity that's not in the courtroom objecting and not a party to this is utterly irrelevant. If it has to do with my client or it has to do with somehow a party opponent, it's not. And so those are my objections for now. I want to hear the response.

THE COURT: Okay.

MR. BEREZIN: May I ask the witness some foundational questions? Let me just briefly respond. All of that sounded like responses to arguments about the weight as opposed to the admissibility. It's giving notice of invoice specifically an audit that took place.

THE COURT: I don't want to get into the substance of it.

MR. BEREZIN: Okay, without getting into the substance. But if counsel's representing that katsumiglobal.com has no agency or other relationship with the entity that has been identified and is objecting in this case, then I suppose we'll take counsel's representation.

MR. KELLEY: Your Honor, I think it's their burden to connect this. They have to present evidence.

MR. BEREZIN: Well, I think people have to object with a good faith basis, Your Honor.

MR. KELLEY: I do, Your Honor. And I referenced the Court to the actual transaction documents.

THE COURT: Those aren't in yet, right, so.

MR. KELLEY: They're not. But the point is it specifies the parties because I think what they're implying is a disingenuous objection. The point is Your Honor needs to know --

THE COURT: They did imply a disingenuous objection because they said it wasn't good in good faith. But I agree. But maybe we can stick to the words and rules where I live. So, --

MR. BEREZIN: So, Your Honor --

THE COURT: So, the basis for admitting it 801(c)(2).

MR. BEREZIN: 801(c)(2) and --

THE COURT: And --

MR. BEREZIN: -- they can argue --

THE COURT: And relevance is the other objection that I -- that I heard from -- and so --

MR. KELLEY: And hearsay also.

THE COURT: Hearsay and relevancy.

MR. BEREZIN: Well, the hearsay, it's not hearsay if it's 801(c)(2).

THE COURT: Okay.

MR. BEREZIN: It's not being admitted for the truth. And we think the katsumiglobal.com engaging in an audit is sufficient basis to invoke 801(c)(2) against an obviously interested and related party.

THE COURT: I don't know if they're interested and related, but I'm going to admit it on 801(c)(2) grounds. Now, whether -- what it means at this point, I think you're going to -- you're going to have to kind of connect the dots. But to get it in, I'll let you in. And someone can then tell me this is basically you've got it wrong. And I'll let you do it. But --

(Debtor's Exhibit 94 entered into evidence.)

MR. KELLEY: I want to be clear, Your Honor. I raised hearsay to hear their exception. But it's hearsay within hearsay within hearsay. It's an email that

communicates something from a third party who's recounting what they've taken from documents.

THE COURT: Understood. Overruled. Let's continue.

MR. KELLEY: Again, Your Honor, is this being offered for the limited purpose that Your Honor has described?

THE COURT: I think that's the -- I'm going on the purpose that they said is that they're just going to -- they're just letting it in for that this email exists and --

MR. KELLEY: Not for the contents, but for the --

THE COURT: Not for the -- I haven't heard any -- at least I haven't heard it. Mr. Bereson, you'll have to confirm.

MR. BEREZIN: I confirm.

THE COURT: Okay. Yeah.

MR. KELLEY: Thank you, Your Honor.

THE COURT: No, no, no. I looked at the back. Yeah, there's nothing in the back. Hold on. There is an email in the back. There's two -- no, it's a name. It's one email. No, it's two emails. Is it -- no, it's a forward of an email. Okay. What is going on here? Did I not get into it? All right. The email says what it says.

MR. BEREZIN: Thank you, Your Honor.

BY MR. BEREZIN:

Q Mr. Moore, can you describe your involvement in the Debtors' investigations into Onset?

A Yes. I was directly involved with the activities going back to right around the petition date when we first started to try to gain a better understanding of the relationship with Onset. And those activities continued throughout the entire case.

Q And based on -- well, withdrawn. Did you authorize the Debtors to file an adversary proceeding against Onset?

A Yes.

MR. BEREZIN: Your Honor if I could approach the witness.

THE COURT: Yes, of course.

MR. BEREZIN: Thank you.

THE COURT: Thank you.

BY MR. BEREZIN:

Q Mr. Moore, do you recognize this document?

A I do.

Q What is it?

A It is in two emails. The original email is from Mr. Ed James to a person at Onset, and then a response from that person at Onset to Mr. James.

MR. BEREZIN: Your Honor, the Debtors seek to offer Exhibit 73 on the same terms, not for the truth of the matter asserted, but under 801(c)(2). And we don't intend

to ask further questions about it.

(Debtor's Exhibit 73 marked for identification.)

MR. DUKE: Thank you, Your Honor. If it's coming in under 801(c)(2) for the limited purposes that are discussed, we have no objection.

THE COURT: Okay. It's admitted for that purpose.

(Debtor's Exhibit 73 entered into evidence.)

MR. BEREZIN: And, Your Honor, we would ask the court to take judicial notice of the complaint filed by Onset. It's Docket Number 1255 in that adversary proceeding.

THE COURT: Can you just identify the adversary just for --

MR. BEREZIN: Yes, one second. Yes, Your Honor, it was filed in Docket Number 1255, and I guess it was filed in --

UNIDENTIFIED SPEAKER 3: Oh, I got it. Sorry, Your Honor.

MR. BEREZIN: In 25-90399, again, at Docket Number 1255.

MS. DEXTER: Your Honor, provided that you're taking judicial notice that the complaint exists and not forming a view as to its contents, we're fine with that.

THE COURT: Yep, that's --

MR. BEREZIN: Yeah, we are not offering it for the

truth.

THE COURT: Yeah, I know, it's just judicial notice, right?

UNIDENTIFIED SPEAKER 3: Just judicial notice.

THE COURT: Okay. I will take judicial notice of.

BY MR. BEREZIN:

Q Okay. Mr. Moore, I'm going to return to feasibility question. My first question, and we're just going to take this step by step, have you determined whether it is reasonable to believe that the liquidating plan, if confirmed, can satisfy the conditions for it to become effective?

A Yes.

Q And can you state your conclusion? Just your conclusion for now, and we'll go through the reasons in a moment.

A The conditions precedent to the plan going effective I've reviewed, and I believe all of those can be achieved. And for those that -- there are certain ones that can be waived as well.

Q Okay. And I'm just going to take you through the basis for that belief just one by one. So, in terms of the Debtor's estimates of 503(b)(9) administrative claims and priority claims you testified about, can you explain to what extent are you relying upon those estimates in arriving at

your conclusion?
A That is a critical part of my overall conclusion, which is what the estimated amount of administrative and priority claims are that will need to be satisfied for the plan to go effective.
Q And in terms of the litigation trust, that part of the plan, can you explain what you were relying upon to arrive at the conclusion that it's reasonable to believe that the liquidating plan can satisfy closing -- the effective conditions?
MR. MENNITT: Objection, Your Honor.
THE COURT: I'm going to object because I didn't understand the question.
MR. BEREZIN: Can I try again?
THE COURT: Yeah.
BY MR. BEREZIN:
Q To the extent the litigation trust influenced your conclusion, can you explain whether -- well, first of all, let me just ask, did the existence of the liquidation trust, assuming the plan is confirmed, play a role in your conclusion you've testified to?
THE COURT: Just hold on. Can we just -- let's, just so the record's clear, establish the conclusion that you're discussing and then ask the question again just so we're really clear about --

MR. BEREZIN: Sure.

THE COURT: -- what you're asking.

MR. BEREZIN: Sure.

BY MR. BEREZIN:

Q You testified that you believe it is reasonable to believe that the liquidating plan can satisfy the conditions to become effective. And so right now my question is whether you took into account the litigation trust.

A I did.

Q Can you then explain what role that played in your decision or conclusion?

THE COURT: Yep, that's where you go too far. I'm not going to let you talk about that. He's not an expert.

MR. BEREZIN: Okay.

THE COURT: He can consider it.

MR. BEREZIN: Okay. Then probably the same --

THE COURT: I will note that there were objections that stood up, but I knew where you were going.

MR. MENNITT: Yes, Your Honor.

THE COURT: I'll just get you there.

MR. MENNITT: Nothing worse than being predictable to the court.

BY MR. BEREZIN:

Q And in terms of litigation waterfall that you've testified to, did you rely upon that provision of the plan

in arriving at your conclusion?

A Yes.

Q And what role did that play in your --

MR. BEREZIN: Objection, Your Honor. Same objection.

THE COURT: Sustained.

MR. BEREZIN: Okay.

BY MR. BEREZIN:

Q And in terms of your personal knowledge of the facts you have testified about today, can you explain to what extent are you relying on those facts to conclude that it is reasonable to believe that the liquidating plan can satisfy conditions to become effective?

MR. KELLEY: I don't think there's a foundation for this that he's going to suggest he has personal, percipient witness knowledge.

THE COURT: I'm going to accept for purposes of 1129. He has, in his role is -- maybe the better way of me asking the -- asking the -- well, the way I think it could work is in your role as CRO and interim CEO, you believe the plan that is set forth is feasible, and you've considered certain things, and what are the things that make you believe that this plan is feasible? And it's not your ultimate -- I don't want to get into conclusions because you said you didn't make any conclusions.

But you can testify as to why you think this plan is feasible, and why don't you articulate what those reasons are. I think that works. That's down the line. If he has any, if you have any conclusions, if you have any reasons why you believe this plan is feasible, state them now.

THE WITNESS: Your Honor, I do believe that the plan is feasible. The items that I look at are really in terms of how the plan is implemented. They -- there are -- is the formation of the various trusts that have been discussed, and with both the DIP collateral trust as well as the litigation trust, those trusts have funding going into them in order to pursue the activities that they are meant to achieve.

The ABL collateral trust also has a friendly foreclosure procedure. No assets in which there are disputes will be transferred to any trust. There are provisions in the plan that provide for how the remaining activities of the estate, essentially how any assets that are not transferred to a trust will be addressed.

The eventual wind-down and dissolution of the plan Debtor entities, the roles that are defined, and the proper funding of carrying out those roles from the standpoint of both a wind-down administrator as well as a claims ombudsman, and procedures for how disputes will be addressed.

THE COURT: Thank you.

MR. BEREZIN: Your Honor, with that, we pass the witness.

THE COURT: Okay. You're going to sit here, right?

MR. MENNITT: Your Honor, may I proceed?

THE COURT: Folks, if we can settle down so we can all hear each other. Good afternoon. Counselor, if you can just state your name for the record just so we have a clean record. We're going to begin with cross-examination.

MR. MENNITT: May it please the Court, Gary Minnett of Dechert, for the lenders to Carnaby II and Carnaby III.

THE COURT: Good afternoon, you may begin.

CROSS EXAMINATION OF CHARLES MOORE

BY MR. MENNITT:

Q Good afternoon, Mr. Moore.

A Good afternoon, Mr. Minnett.

Q And we met on Sunday, correct, of this week?

A Yes.

Q And we've met prior to that as well, correct?

A Yes, sir.

Q Thank you. Mr. Moore, including a 20 percent cushion, you have estimated that the administrative claims in this case will be approximately $222 million, correct?

A Yes.
Q And also including a 20 percent cushion, you have estimated that the priority claims in this matter will be approximately $78 million, correct?
A Correct.
Q That's $300 million?
A Yes.
Q And the Debtors do not currently have $300 million in cash on hand to pay those administrative and priority claims, correct?
A Correct.
Q And the DIP lenders have not agreed to pay those claims when the plan is confirmed, correct?
A Correct. They have agreed to the litigation trust waterfall, but not payment of all of those items on the confirmation date.
Q As we -- as we sit here today, no one has agreed to pay those claims when the plan is confirmed, correct?
A Correct. Not on the confirmation date.
Q And those estimates totaling $300 million are based on various assumptions and not fixed amounts, correct?
A That's correct.
Q Your administrative claims estimate is based on the books and records and claims filed as of July 6th, you testified, correct?

A Yes.
Q But not anything filed after that, correct?
A That's correct. I would just clarify; I did comment earlier that I have taken into account the GLAS item.
Q Okay.
A But it was not -- it didn't exist as of July 6th.
Q And you said that you concluded that it didn't -- that your estimate remained, correct?
A That's correct.
Q But you didn't -- you haven't analyzed the merits of that, correct?
A Well, I sought to understand it, and being in this case for as long as I have and understanding the issues between case constituents, I did feel like I was in a position to have a view on it.
SQ All right, we'll come back to that. And your administrative expense estimate assumes that the Debtors will successfully object to certain filed administrative expense claims in a total aggregate amount of approximately $57 million, is that correct?
A Yes, I think that's about the amount, correct.
Q And those objections if there are objections, have not been filed or resolved yet, correct?
A We actually have resolved a number of various claims that have been filed. So, we've made very good progress

when you look at claims that have been filed either through motions or as part of the claims register. We do expect that there is going to be continued dialogue and discussion and likely objections that get filed.

Q So, you're anticipating that there will be objections and that those will be resolved, correct?

A Yes.

Q Do either of your administrative claim or priority claim estimates include any claims under the WARN Act?

A Currently, they do not.

Q Do you know what the WARN Act is?

A I do.

Q What's your understanding of that?

A That stands for the Worker and Retraining Notification Act.

Q And are you aware that certain WARN Act claimants have objected to confirmation of the plan and asserted that their claims may be administrative or priority claims?

A I am aware of that.

Q But that position is not reflected in your estimate, correct?

A Correct.

Q And there is no administrative bar date in this matter, correct?

A Correct.

Q And no such date will be set under the plan, correct?
A Correct.
Q So obviously no bar date has passed, correct?
A Correct.
Q And additional claims may be filed going forward, correct?
A Yes.
Q And in fact, you testified that you do expect that other parties will file proofs of claim, correct, for administrative claims?
A Yes.
Q Now, we touched on the GLAS claim. You're aware that GLAS, as agent for the Carnaby II and Carnaby III lenders, filed a motion to allow an administrative claim on July 23rd, correct?
A Yes.
Q And that was after the July 6 date you used when you prepared your estimate, correct?
A Yes.
Q And the GLAS claim is for up to $61 million. Do you know that?
A I am aware of that.
Q And GLAS alleges that the Debtors violated the adequate protection order covering the Carnaby II and Carnaby III collateral, correct?

A That's my understanding.
Q And you testified, did you not, that you became aware that the Debtors would not be able to adhere to that stipulation at some point, correct?
A Well, that adequate protection stipulation, under that we reserved rights. There are a number of significant questions that still remain to this date as it relates to the ownership of that inventory. And so that is a very, amongst others, that's a very important question that remains.
Q And you referred to other claims to some of the inventory, is that correct?
A Yes.
Q Do you know whether other secured lenders have adequate protection orders?
A There are other adequate protection orders that have been in existence in the case, yes.
Q And do you know whether those secured lenders will also file claims for administrative expense?
A I'm not sure.
Q And are you aware that the special purpose vehicles themselves could assert administrative estate claims against the Debtors?
A Just to clarify, against the plan Debtors?
Q Correct.

A I suppose that's possible.

Q And none of that was taken into account in your estimate as of July 6th, correct?

A What I would say is that certain items have been taken into account in terms of the overall relationship, not only between the plan Debtor entities and the SPV entities, but also with the SPV lender entities. And there are certainly claims that go back and forth as well, including collateral surcharges.

Q But you haven't attempted to estimate the amount of claims that secured lenders will file under their adequate protection orders, correct?

A What I -- just taking into account what I just went into, it certainly has been considered. Parties may file claims. We don't believe that any of those claims will end up being part of the $300 million or that there would be allowed claims that will result in that $300 million number changing.

Q But you don't know, correct?

A Correct, I don't know for sure.

Q And if those secured lender claims, including the GLAS claim, are allowed, then your estimate of administrative expense claims would be understated, correct?

A Not necessarily.

Q Not necessarily if it falls within the 20 percent

cushion. Is that your testimony?
A As I indicated earlier, I believe that there is more cushion than just the 20 percent. The 20 percent was added on to a number that I believe is already conservative. And I do believe, I expect, that there are going to be claims that end up being either disallowed or never come to be.
Q But it's certainly possible, correct, that your estimate of administrative expense claims will have turned out to be an underestimate?
A That is possible.
Q A little more on the -- on the GLAS adequate protection stipulation. Do you recall testifying that you were involved in the negotiation of that near in time after the petition date?
A Yes.
Q And that stipulation required that sales of Carnaby inventory collateral had to be for cash or eligible customer accounts receivable, correct?
A That's my recollection, yes.
Q And the cash proceeds of those sales were supposed to be placed in a cash collateral account, correct?
A I don't recall all of the specific terms of the adequate protection stipulation as it relates to the specific cash transactions.
Q All right, let me show you that stipulation.

MR. MENNITT: Your Honor, would it be okay if I proceed electronically and put this up? It's a public document.

THE COURT: Yeah, absolutely. Are you going to use kind of plugging it in?

MR. MENNITT: That was my intention.

THE COURT: Not a problem. Are you plugged in hard? Or are you doing go to meeting?

MR. KEEFE: I'll go to -- oh, sorry. I apologize, Your Honor.

THE COURT: No worries.

MR. MENNITT: James Keefe will be the one putting things up.

THE COURT: All righty. Can you tell me the name?

MR. MENNITT: James Keefe.

THE COURT: Oh, James Keefe. All right. And can you use the hand raise feature? Everybody knows how good I am at this. Oh, all right.

MR. MENNITT: And, Your Honor, this is on the docket at ECF 850-8, and I'm going to refer the witness to Paragraph 3.

THE COURT: What was the docket number?

MR. MENNITT: The ECF number is 850-8.

THE COURT: Okay.

MR. MENNITT: And can you go down? It's a long

paragraph. And near the end it says upon collection. Yeah, let's start with Paragraph B. Just scroll up a little bit, please, James. Oh, I see, it's a delay.

BY MR. MENNITT:

Q Can you read Paragraph B into the record?

A "Carnaby II and Carnaby III shall immediately deposit any cash proceeds of sales of Carnaby Inventory Collateral in an amount equal to the purchase price into a segregated cash account with the balance to be remitted to the FBG Debtors, as defined in the first day declaration, in the name of Carnaby II or Carnaby III and subject to the Carnaby II and III secured parties' liens, the adequate protection account."

Q And does that refresh your recollection that the cash proceeds of the sales were supposed to be placed in a cash collateral account?

A Yes. I would just point out again, all of this, the Debtors reserved their rights on -- in this entire document.

Q And if the Debtors sold the inventory for eligible customer accounts receivable and they collected that accounts receivable, they were supposed to put that cash in the cash collateral account, correct?

A Yes. Again, subject to the reservation of rights in the agreement as well as I believe provisions around the replenishment of inventory.

Q And the Debtor purchasers here were the FBG debtors and they incurred the obligation under this stipulation, right?
A Those are the parties that would typically purchase this inventory, yes.
Q But no cash was ever placed in a cash collateral account for GLAS or the Carnaby secured lenders pursuant to the stipulation, correct?
A That's my understanding.
Q And when we last spoke, you said that you were sure that at least there were some sales after the petition date. Do you recall that testimony?
A Yes.
Q Now, you testified that there is no bar date currently for prepetition claims, correct?
A Correct.
Q And so parties may file additional priority claims, correct?
A Yes.
Q And there's a provision in the plan for a 50 percent administrative claims consent program, correct?
A Yes.
Q And claimants who have agreed to reduce their claim in half will get paid before other administrative expense claims, correct?
A Correct.

Q No one has consented to that treatment yet, correct?
A Correct. I don't think that there is even an option for them to do that at this point. The time period for parties to opt into that is in the 60 days following the confirmation date.
Q Has anyone to your knowledge expressed an interest in opting into that program?
A Not that I have heard. However, we have not gone out and solicited that information from anyone.
Q And you have not estimated the amount of claims and claimants likely to consent to that program by amount or by number, correct?
A That's correct. All numbers that I cite as it relates to the litigation trust waterfall assume that no party agrees to or decides to enter into this administrative expense consent program.
Q The waterfall that you've put together is based on your $300 million estimate of administrative and priority claims, correct?
A Yes.
Q And if no one signs up for the consent program, the litigation trust will need to collect $1.9 billion in recoveries on estate claims to pay in full all administrative and priority claims, correct?
A Correct. Assuming that no one enters into the consent

program and the actual amount of administrative and priority claims end up being $300 million.

Q And are you aware that the Debtors have disclosed in their disclosure statement that any recoveries by the litigation trust are contingent on numerous factors including general litigation risks and other matters specific to prolonged litigation, many of which are difficult to predict and/or beyond the Debtor's control?

A Yes.

Q Do you agree with that statement?

A I do.

Q And do you also agree that the initial trust funding may not be sufficient?

A When you say the initial trust funding, are you referring to the $75 million?

Q I am.

A Yes. That is possible that it may not be sufficient.

Q And you have not done any analysis of a budget or for the litigation trust or how long the litigation trust will be able to operate on that initial litigation trust funding, correct?

A My team at A&M has put together some estimates of various expenses that we have provided to the litigation trustee, but it will be up to the litigation trustee to establish the budget for the litigation trust.

Q But you have not done an analysis of that yourself, correct?
A That's correct.
Q And under the plan, if the litigation trust requires what's defined as additional waterfall litigation trust funding, the plan provides that funding could prime the entire waterfall, correct?
A This is a provision that was built in in case the initial funding of $75 million is not sufficient, then there is an ability based on appropriate approvals under the governing structure for up to $37.5 million more that would come in. And that money does get repaid prior to other parties with the exception that the $350 million threshold does not change.
Q Okay. So the $350 million threshold does not change, but the amount of water going into the waterfall would be reduced, correct?
A I don't know if I necessarily follow that analogy. What I would say is that the amount of the litigation funders, the amount that would have to go to the litigation funders is higher. So if the entire $37.5 million is used, you would have $37.5 million plus $75 million getting repaid. However, that waterfall, especially from the $350 million point forward, that stays the same, the splits.
Q And are you aware that in addition to the provisions

that you've talked about, there is also a provision for additional waterfall litigation trust funding that could be structurally and contractually senior to the litigation trust waterfall?

A Generally the way I described it just now is my understanding.

Q Let me just show you the Debtor's plan, Section 6.4(G).

MR. MENNITT: Your Honor, that's on the docket at ECF 3448.

BY MR. MENNITT:

Q And I'm asking you, Mr. Moore, about Paragraph G in that document. Do you see -- in 6.4(G), do you see that provision?

A I do.

Q And can you read the -- the first sentence just says, "Priming effect of additional waterfall litigation trust funding." Correct?

A Correct.

Q And then can you read that next sentence into the record?

A "If the litigation trustee receives any additional waterfall litigation trust funding, such amounts may be structurally and contractually senior to the litigation trust waterfall."

Q In other words, those amounts would come before the

money even gets into the waterfall, correct? Or could be.
A Yes. If there is that additional funding. The way that I described it is consistent with how this plan reads.
Q Understood. And assuming that there is a priming additional waterfall litigation trust funding arrangement, that would have first priority and would need to be paid in full, including any fees and interest associated with it, before any estate claims are paid, correct?
A Correct.
Q And if we look at the demonstrative that your client -- I'm sorry, that your counsel asked about yesterday, which is on the docket at ECF 3466 and has been marked as an exhibit here -- do you have that document in front of you? Okay.
A I do.
Q You're faster than me. Let me just get to the right page. So on this document it shows in the fourth column that when the DIP gets paid in full 1.335, the distributable proceeds are $1.8 billion, correct?
A Mr. Mennitt, just to confirm.
Q Yes.
A You're on Page 5, correct?
Q I am, thank you.
A Yes.
Q Is that what that shows?
A Would you mind repeating your question?

Q Yes. So let me ask you to answer the question, where -- at what level of illustrative recovery of distributable proceeds does the DIP get paid in full?
A It's at the DIP A I assume you're referring to. And that is $1.8 billion and change.
Q And at what threshold do the administrative and priority claims get paid in full?
A This is at $1.9 billion and change.
Q And so if there was a priming litigation trust funding agreement, the amount of distributable proceeds would remain the same, but there would be additional recoveries needed before there were any distributable proceeds, correct?
A In a way. One thing -- I'll just say it as a blanket statement so I don't have to keep repeating. This assumes that the administrative and priority claims, the allowed claims end up being at $300 million. So setting aside the consent program, setting aside any reductions or even increases, we'll just assume that that's $300 million. The amounts that get paid for the additional trust funding do get paid first. The sharing still begins at that $350 million level. The impact of it is that as a result of that additional $37.5 million coming in, and I'll just assume that the full additional amount that comes in, it adds roughly about $60 million to their hurdle for the administrative and priority claims at $300 million to be

paid. So you would be right around $2 billion that is required for the repayment or the payment in full of the administrative and priority claims if the additional $37.5 million came in.

MR. MENNITT: Your Honor, I move to strike most of that answer as nonresponsive. My only question was at what level do the administrative and priority claims get paid in full on this exhibit.

THE COURT: I'll allow it.

BY MR. MENNITT:

Q And Mr. Moore, the administrative and expense claimants who accept the 50 percent consent program, if there are any, would be paid before non-consenting administrative claimants that do not accept, correct?

A When you refer to non-consenting, just parties that have not consensually entered into that program. That's correct.

Q And you agreed with me at your deposition that the timing of when administrative claims might be paid in full is more of a legal estimate than a business estimate, correct?

A I agree with that.

Q And you are not offering any legal opinion, correct?

A Correct.

Q The two examples of avoidance claims called out and

mentioned in that same document, which is on the record in the docket at ECF 3466, are on a different page. On Page 6 of 12. Do you see that?
A Yes.
Q And the two examples of potential avoidance actions are the $988 million claim of total payments to insiders, correct?
A That is, just to be very clear, there's approximately -- we'll call it $989 million of transfers in that section.
Q Okay. So there were two sets of transfers here that you list that I want to call your attention to. One is total payments to Onset, $2.3 billion. Do you see that?
A I do, under the full period column, yes.
Q Yes. And total payments to insiders of $988 million, correct?
A Yes.
Q And you're aware that civil litigation with respect to those claims has been stayed, correct?
A That is my understanding with both of the adversary proceedings that we initiated.
Q And you don't know when that stay will end, correct?
A I don't.
Q You don't know when the criminal actions with respect to FBI -- I'm sorry, First Brands insiders will conclude, correct?

A I do know that they are scheduled to proceed on -- I believe it's February 9th, 2027.

Q And you don't know whether assets of any of the insiders will be subject to criminal forfeiture, correct?

MR. TECCE: Your Honor, I'm just going to object to the line of questioning about the criminal actions.

THE COURT: Go ahead.

MR. TECCE: I'm sorry?

THE COURT: I said go ahead. What's the objection?

MR. TECCE: I don't think it's appropriate examination. The other parties -- all of the parties to the proceeding are not here. And the witness is not in a position to make any statement about what will happen in the criminal proceeding.

MR. MENNITT: Your Honor, I'll withdraw that question and move on.

THE COURT: Thank you. I'm just going to call it lender-on-lender violence.

MR. TECCE: I'm sorry about that.

BY MR. MENNITT:

Q Mr. Moore, do you know whether -- if assets are forfeited to the government by anyone in this case, whether they will ever become available to be distributed under the plan?

A I don't know that for sure, but I do know that it is a possibility.
Q Now, turning back to the litigation trust waterfall chart, which is Page 9 of 12 on Document 3466, ECF 3466.
A Yes.
Q We talked about what happens at $1.8 billion. If the total distributable proceeds are $1 billion, the DIP A would get $702 million, correct?
A That's correct.
Q And if the total distributable proceeds in this illustrative recovery are $350 million, the DIP A would get $221 million, correct?
A Correct.
Q And you are aware that the trade -- I'm sorry, strike that. You are aware that the DIP A trades at a significant discount, correct?
A I haven't seen the recent prices and I'm not sure if there have actually been any trades recently.
Q Let me show you what we have submitted as Carnaby Secured Lender Exhibit 71, which is filed at ECF 3740-1. Are you familiar with this type of document, Mr. Moore? Can you identify it?
A This appears to be quotes as it relates to the pricing of debt. What I don't see on here is when the last trade actually happened, which is a very important part of

understanding where the debt actually trades.
Q Okay. I didn't ask you that question. But what is the -- can you see what the live bid ask is?
A That is 16.857 and 19.571.
Q And what date is that as of?
A That is as of July 26th, 2026.
Q And what security is it for?
A This is for the First Brands new money DIP.
Q That's what we are calling the DIP A?
A Correct.
MR. TSEKERIDES: Your Honor, I don't want to steal Mr. Berezin's thunder, but if you want some representation from counsel on this document, I think it can come in under the market report. But I haven't heard him lay any foundation for that. So I am going to object right now to that document going into evidence or being used as the truth of the matter unless it can apply some foundation that it comes from the market reports. I'm sorry, I didn't want to take Mr. Berezin's witness, but this is a document (indiscernible).
MR. MENNITT: I think the witness did testify, Your Honor, that he understands what this document is, and I offer it into evidence.
THE COURT: Any objection?
MR. TSEKERIDES: The witness understand -- I think

I heard the same testimony you did. He doesn't know that there were any trades after a certain date. So I don't think it's established that the witness knows anything about the document.

MR. MENNITT: That's redirect, Your Honor.

MR. TSEKERIDES: It's an argument about the document.

THE COURT: You're saying that -- well, are you -- under what are you trying to get it in? Are you just -- I mean, I think he said he knew what it was. But you're saying that that authenticates that this document is accurate and for the truth of the matter asserted?

MR. MENNITT: Yes, Your Honor. I think it comes in as a market report. They can obviously challenge it if they think there is a basis to do so. And they can ask him about the other information.

THE COURT: But I'm saying I think you're trying to get it in -- I think once it's in, they can't challenge it, right? I think that's what they are arguing now, is for you to establish that it's a market report.

MR. MENNITT: Yes, Your Honor. I just meant that they could challenge the weight of it.

THE COURT: No, I'm not sure that this is kind of a challenge to the weight. If you can establish that this is a market report, I'm -- you can get it in. There's other

ways you can probably do it.

BY MR. MENNITT:

Q Do you know what the DIP A is trading at currently?

A I don't.

Q Do you know whether it's in the range shown in this document?

A I don't.

Q Do you follow any market reports like this one?

A I don't.

Q Would you agree that this is a market report?

A I have seen reports like this before.

Q And what do you understand reports like this to be?

A Typically it would give information as to the trading prices of securities. And in this particular case, debt securities.

Q And is there any doubt in your mind that that's what this document represents?

A The typical sources for this information -- I have not seen this come from Capital IQ. So I can't verify this report.

Q If you don't use Capital IQ, is there a different source that you would typically look at?

A Typically when I see trading prices, it would come from Bloomberg.

Q From Bloomberg. So you would recognize Bloomberg as a

reliable source of that information?

A I would say that's where I typically see trading prices. I don't have a Bloomberg terminal. And typically when that information is given to me, it's provided to me by someone else.

Q And who would that be that it was provided to you, someone else on your team?

A Typically actually would come from an investment bank that I'm working with.

Q And in the past have you relied on Bloomberg reports for that information?

A I don't know that I would say that I rely upon them. When people put that information in front of me or tell me what things are trading at on Bloomberg, I use it as a data point.

MR. TSEKERIDES: Your Honor, we move to strike the testimony concerning the substance of the document, which was being -- I (indiscernible) foundation for it, but if it's not coming in (indiscernible).

THE COURT: We haven't made that call yet.

MR. CASSEL: Your Honor, Michael Cassel for the LAM parties. I can represent my library pulled this off Cap IQ. If we really need to get a librarian to testify how she got it off Cap IQ, we can do that.

THE COURT: And the parties can get together and

just agree to that.

MR. CASSEL: Up until the very end I thought he got pretty close to the A17. What I was trying to get at when I said it for the first time is if counsel can represent that this was an S&P Capital IQ is an entity that provides market reports and he can represent that --

THE COURT: Yeah. I think we just needed the final part. It's just someone to represent that -- if they can represent that somebody pulled this straight from Cap IQ and not off of a Google --

MR. CASSEL: And I think they satisfy --

THE COURT: Then I think we get there.

MR. CASSEL: I mean, look, if we have to call in a librarian, we will.

THE COURT: No, no, no.

MR. CASSEL: And I can make the representation this comes from our library.

THE COURT: I think that's all that was, quite frankly, needed. The question is where did somebody pull it from. That's really where it was coming from. That's what I took it as. You can kind of Google it. Yeah?

So that being said, what are we calling this to get it in? Carnaby 71, is that right?

MR. MENNITT: Yes, Your Honor.

THE COURT: All right.

MR. MENNITT: Yes. It is on our exhibit list as 71.

THE COURT: Okay. What is the ECF number just so I -- you can give it to later. But we'll let -- Carnaby 71.

MR. MENNITT: It would be 3470 -- I'm sorry, 3740.

THE COURT: There it is. 3470-1?

MR. MENNITT: That's what I have.

THE COURT: Okay.

(Exhibit ECF 3470-1 entered into evidence.)

MR. MENNITT: All right, Your Honor, and subject to tying up, I'll continue with this line of questions obviously.

THE COURT: NO, it's in.

MR. MENNITT: It's in. Thank you.

BY MR. MENNITT:

Q At those prices, the $1.1 billion principal amount of the DIP A would have a market value of between $176 million and $209 million, correct?

A The DIP A, the original principal amount, so the new cash, was $1.1 billion. But there are various fees and accrued interest associated with that. That's why on the waterfall you see $1,335,000. And so typically the trading prices would be attached to something along those lines. When I say something along the lines, the $1.335 is based on a concession that the DIP lenders have made to no longer

accrue interest. But these loans, the DIP A continues to accrue interest. And so this price would be attached to whatever the principal and accrued amount is as of any given point in time.

Q So it's your understanding that the bid ask on the DIP is based on principal and accrued interest and not just on principal?

A Yes. People are bidding on all that comes along with holding this paper.

Q All right. In any event, assuming that the market price reflects a valuation of the DIP A, where would that correlate to distributable litigation trust proceeds?

A Can you give me the number again that you would like for me to assume in terms of market value of the DIP?

Q Let's just use $200 million as an example.

A Okay. That would be around the $350 million in distributable value as you can see on the exhibit that we were looking at. At $350 million, there's $221 million.

Q And at that point there would be no distribution to administrative and priority claims, correct?

A Correct.

Q And it's far below the $1.9 billion in distributable litigation trust proceeds that would be required for full payment of the administrative and priority claims and the -- is that correct? For the effective date.

A You're just referring to the $350 million amount?
Q Yes. I'll withdraw the question. Now, members of the A&M team conducted initial outreach to 26 potential bidders and provided them with summary marketing materials describing the opportunity to bid on the estate claims, correct?
A Yes.
Q And none of those market participants submitted a bid, correct?
A Correct.
Q And so there is a possibility here that what you call the effective date will never occur, correct?
A That is a possibility, yes.
Q But even if the effective date does not occur, transactions related to the litigation trust, the estate claims credit bid transaction, the litigation trust funding, the administrative expense claims consent program, those will all remain in place and will not be nullified, correct?
A Correct.
Q And if the effective date does not occur, the DIP collateral credit bid transaction, the DIP collateral trust funding, the foreclosure by the ABL security -- I'm sorry, the ABL secured parties on the ABL priority security, all of that will remain in place and not be nullified, correct?
A Correct.

Q And even if the effective date does not occur per the related plan supplement documents that established the trusts and the other terms of the plan under articles 6, 7 and 8 of the plan, the provisions that govern the creation of the trusts, those will remain in effect and not be nullified, correct?
A Correct.
Q And further, isn't it true that even if the effective date never occurs, the Debtor releases under Section 13.5(A) of the plan, the exculpation provisions of Section 13.6 of the plan, the waiver of limitations on releases under 13.7 of the plan and the release and exculpation injunctions in Section 13(E) to the plan will all remain in effect and not be nullified, correct?
A Correct.
Q In fact, am I correct that following confirmation, the Debtor's estate will have little to do and will be wound down in a matter of a month?
A I don't believe that's the case.
Q Let's take a look at Exhibit 15 of the Debtor's exhibit list. So that's ECF 3366-2, Exhibit 15.
Mr. Moore, do you have that in front of you?
A I do.
Q What do you recognize this to be, if you recognize it?
A I do recognize it. It is the winddown budget.

Q All right. And under this -- who prepared this winddown budget?

A This was prepared by the A&M team in conjunction with the proposed winddown administrator and with input from both the Ad Hoc Group as well as the ABL lenders.

Q And you're familiar with this document?

A I am.

Q Do you see where corporate costs are listed near the bottom of the page?

A Yes.

Q And am I correct that there are no corporate costs listed in the winddown budget beyond September of 2026?

A The reason why there is nothing shown there is after the end of the third quarter of 2026, so after September, those costs will be funded by the trusts based on their usage. So the estates will no longer be paying corporate costs.

Q And if you look at the top of the page, there are no Debtor advisor fees beyond November of 2026, correct?

A It's labeled as the transition and then the next section down, case administration, the winddown administrator and the winddown counsel take over from there. And you can see fees through this 12-month period.

Q And there are no U.S. Trustee fees listed after the end of 2026, correct?

A That's actually more just a rounding and presentation standpoint. So the fees paid to the U.S. Trustee are based on a formula of disbursements. And they just don't register an amount. If it was zero, it would actually be showing up as a dash. But because the amounts are small, it basically rounds it to 0.0.
Q And what are the total case administration fees after February of next year shown on this document?
A So beginning in February of 2027, it's about $300,000 per month. This budget only covers the first 12 months post-confirmation. And it is expected that a new budget would be developed for the period following July of 2027 based on whatever the status of the case is at that time.
Q And on the confirmation date, if there is one under the plan, several trusts will be created and the FBG debtors will transfer all non-disputed assets to those trusts. Correct?
A Yes.
Q And those transfers will be done through credit bids by the DIP lenders and a foreclosure by the ABL lenders. Is that correct?
A Correct.
Q And the DIP credit bid includes a bid on the avoidance actions, correct?
A Yes. There are two credit bids from the DIP lenders,

one for the estate claims and one for the DIP collateral.
Q And the DIP lender lien is on the proceeds of the avoidance actions, not the actions themselves, correct?
A The credit bid on the estate claims was for all estate claims. And yes, as it relates to avoidance actions, they only have a lien on the proceeds.
Q And the transfer of those assets to the trust are intended to be irrevocable, correct?
A Correct.
Q And so there is no way for the FBG debtors to get back the assets transferred to the trusts in the event the effective date does not occur, correct?
A Correct.
Q Prior to the petition date, the Debtors were audited, correct?
A You're referring to a financial statement audit?
Q Yes. Let me ask a better question. Prior to the petition date, the Debtor's financial statements were audited, correct?
A Correct.
Q And those audited financial statements did not note or disclose any fraud, correct?
A That's correct. I just want to go back. Not all of the debtor entities were audited. So I'm not aware of an audit occurring for any of the SPV debtors. But of the --

we'll call it the First Brands entities, those debtors, they were audited. And I believe every year was an unqualified opinion. Every year in the last four years that I looked at.

Q Four years prior to the petition date, correct?

A Correct.

Q And prior to the petition date at least as far back as 2022, certain of the debt was rated by rating agencies, correct?

A That's my understanding.

Q And you're not aware of any evidence that any rating agency disclosed any fraud, correct?

A Not that I'm aware of.

Q And do you recall testifying on Sunday that in early September 2025, shortly before the petition date, the first lien debt was trading at 95 cents and the second lien term loans were trading at over 90 cents?

A That was a question that was asked of me based on something that was put in front of me. I didn't know what the debt was trading at at that time. I knew it was high. But just to be clear, I was responding to a question based on something that was put in front of me.

Q As we sit here now, do you recall that the first lien debt was trading at 95 cents shortly before the petition date?

A I do.
Q And as we sit here now, do you recall that the second lien term loans were trading at over 90 cents prior to the petition date?
A I don't recall that one specifically, but I know it was high.
Q So would you agree that the market seemed not to have perceived any significant problems with First Brands or the reported financial statements immediately prior to the petition date?
MR. BEREZIN: Your Honor, it sounds like an expert opinion, so (indiscernible) open the door to that (indiscernible).
MR. MENNITT: Yeah. I'll withdraw the question.
THE COURT: Okay.
BY MR. MENNITT:
Q During the four years prior to the petition date, the first and second lien lenders received interest payments, correct?
A That's my understanding.
Q All right. And I'm going to ask you to look at the transfer page that we've previously looked at in the Debtor's Exhibit 235, which is on ECF 3466, Page 6 of that PDF. Do you see that?
A Yes.

Q And you testified about the preparation of this, correct?
A Yes.
Q Is there a reason that the payments to the first and second lien lenders are not indicated here?
A The first and second lien lenders have already been released, as we talked about through the final DIP order. And so there is no reason to list those transfers here.
Q Has someone -- is there a version of this that lists those transfers?
A Not that I am aware of.
Q You are not aware that any First Brands executives ever touted returns paid to an existing lender or investor to a prospective lender or investor to induce a loan or investment, correct?
A I have no idea what First Brands executives were telling parties prior to the petition date.
Q Do you recall that you testified on Sunday that you were not aware of any evidence that that ever happened?
A I'm not aware of any evidence. I just don't know.
Q And prior to and after the petition date, the Debtors were an operating business, correct?
A Yes.
Q And do you recall in your first day declaration in this case that you said they employed 26,000 employees globally

including 6,000 employees in the United States?
A Yes.
Q And you also said at that time that First Brands was a leading supplier of aftermarket parts, correct?
A Yes.
Q And it was a vertically-integrated global manufacturing company with capabilities that included casting, forging, welding, machining, fabricating metals, plastics, rubbers, electronic assembly, surface treatments, packaging, and more, correct?
A Yes.
Q You testified on direct that the Debtors ran low on liquidity before the end of January 2026, correct?
A Yes.
Q And you testified that the Debtors needed to get funding from the OEMs to continue certain operations, correct?
A Correct.
Q And because of the lack of liquidity, the defendants had to expedite sale processes for assets and business lines, correct?
A We chose to initiate an accelerated sale process starting at the beginning of January 2026.
Q And when the motion to approve the DIP was filed, the Unsecured Creditors' Committee objected to the DIP on the

ground that the proposed DIP was not sufficient to provide sufficient liquidity for the case. Do you recall that?

A I don't recall the specifics of the Committee's objection, but I certainly recall that they objected to it.

Q You don't recall the sufficiency of the DIP to be an issue at that time, or just don't remember who objected?

A I just don't remember all the details. If we added up all of the various objections throughout this case, it would fill this room I think.

Q Do you recall that you submitted a declaration in support of the proposed DIP in this case?

A I do.

Q And do you recall that you testified in words or substance that in your professional judgment based on your experience with the Debtors, the initial DIP budget represented a reasonable projection of the Debtor's capital needs to finance the cases?

A Yes.

Q Do you recall that that was the substance of your testimony?

A Yes.

Q And you were deposed in connection with the approval of the DIP, correct?

A Yes.

Q And in that deposition, do you recall that you

testified that you thought the DIP financing would provide enough liquidity to sustain operations through June of this year?
A Yes.
Q And that was based on the company's performance against the DIP budget as of the date of the deposition and your expectation about actions that could be taken to improve cashflow and you would be able to get to a point where the company was self-sustaining, correct?
A Yes. That's right. There was a forecast prepared that went through January. And it showed that we had enough cash to get through January. And then I highlighted the various assumptions that were made as it related to how the Debtors would sustain themselves after that.
Q And contrary to your belief at that time, the DIP in place did not provide enough liquidity to get through a sale process, correct?
A Well, the DIP went as far as we had projected. The issue was that -- there were a couple of things. One, based on the financial statement and manipulation and all of the things that I went through before, it was very difficult to get any party to provide additional funding into the business. And the turnaround plan that was put together for the businesses needed cash. And we could not get parties to provide the cash to pursue that business plan.

Q But again, you testified that the Debtors ran low on liquidity before the end of January 2026, correct?
A We always communicated -- first of all, back at the time of the DIP, the forecast, the cash forecast went to the end of January. All of our pleadings following that always talked about we would run out of cash by the end of January. And so our comments were always consistent. The issue was we did not have the ability to get the company to cashflow positive in that time because our starting point was significantly different than what was originally understood as well as people's reluctance to provide additional funding for the business operations.
Q But you believed that -- at the time of your deposition in November in this case, you believed that the DIP in place would provide enough liquidity to get the company through a sale process, correct?
A We were evaluating different paths to complete the Chapter 11 cases. We expected that we may have a sale process. We could pursue a plan. All of those options were on the table at that time.
Q But in fact the DIP was not adequate to get to a sale process, correct?
A Well, actually, we launched the sale process in early January. As I indicated, it was a very robust process. Probably about 400 parties were contacted. The feedback

from those parties and the noise around this company certainly told us that other than for a few business units, there was not interest in the business. So unfortunately, we terminated the sale process for select businesses and moved to shut them down. We are still selling assets for those businesses. We continued the sale process for the remaining business that we sold as going concerns.

Q But suffice it to say your predictions that the company would become self-sustaining did not prove to be true.

A Well, as I indicated, these were not predictions, they were assumptions. And there were two primary assumptions. One was either that we would be able to get the company to cashflow positive by that time, by the end of January, or that we would be able to obtain additional DIP funding. And so unfortunately, neither of those assumptions proved to be the case.

Q So neither of the assumptions proved to be the case.

A Neither of those two that I just indicated, which is our ability to get the company to a cashflow positive operation by the end of January or that we would be able to get additional DIP financing to cover that period post January. We ended up getting different financing instead.

Q Thank you.

MR. MENNITT: Pass the witness. Your Honor, before I do that, I have had conversations with Mr.

Tsekerides and Mr. Berezin about exhibits. I'm happy to do that now or happy to reserve and do it when the defendants put on their case-in-chief. Whatever the Court's preference is.

THE COURT: Why don't we do it now.

MR. MENNITT: Okay. So my understanding -- so we offer 1 through 8 and 10 through 32 with no objection.

THE COURT: If you could just give me the ECF number one more time. I apologize.

MR. MENNITT: Sorry, Your Honor. Our exhibit list is ECF 3470-1.

THE COURT: Okay. 1 through 8 and 10 through 32?

MR. MENNITT: Yes, Your Honor. And then my understanding is there is no objection to those. We also are -- we are not offering 9. And then --

THE COURT: Before you do, let me just confirm. Any objection to 3470 1 through 8, 10 through 32?

MR. BEREZIN: No, Your Honor.

THE COURT: Okay. Let me just say those are admitted.

(Exhibits 1 through 8 and 10 through 32 entered into evidence.)

MR. MENNITT: Thank you, Your Honor. Exhibits 35 through 50, which are the proof of claims and the GLAS administrative claim application, we offer but not for the

truth of the matter asserted, just for judicial notice.

THE COURT: Okay. 35 through 50, judicial notice.

MR. MENNITT: 51 through 62 we offer. And my understanding is there is no objection.

THE COURT: Any objection? 51 through 62 are admitted. And that's for all purposes?

MR. MENNITT: Yes, Your Honor.

THE COURT: Okay.

(Exhibits 51 through 62 entered into evidence.)

MR. MENNITT: And then 63 we are not offering. And then 64 through 71, we offer 71. As the Court knows, this has already been admitted.

THE COURT: All right.

MR. CASSEL: Your Honor, one tiny bit of housekeeping. I apologize. With respect to Exhibit 71, which Mr. Moore just discussed, it turns out there was a summary chart included at the back that did not come straight from Capital IQ. We'll be getting a corrected version. Of that last -- it was not shown to the witness, but I just wanted to be sure that I made a representation (indiscernible) be removed.

THE COURT: Thank you very much. So 71 will be a revised version of 71. If somebody can just put just something so I know that it's the -- call it corrected 71 or something. And then we can get that on the docket. Okay.

That's admitted.

MR. CASSEL: Your Honor, I have a tiny bit of setup to do with (indiscernible). It may make sense to take five minutes or ten if this is a good time.

THE COURT: Okay. Let's take ten minutes. Just so I know, who from that side of the table intends to examine today? I've got it is subject to reservation. So it is a few of you. Okay. Yeah. All right. Thank you. Yeah, let's take our ten minutes. Thank you.

(Recess.)

THE COURT: All right. Okay. This is Judge Lopez. We are back on the record continuing cross-examination. Mr. Moore, I will remind you that you are still under oath.

THE WITNESS: Yes, sir.

THE COURT: Counsel, if you could state your name for the record, and you may begin.

MR. CASSEL: Michael Cassel for the LAM parties. A little bit of housekeeping. The screen in front of me is actually not...

THE COURT: Is that screen not working?

MR. CASSEL: The screen is not working. While we're doing that --

THE COURT: Let's see. Well, that's why you were walking back there. Couldn't figure out what was going on.

We're going to have to get the tech folks? We may need to -- do you want me to see if I can get a tech person here?

MR. CASSEL: I mean, I can go without it. I just -- I can go without it. Can we put Ms. Herring as the presenter? She'll raise her hand.

THE COURT: I mean, tell me, I don't want to interrupt your -- but it will take like 15 minutes to get someone up here to kind of do it. Or do you want to -- it's up to you.

MR. CASSEL: I think I can go without it.

THE COURT: Give it a go. But if at any point you feel like -- why don't we reach out to them. And maybe what may make sense is why don't you get started. And if they come up, then we can take a five-minute break and they can get going.

MR. CASSEL: Okay, works.

THE COURT: Okay. I am now notoriously known for being bad at this. I appreciate it. I believe we are good to go. Let me just confirm. Yeah. Let's see. I believe Ms. Herring has presenter role.

MR. CASSEL: She just confirmed (inaudible).

BY MR. CASSEL:

Q Mr. Moore, you should see in front of you two binders. One is labeled Charles Moore, one is labeled Charles Moore Cross-Examination Materials.

A Yes.
Q If I ask you to turn to a tab in your binder, I'm referring to the cross-examination materials binder.
A Okay.
Q And your previous transcripts and depositions are in the Charles Moore binder.
A Okay.
Q Does that make sense?
A Yes.
Q Okay, great. So the Debtors do not have any ongoing business operations, correct?
A Correct. All of the manufacturing and production operations have ceased.
Q And the Debtors do not have any employees other than some tech agency employees, correct?
A That's correct.
Q And the Debtor's plan contemplates the liquidation of all of the Debtor's assets, right?
A The continuation of the process that we're in, yes.
Q You are not here attempting to preserve a going concern business, right?
A Correct.
Q And other than the disputed assets, the Debtors are seeking to sell all of their other assets on the confirmation date, right?

A Sell or allow for the ABL lenders to do a foreclosure.
Q And that includes the estate claims, right?
A Yes.
Q Before I turn to that, you had mentioned in your direct the DIP collateral trust bid. That's for other assets of the estate besides the litigation claims, right?
A Specifically machinery and equipment, real property, intellectual property if any remains, yes.
Q And how much is the DIP collateral trust credit bid for?
A $40 million.
Q And then there's the estate claims credit bid, right?
A Yes.
Q And the estate claims credit bid is $75 million, right?
A Correct.
Q Now, as you discussed with Mr. Mennitt a little bit ago, the DIP A currently trades at approximately 18 cents on the dollar, right?
A That was based on the prices that Mr. Mennitt put in front of me, yes.
Q Can you pull back up Carnaby 71? It's in your binder at Tab 3.
A Which tab did you say?
Q Tab 3.
THE COURT: Take a look at your screen.

BY MR. CASSEL:
Q Also on the screen. But it's Tab 3 in your binder.
A Yes.
Q And if we turn four or five pages in --
THE COURT: Can we take a two-minute -- let's take a two-minute break. The tech person is here. Let's see if we can get this working. Okay? Let's take -- so we can get this going. I'll turn off my camera. I'll keep my camera on. We'll see if we can get this done. But everyone just kind of stay in place.
(Recess.)
THE COURT: Okay, we are back officially on the record. Cross-examination. Folks, if we can huddle up in the back. We're going to continue cross-examination.
BY MR. CASSEL:
Q Mr. Moore, I'm turning to the fifth page of Tab 3. And I don't think it's showing on the screen correctly. But I'm looking for the -- it's the fifth page in. It begins with First Brands Loan Security detail. There we go. That page is now on the screen as well.
A Okay.
Q Mr. Moore, is this referring to the DIP rollup instrument?
A On this page that I'm looking at -- are you referring to the second page that has the line graph?

THE COURT: No, I think he's referring to what's on the screen.

BY MR. CASSEL:

Q What's on the screen, Mr. Moore.

A Oh, yes. So this is the rollup.

Q And that's been referred to in this case as the DIP B, right?

A Correct.

Q And what price is the DIP B currently trading at as shown on this page?

A The numbers under the live bid ask are 0.033 and 0.591.

Q So the -- we discussed earlier with Mr. Mennitt the total principal amount of the DIP A is $1.1 billion, right?

A The principal amount, yes.

Q And if you'll take my assumption that that price -- so take my assumption that the 18 cents is calculated based on the $1.1 billion in principal amount, that would imply that the total market value of the DIP A claims is less than $200 million. Right?

A I'll accept your math.

Q The $75 million credit bid price for the estate claims credit bid was ultimately communicated to other bidders, right?

A It was.

Q That amount was first communicated on July 19th, 2026,

right?

A I think that was the date. It was that weekend.

Q So to back you up a bit, you testified on direct that the estate claims marketing process started on or about May 4th, 2026?

A Yes.

Q And at that time the Debtors were proposing the Premier Marketing Group plan, right?

A Correct.

Q Do you know what I mean when I call it the Premier Marketing Group plan?

A Yes.

Q The Premier Marketing Group plan was proposed for a single debtor that was believed to have few if any administrative and priority claims against it, right?

A Correct.

Q Ultimately the court denied conditional approval of the disclosure statement for the Premier Marketing Group plan, right?

A Yes.

Q And that was on May 26th, right?

A I don't recall the exact date, but yes, that's about the right time period.

Q And then the Debtors pivoted to proposing the plan that's now before the Court, right?

A Yes.
Q But from the launch of the estate claims marketing process through July 20th, there was a virtual data room available to bidders, right?
A Yes.
Q But before July 15th, the data room had fairly limited information in it, right?
A I don't know if I would describe it that way. Certainly there was more information added after July 15th.
Q So let's turn to Tab 18 in your binder. I'm sorry, Tab 20 in your binder. It's LAM Exhibit 18. I can't put this one on the screen for confidentiality reasons. So that's why it's in the binder. But it's at Tab 20 in your binder.
A Yes.
Q And Mr. Moore, we went over this email at your deposition, right?
A Yes.
Q I want to start at Page 2 of this email.
A Okay.
MR. CASSEL: At Tab 20, Judge. I'm on Page 2.
BY MR. CASSEL:
Q And again, I'm not going to use the name of this person for confidentiality reasons. But a bidder asks a question in response to emails from A&M saying are the materials in the data room the same materials that have been available to

all DIP A lenders? Do you see that?
A I do.
Q And if we flip back to Page 1, there's a response from Mr. Ferrier at Weil, right?
A Yes.
Q And Mr. Ferrier responds, "The data room for the estate marketing, it's fairly limited to include the publicly-filed examiner report, complaints to related public pleadings, plus certain specific documents related to Onset's financing, all of which was either public or previously shared with the DIP A holders. We intentionally did not include the product of discovery, work product, or privileged analysis." That's what he said, right?
A Yes.
Q And that statement was accurate at the time it was made, right?
A Yes.
Q And that was on May 24th, right?
A Yes.
Q And the data room was not altered between May 24th and July 14th, 2026, right?
A I think that's correct.
MR. CASSEL: Your Honor, I would request to admit LAM Exhibit 18.
THE COURT: Any objection?

MR. BEREZIN: No objection.

THE COURT: LAM 18 is admitted.

(LAM Exhibit 18 entered into evidence.)

MR. CASSEL: Ms. Herring, if we could put Tab 2 on the screen?

BY MR. CASSEL:

Q Mr. Moore, you testified yesterday about this document, correct?

A Yes.

Q This was the teaser document that was admitted as Debtor's 5?

A Yes.

Q Is there any specific discussion in the teaser about -- of avoidance actions against anyone besides Onset and the James's?

A There is a general statement on Page 4, avoidance actions. Any avoidance actions, including any and all actual or potential claims and causes of action to avoid a transfer of property. And it goes on.

Q But no specific discussion, correct?

A I don't know if there's anything else specific related to avoidance actions besides the couple that you mentioned.

Q Before July 15th, was there any information in the data room showing the total amount of avoidable transfers the Debtors were claiming?

A No.

Q Does the teaser contain any specific discussion of who might be sued besides James and Onset?

A No.

Q The teaser shows a bid deadline of May 22nd, 2026, right?

A Correct.

Q And you testified yesterday that bid deadline was extended a few times subsequently, right?

A Yes.

Q But ultimately no third-party bidders made a bid before July 15th, right?

A Correct.

Q So then on July 14th, the Moore and Kirschner declarations are filed, correct?

A Correct.

Q And then right on July 14th, the Debtors started reaching out to some of the third-party bidders that had previously been contacted to see if they were still interested in bidding, right?

A Yes.

Q Was there a new teaser prepared?

A No new teaser.

Q And that was the first time that any third-party bidders learned of the $24.5 billion estimate for potential

estate claims that we have been hearing about, right?
A That was the first time that anyone saw that schedule of transfers that was in my declaration.
Q Can we put up Exhibit 22, which is Tab 4 in your binder? This is LAM 22.
Mr. Moore, you may remember there was some discussion at your deposition about the data room, correct?
A Yes.
Q And I'll represent that this was a document that was provided to us by the Debtors showing the contents of the data room at relative points. Do you understand that?
A I do.
MR. CASSEL: I'll move to admit LAM Exhibit 22.
MR. BEREZIN: No objection.
THE COURT: Exhibit 22 is admitted.
(LAM Exhibit 22 entered into evidence.)
BY MR. CASSEL:
Q And so Mr. Moore, I'd like to walk you through what was added to the data room on July 15th. Ms. Herring, if you could zoom in?
So, Mr. Moore, you see on the right the date available column.
A Yes.
Q And up until May 5th, the data room contained the fairly limited information we've been discussing earlier,

right?
A The documents that are listed there, yes.
Q And so then I guess on July 16th it says here there's an expert declaration supporting documents file added to the data room. Do you see that?
A Yes. A folder and then files.
Q Folder 1.4. Right?
A Yes.
Q But there's also a folder labeled C. Moore Supporting Documents, 1.5. Right?
A Yes.
Q And that doesn't get added until July 20th, right?
A That's correct.
Q I'm going to -- turn to Tab 1 in your binder. This is another one I can't show on the screen given confidentiality.
THE COURT: What tab are you referring to?
MR. CASSEL: Tab 1.
THE COURT: Okay.
MR. CASSEL: And this is LAM Exhibit 21. I just can't show it on the screen.
THE COURT: Yes. You've got it.
BY MR. CASSEL:
Q And so, Mr. Moore, this is another email chain involving an email from Mr. Ferrier of Weil to a potential

third-party bidder. Again, I'm not going to use the name for confidentiality reasons. Do you understand that?
A I do.
Q And I want to turn with you to Page 3 of this email. And do you see there Mr. Ferrier -- this is the third page of an email from Mr. Ferrier to the bidder on July 16th, 2026 at 5:38 p.m. Do you see that?
A I do.
Q And Mr. Ferrier writes in part, "Given the proposed confirmation hearing, at the end of this month, we would need to receive the proposed bid structure this week so that we can work to finalize a deal next week. Right?
A I see that.
Q That's what Mr. Ferrier wrote, right?
A Yes.
Q And July 16th was a Thursday, right?
A It was.
Q So First Brands was asking for bid structures by that Saturday.
A I don't know if we say specifically what the end of the week is.
Q So it's either Friday or Saturday, right?
A Not necessarily. It could be Sunday.
Q Okay. If we continue up the chain in this thread. Weil and the third-party bidder set up a call for that Friday,

right?

A Yes.

Q And then on Sunday, July 19th, Mr. Ferrier writes, "We have extended the marketing process for a limited number of parties and have asked all participants to submit their proposed bid structures by tomorrow. If you would like to be considered as a purchaser of the estate claims, we will need your proposed bid structure, including dollar amounts, by early tomorrow evening." That's what the third-party bidder was told, right?

A Yes.

Q And tomorrow evening would have been July 20th, right?

A Yes.

Q And it's also in this email communication, which is the first communication that the amount of the estate claims credit bid is $75 million, right?

A Yes.

Q But by July 20th, all potential third-party bidders had indicated that they would not be submitting a bid, right?

A Correct.

Q So there were approximately six days between the disclosure of the $24.5 billion number and the ultimate bid deadline, right?

A It was closer to $25.5 billion rather than $24.5 billion. But what's a billion between friends?

Q You'll give me the six days?
A Yes, I will give you the six days.
Q Thank you. And zero days between the upload of the Moore supporting documents folder in the data room and the bid deadline, right?
A Same day.
Q Same day. You're familiar with an April 2026 Summary of Findings presentation?
A I am.
Q And that was the culmination of the A&M team's investigative findings, right?
A That was an update on it, yes.
Q And that document was shared with the Ad Hoc Group at a meeting on April 27th, right?
A Just to clarify, we have multiple categories of restricted parties within our DIP A. And so there is what is referred to as the SteerCo. As I understand it there are three parties within the SteerCo. Two of those three parties listened in on the presentation to the proposed litigation trust trustee when that was presented, but not the entire SteerCo and not the entire Ad Hoc Group, and certainly not all of DIP A.
Q So some members of the Ad Hoc Group plus advisors, right?
A Correct, two members of the SteerCo or Ad Hoc Group.

Q Was the April 2026 summary of findings presentation put in the data room on May 4th?
A It was not.
Q Was it put in the data room on July 15th?
A No.
Q And it never was uploaded to the data room, right?
A Correct.
Q Now, the way the litigation trust works, it's the recipient of the estate claims that are going to be purchased by the Ad Hoc Group, right?
A Yes. The bidders, if you will, the DIP lenders then contribute the estate claims to the trust.
Q So it's functionally the acquisition vehicle, right?
A Well, the DIP lenders are acquiring it and then they are contributing --
Q Immediately contributing.
A Yes.
Q And Mr. Gerard Uzzi is the person who is going to run the litigation trust, correct?
A He will be the litigation trust trustee.
Q Effectively head of the litigation trust entity, right?
A Yes.
Q And that's his only role in this case, right?
A As far as I am aware, yes.
Q And he attended the meeting on April 27th with the

Debtors and their advisors where the summary of findings investigation presentation was shared, right?
A I know you've asked me this before. I don't recall the exact date of the meeting. But yes.
Q Whatever the day of the meeting was, he was there.
A Yes, that's right.
Q But by April 27th, you knew that the Ad Hoc Group was going to be a credit bidder, right?
A Yes.
Q And that Uzzi was there in connection with that bid, right?
A He was there in connection with planning for stepping into the role as the trustee.
Q The entity that would be the recipient of the claims purchase as a result of the bid, right?
A Yes, the party that would -- after the claims were contributed.
Q Can you put up Tab 19? And this is LAM Exhibit 4. Mr. Moore, do you have Tab 19 in front of you?
A I do.
Q You've seen this document before, right?
A Yes, I believe so. Just checking the date. Yes.
Q Can we turn to the second-to-last page?
A Yes.
Q And Mr. Moore, you see this is the verification page?

A Yes.
Q And that's your signature on the bottom, right?
A It is.
Q Can we turn to the supplemental response (indiscernible) eight?
A Yes.
Q And do you see here it says, "The Debtors responded to the best of their knowledge the Debtor have not provided any facts to the Ad Hoc Group in its capacity as a bidder that were not made available to interested bidders. The Debtors have shared draft pleadings in the James and Onset adversary proceedings in addition to the summary of findings deck that the Debtors have produced at a base number with counsel to the Ad Hoc Group and certain of its members, but not in their capacity as a bidder. The Debtors have also had meetings and conversations with counsel to the Ad Hoc Group and certain of its members regarding the assessment of the estate claims, but not in their capacity as a bidder. Do you see that statement?
A I do.
Q Do you still agree with it?
A I do.
Q You can take that down. Thank you. Mr. Moore, before I leave that topic actually, the UCC was there at the April 27th meeting, right?

A The advisors to the UCC were there.
Q So, Mr. Moore, you are not expressing -- you have not expressed in your direct testimony any opinion of the collectability of any claims that the litigation trust might obtain, right?
A Correct.
Q And you mentioned on your direct there were transfers made to a BONY account associated with a Leucadia entity?
A Yes.
Q And that Leucadia entity was named LAM Trade Finance Group LLC, right?
A Generally, yes. I see a lot of correspondence. Sometimes just Leucadia, Leucadia Asset Management, Leucadia Trade Finance Group. I bucket it all under Leucadia.
Q But the BONY account that you're referring to was associated with LAM Trade Finance Group LLC, right?
A That's correct.
Q And you're not expressing -- you have not expressed any opinion about the collectability of claims against that entity, right?
A Let me just take a step back. I am not saying specifically that that account is Leucadia LAM Trade Finance Group. I don't recall what entity, what Leucadia entity owns that account. It's a Leucadia account.
Q You're familiar that the party to the receivables

purchase agreement with the Debtors was LAM Trade Finance Group LLC?
A That's my recollection.
Q You're not expressing -- you've not expressed any opinion on the collectability of claims against that entity, right?
A Correct.
Q You're not expressing any valuation claims at all about claims the litigation trust might have, right?
A Correct.
Q Now, Mr. Moore, as we discussed earlier, the estate claims credit bid is for $75 million, right?
A Correct.
Q Do you recall that you testified at the conditional disclosure statement hearing in this case on June 12th?
A Yes.
Q And one of the things you said in response to a question about valuing the estate claims is that the market speaks and that a bidding process could allow bidders to determine what they believe those claims may be worth. That's what you said, right?
A I don't recall the exact words.
Q Okay. Well, let's turn to the transcript binder. I think it's in Number 3. Ms. Herring, if you could put it on the screen.

A Okay.
Q And so, Mr. Moore, I have on the screen the June 12th, 2026 conditional disclosure statement hearing.
A Okay.
Q You were asked the question, "So how do you know what those claims are worth then?" And you understand that was a reference to the estate claims, right?
A Let me just read earlier in the transcript.
Q Sure. 5221
A Yes.
Q And at Line 5221 to (indiscernible) you were asked the following questions and you gave the following answer. "So how do you know what those claims are worth then?"
"Well, that gets back to the market speaks. And so when you have a process where you have many parties that have access to information, all the same information, they can make a determination as to what they believe those claims may be worth." You were asked that question and you gave that answer, right?
A Yes.
Q So, Mr. Moore, we agree that the DIP A trades at an implied total value of around $200 million, right?
A This is --
MR. BEREZIN: Your Honor, sorry. Before he answers, I think this asks for expert testimony and I also

think it mischaracterizes the witness's prior testimony.

THE COURT: I didn't hear the second part, Mr. Berezin.

MR. BEREZIN: Sorry.

MR. BEREZIN: Mischaracterizes the witness's prior testimony.

THE COURT: Counsel, what's your response?

MR. CASSEL: I'm not sure what -- is he asking on the DIP trading price question or...

MR. BEREZIN: So what I heard --

THE COURT: I don't think the witness had testified to -- well, why don't you ask the question.

MR. CASSEL: I'll ask a different question.

THE COURT: Yes.

BY MR. CASSEL:

Q You're selling the estate claims for the $75 million credit bid, right?

A Yes.

Q The Debtors got no outside bids for the estate claims marketing process, right?

A Correct.

Q And you recall during your direct you testified using a demonstrative exhibit.

A Yes.

Q Do you still have that in front of you?

A I do.
Q Ms. Herring, could we put the demo on the screen? And turn to Page 4 of the demonstrative. One down. Apologies. Page 5. Thank you. Can we zoom in?
So I know the font is small, Mr. Moore. But the area shaded in gray on each of these bars refers to the Class 1 litigation trust interests, right?
A The dark gray at the bottom.
Q Dark gray at the bottom. And that's the litigation funders, right?
A Correct.
Q And so the litigation funders are putting in $50 million, and then they get the returns shown in gray, right?
A Yes. The $25 million is also being contributed to the trust. But yes, litigation funders are $50 million.
Q The litigation funders are a subset of the DIP A holders, right?
A I don't have the exact parties that will be the litigation trust funders.
Q Do you believe that all of the DIP A holders will also be litigation trust funders, or just a subset?
A I don't have a basis to say one way or another.
Q Well, in any event, the new litigation funding is $50 million, right?
A That's right.

Q And what this demonstrative shows is that if the trust recovers $90 million, all of it goes back to the litigation funders, right?
A Correct.
Q And so that's approximately an 80 percent return on their $50 million, right?
A Correct.
Q And this demonstrative shows that if the trust recovers $350 million, then $129 million goes back to the litigation funders, right?
A Yes.
Q About 158 percent return?
A That sounds about right.
Q The demonstrative shows that if the trust recovers a billion dollars, the litigation funders get $194 million, right?
A Yes.
Q And that would be a 288 percent return, right?
A That seems about right.
Q And then at the $1.9 billion figure, that's the figure that would be needed to pay all administrative and priority claims in full?
A Yes.
Q The litigation funders will recover $286 million, right?

A Correct.
Q Which is about a 472 percent return, right?
A I will accept your math.
Q Thank you. So while we're on the demo, let's go to Page 2. So Mr. Moore, this is the transfers page. To be clear, the numbers on this summary show only transfers from the Debtors, right?
A That's correct.
Q It doesn't include transfers to the Debtors at all, right?
A That's correct.
Q And so the Leucadia entity that you have on the screen here, that's LAM Trade Finance Group LLC, right?
A Yes.
Q You understand that LAM Trade Finance Group LLC was actually a net loser, at least within the four-year period?
A How would you define that, loser?
Q That they paid in more than they received out.
A I would have to look at all of the cashflows from any source to make that determination.
Q Well, let's turn to Page 22, Tab 22. And we'll go to Paragraph 93. And then Paragraph 93, at least since January 17th, 2023, you note that LAM funded approximately $7.3 billion in additional funds and was paid $6.9 billion, right?

A Yes.
Q So at least from those dates, LAM is actually a net loser to the tune of $400 million more or less, right?
A Since January 17th of 2023, that's correct.
Q And that's also true for the 90-day preference period, right, that LAM was a net loser?
A I don't recall the exact numbers.
Q Okay. Well, let's turn the Paragraph 164. And there's a chart below Paragraph 164. Do you see that?
A Yes.
Q And then this chart is just to show the 90 days outgoing and incoming?
A Yes.
Q So it's not a full period, but it's 90 days. And the top line again is Leucadia. Do you see that?
A Yes, I do.
Q And it shows that LAM received $737 million and change -- sorry, paid in $737 million and change and got out $743 million, right?
A I think you flipped it.
Q Net loser to the tune of $6 million, right?
A Correct.
Q Thank you.
THE COURT: Counsel, can you confirm exactly what this document -- I believe I know --

MR. CASSEL: This is Mr. Moore's declaration.
THE COURT: Just wanted to confirm. That's the declaration --
MR. CASSEL: His declaration, Docket 3188.
THE COURT: By.
BY MR. CASSEL:
Q A couple questions on your liquidation analysis. You mentioned that one of your assumptions is that in a liquidation, the DIP lenders would foreclose on all non-avoidance claims. Do you recall saying that?
A Yes.
Q Any idea what those claims are?
A Oh, there's a whole host of items. So this could include breach of contract items, tortious interference. I've discussed these with counsel --
Q I don't want to ask for that.
A Yes.
Q But claims that don't arise under the Bankruptcy Code. There are other claims that exist.
A That's correct, yes.
Q So First Brands, at least prepetition, operated a global network of manufacturing and vertically-integrated distribution centers that spanned five continents and was supported by key regional capabilities across the world, right?

A Yes.
Q It was a leading supplier of aftermarket automotive parts including brakes, filters, wipers, lights, pumps and towing solutions, right?
A Yes.
Q And in 2021 First Brands refinanced approximately $2 billion of its term loan debt, right?
A Yes.
Q And as a result of that refinancing, First Brands ended up with the first lien and second lien tranche of term loan, right?
A Yes.
Q And the term lenders periodically receive payments of interest, right?
A That's my understanding.
Q And that would have been true for 2024 and 2025 certainly, right?
A That's my understanding.
Q And First Brands made acquisitions after 2021, right?
A Yes.
Q In 2022 it purchased Pylon and International Brake Industries?
A I would have to look at the list. But yes, I think that was in 2022, yes.
Q In 2023 it purchased Cardone, Hopkins, Walbro, Winning

Group, and Horizon Global, right?
A I think that's the 2023 group, yes.
Q And some of those acquisitions were funded by debt, right?
A That's my understanding, yes.
Q And some of those debt raises were from the term loan market as well, right?
A Yes.
Q And at least some of the holders of the First Brands term loans were among the most sophisticated institutions in the world, right?
A Yes.
Q And we discussed earlier, but First Brands was rated by the credit rating agencies, right?
A Yes.
Q 2022, S&P rated First Brands as a B+ credit rating, right?
A I don't recall the rating.
Q But the ratings were at least in the B family at least until 2024, right?
A Based on that schedule that I recall you putting in front of me at my deposition, I think that's right.
Q And BDO had issued unqualified audit opinions for those years, right?
A Yes.

Q From 2022 to 2024, First Brands' products could be bought at major retailers nationwide, right?

A Yes.

MR. CASSEL: So I'm going to do a few emails. These emails I'm going to have admitted on exactly the same basis that Debtor's counsel put them in. So I'm not going to ask him any questions about them. I'm just going to introduce them under both rule of completeness and based on the non-hearsay ruling that Your Honor made.

THE COURT: Okay.

MR. CASSEL: So I believe the exhibits are LAM 6...

THE COURT: Just to make sure we're clear, what's the ECF number for the LAM exhibits?

MR. CASSEL: Here we go. So they are under ECF 3425.

THE COURT: Okay.

MR. CASSEL: And again, I'm not going to ask questions given the previous ruling, but I want to admit them. So if we could put LAM 6 on the screen. So this is the email you saw. Let's put LAM 7 on. And LAM 9. LAM 11. And LAM 25. So 6 is already in. So I believe it's 7...

THE COURT: I've got 6, 7, 9, 11 and 25.

MR. CASSEL: Six doesn't need to be in because 6 is already in.

THE COURT: Six is already in.

MR. CASSEL: So 7, 9, 11 and 25.

THE COURT: Any objection?

MR. BEREZIN: Just one second, Your Honor. No objection.

THE COURT: Okay, they are admitted.

(Exhibit 7, 9, 11 and 25 entered into evidence.)

MR. CASSEL: On exactly the same basis.

THE COURT: On the exact same basis.

MR. CASSEL: The exact same basis as they were admitted on --

THE COURT: Yes.

BY MR. CASSEL:

Q Mr. Moore, in your declaration, you or members of your team tried to run an analysis to determine the percentage of invoices that LAM purchased that were fraudulent, right?

A That was an exercise that was undertaken, yes.

Q But you subsequently concluded that analysis was erroneous, right?

A I indicated even from the beginning that it was based on a limited set of data. There have been multiple analyses that have been undertaken. At this point I would not feel comfortable citing a percentage of fraud. I think this is going to be better. I'm sure there's going to be litigation about this, and I think it will be better once all of the

discovery occurs and all of the files are received from the parties.

Q Mr. Moore, I believe the Debtor's position is that the Debtor's management had commingled also sources of cash. Is that right?

A Generally speaking cash was moved throughout the enterprise to where it needed to be so it could fund and satisfy obligations.

Q But money was largely concentrated in a few accounts before it was moved through the enterprise?

A Well, there was a concentration account. Certainly that was a primary item. But there were also many other accounts even outside of the Debtors that were used as essentially concentration accounts, like the Bowery accounts.

Q That's what I was referring to. The Bowery account was the principal non-debtor concentration account from about 2023 forward?

A Correct.

Q And money that was obtained from the SPV and FCF parties found its way to the Bowery account where it was comingled with other funds the Debtors had, right?

A With the supply chain finance beginning in about October of 2023, all of those round trip payments, the ones that were based on the fabricated invoices, all went through

Bowery. And then there were a number of the special purpose vehicle financing amounts that went through Bowery as well.

Q The third-party factors, the (indiscernible) factors were used as something like a credit card, right?

A Describe what you mean by used as a credit card.

Q Isn't that what you told Mr. Kirschner?

A That is a statement that I made, yes. I wanted to make sure I understood how you were using it.

Q Well, what did you mean when you told that to Mr. Kirschner?

A So my -- what I learned in direct conversations with people at First Brands is that rather than just using actual invoices for factoring, that they would fabricate information in order to be able to take advantage of the full capacity being provided by the factors.

Q So the analogy is that the factoring parties had like a credit limit, right?

A Correct.

Q And money was constantly being drawn and repaid like a credit card, right?

A Well, money was being repaid. What should happen is as receivables that were factored were collected, that money should be turned over to the factor. So it wouldn't operate like a credit card would, but as cash -- assuming that the factor chose not to have the cash come directly from the

customer to the factor. If cash was received for a factored invoice by the company, it should be turned over. And then if there was new factoring that was done, that would result in an advance from the factor.
Q But the way First Brands was using it, it was more like a credit card where amounts were being paid as they came due, right?
A Well, there is what was supposed to happen under the agreement and then there was what First Brands appeared to be doing.
Q And what First Brands actually appeared to be doing was more like the credit card, right?
A What First Brands appeared to be doing is fabricating information to boost the amount that was advanced to it from the factors. So it was not saying I want $10 million today and getting $10 million, it was fabricating information in many instances to support taking an advance of $10 million.
Q Right. But these facilities had overall size limits, right?
A Well, there are many limits. So there is an overall capacity limitation. There are customer concentration limits. So there are a number of parameters that define what could be advanced.
Q But those facilities did have maximum sizes. So to make more money available, First Brands had to pay first,

right?
A Assuming that they had already factored invoices up to the amount. So as an example, if I have a limit of $100 million and I have factored invoices for $100 million, then I wouldn't be able to factor additional invoices unless those that I already factored were paid and I turned over that cash.
Q There is no indication that the factoring parties would have continued funding indefinitely if First Brands never paid it back, right?
A Can you restate that question for me?
Q If factoring parties had purchased invoices and they never got paid on those invoices, the factors would not have kept funding, right?
A I have no idea. That would be a question for the factor.
Q But the facilities had size limits, right?
A There were many different capacity limitations. Again, there was an overall amount. Customer concentrations, various factors.
Q I'm going to ask a few questions about the preference settlement. The plan gives certain creditors an opportunity to participate in a preference settlement, right?
A Correct.
Q And so for trade creditors that participate in the

preference settlement, it waives -- gives them release on any potential preference liability, right?
A As long as they didn't engage in adverse conduct.
Q So they have to be eligible to participate. But so long as they are eligible and opt in to participate, they get a release, right?
A That's right.
Q And directionally, that would lower the amount that the litigation trust could recover from preference claims, right?
A Presumably the amount of transfers I think to trade vendors is about $200 million in the 90 days prior to the petition date.
Q Say that answer again?
A I think the total transfers to trade creditors in the 90 days preceding the petition date is about $200 million.
Q And so assuming those creditors are eligible and participate, that $200 million would not be recoverable by the litigation trust, right?
A Yes. That would not be something that the litigation trust would pursue.
Q And the benefit to the estate from the preference settlement is you get a resolution with the Creditors' Committee, you get a contribution of direct claims from the preference settlement electing creditors and third-party

releases, right?
A Correct.
Q But the Debtors have done no analysis of the value of the direct claims of any preference settlement electing creditor, right?
A I'm not aware of any analysis that's taken place as it relates to the direct claims.
Q Understand that the definition of adverse conduct is not a term that's found in the Bankruptcy Code?
A I haven't memorized the code. I couldn't tell you if it's in there or not.
Q I don't think any of us have. But I'm pretty sure it's not there. With respect to the other types of creditors that are eligible to participate in the preference settlement, they do not get a complete release from preference liability, correct?
A Correct. Correct.
Q But they get to use something called the modified new value defense, right?
A Yes.
Q And what that does is allows them to aggregate for purposes of the new value defense all transfers that they made to the Debtors or certain non-debtor affiliates as if they had made them to their actual debtor they received transfers from, correct?

A Yes. All new value is aggregated.
Q And so effectively the Debtors are treated as a consolidated enterprise for purposes of the new value defense, right?
A I wouldn't say the Debtors. First, we should just be -- about the plan debtors. But --
Q Fair enough.
A Yes, the new value that was provided to any plan debtor entity is aggregated.

MR. CASSEL: I may be done. Could I take a couple seconds?

THE COURT: Of course.

MR. CASSEL: Pass the witness.

THE COURT: Okay. Thank you.

THE WITNESS: Am I done with these?

MR. CASSEL: Unless Ms. Dexter wants to keep them up there for some reason.

MS. DEXTER: I think you can put it aside.

THE WITNESS: Okay.

MS. DEXTER: If I need to phone a friend, I'll let you know.

THE COURT: Good afternoon. Counsel, if you can state your name for the record, and we'll continue with cross-examination.

MS. DEXTER: I am Erin Dexter from Milbank LLP

here on behalf of Onset Financial.

Mr. Moore, let me know when you're ready.

THE WITNESS: Thank you, Ms. Dexter. I'm ready.

BY MS. DEXTER:

Q Mr. Moore, I'd like to pick up on a topic that Mr. Cassel just discussed with you. And that's the litigation trust funding terms. I won't revert you back to the demonstrative, but let me know at any moment if it's helpful to look at it.

Mr. Moore, the litigation trust funding terms were reached during the mediation in these cases. Is that right?

A I believe that's right, yes.

Q And just a yes or no question. You are not able to discuss with me today any of the back and forth as to how the terms of the litigation trust funding were reached. Is that right?

A That's right.

Q Mr. Moore, you believe that the litigation trust financing is the best litigation financing that was available to the Debtors. Is that right?

A I believe that it's the only litigation funding that was available to the Debtors.

Q Do you believe that it is the best litigation financing available to the Debtors?

A I do.

Q The Debtors did not go to the market with the opportunity to raise funding for the litigation trust, did they?
A Correct.
Q And no analysis has been performed as to whether the litigation trust funding terms are consistent with other market-based litigation trust funding commitments, right?
A Correct.
Q There wasn't any sort of market test?
A Correct.
Q Mr. Moore, you are a fiduciary for all of the Debtors, is that right?
A Yes.
Q That means you are a fiduciary for the FBG Debtors?
A Yes.
Q And also a fiduciary for FBG debtors?
A Yes.
Q And also a fiduciary for the SPV debtors. Is that right?
A Four of the SPV debtor entities have had their cases converted to Chapter 7. So carving those four out, the rest, yes.
Q This plan is filed only for the FBG debtors. Is that right?
A That's what we define it as, yes.

Q And setting aside the SPVs that have been converted to Chapter 7 and talking about just the SPV debtors that are still in Chapter 11, no plan has been filed for those SPV debtors, is that right?
A Correct.
Q You don't believe that this plan we are here on confirmation for today affects the SPV debtors, do you?
A Correct. I do not.
Q In fact, it was important to you that this plan does not impact the assets or the claims available to the SPV debtors, right?
A That's right.
Q And you specifically inquired multiple times about whether this plan impacts the SPV debtors, right?
A That's right.
Q And you had those conversations before the plan was filed, is that right?
A Before and after.
Q Did you have those conversations before I took your deposition on Sunday?
A Yes.
Q And after those conversations, sitting here today, you don't think this plan impacts the SPV debtors, right?
A Correct.
Q Mr. Moore, the Debtors have initiated two adversary

proceedings, right?
A Yes.
Q And you're aware that this FBG plan transfers the claims of the FBG debtors with respect to those two adversary proceedings to the litigation trust, right?
A Yes.
Q And you are aware that those two adversary proceedings were filed with all of the debtors as plaintiffs, right?
A Yes.
Q When we spoke on Sunday, were you aware that those two adversary proceedings were filed on behalf of all of the debtors as plaintiffs?
A I think I was aware of that. I just can't recall if all of the debtor entities were listed.
Q So I want to be clear. When we spoke on Sunday, were you aware that those two adversary proceedings were filed on behalf of all of the Debtor entities?
A I think I was.
Q All right. Mr. Moore, I would like you to please turn to Tab 1 in your binder. And I'd like to direct you to page, amazingly, 530.
A Okay.
Q And at Line 14, there is a question that says, "And those two adversary proceedings were filed with all of the debtors as plaintiffs. Isn't that right?"

And the answer, "I don't recall who the plaintiffs are in those cases." Do you see that?
A Yes.
Q Did you give that answer?
A I did.
Q When I deposed you on Sunday, were you aware whether all of the debtors were plaintiffs in the adversary proceedings filed by the debtors?
A I think I became aware of it after you asked me that.
Q And you had conversations to inquire whether this plan impacts the SPV debtors before we spoke on Sunday, didn't you?
A Yes.
Q So when you inquired as to whether the FBG plan would affect the rights of the SPV debtors, you didn't know that the SPV debtors were co-plaintiffs in the adversary proceedings, isn't that right?
A Not necessarily. My understanding is that any rights that the SPV debtors have, they can still proceed with. And I don't know if -- I don't know how far I can get into this, but there have been discussions around a joint prosecution agreement that involves these entities.
MS. DEXTER: Your Honor, move to strike as nonresponsive. That wasn't my question. I'll re-ask my question.

THE COURT: I will sustain the objection.

BY MS. DEXTER:

Q Mr. Moore, when you inquired as to whether the FBG plan would affect the rights of the SPV debtors, you didn't know that the SPV debtors were co-plaintiffs in the two adversary proceedings. Isn't that right?

A I don't know if I knew that or not, but I was specifically in my questions when I was asking those questions of the SPV debtors understanding that the SPV debtors had claims.

Q Mr. Moore, did you ask whether the transfer of the FBG debtors' claims in the adversary proceedings to the litigation trust would affect the SPV debtors' claims in those same adversary proceedings?

MR. BEREZIN: Your Honor, I don't know -- it's a passive voice, so I don't know with who the witness would be speaking. But to the extent the witness is speaking to lawyers, it's privileged and I would object.

THE COURT: Okay.

THE WITNESS: This certainly --

THE COURT: Can you answer the question without -- no one wants communications with attorney-client.

THE WITNESS: No. These were all communications with counsel.

BY MS. DEXTER:

Q Mr. Moore, it's important to you that this plan does not in any way take any rights or assets that the SPV debtor entities may have. Is that right?
A Yes.
Q You agree with me, Mr. Moore, that this plan contemplates that the work product related to those two adversary proceedings will be transferred to the litigation trust. Is that right?
A Yes.
Q And that includes work product prepared on behalf of all of the plaintiffs in those adversary proceedings, right?
A I don't know that for sure. That's more of a legal topic.
Q You don't know how the SPV debtors will be able to gain access to work product prepared in connection with the two adversary proceedings, do you?
A I am not an attorney, but certainly I understand there are a number of times that parties will enter into common interest agreements where work product will be shared. But again, not being an attorney, I can't tell you all of the different aspects around that. But I certainly have worked with common interest agreements a number of times.
Q Does the plan contemplate any common interest agreement between the First Brands debtors and the SPV debtors?
A No, not at this point.

Q So you don't know sitting here today how the SPV debtors will gain access to the work product prepared on behalf of all plaintiffs in the two adversary proceedings, do you?

A I assume at some point there will be something along the lines of a common interest agreement or there will be discussions about how those claims will be pursued separately.

MS. DEXTER: Move to strike as nonresponsive, Your Honor.

THE COURT: I'll overrule you on that one.

BY MS. DEXTER:

Q Mr. Moore, sitting here today, you don't know how the SPV debtors will be able to gain access to work product prepared on behalf of all debtors as plaintiffs in these two estate adversary proceedings, do you?

A That just hasn't been determined yet.

Q This plan makes no provision for that, right?

A Correct.

Q Mr. Moore, all of the debtors, FBG and SPV alike, are coinsureds under the director and officer insurance policies of the debtors, right?

A Yes.

Q Are you aware that this plan transfers all insurance rights of the FBG debtors with respect to insurance policies

to the litigation trust?
A I am.
Q Does this plan make any provision for how the SPV debtors will gain access to the director and officer insurance policies?
A No.
Q When you were having discussions to ensure that this plan would not impact the SPV debtors, did you inquire as to how the SPV debtors would access the director and officer insurance policies?
THE COURT: Same -- to the extent you can answer without --
THE WITNESS: I can't, Your Honor. It's discussion with counsel.
BY MS. DEXTER:
Q Mr. Moore, do you know who Mr. Benjamin Duster is?
A I do.
Q And he is the independent director for the SPV debtors. Is that right?
A He is an independent director for the SPV debtors.
Q Is Mr. Duster the only independent director that owes duties only to the SPV debtors?
A This is more of a legal question. And again, I am not an attorney. But my understanding is as it relates to conflicts, that's where Mr. Duster is the party that

represents the SPV debtors' interests.
Q Mr. Duster did not vote to authorize the filing of this plan. Is that right?
A Correct.
Q Because Mr. Duster is really just for conflicts issues, isn't he?
A I wouldn't say that's all he's for, but that is what his -- that's why he exists in terms of conflict issues with SPV debtors.
Q And Mr. Duster did not cast a vote on this plan because it was determined that there was no conflict matter, right?
A That's correct.
Q But you don't know who made the determination that confirmation of the FBG plan was not a conflict matter over which the SPV director had purview, right?
A This is a discussion with counsel.
Q So you can't discuss here today who made the determination that confirmation of this plan was not a conflicts matter?
A If you're asking me to get into discussions with counsel, I cannot -- and this does relate to conversations with counsel.
Q Mr. Moore, when we spoke on Sunday, did you know who made the decision that the confirmation of the FBG plan was not a conflict matter over which the SPV director had

purview?

A I certainly know the parties that I have talked to about this, and that was before Sunday.

Q Mr. Moore, I would like to direct you to your transcript, which is Tab 1 in the binder at Page 537, please. And I am looking at Line 19. It reads, question, "Who made the decision that the confirmation of the FBG plan was not a conflict matter over which the SPV director has purview?"

Answer, "I don't know who made that decision. That's my understanding." Do you see that?

A I do. And I think it's important the communication that's before that talking about all of my communications with Weil Gotshal and their communications with Simpson Thatcher.

Q Mr. Moore, did you answer I don't know who made that decision?

A Correct.

Q Mr. Moore, you testified earlier today that you were aware the Debtors filed a complaint against Onset, is that right?

A Yes.

Q Are you aware that Onset has filed an answer, counterclaims, crossclaims, and third-party claims in that same case?

A I am aware that Onset filed something. I don't know exactly what all of the different aspects of it are.

Q In your role as a CEO, are you routinely apprised of filings made in adversary proceedings the Debtors initiate?

A Yes.

Q Are you aware that Onset has filed a motion for a judgment on the pleadings in that same case?

A Again, I don't recall exactly what the items were that were filed, but I am aware that Onset has made filings. I don't know if it's for summary -- or motion for summary dismissal, whatever the case may be. Again, I am not the attorney. But I am aware of pleadings.

MS. DEXTER: Your Honor, we would move that the Court take judicial notice of ECF 16 in Adversary Proceeding 263005, which I'll represent is Onset's answer, counterclaims, crossclaims, and third-party claims.

THE COURT: Okay. I'll take judicial notice.

MS. DEXTER: And we would also move for judicial notice of ECF 32 in that case, Case 26-3005, which is Onset's judgment on the pleadings motion in that case.

THE COURT: I will take judicial notice of it.

BY MS. DEXTER:

Q Mr. Moore, if able, I would like to ask you to turn to Tab 6 in your binder, which is the Debtor's demonstrative that we referred to several times today. And I would direct

you to Page 6 or 12 in the ECF pagination.
A Okay.
Q Mr. Moore, I believe you testified yesterday that this chart reflects transfers to certain parties. Is that fair?
A Correct.
Q And these transfers were identified from bank records I think you testified. Is that right?
A Yes.
Q And you looked at bank records for both the FBG and SPV debtor entities?
A Yes.
Q Mr. Moore, directing you to the line that begins, Onset. There are several figures listed there, right?
A Yes, under the three different columns.
Q Onset has sometimes been referred to as an SPV lender in this case. Is that right?
A Yes.
Q So Onset loaned money to the SPV debtors?
A Or provided other forms of financing, such as a sale leaseback.
Q So some of the funds that are reflected in these transfer figures came from the SPV debtors to Onset, right?
A Correct. From the Onset SPV. So Carnaby Inventory 1, Carnaby Inventory 4, and Carnaby FA.
Q So certain of the transfers reflected in the Onset line

here reflect transfers from those SPV entities that you just identified?

A Correct.

MS. DEXTER: One moment, Your Honor. Thank you, Mr. Moore.

Your Honor, I'll pass the witness.

THE COURT: Okay. Good afternoon.

MR. DUKE: Thank you, Your Honor. Michael Duke from Elsberg Baker & Maruri on behalf of the Evolution entities.

BY MR. DUKE:

Q Hello, Mr. Moore.

A Hello, Mr. Duke.

Q I just have a few questions. I'll try to keep it brief here. You're aware that there is a dispute between Evolution and the debtors over $21.2 million in postpetition collections from inventory, correct?

A I am.

Q And under the plan, disputed assets are not supposed to be moved out of the estates, correct?

A That's correct.

Q But what the debtors plan to do in this case is to move $25 million from the estates into the litigation trust, correct?

A This is $25 million of restricted cash.

Q Sir, just to make sure we're clear, I just want to make sure I understand your answer. $25 million will move from the First Brands Group balance sheet over to the litigation trust, correct?
A Correct.
Q And what will be left at that point is only $5 million on the First Brands Group balance sheet, correct?
A That's an estimate, but yes.
Q Roughly $5 million, correct?
A Yes.
Q Certainly not $21.2 million, correct?
A Correct.
Q And the $5 million that's left, that's going to be roughly $5 million -- withdrawn. I'll ask the question cleaner. The roughly $5 million that's going to be left is for use by the winddown administrator, correct?
A Yes.
Q And you agree with me that cash is fungible, right?
A It can be, but not between restricted and unrestricted.
Q Sir, you agree that cash is fungible though, right?
A I gave my answer. Not all cash is fungible.
Q And when you say restricted, it's restricted by the DIP credit agreement, correct?
A When we took our initial advance from under the interim financing order, we had to set aside $50 million to maintain

a minimum cash balance. And we have maintained that cash the entire time. We have the ability to reduce that to $25 million now. And that remaining $25 million, the DIP cash, is being moved over to the litigation trust.

Q Just so I have an answer to my question, that is a restriction under the DIP credit agreement, correct?

A That's right.

Q I want to talk a little bit about the liquidation analysis. And if we can go to Tab 6 in the Onset binder, I wanted to consolidate a little bit here. I figure that may be helpful for everybody. This is, just for the record, the demonstrative that the debtors introduced. I want to go to Page 7.

THE COURT: Seven on the bottom?

MR. DUKE: Yes, Your Honor.

THE COURT: Okay.

BY MR. DUKE:

Q Are you there, Mr. Moore?

A I am.

Q You would agree with me that in this demonstrative, you are showing a liquidation analysis in a hypothetical Chapter 7, correct?

A Yes.

Q And in this liquidation analysis, nowhere is mentioned any of the estate claims, correct?

A That's correct.
Q So the flows that are coming from estate claims are not treated in this liquidation analysis, correct?
A No, they are treated -- I have a specific assumption in terms of what would happen with the estate claims, and there was zero value.
Q And that's an assumption that you are making, correct?
A Yes. But it has been considered and included.
Q And you would agree with me that the liens that the DIP has here on avoidance claims, that's in the proceeds of the avoidance claims, not the claims themselves, correct?
A That's my understanding.
Q Now, you agree with me that the DIP creditors, they may need to buy the claims in a Chapter 7 from the trustee, correct?
A They may, yes.
Q And you don't know what terms will be entered into between the Chapter 7 trustee and the DIP lenders in order to buy and sell these claims, correct?
A If that were to happen, you are correct. I don't know what the terms would be.
Q Right. And so for example, you don't know whether the trustee would require a release of liens by the DIP creditors, right?
A A release of liens on what assets?

Q On proceeds, on the cash that's given into the estate. Let's start there, o the cash that's given into the estate. You don't know whether a term of that transaction would be a release of liens on cash given into the estate, correct?
A When you say cash given into the estate, proceeds of --
Q The DIP creditors giving money into the estate. You don't know if they would consent to the release of a lien on that cash, correct?
A I’m just not clear why the DIP lenders are providing cash to the estate.
Q Well, you agree they might have to buy the claims, correct?
A I see what you're saying.
Q And as part of that, they may consent to the release of liens on the cash that they provide to the estate, correct?
A So if they buy the estate claims -- I just want to make sure I am clear on your question. If the DIP lenders buy the estate claims from a Chapter 7 trustee and you're asking about they would then release their lien on the proceeds?
Q Correct. I believe the assumption -- maybe we'll start here. I'll back up. One of your assumptions in the liquidation analysis is that any money that the DIP creditors pay into the estate for the chapter sevens would effectively be round tripped because the DIP creditors have a lien on cash in the estate, right?

A No. It's more the lien on the proceeds. So if those -- there are a couple of scenarios I discuss. In the scenario where the DIP lenders actually acquire these claims, there wouldn't be anything flowing back.

Q Understood. Thank you for that clarification. So for example, let's assume that -- withdrawn. You're aware that the debtors are claiming $2 billion will be generated by these estate claims within two-and-a-quarter years, right?

A What I am aware of is that the waterfall lays out where we need to get to. And then I understand that Mr. Kirschner believes that it's reasonable that at least $2 billion in proceeds should be realized within or by the end of 2028.

Q And just to be clear what we're talking about, when you're saying realized this $2 billion, that's going to be from the estate claims, correct?

A Correct.

Q So if the DIP creditors pay $300 million to buy these estate claims, and let's assume the $2 billion number is right, that would be a 6.6 multiple on invested capital within two-and-a-quarter years, right?

A Are you referring to a Chapter 7 scenario?

Q Correct.

A Okay. And so the DIP lenders would buy the claims for $300 million?

Q Correct.

A Okay. And if the DIP lenders buy the claims for $300 million and then they recover $2 billion, that seems about right in terms of the math.

Q And if they pay, the DIP creditors pay $500 million to the Chapter 7 trustee, that could result in a 4X multiple on invested capital if we assume that what the Debtors have been claiming with respect to the timing of payments is correct, right?

MR. BEREZIN: Your Honor, I think we are going pretty far afield from assumptions that he's made.

THE COURT: I think we're just doing math. I'll allow it.

THE WITNESS: Yes. So acquiring estate claims for $500 million and then recovering $2 billion from those estate claims would be 4X.

BY MR. DUKE:

Q And even if the DIP creditors paid the trustee for the benefit of all the other creditors $1 billion, under the assumptions that the Debtors are making in terms of the amount of estate claims and the timing for it, that would be a 2X multiple on invested capital within two-and-a-quarter years, correct?

A Just looking at the -- if you acquire something for a billion and then you recover a billion, that's a 2X, yes.

Q I want to look briefly at Page 5 of the demonstrative.

A Okay.
Q You're a little faster of a page turner than I am.
These are different scenarios that are set forth as illustrative recoveries under the Chapter 11 plan, right?
A Yes.
Q The green is the -- that's the DIP lenders, correct?
A That's DIP A.
Q DIP A recovery, right?
A Yes.
Q And then the litigation funding, that's the gray bar. Correct?
A The dark gray bar on the bottom.
Q And the -- if the DIP A buys all the claims in a Chapter 7, the differences between the colors, it would just all be green, correct?
A How much would they be acquiring the claims for?
Q The estate claims. If they buy the estate claims, whatever recovery comes from the estate claims would be theirs, correct?
A Yes. They would own the estate claims then.
Q And that's in a Chapter 7 scenario, right?
A That's what I understand you are asking me about.
Q They wouldn't be capped at the $1.335 billion, correct?
A If the DIP lenders acquired the estate claims, under our plan they contribute them to a litigation trust with a

waterfall. But under any scenario if you are acquiring an asset, whatever comes back to you is yours.
Q And you would agree with me that the DIP lenders, they are in the business of making money, right?
A Well, that's an interesting question in this case.
Q Fair enough. Fair enough. They sometimes make bad bets, correct?
A I think we can identify a case in point.
Q But they are certainly not charitable organizations for other creditors, right?
A I don't know what they do in terms of charity.
Q Do you think that part of their charity is giving money to the other creditors in this case?
A I think that as part of deals and as part of getting various benefits, certainly here there are some very significant concessions that have been made.
Q And you'd agree in a Chapter 7 scenario the releases under the plan, those are gone, right?
A Yes. I mean, there is no plan.
Q Right. There would be no releases as well, correct?
A Well, there could be some releases. I think that took place with the four SPVs.
Q And you agree or you understand that the UCC has extended out their challenge period, correct?
A Yes.

Q And what that means is that the UCC hasn't released any claims against the prepetition lenders, correct?
A I don't know all of the specifics, but the Debtors granted a release to the prepetition term loan lenders through the DIP order.
Q Just to be clear, the challenge period deals with the release granted under the DIP order. Do you understand that?
A I don't know all of the specifics in terms of what is included under the challenge period.
Q Do you know whether the UCC would be able to assert claims against the prepetition lenders in a Chapter 7 scenario?
A I don't know.
MR. DUKE: I'll pass the witness. Thank you.
THE COURT: Thank you. Good afternoon.
MR. KASLOW: Good afternoon. Thank you. Matt Kaslow from Blank Rome on behalf of Aequum.
THE WITNESS: Good afternoon.
BY MR. KASLOW:
Q I'll keep this brief. Are you familiar with what a claim is under Section 502(h) of the Bankruptcy Code?
A Not offhand.
Q Okay. If I were to tell you that, for example, it's a claim that a creditor may assert for the amount of a payment

that was made to it, that a trustee avoids and recovers under Section 550 of the Bankruptcy Code, would you have any reason to disagree?
A No. And I'm generally familiar with that concept.
Q Okay. Section 502(h) claims will be treated as general unsecured claims under the plan. Is that correct?
A I think that's the case.
Q And general unsecured claims are calculated under the plan on a consolidated basis rather than on a per-debtor basis for purposes of distributions, correct?
A For purposes of distribution from the litigation trust, correct?
Q Thank you. So in that respect, your prior testimony that the consolidation of claims under the plan does not modify the rights of defendants is not entirely correct?
A Could you state the question again, please?
Q So taking into account that a 502(h) claim against a particular debtor is going to be paid in a pool of creditors from all of the debtors, your prior testimony that the consolidation of claims under the plan does not modify the rights of any defendants such as avoidance action defendants who have 502(h) claims, not entirely correct.
A Well, as I understand it, parties can still, whether it's a substantive consolidation argument that they would have available to them. So this is really referring to -- I

think my primary testimony was about ensuring that this plan, because it doesn't cover every debtor entity, doesn't impact any of the non-plan debtor entities. In this regard, treatment of a particular claim is laid out in the plan. But especially as it relates to the consolidation just for distribution purposes, people still have their rights reserved in terms of arguing substantive consolidation.
Q But as the plan is drafted, which does not affect substantive consolidation, this would force them to share in distributions with that pool of creditors, correct?
A I think we're getting a little bit beyond my area of expertise in terms of legal rights of different claimants.
Q Okay. I'll move on. Are you aware that Section 550 of the Bankruptcy Code limits avoidance action recoveries to those that benefit the estate?
A Generally.
Q Without a debtor-by-debtor claims allowance process and a debtor-by-debtor calculation of distributable assets, how will you be able to determine whether the recoveries at issue in any particular debtor's avoidance action asserted by the litigation trust, how would you be able to determine that those recoveries exceed the claims against such debtor?
A Well, again, this is being done for -- the consolidation is for distribution purposes. And if a party feels that they should be getting more, I suppose that they

can argue that. I'm not exactly clear on how that plays out legally.

Q but you are not able to unwind that, and that's part of why you've proposed a plan that consolidates for distributional purposes and consolidates claims, correct?

A I mentioned about the administrative burden involved with that.

Q Thank you. So in that respect as well, your prior testimony about the consolidation of claims under the plan does not modify the rights of defendants is not entirely correct?

A We're getting into legal topics. And it certainly is beyond my area of expertise.

Q We referenced before -- or I should say you referenced before that the government may receive certain proceeds in connection with criminal prosecution such as restitution proceeds. Do you recall that testimony?

A I understand that may be the case, yes.

Q Okay. And under the plan, litigation trust assets include all proceeds of government enforcement actions received by the FBG debtors. Is that correct?

A Yes.

Q Okay. If the government pays 100 percent of the proceeds of these enforcement actions to an FBG debtor, regardless of whether any of those proceeds are allocable to

an SPV debtor, the plan doesn't have any mechanism that would ensure that those proceeds allocable to the SPV debtors make their way to that estate. Is that correct?

A I don't think that's specifically called out, but I also don't think that it impairs anyone's rights to argue that.

Q But it's not addressed in the plan?

A As I said, I don't think that's specifically called out.

Q Okay. You're aware that certain orders have been entered in these cases granting certain parties relief from the automatic stay?

A Yes.

Q And you are aware that one such order was entered in favor of Aequum?

A Yes.

Q Okay.

MR. KASLOW: Your Honor, I'd like to request that the Court take judicial notice of the agreed order granting emergency motion of Aequum Financial II LLC for entry of an order granting relief from the automatic stay. That is ECF -- I think 1820. Let me check. Yes, ECF 1820.

THE COURT: I'll take judicial notice.

MR. KASLOW: Thank you. No further questions. Thank you.

THE COURT: Thank you.

MR. TECCE: Your Honor, I am next. Can we take a five-minute break?

THE COURT: Yeah, absolutely. Let's make it ten. Let's start at 5:10. Thank you. We'll take 12 minutes or something. Yes. Mr. Kelley?

MR. KELLEY: Your Honor, in candor, I'm going after -- sorry, James. Oh, excuse me. I'm going after the UST. But it would be helpful if you stretched that to a 15-minutes so we can compare notes with the intent and purpose of eliminating outline.

THE COURT: Let's do 5:15. Thank you, Mr. Kelley. And I'll remind, I think for the twelfth time, that you are still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Thank you.

CLERK: All rise.

(Recess.)

THE COURT: Please be seated. All right. Give me one second, Mr. Tecce. We are back on the record in First Brands, continuing cross-examination of Mr. Moore. I'm going to turn on my camera. Counsel, if you could state your name for the record and we'll get started.

MR. TECCE: I can. Thank you, Your Honor. Good afternoon. James Tecce of Quinn Emanuel on behalf of

Patrick James and the James entities. Good afternoon, Mr. Moore.

THE WITNESS: Good afternoon, Mr. Tecce.

MR. TECCE: Judge, may I have screen sharing privilege with Grace Sullivan? Thank you very much.

THE COURT: Where you? On this here? Oh, there you are.

MR. TEECE: Thank you very much.

BY MR. TEECE:

Q Good afternoon again, Mr. Moore. Long day for you. Can I ask you to take a look at Debtor's 235, the exhibit chart? I think it might actually be in front of you.

A Yes.

Q This is Page 6 of 12. It's a chart containing the $25,700,000 in total. Do you have that document?

A I do.

Q And in this chart across the top, you have a 90 day, one year and then full period. Do you see that?

A Yes.

Q And that full period, that's a four-year period prior to the petition date, correct?

A Yes.

Q So that would be September 2021 to September 2025, correct?

A Yes.

Q And what this chart reflects are payments that were made over that period to the entities on the left-hand side, correct?
A Yes.
Q And so that includes Leucadia, Katsumi, Raistone, PrimeRevenue, LiquidX, Yieldstreet, Orbian, several others, correct?
A Yes.
Q And during this full period between September 2021 and September 2025, none of the parties on this chart terminated their relationship with the company for nonpayment, correct?
A Not that I'm aware of.
Q During this full period from September 2021 to September 2025, the first lien lenders were paid principal and interest, as far as you know; is that correct?
A My understanding is at least interest. I'm not aware of principal payments, or I just don't know offhand.
Q But in addition to the $25.007 billion, the first lien lenders received at least interest, correct, during this period, the full period?
A Yes.
Q Yesterday when you talked about Patrick James on this chart, Mr. Moore, do you remember that you described that entry as including Mr. James, the Patrick James Trust and other entities affiliated with Mr. James? Do you remember

that?
A Yes.
Q Is that an accurate description of how you described that?
A Yes.
Q And between Mr. James, the Patrick James Trust and entities affiliated with Mr. James, according to your chart, $965 million approximately was distributed during the full period, correct?
A Yes.
Q So that's September 2021 to September 2025?
A Yes.
Q To that group, correct?
A Yes.
Q And there are affiliated entities beyond the Patrick James Trust that the Debtors contend received payments, correct?
A Yes.
Q And what are the names of some of those entities?
A Oh, there are a number of them. So I think there was a Global Assets entity. I'm blanking on all of the names, but they are included in the adversary proceeding.
Q So Albion, is that one of them?
A Albion. Yes, that's one.
Q Broad Street. Is that one of them?

A Yes.
Q Battery Park?
A Yes.
Q Mr. Moore, it's true that your team's tracing identified approximately $592 million transferred from the Patrick James Trust to the Debtors; is that correct?
A Yes.
Q And that was from September 2022 to the petition date, September 2025, correct?
A I believe that's the date range. Yes.
Q So the date range that your team traced was September 2022 to September 2025, but the transfers that the Debtors looked at go back one year more, correct, from September 2021 to September 2025; is that correct?
A Yes.
Q So there could be additional funds just from the Patrick James Trust prior to September 2022 that are not part of your $592 million, correct?
A There may be.
Q There may be that were transferred back into First Brands, correct?
A There may be.
Q And your $592 million figure relates only to the Patrick James Trust, correct?
A I don't know if that would be the entire -- if all of

that would have gone through the trust. But the vast majority would be the Patrick James Trust.
Q And that doesn't include any other entities like the ones we just mentioned, Albion, Broad Street, Battery Park. You didn't do an analysis of whether any other entity affiliated with Patrick James made payments or distributions back into First Brands, correct?
A Correct. We did not have those records.
Q So if I were to adjust the date range from September '22 to back a year to September 2021, and if I were to include entities, additional entities beyond just the Patrick James Trust, that number could go up above $592 million, correct?
A It could.
Q Do you have any idea how much larger than $592 million that could be?
A I don't.
Q Could it be more than the $966 million that the Debtors intend to try and recover?
A I don’t -- I don't know.
Q You don't know one way or the other, correct?
A Correct.
Q So it's possible, but you don't know, correct?
A Correct.
Q Sir, can I trouble you to take a look at Debtors' 230,

which are the BDO financials? I think you probably have them.
A Which year?
Q 2024.
A Okay.
Q And just so we're on the same page, I believe the document starts FBGCH100103633; is that correct?
A Yes.
Q Okay, and these are the First Brands Group LLC and subsidiary consolidated financial statements year ended December 28, 2024, and December 30, 2023, correct?
A Correct.
Q And if you turn to Page 4, these were signed by BDO USA PC; is that correct?
A Yes.
Q Can I ask you, sir, to turn to Page 8?
A Okay.
Q Okay, and this is the First Brands and subsidiaries consolidated statements of members deficit, correct?
A Yes.
Q And this particular page shows there are two line items, Mr. Moore, correct? There's one tax distribution $145 million. Do you see that right before the line balance, December 30, 2023?
A I do.

Q And do you understand what that is?
A My understanding is it is a distribution made for tax purposes.
Q To whom? Do you know?
A I believe that it went to Mr. James.
Q And the line balance December 28, 2024, do you see that? Right above that it says tax distribution $125 million. Do you see that?
A Yes.
Q And what do you understand that to be?
A The same thing, just in the following year. So the first number, the $145 million, was in 2023 and then the $125 million 2024/
Q And do you understand, sir, that these amounts were in the company's general ledger?
A Yes, they were.
Q And you understand that BDO reviewed the company's general ledger, correct?
A Yes, that's my understanding.
Q And it's fair to assume that BDO reviewed the company's general ledger and placed them in these financials, correct?
A That would not typically be how the auditor works. The company prepares the financial statements and then the auditors perform procedures on those financial statements.
Q In the performance of those procedures, BDO would have

access to the general ledger. You would expect that, correct?
A That would be typical. Yes.
Q And they would review the general ledger, correct?
A I can't say what BDO did, but that would be a typical procedure.
Q And these amounts were on the general ledger, correct?
A Yes.
Q And BDO gave unconditional audit opinions for four years, correct?
A Unqualified.
Q Unqualified. I'm sorry. Thank you very much. BDO gave unqualified audit opinions for this company for four years, correct?
A Yes.
Q You testified about the Bowery account. Do you remember that?
A Yes.
Q I believe it was your testimony that, is this fair to say, that you believe approximately $12 billion flowed through that account; is that correct?
A That's about right. Yes.
Q Is it your testimony that none of that money was paid for legitimate business expenses from that account?
A I am not testifying to that.

Q So it's fair to say that of the $12 billion, some portion of that was used for legitimate business expenses from the Bowery account, correct?
A I am not taking a position on any of the dollars, as to whether they were legitimate or not.
Q You've done no analysis about the funds that left Bowery and whether those funds in total were done for legitimate business -- to pay legitimate business expenses, correct?
A I haven't had access to all of the records to be able to do that. I'm sure that, as discovery takes place in litigation, that will be an exercise that will be done.
Q But you haven't -- as you sit here today, you cannot say that the funds that left the Bowery account -- none of those dollars -- were used to pay legitimate business expenses, correct?
A That's correct.
Q You referred to roundtrips and supply chain financing earlier today, correct?
A Yes.
Q And do I understand your definition of roundtrip to mean when funds leave a supply chain platform and go through a bill payer, they leave the bill payer and go to First Brands? Is that what you would describe as a roundtrip, sir?

A Based on a fabricated invoice that started, it then went back to First Brands.

MR. TEECE: I'd actually move to strike that answer as nonresponsive.

BY MR. TEECE:

Q I'm actually just asking a very simple procedural question. The supply chain financing platform distributes money to a bill payer in the first instance. Isn't that correct?

A It could, yes.

Q And so some of those are ITS. Is that a bill payer?

A Yes.

Q And Versify, is that another bill payer?

A Yes.

Q Okay, and so supply chain finance advances the supply chain funds to the bill payer, and, at that point, I believe your position is that if funds leave the bill payer and they go into First Brands, that is what you call a roundtrip, correct?

A No. That's what I was trying to respond to in my question.

Q Okay, and let me ask this question. It is true that funds left supply chain financers, went to bill payers like ITS and Versify and those bill payers -- ITS and Versify -- they made direct payments to satisfy a supplier's invoices,

correct? That did occur?
A That's my understanding. Yes.
Q You referred earlier to results bridges and adjustment bridges; is that correct?
A Yes.
Q You're not aware of any email or text that was sent by Patrick James that directed anyone to make an adjustment to a general ledger, correct?
A I have not gotten involved in that level of review.
Q So the answer to my question is, yes, you are not aware of any email or text sent by Patrick James directing anyone to make adjustments to a general ledger, correct?
A I would have to go back and look. I just can't recall.
Q I'll ask the question one more time. So yes or no, you are not aware of any email or text sent by Patrick James directing anyone to make adjustments to a general ledger, correct?
A I am not aware.
Q And you are not aware of any email or text sent by Patrick James directing someone to falsify a financial record, correct?
A I personally am not aware.
Q And you are not aware of any email or text sent by Patrick James directing someone to falsify an invoice; is that correct?

A I am not aware.

MR. TEECE: Your Honor, I have no more questions for the witness.

THE COURT: Okay.

MR. TEECE: Actually, just one.

BY MR. TEECE:

Q You're not aware of any text or email sent by Patrick James directing someone to double pledge collateral, correct?

A Correct. I specifically am not aware.

MR. TEECE: No more questions for the witness, Your Honor. Thank you.

THE COURT: All right. Thank you.

MS. GARZA: Good evening, Your Honor.

THE COURT: Good evening.

MS. GARZA: Vianey Garza, on behalf of the U.S. trustee. Your Honor, as an initial matter, I wanted to move to admit three of my exhibits which appear at ECF 3356, specifically at 3356-6, 3356-7, and 3356-8, and I understand I have objections to those exhibits. I just want to know what the objections were.

MR. TSEKERIDES: Are those the fee apps?

MS. GARZA: They're not fee app applications. They're summaries of the fee statements and summaries of the MORs.

MR. TSEKERIDES: I have two objections. One is relevancy. These are our bills. So that's the main objection. That's really the main objection is relevancy.

THE COURT: Can you just identify the ECF numbers for me again?

MS. GARZA: Of course, Your Honor. ECF 3356-6, 3356-7, and 3356-8.

THE COURT: I'll allow it.

(Exhibits ECF 3356-6, 3356-7 and 3356-8 entered into evidence.)

MS. GARZA: Thank you, Your Honor.

CROSS EXAMINATION OF CHARLES MOORE

BY MS. GARZA:

Q Good evening, Mr. Moore.

A Good evening.

Q It's been a long day.

A Still going.

Q Would you agree with me, based on the testimony today particularly, that the avoidance actions are potentially some of the most valuable remaining assets of the estate?

A I think I --

MS. DEXTER: Objection, Your Honor. I think this is calling for Mr. Moore to offer a valuation conclusion that he is not giving.

THE COURT: I'm taking it in the context of size

of number, not valuation. Just like important, I think it's -- well, how are you defining the word value?

MS. GARZA: That's fair, Your Honor. I certainly don’t want to get into any territory where Mr. Moore would be potentially speaking as an expert.

BY MS. GARZA:

Q Mr. Moore, the demonstrative that we've been talking about, that 90-day, one-year, four-year period --

A Yes.

Q -- those are transfers out from the estate within those periods of time, correct?

A Yes, with the exception that I've talked about in terms of supply chain finance.

Q Correct, and whatever avoidance actions might exist, the DIP lenders are credit bidding for those estate assets, correct?

A They are credit bidding for the estate claims.

Q And the estate claims include avoidance actions?

A That's right.

Q And the concept of a credit bid was also part of the Premier Marketing plan; is that right?

A Yes.

Q That's been consistent throughout the iterations of the plans that we've seen throughout this case, right?

A Yes.

Q And to confirm, no one has investigated any potential defenses of whatever claims might be out there; is that right?
A Correct.
Q And no one has looked into whether anyone is judgment-proof?
A I assume that's the case.
Q So no one's looked at collectability of any judgments that might be obtained by the estate?
A I don't know if Mr. Kirschner has looked at that or not.
Q And isn't it possible that assets of those potential targets might be dissipated between now and whenever such a judgment might be obtained?
A I don't know.
Q Were the DIP-secured parties prepetition lenders as well?
A It depends on how you define DIP parties because that paper certainly has changed hands. At the time of the filing, my understanding is that the majority of the providers of the DIP financing were prepetition secured lenders, if not all.
Q Do you know how much money was transferred to those parties prepetition within that four-year period?
A I don't.

Q I think you've already confirmed this. To the extent the plan is confirmed, credit big goes effective, the estate claims get transferred to the litigation trust, right?
A Yes, contributed.
Q Contributed. The DIP secured parties get releases on a full and final basis?
A Yes, from the Debtors.
Q And they also get three seats as part of the trust oversight committee; is that right?
A The litigation trust, yes.
Q And so they wouldn't have to investigate any claims against themselves at that point, right?
A Just I know I've already testified to this, but they've already been released through the final DIP order. So this is really just looking at the time period from November to confirmation.
Q Sorry, Mr. Moore. A lot of my outline went away, based on everyone else's questioning.
A That's quite all right.
Q I think you had testified that most of the current vendors of the Debtor are on a COA or CIA basis; is that right?
A Well, just to be clear, we don't have any operating businesses anymore, so there are no providers of goods, and it's a very, very small population of service providers.

Q When was -- well, between January 2026 and today, were there any third-party vendors that weren't on a cash on delivery or cash in advance basis?
A I'm sure that there would have been during that time period.
Q And have those amounts been paid?
A I don't know. I'd have to look at that.
Q When you were talking about the estimates for postpetition administrative claims, was that taken into account?
A Yes, it was.
Q When was the last time the Debtors were able to pay postpetition debts as they became due?
A I believe that we have been doing that for quite some time.
Q Then why do you have any outstanding administrative claims?
A There are a couple of things. One is that these claims, a lot of them, have been outstanding for a while and so under -- especially with the OEM funding that we've had, we have been getting cash to cover all of that week's disbursements needs. So we really have been operating on a CIA or COD basis for a while, plus additional payments to trade vendors. So I would have to look at the exact numbers, but I believe actually we've made good progress on

bringing that amount down over the last few months.
Q So the $147 million number, which I realize is an estimate with a cushion, when was the majority of that incurred?
A I'd have to go back and look at that on an individual basis.
Q Would it be before January of 2026?
A It's certainly possible that some of that would have been before January.
Q Most of it?
A I don't think that most of it, and there would be churn within that as well. So we may have some vendors that incurred, or where we incurred amounts with them that were unpaid as of the end of January, and then we paid those amounts but we incurred new amounts and just didn't grow the liability during that time period.
Q And so that I understand, when you say incur, do you mean you weren't invoiced more amounts or they just weren't doing more work?
A I would use just an example. If we owed a party $5 million as of the end of January, it may be that we paid all of that $5 million over the course of the following months, but we may have purchased another $4 million. So the balance outstanding right now may be $4 million and may be $5 million. I'm not aware of examples where that has grown

with vendors. But we certainly have examples where that amount has come down.

Q When did it become apparent to you that the Debtors could not pay all of their outstanding postpetition liabilities?

A It's never been apparent to me.

Q It's never been apparent to you?

A No.

Q When did it become apparent to you that they couldn't pay them from operations of the business?

A Even then, I don't think that we ever really considered that because we were continuing to operate and we were making payments to our trade vendors, we were in constant dialogue with our trade vendors, I suppose on June 29th, when our last operations ended and we no longer had any OEM funding coming in, I knew that there would not be OEM funding that would be going towards trade payables, if you will. But that is -- we were well into the plan at that time. We had already received conditional approval on the disclosure statement and the plan is our path to pay the rest of the amounts.

Q So the OEM funding was used to pay both invoices that had been unpaid, as well as cash on delivery and cash in advance?

A Yes.

Q In the case, I think that you looked for additional funding or you requested additional funding from the DIP-secured parties; is that right?
A Yes.
Q Was that in November of 2025?
A No, that would have been in December. We started to put together business plan scenarios in November, later November. We had a lot of meetings with our DIP lenders late November through December on a lot of different scenarios, including a lot of scenarios that our DIP lenders wanted us to look at, and these scenarios each had different funding needs associated with them, and we were in regular dialogue with our DIP lenders, as well as our ABL lenders, all the way until the end of January.
Q So you were looking for new money in December of 2025. Why were you looking for new money in 2025?
A These are business plan scenarios to actually fund the turnaround of the business. So these were multi-year projections that had cash needs associated with them. So this was really about soliciting investments for a future reorganized Debtor.
Q Is it fair to say that without the funding, you couldn't continue to operate the business as you have been to that point?
A No, because we did not get that funding and we continue

to operate the business.
Q With the OEM funding?
A Correct.
Q Were any of the businesses profitable during the bankruptcy case?
A I do believe that, especially as we got the OEM funding, we made some very significant decisions in the month of January, which was partially, at least partly informed by the sale process. We had a better sense as to which business units were profitable or not. We also looked at what the Marcet interest in the business units were, and those that were clearly unprofitable we shut down in January and then, for the other businesses, generally, with the terms that we received from our customers, we got each of those businesses to at least a break-even basis.
Q I think that you would agree with me. Maybe you won't. Regardless of what the operations were, you still have significant outstanding unpaid postpetition administrative expenses, right?
A Well, I've talked about the $147 million. When we look at the totality of the payments that have gone out in this case, the $147 is a very small number actually.
Q Would you agree with me, the administrative expense claims basket was meant to give some sort of assurance to those creditors that they would get paid at some point?

A No, it's actually just an opportunity for those parties. If they would like to go to the front of the line, then they have that available to them.
Q I'm not talking about the election. I was talking about the DIP order and the administrative expense claims basket. Are we talking about the same thing?
A We are not talking about the same thing. Could you please ask your question again?
Q Sure. In the DIP order, there was the concept of the administrative claims expense basket, correct?
A Yes.
Q And that was meant to provide some assurance to your administrative creditors that they would get paid; is that right?
A Well, I don't know if that's exactly what that was for.
Q You don't think that you stated that in your declaration, that it was meant to give some assurance to the administrative creditors?
A I just don't recall exactly if that was the full intended purpose or not. That was something that the committee negotiated. It certainly helped.
Q And to confirm, that reserve goes away if the credit bid goes through, correct?
A That reserve never comes into play, unless there's an event of default under the DIP.

Q Mr. Moore, are you familiar with the professional fee carve-out in the DIP order?
A I am.
Q As part of that, the Debtors' professionals are being paid from the DIP order's collateral; is that right?
A Well, there are a couple of elements, I think, that you're getting at. The carve-out that I'm familiar with, if there is a -- I'll just call it a trigger event, then $25 million is funded to cover professional fees from that point forward. So that's the carve-out that I am referring to, and there hasn't been an event that launches that carve-out.
Q To the extent you've provided a fee statement, have you been paid on that fee statement once the expiration period has run?
A For the Debtors -- well, I would say for the advisors that are retained under the Bankruptcy Code, for any party that has filed a fee application, whether it's a monthly or an interim fee application, I'm not aware of any of those that have not been paid once objection periods have run.
Q The plan provides that professional fees are going to be paid in full shortly after confirmation, correct?
A Yes.
Q It's actually a condition precedent to the plan going effective, right?
A I believe that it is, yes.

Q And I think you had to estimate whatever those funds were as part of coming to this hearing; is that right?
A That's right.
Q About how much has been set aside for that?
A I don't recall the number offhand. This is something that I asked my team to put together about a week ago because, exactly to your point, that is something that is required under the plan, and so we solicited information from the various professionals. I just don't recall what the amount is right now.
Q Do you know if the escrow has been funded?
A Yes, it has. It's been funded all along.
MS. GARZA: Your Honor, I was hoping that you could give presenter role to Mr. Ruff, and I'm hoping that he's listening.
THE COURT: I gave it to him.
MS. GARZA: Mr. Ruff, if you wouldn't mind showing what has been Marced as U.S. Trustee's Exhibit 7, which is at 3356-7. If you could make it a little bit bigger, Mr. Ruff? Maybe a little bit too big. That works. Thank you.
BY MS. GARZA:
Q Mr. Moore, this has been admitted. It is a summary of the fee statements that have been circulated for Alvarez & Marsal --
MS. GARZA: Oh, gosh. Fees.

THE COURT: I think we're good.

MS. GARZA: He's not a very good Vanna White, is he?

BY MS. GARZA:

Q I'd like to direct you to the attention of that bottom right cell. So is it right that Alvarez & Marsal incurred about $79 million in fees and expenses through May 31, 2026?

A It may be I don't -- I haven't put together this schedule myself. I don't know the number offhand.

Q Do you know how much you incurred in June?

A I don't think that's been pulled together yet.

Q Any estimate?

A I don't have an estimate.

Q Same thing for July?

A Correct.

MS. GARZA: Mr. Ruff, if you wouldn't mind turning to Exhibit 6.

BY MS. GARZA:

Q Mr. Moore, I'll represent to you that this is a summary of the fee statements that have been circulated for Weil, Gotshal and through April of 2026, and I'll direct you to that bottom right number. Alvarez & Marsal has incurred fees and expenses of $125 million; is that right?

MR. TSEKERIDES: Weil, Gotshal.

THE WITNESS: I think you mean Weil --

BY MS. GARZA:
Q I'm sorry?
A You asked about Alvarez & Marsal.
Q I'm sorry.
A I think you're referring to Weil, Gotshal.
Q I am referring to Weil. I apologize.
A Same response. I did not put this together. I haven't looked at the numbers like this. That could be correct.
Q Does it seem right?
A I have no reason to question it.
Q Do you know how much they've incurred for May?
A I don’t.
Q June?
A I don’t.
Q July?
A No.
MS. GARZA: Mr. Ruff, if you wouldn't mind going back to Exhibit 7.
BY MS. GARZA:
Q Mr. Moore, I'll represent to you that between January 2026 and May 31, 2026, Alvarez & Marsal incurred approximately $35 million in fees. Would you have agreed to reduce your fees by 50 percent in this case?
A Under what scenario are you referring to?
Q Under the plan, you're getting paid in full, correct?

A The amounts related to professionals are funded into a professional fee escrow account on a weekly basis and during that time period that you are referring to our OEM customers funded 100 percent of the professional fees.
Q Fair enough. Under the plan, assuming that your fees are approved by the Court, you will be paid in full, correct?
A Yes, I hope.
Q Fair enough. But under the plan, other administrative creditors are not getting full shortly after the confirmation date, right?
A Well, it all depends on how quickly the litigation proceeds come in.
Q Do you think they're getting paid within three months?
A I'm not sure.
MS. DEXTER: Objection, Your Honor. I don't think Mr. Moore is going to testify as to the timing of when the litigation trust is going to generate returns.
THE COURT: I'll sustain that objection.
BY MS. GARZA:
Q Would you make an election to reduce your fees by 50 percent if you were part of the administrative expense claim election?
A That is a hypothetical that I would need a lot more information on.

Q Does the disclosure statement contain that information to help you make that decision?
A What I'm referring to is I would have to look at my specific situation as a trade vendor in this case to decide how important that is to me. So I just -- I can't -- I don't think that I can comment on any particular party and whether that is attractive to them or not, but the good thing is that they can make that decision.
Q I understand. I'm not asking about the other trade vendors. I'm asking about you. If you had the option to make the election, do you think that the disclosure statement has enough information to allow you to make that decision?
A That's a different question, and I do agree that the disclosure statement contains enough information for a party to make that decision.
Q Has enough information to tell them when they're going to get paid?
A It has enough information to tell them how they're going to get paid, and it also talks about the uncertainty as it relates to the timing of the payment.
MS. GARZA: Objection, nonresponsive.
THE COURT: I'll sustain the objection.
BY MS. GARZA:
Q My question was does the disclosure statement contain

information about when they will get paid if they make that election?
A Yes.
Q When?
A They get paid once the litigation proceeds come in that allow them to get paid.
Q But you don't know when that will be, right?
A Are you referring to a specific date? Because I do know, based on the waterfall, when that will be.
Q But you do not know a specific date, correct?
A Correct, and that's very -- that's made very clear in the disclosure statement.
Q Were any administrative creditors present at the mediation in this case?
A Not that I recall.
Q Did any administrative creditor help negotiate the trust waterfall?
A No.
Q Do you know if any of your fees have been paid out of receivables generated by postpetition administrative creditors?
A Could you state that question again and just maybe state it a little more slowly because I want to make sure that I have the different elements?
Q Sure. Were any of the fees that you were paid

generated from receivables from postpetition administrative work or goods?

A The reason why I asked you to restate it, there are a couple of things I'm not following. So when you say from receivables, what are you referring to specifically on the receivables?

Q That's fair. I'm trying to think of a better way to ask this question. There are vendors who provided postpetition goods and services in this case?

A Yes.

Q Those postpetition goods and services were used by the Debtors to generate auto parts?

A Presumably.

Q They were sold and they've generated receivables. Is that fair to say?

A Well, some of the inventory is still in existence. It may be liquidated. But certainly there are products that were received, that were converted into finished goods and sold.

Q And so you were paid from the postpetition cash flows of the Debtor, correct?

A Not necessarily. As we indicated, from basically the end of January forward, the amounts that have gone to pay professionals came all from OEM funding. Prior to that point, our DIP lenders had provided $1.1 billion in new cash

that went towards the payment of professionals.
Q Turning to the administrative expense claims consent program now, I believe that you've testified you're familiar with that program, correct?
A Yes.
Q Okay, and, generally speaking, that program would allow the administrative creditors a choice to reduce their claims by 50 percent for prompter payment, correct?
A Yes.
Q I think you said yesterday that they go to the front of the line.
A In that category, yes.
Q That necessarily means that people go to the back of the line, right?
A It means that there are two things happening. One is that some parties get paid sooner. But the actual amount that they're getting paid gets cut in half, and so it's unclear -- it's going to depend on how many people would consensually opt into that program -- whether it impacts in any way the other parties, and when they would get paid.
MS. GARZA: Objection nonresponsive.
THE COURT: No, I'll overrule that one.
BY MS. GARZA:
Q I think at the end of it, you said that if people get paid sooner, it means others might get paid later; am I

wrong?
A You are wrong?
Q Can you restate your answer then? Because I missed the last part.
A Yes, what I was referring to, and this is going to depend on how many parties consensually opt into it. But because of the two parts to this, you have parties that are going to get paid first. However, the amount that they get paid is going to be cut in half. And so the point at which the other administrative claimholders, those that would not opt into the program, the point at which they start to get paid may be no different than if no one entered or opted into the program.
Q So the election might not actually provide any benefit to anybody?
A No, it certainly may. But it depends on how many people opt into it. The fact that there is a discount that's happening, even though parties are moving -- getting paid first, those two items work together, and so if you decide that you're not going to opt into the program, it all depends on how many other parties would opt into that program to determine whether it impacts the timing of your payment.
Q But I think in your answer, you would agree with me, if someone gets paid first, that means someone gets paid

second, right?

A No, because, again, I'll just say, I'll just restate it. There's a second element to it, which is the party that is now getting paid first has agreed to take a 50 percent discount.

Q Which means that the party who hasn't elected to take that discount has to wait for the first one to get paid in full, right?

A But the amount is less, and so the amount, the total amount of litigation proceeds that come in for the non-electing parties to start getting paid may be no different.

MS. GARZA: Objection, nonresponsive.

THE COURT: I'll sustain that one.

BY MS. GARZA:

Q If someone gets paid first, they have to get paid in full before the second person gets paid, right?

A When you say the second person, you're referring to the parties, the administrative claimholders, that don't opt into this program?

Q Yes.

A Yes, that's right. They have to -- the parties that opt into the program have to be paid first before the other administrative claimholders can start getting paid.

Q And for the ones that didn't make the election, essentially they're harmed because now they go to the back

of the line. They have to wait for those other people to get paid, right?

A No. There are two things in your question. First, there's a specific order of payment within that category. So the administrative claimholders get paid before the priority claimholders. So they're not moving to the back of the line and they actually are -- let's call it less diluted because -- and that's D-I-L, not D-E-L -- what's happening is that the amount of administrative claims is less.

Q I appreciate the mechanics of the election. What I'm trying to get at is there's a delay associated with not making the election, right? If anyone makes an election, there's a delay on those that did not, right?

A Yeah, the time at which they would get paid first is later than those that have elected into the program.

Q And I think we said this before. But honestly, our sparring has confused me. So I'll ask again. Is there anything in the disclosure statement about how much quicker someone might get paid if they make the election?

A Yes, they go to the front of the line.

Q But it's the front of the line, not the timing. They don't know if they'll get paid six months early, do they?

A That's correct.

Q They don't know if they'll get paid a year early, right?

A That's correct.
Q And in fact I think you said earlier, it's possible that there isn't enough money yet paid and so the effective date never occurs and so they never get paid in full, right?
A That is a possibility.
Q Are administrative creditors getting interest under this plan?
A No.
Q Do you understand whether a creditor is impaired or unimpaired under your plan? Do you understand that generally?
A Generally, yes.
Q So, for example, a general unsecured creditor might be impaired if they're not being paid in full?
A Yes.
Q And a priority creditor might be impaired if they're not getting paid on the effective date. They're waiting five years, let's say.
A Yes.
Q And administrative creditors aren't getting paid shortly after the confirmation date. They have to wait who knows how long to get paid, right?
A Well, however I answer, I'm sure there's going to be an objection to that.
Q Fair. But the fact that they have to wait, that delay

in payment, that's an impairment, right?
A I don't know if that's the case.
Q But you had agreed with me that if you got delayed payment as a priority creditor, that was an impairment, right?
A You talked about it a priority claimant was not paid at the effective date, and I understand your question that you just asked me to be different.
Q But it's that delay that causes the impairment, right, that delay in payment?
MR. BEREZIN: Your Honor, this is now getting into, I think, a legal question.
THE COURT: Do you think -- well, the question is are you using impairment for 1124 purposes or are you just using the word impairment as in a generic sense? That's the question I've got.
MS. GARZA: Your Honor, I think he testified that impairment under the plan -- if you're impaired as a creditor, a delay in payment might cause impairment, and so I'm trying to elicit that testimony from him.
THE COURT: Then I do agree with Mr. Berezin that now we're getting into what impairment is under 1124. If you're just saying delay, front of the line, back of the line, I think that works.
BY MS. GARZA:

Q Mr. Moore, in your experience is it common for creditors to charge interest if their invoices aren't paid when they're due?
A I'm aware that a lot of invoices state that, and I am also aware from a practical standpoint that that very rarely ever happens.
Q It's in there, right?
A It can be on an invoice. I'm saying I never see this, actually interest get charged.
Q You've never seen it get charged?
A I've never seen a trade creditor invoice actually charge interest and have someone pay it.
Q I've represented a bunch of creditors. I always charged interest, and it got paid. So we can agree to disagree. Did administrative creditors receive ballots in this case to vote on the plan?
A No.
Q And they were not entitled to vote on this plan, right
A Correct.
Q As a financial advisor, I think you're probably familiar with the concept of the time value of money.
A Yes.
Q A hundred dollars today isn't the same as a hundred dollars a year from now.
A Well, it all depends on what happens with inflation.

Q Generally speaking, would you agree with that?
A If there is an inflationary environment, then, yes, a dollar in a year is worth less than a dollar today.
Q The reason people charge interest is to accommodate for that, right, that a dollar today might not be worth a dollar tomorrow, correct?
A That is an element of interest rates.

MR. CASSELL: Your Honor, I don't think these questions are really expert. But I just want to be comfortable we're not opening --

THE COURT: I don't think we're opening up any expert testimony to this point in terms of where we are. But I understand the question.

BY MS. GARZA:
Q To the extent a creditor bargained to get paid in 60 days, getting paid two years from now isn't the same thing, is it?
A I think on the surface your question, if I was thinking I was going to get paid in 60 days and I got paid in two years, that's correct. Those are different.

MS. GARZA: I'll pass the witness, Your Honor.

THE COURT: Okay. Thank you. Good evening, Mr. Kelley.

MR. KELLEY: Good evening, Your Honor. For the record, Charles Kelley, from Mayer Brown, on behalf of

Katsumi Servicing. Your Honor, as a housekeeping matter, I've been conferring with Debtors' counsel and we'd like to offer some of our exhibits. I believe these are unobjected to. So if I may?

THE COURT: Okay.

MR. KELLEY: ECF 3443-26 through 3443-30.

THE COURT: Thirty?

MR. KELLEY: Yes, so that's 26, 27, 28, 29, 30. Those are the transaction documents between the Debtors and Katsumi.

THE COURT: Any objection to the admission of 26 through 30? ECF 3443-26 through 30 are admitted.

(Exhibits ECF 3442-26 through ECF 3443-30 entered into evidence.)

CROSS EXAMINATION OF CHARLES MOORE

BY MR. KELLEY:

Q Good evening, Mr. Moore.

A Hello, Mr. Kelley.

Q How are you doing? Do you need water or anything?

A I have been hydrating all day.

Q I'm going to follow up on some questions that were first asked to you by Mr. Cassell. Do you have your demonstrative exhibit in front of you?

A I do.

Q Could you take a look at Page 2?

A Yes, I have it.
Q And you probably anticipate the question. Mr. Cassell asked you these are payments out from the estate that you talked about earlier to the various parties, correct?
A Yes.
Q You know I represent Katsumi Servicing, right?
A I do.
Q And you have a row here that's just Marced Katsumi. Was this intended to relate to the receivables purchase program involving Katsumi Servicing?
A The factoring program.
Q And it only shows monies out, but it does not show monies in. Do you know, first off, was -- do you know, the amount during this same period that Katsumi received from the Debtors?
A I don't.
Q Did you do -- well, since September 27, 2023, you were aware that Katsumi is, as characterized by Mr. Cassell, a net loser in these transactions with the estate, paid more money to the estate than it received?
A Would you like to direct me to something?
MR. KELLEY: May I approach the witness, Your Honor?
THE COURT: Mm-hmm.
MR. KELLEY: It's just going to be faster

(indiscernible). I'm directing you to ECF 3188, Paragraph 89, in particular the (indiscernible).

THE COURT: Is that the declaration?

MR. KELLEY: It is.

THE COURT: Okay. Which paragraph?

MR. KELLEY: I believe it's 89.

THE COURT: Okay.

BY MR. KELLEY:

Q Are you seeing that?

A I do.

Q Does that refresh your recollection (indiscernible) just this point, that since September 27, 2023, Katsumi funded $4.9 billion of third-party factoring and has paid more than 4.7?

A Yes.

THE COURT: Mr. Kelley, just so we have a good record, do you mind repeating just that statement into the record, just to make sure that the --

MR. KELLEY: Since September --

THE COURT: -- mic picks you up?

MR. KELLEY: I'm sorry, Your Honor. I didn't mean to overspeak.

THE COURT: I just wanted to make sure that mic picked you up on that last point.

MR. KELLEY: Yeah. I was away from the

microphone.

BY MR. KELLEY:

Q Since September 27, 2023, Katsumi funded or paid to the estate $4.9 billion for additional third-party factoring and was paid more than $4.7 billion.

MR. KELLEY: I know you're going to be surprised, Your Honor, but given the topics everyone covered, I don't think I want to cover more with this witness at this particular point in time. But I would like to note a reservation. Obviously, we're under federal rules and I've kept our confinement to what was direct. But there are some evidentiary issues with respect to the next witness --

THE COURT: okay.

MR. KELLEY: -- who, as I think you've heard from the parties, relies solely on this witness. So depending on the Court's ruling and how that proceeds, we'd like to -- the collective table would like to reserve the right to call back Mr. Moore if necessary.

THE COURT: Okay. Let's just -- does anyone else have any cross-examination for the witness? Any redirect?

MR. BEREZIN: If we could take maybe five minutes?

THE COURT: Yeah, of course.

MR. BEREZIN: And obviously we reserve our rights on that.

THE COURT: Everybody's rights are reserved on

that point.

MR. BEREZIN: Thak you, Your Honor.

THE COURT: Yeah, yeah.

MR. BEREZIN: I think Mr. Moore would kill me if I didn't say that.

MR. TSEKERIDES: Your Honor, could I raise housekeeping before we break?

THE COURT: Yes, of course.

MR. TSEKERIDES: So I assume we'll do the redirect. But I would like us to at least argue then tonight the issue of Mr. Kirschner because, depending on your ruling, and he's not coming, I'd like to let him know that, and if he is coming, I'd like him to be ready to go tomorrow morning. So if we can argue that today --

THE COURT: I guess the better question is are we arguing it tonight or are we --

MR. TSEKERIDES: I would like it tonight.

THE COURT: -- are we going to do it in the morning? What do you want to do?

MS. DEXTER: Your Honor, we're prepared to argue the motion in limine.

THE COURT: I'm prepared to give you an answer. Let's -- is Mr. Kirschner here?

MR. TSEKERIDES: No, he's not in the courtroom.

THE COURT: I mean, but like somewhat close?

MR. TSEKERIDES: Oh, he's in Houston, yeah.

THE COURT: Got it.

MR. BEREZIN: Your Honor, if we are going to do that, we just need a little bit of time because we need to get Mr. Scott back here to do that.

MR. TSEKERIDES: He's just across the street.

MR. BEREZIN: Yeah, yeah.

THE COURT: Oh, yeah. No, no. No, no. Not a problem at all. But what are we -- are we arguing --

MR. TSEKERIDES: I thought you said 10 o'clock tomorrow. That's the only reason I asked.

THE COURT: Well, why don't we -- why don't we take the five minutes, and then let's just take things one step at a time.

MR. TSEKERIDES: Okay. Fair enough.

THE COURT: Okay. Thank you.

MR. TSEKERIDES: Thanks.

(Recess.)

THE COURT: So let's go back on the record. This is Judge Lopez. Let me --

MR. KELLEY: Do you want to finish the redirect and then do the housekeeping?

THE COURT: Yeah. Yeah, let's finish redirect. All righty. Let's see, we are back on the record in First Brand. Now we're here with the redirect. Mr. Berezin --

MR. BEREZIN: Thank you, Your Honor.

THE COURT: -- you may proceed.

MR. BEREZIN: Thank you, Your Honor.

REDIRECT EXAMINATION OF CHARLES MOORE

BY MR. BEREZIN:

Q Mr. Moore, you were asked several questions on cross-examination about the $75 million credit bid for the estate claims and, without going back over old ground of your testimony concerning the benefits of the plan and the plan settlement, my question to you is this. Would you, as CEO, have approved the credit bid if the only benefit to the estates was $75 million?

A Excluding all other aspects.

Q In other words, it was $75 million all of it, all of the elements of the plan settlement are off the table. Would you have approved that deal?

A No.

MR. BEREZIN: Nothing further, Your Honor.

THE COURT: Any cross?

MR. KELLEY: Not recross, Your Honor, just housekeeping.

(Testimony Completed)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: August 3, 2026