# Exhibit 4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § § § | **Chapter 11** |
| **INSTANT BRANDS ACQUISITION HOLDINGS INC., *et al.*,** | § § | **Case No. 23-90716 (MI)** |
| **Debtors.**[1] | § § § | **Jointly Administered** |

# COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION OF INSTANT BRANDS ACQUISITION HOLDINGS INC. AND ITS DEBTOR AFFILIATES

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Joanna McDonald (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Email: brian.resnick@davispolk.com
steven.szanzer@davispolk.com
joanna.mcdonald@davispolk.com

HAYNES AND BOONE, LLP

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.: (713) 547-2000
Email: charles.beckham@haynesboone.com
arsalan.muhammad@haynesboone.com
david.trausch@haynesboone.com

*Counsel to the Debtors and Debtors in Possession*

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

**IMPORTANT INFORMATION REGARDING THIS COMBINED DISCLOSURE STATEMENT AND PLAN**

**The Debtors are soliciting votes on this Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates from the Holders of the following Classes of outstanding Claims:**

| Voting Class | Name of Class Under the Plan |
|---|---|
| 3 | Prepetition Term Loan Claims |
| 4 | General Unsecured Claims |

**If you are in Class 3 or Class 4, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a ballot to vote on the Plan, you should review this Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates.**

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN FEBRUARY 8, 2024 AT 4:00 P.M. (PREVAILING CENTRAL TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AND SOLICITATION AGENT ELECTRONICALLY (ON THE CLAIMS AND SOLICITATION AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

**You can vote electronically by visiting the Case Information Website maintained by the Claims and Solicitation Agent (https://dm.epiq11.com/instantbrands), clicking on the "E-Ballot" tab, and following the prompts and directions. You will need your unique E-Ballot ID# to submit your E-Ballot; your E-Ballot ID# can be found on your Ballot. Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Holders who vote electronically via the Claims and Solicitation Agent's online portal should not also submit a paper Ballot. The E-Ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the E-Ballot portal. Ballots delivered by email, facsimile, or any other electronic means may not be counted.**

**If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:**

| If by First-Class Mail: | If by Hand Delivery or Overnight Mail: |
|---|---|
| Instant Brands Acquisition Holdings Inc.<br>c/o Epiq Ballot Processing Center<br>P.O. Box 4422<br>Beaverton, OR 97076-4422 | Instant Brands Acquisition Holdings Inc.<br>c/o Epiq Ballot Processing Center<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

## <u>Preliminary Statement and Disclaimers</u>[2]

The Bankruptcy Court has established **February 8, 2024 at 4:00 p.m. (prevailing Central Time)** as the deadline for Filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "**Combined DS and Plan Objection Deadline**"). *See* Docket No. 924. Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, in English, and in text-searchable format, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, Complex Procedures, and the Solicitation Order, (c) state, with specificity, the legal and factual bases thereof, and (d) be Filed with the Bankruptcy Court no later than the Combined DS and Plan Objection Deadline.

A hearing on the final approval of the Disclosure Statement and the confirmation of the Plan (as such hearing may be continued from time to time, the "**Combined Hearing**") will commence on **February 15, 2024 at 8:00 a.m. (prevailing Central Time**) in the Bankruptcy Court before the Honorable Marvin Isgur, in courtroom 404 at 515 Rusk Street, Houston, Texas 77002. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by Filing a notice on the docket of the Chapter 11 Cases. In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined DS and Plan contains summaries of certain provisions and certain other documents and information. The financial information (including any financial projections) included herein is provided solely for the purpose of soliciting votes on the Combined DS and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined DS and Plan. While the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information (including any financial projections) in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined DS and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined DS and Plan. The Bankruptcy Court's approval or confirmation of the Combined DS and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined DS and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined DS and Plan should not assume at the time of such review that

---

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "**Disclosure Statement**," the "**Combined DS and Plan**," or the "**Plan**," as applicable).

there have been no changes to the facts or information set forth herein since the date of the Combined DS and Plan. All Holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined DS and Plan in its entirety before voting on the Plan. No Holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined DS and Plan (including the documents attached hereto). The Combined DS and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to Holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information (including any financial projections) provided herein or incorporated herein by reference, such information contained herein has not been audited, except to the extent specifically indicated otherwise herein. The financial information (including any financial projections) provided herein has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the financial information (including any financial projections) was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined DS and Plan, nor any action taken by a Debtor in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in accordance with rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any Holder of a Claim.

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended,

all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined DS and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. See Articles XVII–XIX for a discussion of certain considerations and risk factors that Holders entitled to vote on the Plan should consider.

The Plan provides for the issuance and distribution of the New Equity Interests and the Litigation Trust Interests to the Holders of Class 3 Prepetition Term Loan Claims and Litigation Trust Beneficiaries, respectively. The Debtors are relying on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and any state securities laws ("**Blue Sky Laws**") the issuance and distribution, if applicable, of such New Equity Interests and the Litigation Trust Interests (to the extent any Litigation Trust Interests are considered "securities" under applicable law) under the Plan; to the extent such exemption is not available, the New Equity Interests and the Litigation Trust Interests shall be issued or distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and Blue Sky Laws. Any securities to be issued or distributed on or after the Effective Date shall not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under any Blue Sky Laws. This Combined DS and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined DS and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined DS and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

***

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ........................3

**A.** Defined Terms ........................ 3
**B.** Rules of Interpretation ........................ 27
**C.** Computation of Time ........................ 28
**D.** Governing Law ........................ 28
**E.** Reference to Monetary Figures ........................ 29
**F.** Nonconsolidated Plan ........................ 29

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ........................29

**A.** The Debtors' Corporate History ........................ 29
**B.** The Company's Business Operations ........................ 29
**C.** The Debtors' Prepetition Capital Structure ........................ 31
1. Prepetition Term Loan Credit Facility ........................31
2. Prepetition ABL Credit Facility ........................32
3. Precious Metal Leases ........................33
4. Preferred Equity ........................33
5. Common Equity ........................33
**D.** Product Liability Claims ........................ 34

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS ........................36

**A.** Macroeconomic Trends and Company-Specific Events ........................ 36
**B.** Prepetition Restructuring Efforts ........................ 38

ARTICLE IV. EVENTS FOLLOWING THE FILING OF THE CHAPTER 11 CASES .........39

**A.** Operational and Other Relief ........................ 39
**B.** DIP Financing and Upsizing ........................ 40
**C.** Canadian Foreign Recognition Proceedings ........................ 41
**D.** Retention of Professionals ........................ 41
**E.** The Sale Transaction ........................ 42
**F.** Claims Bar Date ........................ 42
**G.** Global Settlement/Agreement ........................ 42
**H.** Other Key Filings in the Chapter 11 Cases ........................ 44

ARTICLE V. DIP SUPERPRIORITY CLAIMS; ADMINISTRATIVE CLAIMS; PRIORITY CLAIMS; AND STATUTORY FEES ........................45

**A.** DIP Superpriority Claims ........ 45
**B.** Administrative Claims ........ 46
1. Administrative Claims Bar Date ........ 46
2. Treatment of Administrative Claims ........ 47
3. Professional Fee Claims ........ 47
4. Treatment of Priority Tax Claims ........ 49
5. Litigation Trustee Administrative Claims ........ 50
**C.** Statutory Fees ........ 50
ARTICLE VI. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........ 50
**A.** Classification and Treatment of Claims and Interests ........ 52
1. Class 1 — Other Secured Claims ........ 52
2. Class 2 — Other Priority Claims ........ 52
3. Class 3 — Prepetition Term Loan Claims ........ 53
4. Class 4 — General Unsecured Claims ........ 54
5. Class 5 — Section 510(b) Claims ........ 54
6. Class 6 — Intercompany Claims ........ 54
7. Class 7 — Intercompany Interests ........ 55
8. Class 8 — Existing Interests ........ 55
**B.** Special Provision Governing Unimpaired Claims ........ 56
**C.** Voting Classes; Presumed Acceptance or Rejection by Nonvoting Classes ........ 56
1. Voting Classes Under the Plan ........ 56
2. Acceptance of the Plan by Impaired Classes of Claims ........ 56
3. Presumed Acceptance of the Plan ........ 56
4. Presumed Rejection of the Plan ........ 56
5. Presumed Acceptance or Rejection of the Plan ........ 56
6. Presumed Acceptance by Voting Classes with No Votes ........ 57
**D.** Elimination of Vacant Classes ........ 57
**E.** Controversy Concerning Impairment ........ 57
ARTICLE VII. IMPLEMENTATION OF THE PLAN ........ 57
**A.** Continued Existence and Vesting of Assets ........ 57
1. Reorganized Debtors ........ 57
2. Litigation Trust ........ 58
3. Transfer of Books and Records; Privilege ........ 58
**B.** Transactions Related to the Plan ........ 58
**C.** New Equity Interests ........ 59
1. Issuance of New Equity Interests ........ 59
2. Exemption from Registration ........ 59
**D.** Exit Financing ........ 60
**E.** Boards of Managers/Directors ........ 61

**F.** New Governance Documents; No Further Action ... 61
**G.** Litigation Trust ... 62
1. Creation of the Litigation Trust ... 62
2. The Litigation Trustee ... 63
3. Rights, Powers, and Duties of the Litigation Trust and the Litigation Trustee ... 64
4. Tax Treatment ... 64
5. Litigation Trust Professionals ... 66
6. Indemnification ... 66
7. Dissolution ... 66
**H.** Cancellation of Instruments, Certificates, and Other Documents ... 66
**I.** Subordination ... 67
**J.** Merger and Dissolution ... 68
**K.** Management Incentive Plan ... 68
**L.** Product Liability Claims ... 68

ARTICLE VIII.
PROVISIONS GOVERNING DISTRIBUTIONS ... 69

**A.** Sources for Plan Distributions and Transfers of Funds Among Debtors ... 69
**B.** Distribution Agent ... 69
**C.** Timing of Distributions ... 70
**D.** *De Minimis* Distributions ... 70
**E.** Delivery of Plan Distributions—Allowed Claims ... 71
**F.** Fractional New Equity Interests ... 71
**G.** Manner of Payment Under the Plan ... 72
**H.** Allocation of Plan Distributions Between Principal and Interest ... 72
**I.** Compliance Matters ... 72
**J.** Foreign Currency Exchange Rate ... 72
**K.** Fractional Dollars ... 73
**L.** Undeliverable, Unclaimed, or Non-Negotiated Plan Distributions ... 73
**M.** Claims Paid by Third Parties ... 73
**N.** Claims Payable by Third Parties ... 74

ARTICLE IX.
PROCEDURES FOR RESOLVING CLAIMS ... 74

**A.** Objections to Claims ... 74
**B.** Resolution of Disputed Claims ... 75
**C.** Estimation of Claims and Interests ... 75
**D.** No Distributions Pending Allowance or Settlement of Causes of Action ... 76
**E.** No Amendments to Claims ... 77
**F.** No Late-Filed Claims ... 77

**G.** No Interest ..... 78
**H.** Adjustment to Claims Without Objection ..... 78
**I.** Reservation of Rights To Object to Claims ..... 78
**J.** Disallowance of Claims ..... 79
**K.** Reimbursement or Contribution ..... 79

ARTICLE X. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 79

**A.** Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 79
**B.** Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..... 81
**C.** Employment-Related Provisions ..... 82
1. Employment Agreement and Benefit Programs ..... 82
2. Pension Plan ..... 82
3. Collective Bargaining Agreements ..... 83
**D.** Rejection Claims ..... 83
**E.** Reservation of Rights ..... 84
**F.** Transferred Cure Costs ..... 84
**G.** Indemnification ..... 84
1. Debtor Indemnification Obligations ..... 84
2. Third-Party Indemnities ..... 85
**H.** Insurance-Related Provisions ..... 85

ARTICLE XI. EFFECT OF CONFIRMATION OF THE PLAN ..... 86

**A.** Release of Liens ..... 86
**B.** Releases; Discharges ..... 87
**C.** Term of Injunctions or Stays ..... 87
**D.** Exculpation ..... 88
**E.** Releases by the Debtors ..... 88
**F.** Voluntary Releases by the Releasing Parties ..... 91
**G.** Injunction ..... 93
**H.** Setoff and Recoupment ..... 94
**I.** Preservation of Causes of Action ..... 95
**J.** Compromise and Settlement of Claims and Controversies ..... 96
**K.** Protection Against Discriminatory Treatment ..... 96

ARTICLE XII. CONDITIONS TO EFFECTIVE DATE ..... 97

**A.** Conditions Precedent to the Effective Date ..... 97
**B.** Waiver of Conditions to Effectiveness ..... 98

ARTICLE XIII.
MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......98

**A.** Plan Modifications ............ 98

**B.** Revocation or Withdrawal of Plan and Effects of Nonoccurrence of Confirmation or Effective Date ............ 99

ARTICLE XIV.
RETENTION OF JURISDICTION ............100

ARTICLE XV.
MISCELLANEOUS PROVISIONS ............103

**A.** Exemption from Transfer Taxes and Recording Fees ............ 103

**B.** Dissolution of the Creditors' Committee ............ 103

**C.** Plan Supplement and Other Plan Documents ............ 104

**D.** No Admission ............ 104

**E.** Substantial Consummation ............ 104

**F.** Section 1125 of the Bankruptcy Code ............ 104

**G.** Non-Severability ............ 105

**H.** Binding Effect ............ 106

**I.** Service of Documents ............ 106

**J.** Waiver or Estoppel ............ 107

**K.** Conflicts ............ 107

**L.** Entire Agreement ............ 107

ARTICLE XVI.
CONFIRMATION REQUIREMENTS ............108

**A.** The Combined Hearing ............ 108

**B.** Classification ............ 108

**C.** Consensual Confirmation ............ 108

**D.** Feasibility and Best Interests of Creditors ............ 109

1. Best Interests Test ............109
2. Liquidation Analysis ............110
3. Application of the Best Interests Test ............111
4. Feasibility ............111
5. Valuation of the Debtors ............112

**E.** Confirmation Without Necessary Acceptances; Cramdown ............ 112

ARTICLE XVII.
PLAN-RELATED RISK FACTORS ............113

**A.** Certain Bankruptcy Considerations ............ 113

1. The Plan May Not Be Accepted ............113
2. The Plan May Not Be Confirmed or Recognized ............114
3. Parties in Interest May Object to the Amount or Classification of Claims ............114

4. The Debtors May Object to the Amount or Classification of a Claim ....115
5. Nonconsensual Confirmation ....115
6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code ....115
7. Plan Releases May Not Be Approved ....115
8. Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ....116
9. Certain Tax and Securities Implications of the Plan ....116
10. The Chapter 11 Cases ....116
11. Failure To Consummate the Plan ....116
12. Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero ....117
13. Withdrawal of Support ....117
14. The Financing Commitments for the Exit Financing Facilities May Be Terminated ....117
15. The Reorganized Debtors May Not Be Able To Achieve Their Projected Financial Results ....117
16. The Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based ....117
17. Historical Financial Information May Not Be Indicative of Future Financial Performance ....118
18. The Terms of the Exit Financing Documents and the New Governance Documents Are Subject To Change Based on Negotiations and Approval of the Bankruptcy Court ....118
19. There Is No Established Market for the New Equity Interests ....118
20. Certain Significant Holders of New Equity Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date ....119
21. Holders of the New Equity Interests May Experience Dilution of Their Ownership Interests ....119
22. The Interests of Holders of the New Equity Interests Will Be Subordinated to the Reorganized Debtors' Indebtedness ....119
23. The Reorganized Debtors May Not Pay Dividends on Account of the New Equity Interests ....119
24. The New Equity Interests May Be Subject to Restrictions on Transfers ....120
25. The Exit Financing Facilities Will Be Secured Only to the Extent of the Value of the Assets Granted as Security Therefor; the Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient To Repay the Exit Financing Lenders in Full ....120
26. The Exit Financing Facilities May Include Covenants that Impose Restrictions on the Reorganized Debtors' Finances and Business Operations ....121

27. The Reorganized Debtors May Not Be Able To Service Their Funded Debt, Including the Exit Financing Facilities ....121
28. Any Recoveries on Account of the Litigation Trust Recovery Actions are Speculative and Uncertain ....121
29. The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan ....122

**B.** Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if the Debtors Reorganize Under the Plan .... 122
1. The Company's Industry Is Highly Competitive, and Increased Competitive Pressure Could Adversely Affect its Business and Operating Results ....122
2. The Company's Contracts Subject it to Contract Renewal Risks ....122
3. Certain Claims May Not Be Discharged and May Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations ....122
4. The Reorganized Debtors' Access to Capital May Be Further Limited due to Deterioration of Conditions in the Global Capital Markets, Weakening of Macroeconomic Conditions, and Negative Changes in Financial Performance ....123
5. Increases in Interest Rates Could Adversely Impact the Reorganized Debtors' Ability To Issue Equity or Incur Debt for Acquisitions or Other Purposes ....123
6. Cyberattacks, Acts of Terrorism, or Other Disruptions Could Adversely Impact the Reorganized Debtors' Operational Results ....123
7. The Reorganized Debtors' Ability To Operate Their Businesses Effectively Could Be Impaired If They Fail To Attract and Retain Key Management and Personnel ....123

ARTICLE XVIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ....124

**A.** General .... 124
**B.** Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.... 125
1. Implementation of the Transactions Contemplated by the Plan ..125
2. Cancellation of Debt Income ....126
3. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes....127

**C.** Consequences to U.S. Holders.... 128
1. Consequences to U.S. Holders of Prepetition Term Loan Claims ....128
2. Consequences to U.S. Holders of General Unsecured Claims ....130
3. Accrued Interest and OID ....131
4. Market Discount....131

**D.** Consequences of Ownership of New Equity Interests.... 132

1. Distributions....132
2. Sale, Exchange, Redemption, or Other Taxable Disposition of New Equity Interests....132

**E.** Tax Treatment of the Litigation Trust and U.S. Holders of Litigation Trust Interests....133
1. Classification of the Litigation Trust....133
2. General Tax Reporting by the Litigation Trust and Holders of Litigation Trust Interests....134
3. Tax Reporting for Assets Allocable to Disputed Claims....135

**F.** Withholding on Distributions and Information Reporting....135

**G.** Importance of Obtaining Professional Advice....136

ARTICLE XIX. CERTAIN SECURITIES LAW MATTERS....136

**A.** New Equity Interests....136
1. Issuance of New Equity Interests....136
2. Private Placement Securities....137
3. Subsequent Transfers of New Equity Interests....139

**B.** Litigation Trust Interests....140

## TABLE OF EXHIBITS

**Exhibit A** Organizational Chart

**Exhibit B** Financial Projections

**Exhibit C** Valuation Analysis

**Exhibit D** Liquidation Analysis

**Exhibit E** Schedule of Retained Causes of Action

## Introduction

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[1] the Debtors propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* (as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "**Combined DS and Plan**," the "**Disclosure Statement**," or the "**Plan**," as applicable) to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Combined Hearing to consider confirmation thereof. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan; such items have been or may be Filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XIII, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

After an exhaustive marketing and sale process, the Bankruptcy Court entered the *Order (A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Debtors To Enter into and Perform their Obligations under the Asset Purchase Agreements and Related Documents, (C) Authorizing the Assumption and Assignment of Certain Contracts and Leases, and (D) Granting Related Relief* [Docket No. 636] (the "**Sale Order**") approving the sales of all or substantially all of the Debtors' assets relating to each the appliances business and the housewares business (the "**Appliances Sale Transaction**" and the "**Housewares Sale Transaction**" and, the sale process leading up to the entry into the Appliances APA and the Housewares APA, including the marketing of the Debtors' assets and the auction process with respect thereto, the "**Sale Process**").[2] While the Appliances Sale Transaction closed on November 8, 2023, the Debtors and the Housewares Buyers were unable to obtain the requisite regulatory approvals for the Housewares Sale Transaction within the "Outside Date" set forth (and as defined) in the Housewares APA. As a result, the Debtors terminated the Housewares APA in accordance with its terms and the Debtors and the Ad Hoc Group of Crossover Lenders, in consultation with the Creditors' Committee, worked together to formulate this Plan to facilitate a reorganization of the Debtors' housewares business via, among other things, the equitization of the Class 3 Prepetition Term Loan Claims.

The Plan is the outcome of extensive negotiations among the Debtors and certain of their key stakeholders—including Holders of over 95% of the Class 3 Prepetition Term Loan Claims (who are expected to ACCEPT the Plan) and the Creditors' Committee—and provides a framework for, among other things, a significant reduction of the Company's prepetition funded indebtedness and an operational restructuring of the Company's housewares business to further advance the

---

[1] Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

[2] Additional information regarding the Sale Transactions can be found in the Sale Order and the *Supplemental Declaration of Ronen Bojmel in Support of Entry of Order (A) Approving the Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing Debtors To Enter into and Perform their Obligations under the Asset Purchase Agreements and Related Documents, (C) Authorizing the Assumption and Assignment of Certain Contracts and Leases, and (D) Granting Related Relief* [Docket No. 630-14] (the "**Sale Declaration**"), each of which can be accessed on the Case Information Website free of charge.

Company's efforts in positioning itself for long-term success. In doing so, the Plan contemplates (a) the equitization of over $390 million of the Class 3 Prepetition Term Loan Claims into 100% of the New Equity Interests (subject to dilution, as set forth herein) in the Reorganized Debtors and (b) the distribution of Litigation Trust Interests—85% to Holders of Class 3 Prepetition Term Loan Claims and 15% to Holders of Allowed Class 4 General Unsecured Claims (with such percentages subject to dilution from the repayment of the Litigation Trust Financing)—in a Litigation Trust created to investigate and pursue possible Causes of Action, including Causes of Action against the Debtors' former controlling shareholders and certain of their affiliates (*i.e.*, the Litigation Trust Recovery Actions). All other Classes of Claims held by third-party creditors would be left Unimpaired under the Plan, while the Holders of Existing Interests would receive no consideration.

Upon the effectiveness of the Plan, unless otherwise left Unimpaired, the Plan provides for the full and final discharge of Claims against and Interests in the Debtors and customary exculpation and release of certain claims and Causes of Action against various Persons held by the Debtors, their Estates, and those third parties that grant consensual releases under the terms of the Plan. The Plan also provides for committed secured exit financing sufficient to fund the Debtors' emergence from bankruptcy (including the payment of all Allowed Administrative Claims (including DIP Superpriority Claims, Professional Fee Claims, U.S. Trustee Fees, and Information Officer Fees), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) and to provide working capital required by the Reorganized Debtors' businesses at emergence.

The Company is confident that, upon emergence, it will be well-positioned to create value for all of its economic stakeholders. The Debtors also believe that the Plan (a) is reflective of a global compromise among the Debtors and their key stakeholders and (b) treats Holders of Claims against and Interests in the Debtors in an economic and fair manner in accordance with the Bankruptcy Code's priority scheme and the good-faith compromises and settlements of certain claims and controversies among the Debtors and key stakeholders.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, this Combined DS and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the manner in which Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order conditionally approving the Disclosure Statement contained in this Combined DS and Plan, conditionally finding that it contains "adequate information" in accordance with section 1125 of the Bankruptcy Code [Docket No. 924] (the "**Solicitation Order**"). Entry of the Solicitation Order does not constitute a judgment by the

Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's conditional approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has conditionally determined that the Disclosure Statement contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Combined Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DS AND PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. The Debtors, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for an equitable distribution to Holders of Claims and the compromise and settlement of certain claims and controversies among the Debtors and key stakeholders. The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of hundreds of jobs, the potential demise of the Company's well-recognized and respected brands, the loss of significant value (and a corresponding reduction in the distributions to Holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs. Consequently, the Debtors, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee urge all eligible Holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline.**

# ARTICLE I.
# DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

## A. Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "**163(j) Deductions**" has the meaning set forth in Article XVIII.B.1.

2. "**2019 Acquisition**" has the meaning set forth in Article II.A.

3. "**2021 Financing and Dividend Recapitalization Transactions**" has the meaning set forth in Article III.A.

4. "**4(a)(2) Securities**" means New Equity Interests to be issued in accordance with the Plan to underwriters (as defined in section 1145(b) of the Bankruptcy Code).

5. "**ABL Backstop LC**" has the meaning set forth in Article III.B.

6. "**ABL DIP Agent**" means Bank of America, N.A., as administrative agent and collateral agent under certain of the ABL DIP Documents.

7. "**ABL DIP Credit Agreement**" means, as amended from time to time in accordance with its terms, that certain Superpriority Senior Secured Priming Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 15, 2023, by and among certain of the Debtors, the ABL DIP Agent, the ABL DIP Lenders, and the other parties thereto.

8. "**ABL DIP Documents**" means the ABL DIP Credit Agreement and certain other documents related to the ABL DIP Facility, as further set forth and defined in the Final DIP Order.

9. "**ABL DIP Facility**" has the meaning set forth in Article IV.B.

10. "**ABL DIP Lenders**" means the lenders from time to time party to the ABL DIP Credit Agreement.

11. "**ABL DIP Secured Parties**" means the ABL DIP Agent, the ABL DIP Lenders, and certain other secured parties, as further set forth in the ABL DIP Credit Agreement.

12. "**Ad Hoc Group of Crossover Lenders**" refers to the group of lenders identified in the *Verified Statement of the Ad Hoc Group of Crossover DIP and Prepetition Term Lenders, Pursuant to Bankruptcy Rule 2019* [Docket No. 587], as the membership thereof may change from time to time.

13. "**Administrative Claim**" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the following: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services, and reimbursement of expenses pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise (including the Bankruptcy Court's *Order Approving Procedures for the Retention and Compensation of Ordinary Course Professionals* [Docket No. 289]) for the period commencing on the Petition Date and ending on the Effective Date, including Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to 28 U.S.C. § 1930, including the U.S. Trustee Fees; (d) the Information Officer Fees; (e) the DIP Superpriority Claims; (f) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), or (5) of the Bankruptcy Code and to the extent approved by the Bankruptcy Court; (g) Cure Costs; and (h) any fees and expenses that are earned and payable pursuant to the Plan and the other Plan Documents. For the avoidance of doubt, for the purposes of treatment and Plan Distributions, the DIP Superpriority Claims shall be subject to Article V.A.

14. "**Administrative Claims Bar Date**" means the deadline for Filing requests for payment of Administrative Claims (other than DIP Superpriority Claims or Claims held by a Debtor (or a direct or indirect subsidiary thereof)), which (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

15. "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced Entity were a Debtor.

16. "**Allowed**" means, with respect to Claims against any of the Debtors, except as otherwise provided herein, any Claim that (a)(i) is evidenced by a Proof of Claim Filed by the applicable Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order or as otherwise approved by the Bankruptcy Court) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable, or (ii) for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of an Administrative Claim is not or shall not be required to be Filed, (b) is listed on the Schedules as of the Effective Date as not Contingent, not Unliquidated, and not Disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed, (c) has been compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors by a Final Order of, or a stipulation approved by, the Bankruptcy Court (including the Final DIP Order), or (d) is allowed pursuant to the Plan, a Final Order, or any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; *provided*, *however*, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof, request for estimation, motion to deem the Schedules amended, or other challenge has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, if any, or such a challenge is so interposed and the Claim shall have been Allowed for Plan Distribution purposes only by a Final Order. "**Allow**" and "**Allowing**" shall have correlative meanings. Any Claim that has been or is hereafter listed on the Schedules as Contingent, Unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim has been timely Filed, or that is not or has not been Allowed by a Final Order, is not considered Allowed. Notwithstanding anything to the contrary herein, to the extent applicable, and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such (Reorganized) Debtor. For the avoidance of doubt, a Proof of Claim Filed after the applicable Bar Date or a request for payment of an Administrative Claim Filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim or as agreed by the Debtors. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest, late fees, or other similar related charges on such Claim from and after the Petition Date.

17. "**Appliances APA**" means the asset purchase agreement for the sale of the Company's appliances business attached to the Sale Order [Docket No. 636, Ex. B].

18. "**Appliances Buyers**" means IB Appliances US Holdings, LLC and IB Appliances Canada Holdings, Inc.

19. "**Appliances Sale Transaction**" has the meaning set forth in the Introduction above.

20. “**Assets**” means all rights, titles, interest, and assets of the Debtors of any nature whatsoever, including all property of the Estates of any kind pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests in property (including real, personal, tangible, and intangible property), and proceeds from any of the foregoing items in this Article I.A.20.

21. “**Assumption and Rejection Procedures Order**” means the *Order Approving Procedures To Assume, Assume and Assign, or Reject Executory Contracts and Unexpired Leases* [Docket No. 484].

22. “**Assumption Dispute**” has the meaning ascribed to it in Article X.B.

23. “**Assumption Notice**” means the *Notice of First Amended Schedule of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amount* [Docket No. 492].

24. “**Avoidance Actions**” means any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code, the CCAA, or under similar or related state, federal, and non-U.S. statutes and common law, including fraudulent transfer laws or fraudulent conveyance laws.

25. “**Ballot**” means the ballot upon which Holders of Claims entitled to vote on the Plan shall cast their vote to accept or reject the Plan, including, as applicable, any E-Ballots.

26. “**Bankruptcy Code**” means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases, as may be amended from time to time.

27. “**Bankruptcy Court**” means the United States Bankruptcy Court for the Southern District of Texas, Houston Division or such other court having primary, non-appellate jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.), the United States District Court for the Southern District of Texas.

28. “**Bankruptcy Rules**” means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general and chambers rules of the Bankruptcy Court.

29. “**Bar Date Order**” means the *Order Establishing Deadlines and Procedures For Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 523].

30. “**Bar Dates**” means the General Bar Date, the Governmental Bar Date, and the Rejection Damages Bar Date.

31. “**Best Interests Test**” has the meaning set forth in Article XVI.D.1.

32. “**Blue Sky Laws**” has the meaning set forth in the Preliminary Statement and Disclaimers above.

33. “**Business Day**” means any day, other than a Saturday, Sunday, or Legal Holiday.

34. “**Case Information Website**” means the case information website maintained by the Claims and Solicitation Agent at https://dm.epiq11.com/InstantBrands.

35. “**Cash**” means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

36. “**Causes of Action**” means any claim, interest, damage, remedy, cause of action, proceeding, demand, right, action, suit, obligation, liability, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty, franchise, debt, judgment, or controversy of any kind or character whatsoever, whether known or unknown, choate or inchoate, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, matured or unmatured, suspected or unsuspected, assertable directly or derivatively, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise pursuant to any theory of law. For the avoidance of doubt, Causes of Action include the following: (a) any right of setoff, counterclaim, or recoupment and any claim under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any claims or causes of action for aiding and abetting (including of breaches of fiduciary duties), knowing participation (including knowing participation in breach of fiduciary duty), and conspiracy (including conspiracy to breach fiduciary duty); (d) any claims or causes of action for illegal dividends; (e) any claims or causes of action for fraud, misrepresentations, or omissions; (f) the right to object to, subordinate, disallow, or otherwise contest Claims or Interests; (g) claims or causes of action pursuant to sections 362, 510, 542, 543, 544–550, or 553 of the Bankruptcy Code; (h) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (i) any Avoidance Action; (j) any claim or defense related to tax refunds or tax audits; and (k) any Retained Cause of Action.

37. “**CCAA**” means the Companies’ Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended.

38. “**CCAA Charges**” means the D&O Charge, the Administration Charge (as defined in the Supplemental Order of the CCAA Court dated June 15, 2023), and the DIP Charge (as defined in the Recognition of the Interim DIP Order of the CCAA Court dated June 23, 2023).

39. “**CCAA Court**” means the Ontario Superior Court (Commercial List) in Toronto, Ontario, Canada.

40. “**CCAA Debtors**” means Corelle Brands (Canada) Inc., Instant Brands (Canada) Holding Inc., and Instant Brands Inc.

41. "**CCAA Proceedings**" means the Debtors' cases commenced under Part IV of the CCAA pending before the CCAA Court under case number CV-23-00701154-000CL.

42. "**CCAA Recognition Order**" means an order of the CCAA Court (a) recognizing the Confirmation Order (including the full and final discharge of Claims, Interests, and Causes of Actions and the releases and exculpatory provisions approved thereby), (b) terminating and releasing the CCAA Charges, and (c) such other relief in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, including all exhibits, appendices, supplements, and related documents.

43. "**Certificate**" means any instrument evidencing a Claim or an Interest.

44. "**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor or group of Debtors, the chapter 11 case or cases pending for that Debtor or group of Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

45. "**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

46. "**Claims and Solicitation Agent**" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent employed by the Debtors in the Chapter 11 Cases, as approved by the *Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 52].

47. "**Claims Objection Deadline**" means 11:59 p.m. (prevailing Central Time) on the 365th calendar day after the Effective Date, subject to further extensions or exceptions as may be ordered by the Bankruptcy Court.

48. "**Claims Register**" means the official register of Claims maintained by the Claims and Solicitation Agent.

49. "**Class**" means a category of Claims against or Interests in the Debtors, as set forth in Article VI, under section 1122(a) of the Bankruptcy Code.

50. "**CODI**" has the meaning set forth in Article XVIII.B.1.

51. "**Combined DS and Plan**," "**Disclosure Statement**," or "**Plan**," have the meanings ascribed to them in the Introduction above.

52. "**Combined DS and Plan Objection Deadline**" has the meaning set forth in the Preliminary Statement and Disclaimers above.

53. "**Combined Hearing**" has the meaning set forth in the Preliminary Statement and Disclaimers above.

54. “**Company**” or “**Instant Brands**” means, collectively, the Debtors and their direct and indirect non-Debtor subsidiaries.

55. “**Complex Procedures**” means the Procedures for Complex Cases In the Southern District of Texas.

56. “**Confirmation**” means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

57. “**Confirmation Date**” means the date on which the Confirmation Order is entered on the docket of the Chapter 11 Cases.

58. “**Confirmation Order**” means an order of the Bankruptcy Court (a) approving the Disclosure Statement on a final basis, pursuant to section 1125 of the Bankruptcy Code, (b) confirming the Combined DS and Plan pursuant to section 1129 of the Bankruptcy Code, and (c) granting other related relief in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, and reasonably acceptable to the Creditors’ Committee, including all exhibits, appendices, supplements, and related documents.

59. “**Consummation**” means the occurrence of the Effective Date.

60. “**Contingent**” means, when used in reference to a Claim, any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is Filed, whether or not such event is within the actual or presumed contemplation of the Holder of such Claim and whether or not a relationship between the Holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

61. “**Contributed Assets**” has the meaning set forth in Article III.B.

62. “**Cornell**” means Cornell Capital LLC.

63. “**Covered Claim**” means a claim or Cause of Action of the type set forth in Article XI.D, Article XI.E.1–4, or Article XI.F.1–4.

64. “**Creditors’ Committee**” means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 177], as the membership thereof may change from time to time.

65. “**Cure Costs**” means an amount (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease), including an amount of $0.00, as applicable, required to cure any monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed, or assumed and assigned, by the Debtors via the Plan pursuant to section 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) Bankruptcy Code.

66. “**D&O Charge**” has the meaning set forth in the Supplemental Order of the CCAA Court dated June 15, 2023 (*i.e.*, the second-ranking charge on the current and future Assets,

undertakings, and properties of the Debtors, including all proceeds thereof, in Canada in favor of the directors and officers of the CCAA Debtors, as security for the CCAA Court-ordered indemnity by the CCAA Debtors to their directors and officers against obligations and liabilities that they may incur in such capacities after the commencement of the CCAA Proceedings, except to the extent the obligation or liability was incurred as a result of gross negligence or willful misconduct).

67. "**D&O Liability Insurance Policies**" means all directors', managers', and officers', or employees' liability insurance policies (including any "tail policy" or excess policies) of any of the Debtors that have been issued or provide coverage at any time to current or former directors, managers, officers, or employees of the Debtors, and all agreements, documents, or instruments related thereto.

68. "**Debtors**" means, collectively, the above-captioned debtors, in their capacities as debtors and debtors-in-possession in the Chapter 11 Cases.

69. "**Debtors' Response**" means the *Debtors' Response to Objections to Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Disclosure Statement on a Conditional Basis, (B) Approving the Solicitation and Tabulation Procedures, (C) Approving the Forms of Ballots, Solicitation Package, and Notices, (D) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (E) Scheduling a Combined Hearing For Final Approval of the Disclosure Statement and Confirmation of the Plan, and (F) Granting Related Relief and (II) Approving the Disclosure Statement on a Final Basis* [Docket No. 881], Filed on January 8, 2024 and incorporated into the Disclosure Statement by reference.

70. "**DIP Agents**" means the ABL DIP Agent and TL DIP Agent.

71. "**DIP Amendment Order**" means the *Order (I) Authorizing the Debtors To Enter into the Third Amendment to the TL DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 344].

72. "**DIP Facilities**" means the ABL DIP Facility and the TL DIP Facility.

73. "**DIP Loan Documents**" means the ABL DIP Documents and the TL DIP Documents.

74. "**DIP Lenders**" means the ABL DIP Lenders and the TL DIP Lenders.

75. "**DIP Orders**" means the Interim DIP Orders, the Final DIP Order, and the DIP Amendment Order.

76. "**DIP Secured Parties**" means the ABL DIP Secured Parties and the TL DIP Secured Parties.

77. "**DIP Superpriority Claims**" means superpriority Claims relating to or arising out of the DIP Facilities, as further set forth in the DIP Orders (including, for the avoidance of doubt, all adequate protection obligations set forth therein) and the DIP Loan Documents.

78. “**Disallowed**” means, with respect to a Claim, Interest, or any portion thereof, (a) an objection to the Claim has been Filed, (b) the Claim has been disallowed, subordinated, or expunged, in whole or in part, by a Final Order or stipulation, (c) the Claim has been withdrawn, in whole or in part, (d) the Claim is listed in the Schedules as zero or as Disputed, Contingent, or Unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Combined DS and Plan, the Bankruptcy Code, or any Final Order of the Bankruptcy Court (including the Bar Date Order), (e) the Claim has been reclassified, expunged, subordinated, or estimated to the extent that such reclassification, expungement, subordination, or estimation results in a reduction in amount reflected on the Schedules or the applicable Proof of Claim, or (f) the Claim is evidenced by a Proof of Claim which was not timely or properly Filed.

79. “**Disputed**” means, with respect to a Claim, Interest, or any portion thereof, (a) any such Claim to the extent neither Allowed or Disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503, or 1111 of the Bankruptcy Code or (b) to the extent that the (Reorganized) Debtors or any party in interest has interposed a timely objection before the deadlines imposed by the Confirmation Order, which objection has not been withdrawn or determined by a Final Order. To the extent that only a portion of a Claim is disputed, such Claim shall be deemed Allowed in the amount not disputed, if any, and Disputed as to the balance of such Claim. For avoidance of doubt, solely for the purposes of this Combined DS and Plan, the Claims held or asserted by the Prepetition Term Loan Lenders against the Debtors’ Estates shall not be deemed Disputed.

80. “**Disputed Claims Reserve**” has the meaning set forth in Article IX.D.

81. “**Distribution Agent**” means, as applicable, the Reorganized Debtors, the Litigation Trustee, or any Entity designated or retained by the Reorganized Debtors with the consent of the Ad Hoc Group of Crossover Lenders and the Creditors’ Committee and without the need for any further order of the Bankruptcy Court, to make or facilitate Plan Distributions.

82. “**Distribution Date**” means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors, on or after the Effective Date, upon which the Distribution Agent shall make Plan Distributions to Holders of Allowed Claims entitled to receive Plan Distributions.

83. “**Distribution Record Date**” means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive Plan Distributions, which date shall be the Confirmation Date or such other date and time designated by the (Reorganized) Debtors.

84. “**Effective Date**” means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XII.A have been satisfied or waived in accordance with Article XII.B, and (c) the Debtors declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter and shall otherwise be deemed in compliance with the Plan and Confirmation Order.

85. “**Entity**” has the meaning set forth in section 101(15) of the Bankruptcy Code.

86. "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 (2018 & Supp. III 2021).

87. "**Estate**" means, as to each Debtor, the bankruptcy estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

88. "**Excess Product Liability Claim**" means the amount of any Product Liability Claim that exceeds the amount paid by Insurers and Third-Party Indemnitors under all available and applicable Insurance Contracts and Third-Party Indemnifications, respectively.

89. "**Excluded Party**" means each of the following: (a) Cornell Capital LLC and its affiliate investment funds (including CC WK Co-Invest LP); (b) Agate Informatics Corp.; (c) 4060288 Canada Inc.; (d) 7326998 Canada Inc.; (e) Robert J. Wang Family Trust; (f) Yi Qin Family Trust; (g) Dongjun Wang Family Trust; (h) any Person or other Entity that received, as the initial or subsequent transferee under section 550 of the Bankruptcy Code or any applicable analogous state law provision, any portion of any dividends or distributions transferred from the Debtors (including, for the avoidance of doubt, any amounts used to repay those certain series 1 seller promissory notes by and between Corelle Brands Acquisition Holdings Inc. and certain of its shareholders, dated February 7, 2020) in connection with the 2021 Financing and Dividend Recapitalization Transactions, except for any employee or officer of the Debtors as of the date of the filing of the Plan; (i) any director of Instant Brands Acquisition Holdings Inc., except for Kenneth G. Wilkes, Benoit J. Gadbois, Lawrence McRae, and John S. Dubel; (j) any accountants, advisors, attorneys, auditors, consultants, or professionals who provided services to the Debtors in connection with either the 2021 Financing and Dividend Recapitalization Transactions or the UnSub Financing Transaction, except for Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, and Stikeman Elliott LLP; and (k) any bank, fund, or other financial institution (for the avoidance of doubt, not including Guggenheim Securities, LLC) that served as underwriter, arranger, bookrunner, or a role of similar nature, in each case, in respect of (x) the 2021 Financing and Dividend Recapitalization Transactions, including any dividends and other payments, fees, or transfers made in connection therewith, or (y) the UnSub Financing Transaction and all transactions related thereto. Notwithstanding anything to the contrary herein, "Excluded Party" shall not include any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Term Loan Lender, Prepetition ABL Agent, Prepetition ABL Lender, or other Prepetition ABL Secured Party, solely in their respective capacities as such.

90. "**Exculpated Party**" means (a) the Debtors, (b) each independent director of the Debtors, and (c) the Creditors' Committee and each of its members; *provided, however*, that "Exculpated Party" shall not include any Excluded Party.

91. "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

92. "**Existing Interests**" means all Interests in Instant Brands Acquisition Holdings Inc.

93. “**Exit 1L Commitment Letter**” means a commitment letter setting forth the terms and conditions under which the Exit 1L Lenders have committed to fund the Exit 1L Facility.

94. “**Exit 1L Documents**” means all documentation effectuating the incurrence of the Exit 1L Facility, including the Exit 1L Commitment Letter.

95. “**Exit 1L Facility**” means a senior secured term loan credit facility in an initial principal amount not to exceed the Maximum Exit First Lien Amount to be provided to certain of the Reorganized Debtors on the Effective Date by the Exit 1L Lenders.

96. “**Exit 1L Lenders**” means the lenders under the Exit 1L Facility that executed the Exit 1L Commitment Letter.

97. “**Exit ABL Documents**” means all documentation effectuating the incurrence of the Exit ABL Facility.

98. “**Exit ABL Facility**” means a senior secured asset-based revolving credit facility to be entered into by certain of the Reorganized Debtors on the Effective Date.

99. “**Exit Financing Agreements**” means the term loan agreement for each of the Exit 1L Facility and Exit ABL Facility.

100. “**Exit Financing Documents**” means the Exit 1L Documents and the Exit ABL Documents.

101. “**Exit Financing Facilities**” means the Exit 1L Facility and the Exit ABL Facility.

102. “**Exit Financing Lenders**” means the lenders under the Exit Financing Facilities.

103. “**Federal Judgment Rate**” means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

104. “**File**,” “**Filed**,” or “**Filing**” means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Solicitation Agent.

105. “**Final DIP Order**” means the Bankruptcy Court’s *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate Protection to Prepetition Secured Parties, and (IV) Granting Related Relief* [Docket No. 257].

106. “**Final Order**” means, as applicable, an order or judgment of the Bankruptcy Court, the CCAA Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek leave to appeal, or seek certiorari has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed, has been

resolved by the highest court to which the order or judgment could be appealed or from which certiorari or leave to appeal could be or was sought, or the new trial, reargument, petition for certiorari, leave to appeal, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

107. "**Financial Projections**" refers to the financial projections and related information contained in **Exhibit B** hereto.

108. "**Foreign Representative**" has the meaning set forth in Article IV.A.

109. "**General Bar Date**" has the meaning set forth in Article IV.F.

110. "**General Unsecured Claim**" means any Claim against any of the Debtors that is not one of the following Claims: (a) Administrative Claim (including a Professional Fee Claim, DIP Superpriority Claim, or a Claim related to U.S. Trustee Fees or Information Officer Fees); (b) Priority Tax Claim; (c) Other Secured Claim; (d) Other Priority Claim; (e) Section 510(b) Claim; (f) Prepetition Term Loan Claim; or (g) Intercompany Claim.

111. "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

112. "**GUC Litigation Trust Interests**" has the meaning set forth in Article VI.A.4.b.

113. "**Holder**" means a Person or other Entity holding a Claim or Interest.

114. "**Hollerbach Declaration**" means the *Declaration of Adam Hollerbach as Chief Restructuring Officer of the Debtors in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings* [Docket No. 39].

115. "**Housewares APA**" means the asset purchase agreement for the sale of the Company's housewares business attached to the Sale Order [Docket No. 636, Ex. A].

116. "**Housewares Buyers**" means IB Housewares US Holdings, LLC and IB Housewares Canada Holdings, Inc.

117. "**Housewares Sale Transaction**" has the meaning set forth in the Introduction above.

118. "**Impaired**" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

119. "**Indemnification Obligations**" means each indemnification obligation of a Debtor in effect immediately prior to the occurrence of the Effective Date (including obligations secured by the D&O Charge), whether pursuant to a Debtor's bylaws, articles or certificate of incorporation, corporate charter, other formation, corporate, or organizational document, policy or practice of providing indemnification, board resolutions, management or indemnification

agreements, employment contracts, other agreement or applicable law, or otherwise, to indemnify, defend, reimburse, or otherwise limit the liability of, or to advance fees and expenses to or on behalf of, any of the Debtors' Related Parties.

120. "**Information Officer Fees**" means fees and disbursements incurred by Ernst & Young Inc. in its capacity as the Information Officer of the CCAA Debtors appointed by the CCAA Court in the CCAA Proceedings, including any accrued interest thereon and the fees of its Canadian counsel, Goodmans LLP.

121. "**Insurance Contracts**" means all insurance policies (including the D&O Liability Insurance Policies) that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

122. "**Insurance Coverage Rights**" means any direct or derivative right, interest, claim, entitlement, or Cause of Action of any Debtor under any Insurance Contract, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or any other payment arising out of or under the Insurance Contracts.

123. "**Insurer**" means any company, third-party administrator, or other Entity that issued or entered into an Insurance Contract (or provides insurance coverage) and any respective predecessors, successors, or Affiliates of any of the foregoing Entities in this Article I.A.123.

124. "**Intercompany Claim**" means any Claim arising prior to the Petition Date against a Debtor and held by another Debtor or a non-Debtor Affiliate.

125. "**Intercompany Contract**" means any agreement, contract, or lease, all parties to which are Debtors.

126. "**Intercompany Interest**" means any Interest in a Debtor held by another Debtor.

127. "**Interest**" means, collectively, any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including any issued or unissued share of common stock, preferred stock, or other instrument evidencing any other equity, ownership, or profits interests in a Debtor, whether or not transferable, including membership interests in limited liability companies and partnership interests in partnerships, and any option, warrant, right, or other security or agreement, contractual or otherwise, to acquire or subscribe for, or which are convertible into any shares (or any class thereof) of, any such interest in a Debtor that existed immediately prior to the Effective Date, and any award of stock options, restricted stock units, equity appreciation rights, restricted equity, or phantom equity granted to an existing employee of the Debtors pursuant to any equity plan maintained by the Debtors or under any existing employment agreement of the Debtors' existing employees, other than Intercompany Interests.

128. "**Interim Compensation Order**" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 290].

129. "**Interim DIP Orders**" means the (a) *Interim Order (I) Authorizing the Debtors To (A) Obtain Senior Secured Superpriority Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Providing Adequate*

*Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 96] and (b) *Supplemental Interim Order (I) Authorizing the Debtors To Enter Into the Interim DIP Pull-Forward Amendment and (II) Granting Related Relief* [Docket No. 218].

130. "**IRS**" means the U.S. Internal Revenue Service.

131. "**Legal Holiday**" has the meaning set forth in Bankruptcy Rule 9006(a).

132. "**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

133. "**Litigation Trust**" has the meaning set forth in Article VII.G.1.

134. "**Litigation Trust Advisory Board**" has the meaning set forth in the Litigation Trust Agreement.

135. "**Litigation Trust Agreement**" means that certain agreement establishing and governing the Litigation Trust, which shall be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee, and the Ad Hoc Group of Crossover Lenders.

136. "**Litigation Trust Assets**" means the Litigation Trust Recovery Actions, any proceeds therefrom, and any other assets permitted to be held by the Litigation Trust pursuant to the Litigation Trust Agreement (including the proceeds of the Litigation Trust Financing Facility and any Causes of Action of any Person or other Entity that are assigned to the Litigation Trust).

137. "**Litigation Trust Beneficiaries**" means holders of the Litigation Trust Interests, *i.e.*, Holders of Allowed General Unsecured Claims and Prepetition Term Loan Claims.

138. "**Litigation Trust Expenses**" means the fees and expenses incurred by the Litigation Trust, Litigation Trustee, and Litigation Trust Professionals, in each case to the extent permitted or reimbursable pursuant to the Litigation Trust Agreement.

139. "**Litigation Trust Financing Backstop Percentage Allocation**" equals the quotient of (a) the Litigation Trust Financing Backstop Premium Amount and (b) the product of (i) 1.5 and (ii) the Notional Base Price.

140. "**Litigation Trust Financing Backstop Premium**" has the meaning set forth in Article IV.G.

141. "**Litigation Trust Financing Backstop Premium Amount**" has the meaning set forth in Article IV.G.

142. "**Litigation Trust Financing Commitment Amount**" has the meaning set forth in Article IV.G.

143. "**Litigation Trust Financing Facility**" has the meaning set forth in Article IV.G.

144. "**Litigation Trust Interests**" means the interests in the Litigation Trust, which shall not be certificated and shall not be transferrable (except as set forth in the Litigation Trust Agreement).

145. "**Litigation Trust Lenders**" has the meaning set forth in Article IV.G.

146. "**Litigation Trust Professionals**" means any agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Litigation Trust (solely in its capacity as such), including, for the avoidance of doubt, any such professional necessary to assist the Litigation Trustee in its service as the trustee and administrator for the Litigation Trust.

147. "**Litigation Trust Recovery Actions**" means all Causes of Action of any kind whatsoever (including Avoidance Actions, lender liability, breach of fiduciary duty, aiding and abetting (including aiding and abetting breach of fiduciary duty), knowing participation (including knowing participation in breach of fiduciary duty), conspiracy (including conspiracy to breach fiduciary duty), illegal dividends, negligence, fraud, malpractice, misrepresentations, omissions, and any and all other claims and Causes of Action) relating to either or both of (a) the 2021 Financing and Dividend Recapitalization Transactions, including any dividends and other payments, fees, or transfers made in connection therewith and (b) the UnSub Financing Transaction and all transactions related thereto, in each case, against any Excluded Party. Notwithstanding anything to the contrary herein, "Litigation Trust Recovery Actions" shall not include any Causes of Action of any kind that were released pursuant to a Final Order (including the Final DIP Order) or any other claims against, solely in their respective capacities as such, (y) any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Term Loan Lender, Prepetition ABL Agent, Prepetition ABL Lender, or other Prepetition ABL Secured Party or (z) the Appliances Buyers, Centre Lane Partners V, L.P., the Transferred Employees, or any of their respective Affiliates or Representatives (each as defined in the Appliances APA).[3]

148. "**Litigation Trustee**" means Alan Halperin, who, upon entry of the Confirmation Order, shall have Bankruptcy Court's approval, on the Effective Date, to (a) serve as the trustee and administrator for the Litigation Trust and (b) take such other actions as may be authorized under the Litigation Trust Agreement pursuant to its terms, and any successor thereto.

149. "**Local Rules**" means the Local Bankruptcy Rules for the Southern District of Texas.

150. "**Management Incentive Plan**" has the meaning set forth in Article VII.K.

151. "**Master Assignment Agreement**" refers to that certain *Master Assignment, Bill of Sale, Deed, and Conveyance* by and between the Debtors and the Appliances Buyers, dated November 8, 2023; a redacted version of which is attached as an exhibit to the Debtors' Response [Docket No. 881-1].

---

[3] The "Litigation Trust Recovery Actions" shall include the Causes of Action set forth in item 1 in **Exhibit E** (Schedule of Retained Causes of Action).

152. “**Maximum Exit First Lien Amount**” shall have the meaning set forth in the Exit 1L Commitment Letter.

153. “**MIP Interests**” means 10% of the New Equity Interests reserved for the participants in the Management Incentive Plan in accordance with the terms thereof, as determined by the board of directors of Reorganized Parent.

154. “**New Equity Interests**” means the new equity interests (regardless of series and whether issued as units, shares, or otherwise) in the Reorganized Parent.

155. “**New Governance Documents**” means, collectively, the form of certificate or articles of incorporation, the shareholder agreement, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation or governing documents (if any) of the Reorganized Debtors (which, for the avoidance of doubt, may include amended, supplemented, or restated versions of such documents of the Debtors prior to the Effective Date), each in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders.

156. “**NOLs**” has the meaning set forth in Article XVIII.B.1.

157. “**Nonvoting Classes**” means, Class 1, Class 2, Class 5, Class 6, Class 7, and Class 8.

158. “**Notional Base Price**” has the meaning set forth in Article IV.G.

159. “**Notional Conversion Factor**” has the meaning set forth in the table included in Article IV.G.2.

160. “**Objecting Suppliers**” means, collectively, (a) GuangDong Midea Consumer Electric Manufacturing Company Limited, FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, and Midea Electric Trading (Singapore) Co. Ptd. Ltd. and (b) Zhejiang Tianxi Kitchen Appliance Co., Ltd.

161. “**OID**” has the meaning set forth in Article XVIII.C.1(a).

162. “**Opt-Out Form**” means the form (including the E-Opt-Out Form) through which Holders of Claims or Interests in Nonvoting Classes can affirmatively elect to “opt out” of being a Releasing Party, as further set forth thereon and in the Solicitation Order.

163. “**Other Administrative Claims**” means any Administrative Claims that are DIP Superpriority Claims, U.S. Trustee Fees, Information Officer Fees, or Professional Fee Claims against a (Reorganized) Debtor.

164. “**Other Priority Claims**” means any Claim (other than an Administrative Claim or a Priority Tax Claim) entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

165. “**Other Secured Claims**” means any Secured Claim that is not a DIP Superpriority Claim or Prepetition Term Loan Claim.

166. “**PBGC**” means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States, created under Title IV of ERISA, 29 U.S.C. §§ 1301-1461 to administer the federal pension insurance program.

167. “**PBGC Claims**” means the three Contingent Proofs of Claim Filed by the PBGC against each of the Debtors in the Chapter 11 Cases related to the Pension Plan; these Claims were assigned Claim numbers 10812–10814 on the Claims Register. The PBGC Claims are for (a) unpaid minimum funding contributions owed to the Pension Plan under 29 U.S.C. §§ 1082, 1083, and 1362(b) and 26 U.S.C. §§ 412, 430, (b) the Pension Plan’s unfunded benefit liabilities under 29 U.S.C. §1362(b), and (c) pension insurance premiums under 29 U.S.C. §§ 1306 and 1307, including termination premiums at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).

168. “**Pension Plan**” means the Instant Brands Pension Plan, a single-employer defined-benefit plan insured by the PBGC and covered by Title IV of ERISA, 29 U.S.C. §§ 1301-1461. The Debtors are a contributing sponsor of the Pension Plan, pursuant to 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor’s controlled group, pursuant to 29 U.S.C. § 1301(a)(14).

169. “**Person**” has the meaning set forth in section 101(41) of the Bankruptcy Code.

170. “**Petition Date**” means June 12, 2023, the date on which the Debtors commenced the Chapter 11 Cases.

171. “**Plan Distribution**” means a payment or distribution to Holders of Allowed Claims under the Plan, including the vesting of the Litigation Trust Assets in the Litigation Trust. For the avoidance of doubt, the issuance of the GUC Litigation Trust Interests to the Distribution Agent in accordance with Article VIII.B shall constitute the “Plan Distribution” made to each Holder of an Allowed General Unsecured Claim and subsequent Cash distributions made by the Litigation Trust shall not be considered a “Plan Distribution.”

172. “**Plan Documents**” means the documents (other than the Plan) to be executed, delivered, assumed, and performed in conjunction with the Consummation of the Plan on, prior to, or after the Effective Date, including any documents included in the Plan Supplement.

173. “**Plan Supplement**” means the compilation of documents and forms of documents, schedules, and exhibits (or substantially final forms thereof) to be Filed no later than the Combined DS and Plan Objection Deadline or as soon as reasonably practicable thereafter, in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, which may include, as and to the extent applicable, the following: (a) a Schedule of Retained Causes of Action; (b) the Litigation Trust Agreement; (c) the Litigation Trust Financing Facility; (d) a Schedule of Rejected Contracts; (e) the material Exit Financing Documents (or a summary thereof); (f) the New Governance Documents; (g) documents memorializing the Management Incentive Plan; (h) the identity of the Reorganized Debtors’ directors and officers; (i) the Restructuring Steps Memorandum; and (j) any other documentation that is contemplated by the Plan. For the avoidance of doubt, the Plan Supplement shall be subject to Article XIII.

174. “**Pre-Change Losses**” has the meaning set forth in Article XVIII.B.3.

175. “**Prepetition ABL Agent**” has the meaning set forth in Article II.C.

176. “**Prepetition ABL Credit Facility**” has the meaning set forth in Article II.C.

177. “**Prepetition ABL Documents**” has the meaning set forth in the Final DIP Order.

178. “**Prepetition ABL Lenders**” has the meaning set forth in Article II.C.

179. “**Prepetition ABL Obligations**” has the meaning set forth in the Final DIP Order.

180. “**Prepetition ABL Secured Parties**” has the meaning set forth in the Final DIP Order.

181. “**Prepetition Agent**” has the meaning set forth in Article II.C.

182. “**Prepetition Term Documents**” has the meaning set forth in the Final DIP Order.

183. “**Prepetition Term Loan Claims**” means any Claim against a Debtor arising under, derived from, based on, or related to the Prepetition Term Loan Credit Facility. For the avoidance of doubt, the Prepetition Term Loan Claims shall be deemed Allowed and not Disputed by the (Reorganized) Debtors in the amount specified herein.

184. “**Prepetition Term Loan Credit Agreement**” has the meaning set forth in Article II.C.

185. “**Prepetition Term Loan Credit Facility**” has the meaning set forth in Article II.C.

186. “**Prepetition Term Loan Lenders**” has the meaning set forth in Article II.C.

187. “**Prepetition Term Loans**” has the meaning set forth in Article II.C.

188. “**Priority Tax Claim**” means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code or section 6(3) of the CCAA.

189. “**Pro Rata**” means, as applicable, the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in such particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

190. “**Product Liability Claim**” means any Claim on account of a proceeding commenced prior to the Effective Date that alleges harm that arose prior to the closing of the Appliances Sale Transaction (*i.e.*, November 8, 2023) as a result of, or relating to, a defective design, manufacturing defect, or warning or labeling defect.

191. “**Professional**” means an Entity (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with section 327, 328, 330, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code or (ii) a Final Order authorizing such

retention or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code (excluding those Entities entitled to compensation for services rendered after the Petition Date in the ordinary course of business pursuant to or in accordance with a Final Order granting such relief).

192. "**Professional Fee Claims**" means, at any given moment, all Administrative Claims arising from all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to or in accordance with an order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

193. "**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors in an amount equal to the Professional Fee Reserve Amount no later than the earlier of (a) ten Business Days following the Confirmation Date and (b) the Effective Date.

194. "**Professional Fee Reserve Amount**" has the meaning set forth in Article V.B.3(c).

195. "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

196. "**Reimbursement Note**" has the meaning set forth in Article III.B.

197. "**Reinstated**" or "**Reinstatement**" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default (i) curing any such default that occurred before, on, or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured, (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default, (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law, (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim or Interest (other than the Debtors or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure, and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

198. "**Rejection Claim**" means a Claim under section 502(g) of the Bankruptcy Code.

199. "**Rejection Damages Bar Date**" means, (a) with respect to Claims purportedly arising from an Executory Contract or Unexpired Lease not rejected pursuant to the Assumption

and Rejection Procedures Order, the later of (i) the General Bar Date or Governmental Bar Date, as applicable, and (ii) 4:00 p.m. (prevailing Central Time) on the date that is 30 days from the date that the (Reorganized) Debtors provide notice of the Bankruptcy Court's entry of an order (including the Confirmation Order) authorizing such rejection to the affected contract or lease counterparty and (b) with respect to Claims purportedly arising from an Executory Contract or Unexpired Lease rejected pursuant to the Assumption and Rejection Procedures Order the later of (i) the General Bar Date or Governmental Bar Date, as applicable, (ii) 35 days after the Filing of the notice, in accordance with the Assumption and Rejection Procedures Order, indicating the Debtors' intent to reject the applicable Executory Contract or Unexpired Lease, and (iii) 30 days after the resolution, overruling, withdrawal or adjudication of an objection to a notice referenced in the preceding subclause (b)(ii).

200. "**Related Parties**" means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former directors, board observers, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, actuaries, consultants, representatives, and other professionals and advisors and any such person's or Entity's respective heirs, executors, estates, and nominees; *provided, however*, that, solely with respect to the Litigation Trust Recovery Actions, "Related Party" shall not include any Excluded Party.

201. "**Released Party**" means each of the following, and in each case solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Creditors' Committee and each of its members; (d) the DIP Agents; (e) each DIP Secured Party; (f) each Prepetition Term Loan Lender; (g) the Prepetition Agent (but, for the avoidance of doubt, solely in its capacity as such, and not on behalf of any Prepetition Term Loan Lender); (h) the Prepetition ABL Agent; (i) each Prepetition ABL Lender; (j) solely with respect to Avoidance Actions, Holders of Allowed General Unsecured Claims; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entity's Related Parties; *provided, however*, that, solely with respect to the Litigation Trust Recovery Actions, "Released Party" shall not include any Excluded Party; *provided, further*, that an Entity (other than a Holder of a Prepetition Term Loan Claim) that affirmatively elects to "opt out" of being a Releasing Party by timely objecting to Confirmation or by checking the appropriate box on such Holder's timely and properly submitted Ballot or Opt-Out Form, thereby indicating that such Holder elects to opt out of the Plan's release provisions, shall not be considered a "Released Party" notwithstanding anything to the contrary herein.

202. "**Releasing Party**" means each of the following, and in each case, solely in its capacity as such: (a) the Debtors and their Estates; (b) the Reorganized Debtors; (c) the Creditors' Committee and each of its members; (d) the DIP Agents; (e) each DIP Secured Party; (f) the Prepetition Agent (but, for the avoidance of doubt, solely in its capacity as such, and not on behalf of any Prepetition Term Loan Lender); (g) the Prepetition ABL Agent; (h) each Prepetition ABL

Lender; (i) each Holder of a Claim entitled to vote to accept or reject the Plan that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely and properly submitted Ballot to indicate that such Holder elects to opt out of the Plan's release provisions; (j) each Holder of a Claim or Interest in a Nonvoting Class that does not affirmatively elect to "opt out" of being a Releasing Party by checking the appropriate box on such Holder's timely and properly submitted Opt-Out Form to indicate that such Holder elects to opt out of the Plan's release provisions; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entities' Related Parties.

203. "**Relevant Claims**" has the meaning set forth in Article XVIII.A.

204. "**Reorganized Debtors**" means, collectively, the Debtors (including, for the avoidance of doubt, Reorganized Parent) and any successors thereto, whether by merger, consolidation, or otherwise (including, to the extent applicable, any new Entity that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or equity of any of the Debtors pursuant to the Plan), in each case, on and after the Effective Date.

205. "**Reorganized Parent**" means as determined by the Debtors in consultation with the Ad Hoc Group of Crossover Lenders, either (a) Instant Brands Acquisition Holdings Inc., as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise or (b) a new Entity that may be formed or caused to be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or equity of the Debtors and issue the New Equity Interests to be distributed pursuant to the Plan, in each case, on and after the Effective Date.

206. "**Restructuring Steps Memorandum**" means a document setting forth the material components of the transactions, as well as a description of the steps to effectuate such transactions, contemplated by and in accordance with the Plan.

207. "**Retained Causes of Action**" means the Litigation Trust Recovery Actions and those other Causes of Action listed on the Schedule of Retained Causes of Action.

208. "**Sale Declaration**" has the meaning set forth in the Introduction above.

209. "**Sale Order**" has the meaning set forth in the Introduction above.

210. "**Sale Process**" has the meaning set forth in the Introduction above.

211. "**Sale Transactions**" means the Appliances Sale Transaction and the Housewares Sale Transaction.

212. "**Schedule of Rejected Contracts**" means a schedule of certain Executory Contracts or Unexpired Leases that the Debtors intend to reject pursuant hereto, as the same may be amended, modified, or supplemented from time to time.

213. "**Schedule of Retained Causes of Action**" means a schedule of certain Causes of Action, a copy of which is attached hereto as **Exhibit E**, that are not released, exculpated, or

waived pursuant to the Plan or otherwise, as the same may be amended, modified, or supplemented (including via the Plan Supplement) from time to time.

214. "**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules (as they may be amended, modified, or supplemented from time to time) [Docket Nos. 431–65].

215. "**SEC**" means the United States Securities and Exchange Commission.

216. "**Section 510(b) Claim**" means a Claim or Cause of Action against any of the Debtors (a) arising from rescission of a purchase or sale of shares, notes, or any other Securities of any of the Debtors or an Affiliate of any of the Debtors, (b) for damages arising from the purchase or sale of any such Security, (c) for violations of the Securities laws, misrepresentations, or any similar Claims related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, (d) for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the offer or sale of Securities, or (e) for attorneys' fees, other charges, or costs incurred on account of any of the foregoing Claims or Causes of Action.

217. "**Secured**" means a Claim that is (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan, or separate Final Order of the Bankruptcy Court, as a secured claim.

218. "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local law.

219. "**Securities Exchange Act**" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78nn, as now in effect and hereafter amended, or any similar federal, state, or local law.

220. "**Security**" has the meaning set forth in section 2(a)(1) of the Securities Act.

221. "**SOFR**" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on its website, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

222. "**Solicitation Order**" has the meaning set forth in the Introduction above.

223. "**Specified Return Requirement**" means an amount, with respect to any loan prepaid, sufficient to generate (a) in the case of tranche 2 loans, the greater of (i) an internal rate of return of SOFR as of the first funding date plus 15.00% and (ii) a 1.5 times multiple of invested capital and (b) in the case of Tranche 3 loans, the greater of (i) an internal rate of return of SOFR as of the first funding date plus 15.00% and (ii) a 2.0 times multiple of invested capital.

224. "**Suppliers' Objections**" means, collectively, (a) *Zhejiang Tianxi Kitchen Appliance Co., Ltd.'s Objection and Reservation of Rights Regarding Debtors' Emergency Motion for Entry of Orders (I)(A) Approving the Disclosure Statement on a Conditional Basis, (B) Approving the Solicitation and Tabulation Procedures, (C) Approving the Forms of Ballots, Solicitation Package, and Notices, (D) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (E) Scheduling a Combined Hearing for Final Approval of the Disclosure Statement and Confirmation of the Plan, and (F) Granting Related Relief and (II) Approving the Disclosure Statement on a Final Basis* [Docket No. 870] and (b) *Midea's (I) Preliminary Objection and Reservation of Rights to Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and Its Debtor Affiliates; and (II) Objection to Debtors' Emergency Motion For Entry of Orders (i)(A) Approving the Disclosure Statement on a Conditional Basis, (B) Approving the Solicitation and Tabulation Procedures, (C) Approving the Forms of Ballots, Solicitation Package, and Notices, (D) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (E) Scheduling a Combined Hearing for Final Approval of the Disclosure Statement and Confirmation of the Plan, and (F) Granting Related Relief and (ii) Approving the Disclosure Statement on a Final Basis* [Docket No. 876], each Filed on January 6, 2024.

225. "**Supply Agreements**" has the meaning set forth in the Master Assignment Agreement.

226. "**Taxable Attributes**" has the meaning set forth in <u>Article XVIII.B.2</u>.

227. "**Tax Attributes Motion**" means the *Debtors' Emergency Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for, and Approving Restrictions on, Certain Transfers of and Declarations of Worthlessness with Respect to Equity Interests in the Debtors Estates* [Docket No. 17].

228. "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

229. "**Tax-Free Transaction**" has the meaning set forth in <u>Article XVIII.B.1</u>.

230. "**Taxable Transaction**" has the meaning set forth in <u>Article XVIII.B.1</u>.

231. "**Third-Party Indemnification**" means all contractual or legal rights of indemnification and/or contribution on account of or relating to any Product Liability Claims, including, and subject to the applicable terms of, all agreements, documents, or instruments relating thereto.

232. “**Third-Party Indemnitor**” means any non-Debtor Entity that has agreed to provide, or is legally liable for, a Third-Party Indemnification, and such Entity’s predecessors, successors, or Affiliates.

233. “**Treasury Regulations**” means the regulations promulgated under the Tax Code.

234. “**TL DIP Agent**” means Wilmington Trust, National Association, as administrative agent and collateral agent under the TL DIP Facility.

235. “**TL DIP Credit Agreement**” means, as amended from time to time, that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of June 15, 2023, by and among Instant Brands Holdings Inc., as borrower, Instant Brands Acquisition Intermediate Holdings Inc., as holdings, the TL DIP Lenders, and the TL DIP Agent.

236. “**TL DIP Documents**” means the TL DIP Credit Agreement and the “Loan Documents” (as defined in the TL DIP Credit Agreement).

237. “**TL DIP Facility**” has the meaning set forth in Article IV.B.

238. “**TL DIP Lenders**” means the lenders from time to time party to the TL DIP Credit Agreement.

239. “**TL DIP Secured Parties**” means the TL DIP Agent and TL DIP Lenders.

240. “**U.S. Holder**” has the meaning set forth in Article XVIII.A.

241. “**U.S. Trustee**” means the office of the United States Trustee for the Southern District of Texas.

242. “**U.S. Trustee Fees**” means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717, or as otherwise agreed by the U.S. Trustee.

243. “**Unclaimed Distribution**” means (a) any Plan Distribution returned to the Reorganized Debtors or a Distribution Agent as undeliverable and remains unclaimed for 90 days thereafter, (b) any check issued on account of an Allowed Claim that is not negotiated within 120 calendar days from and after the date of issuance thereof, or (c) any Plan Distribution that remains unclaimed within 180 days of the later of the applicable Claim becoming an Allowed Claim and the Effective Date for any reason, including a Holder failing to return or otherwise provide the Reorganized Debtors or a Distribution Agent, as applicable, with forms or information necessary or requested to effectuate a Plan Distribution (*e.g.*, tax identification information, properly completed distribution forms (to the extent required)).

244. “**Unexpired Lease**” means a nonresidential lease to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

245. "**Unimpaired**" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not impaired within the meaning of section 1124 of the Bankruptcy Code.

246. "**Unliquidated**" means, when used in reference to a Claim, any Claim, the amount of liability for which has not been fixed, whether pursuant to an agreement, applicable law, or otherwise, as of the date on which such Claim is sought to be estimated.

247. "**UnSub Financing Transaction**" has the meaning set forth in Article III.B.

248. "**UnSubs**" has the meaning set forth in Article III.B.

249. "**Valuation Analysis**" refers to the valuation analysis and related information contained in **Exhibit C** hereto.

250. "**Voting Classes**" means Class 3 and Class 4.

251. "**Voting Deadline**" means the date and time by which the Claims and Solicitation Agent must actually receive the Ballots pursuant to the Solicitation Order.

252. "**Voting Record Date**" means January 2, 2024, which is the record date for purposes of determining which Holders are entitled to receive a Ballot to vote to accept or reject the Plan pursuant to the Solicitation Order.

**B. Rules of Interpretation**

The following rules for interpretation and construction shall apply to the Combined DS and Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether Filed, to be Filed, or otherwise, shall mean such document, schedule, or exhibit as it may have been or thereafter may be amended, modified, or supplemented; *provided*, that any capitalized terms herein that are defined with reference to another document or other source, are defined with reference to such other source as of the date hereof, without giving effect to any termination of such other document or amendments to such capitalized terms in any such other source following the date hereof; (4) unless otherwise specified, all references herein to "Articles" or "Sections" are references to articles or sections, respectively, hereof or hereto; (5) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Combined DS and Plan in its entirety rather than to any particular portion of the Combined DS and Plan; (6) captions and headings to Articles, Sections, schedules, and exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the

Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (11) references to "shareholders," "directors," and "officers" shall also include "members" and "managers," as applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law; (12) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (13) unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (14) any reference herein to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (15) capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form; (16) "(Reorganized) Debtors" shall be deemed to be written as "the Debtors or the Reorganized Debtors, as applicable"; and (17) unless otherwise specified, any section or exhibit references to an existing document, schedule, or exhibit shall be deemed to reference the equivalent provisions in any amendment thereto, whether or not such references herein are updated.

Any immaterial effectuating provisions may be interpreted by the (Reorganized) Debtors or the Litigation Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Entity.

## C. Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. Unless otherwise specified, all references herein to times of day shall be references to prevailing Central Time. In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

## D. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection herewith (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters, without giving effect to conflict of laws principles; *provided, however*, that corporate governance matters relating to the (Reorganized) Debtors not incorporated in New York shall be governed by the laws of the state or other jurisdiction of incorporation of the applicable

Debtor or Reorganized Debtor, as applicable; *provided, further*, that this section shall have no impact or effect on the law to be applied to the Litigation Trust Recovery Actions.

### E. Reference to Monetary Figures

All monetary figures referenced herein are denominated in U.S. dollars, unless otherwise expressly provided.

### F. Nonconsolidated Plan

For purposes of administrative convenience and efficiency, the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against and Interests in the Debtors. The Plan does not provide for the substantive consolidation of any of the Debtors.

## ARTICLE II.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. The Debtors' Corporate History

Instant Brands[4] resulted from the March 2019 acquisition (the "**2019 Acquisition**") of Instant Brands Inc., the maker of the best-selling Instant Pot®, by Corelle Brands (formerly known as World Kitchen and since relabeled Instant Brands), the manufacturer and marketer of a portfolio of well-recognized and respected brands, including Pyrex®, Corelle®, Corningware®, Snapware®, Chicago Cutlery®, and Visions®. Cornell acquired World Kitchen in April 2017 and, since the 2019 Acquisition, has controlled the majority of the voting equity interests in Instant Brands.

Instant Brands Acquisition Holdings Inc. is a privately owned company that is the ultimate parent of 14 direct or indirect subsidiaries. Prior to the closing of the Appliances Sale Transaction, Instant Brands Holdings Inc., Instant Brands LLC, and Instant Brands Inc. were the primary operating companies among the Debtor entities and, as a result, substantially all of the Debtors' unsecured creditors hold their claims against one or more of these entities. Instant Brands Holdings Inc. is a wholly owned subsidiary of Instant Brands Acquisition Intermediate Holdings Inc., which in turn is a wholly owned subsidiary of Instant Brands Acquisition Holdings Inc. Instant Brands Acquisition Holdings Inc. is the direct or indirect parent of the remaining Debtors. A chart illustrating the Company's corporate structure as of the Petition Date is attached hereto as **Exhibit A**.

### B. The Company's Business Operations

Instant Brands enjoyed a broad customer base and a diversified lineup of products, with major manufacturing and distribution operations in North America and Asia. Instant Brands' products included well-known best sellers that employed innovative technology that, prior to the closing of the Appliances Sale Transaction, were generally divided into two categories: appliances and housewares. The appliance sector included, among other things, electric pressure cookers, air

[4] Capitalized terms used but not otherwise defined in this Article II and Article III shall have the meanings ascribed to them in the Hollerbach Declaration.

fryers, coffee machines, Dutch ovens, air purifiers, and other multi-feature appliances. The houseware division includes various consumer dinnerware, bakeware, cookware, cutlery, and plastic storage containers under the Pyrex®, Corelle®, CorningWare®, Snapware®, and Chicago Cutlery® brands.

Instant Brands' go-to-market approach differs depending upon the maturity of the retail distribution and customer concentration in each country. Instant Brands has positions in major channels of distribution for its products in North America and also achieved significant presence in certain international markets, including South Korea, Australia, and China. The Company's EMEA business based in the United Kingdom was growing at an annual rate of more than 30% as of the Petition Date. Instant Brands also established sales subsidiaries in South Korea, Australia, China, and Singapore and relies on third-party distributor relationships in such jurisdictions.

In North America, Instant Brands distributed its appliance products to retailers through two distribution models: direct import and domestic warehouse. Under the direct import model, North American retailers issued purchase orders to import Instant Brands' products directly from a non-U.S. port and remitted payment to Instant Brands after the inventory shipped from such non-U.S. port. Under the domestic warehouse model, Instant Brands managed and carried the inventory in transit to one of its distribution warehouses in the United States, based on forecasts from retailers, and received payment from the retailers only after Instant Brands shipped ordered inventory from its domestic warehouse(s) to the retailers' desired location(s). As a result, Instant Brands incurred substantially greater inventory risk and cashflow constraints associated with the domestic warehouse model.

Instant Brands also operates four manufacturing facilities, three of which are owned by the Company. The Corning, New York manufacturing facility is owned by the Company and is the world's only producer of the three-layer Vitrelle® glass dinnerware, which is sold under the Corelle® brand. The Charleroi, Pennsylvania manufacturing operation is also owned by the Company and produces Pyrex® products. The Byhalia, Mississippi location produces the Company's Snapware® products. A Malaysian facility owned by the Company decorates Vitrelle® glass product for distribution in Asia. The Company's Corelle®, Pyrex®, and Snapware® products represent a significant portion of the Company's net sales. In addition to its manufacturing facilities, Instant Brands also operates three distribution facilities in the United States.

As of the Petition Date, Instant Brands also owned almost 1,300 trademarks and patents around the world, and licensed trademarks from many globally recognized companies, including Disney and Sanrio.

### C. The Debtors' Prepetition Capital Structure

As[5] of the Petition Date, Instant Brands had approximately $512.3 million in the aggregate of outstanding principal funded debt obligations, as reflected below:[6]

| Funded Debt | Approximate Outstanding Principal Amount |
|---|---|
| Prepetition Term Loan Credit Facility | $390.9 million |
| Prepetition ABL Credit Facility | $121.4 million |

1. Prepetition Term Loan Credit Facility

On April 12, 2021, Instant Brands Holdings Inc., as borrower, and Instant Brands Acquisition Intermediate Holdings Inc. entered into the Prepetition Term Loan Credit Agreement[7] with Jefferies Finance LLC, the initial administrative agent and collateral agent, and the Prepetition Term Loan Lenders, pursuant to which the Prepetition Term Loan Lenders provided the Debtors with term loans (the "**Prepetition Term Loans**") in an initial aggregate principal amount of $450 million under the senior secured Prepetition Term Loan Credit Facility. As of the Petition Date, approximately $390.9 million in principal amount of the Prepetition Term Loans remained outstanding under the Prepetition Term Loan Credit Facility. Obligations under the Prepetition Term Loan Credit Facility were guaranteed by Instant Brands Acquisition Intermediate Holdings Inc. and each of its direct and indirect wholly owned U.S. and Canadian subsidiaries (other than the UnSubs and other limited exceptions) and secured by substantially all of the assets of such entities, including on a first-priority basis with respect to machinery, equipment, real property, and other assets constituting collateral and not constituting ABL Priority Collateral, and on a second-priority basis with respect to the ABL Priority Collateral.

The Prepetition Term Loans outstanding under the Prepetition Term Loan Credit Facility bore interest at either (a) the Eurocurrency Rate *plus* 5.00% or (b) the Base Rate *plus* 4.00% (in each case excluding any interest accruing at the Default Rate). Overdue amounts under the Prepetition Term Loan Credit Facility accrued interest at the Default Rate. The Prepetition Term Loan Credit Facility has a stated maturity date of April 12, 2028.

---

[5] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. Capitalized terms used but not defined in this Article II.C shall have the meanings ascribed to them in the Prepetition Credit Agreements, as applicable.

[6] The table is for illustrative and summary purposes only. The Debtors do not admit to the validity, priority, or allowance of any claim, lien, or interest in property and reserve their rights in relation to such issues.

[7] The "**Prepetition Term Loan Credit Agreement**" herein refers to that certain senior secured credit agreement, dated as of April 12, 2021 (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date), among Instant Brands Holdings Inc., Instant Brands Acquisition Intermediate Holdings Inc., each lender from time to time party thereto (the "**Prepetition Term Loan Lenders**"), and Wilmington Trust, National Association, as successor administrative agent and successor collateral agent to Jefferies Finance LLC (in such capacities, the "**Prepetition Agent**"), pursuant to which the Prepetition Term Loan Lenders provided the Debtors with a senior secured term loan credit facility (the "**Prepetition Term Loan Credit Facility**").

2. <u>Prepetition ABL Credit Facility</u>

On June 30, 2021, Instant Brands Holdings Inc., as lead borrower, Instant Brands Inc., as the Canadian borrower, and Instant Brands Acquisition Intermediate Holdings Inc. entered into the Prepetition ABL Credit Agreement[8] with the Prepetition ABL Agent and the Prepetition ABL Lenders, pursuant to which the Prepetition ABL Lenders provided the Debtors with credit commitments in an initial aggregate principal amount of $250 million under the Prepetition ABL Credit Facility. Revolving availability under the Prepetition ABL Credit Facility was subject to the lesser of the credit commitments thereunder and the value of the borrowing base from time to time. As of the Petition Date, (a) the Debtors had outstanding borrowings under the Prepetition ABL Credit Facility of approximately $121.4 million and (b) approximately $22.3 million of undrawn letters of credit were issued and outstanding.

The Prepetition ABL Credit Facility was subject to the same guarantees and security as the Prepetition Term Loan Credit Facility, except that the obligations under the Prepetition ABL Credit Facility were secured on a first-priority basis with respect to the ABL Priority Collateral and on a second lien basis with respect to all other collateral (other than any real property) securing the Prepetition Term Loan Credit Facility.

The Prepetition ABL Credit Agreement was amended, on May 13, 2022, to include two new "first in, last out" incremental tranches of debt within the Prepetition ABL Credit Facility. These incremental "Tranche B Revolving Loans" allowed the Debtors to increase liquidity and availability under the Prepetition ABL Credit Facility by effectively increasing the aggregate advance rates for borrowings against certain borrowing base assets under the Prepetition ABL Credit Facility. The Prepetition ABL Credit Agreement was amended again, on January 18, 2023, in connection with the UnSub Financing Transaction.

The Tranche A Revolving Loans (*i.e.*, the revolving loans other than the "first-in, last-out" Tranche B Revolving Loans) outstanding under the Prepetition ABL Credit Facility as of the Petition Date bore interest at either (a) for term rate borrowings, the applicable floating term rate based on the currency of the applicable loan *plus* a margin ranging from 1.75% to 2.25% based on the trailing quarter's Average Excess Availability under the Prepetition ABL Credit Facility or (b) for base rate borrowings, the applicable floating prime rate based on the currency of the applicable loan *plus* a margin ranging from 0.75% to 1.25% based on the trailing quarter's Average Excess Availability under the Prepetition ABL Credit Facility (in each case, excluding any interest accruing at the Default Rate). The Tranche B-1 Revolving Loans under the Prepetition ABL Credit Facility bore interest at the rate per annum that would apply pursuant to the immediately preceding sentence *plus* 1.00% per annum. The Tranche B-2 Revolving Loans under the Prepetition ABL Credit Facility bore interest at the rate per annum that would apply to the Tranche B-1 Revolving Loans *plus* an additional 1.00% per annum. The stated maturity of (x) the Tranche A Revolving

[8] The "**Prepetition ABL Credit Agreement**" herein refers to that certain asset-based revolving credit agreement, dated as of June 30, 2021 (as amended, amended and restated, supplemented, or otherwise modified prior to the Petition Date), among Instant Brands Holdings Inc., Instant Brands Inc., Instant Brands Acquisition Intermediate Holdings Inc., each lender from time to time party thereto (the "**Prepetition ABL Lenders**"), and Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "**Prepetition ABL Agent**"), pursuant to which the Prepetition ABL Lenders provided the Debtors with an asset-based revolving credit facility (the "**Prepetition ABL Credit Facility**").

Commitments and the Tranche A Revolving Loans was June 30, 2026, (y) the Tranche B-1 Revolving Commitments and the Tranche B-1 Revolving Loans was November 13, 2023, and (z) the Tranche B-2 Revolving Commitments and the Tranche B-2 Revolving Loans was the earlier of (i) August 13, 2023 and (ii) the date on which the ABL Backstop LC Termination Conditions are satisfied and Cornell requests termination and return of the ABL Backstop LC.

3. Precious Metal Leases

As part of its manufacturing processes, Instant Brands uses precious metals, such as platinum and rhodium, to coat high-wear areas of its glass furnaces and parts used in the glass melting process. These metals essentially comprise a working component of the Debtors' machinery and are not part of the finished products. Given the significant costs of such precious metals, Instant Brands leases platinum from Bank of Montreal and rhodium from SCMI US Inc. In 2022, Instant Brands paid approximately $2.7 million in the aggregate on account of its precious metal leases.

4. Preferred Equity

As of the Petition Date, 143,000 shares of Series A preferred stock in Instant Brands Acquisition Holdings Inc. were outstanding (assuming the exchange of all Exchangeable Preferred Shares described below into Series A preferred stock). The aggregate liquidation preference of the Series A preferred stock was approximately $232 million as of the Petition Date. The Series A preferred stock has no stated maturity and is perpetual in nature. In the event of Instant Brands Acquisition Holdings Inc.'s liquidation, winding-up, dissolution, or change of control, the holders of shares of Series A preferred stock then outstanding are entitled to be paid out of the assets of Instant Brands Acquisition Holdings Inc. available for distribution to its stockholders and before any payment shall be made to the holders of common stock, an amount per share of Series A preferred stock equal to the outstanding liquidation preference of such holder's Series A preferred stock. The Series A preferred stock ranks junior in right of payment, upon liquidation, winding-up, dissolution, or change of control, to Instant Brands Acquisition Holdings Inc.'s existing and future indebtedness. For certain tax reasons, certain equity holders hold Exchangeable Preferred Shares (as defined in the Tax Attributes Motion) in a subsidiary of Instant Brands Acquisition Holdings Inc. in lieu of shares of Series A preferred stock. These Exchangeable Preferred Shares are exchangeable into shares of Series A preferred stock on a one-for-one basis. The shares of Series A preferred stock or Exchangeable Preferred Shares are held by the founders and former management team of Instant Brands prior to the 2019 Acquisition.

5. Common Equity

As of the Petition Date, 385,709[9] common shares in Instant Brands Acquisition Holdings Inc. were outstanding. Approximately 70% of the Debtors' outstanding Common Shares were held by Cornell. The founders and the former management team of Instant Brands prior to the 2019 Acquisition, along with current and former directors and employees, directly or indirectly held the remainder of the Common Shares, in addition to the Exchangeable Common Shares, the Series A

[9] This amount assumes the exchange of all exchangeable common equity shares into Common Shares in Instant Brands Acquisition Holdings Inc.

Preferred Shares, the Special Voting Shares, the Exchangeable Preferred Shares, and the Options on Stock (each as defined in the Tax Attributes Motion).

## D. Product Liability Claims

Prior to the Petition Date, more than 200 Product Liability Claims were asserted against certain of the Debtors, some of which are subject to proceedings stayed pursuant to section 362 of the Bankruptcy Code, and some of which were settled. Prior to the Petition Date, two non-Company sources existed for the payment of such Product Liability Claims—Third-Party Indemnifications (where the Third-Party Indemnitors are manufacturers of certain of the Company's appliances[10]) and certain Insurance Contracts. For example, with respect to one of the Company's largest appliance manufacturers, when a Holder of a Product Liability Claim asserted such Claim against the Company, the Company, pursuant to its Third-Party Indemnification with the manufacturer, would in turn tender the claim to the manufacturer; from that point on, pursuant to the terms of the applicable agreement, the manufacturer would have exclusive control over any proceedings in connection with such Claim.

After[11] the Debtors Filed the initial version of the Combined DS and Plan [Docket No. 845], the Objecting Suppliers Filed objections (*i.e.*, the Suppliers' Objections) disputing (1) the Debtors' contention that the Objecting Suppliers owe indemnification obligations to the Debtors and (2) that the Plan maintains the status quo based on pre-assignment matured property rights arising out of the Third-Party Indemnifications. As set forth in greater detail in the Suppliers' Objections, it is the position of the Objecting Suppliers that the Combined DS and Plan improperly—and in violation of applicable law, Fifth Circuit caselaw, and the Sale Order—attempts to transfer, assign, or make available to Holders of Product Liability Claims indemnification rights to satisfy Products Liability Claim. The Objecting Suppliers contend that the Products Liability Claims are not rights that can be pursued against the Objecting Suppliers since the Supply Agreements (including any Third-Party Indemnifications contained therein) had to have been (under controlling Fifth Circuit caselaw), and in fact were, transferred and assigned to the Appliances Buyers pursuant to the Sale Order and the Appliances APA.

As[12] set forth in greater detail in the Debtors' Response—which the Creditors' Committee joined [Docket No. 883]—the Debtors and the Creditors' Committee disagree with the Objecting Suppliers' positions and reserve all rights with respect thereto. In particular, the Debtors and the Creditors' Committee believe that a distinction exists between rights arising out of a contract and the contract itself. While section 365 of the Bankruptcy Code prohibits partial assignment of a contract, it does not eviscerate a debtor's pre-assignment, matured property rights arising out of such contracts. Accordingly, the Debtors and the Creditors' Committee assert that the Debtors did in fact assign the Third-Party Indemnitors' supply and manufacturing agreements (including those to which the Objecting Suppliers are party) in their totality to the Appliances Buyers; however, the Debtors' matured pre-assignment rights under the Third-Party Indemnifications arising out of such

[10] For the avoidance of doubt, following the November 8, 2023 closing of the Appliances Sale Transaction, the Debtors no longer design, manufacture, or sell appliances.

[11] This paragraph was provided to the Debtors by the Objecting Suppliers and is not the position of, or binding on, the Debtors, the Creditors' Committee, or the Ad Hoc Group of Crossover Lenders.

[12] The arguments in this paragraph are not the position of, or binding on, the Objecting Suppliers.

agreements with respect to products purchased or sold prior to the assignment remain property of the Debtors' and their Estates in accordance with the terms of the Master Assignment Agreement. Further, and perhaps crucially, the Debtors and the Creditors' Committee maintain that the position taken by the Objecting Suppliers is convenient to them—if they prevail, they would circumvent their contractual obligations to pay for liabilities incurred due to (alleged) harm resulting from products that they themselves manufactured, to the detriment of the Debtors, the Reorganized Debtors, and their economic stakeholders (including Holders of Product Liability Claims).

All rights of the Debtors, the Creditors' Committee, the Ad Hoc Group of Crossover Lenders, and the Objecting Suppliers with respect to final approval of the Disclosure Statement and Confirmation (including with respect to the foregoing dispute) are fully reserved. All rights of the (Reorganized) Debtors to tender a Product Liability Claim to, or to pursue a Product Liability Claim against, a Third-Party Indemnitor or Objecting Supplier are fully reserved, as are the rights of the Third-Party Indemnitors or Objecting Suppliers to dispute such action. All rights of the (Reorganized) Debtors to indemnification and/or contribution under any applicable law are fully reserved, as are the rights of the Third-Party Indemnitors or Objecting Suppliers to dispute the existence of such rights. All assertions herein, in the Suppliers' Objections, in the Debtors' Response, and in the Creditors' Committee's joinder thereto are without prejudice, including without prejudice to (1) their rights to seek declaratory or other relief from the Bankruptcy Court with respect to the Combined DS and Plan (including, but not limited to, the Schedule of Retained Causes of Action and this dispute) or (2) the Objecting Suppliers' rights (a) to raise any and all Confirmation objections in accordance with the Solicitation Order and (b) under their respective Supply Agreements.[13] In addition, although the Bankruptcy Court stated at the hearing held on January 8, 2024 that it would enter the Solicitation Order, the Bankruptcy Court (1) noted that the foregoing constitutes a "bona fide" dispute that needs to be resolved in connection with Confirmation (including via adjudication by the Bankruptcy Court) and (2) scheduled a status conference on such issues for **January 18, 2024 at 1:30 p.m. (prevailing Central Time)**.

**Accordingly, Holders of General Unsecured Claims (including Holders of Product Liability Claims) should be aware that the foregoing dispute may ultimately be adjudicated in favor of the Objecting Suppliers, settled by the Debtors and the Objecting Suppliers, or otherwise resolved, in each case, in connection with Confirmation. As such, the Plan (including Article VII.L) may be modified with respect to the Third-Party Indemnifications such that no indemnification may be available. Holders of General Unsecured Claims (including Holders of Product Liability Claims) should, therefore, consider the attendant risk if and when voting on the Plan.**

[13] For the avoidance of doubt, Holders of Product Liability Claims should be aware that (a) the Supply Agreements may be governed by, or subject to interpretation in accordance with, Chinese or other international law and (b) the venue for any proceedings (*e.g.*, arbitration) commenced in accordance therewith (and not in violation hereof) may have to be brought outside the United States.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS[14]

### A. Macroeconomic Trends and Company-Specific Events

A confluence of events and circumstances contributed to the Debtors' need to commence the Chapter 11 Cases and the CCAA Proceedings. Over the last three years, the Debtors contended with a parade of significant macroeconomic and company-specific headwinds that strained their businesses and resources, made their funded debt level unsustainable, and ultimately led the Debtors to seek chapter 11 relief.

In early 2020, the onset of the COVID-19 pandemic turned the global economy upside down. Unlike other companies, Instant Brands benefited initially, in late 2020 and most of the first half of 2021, from an increase in consumer demand for its products when people turned to more home-cooked meals due to governmental stay-at-home orders throughout the world. Furthermore, consumer sentiment was robust, boosted by stimulus checks issued by various governmental authorities. However, the foregoing generated excessive demand that started to stretch supply chain lead times, thereby creating inflationary pressures on the costs of goods and production.

Instant Brands closely monitored these trends and immediately started taking precautionary steps to de-risk its businesses by ordering raw materials and critical part components more than 60 days in advance to secure supply for its houseware product manufacturing processes. In October 2020, Instant Brands had the foresight to place a large tranche of its 2021 appliance production orders that, as a result, saved the Company $8 million in inflationary costs. Additionally, by the first quarter of 2021, Instant Brands implemented its first round of price increases to outpace emerging inflationary issues (based on a financial forecast of $40 million in cost increases), thereby allowing the Company to track ahead of its financial plan.

In early 2021, Instant Brands management and its largest shareholder explored the possibility of refinancing their material funded debt obligations. In April 2021, the Debtors proceeded with refinancing their previously outstanding term loans by issuing the Prepetition Term Loans, which were also used to finance a dividend to its shareholders and make certain other payments (such refinancing and all such related transactions, the "**2021 Financing and Dividend Recapitalization Transactions**").

Following the 2021 Financing and Dividend Recapitalization Transactions, in the second half of 2021, the Debtors (similar to their competitors and those in other industries) experienced significant supply chain disruptions. Just as the peak shipping season started, several Asian ports heavily relied upon by Instant Brands were closed for weeks due to COVID-19 lockdowns and weather issues. These closures, along with various other issues, created shipping chaos at the Asian ports: shipping lead times were extended by months; retailer product pickups were at 20%-30% of their normal rates; and freight rates spiked tenfold. The ports in the United States similarly experienced historic downtimes, as COVID-19 created labor shortages for truck drivers and logistic workers, further delayed delivery lead times, and drove up costs. As Instant Brands' production and sale of its products depend on an uninterrupted flow of raw materials, component

---

[14] The statements made in Article III are not binding on the Litigation Trust or Litigation Trustee.

parts, and finished goods through its supply chain and distribution network, including the purchase, import, storage, and shipment of Instant Brands' merchandise, Instant Brands was forced to absorb increased freight costs to avoid further delays, thereby placing a significant burden on Instant Brands' profit margins and liquidity.

In addition to supply chain disruptions, Instant Brands' appliance business was negatively impacted by a meaningful drop in consumer demand for its multicookers, as consumers switched their preferences to other forms of cooking. In response, Instant Brands' management team decided to negotiate with suppliers and retailers to cancel production orders on most fourth quarter promotional products for the appliances business and defer some of its product innovation launches. Management based such decision on analyses that demonstrated that products would not have arrived in time for the crucial promotional season window due to supply chain issues and that the excessive shipping costs would have eliminated any corresponding profits. In addition, Instant Brands implemented a second round of price increases and enacted its first round of operational costs reductions to combat continued inflationary pressures.

In the first half of 2022, Russia's invasion of Ukraine exacerbated supply chain and inflation issues, dramatically increased energy prices, and negatively impacted the Company's growth in Europe, the Middle East, and Africa. At the same time, retailers discovered that, due to the late arrival of products and product supply outpacing consumer demand, they were overstocked with billions of dollars of products and, consequently, cut replenishment orders across the board (even where inventory levels remained healthy). With the sizable cuts in replenishment orders by retailers, Instant Brands further reduced orders and promotional activities on core categories and focused its efforts on selling through the existing inventory to generate cash and free up shelf-space for future new products. In addition, the Company implemented a third round of price increases and executed a second round of operational costs reductions. To further support Instant Brands' balance sheet, in the first quarter of 2022, the Company retained for operational purposes $55 million received in connection with certain settlements as a capital contribution and, in May 2022, the Debtors also reached an agreement with their Prepetition ABL Lenders to establish the Tranche B Revolving Commitments (as defined in the Prepetition ABL Credit Agreement) to increase their borrowing base by approximately $25 million.

In the second half of 2022, with the U.S. economy reopening, consumer discretionary spending switched from "at home" merchandise purchases to those related to services or experiences. As the year progressed, consumer debt increased to an almost record high and consumer sentiment dropped to recessionary levels. Consequently, Instant Brands and other consumer goods companies reported deteriorating sales and margins and weaker earnings, thus necessitating downward revisions to market forecasts. To counteract these forces, in August 2022, Instant Brands executed a third round of operational costs reductions by consolidating business units, reducing its corporate headcount, and closing certain offices.

In the first half of 2023, inflation remained at historically high levels, consumer demand for general merchandise continued to fall, interest rates continued to rise, and retailers pushed aggressively to de-risk their inventory levels and increase their margins. In response, Instant Brands executed another round of price increases and operational costs reductions.

The combination of these challenges over the past three years put significant pressure on Instant Brands' businesses. High interest rates, combined with the recent softening in consumer demand, coupled with suppliers severely tightening credit terms and more retailers shifting from the direct import distribution model to the domestic warehouse model, strained Instant Brands' liquidity and made its capital structure untenable. The Debtors commenced the Chapter 11 Cases in order to fix the Company's balance sheet and improve its liquidity position.

### B. Prepetition Restructuring Efforts

In January 2023, in connection with its restructuring efforts, the board of directors of Instant Brands Acquisition Holdings Inc. appointed two independent directors to review and evaluate a potential debt financing transaction to address the Debtors' liquidity needs. On January 18, 2023, Instant Brands consummated a financing transaction (the "**UnSub Financing Transaction**") whereby Instant Brands' manufacturing facilities located in Corning, New York and Charleroi, Pennsylvania, together with the equipment, unencumbered precious metals, fixtures, and tangible property located at such facilities (the "**Contributed Assets**"), were contributed to two newly formed unrestricted subsidiaries (collectively, the "**UnSubs**") and leased back to the Instant Brands entities that previously owned and operated the Contributed Assets. In conjunction with such contributions and leases, a $55 million letter of credit was issued by Goldman Sachs Bank USA for the benefit of the Prepetition ABL Agent to effectuate an increase in the Prepetition ABL Credit Facility's borrowing base on a dollar-for-dollar basis by the amount of the letter of credit, which could be drawn upon the occurrence of an event of default under the Prepetition ABL Credit Facility (the "**ABL Backstop LC**"). The Debtors arranged to have Cornell procure the ABL Backstop LC on its behalf, which in turn required Cornell to enter into a reimbursement arrangement with certain of the Debtors evidenced by a promissory note in favor of Cornell (the "**Reimbursement Note**"). Upon a drawing under the ABL Backstop LC, Cornell would be deemed to have made a loan under the Reimbursement Note to Instant Brands Holdings Inc. in the amount drawn under the ABL Backstop LC, which loan was secured by a first-priority lien on the Contributed Assets owned by the UnSubs and guaranteed by each of the UnSubs (on a secured basis) and the Loan Parties under the Prepetition Credit Agreements (on an unsecured basis)—thereby resulting in Cornell being the only known creditor of the solvent UnSubs. The parties to the Prepetition ABL Credit Agreement entered into an amendment to facilitate the UnSub Financing Transaction and extend the maturity of the Tranche B-2 Revolving Loans from January 13, 2023 to the earlier of (1) August 13, 2023 and (2) the date that the ABL Backstop LC is permitted to be released or terminated prior to its stated expiration date.

Although the UnSub Financing Transaction was intended to provide additional liquidity to the Company and additional runway for continued operations, the circumstances requiring the financing were negatively perceived by the market. Trading price for the term loans under the Prepetition Term Loan Credit Facility fell by approximately 16.4% in the ensuing two months. Moody's also downgraded its rating of the Prepetition Term Loan Credit Facility from B3 to Caa2.

In the second quarter of 2023, in the face of (1) upcoming debt service payments in June 2023, (2) approaching maturities under the Tranche B-1 Revolving Loans and the Tranche B-2 Revolving Loans in the second half of 2023, and (3) significant liquidity pressures arising from shortened payment terms from vendors and suppliers, Instant Brands began working with its advisors to explore a potential comprehensive restructuring to address Instant Brands' liquidity

needs and to right-size its balance sheet. The Debtors engaged with certain Prepetition Term Loan Lenders and Cornell in arm's-length, good-faith negotiations to obtain additional liquidity to support the Debtors' operations. However, the parties to such negotiations did not reach any agreement.

While the second quarter is historically Instant Brands' lowest point from a cashflow perspective, 2023's liquidity reached new lows due to sporadic ordering from retailers, suppliers severely tightening credit terms, and more retailers shifting from the direct import distribution model to the domestic warehouse model. Furthermore, the precious metals lessors requested further assurances from the Company, thereby further increasing the liquidity need.

On June 1, 2023, the Debtors entered into cash dominion under the Prepetition ABL Credit Agreement. On June 6, 2023, in an effort to allow the Debtors to operate in the ordinary course while continuing the discussions regarding potential capital structure solutions, the Debtors entered into an amendment to the Prepetition Term Loan Credit Agreement that extended the Debtors' grace period to cure certain defaults thereunder through to 11:59 p.m. (prevailing Eastern Time) on June 11, 2023, and further extended such grace period to 11:59 p.m. (prevailing Eastern Time) on the Petition Date. Unable to reach an agreement on a comprehensive restructuring solution, the Debtors commenced the Chapter 11 Cases on the Petition Date.

## ARTICLE IV.
## EVENTS FOLLOWING THE FILING OF THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of Chapter 11 Cases* [Docket No. 40] entered by the Bankruptcy Court on June 13, 2023 in each of the Chapter 11 Cases.

On June 27, 2023, the U.S. Trustee appointed the Creditors' Committee. *See United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 177]. The current members of the Creditors' Committee are the following: (a) Midea Electric Trading (Singapore) Co PTE Ltd; (b) Pension Benefit Guaranty Corporation; (c) United Steelworkers International Union; (d) Topim Intelligent Manufacturing; (e) Criteo Corp.; (f) Ravago Americas, LLC d/b/a Muehlstein; and (g) Brandon Thomas. No trustee or examiner has been appointed in the Chapter 11 Cases.

Capitalized terms that are used in this Article IV but not otherwise defined herein shall have the meanings ascribed to them in the relevant motions, orders, or Filings.

### A. Operational and Other Relief

On or shortly after the Petition Date, the Debtors Filed a number of "first day" motions designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. Some of these orders were entered by the Bankruptcy Court on a final basis following the hearing held on June 13, 2023,

while others were entered on an interim basis at that time with the Bankruptcy Court providing final approval following the hearing held on July 12, 2023.

The orders entered by the Bankruptcy Court enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including by, among other things, (1) directing joint administration of the Chapter 11 Cases [Docket No. 40], (2) authorizing the Debtors to maintain existing cash management system, bank accounts, and business forms, and continue to perform intercompany transactions [Docket Nos. 78, 252], (3) authorizing the Debtors to pay certain prepetition taxes and fees [Docket No. 82], (4) authorizing the Debtors to pay their obligations under prepetition insurance policies, continue paying brokerage fees, honor the terms of their premium financing agreements and pay premiums thereunder, enter into new premium financing agreements in the ordinary course of business, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [Docket No. 88], (5) granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and maintain certain employee benefit programs [Docket No. 79], (6) approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide additional adequate assurance [Docket No. 85], (7) authorizing the Debtors to honor prepetition obligations to customers and continue customer practices and financial institutions to honor and process related checks and transfer [Docket No. 80], (8) approving extension of the deadline to File schedules of executory contracts and unexpired leases and statements of financial affairs [Docket No. 83], (9) establishing procedures pursuant to which the Debtors could pay Critical Vendors and Foreign Vendors, granting Prepetition Order Vendors administrative priority status, and authorizing the Debtors to pay Lienholder Claims and return Goods [Docket No. 89], (10) authorizing Instant Brands Inc. to act as the foreign representative on behalf of the Debtors' estates (the "**Foreign Representative**") in any judicial or other proceedings in Canada or any other foreign country [Docket No. 86], and (11) authorizing the Debtors to implement restrictions and procedures regarding shares and Stock in the Debtors [Docket No. 81].

### B. DIP Financing and Upsizing

On June 14, 2023, the Bankruptcy Court entered the first Interim DIP Order authorizing, among other things, the Debtors to obtain (1) a senior secured superpriority post-petition asset-based revolving credit facility (the "**ABL DIP Facility**") in the initial aggregate principal amount of up to $125,000,000 and (2) a senior secured superpriority post-petition multi-draw term loan facility (the "**TL DIP Facility**") with a total commitment of $132,500,000 [Docket No. 96]. The TL DIP Facility consisted of (1) $100,000,000 to be made available to the Debtors on an interim basis following the entry of the first Interim DIP Order and (b) $32,500,000 to be made available to the Debtors on a final basis upon entry of the Final DIP Order and satisfaction of certain other applicable conditions. On June 15, 2023, the DIP Facilities closed, including the funding of the $100,000,000 under the TL DIP Facility. As a result of the closing of the ABL DIP Facility, all Prepetition ABL Obligations were satisfied in full and replaced with ABL DIP Obligations via the ABL DIP Roll-Up.

On July 6, 2023, the Bankruptcy Court entered a second Interim DIP Order authorizing the Debtor to enter into an amendment to the TL DIP Credit Agreement that permitted the Debtors to make a supplemental interim borrowing of $10,000,000 to be pulled forward from the Final Draw

Amount on an interim basis without increasing the total size of the DIP Facilities [Docket No. 218]. Upon the entry of the second Interim DIP Order, the commitment under the TL DIP Facility consisted of an increased Interim Draw Amount of $110,000,000 and a decreased Final Draw Amount of $22,500,000. On July 6, 2023, the TL DIP Lenders funded the $10,000,000.

On July 12, 2023, the Bankruptcy Court approved the remaining Final Draw Amount of $22,500,000 and the DIP Facilities on a final basis [Docket No. 257]. On July 13, 2023, the TL DIP Lenders funded the remaining $22,500,000.

On August 9, 2023, the Bankruptcy Court entered the DIP Amendment Order approving the Debtors' motion to upsize the Final Draw Amount of the TL DIP Facility by $30,000,000 on a final basis [Docket No. 344]. The Final Draw Amount of the TL DIP Facility increased to $52,500,000 and the aggregate principal amount of the TL DIP Facility was amended to $162,500,000. On August 9, 2023, the TL DIP Lenders funded the $30,000,000.

Following the closing of the Appliances Sale Transaction, all outstanding principal of and interest on the ABL DIP Facility was paid in full.

**C. Canadian Foreign Recognition Proceedings**

On June 15, 2023, Instant Brands Inc., as the Foreign Representative, commenced the CCAA Proceedings in the CCAA Court with respect to the CCAA Debtors' Chapter 11 Cases, pursuant to the CCAA. That same day, the CCAA Court entered orders recognizing the Chapter 11 Cases as "foreign main proceedings" and recognizing and giving full force and effect in Canada to certain of the relief granted by the Bankruptcy Court on June 13-14, 2023. *See* In Re Instant Brands Inc. (15 June 2023), Toronto, Ont Sup Ct CV-23-00701154-000CL (Initial Recognition Order); CV-23-00701159-00CL (Supplemental Order).

The CCAA Court subsequently recognized certain subsequent orders entered by the Bankruptcy Court in the Chapter 11 Cases.

**D. Retention of Professionals**

To assist the Debtors in carrying out their duties as debtors in possession, and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered Final Orders authorizing the Debtors to retain and employ the following professionals: (1) Epiq Corporate Restructuring, LLC, as the Debtors' Claims and Solicitation Agent [Docket No. 53]; (2) Davis Polk & Wardwell, LLP, as counsel to the Debtors [Docket No. 293]; (3) Haynes and Boone, LLP, as counsel to the Debtors [Docket No. 292]; (4) AlixPartners, LLP, as financial advisor, and Adam Hollerbach, as Chief Restructuring Officer [Docket No. 291]; and (5) Guggenheim Securities, LLC, as investment banker [Docket No. 288]. On July 25, 2023, the Bankruptcy Court granted the Debtors the authority to retain and compensate certain professionals utilized by the Debtors in the ordinary course of business [Docket No. 289]. On July 25, 2023, the Bankruptcy Court also entered an order approving the Interim Compensation Procedures [Docket No. 290].

On August 30, 2023, the Bankruptcy Court entered orders approving the Creditors' Committee's retention of (1) DLA Piper LLP (US), as counsel [Docket No. 485], and (2) Berkeley Research Group, LLC, as financial advisor [Docket No. 486].

## E. The Sale Transaction

On July 12, 2023, following a hearing, the Bankruptcy Court entered the *Order (I) Approving Bidding Procedures for Sale of Debtors' Assets, (II) Authorizing Potential Selection of Stalking Horse Bidder(s), (III) Approving Bid Protections, (IV) Scheduling Auction for, and Hearing To Approve, Sale of Debtors' Assets, (V) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (VI) Approving Assumption and Assignment Procedures, and (VII) Granting Related Relief* [Docket No. 253].

As further set forth in the Sale Declaration and the Introduction above, the Debtors, with the assistance of their investment banker, Guggenheim Securities, conducted an exhaustive and successful Sale Process that led to the Debtors' entry into and the Bankruptcy Court's approval of the Sale Transactions for all or substantially all of the Debtors' assets relating to each the appliances business and the housewares business. While the Appliances Sale Transaction closed on November 8, 2023, the Debtors and the Housewares Buyers were unable to obtain the requisite regulatory approvals for the Housewares Sale Transaction within the "Outside Date" set forth (and as defined) in the Housewares APA. As a result, the Debtors terminated the Housewares APA in accordance with its terms.

## F. Claims Bar Date

On September 11, 2023, the Bankruptcy Court entered the Bar Date Order [Docket No. 523] approving, among other things, the following: (1) other than the exceptions set forth in the Bar Date Order, 4:00 p.m. (prevailing Central Time) on October 13, 2023 as the deadline for all non-Governmental Units to File Proofs of Claim in the Chapter 11 Cases (the "**General Bar Date**"); (2) 4:00 p.m. (prevailing Central Time) on December 11, 2023 as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases (the "**Governmental Bar Date**"); (3) procedures for Filing Proofs of Claim; and (4) the form and manner of notice of the Bar Dates.

## G. Global Settlement/Agreement

On October 3, 2023, at the hearing before the Bankruptcy Court to consider approval of the Sale Transactions, counsel to the Creditors' Committee informed the Bankruptcy Court (and counsel to the Ad Hoc Group of Crossover Lenders confirmed) that, after extensive good-faith negotiations conducted at arm's length, the Creditors' Committee and the Ad Hoc Group of Crossover Lenders reached an agreement with respect to the Litigation Trust Recovery Actions. *See* Hr'g Tr. (Oct. 10, 2023) [Docket No. 668], 13:9–18:1.

Accordingly, the Litigation Trust will be established to maximize the value of the Litigation Trust Assets, including to pursue the Litigation Trust Recovery Actions, and any proceeds generated therefrom would be allocated between the Prepetition Term Loan Lenders and the Holders of Allowed General Unsecured Claims. The Prepetition Term Loan Lenders and Holders of Allowed General Unsecured Claims shall be the Litigation Trust Beneficiaries, with the former owning 85% of the Litigation Trust Interests and the latter owning 15%.

The Litigation Trust shall be financed by a litigation trust financing facility (the "**Litigation Trust Financing Facility**" and, the lenders thereunder, the "**Litigation Trust Lenders**") that

provides for the issuance of up to $6,000,000 (the "**Litigation Trust Financing Commitment Amount**"), the preliminary terms of which are as follows:

| **Order of Priority** | **Amount of Financing** | **Notional Conversion Factor** | **Conditions to Funding (*inter alia*)** |
|---|---|---|---|
| Tranche 1 | Up to $1 million | 1.5 | Consummation (including establishment of the Litigation Trust) |
| Tranche 2 | Up to $2 million | 2.0 | Consent of the Litigation Trust Lenders and receipt of a draft complaint with respect to the Litigation Trust Recovery Actions |
| Tranche 3 | Up to $3 million | 2.5 | Consent of the Litigation Trust Lenders and a complaint with respect to the Litigation Trust Recovery Actions surviving a motion to dismiss or to which an answer is filed without a motion to dismiss being filed |

Interest on each tranche shall be payable in kind at a rate of SOFR + 15.00%, and tranches 2 and 3 shall be subject to prepayment premiums.[15] All Prepetition Term Loan Lenders shall be allowed to participate in this financing on a Pro Rata basis; to the extent a Prepetition Term Loan Lender does not wish to participate in this financing, members of the Ad Hoc Group of Crossover Lenders have agreed to finance the Litigation Trust Financing Facility.

Each tranche of the Litigation Trust Financing Facility is currently expected to be repaid from any proceeds recovered by the Litigation Trust before any distributions are made to holders of the Litigation Trust Interests. At the option of the Litigation Trust Lenders, such repayment may be made in a cash amount equal to the amount of distributions that the Litigation Trust Lenders would have received had such tranches been converted to Litigation Trust Interests with the specified premium set forth in the above table at a price (the "**Notional Base Price**") equal to the quotient of (1) the greater of (a) $2.25 million and (b) the last settlement offer the potential defendants to any potential Litigation Trust Recovery Actions made between October 3, 2023 and the effective date of the Litigation Trust and (2) the number of Litigation Trust Interests issued as of the effective date of the Litigation Trust.

Up until the commencement of the Combined Hearing, the Creditors' Committee is entitled to seek such financing on terms better than what is set forth herein; *provided*, that (1) the Prepetition Term Loan Lenders have a right of first refusal with respect to such alternative financing and (2) for an alternative financing to be deemed superior, it must provide an amount at least equal to the Litigation Trust Financing Commitment Amount and otherwise be on better economic terms for the Litigation Trust than the terms set forth herein.

The Prepetition Term Loan Lenders who do agree to participate in the Litigation Trust Financing Facility shall be entitled to a backstop premium (the "**Litigation Trust Financing Backstop Premium**") equal to 10% of the Litigation Trust Financing Commitment Amount (such

[15] The prepayment premium means an amount equal to the premium (which shall be no less than zero) that results in the Specified Return Requirement being satisfied with respect to any loan prepaid.

amount, the "**Litigation Trust Financing Backstop Premium Amount**"), which shall be paid (1) upon the Litigation Trust Financing Facility becoming effective in accordance with its terms or (2) upon an alternative financing (as provided in the previous paragraph) becoming effective. The payment of the Litigation Trust Financing Backstop Premium shall be treated for tax purposes as a payment in respect of a put option. The Litigation Trust Financing Backstop Premium shall be payable in tranche 1 loans—or, in the event of an alternative financing, the economic equivalent thereof (which may include tranche 1 loans issued under the alternative financing)—in an aggregate amount equal to the quotient of (1) the Litigation Trust Financing Backstop Premium Amount and (2) 1, less the Litigation Trust Financing Backstop Percentage Allocation.

If the Litigation Trust ultimately requires financing in excess of the Litigation Trust Financing Commitment Amount, some or all of the Litigation Trust Lenders may (in their discretion) provide up to an additional $4 million of incremental financing under the Litigation Trust Financing Facility on the terms set forth therein.

As further set forth below and in the Litigation Trust Agreement, the Litigation Trust Agreement shall govern the administration of the Litigation Trust, including any distributions made thereby. The Litigation Trust Agreement shall provide for the creation of the three-member Litigation Trust Advisory Board, with two members appointed by the Prepetition Term Loan Lenders and one by the Creditors' Committee.

Finally, the Professional Fee Claims accrued by the Creditors' Committee's Professionals through and including October 3, 2023 shall be paid in full, and such Professionals shall be capped at $250,000 for the remainder of the Chapter 11 Cases. For the avoidance of doubt, the fees referenced in the immediately preceding sentence shall remain subject to the Interim Compensation Order and the provisions herein governing the payment of Professional Fee Claims, as applicable.

## H. Other Key Filings in the Chapter 11 Cases

1. On August 16, 2023, the Bankruptcy Court entered orders authorizing Debtor Instant Brands LLC to assume (on an amended basis) the A&R Platinum Lease Agreement [Docket No. 364], and the A&R Rhodium Lease Agreement [Docket No. 365].

2. On August 28, 2023, the Debtors Filed the Schedules [Docket Nos. 431–65] in accordance with section 521 of the Bankruptcy Code.

3. On August 30, 2023, the Bankruptcy Court entered an order establishing the Assumption Procedures and the Rejection Procedures to govern the assumption (and assignment) and rejection (and any related abandonment of personal property in connection therewith) of Executory Contracts and Unexpired Leases [Docket No. 484].

4. On August 30, 2023, the Bankruptcy Court entered an order establishing the Procedures to govern the sale and abandonment of De Minimis Assets outside the ordinary course of business [Docket No. 487].

5. On August 30, 2023, the Bankruptcy Court entered an order approving the key employee incentive program for certain key executives [Docket No. 488]. On January 2, 2024, the Debtors Filed a motion seeking approval to amend the key employee incentive program [Docket No. 852]; such motion remains pending approval as of the date hereof.

6. On September 11, 2023, the Bankruptcy Court entered an order extending the deadline to remove certain civil actions to the Bankruptcy Court through January 9, 2024 [Docket No. 524].

7. On October 9, 2023, the Debtors Filed a motion seeking an extension of the deadline to reject Unexpired Leases of nonresidential real property through and including January 8, 2024 [Docket No. 646]; such motion remains pending approval as of the date hereof.[16]

8. On January 2, 2024, the Bankruptcy Court entered an order extending the Exclusive Periods to File and solicit votes on a chapter 11 plan through and including March 15, 2024 and April 15, 2024, respectively [Docket No. 854].

## ARTICLE V.
## DIP SUPERPRIORITY CLAIMS; ADMINISTRATIVE CLAIMS; PRIORITY CLAIMS; AND STATUTORY FEES

All Claims and Interests (except Administrative Claims, Professional Fee Claims, DIP Superpriority Claims, Priority Tax Claims, U.S. Trustee Fees, and Information Officer Fees) are placed in the Classes set forth in Article VI. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Superpriority Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, U.S. Trustee Fees, and Information Officer Fees have not been classified, and the Holders thereof are not entitled to vote on the Plan.

### A. DIP Superpriority Claims

In accordance with the DIP Orders, all DIP Superpriority Claims are Allowed Claims for all purposes under the Plan. Except to the extent already paid in accordance with the Sale Order or otherwise, on the Effective Date, each Holder of an Allowed DIP Superpriority Claim shall receive, in full and final satisfaction, compromise, settlement, discharge, and release of its Allowed DIP Superpriority Claim, either (1) payment in full in Cash in accordance with the terms of the applicable DIP Documents, (2) to the extent that such Holder is an Exit 1L Lender and elects to fund its loans under the Exit 1L Facility through a cashless conversion of its Allowed DIP Superpriority Claims, the refinancing of its loans under the DIP Facility with loans under the Exit 1L Facility (including the applicable "Exit Premium" (as defined in the Exit 1L Commitment Letter)) on a dollar-for-dollar basis in accordance with the Exit 1L Commitment Letter, or (3) such other treatment acceptable to such Holder, in each case, that results in the full satisfaction of its Allowed DIP Superpriority Claims. In addition, on the Effective Date, any outstanding fees and

[16] Pursuant to section K of the Complex Procedures, the deadline to reject Unexpired Leases of nonresidential real property was automatically extended upon the Filing of this motion until the Bankruptcy Court rules on the relief requested therein, without the Bankruptcy Court having to enter an order extending the time.

expenses incurred by the DIP Agents, the DIP Lenders, or their respective advisors, as required under the DIP Orders, shall be paid in Cash in full.

Notwithstanding anything to the contrary herein, in the Confirmation Order, or in the CCAA Recognition Order, the DIP Facilities and the DIP Loan Documents shall continue in full force and effect after the Effective Date (to the extent they are still in effect at that time) pursuant to the terms thereof with respect to any obligations thereunder, as applicable, including those provisions relating to the rights of the DIP Agents and the other DIP Secured Parties to expense reimbursement, indemnification, exculpation, and other similar rights (either from the (Reorganized) Debtors or the DIP Lenders) and any provisions that may survive termination or maturity of the DIP Facilities in accordance with the terms thereof.

In accordance with the DIP Orders, after the Effective Date, the Reorganized Debtors shall continue to reimburse the DIP Agents for any reasonable and documented fees and expenses incurred by the DIP Agents after the Effective Date to the extent that such obligation survives termination or maturity of the DIP Facilities in accordance with the terms thereof. The Reorganized Debtors shall pay all of the amounts that may become payable to the DIP Agents and the DIP Secured Parties, as applicable, under any of the foregoing provisions in this Article V.A and in accordance with the terms of the DIP Loan Documents and the DIP Orders.

## B. Administrative Claims

### 1. Administrative Claims Bar Date

A notice setting forth the Administrative Claims Bar Date shall be (a) Filed on the Bankruptcy Court's docket and served with the notice of the Effective Date and (b) posted on the Debtors' Case Information Website. No other notice of the Administrative Claims Bar Date need be provided.

All requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Other Administrative Claims, which are subject to the provisions of this Article V) and remain unpaid must be Filed with the Claims and Solicitation Agent and served on counsel for the (Reorganized) Debtors on or prior to the Administrative Claims Bar Date. Any requests for payment of Administrative Claims pursuant to this Article V that are not timely and properly Filed and served shall be Disallowed automatically without the need for any objection from the (Reorganized) Debtors or any action by the Bankruptcy Court. Holders of Administrative Claims that are required to, but do not, timely and properly File and serve a request for payment of such Administrative Claims shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the (Reorganized) Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

The (Reorganized) Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) shall have exclusive authority to settle Administrative Claims without further Bankruptcy Court approval. The (Reorganized) Debtors and the Claims and Solicitation Agent are authorized to update the Claims Register to reflect the foregoing without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust such Claim and without any

further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

Unless the (Reorganized) Debtors object to a timely and properly Filed and served Administrative Claim by the Claims Objection Deadline, such Administrative Claim shall be deemed Allowed in the amount requested. If the (Reorganized) Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**Notwithstanding the foregoing, requests for payment of Administrative Claims need not be Filed for Administrative Claims that (a) previously have been Allowed by Final Order of the Bankruptcy Court (including the Final DIP Order) or pursuant to this Article V.B, (b) the (Reorganized) Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) have otherwise agreed in writing (email being sufficient) do not require such a Filing, (c) relate to post-petition ordinary course operations and are set forth in the (Reorganized) Debtors' books and records, or (d) arise pursuant to 28 U.S.C. § 1930.**

2. Treatment of Administrative Claims

Except with respect to Other Administrative Claims, and except to the extent that (a) an Administrative Claim has already been paid during the Chapter 11 Cases or (b) a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of each Allowed Administrative Claim, on the applicable Distribution Date, each Holder of an Allowed Administrative Claim shall receive an amount of Cash equal to the aggregate amount of such Allowed Administrative Claim. If an Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, the Distribution Date with respect thereto shall be in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Claim.

For the avoidance of doubt, the failure by a Holder of an Allowed Administrative Claim to properly object to this Article V.B.2 before the Combined DS and Plan Objection Deadline shall be deemed to be such Holder's consent, pursuant to section 1129(a)(9) of the Bankruptcy Code, to be paid in accordance with the Plan following the Effective Date.

3. Professional Fee Claims

Except to the extent that an Allowed Professional Fee Claim has already been paid during the Chapter 11 Cases or except to the extent that a Holder of an Allowed Professional Fee Claim agrees to a less favorable treatment with the (Reorganized) Debtors, each Holder of a Professional Fee Claim shall be paid in full in Cash pursuant to the provisions of this Article V.B.3.

*a. Final Fee Applications*

Within 45 days of the Effective Date, or as soon as reasonably practicable thereafter, all applications for payment of Professional Fee Claims shall be Filed and served in accordance with the Interim Compensation Order, which shall also govern the timing and method for Filing and

serving objections with respect to such applications. Distributions on account of Allowed Professional Fee Claims shall be made as soon as reasonably practicable after such Claims become Allowed in accordance with the Interim Compensation Order.

*b. Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided for herein, on the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the (Reorganized) Debtors may employ and pay all professionals without any further notice to, action by, or order or approval of the Bankruptcy Court or any other party; *provided*, *however*, that each Professional shall provide, during the period from the Confirmation Date to the Effective Date, its fee and expense statements or invoices, in summary form, which shall not be required to contain time entries but shall include the number of hours billed by the applicable Professional (except for financial advisors compensated on other than an hourly basis) and a summary statement of services provided and the expenses incurred (which summary may be redacted or modified to the extent necessary to delete any information subject to the attorney-client or other privilege, any information constituting attorney work product, or any other confidential or otherwise sensitive information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to the (Reorganized) Debtors and counsel to the Ad Hoc Group of Crossover Lenders.

The (Reorganized) Debtors shall pay in Cash all such fees and expenses of any Professional, within ten days of presentment of such statements or invoices, if no written objections to the reasonableness of the fees and expenses charged in any such statement or invoice (or portion thereof) is made by the (Reorganized) Debtors or the Ad Hoc Group of Crossover Lenders. Any objection raised by the (Reorganized) Debtors or the Ad Hoc Group of Crossover Lenders with respect to such fee and expense statements or invoices shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the (Reorganized) Debtors or the Ad Hoc Group of Crossover Lenders, on the one hand, and the issuer of the invoice, on the other hand, either party may submit such dispute to the Bankruptcy Court for a determination as to the reasonableness of the relevant disputed fees and expenses set forth in the invoice.

Notwithstanding anything to the contrary set forth herein, professional fees and expenses of professionals incurred in connection with the CCAA Proceeding shall in all cases continue to be paid in accordance with the terms of the orders of the CCAA Court.

*c. Professional Fee Reserve Amount*

All Professionals shall estimate their accrued and unpaid Professional Fee Claims (whether billed or unbilled) prior to and as of the Effective Date (the aggregate amount of such estimated fees and expenses, the "**Professional Fee Reserve Amount**"); *provided*, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses incurred or to be incurred by the Professionals. Each Professional shall deliver its respective estimates for its

portion of the Professional Fee Reserve Amount to the Debtors as soon as reasonably practicable before the Effective Date. If a Professional does not provide its estimate, then the Debtors shall estimate in good faith (with the consent of the Ad Hoc Group of Crossover Lenders) the unbilled fees and expenses for such Professional and shall fund such amount into the Professional Fee Escrow Account.

The Litigation Trust shall pay the costs of its own administration from and after the Effective Date in the manner provided in the Litigation Trust Agreement.

Within ten business days following the Confirmation Date, but in no event later than the Effective Date, the Debtors (in consultation with the Ad Hoc Group of Crossover Lenders) shall fund the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount.

Fees owing to the applicable Holder of a Professional Fee Claim shall be paid in Cash to such Holder from funds held in the Professional Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid pursuant to the Interim Compensation Order; *provided*, that obligations with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of accrued Professional Fee Claims, the Reorganized Debtors shall pay any such outstanding Professional Fee Claims.

The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals and shall revert to the Reorganized Debtors, without any further order or action of the Bankruptcy Court, only after all Allowed Professional Fee Claims have been paid in full. No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account in any way.

4. <u>Treatment of Priority Tax Claims</u>

Except to the extent that (a) a Priority Tax Claim has already been paid during the Chapter 11 Cases or (b) a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, discharge, and release of each Allowed Priority Tax Claim, on the applicable Distribution Date, each Holder of an Allowed Priority Tax Claim shall receive an amount of Cash equal to the aggregate amount of such Allowed Priority Tax Claim. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the (Reorganized) Debtors and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business. The Reorganized Debtors shall have the right (with the consent of the Ad Hoc Group of Crossover Lenders) to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

For the avoidance of doubt, the failure by a Holder of an Allowed Priority Tax Claim to properly object to this <u>Article V.B.4</u> before the Combined DS and Plan Objection Deadline shall be deemed to be such Holder's consent, pursuant to section 1129(a)(9) of the Bankruptcy Code, to be paid in accordance with the Plan following the Effective Date.

5. Litigation Trustee Administrative Claims

Notwithstanding any provision herein to the contrary, the Litigation Trustee, and any professional firms engaged by the Litigation Trustee or any member of the Ad Hoc Group of Crossover Lenders that commenced work investigating the Litigation Trust Recovery Actions with the written consent of the Creditors' Committee and the Ad Hoc Group of Crossover Lenders prior to the Effective Date, shall receive Allowed Administrative Claims for the services performed prior to the Effective Date in connection with (a) the negotiation of the terms of the Litigation Trust Agreement and the Litigation Trust Financing Facility and (b) the investigation of the Litigation Trust Recovery Actions, in each case, without being required to File an application seeking compensation for services or reimbursement of expenses with the Bankruptcy Court.

The Litigation Trust shall pay the costs of its own administration from and after the Effective Date in the manner provided in the Litigation Trust Agreement and without the need for any Bankruptcy Court approval.

**C. Statutory Fees**

On the Effective Date or as soon thereafter as reasonably practicable, the Reorganized Debtors shall pay all U.S. Trustee Fees and Information Officer Fees that are due and owing on the Effective Date. Following the Effective Date, the Reorganized Debtors shall pay (1) the U.S. Trustee Fees for each open Chapter 11 Case for each quarter (including any fraction thereof) until the first to occur of the Chapter 11 Cases being converted, dismissed, or closed and (2) the Information Officer Fees until the first to occur of the CCAA Proceedings being converted or terminated.

## ARTICLE VI.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

The Plan groups the Debtors together solely for the purposes of describing treatment hereunder, Confirmation hereof, and making Plan Distributions in accordance herewith in respect of Claims against and Interests in the Debtors under the Plan. Notwithstanding such groupings, the Plan constitutes a separate chapter 11 plan for each Debtor. The Plan is not premised upon, and shall not cause, the substantive consolidation of any of the Debtors. Except for the Claims addressed in Article V, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or an Interest also is classified in a particular Class for the purpose of receiving Plan Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The votes of each Class shall be tabulated in accordance with the procedures contained in the Solicitation Order. Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted hereunder, all Debtors shall continue to exist as separate legal entities.

The categories of Claims and Interests listed in the table below classify Claims and Interests for all purposes, including voting, confirmation, and Plan Distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.[17] The treatment provided in this chart is for informational purposes only and is qualified in its entirety by this Plan, including this Article VI and the disclaimers included herein. The Class numbers assigned below are for purposes of identifying each separate Class.

| Class | Claims or Interests | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests | Estimated Recoveries for Allowed Claims or Interests |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to accept | $5,819,485 | 100% |
| 2 | Other Priority Claims | Unimpaired | Deemed to accept | $3,613,143 | 100% |
| 3 | Prepetition Term Loan Claims | Impaired | Entitled to vote | $402,359,061 | 7% - 9%[18] |
| 4 | General Unsecured Claims | Impaired | Entitled to vote | $43,777,331 | Between 0% and an Unknown %[19] |
| 5 | Section 510(b) Claims | Impaired | Presumed to Reject | N/A | 0% |
| 6 | Intercompany Claims | Unimpaired or Impaired | Deemed to accept or presumed to reject | N/A | N/A |
| 7 | Intercompany Interests | Unimpaired or Impaired | Deemed to accept or presumed to reject | N/A | N/A |

[17] The amounts contained in this Article VI represent the Debtors' estimate of the Claims that they believe ultimately may be Allowed based on their review of their books and records and do not represent amounts actually asserted by Holders in Proofs of Claim or otherwise. The Debtors have not yet completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objection as necessary or appropriate. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. The actual amount of the Allowed Claims may be greater or lower than estimated, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein or the actual Plan Distributions received by Holders of Allowed Claims. *See* Article XVII. Likewise, because the recoveries in litigation are speculative, the range of recoveries for Classes 3 and 4 cannot be estimated with certainty.

Any controversies regarding the classification of any Claim herein shall be governed by the procedures set forth in the Solicitation Order. If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the Holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

[18] *See* Article VI.A.3(c)(ii) below for additional information.

[19] *See* Article VI.A.4(b) below for additional information.

| Class | Claims or Interests | Status | Voting Rights | Estimated Amount of Allowed Claims or Interests | Estimated Recoveries for Allowed Claims or Interests |
|---|---|---|---|---|---|
| 8 | Existing Interests | Impaired | Presumed to reject | N/A | 0% |

Subject to receiving the required accepting votes of an Impaired Class, the Debtors believe that the Plan satisfies the requirements for confirmation under section 1129 of the Bankruptcy Code. See Article XVI for a more detailed discussion of the requirements for Confirmation under the Bankruptcy Code, including the requirements for the "cramdown" of any rejecting class under section 1129(b) of the Bankruptcy Code.

**A. Classification and Treatment of Claims and Interests**

Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, discharge, and release of such Holder's Allowed Claim or Allowed Interest (except to the extent (1) an Allowed Claim has been paid or otherwise satisfied or (2) a Holder has agreed to receive less favorable treatment than it would otherwise be entitled to), as specified below:

1. Class 1 — Other Secured Claims

   a. *Classification*: Class 1 consists of all Other Secured Claims.

   b. *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Ad Hoc Group of Crossover Lenders), either of the following:

      i. payment in full in Cash, payable on the later of (A) the Effective Date and (B) the date that is 30 Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter; or

      ii. Reinstatement or such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   c. *Voting*: Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim in Class 1 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims.

b. *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, at the option of the (Reorganized) Debtor(s) (with the consent of the Ad Hoc Group of Crossover Lenders), any of the following:

i. payment in full in Cash;

ii. Reinstatement or such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or

iii. other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

The failure to object to Confirmation by a Holder of an Allowed Other Priority Claim shall be deemed to be such Holder's consent to receive treatment for such Claim that is different from that set forth in section 1129(a)(9) of the Bankruptcy Code.

c. *Voting*: Class 2 is Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim in Class 2 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

3. Class 3 — Prepetition Term Loan Claims

a. *Classification*: Class 3 consists of all Prepetition Term Loan Claims.

b. *Allowance*: The Prepetition Term Loan Claims shall be deemed Allowed in the principal amount outstanding under the Prepetition Term Loan Credit Agreement and any and all other obligations related to or arising from the Prepetition Term Documents, including accrued and unpaid interest, costs, fees, expenses, and indemnities as of the Petition Date.

c. *Treatment*: Each Holder of a Prepetition Term Loan Claim shall receive its Pro Rata share of the following:

i. 100% of the New Equity Interests, which shall be subject to dilution by the MIP Interests; and

ii. 85% of the Litigation Trust Interests.[20]

[20] For the avoidance of doubt, the value of the Litigation Trust Interests will depend on the net Cash proceeds of the Litigation Trust Assets (*e.g.*, the Litigation Trustee's success in prosecuting or otherwise resolving the Litigation Trust Recovery Actions) for distribution to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement. There is no guarantee that the Litigation Trust Assets will yield any net recovery for the Litigation Trust

d. *Voting*: Class 3 is Impaired by the Plan. Each Holder of a Prepetition Term Loan Claim in Class 3 is entitled to vote to accept or reject the Plan.

4. Class 4 — General Unsecured Claims

a. *Classification*: Class 4 consists of all General Unsecured Claims.

b. *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of 15% of the Litigation Trust Interests (the "**GUC Litigation Trust Interests**"), pursuant to Article VIII.B and Article IX.D. Distributions of Litigation Trust Asset proceeds in respect of the GUC Litigation Trust Interests shall be made in accordance with Article VIII.B. **For the avoidance of doubt, the value of the Litigation Trust Interests will depend on the net Cash proceeds of the Litigation Trust Assets (*e.g.*, the Litigation Trustee's success in prosecuting or otherwise resolving the Litigation Trust Recovery Actions) for distribution to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement. There is no guarantee that the Litigation Trust Assets will yield any net recovery for the Litigation Trust Beneficiaries, including Holders of Allowed General Unsecured Claims. Accordingly, the value of the Plan Distributions to Holders of Allowed General Unsecured Claims (*i.e.*, each such Holder's Pro Rata share of 15% of the Litigation Trust Interests) may be zero.**

c. *Voting*: Class 4 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim in Class 4 is entitled to vote to accept or reject the Plan.

5. Class 5 — Section 510(b) Claims

a. *Classification*: Class 5 consists of all Section 510(b) Claims.

b. *Treatment*: All Section 510(b) Claims shall be cancelled, released, extinguished, and otherwise eliminated, and Holders of Section 510(b) Claims shall not receive any Plan Distributions or retain any interest in property on account of such Section 510(b) Claims.

c. *Voting*: Class 5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

---

Beneficiaries, including Holders of Prepetition Term Loan Claims. Accordingly, the value of the Plan Distributions to Holders of Prepetition Term Loan Claims on account of the Litigation Trust Interests (*i.e.*, each such Holder's Pro Rata share of 85% of the Litigation Trust Interests) may be zero.

a. *Classification*: Class 6 consists of all Intercompany Claims.

b. *Treatment*: All Allowed Intercompany Claims shall either be, in the discretion of the (Reorganized) Debtors (with the consent of the Ad Hoc Group of Crossover Lenders), (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Claims shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Claims or (ii) Reinstated.

c. *Voting*: Class 6 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Intercompany Claims are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, no Holder of an Intercompany Claim is entitled to vote to accept or reject the Plan.

7. <u>Class 7 — Intercompany Interests</u>

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: All Allowed Intercompany Interests shall either be, in the discretion of the (Reorganized) Debtors (with the consent of the Ad Hoc Group of Crossover Lenders), (i) cancelled, released, extinguished, and otherwise eliminated and Holders of such Intercompany Interests shall not receive any Plan Distributions or retain any interest in property on account of such Intercompany Interests or (ii) Reinstated.

c. *Voting*: Class 7 is either (i) Unimpaired, in which case the Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Intercompany Interests are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, no Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

8. <u>Class 8 — Existing Interests</u>

a. *Classification*: Class 8 consists of all Existing Interests.

b. *Treatment*: All Existing Interests shall be cancelled, released, extinguished, or otherwise eliminated and Holders of such Existing Interests shall not receive any Plan Distributions or retain any interest in property on account of such Existing Interests.

c. *Voting*: Class 8 is Impaired by the Plan. Each Holder of a Class 8 Existing Interest is conclusively presumed to have rejected the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

## B. Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, nothing under the Plan shall affect the Debtors' rights regarding any Unimpaired Claims or Interests, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims or Interests.

## C. Voting Classes; Presumed Acceptance or Rejection by Nonvoting Classes

### 1. Voting Classes Under the Plan

Under the Plan, Classes 3 and 4 are Impaired, and each Holder of a Claim as of the Voting Record Date in such Classes is entitled to vote to accept or reject the Plan.

### 2. Acceptance of the Plan by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class that actually voted on the Plan have voted to accept the Plan.

### 3. Presumed Acceptance of the Plan

Under the Plan, (a) Classes 1 and 2 are Unimpaired, (b) the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan, and (c) such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

### 4. Presumed Rejection of the Plan

Under the Plan, (a) Classes 5 and 8 are Impaired, (b) the Holders of Claims or Interests in such Classes are deemed to have rejected the Plan and shall receive no Plan Distributions on account of their Claims or Interests, and (c) such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

### 5. Presumed Acceptance or Rejection of the Plan

Under the Plan, Classes 6 and 7 are each either (a) Unimpaired, in which case the Holders of such Claims or Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) Impaired and receiving no Plan Distributions (and retaining no interest in property), in which case the Holders of such Claims or Interests are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. In either (a) or (b), as applicable, such Holders are not entitled to vote to accept or reject the Plan and the votes of such Holders shall not be solicited.

6. Presumed Acceptance by Voting Classes with No Votes

If a Class contains Claims eligible to vote on the Plan, and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**D. Elimination of Vacant Classes**

Any Class of Claims or Interests that does not contain a Holder of an Allowed Claim or Allowed Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing, may be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**E. Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class thereof, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE VII.
## IMPLEMENTATION OF THE PLAN

**A. Continued Existence and Vesting of Assets**

1. Reorganized Debtors

To the extent provided in the Restructuring Steps Memorandum, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized, and pursuant to the New Governance Documents, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.

Except as otherwise provided herein (including in the Restructuring Steps Memorandum), on and after the Effective Date all property of the Estates, wherever located, including all claims, rights, and Causes of Action (other than the Litigation Trust Recovery Actions), shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, and other encumbrances and interests. On and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property, wherever located, and prosecute, compromise, or settle any claims (including any Administrative Claims) and Causes of Action (other than the Litigation Trust Recovery Actions) without supervision of or approval by the Bankruptcy Court or the CCAA Court and free and clear of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the CCAA other than restrictions expressly imposed by this Plan, the Confirmation Order, or the CCAA Recognition Order. Such claims and Causes of Action include any of the Debtors' rights to indemnification from third parties and the Debtors' rights in respect of any Insurance Contracts.

2. Litigation Trust

Immediately upon the Effective Date, pursuant to sections 1141(b)–(c) of the Bankruptcy Code, (a) the Litigation Trust Assets shall vest in the Litigation Trust and (b) the (Reorganized) Debtors and their Estates shall transfer, and shall be deemed to have irrevocably transferred, to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, all title and interest in all of the Litigation Trust Assets, in each case, free and clear of all Claims, Liens, encumbrances, charges, other interests, and contractually imposed restrictions, which shall each be deemed fully released as of the Effective Date, except as otherwise provided herein or in the Confirmation Order. Upon the foregoing transfer, the (Reorganized) Debtors shall have no interest in or with respect to the Litigation Trust or the Litigation Trust Assets, and the Debtors and their Related Parties shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect thereto, in accordance with this Article VII.A.2.

Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfers of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code, as further set forth herein.

3. Transfer of Books and Records; Privilege

On or prior to the Effective Date, all documents, books, and records of the Debtors shall be transferred and assigned to the Reorganized Debtors, and such transfer or assignment shall not result in the destruction or waiver of any attorney-client privilege, work-product protection, joint defense or common interest privilege, or other privilege or protection of immunity (a) held by any or all of the Debtors or their Estates, (b) held by the board of directors (or similar body) or any special committee of the board of directors (or similar body) of any of the Debtors, or (c) attaching to any document, communication, or thing (regardless of media); each such privilege shall be transferred to and vest exclusively in the Reorganized Debtors.

For the avoidance of doubt, any communications prior to the Effective Date between the Debtors, the Litigation Trust, the Litigation Trustee, the Prepetition Agent, and the Ad Hoc Group of Crossover Lenders or current or former members thereof (including the Ad Hoc Group of Crossover Lenders), as applicable, shall be protected by common interest privilege.

Upon request of the Litigation Trustee, the Reorganized Debtors shall (a) provide the Litigation Trustee and Litigation Trust Professionals with originals or copies of or access to all documents and business records of the Company in their possession to facilitate the purpose of the Litigation Trust, including the prosecution of the Litigation Trust Recovery Actions, and (b) reasonably cooperate with the foregoing (including by providing reasonable access to management).

## B. Transactions Related to the Plan

On, before, or after the Effective Date, the (Reorganized) Debtors and the Litigation Trustee, as applicable, may, with the consent of the Ad Hoc Group of Crossover Lenders, take all actions as may be deemed necessary or appropriate to effectuate any transaction described in,

approved by, contemplated by, or necessary to effectuate the Plan, including the following: (1) the execution, filing, and delivery, as applicable, of any appropriate agreements, instruments, or other documents of borrowing, financing, merger, amalgamation, consolidation, restructuring, conversion, disposition, sale, transfer, formation, incorporation, partnership, organization, operation, governance, equity issuance, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including the documents comprising the Plan Supplement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (3) the cancelation, extinguishment or transfer of any of the Debtors' interests in the equity of any non-Debtor Affiliates, if any; and (4) all other actions that the (Reorganized) Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) deems to be necessary or appropriate to implement the Plan and the transactions contemplated hereby, including making filings or recordings that may be required by applicable law or retaining the corporate existence and structure of the Debtors and non-Debtor Affiliates.

## C. New Equity Interests

### 1. Issuance of New Equity Interests

On the Effective Date or as soon as reasonably practicable thereafter, 100% of the New Equity Interests shall be issued in book entry form and distributed to the Holders of Allowed Prepetition Term Loan Claims, subject to dilution by the MIP Interests. The Reorganized Debtors shall maintain a register recording the beneficial ownership of the New Equity Interests in accordance with the terms of the New Governance Documents. Holders of the New Equity Interests shall be subject to a limited liability company or other similar agreement having terms acceptable to the Ad Hoc Group of Crossover Lenders, the form of which shall be set forth in the Plan Supplement and shall, among other things, include provisions (which may include differing information rights by equity holders) required to comply with applicable law or other regulatory requirements applicable to the Reorganized Debtors going forward.

All of the New Equity Interests issuable in accordance with this Plan, if so issued, shall be duly authorized, validly issued, fully paid, and nonassessable. The issuance of the New Equity Interests is authorized without the need for any further corporate, limited liability company, or other similar action and without any further action by any holder of an Allowed Claim or Interest.

### 2. Exemption from Registration

To the extent practicable, as determined in good faith by the Debtors and the Ad Hoc Group of Crossover Lenders, the Reorganized Debtors shall (a) emerge from the Chapter 11 Cases as non-publicly reporting companies on the Effective Date and not be subject to SEC reporting requirements under sections 12 or 15 of the Securities Exchange Act, or otherwise, (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC, except, in each case, as otherwise may be required pursuant to the New Governance Documents, the Exit Financing Documents, or applicable law, and (c) not be required to list the New Equity Interests on a U.S. stock exchange.

See Article XIX for a more detailed discussion of certain securities law matters (including securities exemptions) in connections with the New Equity Interests.

## D. Exit Financing

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Financing Documents without the need for any further corporate, limited liability company, or other similar action. The Exit Financing Facilities shall be secured by substantially all of the Reorganized Debtors' assets, with the Exit ABL Facility receiving senior ranking Liens on certain of the Reorganized Debtors' assets and the Exit 1L Facility receiving senior ranking Liens on the remainder of the Reorganized Debtors' assets, in each case, subject to customary exclusions. The relative priority of each Exit Financing Facility's Liens and other security interests and applicable rights of enforcement with respect to the Reorganized Debtors shall be as set forth in an intercreditor agreement acceptable to the Exit Financing Lenders and the agents for the Exit Financing Facilities. The material Exit Financing Documents (or a summary of the same) shall have terms acceptable to the Ad Hoc Group of Crossover Lenders and the agents for the Exit Financing Facilities, the forms of which shall be set forth in the Plan Supplement.

The entry of the Confirmation Order and the CCAA Recognition Order shall be deemed approval of the Exit Financing Documents (including the transactions contemplated thereby, and all actions taken, to be taken, undertakings to be made, and obligations to be incurred by the (Reorganized) Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein and the grant of all guarantees, Liens, and other security interests contemplated thereby) and authorization for the (Reorganized) Debtors to enter into and execute the Exit Financing Agreements and such other documents as the agents and lenders thereunder may reasonably require, subject to such modifications as the (Reorganized) Debtors may deem to be reasonably necessary to consummate the Exit Financing Facilities. The foregoing approval shall explicitly include approval of the 5% "Exit Premium" and the 5% "Funding Premium" (each as defined in the Exit 1L Commitment Letter) payable to the Exit 1L Lenders as consideration for their commitment to fund the Exit 1L Facility. The Reorganized Debtors may use the Exit Financing Facilities for any purpose permitted thereunder, including the funding of (1) obligations under this Plan and (2) the DIP ABL Payment in Full (as defined in the Exit 1L Commitment Letter), to the extent not funded by the Exit ABL Facility.

On the effective date of the Exit Financing Agreements, (1) the (Reorganized) Debtors are authorized to execute and deliver the Exit Financing Documents and perform their obligations thereunder, including the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, (2) the Exit Financing Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their terms, and (3) no obligation, payment, transfer, or grant of security under the Exit Financing Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim. The Reorganized Debtors and the other persons granting any Liens and security interests to secure the obligations under the Exit Financing Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents deemed necessary or desirable to establish and further evidence perfection of such Liens or security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being

understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, subject to the satisfaction in full or waiver of all ABL DIP Obligations in accordance with the terms of the ABL DIP Documents, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## E. Boards of Managers/Directors

The number of managers or directors that initially shall be members of the Reorganized Debtors' boards of managers or directors (or similar governing entities) shall be set forth in the New Governance Documents or otherwise set forth in the Plan Supplement. Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors shall disclose, in the Plan Supplement, the identity and affiliations of the Persons proposed to serve on the Reorganized Debtors' boards of managers or directors (or similar governing entities). Commencing on the Effective Date, each of the managers or directors of each of the Reorganized Debtors and the other Company entities shall serve pursuant to the terms of applicable law and the applicable organizational documents of such Reorganized Debtor or other Company Entity and may be replaced or removed in accordance therewith.

Unless reappointed pursuant to the preceding paragraph, the members of the board of managers or directors of each Company entity prior to the Effective Date shall have no continuing obligations to the Company in their capacities as such on and after the Effective Date, and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Company entity on the Effective Date.

## F. New Governance Documents; No Further Action

On the Effective Date, the New Governance Documents of each of the Reorganized Debtors shall be deemed executed and authorized in all respects (including by the holders of New Equity Interests).

Notwithstanding any requirement under non-bankruptcy law, and subject to approval of the CCAA Court (if and where necessary), except as set forth herein, upon the Effective Date, (1) all actions contemplated by the Plan (including the New Governance Documents, the Exit Financing Documents, and any other document contemplated by the Plan Supplement) and (2) all matters provided for hereunder involving the (Reorganized) Debtors' or the Litigation Trust's corporate structure, or corporate action to be taken by or required of the (Reorganized) Debtors or the Litigation Trust, shall be deemed authorized and approved in all respects and shall be deemed to have occurred (unless contemplated hereunder to occur after the Effective Date) and be effective as provided herein, without the need for further approval, act, action (including corporate, board, shareholder, manager, or similar action), consent, or authorizations under any applicable law, order, rule, or regulation with respect thereto.

On the Effective Date, the Reorganized Debtors may—and, to the extent required under this Plan or applicable non-bankruptcy law, shall—file the New Governance Documents with the applicable Secretary of State or other applicable authorities in its respective state or country of

incorporation or organization. After the Effective Date, the Reorganized Debtors may amend and restate the New Governance Documents, in accordance with their terms, the Plan, and applicable law.

Pursuant to, and only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents will include a provision prohibiting the issuance of nonvoting equity securities.

## G. Litigation Trust

### 1. Creation of the Litigation Trust

On the Effective Date, a liquidating trust (the "**Litigation Trust**"), which shall be administered by the Litigation Trustee pursuant to the Plan (including the Litigation Trust Agreement), shall be established—or, to the extent already established with the agreement of the Debtors, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee, ratified in all respects—for the benefit of the Litigation Trust Beneficiaries. The Litigation Trustee and any other signatories thereto shall execute the Litigation Trust Agreement and shall take all other steps necessary to establish the Litigation Trust pursuant to and consistent with the Plan (including the Litigation Trust Agreement).

The form of the Litigation Trust Agreement shall be approved by the Debtors, the Litigation Trustee, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee, included in the Plan (including in the Plan Supplement), and approved pursuant to the Plan, the Confirmation Order, and the CCAA Recognition Order. Any nonmaterial modifications to the Litigation Trust Agreement made (with the consent of the Debtors and the Ad Hoc Group of Crossover Lenders and in consultation with the Creditors' Committee) shall be deemed ratified via entry of the Confirmation Order and the CCAA Recognition Order. The Litigation Trust Agreement shall contain provisions permitting the amendment or modification of the Litigation Trust Agreement as necessary to implement the provisions of the Plan.

The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustee are set forth in and shall be governed by the Plan (including the Litigation Trust Agreement). The Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including provisions necessary to ensure the continued treatment of the Litigation Trust as a "liquidating trust" as defined under Treasury Regulations section 301.7701-4(d) that is treated as a grantor trust and the Litigation Trust Beneficiaries as the grantors and deemed owners thereof for U.S. federal income tax purposes. The Litigation Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of administering the Litigation Trust Assets, including the pursuit of the Litigation Trust Recovery Actions, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the purposes of the Litigation Trust, and without effect to its status as a "liquidating trust" for U.S. federal income tax purposes.

In the event of any inconsistency between the Plan and the Litigation Trust Agreement (as such conflict relates to anything other than the establishment of the Litigation Trust or the Assets to be transferred to the Litigation Trust), the Litigation Trust Agreement shall control.

2. The Litigation Trustee

Subject to the terms of the Plan (including the Litigation Trust Agreement), the Confirmation Order, and the CCAA Recognition Order, upon the occurrence of the Effective Date, the Litigation Trustee shall be deemed appointed to serve as the trustee and administrator of the Litigation Trust. The appointment of the Litigation Trustee shall be approved via entry of the Confirmation Order and the CCAA Recognition Order, and such appointment shall be effective in accordance with the terms of the Plan. The Litigation Trustee shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be deemed necessary or appropriate to effectuate or further evidence the terms, purpose, and conditions of the Litigation Trust. The Litigation Trustee shall have and shall perform all of its duties, responsibilities, rights, and obligations set forth in the Plan (including the Litigation Trust Agreement). The initial Litigation Trustee shall serve in such capacities until the resignation or discharge and the appointment of a successor Litigation Trustee in accordance with the terms of the Litigation Trust Agreement.

The Litigation Trustee is hereby appointed following the Effective Date, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to prepare and file (or cause to be prepared and filed), on behalf of the Litigation Trust, all tax returns, reports, and statements required to be filed or that the Litigation Trustee otherwise deems appropriate, including the filing of amended tax returns or requests for refunds for all taxable periods, and to handle all of the Litigation Trust's tax matters, including the handling of tax audits, claims, defenses, and proceedings. The Litigation Trustee shall file (or cause to be filed) tax returns, reports, and statements for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).

From and after the Effective Date, the Litigation Trustee shall be paid in accordance with the terms and conditions of the Litigation Trust Agreement and solely from Litigation Trust Assets. Any Litigation Trust Professionals shall be entitled to compensation for services rendered and reimbursement of reasonable and documented expenses incurred from Litigation Trust Assets subject to the Litigation Trust Agreement.

Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee shall be authorized to obtain and pay for out of the Litigation Trust Assets all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, including coverage with respect to (a) any property that is or may in the future become the property of the Litigation Trust and (b) the liabilities, duties, and obligations of the Litigation Trustee and its agents, representatives, employees, or independent contractors under the Litigation Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Litigation Trustee after the termination of the Litigation Trust Agreement.

3. Rights, Powers, and Duties of the Litigation Trust and the Litigation Trustee

The Litigation Trustee shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan. Such rights, powers, and duties, which shall be exercisable by the Litigation Trustee on behalf of the Litigation Trust pursuant to the Plan (including the Litigation Trust Agreement), without the need for Bankruptcy Court approval, shall include (a) investigating and pursuing any Litigation Trust Recovery Actions, (b) administering and pursuing the Litigation Trust Assets, (c) making distributions of any Litigation Trust Assets pursuant to the Litigation Trust Agreement, and (d) taking all actions that the Litigation Trustee reasonably deems necessary and appropriate to protect and preserve the Litigation Trust Assets and to perform other duties and functions that are consistent with the Plan.

4. Tax Treatment

Given the particular nature of the Litigation Trust Interests and the funding of the Litigation Trust, there is some uncertainty as to the proper U.S. federal income tax classification of the Litigation Trust. However, the Debtors intend to take the position that the Litigation Trust is treated as a "liquidating trust" for U.S. federal income tax purposes. The remainder of this discussion assumes that the Litigation Trust is treated accordingly.

The Litigation Trust (other than as provided below with respect to any portion attributable to Disputed Claims) shall be established for the primary purpose of liquidating the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust and making distributions on account thereof as provided for under the Plan (including the Litigation Trust Agreement). The Litigation Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) and generally in compliance with Revenue Procedure 94-45, 1994-2 C.B. 684, and thus, as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code, consistent with the terms hereof; *provided*, that, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee (a) may timely elect to treat any portion of the Litigation Trust allocable to the Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9 and (b) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. Accordingly, the Litigation Trustee shall, in an expeditious but orderly and value-maximizing manner, liquidate and convert to Cash the Litigation Trust Assets, including by investigating and pursuing any Litigation Trust Recovery Actions, make timely Distributions to the Litigation Trust Beneficiaries, and not unduly prolong its duration. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Combined DS and Plan (including the Litigation Trust Agreement). The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose.

To the extent the Litigation Trustee makes an election to treat any portion of the Litigation Trust as a disputed ownership fund, all parties, including the Litigation Trustee and any Litigation Trust Beneficiaries, shall report consistently for all applicable U.S. federal, state, and local income

tax purposes. The Litigation Trustee shall file all income tax and information returns with respect to any income attributable to a disputed ownership fund and shall pay the U.S. federal, state, and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto. Any taxes imposed on any disputed ownership fund or its assets shall be paid out of the assets of the disputed ownership fund (including any Litigation Trust Assets allocable to Disputed Claims) and any subsequent distributions in respect of the allowance or disallowance of such claims shall be reduced accordingly. In the event, and to the extent, that any Cash in any disputed ownership fund is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the disputed ownership fund, assets of the disputed ownership fund (including those otherwise distributable) may be sold to pay such taxes. Pursuant to the Litigation Trust Agreement, all relevant parties shall treat, for U.S. federal, and applicable state and local, income tax purposes, the transfer of assets by the Debtors to the Litigation Trust (a) in part as the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Litigation Trust Assets, subject to any liabilities of the Debtors or the Litigation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust and (b) in part as the transfer of assets by the Debtors to the Disputed Claims Reserve. Immediately thereafter, it is expected that each Holder of Litigation Trust Interests will generally be treated as disposing of a portion of its allocable portion of the Litigation Trust Assets in connection with the payment of the backstop premium for the financing of the Litigation Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), and except to the extent that an election is made to treat a portion of the Litigation Trust as a disputed ownership fund, the (Reorganized) Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries shall treat, for U.S. federal income tax purposes, the transfer of assets to the Litigation Trust as (a) a transfer of the Litigation Trust Assets (subject to obligations relating to those Litigation Trust Assets, if any) directly to the Litigation Trust Beneficiaries, followed by (b) the transfer by such beneficiaries to the Litigation Trust of the Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. Accordingly, such Holders shall be treated for U.S. federal income tax purposes (y) as direct recipients of an undivided interest in the Litigation Trust Assets transferred to the Litigation Trust and as having immediately contributed such Litigation Trust Assets to the Litigation Trust and, thereafter, (z) as the grantors and deemed owners of the Litigation Trust and, thus, the direct owners of an undivided interest in the Litigation Trust Assets held by the Litigation Trust. Immediately thereafter, it is expected that each Holder of Litigation Trust Interests will generally be treated as disposing of a portion of its allocable portion of the Litigation Trust Assets in connection with the payment of the backstop premium for the financing of the Litigation Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

Notwithstanding the foregoing provisions of this Article VII.G.4, in the event of a final determination under section 1313(a) of the Tax Code that the Litigation Trust does not qualify as a grantor trust, the Litigation Trust Beneficiaries and the Litigation Trustee intend that the Litigation Trust be treated as a partnership for U.S. federal income tax purposes and shall take all actions reasonably necessary to cause the Litigation Trust to be treated as such a partnership.

The Litigation Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit (including, for the avoidance of doubt, any U.S. federal income tax returns required for the treatment of the Litigation Trust as a "grantor trust" pursuant to Treasury Regulations section 1.671-4(a)). As soon as practicable after the Effective Date, the Litigation Trustee shall make a good-faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the (Reorganized) Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all U.S. federal, and applicable state and local, income tax purposes. Subject to the Litigation Trust Agreement, in connection with the preparation of the valuation contemplated hereby, the Litigation Trustee shall be entitled to retain on behalf of the Litigation Trust such professionals and advisors as the Litigation Trustee shall determine to be appropriate or necessary, subject to the approval of the Litigation Trust Advisory Board, and the Litigation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary, subject to certain approvals.

See <u>Article XVIII</u> for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

5. <u>Litigation Trust Professionals</u>

Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee shall have the right, without Court approval, to retain the services of Litigation Trust Professionals to assist and advise it in the performance of its duties. Except as expressly provided for in <u>Article V.B.5</u>, the payment of the Litigation Trust Professionals shall be governed by the Litigation Trust Agreement.

6. <u>Indemnification</u>

The Litigation Trust Agreement shall include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee or other parties. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

7. <u>Dissolution</u>

The Litigation Trust shall be dissolved in accordance with the terms of the Litigation Trust Agreement. Prior to such dissolution, the Litigation Trustee shall cause all of the Reorganized Debtors' books and records that were delivered to the Litigation Trust or Litigation Trustee to be returned to the Reorganized Debtors.

**H. Cancellation of Instruments, Certificates, and Other Documents**

On the Effective Date, except as otherwise provided in the Plan, the Confirmation Order, or the CCAA Recognition Order (including with respect to the Reinstatement of the Intercompany Interests), (1) the DIP Facilities, the Prepetition Term Loan Credit Facility, and any Interest, Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest, including, for the avoidance

of doubt, any and all shareholder or similar agreements related to Interests, the DIP Loan Documents, and the Prepetition Term Documents, shall terminate, be cancelled, discharged, and deemed surrendered, as applicable; none of the Reorganized Debtors or the Litigation Trust (as applicable) shall have any continuing obligations thereunder, and the DIP Agents, the Prepetition Agent, and their respective agents, successors, and assigns shall each be automatically and fully released and discharged of and from all duties and obligations thereunder, and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, certificate or articles of incorporation, or similar documents governing the shares, Certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released; *provided*, that notwithstanding such termination, cancellation, discharge, Confirmation, Consummation, or anything to the contrary contained in the Plan, any such agreement that governs the rights of the Holder of an Allowed Claim (including the DIP Loan Documents and the Prepetition Term Documents) shall continue in effect solely for purposes of: (1) enabling such Holder to receive Plan Distributions on account of such Allowed Claim, as provided herein; (2) preserving all rights (including rights of enforcement), remedies, exculpations, indemnities (including with respect to any indemnification or contribution from the respective Holders of Allowed Claims under the DIP Loan Documents and the Prepetition Term Documents, as applicable), powers, and protections of the DIP Agents and Prepetition Agent against any Entity, pursuant to and subject to the terms of the DIP Loan Documents and the Prepetition Term Documents, as applicable; (3) permitting the DIP Agents and Prepetition Agent to enforce the respective obligations owed to them or their respective Holders of Claims under the Plan, the Confirmation Order, and the CCAA Recognition Order in accordance with the DIP Loan Documents and the Prepetition Term Documents, as applicable; and (4) permitting the DIP Agents and Prepetition Agent to perform any functions that are necessary to effectuate the foregoing, including appearing in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; *provided, further*, that the preceding proviso shall not affect the resolution of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, the CCAA Recognition Order, or the Plan or result in any expense or liability to the (Reorganized) Debtors or the Litigation Trustee, as applicable, except to the extent set forth in or provided for under the Plan, the Confirmation Order, or the CCAA Recognition Order.

## I. Subordination

The allowance, classification, and treatment of all Claims and Interests under the Plan takes into consideration any and all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. On the Effective Date, any and all subordination rights or obligations that a Holder of a Claim or Interest may have with respect to any Plan Distributions shall be terminated, and all actions related to the enforcement of such subordination rights shall be enjoined permanently. Accordingly, Plan Distributions to Holders of Allowed Claims shall not be subject to turnover or payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by a beneficiary of such terminated subordination rights; *provided*, that any such subordination rights shall be preserved in the event the Confirmation Order or the CCAA Recognition Order is vacated, the Effective Date does not occur in accordance with the terms hereunder, or the Plan is revoked or withdrawn.

## J. Merger and Dissolution

As soon as reasonably practical after the Confirmation Date, on such date as determined by the (Reorganized) Debtors in consultation with the Ad Hoc Group of Crossover Lenders (the "**Merger Date**"), the (Reorganized) Debtors may take any action reasonably designed to simplify the corporate structure of the (Reorganized) Debtors without the need for (1) a further order of the Bankruptcy Court, (2) any other or further actions to be taken by or on behalf of the (Reorganized) Debtors, or (3) any payments to be made in connection therewith. Such action may include causing any (Reorganized) Debtor to merge with and into any other (Reorganized) Debtor or causing any (Reorganized) Debtor to liquidate or dissolve. Each of the (Reorganized) Debtors may execute and file documents, and take all other actions as each deems appropriate, relating to the allowance of, and to effect the prompt corporate restructuring of the (Reorganized) Debtors as provided herein without the payment of any fee, tax, or charge and without the need for the filing of reports or certificates.

Moreover, on and after the first day following a Merger Date, the applicable (Reorganized) Debtor(s) (1) shall be deemed to have withdrawn business operations from any jurisdiction in which they were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal and (2) shall not be liable in any manner to any taxing or other authority for franchise, business, license, or similar taxes accruing on or after such Merger Date.

## K. Management Incentive Plan

On the Effective Date, or as soon as reasonably practicable thereafter, the board of the Reorganized Parent shall establish and implement a management incentive plan (the "**Management Incentive Plan**") with respect to the Reorganized Parent (and/or its subsidiaries), pursuant to which the MIP Interests shall be reserved as of the Effective Date for the participants in the Management Incentive Plan and be granted to such participants and vest based on terms to be established by the Reorganized Parent's board.

## L. Product Liability Claims

Nothing herein (including Articles XI.B and XI.G) shall preclude Holders of Product Liability Claims from (1) naming a Reorganized Debtor as a nominal defendant in an action brought in respect of a Product Liability Claim, thereby allowing, and solely to the extent required to enable, the named Reorganized Debtor to tender the applicable Product Liability Claim to the applicable Third-Party Indemnitor under all available and applicable Third-Party Indemnifications (as set forth in Article II.D), if any, as will be adjudicated by the Bankruptcy Court in connection with Confirmation unless otherwise consensually settled or resolved, or (2) otherwise pursuing their Claims against Insurers under all available and applicable Insurance Contracts; *provided*, that none of the Reorganized Debtors shall have any obligation to participate or assist in any action brought in pursuit of any Product Liability Claims or have any liability with respect to any Product Liability Claims. For the avoidance of doubt, all liabilities of the Debtors, the Debtors' Estates, or the Reorganized Debtors for any Product Liability Claims shall be discharged on the Effective Date in accordance with the Plan. To ease the burdens on the Reorganized Debtors, all Holders of

Product Liability Claims may use any discovery previously taken in connection with any previous Product Liability Claim against the Debtors, and both the Debtors and the Reorganized Debtors waive any prior protective orders to the extent necessary to effectuate this paragraph (however, any prior confidentiality designations are expressly preserved and shall remain in effect). To the extent that a Product Liability Claim is not satisfied by an Insurer or Third-Party Indemnitor, the Holder will be permitted to assert such Excess Product Liability Claim as a General Unsecured Claim (subject to prior compliance with the Bar Date Order). The Distribution Agent, the Litigation Trustee, or any Holder of a Product Liability Claim may seek estimation of any expected Excess Product Liability Claim, including for purposes of establishing an appropriate reserve in connection with any distributions from the Litigation Trust.

## ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS

For the avoidance of doubt, this Article VIII shall not apply to Cash distributions made by the Litigation Trust nor the vesting of the Litigation Trust Assets in the Litigation Trust.

### A. Sources for Plan Distributions and Transfers of Funds Among Debtors

Plan Distributions shall be funded, as applicable, with (1) Cash on hand, including any proceeds from the Exit Financing Facilities, and any remaining Cash from the proceeds of the Appliances Sale Transaction following application thereof in accordance with paragraph 8 of the Sale Order, (2) the other Assets of the Reorganized Debtors, and (3) the issuance of the Litigation Trust Interests. The (Reorganized) Debtors shall be entitled to transfer funds between and among the Debtors and non-Debtor subsidiaries as the (Reorganized) Debtors as deemed necessary or appropriate to enable the payments and Plan Distributions required by the Plan.

### B. Distribution Agent

The (Reorganized) Debtors may serve as the Distribution Agent or may retain and direct another Entity as Distribution Agent to assist with the Plan Distributions. A Distribution Agent may make all Plan Distributions and shall be empowered to effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder and to exercise such other powers as may be vested in such Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Distribution Agent to be necessary and proper to carry out its duties.

On the Effective Date, all of the GUC Litigation Trust Interests shall be registered in the name of the Distribution Agent on the register of the Litigation Trust to be held in the name of the Distribution Agent for the benefit of the Holders of General Unsecured Claims, to the extent such Claims are Allowed or become Allowed after the Effective Date. In the event that the pursuit of the Litigation Trust Assets results in proceeds for distributions to holders of the Litigation Trust Interests, the Litigation Trustee shall cause the Litigation Trust to pay to the Distribution Agent all proceeds distributable on account of the GUC Litigation Trust Interests in accordance with the Litigation Trust Agreement. No later than 60 calendar days following the receipt of proceeds, the Distribution Agent shall redistribute such proceeds Pro Rata to all Holders of Allowed General Unsecured Claims as reflected on the Claims Register and allocated in accordance with Article

IX.D. The Distribution Agent shall hold all proceeds payable in respect of any unallocated GUC Litigation Trust Interests attributable to the Disputed Claims Reserve in a segregated account in trust until all such GUC Litigation Trust Interests have been allocated in accordance with Article IX.D and shall distribute such proceeds no later than 60 calendar days following such final allocation.

Except as otherwise set forth herein, the Reorganized Debtors shall be authorized, without further Bankruptcy Court or CCAA Court approval, to reimburse any Entity for its reasonable, documented, and customary out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions.

If a Distribution Agent is an independent third party designated to serve in such capacity, the Reorganized Debtors shall be permitted to provide to such Distribution Agent, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable, actual, and documented out-of-pocket expenses incurred in providing post-Confirmation services directly related to Plan Distributions.

For the avoidance of doubt, the Prepetition Agent shall not be required to act as Distribution Agent for any distribution of New Equity Interests or Litigation Trust Interests on account of Prepetition Term Loan Claims and shall have no responsibility or liability for such distributions.

## C. Timing of Distributions

Subject to any reserves or holdbacks established pursuant to the Plan, and taking into account the matters set forth in Article VI, on the applicable Distribution Date or as soon as practicable thereafter, Holders of Allowed Claims shall receive the Plan Distributions provided for Allowed Claims in the applicable Classes as of such date. Because of the size and complexities of the Chapter 11 Cases, the Debtors at the present time cannot accurately predict the timing of the Distribution Dates.

If and to the extent there are Disputed Claims as of the Effective Date, Plan Distributions on account of such Disputed Claims (which shall only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in the Plan with respect to the treatment of Allowed Claims on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after each such Claim is Allowed; *provided*, that Plan Distributions on account of the Claims set forth in Article VI shall be made as set forth therein and Professional Fee Claims shall be made as soon as reasonably practicable after such Claims are Allowed by the Bankruptcy Court or as provided in any other applicable order of the Bankruptcy Court.

## D. *De Minimis* Distributions

Notwithstanding anything herein to the contrary, neither the Reorganized Debtors nor any Distribution Agent shall be required to make Plan Distributions or payments of less than $250 (whether Cash or otherwise), and Cash that otherwise would be payable under the Plan to Holders of Allowed Claims but for this provision shall be available for Plan Distributions to other Holders of Allowed Claims.

## E. Delivery of Plan Distributions—Allowed Claims

Distributions shall only be made to the record Holders of Allowed Claims as of the Distribution Record Date, at which time the Claims Register shall be deemed closed for purposes of determining whether a Holder of such a Claim is a record Holder entitled to Plan Distributions. The (Reorganized) Debtors, any Distribution Agent, the Prepetition Agent, and each of the foregoing's respective Related Parties shall have no obligation to recognize, for purposes of Plan Distributions pursuant to, or in any way arising from, the Plan (or for any other purpose), any Claims that are transferred after the Distribution Record Date. Instead, the foregoing parties shall be entitled to recognize only those record Holders set forth in the registers (including the lender registers) as of the Distribution Record Date.

With respect to a Plan Distribution to be made with Cash, if any dispute arises as to the identity of a Holder of an Allowed Claim that is entitled to receive a Plan Distribution, in lieu of making such Plan Distribution to such person, the Plan Distributions may be made into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Subject to Bankruptcy Rule 9010, a Plan Distribution to a Holder of an Allowed Claim to be sent by mail may be delivered to (1) the address provided by such Holder, if any, (2) the address set forth on the first page of the Proof of Claim Filed by such Holder, (3) the last known address of such Holder on the books and records of the Debtors or their agents if such Holder did not File a Proof of Claim, (4) the address set forth in any written notice of an address change delivered to the (Reorganized) Debtors or any Distribution Agent, (5) the address set forth on the Schedules, (6) in the case of a Holder whose Claim is governed by an agreement and administered by an agent, the address contained in the official records of such Entity, or (7) the address of any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf. The foregoing shall also apply with respect to any forms or notices related to Plan Distributions that, for the avoidance of doubt, may be sent via email to an email address that satisfies any of subclauses (1)–(7) in the previous sentence.

## F. Fractional New Equity Interests

Notwithstanding any other provision herein to the contrary, no fractional New Equity Interests shall be issued or distributed pursuant to this Plan. Whenever any Plan Distribution of a fraction of a New Equity Interest would otherwise be required hereunder, the actual Plan Distribution made shall reflect a rounding of such fraction to the nearest whole New Equity Interest (up or down), with fractions half or less being rounded down and fractions in excess of a half being rounded up. If two or more Holders are entitled to equal fractional entitlements and the number of Holders so entitled exceeds the number of whole New Equity Interests, as the case may be, which remain to be allocated, the (Reorganized) Debtors shall allocate the remaining whole New Equity Interests to such Holders by random lot or such other impartial method as the (Reorganized) Debtors deem fair (in the (Reorganized) Debtors' sole discretion). Upon the allocation of all the whole New Equity Interests authorized hereunder, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.

### G. Manner of Payment Under the Plan

Any Cash payment may be made by check, wire transfer, or any other customary payment method. In the case of non-U.S. creditors, Cash payments may be made in such funds and by such means as are necessary or customary in the applicable jurisdiction.

### H. Allocation of Plan Distributions Between Principal and Interest

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of an Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest for all purposes, including federal income tax purposes.

### I. Compliance Matters

In connection with the Plan, each Debtor, each Reorganized Debtor, and any Distribution Agent, as applicable, shall comply with all tax deduction, withholding, payment, and reporting requirements imposed by applicable law, and all Allowed Claims and Plan Distributions shall be subject to any such deduction, withholding, and reporting requirements as determined in the good-faith discretion of the (Reorganized) Debtors or a Distribution Agent, as applicable. In connection with the Plan and all Plan Distributions, the Reorganized Debtors and any Distribution Agent are authorized to take any and all actions that may be deemed necessary or appropriate to comply with the foregoing requirements (including liquidating a portion of the Plan Distributions to generate sufficient funds to pay applicable withholding taxes and withholding Plan Distributions pending receipt of information necessary to facilitate such Plan Distributions) and establish any other mechanisms that the Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) or any Distribution Agent, as applicable, believe are reasonable and appropriate, and all Allowed Claims and Plan Distributions shall be subject to any such withholding and reporting requirements. All Holders of Claims shall be required to provide any information necessary to allow the Reorganized Debtors to comply with all withholding, payment, and reporting requirements with respect to such taxes. The Reorganized Debtors and any Distribution Agent, as applicable, reserve the right to withhold the full amount required by law on any Plan Distribution on account of any Holder of an Allowed Claim that fails to timely provide the required information to a Distribution Agent or the Reorganized Debtors. The Reorganized Debtors and any Distribution Agent each reserve the right to allocate and distribute all Plan Distributions in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and similar encumbrances. Any amounts deducted, withheld, or reallocated pursuant to this Article VIII shall be treated as if distributed to the Holder of the Allowed Claim.

### J. Foreign Currency Exchange Rate

As of the Confirmation Date, any Claim denominated in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Central Time), midrange spot rate of exchange for the applicable currency as published in the *Wall Street Journal*, National Edition, on the day after the Petition Date. The (Reorganized) Debtors and the Claims and Solicitation Agent

are authorized to update the Claims Register to reflect the foregoing without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

## K. Fractional Dollars

Notwithstanding any other provision of the Plan, Plan Distributions or payments pursuant to the Plan need not be made in fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole dollar.

## L. Undeliverable, Unclaimed, or Non-Negotiated Plan Distributions

Plan Distributions shall not be made to a Holder who is the intended recipient of an Unclaimed Distribution. The underlying Claim of an Unclaimed Distribution shall be automatically discharged and cancelled, and may be expunged from the Claims Register by the Reorganized Debtors or the Claims and Solicitation Agent without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable. The Holder of such Claim shall be deemed to have forfeited its Claim and shall be forever barred and enjoined from asserting any such claim against the (Reorganized) Debtors and their Estates, any Distribution Agent, and each of the foregoing's respective agents, attorneys, representatives, employees, or independent contractors and/or any of its or their property. Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code. All title to and all beneficial interests in the Cash relating to such Unclaimed Distribution, including any dividends or interest attributable thereto, shall remain with or revert to the Reorganized Debtors; checks previously delivered with respect to a now-Unclaimed Distribution shall be null and void; Unclaimed Distributions that are New Equity Interests or Litigation Trust Interests shall be cancelled notwithstanding any state or other escheat or similar laws to the contrary. The reversion of such Cash shall be free of any restrictions thereon notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the Plan Distribution that is an Unclaimed Distribution, to the contrary. Nothing contained in the Plan shall require the (Reorganized) Debtors or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

## M. Claims Paid by Third Parties

To the extent a Holder of an Allowed Claim receives a Plan Distribution on account of a Claim and also receives payment from a party that is not a Debtor, a Reorganized Debtor, or a Distribution Agent on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay, and/or return the Plan Distribution to the applicable Reorganized Debtor, to the extent that the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of the Claim as of the date of any such Plan Distribution. The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each calendar day after the 14-day grace period specified above until the amount is repaid.

To the extent that a Holder receives payment in full or in part on account of a Claim, such Claim may be adjusted or expunged on the Claims Register without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable; *provided*, that, to the extent the non-Debtor party making the payment is subrogated to the Holder's Claim, the non-Debtor party shall have a 30-calendar-day grace period following payment in full to notify the Claims and Solicitation Agent and the Reorganized Debtors of such subrogation rights.

### N. Claims Payable by Third Parties

To the extent that one or more of the Debtors' Insurers satisfies any Claim in full or in part, then immediately upon such satisfaction, such Claim may be expunged from or reduced on (to the extent of such satisfaction) the Claims Register without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that a Debtor or any Entity may hold against any other non-Debtor Entity (including Insurers) under any Insurance Contract(s), nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers under any such Insurance Contract(s).

## ARTICLE IX.
## PROCEDURES FOR RESOLVING CLAIMS

This Article IX shall not apply to DIP Superpriority Claims or Prepetition Term Loan Claims, which Claims shall be Allowed in accordance with the Plan and not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, crossclaims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any Person or other Entity. This Article IX shall also not apply to Professional Fee Claims, objections to which shall be governed by the Interim Compensation Order or such other order of the Bankruptcy Court otherwise permitting the retention of the applicable Professional.

### A. Objections to Claims

If a Holder of a Claim elects to File or submit a Proof of Claim in the Chapter 11 Cases, such Holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim.

Before the Effective Date, any party in interest may object to Claims. After the Effective Date, the Reorganized Debtors shall have the exclusive authority to object to all Claims against the Debtors; *provided*, that the Reorganized Debtors shall not be entitled to object to any Claim that has been expressly Allowed by Final Order or hereunder. If any objection to a Claim Filed by the Debtors remains pending as of the Effective Date, the Reorganized Debtors shall be deemed substituted for the Debtors as the objecting party. Objections to Claims shall be Filed on the Bankruptcy Court's docket on or before the Claims Objection Deadline.

Except as otherwise provided herein, agreed to by the (Reorganized) Debtors (in their or its sole discretion), or otherwise approved by the Bankruptcy Court or the CCAA Court, upon entry

of the Confirmation Order, each Proof of Claim Filed after the applicable Bar Date shall be deemed Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the Litigation Trust; such Proofs of Claim shall be Disallowed without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent). Holders of such Claims may not receive any Plan Distributions on account of such Claims, unless, on or before the Combined Hearing, such late-Filed Claim has been deemed timely Filed by a Final Order or as agreed by the Debtors in writing (email being sufficient).

Objections to Claims Filed before the Effective Date shall be Filed, served, and administered in accordance with the Local Rules and the Complex Procedures, with notice to the parties listed in Article XV.I; after the Effective Date, Filings and notices need only be served on the relevant claimants.

The Reorganized Debtors shall have the exclusive authority to determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed. The Reorganized Debtors shall also be entitled to assert all of the (Reorganized) Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization, and equitable subordination and counterclaims with respect to Claims.

**B. Resolution of Disputed Claims**

On and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to File, litigate, compromise, settle, otherwise resolve, or withdraw any objections to Claims, to compromise and settle any such Claims, and to administer and adjust the Claims Register to reflect any such settlement or compromise, in each case, without notice to or approval by the Bankruptcy Court or any other party.

**C. Estimation of Claims and Interests**

Before the Effective Date, the Debtors, and on or after the Effective Date, the Reorganized Debtors, may (but are not required to), with the consent of the Ad Hoc Group of Crossover Lenders, determine, resolve, and otherwise adjudicate all Contingent Claims, Unliquidated Claims, and Disputed Claims in the Bankruptcy Court or such other court of the (Reorganized) Debtors' choice having jurisdiction over the validity, nature, or amount thereof. At any time, the (Reorganized) Debtors may request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any party in interest has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but either is subject to appeal or has not become a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim, or Disputed Claim, that

estimated amount shall constitute the maximum limitation on such Claim for all purposes and may be used as evidence in any supplemental proceedings, and the (Reorganized) Debtors may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

## D. No Distributions Pending Allowance or Settlement of Causes of Action

Notwithstanding any other provision hereof, no payments or Plan Distributions shall be made (1) for a Disputed Claim, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim has become an Allowed Claim, (2) to a specific Holder of an Allowed Claim, if such Holder is also the Holder of a Disputed Claim, unless and until all objections to such Disputed Claim(s) have been settled or withdrawn or have been determined by a Final Order and each Disputed Claim has become an Allowed Claim, or (3) to a specific Holder of an Allowed Claim, if such Holder is or may be liable to the (Reorganized) Debtors on account of a Cause of Action, unless and until such Cause of Action (to the extent applicable and without prejudice to the rights of any Holder of an Allowed Administrative Claim to argue that section 502(d) of the Bankruptcy Code is inapplicable to its Administrative Claim) has been settled or withdrawn or has been determined by Final Order of the Bankruptcy Court or such other court having jurisdiction over the matter. Following any such settlement or determination in clause (3) of the preceding sentence where the Holder of a Claim is liable to the (Reorganized) Debtors on account of any Cause of Action, any such payment or Plan Distribution to such Holder may be offset against the liability such Holder has to the (Reorganized) Debtors.

On the Effective Date, or as soon as practicable thereafter, the Litigation Trustee shall mark the GUC Litigation Trust Interests in the register of the Litigation Trust in the name of the Distribution Agent for the benefit of the Holders of General Unsecured Claims, to the extent such Claims are Allowed or become Allowed after the Effective Date. The Distribution Agent (with the assistance of the Reorganized Debtors and the Claims and Solicitation Agent) shall maintain records allocating the beneficial interests of the Holders of all General Unsecured Claims in the GUC Litigation Trust Interests, which records shall include a reserve in respect of all Disputed General Unsecured Claims in the amount of the GUC Litigation Trust Interests that would have been allocated to all Holders of Disputed General Unsecured Claims if such Disputed General Unsecured Claims had been Allowed on the Effective Date (the "**Disputed Claims Reserve**"), with the amount of such Claims for purposes of establishing the Disputed Claims Reserve to be determined, solely for the purpose of establishing reserves and for maximum distribution purposes, to be the lesser of (1) the asserted amount of the Disputed General Unsecured Claim Filed or, if

no Proof of Claim was Filed, listed by the Debtors in the Schedules, (2) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, and (3) the amount otherwise agreed to by the (Reorganized) Debtors or the Litigation Trustee and the Holder of such Disputed General Unsecured Claim for reserve purposes. To the extent that a Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, in accordance with the provisions of the Plan, the Distribution Agent (with the assistance of the Reorganized Debtors and the Claims and Solicitation Agent) shall revise the allocation of the GUC Litigation Trust Interests accordingly.

When all Disputed General Unsecured Claims are resolved and either become Allowed or are Disallowed, to the extent any Litigation Trust Interests remain unallocated and in the Disputed Claims Reserve after all Holders of Disputed General Unsecured Claims that have become Allowed General Unsecured Claims have been allocated the full amount to which they are otherwise entitled to receive in accordance with pursuant to the treatment set forth in the Plan, then such remaining Litigation Trust Interests shall be allocated in the Distribution Agent's records Pro Rata to the holders of the Litigation Trust Interests issued in respect of Allowed General Unsecured Claims such that the 15% of the Litigation Trust Interests to be allocated to Holders of Allowed General Unsecured Claims under the Plan, subject to dilution, are fully allocated.

Notwithstanding the foregoing or any other provision in the Plan or the Plan Documents, nothing in the Plan or the Plan Documents shall (1) constitute a determination that section 502(d) of the Bankruptcy Code is, or is not, applicable to Administrative Claims or (2) prejudice the rights of (a) any Holder of an Allowed Administrative Claim to File a motion (or prosecute a pending motion) before or after the Effective Date, seeking entry of an order compelling payment of its Allowed Administrative Claim on or after the Effective Date on the basis that section 502(d) of the Bankruptcy Code is inapplicable to its Allowed Administrative Claim or (b) the (Reorganized) Debtors to oppose any such motion on any grounds.

## E. No Amendments to Claims

On and after the Confirmation Date, the Holder of a Claim (other than a Professional Fee Claim or, after the Administrative Bar Date, an Administrative Claim) must obtain the (Reorganized) Debtors' written consent (email being sufficient) or a Final Order of the Bankruptcy Court to amend a Claim. Unless otherwise permitted by a Final Order of the Bankruptcy Court, any Proofs of Claim that violate this Article IX.E shall be Disallowed without the need for any objection by the (Reorganized) Debtors or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

## F. No Late-Filed Claims

In accordance with the Bar Date Order (or other Final Order of the Bankruptcy Court) and section 502(b)(9) of the Bankruptcy Code, any Person that failed to File a Proof of Claim by the applicable Bar Date or was not otherwise permitted to File a Proof of Claim after the applicable Bar Date by a Final Order of the Bankruptcy Court is and shall be barred, estopped, and enjoined from asserting any Claim against the Debtors (1) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Person as undisputed, noncontingent, and

liquidated or (2) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Person.

All Claims Filed after the applicable Bar Date and for which no Final Order has been entered by the Bankruptcy Court determining that such Claims were timely Filed shall be Disallowed and expunged from the Claims Register (including by the Claims and Solicitation Agent) at the direction of the (Reorganized) Debtors to reflect the same, without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust or expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable. Any Plan Distribution on account of such Claims shall be limited to the amount, if any, listed in the applicable Schedules as undisputed, noncontingent, and liquidated. The (Reorganized) Debtors have no obligation to review or respond to any Claim Filed after the applicable Bar Date unless (1) the filer has obtained a Final Order from the Bankruptcy Court authorizing it to File such Claim after the Bar Date or (2) the (Reorganized) Debtors have consented to the Filing of such Claim in writing.

## G. No Interest

Other than as provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the DIP Orders, the Plan, the Confirmation Order, or the CCAA Recognition Order, post-petition interest shall not accrue or be paid on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Claim or Disputed Claim for the period from and after the Effective Date; *provided*, that nothing in this Article IX shall limit any rights of any Governmental Unit to interest under section 503, 506(b), 1129(a)(9)(A), or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

## H. Adjustment to Claims Without Objection

Any Claim that has been paid or otherwise satisfied (in whole or in part), amended, superseded, cancelled, or otherwise Disallowed (including pursuant to the Plan), and any Claim that is duplicative or redundant of another Claim against the same Debtor, may, on or after the Confirmation Date, be adjusted on or expunged from the Claims Register (including by the Claims and Solicitation Agent) at the direction of the (Reorganized) Debtors to reflect the same, without the need to File an application, motion, complaint, objection, or any other legal proceeding seeking to adjust or expunge such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court or the Holder of such Claim, as applicable.

## I. Reservation of Rights To Object to Claims

The failure of the (Reorganized) Debtors to object to any Claim shall not be construed as an admission to the amount, priority, character, or validity of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the (Reorganized) Debtors to contest, challenge the validity of, or otherwise defend against, any such Claim in the Bankruptcy Court or non-bankruptcy forum.

## J. Disallowance of Claims

Any Claims held by a Person or other Entity from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Entity has paid the amount, or turned over any such property, for which such Entity is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Plan Distributions on account of such Claims until such time as all Causes of Action against that Entity have been settled or a Final Order of the Bankruptcy Court with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

Any Claim that has been or is hereafter listed on the Schedules as Contingent, Unliquidated, or Disputed, and for which no contrary or superseding Proof of Claim has been timely Filed, or that is not or has not been Allowed by a Final Order, shall be deemed Disallowed and shall be expunged (including by the Claims and Solicitation Agent) without further action by the (Reorganized) Debtors and without any further notice to any party or action, order, or approval of the Bankruptcy Court.

## K. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of a Person or other Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is Contingent as of the Effective Date, such Claim, notwithstanding section 502(j) of the Bankruptcy Code, (1) shall be deemed Disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and (2) can be expunged from the Claims Register (including by the Claims and Solicitation Agent) unless, in each case, prior to the Effective Date (1) such Claim has been adjudicated as noncontingent or (2) the Holder of such Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer Contingent.

# ARTICLE X.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or a Final Order, each Executory Contract and Unexpired Lease shall be deemed automatically assumed (subject to the payment of any applicable Cure Cost), pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (1) has been previously assumed, assumed and assigned, or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court (including the Sale Order), in which case, such Final Order shall control; (2) previously expired or was terminated pursuant to its terms; (3) is the subject of a motion or notice of intent to assume,

assume and assign, or reject pending as of the Effective Date; or (4) is otherwise rejected pursuant to the terms hereof (including any Schedule of Rejected Contracts), in which case such rejections shall be deemed effective on the Effective Date (or earlier, if so set forth herein or on any Schedule of Rejected Contracts). Except as otherwise provided herein, each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor(s) in accordance with its terms, except as modified hereby. For the avoidance of doubt, no agreement required or contemplated hereby (including the Litigation Trust Agreement) or by the Appliances Sale Transaction (including that certain transition services agreement, dated November 8, 2023, by and between the Debtors party thereto and the Appliances Buyers) shall be deemed rejected.

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable (Reorganized) Debtor liable thereunder in the ordinary course of its business or as authorized by the Bankruptcy Court. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order or the CCAA Recognition Order and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by a Final Order of the Bankruptcy Court.

Each of the Debtors may, prior to the Effective Date, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive Consummation of the Plan. Any such agreements (or a summary of the material terms thereof) shall be in form and substance acceptable to the Ad Hoc Group of Crossover Lenders.

Except as otherwise provided herein, or agreed to by the (Reorganized) Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, indemnities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, and to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (1) do not alter in any way the prepetition nature of the Executory Contracts and Unexpired Leases, or the validity, priority, or amount of any Claims that may arise under the same, (2) are not and do not create post-petition contracts or leases, (3) do not elevate to administrative expense priority any prepetition Claims of the counterparties to the Executory Contracts and Unexpired Leases against any of the Debtors, and (4) do not entitle any Entity to a Claim under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts and Unexpired Leases and subsequent modifications, amendments, supplements, or restatements.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and rejections described in this Article X, pursuant to sections 365 and 1123 of the Bankruptcy Code, as of the date made applicable by the preceding paragraph.

## B. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

During the course of the Chapter 11 Cases, as part of the Sale Process and in accordance with the Bidding Procedures (as defined in the Sale Order), the Debtors Filed the Assumption Notice listing proposed Cure Costs with respect to their Executory Contracts and Unexpired Leases that may be assumed or assumed and assigned. In accordance therewith, the deadline to object to the proposed Cure Costs of each Executory Contract and Unexpired Lease listed on the Assumption Notice have expired. Only the rights of those parties who submitted a formal or informal objection to the proposed Cure Costs of or in connection with their Executory Contract or Unexpired Lease prior to the objection deadline set forth in the Assumption Notice have been reserved (any objection timely submitted, an "**Assumption Dispute**"). **No other party may dispute or object to the proposed Cure Costs of or in connection with their Executory Contract or Unexpired Lease.** To the extent an Assumption Dispute relates solely to proposed Cure Costs, the applicable (Reorganized) Debtor may assume or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Assumption Dispute; provided, that such (Reorganized) Debtor reserves Cash in an amount sufficient to pay the full amount asserted as the required cure payment by the non-Debtor party to such Executory Contract or Unexpired Lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court). To the extent an Assumption Dispute is resolved or determined against the applicable (Reorganized) Debtor, such (Reorganized) Debtor may reject the applicable Executory Contract or Unexpired Lease after such determination, and the counterparty may thereafter File a Proof of Claim for any purported Rejection Damages in accordance with the Plan. Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease (excluding objections to the proposed Cure Costs) must be asserted by the Combined DS and Plan Objection Deadline.

As soon as reasonably practicable after the Effective Date (unless otherwise agreed by and between the (Reorganized) Debtors and the counterparty to an Executory Contract or Unexpired Lease), the Reorganized Debtors shall pay all outstanding and undisputed Cure Costs set forth in the Assumption Notice other than those relating to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Contracts. Any Cure Cost shall be deemed fully satisfied and released upon payment by the Reorganized Debtors of such Cure Cost; *provided, however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Cost despite the failure of the relevant counterparty to File such request for payment of such Cure Cost. The Reorganized Debtors also may settle any Cure Cost without any further notice to or action, order, or approval of the Bankruptcy Court and Claims associated with such Cure Costs can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and full payment of any applicable Cure Cost pursuant to this Article X.B, shall result in the full release and satisfaction of any Cure Costs, other Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership

interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim, or Claims set forth on the Schedules, based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid, shall be deemed Disallowed upon the later of entry of the Confirmation Order or such payment in full without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

## C. Employment-Related Provisions

### 1. Employment Agreement and Benefit Programs

Each of the Debtors may, prior to the Effective Date, enter into employment agreements with employees that become effective on or prior to the Effective Date and shall survive Consummation of the Plan. Any such agreements (or a summary of the material terms thereof) shall be in form and substance reasonably acceptable to the Ad Hoc Group of Crossover Lenders.

Notwithstanding anything to the contrary herein, all employment, confidentiality, and non-competition agreements (including, for the avoidance of doubt, any agreements with third-party personnel vendors or any agreements with independent contractors), collective bargaining agreements, offer letters (including any severance set forth therein), bonus, gainshare, and incentive programs, vacation, holiday pay, paid-time off, leaves, severance, retirement, supplemental retirement, indemnity, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, agreements, and arrangements, and all other wage, compensation, employee expense reimbursement, unemployment insurance, workers' compensation, and all other benefit obligations (including, for the avoidance of doubt, letter agreements with respect to certain employees' rights and obligations in the event of certain terminations of their employment in connection with and following the Consummation of the Plan) are deemed to be, and will be treated as, Executory Contracts under this Plan and, on the Effective Date, shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code (as amended prior to or on the Effective Date, in each case, as applicable) unless such an agreement has been superseded by a new agreement that has been executed prior to Consummation of the Plan in accordance with Article X.A or such obligation is rejected pursuant to a separate Final Order of the Bankruptcy Court or is the subject of a separate rejection motion Filed by the Debtors.

### 2. Pension Plan

Subject to the occurrence of the Effective Date, the Pension Plan and the related settlement agreement among the PBGC, WKI Holding Company, Inc., and BW Holdings, LLC dated January 30, 2003, as amended, and all obligations thereunder, including that certain reimbursement agreement pursuant to which Bank of Montreal issued that certain Irrevocable Standby Letter of Credit No. BMCH303393OS, dated as of August 17, 2021, as amended, for the benefit of the PBGC, shall be deemed assumed by the (Reorganized) Debtors in accordance with Article X.A pursuant to section 365 of the Bankruptcy Code and shall continue. The Debtors do not presently intend to terminate the Pension Plan. However, the PBGC asserts that if the Pension

Plan terminates under 29 U.S.C. §§ 1341(c) or 1342, the (Reorganized) Debtors will each be jointly and severally liable for each of the PBGC Claims.

After the Effective Date, the Reorganized Debtors shall, in the ordinary course of their business, as and to the extent required by the Pension Plan's governing documents and in accordance with applicable non-bankruptcy law (a) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (b) pay all required premiums, if any, owed to the PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plan under ERISA or the Internal Revenue Code, and (c) administer the Pension Plan in accordance with the applicable provisions of ERISA and the Internal Revenue Code.

Since the Plan provides that the Reorganized Debtors will continue the Pension Plan, the PBGC and the Debtors agree that the PBGC Claims shall be deemed withdrawn on the Effective Date, without the need for any objection by the Reorganized Debtors or the Litigation Trustee or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

Nothing in the Chapter 11 Cases, the Combined DS and Plan, or any other document Filed in the Chapter 11 Cases shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Combined DS and Plan, Bankruptcy Code, or other document Filed in the Chapter 11 Cases. For the avoidance of doubt, the Reorganized Debtors shall not be released from any other liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to the Pension Plan.

3. Collective Bargaining Agreements

Subject to the occurrence of the Effective Date, the Debtors' collective bargaining agreements with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (and its affiliated local unions) shall be deemed assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and the Reorganized Debtors shall be bound by all obligations thereunder in all respects, with Cure Costs relating to such agreements being determined and paid in the ordinary course.

## D. Rejection Claims

Any Rejection Claim must be Filed with the Claims and Solicitation Agent by the Rejection Damages Bar Date in accordance with the Bar Date Order. Any Rejection Claim for which a Proof of Claim is not properly and timely Filed and served in accordance with the Bar Date Order shall be (1) discharged and forever barred and shall not be enforceable against the (Reorganized) Debtors or their respective Estates or properties and (2) deemed Disallowed as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent).

The (Reorganized) Debtors may contest any Rejection Claim in accordance herewith. Allowed Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with Article VI.

## E. Reservation of Rights

Nothing contained in the Plan (including the Plan Supplement) constitutes an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, any Reorganized Debtor, or any other Entity has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the (Reorganized) Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. If any such dispute is not timely resolved, either party may submit the dispute to the Bankruptcy Court for adjudication.

## F. Transferred Cure Costs

With respect to payment of any Cure Costs or disputes over any Cure Costs, none of the (Reorganized) Debtors, any Distribution Agent, or any other Entity, as applicable, shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Cost.

## G. Indemnification

### 1. Debtor Indemnification Obligations

Each Indemnification Obligation shall be deemed to be and treated as an Executory Contract under the Plan. Subject to the occurrence of the Effective Date, each Indemnification Obligation shall (a) be deemed assumed by the (Reorganized) Debtors in accordance with Article X.A pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not Proofs of Claim have been Filed with respect thereto, (b) remain intact, in full force and effect, (c) not be modified, reduced, discharged, impaired, revoked, or otherwise affected in any way, (d) not be limited, reduced, or terminated after the Effective Date, and (e) survive unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on, or after the Petition Date; *provided*, that the immediately preceding subclauses (a)–(e) shall not apply to any obligation of any Debtor to indemnify, hold harmless, or any obligation of similar import that (x) may be assertable in respect of Litigation Trust Recovery Actions by any Entity that is not a Released Party, (y) may be assertable by any Released Party in respect of actual damages awarded in favor of any defendant to a Litigation Trust Recovery Action (and related to such Litigation Trust Recovery Action) against such Released Party, or (z) is on account of conduct determined in a Final Order as constituting fraud, willful misconduct, gross negligence, bad faith, self-dealing, or breach of the duty of loyalty. For the avoidance of doubt, subject to the occurrence of the Effective Date, the indemnification obligations in the proviso of the immediately preceding sentence shall be deemed rejected by the (Reorganized) Debtors pursuant to section 365 of the Bankruptcy Code.

2. Third-Party Indemnities

All of the Debtors' rights to indemnification by third parties (including, for the avoidance of doubt, any right to indemnification by the Appliances Buyers or any other third party arising out of or relating to the Debtors' historic appliances business or any assets sold in the Appliances Sale Transaction) shall vest in the Reorganized Debtors on the Effective Date.

**H. Insurance-Related Provisions**

Notwithstanding anything to the contrary in the Combined DS and Plan (including the Litigation Trust Agreement), the Plan Documents, the Confirmation Order, the CCAA Recognition Order, the Bar Date Order, any Claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

1. nothing, including the vesting of the Insurance Contracts with the Reorganized Debtors, the vesting of the Litigation Trust Recovery Actions in the Litigation Trust, or any relief permitting any Entity to pursue proceeds available under any Insurance Contracts granted pursuant to this Combined DS and Plan (including the Litigation Trust Agreement), the Plan Documents, the Confirmation Order, the CCAA Recognition Order, or any other Final Order of the Bankruptcy Court or the CCAA Court, shall impair, expand, or modify (a) the rights and obligations of the (Reorganized) Debtors (and their Estates), named insureds, any insured or beneficiary, or any of the Insurers under any of the Insurance Contracts, (b) the coverage and benefits provided under the Insurance Contracts, (c) the obligations, terms, and conditions of the Insurance Contracts, or (d) the enforceability of the Insurance Contracts; and

2. on and after the Effective Date (a) all Insurance Contracts which identify any of the Debtors as first named insureds or as a counterparty thereto shall vest unaltered in their entireties with the Reorganized Debtors, (b) any nonmonetary obligations, together with direct or derivative rights, interests, claims, entitlements, or Causes of Action, of any Debtor under any of the Insurance Contracts, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising, at any time, out of or under the Insurance Contracts, regardless of whether such rights or obligations arise or become due before or after the Effective Date, shall vest with the Reorganized Debtors, (c) the Reorganized Debtors shall have standing to pursue the Insurance Coverage Rights, and (d) the Reorganized Debtors shall be authorized to perform any administrative responsibilities on behalf of any named insured under the Insurance Contracts.

For the avoidance of doubt, each Insurer is prohibited and enjoined from denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases or the Plan, including the treatment set out herein for any insured claim or Causes of Action.

After the Confirmation Date, none of the (Reorganized) Debtors shall terminate or otherwise reduce the "side-A" coverage under any D&O Liability Insurance Policy in effect on the Confirmation Date with respect to conduct occurring prior thereto. Each such Person or other Entity shall be entitled to the full benefits of any such side-A coverage for the full term of such policy, subject to the terms and conditions thereof and hereof, regardless of whether such Person or other Entity is an "insured" on or after the Effective Date.

At all times after the Effective Date, the Reorganized Debtors shall purchase or maintain "side-A" liability tail coverage for the six-year period following the Effective Date on terms no less favorable than, and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under, the "side-A" coverage provided through the Debtors' existing D&O Liability Insurance Policies. From and after the Effective Date, reasonable directors' and officers' insurance policies shall remain in place in the ordinary course.

# ARTICLE XI.
# EFFECT OF CONFIRMATION OF THE PLAN

## A. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable Plan Distributions being made and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the (Reorganized) Debtors, and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns. On and after the Effective Date, each party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests (including the Prepetition Agent) shall execute and deliver (at the request and expense of the Reorganized Debtors), and the Reorganized Debtors shall be authorized to file, any documents deemed necessary or appropriate to evidence such release in the name of such party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges, or other security interests. With respect to the security interests securing the DIP Obligations, the release and termination of such security interests shall be subject to satisfaction in full or waiver of all DIP Obligations in accordance with the terms of the applicable DIP Documents.

To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or its agent) shall take any and all steps requested by the Reorganized Debtors (at the request and expense of the Reorganized Debtors) that are deemed reasonable, necessary, or appropriate to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

## B. Releases; Discharges

The releases and discharges of Claims, Interests, and Causes of Action described in the Plan, including releases by the Debtors and by Holders, constitute good-faith compromises and settlements of the matters covered thereby and such releases are consensual. Such compromises and settlements are made in exchange for consideration, are in the best interest of Holders, are fair, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.

Each of the release, indemnification, discharge, and exculpation provisions set forth in the Plan or in the Confirmation Order (1) is within the jurisdiction of the Bankruptcy Court under sections 1334(a), 1334(b), and 1334(e) of title 28 of the United States Code, (2) is an essential means of implementing the Plan, (3) is an integral and non-severable element of the transactions incorporated into the Plan, (4) confers a material benefit on, and is in the best interests of, the Debtors, their Estates, and their creditors, (5) is important to the overall objectives of the Plan to finally resolve all claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, (6) is fair, equitable, and reasonable and in exchange for good and valuable consideration, and (7) is consistent with sections 105, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the releases, stipulations, and exculpation provisions hereof are in addition to and do not replace, the release, stipulations, and other provisions of any Final Order of the Bankruptcy Court (including the Final DIP Order).

To the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided in the Plan (including as set forth in Article VII.L with respect to Product Liability Claims) or the Confirmation Order: (1) all consideration distributed under the Plan shall be in complete satisfaction, settlement, discharge, and release of, or in exchange for (as applicable), all Claims and Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests; (2) the Plan shall bind all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtors; and (3) all Persons and Entities shall be precluded from asserting against the (Reorganized) Debtors, their Estates, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. Except as otherwise expressly provided for in the Plan (including as set forth in Article VII.L with respect to Product Liability Claims) or the Confirmation Order, upon the Effective Date, the Debtors shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests of any kind or nature whatsoever, including demands and liabilities that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

## C. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any

order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of (1) the Effective Date or (2) the date indicated in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**D. Exculpation**

**Pursuant to section 1123(b) and 105(a) of the Bankruptcy Code, to the fullest extent permitted by applicable law and except as otherwise specifically provided in the Confirmation Order, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is released, discharged, and exculpated from any Cause of Action for any claim related to, any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the formulation, preparation, marketing, dissemination, negotiation, filing, or pursuit of approval, confirmation, or consummation of the DIP Facilities, the DIP Loan Documents, the Sale Process, the Sale Transactions, the Combined DS and Plan (including the Plan Supplement and other Plan Documents), the Exit Financing Facilities, the Exit Financing Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith or in the Chapter 11 Cases, and any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any interests (including the New Equity Interests and the Litigation Trust Interests, as applicable) issued or to be issued under or in connection with the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct (including actual fraud) or gross negligence. Each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel concerning its duties and responsibilities pursuant to, or in connection with, the Plan.**

**The Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of votes on, and distribution of consideration (including the New Equity Interests and the Litigation Trust Interests, as applicable) pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. To the extent that any of the Exculpated Parties owed fiduciary duties to the Debtors, their Estates, or the Bankruptcy Court in connection with the Chapter 11 Cases, the Exculpated Parties have, and upon Confirmation of the Plan shall be deemed to have, fully, completely, professionally, and admirably satisfied such duties.**

**E. Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, the Released Parties shall be deemed released and discharged by the Debtors, the**

**Reorganized Debtors, and their Estates from any and all claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal, state, foreign, or other applicable laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, lender liability, joint liability, or otherwise that the Debtors, the Reorganized Debtors, their Estates, the Litigation Trust, the Litigation Trustee, and their respective Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity would have been legally entitled to assert derivatively for or on behalf of the Debtors, the Reorganized Debtors, their Estates, the Litigation Trust, the Litigation Trustee, or their respective Affiliates, based on, relating to, or in any manner arising from, in whole or in part, the following:**

1. **the Debtors or their non-Debtor Affiliates (including the management, ownership, or operation thereof or the issuance of Securities thereby), the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, marketing, dissemination, negotiation, or Filing of the DIP Facilities, the DIP Loan Documents, the Sale Process, the Sale Transactions, the Combined DS and Plan (including the Plan Supplement and other Plan Documents), the Exit Financing Facilities, the Exit Financing Documents, the Prepetition ABL Credit Facility, the Prepetition ABL Documents, the Prepetition Term Loan Credit Facility, the Prepetition Term Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or in the Chapter 11 Cases, and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any Securities (including the New Equity Interests and the Litigation Trust Interests) issued or to be issued under or in connection with the Plan);**

2. **any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by, or in furtherance of, the Plan or the reliance by any Released Party on the Plan, the Confirmation Order, or the CCAA Recognition Order in lieu of such legal opinion) created or entered into in connection with the Combined DS and Plan;**

3. **the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (excluding any**

**assumed Executory Contract or Unexpired Lease), or the restructuring of Claims or Interests prior to or in the Chapter 11 Cases; and**

4. **the negotiation, formulation, marketing, preparation, or performance of or under the Combined DS and Plan (including the Plan Supplement and other Plan Documents), the Litigation Trust Agreement, the DIP Facilities, the DIP Loan Documents, the Sale Process, the Sale Transactions, the Exit Financing Facilities, the Exit Financing Documents, the Prepetition ABL Credit Facility, the Prepetition ABL Documents, the Prepetition Term Loan Credit Facility, the Prepetition Term Documents, or, in each case, related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, *provided,* that if any Released Party directly or indirectly brings or asserts any Claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such Claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such Claim or Cause of Action; *provided, further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other Final Order (*provided*, that, in the case of the preceding proviso, the Debtors shall retain all defenses related to any such action).**

**The foregoing releases in this Article XI.E shall not apply to any Retained Causes of Action (including the Litigation Trust Recovery Actions) or any claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including actual fraud) or gross negligence. Notwithstanding anything contained herein to the contrary, the foregoing releases shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan (including the Plan Supplement).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute its finding that each release described in the Plan is (1) in exchange for the good and valuable consideration provided by the Released Parties (including the Released Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), a good-faith settlement, and compromise of such claims, (2) in the best interests of the Debtors and all Holders of Claims, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) subject to the occurrence of the Effective Date, a bar to the Debtors, the Reorganized Debtors, or the Litigation Trustee**

**asserting any Covered Claim released under or pursuant to the Plan against any of the applicable Released Parties or their respective property.**

**F. Voluntary Releases by the Releasing Parties**

**Except as otherwise specifically provided in the Confirmation Order, on and after the Effective Date, for good and valuable consideration, including their cooperation and contributions to the Chapter 11 Cases, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all claims, interests, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal, state, or other applicable laws, or otherwise, including Avoidance Actions, those Causes of Action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on, relating to, or in any manner arising from, in whole or in part, the following:**

1. **the Debtors or their non-Debtor Affiliates (including the management, ownership, or operation thereof or the issuance of Securities thereby), the Reorganized Debtors, the Litigation Trust, the Litigation Trustee, the Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, or the formulation, preparation, marketing, dissemination, negotiation, or Filing of the DIP Facilities, the DIP Loan Documents, the Prepetition ABL Credit Facility, the Prepetition ABL Documents, the Prepetition Term Loan Credit Facility, the Prepetition Term Documents, the Sale Process, the Sale Transactions, the Combined DS and Plan (including the Plan Supplement and other Plan Documents), the Exit Financing Facilities, the Exit Financing Documents, any settlement, contract, instrument, release, or other agreement or document created or entered into in connection therewith, any prepetition transactions, or in the Chapter 11 Cases, and any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases, the reorganization of the Debtors, or the administration of, or property to be distributed under, the Plan (including the issuance and distribution of any Securities (including the New Equity Interests and the Litigation Trust Interests) issued or to be issued under or in connection with the Plan);**

2. **any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by, or in furtherance of, the Plan or the reliance by any Released Party on the Plan, the Confirmation Order, or the CCAA Recognition Order in lieu of such legal opinion) created or entered into in connection with the Combined DS and Plan;**

3. **the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party (excluding any assumed Executory Contract or Unexpired Lease), or the restructuring of Claims or Interests prior to or in the Chapter 11 Cases; and**

4. **the negotiation, formulation, marketing, preparation, or performance of or under the Combined DS and Plan (including the Plan Supplement and other Plan Documents), the DIP Facilities, the DIP Loan Documents, the Sale Process, the Sale Transactions, the Exit Financing Facilities, the Exit Financing Documents, the Prepetition ABL Credit Facility, the Prepetition ABL Documents, the Prepetition Term Loan Credit Facility, the Prepetition Term Documents, or, in each case, related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; *provided,* that if any Released Party directly or indirectly brings or asserts any claim or Cause of Action that has been released or is contemplated to be released pursuant to the Plan in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against any other Released Party, and such Released Party does not abandon such claim or Cause of Action upon request, then the release set forth in the Plan shall automatically and retroactively be null and void *ab initio* with respect to the Released Party bringing or asserting such claim or Cause of Action; *provided, further*, that the immediately preceding proviso shall not apply to (a) any action by a Released Party in the Bankruptcy Court (or any other court determined to have competent jurisdiction), including any appeal therefrom, to prosecute the amount, priority, or secured status of any prepetition or ordinary course Administrative Claim against the Debtors or (b) any release or indemnification provided for in any settlement or granted under any other Final Order (*provided*, that, in the case of the preceding proviso, the Debtors shall retain all defenses related to any such action).**

**The foregoing releases in this <u>Article XI.F</u> shall not apply to any (1) Retained Causes of Action (including the Litigation Trust Recovery Actions), (2) Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including actual fraud) or gross negligence, or (3) rights, remedies, exculpations, indemnities, powers, and protections under the DIP Loan Documents and Prepetition Term Documents preserved in <u>Article VII.H</u>. Notwithstanding anything contained herein to the contrary, the foregoing releases shall not release any obligation of any party under the Plan or any document, instrument, or agreement executed to implement the Plan (including the Plan Supplement).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute its finding that each release described in the Plan is (1) in exchange for the**

**good and valuable consideration provided by the Released Parties, a good-faith settlement, and compromise of such claims, (2) in the best interests of the Debtors and all Holders of Claims, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) subject to the occurrence of the Effective Date, a bar to the Releasing Party asserting any Covered Claim released under or pursuant to the Plan against any of the applicable Released Parties or their respective property.**

## G. Injunction

**Except as otherwise specifically provided in the Plan (including as set forth in Article VII.L with respect to Product Liability Claims), the Confirmation Order, or any Final Order entered by the Bankruptcy Court in the Chapter 11 Cases, all Persons or other Entities who have held, hold, or may hold claims or interests that arose prior to the Effective Date, and all other parties in interest, along with their respective Related Parties, are permanently enjoined, from and after the Effective Date, on account of, in connection with, or with respect to any such claim or interest for which an Exculpated Party has been exculpated under Article XI.D of the Plan or for which a Released Party has been released under Article XI.E or Article XI.F of the Plan (as applicable), from (1) commencing or continuing in any manner any action or other proceeding on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (2) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any Released Party or Exculpated Party, or the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (3) creating, perfecting, or enforcing any Lien or encumbrance against any Released Party or Exculpated Party, or the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, other than to enforce any right to a Plan Distribution, (4) asserting any right of setoff or subrogation against any obligation due from any Released Party or Exculpated Party, or against the property or interest in property thereof, on account of, in connection with, or with respect to any such claims or interests released, exculpated, or settled pursuant to the Plan, notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise, except to the extent that (a) a right to setoff is asserted with respect to a Proof of Claim that explicitly preserves such setoff and is timely and properly Filed by the applicable Bar Date or pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3) or (b) such Entity was excused from Filing or otherwise not required to File a Proof of Claim pursuant to a Final Order of the Bankruptcy Court (including the Bar Date Order), and (5) interfering with the implementation or Consummation of the Plan or any of the Plan Documents. Such injunction shall extend to any successors or assignees of the Released Parties and Exculpated Parties (unless such successor or assignee is an Excluded Party) and their respective properties and interest in properties. Each of the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties is expressly authorized hereby to seek the enforcement of such injunctions.**

**Except as otherwise provided in Article XI.G of the Plan with respect to the Litigation Trustee, no Entity may commence, continue, amend, or otherwise pursue, join in, or support any other Entity commencing, continuing, amending, or pursuing, a claim, Cause of Action, or Covered Claim of any kind against any Released Party or Exculpated Party, as applicable, that arose, arises from, or is reasonably likely to arise from, or relates to or is reasonably likely to relate to, any Covered Claim subject to Articles XI.D, E, or F of the Plan without first (1) requesting a determination from the Bankruptcy Court, after notice (to all affected parties) and a hearing, that such claim, Cause of Action, or Covered Claim, as applicable, represents a colorable claim against a Debtor or a Released Party, as applicable, and is not a claim, Cause of Action, or Covered Claim that was released or exculpated under or pursuant to the Plan, which request must attach the complaint or petition proposed to be filed by the requesting Entity (which complaint or petition must satisfy the applicable Rules of Federal Procedure), and (2) obtaining from the Bankruptcy Court, in the form of a Final Order, specific authorization for such Entity to bring such claim, Cause of Action, or Covered Claim, as applicable, against a Debtor or any other Released Party or Exculpated Party, as applicable. Any such request shall include a proposed attorney fee reserve, subject to modification by the Bankruptcy Court, that shall be deposited to the Bankruptcy Court's registry to indemnify all potential defendants against costs associated with the successful defense of any claim that is allowed to proceed. For the avoidance of doubt, any Entity that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claim, Cause of Action, or Covered Claim not explicitly included in the authorized complaint or petition must first obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a claim, Cause of Action, or Covered Claim is colorable and, only to the extent legally permissible, shall have jurisdiction to adjudicate the underlying colorable claim, Cause of Action, or Covered Claim.**

**For the avoidance of doubt, nothing in the immediately preceding paragraph or Articles XI.E–F of the Plan shall restrict, impede, or in any way limit any action taken by the Litigation Trust, the Litigation Trustee, any of the Litigation Trustee's Related Parties (including the Litigation Trust Professionals), or any Person or other Entity assisting, supporting, or otherwise working with the Litigation Trust and Litigation Trustee, in each case, in respect of the Litigation Trust Assets and against Persons or other Entities who are not Released Parties.**

## H. Setoff and Recoupment

**Except as otherwise expressly provided for in the Plan or the Confirmation Order, each Debtor, Reorganized Debtor, and the Litigation Trustee, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off or recoup (to the extent applicable) against any Allowed Claim and any Plan Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, or the Litigation Trustee (on behalf of such Debtor or Reorganized Debtor), as applicable, may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law,**

**to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise);** ***provided*****, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver, abandonment, or release by such Debtor, such Reorganized Debtor, or the Litigation Trustee of any such claims, rights, and Causes of Action that they may have against such Holder. Except as otherwise specifically provided in the Plan, including Article XI.G, nothing herein shall (1) alter any rights of setoff or recoupment (to the extent available under applicable law) of any Holder of an Allowed Claim or Allowed Administrative Claim against the Debtors, the Reorganized Debtors, or Litigation Trustee (as applicable) or (2) constitute a waiver of the rights, claims, or defenses of the Debtors, the Reorganized Debtors, the Litigation Trustee, or any other party in interest to dispute such rights of setoff or recoupment on any grounds. In no event shall any Holder of a Claim be entitled to set off any such Claim against any Claim, right, or Cause of Action of the Debtor, unless (1) such Holder has indicated in any timely-Filed Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise or (2) such Holder was not required to File a Proof of Claim pursuant to a Final Order of the Bankruptcy Court (including the Bar Date Order).**

## I. Preservation of Causes of Action

The Debtors, the Reorganized Debtors, their Estates, the Litigation Trust, and the Litigation Trustee expressly retain all Retained Causes of Action and may enforce all rights related thereto that they may have or choose to assert on behalf of their respective Estates, as applicable, under any provision of the Bankruptcy Code, the CCAA, or any applicable analogous statute or non-bankruptcy law, whether such Cause of Action arose before or after the Petition Date. For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Retained Causes of Action shall not include any Causes of Action of any kind that were released pursuant to a Final Order of the Bankruptcy Court (including the Final DIP Order) or any other claims against any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Term Loan Lender, Prepetition ABL Agent, Prepetition ABL Lender, or other Prepetition ABL Secured Party, solely in their respective capacities as such. Upon Consummation, (1) the Reorganized Debtors shall have, retain, reserve, and be entitled to commence, assert, and pursue all Retained Causes of Action (other than the Litigation Trust Recovery Actions referenced in the next clause (*i.e.*, subsection 2), which shall be brought solely by the Litigation Trust and Litigation Trustee) as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights regarding any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced and (2) the Litigation Trust and Litigation Trustee (and only the Litigation Trust and Litigation Trustee) shall have, retain, reserve, and be entitled to commence, assert, and pursue all Litigation Trust Recovery Actions.

Except as set forth in the Plan, the Confirmation Order, the CCAA Recognition Order, the DIP Orders, or a Final Order, nothing contained in the Plan, the Confirmation Order, or the CCAA Recognition Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Subject to applicable law, the Debtors' inclusion or failure to include or describe with sufficient specificity any Retained Cause of Action (including any Litigation Trust Recovery Action) herein (including on any Schedule of Retained Causes of Action), in the Confirmation Order, or in the CCAA Recognition Order shall not be deemed an admission, denial, or waiver of any Retained Cause of Action (including any Litigation Trust Recovery Action) that the Debtors, their Estates, or the Litigation Trust may hold. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Retained Cause of Action (including any Litigation Trust Recovery Action) herein (including on the Schedule of Retained Causes of Action), in the Confirmation Order, or in the CCAA Recognition Order. For the avoidance of doubt, in no instance shall "Retained Causes of Action" include any claim or Cause of Action with respect to, or against, a Released Party that was released pursuant to the Plan.

**No Entity may rely on the absence of a specific reference herein (including on the Schedule of Retained Causes of Action), in the Confirmation Order, or in the CCAA Recognition Order to any Cause of Action against them as any indication that the (Reorganized) Debtors or Litigation Trustee will not pursue any and all available Causes of Action against them.**

## J. Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, the provisions of the Plan shall also constitute a good-faith compromise and settlement of all Claims, Causes of Action, and controversies incorporated in the Plan.

In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's, and the entry of the CCAA Recognition Order shall constitute the CCAA Court's, approval of the compromise or settlement of all such Claims, Interests, controversies, and Causes of Action and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and the Holders of such Claims, and is fair, equitable, and reasonable. Subject to Article VIII, all Plan Distributions made to or for the benefit of Holders of Allowed Claims in any Class are intended to be and shall be final. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order, or approval of the Bankruptcy Court, the Debtors may compromise and settle claims and Causes of Action against other Entities and, upon Consummation, such right shall pass to the Reorganized Debtors, the Litigation Trust, and the Litigation Trustee, as applicable.

## K. Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Debtor or Reorganized Debtor, or any Entity with which a Debtor has been or is associated,

solely because such Debtor or Reorganized Debtor (1) is or was a debtor under chapter 11, (2) may have been insolvent before the commencement of the Chapter 11 Cases or during the Chapter 11 Cases prior to the Effective Date, or (3) has not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE XII.
## CONDITIONS TO EFFECTIVE DATE

### A. Conditions Precedent to the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Article XII.B:

1. The Bankruptcy Court shall have approved the Disclosure Statement on a final basis.

2. The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, and reasonably acceptable to the Creditors' Committee, which shall have become a Final Order.

3. The CCAA Court shall have entered the CCAA Recognition Order, in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, and reasonably acceptable to the Creditors' Committee.

4. All applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan shall have been obtained (and all applicable waiting periods shall have expired).

5. All professional fees and expenses of Professionals already approved by the Bankruptcy Court shall have been paid in full.

6. The Professional Fee Reserve Amount shall have been funded into the Professional Fee Escrow Account.

7. The unpaid, reasonable, and documented fees and expenses of (a) Dechert LLP, as counsel to the Ad Hoc Group of Crossover Lenders, (b) the ABL DIP Secured Parties, (c) the Prepetition Agent and the TL DIP Agent, (d) Ropes & Gray LLP, as counsel to the Prepetition Agent, certain Prepetition Term Loan Lenders, the TL DIP Agent, and certain TL DIP Lenders, and (e) any other professional retained by the Ad Hoc Group of Crossover Lenders, the Prepetition Agent, or the TL DIP Agent, shall have been paid in full in Cash; *provided*, that payment of any such amounts incurred by such professionals as of the Effective Date but not invoiced to the Debtors shall not be a condition precedent to the effectiveness of the Plan and shall be payable by the Reorganized Debtors within ten days after the receipt of summary invoices therefor (without any requirement (y) to provide itemized time

detail or (z) for Bankruptcy Court review or approval (including to File a fee application with the Bankruptcy Court)).

8. No governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced, or entered any law or order (whether temporary, preliminary, or permanent) in any case that is in effect and that prevents or prohibits consummation of the Plan, and no Governmental Unit shall have instituted any action or proceeding (that remains pending on what could otherwise be the Effective Date) seeking to stay, enjoin, restrain, or otherwise prohibit consummation of the transactions contemplated by the Plan.

9. The Litigation Trustee shall have been appointed and assumed its rights and responsibilities under the Litigation Trust Agreement and the Litigation Trust shall have been established in accordance with the terms of the Litigation Trust Agreement.

10. All documents and agreements necessary to implement the Plan, including the Litigation Trust Agreement, the New Governance Documents, the Exit Financing Documents, and all other items contained in the Plan Supplement, shall be in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders and shall have been effected or executed and remain in full force and effect.

### B. Waiver of Conditions to Effectiveness

The Debtors, with the consent of the Ad Hoc Group of Crossover Lenders, may waive or modify any of the conditions set forth in Article XII.A at any time, without any notice to other parties in interest or the Bankruptcy Court and without any further notice to or formal action other than proceeding to confirm and/or consummate the Plan; *provided*, that the condition in Articles XII.A.5–7 may only be waived with the express written condition of each affected professional or agent. The failure to satisfy any condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors with the consent of the Ad Hoc Group of Crossover Lenders). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## ARTICLE XIII.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A. Plan Modifications

Subject to certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors may alter, amend, or modify the Plan, including the Plan Supplement, in its entirety, in part, or as to a particular Debtor, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date; *provided*, that any such alteration, amendment, or modification shall be acceptable to the Ad Hoc Group of Crossover Lenders; *provided, further*, that any such alteration, amendment, or

modification that materially affects the rights of or the obligations owing to (1) the ABL DIP Secured Parties or the Prepetition ABL Secured Parties shall be acceptable to the ABL DIP Agent, (2) the TL DIP Agent or Prepetition Agent shall be acceptable to the TL DIP Agent or Prepetition Agent, or (3) the Holders of Allowed General Unsecured Claims shall be acceptable to the Creditors' Committee, as applicable. In addition, should the Plan fail to be accepted by the requisite number and amount of Claims voting, as required to satisfy section 1129 of the Bankruptcy Code, and notwithstanding any other provision of the Plan to the contrary, the Debtors reserve the right to reclassify Claims and Interests.

After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date but before the Effective Date, the Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of Holders or their Claims or Interests.

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon, pursuant to section 1127(a) of the Bankruptcy Code, and a finding that such modifications to the Plan do not require additional disclosure or solicitation under Bankruptcy Rule 3019.

## B. Revocation or Withdrawal of Plan and Effects of Nonoccurrence of Confirmation or Effective Date

The Debtors reserve the right to revoke, withdraw, or delay consideration of the Plan as to any or all of the Debtors prior to the Confirmation Date, either entirely or as to any one or more of the Debtors, and to File subsequent plans. If the Plan is revoked, withdrawn, or delayed as to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed. Without limiting the foregoing, if the Debtors withdraw the Plan as to any particular Debtor, then, at the option of such Debtor (with the consent of the Ad Hoc Group of Crossover Lenders), (1) the Chapter 11 Case for such Debtor may be dismissed or (2) such Debtor's assets may be sold to another Debtor, with such sale being effective at or before the Effective Date of the Plan of the Debtor transferee and the sale price shall be paid to the Debtor seller in Cash and shall be in an amount equal to the fair value of such assets as proposed by the Debtors (with the consent of the Ad Hoc Group of Crossover Lenders) and approved by the Bankruptcy Court.

If the Debtors revoke or withdraw the Plan, or if the Confirmation Order or CCAA Recognition Order is vacated pursuant to a Final Order, in each case, in its entirety, in part, or as to a particular Debtor, or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court and as to all or such Debtors, as applicable, (1) the Plan shall be null and void in all respects, (2) any settlement or compromise not previously

approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (3) nothing contained in the Plan, the Confirmation Order, or the CCAA Recognition Order, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of such Debtors or any other Person or Entity (including the application of res judicata or collateral estoppel), or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases.

## ARTICLE XIV.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on or after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code to:

1. hear, adjudicate, decide, determine, or resolve all matters relating to the assumption or rejection of Executory Contracts or Unexpired Leases, including any Assumption Disputes and whether a contract or lease is or was executory or expired, and the allowance of Claims resulting therefrom;

2. hear, adjudicate, decide, determine, or resolve any motion, adversary proceeding, application, contested matter, or other matter pending on the Effective Date;

3. hear, adjudicate, decide, determine, or resolve all matters relating to the allowance, disallowance, liquidation, classification, priority, amount, validity, or estimation of any Claim;

4. ensure that Plan Distributions to Holders of Allowed Claims are accomplished as provided herein;

5. hear, adjudicate, decide, determine, or resolve all applications for compensation and reimbursement of Professional Fee Claims;

6. hear, adjudicate, decide, determine, or resolve any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

7. hear, adjudicate, decide, determine, or resolve disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, any settlements, transactions, or payments contemplated hereby or in furtherance hereof, or any agreement, instrument, or other document governing or relating to any of the foregoing;

8. take any action, issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, any Plan Document, or any other order of the Bankruptcy Court;

9. take any action or issue such orders as may be necessary or appropriate to construe, enforce, execute, implement, and consummate, or to maintain the integrity of, the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, the Plan Documents, and contracts, instruments, releases, and other agreements or documents created or entered into in connection with the Plan;

10. enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

11. hear, adjudicate, decide, determine, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

12. hear, adjudicate, decide, determine, or resolve any other matter not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

13. hear, adjudicate, decide, determine, or resolve any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, any of the Plan Documents, or any other contract, instrument, release, or other agreement or document related to the Plan, the Disclosure Statement, or the Plan Supplement; *provided*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in a Plan Document that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning such Plan Documents shall be governed in accordance with the provisions thereof;

14. recover all assets of the Debtors and property of the Debtors' Estates for the benefit of the Reorganized Debtors, wherever located;

15. hear, adjudicate, decide, determine, or resolve any rights, claims, or Causes of Action held by or accruing to the (Reorganized) Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

16. hear, adjudicate, decide, determine, or resolve all matters relating to the establishment and administration of the Litigation Trust and the implementation, interpretation, and enforcement of the Litigation Trust Agreement;

17. enforce and interpret all orders, judgments, injunctions, releases, discharges, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or other Entity;

18. hear, adjudicate, decide, determine, or resolve matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19. enter final decrees in each of the Chapter 11 Cases;

20. enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code, including the Sale Order;

21. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

22. hear, adjudicate, decide, determine, or resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including (a) with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VIII, (b) with respect to the releases, injunctions, discharges, and other provisions contained in Article XI, including entry of such orders as may be necessary or appropriate to implement such provisions, (c) those that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan, or (d) related to section 1141 of the Bankruptcy Code;

23. hear, adjudicate, decide, determine, or resolve whether a party's potential claim or Cause of Action represents a colorable claim against a Debtor or any other Released Party or Exculpated Party, as applicable, and is not a claim that was released or exculpated hereunder;

24. hear, adjudicate, decide, determine, or resolve any and all disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Combined Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Cost;

25. hear, adjudicate, decide, determine, or resolve such other matters, and for such other purposes as may be provided in the Confirmation Order; and

26. hear, adjudicate, decide, determine, or resolve any and all disputes arising from or relating to the Chapter 11 Cases, any orders entered therein (including the interpretation thereof), and any of the foregoing.

In addition, the Bankruptcy Court shall have exclusive jurisdiction to hear, adjudicate, decide, determine, or resolve any motion or proceeding brought or commenced by the Litigation Trust; *provided*, that the Bankruptcy Court shall have nonexclusive jurisdiction with respect to any complaints filed by the Litigation Trust.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have jurisdiction to hear and determine disputes concerning Claims that arose prior to the Effective Date.

## ARTICLE XV.<br>MISCELLANEOUS PROVISIONS

### A. Exemption from Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (1) the issuance, distribution, transfer, or exchange of any securities, instruments, or documents (including the New Equity Interests and the Litigation Trust Interests), (2) the creation of any lien, mortgage, deed of trust, or other security interest, (3) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan, and (4) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed, bill of sale, assignment, or other instrument of transfer under, in furtherance of, contemplated by, arising out of, or in any way related to, the Plan, and Plan Documents, or the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax (including real estate transfer tax), mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Upon entry of the Confirmation Order, the appropriate federal, state, or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Entity with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### B. Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purposes of (1) prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and (2) appearing in connection with any appeals taken of the

Confirmation Order. Notwithstanding anything herein (including Article V.B.3(b)), the Reorganized Debtors, the Litigation Trust, and the Litigation Trustee shall not be responsible for paying any fees or expenses incurred by the members of, or advisors to, the Creditors' Committee after the Effective Date.

## C. Plan Supplement and Other Plan Documents

Draft forms of certain Plan Documents and certain other documents, agreements, instruments, schedules, and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and Filed from time to time, which shall be in form and substance acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders. Unless otherwise expressly provided in the Plan, the Debtors may alter, modify, or amend any Plan Supplement document in accordance with Article XIII.

On or before the Confirmation Date, the Debtors (in consultation with the Ad Hoc Group of Crossover Lenders) may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Once Filed, copies of such Filings shall be available for free download on the Debtors' Case Information Website (https://dm.epiq11.com/InstantBrands).

The (Reorganized) Debtors, the Litigation Trustee, all Holders of Claims receiving Plan Distributions, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan (including the Litigation Trust Agreement).

## D. No Admission

Other than as expressly provided under the Plan, the Confirmation Order, or the CCAA Recognition Order, nothing in the Plan or Disclosure Statement or any document or pleading Filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim.

## E. Substantial Consummation

On the Effective Date, the Plan shall be deemed to be "substantially consummated," as defined in section 1101 of the Bankruptcy Code.

## F. Section 1125 of the Bankruptcy Code

As of, and subject to the occurrence of, the Confirmation Date, the Debtors and their Related Parties shall be deemed to have solicited votes on the Plan and participated in the issuance or distribution of any Securities and interests (including the Litigation Trust Interests and the New Equity Interests) under the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code (including sections 1125(a) and 1125(e) of the Bankruptcy Code) and any applicable non-bankruptcy law, rule, or regulation, including those governing the adequacy of disclosure in connection with such solicitation; therefore, none of the Debtors nor their Related Parties shall have any liability for the violation of any applicable law, rule, or regulation governing

the solicitation of votes on the Plan or the issuance or distribution of any Securities and interests (including the Litigation Trust Interests and the New Equity Interests) under the Plan.

No Entity may commence, continue, amend, or otherwise pursue, join in, or support any other party commencing, continuing, amending, or pursuing, a claim or Cause of Action subject to the terms of the immediately preceding paragraph against any Debtor or any of their Related Parties, without first (1) requesting a determination from the Bankruptcy Court, after notice (to all affected parties) and a hearing, that such claim or Cause of Action, as applicable, represents a colorable claim against a Debtor or one of their Related Parties, as applicable, and is not a claim or Cause of Action that was released or exculpated pursuant to the immediately preceding paragraph, which request must attach the complaint or petition proposed to be filed by the requesting party (which complaint or petition must satisfy the applicable Rules of Federal Procedure), and (2) obtaining from the Bankruptcy Court, in the form of a Final Order, specific authorization for such party to bring such claim or Cause of Action, as applicable, against a Debtor or any of their Related Parties, as applicable. Any such request shall include a proposed attorney fee reserve, subject to modification by the Bankruptcy Court, that shall be deposited to the Bankruptcy Court's registry to indemnify all potential defendants against costs associated with the successful defense of any claim that is allowed to proceed. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any claim or Cause of Action not explicitly included in the authorized complaint or petition must first obtain authorization from the Bankruptcy Court *before* filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a claim or Cause of Action is colorable and, only to the extent legally permissible, shall have jurisdiction to adjudicate the underlying colorable claim or Cause of Action.

## G. Non-Severability

If, before Confirmation, any term or provision of the Plan or any Plan Document is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Ad Hoc Group of Crossover Lenders), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, that any such alteration or interpretation shall be acceptable to the Debtors and the Ad Hoc Group of Crossover Lenders, but only if such alteration or interpretation adversely affects, directly or indirectly, the Ad Hoc Group of Crossover Lenders. Entry of the Confirmation Order and the CCAA Recognition Order shall constitute judicial determinations that each term and provision of the Plan and each Plan Document, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, as well as the Ad Hoc Group of Crossover Lenders, but only if such alteration or interpretation adversely affects, directly or indirectly, the Ad Hoc Group of Crossover Lenders, and (3) non-severable and mutually dependent.

## H. Binding Effect

Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e), 6003, and 6004(h)) or Local Rule to the contrary, upon the occurrence of the Effective Date (or, to the extent expressly provided herein, the Confirmation Date), the Plan shall be binding upon and inure to the benefit of the (Reorganized) Debtors, all present and former Holders of Claims or Interests (whether or not such Holders shall receive or retain any property or interest in property under the Plan and irrespective of whether such Claims or Interests are deemed to have accepted the Plan), the Litigation Trustee, all Persons or other Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions described in the Plan, each Person or other Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, all other parties in interest in the Chapter 11 Cases, and their respective Related Parties.

## I. Service of Documents

After the Effective Date, to be effective, any notice, request, or demand to or upon, as applicable, the Reorganized Debtors, the Ad Hoc Group of Crossover Lenders, the TL DIP Agent, or the Prepetition Agent must be in writing (email being sufficient) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

| **The (Reorganized) Debtors** | |
|---|---|
| Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attention: Brian M. Resnick; Steven Z. Szanzer; Joanna McDonald<br>Email: brian.resnick@davispolk.com; steven.szanzer@davispolk.com; joanna.mcdonald@davispolk.com | Haynes And Boone LLP<br>1221 McKinney Street, Suite 4000<br>Houston, Texas 77010<br>Attention: Charles A. Beckham, Jr.; Arsalan Muhammad; David A. Trausch<br>Email: charles.beckham@haynesboone.com; arsalan.muhammad@haynesboone.com; david.trausch@haynesboone.com |
| **The Ad Hoc Group of Crossover Lenders** | **Counsel to the Prepetition Agent and TL DIP Agent** |
| Dechert LLP<br>1095 6th Ave<br>New York, New York 10036<br>Attention: Allan Brilliant; Shmuel Vasser; and Eric Hilmo<br>Email: allan.brilliant@dechert.com; shmuel.vasser@dechert.com; and eric.hilmo@dechert.com | Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br>Attention: Mark Somerstein; Patricia I. Chen<br>Email: mark.somerstein@ropesgray.com; patricia.chen@ropesgray.com |

| The Litigation Trustee | |
|---|---|
| Halperin Battaglia Benzija, LLP<br>40 Wall Street, 37th floor<br>New York, New York 10005<br>Attention: Alan D. Halperin<br>Email: ahalperin@halperinlaw.net<br><br>With a copy to: | McKool Smith P.C.<br>395 9th Avenue, 50th Floor<br>New York, New York 10001<br>Attention: Kyle A. Lonergan; Joshua J. Newcomer; and James H. Smith<br>Email: klonergan@mckoolsmith.com; jnewcomer@mckoolsmith.com; and jsmith@mckoolsmith.com |

After the Effective Date the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

In accordance with Bankruptcy Rules 2002 and 3020(c), within 14 calendar days of the date of entry of the Confirmation Order, the (Reorganized) Debtors shall serve a notice of Confirmation to all parties served with the Combined Hearing Notice in the same manner so served; *provided*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Combined Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.

## J. Waiver or Estoppel

**Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel or any other Entity, if such agreement was not disclosed herein or in papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

## K. Conflicts

Except as set forth herein, to the extent that any provision of any Plan Document or any Final Order of the Bankruptcy Court (other than the Confirmation Order) or the CCAA Court (other than the CCAA Recognition Order) conflicts with or is in any way inconsistent with any provision of the Plan, unless otherwise ordered by the Bankruptcy Court or the CCAA Court, the Plan (excluding the Plan Supplement) shall govern and control.

## L. Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

# ARTICLE XVI.
# CONFIRMATION REQUIREMENTS

The following is a brief summary of the Plan Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code consult their own legal, financial, and other advisors.

## A. The Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. The Solicitation Order set the date and time for the Combined Hearing as **8:00 a.m. (prevailing Central Time) on February 15, 2024**.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. **Objections to Confirmation of the Plan must be made in writing and must be Filed with the Bankruptcy Court and served in accordance with the** Solicitation Order (as described in the Preliminary Statement hereto).

## B. Classification

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature. Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created hereunder. Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

## C. Consensual Confirmation

In general, the Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. As further set forth in section 1124 of the Bankruptcy Code, a class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest. In addition, Classes that receive no Plan Distributions are not entitled to vote on the Plan and are deemed to have rejected the Plan.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For the

avoidance of doubt, votes will be solicited and tabulated in accordance with the procedures approved in the Solicitation Order.

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. One of these technical requirements is that the Bankruptcy Court finds, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

In addition to the voting requirements, section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is "feasible" and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Combined Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code (see "Best Interests Test" and "Feasibility" below), other than those pertaining to voting, which has not yet concluded.

## D. Feasibility and Best Interests of Creditors

### 1. Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "**Best Interests Test**").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of

each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

2. Liquidation Analysis

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of the Debtors' financial advisor (the "**Liquidation Analysis**"), which is attached hereto as **Exhibit D**. As described in **Exhibit D**, the Debtors developed the Liquidation Analysis based on forecasted values as of October 31, 2023, unless otherwise noted in the Liquidation Analysis. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and financial advisor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test," pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The (Reorganized) Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing or arising after the date the Liquidation Analysis is initially Filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, Holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3. Application of the Best Interests Test

The Debtors believe that the continued operation of the Company as a going concern satisfies the Best Interests Test for the Impaired Classes. Notwithstanding the difficulties in quantifying recoveries to Holders of Claims with precision, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interests Test. As the Plan and Liquidation Analysis indicate, Confirmation of the Plan will provide each Holder of an Allowed Claim in an Impaired Class with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

4. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors, with the assistance of their financial advisor, have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses. As part of this analysis, the Debtors have prepared the Financial Projections, attached hereto as **Exhibit B**.

The Financial Projections present information with respect to all of the Reorganized Debtors. The Financial Projections do not reflect the full impact of "fresh start reporting" in accordance with American Institute of Certified Public Accountants Statement of Position 90-7 "Financial Reporting by Entities in Reorganization under the Bankruptcy Code." Fresh start reporting may have a material impact on the analysis.

The Debtors have prepared the Financial Projections solely for the purpose of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims in Voting Classes to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support that the Plan is feasible, pursuant to section 1129(a)(11) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

In addition to the cautionary notes contained elsewhere herein, it is underscored that the Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the period analyzed in the Financial Projections may vary from the Financial Projections, and the variations may be material. Also, as noted above, the Financial Projections currently do not reflect the full impact of any "fresh start reporting," which may materially impact the Reorganized Debtors' "Consolidated Balance Sheets" and prospective "Results of Operations." All Holders of Claims in the Voting Classes are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections, the Debtors believe that they will be able to make all Plan Distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by liquidation of the Debtors or the need for further restructuring.

5. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Consummation going concern value of the Reorganized Debtors. Accordingly, an analysis regarding the imputed estimated post-Consummation going-concern value of the Reorganized Debtors is attached hereto as **Exhibit C** (the "**Valuation Analysis**") and incorporated herein by reference.

## E. Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, which requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims or Interests in Classes 5, 6, and 8 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those Classes will receive any property under the Plan.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or Interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1. Secured Creditors. Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of

its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

2. Unsecured Creditors. Either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3. Holders of Interests. Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard. Accordingly, the Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class of Claims or Interests, and the Plan constitutes a motion for such nonconsensual Confirmation.

# ARTICLE XVII.
# PLAN-RELATED RISK FACTORS

**THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH HEREIN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

## A. Certain Bankruptcy Considerations

### 1. The Plan May Not Be Accepted

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the Holders, or may liquidate the Estates under chapter 7 or chapter 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to Holders as those proposed in the Plan.

2. <u>The Plan May Not Be Confirmed or Recognized</u>

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan or that the CCAA Court will recognize the Confirmation Order. Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures, and the results were appropriate, the Bankruptcy Court could still decline to confirm the Plan—or, even if the Confirmation Order were entered, the CCAA Court could still decline to recognize the Confirmation Order—if it found that any of the statutory requirements for Confirmation or recognition, as applicable, had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or recognition or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed or recognized, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

3. <u>Parties in Interest May Object to the Amount or Classification of Claims</u>

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation or (b) to use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, if it were to find that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim agrees to a less favorable treatment of its Claim. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the Confirmation and Consummation of the Plan and could increase the risk that the Plan will not be consummated.

4. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided herein, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth herein cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described herein.

5. Nonconsensual Confirmation

In the event that any Impaired Class of Claims or Interests does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

6. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors or any Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling the businesses as going concerns at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during a liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts in connection with cessation of operations.

For the avoidance of doubt, the foregoing may not apply to the CCAA Debtors, since a hypothetical liquidation of the CCAA Debtors may not proceed under the CCAA but rather under the Bankruptcy and Insolvency Act (Canada), such that a proceeding under chapter 7 of the Bankruptcy Code may not be commenced in respect of the CCAA Debtors.

7. Plan Releases May Not Be Approved

There can be no assurance that the third-party release, exculpation, discharge, and injunction provisions, as provided in Article XI, will be granted. Failure of the Bankruptcy Court

to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

8. Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual Allowed amounts of Claims may differ from these estimates. These estimated amounts are based on certain assumptions with respect to a variety of factors. Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein. Because certain Plan Distributions are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain Holders of Allowed Claims under the Plan.

9. Certain Tax and Securities Implications of the Plan

There are a number of material securities and income tax considerations, risks, and uncertainties associated with the Plan, some of which are discussed in Article XVIII and Article XIX (which Holders of Claims and Interests and other interested parties should read carefully). Each Holder should consult its own advisors regarding these matters, based upon the particular circumstances pertaining to such Holder.

10. The Chapter 11 Cases

Although the Plan is designed to minimize the length of the Chapter 11 Cases, and the Debtors believe that, after Confirmation of the Plan, the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. It is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy (irrespective of whether Confirmation occurs). Even if the Plan is confirmed on a timely basis, matters may arise after the date hereof, including in the Chapter 11 Cases, that could have an adverse effect on the Debtors' businesses. The uncertainty surrounding a prolonged restructuring could have other adverse effects on the Debtors (*e.g.*, it could adversely affect (a) the Debtors' ability to raise additional capital, (b) the Debtors' liquidity, (c) how the Debtors' businesses are viewed by investors, lenders, and credit ratings agencies, (d) the Debtors' enterprise value, and (e) the Debtors' business relationships). The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

11. Failure To Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

12. Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero

The Debtors have not obtained or requested an opinion from any bank or other firm as to the value of the Plan Distributions (including the Litigation Trust Interests). As such, any valuation of any of the Plan Distributions (including the Litigation Trust Interests) is necessarily speculative, and the value of certain of such assets could potentially be zero. Accordingly, the ultimate value, if any, of the Plan Distributions (including the Litigation Trust Interests) could materially affect, among other things, recoveries to the Debtors' creditors, including Holders of Allowed Claims in Classes 3 and 4.

13. Withdrawal of Support

The Ad Hoc Group of Crossover Lenders may withdraw their support for the Plan, which could also adversely affect (a) the Debtors' ability to maintain adequate levels of liquidity during the Chapter 11 Cases or (b) the viability or feasibility of the Plan.

14. The Financing Commitments for the Exit Financing Facilities May Be Terminated

The Debtors' ability to confirm or consummate the Plan may be adversely affected if the commitments to finance the Exit Facilities are withdrawn or are otherwise terminated prior to Confirmation or Consummation.

15. The Reorganized Debtors May Not Be Able To Achieve Their Projected Financial Results

Actual financial results may differ materially from the Financial Projections. If the Reorganized Debtors do not achieve projected revenue or cash flow levels, the Reorganized Debtors may lack sufficient liquidity to continue operating their businesses consistent with the Financial Projections after the Effective Date. The Financial Projections represent management's view based on currently known facts and hypothetical assumptions about their future operations; they do not guarantee the Reorganized Debtors' future financial performance.

16. The Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based

The Financial Projections are based on numerous assumptions, including the timing for Confirmation and Consummation of the Plan, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize. Particular uncertainties with respect to the Reorganized Debtors' operations and financial results arise from the risks and uncertainties relating to, among other things, the following: (a) changes in the demand for the Reorganized Debtors' products; (b) legislation and regulations relating to the Reorganized Debtors' industries, the industries of their customers, and other environmental initiatives; (c) inflation; (d) operational, labor, and other macroeconomic and socioeconomic factors; (e) fluctuations in the amount of cash the Reorganized Debtors generate from operations; (f) future integration of acquired businesses; (g) changes in energy or other commodity prices; and (h) numerous other matters of national, regional, and global

scale, including those of a political, economic, business, competitive, or regulatory nature. Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections may not be relied upon as an assurance of the actual results that will occur.

Except with respect to the Financial Projections and except as otherwise specifically and expressly stated herein, this Combined DS and Plan does not reflect any events that might occur subsequent to the date hereof (including the finalization of the terms and documentation of the Exit Financing Documents) or the date of any Financial Projections or any other analysis herein (whichever is earlier), as such events could have a material impact on the information contained herein. Neither the Debtors nor the Reorganized Debtors intend to update the Financial Projections. The Financial Projections, therefore, may not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

17. Historical Financial Information May Not Be Indicative of Future Financial Performance

The Debtors' capital structure will be significantly altered under any plan ultimately confirmed by the Bankruptcy Court. Under fresh start reporting rules that may apply to the Reorganized Debtors upon the Effective Date (the impact of which is not reflected in the Financial Projections), the Reorganized Debtors' assets and liabilities would be adjusted to fair values and its accumulated deficit will be restated to zero. Accordingly, if fresh start reporting rules apply, the Reorganized Debtors' financial condition and results of operations following their emergence from chapter 11 would not be comparable to the financial condition and results of operations reflected in their historical financial statements. In connection with the Chapter 11 Cases and the development of the Plan, it is also possible that additional restructuring and related charges may be identified and recorded in future periods. Such charges could be material to the Debtors' consolidated financial position and results of operations in any given period.

18. The Terms of the Exit Financing Documents and the New Governance Documents Are Subject To Change Based on Negotiations and Approval of the Bankruptcy Court

The terms of the Exit Financing Documents and the New Governance Documents are subject to material change based on negotiations between the Debtors and the Ad Hoc Group of Crossover Lenders, and Holders that are not Ad Hoc Group of Crossover Lenders may not participate in such negotiations. As a result, the final terms of the Exit Financing Documents and the New Governance Documents may be less favorable to certain Holders (though, in any event, such final terms would be consistent with the Plan and the requirements of the Bankruptcy Code). Moreover, the Bankruptcy Court may require changes to the terms of the Exit Financing Documents or the New Governance Documents before approving them.

19. There Is No Established Market for the New Equity Interests

The New Equity Interests will constitute new issuances of Securities, and there is no established trading market for those Securities. Recipients of New Equity Interests under the Plan may not be able to sell their New Equity Interests at a particular time or at favorable prices. As a result, the Debtors cannot assure the liquidity of any trading market for the New Equity Interests.

Accordingly, recipients of New Equity Interests under the Plan may be required to bear the financial risk of their ownership of the New Equity Interests indefinitely. If a trading market were to develop, future trading prices of the New Equity Interests may be volatile and would depend on many factors, including the Reorganized Debtors' operating performance and financial condition, the interest of Securities dealers in making a market for them, and the market for similar Securities.

The (Reorganized) Debtors do not intend to apply for the New Equity Interests to be listed on any Securities exchange or to arrange for quotation on any automated dealer quotation system. As a result, holders of the New Equity Interests may receive less information with respect to the Reorganized Debtors' business than they would have received if the Reorganized Debtors were subject to the reporting requirements of section 13 or section 15(d) of the Securities Exchange Act.

20. Certain Significant Holders of New Equity Interests May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Holders of Claims who receive a substantial percentage of the outstanding shares of the New Equity Interests may be able to influence matters not requiring approval by smaller holders of the New Equity Interests, including the election of directors and the approval of a change of control of the Reorganized Debtors. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and may consequently affect the value of the New Equity Interests. Further, the possibility that one or more holders of a significant portion of New Equity Interests may sell all or a large portion of their New Equity Interests in a short period of time may adversely affect the market price of the New Equity Interests.

21. Holders of the New Equity Interests May Experience Dilution of Their Ownership Interests

Holders of the New Equity Interests shall be subject to dilution of their ownership interests in connection with any equity that may be issued post-emergence, including by the MIP Interests and the conversion of any options, warrants, convertible securities, exercisable securities, or other Securities issued post-emergence.

22. The Interests of Holders of the New Equity Interests Will Be Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors. As a result, Holders of the New Equity Interests would not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

23. The Reorganized Debtors May Not Pay Dividends on Account of the New Equity Interests

The Reorganized Debtors may not pay any dividends on account of the New Equity Interests. In such circumstances, the success of an investment in the Reorganized Debtors would depend entirely upon any future appreciation in the value of the New Equity Interests. There is,

however, no guarantee that the New Equity Interests would appreciate in value or even maintain its initial implied valuation.

24. The New Equity Interests May Be Subject to Restrictions on Transfers

Any New Equity Interests issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, would constitute "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Equity Interests would not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtors, as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders would be permitted to sell New Equity Interests without registration only if they comply with an exemption from registration, such as Rule 144 of the Securities Act.

The New Equity Interests will not be registered under the Securities Act or any other securities laws, and the Debtors make no representation regarding the right of any holder to freely resell securities.

The terms of the New Governance Documents may contain prohibitions on the transfer of the New Equity Interests, to the extent such transfer would subject the Reorganized Debtors to the registration and reporting requirements of the Securities Act and the Securities Exchange Act. Furthermore, the terms of the New Governance Documents may contain additional transfer restrictions. These terms would be binding on all recipients of New Equity Interests under the Plan, including any recipients who do not vote to accept the Plan or affirmatively consent to the New Governance Documents.

25. The Exit Financing Facilities Will Be Secured Only to the Extent of the Value of the Assets Granted as Security Therefor; the Fair Market Value of the Reorganized Debtors Upon Any Foreclosure May Not Be Sufficient To Repay the Exit Financing Lenders in Full

The loans issued under the Exit Financing Facilities will be secured by a first-priority lien on all or substantially all of the Reorganized Debtors' assets, the fair market value of which may be or become less than the total amount of debt secured by such collateral; therefore, upon any foreclosure, the Exit Financing Lenders may not be paid back in full. The amount to be received by the Exit Financing Lenders upon a sale of the aforementioned collateral is inherently uncertain at this time.

If a subsequent bankruptcy or similar proceeding is commenced by or against the Reorganized Debtors, and if the loans issued under the Exit Financing Facilities exceed the value of the collateral securing them, the Exit Financing Lenders may be deemed to have unsecured claims to the same extent that such loans exceed the value of the collateral, in which case, such unsecured claims would not be entitled to the benefits of any security in such collateral. Additionally, some or all accrued but unpaid interest may be disallowed in any bankruptcy proceeding.

The security interests granted in favor of the administrative agent(s) under the Exit Financing Documents are subject to practical problems generally associated with the realization

of security interests in collateral and, accordingly, such agent(s) may be unable to foreclose upon the collateral.

26. The Exit Financing Facilities May Include Covenants that Impose Restrictions on the Reorganized Debtors' Finances and Business Operations

The Exit Financing Facilities (entry of which is contemplated hereby) may include restrictive covenants that could limit the Reorganized Debtors' ability to react to market conditions or satisfy any extraordinary capital needs, or otherwise restrict the Reorganized Debtors' financing and operations, and there can be no assurance that the Reorganized Debtors would be able to comply with such covenants. If the Reorganized Debtors were to fail to comply with such covenants and terms, the Reorganized Debtors may be required to obtain waivers from the applicable lenders under the Exit Facilities, and, if such waivers were not obtained, there could be a material adverse effect on the Reorganized Debtors' financial condition and future performance.

27. The Reorganized Debtors May Not Be Able To Service Their Funded Debt, Including the Exit Financing Facilities

The Reorganized Debtors' ability to make scheduled payments on their debt obligations depends on their financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to maintain a level of cash flow sufficient to permit them to pay the principal, premium, if any, and interest on their debt, including the loans issued pursuant to the Exit Financing Facilities.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, dispose of assets or operations, seek additional capital, or restructure or refinance debt, including the Exit Financing Facilities. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

28. Any Recoveries on Account of the Litigation Trust Recovery Actions are Speculative and Uncertain

The ultimate recoveries, if any, that could be obtained by the Liquidating Trustee on behalf of the Litigation Trust Beneficiaries (*i.e.*, Holders of Allowed Claims in Classes 3 and 4) are contingent on the ultimate resolution of the Litigation Trust Recovery Actions; recoveries on account thereof are speculative and uncertain due to the risks associated with the potential success on the merits and the potential difficulties of collection and enforcement of any judgments. In fact, there is no guarantee that the Litigation Trust Assets will yield any net recovery for the Litigation Trust Beneficiaries. Accordingly, the ultimate value of the Plan Distributions to Holders of Allowed Claims in Classes 3 and 4, on account of the Litigation Trust Interests, may be zero.

29. The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan

Pursuant to Article XI.I, the Reorganized Debtors or the Litigation Trustee, as applicable, will be permitted to pursue the Retained Causes of Action. Accordingly, Holders that vote to accept or reject the Plan can be sued with respect to the Retained Causes of Action.

**B. Factors Affecting the Debtors' Businesses, Operations, and Financial Condition if the Debtors Reorganize Under the Plan**

1. The Company's Industry Is Highly Competitive, and Increased Competitive Pressure Could Adversely Affect its Business and Operating Results

Instant Brands competes with other similarly-sized companies in its areas of operation, and some of these competitors are large companies that have greater financial, managerial, and other resources than the Company. The Reorganized Debtors' ability to renew or replace existing contracts with its customers at rates sufficient to maintain current revenue and cash flow could be adversely affected by the activities of its competitors and customers. All of these competitive pressures could have a material adverse effect on the Reorganized Debtors' businesses, operations, and financial condition.

2. The Company's Contracts Subject it to Contract Renewal Risks

The Company acquires raw materials and ships products under contracts with terms of various durations. As these contracts expire, the Reorganized Debtors may have to negotiate extensions or renewals with existing suppliers or customers or enter into new contracts with other suppliers or customers, which may be unobtainable or not on favorable commercial terms. The Reorganized Debtors also may be unable to maintain the economic structure of a particular contract with an existing supplier or customer or the overall mix of the Company's contract portfolio. To the extent the Reorganized Debtors are unable to renew their existing contracts on terms that are favorable to the Reorganized Debtors or successfully manage their overall contract mix over time, the Reorganized Debtors' revenue, gross operating margin, and cash flows could decline.

3. Certain Claims May Not Be Discharged and May Have a Material Adverse Effect on the Reorganized Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arose prior to the Petition Date or before Confirmation of the Plan (a) will be subject to compromise or treatment hereunder or (b) will be discharged or transferred in accordance herewith. However, all other remaining Claims could be asserted against the applicable Reorganized Debtor and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

4. The Reorganized Debtors' Access to Capital May Be Further Limited due to Deterioration of Conditions in the Global Capital Markets, Weakening of Macroeconomic Conditions, and Negative Changes in Financial Performance

In general, the Company has relied on banks and capital markets to fund its operations, contractual commitments, and refinance existing debt. These markets are experiencing, and may in the future experience, high levels of volatility, such that access to capital can be constrained for an extended period. Other factors, including the Company's financial performance, could cause the Reorganized Debtors to incur increased borrowing costs and to have greater difficulty accessing public and private markets in the future for both secured and unsecured debt. If the Reorganized Debtors are unable to secure financing on acceptable terms, their other sources of capital may not be adequate to fund operations, contractual commitments, and refinance existing debt.

5. Increases in Interest Rates Could Adversely Impact the Reorganized Debtors' Ability To Issue Equity or Incur Debt for Acquisitions or Other Purposes

Interest rates on future credit facilities and debt offerings could be higher than current levels, causing the Reorganized Debtors' financing costs to increase accordingly; such changes could have an adverse impact on the Reorganized Debtors' ability to issue equity or incur debt for acquisitions or other purposes.

6. Cyberattacks, Acts of Terrorism, or Other Disruptions Could Adversely Impact the Reorganized Debtors' Operational Results

Like all companies, the Company is subject to cyber-security risks related to breaches in the systems and technology that it uses to manage its operations and other business processes and protect sensitive information maintained in the normal course of its businesses. The Company has become increasingly dependent on digital technologies to conduct certain processing activities. At the same time, cyber incidents, including deliberate attacks, have increased. The Company's technologies, systems, and networks, and those of its customers, vendors, suppliers, and other business partners, may become the target of cyberattacks or information security breaches (that may be extensive, due to occasional difficulty in detecting such attacks) that could result in the unauthorized release, gathering, monitoring, misuse, loss, or destruction of proprietary and other information, or other disruption of business operations, and the Company's systems and insurance coverage for protecting against cyber-security risks may not be sufficient. As cyber incidents continue to evolve, the Company will likely be required to expend additional resources to continue to modify or enhance its protective measures or to investigate and remediate any vulnerability to cyber incidents.

7. The Reorganized Debtors' Ability To Operate Their Businesses Effectively Could Be Impaired If They Fail To Attract and Retain Key Management and Personnel

The Company's ability to operate its businesses will depend on its ability to attract and retain highly skilled management personnel with industry experience. Competition for these persons in the Company's industry is intense, and the Company may not be able to continue to employ senior executives and key personnel or attract and retain qualified personnel in the future.

## ARTICLE XVIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. General

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Debtors, and to certain U.S. Holders. The following does not address the U.S. federal income tax consequences to U.S. Holders not entitled to vote to accept or reject the Plan. Thus, the following summary applies only to certain U.S. Holders of Prepetition Term Loan Claims and General Unsecured Claims (collectively, the "**Relevant Claims**"). The following summary also does not address the federal income tax consequences to a U.S. Holder of a Relevant Claim that is not treated as debt for U.S. federal income tax purposes.

The following summary is based on the Tax Code, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change or differing interpretations, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in several areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to seek, an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. The discussion below is not binding on the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed below.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (including, for example, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, mutual funds, banks, and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, U.S. Holders that are, or hold Claims through, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, U.S. expatriates, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). The following summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity different than any other Holder of a Claim of the same Class, and the tax consequences may differ materially from that described below. The following summary does not discuss the U.S. federal income tax consequences of the Litigation Trust Financing Facility, if any, or Exit Financing Facilities, if any, including the tax consequences to any U.S. Holder if they are deemed to receive additional consideration in respect thereof. The following summary also does not discuss the U.S. federal income tax consequences to a Holder of a sale, disposition, or exchange of Litigation Trust Interests. In addition, the following discussion does not address U.S. federal taxes other than income taxes, nor does it address provisions of the

Tax Code commonly referred to as "FATCA." Holders of Claims who are not U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

For purposes of this Combined DS and Plan, "**U.S. Holder**" means a beneficial owner of Relevant Claims that is, for U.S. federal income tax purposes: (1) a citizen or resident of the United States; (2) a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state therein or the District of Columbia; or (3) an estate or trust, the income of which is subject to U.S. federal income taxation regardless of its source. If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The following discussion assumes that the U.S. Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year. Additionally, the following discussion assumes that (1) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (2) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code. This discussion also assumes that the Litigation Trust Interests held by the Distribution Agent for the benefit of the Holders of Allowed General Unsecured Claims are treated as beneficially owned for U.S. federal income tax purposes by the Holders of Allowed General Unsecured Claims. The U.S. federal income tax consequences resulting from the implementation of the Plan to the Debtors, Reorganized Debtors, and U.S. Holders may vary from those consequences described below depending on the nature of the transactions in which the (Reorganized) Debtors engage.

**ACCORDINGLY, THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A RELEVANT CLAIM. EACH HOLDER OF A RELEVANT CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

## B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

### 1. Implementation of the Transactions Contemplated by the Plan

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the transactions contemplated hereby are structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "**Taxable Transaction**") or as a tax-free transaction (a "**Tax-Free Transaction**"). It has not yet been determined how such transactions will be structured under applicable law. Such decision will depend on, among other things, an

ongoing analysis with respect to anticipated valuation and the ability to offset taxable income arising from a Taxable Transaction with tax attributes available to the Debtors, any anticipated tax liabilities associated with a Taxable Transaction, and future tax benefits associated with a step-up in the tax basis of the assets sold pursuant to a Taxable Transaction. In light of these various considerations, a decision of whether to consummate the transactions contemplated hereby as a Taxable Transaction or a Tax-Free Transaction is unlikely to occur until a short time before such consummation and, accordingly, U.S. Holders should assume that either option is possible.

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors are generally expected to realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally is expected to equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the Tax Code and by any other available NOLs or other tax attributes, subject to applicable limitations. As of December 31, 2022, the Debtors had a consolidated net operating loss ("**NOL**") carryforward for U.S. federal income tax purposes of approximately $157.8 million and approximately $81.4 million of interest expense deductions that have been deferred under section 163(j) of the Tax Code (the "**163(j) Deductions**").

Any taxable gain remaining after such offsets would result in a cash tax obligation. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, such Reorganized Debtors will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the (Reorganized) Debtors timely make certain elections provided for under the Tax Code to treat such stock purchase as the purchase of the applicable Debtor's assets. If the Taxable Transaction is, or is treated as, a purchase of the applicable Debtor's assets, such Debtors' tax attributes will not carry over to or otherwise be available for utilization by the Reorganized Debtors.

If the transactions undertaken pursuant to the Plan are structured as a Tax-Free Transaction, then it is not expected that the Debtors will recognize gain or loss as a result thereof, other than as a result of cancellation of indebtedness income ("**CODI**") (as described immediately below). The Debtors' tax attributes will, subject to the rules discussed below regarding CODI and sections 382 and 383 of the Tax Code, survive the restructuring process and carry over to the Reorganized Debtors.

2. <u>Cancellation of Debt Income</u>

In general, absent an exception, a taxpayer will realize and recognize CODI upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price (within the meaning of applicable Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of any Cash and the fair market value of any other consideration (including stock of the taxpayer or a party related to the taxpayer) given in satisfaction of such indebtedness. Under section 108 of the Tax Code, a taxpayer is not required to include CODI in gross income if the

taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case. Instead, as a consequence of such exclusion, the taxpayer must reduce certain of its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes will be reduced in the following order: (t) NOLs; (u) general business credits; (v) minimum tax credits; (w) capital loss carryovers; (x) tax basis in assets, which includes the stock in subsidiaries (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (y) passive activity loss and credit carryovers; and (z) foreign tax credits (collectively, the "**Tax Attributes**"). Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code, in which case the limitation described in the immediately preceding sentence does not apply. In general, any reduction in Tax Attributes under the CODI rules does not occur until after the tax for the year of the discharge has been determined. 163(j) Deductions are not subject to reduction under these rules. Any excess CODI over the amount of any such Tax Attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain Tax Attributes of other members of the group also be reduced.

The Debtors are expected to realize CODI in connection with the transactions contemplated hereby, with an attendant reduction in Tax Attributes (but in the case of tax basis where no election is made to reduce the basis of depreciable assets as described above, only to the extent such tax basis exceeds the amount of the Debtors' liabilities, as determined for these purposes, immediately after the Effective Date). The exact amount of any CODI that will be realized by the Debtors will not be determinable until the Consummation of the Plan because the amount of CODI will depend, in part, on the value of the equity interests in the Reorganized Debtors issued in connection with the Plan and the value of other non-cash consideration, neither of which can be determined until after Consummation. Therefore, the total amount of attribute reduction as a result of the Plan cannot be determined until after the Effective Date. Depending on the amount of CODI, if the transactions contemplated hereby are structured as a Tax-Free Transaction, some of the Reorganized Debtors' tax basis in their assets may be reduced by CODI that is not absorbed by the NOLs and other tax attributes. As a general matter, CODI is not expected to be relevant in the event the transactions contemplated hereby are consummated as a Taxable Transaction.

3. <u>Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes</u>

After giving effect to the reduction in Tax Attributes pursuant to excluded CODI, the ability of the Reorganized Debtors in a Tax-Free Transaction to use any remaining Tax Attributes and certain other attributes post-Consummation may be subject to certain limitations under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan. As noted above, in a Taxable Transaction, the Debtors' Tax Attributes and other attributes generally will not carry over to or otherwise be available for utilization by the Reorganized Debtors.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change" as defined under section 382 of the Tax Code, the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the

date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. While proposed Treasury Regulations could significantly modify the calculation and treatment of net unrealized built-in gains and losses, those regulations are not expected to apply to the Reorganized Debtors, and the remainder of this discussion assumes they will not apply.

The rules of section 382 of the Tax Code are complicated, but an ownership change is expected to occur as a result of the transactions contemplated hereby. If such an ownership change occurs, the ability of the Reorganized Debtors to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

## C. Consequences to U.S. Holders

### 1. Consequences to U.S. Holders of Prepetition Term Loan Claims

Pursuant to the Plan, each U.S. Holder of a Prepetition Term Loan Claim will receive in satisfaction thereof New Equity Interests and Litigation Trust Interests.

The U.S. federal income tax consequences to a U.S. Holder of a Prepetition Term Loan Claim of receiving its distribution under the Plan will depend on whether (a) the Prepetition Term Loan Claims are treated as securities for purposes of the reorganization provisions of the Tax Code and (b) the transactions contemplated hereby are structured as a Tax-Free Transaction.

Whether a debt instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of 10 years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others, whether the debt instrument is secured, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

It is unclear whether the Prepetition Term Loans are properly treated as securities and U.S. Holders of Prepetition Term Loan Claims should consult their tax advisors as to whether such claims are properly treated as securities.

*a. Tax-Free Reorganization*

If the Prepetition Term Loan Claims are treated as securities and the transactions contemplated hereby are structured as a Tax-Free Transaction, then the exchange of the Prepetition Term Loan Claims is expected to be treated as a tax-free reorganization with the receipt of the Litigation Trust Interests treated as "boot" in such transaction.

In this case, other than with respect to any amounts received that are attributable to accrued but unpaid interest, a U.S. Holder will recognize capital gain, but not loss, equal to the lesser of (i) the excess of (A) the fair market value of the New Equity Interests and the U.S. Holder's undivided interest in the Litigation Trust Assets consistent with its economic rights in the Litigation Trust received in respect of its Claim over (B) the U.S. Holder's tax basis in the Prepetition Term Loan Claims and (ii) the fair market value of the U.S. Holder's undivided interest in the Litigation Trust Assets consistent with its economic rights in the Litigation Trust received in respect of its Claim. Any capital gain recognized by a U.S. Holder upon the exchange will be long-term capital gain if, at the time of exchange, the Prepetition Term Loan Claims have been held for more than one year.

Such a U.S. Holder's aggregate tax basis in the New Equity Interests received in satisfaction of its Prepetition Term Loan Claim generally is expected to equal the U.S. Holder's aggregate adjusted tax basis in its Prepetition Term Loan Claim decreased by the fair market value of its undivided interest in the Litigation Trust Assets consistent with its economic rights in the trust received in respect of such Claim and increased by any gain recognized by such U.S. Holder in the exchange. In general, the U.S. Holder's holding period for the New Equity Interests received in the exchange is expected to include the U.S. Holder's holding period for the Prepetition Term Loan Claim. A U.S. Holder's aggregate tax basis in its undivided interest in the Litigation Trust Assets is expected to equal the fair market value of the U.S. Holder's undivided interest in the Litigation Trust Assets consistent with any economic rights in the trust received in respect of its Claim, increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Litigation Trust, and that U.S. Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("**OID**"), or market discount, see the sections entitled "Accrued Interest and OID" and "Market Discount" below.

*b. Taxable Exchange*

If the Prepetition Term Loan Claims are not treated as securities or the transactions contemplated hereby are structured as a Taxable Transaction, a U.S. Holder of a Prepetition Term Loan Claim generally is expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than any consideration attributable to a Prepetition Term Loan Claim for accrued but unpaid interest or OID, a U.S. Holder generally is expected to recognize gain or loss equal to the difference between (i) the sum of the fair market value of any New Equity Interests received in the exchange and the fair market value of its undivided interest in the Litigation Trust Assets consistent with its economic rights in the Litigation Trust received in respect of its Claim (each as of the Distribution Date) received in the

exchange and (ii) the U.S. Holder's adjusted basis, if any, in the Prepetition Term Loan Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Prepetition Term Loan Claim in such U.S. Holder's hands, and whether the Prepetition Term Loan was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Prepetition Term Loan for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

Any New Equity Interests received by a U.S. Holder of such a Prepetition Term Loan Claim are generally expected to have a basis equal to the fair market value of the New Equity Interests as of the applicable Distribution Date and a holding period starting on the day following the applicable Distribution Date. A U.S. Holder's aggregate tax basis in its undivided interest in the Litigation Trust Assets is expected to equal the fair market value of its undivided interest in the Litigation Trust Assets, increased by its share of the Debtors' liabilities to which such assets remain subject upon transfer to the Litigation Trust, and that U.S. Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount, see the sections entitled "Accrued Interest and OID" and "Market Discount" below.

2. Consequences to U.S. Holders of General Unsecured Claims

Pursuant to the Plan, each U.S. Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of 15% of the Litigation Trust Interests. The Debtors expect the Litigation Trusts Interests held by the Distribution Agent for the benefit of Holders of Allowed General Secured Claims to be treated as beneficially owned by such Holders for U.S. federal income tax purposes. The discussion that follows assumes such treatment is respected.

A U.S. Holder of an Allowed General Unsecured Claim that receives Litigation Trust Interests is generally expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Accordingly, such a U.S. Holder is generally expected to recognize gain or loss equal to the difference between (a) the fair market value of the U.S. Holder's undivided interest in the Litigation Trust Assets consistent with its economic rights in the Litigation Trust received in respect of its Claim and (b) the U.S. Holder's adjusted basis, if any, in its General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the General Unsecured Claim in such U.S. Holder's hands, and whether the General Unsecured Claim was purchased at a discount. If any recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its General Unsecured Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

A U.S. Holder's aggregate tax basis in its undivided interest in the Litigation Trust Assets is expected to equal the fair market value of the U.S. Holder's undivided interest in the Litigation Trust Assets consistent with any economic rights in the Litigation Trust received in respect of its Claim, increased by its share of the Debtors' liabilities to which such assets remain subject upon

transfer to the Litigation Trust, and that U.S. Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount, see the sections entitled "Accrued Interest and OID" and "Market Discount" below.

3. Accrued Interest and OID

To the extent that any amount received by a U.S. Holder of a Relevant Claim is attributable to accrued but unpaid interest (or OID) on the Relevant Claim, the receipt of such amount is generally expected to be recognized by the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest previously was recognized by the U.S. Holder but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Equity Interests treated as received in satisfaction of accrued but unpaid interest (or OID) is generally expected to equal the amount of such accrued but unpaid interest (or OID). The holding period for such New Equity Interests is generally expected to begin on the day following the receipt of such consideration.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all the principal and interest on a Relevant Claim, the extent to which such consideration will be attributable to accrued interest (or OID) is unclear. Under the Plan, the aggregate consideration received in respect of a Relevant Claim will be allocated first to the principal amount of such Relevant Claim, with any excess allocated to unpaid interest, if any, that accrued on such Claim before the Petition Date. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat payments under a debt instrument as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Relevant Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

4. Market Discount

U.S. Holders of Relevant Claims may be affected by the market discount provisions of sections 1276 through 1278 of the Tax Code. Under these rules, some or all of any gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Relevant Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a market discount obligation if such excess is

less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Any gain recognized by a U.S. Holder on the taxable disposition of a Relevant Claim (determined as described above) that was acquired with market discount is generally expected to be treated as ordinary income to the extent of the market discount that accrued thereon while the Relevant Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). If a Prepetition Term Loan Claim that was acquired with market discount is exchanged in a Tax-Free Transaction (as described above) for New Equity Interests, any market discount that accrued on the Prepetition Term Loan Claim (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the New Equity Interests received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Equity Interests is treated as ordinary income to the extent of such accrued market discount.

## D. Consequences of Ownership of New Equity Interests

### 1. Distributions

The gross amount of any distribution on New Equity Interests that is made out of Reorganized Parent's current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally is expected to be taxable to a U.S. Holder as ordinary dividend income on the date such distribution is actually or constructively received. Any such dividends generally would be expected to be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations. To the extent that the amount of the distribution exceeds Reorganized Parent's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount is generally expected to be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in its New Equity Interests, and thereafter as capital gain recognized on a sale or exchange. U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received from Reorganized Parent.

Dividends paid by Reorganized Parent to non-corporate U.S. Holders who meet certain requirements are generally expected to be eligible to be treated as "qualified dividend income" and therefore taxable at rates applicable to long-term capital gains. U.S. Holders should consult their own tax advisors regarding the availability of these favorable tax rates on dividends in their particular circumstances.

### 2. Sale, Exchange, Redemption, or Other Taxable Disposition of New Equity Interests

Subject to the market discount rules discussed above, a U.S. Holder generally is expected to recognize gain or loss on any sale, exchange, redemption, or other taxable disposition of New Equity Interests in an amount equal to the difference between (a) the amount realized on the disposition and (b) such U.S. Holder's adjusted tax basis in such New Equity Interests. Any gain or loss recognized by a U.S. Holder on a taxable disposition of New Equity Interests generally is

expected to be capital gain or loss and is expected to be long-term capital gain or loss if the U.S. Holder's holding period in such New Equity Interests exceeds one year at the time of the disposition. Preferential tax rates may apply to long-term capital gains of non-corporate U.S. Holders (including individuals). The deductibility of capital losses is subject to limitations.

## E. Tax Treatment of the Litigation Trust and U.S. Holders of Litigation Trust Interests

### 1. Classification of the Litigation Trust

The Debtors expect the Litigation Trusts Interests held by the Distribution Agent for the benefit of Holders of Allowed General Secured Claims to be treated as beneficially owned by such Holders for U.S. federal income tax purposes. The discussion that follows assumes such treatment is respected.

The Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Litigation Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust will be structured with the intention of generally complying with such criteria.

Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Litigation Trustee, and U.S. Holders of Litigation Trust Interests) shall treat the transfer of Litigation Trust Assets to the Litigation Trust as (a) a transfer of the Litigation Trust Assets (subject to any obligations relating to those assets) directly to U.S. Holders of Litigation Trust Interests (other than to the extent Litigation Trust Assets are allocable to Disputed Claims), followed by (b) the transfer by such Litigation Trust Beneficiaries to the Litigation Trust of Litigation Trust Assets in exchange for Litigation Trust Interests. Accordingly, U.S. Holders of Litigation Trust Interests are expected to be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to Disputed Claims). The Litigation Trust may borrow from Litigation Trust Beneficiaries or from third-party lenders. The Litigation Trust is expected to treat this borrowing as indebtedness for U.S. federal income tax purposes, and the remainder of this discussion assumes that such treatment is respected.

While the following discussion assumes that the Litigation Trust would be so treated for U.S. federal income tax purposes, no ruling is expected to be requested from the IRS concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the U.S. Holders of Claims could vary from those discussed herein.

2. General Tax Reporting by the Litigation Trust and Holders of Litigation Trust Interests

For all U.S. federal income tax purposes, all parties must treat the Litigation Trust as a grantor trust of which the U.S. Holders of Litigation Trust Interests are the owners and grantors, and treat the U.S. Holders of Trust Interests as the direct owners of undivided interests in the Litigation Trust Assets (other than any Litigation Trust Assets allocable to Disputed Claims), consistent with their economic interests therein. The Litigation Trustee will file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Litigation Trust shall allocate items of taxable income, gain, loss, deduction, and/or credit of the Litigation Trust (other than such items allocable to any assets allocable to, or retained on account of, Disputed Claims, if such items are otherwise accounted for in a "disputed ownership fund") among the holders of Litigation Trust Interests.

Under the Plan, as soon as practicable after the Effective Date, the Litigation Trustee shall make a good-faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Litigation Trustee, and the U.S. Holders of Relevant Claims receiving Litigation Trust Interests) for all U.S. federal, and applicable state and local, income tax purposes. The Plan also requires that the Litigation Trustee file (or cause to be filed) any other statements, returns, or disclosures relating to each of the Litigation Trust that are required by any Government Unit for taxing purposes. Taxable income or loss allocated to a U.S. Holder of Litigation Trust Interests will be treated as income or loss with respect to such U.S. Holder's undivided interest in the Litigation Trust Assets, and not as income or loss with respect to its prior Relevant Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the U.S. Holder of a Litigation Trust Interest.

The U.S. federal income tax obligations of a U.S. Holder with respect to its Litigation Trust Interests are not dependent on the Litigation Trust distributing any Cash or other proceeds. Thus, a U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of the Litigation Trust's income even if the Litigation Trust does not make a concurrent distribution to the U.S. Holder. In general, other than in respect of Cash retained on account of Disputed Claims that is treated as part of a "disputed ownership fund" and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a U.S. Holder's Relevant Claim), a distribution of Cash by the Litigation Trust will not be separately taxable to a U.S. Holder of Litigation Trust Interests since such U.S. Holder is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust). U.S. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Litigation Trust on account of Disputed Claims.

The Litigation Trustee will comply with all applicable governmental withholding requirements (*e.g.*, Article VIII.I). Thus, in the case of any holders of Litigation Trust Interests that are not U.S. Holders, the Litigation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to an applicable lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax

consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such non-U.S. Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning a Litigation Trust Interest.

3. Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Litigation Trust of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee (a) may elect to treat any Litigation Trust Assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations section 1.468B-9, if applicable and (b) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to any assets, such assets will be subject to tax annually on a separate entity basis on any net income earned with respect to such assets (including any gain recognized upon the disposition of such assets). All distributions from such assets (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by U.S. Holders in respect of their Claims as if distributed by the Debtors. All parties (including the Debtors, the Litigation Trustee, and the U.S. Holders of Litigation Trust Interests) will be required to report for tax purposes consistently with the foregoing. Any portion of the Litigation Trust set aside for Disputed Claims will be responsible for payment, out of the assets of such portion of the Litigation Trust, of any taxes imposed on such portion of the Litigation Trust. In the event, and to the extent, any Cash in such portion of the Litigation Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such portion), assets of such portion of the Litigation Trust may be sold to pay such taxes.

## F. Withholding on Distributions and Information Reporting

All distributions to Holders of Relevant Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (1) fails to furnish its social security number or other taxpayer identification number, (2) furnishes an incorrect taxpayer identification number, (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Relevant Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of a Relevant Claim or a holder of Litigation Trust Interests that is a not a U.S. person may be subject to up to 30% U.S. federal withholding tax, depending on, among

other things, the particular type of income at issue and whether the type of income is subject to an applicable lower treaty rate. A non-U.S. Holder may also be subject to other adverse consequences in connection with the Consummation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their tax advisors regarding potential withholding on Plan Distributions by the (Reorganized) Debtors or payments from the Litigation Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

### G. Importance of Obtaining Professional Advice

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY NON-U.S. OR U.S. STATE OR LOCAL TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE XIX.
## CERTAIN SECURITIES LAW MATTERS

The following discussion summarizes certain matters related to securities laws that may affect those that receive certain Plan Distributions pursuant hereto. Given the complex or subjective nature of such matters, including the factual question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any person to trade in the New Equity Interests, the Litigation Trust Interests, or any other Securities. The Debtors recommend that potential recipients of the New Equity Interests, the Litigation Trust Interests, or any other Securities consult their own counsel concerning whether they may freely trade such Securities without registration under, or exemption from registration under, the Securities Act, the Securities Exchange Act, or similar state, federal, or foreign laws.

### A. New Equity Interests

#### 1. Issuance of New Equity Interests

The Plan provides for the issuance and distribution of the New Equity Interests, which are "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

Section 1145(a)(1) of the Bankruptcy Code exempts the issuance, offer, sale, and distribution of Securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local Securities laws if the following three principal requirements are satisfied: (a) the Securities must be offered and sold under a plan of reorganization and must be Securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the Securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the Securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. *See* 11 U.S.C. § 1145(a)(1).

The issuance and distribution of the New Equity Interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance and distribution are exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of New Equity Interests may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code. The availability of the exemptions under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

2. <u>Private Placement Securities</u>

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The Debtors believe that the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act (including, potentially, pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act) or other applicable exemptions. Each Holder of a Prepetition Term Loan Claim is required to represent that it is an "accredited investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act, or a "qualified institutional buyer" (as defined under Rule 144A of the Securities Act).

The 4(a)(2) Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, including as described below.

In addition to any limitations in the New Governance Documents, the 4(a)(2) Securities will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act), will bear customary legends and transfer restrictions, and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, in each case, subject to the limitations in the applicable New Governance Documents.

Rule 144 of the Securities Act provides a limited safe harbor for the resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 of the Securities Act defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, [the] issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of sections 13 or 15(d) of the Securities Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer. It is currently anticipated that none of the Reorganized Debtors will be subject to the reporting requirements of the Securities Exchange Act after the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of sections 13 or 15(d) of the Securities Exchange Act may resell restricted securities after the one-year holding period if, at the time of the sale, certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144 of the Securities Act. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144 of the Securities Act). Third, if the amount of securities sold under Rule 144 of the Securities Act in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that an exemption under Rule 144 of the Securities Act will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144 of the Securities Act, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES

HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 of the Securities Act as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserves the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144 of the Securities Act, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described herein.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

3. Subsequent Transfers of New Equity Interests

Subject to any limitations in the New Governance Documents, the New Equity Interests may be freely transferred by recipients following the initial issuance under the Plan without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities.

Generally, an "underwriter" (for purposes of section 1145 of the Bankruptcy Code) is any person who:

(A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest;

(B) offers to sell securities offered or sold under the plan for the holders of such securities;

(C) offers to buy securities offered or sold under the plan from the holders of such securities, if such offer to buy is—

(i) with a view to distribution of such securities; and

(ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or

(D) is an issuer, as [defined in section 2(a)(11) of the Securities Act], with respect to such securities.

11 U.S.C. § 1145(b)(1). Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

To the extent that any Entities who receive New Equity Interests pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, resales of such New Equity Interests by such Entities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. However, resales of New Equity Interests satisfying the applicable requirements of rule 144 of the Securities Act (or another available exemption under the Securities Act) may be permitted. Rule 144 permits the public resale of Securities received by such persons if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person may be deemed to be an "underwriter" with respect to the New Equity Interests or any other Security issued pursuant to the Plan depends upon various facts and circumstances applicable to that Entity. Accordingly, the Debtors express no view as to whether any particular Entity receiving New Equity Interests or other Securities hereunder may be an "underwriter" with respect to such New Equity Interests or other Securities.

**B. Litigation Trust Interests**

The Litigation Trust Interests (including beneficial interests in the Litigation Trust) to be distributed to the Litigation Trust Beneficiaries pursuant hereto are not intended to constitute "securities" under applicable law. Such interests shall not have consent or voting rights or otherwise confer on the Litigation Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Litigation Trustee in connection with the Litigation Trust.

Notwithstanding the foregoing, to the extent the Litigation Trust Interests are considered securities under applicable law, the issuance and distribution of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance and distribution is exempt from registration under the Securities Act and any state or local law requiring registration. To the extent the foregoing exemption is not available, the Litigation Trust Interests shall be offered, issued, and distributed under this Combined DS and Plan pursuant to other applicable exemptions from registration under the Securities Act and Blue Sky Laws. To the extent any "offer or sale" of Litigation Trust Interests may be deemed to have occurred, such offer or sale is made under the Plan and in exchange for Claims against one or more of the Debtors, or

principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

## CONCLUSION AND RECOMMENDATION

The Debtors, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee believe that Confirmation and Consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan contemplates a restructuring that will be beneficial to the Company and provides for an equitable distribution of distributable value to Holders of Claims. The Debtors believe that any alternative to Confirmation of the Plan could result in significant delay, litigation, and additional costs, as well as a reduction in the distributions to Holders of Claims in certain Classes. **Consequently, the Debtors, the Ad Hoc Group of Crossover Lenders, and the Creditors' Committee urge all eligible Holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Solicitation Agent on or before the Voting Deadline.**

January 11, 2024

Instant Brands Acquisition Holdings Inc.
on behalf of itself and each of its Debtor affiliates

DocuSigned by:
Adam Hollerbach
41D41EE253DD442...

Adam Hollerbach
Chief Restructuring Officer
Instant Brands Acquisition Holdings Inc.

# Exhibit A

## Organizational Chart

DocuSign Envelope ID: 76651846-A709-4AF3-8D3E-C5619FA3DFF0

# Corporate Structure Chart




Corelle Brands (Asia Pacific) Pte. Ltd. owns 99.99% of the shares in World Kitchen (India) Private Limited. The remaining 0.01% is held by Instant Brands Holdings Inc., as nominee of Corelle Brands (Asia Pacific) Pte. Ltd. All other ownership interests are 100% (assuming the exchange of all exchangeable common equity shares into common shares in Instant Brands Acquisition Holdings Inc.).

**Key**

AUS: Australia
CAN: Canada
CHN: China
GBR: Great Britain
HKG: Hong Kong
IND: India
IRL: Ireland

JPN: Japan
KOR: South Kore
MYS: Malaysia
SGP: Singapore
TWN: Taiwan
US (DE): Delawa
US (TX): Texas

# <u>Exhibit B</u>

## Financial Projections

DocuSign Envelope ID: 76651846-A709-4AF3-8D3E-C5619FA3DFF0

**Forecasted Income Statement**

| *($ in Millions)* | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 |
|---|---|---|---|---|---|
| Net Sales | $423.5 | $441.7 | $460.1 | $470.7 | $481.6 |
| Cost of Sales | (349.3) | (363.7) | (378.2) | (386.7) | (394.5) |
| **Gross Margin** | **$74.2** | **$78.1** | **$81.9** | **$84.1** | **$87.1** |
| SG&A | (52.3) | (53.3) | (54.4) | (55.5) | (56.6) |
| Exceptional Costs | (17.0) | – | (2.5) | (2.5) | – |
| Other Income / Expense | (7.2) | (7.5) | (7.8) | (8.0) | (8.1) |
| **EBIT** | **($2.3)** | **$17.2** | **$17.2** | **$18.1** | **$22.4** |
| D&A Expense | 22.8 | 22.8 | 22.8 | 22.8 | 22.8 |
| Exceptional Costs | 17.0 | – | 2.5 | 2.5 | – |
| **Adjusted EBITDA** | **$37.5** | **$40.1** | **$42.5** | **$43.4** | **$45.2** |

**Forecasted Free Cash Flow Bridge**

| *($ in Millions)* | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 |
|---|---|---|---|---|---|
| Adjusted EBITDA | $37.5 | $40.1 | $42.5 | $43.4 | $45.2 |
| Exceptional Costs | (17.0) | – | (2.5) | (2.5) | – |
| Cash Taxes | (1.3) | (1.3) | (1.4) | (1.5) | (1.5) |
| Capital Expenditures | (16.5) | (12.0) | (20.0) | (13.0) | (5.0) |
| Change in Net Working Capital | 17.4 | (7.3) | (0.6) | (5.6) | (5.9) |
| **Unlevered Free Cash Flow** | **$20.1** | **$19.4** | **$18.0** | **$20.9** | **$32.8** |

**Forecasted Net Working Capital**

| *($ in Millions)* | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 |
|---|---|---|---|---|---|
| Accounts Receivable | $51.3 | $57.3 | $59.8 | $61.1 | $62.5 |
| Inventory | 131.6 | 136.3 | 135.2 | 140.2 | 145.4 |
| Accounts Payable | (30.1) | (33.4) | (34.2) | (35.0) | (35.7) |
| **Net Working Capital** | **$152.8** | **$160.1** | **$160.7** | **$166.3** | **$172.2** |

<u>**Exhibit C**</u>

**Valuation Analysis**

**The imputed valuation estimates described below do not purport to be or constitute (a) a recommendation to any Holder of a Claim against or an Interest in a Debtor as to how to vote on, or otherwise act with respect to, the Plan, (b) an opinion as to the fairness from a financial point of view of the consideration to be received under, or of the terms and provisions of, the Plan or of any transaction contemplated thereby or otherwise described therein, including the contemplated issuance of any New Equity Interests, (c) an appraisal of the Assets of the (Reorganized) Debtors, or (d) a prediction or guarantee of the actual market value that may be realized through a sale or liquidation of the (Reorganized) Debtors or through the sale of any securities to be issued pursuant to the Plan or of the prices at which any such securities may trade after giving effect to the transactions contemplated thereby. The actual value of an operating business such as the (Reorganized) Debtors' is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in various factors affecting the financial conditions and prospects of such a business.**

**The information contained herein is presented solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable Holders of Claims in Voting Classes to make an informed judgment about the Plan. Other than with respect to the foregoing, this information was not prepared for the purpose of providing the basis for an investment decision by any Holder or any other Person or Entity with respect to any transaction offered pursuant to the Plan or otherwise described therein (including the contemplated issuance of any New Equity Interests) and should not be used or relied upon for any other purpose (including the purchase or sale of Claims against or Interests in the Debtors). The imputed valuation estimates described below are subject to various economic and competitive uncertainties and contingencies that are difficult to predict, and should also be considered in conjunction with (a) those additional contingencies and risk factors described in <u>Articles XVII–XIX</u> of the Combined DS and Plan and (b) the Financial Projections.**

The Housewares APA, which was entered into after an exhaustive marketing and sale process, would have resulted in the Debtors receiving a Cash Purchase Price (as defined in the Housewares APA) for the housewares business of $228.2 million, subject to various adjustments. In conjunction with negotiating the Housewares APA, the parties thereto agreed to modify certain of the adjustments contained therein that would have afforded the Debtors and their estates $18 million in additional consideration (the "**Housewares APA Adjustments**"). While the parties were ultimately unable to obtain the requisite regulatory approvals for the Housewares Sale Transaction within the "Outside Date" set forth (and as defined) in the Housewares APA, the Debtors believe that the Sale Process, the resulting Purchase Price, and the Housewares APA Adjustments provide a basis for imputing the estimated total enterprise value of the Reorganized Debtors' housewares business upon emergence. Accordingly, the Debtors believe the imputed total enterprise value of the Reorganized Debtors to be approximately $246.2 million.

The Debtors have liabilities associated with certain pension plans and other post-retirement benefits, which were calculated at $20 million on the Company's most recent audited financial

statements. In addition, on the Effective Date, the Reorganized Debtors project net debt of approximately $190.3 million,[1] which, the Debtors believe, further indicates an imputed estimated equity value for the Reorganized Debtors upon emergence of approximately $35.9 million.

[1] This figure includes liabilities in connection with the Debtors' precious metals leases.

# <u>Exhibit D</u>

## Liquidation Analysis

## Introduction

The Bankruptcy Code[1] requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find that either (a) all members of an impaired class of claims or interests have accepted the plan or (b) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code ("**Chapter 7**") (the "**Best Interests Test**").

Accordingly, the Debtors' management ("**Management**"), with the assistance of the Debtors' financial advisor, prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") in connection with the Combined DS and Plan. The Liquidation Analysis illustrates the estimated recoveries that may be obtained by Classes of Claims and Interests in a hypothetical liquidation in Chapter 7 upon disposition of Assets as an alternative to the Plan. The Liquidation Analysis is based upon certain assumptions, including those discussed herein and in the Disclosure Statement.

In order to make a finding that the Plan is in compliance with section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must (a) estimate the cash proceeds (the "**Liquidation Proceeds**") that a hypothetical Chapter 7 trustee (the "**Trustee**") would generate if each of the Chapter 11 Cases were converted to a Chapter 7 liquidation on the Effective Date and the Assets of each Debtor's estate were liquidated, (b) determine the distribution (the "**Liquidation Distribution**") that each Holder of an Allowed Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in Chapter 7, and (c) compare each Holder's Liquidation Distribution to the Plan Distributions that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.

## Statement of Limitations

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' Assets in a Chapter 7 liquidation is a highly uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by Management based upon its business judgment and input from the Debtors' financial advisor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, Management, and the Debtors' financial advisor. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual Chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual Chapter 7 liquidation. In addition, Management cannot judge with any degree of certainty the effect of forced-liquidation asset sales on the recoverable value of the Assets. Events and

---

[1] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "**Disclosure Statement**," the "**Combined DS and Plan**," or the "**Plan**," as applicable).

circumstances occurring subsequent to the date on which the Liquidation Analysis was prepared may be different from those assumed or, alternatively, may have been unanticipated; thus, the occurrence of these events may affect financial results in a material manner.

This Liquidation Analysis was prepared for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the "Best Interests Test," pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or Interests in, the Debtors or any of their Affiliates. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants, and no independent appraisals were conducted in preparing the Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR FINANCIAL ADVISOR MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN NOR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT OF A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH HEREIN.

## Overview and General Assumptions

As further set forth in the Combined DS and Plan, the Appliances Sale Transaction closed on November 8, 2023, which has left the Debtors with a standalone operating business focused on housewares.

The Liquidation Analysis represents an estimate of recovery values for the remaining Assets based upon a hypothetical liquidation of the Estates if a Chapter 7 Trustee were appointed by the Bankruptcy Court to manage the winddown of the Estates.

The Liquidation Analysis has been prepared with the assumption that the Debtors convert the Chapter 11 Cases to Chapter 7 cases on or about October 31, 2023 (the "**Liquidation Date**"). The Debtors' Assets and liabilities as of the Liquidation Date were estimated using the most recent balance sheet available as of the Liquidation Date (dated October 31, 2023) and the budget in place pursuant to the DIP Orders on October 9, 2023, adjusted to reflect certain subsequent material activity, ***including the effect of the proceeds received, and liabilities resolved as part of, the Appliances Sale Transaction***. The Liquidation Analysis was prepared on a consolidated basis for the remaining housewares business, which comprises the Debtors' Estate, and is summarized in the schedules herein.

The range of values likely to be achieved in a hypothetical Chapter 7 liquidation of any remaining Assets is expected to be the same for many Classes as it would be under the Plan. The Plan also reflects certain settlements and agreements that may not occur if the Chapter 11 Cases are converted to a Chapter 7 liquidation, in which case it is possible that significant litigation and other professional fees would be incurred by the Estates to determine the allowance and treatment for such Claims; the Liquidation Analysis assumes that these fees would be incurred, with recoveries reflecting the impact of the incurrence of such fees. Moreover, pursuant to such

agreements, Holders of Allowed General Unsecured Claims would in fact fair better under the Plan, since they would receive no value in a hypothetical liquidation under Chapter 7 but would receive a portion of the Litigation Trust Interests pursuant to the Plan.

To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims. In preparing the Liquidation Analysis, the Debtors estimated the amounts of Allowed Claims for each Class based upon a review of the Debtors' balance sheets as of October 31, 2023, adjusted to reflect activity subsequent to that date and estimates as needed. The estimated amounts of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including any determination of the value of any Plan Distribution. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated as Allowed in the Liquidation Analysis.[2]

The following is a summary of some other major assumptions underlying the Liquidation Analysis:

1. The Liquidation Analysis was prepared under the theoretical assumption that the Liquidation Date would be followed by a liquidation period of six months (the "**Liquidation Period**"). Under this scenario, the Bankruptcy Court would appoint a Chapter 7 Trustee to liquidate and wind down the Debtors' estates. Under such circumstances, the Chapter 7 Trustee would be independent and entitled to make all decisions (subject to Bankruptcy Court approval, as applicable) regarding the liquidation of the Estates, retention and payment of professionals, the pursuit of claims or Causes of Action, preparation of any reports required by the Bankruptcy Court, calculation and payment of U.S. Trustee Fees, and the payment of or objection to Claims.

   The rationale for the duration of the Liquidation Period is to convert raw materials and work-in-progress inventory to finished goods before selling through it via existing distribution channels and partners, in addition to marketing any fixed assets for a sufficient duration of time to maximize recoveries for the Debtors' estate.

2. The Liquidation Analysis assumes that most of the Debtors' remaining Assets would be liquidated during the Liquidation Period. Although the Debtors believe a six-month period is sufficient to allow for a liquidation of all Assets and sufficient to vacate any leased property, there can be no assurances made that all Assets would be completely liquidated during this period.

[2] The amounts of Allowed Claims contained in the Liquidation Analysis represent the Debtors' estimate of the Claims that they believe ultimately may be Allowed based on their review of their books and records and do not represent amounts actually asserted by Holders in Proofs of Claim or otherwise. The Debtors have not yet completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objection as necessary or appropriate. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. The actual amount of the Allowed Claims may be greater or lower than estimated, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein or the actual Plan Distributions received by Holders of Allowed Claims. *See* Article XVIII.

3. The Liquidation Analysis assumes that a Chapter 7 Trustee and/or a subset of Management would take all steps required to fully wind down the Debtors' operations and Estates within six months, as further set forth herein.

4. It is assumed that Assets would be sold for Cash or Cash equivalents.

5. It is assumed that Assets subject to finance and operating leases (generally, leased real estate properties) and leased precious metals will be returned to their respective lessors at the end of the Liquidation Period. As such, the liquidation analysis assumes there are no liquidation proceeds arising from leased assets and those are excluded from the respective secured claims amounts.

6. It is assumed that all non-operating Assets would be disposed of through sale, liquidation, termination, or abandonment, as appropriate.

7. For purposes of simplicity, the Liquidation Analysis presents the liquidation of the Debtors' housewares business on a consolidated basis. The Holders of DIP Superpriority Claims with respect to the ABL DIP Facility have priority rights over the Debtors' current Assets (though the net liquidation proceeds available to the Holders of such Claims (after considering the recovery of Claims in connection with the Carve Out (as defined in the Final DIP Order)) exceed the estimated liquidated value of current Assets). The Holders of DIP Superpriority Claims with respect to the TL DIP Facility have different priority liens on substantially all the Assets of each of the Debtors. Accordingly, proceeds realized from each Debtor are aggregated in a common distribution source. For purposes of distribution, each Claim asserted against any Debtor is presumed to be entitled to a distribution from the aggregated proceeds. Any Claim against a Debtor, any guarantee thereof executed by any other Debtor, and any joint or several liabilities of any of the Debtors are deemed to have one right to a distribution from the aggregated proceeds. As set forth herein, in a hypothetical Chapter 7 liquidation, it is assumed that no value would be available to any creditors other than the Holders of Secured Claims and certain other Administrative Claims, and such value would be allocated to the Holders of such Claims and Interests in strict priority in accordance with section 726 of the Bankruptcy Code.

8. The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a plan absent a liquidation (*e.g.*, severance and other employee-related claims, unpaid chapter 11 administrative claims, claims related to the rejection of Executory Contracts or Unexpired Leases), and such claims are not reflected in the Liquidation Analysis.

9. The Liquidation Analysis also does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of Assets in the manner described above, which may be material.

10. The Liquidation Analysis does not include any recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other Causes of Action or costs associated with pursuing them.

## Conclusion

The determination of hypothetical proceeds from a Chapter 7 liquidation involves extensive use of estimates and assumptions, which, while considered reasonable by the Debtors, Management, and the Debtors' financial advisor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond their control.

The Liquidation Analysis was prepared before certain of the Bar Dates (*e.g.*, the Administrative Claims Bar Date) and, as a result, the Debtors have not had an opportunity to evaluate all potential Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court. Similarly, both the Plan and the hypothetical Chapter 7 scenario would entail a claims reconciliation process to determine the magnitude of Allowed Claims against each Debtor. Accordingly, the amount of Allowed Claims against the Estates may differ from the Claim amounts used in the Liquidation Analysis.

Notwithstanding the difficulties in quantifying recoveries to Holders of Claims with precision, as summarized in the tables below (which should be reviewed with the foregoing discussion and the footnotes that follow the tables), the Debtors believe that, upon the Effective Date, the Plan will provide each Holder of an Impaired Claim or Interest with a recovery (if any) that is either (a) accepted by such Holder or (b) not less than what such Holder would otherwise receive if the Chapter 11 Cases were converted to cases under Chapter 7. Accordingly, the Debtors believe that the Plan and the continued operation of the Company as a going concern satisfy the Best Interests Test for the Impaired Classes and, thereby, satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

**Hypothetical Liquidation Analysis (as of October 31, 2023)**

| *($ in millions)* | Pro Forma Balance Sheet | Liquidation Value | | Estimated Recovery | |
|---|---|---|---|---|---|
| | | **Low** | **High** | **Low** | **High** |
| Cash and cash equivalents **[A]** | $50.2 | $50.2 | $50.2 | 100% | 100% |
| Accounts receivable, gross **[B]** | 70.4 | 38.8 | 42.1 | 55% | 60% |
| Inventories, gross **[C]** | 135.7 | 54.3 | 66.0 | 40% | 49% |
| Prepaid expenses and other current assets **[D]** | 27.6 | 0.8 | 1.4 | 3% | 5% |
| Intercompany receivables **[E]** | 6.8 | 6.8 | 6.8 | 100% | 100% |
| Other assets **[F]** | 51.4 | 17.8 | 24.4 | 35% | 47% |
| Investments in subsidiaries **[G]** | 42.6 | 5.1 | 7.2 | 12% | 17% |
| Property, plant, and equipment **[H]** | 152.4 | 11.0 | 22.0 | 7% | 14% |
| Other intangible assets **[I]** | 116.0 | 3.5 | 5.8 | 3% | 5% |
| Goodwill **[J]** | 70.5 | 0.0 | 0.0 | 0% | 0% |
| **Gross Liquidation Proceeds Available for Distribution** | **$723.6** | **$188.3** | **$225.9** | **28.0%** | **33.5%** |

| | Estimated Claim Amount | | Estimated Recovery | |
|---|---|---|---|---|
| | Low | High | Low | High |
| **Gross Liquidation Proceeds Available for Distribution** | $188.3 | $225.9 | | |
| Carve Out Claims **[K]** | | | | |
| Professional fees | (22.5) | (22.5) | | |
| LC Drawn Amount / Letters of Credit | (18.2) | (18.2) | | |
| Canadian Admin / D&O Reserve | (1.9) | (1.9) | | |
| Total | (42.5) | (42.5) | 100% | 100% |
| **Net Liquidation Proceeds Available for Winddown Administrative Claims** | $145.8 | $183.4 | | |
| Winddown Administrative Claims **[L]** | | | | |
| Winddown Costs | (41.7) | (37.6) | | |
| Liquidating Trustee Fees | (5.6) | (6.8) | | |
| Total | (47.4) | (44.3) | 100% | 100% |
| **Net Liquidation Proceeds Available for TL DIP-related Claims - Subordinated Tranche** | $98.4 | $139.0 | | |
| TL DIP-related Claims - Subordinated Tranche **[M]** | | | | |
| DIP Term Loan | (125.9) | (125.9) | | |
| Fees and Interest - Paid-In-Kind | (9.5) | (9.5) | | |
| Accrued Interest Balance | (0.7) | (0.7) | | |
| Total | (136.1) | (136.1) | 72% | 100% |
| **Net Liquidation Proceeds Available for Secured Claims** | $0.0 | $3.0 | | |
| Secured Claims **[N]** | | | | |
| Prepetition Term Loan Claims - Principal Balance | (390.9) | (390.9) | | |
| Prepetition Term Loan Claims - Accrued Interest Balance | (11.4) | (11.4) | | |
| Other Secured Claims | (0.2) | (5.8) | | |
| Total | (402.5) | (408.2) | 0% | 1% |
| **Net Liquidation Proceeds Available for Administrative Claims and Priority Claims** | $0.0 | $0.0 | | |
| Administrative Claims and Priority Claims **[O]** | | | | |
| Estimated 503(b)(9) Claims | (3.6) | (3.6) | | |
| Stub Rent | (1.4) | (1.4) | | |
| Total | (24.0) | (24.0) | 0% | 0% |
| **Net Liquidation Proceeds Available for General Unsecured Claims ("GUCs")** | $0.0 | $0.0 | | |
| GUCs Claims **[P]** | | | | |
| Balance | (143.9) | (167.9) | | |
| Total | (143.9) | (167.9) | 0% | 0% |
| **Net Liquidation Proceeds Available for Equity** | $0.0 | $0.0 | | |

## **Specific Notes to the Liquidation Analysis**

[A] Cash & Cash Equivalents: The cash balance is the balance of cash as of the Liquidation Date, as adjusted on a *pro forma* basis for the proceeds received from, and liabilities resolved as part of, the Appliances Sale Transaction, which closed on November 8, 2023. A 100% recovery on cash has been estimated for the low and high scenarios.

[B] Accounts Receivable, Gross: Accounts receivable balances were evaluated by receivable type and in line with the Debtors' borrowing procedures, which have been informed by the net orderly liquidated value range contained within an appraisal of these Assets received by the Debtors, adjusted for recent advance rates available to the Debtors under the DIP ABL Facility. Eligible trade receivables were assigned a 59% to 61% recovery and ineligible trade receivables were assigned a 45% to 57% recovery. On a blended basis, a 55% to 60% recovery has been estimated for these accounts receivable.

[C] Inventories, Gross: A 40% to 49% recovery has been estimated for the eligible inventory balance for the Debtors' housewares business as of the Liquidation Date, which is comprised of in-transit and on-hand raw materials, work-in-progress, and finished goods representing 26%, 8%, and 66% of total inventory, respectively. This level of recovery has been informed by the net orderly liquidation value range contained within an appraisal received by the Debtors, adjusted for results of the Debtors' housewares business, while acknowledging the limited timeframe the Debtors may have to complete a hypothetical liquidation process. Under such limitations, on a blended basis, inventory is assumed to be sold at a quick-sale discount on its book value of 40% at the low end of the analysis and 30% at the high end, both lower than the normalized blended gross profit of the Debtors.

[D] Prepaid Expenses and Other Current Assets: This line item consists of prepaid items that will likely be largely unrecoverable in the event of a liquidation, including prepaid information technology support, reusable goods, marketing, insurance, taxes, and other expenses that are amortized over the applicable license, service, or other relevant period. It is expected that most applicable counterparties would have Claims for goods or services that would not be paid in a liquidation and would seek to set off amounts held against such Claims. On a blended basis, a 3% to 5% recovery has been estimated for these prepaid amounts.

[E] Intercompany Receivables: This line item consists of receivables from the Company's non-Debtor subsidiaries as of the Liquidation Date, solely with respect to the housewares business. Recovery rates assume theoretical liquidation proceedings will take place in each subsidiary's jurisdiction, with asset recoveries in line with those used for the Debtors. A recovery of 100% has been estimated for such receivables, since the proceeds available for the Debtors exceeded the amounts expected to be paid towards winddown costs and to third parties.

[F] Other Assets: This line item represents owned precious metals (rhodium and platinum), a receivable from certain shareholders, and other non-current assets. Owned precious metals were assumed to be recovered at their fair value on the Liquidation Date at the high end of the analysis, and net of a 10% equity bullion owed to the applicable lessors at the low end. The liquidation values also reflect costs and time required to safely extract the metals from the machinery in which they currently reside. For the receivable from certain shareholders, a 0% recovery is estimated. For the balance of Other Assets, recoveries are estimated at 20% and 40% for low and high cases, respectively. On a blended basis, a 35% to 47% recovery has been estimated for this line item.

[G] Investment in Subsidiaries: This line item represents a range of residual values for the Company's non-Debtor entities, net of third-party liabilities, intercompany payables, winddown costs of 3% of liquidation proceeds, and repatriation costs, including tax of 20%. On a blended basis, a 12% to 17% recovery has been estimated for such items.

[H] Property, Plant, and Equipment ("**PP&E**"): The net book value of PP&E Assets consists of land, buildings, melting units, other manufacturing equipment, and construction-in-progress Assets that consist of 7%, 14%, 41%, 27%, and 11% of total PP&E Assets, respectively. For recovery assumption purposes, the net book value of PP&E Assets related to the Debtors' manufacturing facilities in Corning, NY and Charleroi, PA were adjusted to estimated fair value, as informed by a recent third-party appraisal conducted on the facilities. No recovery has been assigned to melting units, considering their specific, custom nature to the Debtors' housewares business. Other PP&E Assets were assumed to be recovered at 15% to 30%. In total, the implied recovery of PP&E Assets relative to net book value is projected, on a blended basis, to be in the range of 7% to 14%.

[I] Other Intangible Assets: This line item includes trademarks, customer relationships, and technology. Upon liquidation, the company would be expected to lose the licensing rights for Pyrex, Corelle, and Corningware, which reflects a material portion of this line item. The liquidation values reflect the fair value of the remaining intangible Assets and are further discounted to reflect the expected proceeds from any sale thereof. On a blended basis, the recovery is approximately 3% to 5% of net book value.

[J] Goodwill: No value has been assigned to the value of the Debtors' goodwill in a liquidation.

[K] Carve-Out Claims: This line item represents an estimate as of the Liquidation Date for the total accrued and unpaid Professional Fee Claims, outstanding letters of credit, and other reserves. For the avoidance of doubt, the claims related to letters of credit are limited to those related to the Debtors' housewares business. No provision for success fees has been included in this line item. The Debtors estimate a 100% recovery on these Claims.

[L] Winddown Administrative Claims: This line item includes winddown costs associated with a six-month liquidation in Chapter 7, including Claims related to payroll (including accrued payroll) and corporate and distribution costs, estimated between [$41] million and [$38] million. Per section 326 of the Bankruptcy Code, a Trustee is eligible to receive 3% of the distribution to interested parties, estimated in the range of $6 million to $7 million.

[M] TL DIP Facility-related Claims: Represents the outstanding balance of the TL DIP Facility, as adjusted to reflect a $40 million payment remitted in connection with the post-Liquidation Date closing of the Appliances Sale Transaction. The Debtors estimate a recovery in the range of [72]% to [100]% for the outstanding balance of the TL DIP Facility.

[N] Secured Claims: Represents Prepetition Term Loan Claims and Other Secured Claims that were unpaid as of the Liquidation Date. The Debtors estimate 1% recovery on the high end and 0% recovery rate on the low end for these claims.

[O] Administrative Claims and Priority Claims: This line item includes Administrative Claims under section 503(b) of the Bankruptcy Code (including projected unpaid budgeted Professional

Fee Claims), Priority Claims under section 507(a) of the Bankruptcy Code, and other post-petition accounts payable as of the Liquidation Date. The Debtors estimate a 0% recovery on these Claims.

[P] General Unsecured Claims: This line item includes General Unsecured Claims that were unpaid as of the Liquidation Date. The high estimate includes the total amounts of claims filed against the Debtors, while the low estimate removes those claims that are currently in the process of being reconciled. The Debtors estimate a 0% recovery on these Claims.

# Exhibit E

## Schedule of Retained Causes of Action

1. To be brought solely by the Litigation Trust and Litigation Trustee: All Causes of Action of any kind whatsoever (including Avoidance Actions, lender liability, breach of fiduciary duty, aiding and abetting (including aiding and abetting breach of fiduciary duty), knowing participation (including knowing participation in breach of fiduciary duty), conspiracy (including conspiracy to breach fiduciary duty), illegal dividends, negligence, malpractice, fraud, misrepresentations, omissions, and any and all other claims and Causes of Action) relating to either or both of (a) the 2021 Financing and Dividend Recapitalization Transactions, including any dividends and other payments, fees or transfers made in connection therewith and (b) the UnSub Financing Transaction and all transactions related thereto, in each case, against each of the following: (p) Cornell Capital LLC and its affiliate investment funds (including CC WK Co-Invest LP); (q) Agate Informatics Corp.; (r) 4060288 Canada Inc.; (s) 7326998 Canada Inc.; (t) Robert J. Wang Family Trust; (u) Yi Qin Family Trust; (v) Dongjun Wang Family Trust; (w) any Person or other Entity that received, as the initial or subsequent transferee under section 550 of the Bankruptcy Code or any applicable analogous state law provision, any portion of any dividends or distributions transferred from the Debtors (including, for the avoidance of doubt, any amounts used to repay those certain series 1 seller promissory notes by and between Corelle Brands Acquisition Holdings Inc. and certain of its shareholders, dated February 7, 2020), except for any employee or officer of the Debtors as of the date of the filing of the Plan; (x) any director of Instant Brands Acquisition Holdings Inc., except for Kenneth G. Wilkes, Benoit J. Gadbois, Lawrence McRae, and John S. Dubel; (y) any accountants, advisors, attorneys, auditors, consultants, or professionals who provided services to the Debtors, except for Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, and Stikeman Elliott LLP; and (z) any bank, fund, or other financial institution (for the avoidance of doubt, not including Guggenheim Securities, LLC) that served as underwriter, arranger, bookrunner, or a role of similar nature.[1] For the avoidance of doubt, the Causes of Action listed in this item are Litigation Trust Recovery Actions retained pursuant to the Plan for which the Litigation Trustee is authorized and empowered to pursue in accordance with the terms of this Plan.

2. To be brought solely by the Reorganized Debtors: Any Causes of Action arising under or relating to the Debtors' contractual or legal rights of indemnification and/or contribution, including, among other things, on account of or relating to any Product Liability Claims, and including, and subject to the applicable terms of, all agreements, documents, or instruments relating to such rights of indemnification, including those that could be asserted against (a) FoShan ShunDe Midea Electrical Heating Appliances Manufacturing Company Limited, (b) GuangDong Midea Consumer Electric Manufacturing Company

---

[1] Notwithstanding anything to the contrary set forth herein, this paragraph shall not include any Causes of Action of any kind that were released pursuant to a Final Order (including the Final DIP Order) or any other claims against, solely in their respective capacities as such, (y) any DIP Agent, DIP Lender, Prepetition Agent, Prepetition Term Loan Lender, Prepetition ABL Agent, Prepetition ABL Lender, or other Prepetition ABL Secured Party or (z) the Appliances Buyers, Centre Lane Partners V, L.P., the Transferred Employees, or any of their respective Affiliates or Representatives (each as defined in the Appliances APA).

Limited, (c) Guangdong Xinbao Electrical Appliance Holdings Co., Ltd., (d) Midea Electric Trading (Singapore) Co. Pte Ltd., (e) Topim Intelligent Manufacturing (Shao Yang) Co. Ltd., (f) Zhejiang Aishida Household Equipment Co., Ltd., (g) Zhejiang Tianxi Kitchen Appliance Co., Ltd., (h) Zhong Shan Rnice Electric Co., Ltd., and (i) with respect to each of the foregoing Entities in clauses (a) through (h), such Entity's Related Parties.

3. To be brought solely by the Reorganized Debtors, except to the extent any of the following Causes of Action constitute Litigation Trust Recovery Actions (see item 1 of this **Exhibit E**), in which case they are to be brought solely by the Litigation Trust and the Litigation Trustee: Any Cause of Action arising from or relating to the assets, rights, and properties listed in section 2.02 of the Appliances APA.