# Exhibit 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **INSTANT BRANDS ACQUISITION HOLDINGS INC., *et al.*,** | § | **Case No. 23-90716 (MI)** |
| | § | |
| **Debtors.**[1] | § | **Jointly Administered** |
| | § | **Re: Docket Nos. 845, 878, 898, 926-1, and 983** |

**NOTICE OF FILING PLAN SUPPLEMENT TO THE DEBTORS' COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN**

**PLEASE TAKE NOTICE** that, on June 12, 2023, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors' chapter 11 cases are being jointly administered under case number 23-90716 (MI) (the "**Chapter 11 Cases**").

**PLEASE TAKE FURTHER NOTICE** that, on January 11, 2024, the Court entered the *Order (I) Approving the Disclosure Statement on a Conditional Basis, (II) Approving the Solicitation and Tabulation Procedures, (III) Approving the Forms of Ballots, Solicitation Package, and Notices, (IV) Establishing Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan, (V) Scheduling a Combined Hearing For Final Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 924] (the "**Solicitation Order**"), pursuant to which the Debtors solicited votes with respect to the *Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* [Docket No. 926-1] (as amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "**Combined DS and Plan**" or the "**Plan**," as applicable).[2]

---

[1] The debtors and debtors in possession in these chapter 11 cases, along with the last four digits of their respective employer identification numbers or registration numbers in the applicable jurisdictions, are as follows: Instant Brands (Texas) Inc. (2526); Instant Brands Acquisition Holdings Inc. (9089); Instant Brands Acquisition Intermediate Holdings Inc. (3303); Instant Brands Holdings Inc. (3318); URS-1 (Charleroi) LLC (7347); Instant Brands LLC (0566); URS-2 (Corning) LLC (8085); Corelle Brands (Latin America) LLC (8862); EKCO Group, LLC (7167); EKCO Housewares, Inc. (0216); EKCO Manufacturing of Ohio, Inc. (7300); Corelle Brands (Canada) Inc. (5817); Instant Brands (Canada) Holding Inc. (4481); Instant Brands Inc. (8272); and Corelle Brands (GHC) LLC (9722). The address of the debtors' corporate headquarters is 3025 Highland Parkway, Suite 700, Downers Grove, IL 60515.

[2] Capitalized terms used but not otherwise defined herein (including, for the avoidance of doubt, the exhibits hereto) shall have the meanings ascribed to them in the Combined DS and Plan.

**PLEASE TAKE FURTHER NOTICE** that, on February 1, 2024, the Debtors filed [Docket No. 983] the following exhibits to the Plan Supplement:

| | |
|---|---|
| **Exhibit A** | Schedule of Retained Causes of Action |
| **Exhibit B** | Schedule of Rejected Contracts |
| **Exhibit C** | Summary of Material Exit Financing Documents |
| **Exhibit D** | Identity of the Reorganized Parent's Managers |

**PLEASE TAKE FURTHER NOTICE** that attached hereto are the substantially final forms of the Plan Documents set forth below, which form part of the Plan Supplement:

| | |
|---|---|
| **Exhibit E** | Litigation Trust Agreement |
| **Exhibit F** | Agreement Providing for the Litigation Trust Financing Facility |
| **Exhibit G** | Certain New Governance Documents |

**PLEASE TAKE FURTHER NOTICE** that certain Plan Documents or portions thereof, including those (to be) contained in the Plan Supplement, remain subject to continuing negotiations among the Debtors and interested parties with respect thereto. Subject to the terms and conditions set forth in the Combined DS and Plan, the Debtors reserve all rights to amend, modify, or supplement the Plan Supplement and any of the Plan Documents and designations contained therein at any time prior to the Combined Hearing, or any such later date as may be permitted by the Combined DS and Plan or by order of the Court (including the Solicitation Order). To the extent amendments or modifications that the Debtors believe to be material are made to any Plan Document attached hereto, the Debtors will file a redline with the Court showing such changes.

**PLEASE TAKE FURTHER NOTICE** that the forms of the Plan Documents contained in the Plan Supplement are integral to—and, for the avoidance of doubt, are considered part of and incorporated by reference into—the Combined DS and Plan. For the avoidance of doubt, if the Plan is confirmed, the Plan Documents (including those in the Plan Supplement) will be approved by the Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that a Combined Hearing on the final approval of the Disclosure Statement and the Confirmation of the Plan will commence on **February 15, 2024 at 8:00 a.m. (prevailing Central Time)** in the Court before the Honorable Marvin Isgur, at 515 Rusk Street, Houston, Texas 77002. The Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Court or by filing a notice on the Court's docket.

**PLEASE TAKE FURTHER NOTICE** that copies of the Combined DS and Plan, the Solicitation Motion, the Solicitation Order, and all other documents publicly filed in the Chapter 11 Cases (including the Plan Supplement), as well as additional information about the Chapter 11 Cases, can be accessed free of charge by visiting the Debtors' case information website located at https://dm.epiq11.com/InstantBrands.

Dated: February 8, 2024
Houston, Texas

HAYNES AND BOONE, LLP

*/s/ David A. Trausch*


Charles A. Beckham, Jr. (TX Bar No. 02016600)
Arsalan Muhammad (TX Bar No. 24074771)
David A. Trausch (TX Bar No. 24113513)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Tel.: (713) 547-2000
Email: charles.beckham@haynesboone.com
arsalan.muhammad@haynesboone.com
david.trausch@haynesboone.com

*-and-*

DAVIS POLK & WARDWELL LLP

Brian M. Resnick (admitted *pro hac vice*)
Steven Z. Szanzer (admitted *pro hac vice*)
Joanna McDonald (admitted *pro hac vice*)
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Email: brian.resnick@davispolk.com
steven.szanzer@davispolk.com
joanna.mcdonald@davispolk.com


*Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that, on February 8, 2024, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ David A. Trausch*
David A. Trausch

# <u>Exhibit E</u>

## Litigation Trust Agreement

## [LITIGATION TRUST AGREEMENT][1]

This Litigation Trust Agreement (the "Litigation Trust Agreement"), dated as of February [●], 2024, by (a) the individual identified on Exhibit A attached hereto, as the trustee for the liquidating trust established pursuant to this Litigation Trust Agreement (such person and each successor trustee, the "Litigation Trustee"), and (b) Instant Brands Acquisition Holdings Inc., on behalf of itself and the other Debtors, is executed pursuant to the Confirmation Order to facilitate the implementation of the [*Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates* [ECF No. [898]] (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof, the "Plan") that provides for the establishment of the Litigation Trust created hereby. Each of the Debtors and the Litigation Trustee are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used in this Litigation Trust Agreement and not otherwise defined shall have the meanings assigned to such terms in the Plan.

**RECITALS**

WHEREAS, on June 12, 2023, Instant Brands Acquisition Holdings Inc. and certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

[WHEREAS, on June 15, 2023, the Debtors commenced proceedings before the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "CCAA") recognizing the Bankruptcy Cases as "foreign main proceedings" (the "CCAA Recognition Proceedings");]

WHEREAS, on February [●], 2024, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

WHEREAS, on February [●], 2024, the Effective Date of the Plan occurred and the reorganization of the Debtors was consummated (as reorganized from and after the Effective Date of the Plan, the "Reorganized Debtors");

WHEREAS, on February [●], 2024, the CCAA Court entered an order recognizing the Confirmation Order (the "CCAA Recognition Order");

WHEREAS, the Litigation Trust is established for the sole purpose of administering and liquidating the Litigation Trust Assets and making all distributions to holders of interests in the Litigation Trust (the "Litigation Trust Interests") as provided for under the Plan;

WHEREAS, the Litigation Trust shall be established for the benefit of the holders of the Litigation Trust Interests (collectively, the "Litigation Trust Beneficiaries"), eighty-five (85%) percent of which shall be held by the holders of Allowed Prepetition Term Loan Claims and fifteen

[1] [NTD: THIS FORM OF THE AGREEMENT REMAINS SUBJECT TO FURTHER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, BUT NOT LIMITED TO, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE REORGANIZED DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED.]

(15%) percent which shall be held in the name of [*Name of Distribution Agent*] as the designated Distribution Agent (as defined in the Plan) (the "Distribution Agent") for the benefit of holders of Allowed General Unsecured Claims (including, for the avoidance of doubt, Disputed General Unsecured Claims to the extent they ultimately become Allowed General Unsecured Claims);

WHEREAS, the Litigation Trustee was duly appointed pursuant to section 1123(a)(5)(B), (a)(7), and (b)(3)(B) of the Bankruptcy Code solely with respect to the Litigation Trust Assets;

WHEREAS, the Litigation Trust has no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust;

WHEREAS, the Litigation Trust (excluding the Distribution Reserves) is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d) that is treated as a grantor trust and the Litigation Trust Beneficiaries are intended to be treated as the grantors of this Litigation Trust (excluding the Distribution Reserves) for U.S. federal income tax purposes, and this Litigation Trust Agreement, the Litigation Trust (excluding the Distributions Reserves), the Confirmation Order, and the Plan are intended to comply with the advance ruling guidelines contained in Rev. Proc. 94-45, 1994-2 C.B. 684; and

WHEREAS, this Litigation Trust Agreement is the "Litigation Trust Agreement" contemplated under the Plan and is executed in order to facilitate the implementation of the Plan;

NOW, THEREFORE, pursuant to the Plan and Confirmation Order, in consideration of the premises and the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE 1
## ESTABLISHMENT OF THE LITIGATION TRUST

Section 1.01 *Establishment of Litigation Trust and Appointment of Litigation Trustee.*

(a) The Litigation Trust is hereby established on behalf of the Litigation Trust Beneficiaries and shall be known as the "Instant Brands Litigation Trust". References herein to the "Litigation Trust" shall refer to the Instant Brands Litigation Trust, and references to the "Litigation Trustee" shall refer to the Litigation Trustee acting with respect of the Instant Brands Litigation Trust.

(b) The Litigation Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date and agrees to accept and hold all assets transferred to the Litigation Trust in trust for the Litigation Trust Beneficiaries subject to the terms of the Plan, the Confirmation Order and this Litigation Trust Agreement. The Litigation Trustee and each successor Litigation Trustee serving from time to time hereunder shall have all the rights, powers and duties set forth herein. "Litigation Trust Assets" shall mean all assets transferred to the Litigation Trust under the Plan, including all Litigation Trust Recovery Actions (as defined in the Plan), and all other assets (including all causes of action, property, monetary assets, rights, titles, powers, and other interests of any kind) transferred to the Litigation Trust from time to time either

by the Debtors, by the Reorganized Debtors, or by any other Person , and all proceeds of the foregoing.

(c) Subject to the terms of this Litigation Trust Agreement, any action by the Litigation Trustee and/or the Litigation Trust Advisory Board shall be binding and conclusive on all Litigation Trust Beneficiaries even if such Litigation Trust Beneficiaries have different or conflicting interests.

(d) The Litigation Trustee and the members of the Litigation Trust Advisory Board may serve without bond.

(e) For the avoidance of doubt, none of the Litigation Trustee or any member of the Litigation Trust Advisory Board is an officer, director or fiduciary of any of the Debtors or the Reorganized Debtors.

Section 1.02 *Transfer of Assets and Rights to the Litigation Trust.*

(a) As of the Effective Date, and pursuant to and subject in all respects to the terms of the Confirmation Order and in accordance with the Bankruptcy Code (including, without limitation, section 1141 thereof), the Debtors, in their respective capacities as debtors in possession on behalf of the Estates, have transferred, assigned, and delivered to the Litigation Trust, without recourse, all of their respective rights, title, and interests in and to the Litigation Trust Assets [free and clear of any and all (1) Claims and Interests, encumbrances, charges, or interests of any kind in such property of any other Person and (2) contractually imposed restrictions (including all Liens, Claims, encumbrances, charges or interests of any kind) other than Claims held by the Debtors or the Reorganized Debtors in the nature of setoff and recoupment and except as provided in the Plan or Confirmation Order.][2] [For the avoidance of doubt, the Litigation Trust Assets shall include in respect of any Litigation Trust Recovery Action transferred to the Litigation Trust, all of the transferor's legal rights and privileges (including any associated attorney-client, common-interest, work product or other legal privileges of such Person) relating in any way to such Litigation Trust Assets or any communications, legal analysis or advice, or other information in respect of such Litigation Trust Assets or any facts relevant thereto, and the Litigation Trustee in his or her sole discretion shall control the assertion and waiver of any such legal rights and privileges.][3]

(b) On and after the Effective Date, upon the request of the Litigation Trustee, the Debtors and the Reorganized Debtors, as applicable, shall (1) provide the Litigation Trustee and the Litigation Trust's professionals with originals or copies of or access to all documents and business records of the Debtors and the Reorganized Debtors in their possession to facilitate the purpose of the Litigation Trust, including the Prosecution of the Litigation Trust Recovery Actions, and (b) reasonably cooperate with the foregoing (including by providing reasonable access to the Reorganized Debtors' management). Any and all costs in connection therewith shall be governed by Section 3.05 hereof.

---

[2] [NTD: Subject to further review.]

[3] [NTD: Under review.]

(c) All of the proceeds received and recoveries by the Litigation Trust from the pursuit of any Litigation Trust Recovery Actions constituting Litigation Trust Assets or otherwise from the administration or liquidation of the Litigation Trust Assets (collectively, such proceeds, the "Litigation Trust Proceeds") shall be added to the Litigation Trust Assets and held as a part thereof (and title thereto shall be vested in the Litigation Trust).

(d) At any time and from time to time on and after the Effective Date, the Debtors agree, for themselves and the Reorganized Debtors, to the extent contemplated in the Plan and in this Litigation Trust Agreement, (i) at the reasonable request of the Litigation Trustee, to execute and/or deliver any instruments, documents, books and records (including those maintained in electronic format and original documents as may be needed), and (ii) to take, or cause to be taken, all such further actions as the Litigation Trustee may reasonably request, in each case in order to evidence or effectuate the transfer of the Litigation Trust Assets to the Litigation Trust. Any and all costs in connection therewith shall be governed by Section 3.05 hereof.

Section 1.03 *Title to Litigation Trust Assets.*

From and after the Effective Date, legal title to the Litigation Trust Assets shall be vested at all times in the Litigation Trust as a separate legal entity except where applicable law in any jurisdiction in which the Litigation Trust Assets may be located requires title to any part of the Litigation Trust Assets to be vested in a trustee, in which case title shall be deemed vested in the Litigation Trustee as set forth in Section 3.01(a). No Litigation Trust Beneficiary shall have legal title to any part of the Litigation Trust Assets. The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the sole benefit of the Litigation Trust Beneficiaries. Upon each transfer of Litigation Trust Assets to the Litigation Trust, the Litigation Trust shall succeed to all of the transferor's rights, title and interests in and to the Litigation Trust Assets and no other Person shall have any interest, legal, beneficial or otherwise, in the Litigation Trust or the Litigation Trust Assets as of their transfer and assignment to the Litigation Trust.

Section 1.04 *Nature and Purpose of the Litigation Trust.*

(a) The Litigation Trust is organized and established as a trust solely for the purposes set forth in the Plan, pursuant to which the Litigation Trustee, subject to the terms and conditions contained herein and in the Plan and this Litigation Trust Agreement, is to (i) administer the Litigation Trust Assets, (ii) oversee and direct the expeditious but orderly liquidation of the Litigation Trust Assets, and (iii) make all distributions of the Net Litigation Trust Proceeds (as defined below) to the Litigation Trust Beneficiaries as provided for herein and under the Plan. The Litigation Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulations section 301.7701-4(d). The primary purpose of the Litigation Trust is to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to maintain the liquidation value of the Litigation Trust Assets, and consistent with, the liquidating purpose of the Litigation Trust.

(b) This Litigation Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust for all applicable purposes. The Litigation Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor

shall the Litigation Trustee, the Litigation Trust Advisory Board (or any of its members), the Debtors, the Reorganized Debtors, or the Litigation Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Litigation Trust Beneficiaries to the Litigation Trustee and the Litigation Trust Advisory Board shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Litigation Trust Agreement.

Section 1.05 *Relationship to, and Incorporation of, the Plan and Confirmation Order.*

[This Litigation Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Litigation Trust Agreement incorporates the provisions of the Plan, the Confirmation Order, and the CCAA Recognition Order (as applicable) by this reference. To that end, the Litigation Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan and to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan, in each case, solely to the extent that such action or orders are in furtherance of this Litigation Trust Agreement. To the extent that there is an explicit conflict between the provisions of this Litigation Trust Agreement, the provisions of the Plan and/or the Confirmation Order and/or the CCAA Recognition Order, each such document shall have controlling effect in the following rank order: (1) this Litigation Trust Agreement, (2) the Confirmation Order; (3) the CCAA Recognition Order; and (4) the Plan.][4]

Section 1.06 *Funding of the Litigation Trust.*

On the Effective Date, the Litigation Trust Lenders, as lenders, and the Litigation Trustee in his capacity as trustee of the Litigation Trust, as borrower, shall become parties to a credit agreement (the "Litigation Trust Credit Agreement") having the terms set forth in the Plan and the Plan Supplement. The Litigation Trust Credit Agreement shall set forth the terms of the Litigation Trust Financing Facility (as defined in the Plan) which shall provide for loans to the Litigation Trust including $6 million in committed financing (subject to satisfaction of certain conditions) and an additional $4 million of incremental financing (all loans extended under the Litigation Trust Financing Facility, "Litigation Trust Loans"). Except as expressly provided in the Litigation Trust Credit Agreement, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the Litigation Trust. Any failure or inability of the Litigation Trust to obtain funding will not affect the enforceability of the Litigation Trust.

Section 1.07 *Appointment as Representative.*

Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Litigation Trustee is deemed to be acting in the capacity of a bankruptcy trustee, monitor, receiver, liquidator, conservator, or any similar official, who has been appointed to take control of, supervise, manage or liquidate the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries. To the extent that any of the Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provisions of the Bankruptcy Code or the

[4] NTD: Subject to further review.

CCAA, such Litigation Trust Assets shall be deemed to have been retained by the applicable Estate and the Litigation Trustee shall be deemed to have been designated as a representative of the applicable Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of such Estate subject to the terms of this Litigation Trust Agreement, the Plan, the Confirmation Order, and the CCAA Recognition Order. Notwithstanding the foregoing, all Litigation Trust Proceeds shall be paid over to the Litigation Trust and shall be applied in accordance with the Plan, this Litigation Trust Agreement and the Litigation Trust distribution schedule, attached hereto as Exhibit C (the "Litigation Trust Distribution Schedule"), which shall include the name, address and other available contact information, the Claim amount and wire instructions of each Holder of Allowed Prepetition Term Loan Claims and the name, address and other available contact information and wire instructions of the Distribution Agent. [For avoidance of doubt, the Distribution Agent shall receive from the Debtors' claims and noticing agent, for maintaining the name, address and other available contact information, and Claim amount of each Holder of Allowed General Unsecured Claims and shall be permitted to rely upon such information for the purpose of any distributions.][5]

## ARTICLE 2
## LITIGATION TRUST INTERESTS

Section 2.01 *Allocation of Litigation Trust Interests.*

The allocation and distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan with 85% of the Litigation Trust Interests issued pro rata to holders of Allowed Prepetition Term Loan Claims and 15% of the Litigation Trust Interests issued to the Distribution Agent for pro rata benefit of the holders of Allowed General Unsecured Claims (including, for the avoidance of doubt, Disputed General Unsecured Claims to the extent they ultimately become Allowed General Unsecured Claims). All Litigation Trust Proceeds shall be used to pay all costs and expenses payable by the Litigation Trust in satisfaction of any obligations under this Litigation Trust Agreement (including, without limitation, as required to repay in full the Litigation Trust Loans, to fund the Expense Fund, to make any payments owing to members of the Litigation Trust Advisory Board, and to make any payments to advisors or professionals engaged by the Litigation Trust or the Litigation Trust Advisory Board, in each case, in accordance with this Litigation Trust Agreement) prior to distribution of the net remaining amounts after such payments (such net amounts of the Litigation Trust Proceeds, the "Net Litigation Trust Proceeds") to the Litigation Trust Beneficiaries in accordance with the terms hereof.

Section 2.02 *Interests Beneficial Only.*

The ownership of a Litigation Trust Interest shall not entitle any Litigation Trust Beneficiary to any title in or to the Litigation Trust Assets (which title shall be vested in the Litigation Trust) or to any right to call for a partition or division of the Litigation Trust Assets or to require an accounting.

---

[5] [NTD: Under review.]

Section 2.03 *Evidence of Beneficial Interests.*

The Litigation Trust Interests shall be uncertificated, and are reflected only on the books and records of the Litigation Trust maintained by the Litigation Trustee (the "Trust Register"). All Litigation Trust Beneficiaries are deemed to have assented to and be bound by the terms and conditions of this Litigation Trust Agreement and the Plan.

Section 2.04 *Exemption from Registration.*

The Parties hereto intend that the rights of the Litigation Trust Beneficiaries arising under this Litigation Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the Parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.[6]

Section 2.05 *Transfer of a Litigation Trust Interest.*

(a) The Litigation Trust Interests are not negotiable, not assignable, not transferable and not capable of being pledged or hypothecated, provided that they may be transferred, in whole only, (x) pursuant to applicable laws of descent and distribution (in the case of a deceased individual Beneficiary), (y) by operation of law, or (z) subject to Section 2.05(b) hereof, in the event the Litigation Trustee and the Litigation Trust Advisory Board receive written notice of transfer executed by both the transferee and the transferor acknowledged before a notary public (upon which, for the avoidance of doubt, the Litigation Trustee and the Litigation Trust Advisory Board may rely as evidence of such transfer without the requirement of any further investigation). The Litigation Trustee shall not be required to record any transfer that, in the Litigation Trustee's sole discretion, may be construed to create any uncertainty or ambiguity as to the identity of the holder of the Litigation Trust Interests. Until a transfer is, in fact, recorded on the Trust Register maintained by the Litigation Trustee for the purpose of identifying Litigation Trust Beneficiaries, the Litigation Trustee, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications as though he or she has no notice of any such transfer, and in so doing the Litigation Trustee shall be fully protected and incur no liability to any purported transferee or any other Person. Neither the Litigation Trust, the Litigation Trustee nor the Professionals shall incur any liability from relying on the Litigation Trust Distribution Schedule to determine the interests of the Litigation Trust Beneficiaries in the Litigation Trust.

(b) Absent consent from the Litigation Trust Advisory Board, the Litigation Trust Interests shall not be capable of being transferred to any Person or Entity.

(c) Any purported transfer of any Litigation Trust Interests in contravention of the forgoing shall constitute a violation of this Section 2.05 and shall be void ab initio.

---

[6] [NTD: Tax to clean up JD comments on same.]

Section 2.06 *Access to the Litigation Trust records by the Litigation Trust Beneficiaries.*

The Litigation Trust Beneficiaries and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Litigation Trustee to inspect the Trust Register with respect to and as they pertain to such Litigation Trust Beneficiary's Litigation Trust Interests at the sole expense of the Litigation Trust Beneficiary seeking the same. [For avoidance of doubt, the rights referenced in this section 2.06 include both the Distribution Agent and the Holders of Allowed General Unsecured Claims on whose behalf the Distribution Agent holds Litigation Trust Interests.][7]

Section 2.07 *Change of Address.*

A Litigation Trust Beneficiary (for the avoidance of doubt, the Prepetition Term Loan Lenders and the Distribution Agent on behalf of the Holders of Allowed General Unsecured Claims) may, after the Effective Date, select an alternative distribution address or provide wire transfer instructions for any distribution hereunder by providing written notice to the Litigation Trustee as set forth in Section 11.06 hereof, including such new address or instructions. Such notification will be effective only upon receipt by the Litigation Trustee as set forth in Section 11.06 hereof, upon which the Litigation Trustee shall update the Litigation Trust Distribution Schedule accordingly. Absent receipt of such notice by the Litigation Trustee, the Litigation Trustee shall not recognize any such change.

Section 2.08 *Tax Identification Numbers.*

The Litigation Trustee shall in accordance with Section 5.06 require Litigation Trust Beneficiaries to furnish to the Litigation Trustee its social security number or employer or taxpayer identification number as assigned by the Internal Revenue Service and complete any related documentation (including but not limited to a Form W-8 or Form W-9) and the Litigation Trustee shall condition any distribution to any such Litigation Trust Beneficiaries on the receipt of such documentation and such other information or documents as the Litigation Trustee reasonably requests in accordance with Section 5.06 or in accordance with such applicable law if the Litigation Trustee does not receive such information. For avoidance of doubt, the Distribution Agent may similarly require Holders of General Unsecured Claims to provide similar information and documentation to the Distribution Agent and may similarly condition any distribution to any Holders of General Unsecured Claims thereon.

Section 2.09 *Conflicting Claims.*

If any conflicting claims or demands are made or asserted with respect to Litigation Trust Interests of a Litigation Trust Beneficiary, the Litigation Trustee shall be entitled, in his, her or its sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Litigation Trustee shall (a) make no payment or distribution with respect to the Litigation Trust Interests or any part thereof, and (b) refer such conflicting claims and demands to the Bankruptcy Court, which shall have exclusive jurisdiction over the resolution of such conflicting claims or demands. In so doing, the Litigation Trustee shall not be liable to any party for his, her or its

[7] NTD: Subject to further review.

refusal to comply with any such conflicting claims or demand. The Litigation Trustee shall be entitled to refuse to comply with conflicting claims and demands until either (a) a Final Order has been entered adjudicating the rights of the adverse claimants or (b) the conflict has been resolved by a written agreement among such parties and the Litigation Trustee, which agreement shall include a complete release of the Litigation Trust and the Litigation Trustee with respect to the subject matter of the dispute.

## ARTICLE 3
## THE LITIGATION TRUSTEE

Section 3.01 *Role of the Litigation Trustee.*

In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, the Litigation Trustee, subject to the terms and conditions contained herein and in the Plan, shall (i) receive, hold, and administer the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries and (ii) make distributions of Net Litigation Trust Proceeds in accordance with the Plan and the Litigation Trust Distribution Schedule. Subject to the provisions of this Litigation Trust Agreement, the Litigation Trustee in consultation with the Litigation Trust Advisory Board shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. The Litigation Trustee and the Litigation Trust Advisory Board shall act in the best interests of all the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust. Neither the Litigation Trustee nor any of its duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Litigation Trustee in accordance with the Litigation Trust Agreement, the Plan or the Confirmation Order, other than acts or omissions resulting from the Litigation Trustee's recklessness, willful misconduct, or fraud. The Litigation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.

Section 3.02 *Authority of the Litigation Trustee.*

In connection with the administration of the Litigation Trust, in addition to any and all of the powers enumerated elsewhere herein, the Litigation Trustee is authorized to perform any and all acts necessary and desirable to accomplish the purposes of this Litigation Trust Agreement and the provisions of the Plan solely relating to the Litigation Trust and the Litigation Trust Assets, within the bounds of the Plan, this Litigation Trust Agreement and applicable law. The Litigation Trustee, in consultation with the Litigation Trust Advisory Board except as set forth herein, shall, in an expeditious but orderly manner, receive, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions and not unduly prolong the duration of the Litigation Trust. The liquidation of the Litigation Trust Assets may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal thereof, or otherwise.

The Litigation Trustee, subject to the approval of the Litigation Trust Advisory Board except as set forth herein, shall have the right to pursue, not pursue, release, dismiss, abandon, settle and/or compromise any and all Litigation Trust Assets (including any counterclaims asserted against the Litigation Trust) as the Litigation Trustee reasonably determines is in the best interests

of the Litigation Trust Beneficiaries. To the extent that any action has been taken to prosecute or otherwise resolve any Litigation Trust Recovery Action constituting Litigation Trust Assets prior to the Effective Date by the Debtors and/or the Official Committee of Unsecured Creditors, on the Effective Date the Litigation Trustee shall be substituted for the Debtors and/or the Official Committee of Unsecured Creditors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the litigation by Rule 7025 of the Federal Rules of Bankruptcy Procedure and the caption with respect to such pending litigation shall be changed to the following: "[Alan Halperin], as Litigation Trustee for the Instant Brands Litigation Trust, et al. v. [Defendants]". Immediately upon the Effective Date, all rights, powers, duties, authority and privileges of the Debtors and/or the Official Committee of Unsecured Creditors relating to any Litigation Trust Assets will be vested in the Litigation Trust and undertaken by the Litigation Trustee, consistent and in accordance with the terms of this Litigation Trust Agreement, without any further act, provided that the Litigation Trustee will not be liable personally for any act or omission of the Debtors and/or the Official Committee of Unsecured Creditors. Subject to any limitations contained herein (including, without limitation, Article 4 herein) or in the Plan, the Litigation Trustee shall have the following powers and authorities:

(a) Subject to Section 1.03 hereof, receive by assignment, investiture, or other legal means of transfer from any source and hold legal title (on behalf of the Litigation Trust as Litigation Trustee, but not individually) to all Litigation Trust Assets which shall include, without limitation, any and all money, causes of action, and other property belonging to or transferred to the Litigation Trust on the Effective Date or thereafter;

(b) in consultation with the Litigation Trust Advisory Board, exercise the right to vote any claim or interest that is a Litigation Trust Asset or related thereto in a case under the Bankruptcy Code, the CCAA or any other insolvency or corporate arrangement statute and receive any distribution with respect thereto;

(c) in consultation with the Litigation Trust Advisory Board, make distributions of Net Litigation Trust Proceeds in accordance with the provisions of the Plan, this Litigation Trust Agreement and the Litigation Trust Distribution Schedule;

(d) in consultation with and subject to the approval of the Litigation Trust Advisory Board as may be required in this Litigation Trust Agreement, exercise and perform the rights, powers, and duties with respect to the Litigation Trust Assets, including, without limitation, the any authority under section 1123(b)(3) of the Bankruptcy Code, and shall be deemed to be acting in the capacity of a bankruptcy trustee, monitor, receiver, liquidator, conservator, or any similar official who has been appointed to take control of, supervise, manage or liquidate, or to provide for the prosecution, settlement, compromise, adjustment, retention, enforcement, abandonment or dismissal of, the Litigation Trust Assets;

(e) in consultation with the Litigation Trust Advisory Board, protect and enforce the rights to the Litigation Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(f) in consultation with the Litigation Trust Advisory Board, obtain reasonable insurance coverage with respect to the duties, liabilities and obligations of the Litigation Trustee and the Litigation Trust Advisory Board under this Litigation Trust Agreement (in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy or otherwise);

(g) upon the prior written consent of the Litigation Trust Advisory Board, without further order of the Bankruptcy Court or CCAA Court, employ various professionals, including, but not limited to, counsel, accountants, tax advisors, consultants, agents and financial advisors, (collectively with the independent public accounting firm as set forth in subparagraph (h) below, the "Professionals") as the Litigation Trustee deems necessary to aid it in fulfilling its obligations under this Litigation Trust Agreement and the Plan, and on whatever fee arrangement the Litigation Trustee deems appropriate including, without limitation, contingency fee arrangements. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. All such compensation and reimbursement shall be paid by the Litigation Trust with Litigation Trust Proceeds or the proceeds of the Litigation Trust Loans; provided that such payments are made in accordance with the Approved Budget then in effect under (and as defined in) the Litigation Trust Credit Agreement and the terms of the Litigation Trust Credit Agreement;

(h) in consultation with and subject to the approval of the Litigation Trust Advisory Board, retain and approve compensation arrangements of an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be reasonable and appropriate in the Litigation Trustee's discretion and to prepare and file any tax returns, informational returns, or periodic or current reports as may be required by applicable laws for the Litigation Trust. Subject to the foregoing, the Litigation Trustee may commit the Litigation Trust to and shall pay such independent public accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, and all such compensation and reimbursement shall be paid from the Litigation Trust with Litigation Trust Proceeds or the proceeds of the Litigation Trust Loans; provided that such payments are made in accordance with the Approved Budget then in effect under the Litigation Trust Credit Agreement and the terms of the Litigation Trust Credit Agreement;

(i) in consultation with and subject to the approval of the Litigation Trust Advisory Board, exercise any rights to borrow under Section 2.02 of the Litigation Trust Credit Agreement.

(j) in consultation with and subject to the approval of the Litigation Trust Advisory Board, assert, enforce, release or waive any privilege or any defense on behalf of the Litigation Trust, the Litigation Trust Assets or the Litigation Trust Beneficiaries, as applicable;

(k) in consultation with the Litigation Trust Advisory Board, coordinate with the Debtors and Reorganized Debtors (as applicable) to, subject to any applicable Plan provisions, execute offsets, assert counterclaims against Holders of Claims and establish one or more disputed claims reserves (each, a "Distributions Reserve" and collectively, the "Distributions Reserves") from the Net Litigation Trust Proceeds on account of Litigation Trust Interests issued to the Distribution Agent; *provided*, however, that the Reorganized Debtors shall reconcile customer accounts, loan balances and ordinary business transactions that may be required to do any of the

foregoing, and the Litigation Trustee shall defer to the Reorganized Debtors with respect to any litigation relating thereto. The amount held back in the Distributions Reserves shall be equal to the amount necessary to satisfy the distributions to which the Holders of the Litigation Trust Interests issued to the Distribution Agent (for the benefit of the Holders of Allowed General Unsecured Claims (including, for the avoidance of doubt, Disputed General Unsecured Claims to the extent they ultimately become Allowed General Unsecured Claims)) would be entitled if all Disputed General Unsecured Claims were to be subsequently Allowed; in each case, which amount shall be determined in accordance with Art. IX. D. of the Plan;

(l) for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulations section 1.468B-9 to treat each Distributions Reserve as a "disputed ownership fund" within the meaning of that section and act as the administrator (as defined under Treasury Regulations section 1.468B-9(b)(2)) of any such "disputed ownership fund," (ii) allocate taxable income or loss to the Distributions Reserves with respect to any given taxable year (but only for the portion of the taxable year with respect to which the applicable General Unsecured Claims are Disputed Claims), (iii) pay any Taxes due on account of such "disputed ownership fund," and distribute assets from the Distributions Reserves as, when, and to the extent, such Disputed General Unsecured Claims become Allowed and the corresponding Litigation Trust Interests are allocated by the Distribution Agent to the Holder of the then Allowed claims;

(m) subject to Section 2.03(b) of the Litigation Trust Credit Agreement, upon the written consent of the Litigation Trust Advisory Board, the Litigation Trustee may invest all the Litigation Trust Assets, including, without limitation, the proceeds of the Litigation Trust Loans, all Litigation Trust Proceeds, the Expense Fund (as defined below) and all income earned by the Litigation Trust (pending periodic distributions in accordance with the provisions of the Plan and the Litigation Trust Distribution Schedule), in short term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills, and withdraw funds of the Litigation Trust, make distributions, incur and pay obligations for reasonable and necessary costs and expenses in administering, liquidating and converting the Litigation Trust Assets to Cash and pay taxes of the Litigation Trust (including taxes attributable to the Distributions Reserves); provided, however, that such actions are consistent with the Litigation Trust's status as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684;

(n) request any appropriate tax determination with respect to the Litigation Trust including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(o) subject to applicable securities laws, if any, establish and maintain a website, which may be maintained by and through the Debtors' claims and noticing agent, to the extent the Litigation Trustee deems necessary, for the purpose of providing notice of Litigation Trust activities in lieu of sending written notice to Litigation Trust Beneficiaries, subject to providing notice of the establishment of such website to such beneficiaries;

(p) take or refrain from taking any and all actions the Litigation Trustee reasonably deems necessary for the continuation, protection and maximization of the Litigation Trust Assets consistent with the purposes hereof, take all steps and execute all instruments and documents

necessary to effectuate the Litigation Trust and take all actions necessary to comply with the Confirmation Order, the CCAA Recognition Order, the Plan and this Litigation Trust Agreement and the obligations thereunder and hereunder;

(q) upon the written consent of the Litigation Trust Advisory Board, liquidate any remaining Litigation Trust Assets and provide for the distributions therefrom in accordance with the provisions of the Plan, this Litigation Trust Agreement and the Litigation Trust Distribution Schedule;

(r) [exercise such other powers and authority as may be vested in or assumed by the Litigation Trustee by any Final Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust; and][8]

(s) in consultation with the Litigation Trust Advisory Board, evaluate and determine strategy with respect to the Litigation Trust Assets, and upon the written consent of the Litigation Trust Advisory Board, hold, pursue, prosecute, adjust, arbitrate, compromise, release, settle, dismiss or abandon the Litigation Trust Assets comprising Litigation Trust Recovery Actions.

Section 3.03 *Limitation of the Litigation Trustee's Authority.*

(a) Notwithstanding anything herein to the contrary, the Litigation Trust shall not be authorized to engage in any trade or business and the Litigation Trustee shall not (i) take any actions inconsistent with the orderly liquidation of the Litigation Trust Assets as are required or contemplated by applicable law, the Confirmation Order, the CCAA Recognition Order, the Plan and this Litigation Trust Agreement; (ii) be authorized to engage in any investments or activities inconsistent with the treatment of the Litigation Trust as a liquidating trust within the meaning of Treasury Regulations section 301.7701-4(d) and in accordance with Rev. Proc. 94-45, 1994-2 C.B. 684; (iii) take any action in contravention of this Litigation Trust Agreement; (iv) take any action that would jeopardize treatment of the Litigation Trust as a grantor trust for U.S. federal income tax purposes under sections 671-677 of the Internal Revenue Code of 1986, as amended (the "IRC"), or any successor provisions thereof, except such prohibition shall not apply with respect to the Distributions Reserves; (v) cause or permit beneficial interest in the Litigation Trust to be traded on (1) an established securities market or (2) a secondary market (or the substantial equivalent thereof), in either case (1) or (2) as defined in IRC section 7704(b).

(b) The Litigation Trustee, acting on behalf of the Litigation Trust, shall comply with, and shall not take any actions inconsistent with or seek to modify or seek relief from, any provision of the Plan, the Confirmation Order or the CCAA Recognition Order except to the extent necessary to clarify an ambiguity in any provision of the Plan, the Confirmation Order, or the CCAA Recognition Order.

Section 3.04 *Payment of Litigation Trust Expenses.*

(a) The Litigation Trustee may incur any reasonable and necessary fees and expenses in pursuing the Litigation Trust Assets, administering the Litigation Trust, managing the Litigation

[8] NTD: Subject to further review.

Trust Assets and making distributions of Litigation Trust Assets on account of Litigation Trust Interests. Subject to the requirements of Section 3.11, all fees, expenses, and costs of the Litigation Trustee and the Litigation Trust (including, for the avoidance of doubt, the fees and expenses of Professionals engaged by the Litigation Trust) shall be paid by, solely out of Litigation Trust Assets, and solely be the obligation of, the Litigation Trust.

(b) The Litigation Trustee shall maintain an expense fund (the "Expense Fund") as a reserve to pay fees and expenses reasonably anticipated to be incurred in the future for the purposes set forth in Sections 3.04(a) and 3.05 herein and expend the assets of the Expense Fund to pay such fees and expenses as and when they become due in accordance with Section 3.11.

(c) As accrued fees and expenses are satisfied and paid, the Litigation Trustee may, in consultation with the Litigation Trust Advisory Board, retain from the Litigation Trust Proceeds at any time and from time to time, in his/her/its discretion, such amounts as the Litigation Trustee reasonably determines should be held in the Expense Fund to ensure that the Expense Fund will be adequate to pay fees and expenses anticipated to be incurred in the future for the purposes set forth in Sections 3.04(a) and 3.05 herein and add such amounts to the Expense Fund. Prior to the repayment in full of the Litigation Trust Loans, the amount of Cash that may be held in the Expense Fund shall not exceed the greater of (i) the amount reserved for the Expense Fund in the Approved Budget then in effect (and as defined in) the Litigation Trust Credit Agreement and (ii) $[350,000]. Upon repayment in full of the Litigation Trust Loans, there shall be no limitation on the amount of Cash that may be held in the Expense Fund; provided, that the approval of such amount shall be obtained from the Litigation Trust Advisory Board, which approval shall not be unreasonably withheld.

(d) Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to take any action or enter into or maintain any claim, demand, action, cause of action or proceeding relating to the Litigation Trust, including the Litigation Trust Assets, unless it shall have sufficient funds in the Expense Fund for that purpose.

Section 3.05 *Reimbursement of Debtors.*

The Litigation Trust shall reimburse the Reorganized Debtors for all reasonable and documented out-of-pocket expenses incurred after the date of this Litigation Trust Agreement (including for reasonable legal fees, travel accommodations, electronic discovery and other forensic investigation and analysis and courier and mail service) solely in performing their obligations under this Litigation Trust Agreement. The Litigation Trust shall provide reimbursement for all such reasonable out-of-pocket expenses incurred within thirty (30) days of receipt of an appropriately detailed written invoice. Reimbursement of the Reorganized Debtors under this Section 3.05 shall be limited to a total of $[50,000], provided that the Reorganized Debtors shall have the right to petition the Bankruptcy Court to increase this total upon a showing that the Reorganized Debtors' actual reasonable out-of-pocket expenses in performing their obligations under this Litigation Trust Agreement significantly exceed $[50,000]. Costs and expenses associated with the Reorganized Debtors' review of documents provided or to be provided to the Litigation Trust, including under Section 1.02(B) hereof, production of documents in connection with any litigation, preparation of employees for and attendance at depositions or

interviews, including under Section 1.02(B) hereof, to attendance at and preparation for other depositions, hearings or trials or otherwise involvement in the actions asserting, related to or in connection with the Litigation Trust Assets shall not be deemed to constitute the performance of the Reorganized Debtors under this Litigation Trust Agreement and shall not be included in any request for reimbursement. For the avoidance of doubt, nothing in this Section 3.05 shall be interpreted as imposing on the Litigation Trustee or the Liquidation Trust any obligation to reimburse any Person other than the Reorganized Debtors for any legal fees or expenses incurred in connection with this Agreement or the production of documents or information generally.

Section 3.06 *Distributions.*

(a) The Litigation Trustee shall distribute the Net Litigation Trust Proceeds in accordance with the provisions of the Plan, Article 6 herein and the Litigation Trust Distribution Schedule.

(b) The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, and pay such amounts, as required by and in accordance with any law, regulation, rule, ruling, directive or other governmental requirement (including, without limitation, tax withholding relating to wage claims).

(c) Any Litigation Trust Assets that are not distributable in accordance with this Section 3.06 as of the termination of the Litigation Trust shall be reallocated and otherwise distributed in accordance with the Litigation Trust Distribution Schedule.

(d) The Litigation Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to the Litigation Trust Beneficiaries and all costs and expenses of such distribution agent shall be paid from the Expense Fund.

Section 3.07 *Tenure, Removal, and Replacement of the Litigation Trustee.*

(a) The Litigation Trustee will serve until resignation and the earlier of the appointment of an Interim Trustee pursuant to subsection (g) below, a successor Litigation Trustee pursuant to subsection (b) below, removal pursuant to subsection (c) below, Disability or death (if applicable).

(b) The Litigation Trustee may resign by giving not less than thirty (30) days' prior written notice to the Litigation Trust Advisory Board, the Distribution Agent, the Debtors, and the Litigation Trust Beneficiaries and filing such notice with the Bankruptcy Court. Such resignation will become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor Litigation Trustee as provided herein; provided, however, if such replacement trustee has not been appointed by the 45th day after the date specified in the resignation notice, the resignation shall become effective, and an interim trustee shall be appointed as provided in sub-section (g) below.

(c) Any Litigation Trustee may be removed as Litigation Trustee (i) without Cause by the Litigation Trust Advisory Board upon not less than thirty (30) days' prior written notice to the then current Litigation Trustee or (ii) for Cause by order of the Bankruptcy Court upon motion of any member of the Litigation Trust Advisory Board or a Litigation Trust Beneficiary.

(d) In the event that the Litigation Trustee is removed, resigns or otherwise ceases to serve as Litigation Trustee due to death or Disability, the Litigation Trust Advisory Board shall appoint a successor Litigation Trustee. The Litigation Trust Advisory Board shall give prompt written notice to the Debtors, the Distribution Agent and the Litigation Trust Beneficiaries of the death or removal of the Litigation Trustee and the appointment of any successor Litigation Trustee.

(e) Immediately upon the appointment of any successor Litigation Trustee, all rights, powers, duties, authority and privileges of the predecessor Litigation Trustee hereunder will be vested in and undertaken by the successor Litigation Trustee without any further act; and the successor Litigation Trustee will not be liable personally for any act or omission of the predecessor Litigation Trustee; and the predecessor Litigation Trustee will not be liable personally for any act or omission of the successor Litigation Trustee. Any successor Litigation Trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Litigation Trustee hereunder, and such successor shall be subject to the same qualifications and shall have the same rights, powers, duties and discretion, and otherwise be in the same position, as the originally named Litigation Trustee. References herein to the Litigation Trustee shall be deemed to refer to any successor Litigation Trustee acting hereunder.

(f) Upon the appointment of a successor Litigation Trustee, all the estates, properties, rights, powers and trusts of such predecessor Litigation Trustee shall automatically transfer to such successor Litigation Trustee upon the trust herein expressed, without recourse to the predecessor Litigation Trustee and the predecessor Litigation Trustee (or the duly appointed legal representative of a deceased Litigation Trustee or a Litigation Trustee suffering a Disability) shall, upon the written request of the successor Litigation Trustee, execute and deliver such instrument or instruments necessary or required to assign, transfer and deliver to such successor Litigation Trustee all property and money, including documents relating to the Litigation Trust, the Litigation Trust Assets, or the Litigation Trust Interests, then in such predecessor Litigation Trustee's possession and held hereunder.

(g) Any successor or interim Litigation Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Litigation Trustee hereunder, and any statement or representation made by a predecessor or interim Litigation Trustee or its agents as to the Litigation Trust Assets or as to any other fact bearing upon the prior administration of the Litigation Trust, so long as it has a good faith basis to do so. The Litigation Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Litigation Trustee Interim Trustee or successor Litigation Trustee shall not be liable for any act or omission of any predecessor Litigation Trustee, nor have a duty to enforce any claims against any predecessor Litigation Trustee on account of any such act or omission.

(h) During any period in which there is a vacancy in the position of Litigation Trustee, the Litigation Trust Advisory Board shall appoint one of its members to serve as interim Litigation Trustee (the "Interim Trustee"). The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder. Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a member of the Litigation Trust Advisory Board merely by such Person's appointment as Interim Trustee.

(i) For purposes of this Section 3.07 and Section 4.07, the following terms shall have the following meanings:

> (i) "Cause" means fraud, self-dealing, material breach of this Litigation Trust Agreement, intentional misrepresentation or willful misconduct.
>
> (ii) "Disability" of the Litigation Trustee or a member of the Litigation Trust Advisory Board shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Trustee or any member of the Litigation Trust Advisory Board, as applicable, and reasonably acceptable to the Litigation Trust Advisory Board, the Litigation Trustee or the member of the Litigation Trust Advisory Board shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

Section 3.08 *Books and Records.*

The Litigation Trustee shall maintain in respect of the Litigation Trust and the Litigation Trust Beneficiaries good and sufficient books and records relating to the Litigation Trust Assets and income of the Litigation Trust and the payment of expenses of, liabilities of and claims against or assumed by the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Trust and the requirements of Article 8 herein. Access to or inspection of such books and records shall be granted to the Litigation Trust Advisory Board upon reasonable prior written request during normal business hours and to the Litigation Trust Beneficiaries consistent with Section 2.06 of this Agreement. Nothing in this Litigation Trust Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust or as a condition for managing any payment or distribution out of the Litigation Trust Assets.

Section 3.09 *Inquiries into the Litigation Trustee's Authority.*

Except as otherwise set forth in this Litigation Trust Agreement or in the Plan, no Person dealing with the Litigation Trust shall be obligated to inquire into the authority of the Litigation Trustee in connection with the protection, conservation or disposition of the Litigation Trust Assets.

Section 3.10 *Compliance with Laws.*

(a) The Litigation Trustee shall ensure that any and all distributions of Net Litigation Trust Proceeds shall be in compliance with applicable laws.

(b) If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with registration and reporting requirements of the Exchange Act, the Trust Indenture Act, the Investment Company Act or other applicable law, then the Litigation Trustee shall, after consultation with the Litigation Trust Advisory Board, take commercially reasonable efforts to comply with such registration and reporting requirements, if any, and file

periodic reports with the U.S. Securities and Exchange Commission, Canadian provincial securities regulatory authorities or other applicable Governmental Authority to the extent required by law.

Section 3.11 *Litigation Trustee Compensation and Reimbursement.*

The Litigation Trustee shall receive compensation from the Litigation Trust as follows:

(a) The Litigation Trustee shall receive the compensation set, from time to time, by agreement between the Litigation Trustee and the Litigation Trust Advisory Board. The Litigation Trust Advisory Board, without application to or approval by the Bankruptcy Court, may by agreement with the Litigation Trustee, reasonably modify the Litigation Trustee's compensation and other terms regarding the retention of the Litigation Trustee. Notwithstanding the foregoing, it is expressly acknowledged that the initial Litigation Trustee shall be paid for his, her or its services at his, her or its regular hourly rate at all times in effect, provided that the initial Litigation Trustee shall provide prior notice to the Litigation Trust Advisory Board of any ordinary course increase in his, her or its regular hourly rate. In addition to the foregoing, all compensation of, and fees and expenses incurred (including professional fees) by, the Litigation Trustee prior to the Effective Date shall be paid on the Effective Date in accordance with the Plan.

(b) In addition, the Litigation Trust will reimburse the Litigation Trustee (out of the Litigation Trust Proceeds or the proceeds of the Litigation Trust Loans) for all reasonable and documented out-of-pocket expenses incurred by the Litigation Trustee in connection with the performance of the Litigation Trustee's duties hereunder and under the Plan; provided that such payments are made in accordance with the Approved Budget then in effect under the Litigation Trust Credit Agreement and the terms of the Litigation Trust Credit Agreement.

(c) The fees and expenses payable to the Litigation Trustee shall be paid to the Litigation Trustee upon approval by the Litigation Trust Advisory Board without necessity for review or approval by the Bankruptcy Court, CCAA Court or any other Person; provided that such payments are made in accordance with the Approved Budget then in effect and the Litigation Trust Credit Agreement. The Litigation Trust Advisory Board shall be deemed to have approved the fees and expenses of the Litigation Trustee if no objection is asserted in writing within ten (10) days after receipt of an invoice therefor. All such compensation and reimbursement shall be paid from the Litigation Trust Proceeds or the proceeds of the Litigation Trust Loans, it being expressly understood and acknowledged that such fees and expenses are not limited by or to the Expense Fund but are limited by the Approved Budget then in effect and the terms of the Litigation Trust Credit Agreement. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute between the Litigation Trustee and the Litigation Trust Advisory Board regarding the fees, compensation and expenses of the Litigation Trustee.

Section 3.12 *Reliance by the Litigation Trustee.*

Except as otherwise provided herein:

(a) The Litigation Trustee and the Professionals shall have the absolute and unconditional right to rely, and shall be protected in acting upon, any resolution, certificate, statement, representation, list, schedule, register, instrument, opinion, report, notice, request,

consent, order or other paper or document believed by the Litigation Trustee and/or the Professionals to be genuine, accurate, complete and/or to have been signed, delivered or presented by the proper party or parties, including, without limitation of the foregoing provided by the Debtors or the Reorganized Debtors under this Litigation Trust Agreement or the Plan, any member of the Litigation Trust Advisory Board, the Distribution Agent, any Litigation Trust Beneficiary, or any party to the Litigation Trust Credit Agreement.

Section 3.13 *Standard of Care; Exculpation.*

Neither the Litigation Trustee nor any of the Litigation Trustee's or the Litigation Trust's duly designated agents or representatives or Professionals shall be liable for any act or omission taken or omitted to be taken by any of them except in the event that there is, and to the extent set forth in, a Final Order of a court of competent jurisdiction determining that the Litigation Trustee or the agents or representatives or Professionals, as the case may be, committed fraud, self-dealing, intentional misrepresentation, bad faith, recklessness, gross negligence or willful misconduct, *provided* that in no event will any such Person be liable for punitive, exemplary, consequential, or special damages under any circumstances. The Litigation Trustee may, in connection with the performance of the Litigation Trustee's functions, and in the Litigation Trustee's sole and absolute discretion, consult with the Professionals and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons to comply with the terms of this Litigation Trust Agreement. Notwithstanding such authority, the Litigation Trustee shall be under no obligation to consult with the Professionals, and the Litigation Trustee's good faith determination not to do so shall not result in the imposition of liability on the Litigation Trustee, unless such determination is based on fraud, self-dealing, intentional misrepresentation, bad faith, recklessness, gross negligence, willful misconduct or knowing violation of law. Except as expressly provided in this Litigation Trust Agreement, the Plan, the Confirmation Order or the CCAA Recognition Order, neither the Litigation Trust nor the Litigation Trustee shall assume any of the liabilities, obligations or duties of the Debtors, the Reorganized Debtors or the Litigation Trust Beneficiaries. The Litigation Trustee may accept and rely upon any accounting made by or on behalf of the Debtors or the Reorganized Debtors and any statement or representation made by the Debtors or the Reorganized Debtors or their respective agents and professionals as to the assets comprising the Litigation Trust Assets or as to any other fact bearing upon the creation of the Litigation Trust. The Litigation Trustee may accept and rely upon any accounting made, information generated and any statement or representation made by the Distribution Agent or its agents and professionals relating to the Holders of General Unsecured Claims. This Section 3.13 shall survive the death, dissolution, resignation or removal of the Litigation Trustee or the termination of the Litigation Trust, and shall inure to the benefit of the Litigation Trustee's heirs and assigns.

Section 3.14 *Acknowledgment of Lack of Control; Exculpation.*

The Parties hereby acknowledge and agree that neither the Debtors, the Reorganized Debtors, nor any Litigation Trust Beneficiary, nor the equity owners of the Debtors or the Reorganized Debtors, nor any creditor or group of creditors of the Debtors or Reorganized Debtors, nor any of their duly designated agents or representatives, in each case solely in their capacities as such (the "<u>Non-Controlling Parties</u>"), are able to exert any control or influence over the Litigation Trustee, the administration of the Litigation Trust, the pursuit of the Litigation Trust

Assets or any other business of the Litigation Trust, and accordingly no Non-Controlling Party shall be liable for any act or omission of the Litigation Trust, the Litigation Trustee or any agent or representative of the Litigation Trustee.

Section 3.15 *Limited Recourse.*

All Persons (including any Professionals retained by the Litigation Trustee, the Litigation Trust Advisory Board or any of its members in accordance with this Agreement) engaged in transactions with the Litigation Trust or the Litigation Trustee shall look only to the Litigation Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with the carrying out the terms of this Litigation Trust Agreement, the Plan, the Confirmation Order, or CCAA Recognition Order, and none of the Litigation Trustee, any member of the Litigation Trust Advisory Board, any Litigation Trust Beneficiary, the Debtors or the Reorganized Debtors shall have any personal obligation to satisfy any such liability. This Section 3.15 shall survive the death, dissolution, resignation or removal of the Litigation Trustee or the termination of the Litigation Trust, and shall inure to the benefit of the Litigation Trustee's heirs and assigns.

Section 3.16 *No Successor Liability.*

Except as otherwise expressly provided in this Litigation Trust Agreement, the Plan, Confirmation Order, or the CCAA Recognition Order, neither the Litigation Trust nor the Litigation Trustee (i) shall be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors relating to or arising out of the Litigation Trust Assets prior to the Effective Date; (ii) shall be deemed successors to the Debtors by any reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtors prior to the Effective Date; and (iii) shall have any successor or transferee liability of any kind or character. This Section 3.16 shall survive the death, dissolution, resignation or removal of the Litigation Trustee or the termination of the Litigation Trust, and shall inure to the benefit of the Litigation Trustee's heirs and assigns.

## ARTICLE 4
## LITIGATION TRUST ADVISORY BOARD

Section 4.01 *Litigation Trust Advisory Board.*

The Litigation Trust Advisory Board, which shall have three members (such members to be appointed in accordance with the Plan as follows: (i) two members appointed by the Prepetition Term Loan Lenders, and (ii) one member appointed by the Official Committee of Unsecured Creditors (or its designee)), is hereby established as of the Effective Date pursuant to Article [*] of the Plan to advise, assist, and supervise the Litigation Trustee in the administration of the Litigation Trust pursuant to this Litigation Trust Agreement. The initial members of the Litigation Trust Advisory Board shall be the Persons set forth on Exhibit B, attached hereto. Members of the Litigation Trust Advisory Board shall have the right to remove the Litigation Trustee and shall have thereupon such other rights to operate and manage the Litigation Trust in a manner consistent with the Confirmation Order, the Plan and the terms of this Litigation Trust Agreement. No other Litigation Trust Beneficiary shall have any consultation or approval rights whatsoever in respect

of management and operation of the Litigation Trust, except as may be set forth in this Litigation Trust Agreement, or the Plan.

Section 4.02 *Authority of the Litigation Trust Advisory Board.*

The Litigation Trust Advisory Board shall have the authority and responsibility to advise, assist, and supervise the Litigation Trustee in the administration of the Litigation Trust and shall have the authority to remove the Litigation Trustee in accordance with Section 3.07(c) herein. The Litigation Trustee shall consult with and provide information to the Litigation Trust Advisory Board in accordance with and pursuant to the terms of this Litigation Trust Agreement and the Plan. The Litigation Trust Advisory Board shall have the authority to select and engage such professional advisors, including, without limitation, any professional previously retained by the Official Committee of Unsecured Creditors or the Debtors, as the Litigation Trust Advisory Board deems necessary and desirable to assist the Litigation Trust Advisory Board in fulfilling its obligations under this Litigation Trust Agreement and the Plan, and the Litigation Trust shall pay the reasonable and documented fees of such advisors (including on an hourly, contingency or modified contingency basis) and reimburse such advisors for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Litigation Trust Agreement.

Section 4.03 *Regular Meetings of the Litigation Trust Advisory Board.*

Meetings of the Litigation Trust Advisory Board are to be held with such frequency and at such place as the Litigation Trustee and the members of the Litigation Trust Advisory Board may determine in their reasonable discretion.

Section 4.04 *Special Meetings of the Litigation Trust Advisory Board.*

Special meetings of the Litigation Trust Advisory Board may be held whenever and wherever called for by the Litigation Trustee or any member of the Litigation Trust Advisory Board.

Section 4.05 *Manner of Acting.*

(a) A majority of the total number of members of the Litigation Trust Advisory Board then in office shall constitute a quorum for the transaction of business at any meeting of the Litigation Trust Advisory Board. The affirmative vote of at least two (2) members of the Litigation Trust Advisory Board present and entitled to vote at a meeting at which a quorum is present shall be the act of the Litigation Trust Advisory Board except as otherwise required by law or as provided in this Litigation Trust Agreement. Any or all of the members of the Litigation Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Litigation Trust Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may be conducted by electronic mail or individual communications by the Litigation Trustee and each member of the Litigation Trust Advisory Board.

(b) Any member of the Litigation Trust Advisory Board who is present and entitled to vote at a meeting of the Litigation Trust Advisory Board when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Trust Advisory Board, unless: (i) such member of the Litigation Trust Advisory Board objects at the beginning of the meeting (or promptly upon his or her arrival) to holding it or transacting business at the meeting; (ii) his or her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he or she delivers written notice (including by electronic or facsimile transmission) of his or her dissent or abstention to the Litigation Trust Advisory Board before its adjournment. The right of dissent or abstention is not available to any member of the Litigation Trust Advisory Board who votes in favor of the action taken.

(c) Prior to any meeting, the taking of a vote or the taking of any action with respect to any matter or issue, each member of the Litigation Trust Advisory Board shall report to the Litigation Trust Advisory Board any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including, without limitation, disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than solely as a Litigation Trust Beneficiary). A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to participate in the meeting, vote or take part in any action with respect to such matter or issue (however such member shall be counted for purposes of determining the existence of a quorum); the meeting, vote or action with respect to such matter or issue shall be undertaken only by members of the Litigation Trust Advisory Board who are not "conflicted members."

Section 4.06 *Litigation Trust Advisory Board's Action Without a Meeting.*

Any action required or permitted to be taken by the Litigation Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Trust Advisory Board as evidenced by one or more written consents describing the action taken, which written consent can be by email, and recorded in the minutes, electronic records, or other transcript of proceedings of the Litigation Trust Advisory Board.

Section 4.07 *Tenure, Removal, and Replacement of the Members of the Litigation Trust Advisory Board.*

The authority of the members of the Litigation Trust Advisory Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 9.01 herein. The service of the members of the Litigation Trust Advisory Board will be subject to the following:

(a) The members of the Litigation Trust Advisory Board will serve until Disability, death, resignation pursuant to subsection (b) below or removal pursuant to subsection (c) below;

(b) A member of the Litigation Trust Advisory Board may resign at any time by providing a written notice of resignation to the Litigation Trustee and the remaining members of the Litigation Trust Advisory Board (with such resignation effective upon the later of the date specified in the written notice or ten (10) business days);

(c) A member of the Litigation Trust Advisory Board may be removed for Cause by the majority vote of the other members of the Litigation Trust Advisory Board, a written resolution of which shall be delivered to the removed Litigation Trust Advisory Board member and the Litigation Trustee;

(d) In the event of a vacancy on the Litigation Trust Advisory Board (whether by removal, Disability, death or resignation), a new member shall be appointed to fill such position by unanimous consent of the remaining members of the Litigation Trust Advisory Board; provided, however, that if any designee of the Prepetition Term Loan Lenders ceases for any reason to be a member of the Litigation Trust Advisory Board, then, Litigation Trust Beneficiaries that hold a majority in amount of the Litigation Trust Interests issued on account of the Prepetition Term Loans shall have the right to appoint a successor member of the Litigation Trust Advisory Board to replace such designee.

(e) Immediately upon the appointment of any successor member of the Litigation Trust Advisory Board, all rights, powers, duties, authority and privileges of the predecessor member of the Litigation Trust Advisory Board hereunder will be vested in and undertaken by the successor member of the Litigation Trust Advisory Board without any further act, and the successor member of the Litigation Trust Advisory Board will not be liable personally for any act or omission of the predecessor member of the Litigation Trust Advisory Board, and the predecessor member of the Litigation Trust Advisory Board will not be liable personally for any act or omission of the successor member of the Litigation Trust Advisory Board.

(f) Every successor member of the Litigation Trust Advisory Board appointed hereunder shall execute, acknowledge and deliver to the Litigation Trustee and other members an instrument accepting the appointment under this Litigation Trust Agreement and agreeing to be bound thereto, and thereupon the successor member of the Litigation Trust Advisory Board without any further act, deed or conveyance shall become vested with all rights, powers, trusts, and duties of the retiring member.

Section 4.08 *Compensation and Reimbursement of Expenses of the Litigation Trust Advisory Board.*

(a) Each member of the Litigation Trust Advisory Board shall receive a fixed $[●] annual aggregate fee in cash as compensation for his or her time expended in connection with the Litigation Trust, to be paid in quarterly increments.

(b) The Litigation Trust will reimburse the members of the Litigation Trust Advisory Board for:

(i) all reasonable and documented out-of-pocket expenses (other than the fees and disbursements of legal counsel retained by the members, which will be reimbursed as provided in, and subject to the limits set forth in, section 4.08(b)(ii) below) incurred by such members in connection with the performance of their respective services hereunder including, without limitation, any services rendered with respect to the Distributions Reserves, without duplication, within ten (10) business days of demand for payment thereof; and

(ii) the reasonable fees, costs and expenses of legal counsel retained by the members up to a maximum for each such member of $[●] for the first year following the Effective Date and $[●] for each subsequent year.

(c) All fees and expenses of the members of the Litigation Trust Advisory Board shall be paid solely from Litigation Trust Proceeds or the proceeds of the Litigation Trust Loans and provision for such payments may be made by the deposit of adequate funds in the Expense Fund; provided that such payments are made in accordance with the Approved Budget then in effect under the Litigation Trust Credit Agreement and the terms of the Litigation Trust Credit Agreement.

Section 4.09 *No Further Liability.*

(a) Each of the members of the Litigation Trust Advisory Board shall have no liability for any actions or omissions in accordance with this Litigation Trust Agreement unless arising out of their bad faith, fraud, recklessness or willful misconduct. In performing their duties under this Litigation Trust Agreement, the members of the Litigation Trust Advisory Board (as applicable) shall have no liability for any action taken in accordance with the advice of counsel, accountants, appraisers and other Professionals retained by the members of the Litigation Trust Advisory Board or the Litigation Trust. Without limiting the generality of the foregoing, the members of the Litigation Trust Advisory Board may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by the members of the Litigation Trust Advisory Board to be genuine and shall have no liability for actions taken in reliance thereon. Each of the members of the Litigation Trust Advisory Board may rely without inquiry upon writings delivered to it under the Plan which the members of the Litigation Trust Advisory Board (as applicable) reasonably believes to be genuine and to have been given by a proper Person. None of the provisions of this Litigation Trust Agreement shall require the members of the Litigation Trust Advisory Board to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Notwithstanding the foregoing, nothing in this Section 4.09 shall relieve the members of the Litigation Trust Advisory Board from any liability for any actions or omissions arising out of their bad faith, fraud, recklessness, or willful misconduct as determined by Final Order of a court of competent jurisdiction. Any action taken or omitted to be taken in the case of the members of the Litigation Trust Advisory Board with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute bad faith, fraud, recklessness or willful misconduct. The rights under this Section 4.09 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Trustee or the members of the Litigation Trust Advisory Board or the termination of the Litigation Trust, and shall inure to the benefit of the Litigation Trustee' and the members of the Litigation Trust Advisory Board' heirs and assigns.

(b) Neither the Litigation Trustee, the members of the Litigation Trust Advisory Board nor their Professionals will be liable for punitive, exemplary, consequential, special or other damages for a breach of this Litigation Trust Agreement under any circumstances.

Section 4.10 *Acknowledgment of Lack of Control; Exculpation.*

The Parties hereby acknowledge and agree that the Non-Controlling Parties are not able to exert any control or influence over the Litigation Trust Advisory Board, the administration of the Litigation Trust, the pursuit of the Litigation Trust Assets or any other business of the Litigation Trust, and accordingly no Non-Controlling Party shall be liable for any act or omission of the Litigation Trust or any member, designee, professional, agent or representative of the Litigation Trust Advisory Board.

## ARTICLE 5
## TAX MATTERS

Section 5.01 *Treatment of Litigation Trust Assets Transfer.*

(a) Notwithstanding Section 1.02(a) herein, and subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), and provided that no such definitive guidance has been received, all Parties shall treat, for U.S. federal income tax purposes, the transfer assets to the Litigation Trust, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred), as (a) a transfer of the Litigation Trust Assets (other than amounts set aside as Distributions Reserves) directly to the Litigation Trust Beneficiaries, followed by (b) the transfer of such Litigation Trust Assets by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for beneficial interests in the Litigation Trust. Accordingly, such Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes (y) as direct recipients of an undivided interest in the Litigation Trust Assets transferred to the Litigation Trust and as having immediately contributed such Litigation Trust Assets to the Litigation Trust and, thereafter, (z) as the grantors and deemed owners of the Litigation Trust and, thus, the direct owners of an undivided interest in the Litigation Trust Assets held by the Litigation Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b) The Parties intend that, pursuant to section 1146(a) of the Bankruptcy Code, the execution and implementation of this Litigation Trust Agreement, including the creation of the Litigation Trust and any transfers of the Litigation Trust Assets to, by or from the Litigation Trust, will not be subject to any stamp tax, transfer tax or similar tax or fee.

Section 5.02 *Income Tax Status.*[9]

(a) For U.S. federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), the Litigation Trust (excluding the Distributions Reserves) shall be treated as a grantor trust pursuant to IRC sections 671-677, or any successor provisions thereof. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Litigation Trust Agreement, this Litigation Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status. Except with respect to the Litigation Trust Assets allocable to the Distributions Reserves, (i) the Litigation Trust Beneficiaries will be treated

[9] NTD: Subject to further review.

as the grantors, deemed owners and beneficiaries of the Litigation Trust, and (ii) any items of income, gain, loss, deduction and credit of the Litigation Trust shall be allocated for U.S. federal income tax purposes among the Litigation Trust Beneficiaries. The Litigation Trust (excluding the Distributions Reserves) shall at all times be administered so as to constitute a domestic grantor trust for U.S. federal income tax purposes.

(b) The Litigation Trustee shall not make an election under Treasury Regulations section 301.7701-3(c) to treat the Litigation Trust as, or otherwise cause the Litigation Trust to be, an association (or a publicly traded partnership) taxable as a corporation for U.S. federal income tax purposes.

(c) If, pursuant to applicable law, the Litigation Trust (excluding the Distributions Reserves) fails to qualify as a grantor trust from its inception or ceases to be treated as a grantor trust for U.S. federal income tax purposes and has two or more equity owners for U.S. federal income tax purposes, the Litigation Trust (excluding the Distributions Reserves) will be treated as a partnership (other than a publicly traded partnership taxable as a corporation). If the Litigation Trust is so treated as a partnership, the following shall apply:

(i) [A Litigation Trust Beneficiary selected by a majority (by beneficial interest) of the related Litigation Trust Beneficiaries] shall be designated as "partnership representative" within the meaning of IRC section 6223; and

(ii) For any taxable period, the Litigation Trust will, to the extent practicable, make the election described in IRC section 6226 (and any corresponding provision of applicable state law).

(d) Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Litigation Trust, the Litigation Trustee will not cause or permit the Litigation Trust to generate any "effectively connected income" for U.S. federal income tax purposes ("ECI"), nor shall the Litigation Trustee cause or permit the Litigation Trust to undertake any activity that could generate any income that could possibly be considered ECI without first obtaining an opinion or advice of nationally recognized tax counsel to the effect that such action will not generate ECI for any direct or indirect owner of beneficial interest in the Litigation Trust that is not a U.S. person.

(e) If subsection 94(3) of the *Income Tax Act* (Canada) applies to the Litigation Trust, then the Litigation Trustee will, if eligible, file an election to be an "electing trust" as defined in subsection 94(1) of the *Income Tax Act* (Canada). The Litigation Trustee shall be entitled to file any other election for Canadian federal or provincial tax purposes which it considers desirable or appropriate.

(f) Amounts distributed by the Litigation Trustee shall be treated as distributions of income or capital for Canadian federal income tax purposes, as determined by the Litigation Trustee.

Section 5.03 *Valuation of Litigation Trust Assets as of Effective Date.*

As soon as practicable after the Effective Date, the Litigation Trustee shall make a good-faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by the Reorganized Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries for all U.S. federal, and applicable state and local, income tax purposes. In connection with the preparation of the valuation contemplated hereby, the Litigation Trustee shall be entitled to retain on behalf of the Litigation Trust such professionals and advisors as the Litigation Trustee shall determine to be appropriate or necessary, subject to the approval of the Litigation Trust Advisory Board, and the Litigation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. For the avoidance of doubt, the valuation shall not be binding on the Litigation Trust Beneficiaries, the Litigation Trust or the Litigation Trustee for any purpose other than U.S. federal income tax purposes, and the valuation shall not impair or prejudice any rights, claims, powers, duties, authority and privileges of the Litigation Trust Beneficiaries, the Litigation Trust or the Litigation Trustee except with respect to U.S. federal income tax purposes.

Section 5.04 *Tax Returns.*

The Litigation Trustee shall arrange for the filing of U.S. federal income tax returns for the Litigation Trust (excluding the Distributions Reserves) as a grantor trust in accordance with Treasury Regulations section 1.671-4 and report, but not pay tax on, the Litigation Trust's tax items of income, gain, loss, deduction and credits, other than such tax items allocable to the Distributions Reserves ("LT Tax Items"). In addition, the Litigation Trustee on behalf of the Litigation Trust shall file in a timely manner such other tax returns, including any state and local tax returns and any Canadian federal or provincial tax returns, as are required by applicable law and pay any taxes shown as due thereon. Within a reasonable time following the end of the taxable year, the Litigation Trust shall arrange for the Professionals to send to each Litigation Trust Beneficiary a separate statement setting forth the Litigation Trust Beneficiary's share of LT Tax Items and will instruct each such Litigation Trust Beneficiary to report such items on its applicable income tax return. [For this purpose, no later than [•] of each year, the Reorganized Debtors' claims and noticing agent shall provide to the Litigation Trustee the names, addresses, and Claim amount of each Holder of General Unsecured Claims to whom the statements must be sent.][10] The Litigation Trustee may provide each Litigation Trust Beneficiary with a copy of the Form 1041 for the Litigation Trust (without attaching any other Litigation Trust Beneficiary's Schedule K-1 or other applicable information form) along with such Litigation Trust Beneficiary's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.

Section 5.05 *Expedited Determination of Taxes.*

The Litigation Trustee may request an expedited determination of Taxes under applicable law for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

[10] NTD: Under review.

Section 5.06 *Withholding of Taxes; Litigation Trust Taxes.*

The Litigation Trustee on behalf of the Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Litigation Trust to the Litigation Trust Beneficiaries (other than to the Distribution Agent) shall be subject to any such withholding and reporting requirements. To the extent that a tax liability is imposed on the Litigation Trust, including a Distributions Reserve, the Litigation Trustee shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Litigation Trust and/or the Distributions Reserve. All Litigation Trust Beneficiaries shall be required to provide any information necessary to comply with all withholding and reporting requirements, including a completed IRS Form W-9 or, if applicable, IRS Form W-8, within thirty (30) days of a written request of the Litigation Trustee, and the Litigation Trustee shall make no more than two (2) such requests. Failure of such a Litigation Trust Beneficiary to respond to the Litigation Trustee's second request for such tax information within 30 days of the second request shall result in such Litigation Trust Beneficiary forfeiting their beneficial interest in the Litigation Trust and rights to any Distribution, and such forfeited amounts shall revest in the Litigation Trust and be distributed in accordance with the Litigation Trust Distribution Schedule.

Section 5.07 *Tax Treatment of Distributions Reserves.*

Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary and provided that no definitive guidance has been received, with respect to any Litigation Trust Assets allocable to the Distributions Reserves, the Litigation Trustee shall, for U.S. federal income tax purposes (and to the extent permitted by law, for state and local income tax purposes), elect to treat such assets as held in a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-9. Accordingly, the Litigation Trustee shall treat as taxable income or loss of such fund or separate trust with respect to each taxable year, the portion of the taxable income or loss and other tax items for such year that would have been allocated to holders of Disputed Claims had such Claims been allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved). Any separate entity level tax incurred with respect to the Distributions Reserve shall be paid by the Litigation Trustee out of the Distributions Reserve. All parties (and the Litigation Trust Beneficiaries) must report consistently with this Litigation Trust Agreement.

## ARTICLE 6
## DISTRIBUTIONS

Section 6.01 *Distribution; Withholding.*

The Litigation Trustee shall distribute from time to time, and at least annually to the extent practicable, Net Litigation Trust Proceeds, as determined in consultation with the Litigation Trust Advisory Board, in accordance with the Plan and the Litigation Trust Distribution Schedule; provided however, that the Litigation Trustee may retain such amounts as it reasonably determines may be necessary (i) to maintain the Distributions Reserves and the Expense Fund and (ii) to pay or reserve for taxes, including those attributable to the Distributions Reserves in accordance with

the Plan or this Litigation Trust Agreement. All such distributions shall be pursuant to the provisions of the Plan and the Litigation Trust Distribution Schedule. The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement and such other amounts as are required under the terms of this Litigation Trust Agreement determined in consultation with the Litigation Trust Advisory Board.

Section 6.02 *Manner of Payment or Distribution.*

(a) All distributions made by the Litigation Trustee to Litigation Trust Beneficiaries shall be payable by the Litigation Trustee directly to the Litigation Trust Beneficiaries of record as of the twentieth (20th) day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such date for the distribution shall be the following Business Day. All distributions shall be in Cash by wire, check or such other method as the Litigation Trustee deems appropriate under the circumstances.

(b) All Net Litigation Trust Proceeds shall be distributed in accordance with the Plan, this Litigation Trust Agreement and the Litigation Trust Distribution Schedule.

Section 6.03 *Delivery of Litigation Trust Distributions.*

All distributions under this Litigation Trust Agreement to any Litigation Trust Beneficiary shall be made at the address of or per wire instruction for such beneficiary as set forth in the Litigation Trust Distribution Schedule or at such other address, wire instruction or in such other manner as such Litigation Trust Beneficiary shall have specified for payment purposes in a written notice to the Litigation Trustee at least twenty (20) days prior to such distribution date. If any distribution to any Litigation Trust Beneficiary other than Distribution Agent is returned as undeliverable, no further distribution to such Litigation Trust Beneficiary shall be made unless and until the Litigation Trustee is notified in writing of such Litigation Trust Beneficiary's then-current address, wire instructions or other payment method, at which time such distribution shall be made to such Litigation Trust Beneficiary without interest consistent with the notice. The Litigation Trustee may but shall have no obligation to determine the current address of any Litigation Trust Beneficiary that is a holder of Allowed Prepetition Term Loan Claims. In the event any check sent to a Litigation Trust Beneficiary (other than Distribution Agent) respecting a distribution has not been cashed within 120 days of the date of the check, such check shall be cancelled and no additional distribution shall be made to such Litigation Trust Beneficiary. Any undeliverable or unclaimed distribution to any Litigation Trust Beneficiary that is a holder of Allowed Prepetition Term Loan Claims shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code on the 120th day after the date of such distribution and shall revest in the Liquidation Trust automatically and be reallocated to the remaining Litigation Trust Beneficiaries that are holders of Allowed Prepetition Term Loan Claims and shall be distributed in accordance with the Plan and the Litigation Trust Distribution Schedule, and the claims/beneficial interests of beneficiaries that may have been entitled to such Distribution shall be discharged and forever barred from receiving distributions under this Litigation Trust Agreement and the Plan. Such undeliverable or unclaimed distributions shall not be subject to (i) any claims by such Litigation Trust Beneficiary or (ii) the unclaimed property or escheat laws of any state or governmental unit.

Section 6.04 *Setoffs.*

[The Litigation Trustee, on behalf of the Litigation Trust, may, including pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off or recoup against any Claim (other than Prepetition Term Loan Claims), payments or other distributions to be made pursuant to the Plan in respect of such Claim, any and all of the claims, rights and causes of action that the Debtors may have or the Litigation Trust may hold against the Holder of such Claim, in each case, to the fullest extent permitted under the Plan, including Article XI.H. thereof; provided, however, that neither the failure to effect such a set off or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Litigation Trust, the Debtors or the Reorganized Debtors of any such claim that the Litigation Trust, the Debtors or the Reorganized Debtors may have against such Holder.][11]

Section 6.05 *Minimum Cash Distributions.*

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions, provided that all Cash shall be distributed in the final distribution of the Net Litigation Trust Proceeds.

Section 6.06 *Donations to Charity.*

If at any time the Litigation Trustee, after consultation with the Litigation Trust Advisory Board, determines that the expense of administering the Litigation Trust so as to make a distribution to the Litigation Trust Beneficiaries is likely to exceed the value of the remaining Litigation Trust Assets, the Litigation Trustee may donate any balance to a charitable organization described in Section 501(c)(3) of the Internal Revenue Code, exempt from U.S. federal income tax under Section 501(a) of the Internal Revenue Code, and that is unrelated to the Debtors, the Litigation Trust, the Litigation Trustee, and any member of the Litigation Trust Advisory Board.

Section 6.07 *Distributions Reserves.*

The Litigation Trustee shall establish the Distributions Reserve(s), which shall include assets held separately from other assets of the Litigation Trust, subject to an allocable share of all expenses and obligations of the Litigation Trust, on account of Disputed General Unsecured Claims. The Litigation Trustee shall remove funds from the Distributions Reserve(s) upon receipt of notice from the Reorganized Debtors or the Distribution Agent that any such the Disputed General Unsecured Claims are resolved and that the Holders of such previously Disputed General Unsecured Claims have been allocated their share of the corresponding Litigation Trust Interests held by the Distribution Agent, which funds shall be distributed as provided in this Article 6, Section 3.02(k) and the Litigation Trust Distribution Schedule.

---

[11] NTD: Under review.

# ARTICLE 7
# INDEMNIFICATION

Section 7.01 *Indemnification of the Litigation Trustee and the Litigation Trust Advisory Board.*

(a) To the fullest extent permitted by law, the Litigation Trust will indemnify and hold harmless the Litigation Trustee and the Litigation Trust Advisory Board and each of their respective directors, members, shareholders, partners, officers, agents, Professionals or employees (collectively, the "Litigation Trust Indemnified Parties" and each a "Litigation Trust Indemnified Party") from and against any and all loss, cost, damage, expense (including, without limitation, reasonable fees and expenses of attorneys and other advisors and any court costs reasonably incurred by any Litigation Trust Indemnified Party) or liability by reason of anything any Litigation Trust Indemnified Party did, does, failed or fails to do or refrained or refrains from doing for the business or affairs of or in connection with the Litigation Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted from the Litigation Trust Indemnified Party's bad faith, fraud, gross negligence or willful misconduct.

(b) Notwithstanding any provision herein to the contrary, the Litigation Trust Indemnified Parties shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of a Litigation Trust Indemnified Party in its capacity as such; provided, however, that the Litigation Trust Indemnified Parties receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Litigation Trust Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.01.

(c) The rights to indemnification under this Section 7.01 are not exclusive of other rights that any Litigation Trust Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.01 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Litigation Trust Agreement or any other agreement or instrument to which that Person is a party.

(d) The indemnification provisions contained in this Trust Agreement shall not be amended, revised or modified in any way without the prior written consent of each and every Litigation Trust Indemnified Party affected or who may be affected by such proposed amendment, revision or modification. The rights to indemnification under this Section 7.01 are not exclusive of other rights that any Litigation Trust Indemnified Party may otherwise have under the Plan, the Confirmation Order, the CCAA Recognition Order or at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.01 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Litigation Trust Agreement or any other agreement or instrument to which that Person is a party. This Section 7.01 shall survive the termination, resignation or removal of such Litigation Trust Indemnified Party from the capacity for which they are indemnified and termination of the Trust Agreement, and shall inure to the benefit of the Litigation Trust Indemnified Parties' heirs and assigns.

ARTICLE 8
REPORTS TO LITIGATION TRUST BENEFICIARIES

Section 8.01 *Reports.*

(a) The Litigation Trustee (in consultation with the Litigation Trust Advisory Board) shall provide annual reports based on its fiscal year to the Litigation Trust Beneficiaries, with respect to (i) the prosecution, administration, and resolution of the Litigation Trust Assets and (ii) expenditures, receipts and distributions of the Litigation Trust, provided that such reports shall not contain privilege or confidential information.

(b) Within [120 days] after the end of the Litigation Trust's fiscal year, the Litigation Trustee shall cause any information reported pursuant to Section 8.01(a) to be provided to the Litigation Trust Beneficiaries, provided the report shall be provided to the Distribution Agent on behalf of all the Litigation Trust Beneficiaries who are Holders of General Unsecured Claims

(c) Any report required to be distributed by the Litigation Trustee under Section 8.01(a) hereof shall also be distributed to the Persons listed in Section 11.06 hereof concurrently with its distribution to the Litigation Trust Beneficiaries under Section 8.01(a) hereof. The Litigation Trustee may post any report required to be provided under this Section 8.01 on a web site maintained by the Litigation Trustee in lieu of actual notice to the Litigation Trust Beneficiaries (unless otherwise required by law) subject to providing notice to the Persons listed in Section 11.06 herein; provided, that the Litigation Trust Beneficiaries shall be notified by email that a report has been posted.

ARTICLE 9
TERM; TERMINATION OF THE LITIGATION TRUST

Section 9.01 *Term; Termination of the Litigation Trust.*

(a) The Litigation Trust will be dissolved [five (5)] years from the Effective Date; provided, however, that the Bankruptcy Court, upon motion by the Litigation Trustee, a member of the Litigation Trust Advisory Board, or a Litigation Trust Beneficiary, on notice with an opportunity for a hearing, may extend the term of the Litigation Trust for a finite period if (i) such extension is necessary to the purpose of the Litigation Trust, (ii) such extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes and (iii) such extension is obtained within the six (6) month period prior to the Litigation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.

(b) Upon dissolution of the Litigation Trust, repayment of the Litigation Trust Loans and payment and satisfaction of all accrued liabilities of the Litigation Trust, any remaining Cash on hand, including any Cash in the Expense Fund and other assets, but excluding any Cash required to comply with Section 9.02 of this Agreement, will be distributed to the Litigation Trust Beneficiaries in accordance with the Plan, this Litigation Trust Agreement and the Litigation Trust Distribution Schedule, provided that if the Litigation Trustee with the approval of the Litigation Trust Advisory Board believes that the remaining Cash is not sufficient to make a distribution

feasible, the Litigation Trustee shall donate the remaining Cash to a charity in accordance with Section 6.06 hereof.

(c) In connection with the dissolution of the Litigation Trust, the Litigation Trustee shall withdraw with prejudice any pending suits, actions or proceedings with respect to any Litigation Trust Recovery Actions constituting Litigation Trust Assets and, upon dissolution of the Litigation Trust, all remaining causes of action constituting Litigation Trust Assets shall be deemed void and abandoned and no Litigation Trust Beneficiary shall have any right, title or interest in or to any such Litigation Trust Recovery Actions.

(d) Prior to the dissolution of the Litigation Trust, the Litigation Trustee shall cause all of the Debtors' or Reorganized Debtors' books and records that were delivered to the Litigation Trust or Litigation Trustee to be returned to the Reorganized Debtors or destroyed, except for copies retained pursuant to the internal compliance policies of the Litigation Trustee and his Professionals, to the extent incorporated into any attorney work product, and/or to the extent of applicable law and regulation.

Section 9.02 *Continuance of the Litigation Trustee for Winding Up.*

After the dissolution of the Litigation Trust and for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until the Litigation Trustee's duties have been fully performed. Prior to the final distribution of all of the remaining Litigation Trust Assets and upon approval of the Litigation Trust Advisory Board, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for the Litigation Trust's and the Litigation Trustee's own costs and expenses in accordance with Section 3.04 and Section 3.11 herein until such time as the winding up of the Litigation Trust is completed. Upon termination of the Litigation Trust, and subject to adequate funding to pay the attendant costs, the Litigation Trustee shall retain for a period of two (2) years, as a cost of administering the Litigation Trust, the books, records, Litigation Trust Beneficiary lists, the Trust Register and certificates and other documents and files that have been delivered to or created by the Litigation Trustee. At the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two (2) years from the completion and winding up of the affairs of the Litigation Trust. Except as otherwise specifically provided herein, upon the later of dissolution of the Litigation Trust and the final distribution of all Litigation Trust Assets, the Litigation Trustee shall have no further duties or obligations hereunder. For the avoidance of doubt, all limitations on liability, indemnification rights, and/or exculpation contained in this Litigation Trust Agreement, the Plan, the Confirmation Order or the CCAA Recognition Order shall survive termination and apply to any actions or inactions taken by the Litigation Trustee during the course of winding up the affairs of the Litigation Trust.

## ARTICLE 10
## AMENDMENT AND WAIVER

Any substantive provision of this Litigation Trust Agreement, except for this Article 10 and Section 1.05 herein, may be amended or waived in writing by the Litigation Trustee, upon notice and approval by a majority of the Litigation Trust Advisory Board and approval of the Bankruptcy Court and provision of reasonable notice to the Debtors or Reorganized Debtors (as

applicable); provided, however, that any modification that may adversely affect distributions to Litigation Trust Beneficiaries shall require the consent of the Distribution Agent and the other Litigation Trust Beneficiaries who hold a majority of the class of Litigation Trust Interests that would be adversely affected. Notwithstanding the foregoing, any amendment or waiver that materially and adversely affects the Debtors or the Reorganized Debtors shall require their consent. Technical amendments to this Litigation Trust Agreement may be made, as necessary to clarify this Litigation Trust Agreement or enable the Litigation Trustee to effectuate the terms of this Litigation Trust Agreement or the Plan, by the Litigation Trustee with approval by a majority of the Litigation Trust Advisory Board and without approval of the Bankruptcy Court or the CCAA Court; provided, however, that all amendments of this Litigation Trust Agreement shall be consistent with the Plan and the purpose and intention of the Litigation Trust to liquidate in an expeditious but orderly manner the Litigation Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.04 herein.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

Section 11.01 *Intention of Parties to Establish a Liquidating Trust.*

The Litigation Trust is intended to be classified as a liquidating trust for U.S. federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith, and, if necessary, this Litigation Trust Agreement may be amended in accordance with Article 10 herein to comply with such U.S. federal income tax laws, which amendments may apply retroactively.

Section 11.02 *Reimbursement of Trust Costs.*

If the Litigation Trustee, the Litigation Trust Advisory Board, the Litigation Trust, or any Reorganized Debtor, as the case may be, is the prevailing party in a dispute regarding the provisions of this Litigation Trust Agreement or the enforcement thereof, the Litigation Trustee, the Litigation Trust Advisory Board, the Litigation Trust, or any Reorganized Debtor, as the case may be, shall be entitled to collect any and all costs, reasonable and documented out-of-pocket expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action, provided that nothing contained herein shall in any way limit the rights of the Litigation Trust Indemnified Parties under Article 7 hereof. To the extent that the Litigation Trust has advanced such amounts, the Litigation Trust may recover such amounts from the non-prevailing party, provided that nothing contained herein shall in any way limit the rights of the Litigation Trust Indemnified Parties under Article 7 hereof.

Section 11.03 *Laws as to Construction.*

Except to the extent the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Litigation Trust Agreement shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the state of Delaware, without giving effect to the principles of conflicts of law thereof.

Section 11.04 *Jurisdiction.*

The Bankruptcy Court shall have the exclusive jurisdiction with respect to any action relating to or arising from the Litigation Trust or this Litigation Trust Agreement; *provided* that in the event the Bankruptcy Court lacks subject matter jurisdiction or declines to hear such action for any reason, then the parties hereto agree that exclusive jurisdiction over any action, suit, or proceeding under, arising out of, or relating to this Agreement shall lie in the federal or state courts sitting within the State of Delaware and any appellate court from any such state or Federal court, and hereby irrevocably and unconditionally agree that all claims with respect to any such action shall be heard and determined in such Delaware court or, to the extent required by applicable law, in such Federal court.

Section 11.05 *Severability.*

If any provision of this Litigation Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Litigation Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 11.06 *Notices.*

(a) All notices, requests or other communications to the Parties hereto shall be in writing and shall be sufficiently given only if (i) delivered in person; (ii) sent by electronic or facsimile communication (as evidenced by an electronic mail return receipt or confirmed fax transmission report, respectively); (iii) sent by registered or certified mail, return receipt requested or (iv) sent by commercial delivery service or courier. Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following addresses or facsimile numbers:

(i) If to the Litigation Trustee, to:

[to be inserted]

With a copy to:

[to be inserted]

(ii) If to the Litigation Trust Advisory Board, to:

[to be inserted]

With a copy to:

[to be inserted]

(iii) If to the Debtors, to:

[to be inserted]

(iv) If to the Reorganized Debtors, to:

[to be inserted]

With a copy to:

[to be inserted]

(iv) If to a Litigation Trust Beneficiary: to the name and address set forth on the Trust Register; provided that notice to the Litigation Trust Beneficiaries who are Holders of General Unsecured Claim shall be to the Distribution Agent.

(b) All notices shall be effective and shall be deemed delivered (i) if by personal delivery, delivery service or courier, on the date of delivery; (ii) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication and (iii) if by mail, on the date of receipt. Any Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other Party hereto.

Section 11.07 *Fiscal Year.*

The fiscal year of the Litigation Trust will begin on the first day of January and end on the last day of December of each year.

Section 11.08 *Headings.*

The section headings contained in this Litigation Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Litigation Trust Agreement or of any term or provision hereof.

Section 11.09 *Counterparts.*

This Litigation Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

Section 11.10 *Confidentiality.*

The Litigation Trustee and each member of the Litigation Trust Advisory Board and each successor member of the Litigation Trust Advisory Board (each a "Covered Person") shall, during the period that they serve in such capacity under this Litigation Trust Agreement and following either the termination of this Litigation Trust Agreement or such individual's removal, incapacity or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the Litigation Trust Assets relates or of which it has become aware in its capacity (the "Information"), except for disclosures to each other and the Professionals or otherwise in accordance with this Litigation Trust Agreement and

to the extent disclosure is required by applicable law, order, regulation or legal process. In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal process) to disclose any Information, such Covered Person shall notify the Litigation Trust Advisory Board and the Debtors or Reorganized Debtors (as applicable), in each case with a copy to the Litigation Trustee, reasonably promptly (unless prohibited by law) so that the Litigation Trust Advisory Board and/or the Debtors or Reorganized Debtors (as applicable) may seek an appropriate protective order or other appropriate remedy or, in its discretion, waive compliance with the terms of this Section 11.10 (and if the Litigation Trust Advisory Board or Debtors or Reorganized Debtors seek such an order, the relevant Covered Person will provide cooperation as the Litigation Trust Advisory Board and/or Debtors or Reorganized Debtors (as applicable) shall reasonably request). In the event that no such protective order or other remedy is obtained, or that the Litigation Trust Advisory Board and the Debtors or Reorganized Debtors (as applicable) waives compliance with the terms of this Section 11.10, and that any Covered Person is nonetheless legally compelled to disclose the Information, the Covered Person will furnish only that portion of the Information that the Covered Person, advised by counsel, is legally required to furnish and will give the Litigation Trust Advisory Board and the Debtors or Reorganized Debtors (as applicable) written notice, in each case with a copy to the Litigation Trustee, (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

Section 11.11 *Entire Agreement.*

This Litigation Trust Agreement (including the Recitals), the Confirmation Order and the Plan constitute the entire agreement by and among the Parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Litigation Trust Agreement, the Plan and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations and discussions (written or oral) of the Parties hereto, relating to any transaction contemplated hereunder. Except as otherwise specifically provided herein, in the Plan, in the Confirmation Order or in the CCAA Recognition Order, nothing in this Litigation Trust Agreement is intended or shall be construed to confer upon or to give any Person other than the Parties hereto and their respective heirs, administrators, executors, successors or assigns any right to remedies under or by reason of this Litigation Trust Agreement.

Section 11.12 *Rules of Interpretation.*

For purposes of this Litigation Trust Agreement, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) the words “herein,” “hereof,” “hereto,” “hereunder” and other words of similar import refer to this Litigation Trust Agreement as a whole and not to any particular section, subsection or clause contained in this Litigation Trust Agreement; (c) the rules of construction set forth in 11 U.S.C. § 102 will apply and (d) the term “including” shall be construed to mean “including, but not limited to,” “including, without limitation,” or words of similar import.

Section 11.13 *Effectiveness.*

This Litigation Trust Agreement shall become effective on the Effective Date.

Section 11.14 *No Waiver.*

The Parties agree that no failure or delay by either party in exercising any right, power or privilege hereunder will operate as a waiver thereof and that no single or partial exercise thereof will preclude any other or further exercise thereof or the exercise of any right, power and privilege hereunder.

Section 11.15 *No Execution.*

All funds in the Litigation Trust and the Expense Fund shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Litigation Trust Beneficiary and no Litigation Trust Beneficiary or any other Person can bind, pledge, encumber, execute upon, garnish or attach the Litigation Trust Assets in any manner or compel payment from the Litigation Trustee except by Final Order of the Bankruptcy Court.

Section 11.16 *Actions Taken on Other Than Business Day.*

In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Parties hereto have either executed and acknowledged this Litigation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

[CORELLE] BRANDS ACQUISITION HOLDINGS LLC (for itself and on behalf of the other Debtors, as Debtors and Debtors in Possession)

By: ______________________________
Name: ______________________________
Title: ______________________________

[INSERT NAME], LITIGATION TRUSTEE OF THE LITIGATION TRUST ESTABLISHED UNDER THIS LITIGATION TRUST AGREEMENT DATED FEBRUARY [●], 2024 PURSUANT TO THE PLAN OF REORGANIZATION FOR INSTANT BRANDS ACQUISITION HOLDINGS INC. AND ITS DEBTOR AFFILIATES

By: ______________________________
Name: ______________________________
Title: ______________________________

**EXHIBIT A**

THE LITIGATION TRUSTEE

[name and contact information to be inserted]

**EXHIBIT B**

INITIAL MEMBERS OF THE LITIGATION TRUST ADVISORY BOARD

[names to be inserted]

## EXHIBIT C[12]

LITIGATION TRUST DISTRIBUTION SCHEDULE

The Litigation Trustee (with the consent of the Litigation Trust Advisory Board) shall make distributions of any proceeds received from the pursuit, administration and liquidation of the Litigation Assets as follows:

(i) **first**, to the payment in full of all accrued and unpaid Litigation Trust expenses (including the fees and expenses of the Litigation Trustee, the Professionals, and the Litigation Trust Advisory Board members) that are accrued, outstanding and due and payable as of the date of such distribution until paid in full;

(ii) **[secondly**, any remainder after the payments provided in the immediately preceding clause, to fund the Expense Fund in an amount not to exceed the greater of (i) the amount reserved for the Expense Fund in the Approved Budget then in effect and (ii) $[350,000] as provided in Section 3.04(c) of the Litigation Trust Agreement;]

(iii) **thirdly**, any remainder after the payments provided in the immediately preceding clause, in or towards the payment of all principal amounts then outstanding on the Litigation Trust Loans (including, for the avoidance of doubt, all accrued paid in kind interest and fees in respect of the Litigation Trust Loans) until paid in full;

(iv) **fourthly**, any remainder after the payments provided in the immediately preceding clause and the repayment in full of the Litigation Trust Loans, into the Expense Fund an additional amount approved by the Litigation Trust Advisory Board sufficient to fund the costs and expenses of the Litigation Trust (including as necessary, through the Litigation Trust's dissolution and the satisfaction of the Litigation Trustee's duties in accordance with Section 9.02 of the Litigation Trust Agreement);

(v) **fifthly**, any remainder after the payments provided in the immediately preceding clause, *pro rata* to the holders of Litigation Trust Interests (including to the Distribution Agent as holder of 15% of the Litigation Trust Interests for the benefit of the holders of Allowed General Unsecured Claims (including, for the avoidance of doubt, Disputed General Unsecured Claims to the extent they ultimately become Allowed General Unsecured Claims); provided that such distributions to the Distribution Agent shall include the funding of any Distributions Reserve in respect of any Litigation Trust Interest which remain unallocated due to unresolved Disputed General Unsecured Claims in the Distribution Agent's records) until all such proceeds have been so applied. For the avoidance of doubt, following the receipt of any distribution from the Litigation Trust, the Distribution Agent shall apply such distributions in accordance with Article VIII.B of the Plan.

---

[12] NTD: Subject to further review.

# <u>Exhibit F</u>

## Agreement Providing for the Litigation Trust Financing Facility

CREDIT AGREEMENT[1]

dated as of [●], 2024

among

[Litigation Trust],
as the Borrower,

Acquiom Agency Services LLC,
as Administrative Agent

and

The Lenders Party Hereto

---

---

[1] NTD: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED.

TABLE OF CONTENTS


Page

ARTICLE I DEFINITIONS AND INTERPRETATION ........ 1

Section 1.01 Defined Terms ........ 1
Section 1.02 Other Interpretive Provisions ........ 11

ARTICLE II LOAN FACILITY ........ 12

Section 2.01 Loans ........ 12
Section 2.02 Borrowings of Loans ........ 12
Section 2.03 Prepayments ........ 12
Section 2.04 Repayment of Loans ........ 12
Section 2.05 Interest and Fees. ........ 12
Section 2.06 Termination or Reduction of Commitments ........ 13
Section 2.07 Notional Conversion Right. ........ 13
Section 2.08 Payments; Generally. ........ 13
Section 2.09 Sharing of Payments by Lenders. ........ 14
Section 2.10 Incremental Borrowings. ........ 14
Section 2.11 Defaulting Lenders. ........ 16

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ........ 17

Section 3.01 Taxes ........ 17
Section 3.02 Illegality ........ 20
Section 3.03 SOFR Option. ........ **Error! Bookmark not defined.**
Section 3.04 Increased Costs ........ 22
Section 3.05 Compensation for Losses ........ 22
Section 3.06 Mitigation Obligations; Replacement of Lenders. ........ 23
Section 3.07 Survival. ........ 23
Section 3.08 Changes in Law; Impracticability or Illegality. ........ 23

ARTICLE IV CONDITIONS PRECEDENT ........ 24

Section 4.01 Conditions to Closing Date and Availability of the Tranche 1 Loans ........ 24
Section 4.02 Conditions to Availability of the Tranche 2 Loans ........ 25
Section 4.03 Conditions to Availability of the Tranche 3 Loans ........ 25

ARTICLE V REPRESENTATIONS AND WARRANTIES ........ 25

Section 5.01 Organization; Powers ........ 26
Section 5.02 Authorization ........ 26
Section 5.03 No Conflicts ........ 26
Section 5.04 Litigation ........ 26
Section 5.05 Governmental Approvals ........ 26
Section 5.06 No Default ........ 26

ARTICLE VI AFFIRMATIVE COVENANTS ........ 26

Section 6.01 Financial Statements ........ 26
Section 6.02 Telephonic Meeting. ........ 26

Page


Section 6.03 Other Information ... 26
Section 6.04 Existence ... 27
Section 6.05 Compliance with Laws ... 27
Section 6.06 Books and Records ... 27
Section 6.07 Approved Budget ... 27
Section 6.08 Use of Proceeds ... 27

ARTICLE VII NEGATIVE COVENANTS ... 27

Section 7.01 Liens ... 27
Section 7.02 Limitation on Incurrence of Debt ... 27
Section 7.03 Merger, Consolidation or Sale of All or Substantially All Assets ... 27
Section 7.04 Limitation on Sales of Assets ... 28
Section 7.05 Limitation on Restricted Payments ... 28
Section 7.06 Prepayments of Indebtedness ... 28
Section 7.07 Amendments and Modifications ... 28
Section 7.08 Settlement ... 28
Section 7.09 Investments ... 28
Section 7.10 Use of Proceeds ... 28
Section 7.11 Activities of Borrower ... 28

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ... 28

Section 8.01 Events of Default ... 28
Section 8.02 Remedies Upon Event of Default ... 29
Section 8.03 Application of Funds ... 29

ARTICLE IX THE ADMINISTRATIVE AGENT ... 30

Section 9.01 Appointment and Authority. ... 30
Section 9.02 Rights as a Lender. ... 30
Section 9.03 Exculpatory Provisions. ... 30
Section 9.04 Reliance by Agent. ... 30
Section 9.05 Non-Reliance on Administrative Agent and Other Lenders. ... 31
Section 9.06 Resignation of Agent. ... 31

ARTICLE X MISCELLANEOUS ... 31

Section 10.01 Amendments. ... 31
Section 10.02 Expenses; Indemnity; Damages Waiver ... 32
Section 10.03 Successors and Assigns. ... 33
Section 10.04 Notice Generally ... 34
Section 10.05 Severability ... 35
Section 10.06 Entire Agreement ... 35
Section 10.07 Governing Law; Jurisdiction; WAIVER OF JURY TRIAL ... 35

This CREDIT AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of [●], 2024, among Instant Brands Litigation Trust (the "Borrower" or the "Litigation Trust"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and Acquiom Agency Services LLC, as administrative agent (the "Administrative Agent").

PRELIMINARY STATEMENTS

WHEREAS, on June 12, 2023, Instant Brands Acquisition Holdings Inc., a Delaware corporation and its United States subsidiaries (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and commenced their chapter 11 cases (the "Chapter 11 Cases"), which are being jointly administered under Case No. 23-90716;

WHEREAS, on [●], the Bankruptcy Court entered its order confirming the Plan (as defined below);

WHEREAS, the Plan and that certain Litigation Trust Agreement entered into and effective as of the Effective Date provide for, among other things, (i) the creation of the Borrower, (ii) the contribution of the Litigation Trust Assets (hereinafter defined) to the Borrower and (iii) the liquidation (and conversion to cash) of the Litigation Trust Assets and the distribution of the proceeds therefrom; and

WHEREAS, pursuant to the Plan and the terms set forth herein, the Lenders have agreed to make up to $6,000,000 of loans (the "Commitment Amount") to fund the administration, management, liquidation (and conversion to cash) of the Litigation Trust Assets by, among other means, pursuing, prosecuting and/or settling claims and/or causes of action constituting the Litigation Trust Assets, subject to the terms and conditions set forth herein.

In consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 1.01 Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Administrative Agent" has the meaning set forth in the Preamble.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning set forth in the Preamble.

"Applicable Rate" means (a) with respect to Tranche 1 Loans, 15.00% per annum; (b) with respect to Tranche 2 Loans, 15.00% per annum and (c) with respect to Tranche 3 Loans, 15.00% per annum.

"Approved Budget" means the Initial Approved Budget and any Proposed Supplemental Budget approved in accordance with Section 6.07 hereof.

"Approved Fund" means (a) any investment company, fund, trust, securitization vehicle or conduit that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business, or (b) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, in each case, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an affiliate of a Lender or (iii) a Person (other than a natural person) or an affiliate of a Person (other than a natural person) that administers or manages a Lender.

"Available Tenor" shall mean, as of any date of determination with respect to the then-current Benchmark, as applicable, (a) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (b) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"Bankruptcy Code" means, as applicable, Title 11 of the U.S. Code (11 U.S.C. §101 et seq.), as now and hereafter in effect and applicable to the Chapter 11 Cases, or any successor statute, and any rule or regulation issued thereunder.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements.

"Backstop Commitment Letter" means the Backstop Commitment Letter for Litigation Trust Financing Facility, dated as January [ ], 2024.

"Backstop Premium" has the meaning set forth Section 2.05(d).

"Backstop Premium Amount" means 10.0% of the Commitment Amount.

"Backstop Percentage Allocation" means the quotient of (a) the Backstop Premium Amount and (b) the product of (i) 1.5 and (ii) the Notional Base Price.

"Benchmark" means, initially, the Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.03(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Required Lenders, in consultation with Borrower, as the replacement Benchmark in their reasonable discretion; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents. "Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Default Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent in consultation with Borrower decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market

practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative.

"Benchmark Transition Event" means, with respect to any then-current Benchmark the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark (or such component), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component) or (b) all Available Tenors of such Benchmark (or such component) are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03.

"Borrower" has the meaning set forth in the Preamble.

"Borrowing" means a borrowing of Loans pursuant to Section 2.01.

"Budget Event" means, during any calendar month starting with the first full month after the Closing Date, the aggregate amount of actual disbursements shall exceed the projected aggregate disbursements in the Approved Budget by an amount greater than the Permitted Variance.

"Business Day" means any day other than a Saturday, Sunday or other day that is a federal holiday or any day on which commercial banks are authorized or obligated by law, regulation or executive order to remain closed; *provided*, *however*, that for purposes of determining the borrowing, payment or continuation of, or determination of interest rate on, the Loans, "Business Day" shall exclude any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Capital Stock" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest, and profits interests, participations, or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning set forth in the Preliminary Statements.

"Closing Date" means the first date on which all conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 4.01.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" means the several obligations of the Lenders to make Loans to the Borrower hereunder as it may be reduced from time to time pursuant to Section 2.06. The initial Commitments of the Lenders with respect to each Tranche as is set forth on Schedule 1,

"Commitment Amount" has the meaning set forth in the Preliminary Statements.

"Confirmation Order" has the meaning set forth in the Plan.

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money and all indebtedness of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) all direct or contingent obligations of such Person arising under or in respect of (i) letters of credit (including standby and commercial), bankers' acceptances, demand guarantees and similar independent undertakings and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business); and (d) all guarantees of such Person in respect of any of the foregoing

"Debtors" has the meaning set forth in the Preliminary Statements.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, dissolution, administration, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, winding up, reorganization (by way of voluntary arrangement scheme of arrangement or otherwise), or similar debtor relief laws of the U.S., any state or territory thereof,

the District of Columbia or any other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or after notice or the passage of time or both would be, an Event of Default.

"Default Rate" means, for any date, an interest rate per annum equal to (a) SOFR with respect to such date plus (b) the Applicable Rate plus (c) 2.00% per annum.

"Defaulting Lender" means, subject to Section 2.11(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's reasonable determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or waived, or (ii) pay to the Administrative Agent, or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's reasonable determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Laws, (ii) had appointed for it, or its direct or indirect parent company, a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its, or its direct or indirect parent company's, business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) has become the subject of a Bail-In Action. Any determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.11(b)) upon delivery of written notice of such determination to Borrower and each Lender.

"Deposit Account" means any "deposit account" as defined in Article 9 of the UCC.

"Dollar" and "$" means the lawful money of the United States.

"Effective Date" has the meaning set forth in the Plan.

"Eligible Assignee" means (a) a Lender, (b) an affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) consented to in writing by the Administrative Agent and the Borrower (such Borrower consent shall not be unreasonably withheld, delayed or conditioned); provided, that (x) no consent of the Borrower shall be required after the occurrence and during the continuance of an Event of Default under Section 8.01(a), and (y) the consent of the Borrower shall be deemed to have been given unless an objection is delivered to the Administrative Agent within ten (10) Business Days after notice of a proposed assignment is delivered to Borrower; provided, further, that notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.05(b) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 4.01(g); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, official rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"Floor" means a rate of interest equal to [0.00%] *per annum*.

"Governmental Authority" means the government of the United States of America, Canada or any other nation, or of any political subdivision thereof, including state, local, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Incremental Amendment" has the meaning specified in Section 2.10(f).

"Incremental Amount" means [$4,000,000].

"Incremental Borrowing Notice" has the meaning specified in Section 2.10(a).

"Incremental Commitment" means a commitment by an Incremental Lender to make Incremental Loans.

"Incremental Facility" has the meaning specified in Section 2.10(a).

"Incremental Facility Closing Date" has the meaning specified in Section 2.10(d).

"Incremental Lender" has the meaning specified in Section 2.10(c).

"Incremental Loan" has the meaning specified in Section 2.10(a).

"Incremental Loan Availability Termination Date" means six months before the Maturity Date.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10.02(b).

"Initial Approved Budget" has the meaning given to it in Section 4.01(e).

"Initial Term SOFR" means with respect to any Loan, Term SOFR for the first Interest Period.

"Interest Payment Date" means, as to any Loan, the last day of each Interest Period applicable to such Loan, and the Maturity Date.

"Interest Period" means three months, beginning on the date each Loan is disbursed.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of equity interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Indebtedness of the type referred to in clause (d) of the definition of "Debt" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IRS" means the United States Internal Revenue Service.

"Joint Defense Agreement" means that certain [Joint Defense/Common Interest Agreement], by and among the Administrative Agent, the Lenders and the Borrower, dated as of the date hereof (as the same may be amended, amended and restated, extended, supplemented or otherwise modified from time to time pursuant to the terms thereof).

"Junior Debt" means, with respect to any Loan, debt that is junior in right of payment to such Loan. Junior Debt with respect to the Tranche 1 Loans shall mean (a) the Tranche 2 Loans and (b) the Tranche 3 Loans. Junior Debt with respect to the Tranche 2 Loans shall mean the Tranche 3 Loans. There shall be no Junior Debt in respect of the Tranche 3 Loans.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the

enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" or "Lenders" has the meaning set forth in the Preamble.

"Lien" means, with respect to any asset, (i) any mortgage, pledge, hypothecation, deed of trust, security interest, lien, charge or similar monetary encumbrance in or on such asset and (ii) the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement relating to such asset; provided that in no event shall an operating lease or an agreement to sell be deemed to be a Lien.

"Litigation" means litigation pursued by the Borrower in accordance with the Litigation Trust Purpose.

"Litigation Trust Agreement" means that certain Litigation Trust Agreement, dated as of [●], among the Litigation Trustee and Instant Brands Acquisition Holdings Inc.

"Litigation Trust Assets" has the meaning ascribed to such term in the Plan.

"Litigation Trust Avoidance Actions" has the meaning set forth in Article [●] of the Plan.

"Litigation Trust Beneficiaries" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trustee" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Interests" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Proceeds" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Purpose" means the purpose set forth in section 1.04 of the Litigation Trust Agreement.

"Loan" has the meaning specified in Section 2.01.

"Loan Documents" means this Agreement and any related documentation for the loan facility.

"Maturity Date" means the earlier of (a) the date of dissolution of the Borrower and (b) five (5) years from the Closing Date.

"Notional Base Price" means the quotient of (a) the greater of (i) $2,250,000 and (ii) the last settlement offer made with respect to the Litigation Trust Avoidance Actions between October 3, 2023 and the Effective Date divided by (b) the number of Litigation Trust Interests issued as of the Effective Date.

"Notional Conversion" has the meaning set forth in Section 2.07.

"Notional Conversion Factor" means (a) with respect to Tranche 1 Loans, 1.5; (b) with respect to Tranche 2 Loans, 2.0 and (c) with respect to Tranche 3 Loans, 2.5.

"Notional Conversion Price" means the product of (a) the Notional Base Price and (b) the Notional Conversion Factor.

"Notional Litigation Trust Interests" has the meaning specified in Section 2.07.

"Obligations" means all liabilities, indebtedness and obligations (monetary or otherwise) of the Borrower under this Agreement or any other document or instrument executed in connection herewith, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.05(b)).

"Participant Register" has the meaning specified in Section 10.03(d).

"Permitted Variance" means a variance of 120% of the estimated aggregate disbursements in the then-in-effect Approved Budget.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision hereof or any other entity (or series of any thereof).

"PIK Interest" has the meaning specified in Section 2.05.

"Plan" means the confirmed plan of reorganization with respect to the Debtors pursuant to the Chapter 11 Cases.

"Proposed Supplemental Budget" has the meaning specified in Section 6.07.

"Prepayment Premium" means an amount equal to the premium (which shall be no less than zero) that results in the Specified Return Requirement being satisfied with respect to any Tranche 2 Loan or Tranche 3 Loan being prepaid (it being understood that a prepayment premium shall be payable only in connection with an optional prepayment pursuant to Section 2.03(a) and in connection with a Refinancing Transaction).

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation the Borrower hereunder or under any other Loan Document.

"Refinancing Transaction" means the issuance by the Borrower, or a third party, of Debt, equity or other capital to repay any or all of the Loans prior to the Maturity Date.

"Register" has the meaning specified in Section 10.03(c).

"Required Lenders" means, as of any date of determination, any Lender or Lenders holding in the aggregate more than 50% of the aggregate outstanding principal amount of all Loans and Commitments; *provided*, that the unused outstanding principal amount of all Loans and Commitments, as applicable, of,

and the portion of the amount of all Loans held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders; *provided, further*, that if at any time, there are two (2) or more Lenders party to this Agreement the term "Required Lenders" must include at least two (2) Lenders that are not Affiliates of each other (Lenders that are Affiliates of each other shall be deemed to be a single Lender for purposes of this definition).

"Requirements of Law" means, as to any Person, any provision of the Plan, Confirmation Order or the Litigation Trust Agreement applicable to such Person, and any law, treaty, rule or regulation or final, non-appealable determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or to which any of its material property is subject.

"Reserves" means amounts reflected in the Approved Budget that are reserved to pay the administrative costs and expenses of the Litigation Trust, including the Expense Fund (as defined in the Litigation Trust Agreement), the fees and expenses of the Litigation Trustee, the Litigation Trust Advisory Board (as defined in the Litigation Trust Agreement) and its members and the Professionals.

"Restricted Payment" means any payment in contravention to this Agreement or the Litigation Trust Agreement.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"SOFR Loan" means a Loan that bears interest at a rate based on Term SOFR.

"Specified Return Requirement" means an amount, with respect to any Tranche 2 Loan or Tranche 3 Loan being prepaid, sufficient to generate (a) in the case of Tranche 2 Loans, the greater of (i) an internal rate of return per annum of Initial Term SOFR plus the Applicable Rate with respect to Tranche 2 Loans and (ii) a 1.5 times multiple of invested capital and (b) in the case of Tranche 3 Loans, the greater of (i) an internal rate of return per annum of Initial Term SOFR plus the Applicable Rate with respect to Tranche 3 Loans and (ii) a 2.0 times multiple of invested capital.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the date on which (a) the Commitments shall have been terminated or expired and (b) the principal of and interest on all Loans, all fees and other Obligations shall have been paid in full.

"Term SOFR" means the forward-looking term rate based on SOFR for a tenor comparable to the applicable Interest Period on the date that is two Business Days prior to the first day of such Interest Period as published by the Term SOFR Administrator.

"Term SOFR Administrator" means CME Benchmark Administration Limited (CBA) (or a successor administrator of the term rate as selected by the Administrative Agent).

"Tranche" means a particular series of Loans, including Tranche 1 Loans, Tranche 2 Loans, Tranche 3 Loans or Incremental Loans, as applicable.

"Tranche 1 Loan" has the meaning specified in Section 2.01.

"Tranche 2 Loan" has the meaning specified in Section 2.01.

"Tranche 3 Availability Period" means the period of time commencing on the date that is 181 days after the Effective Date and ending on the Tranche 3 Availability Termination Date.

"Tranche 3 Availability Termination Date" means four (4) years from the Effective Date.

"Tranche 3 Loan" has the meaning specified in Section 2.01.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Withholding Agent" means the Borrower and the Administrative Agent.

Section 1.02 Other Interpretive Provisions. With reference to this Agreement:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified or extended, replaced or refinanced, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used herein shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references herein to Articles, Sections, Preamble and Preliminary Statements shall be construed to refer to the Articles and Sections of, and Preamble and Preliminary Statements to, this Agreement, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(c) Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

ARTICLE II

LOAN FACILITY

Section 2.01 Loans. Subject to the terms and conditions set forth herein, the Lenders severally agree to make loans (each such Borrowing, a "Loan"; together with each other Loan, the "Loans") to the Borrower, ratably and in accordance with their Commitments in the following amounts: (a) Loans on the Effective Date in an aggregate principal amount of up to $1,000,000, (the "Tranche 1 Loans"), (b) Loans within 180 days of the Effective Date in an aggregate principal amount of up to $2,000,000 (the "Tranche 2 Loans"), and (c) thereafter until the Tranche 3 Availability Termination Date, Loans in an aggregate principal amount of up to $3,000,000 (the "Tranche 3 Loans").

Section 2.02 Borrowings of Loans. Each Borrowing shall be made upon the Borrower's irrevocable written notice to the Administrative Agent. Each such notice must be received by the Administrative Agent not later than noon New York City time three (3) Business Days prior to the requested date of any Borrowing. Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

Section 2.03 Prepayments.

(a) Optional. The Borrower may, upon at least one (1) Business Day's prior written notice to the Administrative Agent, at any time or from time to time, and subject to Section 7.06, voluntarily prepay any Loans in whole or in part. Any prepayment of a Loan shall be accompanied by all accrued interest thereon in cash, and, for each of the Tranche 2 Loans and Tranche 3 Loans, the Prepayment Premium in respect thereof (it being understood that any Prepayment Premium shall be payable only in connection with a Refinancing Transaction).

(b) Mandatory. All Litigation Trust Proceeds received by the Borrower, net of the Reserves, shall, within three (3) Business Days after the receipt thereof by the Borrower, be applied to prepay the Loans, together with all accrued interest thereon, in cash. Loans prepaid under this Section 2.03(b) shall be paid in the same order of priority as is set forth under Section 8.03.

Section 2.04 Repayment of Loans. On the Maturity Date, the Borrower shall repay in cash the aggregate principal amount of the Loans outstanding on such date together with all accrued interest thereon in cash, together with any and all fees and expenses payable in accordance with the terms hereof. For the avoidance of doubt, the Loans shall be repaid in the order set forth in Section 8.03 herein.

Section 2.05 Interest and Fees.

(a) Each Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to (i) Term SOFR for such Interest Period plus (ii) the Applicable Rate. On each Interest Payment Date, the Borrower shall pay in kind all of the interest accrued from the immediately prior Interest Payment Date to such Interest Payment Date in respect of any Loans (the "PIK Interest"), so that on and as of such Interest Payment Date for such Loans, an amount equal to the PIK Interest in respect of such Loans for such Interest Period shall be automatically capitalized and added to the then-outstanding principal amount of such Loans.

(b) During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable in cash upon demand of the Administrative Agent or the Required Lenders.

(c) Interest on each Loan shall be due and payable in kind, as set forth in Section 2.05(a), in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein as aforesaid. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment aforesaid.

(d) The Borrower shall pay to the Lenders (ratably in accordance with the respective percentages set forth in Schedule I hereto) the a backstop premium (the "Backstop Premium") on the Closing Date, which Backstop Premium shall be paid in kind and shall be automatically capitalized and added to the then-outstanding principal amount of Tranche 1 Loans. The "Backstop Premium" shall be payable in Tranche 1 Loans in an aggregate amount equal to the quotient of (a) the Backstop Premium Amount and (b) 1 less the Backstop Percentage Allocation. The Backstop Premium shall be fully earned when paid in accordance with this Section 2.05(d) as original issue discount for tax purposes and shall not be refundable for any reason whatsoever.

Section 2.06 Termination or Reduction of Commitments. The Commitments of the Lenders (a) with respect to the Tranche 1 Loans shall be automatically and permanently reduced to $0 upon the funding of the Tranche 1 Loans on the Closing Date; (b) with respect to the Tranche 2 Loans shall be automatically and permanently reduced by each Borrowing of Tranche 2 Loans in an amount equal to such Borrowing and (c) with respect to the Tranche 3 Loans shall be automatically and permanently reduced by each Borrowing of Tranche 3 Loans in an amount equal to such Borrowing. Notwithstanding the foregoing, the Commitments of the Lenders shall also be reduced upon the mutual agreement of the Borrower and all of the Lenders.

Section 2.07 Notional Conversion Right.

At any time on or prior to the Maturity Date, each Lender shall have the right, at its option, by written notice to the Litigation Trustee, to effectuate a conversion (a "Notional Conversion") of all or any portion of the amounts owing in respect of its Loans to a Notional Litigation Trust Interest at the Notional Conversion Price to be paid in cash, in full on the earlier of (1) the Maturity Date and (2) immediately before any distribution of the Litigation Trust Assets is made to any Litigation Trust Beneficiaries, in each case, equal to the aggregate amount of distributions from Litigation Trust Proceeds (as defined in the Litigation Trust Agreement) that such Lender would have received on its Notional Litigation Trust Interests (as defined below) had such Loans been converted on the date the Lender made such election to Litigation Trust Interests at the Notional Conversion Price (the notional Litigation Trust Interests to have been received by such Lender in respect of such Notional Conversion being, the "Notional Litigation Trust Interest" of such Lender). Notwithstanding anything to the contrary in this Section 2.07, at no time shall any Lender's interest in a Loan convert to a Litigation Trust Interest.

Section 2.08 Payments; Generally.

(a) Payments by Borrower. All payments to be made by the Borrower hereunder and the other Loan Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all such payments shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the office of the Administrative Agent in immediately available funds not later than 12:00 p.m. (New York City time) on the date specified herein. All amounts received by the Administrative Agent after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue. The Administrative Agent will promptly distribute to each Lender its ratable share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable lending office (or otherwise distribute such payment in like funds as received to the Person or Persons entitled thereto as provided herein). If any payment to be made by the

Borrower shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day. Except as otherwise expressly provided herein, all payments hereunder or under any other Loan Document shall be made in Dollars.

(b) Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c) Several Obligations of Lenders. The obligations of the Lenders hereunder to make Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment hereunder.

Section 2.09 Sharing of Payments by Lenders.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact in writing, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(a) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b) the provisions of this Section 2.09 shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including without limitation prepayment premiums or other fees or consideration set forth in the Backstop Commitment Letter) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any participant.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 2.10 Incremental Borrowings.

(a) Incremental Commitments. The Borrower may, at any time, on one or more occasions until the Incremental Loan Availability Termination Date, by written notice to the Administrative Agent (an "Incremental Borrowing Notice") request one or more new Tranches of loan facilities (any such facility, an "Incremental Facility" and any such Loans thereunder, "Incremental Loans") by requesting Incremental Commitments in an aggregate principal amount not to exceed the Incremental Amount. Incremental Commitments may be provided only by existing Lenders (each such existing Lender, an "Incremental Lender"). While no existing Lender shall have any obligation to make any Incremental Commitment, all existing Lenders have the right to make Incremental Commitments in an amount *pro rata* to their existing Loans (to the extent any existing Lender does not exercise such right, other existing Lenders shall have the opportunity to do so in place of such existing Lender).

(b) Incremental Borrowing Notice. Each Incremental Borrowing Notice from the Borrower pursuant to this Section 2.10 shall be given in writing and shall set forth the requested amount and proposed terms of the relevant Incremental Facility subject to Section 2.10(e) hereof. An Incremental Borrowing Notice must be received by the Administrative Agent not later than noon New York City time three (3) Business Days prior to the requested date of any Borrowing. Incremental Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

(c) Incremental Loans. On any Incremental Facility Closing Date on which any Incremental Commitments of any Tranche are effected, subject to the terms and conditions in this Section 2.10, (i) each Incremental Lender of such Tranche shall make its Incremental Loan to the Borrower in an amount equal to its Incremental Commitment of such Tranche and (ii) each Incremental Lender of such Tranche shall become a Lender hereunder with respect to the Incremental Commitment of such Tranche and the Incremental Loans of such Tranche made pursuant thereto. Notwithstanding the foregoing, but subject to Section 2.10(e) hereof, Incremental Loans may have identical terms to any then outstanding Tranche of Loans and be treated as the same or a different Tranche as any of such Loans.

(d) Effectiveness of Incremental Amendment. The effectiveness of any Incremental Amendment and the Incremental Facility thereunder shall be subject to the satisfaction on the date thereof (the "Incremental Facility Closing Date") of each of the following conditions:

(i) no Event of Default under Section 8.01 is then continuing or would result after giving effect to such proposed Incremental Facility;

(ii) each Incremental Facility shall be in an aggregate principal amount that is not less than $1,000,000 and shall be in a multiple of $250,000 in excess thereof;

(iii) the representations and warranties of the Borrower contained in Article V shall be true and correct in all material respects on and as of each Incremental Facility Closing Date, except in the case of any representation and warranty that is already qualified or qualified by materiality, they shall be true and correct in all respects;

(iv) the aggregate amount of the Incremental Commitments relating to such Incremental Facility shall not exceed the Incremental Amount available at the time of incurrence thereof;

(v) no Incremental Facility or Incremental Loan (nor the creation, provision or implementation thereof) shall require the approval of any existing Lender other than in its capacity, if any, as a lender providing all or part of such Incremental Facility or Incremental Loan;

(vi) the Administrative Agent shall have received all documents it may request, in its reasonable discretion, relating to the corporate or other necessary authority for such increase and the validity of such increase and any other matters relevant thereto, all in form and substance satisfactory to the Administrative Agent, in its reasonable discretion; and

(vii) the Administrative Agent's reasonable fees and reasonable documented out-of-pocket costs and expenses, if any, in respect of the new loans and commitments so established, shall have been paid.

(e) Required Terms. The terms, provisions and documentation of the Incremental Loans and Incremental Commitments of any Tranche, if not consistent with the terms of the existing Loans, shall be as agreed between the Borrower and the applicable Incremental Lenders providing such Incremental Commitments, in each case subject to the following:

(i) the pricing and other economic terms of the Incremental Loans shall be substantially similar to the pricing and other economic terms of the Tranche 1 Loans;

(ii) the Incremental Loans shall rank *pari passu* in right of payment and of security with the Tranche 1 Loans; and

(iii) the Incremental Loans shall mature on the Maturity Date.

(f) Incremental Amendment. Incremental Commitments in respect of Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Incremental Lender providing such Commitments and the Administrative Agent. The Incremental Amendment may, without the consent of any other Person, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.10. The Borrower shall use the proceeds of the Incremental Loans for any purpose not prohibited by this Agreement, the Plan or the Litigation Trust Agreement. No Lender shall be obligated to provide any Incremental Loans unless it so agrees.

Section 2.11 Defaulting Lenders.

(a) Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i) Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders;

(ii) Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with

respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has fully funded its appropriate share. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.11(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(b) If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and *provided further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to the Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01 Taxes.

(a) Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Law be made free and clear of and without deduction or withholding for any Taxes.

(ii) If the applicable Withholding Agent shall be required by applicable Law to withhold or deduct any Taxes, including both U.S. federal backup withholding and non-resident withholding Taxes, from any payment, then (A) such Withholding Agent shall withhold or make such deductions as are reasonably determined by such Withholding Agent to be required by applicable Law, (B) such Withholding Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Law and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased by the Borrower as necessary so that after any required withholding or deductions for such Indemnified Taxes has been made (including withholding or deductions for Indemnified Taxes applicable to additional sums payable under this Section 3.01) the applicable Lender (or, in the case of payments made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such withholding or deductions for Indemnified Taxes been made.

(b) Payment of Other Taxes by the Borrower. Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Borrower. The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within fifteen (15) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable by such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender, or by any Agent on its own behalf or on behalf of a Lender (with a copy to such Agent), shall be conclusive absent manifest error.

(d) Evidence of Payments. After any payment of Taxes by the Borrower or the Administrative Agent to a Governmental Authority as provided in this Section 3.01, the Borrower or the Administrative Agent, as applicable, shall deliver to the Administrative Agent or the relevant Lender, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Law to report such payment or other evidence of such payment reasonably satisfactory to the Lender or the Administrative Agent, as the case may be.

(e) Status of Lenders; Tax Documentation.

(i) Each Lender shall deliver to the Borrower and to the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or by the Governmental Authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to withholding Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by the Borrower pursuant to any Loan Document or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction. Any documentation and information required to be delivered by a Lender pursuant to this Section 3.01(e) (including any specific documentation set forth in subsection (ii) below) shall be delivered by such Lender (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before any date on which such documentation expires or becomes invalid or obsolete, (iii) after the occurrence of any change in the Lender's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and each such Lender shall promptly notify in writing the Borrower and the Administrative Agent if such Lender is no longer legally eligible to provide any documentation previously provided. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e)(ii)(A), (ii)(B)(1) through (4) and (iii) of this Section 3.01(e)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal position of such Lender.

(ii) Without limiting the generality of the foregoing, any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent two duly executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding or information reporting requirements

(iii) If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or Section 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times

prescribed by applicable Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iv) The Administrative Agent must be a "United States person" (as defined in Section 7701(a)(30) of the Code), and shall provide the Borrower with two duly completed copies of IRS Form W-9 certifying that such Administrative Agent is exempt from U.S. federal backup withholding.

(v) Notwithstanding anything to the contrary in this Section 3.01, neither the Administrative Agent nor any Lender shall be required to deliver any documentation that it is not legally eligible to deliver.

(vi) Each Lender hereby authorizes the Administrative Agent to deliver to the Borrower and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 3.01(e).

(f) Treatment of Certain Refunds. Subject to the last sentence in Section 3.01(c), at no time shall any Recipient have any obligation to file for or otherwise pursue any refund of Taxes withheld or deducted from funds paid for the account of such Recipient. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 3.01, such Recipient shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including any Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of such Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority. In such event, such Recipient shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Recipient may delete any information therein that it deems confidential). Notwithstanding anything to the contrary in this Section 3.01(f), in no event will the Recipient be required to pay any amount to the Borrower pursuant to this Section 3.01(f) the payment of which would place the Recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.01(f) shall not be construed to require any Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g) Delays in Requests. Failure or delay on the part of any Recipient to demand compensation pursuant to the foregoing provisions of this Section 3.01 shall not constitute a waiver of such Recipient's right to demand such compensation.

(h) Limitation. Notwithstanding anything to the contrary, no Lender shall demand payment of any additional amounts or other compensation pursuant to this Section 3.01 unless such Lender represents

to Borrower in such demand, upon which Borrower can conclusively rely, that it is generally making corresponding demands on similar types of borrowers for similar amounts pursuant to similar provisions in other loan documents to which such Lender is a party.

(i) FATCA. For the avoidance of doubt, for purposes of this Section 3.01, the term "applicable law" includes FATCA.

(j) Intended Tax Treatment. Each of the parties hereto (i) intends that the Loans be treated as debt instruments for U.S. federal, state, and local income Tax purposes and (ii) agrees not to file any Tax return, report or declaration inconsistent with sub-clause (A) of the foregoing clause (i) except, in each case, as otherwise required pursuant to a final "determination" within the meaning of Section 1313(a) of the Code. The inclusion of this Section 3.01(j) is not an admission by any Lender that it is subject to United States taxation.

(k) If the Administrative Agent (in consultation with the Borrower) determines that the Loan is subject to the original issue discount or contingent payment debt instrument rules in the Code, the Borrower shall compute the original issue discount schedule ("OID Schedule") or the comparable yield ("Comparable Yield") and projected payment schedule ("Projected Payment Schedule"), as applicable, for the determination of interest accruals in respect of the Loan for U.S. federal income tax purposes at least thirty (30) days prior to the due date (taking into account extensions) for filing the Borrower's federal income tax return for the taxable year that includes the Closing Date, and shall furnish a copy of the same to the Lenders. The Borrower, the Lenders and the Administrative Agent agree to report all interest accruals in respect of the Loan strictly in accordance with the OID Schedule or Comparable Yield and Projected Payment Schedule (as applicable) and adjustments thereto unless all such parties agree otherwise or as otherwise may be required (to the satisfaction of all such parties, each in its reasonable discretion) or allowed by applicable Law.

Section 3.02 Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to Term SOFR or to determine or charge interest rates based upon Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans in Dollars shall be suspended and (ii), the interest rate on SOFR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to Term SOFR component of the Specified Return Requirement, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon Agent's receipt of such notice, the Agent shall, upon demand from such Lender (with a copy to the Administrative Agent), to the extent necessary to avoid illegality, convert all such Loans of such Lender to the interest rate determined by the Administrative Agent without reference to Term SOFR component of the Specified Return Requirement, in each case, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03 Benchmark Transition.

(a) Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, and solely upon such event, the Administrative Agent and the Required Lenders, in consultation with Borrower, may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. The parties shall use commercially reasonable efforts to satisfy any applicable IRS guidance, including Treasury Regulations 1.1001-6 and any future guidance,

to the effect that the implementation of a Benchmark Replacement will not result in a deemed exchange for U.S. federal income tax purposes of any Loan under this Agreement for U.S. federal income tax purposes. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has served such proposed amendment upon all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.

(b) In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c) The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Except as otherwise provided in this Agreement, any determination, decision or election that may be made by the Administrative Agent and/or the Required Lenders pursuant to this Section 3.03, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document.

(d) Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to the Specified Return Requirement, without reference to the then-current Benchmark. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Specified Returned Requirement based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Specified Return Requirement.

Section 3.04 Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes indemnifiable under Section 3.01 and any Excluded Taxes); or

(iii) impose on any Lender or the relevant local market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation in any such Loan;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, upon request of such Lender by delivery of a certificate pursuant to this Section 3.03(c), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) Certificates for Reimbursement. A certificate of a Lender prepared in good faith setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof by the Borrower.

(c) Delays in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof); provided, further, that the Borrower shall not be required to compensate a Lender for increased costs or reductions suffered more than six months after such Change in Law, except that in the case of any such change having retroactive effect such period shall be extended until six months after the Lender becomes aware of such change.

Section 3.05 Compensation for Losses. Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it (but, in each case, excluding lost profits or any loss, cost or expense arising from such Lender's breach of this Agreement) as a result of:

(a) any continuation, payment or prepayment of any Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b) any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan on the date or in the amount notified by the Borrower.

Section 3.06 Mitigation Obligations; Replacement of Lenders.

(a) Designation of a different lending office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) Replacement of Lenders. If a Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or any Lender becomes a Defaulting Lender, or any other circumstance exists hereunder that gives the Borrowers the right to replace a Lender as a party hereto, then the Borrowers may, at their sole expense and effort, upon notice by the Borrower to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.03), all of its interests, rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its interests, rights and obligations with respect to the Loans or Commitments that is the subject of the related consent, waiver and amendment) and the related Loan Documents to one or more Eligible Assignees (provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender or other such Person) that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment).

Section 3.07 Survival.

Each party's obligations under this Article III shall survive termination of the Commitments, repayment, satisfaction or discharge of all other Obligations hereunder, any assignment of rights by or the replacement of a Lender, the resignation or replacement of the Administrative Agent, and the termination of this Agreement or any other Loan Document.

Section 3.08 Changes in Law; Impracticability or Illegality.

(a) Term SOFR may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except to the extent such changes result in the Lender becoming liable for Indemnified Taxes or Excluded Taxes) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at Term SOFR. In any such event, the affected Lender shall give the Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the

Borrower a statement setting forth the basis for adjusting such Term SOFR and the method for determining the amount of such adjustment, or (ii) repay the SOFR Loans with respect to which such adjustment is made (together with any amounts due under Section 3.01).

(b) In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain SOFR Loans or to continue such funding or maintaining, or to determine or charge interest rates at Term SOFR, such Lender shall give notice of such changed circumstances to the Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each other Lender and as to any SOFR Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such SOFR Loans, and interest upon the SOFR Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder.

(c) The obligations of the Borrower under this Section 3.08 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01 Conditions to Closing Date and Availability of the Tranche 1 Loans. The obligation of the Lenders to make the Tranche 1 Loans hereunder on the Closing Date is subject to Required Lender's satisfaction (or waiver by the Required Lenders making the Tranche 1 Loans) of the following conditions precedent:

(a) the Plan shall have been confirmed by the Bankruptcy Court and the Effective Date shall have occurred;

(b) this Agreement shall have been duly executed and delivered by the Administrative Agent, the Lenders and the Borrower;

(c) the Litigation Trust Agreement shall have become effective;

(d) the Joint Defense Agreement shall have been duly executed and delivered by Administrative Agent, the Lenders and the Borrower;

(e) the Administrative Agent and the Lenders shall have received and be satisfied with a budget depicting the projected statement of sources and uses of cash for the Borrower for the following thirteen (13) weeks from the Closing Date (the "Initial Approved Budget").

(f) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects;

(g) no Default or Event of Default shall exist or would result from the making of the Tranche 1 Loans or from the application of the proceeds therefrom; and

(h) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with this Agreement.

Section 4.02 Conditions to Availability of the Tranche 2 Loans. The making of the Tranche 2 Loans hereunder after the Closing Date is subject to Required Lender's satisfaction of the following conditions precedent:

(a) [the Lenders shall have received a draft complaint in respect of the Litigation Trust Avoidance Actions and such complaint shall be reasonably acceptable to the Required Lenders;]

(b) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date;

(c) no Default or Event of Default shall exist or would result from the making of the Tranche 2 Loans or from the application of the proceeds therefrom;

(d) no more than 180 days shall have passed from the Effective Date;

(e) the Required Lenders shall have consented to making the Tranche 2 Loans; and

(f) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with, the terms of this Agreement.

Section 4.03 Conditions to Availability of the Tranche 3 Loans.

The making of the Tranche 3 Loans hereunder after the Closing Date is subject to Required Lender's satisfaction of the following conditions precedent:

(a) a complaint with respect to the Litigation Trust Avoidance Actions shall have survived a motion to dismiss or no motion to dismiss has been filed and is pending;

(b) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date;

(c) no Default or Event of Default shall exist or would result from the making of the Tranche 3 Loans or from the application of the proceeds therefrom;

(d) the Tranche 3 Loans shall be made during the Tranche 3 Availability Period;

(e) the Required Lenders shall have consented to making the Tranche 3 Loans; and

(f) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with, the terms of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders on the date hereof and at the time of each Borrowing that:

Section 5.01 Organization; Powers. The Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent the concept of "good standing" is recognized thereunder), (b) has all requisite power and authority to carry out the Litigation Trust Purpose and (c) is in good standing in, every jurisdiction where such qualification is required.

Section 5.02 Authorization. The Borrower has the organizational and trust powers and has been duly authorized by all necessary organizational action to execute and deliver this Agreement and perform its obligations hereunder.

Section 5.03 No Conflicts. The execution and delivery by the Borrower of this Agreement and the performance by the Borrower of its obligations hereunder do not (a) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under the Litigation Trust Agreement or any Contractual Obligation of the Borrower or (b) violate any Requirement of Law applicable to the Borrower.

Section 5.04 Litigation. There is no litigation, proceeding or investigation pending or, to the best knowledge of the Borrower, threatened against the Borrower, before any Governmental Authority asserting the invalidity of this Agreement or seeking to prevent the consummation of any of the transactions contemplated by this Agreement.

Section 5.05 Governmental Approvals. All approvals, authorizations, consents, orders, licenses or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Borrower of this Agreement have been obtained.

Section 5.06 No Default. No Default or Event of Default has occurred and is continuing.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Until the Termination Date, the Borrower shall:

Section 6.01 Financial Statements. Deliver to the Administrative Agent and the Lenders within ten (10) days after the end of each calendar month, a statement of disbursements and income and cash balance for the immediately preceding calendar month.

Section 6.02 Telephonic Meeting.

(a) At the request of the Administrative Agent or the Required Lenders, provide a telephonic update to discuss the information delivered pursuant to Section 6.01.

(b) At the request of the Administrative Agent or the Required Lenders, provide a telephonic update to discuss the status of the Litigation.

Section 6.03 Other Information. Furnish to the Administrative Agent and the Lenders promptly, after the Litigation Trustee obtains knowledge thereof, written notice of any material event related to the Borrower, including the following:

(a) the occurrence of any Default or Event of Default; and

(b) any material development with respect to Litigation, including any settlement offers.

Section 6.04 Existence. Do or cause to be done all things necessary to preserve applicable trust formalities and maintain its existence as a trust.

Section 6.05 Compliance with Laws. Comply with all Requirements of Law applicable to it or its property.

Section 6.06 Books and Records. Keep proper books of record and account in which full, true and correct entries in all material respects are made of all material dealings and transactions in relation to its administration.

Section 6.07 Approved Budget. Commencing on the Closing Date and on a quarterly basis thereafter, Borrower shall provide an updated "rolling" 13-week budget (commencing with the immediately succeeding Saturday) supplementing the most recent Approved Budget in substantially the same form as the Initial Approved Budget (a "Proposed Supplemental Budget"); at the time such Proposed Supplemental Budget is in form and substance reasonably acceptable to the Lenders, such budget shall constitute an Approved Budget; *provided*, however, that the Borrower may make modifications to any Approved Budget with the consent of the Lenders in their reasonable discretion; *provided, further,* that each Lender shall be deemed to have approved any Proposed Supplemental Budget if the Administrative Agent has not received written notice from such Lender of its disapproval of such Proposed Supplemental Budget, together with a detailed explanation of its reasons for not approving such Proposed Supplemental Budget, on the date that is two (2) Business Days after such Lender's receipt of such Proposed Supplemental Budget. To the extent that any Proposed Supplemental Budget is not acceptable to the Lenders, then the then-existing Approved Budget will remain the operative Approved Budget until replaced by a Proposed Supplemental Budget that is acceptable to the Lenders.

Section 6.08 Use of Proceeds. Use the proceeds of the Loans in accordance with the Approved Budget as then in effect and in furtherance of the Litigation Trust Purpose.

## ARTICLE VII
## NEGATIVE COVENANTS

Until the Termination Date, unless the Required Lenders shall otherwise consent in writing:

Section 7.01 Liens. The Borrower shall not create, incur, assume or suffer to exist any Liens on the Litigation Trust Assets other than statutory Liens, if applicable.

Section 7.02 Limitation on Incurrence of Debt. The Borrower shall not incur any Debt other than the Loans.

Section 7.03 Merger, Consolidation or Sale of All or Substantially All Assets.

(a) The Borrower shall not merge into or consolidate with any other trust or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure other than, in the case of liquidation, transfer or disposal, in connection with converting the Litigation Trust Assets to Litigation Trust Proceed or in the case of dissolution or termination terminate.

(b) The Borrower shall not commingle its assets with the assets of any other Person.

Section 7.04 Limitation on Sales of Assets. The Borrower shall not sell any assets without the consent of the Required Lenders.

Section 7.05 Limitation on Restricted Payments and Distributions. The Borrower shall not make any Restricted Payments and shall not distribute any Litigation Trust Proceeds (or any other amounts or Litigation Trust Assets) to the Litigation Trust Beneficiaries before the occurrence of the Termination Date.

Section 7.06 Prepayments of Indebtedness. The Borrower shall not prepay any Junior Debt.

Section 7.07 Amendments and Modifications.

(a) The Borrower shall not amend, modify, waive or terminate any provision of the Litigation Trust Agreement or fail to observe applicable trust formalities (if any), in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Administrative Agent or the Lenders in any material respect.

(b) The Borrower shall not amend, modify, waive or terminate any provision of the Litigation Trust Agreement or the Loan Documents, in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Administrative Agent or the Lenders in any material respect.

Section 7.08 Settlement. The Borrower shall not settle, or offer to settle, any Litigation without consent of the Required Lenders.

Section 7.09 Investments. The Borrower shall not directly or indirectly acquire, make, own, or hold any Investment, except in accordance with the terms and conditions of the Litigation Trust Agreement and the Plan.

Section 7.10 Use of Proceeds. The Borrower shall not use the proceeds of any Loan for any purpose other than (a) in furtherance of the Litigation Trust Purpose (which, for the avoidance of doubt, shall include, without limitation, the payment and/or reimbursement of the fees, costs and expenses incurred by the Borrower in connection therewith, including without limitation, the fees, costs and expenses of the professionals retained by the Borrower in furtherance of the Litigation Trust Purpose) and (b) in accordance with the Litigation Trust Agreement.

Section 7.11 Activities of Borrower. The Borrower shall not have any operations, assets or liabilities other than (a) the Litigation Trust Assets (as defined in the Litigation Trust Agreement), (b) performing its obligations under this Agreement, the Plan, the Confirmation Order and the Litigation Trust Agreement, (c) as may be necessary and required to pursue and further the Litigation Trust Purpose, including, pursuing the Litigation Trust Avoidance Actions, (d) preserving and keeping in full force and effect its legal existence and (e) any activities related to any of the foregoing.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01 Events of Default. Any of the following events referred to in this Section 8.01 shall constitute an "Event of Default":

(a) Non-Payment. The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan and (ii) within two (2) Business Days after the same becomes due, any interest on any Loan, any fee or any other amount payable hereunder.

(b) Covenants. The Borrower fails to comply with any of its obligations, covenants or agreements contained in Article VI or Article VII hereof, which failure has not been cured after five (5) Business Days' prior written notice from the Administrative Agent or the Required Lenders.

(c) Representations and Warranties. Any representation, warranty or certification made or deemed made by or on behalf of the Borrower required to be delivered in connection herewith shall be incorrect or misleading in any material respect when made or deemed made, and in either case, such incorrect or misleading representation or warranty (if curable) shall remain incorrect or misleading for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders.

(d) Budget Event. There occurs any Budget Event.

Section 8.02 Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent shall, solely at the written direction of the Required Lenders, take any or all of the following actions:

(a) declare all Commitments to be terminated, whereupon such Commitments shall be terminated;

(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder (including any Prepayment Premiums) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(c) exercise on behalf of the Lenders all rights and remedies available under this Agreement or applicable Law;

provided that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws, the unpaid principal amount of all outstanding Loans and all interest, premiums (including any Prepayment Premiums) and other amounts as aforesaid shall automatically become due and payable, in each case, without further act of the Administrative Agent or the Lenders.

Section 8.03 Application of Funds. After the occurrence and during the continuance of an Event of Default or on the Maturity Date, any amounts received in respect of the Obligations shall be applied as follows and in accordance with the Litigation Trust Agreement:

(a) *first*, to the Administrative Agent, any and all fees and expenses owing to it in accordance with this Agreement, and then to the Lenders, ratably, any and all fees and expenses owing thereto in accordance with this Agreement;

(b) *second*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 1 Loans and any Incremental Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) of in respect of the Tranche 1 Loans and any Incremental Loans;

(c) *third*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 2 Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) of in respect of the Tranche 2 Loans; and

(d) *fourth*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 3 Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) of in respect of the Tranche 3 Loans.

For the avoidance of doubt, nothing contained herein shall be construed as a limitation on Borrowers' right and/or duty to make distributions of Net Litigation Trust Proceeds (as defined in the Litigation Trust Agreement) to the Litigation Trust Beneficiaries in accordance with the terms of the Plan and the Litigation Trust Agreement.

## ARTICLE IX
## THE ADMINISTRATIVE AGENT

Section 9.01 Appointment and Authority.

Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints [●] to act on its behalf as the administrative agent hereunder and authorizes [●], in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any such provisions. It is understood and agreed that the use of the term "**agent**" herein with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under an agency doctrine of any applicable law. Instead, such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties.

Section 9.02 Rights as a Lender.

If applicable, the Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "**Lender**" or "**Lenders**" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.

Section 9.03 Exculpatory Provisions.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein.

Section 9.04 Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may, at its option and in its sole discretion, rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel

for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05 Non-Reliance on Administrative Agent and Other Lenders.

Each Lender expressly acknowledges that the Administrative Agent has not made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of the Borrower or any affiliate thereof, shall be deemed to constitute any representation or any warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of its affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the Litigation Trust Assets and the administration, prospects, financial and other condition and creditworthiness of the Borrower, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisal and decisions in taking or not taking action under or based upon this Agreement, any other related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the Litigation Trust Assets and the administration, prospects, financial and other condition and creditworthiness of the Borrower. Each Lender represents and warrants that (i) this Agreement sets forth the terms of a commercial lending facility and certain other facilities set forth herein and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire or hold commercial loans, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire or hold such commercial loans, is experienced in making, acquiring or holding such commercial loans.

Section 9.06 Resignation of Administrative Agent.

The Administrative Agent may at any time give written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor, which shall be a bank with an office in the United States, or an affiliate of any such bank with an office in the United States, and which successor agent shall be subject to the Borrower's consent at all times other than during the existence of a Default or an Event of Default (which consent of the Borrower shall not be unreasonably withheld, conditioned or delayed).

## ARTICLE X

## MISCELLANEOUS

Section 10.01 Amendments. No amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by the Administrative Agent, with the consent of the Required Lenders and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a) increase the Commitment of any Lender without the written consent of such Lender;

(b) as to any Lender, postpone any date fixed by this Agreement for any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, premiums (including the Prepayment Premium), fees or other amounts due hereunder without the written consent of such Lender,

(c) as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (b) of this Section 10.01) any premiums (including the Prepayment Premium), fees or other amounts payable hereunder to or for the account of such Lender, without the written consent of such Lender; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d) as to any Lender, change any provision of this Agreement, including, without limitation, Section 8.03, in a manner that would alter the priority or pro rata sharing of payments required thereby without the written consent of such Lender;

(e) change any provision of this Section 10.01 or the definition of "Required Lenders", or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(f) except as expressly permitted hereunder, release, or limit the liability of, the Borrower without the written consent of each Lender;

(g) except as expressly permitted herein, subordinate the Obligations hereunder to any other Debt without the written consent of each Lender; and

(h) amend, waive or otherwise modify any of the conditions precedent set forth in Article IV without the written consent of each affected Lender;

and, provided further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of any Administrative Agent under this Agreement.

Section 10.02 Expenses; Indemnity; Damages Waiver

(a) Costs and Expenses. The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.02(a), or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof) and each Lender, and each affiliate of any of the foregoing Persons (each such

Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment or order to have resulted from the fraud, gross negligence or willful misconduct of such Indemnitee, (y) result from a claim brought by the Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under the Loan Documents, if the Borrower has obtained a final and nonappealable judgment or order in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Borrower and that is brought by an Indemnitee against another Indemnitee (other than against the arranger or the Administrative Agent in their capacities as such). Notwithstanding anything in this Agreement to the contrary, the Indemnitees shall be paid exclusively from the Available Litigation Trust Assets. For the avoidance of doubt, the Litigation Trustee shall not have any personal liability of any kind or nature or under any circumstances with respect to any of the matters set forth in this Agreement.

(c) Waiver of Consequential Damages. To the fullest extent permitted by Law, the Borrower shall not assert, and hereby waives, any claim against the Administrative Agent and any Lender on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof. Neither the Administrative Agent nor any Lender shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement, the Loan Documents, or the transactions contemplated hereby or thereby, except to the extent such damage is determined by a court of competent jurisdiction by final and nonappealable judgment or order to have resulted from the fraud, gross negligence or willful misconduct of such Person.

Section 10.03 Successors and Assigns.

(a) Any Lender may at any time assign to one (1) or more Eligible Assignees all or any portion of such Lender's Commitment and Loans, together with all related Obligations of such Lender hereunder, provided that until the Administrative Agent shall have received and accepted an effective assignment agreement in form and substance acceptable to the Administrative Agent, executed, delivered and fully completed by the applicable parties thereto (and the Administrative Agent shall email a copy thereof to the Litigation Trustee within five (5) Business Days following receipt thereof), and shall have received such other information regarding such Eligible Assignee as the Administrative Agent reasonably shall require, the Borrower and the Administrative Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned. If requested by the Administrative Agent, the Borrower agrees to (i) execute any document reasonably required to effectuate and acknowledge each assignment of a Commitment and Loans to an assignee hereunder, (ii) make the Litigation Trustee or his/her/its professionals available to meet with the Administrative Agent and prospective participants and assignees of the Commitments and Loans at times and places to be mutually agreed and (iii) to provide

reasonable assistance to the Administrative Agent or the Lenders in the preparation of non-privileged and/or non-confidential information relating to the financial affairs of the Borrower as any prospective participant or assignee of a Commitment and Loans reasonably may request, and in each case solely to the extent disclosure will not undermine any of the Litigation Trust Assets or any strategy relating thereto.

(b) From and after the date on which the conditions described above have been met, (i) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such assignment agreement, shall have the rights and obligations of a Lender hereunder, and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment agreement, shall be released from its rights and obligations hereunder (other than those that survive termination).

(c) The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain a copy of each assignment agreement delivered to it and a Register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount (and stated interest) of the Loans, owing to, such Lender pursuant to the terms hereof (the "Register"). The entries in such Register shall be conclusive, absent manifest error, and, the Administrative Agent and the Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Such Register shall be available for inspection by the Borrower and any Lender, at any reasonable time upon reasonable prior notice to the Administrative Agent.

(d) The Borrower agrees that each participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Obligations for its own purposes (each, a "Participant Register"), provided that the Administrative Agent and Borrower shall be entitled to continue to deal solely and directly with such Lender in connection with such Lender's Commitments and Loans. The entries in the Participant Registers shall be conclusive, absent manifest error. Each Participant Register shall be available for inspection by the Administrative Agent at any reasonable time upon reasonable prior notice to the applicable Lender; provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations) to any Person (including the Borrower) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Section 10.04 Notice Generally. All notices, consents and other communications required or permitted by this Agreement shall be in writing and shall be (a) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid), (b) sent by facsimile or e-mail or (c) sent by registered or certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by written notice to the other party):

if to the Borrower, to:

[Name]
[Address]

if to the Administrative Agent, to:
[Name]
[Address]

if to each Lender, to the addresses set forth on Schedule 2 of this Agreement

All notices, consents, waivers and other communications shall be deemed to have been duly given (as applicable): if delivered by hand, when delivered by hand; if delivered by overnight service, when delivered by nationally recognized overnight service; if delivered by courier, when delivered by courier; if sent via registered or certified mail, five Business Days after being deposited in the mail, postage prepaid; or if delivered by email or facsimile, when received by the recipient prior to 5:00 p.m. local time for the recipient (and if received by the recipient after 5:00 p.m. local time for the recipient, then delivery will be deemed duly given at 9:00 a.m. local time for the recipient on the subsequent Business Day, unless receipt is otherwise confirmed by the recipient by response email or facsimile prior thereto).

Section 10.05 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.06 Entire Agreement. This Agreement supersedes all prior agreements, representations and warranties, whether written or oral, of the parties with respect to the subject matter contained herein and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to such subject matter.

Section 10.07 Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.

(a) Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to its conflict of law principles.

(b) Jurisdiction; WAIVER OF JURY TRIAL. Any lawsuit or other legal actions arising out of or based upon this Agreement shall be brought and determined in the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York and appellate courts from any thereof. The parties agree that, after a proceeding is before a court as specified in this Section 10.07(b) and during the pendency of such proceeding or any other proceeding, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party waives, and agrees not to assert, as a defense in any such proceeding that it is not subject thereto or that such proceeding may not be brought or is not maintainable in such court or that its property is exempt or immune from execution, that such proceeding is brought in an inconvenient forum or that the venue of the proceeding is improper. Each party irrevocably consents to the service of any and all process in any such proceeding by the delivery of such process to such party at the address and in the manner provided in Section 10.04. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT. Each party agrees that a final judgment in any proceeding described in this Section 10.07(b) after the expiration of any period permitted for appeal and subject to any stay during

appeal shall be conclusive and may be enforced in other jurisdictions on the judgment or in any other manner provided by applicable law.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWER:

[●]

By: ______________________________
Name:
Title:

AGENT:

[●]

By: ______________________________
Name:
Title:

LENDER:

[●]

By: ______________________________
Name:
Title:

**Schedule I**
**Commitments**

| Backstop Lender | Tranche 1 Loan Commitment Amount | Tranche 2 Loan Commitment Amount | Tranche 3 Loan Commitment Amount | Total Loan Commitment Amount | Commitment Percentage |
|---|---|---|---|---|---|
| 11th Lane Partners, LLC | $335,769 | $671,538 | $1,007,307 | $2,014,614 | 33.6% |
| Citadel Credit Master Fund LLC | $654,146 | $1,308,292 | $1,962,438 | $3,924,876 | 65.4% |
| Saratoga Investment Corporation | $10,085 | $20,170 | $30,255 | $60,510 | 1.0% |

**Schedule 2**
**Lender Notice Parties**

[●]

# <u>Exhibit G</u>

## Certain New Governance Documents

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF [COMPANY NAME][1]

This Amended and Restated Limited Liability Company Agreement (the "Agreement") of [COMPANY NAME], a Delaware limited liability company (the "Company"), is entered into by the Company and [NAME OF SOLE MEMBER], as the sole member of the Company (the "Member") on [DATE]. The Member and the Company are sometimes referred to herein collectively as the "Parties", and individually a "Party".

WHEREAS, the Company was formed as a limited liability company [on [COMPANY FORMATION DATE]] by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

WHEREAS, the Member and the Company desire to amend and restate the current limited liability company agreement (with this Agreement superseding the existing limited liability company agreement in full), and agree that the membership in and management of the Company shall be governed by the terms set forth herein.

NOW, THEREFORE, for good and valuable consideration, the Parties, intending to be legally bound, agree as follows:

1. Name. The name of the Company is [COMPANY NAME].

2. Purpose. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

3. Principal Office; Registered Agent.

(a) Principal Office. The location of the principal office of the Company shall be at such location inside or outside of Delaware, as the Member may from time to time designate.

---

[1] NOTE TO DRAFT: EACH OF THE REORGANIZED DEBTOR DELAWARE LIMITED LIABILITY COMPANIES SHALL HAVE AN LLC AGREEMENT SUBSTANTIALLY IDENTICAL TO THIS FORM. THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

(b) Registered Agent. The registered agent of the Company for service of process in the State of Delaware and the registered office of the Company in the State of Delaware shall be that person and location reflected in the Certificate of Formation. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, in the manner provided by law.

4. Members.

(a) Initial Member. The Member owns 100% of the limited liability company interests in the Company. The name and the business, residence, or mailing address of the Member are as follows:

| **Name** | **Address** |
| --- | --- |
| [NAME OF MEMBER] | [ADDRESS OF MEMBER] |

(b) Additional Members. One or more additional members may be admitted to the Company with the consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c) Limited Liability Company Interests; No Certificates. The Company will not issue any certificates to evidence ownership of the limited liability company interests.

(d) Compliance with Section 1123(a)(6). Notwithstanding anything herein to the contrary, the Company shall not be authorized to issue non-voting limited liability company interests or other equity interests in the Company; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Company and after such time, this Section 4(d) shall be of no force and effect, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting limited liability company interests or other equity interests is included in this Agreement in compliance with section 1123(a)(6) of the Bankruptcy Code.

(e) Pledge of Interests. Notwithstanding any other provisions in this Agreement, the Member shall be entitled to pledge its limited liability company interests to, and otherwise grant a lien and security interest in its limited liability company interests and all of its right, title and interest under this Agreement in favor of, any lenders to the Member or the Company or any agent acting on such lenders' behalf without any consents, approvals or actions required by the Member, the Company, or any other Person under this Agreement. So long as any such pledge of or security interest in

the Member's limited liability company interests is in effect, no consent of the Company or the Member shall be required to permit a pledgee thereof or any purchaser or other transferee of such Member's limited liability company interests from such pledgee to be substituted for such Member under this Agreement upon the exercise of such pledgee's rights in accordance with the terms of such pledge with respect to such limited liability company interests. Upon the execution by such substituted member of a counterpart to this Agreement (and without the necessity of compliance with any other provisions herein set forth relating to substitution of members), such substituted member shall have all rights and powers of the "Member" under this Agreement, which shall include all economic rights and all rights to participate in the management of the business and the business affairs of the Company and other control rights as are set forth herein, including all rights and powers of a Member under applicable law. Notwithstanding any other provisions in this Agreement, so long as any limited liability company interests are subject to a pledge, this Section 4(e) may not be amended or modified in any manner adverse to the pledgee without the pledgee's prior written consent.

5. Management.

(a) Authority; Powers and Duties of the Member. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights, and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient, or advisable to effectuate the purposes of this Agreement.

(b) Election of Officers; Delegation of Authority. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her.

6. Liability of Member; Indemnification.

(a) Liability of Member. Except as otherwise required in the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation, or liability of the Company solely by reason of being the Member or participating in the management of the Company.

(b) Indemnification. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim, or expense (including attorneys' fees) whatsoever incurred by the Member relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member on behalf of the Company; provided, however, that any indemnity under this Section 6(b) shall be provided out of and to the extent of Company assets only, and neither the Member nor any other person shall have any personal liability on account thereof.

7. Term. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 11.

8. Additional Capital Contributions. The Member shall have no obligation to contribute additional capital or make any loan to the Company. However, the Member may, from time to time and at its option, make voluntary additional capital contributions to the Company.

9. Tax Status; Income and Deductions.

(a) Tax Status. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state tax purposes and neither the Company nor the Member shall take any action or make any election which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

(b) Income and Deductions. All items of income, gain, loss, deduction, and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction, and credit of the Member.

10. Distributions. Distributions shall be made to the Member at the times and in the amounts determined by the Member.

11. Dissolution; Liquidation.

(a) The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member; or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b) Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c) In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in

an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d) Upon the completion of the winding up of the Company, the Member shall file a Certificate of Cancellation in accordance with the Act.

12. Miscellaneous.

(a) Amendments. Amendments to this Agreement may be made only with the consent of the Member.

(b) Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(c) Severability. In the event that any provision of this Agreement shall be declared to be invalid, illegal, or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality, and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

(d) Entire Agreement. This Agreement contains the entire agreement of the Member with respect to the subject matter hereof, supersedes all prior agreements relating to the subject matter hereof and may not be changed, altered or amended, except in accordance with Section 12(a).

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date first above written.

MEMBER:

[SINGLE MEMBER NAME]

By:_______________________________________________
Name:
Title:

COMPANY:

[COMPANY NAME]

By: ______________________________________________
Name:
Title:

**TABLE OF CONTENTS[1]**

ARTICLE I OFFICES .......... 2
ARTICLE II SHAREHOLDERS .......... 2
ARTICLE III DIRECTORS .......... 8
ARTICLE IV OFFICERS .......... 10
ARTICLE V SHARE CERTIFICATES AND TRANSFER .......... 11
ARTICLE VI DISTRIBUTIONS AND DIVIDENDS .......... 12
ARTICLE VII INDEMNIFICATION .......... 13
ARTICLE VIII MISCELLANEOUS .......... 14
ARTICLE IX AMENDMENT OF BYLAWS .......... 15

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

**AMENDED AND RESTATED
BYLAWS
OF
CORELLE BRANDS (TEXAS) INC.**

## ARTICLE I
## OFFICES

**Section 1.01 REGISTERED OFFICE AND AGENT.** The registered office and registered agent of the Corporation shall be as set forth in the Corporation's Certificate of Formation. The registered office or registered agent may be changed by resolution of the Board of Directors, upon making the appropriate filing with the Secretary of State.

**Section 1.02 PRINCIPAL OFFICE.** The principal office of the Corporation shall be located at such place within or without the State of Texas as shall be fixed from time to time by the Board of Directors.

**Section 1.03 OTHER OFFICES.** The Corporation may also have other offices at any places, within or without the State of Texas, as the Board of Directors may designate, or as the business of the Corporation may require or as may be desirable.

**Section 1.04 BOOKS AND RECORDS.** All records maintained by the Corporation in the regular course of its business, including its share transfer ledger, books of account, and minute books, may be maintained in written paper form or another form capable of being converted to written paper form within a reasonable time. The Corporation shall convert any records so kept upon the request of any person entitled to inspect the records pursuant to applicable law.

## ARTICLE II
## SHAREHOLDERS

**Section 2.01 PLACE OF MEETING.** All meetings of the shareholders shall be held either at the principal office of the Corporation or at any other place, either within or without the State of Texas, as shall be designated in the notice of the meeting or duly executed waiver of notice. The Board of Directors may, in its discretion, determine that the meeting may be held solely by means of remote communication as set out in Section 2.02 below.

**Section 2.02 MEETINGS OF SHAREHOLDERS BY REMOTE COMMUNICATION**. If authorized by the Board of Directors, and subject to any guidelines and procedures adopted by the Board of Directors, shareholders not physically present at a shareholders' meeting may participate in the meeting by means of conference telephone or similar remote communications by which all persons participating in the meeting may hear each other and may be considered present in person and may vote at the meeting, whether held at a designated place or solely by means of remote communication, subject to the conditions imposed by applicable law.

**Section 2.03 ANNUAL MEETING.** An annual meeting of shareholders shall be held on the date and time set by the Board of Directors and stated in the notice of the meeting for the purpose of electing directors and transacting any other business as may be brought properly before the meeting.

Failure to hold the annual meeting at the designated time does not result in the winding up or termination of the Corporation. If the Board of Directors fails to call the annual meeting, any shareholder may make written demand to any officer of the Corporation that an annual meeting be held.

**Section 2.04 SPECIAL SHAREHOLDERS' MEETINGS.** Special meetings of the shareholders may be called by the President, the Board of Directors, or by the holders of at least ten percent (10%) of all the shares entitled to vote at the proposed special meeting. The record date for determining shareholders entitled to call a special meeting is the date the first shareholder signs the notice of that meeting. Only business within the purpose or purposes described in the notice or executed waiver of notice may be conducted at a special meeting of the shareholders.

**Section 2.05 FIXING THE RECORD DATE.** For the purpose of determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, the Board of Directors may fix a date, not more than sixty (60) days or less than ten (10) days before the meeting, as the record date for such determination.

Whenever action by shareholders is proposed to be taken by consent in writing without a meeting of shareholders, the Board of Directors may fix a record date for the purpose of determining shareholders entitled to consent to that action, which record date shall not precede, and shall not be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Board of Directors.

If no record date has been fixed as provided in this Section 2.05, then (a) the record date for determining shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof shall be the date on which notice of the meeting is mailed, (b) the record date for determining shareholders entitled to give written consent to action taken without a meeting, where no prior Board action is required to be taken by the Texas Business Organizations Code ("BOC"), shall be the date on which a signed written consent is first delivered to the Corporation, and (c) the record date for determining shareholders entitled to give written consent to action taken without a meeting, where prior Board action is required to be taken by the BOC, shall be the close of business on the date on which the Board of Directors adopts a resolution taking such prior action.

**Section 2.06 NOTICE OF SHAREHOLDERS' MEETING.** Written notice stating the place, day, and hour of the meeting, the means of any remote communications by which shareholders may be considered present and may vote at the meeting, and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be given not less than ten (10) days and not more than sixty (60) days before the date of the meeting, personally, by electronic transmission (if consented to by a shareholder), or by mail, by or at the direction of the President, the Secretary, or the officer or person calling the meeting, to each shareholder entitled

to vote at the meeting. If mailed, the notice shall be deemed to be given when deposited in the United States mail addressed to the shareholder at the shareholder's address as it appears on the share transfer records of the Corporation, with postage prepaid.

Notwithstanding the preceding paragraph, notice of a shareholder meeting regarding a fundamental business transaction (as defined by Texas law) must be given to each shareholder of the Corporation not later than twenty-one (21) days prior to the meeting, regardless of the shareholder's right to vote on the matter. Notice of such action shall comply with any other requirements set by law.

A shareholder entitled to notice of a meeting may sign a written waiver of notice either before or after the time of the meeting. The participation or attendance of a shareholder at a meeting constitutes waiver of notice, unless the shareholder participates in or attends the meeting solely to object to the transaction of business on the ground that the meeting was not lawfully called or convened.

With the consent of the shareholder, notice may be given to the shareholder by electronic transmission. The shareholder may specify the form of electronic transmission to be used to communicate notice. The shareholder may revoke this consent by written notice to the Corporation. The shareholder's consent is deemed to be revoked if the Corporation is unable to deliver by electronic transmission two (2) consecutive notices, and the Secretary, Assistant Secretary, or transfer agent of the Corporation, or another person responsible for delivering notice on behalf of the Corporation, knows that delivery of these two (2) electronic transmissions was unsuccessful. The inadvertent failure to treat the unsuccessful transmissions as a revocation of shareholder consent does not invalidate a meeting or other action.

Notice by electronic transmission is deemed given when the notice is:

(a) Transmitted to a fax number provided by the shareholder for the purpose of receiving notice;

(b) Transmitted to an email address provided by the shareholder for the purpose of receiving notice;

(c) Posted on an electronic network and a message is sent to the shareholder at the address provided by the shareholder for the purpose of alerting the shareholder of a posting; or

(d) Communicated to the shareholder by any other form of electronic transmission consented to by the shareholder.

**Section 2.07 VOTING LISTS.** The officer or agent in charge of the share transfer records of the Corporation shall prepare, at least eleven (11) days before each meeting of shareholders, a complete list of the shareholders entitled to vote at the meeting or any adjournment thereof, arranged in alphabetical order, with (a) the address of each shareholder, (b) the type of shares held by each shareholder, (c) the number of shares held by each shareholder, and (d) the number of votes that each shareholder is entitled to if different than the number of shares held.

The list shall be kept on file at the registered office or principal place of business of the Corporation and shall be subject to inspection by any shareholder at any time during usual business hours for a period of ten (10) days prior to the meeting. The original share transfer records shall be prima-facie evidence of the shareholders entitled to examine the list and to vote at any meeting of shareholders.

**Section 2.08 QUORUM OF SHAREHOLDERS.** The presence in person or by proxy of the holders of a majority of the shares entitled to vote constitutes a quorum for a meeting of the shareholders. Unless otherwise required by the BOC, the Certificate of Formation, or these Bylaws:

**(a)** The affirmative vote of the holders of a majority of the shares represented at a meeting at which a quorum is present shall be the act of the shareholders.

**(b)** The shareholders represented in person or by proxy at a meeting at which a quorum is present may conduct any business properly brought before the meeting until adjournment, and the subsequent withdrawal from the meeting of any shareholder or the refusal of any shareholder represented in person or by proxy to vote shall not affect the presence of a quorum at the meeting.

If a quorum is not present, the shareholders represented in person or by proxy may adjourn the meeting until a time and place determined by a vote of the holders of a majority of the shares represented in person or by proxy at that meeting. At such adjourned meeting at which the required number of voting shares shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.

**Section 2.09 CONDUCT OF MEETINGS.** The Board of Directors may adopt by resolution rules and regulations for the conduct of meetings of the shareholders as it shall deem appropriate. At every meeting of the shareholders, the President, or in the President's absence or inability to act, a director or officer designated by the Board of Directors, shall act as chair of, and preside at, the meeting. The Secretary or, in the Secretary's absence or inability to act, the person whom the chair of the meeting shall appoint secretary of the meeting, shall act as secretary of the meeting and keep the minutes thereof.

**Section 2.10 VOTING OF SHARES.** Each outstanding share, regardless of class or series, shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders, except to the extent that the Certificate of Formation provides for more or less than one vote per share or limits or denies voting rights to the holders of the shares of any class or series. Unless otherwise required by the BOC, the Certificate of Formation, or these Bylaws, any matter, other than the election of directors, brought before any meeting of shareholders at which a quorum is present shall be decided by the affirmative vote of the holders of the majority of shares present in person or represented by proxy at the meeting and entitled to vote on the matter.

Unless otherwise required by the Certificate of Formation, the election of directors shall be decided by a plurality of the votes cast by the holders of shares entitled to vote in the election at a meeting of the shareholders at which a quorum is present.

Any vote may be taken by voice or show of hands unless a shareholder entitled to vote, either in person or by proxy, objects, in which case written ballots shall be used.

**Section 2.11 VOTING BY PROXY OR NOMINEE.** Shares of the Corporation owned by the Corporation itself or by another corporation or entity, the majority of the voting shares or interest of which is owned or controlled by the Corporation, shall not be voted, directly or indirectly, at any meeting, and shall not be counted in determining the total number of outstanding shares at any given time. Nothing in this Section 2.11 shall be construed as limiting the right of the Corporation or any domestic or foreign corporation or other entity to vote shares, held or controlled by it in a fiduciary capacity, or with respect to which it otherwise exercises voting power in a fiduciary capacity.

Any shareholder may vote either in person or by proxy executed in writing by the shareholder. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Proxies coupled with an interest include the appointment as proxy of (a) a pledgee; (b) a person who purchased or agreed to purchase, or who owns or holds an option to purchase, the shares subject to the proxy; (c) a creditor of the Corporation who extended the Corporation credit under terms requiring the appointment; (d) an employee of the Corporation whose employment contract requires the appointment; or (e) a party to a voting agreement or shareholders' agreement created under the BOC.

Shares owned by another corporation, domestic or foreign, may be voted by any officer, agent, or proxy as the bylaws of that corporation may authorize or, in the absence of authorization, as the board of directors of that corporation may determine.

An administrator, executor, guardian, or conservator may vote shares held in that fiduciary capacity if the shares forming a part of an estate are in the possession and forming a part of the estate being served by the fiduciary, either in person or by proxy, without a transfer of the shares into the fiduciary's name. A trustee may vote shares standing in the trustee's name, either in person or by proxy, but no trustee shall be entitled to vote shares held by such trustee without a transfer of the shares into their name as trustee.

A receiver may vote shares standing in the name of a receiver and may vote shares held by or under the control of a receiver without the transfer thereof into the receiver's name if authority to do so is contained in an appropriate order of the court by which the receiver was appointed.

A shareholder whose shares are pledged shall be entitled to vote the shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares transferred, subject to any agreements containing restrictions on the hypothecation, assignment, pledge, or voluntary or involuntary transfer of shares.

The Board of Directors may establish a procedure by which a shareholder may file a statement with the Corporation that all or a portion of the shares registered in the name of the shareholder are held for the account of a specified person to be recognized by the Corporation as

the shareholder. The procedure must determine the extent of the Corporation's recognition of the specified person as a shareholder and may include any provisions that the Board of Directors deems necessary, including, but not limited to, any of the following:

(a) The types of nominee shareholders who may file a statement;

(b) The rights or privileges of the beneficial owner to be recognized by the Corporation upon filing of a statement;

(c) The information to be included in the statement;

(d) The timeframe within which the statement must be received for the statement to be effective as to an upcoming meeting or vote; and

(e) The time period for which the statement filed will be recognized by the Corporation.

**Section 2.12 WRITTEN CONSENT OF SHAREHOLDERS WITHOUT A MEETING.** Any action required by the BOC to be taken at any annual or special meeting of shareholders, or any action which may be taken at any annual or special meeting of shareholders, may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall have been signed by the holder or holders of shares having not less than the minimum number of votes that would be necessary to take the action at a meeting at which holders of all shares entitled to vote on the action were present and voted. Prompt notice of the taking of any action by shareholders without a meeting by less than unanimous written consent shall be given to those shareholders who did not consent in writing to the action.

**Section 2.13 SHAREHOLDER NOMINATIONS AND PROPOSALS.** For business (including, but not limited to, director nominations) to be properly brought before an annual meeting by a shareholder, the shareholder or shareholders of record intending to propose the business (the "Proposing Shareholder") must have given written notice of the Proposing Shareholder's nomination or proposal, either by personal delivery or by United States mail to the Secretary not later than thirty (30) calendar days prior to the date such annual meeting is to be held. If the current year's meeting is called for a date that is not within thirty (30) days of the anniversary of the previous year's annual meeting, notice must be received not later than ten (10) calendar days following the day on which public announcement of the date of the annual meeting is first made. In no event will an adjournment or postponement of an annual meeting of shareholders begin a new time period for giving a Proposing Shareholder's notice as provided above.

For business to be properly brought before a special meeting of shareholders, the notice of the meeting sent by or at the direction of the person calling the meeting must set forth the nature of the business to be considered. A person or persons who have made a written request for a special meeting pursuant to Section 2.04 of these Bylaws may provide the information required for notice of a shareholder proposal under this section simultaneously with the written request for the meeting submitted to the Secretary or within ten (10) calendar days after delivery of the written request for the meeting to the Secretary.

A Proposing Shareholder's notice shall include as to each matter the Proposing Shareholder proposes to bring before either an annual or special meeting:

(a) The name and address of the Proposing Shareholder, and the classes and number of shares of the Corporation held by the Proposing Shareholder;

(b) If the notice is in regard to a nomination of a candidate for election as director: (a) the name, age, and business and residence address of the candidate; (b) the principal occupation or employment of the candidate; and (c) the class and number of shares of the Corporation beneficially owned by the candidate; and

(c) If the notice is about a proposal other than a nomination of a candidate for election as director, a brief description of the business desired to be brought before the meeting and the material interest of the Proposing Shareholder in such proposal.

## ARTICLE III
## DIRECTORS

**Section 3.01 BOARD OF DIRECTORS.** The business and affairs of the Corporation shall be managed under the direction of the Board of Directors of the Corporation. Directors need not be residents of the State of Texas or shareholders of the Corporation.

**Section 3.02 NUMBER OF DIRECTORS.** The number of directors shall be one or more directors, provided that the number may be increased or decreased from time to time by an amendment to these Bylaws or by resolution adopted by the Board of Directors. No decrease in the number of directors shall have the effect of shortening the term of any incumbent director.

**Section 3.03 TERM OF OFFICE.** At the first annual meeting of shareholders and at each annual meeting thereafter, the holders of shares entitled to vote in the election of directors shall elect directors, each of whom shall hold office until a successor is duly elected and qualified or until the director's earlier death, resignation, disqualification, or removal.

**Section 3.04 VACANCIES AND NEWLY CREATED DIRECTORSHIPS.** Any vacancy occurring in the Board of Directors may be filled by election at an annual or special meeting of shareholders called for that purpose, or may be filled by the affirmative vote of a majority of the remaining directors even when the majority of the remaining directors is less than a quorum of the total number of directors specified in the Certificate of Formation or the Bylaws. A director elected to fill a vacancy shall be elected for the unexpired term of such director's predecessor in office.

A directorship to be filled by reason of an increase in the number of directors may be filled by election at an annual or special meeting of shareholders called for that purpose, or may be filled by the Board of Directors for a term of office continuing only until the next election of one or more directors by the shareholders; provided that the Board of Directors may not fill more than two (2) directorships during the period between any two (2) successive annual meetings of shareholders.

**Section 3.05 REMOVAL.** Any director or the entire Board of Directors may be removed, with or without cause, by a vote of the holders of a majority of the shares then entitled to vote at an election of the director or directors, at any meeting of shareholders called expressly for that purpose.

**Section 3.06 RESIGNATION.** A director may resign by providing written notice to the Corporation. The resignation shall be effective upon the later of the date of receipt of the notice of resignation or the effective date specified in the notice. Acceptance of the resignation shall not be required to make the resignation effective.

**Section 3.07 REGULAR MEETINGS OF DIRECTORS.** A regular meeting of the newly-elected Board of Directors shall be held without other notice immediately following each annual meeting of shareholders, at which the board shall elect officers and transact any other business as shall come before the meeting. The board may designate a time and place for additional regular meetings, by resolution, without notice other than the resolution.

**Section 3.08 SPECIAL MEETINGS OF DIRECTORS.** The President may call a special meeting of the Board of Directors at a time or place determined by the President. The President shall call a special meeting at the written request of two (2) or more directors.

**Section 3.09 NOTICE OF DIRECTORS' MEETINGS.** All special meetings of the Board of Directors shall be held upon not less than twenty-four (24) hours' written notice stating the purpose, date, time, and place of the meeting delivered to each director either personally or by mail. Notice of a regular or special meeting of the Board of Directors may be provided to a director by electronic transmission on consent of the director. The director may specify the form of electronic transmission to be used to communicate notice.

A written waiver of the required notice signed by a director entitled to the notice, before or after the meeting, is the equivalent of giving notice to the director who signs the waiver. A director's attendance at any meeting shall constitute a waiver of notice of the meeting, except where the directors attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called or convened.

**Section 3.10 QUORUM AND ACTION BY DIRECTORS.** A majority of the number of directors shall constitute a quorum for the transaction of business. The act of the majority of the directors present at a meeting at which a quorum is present at the time of the act shall be the act of the Board of Directors, unless the act of a greater number is required by law, the Certificate of Formation, or these Bylaws. The directors at a meeting for which a quorum is not present may adjourn the meeting until a time and place as may be determined by a vote of the directors present at that meeting.

**Section 3.11 ATTENDANCE VIA CONFERENCE TELEPHONE OR SIMILAR COMMUNICATIONS EQUIPMENT.** A member of the Board of Directors or of any committee may attend and participate in a meeting of such members via conference telephone or similar communications equipment by which all persons participating in the meeting may hear each other; provided that all participants are advised of the communications equipment and the

names of the participants in the conference are divulged to all participants. Such participation by a member in a meeting shall constitute presence in person at the meeting.

**Section 3.12 ACTION BY DIRECTORS WITHOUT A MEETING.** Unless otherwise restricted by the Certificate of Formation or these Bylaws, any action required or permitted to be taken at a meeting of the Board of Directors or any committee may be taken without a meeting if all members of the Board of Directors or committee consent in writing or by electronic transmission and the writings or electronic transmissions are filed with the minutes of the proceedings of the Board of Directors.

**Section 3.13 COMMITTEES OF THE BOARD OF DIRECTORS.** The Board of Directors, by resolution adopted by a majority of the Board, may designate one or more directors to constitute one or more committees, to exercise the authority of the Board of Directors to the extent provided in the resolution of the Board of Directors and allowed under the BOC.

No committee of the Board of Directors shall have the authority to authorize a distribution or to authorize the issuance of shares of the Corporation unless the resolution designating a particular committee expressly so provides.

The designation of a committee of the Board of Directors and the delegation thereto of authority shall not operate to relieve the Board of Directors, or any member thereof, of any responsibility imposed by law.

## ARTICLE IV
## OFFICERS

**Section 4.01 POSITIONS AND ELECTION.** The officers of the Corporation shall be elected by the Board of Directors and shall be a President and a Secretary and any other officers, including assistant officers and agents, as may be deemed necessary by the Board of Directors. Any two (2) or more offices may be held by the same person.

Officers shall be elected annually at the meeting of the Board of Directors held after each annual meeting of the shareholders. Each officer shall serve until a successor is elected and qualified or until the earlier death, resignation, or removal of that officer. Vacancies or new offices shall be filled at the next regular or special meeting of the Board of Directors.

**Section 4.02 REMOVAL.** Any officer elected or appointed by the Board of Directors may be removed with or without cause by the affirmative vote of the majority of the Board of Directors. Removal shall be without prejudice to the contract rights, if any, of the officer so removed.

**Section 4.03 POWERS AND DUTIES OF OFFICERS.** The powers and duties of the officers of the Corporation shall be as provided from time to time by resolution of the Board of Directors or by direction of an officer authorized by the Board of Directors to prescribe the duties of other officers. In the absence of such resolution, the respective officers shall have the powers and shall discharge the duties customarily and usually held and performed by like

officers of corporations similar in organization and business purposes to the Corporation, subject to the control of the Board of Directors.

**Section 4.04 AUTHORITY TO EXECUTE AGREEMENTS.** All agreements of the Corporation shall be executed on behalf of the Corporation by (a) the President or any Vice President, (b) such other officer or employee of the Corporation authorized in writing by the President, with such limitations or restrictions on such authority as the President deems appropriate or (c) such other person as may be authorized by the Board of Directors.

## ARTICLE V
## SHARE CERTIFICATES AND TRANSFER

**Section 5.01 CERTIFICATES REPRESENTING SHARES.** The Corporation shall deliver certificates representing all shares to which shareholders are entitled, provided that the Board of Directors may provide by resolution that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of the shares. If shares are represented by certificates, each share certificate shall be consecutively numbered, shall exhibit the holder's name, and shall be signed by the one or more officers, and may be sealed with the seal of the Corporation or facsimile thereof. Any or all signatures may be facsimiles. In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer before the certificate is issued, it may be issued by the Corporation with the same effect as if such person was an officer at the date of its issuance.

Each certificate representing shares of the Corporation shall state upon the face thereof:

(a) That the Corporation is organized under the laws of Texas;

(b) The name of the person to whom issued;

(c) The number and class of shares and the designation of the series, if any, which that certificate represents;

(d) The par value of each share represented by the certificate or a statement that the shares are without par value; and

(e) A conspicuous statement setting forth restrictions on the transfer of the shares, if any.

The Corporation shall, after the issuance or transfer of uncertificated shares, send to the registered owner of uncertificated shares a written notice containing the information required to be set forth or stated on certificates pursuant to the BOC. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated shares and the rights and obligations of the holders of certificates representing shares of the same class and series shall be identical. No share shall be issued until the consideration therefor, fixed as provided by law, has been fully paid.

No requirement of the BOC with respect to matters to be set forth on certificates representing shares of the Corporation shall apply to or affect certificates outstanding when the requirement first becomes applicable to the certificates; but the requirements shall apply to all certificates thereafter issued whether in connection with an original issue of shares, a transfer of shares, or otherwise.

**Section 5.02 TRANSFERS OF SHARES.** Shares of the Corporation shall be transferable in the manner prescribed by law and in these Bylaws. Transfers of shares shall be made on the books of the Corporation only by the holder of record thereof or by such other person as may under law be authorized to endorse such shares for transfer or by such shareholder's attorney lawfully constituted in writing. Except as otherwise provided by law, upon surrender to the Corporation or its transfer agent of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. No transfer of shares shall be valid as against the Corporation for any purpose until it shall have been entered in the share transfer records of the Corporation by an entry showing from and to what person those shares were transferred.

**Section 5.03 REGISTERED SHAREHOLDERS.** The Corporation shall be entitled to treat the holder of record of any shares issued by the Corporation as the holder in fact thereof for all purposes, including voting those shares, receiving dividends or distributions thereon or notices in respect thereof, transferring those shares, exercising rights of dissent with respect to those shares, exercising or waiving any preemptive right with respect to those shares, entering into agreements with respect to those shares in accordance with Texas law, or giving proxies with respect to those shares.

Neither the Corporation nor any of its officers, directors, employees, or agents shall be liable for regarding that person as the owner of those shares at that time for those purposes, regardless of whether that person possesses a certificate for those shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice of such claim or interest, except as otherwise provided by Texas law.

**Section 5.04 LOST CERTIFICATES.** The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate is lost, stolen, or destroyed. When authorizing the issue of a new certificate or certificates, the Board of Directors, in its discretion and as a condition precedent to the issuance thereof, may require the owner of the lost, stolen, or destroyed certificate or certificates or such owner's legal representative to give the Corporation a bond with surety in a sum as it may direct, as indemnity against any claim that may be made against the Corporation on account of the alleged loss, theft, or destruction of any such certificate or the issuance of such new certificate.

## ARTICLE VI
## DISTRIBUTIONS AND DIVIDENDS

**Section 6.01 DECLARATION.** The Board of Directors may authorize distributions on the outstanding shares in cash, property, or in the shares of the Corporation at any annual, regular, or special meeting of the Board of Directors to the extent permitted by, and subject to the provisions of, the laws of the State of Texas. The Board of Directors may by resolution create a reserve or reserves out of the Corporation's surplus or allocate any part or all of surplus in any manner for any proper purpose or purposes, and may increase, decrease, or abolish any such reserve, designation, or allocation in the same manner, after first obtaining the written approval of a majority of the shareholders.

**Section 6.02 FIXING RECORD DATES FOR DISTRIBUTIONS AND DIVIDENDS.** For the purpose of determining shareholders entitled to receive a distribution by the Corporation (other than a distribution involving a purchase or redemption by the Corporation of any of its own shares) or a share dividend, the Board of Directors of the Corporation may, at the time of declaring the distribution or dividend, set a date no more than sixty (60) days prior to the date of the distribution or dividend. If no record date is fixed for the determination of shareholders entitled to receive a distribution (other than a distribution involving a purchase or redemption by the Corporation of any of its own shares) or a share dividend, the date on which the resolution of the Board of Directors declaring the distribution or share dividend is adopted shall be the record date for the determination of shareholders.

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01 INDEMNIFICATION OF EXISTING AND FORMER DIRECTORS AND OFFICERS.** The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action or other proceeding (whether civil, criminal, administrative, arbitrative, or investigative), including any appeal thereof, or any inquiry or investigation that could lead to such an action or proceeding (any of the foregoing to be referred to hereafter as a "proceeding") by reason of the fact that the person (1) is or was a director or officer of the Corporation; or (2) while a director of the Corporation, is or was serving at the request of the Corporation as a partner, director, officer, venturer, proprietor, trustee, employee, administrator, or agent of another entity, organization, or an employee benefit plan (each such person in (2) to be referred to hereafter as a "delegate" and, together with each such person in (1), a "covered person") to the fullest extent permitted by the BOC, but if the BOC is amended, substituted, or replaced, only to the extent that such amendment, substitution, or replacement permits the Corporation to provide broader indemnification rights than the BOC permitted the Corporation to provide prior to such amendment, substitution, or replacement, against all judgments (including arbitration awards), court costs, penalties, settlements, fines, excise, and other similar taxes and reasonable attorneys' fees (all of the foregoing to be referred to hereafter as "expenses") actually incurred by the covered person in connection with such proceeding; provided that no covered person shall be entitled to be indemnified by the Corporation for any expenses which result from such indemnitee's fraud, bad faith, gross negligence, willful misconduct or criminal act. The right to indemnification in this Section 7.01 shall continue as to a covered person who has ceased to be a director, officer, or delegate and shall inure to such covered person's heirs, executors, or administrators.

**Section 7.02 ADVANCEMENT OF EXPENSES.** Costs, charges and expenses (including attorneys' fees) incurred by an indemnitee in defending a civil or criminal action, suit or proceeding (including investigations by any government agency and all costs, charges and expenses incurred in preparing for any threatened action, suit or proceeding), shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding; provided, however, that the payment of such costs, charges and expenses incurred by an indemnitee as set forth herein in advance of the final disposition of such action, suit or proceeding shall be made only upon receipt of an undertaking by or on behalf of the director or officer to repay all amounts so advanced in the event that it shall ultimately be determined as provided elsewhere in this ARTICLE VII that such director or officer is not entitled to be indemnified by the Corporation as authorized in this ARTICLE VII. Notwithstanding the foregoing, if such costs, charges or expenses are incurred in connection with any civil or criminal action, suit or proceeding alleging fraud, bad faith, gross negligence, willful misconduct or a criminal act has been committed by such indemnitee, the Corporation shall not be required to (but may in the sole discretion of the board of directors) advance such expenses. No security shall be required for such undertaking and such undertaking shall be accepted without reference to the recipient's financial ability to make repayment.

**Section 7.03 INDEMNIFICATION OF AND ADVANCEMENT OF EXPENSES TO OTHER PERSONS.** Notwithstanding any other provision of this ARTICLE VII, the Corporation may indemnify and advance expenses to persons other than covered persons, including advisory directors, non-executive officers, employees, and agents of the Corporation, to the extent and in the manner provided by the BOC and these Bylaws.

**Section 7.04 INDEMNIFICATION RIGHTS NOT EXCLUSIVE.** The rights provided pursuant to this ARTICLE VII shall not be exclusive of any other rights to which a person may be entitled by applicable law, the Corporation's Certificate of Formation, action or resolution of the Corporation's shareholders or disinterested directors, or contract.

**Section 7.05 INSURANCE.** The Corporation may purchase and maintain insurance or another arrangement to indemnify any covered person against any liability asserted against and incurred by the covered person in that capacity or arising out of the covered person's status in that capacity, regardless of whether the Corporation would have the power to indemnify the covered person against that liability under applicable law.

**Section 7.06 REPORTS OF INDEMNIFICATION AND ADVANCES.** No later than one (1) year from the date that the Corporation indemnifies or advances expenses to a director, it shall give a written report of such indemnification or advancement to the shareholders, which report must be made with or before the notice or waiver of notice of the next shareholders' meeting or the next submission to the shareholders of a written consent without a meeting.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.01 SEAL.** The Corporation may adopt a corporate seal in a form approved by the Board of Directors. The Corporation shall not be required to use the corporate seal and the

lack of the corporate seal shall not affect an otherwise valid contract or other instrument executed by the Corporation.

**Section 8.02 CHECKS, DRAFTS, ETC.** All checks, drafts, or other instruments for payment of money or notes of the Corporation shall be signed by an officer or officers or any other person or persons as shall be determined from time to time by resolution of the Board of Directors.

**Section 8.03 FISCAL YEAR.** The fiscal year of the Corporation shall be as determined by the Board of Directors.

**Section 8.04 INVALID PROVISIONS.** If any one or more of the provisions of these Bylaws, or the applicability of any provision to a specific situation, shall be held invalid or unenforceable, the provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of these Bylaws and all other applications of any provision shall not be affected thereby.

**Section 8.05 CONFLICT WITH APPLICABLE LAW OR CERTIFICATE OF FORMATION.** These Bylaws are adopted subject to any applicable law and the Certificate of Formation. Whenever these Bylaws may conflict with any applicable law or the Certificate of Formation, such conflict shall be resolved in favor of such law or the Certificate of Formation.

**Section 8.06 EMERGENCY MANAGEMENT OF THE CORPORATION.** In the event of an emergency (as defined by Section 3.251(1) of the BOC), the following provisions regarding the management of the Corporation shall take effect immediately.

In the event of an emergency, a meeting of the Board of Directors may be called following the attempt of not less than two (2) hour notice to each director. Notice may be given by any reasonable means, including electronic transmission, such as fax and email, and by telephone.

The Board of Directors is to approve and maintain a current list of officers or other persons to serve as alternate directors to the extent necessary while these emergency provisions are in effect.

These emergency provisions take effect only in the event of an emergency as defined hereinabove and will not be effective once the emergency ends. Any and all provisions of these Bylaws that are consistent with these emergency provisions remain in effect during an emergency. Any or all of these actions, including emergency actions as defined by Section 3.251(2) of the BOC, that the Corporation takes in accordance with these provisions or Section 3.2535 of the BOC, if in good faith and based on the reasonable belief that the emergency action was in the Corporation's best interest, are binding upon this Corporation and may not be used to impose liability on a managerial official, employee, or agent of the Corporation.

## ARTICLE IX
## AMENDMENT OF BYLAWS

**Section 9.01 AMENDMENT OF BYLAWS.** The Board of Directors may amend, alter, change, and repeal these Bylaws or adopt new bylaws. The shareholders may make additional bylaws and may alter and repeal any bylaws whether such bylaws were originally adopted by them or otherwise.

# Form 424—General Information
# (Certificate of Amendment)

**The attached form is drafted to meet minimal statutory filing requirements pursuant to the relevant code provisions.** *This form and the information provided are not substitutes for the advice and services of an attorney and tax specialist.*

## Commentary

Sections 3.051 to 3.056 of the Texas Business Organizations Code (BOC) govern amendments to the certificate of formation of a Texas filing entity. A filing entity may amend its certificate of formation at any time and in as many respects as may be desired, *as long as the certificate as amended contains only such provisions as could have been included in the original certificate of formation*. Amendments may be adopted to change the language of an existing provision, to add a new provision, or to delete an existing provision. If extensive amendments are proposed, the entity should consider filing a restated certificate of formation pursuant to section 3.059 of the BOC (Form 414).

## Procedural Information by Entity Type

Please note that a document on file with the secretary of state is a public record that is subject to public access and disclosure. Do not include confidential information, such as social security numbers. If amending information relating to directors or governing persons, use a business or post office box address rather than a residence address if privacy concerns are an issue.

<u>For-profit or Professional Corporation</u>
Sections 21.052 to 21.055 of the BOC set forth the procedures for amending the certificate of formation for a for-profit corporation or professional corporation. The board of directors adopts a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the shareholders. Written or printed notice setting forth the proposed amendment is given to each shareholder of record entitled to vote not later than the 10th day and not earlier than the 60th day before the date of the meeting, either personally, by electronic transmission, or by mail (BOC § 21.353). (Please refer to chapters 6 and 21 of the BOC for further information.)

Pursuant to section 21.364 of the BOC, the proposed amendment is adopted on receiving the affirmative vote of two-thirds of the outstanding shares entitled to vote. If any class or series of shares is entitled to vote as a class, the amendment must also receive the affirmative vote of two-thirds of the shares within each class or series that is entitled to vote as a class. Any number of amendments may be submitted to the shareholders and voted on at one meeting. Alternatively, amendments may be adopted by unanimous written consent of the shareholders.

If no shares have been issued, the amendment is adopted by a resolution of the board of directors and the provisions for adoption by shareholders do not apply.

An officer must sign the certificate of amendment. If no shares have been issued and the amendment was adopted by the board of directors, a majority of the directors may sign the certificate of amendment.

<u>Professional Association</u>
The provisions of chapters 20 and 21 of the BOC apply to a professional association, unless there is a conflict with a specific provision in title 7. A professional association may amend its certificate of formation by following the procedures set forth in its certificate of formation. If the certificate of

formation does not provide a procedure for amending the certificate, the certificate of formation is amended by a two-thirds vote of its members.

An officer must sign the certificate of amendment.

Nonprofit Corporation

Sections 22.105 to 22.108 of the BOC set forth the procedures for amending the certificate of formation for a nonprofit corporation. If the corporation has members with voting rights, the board of directors adopts a resolution setting forth the proposed amendment and directing that it be submitted to a vote at a meeting of the members, which may be either an annual or special meeting. The proposed amendment is adopted on receiving two-thirds of the votes that members present, in person or by proxy, were entitled to cast (BOC § 22.164). Any number of amendments may be submitted to the members and voted on at one meeting. Alternatively, the amendment may be adopted without a meeting if a written consent, setting forth the action to be taken, is signed by all the members entitled to vote. (Please refer to chapters 6 and 22 of the BOC for further information.)

If the corporation has no members or no members with voting rights, the amendment is adopted by a majority vote of the board of directors.

An officer of the nonprofit corporation must sign the certificate of amendment.

A nonprofit corporation formed for a special purpose under a statute or code other than the BOC may be required to meet other requirements for a certificate of amendment than those imposed by the BOC. This form may not comply with the requirements imposed under the special statute or code governing the special purpose corporation. Please refer to the statute or code governing the special purpose corporation for specific filing requirements for a certificate of amendment.

Cooperative Association

Section 251.052 of the BOC sets forth the procedure for amending the certificate of formation of a cooperative association. The board of directors may propose an amendment to the certificate of formation by a two-thirds vote of the board members. Notice of the meeting to consider the proposed amendment must be provided to the members no later than the 31st day before the date of the meeting. To be approved, the amendment must be adopted by the affirmative vote of two-thirds of the members voting on the amendment. The cooperative association must file the certificate of amendment with the secretary of state within thirty (30) days after its adoption by the members.

An officer of the cooperative association must sign the certificate of amendment.

Limited Liability Company or Professional Limited Liability Company

Chapter 101 of the BOC governs limited liability companies. Pursuant to section 101.356(d), an amendment to the certificate of formation must be approved by the affirmative vote of all of the company's members. If the company has managers, but has yet to admit its initial member, the amendment would be approved by the affirmative vote of the majority of all the company's managers as permitted by section 101.356(e).

If the limited liability company has managers, an authorized manager must sign the certificate of amendment. If the company does not have managers and is managed by its members, an authorized managing-member must sign the certificate of amendment.

Limited Partnership
Chapter 153 of the BOC governs limited partnerships. A certificate of limited partnership may be amended at any time for any proper purpose determined by the general partners. However, section 153.051 *requires* a certificate of amendment when there is:

(1) a change of name of the partnership;
(2) an admission of a new general partner; or
(3) a withdrawal of a general partner.

Section 153.051 of the BOC also requires that a limited partnership amend its certificate of formation when there is a change of address for the registered office or a change of name or address of the registered agent of the partnership. However, rather than filing an amendment, the partnership may file a statement of change pursuant to section 5.202 of the BOC to effect a change to its registered agent or registered office.

Pursuant to section 153.553, at least one general partner must sign the certificate of amendment. In addition, each general partner designated as a new general partner also must sign the certificate of amendment. A withdrawing general partner need not sign the certificate of amendment. The execution of a certificate by a general partner is an oath or affirmation, under a penalty of perjury, that to the best of the executing party's knowledge and belief, the facts contained in the certificate are true and correct (BOC §153.553(c)).

## Instructions for Form

- **Entity Information:** The certificate of amendment must contain the legal name of the entity and identify the type of filing entity. *If the amendment changes the name of the entity, the name as it currently appears on the records of the secretary of state should be stated*. It is recommended that the date of formation and file number assigned by the secretary of state be provided to facilitate processing of the document.

- **Amendments: 1. Amended Name.** This form is designed to provide a standardized amendment form to effect a change of name for the filing entity. If the legal name of the entity is to be changed, state the new name of the entity in section 1. Please note that the legal name of the entity must include an appropriate organizational designation for the entity type.

  The new entity name will be checked for availability on submission of the certificate of amendment. Under section 5.053 of the BOC, if the new name of the entity is the same as, deceptively similar to, or similar to the name of an existing domestic or foreign filing entity, or any name reservation or name registration filed with the secretary of state, the document cannot be filed. The administrative rules adopted for determining entity name availability (Texas Administrative Code, title 1, part 4, chapter 79, subchapter C) may be viewed at *www.sos.state.tx.us/tac/index.shtml*. If you wish the secretary of state to provide a preliminary determination on name availability, you may call (512) 463-5555, dial 7-1-1 for relay services, or e-mail your name inquiry to *corpinfo@sos.state.tx.us*. A final determination cannot be made until the document is received and processed by the secretary of state. Do not make financial expenditures or execute documents based on a preliminary clearance. Also note that the preclearance of a name or the issuance of a certificate under a name does not authorize the use of a name in violation of another person's rights to the name.

- **Amendments: 2. Changes to Registered Agent and/or Registered Office.** It is not necessary to file a certificate of amendment if the entity seeks only to change its registered agent or its

registered office. A filing entity may file a statement of change of registered agent/registered office pursuant to section 5.202 of the BOC.

However, if the entity is changing its name or making other changes to its certificate of formation, any changes to the registered agent or registered office may be included in a certificate of amendment. Section 2 can be completed to effect a change to the registered agent or registered office address. The registered agent can be either (option A) a domestic entity or a foreign entity that is registered to do business in Texas or (option B) an individual resident of the state. The filing entity cannot act as its own registered agent.

*Consent:* Effective January 1, 2010, a person designated as the registered agent of an entity must have consented, either in a written or electronic form, to serve as the registered agent of the entity. Although the consent of the person designated as registered agent is required, a copy of the written or electronic consent need not be submitted with a certificate of correction that corrects the name of the registered agent. *The liabilities and penalties imposed by sections 4.007 and 4.008 of the BOC apply with respect to a false statement in a filing instrument that names a person as the registered agent of an entity without that person's consent.* (BOC § 5.207)

*Amendment to Registered Office*: The registered office address must be located at a street address where service of process may be personally served on the entity's registered agent during normal business hours. Although the registered office is not required to be the entity's principal place of business, the registered office may not be solely a mailbox service or telephone answering service (BOC § 5.201).

- **Amendments: 3. Other Provisions to be Added, Altered, or Deleted.** Section 3 of this form contains three text areas that may be used to make alterations or changes to other provisions in the certificate of formation or to identify those provisions to be deleted. If the space provided in a text area is insufficient, include the provisions as an attachment to this form.

  - **Add:** If the amendment is an addition to the certificate of formation, check the "Add" statement and provide an identification or reference for the added provision and the full text of each provision added in the text area.
  - **Alter:** If the amendment alters or changes an existing article or provision in the certificate of formation, check the "Alter" statement and provide an identification of the article number or description of the altered provision and the text of the article or provision as it is amended to read in the text area.
  - **Delete:** If the amendment deletes an existing article or provision in its entirety, check the "Delete" statement and provide a reference to the article number or provision being deleted in the text area.

- **Statement of Approval:** As required by section 3.053 of the BOC, the form includes a statement regarding the approval of the amendment. In general, amendments are adopted and approved in the manner set forth in the title of the BOC governing the entity. General procedural information relevant to each filing entity that may use this form precedes the instructions for completing the form.

- **Effectiveness of Filing:** A certificate of amendment becomes effective when filed by the secretary of state (option A). However, pursuant to sections 4.052 and 4.053 of the BOC the effectiveness of the instrument may be delayed to a date not more than ninety (90) days from the date the instrument is signed (option B). The effectiveness of the instrument also may be delayed on the occurrence of a

future event or fact, other than the passage of time (option C). If option C is selected, you must state the manner in which the event or fact will cause the instrument to take effect and the date of the 90th day after the date the instrument is signed. In order for the certificate to take effect under option C, the entity must, within ninety (90) days of the filing of the certificate, file a statement with the secretary of state regarding the event or fact pursuant to section 4.055 of the BOC.

On the filing of a document with a delayed effective date or condition, the computer records of the secretary of state will be changed to show the filing of the document, the date of the filing, and the future date on which the document will be effective or evidence that the effectiveness was conditioned on the occurrence of a future event or fact.

- **Execution:** Pursuant to section 4.001 of the BOC, the certificate of amendment must be signed by a person authorized by the BOC to act on behalf of the entity in regard to the filing instrument. Please refer to the procedural information relating to the specific entity type for further information on execution requirements. Generally, a governing person or managerial official of the entity signs a filing instrument.

  The certificate of amendment need not be notarized. However, before signing, please read the statements on this form carefully. The designation or appointment of a person as the registered agent by a managerial official is an affirmation by that official that the person named in the instrument has consented to serve as registered agent. (BOC § 5.2011, effective January 1, 2010)

  *A person commits an offense under section 4.008 of the BOC if the person signs or directs the filing of a filing instrument the person knows is materially false with the intent that the instrument be delivered to the secretary of state for filing. The offense is a Class A misdemeanor unless the person's intent is to harm or defraud another, in which case the offense is a state jail felony.*

- **Payment and Delivery Instructions**: The filing fee for a certificate of amendment is **$150**, unless the filing entity is a nonprofit corporation or a cooperative association. The filing fee for a certificate of amendment for a nonprofit corporation or a cooperative association is **$25**. Fees may be paid by personal checks, money orders, LegalEase debit cards, or American Express, Discover, MasterCard, and Visa credit cards. Checks or money orders must be payable through a U.S. bank or financial institution and made payable to the secretary of state. Fees paid by credit card are subject to a statutorily authorized convenience fee of 2.7 percent of the total fees.

  Submit the completed form in duplicate along with the filing fee. The form may be mailed to P.O. Box 13697, Austin, Texas 78711-3697; faxed to (512) 463-5709; or delivered to the James Earl Rudder Office Building, 1019 Brazos, Austin, Texas 78701. If a document is transmitted by fax, credit card information must accompany the transmission (Form 807). On filing the document, the secretary of state will return the appropriate evidence of filing to the submitter together with a file-stamped copy of the document, if a duplicate copy was provided as instructed.

Revised 05/11

| | |
|---|---|
| **Form 424**<br>**(Revised 05/11)**<br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: See instructions** | THE STATE OF TEXAS<br><br>**Certificate of Amendment**<br><br>This space reserved for office use. |

## Entity Information

The name of the filing entity is:

Instant Brands (Texas) Inc.

State the name of the entity as currently shown in the records of the secretary of state. If the amendment changes the name of the entity, state the old name and not the new name.

The filing entity is a: (Select the appropriate entity type below.)

- ☑ For-profit Corporation
- ☐ Nonprofit Corporation
- ☐ Cooperative Association
- ☐ Limited Liability Company
- ☐ Professional Corporation
- ☐ Professional Limited Liability Company
- ☐ Professional Association
- ☐ Limited Partnership

The file number issued to the filing entity by the secretary of state is: 805077663

The date of formation of the entity is: May 26, 2023

## Amendments

### 1. Amended Name

(If the purpose of the certificate of amendment is to change the name of the entity, use the following statement)

The amendment changes the certificate of formation to change the article or provision that names the filing entity. The article or provision is amended to read as follows:

The name of the filing entity is: (state the new name of the entity below)

Corelle Brands (Texas) Inc.

The name of the entity must contain an organizational designation or accepted abbreviation of such term, as applicable.

### 2. Amended Registered Agent/Registered Office

The amendment changes the certificate of formation to change the article or provision stating the name of the registered agent and the registered office address of the filing entity. The article or provision is amended to read as follows:

Registered Agent
(Complete either A or B, but not both. Also complete C.)

☐ A. The registered agent is an organization (cannot be entity named above) by the name of:

---

**OR**

☐ B. The registered agent is an individual resident of the state whose name is:

---

*First Name* *M.I.* *Last Name* *Suffix*

The person executing this instrument affirms that the person designated as the new registered agent has consented to serve as registered agent.

C. The business address of the registered agent and the registered office address is:

TX

*Street Address (No P.O. Box)* *City* *State* *Zip Code*

### 3. Other Added, Altered, or Deleted Provisions

Other changes or additions to the certificate of formation may be made in the space provided below. If the space provided is insufficient, incorporate the additional text by providing an attachment to this form. Please read the instructions to this form for further information on format.

Text Area (The attached addendum, if any, is incorporated herein by reference.)

☑ **Add** each of the following provisions to the certificate of formation. The identification or reference of the added provision and the full text are as follows:

Compliance with Section 1123(a)(6). Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity interests in the Corporation; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or

☐ **Alter** each of the following provisions of the certificate of formation. The identification or reference of the altered provision and the full text of the provision as amended are as follows:

☐ **Delete** each of the provisions identified below from the certificate of formation.

## Statement of Approval

The amendments to the certificate of formation have been approved in the manner required by the Texas Business Organizations Code and by the governing documents of the entity.

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ____________________

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: ____________________

The following event or fact will cause the document to take effect in the manner described below:

| |
|---|
| |

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: ____________________

By: ____________________

____________________
Signature of authorized person

____________________
Printed or typed name of authorized person (see instructions)

**AMENDED AND RESTATED BYLAWS[1]**
**OF**
**[NAME OF CORPORATION]**

**A Delaware corporation**
**(*Adopted as of [_], 2024*)**

## ARTICLE I
## OFFICES

**1.1 Offices.** The address of the registered office of [CORPORATION NAME] (the "Corporation") in the State of Delaware shall be as set forth in the certificate of incorporation. The Corporation may have other offices, both within and without the State of Delaware, as the board of directors of the Corporation from time to time shall determine or the business of the Corporation may require.

**1.2 Books and Records.** Any records administered by or on behalf of the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be maintained on any information storage device, method, or one or more electronic networks or databases (including one or more distributed electronic networks or databases); provided that the records so kept can be converted into clearly legible paper form within a reasonable time, and, with respect to the stock ledger, the records so kept comply with Section 224 of the General Corporation Law of the State of Delaware, as amended from time to time ("DGCL"). The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to applicable law. Except as otherwise provided by law, the stock ledger shall be the only evidence as to the identity of the stockholders entitled to examine the stock ledger and the books of the Corporation.

## ARTICLE II
## STOCKHOLDERS

**2.1 Meetings.**

**2.1.1 Place.** Meetings of the stockholders shall be held at such place if any, either within or without the State of Delaware, or by means of remote communication, as may be designated by the board of directors.

[1] NOTE TO DRAFT: EACH OF THE US REORGANIZED DEBTOR CORPORATIONS SHALL HAVE BYLAWS SUBSTANTIALLY IDENTICAL TO THIS FORM. THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED.

**2.1.2 Annual Meeting**. An annual meeting of the stockholders for the election of directors and for other business shall be held on such date and at such time as may be fixed by the board of directors.

**2.1.3 Special Meetings**. Special meetings of the stockholders may be called at any time by the president, or the board of directors, or the holders of a majority of the outstanding shares of stock of the Corporation entitled to vote at the meeting.

**2.1.4 Notice of Meetings**. Except as otherwise required by law, notice of an annual meeting or special meeting stating the place, if any, date, and hour of the meeting and such other information as is required by Section 222 of the DGCL (and, in the case of a special meeting, the purpose or purposes for which the meeting is called), shall be given by the Corporation either personally or by mail or by other lawful means not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. Such notice shall be deemed given in accordance with Section 232 of the DGCL.

**2.1.5 Quorum**. The presence, in person or by proxy, of the holders of a majority of the outstanding shares of stock of the Corporation entitled to vote at a meeting of stockholders shall constitute a quorum for such meeting. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the chairman of the meeting or the holders of a majority in voting power of the shares of capital stock, present in person or represented by proxy and entitled to vote at the meeting, shall have power to adjourn the meeting from time to time, without notice (to the extent permitted by Section 222(c) of the DGCL), until a quorum shall be present or represented. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the board of directors shall fix a new record date for notice of the adjourned meeting in accordance with these bylaws and applicable law, and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date for notice of the adjourned meeting.

**2.1.6 Voting Rights**. Except as otherwise required by applicable law or provided by the certificate of incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder which has voting power upon the matter in question. Each stockholder entitled to vote at a meeting of stockholders or to express consent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by delivering to the secretary of the Corporation a revocation of the proxy or a new proxy bearing a later date. Voting at meetings of stockholders need not be by written ballot. At all meetings of stockholders for the election of directors a plurality of the votes cast shall be sufficient to elect. All other questions and matters submitted to a vote of stockholders shall, unless otherwise provided by the certificate of incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its

securities, be decided by the affirmative vote of the holders of a majority in voting power of the shares of stock of the Corporation which are present in person or by proxy and entitled to vote thereon.

**2.1.7 Action by Consent.** Any action required to be taken at any annual meeting or special meeting, or any action which may be taken at any such annual meeting or special meeting, may be taken without a meeting, without prior notice and without a vote, if a consent shall be given by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given in accordance with Section 228(e) of the DGCL.

**2.1.8 List of Stockholders Entitled to Vote.** The Corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting (provided, however, that if the record date for determining stockholders entitled to vote is less than ten (10) days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.1.8 shall require the Corporation to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, as required by applicable law. Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

**2.1.9 Organization.** At every meeting of stockholders, the chairman of the board of directors shall be the chairman of the meeting or, in the case of vacancy in office or absence of the chairman of the board of directors, a chairman designated by the board of directors or, if no such designation has been made, one of the following officers present shall be the chairman of the meeting in the order stated: the vice chairman of the board of directors, the chief executive officer, the chief operating officer, the president, any vice president, or, in the absence of any of the foregoing, a chairman chosen by the stockholders at the meeting shall act as chairman, and the secretary, or in his or her absence, an assistant secretary, or in the absence of both the secretary and assistant secretaries, a person appointed by the chairman of the meeting, shall act as secretary.

**2.1.10 Record Date.**

(a) In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the board of directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the board of directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the board of directors, the record date for

determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the board of directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such action. If no such record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

## ARTICLE III
## DIRECTORS

**3.1 Number and Term.** The board of directors shall have authority to determine the number of directors that constitute the board of directors. Each director shall serve for a term expiring at the next annual meeting following his election and shall hold office until his successor is duly elected and qualified, or until his earlier death, resignation, removal, retirement or disqualification.

**3.2 Vacancies.** Vacancies resulting from the death, resignation, removal or retirement of a director or other cause, and newly created directorships resulting from any increase in the authorized number of directors, may be filled by a majority vote of the aggregate number of votes of all directors then in office, even if less than a quorum, or by a sole remaining director, and each director so chosen shall serve for a term expiring at the next annual meeting following his appointment and shall hold office until his successor is duly elected and qualified, or until his earlier death, resignation, removal, retirement or disqualification.

**3.3 Resignation.** Any director may resign at any time by notice given either in writing or by electronic transmission to the Corporation. Such resignation shall take effect at the date of receipt of such notice by the Corporation or at such later time as is therein specified. To the fullest extent permitted by law, verbal resignation shall not be deemed effective until confirmed by the director in writing or by electronic transmission to the Corporation.

**3.4 Meetings.**

**3.4.1 Place**. Meetings of the board of directors shall be held at such place, if any, as may be designated by the board of directors or in the notice of the meeting.

**3.4.2** **Regular Meetings**. Regular meetings of the board of directors shall be held at such times as the board of directors or its chairman may designate. Notice of regular meetings need not be given.

**3.4.3** **Special Meetings**. Special meetings of the board of directors may be called by the chairman or any two members of the board of directors on twenty-four (24) hours' prior notice to each director, either personally or by telephone or electronic transmission, or, if given by mail, on at least five (5) days' prior notice.

**3.4.4** **Quorum**. A majority of all the directors in office shall constitute a quorum for the transaction of business at any meeting; provided, that in no event shall such a quorum be less than one-third of the total number of directors.

**3.4.5** **Voting**. Except as otherwise provided herein, in the certificate of incorporation or by law, at all properly called meetings of the board of directors or any committee thereof, in every case where a quorum is present, the affirmative vote of the directors present and representing a majority of the aggregate number of votes entitled to be cast by such directors in attendance at such meeting shall be the act of the board of directors or committee thereof.

**3.4.6** **Actions without a Meeting.** Unless otherwise provided by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting, if all the members of the board of directors or committee, as the case may be, consent thereto in accordance with applicable law.

**3.4.7** **Attendance via Conference Telephone or Other Communications Equipment.** A member of the board of directors or of any committee may attend and participate in a meeting of such members via conference telephone or other communications equipment by which all persons participating in the meeting may hear each other. Such participation by a member in a meeting shall constitute presence in person at the meeting.

**3.4.8** **Committees**. The board of directors may designate one or more committees, each committee to consist of one or more directors and such alternate members (also directors) as may be designated by the board of directors. Unless otherwise provided herein, in the absence or disqualification of any member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another director to act at the meeting in the place of any such absent or disqualified member. Except as otherwise provided herein, in the certificate of incorporation, in the resolutions adopted by the board of directors creating or empowering the applicable committee, or by law, any such committee shall have and may exercise the powers of the full board of directors to the extent provided in the resolution of the board of directors directing the committee.

## ARTICLE IV
## OFFICERS

**4.1** **Election.** The officers of the Corporation shall be the president, the secretary and the treasurer. The board of directors, in its discretion, may elect a chairman (who must be a director),

one or more vice chairmen (who must be directors), and one or more vice presidents, assistant treasurers, assistant secretaries, and any other officers. Any two or more offices may be held by the same person.

**4.2 Authority, Duties and Compensation.** The officers shall have such authority, perform such duties and serve for such compensation as may be determined by resolution of the board of directors. Except as otherwise provided by the resolution of the board of directors, (i) the president shall be the chief executive officer of the Corporation, shall have general supervision over the business and operations of the Corporation, may perform any act and execute any instrument for the conduct of such business and operations and shall have such other powers granted by the board of directors, (ii) the other officers shall have the duties customarily related to their respective offices and (iii) any vice president, or vice presidents in the order determined by the board of directors, shall in the absence of the president have the authority and perform the duties of the president.

## ARTICLE V
## INDEMNIFICATION

**5.1 Power to Indemnify in Actions, Suits or Proceedings Other than by or in the Right of the Corporation.** The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer or employee of another corporation, partnership, joint venture, trust or other enterprise (each an "Indemnitee" and collectively, the "Indemnitees"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding; provided that no Indemnitee shall be entitled to be indemnified by the Corporation for any expense, judgements fines or amounts paid in settlement unless such Indemnitee has satisfied the standard of conduct required by Section 145(a) of the DGCL. Notwithstanding the foregoing, except in connection with an action by the Indemnitee to enforce his rights to indemnification or advancement as provided in this Article V, the Corporation shall be required to provide the indemnification described in the immediately preceding sentence in connection with a proceeding (or part thereof) commenced by such person only if the commencement of such proceeding (or part thereof) by the person was authorized by the board of directors.

**5.2 Power to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation.** The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that he is or was a director or officer of the Corporation, or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer or employee of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit; provided that no Indemnitee shall be entitled to be indemnified by the Corporation for any such expenses unless such Indemnitee has satisfied the standard of conduct required by Section

145(b) of the DGCL. No indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the court in which such action or suit was brought or the Delaware Court of Chancery shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

**5.3 Costs; Charges and Expenses.** Notwithstanding the other provisions of this Article V, to the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise, including without limitation, the dismissal of an action without prejudice, in the defense of any action, suit or proceeding referred to in Sections 5.1 and 5.2 above, or in the defense of any claim, issue or matter therein, that person shall be indemnified against all expenses (including attorneys' fees) actually and reasonably incurred by that person or on that person's behalf in connection therewith to the fullest extent permitted by law (including Section 145(c)(2) of the DGCL).

**5.4 Advance of Costs, Charges and Expenses.** Expenses (including attorneys' fees) incurred by an Indemnitee in defending a civil, criminal, administrative or investigative action, suit or proceeding (including investigations by any government agency, but not an internal investigation conducted by or on behalf of the Corporation), and all expenses incurred in preparing for any action, suit or proceeding threatened against such Indemnitee, shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding; provided, however, that the payment of such expenses incurred by an Indemnitee as set forth herein in advance of the final disposition of such action, suit or proceeding shall be made only upon receipt of an undertaking by or on behalf of the director or officer to repay all amounts so advanced in the event that it shall ultimately be determined as provided elsewhere in this Article V that such director or officer is not entitled to be indemnified by the Corporation as authorized in this Article V. Notwithstanding the foregoing, if such expenses are incurred in connection with any civil or criminal action, suit or proceeding alleging fraud, bad faith, gross negligence, willful misconduct or a criminal act has been committed by such Indemnitee, the Corporation shall not be required to (but may in the sole discretion of the board of directors) advance such expenses. No security shall be required for such undertaking and such undertaking shall be accepted without reference to the recipient's financial ability to make repayment.

**5.5 Non-Exclusivity of Indemnification and Advancement of Expenses.** The indemnification and advancement of expenses provided by or granted pursuant to this Article V shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under these bylaws or any agreement, contract, vote of stockholders or disinterested directors or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, it being the policy of the Corporation that indemnification of and advancement of expenses with respect to the persons specified in Sections 5.1, 5.2, or 5.3 of this Article V shall be made to the fullest extent permitted by law. The provisions of this Article V shall not be deemed to preclude the indemnification of or provision of advancement of expenses to any person who is not specified in Sections 5.1, 5.2, or 5.3 of this Article V but whom the Corporation has the power or obligation to indemnify or provide an advancement of expenses under the provisions of the DGCL, or otherwise.

**5.6 Certain Matters.**

**5.6.1** Given that certain Jointly Indemnifiable Claims by reason of the service of Indemnitee as a director of the Corporation and/or an director, executive officer, employee, consultant, fiduciary or agent (each, an "Indemnifiable Position") of other corporations, limited liability companies, partnerships, joint ventures, trusts, employee benefit plans or other enterprises controlled by the Corporation (the "Controlled Entities"), or by reason of any action alleged to have been taken or omitted in any such capacity, the Corporation acknowledges and agrees that, to the fullest extent permitted by Delaware law, the Corporation shall, and to the extent applicable shall cause the Controlled Entities to, be the indemnitor of first resort and be fully and primarily responsible for the payment to the Indemnitee in respect of indemnification or advancement of expenses in connection with any such Jointly Indemnifiable Claim, pursuant to and in accordance with (as applicable) the terms of (i) the DGCL, (ii) the certificate of incorporation or bylaws of the Corporation or (iii) any other agreement between the Corporation or any Controlled Entity and the Indemnitee pursuant to which the Indemnitee is indemnified, (iv) the laws of the jurisdiction of incorporation or organization of any Controlled Entity and/or (v) the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of any Controlled Entity ((i) through (v) collectively, the "Indemnification Sources"), irrespective of any right of recovery the Indemnitee may have from the Indemnitee-Related Entities. Under no circumstance shall the Corporation or any Controlled Entity be entitled to any right of subrogation or contribution by the Indemnitee-Related Entities and no right of advancement or recovery the Indemnitee may have from the Indemnitee-Related Entities shall reduce or otherwise alter the rights of the Indemnitee or the obligations of the Corporation or any Controlled Entity under the Indemnification Sources. In the event that any of the Indemnitee-Related Entities shall make any payment to the Indemnitee in respect of indemnification or advancement of expenses with respect to any Jointly Indemnifiable Claim, (i) the Corporation shall, and to the extent applicable shall cause the Controlled Entities to, reimburse the Indemnitee-Related Entity making such payment to the extent of such payment promptly upon written demand from such Indemnitee-Related Entity, (ii) to the extent not previously and fully reimbursed by the Corporation and/or any Controlled Entity pursuant to clause (i), the Indemnitee-Related Entity making such payment shall be subrogated to the extent of the outstanding balance of such payment to all of the rights of recovery of the Indemnitee against the Corporation and/or any Controlled Entity or under any insurance policy, as applicable, and (iii) Indemnitee and the Corporation and, as applicable, any Controlled Entity shall execute all papers reasonably required and shall do all things that may be reasonably necessary to secure such rights, including the execution of such documents as may be necessary to enable the Indemnitee-Related Entities effectively to bring suit to enforce such rights. The Corporation and Indemnitee agree that each of the Indemnitee-Related Entities shall be third-party beneficiaries with respect to this Section 5.6, entitled to enforce this Section 5.6. The Corporation shall cause each of the Controlled Entities to perform the terms and obligations of this Section 5.6.

**5.6.2** The term "Indemnitee-Related Entities" means any company, corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (other than the Corporation, any Controlled Entity or the insurer under and pursuant to an insurance policy of the Corporation or any Controlled Entity) from whom an Indemnitee may be entitled to

indemnification or advancement of expenses with respect to which, in whole or in part, the Corporation or any Controlled Entity may also have an indemnification or advancement obligation.

**5.6.3** The term "Jointly Indemnifiable Claims" shall be broadly construed and shall include, without limitation, any action, suit or proceeding for which the Indemnitee shall be entitled to indemnification or advancement of expenses from both (i) the Corporation and/or any Controlled Entity pursuant to the Indemnification Sources, on the one hand, and (ii) any Indemnitee-Related Entity pursuant to any other agreement between any Indemnitee-Related Entity and the Indemnitee pursuant to which the Indemnitee is indemnified, the laws of the jurisdiction of incorporation or organization of any Indemnitee-Related Entity and/or the certificate of incorporation, certificate of organization, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or other organizational or governing documents of any Indemnitee-Related Entity, on the other hand.

**5.7 Survival of Indemnification and Advancement of Expenses.** The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of the heirs, executors and administrators of such officer or director, in each case in their respective capacities as such. The indemnification and advancement of expenses that may have been provided to an employee or agent of the Corporation by action of the board of directors shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be an employee or agent of the Corporation and shall inure to the benefit of the heirs, executors and administrators of such a person, after the time such person has ceased to be an employee or agent of the Corporation, in each case in their respective capacities as such, only on such terms and conditions and to the extent determined by the board of directors in its sole discretion.

## ARTICLE VI
## SHARE CERTIFICATES

**6.1 Share Certificates.** The shares of stock of the Corporation shall be represented by certificates; provided that the board of directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock. If shares are represented by certificates, such certificates shall be in the form, other than bearer form, approved by the board of directors. The certificates, if any, representing shares of stock of each class registered in certificate form shall be signed by, or in the name of, the Corporation by any two authorized officers of the Corporation. Any or all such signatures may be facsimiles. Although any officer, transfer agent, or registrar whose manual or facsimile signature is affixed to such a certificate ceases to be such officer, transfer agent, or registrar before such certificate has been issued, it may nevertheless be issued by the Corporation with the same effect as if such officer, transfer agent, or registrar were still such at the date of its issue.

**6.2 Transfer of Stock.** Stock of the Corporation shall be transferable in the manner prescribed by law and in these bylaws. Transfers of stock shall be made on the books of the Corporation only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof together with an

effective endorsement, which shall be cancelled before a new certificate or uncertificated shares shall be issued. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

## ARTICLE VII
## NOTICES

**7.1 Notices.** Except as otherwise provided herein or permitted by applicable law, whenever notice is required by law, the certificate of incorporation or these bylaws, to be given to any director or stockholder, such notice may be given by mail, addressed to such director, member of a committee or stockholder, at his address as it appears on the records of the Corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by means of electronic transmission.

**7.2 Waivers of Notice.** Whenever any notice is required by law, the certificate of incorporation or these bylaws, to be given to any director or stockholder, a waiver thereof, given by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VIII
## AMENDMENTS

These bylaws may be amended or repealed by the board of directors or by stockholders by the affirmative vote of holders of a majority of the voting power of the outstanding stock entitled to vote thereon.

**AMENDED AND RESTATED**
**CERTIFICATE OF FORMATION**
**OF [COMPANY NAME][1]**

This Amended and Restated Certificate of Formation of [COMPANY NAME] (the "Company"), has been duly executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 Del. C. §18-208, to amend and restate the original Certificate of Formation of the Company (the "Certificate"), which was filed on [DATE] with the Secretary of State of the State of Delaware.

The Certificate is hereby amended and restated as follows:

1. The name of the limited liability company is [COMPANY NAME].

2. The registered office of [COMPANY NAME] in the State of Delaware is located at [1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801]. The name of the registered agent at such address upon whom process against [COMPANY NAME] may be served is [The Corporation Trust Company].

3. This Amended and Restated Certificate of Formation shall be effective on the date of filing with the Secretary of State of the State of Delaware.

[*Signature Page Follows*]

---

[1] NOTE TO DRAFT: EACH OF THE REORGANIZED DEBTOR DELAWARE LIMITED LIABILITY COMPANIES SHALL HAVE A CERTIFICATE OF FORMATION SUBSTANTIALLY IDENTICAL TO THIS FORM. THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

IN WITNESS WHEREOF, the undersigned authorized person has duly executed this Amended and Restated Certificate of Formation on the __ day of _____, 2024.

By_____________________
Name:
Title: Authorized Person

**AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**[NAME OF CORPORATION][1]**

WHEREAS, [NAME OF CORPORATION], a Delaware corporation (the "Corporation"), [which was originally incorporated under the name [____]][2], desires to amend and restate its Certificate of Incorporation as currently in effect, which was filed with the Secretary of State of Delaware on [DATE] (the "Initial Certificate of Incorporation"); and

WHEREAS, this Amended and Restated Certificate of Incorporation, which restates and integrates and further amends the provisions of the Initial Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware; and

WHEREAS, the following provisions are all of the provisions of the Amended and Restated Certificate of Incorporation currently in effect and as hereinafter amended.

1. Name. The name of the Corporation is [NAME OF CORPORATION].

2. Registered Office and Agent. The address of the Corporation's registered office in the State of Delaware is [Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, DE 19801]. The name of the Corporation's registered agent at such address is [The Corporation Trust Company].

3. Purpose. The purposes for which the Corporation is formed are to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware and to possess and exercise all of the powers and privileges granted by such law and any other law of Delaware.

4. Authorized Capital. The aggregate number of shares of stock which the Corporation shall have authority to issue is [_______] ([___]) shares, all of which are of one class and are designated as Common Stock and each of which has a par value of $0.01.

---

1 NOTE TO DRAFT: EACH OF THE REORGANIZED DEBTOR DELAWARE CORPORATIONS SHALL HAVE A CERTIFICATE OF INCORPORATION SUBSTANTIALLY IDENTICAL TO THIS FORM. THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

2 Note to Draft: To be included for entities that have changed their name following incorporation.

5. Compliance with Section 1123(a)(6). Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity interests in the Corporation; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity interests is included in the Amended and Restated Certificate of Incorporation in compliance with section 1123(a)(6) of the Bankruptcy Code.

6. Bylaws. The board of directors of the Corporation is authorized to adopt, amend or repeal the bylaws of the Corporation, except as otherwise specifically provided therein.

7. Elections of Directors. Elections of directors need not be by written ballot unless the bylaws of the Corporation shall so provide.

8. Right to Amend. The Corporation reserves the right to amend any provision contained in this Amended and Restated Certificate of Incorporation as the same may from time to time be in effect in the manner now or hereafter prescribed by law, and all rights conferred on stockholders or others hereunder are subject to such reservation.

9. Limitation on Liability. The directors of the Corporation shall be entitled to the benefits of all limitations on the liability of directors generally that are now or hereafter become available under the General Corporation Law of the State of Delaware. Without limiting the generality of the foregoing, no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. Any repeal or modification of this Section 9 shall be prospective only, and shall not affect, to the detriment of any director, any limitation on the personal liability of a director of the Corporation existing at the time of such repeal or modification.

10. Business Combinations with Interested Stockholders. The Corporation elects not to be governed by Section 203 of the General Corporation Law of the State of Delaware.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has caused this Amended and Restated Certificate of Incorporation to be executed this __ day of _______________, 2024.

By:___________________________
Name:
Title:

# State of Delaware
# Certificate of Conversion
# From a Corporation to a
# Limited Liability Company Pursuant to
# Section 18-214 of the Limited Liability Company Act[1]

This Certificate of Conversion is being filed for the purpose of converting Instant Brands Acquisition Holdings Inc. (the "Converting Corporation"), to a Delaware limited liability company to be named Corelle Brands Acquisition Holdings LLC (the "Company") pursuant to Section 18-214 of the Delaware Limited Liability Company Act, 6 Del. C. § § 18-101 et seq. (the "Delaware LLC Act"), and Section 266 of the Delaware General Corporation Law, 8 Del. C. § § 101 et seq. (the "DGCL").

The undersigned hereby certifies as follows:

1. The Converting Corporation was first incorporated in the State of Delaware on March 21, 2017, under the name "Instant Brands Acquisition Holdings Inc."

2. Immediately prior to filing this Certificate of Conversion, the Converting Corporation was a Delaware corporation with the name "Instant Brands Acquisition Holdings Inc."

3. The name of the Delaware limited liability company as set forth in the Certificate of Formation of the Company being filed in accordance with Section 18-214(b) of the Delaware LLC Act is "Corelle Brands Acquisition Holdings LLC."

4. This Certificate of Conversion (and the conversion referenced herein) shall become effective [●].

[*Signature Page Follows*]

---

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

IN WITNESS WHEREOF, an authorized person of the Converting Corporation has executed this Certificate of Conversion on the [DAY] of [MONTH] 2024 in accordance with the DGCL.

By______________________
Name:
Title:

# State of Delaware
# Certificate of Formation
# of Limited Liability Company[1]

The undersigned authorized person, desiring to form a limited liability company pursuant to Section 18-201 of the Delaware Limited Liability Company Act, hereby certifies as follows:

1. The name of the limited liability company is Corelle Brands Acquisition Holdings LLC.

2. The registered office of Corelle Brands Acquisition Holdings LLC in the State of Delaware is located at Corporation Trust Center 1209 Orange St., in the City of Wilmington, County of New Castle, Delaware 19801. The name of the registered agent at such address upon whom process against Corelle Brands Acquisition Holdings LLC may be served is The Corporation Trust Company.

3. This Certificate shall become effective [●].

*[Signature Page Follows]*

---

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

IN WITNESS WHEREOF, an authorized person has executed this Certificate of Formation on the [DAY] of [MONTH] 2024.

By____________________
Name:
Title:

# BY-LAW NO. 2[1]

A by-law relating generally to
the transaction of the business
and affairs of

**CORELLE BRANDS (CANADA) HOLDING INC.**

## TABLE OF CONTENTS


| | | |
|---|---|---|
| **SECTION ONE INTERPRETATION** | | **1** |
| 1.1 | Definitions | 1 |
| 1.2 | Subject to Act and Articles | 1 |
| 1.3 | Unanimous Shareholder Agreement | 1 |
| **SECTION TWO BUSINESS OF THE CORPORATION** | | **3** |
| 2.1 | Registered Office | 3 |
| 2.2 | Corporate Seal | 3 |
| 2.3 | Financial Year | 3 |
| 2.4 | Execution of Instruments | 3 |
| 2.5 | Banking Arrangements | 3 |
| 2.6 | Voting Rights in Other Bodies Corporate | 3 |
| 2.7 | Divisions | 3 |
| **SECTION THREE DIRECTORS** | | **5** |
| 3.1 | Number of Directors | 5 |
| 3.2 | Qualification | 5 |
| 3.3 | Election and Term | 5 |
| 3.4 | Removal of Directors | 5 |
| 3.5 | Vacation of Office | 5 |
| 3.6 | Appointment of Additional Directors | 5 |
| 3.7 | Action by the Board | 6 |
| 3.8 | Canadian Directors Present at Meetings | 6 |
| 3.9 | Meeting by Telephone | 6 |
| 3.10 | Place of Meetings | 6 |
| 3.11 | Calling of Meetings | 6 |
| 3.12 | Notice of Meeting | 6 |
| 3.13 | First Meeting of New Board | 6 |
| 3.14 | Adjourned Meeting | 6 |
| 3.15 | Regular Meetings | 7 |


[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

**TABLE OF CONTENTS**
(continued)


| | | |
|---|---|---|
| 3.16 | Chair | 7 |
| 3.17 | Quorum | 7 |
| 3.18 | Votes to Govern | 7 |
| 3.19 | Conflict of Interest | 7 |
| 3.20 | Remuneration and Expenses | 7 |
| **SECTION FOUR COMMITTEES** | | **8** |
| 4.1 | Committees of the Board | 8 |
| 4.2 | Transaction of Business | 8 |
| 4.3 | Advisory Bodies | 8 |
| 4.4 | Quorum and Procedure | 8 |
| **SECTION FIVE OFFICERS** | | **9** |
| 5.1 | Appointment | 9 |
| 5.2 | Chair of the Board | 9 |
| 5.3 | President | 9 |
| 5.4 | Secretary | 9 |
| 5.5 | Treasurer | 9 |
| 5.6 | Powers and Duties of Officers | 9 |
| 5.7 | Term of Office | 9 |
| 5.8 | Agents and Attorneys | 10 |
| 5.9 | Conflict of Interest | 10 |
| **SECTION SIX PROTECTION OF DIRECTORS, OFFICERS AND OTHERS** | | **11** |
| 6.1 | Limitation of Liability | 11 |
| 6.2 | Indemnity | 11 |
| 6.3 | Advance of Costs | 11 |
| 6.4 | Limitation | 11 |
| 6.5 | Additional Circumstances | 12 |
| 6.6 | Insurance | 12 |
| **SECTION SEVEN SHARES** | | **13** |
| 7.1 | Issuances of Shares | 13 |
| 7.2 | Registration of Transfers | 13 |
| 7.3 | Dealing with Registered Holders | 13 |
| 7.4 | Share Certificates | 13 |
| 7.5 | Replacement of Share Certificates | 13 |
| 7.6 | Joint Shareholders | 13 |
| 7.7 | Deceased Shareholders | 13 |
| 7.8 | Lien for Indebtedness | 13 |
| **SECTION EIGHT DIVIDENDS** | | **15** |
| 8.1 | Dividends | 15 |
| 8.2 | Record Date for Dividends | 15 |
| 8.3 | Payments on Dividends and Other Distributions | 15 |
| 8.4 | Non-Receipt of Payment | 15 |
| **SECTION NINE MEETINGS OF SHAREHOLDERS** | | **16** |
| 9.1 | Annual Meetings | 16 |

**TABLE OF CONTENTS**
(continued)


| | | |
|---|---|---|
| 9.2 | Special Meetings | 16 |
| 9.3 | Place of Meetings | 16 |
| 9.4 | Participation in Meeting by Electronic Means | 16 |
| 9.5 | Meeting held by Electronic Means | 16 |
| 9.6 | Notice of Meetings | 16 |
| 9.7 | List of Shareholders Entitled to Notice | 17 |
| 9.8 | Record Date for Notice | 17 |
| 9.9 | Meetings Without Notice | 17 |
| 9.10 | Chair, Secretary and Scrutineers | 17 |
| 9.11 | Persons Entitled to be Present | 18 |
| 9.12 | Quorum | 18 |
| 9.13 | Right to Vote | 18 |
| 9.14 | Proxyholders and Representatives | 18 |
| 9.15 | Time for Deposit of Proxies | 18 |
| 9.16 | Joint Shareholders | 19 |
| 9.17 | Votes to Govern | 19 |
| 9.18 | Show of Hands | 19 |
| 9.19 | Ballots | 19 |
| 9.20 | Adjournment | 19 |
| 9.21 | Action in Writing by Shareholders | 20 |
| 9.22 | Only One Shareholder | 20 |
| **SECTION TEN NOTICES** | | |
| 10.1 | Method of Giving Notices | 21 |
| 10.2 | Notice to Joint Shareholders | 21 |
| 10.3 | Computation of Time | 21 |
| 10.4 | Undelivered Notices | 21 |
| 10.5 | Omissions and Errors | 21 |
| 10.6 | Persons Entitled by Death or Operation of Law | 21 |
| 10.7 | Waiver of Notice | 21 |
| **SECTION ELEVEN EFFECTIVE DATE, AMENDMENT AND REPEAL** | | **23** |
| 11.1 | Effective Date | 23 |
| 11.2 | Amendment | 23 |
| 11.3 | Repeal | 23 |

BE IT ENACTED as a by-law of the Corporation as follows:

## SECTION ONE

## INTERPRETATION

**1.1 Definitions**. In the By-Laws, unless the context otherwise requires:

"**Act**" means the *Canada Business Corporations Act*, or any statute that may be substituted for it, and the regulations to it, as from time to time amended.

"**Articles**" means the articles attached to the certificate of amalgamation of the Corporation, as from time to time amended or restated.

"**Board**" means the board of directors of the Corporation.

"**By-Laws**" means This By-Law and all other by-laws of the Corporation from time to time in force and effect.

"**Corporation**" means the corporation amalgamated under the Act by the said certificate to which the Articles are attached, and named "**Corelle Brands (Canada) Holding Inc.**".

"**Director**" means a member of the Board.

"**Meeting of Shareholders**" includes an annual meeting of shareholders and a Special Meeting of Shareholders; and "**Special Meeting of Shareholders**" includes a meeting of any class or classes of shareholders and a special meeting of all shareholders entitled to vote at an annual meeting of shareholders.

"**Recorded Address**" means: in the case of a shareholder, the address as recorded in the securities register; in the case of joint shareholders, the address appearing in the securities register in respect of such joint holding or the first address so appearing if there are more than one; and in the case of a Director, officer, auditor or member of a committee of the Board, the latest address as recorded in the records of the Corporation.

"**This By-Law**" means this By-Law No. 2 of the Corporation.

Except as provided above, words and expressions defined in the Act, including "**resident Canadian**" and "**unanimous shareholder agreement**", have the same meanings when used herein. Words importing the singular number include the plural and vice versa; and words importing a person include an individual, partnership, association, body corporate, trustee, executor, administrator and legal representative.

**1.2 Subject to Act and Articles**. This by-law is subject to, and should be read in conjunction with, the Act and the articles. If there is any conflict or inconsistency between any provision of the Act or the articles and any provision of this by-law, the provision of the Act or the articles will govern.

**1.3 Unanimous Shareholder Agreement**. The provisions of the By-Laws shall be subject to any unanimous shareholder agreement entered into from time to time. In the event of any

conflict between any provision of the By-Laws and any provision of any unanimous shareholder agreement, the provision of the unanimous shareholder agreement shall prevail to the extent of the conflict, and the Directors and the shareholders shall amend the By-Laws accordingly.

## SECTION TWO

## BUSINESS OF THE CORPORATION

**2.1 Registered Office.** The registered office of the Corporation shall be in the province in Canada from time to time specified in the Articles, and at such location within such province initially as is specified in the notice thereof filed with the Articles and thereafter as the Board may from time to time determine.

**2.2 Corporate Seal.** The Corporation may, but need not, adopt a corporate seal and if one is adopted it shall be in a form approved from time to time by the Board.

**2.3 Financial Year.** The financial year of the Corporation ends on such a date of each year as the directors determine from time to time.

**2.4 Execution of Instruments.** Deeds, transfers, assignments, contracts, obligations, certificates and other instruments may be signed on behalf of the Corporation by any Director or any officer of the Corporation. In addition, the Board or the said person may from time to time direct the manner in which and the person or persons by whom any particular instrument or class of instruments may or shall be signed, provided that in the case of share certificates at all times at least two Directors or officers of the Corporation are required to sign. Any signing officer may affix the corporate seal to any instrument requiring it.

**2.5 Banking Arrangements.** The banking business of the Corporation including without limitation, the borrowing of money and the giving of security for it, shall be transacted with such banks, trust companies or other bodies corporate or organizations as may from time to time be designated by or under the authority of the Board. Such banking business or any part of it shall be transacted under such agreements, instructions and delegations of powers as the Board may from time to time prescribe.

**2.6 Voting Rights in Other Bodies Corporate.** The signing officers of the Corporation under Section 2.4 may execute and deliver proxies and arrange for the issuance of voting certificates or other evidence of the right to exercise the voting rights attaching to any securities held by the Corporation. Such instruments shall be in favour of such persons as may be determined by the officers executing or arranging for them. In addition, the Board may from time to time direct the manner in which and the persons by whom any particular voting rights or class of voting rights may or shall be exercised.

**2.7 Divisions.** The Board may cause the business and operations of the Corporation or any part of them to be divided into one or more divisions upon such basis, including without limitation, types of business or operations, geographical territories, product lines or goods or services, as may be considered appropriate in each case. In connection with any such division, the Board or subject to any direction by the Board, the chief executive officer may authorize from time to time, upon such basis as may be considered appropriate in each case:

(a) *Subdivision and Consolidation.* the further division of the business and operations of any such division into sub-units and the consolidation of the business and operations of any such divisions and sub-units;

(b) *Name*. the designation of any such division or sub-unit by, and the carrying on of the business and operations of, any such division or sub-unit under, a name other than the name of the Corporation, provided that the Corporation shall set out its name in legible characters in all places required by law; and

(c) *Officers.* the appointment of officers for any such division or sub-unit, the determination of their powers and duties, and the removal of any of such officers so appointed, provided that any such officers shall not, as such, be officers of the Corporation.

## SECTION THREE

## DIRECTORS

**3.1 Number of Directors.** Until changed in accordance with the Act, the Board shall consist of not fewer than the minimum number and not more than the maximum number of Directors provided in the Articles. If the articles specify a minimum and a maximum number of directors, the number of directors is, at any time, the number within the minimum and maximum determined from time to time by ordinary resolution or, if a special resolution empowers the directors to determine the number, by the directors. No decrease in the number of directors will shorten the term of an incumbent director. Where the number of directors has not been determined as provided in this section, the number of directors is the number of directors holding office immediately following the most recent election or appointment of directors, whether at an annual or special meeting of the shareholders, or by the directors pursuant to the Act.

**3.2 Qualification.** No person shall be qualified for election as a Director if such person is less than 18 years of age, is of unsound mind and has been so found by a court in Canada or elsewhere, is not an individual, or has the status of a bankrupt. A Director need not be a shareholder. Subject to the Act, at least 25 per cent of the Directors shall be resident Canadians, or if the number of Directors is fewer than four, at least one Director shall be a resident Canadian.

**3.3 Election and Term.** The election of Directors shall take place at each annual meeting of shareholders and all the Directors then in office shall retire but, if qualified, shall be eligible for re-election. The number of Directors to be elected at any such Meeting of Shareholders shall be the number of Directors then in office unless the Directors otherwise determine. If the shareholders adopt an amendment to the Articles to increase the number or maximum number of Directors, the shareholders may, at the Meeting of Shareholders at which they adopt the amendment, elect the additional number of Directors authorized by the amendment. The election shall be by resolution. If an election of Directors is not held at the proper time, the incumbent Directors shall continue in office until their successors are elected.

**3.4 Removal of Directors.** Subject to the Act, the shareholders may by resolution passed at a Meeting of Shareholders specially called for such purpose remove any Director from office and the vacancy created by such removal may be filled at such Meeting of Shareholders, failing which it may be filled by the Board.

**3.5 Vacation of Office.** A Director ceases to hold office on death, on removal from office by the shareholders, on ceasing to be qualified for election as a Director, on receipt by the Corporation of a written resignation of such Director, or, if a time is specified in such resignation, at the time so specified, whichever is later. Subject to the Act, a quorum of the Board may appoint a qualified individual to fill a vacancy in the Board.

**3.6 Appointment of Additional Directors.** If the Articles of the Corporation so provide, the Directors may, within the maximum number permitted by the Articles, appoint one or more additional Directors, who shall hold office for a term expiring not later than the close of the next annual meeting of the shareholders, but the total number of Directors so appointed may not exceed one third of the number of Directors elected at the previous annual meeting of shareholders.

**3.7 Action by the Board.** Subject to any unanimous shareholder agreement, the Board shall manage, or supervise the management of, the business and affairs of the Corporation. The powers of the Board may be exercised at a meeting of the Board (subject to Sections 3.8 and 3.9) at which a quorum is present or by resolution in writing signed by all the Directors entitled to vote on that resolution at a meeting of the Board. If there is a vacancy in the Board, the remaining Directors may exercise all the powers of the Board so long as a quorum remains in office. If the Corporation has a Board consisting of only one Director, that Director may constitute a meeting.

**3.8 Canadian Directors Present at Meetings.** Subject to the Act, the Board shall not transact business at a meeting, other than filling a vacancy in the Board, unless at least 25 per cent of the Directors present are resident Canadians, or if the Corporation has fewer than four Directors, at least one of the Directors present is a resident Canadian, except where:

(a) a resident Canadian Director who is unable to be present approves in writing, or by telephonic, electronic or other communication facility, the business transacted at the meeting; and

(b) the required number of resident Canadians would have been present had that Director been present at the meeting.

**3.9 Meeting by Telephone.** Subject to the Act, if all the Directors consent generally or in respect of a particular meeting, a Director may participate in a meeting of the Board or of a committee of the Board by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the meeting, and a Director participating in such a meeting by such means is deemed to be present at the meeting. Any such consent shall be effective whether given before or after the meeting to which it relates and may be given with respect to all meetings of the Board and of committees of the Board.

**3.10 Place of Meetings.** Meetings of the Board may be held at any place in or outside Canada.

**3.11 Calling of Meetings.** Meetings of the Board shall be held from time to time at such time and at such place as the Board, the chair of the Board, the president or any two Directors may determine.

**3.12 Notice of Meeting.** Notice of the time and place of each meeting of the Board shall be given in the manner provided in Section 10 to each Director (a) not less than seven days before the time when the meeting is to be held if the notice is mailed, or (b) not less than 48 hours before the time the meeting is to be held if the notice is given personally, or is delivered or is communicated by any means of transmitted or recorded communication. A notice of a meeting of the Board need not specify the purpose of or the business to be transacted at the meeting except where the Act requires such purpose or business to be specified.

**3.13 First Meeting of New Board.** Provided a quorum of Directors is present, each newly elected Board may without notice hold its first meeting immediately following the Meeting of Shareholders at which such Board is elected.

**3.14 Adjourned Meeting.** Notice of an adjourned meeting of the Board is not required if the time and place of the adjourned meeting is announced at the original meeting.

**3.15 Regular Meetings.** The Board may appoint a day or days in any month or months for regular meetings of the Board at a place and hour to be named. A copy of any resolution of the Board fixing the place and time of such regular meetings shall be sent to each Director promptly after being passed, but no other notice shall be required for any such regular meeting except where the Act requires the purpose of the regular meeting or the business to be transacted at it to be specified.

**3.16 Chair.** The chair of any meeting of the Board shall be the first mentioned of the following officers as have been appointed and who is a Director and is present at the meeting: chair of the Board or president. If no such officer is present, the Directors present shall choose one of their number to be chair.

**3.17 Quorum.** Subject to Sections 3.7 and 3.8, the quorum for the transaction of business at any meeting of the Board shall consist of a majority of the directors then in office or such number of Directors as the Board may from time to time determine.

**3.18 Votes to Govern.** At all meetings of the Board every question shall be decided by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes the chair of the meeting shall not be entitled to a second or casting vote.

**3.19 Conflict of Interest.** A Director shall disclose to the Corporation, in the manner and to the extent provided by the Act, any interest that such Director has in a material contract or transaction, whether made or proposed, with the Corporation, if such Director (a) is a party to the contract or transaction, (b) is a director or an officer, or an individual acting in a similar capacity, of a party to the contract or transaction, or (c) has a material interest in a party to the contract or transaction. Such a Director shall not vote on any resolution to approve the same except as provided by the Act.

**3.20 Remuneration and Expenses.** Subject to any unanimous shareholder agreement, the Directors shall be paid such remuneration for their services as the Board may from time to time determine. The Directors shall also be entitled to be reimbursed for travelling and other expenses properly incurred by them in attending meetings of the Board or any committee of the Board. Nothing in This By-Law shall preclude any Director from serving the Corporation in any other capacity and receiving remuneration therefor.

---

## SECTION FOUR

## COMMITTEES

**4.1 Committees of the Board.** The Board may appoint one or more committees of the Board, however designated, and delegate to any such committee any of the powers of the Board except those which pertain to items which, under the Act, a committee of the Board has no authority to exercise.

**4.2 Transaction of Business.** The powers of a committee of the Board may be exercised by a meeting at which a quorum (as referenced in Section 4.4) is present or by resolution in writing signed by all members of such committee who would have been entitled to vote on that resolution at a meeting of the committee. Meetings of such committee may be held at any place in or outside Canada.

**4.3 Advisory Bodies.** The Board may from time to time appoint such advisory bodies as it may deem advisable.

**4.4 Quorum and Procedure.** Unless otherwise determined by the Board, each committee and advisory body shall fix its quorum at not less than a majority of its members, elect its chair and regulate its procedure.

## SECTION FIVE

## OFFICERS

**5.1 Appointment.** Subject to any unanimous shareholder agreement, the Board may from time to time appoint a president, one or more vice-presidents (to which title may be added words indicating seniority or function), a secretary, a treasurer and such other officers as the Board may determine, including one or more assistants to any of the officers so appointed. A person may hold more than one office. The Board may specify the duties of and, in accordance with This By-Law and subject to the Act, delegate to such officers powers to manage the business and affairs of the Corporation. Subject to Section 5.2, an officer may but need not be a Director.

**5.2 Chair of the Board.** The Board may from time to time also appoint a chair of the Board who shall be a Director. If appointed, the Board may assign to the chair any of the powers and duties that are by any provisions of This By-Law assigned to the president. The chair shall have such other powers and duties as the Board may specify.

**5.3 President.** Subject to the authority of the Board, the president shall have general supervision of the business of the Corporation and such other powers and duties as the Board may specify.

**5.4 Secretary.** The secretary shall attend and be the secretary of all meetings of the Board, Meeting of Shareholders and committees of the Board and shall enter or cause to be entered in records kept for that purpose minutes of all proceedings at such meetings. The secretary shall give or cause to be given, as and when instructed, all notices to shareholders, Directors, officers, auditors and members of committees of the Board. The secretary shall be the custodian of the stamp or mechanical device generally used for affixing the corporate seal of the Corporation and of all books, records and instruments belonging to the Corporation, except when some other officer or agent has been appointed for that purpose, and have such other powers and duties as the Board may specify.

**5.5 Treasurer.** The treasurer shall keep proper accounting records in compliance with the Act and shall be responsible for the deposit of money, the safekeeping of securities and the disbursement of the funds of the Corporation. The treasurer shall render to the Board whenever required an account of all transactions as treasurer and of the financial position of the Corporation and shall have such other powers and duties as the Board may specify.

**5.6 Powers and Duties of Officers.** The powers and duties of all officers shall be in accordance with the terms of their engagement or as the Board or (except for those whose powers and duties are to be specified only by the Board) the chief executive officer may specify. The Board and (except as provided above) the chief executive officer may, from time to time and subject to the provisions of the Act, vary, add to or limit the powers and duties of any officer. Any of the powers and duties of an officer to whom an assistant has been appointed may be exercised and performed by such assistant, unless the Board or the chief executive officer otherwise directs.

**5.7 Term of Office.** The Board, in its discretion, may remove any officer of the Corporation. Otherwise each officer appointed by the Board shall hold office until a successor is appointed or until the officer resigns.

**5.8 Agents and Attorneys.** The Corporation, by or under the authority of the Board, shall have power from time to time to appoint agents or attorneys for the Corporation in or outside Canada with such powers (including the power to subdelegate) of management, administration or otherwise as the Board thinks fit.

**5.9 Conflict of Interest.** An officer who is a party to, or who is a director or officer of or has a material interest in any person who is a party to, a material contract or material transaction, whether made or proposed, with the Corporation shall disclose to the Corporation the nature and extent of that interest at the time and in the manner provided by the Act.

## SECTION SIX

## PROTECTION OF DIRECTORS, OFFICERS AND OTHERS

**6.1 Limitation of Liability.** All Directors and officers of the Corporation in exercising their powers and discharging their duties shall act honestly and in good faith with a view to the best interests of the Corporation and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. Subject to the foregoing, and provided that nothing herein shall relieve any Director or officer from the duty to act in accordance with the Act or from liability for any breach of it, no Director or officer shall be liable:

(a) for the acts, omissions, failures, neglects or defaults of any other Director, officer or employee;

(b) for any loss, damage or expense incurred by the Corporation through the insufficiency or deficiency of title to any property acquired for or on behalf of the Corporation;

(c) for the insufficiency or deficiency of any security in or upon which any of the moneys of the Corporation shall be invested;

(d) for any loss, damage or expense arising from the bankruptcy, insolvency or tortious acts of any person with whom any of the money, securities or effects of the Corporation shall be deposited;

(e) for any loss, damage or expense arising from any error of judgment or oversight on the part of such Director or officer; or

(f) for any other loss, damage or expense arising from the execution of the duties of office or in relation thereto.

**6.2 Indemnity.** Subject to the Act and Section 6.4, the Corporation shall indemnify a Director or an officer, a former Director or officer, or another individual who acts or acted at the Corporation's request as a director or officer (or any individual acting in a similar capacity) of another entity, and their heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by such individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of his/her association with the Corporation or such other entity.

**6.3 Advance of Costs.** The Corporation shall advance money to a Director, officer or other individual for the costs, charges and expenses of a proceeding referred to in Section 6.2. The individual shall repay the money if the individual does not fulfil the conditions of Section 6.4.

**6.4 Limitation.** The Corporation shall not indemnify an individual under Section 6.2 unless the individual:

(a) acted honestly and in good faith with a view to the best interests of the Corporation, or, as the case may be, to the best interests of the other entity for

which the individual acted as director or officer (or in a similar capacity) at the Corporation's request; and

(b) in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, had reasonable grounds for believing that the individual's conduct was lawful.

**6.5 Additional Circumstances.** The Corporation shall also indemnify any individual referred to in Section 6.2 in such other circumstances as the Act or law permits or requires. Nothing in This By-Law shall limit the right of any individual entitled to indemnity to claim indemnity apart from the provisions of This By-Law.

**6.6 Insurance.** Subject to the Act, the Corporation may purchase and maintain such insurance for the benefit of any individual referred to in Section 6.2 as the Board may from time to time determine.

## SECTION SEVEN

## SHARES

**7.1 Issuances of Shares.** Subject to the Act, the Articles and any unanimous shareholder agreement, the Board may issue or grant options to purchase the whole or any part of the authorized and unissued shares of the Corporation at such times and to such persons and for such consideration as the Board shall determine, provided that no share shall be issued until it is fully paid as provided by the Act.

**7.2 Registration of Transfers.** Subject to the Act, no transfer of a share of the Corporation shall be registered in a securities register except upon compliance with the reasonable requirements of the Corporation and with such restrictions on issues, transfer or ownership as are authorized by the Articles or any unanimous shareholder agreement.

**7.3 Dealing with Registered Holders.** Subject to the Act, the Corporation may treat the registered holder of any share of the Corporation as the person exclusively entitled to vote, to receive notices, to receive any dividend or other payment in respect of the share, and otherwise to exercise all the rights and powers of an owner of the share.

**7.4 Share Certificates.** Every holder of one or more shares of the Corporation shall be entitled, at the holder's option, to a share certificate, or to a non-transferable written certificate of acknowledgement of such right to obtain a share certificate, stating the number and class or series of shares held by such holder as shown in the securities register. Such certificates shall be in such form as the Board may from time to time approve and need not be under corporate seal. Any such certificate shall be signed in accordance with Section 2.4.

**7.5 Replacement of Share Certificates.** The Board, or any officer or agent designated by the Board, may direct the issue of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, apparently destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, reimbursement of expenses and evidence of loss and of title as the Board may from time to time prescribe, whether generally or in any particular case.

**7.6 Joint Shareholders.** If two or more persons are registered as joint holders of any share of the Corporation, the Corporation shall not be bound to issue more than one certificate in respect of such share, and delivery of such certificate to one of such persons shall be sufficient delivery to all of them. Any one of such persons may give effectual receipts for the certificate issued in respect of such share or for any dividend, bonus, return of capital or other money payable or warrant issuable in respect of such share.

**7.7 Deceased Shareholders.** In the event of the death of a holder, or of one of the joint holders, of any share of the Corporation, the Corporation shall not be required to make any entry in the securities register in respect of the death or to make any dividend or other payments in respect of the share except upon production of all such documents as may be required by law and upon compliance with the reasonable requirements of the Corporation.

**7.8 Lien for Indebtedness.** If the articles provide that the Corporation has a lien on shares registered in the name of a shareholder or the shareholder's personal representative for a debt

of that shareholder to the Corporation, such lien may be enforced, subject to applicable law, as follows:

(a) where such shares are redeemable pursuant to the articles, by redeeming such shares and applying the redemption price to the debt;

(b) by purchasing such shares for cancellation for a price equal to the fair value of such shares, as determined by the directors, and applying the proceeds to the debt;

(c) by selling such shares to any third party whether or not such party is at arm's length to the Corporation for the best price which the directors in their sole discretion consider to be obtainable for such shares and applying the proceeds to the debt;

(d) by refusing to permit the registration of a transfer of such shares until the debt is paid; and

(e) by any other means permitted by law.

## SECTION EIGHT

## DIVIDENDS

**8.1 Dividends.** Subject to the Act, the Board may from time to time declare dividends payable to the shareholders according to their respective rights and interests in the Corporation. Dividends may be paid in money or property or by issuing fully paid shares of the Corporation. Any dividend unclaimed after a period of six years from the date on which it has been declared to be payable shall be forfeited and shall revert to the Corporation.

**8.2 Record Date for Dividends.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for the purpose of determining shareholders entitled to receive payment of a dividend. Notice of the record date shall be given within the period prescribed by the Act in the manner provided by the Act. If no record date is so fixed, the record date for the determination of the shareholders entitled to receive payment of any dividend shall be at the close of business on the day on which the Board passes the resolution relating to such dividend.

**8.3 Payments on Dividends and Other Distributions.** Any dividend or other distribution payable in cash to shareholders will be paid by cheque or by electronic means or by such other method as the directors may determine. The payment will be made to or to the order of each registered holder of shares in respect of which the payment is to be made. Cheques will be sent to the registered holder's recorded address, unless the holder otherwise directs. In the case of joint holders, the payment will be made to the order of all such joint holders and, if applicable, sent to them at their recorded address, unless such joint holders otherwise direct. The sending of the cheque or the sending of the payment by electronic means or the sending of the payment by a method determined by the directors in an amount equal to the dividend or other distribution to be paid less any tax that the Corporation is required to withhold will satisfy and discharge the liability for the payment, unless payment is not made upon presentation, if applicable.

**8.4 Non-Receipt of Payment.** In the event of non-receipt of any payment made as contemplated by Section 8.3 by the person to whom it is sent, the Corporation may issue re-payment to such person for a like amount. The directors may determine, whether generally or in any particular case, the terms on which any re-payment may be made, including terms as to indemnity, reimbursement of expenses, and evidence of non-receipt and of title.

## SECTION NINE

## MEETINGS OF SHAREHOLDERS

**9.1 Annual Meetings.** Subject to the Act, the Board shall call an annual meeting of shareholders (a) not later than 18 months after the Corporation comes into existence, and (b) subsequently, not later than 15 months after holding the last preceding annual meeting but no later than six months after the end of the Corporation's preceding financial year. The annual meeting of shareholders shall be held for the purpose of considering the financial statements and reports required by the Act to be placed before the annual meeting of shareholders, electing Directors, appointing auditors and for the transaction of such other business as may properly be brought before the annual meeting of shareholders.

**9.2 Special Meetings.** Special Meetings of the Shareholders may be called at any time by the president, or the Board, or the holders of a majority of the outstanding shares of Corporation entitled to vote at the meeting.

**9.3 Place of Meetings.** Meetings of Shareholders shall be held at the registered office of the Corporation or elsewhere in Canada if the Board shall so determine. A Meeting of Shareholders may be held at a place outside Canada if the place is specified in the Articles or all the shareholders entitled to vote at the Meeting of Shareholders agree that the Meeting of Shareholders is to be held at that place. A shareholder who attends a Meeting of Shareholders held outside Canada is deemed to have agreed to it being held outside Canada except when the shareholder attends the Meeting of Shareholders for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully held.

**9.4 Participation in Meeting by Electronic Means.** Any person entitled to attend a Meeting of Shareholders may participate in it, in accordance with the Act, by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders, if the Corporation makes available such a communication facility. A person participating in a Meeting of Shareholders by such means is deemed for the purposes of the Act to be present at the Meeting of Shareholders.

**9.5 Meeting held by Electronic Means.** If the Directors or the shareholders of the Corporation call a Meeting of Shareholders pursuant to the Act, those Directors or shareholders, as the case may be, may determine that the Meeting of Shareholders shall be held, in accordance with the Act, entirely by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders.

**9.6 Notice of Meetings.** Notice of the time and place of each Meeting of Shareholders shall be given in the manner provided in Section 10 not less than 10 nor more than 60 days before the date of the Meeting of Shareholders to each Director, to the auditor, and to each shareholder who at the close of business on the record date for notice is entered in the securities register as the holder of one or more shares carrying the right to vote at the Meeting of Shareholders. Notice of a Meeting of Shareholders called for any purpose other than consideration of the financial statements and auditor's report, election of Directors and reappointment of the incumbent auditor shall state the nature of such business in sufficient

detail to permit the shareholder to form a reasoned judgment thereon and shall state the text of any special resolution to be submitted to the Meeting of Shareholders.

**9.7 List of Shareholders Entitled to Notice.** For every Meeting of Shareholders, the Corporation shall prepare a list of shareholders entitled to receive notice of the Meeting of Shareholders, arranged in alphabetical order and showing the number of shares held by each shareholder entitled to vote at the Meeting of Shareholders. If a record date for the Meeting of Shareholders is fixed pursuant to Section 9.8, the shareholders listed shall be those registered at the close of business on such record date. If no record date is fixed, the shareholders listed shall be those registered at the close of business on the day immediately preceding the day on which notice of the Meeting of Shareholders is given or, if no such notice is given, on the day on which the Meeting of Shareholders is held. The list shall be available for examination by any shareholder during usual business hours at the registered office of the Corporation or at the place where the central securities register is maintained, and at the Meeting of Shareholders for which the list was prepared. If a separate list of shareholders has not been prepared, the names of persons appearing in the securities register at the requisite time as the holder of one or more shares carrying the right to vote at such Meeting of Shareholders shall be deemed to be a list of shareholders.

**9.8 Record Date for Notice.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for determination of the shareholders (a) entitled to receive notice of a Meeting of Shareholders and (b) entitled to vote at a Meeting of Shareholders. Unless waived in accordance with the Act, notice of any such record date shall be given within the period prescribed by the Act before such record date, by newspaper advertisement in the manner provided in the Act. If no record date is fixed, then such record date for the determination of the shareholders entitled to receive notice of the Meeting of Shareholders shall be at the close of business on the day immediately preceding the day on which the notice is given or, if no notice is given, the day on which the Meeting of Shareholders is held.

**9.9 Meetings Without Notice.** A Meeting of Shareholders may be held without notice at any time and place permitted by the Act (a) if all the shareholders entitled to vote at the Meeting of Shareholders are present in person or duly represented or if those not present or represented waive notice of or otherwise consent to such Meeting of Shareholders being held, and (b) if the auditors and the Directors are present or waive notice of or otherwise consent to such Meeting of Shareholders being held, provided that such shareholders, auditors or Directors present are not attending for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully called. At such Meeting of Shareholders any business may be transacted which the Corporation may transact at a Meeting of Shareholders. If the Meeting of Shareholders is held at a place outside Canada, shareholders not present or duly represented, but who have waived notice of or otherwise consented to such Meeting of Shareholders, shall also be deemed to have consented to the Meeting of Shareholders being held at such place.

**9.10 Chair, Secretary and Scrutineers.** The chair of any Meeting of Shareholders shall be the first mentioned of such of the following officers as have been appointed and who is present at the Meeting of Shareholders: president, chair of the Board, or a vice president who is a shareholder. If no such officer is present within 15 minutes from the time fixed for holding the Meeting of Shareholders, the persons present and entitled to vote shall choose one of their number to be chair. If the secretary of the Corporation is absent, the chair shall appoint some person, who need not be a shareholder, to act as secretary of the Meeting of Shareholders. If

desired, one or more scrutineers, who need not be shareholders, may be appointed by a resolution or by the chair with the consent of the Meeting of Shareholders.

**9.11 Persons Entitled to be Present.** The only persons entitled to be present at a Meeting of Shareholders shall be those entitled to vote at the Meeting of Shareholders, the Directors and auditors of the Corporation and others who, although not entitled to vote, are entitled or required under any provision of the Act, the Articles, the By-Laws or any unanimous shareholder agreement to be present at the Meeting of Shareholders. Any other person may be admitted only on the invitation of the chair of the Meeting of Shareholders or with the approval of the majority of shareholders at the Meeting of Shareholders.

**9.12 Quorum.** Subject to the Act in respect of a majority shareholder and Section 9.22, a quorum for the transaction of business at any Meeting of Shareholders shall be holders of a majority of the outstanding shares of the Corporation entitled to vote on a particular matter, whether present in person or by proxy. If a quorum is present at the opening of any Meeting of Shareholders, the shareholders present or represented may proceed with the business of the Meeting of Shareholders notwithstanding that a quorum is not present throughout the Meeting of Shareholders. If a quorum is not present at the opening of any Meeting of Shareholders, the chairman of the meeting or the holders of a majority in voting power of the shares of the Corporation, present in person or represented by proxy and entitled to vote at the meeting, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting of the time, place, if any, thereof and the means of remote communications, if any, by which shareholders may be deemed present in person at such adjourned meeting, until a quorum shall be present or represented. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the meeting. If after the adjournment a new record date for shareholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of the adjourned meeting in accordance with This By-Law and the Act, and shall give notice of the adjourned meeting to each shareholder of record entitled to vote at such adjourned meeting as of the record date for notice of the adjourned meeting.

**9.13 Right to Vote.** Every person named in the list referred to in Section 9.7 shall be entitled to vote the shares shown thereon opposite such person's name at the Meeting of Shareholders to which such list relates.

**9.14 Proxyholders and Representatives.** Every shareholder entitled to vote at a Meeting of Shareholders may appoint a proxyholder, or one or more alternate proxyholders, to attend and act as the shareholder's representative at the Meeting of Shareholders in the manner and to the extent authorized and with the authority conferred by the proxy. A proxy shall be in writing executed by the shareholder or the shareholder's attorney authorized in writing and shall conform with the requirements of the Act. Alternatively, every such shareholder which is a body corporate or association may authorize by resolution of its directors or governing body an individual to represent it at a Meeting of Shareholders and such individual may exercise on the shareholder's behalf all the powers it could exercise if it were an individual shareholder. The authority of such an individual shall be established by depositing with the Corporation a certified copy of such resolution, or in such other manner as may be satisfactory to the secretary of the Corporation or the chair of the Meeting of Shareholders. Any such proxyholder or representative need not be a shareholder.

**9.15 Time for Deposit of Proxies.** The Board may specify in a notice calling a Meeting of Shareholders a time not exceeding the time of such Meeting of Shareholders by more than 48

hours, excluding Saturdays and holidays, preceding any Meeting of Shareholders or adjournment of it before which time proxies to be used at such Meeting of Shareholders must be deposited with the Corporation or its agent. A proxy shall be acted upon only if, prior to the time so specified, it shall have been deposited with the Corporation or an agent of it specified in such notice or if, no such time having been specified in such notice, it has been received by the secretary of the Corporation or by the chair of the Meeting of Shareholders or any adjournment of it prior to the time of voting.

**9.16 Joint Shareholders.** If two or more persons hold shares jointly, any one of them present in person or duly represented at a Meeting of Shareholders may, in the absence of the other or others, vote the shares, but if two or more of those persons are present in person or represented and vote, they shall vote as one the shares jointly held by them.

**9.17 Votes to Govern.** At any Meeting of Shareholders every question shall, unless otherwise required by the Articles, the By-Laws or any unanimous shareholder agreement, be determined by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes, either upon a show of hands or upon a poll, the chair of the Meeting of Shareholders shall not be entitled to a second or casting vote.

**9.18 Show of Hands.** Subject to the Act, any question at a Meeting of Shareholders shall be decided by a show of hands, unless a ballot is required or demanded for such question as provided in this By-Law, and upon a show of hands every person who is present and entitled to vote shall have one vote. Whenever a vote by show of hands shall have been taken upon a question, unless a ballot is required or demanded for such question, a declaration by the chair of the Meeting of Shareholders that the vote upon the question has been carried or carried by a particular majority or not carried and an entry to that effect in the minutes of the Meeting of Shareholders shall be prima facie evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against any resolution or other proceeding in respect of such question, and the result of the vote so taken shall be the decision of the shareholders upon such question. Any vote referred to in this Section 9.18 may be held, in accordance with the Act, partly or entirely by means of a telephonic, electronic or other communication facility, if the Corporation makes available such a communication facility. Any person participating in a Meeting of Shareholders under Sections 9.4 or 9.5 and entitled to vote at that Meeting of Shareholders may vote by means of the telephonic, electronic or other communication facility that the Corporation has made available for that purpose.

**9.19 Ballots.** On any question proposed for consideration at a Meeting of Shareholders, and whether or not a show of hands has been taken upon such question, the chair may require a ballot or any person who is present and entitled to vote on such question at the Meeting of Shareholders may demand a ballot. A ballot so required or demanded shall be taken in such manner as the chair shall direct. A requirement or demand for a ballot may be withdrawn at any time prior to the taking of the ballot. If a ballot is taken, each person present shall be entitled, in respect of the shares which such person is entitled to vote at the Meeting of Shareholders upon the question, to that number of votes provided by the Act or the Articles, and the result of the ballot so taken shall be the decision of the shareholders upon such question.

**9.20 Adjournment.** The chair at a Meeting of Shareholders may, with the consent of the Meeting of Shareholders and subject to such conditions as the Meeting of Shareholders may decide, adjourn the Meeting of Shareholders from time to time and from place to place. If a Meeting of Shareholders is adjourned for less than 30 days, it shall not be necessary to give notice of the adjourned Meeting of Shareholders, other than by announcement at the earliest

Meeting of Shareholders that is adjourned. Subject to the Act, if a Meeting of Shareholders is adjourned by one or more adjournments for an aggregate of 30 days or more, notice of the adjourned Meeting of Shareholders shall be given as for an original Meeting of Shareholders.

**9.21 Action in Writing by Shareholders.** A resolution in writing signed by all the shareholders entitled to vote on that resolution at a Meeting of Shareholders is as valid as if it had been passed at a Meeting of Shareholders, unless a written statement with respect to the subject matter of the resolution is submitted by a Director or the auditor, in each case in accordance with the Act.

**9.22 Only One Shareholder.** If the Corporation has only one shareholder, or only one holder of any class or series of shares, the shareholder present in person or duly represented constitutes a Meeting of Shareholders.

## SECTION TEN

## NOTICES

**10.1 Method of Giving Notices.** Any notice (which term includes any communication or document) to be given (which term includes sent, delivered or served) pursuant to the Act, the Articles, the By-Laws or otherwise to a shareholder, Director, officer, auditor or member of a committee of the Board shall be sufficiently given: (a) if delivered personally to the person to whom it is to be given; (b) if mailed to such person at the person's Recorded Address by prepaid mail, or (c) if transmitted by electronic means in accordance with the Act. A notice so delivered shall be deemed to have been given and received when it is delivered personally or to the Recorded Address; a notice so mailed shall be deemed to have been given when deposited in a post office or public letter box and deemed received at the time it would be delivered in the ordinary course of mail; and a notice so sent by any means of transmitted or recorded communication shall be considered given and received at the times prescribed by the Act. The secretary may change or cause to be changed the Recorded Address of any shareholder, Director, officer, auditor or member of a committee of the Board in accordance with any information believed by the secretary to be reliable.

**10.2 Notice to Joint Shareholders.** If two or more persons are registered as joint holders of any share, any notice may be addressed to all such joint holders, but notice addressed to one of such persons shall be sufficient notice to all of them.

**10.3 Computation of Time.** In computing the date when notice must be given under any provision requiring a specified number of days' notice of any meeting or other event, the day of giving the notice shall be excluded and the day of the meeting or other event shall be included.

**10.4 Undelivered Notices.** If any notice given to a shareholder pursuant to Section 10.1 is returned on two consecutive occasions because the shareholder cannot be found, the Corporation shall not be required to give any further notices to such shareholder until informed in writing by the shareholder of a new address.

**10.5 Omissions and Errors.** The accidental omission to give any notice to any shareholder, Director, officer, auditor or member of a committee of the Board or the non-receipt of any notice by any such person or any error in any notice not affecting the substance of the notice shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise founded on the notice.

**10.6 Persons Entitled by Death or Operation of Law.** Every person who, by operation of law, transfer, death of a shareholder or any other means whatsoever becomes entitled to any share, shall be bound by every notice in respect of such share which shall have been duly given to the shareholder from whom such person derives title to such share prior to the name and address of such person being entered on the securities register (whether such notice was given before or after the happening of the event upon which such person became so entitled) and prior to such person furnishing to the Corporation the proof of authority or evidence of entitlement prescribed by the Act.

**10.7 Waiver of Notice.** Any shareholder, proxyholder, Director, officer, auditor or member of a committee of the Board, or any other person entitled to receive notice of a Meeting of Shareholders or any other notice from the Corporation, may at any time waive any notice, or

waive or abridge the time for any notice, required to be given to such person under the Act, the Articles, the By-Laws or otherwise. Any such waiver or abridgement, whether given before or after the meeting or other event of which notice is required to be given, shall cure any default in the giving or in the time of such notice, as the case may be. Any such waiver or abridgement shall be in writing, except a waiver of notice of a Meeting of Shareholders or of the Board or a committee of the Board may be given in any manner.

## SECTION ELEVEN

## EFFECTIVE DATE, AMENDMENT AND REPEAL

**11.1 Effective Date.** This By-Law shall come into force when made by the Board in accordance with the Act.

**11.2 Amendment.** This By-Law may be amended or repealed at any regular or special meeting of the Board by vote of a majority of all directors in office or at any annual or special Meeting of Shareholders by vote of holders of a majority of the outstanding shares of the Corporation entitled to vote.

**11.3 Repeal**. All previous by-laws of the Corporation are repealed as of the coming into force of This By-Law. Such repeal shall not affect the previous operation of any by-law so repealed, or affect the validity of any act done or right, privilege, obligation or liability acquired or incurred under, or the validity of any contract or agreement made pursuant to, or the validity of any articles (as defined in the Act) or predecessor charter documents of the Corporation obtained pursuant to, any such by-law prior to its repeal. All officers and persons acting under any by-law so repealed shall continue to act as if appointed under the provisions of This By-Law and all resolutions of the shareholders or the Board or a committee of the Board with continuing effect passed under any repealed by-law shall continue to be good and valid except to the extent inconsistent with This By-Law and until amended or repealed.

---

This By-Law was made by the Directors on _______________, 2024, and was confirmed without variation by the shareholders of the Corporation on ________________, 2024.

_______________________________________

# Form 4
## Articles of Amendment
*Canada Business Corporations Act (CBCA) (s. 27 or 177)*

# Formulaire 4
## Clauses modificatrices
*Loi canadienne sur les sociétés par actions (LCSA) (art. 27 ou 177)*

1 Corporate name
Dénomination sociale
INSTANT BRANDS (CANADA) HOLDING INC.

2 Corporation number
Numéro de la société
1077027-2

3 The articles are amended as follows
Les statuts sont modifiés de la façon suivante

See attached schedule / Voir l'annexe ci-jointe

4 Declaration: I certify that I am a director or an officer of the corporation.
Déclaration : J'atteste que je suis un administrateur ou un dirigeant de la société.

**Name:**
**Phone:**

Misrepresentation constitutes an offence and, on summary conviction, a person is liable to a fine not exceeding $5000 or to imprisonment for a term not exceeding six months or both (subsection 250 (1) of the CBCA).

Faire une fausse déclaration constitue une infraction et son auteur, sur déclaration de culpabilité par procédure sommaire, est passible d'une amende maximale de 5 000 $ et d'un emprisonnement maximal de six mois, ou l'une de ces peines (paragraphe 250(1) de la LCSA).

You are providing information required by the CBCA. Note that both the CBCA and the *Privacy Act* allow this information to be disclosed to the public. It will be stored in personal information bank number IC/PPU-049.

Vous fournissez des renseignements exigés par la LCSA. Il est à noter que la LCSA et la *Loi sur les renseignements personnels* permettent que de tels renseignements soient divulgués au public. Ils seront stockés dans la banque de renseignements personnels numéro IC/PPU-049.

**SCHEDULE TO ARTICLES OF AMENDMENT**

**OF**

**INSTANT BRANDS (CANADA) HOLDING INC.**

The Corporation amend its articles as follows:

1. To change the name of the Corporation to **Corelle Brands (Canada) Holding Inc.**

2. By deleting section 7 "Other Provisions" in its entirety and replacing it with the following:

"(1) Securities of the Corporation, other than non-convertible debt securities, may not be transferred unless

(a) such transfer is approved by the directors or shareholders as evidenced by a resolution of the directors or shareholders, as the case may be; or

(b) in the case of securities which are subject to restrictions on transfer contained in a security holders' agreement, such restrictions are complied with.

(2) The directors may appoint one or more additional directors, who shall hold office for a term expiring no later than the close of the next annual meeting of shareholders, but the total number of directors so appointed may not exceed one third of the number of directors elected at the previous annual meeting of shareholders.

(3) Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity interests in the Corporation; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity interests is in compliance with section 1123(a)(6) of the Bankruptcy Code."

**BY-LAW NO. 2**[1]

A by-law relating generally to
the transaction of the business
and affairs of

**CORELLE BRANDS (CANADA) INC.**

---

## TABLE OF CONTENTS


| | | |
|---|---|---|
| **SECTION ONE INTERPRETATION** | | **1** |
| 1.1 | Definitions | 1 |
| 1.2 | Subject to Act and Articles. | 1 |
| 1.3 | Unanimous Shareholder Agreement | 1 |
| **SECTION TWO BUSINESS OF THE CORPORATION** | | **3** |
| 2.1 | Registered Office | 3 |
| 2.2 | Corporate Seal | 3 |
| 2.3 | Financial Year | 3 |
| 2.4 | Execution of Instruments | 3 |
| 2.5 | Banking Arrangements | 3 |
| 2.6 | Voting Rights in Other Bodies Corporate | 3 |
| 2.7 | Divisions | 3 |
| **SECTION THREE DIRECTORS** | | **5** |
| 3.1 | Number of Directors | 5 |
| 3.2 | Qualification | 5 |
| 3.3 | Election and Term | 5 |
| 3.4 | Removal of Directors | 5 |
| 3.5 | Vacation of Office | 5 |
| 3.6 | Appointment of Additional Directors | 5 |
| 3.7 | Action by the Board | 6 |
| 3.8 | Canadian Directors Present at Meetings | 6 |
| 3.9 | Meeting by Telephone | 6 |
| 3.10 | Place of Meetings | 6 |
| 3.11 | Calling of Meetings | 6 |
| 3.12 | Notice of Meeting | 6 |
| 3.13 | First Meeting of New Board | 6 |
| 3.14 | Adjourned Meeting | 6 |
| 3.15 | Regular Meetings | 7 |


---

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 3.16 | Chair | 7 |
| 3.17 | Quorum | 7 |
| 3.18 | Votes to Govern | 7 |
| 3.19 | Conflict of Interest | 7 |
| 3.20 | Remuneration and Expenses | 7 |
| **SECTION FOUR COMMITTEES** | | **8** |
| 4.1 | Committees of the Board | 8 |
| 4.2 | Transaction of Business | 8 |
| 4.3 | Advisory Bodies | 8 |
| 4.4 | Quorum and Procedure | 8 |
| **SECTION FIVE OFFICERS** | | **9** |
| 5.1 | Appointment | 9 |
| 5.2 | Chair of the Board | 9 |
| 5.3 | President | 9 |
| 5.4 | Secretary | 9 |
| 5.5 | Treasurer | 9 |
| 5.6 | Powers and Duties of Officers | 9 |
| 5.7 | Term of Office | 9 |
| 5.8 | Agents and Attorneys | 10 |
| 5.9 | Conflict of Interest | 10 |
| **SECTION SIX PROTECTION OF DIRECTORS, OFFICERS AND OTHERS** | | **11** |
| 6.1 | Limitation of Liability | 11 |
| 6.2 | Indemnity | 11 |
| 6.3 | Advance of Costs | 11 |
| 6.4 | Limitation | 11 |
| 6.5 | Additional Circumstances | 12 |
| 6.6 | Insurance | 12 |
| **SECTION SEVEN SHARES** | | **13** |
| 7.1 | Issuances of Shares | 13 |
| 7.2 | Registration of Transfers | 13 |
| 7.3 | Dealing with Registered Holders | 13 |
| 7.4 | Share Certificates | 13 |
| 7.5 | Replacement of Share Certificates | 13 |
| 7.6 | Joint Shareholders | 13 |
| 7.7 | Deceased Shareholders | 13 |
| 7.8 | Lien for Indebtedness | 13 |
| **SECTION EIGHT DIVIDENDS** | | **15** |
| 8.1 | Dividends | 15 |
| 8.2 | Record Date for Dividends | 15 |
| 8.3 | Payments on Dividends and Other Distributions | 15 |
| 8.4 | Non-Receipt of Payment | 15 |
| **SECTION NINE MEETINGS OF SHAREHOLDERS** | | **16** |

**TABLE OF CONTENTS**
(continued)


| | | |
|---|---|---|
| 9.1 | Annual Meetings | 16 |
| 9.2 | Special Meetings | 16 |
| 9.3 | Place of Meetings | 16 |
| 9.4 | Participation in Meeting by Electronic Means | 16 |
| 9.5 | Meeting held by Electronic Means | 16 |
| 9.6 | Notice of Meetings | 16 |
| 9.7 | List of Shareholders Entitled to Notice | 17 |
| 9.8 | Record Date for Notice | 17 |
| 9.9 | Meetings Without Notice | 17 |
| 9.10 | Chair, Secretary and Scrutineers | 17 |
| 9.11 | Persons Entitled to be Present | 18 |
| 9.12 | Quorum | 18 |
| 9.13 | Right to Vote | 18 |
| 9.14 | Proxyholders and Representatives | 18 |
| 9.15 | Time for Deposit of Proxies | 18 |
| 9.16 | Joint Shareholders | 19 |
| 9.17 | Votes to Govern | 19 |
| 9.18 | Show of Hands | 19 |
| 9.19 | Ballots | 19 |
| 9.20 | Adjournment | 19 |
| 9.21 | Action in Writing by Shareholders | 20 |
| 9.22 | Only One Shareholder | 20 |
| **SECTION TEN NOTICES** | | |
| 10.1 | Method of Giving Notices | 21 |
| 10.2 | Notice to Joint Shareholders | 21 |
| 10.3 | Computation of Time | 21 |
| 10.4 | Undelivered Notices | 21 |
| 10.5 | Omissions and Errors | 21 |
| 10.6 | Persons Entitled by Death or Operation of Law | 21 |
| 10.7 | Waiver of Notice | 21 |
| **SECTION ELEVEN** | **EFFECTIVE DATE, AMENDMENT AND REPEAL** | **23** |
| 11.1 | Effective Date | 23 |
| 11.2 | Amendment | 23 |
| 11.3 | Repeal | 23 |

BE IT ENACTED as a by-law of the Corporation as follows:

## SECTION ONE

## INTERPRETATION

**1.1 Definitions**. In the By-Laws, unless the context otherwise requires:

"**Act**" means the *Canada Business Corporations Act*, or any statute that may be substituted for it, and the regulations to it, as from time to time amended.

"**Articles**" means the articles attached to the certificate of amalgamation of the Corporation, as from time to time amended or restated.

"**Board**" means the board of directors of the Corporation.

"**By-Laws**" means This By-Law and all other by-laws of the Corporation from time to time in force and effect.

"**Corporation**" means the corporation amalgamated under the Act by the said certificate to which the Articles are attached, and named "**Corelle Brands (Canada) Inc.**".

"**Director**" means a member of the Board.

"**Meeting of Shareholders**" includes an annual meeting of shareholders and a Special Meeting of Shareholders; and "**Special Meeting of Shareholders**" includes a meeting of any class or classes of shareholders and a special meeting of all shareholders entitled to vote at an annual meeting of shareholders.

"**Recorded Address**" means: in the case of a shareholder, the address as recorded in the securities register; in the case of joint shareholders, the address appearing in the securities register in respect of such joint holding or the first address so appearing if there are more than one; and in the case of a Director, officer, auditor or member of a committee of the Board, the latest address as recorded in the records of the Corporation.

"**This By-Law**" means this By-Law No. 2 of the Corporation.

Except as provided above, words and expressions defined in the Act, including "**resident Canadian**" and "**unanimous shareholder agreement**", have the same meanings when used herein. Words importing the singular number include the plural and vice versa; and words importing a person include an individual, partnership, association, body corporate, trustee, executor, administrator and legal representative.

**1.2 Subject to Act and Articles.** This by-law is subject to, and should be read in conjunction with, the Act and the articles. If there is any conflict or inconsistency between any provision of the Act or the articles and any provision of this by-law, the provision of the Act or the articles will govern.

**1.3 Unanimous Shareholder Agreement**. The provisions of the By-Laws shall be subject to any unanimous shareholder agreement entered into from time to time. In the event of any

conflict between any provision of the By-Laws and any provision of any unanimous shareholder agreement, the provision of the unanimous shareholder agreement shall prevail to the extent of the conflict, and the Directors and the shareholders shall amend the By-Laws accordingly.

## SECTION TWO

## BUSINESS OF THE CORPORATION

**2.1 Registered Office.** The registered office of the Corporation shall be in the province in Canada from time to time specified in the Articles, and at such location within such province initially as is specified in the notice thereof filed with the Articles and thereafter as the Board may from time to time determine.

**2.2 Corporate Seal.** The Corporation may, but need not, adopt a corporate seal and if one is adopted it shall be in a form approved from time to time by the Board.

**2.3 Financial Year.** The financial year of the Corporation ends on such a date of each year as the directors determine from time to time.

**2.4 Execution of Instruments.** Deeds, transfers, assignments, contracts, obligations, certificates and other instruments may be signed on behalf of the Corporation by any Director or any officer of the Corporation. In addition, the Board or the said person may from time to time direct the manner in which and the person or persons by whom any particular instrument or class of instruments may or shall be signed, provided that in the case of share certificates at all times at least two Directors or officers of the Corporation are required to sign. Any signing officer may affix the corporate seal to any instrument requiring it.

**2.5 Banking Arrangements.** The banking business of the Corporation including without limitation, the borrowing of money and the giving of security for it, shall be transacted with such banks, trust companies or other bodies corporate or organizations as may from time to time be designated by or under the authority of the Board. Such banking business or any part of it shall be transacted under such agreements, instructions and delegations of powers as the Board may from time to time prescribe.

**2.6 Voting Rights in Other Bodies Corporate.** The signing officers of the Corporation under Section 2.4 may execute and deliver proxies and arrange for the issuance of voting certificates or other evidence of the right to exercise the voting rights attaching to any securities held by the Corporation. Such instruments shall be in favour of such persons as may be determined by the officers executing or arranging for them. In addition, the Board may from time to time direct the manner in which and the persons by whom any particular voting rights or class of voting rights may or shall be exercised.

**2.7 Divisions.** The Board may cause the business and operations of the Corporation or any part of them to be divided into one or more divisions upon such basis, including without limitation, types of business or operations, geographical territories, product lines or goods or services, as may be considered appropriate in each case. In connection with any such division, the Board or subject to any direction by the Board, the chief executive officer may authorize from time to time, upon such basis as may be considered appropriate in each case:

(a) *Subdivision and Consolidation.* the further division of the business and operations of any such division into sub-units and the consolidation of the business and operations of any such divisions and sub-units;

(b) *Name*. the designation of any such division or sub-unit by, and the carrying on of the business and operations of, any such division or sub-unit under, a name other than the name of the Corporation, provided that the Corporation shall set out its name in legible characters in all places required by law; and

(c) *Officers.* the appointment of officers for any such division or sub-unit, the determination of their powers and duties, and the removal of any of such officers so appointed, provided that any such officers shall not, as such, be officers of the Corporation.

---

## SECTION THREE

## DIRECTORS

**3.1 Number of Directors.** Until changed in accordance with the Act, the Board shall consist of not fewer than the minimum number and not more than the maximum number of Directors provided in the Articles. If the articles specify a minimum and a maximum number of directors, the number of directors is, at any time, the number within the minimum and maximum determined from time to time by ordinary resolution or, if a special resolution empowers the directors to determine the number, by the directors. No decrease in the number of directors will shorten the term of an incumbent director. Where the number of directors has not been determined as provided in this section, the number of directors is the number of directors holding office immediately following the most recent election or appointment of directors, whether at an annual or special meeting of the shareholders, or by the directors pursuant to the Act.

**3.2 Qualification.** No person shall be qualified for election as a Director if such person is less than 18 years of age, is of unsound mind and has been so found by a court in Canada or elsewhere, is not an individual, or has the status of a bankrupt. A Director need not be a shareholder. Subject to the Act, at least 25 per cent of the Directors shall be resident Canadians, or if the number of Directors is fewer than four, at least one Director shall be a resident Canadian.

**3.3 Election and Term.** The election of Directors shall take place at each annual meeting of shareholders and all the Directors then in office shall retire but, if qualified, shall be eligible for re-election. The number of Directors to be elected at any such Meeting of Shareholders shall be the number of Directors then in office unless the Directors otherwise determine. If the shareholders adopt an amendment to the Articles to increase the number or maximum number of Directors, the shareholders may, at the Meeting of Shareholders at which they adopt the amendment, elect the additional number of Directors authorized by the amendment. The election shall be by resolution. If an election of Directors is not held at the proper time, the incumbent Directors shall continue in office until their successors are elected.

**3.4 Removal of Directors.** Subject to the Act, the shareholders may by resolution passed at a Meeting of Shareholders specially called for such purpose remove any Director from office and the vacancy created by such removal may be filled at such Meeting of Shareholders, failing which it may be filled by the Board.

**3.5 Vacation of Office.** A Director ceases to hold office on death, on removal from office by the shareholders, on ceasing to be qualified for election as a Director, on receipt by the Corporation of a written resignation of such Director, or, if a time is specified in such resignation, at the time so specified, whichever is later. Subject to the Act, a quorum of the Board may appoint a qualified individual to fill a vacancy in the Board.

**3.6 Appointment of Additional Directors.** If the Articles of the Corporation so provide, the Directors may, within the maximum number permitted by the Articles, appoint one or more additional Directors, who shall hold office for a term expiring not later than the close of the next annual meeting of the shareholders, but the total number of Directors so appointed may not exceed one third of the number of Directors elected at the previous annual meeting of shareholders.

**3.7 Action by the Board.** Subject to any unanimous shareholder agreement, the Board shall manage, or supervise the management of, the business and affairs of the Corporation. The powers of the Board may be exercised at a meeting of the Board (subject to Sections 3.8 and 3.9) at which a quorum is present or by resolution in writing signed by all the Directors entitled to vote on that resolution at a meeting of the Board. If there is a vacancy in the Board, the remaining Directors may exercise all the powers of the Board so long as a quorum remains in office. If the Corporation has a Board consisting of only one Director, that Director may constitute a meeting.

**3.8 Canadian Directors Present at Meetings.** Subject to the Act, the Board shall not transact business at a meeting, other than filling a vacancy in the Board, unless at least 25 per cent of the Directors present are resident Canadians, or if the Corporation has fewer than four Directors, at least one of the Directors present is a resident Canadian, except where:

(a) a resident Canadian Director who is unable to be present approves in writing, or by telephonic, electronic or other communication facility, the business transacted at the meeting; and

(b) the required number of resident Canadians would have been present had that Director been present at the meeting.

**3.9 Meeting by Telephone.** Subject to the Act, if all the Directors consent generally or in respect of a particular meeting, a Director may participate in a meeting of the Board or of a committee of the Board by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the meeting, and a Director participating in such a meeting by such means is deemed to be present at the meeting. Any such consent shall be effective whether given before or after the meeting to which it relates and may be given with respect to all meetings of the Board and of committees of the Board.

**3.10 Place of Meetings.** Meetings of the Board may be held at any place in or outside Canada.

**3.11 Calling of Meetings.** Meetings of the Board shall be held from time to time at such time and at such place as the Board, the chair of the Board, the president or any two Directors may determine.

**3.12 Notice of Meeting.** Notice of the time and place of each meeting of the Board shall be given in the manner provided in Section 10 to each Director (a) not less than seven days before the time when the meeting is to be held if the notice is mailed, or (b) not less than 48 hours before the time the meeting is to be held if the notice is given personally, or is delivered or is communicated by any means of transmitted or recorded communication. A notice of a meeting of the Board need not specify the purpose of or the business to be transacted at the meeting except where the Act requires such purpose or business to be specified.

**3.13 First Meeting of New Board.** Provided a quorum of Directors is present, each newly elected Board may without notice hold its first meeting immediately following the Meeting of Shareholders at which such Board is elected.

**3.14 Adjourned Meeting.** Notice of an adjourned meeting of the Board is not required if the time and place of the adjourned meeting is announced at the original meeting.

**3.15 Regular Meetings.** The Board may appoint a day or days in any month or months for regular meetings of the Board at a place and hour to be named. A copy of any resolution of the Board fixing the place and time of such regular meetings shall be sent to each Director promptly after being passed, but no other notice shall be required for any such regular meeting except where the Act requires the purpose of the regular meeting or the business to be transacted at it to be specified.

**3.16 Chair.** The chair of any meeting of the Board shall be the first mentioned of the following officers as have been appointed and who is a Director and is present at the meeting: chair of the Board or president. If no such officer is present, the Directors present shall choose one of their number to be chair.

**3.17 Quorum.** Subject to Sections 3.7 and 3.8, the quorum for the transaction of business at any meeting of the Board shall consist of a majority of the directors then in office or such number of Directors as the Board may from time to time determine.

**3.18 Votes to Govern.** At all meetings of the Board every question shall be decided by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes the chair of the meeting shall not be entitled to a second or casting vote.

**3.19 Conflict of Interest.** A Director shall disclose to the Corporation, in the manner and to the extent provided by the Act, any interest that such Director has in a material contract or transaction, whether made or proposed, with the Corporation, if such Director (a) is a party to the contract or transaction, (b) is a director or an officer, or an individual acting in a similar capacity, of a party to the contract or transaction, or (c) has a material interest in a party to the contract or transaction. Such a Director shall not vote on any resolution to approve the same except as provided by the Act.

**3.20 Remuneration and Expenses.** Subject to any unanimous shareholder agreement, the Directors shall be paid such remuneration for their services as the Board may from time to time determine. The Directors shall also be entitled to be reimbursed for travelling and other expenses properly incurred by them in attending meetings of the Board or any committee of the Board. Nothing in This By-Law shall preclude any Director from serving the Corporation in any other capacity and receiving remuneration therefor.

## SECTION FOUR

## COMMITTEES

**4.1 Committees of the Board.** The Board may appoint one or more committees of the Board, however designated, and delegate to any such committee any of the powers of the Board except those which pertain to items which, under the Act, a committee of the Board has no authority to exercise.

**4.2 Transaction of Business.** The powers of a committee of the Board may be exercised by a meeting at which a quorum (as referenced in Section 4.4) is present or by resolution in writing signed by all members of such committee who would have been entitled to vote on that resolution at a meeting of the committee. Meetings of such committee may be held at any place in or outside Canada.

**4.3 Advisory Bodies.** The Board may from time to time appoint such advisory bodies as it may deem advisable.

**4.4 Quorum and Procedure.** Unless otherwise determined by the Board, each committee and advisory body shall fix its quorum at not less than a majority of its members, elect its chair and regulate its procedure.

## SECTION FIVE

## OFFICERS

**5.1 Appointment.** Subject to any unanimous shareholder agreement, the Board may from time to time appoint a president, one or more vice-presidents (to which title may be added words indicating seniority or function), a secretary, a treasurer and such other officers as the Board may determine, including one or more assistants to any of the officers so appointed. A person may hold more than one office. The Board may specify the duties of and, in accordance with This By-Law and subject to the Act, delegate to such officers powers to manage the business and affairs of the Corporation. Subject to Section 5.2, an officer may but need not be a Director.

**5.2 Chair of the Board.** The Board may from time to time also appoint a chair of the Board who shall be a Director. If appointed, the Board may assign to the chair any of the powers and duties that are by any provisions of This By-Law assigned to the president. The chair shall have such other powers and duties as the Board may specify.

**5.3 President.** Subject to the authority of the Board, the president shall have general supervision of the business of the Corporation and such other powers and duties as the Board may specify.

**5.4 Secretary.** The secretary shall attend and be the secretary of all meetings of the Board, Meeting of Shareholders and committees of the Board and shall enter or cause to be entered in records kept for that purpose minutes of all proceedings at such meetings. The secretary shall give or cause to be given, as and when instructed, all notices to shareholders, Directors, officers, auditors and members of committees of the Board. The secretary shall be the custodian of the stamp or mechanical device generally used for affixing the corporate seal of the Corporation and of all books, records and instruments belonging to the Corporation, except when some other officer or agent has been appointed for that purpose, and have such other powers and duties as the Board may specify.

**5.5 Treasurer.** The treasurer shall keep proper accounting records in compliance with the Act and shall be responsible for the deposit of money, the safekeeping of securities and the disbursement of the funds of the Corporation. The treasurer shall render to the Board whenever required an account of all transactions as treasurer and of the financial position of the Corporation and shall have such other powers and duties as the Board may specify.

**5.6 Powers and Duties of Officers.** The powers and duties of all officers shall be in accordance with the terms of their engagement or as the Board or (except for those whose powers and duties are to be specified only by the Board) the chief executive officer may specify. The Board and (except as provided above) the chief executive officer may, from time to time and subject to the provisions of the Act, vary, add to or limit the powers and duties of any officer. Any of the powers and duties of an officer to whom an assistant has been appointed may be exercised and performed by such assistant, unless the Board or the chief executive officer otherwise directs.

**5.7 Term of Office.** The Board, in its discretion, may remove any officer of the Corporation. Otherwise each officer appointed by the Board shall hold office until a successor is appointed or until the officer resigns.

**5.8 Agents and Attorneys.** The Corporation, by or under the authority of the Board, shall have power from time to time to appoint agents or attorneys for the Corporation in or outside Canada with such powers (including the power to subdelegate) of management, administration or otherwise as the Board thinks fit.

**5.9 Conflict of Interest.** An officer who is a party to, or who is a director or officer of or has a material interest in any person who is a party to, a material contract or material transaction, whether made or proposed, with the Corporation shall disclose to the Corporation the nature and extent of that interest at the time and in the manner provided by the Act.

## SECTION SIX

## PROTECTION OF DIRECTORS, OFFICERS AND OTHERS

**6.1 Limitation of Liability.** All Directors and officers of the Corporation in exercising their powers and discharging their duties shall act honestly and in good faith with a view to the best interests of the Corporation and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. Subject to the foregoing, and provided that nothing herein shall relieve any Director or officer from the duty to act in accordance with the Act or from liability for any breach of it, no Director or officer shall be liable:

(a) for the acts, omissions, failures, neglects or defaults of any other Director, officer or employee;

(b) for any loss, damage or expense incurred by the Corporation through the insufficiency or deficiency of title to any property acquired for or on behalf of the Corporation;

(c) for the insufficiency or deficiency of any security in or upon which any of the moneys of the Corporation shall be invested;

(d) for any loss, damage or expense arising from the bankruptcy, insolvency or tortious acts of any person with whom any of the money, securities or effects of the Corporation shall be deposited;

(e) for any loss, damage or expense arising from any error of judgment or oversight on the part of such Director or officer; or

(f) for any other loss, damage or expense arising from the execution of the duties of office or in relation thereto.

**6.2 Indemnity.** Subject to the Act and Section 6.4, the Corporation shall indemnify a Director or an officer, a former Director or officer, or another individual who acts or acted at the Corporation's request as a director or officer (or any individual acting in a similar capacity) of another entity, and their heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by such individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of his/her association with the Corporation or such other entity.

**6.3 Advance of Costs.** The Corporation shall advance money to a Director, officer or other individual for the costs, charges and expenses of a proceeding referred to in Section 6.2. The individual shall repay the money if the individual does not fulfil the conditions of Section 6.4.

**6.4 Limitation.** The Corporation shall not indemnify an individual under Section 6.2 unless the individual:

(a) acted honestly and in good faith with a view to the best interests of the Corporation, or, as the case may be, to the best interests of the other entity for

which the individual acted as director or officer (or in a similar capacity) at the Corporation's request; and

(b) in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, had reasonable grounds for believing that the individual's conduct was lawful.

**6.5 Additional Circumstances.** The Corporation shall also indemnify any individual referred to in Section 6.2 in such other circumstances as the Act or law permits or requires. Nothing in This By-Law shall limit the right of any individual entitled to indemnity to claim indemnity apart from the provisions of This By-Law.

**6.6 Insurance.** Subject to the Act, the Corporation may purchase and maintain such insurance for the benefit of any individual referred to in Section 6.2 as the Board may from time to time determine.

## SECTION SEVEN

## SHARES

**7.1 Issuances of Shares.** Subject to the Act, the Articles and any unanimous shareholder agreement, the Board may issue or grant options to purchase the whole or any part of the authorized and unissued shares of the Corporation at such times and to such persons and for such consideration as the Board shall determine, provided that no share shall be issued until it is fully paid as provided by the Act.

**7.2 Registration of Transfers.** Subject to the Act, no transfer of a share of the Corporation shall be registered in a securities register except upon compliance with the reasonable requirements of the Corporation and with such restrictions on issues, transfer or ownership as are authorized by the Articles or any unanimous shareholder agreement.

**7.3 Dealing with Registered Holders.** Subject to the Act, the Corporation may treat the registered holder of any share of the Corporation as the person exclusively entitled to vote, to receive notices, to receive any dividend or other payment in respect of the share, and otherwise to exercise all the rights and powers of an owner of the share.

**7.4 Share Certificates.** Every holder of one or more shares of the Corporation shall be entitled, at the holder's option, to a share certificate, or to a non-transferable written certificate of acknowledgement of such right to obtain a share certificate, stating the number and class or series of shares held by such holder as shown in the securities register. Such certificates shall be in such form as the Board may from time to time approve and need not be under corporate seal. Any such certificate shall be signed in accordance with Section 2.4.

**7.5 Replacement of Share Certificates.** The Board, or any officer or agent designated by the Board, may direct the issue of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, apparently destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, reimbursement of expenses and evidence of loss and of title as the Board may from time to time prescribe, whether generally or in any particular case.

**7.6 Joint Shareholders.** If two or more persons are registered as joint holders of any share of the Corporation, the Corporation shall not be bound to issue more than one certificate in respect of such share, and delivery of such certificate to one of such persons shall be sufficient delivery to all of them. Any one of such persons may give effectual receipts for the certificate issued in respect of such share or for any dividend, bonus, return of capital or other money payable or warrant issuable in respect of such share.

**7.7 Deceased Shareholders.** In the event of the death of a holder, or of one of the joint holders, of any share of the Corporation, the Corporation shall not be required to make any entry in the securities register in respect of the death or to make any dividend or other payments in respect of the share except upon production of all such documents as may be required by law and upon compliance with the reasonable requirements of the Corporation.

**7.8 Lien for Indebtedness.** If the articles provide that the Corporation has a lien on shares registered in the name of a shareholder or the shareholder's personal representative for a debt

of that shareholder to the Corporation, such lien may be enforced, subject to applicable law, as follows:

(a) where such shares are redeemable pursuant to the articles, by redeeming such shares and applying the redemption price to the debt;

(b) by purchasing such shares for cancellation for a price equal to the fair value of such shares, as determined by the directors, and applying the proceeds to the debt;

(c) by selling such shares to any third party whether or not such party is at arm's length to the Corporation for the best price which the directors in their sole discretion consider to be obtainable for such shares and applying the proceeds to the debt;

(d) by refusing to permit the registration of a transfer of such shares until the debt is paid; and

(e) by any other means permitted by law.

## SECTION EIGHT

## DIVIDENDS

**8.1 Dividends.** Subject to the Act, the Board may from time to time declare dividends payable to the shareholders according to their respective rights and interests in the Corporation. Dividends may be paid in money or property or by issuing fully paid shares of the Corporation. Any dividend unclaimed after a period of six years from the date on which it has been declared to be payable shall be forfeited and shall revert to the Corporation.

**8.2 Record Date for Dividends.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for the purpose of determining shareholders entitled to receive payment of a dividend. Notice of the record date shall be given within the period prescribed by the Act in the manner provided by the Act. If no record date is so fixed, the record date for the determination of the shareholders entitled to receive payment of any dividend shall be at the close of business on the day on which the Board passes the resolution relating to such dividend.

**8.3 Payments on Dividends and Other Distributions.** Any dividend or other distribution payable in cash to shareholders will be paid by cheque or by electronic means or by such other method as the directors may determine. The payment will be made to or to the order of each registered holder of shares in respect of which the payment is to be made. Cheques will be sent to the registered holder's recorded address, unless the holder otherwise directs. In the case of joint holders, the payment will be made to the order of all such joint holders and, if applicable, sent to them at their recorded address, unless such joint holders otherwise direct. The sending of the cheque or the sending of the payment by electronic means or the sending of the payment by a method determined by the directors in an amount equal to the dividend or other distribution to be paid less any tax that the Corporation is required to withhold will satisfy and discharge the liability for the payment, unless payment is not made upon presentation, if applicable.

**8.4 Non-Receipt of Payment.** In the event of non-receipt of any payment made as contemplated by Section 8.3 by the person to whom it is sent, the Corporation may issue re-payment to such person for a like amount. The directors may determine, whether generally or in any particular case, the terms on which any re-payment may be made, including terms as to indemnity, reimbursement of expenses, and evidence of non-receipt and of title.

## SECTION NINE

## MEETINGS OF SHAREHOLDERS

**9.1 Annual Meetings.** Subject to the Act, the Board shall call an annual meeting of shareholders (a) not later than 18 months after the Corporation comes into existence, and (b) subsequently, not later than 15 months after holding the last preceding annual meeting but no later than six months after the end of the Corporation's preceding financial year. The annual meeting of shareholders shall be held for the purpose of considering the financial statements and reports required by the Act to be placed before the annual meeting of shareholders, electing Directors, appointing auditors and for the transaction of such other business as may properly be brought before the annual meeting of shareholders.

**9.2 Special Meetings.** Special Meetings of the Shareholders may be called at any time by the president, or the Board, or the holders of a majority of the outstanding shares of Corporation entitled to vote at the meeting.

**9.3 Place of Meetings.** Meetings of Shareholders shall be held at the registered office of the Corporation or elsewhere in Canada if the Board shall so determine. A Meeting of Shareholders may be held at a place outside Canada if the place is specified in the Articles or all the shareholders entitled to vote at the Meeting of Shareholders agree that the Meeting of Shareholders is to be held at that place. A shareholder who attends a Meeting of Shareholders held outside Canada is deemed to have agreed to it being held outside Canada except when the shareholder attends the Meeting of Shareholders for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully held.

**9.4 Participation in Meeting by Electronic Means.** Any person entitled to attend a Meeting of Shareholders may participate in it, in accordance with the Act, by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders, if the Corporation makes available such a communication facility. A person participating in a Meeting of Shareholders by such means is deemed for the purposes of the Act to be present at the Meeting of Shareholders.

**9.5 Meeting held by Electronic Means.** If the Directors or the shareholders of the Corporation call a Meeting of Shareholders pursuant to the Act, those Directors or shareholders, as the case may be, may determine that the Meeting of Shareholders shall be held, in accordance with the Act, entirely by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders.

**9.6 Notice of Meetings.** Notice of the time and place of each Meeting of Shareholders shall be given in the manner provided in Section 10 not less than 10 nor more than 60 days before the date of the Meeting of Shareholders to each Director, to the auditor, and to each shareholder who at the close of business on the record date for notice is entered in the securities register as the holder of one or more shares carrying the right to vote at the Meeting of Shareholders. Notice of a Meeting of Shareholders called for any purpose other than consideration of the financial statements and auditor's report, election of Directors and reappointment of the incumbent auditor shall state the nature of such business in sufficient

detail to permit the shareholder to form a reasoned judgment thereon and shall state the text of any special resolution to be submitted to the Meeting of Shareholders.

**9.7 List of Shareholders Entitled to Notice.** For every Meeting of Shareholders, the Corporation shall prepare a list of shareholders entitled to receive notice of the Meeting of Shareholders, arranged in alphabetical order and showing the number of shares held by each shareholder entitled to vote at the Meeting of Shareholders. If a record date for the Meeting of Shareholders is fixed pursuant to Section 9.8, the shareholders listed shall be those registered at the close of business on such record date. If no record date is fixed, the shareholders listed shall be those registered at the close of business on the day immediately preceding the day on which notice of the Meeting of Shareholders is given or, if no such notice is given, on the day on which the Meeting of Shareholders is held. The list shall be available for examination by any shareholder during usual business hours at the registered office of the Corporation or at the place where the central securities register is maintained, and at the Meeting of Shareholders for which the list was prepared. If a separate list of shareholders has not been prepared, the names of persons appearing in the securities register at the requisite time as the holder of one or more shares carrying the right to vote at such Meeting of Shareholders shall be deemed to be a list of shareholders.

**9.8 Record Date for Notice.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for determination of the shareholders (a) entitled to receive notice of a Meeting of Shareholders and (b) entitled to vote at a Meeting of Shareholders. Unless waived in accordance with the Act, notice of any such record date shall be given within the period prescribed by the Act before such record date, by newspaper advertisement in the manner provided in the Act. If no record date is fixed, then such record date for the determination of the shareholders entitled to receive notice of the Meeting of Shareholders shall be at the close of business on the day immediately preceding the day on which the notice is given or, if no notice is given, the day on which the Meeting of Shareholders is held.

**9.9 Meetings Without Notice.** A Meeting of Shareholders may be held without notice at any time and place permitted by the Act (a) if all the shareholders entitled to vote at the Meeting of Shareholders are present in person or duly represented or if those not present or represented waive notice of or otherwise consent to such Meeting of Shareholders being held, and (b) if the auditors and the Directors are present or waive notice of or otherwise consent to such Meeting of Shareholders being held, provided that such shareholders, auditors or Directors present are not attending for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully called. At such Meeting of Shareholders any business may be transacted which the Corporation may transact at a Meeting of Shareholders. If the Meeting of Shareholders is held at a place outside Canada, shareholders not present or duly represented, but who have waived notice of or otherwise consented to such Meeting of Shareholders, shall also be deemed to have consented to the Meeting of Shareholders being held at such place.

**9.10 Chair, Secretary and Scrutineers.** The chair of any Meeting of Shareholders shall be the first mentioned of such of the following officers as have been appointed and who is present at the Meeting of Shareholders: president, chair of the Board, or a vice president who is a shareholder. If no such officer is present within 15 minutes from the time fixed for holding the Meeting of Shareholders, the persons present and entitled to vote shall choose one of their number to be chair. If the secretary of the Corporation is absent, the chair shall appoint some person, who need not be a shareholder, to act as secretary of the Meeting of Shareholders. If

desired, one or more scrutineers, who need not be shareholders, may be appointed by a resolution or by the chair with the consent of the Meeting of Shareholders.

**9.11 Persons Entitled to be Present.** The only persons entitled to be present at a Meeting of Shareholders shall be those entitled to vote at the Meeting of Shareholders, the Directors and auditors of the Corporation and others who, although not entitled to vote, are entitled or required under any provision of the Act, the Articles, the By-Laws or any unanimous shareholder agreement to be present at the Meeting of Shareholders. Any other person may be admitted only on the invitation of the chair of the Meeting of Shareholders or with the approval of the majority of shareholders at the Meeting of Shareholders.

**9.12 Quorum.** Subject to the Act in respect of a majority shareholder and Section 9.22, a quorum for the transaction of business at any Meeting of Shareholders shall be holders of a majority of the outstanding shares of the Corporation entitled to vote on a particular matter, whether present in person or by proxy. If a quorum is present at the opening of any Meeting of Shareholders, the shareholders present or represented may proceed with the business of the Meeting of Shareholders notwithstanding that a quorum is not present throughout the Meeting of Shareholders. If a quorum is not present at the opening of any Meeting of Shareholders, the chairman of the meeting or the holders of a majority in voting power of the shares of the Corporation, present in person or represented by proxy and entitled to vote at the meeting, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting of the time, place, if any, thereof and the means of remote communications, if any, by which shareholders may be deemed present in person at such adjourned meeting, until a quorum shall be present or represented. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the meeting. If after the adjournment a new record date for shareholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of the adjourned meeting in accordance with This By-Law and the Act, and shall give notice of the adjourned meeting to each shareholder of record entitled to vote at such adjourned meeting as of the record date for notice of the adjourned meeting.

**9.13 Right to Vote.** Every person named in the list referred to in Section 9.7 shall be entitled to vote the shares shown thereon opposite such person’s name at the Meeting of Shareholders to which such list relates.

**9.14 Proxyholders and Representatives.** Every shareholder entitled to vote at a Meeting of Shareholders may appoint a proxyholder, or one or more alternate proxyholders, to attend and act as the shareholder’s representative at the Meeting of Shareholders in the manner and to the extent authorized and with the authority conferred by the proxy. A proxy shall be in writing executed by the shareholder or the shareholder’s attorney authorized in writing and shall conform with the requirements of the Act. Alternatively, every such shareholder which is a body corporate or association may authorize by resolution of its directors or governing body an individual to represent it at a Meeting of Shareholders and such individual may exercise on the shareholder’s behalf all the powers it could exercise if it were an individual shareholder. The authority of such an individual shall be established by depositing with the Corporation a certified copy of such resolution, or in such other manner as may be satisfactory to the secretary of the Corporation or the chair of the Meeting of Shareholders. Any such proxyholder or representative need not be a shareholder.

**9.15 Time for Deposit of Proxies.** The Board may specify in a notice calling a Meeting of Shareholders a time not exceeding the time of such Meeting of Shareholders by more than 48

hours, excluding Saturdays and holidays, preceding any Meeting of Shareholders or adjournment of it before which time proxies to be used at such Meeting of Shareholders must be deposited with the Corporation or its agent. A proxy shall be acted upon only if, prior to the time so specified, it shall have been deposited with the Corporation or an agent of it specified in such notice or if, no such time having been specified in such notice, it has been received by the secretary of the Corporation or by the chair of the Meeting of Shareholders or any adjournment of it prior to the time of voting.

**9.16 Joint Shareholders.** If two or more persons hold shares jointly, any one of them present in person or duly represented at a Meeting of Shareholders may, in the absence of the other or others, vote the shares, but if two or more of those persons are present in person or represented and vote, they shall vote as one the shares jointly held by them.

**9.17 Votes to Govern.** At any Meeting of Shareholders every question shall, unless otherwise required by the Articles, the By-Laws or any unanimous shareholder agreement, be determined by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes, either upon a show of hands or upon a poll, the chair of the Meeting of Shareholders shall not be entitled to a second or casting vote.

**9.18 Show of Hands.** Subject to the Act, any question at a Meeting of Shareholders shall be decided by a show of hands, unless a ballot is required or demanded for such question as provided in this By-Law, and upon a show of hands every person who is present and entitled to vote shall have one vote. Whenever a vote by show of hands shall have been taken upon a question, unless a ballot is required or demanded for such question, a declaration by the chair of the Meeting of Shareholders that the vote upon the question has been carried or carried by a particular majority or not carried and an entry to that effect in the minutes of the Meeting of Shareholders shall be prima facie evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against any resolution or other proceeding in respect of such question, and the result of the vote so taken shall be the decision of the shareholders upon such question. Any vote referred to in this Section 9.18 may be held, in accordance with the Act, partly or entirely by means of a telephonic, electronic or other communication facility, if the Corporation makes available such a communication facility. Any person participating in a Meeting of Shareholders under Sections 9.4 or 9.5 and entitled to vote at that Meeting of Shareholders may vote by means of the telephonic, electronic or other communication facility that the Corporation has made available for that purpose.

**9.19 Ballots.** On any question proposed for consideration at a Meeting of Shareholders, and whether or not a show of hands has been taken upon such question, the chair may require a ballot or any person who is present and entitled to vote on such question at the Meeting of Shareholders may demand a ballot. A ballot so required or demanded shall be taken in such manner as the chair shall direct. A requirement or demand for a ballot may be withdrawn at any time prior to the taking of the ballot. If a ballot is taken, each person present shall be entitled, in respect of the shares which such person is entitled to vote at the Meeting of Shareholders upon the question, to that number of votes provided by the Act or the Articles, and the result of the ballot so taken shall be the decision of the shareholders upon such question.

**9.20 Adjournment.** The chair at a Meeting of Shareholders may, with the consent of the Meeting of Shareholders and subject to such conditions as the Meeting of Shareholders may decide, adjourn the Meeting of Shareholders from time to time and from place to place. If a Meeting of Shareholders is adjourned for less than 30 days, it shall not be necessary to give notice of the adjourned Meeting of Shareholders, other than by announcement at the earliest

Meeting of Shareholders that is adjourned. Subject to the Act, if a Meeting of Shareholders is adjourned by one or more adjournments for an aggregate of 30 days or more, notice of the adjourned Meeting of Shareholders shall be given as for an original Meeting of Shareholders.

**9.21 Action in Writing by Shareholders.** A resolution in writing signed by all the shareholders entitled to vote on that resolution at a Meeting of Shareholders is as valid as if it had been passed at a Meeting of Shareholders, unless a written statement with respect to the subject matter of the resolution is submitted by a Director or the auditor, in each case in accordance with the Act.

**9.22 Only One Shareholder.** If the Corporation has only one shareholder, or only one holder of any class or series of shares, the shareholder present in person or duly represented constitutes a Meeting of Shareholders.

---

## SECTION TEN

## NOTICES

**10.1 Method of Giving Notices.** Any notice (which term includes any communication or document) to be given (which term includes sent, delivered or served) pursuant to the Act, the Articles, the By-Laws or otherwise to a shareholder, Director, officer, auditor or member of a committee of the Board shall be sufficiently given: (a) if delivered personally to the person to whom it is to be given; (b) if mailed to such person at the person's Recorded Address by prepaid mail, or (c) if transmitted by electronic means in accordance with the Act. A notice so delivered shall be deemed to have been given and received when it is delivered personally or to the Recorded Address; a notice so mailed shall be deemed to have been given when deposited in a post office or public letter box and deemed received at the time it would be delivered in the ordinary course of mail; and a notice so sent by any means of transmitted or recorded communication shall be considered given and received at the times prescribed by the Act. The secretary may change or cause to be changed the Recorded Address of any shareholder, Director, officer, auditor or member of a committee of the Board in accordance with any information believed by the secretary to be reliable.

**10.2 Notice to Joint Shareholders.** If two or more persons are registered as joint holders of any share, any notice may be addressed to all such joint holders, but notice addressed to one of such persons shall be sufficient notice to all of them.

**10.3 Computation of Time.** In computing the date when notice must be given under any provision requiring a specified number of days' notice of any meeting or other event, the day of giving the notice shall be excluded and the day of the meeting or other event shall be included.

**10.4 Undelivered Notices.** If any notice given to a shareholder pursuant to Section 10.1 is returned on two consecutive occasions because the shareholder cannot be found, the Corporation shall not be required to give any further notices to such shareholder until informed in writing by the shareholder of a new address.

**10.5 Omissions and Errors.** The accidental omission to give any notice to any shareholder, Director, officer, auditor or member of a committee of the Board or the non-receipt of any notice by any such person or any error in any notice not affecting the substance of the notice shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise founded on the notice.

**10.6 Persons Entitled by Death or Operation of Law.** Every person who, by operation of law, transfer, death of a shareholder or any other means whatsoever becomes entitled to any share, shall be bound by every notice in respect of such share which shall have been duly given to the shareholder from whom such person derives title to such share prior to the name and address of such person being entered on the securities register (whether such notice was given before or after the happening of the event upon which such person became so entitled) and prior to such person furnishing to the Corporation the proof of authority or evidence of entitlement prescribed by the Act.

**10.7 Waiver of Notice.** Any shareholder, proxyholder, Director, officer, auditor or member of a committee of the Board, or any other person entitled to receive notice of a Meeting of Shareholders or any other notice from the Corporation, may at any time waive any notice, or

waive or abridge the time for any notice, required to be given to such person under the Act, the Articles, the By-Laws or otherwise. Any such waiver or abridgement, whether given before or after the meeting or other event of which notice is required to be given, shall cure any default in the giving or in the time of such notice, as the case may be. Any such waiver or abridgement shall be in writing, except a waiver of notice of a Meeting of Shareholders or of the Board or a committee of the Board may be given in any manner.

## SECTION ELEVEN

## EFFECTIVE DATE, AMENDMENT AND REPEAL

**11.1 Effective Date.** This By-Law shall come into force when made by the Board in accordance with the Act.

**11.2 Amendment.** This By-Law may be amended or repealed at any regular or special meeting of the Board by vote of a majority of all directors in office or at any annual or special Meeting of Shareholders by vote of holders of a majority of the outstanding shares of the Corporation entitled to vote.

**11.3 Repeal**. All previous by-laws of the Corporation are repealed as of the coming into force of This By-Law. Such repeal shall not affect the previous operation of any by-law so repealed, or affect the validity of any act done or right, privilege, obligation or liability acquired or incurred under, or the validity of any contract or agreement made pursuant to, or the validity of any articles (as defined in the Act) or predecessor charter documents of the Corporation obtained pursuant to, any such by-law prior to its repeal. All officers and persons acting under any by-law so repealed shall continue to act as if appointed under the provisions of This By-Law and all resolutions of the shareholders or the Board or a committee of the Board with continuing effect passed under any repealed by-law shall continue to be good and valid except to the extent inconsistent with This By-Law and until amended or repealed**.**

---

This By-Law was made by the Directors on ______________, 2024, and was confirmed without variation by the shareholders of the Corporation on _______________, 2024.

____________________________________

# Form 4 Articles of Amendment
*Canada Business Corporations Act (CBCA) (s. 27 or 177)*

# Formulaire 4 Clauses modificatrices
*Loi canadienne sur les sociétés par actions (LCSA) (art. 27 ou 177)*

1 Corporate name
Dénomination sociale
CORELLE BRANDS (CANADA) INC.

2 Corporation number
Numéro de la société
434260-7

3 The articles are amended as follows
Les statuts sont modifiés de la façon suivante

See attached schedule / Voir l'annexe ci-jointe

4 Declaration: I certify that I am a director or an officer of the corporation.
Déclaration : J'atteste que je suis un administrateur ou un dirigeant de la société.

**Name:**
**Phone:**

Misrepresentation constitutes an offence and, on summary conviction, a person is liable to a fine not exceeding $5000 or to imprisonment for a term not exceeding six months or both (subsection 250 (1) of the CBCA).

Faire une fausse déclaration constitue une infraction et son auteur, sur déclaration de culpabilité par procédure sommaire, est passible d'une amende maximale de 5 000 $ et d'un emprisonnement maximal de six mois, ou l'une de ces peines (paragraphe 250(1) de la LCSA).

You are providing information required by the CBCA. Note that both the CBCA and the *Privacy Act* allow this information to be disclosed to the public. It will be stored in personal information bank number IC/PPU-049.

Vous fournissez des renseignements exigés par la LCSA. Il est à noter que la LCSA et la *Loi sur les renseignements personnels* permettent que de tels renseignements soient divulgués au public. Ils seront stockés dans la banque de renseignements personnels numéro IC/PPU-049.

**SCHEDULE TO ARTICLES OF AMENDMENT**
**OF**
**CORELLE BRANDS (CANADA) INC.**

The Corporation amend its articles by deleting section 7 “Other Provisions” in its entirety and replacing it with the following:

“(a) The Corporation shall be entitled to a lien on a share registered in the name of a shareholder or his legal representative for a debt of that shareholder to the Corporation.

(b) Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity interests in the Corporation; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the “Bankruptcy Code”), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity interests is included in compliance with section 1123(a)(6) of the Bankruptcy Code.”

**BY-LAW NO. 2[1]**

A by-law relating generally to
the transaction of the business
and affairs of

**CORELLE BRANDS INC.**

---

## TABLE OF CONTENTS


| | | |
|---|---|---|
| **SECTION ONE INTERPRETATION** | | **1** |
| 1.1 | Definitions | 1 |
| 1.2 | Subject to Act and Articles | 1 |
| 1.3 | Unanimous Shareholder Agreement | 1 |
| **SECTION TWO BUSINESS OF THE CORPORATION** | | **3** |
| 2.1 | Registered Office | 3 |
| 2.2 | Corporate Seal | 3 |
| 2.3 | Financial Year | 3 |
| 2.4 | Execution of Instruments | 3 |
| 2.5 | Banking Arrangements | 3 |
| 2.6 | Voting Rights in Other Bodies Corporate | 3 |
| 2.7 | Divisions | 3 |
| **SECTION THREE DIRECTORS** | | **5** |
| 3.1 | Number of Directors | 5 |
| 3.2 | Qualification | 5 |
| 3.3 | Election and Term | 5 |
| 3.4 | Removal of Directors | 5 |
| 3.5 | Vacation of Office | 5 |
| 3.6 | Appointment of Additional Directors | 5 |
| 3.7 | Action by the Board | 6 |
| 3.8 | Canadian Directors Present at Meetings | 6 |
| 3.9 | Meeting by Telephone | 6 |
| 3.10 | Place of Meetings | 6 |
| 3.11 | Calling of Meetings | 6 |
| 3.12 | Notice of Meeting | 6 |
| 3.13 | First Meeting of New Board | 6 |
| 3.14 | Adjourned Meeting | 7 |


---

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

**TABLE OF CONTENTS**
(continued)


| | | |
|---|---|---|
| 3.15 | Regular Meetings | 7 |
| 3.16 | Chair | 7 |
| 3.17 | Quorum | 7 |
| 3.18 | Votes to Govern | 7 |
| 3.19 | Conflict of Interest | 7 |
| 3.20 | Remuneration and Expenses | 7 |
| **SECTION FOUR COMMITTEES** | | **8** |
| 4.1 | Committees of the Board | 8 |
| 4.2 | Transaction of Business | 8 |
| 4.3 | Advisory Bodies | 8 |
| 4.4 | Quorum and Procedure | 8 |
| **SECTION FIVE OFFICERS** | | **9** |
| 5.1 | Appointment | 9 |
| 5.2 | Chair of the Board | 9 |
| 5.3 | President | 9 |
| 5.4 | Secretary | 9 |
| 5.5 | Treasurer | 9 |
| 5.6 | Powers and Duties of Officers | 9 |
| 5.7 | Term of Office | 10 |
| 5.8 | Agents and Attorneys | 10 |
| 5.9 | Conflict of Interest | 10 |
| **SECTION SIX PROTECTION OF DIRECTORS, OFFICERS AND OTHERS** | | **11** |
| 6.1 | Limitation of Liability | 11 |
| 6.2 | Indemnity | 11 |
| 6.3 | Advance of Costs | 11 |
| 6.4 | Limitation | 11 |
| 6.5 | Additional Circumstances | 12 |
| 6.6 | Insurance | 12 |
| **SECTION SEVEN SHARES** | | **13** |
| 7.1 | Issuances of Shares | 13 |
| 7.2 | Registration of Transfers | 13 |
| 7.3 | Dealing with Registered Holders | 13 |
| 7.4 | Share Certificates | 13 |
| 7.5 | Replacement of Share Certificates | 13 |
| 7.6 | Joint Shareholders | 13 |
| 7.7 | Deceased Shareholders | 13 |
| 7.8 | Lien for Indebtedness | 13 |
| **SECTION EIGHT DIVIDENDS** | | **15** |
| 8.1 | Dividends | 15 |
| 8.2 | Record Date for Dividends | 15 |
| 8.3 | Payments on Dividends and Other Distributions | 15 |
| 8.4 | Non-Receipt of Payment | 15 |
| **SECTION NINE MEETINGS OF SHAREHOLDERS** | | **16** |

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 9.1 | Annual Meetings | 16 |
| 9.2 | Special Meetings | 16 |
| 9.3 | Place of Meetings | 16 |
| 9.4 | Participation in Meeting by Electronic Means | 16 |
| 9.5 | Meeting held by Electronic Means | 16 |
| 9.6 | Notice of Meetings | 16 |
| 9.7 | List of Shareholders Entitled to Notice | 17 |
| 9.8 | Record Date for Notice | 17 |
| 9.9 | Meetings Without Notice | 17 |
| 9.10 | Chair, Secretary and Scrutineers | 17 |
| 9.11 | Persons Entitled to be Present | 18 |
| 9.12 | Quorum | 18 |
| 9.13 | Right to Vote | 18 |
| 9.14 | Proxyholders and Representatives | 18 |
| 9.15 | Time for Deposit of Proxies | 19 |
| 9.16 | Joint Shareholders | 19 |
| 9.17 | Votes to Govern | 19 |
| 9.18 | Show of Hands | 19 |
| 9.19 | Ballots | 19 |
| 9.20 | Adjournment | 19 |
| 9.21 | Action in Writing by Shareholders | 20 |
| 9.22 | Only One Shareholder | 20 |

**SECTION TEN NOTICES**

| | | |
|---|---|---|
| 10.1 | Method of Giving Notices | 21 |
| 10.2 | Notice to Joint Shareholders | 21 |
| 10.3 | Computation of Time | 21 |
| 10.4 | Undelivered Notices | 21 |
| 10.5 | Omissions and Errors | 21 |
| 10.6 | Persons Entitled by Death or Operation of Law | 21 |
| 10.7 | Waiver of Notice | 21 |

**SECTION ELEVEN EFFECTIVE DATE, AMENDMENT AND REPEAL** **23**

| | | |
|---|---|---|
| 11.1 | Effective Date | 23 |
| 11.2 | Amendment | 23 |
| 11.3 | Repeal | 23 |

BE IT ENACTED as a by-law of the Corporation as follows:

## SECTION ONE

## INTERPRETATION

**1.1 Definitions**. In the By-Laws, unless the context otherwise requires:

"**Act**" means the *Canada Business Corporations Act*, or any statute that may be substituted for it, and the regulations to it, as from time to time amended.

"**Articles**" means the articles attached to the certificate of amalgamation of the Corporation, as from time to time amended or restated.

"**Board**" means the board of directors of the Corporation.

"**By-Laws**" means This By-Law and all other by-laws of the Corporation from time to time in force and effect.

"**Corporation**" means the corporation amalgamated under the Act by the said certificate to which the Articles are attached, and named "**Corelle Brands Inc.**".

"**Director**" means a member of the Board.

"**Meeting of Shareholders**" includes an annual meeting of shareholders and a Special Meeting of Shareholders; and "**Special Meeting of Shareholders**" includes a meeting of any class or classes of shareholders and a special meeting of all shareholders entitled to vote at an annual meeting of shareholders.

"**Recorded Address**" means: in the case of a shareholder, the address as recorded in the securities register; in the case of joint shareholders, the address appearing in the securities register in respect of such joint holding or the first address so appearing if there are more than one; and in the case of a Director, officer, auditor or member of a committee of the Board, the latest address as recorded in the records of the Corporation.

"**This By-Law**" means this By-Law No. 2 of the Corporation.

Except as provided above, words and expressions defined in the Act, including "**resident Canadian**" and "**unanimous shareholder agreement**", have the same meanings when used herein. Words importing the singular number include the plural and vice versa; and words importing a person include an individual, partnership, association, body corporate, trustee, executor, administrator and legal representative.

**1.2 Subject to Act and Articles**. This by-law is subject to, and should be read in conjunction with, the Act and the articles. If there is any conflict or inconsistency between any provision of the Act or the articles and any provision of this by-law, the provision of the Act or the articles will govern.

**1.3 Unanimous Shareholder Agreement**. The provisions of the By-Laws shall be subject to any unanimous shareholder agreement entered into from time to time. In the event of any

conflict between any provision of the By-Laws and any provision of any unanimous shareholder agreement, the provision of the unanimous shareholder agreement shall prevail to the extent of the conflict, and the Directors and the shareholders shall amend the By-Laws accordingly.

## SECTION TWO

## BUSINESS OF THE CORPORATION

**2.1 Registered Office.** The registered office of the Corporation shall be in the province in Canada from time to time specified in the Articles, and at such location within such province initially as is specified in the notice thereof filed with the Articles and thereafter as the Board may from time to time determine.

**2.2 Corporate Seal.** The Corporation may, but need not, adopt a corporate seal and if one is adopted it shall be in a form approved from time to time by the Board.

**2.3 Financial Year.** The financial year of the Corporation ends on such a date of each year as the directors determine from time to time.

**2.4 Execution of Instruments.** Deeds, transfers, assignments, contracts, obligations, certificates and other instruments may be signed on behalf of the Corporation by any Director or any officer of the Corporation. In addition, the Board or the said person may from time to time direct the manner in which and the person or persons by whom any particular instrument or class of instruments may or shall be signed, provided that in the case of share certificates at all times at least two Directors or officers of the Corporation are required to sign. Any signing officer may affix the corporate seal to any instrument requiring it.

**2.5 Banking Arrangements.** The banking business of the Corporation including without limitation, the borrowing of money and the giving of security for it, shall be transacted with such banks, trust companies or other bodies corporate or organizations as may from time to time be designated by or under the authority of the Board. Such banking business or any part of it shall be transacted under such agreements, instructions and delegations of powers as the Board may from time to time prescribe.

**2.6 Voting Rights in Other Bodies Corporate.** The signing officers of the Corporation under Section 2.4 may execute and deliver proxies and arrange for the issuance of voting certificates or other evidence of the right to exercise the voting rights attaching to any securities held by the Corporation. Such instruments shall be in favour of such persons as may be determined by the officers executing or arranging for them. In addition, the Board may from time to time direct the manner in which and the persons by whom any particular voting rights or class of voting rights may or shall be exercised.

**2.7 Divisions.** The Board may cause the business and operations of the Corporation or any part of them to be divided into one or more divisions upon such basis, including without limitation, types of business or operations, geographical territories, product lines or goods or services, as may be considered appropriate in each case. In connection with any such division, the Board or subject to any direction by the Board, the chief executive officer may authorize from time to time, upon such basis as may be considered appropriate in each case:

(a) *Subdivision and Consolidation.* the further division of the business and operations of any such division into sub-units and the consolidation of the business and operations of any such divisions and sub-units;

(b) *Name*. the designation of any such division or sub-unit by, and the carrying on of the business and operations of, any such division or sub-unit under, a name other than the name of the Corporation, provided that the Corporation shall set out its name in legible characters in all places required by law; and

(c) *Officers.* the appointment of officers for any such division or sub-unit, the determination of their powers and duties, and the removal of any of such officers so appointed, provided that any such officers shall not, as such, be officers of the Corporation.

## SECTION THREE

## DIRECTORS

**3.1 Number of Directors.** Until changed in accordance with the Act, the Board shall consist of not fewer than the minimum number and not more than the maximum number of Directors provided in the Articles. If the articles specify a minimum and a maximum number of directors, the number of directors is, at any time, the number within the minimum and maximum determined from time to time by ordinary resolution or, if a special resolution empowers the directors to determine the number, by the directors. No decrease in the number of directors will shorten the term of an incumbent director. Where the number of directors has not been determined as provided in this section, the number of directors is the number of directors holding office immediately following the most recent election or appointment of directors, whether at an annual or special meeting of the shareholders, or by the directors pursuant to the Act.

**3.2 Qualification.** No person shall be qualified for election as a Director if such person is less than 18 years of age, is of unsound mind and has been so found by a court in Canada or elsewhere, is not an individual, or has the status of a bankrupt. A Director need not be a shareholder. Subject to the Act, at least 25 per cent of the Directors shall be resident Canadians, or if the number of Directors is fewer than four, at least one Director shall be a resident Canadian.

**3.3 Election and Term.** The election of Directors shall take place at each annual meeting of shareholders and all the Directors then in office shall retire but, if qualified, shall be eligible for re-election. The number of Directors to be elected at any such Meeting of Shareholders shall be the number of Directors then in office unless the Directors otherwise determine. If the shareholders adopt an amendment to the Articles to increase the number or maximum number of Directors, the shareholders may, at the Meeting of Shareholders at which they adopt the amendment, elect the additional number of Directors authorized by the amendment. The election shall be by resolution. If an election of Directors is not held at the proper time, the incumbent Directors shall continue in office until their successors are elected.

**3.4 Removal of Directors.** Subject to the Act, the shareholders may by resolution passed at a Meeting of Shareholders specially called for such purpose remove any Director from office and the vacancy created by such removal may be filled at such Meeting of Shareholders, failing which it may be filled by the Board.

**3.5 Vacation of Office.** A Director ceases to hold office on death, on removal from office by the shareholders, on ceasing to be qualified for election as a Director, on receipt by the Corporation of a written resignation of such Director, or, if a time is specified in such resignation, at the time so specified, whichever is later. Subject to the Act, a quorum of the Board may appoint a qualified individual to fill a vacancy in the Board.

**3.6 Appointment of Additional Directors.** If the Articles of the Corporation so provide, the Directors may, within the maximum number permitted by the Articles, appoint one or more additional Directors, who shall hold office for a term expiring not later than the close of the next annual meeting of the shareholders, but the total number of Directors so appointed may not

exceed one third of the number of Directors elected at the previous annual meeting of shareholders.

**3.7 Action by the Board.** Subject to any unanimous shareholder agreement, the Board shall manage, or supervise the management of, the business and affairs of the Corporation. The powers of the Board may be exercised at a meeting of the Board (subject to Sections 3.8 and 3.9) at which a quorum is present or by resolution in writing signed by all the Directors entitled to vote on that resolution at a meeting of the Board. If there is a vacancy in the Board, the remaining Directors may exercise all the powers of the Board so long as a quorum remains in office. If the Corporation has a Board consisting of only one Director, that Director may constitute a meeting.

**3.8 Canadian Directors Present at Meetings.** Subject to the Act, the Board shall not transact business at a meeting, other than filling a vacancy in the Board, unless at least 25 per cent of the Directors present are resident Canadians, or if the Corporation has fewer than four Directors, at least one of the Directors present is a resident Canadian, except where:

(a) a resident Canadian Director who is unable to be present approves in writing, or by telephonic, electronic or other communication facility, the business transacted at the meeting; and

(b) the required number of resident Canadians would have been present had that Director been present at the meeting.

**3.9 Meeting by Telephone.** Subject to the Act, if all the Directors consent generally or in respect of a particular meeting, a Director may participate in a meeting of the Board or of a committee of the Board by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the meeting, and a Director participating in such a meeting by such means is deemed to be present at the meeting. Any such consent shall be effective whether given before or after the meeting to which it relates and may be given with respect to all meetings of the Board and of committees of the Board.

**3.10 Place of Meetings.** Meetings of the Board may be held at any place in or outside Canada.

**3.11 Calling of Meetings.** Meetings of the Board shall be held from time to time at such time and at such place as the Board, the chair of the Board, the president or any two Directors may determine.

**3.12 Notice of Meeting.** Notice of the time and place of each meeting of the Board shall be given in the manner provided in Section 10 to each Director (a) not less than seven days before the time when the meeting is to be held if the notice is mailed, or (b) not less than 48 hours before the time the meeting is to be held if the notice is given personally, or is delivered or is communicated by any means of transmitted or recorded communication. A notice of a meeting of the Board need not specify the purpose of or the business to be transacted at the meeting except where the Act requires such purpose or business to be specified.

**3.13 First Meeting of New Board.** Provided a quorum of Directors is present, each newly elected Board may without notice hold its first meeting immediately following the Meeting of Shareholders at which such Board is elected.

**3.14 Adjourned Meeting.** Notice of an adjourned meeting of the Board is not required if the time and place of the adjourned meeting is announced at the original meeting.

**3.15 Regular Meetings.** The Board may appoint a day or days in any month or months for regular meetings of the Board at a place and hour to be named. A copy of any resolution of the Board fixing the place and time of such regular meetings shall be sent to each Director promptly after being passed, but no other notice shall be required for any such regular meeting except where the Act requires the purpose of the regular meeting or the business to be transacted at it to be specified.

**3.16 Chair.** The chair of any meeting of the Board shall be the first mentioned of the following officers as have been appointed and who is a Director and is present at the meeting: chair of the Board or president. If no such officer is present, the Directors present shall choose one of their number to be chair.

**3.17 Quorum.** Subject to Sections 3.7 and 3.8, the quorum for the transaction of business at any meeting of the Board shall consist of a majority of the directors then in office or such number of Directors as the Board may from time to time determine.

**3.18 Votes to Govern.** At all meetings of the Board every question shall be decided by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes the chair of the meeting shall not be entitled to a second or casting vote.

**3.19 Conflict of Interest.** A Director shall disclose to the Corporation, in the manner and to the extent provided by the Act, any interest that such Director has in a material contract or transaction, whether made or proposed, with the Corporation, if such Director (a) is a party to the contract or transaction, (b) is a director or an officer, or an individual acting in a similar capacity, of a party to the contract or transaction, or (c) has a material interest in a party to the contract or transaction. Such a Director shall not vote on any resolution to approve the same except as provided by the Act.

**3.20 Remuneration and Expenses.** Subject to any unanimous shareholder agreement, the Directors shall be paid such remuneration for their services as the Board may from time to time determine. The Directors shall also be entitled to be reimbursed for travelling and other expenses properly incurred by them in attending meetings of the Board or any committee of the Board. Nothing in This By-Law shall preclude any Director from serving the Corporation in any other capacity and receiving remuneration therefor.

## SECTION FOUR

## COMMITTEES

**4.1 Committees of the Board.** The Board may appoint one or more committees of the Board, however designated, and delegate to any such committee any of the powers of the Board except those which pertain to items which, under the Act, a committee of the Board has no authority to exercise.

**4.2 Transaction of Business.** The powers of a committee of the Board may be exercised by a meeting at which a quorum (as referenced in Section 4.4) is present or by resolution in writing signed by all members of such committee who would have been entitled to vote on that resolution at a meeting of the committee. Meetings of such committee may be held at any place in or outside Canada.

**4.3 Advisory Bodies.** The Board may from time to time appoint such advisory bodies as it may deem advisable.

**4.4 Quorum and Procedure.** Unless otherwise determined by the Board, each committee and advisory body shall fix its quorum at not less than a majority of its members, elect its chair and regulate its procedure.

---

## SECTION FIVE

## OFFICERS

**5.1 Appointment.** Subject to any unanimous shareholder agreement, the Board may from time to time appoint a president, one or more vice-presidents (to which title may be added words indicating seniority or function), a secretary, a treasurer and such other officers as the Board may determine, including one or more assistants to any of the officers so appointed. A person may hold more than one office. The Board may specify the duties of and, in accordance with This By-Law and subject to the Act, delegate to such officers powers to manage the business and affairs of the Corporation. Subject to Section 5.2, an officer may but need not be a Director.

**5.2 Chair of the Board.** The Board may from time to time also appoint a chair of the Board who shall be a Director. If appointed, the Board may assign to the chair any of the powers and duties that are by any provisions of This By-Law assigned to the president. The chair shall have such other powers and duties as the Board may specify.

**5.3 President.** Subject to the authority of the Board, the president shall have general supervision of the business of the Corporation and such other powers and duties as the Board may specify.

**5.4 Secretary.** The secretary shall attend and be the secretary of all meetings of the Board, Meeting of Shareholders and committees of the Board and shall enter or cause to be entered in records kept for that purpose minutes of all proceedings at such meetings. The secretary shall give or cause to be given, as and when instructed, all notices to shareholders, Directors, officers, auditors and members of committees of the Board. The secretary shall be the custodian of the stamp or mechanical device generally used for affixing the corporate seal of the Corporation and of all books, records and instruments belonging to the Corporation, except when some other officer or agent has been appointed for that purpose, and have such other powers and duties as the Board may specify.

**5.5 Treasurer.** The treasurer shall keep proper accounting records in compliance with the Act and shall be responsible for the deposit of money, the safekeeping of securities and the disbursement of the funds of the Corporation. The treasurer shall render to the Board whenever required an account of all transactions as treasurer and of the financial position of the Corporation and shall have such other powers and duties as the Board may specify.

**5.6 Powers and Duties of Officers.** The powers and duties of all officers shall be in accordance with the terms of their engagement or as the Board or (except for those whose powers and duties are to be specified only by the Board) the chief executive officer may specify. The Board and (except as provided above) the chief executive officer may, from time to time and subject to the provisions of the Act, vary, add to or limit the powers and duties of any officer. Any of the powers and duties of an officer to whom an assistant has been appointed may be exercised and performed by such assistant, unless the Board or the chief executive officer otherwise directs.

**5.7 Term of Office.** The Board, in its discretion, may remove any officer of the Corporation. Otherwise each officer appointed by the Board shall hold office until a successor is appointed or until the officer resigns.

**5.8 Agents and Attorneys.** The Corporation, by or under the authority of the Board, shall have power from time to time to appoint agents or attorneys for the Corporation in or outside Canada with such powers (including the power to subdelegate) of management, administration or otherwise as the Board thinks fit.

**5.9 Conflict of Interest.** An officer who is a party to, or who is a director or officer of or has a material interest in any person who is a party to, a material contract or material transaction, whether made or proposed, with the Corporation shall disclose to the Corporation the nature and extent of that interest at the time and in the manner provided by the Act.

## SECTION SIX

## PROTECTION OF DIRECTORS, OFFICERS AND OTHERS

**6.1 Limitation of Liability.** All Directors and officers of the Corporation in exercising their powers and discharging their duties shall act honestly and in good faith with a view to the best interests of the Corporation and exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances. Subject to the foregoing, and provided that nothing herein shall relieve any Director or officer from the duty to act in accordance with the Act or from liability for any breach of it, no Director or officer shall be liable:

(a) for the acts, omissions, failures, neglects or defaults of any other Director, officer or employee;

(b) for any loss, damage or expense incurred by the Corporation through the insufficiency or deficiency of title to any property acquired for or on behalf of the Corporation;

(c) for the insufficiency or deficiency of any security in or upon which any of the moneys of the Corporation shall be invested;

(d) for any loss, damage or expense arising from the bankruptcy, insolvency or tortious acts of any person with whom any of the money, securities or effects of the Corporation shall be deposited;

(e) for any loss, damage or expense arising from any error of judgment or oversight on the part of such Director or officer; or

(f) for any other loss, damage or expense arising from the execution of the duties of office or in relation thereto.

**6.2 Indemnity.** Subject to the Act and Section 6.4, the Corporation shall indemnify a Director or an officer, a former Director or officer, or another individual who acts or acted at the Corporation's request as a director or officer (or any individual acting in a similar capacity) of another entity, and their heirs and legal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by such individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of his/her association with the Corporation or such other entity.

**6.3 Advance of Costs.** The Corporation shall advance money to a Director, officer or other individual for the costs, charges and expenses of a proceeding referred to in Section 6.2. The individual shall repay the money if the individual does not fulfil the conditions of Section 6.4.

**6.4 Limitation.** The Corporation shall not indemnify an individual under Section 6.2 unless the individual:

(a) acted honestly and in good faith with a view to the best interests of the Corporation, or, as the case may be, to the best interests of the other entity for

which the individual acted as director or officer (or in a similar capacity) at the Corporation's request; and

(b) in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, had reasonable grounds for believing that the individual's conduct was lawful.

**6.5 Additional Circumstances.** The Corporation shall also indemnify any individual referred to in Section 6.2 in such other circumstances as the Act or law permits or requires. Nothing in This By-Law shall limit the right of any individual entitled to indemnity to claim indemnity apart from the provisions of This By-Law.

**6.6 Insurance.** Subject to the Act, the Corporation may purchase and maintain such insurance for the benefit of any individual referred to in Section 6.2 as the Board may from time to time determine.

## SECTION SEVEN

## SHARES

**7.1 Issuances of Shares.** Subject to the Act, the Articles and any unanimous shareholder agreement, the Board may issue or grant options to purchase the whole or any part of the authorized and unissued shares of the Corporation at such times and to such persons and for such consideration as the Board shall determine, provided that no share shall be issued until it is fully paid as provided by the Act.

**7.2 Registration of Transfers.** Subject to the Act, no transfer of a share of the Corporation shall be registered in a securities register except upon compliance with the reasonable requirements of the Corporation and with such restrictions on issues, transfer or ownership as are authorized by the Articles or any unanimous shareholder agreement.

**7.3 Dealing with Registered Holders.** Subject to the Act, the Corporation may treat the registered holder of any share of the Corporation as the person exclusively entitled to vote, to receive notices, to receive any dividend or other payment in respect of the share, and otherwise to exercise all the rights and powers of an owner of the share.

**7.4 Share Certificates.** Every holder of one or more shares of the Corporation shall be entitled, at the holder’s option, to a share certificate, or to a non-transferable written certificate of acknowledgement of such right to obtain a share certificate, stating the number and class or series of shares held by such holder as shown in the securities register. Such certificates shall be in such form as the Board may from time to time approve and need not be under corporate seal. Any such certificate shall be signed in accordance with Section 2.4.

**7.5 Replacement of Share Certificates.** The Board, or any officer or agent designated by the Board, may direct the issue of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, apparently destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, reimbursement of expenses and evidence of loss and of title as the Board may from time to time prescribe, whether generally or in any particular case.

**7.6 Joint Shareholders.** If two or more persons are registered as joint holders of any share of the Corporation, the Corporation shall not be bound to issue more than one certificate in respect of such share, and delivery of such certificate to one of such persons shall be sufficient delivery to all of them. Any one of such persons may give effectual receipts for the certificate issued in respect of such share or for any dividend, bonus, return of capital or other money payable or warrant issuable in respect of such share.

**7.7 Deceased Shareholders.** In the event of the death of a holder, or of one of the joint holders, of any share of the Corporation, the Corporation shall not be required to make any entry in the securities register in respect of the death or to make any dividend or other payments in respect of the share except upon production of all such documents as may be required by law and upon compliance with the reasonable requirements of the Corporation.

**7.8 Lien for Indebtedness.** If the articles provide that the Corporation has a lien on shares registered in the name of a shareholder or the shareholder’s personal representative for a debt

of that shareholder to the Corporation, such lien may be enforced, subject to applicable law, as follows:

(a) where such shares are redeemable pursuant to the articles, by redeeming such shares and applying the redemption price to the debt;

(b) by purchasing such shares for cancellation for a price equal to the fair value of such shares, as determined by the directors, and applying the proceeds to the debt;

(c) by selling such shares to any third party whether or not such party is at arm's length to the Corporation for the best price which the directors in their sole discretion consider to be obtainable for such shares and applying the proceeds to the debt;

(d) by refusing to permit the registration of a transfer of such shares until the debt is paid; and

(e) by any other means permitted by law.

## SECTION EIGHT

## DIVIDENDS

**8.1 Dividends.** Subject to the Act, the Board may from time to time declare dividends payable to the shareholders according to their respective rights and interests in the Corporation. Dividends may be paid in money or property or by issuing fully paid shares of the Corporation. Any dividend unclaimed after a period of six years from the date on which it has been declared to be payable shall be forfeited and shall revert to the Corporation.

**8.2 Record Date for Dividends.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for the purpose of determining shareholders entitled to receive payment of a dividend. Notice of the record date shall be given within the period prescribed by the Act in the manner provided by the Act. If no record date is so fixed, the record date for the determination of the shareholders entitled to receive payment of any dividend shall be at the close of business on the day on which the Board passes the resolution relating to such dividend.

**8.3 Payments on Dividends and Other Distributions.** Any dividend or other distribution payable in cash to shareholders will be paid by cheque or by electronic means or by such other method as the directors may determine. The payment will be made to or to the order of each registered holder of shares in respect of which the payment is to be made. Cheques will be sent to the registered holder's recorded address, unless the holder otherwise directs. In the case of joint holders, the payment will be made to the order of all such joint holders and, if applicable, sent to them at their recorded address, unless such joint holders otherwise direct. The sending of the cheque or the sending of the payment by electronic means or the sending of the payment by a method determined by the directors in an amount equal to the dividend or other distribution to be paid less any tax that the Corporation is required to withhold will satisfy and discharge the liability for the payment, unless payment is not made upon presentation, if applicable.

**8.4 Non-Receipt of Payment.** In the event of non-receipt of any payment made as contemplated by Section 8.3 by the person to whom it is sent, the Corporation may issue re-payment to such person for a like amount. The directors may determine, whether generally or in any particular case, the terms on which any re-payment may be made, including terms as to indemnity, reimbursement of expenses, and evidence of non-receipt and of title.

## SECTION NINE

## MEETINGS OF SHAREHOLDERS

**9.1 Annual Meetings.** Subject to the Act, the Board shall call an annual meeting of shareholders (a) not later than 18 months after the Corporation comes into existence, and (b) subsequently, not later than 15 months after holding the last preceding annual meeting but no later than six months after the end of the Corporation's preceding financial year. The annual meeting of shareholders shall be held for the purpose of considering the financial statements and reports required by the Act to be placed before the annual meeting of shareholders, electing Directors, appointing auditors and for the transaction of such other business as may properly be brought before the annual meeting of shareholders.

**9.2 Special Meetings.** Special Meetings of the Shareholders may be called at any time by the president, or the Board, or the holders of a majority of the outstanding shares of Corporation entitled to vote at the meeting.

**9.3 Place of Meetings.** Meetings of Shareholders shall be held at the registered office of the Corporation or elsewhere in Canada if the Board shall so determine. A Meeting of Shareholders may be held at a place outside Canada if the place is specified in the Articles or all the shareholders entitled to vote at the Meeting of Shareholders agree that the Meeting of Shareholders is to be held at that place. A shareholder who attends a Meeting of Shareholders held outside Canada is deemed to have agreed to it being held outside Canada except when the shareholder attends the Meeting of Shareholders for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully held.

**9.4 Participation in Meeting by Electronic Means.** Any person entitled to attend a Meeting of Shareholders may participate in it, in accordance with the Act, by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders, if the Corporation makes available such a communication facility. A person participating in a Meeting of Shareholders by such means is deemed for the purposes of the Act to be present at the Meeting of Shareholders.

**9.5 Meeting held by Electronic Means.** If the Directors or the shareholders of the Corporation call a Meeting of Shareholders pursuant to the Act, those Directors or shareholders, as the case may be, may determine that the Meeting of Shareholders shall be held, in accordance with the Act, entirely by means of a telephonic, electronic or other communication facility that permits all participants to communicate adequately with each other during the Meeting of Shareholders.

**9.6 Notice of Meetings.** Notice of the time and place of each Meeting of Shareholders shall be given in the manner provided in Section 10 not less than 10 nor more than 60 days before the date of the Meeting of Shareholders to each Director, to the auditor, and to each shareholder who at the close of business on the record date for notice is entered in the securities register as the holder of one or more shares carrying the right to vote at the Meeting of Shareholders. Notice of a Meeting of Shareholders called for any purpose other than consideration of the financial statements and auditor's report, election of Directors and reappointment of the incumbent auditor shall state the nature of such business in sufficient

detail to permit the shareholder to form a reasoned judgment thereon and shall state the text of any special resolution to be submitted to the Meeting of Shareholders.

**9.7 List of Shareholders Entitled to Notice.** For every Meeting of Shareholders, the Corporation shall prepare a list of shareholders entitled to receive notice of the Meeting of Shareholders, arranged in alphabetical order and showing the number of shares held by each shareholder entitled to vote at the Meeting of Shareholders. If a record date for the Meeting of Shareholders is fixed pursuant to Section 9.8, the shareholders listed shall be those registered at the close of business on such record date. If no record date is fixed, the shareholders listed shall be those registered at the close of business on the day immediately preceding the day on which notice of the Meeting of Shareholders is given or, if no such notice is given, on the day on which the Meeting of Shareholders is held. The list shall be available for examination by any shareholder during usual business hours at the registered office of the Corporation or at the place where the central securities register is maintained, and at the Meeting of Shareholders for which the list was prepared. If a separate list of shareholders has not been prepared, the names of persons appearing in the securities register at the requisite time as the holder of one or more shares carrying the right to vote at such Meeting of Shareholders shall be deemed to be a list of shareholders.

**9.8 Record Date for Notice.** The Board may, within the period prescribed by the Act, fix in advance a date as the record date for determination of the shareholders (a) entitled to receive notice of a Meeting of Shareholders and (b) entitled to vote at a Meeting of Shareholders. Unless waived in accordance with the Act, notice of any such record date shall be given within the period prescribed by the Act before such record date, by newspaper advertisement in the manner provided in the Act. If no record date is fixed, then such record date for the determination of the shareholders entitled to receive notice of the Meeting of Shareholders shall be at the close of business on the day immediately preceding the day on which the notice is given or, if no notice is given, the day on which the Meeting of Shareholders is held.

**9.9 Meetings Without Notice.** A Meeting of Shareholders may be held without notice at any time and place permitted by the Act (a) if all the shareholders entitled to vote at the Meeting of Shareholders are present in person or duly represented or if those not present or represented waive notice of or otherwise consent to such Meeting of Shareholders being held, and (b) if the auditors and the Directors are present or waive notice of or otherwise consent to such Meeting of Shareholders being held, provided that such shareholders, auditors or Directors present are not attending for the express purpose of objecting to the transaction of any business on the grounds that the Meeting of Shareholders is not lawfully called. At such Meeting of Shareholders any business may be transacted which the Corporation may transact at a Meeting of Shareholders. If the Meeting of Shareholders is held at a place outside Canada, shareholders not present or duly represented, but who have waived notice of or otherwise consented to such Meeting of Shareholders, shall also be deemed to have consented to the Meeting of Shareholders being held at such place.

**9.10 Chair, Secretary and Scrutineers.** The chair of any Meeting of Shareholders shall be the first mentioned of such of the following officers as have been appointed and who is present at the Meeting of Shareholders: president, chair of the Board, or a vice president who is a shareholder. If no such officer is present within 15 minutes from the time fixed for holding the Meeting of Shareholders, the persons present and entitled to vote shall choose one of their number to be chair. If the secretary of the Corporation is absent, the chair shall appoint some person, who need not be a shareholder, to act as secretary of the Meeting of Shareholders. If

desired, one or more scrutineers, who need not be shareholders, may be appointed by a resolution or by the chair with the consent of the Meeting of Shareholders.

**9.11 Persons Entitled to be Present.** The only persons entitled to be present at a Meeting of Shareholders shall be those entitled to vote at the Meeting of Shareholders, the Directors and auditors of the Corporation and others who, although not entitled to vote, are entitled or required under any provision of the Act, the Articles, the By-Laws or any unanimous shareholder agreement to be present at the Meeting of Shareholders. Any other person may be admitted only on the invitation of the chair of the Meeting of Shareholders or with the approval of the majority of shareholders at the Meeting of Shareholders.

**9.12 Quorum.** Subject to the Act in respect of a majority shareholder and Section 9.22, a quorum for the transaction of business at any Meeting of Shareholders shall be holders of a majority of the outstanding shares of the Corporation entitled to vote on a particular matter, whether present in person or by proxy. If a quorum is present at the opening of any Meeting of Shareholders, the shareholders present or represented may proceed with the business of the Meeting of Shareholders notwithstanding that a quorum is not present throughout the Meeting of Shareholders. If a quorum is not present at the opening of any Meeting of Shareholders, the chairman of the meeting or the holders of a majority in voting power of the shares of the Corporation, present in person or represented by proxy and entitled to vote at the meeting, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting of the time, place, if any, thereof and the means of remote communications, if any, by which shareholders may be deemed present in person at such adjourned meeting, until a quorum shall be present or represented. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the meeting. If after the adjournment a new record date for shareholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of the adjourned meeting in accordance with This By-Law and the Act, and shall give notice of the adjourned meeting to each shareholder of record entitled to vote at such adjourned meeting as of the record date for notice of the adjourned meeting.

**9.13 Right to Vote.** Every person named in the list referred to in Section 9.7 shall be entitled to vote the shares shown thereon opposite such person’s name at the Meeting of Shareholders to which such list relates.

**9.14 Proxyholders and Representatives.** Every shareholder entitled to vote at a Meeting of Shareholders may appoint a proxyholder, or one or more alternate proxyholders, to attend and act as the shareholder’s representative at the Meeting of Shareholders in the manner and to the extent authorized and with the authority conferred by the proxy. A proxy shall be in writing executed by the shareholder or the shareholder’s attorney authorized in writing and shall conform with the requirements of the Act. Alternatively, every such shareholder which is a body corporate or association may authorize by resolution of its directors or governing body an individual to represent it at a Meeting of Shareholders and such individual may exercise on the shareholder’s behalf all the powers it could exercise if it were an individual shareholder. The authority of such an individual shall be established by depositing with the Corporation a certified copy of such resolution, or in such other manner as may be satisfactory to the secretary of the Corporation or the chair of the Meeting of Shareholders. Any such proxyholder or representative need not be a shareholder.

**9.15 Time for Deposit of Proxies.** The Board may specify in a notice calling a Meeting of Shareholders a time not exceeding the time of such Meeting of Shareholders by more than 48 hours, excluding Saturdays and holidays, preceding any Meeting of Shareholders or adjournment of it before which time proxies to be used at such Meeting of Shareholders must be deposited with the Corporation or its agent. A proxy shall be acted upon only if, prior to the time so specified, it shall have been deposited with the Corporation or an agent of it specified in such notice or if, no such time having been specified in such notice, it has been received by the secretary of the Corporation or by the chair of the Meeting of Shareholders or any adjournment of it prior to the time of voting.

**9.16 Joint Shareholders.** If two or more persons hold shares jointly, any one of them present in person or duly represented at a Meeting of Shareholders may, in the absence of the other or others, vote the shares, but if two or more of those persons are present in person or represented and vote, they shall vote as one the shares jointly held by them.

**9.17 Votes to Govern.** At any Meeting of Shareholders every question shall, unless otherwise required by the Articles, the By-Laws or any unanimous shareholder agreement, be determined by a majority of the votes cast on the question. Subject to any unanimous shareholder agreement, in case of an equality of votes, either upon a show of hands or upon a poll, the chair of the Meeting of Shareholders shall not be entitled to a second or casting vote.

**9.18 Show of Hands.** Subject to the Act, any question at a Meeting of Shareholders shall be decided by a show of hands, unless a ballot is required or demanded for such question as provided in this By-Law, and upon a show of hands every person who is present and entitled to vote shall have one vote. Whenever a vote by show of hands shall have been taken upon a question, unless a ballot is required or demanded for such question, a declaration by the chair of the Meeting of Shareholders that the vote upon the question has been carried or carried by a particular majority or not carried and an entry to that effect in the minutes of the Meeting of Shareholders shall be prima facie evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against any resolution or other proceeding in respect of such question, and the result of the vote so taken shall be the decision of the shareholders upon such question. Any vote referred to in this Section 9.18 may be held, in accordance with the Act, partly or entirely by means of a telephonic, electronic or other communication facility, if the Corporation makes available such a communication facility. Any person participating in a Meeting of Shareholders under Sections 9.4 or 9.5 and entitled to vote at that Meeting of Shareholders may vote by means of the telephonic, electronic or other communication facility that the Corporation has made available for that purpose.

**9.19 Ballots.** On any question proposed for consideration at a Meeting of Shareholders, and whether or not a show of hands has been taken upon such question, the chair may require a ballot or any person who is present and entitled to vote on such question at the Meeting of Shareholders may demand a ballot. A ballot so required or demanded shall be taken in such manner as the chair shall direct. A requirement or demand for a ballot may be withdrawn at any time prior to the taking of the ballot. If a ballot is taken, each person present shall be entitled, in respect of the shares which such person is entitled to vote at the Meeting of Shareholders upon the question, to that number of votes provided by the Act or the Articles, and the result of the ballot so taken shall be the decision of the shareholders upon such question.

**9.20 Adjournment.** The chair at a Meeting of Shareholders may, with the consent of the Meeting of Shareholders and subject to such conditions as the Meeting of Shareholders may

decide, adjourn the Meeting of Shareholders from time to time and from place to place. If a Meeting of Shareholders is adjourned for less than 30 days, it shall not be necessary to give notice of the adjourned Meeting of Shareholders, other than by announcement at the earliest Meeting of Shareholders that is adjourned. Subject to the Act, if a Meeting of Shareholders is adjourned by one or more adjournments for an aggregate of 30 days or more, notice of the adjourned Meeting of Shareholders shall be given as for an original Meeting of Shareholders.

**9.21 Action in Writing by Shareholders.** A resolution in writing signed by all the shareholders entitled to vote on that resolution at a Meeting of Shareholders is as valid as if it had been passed at a Meeting of Shareholders, unless a written statement with respect to the subject matter of the resolution is submitted by a Director or the auditor, in each case in accordance with the Act.

**9.22 Only One Shareholder.** If the Corporation has only one shareholder, or only one holder of any class or series of shares, the shareholder present in person or duly represented constitutes a Meeting of Shareholders.

## SECTION TEN

## NOTICES

**10.1 Method of Giving Notices.** Any notice (which term includes any communication or document) to be given (which term includes sent, delivered or served) pursuant to the Act, the Articles, the By-Laws or otherwise to a shareholder, Director, officer, auditor or member of a committee of the Board shall be sufficiently given: (a) if delivered personally to the person to whom it is to be given; (b) if mailed to such person at the person's Recorded Address by prepaid mail, or (c) if transmitted by electronic means in accordance with the Act. A notice so delivered shall be deemed to have been given and received when it is delivered personally or to the Recorded Address; a notice so mailed shall be deemed to have been given when deposited in a post office or public letter box and deemed received at the time it would be delivered in the ordinary course of mail; and a notice so sent by any means of transmitted or recorded communication shall be considered given and received at the times prescribed by the Act. The secretary may change or cause to be changed the Recorded Address of any shareholder, Director, officer, auditor or member of a committee of the Board in accordance with any information believed by the secretary to be reliable.

**10.2 Notice to Joint Shareholders.** If two or more persons are registered as joint holders of any share, any notice may be addressed to all such joint holders, but notice addressed to one of such persons shall be sufficient notice to all of them.

**10.3 Computation of Time.** In computing the date when notice must be given under any provision requiring a specified number of days' notice of any meeting or other event, the day of giving the notice shall be excluded and the day of the meeting or other event shall be included.

**10.4 Undelivered Notices.** If any notice given to a shareholder pursuant to Section 10.1 is returned on two consecutive occasions because the shareholder cannot be found, the Corporation shall not be required to give any further notices to such shareholder until informed in writing by the shareholder of a new address.

**10.5 Omissions and Errors.** The accidental omission to give any notice to any shareholder, Director, officer, auditor or member of a committee of the Board or the non-receipt of any notice by any such person or any error in any notice not affecting the substance of the notice shall not invalidate any action taken at any meeting held pursuant to such notice or otherwise founded on the notice.

**10.6 Persons Entitled by Death or Operation of Law.** Every person who, by operation of law, transfer, death of a shareholder or any other means whatsoever becomes entitled to any share, shall be bound by every notice in respect of such share which shall have been duly given to the shareholder from whom such person derives title to such share prior to the name and address of such person being entered on the securities register (whether such notice was given before or after the happening of the event upon which such person became so entitled) and prior to such person furnishing to the Corporation the proof of authority or evidence of entitlement prescribed by the Act.

**10.7 Waiver of Notice.** Any shareholder, proxyholder, Director, officer, auditor or member of a committee of the Board, or any other person entitled to receive notice of a Meeting of

Shareholders or any other notice from the Corporation, may at any time waive any notice, or waive or abridge the time for any notice, required to be given to such person under the Act, the Articles, the By-Laws or otherwise. Any such waiver or abridgement, whether given before or after the meeting or other event of which notice is required to be given, shall cure any default in the giving or in the time of such notice, as the case may be. Any such waiver or abridgement shall be in writing, except a waiver of notice of a Meeting of Shareholders or of the Board or a committee of the Board may be given in any manner.

## SECTION ELEVEN

## EFFECTIVE DATE, AMENDMENT AND REPEAL

**11.1 Effective Date.** This By-Law shall come into force when made by the Board in accordance with the Act.

**11.2 Amendment.** This By-Law may be amended or repealed at any regular or special meeting of the Board by vote of a majority of all directors in office or at any annual or special Meeting of Shareholders by vote of holders of a majority of the outstanding shares of the Corporation entitled to vote.

**11.3 Repeal**. All previous by-laws of the Corporation are repealed as of the coming into force of This By-Law. Such repeal shall not affect the previous operation of any by-law so repealed, or affect the validity of any act done or right, privilege, obligation or liability acquired or incurred under, or the validity of any contract or agreement made pursuant to, or the validity of any articles (as defined in the Act) or predecessor charter documents of the Corporation obtained pursuant to, any such by-law prior to its repeal. All officers and persons acting under any by-law so repealed shall continue to act as if appointed under the provisions of This By-Law and all resolutions of the shareholders or the Board or a committee of the Board with continuing effect passed under any repealed by-law shall continue to be good and valid except to the extent inconsistent with This By-Law and until amended or repealed**.**

____________________________

This By-Law was made by the Directors on _______________, 2024, and was confirmed without variation by the shareholders of the Corporation on ________________, 2024.

_______________________________________

# Form 4 / Formulaire 4
## Articles of Amendment / Clauses modificatrices
*Canada Business Corporations Act (CBCA) (s. 27 or 177)* / *Loi canadienne sur les sociétés par actions (LCSA) (art. 27 ou 177)*

1 Corporate name
Dénomination sociale
INSTANT BRANDS INC.

2 Corporation number
Numéro de la société
1132783-6

3 The articles are amended as follows
Les statuts sont modifiés de la façon suivante

See attached schedule / Voir l'annexe ci-jointe

4 Declaration: I certify that I am a director or an officer of the corporation.
Déclaration : J'atteste que je suis un administrateur ou un dirigeant de la société.

**Name:**
**Phone:**

Misrepresentation constitutes an offence and, on summary conviction, a person is liable to a fine not exceeding $5000 or to imprisonment for a term not exceeding six months or both (subsection 250 (1) of the CBCA).

Faire une fausse déclaration constitue une infraction et son auteur, sur déclaration de culpabilité par procédure sommaire, est passible d'une amende maximale de 5 000 $ et d'un emprisonnement maximal de six mois, ou l'une de ces peines (paragraphe 250(1) de la LCSA).

You are providing information required by the CBCA. Note that both the CBCA and the *Privacy Act* allow this information to be disclosed to the public. It will be stored in personal information bank number IC/PPU-049.

Vous fournissez des renseignements exigés par la LCSA. Il est à noter que la LCSA et la *Loi sur les renseignements personnels* permettent que de tels renseignements soient divulgués au public. Ils seront stockés dans la banque de renseignements personnels numéro IC/PPU-049.

**SCHEDULE TO ARTICLES OF AMENDMENT**

**OF**

**INSTANT BRANDS INC.**

The Corporation amend its articles as follows:

1. To change the name of the Corporation to **Corelle Brands Inc.**

2. By deleting section 7 "Other Provisions" in its entirety and replacing it with the following:

"(1) Securities of the Corporation, other than non-convertible debt securities, may not be transferred unless

(a) such transfer is approved by the directors or shareholders as evidenced by a resolution of the directors or shareholders, as the case may be; or

(b) in the case of securities which are subject to restrictions on transfer contained in a security holders' agreement, such restrictions are complied with.

(2) The directors may appoint one or more additional directors, who shall hold office for a term expiring no later than the close of the next annual meeting of shareholders, but the total number of directors so appointed may not exceed one third of the number of directors elected at the previous annual meeting of shareholders.

(3) Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity interests in the Corporation; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under section 1123(a)(6) of title 11 of the United States Code (the "Bankruptcy Code"), (b) only have such force and effect for so long as section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting equity interests is in compliance with section 1123(a)(6) of the Bankruptcy Code."

LIMITED LIABILITY COMPANY AGREEMENT[1]

OF

CORELLE BRANDS ACQUISITION HOLDINGS LLC

A Delaware Limited Liability Company

Effective as of [__], 2024

THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

[1] NOTE TO DRAFT: THIS FORM REMAINS UNDER REVIEW BY VARIOUS PARTIES IN INTEREST INCLUDING, WITHOUT LIMITATION, THE TRUSTEE, THE AD HOC GROUP OF CROSSOVER LENDERS, THE DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, WITH ALL RIGHTS RESERVED. AS CONTEMPLATED IN THE PLAN AND CONFIRMATION ORDER, THE NAMES OF THE DEBTOR ENTITIES MAY BE CHANGED IN CONNECTION WITH THE EFFECTIVE DATE.

TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ........ 1

ARTICLE II. ORGANIZATIONAL MATTERS ........ 11

SECTION 2.1. Formation of the Company ........ 11
SECTION 2.2. Limited Liability Company Agreement ........ 11
SECTION 2.3. Name ........ 11
SECTION 2.4. Purpose ........ 11
SECTION 2.5. Principal Office; Registered Office ........ 11
SECTION 2.6. Term ........ 11
SECTION 2.7. No State-Law Partnership ........ 11
SECTION 2.8. Tax Treatment ........ 12

ARTICLE III. CAPITAL CONTRIBUTIONS ........ 12

SECTION 3.1. Members ........ 12
SECTION 3.2. No Withdrawal ........ 13
SECTION 3.3. Distributions In-Kind ........ 13
SECTION 3.4. Classes of Units; Rights and Privileges ........ 13
SECTION 3.5. Meetings of Members ........ 14

ARTICLE IV. DISTRIBUTIONS AND ALLOCATIONS; REDEMPTION AND CONVERSIONS ........ 15

SECTION 4.1. Distributions ........ 15
SECTION 4.2. Withholding ........ 15

ARTICLE V. MANAGEMENT ........ 16

SECTION 5.1. Authority of Board ........ 16
SECTION 5.2. Composition of the Board ........ 16
SECTION 5.3. Board Actions; Meetings ........ 18
SECTION 5.4. Limitation of Liability ........ 18
SECTION 5.5. Officers ........ 19
SECTION 5.6. Board Observers ........ 19
SECTION 5.7. Actions Requiring Majority Class A Unit Approval ........ 20
SECTION 5.8. Actions Requiring Class A Unit Supermajority Approval ........ 20
SECTION 5.9. Actions Requiring Class B Unit Approval ........ 21
SECTION 5.10. Right of First Offer for Sale of Company Assets ........ 21

ARTICLE VI. RIGHTS AND OBLIGATIONS OF MEMBERS ........ 23

SECTION 6.1. Limitation of Liability ........ 23
SECTION 6.2. Lack of Authority ........ 23
SECTION 6.3. No Right of Partition ........ 23
SECTION 6.4. Indemnification ........ 23
SECTION 6.5. Confidentiality ........ 26
SECTION 6.6. Future Equity Issuances ........ 27

SECTION 6.7. Initial Public Offering ........ 29

ARTICLE VII. BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION ........ 30

SECTION 7.1. Records and Accounting ........ 30
SECTION 7.2. Reports ........ 30
SECTION 7.3. Transmission of Communications ........ 31
SECTION 7.4. Member Information ........ 31

ARTICLE VIII. TAX MATTERS ........ 31

SECTION 8.1. Corporation for U.S. Federal Tax Purposes ........ 31

ARTICLE IX. TRANSFER OF UNITS ........ 31

SECTION 9.1. Transfers of Interests; Restrictions on Transfers ........ 31
SECTION 9.2. Tag-Along Right ........ 32
SECTION 9.3. Drag-Along Right ........ 34
SECTION 9.4. Right of First Offer for Class A Units. ........ 35
SECTION 9.5. Effect of Transfer ........ 37
SECTION 9.6. Additional Restrictions on Transfer ........ 38
SECTION 9.7. Void Transfers ........ 38
SECTION 9.8. Class B Units Special Repurchase Right ........ 38
SECTION 9.9. No Appraisal Rights ........ 38
SECTION 9.10. Optional Realization Event; Conversion ........ 39
SECTION 9.11. Put Right. ........ 39
SECTION 9.12. Right of First Offer for Company Sale. ........ 42

ARTICLE X. ADMISSION OF MEMBERS ........ 44

SECTION 10.1. Substituted Members ........ 44

ARTICLE XI. WITHDRAWAL AND RESIGNATION OF MEMBERS ........ 44

SECTION 11.1. Withdrawal and Resignation of Members ........ 44

ARTICLE XII. DISSOLUTION AND LIQUIDATION ........ 44

SECTION 12.1. Dissolution ........ 44
SECTION 12.2. Liquidation and Termination ........ 44
SECTION 12.3. Cancellation of Certificate ........ 45
SECTION 12.4. Reasonable Time for Winding Up ........ 45
SECTION 12.5. Return of Capital ........ 45

ARTICLE XIII. VALUATION ........ 45

SECTION 13.1. Valuation of Securities and Other Assets ........ 45
SECTION 13.2. Valuation Methodology ........ 46

ARTICLE XIV. GENERAL PROVISIONS ........ 46

SECTION 14.1. Opportunities and Competition ........ 46

SECTION 14.2. Amendments ..... 46
SECTION 14.3. Title to the Company Assets ..... 47
SECTION 14.4. Remedies ..... 47
SECTION 14.5. Successors and Assigns ..... 48
SECTION 14.6. Severability ..... 48
SECTION 14.7. Counterparts; Binding Agreement ..... 48
SECTION 14.8. Descriptive Headings; Interpretation ..... 48
SECTION 14.9. Applicable Law; Jurisdiction, Waiver of Jury Trial ..... 48
SECTION 14.10. Addresses and Notices ..... 49
SECTION 14.11. Creditors ..... 49
SECTION 14.12. Waiver ..... 50
SECTION 14.13. Further Action ..... 50
SECTION 14.14. Entire Agreement ..... 50
SECTION 14.15. No Effect on Lending Relationship ..... 50
SECTION 14.16. Specific Performance ..... 50
SECTION 14.17. Effect of IPO ..... 50
SECTION 14.18. Use of Member's Name ..... 50
SECTION 14.19. No Recourse ..... 50
SECTION 14.20. Opt-in to Article 8 of the Uniform Commercial Code ..... 51

Exhibit A: Schedule of Members
Annex 1: Bad Actor Representations

**CORELLE BRANDS ACQUISITION HOLDINGS LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

THIS LIMITED LIABILITY COMPANY AGREEMENT, is entered into as of [__], 2024 (the "Effective Date"), by and among Corelle Brands Acquisition Holdings LLC, a Delaware limited liability company (the "Company"), [Citadel Member], a [__] (the "Citadel Member"), [11th Lane Holdings, LLC], a [Delaware limited liability company][2] (the "11th Lane Member"), and [Members][3], and each of the other Persons that are Members from time to time. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Article I.

WHEREAS, the Company is being formed in accordance with the terms and conditions of the Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization of Instant Brands Acquisition Holdings Inc. and its Debtor Affiliates, Doc. No. 845, Case No. 23-90716, as filed on December 22, 2023 (together with all schedules, documents and exhibits contained therein, as amended, supplemented, modified or waived from time to time, the "Plan") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") of Instant Brands Acquisition Holdings Inc., a Delaware corporation ("IB Holdings Corporation", together with its debtor Affiliates, collectively, the "Debtors"), as confirmed by the [Name of Confirmation Order] entered by the Bankruptcy Court on [ ], 2024 (the "Confirmation Order");

WHEREAS, in accordance with the Plan and the Confirmation Order, IB Holdings Corporation was converted into the Company pursuant to the filing of the Certification of Conversion and the Certificate with the Delaware Secretary of State on [ ], 2024, and as a result thereof the Company is the successor-by-conversion to IB Holdings Corporation (the "Conversion"); and

WHEREAS, the parties hereto wish to provide for, among other things, how the business and affairs of the Company shall be managed, all as permitted under the Delaware Act.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I.
# DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

"11th Lane Manager" has the meaning set forth in Section 5.2(b)(i)(2).

"11th Lane Member" has the meaning set forth in the preamble.

"11th Lane Observer" has the meaning set forth in Section 5.6(a).

"Acceptance Period" has the meaning set forth in Section 6.6(a).

"Additional ROFO Rights Member Notice" has the meaning set forth in Section 9.4(c).

---

[2] Note to Draft: To be confirmed.

[3] Note to Draft: Post-reorganization members to be confirmed.

"Affiliate" of any particular Person means (a) any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise; (b) any Person that is an officer, partner, member or trustee of, or serves in a similar capacity with respect to, the specified Person; and (c) any member of the immediate family of the specified Person (which shall include parents, children and siblings, both by-blood and in-law). For the purposes of the representations and warranties of the Members set forth herein, the Company and its Subsidiaries shall not be deemed Affiliates of the Citadel Member or the 11th Lane Member, or any other Person directly or indirectly controlling, controlled by or under common control with Citadel Advisors LLC or Centre Lane Partners, LLC.

"Agreement" means this Limited Liability Company Agreement, as amended, modified or waived from time to time in accordance with the terms hereof.

"Appliances APA" means the Asset Purchase Agreement, dated as of September 27, 2023, by and among IB Holdings Corporation, each of the Subsidiaries of IB Holdings Corporation listed on Schedule 1 thereto and the Appliances Buyers.

"Appliances Business" means the business purchased, transferred and assigned pursuant to the Appliances APA.

"Appliances Buyers" means, collectively, IB Appliances US Holdings, LLC and IB Appliances Canada Holdings, Inc.

"Appliances TSA" means the Transition Services Agreement, dated as of November 8, 2023, by and among IB Holdings Corporation, each of the Subsidiaries of IB Holdings Corporation set forth on the signature pages thereto and the Appliances Buyers.

"Approved Sale" has the meaning set forth in Section 9.3(a).

"Board" has the meaning set forth in Section 5.2(a).

"Business" means the designing, manufacturing, marketing, distributing and selling consumer dinnerware, bakeware, cookware, cutlery, food storage and other storage products lifestyle brands.

"Business Day" means any day, other than Saturday or Sunday, on which commercial banks in New York, New York are authorized or required by law to close.

"Business Issuance" means an issuance of Equity Securities that is one of the following: (a) the issuance of Class B Units, options to purchase Units or restricted Units under a bona fide equity incentive plan or other Units in connection with an investment by an employee of, or service provider to, the Company or any of its Subsidiaries (including any issuances under a bona fide equity incentive plan or an investment by an employee of, or service provider to, the Company or any of its Subsidiaries); (b) a Unit split, Unit dividend, reorganization or recapitalization or combination applicable to all Units; (c) equity securities issued upon exercise, conversion or exchange of any security or obligation of the Company or its Subsidiary, as applicable, either (i) issued as of the Effective Date or (ii) issued in accordance with the terms of this Agreement after the Effective Date; (d) the issuance of Equity Securities pursuant to or in consideration for the acquisition of another Person, business or assets by the Company or any of its Subsidiaries, whether by purchase of stock, merger, consolidation, purchase of any assets of such Person or otherwise; (e) the issuance of Equity Securities to independent third parties that are vendors, lenders, real

property lessors and customers of, and consultants to, the Company or any of its Subsidiaries or in connection with a bona fide debt financing or restructuring, equipment leasing, real property leasing transaction, joint venture or strategic partnership of the Company or any of its Subsidiaries, in each case, that is approved by the Board; (f) the Class A Units issued on the Effective Date as set forth on Schedule of Members; or (g) the issuance of Equity Securities to the Company or any Wholly Owned Subsidiary of the Company.

"Capital Contributions" means any cash, cash equivalents, promissory obligations or the Fair Market Value of other property (other than cash) that a Member contributes with respect to any Unit as contemplated by Section 3.1; provided that any Unit issued in connection with the Plan of Reorganization shall be deemed to have a Fair Market Value equal to [●].

"Cash Amount" means an amount, without duplication, equal to the sum of (a) all cash and cash equivalents of the Company and its Subsidiaries (including, for the avoidance of doubt, any international cash), but excluding the amount of any Restricted Cash, (b) all amounts owed, but unpaid, to the Company and its Subsidiaries by the Appliances Business, including (i) under the Appliances TSA and (ii) for reimbursement of expenses paid by the Company and its Subsidiaries for the benefit, or on behalf, of the Appliances Business; (c) any cash collateralizing letters of credit on the Effective Date that either (i) promptly following the Effective Date, will be issued under an exit asset-based lending facility or another letter of credit facility or (ii) had been outstanding under the DIP ABL Facility; (d) any security deposit amount under the Company's or its Subsidiary's lease of the real property located at 1200 South Antrim Way, Greencastle, Pennsylvania; and (e) all Excluded Fees paid in cash (or in the case of fees in respect of the New ABL Facility, the original issue discount) on or before the Effective Date.

"Certificate" means the Company's Certificate of Formation as filed with the Secretary of State of Delaware.

"Change of Control" means a Company Sale or any other transaction in which any independent third Person acquires more than 50.0% of the Class A Units.

"Citadel Member" has the meaning set forth in the preamble.

"Citadel Observer" has the meaning set forth in Section 5.6(a).

"Class A Units" has the meaning set forth in Section 3.4(a).

"Class B Units" has the meaning set forth in Section 3.4(a).

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble.

"Company ROFO Acceptance Notice" has the meaning set forth in Section 9.4(c).

"Company ROFO Offer Period" has the meaning set forth in Section 9.4(b).

"Company Sale" means (a) any merger, consolidation or other business combination of the Company or any of its Subsidiaries with or into any Person, which results in the Members of the Company immediately prior to such transaction owning less than 50% of the voting power of the voting securities of the Company or other entity resulting from such merger, consolidation or other business combination; (b) the sale of all or substantially all of the Company's assets (determined on a consolidated basis with its

Subsidiaries); or (c) the Transfer (other than a Transfer pursuant to clause (a) of this definition, an IPO and other than Transfers to Permitted Transferees) of all or substantially all of the Class A Units, in each case of the immediately preceding clause (a), clause (b) and clause (c), in one transaction or a series of related transactions with a Person who is not an Affiliate of a Member; provided, that any pledge, mortgage, hypothecation, grant of a security interest or other encumbrance on the assets of the Company or its Subsidiaries that is approved by the Board in connection with any bona fide loan from an independent third party financial institution, bank or equipment lessor shall not be a "Company Sale".

"Company Sale Acceptance Notice" has the meaning set forth in Section 9.12(c).

"Company Sale Offer Notice" has the meaning set forth in Section 9.12(b).

"Company Sale Offer Period" has the meaning set forth in Section 9.12(b).

"Competitor" means any Person who, directly or indirectly (including through any partnership, limited liability company, corporation, joint venture or similar arrangement (whether now or hereafter existing)), (a) owns 10% or more of the outstanding capital stock or other equity interests of any Person engaged in the Business, (b) is a director, officer or employee of any Person engaged in the Business, (c) is a Person engaged in the Business, or an Affiliate thereof, or (d) the Board determines in its reasonable business judgment to be a competitor of the Company; provided, for the avoidance of doubt, none of the 11th Lane Member, the Citadel Member or any of their respective Affiliates shall be deemed a "Competitor" solely as a result of its direct or indirect equity interest in any "portfolio company", as such term is commonly understood in the private equity industry, that participates in or operates any business similar to or overlapping with the Business.

"Confidential Information" has the meaning set forth in Section 6.5.

"Conversion" has the meaning set forth in the recitals.

"Debt Reduction Election" means the election on or prior to the Effective Date of any holder of indebtedness, including any Member, to extinguish, for no consideration, a specified amount (the "Debt Reduction Amount") of indebtedness payable by the Company and its Subsidiaries to such holder of indebtedness, which election shall be effective on the first Business Day following the Effective Date.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

"DIP ABL Facility" means the credit facility pursuant to the Superpriority Senior Secured Priming Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 15, 2023, by and among Instant Brands Holdings Inc., Instant Brands Inc., Instant Brands Acquisition Intermediate Holdings Inc., Bank of America, N.A., as administrative agent and collateral agent, and each lender and issuing bank from time to time party hereto.

"Disposition ROFR Acceptance Notice" has the meaning set forth in Section 5.10(c).

"Disposition ROFR Assets" has the meaning set forth in Section 5.10(a).

"Disposition ROFR Offer Notice" has the meaning set forth in Section 5.10(b).

"Disposition ROFR Offer Period" has the meaning set forth in Section 5.10(b).

"Distribution" means each distribution in respect of any Equity Securities of the Company made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase (except a repurchase of Equity Securities by the Company pursuant to the terms of an award agreement or a bona fide repurchase outside a Company Sale) or otherwise; provided that any (a) recapitalization, exchange or conversion of securities of the Company for equivalent value, or any (b) subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units on a pro rata basis, in each case of clauses (a)-(b), shall not be a Distribution.

"Drag-Along Members" has the meaning set forth in Section 9.3(a).

"Drag-Along Notice" has the meaning set forth in Section 9.3(b).

"Drag-Along Right" has the meaning set forth in Section 9.3(a).

"Dragging Member" has the meaning set forth in Section 9.3(a).

"Effective Date" has the meaning set forth in the preamble.

"Enforcement Costs" has the meaning set forth in Section 9.11(f)(i).

"Equity Securities" means (a) Units or other equity interests in the Company (including other classes, groups or series thereof having such relative rights, powers, or obligations as may from time to time be established, as the case may be, including rights, powers, or duties different from, senior to or more favorable than existing classes, groups and series of units and other equity interests in the Company); (b) obligations, evidences of indebtedness or other debt securities or interests issued by the Company that contain equity features and/or are convertible or exchangeable into Units or other equity interests in the Company; and (c) warrants, options or other convertible or exchangeable securities or other rights to purchase or otherwise acquire Units or other equity interests in the Company.

"Excess ROFO Units" has the meaning forth in Section 9.4(e).

"Excluded Fees" means (a) any fees of any professional to the extent that such professional was not included in the Reference 13-Week Cash Flow Forecast, (b) any transaction fees that were not included in the Reference 13-Week Cash Flow Forecast, and (c) without duplication of clauses (a)-(b), any fees payable by the 11th Lane Member.

"Exercise Notice" has the meaning set forth in Section 6.6(b).

"Fair Market Value" has the meaning set forth in Section 13.2.

"Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period as may be established by the Board.

"Fiscal Year" means the calendar year ending on December 31, or such other annual accounting period as may be established by the Board in accordance with Code Section 706.

"Fully Exercising Holder" has the meaning set forth in Section 6.6(b).

"Fund Indemnitors" has the meaning set forth in Section 6.4(f).

"Governmental Entity" means any court or tribunal in any jurisdiction (domestic or foreign) or any transnational, federal, tribal, state, territory, provincial, parish, county, municipal or other governmental or quasi-governmental, taxing, administrative, judicial, arbitral or regulatory body, agency, authority, department, board, commission, bureau, official or other authority or instrumentality.

"IB Holdings Corporation" has the meaning set forth in the recitals.

"Incentive Plan" means any equity incentive plan of the Company, as may be amended from time to time, duly adopted by the Board.

"Indemnitee" has the meaning set forth in Section 6.4(f).

"Initial Manager Term" has the meaning set forth in Section 5.2(b).

"Interest Amount" has the meaning set forth in Section 9.11(f)(i).

"Interest and Enforcement Costs" has the meaning set forth in Section 9.11(f)(i).

"IPO" shall mean a sale of equity securities of PublicCo pursuant to a firm commitment underwritten offering (or series of related offerings) of equity securities to the public pursuant to an effective registration statement under the Securities Act filed with the Securities and Exchange Commission on Forms S-1 or S-3 (or any successor forms adopted by the Securities and Exchange Commission).

"IPO Conversion" has the meaning set forth in Section 6.7.

"Liquidation Assets" has the meaning set forth in Section 12.2(b).

"Liquidation FMV" has the meaning set forth in Section 12.2(b).

"Liquidation Statement" has the meaning set forth in Section 12.2(b).

"Manager" means an individual elected as a member of the Board pursuant to Sections 5.2(b) or (c).

"Material Adverse Effect" means any event, condition, circumstance, development, change or effect (each, an "Effect") that, individually or in the aggregate with all other Effects, (a) has had or would reasonably be expected to have a material adverse effect on the assets, value, operation or condition (financial or otherwise) of the Company and its Subsidiaries, considered as a whole, or (b) would prevent the applicable Members from consummating the transactions contemplated by Section 9.11, provided that, solely with respect to clause (a), no Effect arising from any of the following will be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect: (i) any change in the United States economy or foreign economies where the Company and its Subsidiaries operate, financial markets, credit markets, commodity markets or political conditions; (ii) any change that generally affects the industry in which the Company and its Subsidiaries operates; (iii) any Proceeding by any Person by reason of, based upon, attributable to, resulting from or arising in connection with, the negotiation, entry into or consummation of the transactions contemplated by this Agreement; (iv) any hostilities, act of war, civil unrest, cyber-attack, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, acts of war, civil unrest, cyber-attack, sabotage or terrorism or military action after the date hereof; (v) any act of God, hurricane, flood, tornado, fire, explosion, weather event, earthquake, landslide, other natural disaster, epidemic, plague, pandemic (including COVID-19), other outbreak of illness or public health event (whether human or animal) and any other force majeure events;

(vi) any change in applicable law or accounting rules (or the interpretation or enforcement thereof), in each case after the date hereof; (vii) any public announcement of this Agreement, the negotiation, execution, performance of this Agreement or the consummation of the transactions contemplated by this Agreement, the identity of the Members or the announcement or other disclosure of Company's and its Subsidiaries' plans or intentions with respect to the conduct of their respective businesses, including with respect to the relationships, contractual or otherwise, of the Company and its Subsidiaries with clients, customers, employees, suppliers, vendors, service providers or Governmental Entities; (viii) any failure to meet any projections, budgets, forecasts, estimates, plans, predictions, performance metrics or operating statistics (it being understood and agreed that the foregoing will not preclude the 11th Lane Member from asserting that any facts or occurrences giving rise to or contributing to such failure that are not otherwise excluded from the definition of Material Adverse Effect may be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect); (ix) any action taken (or omitted to be taken) at the express written request or with the express written consent of the Members; (x) any action taken (or not taken) by the Company or any of its Subsidiaries that is expressly required to be taken (or not taken) pursuant to this Agreement; (xi) any voluntary or mandatory recalls of, or assertion of personal injury claims in connection with, products currently or formerly sold by the Company or any of its current or former Subsidiaries (including for the avoidance of doubt, the Appliances Business); and (xii) any obligations to pay, or any payments, by the Company or any of its Subsidiaries in connection with any Effect set forth in clauses (xi); provided, however, that, in the case of clauses (i), (ii), (iv), (v) and (vi), such Effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such Effect has a disproportionate adverse effect on the Company and its Subsidiaries, taken as a whole, as compared to other similarly situated participants in the industries in which the Company and its Subsidiaries operate.

"Member" means each Person listed on the Schedule of Members attached hereto, and any Person admitted to the Company as a Member, but only for so long as such Person is shown on the Company's books and records as the owner of one or more Units.

"Member Requested Special Meeting" has the meaning set forth in Section 3.5(a).

"Member ROFO Acceptance Notice" has the meaning set forth in Section 9.4(d).

"Member ROFO Offer Period" has the meaning set forth in Section 9.4(b).

"Net Debt" means, with respect to the Company and its Subsidiaries, (a) the outstanding aggregate principal amount of all indebtedness for borrowed money (excluding, for the avoidance of doubt, any precious metal leases, capital lease obligations, equipment loans, undrawn letters of credit, pension obligations or other post-employment benefit obligations), subject to the Debt Reduction Election, *less* (b) the Cash Amount, *less* (c) the Debt Reduction Amount, if any.

"New ABL Facility" means the asset-based lending facility to be entered into by certain Subsidiaries of the Company on the Effective Date.

"New Debt" has the meaning set forth in Section 6.6(a).

"New Equity" has the meaning set forth in Section 6.6(a).

"New Securities" has the meaning set forth in Section 6.6(a).

"Observer" has the meaning set forth in Section 5.6(a).

"Order" means any award, writ, injunction, consent, settlement, determination, assessment, judgment, stay, temporary restraining order, order, decree or other restraint entered, issued, made or rendered by any Governmental Entity.

"Permitted Transferee" means (a) in the case of a Member that is not a natural person, any Affiliate of such Member as of such date (other than any "portfolio company", as such term is commonly understood in the private equity industry, that is a Competitor), (ii) any investment fund or partnership organized and/or managed by, or that is an Affiliate of, such Member (and any investor or partner (direct or indirect) in any such fund or partnership or any of their respective Affiliates (other than any "portfolio company", as such term is commonly understood in the private equity industry, that is a Competitor)), and (iii) any vehicle through which any investor or partner in any such fund or partnership (or any of their respective Affiliates) directly or indirectly invests or co-invests in the Company, or (b) in the case of a Member that is a natural person, such Member's family members (or the family members of each Member's spouse) heirs, executors or legal representatives upon the death, incompetency or disability of such Member, or any trust, partnership or similar entity established for the sole benefit of such Member or such Member's family members (or the family members of each Member's spouse) heirs, executors or legal representatives. A Permitted Transferee of the Citadel Member or the 11th Lane Member shall thereafter become the Citadel Member or the 11th Lane Member, respectively; provided, that there shall never be more than one Citadel Member and one 11th Lane Member, and the transferring Citadel Member and/or 11th Lane Member, as applicable, shall designate who shall thereafter be the Citadel Member or 11th Lane Member if there is the possibility of more than one Citadel Member or 11th Lane Member.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Entity.

"Preemptive Rights Notice" has the meaning set forth in Section 6.6(a).

"Pro Rata ROFO Fraction" has the meaning set forth in Section 9.4(d).

"Proceeding" has the meaning set forth in Section 6.4(a).

"Proportionate Percentage" has the meaning set forth in Section 6.6(a).

"Proposed Company Sale Transaction" has the meaning set forth in Section 9.12(a).

"Proposed Disposition ROFR Transaction" has the meaning set forth in Section 5.10(a).

"Proposed ROFO Transaction" has the meaning set forth in Section 9.4(a).

"PublicCo" shall mean the entity contemplated by Section 6.7 pursuing an IPO.

"Put Exercise Notice" has the meaning set forth in Section 9.11(b).

"Put Period" has the meaning set forth in Section 9.11(a).

"Put Purchase Price" has the meaning set forth in Section 9.11(b).

"Put Right" has the meaning set forth in Section 9.11(a).

"Put Seller" has the meaning set forth in Section 9.11(a).

"Put Unit" has the meaning set forth in Section 9.11(a).

"Realization Event" means any one of: (a) an IPO, (b) a Company Sale or (c) an investment into the equity of the Company by an independent third Person that is in such an amount, or structured in such a way, that the Board determines, in its sole discretion, that the Equity Securities of the Company then-existing should be reclassified into Standard Units.

"Reference 13-Week Cash Flow Forecast" means the 13-week cash flow forecast delivered by the Debtors for the week ending December 1, 2023.

"Relative Price" means the implied value of a particular Unit held by (a) a Tagging Member that such Tagging Member desires to include in a Tag Sale, as derived from the offer price for the Units the Selling Members desire to sell in a Tag Sale or (b) a Drag-Along Member that is to be included in an Approved Sale, as derived from the offer price for the Units to be purchased from the Drag-Along Member in such Approved sale, as applicable, in each case based upon the relative Distributions that would be made to those different Units pursuant to Article XII based upon such offered price, assuming a complete liquidation of the Company.

"Remaining ROFO Units" has the meaning set forth in Section 9.4(c).

"Reorganization" has the meaning set forth in Section 14.17.

"Requesting Member" has the meaning set forth in Section 3.5(a).

"Restricted Cash" means (a) any cash or cash equivalents of the Company and its Subsidiaries that are held in escrow, as of the Effective Date, to pay professional fees or other administrative claims that have not been paid on or prior to the Effective Date, (b) any cash collateralizing letters of credit on the Effective Date that (i) promptly following the Effective Date, will not be issued under an exit asset-based lending facility or another letter of credit facility and (ii) had not been outstanding under the DIP ABL Facility, or (c) any cash deposits and bank guarantee deposits, performance bonds or other similar obligations; provided that, notwithstanding the foregoing, Restricted Cash shall not include any cash or cash equivalents of the Company and its Subsidiaries that are expressly included in clauses (b)-(d) of the definition of "Cash Amount."

"ROFO Excess Rights Member" has the meaning set forth in Section 9.4(e).

"ROFO Offer Notice" has the meaning set forth in Section 9.4(b).

"ROFO Units" has the meaning set forth in Section 9.4(a).

"Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.

"Selling Members" has the meaning set forth in Section 9.2(a).

"Special Meeting Request" has the meaning set forth in Section 3.5(a).

"Standard Units" means the Units (including any fraction thereof) designated as Standard Units, with such stated value as determined by the Board upon the occurrence of a conversion of the outstanding Units into Standard Units pursuant to Section 9.10.

"Subsidiary" means, with respect to any Person, any other Person of which such Person owns, directly or indirectly, 50% or more of the outstanding equity securities or securities carrying the voting power in the election of the board of directors or other governing body of such Person.

"Tag Sale" has the meaning set forth in Section 9.2(a).

"Tag-Along Election" has the meaning set forth in Section 9.2(b).

"Tag-Along Notice" has the meaning set forth in Section 9.2(b).

"Tag-Along Right" has the meaning set forth in Section 9.2(a).

"Tagging Members" has the meaning set forth in Section 9.2(a).

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other Tax, of any kind whatsoever, including any transferee liability and any interest, penalties or additions to Tax or additional amounts in respect of the foregoing.

"Third Party Information" has the meaning set forth in Section 6.5(a).

"Third Party Purchaser" has the meaning set forth in Section 9.4(a).

"Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof, but excluding conversions and redemptions of Units by the Company made in accordance with this Agreement. A Transfer will not include (a) a Transfer of any interest in the Citadel Member unless the result of that Transfer (or series of related Transfers) is that Persons controlling, controlled by or under common control with Citadel Advisors LLC (or a successor entity thereto) no longer control the Citadel Member, (b) any financing transactions by the Citadel Member involving a swap or pledged custody account, or (c) a Transfer of any interest in the 11th Lane Member unless the result of that Transfer (or series of related Transfers) is that Persons controlling, controlled by or under common control with Centre Lane Partners, LLC (or a successor entity thereto) no longer control the 11th Lane Member. The terms "Transferee," "Transferor," "Transferred," "Transferrable," and other forms of the word "Transfer" shall have the correlative meanings. Each reference to "control," "controlling" or "controlled" shall have the correlative meaning of how "control" is defined in the definition of "Affiliate."

"Transfer Terms" has the meaning set forth in Section 9.2(a).

"Transferring Member" has the meaning set forth in Section 9.4(a).

"Treasury Regulations" means the United States Treasury Regulations, as amended.

"Unit" has the meaning set forth in Section 3.4(a).

"Valuation Amount" has the meaning set forth in Section 9.10.

"Wholly Owned Subsidiary" means, with respect to any Person, a Subsidiary of which all of the outstanding capital stock or other ownership interests are owned by such Person or another Wholly Owned Subsidiary of such Person.

## ARTICLE II.
## ORGANIZATIONAL MATTERS

SECTION 2.1. Formation of the Company. The Company has been organized following the Conversion and the filing of the Certificate, pursuant to the provisions of the Delaware Act.

SECTION 2.2. Limited Liability Company Agreement. The Members hereby execute this Agreement for the purpose of establishing the affairs of the Company and the conduct of its business in accordance with the provisions set forth herein and the Delaware Act. The Members hereby agree that during the term of the Company set forth in Section 2.6 the rights, powers and obligations of the Company and the Members with respect to the Company will be determined in accordance with the terms and conditions of this Agreement and, except where the Delaware Act provides that such rights, powers and obligations specified in the Delaware Act shall apply "unless otherwise provided in a limited liability company agreement" or words of similar effect and such rights, powers and obligations are set forth in this Agreement, the Delaware Act; provided that, notwithstanding the foregoing, Section 18-210 of the Delaware Act (entitled "Contractual Appraisal Rights") and Section 18-305(a) of the Delaware Act (entitled "Access to and Confidentiality of Information; Records") shall not apply or be incorporated into this Agreement.

SECTION 2.3. Name. The name of the Company shall be "Corelle Brands Acquisition Holdings LLC". The Board may change the name of the Company at any time and from time to time. Notification of any such change shall be given to all Members; provided that failure to provide any such notice shall not affect the validity of any such change. The Company's business may be conducted under its name or any other name or names deemed advisable by the Board.

SECTION 2.4. Purpose. The purpose and business of the Company shall be to engage in any other lawful acts or activities for which limited liability companies may be organized under the Delaware Act.

SECTION 2.5. Principal Office; Registered Office. The principal office of the Company shall be located at such place as the Board may from time to time designate. The Company may maintain offices at such other place or places as the Board deems advisable. Notification of any such change in the principal office shall be given to all Members; provided that failure to provide any such notice shall not affect the validity of any such change. The address of the registered office of the Company in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by applicable law, and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be the registered agent named in the Certificate or such Person or Persons as the Board may designate from time to time in the manner provided by applicable law.

SECTION 2.6. Term. The term of the Company commenced upon the Conversion and filing of the Certificate in accordance with the Delaware Act and shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XII.

SECTION 2.7. No State-Law Partnership. The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member by virtue of this Agreement, for any purposes, and neither this Agreement

nor any other document entered into by the Company or any Member relating to the subject matter hereof shall be construed to suggest otherwise.

SECTION 2.8. Tax Treatment. The Members intend that the Company shall be treated as an association taxable as a corporation for federal and, if applicable, state and local income Tax purposes, and that the Company shall file all Tax returns and shall otherwise take all Tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III.
## CAPITAL CONTRIBUTIONS

SECTION 3.1. Members.

(a) Units Generally. The Company may (but need not) issue certificates representing the Units at the election of the Board. The ownership by a Member of Units shall entitle such Member to Distributions of cash and other property as set forth in Article IV and Article XII hereof.

(b) Capital Contributions; Schedule of Members.

(i) Each Member named on the Schedule of Members attached hereto has made Capital Contributions in the amounts and on the dates specified in the books and records of the Company and each such Member owns the number of Units specified opposite its name on the Schedule of Members. Any reference in this Agreement to the Schedule of Members shall be deemed a reference to the Schedule of Members as amended and in effect from time to time. The Board is hereby authorized to update the Schedule of Members as it may determine to be necessary from time to time, including to reflect additional Capital Contributions made by any Member, and such updates shall not be deemed to be amendments to this Agreement.

(ii) No Member shall be required to make any additional Capital Contributions to the Company without such Member's written consent.

(iii) Upon the approval of the Board, the Company may issue additional Class A Units to any Member in exchange for such Capital Contribution as the Board may determine in accordance with Section 6.6.

(c) Representations and Warranties of Members. Each Member, several and not jointly, as to such Member only, hereby represents and warrants to the Company and acknowledges and agrees, in each case as applicable, that as of the date hereof: (i) such Person is an "accredited investor" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder or such Person has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Person has reviewed and evaluated all information necessary to assess the merits and risks of his, her or its investment in the Company and has had answered to such Person's satisfaction any and all questions regarding such information; (iii) such Person is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) such Person is acquiring interests in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (vi) to the extent applicable, the execution, delivery and performance of this Agreement have been duly authorized by such Person and do not require such Person or any Affiliate thereof to obtain any consent or

approval that has not been obtained prior to the date hereof, and do not contravene or result in a default under any provision of any law or regulation applicable to such Person or any Affiliate thereof or other governing documents or any agreement or instrument to which such Person or any Affiliate thereof is a party or by which such Person is bound; (vii) any determination of such Person to purchase interests in the Company has been made by such Person independent of any other Person and independent of any statements, opinions, information or documents (including any financial or other projections) as to the advisability of such purchase, which may have been made or given by any other Person (including the Company or any Member or any of their respective Affiliates) or by any agent or employee of any other Person (including the Company or any Member or any of their respective Affiliates), and such Person acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, liabilities, results of operations and projected operations of the Company and its Subsidiaries and, in making the determination to proceed with the transactions contemplated by this Agreement, has relied solely on the results of its own independent investigation and the representations and warranties expressly set forth in this Agreement (and not on any other statements, opinions, information or documents (including any financial or other projections), and that no Person (including the Company or any Member or any of their respective Affiliates) makes any representation or warranty other than those expressly set forth in this Agreement, and all other representations and warranties (express or implied) are disclaimed; (viii) the interests in the Company were not offered to such Person by means of general solicitation or general advertising; (ix) this Agreement is valid, binding and enforceable against such Person in accordance with its terms; (x) the information in Annex 1 is true, accurate and complete; (xi) such Person agrees to be bound by the terms of Annex 1; (xii) such Person agrees that it will promptly inform the Company in writing if at any time after the date hereof any of the representations in Annex 1 are no longer true, accurate and complete; and (xiii) the information in Annex 1 remains true, accurate and complete until such date as such Person has otherwise notified the Company in writing in accordance with the foregoing.

SECTION 3.2. No Withdrawal. No Person shall be entitled to withdraw any part of such Person's Capital Contributions or to receive any Distribution from the Company or otherwise withdraw as a Member, except in all cases as expressly provided herein.

SECTION 3.3. Distributions In-Kind. To the extent that the Company distributes property in-kind to the Members, the Company shall be treated as making a distribution equal to the Fair Market Value of such property for purposes of Section 4.1.

SECTION 3.4. Classes of Units; Rights and Privileges.

(a) As of the date hereof, the Equity Securities of the Company shall be comprised of units (the "Units"), consisting of Class A Units (the "Class A Units") and Class B Units (the "Class B Units"). The Company is hereby authorized to issue up to [__] Class A Units [and [__] Class B Units]. As of the date hereof, [__] Class A Units [and [__] Class B Units][4] are issued and outstanding as more fully set forth on the Schedule of Members attached hereto.

(b) Subject to the terms of this Agreement and the prior approval of one or more Incentive Plans (to the extent granted pursuant to an Incentive Plan), the Company may from time to time issue Class B Units directly or indirectly to employees, consultants, managers, officers or independent contractors of the Company or its Affiliates, whether in connection with an investment by such Person or otherwise upon terms, conditions, vesting rights and consideration, if any, as the Board deems appropriate (subject, with respect to grants under an Incentive Plan, to compliance with the terms and conditions of the applicable

[4] Note to Draft: The structuring of the Incentive Plan and the securities to be issued thereunder remain subject to further discussion.

Incentive Plan).

(c) Notwithstanding anything herein to the contrary, the Company shall not issue non-voting Equity Securities; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect. The prohibition on the issuance of non-voting Equity Securities is included in this Agreement in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

SECTION 3.5. Meetings of Members.

(a) Meetings

(i) Meetings of the Members may be called by any one or more Members collectively holding (together with its Affiliates) at least 45% of the Class A Units (the "Requesting Member"), subject to the following: in order for a special meeting requested by a Requesting Member (a "Member Requested Special Meeting") to be called, one or more written requests for a special meeting (each a "Special Meeting Request"), stating the purpose of the special meeting and the matters proposed to be acted upon thereat, must be delivered by hand, electronic mail or overnight courier to the Board at the principal office of the Company and must contain the affirmation of the Requesting Member(s) to notify the Board immediately in the case of any disposition of Class A Units prior to the record date for the Member Requested Special Meeting and an acknowledgement that any such disposition shall be deemed a revocation of such Special Meeting Request to the extent such disposition causes the Requesting Member(s) to no longer hold at least 45% of the Class A Units.

(ii) A Member Requested Special Meeting shall be held at such date and time as may be fixed by the Board; provided, however, that the Member Requested Special Meeting shall be called for a date no more than ten Business Days after the Company receives a Special Meeting Request from the Requesting Member as provided in Section 3.5(a)(i).

(iii) A Member Requested Special Meeting may be held by telephone conference or similar communications equipment by means of which all Members participating in the meeting can be heard.

(b) Quorum; Action by Written Consent. The presence, in person or by proxy, of Members of a majority of the Class A Units (or such higher threshold, as required with respect to any action enumerated in Section 5.8) generally entitled to vote at a meeting of Members shall constitute a quorum for the transaction of business. The affirmative vote of the Members of a majority of the Class A Units (or such higher threshold, as required with respect to any action enumerated in Section 5.8) generally entitled to vote at a meeting at which a quorum is present shall be sufficient to take action. If a quorum shall not be present or represented at any meeting of the Members, the chairperson of the meeting or Members holding a majority the Class A Units (or such higher threshold, as required with respect to any action enumerated in Section 5.8) present in person or represented by proxy shall adjourn the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been

transacted at the meeting as originally notified. Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting, if Members holding a majority of the Class A Units (or such higher threshold, as required with respect to any action enumerated in Section 5.8) consent thereto in writing or by electronic transmission; provided, further, that prompt written notice of the approval of such action shall be delivered to the non-consenting Members.

## ARTICLE IV.
## DISTRIBUTIONS AND ALLOCATIONS; REDEMPTION AND CONVERSIONS

SECTION 4.1. Distributions.

(a) General Distributions. Subject to the provisions of Section 18-607 of the Delaware Act, the Board may in its sole discretion make Distributions at any time or from time to time. Except as otherwise expressly provided in this Agreement, all Distributions shall be distributed to the Members as follows:

(i) First, to each Member holding Class A Units, *pro rata* in the proportion to that the amount of each such Member's total unreturned Capital Contribution bears to the aggregate amount of all unreturned Capital Contributions of all such Members, until the cumulative amount distributed to such Members pursuant to this Section 4.1 equals the aggregate of the Capital Contributions made by all such Members;

(ii) thereafter, to the Members *pari passu* on a per Unit basis.

(b) Undistributed Amounts. Notwithstanding anything to the contrary herein, any Distributions with respect to any Units that are unvested that would otherwise be distributed to the Member holding such Units pursuant to Section 4.1 shall be held by the Company in a segregated interest-bearing account (separate from and not commingled with the general funds of the Company) and shall be invested in such manner as may be determined by the Board. Any such amount with respect to such Unit that is unvested, including any interest or other income with respect thereto, shall not be distributed, and shall not be treated as distributed for income tax purposes, to the Member holding such Unit until such Unit vests and, at such time as the Unit vests, such amount shall be distributed to the Member holding such Unit. Without limiting the foregoing, if any Unit is forfeited prior to the vesting of such Unit, then such amount (including any interest or other income with respect thereto) shall be retained by the Company or distributed to the other Members pursuant to the provisions of Section 4.1(a).

SECTION 4.2. Withholding. The Company shall be entitled to withhold from Distributions or portions thereof any amounts required to be withheld pursuant to applicable law. Any amount withheld or paid on behalf of or with respect to a Member pursuant to this Section 4.2 shall be treated as if such amount were distributed to such Member under this Agreement. Each Member will furnish the Company with such information as may be reasonably requested by the Board from time to time to determine whether withholding is required, and each Member will promptly notify the Company if such Member determines at any time that it is subject to withholding. The provisions of this Section 4.2 will survive the termination or liquidation of the Company and not withstanding anything to the contrary in this Agreement, any Member that acquires its Units from a person that was a Member of the Company at the time of the Transfer will succeed to and be responsible for, and, unless otherwise agreed to by the Board (on behalf of the Company), will, to the fullest extent permitted by law, indemnify and hold harmless the Company from, any amounts the transferor Member would have been liable for under this Section 4.2 if the transferor had remained a Member of the Company.

ARTICLE V.
MANAGEMENT

SECTION 5.1. Authority of Board.

(a) Authority. Subject to the Delaware Act, the Board shall conduct, direct and exercise full control over all activities of the Company. Subject to Section 5.7, the Board shall have, and is hereby granted, full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as they may deem necessary or advisable to carry out any and all of the objectives and purposes of the Company.

(b) Number of Votes. Notwithstanding anything to the contrary set forth in this Agreement, each Manager shall be entitled to cast one vote with respect to any determination or action to be taken by the Board hereunder.

SECTION 5.2. Composition of the Board.

(a) Number. The Board (the "Board") shall initially be comprised of three Managers and may be increased or decreased from time to time by resolution of the Board; provided, that the number of Managers shall not be increased or decreased unless one or more Members holding at least 66.66% of the Class A Units then outstanding approve such increase or decrease in the size of the Board.

(b) Composition. From and after the Effective Date, each Member holding Class A Units shall vote (or cause to be voted or provide consent with respect to) all of such Member's Class A Units and any other voting securities of the Company over which such Member has voting control and shall take all other necessary or desirable actions with such Member's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary or desirable actions within its control (including calling special Board and Member meetings), so that:

(i) the following individuals shall be elected on the Effective Date and shall, subject to each individual's resignation or removal in accordance with Section 5.2(c), serve as Managers until the next annual meeting of the Members following the Effective Date (the "Initial Manager Term"):

(1) Kenneth Wilkes and Lawrence McRae; and

(2) for so long as the 11th Lane Member and any of its Affiliates holds at least 33% of the issued and outstanding Class A Units, an individual designated by the 11th Lane Member (the "11th Lane Manager"), who will initially be Bob Burbank

(ii) following the Initial Manager Term, the following individuals shall be elected at each annual meeting of the Members (which shall be held within 13-months after the prior year's annual meeting), or at a special meeting or by written consent of the Members, and otherwise continue to serve as Managers in accordance with the terms and conditions of this Agreement:

(1) for so long as the 11th Lane Member and any of its Affiliates holds at least 33% of the issued and outstanding Class A Units, the 11th Lane Manager; and

(2) the remaining number of Managers, who shall be elected by the Members holding a majority of the Class A Units; and

(iii) The Board shall nominate for election by the Members a slate of Managers, including the 11th Lane Manager, if applicable, in advance of each meeting of the Members.

(c) Removal; Resignation; Vacancies.

(i) Prior to the expiration of the Initial Manager Term, Members holding a majority of the Class A Units may remove any or all of the Managers from office, either with or without cause, other than the 11th Lane Manager (whom shall only be removed by the 11th Lane Member in its sole discretion).

(ii) Following the Initial Manager Term:

(1) Members holding a majority of the Class A Units may remove any or all of the Managers, other than the 11th Lane Manager, from office, either with or without cause;

(2) the 11th Lane Member may remove the 11th Lane Manager from office, either with or without cause; and

(3) notwithstanding anything to the contrary in this Agreement, if at any time a vacancy is created on the Board by reason of the incapacity, death, removal or resignation of any Manager, the remaining Managers then serving on the Board shall have the right (but not the obligation) to nominate a new Manager to fill the vacant position; provided, that any such Manager nominee must be elected by the Members collectively holding a majority of the Class A Units; provided, further, that if such vacancy is created by the incapacity, death, removal or resignation of the 11th Lane Manager, the 11th Lane Member shall have the sole right to designate a new 11th Lane Manager; provided, further, that if any or all of the Managers are removed by the holders of a majority of the Class A Units following a Change of Control, such holders shall have the right to replace such Managers.

(d) Reimbursement. The Company shall pay all reasonable out of pocket costs and expenses incurred by each Manager and the Observers in the course of its service as such, including in connection with attending regular and special meetings of the Board, any board of managers or board of directors of any of the Company's Subsidiaries or any of their respective committees.

(e) Board Committees. The Board may create committees; provided, that the Board shall establish and maintain the existence of a nominating committee (the "Nominating Committee"), an audit committee and a compensation committee. Committees are permitted to act in any manner only to the extent authorized by the Board and permitted by applicable law. Each committee shall keep regular minutes of its meetings and report the same to the Board when required. The principal duties and responsibilities of the Nominating Committee shall be determined by the Board from time to time, and shall include: (i) identifying individuals qualified to become Managers consistent with criteria approved by the Board; (ii) [recommending to the

Board the slate of Managers to be proposed to the Members for election to the Board as Managers following the Initial Manager Term]; and (iii) evaluating the performance of the officers of the Company and, together with management, selecting and recommending to the Board appropriate individuals for election, appointment and promotion as officers of the Company.

(f) Reliance by Third Parties. Any Person dealing with the Company, other than a Member, may rely on the authority of the Board (or any officer authorized by the Board) in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by the Board (or any officer authorized by the Board) in the name of the Company with respect to any business or property of the Company shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (i) at the time of the execution or delivery thereof, this Agreement was in full force and effect; (ii) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the Company; and (iii) the Board or such officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the Company.

SECTION 5.3. Board Actions; Meetings. Any determination or action to be taken by the Board shall be taken, subject to Section 5.1(b), by a majority of the votes held by the Managers then in office (through meetings of the Board or written consents pursuant to this Section 5.3). At all duly called meetings of the Board, Managers holding a majority of the total votes of all Managers shall constitute a quorum sufficient for conducting meetings and making decisions at a meeting. Members of the Board may participate in a meeting of the Board by means of telephone conference or similar communications equipment by which all Persons participating in the meeting can communicate with each other, and such participation in a meeting shall constitute presence in person at the meeting. Any Manager unable to attend a meeting of the Board may designate another Manager as his or her proxy. The Board may adopt such other procedures governing meetings and the conduct of business at such meetings as it shall deem appropriate. The actions by the Board or any committee thereof may be taken by vote of the Board or any committee at a meeting thereof or by written consent (without a meeting, without notice and without a vote) so long as such consent is signed by the Managers holding the number of votes that would be necessary to authorize or take such action at a meeting of the Board or such committee at which all Managers then serving on the Board or such committee, as the case may be, were present. Notice of any action so taken without a meeting shall be promptly given by the Company to those Managers who have not consented in writing.

SECTION 5.4. Limitation of Liability.

(a) Waiver of Liability. Except as otherwise expressly provided herein or in any written agreement entered into by such Person and the Company and to the maximum extent permitted by the Delaware Act, none of the Citadel Member, 11th Lane Member, any present or former Manager or officer or any of their respective Affiliates, employees, agents or representatives shall be liable to the Company or to any Member for any act or omission performed or omitted by such Person in its capacity as a Manager, officer, the Citadel Member or the 11th Lane Member; provided that, except as otherwise provided herein, such limitation of liability shall not apply to the extent the act or omission was attributable to such Person's fraud, gross negligence, willful misconduct, bad faith or criminal activity as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). The Citadel Member, the 11th Lane Member and each Manager or officer shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Citadel Member, the 11th Lane Member or any Manager or officer in good faith reliance on such

advice shall in no event subject such Person or any of such Person's Affiliates, employees, agents or representatives to liability to the Company or any Member.

(b) No Fiduciary Duties. To the fullest extent permitted by law (including the Delaware Act), and notwithstanding any other provision of this Agreement or applicable provisions of law or equity or otherwise, and without limitation of the terms set forth in Section 14.1, no Member or any Manager, shall (i) be deemed to have any fiduciary or other duties (including any duty of care or duty of loyalty) to the Company or any Member or any other Person, or (ii) be obligated to do or perform any act or thing in connection with the Company and its Subsidiaries not expressly set forth in this Agreement, and to the fullest extent permitted by law, the Company and the Members hereby agree not to make or threaten to make (and hereby irrevocably and unconditionally waive), and shall cause their Affiliates not to make or threaten to make (and, if requested, shall cause their Affiliates to irrevocably and unconditionally waive), any claim or bring any action, suit or other proceeding or take any similar action, in each case alleging that any Member or any Manager shall have breached any fiduciary or other duty to the Company or any Member or any other Person. Without limiting the foregoing, the provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of any Member or any Manager otherwise existing at law or in equity, are agreed by the parties hereto to replace (or eliminate) such other duties and liabilities of such Persons, to the maximum extent permitted by applicable law. This provision shall not limit any other duties imposed upon any Person by a separate written agreement with the Company or any of its Subsidiaries.

SECTION 5.5. Officers.

(a) Designation and Appointment. Subject to Section 5.1(b), the Board may (but need not), from time to time, designate and appoint one or more persons as an officer of the Company. No officer need be a resident of the State of Delaware, a Member or a Manager. Any officers so designated shall have such authority and perform such duties as the Board may, from time to time, delegate to them. The Board may assign titles to particular officers. Unless the Board otherwise decides, if the title is one commonly used for officers of a business corporation, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office. Each officer shall hold office until such officer's successor shall be duly designated and shall qualify or until such officer's death or until such officer shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same individual. Subject to the terms of any employment agreement with any applicable Person, the salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Board.

(b) Resignation; Removal; Vacancies. Any officer (subject to any contract rights available to the Company, if applicable) may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, at any time by the Board in its discretion; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed. Designation of an officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company may be filled by the Board and shall remain vacant until filled by the Board.

SECTION 5.6. Board Observers.

(a) For so long as the Citadel Member holds any Units, the Citadel Member shall have the right to designate an individual to attend meetings of the Board and any committee thereof as a non-voting observer (the "Citadel Observer"). For so long as the 11th Lane Member holds any Units, the 11th Lane Member

shall have the right to designate an individual to attend meetings of the Board and any committee thereof as a non-voting observer (the "11th Lane Observer" and together with the Citadel Observer, each, an "Observer" and collectively, the "Observers"). The Observers shall have no attendance or other rights with respect to any executive sessions designated by the Board.

(b) Each Observer shall be entitled to receive at the same time and in the same manner copies of all written materials (including copies of meeting minutes) given to Managers in connection with such meetings (and if the Board or any committee thereof proposes to act by written consent, the Board shall provide the Observers at the same time and in the same manner with copies of all notices and written materials given to Managers in connection with such action); provided, however, that the Board may exclude any Observer from access to any material or meeting or portion thereof (including the meeting of any committee of the Board) if the Board determines, in good faith, that such exclusion is reasonably necessary to preserve attorney-client privilege or as the result of a conflict of interest between the Company and the Member who designated such Observer, and any such decision of the Board made in good faith shall be final and binding. All information provided to the Observers shall be treated as Confidential Information in accordance with Section 6.5.

SECTION 5.7. Actions Requiring Majority Class A Unit Approval. Notwithstanding anything herein to the contrary, the Company shall not, and shall cause its Subsidiaries not to, take or approve any of the following actions without the prior written consent of Members holding at least a majority of the Class A Units:

(a) approving, consummating or effecting, (i) any liquidation, dissolution or winding-up of the business and affairs of the Company, or (ii) any merger, consolidation or other similar transaction resulting in any of the foregoing, or consenting to any of the foregoing;

(b) incurring of any indebtedness secured by the equity interests of the Company or any of its Subsidiaries;

(c) issuing any Equity Securities, other than pursuant to the procedures set forth in Section 6.6;

(d) filing or accepting (i) any petition in connection with any voluntary or involuntary bankruptcy or insolvency proceeding of the Company; or (ii) the appointment of a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of the Company; and

(e) hiring or terminating, other than terminating due to death or disability, the Chief Executive Officer of the Company.

SECTION 5.8. Actions Requiring Class A Unit Supermajority Approval. Notwithstanding anything herein to the contrary, the Company shall not, and shall cause its Subsidiaries not to, take or approve any of the following actions without the prior written consent of Members holding at least 66.66% of the Class A Units:

(a) approving or consummating any material change in the type of business that constitutes the primary business of the Company and its Subsidiaries;

(b) approving or consummating any IPO or other similar action in respect of the Company, any of its Subsidiaries or the Business;

(c) approving or consummating any acquisitions or dispositions, by the Company or any of its

Subsidiaries, outside of the ordinary course of business, in each case, with an aggregate value in excess of $5,000,000 (other than any disposition consummated in accordance with Section 5.10);

(d) other than in connection with an Approved Sale consummated in accordance with Section 9.3, changing the legal form, tax structure or classification for U.S. income tax purposes, jurisdiction of formation or tax residence, in each case, of the Company;

(e) increasing the number of Class B Units issuable pursuant to (i) the Incentive Plan in excess of 10% of the Units outstanding as of the Effective Date (calculated on a fully diluted basis, including the equity interests issuable under the Incentive Plan);

(f) changing the tax policies of the Company and its Subsidiaries in a manner that would materially and adversely affect any Member in a manner that is disproportionate in relation to the economic rights of the other Members holding Class A Units;

(g) entering into any agreement, contract, transaction, payment or other arrangement between the Company and its Affiliates, on the one hand, and any Member or any of their Affiliates, on the other hand other than commercial arrangements arising in the ordinary course of business on an arms-length basis;

(h) any Company Sale (other than pursuant to (i) the exercise of the Put Right in accordance with Section 9.11, (ii) a Company Sale consummated in accordance with Section 9.12, or (iii) an Approved Sale consummated in accordance with Section 9.3(a), but subject to prior compliance with Section 9.12 (to the extent it remains in effect)); and

(i) amending any of the governing documents of the Company or its Subsidiaries in a manner that adversely affects the powers, preferences or rights of the Members holding Class A Units or adversely amending, altering, waiving, repealing, eliminating or nullifying the rights, preferences, privileges or powers of the Members holding Class A Units (whether by merger, consolidation or otherwise), including pursuant to any amendment, alteration, waiver, repeal, elimination, or nullification of any provision of this Agreement.

SECTION 5.9. Actions Requiring Class B Unit Approval. Notwithstanding anything herein to the contrary, the Company shall not, and shall cause its Subsidiaries not to, take or approve any of the following actions without the prior written consent of Members holding at least a majority of the Class B Units:

(a) amending any of the governing documents of the Company or its Subsidiaries in a manner that adversely affects the powers, preferences or rights of the Members holding Class B Units or adversely amending, altering, waiving, repealing, eliminating or nullifying the rights, preferences, privileges or powers of the Members holding Class B Units (whether by merger, consolidation or otherwise), including pursuant to any amendment, alteration, waiver, repeal, elimination, or nullification of any provision of this Agreement.

SECTION 5.10. Right of First Refusal for Sale of Company Assets.

(a) In the event that the Company shall receive a bona-fide written offer, including a term sheet or letter of intent, from any third-party Person with respect to the proposed acquisition of any assets of the Company for an aggregate purchase price in excess of $5,000,000 and which the Company desires to accept (a "Proposed Disposition ROFR Transaction," and such assets to be sold, the "Disposition ROFR Assets"), the 11th Lane Member shall have a right of first refusal to purchase such Disposition ROFR Assets pursuant to this Section 5.10 for so long as the 11th Lane Member and any of its Affiliates holds at least 33% of the

issued and outstanding Class A Units.

(b) The Company shall promptly provide written notice to the 11th Lane Member of the Company's desire to accept and consummate the Proposed Disposition ROFR Transaction and otherwise comply with the provisions of this Section 5.10 (such notice, the "Disposition ROFR Offer Notice"), which Disposition ROFR Offer Notice must specify in reasonable detail (i) the Disposition ROFR Assets to be disposed of by the Company, (ii) the identity of the proposed third-party purchaser of the Disposition ROFR Assets (to the extent legally and contractually disclosable), and (iii) the material terms and conditions of the Proposed Disposition ROFR Transaction (including (A) the price for each such Disposition ROFR Asset (including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, if applicable) and (B) the proposed closing date of the Proposed Disposition ROFR Transaction) pursuant to which the Company proposes to dispose of the Disposition ROFR Assets. The Company's Disposition ROFR Offer Notice shall constitute an irrevocable offer to sell all of the Disposition ROFR Assets to the 11th Lane Member, on the basis described below, which offer will expire 20 days following receipt by the 11th Lane Member of the Disposition ROFR Offer Notice (such period, the "Disposition ROFR Offer Period").

(c) The 11th Lane Member shall have the right of first refusal to purchase all (and no less than all) of the Disposition ROFR Assets. At any time prior to the expiration of the Disposition ROFR Offer Period, the 11th Lane Member may elect to accept the offer to purchase with respect to all (and no less than all) of the Disposition ROFR Assets and shall give written notice of such election (the "Disposition ROFR Acceptance Notice") to the Company, which Disposition ROFR Acceptance Notice shall indicate that the 11th Lane Member elects irrevocably to purchase the Disposition ROFR Assets on the same terms and purchase price set forth in the Disposition ROFR Offer Notice. If the 11th Lane Member accepts the offer to purchase all (and no less than all) of the Disposition ROFR Assets, the closing for such purchase of the Disposition ROFR Assets by the 11th Lane Member pursuant to this Section 5.10 shall take place within 30 days after the later of (i) the expiration of the Disposition ROFR Offer Period and (ii) the satisfaction of all governmental approval or filing requirements necessary to consummate the purchase of the Disposition ROFR Assets; provided, that if the governmental approvals are not received or filings are not made within 60 days of the delivery of the Disposition ROFR Acceptance Notice, the 11th Lane Member's right of first refusal with respect to the Proposed Disposition ROFR Transaction shall terminate and the Company may sell the Disposition ROFR Assets to such third-party Person identified in the Disposition ROFR Offer Notice on the same terms and conditions, including the price (but no less than such price), set forth in the Disposition ROFR Offer Notice.

(d) The failure of the 11th Lane Member to deliver a Disposition ROFR Acceptance Notice by the end of the Disposition ROFR Offer Period shall constitute a waiver of the 11th Lane Member's right of first refusal under this Section 5.10 with respect to the purchase of the Disposition ROFR Assets described in the Disposition ROFR Offer Notice, but shall not affect the 11th Lane Member's rights with respect to any future dispositions of the Company's assets. In the event that the 11th Lane Member does not elect to exercise the right of first refusal to purchase the Disposition ROFR Assets under this Section 5.10, then the Company may sell the Disposition ROFR Assets to such third-party Person identified in the Disposition ROFR Offer Notice on the same terms and conditions, including the price (but no less than such price), set forth in the Disposition ROFR Offer Notice. Promptly after the consummation of such disposition, the Company shall notify the 11th Lane Member of the consummation thereof and shall furnish reasonable evidence of the consummation of the sale of the Disposition ROFR Assets (including the date of completion) and the terms and conditions thereof. If the Company's disposition of the Disposition ROFR Assets to such third party is not consummated in accordance with the terms of the Disposition ROFR Offer Notice on or before 90 days after the later of (i) the Disposition ROFR Offer Period and (ii) the satisfaction of all governmental approval or filing requirements necessary to consummate the proposed disposition, the disposition of the Disposition ROFR Assets to a third party shall be prohibited, and any disposition of the

Disposition ROFR Assets pursuant to such proposed disposition shall be in violation of the provisions of this Agreement unless the Company sends a new Disposition ROFR Offer Notice and once again complies with the provisions of this Section 5.10 with respect to such proposed disposition.

(e) The 11th Lane Member acknowledges and agrees that its rights under this Section 5.10 shall terminate in the event that (i) the Put Right is exercised in accordance with Section 9.11 and the consummation of the purchase of the Put Units fails to occur or is terminated pursuant to Section 9.11(e)(vi) as applied to the 11th Lane Member or (ii) the 11th Lane Member and its Affiliates no longer hold at least 33% of the issued and outstanding Class A Units.

## ARTICLE VI.
## RIGHTS AND OBLIGATIONS OF MEMBERS

SECTION 6.1. Limitation of Liability. Subject to the Members' obligations to make payments to the Company pursuant to Section 4.2 or Article VIII, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager. Except as otherwise provided in this Agreement, a Member's liability (in its capacity as such) for debts, liabilities and losses of the Company shall be such Member's share of the Company's assets; provided, that a Member shall be required to return to the Company any Distribution made to it in clear and manifest accounting or similar error. The immediately preceding sentence shall constitute a compromise to which all Members have consented within the meaning of the Delaware Act. Notwithstanding anything contained herein to the contrary, the failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Members or any Manager for liabilities of the Company, except to the extent constituting fraud, gross negligence, bad faith, willful misconduct or criminal activity by such Members as determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected).

SECTION 6.2. Lack of Authority. Except as expressly permitted pursuant to this Agreement, no Member in his, her or its capacity as such has the authority or power to act for or on behalf of the Company in any manner or way, to bind the Company, or do any act that would be (or could be construed as) binding on the Company, in any manner or way, or to make any expenditures on behalf of the Company, unless such specific authority has been expressly granted to and not revoked from such Member by the Board, and the Members hereby consent to the exercise by the Board of the powers conferred on it by law and this Agreement.

SECTION 6.3. No Right of Partition. No Member shall have the right to seek or obtain partition by court decree or operation of law of any property of the Company, or the right to own or use particular or individual assets of the Company.

SECTION 6.4. Indemnification.

(a) Generally. The Company agrees, and shall cause each of its Subsidiaries to agree, that, subject only to the limitations and conditions in this Section 6.4, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member or

Manager, or while a Member or Manager is or was serving at the request of the Company or any of its Subsidiaries as a manager, director, advisor, officer, partner, joint venturer, proprietor, trustee, employee, agent, designated individual or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company or the applicable Subsidiary to the fullest extent permitted by the Delaware Act or other applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company or the applicable Subsidiary to provide broader indemnification rights than said law permitted the Company or the applicable Subsidiary to provide prior to such amendment) against judgments, losses, damages, penalties (including excise and similar Taxes and punitive damages), fines, settlements and reasonable expenses (including attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Section 6.4 (or otherwise) shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to such indemnity and shall inure to the benefit of the heirs, executors and administrators of such a Person. The rights granted pursuant to this Section 6.4 shall be deemed contract rights, and no amendment, modification or repeal of this Section 6.4 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Section 6.4 could involve indemnification for negligence or under theories of strict liability. Notwithstanding the foregoing, unless the Board shall otherwise determine, no indemnification shall be available to any Person otherwise entitled to indemnification hereunder in respect of (i) any Proceeding commenced by such Person against the Company or any Subsidiary thereof or any Member or any Affiliate thereof, or by the Company or any Subsidiary thereof against such Person or any Affiliate thereof, (ii) if the Person otherwise entitled to indemnification hereunder shall settle or compromise (or otherwise take any similar action) with respect to any Proceeding or other matter otherwise subject to indemnification hereunder unless the Company shall have provided its prior written consent thereto, it being agreed that such Person shall not have the right to settle or compromise (or take any similar action) any such Proceeding or other matter without the prior written consent of the Company, (iii) any Proceeding arising from such Person's fraud, bad faith, gross negligence, willful misconduct or criminal activity to the extent determined by a final judgment, order or decree of an arbitrator or a court of competent jurisdiction (which is not appealable or with respect to which the time for appeal therefrom has expired and no appeal has been perfected). In respect of any matter subject to indemnification hereunder, the Person entitled to indemnification hereunder shall advise the Company of the existence thereof promptly after becoming aware thereof, and thereafter, the Company shall have the right, upon written notice to such Person, to assume the control of the defense thereof. In addition, each Person designated or nominated by a Member to serve on the Board or the board of directors (or a similar governing body) of any Subsidiary of the Company shall have the right to enter into, and the Company agrees to enter into (or to cause such Subsidiaries to enter into), an indemnification agreement in a form consistent with indemnification agreements customarily entered into between companies and their board members and a related indemnification side letter with the applicable Member confirming that the Company or any of its Subsidiaries are the primary obligors in director indemnification matters in a form consistent with indemnification side letters customarily entered into between companies and their investors.

(b) Advance Payment. Reasonable and documented out-of-pocket expenses incurred by a Person of the type entitled to be indemnified under this Section 6.4 who was, is or is threatened to be made a named defendant or respondent in a Proceeding (other than a Proceeding brought by the Company or any Subsidiary thereof against such Person or by such Person against the Company, any Subsidiary thereof, any Member or any Affiliate thereof) shall, unless otherwise determined by the Board in the specific circumstance (provided that the Board shall have no such discretion in the case of a Manager), be paid by the Company in advance of the final disposition of the Proceeding upon receipt of a written undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company. Notwithstanding the foregoing, if such expenses are incurred in connection with any Proceeding alleging fraud, bad faith, gross negligence, willful misconduct or a

criminal act has been committed by such Person, the Company shall not be required to (but may in the sole discretion of the Board) advance such expenses. The advancement of expenses under this Section 6.4 shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to such advancement of expenses and shall inure to the benefit of the heirs, executors and administrators of such a Person.

(c) Nonexclusivity of Rights. The right to indemnification and the advancement of expenses conferred in this Section 6.4 shall not be exclusive of any other right that any Person may have or hereafter acquire under any statute, agreement, law, vote of the Board or otherwise.

(d) Insurance. The Company shall obtain customary manager and officer indemnity insurance on commercially reasonable terms as determined by the Board, at its expense.

(e) Limitation. Notwithstanding anything contained herein to the contrary (including in this Section 6.4), any indemnity by the Company relating to the matters covered in this Section 6.4 shall be provided out of and to the extent of the Company's assets only, and no Member (unless such Member otherwise agrees in writing or is found in a final decision by a court of competent jurisdiction to have personal liability on account thereof) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company (except as expressly provided herein). Notwithstanding anything in this Agreement to the contrary, in no event will the Company or any of its Subsidiaries indemnify, hold harmless or advance expenses with respect to any breaches of agreements (including this Agreement) with the Company or any of its Subsidiaries.

(f) Priority. The Company hereby acknowledges that the Managers and the Members or representative of the Members or any heir of or successor to the Members or any such representative (each an "Indemnitee"), may have certain rights to indemnification, advancement of expenses or insurance provided by or on behalf of such Members or their respective Affiliates (other than the Company) (collectively, the "Fund Indemnitors"). Notwithstanding anything to the contrary in this Agreement or otherwise: (a) the Company is the indemnitor of first resort (i.e., the Company's obligations to each Indemnitee are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each Indemnitee are secondary); (b) the Company will be required to advance the full amount of expenses incurred by each Indemnitee and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Section 6.4, without regard to any rights each Indemnitee may have against the Fund Indemnitors; and (c) the Company and the Members irrevocably waive, relinquish and release the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by the Fund Indemnitors on behalf of an Indemnitee with respect to any claim for which such Indemnitee has sought indemnification or advancement of expenses from the Company will affect the foregoing and the Fund Indemnitors will have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Indemnitee against the Company. The Fund Indemnitors are express third party beneficiaries of the terms of this Section 6.4(f).

(g) Savings Clause. If this Section 6.4 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Section 6.4 to the fullest extent permitted by any applicable portion of this Section 6.4 that shall not have been invalidated and to the fullest extent permitted by applicable law.

SECTION 6.5. Confidentiality.

(a) Each Member recognizes and acknowledges that it has and may in the future receive certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries and other Persons with which the Company and its Subsidiaries does business, and that such Confidential Information constitutes valuable, special and unique property of the Company and its Subsidiaries. "Confidential Information" will be interpreted to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is related to the Company's or its Subsidiaries' business. Confidential Information includes, without specific limitation, this Agreement, the information, observations and data obtained by any Member during the course of his ownership of Units under this Agreement concerning the business and affairs of the Company and its Subsidiaries, information concerning acquisition opportunities in or reasonably related to the Company's or its Subsidiaries' business or industry of which such Member becomes aware during his ownership of the Units, the persons or entities that are current, former or prospective suppliers or customers of any one or more of them during Member's ownership of Units, as well as development, transition and transformation plans, methodologies and methods of doing business, strategic, marketing and expansion plans, including plans regarding planned and potential sales, financial and business plans, employee and client lists and telephone numbers, locations of sales representatives, new and existing programs and services, prices and terms, customer service, integration processes, requirements and costs of providing service, support and equipment. Each Member agrees not to disclose or use for his own account or the account of any other Person (other than the Company or any Subsidiary thereof) any Confidential Information; provided that the foregoing shall not restrict the Member from disclosing Confidential Information to (i) the Member's representatives in the normal course of the performance of their duties for such Member (it being understood that such representatives shall be informed by the Member of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 6.5; provided, that such Member shall be responsible for any breach of this Section 6.5 by its representatives; (ii) to the extent requested or required by applicable law, rule or regulation (including by oral question or request for information or documents in any legal proceeding, action, interrogatory, subpoena, civil investigative demand or similar process); provided, that the Member shall give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Member shall use its commercially reasonable efforts to (A) cooperate with such efforts by the Company, (B) make only the minimum disclosure required by such law, rule or regulation and (C) obtain an order or other reliable assurance that confidential treatment shall be accorded to such information); (iii) any governmental, regulatory or self-regulatory authority or rating agency to which the Member or any of its Affiliates is subject or with which it has regular dealings in connection with any routine request of or any routine examination by such authority or agency, as long as such authority or agency is advised of the confidential nature of such information; and (iv) in connection with the Member's or the Member's Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Member or the Member's Affiliates, or prospective merger partner of the Member or the Member's Affiliates; provided, that prior to such disclosure the Persons to whom such information is disclosed are advised of the confidential nature of such information and execute a non-disclosure agreement in a customary form and such Member shall be responsible for any breach of this Section 6.5 by such Persons; provided, further, that the foregoing shall not restrict any Member from using the Confidential Information on behalf of the Company or any Subsidiary thereof in the course of such Member's duties; provided, further, that the notwithstanding the foregoing, no Member may disclose Confidential Information to any "portfolio company" of such Member or such Member's Affiliates or to a Competitor. Each Member acknowledges and agrees that all notes, records, reports, sketches, plans, unpublished memoranda or other documents, whether in paper or electronic form (and copies thereof), held by such Member concerning any information relating to the Company's business, whether confidential or not, are the property of the Company and will be promptly delivered to it upon the termination of any Member's ownership of Units. Each Member further understands

that the Company and its Subsidiaries will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's and its Subsidiaries' part to maintain the confidentiality of such information and to use it only for certain limited purposes. Each Member will hold Third Party Information in confidence and will not disclose to anyone (other than personnel of the Company or its Subsidiaries and Affiliates who need to know such information as required by their work for the Company or such Subsidiaries and Affiliates) or use Third Party Information unless expressly authorized by the Board or such third party in writing. Notwithstanding anything to the contrary in this Agreement, no former employee of the Company or any of its Subsidiaries (or any Member in which such person has an interest) shall have the right to receive any Confidential Information (and not Member shall provide any such Person any Confidential Information) except as otherwise required by law or judicial order.

(b) For purposes of this Section 6.5, Confidential Information shall not include any information which (i) such Person has developed on its own without the use of, or reference to, any Confidential Information, (ii) such Person learns from a source other than the Company or its Subsidiaries, or any of their respective Managers, representatives, employees, agents or other service providers, who, in each case, is not known by such Person to be bound by a confidentiality obligation with respect to such information, (iii) becomes or is generally known to and available for use by the public other than as a result of such Person's acts or omissions to act in violation or breach of this Agreement, the Incentive Plan or any other agreement with the Company or any of its Subsidiaries, (iv) constitutes general industry knowledge that such Person can reasonably demonstrate has been gained as a result of direct or indirect investments in the same or similar industries as the Business or (v) is disclosed in a prospectus or other documents for dissemination to the public.

(c) Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or any Member or their respective Affiliates. Furthermore, the Company acknowledges and agrees that each Member's and its representatives' review of the Confidential Information will inevitably enhance such Member's and its representatives' knowledge and understanding of the Company's and its Subsidiaries' industries in a way that cannot be separated from such Member's or its representatives' other knowledge and the Company agrees that, without limiting such Member's other obligations under this Agreement, this Section 6.5 shall not restrict such Member's or its representatives' use of such overall knowledge and understanding of such industries so long as such knowledge and understanding was not the result of intentionally memorizing any Confidential Information and can be recalled without having to refer back to the Confidential Information.

(d) The restrictions contained in this Section 6.5 shall terminate, with respect to any Member, 24-months following the date on which such Member ceases to own any Units.

SECTION 6.6. Future Equity Issuances.

(a) In the event that the Company or any of its Subsidiaries proposes to (i) issue Equity Securities of the Company (other than a Business Issuance) or equity securities of any Subsidiary ("New Equity") or (ii) incur any indebtedness ("New Debt" and collectively with New Equity, "New Securities") of the Company or any of its Subsidiaries, the Company shall provide written notice (a "Preemptive Rights Notice") thereof to each holder of Class A Units at least seven Business Days prior to the estimated date of such issuance of such New Securities of the Company or any Subsidiary setting forth the number and type of New Securities to be issued, the proposed price and the other principal terms thereof (including, as may be applicable, their relative designations, preferences, privileges and rights, and in the case of New Debt, the applicable interest rate and any other material terms relevant to such New Debt) and the period of time within which the Preemptive Right (as defined below) must be exercised, which shall be no less than 14 Business Days from receipt of the Preemptive Rights Notice (the "Acceptance Period"). Subject to this

Section 6.6 each holder of Class A Units shall have the right (the "Preemptive Right"), exercisable as hereinafter provided, to purchase up to an amount of such New Securities proposed to be issued equal to the aggregate amount of New Securities proposed to be issued *multiplied by* a fraction, (x) the numerator of which shall be the aggregate number of Class A Units owned by such Member on the date of the Preemptive Rights Notice and (y) the denominator of which shall be the total number of Class A Units outstanding on such date (such amount of New Securities, the holder of Class A Unit's "Proportionate Percentage"), such purchase to be at the same price and on the same terms and conditions as set forth in the Preemptive Rights Notice. The Preemptive Rights shall be exercisable by delivery of notice to such effect by an exercising Member to the Company within the Acceptance Period set forth in the Preemptive Rights Notice. A Member's failure to respond to the Company by the expiration of the Acceptance Period shall be regarded as a rejection of such Member's right to exercise its Preemptive Right.

(b) At the expiration of the Acceptance Period, the Company shall deliver a notice to the holders of Class A Units that have elected to purchase or acquire all of its Proportionate Percentage of New Securities (the "Fully Exercising Holder") of any other holder of Class A Unit's failure to do likewise (the "Exercise Notice"). During the seven Business Day period following the delivery of such Exercise Notice, each Fully Exercising Holder may elect to purchase such number of the New Securities that were not subscribed for by the holders of Class A Units that is equal to such Fully Exercising Holder's Proportionate Percentage of the New Securities that were not subscribed for by the holders of Class A Units; provided that for the purposes of this Section 6.6(b), the clause (y) of the definition of "Proportionate Percentage" shall mean the total number of Class A Units held by the Fully Exercising Holders.

(c) The closing of the purchase of New Securities subscribed for by the holders of Class A Units under this Section 6.6 shall be held at (i) the executive office of the Company at 11:00 a.m., local time, on the tenth Business Day after the giving of the Exercise Notice pursuant to Section 6.6(b), or (ii) at such other time and place as the parties to the transaction may reasonably agree in writing. At such closing, as applicable, the Company shall (or shall cause its applicable Subsidiary to) deliver certificates (to the extent that the Company or its applicable Subsidiary has certificated shares) representing the New Securities to the participating holders of Class A Units, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Company shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the holders of Class A Units and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. At the closing, each holder of Class A Units purchasing the New Securities shall deliver payment to the bank account designated by the Company, by wire transfer of immediately available funds (or such other manner approved by the Board), for the New Securities purchased by such holder of Class A Units. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise deemed reasonably necessary by the Company to effectuate the closing.

(d) In the event that the holders of Class A Units do not elect to exercise the rights to purchase all of the New Securities proposed to be issued pursuant to a Preemptive Rights Notice, then the Company may issue the New Securities to any third party on the terms and conditions set forth in the Preemptive Rights Notice but not purchased by the holders of Class A Units pursuant to Section 6.6(a) or Section 6.6(b). Promptly after such sale or issuance of the New Securities, the Company shall promptly notify the holders of Class A Units, of the consummation issuance and shall furnish such evidence of the completion and time of completion of the issuance and of the terms thereof. Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which an applicable Preemptive Rights Notice is delivered or if the principal terms of such sale change such that the terms are less favorable in any material respect to the holders of Class A Units than those in the Preemptive Rights Notice, then the restrictions provided for

herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Company or its applicable Subsidiary without first offering such New Securities to the holders of Class A Units in accordance with this Section 6.6. Notwithstanding any other provision of this Section 6.6, there shall be no liability on the part of the Company, any of its Subsidiaries or any Member to any holder of Class A Units arising from the failure of the Company or its applicable Subsidiary to consummate the sale of New Securities for any reason.

(e) The rights contained in this Section 6.6 may be assigned or otherwise conveyed by a holder of Class A Units to one or more of its Affiliates who, in each case, are "accredited investors" as such term is defined under the Securities Act and the rules and regulations promulgated thereunder; provided, that such assignment or conveyance is otherwise effected in compliance with the terms and conditions of this Agreement applicable to the assignment or Transfer of outstanding Units.

(f) Notwithstanding anything to the contrary contained herein, the preemptive rights of each holder of Class A Units under this Section 6.7 will be deemed satisfied with respect to any issuance of New Securities, despite the fact that such issuance of New Securities was not conducted according to the requirements of this Section 6.7, if within 30 days following such issuance of New Securities, the Company offers to sell to the holders of Class A Units, on the same terms as such issuance, the amount of New Securities which each holder of Class A Units would have been entitled to purchase if such issuance of New Securities had been conducted pursuant to this Section 6.7, and a portion of the New Securities previously issued prior to the Company's offer to the holders of Class A Units in an amount necessary to give effect to the requirements of this Section 6.7 are contemporaneously redeemed by the Company for the consideration paid therefor. The Fully-Exercising Holders will have no voting rights, but will have retroactive rights to Distributions, as applicable, with respect to such New Securities until the requirements of this Section 6.7 have been fully complied with.

SECTION 6.7. Initial Public Offering. Subject to Section 5.8(b), each Member acknowledges and agrees that the Board shall have the right to determine whether, and the terms on which, the Company or any successor to the business of the Company shall pursue and consummate an IPO. Subject to Section 5.8(b), in connection with the consummation of an IPO, the Board may cause the Company to take any and all actions reasonably necessary or advisable to create and implement the IPO of a PublicCo, including (a) amending this Agreement, including amendments that (i) alter the capital structure of the Company, or (ii) provide for the conversion of the Company in accordance with Delaware law or other applicable law to a corporation or such other entity, whether through the issuance, conversion or exchange of equity securities or otherwise; (b) merging, converting or consolidating the Company; (c) forming a Subsidiary holding company that would serve as PublicCo and distributing its common shares to the Members; (d) transferring, domesticating or otherwise moving the Company to another jurisdiction; (e) exchanging Units for shares of PublicCo; and (f) taking such other steps as it deems necessary or advisable to create a suitable vehicle for an offering, and in each case solely for the express purpose of an initial offering of the securities of such PublicCo for sale to the public in the IPO (any such action, an "IPO Conversion"). Each Member shall cooperate with such reasonable requests of the Board, the Company or any Company Subsidiaries in connection with an IPO and shall execute and deliver such instruments and take such other action, including executing any agreement or document as may be reasonably required by the Board in order to carry out the terms and provisions of this Section 6.7. In connection with such IPO, the Company shall be permitted to cause each Member to exchange its Units for common stock of the PublicCo with an economic value equal to the value (if any) that such Member would be entitled to receive on account of such Member's interest in the Company if the Company were liquidated pursuant to Article XII and the proceeds therefrom distributed to the Members pursuant to Section 4.1(a) at an implied aggregate equity valuation equal to the implied aggregate equity valuation of PublicCo in the IPO based on the midpoint of the expected gross offering price (before underwriters' discounts, commissions or similar fees) of the shares of common stock or other equity interests of PublicCo as set forth on the cover page of

the final prospectus relating to the IPO, as reasonably determined in good faith by the Members holding a majority of the issued and outstanding Class A Units in consultation with the managing underwriter of such IPO; and any Units that would not receive common stock in such conversion shall be thereafter cancelled.

## ARTICLE VII.
## BOOKS, RECORDS, ACCOUNTING AND REPORTS; INSPECTION

SECTION 7.1. Records and Accounting. The Company shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 7.2 or pursuant to applicable laws. All matters concerning (a) the determination of the relative amount of allocations and distributions among the Members pursuant to Articles III and IV and (b) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Board, whose determination shall be final and conclusive as to all of the Members absent manifest clerical error. Unless the Board shall otherwise consent thereto, no Member shall have the right to access any of the Company's books or records. In addition, the Board may redact any schedule to this Agreement that discloses the names of Members or the Capital Contributions or other information with respect thereto if the Board determines such action to be necessary.

SECTION 7.2. Reports.

(a) The Company shall use commercially reasonable efforts to deliver, or cause to be delivered, to each Member holding more than 10% of the issued and outstanding Class A Units that is not a Competitor the following:

(i) within 120 days following the end of each Fiscal Year of the Company, a copy of the annual audit report and the audited consolidated financial statements of the Company and its Subsidiaries as of the end of such Fiscal Year;

(ii) within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year ending after the date hereof, the quarterly unaudited consolidated balance sheet of the Company and its Subsidiaries as of the end of such Fiscal Quarter, together with internally prepared consolidated statements of earnings and consolidated statements of cash flows for such Fiscal Quarter;

(iii) within 30 days after the end of each calendar month, the monthly unaudited consolidated balance sheet of the Company and its Subsidiaries as of the end of such prior month, together with internally prepared consolidated statements of earnings and consolidated statements of cash flows for such prior month;

(iv) within 30 days following the end of each Fiscal Year of the Company, the annual budget and business plan of the Company and its Subsidiaries for such Fiscal Year; and

(v) any additional reports, management letter or other detailed information concerning material aspects of the Company's and its Subsidiaries' operations or financial affairs provided by their independent accounts or

auditors (and not otherwise contained in other materials required to be provided in accordance with this Section 7.2(a)).

(b) Reasonably promptly following the release of each of the financial statements set forth in Sections 7.2(a)(i) and 7.2(a)(ii) (but in any event, not later than ten Business Days following any such release by the Company), the Company shall provide a telephonic presentation to the representatives of the recipients of such financial statements to discuss the Company's financial condition and results of operations, following which presentation the Company shall allow representatives of the recipients of the financial statements to ask reasonable questions.

(c) Notwithstanding anything to the contrary herein, no Member shall be furnished with or otherwise entitled to receive any of the foregoing financial information (including participation in quarterly calls) set forth in Section 7.2(a) if such Member at the time such information is to be distributed or call is to take place, is a Competitor. The Board may condition its obligation to provide any information, or otherwise permit any Member (or any of its representatives) to join or otherwise participate in any telephonic conference (including as contemplated by this Section 7.2(b)), on such Member first delivering a certification to the Company confirming that such Member is not a Competitor.

SECTION 7.3. Transmission of Communications. Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice or other communication received from the Company to such other Person or Persons.

SECTION 7.4. Member Information. Each Member shall provide such information as to such Member as the Company may reasonably request from time to time, including as may reasonably be required for the Company or any Subsidiary to comply with applicable law or to file any tax returns. The Members acknowledge and agree that, solely to the extent required by applicable law, the Company may disclose information relating to the Members or their Affiliates to third parties, including in any filing made by the Company or any Subsidiary thereof with any federal or state governmental authority, including the Securities and Exchange Commission or any state level equivalent thereof; provided, however, the Company shall, to the extent reasonably practicable, provide prior written notice to such Member(s) and a reasonable opportunity for such Member(s) to, at its sole cost and expense, seek a protective order or other remedy prior to the disclosure of such information relating to such Member.

## ARTICLE VIII.
## TAX MATTERS

SECTION 8.1. Corporation for U.S. Federal Tax Purposes. The Company shall timely elect under Treasury Regulations Section 301.7701-3 to be treated as an association taxable as a corporation for U.S. federal income tax purposes, effective from the date of the Conversion and filing of the Certificate.

## ARTICLE IX.
## TRANSFER OF UNITS

SECTION 9.1. Transfers of Interests; Restrictions on Transfers.

(a) No Member is permitted to Transfer any interest in any Units except as specifically permitted by Section 9.1(b).

(b) Subject to compliance with the provisions of this Agreement relating to Transfers, any Member may Transfer any Units if (i) such Transfer of Units is to a Permitted Transferee or to a third party transferee who is not an Affiliate of such Member which, as of the expected date of such Transfer, is not a Competitor

unless otherwise approved by the Board (it being understood that the Company may require such transferee to deliver a certificate to such effect to the Company (in form and substance reasonably satisfactory to the Company) as a condition precedent to the consummation of such Transfer), (ii) such Transfer is by a Tagging Member pursuant to Section 9.2, (iii) such Transfer is made pursuant to Section 9.3, (iv) such Transfer is made pursuant to Section 9.4, (v) such Transfer is made pursuant to Section 9.11, (vi) such Transfer is made pursuant to Section 9.12, or (vii) such Transfer of Units is made to the Company; provided that if any such Units are subject to vesting, then those Units shall only be transferrable, other than to a Permitted Transferee, once they are vested.

SECTION 9.2. Tag-Along Right.

(a) In connection with a Transfer, if one or more Members ("Selling Members") propose a Transfer of, in one transaction or a series of related transactions, more than 20% of the then outstanding Class A Units (a "Tag Sale") to any Person other than a Permitted Transferee, then each of the Members owning Class A Units who is not a Selling Member (collectively, the "Tagging Members") shall have the right (but not the obligation) (the "Tag-Along Right") to require the proposed Transferee to purchase from such Tagging Members the number of Class A Units equal to the product of (x) the number of Class A Units proposed to be Transferred by the Selling Members multiplied by (y) a fraction, with (A) the numerator equal to the number of Class A Units owned by such Tagging Member and (B) the denominator equal to the number of Class A Units owned by the Selling Members and the Tagging Members in the aggregate. Any Class A Units purchased from a Tagging Member shall be purchased at the then Relative Price and on the same terms and conditions as are applicable to the Selling Members (the "Transfer Terms"); provided, however, that in order to be entitled to exercise the Tag-Along Right, each Tagging Member must agree to (and thereafter become a party to) all of the agreements, documents and other instruments of conveyance and transfer being entered into by the Selling Members and, in furtherance of the foregoing, must agree (subject to the terms of the immediately following proviso) to make to the proposed Transferee substantially the same representations, warranties, covenants, indemnities and agreements as the Selling Members agree to make in connection with the proposed Tag Sale (but in no event including any non-compete, non-solicit or similar obligations), and agree to the same conditions to such proposed Tag Sale as the Selling Members agree (except that, in the case of representations, warranties, covenants, indemnities, agreements and conditions pertaining specifically to the Selling Members, each other Tagging Member shall make comparable representations, warranties, covenants, indemnities and agreements and shall agree to comparable conditions, in each case, to the extent applicable and pertaining specifically to itself and only to itself); provided further, however, that, all representations, warranties, covenants, indemnities and agreements shall be made by the Selling Members and Tagging Members severally and not jointly, and any liability of the Selling Members and Tagging Members thereunder shall (A) be borne by each of them on a pro rata basis determined according to the aggregate proceeds to be received by them in connection with the Tag Sale, determined as herein provided, and (B) in no event exceed the net proceeds to be paid to the Selling Members and Tagging Members, as applicable, in connection with the Tag Sale (it being understood and agreed that, with respect to representations, warranties, covenants, indemnities and agreements pertaining specifically to any Member, only such Member making such representations, warranties, covenants, indemnities and agreements shall have any liability in respect thereof, subject in all cases to the limitation set forth in clause (B) immediately above). In no event shall the Selling Member structure the Transfer (and agreements related thereto) in a manner that would frustrate the intent of this Section 9.2. Without limiting the foregoing, each Member (other than the 11th Lane Member) hereby irrevocably appoints each Manager such Member's duly appointed proxy and attorney in fact (with full power of substitution and resubstitution) to vote (or act by written consent with respect to) such Member's Class A Units or take any other action that may be necessary of, or required by, such Member in connection with the matters contemplated by this Section 9.2, including in respect of the execution and delivery of any agreement, documentation or other instruments as may be required in connection with a Tag Sale or otherwise in connection with a transaction initiated pursuant to this Section 9.2. The foregoing proxy and

appointment of attorney in fact is coupled with an interest and shall be irrevocable, and each Member (other than the 11th Lane Member) will take such further action or execute such other instruments as may be reasonably necessary to effectuate the intent of such proxy and appointment and hereby revokes any proxy or similar appointment previously granted by such Member with respect to any Class A Units other than any proxy granted pursuant to this Agreement.

(b) The Selling Members shall promptly (and in no event later than ten Business Days prior to the closing date of the Tag Sale) notify in writing the Tagging Members in the event they propose to make a Transfer giving rise to the Tag-Along Right (the "Tag-Along Notice"), and shall furnish the Tagging Members with the Transfer Terms. The Tag-Along Right may be exercised by any Tagging Member by delivery of an irrevocable written notice to each Selling Member proposing to sell Class A Units (the "Tag-Along Election") within ten Business Days following a Member's receipt of the Tag-Along Notice. The Tag-Along Election shall state the amount of Class A Units that such Tagging Member proposes to include in such Transfer to the proposed Transferee and a computation of the purchase price applicable to such Tagging Member. The failure of any Member to deliver a Tag-Along Election within such ten Business Day period shall constitute a waiver by such Member of its right to participate in such Tag Sale, but shall not affect such Member's rights under this Section 9.2 in respect of any subsequent Tag Sale.

(c) If any Tagging Member delivered a Tag-Along Election in respect of any Tag Sale, (i) such Tagging Member shall be irrevocably bound (subject to the terms and conditions set forth in the definitive documentation entered into in connection with such sale) to sell all of the Class A Units set forth in the Tag-Along Election on the terms and conditions set forth in this Section 9.2, and (ii) the closing of the purchase of the Class A Units of any Tagging Member will take place concurrently with the closing of the sale of the Selling Members' Units to the proposed Transferee. In the event that the proposed Transferee does not purchase all of the Class A Units proposed to be purchased from the Selling Members and all of the Class A Units in respect of which any Tagging Members have delivered Tag-Along Elections, then the number of Class A Units proposed to be purchased from the Selling Members shall be reduced by the number of Class A Units the proposed Transferee is required to purchase from the Tagging Members. In the event the proposed Transferee does not purchase all of the required Class A Units from the Tagging Members on the Transfer Terms, subject to the same terms and conditions as are applicable to the Selling Members in such transaction, then the Selling Members shall not be permitted to sell any Class A Units to the proposed Transferee in the proposed Transfer. In the event that no Member exercises its Tag-Along Right, the Selling Members shall have 120 days after the date of the Tag-Along Notice to sell to the proposed Transferee identified therein the Class A Units set forth in such Tag-Along Notice at a price that is not higher than the price set forth in such Tag-Along Notice (other than any increase in price due to purchase price adjustment provisions set forth in the definitive documentation relating thereto), and if such Tag Sale is not consummated on or before such date, the Selling Members shall again be required to comply with the terms set forth in this Section 9.2 with respect to such Tag Sale; provided, however, that if any such Tag Sale shall not have received all required approvals of governmental authorities of competent jurisdiction or other required third party approvals, then the period within which the Selling Members shall be required to consummate such Tag Sale may be extended until the date that is no later than five days following the receipt of all such approvals of such governmental authorities or other third parties (and such Selling Members shall use reasonable efforts to pursue and obtain all such approvals); provided, further, that such extension shall not exceed 150 days. Notwithstanding anything to the contrary contained in this Section 9.2, in the event that all or a portion of the price for Class A Units consists of securities and the sale of such securities to the Tagging Members would require either a registration under the Securities Act or the preparation of a disclosure document pursuant to Regulation D under the Securities Act (or any successor regulation) or a similar provision of any state securities law, then, at the option of the Board, any one or more of the Members may receive, in lieu of such securities, an amount in cash, based on the fair market value of such securities as reasonably determined in good faith by the Board.

(d) In connection with any Tag Sale, the Selling Members and the Tagging Members shall bear their pro rata share of the reasonable out-of-pocket expenditures incurred by the Company, the Tagging Members or the Selling Members in connection with such Tag Sale (based on the proceeds payable to each such Member upon the consummation of the Tag Sale), provided that no such Member shall be obligated to contribute to such expenditures prior to the consummation of the Tag Sale and no such Member shall be obligated to pay more than the consideration actually received by such Member, it being agreed that prior to the consummation of such Tag Sale, such expenditures may be paid by the Company or any Subsidiary thereof. For the avoidance of doubt, this Section 9.2 shall not apply to Transfers of Units to the Company, Transfers of Units to Permitted Transferees or Transfers subject to Section 9.3.

SECTION 9.3. Drag-Along Right.

(a) If one or more Members who together own at least a majority of the outstanding Class A Units of the Company (the "Dragging Member") intends to (i) sell their Units, or receives a bona fide offer from a third Person who is not an Affiliate of the Company or any Dragging Member to consummate, in a single Transfer or a series of related Transfers to a single Transferee or a group of Transferees, a Company Sale; or (ii) exercise their Put Right pursuant to Section 9.11 (in each case of clauses (i)-(ii), an "Approved Sale"), then the Dragging Member shall have the right (the "Drag-Along Right"), but not the obligation, to cause each of the other Members (the "Drag-Along Members") to vote for (whether at a meeting of Members or by written consent), consent to and raise no objections against, and not otherwise impede or delay, such Approved Sale, and to tender for purchase to such third party Transferee all of the Units owned by such Drag-Along Members; provided, that, the Dragging Member has first complied with the requirements of Section 9.12 (to the extent it remains in effect). In furtherance of the foregoing, if the Approved Sale is structured as a (x) merger or consolidation, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (y) sale of Units or other Equity Securities, each Member shall agree to sell, and shall sell, all of his, her or its Units or other Equity Securities and rights to acquire Units or other Equity Securities on the terms and conditions approved by the Dragging Member. Each Member shall take all necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Dragging Member or the Company (including executing and delivering any and all agreements, instruments and other documents, including any applicable purchase agreement, stockholders agreement or indemnification or contribution agreement, and shall be bound by and perform their respective obligations thereunder, including any indemnification or similar obligations thereunder). Without limiting the foregoing, each Member (other than the 11th Lane Member) hereby irrevocably appoints each Manager as such Member's duly appointed proxy and attorney in fact (with full power of substitution and resubstitution) to vote (or act by written consent with respect to) such Member's Units or take any other action that may be necessary of, or required by, such Member in connection with the matters contemplated by this Section 9.3, including in respect of the execution and delivery of any agreement, documentation or other instruments as may be required in connection with an Approved Sale or otherwise in connection with a transaction initiated pursuant to this Section 9.3. The foregoing proxy and appointment of attorney in fact is coupled with an interest and shall be irrevocable, and each Member (other than the 11th Lane Member) will take such further action or execute such other instruments as may be reasonably necessary to effectuate the intent of such proxy and appointment and hereby revokes any proxy or similar appointment previously granted by such Member with respect to any Units other than any proxy granted pursuant to this Agreement.

(b) If the Dragging Member elects to exercise the Drag-Along Right, then it shall so notify each of the Drag-Along Members (the "Drag-Along Notice"). Each Drag-Along Notice shall set forth the name and address of the proposed Transferee, proposed amount and form of consideration and other terms of the Approved Sale offered by the proposed Transferee. Any Units purchased from, or Transferred by, a Drag-Along Member shall be at the then Relative Price and on the same terms and conditions as are applicable to the Dragging Member, other than in respect of any rollover opportunity or any Drag-Along Member who

is an officer, director, employee or consultant of the Company or its Subsidiaries. Any Units that would not receive consideration in such distribution will thereafter be cancelled.

(c) Each Member shall be required to make to the proposed Transferee in an Approved Sale substantially the same representations, warranties, covenants, indemnities and agreements as the Dragging Member agrees to make in connection with such Approved Sale (but in no event including any non-compete, non-solicit or similar obligations), and agree to the same conditions to such transaction as the Dragging Member agrees (except that, in the case of representations, warranties, covenants, indemnities, agreements and conditions pertaining specifically to the Dragging Member, each other Member shall make comparable representations, warranties, covenants, indemnities and agreements and shall agree to comparable conditions, in each case to the extent applicable and pertaining specifically to itself and only to itself); provided, that, all representations, warranties, covenants, indemnities and agreements shall be made by the Members severally and not jointly, and any liability of the Members thereunder shall (i) be borne by each of them on a pro rata basis determined according to the aggregate proceeds to be received by them in connection with the Approved Sale, determined as herein provided, and (ii) in no event exceed the net proceeds to be paid to such Member, as applicable, in connection with the Approved Sale (it being understood and agreed that, with respect to representations, warranties, covenants, indemnities and agreements pertaining specifically to any Member, only such Member making such representations, warranties, covenants, indemnities and agreements shall have any liability in respect thereof, subject in all cases to the limitation set forth in clause (ii) immediately above).

(d) In connection with any Approved Sale, the Members may be required to bear their pro rata share of the reasonable out-of-pocket expenditures incurred by the Company or the Dragging Member in connection with such Approved Sale (based on the proceeds payable to each such Member upon the consummation of the Approved Sale, with the amount of such proceeds to be determined on the terms set forth herein); provided that no Member shall be obligated to contribute to such expenditures prior to the consummation of the Approved Sale and no Member shall be obligated to pay more than the consideration actually received by such Member, it being agreed that prior to the consummation of such Approved Sale, such expenditures may be paid by the Company or any Subsidiary thereof.

SECTION 9.4. Right of First Offer for Class A Units.

(a) In the event that any Member (the "Transferring Member") seeks to Transfer (whether sua sponte or in response to a bona fide offer) to any Person, other than (i) a Permitted Transferee (each, a "Third Party Purchaser"), (ii) in connection with an Approved Sale contemplated by Section 9.3 or (iii) any Company Sale contemplated by Section 9.12, all or any portion of the Class A Units owned by such Member (a "Proposed ROFO Transaction," and such Class A Units to be sold, the "ROFO Units"), the Company, first, and each other Member holding Class A Units, second, shall have a right of first offer to purchase such ROFO Units pursuant to this Section 9.4.

(b) The Transferring Member shall promptly provide written notice to the Company and each other Member of such Transferring Member's desire to effect the Proposed ROFO Transaction and otherwise comply with the provisions of this Section 9.4 (such notice, the "ROFO Offer Notice"), which ROFO Offer Notice must specify the number of ROFO Units to be Transferred by the Transferring Member, and the material terms and conditions (including the price (which must be payable solely in cash or cash equivalents) for each such ROFO Units) pursuant to which the Transferring Member proposes to Transfer the ROFO Units. The Transferring Member's ROFO Offer Notice shall constitute an irrevocable offer to sell all of the ROFO Units to the Company and the other Members, on the basis described below, which offer will expire at the end of (x) for the Company, 20 days after receipt of the ROFO Offer Notice (such period, the "Company ROFO Offer Period") and (y) for the other Members holding Class A Units, 30 days after receipt of the Additional ROFO Rights Member Notice (such period, the "Member ROFO Offer

Period”).

(c) The Company shall have the first option to purchase all or a portion of the ROFO Units. At any time prior to the expiration of the Company ROFO Offer Period, the Company may elect to accept the offer to purchase with respect to any or all of the ROFO Units and shall give written notice of such election (the “Company ROFO Acceptance Notice”) to the Transferring Member, which Company ROFO Acceptance Notice shall indicate the number of ROFO Units that the Company elects irrevocably to purchase on the terms and purchase price set forth in the ROFO Offer Notice. If the Company accepts the offer to purchase all or a portion of the ROFO Units, the closing for such purchase of the ROFO Units by the Company pursuant to this Section 9.4(c) shall take place within 30 days following the expiration of the Company ROFO Offer Period, subject to the satisfaction of all governmental approval or filing requirements necessary to consummate the proposed Transfer. If the Company fails to purchase any of the ROFO Units by exercising its option under this Section 9.4(c) within the Company ROFO Offer Period, the Transferring Member shall so notify the other Members holding Class A Units promptly (the “Additional ROFO Rights Member Notice”), which Additional ROFO Rights Member Notice shall identify the ROFO Units that the Company has failed to purchase (the “Remaining ROFO Units”), including the number of ROFO Units comprising such Remaining ROFO Units. The Remaining ROFO Units shall be subject to the options granted to the other Members holding Class A Units pursuant to Section 9.4(d) below.

(d) If the Company fails to purchase all of the ROFO Units under Section 9.4(c) above, at any time prior to the expiration of the Member ROFO Offer Period, each other Member holding Class A Units may elect to accept the offer to purchase with respect to any or all of the Remaining ROFO Units and shall give written notice (the “Member ROFO Acceptance Notice”) to the Transferring Member and each other Member holding Class A Units, which Member ROFO Acceptance Notice shall indicate the maximum number of Remaining ROFO Units that the Member is willing to purchase, including (x) the number of Remaining ROFO Units it is willing to purchase up to such Member’s Pro Rata ROFO Fraction (as defined below) of such Remaining ROFO Units and (y) the number of Remaining ROFO Units it would purchase in excess of its Pro Rata ROFO Fraction of such Remaining ROFO Units if any other Member holding Class A Units elects not to purchase its Pro Rata ROFO Fraction of such Remaining ROFO Units. The Member ROFO Acceptance Notice shall constitute a valid, legally binding and enforceable agreement for the sale and purchase of the Remaining ROFO Units covered by the Member ROFO Acceptance Notice. The closing for any purchase of Remaining ROFO Units by the other Members holding Class A Units under this Section 9.4(d) shall take place within 30 days following the expiration of the Member ROFO Offer Period or on such other date as may be agreed to by the Transferring Member and the majority of such Members holding Class A Units exercising their rights to purchase the Remaining ROFO Units, subject to the satisfaction of all governmental approval or filing requirements necessary to consummate the proposed Transfer. Each Member’s “Pro Rata ROFO Fraction” shall mean the product obtained by multiplying (A) the total number of Remaining ROFO Units by (B) a fraction, the numerator of which is the total number of Class A Units held by such Member, and the denominator of which is the total number of Class A Units held by all of the Members (other than the Transferring Member), in each case of the date of the ROFO Offer Notice.

(e) The Transferring Member shall notify the other Members holding Class A Units promptly if any Member holding Class A Units fails to offer to purchase all of its Pro Rata ROFO Fraction. Upon the expiration of the Member ROFO Offer Period, the number of Remaining ROFO Units to be purchased by each Member holding Class A Units shall be determined as follows: (A) the number of Remaining ROFO Units as to which such Member electing to purchase, a number of Remaining ROFO Units equal to the lesser of (1) the number of Remaining ROFO Units as to which such Member accepted as set forth in its respective Member ROFO Acceptance Notice or (2) such Member’s Pro Rata ROFO Fraction of such Remaining ROFO Units and (B) second, the balance, if any, not allocated under clause (A) above (the “Excess ROFO Units”), shall be allocated to those Members who, within the Member ROFO Offer Period,

delivered Member ROFO Acceptance Notices that set forth Remaining ROFO Units that exceeded their respective Pro Rata ROFO Fractions (each, a "ROFO Excess Rights Member"), in each case, in an amount equal to the lesser of (1) the number of Excess ROFO Units as to which such Member elected to purchase pursuant to its Member ROFO Acceptance Notice and (2) such Member's Pro Rata ROFO Fraction of such Excess ROFO Units (provided, that solely for the purposes of this Section 9.4(e), the denominator in prong (B) of the defined term "Pro Rata ROFO Fraction" shall be equal to the total number of Class A Units held by all ROFO Excess Rights Members).

(f) In the event that the price set forth in the ROFO Offer Notice is stated in consideration other than cash or cash equivalents, the Transferring Member and the Company shall mutually determine the fair market value of such consideration, reasonably and in good faith, and the Company and/or Members holding Class A Units (other than the Transferring Member), as the case may be, may effect their purchase under this Section 9.4 by payment of such fair market value in cash or cash equivalents.

(g) The failure of the Company or any Member holding Class A Units to deliver a Company ROFO Acceptance Notice or Member ROFO Acceptance Notice, respectively, by the end of the Company ROFO Offer Period or the Member ROFO Offer Period, respectively, shall constitute a waiver of their respective rights of first offer under this Section 9.4 with respect to the Transfer of the ROFO Units in question, but shall not affect their respective rights with respect to any future Transfers. In the event that the Company and the Members do not elect to exercise the rights to purchase under this Section 9.4 with respect to all of the ROFO Units proposed to be sold, then the Transferring Member may sell any such remaining ROFO Units to any eligible third party on the terms and conditions set forth in the ROFO Offer Notice, subject, in each case to the provisions of Section 9.1. Promptly after such Transfer, the Transferring Member shall notify the Company, which in turn shall promptly notify the other Members holding Class A Units, of the consummation thereof and shall furnish such evidence of the completion and time of completion of the Transfer and of the terms thereof. If the Transferring Member's sale to a third party is not consummated in accordance with the terms of the ROFO Offer Notice on or before 60 days after the latest of: (A) the expiration of the Company ROFO Offer Period, (B) the expiration of the Member ROFO Offer Period and (C) the satisfaction of all governmental approval or filing requirements necessary to consummate the proposed Transfer, the Transfer to a third party shall be prohibited and any Transfers of ROFO Units pursuant to such proposed Transfer shall be in violation of the provisions of this Agreement unless the Transferring Member sends a new ROFO Offer Notice and once again complies with the provisions of this Section 9.4 with respect to such proposed Transfer.

(h) For the avoidance of doubt, the provisions of this Section 9.4 shall not apply to Units Transferred to Permitted Transferees or Units Transferred pursuant to Section 9.2, Section 9.3, Section 9.11 or Section 9.12.

SECTION 9.5. Effect of Transfer.

(a) Termination of Rights. Any Member who shall effect a permitted Transfer of any Units in the Company shall cease to be a Member with respect to such Units or other interest and shall no longer have any rights or privileges of a Member with respect to such Units or other interest; provided that such Member shall continue to be liable in respect of any breaches prior to the time of such Transfer.

(b) Deemed Agreement. Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the Company of such Person was subject to or by which such predecessor was bound.

SECTION 9.6. Additional Restrictions on Transfer.

(a) Execution of Counterpart. Each Transferee of Units or other Equity Securities in the Company shall, as a condition prior to such Transfer, execute and deliver to the Company a counterpart to this Agreement pursuant to which such Transferee shall agree to be bound by the provisions of this Agreement. Such counterpart shall include the representations and warranties set forth in Section 3.1(c) as of the date of Transfer.

(b) Notice. In connection with the Transfer of any Units or other Equity Securities in the Company, the holder of such Units or other Equity Securities in the Company will deliver written notice to the Company describing in reasonable detail the Transfer or proposed Transfer.

(c) Legal Opinion. Notwithstanding anything to the contrary contained herein, no Transfer of Units or any other interest in the Company may be made unless upon the advice of counsel, in form and substance satisfactory to the Board, such Transfer (i) would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the Units or other interest to be Transferred or would not constitute a breach of the conditions to any exemption from registration of the Units or other interest under any such laws or a breach of any undertaking or agreement of a Member entered into pursuant to such laws or in connection with obtaining an exemption thereunder, (ii) would not cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended, or (iii) would not cause the Company to subject to the reporting requirements set forth in Section 12(g) of the Exchange Act. Such opinion of counsel shall be delivered in writing to the Company prior to the date of the Transfer.

(d) No Avoidance of Provisions. Without the consent of the Board, no Member shall directly or indirectly (i) permit the Transfer of all or any portion of the direct or indirect equity or beneficial interest in such Member, including by way of the issuance of new equity or beneficial interest in a Member (or the direct or indirect equityholders of a Member) or (ii) otherwise seek to avoid the provisions of this Agreement by issuing, or permitting the issuance of, any direct or indirect equity or beneficial interest in such Member, in any such case in a manner that would fail to comply with this Article IX if such Member had Transferred the Units directly, unless such Member first complies with the terms of this Agreement.

SECTION 9.7. Void Transfers. Any Transfer by any Member of any Units or other interest in the Company in contravention of this Agreement (including the failure of the Transferee to execute a counterpart to this Agreement) shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. No purported Transferee shall have any right to any Distributions of the Company.

SECTION 9.8. Class B Units Special Repurchase Right. [In the event that the Company desires to exercise its right to repurchase any Class B Units, the Class B Units shall be repurchased by the Company at the price and on the terms at which the Company is permitted to repurchase such Class B Units; provided, that in the event that any such Class B Units are held by a Member (including the direct and indirect holders of equity securities in a Member), Manager, officer or Affiliate of the Company or any trust, partnership, company or other entity in which any such Person has a direct or indirect interest, such repurchase shall be subject to the approval requirements of Section 5.7.][5]

SECTION 9.9. No Appraisal Rights. No Member shall be entitled to any valuation, appraisal or similar rights with respect to such Member's Units, whether individually or as part of any class or group of Members, in the event of a merger, consolidation, Company Sale or other transaction involving

---

[5] Note to Draft: Subject to further discussions on the Incentive Plan.

the Company or its securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

SECTION 9.10. Optional Realization Event; Conversion. Notwithstanding anything herein to the contrary, upon the occurrence of a Realization Event, the Board may, in its sole discretion (and shall not be obligated to), elect to convert all outstanding Units of the Company into the applicable number of Standard Units based upon (x) the Board's determination of the Fair Market Value of the equity of the Company at such time (such Fair Market Value of the equity of the Company, the "Valuation Amount"), using whatever information the Board determines to be relevant (including any information that the Board may derive from the pricing associated with the Realization Event) and (y) the relative sharing of the Valuation Amount that each Unit would have received if the Valuation Amount was distributed to the Units in accordance with Article IV. The Board may determine to make a Distribution in respect of Units pursuant to Article IV in connection with a Realization Event and then consummate the conversion into Standard Units thereafter pursuant to the preceding sentence; provided that for the avoidance of doubt, the Valuation Amount shall be calculated after such Distribution that precedes the conversion. In the event that no amounts would have been distributed with respect to any particular Units if the Valuation Amount was to be distributed pursuant to Article IV, then such Units that would not entitle its holder to receive a Distribution shall not be converted and shall instead be automatically cancelled. Upon a conversion of Units into Standard Units, this Agreement shall be amended by the Members *mutatis mutandis* to provide for the existence of such Standard Units.

SECTION 9.11. Put Right.

(a) Notwithstanding anything herein to the contrary, at any time after the date that is 15 days after the Effective Date but prior to the date that is 60 days after the Effective Date (the "Put Period"), any Member holding more than 10% of the Class A Units (each, a "Put Seller") shall have the option and right (the "Put Right"), but not the obligation, to require that the 11th Lane Member purchase all (but not less than all) of such Member's Class A Units (the "Put Units") in accordance with this Section 9.11.

(b) Put Right Procedures; Purchase Price.

(i) If the Put Seller(s), acting in its or their sole discretion, desires to exercise the Put Right, the Put Seller(s) shall deliver to the 11th Lane Member a written, unconditional and irrevocable notice (the "Put Exercise Notice") stating such Put Seller's election to sell the Put Units to the 11th Lane Member for a purchase price per Unit based on an equity valuation of the Company of $41,000,000 (such amount, the "Put Purchase Price").

(ii) The Put Seller(s) shall, at the closing of any purchase consummated pursuant to the Put Right, represent and warrant to the 11th Lane Member that (i) such Put Seller has full right, title, and interest in and to the Put Units, (ii) such Put Seller has all the necessary limited liability company or other power and authority and has taken all necessary action to sell the Put Units as contemplated by this Section 9.11, (iii) the Put Units will be Transferred free and clear of any and all liens, pledges, security interests, options, rights of first offer, encumbrances, or other restrictions or limitations of any nature whatsoever, other than those arising as a result of or under the terms of this Agreement, (iv) there are no conflicts or required governmental approvals required to be obtained by such Put Seller in connection with the transactions contemplated by this Section 9.11 (other than as may be disclosed by such Put Seller, which shall not be a condition

to the closing of the purchase of the Put Units) and (v) no broker or investment banker fee is payable by such Put Seller to any Person in connection with the transactions contemplated by this Section 9.11.

(c) Closing. The closing of the purchase of the Put Units pursuant to this Section 9.11 shall take place no later than 11 Business Days following the delivery of the Put Exercise Notice to the 11th Lane Member; provided, however, in the event of the enactment, issuance, promulgation or enforcement of any law or Order, or any threat in writing to enact, issue, promulgate or enforce any law or Order, that would restrain, enjoin or otherwise prohibit or make illegal the consummation of the transactions contemplated by this Section 9.11 prior to the closing of the purchase of the Put Units, the 11th Lane Member shall have no obligation to consummate the purchase of the Put Units pursuant to this Section 9.11 until resolution of such matter unless sooner terminated under Section 9.11(e), in which case the 11th Lane Member shall have no obligation to consummate the purchase of the Put Units. At the closing of the sale pursuant to this Section 9.11:

(i) the 11th Lane Member shall pay the Put Purchase Price to the Put Seller(s), by wire transfer of immediately available funds, to the account designated by such Put Seller to the 11th Lane Member in writing;

(ii) the Put Seller(s) shall deliver to the 11th Lane Member such instruments of transfer representing the Put Units, including any Unit transfer power or any other instrument reasonably necessary to Transfer the Put Units; and

(iii) the Put Seller(s) shall execute and deliver to the Company: a restrictive covenants agreement to the Company, in form and substance reasonably acceptable to the Company that shall be limited to (A) confidentiality and non-disparagement obligations and (B) a release of any and all claims of such Put Seller(s) against the Company and/or its Subsidiaries in its capacity as an equity holder (and not, for the avoidance of doubt, as a debtholder).

(d) Drag-Along Put Right. If one or more Put Seller(s), who together at least a majority of the outstanding Class A Units of the Company, exercise their Put Right in accordance with this Section 9.11, then, in addition to the procedures set forth in this Section 9.11, Section 9.3 of this Agreement shall automatically apply to the Put Right *mutatis mutandis* and the 11th Lane Member shall be obligated to purchase all of the then-outstanding Class A Units of the Company not already owned by the 11th Lane Member or its Affiliates.

(e) Termination of Put Right. The Put Right in this Section 9.11 shall terminate upon the earliest to occur of the following events after the Effective Date (but prior to the purchase of the Put Units by the 11th Lane Member in accordance with this Section 9.11):

(i) a Company Sale;

(ii) the Company's failure to operate in the ordinary course of business after the Effective Date in any material respect (other than as approved in accordance with Section 5.8);

(iii) the occurrence of a Material Adverse Effect;

(iv) the declaration by the Company of a dividend;

(v) Net Debt on the Effective Date (1) exceeding $160,000,000 or (2) falling below $145,000,000, in each case, after giving effect to any Debt Reduction Election made on or prior to the Effective Date; provided, that the 11th Lane Member and the Put Sellers may each waive this clause (v), respectively, in their sole discretion; and

(vi) the enactment, issuance, promulgation or enforcement of any law or Order, or any threat in writing to enact, issue, promulgate or enforce any law or Order, that would restrain, enjoin or otherwise prohibit or make illegal the consummation of the transactions contemplated by this Section 9.11; provided, that any such law or Order that would restrain, enjoin or otherwise prohibit or make illegal the consummation of the transactions contemplated by this Section 9.11 shall have remained in effect beyond the later of (1) the date that is 45 days from the date of the enactment, issuance, promulgation or enforcement of such law or Order and (2) the expiration of the Put Period; provided, further, that any such threat in writing of the enactment, issuance, promulgation or enforcement of any such law or Order that would restrain, enjoin or otherwise prohibit or make illegal the consummation of the transactions contemplated by this Section 9.11 shall have remained in effect (or not otherwise be rescinded) beyond the date that is 12 months from the date of receipt of such threat in writing by the Company and/or the Members and the Members shall have used reasonable best efforts to resolve such threat during such 12 month period; provided, further that, the 11th Lane Member may waive this clause (vi) in its sole discretion.

(f) Interest and Enforcement Costs.

(i) In the event that the closing of the purchase of the Put Units does not timely occur pursuant to Section 9.11(c) following the delivery of a Put Exercise Notice by one or more Put Seller(s) (other than as the result of a breach by the Put Seller(s) of their respective obligations under this Section 9.11 or due to the termination of the Put Right pursuant to Section 9.11(e)), the Put Seller(s) and the 11th Lane Member acknowledge and agree that the Put Purchase Price shall begin to accrue interest at a rate of 5% per annum, compounded quarterly (the "Interest Amount") on the first Business Day following the date on which the purchase of the Put Units by the 11th Lane Member should have occurred in accordance with Section 9.11(c). Upon the ultimate consummation of the purchase of the Put Units on or following the first Business Day following the date on which the purchase of the Put Units by the 11th Lane Member should have occurred in accordance with Section 9.11(c), the 11th Lane Member acknowledges and agrees that, in addition to the Put Purchase Price, the 11th Lane Member shall be responsible to the Put Seller(s) for the (A) Interest Amount and (B) reimbursement of the out-of-pocket fees, costs and expenses (including reasonable attorneys' fees) incurred or payable by the Put Seller(s) in connection with enforcing its rights under this Section 9.11(f) (the "Enforcement Costs," and together with the Interest Amount, the "Interest and Enforcement Costs"). The Members agree that

payment of the Interest and Enforcement Costs are not a penalty, but rather are liquidated damages in a reasonable amount that will compensate the Put Seller(s) in the event that the closing of the purchase of the Put Units does not timely occur in accordance with Section 9.11(c) for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be uncertain and incapable of accurate determination.

(ii) From the Effective Date until the earlier of the (A) closing of the purchase of the Put Units pursuant to Section 9.11 and (B) termination of the Put Right in accordance with Section 9.11(e), the 11th Lane Member acknowledges and agrees that it will operate in the ordinary course of business consistent with past practice, including not assigning, forgiving or otherwise disposing of any loans, indebtedness, promissory notes or other debt securities or equity securities of any Person held by the 11th Lane Member.

(iii) Notwithstanding anything herein to the contrary, in the event of the closing of the purchase of the Put Units on or following the first Business Day following the date on which the purchase of the Put Units by the 11th Lane Member should have occurred in accordance with Section 9.11(c), the Put Seller(s) right to receive any Interest and Enforcement Costs pursuant to Section 9.11(f)(i), in addition to the Put Purchase Price, shall be the sole and exclusive remedy of the Put Seller(s) against the 11th Lane Member for any loss suffered as a result of the failure of the closing of the purchase of the Put Units to timely occur pursuant to Section 9.11(c) following the delivery of a Put Exercise Notice by such Put Seller(s) (other than as the result of a breach by the Put Seller(s) of their respective obligations under this Section 9.11 or due to the termination of the Put Right pursuant to Section 9.11(e)), and that the 11th Lane Member shall not have any further liability or obligation relating to or arising out of this Section 9.11 or the transactions contemplated by this Section 9.11.

(iv) The Members have carefully reviewed this provision and acknowledge that the liquidated damages specified in this provision are fair and reasonable and adequately compensate the Put Seller(s) for the harm caused by the failure to timely close the purchase of the Put Units pursuant to Section 9.11(c) following the delivery of a Put Exercise Notice by such Put Seller(s) (other than as the result of a breach by the Put Seller(s) of their respective obligations under this Section 9.11 or due to the termination of the Put Right pursuant to Section 9.11(e)).

SECTION 9.12. Right of First Refusal for Company Sale.

(a) In the event that the Company or one or more Member(s) who together hold at least a majority of the Class A Units, as applicable, receive a bona-fide written offer, including a term sheet or letter of intent, from any third-party Person with respect to the consummation of a Company Sale (such proposed transaction, a "Proposed Company Sale Transaction"), the 11th Lane Member shall have a right of first refusal to effect such Company Sale with the Company or the Member(s), as applicable, pursuant to this

Section 9.12 for so long as the 11th Lane Member and any of its Affiliates holds at least 33% of the issued and outstanding Class A Units[; provided, however, that the 11th Lane Member shall not have a right of first refusal pursuant to this Section 9.12 with respect to any Proposed Company Sale Transaction which would result in aggregate proceeds to the Member(s) for the Class A Units in an amount equal to or greater than $[●]].[6]

(b) The Member(s) shall promptly provide written notice to the 11th Lane Member of their desire to accept and consummate the Proposed Company Sale Transaction and otherwise comply with the provisions of this Section 9.12 (such notice, the "Company Sale Offer Notice"), which Company Sale Offer Notice must specify in reasonable detail, (i) the proposed structure of the Company Sale, (ii) the identity of the proposed third-party purchaser (to the extent legally and contractually disclosable), and (iii) the material terms and conditions (including (A) the purchase price (including a description of any non-cash consideration in sufficient detail to permit the valuation thereof, if applicable) and (B) the proposed closing date of the Proposed Company Sale Transaction) pursuant to which the Member(s) propose to effect the Company Sale. The Company Sale Offer Notice shall constitute an irrevocable offer to effect the Company Sale with the 11th Lane Member, on the basis described below, which offer will expire 20 days following receipt by the 11th Lane Member of the Company Sale Offer Notice (such period, the "Company Sale Offer Period").

(c) The 11th Lane Member shall have the right of first refusal to effect the Company Sale. At any time prior to the expiration of the Company Sale Offer Period, the 11th Lane Member may elect to consummate the Company Sale and shall give written notice of such election (the "Company Sale Acceptance Notice") to the Member(s), which Company Sale Acceptance Notice shall indicate the that the 11th Lane Member elects irrevocably to effect the Company Sale on the same terms and purchase price set forth in the Company Sale Offer Notice. If the 11th Lane Member elects to consummate the Company Sale, the closing for such Company Sale pursuant to this Section 9.12 shall take place within 45 days following the later of (i) the expiration of the Company Sale Offer Period and (ii) the satisfaction of all governmental approval or filing requirements necessary to consummate the Proposed Company Sale Transaction; provided, that if the governmental approvals are not received or filings are not made within 60 days of the delivery of the Company Sale Acceptance Notice, the 11th Lane Member's right of first refusal with respect to the Proposed Company Sale Transaction shall terminate and the Member(s) may effect, or cause the Company to effect, the Proposed Company Sale Transaction with such third-party Person identified in the Company Sale Offer Notice on the same terms and conditions, including the price (but no less than such price), set forth in the Company Sale Offer Notice.

(d) The failure of the 11th Lane Member to deliver a Company Sale Acceptance Notice by the end of the Company Sale Offer Period shall constitute a waiver of its right of first refusal under this Section 9.12 with respect to the Proposed Company Sale Transaction described in the Company Sale Offer Notice, but shall not affect its rights with respect to any future Company Sale. In the event that the 11th Lane Member does not elect to exercise its right of first refusal to effect the Company Sale under this Section 9.12, then the Member(s) may effect, or cause the Company to, effect the Proposed Company Sale Transaction with such third-party Person identified in the Company Sale Offer Notice on the same terms and conditions, including the price (but no less than such price), set forth in the Company Sale Offer Notice. Promptly after the consummation of such Proposed Company Sale Transaction, the Member(s) shall notify the 11th Lane Member of the consummation thereof and shall furnish reasonable evidence of the consummation of the Company Sale (including the date of completion) and the terms and conditions thereof. If the Proposed Company Sale Transaction is not consummated with such third party in accordance with the terms of the Company Sale Offer Notice on or before 90 days after the latest of: (i) the Company Sale Offer Period and (ii) the satisfaction of all governmental approval or filing requirements necessary to

---

[6] Note to Draft: Subject to further discussion.

consummate the Proposed Company Sale Transaction, the consummation of the Proposed Company Sale Transaction with a third party shall be prohibited, and any Company Sale pursuant to such Proposed Company Sale Transaction shall be in violation of the provisions of this Agreement unless the Member(s) send a new Company Sale Offer Notice and once again complies with the provisions of this Section 9.12 with respect to such proposed disposition.

(e) The 11th Lane Member acknowledges and agrees that its rights under this Section 9.12 shall terminate in the event that (i) the Put Right is exercised in accordance with Section 9.11 and the consummation of the purchase of the Put Units fails to occur or is terminated pursuant to Section 9.11(e)(vi) as applied to the 11th Lane Member or (ii) the 11th Lane Member and its Affiliates no longer hold at least 33% of the issued and outstanding Class A Units.

## ARTICLE X.
## ADMISSION OF MEMBERS

SECTION 10.1. Substituted Members. In connection with the Transfer of Units of a Member permitted under the terms of this Agreement, the Transferee shall become a Member on the later of (a) the effective date of such Transfer, and (b) the date on which the Board approves such Transferee as a Member, if such approval is required hereunder, and such admission shall be shown on the books and records of the Company.

## ARTICLE XI.
## WITHDRAWAL AND RESIGNATION OF MEMBERS

SECTION 11.1. Withdrawal and Resignation of Members. No Member shall have the power or right to withdraw from the Company prior to the dissolution and winding up of the Company pursuant to Article XII, without the prior written consent of the Board (which consent may be withheld by the Board in its sole discretion). Upon a Transfer of all of a Member's Units in a Transfer permitted by this Agreement, such Member shall cease to be a Member. Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Member will not be considered a Member for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Member's Units (and corresponding voting and other rights) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

## ARTICLE XII.
## DISSOLUTION AND LIQUIDATION

SECTION 12.1. Dissolution. The Company shall not be dissolved by the admission of additional Members or substituted Members. The Company shall dissolve, and its affairs shall be wound up upon the first of the following to occur:

(a) approval of the holders of Class A Units in accordance with Section 5.7(b); or

(b) the entry of a decree of judicial dissolution of the Company under Section 35-5 of the Delaware Act or an administrative dissolution under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XII, the Company is intended to have perpetual existence.

SECTION 12.2. Liquidation and Termination. On the dissolution of the Company, the Board shall act as liquidator or may appoint one or more representatives, Members or other Persons as

liquidator(s). The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Delaware Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Board. The steps to be accomplished by the liquidators are as follows:

(a) The liquidators shall pay, satisfy or discharge from the Company's funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine).

(b) As promptly as practicable after dissolution, the liquidators shall (i) determine the Fair Market Value (the "Liquidation FMV") of the Company's remaining assets (the "Liquidation Assets") in accordance with Article XIII hereof, (ii) determine the amounts to be distributed to each Member in accordance with Section 12.2(c), and (iii) deliver to each Member a statement (the "Liquidation Statement") setting forth the Liquidation FMV and the amounts and recipients of such Distributions.

(c) As soon as the Liquidation FMV and the proper amounts of Distributions have been determined in accordance with Section 12.2(b) above, the liquidators shall promptly distribute the Company's Liquidation Assets to the holders of Units in accordance with Section 4.1(a).

The distribution of cash or property to a Member in accordance with the provisions of this Section 12.2 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its interest in the Company and all of the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Delaware Act. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

SECTION 12.3. Cancellation of Certificate. On completion of the distribution of the Company's assets as provided herein, the Company is terminated (and the Company shall not be terminated prior to such time), and the Board (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled and take such other actions as may be necessary to terminate the Company. The Company shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 12.3.

SECTION 12.4. Reasonable Time for Winding Up. A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 12.2 in order to minimize any losses otherwise attendant upon such winding up.

SECTION 12.5. Return of Capital. The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from the Company's assets).

## ARTICLE XIII.
## VALUATION

SECTION 13.1. Valuation of Securities and Other Assets. Subject to Section 13.2, the Fair Market Value of the assets of the Company or of a Unit or any other asset will be determined by the Board (or, if pursuant to Section 12.2, the liquidators) in its good faith judgment in such manner as its deems reasonable and using all factors, information and data deemed to be pertinent.

SECTION 13.2. Valuation Methodology. The "Fair Market Value" of (a) a specific asset, means the amount that the Company or other owner thereof would receive in an all-cash sale of such asset (free and clear of all liens and after payment of all liabilities secured by such asset) in an arm's-length transaction with an unaffiliated third party consummated on the day immediately preceding the date on which the event occurred that necessitated the determination of the Fair Market Value (and after giving effect to any transfer Taxes payable in connection with such sale); and (b) the Company, means the amount that the Company would receive in an all-cash sale of all of its assets and businesses as a going concern (free and clear of all liens and after payment of all indebtedness for borrowed money and other liabilities that would customarily reduce the enterprise value of a business when computing the equity value thereof) in an arms-length transaction with an unaffiliated third party consummated on the day immediately preceding the date on which the event occurred that necessitated the determination of the Fair Market Value (assuming that all of the proceeds from such sale were paid directly to the Company other than an amount of such proceeds necessary to pay transfer Taxes payable in connection with such sale, which amount will not be received or deemed received by the Company). In all cases, the determination of Fair Market Value shall be determined in good faith by the Board or by such process as determined by the Board. Except as otherwise provided herein or in any agreement, document or instrument contemplated hereby, any amount to be paid under this Agreement by reference to the Fair Market Value shall be paid in full in cash, and any Unit being transferred in exchange therefor will be transferred free and clear of all liens.

## ARTICLE XIV.
## GENERAL PROVISIONS

SECTION 14.1. Opportunities and Competition. Notwithstanding anything to the contrary contained herein, but subject to and without limiting any other obligations that a Member may have to the Company pursuant to any separate written agreement signed by such Member or Manager and the Company, (a) no Member or Manager shall be required to manage the Company and its Subsidiaries as its sole and exclusive function, and the Managers, Members and any of their respective Affiliates may dedicate such time to the business of the Company and its Subsidiaries as they shall determine to be necessary or appropriate in their sole discretion, and the Managers, Members and their respective Affiliates may have other business interests and may engage in other activities in addition to those relating to the Company and its Subsidiaries, and such other business interests or activities may be of any nature or description, and may be engaged in independently or with others, and may be competitive with the business of the Company or its Subsidiaries, and (b) none of the Company, any Subsidiary thereof nor any Member or any Affiliate thereof or any other Person shall have any right, by virtue of this Agreement or the Company relationship created hereby or otherwise, in or to such other ventures or activities of the Managers or any other Member or any of their respective Affiliates, or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company or any Subsidiary thereof, shall not be (or be deemed) wrongful or improper or a breach of this Agreement, and no notice of the pursuit thereof or the engagement therein shall be required to be provided to the Company, any Subsidiary thereof, any Member, any Affiliate thereof or any other Person. Notwithstanding the foregoing, in the event that during the term of this Agreement any of the Members (including their Affiliates), other than the Citadel Member (and its Affiliates) and the 11th Lane Member (and its Affiliates), acquires knowledge of a potential transaction or matter that may be a corporate or other business opportunity for the Company or any of its Subsidiaries, such Person shall communicate or present such corporate opportunity to the Company or its Subsidiaries and shall not pursue such opportunity unless and until the Company or its Subsidiaries renounces its interest in such potential transaction or matter in writing.

SECTION 14.2. Amendments.

(a) This Agreement may be amended, modified, or waived with the written consent of the Company and holders of no less than 60% of the Class A Units; provided that if any such amendment,

modification, or waiver would adversely affect in any material respect any Member (solely in its capacity as a Member) in a manner disproportionate to its effect on the other Members holding the same class(es) of Units (solely in their respective capacity as a Member of the same class(es) of Units), such amendment, modification, or waiver shall also require the written consent of the Member so adversely affected; provided, further, that any amendments reasonably required to effect an action described in Section 5.7 that is otherwise validly approved by Members holding at least a majority of the Class A Units shall only require such majority approval; provided, further that any amendments, modifications or waiver of Section 5.8 or any amendments reasonably required to effect an action described in Section 5.8 shall require such 66.66% approval; and provided, further, that, except in connection with any event set forth in Section 5.7(a), Section 5.8(b), or any similar transaction affecting all rights of the Members set forth in this Agreement, no amendment, modification or waiver of the preemptive rights set forth in Section 6.6 or the Put Right in Section 9.11 shall be effective without the unanimous approval of each Member holding at least 10% of the Class A Units.

(b) Notwithstanding anything contained in Section 14.2 to the contrary, the following amendments, modifications and waivers of this Agreement may be made by the Company (with the approval of the Board (in its sole discretion)) from time to time, without the consent of any Member, by delivery of a written notice of such amendment, modification or waiver to the Members: (A) to correct any typographical or similar ministerial errors in this Agreement or any schedule or exhibit hereto (including the Schedule of Members); (B) to delete or add any provisions of this Agreement required to be so deleted or added to comply with applicable law; (C) to reflect the authorization, creation and issuance (including, for the avoidance of doubt, the designations, preferences, privileges and rights) of any additional Units (or any securities convertible into, or exercisable or exchangeable for, Units) otherwise consummated in accordance with this Agreement and the Certificate; and (D) in connection with any Transfer otherwise consummated in accordance with this Agreement, to reflect the addition or removal of any Person as a Member.

(c) Except as required by applicable law, no amendment, modification or waiver of any provision of or under this Agreement shall require the consent of any Person not a party to this Agreement.

SECTION 14.3. Title to the Company Assets. The Company's assets (real or personal, tangible or intangible, including limited liability company interests) shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such the Company's assets or any portion thereof. Legal title to any or all of the Company's assets may be held in the name of the Company or one or more nominees, as the Board may determine. The Board hereby declares and warrants that any of the Company's assets for which legal title is held in the name of any nominee shall be held in trust by such nominee for the use and benefit of the Company in accordance with the provisions of this Agreement. All of the Company's assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which legal title to such assets is held. Each Member hereby expressly waives the right to require the partition of any Company property or any part thereof.

SECTION 14.4. Remedies. Each Member and the Company shall have all rights and remedies set forth in this Agreement and all rights and remedies that such Person has been granted at any time under any other agreement or contract and all of the rights that such Person has under any law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.

SECTION 14.5. Successors and Assigns. Except as otherwise provided herein, all covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto, any other Members and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns, whether so expressed or not.

SECTION 14.6. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

SECTION 14.7. Counterparts; Binding Agreement. This Agreement may be executed simultaneously in two or more separate counterparts (including by means of facsimile), any one of which need not contain the signatures of more than one party, but each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto and the other Members. This Agreement and all of the provisions hereof shall be binding upon and effective as to each Person who (a) is a Member, (b) executes this Agreement in the appropriate space provided in the signature pages hereto notwithstanding the fact that other Persons who have not executed this Agreement may be listed on the signature pages hereto or (c) may from time to time become a party to this Agreement by executing a counterpart of or joinder to this Agreement.

SECTION 14.8. Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Whenever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either" and "any" shall not be exclusive. All references to "laws" shall include applicable laws, rules, regulations ordinances, treaties, rulings and judgments. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

SECTION 14.9. Applicable Law; Jurisdiction, Waiver of Jury Trial. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. ANY DISPUTE RELATING HERETO SHALL BE HEARD IN THE DELAWARE COURT OF CHANCERY IN NEW CASTLE COUNTY, OR IN THE EVENT (BUT ONLY IN THE EVENT) THAT SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER SUCH ACTION, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, AND EACH OF THE PARTIES HERETO HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF ANY SUCH LEGAL PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF

VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. AS A SPECIFICALLY BARGAINED FOR INDUCEMENT FOR EACH OF THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT (AFTER HAVING THE OPPORTUNITY TO CONSULT WITH COUNSEL), THE COMPANY AND EACH MEMBER HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG THE MEMBERS OR BETWEEN THE COMPANY AND CERTAIN MEMBERS (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE RELATIONSHIPS ESTABLISHED AMONG THE PARTIES HEREUNDER.

SECTION 14.10. Addresses and Notices. All notices, demands, or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made (a) on such Business Day, when sent by email before 5:00 p.m. local time of recipient on any Business Day, (b) on the next Business Day, when sent by email between 5:00 p.m. local time of recipient on any Business Day or any time on a day that is not a Business Day, (c) when delivered personally to the recipient or (d) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Any notice to the Board or the Company shall be deemed given if received by the Board at the principal office of the Company designated pursuant to Section 2.5. Such notices, demands, and other communications shall be sent to the Members at the addresses set forth on the signature page of this Agreement, and if to the Company, as follows:

If to the Company, addressed to:

Corelle Brands Acquisition Holdings LLC
3025 Highland Parkway
Downers Grove, IL 60515
Attn: Cathy Landman
Email: Cathy.Landman@instantbrands.com

with a copy (which shall not constitute notice) to:

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attn: Allan Brilliant
Nick Marchica
Email: allan.brilliant@dechert.com
nick.marchica@dechert.com

or to such other addresses or addressees as may be designated by notice given in accordance with the provisions of this Section 14.10.

SECTION 14.11. Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any of its Affiliates, and no creditor who makes a loan to the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Distributions, capital or property of the Company, other than as a secured creditor.

SECTION 14.12. Waiver. No failure by any party or other Member to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

SECTION 14.13. Further Action. The parties and the other Members agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

SECTION 14.14. Entire Agreement. This Agreement, those documents expressly referred to herein and other documents as of the date herewith embody the complete agreement and understanding among the parties and the other Members and supersede and preempt any prior understandings, agreements or representations by or among the parties and the other Members, written or oral, which may have related to the subject matter hereof in any way.

SECTION 14.15. No Effect on Lending Relationship. Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any Member in its capacity as a lender to, or investor in debt securities issued by, the Company or any of its Subsidiaries pursuant to any agreement which the Company or any of its Subsidiaries has borrowed money. Without limiting the generality of the foregoing, any such Person, in exercising its rights as a lender or debt investor, shall have no duty to consider (a) its or any of its Affiliates' status as a direct or indirect equityholder of the Company or any of its Subsidiaries, (b) the interests of the Company, or any of its Subsidiaries, (c) the Equity Securities of the Company or the equity interests of any of its Subsidiaries, or (d) any duty it or any of its Affiliates may have hereunder or otherwise to any other direct or indirect equityholder of the Company or any of its Subsidiaries, except as may be specifically and expressly required under the applicable loan documents or by applicable law (including commercial law applicable to creditors generally).

SECTION 14.16. Specific Performance. The parties hereto agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity, and shall not be required to post a bond or other collateral in connection therewith.

SECTION 14.17. Effect of IPO. Unless the holders of a majority of the issued and outstanding Class A Units determine otherwise, this Agreement shall terminate upon the occurrence of an IPO Conversion.

SECTION 14.18. Use of Member's Name. None of the Company, its Subsidiaries and their respective representatives shall issue any press releases or other public disclosure using the name of any Member or any of its Affiliates without such Member's prior written consent; provided, however, the exceptions set forth in Section 6.5 shall apply *mutatis mutandis* to the Company, its Subsidiaries and their respective representatives with respect to the disclosure of the name of a Member or any of its Affiliates (in any press release, other public disclosure or otherwise) as if the name of such Member or any of its Affiliates were "Confidential Information" (as defined herein).

SECTION 14.19. No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Members may be partnerships or limited liability companies, the Company and each Member covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this

Agreement shall be had against any Member's Affiliates, and its and their respective former, current or future direct or indirect equity holders, controlling Persons, stockholders, directors, officers, employees, agents, members, financing sources, managers, general or limited partners or assignees (collectively, the "Non-Recourse Parties"), in each case other than the Company, the Members or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Company or the Members under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, and for the avoidance of doubt, nothing in this Section 14.19 shall relieve or otherwise limit the liability of the Company or any Member, as such, for any breach or violation of its obligations under this Agreement or such documents or instruments.

SECTION 14.20. Opt-in to Article 8 of the Uniform Commercial Code. The Members hereby agree that the Units shall be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

* * * * *

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

COMPANY:

CORELLE BRANDS ACQUISITION HOLDINGS LLC

By: ___________________________________
Name:
Title:

MEMBERS:

[MEMBER]

By: ___________________________________
Name:
Title:

Address:

[Address]

[MEMBER]

By: ___________________________________
Name:
Title:

Address:

[Address]

[MEMBER]

By: ___________________________________
Name:
Title:

Address:

[Address]

**EXHIBIT A – SCHEDULE OF MEMBERS**

| **Member** | **Capital Contribution** | **Class A Units** | **Class B Units** | **Date of Issuance** | **Purchase Price Per Class A Unit ($)** | **Purchase Price Per Class B Unit ($)** |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total:** | | | | | | |

## ANNEX 1 – BAD ACTOR REPRESENTATIONS

Except as has been previously disclosed to the Company in writing, each Member hereby represents and warrants the following with respect to itself and any other Person who, within the meaning of Rule 506(d) of Regulation D under the Securities Act would be a "beneficial owner of 20% or more of the issuer's outstanding voting equity securities" with respect to such Member's interest in the Company:

1.1.1 It has not been convicted, within the past ten years, of any felony or misdemeanor:

(a) in connection with the purchase or sale of any security;

(b) involving the making of any false filing with the SEC; or

(c) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

1.1.2 It is not the subject of any order, judgment or decree of any court of competent jurisdiction, entered within the prior five years, that restrains or enjoins such Member from engaging or continuing to engage in any conduct or practice:

(a) in connection with the purchase or sale of any security;

(b) involving the making of any false filing with the SEC; or

(c) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities.

1.1.3 It is not the subject of a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration, that bars such Member from:

(a) association with an entity regulated by such commission, authority, agency, or officer;

(b) engaging in the business of securities, insurance or banking; or

(c) engaging in savings association or credit union activities.

1.1.4 It is not the subject of a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration, that constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within the past ten years.

1.1.5 It is not the subject to an order of the SEC entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 or section 203(e) or (f) of the Investment Advisers Act of 1940 that:

(a) suspends or revokes such Member's registration as a broker, dealer, municipal securities dealer or investment adviser;

(b) places limitations on such Member's activities, functions or operations of, or imposes civil money penalties on such Member; or

(c) bars such Member from being associated with any entity or from participating in the offering of any penny stock.

1.1.6 It is not subject to any order of the SEC entered within the prior five years that orders such Member to cease and desist from committing or causing a violation or future violation of:

(a) any scienter-based anti-fraud provision of the federal securities laws; or

(b) Section 5 of the Securities Act of 1933.

1.1.7 It is not suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade.

1.1.8 It has not filed (as a registrant or issuer), or been named as an underwriter in any registration statement or Regulation A offering statement filed with the SEC that, within the past five years, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is currently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued.

1.1.9 It is not the subject of any ongoing proceeding, arbitration, action, indictment or charge that if resolved against such Member or such Person could result in any statement in this Annex 1 being untrue.