# Exhibit 7

# AMENDMENT TO CREDIT AGREEMENT

AMENDMENT TO CREDIT AGREEMENT (this "**Amendment**"), dated as of September 5, 2025, among Instant Brands Litigation Trust (the "**Borrower**"), the Lenders party hereto, and Acquiom Agency Services LLC, as Administrative Agent (the "**Administrative Agent**").

## WITNESSETH

WHEREAS, the Borrower, the Lenders and the Administrative Agent entered into that certain Credit Agreement, dated as of February 27, 2024 (as amended, restated, supplemented, increased, extended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"); and

WHEREAS, in connection with this Amendment, the Borrower has requested, and the Administrative Agent and the Lenders are willing, to amend certain provisions of the Credit Agreement as set forth herein, in each case subject to the terms and conditions set forth in this Amendment;

NOW, THEREFORE, in consideration of the agreements hereinafter set forth, and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## PART 1
## DEFINITIONS

Unless otherwise defined herein or the context otherwise requires, capitalized terms used in this Amendment, including its preamble and recitals, have the meanings provided in the Credit Agreement.

## PART 2
## AMENDMENTS TO CREDIT AGREEMENT

(a) Each of the following shall be added as a new definition in Section 1.01 of the Credit Agreement in proper alphabetical order:

"**First Amendment**" means that certain First Amendment to Credit Agreement, dated as of the First Amendment Effective Date, among the Borrower, the Lenders and the Administrative Agent.

"**First Amendment Effective Date**" means September 5, 2025.

(b) The definition of "Incremental Amount" set forth in Section 1.01 of the Credit Agreement is hereby amended and restated in its entirety to read in full as follows:

"**Incremental Amount**" means $5,000,000.

(c) Clause (a) of Section 4.03 of the Credit Agreement shall be deleted and replaced in the Credit Agreement in its entirety by the following:

"[reserved];".

(d) Section 2.03 of the Credit Agreement shall be amended by adding thereto the following new clause (c):

"(c) Notwithstanding any other provision hereof (including without limitation clauses (a) and (b) of this Section 2.03), no Loan of any Lender shall be prepaid hereunder without the express prior written consent of such Lender furnished by such Lender to the Administrative Agent and the Borrower. Prepayments under clauses (a) and (b) of this Section 2.03 to be made to any Lender hereunder pursuant to such Lender's express prior written consent in accordance with the immediately preceding sentence, shall be made to such Lender in each case in its ratable amount in accordance with clause (a) or (b) of this Section 2.03, as applicable, as if all Lenders had consented to such prepayment in such case, and with the amount of such prepayment hereunder to such Lender being unaffected by the provisions of this clause (c)."

## PART 3
## CONDITIONS TO EFFECTIVENESS

This Amendment shall become effective as of the date hereof (the "**First Amendment Effective Date**") when all of the following conditions set forth in this Part 3 shall have been satisfied, and thereafter this Amendment shall be known, and may be referred to, as the "**First Amendment**":

(a) Counterparts of Amendment. The Administrative Agent shall have received counterparts of this Amendment, which collectively shall have been duly executed on behalf of the Borrower, the Lenders and the Administrative Agent.

(b) Fees and Expenses. The Borrower shall have paid the reasonable fees and expenses incurred by the Administrative Agent and the Lenders (including the reasonable fees and expenses of legal counsel of each of the foregoing), in connection with the preparation, execution and delivery of this Amendment.

(c) Representations and Warranties; No Default. The representations and warranties of the Borrower set forth in the Loan Documents are and shall be true and correct in all material respects (without duplication of any materiality qualifier therein) on and as of the First Amendment Effective Date, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of such date or for such period, as the case may be. No Default or Event of Default has occurred or shall have occurred and be continuing as of the First Amendment Effective Date.

## PART 4
## MISCELLANEOUS

(a) Representations and Warranties. The Borrower hereby represents and warrants to the Administrative Agent and the Lenders that, immediately after giving effect to this Amendment, (i) no Default or Event of Default shall have occurred and be continuing, (ii) the execution and delivery by the Borrower of this Amendment and the performance by the Borrower of its Obligations hereunder, do not conflict with, result in the breach of any terms and provisions of, or constitute (with or without a notice or lapse of time or both) a default under the Litigation Trust Agreement or any Contractual Obligation of the Borrower and (iii) the representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct in all material respects (without duplication of any materiality qualifier therein) on and as of the First Amendment Effective Date, except that any such representation and warranty that expressly relates to a given date or period shall be true and correct in all material respects (without duplication of any materiality qualifier therein) as of such date or for such period, as the case may be.

(b) Reaffirmation of the Borrower Obligations. The Borrower hereby ratifies the Credit Agreement and acknowledges and reaffirms (i) that it is bound by all terms of the Credit Agreement and (ii) that it is responsible for the observance and full performance of the Obligations.

(c) Cross-References. References in this Amendment to any Part or clause are, unless otherwise specified, to such Part or clause of this Amendment.

(d) Instrument Pursuant to Credit Agreement. This Amendment is a Loan Document executed pursuant to the Credit Agreement and shall (unless otherwise expressly indicated therein) be construed, administered and applied in accordance with the terms and provisions of the Credit Agreement.

(e) References in Other Loan Documents. At such time as this Amendment shall become effective pursuant to the terms of Part 3, all references in the Credit Agreement to the "Agreement" or in any other Loan Document to the "Credit Agreement" shall be deemed to refer to the Credit Agreement as amended by this Amendment.

(f) Counterparts. This Amendment may be executed by the parties hereto in several counterparts, each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement. Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by email as a ".pdf" or ".tiff" attachment shall be effective as delivery of a manually executed counterpart of this Amendment.

(g) Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of law.

(h) Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(i) Consent to Jurisdiction; Service of Process; Waiver of Jury Trial. The jurisdiction, service of process and waiver of jury trial provisions set forth in Sections 10.07(b) of the Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.

(j) Conformed Version of Credit Agreement. Attached as Exhibit A to this Amendment is a conformed version of the Credit Agreement, indicating the modifications to the Credit Agreement made by this Amendment.

(k) Administrative Agent. Each of the Lenders party hereto (constituting all of the Lenders under the Credit Agreement) hereby authorize and direct the Administrative Agent to execute and deliver this Amendment. In entering this Amendment, the Administrative Agent shall be entitled to all of the same rights, protections, immunities and indemnities afforded to the Administrative Agent in the Credit Agreement and the other Loan Documents.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Amendment to be duly executed and delivered as of the date first above written.

BORROWER:

INSTANT BRANDS LITIGATION TRUST

By: [signature], Trustee

Name: Alan D. Halperin solely in his capacity as Litigation Trustee

ADMINISTRATIVE AGENT:

ACQUIOM AGENCY SERVICES LLC,
as Administrative Agent

By: J. Anderson
Name: Jennifer Anderson
Title: Senior Director

[Signature Page to First Amendment to Credit Agreement]

LENDERS:

**CITADEL CREDIT MASTER FUND LLC**,
as a Lender
By its Manager, Citadel Advisors LLC

By: 

Name: Christopher Ramsay
Title: Authorized Signatory

**SARATOGA INVESTMENT CORP CLO 2013-1 LTD.**, as a Lender
By: Saratoga Investment Corp, its Investment Manager

By: [signature]
Name: Thomas V. Inglesby
Title: Managing Director

Exhibit A

Conformed Version of the Credit Agreement

**Execution Version**
**Conformed Through First Amendment**

CREDIT AGREEMENT

dated as of February 27, 2024

among

Instant Brands Litigation Trust,
as the Borrower,

Acquiom Agency Services LLC,
as Administrative Agent

and

The Lenders Party Hereto

TABLE OF CONTENTS


Page

ARTICLE I DEFINITIONS AND INTERPRETATION 1

SECTION 1.01 DEFINED TERMS 1

SECTION 1.02 OTHER INTERPRETIVE PROVISIONS 12

ARTICLE II LOAN FACILITY 13

SECTION 2.01 LOANS 13

SECTION 2.02 BORROWINGS OF LOANS 13

SECTION 2.03 PREPAYMENTS 13

SECTION 2.04 REPAYMENT OF LOANS 13

SECTION 2.05 INTEREST AND FEES. 13

SECTION 2.06 TERMINATION OR REDUCTION OF COMMITMENTS 14

SECTION 2.07 NOTIONAL CONVERSION RIGHT. 14

SECTION 2.08 PAYMENTS; GENERALLY. 15

SECTION 2.09 SHARING OF PAYMENTS BY LENDERS. 15

SECTION 2.10 INCREMENTAL BORROWINGS. 16

SECTION 2.11 DEFAULTING LENDERS. 18

ARTICLE III TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY 19

SECTION 3.01 TAXES 19

SECTION 3.02 ILLEGALITY 22

SECTION 3.03 BENCHMARK TRANSITION. 22

SECTION 3.04 INCREASED COSTS 24

SECTION 3.05 COMPENSATION FOR LOSSES 25

SECTION 3.06 MITIGATION OBLIGATIONS; REPLACEMENT OF LENDERS. 25

SECTION 3.07 SURVIVAL. 26

SECTION 3.08 CHANGES IN LAW; IMPRACTICABILITY OR ILLEGALITY. 26

ARTICLE IV CONDITIONS PRECEDENT 26

SECTION 4.01 CONDITIONS TO CLOSING DATE AND AVAILABILITY OF THE TRANCHE 1 LOANS 26

SECTION 4.02 CONDITIONS TO AVAILABILITY OF THE TRANCHE 2 LOANS 27

SECTION 4.03 CONDITIONS TO AVAILABILITY OF THE TRANCHE 3 LOANS. 27

ARTICLE V REPRESENTATIONS AND WARRANTIES 28

SECTION 5.01 ORGANIZATION; POWERS 28

SECTION 5.02 AUTHORIZATION 28

SECTION 5.03 NO CONFLICTS 28

SECTION 5.04 LITIGATION 28

Page


SECTION 5.05 GOVERNMENTAL APPROVALS 28

SECTION 5.06 NO DEFAULT 28

ARTICLE VI AFFIRMATIVE COVENANTS 28

SECTION 6.01 FINANCIAL STATEMENTS 29

SECTION 6.02 TELEPHONIC MEETING. 29

SECTION 6.03 OTHER INFORMATION 29

SECTION 6.04 EXISTENCE 29

SECTION 6.05 COMPLIANCE WITH LAWS 29

SECTION 6.06 BOOKS AND RECORDS 29

SECTION 6.07 APPROVED BUDGET. 29

SECTION 6.08 USE OF PROCEEDS 29

ARTICLE VII NEGATIVE COVENANTS 30

SECTION 7.01 LIENS 30

SECTION 7.02 LIMITATION ON INCURRENCE OF DEBT 30

SECTION 7.03 MERGER, CONSOLIDATION OR SALE OF ALL OR SUBSTANTIALLY ALL ASSETS 30

SECTION 7.04 LIMITATION ON SALES OF ASSETS 30

SECTION 7.05 LIMITATION ON RESTRICTED PAYMENTS 30

SECTION 7.06 PREPAYMENTS OF INDEBTEDNESS 30

SECTION 7.07 AMENDMENTS AND MODIFICATIONS 30

SECTION 7.08 SETTLEMENT 30

SECTION 7.09 INVESTMENTS 31

SECTION 7.10 USE OF PROCEEDS 31

SECTION 7.11 ACTIVITIES OF BORROWER 31

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES 31

SECTION 8.01 EVENTS OF DEFAULT 31

SECTION 8.02 REMEDIES UPON EVENT OF DEFAULT 31

SECTION 8.03 APPLICATION OF FUNDS 32

ARTICLE IX THE ADMINISTRATIVE AGENT 32

SECTION 9.01 APPOINTMENT AND AUTHORITY. 32

SECTION 9.02 [RESERVED]. 33

SECTION 9.03 EXCULPATORY PROVISIONS. 33

SECTION 9.04 RELIANCE BY ADMINISTRATIVE AGENT. 35

SECTION 9.05 DELEGATION OF DUTIES. 36

SECTION 9.06 NON-RELIANCE ON ADMINISTRATIVE AGENT AND OTHER LENDERS. 36

SECTION 9.07 WITHHOLDING TAX. 37

Page

SECTION 9.08 ERRONEOUS PAYMENTS. 37
SECTION 9.09 RESIGNATION OF ADMINISTRATIVE AGENT. 38
ARTICLE X MISCELLANEOUS 39
SECTION 10.01 AMENDMENTS. 39
SECTION 10.02 EXPENSES; INDEMNITY; DAMAGES WAIVER 40
SECTION 10.03 SUCCESSORS AND ASSIGNS. 41
SECTION 10.04 NOTICE GENERALLY 43
SECTION 10.05 SEVERABILITY 44
SECTION 10.06 ENTIRE AGREEMENT 45
SECTION 10.07 GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL 45

This CREDIT AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of February 27, 2024, among Instant Brands Litigation Trust (the "Borrower" or the "Litigation Trust"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and Acquiom Agency Services LLC, as administrative agent (the "Administrative Agent").

PRELIMINARY STATEMENTS

WHEREAS, on June 12, 2023, Instant Brands Acquisition Holdings Inc., a Delaware corporation and its United States subsidiaries (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and commenced their chapter 11 cases (the "Chapter 11 Cases"), which are being jointly administered under Case No. 23-90716;

WHEREAS, on June 15, 2023, all of the Debtors commenced proceedings before the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") under Part IV of the Companies' Creditors Arrangement Act, R.S.C., 1985, c. C-36, as amended (the "CCAA") recognizing the Bankruptcy Cases as "foreign main proceedings";

WHEREAS, on February 23, 2024, the Bankruptcy Court entered its order (the "Confirmation Order") confirming the Plan (as defined below);

WHEREAS, on February 26, 2024, the CCAA Court entered an order recognizing the Confirmation Order (the "CCAA Recognition Order");

WHEREAS, the Plan and that certain Litigation Trust Agreement entered into and effective as of the Effective Date provide for, among other things, (i) the creation of the Borrower, (ii) the contribution of the Litigation Trust Assets (hereinafter defined) to the Borrower and (iii) the liquidation (and conversion to cash) of the Litigation Trust Assets and the distribution of the proceeds therefrom; and

WHEREAS, pursuant to the Plan and the terms set forth herein, the Lenders have agreed to make up to $6,000,000 of loans (the "Commitment Amount") to fund the administration, management, liquidation (and conversion to cash) of the Litigation Trust Assets by, among other means, pursuing, prosecuting and/or settling claims and/or causes of action constituting the Litigation Trust Assets, subject to the terms and conditions set forth herein.

In consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

Section 1.01 Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Administrative Agent" has the meaning set forth in the Preamble.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning set forth in the Preamble.

"Agent Fee Letter" means the Agent Fee Letter, dated as of the date hereof, by and between the Borrower and the Administrative Agent.

"Applicable Rate" means (a) with respect to Tranche 1 Loans, 15.00% per annum; (b) with respect to Tranche 2 Loans, 15.00% per annum and (c) with respect to Tranche 3 Loans, 15.00% per annum.

"Approved Budget" means the Initial Approved Budget and any Proposed Supplemental Budget approved in accordance with Section 6.07 hereof.

"Approved Fund" means (a) any investment company, fund, trust, securitization vehicle or conduit that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business, or (b) any Person (other than a natural person) that temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, in each case, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an affiliate of a Lender or (iii) a Person (other than a natural person) or an affiliate of a Person (other than a natural person) that administers or manages a Lender.

"Available Tenor" shall mean, as of any date of determination with respect to the then-current Benchmark, as applicable, (a) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (b) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"Bankruptcy Code" means, as applicable, Title 11 of the U.S. Code (11 U.S.C. §101 et seq.), as now and hereafter in effect and applicable to the Chapter 11 Cases, or any successor statute, and any rule or regulation issued thereunder.

"Bankruptcy Court" has the meaning set forth in the Preliminary Statements.

"Backstop Premium" has the meaning set forth Section 2.05(e).

"Backstop Premium Amount" means 10.0% of the Commitment Amount.

"Backstop Percentage Allocation" means the quotient of (a) the Backstop Premium Amount and (b) the product of (i) 1.5 and (ii) the Notional Base Price.

"Base Rate" means the rate *per annum* last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent (as directed by the Required Lenders)) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent (as directed by the Required Lenders)). Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"Base Rate Loan" means a Loan that bears interest at a rate based on the Base Rate.

"Benchmark" means, initially, the Term SOFR; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.03(a).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Required Lenders and the Borrower (and notified to the Administrative Agent), as the replacement Benchmark in their reasonable discretion; provided that, such Benchmark Replacement is administratively feasible for the Administrative Agent; provided further that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Default Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Required Lenders decide may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Required Lenders determine that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent (as directed by the Required Lenders) decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents); provided that such Benchmark Replacement Conforming Changes implement changes that are administratively feasible for the Administrative Agent.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; or

(b) the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in clause (a) of the definition of "Benchmark Transition Event" and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

"Benchmark Transition Event" means, with respect to any then-current Benchmark the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve



CONFIDENTIAL CITADEL_0000270

System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark (or such component), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component) or (b) all Available Tenors of such Benchmark (or such component) are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Benchmark Unavailability Period" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.03.

"Borrower" has the meaning set forth in the Preamble.

"Borrower Materials" means materials and/or information provided by or on behalf of the Borrower hereunder.

"Borrowing" means a borrowing of Loans pursuant to Section 2.01.

"Budget Event" means, during any calendar month starting with the first full month after the Closing Date, the aggregate amount of actual disbursements shall exceed the projected aggregate disbursements in the Approved Budget by an amount greater than the Permitted Variance.

"Business Day" means any day other than a Saturday, Sunday or other day that is a federal holiday or any day on which commercial banks are authorized or obligated by law, regulation or executive order to remain closed under the Laws of, or are in fact closed in, the state of New York; *provided*, *however*, that for purposes of determining the borrowing, payment or continuation of, or determination of interest rate on, the Loans, "Business Day" shall exclude any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning set forth in the Preliminary Statements.

"Closing Date" means the first date on which all conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 4.01.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" means the several obligations of the Lenders to make Loans to the Borrower hereunder as it may be reduced from time to time pursuant to Section 2.06. The initial Commitments of the Lenders with respect to each Tranche as is set forth on Schedule 1,

"Commitment Amount" has the meaning set forth in the Preliminary Statements.

"Common Interest Agreement" means that certain Common Interest Agreement, by and among the Lenders, the Litigation Trustee and the Borrower, dated as of the date hereof (as the same may be amended, amended and restated, extended, supplemented or otherwise modified from time to time pursuant to the terms thereof).

"Confirmation Order" has the meaning set forth in the Plan.

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Notice" has the meaning set forth in Section 2.07.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money and all indebtedness of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) all direct or contingent obligations of such Person arising under or in respect of (i) letters of credit (including standby and commercial), bankers' acceptances, demand guarantees and similar independent undertakings and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business); and (d) all guarantees of such Person in respect of any of the foregoing

"Debtors" has the meaning set forth in the Preliminary Statements.

"Debtor Relief Laws" means the Bankruptcy Code and all other liquidation, dissolution, administration, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, winding up, reorganization (by way of voluntary arrangement scheme of arrangement or otherwise), or similar debtor relief laws of the U.S., any state or territory thereof, the District of Columbia or any other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event that is, or after notice or the passage of time or both would be, an Event of Default.

"Default Rate" means, for any date, an interest rate per annum equal to (a) SOFR with respect to such date plus (b) the Applicable Rate plus (c) 2.00% per annum.

"Defaulting Lender" means, subject to Section 2.11(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's reasonable determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied or waived, or (ii) pay to the Administrative Agent, or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's reasonable determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Laws or (ii) had appointed for it, or its direct or indirect parent company, a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its, or its direct or indirect parent company's, business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Any determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.11(b)) upon delivery of written notice of such determination to Borrower and each Lender. Notwithstanding the foregoing, the Administrative Agent shall have no obligation to monitor or determine if any lender is a "Defaulting Lender" hereunder; provided that absent a determination by Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, the determination may be made by the Borrower (with written notice to such Lender and the Administrative Agent), which shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender.

"Deposit Account" means any "deposit account" as defined in Article 9 of the UCC.

"Dollar" and "$" means the lawful money of the United States.

"Effective Date" has the meaning set forth in the Plan.

"Eligible Assignee" means a U.S. Person, who is (a) a Lender, (b) an affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) consented to in writing by the Administrative Agent and the Borrower (such Borrower consent shall not be unreasonably withheld, delayed or conditioned); provided, that (x) no consent of the Borrower shall be required after the occurrence and during the continuance of an Event of Default under Section 8.01(a), and (y) the consent of the Borrower shall be deemed to have been given unless an objection is received by the Administrative Agent within ten (10) Business Days after notice of a proposed assignment is delivered to Borrower; provided, further, that notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower.

"Erroneous Payments" has the meaning set forth in Section 9.08.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.06(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, official rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"First Amendment" means that certain First Amendment to Credit Agreement, dated as of the First Amendment Effective Date, among the Borrower, the Lenders and the Administrative Agent.

"First Amendment Effective Date" means September 5, 2025.

"Floor" means a rate of interest equal to 0.00% *per annum*.

"Governmental Authority" means the government of the United States of America, Canada or any other nation, or of any political subdivision thereof, including state, local, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Incremental Amendment" has the meaning specified in Section 2.10(f).

"Incremental Amount" means $~~4,000,000~~5,000,000.

"Incremental Borrowing Notice" has the meaning specified in Section 2.10(a).

"Incremental Commitment" means a commitment by an Incremental Lender to make Incremental Loans.

"Incremental Facility" has the meaning specified in Section 2.10(a).

"Incremental Facility Closing Date" has the meaning specified in Section 2.10(d).

"Incremental Lender" has the meaning specified in Section 2.10(a).

"Incremental Loan" has the meaning specified in Section 2.10(a).

"Incremental Loan Availability Period" means the period of time prior to six months before the Maturity Date; provided, that the Incremental Term Loan shall be available only so long as (i) the Tranche 1 Loans, the Tranche 2 Loans, and the Tranche 3 Loans have been made and (ii) the Borrower requires financing in excess of the Commitment Amount.

"Incremental Loan Availability Termination Date" means the first date following the end of the Incremental Loan Availability Period.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning specified in Section 10.02(b).

"Initial Approved Budget" has the meaning given to it in Section 4.01(e).

"Initial Term SOFR" means with respect to any Loan, Term SOFR for the first Interest Period.

"Interest Payment Date" means, as to any Loan, the last day of each Interest Period applicable to such Loan, and the Maturity Date.

"Interest Period" means three months, beginning on the date each Loan is disbursed.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of equity interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Indebtedness of the type referred to in clause (d) of the definition of "Debt" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"IRS" means the United States Internal Revenue Service.

"Junior Debt" means, with respect to any Loan, debt that is junior in right of payment to such Loan. Junior Debt with respect to the Tranche 1 Loans shall mean (a) the Tranche 2 Loans and (b) the

Tranche 3 Loans. Junior Debt with respect to the Tranche 2 Loans shall mean the Tranche 3 Loans. There shall be no Junior Debt in respect of the Tranche 3 Loans.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Lender" or "Lenders" has the meaning set forth in the Preamble.

"Lien" means, with respect to any asset, (i) any mortgage, pledge, hypothecation, deed of trust, security interest, lien, charge or similar monetary encumbrance in or on such asset and (ii) the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement relating to such asset; provided that in no event shall an operating lease or an agreement to sell be deemed to be a Lien.

"Litigation" means litigation pursued by the Borrower in accordance with the Litigation Trust Purpose.

"Litigation Trust Agreement" means that certain Litigation Trust Agreement, dated as of February 27, 2024, among the Litigation Trustee and Instant Brands Acquisition Holdings Inc., a copy of which is attached hereto as Schedule 2.

"Litigation Trust Assets" has the meaning ascribed to such term in the Plan.

"Litigation Trust Recovery Actions" has the meaning set forth in Article I.A of the Plan.

"Litigation Trust Beneficiaries" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trustee" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Interests" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Proceeds" has the meaning set forth in the Litigation Trust Agreement.

"Litigation Trust Purpose" means the purpose set forth in section 1.04 of the Litigation Trust Agreement.

"Loan" has the meaning specified in Section 2.01.

"Loan Documents" means this Agreement and any related documentation for the loan facility, including, without limitation, the Agent Fee Letter and the First Amendment.

"Maturity Date" means the earlier of (a) the date of dissolution of the Borrower (as notified to the Administrative Agent in writing) and (b) five (5) years from the Closing Date.

"Notional Base Price" means the quotient of (a) the greater of (i) $2,250,000 and (ii) the last settlement offer made with respect to the Litigation Trust Recovery Actions between October 3, 2023 and the Effective Date divided by (b) the number of Litigation Trust Interests issued as of the Effective Date.

"Notional Conversion" has the meaning set forth in Section 2.07.

"Notional Conversion Factor" means (a) with respect to Tranche 1 Loans, 1.5; (b) with respect to Tranche 2 Loans, 2.0 and (c) with respect to Tranche 3 Loans, 2.5.

"Notional Conversion Price" means the product of (a) the Notional Base Price and (b) the Notional Conversion Factor.

"Notional Litigation Trust Interests" has the meaning specified in Section 2.07.

"Obligations" means all liabilities, indebtedness and obligations (monetary or otherwise) of the Borrower under this Agreement or any other document or instrument executed in connection herewith, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.05(b)).

"Participant Register" has the meaning specified in Section 10.03(d).

"Payment Recipient" has the meaning specified in Section 9.09.

"Permitted Variance" means a variance of 120% of the estimated aggregate disbursements in the then-in-effect Approved Budget.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or any agency or political subdivision hereof or any other entity (or series of any thereof).

"PIK Interest" has the meaning specified in Section 2.05.

"Plan" means the confirmed plan of reorganization with respect to the Debtors pursuant to the Chapter 11 Cases.

"Platform" means IntraLinks or another similar electronic system to which the Administrative Agent will post Borrower Materials to be made available to the Lenders.

"Proposed Supplemental Budget" has the meaning specified in Section 6.07.

"Prepayment Premium" means an amount equal to the premium (which shall be no less than zero) that results in the Specified Return Requirement being satisfied with respect to any Tranche 2 Loan or Tranche 3 Loan being prepaid, as determined by the Administrative Agent, which shall be binding on

the parties absent manifest error, (it being understood that a prepayment premium shall be payable only in connection with an optional prepayment pursuant to Section 2.03(a) and in connection with a Refinancing Transaction).

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or under any other Loan Document.

"Refinancing Transaction" means the issuance by the Borrower, or a third party, of Debt, equity or other capital to repay any or all of the Loans prior to the Maturity Date.

"Register" has the meaning specified in Section 10.03(c).

"Required Lenders" means, as of any date of determination, any Lender or Lenders holding in the aggregate more than 50% of the aggregate outstanding principal amount of all Loans and Commitments; *provided*, that the unused outstanding principal amount of all Loans and Commitments, as applicable, of, and the portion of the amount of all Loans held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders; *provided, further*, that if at any time, there are two (2) or more unaffiliated Lenders party to this Agreement the term "Required Lenders" must include at least two (2) Lenders that are not Affiliates of each other (Lenders that are Affiliates of each other shall be deemed to be a single Lender for purposes of this definition).

"Requirements of Law" means, as to any Person, any provision of the Plan, Confirmation Order or the Litigation Trust Agreement applicable to such Person, and any law, treaty, rule or regulation or final, non-appealable determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or to which any of its material property is subject.

"Reserves" means amounts reflected in the Approved Budget that are reserved to pay the administrative costs and expenses of the Litigation Trust, including the Expense Fund (as defined in the Litigation Trust Agreement), the fees and expenses of the Litigation Trustee, the Litigation Trust Advisory Board (as defined in the Litigation Trust Agreement) and its members and the Professionals (as defined in the Litigation Trust Agreement).

"Restricted Payment" means any payment in contravention to this Agreement or the Litigation Trust Agreement.

"SOFR" means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"SOFR Loan" means a Loan that bears interest at a rate based on Term SOFR.

"Specified Return Requirement" means an amount, with respect to any Lender in respect of any Tranche 2 Loan or Tranche 3 Loan being prepaid, sufficient to generate (a) in the case of Tranche 2 Loans of such Lender, the greater of (i) an internal rate of return per annum of Initial Term SOFR plus the Applicable Rate with respect to such Tranche 2 Loans and (ii) a 1.5 times multiple of invested capital in respect of the Tranche 2 Loans funded by such Lender and (b) in the case of Tranche 3 Loans of such Lender, the greater of (i) an internal rate of return per annum of Initial Term SOFR plus the Applicable

Rate with respect to such Tranche 3 Loans and (ii) a 2.0 times multiple of invested capital in respect of the Tranche 3 Loans funded by such Lender.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the date on which (a) the Commitments shall have been terminated or expired and (b) the principal of and interest on all Loans, all fees and other Obligations shall have been paid in full.

"Term SOFR" means the forward-looking term rate based on SOFR for a tenor comparable to the applicable Interest Period on the date that is two Business Days prior to the first day of such Interest Period as published by the Term SOFR Administrator.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the term rate as selected by the Administrative Agent (at the direction of the Required Lenders in their reasonable discretion) and that is administratively feasible for the Administrative Agent).

"Tranche" means a particular series of Loans, including Tranche 1 Loans, Tranche 2 Loans, Tranche 3 Loans or Incremental Loans, as applicable.

"Tranche 1 Loan" has the meaning specified in Section 2.01.

"Tranche 2 Loan" has the meaning specified in Section 2.01.

"Tranche 3 Availability Period" means the period of time commencing on the date that is 181 days after the Effective Date and ending on the Tranche 3 Availability Termination Date.

"Tranche 3 Availability Termination Date" means four (4) years from the Effective Date.

"Tranche 3 Loan" has the meaning specified in Section 2.01.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Withholding Agent" means the Borrower and the Administrative Agent.

Section 1.02 Other Interpretive Provisions. With reference to this Agreement:

(i) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified or extended, replaced or refinanced, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and

words of similar import when used herein shall be construed to refer to this Agreement in its entirety and not to any particular provision thereof, (iv) all references herein to Articles, Sections, Preamble and Preliminary Statements shall be construed to refer to the Articles and Sections of, and Preamble and Preliminary Statements to, this Agreement, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(ii) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through" means "to and including."

(iii) Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Agreement.

## ARTICLE II

## LOAN FACILITY

Section 2.01 Loans. Subject to the terms and conditions set forth herein, the Lenders severally agree to make loans (each such Borrowing, a "Loan"; together with each other Loan, the "Loans") to the Borrower, ratably and in accordance with their Commitments in the following amounts: (a) Loans on the Effective Date in an aggregate principal amount of up to $1,000,000, (the "Tranche 1 Loans"), (b) Loans within 180 days of the Effective Date in an aggregate principal amount of up to $2,000,000 (the "Tranche 2 Loans"), and (c) thereafter until the Tranche 3 Availability Termination Date, Loans in an aggregate principal amount of up to $3,000,000 (the "Tranche 3 Loans").

Section 2.02 Borrowings of Loans. Each Borrowing shall be made upon the Borrower's irrevocable written notice to the Administrative Agent substantially in the form of Schedule 4. Each such notice must be received by the Administrative Agent not later than noon New York City time three (3) Business Days prior to the requested date of any Borrowing. Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

Section 2.03 Prepayments.

(a) Optional. The Borrower may, upon at least three (3) Business Day's prior written notice to the Administrative Agent, to be received by the Administrative Agent not later than 1:00 p.m. New York City time, at any time or from time to time, and subject to Section 7.06, voluntarily prepay any Loans in whole or in part. Any prepayment of a Loan shall be accompanied by all accrued interest thereon in cash, and, for each of the Tranche 2 Loans and Tranche 3 Loans, the Prepayment Premium in respect thereof (it being understood that any Prepayment Premium shall be payable only in connection with a Refinancing Transaction).

(b) Mandatory. The Litigation Trust Proceeds received by the Borrower, net of the Reserves, shall, within ten (10) Business Days after the receipt thereof by the Borrower, be applied to prepay the Loans, together with all accrued interest thereon, in cash. Loans prepaid under this Section 2.03(b), together with payment of any amounts then due to the Administrative Agent, shall be paid in the same order of priority as is set forth under Section 8.03.



CONFIDENTIAL 

(c) Notwithstanding any other provision hereof (including without limitation clauses (a) and (b) of this Section 2.03), no Loan of any Lender shall be prepaid hereunder without the express prior written consent of such Lender furnished by such Lender to the Administrative Agent and the Borrower. Prepayments under clauses (a) and (b) of this Section 2.03 to be made to any Lender hereunder pursuant to such Lender's express prior written consent in accordance with the immediately preceding sentence, shall be made to such Lender in each case in its ratable amount in accordance with clause (a) or (b) of this Section 2.03, as applicable, as if all Lenders had consented to such prepayment in such case, and with the amount of such prepayment hereunder to such Lender being unaffected by the provisions of this clause (c).

Section 2.04 Repayment of Loans. On the Maturity Date, the Borrower shall repay in cash the aggregate principal amount of the Loans outstanding on such date together with all accrued interest thereon in cash, together with any and all fees, expenses and other amounts payable in accordance with the terms hereof. For the avoidance of doubt, the Loans and such other amounts shall be repaid in the order set forth in Section 8.03 herein.

Section 2.05 Interest and Fees.(a)

(a) Each Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to (i) Term SOFR for such Interest Period plus (ii) the Applicable Rate. On each Interest Payment Date, the Borrower shall pay in kind all of the interest accrued from the immediately prior Interest Payment Date to such Interest Payment Date in respect of any Loans (the "PIK Interest"), so that on and as of such Interest Payment Date for such Loans, an amount equal to the PIK Interest in respect of such Loans for such Interest Period shall be automatically capitalized and added to the then-outstanding principal amount of such Loans.

(b) All computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day-year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid.

(c) During the continuance of an Event of Default, the Borrower shall pay interest on past due amounts owing by it hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable in cash upon demand of the Administrative Agent or the Required Lenders.

(d) Interest on each Loan shall be due and payable in kind, as set forth in Section 2.05(a), in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein as aforesaid. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment aforesaid.

(e) The Borrower shall pay to the Lenders (ratably in accordance with the respective percentages set forth in Schedule 1 hereto and as calculated by the Administrative Agent, which shall be conclusive absent manifest error and may be fully relied upon by the Borrower, its agents (including the Litigation Trustee) and professionals) a backstop premium (the "Backstop Premium") on the Closing Date, which Backstop Premium shall be paid in kind and shall be automatically capitalized and added to the then-outstanding principal amount of Tranche 1 Loans on the Closing Date. The "Backstop Premium" shall be payable in Tranche 1 Loans in an aggregate amount equal to the quotient of (a) the Backstop Premium Amount and (b) 1 less the Backstop Percentage Allocation. The Backstop Premium shall be fully earned when paid in accordance with this Section 2.05(e) as original issue discount for tax

purposes and shall not be refundable for any reason whatsoever. The Administrative Agent shall determine the Backstop Premium for each Lender and shall provide the results of such determination to the Borrower on or prior to the Closing Date.

Section 2.06 Termination or Reduction of Commitments. The Commitments of the Lenders (a) with respect to the Tranche 1 Loans shall be automatically and permanently reduced to $0 upon the funding of the Tranche 1 Loans on the Closing Date; (b) with respect to the Tranche 2 Loans shall be automatically and permanently reduced by each Borrowing of Tranche 2 Loans in an amount equal to such Borrowing and (c) with respect to the Tranche 3 Loans shall be automatically and permanently reduced by each Borrowing of Tranche 3 Loans in an amount equal to such Borrowing. Notwithstanding the foregoing, the Commitments of the Lenders shall also be reduced upon the mutual agreement of the Borrower and all of the Lenders, as notified in writing to the Administrative Agent by the Borrower.

Section 2.07 Notional Conversion Right.

At any time on or prior to the Maturity Date, each Lender shall have the right, at its option, by written notice to the Borrower (with a copy to the Administrative Agent) (a "Conversion Notice"), to effectuate a conversion (a "Notional Conversion") of all or any portion of the amounts owing in respect of its Loans to a Notional Litigation Trust Interest at the Notional Conversion Price to be paid in cash, in full by the Borrower directly to such Lender on the earlier of (1) the Maturity Date and (2) immediately before any distribution of the Litigation Trust Assets is made to any Litigation Trust Beneficiaries, in each case, in an amount determined by the Administrative Agent (which determination shall be conclusive absent manifest error and may be fully relied upon by the Borrower, its agents (including the Litigation Trustee) and professionals) that is equal to the aggregate amount of distributions from Litigation Trust Proceeds (as defined in the Litigation Trust Agreement) that such Lender would have received on its Notional Litigation Trust Interests (as defined below) had such Loans been converted on the date the Lender made such election to Litigation Trust Interests at the Notional Conversion Price (the notional Litigation Trust Interests to have been received by such Lender in respect of such Notional Conversion being, the "Notional Litigation Trust Interest" of such Lender). Notwithstanding anything to the contrary in this Section 2.07, at no time shall any Lender's interest in a Loan convert to a Litigation Trust Interest, provided that upon its receipt of written notice of the consummation of a Notional Conversion, Administrative Agent shall cancel the respective principal amount of the Loan on the Register. The Administrative Agent shall determine the Notional Conversion Price for each Notional Conversion and shall provide to the Borrower the results of such determination within one (1) Business Day of receiving the Conversion Notice.

Section 2.08 Payments; Generally.

(a) Payments by Borrower. Subject to Section 2.11, all payments to be made by the Borrower hereunder and the other Loan Documents shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all such payments shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the office of the Administrative Agent in immediately available funds not later than 12:00 p.m. (New York City time) on the date specified herein. All amounts received by the Administrative Agent after such time on any date shall be deemed to have been received on the next succeeding Business Day and any applicable interest or fees shall continue to accrue. The Administrative Agent will promptly distribute to each Lender its ratable share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable lending office (or otherwise distribute such payment in like funds as received to the Person or Persons entitled thereto as provided herein). If any payment to be made by the Borrower shall fall due on a day that is not a Business Day, payment shall be made on the next succeeding Business Day and such

extension of time shall be reflected in computing interest or fees, as the case may be; provided that, if such next succeeding Business Day would fall after the Maturity Date, payment shall be made on the immediately preceding Business Day. Except as otherwise expressly provided herein, all payments hereunder or under any other Loan Document shall be made in Dollars.

(b) Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(c) Several Obligations of Lenders. The obligations of the Lenders hereunder to make Loans and to make payments hereunder are several and not joint. The failure of any Lender to make any Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment hereunder.

Section 2.09 Sharing of Payments by Lenders.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact in writing and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(a) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b) the provisions of this Section 2.09 shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including without limitation prepayment premiums, other fees or consideration or the Backstop Premium) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any participant.

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation. The applicable Lender will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.09; provided that (i) the Administrative Agent and

Borrower shall be entitled to continue to deal solely and directly with such Lender in connection with such Lender's Commitments and Loans and such Lender's rights and obligations hereunder and under the other Loan Documents and (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations hereunder.

Section 2.10 Incremental Borrowings.

(a) Incremental Commitments. The Borrower may, at any time, on one or more occasions until the Incremental Loan Availability Termination Date, by written notice to the Administrative Agent (an "Incremental Borrowing Notice") request one or more new Tranches of loan facilities (any such facility, an "Incremental Facility" and any such Loans thereunder, "Incremental Loans") by requesting Incremental Commitments in an aggregate principal amount not to exceed the Incremental Amount. Incremental Commitments may be provided only by existing Lenders (each such existing Lender, an "Incremental Lender"). While no existing Lender shall have any obligation to make any Incremental Commitment, all existing Lenders have the right to make Incremental Commitments in an amount *pro rata* to their existing Loans (to the extent any existing Lender does not exercise such right, other existing Lenders shall have the opportunity to do so in place of such existing Lender).

(b) Incremental Borrowing Notice. Each Incremental Borrowing Notice from the Borrower pursuant to this Section 2.10 shall be given in writing and shall set forth the requested amount, requested date and proposed terms of the relevant Incremental Facility subject to Section 2.10(e) hereof. An Incremental Borrowing Notice must be received by the Administrative Agent not later than noon New York City time three (3) Business Days prior to the requested date of any Borrowing. Incremental Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

(c) Incremental Loans. On any Incremental Facility Closing Date on which any Incremental Commitments of any Tranche are effected, subject to the terms and conditions in this Section 2.10, (i) each Incremental Lender of such Tranche shall make its Incremental Loan to the Borrower in an amount equal to its Incremental Commitment of such Tranche and (ii) each Incremental Lender of such Tranche shall become a Lender hereunder with respect to the Incremental Commitment of such Tranche and the Incremental Loans of such Tranche made pursuant thereto. Notwithstanding the foregoing, but subject to Section 2.10(e) and Section 8.03(b) hereof, Incremental Loans may have identical terms to any then outstanding Tranche of Loans and be treated as the same or a different Tranche as any of such Loans (as specified by the Borrower in the Incremental Borrowing Notice); provided, however that no Incremental Loans shall be fungible with any outstanding Tranche of Loans other than Tranche 1 Loans to the extent they have identical terms with the Tranche 1 Loans.

(d) Effectiveness of Incremental Amendment. The effectiveness of any Incremental Amendment and the Incremental Facility thereunder shall be subject to the satisfaction on the date thereof (the "Incremental Facility Closing Date") of each of the following conditions:

(i) no Event of Default under Section 8.01 is then continuing or would result after giving effect to such proposed Incremental Facility;

(ii) each Incremental Facility shall be in an aggregate principal amount that is not less than $1,000,000 and shall be in a multiple of $250,000 in excess thereof;

(iii) the representations and warranties of the Borrower contained in Article V shall be true and correct in all material respects on and as of each Incremental Facility Closing Date,

except in the case of any representation and warranty that is already qualified or qualified by materiality, they shall be true and correct in all respects;

(iv) the aggregate amount of the Incremental Commitments relating to such Incremental Facility shall not exceed the Incremental Amount available at the time of incurrence thereof;

(v) no Incremental Facility or Incremental Loan (nor the creation, provision or implementation thereof) shall require the approval of any existing Lender other than in its capacity, if any, as a lender providing all or part of such Incremental Facility or Incremental Loan;

(vi) the Administrative Agent (on behalf of the lenders providing the Incremental Facility) shall have received all documents each party may request, in its reasonable discretion, relating to the corporate or other necessary authority for such increase and the validity of such increase and any other matters relevant thereto, all in form and substance satisfactory to the lenders providing the Incremental Facility, in their reasonable discretion; and

(vii) the Administrative Agent's reasonable fees and reasonable documented out-of-pocket costs and expenses, if any, in respect of the new loans and commitments so established, shall have been paid.

For purposes of determining whether the conditions specified in this Section 2.10(d) have been satisfied, by making the Incremental Loans on such date, each Incremental Lender shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be provided to, consented to or approved by or acceptable or satisfactory to such Lender.

(e) Required Terms. The terms, provisions and documentation of the Incremental Loans and Incremental Commitments of any Tranche, if not consistent with the terms of the existing Loans, shall be as agreed between the Borrower and the applicable Incremental Lenders providing such Incremental Commitments, in each case subject to the following:

(i) the pricing and other economic terms of the Incremental Loans shall be substantially similar to the pricing and other economic terms of the Tranche 1 Loans;

(ii) the Incremental Loans shall rank *pari passu* in right of payment and of security with the Tranche 1 Loans; and

(iii) the Incremental Loans shall mature on the Maturity Date.

(f) Incremental Amendment. Incremental Commitments in respect of Incremental Loans shall become Commitments under this Agreement pursuant to an amendment (an "Incremental Amendment") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Incremental Lender providing such Commitments and the Administrative Agent. The Incremental Amendment may, without the consent of any other Person, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable discretion of the parties to the Incremental Amendment, to effect the provisions of this Section 2.10. The Borrower shall use the proceeds of the Incremental Loans for any purpose not prohibited by this Agreement, the Plan or the Litigation Trust Agreement. No Lender shall be obligated to provide any Incremental Loans unless it so agrees.

Section 2.11 Defaulting Lenders.

(a) Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i) Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders;

(ii) Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has, based on the records maintained by the Administrative Agent, failed to fund its portion thereof as required by this Agreement; *third*, if so determined by the Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has fully funded its appropriate share. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.11(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto;

(b) If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and *provided further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to the Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01 Taxes.

(a) Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall to the extent permitted by applicable Law be made free and clear of and without deduction or withholding for any Taxes.

(ii) If the applicable Withholding Agent shall be required by applicable Law to withhold or deduct any Taxes, including both U.S. federal backup withholding and non-resident withholding Taxes, from any payment, then (A) such Withholding Agent shall withhold or make such deductions as are reasonably determined by such Withholding Agent to be required by applicable Law, (B) such Withholding Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Law and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Borrower shall be increased by the Borrower as necessary so that after any required withholding or deductions for such Indemnified Taxes has been made (including withholding or deductions for Indemnified Taxes applicable to additional sums payable under this Section 3.01) the applicable Lender (or, in the case of payments made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such withholding or deductions for Indemnified Taxes been made.

(b) Payment of Other Taxes by the Borrower. Without limiting the provisions of subsection (a) above, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c) Indemnification by the Borrower. The Borrower shall, and does hereby, indemnify each Recipient, and shall make payment in respect thereof within fifteen (15) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) payable by such Recipient and any reasonable and documented expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender, or by any Agent on its own behalf or on behalf of a Lender (with a copy to such Agent), shall be conclusive absent manifest error.

(d) Evidence of Payments. After any payment of Taxes by the Borrower or the Administrative Agent to a Governmental Authority as provided in this Section 3.01, the Borrower or the Administrative Agent, as applicable, shall deliver to the Administrative Agent or the relevant Lender, as the case may be, any original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Law to report such payment or other evidence of such payment reasonably satisfactory to the Lender or the Administrative Agent, as the case may be.

(e) Status of Lenders; Tax Documentation.

(iii) Each Lender shall deliver to the Borrower and to the Administrative Agent such properly completed and executed documentation prescribed by applicable Law or by the Governmental Authorities of any jurisdiction and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Loan Document are subject to withholding Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by the Borrower pursuant to any Loan Document or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction. Any documentation and information required to be delivered by a Lender pursuant to this Section 3.01(e) (including any specific documentation set forth

in subsection (ii) below) shall be delivered by such Lender (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before any date on which such documentation expires or becomes invalid or obsolete, (iii) after the occurrence of any change in the Lender's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower and the Administrative Agent and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and each such Lender shall promptly notify in writing the Borrower and the Administrative Agent if such Lender is no longer legally eligible to provide any documentation previously provided. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (e)(ii) and (iii) of this Section 3.01(e)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal position of such Lender.

(iv) Without limiting the generality of the foregoing, each Lender shall deliver to the Borrower and the Administrative Agent two duly executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding or information reporting requirements

(v) If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or Section 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by applicable Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (iii), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(vi) The Administrative Agent must be a U.S. Person and shall provide the Borrower with two duly completed copies of IRS Form W-9 certifying that such Administrative Agent is exempt from U.S. federal backup withholding.

(vii) Notwithstanding anything to the contrary in this Section 3.01, neither the Administrative Agent nor any Lender shall be required to deliver any documentation that it is not legally eligible to deliver.

(viii) Each Lender hereby authorizes the Administrative Agent to deliver to the Borrower and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 3.01(e).

(f) Treatment of Certain Refunds. Subject to the last sentence in Section 3.01(c), at no time shall any Recipient have any obligation to file for or otherwise pursue any refund of Taxes withheld or deducted from funds paid for the account of such Recipient. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 3.01, such Recipient shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses

(including any Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower, upon the request of such Recipient, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority. In such event, such Recipient shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (provided that such Recipient may redact any information therein that it deems confidential). Notwithstanding anything to the contrary in this Section 3.01(f), in no event will the Recipient be required to pay any amount to the Borrower pursuant to this Section 3.01(f) the payment of which would place the Recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 3.01(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(g) Delays in Requests. Failure or delay on the part of any Recipient to demand compensation pursuant to the foregoing provisions of this Section 3.01 shall not constitute a waiver of such Recipient's right to demand such compensation.

(h) Limitation. Notwithstanding anything to the contrary, no Lender shall demand payment of any additional amounts or other compensation pursuant to this Section 3.01 unless such Lender represents to Borrower in such demand, upon which Borrower can conclusively rely, that it is generally making corresponding demands on similar types of borrowers for similar amounts pursuant to similar provisions in other loan documents to which such Lender is a party.

(i) FATCA. For the avoidance of doubt, for purposes of this Section 3.01, the term "applicable law" includes FATCA.

(j) Intended Tax Treatment. Each of the parties hereto (i) intends that the Loans be treated as debt instruments for U.S. federal, state, and local income Tax purposes and (ii) agrees not to file any Tax return, report or declaration inconsistent with sub-clause (A) of the foregoing clause (i) except, in each case, as otherwise required pursuant to a final "determination" within the meaning of Section 1313(a) of the Code. The inclusion of this Section 3.01(j) is not an admission by any Lender that it is subject to United States taxation.

(k) If the Required Lenders (in consultation with the Borrower) determine that the Loan is subject to the original issue discount or contingent payment debt instrument rules in the Code, the Borrower and the Required Lenders shall compute the original issue discount schedule ("OID Schedule") or the comparable yield ("Comparable Yield") and projected payment schedule ("Projected Payment Schedule"), as applicable, for the determination of interest accruals in respect of the Loan for U.S. federal income tax purposes at least thirty (30) days prior to the due date (taking into account extensions) for filing the Borrower's federal income tax return for the taxable year that includes the Closing Date, and shall furnish a copy of the same to the Lenders. The Borrower, the Lenders and the Administrative Agent agree to report all interest accruals in respect of the Loan strictly in accordance with the OID Schedule or Comparable Yield and Projected Payment Schedule (as applicable) and adjustments thereto unless all such parties agree otherwise or as otherwise may be required (to the satisfaction of all such parties, each in its reasonable discretion) or allowed by applicable Law.

Section 3.02 Illegality. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to Term SOFR or to determine or charge interest rates based upon Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue SOFR Loans in Dollars shall be suspended . Upon Administrative Agent's receipt of such notice, the Administrative Agent shall, to the extent necessary to avoid illegality, convert all such Loans of such Lender to Base Rate Loans either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03 Benchmark Transition.

(a) Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, and solely upon such event, the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower, may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. The Administrative Agent and the Required Lenders shall use commercially reasonable efforts to satisfy any applicable IRS guidance, including Treasury Regulations 1.1001-6 and any future guidance, to the effect that the implementation of a Benchmark Replacement will not result in a deemed exchange for U.S. federal income tax purposes of any Loan under this Agreement for U.S. federal income tax purposes. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has served such proposed amendment upon all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.

(b) In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Required Lenders (in consultation with the Administrative Agent) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. Notwithstanding anything to the contrary, the Administrative Agent shall not be bound to follow or agree to any such amendments, modifications or Benchmark Replacement Conforming Changes pursuant to Section 3.03 that affect its rights, duties, immunities, protections or indemnities.

(c) The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Except as otherwise provided in this Agreement, any determination, decision or election that may be made by the Administrative Agent and/or the Required Lenders pursuant to this Section 3.03, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document.

(d) Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR) and either (A) any tenor for such

Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent (at the direction of the Required Lenders in their reasonable discretion) or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to the Base Rate Loans without reference to the then-current Benchmark.

(f) Notwithstanding anything in this Agreement to the contrary, upon the occurrence of a Benchmark Transition Event, this Section 3.03 provides a mechanism for determining an alternative rate of interest. However, the Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (x) the continuation of, administration of, submission of, calculation of or any other matter related to Term SOFR, or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, Term SOFR or any other Benchmark prior to its discontinuance or unavailability or (y) the effect, implementation, or composition of any Benchmark Replacement Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions unrelated to the Borrower or the administration of the Loan hereunder that may affect the calculation of Term SOFR, any other Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner that may be adverse to Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrowers, any Lender, or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses, or expenses (whether in tort, contract, or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service, except for direct damages to the extent caused by the Administrative Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment in the calculation of such rate. Under no circumstances will the Administrative Agent be responsible for selecting or determining any Benchmark Replacement if Term SOFR or any other Benchmark will no longer be available past the Benchmark Replacement Date. In the case of a Benchmark Transition Event, the Required Lenders will select the Benchmark Replacement and any Benchmark Replacement Adjustment prior to the Benchmark Replacement Date and in consultation with the Administrative Agent, ensuring that the Administrative Agent will be able to meet its obligations and requirements under this Agreement and the other Loan Documents with respect to the Benchmark

Replacement replacing the applicable Benchmark. No such replacement (including any Benchmark Replacement Conforming Changes to any Loan Document) shall affect the Administrative Agent's own rights, duties or immunities under the Loan Documents or otherwise.

Section 3.04 Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes indemnifiable under Section 3.01 and any Excluded Taxes); or

(iii) impose on any Lender or the relevant local market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation in any such Loan;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, upon request of such Lender by delivery of a certificate pursuant to this Section 3.03(c), the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) Certificates for Reimbursement. A certificate of a Lender prepared in good faith setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section 3.04 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt thereof by the Borrower.

(c) Delays in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 3.04 for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof); provided, further, that the Borrower shall not be required to compensate a Lender for increased costs or reductions suffered more than six months after such Change in Law, except that in the case of any such change having retroactive effect such period shall be extended until six months after the Lender becomes aware of such change.

Section 3.05 Compensation for Losses. Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any reasonable and documented loss, cost or expense incurred by it



CONFIDENTIAL CITADEL_0000292

(but, in each case, excluding lost profits or any loss, cost or expense arising from such Lender's breach of this Agreement) as a result of:

(iv) any continuation, payment or prepayment of any Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b) any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan on the date or in the amount notified by the Borrower.

Section 3.06 Mitigation Obligations; Replacement of Lenders.

(a) Designation of a different lending office. If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) Replacement of Lenders. If a Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01 or any Lender becomes a Defaulting Lender, or any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice by the Borrower to such Lender (with a copy to the Administrative Agent), require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.03), all of its interests, rights and obligations under this Agreement (or, with respect to clause (iii) above, all of its interests, rights and obligations with respect to the Loans or Commitments that is the subject of the related consent, waiver and amendment) and the related Loan Documents to one or more Eligible Assignees (provided that neither the Administrative Agent nor any Lender shall have any obligation to the Borrowers to find a replacement Lender or other such Person) that shall assume such obligations (any of which assignee may be another Lender, if a Lender accepts such assignment).

Section 3.07 Survival.

Each party's obligations under this Article III shall survive termination of the Commitments, repayment, satisfaction or discharge of all other Obligations hereunder, any assignment of rights by or the replacement of a Lender, the resignation or replacement of the Administrative Agent, and the termination of this Agreement or any other Loan Document.

Section 3.08 Changes in Law; Impracticability or Illegality.

(a) Term SOFR may be adjusted by the Administrative Agent (at the direction of the Required Lenders) with respect to any Lender on a prospective basis to take into account any additional

or increased costs due to Changes in Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except to the extent such changes result in the Lender becoming liable for Indemnified Taxes or Excluded Taxes) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at Term SOFR. In any such event, the affected Lender shall give the Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Borrower a statement setting forth the basis for adjusting such Term SOFR, the amount of such adjustment and the method for determining the amount of such adjustment, or (ii) repay the SOFR Loans with respect to which such adjustment is made (together with any amounts due under Section 3.01).

(b) In the event that any change in market conditions shall at any time after the date hereof, in the reasonable opinion of any Lender, make it impractical for such Lender to fund or maintain SOFR Loans or to continue such funding or maintaining, or to determine or charge interest rates at Term SOFR, such Lender shall give notice of such changed circumstances to the Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each other Lender and as to any SOFR Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such SOFR Loans, and interest upon the SOFR Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans of the same type hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01 Conditions to Closing Date and Availability of the Tranche 1 Loans• . The obligation of the Lenders to make the Tranche 1 Loans hereunder on the Closing Date is subject to Required Lenders' satisfaction (or waiver by the Lenders making the Tranche 1 Loans) of the following conditions precedent:

(a) the Plan shall have been confirmed by the Bankruptcy Court and the Effective Date shall have occurred;

(b) this Agreement shall have been duly executed and delivered by the Administrative Agent, the Lenders and the Borrower;

(c) the Litigation Trust Agreement shall have become effective;

(d) the Common Interest Agreement shall have been duly executed and delivered by the Litigation Trustee, the Lenders and the Borrower;

(e) the Administrative Agent and the Lenders shall have received, and the Required Lenders shall be satisfied with, a budget depicting the projected statement of sources and uses of cash for the Borrower for the following thirteen (13) weeks from the Closing Date (the "Initial Approved Budget").

(f) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects;

(g) no Default or Event of Default shall exist or would result from the making of the Tranche 1 Loans or from the application of the proceeds therefrom; and

(h) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with this Agreement.

Section 4.02 Conditions to Availability of the Tranche 2 Loans. The making of the Tranche 2 Loans hereunder after the Closing Date is subject to Required Lenders' reasonable satisfaction (or waiver by the Lenders making the Tranche 2 Loans) of the following conditions precedent:

(v) the Lenders shall have received a draft complaint in respect of the Litigation Trust Recovery Actions and such complaint shall be reasonably acceptable to the Required Lenders;

(vi) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date;

(c) no Default or Event of Default shall exist or would result from the making of the Tranche 2 Loans or from the application of the proceeds therefrom;

(d) no more than 180 days shall have passed from the Effective Date;

(e) the Required Lenders shall have consented to making the Tranche 2 Loans; and

(f) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with, the terms of this Agreement.

Section 4.03 Conditions to Availability of the Tranche 3 Loans.

The making of the Tranche 3 Loans hereunder after the Closing Date is subject to Required Lenders' reasonable satisfaction (or waiver by the Lenders making the Tranche 3 Loans) of the following conditions precedent:

~~(a) a complaint with respect to the Litigation Trust Recovery Actions shall have survived a motion to dismiss or no motion to dismiss has been granted;~~

(vii) [reserved];

(viii) the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects as of such earlier date;

(ix) no Default or Event of Default shall exist or would result from the making of the Tranche 3 Loans or from the application of the proceeds therefrom;

(x) the Tranche 3 Loans shall be made during the Tranche 3 Availability Period;

(e) the Required Lenders shall have consented to making the Tranche 3 Loans; and

(f) the Borrower shall have paid in full all fees, expenses and other amounts payable under, and in accordance with, the terms of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders on the date hereof and at the time of each Borrowing that:

Section 5.01 Organization; Powers. The Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (to the extent the concept of "good standing" is recognized thereunder) and (b) has all requisite power and authority to carry out the Litigation Trust Purpose.

Section 5.02 Authorization. The Borrower has the organizational and trust powers under the Litigation Trust Agreement, the Plan and Confirmation Order and has been duly authorized thereunder to execute and deliver this Agreement and perform its obligations hereunder.

Section 5.03 No Conflicts. The execution and delivery by the Borrower of this Agreement and the performance by the Borrower of its obligations hereunder do not (a) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under the Litigation Trust Agreement or any Contractual Obligation of the Borrower or (b) violate any Requirement of Law applicable to the Borrower.

Section 5.04 Litigation. There is no litigation, proceeding or investigation pending or, to the best knowledge of the Borrower, threatened against the Borrower, before any Governmental Authority asserting the invalidity of this Agreement or seeking to prevent the consummation of any of the transactions contemplated by this Agreement.

Section 5.05 Governmental Approvals. All approvals, authorizations, consents, orders, licenses or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Borrower of this Agreement have been obtained.

Section 5.06 No Default. No Default or Event of Default has occurred and is continuing.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

Until the Termination Date, the Borrower shall:

Section 6.01 Financial Statements. Deliver to the Administrative Agent and the Lenders within ten (10) days after the end of each calendar month, a statement of disbursements and income and cash balance for the immediately preceding calendar month.

Section 6.02 Telephonic Meeting.

(a) At the request of the Administrative Agent or the Required Lenders, provide a telephonic update to discuss the information delivered pursuant to Section 6.01.

(b) At the request of the Administrative Agent or the Required Lenders, provide a telephonic update to discuss the status of the Litigation.

Section 6.03 Other Information. Furnish to the Administrative Agent and the Lenders promptly, after the Litigation Trustee obtains knowledge thereof, written notice of any material event related to the Borrower, including the following:

(a) the occurrence of any Default or Event of Default; and

(b) any material development with respect to Litigation, including any settlement offers.

Section 6.04 Existence. Do or cause to be done all things necessary to preserve applicable trust formalities and maintain its existence as a trust.

Section 6.05 Compliance with Laws. Comply with all Requirements of Law applicable to it or its property.

Section 6.06 Books and Records. Keep proper books of record and account in which full, true and correct entries in all material respects are made of all material dealings and transactions in relation to its administration.

Section 6.07 Approved Budget. Commencing on the Closing Date and on a quarterly basis thereafter, Borrower shall provide the Lenders with an updated "rolling" 13-week budget (commencing with the immediately succeeding Saturday) supplementing the most recent Approved Budget in substantially the same form as the Initial Approved Budget (a "Proposed Supplemental Budget"); at the time such Proposed Supplemental Budget is in form and substance reasonably acceptable to the Lenders, such budget shall constitute an Approved Budget; *provided*, however, that the Borrower may make modifications to any Approved Budget with the consent of the Lenders in their reasonable discretion; *provided, further,* that each Lender shall be deemed to have approved any Proposed Supplemental Budget if the Borrower has not received written notice from such Lender of its disapproval of such Proposed Supplemental Budget, together with a detailed explanation of its reasons for not approving such Proposed Supplemental Budget, on the date that is two (2) Business Days after such Lender's receipt of such Proposed Supplemental Budget. To the extent that any Proposed Supplemental Budget is not acceptable to the Lenders, then the then-existing Approved Budget will remain the operative Approved Budget until replaced by a Proposed Supplemental Budget that is acceptable to the Lenders.

Section 6.08 Use of Proceeds. Use the proceeds of the Loans in accordance with the Approved Budget as then in effect and in furtherance of the Litigation Trust Purpose.

## ARTICLE VII
## NEGATIVE COVENANTS

Until the Termination Date, unless the Required Lenders shall otherwise consent in writing:

Section 7.01 Liens. The Borrower shall not create, incur, assume or suffer to exist any Liens on the Litigation Trust Assets other than statutory Liens or Liens automatically granted or created by applicable law.

Section 7.02 Limitation on Incurrence of Debt. The Borrower shall not incur any Debt other than the Loans.

Section 7.03 Merger, Consolidation or Sale of All or Substantially All Assets.

(a) The Borrower shall not merge into or consolidate with any other trust or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure other than, in the case of liquidation, transfer or disposal, in connection with converting the Litigation Trust Assets to Litigation Trust Proceeds or as otherwise permitted hereunder, under the Litigation Trust Agreement or Plan, or in the case of dissolution or termination terminate in accordance with the Litigation Trust Agreement or Plan.

(b) The Borrower shall not commingle its assets with the assets of any other Person.

Section 7.04 Limitation on Sales of Assets. The Borrower shall not sell any assets without the consent of the Required Lenders.

Section 7.05 Limitation on Restricted Payments and Distributions. The Borrower shall not make any Restricted Payments and shall not distribute any Litigation Trust Proceeds (or any other amounts or Litigation Trust Assets) to the Litigation Trust Beneficiaries before the occurrence of the Termination Date.

Section 7.06 Prepayments of Indebtedness. The Borrower shall not prepay any Junior Debt unless and until all Obligations on account of the Tranche 1 Loans are paid in full. The Borrower shall not prepay any Junior Debt on account of Tranche 3 Loans unless and until all Obligations on account of the Tranche 1 and 2 Loans are paid in full.

Section 7.07 Amendments and Modifications.

(a) The Borrower shall not amend, modify, waive or terminate any provision of the Litigation Trust Agreement or fail to observe applicable trust formalities (if any), in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Administrative Agent or the Lenders in any material respect.

(b) The Borrower shall not amend, modify, waive or terminate any provision of the Litigation Trust Agreement or the Loan Documents, in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Administrative Agent or the Lenders in any material respect.

Section 7.08 Settlement. The Borrower shall not settle, or offer to settle, any Litigation without consent of the Required Lenders, which may not be unreasonably withheld.

Section 7.09 Investments. The Borrower shall not directly or indirectly acquire, make, own, or hold any Investment, except in accordance with the terms and conditions of the Litigation Trust Agreement and the Plan.

Section 7.10 Use of Proceeds. The Borrower shall not use the proceeds of any Loan for any purpose other than (a) in furtherance of the Litigation Trust Purpose (which, for the avoidance of doubt, shall include, without limitation, the payment and/or reimbursement of the fees, costs and expenses incurred by the Borrower in connection therewith, including without limitation, the fees, costs and

expenses of the professionals retained by the Borrower in furtherance of the Litigation Trust Purpose) and (b) in accordance with the Litigation Trust Agreement and the Plan.

Section 7.11 Activities of Borrower. The Borrower shall not have any operations, assets or liabilities other than (a) the Litigation Trust Assets (as defined in the Litigation Trust Agreement), (b) performing its obligations under this Agreement, the Plan, the Confirmation Order, the CCAA Recognition Order and the Litigation Trust Agreement, (c) as may be necessary and required to pursue and further the Litigation Trust Purpose, including, pursuing the Litigation Trust Recovery Actions, (d) preserving and keeping in full force and effect its legal existence and (e) any activities related to any of the foregoing.

## ARTICLE VIII

## EVENTS OF DEFAULT AND REMEDIES

Section 8.01 Events of Default. Any of the following events referred to in this Section 8.01 shall constitute an "Event of Default":

(xi) Non-Payment. The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan and (ii) within two (2) Business Days after the same becomes due, any interest on any Loan, any fee or any other amount payable hereunder. For the avoidance of doubt, any failure to pay any Lender arising from or in connection an Erroneous Payment shall not be deemed a default or an Event of Default.

(xii) Covenants. The Borrower fails to comply with any of its obligations, covenants or agreements contained in Article VI or Article VII hereof, which failure has not been cured after five (5) Business Days' prior written notice from the Administrative Agent or the Required Lenders.

(xiii) Representations and Warranties. Any representation, warranty or certification made or deemed made by or on behalf of the Borrower required to be delivered in connection herewith shall be incorrect or misleading in any material respect when made or deemed made, and in either case, such incorrect or misleading representation or warranty (if curable) shall remain incorrect or misleading for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders.

(xiv) Budget Event. There occurs any Budget Event.

Section 8.02 Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent shall, solely at the written direction of the Required Lenders, take any or all of the following actions:

(xv) declare all Commitments to be terminated, whereupon such Commitments shall be terminated;

(xvi) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder (including any Prepayment Premiums) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(xvii) exercise on behalf of the Lenders all rights and remedies available under this Agreement or applicable Law;

provided that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under Debtor Relief Laws, the unpaid principal amount of all outstanding Loans and all interest, premiums (including any Prepayment Premiums) and other amounts as aforesaid shall automatically become due and payable, in each case, without further act of the Administrative Agent or the Lenders.

Section 8.03 Application of Funds. After the occurrence and during the continuance of an Event of Default or on the Maturity Date, any amounts received in respect of the Obligations shall be applied as follows and in accordance with the Litigation Trust Agreement:

(xviii) *first*, to the Administrative Agent, any and all fees, expenses, indemnities and other amounts owing to it in accordance with this Agreement, and then to the Lenders, ratably, any and all fees and expenses owing thereto in accordance with this Agreement;

(b) *second*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 1 Loans and any Incremental Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) in respect of the Tranche 1 Loans and any Incremental Loans;

(c) *third*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 2 Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) in respect of the Tranche 2 Loans; and

(d) *fourth*, to the Administrative Agent, for payment to the Lenders, ratably, of accrued interests in respect of the Tranche 3 Loans in cash, and then to the Lenders, ratably, all principal (including, without limitation, all previously capitalized interests) in respect of the Tranche 3 Loans.

For the avoidance of doubt, nothing contained herein shall be construed as a limitation on Borrower's right and/or duty to make distributions of Net Litigation Trust Proceeds (as defined in the Litigation Trust Agreement) to the Litigation Trust Beneficiaries in accordance with the terms of the Plan and the Litigation Trust Agreement. Borrower and its agents (including the Litigation Trustee), representatives and their respective advisers and professionals shall have the absolute and unconditional right to rely upon, and shall be protected in acting or not acting upon any schedule, register, instrument, calculation, determination or allocation by the Administrative Agent or any of the Lenders of or related to the Obligations, amounts paid or payable under this Section 8.03 or otherwise in this Agreement.

## ARTICLE IX
## THE ADMINISTRATIVE AGENT

Section 9.01 Appointment and Authority.

(a) Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints Acquiom Agency Services LLC to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents, as applicable, and authorizes the Administrative Agent, in such capacity, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, the Borrower shall not have rights as a third-party beneficiary of any such provisions. In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of the Lenders and



CONFIDENTIAL CITADEL_0000300

does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Person.

(b) For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to the Administrative Agent hereunder (including without limitation this Article IX), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import that authorize and permit the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), to take such action or to exercise such rights. Nothing contained in this Agreement shall require the Administrative Agent to exercise any discretionary acts and any permissive grant of power to the Administrative Agent hereunder shall not be construed to be a duty to act.

(c) For the avoidance of doubt, the Administrative Agent's rights, protections, indemnities and immunities provided herein shall apply to the Administrative Agent for any actions taken or omitted to be taken under this Agreement or any other Loan Documents and any other related agreements in any of their respective capacities.

Section 9.02 [Reserved].

Section 9.03 Exculpatory Provisions.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, the Administrative Agent:

i. shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing additionally, each Lender agrees that it will not assert any claim against the Administrative Agent based on an alleged breach of fiduciary duty by the Administrative Agent in connection with this Agreement and/or the transactions contemplated hereby;

ii. shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law; and

iii. shall not, except as expressly set forth herein, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of or ratified by, the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be

necessary, under the circumstances as provided in Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct (as determined in a final and non-appealable judgment by a court of competent jurisdiction); provided that, no action taken or not taken in accordance with the direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) shall be deemed to constitute gross negligence or willful misconduct of the Administrative Agent. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default as such is given to the Administrative Agent by the Borrower or a Lender and expressly stating that such notice constitutes a "notice of default" or "notice of event of default", as applicable. To the extent that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in Section 10.01) instruct, consent, request or otherwise direct the Administrative Agent to take (or not take) any action, the Administrative Agent may, in its sole discretion inform the Borrower of such instruction, consent, request or direction and identify the instructing Lenders. Any such instruction, consent, request or direction shall expressly state that it constitutes an "instruction", "consent", "request" or "direction" of such Lenders and shall be executed by such Lenders.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, (v) the value or the sufficiency of any collateral or the creation, perfection or priority of any Lien purported to be created by any related agreements or documents (as applicable) or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(b) Nothing herein or in any other Loan Document or related documents shall obligate the Administrative Agent to advance, expend or risk its own funds, or to take any action which in its reasonable judgment may cause it to incur any expense or financial or other liability for which it is not indemnified to its satisfaction.

(c) In no event shall the Administrative Agent be responsible or liable for: (i) delays or failures in performance resulting from acts beyond its control, including but not limited to, acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters, the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, (ii) any delay, error omission or default of any mail, telegraph, cable or wireless agency or operator, or (iii) the acts or edicts of any government or governmental agency or other group or entity exercising governmental powers. The Administrative Agent shall not be liable for interest on any money received by it.

(d) The Administrative Agent shall not have any liability for any failure, inability or unwillingness on the part of any Lender or the Borrower to provide accurate and complete information on a timely basis to the Administrative Agent, or otherwise on the

part of any such party to comply with the terms of this Agreement, and shall not have any liability for any inaccuracy or error in the performance or observance on the Administrative Agent's part of any of its duties hereunder that is caused by or results from any such inaccurate, incomplete or untimely information received by it, or other failure on the part of any such other party to comply with the terms hereof.

(e) With respect to any permissive rights or the exercise of discretionary authority, the Administrative Agent shall be entitled to refrain from exercising such rights or authority unless and until the Administrative Agent shall have received instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and the Administrative Agent shall not incur liability to any Person by reason of so refraining.

(f) The Administrative Agent shall have no obligation (i) to monitor, determine or verify the unavailability or cessation of any Benchmark (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitioned or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any modifier to any replacement or successor index, or (iv) to determine whether or what any amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing. The Administrative Agent shall not be liable for any inability, failure or delay on its part to perform any of its duties set forth in this Agreement or any other Loan Document as a result of the unavailability of any Benchmark (or other applicable benchmark interest rate), including as a result of any inability, delay, error or inaccuracy on the part of any other party, including without limitation any Lenders or the Borrower in providing any direction, instruction, notice or information required or contemplated by the terms of this Agreement and reasonably required for the performance of such duties. The Administrative Agent shall have no liability for any interest rate published by any publication that is the source for determining the interest rates of the Loans, including but not limited to Bloomberg (or any successor source) and the Bloomberg or Reuters screen (or any successor source), or for any rates published on any publicly available source, including without limitation the Federal Reserve Bank of New York's Website or any website administered by the Term SOFR Administrator, or in any of the foregoing cases for any delay, error or inaccuracy in the publication of any such rates, or for any subsequent correction or adjustment thereto.

Section 9.04 Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may, at its option and in its sole discretion, rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel,

accountants or experts. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amounts owing hereunder as the owner thereof for all purposes including any voting, direction or other Lender thresholds.

Section 9.05 Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents, agents, employees or attorneys-in-fact appointed by the Administrative Agent, as applicable. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective affiliates and its respective officers, directors, employees, agents, advisors and attorneys-in-fact of such Person and its affiliates, accountants, advisors (including investment managers, financial advisors and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns ("Related Part(y)(ies)"). The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, as applicable, and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence, misconduct, acts or omissions of any agents, sub-agents or attorneys-in-fact except to the extent that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such agents, sub-agents or attorneys-in-fact as determined by a court of competent jurisdiction in a final and non-appealable judgment.

Section 9.06 Non-Reliance on Administrative Agent and Other Lenders.

Each Lender expressly acknowledges that the Administrative Agent has not made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of the Borrower or any affiliate thereof, shall be deemed to constitute any representation or any warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of its affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the Litigation Trust Assets and the administration, prospects, financial and other condition and creditworthiness of the Borrower, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisal and decisions in taking or not taking action under or based upon this Agreement, any other related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the Litigation Trust Assets and the administration, prospects, financial and other condition and creditworthiness of the Borrower. Each Lender represents and warrants that (i) this Agreement sets forth the terms of a commercial lending facility and certain other facilities set forth herein and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire or hold commercial loans, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision

to make, acquire or hold such commercial loans, is experienced in making, acquiring or holding such commercial loans.

Section 9.07 Withholding Tax. To the extent required by any applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equal to any applicable withholding Tax. If the IRS or any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from any amount paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting or expanding the obligation of the Borrower to do so) for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including any penalties, additions to Tax or interest thereon, together with all expenses incurred, including legal expenses and any out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section 9.07. The agreements in this Section 9.07 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Loans and the repayment, satisfaction or discharge of all Loan Obligations under this Agreement. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender any refund of Taxes withheld or deducted from funds paid for the account of such Lender.

Section 9.08 Erroneous Payments.

(a) If the Administrative Agent notifies a Lender or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b) Without limiting immediately preceding clause (a), each Lender, or any Person who has received funds on behalf of a Lender, hereby further agrees that if it receives a payment, prepayment or

repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i) (A) in the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 9.08(b).

(c) Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender from any source, against any amount due to the Administrative Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d) For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to Section 9.08(b)(ii) shall not have any effect on a Payment Recipient's obligations pursuant to Section 9.08(a) or on whether or not an Erroneous Payment has been made.

(e) The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f) To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g) Each party's obligations, agreements and waivers under this Section 9.08 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Loan Obligations (or any portion thereof) under any Loan Document.

Section 9.09 Resignation of Administrative Agent.

(a) The Administrative Agent may at any time give not less than thirty (30) days' prior written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank subject

to the qualification set forth in Section 3.01(e)(iv) hereof. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) all payments, communications and determinations to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 9.09. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section 9.09). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.02 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b) Notwithstanding anything to the contrary contained herein or in any related document, any entity into which the Administrative Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any entity succeeding to the business of the Administrative Agent shall be the successor of the Administrative Agent hereunder without the execution or filing of any paper with any Person or any further act on the part of any Person.

## ARTICLE X

## MISCELLANEOUS

Section 10.01 Amendments. No amendment or waiver of any provision of this Agreement shall be effective unless in writing signed by the Administrative Agent, Required Lenders, and the Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a) increase the Commitment of any Lender without the written consent of such Lender;

(b) as to any Lender, postpone any date fixed by this Agreement for any scheduled payment (including the Maturity Date) or mandatory prepayment of principal, interest, premiums (including the Prepayment Premium), fees or other amounts due hereunder without the written consent of such Lender,

(c) as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (b) of this Section 10.01) any premiums (including the Prepayment Premium), fees or other amounts payable hereunder to or for the account of such Lender (subject to Section 2.11), without the written consent of such Lender; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d) as to any Lender, change any provision of this Agreement, including, without limitation, Section 8.03, in a manner that would alter the priority or pro rata sharing of payments required thereby without the written consent of such Lender;

(e) change any provision of this Section 10.01 or the definition of "Required Lenders", or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(f) except as expressly permitted hereunder, release, or limit the liability of, the Borrower without the written consent of each Lender;

(g) except as expressly permitted herein, subordinate the Obligations hereunder to any other Debt without the written consent of each Lender; and

(h) amend, waive or otherwise modify any of the conditions precedent set forth in Article IV without the written consent of each affected Lender;

and, provided further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement.

Section 10.02 Expenses; Indemnity; Damages Waiver

(a) Costs and Expenses. The Borrower shall pay to the Administrative Agent, for its own account, such fees as shall have been separately agreed upon in writing in the Agent Fee Letter in the amounts and at the times so specified in the Agent Fee Letter. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent). The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.02(a), or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) Indemnification by the Borrower. The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof) and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities, obligations, penalties, actions, judgments, suits, costs, disbursements and related reasonable and documented expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any

Loan or the use or proposed use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment or order to have resulted from the gross negligence or willful misconduct of such Indemnitee, (y) other than with respect to the Administrative Agent, result from a claim brought by the Borrower against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under the Loan Documents, if the Borrower has obtained a final and nonappealable judgment or order in its favor on such claim as determined by a court of competent jurisdiction or (z) result from a claim not involving an act or omission of the Borrower and that is brought by an Indemnitee against another Indemnitee (other than a claim by or against the Administrative Agent in their capacities as such). Notwithstanding anything in this Agreement to the contrary, the Indemnitees shall be paid exclusively from the Litigation Trust Assets.

(c) Limited Recourse. Notwithstanding anything in this Agreement to the contrary, consistent with Section 3.15 of the Litigation Trust Agreement, any and all Obligations shall be paid exclusively from the Litigation Trust Assets. In accordance with and subject to Section 3.01 and Section 3.13 of the Litigation Trust Agreement, neither the Litigation Trustee nor its agents, advisors or professionals shall have any personal liability of any kind or nature with respect to any of the matters set forth in this Agreement.

(d) Waiver of Consequential Damages. To the fullest extent permitted by Law, the Borrower shall not assert, and hereby waives, any claim against the Administrative Agent and any Lender on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof. To the fullest extent permitted by Law, the Lenders shall not assert, and hereby waives, any claim against the Administrative Agent on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan, or the use of the proceeds thereof. Neither the Administrative Agent nor any Lender shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement, the Loan Documents, or the transactions contemplated hereby or thereby, except to the extent such damage is determined by a court of competent jurisdiction by final and nonappealable judgment or order to have resulted from the fraud, gross negligence or willful misconduct of such Person.

(e) The agreements in this Section 10.02 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of the other Obligations.

Section 10.03 Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby. Any Lender may at any time assign to one (1) or more Eligible Assignees all or any portion of such Lender's Commitment and Loans, together with all related Obligations of such Lender hereunder, provided that until the Administrative Agent shall have received and accepted an effective assignment agreement substantially in the form of Schedule 6, executed, delivered and fully completed by the applicable parties thereto (an "Assignment

Agreement") (and the Administrative Agent shall email a copy thereof to the Borrower (pursuant to the notice information in Section 10.04) within five (5) Business Days following receipt thereof), and shall have received such other information regarding such Eligible Assignee as the Administrative Agent reasonably shall require, the Borrower and the Administrative Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned. If requested by the Administrative Agent, the Borrower agrees to (i) execute any document reasonably required to acknowledge each assignment of a Commitment and Loans to an assignee hereunder, (ii) make the Litigation Trustee or his/her/its professionals available to meet with the Administrative Agent and prospective participants and assignees of the Commitments and Loans at times and places to be mutually agreed and (iii) to provide reasonable assistance to the Administrative Agent or the Lenders in the preparation of non-privileged and/or non-confidential information relating to the financial affairs of the Borrower as any prospective participant or assignee of a Commitment and Loans reasonably may request, and in each case solely to the extent disclosure will not undermine any of the Litigation Trust Assets or any strategy relating thereto. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement, together with a processing and recordation fee in the amount of $3,500, its applicable tax forms and its completed administrative questionnaire; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(b) From and after the effective date of each Assignment Agreement, (i) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such assignment agreement, shall have the rights and obligations of a Lender hereunder, and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment agreement, shall be released from obligations hereunder and its rights hereunder shall terminate (other than those that survive termination) (and, in each case of an Assignment Agreement covering all the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(c) The Administrative Agent, in its capacity as administrative agent for the Lenders and acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a copy of each Assignment Agreement delivered to it and a Register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount (and stated interest) of the Loans, owing to, such Lender pursuant to the terms hereof (the "Register"). The entries in such Register shall be conclusive, absent manifest error, and, the Administrative Agent, the Borrower and the Lenders shall treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Borrower and its agents (including the Litigation Trustee), representatives and their respective advisers and professionals shall have the absolute and unconditional right to rely, and shall be protected in acting or not acting upon, the Register. Such Register shall be available for inspection by the Borrower and any Lender, at any reasonable time upon reasonable prior notice to the Administrative Agent.

(d) The Borrower agrees that each participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations therein, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Obligations for its own purposes (each, a "Participant Register"), provided that (i) the Administrative Agent and Borrower shall be entitled to continue to deal solely and directly with such Lender in connection with such Lender's Commitments and Loans and such Lender's rights and

obligations hereunder and under the other Loan Documents and (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations hereunder. The entries in the Participant Registers shall be conclusive, absent manifest error. Each Participant Register shall be available for inspection by the Administrative Agent (without obligation to so inspect) at any reasonable time upon reasonable prior notice to the applicable Lender; provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations) to any Person (including the Borrower) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Section 10.04 Notice Generally; Electronic Communications. All notices, consents and other communications required or permitted by this Agreement shall be in writing and shall be (a) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid), (b) sent by e-mail or (c) sent by registered or certified mail, return receipt requested, in each case to the following addresses or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by written notice to the other party):

if to the Borrower, to:
Instant Brands Litigation Trust
c/o Alan D. Halperin, solely in his capacity as Litigation Trustee
Halperin Battaglia Benzia, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Email: ahalperin@halperinlaw.net

with a copy (which does not constitute notice) to:

Halperin Battaglia Benzia, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Attention: Debra J. Cohen, Esq,
Email: dcohen@halperinlaw.net

if to the Administrative Agent, to:

Acquiom Agency Services LLC
Attention: Jennifer Anderson – Loan Agency
950 17th Street, Suite 1400
Denver, CO 80202
Email: janderson@srsacquiom.com; loanagency@srsacquiom.com

with a copy (which does not constitute notice) to:

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004

Attention: Gregg Bateman
Email: bateman@sewkis.com

if to each Lender, to the addresses set forth on Schedule 3 of this Agreement

All notices, consents, waivers and other communications shall be deemed to have been duly given (as applicable): if delivered by hand, when delivered by hand; if delivered by overnight service, when delivered by nationally recognized overnight service; if delivered by courier, when delivered by courier; if sent via registered or certified mail, five Business Days after being deposited in the mail, postage prepaid; or if delivered by email, when received by the recipient prior to 5:00 p.m. local time for the recipient (and if received by the recipient after 5:00 p.m. local time for the recipient, then delivery will be deemed duly given at 9:00 a.m. local time for the recipient on the subsequent Business Day, unless receipt is otherwise confirmed by the recipient by response email prior thereto).

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article II by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received when sent; provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any Borrower's or the Administrative Agent's transmission of Borrower Materials through electronic telecommunications or other information transmission systems, except for direct or "economic" (as such term is used in Title 18, United States Code, Section 1030(g)) (as opposed to special, indirect, consequential or punitive) losses, claims, damages, liabilities or expenses to the extent that such losses, claims, damages, liabilities or expenses (x) are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party or (y) result from a claim brought by the Borrower against an Indemnitee for material breach of such Indemnitee's obligations hereunder or under any other Loan Document in



CONFIDENTIAL CITADEL_0000312

respect of Borrower Materials made available through electronic telecommunications or other information transmission systems, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to such direct or "economic" damages).

Section 10.05 Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.06 Entire Agreement. This Agreement supersedes all prior agreements, representations and warranties, whether written or oral, of the parties with respect to the subject matter contained herein and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to such subject matter.

Section 10.07 Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.

(xix) Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to its conflict of law principles.

(xx) Jurisdiction; WAIVER OF JURY TRIAL. Any lawsuit or other legal actions arising out of or based upon this Agreement shall be brought and determined in the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York and appellate courts from any thereof. The parties agree that, after a proceeding is before a court as specified in this Section 10.07(b) and during the pendency of such proceeding or any other proceeding, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court. Each party waives, and agrees not to assert, as a defense in any such proceeding that it is not subject thereto or that such proceeding may not be brought or is not maintainable in such court or that its property is exempt or immune from execution, that such proceeding is brought in an inconvenient forum or that the venue of the proceeding is improper. Each party irrevocably consents to the service of any and all process in any such proceeding by the delivery of such process to such party at the address and in the manner provided in Section 10.04. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT. Each party agrees that a final judgment in any proceeding described in this Section 10.07(b) after the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions on the judgment or in any other manner provided by applicable law.

[*Remainder of page intentionally left blank.*]



CONFIDENTIAL CITADEL_0000313