# Exhibit 8

# EXHIBIT 1

[REDACTED]

Citadel Credit Master Fund LLC
Citadel Multi-Asset Master Fund Ltd.
c/o Citadel Enterprise Americas LLC
Southeast Financial Center
200 South Biscayne Boulevard, Suite 3300
Miami, FL 33131

December 27, 2024

InstaLit Funding 1 LLC
c/o Parabellum Capital LLC
810 Seventh Avenue, Suite 1700/2900
New York, NY 10019

Re: Purchase and sale of an undivided participation interest in and under (A) the Credit Agreement, dated as of February 27, 2024, as amended, restated, supplemented or otherwise modified, from time to time (the "Credit Agreement"), among Instant Brands Litigation Trust (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), and Acquiom Agency Services LLC, as administrative agent for the Lenders (the "Agent") and (B) the Litigation Trust Agreement, dated as of February 27, 2024, as amended, restated, supplemented or otherwise modified, from time to time, by and among, the Litigation Trustee a party thereto, Corelle Brands Acquisition Holdings LLC (f/k/a Instant Brands Acquisition Holdings Inc.), on behalf of itself and the other parties set forth therein and the Litigation Trust Beneficiaries (the "LTA" and, collectively with the Credit Agreement and any related or ancillary documents thereto, the "Operative Agreements")

Ladies and Gentlemen:

Reference is made to that certain trade agreed upon with a trade date of December 12, 2024 between (a) Citadel Credit Master Fund LLC ("Debt Seller") and Citadel Multi-Asset Master Fund Ltd. (the "LTI Seller" and the Debt Seller each referred to herein as a "Seller" and collectively as "Sellers") and (b) InstaLit Funding 1 LLC ("Buyer"), pursuant to which:

(1) Debt Seller agreed to sell and grant to Buyer and Buyer agreed to purchase and acquire from Debt Seller an undivided participation interest in, to and under the following: (i) Tranche 1 Loans extended under the Credit Agreement in the outstanding principal amount of [redacted] (the "T1 Loans"); (ii) Tranche 2 Loans extended under the Credit Agreement in the outstanding principal amount of [redacted] (the "T2 Loans"); (iii) unfunded commitment to extend Tranche 3 Loans under the Credit Agreement in the principal amount of [redacted] (the "T3 Commitment"); and (iv) the right (but not the obligation) to make an Incremental Commitment pursuant to Section 2.10 of the Credit Agreement in a pro rata principal amount of up to [redacted] (to the extent the full Incremental Amount is requested to be drawn) (the "Incremental Commitment" and together with the T1 Loans, the T2 Loans, the T3 Commitment, as the "Participated Loans and Commitment"); and

(2) LTI Seller agreed to sell and grant to Buyer and Buyer agreed to purchase and acquire from LTI Seller an undivided participation interest in, to and under 90,407.17 Litigation Trust Interest issued under the LTA (the "Participated LTI").

Capitalized terms used in this letter agreement (the "Agreement") without definition have the meanings given to them in the applicable Operative Agreements. The Participated Loans and

Commitment and Participated LTI are collectively referred to herein as the "Participated Assets." Each Seller, and Buyer are a "Party" hereunder and are collectively referred to as "Parties" hereto.

In full and final satisfaction of their respective rights and obligations with respect to the agreed upon trade, each Seller and Buyer agree as follows (the transactions contemplated hereby, collectively, the "Transaction"):

1. In accordance with the terms and conditions of this Agreement, effective as of the Settlement Date:

(a) Debt Seller sells, transfers, grants and conveys to Buyer, and Buyer purchases, and acquires from Debt Seller, an undivided participation interest in, to and under the Participated Loans and Commitment, and solely to the extent related thereto, any and all of Debt Seller's right and interest in, to, and under, (i) the Credit Agreement, (ii) all amounts payable to Debt Seller under the Credit Agreement, and all obligations owed to Debt Seller in connection with the Participated Loans and Commitment, (iii) all cash, securities, or other property, received, applied, or effected by or for the account of Debt Seller, under the Participated Loans and Commitment (whether for principal, interest, fees, reimbursement obligations, or otherwise and whether accruing before, on or after the date of this Agreement), other extensions of credit under the Credit Agreement, including all property obtained by or through litigation, mediation, arbitration, redemption, consummation of a chapter 11 plan, restructuring, liquidation, or otherwise of Borrower or any other entity that is obligated with Borrower under the Credit Agreement (a "Debt Obligor"), and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing, (iv) all claims (as defined in Section 101(5) of Title 11, United States Code) and any other rights of Debt Seller, whether known or unknown, whether arising before, on, or after the date hereof, against Borrower or any Debt Obligor or any of their respective affiliates, directors, officers, agents, representatives, contractors, advisors, or any other entity that in any way is based upon, arises out of, or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Debt Seller against any attorney, accountant, financial advisor, or other entity arising under, in connection with or relating to the Credit Agreement or the transactions related thereto or contemplated thereby and (v) all proceeds of the foregoing. The items described in the immediately preceding sentence are referred to herein as the "Debt Participated Rights";

(b) LTI Seller sells, transfers, grants and conveys to Buyer, and Buyer purchases, and acquires from LTI Seller, an undivided participation interest in, to and under the Participated LTI, and solely to the extent related thereto, any and all of LTI Seller's right and interest in, to, and under, (i) the LTA, Litigation Trust Assets and Litigation Trust Proceeds, (ii) all amounts payable to LTI Seller under the LTA, and all obligations owed to LTI Seller in connection with the Participated LTI, (iii) all cash, securities, or other property, received, applied, or effected by or for the account of LTI Seller, under or in connection with the Participated LTI, including all property obtained by or through litigation (including, without limitation, any Litigation Trust Recovery Actions), mediation, arbitration, redemption, consummation of a chapter 11 plan, restructuring, liquidation, or otherwise, and all cash, securities, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing, (iv) all claims (as defined in Section 101(5) of Title 11, United States Code) and any other rights of LTI Seller, whether known or unknown, whether arising before, on, or after the date hereof, against any entity or any entities' respective affiliates, directors, officers, agents, representatives, contractors, advisors, or any other entity that in any way is based upon, arises out of, or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of LTI Seller against any attorney, accountant, financial advisor, or other entity arising under, in connection with or relating to the LTA or the transactions related thereto or contemplated thereby and (v) all proceeds of the foregoing. The items described

in the immediately preceding sentence are referred to herein as the "LTI Participated Rights". The Debt Participated Rights and the LTI Participated Rights are collectively referred to herein as the "Participated Rights"; and

(c) Until (i) an Elevation Date (as defined below) with respect to the Debt Participated Rights, Debt Seller shall hold record title to the Participated Loans and Commitment for the benefit of Buyer and (ii) an Elevation Date with respect to the LTI Participated Rights, LTI Seller shall hold title to the Participated LTI for the benefit of Buyer.

2. Following (x) the execution and delivery by the Parties of this Agreement to each other on the date hereof (the "Agreement Date") and (y) receipt of the consent of the transfer of the LTI Participated Rights by LTI Seller to Buyer from the Litigation Trust Advisory Board, Buyer irrevocably covenants and agrees that it shall pay (A) the purchase price for the Debt Participated Rights (the "Debt Purchase Price") as set forth on Schedule A and (B) the purchase price for the LTI Participated Rights (the "LTI Purchase Price" and collectively with the Debt Purchase Price, the "Purchase Price") as set forth on Schedule A in immediately available funds (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) to the Seller's wire instructions set forth on Schedule B by no later than fourteen (14) Business Days after the Agreement Date (which end date for the avoidance of doubt is January 17, 2025 (referred to herein as the "Cutoff Date")); provided, however, Buyer shall pay five percent (5%) of the Purchase Price on the Agreement Date (the "Initial Payment") in immediately available funds (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) to the LTI Seller's wire instructions set forth on Schedule B. The date upon which Seller receives the balance of the Purchase Price (the "Purchase Price Balance") owed shall be deemed the "Settlement Date" and such date shall be on a Business Day on or before the Cutoff Date. On the Settlement Date, Seller shall deliver a transfer notice (the "LTI Transfer Notice") duly executed by LTI Seller and the Buyer pursuant to which the Seller notifies the Litigation Trustee of the participation of the Participated LTI (and the signature of the LTI Seller and the Buyer on the LTI Transfer Notice shall be acknowledged before a notary public). In the event the Purchase Price Balance is not received in full by Seller by the Cutoff Date, Seller shall be entitled to retain the Initial Payment and shall have no obligation to refund such amount to Buyer and Seller's retention of the Initial Payment shall not be deemed an election of remedies or any limitation on any other rights that Seller may have hereunder or under applicable law. As used in this Agreement, "Business Day" means any day that is not (a) a Saturday, (b) a Sunday, or (c) any other day on which the Federal Reserve Bank of New York is closed. In the event the Purchase Price Balance is not received in full by Seller by the Cutoff Date, Buyer shall be obligated to immediately pay to Seller, upon Seller's demand, an amount equal to five percent (5%) of the Purchase Price ("Recourse Amount") in immediately available funds (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) to the Seller's wire instructions set forth on Schedule B; provided, however, that (x) payment of a Recourse Amount shall cause this Agreement to terminate in full and neither Buyer nor Seller shall have any further obligations under this Agreement and (y) Buyer shall not be obligated to pay a Recourse Amount in the event that any of the following conditions are satisfied: (i) Seller breaches any of its representations, warranties, covenants, or agreements contained in this Agreement and/or (ii) Seller sells or offers to sell any interest held by Seller in any other loans or commitments extended under the Credit Agreement or any other litigation trust beneficial interest held by Seller under the LTA, whether or not such interest is part of the Participated Rights, prior to the Cutoff Date.

3. (a) If at any time after the Settlement Date, Debt Seller receives a distribution or payment on account of the Debt Participated Rights (a "Debt Distribution"), whether or not the Debt Distribution is assignable, Debt Seller shall (i) accept and hold the Debt Distribution (to the extent received by Debt Seller) on behalf of and for the sole benefit of Buyer, (ii) have no equitable or beneficial interest in the Debt Distribution, and (iii) deliver the Debt Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Debt Distribution, in no event later than five (5) Business Days after the date on which Debt Seller receives the Debt Distribution) to Buyer in the same form received and, when necessary or appropriate, with Debt Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule, or order or underlying document governing the transfer of any such Debt Distribution, or use commercially reasonable efforts to assist Buyer to cause the Debt Distribution to be registered in Buyer's

name, or such name as Buyer may direct in writing, and deliver securities or any non-cash Distribution as soon as practicable to Buyer or to such entity as Buyer may direct. Notwithstanding anything to the contrary in this Agreement, in the event Debt Seller receives (x) a cash Debt Distribution on or after the Agreement Date and prior to the Settlement Date, Debt Seller shall provide a credit to the Purchase Price with respect to such cash Debt Distribution on the Settlement Date or (y) a non-cash Debt Distribution on or after the Agreement Date and prior to the Settlement Date, Debt Seller will be deemed to hold such non-cash Debt Distribution for the sole benefit of Buyer and shall use good faith efforts to promptly deliver such non-cash Debt Distribution to Buyer in accordance with clause (iii) of the first sentence of this Section 3(a) following the Settlement Date.

(b) If at any time after the Settlement Date, LTI Seller receives a distribution or payment on account of the LTI Participated Rights (an "LTI Distribution" and collectively with Debt Distribution referred to herein as "Distributions"), whether or not the LTI Distribution is assignable, LTI Seller shall (i) accept and hold the LTI Distribution (to the extent received by LTI Seller) on behalf of and for the sole benefit of Buyer, (ii) have no equitable or beneficial interest in the LTI Distribution, and (iii) deliver the LTI Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash LTI Distribution, in no event later than five (5) Business Days after the date on which LTI Seller receives the LTI Distribution) to Buyer in the same form received and, when necessary or appropriate, with LTI Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule, or order or underlying document governing the transfer of any such LTI Distribution, or use commercially reasonable efforts to assist Buyer to cause the LTI Distribution to be registered in Buyer's name, or such name as Buyer may direct in writing, and deliver securities or any non-cash Distribution as soon as practicable to Buyer or to such entity as Buyer may direct. Notwithstanding anything to the contrary in this Agreement, in the event LTI Seller receives (x) a cash LTI Distribution on or after the Agreement Date and prior to the Settlement Date, LTI Seller shall provide a credit to the Purchase Price with respect to such cash LTI Distribution on the Settlement Date or (y) a non-cash LTI Distribution on or after the Agreement Date and prior to the Settlement Date, LTI Seller will be deemed to hold such non-cash LTI Distribution for the sole benefit of Buyer and shall use good faith efforts to promptly deliver such non-cash LTI Distribution to Buyer in accordance with clause (iii) of the first sentence of this Section 3(b) following the Settlement Date.

(c) Subject to applicable law, each Party hereto is each entitled to receive any payments to be remitted by the other Party under this Agreement without the withholding of any tax. If one Party ("Remitting Party") is required to make a payment or remit a distribution to the other Party ("Receiving Party"), the Receiving Party shall furnish to the Remitting Party such forms, certifications, statements, and other documents as the Remitting Party may reasonably request in writing to evidence the Receiving Party's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable the Remitting Party to comply with any applicable laws or regulations relating thereto, and the Remitting Party may refrain from making such payment or remitting such distribution until such forms, certifications, statements and other documents have been so furnished. With respect to the payment or delivery of any funds or other property from the Remitting Party to the Receiving Party under this Agreement, (i) the Remitting Party may withhold therefrom any amount required by law to be withheld, and any amount due and payable under this Agreement and paid to Receiving Party net of such withholding shall be treated for all purposes of this Agreement as having been paid in full and (ii) in the case of a failure by the Remitting Party to make full payment of any amount when due and payable (subject to withholding under clause (i) of this sentence) the Remitting Party shall pay such unpaid amount together with interest thereon (for each day from (and including) the date when due to (but excluding) the date when paid) at the Federal Funds Rate.

4. Each Seller represents and warrants (severally and not jointly) to Buyer, and Buyer represents and warrants to each Seller (as of the Settlement Date and, where specifically indicated, the Agreement Date) that: (a) it has, in each case, as of the Agreement Date, full power and authority to enter into this Agreement, the LTI Transfer Notice, and the Transaction, and this Agreement and the Transaction have been duly authorized, are valid and enforceable against it, are not in contravention of any law, order or agreement by which it is bound, and do not require any consent, notice, or filing of any kind (except with respect to the consent by the Litigation Trust Advisory Board with respect to the LTI Transfer Notice and

any notice required by the Litigation Trust Agreement), (b) it (i) is sophisticated with respect to the sale or purchase (as applicable) of the Participated Rights, (ii) has adequate information to make an informed decision regarding the sale or purchase (as applicable) of the Participated Rights, (iii) has independently and without reliance upon the other Party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon the other Party's express representations, warranties, covenants, agreements, and indemnities in this Agreement, and (iv) acknowledges that the other Party has not given it any investment advice, credit information, or opinion on whether the sale or purchase (as applicable) of the Participated Rights is prudent, (c) it is an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended,15 U.S.C. § 77a et seq. (the "Securities Act"), and (d) either (i) no interest in the Participated Rights is being sold or acquired (as applicable) by or on behalf of an entity that is (or, in the case of Buyer, at any time while the Participated Rights are held thereby will be) a Benefit Plan or (ii) the transaction exemption set forth in one or more prohibited transaction exemptions, as such exemptions may be amended from time to time ("PTEs"), such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to, in the case of Seller, the sale, or in the case of Buyer, the purchase and holding, of the Participated Rights and the exercise of Buyer's rights thereunder. Except as expressly stated in this Agreement, neither Seller nor Buyer makes any representations or warranties, express or implied, with respect to the Transaction. "Benefit Plan" means an "employee benefit plan" (as defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA")) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code, or any entity whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

5. Debt Seller further represents and warrants to Buyer as of the Settlement Date that (i) Debt Seller is the sole legal and beneficial owner of and has good title to the Participated Loans and Commitment and the other Debt Participated Rights free and clear of any mortgage, pledge, lien, security interest, charge, hypothecation, encumbrance or other adverse claim against title of any kind; (ii) Debt Seller has not made any prior sale, transfer, or assignment of, or granted any participation in, any of the Debt Participated Rights; (iii) without characterizing the Debt Participated Rights as a "security" within the meaning of applicable securities laws, Debt Seller has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Debt Participated Rights in violation of any applicable securities laws; (iv) Debt Seller has provided Buyer with a true, accurate and complete copy of the Credit Agreement; and (v) to Debt Seller's knowledge, there are in respect of the Borrower no other documents or agreements by which Debt Seller is bound (other than the Credit Agreement, the LTA, common interest agreements with the Litigation Trustee and any orders entered in any Litigation Trust Recovery Actions) that would materially and adversely affect the Debt Participated Rights.

6. LTI Seller further represents and warrants to Buyer as of the Settlement Date that (i) LTI Seller is the sole legal and beneficial owner of and has good title to the Participated LTI the other LTI Participated Rights free and clear of any mortgage, pledge, lien, security interest, charge, hypothecation, encumbrance or other adverse claim against title of any kind; (ii) LTI Seller has not made any prior sale, transfer, or assignment of, or granted any participation in, any of the LTI Participated Rights; (iii) without characterizing the LTI Participated Rights as a "security" within the meaning of applicable securities laws, LTI Seller has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the LTI Participated Rights in violation of any applicable securities laws; (iv) LTI Seller has provided Buyer with a true, accurate and complete copy of the LTA; and (v) to LTI Seller's knowledge, there are in respect of Borrower no other documents or agreements by which LTI Seller is bound by (other than the Credit Agreement, the LTA, common interest agreements with the Litigation Trustee and any orders entered in

any Litigation Trust Recovery Actions) that would materially and adversely affect the LTI Participated Rights.

7. Buyer represents and warrants to each Seller as of the Settlement Date that (i) Buyer has received copies of the Operative Agreements in the form delivered to Buyer by Seller and is familiar with the terms and conditions set forth therein, including, without limitation, the transfer restrictions set forth therein, and Buyer assumes all risk with respect to the accuracy or sufficiency of the such documents, (ii) Buyer is able to bear the economic risk associated with the purchase of the Participated Rights and has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights of the type contemplated in this Agreement, (iii) Buyer acknowledges that Sellers or an affiliate of Sellers is a member of the Litigation Trust Advisory Board and in such capacity Sellers may have knowledge of material and private information relating to the Borrower, the LTA and the Litigation Trust Recovery Actions which is not known to the Buyer and the Sellers have not disclosed such information to the Buyer (the "Buyer Excluded Information"), which Buyer Excluded Information may affect the view of the Buyer with respect to the value of the Participated Rights, and Buyer agrees that, the Sellers shall have no liability to the Buyer with respect to the non-disclosure of any Buyer Excluded Information, and Buyer agrees that Buyer irrevocably and unconditionally waives and releases the Sellers and its respective officers, directors, shareholders, partners, representatives, agents, employees and affiliates (the "Seller Parties") from any and all claims (including, for the avoidance of doubt, claims for breach of a pre-contractual duty) that Buyer would or might otherwise have (whether for damages, rescission or any other relief), and agrees that Buyer will not pursue any claim that Buyer may have against the Seller Parties on the basis of the Seller having access to, being in possession of or not disclosing the Buyer Excluded Information to the Buyer, and the Buyer agrees not to solicit or encourage (directly or indirectly) any other person to assert such a claim in connection with the foregoing, and (iv) without characterizing the Participated Rights as a "security" within the meaning of applicable securities law, Buyer is not acquiring the Participated Rights with a view to distribution in violation of the Securities Act.

8. Each Seller (severally and not jointly and severally) shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, or expense (including reasonable attorneys' fees and expenses) that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of such Seller's representations, warranties, covenants, or agreements in this Agreement and/or (ii) Seller's fraud, willful misconduct or gross negligence as determined by a court of competent jurisdiction pursuant to a final and non-appealable judgment. Buyer shall indemnify, defend, and hold each Seller and its officers, directors, agents, partners, members, controlling entities, and employees (collectively, "Seller Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage, or expense (including reasonable attorneys' fees and expenses) that any Seller Indemnitee incurs or suffers as a result of or arising out of (i) a breach of any of Buyer's representations, warranties, covenants, or agreements in this Agreement and/or (ii) Buyer's fraud, willful misconduct or gross negligence as determined by a court of competent jurisdiction pursuant to a final and non-appealable judgment.

9. Prior to an Elevation Date with respect to any Debt Participated Rights, Debt Seller shall, subject to applicable law and regulation and the Credit Agreement, use commercially reasonable efforts to furnish and convey to Buyer at the address specified in Schedule B, all written information and documents received by Seller in its capacity as a Lender from time to time with respect to the Credit Agreement and the Debt Participated Rights promptly after the same are received by Seller. Prior to an Elevation Date with respect to any LTI Participated Rights, LTI Seller shall, subject to applicable law and regulation and the LTA, use commercially reasonable efforts to furnish and convey to Buyer at the address specified in Schedule B, all written information and documents received by Seller in its capacity as a holder of litigation trust interests from time to time with respect to the LTA and the LTI Participated Rights promptly after the same are received by Seller. Buyer agrees for purposes of receiving information or documents in accordance with the foregoing that Buyer shall maintain the confidentiality of any information and documents delivered to Buyer (and shall cause any affiliate of Buyer or any representative of Buyer or Buyer's affiliates to agree) to the extent required therein and to the same extent as if Buyer were a party to

the Credit Agreement and/or the LTA and shall, upon either Seller's request, provide to either Seller a confidentiality undertaking to such effect in accordance with the terms of the Credit Agreement and/or LTA and any other agreement or undertaking reasonably requested by Seller (including a common interest agreement) prior to the delivery of any such information or documents.

10. (a) On and after the Settlement Date, Seller shall have sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents or waivers, and otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Participated Rights. Notwithstanding the immediately preceding sentence, Seller agrees to use good faith efforts to consult with Buyer prior to exercising any rights or remedies with respect to an Essential Act; provided, however, Seller shall have no obligation to follow the direction of Buyer in connection with such consultation. "Essential Acts" means any of the following: (i) any action, or inaction, the impact of which would materially increase Buyer's obligations under this Agreement; (ii) consent to a settlement with respect to any Litigation Trust Recovery Action; (iii) exercising any right not to make any future funding anticipated under the Credit Agreement, such as the Tranche 3 Loans; (iv) exercising any remedies upon an Event of Default (as such term is used in the Credit Agreement); and (v) bringing any action to enforce the terms of an Operative Document against another party thereto. Seller shall not take any action under any Operative Agreement which would be disproportionately worse for the Buyer, in respect of the Participated Assets, than for a Seller, in respect of LTI Seller's non-participated beneficial interests under the LTA or in respect of Debt Seller's non-participated loan holdings under the Credit Agreement, without the prior written consent of Buyer (a "Disproportionate Action"); provided, however, that settlement by Seller of a Litigation Trust Recovery Action, for an amount not agreed upon by Buyer or otherwise, shall not be a Disproportionate Action.

(b) On and after the Settlement Date, and subject to any confidentiality requirements and any other documentation or terms reasonably required by Seller to avoid Seller from losing the benefit of any privilege or address any conflicts issue, Seller agrees to use good faith efforts to invite Buyer to participate with Seller in scheduled substantive meetings with the Litigation Trustee and advisors to the Borrower, including, but not limited to legal and financial advisors; provided, however, for the avoidance of doubt, Buyer shall have no rights to control any decisions with respect to such meetings, as it relates to the Participated Rights, and any decisions related to the Participated Rights in connection with such meetings will be controlled by Seller (other than with respect to a Disproportionate Action).

11. Debt Seller will not be held to the standard of care of a fiduciary but will exercise the same duty of care in the administration of the Debt Participated Rights it would exercise if it held the Debt Participated Rights solely for its own account, and LTI Seller will not be held to the standard of care of a fiduciary but will exercise the same duty of care in the administration of the LTI Participated Rights it would exercise if it held the LTI Participated Rights solely for its own account, and in each case, except for losses that result from the express terms and provisions of this Agreement or its fraud, willful misconduct or gross negligence (in each case as determined by a court of competent jurisdiction pursuant to a final and non-appealable court order), neither Debt Seller nor LTI Seller, as applicable, shall be liable for any error in judgment or for any action taken or omitted to be taken by it. Each Seller (i) may rely on legal counsel (including counsel for Borrower, any Debt Obligor, the Agent, the Litigation Trustee or any other Lender), independent public accountants and other experts selected or accepted in good faith by it (collectively, the "Experts") and neither Seller shall be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such Experts, (ii) shall be entitled to rely on, and shall incur no liability by acting upon, any conversation, notice, consent, certificate, statement, order, or any document or other writing (including, without limitation, facsimile, electronic mail, or other telecommunication device) believed by it to be genuine with respect to the Participated Rights, (iv) except for any express representations and warranties made in this Agreement, makes no warranty or representation (express or implied) and shall not be responsible for any statement, warranty or representation made in connection with the Operative Agreements or any related document or for the financial condition of Borrower, (v) shall have no duties or obligations hereunder other than those expressly provided for herein and (vi) shall have no obligation to take any action which it determines in good faith could violate applicable law, rule, regulation, order, the Operative Agreements or, in its reasonable judgment, prejudice its continuing relationship with any regulatory authority or damage Seller's reputation or relationships or, unless and until it shall have been

provided adequate indemnity therefor, expose it to any material obligation, liability or expense. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any of the Seller Parties (as defined above), including, without limitation, Seller, from taking any action, or to refrain from taking any action, to the extent taking or failing to take such action would be inconsistent with its obligations as a member of the Litigation Trust Advisory Board under the LTA, and any such action or inaction shall not be deemed to constitute a breach of this Agreement.

12. (a) To the extent that there is a borrowing with respect to the T3 Commitment or the Incremental Commitment, upon the receipt by Debt Seller of a notice of a proposed funding from Borrower or the Agent with respect to a borrowing of such funds (a "Borrower Funding Notice"), Debt Seller shall, upon receipt of a Borrower Funding Notice, promptly notify Buyer, by electronic transmission, of (a) any funding to be made in respect thereto and (b) the amount of such funding (the "Funding Advance"). The date upon which Buyer receives notification from Debt Seller (which may be by email) of the Borrowing Funding Notice related to the Funding Advance shall be the "Buyer Funding Notification Date". Buyer shall pay the Funding Advance to Debt Seller in immediately available funds, without set-off, counterclaim or deduction of any kind not later than 12:00 (noon) (New York time) within fourteen (14) Business Days following the Buyer Funding Notification Date (the "Buyer Funding Deadline"). Notwithstanding anything to the contrary in this Agreement, any interest accrued and/or paid, including any capitalized interest, with respect to any Funding Advance funded by Debt Seller, prior to payment by Buyer to Debt Seller with respect to such Funding Advance, shall be for the sole benefit and account of Debt Seller for the period of time from (and including) the date Debt Seller funds such Funding Advance to (but excluding) the date Buyer pays Debt Seller for such Funding Advance (and such amounts shall not be part of the Debt Participated Rights for Buyer's benefit).

(b) Notwithstanding anything to the contrary in this Agreement, in the event (i) Buyer fails to timely remit a Funding Advance to Debt Seller by the Buyer Funding Deadline, and Buyer fails to cure any missed Funding Advance within two (2) Business Days of notice from Debt Seller to Buyer of such failure to timely fund a Funding Advance (a "Funding EOD") and (ii) the Funding Advance has been remitted by Debt Seller to the Borrower or the Agent, then the portion of the loans extended by Debt Seller with respect to such Funding Advance (and any related rights and interests thereto, including without limitation, to any distributions received thereon), shall be deemed automatically to revert to be for the sole beneficial interest and account of Debt Seller and Buyer shall have no further rights or interest in such loans extended with respect to the Funding EOD and such interest in such extended loans shall not be considered part of the Debt Participated Rights.

13. Following the Settlement Date, Buyer shall reimburse each Seller, promptly upon request for its applicable pro rata share of (i) all out-of-pocket expenses and disbursements (including reasonable fees and disbursements of counsel) incurred by either Seller in connection with the administration of the Participated Rights, the Credit Agreement or the LTA or any related documents on or after the Agreement Date, (ii) any effort to enforce or protect Seller's or Buyer's rights or interests thereunder on or after the Agreement Date and (iii) all amounts paid or incurred by such Seller in connection with any obligations and liabilities of Seller with respect to, or in connection with the Participated Rights, arising on or after the Agreement Date, in connection with such Seller being the record owner of the Participated Assets.

14. Buyer may not make sell, assign, participate, or otherwise transfer any interest in the Participated Rights or the Participated Obligations without the prior consent of Sellers (which consent shall not be unreasonably withheld or delayed); provided, however, Buyer may assign its participation interest held with respect to the Participated Rights to InstaLit Funding 2 LLC solely upon giving written notice to the Seller of such participation (referred to as an "Affiliate Transfer"). In connection with any Affiliate Transfer, (a) Buyer shall notify Seller of the amount of such assignment of the Participated Rights and (b) the effectiveness of such Affiliate Transfer shall be on the date upon which Seller acknowledges receipt of such Affiliate Transfer to Buyer. Seller may not assign its rights or delegate its obligations under

this Agreement without the prior consent of Buyer (which consent shall not be unreasonably withheld or delayed).

15. Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement (including the Purchase Price) to any entity, except that any Party may make any such disclosure (i) as required to implement or enforce this Agreement, including to the Litigation Trustee, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it, (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority, or (v) to its respective affiliates and the directors, officers, employees, agents, advisors, counsel, and auditors of such Party or such Party's affiliates.

16. (a) Sellers shall have a right to request from Buyer, and Buyer shall have a right to request from Sellers, an elevation of an outright assignment of all (or any portion of) the Participated Rights whereby Buyer becomes the direct lender of record under the Credit Agreement with respect to the Debt Participated Rights, and/or the direct beneficial holder of litigation trust interests under the LTA with respect to the LTI Participated Rights under the LTA (an "Elevation Request"). In the event an Elevation Request has been delivered by a Seller to Buyer or by Buyer to a Seller, the recipient party agrees to use commercially reasonable efforts and to take such actions as are necessary (including obtaining all required consents to facilitate an elevation to an outright assignment), as soon as reasonably practicable, to cause Buyer to become, as applicable, a Lender under the Credit Agreement with respect to all or any part of the Debt Participated Rights, or a direct beneficial holder of litigation trust interests under the LTA with respect to the LTI Participated Rights under the LTA (each an "Elevation"; and the date on which Buyer becomes a Lender under the Credit Agreement and/or a direct beneficial holder of the LTI Participated Rights under the LTA, an "Elevation Date").

(b) Upon an Elevation Date, to the extent of such Elevation, (i) Buyer shall assume all of the Participated Obligations, (ii) Seller shall have no further responsibility in respect of such Participated Obligations and (iii) this Agreement shall terminate. This Agreement shall also terminate when (i) Sellers have received all Distributions in respect of the Participated Rights and shall, to the extent required hereunder, have distributed the same to Buyer. Notwithstanding the foregoing, the termination of this Agreement shall not affect (a) a party's rights or obligations hereunder or (b) the indemnities set forth in this Agreement, in each case arising on or before the date of such termination, including, without limitation, any rights or obligations relating to a party's breach of any of its representations, warranties, covenants or agreements hereunder.

17. Each Party agrees to (a) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (b) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement.

18. The Parties agree to bear their own respective legal and other costs and expenses for preparing, negotiating, executing, and implementing this Agreement and any related documents and consummating the Transaction.

19. All communications between the Parties under or relating to this Agreement shall be in writing, shall be addressed to the physical address, or electronic mail address, specified in Schedule B hereto or as such Party may later request in writing, and shall be effective upon receipt.

20. This Agreement and the LTI Transfer Notice constitute the entire agreement of the Parties with respect to the Transaction and supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations, and warranties in respect thereof, including, from and after the Settlement Date, except to the extent expressly incorporated into this Agreement. The illegality, invalidity, or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity, or enforceability under the law of any other jurisdiction

nor the legality, validity, or enforceability of any other provision. This Agreement may be executed in multiple counterparts, and all such counterparts taken together shall be deemed to constitute one and the same original instrument. No amendment or waiver of, nor consent to departure from, any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and then only in the specific instance and for the specific purpose for which given. No failure on the part of a Party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies of each Party provided herein are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other entity. All representations and warranties shall survive the execution, delivery and performance of this Agreement. The obligations of each Seller hereunder are several and not joint and several, and neither Seller shall have any liability to Buyer for any breach of any representation, warranty, covenant, agreement or indemnity made by the other Seller hereto. This Agreement, including the representations, warranties, covenants, and indemnities, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and assigns. Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive. This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole. This Transaction is intended to be treated for accounting purposes as a sale by Seller and as a purchase by Buyer.

21. The Parties irrevocably and unconditionally submit exclusively to and accept the jurisdiction of the United States District Court for the Southern District of New York located in Manhattan or the courts of the State of New York located in New York County for any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating to it and waive any objection that they may have to the laying of venue in any such court or that any such court is an inconvenient forum or does not have personal jurisdiction over them. This Agreement, the rights and obligations of the parties under this Agreement, and any claim or controversy directly or indirectly based upon or arising out of this Agreement or the Transaction (whether based on contract, tort, or any other theory), including all matters of construction, validity, and performance, shall in all respects be governed by and interpreted, construed and determined in accordance with, the internal laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction). The parties hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any right that they may have to trial by jury of any claim or cause of action, or in any legal proceeding, directly or indirectly based upon or arising out of this Agreement or the Transaction (whether based on contract, tort or any other theory).

22. Seller agrees that in the event Seller desires to sell any interest held by Seller in any other loans or commitments extended under the Credit Agreement or any other litigation trust beneficial interest held by Seller under the LTA which are not part of the Participated Rights (a "Potential New Sale"), Seller will use commercially reasonable efforts to consult with Buyer in connection with any Potential New Sale, and to the extent Buyer promptly provides a bona fide offer to the Seller (a "Buyer Offer") to purchase such assets in connection with such Potential New Sale, then prior to Seller consummating any such Potential New Sale to another purchaser, Seller covenants and agrees to consider such Buyer Offer in good faith. Notwithstanding the immediately preceding sentence, Seller shall have no obligation to accept any Buyer Offer in the event that Seller determines, in its sole discretion (acting in good faith), that the Buyer Offer is not the best offer made to Seller with respect to such Potential New Sale and under such circumstance Seller shall be free to sell such assets to another purchaser.

[Signature page follows]

If you are in agreement with the foregoing, please sign where indicated.

Very truly yours,

**CITADEL CREDIT MASTER FUND LLC**

By: Its Manager, Citadel Advisors LLC

DocuSigned by:

By: ______________________
091201E333DC4B0...
Name: Christopher L. Ramsay
Title: Authorized Signatory

**CITADEL MULTI-ASSET MASTER FUND LTD.**

By: Its Portfolio Manager, Citadel Advisors LLC

DocuSigned by:

By: ______________________
091201E333DC4B0...
Name: Christopher L. Ramsay
Title: Authorized Signatory

ACCEPTED AND AGREED:

**InstaLit Funding 1 LLC**

DocuSigned by:

By: Howard Shams ______________
7AA26F2A418E4F4...
Name:Howard Shams
Title: Authorized Signatory

JC

## Schedule A

| Total Purchase Price | |
|---|---|
| Purchase Price | [redacted] |
| **Initial Payment (to be paid to LTI Seller on Agreement Date)** | [redacted] |
| Purchase Price Balance | [redacted] |
| **Debt Purchase Price** | |
| **Debt Purchase Price** | [redacted] |
| **LTI Purchase Price** | |
| **LTI** Purchase Price | [redacted] |
| **LTI Purchase Price (minus Initial Payment)** | [redacted] |

**Schedule B**

Buyer's Address for Notices and Delivery

InstaLit Funding 1 LLC
c/o Parabellum Capital LLC
810 Seventh Avenue, Suite 1700/2900
New York, NY 10019

Buyer's Wire Instructions

Bank Name: [redacted]
Account Name: [redacted]
SWIFT Code: [redacted]
ABA #: [redacted]
Reference: [redacted]

Debt Seller's Address for Notices and Delivery

Citadel Credit Master Fund LLC
c/o Citadel Enterprise Americas LLC
350 Park Avenue
New York, NY 10022

Attn: Jonny Cheatle
Phone: 347-797-5489 (office) / 347-836-1983 (cell)
Email: Jonny.Cheatle@citadel.com

Attn: Benjamin Xie
Phone: 212-652-7877 (office) / 475-231-0844 (cell)
Email: benjamin.xie@citadel.com

Debt Seller's Wire Instructions

Bank Name: [redacted]
Account With Institution: [redacted]
SWIFT Code: [redacted]
ABA #: [redacted]
Account #: [redacted]
Reference: [redacted]

LTI Seller's Address for Notices and Delivery

Citadel Multi-Asset Master Fund Ltd.
c/o Citadel Enterprise Americas LLC
350 Park Avenue
New York, NY 10022

Attn: Jonny Cheatle
Phone: 347-797-5489 (office) / 347-836-1983 (cell)
Email: Jonny.Cheatle@citadel.com

Attn: Benjamin Xie

Phone: 212-652-7877 (office) / 475-231-0844 (cell)
Email: benjamin.xie@citadel.com

LTI Seller's Wire Instructions

Bank Name: [redacted]
Account With Institution: [redacted]
SWIFT Code: [redacted]
ABA #: [redacted]
Account #: [redacted]
Reference: [redacted]