# Exhibit 20

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\- - - - - - - - - - - - - - - - - - - - x

IN RE:

INSTANT BRANDS ACQUISITION HOLDINGS, INC., et al.,

Case No. 23-90716(MI)

Reorganized Debtors.

\- - - - - - - - - - - - - - - - - - - - x

Zoom video conference deposition of JOHN SINNA, taken pursuant to subpoena, was held remotely, commencing September 9, 2026, 11:08 a.m., before Leslie Fagin, a Stenographic Court Reporter and Notary Public in the State of New York.

\- - -



MAGNA LEGAL SERVICES

A P P E A R A N C E S:
(All Parties Present Via Zoom.)

ELSBERG BAKER & MARURI
Attorneys for Plaintiff
1 Penn Plaza, 40th Floor
New York, New York 10119
BY: VIVEK TATA, ESQUIRE
EDGAR ALIFEROV, ESQUIRE

BOIES SCHILLER & FLEXNER LLP
Attorneys for Defendant CORNELL CAPITAL LLC
55 Hudson Yards
New York, New York 10001
BY: MARC AYALA, ESQUIRE
KATHERINE ZHANG, ESQUIRE
BROOKE ALEXANDER, ESQUIRE

GREENBERG TRAURIG, LLP
Attorneys for FORMER OFFICERS AND DIRECTORS DEFENDANTS
One Vanderbilt Avenue
New York, New York 10017
BY: MIAN WANG, ESQUIRE

DENTONS US LLP
Attorneys for SELLER AND FOUNDER DEFENDANTS
1121 Avenue of the Americas
New York, New York 10020
BY: CASEY DOHERTY, ESQUIRE

RAINES FELDMAN LITRELL LLP
Attorneys for the Witness JOHN SINNA and PARABELLUM CAPITAL
30 North LaSalle Street
Chicago, Illinois 60602
BY: JOHN MARTIN, ESQUIRE
SEAN THOMPSON, ESQUIRE

A P P E A R A N C E S:
(All Parties Present Via Zoom.)

DECHERT LLP
Attorneys for CITADEL ADVISORS BEN XIE and JONNY CHEATLE
3 Bryant Park
New York, New York 10036
BY: GARY MENNITT, ESQUIRE

ALSO PRESENT:

HARRY BERGENFIELD, Videographer
Magna Legal Services

THE VIDEOGRAPHER: We are now on the record.

This begins video No. 1 in the deposition of John Sinna in the matter of In Re: Instant Brands Acquisitions Holding Incorporated, et al.

Today is Wednesday, September 9, 2026 and the time is 11:08 a.m.

Counsel and all parties present will be noted on the stenographic record.

Will the court reporter please swear in the witness?

THE REPORTER: I need to make statement on the record, because I'm not with the witness.

The attorneys participating in this deposition acknowledge that I am not physically in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

J. Sinna

The parties and their counsel further agree that the witness may be in a state where I am not a notary and stipulate to the witness being sworn in by an out-of-state notary.

If any party has an objection to this manner of proceeding, please state so now.

(No objections.)

J O H N S I N N A, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. AYALA:

Q. Good morning, Mr. Sinna.

A. Good morning.

Q. Is there any reason you cannot give complete and truthful testimony today?

A. There is no reason.

Q. What roles does Parabellum have in connection with the litigation trust?

A. Parabellum is a participant through -- owns participation rights to parts of

J. Sinna

Citadel's loan to the litigation trust. Parabellum also owns litigation trust interests and I am on the board of the LTAB. The LTAB, I guess the board is itself.

Q. What documents govern the trust?

A. The documents that I know to govern the trust are the litigation trust agreement.

Q. Anything else?

A. Not that I know of.

Q. Why don't we turn to -- we introduce tab 1.

A. Give me a second to go through. It will be here somewhere.

(Exhibit 1, confirmation order issued by the court in the Instant Brands bankruptcy case, marked for identification, as of this date.)

Q. This will be marked as Exhibit 1.

A. Okay. It's opening.

Q. Great.

A. I've got your document open.

Q. Mr. Sinna, this is the confirmation order issued by the court in the Instant Brands bankruptcy case.

J. Sinna

Do you see that?

A. I do see that.

Q. Are you familiar with this document?

A. I recall having read it a while ago perhaps, but not recently familiar, no.

Q. Could we turn to page 62 of the plan?

A. Is that 62 of the document or the page marked on top?

Q. It's page 62 of the plan which is attached to the order and so we will get -- and it's page 119 of the PDF.

A. I'm there.

Q. Got it?

A. I'm there.

Q. Do you see the header that says Creation of the Litigation Trust?

A. Yes, I see that.

Q. Do you see the language below it that says, On the effective date, a liquidation trust shall be established for the benefit of the litigation trust beneficiaries, and I'm summarizing?

J. Sinna

A. I see that language, yes.

Q. Is Parabellum a litigation trust beneficiary?

A. We are by way of the ownership of litigation trust interests.

Q. Are you a litigation trust beneficiary in any other respect other than your ownership of litigation trust interests?

A. Not that I am aware of.

Q. Is Parabellum a holder of general unsecured claims?

A. No, I don't believe we are.

Q. Is Parabellum a holder of prepetition term loan claims?

A. No, I don't believe we are.

MR. AYALA: Kat, can you put up tab 15 which will be marked as Exhibit 2.

(Exhibit 2, joinder filed in the Corelle Brand's Chapter 11 case, marked for identification, as of this date.)

Q. Mr. Sinna, are you familiar with this document?

A. I believe I've seen it before, yes.

Q. And, I'm sorry --

J. Sinna

A. Can I open it on here? That's tab 15?

Q. Tab 15, that's right.

Just let me know when you have it.

A. I think I've got it.

Q. This is a joinder that you filed in the Corelle Brand's Chapter 11 case?

A. Yes, I see that.

Q. Did you review this before it was filed?

A. Hold on. Just bear with me.

I believe I would have read through it, yes.

Q. And you were comfortable with its contents before it was filed?

A. Yeah, under advice of counsel, I was comfortable with its contents.

Q. In paragraph 1, the joinder states, The Parabellum respondents join in and adopt arguments set forth in the objection.

Do you see that?

A. I see that.

Q. So you have joined in and adopted the arguments of the trustee and the

trustee's objection related to this joinder?
A. It would seem so, yes.
Q. It's your filing so...
A. I agree with its wording.
Q. If you go to paragraph 2 which is on the following page.
A. Got it.
Q. You write in paragraph 2, towards about three quarters of the way down. Under paragraph 16 of the participation agreements, Parabellum was provided a right to obtain trust interests from Citadel.
Do you see that?
A. I see that.
Q. Then you write, Parabellum exercised that right and transferred certain of Citadel's units in the litigation trust as set forth in March 2025 transfer notices provided to the trustee in the LTAB.
Do you see that?
A. I see that.
Q. That's accurate?
A. To my understanding.
Q. Paragraph 4 of your joinder, on the

following page, you write, Whether those participation agreements or that appointment is consistent with the confirmation order or the plan or the litigation trust agreement, does not require additional discovery from Parabellum or others. It simply requires comparison with the terms of the confirmation order and the plan in the litigation trust agreement.

Do you see that?

A. Yeah, I do see that.

Q. Do you believe that to be true?

A. Under advice of counsel, I believe that to be true.

Q. Independent of any advice of counsel you received, do you believe that statement to be true?

A. I mean, I'm not a lawyer, but I relied on counsel so that's really all I can say.

MR. AYALA: Let's introduce tab 16 as Exhibit 3.

(Exhibit 3, litigation trustee's objection to Cornell Capital's motion

J. Sinna

for expedited discovery and response to order to show cause, marked for identification, as of this date.)

A. Okay. I've got it.

Q. Okay. This is the litigation trustee's objection to Cornell Capital's motion for expedited discovery and response to order to show cause.

Do you see that?

A. I see that.

Q. This is the objection that you joined in and adopted, correct?

A. It would appear so, yeah.

Q. If you turn to paragraph 5 on page 3 of the document.

A. Paragraph 5, page 3?

Q. Paragraph 5, page 3.

A. Okay.

Q. Do you see it states, Citadel initially entered into participation agreements with Parabellum and then, shortly thereafter, fully transferred trust interests to Parabellum with the consent of the LTAB as is expressly permitted under litigation trust

J. Sinna

agreement.

Do you see that?

A. Yeah, I see that.

Q. Do you agree with that statement?

A. I don't have a reason to believe it's not a true statement. I agree with that.

Q. Where it says, fully transferred trust interest to Parabellum with the consent of the LTAB, how did Parabellum obtain the consent of the LTAB?

A. I don't recall.

Q. If you turn to paragraph 45 of the objection which is on page 13 of the document, going on to 14.

A. Bear with me. You said paragraph 45?

Q. Paragraph 45.

A. I've got it.

Q. Do you see in paragraph 45, the trustee writes about the transfer of the LTIs from Citadel to Parabellum?

A. Give me just a minute to read it.

Q. Take your time.

J. Sinna

A. Okay. I read that paragraph.

Q. Now, if you look at footnote 8 in that paragraph, the trustee writes, through his counsel, Mr. Olson approved the transfers.

Do you see that?

A. Hold on. Is that on the next page?

Q. It's on page 14.

A. Yeah, I was on 13. Yes, I see that.

Q. Does that refresh your recollection that Mr. Olson approved the transfers of the LTIs from Citadel to Parabellum?

A. No, it doesn't.

Q. Do you have any reason to believe that statement is untrue?

A. I don't recall Mr. Olson.

Q. I'm not asking whether you recall Mr. Olson.

I'm asking whether you have any reason to believe that the trustee's statement here that Mr. Olson approved the transfers is untrue?

A. No, I don't have any reason.

J. Sinna

MR. AYALA: Let's look at tab 19 which will be Exhibit 4.

(Exhibit 4, email chain between Mr. Halperin, Mr. Cheatle and Ms. Cohen, marked for identification, as of this date.)

A. Okay. I've got that.

Q. This is an email chain among Mr. Halperin, Mr. Cheatle and Ms. Cohen.

Do you see that?

A. Yes, I do see that. I see the document.

Q. Lower in the chain, Mr. Xie, Mr. Olson and Mr. Patel are included on the email chain.

Do you see that?

A. I'm sorry, is that the part March 4, 2025, 3:31 below?

Q. Yes.

A. I apologize, my eyesight isn't what it used to be. I see that.

Q. If you look at the bottom of the email chain, do you see an email from Mr. Cheatle directed to the trustee and board

J. Sinna

members asking them to reply to the email with a yes to signify their consent to the transfer of the LTIs that Citadel ultimately transferred to Parabellum?

A. I see an email.

Can you repeat your question please? I see an email. What specifically are you asking?

Q. I'm just asking if you see the email that Mr. Cheatle wrote starting with dear trustee and board members wherein he requests that they reply to the email with a yes to signify their consent to the transfer of the LTIs that Citadel transferred to Parabellum?

A. Yeah, I see the email you are describing.

Q. Very good. Do you see in response to that email, Mr. Patel says yes?

A. It appears to be the case, yes.

Q. And in response to Mr. Patel's email, Mr. Halperin writes to Mr. Cheatle, Jonny, you now have approval of the sale to close with Parabellum.

J. Sinna

Do you see that?

A. Yeah, I see what appears to be Alan's response.

Q. Who is Mr. Patel?

A. I don't know Mr. Patel.

Q. Do you know of any relationship between Mr. Patel and Mr. Olson or Ravago?

A. I don't.

Q. Are you aware of anybody other than Mr. Olson voting on the transfer of LTIs from Citadel to Parabellum?

A. I'm not.

Q. Earlier you testified that the document governing the trust is the litigation trust agreement.

Do you recall that?

A. I recall having said that, yes.

Q. Is it your view that the plan does not bear on the governance of the trust?

A. No, it's not my view. We might be mincing words and I think was your word govern. I think my view of govern might differ slightly from the way that you are using the word govern.

J. Sinna

Q. Okay.

A. In terms of the governance, so that could have been my confusion.

Q. Sure. Do you understand there to be a relationship between the plan and the trust?

A. Absolutely.

Q. And could you describe that relationship?

A. So my understanding of the relationship, and again, I'm not a lawyer, is that the plan allows for the creation of the trust and lays that out and then the trust agreement lays out in more detail what I will call the day to day, so the governance.

So referring back to your prior question, that's what I was referring to there. That's my sort of non-lawyerly short.

Q. In your view, is the plan relevant to the governance of the trust?

A. In my view, the plan is relevant insomuch as it allowed for the creation of the trust.

Q. And your view is that other than

allowing for the creation of the trust, the plan is irrelevant to the trust?

MR. MARTIN: Form.

Q. You can answer.

A. Pardon me?

Q. You can answer the question.

A. Can you repeat the question?

Q. Is it your view that other than allowing for the creation of the trust, the plan is irrelevant to the trust?

MR. MARTIN: Form.

Q. You can answer.

THE WITNESS: John Martin, I can answer?

MR. MARTIN: You can absolutely answer.

A. Okay. I wouldn't say irrelevant, but I think in terms of when I think of governance, I'm looking more at the litigation trust agreement.

Q. So other than allowing for the creation of the trust, how is the plan relevant to the trust in your view?

MR. MARTIN: Form and foundation.

J. Sinna

Q. You can answer.

A. How is it relevant is your question?

Q. Yes.

A. It allows for the creation. I think that's probably relevant.

Q. Other than it allowing for the creation, is there any other way in which the trust is relevant or, sorry, strike that.

Other than allowing for the creation of the trust, is there any other way in which the plan is relevant to the trust in your view?

MR. MARTIN: Form and foundation.

Q. You can answer.

A. In my view, it isn't relevant.

Q. Okay.

MR. AYALA: Let's introduce tab 2 as Exhibit 5.

(Exhibit 5, litigation trust agreement, marked for identification, as of this date.)

A. Bear with me again. Tab 2?

Q. Yes.

J. Sinna

A. I've got it.

Q. Tab 2 is the litigation trust agreement.

Do you see that?

A. I do. I see that.

Q. Are you familiar with this document?

A. I have read this document.

Q. When did you read this document?

A. I don't recall.

Q. Did you read this document before Parabellum acquired LTIs from Citadel?

A. Yes.

Q. Why?

A. As part of our due diligence process.

Q. Have you read -- did you read the litigation trust agreement in connection with transferring the LTIs from Citadel to Parabellum?

A. I don't recall.

Q. Let's turn to page 8 of this document, section 2.05 of the agreement.

A. Bear with me again. You said 2

J. Sinna

spot 05?

Q. 2.05.

A. Okay. I got it. I'm there.

Q. Do you see the section titled Transfer of the Litigation Trust Interest?

A. Yeah, I see that.

Q. Have you reviewed this section before?

A. I believe I have.

Q. What makes you believe that you have?

A. My prior recollection of having read the document and this is inclusive of the document. The document is inclusive of this section, rather.

Q. Other than reading the document as a whole, you don't remember reviewing this provision in particular?

A. I don't recall reviewing this provision in particular in response to the subpoena.

Q. If you look at subsection B, section 2.05, subsection B.

Do you see that?

J. Sinna

A. I do see subsection B, yeah.

Q. It states, Absent written consent from the litigation trust advisory board, the litigation trust interests shall not be capable of being transferred to any person or entity.

Do you see that?

A. I do see that.

Q. Do you recall ever reading that provision?

A. I recall reading the document. The provision is part of the document, so yes.

Q. Sitting here today, do you have a view on what section 2.05(b) means?

A. Sitting here today, I don't have a view on what section 2.05(b) means.

THE WITNESS: Can I refill my coffee? It will take two minutes.

MR. AYALA: We will go off the record for five minutes.

THE VIDEOGRAPHER: The time is 11:30 a.m. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: The time is

J. Sinna

11:31 a.m. We are back on the record.

BY MR. AYALA:

Q. Mr. Sinna, why don't you turn to page 23 of Exhibit 5, section 4.05 of the litigation trust agreement.

A. I see that, yes.

Q. Do you see in section 4.05(a), that it states that a majority of the total number of members of the litigation trust advisory board then in office shall constitute a quorum for the transaction of business and any meeting of the litigation trust advisory board?

A. I see that.

Q. Have you ever reviewed this provision?

A. I've read the document. The provision is in the document so I read the provision.

Q. But you don't recall ever reviewing section 4.05 specifically?

A. I don't recall reviewing section 4.05 specifically.

Q. The second sentence in section 4.05

J. Sinna

says, The affirmative vote of at least two members of the litigation trust advisory board present and entitled to vote at a meeting at which a quorum is present shall be the act of the litigation trust advisory board except as otherwise required by law or as provided in this litigation trust agreement.

Do you see that?

A. Yeah, I see that.

Q. Are you aware of Parabellum having obtained the affirmative vote of at least two members of the litigation trust advisory board present and entitled to vote at a meeting at which a quorum is present in connection with Citadel's transfer of LTIs to Parabellum?

A. Can you start the question over? I didn't catch the first part.

Q. Sure. Are you aware of Parabellum or Citadel having obtained the affirmative vote of at least two members of the litigation trust advisory board present and entitled to vote at a meeting at which a

J. Sinna

quorum is present in connection with Citadel's transfer of LTIs to Parabellum?

A. I don't recall.

Q. Sitting here today, you can't identify two such affirmative votes that Parabellum obtained in connection with the transfer of the LTIs from Citadel to Parabellum, can you?

A. I'm sorry, can you start that again please? The first part broke up.

Q. Sitting here today?

A. Yes.

Q. You can't identify two such affirmative votes that were obtained in connection with the transfer of the LTIs from Citadel to Parabellum, can you?

A. No, but we've got the transfer notices signed so I would have to look at those.

And I guess I'm a little confused by the question, but I think my answer is probably no, but...

Q. Other than what might be in the transfer notices you referred to?

A. Yes.

Q. Are you aware of Citadel or Parabellum having obtained the affirmative vote of two LTAB members entitled to vote on the transfer of the LTIs from Citadel to Parabellum?

A. No, I'm not, as I sit here today, I'm not.

Q. Do you have any understanding of what the consequences are of failing to obtain litigation trust advisory board approval for a transfer of LTIs?

A. I don't think I am.

Q. If you turn back to page 8 of the litigation trust agreement.

A. Yes.

Q. Which sets forth section 2.05.

A. Back to 2.05.

Q. If you read section 2.05(d), it states, Any purported transfer of any litigation trust interests in contravention of the foregoing shall constitute a violation of this section 2.05 and shall be void ab initio.

J. Sinna

Do you see that?

A. I see that.

Q. Have you ever considered the prospect of Citadel's transfer of LTIs to Parabellum to be void ab initio?

A. No, I haven't considered that prospect.

Q. If that transfer is void ab initio, is Parabellum a litigation trust beneficiary?

MR. MARTIN: Form and foundation.

Q. You can answer.

A. I'm sorry, were we a beneficiary?

Q. Are you a litigation trust beneficiary if the transfer of LTIs from Citadel to Parabellum is deemed void ab initio?

MR. MARTIN: Same objections.

Q. You can answer.

A. Indirectly.

Q. In those circumstances, how would Parabellum indirectly be a litigation trust beneficiary?

A. We have a participation agreement with Citadel and if Citadel remains a

J. Sinna

beneficiary of the litigation trust, then by way of participation agreement, we would have the rights thereunder. I would have to open a document, but the benefits that would accrue, economic to a litigation trusts interest by way of their participation would then be under the participation agreement.

Q. Understood. So let's turn back to Exhibit 1 please. Tab 1 for you, Mr. Sinna.

A. I'm there.

Q. If you could turn to page 16 of the plan.

A. What is that in the PDF pages?

Q. We will have it in just a moment. PDF page 73.

A. I see that.

Q. Do you see the definition of litigation trust beneficiaries?

A. Yeah, I do.

Q. It includes holders of the litigation trust interests, i.e., holders of allowed general unsecured claims and prepetition term loan claims.

Do you see that?

J. Sinna

A. Yeah, I do.

Q. I think we've already established that Parabellum is not a holder of a general loan secured claim, correct?

A. Yeah, we've said that.

Q. I think we've established that Parabellum is not a holder of prepetition term loan claims?

A. Correct.

Q. And we were just discussing circumstances in which the transfer of litigation trust interests from Citadel to Parabellum is deemed void ab initio and you said you believe Parabellum would continue to indirectly be a litigation trust beneficiary, correct?

A. That's what I said.

Q. In those circumstances, would Parabellum be a holder of the litigation trust interests?

A. No, in that circumstance, we would not.

Q. So what component of a definition -- strike that.

J. Sinna

In those circumstances, what component of the litigation trust beneficiary's definition would Parabellum qualify for?

MR. MARTIN: Objection, form and foundation.

Q. You can answer.

A. In that definition, we would then not be beneficiaries under that definition.

Q. We can agree then in those circumstances, Parabellum would no longer be a litigation trust beneficiary as that term is defined in the plan, correct?

MR. MARTIN: Form. Go ahead.

A. I can answer though, okay.

Under that definition -- I will expand. Again, in your hypothetical, under that definition where we no longer hold trust interests, then it would appear that we would no longer be litigation trust beneficiaries in that scenario.

MR. TATA: Can we agree an objection for one is an objection for all?

J. Sinna

MR. AYALA: Yes.

Let's introduce tab 4. Sorry, I have that wrong. That's right, tab 4 which will be Exhibit 6.

(Exhibit 6, participation agreement between Parabellum, LLC and Citadel, marked for identification, as of this date.)

A. Is it 4(a).

Q. 4(a) is fine, yes.

A. Thank you.

Q. You have it up there, Mr. Sinna?

A. I have 4(a) open.

Q. Are you familiar with this document?

A. I am.

Q. What is this document?

A. This is a participation agreement between Parabellum, LLC and Citadel.

Q. What is InstaLit Funding 1, LLC?

A. That's the LLC that we've used for this investment.

Q. What business is InstaLit Funding 1, LLC engaged in?

J. Sinna

A. Just this business.

Q. What is this business?

A. The investment in this participation, that's the only thing I know it to be involved in.

Q. You see at the bottom right-hand corner of this document, there is what's called a Bates stamp. It starts with Para B, and then has numbers after it?

A. I do.

Q. Could you turn to Bates stamp ending in 12?

A. Sure thing. Yes, I've got it.

Q. Do you see this is -- this page is titled Schedule A?

A. Yes, I see that.

Q. What is this schedule depicting?

A. Give me a second. I have to read this one for a second.

Q. Sure.

A. This is a summary of the purchase or the funding, whatever word you want to use, of the participation that's memorialized in the rest of the document. It's a

J. Sinna

breakdown amount.

Q. And it appears that InstaLit 1 paid $4,714,824.29 for its acquisition of LTIs from Citadel, is that right?

A. No, that's incorrect.

Q. What is the line item that states LTI purchase price depicting?

A. That's depicting the net balance due from the grander participation that was allocated to the participation rights for LTI units as memorialized in the remainder of the agreement.

Q. By net balance due, there was some other payment made in respect of those participation rights for the LTIs?

A. Yeah, I have to strike that first. That is the number below it. You are looking at the 4.7 million?

Q. Correct.

A. Yes, this is where I have to go back. I'm really not organized.

Q. Take your time.

A. That number is the gross, I said net. That is the gross amount of the

J. Sinna

participation that was memorialized or that was allocated for the participation of the LTI units as memorialized in the rest of the unit, the gross, not net, the net is the number below it.

Q. Got it. So do I have it right that the line item that says LTI purchase price followed by a number, that is approximately 4.7 million?

A. Yes.

Q. State the amount that was due from Parabellum to Citadel in respect of the LTI participations that it was acquiring?

MR. MARTIN: Form.

You can answer.

A. Yes, the $4.7 million reflects the amount of the aggregated participation allocated to the LTI units.

MR. AYALA: This is a little cumbersome. I think there might be a simpler way to do this.

Why don't we turn to -- why don't we introduce tab 9 as Exhibit 7.

(Exhibit 7, internal Parabellum

J. Sinna

schedule, marked for identification, as of this date.)

A. I got it.

Q. Do you recognize tab 9?

A. I recognize tab 9.

Q. What is Exhibit 7 depicting?

A. Can you say it again?

Q. What is Exhibit 7 which is in front of you?

A. Okay. This is tab 9 I have. Exhibit 13, is that the same thing?

Q. So it might be a little confusing because this was taken from a filing of a different document so it had an Exhibit 13 cover page on it.

A. Can you scroll up on the screen so I make sure I have the right thing? Yeah.

Q. For purposes of this deposition, it's Exhibit 7.

A. We are there.

Q. What is Exhibit 7 depicting?

A. This appears to be depicting an internal Parabellum schedule, the various fundings that we made to Citadel under the

J. Sinna

participation agreements with them.

Q. In the chart, on the fourth row down, there is a line item that says LTI purchase price.

A. I see that.

Q. It's an amount a little over 4.4 million, correct?

A. Yeah, I see that.

Q. What is that?

A. Okay. This is going to be a little longer answer.

So I will refer back to the prior. So this table kind of squares up with that. Specifically, the item that you are speaking to here, the 4.4, is the net balance owed to Citadel under the participation agreement for the rights to the LTI units in that participation agreement.

Q. Got it. Parabellum Partners 3 LP paid that amount, correct?

A. That's my understanding.

Q. And that appears to be on behalf of the investment that was made by InstaLit Funding 1, LLC correct?

J. Sinna

A. That appears to be the case, yes.

Q. And two rows down, there is another line item described as LTI purchase price.

Is that depicting the same payment, but just in respect of the LTIs that were transferred to InstaLit Funding 2, LLC?

A. It's not the same payment because it's a different line item, it's a different agreement, so I will answer no to that one and then if you want to rephrase your question, I can address that, but because it's no, I can't really answer the second part.

Q. Sure. So what is that line item depicting?

A. That line item depicts the net balance owed for the rights to the LTI units in the participation agreement.

The second one, there is two of them, that's the second one that covers the investment from as you pointed out InstaLit Funding 2, LLC.

Q. That was paid by LitFin L24 PB, LLC, correct?

J. Sinna

A. That's the fund pay word, so that's what it says, yes. I will rely on the table. I'm not your party for -- yes, let's just say yes.

Q. You say these depict net payments.
Are these payments net of the initial payments identified in the first two rows?

A. They should be, yes. That's my understanding.

Q. And the payments in the first two rows are in respect of the participation rights concerning the LTIs that Citadel transferred to these Parabellum entities, right?

A. Say that again please.

Q. The payments in the first two rows are in respect of the transfers of the LTIs from Citadel -- from the Parabellum entities, InstaLit --

A. No, nothing to do with transfer. This is all participation.

Q. So they are in respect of the participation rights that InstaLit Funding 1

J. Sinna

and InstaLit Funding 2 were acquiring from Citadel?

A. Yes, both the initial pavements and net payments are in respect of the participation rights.

Q. Got it. Thank you.

Now, in connection with the transfers versus the participations, Citadel did not transfer its whole interest in the LTIs to Parabellum, correct?

MR. MARTIN: Form.

A. I don't believe so.

Q. Citadel continues to hold interests in the LTIs, yes?

MR. MARTIN: Form.

A. I don't recall.

Q. You don't know whether Citadel possesses LTIs sitting here today?

A. No, I don't.

Q. Are you aware of any notice being provided to trust beneficiaries or the court of Parabellum's acquisition of participation rights in the LTIs?

A. Say that again please.

J. Sinna

Q. Are you aware of any notice being provided to trust beneficiaries or the court of Parabellum's acquisition of participation rights in the LTIs?

A. I don't recall.

Q. Sitting here today, are you aware of any such notice?

A. I don't recall.

Q. I'm asking whether you are aware of something.

Are you saying you don't recall whether you are aware of it?

A. No, I am not aware.

Q. I'm not trying to be difficult. I want the record to be clear.

Are you aware of any notice being provided to trust beneficiaries or the court of Parabellum's -- strike that.

Are you aware of any notice being provided to trust beneficiaries or the court of Citadel's transfer of LTIs to Parabellum?

A. I don't recall.

Q. Now, earlier, you testified that in addition to being an LTI holder, Parabellum

J. Sinna

provides funding to the trust, is that right?

MR. MARTIN: Form.

A. That's incorrect.

Q. How would you describe Parabellum's role in respect of the loans that are provided to the trust?

A. We have no role in the loans provided to the trust other than we have a participation agreement with Citadel.

Q. Got it. What is the difference in your mind between Parabellum providing funding to the trust and having a participation agreement in such loans with Citadel?

A. What is my understanding of the difference?

Q. Yes.

A. Well, for one, Citadel is a lender, we are not and then you can refer back to the credit agreement to see the rights that Citadel has that we do not.

Q. When you say Citadel is a lender and you are not, what do you mean by that?

A. As a participant in a loan, I am

J. Sinna

not a lender of record.

Q. You are not a party to the credit agreement?

A. No.

Q. Why don't we turn back to Exhibit 6. It's Exhibit 6, tab 4.

A. I'm sorry, I'm opening one at a time. I have zero bandwidth.

Q. Take your time.

A. Tab 4, Exhibit 6. I'm now on tab 4.

Q. This again is the participation agreements that we referred to, right?

A. That's right.

Q. And the -- on the first page, you will see two numbered paragraphs 1 and 2.

These are the references to Parabellum's acquisition of loan participations and also LTIs, correct?

A. I agree, that's correct.

Q. If you turn to, you will see this document, again, has Bates stamps in the bottom right-hand corner. Please turn to the Bates stamp ending in 9.

J. Sinna

A. Nineteen?
Q. Just 9.
A. Hold on.
Q. In tab 4, there are two participation agreements and --
A. Are you on B? I'm on the wrong one. Are you on tab 4(a) or 4(b).
Q. I believe it's 4(a).
A. Okay, that's the problem. Hold on. Okay. Cool. Hold on. You said 09?
Q. Just for the benefit of the record, what you were previously looking at was the participation agreement in respect of InstaLit Funding 2, LLC.
What you are now looking at is the participation agreement in respect of InstaLit Funding 1, LLC?
A. Correct.
Q. And as with the participation agreement in respect of InstaLit Funding 2, LLC, this participation agreement, on the first page, in paragraphs 1 and 2, is referring to the transactions by which Parabellum acquired loan participations and

J. Sinna

LTIs?

A. This is InstaLit Funding 1, LLC. That's your question?

Q. This agreement, like the other agreement, on page 1, refers to Parabellum's acquisition of the loan participation interests and the LTIs?

A. Agree.

Q. Very good. Let's turn to the page ending in Bates stamp 9.

A. Okay.

Q. Now, under this agreement, there are debt participated rights in respect of the loans and there are LTI participated rights in respect to the LTIs, correct?

A. Yes.

Q. And section 16(a) provides for an elevation request in respect of either or both of the debt participated rights or the LTI participated rights, is that fair?

A. That's my understanding, yes.

Q. Did Parabellum ever exercise its rights pursuant to this paragraph 16(a) to seek an elevation in respect of the debt

participated rights?

A. I don't believe we did.

THE WITNESS: Can I take a break for five?

THE VIDEOGRAPHER: The time is 12:00 p.m. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 12:05 p.m. We are back on the record.

BY MR. AYALA:

Q. Let's turn back to tab 1, Exhibit 1. We will go to page 31 of the plan. We will have a PDF for you in a moment.

MR. MARTIN: Which page?

MR. AYALA: Page 31 of the plan.

MR. MARTIN: Thanks.

Q. Are you there, Mr. Sinna?

A. I. Am, what page are you on?

Q. I promised you a PDF No. 88 of the PDF.

Are you there now?

A. I'm there.

Q. Do you see in footnote 7, the term prepetition term loan lenders is defined?

J. Sinna

A. Bear with me for a sec.

Q. Sure.

A. Yeah, I see that it's defined.

Q. And that definition refers to the lenders that are party to the senior secured credit agreement dated as of April 12, 2021.

Do you see that?

A. Yeah, I see that.

Q. That is the agreement that Parabellum is not a party to per your earlier testimony, correct?

A. We are not.

Q. We can agree then that Parabellum is not a prepetition term loan lender as defined in the plan?

A. That's my understanding.

Q. Why don't we turn to page 42 of the plan and here on page 42, Mr. Sinna, you will see the language under section G in the second paragraph stating that accordingly, the litigation trust will be established to maximize the value of the litigation trust assets, including to pursue the litigation trust recovery actions and any proceeds

J. Sinna

generated therefrom would be allocated between the prepetition term loan lenders and the holders of allowed general unsecured claims.

Do you see that?

A. I see that language, yeah.

Q. I think we've already established that Parabellum is not a prepetition term loan lender as defined in the plan, correct?

A. That's right.

Q. And we've established that Parabellum is not a holder of a general unsecured claim, is that correct?

A. That's correct.

Q. In view of this language, does Parabellum have any basis to be allocated proceeds generated from the litigation trust assets?

MR. MARTIN: Form and foundation.

Q. You can answer.

A. Not directly.

Q. Okay.

A. I guess, can I amend that? If you are assuming that we don't hold the

J. Sinna

litigation trust interests, so your prior assumption, yes, but since we do, yes, we would be allocated proceeds.

Q. So where in this sentence does the plan refer to the allocation of proceeds to holders of litigation trust interests?

MR. MARTIN: Form and foundation.

A. I guess the sentence doesn't include that.

Q. So based on this sentence, why would holding litigation trust interests entitle Parabellum to an allocation of proceeds generated from the litigation trust assets?

MR. MARTIN: Objection, same objection.

You can answer.

A. Based on this sentence, I would say it doesn't, but the only way that the lenders and the claims you are getting -- the only way the prepetition loan lenders and the GUC, the general secured creditors are getting interest, getting their allocation would be through litigation trust interests, so I

J. Sinna

would say yes, but...

Q. I don't understand, Mr. Sinna. The sentence says allocated between the prepetition term loan lenders and the holders of allowed general unsecured claims.

I think we agree that Parabellum is in neither of those populations, correct?

A. Correct, but the sentence that follows is actually important to what you are saying.

Q. Okay. How is that important?

A. It's the sentence that follows describes the litigation trusts interests that are allocated to those two parties which is the method they would get economic benefits.

Q. So your testimony is that under this language in the plan, any proceeds generated from the litigation trust assets can be allocated to people or entities that are neither prepetition term loan lenders or holders of allowed general unsecured claims?

MR. TATA: Objection.

Q. You can answer.

J. Sinna

A. I would -- what you just said, I don't think it's different from what you just said.

Q. The first sentence defines two populations to whom proceeds generated from the litigation trust assets are to be allocated which is the prepetition term loan lenders and the holders of allowed general unsecured claims?

A. That's correct, but my question --

MR. TATA: Can I get an objection in?

I would like to ask the witness to just pause before he answers so that objections could be made.

Q. I actually didn't finish the question, so let me just finish the question.

The first sentence of this paragraph defines two populations to whom proceeds generated from the litigation trust assets are to be allocated.

Do you agree with that?

MR. TATA: Objection.

MR. MARTIN: Form.

J. Sinna

Q. You can answer.

A. I agree with that.

Q. And Parabellum is in neither of those populations as defined under the plan, correct?

MR. MARTIN: Same objection.

A. Sure. I agree with that.

Q. So your testimony is that notwithstanding that first sentence, the plan contemplates and provides for populations other than the two populations referenced in the sentence to be allocated proceeds generated from the litigation trust assets, is that correct?

MR. TATA: Objection, asked and answered.

MR. MARTIN: Same objections.

Q. You can answer.

A. I'm not sure if the plan contemplates that, but certainly holders of litigation trust interests are allocated in -- there are holders of litigation trust interests away from those two populations, that's where I'm going.

J. Sinna

If you are saying -- I would have to look at the plan because I don't think it's just isolated here. I'm speaking towards the litigation trust interests.

Q. So what I understand you to be saying is there was a population. The plan authorizes a population other than the prepetition term loan lenders and the holders of allowed general unsecured claims to be allocated proceeds generated from the litigation trust assets and that population are holders of litigation trust interests that are neither prepetition term loan lenders or holders of allowed general unsecured claims?

MR. MARTIN: Objection to form.

You can go ahead and answer the question.

A. No, that's not what I'm saying. I'm suggesting I need to review the plan in order to say that, so I'm suggesting that litigation trust interest holders are intended to receive economics. I would have to look at the plan and dive through that,

J. Sinna

but I'm not suggesting that at all.

Q. So is it fair to say that you don't know whether there are populations other than the prepetition term loan lenders and the holders of allowed general unsecured claims who could be allocated proceeds generated from the litigation trust assets, you would need to review the plan in full to answer that question?

A. That's fair.

Q. Let's turn back to Exhibit 7 which is tab 9.

A. I'm there.

Q. Very good. Do you see in the last line item in this document, there is a reference to tranche 4 loan funding notice?

Do you see that?

A. I see that.

Q. What is tranche 4?

A. That is the incremental tranche beyond tranche 3.

Q. What is the incremental tranche beyond tranche 3?

A. I believe that's described in the

J. Sinna

litigation trust agreement or the credit agreement.

Q. Let's go back to tab 1 and back to page 42 of the plan. This is PDF page 99 of Exhibit 1.

Do you see section G in this portion of the plan?

A. I do.

Q. Have you reviewed that section before?

A. I believe I've read this before.

Q. When have you read this?

A. I don't recall.

Q. Have you read it in the last two months?

A. I don't believe so, no.

Q. At the bottom of page 42, the document reads, The litigation trust shall be financed by a litigation trust financing facility that provides for the issuance of up to $6 million preliminary terms of which are as follows.

Do you see that?

A. I see that.

J. Sinna

Q. What do you understand the phrase up to to mean?

A. Generally, that would be a maximum.

Q. On page 44 of this section, the document reads, this is the first full paragraph, If the litigation trust ultimately requires financing in excess of the litigation trust financing amount -- sorry, strike that.

If the litigation trust ultimately requires financing in excess of the litigation trust financing commitment amount, some or all of the litigation trust lenders may, in their discretion, provide up to an additional $4 million in incremental financing under the litigation trust financing facility on the terms set forth therein.

Do you see that?

A. I see that.

Q. How do you interpret the phrase up to in that sentence?

MR. TATA: Objection.

THE WITNESS: Can I answer that?

J. Sinna

MR. TATA: Yeah.

A. Maximum amount, upper limit.

Q. So fair to say that this section provides for an issuance of up to a maximum of $6 million which is the litigation trust financing commitment amount and then on the following page, it authorizes additional financing in excess of the litigation trust financing commitment amount in an amount up to an additional $4 million?

MR. TATA: Objection.

THE WITNESS: John, can I answer that?

MR. MARTIN: Yes.

A. Yeah, I think that's a read.

Q. Mr. Sinna, do you have a different read than that?

A. No, I think that's a fair read.

Q. Just as a housekeeping matter, when I ask questions and attorneys object, you are still obligated to answer them unless they direct you not to answer. That will relieve you of the burden of having to check with the attorneys and give Leslie a break too.

J. Sinna

A. Appreciate it.

Q. Are you aware of any provision in the plan that would permit the credit agreement to provide for funding amounts in excess of the litigation trust financing commitment amount or the up to additional $4 million of incremental financing set forth in this section?

A. I'm not aware.

Q. Let's go to tab 2 which is Exhibit 5.

A. Okay. I'm in tab 2.

Q. If you go to section 1.06 on page 5 of the document.

A. There we go.

Q. The first sentence requires the litigation trust agreement or, sorry, strike that.

The first sentence requires the credit agreement to have the terms set forth in the plan and the plan supplement, right?

A. Hold on. Let me read.

Q. Sure.

A. Sorry, you are in 106?

J. Sinna

Q. 1.06, yes, on page 5.

A. And you said the first sentence says what?

Q. It requires the credit agreement to have the terms set forth in the plan and the plan supplement.

A. The first sentence?

Q. Yes.

A. The first sentence in 106 does not say that.

Q. Let's make sure we are looking at the same language. It starts with On the effective date, is that right?

A. Yeah, I see that sentence.

Q. So it says, On the effective date, the litigation trust lenders as lenders and the litigation trust.

A. Sorry, I missed a period, yeah.

Q. So we are agreed then that the first sentence requires the credit agreement to have the terms set forth in the plan and the plan supplement?

MR. MARTIN: Form.

A. Yeah, I see that sentence.

J. Sinna

Q. Do you agree that's what that sentence says?

MR. TATA: Objection.

Q. You can answer.

A. Yes.

Q. And the following sentence, consistent with the plans, says that the credit agreement shall set forth the terms of the litigation trust financing facility which shall provide for loans in litigation trust, including $6 million in committed financing and additional $4 million of incremental financing.

Do you see that?

A. I do.

Q. That correlates to the $6 million and $4 million amounts that were set forth in the plan that we just looked at, correct?

MR. TATA: Objection.

MR. MARTIN: Form, foundation.

Q. Correct?

A. Yes.

Q. Are you aware of any provision in the litigation trust agreement that would

J. Sinna

permit the credit agreement to provide for funding amounts in excess of the amounts set forth in this section?

MR. MARTIN: Form and foundation.

A. No.

Q. How much funding has been provided to the litigation trust in total?

A. I don't know the total.

Q. Do you have an understanding of whether it's more or less than $10 million?

A. I believe it's less.

Q. What is your basis for believing that it's less?

A. The schedule that we looked at, yeah.

Q. Let's look back at that. That was tab 9, Exhibit 7.

A. Yeah. We are there, tab 9.

Can I do some math?

Q. You absolutely can.

The question is, you said you believe it's less than $10 million, I asked you for your basis for that belief, you referenced this schedule.

J. Sinna

So I will ask you what about this schedule informs your belief that the amount of funding that has been provided to the litigation trust in total is less than $10 million?

A. What informs me of that belief is if you reference back, tranche 3 in aggregate spoke to a $6 million cap, so I will write this down because I'm old, 6 million and then the tranche 4 funding occurred which is whatever we are calling the incremental 4 million and just doing roughly -- our participation within Citadel's loan would lead me to believe that it's less than 10 million.

Q. Can you explain the math to me on that?

MR. TATA: Objection.

Go ahead.

A. Yes. So this is rough, so let's do the math. Up to tranche 3, so $6 million, right?

Q. Point me to the line items you are talking about.

J. Sinna

A. So line item 8 is the last -- I should say 7 and 8, so those aren't numbered but it's 2 and 3 off the bottom. Those are tranche 2 and 3 funding, so once those are funded, my assumption is that exhausted the $6 million. That's taken care of because the tranche 4 loan occurred, so had there been capacity under tranche 3, that would have been labeled tranche 3.

So my assumption then is that those exhausted the 6 and then what's labeled as tranche 4 funding, the 594,000 is within the $4 million and this is my recollection of rough math. I believe that Citadel's piece is roughly, let's just -- round numbers, 100 percent, something shy of that maybe and our piece of that is about 20 percent so let's just use the 100 and the 20, so multiply the 590 by five and that sort of informs what we are looking at in terms of total tranche 4 funding.

Does that make sense?

Q. Most of it does, except for the last part when you said Citadel has 100

J. Sinna

percent and you guys have 20.

Can you break that piece out for me?

A. I'm not suggesting that's the case. I'm suggesting that's the rough math.

Q. I understand it's rough math, but I don't understand mechanically the rough math you are doing. I just want to make sure I understand it.

A. Let's say tranche 4 --

MR. TATA: Is there a question? I want to lodge an objection, but I want to make sure -- is there a question?

Q. The question is, when you were describing the 100 percent in relation to Citadel in tranche 4 and 20 percent in relation to tranche 4 for Parabellum and you undertook some math, I didn't understand that so can you please explain it to me?

MR. TATA: Objection.

Q. You can answer.

A. This is rough math. Let's assume for our purposes that Citadel is funding the loan, Citadel's loan is 100 percent, it's

J. Sinna

not, but let's just roughly.

Q. Sorry, go ahead.

A. So of the $4 million, Citadel is a lender under the terms of all the agreements, of all of that. It has the option to make a loan, whatever you want to call it, for $4 million, okay, so that's 100 percent. This is again rough math. Through our participation we are, again, rough-rough, about 20 percent of that, okay, so 100 divided by 20 is 5. Can we all agree to that?

So then you multiply the 594 number by 5 and that gets me an estimate of what tranche 4 looks like.

Q. Got it.

A. That should be just shy of $3 million or something like that.

Q. That's helpful. Thank you.

Let's move to tab 16 which is Exhibit 3.

A. Tab 16? I have to find that one.

Q. Yeah, tab 16, Exhibit 3. Take your time.

J. Sinna

A. I may have to go off your screen.

Q. Sure.

A. One more try.

Q. Take your time.

A. I'm going to have to go off your screen.

Q. If you could -- if you don't mind going to paragraph 62 on page 19, you can see in this paragraph, and if you would like to review the paragraphs surrounding this, please feel free, the trustee is discussing the issue of whether the plan permits additional incremental financing over the initial $4 million?

A. Okay.

Q. Do you see that?

A. I see that paragraph.

Q. The trustee writes in that paragraph, The credit agreement can, thus, be amended to increase incremental amount if necessary.

Do you see that?

A. Yeah, I see that.

Q. Do you agree with that statement?

J. Sinna

A. I don't know. I don't know if I agree with that statement.

Q. Do you have a view on whether that statement is accurate or not?

MR. MARTIN: Objection, form.

A. I would have to defer to the trustee or the lenders.

Q. I'm asking you a question about whether you have a view of whether that's correct or not?

MR. MARTIN: Same objection.

A. I provide no view.

Q. I hear you provide no view. I'm asking a slightly different question, whether you have a view on whether that's correct or not and if you don't, that's fine, but I want to make sure the transcript is clear for the court.

MR. MARTIN: Same objection.

A. Same answer. I don't have a view.

Q. Are you aware of any notice being provided to trust beneficiaries or the court about Parabellum's role in connection with the loans extended to the trust?

J. Sinna

MR. TATA: Objection.

A. No.

Q. Do you have a view on whether there are limits as to how much funding the plan authorizes the trust to take on?

A. I don't have a view.

Q. Who were the members of the LTAB before you joined?

A. I believe it was the two gentlemen from Citadel, Jonny and Ben and the third person's name, I don't recall. I think he was a member of the UCC.

Q. Does the name Martin Olson refresh your recollection?

A. That's the guy. I believe it was Martin Olson. Thank you for the recollection.

Q. Who were the designees of the prepetition term loan lenders?

A. I don't recall.

Q. Who was the designee of the creditors committee?

A. I don't recall.

Q. When did Parabellum first consider

J. Sinna

the prospect of joining the LTAB?

A. Hang with me for a sec. So the prospect was -- you said considered?

Q. Yes. When did Parabellum first consider the prospect of joining the LTAB?

A. I first considered when the open seat was offered.

Q. Your testimony is the first time that Parabellum considered the prospect of joining the LTAB is after Ravago resigned from the LTAB?

MR. TATA: Objection.

MR. MARTIN: Form.

A. I want to be clear. Yes, in the sense that when the first time it considered joining the seat that was opened was then, we discussed board seats with Citadel before the participation agreement was entered into.

Q. Who participated in those discussions?

A. I believe it would have been Ben and Jonny.

Q. Who from Parabellum?

A. Me.

J. Sinna

Q. Through what mediums were those discussions had, in person, text message, email?

A. Those would have been in person.

Q. You did not exchange emails about the prospect of Parabellum joining the LTAB?

A. I don't recall.

Q. You don't recall one way or the other?

A. No.

Q. You did not exchange text messages about the prospect of Parabellum joining the LTAB?

A. I don't do texts.

Q. You did not use any other means of communication concerning the prospect of Parabellum joining the LTAB?

A. No, not that I recall.

Q. So all you recall are in-person meetings about this?

A. Can I ask a question in response, because do you consider this in person? I am obviously remote.

Q. Fair question. Is it your

testimony that as to these discussions that you reference with the Citadel representatives about the prospect of Parabellum joining the LTAB, those occurred either in person or via zoom?

A. That's my recollection.

Q. Whatever video conference methodology, Microsoft Teams, whatever it was?

A. Right.

Q. How about phone calls?

A. I don't recall.

Q. Let's turn to tab 7 which is -- has not been introduced.

MR. AYALA: I believe this will be Exhibit 8.

(Exhibit 8, internal emails to Parabellum, marked for identification, as of this date.)

A. Okay. I have that one. Okay. I've got it.

Q. What do you have in front of you on your computer?

A. It appears to be two emails,

J. Sinna

internal emails to Parabellum.

Q. Do you have any other windows open or means of communication open?

A. I'm sorry, right now?

Q. Yes.

A. I have my email open because I'm pulling the tabs up, yeah.

Q. I would ask that you move the emails that have the tabs on to your desktop and that you close Outlook and that you are not in position of receiving messages during the deposition.

A. A couple of them were able to move over, a couple of them weren't, the files.

Let's go off screen. I will just squint.

Q. During the course of this deposition, did you receive communications from anybody in respect of this deposition?

A. No.

Q. Turning back to Exhibit 8, at the bottom of this email chain is an email from you to Mr. Thompson and Ms. Conway.

Do you see that?

J. Sinna

A. Yes, I see that.

Q. Dated September 5, 2025?

A. I see that.

Q. You write, As discussed with you, as well as Erin and as you have also approved, I'm going to join the advisory board for the Instant Brands Litigation Trust alongside the two exiting parties from Citadel.

Do you see that?

A. I do.

Q. When you refer to the two exiting parties from Citadel, who are you referring to?

A. I think it's a typo. It should be existing, but the reference is made to Ben and Jonny.

Q. You say, As discussed with you, the benefits of this would include, and in your first sentence, you write, We asked for a seat when we purchased the interest from Citadel in 2024 and were denied.

Do you see that?

A. I do.

J. Sinna

Q. Just for Leslie's benefit, if you could wait for me to finish the question before you answer, otherwise, it's difficult for her to transcribe.

When you say we had asked for a seat when we purchased the interest from Citadel in 2024, what are you referring to?

A. So we previously went through the participation agreement so that's the purchase of the interests.

In discussions, the negotiations led up to the memorialization and the final deals reflected in those participation agreements we discussed, we negotiated various terms, things we wanted.

Given that we were taking an economic interest via participation, one of the things we asked for was one of the board seats.

Q. And in any of these discussions or negotiations that you refer to -- strike that.

Are any of these discussions or negotiations that you refer to reflected in

J. Sinna

any documents or communications?

A. I don't recall.

Q. You don't know one way or the other?

A. No.

Q. You say given that we are taking an economic interest via participation, one of the things we asked for is one of the board seats.

Why do you say given that we were taking an economic interest, you asked for one of the board seats?

A. We were making an investment and we wanted to see what was going on. How about that?

Q. Helpful. So when you say you wanted to see what was going on, what did having a board seat do with respect to that interest?

A. It just allowed you to see what was going on with the litigation, what decisions were being made around it, I guess doing the responsible thing by way of our investment, we saw that as a way to do that, a potential

J. Sinna

way to do that.

Q. When you say the responsible thing by way of our investment, what do you mean by that?

A. Oftentimes, when we make an investment, you ask for really anything, seats, whatever. You want to be close to the investment to make sure that you are just sort of seeing what actions are being taken, strategy that's occurring, simple things like that.

Q. You said you were denied.

Do you see that?

A. I do.

Q. Who communicated that?

A. One of the two gentlemen from Citadel.

Q. How was that communicated to you?

A. I don't recall.

Q. What was the reason that you were denied that seat?

A. I don't recall. You will to have to ask them.

Q. Did they ever communicate a reason

J. Sinna

to you?

A. I don't recall.

Q. In connection with this initial request for a seat on the LTAB, did you have any discussions with the trustee?

A. No.

Q. Same question as to Mr. Olson?

A. No.

Q. Did you communicate with others at Parabellum about that issue other than what is reflected in this email that you are looking at?

A. What issue are you speaking to?

Q. The issue of Parabellum's initial request to join the LTAB.

MR. TATA: Objection.

A. I don't recall.

Q. Have you ever conducted any search for documents concerning Parabellum's request for or the denial of a seat on the LTAB in connection with its acquisition of its participation interest?

A. Can I ask John Martin to assist on that?

J. Sinna

Q. I'm asking what your knowledge is of that issue?

A. I don't recall.

Q. Sitting here today, you don't recall ever having done such a search?

A. No, I don't.

Q. Are you aware of your attorney having done such a search?

A. I don't recall.

Q. You don't know one way or the other?

A. No.

Q. After Parabellum was denied an LTAB seat, did it seek any other form of participation in trust governance?

A. I'm sorry, the question again?

Q. After Parabellum was denied an LTAB seat, did it seek any other form of participation in trust governance?

MR. MARTIN: Form.

Q. You can answer.

A. We discussed having observation rights.

Q. When you say we discussed having

J. Sinna

observation rights, who participated in those discussions?

A. That would have been the gentlemen from Citadel.

Q. What was their response in respect of the prospect of you having observation rights?

A. I don't recall.

Q. Do you recall generally whether they were supportive of the prospect of you having observation rights?

A. I think I would recall generally supportive.

Q. Do you have a view on why they were supportive of that?

MR. TATA: Objection.

A. I have a view.

Q. What is that view?

A. We were adding value.

Q. You were adding value to what?

A. Discussions around -- we talked about solvency, that's something I have a background in. I think that they saw that we had a deep bench of parties that we worked

J. Sinna

with in terms of analysis. That's just the term that comes to mind. We were a valuable party to have around.

Q. So your view was that Citadel was supportive of you having a role on the LTAB because it would potentially increase the value of Citadel's economic position in respect of the trust?

MR. MARTIN: Form, foundation.

A. No, I didn't say that.

Q. So when you say we were a valuable party to have around, why would you be a valuable party to have around from Citadel's perspective?

MR. TATA: Objection.

A. As a party that's been experienced around litigation and investing, I think just in a general way.

Q. Why would that create value for Citadel?

MR. TATA: Objection.

MR. MARTIN: Form.

A. You will have to ask them.

Q. You also negotiated certain rights

with Citadel under the participation agreements in respect of trust governance, correct?

MR. TATA: Objection.

MR. MARTIN: Form.

A. Can we refer to those?

Q. Sure. We can look at them. We will go back to tab 4, Exhibit 6. Let's turn to the page in this document ending in 7, Bates stamp 7.

Mr. Sinna, this is one of the participation agreements, correct?

A. It appears so, yeah.

Q. Now, do you see section 10(a).

A. Yeah. Hold on. I see that section, yeah.

Q. Now, the term seller in this agreement refers to Citadel and the term buyer refers to Parabellum, correct?

A. That's correct.

Q. And the second sentence of 10(a) states that Notwithstanding the immediately preceding sentence, seller agrees to use good faith effort to consult with buyer prior to

J. Sinna

exercising any rights or remedies with respect to an essential act.

Do you see that?

A. I see that.

Q. And the paragraph goes on to identify a variety of essential acts.

Do you see that?

A. I see that.

Q. And among those essential acts is consent to a settlement with respect to any litigation trust recovery action.

Do you see that?

A. Can you point it out for me?

Q. Sure. It's after Romanette ii in the definition of essential acts?

A. Okay. I see that.

Q. Do you believe that the prospect of consenting to a settlement with respect to any litigation trust recovery action concerns governance of the trust?

A. Can you hold on for a second while I reread that?

Q. Sure. Take your time.

A. Can you repeat your question

J. Sinna

please?

Q. Sure. So in looking at Romanette ii, the definition of essential acts here, do you believe that the prospect of consenting to a settlement with respect to any litigation trust recovery action concerns governance of the trust?

MR. TATA: Objection.

MR. MARTIN: Form and foundation.

Q. You can answer.

A. Yes, but it's qualified.

Q. What in Romanette ii is qualified?

A. Seller shall have no obligation to follow the direction of buyer in connection with such consultation.

Q. I'm not asking you about obligations to follow the direction of buyer.

I'm asking you whether the prospect of consenting to a settlement with respect to any litigation trust recovery action concerns governance of the trust?

MR. MARTIN: Form.

A. Yes.

Q. And in the sentence preceding the

definition of essential acts, Citadel agrees to use good faith efforts to consult with Parabellum prior to exercising any rights or remedies with respect to an essential act, correct?

MR. MARTIN: Form.

A. Agreed.

Q. Now, if you look at 10(b), let me just pause there for a moment.

The date of this participation agreement is December 27, 2024, correct?

A. That's correct.

Q. Do you know when the settlement date was?

A. I don't recall.

Q. Do you recall Citadel consulting with Parabellum on any of the items enumerated with Roman numerals in the definition of essential acts before you became a full member of the LTAB?

A. I don't recall.

Q. You don't know one way or the other sitting here today?

A. I don't know one way or the other

J. Sinna

sitting here today.

Q. Do you recall exchanging communications with Citadel about any of the topics listed in Romanette i through v of the definition of essential facts at any time?

A. Can I read those again?

Q. Yes. Take your time.

A. No, I don't think so.

Q. Your testimony is that you don't think you ever communicated with Citadel about exercising any right not to make any future funding anticipated under the credit agreement such as the tranche 3 loans?

A. Romanette iii?

Q. Yes.

A. Exercising any right not to make any future funding, no, I don't recall that.

Q. You are saying that did not happen or you don't you recall one way or the other?

A. I don't recall one way or the other.

THE WITNESS: Can we take a quick coffee?

MR. AYALA: We will come back 1:05.

J. Sinna

THE VIDEOGRAPHER: The time is 12:58 p.m. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 1:06 p.m. We are back on the record.

MR. AYALA: Let's introduce tab 4, Exhibit 6. It's already introduced. I'm mixed up.

Let's introduce tab 6 which will be Exhibit 9.

(Exhibit 9, common interest agreement, marked for identification, as of this date.)

BY MR. AYALA:

Q. Mr. Sinna, are you familiar with this document?

A. I've seen this.

Q. What is this? What is the document?

A. It's a common interest agreement.

Q. This is a common interest agreement to which you are a party, correct?

A. Yes.

Q. And the first paragraph identifies

J. Sinna

you as an ex-officio board member.

Do you see that?

A. I do.

Q. What is that?

A. That is a person with observation rights.

Q. When did you become an ex-officio board member?

A. I believe on or about March 10, 2025.

Q. When did you first start considering the prospect of being an ex-officio board member?

A. I don't recall.

Q. Before you became an ex-officio board member, who did you discuss the prospect of you becoming one with?

A. The gentlemen from Citadel.

Q. That's both Mr. Cheatle and Mr. Xie?

A. I believe that's true.

Q. And in what form did those discussions take?

A. The same form as other

J. Sinna

communications, in person.

Q. You recall in-person discussions on that topic?

A. Yeah, I think I do.

Q. Do you recall video conference discussions on that topic?

A. I would include that there. I think it would have been over video conference.

Q. Do you recall exchanging email communications or other documents on that topic?

A. No, I don't recall.

Q. Sitting here today, you don't recall one way or the other whether those exist?

A. That's correct, I don't recall one way or the other.

Q. Have you looked for those documents?

A. I don't believe I have.

Q. Has your counsel looked for those documents?

A. I don't recall.

J. Sinna

Q. Did you request the ex-officio board position or did Citadel offer it?

A. I don't recall.

Q. You say earlier that you discussed the -- let me make sure I summarize it correctly.

I had asked before you became an ex-officio board member, who did you discuss the prospect of you becoming one with and you said the gentlemen from Citadel.

Do you remember that?

A. Yes, I do.

Q. Was there anyone else you discussed that topic with before you became an ex-officio board member?

A. I don't recall.

Q. You don't recall one way or the other?

A. No.

Q. When you say an ex-officio board member is a person with observation rights, what do you mean by that?

A. My understanding is someone who can just observe what is going on.

J. Sinna

Q. What is that understanding based on?

A. I don't know, it's just my understanding.

Q. Did you ever discuss with anybody what the parameters of this role would be in connection with the Instant Brands Litigation Trust?

A. I don't recall.

Q. You don't recall one way or the other?

A. No, I don't.

Q. So it's possible you discussed that issue with the trustee?

A. I don't believe I discussed it with the trustee, no.

Q. And why don't you believe you discussed that topic with the trustee?

A. Because I think I would have recalled having that conversation with the trustee and I don't.

Q. So you don't recall having the conversation with the trustee. On that basis, you don't believe it happened, that's

J. Sinna

what you are saying?

A. That's what I'm saying, yes.

Q. Did you discuss that issue with Citadel?

A. I'm sorry, that issue?

Q. That is, the issue of what the parameters of the ex-officio board member would be in connection with the Instant Brands Litigation Trust?

MR. TATA: Objection.

A. I don't recall.

Q. You don't recall one way or the other whether you discussed those issues with Citadel?

MR. TATA: Objection.

A. No.

Q. Do you recall discussing that issue with Mr. Olson or any representative of Ravago?

A. I don't believe I had any conversations with Mr. Olson on that, so no, I don't recall.

Q. Do you recall there being any documents concerning that issue?

J. Sinna

A. I don't recall, no.

Q. You don't recall one way or the other?

A. Correct, I don't recall one way or the other.

Q. You have not searched for those documents?

MR. TATA: Objection.

A. I have not.

Q. You have not?

A. I don't recall.

Q. You don't recall whether you searched for documents?

A. I don't recall of any documents.

Q. I'm just asking, have you conducted a search for those documents?

A. I defer to my lawyer on that.

Q. I'm asking if you personally have conducted a search for those documents?

A. No, I don't recall having personally done a search for those documents.

Q. Are you aware of your counsel having done a search for those documents?

A. I don't recall.

J. Sinna

Q. Sitting here today, you don't know one way or the other?

A. Correct.

MR. AYALA: Let's introduce tab 8 as Exhibit 10.

(Exhibit 10, email exchange between Mr. Sinna, Mr. Xie and others, marked for identification, as of this date.)

Q. Do you have that document in front of you, Mr. Sinna?

A. Yeah, I see it open on my screen.

Q. This is an email exchange between you and Mr. Xie and others, is that right?

A. Yes, looks that way.

Q. Are you familiar with this document?

A. It looks look it's an email to me, so sure.

Q. Have you reviewed this document before?

A. I have seen this before, yeah.

Q. When did you most recently see it?

A. Let me think about that for a second. I think in the last couple of days.

J. Sinna

Q. Who did you review this document with?

A. I think I recall reviewing that with my lawyer.

Q. Anybody else?

A. No.

Q. Mr. Xie writes -- strike that.

At the first email in the chain, Mr. Halperin writes, Attached, please find the fully executed amended and restated common interest agreement for your records.

Do you see that?

A. No -- now, I do. Can you go down please? Is that it?

Q. That's it.

A. I do see that part.

Q. That's the common interest agreement we just looked at, correct?

A. The email ending thank you, is there anything else below that -- oh, okay, now, I see it.

Q. It refers to the common interest agreement that we just looked at, correct?

A. Yes, that appears to.

J. Sinna

Q. It's addressed to dear trust board members and ex-officio member.

You are the ex-officio member that it is being sent to, correct?

A. It's a reasonable conclusion.

Q. Now, Mr. Xie drops everybody who is on the chain and leaves only you and Mr. Cheatle in his email and response.

Do you see that?

A. Not at the current. It's not on the screen.

MR. AYALA: Kat, do you mind scrolling up?

Q. Do you see that now?

A. Do I see what now?

Q. Mr. Xie in his email responding to Mr. Halperin's email drops everybody from the chain except for you and Mr. Cheatle.

Do you see that?

A. Yeah. The email on top is just to me and Jonny Cheatle, I see that.

Q. He writes -- in his writing, he describes getting you to become an ex-officio board member took an ordeal and a Herculean

J. Sinna

effort mainly undertook by Jonny.

Do you see that?

A. Yeah, I see that.

Q. What is your understanding of that ordeal?

A. I have no understanding of that ordeal.

Q. Did you ever discuss that ordeal with anybody?

A. I don't recall, no.

Q. What do you know about the Herculean effort that was mainly undertook by Jonny?

A. I don't recall the Herculean effort that was taken by Jonny.

Q. What is your understanding of what that involved?

A. I don't have any understanding of what that involved.

Q. You never discussed that issue with anybody?

A. I don't recall having discussed that issue with anybody.

Q. Sitting here today, you don't

J. Sinna

recall one way or the other whether you discussed that issue with anybody?

A. That's correct.

Q. Sitting here today, you don't know whether documents were exchanged concerning that issue, correct?

A. I have no knowledge of that.

Q. You have not looked for those documents?

A. I don't recall looking for those documents.

Q. And you are not aware of your counsel having looked for those documents?

A. I don't have -- I don't know.

Q. Do you have a view on why any effort was required to get you an ex-officio board member role?

A. I have no view.

Q. Sitting here today, you have no understanding of why any effort was required to obtain an ex-officio board member for you?

A. I don't recall of the Herculean effort or any circumstances around it.

Q. You say you don't recall. I'm

J. Sinna

asking something slightly different.

A. Can you reask the question then please, sorry?

Q. Sitting here today, do you have an understanding of what efforts were required to get you an ex-officio board member role?

A. No, sitting here today, I don't.

Q. Mr. Xie writes, Jonny and I are happy to catch you up on everything that you missed and to get your thoughts on some of the decisions we made/are about to make on the case.

Do you see that?

A. I see that.

Q. Without disclosing the substance of any litigation-related discussions, did you provide him thoughts about the decisions he refers to here?

A. I don't recall.

Q. Again, without disclosing the substance of any litigation-related discussions, do you recall discussing with Mr. Xie and Mr. Cheatle decisions made that concern the case?

J. Sinna

A. I don't recall.

Q. Mr. Sinna, sitting here right now, you don't recall ever discussing any decision with Mr. Xie or Mr. Cheatle?

MR. TATA: Objection.

A. Are you asking to this specific email?

Q. I'm asking ever.

A. Certainly ever, we discussed those topics, of course.

Q. Do you recall having discussions on those topics while you were an ex-officio board member?

A. I don't recall.

Q. Sitting here today, you don't know one way or the other?

A. I don't.

Q. You have not conducted a search to determine the answer to that question, correct?

MR. TATA: Objection.

MR. MARTIN: Form.

A. I don't believe so.

Q. Without disclosing the substance of

J. Sinna

any litigation-related discussions, what did Parabellum do as an ex-officio member of the LTAB?

A. I recall that we had calls with Citadel just to get caught up on what was going on in the case, that's it. That's what I recall.

Q. In your position as an ex-officio member of the LTAB, did you attend any meetings of the LTAB?

A. Did I attend any meetings of the LTAB?

Q. Yes.

A. I believe so.

Q. In your capacity as an ex-officio board member, did you speak at meetings among the LTAB members?

A. Can you expand on speak?

Q. Well, to the extent the meeting was a live meeting using your voice, to the extent it was a written meeting, typing words, I'm not trying to be overly reductive, but I'm just trying to be straightforward.

A. I'm not going to try to be overly

J. Sinna

whatever, but, yeah, when you get on a call, you probably said hello. So did I speak on a meeting, sure.

Q. In your position as an ex-officio board member, did you ever speak as to substantive matters in meetings with the LTAB members?

A. I don't recall.

Q. Sitting here today, you don't recall one way or the other?

A. No, I don't.

Q. In that capacity as an ex-officio member, did you receive board materials?

A. I don't recall receiving board material.

Q. Did you communicate with the trustee?

A. I don't recall communicating with the trustee.

Q. You don't recall ever communicating with the trustee in your capacity as an ex-officio board member of the LTAB?

A. Correct, I don't recall.

Q. You don't recall it one way or the

J. Sinna

other sitting here today?

A. That's correct.

Q. In your capacity as an ex-officio board member of the LTAB, did you ever vote on any issue?

A. I don't recall voting on any issue, no.

Q. To be clear, is the answer no or you don't --

A. I don't -- I'm going to say this way. I am an ex-officio so nonvoting, so I don't recall having voted so I wouldn't have had a vote.

Q. Other than inferring that you would not have voted because you were an ex-officio member, do you know, sitting here today, one way or the other, whether you voted as an ex-officio board member?

MR. TATA: Objection.

A. I will answer the same way. I didn't have a vote to give.

Q. Not answering my question, sorry, let me try again.

Other than inferring that you would

J. Sinna

have not voted because you were an ex-officio board member, do you know, sitting here today, one way or the other, whether you voted?

A. No, I don't recall.

MR. TATA: Objection.

MR. MARTIN: Form.

Go ahead.

A. No, I don't recall.

Q. You don't recall one way or the other?

A. Correct.

Q. When you accepted the ex-officio role, did you review the plan for the litigation trust agreement?

A. I don't recall.

Q. You don't recall whether you did that at all in connection with considering the prospect of joining the LTAB as an ex-officio member?

A. That's correct, I don't recall having done that in that capacity.

Q. You don't recall considering whether the litigation trust agreement

J. Sinna

authorizes the existence of ex-officio board members, correct?

A. Correct.

Q. Why don't we turn to tab 2 which is Exhibit 5.

Are you there, Mr. Sinna?

A. I'm there.

Q. Let's turn to -- I take it from your answer then that you are not aware of any document that authorizes an ex-officio board member role?

A. I'm sorry?

MR. TATA: Objection.

A. Ask that question again.

Q. Are you aware of any document that authorizes the Instant Brands Litigation Trust to have an ex-officio board member?

MR. TATA: Objection.

MR. MARTIN: Form.

A. No, I don't recall, no.

Q. The answer is no?

A. The question is, am I aware of any document that authorizes the ex-officio, is that your specific question?

J. Sinna

Q. Yes.

A. No, I am not aware.

MR. TATA: We assert an objection.

You can answer.

Q. We are looking at tab 2, Exhibit 5. Let's turn to section 4.01.

Have you reviewed section 4.01 in front of you before?

A. Yes, I have.

Q. When did you most recently review it?

A. I don't recall.

Q. Within the last two weeks?

A. No, I don't believe so.

Q. Within the last two months?

A. I don't believe so, but I don't recall.

Q. Why don't you read section 4.01 -- do you see the first sentence that says, The litigation trust advisory board which shall have three members, and it goes on?

A. Yeah, I see that sentence.

Q. Can we agree that that sentence establishes that the litigation trust

J. Sinna

advisory board is to have three members?

A. Yeah, I can agree with that.

Q. It goes on to discuss who the initial members of the litigation trust advisory board would be.

Do you see that in the second sentence?

A. Yeah. References Exhibit B, that sentence?

Q. Yes.

A. I see it.

Q. Then do you see the third sentence discusses how members of the litigation trust advisory board shall have the right to remove the litigation trustee and it goes on?

Do you see that?

A. Yeah, I see that.

Q. And then in the last sentence -- sorry, did you have something -- in the last sentence of this paragraph, it states, No other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the trust, except as maybe set

J. Sinna

forth in this litigation trust agreement or the plan.

Do you see that?

A. I do.

Q. Do you see any language in this section that authorizes the litigation trust advisory board to have an ex-officio member?

MR. TATA: Objection.

MR. MARTIN: Form.

Q. You can answer.

A. No.

Q. Are you aware of any language in the litigation trust agreement or the plan that authorizes such a role?

MR. TATA: Objection.

MR. MARTIN: Form and foundation.

A. No.

Q. Do you have a view on whether the consultation rights Parabellum obtained pursuant to the participation agreements complies with the sentence of section 4.01 that says no other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of

J. Sinna

management and operation of the litigation trust --

MR. TATA: Objection.

MR. MARTIN: Foundation.

Q. -- except as maybe set forth in this litigation trust agreement with the plan?

MR. TATA: Objection.

A. Can you start that one over please?

MR. AYALA: I would just ask the gallery to let me finish.

MR. MARTIN: You paused. I thought you were done.

Q. Do you have a view on whether the consultation rights Parabellum obtained pursuant to the participation agreements it entered into with Citadel comply with the sentence of section 4.01, the litigation trust agreement that says, No other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the litigation trust except as maybe set forth in this litigation trust agreement or the plan?

J. Sinna

MR. TATA: Objection.

MR. MARTIN: Form.

A. No, I don't have a view, no, I don't.

Q. Have you ever considered that issue?

A. I don't recall.

Q. You don't recall whether you considered that issue one way or the other?

A. That's correct.

Q. Do you think it's important in connection with Parabellum's relationships with the litigation trust agreement that it comply with the terms of the litigation trust agreement?

MR. TATA: Objection.

MR. MARTIN: Same objection, form and foundation -- actually, just form on that.

A. Can you ask it again please?

Q. Do you think it's important in connection with Parabellum's relationships with the litigation trust that it comply with the terms of the litigation trust agreement?

J. Sinna

MR. TATA: Objection.

MR. MARTIN: Form.

A. Can you expand --

MR. MARTIN: And foundation.

A. Can you expand on relationship please?

Q. I think we established that Parabellum has multiple relationships with the trust, including its interest in the loan participations as an asserted transferee of the LTIs and in your role on the LTAB, correct?

MR. TATA: Objection.

MR. MARTIN: Same objections.

A. Can you expand on important?

Q. Do you use the word important in your daily life and have an understanding of what it means?

A. I do, but I don't understand this context, so I will need more.

Q. You can decline to answer the question if you want, but I think it's a fair question.

Do you think it's important in

connection with Parabellum's relationships with the litigation trust that it comply with the terms of the litigation trust agreement?

MR. MARTIN: Form.

A. Yes.

Q. In connection with Parabellum acquiring its relationships with the litigation trust, what did Parabellum do to ensure that those relationships complied with the terms of the litigation trust agreement without disclosing any attorney-client privilege advice?

MR. MARTIN: Foundation.

A. I'm not sure I can answer that without getting into attorney-client privilege.

Q. Okay. So in connection with Parabellum acquiring its relationships with the litigation trust, Parabellum sought legal advice to ensure that those relationships complied with the terms of the litigation trust agreement, is that correct?

MR. MARTIN: Foundation.

A. I mean, I believe so. I honestly

J. Sinna

don't recall. I don't recall, but I believe so.

Q. You don't recall one way or the other whether you got legal advice on that issue?

A. No, I don't.

MR. MARTIN: Form.

Go ahead.

Q. You say I don't recall, but I believe so.

What is your basis for believing so?

A. I'm sorry, I'm sorry. I'm verbalizing. I will stick with I don't recall. I'm trying to remember, but I don't recall.

Q. So you don't remember one way or the other?

A. No, I don't.

Q. Earlier I asked in connection with Parabellum acquiring its relationships with the litigation trust, what did Parabellum do to ensure that those relationships complied with the terms of the litigation trust

J. Sinna

agreement and you identified that you couldn't answer that question without going into attorney-client privilege, is that correct?

A. I recall that answer, yes.

Q. Aside from any such attorney-client communications, did Parabellum do anything to ensure that those relationships complied with the terms of the litigation trust agreement?

MR. TATA: Objection.

MR. MARTIN: Form.

A. I don't recall.

Q. You don't recall one way or the other?

A. No, I don't.

Q. Let's go back to tab 1, Exhibit 1 which is the plan. Go to page 44.

Now, in the second full paragraph, do you see that, Mr. Sinna, starting with, As further set forth below?

A. I see that.

Q. The second sentence of that paragraph states, The litigation trust agreement shall provide for the creation of

J. Sinna

the three-member litigation trust advisory board with two members appointed by the prepetition term lenders and one by the creditors committee.

Do you see that?

A. I do.

Q. Are you familiar with that language?

A. I believe I've seen that before, yes.

Q. You see that two of the three seats are allocated to being appointed by the prepetition term loan lenders, correct?

A. I see that.

Q. And one of the seats is to be appointed by the creditors committee, correct?

MR. MARTIN: Form.

A. Yes.

Q. Do you have a view on what the rationale was for the three-member litigation trust advisory board to be constituted by two members appointed by the prepetition term loan lenders and one by the creditors

J. Sinna

commission?

MR. MARTIN: Foundation.

A. I don't have a view.

Q. Have you ever considered that issue?

A. No.

Q. Have you ever discussed that issue with anybody?

A. I don't recall having discussed that issue with anybody.

Q. Let's go to tab 2, Exhibit 5, page 22. We are back to section 4.01 we were looking at earlier.

Do you see in the first sentence, it states that the litigation trust advisory board, which shall have three members, such members to be appointed in accordance with the plan as follows: Romanette i, two members appointed by the prepetition term loan lenders and; Romanette ii, one member appointed by the official committee of unsecured creditors or its designee.

Do you see that?

A. I see that.

J. Sinna

Q. Now, this litigation trust agreement is the agreement that you said I believe bore on the governance of the trust?

A. I believe I said that earlier.

Q. In respect of this language here in the litigation trust agreement, do you have a view on the purpose of the litigation trust agreement mandating that two members of the LTAB be appointed by the prepetition term loan lenders and one member be appointed by the creditors committee or its designee?

MR. MARTIN: Form and foundation.

Q. You can answer.

A. Can you ask it again please?

Q. Sure. We are looking at the first sentence of the section 4.01 of the litigation trust. In respect of that sentence, do you have a view on the purpose of the litigation trust agreement mandating that two members of the LTAB are required to be appointed by the prepetition term loan lenders and one is required to be appointed by the creditors committee or its designee?

MR. TATA: Objection.

J. Sinna

MR. MARTIN: Same objections.

Q. You can answer.

A. No view.

Q. Have you ever considered that issue?

A. I don't recall having considered that issue.

Q. Have you ever discussed that issue with anybody?

MR. TATA: Objection.

A. I don't recall having discussed that issue with anybody.

Q. Your testimony -- well, have you ever discussed this language with anybody at all?

A. Have I discussed this language with anybody at all?

Q. Yes. Have you discussed the first sentence of section 4.01 with anybody at all?

MR. TATA: Objection, and I'm going to caution the witness not to discuss the substance of any communications with counsel.

A. I may have discussed it with

J. Sinna

counsel.

Q. And when you say you may have discussed it with counsel, who is the counsel you are referring to?

A. I believe Vivek.

Q. Was that in connection with this deposition?

THE WITNESS: Do I need to answer that.

MR. MARTIN: The question of whether you discussed it with him in connection with the deposition is a timing and circumstance. Don't give him the substance.

A. No.

Q. So just to make sure I understand the testimony, you discussed this language with Mr. Tata, but it was not in connection with this deposition?

A. That's my recollection.

Q. When did this discussion happen?

A. I don't recall.

Q. Was it within the last two months?

A. Perhaps.

Q. Are there documents concerning this discussion, including calendar invites?
A. I don't recall.
Q. You don't know one way or the other?
A. No, I don't.
Q. You closed -- Parabellum closed on the acquisition of the LTIs in January 2025?
A. I'm sorry, I would have to see the documents to provide an answer for that. That's not my understanding.
Q. Was it March 2025?
A. I would have to see the documents, I don't recall.
Q. Sure.
MR. AYALA: Why don't we introduce tab 5 which will be Exhibit 11.
(Exhibit 11, document dated March 3, 2025, marked for identification, as of this date.)
Q. Are you familiar with this document, Mr. Sinna?
A. Yes, I've seen this.
Q. And this document is dated March 3,

J. Sinna

2025.

Do you see that?

A. I do.

Q. Does this refresh your recollection as to when Parabellum closed on its acquisition of the LTIs?

A. Yes, it does.

Q. In what way does it refresh your recollection?

A. There is a date on the document.

Q. So the date March 3, 2025 is the date that you understand to be the date on which you or on which Parabellum closed on its acquisition of Citadel's LTIs?

A. That would be the transfer, if that's what you mean by acquisition.

Q. In other words, in or around this time, you understand Parabellum to have closed on its acquisition of LTIs from Citadel?

A. That's when the transfer occurred, as the document shows.

Q. Now, earlier you testified that you participated in meetings among LTAB members

J. Sinna

in your capacity as an ex-officio board member.

Do you recall that?

A. That's my recollection.

Q. At those meetings, was Mr. Olson present?

A. I don't recall.

Q. Do you recall ever discussing any trust-related topics with Mr. Olson at any point in time without disclosing the substance of any such discussion?

A. No, I don't recall.

Q. So it's possible that you were appointed an ex-officio board member by March 10, 2025 and through the time of Mr. Olson's retirement in May 2025, you never discussed a trust-related matter with him?

A. Are you asking if that's possible?

Q. Yes.

A. I suppose that's possible.

Q. Do you have a view on whether that's likely or unlikely?

A. It's likely that I didn't discuss or did.

J. Sinna

Q. Likely that you did not discuss?

A. No, I don't.

Q. Do you have a view on whether it's likely or unlikely that you ever discussed any trust-related issue with Mr. Olson?

A. Do I have a view, no, I don't.

Q. You simply don't have a view on the likelihood that you had a trust-related discussion with Mr. Olson?

MR. TATA: Objection.

A. If I have to pick A or B, it's probably more likely that I never did.

Q. More likely that you never did.

And in picking A or B and asserting it's probably more likely that you never did, what informs that view?

A. My recollection as I sit today.

Q. Okay.

MR. AYALA: Let's look at tab 11 which we will introduce as Exhibit 12.

(Exhibit 12, email between Mr. Patel, Mr. Halperin and Ms. Cohen, marked for identification, as of this date.)

J. Sinna

Q. You will see, Mr. Sinna, this is an email between Mr. Patel, Mr. Halperin and Ms. Cohen.

Do you see that?

A. Would you mind paging down so I can see the bottom or is this the bottom?

Yeah, I can see that.

Please keep going. Can we go up? That appears to be the case.

Q. Do you see Mr. Patel writes to Mr. Halperin, Separately, Martin from Ravago is retiring, will no longer be the contact at Ravago. Please update the committee list to add Paulo, info below, as a contact.

Do you see that?

A. Yeah, I see that.

Q. In or around the time of this email, were you made aware that Mr. Olson was retiring?

A. I don't recall.

Q. You don't recall one way or the other?

A. No.

Q. And in or around this time, do you

J. Sinna

recall being made aware that Ravago was designated Mr. Paulo -- strike that.

In or around the time of this email, do you recall being made aware that Ravago was designating Mr. Paulo Menezes as its LTAB designee in replacement of Mr. Olson?

A. Can you ask that again?

Q. In or around this time of this email, do you recall being made aware that Ravago was designating Mr. Menezes as a replacement for Mr. Olson as its LTAB designee?

A. No, I don't recall that.

Q. You don't recall one way or the other?

A. No.

Q. Do you know whether there are documents that concern this issue?

A. I am unaware of documents that concern this issue.

Q. Have you ever searched for them?

A. No.

Q. Has your counsel?

J. Sinna

A. I don't know.

MR. AYALA: Let's move to tab 20 which will be Exhibit 13.

(Exhibit 13, email chain, marked for identification, as of this date.)

Q. Mr. Sinna, would you like to review the whole chain before I ask you questions about it?

A. Most likely.

Q. Go ahead.

A. Please move up slowly, page 4, page 3. Keep going up. Stop there please. Okay. Thanks.

Q. Yes. Now, do you see on page 3 of this document, Mr. Patel asks Mr. Halperin to update the committee list to add Paulo.

Do you see that?

A. Can you go down to page 3 so I can see it? Which part -- I see it.

Q. Mr. Patel asks to update the committee list.

A. I see it.

Q. Ms. Cohen responds, she says, Thank you. We updated the address information, but

J. Sinna

can you please provide a telephone number?

Do you see that?

A. I see that.

Q. Following this exchange, on the first page of the document, Mr. Patel writes to Mr. Halperin again and says, We've decided to further update the contact for Ravago going forward. Below is the updated contact information for the new representative, and he identifies Mr. Amato.

Do you see that?

A. I do see that.

Q. And Ms. Cohen says updated per the attached.

Do you see that?

A. I see that.

Q. In or around this time, were you made aware that Ravago had additionally named Mr. Amato to serve in the LTAB seat reserved for unsecured creditor interest?

MR. TATA: Objection.

A. No, I don't think I was made aware of that.

Q. Have you ever been made aware of

J. Sinna

that?

A. I don't believe so.

Q. This is the first time you are hearing of it?

MR. TATA: Objection.

A. This is the first time I am hearing about it.

Q. I take it then that you were also not informed that the committee list was updated to reflect those changes?

MR. TATA: Objection.

A. No, I don't believe I was informed the committee list was updated to reflect those changes.

Q. Now, this is May 31, 2025. This is -- strike that.

Did you ever object, in words or in substance, directly or indirectly, to Ravago naming a new designee in place of Mr. Olson?

MR. TATA: Objection.

A. So no, but I don't recall ever knowing that they named a new designee.

Q. Did you -- without regard to the fact that they had named a new designee

J. Sinna

already, did you ever object, in words and substance or in substance, directly or indirectly, to Ravago naming a new designee in place of Mr. Olson?

MR. TATA: Objection.

A. Can you say that again please?

Q. So let me clarify something.

So we just looked at an email where Ravago is identifying designees to replace Mr. Olson, right?

MR. TATA: Objection.

A. Is that a question?

Q. I'm just confirming that you are with me on that.

A. Yes, I see the emails.

MR. MARTIN: Objection.

Q. I asked you whether you objected to Ravago naming a new designee and you said you didn't know that they had named a new designee, so you don't recall objecting to that, correct?

MR. TATA: Objection.

A. Yes, but then also hearing your question, because I asked for clarification.

J. Sinna

I had no basis to -- I would have no basis to provide a view on that and this is the first time I'm hearing of it so that's really all I have to say.

Q. Did you ever become aware -- when did you first become aware that there was potentially an LTAB seat available for Parabellum to fill?

A. I don't recall.

Q. Let's turn to Exhibit 3 --

THE WITNESS: Can we break again?

MR. AYALA: Five minutes?

THE VIDEOGRAPHER: The time is 1:58 p.m. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 2:00 p.m. We are back on the record.

BY MR. AYALA:

Q. So, Mr. Sinna, we were just turning to tab 16 which is Exhibit 3. This, you will recall, is the trustee's objection in which you joined and adopted.

Do you recall that?

A. I see that. Yes, I agree.

J. Sinna

Q. Let's turn to paragraph 24 on page 8.

Do you see paragraph 24, starting with Ravago?

A. I see that, yes.

Q. It says, Ravago, the unsecured creditor which had appointed Mr. Olson, initially proposed another employee to take Mr. Olson's seat.

Do you see that?

A. I do.

Q. Do you have any knowledge of that event happening?

A. No, not until this discussion took place.

Q. This discussion that we are having today?

A. The discussion that colored this filing.

Q. You were not aware of the event described in this first sentence until you were involved in preparing this filing?

A. Yes.

MR. TATA: Objection.

J. Sinna

MR. MARTIN: Form and foundation.

MR. TATA: I will caution the witness not to disclose any substance of any discussions with counsel.

You can answer.

A. I was not made aware of the details until the conversations that colored again this document.

Q. So until you were involved in preparing this document, you were not aware that Ravago initially proposed another employee to take Mr. Olson's seat?

MR. MARTIN: Form and foundation.

MR. TATA: Objection.

A. Yes.

Q. And in the following sentence, it says, But after discussion about whether the seat was Ravago's to designate, Ravago informed the trustee in September that it would not seek to appoint a new designee.

Do you see that?

A. Yes, I see that.

Q. Do you recall any discussion about whether the seat was Ravago's to designate?

J. Sinna

A. No, I don't recall.

Q. Have you ever participated in a discussion about whether under the plan in the litigation trust agreement, Ravago was entitled to designate a new designee in replacement of Mr. Olson?

A. Sorry, to clarify, the discussion that Ravago had the right to designate, that's your question?

Q. Yes. I will say it again.

A. Please.

Q. Have you ever participated in a discussion about whether under the plan or the litigation trust agreement, Ravago was entitled to designate a new designee in replacement of Mr. Olson?

A. I don't recall, no, I don't recall, I don't recall.

Q. You don't recall ever participating in any discussion with anybody about that topic?

MR. TATA: Objection.

A. No, I don't recall discussing Ravago's designation, no, I don't.

J. Sinna

Q. You don't recall participating in any discussion with anybody about the issue of Ravago's designation rights under the litigation trust agreement?

MR. TATA: Objection.

A. No, I don't recall.

Q. I take it then that you do not have any knowledge of the events described after the semicolon in that sentence regarding Ravago's purported determination that it did not have a sufficiently material interest in the bankruptcy to warrant remaining on the board, is that right?

A. Not until discussions I had of the document, similar to the previous.

Q. So to the extent those events actually happened, the only way that you became aware of them was in connection in preparing this file?

MR. MARTIN: Form.

A. Yeah, that's my recollection.

Q. This is a document that you joined in and incorporated into your joinder, correct?

J. Sinna

A. I don't recall. I would have to ask counsel if that's the case.

Q. Mr. Sinna, we can turn back and look at the document. It's Exhibit 2.

A. I'm sorry, what's the question?

Q. We are looking at Exhibit 2, this is the joinder of John Sinna, correct?

A. That looks to be the case.

Q. And in the first sentence, John Sinna hereby joins in the litigation trustee's objection, correct?

A. Yeah, I agree with that.

Q. And John says, Included in the definition of the Parabellum parties, correct?

In the first sentence of paragraph 1 of the document, you join in and adopt the arguments set forth in the objection, correct?

A. Yeah, that looks correct.

Q. To be clear, this was your filing, not just Parabellum's filing.

Do you understand that?

A. Yeah.

J. Sinna

Q. So let's turn back to Exhibit 3 and we will look at paragraph 24. This was the paragraph we were just looking at.

A. Yeah, I see that.

Q. Before adopting what the trustee writes in this document, what did you do to make yourself comfortable that the facts alleged in paragraph 24 are true, without disclosing any attorney-client communications?

MR. MARTIN: Form and foundation.

MR. TATA: I will reiterate the caution that Mr. Ayala gave you.

MR. MARTIN: Do not get into communications with your counsel, period.

A. There is nothing that I can offer that doesn't cross into that.

Q. So in order to make yourself comfortable that the facts alleged in paragraph 24 of the trustee's objection are true, you had conversations with counsel, is that right?

A. I believe that's true, yeah.

J. Sinna

Q. And what counsel are you referring to?

A. I believe that would have been Vivek's team, Elsberg Baker.

Q. Was any other counsel present for that discussion?

A. I don't believe so.

Q. In order to make yourself comfortable with the facts alleged in paragraph 24 of the trustee's objection, did you look at any documents?

A. I don't recall.

Q. When did these discussions happen?

A. I don't recall.

Q. I think we've established that they happened in connection with the preparation of the objection, is that right?

A. I think --

MR. MARTIN: Foundation.

Go ahead.

A. I think that would be a fair thing to say, yeah. I just don't recall when.

Q. That was filed on August 28, 2026.

Do you see that at the top of the

J. Sinna

document?

A. I don't see the top of the document right now. Can we go there?

MR. MARTIN: There is a docket listing on the top.

A. I see it now. I still don't recall.

Q. I'm just asking, do you see that on the top of the document that it was filed --

A. Yeah, I see the date, yeah.

Q. So is it your recollection that in the days leading up to August 28, 2026, you had a conversation with Mr. Tata and his colleagues about this objection?

A. Yes, I believe we had a conversation about this objection.

Q. Other than having a conversation with Mr. Tata and his colleagues about this objection, did you look at documents to make yourself comfortable that the facts alleged in paragraph 24 of the objection are true?

A. I don't recall having looked at documents.

Q. Did you speak with anybody other

J. Sinna

than Mr. Tata and his colleagues about whether the facts alleged in paragraph 24 of this objection are true?

A. No, I don't recall having spoken with anyone else.

Q. Okay. I want you to look at paragraph -- if you could please look at paragraphs 21 through 24 of this objection.

Do you see those?

A. Twenty-one through 24?

Q. Yes.

A. I see those.

Q. Did you do anything to make yourself comfortable that those alleged facts in those paragraphs are accurate other than to have a conversation with Mr. Tata in the days leading up to August 28, 2026?

A. Can I read those?

Q. Yes, of course.

A. No, I don't recall that I did.

Q. Do you recall Ravago ever expressing a view on whether it had a right to identify a designee other than Mr. Olson?

A. No, I don't recall such a view

J. Sinna

being expressed.

Q. You don't recall one way or the other?

A. No.

Q. Do you recall anyone ever considering whether a holder of a general unsecured claim should fill the seat vacated by Ravago?

A. No, I don't recall.

Q. You don't recall one way or the other?

A. No, I don't.

Q. Have you looked for documents concerning that issue?

A. I don't recall looking for documents around that issue.

Q. Are you aware of your counsel looking for documents around that issue?

A. I am not aware of my counsel looking for documents.

MR. AYALA: Let's introduce tab 10 as exhibit -- I think this will be Exhibit 14.

(Exhibit 14, email dated October 3,

J. Sinna

2025, marked for identification, as of this date.)

Q. Do you see this now?

A. Yes, I see it.

Q. This is an email dated October 3, 2025.

Do you see that?

A. I do see that.

Q. And it's an email between Mr. Halperin and Mr. Cheatle wherein Mr. Halperin writes, Heard back from Dipesh Patel. Ravago is prepared to resign from the trust oversight board. The only caveat is that Dipesh's last bill be paid.

Do you see that?

A. I see that.

Q. Do you recall learning in or around this time period that the seat held by Ravago was being vacated?

A. I don't recall.

Q. You don't recall one way or the other whether you were informed of that fact?

A. No, I don't.

Q. When did you first begin discussing

J. Sinna

the prospect of Parabellum being appointed to the LTAB as a full LTAB member with Citadel?
A. I don't recall.
Q. Would it have been after Ravago's seat on the LTAB was vacated?
A. I don't recall.
Q. But you did have conversations with Citadel about that issue before you were actually appointed to the board as an LTAB member?
A. Could you expand on that issue please?
Q. Yeah. So at the outset of Parabellum's acquisition of LTIs and loan participation rights, Parabellum had requested a seat on the LTAB, correct?
A. Yes.
Q. And that request was denied, correct?
A. Correct.
Q. Now, so I want to distinguish that series of events from a later series of events whereby Parabellum was appointed to the LTAB as a full member after serving as an

J. Sinna

ex-officio member.

Does that make sense?

A. Yes, it does.

Q. So focusing on the sequence in which Parabellum was ultimately appointed to the LTAB, did you speak with Citadel about Parabellum being appointed to the LTAB before that appointment occurred?

A. No, I don't recall.

Q. You don't recall having any discussions with Citadel on that topic before Parabellum was appointed to the LTAB?

A. No, I don't.

Q. You don't recall one way or the other?

A. No, I don't recall one way or the other.

Q. Did you look for any documents concerning that issue?

A. I don't believe I did.

Q. Did your counsel?

A. I don't know.

Q. Would your counsel be able to search your documents without your knowledge?

J. Sinna

A. I don't know the answer to that question.

Q. But you recall Citadel being supportive about the prospect of Citadel being appointed to the LTAB, right?

A. At some point, yeah.

Q. Let's turn back to tab 7 which is Exhibit 8. Here in tab 7, this is the email from you to Mr. Thompson and Mr. Conway?

A. Yeah.

Q. You write, Taking us on the board reduces the potential cost or admin burden of finding another party and we also see it as a nice little nod from Citadel with whom we are also working on other potential opportunities.

Do you see that?

A. I see that.

Q. When you say taking us on the board reduces the admin cost or the burden of finding another admin party, what were you referring to?

A. I guess I had in mind a process like what lawyers go through, where you hire

J. Sinna

someone to -- I guess what I envisioned when I wrote that is think of like an employee search thing, when you are paying somebody to find go somebody and it was just related expenses with trying to find someone else to sit on a board, that's what I had in mind there.

Q. Got it.

A. Like you guys go through these too, like someone is hiring litigation resources and, you know, there is a whole process and there is an interview process and everyone pitches and stuff like that. You guys know that. That's what I had in mind.

Q. You wanted to avoid that process?

A. I just thought it could be avoided.

Q. You write, we also see it as a nice little nod from Citadel.

Do you see that?

A. I do.

Q. What did you mean by that?

A. So my view on that was that they just recognized that we are a party of value and they wanted us to be officially on the

J. Sinna

board with them. Simple as that.

Q. Did they ever express why they wanted you to be officially on the board with them?

A. You know, I don't recall, I don't recall.

Q. Who appointed you to the LTAB?

A. So I believe the letter was the trustee and Jonny and Ben.

Q. There was a letter that you received in connection with your appointment to the LTAB?

A. I believe there was, like, an appointment, something, that was Jonny, Ben and the trustee.

Q. Was that produced to us if you know?

A. I don't know.

Q. Do you recall searching for that letter in connection with this matter?

A. I don't.

Q. Do you recall your attorney searching for that letter?

A. No, I don't. I don't recall.

J. Sinna

Q. When did you first discuss with -- strike that.

Setting aside the initial sequence in which Parabellum requested a seat on the LTAB and was denied, when do you recall -- do you recall discussing with the trustee the prospect of you joining the LTAB as a full member?

A. I don't recall.

Q. You don't recall one way or the other?

A. No, I don't.

Q. You don't know one way or the other whether there were documents concerning any such communications?

A. No, I don't.

Q. You have not searched for any documents?

A. No, not that I know of.

Q. Nor has your attorney?

MR. MARTIN: Foundation.

A. I don't know.

Q. Earlier you said, so my view on that was that they just recognized that we

J. Sinna

are a party of value and they wanted us to be officially on the board with them.

How did they express that recognition?

A. I don't recall. It's just a feeling I guess.

Q. They just gave you a feeling in that regard?

A. Yeah, that's my recollection.

Q. You don't recall that they communicated such a view to you in words?

A. I don't recall anything specific like that.

Q. You don't recall one way or the other whether that happened?

A. I don't.

Q. In the same document --

MR. AYALA: Kat, do you mind putting that back up, I'm sorry?

Q. In the same document, you write, We are already observers to the board and have been working with Citadel on related matters since our purchase.

Do you see that?

J. Sinna

A. Yes.

Q. Without divulging the substance of any litigation-related discussion, what were those related matters?

A. I don't think there is anything else I can disclose.

Q. So when you refer to related matters, you are referring to litigation-related discussions?

A. It would be our views on strategy that we share.

Q. With respect to the case that Mr. Halperin is pursuing?

A. Correct.

Q. And you had those discussions when you were observers to the board preceding your appointment to the LTAB prior to appointment as a full LTAB member, correct?

A. Yeah, I would share my opinion.

Q. In connection with your appointment, was there a written resolution?

A. I don't recall of a written resolution.

Q. Did you have to sign anything in

connection with your appointment to the LTAB?
A. I believe so.
Q. What do you recall signing?
A. I don't recall what it is exactly.
Q. You have one document in mind or is it possible there are multiple?
A. I think it's just one.
Q. Have you produced that document in this matter?
A. I'm not sure.
Q. Are you aware of any notice being provided to trust beneficiaries, any present or former representatives of the creditors committee or the court as to your appointment to the LTAB?
MR. TATA: Objection.
A. Just give me one sec.
Thanks for that. No, I am not aware.
Q. How about as to Ravago's seat on the LTAB being vacated?
MR. TATA: Objection.
A. No, I am not aware.
Q. In any discussions you had with

J. Sinna

Citadel, the trustee or Ravago concerning the prospect of your appointment to the LTAB, did you discuss the mandate in section 4.01 of the litigation trust agreement as to the composition of the LTAB without disclosing substance of any such communications?

MR. MARTIN: Form and foundation.

A. Can you go back to 4.01 for me please?

Q. Yes. It is Exhibit 5.

A. Okay. Thank you. I'm sorry, the question again was?

Q. Sorry. The question is, in any discussions that you had with either Citadel, the trustee or Ravago concerning the prospect of your employment, did you discuss section 4.01's mandate as to the composition of the LTAB without disclosing any attorney-client communications?

MR. MARTIN: Form and foundation.

A. No, I don't recall, I don't recall having those discussions.

Q. You don't recall it one way or the other?

J. Sinna

A. Correct.

Q. In what capacity do you sit on the LTAB, in your personal capacity or as Parabellum's representative?

A. I believe I'm Parabellum's representative.

Q. And what is the distinction in your mind?

A. I take it back, because Parabellum doesn't have the right to appoint somebody as far as I see it, but the reason I sit is because Parabellum has the participation with Citadel, so it's sort of a mix, I guess that's the distinction.

Q. What do you mean, the reason you sit is because Parabellum has the participation with Citadel?

A. Well, the absence of participation with Citadel, I wouldn't be around the situation.

Does that make sense?

Q. Why wouldn't you be around the situation in that context?

A. I just don't know how to answer

J. Sinna

that question. I don't know how to answer that question.

Q. Who do you think would be around if you left?

A. I don't know. You would have to ask --

MR. TATA: Objection. Just wanted to get the objection on the record.

A. I'm not sure. I don't know.

Q. Who do you think I would have to ask?

MR. TATA: Objection.

MR. MARTIN: Form, foundation.

A. The other LTAB members.

Q. In Exhibit 8, tab 7.

MR. AYALA: Kat, do you mind putting that back up?

Q. You write, Majority rules, as Citadel has and will continue to control the board anyway.

Do you see that?

A. I do.

Q. Why was that relevant to your email?

J. Sinna

A. It's my recollection -- my recollection was that it was my way of suggesting to my colleagues that this wouldn't become an undue burden where we would have a lot of -- we wouldn't have -- how do I put this? That it sort of remained an observation thing. I don't have another way to put it.

It's not that the third vote isn't unimportant because it is, but it was more my attempt of saying that we are probably not taking on a lot more in terms of time obligation.

Does that make sense?

I'm not doing a great job of describing. Maybe it was poorly written like that, but that was the intent behind it, that we are just sort of one of three and that was it.

Did that answer your question? Maybe not, maybe so.

Q. Help me understand what you mean when you say it sort of remained an observation thing.

J. Sinna

A. I mean, if you need two votes to do anything, hypothetical, we are one of those three votes. The two Citadel representatives wanted to vote together or had the same view. Our view didn't really influence what was then passed on in terms of guidance. It was considered, but in a sense, the other two members had, you know, the vote if they wanted it.

Q. So as a consequence, Parabellum wasn't taking on a lot more in terms of time obligation in connection with the trust?

A. Yeah, it's a weird way to put it and I'm kind of dancing in language, but that was the reason that I guess phrased it like that.

It wasn't like we -- maybe it's better said this way. It wasn't like we were controlling the board because that's just -- it was my attempt of showing that there wasn't any, like, us controlling the board.

Q. As a matter of governance, does the LTAB keep meeting minutes, voting records, attendance or other documentation of its

J. Sinna

meeting or discussion?
A. No, I'm not aware of any of those.
Q. In connection with your role as an LTAB member, through what forms did you communicate with the trustee about trust governance?
A. Me, specifically or speaking to the board's communication?
Q. You, specifically.
A. So that would have been email.
Q. So during the course of Parabellum's participation on the LTAB, it would communicate with the trustee about trust governance through email?
A. If there were communications, they would, yeah, they would be email.
Q. Sitting here today, do you recall having any communications with the trustee about trust governance?
A. About trust governance is your question specifically?
Q. About any topics involving the trust.
A. Oh, yes, I think that we would have

J. Sinna

been receipt of, like, I think he delivers, like, some sort of financial report on a quarterly basis and that's really all I can recall.

Q. So in your experience, serving as an LTAB member, the only email communications -- strike that.

During your tenure as an LTAB member, the only communications you recall with the trustee regarding the trust are financial reports delivered on a quarterly basis?

MR. MARTIN: Form.

A. There are probably others, but I'm thinking of things that I can definitely recall and that's it.

Q. When you say probably others, what are you referring to?

MR. MARTIN: Objection.

A. I mean -- I recall Alan being on other emails, but I'm trying to recall other ones. That's it, yeah. I mean, Alan would have been on emails or in email traffic.

Q. This is email traffic between Mr.

J. Sinna

Halperin and Citadel, the Citadel representatives and you concerning trust-related decisions without disclosing the substance of any of them?

A. I would think so.

Q. Well, do you remember one way or the other?

A. No, but I'm sorry, I'm trying to remember.

Q. Do you think there would be, since the time you were appointed to the LTAB, do you think there would be more than 10 of such emails?

A. I don't know.

Q. Do you think there would have been more than 50 of such emails?

A. I don't know.

Q. Have you ever done anything to assess the quantum of such emails?

MR. MARTIN: Form.

A. I don't recall.

Q. You don't recall ever doing anything to assess the amount of such emails?

MR. MARTIN: Objection.

J. Sinna

A. I don't recall what was done to assess the quantum.

Q. Do you recall anything being done to assess the quantum of the emails you described?

MR. MARTIN: Objection, form.

A. I don't, I don't recall.

Q. So sitting here today, you don't know if it's one email or 100 such emails that exist?

A. Sitting here today, I don't.

Q. Are you aware of your counsel --

MR. MARTIN: Just curiosity, how much longer are we going on this? We are several hours in. It's 1:30 Chicago time. If we are going to go many more hours, we should take a more extensive break, for the reporter, if for no one else, but where do we stand?

MR. AYALA: I'm happy to take a break. I think I'm probably about three quarters of the way through. No promises.

MR. MARTIN: Okay. I'm inclined to

J. Sinna

make a more substantial break here of about half an hour or so, but I'm going to defer to my client.

How are you holding up?

THE WITNESS: I could use a break.

MR. AYALA: That's fine.

Mr. Martin interrupted a question. Let me ask the question and he can answer and then we can take a break.

MR. MARTIN: Sure.

Q. Are you aware of your counsel having done anything to assess how many emails exist between you and the trustee of the type you described?

MR. TATA: Objection.

MR. MARTIN: Form.

A. I think it's part of the discovery requests and, again, I don't remember. There are so many of these things going on.

MR. MARTIN: I'm going to caution you, Mr. Sinna, not to reveal communications.

A. I think something was done in that respect.

J. Sinna

Q. You think something was done.

Without disclosing what the something is, do you know what was done?

MR. MARTIN: Foundation.

Counsel, it was --

MR. AYALA: Mr. Martin, how could a question about whether he knows something be lacking in foundation?

MR. MARTIN: The question is whether the foundation is, whether it lies within communications he had with his counsel, that's the unclear aspect in the predicate of your question, that's the issue.

Go ahead. Does he know?

MR. AYALA: The witness said I think something was done in that respect and all I'm asking is, does he know something was done or does he not know something was done?

MR. MARTIN: John, answer the question as best you can. Do not get into communications with me.

A. Yeah, I think I know something was

J. Sinna

done. I'm sorry, I'm not trying to not answer your question. I'm a little bit confused by the back and forth here.

Q. I'm just trying to clarify your testimony. You said you think you know something was done.

I'm asking you, sitting here today under oath, can you testify with certainty that something was done to assess how many communications of the type you described exist?

A. Yeah, I know something was done, yeah.

Q. Disclosing what was done you say would disclose privileged attorney-client communications, correct?

A. Can I look to John Martin?

MR. MARTIN: The question is, can you get into that without getting into your communications -- disclosing what was done would involve communications with your lawyer, correct?

THE WITNESS: That would, yeah.

MR. AYALA: So, Mr. Martin, you are

J. Sinna

directing him not to answer?

MR. MARTIN: I would direct him not to answer any further questions about what specifically was done.

MR. AYALA: How long do you guys want to take a break for?

MR. MARTIN: I think we need at least a half an hour.

THE VIDEOGRAPHER: The time is 2:39 p.m. We are off the record.

(Luncheon recess taken at 2:39 p.m.)

J. Sinna

A F T E R N O O N   S E S S I O N

(Time noted: 3:10 p.m.)

J O H N   S I N N A, resumed and testified as follows:

THE VIDEOGRAPHER: The time is 3:10 p.m. We are back on the record.

EXAMINATION BY (Cont'd.)

MR. AYALA:

Q. Good afternoon, Mr. Sinna.

Why don't we turn back to tab 7 which is Exhibit 8. At the top of this email chain, there is an, in the to field, it says files at Parabellumcap.com.

Do you see that?

A. I see that.

Q. What is that address used for?

A. My understanding is it's an email inbox where things like updates to cases we are invested around would be sent and then parsed out into the proper folders.

So my understanding is it's sort of like a collection point. I'm not an IT guy, so I'm not your best person on that, but that's sort of my understanding of it.

J. Sinna

Q. Are you aware of any search being conducted of the or in the files address referred to here in connection with this action?

A. No, I'm not.

Q. You are not aware one way or the other?

A. No, I am not.

Q. During your tenure as either an ex-officio board member on the LTAB or a full member of the board, did the LTAB observe any formalities in how it functioned?

MR. TATA: Objection.

MR. MARTIN: Form.

A. You broke up, Marc. Can you ask that again please?

Q. During your tenure as either an ex-officio board member on the LTAB or a full member of the LTAB, did the LTAB observe any formalities in how it functioned?

MR. TATA: Objection.

MR. MARTIN: Form.

A. Not to my knowledge, no.

Q. Is there anybody at Parabellum

J. Sinna

other than you who has responsibilities in connection with the trust?

A. No.

Q. Other than you, is there anybody at Parabellum who played any role in connection with producing documents in this action?

MR. MARTIN: Form and foundation.

A. In producing documents in respect of what please? You broke up again at the end. It could be my end.

Q. Let's just take a step back.

You understand that in this proceeding, Cornell Capital issued document requests to various parties?

A. Yeah, I am aware of those. I am aware of the request.

Q. You understand that in response to those requests, Parabellum produced certain documents?

A. Yes, I am aware of that.

Q. So the question is other than you, is there anyone else at Parabellum who participated in that process of document collection and production?

J. Sinna

A. Yes.

Q. Who else?

A. My chief compliance officer.

Q. And what did he do in connection with that process, without disclosing any attorney-client privileged communications?

MR. MARTIN: Foundation.

A. My understanding is that a document search, email search and, again, I'm not an IT person, so that is what my understanding of that is.

Q. You understand the parameters of the search that you understand that he did?

MR. MARTIN: I'm going to caution the witness not to get into any communications you had with that person and counsel.

Q. Yes or no, do you know the parameters of the search that you understand that he did, without disclosing what those parameters were?

A. I'm aware there are parameters. Do I know what they are like right here, no.

Q. In the same document, do you

J. Sinna

remember we discussed the language that discusses the potential cost or admin burden of finding another party?

A. Yes.

Q. Are you aware of anybody other than you having been considered to fill the seat vacated by Ravago?

MR. TATA: Objection.

A. No, I am not aware.

Q. When you were an ex-officio board member, you received communications from either the trustee or the LTAB members regarding the claims that Mr. Halperin is pursuing?

A. Yes, regarding the claims, I believe so.

Q. Did the trust or the trustee have any procedures in place to prevent disclosing confidential discovery material to you in those communications?

A. Procedures, as an ex-officio member, it was my understanding that I was not supposed to receive confidential information. That's really the extent of my

J. Sinna

knowledge.

Q. Were you aware of the trust or the trustee having any processes or policies in place to prevent you from receiving such information?

A. No, that's the extent of my knowledge.

Q. To your knowledge, did the trustee or any other LTAB member take any steps to prevent disclosing confidential discovery material to you from the Halperin versus Cornell litigation in communications when you were an ex-officio board member?

MR. MARTIN: Form.

A. I'm not aware of any. To my knowledge, am I aware -- say it again please, I am a little twisted.

Q. To your knowledge, did the trustee or any other LTAB member take any steps to prevent the disclosure of confidential discovery material to you from the Halperin versus Cornell litigation in communications when you were an ex-officio board member?

MR. MARTIN: Form.

J. Sinna

A. I don't know. I don't know.

Q. You don't know one way or the other?

A. No.

Q. You don't recall any such steps?

A. I was never made aware of any such steps that they were taking.

Q. Without getting into the substance or identifying any specific documents from the Halperin versus Cornell litigation, have you seen any of the discovery materials produced in that case?

A. Have I seen any discovery materials produced? Hang on. No, I don't recall, I don't recall.

Q. You don't recall one way or the other whether you've seen those discovery materials?

A. No, I don't.

Q. So then I take it you don't recall one way or the other whether you saw any such materials during the period when you were serving as an ex-officio LTAB member?

A. That's correct.

J. Sinna

Q. Without disclosing the substance of any communications, do you have a view on why Mr. Halperin resigned as trustee?

A. Do I have a view on why?

Q. Yes, if you have a view.

MR. MARTIN: Form and foundation.

A. I don't know why he resigned, I don't. Do I have a view, yeah, I probably have a view.

Q. What is that view?

A. I think that --

MR. MARTIN: Pardon me, John, you can answer, but I will throw in a foundation issue.

A. In my personal view, is that what you are asking for?

Q. Yes, the view you referred to.

A. So my personal view is that this has become a lot more work than he signed up for.

Q. And what is your view on why that would motivate Mr. Halperin to resign?

A. I don't have a view otherwise. It's just a view. There is really nothing

J. Sinna

that colors it, that's just my view and it's speculative, but if you wanted a view, that's my view.

Q. Did you ever directly or indirectly receive any communication concerning any reason for his resignation?

A. No, I don't recall having received any communication like that.

Q. Have you ever discussed that topic at any point with either Mr. Cheatle or Mr. Xie?

A. No, I don't recall having discussed that topic.

Q. Have you ever discussed that topic with anybody?

A. No, I don't recall having discussed that topic with anybody.

MR. AYALA: Let's turn to tab 12, the Exhibit 15.

(Exhibit 15, Mr. Halperin's resignation letter, marked for identification, as of this date.)

Q. Based on your answers, would it be accurate to say that Mr. Halperin never told

J. Sinna

you any reason for his resignation?

A. Yeah, I don't recall ever being told the reason by Mr. Halperin.

Q. Do you recognize Exhibit 15?

A. It appears to be his resignation letter.

Q. You see that this letter was addressed to you, Mr. Sinna?

A. I see that.

Q. Do you recall receiving this letter?

A. I don't recall receiving it, but I sort of recognize it, so I don't know.

Q. At the top of the page, it indicates it was filed in the Bankruptcy Court on July 30, 2026.

Do you see that?

A. I do see that.

Q. And who filed this letter on the bankruptcy docket?

A. I don't recall.

Q. Did LTAB file this letter on the bankruptcy docket?

A. I don't recall.

J. Sinna

Q. You don't recall one way or the other?

A. No, I don't.

Q. Do you recall discussing the issue with anybody of whether to file this letter on the bankruptcy docket?

A. Do I recall discussing whether to file this letter on the bankruptcy docket? I think a discussion may have taken place about filing it so, yeah, I think I do recall that.

Q. And who were the parties to that discussion?

A. Give me a sec. So I think -- maybe -- again, it's not perfect, but my recollection would have been the other LTAB members and counsel to the trust.

MR. TATA: At this point, I caution the witness not to disclose the substance of any discussion.

Q. So this was a conversation about filing this letter on the bankruptcy docket that you had with the other LTAB members and counsel to the trust, is that right?

A. I think that's right.

J. Sinna

Q. When you say counsel to the trust, who are you referring to?

A. I believe it was the Elsberg team.

Q. This discussion was before the letter was filed on the bankruptcy docket or after?

A. I don't recall.

Q. Mr. Halperin did not participate in that discussion?

A. I don't recall if Mr. Halperin participated in that discussion.

Q. You don't recall one way or the other?

A. No, I don't.

Q. Do you ever recall discussing with Mr. Halperin the issue of filing this letter on the bankruptcy docket?

A. No, I don't recall ever having had that discussion or any discussion like that.

Q. Do you have any reason to doubt that you received this letter on or about July 1, 2026?

A. Do I have any reason to doubt that I received it?

J. Sinna

Q. On or about July 1, 2026.

A. I don't know why I wouldn't have. My email address is right there, so that's really all I can say. It looks right.

Q. Do you recall discussing whether to disclose the fact of Mr. Halperin's resignation without disclosing the substance of any such discussions?

A. The fact over substance is your question?

Q. I'm asking, do you recall ever having discussions as to whether to disclose the fact of Mr. Halperin's resignation, but in answering that question, I'm not asking you to tell me the substance of those discussions.

Does that make sense?

A. I'm sorry, no. I don't recall any discussion like that, no.

Q. You don't recall ever having a discussion about that topic one way or the other?

A. No, I don't.

Q. At any point in time?

J. Sinna

A. No, I don't recall.

Q. Has a successor trustee been identified?

A. My recollection is -- I believe there were a couple of parties in consideration. That's really all that I recall knowing about that. I think you would have to ask Citadel.

Q. Describe the nature of your involvement in the process to identify a successor trustee without disclosing the substance of any communications that you had on that topic?

A. My involvement has been nil to minimal.

Q. Did Parabellum ever purchase any unsecured claims?

A. No. We -- not that I am aware of.

Q. Did Parabellum ever purchase any class 4 general unsecured claims?

MR. MARTIN: Form.

A. I don't think so.

Do you want to flash that up for me just so I'm not speaking out of school?

J. Sinna

Q. I don't have a document. I'm just asking you what you know standing here.

A. So predicated on, I don't have the documents, so I don't know what those are, I'm going to guess not.

Q. To your knowledge, Parabellum has not --

A. I don't know what a class 4 claim is and I then don't know if I purchased them.

If you show me a document, I can say something, but other than that, I doubt we have.

Q. Who is directly or indirectly funding the trust?

A. Directly funding --

MR. MARTIN: Objection, form.

Q. Directly or indirectly funding the trust?

MR. TATA: Objection.

MR. MARTIN: Form.

A. So directly would be the lenders, Citadel and I think is it Saratoga, is that right?

And what do you mean by indirectly?

J. Sinna

Q. Providing monies that ultimately are used to fund the trust.

A. Okay. Can you expand on that? Like, would my participation be an indirect funding under your definition?

Q. The question is to you, is your understanding that your loan participation plays a role in funding the trust?

A. Not to be cute, money is fungible. The monies that Citadel calls us to fund for the participation are then, in turn, used to fulfill their obligations. As for others, I don't know.

Q. So the sum total of the persons or entities that you are aware of that either directly or indirectly fund the trust are Citadel, Saratoga and Parabellum, correct?

A. You broke up again. Say it again.

Q. So the sum total of the persons or entities that you are aware of that either directly or indirectly fund the trust are Citadel, Saratoga and Parabellum, correct?

A. So my understanding, Citadel and Saratoga, because I believe those two are

J. Sinna

lenders in the capital L sense and that I'm the only party that has a participation.

And in the answer I gave to my previous question, if you assume that that is that, then that would be me and I don't know of any others.

Q. Okay. Are you aware of any holder of an unsecured claim that funds the trust?

A. I'm sorry, Marc, you broke up again.

THE WITNESS: Can we go off record for just a sec?

THE VIDEOGRAPHER: The time is 3:32 p.m. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: The time is 3:33 p.m. We are back on the record.

BY MR. AYALA:

Q. Are you aware of any holder of an unsecured claim that funds the trust directly or indirectly?

A. I don't believe I'm aware of any unsecured holder that funds the trust directly or indirectly -- how about this, I

J. Sinna

am not aware of any of the direct funders that are unsecured claim holders, I think.

I mean, they hold LTI interests. Is that an unsecured claim? Maybe. I mean, what do you consider unsecured claim? I would have to go back, I probably need to see a schedule again because I'm twisting this into a tornado.

Maybe disregard everything I just said. If you want to show me what an unsecured claim is, I can speak to that because I think we may be conflating.

Q. It may be that you don't know the answer to the question which is fine, so let me ask it again and if you don't know, you can say that.

A. Yeah.

Q. Are you aware of any holder of an unsecured claim that funds the trust directly or indirectly?

A. Yeah, I don't think I am aware, no.

Q. Upon a recovery in connection with the litigation trust assets, Parabellum stands to be repaid in respect of its debt

J. Sinna

participation ahead of holders of the litigation trust interests, correct?

MR. TATA: Objection.

MR. MARTIN: Form.

A. I didn't get any of that, I'm sorry. This is so my end, I apologize. I told John Martin this was going to happen and here it is.

Q. That's all right.

Upon a recovery of the litigation trust assets, Parabellum stands to be repaid in respect of its debt participations ahead of holders of the litigation trust interests, correct?

MR. TATA: Objection.

A. My understanding is not necessarily.

Q. And what are the circumstances in which that would not necessarily happen?

A. So I would need to go through my analysis again, but my understanding is that the funding to the trust, you can look at the agreement, my understanding is there are a couple of different ways it can be treated.

J. Sinna

One of those options is the money that the lenders have advanced. That we would have a participation on Citadel's piece, would convert into units so, therefore, that would not then, under my understanding, come ahead of because it would be in the former.

So my answer is then, my understanding is not necessarily.

Q. Outside of those circumstances that you just described, Parabellum would stand to be repaid in respect of its debt participation rights ahead of holders of the litigation trust interest, correct?

MR. TATA: Objection.

A. So you are saying if not for that?

Q. Yes.

A. Then that is a potential, yes.

Q. What is the interest rate on the tranches of the litigation trust financing facility?

A. I would have to see the document. I don't recall off the top of my head.

Q. Are there any premiums payable in

connection with the tranches of the litigation trust financing facility?

MR. TATA: Objection.

A. I would have to see the document. I don't recall off the top of my head.

Q. It is possible that an outcome in this matter could result in Parabellum being repaid in respect of its debt participation interest while holders of allowed general unsecured claims receive nothing, correct?

MR. TATA: Objection.

A. I believe there are scenarios that exist where that could be the case.

Q. Collectively, Parabellum has --

A. Can I take that back? Actually, I don't think that's the case.

I think that, and I'm going to go a little bit, I believe the scenario I'm speaking to is where it's not zero, I don't believe zero is right. I believe there is always some recovery that would accrue to the, I will call it the LTI holders.

I would have to look at everything again, I don't have it in front of me, but

J. Sinna

that's just where I'm sitting right now.

Q. There are scenarios where Parabellum could -- strike that.

There are scenarios where an outcome in this matter could result in Parabellum receiving payment in respect of its debt participation interest that exceed the values that holders of allowed general unsecured claims receive from the trust, correct?

MR. TATA: Objection.

A. You are asking the question, there are scenarios where in respect of our debt participation, our economic receipt would exceed and then -- give me a little more detail. When you say exceed, what do you mean by that?

Q. So let me just try to ask the question a different way. Maybe it will elucidate the issue.

A. Please.

Q. There are scenarios where an outcome in this matter could result in Parabellum receiving a payment in respect of

J. Sinna

its debt participation interest, the quantum of which exceeds the value that holders of allowed general unsecured claims receive from the trust in connection with that outcome, correct?

MR. TATA: Objection.

A. Again, without having it in front of me, I can't speak with certainty. Yeah, I can't speak with certainty on that matter.

Q. So you don't know the answer to that question sitting here today?

A. Not off the top of my head, no.

Q. Parabellum has invested over $9 million to obtain its position in the trust debt and Citadel's LTIs, correct?

MR. TATA: Objection.

A. I believe that's correct.

Q. To your knowledge, will any holders of allowed general unsecured claims be required to pay for LTIs?

A. I'm so sorry, Marc, can you say that again? Can I turn my camera off, is that not allowed?

Q. Let's try to give it a little

J. Sinna

longer, but if it continues to be an issue, we can.

A. I may have to go off and on. I'm sorry, you broke up midway. Every question is going this way.

Q. That's fine. To your knowledge --

A. To my knowledge.

Q. -- will any holders of allowed general unsecured claims be required to pay for LTIs?

A. Pay for LTIs.

MR. TATA: Objection.

A. I don't know the answer to that question.

Q. In connection with potential outcomes of the -- I will start again.

In connection with potential outcomes of the Halperin v. Cornell Capital, et al., matter, could Parabellum's interest diverge from the interests of holders of allowed general unsecured claims?

A. No, I believe we are aligned.

Q. In all circumstances?

A. Yeah, I believe we are aligned.

J. Sinna

Q. And what is your basis for that?

A. So this is conceptual. I'm thinking about the totality of the situation where the bigger the pie, the bigger the pie is really better for everyone, like, that's just kind of -- I think that speaks for itself. That's really what I'm thinking of.

I mean, our interests are in being efficient in terms of capital deployment, in maximizing the returns on that and the pot is there for everybody.

Q. And you agree that Parabellum, in respect of its debt participation rights, has a repayment right that holders of general unsecured claims don't have, correct?

A. We have repayment rights.

Q. In respect of your debt participation rights and in connection with an outcome in respect of the litigation trust assets.

A. Okay. I'm following.

Q. Parabellum has a repayment right that holders of general unsecured claims do not have, correct?

J. Sinna

A. I guess -- I don't have a clear view of what the general unsecured payment rights are.

If you are speaking of them having LTI units which I guess is the way I'm thinking about it, it's not necessarily.

Q. I take it then that you are referring to the scenario where I think you described it as a conversion of your debt participation rights into LTIs, correct?

A. Again, yes, but I don't have this in front of me, so I'm going on belief and you are asking me my view as I stand, yes.

Q. Understood. Absent such a conversion scenario, do you agree that Parabellum, in respect of its debt participation rights -- do you want to log off and log back in?

A. Yeah. Do you mind?

THE VIDEOGRAPHER: The time is 3:45 p.m. We are off the record.

(Off the record.)

THE VIDEOGRAPHER: The time is 3:36 p.m. We are back on the record.

J. Sinna

BY MR. AYALA:

Q. So just to close the loop on this, you had identified a scenario where, as I understood it, Parabellum's debt participation rights would be converted into LTIs, you referred to that earlier?

A. That's what I recall.

Q. In a scenario where Parabellum does not undertake such a conversion, you agree that in respect of its debt participation rights and in connection with an outcome in the Halperin v. Cornell matter, Parabellum would be entitled to repayment rights that holders of general unsecured claims would not have, correct?

MR. TATA: Objection.

A. So Citadel would be entitled to those and then I guess we would have rights through our participation, so that's the way I -- just to put a little spin on it.

Q. So other than Citadel, Saratoga and Parabellum, holders of general unsecured claims in a scenario where there is no conversion would not have the same repayment

J. Sinna

rights as Parabellum?

MR. TATA: Objection.

A. So I think that's the case, but again, I don't have it in front of me, that's from recollection.

Q. Okay. Let's turn to tab 2 which is Exhibit 5.

In front of you -- let's get to the page. It should be page 10 of the document.

Do you see section 3.01, Mr. Sinna?

A. I do, I see it.

Q. Are you familiar with this section?

A. I think I read it before, as I read the document before, so yes.

Q. Other than reading the document in full, you don't recall any instance in which you looked at this provision in particular?

A. No, I don't.

Q. About halfway down the paragraph, it states, The litigation trustee and the litigation trust advisory board shall act in the best interests of all the litigation trust beneficiaries and furtherance of the purpose of the litigation trust.

J. Sinna

Do you see that?

A. I do.

Q. Have you ever reviewed that sentence other than your review of the entire agreement?

A. I don't recall that I have, no.

Q. Do you recall that sentence from the time you reviewed the entire agreement?

A. No, I can't say that I do.

Q. Do you have an understanding of what the obligation set forth in the sentence entails?

A. Do I have an understanding of the obligation?

Q. Yeah. Do you have an understanding of the obligation that this sentence -- strike that.

Do you have an understanding of what the obligation set forth in this sentence entails?

A. I have an understanding.

Q. You do have an understanding?

A. I probably have an understanding.

Q. What is your understanding?

J. Sinna

A. That the purpose -- the trustee and the trust advisory board are -- it sort of stands on its own. What else can I say?

Q. So you don't have any view of what it means other than the literal meaning of the words in the sentence?

A. No, not really. I just think it stands on its own.

Q. Do you have a view of whether Parabellum was able to act in the best interest of all the litigation trust beneficiaries?

A. Is Parabellum able?

Q. Yes.

A. I don't know that I have a view on that either right now.

Q. Do you have a view on whether you are able to act in the best interests of all the litigation trust beneficiaries?

A. I don't know that I have a view on that as I sit right now either.

Q. Let's turn to tab 4 which is Exhibit 6.

Let's go to, Mr. Sinna, you see

J. Sinna

this is the participation agreement for InstaLit Funding 1, LLC?

A. I see that.

Q. Let's turn to the page ending in Bates stamp Para B-7.

One quick question. Do you see section 10(b)?

A. Yes, I do.

Q. Do you see in that section, it says, Seller agrees to use good faith efforts to invite buyer to participate with seller in scheduled substantive meetings with the litigation trustee and advisors to the borrower, including, but to the limited to, legal and financial advisors?

Do you see that?

A. Yes, I see that.

Q. Did you participate in such meetings?

MR. TATA: Objection.

Q. Sorry, did you participate in such meetings?

MR. TATA: Same objection.

A. Yes.

J. Sinna

Q. You participated in such meetings before you were appointed as a full member of the LTAB, correct?

A. I joined them in an observer capacity.

Q. And in that capacity, you participated in the meetings referred to in section 10(b)?

A. If participation means, like, hitting the join button, then yeah.

Q. Are you saying that the extent of your participating in such meetings was hitting the join button?

A. If that counts as participation and listening in, then that's my recollection.

Q. Did you do anything else in those meetings before you were appointed as a full LTAB member other than hitting the join button and listening in?

A. I don't recall having done anything else.

Q. You don't recall one way or the other, right?

A. No, I don't.

J. Sinna

Q. Looking at section 10(a). I would ask you to look at the first sentence of 10(a) where it says, On and after the settlement date, seller shall have sole authority to make, grant and exercise or refrain from making, granting and exercising all votes, whether pursuant to amendments, consents or waivers and otherwise, to exercise or refrain from exercising all other rights and remedies with respect to the participated rights.

Do you see that?

A. Yeah, I see that.

Q. What does the term participated rights refer to?

A. Can we find that? Is that not defined in the document?

Q. If you turn to the pages ending in 2 and 3, you will see at the end of paragraph 1(b) extending on to page 3, a definition of participated rights.

A. Yeah. So those are all above them, is that what you are saying?

Q. It says, The debt participated

J. Sinna

rights and the LTI participated rights are collectively referred to herein as the participated rights.

Do you see that?

A. Yeah, I do.

Q. LTI participated rights refers to the LTIs that Parabellum acquired from Citadel?

A. I believe so.

Q. So --

A. At this point, it would be the participation, but eventually, they were assigned, so just to keep the chain running.

Q. So to make sure I understand your comment, what you are saying is the term participated rights, insofar as it concerns LTI participated rights, refers to the LTIs after Citadel transferred them to Parabellum?

A. At the time the participation agreement was signed, we didn't own any rights, LTIs, right, those were then assigned under the assignment agreements, so here they were just participated, just they're still party to a participation, so just clarifying

J. Sinna

that because I think you may have been suggesting otherwise.

Q. Do you understand section 1(b) to be referring to the transfer of the LTIs from Citadel to Parabellum which was ultimately effectuated?

A. Do I understand this to be addressing the transfer?

Q. Yes. Put differently, you understand the participation agreement to have a relationship to the transfer of LTIs from Citadel to Parabellum?

MR. MARTIN: Form.

A. I would have to read it in detail, but there is language in it that discusses how you would have the rights to have whatever, we are using the term elevation, that's sort of where my understanding right as I sit goes, I would have to read it again in detail.

Q. Okay. Under paragraph 16, did -- which is on the page ending in 9.

A. Yeah.

Q. Did Parabellum exercise or did

J. Sinna

Parabellum make an elevation request in respect of the LTI participated rights?

MR. TATA: Objection.

A. I believe that went with the assignment which would have been -- we kind of have gone through that.

Q. I'm asking, is it your understanding that Parabellum made an elevation request in respect of its LTI participated rights under this paragraph of the participation agreement?

A. Let me just read it again.

Q. Sure.

A. I believe that went with the elevation for the assignment of the LTI units.

THE WITNESS: Can I take a two-minute bathroom break?

MR. AYALA: We can take five minutes.

THE VIDEOGRAPHER: The time is 3:59. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 4:15

J. Sinna

p.m. We are back on the record.

BY MR. AYALA:

Q. Without disclosing the substance of any communications, did you ever ask the trustee why he resigned?

A. No, I don't recall asking the trustee why he resigned.

Q. Do you think that issue is relevant to your role as an LTAB member?

MR. MARTIN: Form.

A. No.

Q. Why not?

A. Because my role is to work with the other LTAB members to provide guidance to the trustee, whoever that is.

Q. So from your perspective as an LTAB member, it's irrelevant what the reasons were for Mr. Halperin's resignation?

MR. TATA: Objection.

A. From my perspective, the reasons for -- I would say no, because it doesn't change what I would do as a board member, which is provide the same guidance I guess.

Q. Okay. Did you ever consider asking

J. Sinna

him what the reasons were?

A. Yeah, you know, I think I did. Yeah, I don't recall that I did. No, I don't recall that I did.

Q. So just to clarify the record, you said, you know, I think I did. Yeah, I don't recall that I did.

A. No, I don't recall that I did.

Q. So you don't recall ever considering asking Mr. Halperin what the reasons for his resignation were?

A. That's correct.

Q. How would you characterize the frequency of your communications with Mr. Halperin since you were appointed an LTAB member, a full LTAB member?

A. Very, very infrequent to nearly zero.

Q. Earlier you mentioned a compliance member who participated in the document collection and production process.

A. I did.

Q. What's the name of that person?

A. Her name is Tamara Conway.

J. Sinna

Q. Let's go to tab 15, Exhibit 2. This, again, is your joinder.

Do you see that, Mr. Sinna?

A. Yeah, I see that.

Q. What did you do to make yourself comfortable with the statements and allegations in this filing before it was filed?

A. Discussed them with counsel.

Q. And the counsel you are referring to is Mr. Tata?

A. Correct.

Q. That was in connection with the process of preparing this document?

A. Correct.

Q. And there is no other counsel that you are referring to, correct?

MR. MARTIN: Form.

A. I recall it just being Vivek's team.

Q. Other than speaking with Mr. Tata and his team, did you do anything else to make yourself comfortable with the allegations and statement in your joinder?

J. Sinna

A. No, just discussions with counsel.

Q. And let's turn to tab 16 which is Exhibit 3. This is the trustee's objection in which you joined and adopted.

Do you see that?

A. I see.

Q. Other than speaking -- what did you do to make yourself comfortable with the assertions and allegations in this document before it was filed?

A. Spoke with counsel.

Q. And the counsel you are referring to is Mr. Tata and his team?

A. Yes, I think that's correct.

Q. And are you referring to the same conversation that you were just referring to in respect of your joinder?

A. I don't recall.

Q. But it was a discussion with Mr. Tata and other lawyers at Elsberg Baker in connection with the preparation of this filing?

A. Yeah, and I could have spoken with John Martin as well on these two, I'm sorry,

J. Sinna

I'm looking at these. Those conversations could have occurred as well, I -- so I guess that's probably realistic.

Q. And before joining in and adopting the statements set forth in the trustees's objection, did you do anything other than speak with Mr. Tata and others at his firm and potentially Mr. Martin?

A. No, I don't believe I did.

Q. Was anybody else at Parabellum responsible for considering either Parabellum's joinder which is Exhibit 2 or the trustee's objection which is Exhibit 3 before they were filed before this court.

MR. MARTIN: Try to be cautious here, Mr. Sinna. I'm concerned you are going to know some of this from communications with counsel. If you can answer without reference to that, so be it.

THE WITNESS: If I can answer without reference to conversations to counsel?

MR. MARTIN: Correct. What you

J. Sinna

would know from communications -- you were represented --

MR. AYALA: Why don't I reask the question?

MR. MARTIN: Let's start with that.

Q. Can you identify the name of anybody at Parabellum other than you who considered the joinder that is Exhibit 2 or the trustee's objection at Exhibit 3 before it was filed?

A. I think it would have just been counsel.

Q. And the counsel you are referring to is who?

A. I think it would be John Martin and Vivek's team. That could be my recollection.

Q. Anybody else?

A. I mean, could my general counsel have been involved? That's really all I can think of.

Q. To your knowledge, was your general counsel involved in that process?

A. I don't recall, I'm sorry, I don't recall. I'm trying to remember. I don't.

J. Sinna

Q. We are nearing the end here, so hopefully we will have you out of here.

Turn to tab 14 which will be Exhibit 16 now, is that right?

(Exhibit 16, document titled Parabellum Capital, LLC's Responses and Objections to Cornell Capital, LLC's Subpoena Duces Tecum, marked for identification, as of this date.)

Q. Do you recognize this document, Mr. Sinna?

A. Yeah, I've seen this.

Q. What is this?

A. It's titled Parabellum Capital, LLC's Responses and Objections to Cornell Capital, LLC's Subpoena -- I'm not a lawyer or a Latin enthusiast, something in Latin, duces tecum.

Q. Did you review this before it was served in this action?

A. Yes, I looked through this.

Q. Turn to page 3. Do you see starting on page 3 that there are a series of questions for production 1 through 5 that

J. Sinna

extend on to page 5?

A. Can you zoom out for a minute? I don't see 1 through 3. I see 8 through 12.

MR. AYALA: Kat, do you mind showing the request and responses for requests 1 through 5?

A. Here we go.

Q. Why don't we start at 1.

So you see that request for production No. 1 calls for documents sufficient to show a variety of items?

A. I see that.

Q. Do you see that the same language is used in request for production No. 2?

A. Yeah, I see that.

MR. AYALA: Kat, do you mind scrolling down to show 3, 4 and 5?

Q. Do you see that the request 3, 4 and 5 also call for documents sufficient to show a variety of topics?

A. I do see that, yeah.

Q. You broke up there.

Do you see request 3, 4 and 5 also call for documents on a variety of topics?

J. Sinna

A. Yeah, I see that.

Q. Is it your understanding that you and Parabellum have satisfied those requests?

A. I believe we have.

Q. In respect of each of the requests 1 through 5, what did you do to determine that you identified the documents sufficient to show the topics listed in requests 1 through 5?

MR. MARTIN: Foundation.

A. I worked in conjunction with counsel based on the requests.

Q. And what did that work that you are describing involve, without disclosing any attorney-client communications?

A. I believe searches were done in order to look, based on the requests, that's my understanding.

Q. You understand the searches to have been done by the compliance person you mentioned?

A. I believe counsel and compliance.

MR. MARTIN: We are getting pretty close to the realm where I'm going to

J. Sinna

assert privilege.

MR. AYALA: That's fine.

Q. Other than that, did you do anything to form the view that you have produced documents sufficient to show the topics listed in requests 1 through 5, without disclosing any attorney-client communications?

A. No, I was -- no.

Q. Did you look at any documents to form that conclusion?

A. Did I look at any documents, I don't recall. I'm sorry, I don't, I don't.

Q. Okay. If you turn to request for production No. 6 which is on page 6 of the document.

A. Yeah.

Q. This calls for -- you can read it. You see request for production No. 6?

A. Yes, I see that.

Q. Are there documents predating your appointment to the LTAB concerning whether your appointment to the LTAB complies with the plan, the LTA or any other governing

J. Sinna

instruments?

MR. MARTIN: Form.

Could you, Madam Court Reporter, can you read the question back?

(Record read.)

Q. Why don't I reask the question. The question is, are there documents predating your appointment to the LTAB concerning whether the appointment complies with the plan, the litigation trust agreement or any other governing instruments?

MR. MARTIN: Form.

A. Not to my knowledge.

Q. You don't know one way or the other?

A. No, not to my knowledge.

Q. Looking at request for production No. 7.

Do you see that?

A. Yes, I see that.

Q. Are there documents reflecting your involvement in trust governance?

A. Not to my knowledge.

Q. Request No. 8, are there documents

J. Sinna

concerning your or Parabellum's involvement in litigation-related decisions and deliberations, and I'm not asking you to disclose the substance of any of those documents?

MR. MARTIN: Form.

A. Can you repeat the question please? I think I know where you're going, but just clarify please.

Q. Sure. Without disclosing the substance of any litigation-related documents.

A. Okay.

Q. Are there documents reflecting Parabellum's involvement in litigation-related decisions and deliberations?

MR. MARTIN: Form.

A. Documents?

Q. Any form of document, communication, email, text.

MR. MARTIN: Form.

A. Yes.

Q. What form do those documents take?

J. Sinna

A. Email.

Q. Who are the parties to those emails?

A. Parties to those emails would be the other LTAB board members, so Jonny and Ben, Vivek and his team at Elsberg, and then we covered this earlier, but sparingly, Alan.

Q. If you look at request No. 9, are there documents showing any reasons for the trustee's resignation to your knowledge?

A. Not to my knowledge.

Q. And earlier, you testified that your communications with Mr. Halperin since you were appointed an LTAB member, as a full LTAB member, were very, very infrequent to nearly zero.

Do you recall that?

A. Yes, I recall that.

Q. Given those circumstances, how are you, as an LTAB member, able to advise, assist and supervise the litigation trustee in the administration of the litigation trust?

A. As I mentioned, I'm one of three

J. Sinna

members, so it's not necessarily my understanding or my duty as one of the three members is not necessarily to have direct communications with frequency, so I would say that other members of the trust had more frequent communication and had then provided the collective decision to Alan and at times, I have been included on those and that's been what -- what was my phraseology, minimum to zero, something like that, so it's my understanding of how that worked.

Q. Why would two of the three LTAB members exclude the third LTAB member in communications with the trust concerning management of the trust?

MR. TATA: Objection.

MR. MARTIN: Foundation.

A. I guess I don't see it as exclusionary. I just, you know, like, the message, it was just delivered by some subset.

Q. Have you ever discussed the dynamic in which the other members of the LTAB had more frequent communications with the trustee

J. Sinna

than you with anybody?

A. Have I discussed the dynamic?

Q. Have you discussed with anybody the dynamic you are describing in which the other members of the LTAB have more direct communications with the trustee than you?

A. No, I don't recall, I don't recall it coming up.

Q. Do you have any understanding or view as to what the rationale is for that?

A. Understanding or view of the rationale?

MR. MARTIN: Foundation.

A. Not really. I don't really have an understanding or a view.

Q. Have you ever asked anybody what the rationale is for that?

MR. TATA: Objection.

A. No, I don't recall having done that.

Q. Have you ever considered asking anybody what the rationale is for that?

A. Not really, no.

MR. AYALA: Okay. I have no

J. Sinna

further questions at this time.

Thank you, Mr. Sinna.

MR. MARTIN: Anybody else have questions?

MR. MENNITT: No questions.

THE COURT REPORTER: Who wants a copy of the transcript?

MR. TATA: We will take one.

MR. AYALA: Cornell Capital would like a copy.

MR. MARTIN: We will take one as well.

MR. MENNITT: And Citadel as well.

THE VIDEOGRAPHER: The time is 4:37 p.m. We are off the record.

(Time noted: 4:37 p.m.)

- - -

I N D E X

- - -


JOHN SINNA PAGE

By Mr. Ayala 5


- - -

E X H I B I T

- - -


EXHIBIT PAGE

Exhibit 1 Confirmation order issued by the court in the Instant Brands bankruptcy case 6

Exhibit 2 Joinder filed in the Corelle Brand's Chapter 11 case 8

Exhibit 3 Litigation trustee's objection to Cornell Capital's motion for expedited discovery and response to order to show cause 11

Exhibit 4 Email chain between Mr. Halperin, Mr. Cheatle and Ms. Cohen 15

- - -

E X H I B I T

- - -


| EXHIBIT | PAGE |
| --- | --- |
| Exhibit 5 Litigation trust agreement | 20 |
| Exhibit 6 Participation agreement between Parabellum, LLC and Citadel | 32 |
| Exhibit 7 Internal Parabellum schedule | 35 |
| Exhibit 8 Internal emails to Parabellum | 71 |
| Exhibit 9 Common interest agreement | 86 |
| Exhibit 10 Email exchange between Mr. Sinna, Mr. Xie and others | 93 |
| Exhibit 11 Document dated March 3, 2025 | 119 |
| Exhibit 12 Email between Mr. Patel, Mr. Halperin and Ms. Cohen | 122 |
| Exhibit 13 Email chain | 124 |
| Exhibit 14 Email dated October 3, 2025 | 139 |
| Exhibit 15 Mr. Halperin's resignation letter | 171 |

- - -
E X H I B I T
- - -


| EXHIBIT | PAGE |
| --- | --- |
| Exhibit 16 Document titled Parabellum Capital, LLC's Responses and Objections to Cornell Capital, LLC's Subpoena Duces Tecum | 205 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Request for Production of Documents

Page Line Page Line Page Line

None

- - -

Stipulations

Page Line Page Line Page Line

None

- - -

Questions Marked

Page Line Page Line Page Line

None

- - -

To Be Filled In

Page Line Page Line Page Line

None

- - -

CERTIFICATE

I HEREBY CERTIFY that the witness, JOHN SINNA, was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Leslie Fagin
_______________________________
Leslie Fagin,
Registered Professional Reporter
Dated: September 9, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

ACKNOWLEDGMENT OF DEPONENT

I, , do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

JOHN SINNA DATE

Subscribed and sworn to before me this day of , 2026.

My commission expires:

Notary Public

- - - - - -
E R R A T A
- - - - - -

PAGE LINE CHANGE



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Kendra Suggs (E: KSuggs@MagnaLS.com | C: 407-716-6624)

**Director of Production Services:**
Ron Hickman (E: RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**ab** 27:24 28:6,9 28:16 30:14
**able** 72:14 142:24 192:11 192:14,19 211:21
**about** 10:10 13:22 62:2,25 63:18 65:11 67:9,24 70:6 70:13,21 71:4 71:12 75:15 77:11 79:23 83:17 85:4,12 87:10 93:24 96:12 98:12,18 125:9 127:8 131:18,24 132:4,14,21 133:3 137:15 137:17,19 138:2 141:9 142:7 143:5 149:21 155:6 155:14,20,21 155:23 158:22 159:3 160:8 162:4 173:10 173:21 174:22 175:2,22 176:8 179:25 187:4 188:7 190:20
**above** 195:23
**absence** 151:19
**Absent** 23:3 188:15
**absolutely** 18:8 19:16 61:21
**accepted** 103:14
**accordance** 115:18
**accordingly** 47:21
**accrue** 29:6
183:22
**accurate** 10:23 67:5 138:16 171:25
**acknowledge** 4:19,23
**ACKNOWLE...** 220:2
**acquired** 21:13 44:25 196:8
**acquiring** 35:14 40:2 111:8,19 112:22
**acquisition** 1:7 34:4 40:23 41:4 43:19 45:7 77:22 119:9 120:7,15 120:17,20 141:15
**Acquisitions** 4:6
**act** 25:6 82:3 84:5 190:22 192:11,19
**action** 82:12,20 83:7,21 164:5 165:7 205:21
**actions** 47:25 76:10
**acts** 82:7,10,16 83:4 84:2,20
**actually** 50:10 51:17 109:19 133:18 141:10 183:16
**add** 123:15 125:17
**adding** 79:20,21
**addition** 41:25
**additional** 11:6 56:16 57:8,11 58:7 60:13 66:14
**additionally** 126:19
**address** 38:12
125:25 163:17 164:3 175:4
**addressed** 95:2 172:9
**addressing** 197:9
**admin** 143:13,21 143:22 167:3
**administer** 4:25
**administered** 4:24
**administration** 211:23
**adopt** 9:20 134:18
**adopted** 9:24 12:13 129:23 202:5
**adopting** 135:6 203:5
**advanced** 182:3
**advice** 9:17 11:14,16 111:13,21 112:5
**advise** 211:21
**advisors** 3:4 193:14,16
**advisory** 23:4 24:10,13 25:3 25:6,14,24 27:12 73:7 105:21 106:2,6 106:15 107:8 114:2,23 115:16 190:22 192:3
**affirmative** 25:2 25:13,22 26:6 26:15 27:4
**after** 33:10 69:11 78:14,18 82:15 131:18 133:9 141:5,25 174:7 195:4 196:19
**afternoon** 163:10
**again** 18:12 20:24 21:25 26:10 31:18 36:8 39:17 40:25 43:13,23 65:9,10 78:17 85:7 98:21 102:24 104:15 109:21 116:15 124:9 126:7 128:7 129:12 131:8 132:11 150:13 159:19 164:17 165:10 166:10 168:17 173:15 178:19 178:19 179:11 180:8,16 181:22 183:25 185:8,23 186:17 188:12 190:5 197:20 198:13 201:3
**aggregate** 62:8
**aggregated** 35:18
**ago** 7:6
**agree** 5:3 10:5 13:5,7 31:11 31:23 43:21 45:9 47:14 50:7 51:23 52:3,8 60:2 65:12 66:25 67:3 105:24 106:3 129:25 134:13 187:13 188:16 189:10
**agreed** 59:20 84:8
**agreement** 6:8 11:5,10 13:2 17:16 18:15 19:21 20:22
21:4,19,24 24:6 25:9 27:16 28:24 29:3,8 32:6,19 34:13 37:17,19 38:10,19 42:10 42:14,21 43:4 44:14,17,21,22 45:5,6,13 47:7 47:10 55:2,3 58:5,18,21 59:5,21 60:9 60:25 61:2 66:20 69:19 74:10 81:19 84:12 85:14 86:13,21,22 94:12,19,24 103:16,25 107:2,14 108:7 108:20,25 109:14,16,25 111:4,11,23 113:2,10,25 116:3,3,7,9,20 132:5,15 133:5 150:5 181:24 191:6,9 193:2 196:21 197:11 198:12 209:11 216:6,7,13
**agreements** 10:11 11:3 12:22 37:2 43:14 44:6 65:5 74:15 81:3,13 107:21 108:17 196:23
**agrees** 81:24 84:2 193:11
**ahead** 31:15 53:18 62:20 65:3 103:9 112:9 125:11 136:21 160:16 181:2,13 182:7

182:14
**al** 1:7 4:7 186:20
**Alan** 156:21,23 211:8 212:8
**Alan's** 17:4
**ALEXANDER** 2:12
**ALIFEROV** 2:7
**aligned** 186:23 186:25
**all** 2:2 3:2 4:10 11:20 31:25 39:23 54:2 56:14 65:5,6 65:12 70:20 103:19 117:16 117:18,20 129:4 156:4 160:19 175:5 176:7 181:10 186:24 190:23 192:12,19 195:8,10,23 204:20
**allegations** 201:8,25 202:10
**alleged** 135:9,21 136:10 137:21 138:3,15
**allocated** 34:11 35:3,19 48:2 48:17 49:4 50:4,15,21 51:8,22 52:13 52:22 53:11 54:7 114:13
**allocation** 49:6 49:13,24
**allowed** 18:23 29:23 48:4 50:6,23 51:9 53:10,15 54:6 75:21 183:10 184:9 185:4,20 185:24 186:9
186:22
**allowing** 19:2,10 19:22 20:8,11
**allows** 18:13 20:6
**alongside** 73:9
**already** 30:3 48:8 86:8 128:2 147:22
**also** 3:8 6:3 43:20 73:6 80:25 127:9 128:24 143:14 143:16 144:18 206:20,24
**always** 183:22
**am** 4:19 5:4 6:4 8:10 27:14 32:17 41:14 42:25 46:19 70:23 102:12 104:23 105:3 124:21 127:7 139:20 149:19 149:24 164:9 165:16,16,21 167:10 168:17 168:18 176:19 180:2,22
**Amato** 126:11 126:20
**amend** 48:24
**amended** 66:21 94:11
**amendments** 195:8
**Americas** 2:19
**among** 15:9 82:10 100:17 120:25
**amount** 34:2,25 35:12,18 37:7 37:21 56:9,13 57:3,7,10,10 58:7 62:3 66:21 157:24
**amounts** 58:5 60:18 61:3,3
**analysis** 80:2 181:22
**and/or** 219:12
**another** 38:3 130:9 131:12 143:14,22 153:8 167:4
**answer** 19:5,7 19:13,15,17 20:2,16 26:22 28:12,19 31:8 31:16 35:16 37:12 38:10,13 48:21 49:18 50:25 52:2,19 53:18 54:9 56:25 57:13,22 57:23 60:5 64:22 67:21 74:4 78:22 83:11 99:20 102:9,21 104:10,22 105:5 107:11 110:22 111:15 113:3,6 116:14 117:3 118:9 119:11 131:6 143:2 151:25 152:2 153:21 159:10 160:22 161:3 162:2,4 170:14 179:4 180:15 182:9 185:11 186:14 203:20,22
**answered** 52:17
**answering** 102:23 175:15
**answers** 51:15 171:24 220:4
**anticipated** 85:13
**anybody** 17:10
72:20 90:6 94:6 96:10,22 96:24 97:3 115:9,11 117:10,13,15 117:18,20 132:21 133:3 137:25 164:25 165:5 167:6 171:16,18 173:6 203:11 204:8,18 213:2 213:4,17,23 214:4
**anyone** 89:14 138:6 139:6 165:23
**anything** 6:9 76:7 94:21 113:8 138:14 147:13 148:6 148:25 154:3 157:19,24 158:4 159:13 194:17,21 201:23 203:7 208:5
**anyway** 152:21
**apologize** 15:21 181:7
**appear** 12:14 31:20
**appears** 16:21 17:3 34:3 36:23 37:23 38:2 71:25 81:14 94:25 123:10 172:6
**apply** 219:11
**appoint** 131:21 151:11
**appointed** 114:3 114:13,17,24 115:18,20,22 116:10,11,22 116:23 121:15
130:8 141:2,10 141:24 142:6,8 142:13 143:6 145:8 157:12 194:3,18 200:16 211:15
**appointment** 11:3 142:9 145:12,15 148:18,19,22 149:2,15 150:3 208:23,24 209:9,10
**Appreciate** 58:2
**approval** 16:24 27:13 106:23 107:25 108:22
**approved** 14:5 14:13,23 73:7
**approximately** 35:9
**April** 47:7
**aren't** 63:3
**arguments** 9:21 9:25 134:19
**around** 75:23 79:22 80:4,13 80:14,18 97:24 120:18 123:18 123:25 124:4 124:10 126:18 139:17,19 140:18 151:20 151:23 152:4 163:20
**aside** 113:7 146:4
**ask** 51:14 57:21 62:2 70:22 72:9 76:7,24 77:24 80:24 104:15 108:11 109:21 116:15 124:9 125:8 134:3 152:7,12 159:9 164:16

176:9 180:16 184:19 195:3 199:5
**asked** 52:16 61:23 73:21 74:6,19 75:9 75:12 89:8 112:21 128:18 128:25 213:17
**asking** 14:19,21 16:2,9,10 41:10 67:9,15 78:2 83:17,19 92:16,19 98:2 99:7,9 121:19 137:9 160:19 161:8 170:17 175:12,15 177:3 184:13 188:14 198:8 199:7,25 200:11 210:4 213:22
**asks** 125:16,21
**aspect** 160:13
**assert** 105:4 208:2
**asserted** 110:11
**asserting** 122:15
**assertions** 202:10
**assess** 157:20,24 158:3,5 159:13 161:10
**assets** 47:24 48:19 49:15 50:20 51:7,22 52:14 53:12 54:8 180:24 181:12 187:21
**assigned** 196:14 196:22
**assignment** 196:23 198:6 198:16
**assist** 77:24 211:22
**assume** 64:23 179:5
**assuming** 48:25
**assumption** 49:3 63:6,11
**at** 14:3 15:2,23 19:20 22:23 25:2,4,5,13,15 25:16,23,25,25 26:19 33:7 34:19 43:8 44:13,16 53:3 53:25 54:2 55:18 59:12 60:19 61:15,17 63:21 72:22 77:10,13 81:8 83:3 84:9 85:6 94:9,19,24 95:11 100:17 103:19 105:6 115:14 116:16 117:15,18,20 121:6,10 122:20 123:13 128:9 134:5,7 135:3,4 136:12 136:25 137:20 137:23 138:7,8 141:14 143:7 162:8,12 163:12,14 164:25 165:5 165:10,23 171:11 172:15 173:18 175:25 181:23 183:24 190:18 195:2,3 195:20 196:12 196:20 202:21 203:2,8,11 204:8,10 206:9 208:11,13 209:18 211:7,9 212:8 214:2
**attached** 7:13 94:10 126:15 220:6
**attempt** 153:12 154:21
**attend** 100:10,12
**attendance** 154:25
**attorney** 78:8 145:23 146:21
**attorneys** 2:5,9 2:14,18,22 3:4 4:18 57:21,25
**attorney-client** 111:12,16 113:4,7 135:10 150:19 161:16 166:7 207:16 208:8
**August** 136:24 137:13 138:18
**authority** 195:6
**authorizes** 53:8 57:8 68:6 104:2,11,17,24 107:7,15
**available** 129:8
**Avenue** 2:15,19
**avoid** 144:16
**avoided** 144:17
**aware** 8:10 17:10 25:12,21 27:3 40:21 41:2,7,10,13 41:14,17,20 58:3,10 60:24 67:22 78:8 92:23 97:13 104:10,16,23 105:3 107:13 123:19 124:2,5 124:11 126:19 126:23,25 129:6,7 130:21 131:7,11 133:19 139:18 139:20 149:12 149:20,24 155:3 158:13 159:12 164:2,7 165:16,17,21 166:23 167:6 167:10 168:3 168:16,17 169:7 176:19 178:16,21 179:8,20,23 180:2,19,22
**away** 52:24
**Ayala** 2:11 5:16 8:17 11:22 15:2 20:19 23:20 24:3 32:2 35:20 46:11,16 71:16 85:25 86:7,15 93:5 95:13 108:11 119:17 122:20 125:3 129:13,19 135:14 139:22 147:19 152:17 158:21 159:7 160:7,17 161:25 162:6 163:9 171:19 179:19 189:2 198:20 199:3 204:4 206:5,17 208:3 213:25 214:10 215:7
**a.m** 1:13 4:9 23:23 24:2

**B**

**B** 22:23,24 23:2 33:9 44:7 106:9 122:12 122:15 215:10 216:3 217:3
**back** 18:17 24:2 27:15,19 29:9 34:22 37:13 42:20 43:6 46:10,12 54:12 55:4,4 61:17 62:8 72:22 81:9 85:25 86:6 113:17 115:13 129:18 134:4 135:2 140:12 143:8 147:20 150:9 151:10 152:18 161:4 163:7,11 165:12 179:18 180:7 183:16 188:19,25 199:2 209:5
**background** 79:24
**Baker** 2:4 136:5 202:21
**balance** 34:9,14 37:16 38:18
**bandwidth** 43:9
**bankruptcy** 1:2 6:17,25 133:13 172:16,21,24 173:7,9,22 174:6,18 215:15
**based** 49:11,19 90:2 171:24 207:13,18
**basis** 48:17 61:13,24 90:25 112:12 129:2,2 156:4,13 187:2
**Bates** 33:9,12 43:23,25 45:11 81:11 193:6
**bathroom** 198:19
**bear** 9:12 13:17 17:20 20:24 21:25 47:2
**became** 84:21

87:16 89:8,15 133:19
**because** 4:16 36:14 38:8,12 53:3 62:10 63:7 70:23 72:7 80:7 90:20 102:16 103:2 128:25 151:10,13,17 153:11 154:20 178:25 180:8 180:13 182:7 197:2 199:14 199:22
**become** 87:8 95:24 129:6,7 153:5 170:20
**becoming** 87:18 89:10
**been** 5:12 18:4 61:7 62:4 63:8 63:10 69:22 70:5 71:15 79:4 80:17 88:9 126:25 136:4 141:5 147:23 155:11 156:2,24 157:16 167:7 173:16 176:3 176:15 197:2 198:6 204:12 204:20 207:21 212:9,9
**before** 1:13 8:24 9:10,16 21:12 22:9 51:15 55:11,12 68:9 69:18 74:4 84:20 87:16 89:8,15 93:21 93:22 105:9 114:10 125:8 135:6 141:9 142:8,12 174:5 190:14,15 194:3,18 201:8 202:11 203:5 203:15,15 204:10 205:20 220:11
**begin** 140:25
**begins** 4:4
**behalf** 37:23
**behind** 153:18
**being** 5:5 23:6 40:21 41:2,17 41:20,25 67:22 75:23 76:10 87:13 91:24 95:5 114:13 124:2,5,11 139:2 140:20 141:2 142:8 143:4,6 149:12 149:22 156:21 158:4 164:2 172:3 183:8 187:9 201:20
**belief** 61:24 62:3 62:7 188:13
**believe** 8:13,16 8:24 9:13 11:13,14,17 13:6 14:16,22 22:10,11 30:15 40:13 44:9 46:3 54:25 55:12,17 61:12 61:23 62:15 63:15 68:10,16 69:22 71:16 82:18 83:5 87:10,22 88:22 90:16,18,25 91:21 99:24 100:15 105:15 105:17 111:25 112:2,11 114:10 116:4,5 118:6 127:3,13 135:25 136:4,8 137:16 142:21 145:9,14 149:3 151:6 167:17 174:4 176:5 178:25 179:23 183:13,19,21 183:21 185:18 186:23,25 196:10 198:5 198:15 203:10 207:5,17,23
**believing** 61:13 112:12
**below** 7:21 15:19 34:18 35:6 94:21 113:21 123:15 126:9
**Ben** 3:4 68:11 69:22 73:17 145:10,15 211:7
**bench** 79:25
**beneficiaries** 7:25 29:19 31:10,21 40:22 41:3,18,21 67:23 149:13 190:24 192:13 192:20
**beneficiary** 8:4 8:8 28:10,13 28:15,23 29:2 30:16 31:13 106:22 107:24 108:21
**beneficiary's** 31:4
**benefit** 7:24 44:12 74:2
**benefits** 29:5 50:17 73:20
**BERGENFIE...** 3:10
**best** 160:23 163:24 190:23 192:11,19
**better** 154:19 187:6
**between** 15:4 17:8 18:6 32:7 32:20 42:12 48:3 50:4 93:7 93:13 122:22 123:3 140:10 156:25 159:14 215:23 216:8 216:14,18
**beyond** 54:22,24
**bigger** 187:5,5
**bill** 140:15
**bit** 161:3 183:19
**board** 6:4,5 15:25 16:12 23:4 24:11,14 25:4,7,15,24 27:12 69:18 73:8 74:19 75:9,13,19 87:2,9,14,17 89:3,9,16,21 91:8 95:2,25 97:18,22 98:7 99:14 100:17 101:6,14,15,23 102:5,19 103:3 104:2,12,18 105:21 106:2,6 106:15 107:8 114:3,23 115:17 121:2 121:15 133:14 140:14 141:10 143:12,20 144:7 145:2,4 147:3,22 148:17 152:21 154:20,22 164:11,12,19 167:11 168:14 168:24 190:22 192:3 199:23 211:6
**board's** 155:9
**BOIES** 2:9
**bore** 116:4
**borrower** 193:15
**both** 40:4 45:20 87:20
**bottom** 15:23 33:7 43:24 55:18 63:4 72:23 123:7,7
**Brands** 1:7 4:6 6:17,25 73:8 90:8 91:10 104:17 215:15
**Brand's** 8:20 9:8 215:17
**break** 46:4 57:25 64:3 129:12 158:19 158:22 159:2,6 159:10 162:7 198:19
**breakdown** 34:2
**broke** 26:11 164:16 165:10 178:19 179:10 186:5 206:23
**BROOKE** 2:12
**Bryant** 3:5
**burden** 57:24 143:13,21 153:5 167:3
**business** 24:12 32:24 33:2,3
**but** 7:7 11:19 19:19 24:21 26:18,22,23 29:5 38:6,12 49:3,20 50:2,9 51:11 52:21 54:2 63:4 64:7 64:13 65:2 67:17 73:17

83:12 100:24 101:2 105:17 110:20,23 112:2,10,16 118:19 125:25 127:22 128:24 131:18 141:8 143:4 151:12 153:11,18 154:8,15 156:15,22 157:9 158:20 159:3 163:24 170:14 171:3 172:13 173:15 175:14 177:12 181:22 183:25 186:2 188:12 190:4 193:15 196:13 197:16 202:20 210:9 211:8
**button** 194:11 194:14,20
**buyer** 81:20,25 83:15,18 193:12
**by** 2:6,11,16,20 2:24 3:6 5:6,12 5:15 6:16,24 8:5 24:3 25:7 26:22 29:2,7 34:14 35:9 37:24 38:24 42:24 44:24 46:11 55:20 63:20 65:12,15 75:24 76:4,4 86:15 89:23 96:2,13,16 114:3,4,13,17 114:23,24,25 115:20,22 116:10,11,22 116:24 120:17 121:15 129:19 139:9 140:19 144:22 161:4 163:8 167:8 172:4 177:25 179:19 184:18 189:2 199:3 207:21 212:21 215:7,14 219:4 219:5,11 220:4
**B-7** 193:6

**C**

**C** 2:2 3:2
**calendar** 119:3
**call** 18:16 65:7 101:2 183:23 206:20,25
**called** 5:11 33:9
**calling** 62:12
**calls** 71:12 100:5 178:11 206:11 208:19
**camera** 185:23
**cannot** 5:19
**can't** 26:5,14 38:13 185:9,10 191:10
**cap** 62:9
**capable** 23:6
**capacity** 63:9 100:16 101:13 101:22 102:4 103:23 121:2 151:3,4 194:6 194:7
**capital** 2:9,23 165:14 179:2 186:19 187:10 205:7,8,15,17 214:10 217:7,8
**Capital's** 11:25 12:7 215:19
**care** 63:7
**case** 1:7 6:17,25 8:20 9:8 16:21 38:2 64:5 98:13,25 100:7 123:10 134:3,9 148:13 169:13 183:14,17 190:4 215:15 215:17
**cases** 163:19
**CASEY** 2:20
**catch** 25:20 98:10
**caught** 100:6
**cause** 12:3,9 215:22
**caution** 117:22 131:3 135:14 159:21 166:15 173:18
**cautious** 203:16
**caveat** 140:14
**certain** 10:17 80:25 165:19
**certainly** 52:21 99:10
**certainty** 161:9 185:9,10
**CERTIFICATE** 219:2
**certification** 219:10
**certify** 219:3 220:3
**certifying** 219:12
**chain** 15:4,9,14 15:16,24 72:23 94:9 95:8,19 125:5,8 163:13 196:14 215:23 216:20
**change** 199:23 221:3
**changes** 127:11 127:15 220:5
**Chapter** 8:20 9:8 215:17
**characterize** 200:14
**chart** 37:3
**Cheatle** 3:5 15:5 15:10,25 16:11 16:23 87:20 95:9,19,22 98:24 99:5 140:11 171:11 215:24
**check** 57:24
**Chicago** 2:24 158:16
**chief** 166:4
**circumstance** 30:22 118:14
**circumstances** 28:21 30:12,19 31:2,12 97:24 181:19 182:11 186:24 211:20
**Citadel** 3:4 10:13 12:20 13:23 14:14 16:4,15 17:12 21:13,20 25:22 26:8,17 27:3,6 28:16,25,25 30:13 32:7,20 34:5 35:13 36:25 37:17 39:14,20 40:3 40:9,14,18 42:10,15,19,22 42:23 63:25 64:17,24 65:4 68:11 69:18 71:3 73:10,14 73:23 74:8 76:18 79:5 80:5,21 81:2 81:19 84:2,17 85:4,11 87:19 89:3,11 91:5 91:15 100:6 108:18 120:21 141:3,9 142:7 142:12 143:4,5 143:15 144:19 147:23 150:2 150:15 151:14 151:18,20 152:20 154:4 157:2,2 176:9 177:23 178:11 178:18,23,24 189:18,22 196:9,19 197:6 197:13 214:14 216:9
**Citadel's** 6:2 10:18 25:17 26:3 28:5 41:22 62:14 63:15 64:25 80:8,14 120:15 182:4 185:16
**claim** 30:5 48:14 139:8 177:9 179:9,21 180:3 180:5,6,12,20
**claims** 8:12,15 29:23,24 30:9 48:5 49:21 50:6,23 51:10 53:10,16 54:6 167:14,16 176:18,21 183:11 184:10 185:4,20 186:10,22 187:16,24 189:15,24
**clarification** 128:25
**clarify** 128:8 132:8 161:5 200:6 210:10
**clarifying** 196:25
**class** 176:21 177:9
**clear** 41:16

67:18 69:15 102:9 134:22 188:2
**client** 159:4
**close** 16:25 72:11 76:8 189:3 207:25
**closed** 119:8,8 120:6,14,20
**coffee** 23:19 85:24
**Cohen** 15:5,10 122:23 123:4 125:24 126:14 215:25 216:19
**colleagues** 137:15,19 138:2 153:4
**collection** 163:23 165:25 200:22
**collective** 212:8
**collectively** 183:15 196:3
**colored** 130:19 131:8
**colors** 171:2
**come** 85:25 182:7
**comes** 80:3
**comfortable** 9:15,18 135:8 135:21 136:10 137:21 138:15 201:7,24 202:9
**coming** 213:9
**commencing** 1:13
**comment** 196:16
**commission** 115:2 220:12
**commitment** 56:13 57:7,10 58:7
**committed** 60:12
**committee** 68:23 114:5,17 115:22 116:12 116:24 123:14 125:17,22 127:10,14 149:15
**common** 86:12 86:21,22 94:12 94:18,23 216:13
**communicate** 76:25 77:10 101:17 155:6 155:14
**communicated** 76:16,19 85:11 147:12
**communicating** 101:19,21
**communication** 70:17 72:4 155:9 171:6,9 210:22 212:7
**communicatio...** 72:19 75:2 85:4 88:2,12 113:8 117:23 135:11,16 146:16 150:7 150:20 155:16 155:19 156:7 156:10 159:23 160:12,24 161:11,17,21 161:22 166:7 166:17 167:12 167:21 168:13 168:23 170:3 176:13 199:5 200:15 203:19 204:2 207:16 208:9 211:14 212:5,15,25 213:7
**comparison** 11:8
**complete** 5:20
**compliance** 166:4 200:20 207:21,23
**complied** 111:10 111:22 112:24 113:9
**complies** 107:22 208:24 209:10
**comply** 108:18 109:15,24 111:3
**component** 30:24 31:3
**composition** 150:6,18
**computer** 71:24
**conceptual** 187:3
**concern** 98:25 124:20,22
**concerned** 203:17
**concerning** 39:14 70:17 77:20 91:25 97:6 119:2 139:15 142:20 146:15 150:2 150:16 157:3 171:6 208:23 209:10 210:2 212:15
**concerns** 82:20 83:7,21 196:17
**conclusion** 95:6 208:12
**conducted** 77:19 92:16,20 99:19 164:3
**conference** 1:12 71:8 88:6,10
**confidential** 167:20,24 168:11,21
**confirmation** 6:15,23 11:4,8 215:13
**confirming** 128:14
**conflating** 180:13
**confused** 26:21 161:4
**confusing** 36:13
**confusion** 18:4
**conjunction** 207:12
**connection** 5:23 21:19 25:17 26:2,7,16 40:8 67:24 77:4,22 83:15 90:8 91:9 103:19 109:13,23 111:2,7,18 112:21 118:7 118:13,19 133:19 136:17 145:12,21 148:21 149:2 154:13 155:4 164:4 165:3,6 166:5 180:23 183:2 185:5 186:16,18 187:19 189:12 201:14 202:22
**consent** 12:24 13:10,12 16:3 16:14 23:3 82:11
**consenting** 82:19 83:5,20
**consents** 195:9
**consequence** 154:11
**consequences** 27:11
**consider** 68:25 69:6 70:23 180:6 199:25
**consideration** 176:7
**considered** 28:4 28:7 69:4,7,10 69:16 109:6,10 115:5 117:5,7 154:8 167:7 204:9 213:22
**considering** 87:13 103:19 103:24 139:7 200:11 203:12
**consistent** 11:4 60:8
**constitute** 24:11 27:23
**constituted** 114:23
**consult** 81:25 84:3
**consultation** 83:16 106:23 107:20,24 108:16,22
**consulting** 84:17
**contact** 123:13 123:15 126:8,9
**contemplates** 52:11,21
**contents** 9:16,18
**context** 110:21 151:24
**continue** 30:15 152:20
**continues** 40:14 186:2
**contravention** 27:22
**control** 152:20 219:12
**controlling** 154:20,22
**Cont'd** 163:8
**conversation** 90:21,24

137:14,17,18 138:17 173:21 202:17
**conversations** 91:22 131:8 135:23 141:8 203:2,23
**conversion** 188:10,16 189:10,25
**convert** 182:5
**converted** 189:6
**Conway** 72:24 143:10 200:25
**Cool** 44:11
**copy** 214:8,11
**Corelle** 8:20 9:8 215:17
**Cornell** 2:9 11:25 12:7 165:14 168:13 168:23 169:11 186:19 189:13 205:8,16 214:10 215:19 217:8
**corner** 33:8 43:24
**correct** 12:13 30:5,10,17 31:14 34:20 37:8,21,25 38:25 40:11 43:20,21 44:19 45:16 47:12 48:10,14,15 50:8,9 51:11 52:6,15 60:19 60:22 67:11,16 81:4,13,20,21 84:6,12,13 86:23 88:18 92:5 93:4 94:19,24 95:5 97:4,7 99:21 101:24 102:3 103:13,22 104:3,4 109:11 110:13 111:23 113:5 114:14 114:18 128:22 133:25 134:8 134:12,16,20 134:21 141:17 141:20,21 148:15,19 151:2 161:17 161:23 169:25 178:18,23 181:3,15 182:15 183:11 184:11 185:6 185:16,18 187:16,25 188:11 189:16 194:4 200:13 201:13,16,18 202:15 203:25 220:4
**corrections** 220:5
**correctly** 89:7
**correlates** 60:17
**cost** 143:13,21 167:3
**could** 7:8 18:4,9 29:12 33:12 51:16 54:7 66:8 74:3 138:8 141:12 144:17 159:6 160:7 165:11 183:8,14 184:4 184:6,24 186:20 202:24 203:3 204:17 204:19 209:4
**couldn't** 113:3
**counsel** 4:10 5:2 9:17 11:14,17 11:20 14:5 88:23 92:23 97:14 117:24 118:2,4,4 124:25 131:5 134:3 135:16 135:23 136:2,6 139:18,20 142:22,24 158:13 159:12 160:6,13 166:18 173:17 173:24 174:2 201:10,11,17 202:2,12,13 203:19,24 204:13,14,19 204:23 207:13 207:23
**counts** 194:15
**couple** 72:14,15 93:25 176:6 181:25
**course** 72:18 99:11 138:20 155:12
**court** 1:2,14 4:13 6:16,24 40:22 41:3,18 41:21 67:19,23 149:15 172:17 203:15 209:4 214:7 215:14
**cover** 36:16
**covered** 211:8
**covers** 38:21
**create** 80:20
**creation** 7:19 18:13,23 19:2 19:10,23 20:6 20:9,12 113:25
**credit** 42:21 43:3 47:7 55:2 58:4,21 59:5 59:21 60:9 61:2 66:20 85:13
**creditor** 126:21 130:8
**creditors** 49:23 68:23 114:5,17 114:25 115:23 116:12,24 149:14
**cross** 135:19
**cumbersome** 35:21
**curiosity** 158:14
**current** 95:11
**cute** 178:10

**D**

**D** 215:3
**daily** 110:18
**dancing** 154:15
**date** 6:18 7:22 8:21 12:4 15:7 20:23 32:9 36:3 59:14,16 71:20 84:11,15 86:14 93:9 119:21 120:11 120:12,13,13 122:25 125:6 137:11 140:3 171:23 195:5 205:10 220:8
**dated** 47:7 73:3 119:19,25 139:25 140:6 216:16,21 219:7
**day** 18:16,16 220:11
**days** 93:25 137:13 138:18
**deals** 74:14
**dear** 16:12 95:2
**debt** 45:14,20,25 180:25 181:13 182:13 183:9 184:8,14 185:2 185:16 187:14 187:18 188:10 188:17 189:5 189:11 195:25
**Debtors** 1:8
**December** 84:12
**DECHERT** 3:4
**decided** 126:7
**decision** 99:4 212:8
**decisions** 75:22 98:12,18,24 157:4 210:3,17
**decline** 110:22
**deemed** 28:16 30:14
**deep** 79:25
**Defendant** 2:9
**DEFENDANTS** 2:14,18
**defer** 67:7 92:18 159:4
**defined** 31:14 46:25 47:4,16 48:10 52:5 195:18
**defines** 51:5,20
**definitely** 156:16
**definition** 29:18 30:24 31:4,9 31:10,17,19 47:5 82:16 83:4 84:2,20 85:6 134:15 178:6 195:21
**deliberations** 210:4,18
**delivered** 156:12 212:21
**delivers** 156:2
**denial** 77:21
**denied** 73:23 76:13,22 78:14 78:18 141:19 146:6
**DENTONS** 2:18
**depict** 39:6

**depicting** 33:18 34:8,9 36:7,22 36:23 38:5,16
**depicts** 38:17
**deployment** 187:10
**DEPONENT** 220:2
**deposition** 1:12 4:5,19,20,21 36:19 72:13,19 72:20 118:8,13 118:20 218:3 219:4
**describe** 18:9 42:5 176:10
**described** 38:4 54:25 130:22 133:9 158:6 159:15 161:11 182:12 188:10
**describes** 50:14 95:24
**describing** 16:18 64:16 153:17 207:15 213:5
**designate** 131:19,25 132:6,9,16
**designated** 124:3
**designating** 124:6,12
**designation** 132:25 133:4
**designee** 68:22 115:23 116:12 116:24 124:7 124:14 127:20 127:23,25 128:4,19,21 131:21 132:6 132:16 138:24
**designees** 68:19 128:10
**desktop** 72:10
**detail** 18:15 184:17 197:15 197:21
**details** 131:7
**determination** 133:11
**determine** 99:20 207:7
**didn't** 25:20 51:17 64:19 80:11 102:22 121:24 128:20 154:6 181:6 196:21
**differ** 17:24
**difference** 42:11 42:17
**different** 36:15 38:9,9 51:3 57:17 67:15 98:2 181:25 184:20
**differently** 197:10
**difficult** 41:15 74:4
**diligence** 21:16
**Dipesh** 140:12
**Dipesh's** 140:15
**direct** 57:23 162:3 180:2 212:4 213:6 219:12
**directed** 15:25
**directing** 162:2
**direction** 83:15 83:18
**directly** 48:22 127:19 128:3 171:5 177:14 177:16,18,22 178:17,22 179:21,25 180:20
**DIRECTORS** 2:14
**disclose** 131:4 148:7 161:16 173:19 175:7 175:13 210:5
**disclosing** 98:16 98:21 99:25 111:12 121:11 135:10 150:6 150:19 157:4 160:3 161:15 161:21 166:6 166:21 167:19 168:11 170:2 175:8 176:12 199:4 207:15 208:8 210:11
**disclosure** 168:21
**discovery** 11:6 12:2,8 159:18 167:20 168:11 168:22 169:12 169:14,18 215:20
**discretion** 56:15
**discuss** 87:17 89:9 90:6 91:4 96:9 106:4 117:22 121:24 122:2 146:2 150:4,17
**discussed** 69:18 73:5,19 74:15 78:23,25 89:5 89:14 90:14,16 90:19 91:14 96:21,23 97:3 99:10 115:8,10 117:9,12,15,17 117:19,25 118:4,12,18 121:17 122:5 167:2 171:10 171:13,15,17 201:10 212:23 213:3,4
**discusses** 106:14 167:3 197:16
**discussing** 30:11 66:12 91:18 98:23 99:4 121:9 132:24 140:25 146:7 173:5,8 174:16 175:6
**discussion** 118:22 119:3 121:12 122:10 130:15,17,19 131:18,24 132:4,8,14,21 133:3 136:7 148:4 155:2 173:10,13,20 174:5,10,12,20 174:20 175:20 175:22 202:20
**discussions** 69:21 70:3 71:2 74:12,21 74:24 77:6 79:3,22 87:24 88:3,7 98:17 98:23 99:12 100:2 131:5 133:15 136:14 142:12 148:10 148:16 149:25 150:15,23 175:9,13,17 202:2
**disregard** 180:10
**distinction** 151:8,15
**distinguish** 141:22
**DISTRICT** 1:3
**dive** 53:25
**diverge** 186:21
**divided** 65:12
**DIVISION** 1:4
**divulging** 148:3
**docket** 137:5 172:21,24 173:7,9,22 174:6,18
**document** 6:22 7:5,10 8:23 12:16 13:16 15:13 17:15 21:8,9,10,12 21:24 22:14,15 22:15,17 23:12 23:13 24:18,19 29:5 32:16,18 33:8,25 36:15 43:23 54:16 55:19 56:6 58:15 81:10 86:17,20 93:10 93:17,20 94:2 104:11,16,24 119:19,23,25 120:11,23 125:16 126:6 131:9,11 133:16,23 134:5,18 135:7 137:2,3,10 147:18,21 149:6,9 165:14 165:24 166:9 166:25 177:2 177:11 182:23 183:5 190:10 190:15,16 195:18 200:21 201:15 202:10 205:6,11 208:17 210:21 216:16 217:6
**documentation** 154:25
**documents** 6:6,7 75:2 77:20 88:12,21,24 91:25 92:8,14

92:15,17,20,22 92:24 97:6,10 97:12,14 119:2 119:11,14 124:20,21 136:12 137:20 137:24 139:14 139:17,19,21 142:19,25 146:15,19 165:7,9,20 169:10 177:5 206:11,20,25 207:8 208:6,11 208:13,22 209:8,22,25 210:6,13,15,20 210:25 211:10 218:5

**does** 5:22 11:6 14:12 17:19 48:16 49:5 59:10 63:23,24 68:14 120:5,8 120:9 142:3,4 151:22 153:15 154:23 160:16 160:19,20 175:18 189:9 195:15 219:11

**doesn't** 14:15 49:9,20 135:19 151:11 199:22

**DOHERTY** 2:20

**doing** 62:13 64:9 75:23 153:16 157:23

**done** 78:6,9 92:22,24 103:23 108:14 157:19 158:2,4 159:13,24 160:2,4,18,20 160:21 161:2,7 161:10,13,15 161:22 162:5 194:21 207:17 207:21 213:20

**doubt** 174:21,24 177:12

**down** 10:10 37:4 38:3 62:10 94:14 123:6 125:19 190:20 206:18

**drops** 95:7,18

**duces** 205:9,19 217:9

**due** 21:16 34:10 34:14 35:12

**duly** 5:12 219:4

**during** 72:12,18 155:12 156:9 164:10,18 169:23

**duty** 212:3

**dynamic** 212:23 213:3,5

**E**

**E** 2:2,2 3:2,2 163:2,2 215:3 215:10 216:3 217:3 221:2

**each** 207:6

**earlier** 17:14 41:24 47:11 89:5 112:21 115:14 116:5 120:24 146:24 189:7 200:20 211:8,13

**economic** 29:6 50:16 74:18 75:8,12 80:8 184:15

**economics** 53:24

**EDGAR** 2:7

**effective** 7:22 59:14,16

**effectuated** 197:7

**efficient** 187:10

**effort** 81:25 96:2 96:13,15 97:17 97:21,24

**efforts** 84:3 98:6 193:11

**either** 45:19 71:6 150:15 164:10,18 167:13 171:11 178:16,21 192:17,22 203:12

**elevation** 45:19 45:25 197:18 198:2,10,16

**Elsberg** 2:4 136:5 174:4 202:21 211:7

**else** 6:9 89:14 94:6,21 138:6 144:6 148:7 158:20 165:23 166:3 192:4 194:17,22 201:23 203:11 204:18 214:4

**elucidate** 184:21

**email** 15:4,9,15 15:24,24 16:2 16:6,8,11,13 16:17,20,23 70:4 72:7,23 72:23 77:12 88:11 93:7,13 93:18 94:9,20 95:9,17,18,21 99:8 122:22 123:3,19 124:5 124:11 125:5 128:9 139:25 140:6,10 143:9 152:25 155:11 155:15,17 156:7,24,25 158:10 163:12 163:18 166:10 175:4 210:22 211:2 215:23 216:14,18,20 216:21

**emails** 70:6 71:18,25 72:2 72:10 128:16 156:22,24 157:14,17,20 157:24 158:5 158:10 159:14 211:4,5 216:11

**employee** 130:9 131:13 144:3

**employment** 150:17

**end** 165:11,11 181:7 195:20 205:2

**ending** 33:13 43:25 45:11 81:10 94:20 193:5 195:19 197:23

**engaged** 32:25

**ensure** 111:10 111:21 112:24 113:9

**entails** 191:13 191:21

**entered** 12:21 69:19 108:18

**enthusiast** 205:18

**entire** 191:5,9

**entities** 39:15,20 50:21 178:16 178:21

**entitle** 49:13

**entitled** 25:4,15 25:25 27:5 132:6,16 189:14,18

**entity** 23:7

**enumerated** 84:19

**envisioned** 144:2

**Erin** 73:6

**Errata** 220:6

**ESQUIRE** 2:6,7 2:11,11,12,16 2:20,24,25 3:6

**essential** 82:3,7 82:10,16 83:4 84:2,5,20 85:6

**established** 7:23 30:3,7 47:22 48:8,12 110:8 136:16

**establishes** 105:25

**estimate** 65:15

**et** 1:7 4:7 186:20

**event** 130:14,21

**events** 133:9,17 141:23,24

**eventually** 196:13

**ever** 23:10 24:16 24:21 28:4 45:23 76:25 77:19 78:6 85:11 90:6 96:9 99:4,9,10 101:6,21 102:5 109:6 115:5,8 117:5,9,15 121:9 122:5 124:23 126:25 127:18,22 128:2 129:6 132:3,13,20 138:22 139:6 145:3 157:19 157:23 171:5 171:10,15 172:3 174:16 174:19 175:12 175:21 176:17

176:20 191:4 199:5,25 200:10 212:23 213:17,22
**Every** 186:5
**everybody** 95:7 95:18 187:12
**everyone** 144:13 187:6
**everything** 98:10 180:10 183:24
**exactly** 149:5
**EXAMINATI...** 5:15 163:8
**examined** 5:13
**exceed** 184:8,16 184:17
**exceeds** 185:3
**except** 25:7 63:24 95:19 106:25 108:6 108:24 220:5
**excess** 56:8,12 57:9 58:6 61:3
**exchange** 70:6 70:12 93:7,13 126:5 216:14
**exchanged** 97:6
**exchanging** 85:3 88:11
**exclude** 212:14
**exclusionary** 212:20
**executed** 94:11
**exercise** 45:23 195:6,10 197:25
**exercised** 10:17
**exercising** 82:2 84:4 85:12,17 195:7,10
**exhausted** 63:6 63:12
**exhibit** 6:15,19 8:18,19 11:23 11:24 15:3,4 20:20,21 24:5 29:10 32:5,6 35:24,25 36:7 36:9,12,15,20 36:22 43:6,7 43:11 46:12 54:12 55:6 58:11 61:18 65:22,24 71:17 71:18 72:22 81:9 86:8,11 86:12 93:6,7 104:6 105:6 106:9 113:17 115:12 119:18 119:19 122:21 122:22 125:4,5 129:11,21 134:5,7 135:2 139:23,24,25 143:9 150:11 152:16 163:12 171:20,21 172:5 190:8 192:24 201:2 202:4 203:13 203:14 204:9 204:10 205:5,6 215:12,13,16 215:18,23 216:5,6,7,10 216:11,13,14 216:16,18,20 216:21,23 217:5,6
**exist** 88:17 158:11 159:14 161:12 183:14
**existence** 104:2
**existing** 73:17
**exiting** 73:9,13
**expand** 31:18 100:19 110:4,6 110:16 141:12 178:4
**expedited** 12:2,8 215:20
**expenses** 144:6
**experience** 156:6
**experienced** 80:17
**expires** 220:12
**explain** 62:17 64:20
**express** 145:3 147:4
**expressed** 139:2
**expressing** 138:23
**expressly** 12:25
**extend** 206:2
**extended** 67:25
**extending** 195:21
**extensive** 158:18
**extent** 100:20,22 133:17 167:25 168:7 194:12
**ex-officio** 87:2,8 87:14,16 89:2 89:9,16,21 91:8 95:3,4,24 97:17,22 98:7 99:13 100:3,9 100:16 101:5 101:13,23 102:4,12,16,19 103:2,14,21 104:2,11,18,24 107:8 121:2,15 142:2 164:11 164:19 167:11 167:22 168:14 168:24 169:24
**eyesight** 15:21

**F**

**F** 163:2
**facility** 55:21 56:18 60:10 182:22 183:3
**fact** 127:25 140:23 175:7 175:10,14
**facts** 85:6 135:8 135:21 136:10 137:21 138:3 138:15
**Fagin** 1:14 219:6
**failing** 27:11
**fair** 45:21 54:3 54:11 57:4,19 70:25 110:23 136:22
**faith** 81:25 84:3 193:11
**familiar** 7:4,7 8:22 21:7 32:15 86:16 93:16 114:8 119:22 190:13
**far** 151:12
**feel** 66:12
**feeling** 147:7,8
**FELDMAN** 2:22
**field** 163:13
**file** 133:20 172:23 173:6,9
**filed** 8:19 9:7,11 9:16 136:24 137:10 172:16 172:20 174:6 201:9 202:11 203:15 204:11 215:16
**files** 72:15 163:14 164:3
**filing** 10:4 36:14 130:20,23 134:22,23 173:11,22 174:17 201:8 202:23
**fill** 129:9 139:8 167:7
**Filled** 218:13
**final** 74:13
**financed** 55:20
**financial** 156:3 156:12 193:16
**financing** 55:20 56:8,9,12,13 56:17,18 57:7 57:9,10 58:6,8 60:10,12,14 66:14 182:21 183:3
**find** 65:23 94:10 144:5,6 195:17
**finding** 143:14 143:22 167:4
**fine** 32:11 67:17 159:7 180:15 186:7 208:3
**finish** 51:17,18 74:3 108:12
**firm** 203:8
**first** 25:20 26:11 34:17 39:8,12 39:18 43:16 44:23 51:5,19 52:10 56:6 58:17,20 59:3 59:8,10,21 68:25 69:5,7,9 69:16 73:21 86:25 87:12 94:9 105:20 115:15 116:16 117:19 126:6 127:4,7 129:3 129:7 130:22 134:10,17 140:25 146:2 195:3
**five** 23:21 46:5 63:20 129:13 198:20
**flash** 176:24
**FLEXNER** 2:9
**Floor** 2:5

**focusing** 142:5
**folders** 163:21
**follow** 83:15,18
**followed** 35:9
**following** 10:7 11:2 57:8 60:7 126:5 131:17 187:22
**follows** 5:14 50:10,13 55:23 115:19 163:5
**footnote** 14:3 46:24
**foregoing** 27:23 219:10 220:3
**form** 19:4,12,25 20:15 28:11 31:6,15 35:15 40:12,16 42:3 48:20 49:8 51:25 53:17 59:24 60:21 61:5 67:6 69:14 78:15,19 78:21 80:10,23 81:6 83:10,23 84:7 87:23,25 99:23 103:8 104:20 107:10 107:17 109:3 109:18,19 110:3 111:5 112:8 113:12 114:19 116:13 131:2,14 133:21 135:12 150:8,21 152:14 156:14 157:21 158:7 159:17 164:15 164:23 165:8 168:15,25 170:7 176:22 177:17,21 181:5 197:14 199:11 201:19 208:5,12 209:3 209:13 210:7 210:19,21,23 210:25 220:5
**formalities** 164:13,21
**former** 2:14 149:14 182:8
**forms** 155:5
**forth** 9:21 10:19 27:18 56:18 58:8,21 59:6 59:22 60:9,18 61:4 107:2 108:6,24 113:21 134:19 161:4 191:12 191:20 203:6
**forward** 126:9
**foundation** 19:25 20:15 28:11 31:7 48:20 49:8 60:21 61:5 80:10 83:10 107:17 108:5 109:19 110:5 111:14,24 115:3 116:13 131:2,14 135:12 136:20 146:22 150:8 150:21 152:14 160:5,9,11 165:8 166:8 170:7,15 207:11 212:18 213:14
**FOUNDER** 2:18
**fourth** 37:3
**free** 66:12
**frequency** 200:15 212:5
**frequent** 212:7 212:25
**from** 10:13 11:6 13:23 14:14 15:24 17:11,24 21:13,20 23:4 26:8,16 27:6 28:15 30:13 34:5,10 35:12 36:14 38:22 39:20,20 40:2 48:18 49:14 50:20 51:3,6 51:21 52:14,24 53:11 54:8 68:11 69:12,24 72:20,23 73:9 73:14,22 74:7 76:17 79:5 80:14 87:19 89:11 95:18 104:9 113:7 120:20 123:12 140:12,13 141:23 143:10 143:15 144:19 167:12 168:5 168:12,22 169:10 184:10 185:4 186:21 190:6 191:8 195:7,10 196:8 197:5,13 199:17,21 203:18 204:2
**front** 36:9 71:23 93:10 105:9 183:25 185:8 188:13 190:5,9
**fulfill** 178:13
**full** 54:9 56:6 84:21 113:19 141:3,25 146:8 148:19 164:11 164:19 190:17 194:3,18 200:17 211:15
**fully** 12:23 13:9 94:11
**functioned** 164:13,21
**fund** 39:2 178:3 178:11,17,22
**funded** 63:6
**funders** 180:2
**funding** 32:21 32:24 33:23 37:25 38:7,23 39:25 40:2 42:2,13 44:15 44:18,21 45:3 54:17 58:5 61:3,7 62:4,11 63:5,13,22 64:24 68:5 85:13,18 177:15,16,18 178:6,9 181:23 193:3
**fundings** 36:25
**funds** 179:9,21 179:24 180:20
**fungible** 178:10
**further** 4:23 5:3 113:21 126:8 162:4 214:2
**furtherance** 190:24
**future** 85:13,18

**G**

**G** 47:20 55:7
**gallery** 108:12
**GARY** 3:6
**gave** 135:14 147:8 179:4
**general** 8:11 29:23 30:4 48:4,13 49:23 50:6,23 51:9 53:10,15 54:6 80:19 139:7 176:21 183:10 184:9 185:4,20 186:10,22 187:15,24 188:3 189:15 189:23 204:19 204:22
**generally** 56:4 79:10,13
**generated** 48:2 48:18 49:14 50:20 51:6,21 52:14 53:11 54:7
**gentlemen** 68:10 76:17 79:4 87:19 89:11
**get** 7:13 50:16 51:12 97:17 98:7,11 100:6 101:2 135:15 152:9 160:23 161:20 166:16 181:6 190:9
**gets** 65:15
**getting** 49:21,23 49:24 95:24 111:16 161:20 169:9 207:24
**give** 5:19 6:13 13:24 33:19 57:25 102:22 118:14 149:18 173:14 184:16 185:25
**given** 74:17 75:7 75:11 211:20 219:5 220:4
**go** 6:13 10:6 23:20 31:15 34:21 46:13 53:18 55:4 58:11,14,16 62:20 65:3 66:2,6 72:16 81:9 94:14 103:9 112:9 113:17,18 115:12 123:9

125:11,19 136:21 137:4 143:25 144:5 144:10 150:9 158:17 160:16 179:12 180:7 181:21 183:18 186:4 192:25 201:2 206:8
**goes** 82:6 105:22 106:4,16 197:20
**going** 13:16 37:11 52:25 66:6,9 73:7 75:15,18,22 89:25 100:7,25 102:11 113:3 117:21 123:9 125:13 126:9 158:15,17 159:3,20,21 166:15 177:6 181:8 183:18 186:6 188:13 203:18 207:25 210:9
**gone** 198:7
**good** 5:17,18 16:19 45:10 54:15 81:24 84:3 163:10 193:11
**got** 6:22 7:16 9:6 10:8 12:5 13:20 15:8 21:2 22:4 26:18 33:14 35:7 36:4 37:20 40:7 42:11 65:17 71:22 112:5 144:9
**govern** 6:6,7 17:23,23,25
**governance** 17:20 18:3,16 18:21 19:20 78:16,20 81:3 82:21 83:8,22 116:4 154:23 155:7,15,20,21 209:23
**governing** 17:15 208:25 209:12
**grander** 34:10
**grant** 195:6
**granting** 195:7
**great** 6:21 153:16
**GREENBERG** 2:13
**gross** 34:24,25 35:5
**GUC** 49:22
**guess** 6:5 26:21 48:24 49:9 75:23 143:24 144:2 147:7 151:14 154:16 177:6 188:2,6 189:19 199:24 203:3 212:19
**guidance** 154:7 199:15,24
**guy** 68:16 163:23
**guys** 64:2 144:10 144:14 162:6

**H**

**H** 5:11 163:4 215:10 216:3 217:3
**had** 36:15 63:8 70:3 74:6 79:25 89:8 91:21 100:5 102:14 122:9 126:19 127:25 128:20 129:2 130:8 132:9 133:15 135:23 137:14,16 138:23 141:16 143:24 144:7 144:15 148:16 149:25 150:15 154:5,9 160:12 166:17 173:23 174:19 176:13 189:4 212:6,7 212:24
**half** 159:3 162:9
**halfway** 190:20
**Halperin** 15:5 15:10 16:23 94:10 122:23 123:3,12 125:16 126:7 140:11,11 148:14 157:2 167:14 168:12 168:22 169:11 170:4,23 171:25 172:4 174:9,11,17 186:19 189:13 200:11,16 211:14 215:24 216:19
**Halperin's** 95:18 171:21 175:7,14 199:19 216:23
**Hang** 69:3 169:15
**happen** 85:19 118:22 136:14 181:8,20
**happened** 90:25 133:18 136:17 147:16
**happening** 130:14
**happy** 98:10 158:21
**HARRY** 3:10
**has** 5:7 33:10 42:22 43:23 61:7 62:4 63:25 65:6 71:14 88:23 110:9 124:25 146:21 151:13 151:17 152:20 165:2 170:20 176:3,15 177:7 179:3 183:15 185:14 187:14 187:23
**haven't** 28:7
**having** 5:12 7:6 17:18 22:13 25:12,22 27:4 42:13 57:24 75:19 78:6,9 78:23,25 79:7 79:12 80:6 90:21,23 92:21 92:24 96:23 97:14 99:12 102:13 103:23 115:10 117:7 117:12 130:17 137:18,23 138:5 142:11 150:23 155:19 159:13 167:7 168:4 171:8,13 171:17 174:19 175:13,21 185:8 188:5 194:21 213:20
**he** 16:12 51:15 68:12 95:23,23 98:18 126:11 156:2 159:9 160:8,12,16,19 160:20 166:5 166:14,21 170:8,20 199:6 199:8
**head** 182:24 183:6 185:13
**header** 7:18
**hear** 67:14
**Heard** 140:12
**hearing** 127:5,7 128:24 129:4
**held** 1:13 140:19
**hello** 101:3
**Help** 153:23
**helpful** 65:20 75:17
**her** 74:5 200:25
**Herculean** 95:25 96:13,15 97:23
**here** 6:14 9:2 14:23 23:14,16 26:5,12 27:8 37:16 40:19 41:7 47:19 53:4 78:5 83:4 84:24 85:2 88:15 93:2 96:25 97:5,20 98:5,8,19 99:3 99:16 101:10 102:2,17 103:3 116:6 143:9 155:18 158:9 158:12 159:2 161:4,8 164:4 166:24 177:3 181:9 185:12 196:23 203:17 205:2,3 206:8
**hereby** 134:11 219:3 220:3
**herein** 196:3
**him** 98:18 118:12,14 121:18 162:2,3 200:2
**hire** 143:25
**hiring** 144:11
**his** 14:5 95:9,17 95:23 137:14 137:19 138:2

160:13 171:7
172:2,6 200:12
201:23 202:14
203:8 211:7
**hitting** 194:11
194:14,19
**hold** 9:12 14:8
31:19 40:14
44:4,10,11
48:25 58:23
81:16 82:22
180:4
**holder** 8:11,14
30:4,8,20
41:25 48:13
139:7 179:8,20
179:24 180:19
**holders** 29:21,22
48:4 49:7 50:5
50:23 51:9
52:21,23 53:9
53:13,15,23
54:6 180:3
181:2,14
182:14 183:10
183:23 184:9
185:3,19 186:9
186:21 187:15
187:24 189:15
189:23
**holding** 4:7
49:12 159:5
**HOLDINGS** 1:7
**honestly** 111:25
**hopefully** 205:3
**hour** 159:3
162:9
**hours** 158:16,18
**housekeeping**
57:20
**HOUSTON** 1:4
**how** 13:11 19:23
20:3 28:21
42:5 50:12
56:22 61:7
68:5 71:12
75:15 76:19
106:14 147:4
149:21 151:25
152:2 153:7
158:14 159:5
159:13 160:7
161:10 162:6
164:13,21
179:25 197:17
200:14 211:20
212:12
**Hudson** 2:10
**hypothetical**
31:18 154:3

**I**

**identification**
6:18 8:21 12:4
15:6 20:22
32:8 36:2
71:19 86:13
93:9 119:20
122:24 125:6
140:2 171:23
205:10
**identified** 39:8
113:2 176:4
189:4 207:8
**identifies** 86:25
126:11
**identify** 26:6,14
82:7 138:24
176:11 204:7
**identifying**
128:10 169:10
**if** 5:7 10:6 12:15
13:14 14:3
15:23 16:10
22:23 27:15,20
28:9,15,25
29:12 38:11
43:22 48:24
52:20 53:2
56:7,11 58:14
62:8 66:8,8,10
66:21 67:2,17
74:2 84:9
92:19 110:23
120:16 121:19
122:12 134:3
138:8 145:17
152:4 154:2,9
155:16 158:10
158:17,19
170:6 171:3
174:11 177:10
177:11 179:5
180:11,16
182:17 186:2
188:5 194:10
194:15 195:19
203:19,22
208:15 211:9
220:6
**ii** 82:15 83:4,13
115:21
**iii** 85:15
**Illinois** 2:24
**immediately**
81:23
**important** 50:10
50:12 109:12
109:22 110:16
110:17,25
**inbox** 163:19
**INC** 1:7
**inclined** 158:25
**include** 49:10
73:20 88:8
**included** 15:15
134:14 212:9
**includes** 29:21
**including** 47:24
60:12 110:10
119:3 193:15
**inclusive** 22:14
22:15
**incorporated**
4:7 133:24
**incorrect** 34:6
42:4
**increase** 66:21
80:7
**incremental**
54:21,23 56:16
58:8 60:13
62:12 66:14,21
**Independent**
11:16
**INDEX** 218:3
**indicates** 172:16
**indirect** 178:5
**indirectly** 28:20
28:22 30:16
127:19 128:4
171:5 177:14
177:18,25
178:17,22
179:22,25
180:21
**inferring** 102:15
102:25
**influence** 154:6
**info** 123:15
**information**
125:25 126:10
167:25 168:6
**informed** 127:10
127:13 131:20
140:23
**informs** 62:3,7
63:20 122:17
**infrequent**
200:18 211:16
**initial** 39:8 40:4
66:15 77:4,15
106:5 146:4
**initially** 12:21
130:9 131:12
**initio** 27:25 28:6
28:9,17 30:14
**insofar** 196:17
**insomuch** 18:23
**InstaLit** 32:21
32:24 34:3
37:24 38:7,22
39:21,25 40:2
44:15,18,21
45:3 193:3
**instance** 190:17
**Instant** 1:7 4:6
6:16,24 73:8
90:8 91:9
104:17 215:14
**instruments**
209:2,12
**intended** 53:24
**intent** 153:18
**interest** 13:10
22:6 29:7
40:10 49:24
53:23 73:22
74:7,18 75:8
75:12,20 77:23
86:12,21,22
94:12,18,23
110:10 126:21
133:12 182:15
182:20 183:10
184:8 185:2
186:20 192:12
216:13
**interests** 6:4 8:6
8:9 10:13
12:23 23:5
27:22 29:22
30:13,21 31:20
40:14 45:8
49:2,7,12,25
50:14 52:22,24
53:5,13 74:11
180:4 181:3,14
186:21 187:9
190:23 192:19
**internal** 35:25
36:24 71:18
72:2 216:10,11
**interpret** 56:22
**interrupted**
159:8
**interview**
144:13
**into** 12:21 69:19
108:18 111:16

113:4 133:24 135:15,19 160:24 161:20 161:20 163:21 166:16 169:9 180:9 182:5 188:11 189:6
**introduce** 6:12 11:22 20:19 32:3 35:24 86:7,10 93:5 119:17 122:21 139:22
**introduced** 71:15 86:8
**invested** 163:20 185:14
**investing** 80:18
**investment** 32:23 33:4 37:24 38:22 75:14,24 76:4 76:7,9
**invite** 193:12
**invites** 119:3
**involve** 161:22 207:15
**involved** 33:6 96:18,20 130:23 131:10 204:20,23
**involvement** 176:11,15 209:23 210:2 210:16
**involving** 155:23
**in-person** 70:20 88:3
**irrelevant** 19:3 19:11,18 199:18
**isn't** 15:21 20:17 153:10
**isolated** 53:4
**issuance** 55:21 57:5
**issue** 66:13 77:11,14,15 78:3 90:15 91:4,6,7,18,25 96:21,24 97:3 97:7 102:6,7 109:7,10 112:6 115:6,8,11 117:6,8,9,13 122:6 124:20 124:22 133:3 139:15,17,19 141:9,12 142:20 160:15 170:15 173:5 174:17 184:21 186:2 199:9
**issued** 6:16,24 165:14 215:13
**issues** 91:14
**item** 34:7 35:8 37:4,15 38:4,9 38:15,17 54:16 63:2
**items** 62:24 84:18 206:12
**its** 9:15,18 10:5 34:4 40:10 45:23 77:22,22 110:10 111:8 111:19 112:22 115:23 116:12 116:24 120:6 120:15,20 124:7,13 154:25 180:25 181:13 182:13 183:9 184:8 185:2,15 187:14 188:17 189:11 192:4,9 198:10
**itself** 6:5 187:8
**it's** 6:20 7:12,14 10:4 13:7 14:9 17:21 33:25 36:20 37:7 38:8,9,9,13 43:7 44:9 47:4 50:13 51:3 53:4 61:11,12 61:14,23 62:15 63:4 64:7,25 73:16 74:4 82:15 83:12 86:8,21 90:4 90:14 93:18 95:2,6,11 109:12,22 110:23,25 121:14,24 122:4,12,16 134:5 140:10 147:6 149:8 151:14 153:2 153:10 154:14 154:18 158:10 158:16 159:18 163:18,22 170:25 171:2 173:15 183:20 188:7 199:18 205:15 212:2 212:11
**I've** 6:22 8:24 9:6 12:5 13:20 15:8 21:2 24:18 33:14 55:12 71:22 86:18 114:10 119:24 205:13
**i.e** 29:22

**J**

**January** 119:9
**job** 153:16
**John** 1:12 2:22 2:24 4:5 19:14 57:13 77:24 134:8,10,14 160:22 161:18 170:13 181:8 202:25 204:16 215:6 219:4 220:8
**join** 9:20 73:7 77:16 134:18 194:11,14,19
**joinder** 8:19 9:7 9:19 10:2,25 133:24 134:8 201:3,25 202:18 203:13 204:9 215:16
**joined** 9:24 12:13 68:9 129:23 133:23 194:5 202:5
**joining** 69:2,6 69:11,17 70:7 70:13,18 71:5 103:20 146:8 203:5
**joins** 134:11
**Jonny** 3:5 16:24 68:11 69:23 73:18 95:22 96:2,14,16 98:9 145:10,15 211:6
**July** 172:17 174:23 175:2
**just** 9:5,12 13:24 16:10 29:15 30:11 33:2 38:6 39:4 44:3 44:12 51:2,3 51:15,18 53:4 57:20 60:19 62:13 63:16,19 64:9 65:2,18 72:16 74:2 75:21 76:9 80:2,18 84:10 89:25 90:4 92:16 94:19,24 95:21 100:6,24 108:11 109:19 118:17 128:9 128:14 129:20 134:23 135:4 136:23 137:9 144:5,17,24 146:25 147:6,8 149:8,18 151:25 152:8 153:19 154:20 158:14 161:5 165:12 170:25 171:2 176:25 177:2 179:13 180:10 182:12 184:2,19 187:7 189:3,21 192:8 196:14,24,24 196:25 198:13 200:6 201:20 202:2,17 204:12 210:9 212:20,21

**K**

**Kat** 8:17 95:13 147:19 152:17 206:5,17
**KATHERINE** 2:11
**keep** 123:9 125:13 154:24 196:14
**kind** 37:14 154:15 187:7 198:6
**know** 6:7,10 9:5 17:6,7 33:5 40:18 54:4 61:9 67:2,2 75:4 78:11 84:14,23,25 90:4 93:2 96:12 97:5,15 99:16 102:17 103:3 119:5 124:19 125:2

128:20 142:23 143:2 144:12 144:14 145:6 145:18,19 146:14,20,23 151:25 152:2,6 152:10 154:9 157:15,18 158:10 160:4 160:16,19,20 160:25 161:6 161:13 166:19 166:24 169:2,2 169:3 170:8 172:14 175:3 177:3,5,9,10 178:14 179:6 180:14,16 185:11 186:14 192:16,21 200:3,7 203:18 204:2 209:15 210:9 212:20
**knowing** 127:23 176:8
**knowledge** 78:2 97:8 130:13 133:9 142:25 164:24 168:2,8 168:9,17,19 177:7 185:19 186:7,8 204:22 209:14,17,24 211:11,12
**knows** 160:8

**L**

**L** 179:2
**labeled** 63:10,12
**lacking** 160:9
**language** 7:21 8:2 47:20 48:7 48:16 50:19 59:13 107:6,13 114:9 116:6 117:15,17 118:18 154:15 167:2 197:16 206:14
**LaSalle** 2:23
**last** 54:15 55:15 63:2,25 93:25 105:14,16 106:19,20 118:24 140:15
**later** 141:23
**Latin** 205:18,18
**law** 25:7
**lawyer** 11:19 18:12 92:18 94:5 161:23 205:17
**lawyers** 143:25 202:21
**lays** 18:14,15
**lead** 62:15
**leading** 137:13 138:18
**learning** 140:18
**least** 25:2,13,23 162:9
**leaves** 95:8
**led** 74:13
**left** 152:5
**legal** 1:23 3:10 111:20 112:5 193:16
**lender** 42:19,23 43:2 47:15 48:10 65:5
**lenders** 46:25 47:6 48:3 49:20,22 50:5 50:22 51:9 53:9,15 54:5 56:14 59:17,17 67:8 68:20 114:4,14,25 115:21 116:11 116:23 177:22 179:2 182:3
**Leslie** 1:13 57:25 219:6
**Leslie's** 74:2
**less** 61:11,12,14 61:23 62:5,15
**let** 9:5 51:18 58:23 84:9 89:6 93:24 102:24 108:12 128:8 159:9 180:15 184:19 198:13
**letter** 145:9,11 145:21,24 171:22 172:7,8 172:12,20,23 173:6,9,22 174:6,17,22 216:24
**let's** 11:22 15:2 20:19 21:23 29:9 32:3 39:4 45:10 46:12 54:12 55:4 58:11 59:12 61:17 62:21 63:16,18 64:11 64:23 65:2,21 71:14 72:16 81:9 86:7,10 93:5 104:9 105:7 113:17 115:12 122:20 125:3 129:11 130:2 135:2 139:22 143:8 165:12 171:19 185:25 190:7,9 192:23,25 193:5 201:2 202:3 204:6
**lies** 160:12
**lieu** 4:24
**life** 110:18
**like** 45:5 51:14 65:16,19 66:10 76:11 125:7 143:25 144:3 144:10,11,14 145:14 147:14 153:17 154:16 154:18,19,22 156:2,3 163:19 163:23 166:24 171:9 174:20 175:20 178:5 187:6 194:10 212:11,20 214:11
**likelihood** 122:9
**likely** 121:23,24 122:2,5,13,14 122:16 125:10
**limit** 57:3
**limited** 193:15
**limits** 68:5
**line** 34:7 35:8 37:4 38:4,9,15 38:17 54:16 62:24 63:2 218:5,5,5,8,8,8 218:11,11,11 218:13,13,13 221:3
**liquidation** 7:23
**list** 123:14 125:17,22 127:10,14
**listed** 85:5 207:9 208:7
**listening** 194:16 194:20
**listing** 137:6
**literal** 192:6
**LitFin** 38:24
**litigation-relat...** 98:17,22 100:2 148:4,10 210:3 210:12,17
**LITRELL** 2:22
**little** 26:21 35:20 36:13 37:7,11 143:15 144:19 161:3 168:18 183:19 184:16 185:25 189:21
**live** 100:21
**LLC** 2:9 32:7,20 32:21,22,25 37:25 38:7,23 38:25 44:15,18 44:22 45:3 193:3 216:8
**LLC's** 205:7,8 205:16,17 217:7,9
**LLP** 2:9,13,18 2:22 3:4
**loan** 6:2 8:15 29:24 30:5,9 42:25 43:19 44:25 45:7 46:25 47:15 48:3,10 49:22 50:5,22 51:8 53:9,14 54:5 54:17 62:14 63:8 64:25,25 65:7 68:20 110:10 114:14 114:25 115:21 116:11,22 141:15 178:8
**loans** 42:6,8,14 45:15 60:11 67:25 85:14
**lodge** 64:13
**log** 188:18,19
**long** 162:6
**longer** 31:12,19 31:21 37:12 123:13 158:15 186:2
**look** 14:3 15:2 15:23 22:23 26:19 53:3,25 61:17 81:8 84:9 93:18 122:20 134:5

135:3 136:12 137:20 138:7,8 142:19 161:18 181:23 183:24 195:3 207:18 208:11,13 211:9
**looked** 60:19 61:15 88:20,23 94:19,24 97:9 97:14 128:9 137:23 139:14 190:18 205:22
**looking** 19:20 34:18 44:13,16 59:12 63:21 77:13 83:3 97:11 105:6 115:14 116:16 134:7 135:4 139:16,19,21 195:2 203:2 209:18
**looks** 65:16 93:15,18 134:9 134:21 175:5
**loop** 189:3
**lot** 153:6,13 154:12 170:20
**Lower** 15:14
**LP** 37:20
**LTA** 208:25
**LTAB** 6:4,5 10:20 12:24 13:11,12 27:5 68:8 69:2,6,11 69:12 70:7,14 70:18 71:5 77:5,16,21 78:14,18 80:6 84:21 100:4,10 100:11,13,18 101:7,23 102:5 103:20 110:12 116:10,21 120:25 124:7 124:13 126:20 129:8 141:3,3 141:6,10,17,25 142:7,8,13 143:6 145:8,13 146:6,8 148:18 148:19 149:2 149:16,22 150:3,6,19 151:4 152:15 154:24 155:5 155:13 156:7,9 157:12 164:11 164:12,19,20 164:20 167:13 168:10,20 169:24 172:23 173:16,23 194:4,19 199:10,15,17 200:16,17 208:23,24 209:9 211:6,15 211:16,21 212:13,14,24 213:6
**LTI** 34:8,11 35:4,8,13,19 37:4,18 38:4 38:18 41:25 45:15,21 180:4 183:23 188:6 196:2,7,18 198:3,10,16
**LTIs** 13:22 14:14 16:4,15 17:11 21:13,20 25:17 26:3,8 26:16 27:6,13 28:5,15 34:4 34:16 38:6 39:14,19 40:11 40:15,19,24 41:5,22 43:20 45:2,8,16 110:12 119:9 120:7,15,20 141:15 185:16 185:21 186:11 186:12 188:11 189:7 196:8,18 196:22 197:5 197:12
**Luncheon** 162:12
**L24** 38:24

**M**

**Madam** 209:4
**made** 34:15 36:25 37:24 51:16 73:17 75:23 98:24 123:19 124:2,5 124:11 126:19 126:23,25 131:7 169:7 198:9
**made/are** 98:12
**Magna** 1:23 3:10
**mainly** 96:2,13
**majority** 24:9 152:19
**make** 4:15 36:18 59:12 63:23 64:9,14 65:6 67:18 76:6,9 85:12,17 89:6 98:12 118:17 135:8,20 136:9 137:20 138:14 142:3 151:22 153:15 159:2 175:18 195:6 196:15 198:2 201:6,24 202:9
**makes** 22:11
**making** 75:14 195:7
**management** 106:24 108:2 108:23 212:16
**mandate** 150:4 150:18
**mandating** 116:9,20
**manner** 5:8
**many** 158:17 159:13,20 161:10
**Marc** 2:11 164:16 179:10 185:22
**March** 10:19 15:18 87:10 119:13,19,25 120:12 121:15 216:16
**marked** 6:17,19 7:11 8:18,20 12:3 15:6 20:22 32:8 36:2 71:19 86:13 93:8 119:20 122:24 125:5 140:2 171:22 205:9 218:10
**MARURI** 2:4
**material** 101:16 133:12 167:20 168:12,22
**materials** 101:14 169:12 169:14,19,23
**math** 61:20 62:17,22 63:15 64:6,7,8,19,23 65:9
**matter** 4:5 57:20 121:18 145:21 149:10 154:23 183:8 184:6,24 185:10 186:20 189:13
**matters** 101:7 147:23 148:5,9
**maximize** 47:23
**maximizing** 187:11
**maximum** 56:4 57:3,5
**may** 5:3 56:15 66:2 117:25 118:3 121:17 127:16 173:10 180:13,14 186:4 197:2
**maybe** 63:17 106:25 108:6 108:24 153:17 153:22,22 154:18 173:14 180:5,10 184:20
**me** 6:13 9:5,12 13:17,24 19:6 20:24 21:25 33:19 47:2 51:18 58:23 62:7,15,17,24 64:4,20 65:15 69:3,25 74:3 82:14 84:9 89:6 93:18,24 95:22 102:24 108:12 128:8 128:15 149:18 150:9 153:23 155:8 159:9 160:24 170:13 173:14 175:16 176:24 177:11 179:6 180:11 180:16 183:25 184:16,19 185:9 188:13 188:14 190:5 198:13 219:4 220:4,11
**mean** 11:19 42:24 56:3 76:4 89:23

111:25 120:17 144:22 151:16 153:23 154:2 156:21,23 177:25 180:4,5 184:18 187:9 204:19
**meaning** 192:6
**means** 23:15,17 70:16 72:4 110:19 192:6 194:10 219:11
**mechanically** 64:8
**mediums** 70:2
**meeting** 24:13 25:5,16,25 100:20,21,22 101:4 154:24 155:2
**meetings** 70:21 100:11,12,17 101:7 120:25 121:6 193:13 193:20,23 194:2,8,13,18
**member** 68:13 84:21 87:2,9 87:14,17 89:9 89:16,22 91:8 95:3,4,25 97:18,22 98:7 99:14 100:3,10 100:17 101:6 101:14,23 102:5,17,19 103:3,21 104:12,18 107:8 115:21 116:11 121:3 121:15 141:3 141:11,25 142:2 146:9 148:19 155:5 156:7,10 164:11,12,19 164:20 167:12 167:23 168:10 168:14,20,24 169:24 194:3 194:19 199:10 199:18,23 200:17,17,21 211:15,16,21 212:14
**members** 16:2 16:12 24:10 25:3,14,23 27:5 68:8 95:3 100:18 101:8 104:3 105:22 106:2,5,14 114:3,24 115:17,18,20 116:9,21 120:25 152:15 154:9 167:13 173:17,23 199:15 211:6 212:2,4,6,14 212:24 213:6
**memorializati...** 74:13
**memorialized** 33:24 34:12 35:2,4
**Menezes** 124:6 124:12
**MENNITT** 3:6 214:6,14
**mentioned** 200:20 207:22 211:25
**message** 70:3 212:21
**messages** 70:12 72:12
**method** 50:16
**methodology** 71:9
**MIAN** 2:16
**Microsoft** 71:9
**midway** 186:5
**might** 17:21,23 26:24 35:21 36:13
**million** 34:19 35:10,17 37:8 55:22 56:16 57:6,11 58:8 60:12,13,17,18 61:11,23 62:6 62:9,10,13,16 62:22 63:7,14 65:4,8,19 66:15 185:15
**mincing** 17:22
**mind** 42:12 66:8 80:3 95:13 123:6 143:24 144:7,15 147:19 149:6 151:9 152:17 188:20 206:5 206:17
**minimal** 176:16
**minimum** 212:10
**minute** 13:24 206:3
**minutes** 23:19 23:21 129:13 154:24 198:21
**missed** 59:19 98:11
**mix** 151:14
**mixed** 86:9
**moment** 29:15 46:14 84:10
**money** 178:10 182:2
**monies** 178:2,11
**months** 55:16 105:16 118:24
**more** 18:15 19:20 61:11 66:4 110:21 122:13,14,16 153:11,13 154:12 157:13 157:17 158:17 158:18 159:2 170:20 184:16 212:6,25 213:6
**morning** 5:17,18
**most** 63:24 93:23 105:11 125:10
**motion** 11:25 12:8 215:20
**motivate** 170:23
**move** 65:21 72:9 72:14 125:3,12
**Ms** 15:5,10 72:24 122:23 123:3 125:24 126:14 215:25 216:19
**much** 61:7 68:5 158:15
**multiple** 110:9 149:7
**multiply** 63:19 65:14
**my** 10:24 15:21 17:21,23 18:4 18:11,19,22 20:17 22:13 23:18 26:22 37:22 39:10 42:16 45:22 47:17 51:11 63:6,11,14 71:7 72:7 89:24 90:4 92:18 93:12 94:5 102:23 118:21 119:12 121:5 122:18 133:22 139:20 144:23 146:24 147:10 148:20 153:2,2,3,4,11 154:21 159:4 163:18,22,25 164:24 165:11 166:4,9,11 167:23,25 168:7,16 170:16,19 171:2,4 173:15 175:4 176:5,15 178:5,24 179:4 181:7,17,21,22 181:24 182:6,9 182:9,24 183:6 185:13,23 186:8 188:14 194:16 197:19 199:14,21 204:17,19 207:19 209:14 209:17,24 211:12 212:2,3 212:10,11 220:12

**N**

**N** 2:2 3:2 5:11 5:11,11 163:2 163:2,2,4,4,4 215:3
**name** 68:12,14 200:24,25 204:7
**named** 126:19 127:23,25 128:20
**naming** 127:20 128:4,19
**nature** 176:10
**nearing** 205:2
**nearly** 200:18 211:17
**necessarily** 181:18,20 182:10 188:7 212:2,4
**necessary** 66:22
**need** 4:15 53:21

54:9 110:21 118:9 154:2 162:8 180:7 181:21
**negotiated** 74:15 80:25
**negotiations** 74:12,22,25
**neither** 50:8,22 52:4 53:14
**net** 34:9,14,25 35:5,5 37:16 38:17 39:6,7 40:5
**never** 96:21 121:17 122:13 122:14,16 169:7 171:25
**new** 1:14 2:6,6 2:10,10,15,15 2:19,19 3:6,6 126:10 127:20 127:23,25 128:4,19,20 131:21 132:6 132:16
**next** 14:8
**nice** 143:15 144:18
**nil** 176:15
**Nineteen** 44:2
**nod** 143:15 144:19
**None** 218:6,9,11 218:14
**nonvoting** 102:12
**non-lawyerly** 18:19
**Nor** 146:21
**North** 2:23
**notary** 1:14 5:4 5:6,12 220:14
**noted** 4:11 163:3 214:17 220:6
**nothing** 39:22 135:18 170:25 183:11
**notice** 40:21 41:2,8,17,20 54:17 67:22 149:12
**notices** 10:19 26:19,25
**notwithstanding** 52:10 81:23
**now** 4:2 5:9 14:3 16:24 40:8 41:24 43:11 44:16 45:13 46:22 72:5 81:15,18 84:9 94:14,22 95:7 95:15,16 99:3 113:19 116:2 120:24 125:15 127:16 137:4,7 140:4 141:22 184:2 192:17 192:22 205:5
**number** 24:9 34:18,24 35:6 35:9 65:14 126:2
**numbered** 43:17 63:3
**numbers** 33:10 63:16
**numerals** 84:19

**O**

**O** 5:11 163:2,2,2 163:4
**oath** 4:24,25 161:9
**object** 57:21 127:18 128:2
**objected** 128:18
**objecting** 128:21
**objections** 5:10 28:18 51:16 52:18 110:15 117:2 205:8,16 217:8
**obligated** 57:22
**obligation** 83:14 153:14 154:13 191:12,15,17 191:20
**obligations** 83:18 178:13
**observation** 78:23 79:2,7 79:12 87:6 89:22 153:8,25
**observe** 89:25 164:12,20
**observer** 194:5
**observers** 147:22 148:17
**obtain** 10:12 13:11 27:12 97:22 185:15
**obtained** 25:13 25:22 26:7,15 27:4 107:20 108:16
**obviously** 70:24
**occurred** 62:11 63:8 71:5 120:22 142:9 203:3
**occurring** 76:11
**October** 139:25 140:6 216:21
**off** 23:20,23,24 46:7 63:4 66:2 66:6 72:16 86:3 129:15 162:11 179:12 179:15,16 182:24 183:6 185:13,23 186:4 188:19 188:22,23 198:23 214:16
**offer** 89:3 135:18
**offered** 69:8
**office** 24:11
**officer** 166:4
**OFFICERS** 2:14
**official** 115:22
**officially** 144:25 145:4 147:3
**Oftentimes** 76:6
**oh** 94:21 155:25
**okay** 6:20 12:5,6 12:19 14:2 15:8 18:2 19:18 20:18 22:4 31:16 36:11 37:11 44:10,11 45:12 48:23 50:12 58:13 65:8,11 66:16 71:21,21 82:17 94:21 111:18 122:19 125:13 138:7 150:12 158:25 178:4 179:8 187:22 190:7 197:22 199:25 208:15 210:14 213:25
**old** 62:10
**Olson** 14:5,13 14:18,20,23 15:15 17:8,11 68:14,17 77:8 91:19,22 121:6 121:10 122:6 122:10 123:19 124:8,13 127:20 128:5 128:11 130:8 132:7,17 138:24
**Olson's** 121:16 130:10 131:13
**once** 63:5
**one** 2:15 31:24 33:20 38:10,20 38:21 42:19 43:8 44:8 65:23 66:4 70:9 71:21 74:18,19 75:4 75:8,9,13 76:17 78:11 81:12 84:23,25 85:20,21 87:18 88:16,18 89:10 89:18 90:11 91:13 92:3,5 93:3 97:2 99:17 101:11 101:25 102:17 103:4,11 108:10 109:10 112:4,18 113:14 114:4 114:16,25 115:21 116:11 116:23 119:5 123:22 124:16 139:3,11 140:22 142:15 142:17 146:11 146:14 147:15 149:6,8,18 150:24 153:19 154:3 157:7 158:10,19 164:7 169:3,17 169:22 173:2 174:13 175:22 182:2 193:7 194:23 209:15 211:25 212:3 214:9,12
**ones** 156:23
**only** 33:5 49:20 49:21 95:8 133:18 140:14 156:7,10 179:3
**open** 6:22 9:2 29:4 32:14

69:7 72:3,4,7 93:12
**opened** 69:17
**opening** 6:20 43:8
**operation** 106:25 108:2 108:23
**opinion** 148:20
**opportunities** 143:17
**option** 65:6
**options** 182:2
**ordeal** 95:25 96:6,8,9
**order** 6:15,24 7:13 11:4,9 12:3,9 53:22 135:20 136:9 207:18 215:13 215:21
**organized** 34:22
**others** 11:7 77:10 93:8,14 156:15,18 178:13 179:7 203:8 216:15
**otherwise** 25:7 74:4 170:24 195:9 197:3
**our** 21:16 62:13 63:17 64:24 65:9 75:24 76:4 147:24 148:11 154:6 184:14,15 187:9 189:20
**out** 18:14,15 38:22 64:3 82:14 163:21 176:25 205:3 206:3
**outcome** 183:7 184:6,24 185:5 187:20 189:12
**outcomes** 186:17,19
**Outlook** 72:11
**outset** 141:14
**Outside** 182:11
**out-of-state** 5:6
**over** 25:19 37:7 66:14 72:15 88:9 108:10 175:10 185:14
**overly** 100:23,25
**oversight** 140:14
**owed** 37:16 38:18
**own** 192:4,9 196:21
**ownership** 8:5,9
**owns** 5:25 6:3

**P**

**P** 2:2,2 3:2,2
**page** 7:8,11,12 7:14 10:7 11:2 12:15,17,18 13:15 14:8,9 21:23 24:5 27:15 29:12,16 33:15 36:16 43:16 44:23 45:6,10 46:13 46:15,16,19 47:18,19 55:5 55:5,18 56:5 57:8 58:14 59:2 66:9 81:10 113:18 115:12 125:12 125:12,15,19 126:6 130:2 172:15 190:10 190:10 193:5 195:21 197:23 205:23,24 206:2 208:16 215:6,12 216:5 217:5 218:5,5 218:5,8,8,8,11 218:11,11,13 218:13,13 221:3
**pages** 29:14 195:19 220:3
**paging** 123:6
**paid** 34:3 37:21 38:24 140:15
**Para** 33:9 193:6
**Parabellumca...** 163:14
**Parabellum's** 40:23 41:4,19 42:5 43:19 45:6 67:24 77:15,20 109:13,23 111:2 134:23 141:15 151:5,6 155:13 186:20 189:5 203:13 210:2,16
**paragraph** 9:19 10:6,9,11,25 12:15,17,18 13:14,17,19,21 14:2,4 45:24 47:21 51:20 56:7 66:9,10 66:18,20 82:6 86:25 106:21 113:19,24 130:2,4 134:17 135:3,4,9,22 136:11 137:22 138:3,8 190:20 195:20 197:22 198:11
**paragraphs** 43:17 44:23 66:11 138:9,16
**parameters** 90:7 91:8 166:13,20 166:22,23
**Pardon** 19:6 170:13
**Park** 3:5
**parsed** 163:21
**part** 15:18 21:16 23:13 25:20 26:11 38:14 63:25 94:17 125:20 159:18
**participant** 5:24 42:25
**participate** 174:9 193:12 193:19,22
**participated** 45:14,15,20,21 46:2 69:20 79:2 120:25 132:3,13 165:24 174:12 194:2,8 195:12 195:15,22,25 196:2,4,7,17 196:18,24 198:3,11 200:21
**participating** 4:18 132:20 133:2 194:13
**participation** 5:25 10:11 11:3 12:21 28:24 29:3,7,8 32:6,19 33:5 33:24 34:10,11 34:16 35:2,3 35:18 37:2,17 37:19 38:19 39:13,23,25 40:6,23 41:4 42:10,14 43:13 44:6,14,17,20 44:22 45:7 62:14 65:10 69:19 74:10,14 74:18 75:8 77:23 78:16,20 81:2,13 84:11 107:21 108:17 141:16 151:13 151:18,19 155:13 178:5,8 178:12 179:3 181:2 182:4,14 183:9 184:8,15 185:2 187:14 187:19 188:11 188:18 189:6 189:11,20 193:2 194:10 194:15 196:13 196:20,25 197:11 198:12 216:7
**participations** 35:14 40:9 43:20 44:25 110:11 181:13
**particular** 22:19 22:21 190:18
**parties** 2:2 3:2 4:10 5:2 50:15 73:9,14 79:25 134:15 165:15 173:12 176:6 211:3,5
**Partners** 37:20
**parts** 5:25
**party** 5:7 39:4 43:3 47:6,11 80:4,13,14,17 86:23 143:14 143:22 144:24 147:2 167:4 179:3 196:25
**passed** 154:7
**Patel** 15:15 16:20 17:5,6,8 122:23 123:3 123:11 125:16 125:21 126:6 140:12 216:18
**Patel's** 16:22
**Paulo** 123:15

124:3,6 125:17
**pause** 51:15 84:10
**paused** 108:13
**pavements** 40:4
**pay** 39:2 185:21 186:10,12
**payable** 182:25
**paying** 144:4
**payment** 34:15 38:5,8 184:7 184:25 188:3
**payments** 39:6,7 39:8,12,18 40:5
**PB** 38:24
**PDF** 7:14 29:14 29:16 46:14,20 46:21 55:5
**Penn** 2:5
**people** 50:21
**per** 47:11 126:14
**percent** 63:17,18 64:2,16,17,25 65:8,11
**perfect** 173:15
**perhaps** 7:7 118:25
**period** 59:19 135:17 140:19 169:23
**permit** 58:4 61:2
**permits** 66:13
**permitted** 12:25
**person** 4:24 23:6 70:3,5,23 71:6 87:6 88:2 89:22 163:24 166:11,17 200:24 207:21
**personal** 151:4 170:16,19
**personally** 92:19 92:22
**persons** 178:15 178:20
**person's** 68:12
**perspective** 80:15 199:17 199:21
**phone** 71:12
**phrase** 56:2,22
**phrased** 154:16
**phraseology** 212:10
**physically** 4:20
**pick** 122:12
**picking** 122:15
**pie** 187:5,5
**piece** 63:15,18 64:3 182:5
**pitches** 144:14
**place** 127:20 128:5 130:16 167:19 168:5 173:10
**Plaintiff** 2:5
**plan** 7:9,12 11:5 11:9 17:19 18:6,13,20,22 19:3,11,23 20:13 29:13 31:14 46:13,16 47:16,19 48:10 49:6 50:19 52:5,10,20 53:3,7,21,25 54:9 55:5,8 58:4,22,22 59:6,7,22,23 60:19 66:13 68:5 103:15 107:3,14 108:8 108:25 113:18 115:19 132:4 132:14 208:25 209:11
**plans** 60:8
**played** 165:6
**plays** 178:9
**Plaza** 2:5
**please** 4:13 5:8 16:8 26:11 29:10 39:17 40:25 43:24 64:20 66:12 83:2 94:10,15 98:4 108:10 109:21 110:7 116:15 123:9 123:14 125:12 125:13 126:2 128:7 132:12 138:8 141:13 150:10 164:17 165:10 168:17 184:22 210:8 210:10
**point** 62:24 82:14 121:11 143:7 163:23 171:11 173:18 175:25 196:12
**pointed** 38:22
**policies** 168:4
**poorly** 153:17
**population** 53:7 53:8,12
**populations** 50:8 51:6,20 52:5,11,12,24 54:4
**portion** 55:8
**position** 72:12 80:8 89:3 100:9 101:5 185:15
**possesses** 40:19
**possible** 90:14 121:14,19,21 149:7 183:7
**pot** 187:11
**potential** 75:25 143:13,16 167:3 182:19 186:16,18
**potentially** 80:7 129:8 203:9
**preceding** 81:24 83:25 148:17
**predating** 208:22 209:9
**predicate** 160:14
**predicated** 177:4
**preliminary** 55:22
**premiums** 182:25
**preparation** 136:17 202:22
**prepared** 140:13
**preparing** 130:23 131:11 133:20 201:15
**prepetition** 8:15 29:24 30:8 46:25 47:15 48:3,9 49:22 50:5,22 51:8 53:9,14 54:5 68:20 114:4,14 114:24 115:20 116:10,22
**present** 2:2 3:2,8 4:10 25:4,5,15 25:16,24 26:2 121:7 136:6 149:13
**pretty** 207:24
**prevent** 167:19 168:5,11,21
**previous** 133:16 179:5
**previously** 44:13 74:9
**price** 34:8 35:8 37:5 38:4
**prior** 18:17 22:13 37:13 49:2 81:25 84:4 148:18
**privilege** 111:13 111:17 113:4 208:2
**privileged** 161:16 166:7
**probably** 20:7 26:23 101:3 122:13,16 153:12 156:15 156:18 158:22 170:9 180:7 191:24 203:4
**problem** 44:10
**procedures** 167:19,22
**proceeding** 5:8 165:14
**proceeds** 47:25 48:18 49:4,6 49:14 50:19 51:6,21 52:13 53:11 54:7
**process** 21:17 143:24 144:12 144:13,16 165:24 166:6 176:11 200:22 201:15 204:23
**processes** 168:4
**produced** 145:17 149:9 165:19 169:13 169:15 208:6
**producing** 165:7 165:9
**production** 165:25 200:22 205:25 206:11 206:15 208:16 208:20 209:18 218:5
**Professional** 219:7
**promised** 46:20
**promises** 158:24
**proper** 163:21
**proposed** 130:9

131:12
**propounded** 220:5
**prospect** 28:5,8 69:2,4,6,10 70:7,13,17 71:4 79:7,11 82:18 83:5,19 87:13,18 89:10 103:20 141:2 143:5 146:8 150:3,16
**provide** 56:15 58:5 60:11 61:2 67:13,14 98:18 113:25 119:11 126:2 129:3 199:15 199:24
**provided** 10:12 10:20 25:8 40:22 41:3,18 41:21 42:7,9 61:7 62:4 67:23 149:13 212:7
**provides** 42:2 45:18 52:11 55:21 57:5
**providing** 42:12 178:2
**provision** 22:19 22:21 23:11,13 24:17,19,20 58:3 60:24 190:18
**Public** 1:14 5:13 220:14
**pulling** 72:8
**purchase** 33:22 34:8 35:8 37:5 38:4 74:11 147:24 176:17 176:20
**purchased** 73:22 74:7 177:10
**purported** 27:21 133:11
**purpose** 116:8 116:19 190:25 192:2
**purposes** 36:19 64:24
**pursuant** 1:12 45:24 107:21 108:17 195:8
**pursue** 47:24
**pursuing** 148:14 167:15
**put** 8:17 153:7,9 154:14 189:21 197:10
**putting** 147:20 152:18
**p.m** 46:7,10 86:3 86:6 129:15,18 162:11,13 163:3,7 179:15 179:18 188:22 188:25 199:2 214:16,17

**Q**

**qualified** 83:12 83:13
**qualify** 31:5
**quantum** 157:20 158:3,5 185:2
**quarterly** 156:4 156:12
**quarters** 10:10 158:23
**question** 16:7 18:18 19:7,8 20:4 25:19 26:22 38:12 45:4 51:11,18 51:18 53:19 54:10 61:22 64:12,14,15 67:9,15 70:22 70:25 74:3 77:8 78:17 82:25 98:3 99:20 102:23 104:15,23,25 110:23,24 113:3 118:11 128:13,25 132:10 134:6 143:3 150:13 150:14 152:2,3 153:21 155:22 159:8,9 160:8 160:10,14,23 161:3,19 165:22 175:11 175:15 178:7 179:5 180:15 184:13,20 185:12 186:5 186:15 193:7 204:5 209:5,7 209:8 210:8
**questions** 57:21 125:8 162:4 205:25 214:2,5 214:6 218:10 220:4
**quick** 85:23 193:7
**quorum** 24:12 25:5,16 26:2

**R**

**R** 2:2 3:2 163:2 221:2,2
**RAINES** 2:22
**rate** 182:20
**rather** 22:16
**rationale** 114:22 213:11,13,18 213:23
**Ravago** 17:8 69:11 91:20 123:12,14 124:2,6,12 126:8,19 127:19 128:4 128:10,19 130:5,7 131:12 131:19 132:5,9 132:15 138:22 139:9 140:12 140:19 150:2 150:16 167:8
**Ravago's** 131:19 131:25 132:25 133:4,11 141:5 149:21
**Re** 1:6 4:6
**read** 7:6 9:13 13:24 14:2 21:9,10,12,18 21:18 22:14 24:18,19 27:20 33:19 55:12,13 55:15 57:16,18 57:19 58:23 85:7 105:19 138:19 190:14 190:14 197:15 197:20 198:13 208:19 209:5,6 220:3
**reading** 22:17 23:10,12 190:16
**reads** 55:19 56:6
**realistic** 203:4
**really** 11:20 34:22 38:13 76:7 129:4 154:6 156:4 167:25 170:25 175:5 176:7 187:6,8 192:8 204:20 213:15 213:15,24
**realm** 207:25
**reask** 98:3 204:4 209:7
**reason** 5:19,21 13:6 14:16,22 14:25 76:21,25 151:12,16 154:16 171:7 172:2,4 174:21 174:24
**reasonable** 95:6
**reasons** 199:18 199:21 200:2 200:12 211:10
**recalled** 90:21
**receipt** 156:2 184:15
**receive** 53:24 72:19 101:14 167:24 171:6 183:11 184:10 185:4
**received** 11:17 145:12 167:12 171:8 174:22 174:25
**receiving** 72:12 101:15 168:5 172:11,13 184:7,25
**recently** 7:7 93:23 105:11
**recess** 46:8 86:4 129:16 162:12 198:24
**recognition** 147:5
**recognize** 36:5,6 172:5,14 205:11
**recognized** 144:24 146:25
**recollection** 14:12 22:13 63:14 68:15,18 71:7 118:21 120:5,10 121:5 122:18 133:22 137:12 147:10 153:2,3 173:16 176:5 190:6

194:16 204:17
**record** 4:3,12,16 23:21,23,24 24:2 41:16 43:2 44:12 46:7,10 86:3,6 129:15,18 152:9 162:11 163:7 179:12 179:15,16,18 188:22,23,25 198:23 199:2 200:6 209:6 214:16 219:4
**records** 94:12 154:24
**recovery** 47:25 82:12,20 83:7 83:21 180:23 181:11 183:22
**reduces** 143:13 143:21
**reductive** 100:23
**refer** 37:13 42:20 49:6 73:13 74:22,25 81:7 148:8 195:16
**reference** 54:17 62:8 71:3 73:17 203:20 203:23
**referenced** 52:12 61:25
**references** 43:18 106:9
**referred** 26:25 43:14 164:4 170:18 189:7 194:8 196:3
**referring** 18:17 18:18 44:24 73:14 74:8 118:5 136:2 143:23 148:9 156:19 174:3 188:9 197:5 201:11,18 202:13,16,17 204:14
**refers** 45:6 47:5 81:19,20 94:23 98:19 196:7,18
**refill** 23:18
**reflect** 127:11,14
**reflected** 74:14 74:25 77:12
**reflecting** 209:22 210:15
**reflects** 35:17
**refrain** 195:7,10
**refresh** 14:12 68:14 120:5,9
**regard** 127:24 147:9
**regarding** 133:10 156:11 167:14,16
**Registered** 219:7
**reiterate** 135:13
**related** 10:2 144:5 147:23 148:5,8
**relation** 64:16 64:18
**relationship** 17:7 18:6,10 18:12 110:6 197:12
**relationships** 109:13,23 110:9 111:2,8 111:10,19,21 112:22,24 113:9
**relevant** 18:20 18:22 19:24 20:3,7,10,13 20:17 152:24 199:9
**relied** 11:20
**relieve** 57:23
**rely** 39:3
**remainder** 34:12
**remained** 153:7 153:24
**remaining** 133:13
**remains** 28:25
**remedies** 82:2 84:5 195:11
**remember** 22:18 89:12 112:16 112:18 157:7 157:10 159:19 167:2 204:25
**remote** 70:24
**remotely** 1:13 4:22,25
**remove** 106:15
**Reorganized** 1:8
**repaid** 180:25 181:12 182:13 183:9
**repayment** 187:15,17,23 189:14,25
**repeat** 16:7 19:8 82:25 210:8
**rephrase** 38:11
**replace** 128:10
**replacement** 124:7,13 132:7 132:17
**reply** 16:2,13
**report** 156:3
**reporter** 1:14 4:13,15 158:19 209:4 214:7 219:7,12
**reporting** 4:21
**reports** 156:12
**representative** 91:19 126:10 151:5,7
**representatives** 71:4 149:14 154:4 157:3
**represented** 204:3
**reproduction** 219:11
**request** 45:19 77:5,16,20 89:2 141:19 165:17 198:2 198:10 206:6 206:10,15,19 206:24 208:15 208:20 209:18 209:25 211:9 218:5
**requested** 141:17 146:5
**requests** 16:13 159:19 165:15 165:19 206:7 207:4,6,9,13 207:18 208:7
**require** 11:6
**required** 25:7 97:17,21 98:6 116:21,23 185:21 186:10
**requires** 11:7 56:8,12 58:17 58:20 59:5,21
**reread** 82:23
**reserved** 126:20
**resign** 140:13 170:23
**resignation** 171:7,22 172:2 172:6 175:8,14 199:19 200:12 211:11 216:23
**resigned** 69:11 170:4,8 199:6 199:8
**resolution** 148:22,24
**resources** 144:11
**respect** 8:8 34:15 35:13 38:6 39:13,19 39:24 40:5 42:6 44:14,17 44:21 45:14,16 45:19,25 72:20 75:19 79:6 80:9 81:3 82:3 82:11,19 83:6 83:20 84:5 106:24 107:25 108:23 116:6 116:18 148:13 159:25 160:18 165:9 180:25 181:13 182:13 183:9 184:7,14 184:25 187:14 187:18,20 188:17 189:11 195:11 198:3 198:10 202:18 207:6
**respondents** 9:20
**responding** 95:17
**responds** 125:24
**response** 12:2,8 16:19,22 17:4 22:21 70:22 79:6 95:9 165:18 215:21
**responses** 205:7 205:16 206:6 217:7
**responsibilities** 165:2
**responsible** 75:24 76:3 203:12
**rest** 33:25 35:4
**restated** 94:11

**result** 183:8 184:6,24
**resumed** 163:4
**retirement** 121:17
**retiring** 123:13 123:20
**returns** 187:11
**reveal** 159:22
**review** 9:10 53:21 54:9 66:11 94:2 103:15 105:11 125:7 191:5 205:20
**reviewed** 22:8 24:16 55:10 93:20 105:8 191:4,9
**reviewing** 22:18 22:20 24:21,23 94:4
**right** 9:4 10:12 10:17 32:4 34:5 35:7 36:18 39:16 42:2 43:14,15 48:11 58:22 59:14 62:23 71:11 72:5 85:12,17 93:14 99:3 106:15 128:11 132:9 133:14 135:24 136:18 137:4 138:23 143:6 151:11 166:24 173:24,25 175:4,5 177:24 181:10 183:21 184:2 187:15 187:23 192:17 192:22 194:24 196:22 197:19 205:5
**rights** 5:25 29:4 34:11,16 37:18 38:18 39:14,25 40:6,24 41:5 42:21 45:14,16 45:20,21,24 46:2 78:24 79:2,8,12 80:25 82:2 84:4 87:7 89:22 106:23 107:20,25 108:16,22 133:4 141:16 182:14 187:14 187:17,19 188:4,11,18 189:6,12,14,19 190:2 195:11 195:12,16,22 196:2,2,4,7,17 196:18,22 197:17 198:3 198:11
**right-hand** 33:7 43:24
**role** 42:6,8 67:24 80:6 90:7 97:18 98:7 103:15 104:12 107:15 110:12 155:4 165:6 178:9 199:10 199:14
**roles** 5:22
**Roman** 84:19
**Romanette** 82:15 83:3,13 85:5,15 115:19 115:21
**room** 4:20
**rough** 62:21 63:15 64:6,7,8 64:23 65:9
**roughly** 62:13 63:16 65:2
**rough-rough** 65:10
**round** 63:16
**row** 37:3
**rows** 38:3 39:9 39:13,18
**rules** 152:19
**running** 196:14

**S**

**S** 2:2 3:2 5:11 163:2,2,2,4
**said** 13:17 17:18 21:25 30:6,15 30:18 34:24 44:11 51:2,4 59:3 61:22 63:25 69:4 76:13 89:11 101:3 116:3,5 128:19 146:24 154:19 160:17 161:6 180:11 200:7
**sale** 16:24
**same** 28:18 36:12 38:5,8 49:16 52:7,18 59:13 67:12,20 67:21 77:8 87:25 102:21 109:18 110:15 117:2 147:18 147:21 154:5 166:25 189:25 193:24 199:24 202:16 206:14 219:11 220:4
**Saratoga** 177:23 178:18,23,25 189:22
**satisfied** 207:4
**saw** 75:25 79:24 169:22
**say** 11:21 19:18 36:8 39:4,6,17 40:25 42:23 49:19 50:2 53:22 54:3 57:4 59:11 63:3 64:11 73:19 74:6 75:7,11,17 76:3 78:25 80:11,12 89:5 89:21 97:25 102:11 112:10 118:3 128:7 129:5 132:11 136:23 143:20 153:24 156:18 161:15 168:17 171:25 174:2 175:5 177:12 178:19 180:17 184:17 185:22 191:10 192:4 199:22 212:5
**saying** 41:12 50:11 53:2,7 53:20 85:19 91:2,3 153:12 182:17 194:12 195:24 196:16
**says** 7:18,22 13:9 16:20 25:2 35:8 37:4 39:3 50:4 59:4 59:16 60:3,8 105:20 107:23 108:20 125:24 126:7,14 130:7 131:18 134:14 163:13 193:11 195:4,25
**scenario** 31:22 183:19 188:9 188:16 189:4,9 189:24
**scenarios** 183:13 184:3,5,14,23
**schedule** 33:16 33:18 36:2,24 61:15,25 62:3 180:8 216:10
**scheduled** 193:13
**SCHILLER** 2:9
**school** 176:25
**screen** 36:17 66:2,7 72:16 93:12 95:12
**scroll** 36:17
**scrolling** 95:14 206:18
**SEAN** 2:25
**search** 77:19 78:6,9 92:17 92:20,22,24 99:19 142:25 144:4 164:2 166:10,10,14 166:20
**searched** 92:7 92:14 124:23 146:18
**searches** 207:17 207:20
**searching** 145:20,24
**seat** 69:8,17 73:22 74:7 75:19 76:22 77:5,21 78:15 78:19 126:20 129:8 130:10 131:13,19,25 139:8 140:19 141:6,17 146:5 149:21 167:7
**seats** 69:18 74:20 75:10,13 76:8 114:12,16
**sec** 47:2 69:3 149:18 173:14 179:13
**second** 6:13 24:25 33:19,20 38:13,20,21

47:21 81:22 82:22 93:25 106:7 113:19 113:23
**section** 21:24 22:5,8,16,24 23:15,17 24:5 24:8,22,23,25 27:18,20,24 45:18 47:20 55:7,10 56:5 57:4 58:9,14 61:4 81:15,17 105:7,8,19 107:7,22 108:19 115:13 116:17 117:20 150:4,17 190:11,13 193:8,10 194:9 195:2 197:4
**secured** 30:5 47:6 49:23
**seeing** 76:10
**seek** 45:25 78:15 78:19 131:21
**seem** 10:3
**seen** 8:24 86:18 93:22 114:10 119:24 169:12 169:14,18 205:13
**seller** 2:18 81:18 81:24 83:14 193:11,12 195:5
**semicolon** 133:10
**senior** 47:6
**sense** 63:23 69:16 142:3 151:22 153:15 154:8 175:18 179:2
**sent** 95:5 163:20
**sentence** 24:25 49:5,9,11,19 50:4,9,13 51:5 51:19 52:10,13 56:23 58:17,20 59:3,8,10,15 59:21,25 60:3 60:7 73:21 81:22,24 83:25 105:20,23,24 106:8,10,13,19 106:21 107:22 108:19 113:23 115:15 116:17 116:19 117:20 130:22 131:17 133:10 134:10 134:17 191:5,8 191:12,17,21 192:7 195:3
**Separately** 123:12
**September** 1:13 4:8 73:3 131:20 219:7
**sequence** 142:5 146:4
**series** 141:23,23 205:24
**serve** 126:20
**served** 205:21
**Services** 1:23 3:10
**serving** 141:25 156:6 169:24
**set** 9:21 10:19 56:18 58:8,21 59:6,22 60:9 60:18 61:3 106:25 108:6 108:24 113:21 134:19 191:12 191:20 203:6
**sets** 27:18
**Setting** 146:4
**settlement** 82:11 82:19 83:6,20 84:14 195:5
**several** 158:16
**shall** 7:23 23:5 24:11 25:5 27:23,24 55:19 60:9,11 83:14 105:21 106:15 106:22 107:24 108:21 113:25 115:17 190:22 195:5
**share** 148:12,20
**she** 125:24
**Sheet** 220:6
**short** 18:19
**shortly** 12:22
**should** 39:10 63:3 65:18 73:16 139:8 158:18 190:10
**show** 12:3,9 177:11 180:11 206:12,18,21 207:9 208:6 215:21
**showing** 154:21 206:6 211:10
**shows** 120:23
**shy** 63:17 65:18
**sign** 148:25
**signed** 26:19 170:20 196:21
**signify** 16:3,14
**signing** 149:4
**similar** 133:16
**simple** 76:11 145:2
**simpler** 35:22
**simply** 11:7 122:8
**since** 49:3 147:24 157:11 200:16 211:14
**sit** 27:8 122:18 144:7 151:3,12 151:17 192:22 197:20
**sitting** 23:14,16 26:5,12 40:19 41:7 78:5 84:24 85:2 88:15 93:2 96:25 97:5,20 98:5,8 99:3,16 101:10 102:2 102:17 103:3 155:18 158:9 158:12 161:8 184:2 185:12
**situation** 151:21 151:24 187:4
**slightly** 17:24 67:15 98:2
**slowly** 125:12
**sole** 195:5
**solvency** 79:23
**some** 34:14 56:14 61:20 64:19 98:11 143:7 156:3 183:22 203:18 212:21
**somebody** 144:4 144:5 151:11
**someone** 89:24 144:2,6,11
**something** 41:11 63:17 65:19 79:23 98:2 106:20 128:8 145:15 159:24 160:2,4,9,18 160:20,21,25 161:7,10,13 177:12 205:18 212:11
**somewhere** 6:14
**sorry** 8:25 15:18 20:10 26:10 28:13 32:3 43:8 56:9 58:18,25 59:19 65:3 72:5 78:17 91:6 98:4 102:23 104:13 106:20 112:14,14 119:10 132:8 134:6 147:20 150:12,14 157:9 161:2 175:19 179:10 181:7 185:22 186:5 193:22 202:25 204:24 208:14
**sort** 18:19 63:20 76:10 151:14 153:7,19,24 156:3 163:22 163:25 172:14 192:3 197:19
**sought** 111:20
**SOUTHERN** 1:3
**sparingly** 211:8
**speak** 100:17,19 101:3,6 137:25 142:7 180:12 185:9,10 203:8
**speaking** 37:15 53:4 77:14 155:8 176:25 183:20 188:5 201:22 202:8
**speaks** 187:7
**specific** 99:7 104:25 147:13 169:10
**specifically** 16:8 24:22,24 37:15 155:8,10,22 162:5
**speculative** 171:3
**spin** 189:21
**spoke** 62:9 202:12

**spoken** 138:5 202:24
**spot** 22:2
**squares** 37:14
**squint** 72:17
**stamp** 33:9,12 43:25 45:11 81:11 193:6
**stamps** 43:23
**stand** 158:20 182:12 188:14
**standing** 177:3
**stands** 180:25 181:12 192:4,9
**start** 25:19 26:10 87:12 108:10 186:17 204:6 206:9
**starting** 16:11 113:20 130:4 205:24
**starts** 33:9 59:13
**state** 1:14 5:4,8 35:12
**statement** 4:16 11:18 13:5,7 14:17,23 66:25 67:3,5 201:25
**statements** 201:7 203:6
**states** 1:2 9:19 12:20 23:3 24:9 27:21 34:7 81:23 106:21 113:24 115:16 190:21
**stating** 47:21
**stenographic** 1:14 4:11
**step** 165:12
**steps** 168:10,20 169:6,8
**stick** 112:15
**still** 57:22 137:7 196:24
**stipulate** 5:5
**Stipulations** 218:8
**Stop** 125:13
**straightforward** 100:24
**strategy** 76:11 148:11
**Street** 2:23
**strike** 20:10 30:25 34:17 41:19 56:10 58:18 74:22 94:8 124:3 127:17 146:3 156:8 184:4 191:18
**stuff** 144:14
**subpoena** 1:12 22:22 205:9,17 217:9
**Subscribed** 220:10
**subsection** 22:23 22:24 23:2
**subset** 212:22
**substance** 98:16 98:22 99:25 117:23 118:15 121:12 127:19 128:3,3 131:4 148:3 150:7 157:5 169:9 170:2 173:20 175:8,10,16 176:13 199:4 210:5,12 220:5
**substantial** 159:2
**substantive** 101:7 193:13
**successor** 176:3 176:12
**such** 26:6,14 41:8 42:14 78:6,9 83:16 85:14 107:15 113:7 115:17 121:12 138:25 146:16 147:12 150:7 157:13 157:17,20,24 158:10 168:5 169:6,7,22 175:9 188:15 189:10 193:19 193:22 194:2 194:13
**sufficient** 206:12 206:20 207:8 208:6
**sufficiently** 133:12
**suggesting** 53:21 53:22 54:2 64:5,6 153:4 197:3
**sum** 178:15,20
**summarize** 89:6
**summarizing** 7:25
**summary** 33:22
**supervise** 211:22
**supervision** 219:12
**supplement** 58:22 59:7,23
**SUPPORT** 218:3
**supportive** 79:11,14,16 80:6 143:5
**suppose** 121:21
**supposed** 167:24
**sure** 18:5 25:21 33:14,21 36:18 38:15 47:3 52:8,20 58:24 59:12 64:9,14 66:3 67:18 76:9 81:8 82:15,24 83:3 89:6 93:19 101:4 111:15 116:16 118:17 119:16 149:11 152:10 159:11 196:15 198:14 210:11
**surrounding** 66:11
**swear** 4:14
**sworn** 5:5,12 219:4 220:10

**T**

**T** 163:2 215:10 216:3 217:3 221:2
**tab** 6:12 8:17 9:2 9:4 11:22 15:2 20:19,24 21:3 29:10 32:3,4 35:24 36:5,6 36:11 43:7,11 43:11 44:5,8 46:12 54:13 55:4 58:11,13 61:18,19 65:21 65:23,24 71:14 81:9 86:7,10 93:5 104:5 105:6 113:17 115:12 119:18 122:20 125:3 129:21 139:22 143:8,9 152:16 163:11 171:19 190:7 192:23 201:2 202:3 205:4
**table** 37:14 39:3
**tabs** 72:8,10
**take** 13:25 23:19 34:23 43:10 46:4 65:24 66:5 68:6 82:24 85:8,23 87:24 104:9 127:9 130:9 131:13 133:8 151:10 158:18 158:21 159:10 162:7 165:12 168:10,20 169:21 183:16 188:8 198:18 198:20 210:25 214:9,12
**taken** 1:12 36:14 63:7 76:10 96:16 162:12 173:10
**taking** 74:17 75:7,12 143:12 143:20 153:13 154:12 169:8
**talked** 79:22
**talking** 62:25
**Tamara** 200:25
**Tata** 2:6 31:23 50:24 51:12,24 52:16 56:24 57:2,12 60:4 60:20 62:19 64:12,21 68:2 69:13 77:17 79:17 80:16,22 81:5 83:9 91:11,16 92:9 99:6,22 102:20 103:7 104:14 104:19 105:4 107:9,16 108:4 108:9 109:2,17 110:2,14 113:11 116:25 117:11,21 118:19 122:11 126:22 127:6 127:12,21 128:6,12,23 130:25 131:3 131:15 132:23

133:6 135:13 137:14,19 138:2,17 149:17,23 152:8,13 159:16 164:14 164:22 167:9 173:18 177:20 181:4,16 182:16 183:4 183:12 184:12 185:7,17 186:13 189:17 190:3 193:21 193:24 198:4 199:20 201:12 201:22 202:14 202:21 203:8 212:17 213:19 214:9
**team** 136:5 174:4 201:21 201:23 202:14 204:17 211:7
**Teams** 71:9
**tecum** 205:9,19 217:9
**telephone** 126:2
**tell** 175:16
**tenure** 156:9 164:10,18
**term** 8:15 29:24 30:9 31:13 46:24,25 47:15 48:3,9 50:5,22 51:8 53:9,14 54:5 68:20 80:3 81:18,19 114:4,14,24 115:20 116:10 116:22 195:15 196:16 197:18
**terms** 11:8 18:3 19:19 55:22 56:18 58:21 59:6,22 60:9 63:21 65:5 74:16 80:2 109:15,25 111:4,11,22 112:25 113:10 153:13 154:7 154:12 187:10
**testified** 5:13 17:14 41:24 120:24 163:4 211:13
**testify** 161:9
**testimony** 5:20 47:12 50:18 52:9 69:9 71:2 85:10 117:14 118:18 161:6 219:4
**TEXAS** 1:3
**text** 70:3,12 210:22
**texts** 70:15
**than** 8:8 17:10 18:25 19:9,22 20:8,11 22:17 26:24 42:9 52:12 53:8 54:4 57:18 61:11,23 62:5 62:15 77:11 102:15,25 137:18 138:2 138:16,24 157:13,17 165:2,5,22 167:6 170:20 177:12 189:22 190:16 191:5 192:6 194:19 201:22 202:8 203:7 204:8 208:4 213:2,7
**thank** 32:12 40:7 65:20 68:17 94:20 125:24 150:12 214:3
**Thanks** 46:17 125:14 149:19
**their** 5:2 16:3,14 29:7 49:24 56:15 79:6 178:13
**them** 16:2 37:2 38:21 57:22 72:14,15 76:24 80:24 81:8 124:23 133:19 145:2,5 147:3 157:5 177:10 188:5 194:5 195:23 196:19 201:10
**then** 10:16 12:22 18:14 24:11 29:2,8 31:9,11 31:20 33:10 38:11 42:20 47:14 57:7 59:20 62:10 63:11,12 65:14 69:17 98:3 104:10 106:13 106:19 127:9 128:24 133:8 154:7 159:10 163:20 169:21 177:10 178:12 179:6 182:6,9 182:19 184:16 188:8 189:19 194:11,16 196:22 211:7 212:7
**there** 5:19,21 7:15,17 18:5 18:19 20:9,12 22:4 29:11 32:13 33:8 34:14 35:21 36:21 37:4 38:3,20 44:5 45:13,15 46:18 46:22,23 52:23 53:7 54:4,14 54:16 58:16 61:19 63:8 64:12,14 68:4 84:10 88:8 89:14 91:24 94:21 104:7,8 119:2 120:11 124:19 125:13 129:7 135:18 137:4,5 144:8 144:12,13 145:11,14 146:15 148:6 148:22 149:7 154:21 155:16 156:15 157:11 157:13,16 159:19 163:13 164:25 165:5 165:23 166:23 170:25 175:4 176:6 181:24 182:25 183:13 183:21 184:3,5 184:13,23 187:12 189:24 197:16 201:17 205:24 206:23 208:22 209:8 209:22,25 210:15 211:10
**thereafter** 12:23
**therefore** 182:6
**therefrom** 48:2
**therein** 56:19 220:5
**thereunder** 29:4
**these** 39:6,7,15 43:18 71:2 74:21,24 136:14 144:10 159:20 202:25 203:2
**they** 4:23 16:13 39:10,24 50:16 57:22 76:25 79:11,15,24 127:23,25 128:20 136:16 144:23,25 145:3,3 146:25 147:2,4,8,11 154:9 155:16 155:17 166:24 169:8 180:4 196:13,23 203:15
**they're** 196:24
**thing** 33:5,14 36:12,18 75:24 76:3 136:22 144:4 153:8,25
**things** 74:16,19 75:9 76:11 156:16 159:20 163:19
**think** 9:6 17:22 17:23 19:19,19 20:7 26:22 27:14 30:3,7 35:21 48:8 50:7 51:3 53:3 57:16,19 68:12 73:16 79:13,24 80:18 85:9,11 88:5,9 90:20 93:24,25 94:4 109:12,22 110:8,23,25 126:23 136:16 136:19,22 139:23 144:3 148:6 149:8 152:4,11 155:25 156:2 157:6,11,13,16 158:22 159:18 159:24 160:2 160:18,25

161:6 162:8
170:12 173:10
173:11,14,25
176:8,23
177:23 180:3
180:13,22
183:17,18
187:7 188:9
190:4,14 192:8
197:2 199:9
200:3,7 202:15
204:12,16,21
210:9
**thinking** 156:16
187:4,8 188:7
**third** 68:11
106:13 153:10
212:14
**Thompson** 2:25
72:24 143:10
**those** 11:2 26:20
28:21 30:19
31:2,11 34:15
50:8,15 52:5
52:24 63:3,4,5
63:11 69:20
70:2,5 71:5
74:14 79:2
81:7 82:10
85:7 87:23
88:16,20,23
91:14 92:7,17
92:20,22,24
97:9,11,14
99:10,13
111:10,21
112:24 113:9
121:6 127:11
127:15 133:17
138:10,13,15
138:16,19
148:5,16
150:23 154:3
155:3 165:16
165:19 166:21
167:21 169:18
175:16 177:5
178:25 182:2
182:11 189:19
194:17 195:23
196:22 203:2
207:4 210:5,25
211:3,5,20
212:9
**though** 31:16
**thought** 108:13
144:17
**thoughts** 98:11
98:18
**three** 10:10
105:22 106:2
114:12 115:17
153:19 154:4
158:22 211:25
212:3,13
**three-member**
114:2,22
**through** 5:24
6:13 9:13 14:4
49:25 53:25
65:9 70:2 74:9
85:5 121:16
138:9,11
143:25 144:10
155:5,15
158:23 181:21
189:20 198:7
205:22,25
206:4,4,7
207:7,10 208:7
**throw** 170:14
**thus** 66:20
**time** 4:9 13:25
23:22,25 34:23
43:9,10 46:6,9
65:25 66:5
69:9,16 82:24
85:6,8 86:2,5
120:19 121:11
121:16 123:18
123:25 124:4
124:10 126:18
127:4,7 129:4
129:14,17
140:19 153:13
154:12 157:12
158:17 162:10
163:3,6 175:25
179:14,17
188:21,24
191:9 196:20
198:22,25
214:2,15,17
**times** 212:8
**timing** 118:14
**titled** 22:5 33:16
205:6,15 217:6
**today** 4:8 5:20
23:14,16 26:5
26:12 27:8
40:19 41:7
78:5 84:24
85:2 88:15
93:2 96:25
97:5,20 98:5,8
99:16 101:10
102:2,17 103:4
122:18 130:18
155:18 158:9
158:12 161:8
185:12
**together** 154:5
**told** 171:25
172:4 181:8
**too** 57:25 144:10
**took** 95:25
130:15
**top** 7:11 95:21
136:25 137:3,6
137:10 163:12
172:15 182:24
183:6 185:13
**topic** 88:4,7,13
89:15 90:19
132:22 142:12
171:10,14,15
171:18 175:22
176:14
**topics** 85:5
99:11,13
121:10 155:23
206:21,25
207:9 208:7
**tornado** 180:9
**total** 24:9 61:8,9
62:5 63:21
178:15,20
**totality** 187:4
**towards** 10:9
53:5
**traffic** 156:24,25
**tranche** 54:17
54:20,21,22,23
54:24 62:8,11
62:22 63:5,8,9
63:10,13,21
64:11,17,18
65:16 85:14
**tranches** 182:21
183:2
**transaction**
24:12
**transactions**
44:24
**transcribe** 74:5
**transcript** 67:18
214:8 219:11
**transcription**
220:4
**transfer** 10:19
13:22 16:4,14
17:11 22:6
25:17 26:3,8
26:16,18,25
27:6,13,21
28:5,9,15
30:12 39:22
40:10 41:22
120:16,22
197:5,9,12
**transferee**
110:11
**transferred**
10:17 12:23
13:9 16:5,15
23:6 38:7
39:15 196:19
**transferring**
21:20
**transfers** 14:6
14:13,24 39:19
40:9
**TRAURIG** 2:13
**treated** 181:25
**true** 11:13,15,18
13:7 87:22
135:9,23,25
137:22 138:4
219:4
**trustee** 9:25
10:20 13:22
14:4 15:25
16:12 66:12,19
67:8 77:6
90:15,17,19,22
90:24 101:18
101:20,22
106:16 131:20
135:6 145:10
145:16 146:7
150:2,16 155:6
155:14,19
156:11 159:14
167:13,18
168:4,9,19
170:4 176:3,12
190:21 192:2
193:14 199:6,8
199:16 211:22
212:25 213:7
**trustees's** 203:6
**trustee's** 10:2
11:24 12:7
14:22 129:22
134:12 135:22
136:11 202:4
203:14 204:10
211:11 215:18
**trusts** 29:6 50:14
**trust-related**

121:10,18 122:6,9 157:4
**truthful** 5:20
**try** 66:4 100:25 102:24 184:19 185:25 203:16
**trying** 41:15 100:23,24 112:16 144:6 156:22 157:9 161:2,5 204:25
**turn** 6:11 7:8 12:15 13:14 21:23 24:4 27:15 29:9,12 33:12 35:23 43:6,22,24 45:10 46:12 47:18 54:12 71:14 81:9 104:5,9 105:7 129:11 130:2 134:4 135:2 143:8 163:11 171:19 178:12 185:23 190:7 192:23 193:5 195:19 202:3 205:4,23 208:15
**turning** 72:22 129:20
**Twenty-one** 138:11
**twisted** 168:18
**twisting** 180:8
**two** 23:19 25:2 25:13,23 26:6 26:14 27:5 38:3,20 39:8 39:12,18 43:17 44:5 50:15 51:5,20 52:12 52:24 55:15 68:10 71:25 73:9,13 76:17 105:14,16 114:3,12,23 115:19 116:9 116:21 118:24 154:2,4,8 178:25 202:25 212:13
**two-minute** 198:19
**type** 159:15 161:11
**typing** 100:22
**typo** 73:16

**U**

**UCC** 68:13
**ultimately** 16:4 56:7,11 142:6 178:2 197:6
**unaware** 124:21
**unclear** 160:13
**under** 9:17 10:10 11:14 12:25 29:8 31:10,17,18 36:25 37:17 45:13 47:20 50:18 52:5 56:17 63:9 65:5 81:2 85:13 132:4,14 133:4 161:9 178:6 182:6 196:23 197:22 198:11 219:12
**understand** 18:5 50:3 53:6 56:2 64:7,8,10,19 110:20 118:17 120:13,19 134:24 153:23 165:13,18 166:13,14,20 196:15 197:4,8 197:11 207:20
**understanding** 10:24 18:11 27:10 37:22 39:11 42:16 45:22 47:17 61:10 89:24 90:2,5 96:5,7 96:17,19 97:21 98:6 110:18 119:12 163:18 163:22,25 166:9,11 167:23 178:8 178:24 181:17 181:22,24 182:7,10 191:11,14,16 191:19,22,23 191:24,25 197:19 198:9 207:3,19 212:3 212:12 213:10 213:12,16
**understood** 29:9 188:15 189:5
**undertake** 189:10
**undertook** 64:19 96:2,13
**undue** 153:5
**unimportant** 153:11
**unit** 35:5
**UNITED** 1:2
**units** 10:18 34:12 35:4,19 37:18 38:18 182:5 188:6 198:17
**unless** 57:22 219:11
**unlikely** 121:23 122:5
**unsecured** 8:12 29:23 48:4,14 50:6,23 51:10 53:10,16 54:6 115:23 126:21 130:7 139:8 176:18,21 179:9,21,24 180:3,5,6,12 180:20 183:11 184:10 185:4 185:20 186:10 186:22 187:16 187:24 188:3 189:15,23
**until** 130:15,22 131:8,10 133:15
**untrue** 14:17,24
**up** 8:17 26:11 32:13 36:17 37:14 55:21 56:3,15,22 57:5,10 58:7 62:22 72:8 74:13 86:9 95:14 98:10 100:6 123:9 125:12,13 137:13 138:18 147:20 152:18 159:5 164:16 165:10 170:20 176:24 178:19 179:10 186:5 206:23 213:9
**update** 123:14 125:17,21 126:8
**updated** 125:25 126:9,14 127:11,14
**updates** 163:19
**Upon** 180:23 181:11
**upper** 57:3
**us** 2:18 143:12 143:20 144:25 145:17 147:2 154:22 178:11
**use** 33:24 63:19 70:16 81:24 84:3 110:17 159:6 193:11
**used** 15:22 32:22 163:17 178:3 178:12 206:15
**using** 17:25 100:21 197:18

**V**

**v** 85:5 186:19 189:13
**vacated** 139:8 140:20 141:6 149:22 167:8
**valuable** 80:3,12 80:14
**value** 47:23 79:20,21 80:8 80:20 144:24 147:2 185:3
**values** 184:9
**Vanderbilt** 2:15
**variety** 82:7 206:12,21,25
**various** 36:24 74:16 165:15
**verbalizing** 112:15
**versus** 40:9 168:12,23 169:11
**very** 16:19 45:10 54:15 200:18 200:18 211:16 211:16
**via** 2:2 3:2 71:6 74:18 75:8
**video** 1:12 4:4 71:8 88:6,9
**Videographer** 3:10 4:2 23:22 23:25 46:6,9 86:2,5 129:14 129:17 162:10

163:6 179:14 179:17 188:21 188:24 198:22 198:25 214:15
**view** 17:19,21,23 18:20,22,25 19:9,24 20:14 20:17 23:15,17 48:16 67:4,10 67:13,14,16,21 68:4,7 79:15 79:18,19 80:5 97:16,19 107:19 108:15 109:4 114:21 115:4 116:8,19 117:4 121:22 122:4,7,8,17 129:3 138:23 138:25 144:23 146:24 147:12 154:5,6 170:3 170:5,6,9,10 170:11,16,18 170:19,22,24 170:25 171:2,3 171:4 188:3,14 192:5,10,16,18 192:21 208:5 213:11,12,16
**views** 148:11
**violation** 27:23
**Vivek** 2:6 118:6 211:7
**Vivek's** 136:5 201:20 204:17
**voice** 100:21
**void** 27:24 28:6 28:9,16 30:14
**vote** 25:2,4,13 25:15,23,25 27:5,5 102:5 102:14,22 153:10 154:5,9
**voted** 102:13,16 102:18 103:2,5
**votes** 26:6,15 154:2,4 195:8
**voting** 17:11 102:7 154:24

**W**

**wait** 74:3
**waivers** 195:9
**WANG** 2:16
**want** 33:23 38:11 41:16 64:9,13,13 65:7 67:17 69:15 76:8 110:23 138:7 141:22 162:7 176:24 180:11 188:18
**wanted** 74:16 75:15,18 144:16,25 145:4 147:2 152:8 154:5,10 171:3
**wants** 214:7
**warrant** 133:13
**wasn't** 154:12 154:18,19,22
**way** 8:5 10:10 17:24 20:9,12 29:3,7 35:22 49:20,22 70:9 75:4,24,25 76:2,4 78:11 80:19 84:23,25 85:20,21 88:16 88:19 89:18 90:11 91:13 92:3,5 93:3,15 97:2 99:17 101:11,25 102:12,18,21 103:4,11 109:10 112:4 112:18 113:14 119:5 120:9 123:22 124:16 133:18 139:3 139:11 140:22 142:15,17 146:11,14 147:15 150:24 153:3,9 154:14 154:19 157:7 158:23 164:7 169:3,17,22 173:2 174:13 175:22 184:20 186:6 188:6 189:20 194:23 209:15
**ways** 181:25
**Wednesday** 4:8
**weeks** 105:14
**weird** 154:14
**well** 42:19 73:6 100:20 117:14 151:19 157:7 202:25 203:3 214:13,14
**went** 74:9 198:5 198:15
**were** 9:15 26:15 28:13 30:11 38:6 40:2 44:13 60:18 64:15 68:8,19 70:2 72:14 73:23 74:17 75:11,14,23 76:13,21 79:11 79:15,20,21 80:3,12 97:6 98:6 99:13 102:16 103:2 108:14 115:13 121:14 123:19 126:18 127:9 129:20 130:21 130:23 131:10 131:11 135:4 140:23 141:9 143:22 146:15 148:4,17 154:19 155:16 157:12 166:22 167:11 168:3 168:14,24 169:8,23 173:12 176:6 194:3,18 196:13,22,24 199:18 200:2 200:12,16 202:17 203:15 204:3 207:17 211:15,16
**weren't** 72:15
**we've** 26:18 30:3 30:6,7 32:22 48:8,12 126:7 136:16
**whatever** 33:23 62:12 65:7 71:8,9 76:8 101:2 197:18
**whatsoever** 106:24 107:25 108:22
**what's** 33:8 63:12 134:6 200:24
**when** 9:5 19:19 21:10 42:23 55:13 57:20 63:25 64:15 68:25 69:5,7 69:16 73:13,22 74:6,7 75:17 76:3,6 78:25 80:12 84:14 87:8,12 89:21 93:23 101:2 103:14 105:11 118:3,22 120:6 120:22 129:6 136:14,23 140:25 143:20 144:2,4 146:2 146:6 148:8,16 153:24 156:18 167:11 168:13 168:24 169:23 174:2 184:17
**where** 5:4 13:9 31:19 34:21 49:5 52:25 128:9 143:25 153:5 158:20 163:19 183:14 183:20 184:2,3 184:5,14,23 187:5 188:9 189:4,9,24 195:4 197:19 207:25 210:9
**whereby** 141:24
**wherein** 16:12 140:11
**whether** 11:2 14:19,21 40:18 41:10,13 54:4 61:11 66:13 67:4,10,10,15 67:16 68:4 79:10 83:19 88:16 91:14 92:13 97:2,6 102:18 103:4 103:18,25 107:19 108:15 109:9 112:5 118:12 121:22 122:4 124:19 128:18 131:18 131:25 132:4 132:14 138:3 138:23 139:7 140:23 146:15 147:16 160:8 160:11,11 169:18,22 173:6,8 175:6 175:13 192:10

192:18 195:8 208:23 209:10
**which** 7:12 8:18 10:6 13:15 15:3 20:9,13 25:5,16,25 27:18 30:12 32:5 36:9 44:24 46:15 50:15 51:8 54:12 55:22 57:6 58:11 60:10 62:11 65:21 71:14 86:10,23 104:5 105:21 113:18 115:17 119:18 120:14,14 122:21 125:4 125:20 129:21 129:22 130:8 142:6 143:8 146:5 163:12 180:15 181:20 185:3 188:6 190:7,17 192:23 197:6 197:23 198:6 199:24 202:3,5 203:13,14 205:4 208:16 212:24 213:5
**while** 7:6 82:22 99:13 183:10
**who** 17:5 54:7 68:8,19,22 69:20,24 73:14 76:16 79:2 87:17 89:9,24 94:2 95:7 106:4 118:4 145:8 152:4,11 165:2,6,23 166:3 172:20 173:12 174:3 177:14 200:21 204:8,15 211:3 214:7
**whoever** 199:16
**whole** 22:18 40:10 125:8 144:12
**whom** 51:6,20 143:15
**why** 6:11 21:15 24:4 35:23,23 43:6 47:18 49:11 75:11 79:15 80:13,20 90:18 97:16,21 104:5 105:19 119:17 145:3 151:23 152:24 163:11 170:3,5 170:8,22 175:3 199:6,8,13 204:4 206:9 209:7 212:13
**will** 4:11,13,21 4:25 6:14,19 7:13 8:18 15:3 18:15 23:19,20 29:15 31:17 32:5 37:13 38:10 39:3 43:17,22 46:13 46:14 47:19,22 57:23 62:2,9 71:16 72:16 76:23 80:24 81:9 85:25 86:10 102:21 110:21 112:15 119:18 122:21 123:2,13 125:4 129:21 131:3 132:11 135:3 135:13 139:23 152:20 170:14 183:23 184:20 185:19 186:9 186:17 195:20 205:3,4 214:9 214:12
**windows** 72:3
**within** 62:14 63:13 105:14 105:16 118:24 160:12
**without** 98:16 98:21 99:25 111:12,16 113:3 121:11 127:24 135:9 142:25 148:3 150:6,19 157:4 160:3 161:20 166:6,21 169:9 170:2 175:8 176:12 185:8 199:4 203:20 203:23 207:15 208:8 210:11
**witness** 2:22 4:14,17 5:3,5 5:11 19:14 23:18 46:4 51:14 56:25 57:13 85:23 117:22 118:9 129:12 131:4 159:6 160:17 161:24 166:16 173:19 179:12 198:18 203:22 219:3,5
**word** 17:22,25 33:23 39:2 110:17
**wording** 10:5
**words** 17:22 100:23 120:18 127:18 128:2 147:12 192:7
**work** 170:20 199:14 207:14
**worked** 79:25 207:12 212:12
**working** 143:16 147:23
**wouldn't** 19:18 102:13 151:20 151:23 153:5,6 175:3
**write** 10:9,16 11:2 62:9 73:5 73:21 143:12 144:18 147:21 152:19
**writes** 13:22 14:4 16:23 66:19 94:8,10 95:23 98:9 123:11 126:6 135:7 140:12
**writing** 95:23
**written** 23:3 100:22 148:22 148:23 153:17
**wrong** 32:4 44:7
**wrote** 16:11 144:3
**www.MagnaL...** 1:24

**X**

**x** 1:5,9 215:3,10 216:3 217:3
**Xie** 3:4 15:14 87:21 93:8,14 94:8 95:7,17 98:9,24 99:5 171:12 216:15

**Y**

**Yards** 2:10
**yeah** 9:17 11:12 12:14 13:4 14:10 16:17 17:3 22:7 23:2 25:11 29:20 30:2,6 34:17 36:18 37:9 47:4,9 48:7 57:2,16 59:15 59:19,25 61:16 61:19 65:24 66:24 72:8 81:14,16,17 88:5 93:12,22 95:21 96:4 101:2 105:23 106:3,9,18 123:8,17 133:22 134:13 134:21,25 135:5,25 136:23 137:11 137:11 141:14 143:7,11 147:10 148:20 154:14 155:17 156:23 160:25 161:13,14,24 165:16 170:9 172:3 173:11 180:18,22 185:9 186:25 188:20 191:16 194:11 195:14 195:23 196:6 197:24 200:3,4 200:7 201:5 202:24 205:13 206:16,22 207:2 208:18
**York** 1:14 2:6,6 2:10,10,15,15 2:19,19 3:6,6
**yourself** 135:8 135:20 136:9 137:21 138:15 201:6,24 202:9
**you're** 210:9
**you've** 169:18

**Z**

**zero** 43:9 183:20 183:21 200:19 211:17 212:11

**ZHANG** 2:11
**zoom** 1:12 2:2 3:2 71:6 206:3

**$**

**$10** 61:11,23 62:5
**$3** 65:18
**$4** 56:16 57:11 58:7 60:13,18 63:14 65:4,7 66:15
**$4,714,824.29** 34:4
**$4.7** 35:17
**$6** 55:22 57:6 60:12,17 62:9 62:22 63:7
**$9** 185:15

**0**

**05** 22:2
**09** 44:11

**1**

**1** 2:5 4:4 6:12,15 6:19 9:19 29:10,10 32:21 32:25 34:3 37:25 39:25 43:17 44:18,23 45:3,6 46:12 46:13 55:4,6 113:17,17 134:18 174:23 175:2 193:3 205:25 206:4,7 206:9,11 207:7 207:9 208:7 215:13
**1(b)** 195:21 197:4
**1.06** 58:14 59:2
**1:05** 85:25
**1:06** 86:5
**1:30** 158:16
**1:58** 129:14
**10** 62:15 87:10 93:6,7 121:16 139:22 157:13 190:10 216:14
**10(a)** 81:15,22 195:2,4
**10(b)** 84:9 193:8 194:9
**100** 63:16,19,25 64:16,25 65:8 65:11 158:10
**10001** 2:10
**10017** 2:15
**10020** 2:19
**10036** 3:6
**10119** 2:6
**106** 58:25 59:10
**11** 8:20 9:8 119:18,19 122:20 215:17 215:18 216:16
**11:08** 1:13 4:9
**11:30** 23:23
**11:31** 24:2
**1121** 2:19
**119** 7:14 216:16
**12** 33:13 47:7 122:21,22 171:19 206:4 216:18
**12:00** 46:7
**12:05** 46:10
**12:58** 86:3
**122** 216:18
**124** 216:20
**13** 13:15 14:10 36:12,15 125:4 125:5 216:20
**139** 216:21
**14** 13:16 14:9 139:24,25 205:4 216:21
**15** 8:18 9:3,4 171:20,21 172:5 201:2 215:23 216:23
**16** 10:11 11:22 29:12 65:21,23 65:24 129:21 197:22 202:3 205:5,6 217:6
**16(a)** 45:18,24
**171** 216:23
**19** 15:2 66:9

**2**

**2** 8:18,19 10:6,9 20:19,24 21:3 21:25 38:7,23 40:2 43:17 44:15,21,23 58:11,13 63:4 63:5 104:5 105:6 115:12 134:5,7 190:7 195:20 201:2 203:13 204:9 206:15 215:16
**2.05** 21:24 22:3 22:24 27:18,19 27:24
**2.05(b)** 23:15,17
**2.05(d)** 27:20
**2:00** 129:17
**2:39** 162:10,12
**20** 63:18,19 64:2 64:17 65:11,12 125:3 216:6
**2021** 47:7
**2024** 73:23 74:8 84:12
**2025** 10:19 15:19 73:3 87:11 119:9,13 119:20 120:2 120:12 121:16 121:17 127:16 140:2,7 216:17 216:22
**2026** 1:13 4:9 136:24 137:13 138:18 172:17 174:23 175:2 219:7 220:11
**205** 217:6
**21** 138:9
**22** 115:13
**23** 24:5
**23-90716(MI)** 1:7
**24** 130:2,4 135:3 135:9,22 136:11 137:22 138:3,9,11
**27** 84:12
**28** 136:24 137:13 138:18

**3**

**3** 3:5 11:23,24 12:16,17,18 37:20 54:22,24 62:8,22 63:4,5 63:9,10 65:22 65:24 85:14 119:20,25 120:12 125:13 125:15,19 129:11,21 135:2 139:25 140:6 195:20 195:21 202:4 203:14 204:10 205:23,24 206:4,18,19,24 215:18 216:16 216:21
**3.01** 190:11
**3:10** 163:3,6
**3:31** 15:19
**3:32** 179:14
**3:33** 179:17
**3:36** 188:24
**3:45** 188:21
**3:59** 198:23
**30** 2:23 172:17
**31** 46:13,16 127:16
**32** 216:7
**35** 216:10

**4**

**4** 10:25 15:3,4 15:19 32:3,4 43:7,11,12 44:5 54:17,20 62:11,12 63:8 63:13,21 64:11 64:17,18 65:16 81:9 86:7 125:12 176:21 177:9 192:23 206:18,19,24 215:23
**4(a)** 32:10,11,14 44:8,9
**4(b)** 44:8
**4.01** 105:7,8,19 107:22 108:19 115:13 116:17 117:20 150:4,9
**4.01's** 150:18
**4.05** 24:5,22,24 24:25
**4.05(a)** 24:8
**4.4** 37:7,16
**4.7** 34:19 35:10
**4:15** 198:25
**4:37** 214:15,17
**40th** 2:5
**42** 47:18,19 55:5 55:18
**44** 56:5 113:18
**45** 13:14,18,19 13:21

**5**

**5** 12:15,17,18 20:20,21 24:5 58:12,14 59:2 65:12,15 73:3 104:6 105:6 115:12 119:18

150:11 190:8 205:25 206:2,7 206:18,20,24 207:7,10 208:7 215:7 216:6
**50** 157:17
**55** 2:10
**590** 63:20
**594** 65:14
**594,000** 63:13

**6**

**6** 32:5,6 43:7,7 43:11 62:10 63:12 81:9 86:8,10 192:24 208:16,16,20 215:13 216:7
**60602** 2:24
**62** 7:8,10,12 66:9
**624-6221** 1:23

**7**

**7** 35:24,25 36:7 36:9,20,22 46:24 54:12 61:18 63:3 71:14 81:10,11 143:8,9 152:16 163:11 209:19 216:10
**71** 216:11
**73** 29:16

**8**

**8** 14:3 21:23 27:15 63:2,3 71:17,18 72:22 93:5 130:3 143:9 152:16 163:12 206:4 209:25 215:16 216:11
**86** 216:13
**866** 1:23
**88** 46:20

**9**

**9** 1:13 4:8 35:24 36:5,6,11 43:25 44:3 45:11 54:13 61:18,19 86:11 86:12 197:23 211:9 216:13 219:7
**93** 216:14
**99** 55:5