# Exhibit 22

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - - x

IN RE:

| | |
|---|---|
| INSTANT BRANDS ACQUISITION HOLDINGS, INC., et al., | Case No. 23-90716(MI) |

Reorganized Debtors.

- - - - - - - - - - - - - - - - - - - - x

Videotaped deposition of ALAN HALPERIN, taken pursuant to subpoena, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 55 Hudson Yards, New York, New York, commencing September 16, 2026, 9:15 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

- - -

Case 25-90399 Document 3811-22 Filed in TXSB on 09/21/26 Page 2 of 263



MAGNA LEGAL SERVICES

A P P E A R A N C E S:

ELSBERG BAKER & MARURI
Attorneys for Plaintiff
1 Penn Plaza, 40th Floor
New York, New York 10119
BY: VIVEK TATA, ESQUIRE
EDGAR ALIFEROV, ESQUIRE (Zoom)
CHASE SHELTON, ESQUIRE (Zoom)

BOIES SCHILLER & FLEXNER LLP
Attorneys for Defendant CORNELL CAPITAL LLC
55 Hudson Yards
New York, New York 10001
BY: JOSHUA SCHILLER, ESQUIRE
MARC AYALA, ESQUIRE
KATHERINE ZHANG, ESQUIRE

GREENBERG TRAURIG, LLP
Attorneys for FORMER OFFICERS AND DIRECTORS DEFENDANTS
One Vanderbilt Avenue
New York, New York 10017
BY: JOSEPH DAVIS, ESQUIRE (Zoom)

DENTONS US LLP
Attorneys for SELLER AND FOUNDER DEFENDANTS
1121 Avenue of the Americas
New York, New York 10020
BY: CASEY DOHERTY, ESQUIRE (Zoom)
LEE WHIDDEN, ESQUIRE (Zoom)

A P P E A R A N C E S: (Cont'd)

DECHERT LLP
Attorneys for CITADEL ADVISORS BEN XIE and
JONNY CHEATLE
3 Bryant Park
New York, New York 10036
BY: GARY MENNITT, ESQUIRE (Zoom)
TESS McMULLIN, ESQUIRE (Zoom)
ALLAN BRILLIANT, ESQUIRE (Zoom)

ALSO PRESENT:
MARC ROSEN (Zoom)
JOSEPH LERCH, Videographer
Magna Legal Services

THE VIDEOGRAPHER: We are now on the record.

This begins videotape No. 1 in the deposition of Alan Halperin in the matter of In Re: Instant Brands Acquisitions Incorporated, et al., in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

Today is Wednesday, September 16, 2026 and the time is 9:15 a.m.

The deposition is being taken at 55 Hudson Yards, New York, New York at the request of Boies Schiller Flexner LLP.

The videographer is Joseph Lerch of Magna Legal Services and the court reporter is Leslie Fagin of Magna Legal Services.

All present and counsel will be held upon the stenographic record.

Will the court reporter please swear in the witness and we may begin.

A L A N H A L P E R I N, called as a witness, having been duly sworn by a

A. Halperin
Notary Public, was examined and testified
as follows:
EXAMINATION BY
MR. SCHILLER:
Q. Good morning. Could you please state your name and your business address for us?
A. Alan Halperin, 40 Wall Street, 37th floor, New York New York 10005.
Q. And you are a lawyer?
A. I am.
Q. Is there a name of the law firm you work at?
A. There is.
Q. What is it?
A. Halperin Battaglia Benzija.
Q. You are a bankruptcy and restructuring lawyer?
A. I am.
Q. How long have you been doing that for?
A. About 36 years.
Q. And in this case, you've been serving as the litigation trustee until you

A. Halperin

recently resigned, correct?

A. That's correct.

Q. And how many times in your career have you served as a litigation trustee, a liquidating trustee or a plan administrator approximately?

A. Thank you. About 40.

Q. That's a lot. How long do those engagements go on, years sometimes?

A. It varies. Depends upon the engagement. Some are longer than others, but I have been on some that go on for years.

Q. Do you do multiple ones at the same time at any given time?

A. Yes.

Q. What other educational experiences do you think qualify you to act as a litigation trustee?

A. I'm sorry?

Q. Other than being a lawyer and having experience, do you have any educational background that you think helped make you qualify to be a litigation trustee?

A. I had the same basic education as

A. Halperin

everybody else -- I have the same general education background, college law school, everything before that, but I don't know anything was particularly tied to being a liquidation or litigation trustee.

Q. So there is no independent professional training, in other words, that made you qualified?

A. No.

Q. Is it fair to say you are regularly deposed when you act as a litigation trustee?

A. Depends on the case, sometimes yes, sometimes no.

Q. Is it fair to say you sat for more than 20 depositions?

A. I don't think I have, no.

Q. About how many times?

A. Five or six.

Q. Now, we are here because you were the litigation trustee for Instant Brands, correct?

A. I believe so.

Q. Do you recall when you were appointed?

A. Halperin

A. I don't remember the specific date, but I believe it was 2024.

Q. Do you know who appointed you?

A. I believe it was a joint decision. I was appointed by the Bankruptcy Court under the plan if I remember correctly, but I believe it was a joint decision by the secured lenders and the creditors' committee.

Q. Do you recall who contacted you to ask you if you could first take on the role?

A. I think it was the secured lenders.

Q. Do you remember who?

A. I think it may have been someone from their counsel, Dechert.

Q. Somebody who you had a prior relationship with?

A. I knew him.

Q. What was his name?

A. I don't remember if it was Jule Rosser or Allan Brilliant.

Q. It could have been either of them?

A. It could have been either of them.

Q. They currently represent two of the members of the LTAB, right?

A. Halperin

A. I believe that's right.

Q. Now, you understand your testimony today is based on your work as the former trustee, right?

MR. TATA: Objection.

A. Yes.

Q. Do you have any understanding when your resignation became effective?

A. I believe it went effective Sunday.

Q. That was September 13th?

A. Correct.

Q. Is there any reason you cannot give complete and truthful testimony today?

A. No.

Q. Now, your counsel is sitting here.

What law firm does he work with?

A. Elsberg Baker.

Q. And prior to the Instagram bankruptcy, did you have a relationship with that law firm?

A. I'm sorry, which bankruptcy.

Q. Prior to your work in this matter the Instant Brand bankruptcy. Did I say Instagram, sorry.

A. Halperin

A. I think you did.

Q. Prior to your work as the Instant Brand trustee, did you have a relationship with the Elsberg firm?

A. No.

Q. Fair to say this was your first experience working with them?

A. That's correct.

Q. What about McCool Smith?

A. What about them?

Q. Did you have a relationship with them prior to this litigation job?

A. I worked with them before, yes.

Q. They're still counsel to you and the trust?

A. The trust.

Q. But not to you?

A. Not to me personally, no.

Q. Do you recall when Elsberg was retained?

A. I don't recall the specific date, but it was I believe after the summer of 2025.

Q. Do you recall who decided to retain

A. Halperin
Elsberg?
A. It was an agreement amongst the litigation trust advisory board with my approval.
Q. But fair to say it wasn't your idea to originally to retain that firm?
A. No, I didn't initiate the discussion.
Q. Do you understand who is paying for your representation in this proceeding?
A. It's going to be the trust.
Q. And are you aware whether you are indemnified by the trust?
A. I believe I am.
Q. Do you know what provision of the plan provides an indemnification?
A. Sitting here today, I couldn't cite to it, but I believe it's provided for in the litigation trust agreement.
Q. We may call that, if I say the LTA, will you understand I will be referencing that document?
A. I will try, but if I look confused...

A. Halperin

Q. I will try my best to make you not confused.

A. Thank you.

Q. Did you meet with anyone to prepare for today's deposition?

A. I met with counsel.

Q. Was anyone else present?

A. No.

Q. Was counsel just the Elsberg firm or both Elsberg and McCool?

A. Just the Elsberg firm.

Q. So is it fair to say you didn't meet with anyone from Citadel?

A. That's correct.

Q. And no one from Parabellum?

A. No.

Q. Now, you are aware who is on the LTAB at the moment?

A. I am.

Q. Mr. Cheatle, who is I guess an employee of Citadel, he is on the LTAB?

A. He is on the LTAB.

Q. Mr. Xie is a member of the LTAB and an employee at Citadel?

A. Halperin
A. He is on the LTAB as well.
Q. And John Sinna is an employee of Parabellum and he is the third member of the LTAB currently?
A. I don't know if he is an employee of Parabellum, but yes, he is on the LTAB.
Q. Where did you think he worked?
A. I am not sure if he is an employee, an owner, I don't know what his capacity is with Parabellum.
Q. Did you think he worked at Citadel?
A. No.
Q. But you understand him to be affiliated with Parabellum, you just don't know his job?
A. Correct.
Q. Did counsel for Citadel or Parabellum meet with you or speak with you about this deposition?
A. No.
Q. Okay. Did you review documents to prepare for today?
A. Yes.
Q. Now, did you review emails dated

A. Halperin
March 4th and 5th, 2025 that talked about consent to transfer litigation trust interest to Parabellum in your preparation for today?
A. I may have. If you show it to me, I might be able to give you a more definitive answer.
Q. Did you review the litigation trust agreement? Yes?
A. I did.
Q. Do you recall which sections you specifically reviewed in anticipation of today?
A. Not specifically.
Q. Did you review a transcript of Mr. Sinna's deposition in this matter prior to appearing today?
A. No.
Q. Mr. Olson's deposition transcript?
A. No.
Q. Did anyone describe their testimony to you?
MR. TATA: I will caution you not to disclose the content of attorney-client communications, but you

A. Halperin
can answer. Go ahead.
A. Maybe, I think surface level.
Q. Now, just to make clear I'm not going to ask you today about your discussions with your lawyer in relation to legal advice he may have given you prior to today and I'm also going to try to avoid to ask you about strategic or substantive decisions that you may have made in relation to the litigation, you may understand that that's not the purpose of today's deposition. So if you have any trouble understanding my question because you are worried or concerned about that, please just ask me and I will clarify.
A. Okay.
Q. The trustee has -- you have signed a common interest agreement to which Parabellum and Citadel are a party, correct?
A. Correct.
Q. Is anyone else a party to that common interest agreement currently?
A. I would need to look in the document. I don't recall.
Q. Do you recall who drafted the

A. Halperin
common interest agreement?
A. I think my firm did, but I'm not 100 percent sure. It's fairly standard to enter into those with a trust advisory board.
Q. Is it also standard for the litigation trust advisory board to also be party to those?
A. Yes.
Q. So is it fair to say Mr. Olson, while he was a member of the LTAB, was a party to that agreement?
A. Yes.
Q. Is it fair to say Mr. Sinna had to sign that agreement before joining the LTAB?
A. Yes.
Q. You understand that Mr. Olson -- sorry, Mr. Sinna first became what's been described to us as an ex-officio member of the LTAB?
A. I am aware of that.
Q. Did he sign the common interest agreement at the time he became an ex-officio?
A. I believe he did.

A. Halperin
Q. Now, you are a fiduciary to all litigation trust beneficiaries, correct?
MR. TATA: Objection. Just give me a moment to object before answering the question.
A. Yes.
Q. What documents govern the litigation trust?
A. It's primarily the litigation trust agreement.
Q. Is that the only document that governs the litigation trust advisory board?
A. There may be provisions in other documents, perhaps the confirmation order and/or the plan, but it's going to be primarily the litigation trust agreement.
Q. Okay. Let's talk about what that governs.
Does it govern the composition of the board?
A. Just to be clear, when you say it, you are referring to the litigation trust agreement?
Q. Exactly.

A. It provides for how the board is -- I'm not sure I'm following the question.

Q. Does it determine how the board is put together, in other words, who is on the board?

MR. TATA: Objection.

Q. Does it designate the composition of the board?

MR. TATA: Objection.

THE WITNESS: May I answer?

MR. TATA: You may answer, unless I instruct you not to answer, you may answer.

A. In part, it provides a structure for -- the board was constituted at the outset and the litigation trust agreement provides for how you address membership going forward.

Q. And do you understand when the litigation trust agreement was approved by the court?

A. I don't recall the date of confirmation or when the plan specifically went effective. I'm not 100 percent sitting

A. Halperin
here.
Q. Do you understand whether it was ever amended after it first became effective?
A. Again, it being the litigation trust agreement?
Q. Yes.
A. I don't recall.
Q. Do you ever recall a moment where you thought it needed to be amended?
A. Not sitting here, no, I don't.
Q. Now, focusing on that document, does it determine how the board takes action in regard to meetings, quorum and a vote?
A. I believe it does.
Q. Does it address what happens when there is a vacancy on the board?
A. I believe it does.
Q. Does it address conflicts of interest, generally speaking?
MR. TATA: Objection.
A. I believe it does.
Q. Now, in addition to the litigation trust agreement, you said there may be other documents that also relate to or govern the

A. Halperin

LTAB, right?

A. Correct.

Q. Are you aware that there is a plan that was approved by the court?

A. I am aware of the plan.

Q. And are you aware that there was a confirmation order?

A. I am aware of the confirmation order.

Q. Are you aware of a document called the plan supplement?

A. Yes.

Q. And are you aware of a document called the litigation trust credit agreement?

A. I am.

Q. Are you aware that that document has various amendments as well?

A. I think it does, yes.

Q. Would you agree with me that those are the core set of documents that govern the LTAB and the trustee's responsibilities?

A. I'm not sure. I would say the credit agreement does, but it's a set of core documents relevant to the trust agreement.

A. Halperin

Q. Are there any other core documents I overlooked?

A. Possibly, but sitting here right now, nothing is coming to mind.

Q. I would like to take you to the LTA and page 5.

(Exhibit 1, copy of the LTA, marked for identification, as of this date.)

Q. Did I hand you a copy of the LTA?

A. The court reporter did.

Q. Thank you. You are familiar with this document, correct?

A. I believe so, yes.

Q. Could you turn to page 5 please? Specifically, I want to ask you some questions about Section 1.05.

Now, Section 1.05 is described as a relation -- a provision that is titled Relationship to and Incorporation of the Plan and Confirmation Order.

Did I read that correctly?

A. Yes.

Q. Do you see Section 1.05 ranks certain documents in an order; first, the

A. Halperin
confirmation order; second, the litigation trust agreement; third, the CCAA recognition order and; fourth, the plan?
Do you see that?
A. I do.
Q. Now, the confirmation order controls over the litigation trust agreement, right?
MR. TATA: Objection.
A. The provision indicates that it controls in that order and the confirmation order is listed first.
Q. Thank you. Have you ever taken a different view?
A. No.
Q. Let me ask you, when was the last time that you read the plan, Article IV.G?
A. I couldn't tell you sitting here today.
Q. When was the last time you read Section 2.05 of this agreement?
A. I would need to look at 2.05.
Q. That's on page 8. You can turn to it please.

A. Halperin

A. I don't recall when I specifically reviewed this section, but I am familiar with it.

Q. Did you review it recently?

MR. TATA: Objection.

A. I haven't focused on it recently.

Q. Did you understand my question, sir?

A. I may not have.

Q. Have you recently read this section?

MR. TATA: Objection.

A. I recently have reviewed the trust agreement. I do not have a specific recollection of focusing on Section 2.08 regarding tax identification numbers, but I will not fib to you, I may have.

Q. I appreciate that. If you go to page 22, I want to ask if you have recently read Section 4.01?

A. Generally, yes, I think I have reviewed this recently.

Q. I want to ask you the same question about Section 4.05 on the following page, 23.

A. Halperin

A. Generally, yes, I looked this over recently.

Q. I would like to ask you about Section 4.06 on page 24.

Have you recently read that provision?

A. I don't recall if I specifically looked at this one or not.

Q. Also on that page, Section 4.07.

Have you recently read that section?

A. I don't recall specifically reviewing this recently.

Q. Now, one more question, on page 35, there is a section titled Article X, Amendment and Waiver.

Have you recently read this section?

A. I'm sorry, what page?

Q. It's 35.

A. I don't know that I specifically reviewed this recently.

Q. Can you please turn to page 14. I'm going to ask you a couple of questions

A. Halperin

about Section 3.03 which is titled Limitation of the Litigation Trustee's Authority.

Let me know when you are ready.

A. I may need to review it, but please ask the question.

Q. Section 3.03.B states, The litigation trustee acting on behalf of the litigation trust shall comply with and shall not take any actions inconsistent with or seek to modify or seek relief from any provision of the plan, the confirmation order or the CCAA recognition order except to the extent necessary, to clarify an ambiguity or conflict in any provision of the plan, the confirmation order or the CCAA recognition order.

Did I read that correctly?

A. I believe you did.

Q. So you would agree with me that you were obligated to comply with the plan, correct?

MR. TATA: Objection.

A. Yes.

Q. You would agree with me that as the

A. Halperin
litigation trustee, you were obligated to comply with the confirmation order, correct?
A. Yes.
Q. And you were also obligated not to take any action inconsistent with either of those documents, correct?
A. Correct.
Q. And you were not to seek to modify or seek relief from any provision of either of those documents, correct?
MR. TATA: Objection.
A. I think there is a corollary of that in this text. I think it says except as -- I think there is, I used the word corollary. I'm not sure it's the right word, but it says --
Q. Qualification maybe.
A. Thank you.
Q. You were just anticipating my next question, but you were not to seek to modify or seek relief from any provision except to clarify an ambiguity or conflict?
A. That's what the language says.
Q. Did you ever seek relief from the

A. Halperin
plan or the confirmation order that you recall?
A. I don't recall, no.
Q. Did you ever ask this court to clarify an ambiguity in Article IV.G?
A. I do not believe so, no.
Q. Did you ever ask the court to clarify anything about the composition of the LTAB?
A. No.
Q. What about the trust's funding limits?
A. No.
Q. Do you believe that sitting here today, Article IV.G is many ambiguous?
A. Article IV.G of this agreement?
Q. Of the confirmation order -- the plan.
A. May I see that please? I would like to see it if I could.
Q. Do you recall if you ever thought anything in the plan was ambiguous?
A. I don't recall bringing that up as an issue, so I don't think so. I don't

A. Halperin

recall sitting here.

Q. I will show it to you. It's just easier if we move past that question for the moment.

Now, I want to move to 3.03A(iii) which is the paragraph right above the paragraph that I read to you.

A. Okay.

Q. It states that the litigation trustee shall not, quote, take any action in contravention of this litigation trust agreement.

Did I read that correctly?

A. If you can point me to where on the page.

Q. Right in the middle. If you see the No. 684, right in the middle of the paragraph.

A. Okay.

Q. It says little Roman numeral iii, Take any action in contravention of the litigation trust agreement.

MR. TATA: Objection.

A. I see that.

A. Halperin

Q. You were obligated not to act in contravention of this litigation trust agreement, right?

A. That's what the language seems to say.

Q. I want to put that down for a moment and I want to show you Article IV.G of the plan so that you have an opportunity to refresh your memory.

(Exhibit 2, Article IV.G, marked for identification, as of this date.)

Q. I'm getting you a page number.

A. I'm trying to figure out which documents are in this clip.

Q. I believe that's just the plan.

A. It's the confirmation order and I think the disclosure statement may be here too.

Q. I'm going to ask you about page 42, but take your time to familiarize yourself with the document.

A. A page number would be helpful.

Q. Forty-two. If you turn actually to page 39 that's where Article IV starts. It's

A. Halperin

titled Events Following the Filing of the Chapter 11 Cases. It reads quite like a Steven King novel.

A. It's a combined plan and disclosure statement, so it's not -- it's not as normally structured in terms of the -- it's different than what one would normally expect in a plan and disclosure statement.

Q. But you are familiar with it?

A. Yes.

Q. Do you need to read the whole section in order for me to ask you some questions about it?

A. You can ask questions, but I may need to look, depending on what the question is.

Q. Fair enough. I'm going to just ask you to take a look at 4-G which is on page 42, it's called the global settlement/agreement and I'm just going to ask if you could please let me know when you've read that and I will ask you some questions about it.

A. Okay. I skimmed it. I haven't

A. Halperin

studied. Go ahead.

Q. Now, this document, you are generally familiar with this document in front of you marked Exhibit 2?

A. That's correct.

Q. And it's more than just the plan, it also includes the confirmation order, correct?

A. Yes.

Q. Now, sitting here today, have you complied, in your role as litigation trustee, with Article IV.G of the plan that you just reread?

A. I believe I have.

Q. Do you believe you've complied with the confirmation order?

A. I believe I have.

Q. Do you believe you have complied with the litigation trust agreement?

A. I believe I have.

Q. Do you believe you've complied with Section 2.05 governing transfers of the litigation trust's interests?

A. I'm sorry, 2.05 of which document?

A. Halperin

Q. The LTA.

A. May I look?

Q. Yes, please. It is on page 14.

A. Thank you.

Q. Actually, that was the wrong document. It's on page 8. It's titled Transfer of Litigation Trust Interest.

A. I believe I have.

Q. Do you believe you've complied with Section 4.01 governing the composition of the LTAB?

A. I believe I have.

Q. Do you believe you complied with Section 4.05 governing the manner of acting quorum and conflicts?

A. I believe I have.

Q. Do you believe you've complied with Section 4.06 governing action without a meeting? It's on page 24.

A. Thank you. The pages are sticking a little bit. I believe I have.

Q. Do you believe you've complied with Section 4.07 also on the same page governing tenure and replacement of LTAB members?

A. Halperin

A. Yes, I believe I have.

Q. Lastly, Section 3.07 governs your resignation.

Do you believe you complied with that?

A. Yes, I do.

Q. Do you believe you've complied with the litigation trust credit agreement?

A. Yes, I do.

Q. Are there any provisions of any of the documents we've discussed so far that you believe you did not comply with?

A. To the best of my knowledge, no, there are not.

Q. Has anyone ever told you that the trust was not in compliance with any of these documents?

A. No.

Q. Did you ever ask anyone to assess whether the Parabellum arrangements complied with the plan, the confirmation order or the LTA?

MR. TATA: Objection.

I also caution the witness that you

A. Halperin

shouldn't disclose the content of any communication with counsel. If you can answer the question yes or no, go ahead.

A. Yes.

Q. Who was that?

A. Counsel.

Q. When were you told that?

MR. TATA: Objection.

A. I may have gotten confused. If you can go back to the original question.

Q. I'm not asking about the substance of the communication.

A. No, but I thought you said did you ever consult with anybody about that section and the answer was yes, and you said when --

MR. TATA: Let's have the question again.

Q. I will reread my question. It was, did you ever ask anyone to assess whether the Parabellum arrangements complied with the plan, the confirmation order or the LTA?

MR. TATA: Mr. Halperin, just to repeat my instruction, you can answer if you can answer without disclosing

A. Halperin

content of communications with counsel.

A. I'm sorry to do this to you, can you ask the question again?

Q. Absolutely. Did you ever ask anyone to assess whether the Parabellum arrangements complied with the plan, the confirmation order or the LTAB?

MR. TATA: Same instruction.

A. I don't recall if that specifically was asked.

Q. Do you recall discussing Parabellum's arrangements for a different purpose?

MR. TATA: Objection.

A. Which specific Parabellum arrangements are you referring to?

Q. We can take them one at a time. How about the transfer of litigation trust interests to Parabellum, do you recall asking or being told whether that complied with these various documents?

MR. TATA: Objection, and the same instruction I gave earlier.

A. There were conversations with

A. Halperin

counsel around the time. I do not recall the specific set of instructions and discussions at the time.

Q. Was anyone else involved in those discussions?

A. No.

Q. Just counsel?

A. Me and counsel.

Q. When you say counsel, to whom are you referring?

A. It most likely would have been Debra Cohen of my firm.

Q. What role was Debra serving at that time?

A. Counsel to the trust.

Q. And around what time was that, do you recall?

A. I don't, but it would have been around the time of the transfers. It also could have been McCool and/or Elsberg, but it would have been Debra probably.

Q. When you referred to Ms. -- what was her name?

A. Cohen.

A. Halperin

Q. Cohen. And she is a colleague at your firm?

A. She is.

Q. Do you have an engagement letter with her as the trustee?

A. I don't recall that, but it was agreed to at the beginning of the case that my firm would be working with me on general trust matters, not the litigation.

Q. Do you believe your conversations with Ms. Cohen to be privileged?

A. Absolutely.

Q. So you were consulting her for the purpose of giving you legal advice?

A. Yes.

Q. In addition to the legal advice you were getting from Elsberg?

A. Correct.

MR. TATA: Objection.

Q. And from McCool?

A. Correct.

Q. And are you paying your firm as the trustee?

MR. TATA: Objection.

A. Halperin
A. Yes.
Q. And where did those payments come from?
A. The trust.
Q. And were those payments limited or capped in any way?
MR. TATA: Objection.
A. I don't believe so but -- they're pursuant to a -- yes.
Q. And how are they capped or limited?
A. There is a budgeting and billing process that is reviewed by the LTAB.
Q. So the LTAB approved your engagement of your firm for this purpose?
A. Yes.
Q. And did they approve any payments to your firm also?
A. Yes.
Q. Aside from discussing the Parabellum arrangements with Ms. Cohen, did you discuss them with anyone else?
MR. TATA: Objection.
A. I may have with Elsberg or McCool, but I don't recall specifically.

A. Halperin

Q. Am I understanding your testimony correctly that sitting here today, you never discussed the Parabellum arrangements with anyone from the LTAB at the time that Parabellum came into the picture?

MR. TATA: Objection.

A. I thought and I think your original question went back to whether it complies with plan terms and I think you are asking a different question now.

Q. I am. The question is, do you recall discussing in general in any way the Parabellum arrangements with anyone other than Ms. Cohen at the time, and you said no, so I'm asking whether I understand your testimony to mean that at the time Parabellum came into the picture, you did not discuss Parabellum's arrangements with anyone who was currently sitting on the litigation trust advisory board, is that correct?

MR. TATA: Objection.

A. Can you please clarify what you mean by arrangements?

Q. Parabellum -- what do you

A. Halperin

understand Parabellum -- do you understand Parabellum to have gained its position on the LTAB, what did it do in order to get there?

MR. TATA: Objection.

THE WITNESS: May I answer?

MR. TATA: You may answer.

A. They initially came on to the board as an ex-officio member. I understand that around that time they purchased a participation in some of Citadel's position and then after that, their position changed and they became a member of the LTAB itself and at that time, on or around that time, they were now outright owners of certain trust positions as beneficiaries.

Q. Is it your understanding that that is still the case, they are still owners of certain interests and they have an employee or Mr. Sinna sitting on the board?

MR. TATA: Objection.

A. That's my understanding, yes.

Q. Now, is it your testimony that you've never discussed, at any point in time, Parabellum's acquisition of this interest and

A. Halperin

their entry on to the board with anyone else on the board?

MR. TATA: Objection.

A. No, that's why I got confused, because you changed the question. To the extent you are asking if I discussed the involvement in the board with anybody else, yes, I did.

Q. Who did you discuss their involvement with?

A. The LTAB.

Q. Who was that?

A. At the time, it would have been Jonny Cheatle, Ben Xie and Martin Olson.

Q. So you discussed Parabellum's role with Martin Olson?

A. It would have been with either Martin Olson or his counsel, Dipesh Patel.

Q. You are certain that happened?

A. Yes.

Q. And what did you discuss about Parabellum with Mr. Patel?

A. I will start by saying I believe the conversation was -- conversations were

A. Halperin

primarily with Mr. Patel. I don't recall if it was Martin Olson directly or through Mr. Patel on that, I'm not 100 percent sure sitting here today. I don't remember the specifics, but it would have been about his participation as an ex-officio member and how that would be implemented and what it would mean.

Q. What was Mr. Patel's view of that?

A. He didn't have a problem with it.

Q. Did you discuss whether that would comply with the plan and the LTA?

A. It never came up. I believe it does.

Q. How many times have you been, again, a litigation trustee?

A. If you include, by that you include the other titles that may come up because there are different variants of it.

Q. Thank you.

A. I would say 40.

Q. In all of those cases, you've had ex-officio board members?

A. No.

A. Halperin

MR. TATA: Objection.

Q. Have you ever had an ex-officio board member outside of this case?

A. I can't recall sitting here, no.

Q. What is an ex-officio board member?

A. It's a construct. It's not a -- the concept of ex-officio membership comes from bankruptcy cases. It's most frequently used in connection with creditors' committees where the creditors would like somebody who was not appointed to the committee to be able to sit in and listen and if asked, be able to offer thoughts.

And so when the issue came up about if it's possible to allow Mr. Sinna to be able to listen in and answer questions if they were posed to him and how to effect that, we started discussing the concept of ex-officio and how it could apply.

Q. And what did you do to ensure that in allowing Mr. Sinna to act as an ex-officio board member, you were fulfilling your duties and obligations as the trustee?

A. I made sure that before anything

A. Halperin
was done, that the LTAB was in total agreement on it and he never had a vote or a consultation right with me or the trust on anything.

Q. Sitting here today, do you recall doing anything else to ensure that you were fulfilling your obligations in connection with this investigation and agreement?

MR. TATA: Objection.

A. I don't recall.

Q. So it's fair to say you never spoke to Ms. Cohen about it?

A. I may have at the time he was coming on, but I don't recall the specifics and I couldn't get into it even if you asked me because I'm not supposed to disclose conversations with counsel.

Q. Right. So it's fair to say that you never looked at the documents to understand whether they permitted an ex-officio board member to sit on the board and ask questions, correct?

MR. TATA: Objection.

A. I believe I had conversations with

A. Halperin

counsel.

Q. Okay. Now, if you go to the litigation trust agreement. On page 1, it states, This litigation trust agreement defined as a capitalized term, in quotations, litigation trust agreement, dated as of February 27, 2024 by; A, the individual identified on Exhibit A attached hereto as the trustee for the liquidating trust established pursuant to the litigation trustee agreement.

Do you recall that your name is identified as Exhibit A as the litigation trustee?

MR. TATA: Do you want to direct him to a page?

Q. It's 44.

MR. TATA: Are you looking at Exhibit A? You said page 44 or Exhibit A?

Q. It's page 43 of the PDF which is the top right, blue.

A. I do see it there. I am designated and right below that. Just to go back it

A. Halperin
designates Debra Cohen and Donna Lieberman as counsel.
Q. For the record, that's on the following page, 44?
A. I'm assuming. May I show you what I'm looking at?
Q. I think you are right. I was looking at your signature page, but it doesn't really matter. We can move on.
A. I thought that's where you were, I'm sorry.
Q. Did you negotiate this agreement?
A. I was given the opportunity to give some comments, but the agreement had already been drafted.
Q. Who drafted it?
A. I don't know who was the initial draft person because it was already given to me. I understood it was negotiated between the, I will call them the lenders, because I don't remember what their specific title was, but the prebankruptcy lenders and the creditors' committee I believe were the primary two parties who negotiated the

A. Halperin

document.

Q. Is it fair to say there were multiple drafts and things were changed as it was negotiated?

A. Are you asking me definitively or are you asking me expectations?

Q. In general, whether you have an understanding.

A. I don't recall discussing it specifically with them, but I would expect that's probably accurate.

Q. Can you turn to page 22 please?

A. Yes.

Q. And I want to ask you about Section 4.01 titled The Litigation Trust Advisory Board, and do you have any knowledge as to whether this provision was modified during any of the negotiations?

A. I have no idea whether this was original or if that was changed.

Q. Now, to whom do you owe duties as the litigation trustee?

MR. TATA: Objection.

A. My understanding is trust

A. Halperin

beneficiaries.

Q. If you turn to page 10, Section 3.01 titled The Role of the Litigation Trustee.

A. Okay.

Q. In the middle of the paragraph, I will read you, I believe it's the third sentence, it says --

A. Which line are you starting, so I can follow along?

Q. The eighth line. The litigation trustee and the litigation trust advisory board shall act in the best interest of all the litigation trust beneficiaries and in furtherance of the purpose of the litigation trust.

Do you see that?

A. I do.

Q. Who are the litigation trust beneficiaries?

A. Colloquially, all the creditors, the lenders and the general unsecured creditors.

Q. And your understanding is that

A. Halperin

would include all of the general unsecured creditors, not just some of them?

A. Those that hold allowed claims.

Q. And it would include all holders of allowed general unsecured claims?

A. Yes.

Q. Now, under the plan, recoveries are allocated 85 percent to the prepetition term loan lenders and 15 percent to holders of allowed general unsecured claims, right?

MR. TATA: Objection.

A. That's familiar. I don't recall the specific percentage, but that sounds about right.

If you want to refer me to a specific provision, I'm happy to look at it. If you don't need it, I don't care.

Q. It's correct, but we can look at it if you want to.

Is the litigation trust the only source of recovery for general unsecured creditors under the plan if you know?

A. I believe it is.

Q. Can the interests of the term loan

A. Halperin
lenders and the unsecured creditors ever diverge?
A. They shouldn't.
Q. What might make them diverge, do you know?
MR. TATA: Objection.
A. I would be speculating, but the trust is formed to investigate and then if it bears out, pursue litigation for a recovery, the trust doesn't deal with claims objections, the trust doesn't deal with any of that, so it's in everybody's interest to try to get as large a recovery as you can and it's just going to be a question of how much is channelled to the two different paths.
I can't sit here and say definitively, absolutely yes or absolutely no that they could never diverge, that they have the came goal at least in my mind.
Q. Let me ask you about your experiences.
In your 40 or so experiences approximately, do you ever recall a situation in which there was a divergence of the

A. Halperin

interests of the term loan lenders and the unsecured creditors?

A. I should clarify first that I couldn't, sitting here today, tell you specifically how many cases I had where there were term loan lenders versus unsecured creditors.

A more common construct is that it's a general unsecured creditor trust. I have had, I think I've had cases where there have been different kinds of creditors that hold different kinds of interests.

I've seen creditor interests diverge with if creditor A's claim is allowed in a very large amount, it reduces the pro rata share distributed to creditor B or C or anybody else just because the denominator of the fraction is now bigger, the money is spread out over more people, but none of those interests, none of the claims allowance process is the responsibility of this trust.

And that's also something a little different from the typical that was left with the debtor, as I recall, so the trust really

A. Halperin
is sort of tunnel vision, if you will, on investigating it, pursuing the litigation, but I'm not comfortable sitting here and saying they can never diverge.

Q. Let's ask a more specific question.
When it comes to determining when or how much to settle a case for, who makes that determination?

MR. TATA: Objection.

Q. If you know.

A. I know it's provided for in here and I believe it's mine -- let me rephrase.
Would have been mine when I was the trustee, but I believe LTAB approval is required and I just don't recall what the percentages were.

Q. Do you -- are you able to say whether a decision to enter into a settlement or for how much could create a divergence of interest between the term loan lenders and the unsecured creditors?

A. It could create a divergence of interest between any of the members of the LTAB because I have seen cases where one

A. Halperin

person is more bullish about a litigation and another feels it's worth a lot more.

Again, I will never say no, that it can't happen, but to my understanding, they're all -- the money gets whacked up, but they're all going in the same path and they're all trying to get the best recovery and that's really the only function of the trust, so it's just a question of what you are going to get at the end. I think it comes down more to what people's beliefs will be in the strengths and value of the litigation they're bringing.

Q. Let me ask another question. When it comes to how much debt the trust takes on and what the terms of the debt is, can that cause a divergence of interest among the term loan lenders and the unsecured creditors?

MR. TATA: Objection.

A. I think I know what you mean, but I think you are using the wrong terms. I don't think that it would create a -- excuse me, I don't think that would create a divergence between the term loan lenders and the

A. Halperin

unsecured creditors for multiple reasons.

Q. What did I get wrong if you don't mind?

A. Term loan lenders are anybody that had a claim. The term loan lenders is not the same as the lenders.

Q. I think I know what you are saying.

So funders are the ones who are providing debt under certain terms pursuant to the credit agreement to fund the trust litigation activities, correct?

A. That's how I'm using the term.

Q. And can the interests of the funders of that debt and the interests of the unsecured creditors ever become divergent?

MR. TATA: Objection.

A. You are asking is it theoretically possible?

Q. Right.

A. I suppose, people could bicker about terms, et cetera, but again, the trust's only funding comes from the loans, it doesn't have anything else and so the trust needs to have that funding in order to be

A. Halperin

able to prosecute its litigation.

Q. Let me just ask you a side question because I want to minimize your time with me today.

Are planning to attend the hearing next Wednesday in Texas?

A. Probably.

Q. You are available to?

A. Yes.

Q. That may help us save some time, not having to make an unnecessarily detailed record.

A. Okay.

Q. One more question on the divergence interest issue if you don't mind.

Do you have any understanding whether the term loan lenders and the unsecured creditors' interest may become divergent in relation to the retention and cost of professionals?

A. Again, I think it depends upon the individuals. People can always disagree about costs and whose hired, that's always something someone can bring up I suppose, but

A. Halperin

at the end of the day, the beneficiaries are the same trust, it's the same singular goal and source of recovery so, you know, if -- again, could they become divergent, I will never say never, but to me, it seems like they are aligned. They both want to be careful of what they are spending. They both want to maximize the value that comes out of it and they're all fiduciaries for everybody when they're wearing their LTAB hats.

Q. Now, if you turn to page 22 please.

MR. TATA: I don't want to interrupt your line of questioning, but can we take a break?

MR. SCHILLER: I was going to suggest as much after one or two more questions.

Q. 4.02, which we looked at earlier, on page 22 is titled Authority of the Litigation Trust Advisory Board, right?

A. Yes.

Q. And the LTAB is created to, quote, advise, assist and supervise, correct, you personally?

A. Halperin

MR. TATA: Objection.

Q. It's in the first sentence.

A. That's the wording there, yes.

Q. Now, for what actions do you need the LTAB's approval rather than merely their consultation?

MR. TATA: Objection.

A. I couldn't cite you the laundry list sitting here, but it's in the document.

MR. SCHILLER: I think we should take a break because my next line of questions may...

THE VIDEOGRAPHER: The time is 10:22 a.m. This is the end of part 1 and we are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 10:38 a.m. This is the beginning of part 2 and we are back on the record.

BY MR. SCHILLER:

Q. Is it your understanding that in the case of the Instant Brands trustee and your experience with the LTAB, that the trust did not maintain any minutes, resolutions or

A. Halperin

voting records for the LTAB?

MR. TATA: Objection.

A. Not formally, no.

Q. Now, I would like to hand you a document. It's marked Trustee 01917448 and it's an email and I will wait until we give it to you.

(Exhibit 3, document bearing Bates stamp Nos. Trustee 01917448, marked for identification, as of this date.)

Q. Now, I want to direct you to, this is an email chain which you are copied on and it's a long chain and if you will see, it begins with emails from Mr. Tata to you copying David Elsberg and Rogan Feng to his colleagues.

Do you see that at the very beginning?

A. Yes.

Q. And eventually, if you go to the page marked 53, I believe at some point, Debra Cohen from your law firm is copied on this chain.

Do you see that?

A. Halperin

A. Not yet -- yes.

Q. You copied her into this chain, do you recall?

A. Hold on. I need to go back.

Q. Strike that. It's not important.

Does anyone else at your firm work in connection with the trust?

A. Not with any degree of regularity.

Q. Now, what records does the trust maintain concerning the LTAB?

A. I mean -- sorry to do this, what do you mean by records?

Q. You know, business records, whether that's formal minutes, descriptions of meetings or votes or summaries of the actions and activities of the boards. It could be emails concerning agendas, things like that.

MR. TATA: Objection.

A. There is very little that is formulaic and formal, but we maintain all emails, we maintain, you know, our documents on the system and when there are things that require approval, it's typically done either by email or phone call or Zoom and if there

A. Halperin

is something that requires documentation, then documentation will be followed up.

Q. Now, who maintains the litigation trust register?

A. Of --

MR. TATA: Objection.

Q. Do you know what I mean when I say litigation trust register?

A. I think I do, but I'm being careful because I don't want to assume something that I'm wrong on.

Do you mean the list of who the creditors are?

Q. Yes.

A. There are two components to the register. The list of who the lenders are is an outside firm that, sitting here today, I can't recall what the name is, but they sort of serve almost as like, and I'm making analogies, they almost serve as like an agent or if it were an indenture, like an indenture trustee and they would be responsible for keeping track of who the lenders are and I anticipate when the trust gets to a point, if

A. Halperin

it does, of distribution, the distribution would be made to that entity and then they would disburse to the holders of record.

With respect to the GUCs, general unsecured creditors, that is different, that's the debtors.

Q. I would like to hand you another email.

(Exhibit 4, document bearing Bates stamp Nos. Trustee 01917443, marked for identification, as of this date.)

Q. This is a document marked Trustee 01917443 and it's an email dated May 20, 2025.

Do you see that?

A. Yes.

Q. This is an email from, at the top at least, there are several emails in the chain, but at the top of the page, it's from Mr. Patel to you copying Ms. Cohen.

Do you see that?

A. Yes.

Q. And in his email which actually -- sorry, I was confused, so strike that.

A. Halperin

In his email, he references at the top of the page, Please update the committee list.

What is the committee list?

A. I'm not really sure. I have a supposition of what he meant, but I don't know. Ravago itself, the entity was a member of the creditors' committee and I believe Dipesh Patel was counsel to them in that capacity, but obviously, the committee is gone at this point, so I'm assuming he is talking about the trust board list, but that's not what he says.

Q. As of May 20, 2025, was the committee gone or was it --

A. It was gone.

Q. Would there have been a list if it was gone?

MR. TATA: Objection.

A. I'm sorry?

Q. Is it fair to say you don't know what he was talking about?

A. I can't be certain, but that's the only thing he would have brought to me. I

A. Halperin

had no interaction with the committee. The committee dissolved as of the effective date of the plan, it didn't exist anymore. I'm assuming he misspoke.

Q. He is telling you in this email, Please update the committee list to add Paulo.

Do you see that?

A. Yes.

Q. Who is Paulo?

A. I don't know.

Q. Do you have any understanding why he was asking to add Paulo to the committee list?

A. I believe I do.

Q. What was that understanding?

A. Martin was retiring and I think he either wanted to or believed he was entitled to -- I say he, it's not he, it's obviously the creditor.

Q. Ravago?

A. Ravago. I mean, a successor to Martin.

Q. And he was proposing that Paulo

A. Halperin

Menezes be named to replace Martin.

Is that your understanding?

A. I believe so, and I have in my head, but I don't recall where it's from -- it's right below, he gave me the email address, that's right, that he was another employee of Ravago.

Q. Now, was -- did you ever receive an email asking to add Mr. Sinna to the committee?

A. In what context?

Q. Well, it's your understanding that Mr. Patel is actually talking about the LTAB when he says committee list, is that fair?

A. I believe that's correct.

Q. Was there a point in time when you were also asked to add Mr. Sinna as an ex-officio member to the LTAB?

A. I don't think it came that way, I think it was more of a discussion of if we wanted to have him be able to observe what was going on, how is that doable and then it was discussed as to what may or may not work and came to a conclusion that we can do this.

A. Halperin

Q. Does the trust maintain any documents reflecting minutes, resolutions, written consents or attendance for the LTAB?

A. No, it has been operating a lot less formally than that.

Q. How would you describe board action to be recorded in your experience?

A. Typically, by email.

Q. How would anyone determine after the fact how a member voted?

A. I believe it would show up in an email.

Q. Does the trust issue any reports to beneficiaries?

A. There are -- I don't recall the requirements sitting here. I know that at the end of a year, there is a tax filing required to -- but it's flow through because it's a grantor trust and then that gets filed and grantor letters would have to be sent out to holders of, at the time, allowed claims.

Q. And that's an annual event?

A. It's an annual event.

Q. And aside from this specific annual

A. Halperin

event, are there any other --

A. I don't recall.

Q. Now, have any of these annual reports disclosed Parabellum's role in the LTAB?

MR. TATA: Objection.

A. I don't believe so.

Q. You can put that away for the moment. Thank you.

We talked briefly about compensation to your firm. In your experience as a trustee in the various capacities we discussed today, is it usual to engage three law firms or typical, I should say?

MR. TATA: Objection.

A. Depends on the case.

Q. You don't find it unusual in this case to have retained three?

A. No.

Q. Is it typical to have traditional hourly billing engagements or do you sometimes consider contingency arrangements with different law firms?

A. Halperin

A. I've seen it both ways.

Q. In this case, did you consider any contingency arrangements?

MR. TATA: Objection. I think we are getting pretty far outside the scope of what has been ordered here. You are asking about strategic decisions made about engagement of counsel. I don't think that's within the scope of Judge Isgur's order.

MR. SCHILLER: Are you instructing him not to answer?

MR. TATA: I'm instructing him not to answer. If you want to confer about it at a break.

MR. SCHILLER: I'm interested in his experiences in general and how it relates to the operations of this trust and I was curious if he had explored that issue and we can talk about that later if necessary.

Q. Are you aware the LTA requires that transfers be approved by at least two disinterested members of the LTAB?

A. Halperin
MR. TATA: Objection.
A. I would need to review the specific provision. I don't recall the specifics.
Q. If you turn to page 23 of the LTA agreement, Section 4.05.A which we briefly talked about earlier. Let me get there. 4.05 is titled Manner of Acting and Section A states in the second sentence, which is the third line, The affirmative vote of at least two members of the litigation trust advisory board present and entitled to vote at a meeting at which a quorum is present shall be the act of the litigation trust advisory board, except as otherwise required by law or as provided in this litigation trust agreement.
Do you see that?
A. I do.
Q. Now, was there a meeting of the LTAB on the transfer to Parabellum?
A. There were emails to the LTAB and there were calls.
Q. And that would constitute meetings in your view?

A. Halperin

A. Yes.

Q. Were there two affirmative votes from members entitled to vote?

MR. TATA: Objection.

You can answer.

A. There were not two members entitled to vote.

Q. How many members were there who were entitled to vote?

A. There was only one.

Q. Did that member vote?

A. Yes.

Q. In favor of the transfer?

A. In favor of the transfer, yes.

Q. Is it fair to say that there was only one vote on the transfer to Parabellum?

A. The other two would have been conflicted because they were the proposed transferrer, so under a different provision, they would have been prohibited from voting.

Q. If you go to 4.06 on the following page, it's titled Litigation Trust Advisory Board's Actions Without a Meeting. It says, Any action required or permitted to be taken

A. Halperin

by the litigation trust advisory board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the litigation trust advisory board as evidenced by one or more written consents describing the action taken, which written consent can be by email and recorded in the minutes, electronic records or other transcripts of the proceedings.

Now, with that in mind, you said there were no -- there wasn't a formal meeting, but there were emails and calls that constituted a meeting in relation to the Parabellum transfer, right?

A. Correct.

MR. TATA: Objection.

Q. Was there unanimous consent of the LTAB?

MR. TATA: Objection.

A. I believe there was, but two of the votes are irrelevant, they didn't count because there is another provision that says if you are conflicted, you are not permitted to vote. The two that didn't vote supported

A. Halperin

it. They were the transferrers, the purported transferrer, singular, I'm sorry, the only nonconflicted member was Ravago and they voted formally in favor.

Q. How did they vote, do you recall, was it on a phone call or email?

MR. TATA: Give me a second to object. Objection.

A. It was definitely a phone call. It may have been a phone call and an email, I just don't recall.

Q. Do you recall who was present on the phone, was it all three members?

A. I spoke to them separately. I wasn't going to involve the two conflicted members on a direct call with the one nonconflicted member. I felt that would have been putting undue pressure on them.

Q. Do you have a memory when you spoke to Ravago, it was one on one in relation to the Parabellum transfer?

A. Yes, with Dipesh Patel.

Q. Do you believe that constituted a meeting of the board?

A. Halperin

A. I believe all of it in totality. Yes, I spoke to all of them.

Q. I was asking about that one phone call.

A. Alone, I don't know that it would have.

Q. If you go back to 4.05.C, I think that's the section that you were referring to a minute ago, if you would agree with me on what constitutes a conflicted member.

If you read the bottom half of that paragraph, it says, A member who has or who may have a conflict of interest shall be deemed to be a conflicted member.

Was this the paragraph you were referring to a minute ago?

A. Yes.

Q. Now, is it your understanding as to whether a conflicted member can still count towards a quorum and, therefore, constitute a meeting of the board if they're conflicted?

MR. TATA: Objection.

A. I'm sorry, can you repeat the question?

A. Halperin

Q. Sure. Let's read the whole bottom of the paragraph. A member who has or who may have a conflict of interest shall be deemed to be a conflicted member who shall not be entitled to participate in the meeting, vote or take part in any action with respect to such matter or issue, however, such member shall be counted for purposes of determining the existence of a quorum, the meeting vote or action with respect to such matter or issue shall be undertaken only by members of the litigation trust advisory board who are not conflicted members.

Did I read that correctly?

A. You did.

Q. So it's possible to have a quorum even if the conflicted members are not voting?

A. Correct.

Q. Are you aware of any provision in the LTA that permits the board to act on the vote of a single member?

MR. TATA: Objection.

A. If I were to take it at face value,

A. Halperin

it would be the provision that you worked through with me before that you have to have two votes, but that's, I think just an inconsistency that had not been addressed in the document.

That would mean that there is a situation where the trust could be paralyzed and unable to act and my understanding of this provision is that it was -- it did ask about this, I just don't remember the exact timing of when, but this was the lenders requiring one of their votes to be involved in an approval which I really didn't quite understand at the time because they had two members anyway out of three, but that's why this was in there, I was told.

That being said, the two are inconsistent and I don't believe you have a -- you can have a board that simply can't act. I would almost say that could rise to the level of being a, I forget what the term is, you went through it with me before about how an agreement could be amended if it had to be, but I just don't see that as

A. Halperin

inconsistent.

This was the only entity that could vote on it. It was the entity that was not part of the transaction and they approved, so in theory, it was unanimous approval by the only remaining person. Was it two people, no, there weren't two people left.

Q. You were comfortable with it?

A. I was.

Q. Would you agree with me that it was your job to determine whether that vote complied with the agreements, that was one of your roles, right?

MR. TATA: Objection.

A. Could be.

Q. And ultimately, you got comfortable with the fact that there was only going to be one vote and you didn't, as you said earlier, you didn't raise the issue with the court or try to amend the plan or otherwise disclose it, correct, to beneficiaries, for example?

A. No.

Q. If we go to my next tab, there are a couple of documents I would like to show

A. Halperin

you. You can probably put that aside, but I would keep it close.

A. Okay.

Q. Just to confirm, based on what we were just discussing, there is no provision in the LTAB that says when there are two -- sorry, I'm using the wrong words.

You agree with me that there is no provision in the LTA that describes a situation that says when there are two conflicted members and only one member votes, that constitutes a unanimous vote, right?

MR. TATA: Objection.

A. I don't believe that's addressed in the LTA.

Q. Now, I have two documents that I'm going to provide you with. Let's start with the one that says Exhibit 3 please.

(Exhibit 5, transfer notice, marked for identification, as of this date.)

(Exhibit 6, transfer notice, marked for identification, as of this date.)

Q. These are documents produced by your counsel and these are the transfer

A. Halperin
notices as it relates to Parabellum and I want you to take a minute to familiarize yourself and tell me when you are ready and I will ask you a few questions.

A. Do you want me to focus on 3?

Q. They are similar. I will just ask you a few questions.

If you take document 3 -- first page says Exhibit 3, but it's actually Exhibit 5 for this deposition.

A. Okay.

Q. What is InstaLit Funding, if you know?

A. I believe it's an affiliated entity, I can't tell you how, of Parabellum.

Q. When did you first learn about InstaLit Funding?

A. I don't recall when the first time I heard about them was.

Q. What role or roles do the InstaLit Funding entities have with the trust?

MR. TATA: Objection.

A. They're a beneficiary.

Q. Did you -- do you have an

A. Halperin

understanding of what these two documents are?

A. I have an understanding, yes.

Q. What are they?

A. They effect transfers of positions -- let me take a look back because there are two, so I have to look at the other one.

Q. They are identical, but take your time please.

MR. TATA: Objection.

A. Go ahead. What was your question?

Q. Did you work on drafting either of these documents?

A. No.

Q. Do you recall when the first time you saw either of these documents was?

A. Specifically, no, but I think it would have been after the parties reached agreement.

Q. Likely it would have been in 2025 then?

To help you out, the document is dated March 3, 2025.

A. I saw effective March 3, 2025. I

A. Halperin

didn't know if it was dated then -- it is, subscribed and sworn to me the 3rd day of March is the notary, so it would have been around then.

Q. You can put those away.

(Exhibit 7, document bearing Bates stamp Nos. Trustee 01917428, marked for identification, as of this date.)

Q. The court reporter is handing you an exhibit Bates stamped Trustee 01 -- sorry, 01917428. It's an email chain dated March 4th and 5th, 2025.

Do you see that?

A. I do.

Q. Now, the bottom email is from Jonny Cheatle and it states, quote, Dear Trustee and Board Members, and it's asking recipients to reply yes to signify consent to the transfer of 90,407.17 units to InstaLit Funding 1 and 74,298.92 units to InstaLit Funding 2.

Do you see that?

A. I do.

Q. Mr. Cheatle was a member of the

A. Halperin

LTAB and employee of Citadel and Citadel Multi Asset Master Fund LTD was the seller in this case, correct?

A. Yes.

Q. Now, why was the request for the board's consent circulated by the seller's representative rather than by you?

A. I don't recall the specifics of the provisions or procedures for circulation of this, but I know that LTAB approval is required and in terms of the documents as trustee, if it's been approved and I'm provided properly documented sale transactions, it's more just formulaic and I'm supposed to make sure it gets properly recorded and transferred to the transfer agent.

I couldn't tell you specifically why it went this way as opposed to any other way.

Q. Do you recall if you reviewed those documents before they were circulated by Mr. Cheatle?

A. I don't recall.

A. Halperin

Q. Do you recall whether you directed Mr. Cheatle to circulate this email and circulate those documents?

A. I don't think I did, but I don't specifically recall. I may have.

Q. Now, you would agree with me, in this email chain, the only affirmative reply is from Mr. Patel, correct?

A. Correct.

Q. And he was acting on behalf of Ravago, is that your understanding?

A. That's correct.

Q. Now, Mr. Patel wasn't a member of the LTAB, right?

A. I'm sorry, can you repeat that please?

Q. Mr. Patel was not a member of the LTAB, right?

A. No, but he spoke for Martin Olson and I asked about that early on, should I be speaking directly with Martin or going through you? I just want to know what Martin wants and it was confirmed that generally, it was fine to take direction from him,

A. Halperin

especially because --

MR. TATA: I think the witness wasn't done answering.

A. -- because Martin wasn't always the easiest to reach or get in touch with.

Q. Do you recall whether that was by email or by phone?

A. No, that was by phone and I recall there was a subsequent conversation with Marty at some point confirming that that was okay.

Q. The following day, on March 5th, you wrote back to Mr. Cheatle, Jonny, You now have approval of the sale. Has it closed with Parabellum?

Do you see that?

A. I do.

Q. Now, when you wrote, you now have approval of the sale, what did you understand had been approved and by whom?

A. That the approval of the transfer.

Q. It had been approved by who?

A. Obviously, Citadel was in favor of it.

A. Halperin

The question as to whether that would even matter for the same reasons discussed earlier, to the extent they were a conflicted member on an approval, the only remaining unconflicted member voted yes.

Q. Was it your understanding that based on this email alone, the LTAB had approved the transfer to Parabellum?

MR. TATA: Objection.

A. I don't recall if there had been telephone conferences before this related to this, but yes, we can say yes for this because I just don't recall specifics, if there had been a phone conversation about this or not.

Q. And again, what was the basis for your understanding that based on the email, approval by Mr. Patel on behalf of Mr. Olson, the LTAB had approved the transfer to Parabellum?

MR. TATA: Objection.

A. Because it's a transfer of an interest, the LTA requires board approval and then once there is board approval, I am to

A. Halperin

process it.

There are three LTA members, two are Citadel who were in favor as the transferrer, the proposed transferrer. There is one unconflicted member. That member voted yes.

Q. Now, I'm handing the court reporter the next exhibit. You can put that away.

(Exhibit 8, document titled The Litigation Trustee's Objection to Cornell Capital LLC's Motion For Expedited Discovery and Response to Order to Show Cause, marked for identification, as of this date.)

Q. I've handed you a document that isn't Bates stamped because it's a file document in this proceeding and titled The Litigation Trustee's Objection to Cornell Capital LLC's Motion For Expedited Discovery and Response to Order to Show Cause.

Do you see that?

A. I do.

Q. If you turn to page 8, are you familiar with this document?

A. Generally familiar.

Q. If you turn to page 8, I want to direct your attention to paragraph 20.

A. One second please.

Q. Take your time please.

A. Okay.

Q. In your objection at paragraph 20, you state that the transfer notices were executed March 3, 2025, the day before the consent requests went out.

Do you see that?

MR. TATA: Objection.

A. You are talking about paragraph 20?

Q. Yes.

A. I just read it.

Q. If you recall, in the email chain I just showed you which is Exhibit 7, you asked, Has it closed with Parabellum?

Did you understand the transaction had not yet closed as of March 5th?

A. I was not sure whether it had or had not.

Q. Which came first, the transfer or the consent?

A. Halperin
A. I'm sorry?
Q. Which came first in regards to Parabellum, was it the transfer or the consent to the transfer?
A. I don't think the transfer. I couldn't tell you which was documented first, but I don't believe that the transfer is valid until the consent is there.
Q. Now, do you recall that when we were looking at the LTA earlier, Section 2.05.B, conditions to transfer on written consent, it's on page 8 if would you like to turn back to it.
A. I would.
MR. TATA: Objection.
Q. 2.05.B.
A. Okay.
Q. In order for the transfer to be valid, it requires written consent, right?
A. Correct.
Q. Was that condition satisfied before the transfer notices were executed?
MR. TATA: Objection.
A. May I go back and look at the

A. Halperin

email?

Q. Sure.

A. It seems to be. It seems to have been the day before. Again, not effective until that approval is given.

Q. If you go to the trustee's objection --

A. One other thing, just so you are aware, because my signature was separate and obtained separately and it's not dated. It's acknowledged as effective as of, but if I recall correctly, that didn't go on until that came through.

Q. So after March 5th, on or after March 5th?

A. I believe so. After we got Martin's approval through Dipesh.

Q. If you turn back to the objection which is Exhibit 8.

A. What page do you want me to look at?

Q. You reviewed this and approved it before it was filed with the court, correct?

A. Yes.

A. Halperin

Q. And if you turn to paragraph 21 which is on the same page we were just looking at, it again states that on March 3rd, each member of the LTAB approved the transfers from Citadel to Parabellum, so that's incorrect?

A. That's a mistake.

Q. And if you turn to paragraph 43 which is on page 13, it states that as Cornell is aware, in March 2025, with the written approval of the LTAB, Citadel transferred trust interests to Parabellum via notarized transfer notices as required by the LTA.

Do you see that?

A. I do.

Q. Now, it also contains a footnote, but I want to direct your attention to the following page, to a different footnote which is footnote 8 on page 14 and footnote 8 says, quote, Because Citadel had a financial or other pecuniary interest in the transfer to Parabellum, Messrs. Cheatle and Xie, both Citadel employees, were not entitled to vote

A. Halperin
on the transfer LTA, Section 4.05.C. through his counsel, Mr. Olson approved the transfers.
Do you see that?
A. I do.
Q. Which one is accurate, that each member approved or that the two of the three were not entitled to vote?
MR. TATA: Objection.
A. A couple of things. One, as we discussed earlier, you can have the other two, being Mr. Xie and Mr. Cheatle, count for purposes of a quorum. Did they approve? The answer is, of course they approved, because they are the transferrer. Do they count? No, they do not count.
Q. Did Mr. Cheatle or Mr. Xie ever write you and say they had a conflict?
MR. TATA: Objection.
A. No, but if they're selling their own interests and the board has to approve, they have a conflict. To my read, based upon what we went through earlier, they have an interest in it.

A. Halperin

Q. It was understood even if it wasn't discussed?

A. It's understood by me.

Q. They didn't respond to that email, right?

A. No.

Q. So was there an understanding between you and them that they would not vote?

A. I didn't discuss it with them.

Q. They just knew on their own?

A. I cannot tell you what they understood. I can tell you what I understood.

Q. In that email, if you look back on it, under Mr. Cheatle's title, it says this email is being sent by an attorney.

Do you understand Mr. Cheatle to be an attorney?

A. Which document?

Q. The email that Mr. Cheatle sent you, it's Exhibit 7.

If you look at the very bottom, under signature line, it says, being sent by

A. Halperin

an attorney?

A. That's his signature block. I think that's on all of his emails. I can't tell you what he meant in terms of what capacity. You are doing it on standard --

Q. That wasn't quite my question.

You understand him to be an attorney?

A. I think he is a lawyer or -- let me rephrase that.

I don't know the British system. There is barristers, there are solicitors and there may be other stuff.

What I know, he is a lawyer. When you dice it and slice it a little more under the U.K. system, I don't know what he is.

Q. He is barred in the U.K. is your understanding?

A. I think so. I don't know if he is barred here or not.

Q. It certainly doesn't say in that email, does it?

A. No.

Q. So do you recall whether you or

A. Halperin

anyone else to your knowledge ever told Mr. Olson that the other two members were recused from this vote?

A. I don't recall.

Q. Same question, but in terms of Mr. Patel, do you recall whether you told Mr. Patel that?

A. I don't recall.

Q. Now, if you go to the LTA, you can put the other documents away for the moment please.

A. All right.

Q. Back to the LTA.

A. The objection goes away?

Q. For now. Sorry, it's a lot of shuffling today.

A. I'm trying to keep it organized so I can find it when I need it.

Where would you like me to look?

Q. Page 8, Section 2.05.A.

A. Uh-huh.

Q. Now, Section 2.05.A states in the first sentence, The litigation trust's interests are not negotiable, not assignable,

not transferrable and not capable of being pledged or hypothecated.

Do you see that?

A. I do.

Q. Section 205.B continues, Upon a notarized written notice of transfer and maybe transferred in whole --

A. Where are you, sorry, I apologize?

Q. It's okay. Section B, it says, After written consent from the litigation trust advisory board, litigation trust shall not be capable of being transferred to any person or entity.

A. Okay.

Q. And then, I think I have the wrong section in my outline actually. Strike that. Sorry, I meant to read from Section A. It says, in the first sentence, where it continues after not negotiable, not assignable, it says, Provided that in many -- it may -- they, they, the interests, may be transferred in whole only.

Do you see that?

A. In whole only and then there are

A. Halperin

three provisos?

Q. Uh-huh. Did Citadel Multi Asset Master Fund LTD transfer its whole interest into the litigation trust interest to Parabellum?

MR. TATA: Objection.

A. I think they transferred whole interests. I don't think they transferred their whole interest. I think they continue to hold a large position, but I don't think they split claims or split dollars.

Q. What do you mean by that?

A. I don't think -- so what I think this gets at is that you -- it's a bad example because if you think of it in dollars, which you really can't because it's not dollars, it's a litigation trust interest which I think was assigned originally on dollars and you have whole and partial interests, I don't think you can -- I think it's talking about splitting it up, like you can either have it or not and they may have different positions from different reasons.

I'm really not privy to all the

A. Halperin

specifics of what the totals and how they aggregated them are and I think this goes -- I think this goes to not creating chaos, at least that's how I interpret it because I actually dealt with it before.

That's typically why, especially with respect to GUCs, you get like a record date in a case where you say no transfers after this because it can get really ugly and you don't know who is holding what and God willing, to get to a distribution and it's created issues before, at least that's been my experience.

Q. Let me see if I understand what you are saying --

A. I think.

Q. I think I follow you, but I want to ask a couple of questions.

A. Sure.

Q. So your understanding was and is that Citadel did not transfer all of its interests to Parabellum?

A. That's correct.

Q. But your understanding is also that

A. Halperin

the transfer of interest to Parabellum did not violate 2.05 even if it did not transfer all of the Citadel's interests to Parabellum?

A. I think that's correct.

Q. Now, if you go to Section 2.05.B and D, I got ahead of myself and read it to you a minute ago. If you read them, B says, Absent written consent from the LTAB, the litigation trust interest shall not be capable of being transferred to any person or entity.

Did I read that correctly?

A. Yes.

Q. And D says, Any purported transfer of any litigation trusts in contravention of the foregoing shall constitute a violation of this Section 2.05 and be void ab initio, correct?

A. That's correct.

Q. So you would agree with me that if Citadel's transfer to Parabellum did not comply with the terms of 2.05, it would be void ab initio, correct?

MR. TATA: Objection.

A. Halperin

You can answer.

A. Yes, that's what the document provides.

Q. Did you ever consider whether the transfer to Parabellum, at the time it was transferred, was void ab initio for failing to comply with Section 2.05?

A. I don't recall specifically thinking about 2.05D. I remember thinking this was a valid transfer and it was properly executed.

Q. Is that your belief today sitting here?

A. Yes, although I'm not the trustee anymore.

Q. Would you also agree with me that -- thank you, but it's based on your most recent understanding. If anything happened since Sunday, I can't comment on it either.

You would agree with me that if Parabellum doesn't hold any litigation trust's interest, it would not be a litigation trust beneficiary as the plan defines that term?

A. Halperin

MR. TATA: Objection.

A. I believe that's correct, but again, I don't have the definition in front of me. I'm not trying to play cute with you, but I'm careful with the documents and obviously, it's not a task, it's what do I know and recall and I don't recall the specifics of the definition.

If you are saying what the definition is then, yes, that's true.

Q. You would agree with me that if Parabellum didn't hold any litigation trust's interest and if they were not a trust beneficiary, they wouldn't have been allowed to sit on the board, right?

MR. TATA: Objection.

A. As an actual member you are talking about?

Q. Yes.

A. I think that's correct.

Q. If you go back to the objections which I believe is Exhibit 8 which I think is right there.

A. Yeah.

A. Halperin

Q. On page 14, paragraph 47 states that the trust's register, quote, was properly updated to record the transaction.

Do you see that? It's the second to last sentence.

A. I believe that's correct, yes, I see it and I believe that is accurate.

Q. Do you have any understanding as to who updated it?

A. Earlier I mentioned there is an agent that -- I'm using the word agent loosely. I don't know if that's the formal term. Records the ownership interests of the lenders and once we had the approval and signed document, it was forwarded to them and it would have been recorded by them.

Q. Do you know when they recorded it?

A. It would have been after we sent it to them.

Q. Now, going back to the LTA at page 8 where we just were, section 2.05.A says, you, quote, may rely on evidence of such transfer without the requirement of any further investigation and it refers to the

A. Halperin

notarized notice.

Do you see that?

A. No, that's what I was asking. I don't know where you are in the paragraph.

Q. It's the end of the first sentence, so if you keep going where it has an underlined Section 2.05.B, it says, Hereof, in the event of the litigation trustee and the litigation trust advisory board received written notice of transfer executed by both the transferee and transferrer acknowledged before a notary public.

A. Okay.

Q. Is it your understanding that is all the evidence you need to understand that the transfers happened?

MR. TATA: Objection.

A. I don't -- that they've happened or been recorded?

Q. Let me ask that question.

Recording the transfer on the register doesn't reflect any determination by you that the board consent had been obtained, does it?

A. Halperin
MR. TATA: Objection.
A. I think it could be inferred because one of the steps you have to do to get there, but no, it doesn't specifically state that, it's ministerial in nature.
Q. Now, if you also read -- in the following sentence which is the second sentence which is about eight lines down, it says, The litigation trustee shall not be required to record any transfer that in the litigation trustees's sole discretion, may be construed to create any uncertainty or ambiguity as to the identity of the holder of the litigation trust's interests.
Did I read that correctly?
A. I believe you did.
Q. Did you consider exercising that discretion here?
A. No.
Q. Now, you can put the LTA back for a minute and I'm going to show you an email.
A. I just want to read one other thing. Bear with me.
No, I did not. You had referenced

A. Halperin
some language earlier which was that as long as it comes to me in proper form and it's been notarized before a Notary Public, the board and the trustee can rely on that, which we got it, we did, and it had been approved, so we then sent it forward for, I will use the word recordation by the agent.
Q. After you signed it?
A. After it was signed, yes.
(Exhibit 9, document bearing Bates stamp Nos. Para B 000180, marked for identification, as of this date.)
Q. Exhibit 9 is a document Bates stamped Para B 000180 and it's an email from Mr. Sinna on September 5, 2025.
If you see, Mr. Sinna states, We asked for a seat when we purchased the interest of Citadel in 2024 and were denied.
Do you see that?
A. The bottom email, correct?
Q. Yes.
A. That's the first bullet point.
Q. Exactly. Do you see that?
A. I do.

A. Halperin

Q. Were you aware that Parabellum had asked for a seat on the LTAB in 2024?

MR. TATA: Objection.

A. I don't recall knowing that, no.

Q. So it's fair to say no one consulted you about that request?

MR. TATA: Objection.

A. I don't remember anybody telling me or asking about this.

Q. Certainly it wasn't you who denied them that request then?

MR. TATA: Objection.

A. Again, I just don't recall, I don't recall seeing this. I don't think I did.

Q. Do you have any understanding of who denied them the request sitting here today?

A. Honestly, until you just showed this email, I didn't even know this email existed, so no. If there was something else that someone showed me that was familiar to me, it might jog something, but I have never seen this email.

Q. You can put it way for a minute.

A. Halperin
Do you have any understanding as to why Parabellum's request was denied in 2024, sitting here today?
A. No.
Q. Do you have any understanding of what changed between 2024 and 2026 that finally allowed them to be on the board?
A. I don't know about their request, but we were going through an email before from Martin Olson, which exhibit was that, or Dipesh? Do you know which one that was?
Q. Exhibit 7. Is that the one?
A. Yes, it is. Hold on. No, that's the transfer.
Q. There those are the transfer notices.
A. You said 2026. Did you mean 2025 or did you mean 2026?
Q. My understanding is that Parabellum took its official seat on the board in 2026.
A. Okay. I honestly don't recall when it did, but the only thing I am aware of that ultimately drove the timing was, or the ability, you had a three-person board and it

A. Halperin

was filled, but I don't know what they're referring to here about being denied and I don't know -- so I'm not really sure.

Q. No one said, hey, we let -- we wouldn't let Parabellum on the board before, but we've changed or mind, what you do think Alan?

A. I don't recall being asked that. I recall when the vacancy opened up, a discussion happening.

Q. I'm going to hand you two more exhibits.

MR. TATA: It's an hour since our last break. Does it make sense for a break now, Alan?

Q. Do you need a break?

A. I'm still okay if you guys are okay.

How much longer is this next line going to go?

Q. We can take a quick break if you want.

THE VIDEOGRAPHER: The time is 11:39 a.m. and we are off the record.

A. Halperin

(Recess.)

THE VIDEOGRAPHER: The time is 11:51 a.m. and we are back on the record.

BY MR. SCHILLER:

Q. I'm about to hand you two more exhibits. These are the Parabellum participation agreements.

(Exhibit 10, Parabellum participation agreement, marked for identification, as of this date.)

(Exhibit 11, Parabellum participation agreement, marked for identification, as of this date.)

Q. Are you familiar with that document marked Exhibit 10?

I'm going to ask you about page 7 specifically. I only have really one or two questions, but let me know when you've had a chance to familiarize yourself with the document please.

A. Sure thing. Okay.

Q. Are you familiar with this document?

A. Halperin
A. I think I've seen it.
Q. Now, if you turn to page 7, there is a Section 10.A and B.
Do you see that?
A. I do.
Q. And if you see, I'm going to try to give you the line, the fifth line in Section 10.A, it states that Citadel agreed to use good faith efforts to consult Parabellum before exercising rights to, quote, essential acts, including the consent to a settlement of a litigation trust recovery action.
Do you see that?
MR. TATA: Objection.
A. I see the language.
Q. Now, Citadel also agreed to use good faith effort to invite Parabellum to, quote, schedule substantive meetings with the litigation trustee and advisors to the borrower.
Do you see that?
A. Where is that?
MR. TATA: Objection.
Q. 10.B, right in the third line.

A. Halperin

Seller agrees to use good faith efforts to invite buyer to participate with seller in scheduled subsequent meetings with the litigation trustee.

Do you see that?

A. I do.

Q. When did you first learn about these provisions?

A. I'm not sure.

Q. Did you learn about these provisions prior to this emergency litigation arising?

MR. TATA: Objection.

A. I don't recall when I first saw this document, I really don't.

Q. Okay. You do recall seeing this document in connection with the emergency motion that we are litigating?

A. Yes.

Q. And you don't recall if you saw it before then, is that fair?

A. I think I would have in connection with the transfer, but I may not have, I may have just seen the transfer agreement.

A. Halperin

Q. Is it fair to say you weren't shown these documents before they were signed?

A. I don't believe I was.

Q. Do you recall whether you had any concerns the first time you saw these documents?

A. I don't think I did.

Q. Do you recall whether -- is it fair to say at the time you saw these documents, you would have already known that Parabellum was an ex-officio and or a board member?

MR. TATA: Objection.

A. I just don't have the timeline straight in my head as to timing and who was appointed when, so I would need to go back and look at documents, but obviously, if I saw this after they were an ex-officio member, then I would have known.

Q. Do you have any reason to believe that Section 10.A and 10.B still govern -- sorry, let me ask that differently.

Do you have any reason to believe whether or not these sections still govern the relationship between Citadel and

A. Halperin

Parabellum?

MR. TATA: Objection.

A. I don't know specifically because I haven't reconciled them, but if I'm remembering correctly, it's a participation agreement and later, there was an actual transfer of interests, so I can't say sitting here because I'm just not expert with these documents, whether one totally supersedes the other or not, I just don't know.

Q. You can put those to the side for the minute. I'm going to go back to the LTA.

If you recall, we've discussed at several points this morning that in what I think you described as an unusual event based on your experiences, Citadel joined the board as an ex-officio member, is that fair?

A. No.

MR. TATA: Objection.

Q. Citadel, sorry, you described Parabellum as first joining the board as an ex-officio member, right?

A. InstaLit or Parabellum, whoever it was at the time, yes.

A. Halperin

Q. And it was Mr. Sinna who took on that role?

A. Correct.

Q. Do you recall precisely when you first learned about that?

MR. TATA: Objection.

Q. Let me ask you a different question.

A. I'm trying to place it in time when the discussions took place.

Q. You are having trouble, so I want to ask you a different question since it's really not that important.

Do you recall whether you were consulted as to whether Mr. Sinna could join a meeting or you were told he would be joining a meeting?

A. I don't recall whether there was a specific -- nobody ever told me anybody was joining a meeting. I think there was discussions about if we wanted him to, can that be affected and how.

Q. Those were discussions with Mr. Cheatle?

A. Halperin

MR. TATA: Objection.

A. At least initially I think, yes.

Q. Now, if you turn back to the LTA, I would like to direct you to page 22.

Now page 22, Section 4.01, again, it refers to the litigation trust advisory board which shall have three members.

Do you see that?

A. Yes.

Q. And then if you continue, again, I think we've read this paragraph already, but at the very last sentence, four lines up from the bottom, it starts, No other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the litigation trust except as maybe set forth in this litigation trust agreement or the plan.

Do you see that?

A. Uh-huh.

Q. Now --

A. Yes.

Q. They mean the same thing to me. Parabellum was a litigation trust beneficiary

A. Halperin

and was not an LTAB member in March 2025, correct?

A. Again, going back and looking at the timing once they acquired the interest, that's correct.

Q. How do you reconcile having an ex-officio board member with that sentence of the LTA that we just read?

A. Because they didn't have consultation rights.

Q. Well, what do you mean they didn't have consultation rights?

A. Certainly not with the trust or me, they didn't ask anything, they didn't -- I had no duty to them whatsoever.

You are referring back to, I'm sorry, this document that we were looking at before?

Q. In part, sure.

A. I'm genuinely asking.

Q. I mean, 10.A and B give them certain rights, you would agree?

A. Yes, to Citadel, not to me, not to the trust.

A. Halperin

Q. At some point, consistent with that agreement, they joined as an ex-officio member of the board, right?

MR. TATA: Objection.

A. Yes.

Q. How is Parabellum sitting as an ex-officio board member consistent with the sentence I just read from 4.01B which prohibits any other litigation trust beneficiary from having any consultation or approval rights?

A. Because they didn't have consultation or approval rights with the trust.

Q. How is sitting on the board not consulting with you?

A. They got copies on emails, they didn't email me saying I want this, I think we should do that, none of that, and whatever discussions they had with Citadel, they had with Citadel. I don't owe them any duty. I don't -- I'm not -- I know what my obligations are and who they're to.

No, I don't see that as

A. Halperin

inconsistent and this document says that Citadel has to -- good faith effort to whatever the heck it just said that you read on the record. I don't see these two as inconsistent.

Q. Did you ever do anything to ensure that allowing them to have an ex-officio board seat or participation right was in conflict with this section or is it your testimony you didn't have to?

A. I don't think there was anything in conflict with this.

Q. Now, can you point me to language in here that limits the prohibition on litigation trust beneficiary's consultation to just the litigation trustee?

MR. TATA: Objection.

A. Can you -- you said in here. You are referring to the litigation trust agreement?

Q. What you said in your answer, if I understood it correctly, was they weren't consulting with me, they were consulting with Citadel and so I was fine with that, is that

A. Halperin

fair?

MR. TATA: Objection.

A. Essentially.

Q. And where is that limitation in this paragraph, so long as they do not consult with Mr. Halperin, they shall not be violating this provision?

A. No other litigation trust beneficiary, and this is in the section on the litigation trust advisory board and we start by saying how it's composed, who the initial members are.

I mean, I don't see the hair split that finally, but I'm the trustee, I'm supposed to be approving everything, they don't consult with me.

Q. Okay.

A. I mean, it's not unusual for creditors to talk to and speak with each other in any situation and, in fact, in normal situations, I will get told, hey, creditor X has reached out to me or I heard from this entity or that entity. It's just not unusual and it's not surprising to me.

A. Halperin

There is an agreement here, their agreement with Citadel is what it is, but I think in the Section 10.A, they have consultation rights with Citadel, at least I think that's what they talk about and then, you know, they talk about certain things and there is a proviso right after that it says seller, which is Citadel, shall have no obligation to follow the direction of buyer in such consultation.

So you can talk in my ear, but I don't have to listen to you. That's Citadel. I'm not party to this agreement and as far as I'm concerned, I don't have anything to do with them at this point.

Eventually they became a member of the board and that's a little different.

Q. But at the time they became an ex-officio member, your understanding was they were consulting with Citadel, correct?

MR. TATA: Objection.

A. Actually, I'm not -- I don't recall when I first saw this document, as I said before, so maybe, I don't know.

A. Halperin

Q. Is --

A. But that's not a me issue.

Q. But fair to say you never did anything to prohibit Citadel from consulting with Parabellum at any time?

A. I never did anything to prohibit Citadel from consulting with Parabellum. I never did anything to prevent Citadel from consulting or talking to other people. I never did anything to prevent Ravago from talking or consulting with other people.

To the extent they did, it's a big trust, there are a lot of creditors and beneficiaries out there and people do speak.

Q. And you never told Citadel you can't discuss the management or operation of the board with Parabellum, did you?

A. No.

Q. And can you point me to the words once again, in Section 4.01 and identify any sentence that limit the scope of consultation to be directly with the trustee as opposed to members of the board?

MR. TATA: Objection. As a direct

A. Halperin

answer to the specific question, you are asking, I do not see that language that you are asking for in this section.

MR. SCHILLER: It's not in there?

A. Which I think is what you are looking for, so we can move on to the next one.

Q. Let's go back to the trustee's objection. You have it right there.

And I want to direct your attention back to page 8, paragraph 22.

A. Okay.

Q. And it says, On March 10, 2025, the LTAB appointed John Sinna in his capacity as agent for Parabellum as an ex-officio/observer member of the LTAB with no voting right.

Did I read that correctly?

A. That's what it says.

Q. Now, what did the LTAB do?

MR. TATA: Objection.

Q. If you recall?

A. I'm sorry, what does the LTAB do?

Q. What did it do? Paragraph 22, it

A. Halperin
refers to an action taken by the LTAB.
What did it do or how did it do that?
MR. TATA: Objection.
A. I'm not sure what specifically happened on March 10th.
Q. Was there a meeting?
A. We went through before, I thought we went through before the appointment and the back and forth, but that may have been the -- I'm not sure.
Q. We talked about the transfer. We didn't talk about the appointment.
Do you recall whether there was a meeting on March 10th --
A. Again, I think --
Q. -- 2025?
A. I think there were discussions with the members of the LTAB. There would have been calls and/or meetings, sorry, and/or emails.
Q. Do you recall whether there was written consent?
A. It probably would have been through

A. Halperin

an email.

Q. Do you recall whether -- do you recall how many members voted?

A. I think it would have been all three.

Q. Do you recall whether Mr. Olson voted?

A. I believe it was either him or Dipesh Patel.

Q. Do you recall whether Mr. Olson was told there was a fourth participant in the board at any point, by you or anyone else?

A. Yes.

Q. When was that?

A. It would have been around the time it was brought up as a possibility and/or option and it would have been either by phone call, either from me to Dipesh and then Dipesh to Marty Olson or me directly to Marty Olson and probably emails that included him.

Q. Were Mr. Cheatle and Mr. Xie conflicted as to Parabellum in March 2025, given Citadel's participation agreements with Parabellum?

A. Halperin

A. I don't think so.

Q. Did either of them report a conflict under Section 4.05.C in connection with this appointment?

A. I don't believe anybody reported a conflict.

Q. If they were conflicted here, as you say they were on the transfer, who was entitled to vote on the ex-officio appointment?

MR. TATA: Objection.

A. We are in a hypothetical. If they were conflicted, it would have been the same as for the transfer, it would have been Marty Olson.

Q. Now, I want to show you an email dated March 2025.

(Exhibit 12, email chain, marked for identification, as of this date.)

A. I have it in front of me.

Q. This is an email chain. You circulated in this email chain the fully executed amended and restated common interest agreement and you wrote, Dear Trust Board

A. Halperin

Members and Ex-Officio Member.

Do you see that?

A. I do.

Q. And by ex-officio member, you were referring to Mr. Sinna, correct?

A. Yes.

Q. Now, Mr. Xie then replied only to Mr. Sinna and Mr. Cheatle dropping everyone off and he wrote that getting Mr. Sinna made an ex-officio board member, quote, took an ordeal and, quote, a Herculean effort mainly undertook by Jonny.

Do you know what ordeal he was referring to?

A. I have a supposition which I'm happy to share.

Q. Please.

A. I think when he wanted to -- I'm getting a little folksy with you.

Q. Okay.

A. Everybody hates freaking lawyers because we make everything complicated and difficult. I can't tell you how many, when they were still alive, holiday dinners,

A. Halperin

sitting around my parents' table with my brother and my dad, who was a dental surgeon. The conversation by the end, after God knows how many glasses of wine, but always evolved into how lawyers ruin the freaking world and they mess everything up, especially lawyers -- I'm amazed my father didn't shoot me in the head.

When we went through the process, I will be careful what I say because I don't want to cross a line, I didn't just say, yeah, yeah, everything is fine. It was a pain in people's tush. I made sure things were done properly, made sure that we actually went through a process and made sure the people understood what was being asked of them and there were votes on it and that it wasn't just like someone wants something or suggests something and it's going to happen.

So I think he is probably referring to me being a pain in his ass. I could be mistaken. I didn't specifically ask him, but it wasn't linear.

Q. So you specifically recall being a

A. Halperin

pain in the ass to Mr. Cheatle when it came --

MR. TATA: I want to lodge an objection. Mr. Halperin, please give me a chance to object.

MR. SCHILLER: You interrupted my question. I will start over.

MR. TATA: Go ahead.

Q. It's your testimony that you were a pain in the ass when you were approached to allow Parabellum to participate in the board, correct?

MR. TATA: Objection.

A. No.

Q. So when you refer to being a pain in the ass, what did you mean?

MR. TATA: Objection.

A. It's my job to make sure that if we are going to do something, that I believe it's being done in accordance with the strictures that we are governed by.

You can't wave a magic wand and make something happen, so the process took a while to discuss and figure out what was

A. Halperin

possible and what was not possible and I think in a perfect world, people got frustrated that I was doing -- taking my time to do things in the way I thought it had to be done and the way it should be done and I wasn't marching to anybody else's beat and timetable.

It is what it is and it was more than I think people were expecting it to happen. I don't think that they were expecting it to take as long or be as, you know, time consuming as it was, I think that's what he is referring to, and if I'm being truthful, that was largely driven by me.

Q. Is it fair to say all we are talking about is the time between Parabellum becoming an ex-officio board member and then later becoming an actual board member?

MR. TATA: Objection.

A. I don't think so. I think we are talking about them becoming an ex-officio member, that's what I'm talking about.

Q. Your first reaction was that was

not possible. That is your testimony?

A. No, my first reaction is I'm not quite sure how to do it. You can't say, okay, why don't you sit in on board meetings because I don't think that is permitted.

Q. What are some examples of the things that were not permitted that you had to consider?

A. I mean, we read through them about who could be appointed to a board, consultation rights, just general. I don't have the specifics in my head, but I remember thinking to myself and consulting with counsel about this.

MR. TATA: At this point, Mr. Halperin, I will caution you not to disclose the contents of your communications.

MR. SCHILLER: I don't think he did.

MR. TATA: I'm giving him the instruction.

A. And it took time. A little bit hyperbole in there too.

A. Halperin

Q. Now, the email continues in the next sentence, Jonny and I are happy to catch you up on everything you missed and to get your thoughts on some of the additions we made/are about to make on the case.

Do you see that?

A. I do.

Q. At that point, on March 12, 2025, Mr. Sinna was not a member of the LTAB, right?

MR. TATA: Objection.

Q. If you recall paragraph 22.

A. That's what I'm looking at.

Q. It says it was March 25th.

A. On March 10th, the LTAB appointed John Sinna in his capacity as agent, as an ex-officio member and this is March 12th.

Q. Right, you are correct. I got the date wrong, I apologize.

A. It's okay.

Q. Mr. Sinna was not a member of the LTAB on March 12, 2025, was he?

MR. TATA: Objection.

A. According to this, he was two days

A. Halperin

earlier.

Q. Your testimony is that an ex-officio role is a member of the LTAB?

A. I'm sorry, okay.

Q. I was making a distinction, but is there no distinction in your mind?

A. There is absolutely a distinction. Never mind, I thought you were conflating.

Q. I'm not trying to confuse you, I apologize.

Would you agree that Mr. -- I believe you agree with me that Mr. Sinna was not a member of the LTAB on March 12, 2025, right?

A. Correct.

Q. And despite that, two members of the LTAB were offering to brief Parabellum on decisions already made about the case, is that correct?

A. That is correct.

Q. And to take Parabellum's thoughts on decisions not yet made, correct?

A. Correct.

Q. That consultation in respect of the

A. Halperin

management and operation of the litigation trust?

A. I don't think it's in relation to the management of the trust. I think it's about litigation strategy or case issues.

Again, you know, he was, at that point a member, an ex-officio member of the board. He signed the common interest agreement. They had an economic stake, but it wasn't direct and I don't think that's an issue at all, no. It's a discussion about what's going on and he was effectively brought under the tent, but that's it and that's typically a thing that you will do with ex-officio members.

For example, where I have seen them in committees, you want someone to be aware of what is going on and this is not unusual. I don't see anything -- and it's not like he is deferring to them or saying you have decision rights. In fact, the agreement is to the contrary. I think it specifically says, I'm paraphrasing, we don't have to listen to you.

A. Halperin

Q. Now, you testified that a little bit ago that, I'm going to read back your testimony. You said, You can't say okay, why don't you sit in on board meetings because I don't think that is permitted.

Do you recall why you didn't think that was permitted?

MR. TATA: Objection.

A. I don't think that you can bring in an outsider.

Q. And why was Parabellum an outsider, what made them an outsider?

A. Because they weren't subject to any of the strictures of the board. I'm not a corporate guy, I've heard of board observer rights and things like that, but it's not really a concept that I'm familiar with.

So after discussing what might be doable and what might not be doable and discussing it and counsel ultimately arrived at the possibility of creating an ex-officio membership as we had seen done in bankruptcy contexts on creditors' committees where they're subject to all the confidentiality

A. Halperin

provisions, making sure that you have that put in place and they have no voice in decisionmaking.

Q. Did Mr. Cheatle or Mr. Xie ask you if they could discuss the decisions that were going to be made with Mr. Sinna on March 12, 2025?

A. No, I think it was acknowledged ahead of time by all of the board members, it would enable people to have discussions with Parabellum.

Q. But you told me a minute ago that you never were consulted by either of them and you never gave them instructions on what to share with Parabellum and what not to share with Parabellum, is that correct?

A. That's correct.

Q. Do you know whether Mr. Sinna, as an ex-officio member, received communications concerning the claims in the New York action?

A. I don't recall sitting here right now, I don't.

Q. Did you or the trust have any procedures in place to prevent confidential

A. Halperin

discovery material from reaching Mr. Sinna in his role as ex-officio member?

A. No.

Q. Now, the protective order in the New York action requires disclosure to defendants of LTAB members given access to confidential discovery material.

Was Mr. Sinna's ex-officio role ever disclosed under that provision?

A. I don't remember.

Q. When was Mr. Sinna's first -- sorry, when was Mr. Sinna first disclosed as having received confidential material, was it not until March 2026?

A. A, I'm not sure what he received and; B, I don't know.

Q. So you weren't the one that provided him with any confidential materials?

A. No.

Q. At any point?

A. I don't believe so, no.

Q. All right. You can't tell me what materials he received prior to March 2026 as an ex-officio board member, starting in or

A. Halperin

around March 2025, correct?

A. I can't tell you what, if any, he received.

Q. Now, what provision of the LTA allowed you to make an outsider subject to the strictures of the board?

A. I don't believe there is anything that specifically addresses the concept of ex-officio being allowed or not allowed.

Q. Now, sticking with the LTA, what are the strictures of the board?

A. That they -- it's set forth primarily in 401.

Q. Anywhere else?

A. The whole thing. I would have to go through the entire agreement, but that's...

Q. Well, sitting here right now, can you --

A. No.

Q. -- does any other provision come to mind?

A. No.

Q. Now, if you turn to the first page,

A. Halperin

the recitals. The last whereas clause, at the bottom of the page, it says, Whereas, the litigation trust shall be established for the benefit of the holders of the litigation trust interests, collectively the litigation trust beneficiaries, 85 percent of which shall be held by the holders of allowed prepetition term loan claims and 15 percent which shall be held in the name the litigation trustee or his designee as the designated distribution agent continuing on for the benefit of holders of allowed general unsecured claims.

Do you see that?

A. I do.

Q. The litigation trust beneficiaries are the holders of the litigation trust interests, right?

A. Can you repeat that last part?

Q. The litigation trust beneficiaries, which is a defined term, are the holders of the litigation trust interests, also a defined term, right?

A. I believe that's correct.

A. Halperin

Q. And 85 percent of those interests are held by holders of allowed prepetition term loan claims, right?

A. Correct.

Q. And 15 percent are held for the benefit of holders of allowed general unsecured claims, right?

A. That's correct.

Q. So there are two sort of categories of beneficiaries, is that fair?

A. That's fair.

Q. Term loan lenders and general unsecured creditors, right?

A. Correct.

Q. Now, if we go to Section 201 on page 7, it states in the second line, 85 percent of the litigation trust interests issued pro rata to holders of allowed preposition term loan claims and 15 percent of the litigation trust interests issued to the distribution agent for pro rata benefit of the holders of allowed general unsecured claims.

Did I read that correctly?

A. Halperin

A. I believe you did.

Q. Within each of these two groups, the interests are allocated pro rata, right?

A. They are or are to be, but yes.

Q. Who is the distribution agent?

A. I mean, nominally, it's the trustee.

Q. So you or someone you might designate hold 15 percent of the litigation trust's interests that belong to the unsecured creditors, is that fair?

A. I believe that's accurate.

Q. Are you a holder of litigation trust's interests in that capacity?

MR. TATA: Objection.

A. I am more of a custodian in that capacity for other people.

Q. Okay. Did you ever vote, consent or take any action in that capacity, including in relation to the March 2025 transfer?

A. Absolutely not.

Q. Did anyone ever ask you to?

A. No.

A. Halperin

Q. Now, under the plan, holders of the allowed general unsecured claims received no distribution other than their interests in the trust, right?

A. I believe that's correct.

Q. And the prepetition term loan lenders also received 100 percent of the new equity interest in the reorganized debtors, right?

A. I think that's right, but I'm not really sure.

Q. You would agree with me that two constituencies are differently situated, right?

MR. TATA: Objection.

A. In terms of what, in terms of the plan?

Q. Yes, and their outcomes.

A. Their recoveries under the plan were different.

Q. Does the trust owe the same duties to both constituencies?

A. Yes.

MR. TATA: Mr. Halperin, please

A. Halperin

give me a minute.

MR. SCHILLER: Did you want to object?

MR. TATA: No, I'm just reminding the witness.

Q. We are on page 7 so we will stay right there. Again, in Section 2.01.

Can you point me to -- it's not highlighted. In the middle, about six lines down, the sentence starts, All litigation trust proceeds, and it continues two lines down, including, without limitation, as required to be paid in full, the litigation trust and it continues on, and it states, Before any, quote, net litigation trust proceeds are distributed to the litigation trust beneficiaries.

So I want to ask you a question about that.

A. If you bear with me one second.

Q. Sure.

A. Okay.

Q. So in Section 2.01 it states that the lenders will be repaid in full off the

A. Halperin

top before any constituency receives anything, right?

A. For their loans, yes.

Q. The 85/15 split only applies to what's left after that?

A. Correct.

Q. And Parabellum is a lender to the trust through its participation, right?

MR. TATA: Objection.

A. They're not a lender to the trust or at least not -- they don't have privity with the trust from a lender capacity. They have a participation with Citadel, Citadel is the lender. If Parabellum were to say I'm not funding it, Citadel still has a full obligation, so through the participation to the -- do they participate in the funding, I suppose they do, but they are not a lender to the trust.

Q. Parabellum would be pretty upset if they didn't get paid back for their loans, wouldn't they?

A. Parabellum would get nothing from the trust, Citadel would, and this would be

A. Halperin

an issue between them and Citadel. I have no privity to them as a lender.

Q. Parabellum also holds litigation trust interests and those interests come from the 85 percent, right?

A. That's correct.

Q. And Parabellum, you would agree with me, holds no interest in the unsecured claims which get 15 percent, right?

A. I would say, to my knowledge, they don't, I am not aware of them having acquired any unsecured claims, but again, that was not the trust's purview, that was the debtor.

Q. Let me ask you a different question. Are you aware of any litigation trust beneficiary on the unsecured sides that funds the trust?

A. I am not aware of any, no.

Q. You would agree with me that the more the trust borrows, the more it must be repaid before any constituency receives anything, right?

A. I would say that's true, but I would also say the trust has to be able to

A. Halperin

fund its litigation or there would be no quantum to distribute to anybody.

Q. And a recovery to pay the lenders in full and leave the general unsecured creditors with nothing possibly, right?

A. If the litigation fails.

Q. Would that outcome effect Parabellum and the unsecured creditors in the same way?

A. In their capacity as beneficiaries, absolutely.

Q. But not in the capacity as a lender that gets repaid, right?

A. The creditors' committee negotiated for loans from lenders, so the litigation could be brought, there had to be funding somewhere. That was what the unsecured creditors' committee negotiated for.

Q. Now, I would like to take you back to the plan, which I think is the big document in front of you.

If you turn to page 44, it's the same section we were looking at earlier.

A. What page?

A. Halperin

Q. Forty-four.

A. Of the PDF?

Q. Sorry, they garbled the numbers on the PDF on the top. It's sort of right in the middle. I, unfortunately, can't tell you exactly what PDF page it is, but it's page 44 of the plan. I think you are on the plan right now.

A. This?

Q. Yes. Now, on page 44, Section 4.G, it states, The litigation trust agreement shall provide for the creation. I'm going to read from the third paragraph down, the second sentence. The litigation trust agreement shall provide for the creation of the three-member litigation trust advisory board with two members appointed by the prepetition term loan lenders and one by the creditors' committee.

Do you see that?

A. No, and I'm trying to. If you can point to where it is on the page.

Q. It's right here in the third paragraph.

A. Halperin

A. Thank you. Okay. Yes, I see that.

Q. Do you see the word initial anywhere in that sentence?

A. No, I thought I saw it somewhere else in the document. I don't remember if it was in here or in the LTA.

Q. So the word initial has been used in other documents?

A. I think so.

Q. I'm only asking about this sentence. You agree the word initial does not appear in this sentence?

A. Yes, I do not see the word initial in this sentence.

Q. You would agree with me the word temporary does not -- is not included in this sentence?

A. No, nor would I expect it to be.

Q. It does not say until the committee dissolves or anything like that, does it?

MR. TATA: Objection.

A. No, and, in fact, that's consistent with what happened. The committee did dissolve on the effective date.

A. Halperin

Q. Now, if you turn to the LTA and go to page 22, again, at Section 4.01, it states in the first sentence that there shall be two members appointed by the prepetition term loan lenders and one member appointed by the official committee of unsecured creditors or its designee.

Do you see that?

A. I do.

Q. What's the purpose of allocating two seats to the term loan lenders and one to the creditors' committee?

A. They were choosing who was going to appoint the members of the -- initial members of the and perhaps forever of the LTAB.

Q. Do you understand that allocation to correspond to the two constituencies, the 85 and the 15 percent split on the trust recoveries?

A. I don't think it necessarily corresponds to that. I mean, it's not as if it's two-thirds, one-third, but the two were appointed by the 85 percent constituency and the one is appointed by the 15 percent

A. Halperin

constituency, but not a mathematical correlation if that's what you are saying.

Q. If you go to -- back to page 1 of the LTA and back to the final whereas clause. We were talking about the splits and you are saying it's not identical, but it's approximate to the mathematical split in terms of two seats to the 85 percent group and one seat to the 15 percent group?

MR. TATA: Objection.

Q. Is that what your testimony is?

A. No, it's not approximate. I'm saying I understand why it could be that way, but that's -- I thought you were making a mathematical correlation and it's not okay we get the same percentage here as we get there, because it's not. There are not as many board members to get directly to an 85/15.

Q. Who were the board members when the LTAB was originally established by the trust?

A. I think it was Peter Zuckerman, Jonny Cheatle and Martin Olson.

Q. Who were the designees of the prepetition term loan lenders?

A. Halperin

A. I believe Peter Zuckerman and Jonny Cheatle.

Q. Who was the designee of the creditors' committee?

A. Martin Olson.

Q. If we go to PDF page 45, the top, right?

A. Which document?

Q. The same document. And for the record, I think you got the names right.

A. I will take the win.

Q. And you will see that Mr. Olson is identified on that page, which is Exhibit B to the LTA, in his capacity as, quote, an employee of Ravago Americas LLC d/b/a Muehlstein.

Do you see that?

A. I do.

Q. And Ravago was a holder of an allowed general unsecured claim, right?

A. I don't know that it was allowed or not. I assumed it was.

Q. Did you understand Mr. Olson to represent unsecured creditor interests on the

A. Halperin

board?

A. No.

Q. What did you understand him to represent?

A. I understand him and the Citadel members all to be fiduciaries for all litigation trust beneficiaries because that's what they're charged for.

Q. So you never investigated that?

MR. TATA: Objection.

A. Excuse me?

Q. You never investigated to make sure that when the members of board were appointed, at least one of them represented the general unsecured claims?

MR. TATA: Objection.

A. He was an appointee of the creditors' committee which is what it was provided for. Every member of this board has a duty to all the trust beneficiaries, just because you are appointed by someone who was a secured creditor, deferred deficiency position or are appointed by the creditors' committee who was the designee of the -- or

A. Halperin

the representative of the general unsecured creditors in the bankruptcy case.

Once you go on to a board, once you are a trustee, you have to represent the interests of everybody.

MR. SCHILLER: I'm going to move to strike that answer as nonresponsive.

Q. Who was appointed by the creditors' committee on the original board?

A. Apologies, I cut you off.

Q. And after Mr. Olson resigned, who did the creditors' committee appoint or designate to the board?

A. There was no creditors' committee anymore.

Q. Okay. And it's fair to say that the only person ever appointed by the creditors' committee was Mr. Olson, is that fair?

A. That's true.

Q. Now, Mr. Zuckerman resigned at some point, correct?

A. That is correct.

Q. He was replaced by Mr. Xie?

A. That is correct.

Q. Do you recall who appointed Mr. Xie?

A. I believe he was appointed by Citadel.

Q. Do you know what provision of the LTA he was appointed?

A. No, not off the top of my head, but I know it's provided for in here. I think we got a notice about that that cited the sections they were relying on. I need to look.

Q. When you answered, I believe we got a notice that cited the sections they were relying on, you are referring to Citadel, correct?

A. Yes.

Q. So Citadel cited some provision of the LTA that you can't find right now and that's how Mr. Xie became a member of the board?

MR. TATA: Objection.

A. I'm looking right now for the section if you bear with me.

A. Halperin

Q. I don't really need to know which section it was, but you recall they cited a section in a writing to you?

A. I recall that there was a difference in respect of appointing a replacement of the secured representatives they had specific rights if one of their board members resigned and there was a notice that cited the sections.

Q. And do you still have a copy of that notice today?

A. Somewhere.

Q. Did anyone ask you to look for that in connection with this proceeding that we are currently in?

A. I don't know.

Q. Would you be able to find it if we asked you to find it this afternoon, for example?

A. I can try.

Q. If you found that, you believe that would evidence the citation to the LTA?

A. I believe it would.

Q. Now, you just said and I wanted to

A. Halperin
confirm that we looked at a couple of emails earlier in terms of a discussion about replacing Mr. Olson.
Do you remember that?
A. I do.
Q. And your testimony just now is that the position that Citadel took was different in terms of the way they handled the replacement of Mr. Zuckerman, correct?
A. Correct.
Q. Do you remember why these two things were handled differently or can you not recall without looking at the notice that you were given?
A. I need to look over the sections.
Q. Okay. But you don't know what the sections are?
A. I believe it's in Article IV and I think it's in 4.07, but I would need to look at them, I don't have this committed to memory.
It's in 4.06.D. In the event -- this follows after death resignation, et cetera. In the event of a vacancy on the

A. Halperin

litigation trust advisory board, whether by removal, disability, death or resignation, a new member shall be appointed to fill such position by unanimous consent of the remaining of the litigation trust advisory board; provided, however, that if any designee of the prepetition term loan lenders ceases for any reason to be a member of the litigation trust advisory board, then litigation trust beneficiaries that hold a majority amount of the litigation trust interests issued on account of the prepetition term loans shall have the right to appoint a successor member of the litigation trust advisory board to replace such designee.

So it provides separate rules or provides a general rule and then provides a proviso to accept it with regard to the members of the term loan lender group, that's 4.07.D.

Q. Do you recall that at the time Mr. Zuckerman stepped down from the board, Mr. Xie was appointed to the board by Citadel and

A. Halperin

you received a notice?

A. I don't think it was Citadel. I think it was I got notice from Citadel. I think it was by the requisite holders of the term loan lender interest holders.

Q. And you are going to look for that this afternoon or at a convenient time?

MR. TATA: Objection. If you have a document request, we can discuss it.

Q. Now, after you learned of Mr. Olson's resignation in May 2025, did you contact the unsecured creditors' committee or its representatives or its designee about his resignation?

A. No, because they were disbanded, I believe it's in the plan, if not, the confirmation order, that they dissolved or they disbanded and they're done on the effective date, they don't exist anymore.

Q. Did you contact their former counsel?

A. No.

Q. Are you aware of -- have you spoken with their former counsel in the last two

A. Halperin

years?

A. On occasion, mostly social occasions. I know Dennis fairly well.

Q. About this litigation, have you spoken to him?

A. Not substantively, no.

Q. Are you aware of anyone informing the UCC, its representatives or its designees about Mr. Olson's resignation at the time he planned to resign?

A. You can't inform the UCC because it does not exist. I did not let their counsel know.

Q. Now, can we pull out docket No. 1694 please.

(Exhibit 13, document bearing Bates stamp Nos. 1694, marked for identification, as of this date.)

Q. Now, this is a docket entry and it's DLA Piper's joinder to your objections.

Are you familiar with this document?

A. I am.

Q. Were you aware that the creditors'

A. Halperin

committee still existed as of May 2025?
A. It doesn't exist.
Q. Did you understand DLA Piper to be its counsel?
A. They were.
Q. If you take a look at footnote 1, you see at bottom, the last sentence, can you read that for me?
A. The committee -- I need to read the entire thing. Okay. I read the entire thing.
Q. What does the last sentence say?
A. The last sentence says that it remained active so the professionals could pursue their fee applications.
Q. Can you read it into the record please?
A. The committee remained active for such purposes, such purposes until June '25, but it is now fully dissolved. Such purposes refers to the prior sentences which says to pursue their fee applications.
Q. Hold on, hold on. You read it incorrectly.

A. Halperin

MR. TATA: Let the witness finish his answer. I'm not sure that was intentional.

Q. Does it say that the committee remained active for such purposes until June 2025?

MR. TATA: Objection.

A. For such purposes until June '25, but it is now fully dissolved.

Q. Were you aware that they remained active in 2025 or were you unaware?

MR. TATA: Objection.

A. I was not aware they remained active to pursue their fee applications or it took that long until the end of the case to get their fee applications approved, no.

Q. You didn't investigate it, you didn't do anything to contact them at that time, in fact, you didn't even think about whether or not you should, is that fair?

MR. TATA: Objection.

A. No, it's not fair. I don't think it would be. They remained active solely for the purpose of pursuing their necessary

A. Halperin

applications to get paid for their time on the case, that's standard, that's all they remained active for.

You have to read the whole footnote for context. If you read one sentence isolated from anything, it's going to be misleading.

Such purposes refers to the prior sentence. I'm sorry if it's upsetting to you right now that I'm referring to it, but that's why I said I had to read the whole thing.

It says, Pursuant to the terms of plan, they were dissolved when it went effective on February 27th, which is what I said, other than for the purpose of prosecuting fee applications and appearing in connection with appeals of the confirmation order. That's it.

MR. SCHILLER: I'm going to move to strike the answer as nonresponsive.

Q. Can we just agree that you did nothing to contact anyone from the creditors' committee in or around the time Mr. Olson

A. Halperin

gave his notice that he was stepping down?

MR. TATA: Objection.

A. No, we can't because I don't think there was a creditors' committee to contact.

Q. Did you consider whether or not there was a creditors' committee to contact at that time?

A. No, I did not.

Q. Did you take into account the language of Section 4.01 of the LTA that said one member be appointed by the official committee of unsecured creditors or its designee when considering who would appoint a new member to the board upon Mr. Olson's resignation?

A. I remember reading through documents at the time of his designation.

Q. Did you consider 4.01 at that time?

A. I believe I did, but in conjunction with other provisions.

Q. You see the words designee, right?

A. I see those words.

Q. Mr. Olson was the designee, wasn't he?

A. Halperin

A. I don't know who was the designee.

Q. You don't know who the designee was?

A. No.

Q. Okay. Did you ever do anything to figure out who the designee was?

A. I don't know if there was a designee. It's a small letter D and it's not a defined term.

Q. So your testimony is that Mr. Olson was not designated to sit on the board by the unsecured creditors?

MR. TATA: Objection.

A. He was appointed by the committee. They use word one member appointed by the official unsecured committee.

Q. But you didn't consider whether that made him the designee as it's defined?

A. No, I did not.

Q. That may be the reason you never went back to them or considered it or even asked Mr. Olson who should follow him on the board, is that fair?

MR. TATA: Objection.

A. Halperin

A. No, it's not.

Q. Why not?

A. Because there was other language in here that talks about specifically, I won't say contradictory to that, that talks about replacement and it's later on. I think also in 4.07.D specifically says, in the event of a vacancy on a litigation trust advisory board, for whatever the reason, a new member shall be appointed to fill such position by unanimous consent of the remaining members of the litigation trust advisory board. That's what it says. The remaining members, because it was Martin Olson who resigned, the other two members.

MR. TATA: We are over an hour after the last break. Would now be a good time?

THE WITNESS: I would love a cup of coffee.

THE VIDEOGRAPHER: The time is 12:58 p.m. and we are going off the record.

(Luncheon recess taken at 12:58

A. Halperin

p.m.)

A. Halperin

A F T E R N O O N   S E S S I O N

(Time noted: 1:28 p.m.)

A L A N   H A L P E R I N, resumed and testified as follows:

THE VIDEOGRAPHER: The time is 1:28 p.m. This is the beginning of part 3 and we are back on the record.

EXAMINATION BY (Cont'd.)

MR. SCHILLER:

Q. I'm going to go back to the trustee's objections, your objections, and I'm going to ask you again, on page 8, paragraph 24, which we previously discussed.

A. Okay.

Q. Now, this paragraph, I'm at paragraph 246, the trustee's objections to this proceeding and I will read from the first line of paragraph 24 on page 8. Ravago, the unsecured creditor which had appointed Mr. Olson, initially proposed another employee to take Mr. Olson's seat, but after discussion about whether the seat was Ravago's to designate, Ravago informed the trustee in September that it would not

A. Halperin

seek to appoint a new designee.

Do you recall that statement?

A. I do.

Q. That's your statement, right?

A. Those specific words. This is my objection.

Q. This is the trustee's statement, so it was your statement at the time?

A. Yes.

Q. Now, who participated in those discussions?

A. It was the members of the LTAB, there were discussions with Dipesh Patel, Jonny Cheatle and Ben Xie.

Q. When did those occur?

A. It was multiple, just different calls. There were discussions over -- multiple different calls.

Q. Now, did you participate in any of those calls?

A. Yes.

Q. Did you participate in all of those calls?

A. I believe so.

A. Halperin

Q. What was said on those calls?

A. The discussions primary revolved around who the members of the board were, whether it was the individuals or the entities.

Q. What was the conclusion?

MR. TATA: Objection.

A. There was a disagreement between Dipesh Patel on behalf of Ravago and the other two had a different view from Citadel.

Q. What were the different views?

A. Whether it was the individuals that were appointed or whether it was --

Q. Sorry, you said that. I think I unintentionally confused you.

What was Citadel's view?

MR. TATA: Objection.

A. That it was the individuals that were appointed.

Q. What was Mr. Patel's view?

A. That it was the entity that was appointed.

Q. Is it fair to say that Mr. Olson didn't participate in those discussions?

A. Halperin

A. I believe he only did through Dipesh Patel.

Q. He didn't personally participate at that point?

A. Only through Dipesh. I don't recall having a specific conversation with Marty Olson about that.

Q. Were there any emails exchanged in connection with these discussions?

A. There were a few.

Q. And you were copied on them?

A. Either sent them or were copied on them I believe.

Q. You still have those emails in your possession most likely?

A. They were all provided to counsel.

Q. They were?

A. And either produced or withheld because of privilege.

Q. Now, were there text messages exchanged in connection with these discussions?

A. I don't really use texts.

Q. Did you take any notes?

A. Halperin

A. No.

Q. Are there calendar entries reflecting these discussions?

A. Unless it was a scheduled Zoom, I don't think there were Zooms, no.

Q. Are you aware whether any documents reflecting this discussion have been produced?

A. I'm sorry, can you repeat that?

Q. Are you aware whether any documents reflecting these discussions have been produced?

A. Sitting here, I can't recall specifically what was or was not produced. I'm under the impression that they were.

Q. Did you take time to search for documents yourself?

A. Yes.

Q. Do you know approximately how many documents you provided counsel with?

A. No, I'm not sure.

Q. Was it more than 10?

A. I think so.

Q. More than 20?

A. Halperin

A. I don't know.

Q. Was it less than 30?

A. Probably.

Q. Would you be surprised that none of those documents have been produced to us?

MR. TATA: Objection.

A. I went through -- I don't want to breach privilege. I worked with counsel to come up with search terms. Both I and Debra Cohen used those search terms to try to find anything that was relevant. We searched emails and documents. Whatever came up on any of those searches were shared with counsel and it was left to them to determine whether it was something that should be produced or not.

Q. In connection with these discussions, did you form a view as to whether it was the individual or the actual creditor who was the member of the board?

MR. TATA: Objection.

A. I had my own personal opinion, but I don't know that I expressed it to anybody.

Q. What was your opinion?

A. Halperin

A. That it probably was the individuals because I don't think Citadel could be appointed twice for the same entity, but I didn't voice that and the parties never came to agreement on it.

Q. So your personal opinion was that Citadel shouldn't have been able to put two members on the board?

A. No. My opinion was if it was the entity that was named, it wouldn't be Citadel and Citadel, they would have had to find a different entity. It wasn't entities that was named, it was individuals.

So the board seat was held by, at this time, one was held by Jonny Cheatle, one was held by Benjamin Xie, and one was held by Martin Olson.

Q. You don't recall expressing your views?

A. I don't think I said that to anybody.

Q. Do you recall whether you were opposed to the idea of Ravago appointing another member?

A. Halperin

A. I don't think I was.

Q. Did you support that?

A. I don't think I did because I don't think it would have been right. I think that if -- I don't think it would have been right in accordance with the terms of the trust agreement and who is supposed to appoint a replacement.

Q. Are there any other bases for your view that the individuals were the LTAB members?

A. No.

Q. Now, going back to the page in front of you, the paragraph continues. By that time, Ravago determined that it did not have a sufficiently material interest in the bankruptcy to warrant remaining on the board, given its recovery on its administrative claim.

Who told you that?

A. The communication that Ravago wasn't interested in disputing the issue of whether they had a right to appoint a replacement was communicated to me by Dipesh

A. Halperin

Patel.

Q. When?

A. I don't remember the specific date. It would have been around the time of --

MR. TATA: The witness was not done with his answer.

A. It would have been around the time of an email you showed me earlier from, I think it was from Dipesh.

Q. Now, were those the words that Dipesh used or are you just characterizing it?

A. I'm paraphrasing. I don't remember the specific words.

Q. Do you have any understanding whether Ravago continued to hold an allowed general unsecured claim?

A. Again, I don't have visibility into what the debtor did with respect to the claims reconciliation process that was reserved to the debtors, so I can't tell you if it's allowed or not, but I do have an opinion that they continue to hold a claim.

Q. You do? Dipesh didn't tell you

A. Halperin

they sold and had gotten rid of it?

A. No.

Q. Is there any document reflecting this conversation between you and Dipesh?

A. It only would have been referenced in emails if it was.

Q. Now, Mr. Olson resigned on May 2025 if you recall. His seat was then occupied by a fellow name Jeff Amato.

Do you recall that?

MR. TATA: Objection.

A. No.

Q. Do you know who Jeff Amato is?

A. Only that he was mentioned in an email by Dipesh as someone that Ravago was proposing to take Marty's place.

Q. So it's your opinion that he never actually became a member of the board?

A. Correct.

Q. Is it also your understanding or should I understand that it's your testimony today that you had no dealings with Mr. Amato?

A. That's correct.

A. Halperin

Q. Now, did you treat Mr. Amato as a member of the board of the LTAB after June 4, 2025?

A. No.

Q. Are there any documents, aside from the email that you referenced, by which Mr. Amato or Ravago resigned and/or subsequently relinquished their seat on the board?

MR. TATA: Objection.

A. I think it was only email, it was only email.

Q. There were emails?

A. I think you referenced an email earlier. I said I think it was only an email.

Q. An email.

A. I believe that was it. There may have been others in the chain that discussed it, but I don't think there was any formal pronouncement.

Q. From June 2025 to February 2026, who held that third seat?

A. Only because I don't remember the specific dates, but from the time that Dipesh

A. Halperin
said that Marty's out and then there was disagreement about who was entitled to appoint the replacement, nobody held the seat.

Q. Now, during that period of time, what actions did the board take?

A. I don't recall timing, I just don't. I'm not sure exactly what happened during that time period.

Q. But things certainly did happen?

A. I just don't know sitting here.

Q. Do you ever recall any period of time in the last two years where the board did nothing for extended period of time?

A. Depending what was going on in the case, might have had discussions, but not acted on anything.

Q. What about when discovery started in the SDNY action, were there things the board was doing in connection with that?

That's a yes or no answer. It's not trying to get into the substance obviously of those actions.

A. I understand that. The only thing

A. Halperin

I'm struggling with is I don't remember what happened when. I don't have the context in my head, but the board was aware and had some involvement with discovery, they were kept informed and advised, so if that happened during that time period, then the board would have been aware of that and had some involvement in it.

Q. Now, after Ravago withdrew from the LTAB, did you ask any holder of a general unsecured claim to serve on the LTAB?

A. I did not. I can only follow the procedure in the trust agreement. I don't have a right to ask somebody to do that.

Q. Did you ask anyone to fill the LTAB seat after Ravago withdrew?

A. Did I, no.

Q. Did you propose anyone to the members of the LTAB who remained?

A. No, I did not.

Q. Are you aware of whether anyone asked on behalf of the LTAB, asked any holder of a general unsecured claim to serve?

A. I do not know.

A. Halperin

Q. Do you understand whether anyone was asked by the remaining members of the LTAB to serve on the board before and excluding Parabellum?

A. I don't know.

Q. Did you inquire?

A. Whether they had asked anybody other than Parabellum.

Q. Well, before Parabellum. We know they asked Parabellum, you would agree with me, right?

A. Yes.

Q. So aside from Parabellum, did you inquire with the remaining members of the LTAB as to whom they were looking for, were they running a search, who they might propose, how they were going to fill the seat?

A. No.

Q. You weren't concerned at all?

MR. TATA: Objection.

A. No.

Q. Do you believe that was consistent with your obligations?

A. Halperin

A. I do.

Q. When did you first take the position that unsecured creditors are not entitled to representation on the LTAB?

MR. TATA: Objection.

A. I don't think I ever took a position that they were not entitled to representation on the LTAB.

Q. That's your position sitting here today, you've never taken the position that the unsecured creditors are not entitled to representation on the LTAB?

A. I have taken the position that they negotiated a trust agreement and there are provisions that have to be followed and they provide that the remaining members get to appoint the replacement.

Q. Can you turn back to Exhibit 9 which is an email with the four bullet points at the bottom from John Sinna. It's the one that talked about his discussions with Citadel. It's from September 5, 2025. It's one page and has the four bullet points at the bottom. Right there.

A. Halperin

A. This one?

MR. SCHILLER: For the record, the witness is looking at Exhibit No. 9.

Q. It's an email from John Sinna on September 5, 2025 and in an internal Parabellum email, Mr. Sinna explains to some of his colleagues, Taking us on the board reduces the potential cost or admin burden of finding another party and we also see it as a nice little nod from Citadel, with whom we are also working on other potential opportunities.

Were you aware that Citadel and Parabellum were working together on other opportunities?

A. No.

Q. Did anyone tell you Citadel wanted Parabellum on the board?

A. Citadel told me they wanted Parabellum on the board at some point.

Q. Who told you?

A. Jonny Cheatle and or Ben Xie.

Q. When?

A. First, it was that they wanted to

A. Halperin

find a way for them to at least be able to participate, that we discussed earlier. Listen in, that we discussed earlier when we were discussing ex-officio and then later, in connection with the replacement of the board opening.

Q. Did Citadel have an interest in Parabellum being appointed?

A. Can you explain what you mean by interest?

Q. Do they have an interest in it? Was there a benefit to them that you understood in appointing Parabellum?

A. I'm not aware of any benefit, economic, I'm not aware of any benefit.

Q. Is the third seat simply Citadel's to give to anyone they choose?

A. Whoever they're going to -- whoever they're going to appoint is going to have the same fiduciary obligations and I would like to think it's someone that is qualified and it's going to have to be someone who has an interest, so, you know, I don't think we can gift it to anybody they want to.

A. Halperin
Q. If you go to the second bullet in this email, Mr. Sinna writes, We are already observers to the board and have been working with Citadel on related matters since our purchase.
What are those related matters that Mr. Sinna is referring to?
A. I don't know. Related? He says we are already observers on the board, then he says, working with Citadel on related matters. I'm assuming it's related to the board seat, so I'm assuming it's related to Instant Brands, but I don't know.
Q. Now, Mr. Sinna further writes in the last sentence of the next bullet point, Majority rules, so Citadel has and will continue to control the board anyway.
Do you agree that Citadel controls the LTAB?
A. Sitting here, I don't recall the specifics of every provision in the litigation trust agreement, so I can't tell you what is majority rule and what is unanimity required, I just can't sitting

A. Halperin

here, but if it's majority vote then, yeah, they would, but they and anybody else who sits on the board is a fiduciary and sits in a fiduciary capacity and have to pay in accordance with that.

Q. Did anybody from Citadel ever provide a rationale as to why they wanted Parabellum to join the board?

MR. TATA: Objection.

A. I recall somebody saying that he had experience with managing litigation and I thought that would be a good addition, but I can't remember the specifics and I can't remember who said it. I believe it would have been someone from Citadel on the board, either Jonny Cheatle or Ben Xie, I just don't remember the specifics.

Q. Did you ever interview Mr. Sinna before he joined the board?

A. No, I spoke with him briefly, but I did not interview him.

Q. Now, with Mr. Cheatle and Mr. Xie holding two of the three seats, does that mean that any action can be taken if either

A. Halperin

of them or both of them are to object?

MR. TATA: Objection.

A. Can you repeat that please?

Q. With Mr. Cheatle and Xie holding two of the three seats, if they both take the same position, can an action be taken despite their objection?

MR. TATA: Objection.

A. My instinct is to say probably not, but I would need to go through the trust agreement to see what the provisions are. I just don't recall everything sitting here.

Q. Do you recall discussing Mr. Sinna becoming a full member of the board with Ravago at the time it was proposed?

A. At the time it was proposed by Citadel, meaning, after Marty's announcing his resignation?

Q. Yes.

A. Yeah, I think I discussed it with Dipesh Patel at some point.

Q. Did he have an opinion about it?

A. That that was the whole discussion that I mentioned to you earlier about is the

A. Halperin

board seat held by the entity or held by the individual.

Q. Right. But we didn't talk about whether he had a position as to whether Parabellum could fulfill the seat that had been vacated by Mr. Olson.

Did you talk to him about that?

MR. TATA: Objection.

A. He didn't express any concerns one way or the other. It was just a question of whether it should be someone from Ravago.

Q. So he maintained his position that Parabellum should not take a seat then?

MR. TATA: Objection.

A. I don't think he really cared much if it was Parabellum or somebody else. I think the thing that was an issue for him, at least until he said, you know what, don't care is whether it would be Ravago in some capacity that would be continuing and that goes to the discussion we had before.

Q. So he gave up?

MR. TATA: Objection.

Q. Is that fair?

A. Halperin

A. Not when we were first discussing this, no.

(Exhibit 14, document bearing Bates stamp Nos. Trustee 01917458, marked for identification, as of this date.)

A. Eventually, I don't know if it was him or Ravago or both, I don't know.

Q. In front of you is a document marked Exhibit 14. It's Trustee Bates stamp 01917458 and it's the February 23, 2026 appointment, acceptance of appointment and joinder.

Do you know who prepared this document?

A. This was us, this was my firm.

Q. Ms. Cohen prepared this document?

A. It would have been Ms. Cohen, yes.

Q. You signed it along with Mr. Cheatle and Mr. Xie, correct?

A. I don't think I did. No, I don't think I did.

Q. Under LTA Section 407.D, a vacancy is filled by, quote, unanimous consent of the remaining members.

A. Halperin

Do you know whether you had a role in this appointment or not?

A. I would not have. I'm not one of the remaining members.

Q. Do you recall whether there was a written resolution or a meeting consistent with this appointment?

MR. TATA: Objection.

A. A formal meeting, no. It would have been a discussion either, again, by phone or an email or a combination of those.

Q. Do you know whether anyone else was considered for this third seat prior to this appointment?

MR. TATA: Objection.

A. I presume you mean other than the...

Q. Other than the Ravago folks.

A. The two gentlemen that Ravago suggested, first one and then another?

Q. Exactly.

A. I don't remember whether or not it was the first or the second. I don't know.

Q. When did the vote take place to

A. Halperin

appoint Parabellum?

A. I'm not sure of the exact date.

Q. Now, you understood at the time Citadel appointed Parabellum, they had a contractual relationship; in fact, we looked at those participation agreements, right?

A. Yes.

Q. Now, when you received notice of this appointment, did you or anyone raise concerns that Mr. Cheatle and Xie were conflicted with respect to appointing Parabellum as representative?

A. No.

Q. So it's fair to say that no notice of Mr. Olson's departure or Mr. Sinna's appointment were given to the court, the beneficiaries or the former creditors' committee at that point in time?

MR. TATA: Objection.

A. We complied with the terms of the trust agreement and if it said do it, we didn't and if it didn't, we didn't.

Q. Did my question confuse you?

A. A little bit.

A. Halperin

Q. Let me ask it a different way.

Were any disclosures made to the best of your knowledge when Ravago departed from the LTAB?

MR. TATA: Objection.

A. No.

Q. Were any disclosures made when Mr. Sinna was appointed to the LTAB?

MR. TATA: Objection.

A. I don't believe so.

Q. Did anyone raise the question of whether disclosures should have been made at that time?

MR. TATA: Objection.

A. I think the only way I can answer that is to say I had discussions with counsel about what our requirements were under the LTA.

Q. But outside of those discussions, did anyone raise any question? And I am obviously not asking about your lawyers. I'm just saying anyone raise any questions about whether disclosures should be made?

And if you can't answer that

A. Halperin

without revealing those conversations, that's fine.

A. I don't believe anybody did.

Q. I want to go back to the plan and our favorite pages, 42 through 44, and maybe you are still there, which is excellent.

Now, I'm going to go back to page 44 to Section G and actually, I'm not in Section G -- sorry, so I'm going to go to the bottom of page 42 to give you the context.

The last sentence talks about a defined term, the litigation trust financing facility.

Do you see that?

A. Yes.

Q. Do you know what that is?

A. Yes.

Q. On the top of the following page, page 43, it says that the facility, quote, provides for the issuance of up to $6 million and that lenders may, in their discretion, provide, quote, up to an additional $4 million of incremental financing.

Do you see that?

A. Halperin

A. I know it's in here, but I don't see the reference to the 4 million.

Can you tell me where it is on this document -- oh, there it is on the next page.

Q. I'm sorry?

A. Okay.

Q. Now, if you go back to the LTA and you can leave that like that, just in case you want to look at it again. If you go back to the LTA and turn to page 5, Section 1.06 titled Funding of the Litigation Trust, and Section 1.06 specifically states in the third line that the credit agreement should have the, quote, terms set forth in the plan and the plan supplement.

Do you see that?

A. The third line?

Q. It's 1.06.

A. I'm reading the wrong section.

Q. It says on the effective date and then defines the litigation trust credit agreement and then it says, having the terms set forth in the plan and the plan supplement.

A. Halperin
Do you see that?
A. Okay.
Q. Turning back to the plan. What do you understand the words up to to mean?
A. That it's a limit on the lender's funding commitment.
Q. Are you aware of any provision of the plan permitting funding in excess of those limits?
A. I don't think those are limits on funding. I think that's a limit on the commitment of the lenders. I think that's what they were prepared to commit to at that time and up to that amount.
Q. Are you aware of any provision of the plan permitting funding in excess of those amounts described in the plan?
MR. TATA: Objection.
A. I don't think there is anything in the plan that limits the amount of funding. I think that is the amount of the commitment that the lenders were prepared to make at that time.
Q. What provision of the plan explains

A. Halperin

that?

A. My reading what you just shared with me.

Q. Aren't you just making a very clear contradiction? You called it a limit, but then you are saying it's not a limit, which is it?

A. It's a limit on what they were prepared to commit to funding. It's not a limit on what the trust can borrow.

Q. Where does it say that in the agreement?

A. I don't think it says that or says to the contrary anywhere.

Q. Where does it say that in the LTA?

A. I don't think it says that anywhere or to the contrary, anywhere.

Q. So you don't believe there is anything in the plan or the LTA that explains your interpretation that the words up to, are not actually a limit on the amount of funding that can be provided?

MR. TATA: Objection.

A. I don't think there is anything

A. Halperin

that says it one way or the other. I think it's what they were prepared to commit to funding.

Q. Does it say they're prepared to commit or does it say up to?

A. For the issuance of up to $6 million, quote, the litigation trust financing commitment amount.

Q. The word prepared, where is it?

A. I'm sorry, the top of page 43.

Q. Let's talk about --

A. That's in the definition. Let me finish reading.

Q. Take your time.

A. Thank you. Then in that provision on page 44, that has the extra 4 million. That says if the litigation trust ultimately requires financing in excess of the litigation trust financing commitment amount, some or all of the lenders -- some or all of the litigation trust lenders may, in their discretion, provide up to an additional 4 million of incremental financing under the facility on such terms set forth therein.

A. Halperin

So I took that to be what they were prepared to commit to at this time and they were not going to go beyond that in the plan and I think that was a term that was negotiated between the creditors' committee and the lenders, but I wasn't there.

Q. How much has been funded to the litigation trust in total as of today?

A. I'm not sure. I'm really not.

Q. Who would have that information?

A. I could probably get it, probably have it in my office. I just don't recall what the number is sitting here.

Q. Do you know how much of the funding has come from Citadel?

A. The majority of it, but Citadel is not the only lender.

Q. Do you know how much of it has come from Parabellum's participations?

A. I don't.

MR. TATA: Objection.

Q. Have there been any other sources of funding?

A. Yes, there are at least two others

A. Halperin

that I can think of that are part of the lender's group.

Q. Who are they?

A. I think that they're Monroe, I might be messing up the names, Monroe Capital and Saratoga, I don't remember, Saratoga, what.

Q. Do you know how much either of them have funded?

A. I don't recall.

Q. Has the total funding exceeded 10 million?

A. I think it has.

Q. Has it exceeded 11 million?

A. I don't recall.

Q. Has it exceeded more than 12 million?

A. I don't recall.

Q. Parabellum has invested over 9 million to obtain its position in the trust debt in the LTIs.

Are you aware of that?

A. No, I may have seen it in a document, but I don't recall that.

A. Halperin

Q. Turning our attention to the credit agreement, I don't think we provided this yet, have we?

A. Keep these open?

Q. You might as well. I'm not sure if I will turn back to them, but it was hard to find.

(Exhibit 15, credit agreement dated February 27, 2024 for the Instant Brands Litigation Trust, marked for identification, as of this date.)

Q. Now, I've had marked as Exhibit 15, the credit agreement dated February 27, 2024 for the Instant Brands Litigation Trust.

Do you see that?

A. Yes.

Q. Do you recall that the credit agreement was amended in September '25 to raise incremental financing from 4 million to 5 million?

A. I don't remember the specific dates, but I do remember that it was amended.

Q. If you turn to page 17, do you recall that the original credit agreement --

A. Halperin

A. PDF page 17 or page No. 17?

Q. I'm going to go to it. It talks about on page 17, not PDF, it's PDF page 22.

A. Okay.

Q. It talks about the incremental commitments. I'm sorry, elsewhere, it's actually defined the amount. On page 7, it defines the incremental amount, at the bottom of page 7, which is 12 of the PDF, and you will agree with me that it reflects that the incremental amount was redlined out at 4 million and 5 million was inserted.

Do you see that?

A. Yes.

Q. Now, when this was amended, was it put to the LTAB?

MR. TATA: Objection.

Go ahead.

A. If I remember correctly, I made the request for additional funding and circulated it to the lenders and advised the LTAB.

Q. Now, who on behalf of the trust has the right to increase the amount of borrowing?

A. Halperin

A. Sitting here today without looking at the trust agreement, I couldn't tell you, I don't recall.

Q. Do you have the right to commit the trust to additional amounts of borrowing?

A. I would need to consult the document to figure that out.

Q. When deciding whether to increase the amount, does the LTAB have any fiduciary duties to creditors before increasing the amount?

A. The LTAB always has a fiduciary duty to the trust beneficiaries.

Q. When the incremental amount was increased, was there a vote?

MR. TATA: Objection.

A. I don't know that it was a formal vote. It would have been discussed with the LTAB and been approved.

Q. Do you recall how many members voted on it?

A. I don't.

Q. Do you recall how many members approved it?

A. Halperin

A. I think everything was unanimous.

Q. Was Parabellum consulted before it was agreed upon?

A. Based upon the timing, what was the date of the amendment?

Q. The amendment was dated September 2025, so before Parabellum actually began its -- actually took its role as an official member of the committee.

A. Not by me and not by the trust.

Q. Clearly, this reflects an action taken by the committee during the period of time when there were only two active board members, correct?

MR. TATA: Objection.

Q. I said committee. I meant board. I apologize. You understood what I meant?

A. We have a record. I want to make sure I say the right thing.

Q. You would agree with me, when we were talking a few minutes ago, we talked about whether actions were taken when there were only two active members of the board and this appears to be an action that was taken?

A. Halperin

A. This would have been one of them.

Q. Now, did you ever consider whether this amendment was consistent with the original provision of the LTA 1.06 that we just talked about discussing the amounts that were to be funded?

A. I believed and still believe that it was consistent with it, that we needed to get them to. If they were willing to, we needed to get them to agree to provide additional funding because there was no commitment, although, truthfully, there was no formal commitment to the 4 million either because if they didn't want to fund, it was subject to their discretion.

Q. Nobody sought approval from the Bankruptcy Court to increase the amount of funding, correct?

A. No.

Q. The beneficiaries were not notified when the incremental amount was increased, were they?

MR. TATA: Objection.

A. No, that's -- no.

A. Halperin

Q. So is there any limit on what the incremental amount could be adjusted to in your opinion?

A. I think any decision needs to be made consistent with the best interests of the trust and its beneficiaries and as I said, as I testified earlier, the only distribution that's going to happen to any of the beneficiaries of this trust from the trust is the successful resolution of this litigation and that's going to involve paying the professionals to prosecute that litigation, so as long as the decision is being made consistent with that and it's being done in an appropriate manner.

I wouldn't say right now that there is a minimum or a maximum because if we don't prosecute it, there is nothing for the beneficiaries of the trust.

MR. SCHILLER: I would like the court reporter to mark the next exhibit please.

(Exhibit 16, printout of Excel spreadsheet, marked for identification,

A. Halperin

as of this date.)

Q. In your last answer, what do you consider to be the criteria for increasing borrowing?

A. Funding needs, cost.

Q. Anything else?

A. Not really.

Q. Now, I've handed you another document. This document is marked with the Bates stamp Para B 000182 and it's dated July 10, 2024 and it's called the tranche 4 loan funding notice debt.

Do you see that?

MR. TATA: I think we have the wrong document.

A. This isn't stamped.

Q. I was incorrect. This is a printout of an Excel spreadsheet in the native form and you will see on the first page, I don't mean to --

A. I promise, I'm not offended.

Q. There is a line there, you will see it's the fourth column over and at the bottom, it describes something called tranche

A. Halperin

4 loan funding.

Do you see that?

A. Can you point it out to me?

Q. Right there, last line in column 4.

Do you see that?

A. I do.

Q. Do you know what tranche 4 is?

A. I believe I do, but I want to --

Q. Are you looking for the credit agreement?

A. Yeah.

Q. With pages are the tranches described on -- I'm sorry, it's going to be in the plan, the reference to the tranches, the pages we had open before.

On page 43, you will see there is a reference and I'm going to ask you a question when you get there.

A. Okay.

Q. Do you see the reference to the tranches?

A. I don't see a reference to tranche 4, but I'm assuming it's the $4 million or maybe not.

A. Halperin

Q. There is no -- you would agree with me, there is no reference to tranche 4 in the credit agreement, right?

MR. TATA: Objection.

Go ahead.

A. I don't see one here.

Q. Are you aware of any document that authorizes a tranche 4?

MR. TATA: Objection.

A. I don't know because there is talk about tranches 1, 2 and 3 and those are the components of the 6 million referenced on page 43 and on page 44, there is a reference to a discretionary 4 million commitment, but it doesn't say whether it's a tranche or not, so I don't know if that's what they're referring to or if they're referring to the incremental 1 million beyond that, I'm just not sure.

Q. Do you know who requested tranche 4 payments to be made or funded?

A. Who requested the borrowing?

Q. Yes.

A. It would have been me, the trust.

A. Halperin

Q. And are you aware of who approved the tranche 4 funding?

A. Again, based on timing, it would have been whoever was on the LTAB at that time.

Q. How much was tranche 4?

A. It depends upon whether this is part of the -- wait a second. I'm not sure because I don't know what it specifically refers to. If it was the 4 million, it -- I don't recall drawing the entire 4 million in one request, but I could be mistaken on that and if it was the 1 million then, you know, I mean, either way, I would have made the loan request.

Q. You can put the document away for the moment.

How frequently do you communicate with Mr. Sinna about the trust while you were the trustee?

A. Really not very much and not individually.

Q. You communicated more frequently with Mr. Cheatle and Xie?

A. Halperin

A. Initially, with Mr. Olson too when he was still there, but I would say yeah, with Mr. Cheatle and Xie, but my communications with Mr. Sinna is more along the lines is when there is an entire LTAB communication.

Q. Why do you have more frequent communications with Mr. Cheatle and Mr. Xie than Mr. Sinna?

A. They have been active since the very beginning. They have been a pretty active board.

Q. There is no other reason?

A. No. It may be them reaching out to me or asking a question or something like that.

Q. I'm just curious, is it the case that the two Citadel members will confer and convey a single position to you normally?

A. No, it's more just talking about issues that may come up or thought on strategy or funding or anything else and it's not uncommon sometimes for me to, when I have a communication, if it's only with Jonny

A. Halperin

Cheatle, that he is speaking for the board as a point of contact.

Q. Parabellum's responses to this emergency action describe thousands of communications with members of the LTAB concerning the Halperin action in relation to the document requests that were made.

Have you been a party to thousands of communications between Parabellum and the LTAB?

MR. TATA: Objection.

A. I don't know the numbers, but it's very possible that there were -- you get an email chain frequently with counsel and that they would start back and forth and back and forth and back and forth, so you could have numerous on the same email chain, but thousands, I don't know.

Q. Do you think that perhaps you just weren't a party to most of those communications?

A. It's always possible.

Q. How many communications do you think you've had with Parabellum about the

A. Halperin

trust, approximately?

A. Just me and Parabellum?

Q. Yes -- no, any communications in which Parabellum was involved.

A. I don't know.

Q. More than 100?

A. Probably. I don't know.

Q. But nothing close to 1,000, right?

A. Again, I don't know. Every now and again, like I said, you get people who start. The emails go back and forth and one email can grow into nothing substantive was said, can grow into five or 10 or whatever, I just don't know.

Q. Did you have any communications with Parabellum prior to February 23, 2026, the date that they became an official board member?

A. I'm sure.

MR. TATA: Objection.

Q. What authorized Parabellum to participate in those conversations with you before they became a board member?

MR. TATA: Objection.

A. Halperin

A. Can we take a step back? I'm not sure I'm following where we are.

Q. I think we already answered that question actually.

A. Okay.

Q. I will move on.

The trustee never consulted -- strike that. Sorry, trying to be efficient here. I jumped ahead of myself earlier, so I'm trying not to repeat what I've already asked you.

I think you raised this paragraph earlier and we may have discussed it, but it's page 16 of the LTA, Section 3.07.B and I wanted to go back and ask you a question.

This is the section titled Ten-Year Removal and Replacement of the Litigation Trustee.

Do you see that?

A. I do.

Q. And paragraph B, it says, The litigation trustee may resign by giving not less than 45 days prior written notice to the litigation trust advisory board, the

A. Halperin
distribution agent, the reorganized debtors and the litigation trust beneficiaries and filing such notice with the Bankruptcy Court.
Now, this is the provision under which you resigned, correct?
A. Yes.
Q. And it required not less than 45 days on prior written notice, correct?
A. It requires not less than 45 days notice, written notice to the enumerated people and then I read it as additionally, a filing of that notice with the Bankruptcy Court.
Q. When did you file that notice?
A. Subsequent to when we sent the initial -- we distributed the initial notice to the parties.
Q. Had the enumerated people listed in that provision been notified before the notice was filed with the court?
A. The answer is yes, but we wound up going broader when we -- we wound up going broader when I agreed to the court's request to extend my duration of notice.

A. Halperin

Q. So your testimony is that prior to July 30th, which I will represent to you is the day your counsel filed the notice with the court, all of those enumerated parties had been notified?

MR. TATA: Objection.

A. The answer is yes.

Q. Is it possible that you just didn't know that that hadn't happened?

A. No.

Q. What did you do to make sure that those parties were noticed prior to July 30th?

A. There is a list of parties that are supposed to get the information pursuant to the trust agreement and then it goes to a question of who the beneficiaries are.

We did not do a broad mailing, which is where I'm assuming you are going to, and I'm trying to short circuit an hour of questions.

We did not notify every GUC at that point in time because the last register that we had from the reorganized debtors was that

A. Halperin

all of the claims were still disputed. They had not yet -- I think they were scheduled that way and they were not formally allowed -- not holders of allowed claims, they are technically not beneficiaries. They were supposed to be going through and reconciling it.

So rather than incur thousands of dollars to do a notice to those people, we didn't, but then, after we renoticed and -- sorry, after we extended the time and we did the renotice, we just wanted to go conservative, contacted Epic, said get us the total notice list, don't care if they're disputed, we are sending it out to everybody.

Q. Who made the decisions to follow that process?

A. The first or the second or both?

Q. Either. If there were different people who made different decisions, can you explain?

A. Me.

Q. Do you believe you complied with Section 3.07.B?

A. Halperin

A. I do.

Q. When did you first decide to resign?

A. Not all that long before the notice was sent the first time.

Q. When you are saying the notice was sent the first time, what notice are you referring to, your letter to the board, to the LTAB board?

A. The letter to the LTAB board that also went to other parties tendering my resignation.

Q. That was July 1st, I believe?

A. On or about, so it would have been a little bit before that, I don't remember specifically.

Q. Prior to sending that letter, did you tell anyone that you intended to resign?

A. No.

Q. Why not?

A. Because I wanted to make sure I was really certain I was going to go through with it and I was prepared to go through with it.

Q. Can you walk me through the

A. Halperin

sequence of events as you recall it from the first discussion you had of resigning to the July 30th filing?

MR. TATA: Objection.

A. Discussion of resigning with who?

Q. Your resignation.

A. Not what, but with whom?

Q. Who did you discuss your resignation with?

A. The only person that I recall having a discussion with this about was Debbie Cohen as counsel.

Q. So it's your testimony that you never had a discussion any of the members of the LTAB about your resignation?

A. Before --

MR. TATA: Objection.

A. I thought I already answered that. Yeah, I didn't, but no. The first notice that the LTAB got about my resignation was when I sent the notice, I think. It's possible that I mentioned it to somebody like the day before, but I don't recall doing that.

A. Halperin

Q. Did the members of the LTAB have an understanding as to why you resigned?

A. I think so.

Q. What is that reason?

A. We had differences of opinion on budgeting and funding needs and I just don't think I was in sync with the board on that.

I also found that at times, getting approvals on bills were taking longer than I thought they ought to and I think it just got to a point where I had determined that I was just not comfortable with how it was going, that I wasn't really in sync with my board and I felt it would be better if I resigned and they could go through the process and select whoever they wanted to replace me.

Q. Did anyone try to convince you not to resign?

A. Yes.

Q. Who?

A. I got a call from Ben Xie after he got the notice.

Q. What did he say?

A. I don't remember the specifics,

A. Halperin

like, the exact quotes back and forth, but something to the effect that he would prefer that I not resign, that he liked having me in there as trustee, perhaps we can work through some of the issues with respect to budgeting and funding and it was very nice of him to call. I think he is actually a pretty decent person and I think I told him --

Q. Please continue.

A. You got to do what you got to do, that's fine.

I pretty much made up my mind at that point. I did agree to sleep on it and give it some thought, came back the next day and said, you know, I'm going through with it.

Actually, I think I might have told them -- I don't recall if that was a conversation I had with them where I said I'm going to be submitting the resignation or if I submitted the resignation. I might have spoken to them and said I'm going to be submitting my resignation tomorrow. I'm trying to remember the sequencing of events

A. Halperin

and Ben reached out to me and I just don't recall if I had that conversation or I just sent the notice. I'm having trouble recalling it.

In any event, that was the conversation I had with Ben. I took the night to think about it, I decided I wanted to resign. I thought it was better to have a clean break.

MR. SCHILLER: I would like to take a two-minute break to consult with my colleagues to see if we have any other questions.

THE VIDEOGRAPHER: The time is 2:32 p.m. and we are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 2:39 p.m. and we are back on the record.

MR. SCHILLER: For the record, I'm asking the witness about Exhibit 15, the credit agreement.

Let's go off the record.

THE VIDEOGRAPHER: The time is 2:39 p.m. and we are off the record.

A. Halperin
(Off the record.)
THE VIDEOGRAPHER: The time is 2:40 p.m. and we are back on the record.
BY MR. SCHILLER:
Q. If you turn to page 15 please.
Do you see there is a section called the notional conversion right?
A. I see the section.
Q. Are you familiar with that?
A. Not as I sit here now.
Q. Do you know what the notional conversion factors are for the tranche 4 loans that have been funded?
A. I do not off the top of my head, no.
Q. Were you ever aware of what the tranche 4 notional conversion factors were?
A. Specifically, no, but I think that -- first of all, I have to go back to it. I'm not sure what tranche 4 is. I don't know if it refers to the 4 million or the 1 million.
Q. So you don't know sitting here today whether you were ever aware of what the

A. Halperin
notional conversion factors were for tranche 4?
A. Since I don't know what tranche 4 is, no.
Q. Just one last question. In the various experiences you've had over the years that we've talked about, have you ever resigned before?
A. No, I have not.
MR. SCHILLER: Thank you. We have no further questions at this time.
MR. TATA: Can you give me five minutes?
THE VIDEOGRAPHER: The time is 2:41 p.m. and we are off the record.
(Off the record.)
THE VIDEOGRAPHER: The time is 2:46 p.m. and we are back on the record and we are off the record at 2:46 p.m., concluding today's testimony given by Alan Halperin.
The total number of parts was three and will be retained by LFM and Magna Legal Services.

A. Halperin

Thank you very much, everybody.

(Time noted: 2:46 p.m.)

- - -

I N D E X

- - -


| | |
|---|---|
| ALAN HALPERIN | PAGE |
| By Mr. Schiller | 5 |


- - -

E X H I B I T

- - -


| | |
|---|---|
| EXHIBIT | PAGE |
| Exhibit 1 Copy of the LTA | 21 |
| Exhibit 2 Article IV.G | 29 |
| Exhibit 3 Document bearing Bates Stamp Nos. Trustee 01917448 | 58 |
| Exhibit 4 Document bearing Bates Stamp Nos. Trustee 01917443 | 61 |
| Exhibit 5 Transfer notice | 76 |
| Exhibit 6 Transfer notice | 76 |
| Exhibit 7 Document bearing Bates Stamp Nos. Trustee 01917428 | 79 |

- - -

E X H I B I T

- - -


| EXHIBIT | PAGE |
|---|---|
| Exhibit 8 Document titled The Litigation Trustee's Objection To Cornell Capital LLC's Motion For Expedited Discovery and Response to Order to Show Cause | 84 |
| Exhibit 9 Document bearing Bates Stamp Nos. Para B 000180 | 102 |
| Exhibit 10 Parabellum participation agreement | 106 |
| Exhibit 11 Parabellum participation agreement | 106 |
| Exhibit 12 Email chain | 122 |
| Exhibit 13 Document bearing Bates Stamp Nos. 1694 | 155 |
| Exhibit 14 Document bearing Bates Stamp Nos. Trustee 01917458 | 183 |
| Exhibit 15 Credit agreement dated February 27, 2024 for the Instant Brands Litigation Trust | 194 |

- - -

E X H I B I T

- - -


| EXHIBIT | PAGE |
| --- | --- |
| Exhibit 16 Printout of Excel spreadsheet | 199 |

\- - -

DEPOSITION SUPPORT INDEX

\- - -

Request for Production of Documents

Page Line Page Line Page Line

None

\- - -

Stipulations

Page Line Page Line Page Line

None

\- - -

Questions Marked

Page Line Page Line Page Line

None

\- - -

To Be Filled In

Page Line Page Line Page Line

None

\- - -

CERTIFICATE

I HEREBY CERTIFY that the witness, ALAN HALPERIN, was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Leslie Fagin
______________________________
Leslie Fagin,
Registered Professional Reporter
Dated: September 16, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

ACKNOWLEDGMENT OF DEPONENT

I, , do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

ALAN HALPERIN DATE

Subscribed and sworn to before me this day of , 2026.

My commission expires:

Notary Public

\- - - - - -

E R R A T A

\- - - - - -

PAGE LINE CHANGE

MAGNA LEGAL SERVICES
Web: MagnaLS.com Phone: 866.624.6221

## Magna Litigation Screen Grab Preview



s

*The video of this deposition may be available to order through our Magna VOD program. If this deposition was **not noticed** for video, all parties must approve of the production for it to be released to any party. Admissibility will ultimately be determined by a judge. Please visit magnals.com/vod to order.*



# Magna Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Kendra Suggs (E: KSuggs@MagnaLS.com | C: 407-716-6624)

**Director of Production Services:**
Ron Hickman (E: RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

**A**

**ab** 96:18,24 97:7
**ability** 104:25
**able** 14:6 43:12 43:13,17 52:18 55:2 64:22 141:25 151:18 169:8 179:2
**above** 1:14 28:7
**Absent** 96:9
**absolutely** 35:5 37:13 50:18,18 129:8 137:23 142:12
**accept** 153:20
**acceptance** 184:12
**access** 133:7
**accordance** 125:21 170:7 181:6
**According** 128:25
**account** 153:13 159:10
**accurate** 47:12 89:7 99:8 137:13
**acknowledged** 87:12 100:12 132:9
**ACKNOWLE...** 225:2
**acquired** 113:5 141:12
**acquisition** 1:7 40:25
**Acquisitions** 4:7
**act** 6:18 7:12 29:2 43:22 48:14 68:14 73:22 74:9,21
**acted** 174:18
**acting** 25:8 32:15 68:8 81:11
**action** 19:13 26:6 28:11,22 32:19 65:7 69:25 70:4 70:7 73:7,11 107:13 120:2 132:21 133:6 137:20 174:20 181:25 182:7 198:12,25 206:5,7
**actions** 25:10 57:5 59:16 69:24 174:7,24 198:23
**active** 156:15,19 157:6,12,15,24 158:4 198:14 198:24 205:11 205:13
**activities** 54:12 59:17
**acts** 107:12
**actual** 98:18 110:7 126:20 168:20
**actually** 29:24 32:6 61:24 64:14 77:10 93:17 95:6 117:23 124:16 172:19 188:9 191:22 196:8 198:8,9 208:5 215:8,18
**add** 63:7,14 64:10,18
**addition** 19:23 37:17 181:13
**additional** 188:23 192:23 196:21 197:6 199:12
**additionally** 209:12
**additions** 128:5
**address** 5:7 18:18 19:16,19 64:7
**addressed** 74:5 76:15
**addresses** 134:9
**adjusted** 200:3
**admin** 178:9
**administrative** 170:19
**administrator** 6:6
**advice** 15:6 37:15 37:17
**advise** 56:24
**advised** 175:6 196:22
**advisors** 3:4 107:20
**advisory** 11:4 16:5,7 17:13 39:21 47:16 48:13 56:21 68:11,14 69:23 70:2,5 73:13 93:12 100:10 112:7 116:11 143:17 153:2,6 153:10,16 161:9,13 208:25
**affected** 111:23
**affiliated** 13:15 77:15
**affirmative** 68:10 69:3 81:8
**after** 10:23 19:4 40:12 56:17 65:10 78:19 87:15,15,17 93:11,20 95:10 99:19 102:9,10 109:18 117:8 124:4 131:19 140:6 149:12 152:24 154:11 161:18 163:23 173:3 175:10 175:17 182:18 211:11,12 214:22
**afternoon** 151:19 154:8
**again** 19:5 34:18 35:4 42:17 53:4 54:22 55:22 56:5 83:17 87:5 88:4 98:4 103:14 112:6 112:11 113:4 118:21 120:17 130:7 139:8 141:13 145:3 163:13 171:19 185:11 189:10 204:4 207:10 207:11
**agendas** 59:18
**agent** 60:21 80:18 99:12,12 102:8 119:16 128:17 135:12 136:22 137:6 209:2
**aggregated** 95:3
**ago** 72:10,17 96:8 131:3 132:13 198:22
**agree** 20:20 25:20,25 72:10 75:11 76:9 81:7 96:21 97:17,21 98:12 113:23 129:12,13 138:13 141:8 141:20 144:12 144:16 158:23 176:11 180:19 196:11 198:21 199:11 203:2 215:14
**agreed** 37:8 107:9,17 198:4 209:24
**agreement** 11:3 11:20 14:9 15:18,22 16:2 16:12,15,23 17:11,17,24 18:17,21 19:6 19:24 20:15,24 20:25 22:3,8,22 23:15 27:17 28:13,23 29:4 31:20 33:9 44:3 44:9 45:4,5,7 45:12 46:13,15 54:11 68:6,17 74:24 78:20 106:11,14 108:25 110:7 112:19 114:3 115:21 117:2,3 117:14 122:25 130:10,22 134:17 143:12 143:16 169:6 170:8 175:14 177:15 180:23 182:12 186:22 189:14,23 191:13 195:3,9 195:14,19,25 197:3 202:11 203:4 210:17 216:22 221:14 221:16,22
**agreements** 75:13 106:9 121:24 186:7
**agrees** 108:2
**ahead** 15:2 31:2 34:4 78:12 96:7 125:9 132:10 196:19 203:6

208:10
**al** 1:7 4:7
**Alan** 1:12 4:5 5:9 105:8,16 218:22 220:6 224:4 225:8
**ALIFEROV** 2:6
**aligned** 56:7
**alive** 123:25
**all** 4:20 17:2 42:23 48:14,22 49:2,5 53:6,7,8 56:10 59:21 71:14 72:2,3 91:4 92:13 94:25 95:22 96:4 100:16 121:5 126:17 130:12 131:25 132:10 133:23 139:11 148:7,7 148:21 158:3 164:23 166:17 176:21 192:21 192:21 210:5 211:2 212:5 217:20
**Allan** 3:7 8:21
**allocated** 49:9 137:4
**allocating** 145:11
**allocation** 145:17
**allow** 43:16 125:12
**allowance** 51:21
**allowed** 49:4,6,11 51:15 65:22 98:15 104:8 134:6,10,10 135:8,13 136:3 136:7,19,23 138:3 147:21 147:22 171:17 171:23 211:4,5
**allowing** 43:22 115:8
**almost** 60:20,21 74:21
**alone** 72:6 83:8
**along** 48:11 184:19 205:5
**already** 46:15,19 109:11 112:12 129:19 180:3 180:10 208:4 208:11 213:19
**also** 3:10 15:8 16:6,7 19:25 24:10 26:5 31:8 32:24 33:25 36:20 38:18 51:23 64:18 88:18 95:25 97:17 101:7 107:17 135:23 138:8 141:4,25 161:7 172:21 178:10,12 212:12 214:9
**although** 97:15 199:13
**always** 55:23,24 82:5 124:5 197:13 206:23
**am** 5:12,20 11:15 12:20 13:9 16:21 20:6,9,16 23:3 39:2,12 45:24 83:25 104:23 137:17 141:12,19 155:24 187:21
**Amato** 172:10,14 172:24 173:2,8
**amazed** 124:8
**ambiguity** 25:14 26:23 27:6 101:14
**ambiguous** 27:16 27:23
**amend** 75:21
**amended** 19:4,10 74:24 122:24 195:19,23 196:16
**amendment** 24:17 198:6,7 199:4
**amendments** 20:18
**Americas** 2:20 147:16
**among** 53:18
**amongst** 11:3
**amount** 51:16 153:12 190:15 190:21,22 191:22 192:9 192:20 196:8,9 196:12,24 197:10,12,15 199:18,22 200:3
**amounts** 190:18 197:6 199:6
**analogies** 60:21
**and/or** 17:16 36:21 120:21 120:21 121:17 173:8 224:12
**announcing** 182:18
**annual** 65:23,24 65:25 66:4
**another** 53:3,15 61:8 64:7 70:23 163:22 169:25 178:10 185:21 201:9
**answer** 14:7 15:2 18:11,12,13,14 34:4,16,24,25 40:6,7 43:17 67:13,15 69:6 89:15 97:2 115:22 119:2 149:8 157:3 158:22 171:7 174:22 187:16 187:25 201:3 209:22 210:8
**answered** 150:14 208:4 213:19
**answering** 17:5 82:4
**answers** 225:4
**anticipate** 60:25
**anticipating** 26:20
**anticipation** 14:12
**anybody** 34:15 41:8 51:18 54:5 103:9 111:20 122:6 126:7 142:3 168:24 169:22 176:8 179:25 181:3,7 188:4
**anymore** 63:4 97:16 149:16 154:20
**anyone** 12:5,8,14 14:21 15:21 33:16,20 34:20 35:6 36:5 38:22 39:5,14,19 41:2 59:7 65:10 92:2 121:13 137:24 151:14 155:8 158:24 175:16 175:19,22 176:2 178:18 179:18 185:13 186:10 187:12 187:21,23 212:19 214:18
**anything** 7:5 27:9,23 43:25 44:5,7 54:24 97:19 113:15 115:7,12 117:15 118:5,7 118:9,11 130:20 134:8 140:3 141:23 144:21 157:19 158:7 160:6 168:12 174:18 190:20 191:20 191:25 201:7 205:23
**anyway** 74:16 180:18
**anywhere** 134:15 144:4 191:15 191:17,18
**Apologies** 149:11
**apologize** 93:9 128:20 129:11 198:18
**appeals** 158:19
**appear** 144:13
**appearing** 14:17 158:18
**appears** 198:25
**applications** 156:16,23 157:15,17 158:2,18
**applies** 140:5
**apply** 43:20 224:11
**appoint** 145:15 149:13 153:15 159:14 164:2 170:8,24 174:4 177:18 179:20 186:2
**appointed** 7:25 8:4,6 43:12 109:16 119:15 127:11 128:16 143:18 145:5,6 145:24,25

148:15,22,24 149:9,18 150:3 150:5,8 153:4 153:25 159:12 160:15,16 161:11 163:21 165:14,20,23 169:4 179:9 186:5 187:9
**appointee** 148:18
**appointing** 151:6 169:24 179:14 186:12
**appointment** 120:10,14 122:5,11 184:12,12 185:3,8,15 186:10,17
**appreciate** 23:19
**approached** 125:11
**appropriate** 200:16
**approval** 11:5 52:15 57:6 59:24 74:14 75:6 80:11 82:15,20,22 83:5,19,24,25 87:6,18 88:12 99:15 112:16 114:12,14 199:17
**approvals** 214:10
**approve** 38:17 89:14,22
**approved** 18:21 20:5 38:14 67:24 75:5 80:13 82:21,23 83:9,20 87:23 88:5 89:3,8,15 102:6 157:17 197:20,25 204:2
**approving** 116:16
**approximate** 146:8,13
**approximately** 6:7 50:24 167:20 207:2
**Aren't** 191:5
**arising** 108:13
**around** 36:2,17 36:20 40:10,14 79:5 121:16 124:2 134:2 158:25 165:4 171:5,8
**arrangements** 33:21 34:21 35:7,13,17 38:21 39:4,14 39:19,24 66:24 67:4
**arrived** 131:21
**Article** 22:18 24:16 27:6,16 27:17 29:8,11 29:25 31:13 152:19 220:14
**aside** 38:20 65:25 76:2 173:6 176:14
**ask** 8:11 15:5,8 15:15 21:16 22:17 23:20,24 24:4,25 25:6 27:5,8 29:20 30:13,15,18,22 30:23 33:20 34:20 35:4,5 44:23 47:15 50:21 52:6 53:15 55:3 74:10 77:5,7 95:19 100:21 106:18 109:22 111:8,13 113:15 124:23 132:5 137:24 139:19 141:15 151:14 163:13 175:11,15,16 187:2 202:18 208:16
**asked** 35:11 43:13 44:16 64:18 81:21 85:19 102:18 103:3 105:9 124:17 151:19 160:23 175:23 175:23 176:3,8 176:11 208:12
**asking** 34:12 35:20 39:10,16 41:7 47:6,7 54:18 63:14 64:10 67:8 72:4 79:18 100:4 103:10 113:21 119:3,4 144:11 187:22 205:16 216:21
**ass** 124:22 125:2 125:11,17
**assess** 33:20 34:20 35:6
**Asset** 80:3 94:3
**assignable** 92:25 93:21
**assigned** 94:19
**assist** 56:24
**assume** 60:11
**assumed** 147:23
**assuming** 46:6 62:12 63:5 180:12,13 202:24 210:20
**attached** 45:9 225:6
**attend** 55:6
**attendance** 65:4
**attention** 85:4 88:19 119:11 195:2
**attorney** 90:18 90:20 91:2,9
**Attorneys** 2:4,9 2:15,19 3:4
**attorney-client** 14:25
**Authority** 25:3 56:20
**authorized** 207:22
**authorizes** 203:9
**available** 55:9
**Avenue** 2:16,20
**avoid** 15:8
**aware** 11:13 12:18 16:21 20:4,6,7,9,11 20:14,17 67:23 73:21 87:10 88:11 103:2 104:23 130:18 141:12,16,19 154:24 155:8 155:25 157:11 157:14 167:7 167:11 175:4,8 175:22 178:14 179:15,16 190:8,16 194:23 203:8 204:2 217:17 217:25
**away** 66:9 79:6 84:9 92:11,15 204:17
**AYALA** 2:11
**A's** 51:15
**a.m** 1:14 4:12 57:15,19 105:25 106:4

**B**

**B** 51:17 93:10 96:8 102:12,15 107:4 113:22 133:17 147:14 201:11 208:22 220:10 221:3 221:12 222:3
**back** 34:11 39:9 45:25 57:20 59:5 72:8 78:7 82:14 86:14,25 87:19 90:16 92:14 98:22 99:21 101:21 106:4 109:16 110:13 112:4 113:4,17 119:9 119:12 120:11 131:3 140:22 142:20 146:4,5 160:22 163:8 163:11 170:14 177:19 188:5,8 189:8,10 190:4 195:7 206:16 206:16,17 207:12 208:2 208:16 215:2 215:15 216:19 217:4,20 218:19
**background** 6:23 7:3
**bad** 94:15
**Baker** 2:4 9:18
**bankruptcy** 1:2 4:8 5:18 8:6 9:20,22,24 43:9 131:23 149:3 170:18 199:18 209:4,13
**barred** 91:18,21
**barristers** 91:13
**based** 9:4 76:5

83:8,18 89:23 97:18 110:16 198:5 204:4
**bases** 170:10
**basic** 6:25
**basis** 83:17
**Bates** 58:9 61:10 79:7,11 84:17 102:11,14 155:17 184:4 184:10 201:11 220:15,17,21 221:11,18,20
**Battaglia** 5:17
**bear** 101:24 139:21 150:25
**bearing** 58:9 61:10 79:7 102:11 155:17 184:4 220:15 220:17,21 221:11,18,20
**bears** 50:10
**beat** 126:7
**became** 9:9 16:18 16:23 19:4 40:13 117:17 117:19 150:21 172:19 207:18 207:24
**because** 7:20 15:14 41:6 42:19 44:17 46:19,21 51:18 52:25 55:4 57:12 60:11 65:19 69:19 70:23 74:15 78:7 82:2,5 83:14,23 84:17 87:10 88:22 89:15 94:16,17 95:5,10 101:4 110:4,9 113:10 114:13 123:23 124:11 127:6 131:5,14 146:18 148:8 148:22 154:16 155:12 159:4 161:4,14 166:20 169:3 170:4 173:24 199:12,15 200:18 203:11 204:10 210:24 212:22
**become** 54:16 55:19 56:5
**becoming** 126:19 126:20,23 182:15
**been** 4:25 5:21,24 6:13 8:14,22,23 16:18 36:12,19 36:21,22 41:14 41:18 42:6,16 46:16 51:12 52:14 62:18 65:5 67:7 69:18 69:21 71:11,19 74:5 78:19,21 79:4 80:13 82:21,23 83:11 83:15 87:5 95:13 98:15 99:17,19 100:20,24 102:4,6 120:11 120:21,25 121:5,16,18 122:14,15 144:8 167:8,12 168:6 169:8 170:5,6 171:5,8 172:6 173:19 175:8 180:4 181:16 183:7 184:18 185:11 187:13 193:8 193:23 197:19 197:20 199:2 203:25 204:5 205:11,12 206:9 209:20 210:6 212:15 217:14
**before** 1:15 7:4 10:14 16:15 17:5 43:25 74:3 74:23 80:23 83:12 85:10 86:22 87:5,24 95:6,13 100:13 102:4 104:10 105:6 107:11 108:22 109:3 113:19 117:25 120:9,10 139:16 140:2 141:22 176:4 176:10 181:20 183:22 197:11 198:3,8 202:16 207:24 209:20 212:5,16 213:17,24 218:9 225:11
**began** 198:8
**begin** 4:23
**beginning** 37:8 57:19 58:19 163:7 205:12
**begins** 4:4 58:15
**behalf** 25:8 81:11 83:19 165:10 175:23 196:23
**being** 4:13 6:21 7:5 19:5 35:21 60:10 74:18,22 89:13 90:18,25 93:2,13 96:11 105:3,9 124:17 124:22,25 125:16,21 126:15 134:10 179:9 200:15 200:16
**belief** 97:13
**beliefs** 53:12
**believe** 7:23 8:3,5 8:8 9:2,10 10:23 11:15,19 16:25 19:15,18 19:22 21:14 25:19 27:7,15 29:16 31:15,16 31:18,19,21,22 32:9,10,13,14 32:17,18,22,23 33:2,5,8,13 37:11 38:9 41:24 42:14 44:25 46:24 48:8 49:24 52:13,15 58:22 62:9 63:16 64:4 64:16 65:12 66:8 70:21 71:24 72:2 74:19 76:15 77:15 86:8 87:17 98:3,23 99:7,8 101:17 109:4,20,23 121:9 122:6 125:20 129:13 133:22 134:8 135:25 137:2 137:13 138:6 147:2 150:5,14 151:22,24 152:19 154:17 159:20 164:25 166:2,14 173:18 176:24 181:15 187:11 188:4 191:19 199:8 202:9 211:24 212:14
**believed** 63:19 199:8
**belong** 137:11
**below** 45:25 64:6
**Ben** 3:4 41:15 164:15 178:23 181:17 214:22 216:2,7
**beneficiaries** 17:3 40:16 48:2 48:15,21 56:2 65:15 75:22 118:15 135:7 135:17,21 136:11 139:18 142:11 148:8 148:21 153:11 186:18 197:14 199:21 200:7 200:10,20 209:3 210:18 211:6
**beneficiary** 77:24 97:24 98:15 112:15,25 114:11 116:10 141:17
**beneficiary's** 115:16
**benefit** 135:5,13 136:7,22 179:13,15,16
**Benjamin** 169:17
**Benzija** 5:17
**best** 12:2 33:14 48:14 53:8 187:4 200:6
**better** 214:15 216:9
**between** 46:20 52:21,24 53:25 90:9 104:7 109:25 126:18 141:2 165:9 172:5 193:6

206:10
**beyond** 193:4 203:19
**bicker** 54:21
**big** 118:13 142:21
**bigger** 51:19
**billing** 38:12 66:23
**bills** 214:10
**bit** 32:22 127:24 131:3 186:25 212:16
**block** 91:3
**blue** 45:23
**boards** 59:17
**board's** 69:24 80:7
**Boies** 1:13 2:9 4:15
**borrow** 191:11
**borrower** 107:21
**borrowing** 196:25 197:6 201:5 203:23
**borrows** 141:21
**both** 12:11 56:7,8 67:2 88:24 100:11 138:23 168:10 182:2,6 184:8 211:19
**bottom** 72:12 73:2 79:16 90:24 102:21 112:14 135:3 156:8 177:21 177:25 188:11 196:9 201:25
**Brand** 9:24 10:4
**Brands** 1:7 4:6 7:21 57:23 180:14 195:10 195:15 221:24
**breach** 168:9
**break** 56:15
57:12 67:16 105:15,16,17 105:22 161:18 216:10,12
**brief** 129:18
**briefly** 66:11 68:6 181:21
**Brilliant** 3:7 8:21
**bring** 55:25 131:10
**bringing** 27:24 53:14
**British** 91:12
**broad** 210:19
**broader** 209:23 209:24
**brother** 124:3
**brought** 62:25 121:17 130:14 142:17
**Bryant** 3:5
**budgeting** 38:12 214:7 215:6
**bullet** 102:23 177:20,24 180:2,16
**bullish** 53:2
**burden** 178:9
**business** 5:7 59:14
**buyer** 108:3 117:10

**C**

**C** 2:2 3:2 51:17
**calendar** 167:3
**call** 11:21 46:21 59:25 71:7,10 71:11,17 72:5 121:19 214:22 215:8
**called** 4:24 20:11 20:15 30:20 191:6 201:12 201:25 217:8
**calls** 68:23 70:13 120:21 164:18 164:19,21,24 165:2
**came** 39:6,18 40:8 42:14 43:15 50:20 64:20,25 85:24 86:3 87:14 125:3 168:13 169:6 215:15
**can** 15:2 22:24 24:24 28:15 30:15 34:3,11 34:24,25 35:3 35:18 39:23 46:10 47:13 48:11 49:19,25 50:14 52:5 53:17 54:14 55:23,25 56:15 64:25 66:9 67:21 69:6 70:8 72:20,24 74:20 76:2 79:6 81:16 83:13 84:9 89:12 90:14 92:10,19 94:21 94:23 95:10 97:2 101:21 102:5 103:25 105:22 110:12 111:22 115:14 115:19 117:12 118:20 119:7 131:10 134:19 135:20 139:9 143:22 151:21 152:13 154:10 155:15 156:8 156:17 158:23 167:10 175:13 177:19 179:10 179:24 181:25 182:4,7 187:16
189:4,9 191:11 191:23 194:2 202:4 204:17 207:13,14 208:2 211:21 212:25 215:5 218:13
**cannot** 9:13 90:13
**can't** 43:5 50:17 53:5 60:19 62:24 74:20 77:16 91:4 94:17 97:20 110:8 118:17 123:24 125:23 127:4 131:4 133:23 134:3 143:6 150:20 155:12 159:4 167:14 171:22 180:23,25 181:14,14 187:25
**capable** 93:2,13 96:11
**capacities** 66:14
**capacity** 13:10 62:11 91:6 119:15 128:17 137:15,18,20 140:13 142:11 142:13 147:15 181:5 183:21
**Capital** 2:9 84:12 84:20 194:6 221:8
**capitalized** 45:6
**capped** 38:7,11
**care** 49:18 183:20 211:15
**cared** 183:16
**career** 6:4
**careful** 56:8 60:10 98:6
124:11
**case** 1:7 5:24 7:13 37:8 40:18 43:4 52:8 57:23 66:18,20 67:3 80:4 95:9 128:6 129:19 130:6 149:3 157:16 158:3 174:17 189:9 205:18
**cases** 30:3 42:23 43:9 51:6,11 52:25
**CASEY** 2:21
**catch** 128:3
**categories** 136:10
**cause** 53:18 84:14,21 221:10
**caution** 14:23 33:25 127:17
**CCAA** 22:3 25:13,16
**ceases** 153:9
**certain** 21:25 40:15,19 41:20 54:10 62:24 113:23 117:7 212:23
**certainly** 91:22 103:11 113:14 174:11
**CERTIFICATE** 224:2
**certification** 224:10
**certify** 224:3 225:3
**certifying** 224:12
**cetera** 54:22 152:25
**chain** 58:13,14 58:24 59:3 61:20 79:12 81:8 85:17

122:19,22,23 173:19 206:15 206:18 221:17
**chance** 106:21 125:6
**CHANGE** 226:3
**changed** 40:12 41:6 47:4,21 104:7 105:7
**changes** 225:5
**channelled** 50:16
**chaos** 95:4
**Chapter** 30:3
**characterizing** 171:12
**charged** 148:9
**CHASE** 2:7
**Cheatle** 3:5 12:21 41:15 79:17,25 80:24 81:3 82:14 88:24 89:13,18 90:19 90:22 111:25 121:22 123:9 125:2 132:5 146:23 147:3 164:15 169:16 178:23 181:17 181:23 182:5 184:20 186:11 204:25 205:4,9 206:2
**Cheatle's** 90:17
**choose** 179:18
**choosing** 145:14
**circuit** 210:21
**circulate** 81:3,4
**circulated** 80:7 80:23 122:23 196:21
**circulation** 80:10
**Citadel** 3:4 12:14 12:22,25 13:12 13:18 15:19 80:2,2 82:24 84:4 88:6,12,22 88:25 94:3 95:22 102:19 107:9,17 109:25 110:17 110:21 113:24 114:21,22 115:3,25 117:3 117:5,9,13,21 118:5,8,9,16 140:14,14,16 140:25 141:2 148:6 150:6,16 150:19 152:8 153:25 154:3,4 165:11 169:3,8 169:11,12 177:23 178:11 178:14,18,20 179:8 180:5,11 180:17,19 181:7,16 182:18 186:5 193:16,17 205:19
**Citadel's** 40:11 96:4,22 121:24 165:17 179:17
**citation** 151:23
**cite** 11:18 57:9
**cited** 150:11,15 150:19 151:3 151:10
**claim** 51:15 54:6 147:21 170:20 171:18,24 175:12,24
**claims** 49:4,6,11 50:11 51:21 65:22 94:12 132:21 135:9 135:14 136:4,8 136:20,24 138:3 141:10 141:13 148:16 171:21 211:2,5
**clarify** 15:15 25:14 26:23 27:6,9 39:23 51:4
**clause** 135:2 146:5
**clean** 216:10
**clear** 15:4 17:22 191:5
**Clearly** 198:12
**clip** 29:15
**close** 76:3 207:9
**closed** 82:15 85:19,21
**coffee** 161:21
**Cohen** 36:13,25 37:2,12 38:21 39:15 44:13 46:2 58:23 61:21 168:11 184:17,18 213:13
**colleague** 37:2
**colleagues** 58:17 178:8 216:13
**collectively** 135:6
**college** 7:3
**Colloquially** 48:22
**column** 201:24 202:5
**combination** 185:12
**combined** 30:5
**come** 38:3 42:19 134:22 141:5 168:10 193:16 193:19 205:22
**comes** 43:8 52:7 53:12,16 54:23 56:9 102:3
**comfortable** 52:4 75:9,17 214:13
**coming** 21:5 44:15
**commencing** 1:14
**comment** 97:20
**comments** 46:15
**commission** 225:12
**commit** 190:14 191:10 192:3,6 193:3 197:5
**commitment** 190:7,13,22 192:9,20 199:13,14 203:15
**commitments** 196:7
**committed** 152:21
**committee** 8:9 43:12 46:24 62:3,5,9,11,16 63:2,3,7,14 64:11,15 142:15,19 143:20 144:20 144:24 145:7 145:13 147:5 148:19,25 149:10,13,15 149:19 154:13 156:2,10,19 157:5 158:25 159:5,7,13 160:15,17 186:19 193:6 198:10,13,17
**committees** 43:10 130:18 131:24
**common** 15:18 15:22 16:2,22 51:9 122:24 130:9
**communicate** 204:19
**communicated** 170:25 204:24
**communication** 34:3,13 170:22 205:7,25
**communications** 14:25 35:2 127:19 132:20 205:5,9 206:6 206:10,22,24 207:4,16
**compensation** 66:12
**complete** 9:14
**compliance** 33:17
**complicated** 123:23
**complied** 31:12 31:16,19,22 32:10,14,18,23 33:5,8,21 34:21 35:7,21 75:13 186:21 211:24
**complies** 39:9
**comply** 25:9,21 26:3 33:13 42:13 96:23 97:8
**components** 60:16 203:13
**composed** 116:12
**composition** 17:20 18:8 27:9 32:11
**concept** 43:8,19 131:18 134:9
**concerned** 15:14 117:15 176:21
**concerning** 59:11 59:18 132:21 206:7
**concerns** 109:6 183:10 186:11
**concluding**

218:21
**conclusion** 64:25 165:7
**condition** 86:22
**conditions** 86:12
**confer** 67:15 205:19
**conferences** 83:12
**confidential** 132:25 133:8 133:14,19
**confidentiality** 131:25
**confirm** 76:5 152:2
**confirmation** 17:15 18:24 20:8,9 21:21 22:2,7,12 25:12 25:16 26:3 27:2 27:18 29:17 31:8,17 33:22 34:22 35:8 154:18 158:19
**confirmed** 81:24
**confirming** 82:11
**conflating** 129:9
**conflict** 25:15 26:23 72:14 73:4 89:19,23 115:10,13 122:4,7
**conflicted** 69:19 70:24 71:16 72:11,15,20,22 73:5,14,18 76:12 83:5 121:23 122:8 122:14 186:12
**conflicts** 19:19 32:16
**confuse** 129:10 186:24
**confused** 11:25 12:3 34:10 41:5 61:25 165:16
**conjunction** 159:20
**connection** 43:10 44:8 59:8 108:18,23 122:4 151:15 158:19 166:10 166:22 168:18 174:21 179:6
**consent** 14:3 70:4 70:8,18 79:19 80:7 85:11,25 86:5,9,13,20 93:11 96:9 100:24 107:12 120:24 137:19 153:5 161:12 184:24
**consents** 65:4 70:6
**conservative** 211:14
**consider** 66:24 67:3 97:5 101:18 127:9 159:6,19 160:18 199:3 201:4
**considered** 160:22 185:14
**considering** 159:14
**consistent** 114:2 114:8 144:23 176:24 185:7 199:4,9 200:6 200:15
**constituencies** 138:14,23 145:18
**constituency** 140:2 141:22 145:24 146:2
**constitute** 68:24 72:21 96:17
**constituted** 18:16 70:14 71:24
**constitutes** 72:11 76:13
**construct** 43:7 51:9
**construed** 101:13
**consult** 34:15 107:10 116:7 116:17 197:7 216:12
**consultation** 44:4 57:7 112:15 113:11,13 114:11,14 115:16 117:5 117:11 118:22 127:12 129:25
**consulted** 103:7 111:16 132:14 198:3 208:8
**consulting** 37:14 114:17 115:24 115:24 117:21 118:5,8,10,12 127:14
**consuming** 126:13
**contact** 154:13 154:21 157:19 158:24 159:5,7 206:3
**contacted** 8:10 211:14
**contains** 88:18
**content** 14:24 34:2 35:2
**contents** 127:18
**context** 64:12 158:6 175:3 188:11
**contexts** 131:24
**contingency** 66:24 67:4
**continue** 94:10 112:11 171:24 180:18 215:10
**continued** 171:17
**continues** 93:6 93:20 128:2 139:12,15 170:15
**continuing** 135:12 183:21
**contractual** 186:6
**contradiction** 191:6
**contradictory** 161:6
**contrary** 130:23 191:15,18
**contravention** 28:12,22 29:3 96:16
**control** 180:18 224:12
**controls** 22:8,12 180:19
**Cont'd** 3:2 163:9
**convenient** 154:8
**conversation** 41:25 82:10 83:15 124:4 166:7 172:5 215:20 216:3,7
**conversations** 35:25 37:11 41:25 44:18,25 188:2 207:23
**conversion** 217:8 217:13,18 218:2
**convey** 205:20
**convince** 214:18
**copied** 58:13,23 59:3 166:12,13
**copies** 114:18
**copy** 21:8,10 151:11 220:13
**copying** 58:16 61:21
**core** 20:21,24 21:2
**Cornell** 2:9 84:12 84:19 88:11 221:8
**corollary** 26:13 26:16
**corporate** 131:16
**correct** 6:2,3 7:22 9:12 10:9 12:15 13:17 15:19,20 17:3 20:3 21:13 25:22 26:3,7,8 26:11 31:6,9 37:19,22 39:21 44:23 49:19 54:12 56:24 64:16 70:16 73:20 75:22 80:4 81:9,10,13 86:21 87:24 95:24 96:5,19 96:20,24 98:3 98:21 99:7 102:21 111:4 113:3,6 117:21 123:6 125:13 128:19 129:16 129:20,21,23 129:24 132:17 132:18 134:2 135:25 136:5,9 136:15 138:6 140:7 141:7 149:23,24 150:2,17 152:10,11 172:20,25 184:20 198:15 199:19 209:6,9

**corrections** 225:5
**correctly** 8:7 21:22 25:18 28:14 39:3 73:15 87:13 96:13 101:16 110:6 115:23 119:19 136:25 196:20
**correlation** 146:3 146:16
**correspond** 145:18
**corresponds** 145:22
**cost** 55:21 178:9 201:6
**costs** 55:24
**could** 5:6 8:11,22 8:23 21:15 27:21 30:22 36:21 43:20 50:19 52:20,23 54:21 56:5 59:17 74:8,21 74:24 75:3,16 101:3 111:16 124:22 127:11 132:6 142:17 146:14 156:15 169:4 183:6 193:12 200:3 204:13 206:17 214:16
**couldn't** 11:18 22:19 44:16 51:5 57:9 80:19 86:7 197:3
**counsel** 4:20 8:15 9:16 10:15 12:7 12:10 13:18 34:3,7 35:2 36:2,8,9,10,16 41:19 44:18 45:2 46:3 62:10 67:9 76:25 89:3 127:15 131:21 154:22,25 155:13 156:5 166:17 167:21 168:9,15 187:17 206:15 210:4 213:13
**count** 70:22 72:20 89:13,16 89:17
**counted** 73:9
**couple** 24:25 75:25 89:11 95:19 152:2
**course** 89:15
**court** 1:2,15 4:8 4:17,22 8:6 18:22 20:5 21:11 27:5,8 75:20 79:10 84:8 87:24 186:17 199:18 200:22 209:4 209:14,21 210:5
**court's** 209:24
**create** 52:20,23 53:23,24 101:13
**created** 56:23 95:13
**creating** 95:4 131:22
**creation** 143:13 143:16
**credit** 20:15,24 33:9 54:11 189:14,22 195:2,9,14,18 195:25 202:10 203:4 216:22 221:22
**creditor** 51:10,14 51:15,17 63:21 116:23 147:25 148:23 163:20 168:21
**creditors** 8:9 43:10,11 46:24 48:22,24 49:3 49:23 50:2 51:3 51:8,12 52:22 53:19 54:2,16 55:19 60:14 61:6 62:9 116:20 118:14 131:24 136:14 137:12 142:6,9 142:15,19 143:20 145:7 145:13 147:5 148:19,24 149:3,9,13,15 149:19 154:13 155:25 158:24 159:5,7,13 160:13 177:4 177:12 186:18 193:6 197:11
**criteria** 201:4
**cross** 124:12
**cup** 161:20
**curious** 67:20 205:18
**currently** 8:24 13:5 15:22 39:20 151:16
**custodian** 137:17
**cut** 149:11
**cute** 98:5

**D**

**D** 96:7,15 160:9 220:3
**dad** 124:3
**date** 1:14 8:2 10:22 18:23 21:9 29:12 58:11 61:12 63:3 76:21,23 79:9 84:15 95:9 102:13 106:12 106:15 122:20 128:20 144:25 154:20 155:19 171:4 184:6 186:3 189:21 195:12 198:6 201:2 207:18 225:8
**dated** 13:25 45:7 61:14 78:24 79:2,12 87:11 122:18 195:9 195:14 198:7 201:11 221:22 224:7
**dates** 173:25 195:23
**David** 58:16
**DAVIS** 2:17
**day** 56:2 79:3 82:13 85:10 87:5 210:4 213:24 215:15 225:11
**days** 128:25 208:24 209:9 209:10
**deal** 50:11,12
**dealings** 172:23
**dealt** 95:6
**Dear** 79:17 122:25
**death** 152:24 153:3
**Debbie** 213:13
**Debra** 36:13,14 36:22 46:2 58:23 168:10
**debt** 53:16,17 54:10,15 194:22 201:13
**debtor** 51:25 141:14 171:20
**debtors** 1:8 61:7 138:9 171:22 209:2 210:25
**decent** 215:8
**Dechert** 3:4 8:15
**decide** 212:3
**decided** 10:25 216:8
**deciding** 197:9
**decision** 8:5,8 52:19 130:22 200:5,14
**decisionmaking** 132:4
**decisions** 15:9 67:8 129:19,23 132:6 211:17 211:21
**deemed** 72:15 73:5
**Defendant** 2:9
**defendants** 2:15 2:19 133:7
**deferred** 148:23
**deferring** 130:21
**deficiency** 148:23
**defined** 45:6 135:22,24 160:10,19 188:13 196:8
**defines** 97:25 189:22 196:9
**definitely** 71:10
**definition** 98:4,9 98:11 192:13
**definitive** 14:6
**definitively** 47:6 50:18
**degree** 59:9
**denied** 102:19 103:11,17 104:3 105:3
**Dennis** 155:4
**denominator**

51:18
**dental** 124:3
**DENTONS** 2:19
**departed** 187:4
**departure** 186:16
**depending** 30:16 174:16
**depends** 6:11 7:13 55:22 66:18 204:8
**DEPONENT** 225:2
**deposed** 7:12
**deposition** 1:12 4:5,13 12:6 13:20 14:16,19 15:12 77:11 223:3 224:4
**depositions** 7:16
**describe** 14:21 65:7 206:5
**described** 16:19 21:18 110:16 110:21 190:18 202:14
**describes** 76:10 201:25
**describing** 70:7
**descriptions** 59:15
**designate** 18:8 137:10 149:14 163:24
**designated** 45:24 135:12 160:12
**designates** 46:2
**designation** 159:18
**designee** 135:11 145:8 147:4 148:25 153:8 153:17 154:14 159:14,22,24 160:2,3,7,9,19 164:2
**designees** 146:24 155:9
**despite** 129:17 182:7
**detailed** 55:12
**determination** 52:9 100:23
**determine** 18:4 19:13 65:10 75:12 168:15
**determined** 170:16 214:12
**determining** 52:7 73:10
**dice** 91:16
**didn't** 11:8 12:13 42:11 63:4 70:22,25 74:14 75:19,20 79:2 87:13 90:5,11 98:13 103:20 113:10,12,15 113:15 114:13 114:19 115:11 120:14 124:8 124:12,23 131:7 140:22 157:18,19,20 160:18 165:25 166:4 169:5 171:25 183:4 183:10 186:23 186:23,23 199:15 210:9 211:11 213:20
**difference** 151:6
**differences** 214:6
**different** 22:15 30:8 35:13 39:11 42:20 50:16 51:12,13 51:24 61:6 66:25 69:20 88:20 94:24,24 111:8,13 117:18 138:21 141:15 152:8 164:17,19 165:11,12 169:13 187:2 211:20,21
**differently** 109:22 138:14 152:13
**difficult** 123:24
**dinners** 123:25
**Dipesh** 41:19 62:10 71:23 87:18 104:12 121:10,19,20 164:14 165:10 166:3,6 170:25 171:10,12,25 172:5,16 173:25 182:22
**direct** 45:16 58:12 71:17 85:4 88:19 112:5 118:25 119:11 130:11 224:12
**directed** 81:2
**direction** 81:25 117:10
**directly** 42:3 81:22 118:23 121:20 146:19
**DIRECTORS** 2:15
**disability** 153:3
**disagree** 55:23
**disagreement** 165:9 174:3
**disbanded** 154:16,19
**disburse** 61:4
**disclose** 14:24 34:2 44:17 75:21 127:18
**disclosed** 66:5 133:10,13
**disclosing** 34:25
**disclosure** 29:18 30:5,9 133:6
**disclosures** 187:3 187:8,13,24
**discovery** 84:13 84:20 133:2,8 174:19 175:5 221:9
**discretion** 101:12 101:19 188:22 192:23 199:16
**discretionary** 203:15
**discuss** 38:22 39:18 41:10,22 42:12 90:11 118:17 125:25 132:6 154:10 213:9
**discussed** 33:12 39:4 40:24 41:7 41:16 64:24 66:14 83:4 89:12 90:3 110:14 163:14 173:19 179:3,4 182:21 197:19 208:14
**discussing** 35:12 38:20 39:13 43:19 47:10 76:6 131:19,21 179:5 182:14 184:2 199:6
**discussion** 11:9 64:21 105:11 130:12 152:3 163:23 167:8 182:24 183:22 185:11 213:3,6 213:12,15
**discussions** 15:5 36:3,6 111:11 111:22,24 114:21 120:19 132:11 164:12 164:14,18 165:3,25 166:10,23 167:4,12 168:19 174:17 177:22 187:17 187:20
**disinterested** 67:25
**disputed** 211:2 211:16
**disputing** 170:23
**dissolve** 144:25
**dissolved** 63:3 154:18 156:21 157:10 158:15
**dissolves** 144:21
**distinction** 129:6 129:7,8
**distribute** 142:3
**distributed** 51:17 139:17 209:17
**distribution** 61:2 61:2 95:12 135:12 136:22 137:6 138:4 200:9 209:2
**District** 1:3 4:9
**diverge** 50:3,5,19 51:15 52:5
**divergence** 50:25 52:20,23 53:18 53:24 55:15
**divergent** 54:16 55:20 56:5
**Division** 1:4 4:10
**DLA** 155:21 156:4
**doable** 64:23 131:20,20
**docket** 155:15,20
**document** 11:23

15:24 17:12 19:12 20:11,14 20:17 21:13 29:22 31:3,4,25 32:7 47:2 57:10 58:6,9 61:10,13 74:6 77:9 78:23 79:7 84:10,16 84:18,25 90:21 97:3 99:16 102:11,14 106:16,22,25 108:16,18 113:18 115:2 117:24 142:22 144:6 147:9,10 154:10 155:17 155:23 172:4 184:4,9,15,17 189:5 194:25 197:8 201:10 201:10,16 203:8 204:17 206:8 220:15 220:17,21 221:6,11,18,20
**documentation** 60:2,3
**documented** 80:14 86:7
**documents** 13:22 17:8,15 19:25 20:21,25 21:2 21:25 26:7,11 29:15 33:12,18 35:22 44:20 59:22 65:3 75:25 76:17,24 78:2,14,17 80:12,23 81:4 92:11 98:6 109:3,7,10,17 110:10 144:9 159:18 167:7 167:11,18,21 168:6,13 173:6 223:5
**does** 9:17 17:20 18:4,8 19:13,15 19:16,18,19,22 20:19,24 42:15 59:7,10 61:2 65:2,14 91:23 100:25 105:15 119:24 134:22 138:22 144:12 144:17,20,21 155:13 156:13 157:5 181:24 191:12,16 192:5,6 197:10 224:11
**doesn't** 46:10 50:11,12 54:24 91:22 97:22 100:23 101:5 156:3 203:16
**DOHERTY** 2:21
**doing** 5:21 44:7 91:6 126:4 174:21 213:24
**dollars** 94:12,17 94:18,20 211:10
**done** 44:2 59:24 82:4 124:15 125:21 126:6,6 131:23 154:19 171:6 200:16
**Donna** 46:2
**down** 29:7 53:12 101:9 139:11 139:13 143:14 153:24 159:2
**draft** 46:19
**drafted** 15:25 46:16,17
**drafting** 78:13
**drafts** 47:4
**drawing** 204:12
**driven** 126:15
**dropping** 123:9
**drove** 104:24
**duly** 4:25 224:4
**duration** 209:25
**during** 47:18 174:6,10 175:7 198:13
**duties** 43:23 47:22 138:22 197:11
**duty** 113:16 114:22 148:21 197:14
**d/b/a** 147:16

**E**

**E** 2:2,2 3:2,2 4:24 163:2,2,4 220:3 220:10 221:3 222:3 226:2
**each** 88:5 89:7 116:20 137:3
**ear** 117:12
**earlier** 35:24 56:19 68:7 75:19 83:4 86:11 89:12,24 99:11 102:2 129:2 142:24 152:3 171:9 173:15 179:3,4 182:25 200:8 208:10,14
**early** 81:21
**easier** 28:4
**easiest** 82:6
**economic** 130:10 179:16
**EDGAR** 2:6
**education** 6:25 7:3
**educational** 6:17 6:23
**effect** 43:18 78:6 142:8 215:3
**effective** 9:9,10 18:25 19:4 63:3 78:25 87:5,12 144:25 154:20 158:16 189:21
**effectively** 130:13
**efficient** 208:9
**effort** 107:18 115:3 123:12
**efforts** 107:10 108:2
**eight** 101:9
**eighth** 48:12
**either** 8:22,23 26:6,10 41:18 59:24 63:19 78:13,17 94:23 97:20 121:9,18 121:19 122:3 132:14 166:13 166:19 181:17 181:25 185:11 194:9 199:14 204:15 211:20
**electronic** 70:9
**Elsberg** 2:4 9:18 10:5,20 11:2 12:10,11,12 36:21 37:18 38:24 58:16
**else** 7:2 12:8 15:21 36:5 38:22 41:2,8 44:7 51:18 54:24 59:7 92:2 103:21 121:13 134:15 144:6 181:3 183:17 185:13 201:7 205:23
**elsewhere** 196:7
**else's** 126:7
**email** 58:7,13 59:25 61:9,14 61:18,24 62:2 63:6 64:6,10 65:9,13 70:8 71:7,11 79:12 79:16 81:3,8 82:8 83:8,18 85:17 87:2 90:5 90:16,18,22 91:23 101:22 102:15,21 103:20,20,24 104:10 114:19 121:2 122:17 122:19,22,23 128:2 171:9 172:16 173:7 173:11,12,14 173:16,17 177:20 178:5,7 180:3 185:12 206:15,18 207:12 221:17
**emails** 13:25 58:15 59:18,22 61:19 68:22 70:13 91:4 114:18 120:22 121:21 152:2 166:9,15 168:13 172:7 173:13 207:12
**emergency** 108:12,18 206:5
**employee** 12:22 12:25 13:3,6,9 40:19 64:8 80:2 147:16 163:22
**employees** 88:25
**enable** 132:11
**end** 53:11 56:2 57:15 65:18 100:6 124:4 157:16

**engage** 66:15
**engagement** 6:12 37:5 38:15 67:9
**engagements** 6:10 66:23
**enough** 30:18
**ensure** 43:21 44:7 115:7
**enter** 16:5 52:19
**entire** 134:17 156:11,11 204:12 205:6
**entities** 77:22 165:6 169:13
**entitled** 63:19 68:12 69:4,7,10 73:6 88:25 89:9 122:10 174:3 177:5,8,12
**entity** 61:3 62:8 75:3,4 77:16 93:14 96:12 116:24,24 165:22 169:4 169:11,13 183:2
**entries** 167:3
**entry** 41:2 155:20
**enumerated** 209:11,19 210:5
**Epic** 211:14
**equity** 138:9
**Errata** 225:6
**especially** 82:2 95:7 124:7
**ESQUIRE** 2:6,6 2:7,11,11,12,17 2:21,21 3:6,7,7
**essential** 107:11
**Essentially** 116:4
**established** 45:11 135:4 146:21
**et** 1:7 4:7 54:22 152:24
**even** 44:16 73:18 83:3 90:2 96:3 103:20 157:20 160:22
**event** 65:23,24 66:2 100:9 110:16 152:23 152:25 161:8 216:6
**events** 30:2 213:2 215:25
**eventually** 58:21 117:17 184:7
**ever** 19:4,9 22:14 26:25 27:5,8,22 33:16,20 34:15 34:20 35:5 43:3 50:2,24 54:16 64:9 89:18 92:2 97:5 111:20 115:7 133:10 137:19,24 149:18 160:6 174:13 177:7 181:7,19 199:3 217:17,25 218:8
**every** 148:20 180:22 207:10 210:23
**everybody** 7:2 56:10 123:22 149:6 211:16 219:2
**everybody's** 50:13
**everyone** 123:9
**everything** 7:4 116:16 123:23 124:7,13 128:4 182:13 198:2
**evidence** 99:23 100:16 151:23
**evidenced** 70:6
**evolved** 124:5
**exact** 74:11 186:3 215:2
**exactly** 17:25 102:24 143:7 174:9 185:22
**EXAMINATI...** 5:4 163:9
**examined** 5:2
**example** 75:22 94:16 130:17 151:20
**examples** 127:7
**exceeded** 194:12 194:15,17
**Excel** 200:24 201:19 222:6
**excellent** 188:7
**except** 25:13 26:14,22 68:15 112:18 225:5
**excess** 190:9,17 192:19
**exchanged** 166:9 166:22
**excluding** 176:5
**excuse** 53:23 148:12
**executed** 85:10 86:23 97:12 100:11 122:24
**exercising** 101:18 107:11
**exhibit** 21:8 29:11 31:5 45:9 45:14,20,20 58:9 61:10 76:19,20,22 77:10,11 79:7 79:11 84:9,10 85:18 87:20 90:23 98:23 102:11,14 104:11,13 106:10,13,17 122:19 147:14 155:17 177:19 178:4 184:4,10 195:9,13 200:22,24 216:21 220:12 220:13,14,15 220:17,19,20 220:21 221:5,6 221:11,13,15 221:17,18,20 221:22 222:5,6
**exhibits** 105:13 106:8
**exist** 63:4 154:20 155:13 156:3
**existed** 103:21 156:2
**existence** 73:10
**expect** 30:8 47:11 144:19
**expectations** 47:7
**expecting** 126:10 126:12
**Expedited** 84:13 84:20 221:9
**experience** 6:22 10:8 57:24 65:8 66:13 95:14 181:12
**experiences** 6:17 50:22,23 67:18 110:17 218:7
**expert** 110:9
**expires** 225:12
**explain** 179:10 211:22
**explains** 178:7 190:25 191:20
**explored** 67:20
**express** 183:10
**expressed** 168:24
**expressing** 169:19
**extend** 209:25
**extended** 174:15 211:12
**extent** 25:14 41:7 83:4 118:13
**extra** 192:17
**ex-officio** 16:19 16:24 40:9 42:7 42:24 43:3,6,8 43:20,22 44:22 64:19 109:12 109:18 110:18 110:23 113:8 114:3,8 115:8 117:20 122:10 123:2,5,11 126:19,23 128:18 129:4 130:8,16 131:22 132:20 133:3,9,25 134:10 179:5
**ex-officio/obse...** 119:17

**F**

**F** 163:2
**face** 73:25
**facility** 188:14,20 192:25
**fact** 65:11 75:18 116:21 130:22 144:23 157:20 186:6
**factors** 217:13,18 218:2
**Fagin** 1:15 4:18 224:6
**failing** 97:7
**fails** 142:7
**fair** 7:11,15 10:7 11:6 12:13 16:10,14 30:18 44:12,19 47:3 62:22 64:15 69:16 103:6 108:22 109:2,9

110:18 116:2 118:4 126:17 136:11,12 137:12 149:17 149:20 157:21 157:23 160:24 165:24 183:25 186:15
**fairly** 16:4 155:4
**faith** 107:10,18 108:2 115:3
**familiar** 21:12 23:3 30:10 31:4 49:13 84:25 85:2 103:22 106:16,24 131:18 155:22 217:10
**familiarize** 29:21 77:3 106:21
**far** 33:12 67:6 117:14
**father** 124:8
**favor** 69:14,15 71:5 82:24 84:4
**favorite** 188:6
**February** 45:8 158:16 173:22 184:11 195:10 195:14 207:17 221:23
**fee** 156:16,23 157:15,17 158:18
**feels** 53:3
**fellow** 172:10
**felt** 71:18 214:15
**Feng** 58:16
**few** 77:5,8 166:11 198:22
**fib** 23:18
**fiduciaries** 56:10 148:7
**fiduciary** 17:2 179:21 181:4,5 197:10,13
**fifth** 107:8
**figure** 29:14 125:25 160:7 197:8
**file** 84:17 209:15
**filed** 65:20 87:24 209:21 210:4
**filing** 30:2 65:18 209:4,13 213:4
**fill** 153:4 161:11 175:16 176:18
**filled** 105:2 184:24 223:13
**final** 146:5
**finally** 104:8 116:15
**financial** 88:22
**financing** 188:13 188:24 192:9 192:19,20,24 195:20
**find** 66:19 92:19 150:20 151:18 151:19 168:11 169:12 179:2 195:8
**finding** 178:10
**fine** 81:25 115:25 124:13 188:3 215:12
**finish** 157:2 192:14
**firm** 5:13 9:17,21 10:5 11:7 12:10 12:12 16:3 36:13 37:3,9,23 38:15,18 58:23 59:7 60:18 66:12 184:16
**firms** 66:15,25
**first** 8:11 10:7 16:18 19:4 21:25 22:13 51:4 57:3 77:9 77:17,19 78:16 85:24 86:3,7 92:24 93:19 100:6 102:23 108:8,15 109:6 110:22 111:6 117:24 126:25 127:3 133:12 133:13 134:25 145:4 163:19 177:3 178:25 184:2 185:21 185:24 201:20 211:19 212:3,6 212:8 213:3,20 217:20
**five** 7:19 207:14 218:13
**Flexner** 1:13 2:9 4:15
**floor** 2:5 5:10
**flow** 65:19
**focus** 77:6
**focused** 23:7
**focusing** 19:12 23:16
**folks** 185:19
**folksy** 123:20
**follow** 48:11 95:18 117:10 160:23 175:13 211:17
**followed** 60:3 177:16
**following** 18:3 23:25 30:2 46:5 69:22 82:13 88:20 101:8 188:19 208:3
**follows** 5:3 152:24 163:5
**footnote** 88:18,20 88:21,21 156:7 158:5
**foregoing** 96:17 224:10 225:3
**forever** 145:16
**forget** 74:22
**form** 102:3 168:19 201:20 225:5
**formal** 59:15,21 70:12 99:13 173:20 185:10 197:18 199:14
**formally** 58:4 65:6 71:5 211:4
**formed** 50:9
**former** 2:15 9:4 154:21,25 186:18
**formulaic** 59:21 80:15
**forth** 112:18 120:11 134:13 189:15,24 192:25 206:16 206:17,17 207:12 215:2
**Forty-four** 143:2
**Forty-two** 29:24
**forward** 18:19 102:7
**forwarded** 99:16
**found** 151:22 214:9
**FOUNDER** 2:19
**four** 112:13 177:20,24
**fourth** 22:4 121:12 201:24
**fraction** 51:19
**freaking** 123:22 124:6
**frequent** 205:8
**frequently** 43:9 204:19,24 206:15
**from** 8:15 12:14 12:16 25:11 26:10,22,25 37:18,21 38:4 38:20 39:5 43:9 51:24 54:23 58:15,23 61:18 61:20 64:5 65:25 69:4,21 79:16 81:9,25 88:6 92:4 93:11 93:18 94:24 96:9 102:15 104:11 112:13 114:9,11 116:24 118:5,8 118:9,11 121:19 133:2 140:13,24 141:5 142:16 143:14 153:24 154:4 158:7,24 163:18 165:11 171:9,10 173:6 173:22,25 175:10 176:14 177:21,23 178:5,11 181:7 181:16 183:12 187:5 193:16 193:20 195:20 199:17 200:10 210:25 213:2 214:22
**front** 31:5 98:4 122:21 142:22 170:15 184:9
**frustrated** 126:4
**fulfill** 183:6
**fulfilling** 43:23 44:8
**full** 139:14,25 140:16 142:5 182:15
**fully** 122:23 156:21 157:10
**function** 53:9

**fund** 54:11 80:3 94:4 142:2 199:15
**funded** 193:8 194:10 199:7 203:22 217:14
**funders** 54:9,15
**funding** 27:12 54:23,25 77:13 77:18,22 79:21 79:22 140:16 140:18 142:17 189:12 190:7,9 190:12,17,21 191:10,22 192:4 193:15 193:24 194:12 196:21 199:12 199:19 201:6 201:13 202:2 204:3 205:23 214:7 215:7
**funds** 141:18
**further** 99:25 180:15 218:12
**furtherance** 48:16

**G**

**G** 188:9,10
**gained** 40:3
**garbled** 143:4
**GARY** 3:6
**gave** 35:24 64:6 132:15 159:2 183:23
**general** 7:2 37:9 39:13 47:8 48:23 49:2,6,11 49:22 51:10 61:5 67:18 127:12 135:13 136:7,13,23 138:3 142:5 147:21 148:16 149:2 153:19 171:18 175:11 175:24
**generally** 19:20 23:22 24:2 31:4 81:24 85:2
**gentlemen** 185:20
**genuinely** 113:21
**get** 40:4 44:16 50:14 53:8,11 54:3 68:7 82:6 95:8,10,12 101:5 116:22 128:4 140:22 140:24 141:10 146:17,17,19 157:17 158:2 174:23 177:17 193:12 199:10 199:11 202:19 206:14 207:11 210:16 211:14
**gets** 53:6 60:25 65:20 80:16 94:15 142:14
**getting** 29:13 37:18 67:6 123:10,20 214:9
**gift** 179:25
**give** 9:13 14:6 17:4 46:14 58:7 71:8 107:8 113:22 125:5 139:2 179:18 188:11 215:15 218:13
**given** 6:15 15:7 46:14,19 87:6 121:24 133:7 152:15 170:19 186:17 218:21 224:5 225:4
**giving** 37:15 127:22 208:23
**glasses** 124:5
**global** 30:20
**go** 6:10,13 15:2 23:19 31:2 34:4 34:11 45:3,25 58:21 59:5 69:22 72:8 75:24 78:12 86:25 87:7,13 92:10 96:6 98:22 105:21 109:16 110:13 119:9 125:9 134:17 136:16 145:2 146:4 147:7 149:4 163:11 180:2 182:11 188:5,8 188:10 189:8 189:10 193:4 196:3,19 203:6 207:12 208:16 211:13 212:23 212:24 214:16 216:23 217:20
**goal** 50:20 56:3
**God** 95:11 124:4
**goes** 92:15 95:3,4 183:22 210:17
**going** 11:12 15:5 15:8 17:16 18:18 24:25 29:20 30:18,21 50:15 53:7,11 56:16 64:23 71:16 75:18 76:18 81:22 99:21 100:7 101:22 104:10 105:12,21 106:18 107:7 110:13 113:4 124:20 125:20 130:13,19 131:3 132:7 143:13 145:14 149:7 154:7 158:7,21 161:23 163:11 163:13 170:14 174:16 176:18 179:19,20,20 179:23 188:8 188:10 193:4 196:3 200:9,12 202:14,18 209:23,23 210:20 211:7 212:23 214:13 215:16,21,23
**gone** 62:12,16,17 62:19
**good** 5:6 107:10 107:18 108:2 115:3 161:19 181:13
**got** 41:5 75:17 87:17 96:7 102:6 114:18 126:3 128:19 147:11 150:11 150:14 154:4 213:21 214:11 214:22,23 215:11,11
**gotten** 34:10 172:2
**govern** 17:8,20 19:25 20:21 109:21,24
**governed** 125:22
**governing** 31:23 32:11,15,19,24
**governs** 17:13,19 33:3
**grantor** 65:20,21
**GREENBERG** 2:14
**group** 146:9,10 153:21 194:3
**groups** 137:3
**grow** 207:13,14
**GUC** 210:23
**GUCs** 61:5 95:8
**guess** 12:21
**guy** 131:16
**guys** 105:18

**H**

**H** 4:24 163:4 220:10 221:3 222:3
**had** 6:25 8:16 16:14 42:23 43:3 44:3,25 46:15 51:6,11 51:11 54:6 63:2 67:20 74:5,15 74:24 82:21,23 83:8,11,15,20 85:21,22,23 88:22 89:19 99:15 100:24 101:25 102:6 103:2 104:25 106:20 109:5 113:16 114:21 114:21 126:5 127:8 130:10 131:23 142:17 151:8 158:12 163:20 165:11 168:23 169:12 170:24 172:2 172:23 174:17 175:4,8 176:8 181:12 183:5,6 183:22 185:2 186:5 187:17 195:13 202:16 206:25 209:19 210:6,25 211:3 213:3,15 214:6 214:12 215:20

216:3,7 218:7
**hadn't** 210:10
**hair** 116:14
**half** 72:12
**hand** 21:10 58:5 61:8 105:12 106:7
**handed** 84:16 201:9
**handing** 79:10 84:8
**handled** 152:9,13
**happen** 53:5 124:20 125:24 126:11 174:11 200:9
**happened** 41:20 97:19 100:17 100:19 120:7 144:24 174:9 175:3,6 210:10
**happening** 105:11
**happens** 19:16
**happy** 49:17 123:17 128:3
**hard** 195:7
**has** 15:17 20:18 33:16 65:5 67:7 72:13 73:3 82:15 85:19 89:22 100:7 115:3 116:23 140:16 141:25 144:8 148:20 177:24 179:23 180:17 192:17 193:8,16,19 194:12,14,15 194:17,20 196:23 197:13
**hates** 123:22
**hats** 56:11
**haven't** 23:7 30:25 110:5
**having** 4:25 6:22 55:12 111:12 113:7 114:11 133:14 141:12 166:7 189:23 213:12 215:4 216:4
**he** 9:17 12:22,23 13:2,4,6,7,8,9 13:12 15:7 16:11,22,23,25 42:11 44:3,14 62:2,7,12,14,23 62:25 63:5,6,14 63:18,19,20,20 63:25 64:6,7,15 67:20 81:11,20 91:5,10,15,17 91:18,20 111:17 123:10 123:14,19 124:21 126:14 127:20 128:23 128:25 130:7,9 130:13,20 133:16,24 134:3 148:18 149:25 150:5,8 155:10 159:2 159:25 160:15 166:2,4 172:15 172:18 180:9 180:10 181:11 181:20 182:23 183:5,10,13,16 183:19,23 205:3 206:2 214:22,24 215:3,4,8
**head** 64:5 109:15 124:9 127:13 150:9 175:4 217:15
**heard** 77:20 116:23 131:16
**hearing** 55:6
**heck** 115:4
**held** 1:13 4:21 135:8,10 136:3 136:6 169:15 169:16,17,17 173:23 174:4 183:2,2
**help** 55:11 78:23
**helped** 6:23
**helpful** 29:23
**her** 36:24 37:6,14 59:3
**Herculean** 123:12
**here** 7:20 9:16 11:18 19:2,11 21:4 22:19 27:15 28:2 29:18 31:11 39:3 42:5 43:5 44:6 50:17 51:5 52:4,12 57:10 60:18 65:17 67:7 91:21 97:14 101:19 103:17 104:4 105:3 110:9 115:15,19 117:2 122:8 132:22 134:19 143:24 144:7 146:17 150:10 161:5 167:14 174:12 177:10 180:21 181:2 182:13 189:2 193:14 197:2 203:7 208:10 217:11,24
**hereby** 224:3 225:3
**Hereof** 100:8
**hereto** 45:9
**hey** 105:5 116:22
**highlighted** 139:10
**him** 8:18 13:14 43:18 45:17 64:22 67:13,14 81:25 91:8 111:22 121:9 121:21 124:23 127:22 133:19 148:4,6 155:6 160:19,23 181:21,22 183:8,18 184:8 215:7,9
**hired** 55:24
**his** 8:19 13:10,16 41:19 42:6 58:16 61:24 62:2 67:18 89:3 91:3,4 119:15 124:22 128:17 133:3 135:11 147:15 154:14 157:3 159:2,18 171:7 172:9 177:22 178:8 182:19 183:13
**hold** 49:4 51:13 59:5 94:11 97:22 98:13 104:14 137:10 153:11 156:24 156:24 171:17 171:24
**holder** 101:14 137:14 147:20 175:11,23
**holders** 49:5,10 61:4 65:22 135:5,8,13,18 135:22 136:3,7 136:19,23 138:2 154:5,6 211:5
**holding** 95:11 181:24 182:5
**HOLDINGS** 1:7
**holds** 141:4,9
**holiday** 123:25
**honestly** 103:19 104:22
**hour** 105:14 161:17 210:21
**hourly** 66:23
**Houston** 1:4 4:9
**how** 5:21 6:4,9 7:18 18:2,4,18 19:13 35:19 38:11 42:7,16 43:18,20 50:15 51:6 52:8,20 53:16 54:13 64:23 65:7,10 65:11 67:18 69:9 71:6 74:24 77:16 95:2,5 105:20 111:23 113:7 114:7,16 116:12 120:3 121:4 123:24 124:5,6 127:4 150:21 167:20 176:18 193:8 193:15,19 194:9 197:21 197:24 204:7 204:19 206:24 214:13
**however** 73:8 153:7
**Hudson** 1:13 2:10 4:14
**hyperbole** 127:25
**hypothecated** 93:3
**hypothetical** 122:13

**I**

**idea** 11:6 47:20

169:24
**identical** 78:9 146:7
**identification** 21:9 23:17 29:12 58:11 61:12 76:21,23 79:9 84:15 102:13 106:12 106:15 122:20 155:19 184:6 195:12 200:25
**identified** 45:9 45:14 147:14
**identify** 118:21
**identity** 101:14
**iii** 28:21
**implemented** 42:8
**important** 59:6 111:14
**impression** 167:16
**INC** 1:7
**include** 42:18,18 49:2,5
**included** 121:21 144:17
**includes** 31:8
**including** 107:12 137:21 139:13
**inconsistency** 74:5
**inconsistent** 25:10 26:6 74:19 75:2 115:2,6
**Incorporated** 4:7
**Incorporation** 21:20
**incorrect** 88:7 201:18
**incorrectly** 156:25
**increase** 196:24 197:9 199:18
**increased** 197:16 199:22
**increasing** 197:11 201:4
**incremental** 188:24 192:24 195:20 196:6,9 196:12 197:15 199:22 200:3 203:19
**incur** 211:9
**indemnification** 11:17
**indemnified** 11:14
**indenture** 60:22 60:22
**independent** 7:7
**INDEX** 223:3
**indicates** 22:11
**individual** 45:8 168:20 183:3
**individually** 204:23
**individuals** 55:23 165:5,13,19 169:3,14 170:11
**inferred** 101:3
**inform** 155:12
**information** 193:11 210:16
**informed** 163:24 175:6
**informing** 155:8
**initial** 46:18 116:13 144:3,8 144:12,14 145:15 209:17 209:17
**initially** 40:8 112:3 163:21 205:2
**initiate** 11:8
**initio** 96:18,24 97:7
**inquire** 176:7,15
**inserted** 196:13
**Instagram** 9:19 9:25
**InstaLit** 77:13,18 77:21 79:20,21 110:24
**Instant** 1:7 4:6 7:21 9:24 10:3 57:23 180:14 195:10,15 221:24
**instinct** 182:10
**instruct** 18:13
**instructing** 67:12 67:14
**instruction** 34:24 35:9,24 127:23
**instructions** 36:3 132:15
**intended** 212:19
**intentional** 157:4
**interaction** 63:2
**interest** 14:3 15:18,22 16:2 16:22 19:20 32:8 40:25 48:14 50:13 52:21,24 53:18 55:16,19 72:14 73:4 83:24 88:23 89:25 94:4,5,10,18 96:2,10 97:23 98:14 102:19 113:5 122:24 130:9 138:9 141:9 154:6 170:17 179:8 179:11,12,24
**interested** 67:17 170:23
**interests** 31:24 35:20 40:19 49:25 51:2,13 51:14,21 54:14 54:15 88:13 89:22 92:25 93:22 94:9,21 95:23 96:4 99:14 101:15 110:8 135:6,19 135:23 136:2 136:18,21 137:4,11,15 138:4 141:5,5 147:25 149:6 153:13 200:6
**internal** 178:6
**interpret** 95:5
**interpretation** 191:21
**interrupt** 56:14
**interrupted** 125:7
**interview** 181:19 181:22
**into** 16:5 39:6,18 44:16 52:19 59:3 94:5 124:6 156:17 159:10 171:19 174:23 207:13,14
**invested** 194:20
**investigate** 50:9 157:18
**investigated** 148:10,13
**investigating** 52:3
**investigation** 44:9 99:25
**invite** 107:18 108:3
**involve** 71:16 200:12
**involved** 36:5 74:13 207:5
**involvement** 41:8 41:11 175:5,9
**irrelevant** 70:22
**Isgur's** 67:11
**isn't** 84:17 201:17
**isolated** 158:7
**issuance** 188:21 192:7
**issue** 27:25 43:15 55:16 65:14 67:21 73:8,12 75:20 118:3 130:12 141:2 170:23 183:18
**issued** 136:19,21 153:13
**issues** 95:13 130:6 205:22 215:6
**its** 40:3 55:2 94:4 95:22 104:21 140:9 142:2 145:8 154:14 154:14 155:9,9 156:5 159:13 170:19,19 194:21 198:8,9 200:7
**itself** 40:13 62:8
**IV** 29:25 152:19
**IV.G** 22:18 27:6 27:16,17 29:8 29:11 31:13 220:14
**I've** 51:11,14 67:2 84:16 107:2 131:16 195:13 201:9 208:11

**J**

**Jeff** 172:10,14
**job** 10:13 13:16 75:12 125:19

**jog** 103:23
**John** 13:3 119:15 128:17 177:21 178:5
**join** 111:16 181:9
**joinder** 155:21 184:13
**joined** 110:17 114:3 181:20
**joining** 16:15 110:22 111:18 111:21
**joint** 8:5,8
**Jonny** 3:5 41:15 79:16 82:14 123:13 128:3 146:23 147:2 164:15 169:16 178:23 181:17 205:25
**Joseph** 2:17 3:12 4:16
**JOSHUA** 2:11
**Judge** 67:10
**Jule** 8:20
**July** 201:11 210:3,13 212:14 213:4
**jumped** 208:10
**June** 156:20 157:6,9 173:3 173:22
**just** 12:10,12 13:15 15:4,15 17:4,22 26:20 28:3 29:16 30:18,21 31:7 31:13 34:23 36:8 45:25 49:3 50:15 51:18 52:16 53:10 55:3 71:12 74:4 74:11,25 76:5,6 77:7 80:15 81:23 83:14 85:16,18 87:9 88:3 90:12 99:22 101:23 103:14,19 108:25 109:14 110:9,11 113:9 114:9 115:4,17 116:24 124:12 124:19 127:12 139:5 148:21 151:25 152:7 158:23 164:17 171:12 174:8 174:12 180:25 181:17 182:13 183:11 187:23 189:9 191:3,5 193:13 199:6 203:19 205:18 205:21 206:20 207:3,14 210:9 211:13 214:7 214:11,13 216:2,3 218:6

**K**

**KATHERINE** 2:12
**keep** 76:3 92:18 100:7 195:5
**keeping** 60:24
**kept** 175:5
**kinds** 51:12,13
**King** 30:4
**knew** 8:18 90:12
**knowing** 103:5
**knowledge** 33:14 47:17 92:2 141:11 187:4
**known** 109:11,19
**knows** 124:4

**L**

**L** 4:24,24 163:4,4
**language** 26:24 29:5 102:2 107:16 115:14 119:3 159:11 161:4
**large** 50:14 51:16 94:11
**largely** 126:15
**last** 22:17,21 99:6 105:15 112:13 135:2,20 154:25 156:8 156:13,14 161:18 174:14 180:16 188:12 201:3 202:5 210:24 218:6
**Lastly** 33:3
**later** 67:22 110:7 126:20 161:7 179:5
**laundry** 57:9
**law** 1:13 5:13 7:3 9:17,21 58:23 66:15,25 68:15
**lawyer** 5:11,19 6:21 15:6 91:10 91:15
**lawyers** 123:22 124:6,8 187:22
**learn** 77:17 108:8 108:11
**learned** 111:6 154:11
**least** 50:20 61:19 67:24 68:10 95:5,13 112:3 117:5 140:12 148:15 179:2 183:19 193:25
**leave** 142:5 189:9
**LEE** 2:21
**left** 51:24 75:8 140:6 168:15
**legal** 1:24 3:12 4:17,18 15:6 37:15,17 218:25
**lender** 140:8,11 140:13,15,19 141:3 142:13 153:21 154:6 193:18
**lenders** 8:9,12 46:21,23 48:23 49:10 50:2 51:2 51:7 52:21 53:19,25 54:5,6 54:7 55:18 60:17,24 74:12 99:15 136:13 138:8 139:25 142:4,16 143:19 145:6 145:12 146:25 153:8 188:22 190:13,23 192:21,22 193:7 196:22
**lender's** 190:6 194:3
**Lerch** 3:12 4:16
**Leslie** 1:15 4:18 224:6
**less** 65:6 168:3 208:24 209:8 209:10
**let** 22:17 25:4 30:22 50:21 52:13 53:15 55:3 68:7 78:7 91:10 95:15 100:21 105:5,6 106:20 109:22 111:8 141:15 155:13 157:2 187:2 192:13
**letter** 37:5 160:9 212:9,11,18
**letters** 65:21
**Let's** 17:18 34:17 52:6 73:2 76:18 119:9 192:12 216:23
**level** 15:3 74:22
**LFM** 218:24
**Lieberman** 46:2
**like** 21:6 24:4 27:21 30:3 43:11 56:6 58:5 59:18 60:20,21 60:22 61:8 75:25 86:13 92:20 94:22 95:8 112:5 124:19 130:20 131:17 142:20 144:21 179:21 189:9 200:21 205:16 207:11 213:23 215:2 216:11
**liked** 215:4
**likely** 36:12 78:21 166:16
**limit** 118:22 190:6,12 191:6 191:7,9,11,22 200:2
**limitation** 25:2 116:5 139:13
**limited** 38:6,11
**limits** 27:13 115:15 190:10 190:11,21
**line** 48:10,12 56:14 57:12 68:10 90:25 105:20 107:8,8 107:25 124:12 136:17 163:19 189:14,18 201:23 202:5 223:5,5,5,8,8,8 223:11,11,11 223:13,13,13 226:3

**linear** 124:24
**lines** 101:9 112:13 139:10 139:12 205:6
**liquidating** 6:6 45:10
**liquidation** 7:6
**list** 57:10 60:13 60:17 62:4,5,13 62:18 63:7,15 64:15 210:15 211:15
**listed** 22:13 209:19
**listen** 43:13,17 117:13 130:25 179:4
**litigating** 108:19
**little** 28:21 32:22 51:23 59:20 91:16 117:18 123:20 127:24 131:2 178:11 186:25 212:16
**LLC** 2:9 147:16
**LLC's** 84:12,20 221:8
**LLP** 1:13 2:9,14 2:19 3:4 4:15
**loan** 49:10,25 51:2,7 52:21 53:19,25 54:5,6 55:18 135:9 136:4,13,20 138:7 143:19 145:6,12 146:25 153:8 153:21 154:6 201:12 202:2 204:15
**loans** 54:23 140:4 140:22 142:16 153:14 217:14
**lodge** 125:4
**long** 5:21 6:9 58:14 102:2 116:6 126:12 157:16 200:14 212:5
**longer** 6:12 105:20 214:10
**look** 11:24 15:23 22:23 30:16,19 32:3 49:17,19 78:7,8 86:25 87:21 90:16,24 92:20 109:17 150:13 151:14 152:16,20 154:7 156:7 189:10
**looked** 24:2,9 44:20 56:19 152:2 186:6
**looking** 45:19 46:7,9 86:11 88:4 113:4,18 119:7 128:14 142:24 150:24 152:14 176:16 178:4 197:2 202:10
**loosely** 99:13
**lot** 6:9 53:3 65:5 92:16 118:14
**love** 161:20
**LTA** 11:21 21:6 21:8,10 32:2 33:23 34:22 42:13 67:23 68:5 73:22 76:10,16 83:24 84:3 86:11 88:15 89:2 92:10,14 99:21 101:21 110:13 112:4 113:9 134:5,11 144:7 145:2 146:5 147:15 150:8 150:20 151:23 159:11 184:23 187:19 189:8 189:11 191:16 191:20 199:5 208:15 220:13
**LTAB** 8:25 12:19 12:22,23,24 13:2,5,7 16:11 16:15,20 20:2 20:22 27:10 32:12,25 35:8 38:13,14 39:5 40:4,13 41:12 44:2 52:15,25 56:11,23 57:24 58:2 59:11 64:14,19 65:4 66:6 67:25 68:21,22 70:19 76:7 80:2,11 81:15,19 83:8 83:20 88:5,12 96:9 103:3 113:2 119:15 119:17,21,24 120:2,20 128:10,16,23 129:4,14,18 133:7 145:16 146:21 164:13 170:11 173:3 175:11,12,16 175:20,23 176:4,16 177:5 177:9,13 180:20 187:5,9 196:17,22 197:10,13,20 204:5 205:6 206:6,11 212:10,11 213:16,21 214:2
**LTAB's** 57:6
**LTD** 80:3 94:4
**LTIs** 194:22
**Luncheon** 161:25

**M**

**made** 7:9 15:10 43:25 61:3 67:8 123:10 124:14 124:15,16 129:19,23 131:13 132:7 160:19 187:3,8 187:13,24 196:20 200:6 200:15 203:22 204:15 206:8 211:17,21 215:13
**made/are** 128:6
**magic** 125:23
**Magna** 1:24 3:12 4:17,18 218:24
**mailing** 210:19
**mainly** 123:12
**maintain** 57:25 59:11,21,22 65:2
**maintained** 183:13
**maintains** 60:4
**majority** 153:12 180:17,24 181:2 193:17
**make** 6:24 12:2 15:4 50:5 55:12 80:16 105:15 123:23 125:19 125:24 128:6 134:6 148:13 190:23 198:19 210:12 212:22
**makes** 52:8
**making** 60:20 129:6 132:2 146:15 191:5
**management** 112:17 118:17 130:2,5
**managing** 181:12
**manner** 32:15 68:8 200:16
**many** 6:4 7:18 27:16 42:16 51:6 69:9 93:21 121:4 123:24 124:5 146:18 167:20 197:21 197:24 206:24
**MARC** 2:11 3:11
**March** 14:2 78:24,25 79:4 79:12 82:13 85:10,21 87:15 87:16 88:4,11 113:2 119:14 120:7,16 121:23 122:18 128:9,15,16,18 128:23 129:14 132:7 133:15 133:24 134:2 137:21
**marching** 126:7
**mark** 200:22
**marked** 21:8 29:11 31:5 58:6 58:10,22 61:11 61:13 76:20,22 79:8 84:14 102:12 106:11 106:14,17 122:19 155:18 184:5,10 195:11,13 200:25 201:10 223:10
**Martin** 41:15,17 41:19 42:3 63:18,24 64:2 81:20,22,23

82:5 104:11 146:23 147:6 161:15 169:18
**Martin's** 87:18
**Marty** 82:11 121:20,20 122:15 166:8
**Marty's** 172:17 174:2 182:18
**MARURI** 2:4
**Master** 80:3 94:4
**material** 133:2,8 133:14 170:17
**materials** 133:19 133:24
**mathematical** 146:2,8,16
**matter** 4:6 9:23 14:16 46:10 73:8,12 83:3
**matters** 37:10 180:5,7,12
**maximize** 56:9
**maximum** 200:18
**may** 4:23 8:14 11:21 14:5 15:7 15:10,11 17:14 18:11,12,13 19:24 23:10,18 25:5 27:20 29:18 30:15 32:3 34:10 38:24 40:6,7 42:19 44:14 46:6 55:11,19 57:13 61:14 62:15 64:24,24 70:3 71:11 72:14 73:4 81:6 86:25 91:14 93:22,22 94:23 99:23 101:12 108:24,24 120:11 154:12 156:2 160:21 172:8 173:18 188:22 192:22 194:24 205:15 205:22 208:14 208:23
**maybe** 15:3 26:18 93:8 112:18 117:25 188:6 202:25
**McCool** 10:10 12:11 36:21 37:21 38:24
**McMULLIN** 3:7
**mean** 39:17,24 42:9 53:21 59:12,13 60:8 60:13 63:23 74:7 94:13 104:18,19 112:24 113:12 113:22 116:14 116:19 125:17 127:10 137:7 145:22 179:10 181:25 185:17 190:5 201:21 204:15
**meaning** 182:18
**means** 224:11
**meant** 62:7 91:5 93:18 198:17 198:18
**meet** 12:5,14 13:19
**meeting** 32:20 68:13,20 69:24 70:3,3,13,14 71:25 72:22 73:7,11 111:17 111:18,21 120:8,16 185:7 185:10
**meetings** 19:14 59:16 68:24 107:19 108:4 120:21 127:5 131:5
**member** 12:24 13:4 16:11,19 40:9,13 42:7 43:4,6,23 44:22 62:8 64:19 65:11 69:12 71:4,18 72:11 72:13,15,20 73:3,5,9,23 76:12 79:25 81:14,18 83:5,6 84:6,6 88:5 89:8 98:18 109:12,19 110:18,23 113:2,8 114:4,8 117:17,20 119:17 123:2,5 123:11 126:19 126:20,24 128:10,18,22 129:4,14 130:8 130:8 132:20 133:3,25 145:6 148:20 150:21 153:4,9,15 159:12,15 160:16 161:10 168:21 169:25 172:19 173:3 182:15 198:10 207:19,24
**members** 8:25 32:25 42:24 52:24 67:25 68:11 69:4,7,9 71:14,17 73:13 73:14,18 74:16 76:12 79:18 84:3 92:3 112:8 116:13 118:24 120:20 121:4 123:2 129:17 130:16 132:10 133:7 143:18 145:5,15,15 146:19,20 148:7,14 151:9 153:21 161:12 161:14,16 164:13 165:4 169:9 170:12 175:20 176:3 176:15 177:17 184:25 185:5 197:21,24 198:15,24 205:19 206:6 213:15 214:2
**membership** 18:18 43:8 131:23
**memory** 29:10 71:20 152:22
**Menezes** 64:2
**MENNITT** 3:6
**mentioned** 99:11 172:15 182:25 213:23
**merely** 57:6
**mess** 124:7
**messages** 166:21
**messing** 194:6
**Messrs** 88:24
**met** 12:7
**middle** 28:17,18 48:7 139:10 143:6
**might** 14:6 50:5 103:23 131:19 131:20 137:9 174:17 176:17 194:6 195:6 215:18,22
**million** 188:21,24 189:3 192:8,17 192:24 194:13 194:15,18,21 195:20,21 196:13,13 199:14 202:24 203:13,15,19 204:11,12,14 217:22,23
**mind** 21:5 50:20 54:4 55:16 70:11 105:7 129:7,9 134:23 215:13
**mine** 52:13,14
**minimize** 55:4
**minimum** 200:18
**ministerial** 101:6
**minute** 72:10,17 77:3 96:8 101:22 103:25 110:13 132:13 139:2
**minutes** 57:25 59:15 65:3 70:9 198:22 218:14
**misleading** 158:8
**missed** 128:4
**misspoke** 63:5
**mistake** 88:8
**mistaken** 124:23 204:13
**modified** 47:18
**modify** 25:11 26:9,21
**moment** 12:19 17:5 19:9 28:5 29:8 66:10 92:11 204:18
**money** 51:19 53:6
**Monroe** 194:5,6
**more** 7:15 14:6 24:15 31:7 51:9 51:20 52:6 53:2 53:3,12 55:15 56:17 64:21 70:6 80:15

91:16 105:12 106:7 126:9 137:17 141:21 141:21 167:23 167:25 194:17 204:24 205:5,8 205:21 207:7
**morning** 5:6 110:15
**most** 36:12 43:9 97:18 166:16 206:21
**mostly** 155:3
**motion** 84:12,20 108:19 221:8
**move** 28:4,6 46:10 119:7 149:7 158:21 208:7
**Ms** 36:23 37:12 38:21 39:15 44:13 61:21 184:17,18
**much** 50:15 52:8 52:20 53:16 56:17 105:20 183:16 193:8 193:15,19 194:9 204:7,22 215:13 219:2
**Muehlstein** 147:17
**Multi** 80:3 94:3
**multiple** 6:14 47:4 54:2 164:17,19
**must** 141:21
**my** 11:4 12:2 15:13 16:3 23:8 26:20 33:14 34:19,24 36:13 37:9 40:22 47:25 50:20 53:5 57:12 64:4 74:9 75:24 87:10 89:23 91:7 93:17 95:14 104:20 109:15 114:23 117:12 124:2,2 124:3,8 125:7 125:19 126:4 127:3,13 141:11 150:9 164:6 168:23 169:10 175:4 182:10 184:16 186:24 191:3 193:13 205:4 209:25 212:12 213:21 214:14 215:13,24 216:12 217:15 225:12
**myself** 96:7 127:14 208:10

**N**

**N** 2:2 3:2 4:24,24 163:2,2,2,4,4 220:3
**name** 5:7,13 8:19 36:24 45:13 60:19 135:10 172:10
**named** 64:2 169:11,14
**names** 147:11 194:6
**native** 201:20
**nature** 101:6
**necessarily** 145:21
**necessary** 25:14 67:22 157:25
**need** 15:23 22:23 25:5 30:12,16 49:18 57:5 59:5 68:3 92:19 100:16 105:17 109:16 150:12 151:2 152:16 152:20 156:10 182:11 197:7
**needed** 19:10 199:9,11
**needs** 54:25 200:5 201:6 214:7
**negotiable** 92:25 93:20
**negotiate** 46:13
**negotiated** 46:20 46:25 47:5 142:15,19 177:15 193:6
**negotiations** 47:19
**net** 139:16
**never** 39:3 40:24 42:14 44:3,12 44:20 50:19 52:5 53:4 56:6 56:6 103:23 118:4,7,9,11,16 129:9 132:14 132:15 148:10 148:13 160:21 169:5 172:18 177:11 208:8 213:15
**new** 1:14,14,15 2:5,5,10,10,16 2:16,20,20 3:6 3:6 4:14,14 5:10,10 132:21 133:6 138:8 153:4 159:15 161:10 164:2
**next** 26:20 55:7 57:12 75:24 84:9 105:20 119:7 128:3 180:16 189:5 200:22 215:15
**nice** 178:11 215:7
**night** 216:8
**nobody** 111:20 174:4 199:17
**nod** 178:11
**nominally** 137:7
**nonconflicted** 71:4,18
**none** 51:20,21 114:20 168:5 223:6,9,11,14
**nonresponsive** 149:8 158:22
**nor** 144:19
**normal** 116:22
**normally** 30:7,8 205:20
**Nos** 58:10 61:11 79:8 102:12 155:18 184:5 220:16,18,22 221:12,19,21
**notarized** 88:14 93:7 100:2 102:4
**notary** 1:15 5:2 79:4 100:13 102:4 225:14
**noted** 163:3 219:3 225:6
**notes** 166:25
**nothing** 21:5 140:24 142:6 158:24 174:15 200:19 207:9 207:13
**notice** 76:20,22 93:7 100:2,11 150:11,15 151:9,12 152:14 154:2,4 159:2 186:9,15 201:13 208:24 209:4,9,11,11 209:13,15,17 209:21,25 210:4 211:10 211:15 212:5,7 212:8 213:20 213:22 214:23 216:4 220:19 220:20
**noticed** 210:13
**notices** 77:2 85:9 86:23 88:14 104:17
**notified** 199:21 209:20 210:6
**notify** 210:23
**notional** 217:8,12 217:18 218:2
**novel** 30:4
**number** 29:13,23 193:14 218:23
**numbers** 23:17 143:4 206:13
**numeral** 28:21
**numerous** 206:18

**O**

**O** 163:2,2,2
**object** 17:5 71:9 125:6 139:4 182:2
**objections** 50:12 98:22 155:21 163:12,12,17
**obligated** 25:21 26:2,5 29:2
**obligation** 117:10 140:17
**obligations** 43:24 44:8 114:24 176:25 179:21
**observe** 64:22
**observer** 131:16
**observers** 180:4 180:10
**obtain** 194:21
**obtained** 87:11

100:24
**obviously** 62:11 63:20 82:24 98:7 109:17 174:24 187:22
**occasion** 155:3
**occasions** 155:4
**occupied** 172:9
**occur** 164:16
**off** 57:16 105:25 123:10 139:25 149:11 150:9 161:23 216:16 216:23,25 217:2,15 218:16,17,20
**offended** 201:22
**offer** 43:14
**offering** 129:18
**office** 193:13
**OFFICERS** 2:15
**offices** 1:13
**official** 104:21 145:7 159:12 160:17 198:9 207:18
**oh** 189:5
**okay** 13:22 15:16 17:18 28:9,20 30:25 45:3 48:6 55:14 76:4 77:12 82:12 85:7 86:18 93:10,15 100:14 104:22 105:18,19 106:23 108:17 116:18 119:13 123:21 127:5 128:21 129:5 131:4 137:19 139:23 144:2 146:16 149:17 152:17 156:11 160:6 163:15 189:7 190:3 196:5 202:20 208:6
**Olson** 16:10,17 41:15,17,19 42:3 81:20 83:19 89:3 92:3 104:11 121:7 121:11,20,21 122:16 146:23 147:6,13,24 149:12,19 152:4 158:25 159:24 160:11 160:23 161:15 163:21 165:24 166:8 169:18 172:8 183:7 205:2
**Olson's** 14:19 154:12 155:10 159:15 163:22 186:16
**once** 83:25 99:15 113:5 118:21 149:4,4
**one** 2:16 12:16 24:9,15 30:8 35:18 52:25 55:15 56:17 69:11,17 70:6 71:17,21,21 72:4 74:13 75:13,19 76:12 76:19 78:8 84:6 85:5 87:9 89:7 89:11 101:4,23 103:6 104:12 104:13 105:5 106:19 110:10 119:8 133:18 139:21 143:19 145:6,12,25 146:10 148:15 151:8 158:6 159:12 160:16 169:16,16,17 177:21,24 178:2 183:10 185:4,21 192:2 199:2 203:7 204:13 207:12 218:6
**ones** 6:14 54:9
**one-third** 145:23
**only** 17:12 49:21 53:9 54:23 62:25 69:11,17 71:4 73:12 75:3 75:7,18 76:12 81:8 83:5 93:23 93:25 104:23 106:19 123:8 140:5 144:11 149:18 166:2,6 172:6,15 173:11,12,15 173:24 174:25 175:13 187:16 193:18 198:14 198:24 200:8 205:25 213:11
**open** 195:5 202:16
**opened** 105:10
**opening** 179:7
**operating** 65:5
**operation** 112:17 118:17 130:2
**operations** 67:19
**opinion** 168:23 168:25 169:7 169:10 171:24 172:18 182:23 200:4 214:6
**opportunities** 178:13,16
**opportunity** 29:9 46:14
**opposed** 80:20 118:23 169:24
**option** 121:18
**ordeal** 123:12,14
**order** 17:15 20:8 20:10 21:21,25 22:2,4,7,12,13 25:12,13,16,17 26:3 27:2,18 29:17 30:13 31:8,17 33:22 34:22 35:8 40:4 54:25 67:11 84:14,21 86:19 133:5 154:18 158:20 221:10
**ordered** 67:7
**organized** 92:18
**original** 34:11 39:8 47:21 149:10 195:25 199:5
**originally** 11:7 94:19 146:21
**other** 6:17,21 7:8 17:14 18:5 19:24 21:2 39:14 42:19 66:2 69:18 70:9 78:8 80:20 87:9 88:23 89:12 91:14 92:3,11 101:23 110:11 112:14 114:10 116:9,21 118:10,12 134:22 137:18 138:4 144:9 158:17 159:21 161:4,15 165:11 170:10 176:9 178:12 178:15 183:11 185:17,19 192:2 193:23 205:14 212:12 216:13
**others** 6:12 173:19 193:25
**otherwise** 68:15 75:21
**ought** 214:11
**our** 59:22 105:14 180:5 187:18 188:6 195:2
**out** 29:14 50:10 51:20 56:9 65:21 74:16 78:23 85:11 116:23 118:15 125:25 155:15 160:7 174:2 196:12 197:8 202:4 205:15 211:16 216:2
**outcome** 142:8
**outcomes** 138:19
**outline** 93:17
**outright** 40:15
**outset** 18:17
**outside** 43:4 60:18 67:6 187:20
**outsider** 131:11 131:12,13 134:6
**over** 22:8 24:2 51:20 125:8 152:16 161:17 164:18 194:20 201:24 218:7
**overlooked** 21:3
**owe** 47:22 114:22 138:22
**own** 89:22 90:12 168:23
**owner** 13:10
**owners** 40:15,18
**ownership** 99:14

**P**

**P** 2:2,2 3:2,2 4:24 163:4
**pages** 32:21 188:6 202:13 202:16 225:3
**paid** 139:14 140:22 158:2
**pain** 124:14,22 125:2,11,16
**Para** 102:12,15 201:11 221:12
**Parabellum's** 35:13 39:19 40:25 41:16 66:5 104:3 129:22 193:20 206:4
**paragraph** 28:7 28:8,19 48:7 72:13,16 73:3 85:4,8,14 88:2 88:9 99:2 100:5 112:12 116:6 119:12,25 128:13 143:14 143:25 163:14 163:16,17,19 170:15 208:13 208:22
**paralyzed** 74:8
**paraphrasing** 130:24 171:14
**parents** 124:2
**Park** 3:5
**part** 18:15 57:15 57:20 73:7 75:5 113:20 135:20 163:7 194:2 204:9
**partial** 94:20
**participant** 121:12
**participate** 73:6 108:3 125:12 140:18 164:20 164:23 165:25 166:4 179:3 207:23
**participated** 164:11
**participation** 40:11 42:7 106:9,11,14 110:6 115:9 121:24 140:9 140:14,17 186:7 221:13 221:15
**participations** 193:20
**particularly** 7:5
**parties** 46:25 78:19 169:5 209:18 210:5 210:13,15 212:12
**parts** 218:23
**party** 15:19,21 16:8,12 117:14 178:10 206:9 206:21
**past** 28:4
**Patel** 41:19,23 42:2,4 61:21 62:10 64:14 71:23 81:9,14 81:18 83:19 92:7,8 121:10 164:14 165:10 166:3 171:2 182:22
**Patel's** 42:10 165:21
**path** 53:7
**paths** 50:16
**Paulo** 63:8,11,14 63:25
**pay** 142:4 181:5
**paying** 11:10 37:23 200:12
**payments** 38:3,6 38:17 203:22
**PDF** 45:22 143:3 143:5,7 147:7 196:2,4,4,10
**pecuniary** 88:23
**Penn** 2:5
**people** 51:20 54:21 55:23 75:7,8 118:10 118:12,15 124:17 126:3 126:10 132:11 137:18 207:11 209:12,19 211:10,21
**people's** 53:12 124:14
**percent** 16:4 18:25 42:4 49:9 49:10 135:7,9 136:2,6,18,20 137:10 138:8 141:6,10 145:19,24,25 146:9,10
**percentage** 49:14 146:17
**percentages** 52:17
**perfect** 126:3
**perhaps** 17:15 145:16 206:20 215:5
**period** 174:6,10 174:13,15 175:7 198:13
**permits** 73:22
**permitted** 44:21 69:25 70:24 127:6,8 131:6,8
**permitting** 190:9 190:17
**person** 46:19 53:2 75:7 93:14 96:11 149:18 213:11 215:9
**personal** 168:23 169:7
**personally** 10:19 56:25 166:4
**Peter** 146:22 147:2
**phone** 59:25 71:7 71:10,11,14 72:4 82:8,9 83:15 121:18 185:12
**picture** 39:6,18
**Piper** 156:4
**Piper's** 155:21
**place** 111:10,11 132:3,25 172:17 185:25
**Plaintiff** 2:4
**plan** 6:6 8:7 11:17 17:16 18:24 20:4,6,12 21:20 22:4,18 25:12,15,21 27:2,19,23 29:9 29:16 30:5,9 31:7,13 33:22 34:22 35:7 39:10 42:13 49:8,23 63:4 75:21 97:24 112:19 138:2 138:18,20 142:21 143:8,8 154:17 158:15 188:5 189:15 189:16,24,24 190:4,9,17,18 190:21,25 191:20 193:4 202:15
**planned** 155:11
**planning** 55:6
**play** 98:5
**Plaza** 2:5
**please** 4:22 5:6 15:15 21:15 22:25 24:24 25:5 27:20 30:22 32:4 39:23 47:13 56:12 62:3 63:7 76:19 78:10 81:17 85:5,6 92:12 106:22 123:18 125:5 138:25 155:16 156:18 182:4 200:23 215:10 217:6
**pledged** 93:3
**point** 28:15 40:24 58:22 60:25 62:12 64:17 82:11 102:23 114:2 115:14 117:16 118:20 121:13 127:16 128:9 130:8 133:21 139:9 143:23 149:23 166:5 178:21 180:16 182:22 186:19 202:4 206:3 210:24 214:12 215:14
**points** 110:15 177:20,24
**posed** 43:18
**position** 40:3,11 40:12 94:11 148:24 152:8 153:5 161:11 177:4,8,10,11 177:14 182:7 183:5,13 194:21 205:20
**positions** 40:16 78:6 94:24

**possession** 166:16
**possibility** 121:17 131:22
**possible** 43:16 54:19 73:17 126:2,2 127:2 206:14,23 210:9 213:23
**possibly** 21:4 142:6
**potential** 178:9 178:12
**prebankruptcy** 46:23
**precisely** 111:5
**prefer** 215:3
**preparation** 14:4
**prepare** 12:5 13:23
**prepared** 184:14 184:17 190:14 190:23 191:10 192:3,5,10 193:3 212:24
**prepetition** 49:9 135:9 136:3 138:7 143:19 145:5 146:25 153:8,14
**preposition** 136:20
**present** 3:10 4:20 12:8 68:12,13 71:13
**pressure** 71:19
**presume** 185:17
**pretty** 67:6 140:21 205:12 215:8,13
**prevent** 118:9,11 132:25
**previously** 163:14
**primarily** 17:10 17:17 42:2 134:14
**primary** 46:25 165:3
**printout** 200:24 201:19 222:6
**prior** 8:16 9:19 9:23 10:3,13 14:16 15:7 108:12 133:24 156:22 158:9 185:14 207:17 208:24 209:9 210:2,13 212:18
**privilege** 166:20 168:9
**privileged** 37:12
**privity** 140:12 141:3
**privy** 94:25
**pro** 51:16 136:19 136:22 137:4
**probably** 36:22 47:12 55:8 76:2 120:25 121:21 124:21 168:4 169:2 182:10 193:12,12 207:8
**problem** 42:11
**procedure** 175:14
**procedures** 80:10 132:25
**proceeding** 11:11 84:18 151:15 163:18
**proceedings** 70:10
**proceeds** 139:12 139:17
**process** 38:13 51:22 84:2 124:10,16 125:24 171:21 211:18 214:16
**produced** 76:24 166:19 167:9 167:13,15 168:6,17
**Production** 223:5
**professional** 7:8 224:7
**professionals** 55:21 156:15 200:13
**prohibit** 118:5,7
**prohibited** 69:21
**prohibition** 115:15
**prohibits** 114:10
**promise** 201:22
**pronouncement** 173:21
**proper** 102:3
**properly** 80:14 80:16 97:11 99:4 124:15
**propose** 175:19 176:18
**proposed** 69:19 84:5 163:21 182:16,17
**proposing** 63:25 172:17
**propounded** 225:5
**prosecute** 55:2 200:13,19
**prosecuting** 158:18
**protective** 133:5
**provide** 76:18 143:13,16 177:17 181:8 188:23 192:23 199:11
**provided** 11:19 52:12 68:16 80:14 93:21 133:19 148:20 150:10 153:7 166:17 167:21 191:23 195:3
**provides** 11:17 18:2,15,18 97:4 153:18,19,19 188:21
**providing** 54:10
**provision** 11:16 21:19 22:11 24:7 25:12,15 26:10,22 47:18 49:17 68:4 69:20 70:23 73:21 74:2,10 76:6,10 116:8 133:10 134:5 134:22 150:7 150:19 180:22 190:8,16,25 192:16 199:5 209:5,20
**provisions** 17:14 33:11 80:10 108:9,12 132:2 159:21 177:16 182:12
**proviso** 117:8 153:20
**provisos** 94:2
**public** 1:15 5:2 100:13 102:4 225:14
**pull** 155:15
**purchase** 180:6
**purchased** 40:10 102:18
**purported** 71:3 96:15
**purpose** 15:12 35:14 37:15 38:15 48:16 145:11 157:25 158:17
**purposes** 73:9 89:14 156:20 156:20,21 157:6,9 158:9
**pursuant** 1:12 38:10 45:11 54:10 158:14 210:16
**pursue** 50:10 156:16,23 157:15
**pursuing** 52:3 157:25
**purview** 141:14
**put** 18:5 29:7 66:9 76:2 79:6 84:9 92:11 101:21 103:25 110:12 132:3 169:8 196:17 204:17
**putting** 71:19
**p.m** 161:23 162:2 163:3,7 216:16 216:19,25 217:4 218:16 218:19,20 219:3

**Q**

**Qualification** 26:18
**qualified** 7:9 179:22
**qualify** 6:18,24
**quantum** 142:3
**question** 15:13 17:6 18:3 23:8 23:24 24:15 25:6 26:21 28:4 30:16 34:4,11 34:17,19 35:4 39:9,11,12 41:6 50:15 52:6

53:10,15 55:3 55:15 72:25 78:12 83:2 91:7 92:6 100:21 111:9,13 119:2 125:8 139:19 141:16 183:11 186:24 187:12 187:21 202:18 205:16 208:5 208:16 210:18 218:6
**questioning** 56:14
**questions** 21:17 24:25 30:14,15 30:24 43:17 44:23 56:18 57:13 77:5,8 95:19 106:20 187:23 210:22 216:14 218:12 223:10 225:4
**quick** 105:22
**quite** 30:3 74:14 91:7 127:4
**quorum** 19:14 32:16 68:13 72:21 73:10,17 89:14
**quotations** 45:6
**quote** 28:11 56:23 79:17 88:22 99:3,23 107:11,19 123:11,12 139:16 147:15 184:24 188:20 188:23 189:15 192:8
**quotes** 215:2

**R**

**R** 2:2 3:2 4:24 163:2,4 226:2,2
**raise** 75:20 186:10 187:12 187:21,23 195:20
**raised** 208:13
**ranks** 21:24
**rata** 51:17 136:19 136:22 137:4
**rather** 57:6 80:8 211:9
**rationale** 181:8
**Ravago** 62:8 63:22,23 64:8 71:4,21 81:12 118:11 147:16 147:20 163:20 163:24 165:10 169:24 170:16 170:22 171:17 172:16 173:8 175:10,17 182:16 183:12 183:20 184:8 185:19,20 187:4
**Ravago's** 163:24
**Re** 1:6 4:6
**reach** 82:6
**reached** 78:19 116:23 216:2
**reaching** 133:2 205:15
**reaction** 126:25 127:3
**read** 21:22 22:18 22:21 23:11,21 24:6,11,18 25:18 28:8,14 30:12,23 48:8 72:12 73:2,15 85:16 89:23 93:18 96:7,8,13 101:7,16,23 112:12 113:9 114:9 115:4 119:19 127:10 131:3 136:25 143:14 156:9 156:10,11,17 156:24 158:5,6 158:12 163:18 209:12 225:3
**reading** 159:17 189:20 191:3 192:14
**reads** 30:3
**ready** 25:4 77:4
**really** 46:10 51:25 53:9 62:6 74:14 94:17,25 95:10 105:4 106:19 108:16 111:14 131:18 138:12 151:2 166:24 183:16 193:10 201:8 204:22 212:23 214:14
**reason** 9:13 109:20,23 153:9 160:21 161:10 205:14 214:5
**reasons** 54:2 83:3 94:24
**recalling** 216:5
**receive** 64:9
**received** 100:10 132:20 133:14 133:16,24 134:4 138:3,8 154:2 186:9
**receives** 140:2 141:22
**recent** 97:19
**recently** 6:2 23:5 23:7,11,14,20 23:23 24:3,6,11 24:14,18,23
**recess** 57:17
106:2 161:25 216:17
**recipients** 79:18
**recitals** 135:2
**recognition** 22:3 25:13,16
**recollection** 23:16
**reconcile** 113:7
**reconciled** 110:5
**reconciliation** 171:21
**reconciling** 211:7
**record** 4:3,21 46:4 55:13 57:16,20 61:4 95:8 99:4 101:11 105:25 106:5 115:5 147:11 156:17 161:24 163:8 178:3 198:19 216:16,19,20 216:23,25 217:2,4 218:16 218:17,19,20 224:4
**recordation** 102:8
**recorded** 65:8 70:8 80:17 99:17,18 100:20
**Recording** 100:22
**records** 58:2 59:10,13,14 70:9 99:14
**recoveries** 49:8 138:20 145:20
**recovery** 49:22 50:10,14 53:8 56:4 107:13 142:4 170:19
**recused** 92:3
**redlined** 196:12
**reduces** 51:16 178:9
**refer** 49:16 125:16
**reference** 189:3 202:15,18,21 202:23 203:3 203:14
**referenced** 101:25 172:6 173:7,14 203:13
**references** 62:2
**referencing** 11:22
**referred** 36:23
**referring** 17:23 35:17 36:11 72:9,17 105:3 113:17 115:20 123:6,15 124:21 126:14 150:16 158:11 180:8 203:18 203:18 212:9
**refers** 99:25 112:7 120:2 156:22 158:9 204:11 217:22
**reflect** 100:23
**reflecting** 65:3 167:4,8,12 172:4
**reflects** 196:11 198:12
**refresh** 29:10
**regard** 19:14 153:20
**regarding** 23:17
**regards** 86:3
**register** 60:5,9,17 99:3 100:23 210:24
**Registered** 224:7

**regularity** 59:9
**regularly** 7:11
**relate** 19:25
**related** 83:12 180:5,7,9,11,12 180:13
**relates** 67:19 77:2
**relation** 15:6,10 21:19 55:20 70:14 71:21 130:4 137:21 206:7
**relationship** 8:17 9:20 10:4,12 21:20 109:25 186:6
**relevant** 20:25 168:12
**relief** 25:11 26:10 26:22,25
**relinquished** 173:9
**rely** 99:23 102:5
**relying** 150:12,16
**remained** 156:15 156:19 157:6 157:11,14,24 158:4 175:20
**remaining** 75:7 83:6 153:6 161:12,14 170:18 176:3 176:15 177:17 184:25 185:5
**remember** 8:2,7 8:13,20 42:5 46:22 74:11 97:10 103:9 127:13 133:11 144:6 152:5,12 159:17 171:4 171:14 173:24 175:2 181:14 181:15,18 185:23 194:7 195:22,23 196:20 212:16 214:25 215:25
**remembering** 110:6
**reminding** 139:5
**removal** 153:3 208:18
**renotice** 211:13
**renoticed** 211:11
**reorganized** 1:8 138:9 209:2 210:25
**repaid** 139:25 141:22 142:14
**repeat** 34:24 72:24 81:16 135:20 167:10 182:4 208:11
**rephrase** 52:13 91:11
**replace** 64:2 153:16 214:17
**replaced** 149:25
**replacement** 32:25 151:7 152:10 161:7 170:9,25 174:4 177:18 179:6 208:18
**replacing** 152:4
**replied** 123:8
**reply** 79:19 81:8
**report** 122:3
**reported** 122:6
**reporter** 1:15 4:18,22 21:11 79:10 84:8 200:22 224:7 224:12
**reports** 65:14 66:5
**represent** 8:24 147:25 148:5 149:5 210:3
**representation** 11:11 177:5,9 177:13
**representative** 80:8 149:2 186:13
**representatives** 151:7 154:14 155:9
**represented** 148:15
**reproduction** 224:11
**request** 4:15 80:6 103:7,12,17 104:3,9 154:10 196:21 204:13 204:16 209:24 223:5
**requested** 203:21 203:23
**requests** 85:11 206:8
**require** 59:24
**required** 52:16 65:19 68:15 69:25 80:12 88:14 101:11 139:14 180:25 209:8
**requirement** 99:24
**requirements** 65:17 187:18
**requires** 60:2 67:23 83:24 86:20 133:6 192:19 209:10
**requiring** 74:13
**requisite** 154:5
**reread** 31:14 34:19
**reserved** 171:22
**resign** 155:11 208:23 212:4 212:19 214:19 215:4 216:9
**resignation** 9:9 33:4 152:24 153:3 154:12 154:15 155:10 159:16 182:19 212:13 213:7 213:10,16,21 215:21,22,24
**resigned** 6:2 149:12,22 151:9 161:15 172:8 173:8 209:6 214:3,15 218:9
**resigning** 213:3,6
**resolution** 185:7 200:11
**resolutions** 57:25 65:3
**respect** 61:5 73:8 73:11 95:8 112:16 129:25 151:6 171:20 186:12 215:6
**respond** 90:5
**Response** 84:13 84:21 221:10
**responses** 206:4
**responsibilities** 20:22
**responsibility** 51:22
**responsible** 60:23
**restated** 122:24
**restructuring** 5:19
**resumed** 163:4
**retain** 10:25 11:7
**retained** 10:21 66:20 218:24
**retention** 55:20
**retiring** 63:18
**revealing** 188:2
**review** 13:22,25 14:8,15 23:5 25:5 68:3
**reviewed** 14:12 23:3,14,23 24:23 38:13 80:22 87:23
**reviewing** 24:14
**revolved** 165:3
**rid** 172:2
**right** 8:25 9:2,5 20:2 21:4 22:9 26:16 28:7,17 28:18 29:4 44:4 44:19 45:23,25 46:8 49:11,15 54:20 56:21 64:6,7 70:15 75:14 76:13 81:15,19 86:20 90:6 92:13 98:16,24 107:25 110:23 114:4 115:9 117:8 119:10 119:18 128:11 128:19 129:15 132:22 133:23 134:19 135:19 135:24 136:4,8 136:14 137:4 138:5,10,11,15 139:8 140:3,9 141:6,10,23 142:6,14 143:5 143:9,24 147:8 147:11,21 150:20,24 153:14 158:11 159:22 164:5 170:5,6,24 175:15 176:12 177:25 183:4

186:7 196:24 197:5 198:20 200:17 202:5 203:4 207:9 217:8
**rights** 107:11 112:16 113:11 113:13,23 114:12,14 117:5 127:12 130:22 131:17 151:8
**rise** 74:21
**Rogan** 58:16
**role** 8:11 31:12 36:14 41:16 48:4 66:5 77:21 111:3 129:4 133:3,9 185:2 198:9
**roles** 75:14 77:21
**Roman** 28:21
**ROSEN** 3:11
**Rosser** 8:21
**ruin** 124:6
**rule** 153:19 180:24
**rules** 153:18 180:17
**running** 176:17

**S**

**S** 2:2 3:2 163:2,2 163:2
**said** 19:24 34:14 34:16 39:15 45:20 70:11 74:18 75:19 104:18 105:5 115:4,19,22 117:24 131:4 151:25 158:12 158:17 159:11 165:2,15 169:21 173:15 174:2 181:15 183:19 186:22 198:17 200:8 207:11,13 211:14 215:16 215:20,23
**sale** 80:14 82:15 82:20
**same** 6:14,25 7:2 23:24 32:24 35:9,23 53:7 54:7 56:3,3 83:3 88:3 92:6 112:24 122:14 138:22 142:10 142:24 146:17 147:10 169:4 179:21 182:7 206:18 224:11 225:4
**Saratoga** 194:7,7
**sat** 7:15
**satisfied** 86:22
**save** 55:11
**saw** 78:17,25 108:15,21 109:6,10,18 117:24 144:5
**say** 7:11,15 9:24 10:7 11:6,21 12:13 16:10,14 17:22 20:23 29:6 36:10 42:22 44:12,19 47:3 50:17 52:18 53:4 56:6 60:8 62:22 63:20 66:16 69:16 74:21 83:13 89:19 91:22 95:9 103:6 109:2,10 110:8 118:4 122:9 124:11 124:12 126:17 127:4 131:4 140:15 141:11 141:24,25 144:20 149:17 156:13 157:5 161:6 165:24 182:10 186:15 187:17 191:12 191:16 192:5,6 198:20 200:17 203:16 205:3 214:24
**saying** 41:24 52:5 54:8 95:16 98:10 114:19 116:12 130:21 146:3,7,14 181:11 187:23 191:7 212:7
**says** 26:14,17,24 28:21 48:9 62:14 64:15 69:24 70:23 72:13 76:7,11 76:19 77:10 88:21 90:17,25 93:10,19,21 96:8,15 99:22 100:8 101:10 115:2 117:8 119:14,20 128:15 130:24 135:3 156:14 156:22 158:14 161:8,14 180:9 180:11 188:20 189:21,23 191:14,14,17 192:2,18 208:22
**schedule** 107:19
**scheduled** 108:4 167:5 211:3
**Schiller** 1:13 2:9 2:11 4:15 5:5 56:16 57:11,21 67:12,17 106:6 119:5 125:7 127:20 139:3 149:7 158:21 163:10 178:3 200:21 216:11 216:20 217:5 218:11 220:7
**school** 7:3
**scope** 67:6,10 118:22
**SDNY** 174:20
**search** 167:17 168:10,11 176:17
**searched** 168:12
**searches** 168:14
**seat** 102:18 103:3 104:21 115:9 146:10 163:22 163:23 169:15 172:9 173:9,23 174:5 175:17 176:19 179:17 180:13 183:2,6 183:14 185:14
**seats** 145:12 146:9 181:24 182:6
**second** 22:2 68:9 71:8 85:5 99:5 101:8 136:17 139:21 143:15 180:2 185:24 204:9 211:19
**section** 21:17,18 21:24 22:22 23:3,12,16,21 23:25 24:5,10 24:12,16,19 25:2,7 30:13 31:23 32:11,15 32:19,24 33:3 34:15 47:15 48:3 68:6,8 72:9 86:11 89:2 92:21,23 93:6 93:10,17,18 96:6,18 97:8 99:22 100:8 107:4,8 109:21 112:6 115:10 116:10 117:4 118:21 119:4 122:4 136:16 139:8,24 142:24 143:11 145:3 150:25 151:3,4 159:11 184:23 188:9 188:10 189:11 189:13,20 208:15,17 211:25 217:7,9
**sections** 14:11 109:24 150:12 150:15 151:10 152:16,18
**secured** 8:9,12 148:23 151:7
**see** 21:24 22:5 27:20,21 28:17 28:25 45:24 48:18 58:14,18 58:25 61:16,22 63:9 68:18 74:25 79:14,23 82:17 84:22 85:12 88:16 89:5 93:4,24 95:15 99:5,8 100:3 102:17 102:20,24 107:5,7,14,16 107:22 108:6 112:9,20 114:25 115:5 116:14 119:3 123:3 128:7

130:20 135:15 143:21 144:2,3 144:14 145:9 147:13,18 156:8 159:22 159:23 178:10 182:12 188:15 188:25 189:3 189:17 190:2 195:16 196:14 201:14,20,23 202:3,6,17,21 202:23 203:7 208:20 216:13 217:7,9
**seeing** 103:15 108:17
**seek** 25:11,11 26:9,10,21,22 26:25 164:2
**seems** 29:5 56:6 87:4,4
**seen** 51:14 52:25 67:2 103:24 107:2 108:25 130:17 131:23 194:24
**select** 214:17
**seller** 2:19 80:3 108:2,3 117:9
**seller's** 80:7
**selling** 89:21
**sending** 211:16 212:18
**sense** 105:15
**sent** 65:21 90:18 90:22,25 99:19 102:7 166:13 209:16 212:6,8 213:22 216:4
**sentence** 48:9 57:3 68:9 92:24 93:19 99:6 100:6 101:8,9 112:13 113:8
114:9 118:22 128:3 139:11 143:15 144:4 144:12,13,15 144:18 145:4 156:8,13,14 158:6,10 180:16 188:12
**sentences** 156:22
**separate** 87:10 153:18
**separately** 71:15 87:11
**September** 1:14 4:11 9:11 102:16 163:25 177:23 178:6 195:19 198:7 224:7
**sequence** 213:2
**sequencing** 215:25
**serve** 60:20,21 175:12,24 176:4
**served** 6:5
**Services** 1:24 3:12 4:17,19 218:25
**serving** 5:25 36:14
**set** 20:21,24 36:3 112:18 134:13 189:15,24 192:25
**settle** 52:8
**settlement** 52:19 107:12
**settlement/agr...** 30:21
**several** 61:19 110:15
**shall** 25:9,9 28:11 48:14 68:13 72:14 73:4,5,9
73:12 93:12 96:10,17 101:10 112:8 112:15 116:7 117:9 135:4,8 135:10 143:13 143:16 145:4 153:4,14 161:11
**share** 51:17 123:17 132:16 132:17
**shared** 168:14 191:3
**she** 37:2,4
**Sheet** 225:6
**SHELTON** 2:7
**shoot** 124:8
**short** 210:21
**should** 51:4 57:11 66:15 81:21 114:20 126:6 157:21 160:23 168:16 172:22 183:12 183:14 187:13 187:24 189:14
**shouldn't** 34:2 50:4 169:8
**show** 14:5 28:3 29:8 46:6 65:12 75:25 84:14,21 101:22 122:17 221:10
**showed** 85:18 103:19,22 171:9
**shown** 109:2
**shuffling** 92:17
**side** 55:3 110:12
**sides** 141:17
**sign** 16:15,22
**signature** 46:9 87:10 90:25 91:3
**signed** 15:17 99:16 102:9,10 109:3 130:9 184:19
**signify** 79:19
**similar** 77:7
**simply** 74:20 179:17
**since** 97:20 105:14 111:13 180:5 205:11 218:4
**single** 73:23 205:20
**singular** 56:3 71:3
**Sinna** 13:3 16:14 16:18 40:20 43:16,22 64:10 64:18 102:16 102:17 111:2 111:16 119:15 123:6,9,10 128:10,17,22 129:13 132:7 132:19 133:2 133:13 177:21 178:5,7 180:3,8 180:15 181:19 182:14 187:9 204:20 205:5 205:10
**Sinna's** 14:16 133:9,12 186:16
**sir** 23:9
**sit** 43:13 44:22 50:17 98:16 127:5 131:5 160:12 217:11
**sits** 181:4,4
**sitting** 9:16 11:18 18:25 19:11 21:4 22:19 27:15 28:2
31:11 39:3,20 40:20 42:5 43:5 44:6 51:5 52:4 57:10 60:18 65:17 97:13 103:17 104:4 110:8 114:7,16 124:2 132:22 134:19 167:14 174:12 177:10 180:21,25 182:13 193:14 197:2 217:24
**situated** 138:14
**situation** 50:24 74:8 76:11 116:21
**situations** 116:22
**six** 7:19 139:10
**skimmed** 30:25
**sleep** 215:14
**slice** 91:16
**small** 160:9
**Smith** 10:10
**social** 155:3
**sold** 172:2
**sole** 101:12
**solely** 157:24
**solicitors** 91:13
**some** 6:12,13 21:16 30:13,23 40:11 46:15 49:3 55:11 58:22 82:11 102:2 114:2 127:7 128:5 149:22 150:19 175:4,8 178:7 178:21 182:22 183:20 192:21 192:21 215:6 215:15
**somebody** 8:16 43:11 175:15 181:11 183:17

213:23
**someone** 8:14 55:25 103:22 124:19 130:18 137:9 148:22 172:16 179:22 179:23 181:16 183:12
**something** 51:23 55:25 60:2,11 103:21,23 124:19,20 125:20,24 168:16 201:25 205:16 215:3
**sometimes** 6:10 7:13,14 66:24 205:24
**somewhere** 142:18 144:5 151:13
**sorry** 6:20 9:22 9:25 16:18 24:20 31:25 35:3 46:12 59:12 61:25 62:21 71:3 72:24 76:8 79:11 81:16 86:2 92:16 93:9 93:18 109:22 110:21 113:18 119:24 120:21 129:5 133:13 143:4 158:10 165:15 167:10 188:10 189:6 192:11 196:7 202:14 208:9 211:12
**sort** 52:2 60:19 136:10 143:5
**sought** 199:17
**sounds** 49:14
**source** 49:22 56:4
**sources** 193:23
**Southern** 1:3 4:9
**speak** 13:19 116:20 118:15
**speaking** 19:20 81:22 206:2
**specific** 8:2 10:22 23:15 35:16 36:3 46:22 49:14,17 52:6 65:25 68:3 111:20 119:2 151:8 164:6 166:7 171:4,15 173:25 195:22
**specifically** 14:12 14:14 18:24 21:16 23:2 24:8 24:13,22 35:10 38:25 47:11 51:6 78:18 80:19 81:6 97:9 101:5 106:19 110:4 120:6 124:23,25 130:23 134:9 161:5,8 167:15 189:13 204:10 212:17 217:19
**specifics** 42:6 44:15 68:4 80:9 83:14 95:2 98:9 127:13 180:22 181:14,18 214:25
**speculating** 50:8
**spending** 56:8
**split** 94:12,12 116:14 140:5 145:19 146:8
**splits** 146:6
**splitting** 94:22
**spoke** 44:12 71:15,20 72:3 81:20 181:21
**spoken** 154:24 155:6 215:23
**spread** 51:20
**spreadsheet** 200:25 201:19 222:7
**stake** 130:10
**stamp** 58:10 61:11 79:8 102:12 155:18 184:5,10 201:11 220:16 220:18,22 221:12,19,21
**stamped** 79:11 84:17 102:15 201:17
**standard** 16:4,6 91:6 158:3
**start** 41:24 76:18 116:12 125:8 206:16 207:11
**started** 43:19 174:19
**starting** 48:10 133:25
**starts** 29:25 112:14 139:11
**state** 1:15 5:7 85:9 101:6
**statement** 29:18 30:6,9 164:3,5 164:8,9
**states** 1:2 4:8 25:7 28:10 45:5 68:9 79:17 88:4 88:10 92:23 99:2 102:17 107:9 136:17 139:15,24 143:12 145:3 189:13
**stay** 139:7
**stenographic** 4:21
**step** 208:2
**stepped** 153:24
**stepping** 159:2
**steps** 101:4
**Steven** 30:4
**sticking** 32:21 134:11
**still** 10:15 40:18 40:18 72:20 105:18 109:21 109:24 123:25 140:16 151:11 156:2 166:15 188:7 199:8 205:3 211:2
**Stipulations** 223:8
**straight** 109:15
**strategic** 15:9 67:8
**strategy** 130:6 205:23
**Street** 5:9
**strengths** 53:13
**strictures** 125:22 131:15 134:7 134:12
**strike** 59:6 61:25 93:17 149:8 158:22 208:9
**structure** 18:15
**structured** 30:7
**struggling** 175:2
**studied** 31:2
**stuff** 91:14
**subject** 131:14,25 134:6 199:16
**submitted** 215:22
**submitting** 215:21,24
**subpoena** 1:12
**subscribed** 79:3 225:10
**subsequent** 82:10 108:4 209:16
**subsequently** 173:8
**substance** 34:12 174:23 225:5
**substantive** 15:9 107:19 207:13
**substantively** 155:7
**successful** 200:11
**successor** 63:23 153:15
**such** 73:8,9,11 99:23 117:11 153:4,17 156:20,20,21 157:6,9 158:9 161:11 192:25 209:4
**sufficiently** 170:17
**suggest** 56:17
**suggested** 185:21
**suggests** 124:20
**summaries** 59:16
**summer** 10:23
**Sunday** 9:10 97:20
**supersedes** 110:10
**supervise** 56:24
**supervision** 224:12
**supplement** 20:12 189:16 189:25
**support** 170:3 223:3
**supported** 70:25
**suppose** 54:21 55:25 140:19
**supposed** 44:17 80:16 116:16 170:8 210:16 211:7
**supposition** 62:7

123:16
**sure** 13:9 16:4 18:3 20:23 26:16 42:4 43:25 62:6 73:2 80:16 85:22 87:3 95:20 105:4 106:23 108:10 113:20 120:6,12 124:14,15,16 125:19 127:4 132:2 133:16 138:12 139:22 148:13 157:3 167:22 174:9 186:3 193:10 195:6 198:20 203:20 204:9 207:20 208:3 210:12 212:22 217:21
**surface** 15:3
**surgeon** 124:3
**surprised** 168:5
**surprising** 116:25
**swear** 4:23
**sworn** 4:25 79:3 224:4 225:10
**sync** 214:8,14
**system** 59:23 91:12,17

**T**

**T** 163:2 220:10 221:3 222:3 226:2
**tab** 75:24
**table** 124:2
**take** 8:11 21:6 25:10 26:6 28:11,22 29:21 30:19 35:18 56:15 57:12 73:7,25 77:3,9 78:7,9 81:25 85:6 105:22 126:12 129:22 137:20 142:20 147:12 156:7 159:10 163:22 166:25 167:17 172:17 174:7 177:3 182:6 183:14 185:25 192:15 208:2 216:11
**taken** 1:12 4:13 22:14 69:25 70:3,4,7 120:2 161:25 177:11 177:14 181:25 182:7 198:13 198:23,25
**takes** 19:13 53:16
**taking** 126:4 178:8 214:10
**talk** 17:18 67:21 116:20 117:6,7 117:12 120:14 183:4,8 192:12 203:11
**talked** 14:2 66:11 68:7 120:13 177:22 198:22 199:6 218:8
**talking** 62:13,23 64:14 85:14 94:22 98:18 118:10,12 126:18,23,24 146:6 198:22 205:21
**talks** 161:5,6 188:12 196:3,6
**task** 98:7
**tax** 23:17 65:18
**technically** 211:6
**telephone** 83:12
**tell** 22:19 51:5 77:4,16 80:19 86:7 90:13,14 91:5 123:24 133:23 134:3 143:6 171:22 171:25 178:18 180:23 189:4 197:3 212:19
**telling** 63:6 103:9
**temporary** 144:17
**tendering** 212:12
**tent** 130:14
**tenure** 32:25
**Ten-Year** 208:17
**term** 45:6 49:9 49:25 51:2,7 52:21 53:18,25 54:5,6,13 55:18 74:22 97:25 99:14 135:9,22 135:24 136:4 136:13,20 138:7 143:19 145:5,12 146:25 153:8 153:14,21 154:6 160:10 188:13 193:5
**terms** 30:7 39:10 53:17,22 54:10 54:22 80:12 91:5 92:6 96:23 138:17,17 146:9 152:3,9 158:14 168:10 168:11 170:7 186:21 189:15 189:23 192:25
**TESS** 3:7
**testified** 5:2 131:2 163:5 200:8
**testimony** 9:3,14 14:21 39:2,17 40:23 115:11 125:10 127:2 129:3 131:4 146:12 152:7 160:11 172:22 210:2 213:14 218:21 224:5
**Texas** 1:3 4:9 55:7
**text** 26:14 166:21
**texts** 166:24
**than** 6:12,21 7:16 30:8 31:7 39:15 57:6 65:6 80:8 126:10 138:4 158:17 167:23 167:25 168:3 176:9 185:17 185:19 194:17 205:10 207:7 208:24 209:8 209:10 211:9 214:10
**thank** 6:8 12:4 21:12 22:14 26:19 32:5,21 42:21 66:10 97:18 144:2 192:16 218:11 219:2
**their** 8:15 14:21 40:12 41:2,10 46:22 56:11 57:6 74:13 89:21 90:12 94:10 104:9 117:2 138:4,19 138:20 140:4 140:22 142:11 151:8 154:21 154:25 155:13 156:16,23 157:15,17,25 158:2 173:9 182:8 188:22 192:22 199:16
**them** 8:22,23 10:8,11,13,14 35:18 38:22 46:21 47:11 49:3 50:5 62:10 71:15,19 72:3 77:20 90:9,11 95:3 96:8 99:16 99:17,20 103:12,17 104:8 110:5 113:16,22 114:22 115:8 117:16 122:3 124:18 126:23 127:10 130:17 130:21 131:13 132:14,15 141:2,3,12 148:15 152:21 157:19 160:22 166:12,13,14 168:15 179:2 179:13 182:2,2 194:9 195:7 199:2,10,11 205:15 215:19 215:20,23
**then** 40:12 50:9 60:3 61:3 64:23 65:20 78:22 79:2,5 83:25 93:16,25 98:11 102:7 103:12 108:22 109:19 112:11 117:6 121:19 123:8 126:19 153:10 153:19 172:9 174:2 175:7 179:5 180:10 181:2 183:14 185:21 189:22

189:23 191:7 192:16 204:14 209:12 210:17 211:11
**theoretically** 54:18
**theory** 75:6
**therefore** 72:21
**therein** 192:25 225:5
**these** 33:17 35:22 66:4 76:24,25 78:2,14,17 106:8 108:9,11 109:3,6,10,24 110:9 115:5 137:3 152:12 166:10,22 167:4,12 168:18 195:5
**they're** 10:15 38:9 53:6,7,8 53:14 56:10,11 72:22 77:24 89:21 105:2 114:24 131:25 140:11 148:9 154:19 179:19 179:20 192:5 194:5 203:17 203:18 211:15
**they've** 100:19
**thing** 62:25 87:9 101:24 104:23 106:23 112:24 130:15 134:16 156:11,12 158:13 174:25 183:18 198:20
**things** 47:4 59:18 59:23 89:11 117:7 124:14 126:5 127:8 131:17 152:13 174:11,20
**thinking** 97:10 97:10 127:14
**third** 13:4 22:3 48:8 68:10 107:25 143:14 143:24 173:23 179:17 185:14 189:13,18
**those** 6:9 16:5,8 20:20 26:7,11 36:5 38:3,6 42:23 49:4 51:21 79:6 80:22 81:4 104:16 110:12 111:24 136:2 141:5 159:23 164:6,11,16,21 164:23 165:2 165:25 166:15 168:6,11,14 171:11 174:24 180:7 185:12 186:7 187:20 188:2 190:10 190:11,18 203:12 206:21 207:23 210:5 210:13 211:10
**thought** 19:10 27:22 34:14 39:8 46:11 120:9 126:5 129:9 144:5 146:15 181:13 205:22 213:19 214:11 215:15 216:9
**thoughts** 43:14 128:5 129:22
**thousands** 206:5 206:9,19 211:9
**three** 66:15,20 71:14 74:16 84:3 89:8 94:2 112:8 121:6 181:24 182:6 218:23
**three-member** 143:17
**three-person** 104:25
**through** 42:3 65:19 74:3,23 81:23 87:14,18 89:2,24 104:10 120:9,10,25 124:10,16 127:10 134:17 140:9,17 159:17 166:2,6 168:8 182:11 188:6 211:7 212:23,24,25 214:16 215:5 215:16
**tied** 7:5
**time** 4:12 6:15,15 16:23 22:18,21 29:21 35:18 36:2,4,15,17,20 39:5,15,17 40:10,14,14,24 41:14 44:14 55:4,11 57:14 57:18 64:17 65:22 74:15 77:19 78:10,16 85:6 97:6 105:24 106:3 109:6,10 110:25 111:10 117:19 118:6 121:16 126:4 126:13,18 127:24 132:10 153:23 154:8 155:10 157:20 158:2,25 159:8 159:18,19 161:19,22 163:3,6 164:9 167:17 169:16 170:16 171:5,8 173:25 174:6 174:10,14,15 175:7 182:16 182:17 186:4 186:19 187:14 190:15,24 192:15 193:3 198:14 204:6 210:24 211:12 212:6,8 216:15 216:18,24 217:3 218:12 218:15,18 219:3
**timeline** 109:14
**times** 6:4 7:18 42:16 214:9
**timetable** 126:8
**timing** 74:12 104:24 109:15 113:5 174:8 198:5 204:4
**title** 46:22 90:17
**titled** 21:19 24:16 25:2 30:2 32:7 47:16 48:4 56:20 68:8 69:23 84:10,18 189:12 208:17 221:6
**titles** 42:19
**today** 4:11 9:4,14 11:18 13:23 14:4,13,17 15:5 15:7 22:20 27:16 31:11 39:3 42:5 44:6 51:5 55:5 60:18 66:14 92:17 97:13 103:18 104:4 151:12 172:23 177:11 193:9 197:2 217:25
**today's** 12:6 15:12 218:21
**together** 18:5 178:15
**told** 33:16 34:8 35:21 74:17 92:2,7 111:17 111:20 116:22 118:16 121:12 132:13 170:21 178:20,22 215:9,18
**tomorrow** 215:24
**too** 29:19 127:25 205:2
**took** 104:21 111:2,11 123:11 125:24 127:24 152:8 157:16 177:7 193:2 198:9 216:7
**top** 45:23 61:18 61:20 62:3 140:2 143:5 147:7 150:9 188:19 192:11 217:15
**total** 44:2 193:9 194:12 211:15 218:23
**totality** 72:2
**totally** 110:10
**totals** 95:2
**touch** 82:6
**towards** 72:21
**track** 60:24
**traditional** 66:22
**training** 7:8
**tranche** 201:12 201:25 202:8 202:23 203:3,9

203:16,21 204:3,7 217:13 217:18,21 218:2,4
**tranches** 202:13 202:15,22 203:12
**transaction** 75:5 85:20 99:4
**transactions** 80:15
**transcript** 14:15 14:19 224:11
**transcription** 225:4
**transcripts** 70:10
**transfer** 14:3 32:8 35:19 68:21 69:14,15 69:17 70:15 71:22 76:20,22 76:25 79:20 80:17 82:22 83:9,20,23 85:9 85:24 86:4,5,6 86:8,12,19,23 88:14,23 89:2 93:7 94:4 95:22 96:2,3,15,22 97:6,11 99:24 100:11,22 101:11 104:15 104:16 108:24 108:25 110:8 120:13 122:9 122:15 137:22 220:19,20
**transferee** 100:12
**transferrable** 93:2
**transferred** 80:17 88:13 93:8,13,23 94:8 94:9 96:11 97:7
**transferrer** 69:20 71:3 84:5,5 89:16 100:12
**transferrers** 71:2
**transfers** 31:23 36:20 67:24 78:6 88:6 89:4 95:9 100:17
**TRAURIG** 2:14
**treat** 173:2
**trouble** 15:13 111:12 216:4
**true** 98:11 141:24 149:21 224:4
**trustee** 5:25 6:5,6 6:19,24 7:6,12 7:21 9:5 10:4 15:17 25:8 26:2 28:11 31:12 37:6,24 42:17 43:24 45:10,12 45:15 47:23 48:5,13 52:15 57:23 58:6,10 60:23 61:11,13 66:13 79:8,11 79:17 80:13 97:15 100:9 101:10 102:5 107:20 108:5 115:17 116:15 118:23 135:11 137:8 149:5 163:25 184:5 184:10 204:21 208:8,19,23 215:5 220:16 220:18,22 221:21
**trustees's** 101:12
**trustee's** 20:22 25:3 84:11,19 87:7 119:9 163:12,17 164:8 221:7
**trusts** 96:16
**trust's** 27:12 31:24 54:23 92:24 97:23 98:13 99:3 101:15 137:11 137:15 141:14
**truthful** 9:14 126:15
**truthfully** 199:13
**try** 11:24 12:2 15:8 50:14 75:21 107:7 151:21 168:11 214:18
**trying** 29:14 53:8 92:18 98:5 111:10 129:10 143:22 174:23 208:9,11 210:21 215:25
**tunnel** 52:2
**turn** 21:15 22:24 24:24 29:24 47:13 48:3 56:12 68:5 84:24 85:3 86:14 87:19 88:2,9 107:3 112:4 134:25 142:23 145:2 177:19 189:11 195:7,24 217:6
**Turning** 190:4 195:2
**tush** 124:14
**twice** 169:4
**two** 8:24 46:25 50:16 56:17 60:16 67:24 68:11 69:3,7,18 70:21,25 71:16 74:4,15,18 75:7 75:8 76:7,11,17 78:2,8 84:3 89:8,13 92:3 105:12 106:7 106:19 115:5 128:25 129:17 136:10 137:3 138:13 139:12 143:18 145:4 145:12,18,23 146:9 152:12 154:25 161:16 165:11 169:8 174:14 181:24 182:6 185:20 193:25 198:14 198:24 205:19
**two-minute** 216:12
**two-thirds** 145:23
**typical** 51:24 66:15,22
**typically** 59:24 65:9 95:7 130:15

**U**

**UCC** 155:9,12
**ugly** 95:10
**Uh-huh** 92:22 94:3 112:21
**ultimately** 75:17 104:24 131:21 192:18
**unable** 74:9
**unanimity** 180:25
**unanimous** 70:4 70:18 75:6 76:13 153:5 161:12 184:24 198:2
**unaware** 157:12
**uncertainty** 101:13
**uncommon** 205:24
**unconflicted** 83:6 84:6
**under** 8:6 49:8 49:23 54:10 69:20 90:17,25 91:16 122:4 130:14 133:10 138:2,20 167:16 184:23 187:18 192:24 209:5 224:12
**underlined** 100:8
**understand** 9:3 11:10,22 13:14 15:11 16:17 18:20 19:3 23:8 39:16 40:2,2,9 44:21 74:15 82:20 85:20 90:19 91:8 95:15 100:16 145:17 146:14 147:24 148:4,6 156:4 172:22 174:25 176:2 190:5
**understanding** 9:8 15:13 39:2 40:17,22 47:9 47:25 48:25 53:5 55:17 57:22 63:13,17 64:3,13 72:19 74:9 78:2,4 81:12 83:7,18 90:8 91:19 95:21,25 97:19 99:9 100:15 103:16 104:2,6 104:20 117:20 171:16 172:21 214:3
**understood** 46:20 90:2,4,14

90:15 115:23 124:17 179:14 186:4 198:18
**undertaken** 73:12
**undertook** 123:13
**undue** 71:19
**unfortunately** 143:6
**unintentionally** 165:16
**United** 1:2 4:8
**units** 79:20,21
**unless** 18:12 167:5 224:11
**unnecessarily** 55:12
**unsecured** 48:23 49:2,6,11,22 50:2 51:3,7,10 52:22 53:19 54:2,16 55:19 61:6 135:14 136:8,14,23 137:12 138:3 141:9,13,17 142:5,9,18 145:7 147:21 147:25 148:16 149:2 154:13 159:13 160:13 160:17 163:20 171:18 175:12 175:24 177:4 177:12
**until** 5:25 58:7 86:9 87:6,13 103:19 133:15 144:20 156:20 157:6,9,16 183:19
**unusual** 66:19 110:16 116:19 116:25 130:19
**up** 27:24 42:14 42:19 43:15 53:6 55:25 60:3 65:12 94:22 105:10 112:13 121:17 124:7 128:4 168:10 168:13 183:23 188:21,23 190:5,15 191:21 192:6,7 192:23 194:6 205:22 209:22 209:23 215:13
**update** 62:3 63:7
**updated** 99:4,10
**upon** 4:21 6:11 55:22 89:23 93:6 159:15 198:4,5 204:8
**upset** 140:21
**upsetting** 158:10
**us** 2:19 5:8 16:19 55:11 168:6 178:8 184:16 211:14
**use** 102:7 107:9 107:17 108:2 160:16 166:24
**used** 26:15 43:10 144:8 168:11 171:12
**using** 53:22 54:13 76:8 99:12
**usual** 66:14
**U.K** 91:17,18

**V**

**vacancy** 19:17 105:10 152:25 161:9 184:23
**vacated** 183:7
**valid** 86:9,20 97:11
**value** 53:13 56:9 73:25
**Vanderbilt** 2:16
**variants** 42:20
**varies** 6:11
**various** 20:18 35:22 66:13 218:7
**versus** 51:7
**very** 51:16 58:18 59:20 90:24 112:13 191:5 204:22 205:12 206:14 215:7 219:2
**via** 88:13
**videographer** 3:12 4:2,16 57:14,18 105:24 106:3 161:22 163:6 216:15,18,24 217:3 218:15 218:18
**videotape** 4:4
**Videotaped** 1:12
**view** 22:15 42:10 68:25 165:11 165:17,21 168:19 170:11
**views** 165:12 169:20
**violate** 96:3
**violating** 116:8
**violation** 96:17
**visibility** 171:19
**vision** 52:2
**VIVEK** 2:6
**voice** 132:3 169:5
**void** 96:18,24 97:7
**vote** 19:14 44:3 68:10,12 69:4,8 69:10,12,17 70:25,25 71:6 73:7,11,23 75:4 75:12,19 76:13 88:25 89:9 90:10 92:4 122:10 137:19 181:2 185:25 197:16,19
**voted** 65:11 71:5 83:6 84:7 121:4 121:8 197:22
**votes** 59:16 69:3 70:22 74:4,13 76:12 124:18
**voting** 58:2 69:21 73:19 119:18

**W**

**wait** 58:7 204:9
**Waiver** 24:17
**walk** 212:25
**Wall** 5:9
**wand** 125:23
**want** 21:16 23:20 23:24 28:6 29:7 29:8 45:16 47:15 49:16,20 55:4 56:7,9,13 58:12 60:11 67:15 77:3,6 81:23 85:3 87:21 88:19 95:18 101:23 105:23 111:12 114:19 119:11 122:17 124:12 125:4 130:18 139:3,19 168:8 179:25 188:5 189:10 198:19 199:15 202:9
**wanted** 63:19 64:22 111:22 123:19 151:25 178:18,20,25 181:8 208:16
211:13 212:22 214:17 216:8
**wants** 81:24 124:19
**warrant** 170:18
**wasn't** 11:6 70:12 71:16 81:14 82:4,5 90:2 91:7 103:11 124:19 124:24 126:7 130:11 159:24 169:13 170:23 193:7 214:14
**wave** 125:23
**way** 38:7 39:13 64:20 80:20,21 103:25 126:5,6 142:10 146:14 152:9 179:2 183:11 187:2 187:16 192:2 204:15 211:4
**ways** 67:2
**wearing** 56:11
**Wednesday** 4:11 55:7
**well** 13:2 20:18 64:13 113:12 134:19 155:4 176:10 195:6
**went** 9:10 18:25 39:9 74:23 80:20 85:11 89:24 120:9,10 124:10,16 158:15 160:22 168:8 212:12
**weren't** 75:8 109:2 115:23 131:14 133:18 176:21 206:21
**we've** 33:12 105:7 110:14 112:12 218:8

**whacked** 53:6
**whatever** 114:20 115:4 161:10 168:13 207:14
**whatsoever** 112:16 113:16
**what's** 16:18 130:13 140:6 145:11
**when** 7:12,24 9:8 10:20 17:22 18:20,24 19:16 22:17,21 23:2 25:4 30:22 34:8 34:16 36:10,23 43:15 52:7,7,14 53:15 56:11 59:23 60:8,25 64:15,17 71:20 74:12 76:7,11 77:4,17,19 78:16 82:19 86:10 91:15 92:19 99:18 102:18 104:22 105:10 106:20 108:8,15 109:16 111:5 111:10 117:24 121:15 123:19 123:24 124:10 125:2,11,16 133:12,13 146:20 148:14 150:14 158:15 159:14 164:16 171:3 174:19 175:3 177:3 178:24 179:4 184:2 185:25 186:9 187:4,8 196:16 197:9 197:15 198:14 198:21,23 199:22 202:19 205:2,6,24 209:15,16,23 209:24 212:3,7 213:22
**where** 13:8 19:9 28:15 29:25 38:3 43:11 46:11 51:6,11 52:25 64:5 74:8 92:20 93:9,19 95:9 99:22 100:5,7 107:23 116:5 130:17 131:24 143:23 174:14 189:4 191:12,16 192:10 208:3 210:20 214:12 215:20
**whereas** 135:2,3 146:5
**whether** 11:13 19:3 33:21 34:20 35:6,21 39:9,16 42:12 44:21 47:8,18 47:20 52:19 55:18 59:14 72:20 75:12 81:2 82:7 83:2 85:22 91:25 92:7 97:5 109:5 109:9,24 110:10 111:15 111:16,19 120:15,23 121:3,7,11 132:19 153:2 157:21 159:6 160:18 163:23 165:5,13,14 167:7,11 168:16,20 169:23 170:24 171:17 175:22 176:2,8 183:5,5 183:12,20 185:2,6,13,23 187:13,24 197:9 198:23 199:3 203:16 204:8 217:25
**which** 9:22 14:11 15:18 25:2 28:7 29:14 30:19 31:25 35:16 45:22 48:10 50:25 56:19 58:13 61:24 68:6,9,13 70:7 74:14 85:18,24 86:3,7 87:20 88:3,10,20 89:7 90:21 94:17,19 98:23,23 101:8 101:9 102:2,5 104:11,12 112:8 114:9 117:9 119:6 123:16 135:7 135:10,22 141:10 142:21 147:9,14 148:19 151:2 156:22 158:16 163:14,20 173:7 177:20 188:7 191:7 196:10 207:5 209:6 210:3,20
**WHIDDEN** 2:21
**while** 16:11 125:25 204:20
**who** 8:4,10,13,16 10:25 11:10 12:18,21 15:25 18:5 34:6 39:19 41:10,13 43:11 46:17,18,25 48:20 52:8 54:9 60:4,13,17,24 63:11 69:9 71:13 72:13,13 73:3,3,5,14 82:23 84:4 95:11 99:10 103:11,17 109:15 111:2 114:24 116:12 122:9 124:3 127:11 137:6 145:14 146:20 146:24 147:4 148:22,25 149:9,12 150:3 159:14 160:2,3 160:7,23 161:15 164:11 165:4 168:21 170:8,21 172:14 173:23 174:3 175:20 176:17 178:22 179:23 181:3 181:15 184:14 193:11 194:4 196:23 203:21 203:23 204:2 207:11 210:18 211:17,21 213:6,9 214:21
**whoever** 110:24 179:19,19 204:5 214:17
**whole** 30:12 73:2 93:8,23,25 94:4 94:8,10,20 134:16 158:5 158:12 182:24
**whom** 36:10 47:22 82:21 176:16 178:11 213:8
**whose** 55:24
**why** 41:5 63:13 74:16 80:6,20 95:7 104:3 127:5 131:4,7 131:12 146:14 152:12 158:12 161:3 181:8 205:8 212:21 214:3
**will** 4:20,22 11:22,22,24 12:2 14:23 15:15 23:18 28:3 30:23 34:19 41:24 46:21 48:8 52:2 53:4,12 56:5 58:7,14 60:3 77:5,7 102:7 116:22 124:11 125:8 127:17 130:15 139:7 139:25 147:12 147:13 163:18 180:17 195:7 196:11 201:20 201:23 202:17 205:19 208:7 210:3 218:24
**willing** 95:12 199:10
**win** 147:12
**wine** 124:5
**withdrew** 175:10 175:17
**withheld** 166:19
**within** 67:10 137:3
**without** 32:19 34:25 69:24 70:3 99:24 139:13 152:14 188:2 197:2
**witness** 4:23,25 18:11 33:25 40:6 82:3 139:6

157:2 161:20 171:6 178:4 216:21 224:3,5
**won't** 161:5
**word** 26:15,16 99:12 102:8 144:3,8,12,14 144:16 160:16 192:10
**wording** 57:4
**words** 7:8 18:5 76:8 118:20 159:22,23 164:6 171:11 171:15 190:5 191:21
**work** 5:14 9:4,17 9:23 10:3 59:7 64:24 78:13 215:5
**worked** 10:14 13:8,12 74:2 168:9
**working** 10:8 37:9 178:12,15 180:4,11
**world** 124:6 126:3
**worried** 15:14
**worth** 53:3
**wouldn't** 98:15 105:6 140:23 169:11 200:17
**wound** 209:22,23
**write** 89:19
**writes** 180:3,15
**writing** 151:4
**written** 65:4 70:4 70:6,7 86:12,20 88:12 93:7,11 96:9 100:11 120:24 185:7 208:24 209:9 209:11
**wrong** 32:6 53:22 54:3 60:12 76:8 93:16 128:20 189:20 201:16
**wrote** 82:14,19 122:25 123:10
**www.MagnaL...** 1:25

**X**

**x** 1:5,9 24:16 116:23 220:3 220:10 221:3 222:3
**Xie** 3:4 12:24 41:15 88:24 89:13,18 121:22 123:8 132:5 149:25 150:4,21 153:25 164:15 169:17 178:23 181:17,23 182:5 184:20 186:11 204:25 205:4,9 214:22

**Y**

**Yards** 1:13 2:10 4:14
**yeah** 98:25 124:13,13 181:2 182:21 202:12 205:3 213:20
**year** 65:18
**years** 5:23 6:10 6:13 155:2 174:14 218:7
**yet** 59:2 85:21 129:23 195:4 211:3
**York** 1:14,14,16 2:5,5,10,10,16 2:16,20,20 3:6 3:6 4:14,14 5:10,10 132:21 133:6
**yourself** 29:21 77:4 106:21 167:18
**you've** 5:24 30:23 31:16,22 32:10,18,23 33:8 40:24 42:23 106:20 177:11 206:25 218:7

**Z**

**ZHANG** 2:12
**Zoom** 2:6,7,17,21 2:21 3:6,7,7,11 59:25 167:5
**Zooms** 167:6
**Zuckerman** 146:22 147:2 149:22 152:10 153:24

**$**

**$4** 188:23 202:24
**$6** 188:21 192:8

**0**

**000180** 102:12,15 221:12
**000182** 201:11
**01** 79:11
**01917428** 79:8,12 220:22
**01917443** 61:11 61:14 220:18
**01917448** 58:6,10 220:16
**01917458** 184:5 184:11 221:21

**1**

**1** 2:5 4:4 21:8 45:4 57:15 79:21 146:4 156:7 203:12 203:19 204:14 217:22 220:13
**1st** 212:14
**1,000** 207:9
**1.05** 21:17,18,24
**1.06** 189:11,13,19 199:5
**1:28** 163:3,6
**10** 48:3 106:10,17 119:14 167:23 194:12 201:12 207:14 221:13
**10th** 120:7,16 128:16
**10.A** 107:4,9 109:21 113:22 117:4
**10.B** 107:25 109:21
**10:22** 57:15
**10:38** 57:19
**100** 16:4 18:25 42:4 138:8 207:7
**10001** 2:10
**10005** 5:10
**10017** 2:16
**10020** 2:20
**10036** 3:6
**10119** 2:5
**102** 221:11
**106** 221:13,15
**11** 30:3 106:13 194:15 221:15
**11:39** 105:25
**11:51** 106:4
**1121** 2:20
**12** 122:19 128:9 128:23 129:14 132:7 194:17 196:10 221:17
**12th** 128:18
**12:58** 161:23,25
**122** 221:17
**13** 88:10 155:17 221:18
**13th** 9:11
**14** 24:24 32:4 88:21 99:2 184:4,10 221:20
**15** 49:10 135:9 136:6,20 137:10 141:10 145:19,25 146:10 195:9 195:13 216:21 217:6 221:22
**155** 221:18
**16** 1:14 4:11 200:24 208:15 222:6 224:7
**1694** 155:16,18 221:19
**17** 195:24 196:2,2 196:4
**183** 221:20
**194** 221:22
**199** 222:6

**2**

**2** 29:11 31:5 57:20 79:22 203:12 220:14
**2.01** 139:8,24
**2.05** 22:22,23 31:23,25 96:3 96:18,23 97:8
**2.05D** 97:10
**2.05.A** 92:21,23 99:22
**2.05.B** 86:12,17 96:6 100:8
**2.08** 23:16
**2:32** 216:15
**2:39** 216:18,24
**2:40** 217:3
**2:41** 218:15
**2:46** 218:18,20 219:3

**20** 7:16 61:14 62:15 85:4,8,14 167:25
**201** 136:16
**2024** 8:3 45:8 102:19 103:3 104:3,7 195:10 195:14 201:12 221:23
**2025** 10:24 14:2 61:15 62:15 78:21,24,25 79:13 85:10 88:11 102:16 104:18 113:2 119:14 120:18 121:23 122:18 128:9,23 129:14 132:8 134:2 137:21 154:12 156:2 157:7,12 172:8 173:4,22 177:23 178:6 198:8
**2026** 1:14 4:12 104:7,18,19,21 133:15,24 173:22 184:11 207:17 224:7 225:11
**205.B** 93:6
**21** 88:2 220:13
**22** 23:20 47:13 56:12,20 112:5 112:6 119:12 119:25 128:13 145:3 196:4
**23** 23:25 68:5 184:11 207:17
**23-90716(MI)** 1:7
**24** 24:5 32:20 163:14,19
**246** 163:17
**25** 156:20 157:9 195:19
**25th** 128:15
**27** 45:8 195:10,14 221:23
**27th** 158:16
**29** 220:14

**3**

**3** 3:5 58:9 76:19 77:6,9,10 78:24 78:25 85:10 163:7 203:12 220:15
**3rd** 79:3 88:5
**3.01** 48:4
**3.03** 25:2
**3.03A(iii)** 28:6
**3.03.B** 25:7
**3.07** 33:3
**3.07.B** 208:15 211:25
**30** 168:3
**30th** 210:3,14 213:4
**35** 24:15,21
**36** 5:23
**37th** 5:9
**39** 29:25

**4**

**4** 61:10 173:3 189:3 192:17 192:23 195:20 196:12 199:14 201:12 202:2,5 202:8,24 203:3 203:9,15,21 204:3,7,11,12 217:13,18,21 217:22 218:3,4 220:17
**4th** 14:2 79:13
**4-G** 30:19
**4.G** 143:11
**4.01** 23:21 32:11 47:16 112:6 118:21 145:3 159:11,19
**4.01B** 114:9
**4.02** 56:19
**4.05** 23:25 32:15 68:8
**4.05.A** 68:6
**4.05.C** 72:8 89:2 122:4
**4.06** 24:5 32:19 69:22
**4.06.D** 152:23
**4.07** 24:10 32:24 152:20
**4.07.D** 153:22 161:8
**40** 5:9 6:8 42:22 50:23
**40th** 2:5
**401** 134:14
**407.D** 184:23
**42** 29:20 30:20 188:6,11
**43** 45:22 88:9 188:20 192:11 202:17 203:14
**44** 45:18,20 46:5 142:23 143:7 143:11 188:6,9 192:17 203:14
**45** 147:7 208:24 209:8,10
**47** 99:2

**5**

**5** 21:7,15 76:20 77:11 102:16 177:23 178:6 189:11 195:21 196:13 220:7 220:19
**5th** 14:2 79:13 82:13 85:21 87:15,16
**53** 58:22
**55** 1:13 2:10 4:13
**58** 220:15

**6**

**6** 76:22 203:13 220:20
**61** 220:17
**624-6221** 1:24
**684** 28:18

**7**

**7** 79:7 85:18 90:23 104:13 106:18 107:3 136:17 139:7 196:8,10 220:21
**74,298.92** 79:21
**76** 220:19,20
**79** 220:21

**8**

**8** 22:24 32:7 84:10,24 85:3 86:13 87:20 88:21,21 92:21 98:23 99:22 119:12 163:13 163:19 221:6
**84** 221:6
**85** 49:9 135:7 136:2,17 141:6 145:19,24 146:9
**85/15** 140:5 146:19
**866** 1:24

**9**

**9** 102:11,14 177:19 178:4 194:20 221:11
**9:15** 1:14 4:12
**90,407.17** 79:20