# Exhibit 23

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - - x

IN RE:

INSTANT BRANDS ACQUISITION HOLDINGS, INC., et al.,

Case No. 23-90716(MI)

Reorganized Debtors.

- - - - - - - - - - - - - - - - - - - - x

Zoom video conference deposition of JONNY CHEATLE, was held remotely, commencing September 18, 2026, 7:05 a.m., before Leslie Fagin, a Stenographic Court Reporter and Notary Public in the State of New York.

- - -



MAGNA LEGAL SERVICES

A P P E A R A N C E S: (Appearing via Zoom)

ELSBERG BAKER & MARURI
Attorneys for Plaintiff
1 Penn Plaza, 40th Floor
New York, New York 10119
BY: MICHAEL DUKE, ESQUIRE

BOIES SCHILLER & FLEXNER LLP
Attorneys for Defendant CORNELL CAPITAL LLC
55 Hudson Yards
New York, New York 10001
BY: MARC AYALA, ESQUIRE
KATHERINE ZHANG, ESQUIRE
CAROLYN DRELL, ESQUIRE

GREENBERG TRAURIG, LLP
Attorneys for FORMER OFFICERS AND DIRECTORS DEFENDANTS
One Vanderbilt Avenue
New York, New York 10017
BY: JOSEPH DAVIS, ESQUIRE
ALI HOLDWAY, ESQUIRE

DENTONS US LLP
Attorneys for SELLER AND FOUNDER DEFENDANTS
1121 Avenue of the Americas
New York, New York 10020
BY: LEANNE SUNDERLAND, ESQUIRE

A P P E A R A N C E S: (Cont'd)

DECHERT LLP
Attorneys for CITADEL ADVISORS BEN XIE and JONNY CHEATLE
3 Bryant Park
New York, New York 10036
BY: GARY MENNITT, ESQUIRE (Zoom)
TESS McMULLIN, ESQUIRE (Zoom)
ALLAN BRILLIANT, ESQUIRE (Zoom)

ALSO PRESENT:
MARC ROSEN
MAYA DANAHER, Citadel
JOHN VITALI, Videographer
Magna Legal Services

THE VIDEOGRAPHER: We are now on record this begins videotape No. 1 in the deposition of Jonny Cheatle in relation to Instant Brands Acquisition Holdings Incorporated, et al.

Today is Friday, September 18, 2026. The time 7:05 a.m. Eastern Time.

This deposition is being taken remotely at the request of Boies Schiller Flexner LLP.

The videographer is John Vitale of Magna Legal Services. The court reporter is Leslie Fagin of Magna Legal Services.

The presence of all counsel and parties will be noted on the stenographic record.

Will the court reporter please swear in the witness?

THE REPORTER: I need to make statement on the record, because I'm not with the witness.

The attorneys participating in this deposition acknowledge that I am not

J. Cheatle

physically in the deposition room, and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel further agree that the witness may be in a state where I am not a notary and stipulate to the witness being sworn in by an out-of-state notary.

If any party has an objection to this manner of proceeding, please state so now.

J O N N Y C H E A T L E, called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. AYALA:

Q. Good morning Mr. Cheatle?

A. Good morning.

Q. I guess I should say good afternoon.

J. Cheatle

Have you been deposed before?

A. No.

Q. So just basics, I will be taking your deposition today. My name is Marc Ayala. Along the way, I will be asking you questions. You are obligated to provide complete and truthful answers.

From time to time your counsel may object. You are required to still answer the question unless your counsel directs you not to answer.

Do you understand that?

A. Yeah.

Q. And during the course of the deposition, it would be helpful to the court reporter if you could make sure that your answers are audible as opposed to head shakes or uh-huhs, that sort of thing. Try to keep them to audible words.

Does that make sense?

A. Yeah.

Q. I understand you have some time pressures today, so I will do my best to accommodate that, but if you need breaks

J. Cheatle

along the way, feel free to let me know, happy to take a break. The only exception to that is if a question is pending, we can't take a break.

Do you understand that?

A. Yes.

Q. Then with these remote depositions, the procedure can be a little clunky since we are not in person, so just by way of process, we have shared with you a ZIP file of documents. We may look at some of them, probably not all of them today.

When we do that, I will ask my colleague, Ms. Drell, to put the document up on the screen so you can look at it through the share screen function. You are also welcome to open them up locally on your computer and what I will do, I think in the folder, there should be tab numbers and the file name of each document that you have, so when I direct you to documents, some of the documents will be admitted as exhibits and they will have different exhibit numbers than tab numbers, so when I'm speaking with you, I

J. Cheatle

will try to refer to both of them and the tab number correlates to the number and file name.

Does that make sense?

A. Yeah.

Q. Great. What is your experience with litigation?

A. That's a very broad question. I have seen a number and read about a number of litigations over the years.

Q. Describe generally your experience with managing litigations?

A. Managing litigations, I'm not sure what you mean by managing.

Q. In your professional experience, have you ever had a role where you have a say in how a litigation ought to be handled?

A. I'm not a litigator, but I am an internal counsel, so I've been involved in that respect.

Q. And in your role as an internal counsel, what are your job responsibilities?

A. I'm a business coverage lawyer.

Q. And as a business coverage lawyer,

J. Cheatle

is managing litigation a component of your responsibilities?

A. The litigation matters of the businesses I cover, yeah.

Q. So when there are litigation matters in the businesses that you cover, what are your responsibilities?

A. To advise the businesses on relevant aspects of that.

Q. Relevant aspects of the litigation itself?

A. It can be, yeah.

Q. And how long have you been operating in that role?

A. At Citadel, maybe six years.

Q. And what has your title been at Citadel?

A. Counsel.

Q. Before Citadel, what did you do?

A. I worked at Goldman Sachs.

Q. And what did you do at Goldman Sachs?

A. I was internal counsel there too.

Q. Have you ever acted as a litigator?

J. Cheatle

A. No.

Q. Approximately how many litigations have you become involved in in your role as internal counsel?

A. I don't know. Dozens maybe.

Q. So you regard yourself as experienced with managing litigation?

A. I would regard myself with having some experience. I'm not sure how you define experience.

Q. You feel comfortable managing litigation?

A. That's not my role.

Q. So you are not comfortable managing litigation?

A. I just said it's not my role.

Q. So I will ask the question again then.

Are you comfortable managing litigation?

MR. DUKE: Objection, form.

A. It's a hypothetical. I don't know how to answer that.

Q. Your testimony is you don't know

J. Cheatle

how to answer the question as to whether you are comfortable managing litigation?

A. My answer is that it's hypothetical.

MR. DUKE: Can we pause for a second, sorry.

Is anybody's realtime not working?

THE VIDEOGRAPHER: We are going off the record at 7:12 a.m. Eastern Time.

(Off the record.)

THE VIDEOGRAPHER: We are back on record at 7:14 a.m.

Counsel, proceed.

BY MR. AYALA:

Q. Mr. Cheatle, earlier I asked you, so you were not comfortable managing litigation and you said, I just said it's not my role.

What did you mean by it's not my role?

A. Simply that my role is not to manage, I'm not a manager of litigation matters.

Q. What do you mean by that?

J. Cheatle

A. Well, I mean what I say, that's not my role. My involvement is not a management role.

Q. When you say my involvement is not a management role, what distinction are you drawing between a management role and your involvement?

A. I infer your use of management to mean something like directing or controlling or deciding and that's not my role.

Q. What is your role with respect to litigation when you become involved in those matters?

A. What I described before, certain aspects of it, I would advise the business on.

Q. Can you give me examples?

A. But I'm not the litigator.

Q. Can you give me examples of those types of aspects?

A. Well...

MR. MENNITT: Objection, to the extent it calls for privileged communications, but I think very

J. Cheatle

generally, you can answer.

MR. DUKE: We talked about this off the record, but, Marc, just on the record, one objection is good for everybody.

MR. AYALA: Agreed.

MR. DUKE: Thanks.

Q. Examples of the types of aspects that you would advise the business on with respect to litigation when you become involved in those types of matters.

A. So typically, it would be the deal-related aspects, like the structure of the deal, that sort of thing.

Q. When you are talking about the structure of the deal, again, at a general level, what do you mean by that?

A. So, you know, who are the different constituents, what are the relevant documents governing their relationship, what are their respective rights and obligations.

Q. How did you come to be involved in the Instant Brands bankruptcy?

A. One of the businesses that I cover

J. Cheatle

held positions in Instant Brands.

Q. Which business was that?

A. It was a credit business within Citadel.

Q. And what were your responsibilities with respect to these positions in Instant Brands that the credit business within Citadel held?

MR. DUKE: Objection, form.

Q. You can answer.

A. I mean, as before, advise the business on aspects of the transaction, aspects of the bankruptcy outcome, liaise with external counsel.

Q. And what are your responsibilities with respect to Citadel's interest in the litigation trust?

MR. MENNITT: Objection to form, but you can answer.

A. Citadel's responsibilities in respect of the litigation trust, that's the question?

Q. Your responsibilities in connection with the litigation trust.

J. Cheatle

A. So, generally, I still have the role as counsel, internal counsel to the business, but then, more specifically, I'm a member of the trust advisory board.

Q. And what are your responsibilities as a member of the trust advisory board?

MR. DUKE: Objection, form.

A. So as set out in the trust agreement, the key aspects of it are, if I recall, advise, supervise the trustee.

Q. What is the nature of your working relationship with Mr. Xie? Does he report to you?

A. No.

Q. Do you report to him?

A. No.

Q. Could you characterize the nature of that working relationship?

A. I'm internal counsel to the business unit he is part of, so colleagues I would say.

Q. And who was involved first with respect to Citadel's interest in the debtor, you or Mr. Xie?

J. Cheatle

MR. DUKE: Objection, form.

A. Probably Mr. Xie.

Q. So I should ask, is it pronounced Xie or Xie?

A. I say Xie.

Q. To your knowledge, does Mr. Xie have any experience with managing litigation?

A. Not to my knowledge. In the terms as I understood it as I mentioned before, not to my knowledge.

Q. To your knowledge, does Mr. Xie have any experience at all with litigation?

A. Yes.

Q. In what capacity?

A. As a holder of interest that have been part of litigations, the subject of litigations.

Q. Prior to your involvement in the litigation trust here, have you ever had a role where you manage or supervise the trustee?

MR. DUKE: Objection, form.

A. Yeah, I don't think I managed the trustee here, but no is the answer.

J. Cheatle

Q. You've never sat on an advisory board in connection with a trust before?

MR. MENNITT: I'm going to object.

Are you asking him whether he, as Jonny Cheatle, has done that or are you asking Citadel?

MR. AYALA: I'm asking the witness.

A. As Jonny Cheatle, no.

Q. So today, you are Jonny Cheatle and my questions are to you, Jonny Cheatle, and if I have a question about Citadel, I will ask about Citadel.

A. Okay.

Q. To clarify the record, you have never sat on any board in connection with a trust before in any capacity, correct?

MR. DUKE: Objection to form.

A. Correct.

Q. To your knowledge, has Mr. Xie ever done so?

A. I don't know.

MR. DUKE: Objection, form.

Q. You don't know one way or the other?

J. Cheatle

A. I don't know.

Q. Did you participate in any way in the drafting or negotiation of the plan that was confirmed in the Instant Brands bankruptcy?

MR. MENNITT: I will caution the witness, you can answer that question yes or no, but, obviously, don't disclose any attorney-client privileged information in that regard.

A. Did I participate in the negotiation of the plan?

Q. Did you participate in any way in the drafting or negotiation of the plan that was confirmed in the Instant Brands bankruptcy? It's a yes or no question.

A. No.

Q. Did you participate in any way in the drafting or negotiation of the litigation trust agreement?

A. No.

Q. Did you participate in any way in the drafting or negotiation of the credit agreement that provides for funding of the

J. Cheatle

litigation trust?

A. No.

Q. What roles does Citadel have in connection with the litigation trust?

MR. DUKE: Objection, form.

A. So Citadel institutionally, one Citadel fund is a lender to the trust and another Citadel fund holds trust interests.

Q. What roles does Parabellum have in connection with the trust?

MR. DUKE: Same objection.

A. So I think two Parabellum funds hold trust interests and an employee of Parabellum is a member of the advisory board.

Q. How did Citadel come to be a holder of litigation trust interests?

A. That was a consequence of its prepetition debt holdings.

Q. Can you expand on that answer please?

A. Yeah. My understanding was that through the plan, those interests or a portion of those interests were converted into trust interests.

J. Cheatle

Q. At any cost to Citadel?

MR. MENNITT: Objection to form.

A. In the sense of a cash payment?

Q. Yes.

A. I don't think so through the plan.

Q. In any other sense?

A. The debt was cancelled I suppose.

Q. Anything else? Any other sense?

A. I don't think so, no.

Q. What documents govern the operation of the of the trust?

MR. DUKE: Objection, form.

A. The trust agreement and the plan.

Q. You understand that when I refer to the plan, I'm referring to the plan of reorganization that was confirmed in the Instant Brands bankruptcy?

A. I should have clarified that, yes.

Q. I'm clarifying now just to make sure we are on the same page. When I refer to the litigation trust agreement, you understand me to be referring to the litigation trust agreement that establishes and governs the Instant Brands Litigation

J. Cheatle

Trust?

A. Yes.

Q. When I use the term litigation trust, you understand I'm referring to the Instant Brands Litigation Trust?

A. Yes.

MR. AYALA: Leslie, you will remember from the other depositions, one of the short hands we use is LTAB, L-T-A-B, which refers to the litigation trust advisory board.

Q. Mr. Cheatle, are you familiar with that abbreviation if I use it today?

A. Okay.

Q. Great.

MR. AYALA: Why don't you put up tab 22, which we will mark as Exhibit 1.

(Exhibit 1, email chain, marked for identification, as of this date.)

Q. It should be an email chain that starts with the March 17th email at the top.

A. Yeah.

Q. So, Mr. Cheatle, feel free to review the email chain in full. I'm going to

J. Cheatle

ask you first about the earliest email in the chain which is on the last page starting with the Bates stamp ending in 376 and the Bates stamps are the numbers in the bottom right-hand corner of the document.

A. Yeah, the trustee and board members.

Q. Yes. In this email, you were seeking the LTAB's approval of the transfer of LTIs from Citadel to the Parabellum entities, correct?

A. Correct.

Q. And you did not vote on that issue, right?

MR. DUKE: Objection.

A. I did not, correct.

Q. Who did vote on that issue?

A. I need to read this.

So Martin Olson, through his counsel, Dipesh Patel.

Q. Just to clarify, you are saying the person who voted on that issue was Martin Olson through his counsel, Dipesh Patel?

A. Yeah, that's how I understood the

J. Cheatle

arrangement, yeah.

Q. And nobody else voted on that issue, correct?

A. Correct.

Q. In the -- earlier in the chain, on the page ending in 375, there is an email from you to Mr. Halperin dated March 5, 2025 at 6:25 p.m.

Do you see that?

A. Hi, Alan, Thanks for facilitating.

Q. That's the one. You write, Thanks for facilitating.

What did you mean by that?

A. I meant; one, thank you and; two, Alan had helped, had arranged the process for seeking that consent.

Q. What did he do to arrange the process for seeking that consent?

A. He thought about how best to do it and proposed this method.

Q. And in considering how best to do it -- strike that.

Did you have conversations with Mr. Halperin about how best to do it?

J. Cheatle

A. Yes.

Q. And what ways to do it did you and Mr. Halperin discuss?

MR. DUKE: I caution the witness, to the extent that involves the disclosure of attorney-client information, you should exclude that from your answer.

A. Really, I asked him to think about it and he said he would consult -- he would think about it and consult with his partner, his law firm partner, Debra.

MR. MENNITT: I caution the witness, I think we would stray into privilege because you can't disclose anything Alan told you that Debra had advised. The mechanics of it I think are okay.

Q. As to the subject matter, did you and Mr. Halperin discuss any ways to arrange for this transfer that were not what was communicated between Mr. Halperin and his counsel, Debra?

MR. DUKE: Same objection and

J. Cheatle

instruction.

A. But I can answer. I don't know is the answer to that.

Q. You don't recall, in other words?

A. I don't know what conversations or what conversations he had with Debra.

Q. This is Ms. Cohen, I take it?

A. Yeah, that's who I mean, yeah.

Q. So you had discussions with Mr. Halperin and you don't know one way or the other whether any of those discussions involved substance that was communicated between Mr. Halperin and Ms. Cohen, correct?

A. I don't.

Q. So what were the methods that you and Mr. Halperin discussed to accomplish the transfer of the LTIs from Citadel to Parabellum?

A. We didn't with specificity. I just asked him to think about it.

Q. Other than asking him to think about it, did you and Mr. Halperin have any discussions about the method by which the transfer of LTIs from Citadel to Parabellum

J. Cheatle

could be accomplished?

A. Not beyond the proposal that he made which resulted in this email chain.

Q. What was the proposal that he made?

A. That I request approval of the transfer in the form that you see here or in this email chain.

Q. And that only Mr. Olson vote on that issue?

A. Yeah.

Q. In that discussion, did you all discuss -- withdrawn.

In that discussion, did you and Mr. Halperin discuss whether you or Mr. Xie would be entitled to vote on the issue?

A. I don't recall that specifically.

Q. Do you recall that generally?

A. I would -- yes.

Q. What do you recall generally about that topic?

A. That Alan's view was that the transfer would require and the approval would require Martin Olson's approval.

Q. And that you and Mr. Xie would not

J. Cheatle

be entitled to vote on that issue?

A. Yeah.

Q. And what was his rationale, if he communicated it to you, as to why that was the case?

A. I don't recall that he did.

Q. In the same email, you write, Just need to get the common interest agreement done.

Do you see that?

A. Yes.

Q. What were you referring to there?

A. The trustee, the LTAB is subject to a common interest agreement, that's what I'm referring to.

Q. Why did you need to get the common interest agreement done?

A. Because Ben and I, so this is the appointed LTAB members, I didn't want to have conversations with anyone at Parabellum that would compromise that common interest.

Q. So you wanted a common interest agreement in place to facilitate communications with Parabellum regarding the

J. Cheatle

litigation trust assets, correct?
A. With, if I recall, I think it was an individual at Parabellum, but I would have to check on that, but yes.
Q. Mr. Sinna?
A. Yeah.
Q. And why did you want to have communications with Mr. Sinna regarding the litigation trust assets?
MR. DUKE: I will hop in here and caution the witness not to disclose the contents of any attorney-client privileged information.
If you can answer without disclosing anything.
A. Ben and I thought they might have useful or John might have useful insights, useful guidance for us.
Q. Why did you think that they or John might have useful insights or useful guidance for you, without disclosing the subject of any attorney-client communications?
A. Because John represents an experienced fund in litigation matters.

J. Cheatle

Q. And why would that be attractive for you all to get his views on those matters?

MR. MENNITT: I caution the witness, again, not to disclose any privileged communications, but I think the answer to that question is okay.

A. Because it was part of our, Ben and my duty in advising the trustee, to maximize the return for the beneficiaries of the trust, that was the objective.

Q. What is the relationship between John being, or John representing an experienced fund in the litigation matters and your duty in advising the trustee to maximize the return for the beneficiaries of the trust, without disclosing the substance of any attorney-client communications?

A. I will answer it in general terms. It's just getting intelligent, insightful guidance on how we might think about things, how we might approach things.

Q. In the following email, Ms. Cohen writes, Please review the changes to the

J. Cheatle

register. See attached. We reduce the interest assigned from the interest acquired from 11th Lane and base the claim amounts proportionally.

Do you see that?

A. Yeah.

Q. Do you have an understanding of what Ms. Cohen is referring to there?

A. The register of trust interest holders.

Q. You understand what she means by we reduce the interest assigned from the interest acquired from 11th Lane based the claims amounts proportionally?

MR. MENNITT: Again, to the extent this is based on any conversation with Debra Cohen, that would be privileged, but you can answer with that caution.

A. Specifically, no. Generally, she is referring to updating the register to reflect changes in ownership.

Q. Did Citadel acquire interests from 11th Lane to your knowledge?

A. I think so, yeah.

J. Cheatle

Q. Do you recall when that happened?

A. Back end of 2024 I think.

Q. Do you know who Mr. Howard Shams is?

A. I don't, but I recognize the name.

Q. I take it then you never communicated with Mr. Shams?

A. Not to my knowledge, no.

Q. Now, is it your understanding that...

MR. AYALA: Katie, why don't you put up tab 16 which we will mark as Exhibit 2.

(Exhibit 2, Litigation Trustees's Objection to Cornell Capital, marked for identification, as of this date.)

A. Tab 16, I have it here. Litigation Trustees's Objection to Cornell Capital, that one?

Q. That's right.

A. Go ahead.

Q. Could you turn to page 3 and I will ask you about paragraph 5.

A. The reality is the opposite.

J. Cheatle

Q. That's the one.

Do you see in that paragraph, the trustee writes, Citadel initially entered into participation agreements with Parabellum and shortly thereafter, fully transferred trust interests to Parabellum with the consent of the LTAB?

A. Yes.

Q. Do you agree with that statement?

A. Yes.

Q. And where it says fully transferred trust interests to Parabellum with the consent of the LTAB, what is your basis for your agreement with the statement that that transfer was made with the consent of the LTAB?

A. That's the email exchange that we just discussed.

Q. Mr. Olson's vote?

A. Correct.

Q. Through Mr. Patel?

A. Yeah.

Q. No other basis for agreeing with that statement?

J. Cheatle

MR. DUKE: Objection, form.

A. The consent piece, that's the basis for it.

Q. If you could turn to page 13. You will see paragraph 45 starting at the bottom of that page.

A. The credit agreement expressly permits?

Q. That's right.

You will see that paragraph discusses the transfer of LTIs from Citadel to Parabellum, correct?

A. That is exactly what happened here, Citadel and Parabellum, executed written transfer notices, I see that, yeah.

Q. And then there is a footnote 8 that starts with Because Citadel.

Do you see that at the bottom of page 14?

A. Yeah. Had a financial or other pecuniary interest.

Q. It says, Because Citadel had a financial or other pecuniary interest in the transfer to Parabellum, Messrs. Cheatle and

J. Cheatle

Xie, both Citadel employees, were not entitled to vote on the transfers, end quote.

Do you agree with that statement?

MR. DUKE: Objection to form.

A. I don't.

Q. Why don't you agree with that statement?

A. I don't think Citadel did have a financial or pecuniary interest in that transfer.

Q. What's your rationale for that?

A. It was an administrative elevation, is the term I would use, but we can use transfer for this purpose, that there were no economics associated with that.

Q. Your testimony is that there were no economics associated with the transfer of the LTIs from Citadel to Parabellum?

A. Correct, yeah.

Q. Did you ever express a disagreement with the trustee's view that you were not entitled to vote on these transfers?

MR. DUKE: Objection, and caution the witness not to disclose the content

J. Cheatle

of any communications with counsel, but to the extent you can answer excluding that.

A. Can we go through the question again please?

Q. Did you ever seek advice as to whether you were entitled to vote on those transfers or not?

It's a yes or no question. Did you ever seek legal advice as to whether you were entitled to vote --

MR. DUKE: Let me put in a caution. You can answer yes or no, but don't disclose contents of any communications.

A. Yes.

Q. Who did you seek advice from on that issue?

A. Alston & Bird.

Q. Other than Alston & Bird, did you seek advice from anybody else on that issue?

A. Legal advice, no.

Q. Did you communicate any legal advice you obtained from Alston & Bird to the trustee on that issue?

J. Cheatle

A. I don't recall.

Q. Did the trustee ever provide you legal advice on that issue?

MR. MENNITT: Again, you can answer these yes or no.

A. No, no.

Q. So I will ask again. Did you ever communicate to the trustee that you disagreed with his conclusion that you were not entitled to vote on these transfers?

A. I don't know that he concluded that, but I was happy with the method that he proposed.

Q. So you don't know one way or the other whether the trustee ever formed that conclusion?

MR. DUKE: Objection, form.

Q. You can answer.

A. Yeah, I don't recall him saying that to me.

MR. AYALA: Katie, why don't you put up tab 5 please?

A. I have 5(a) or 5(b). Does it matter, 5(a).

MR. AYALA: We will mark this as Exhibit 3.

(Exhibit 3, transfer notice from Citadel to InstaLit of litigation trust interests, marked for identification, as of this date.)

Q. Mr. Cheatle, do you recognize this document?

A. Yes.

Q. What is this document?

A. It's a transfer notice from Citadel to InstaLit of litigation trust interests.

Q. Your testimony is that Citadel did not have any economic or pecuniary interest in the transfer reflected in this transfer notice?

A. In that transfer, yeah.

Q. Sorry, just a little unclear. Your testimony is that Citadel did not have any economic or pecuniary interest in the -- withdrawn.

Your testimony is that Citadel did not have any economic or pecuniary interest in the transfer reflected in this transfer

J. Cheatle

notice?
A. Yeah, the economics are in the participation agreement.
Q. And what is the distinction you are drawing between the transaction reflected in this transfer notice and the economics in the participation agreement?
A. The participation agreement creates an economic or synthetic interest equivalent to the trust interests or the transfer, so that's where the economics reside.
The transfer notice is a mere transfer of one registered owner to another.
Q. As a consequence of the transfer reflected in this transfer notice, did the parties to the participation agreements rights or obligations change in any respect?
MR. MENNITT: Objection to form, but you can answer.
MR. DUKE: Join.
A. In some respects, yes.
Q. In what ways?
A. So most direct, the transfer is a consequence or related to an elevation right,

J. Cheatle

what I'm calling elevation, in the participation agreement, so that would no longer be relevant, for example.

Q. Other than the elevation right no longer being relevant, would the parties' rights and obligations and the participation agreements change in any respect as a consequence of the transfer notice?

MR. DUKE: Objection, form.

A. I would have to think about that, but not -- I don't think so, no.

MR. AYALA: Why don't we turn to tab 2. That will be Exhibit 4.

(Exhibit 4, litigation trust agreement, marked for identification, as of this date.)

A. Tab 2 did you say?

Q. Yes. It should be the litigation trust agreement.

A. What's the exhibit number?

Q. It will be Exhibit 4.

MR. MENNITT: The PDF is defined as tab 02, litigation trust agreement.

MR. DUKE: It's nine down the list

J. Cheatle

when I opened it in the ZIP file.

MR. MENNITT: I think because of Citadel's way to download it.

A. Let's do it on the screen and if I have to pause to bring up the whole doc.

Q. It's probably worth taking a break and emailing you a copy.

A. If you are happy to do that, all I need to do is go back into my email, but I shut that down.

THE WITNESS: Shall we break for two minutes while I do that?

MR. DUKE: If you open the Chat, I just dropped it there. You can grab it there.

MR. AYALA: In the Chat. Can you download from the Chat?

MR. MENNITT: You will see there is a Chat band.

A. I got that. I see, got it. Okay. I've got it. Thank you.

Q. Great. You are familiar with this document?

A. I am.

J. Cheatle

Q. Did you review this document before becoming a member of the LTAB?

A. Yes.

Q. Did you -- have you reviewed the provisions of this agreement relating to transferring LTIs?

A. Yes.

Q. When did you most recently review it?

A. Probably in the last week, I looked at it.

Q. Before then, do you recall ever looking at those provisions?

A. Yeah, I did, yeah.

Q. And in what context do you recall looking at those provisions?

A. The context of thinking about transfers, the participation.

Q. When you refer to thinking about transfers the participation, you are referring to the participation rights that Parabellum acquired and the subsequent transfer of the LTIs from Citadel to Parabellum?

J. Cheatle

A. That was the specific instance, yeah.

Q. So in that context, you considered the provisions of the litigation trust agreement that concerned the transfer of LTIs?

A. Yes.

Q. If you look at Section 2.05(b), it states -- this is on page 8 litigation trust agreement.

A. Got it.

Q. Absent written consent from the litigation trust advisory board, the litigation trust interests shall not be capable of being transferred to any person or entity.

Do you see that?

A. Yeah.

Q. When you were considering the prospect of the participation rights and the transfer of LTIs to Parabellum that you referred to earlier, did you consider whether or how you could satisfy that provision?

MR. DUKE: Objection.

J. Cheatle

MR. MENNITT: You can answer that question yes or no, but to the extent you discussed it with counsel, obviously, you should not testify about that.

A. So, sorry, did I consider that provision?

Q. Yes.

A. Yes.

Q. What view did you form, if any, as to how you could satisfy that provision, without disclosing the substance of any attorney-client communications?

A. I would answer it slightly differently if I may. There is no basis of the question that I put to Alan that we spoke about earlier.

MR. DUKE: Objection to form. I didn't want to stop the answer.

Q. So, in other words, you saw this provision in connection with the potential transfer of LTIs to Parabellum and you raised with Mr. Halperin how the LTAB could satisfy that provision in order to effectuate the

J. Cheatle

transfers?

A. Yes.

Q. Then he proposed to you the process that we saw reflected in the email chain where Mr. Olson and Mr. Olson alone voted on that issue, correct?

A. Yes.

Q. Can you turn to page 23 of the litigation trust agreement?

A. Yes.

Q. In connection with the participation rights and the transfer of LTIs to Parabellum, did you consider Section 4.05?

A. Yes.

Q. And did you obtain legal advice on whether or how Citadel and Parabellum could comply with Section 4.05 in effectuating those transactions?

A. I don't recall, no.

Q. You don't recall one way or the other?

A. No.

Q. If you look at 4.05(a), it states in the second sentence, The affirmative vote

J. Cheatle

of at least two members of the litigation trust advisory board present and entitled to vote at a meeting at which a quorum is present shall be the act of the litigation advisory board except as otherwise required by law or as provided in this litigation trust agreement.

Do you see that?

A. Yeah.

Q. Do you understand the process by which the transfer of LTIs to Parabellum was effectuated to have satisfied that requirement?

MR. DUKE: Objection to form.

MR. MENNITT: Again, a caution here, to the extent that you have an understanding of that as an LTAB member, you can answer, but, obviously, not based on advice of counsel or any advice that you gave to Citadel on that issue. Maybe you can reask.

MR. AYALA: Let me reask the question.

Q. I will withdraw it.

J. Cheatle

Do you understand the process by which the transfer of LTIs to Parabellum was effectuated to have satisfied that voting requirement in Section 4.05(a), without disclosing the substance of any attorney-client communications?

MR. DUKE: Objection to form.

MR. MENNITT: You can answer.

A. Those are tricky constraints, but I will try.

I looked at the exception that you referred to and thought about the approval as provided through the prism of that. That's my understanding, that that had an influence there.

Q. How is the exception that you referred to relevant to the conclusion that you drew, without disclosing the substance of any attorney-client communications?

MR. DUKE: Objection to form.

A. Yeah, so I will just give my opinion. I thought it must be the case --

MR. MENNITT: To the extent this is an opinion, this is an opinion you had

J. Cheatle

as an LTAB member?

THE WITNESS: Yeah.

MR. MENNITT: You can answer.

A. The voting protocol would allow for situations where not all members voted.

Q. You say Mr. Menezes interrupted you, but if I understand your answer, it was, yeah, so I will just give my opinion. I thought it must be the case, the voting protocol would allow for situations where not all members voted.

Is that your testimony?

A. Yeah.

Q. And when you say, I thought it must be the case, the voting protocol would allow for situations where not all members voted, doesn't the two-vote requirement already allow for that situation, given that there are three LTAB members?

MR. DUKE: Objection to form.

MR. MENNITT: Objection, calls for a legal conclusion.

Marc, as long as you stipulate that his answer to this is not a waiver

J. Cheatle

beyond the answer, I'm okay with him answering.

MR. AYALA: I will stipulate.

MR. MENNITT: Thank you.

A. If I understood correctly, only if one member were unable to vote, there could still be a majority of two.

Q. So you thought it must be the case that the voting protocol would allow for situations where two members could not vote, right?

MR. DUKE: Objection to form.

A. Yeah.

Q. And what was your basis for thinking that?

MR. MENNITT: I will object on the same grounds and request the same stipulation, that the answer is not a waiver beyond the specific answer to this question.

A. It's tricky.

MR. DUKE: Objection as well.

Q. I will withdraw it and reask the question.

J. Cheatle

Did you think it must be the case that the voting protocol would allow for situations where two members could not vote, yes or no?

MR. DUKE: Objection to form.

A. Yes.

Q. And did you form that view on anything other than attorney-client communications?

A. Only my read of those words in the document more generally, so probably no, I suppose is the answer.

Q. And based on your read of those words in the document and without disclosing the substance of any attorney-client communications, what made you think that the voting protocol must allow for situations where two members could not vote?

MR. DUKE: Objection to form.

MR. MENNITT: Marc, we have a standing stipulation. It's not a waiver beyond the answer to the question, correct?

MR. AYALA: Gary, I don't know what

a standing agreement is, but I think we've established that he formed his own view on this, not based on attorney-client communications and I'm asking what the basis was for his view without disclosing attorney-client communications.

MR. MENNITT: Okay. I'm okay on that basis.

MR. AYALA: Okay. Thanks.

A. It's a reasonable read that the, or a reasonable application of the carve-outs that the LTAB is still able to function in those circumstances.

Q. Are there any words in the LTA that contribute to your view that the litigation trust agreement must allow for situations where two members could not vote, without disclosing the substance of any attorney-client communications?

MR. DUKE: Objection to form.

A. Sorry, can you ask the question again?

Q. Sure. Are there any words in the

J. Cheatle

LTA that contribute to your view that the litigation trust agreement must allow for situations where two members could not vote, without disclosing the substance of any attorney-client communications?

MR. DUKE: Objection to form.

A. The words that I referred to, the exception there and the operation of other parts of the agreement.

Q. What are the other parts of the agreement that you are referring to?

A. So recusal from voting, for example.

Q. You are referring to 4.05(c)?

A. Yeah, for example, yeah.

Q. What words in 4.05(c) do you believe provide that in a context where two members are conflicted from voting, the LTAB can act based on the vote of one member, without disclosing the substance of any attorney-client communications?

MR. DUKE: Objection to form.

A. Can I consult with Gary on that because I think I can answer?

J. Cheatle

MR. MENNITT: You are concerned this is a privilege?

MR. AYALA: We can take a break if you would like to consult with him.

THE VIDEOGRAPHER: We are going off record at 8:06 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on record at 8:09 a.m.

Counsel, proceed.

BY MR. AYALA:

Q. The question was, Mr. Cheatle, what words in Section 4.05(c) do you believe provide that in a context where two members are conflicted from voting, the LTAB can act based on the vote of one member, without disclosing the substance of any attorney-client privilege?

A. I will refer to privilege here. I can't answer that without crossing that line.

Q. I take it then that you received legal advice on that issue, yes or no?

A. Yes.

Q. And from whom?

J. Cheatle

A. Alston & Bird.

Q. That was in and around the time of the transfer of LTIs to Parabellum?

A. Yeah, before then, yeah.

Q. Before then, but in connection with the participation agreements that you undertook with Parabellum?

A. Yeah.

Q. And so apart from revealing any attorney-client advice you received, you can't, sitting here today, identify any language in 4.05(c) that provides that in the context where two members are conflicted, the LTAB can act based on the vote of one member, correct?

MR. DUKE: Objection to form.

A. So I think I can answer it this way. Perhaps there is no explicit words stating approval or referring to approval by one member.

Q. And the same is true of 4.06 of the litigation trust agreement, correct?

MR. DUKE: Objection to form.

A. There is no explicit approval --

J. Cheatle

sorry, there is no explicit reference to approval by one member, that's the question?

Q. Yes. In other words, there are no words in Section 4.06 that authorize the LTAB to act based on the vote of a single member?

MR. DUKE: Objection.

MR. MENNITT: Objection. I think it may raise the same issue.

Q. Apart from revealing any attorney-client communications, sitting here today, you can't identify any language in Section 4.06 that authorizes the LTAB to act based on the vote of a single member, correct?

MR. DUKE: Objection to form.

A. I think I can only repeat the answer I just gave you I'm afraid.

Q. Which is?

A. There is no explicit reference to approval by a single member vote.

Q. Do you recall whether any notice was provided to trust beneficiaries or the court of Citadel entering into the participation agreements with Parabellum?

J. Cheatle
MR. DUKE: Objection to form.
A. Noticed trust beneficiaries of the court of the participation between Citadel, not to my knowledge, no.
Q. Nor was there any such notice in connection with the transfer of LTIs from Citadel to Parabellum, correct?
A. Not to my knowledge.
Q. Did you ever consider providing notice of those transactions?
A. To the court and other beneficiaries, I didn't, no.
Q. Citadel also provides financing to the trust, correct?
A. Citadel fund does, yeah.
Q. In addition to that Citadel fund, what other entities provide financing to the trust?
A. The current lender group is Citadel and Saratoga I believe.
Q. Nobody else?
A. No.
Q. What is the total amount of financing that Citadel and Saratoga have

J. Cheatle

provided to the litigation trust?

A. $9 million.

Q. Is that an estimate or is that a flat figure?

A. Also, can I caveat that?

Q. Sure.

A. It's not all provided by Citadel and Saratoga as there were other lenders previously, so the total amount of lending to the trust is $9 million.

Q. And who were the previous lenders you just referred to?

A. So Monroe, Monroe Funds at some point I think were lenders and I think 11th Lane we referred to earlier. Whether they lent, I'm not sure, but there are a couple of others.

MR. AYALA: Why don't we -- if you can put up tab 4, which will be Exhibit 5.

(Exhibit 5, participation agreement, marked for identification, as of this date.)

A. Participation agreement.

J. Cheatle

MR. DUKE: Is there a specific one you are pulling up?

MR. AYALA: The first one.

Q. This is an example of the participation agreements you were referring to earlier, right, Mr. Cheatle?

A. Yes.

Q. Can you characterize, generally, the transaction that is embodied in the participation agreement that we are looking at here?

A. Yeah, I can try. So as I described it earlier, it creates an economic interest for InstaLit Funding 1 in this case, in two things; one is the loan agreement with the trust and; two, the trust interests that we spoke about earlier, so a participation, an economic interest in each of those two things.

Q. If you turn to the page that ends in Bates stamp 9, there is a section 16 there.

A. Yeah.

Q. And this 16(a) reflects the

J. Cheatle

elevation rights you were referring to earlier, correct?

A. Yeah, that looks right.

Q. In your experience, what is the utility of an elevation right?

A. It's more common in loans. It allows the party being elevated to become the holder of record and, for example, receive information directly and vote that sort of thing.

Q. Now, this document refers to debt participated rights which refers to the loan interests, right?

A. Yeah.

Q. And then it refers to LTI participated rights which refers to the LTI interests, right?

A. Yeah.

Q. Now, to your knowledge, Parabellum exercised its elevation right in connection with the LTI participated rights, correct?

A. So the transfer that we spoke about earlier, I view that as the elevation.

Q. And what is your understanding as

to why Parabellum exercised that right?

MR. MENNITT: Objection to form.

You can answer.

A. Because -- this was really a preference of the trustee, the Parabellum funds become outright holders of the trust interests.

Q. In what context did the trustee express that preference?

A. So the conversation that we had earlier about the procedure for the transfer was linked to a request from Citadel, from Ben and I, as the Citadel appointees on the board to be able to seek John Sinna's guidance as I described to you earlier, that was the link.

Q. Did the trustee express his rationale for that preference?

A. Yes, yes.

Q. What was his rationale?

MR. MENNITT: Again, I caution you, to the extent he is communicating any advice he got from Debra Cohen or any other counsel to the trustee, that would

J. Cheatle

be privileged, but if you can answer with that in mind.

A. Yeah, his preference was that -- because the trust is created for the benefit of trust beneficiaries, it was cleaner to be able to deal with trust beneficiaries rather than third parties.

Q. What do you mean by cleaner?

A. I mean, there was a direct trust beneficiary relationship there.

Q. Why was that relevant?

MR. DUKE: Objection, form.

A. It was Alan's preference, which I understood in his role as trustee as being a reasonable -- as being a reasonable preference.

Q. Why did you understand that to be a reasonable preference?

A. For the reasons that I gave. My understanding is that the trustee and the LTAB have the ability to consult with whoever they want, but because of the common interest arrangement that we referred to earlier, in this context, it was sounder, it was better

J. Cheatle

to have a litigation trust beneficiary come into that common interest agreement.
Q. Parabellum has not exercised its elevation request in respect of the debt participated rights, correct?
A. Correct.
Q. Do you have an understanding of why that is?
A. That's really for them.
Q. Have you ever had a communication with Mr. Sinna regarding that topic?
A. Only that his preference is to hold participation interests only.
Q. In such discussions, he has not expressed a rationale for that view?
A. No.
Q. You've never asked?
A. No.
MR. AYALA: If you don't mind putting up tab 1 --
MR. MENNITT: If we are moving to another exhibit here, can we take a five-minute break?
MR. AYALA: As much time as you

J. Cheatle

guys want.

MR. MENNITT: Let's come back in seven minutes or five minutes.

THE WITNESS: Five minutes.

THE VIDEOGRAPHER: Going off record. This marks the end of media 1 at 8:23 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on record. This marks the beginning of media No. 2 at 8:31 a.m.

Counsel, proceed.

MR. AYALA: Okay. We were just about to put tab 1 up which we will mark as Exhibit 6.

(Exhibit 6, confirmation order and plan, marked for identification, as of this date.)

MR. MENNITT: Confirmation order and plan.

A. What exhibit number?

BY MR. AYALA:

Q. It's tab 1 on the titles of the PDFs.

J. Cheatle

A. I'm looking for the confirmation order and plan.

MR. MENNITT: That's the title of the PDF, but if you open the document, it's a court document that starts with findings of fact.

Are you looking at the titles of the PDFs?

THE WITNESS: I'm looking at both as I flip through them.

Q. Do you want to go off the record?

A. I don't want to waste your time, sorry.

THE VIDEOGRAPHER: We are going off record at 8:34 a.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on record at 8:35 a.m.

Counsel, proceed.

BY MR. AYALA:

Q. Mr. Cheatle, do you recognize this document?

A. I do.

Q. Have you reviewed this document?

J. Cheatle

A. In part.

Q. And in what context do you recall reviewing parts of this document?

A. Most recently for this deposition, but around the time of exit and formation of the trust, amongst other things.

Q. Why don't we turn to page 99 of the PDF. It should have a header that says the sale transaction at the top of it.

A. Yes.

Q. At the bottom of this page, you will see a paragraph starting with the litigation trust shall be financed.

Do you see that?

A. Yeah.

Q. And it states that it shall be financed by the litigation trust financing facility that provides for the issuance of up to $6 million.

Do you see that?

A. Yes.

Q. What do you understand the phrase up to to mean there?

MR. DUKE: Objection to form.

J. Cheatle

A. To and including I suppose would be a different term.

Q. And if you turn to the page, it's page 44 of the document itself. It will be I think 101 of the PDF. It should have the definition of litigation trust financing backstop at the top.

A. Yeah.

Q. In the first full paragraph on that page, it states, If the litigation trust ultimately requires financing in excess of the litigation trust financing commitment amount, some or all of the litigation trust lenders may in their discretion provide up to an additional $4 million in incremental financing.

Do you see that?

A. Yeah.

Q. Do you see any language in this section of the plan that authorizes the trust to take on financing in excess of the $6 million litigation trust financing commitment amount and the additional $4 million of incremental financing that we just looked at?

J. Cheatle

MR. DUKE: Objection to form.

MR. MENNITT: I will caution the witness, you can answer that question the way it's phrased, but keep in mind that your role in connection with this document at the time would have been as counsel and you would have been working with outside counsel presumably, so to the extent there is a privilege issue, you should be cognizant of that.

A. On the credit agreement, yeah, we should recap on the question.

Q. Sure. I think we looked at language establishing the litigation trust financing commitment amount which was an amount of $6 million?

A. Yeah.

Q. And then we looked at the language establishing that the litigation trust lenders may, in their discretion, provide up to an additional $4 million of incremental financing to the trust.

Do you recall that?

A. Yeah.

J. Cheatle

Q. That's a total of $10 million of financing, correct?

A. Yeah, the 6 plus 4, yeah.

Q. Can you identify any language in this section of the plan that authorizes the trust to take on financing in excess of that $10 million?

MR. DUKE: Objection to form.

A. Yeah, I'm going to have to read this whole thing to answer that.

Should we limit it to the two provisions you referred me to?

Q. My question is about this Section G in the plan and I'm happy for you to read that in full if you would like.

A. Let's do that. Okay. I've read it.

Q. I will restate the question.

Can you identify any language in this section of the plan that authorizes the trust to take on financing in excess of the $10 million it refers to?

MR. DUKE: Objection to form.

A. I can answer?

J. Cheatle

MR. MENNITT: Yes, you can answer.

A. I don't see any explicit word to that effect.

Q. Do you see any wording that is not explicit to that effect?

MR. DUKE: Objection to form.

A. No.

Q. Let's turn to tab 2 which is Exhibit 4.

MR. MENNITT: It's the litigation trust agreement.

Q. I will ask you to turn to page 5 when you get there.

A. I'm there.

Q. Great. This section is titled Funding of the Litigation Trust.

Do you see the first sentence states that -- withdrawn.

Do you see that the first sentence provides that the credit agreement shall have the terms set forth in the plan and the plan supplement?

A. Having the terms set forth in the plan and the plan supplement, yeah.

J. Cheatle

Q. You understand this sentence to require the credit agreement to have the terms set forth in the plan and the plan supplement, correct?

MR. DUKE: Objection to form.

A. Yeah.

Q. It goes on, it states that the litigation trust agreement shall set forth the terms of the litigation trust financing facility as defined in the plan. It shall provide for loans to the litigation trust including the $6 million in committed financing. That correlates to the $6 million in the plan we just looked at, right?

A. Yeah.

Q. And an additional $4 million of incremental financing, which refers to the incremental financing of $4 million we just looked at in the plan, right?

MR. MENNITT: Objection to form, but you can answer.

A. Yes.

Q. You see that. Are you aware of -- withdrawn.

J. Cheatle

Can you identify any language in this section of litigation trust agreement that authorizes the trust to take on financing in excess of that $10 million?

MR. DUKE: Objection to form.

A. No, I think the credit agreement governs that.

Q. Are you aware of any other provision in the LTA outside of this section that would authorize the trust to do that?

MR. DUKE: Objection to form.

A. There is a general borrowing right of the trustee.

Q. Is it your understanding that that general borrowing right empowers the trust to take on loans in excess of the $10 million in financing contemplated by Section 1.06?

MR. DUKE: Objection, form.

MR. MENNITT: Objection to form and also caution the witness, to the extent that that is a -- that there is a privileged communication embedded in any answer.

A. Okay. So my understanding is

J. Cheatle

subject to the credit agreement itself and the approval process, yes, that is possible.

Q. And without disclosing substance of any attorney-client communications, what is your view that that is possible based on?

MR. DUKE: Objection to form.

A. That the credit agreement includes a process for amendments.

Q. So your view is that the credit agreement can be amended in a way that would position the trust to take on financing in excess of the $10 million contemplated by the plan in Section 1.06 of the litigation trust agreement?

MR. DUKE: Objection to form.

A. Sorry, can you ask that again?

Q. Yes. So your view is that the credit agreement can be amended in a way that would position the trust to take on financing in excess of the $10 million contemplated by the plan and in Section 1.06 of the litigation trust agreement?

A. Yes, yes.

MR. DUKE: Objection to form.

J. Cheatle

Q. That view is based solely on the terms of the credit agreement and not any terms of the plan or the litigation trust agreement, correct?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form and again, same caution.

A. No, not based solely on that.

Q. Without disclosing the substance of any attorney-client communications, what is that view based on, other than the terms of the credit agreement?

A. I will formulate this in the right way. The credit agreement in total was part of the plan, approved by the plan.

Q. Your testimony is that the credit agreement was approved by the plan?

A. Yes.

Q. Your testimony is that the court considered and approved the credit agreement?

A. Yeah, that's my understanding, yeah.

Q. Let me see if I can save everybody some time.

J. Cheatle

Do you recall there being an amendment to the credit agreement?

A. Yes.

Q. And that amendment expanded the incremental amount of financing available to the trust from $4 million to $5 million, correct?

A. Let's turn to it, but I have a fairly good recollection of it.

MR. AYALA: It's tab 18. If you don't mind putting it up please. We will mark that as Exhibit 7.

(Exhibit 7, amendment to the credit agreement, marked for identification, as of this date.)

A. I have it. So, yes, increase the incremental amount to 5 million.

Q. The original credit agreement had three tranches of financing -- withdrawn.

The original credit contemplated three tranches of financing which correlated to the $6 million in financing that the plan contemplated, correct?

A. Yeah.

J. Cheatle

Q. And then it allowed for the possibility of an incremental $4 million in financing that correlated to the incremental $4 million that the plan references, correct?

MR. DUKE: Objection to form.

A. Yeah.

Q. And then when the parties to the credit agreement amended it, they modified the incremental amount from 4 to $5 million, correct?

A. Yeah.

Q. Now, the total capacity of financing available to the trust under the credit agreement is $11 million, correct?

A. Yeah.

Q. Which exceeded the $10 million set forth in the provision of the plan that we just reviewed and Section 1.06 of the litigation trust agreement that we just reviewed, correct?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

A. Yeah, yeah, it's a higher amount, yeah.

J. Cheatle

Q. Do you know -- you are familiar with the term notional conversion factor?

A. Yeah.

Q. What is the notional conversion factor for the incremental amount?

A. I would have to look here. It's in the credit agreement. I'm not sure off the cuff.

Q. We can turn to it in more detail. I thought I may know it offhand.

What is tranche 4?

MR. DUKE: Objection.

A. There isn't a tranche 4.

MR. AYALA: Why don't we turn to tab 23, which will be Exhibit 8.

(Exhibit 8, email from Mr. Sinna to Mr. Cheatle and Mr. Xie, marked for identification, as of this date.)

A. Yeah, I got it, yeah. Hi, Guys, I'm approved for tranche 4.

Q. This is an email from Mr. Sinna to you and Mr. Xie where, as you say, I am approved for tranche 4. Our piece of the 3 million we discussed.

J. Cheatle

Do have an understanding of what he is referring to?

A. There isn't a tranche 4, so when is this from, June 2026, I can guess, but there isn't a tranche 4.

Q. I take it your guess is that he is referring to the incremental amount?

A. Yeah.

Q. Then he says, I imagine I can get access to the remainder as well.

Do you see that?

A. Yeah.

Q. Do you have an understanding of what the remainder is?

MR. MENNITT: Objection to form and just caution the witness not to speculate.

A. Our piece of the 3 million we discussed -- I'm not sure, but -- I'm not sure what he means there.

MR. DUKE: Just for clarity of the record, the witness was reading --

A. I was reading the email.

MR. DUKE: Which shows up in the

J. Cheatle

realtime.

MR. AYALA: Thank you, Michael.

MR. DUKE: No problem.

Q. Do you have a view on how much funding -- withdrawn.

Do you have a view on how much in financing can be provided to the trust through an amendment to the credit agreement?

MR. DUKE: Objection to form.

MR. MENNITT: Again, obviously excluding any communications with counsel.

A. As a mechanical matter, yes, I do have a view, yeah.

Q. What is your view on that, without disclosing the substance of any attorney-client communications?

A. That the credit agreement doesn't impose a hard cap, let's put it that way.

Q. Did you have a view that it imposes a soft cap?

MR. DUKE: Objection to form.

A. If soft cap means amendable, yes, we can describe it that way.

J. Cheatle

Q. And why would the fact that it's amendable constitute a soft cap?

MR. DUKE: Objection to form.

A. Because it would constrain the trustee in the amount that it could request.

Q. In what way?

A. The trustee, I believe, could only request what is available under the credit agreement which were the tranches and the incremental amount.

Q. In other words, what you are saying is there is no limit on how much financing the trust could take on, except that for it to increase the amount, it's going to need its counterparty's agreement?

MR. MENNITT: Objection to form.

MR. DUKE: Join.

A. Yeah, I agree, yeah.

Q. And if that dynamic of needing the counterparty's agreement, that imposes a soft cap, so to speak, on the amount of financing the trust can take on?

MR. DUKE: Objection to form.

A. Yeah.

J. Cheatle

Q. But aside from needing to get the counterparty's consent, the trust's borrowing capacity is unlimited, correct?

MR. DUKE: Objection to form.

A. I think that's true as a credit agreement matter, yeah.

Q. Do you have a view on whether that's true as -- withdrawn.

Do you have a view on whether that's true generally, not as just a credit agreement matter?

MR. DUKE: Objection to form.

A. Sorry, I lost track of the question actually.

Q. Sure. I think you said -- I asked, aside from needing to get the counterparty's consent, the trust borrowing capacity is unlimited, correct? You answered, I think that's true as a credit agreement matter, yeah. And I asked, do you have a view on whether that's true generally, not as just a credit agreement matter?

A. Yeah, yeah. So, mechanically, I think that's right, there is no limit. The

trustee doesn't have a contractual constraint on seeking more if lenders are willing to provide it.

Q. Are you aware of any noncontractual constraints on the trustee seeking more if the lenders are willing to provide?

MR. MENNITT: Objection to form.

A. You would have to consider its obligations under the trust agreement.

Q. What obligations do those include generally?

MR. DUKE: Objection to form.

A. Acting in the best interest of the beneficiaries, the trust beneficiaries.

Q. Sorry, I didn't mean to interrupt you, I apologize.

Let's turn back to tab 18 which is Exhibit 7. This is the amended -- the amendment to the credit agreement.

A. Yeah.

Q. So you are there, Mr. Cheatle?

A. I am there, yeah.

Q. What we are looking at here is an amendment to the credit agreement and it

J. Cheatle

attaches an execution version of the credit agreement that's conformed through that amendment in red line, correct? You will see that on the Bates stamp ending 264.

A. Conformed through first amendment, yeah.

Q. Let's turn to the page ending in Bates stamp 282.

MR. DUKE: Do you have a PDF number on that?

MR. AYALA: I don't have one on my outline, but it looks like it's 27.

A. Yeah.

Q. So this refers to the notional conversion rights, Section 2.07 that we were talking about earlier, right?

A. Yeah.

Q. What is the notional conversion right?

MR. DUKE: Objection to form.

A. This is a little complicated I think. It is -- I think it is a mechanic which allows lenders to be repaid by reference to trust interests rather than by

J. Cheatle

reference to the cash amount due under the credit agreement.

Q. And that conversion happens based on a notional conversion price, correct, among other variables?

A. Yeah.

MR. MENNITT: Objection to form.

Q. If you turn to the page ending in Bates stamp 277, page 10 of this amended version of the credit agreement.

A. Yes.

Q. You will see the definition of notional conversion price at the top of the page?

A. Yeah.

Q. It's the product of the notional base price and the notional conversion factor.

Do you see that?

A. Yeah, yeah.

Q. And you will see immediately above that, there is a definition for the notional conversion factor?

A. Yeah.

J. Cheatle

Q. That sets out the notional conversion factors for tranche 1, 2 and 3?

A. Yeah.

Q. And if you turn to the page ending in 280 which is page 13 of this attached credit agreement.

A. Yeah.

Q. You will see that tranches 1, 2 and 3 in Section 2.01 add up to the $6 million initial overall tranche of financing that we were discussing earlier.

Do you see that?

A. Yeah.

Q. So if you turn back to the definition of notional conversion factor which is at the page ending in 277, it does not appear to define the notional conversion factor for loans in excess of that -- in excess of tranches 1, 2 and 3 which cover the initial $6 million amount.

Do you see that?

MR. DUKE: Objection to form.

A. It does not reference a conversion factor, sorry, so it specifies a conversion

J. Cheatle

factor for tranches 1, 2, and 3.

Q. It does not specify a conversion factor for any of the incremental financing, correct?

A. I'm not sure that's correct.

Q. Let's just limit the scope of the question so that it's at least clear what we are talking about.

On the page ending in 277 and the definition of notional conversion factor, do you see it identifying a notional conversion factor for financing raised in excess of tranches 1 through 3?

A. It doesn't refer explicitly to -- I mean, this is how I think I can best answer it. It does not refer explicitly to incremental loans.

Q. Sitting here today, you are not aware of whether there is a notional conversion factor for incremental loans?

MR. MENNITT: Objection to form.

A. I thought incremental loans were treated as tranche 1 loans.

Q. What is the basis for that thought?

J. Cheatle

A. We would have to go through the document. I'm not sure.

Q. We don't -- you are welcome to look at it, but I'm not going to ask you to.

A. Okay.

Q. Sitting here today, without reviewing the document, you don't recall any particular language that sets that out?

A. I would have to look.

Q. If you turn to the page ending in 281, the Bates stamp ending in 281.

A. Yeah.

Q. You will see at the top, there has been inserted a prepayment, a prohibition against prepayments?

A. Yeah.

Q. Why was that added to the credit agreement in connection with the amendment?

MR. DUKE: Objection to form, and I also caution you not to disclose the content of any attorney-client communications.

MR. MENNITT: Same caution.

A. So I think the purpose was to give

J. Cheatle

the trustee comfort on budgeting and that it could keep money within the trust rather than disbursing it to lenders.

Q. So as I read this provision, this provides lenders the right to decline to be prepaid?

A. Yeah.

MR. MENNITT: Objection.

Was there a question there?

MR. AYALA: I sort of ended it in a way that one asks a question, but I can make it more express. I will reask it.

Q. As I read this provision, this provides lenders the right to decline to be prepaid.

Do you agree with that reading?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

A. Yes.

Q. Why would the trustee, for budgeting purposes, want the lenders to have the right to decline to be prepaid?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form. I

J. Cheatle

think it calls for speculation.

A. It's difficult to answer on behalf of the trustee.

Q. Do you have -- go ahead.

A. No, that was it.

Q. Earlier you said, I think the purpose was to give the trustee comfort on budgeting and it could keep money within the trust rather than disbursing it to lenders.

What was that understanding based on?

A. The discussions around the time of the amendment.

Q. And based on those discussions, do you have an understanding of why the trustee wanted the lenders to have a right to decline prepayment in view of the trustee's interests around budgeting?

A. I'm hesitating a little bit because I wasn't closely involved in this part of it, so I'm not so sure, but my understanding is what I described.

Q. Got it. Did Citadel request a right to decline --

J. Cheatle

MR. DUKE: Can we pause it? I put an objection on that last one, it's not reflected in the realtime. I wanted it to be noted.

I put in an objection to the last question and it didn't show up on the realtime so I wanted to note it for the record.

MR. AYALA: Very good.

Q. Did Citadel request that it have a right to decline prepayment as reflected in this provision?

MR. MENNITT: Objection to form.

A. I'm not sure.

Q. You don't know one way or the other?

A. No.

Q. Who were the members of the LTAB before you joined?

A. The LTAB was Martin Olson and Peter Zuckerman who was a Citadel employee at the time.

Q. Who were the designees of the prepetition term loan lenders?

J. Cheatle

A. For what purpose?

Q. For the LTAB.

A. The day one members, Peter Zuckerman and me.

Q. Who was the designee of the creditors' committee?

A. Martin Olson.

Q. Now, Parabellum became a full member of the LTAB in February of this year, correct?

A. Yeah, John Sinna did, yeah.

Q. Before Mr. Sinna was appointed as a full member of the LTAB, did Citadel discuss trust-related matters with Mr. Sinna?

MR. DUKE: Objection to form.

A. You will have to be more precise about trust-related matters.

We discussed -- we discussed litigation strategy I suppose.

Q. Without disclosing the substance of any litigation-related communications, did you discuss any topics with Mr. Sinna that related to the trust other than litigation strategy before he was appointed as a full

J. Cheatle

member of the LTAB?

MR. DUKE: Objection to form.

A. I don't think so, no.

Q. Before Mr. Sinna became a member, full member of the LTAB, why did you have discussions with him about litigation-related matters without disclosing the substance of those communications?

MR. DUKE: Objection to form.

A. So it goes back to what we discussed earlier, Ben and I thought that John would be able to provide helpful guidance on how we should think about the litigation and that was a useful opinion for us.

Q. Before Mr. Sinna became a full member of the LTAB, did you or Mr. Xie ever invite will Sinna to meet with Mr. Halperin or any of the trust advisors?

MR. DUKE: Objection to form.

A. I don't think so, no.

Q. When do you recall first discussing with Parabellum the prospect of somebody from Parabellum joining the LTAB?

J. Cheatle

A. That wasn't me. I'm not sure.

Q. When you say that wasn't me, who was it?

A. The negotiation of the participation was Ben on that.

Q. What is the relationship between the negotiation of the participation and the prospect of somebody from Parabellum joining the LTAB?

A. To my understanding is that when that issue was raised by Sinna or Parabellum, I'm not sure.

Q. So your understanding is that in connection with the negotiation of the participation, the issue of somebody from Parabellum joining the LTAB was raised?

A. That's my understanding, yeah.

Q. Why don't we turn to tab 7 --

MR. MENNITT: Can we take a 10-minute break here? I'm having a connectivity issue.

MR. AYALA: Sure. We can come back at 9:23 if that works.

MR. MENNITT: That's fine.

J. Cheatle

THE VIDEOGRAPHER: Going off record at 9:14 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on record at 9:34 a.m.

Counsel, proceed.

BY MR. AYALA:

Q. Mr. Cheatle, before the break, you testified that your understanding in connection with the negotiation of the participation agreements, the issue of somebody from Parabellum joining the LTAB was raised.

Do you recall that?

A. Yeah, I do.

Q. Did you discuss that issue with Mr. Xie at the time?

A. Yeah, yeah.

Q. And what did you and Mr. Xie discuss in that regard?

A. I'm not sure there was much of a discussion. We didn't think we could offer that.

Q. Why didn't you think you could

J. Cheatle

offer that?

A. Because there was no available seats and we didn't want to give one up.

Q. Why didn't you want to give one up?

A. Because we are a significant trust interest holder.

Q. What is the relationship between you not wanting to give up a seat on the LTAB and you being a significant trust interest holder?

A. It allowed us --

MR. MENNITT: And I'm going to caution the witness here, this may stray beyond your role as an LTAB member and any advice you were giving to Citadel, so I just caution you in that respect.

Q. The question is, what is the relationship between you not wanting to give up a seat on the LTAB and you being a significant trust interest holder? I think that squarely relates to his role as an LTAB member. You can answer the question.

MR. MENNITT: With that caution, you can answer.

J. Cheatle

A. We wanted to have that connectivity, information flow with the trustee and trustee's counsel.

Q. Why?

A. Because it allowed us, from the perspective of being a trust interest holder, it allowed us to understand, have a better sense of the potential value.

Q. Why would -- I'm going to caution you, I don't want to know about the substance of any attorney-client communications or discussions around the potential value of litigation trust assets, but why would having two seats rather than one seat be relevant to having -- to being able to understand the potential value, as you put it?

A. We wouldn't need two seats just for the information.

Q. Right. So going back to my question, why did you want to keep the second seat?

A. So the second seat allowed us to earn approval rights as well or gave us a significant voice in certain approval rights.

J. Cheatle

Q. And those approval rights were valuable to you?

A. Potentially, yeah.

Q. When did you first discuss with anybody at Ravago the prospect of Ravago resigning from the LTAB?

MR. MENNITT: Objection to form.

A. I didn't have that discussion.

Q. Are you aware of anybody having that discussion?

A. Alan Halperin.

Q. Other than Mr. Halperin, are you aware of anybody having had that discussion?

A. No, no, I'm not.

Q. Do you have any understanding of when Mr. Halperin first discussed with anybody at Ravago, the prospect of Ravago resigning from the LTAB?

MR. DUKE: Objection to form.

A. Sort of late, I don't remember the timeline here, late 2025 I think.

Q. Earlier you testified that you and Mr. Xie concluded that there were no available seats and you didn't want to give

J. Cheatle

one up.

Is it your understanding that somebody from Citadel then communicated that to somebody at Parabellum?

MR. MENNITT: Objection to form.

A. We didn't agree or weren't able to, it must be.

Q. That wasn't you who communicated that?

A. No, the negotiation, I wasn't conducting that.

Q. That would have been a conversation between Mr. Xie and Mr. Sinna?

A. I expect so.

Q. Were there documents generated in connection with Parabellum's request for an LTAB seat or Citadel's denial of that request?

MR. DUKE: Objection to form.

A. I'm only aware of the participation agreement.

Q. There weren't emails on that topic?

MR. DUKE: Objection to form.

A. Not that I'm aware of, no.

J. Cheatle

Q. Let's turn back to tab 4(a) which is Exhibit 5.

A. InstaLit 1.

Q. Before Citadel entered into these participation agreements, did you review them?

A. Yes.

Q. And did you provide comments on them?

A. Yes.

Q. Was that a discussion between you and Mr. Xie?

A. It was with our external counsel.

Q. These were discussions between you, Mr. Xie and your external counsel at Alston & Bird I take it?

A. Correct.

Q. If you turn to the page ending in Bates stamp 7.

MR. MENNITT: Which tab is this?

MR. AYALA: Tab 4(a) should be Exhibit 5.

Q. Are you there?

MR. MENNITT: Okay. Got it.

J. Cheatle

Q. We are on the page ending in Bates stamp 7.

A. Okay.

Q. If you look at Section 10(a), Mr. Cheatle, you will see in the second sentence, it states, Notwithstanding the immediately preceding sentence, seller agrees to use good faith efforts to consult with buyer prior to exercising any rights or remedies with respect to an essential act.

Do you see that?

A. Yeah.

Q. Do you remember that provision being included in the participation agreements?

MR. DUKE: Objection to form.

Just for clarity, do you mean that provision or that portion of the sentence?

MR. AYALA: Either one.

A. Yeah, I do.

Q. What was the purpose of including this provision in the participation agreement?

J. Cheatle

MR. MENNITT: I caution the witness, to the extent that it is a privileged communication.

A. Yeah, Citadel counsel, yeah.

What was the purpose of including this provision?

Q. Yeah, I can withdraw it and ask it a different way.

Setting aside any legal advice you offered or received, do you have an understanding of what the commercial purpose was of including the second sentence of Section 10(a)?

MR. DUKE: Objection to form, and same caution.

A. I'm speculating a little bit, but I think the commercial purpose is to allow for some discussion within constraints in relation to essential acts so the Parabellum funds could at least express their views in relation to essential acts.

Q. After having been denied an LTAB seat in the negotiation of this agreement, right?

J. Cheatle

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

Q. You can answer.

A. Yeah.

Q. In the last sentence of this section, it provides Parabellum protection against what's defined as a disproportionate action.

Do you see that?

A. Yeah.

Q. Setting aside any legal advice you offered or received, do you have an understanding of what the commercial purpose of including that sentence was?

MR. DUKE: Objection to form.

A. Yeah, yeah, I think so. These provisions are generally to align, in this case, treatment of interests that we held that weren't subject to the participation agreement, so we treated all interests in the same way.

Q. When you referred to treatment of interests that we held that weren't subject to the participation agreement, what

J. Cheatle

interests were you referring to?
A. The trust interests that the Citadel fund -- all of the trust interests, but the trust interests that the Citadel fund held that weren't referenced in this participation agreement.
Q. I understand.
A. We held more than were referenced here.
Q. Understood. Thank you.
What is your understanding of what a disproportionate action is as contemplated by this section?
MR. MENNITT: Same caution with respect to advice given or received.
A. Really, what I just described, that we wouldn't treat those two things differently.
Q. If you look at Section 10(b).
A. Yeah.
Q. It states that seller agrees to use good faith efforts to invite buyer to participate with seller and schedule substantive meetings with the litigation

J. Cheatle

trustee and advisors to the borrower, including but not limited to legal and financial advisors.

A. Yeah.

Q. Setting aside any legal advice you gave or received, do you have an understanding of what the commercial purpose for including that provision was?

MR. DUKE: Objection to form.

A. Yeah, yeah, to allow -- to give buyer the opportunity to understand better the passage of litigation.

Q. And did Parabellum or its related entities participate in meetings contemplated by Section 10(b)?

MR. DUKE: Objection to form.

A. No, I don't think so.

Q. Did -- do you understand Sections 10(a) and 10(b) to continue to apply to Citadel's relationship with Parabellum?

MR. DUKE: Objection to form.

A. Yeah, yeah, I think they still apply.

Q. Now, after obtaining the

J. Cheatle

consultation rights in Section 10(a) here, Parabellum became an ex-officio member of the LTAB, correct?

A. Two things there. It depends what you mean by consultation rights, but I don't read 10(a) as providing the Parabellum funds with any consultation rights and then the second bit was shortly thereafter, John Sinna I think specifically became the ex-officio member.

Does that answer the question.

Q. The second sentence in Section 10(a) says, Notwithstanding the immediately preceding sentence, seller agrees to use good faith efforts to consult with buyer.

Do you see that language?

A. Yeah.

Q. What is the distinction that you are drawing between the right that Parabellum has there and the phrase consultation rights?

A. I view that as describing a good faith efforts obligation on the seller.

Q. From which Parabellum benefits, correct?

J. Cheatle

MR. MENNITT: Objection to form.

A. Yeah, it can, yeah.

Q. What makes that right and obligation not be a consultation right?

MR. MENNITT: Again, setting aside any advice you gave or received.

MR. DUKE: And I will object to the form of the question.

A. A consultation right against or with the Citadel fund, is that the question?

Q. I understood your testimony to be that you don't understand this language to give rise to a consultation right, is that correct?

A. Correct, yeah, that's how I understand it, yeah.

Q. I think we agreed, it obligates Citadel to use good faith efforts to consult with Parabellum as to certain issues, right?

A. Yeah, I agree.

Q. And we can agree that Parabellum benefits from Citadel's obligation to use those good faith efforts, correct?

MR. DUKE: Objection to form.

J. Cheatle

A. Yeah, it can do, yeah.

Q. What I'm asking you is why, in your mind, does that not give rise to a consultation right?

A. I think the right, if it were a right, I think a right is different to an obligation. This is constructed as an obligation on Citadel.

Q. If Citadel failed to use good faith effort to consult with buyer as to the essential acts, is it your view that a buyer would have no right to enforce that obligation?

MR. MENNITT: Again, I caution the witness, to the extent this is asking about advice that you gave to Citadel or advice that you received from counsel.

A. Yeah, yeah, I can agree as a general proposition, but their breach of obligation could result in a claim for the beneficiary of that.

Q. One might say the buyer has a right to enforce that obligation, correct?

MR. DUKE: Objection to form.

J. Cheatle

A. Yes.

Q. So going back to my question, why in your mind does the second sentence of Section 10(a) not give rise to a consultation right?

MR. MENNITT: Objection to form.

A. We are getting into legal interpretation here, but I don't read it to say that.

Q. Point me to the words in this sentence that in your mind make this something other than a consultation right?

MR. DUKE: Objection to form.

A. It's just the words that I referred to already.

Q. Which words are those?

A. Seller agrees to use good faith effort, I understand that to be the operative obligation here.

Q. What role do you understand the word to consult to play in this sentence?

MR. MENNITT: Objection to form.

MR. DUKE: Join.

A. That's the thing, the good faith

J. Cheatle

efforts should procure.

Q. And Parabellum has a right to enforce that obligation to receive those good faith efforts, correct?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

Q. Withdrawn. Parabellum has a right to enforce seller's obligation to use those good faith efforts, correct?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

A. I think that's right, yes.

Q. Why did Citadel agree to the terms in Section 10(a)?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

Also, I do think that that is calling for privileged communication between the witness and Citadel.

MR. AYALA: Are you directing him not to answer?

MR. MENNITT: Yes.

Q. Apart from any legal advice you gave or received, do you have an

J. Cheatle

understanding as to why, as a commercial matter, Citadel agreed to the terms set forth in Section 10(a)?

MR. MENNITT: Same objection. I just caution the witness, unless you can exclude advice given or received on behalf of Citadel.

A. I don't think I can.

Q. Same question as to Section 10(b).

MR. MENNITT: Same caution.

A. I'm just reading this. The question is, why did Citadel agree to that?

Q. Yes, as a commercial matter and without disclosing the substance of any attorney-client advice given or received.

A. That's more for the commercial folk than it is for me, but to me, it's an unsurprising thing to agree to it.

Q. What makes it unsurprising?

A. It's unsurprising. The buyer would have an interest in having access to those meetings, as we discussed before, and the seller would help to procure that if he could.

J. Cheatle

Q. Why would the seller help to procure that if he could?

MR. DUKE: Objection to form.

A. Because that's the negotiated position in relation to the sale of the participated interests. That's the fruit, the product of the negotiation.

Q. Could you describe the process by which Mr. Sinna became an ex-officio board member?

A. Yeah, I think I can, or elements of it at least.

Q. Can you please do so?

A. I think the two important components were the LTAB approval which Alan organized and the update to the common interest agreement, they were the two key parts of it.

Q. And you referred to an LTAB approval which Alan organized.

What is the process you are referring to in that regard?

A. So I think that was a request of, I think that was conducted by email if I recall

J. Cheatle

and it was a request to the LTAB members to approve that designation.

Q. Who voted on approving that designation?

A. So all three members, if I recall correctly.

Q. All three members -- sorry, I didn't mean to interrupt.

A. No, I had a frog in my throat.

Q. So your testimony is that all three LTAB members voted on approving Mr. Sinna serving as an ex-officio board member?

A. Yeah, that's right.

Q. That included you?

A. Yes.

Q. Why did you vote in favor of appointing Mr. Sinna as an ex-officio board member?

A. For the reasons that we discussed already. I thought it would be useful to us as LTAB members to have John Sinna's input.

Q. Did you all discuss by email the prospect of Mr. Sinna serving as an ex-officio board member?

J. Cheatle

A. So Alan, the trustee, really managed that part of it, but I discussed it with Alan if I recall correctly.

Q. And what did your discussions with Alan in that regard involve?

A. I think I asked him whether there was a way for us, the Citadel members at least, the LTAB more generally, to be able to have the conversations of the type that I described with John Sinna and Alan came up with this construct.

Q. What was Mr. Halperin's reaction to you asking him whether there was a way for the Citadel members at least or the LTAB more generally to have the conversations of the type that you described with Mr. Sinna?

MR. MENNITT: Objection, and caution the witness, to the extent Mr. Halperin was conveying any advice he received from counsel.

A. I don't think he did. He said along the lines of let me think about it and consult with my law firm partner, Debra Cohen.

J. Cheatle

Q. How long was the process approximately between when you first raised Citadel's interest in having Sinna join as an ex-officio member and the time at which Mr. Sinna became an ex-officio member?

A. I'm not sure, I'm not sure.

Q. Was it days?

A. No, more than that.

Q. Weeks?

A. Weeks probably.

Q. Months?

A. I don't think so.

MR. AYALA: Let's turn to tab 8, which will be Exhibit 9.

Q. Some of these documents were exhibits in other filings, so when you open it, it will have --

A. Exhibit 11, I have it.

Q. To clarify the record, we are turning to tab 8, Exhibit 9.

(Exhibit 9, email chain between Mr. Xie, Mr. Sinna and Mr. Cheatle dated March 12, 2025, marked for identification, as of this date.)

J. Cheatle

Q. Mr. Cheatle, this is an email chain between Mr. Xie, Mr. Sinna and you.

Do you see that?

A. Yeah.

Q. Dated March 12, 2025?

A. Yeah.

Q. And Mr. Xie says, You may not have been privy to the ordeal it took us to get here. The Herculean effort mainly undertook by Jonny, but congratulations on becoming an ex-officio board member.

Do you see that?

A. Yeah.

Q. What did you understand Mr. Xie to be referring to when he references an ordeal?

MR. MENNITT: Objection to form, but you can answer.

A. I'm not sure. It took a little bit of time, but it wasn't an ordeal.

Q. Was any effort required to get Mr. Sinna that role?

MR. DUKE: Objection to form.

A. Yeah, a little bit, yeah.

Q. And how many conversations with Mr.

J. Cheatle

Halperin did you have, approximately, regarding that issue?

A. I'm not sure, a handful, less, I'm not sure.

Q. Mr. Xie writes, Jonny and I are happy to catch you up on everything you missed and to get your thoughts on some of the decisions we made/are about to make on the case.

Do you see that?

A. Yes.

Q. Without disclosing the substance of any litigation-related communications, did you or Mr. Xie have discussions with Mr. Sinna about decisions you had made or were about to make on the case?

A. I'm looking at the subject matter of this email. Amended common interest agreement. Once the common interest agreement had been signed, yes.

Q. And without disclosing the substance of any litigation-related discussions, what did Mr. Sinna do as an ex-officio member of the LTAB?

J. Cheatle

MR. DUKE: Objection to form.

A. I know he spoke to Ben for the purpose that I described.

Q. Anything other than that?

A. It's me and Ben -- not that I am aware of, no, not that I am aware of.

Q. I take it you are clarifying that you know he spoke to both you and Ben for the purpose that you described?

A. Yes, that happened, yeah.

Q. Did Mr. Sinna attend any LTAB meetings as an ex-officio board member?

A. No.

Q. Did he participate on any written communications as an ex-officio board member?

A. Of the LTAB, I don't think so.

Q. So it's your recollection as an ex-officio member, the only communications Mr. Sinna had were with you or Ben Xie?

A. Yeah, as far as I know, yeah.

Q. In those communications that you or Ben Xie had with Mr. Sinna, did you share information with him about the trust and, again, without discussing the substance of

J. Cheatle

those discussions?

MR. DUKE: Objection to form.

A. About the trust, I mean, about the litigation, yes, if that's what you mean by about the trust.

Q. Did you share materials with Mr. Sinna from the litigation, again, without discussing disclosing the substance of what any materials may be?

MR. DUKE: Objection to form.

MR. MENNITT: Are you limiting this to the ex-officio period?

MR. AYALA: Yes.

A. Materials, I'm not sure.

Q. Do you recall there being any measures in place to protect the disclosure of confidential information to Mr. Sinna?

MR. DUKE: Objection to form.

A. So Ben and I had those measures in place with the trustee and the trustee's counsel.

Q. Sorry, go ahead.

A. That's where it applied to us.

Q. When you refer to those measures,

J. Cheatle

what are you referring to?

A. So as I recall, there was information that was subject to a confidentiality order that we weren't able to share.

Q. When you say that we weren't able to share, you mean with Mr. Sinna?

A. That Ben and I weren't able to share.

Q. With any third party, including Mr. Sinna?

A. That's right, yeah.

Q. And your testimony is that you and Mr. Xie complied with that obligation in your dealings with Mr. Sinna as an ex-officio board member?

A. For me, yes.

Q. What were the parameters of Mr. Sinna's ex-officio board member role?

MR. DUKE: Objection to form.

A. The parameters, the best description is probably in the common interest agreement.

Q. Outside of the common interest

J. Cheatle

agreement, were the parameters of Mr. Sinna's ex-officio memorialized anywhere to your knowledge?

MR. DUKE: Objection to form.

A. No, in the common interest agreement.

Q. Outside of the common interest agreement, were the parameters of his ex-officio board member role discussed at all?

MR. DUKE: Objection to form.

A. A point of appointment, yes.

Q. Other than as to the issue of how he might be appointed, were the parameters of what his role would entail discussed?

MR. DUKE: Objection to form.

A. Discussed with the trustee?

Q. Sure. We can start there.

A. Yes.

Q. What was the substance of those discussions?

MR. DUKE: Hold on one second. To the extent that that would result in you disclosing any communications with

J. Cheatle

between an attorney and client in connection with the functioning of the LTAB board, I instruct you not to answer, but, otherwise, you can respond.

A. Can you say that again?

MR. DUKE: To the extent that would result in you disclosing any communication between you and an attorney in connection with the functioning of the LTAB, I instruct you not to answer, but, otherwise, you can respond.

A. So the discussion with Alan reflected in the common interest agreement, that it was an observer role with no -- nothing more than that.

Q. So your conversations with Mr. Halperin about the progress of the ex-officio role does not reflect substance that is not reflected in the common interest agreement?

A. No, there is no other agreement I am aware of.

Q. Did you discuss with Mr. Xie what the parameters of the ex-officio role would

J. Cheatle

be?

A. Yes.

Q. What did you discuss with Mr. Xie in that regard, excluding any attorney-client communications?

A. It's really that bit, the attorney-client privilege bit, beyond what I just described to you already.

Q. So to clarify, you gave legal advice to Mr. Xie on the issue of the parameters of Mr. Sinna's ex-officio role?

MR. DUKE: Objection to form.

A. No, more on our obligations.

Q. You discussed with Mr. Xie the issue of -- withdrawn.

When you say more on our obligations, what is the topic of the discussion you are referring to, without disclosing the substance of the discussion?

A. That's tricky. You know, reminding Ben of the rules of the road that applied to us, vis John Sinna or anyone else.

Q. In or around the time Mr. Sinna was appointed as an ex-officio board member, did

J. Cheatle

you consider whether the plan authorized
that?
MR. DUKE: Objection to form.
MR. MENNITT: Again, just caution
you, to the extent this deals with
advice you received or gave.
A. I deferred to Alan.
Q. So did you not, you, yourself, did
not consider that issue in connection with
the appointment of Mr. Sinna as an ex-officio
board member? It's a yes or no question.
A. No.
Q. Did you, in or around the time Mr.
Sinna was appointed as an ex-officio board
member, did you consider whether the
litigation trust agreement authorized that?
MR. DUKE: Objection to form.
MR. MENNITT: Hold on one second.
You can answer whether you
considered it.
A. Sorry, can you ask the question
again?
Q. Sure. Yes or no question. Did
you, in or around the time Mr. Sinna was

J. Cheatle

appointed as an ex-officio board member, consider whether the litigation trust agreement authorized that?

A. Yes.

Q. And setting aside any legal advice you gave or received, did you form a conclusion in that regard?

MR. DUKE: Objection to form and also, I think this is just a yes, no.

A. Did I form a conclusion, yes.

Q. Setting aside any legal advice you gave or received, what was that conclusion?

MR. MENNITT: I will caution you, but in light of the fact that there was a subsequent agreement, I think you can answer.

MR. DUKE: Objection to form, and to the extent that if you can separate it, I imagine that may be difficult, but I caution you on the attorney-client privilege ground.

A. So my understanding was that the LTA did not prohibit the ex-officio role, if that answers the question.

J. Cheatle

Q. It does not. I asked a slightly different question which is, setting aside any legal advice you gave or received, did you consider whether the litigation trust agreement authorized the appointment of an ex-officio board member?

A. My answer to that was yes, I considered that.

Q. And I take it your testimony was that your understanding was the LTA did not prohibit the ex-officio role, correct?

A. To your follow-up question, what was my conclusion or something like that, yes.

Q. Did you form a view on whether the LTA authorized an ex-officio role?

A. Yeah, I think I answered that already, yes.

Q. What was the basis for your view that the LTA authorizes an ex-officio board member role?

MR. MENNITT: Objection to form, and I caution the witness that if that basis is your receipt or provision of

J. Cheatle

legal advice, it would be -- I direct you not to answer.

A. Yeah, I think I have to state I considered it.

Q. So you are comfortable saying that you formed the view that the LTAB does not prohibit the ex-officio role, correct?

A. Yes.

Q. And that was based on your assessment of the LTA, in or around the time Mr. Sinna was appointed as an ex-officio board member?

A. Yes.

Q. In or around the time that Mr. Sinna was appointed as an ex-officio board member, did you form a view that the LTA authorized the appointment of an ex-officio board member, yes or no?

A. I thought I was instructed or guided not to answer that.

MR. AYALA: Are you instructing him not to answer that?

MR. MENNITT: I think the witness has already answered that question,

J. Cheatle

whether you formed a view.

Q. What was the answer, Mr. Cheatle?

A. Whether I formed a view, yes.

Q. What was your view as to whether the LTA authorized the appointment of an ex-officio board member based on, was it legal advice?

A. Yeah, I think it was, yeah. I paused because I was just trying to remember properly. I think it was, yeah.

Q. Sure. Who did you obtain legal advice from on that issue?

A. I didn't directly.

Q. Where did you obtain legal advice on that issue indirectly from?

A. Through the trustee.

Q. And so your testimony is that the trustee provided -- withdrawn.

Whose legal advice do you understand yourself to have received indirectly through the trustee?

A. Debra Cohen or the trustee's counsel.

Q. So in or around the time Mr. Sinna

J. Cheatle

was appointed as an ex-officio board member, you, yourself concluded that the LTA does not prohibit an ex-officio board member and then you received legal advice indirectly from Ms. Cohen as to whether the LTA authorized the appointment of an ex-officio board member, correct?

MR. DUKE: Objection to form, but you can answer.

A. I would say the two are related, but that's my recollection of how it worked.

Q. Got it. Let's look at the LTA, it's tab 2, Exhibit 4.

A. LTA, yeah.

Q. Let's turn to page 22 of the document. We are going to look at Section 4.01.

A. Yeah.

Q. Do you see the section, litigation trust advisory board?

A. Yeah.

Q. This section states that the litigation trust advisory board is to have three members, correct?

J. Cheatle

A. The litigation trust advisory board which shall have three members.

Q. The last sentence says, No other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of litigation trust, except as maybe set forth in this litigation trust agreement or the plan.

Do you see that?

A. I do.

Q. Can you identify any language in this section that authorizes the existence of a ex-officio board member?

MR. DUKE: Objection to form. I think you testified as to the privilege that you couldn't disclose your understanding because it derived from privileged information.

MR. AYALA: Michael, what are we doing here? We don't need lengthy colloquy about past testimony and so forth. I don't think that's appropriate.

J. Cheatle

MR. DUKE: Well, I want to make sure he is not going to disclose privileged information and I am entitled to give that instruction.

MR. AYALA: Sure. You can give a standard privilege instruction and I can withdraw and reask the question.

MR. DUKE: Based on the testimony he gave --

MR. AYALA: You don't need to tell me anything. I can withdraw the question and reask it.

MR. DUKE: Are you going to withdraw it?

MR. AYALA: I will and I will reask it. I will withdraw the question.

Q. Mr. Cheatle, setting aside any legal advice you have ever given or received, can you identify any language in Section 4.01 that authorizes the existence of an ex-officio board member?

MR. DUKE: Objection to form.

A. No, I don't.

Q. Sitting here today and setting

J. Cheatle

aside any legal advice you have given or received, can you identify or are you aware of any language in the litigation trust agreement that authorizes the existence of an ex-officio board member role?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

You can answer.

A. No, there is no specific reference to appointment of an ex-officio member.

Q. Are you aware of any general reference to the appointment of an ex-officio member?

A. There is no use of that term.

Q. I will ask the question again. Are you aware of any general reference to the appointment of an ex-officio member, yes or no?

MR. DUKE: Objection to form.

A. No.

Q. Are you aware of any language in the plan that authorizes the existence of an ex-officio board member, yes or no?

MR. DUKE: Objection to form.

J. Cheatle

A. No.

Q. Now, let's look back at tab 4. I want you to keep the litigation trust agreement up.

A. I can flip between them. You want me to be able to see both at the same time?

Q. It would make things go faster.

A. Let me see if I can pull out -- no, I can't.

Q. Tab 4(a) which is Exhibit 5.

A. Back to the participation agreement. You want me to have the LTA open as well?

Q. If you are able to.

A. What tab was the LTA?

Q. Two.

A. Yeah, I'm ready.

Q. Okay. So on tab 4(a), Exhibit 5, I ask you to turn to the page ending in Bates stamp 7. You will see section A there.

A. Yeah.

Q. If you look back at, you will recall in the second sentence of Section 10(a), there is a language, providing that

J. Cheatle

seller agrees to use good faith efforts to consult with buyer, and it goes on.

Do you see that?

A. Yeah.

Q. If we turn back to the litigation trust agreement, Section 4.01, page 22, you will see the last sentence says, No other litigation trust beneficiary shall have any consultation or approval rights whatsoever in respect of management and operation of the litigation trust, except as maybe set forth in this litigation trust agreement or the plan.

Do you see that?

A. No other litigation trust beneficiary, yeah, yeah.

Q. Did you ever consider whether the language in Section 10(a) obligating seller to agree to use good faith efforts to consult with buyer complied with the last sentence of Section 4.01 of the litigation trust agreement?

MR. MENNITT: I caution you again, to the extent you received or gave legal

J. Cheatle

advice on that issue.

A. Yes, yes, I considered it.

Q. Yes or no question, did you consider that in or around the time the parties entered into the participation agreement?

A. Yes.

Q. And did you obtain legal advice on that issue?

A. Yes.

Q. Who did you obtain legal advice on that issue from?

A. Alston & Bird.

Q. Independent of any legal advice you received from Alston & Bird, did you ever form a view on that issue?

A. Yes.

Q. And without disclosing the substance of any advice you got, what conclusion did you draw -- withdrawn.

Without disclosing the substance of any legal advice you received, what view did you form on that issue independent of any legal advice?

J. Cheatle

MR. DUKE: Objection to form.

MR. MENNITT: I also caution you to also exclude any advice that you gave.

A. That narrows it down.

I'm sorry, can you ask the question again?

Q. Sure. I'm not asking you to disclose the substance of any legal advice you received.

Do you understand that?

A. Yes.

Q. I'm not asking you to disclosure any communications you had wherein you provided legal advice to anybody else.

Do you understand that?

A. Yes.

Q. I understand you to have formed a view on the issue of whether the seller's agreement to use good faith efforts to consult with buyer in Section 10(a) of the participation agreements complies with the last sentence of Section 4.01, and you testified that you did form that view, correct?

J. Cheatle

A. I formed a view, yeah.

Q. So my question is simply, what is that view? I am not asking you to disclose what you heard from other people or what you discussed with other people. I'm solely asking you for what that view is.

A. So my view is that it doesn't -- the participation agreement wording doesn't conflict with the LTA wording that you are referring to, the no other litigation trust beneficiary.

Q. What was the basis for that view, independent of any legal advice you received or provided?

MR. DUKE: Objection to form.

A. It's difficult to thread that needle. My understanding is the participation agreement doesn't grant Parabellum entities any rights versus the trustee or the trust.

Q. So when you look at the last sentence of Section 4.01, what language in that sentence limits its scope to rights versus the trustee or the trust?

J. Cheatle

A. I should have said the LTAB.

Q. Looking at the last sentence in Section 4.01, what language in that sentence limits its scope to rights versus the trustee or the trust or the LTAB?

MR. DUKE: Objection to form.

A. Again, this is a thread the needle point. It says in respect of the litigation trust.

Q. So your testimony is that the language that says, in respect of management and operation of the litigation trust operates to limit the scope of the last sentence of Section 4.01 to rights as against the trustee, the trust or the LTAB?

MR. MENNITT: Objection to form.

MR. DUKE: Join.

MR. MENNITT: You can answer, obviously, excluding any conversations you had with Alston & Bird or any advice that you gave.

A. I'm not sure who else it would be, so that is my understanding, yeah.

Q. And by versus the trustee or the

J. Cheatle

trust or the LTAB, what do you mean by that?

A. This is an agreement -- the LTA itself is an agreement governing the operation of the trust, so that's what I mean by that. It relates to -- as it says here, in respect of management and operation of the litigation trust, I don't think that refers to third parties.

Q. So, in other words, I understand your testimony to be that the last sentence of Section 4.01 limits the prohibition against consultation or approval rights to be -- to rights as against the trustee, the trust or the LTAB only, is that fair?

MR. DUKE: Objection to form.

A. That's my understanding of it, yeah.

Q. In other words, a consultation or approval right in respect of management and operation of the litigation trust would not run afoul of the prohibition in this sentence as long as the right -- as long as the right does not obligate the trustee, the trust or the LTAB itself, is that your position?

J. Cheatle

MR. MENNITT: Objection to form and same caution.

MR. DUKE: Objection.

Q. So put differently, your understanding of this section is that only precludes consultation or approval rights in respect of the management and operation of the litigation trust, to the extent those rights bind the trust, the trustee or the LTAB, correct?

MR. DUKE: Objection to form.

A. Yeah, yeah, that's how I read -- that's what I think in respect to management and operation of the litigation trust.

Q. That's based on your reading of the plain language in that sentence, correct?

A. Yeah, this commentary here, yeah.

Q. Got it. Now, the first sentence of this section states that the litigation trust advisory board shall have three members with two of the members appointed by the prepetition term loan lenders and one appointed by the official committee of unsecured creditors or its designee.

J. Cheatle

Do you see that?

A. Yeah.

Q. Do you have any view on the purpose of that mandate, that two members of the litigation trust advisory board be appointed by the prepetition term loan lenders, whereas one is appointed by the official committee of the unsecured creditors or its designee?

MR. DUKE: Objection to form.

MR. MENNITT: And same caution, that you should exclude any advice you have received or given on this issue.

A. The question was?

Q. So the language sets out that the LTAB should have two seats appointed by the prepetition term loan lenders, right?

A. Yeah.

Q. And one seat appointed by the official committee of unsecured creditors or its designee, right?

A. Yeah.

Q. And I'm asking you whether you have a view on the purpose of that allocation of the seats across those two interests?

J. Cheatle

MR. DUKE: Objection to form.

A. I think the purpose, I'm speculating a little bit, the purpose is to reflect the prepetition term loan lenders at the greatest share of the interests, of the trust interests.

Q. Why would that be relevant to the allocation of the LTAB seats?

MR. DUKE: Objection to form.

MR. MENNITT: Objection, form. Same caution.

A. Because they would have had the most significant interest in maximizing the value of those interests.

Q. Sorry, I didn't mean to interrupt.

A. Go ahead.

Q. In that context, do you have a view on the purpose of allocating one of the seats to a designee of the official committee of unsecured creditors or its designee?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form and, again, same caution, exclude any advice you gave to Citadel on this

J. Cheatle

issue.

A. So the corollary is that the official committee also received a portion of the trust interest.

Q. Do you recall Mr. Olson retiring from his employment?

A. I recall being informed about it.

Q. And do you recall whether Ravago named a different employee to fill Mr. Olson's role on the LTAB?

MR. MENNITT: Objection to form.

A. No.

Q. Let me do this quickly then. Let's do tab 20.

MR. MENNITT: Marc, can we take a five-minute break if you are doing something?

MR. AYALA: That's fine.

THE VIDEOGRAPHER: Going off record. This marks the end of media No. 2 at 10:45 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. This marks the beginning of

J. Cheatle

media No. 3 at 10:53 a.m.

Counsel, proceed.

BY MR. AYALA:

Q. Mr. Cheatle, just a quick point of clarification on tab 2, Exhibit 4.

A. Which one is that, which document is that -- the LTA, yeah.

Q. Are you ready?

A. Yeah.

Q. Focusing on the last sentence of this paragraph, as I understand your testimony, you understand that sentence to preclude consultation or approval rights in respect of management and operation of the litigation trust only to the extent they bind the trust, the trustee or the LTAB, correct?

MR. DUKE: Objection to form.

MR. MENNITT: Objection.

You can answer subject to the caution we've previously put on.

A. Yeah, I think it's the same answer, yeah.

Q. But your understanding is that that sentence does not preclude consultation or

approval rights in respect of management and operation of the litigation trust that bind the LTAB members?

MR. DUKE: Objection to form.

MR. MENNITT: You can answer subject to the same caution.

A. No, I don't think that's -- I thought I said it relates to the trust, the trustee and the LTAB.

Q. So it would not preclude consultation or approval rights in respect of management and operation of the litigation trust that bind individual LTAB members, that's your testimony?

MR. DUKE: Objection to form.

MR. MENNITT: Objection.

A. I didn't follow the question, sorry.

Q. Your understanding, if I'm following you, is that this sentence would not preclude consultation or approval rights in respect of management and operation of the litigation trust that bind a member of the litigation trust advisory board as opposed to

J. Cheatle

the LTAB itself?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

A. No, I don't think I would make that distinction.

Q. So then you think this sentence would preclude consultation or approval rights in respect of management and operation of the litigation trust that bind a member of the litigation trust advisory board, correct?

MR. DUKE: Objection to form.

A. Yeah, I think that's right.

Q. Turning back to tab 16, which will be Exhibit 11, I think we looked at this earlier. This is the litigation trustee's objection.

Do you see that?

A. Did we -- sorry, which one are we on?

Q. Very briefly it's the litigation trustee's objection to Cornell's motion for expedited discovery, it should be tab 16. It is not a new exhibit, it's Exhibit 2.

A. Tab 16?

J. Cheatle

Q. Yes.

A. I'm sorry, I'm not seeing that one.

Q. I think it's in the Chat, if you want to just download it. I'm going to ask you about one sentence in it, if you just want to look on the screen.

A. Okay. Fine.

Q. Can you turn to paragraph 24 on page 8.

MR. AYALA: Do you mind scrolling up a little bit? Thank you.

Q. So you see here, the trustee's discussing the -- discussing events leading up to Ravago's resignation from the LTAB.

Do you see that?

A. Mr. Olson's counsel notified the trustee?

Q. Yes.

A. Yes.

Q. And in the paragraph following that, it says, Ravago, the unsecured creditor which had appointed Mr. Olson, initially proposed another employee to take Mr. Olson's seat.

J. Cheatle

Do you see that?

A. Yeah.

Q. Do you recall that happening?

A. No.

Q. And the next sentence, the trustee writes, But after discussion about whether the seat was Ravago's to designate, Ravago informed the trustee in September that it would not seek to appoint a new designee.

Do you see that?

A. Yes.

Q. Do you recall a discussion about whether the seat was Ravago's to designate?

A. I didn't have a discussion with Ravago.

Q. Sorry, I didn't mean to interrupt. Please go ahead.

A. I'm sorry, I was just reiterating notes. That was it.

Q. Do you recall any discussions about whether the seat was Ravago's to designate?

MR. MENNITT: Obviously, excluding conversations with counsel.

A. I think I had a conversation with

J. Cheatle

Alan about that, the trustee.

Q. So in or around the time when Mr. Olson was retiring, you recall having a discussion with Mr. Halperin on the issue of whether the seat was Ravago's to designate, is that right?

A. Yeah.

Q. Do you recall discussing that topic with anybody else?

A. No.

Q. Did you discuss that topic with Mr. Xie in or around this time?

A. I don't recall.

Q. You don't recall one way or the other?

A. No.

Q. And you only recall one discussion with Mr. Halperin on this topic or do you recall there being multiple discussions on this topic?

A. Just one I think.

Q. Do you have an understanding of what Ravago's view was on whether it was Ravago's seat to designate?

J. Cheatle

MR. MENNITT: Objection to form, but you can answer.

A. Only as relayed to me by Alan.

Q. What did Mr. Halperin relay to you in that regard?

A. He gave me the impression that Ravago thought it could appoint a successor.

Q. Did you form a view on that issue, yes or no?

A. Yes.

Q. Was that view -- did you form a view on that issue independent of any legal advice you received?

A. No.

Q. And whose legal advice did you receive on that topic?

A. Actually, I'm not sure about that.

Q. You are not sure about whether you received legal advice on that topic or you don't know who, if anybody, gave you that legal advice?

A. The latter. Let me just think.

Q. Sure. Take your time.

A. I think it would have been Alan and

J. Cheatle

the litigation trustee in this case.

Q. Just to try to clarify and save time. What I understand you to be saying is that in or around this time, legal advice from the trustee's counsel, Ms. Cohen, was conveyed to you as to whether the seat was Ravago's seat to designate?

A. Yeah, I said litigation trust counsel. I think it might have been the litigation counsel rather than Debra, but, honestly, I'm struggling to remember.

Q. Did Citadel ever take a position on that issue?

A. Citadel, I don't think Citadel as such took a position on it.

Q. Do you understand your position on that issue to have been communicated to Ravago?

A. I don't know.

MR. AYALA: Let's turn to tab 7, which will be Exhibit 11.

(Exhibit 11, email chain, marked for identification, as of this date.)

Q. Is it your recollection that there

J. Cheatle

was a disagreement about whether Ravago had the right to designate a replacement for Mr. Olson?

A. I'm not sure that their reading was correct, but, no disagreement I was involved in.

Q. Do you recall whether anybody ever considered raising that issue for the court's consideration?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form and, again, you have to exclude any advice you may have gotten from counsel on that.

Q. Let me ask it again. Withdrawn.

Do you recall in or around this time whether anybody considered raising that issue for the court's consideration, yes or no?

A. The court, I thought I said the board.

MR. DUKE: Objection to form.

A. I don't know, I didn't.

Q. So we are on tab 7, Exhibit 11.

J. Cheatle

This is an email chain from. At the top of the chain, it's an email from Angela Ni dated October 1, 2025.

Do you see that?

A. Yes.

Q. Do you see below that, Mr. Sinna wrote an email dated September 5, 2025?

Do you see that?

A. Yeah.

Q. In his email, he writes to his colleagues at Parabellum, I'm going to join the advisory board for the Instant Brands Litigation Trust alongside the two existing parties from Citadel.

Do you see that?

A. I'm going to join the advisory board, yeah.

Q. Do you recall discussions about the prospect of Parabellum being appointed as a full LTAB member, rather than just an ex-officio member in or around this time?

A. September 2025, no, not in September, no.

Q. How about prior to September 2025?

J. Cheatle

A. Certainly in the negotiation of the participation agreement, as we discussed.

Q. Other than that?

A. I don't recall when the topic was revised.

Q. Were you supportive of Parabellum being appointed as a full member to the LTAB?

A. Yes.

Q. Why was that?

A. For the reasons I gave earlier and at that point, the Parabellum funds were holders of nontrivial amount of litigation trust interests.

Q. What is the relationship between Parabellum funds being holders of nontrivial amount of litigation trust interests and your support of Parabellum being appointed as full member of the LTAB?

A. Alignment of interest.

Q. In what regard?

A. John would be incentivized to maximize the return for beneficiaries.

Q. Would that not be the case for any holder of LTIs?

J. Cheatle

MR. DUKE: Objection to form.

A. It could be.

Q. He says -- by the time, Mr. Sinna wrote this email, Citadel had already told John that they would -- withdrawn.

By the time, Mr. Sinna writes this email, you and/or Mr. Xie had already told Mr. Sinna that you would support him being a full member of the LTAB, right?

A. I hadn't.

Q. Did you ever have a discussion with Mr. Sinna where you told him that you would support him becoming a full member of the LTAB?

A. I don't recall that, but I did support it.

Q. Do you have any reason to believe that Mr. Sinna would tell his colleagues that he was going to join the advisory board for the Instant Brands Litigation Trust alongside you and Mr. Xie without discussing that issue with you first?

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

J. Cheatle

A. No, that would be odd.

Q. He writes in the first bullet -- sorry, he writes in the last bullet, Taking us on the board reduces the potential cost or admin burden of finding another party and we also see it as a nice little nod from Citadel with whom we are also working on other potential opportunities.

Do you see that?

A. Yes.

Q. Have you worked with Mr. Sinna on other potential opportunities, without disclosing the substance of those opportunities?

A. I haven't.

Q. Do you know if Mr. Xie has worked with Mr. Sinna on other potential opportunities without disclosing the substance of those opportunities?

A. I don't, no.

Q. Outside of the Instant Brands matter, to your knowledge, does Citadel have any other business relationship -- sorry, withdrawn.

J. Cheatle

Outside of the Instant Brands matter, to your knowledge, does Citadel have any other business relationships with Parabellum?

A. Not to my knowledge.

Q. How about Mr. Sinna?

A. Not to my knowledge.

Q. He writes, We are already observers to the board and have been working with Citadel on related matters since our purchase, the second bullet.

Do you see that?

A. On related -- yeah.

Q. Prior to the time Mr. Sinna was appointed as a full LTAB member, he had been working with you and Mr. Xie on matters related to the board?

MR. DUKE: Objection to form.

A. No, I don't think so.

Q. Prior to Mr. Sinna's appointment as a full LTAB member, he had been working with you and Mr. Xie on matters related to the litigation, without disclosing the substance of such matters?

J. Cheatle

A. I'm not sure what he means by working with Citadel, but we did have discussions with him as I described earlier.

Q. Now, let's turn back to Exhibit 7 which is tab 18. It's the credit agreement.

A. Yeah. Did you say tab 18?

Q. Yes. This agreement is dated September 5, 2025.

Do you see that?

A. I'm not there yet. This isn't working very well, I'm sorry.

Okay. I have it.

Q. Do you see at the top, it's dated September 5, 2025?

A. Yeah.

Q. That is the same date as the email from Mr. Sinna where he tells his colleagues he is going to join the advisory board for the Instant Brands Litigation Trust.

Do you see that?

A. I have to go back to the email.

Q. Sure. Tab 7, Exhibit 4.

MR. DUKE: For the record, I don't think it's Exhibit 4.

J. Cheatle

MR. AYALA: Sorry, 11. Thanks, Michael.

A. Flipping between them is not proving very easy I'm afraid. Tab 7, okay. Friday, September 5th.

Q. Was there any relationship between Mr. Sinna joining the LTAB and the amendment to the credit agreement?

A. No, not that I know of.

Q. Just a coincidence that the lenders amended the credit agreement and Mr. Sinna told his colleagues he was joining the LTAB on the same day, to your knowledge?

A. To my knowledge, yeah.

MR. AYALA: Tab 10, Exhibit 12.

(Exhibit 12, email chain between Mr. Cheatle and Mr. Halperin dated October 3, 2025, marked for identification, as of this date.)

A. Yeah.

Q. This is an email chain between you and Mr. Halperin.

Do you see that?

A. Yeah.

J. Cheatle

Q. It's dated October 3, 2025?

A. Yeah.

Q. And in the paragraph No. 2, he writes, Heard back from Dipesh Patel. Ravago is prepared to resign from the trust oversight board. The only caveat is that Dipesh's last bill be paid.

Do you see that?

A. Yeah.

Q. Do you recall having this exchange?

A. Yeah, I remember this email, yeah.

Q. And is it fair to say that Mr. Sinna was -- withdrawn.

Is it fair to say that either you or Mr. Xie had spoken with Mr. Sinna about the prospect of him joining the LTAB before Ravago indicated that it was prepared to resign from the board?

MR. DUKE: Objection to form.

A. Yeah -- no, I don't recall that.

Q. Do you recall Ravago being prepared to resign from the board before you received this email?

A. No.

J. Cheatle

Q. But about a month before this email, Mr. Sinna reported to his colleagues he would be joining the LTAB.

Do you recall that?

A. The email that we looked at, yeah.

Q. You don't have any recollection as to whether, before this email, you or Mr. Xie spoke with Mr. Sinna about that issue?

MR. MENNITT: Objection to form.

Marc, when you say this email, you are obviously talking about the October 3rd email?

MR. AYALA: Yes, Exhibit 12.

A. I don't recall that.

Q. You don't recall one way or the other or you don't recall having those discussions?

A. I don't recall having those discussions.

Q. So do you have any explanation for why Mr. Sinna would be telling his colleagues that he would be joining the LTAB a month before you learned Ravago was prepared to resign from the board?

J. Cheatle

A. No, I don't know.

MR. DUKE: Objection to form.

MR. AYALA: Let's do tab 26, which will be Exhibit 13.

(Exhibit 13, acceptance of appointment and joinder dated February 23, 2026, marked for identification, as of this date.)

A. Tab 26?

Q. Tab 26. The first page says Exhibit 8 and it's the acceptance of appointment and joinder?

A. Exhibit 8?

Q. It says Exhibit 8.

A. I've got it. Acceptance of appointment and joinder, yeah.

Q. Do you recognize this document?

A. Yeah.

Q. What is it?

A. It's John Sinna agreeing to become part of the LTAB.

Q. It's dated February 27, 2024, right?

MR. DUKE: Objection.

J. Cheatle

A. That's not right, February 23, 2026.

MR. AYALA: Correct. Thank you, guys. It's dated February 23, 2026.

Q. That is months after Ravago had indicated it was prepared to resign from the board, right?

A. The October, I think it was the October email we looked at.

Q. Yes.

A. Yeah.

Q. During that period between when Ravago indicated it was prepared to resign and the time Mr. Sinna executed this agreement, in what role did Mr. Sinna serve on the LTAB?

A. No role.

Q. Did he continue to have his ex-officio board role?

A. Yes.

Q. In connection with the vote on Mr. Sinna becoming a full LTAB member, did you or Mr. Xie disclose any and all financial or other pecuniary interests that Citadel might

J. Cheatle

have with respect to or in connection with that vote other than solely as a litigation trust beneficiary?

MR. DUKE: Objection to form.

A. No.

Q. Did you consider in or around the time of the vote on Mr. Sinna becoming a full LTAB member whether Citadel had any such interests?

MR. DUKE: Objection to form.

A. Yes.

Q. Did you receive legal advice on that issue, yes or no?

A. I think no.

Q. What conclusion did you reach in considering that issue, if any?

MR. MENNITT: Same caution we had before.

You should also exclude any advice you gave to Citadel on that issue.

A. That makes it difficult to answer.

Q. I don't think that's quite right. You've testified that you did not receive legal advice on this issue, right?

J. Cheatle

A. Yeah, I don't recall.

Q. I take it then that you provided legal advice on this issue?

A. Yes.

Q. Who did you provide legal advice on this issue to?

A. To Ben.

Q. I'm not asking you for the substance of any legal advice that you communicated to Ben.

I'm asking whether you, Mr. Cheatle, formed a view on that issue and, if so, what was that view?

A. Whether Citadel had a pecuniary interest in that appointment, is that the question.

Q. Yeah, a financial or other pecuniary interest that Citadel had or may have in appointing Parabellum as a full LTAB member?

MR. DUKE: Objection to form.

MR. MENNITT: I think you can answer as to your knowledge as an LTAB member, but not any legal advice you

J. Cheatle

gave.

A. Right. So, no, I didn't think Citadel had that interest.

Q. And what was that conclusion based on?

A. That's difficult, okay. That was based on -- that was based on the fact of the appointment, the process around the appointment and the contractual arrangements with the Parabellum funds.

Q. What about the contractual arrangements with the Parabellum funds informed your view that Citadel did not have such interests?

MR. MENNITT: Objection to form.

You can answer.

A. I can. Because the appointment had no impact on the economics of the participations.

Q. In considering the prospect of Mr. Sinna's appointment, did you consider the language in Section 4.01 of the litigation trust agreement concerning the right of the prepetition term lenders to designate two

J. Cheatle

seats and the creditors' committee or its designee to designate one seat?

MR. MENNITT: Objection to form.

You can answer.

A. Can we pull it up to make sure we are talking about the same thing.

Q. Absolutely. I'm looking for opportunities to save time, but sure.

A. My tab switching is not the best here.

Q. Tab 2, Exhibit 4, page 22 of the document.

A. Yeah.

Q. I was just referring to the first sentence of this section and asking whether, in considering the prospect of appointing Mr. Sinna as a full-time member of the board, you considered the allocation of appointments set out in the first sentence of Section 4.01?

MR. DUKE: Objection, form.

A. Considered, yes.

Q. And did you receive legal advice on that issue?

A. Yes.

J. Cheatle

Q. Who did you obtain legal advice from on that issue?

A. Again, this was through, indirectly through the trustee and in this case, trustee counsel.

Q. So you indirectly received advice on that issue from Ms. Cohen?

A. Or the litigation counsel, yeah.

Q. Independent of that legal advice, did you ever consider that issue?

A. Yes.

Q. Did you form a view on whether there was a relationship between the requirements in the first section -- the first sentence of Section 4.01 and the prospect of appointing Mr. Sinna as a full LTAB member?

MR. DUKE: Objection to form, and just to make sure, because your question didn't say, Marc, are you saying connecting to the last question of excluding the legal advice.

MR. AYALA: I will just withdraw it and ask it again.

J. Cheatle

Q. In considering this issue, independent of the legal advice you received, did you form a view on whether Mr. Sinna's appointment as a full LTAB member would be consistent with the first sentence of Section 4.01?

MR. DUKE: Objection to form.

A. Yes, yes.

Q. And what view did you form?

MR. DUKE: Objection to form.

MR. MENNITT: Again, you shouldn't disclose any advice that you gave, but you can answer, to the extent if your understanding is as an LTAB member.

A. That's difficult because the answer relates -- implicates other provisions, yeah, specifically the provisions relating to replacements on the board.

Q. So, in other words, you would not be able to reveal the view that you formed without also revealing legal advice that you received?

A. Yeah.

Q. During your tenure on the LTAB, did

J. Cheatle

you ever identify a potential or actual conflict of interest?

MR. DUKE: Objection to form.

A. Potential, yes.

Q. What potential conflicts of interest did you identify?

A. So regarding the trust interests transfer to the Parabellum funds that we discussed before.

Q. Anything else?

A. We thought or I thought about it in relation to all of the approvals that the trustee requested of the advisory board.

Q. So your testimony is that each time the trustee requested a vote from the LTAB members, you considered the issue of whether there were any potential conflicts of interest?

A. Yes.

Q. But the only potential conflict of interest that you actually identified is or was in connection with the transfer of LTIs from Citadel funds to Parabellum funds, correct?

J. Cheatle

MR. DUKE: Objection to form.

A. Yes.

Q. During your tenure on the LTAB, did you ever disclose a potential or actual conflict of interest?

A. Yes.

Q. Yes, what did you disclose?

A. The transfer of the trust's interests. We went through the document earlier.

Q. Do you have an understanding of the reasons for Mr. Halperin's resignation as trustee?

A. Yeah, a little bit, yeah.

Q. What is that understanding?

A. He didn't tell me, so I don't know, but I think it was to do with the trust budget.

Q. You came to that understanding through conversations with Mr. Xie?

A. Yeah, that's my recollection, yeah.

Q. Did you have any direct conversations with the trustee or sorry, Mr. Halperin, about his resignation?

J. Cheatle

A. No.

Q. Are you aware that Mr. Xie asked Mr. Halperin to reconsider resigning?

MR. DUKE: Objection to form.

A. Yeah, I think he did, yeah.

Q. Do you recall discussing with Mr. Xie whether Mr. Halperin would reconsider?

A. No, no, I don't.

Q. How did you come to learn that Mr. Xie had asked Mr. Halperin to reconsider resigning?

A. I don't have a crisp recollection. I think he would have told me.

Q. Did you want Mr. Halperin to remain as trustee?

A. Yes.

Q. Without getting into the substance of any litigation-related discussions, why did you want him to remain as trustee?

A. He did a good job.

Q. Let's turn to tab 12.

A. I got that one straight-away.

(Exhibit 14, letter dated July 1, 2026, marked for identification, as of

J. Cheatle

this date.)

Q. Do you recognize this document?

A. The email from Alan to me, amongst others, yes, I do.

Q. Do you see it's dated July 1, 2026?

A. Yeah.

Q. Do you recall receiving this letter?

A. No, I recall that it happened, but I don't.

Q. Do you recall what your reaction was to receiving it?

MR. DUKE: Objection to form.

A. Yeah.

Q. How would you characterize that reaction?

A. Disappointed, but I thought we could deal with it.

Q. Were you surprised?

A. Yeah.

Q. Were you aware that Mr. Halperin had been considering resigning prior to receiving this letter?

A. No.

J. Cheatle

Q. After receiving this letter, did you consider whether to notify the Houston Bankruptcy Court?

MR. MENNITT: Again, I caution you, to the extent that is based on advice of counsel.

A. I think that was handled by Alan.

Q. But you did consider that issue?

MR. DUKE: Objection to form.

A. I didn't, no.

Q. Do you remember discussing that issue with either your counsel or Mr. Xie, without revealing the substance of any such discussions?

A. I don't think we discussed it.

Q. Do you remember discussing that issue with counsel to the litigation trust?

A. Yeah, I think so, yeah.

Q. Was that the Elsberg Baker firm?

A. Yeah.

Q. And ultimately, this document was not filed with the court until July 30, 2026, right?

A. I'm not sure of the date of the

J. Cheatle

filing.

Q. Do you recall that it was some weeks after the letter was sent?

A. I don't know.

Q. Sitting here today, you are not aware there was a period of time after the letter was sent where the letter was not made public?

A. No, I'm not sure about that.

Q. What was the process by which the replacement trustee was identified, without getting into the substance of the process itself?

MR. DUKE: Objection to form.

A. We asked for some recommendations and spoke to some firms.

Q. Was Mr. Sinna involved in that process?

A. Yes.

Q. In what capacity, without getting into the substance?

MR. DUKE: Objection to form.

A. I think he provided some recommendations.

J. Cheatle

Q. Do you recall any involvement beyond that?

A. In the decisionmaking?

Q. Yes. For instance --

A. Yes, yes.

MR. AYALA: Let's do tab 24, which will be Exhibit 15.

(Exhibit 15, appointment of a successor litigation trustee, marked for identification, as of this date.)

A. What is that substantively?

Q. It's the notice of appointment of a successor litigation trustee.

Do you recognize this document?

A. Yes.

Q. If you don't mind scrolling to the second page. This identifies Argent Institutional Trust as the replacement trustee?

A. Yes.

Q. Do you have any experience working with Argent Institutional Trust?

A. I don't.

Q. Did Mr. Xie, to your knowledge?

J. Cheatle

A. I don't know.

Q. Do you have any experience working with Mr. Dobrava?

A. I don't.

Q. To your knowledge, does Mr. Xie?

A. Not to my knowledge.

Q. To your knowledge, does Mr. Dobrava have any experience serving as a trustee to a litigation trust?

A. I'm not sure.

Q. To your knowledge, does Argent Institutional Trust have any experience serving as a trustee to a litigation trust?

MR. DUKE: I'm going to object to the scope of the questioning here.

Q. You can answer.

A. Yeah, I'm not sure. I have to remind myself what we discussed.

Q. Do you have any knowledge if either Argent Institutional Trust or Mr. Dobrava as having served as a fiduciary in the context of a litigation?

A. I don't know.

Q. Just a quick clarifying question

J. Cheatle

and then I think we can take a break and I can work on wrapping up.

Let's turn to tab 4(a) again. Turn to the page ending in 7.

A. Yeah.

Q. Do you see the first sentence of Section 10(a)?

A. On and after the settlement date?

Q. Yes. Do you understand Citadel to be bound by that language today?

MR. DUKE: Objection to form.

A. Let me just read it. Yes.

Q. That's in respect of the LTI and the debt participated rights, right?

MR. DUKE: Objection to form.

A. I think as of now, there are no LTI participated rights.

Q. So your understanding is that the first sentence of 10(a) continues to be binding on the Citadel funds with respect to the debt participated rights, correct?

MR. MENNITT: Objection to form.

A. Yes.

Q. And the -- sorry to switch back and

J. Cheatle

forth. I'm trying to gather the loose ends here.

The replacement trustee is Argent Institutional Trust, right?

A. Yeah.

Q. Not Mr. Dobrava personally?

MR. DUKE: Objection to form.

A. Yeah, I understand it to be the institution.

MR. AYALA: Why don't we take, if it's all right with you, take seven minutes and I will try to make sure that we are tidying up here and be on our way.

MR. BRILLIANT: Can we have just a little bit longer than that? Can we have 10 minutes?

THE VIDEOGRAPHER: Going off record at 11:50 a.m. Eastern Time.

(Recess.)

THE VIDEOGRAPHER: We are back on record at 12:13 p.m.

BY MR. AYALA:

Q. Just a couple of quick questions to

J. Cheatle

wrap up.

Earlier I asked you, During your tenure on the LTAB, did you ever disclose potential or actual conflict of interest? And you answered, Yes. And I asked, What did you disclose? And you answered, The transfer of the trust interests. We went through the document earlier.

Do you remember that?

A. Yeah.

Q. Why did you perceive that as a potential conflict of interest?

A. I actually didn't, but when I consulted with Alan, you know, we adopted the process we discussed earlier.

Q. So after discussing it with the then serving trustee, you disclosed that issue?

A. Yeah.

Q. During our breaks today, did you discuss the subject matter of your deposition with counsel?

A. No.

MR. AYALA: No further questions.

J. Cheatle

MR. MENNITT: I just have one question. One thing I wanted to clarify.

EXAMINATION BY

MR. MENNITT:

Q. Mr. Cheatle, do you recall earlier in your testimony, you were asked a question whether you think Section 4.01 of the litigation trust agreement would preclude consultation or approval rights in respect of management and operation of the litigation trust that binds a member of the litigation trust advisory board?

A. I remember the question, yeah.

Q. And specifically -- why don't you open up that document.

I'm asking, there was extensive questioning, particularly on the last sentence of 4.01.

Do you recall that?

A. Yeah.

Q. So my question is whether Section 4.01 and specifically that sentence, preclude the LTAB members like you and Mr. Xie from

J. Cheatle

consulting with anyone concerning litigation trust business?

A. No, I don't think it does.

Q. Why not?

A. Because the board members have consultation rights, including to consult with counsel, et cetera.

Q. So who do you think is precluded from giving a consultation or approval right by the last sentence of Section 4.01?

A. The trustee I think.

Q. And is the trustee a party to the litigation trust agreement?

A. Yes.

MR. MENNITT: I have nothing further.

MR. AYALA: I have a follow-up question to that.

EXAMINATION BY

MR. AYALA:

Q. Look up Section 4.01. We are looking at the last sentence of Section 4.01, Mr. Cheatle.

Do you see that?

J. Cheatle

A. Yes.

Q. Is it your testimony that notwithstanding the last sentence of section 4.01, a litigation trust advisory board member can grant approval rights in respect of management and operation of the litigation trust to another litigation trust beneficiary?

A. I don't think it regulates that.

Q. So, in other words, you don't think there is anything in the last sentence of Section 4.01 that precludes an LTAB member from being bound to approval rights held by a nonLTAB member?

MR. MENNITT: Objection to form.

You can answer.

A. I don't think so.

Q. So any litigation trust advisory board member, notwithstanding the last sentence of Section 4.01, can grant consultation or approval rights to nonlitigation trust advisory board members in respect of management and operation of litigation trust, is that right?

J. Cheatle

MR. DUKE: Objection to form.

MR. MENNITT: Objection to form.

A. Yeah, I think that's right.

Q. And then in relation to that, let me ask you to turn to page 10 of this document, Section 3.01.

A. 3.01, yeah.

Q. Do you see the sentence in this section that states, The litigation trustee and the litigation trust advisory board shall act in the best interests of all the litigation trust beneficiaries and in furtherance for the purpose of the litigation trust?

A. Yeah.

Q. If a litigation trust advisory board member granted a third-party approval rights in respect of that member's voting rights as an LTAB member, how could they ensure that they would act in the best interests of all the litigation trust beneficiaries?

MR. DUKE: Objection to the hypothetical, but you can answer.

J. Cheatle
MR. MENNITT: Objection to form.
A. Yeah, I was going to say the same thing. It's hypothetical. It would depend on the terms agreed.
Q. If a litigation trust advisory board member conveyed to a third party the right to control his vote as a litigation trust advisory board member, how could that member then control that he is acting in the best interest of all the litigation trust beneficiaries?
MR. DUKE: Objection to form.
MR. MENNITT: Objection to form.
A. Again, it's hypothetical and it would depend on the terms. It may be conditioned on that, acting in the best interests of, but on both sides.
Q. So your view is that a litigation advisory board member can give up his control of a vote and still maintain compliance with that sentence?
MR. DUKE: Objection to form.
MR. MENNITT: Objection to form.
A. I would have to think about it, but

J. Cheatle

that's possible, yeah.

MR. AYALA: Okay. No further questions.

MR. DUKE: I don't have anything.

THE VIDEOGRAPHER: We are going off record. This marks the end of media No. 3. Concluding today's deposition at 12:22 p.m. Eastern Time.

(Time noted: 12:22 p.m.)

- - -

I N D E X

- - -


| JONNY CHEATLE | PAGE |
|---|---|
| By Mr. Ayala | 5, 179 |
| By Mr. Mennitt | 177 |


- - -

E X H I B I T

- - -


| EXHIBIT | PAGE |
|---|---|
| Exhibit 1 Email chain | 21 |
| Exhibit 2 Litigation Trustees's Objection to Cornell Capital | 31 |
| Exhibit 3 Transfer notice from Citadel to InstaLit of litigation trust interests | 37 |
| Exhibit 4 Litigation trust agreement | 39 |
| Exhibit 5 Participation agreement | 56 |
| Exhibit 6 Confirmation order and plan | 62 |
| Exhibit 7 Amendment to the credit agreement | 73 |

- - -

E X H I B I T

- - -


| EXHIBIT | PAGE |
|---|---|
| Exhibit 8 Email from Mr. Sinna to Mr. Cheatle and Mr. Xie | 75 |
| Exhibit 9 Email chain between Mr. Xie, Mr. Sinna and Mr. Cheatle dated March 12, 2025 | 112 |
| Exhibit 10 (skipped) | |
| Exhibit 11 Email chain | 148 |
| Exhibit 12 Email chain between Mr. Cheatle and Mr. Halperin dated October 3, 2025 | 156 |
| Exhibit 13 Acceptance of appointment and joinder dated February 23, 2026 | 158 |
| Exhibit 14 Letter dated July 1, 2026 | 169 |
| Exhibit 15 Appointment of a successor litigation trustee | 173 |

- - -

DEPOSITION SUPPORT INDEX

- - -

Request for Production of Documents

Page Line Page Line Page Line

None

- - -

Stipulations

Page Line Page Line Page Line

None

- - -

Questions Marked

Page Line Page Line Page Line

None

- - -

To Be Filled In

Page Line Page Line Page Line

None

- - -

CERTIFICATE

I HEREBY CERTIFY that the witness, JONNY CHEATLE, was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Leslie Fagin
________________________________

Leslie Fagin,
Registered Professional Reporter
Dated: September 18, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

ACKNOWLEDGMENT OF DEPONENT

I, , do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

JONNY CHEATLE DATE

Subscribed and sworn to before me this day of , 2026.

My commission expires:

Notary Public

\- - - - - -

E R R A T A

\- - - - - -

PAGE LINE CHANGE



# Magna Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA LEGAL SERVICES

A

**abbreviation** 21:14
**ability** 60:22
**able** 50:14 59:15 60:7 90:13 94:16 96:7 111:9 117:5,7,9 130:7,15 166:21
**Absent** 42:13
**Absolutely** 164:8
**acceptance** 159:6,12,16 185:16
**access** 76:11 108:22
**accommodate** 6:25
**accomplish** 25:17
**accomplished** 26:2
**acknowledge** 4:25 5:5
**ACKNOWLEDG...** 188:2
**acquire** 30:23
**acquired** 30:3,14 41:23
**Acquisition** 1:7 4:5
**act** 45:5 51:20 52:16 53:15 54:6,13 98:11 181:12,21
**acted** 9:25
**acting** 80:14 182:10,17
**action** 100:9 101:13
**acts** 99:20,22 105:12
**actual** 167:2 168:5 177:5
**add** 83:10
**added** 85:18
**addition** 55:17
**additional** 65:16,24 66:22 69:17
**admin** 153:6
**administer** 5:7
**administered** 5:6
**administrative** 34:13
**admitted** 7:23
**adopted** 177:15
**advice** 35:7,11,17,21,22,24 36:4 44:16 45:20,20 52:23 53:11 59:24 93:16 99:10 100:12 101:16 102:6 104:7 105:17,18 107:24 108:7,16 111:20 120:11 121:7 122:6 122:12 123:4 124:2 125:8,13,15,20 126:5 128:19 129:2 132:2,9,12,15,20,23 132:25 133:4,9,15 134:14 135:21 138:12 139:25 147:14,16,20,22 148:5 149:14 161:13,20,25 162:4 162:6,10,25 164:23 165:2,7,10,23 166:3 166:13,22 171:6
**advise** 9:9 12:16 13:10 14:12 15:11
**advised** 24:18
**advising** 29:10,16
**advisors** 3:4 90:20 102:2,4
**advisory** 15:5,7 17:2 19:15 21:12 42:14 45:3,6 126:21,24 127:2 137:21 138:6 142:25 143:11 150:13,17 152:20 155:19 167:14 178:14 180:5,19,23 181:11,17 182:6,9 182:20
**affirmative** 44:25
**afoul** 136:22
**afraid** 54:18 156:5
**afternoon** 5:25
**agree** 5:9 32:10 34:4,7 78:19 86:17 96:7 104:21,22 105:19 107:14 108:13,19 131:20
**agreed** 13:7 104:18 108:3 182:5
**agreeing** 32:24 159:21
**agreement** 15:10 18:21,25 20:14 20:22,24 27:9,15,18 27:24 32:15 33:8 38:4,8,9 39:3,16,20 39:24 41:6 42:6,11 44:10 45:8 50:2,18 51:3,10,12 53:23 56:23,25 57:11,16 61:3 66:12 68:12,21 69:3,9 70:3,7 71:2,8 71:11,15,19,23 72:3 72:5,13,15,18,21 73:3,15,19 74:9,15 74:20 75:8 77:9,19 78:10,16,21 79:7,12 79:20,23 80:10,20 80:25 81:3 82:3,11 83:7 85:19 96:22 98:25 99:24 100:21 100:25 101:7 109:18 114:20,21 117:24 118:2,7,9 119:15,21,22 121:17 122:4,16 123:6 127:9 129:5 130:5,13 131:7,13 131:23 132:7 133:20 134:9,19 136:3,4 151:3 155:6 155:8 156:9,12 160:16 163:24 178:10 179:14 184:20,21,24
**agreements** 32:5 38:17 39:8 53:7 54:25 57:6 92:12 97:6 98:16 133:22
**agrees** 98:8 101:22 103:15 106:18 131:2
**ahead** 31:22 87:5 116:23 139:17 145:18
**al** 1:7 4:6
**Alan** 23:11,16 24:17 43:17 95:12 109:16,21 111:2,4,6,11 119:14 121:8 146:2 147:4

147:25 170:4 171:8 177:15
**Alan's**
26:22 60:14
**ALI**
2:16
**align**
100:18
**Alignment**
151:20
**ALLAN**
3:7
**allocating**
139:19
**allocation**
138:24 139:9 164:19
**allow**
47:5,11,16,19 48:10 49:3,18 50:18 51:3 99:18 102:11
**allowed**
74:2 93:12 94:6,8,23
**allows**
58:8 81:24
**alongside**
150:14 152:21
**Alston**
35:19,20,24 53:2 97:16 132:14,16 135:21
**amendable**
77:24 78:3
**amended**
71:11,19 74:9 80:19 82:10 114:19 156:12
**amendment**
73:3,5,14 77:9 80:20 80:25 81:4,6 85:19 87:14 156:8 184:23
**amendments**
71:9
**Americas**
2:18
**amount**
55:24 56:10 65:14,24 66:16,17 73:6,18 74:10,24 75:6 76:8 78:6,11,15,22 82:2 83:21 151:13,17
**amounts**
30:4,15
**and/or**
152:8 187:12
**Angela**
150:3
**answer**
6:10,12 10:24 11:2,4 13:2 14:11,20 16:25 18:8 19:20 24:9 25:3,4 28:15 29:8 29:20 30:19 35:3,14 36:5,19 38:20 43:2 43:15,20 45:19 46:9 47:4,8,25 48:2,19 48:20 49:13,23 51:25 52:21 53:18 54:18 59:4 60:2 66:4 67:11,25 68:2 69:22 70:24 84:16 87:3 93:23,25 100:4 103:12 107:22 113:18 119:5,12 121:20 122:17 123:8 124:3,21,23 125:3 126:10 129:9 135:19 141:20,22 142:6 147:3 161:22 162:24 163:17 164:5 166:14,16 174:17 180:17 181:25
**answered**
79:19 123:18 124:25 177:6,7
**answering**
48:3
**answers**
6:8,18 122:25 188:4
**anybody**
35:21 95:6,10,14,18 133:15 146:10 147:21 149:8,18
**anybody's**
11:8
**apart**
53:10 54:10 107:24
**apologize**
80:17
**appear**
83:18
**Appearing**
2:2
**application**
50:13
**applied**
116:24 120:22
**apply**
102:20,24 187:11
**appoint**
145:10 147:8
**appointed**
27:20 89:13,25 118:15 120:25 121:15 122:2 124:12,16 126:2 137:22,24 138:6,8 138:16,19 144:23 150:20 151:8,18 154:16
**appointees**
59:14
**appointing**
110:18 162:20 164:17 165:17
**appointment**
118:13 121:11 123:6 124:18 125:6 126:7 129:11,13,18 154:21 159:7,13,17 162:16 163:9,10,18 163:22 166:5 173:9 173:13 185:16,20
**appointments**
164:19
**approach**
29:23
**appropriate**
127:25
**approval**
22:10 26:6,23,24 46:13 53:20,20,25 54:3,21 71:3 94:24 94:25 95:2 109:16 109:21 127:6 131:10 136:13,20 137:7 141:14 142:2 142:12,22 143:8 178:11 179:10 180:6,14,22 181:18
**approvals**
167:13
**approve**
110:3
**approved**
72:16,18,21 75:21,24
**approving**
110:4,12
**approximately**
10:3 112:3 114:2
**Argent**
173:18,23 174:12,21 176:4
**arrange**
23:18 24:21
**arranged**
23:16
**arrangement**
23:2 60:24
**arrangements**
163:10,13
**aside**
79:2,17 99:10 100:12 102:6 104:6 122:6 122:12 123:3 128:18 129:2
**asked**
11:16 24:10 25:21 61:18 79:16,21 111:7 123:2 169:3

169:11 172:16 177:3,6 178:8
**asking**
6:6 17:5,7,8 25:22 50:6 105:3,16 111:14 133:8,13 134:4,7 138:23 162:9,12 164:16 178:18
**asks**
86:12
**aspects**
9:10,11 12:16,21 13:9,14 14:13,14 15:10
**assessment**
124:11
**assets**
28:2,10 94:14
**assigned**
30:3,13
**associated**
34:16,18
**attached**
30:2 83:6 188:6
**attaches**
81:2
**attend**
115:12
**attorney**
119:2,10
**attorneys**
2:4,8,13,18 3:4 4:24
**attorney-client**
18:10 24:7 28:13,23 29:19 43:14 46:7,20 49:9,16 50:5,7,21 51:6,22 52:19 53:11 54:11 71:5 72:11 77:18 85:22 94:12 108:16 120:5,8 122:21
**attractive**
29:2
**audible**
6:18,20
**authorize**
54:5 70:11
**authorized**
121:2,17 122:4 123:6 123:17 124:18 125:6 126:6
**authorizes**
54:13 65:21 67:6,21 70:4 123:21 127:14 128:21 129:5,23
**available**
73:6 74:14 78:9 93:3 95:25
**Avenue**
2:14,18
**aware**
69:24 70:9 80:5 84:20 95:10,14 96:21,25 115:7,7 119:23 129:3,12,17 129:22 169:3 170:22 172:7
**Ayala**
2:10 5:21 6:6 11:15 13:7 17:8 21:8,17 31:12 36:22 37:2 39:13 40:17 45:23 48:4 49:25 50:11 52:4,12 56:19 57:4 61:20,25 62:14,23 63:21 73:11 75:15 77:3 81:12 86:11 88:10 91:23 92:8 97:22 98:21 107:21 112:14 116:14 124:22 127:21 128:6,11,16 140:19 141:4 144:11 148:21 156:2,16 158:14 159:4 160:4 165:24 173:7 176:11,24 177:25 179:18,21 183:3 184:7
**a.m**
1:13 4:8 11:10,13 52:7,10 62:8,12 63:16,19 92:3,6 140:22 141:2 176:20

**B**

**B**
184:11 185:3
**back**
11:12 31:3 40:10 52:9 62:3,10 63:18 80:18 83:15 90:11 91:23 92:5 94:20 97:2 106:3 130:3,12 130:23 131:6 140:24 143:14 155:5,22 157:5 175:25 176:22
**backstop**
65:8
**Baker**
2:4 171:20
**band**
40:20
**bankruptcy**
1:2 13:24 14:14 18:6 18:17 20:18 171:4
**base**
30:4 82:18
**based**
30:14,17 45:20 49:14 50:4 51:20 52:17 53:15 54:6,14 71:6 72:2,9,12 82:4 87:11,15 124:10 125:7 128:9 137:16 163:5,8,8 171:6
**basics**
6:4
**basis**
32:14,24 33:3 43:16 48:15 50:6,10 84:25 123:20,25 134:13
**Bates**
22:4,4 57:22 81:5,9 82:10 85:12 97:20 98:2 130:20
**becoming**
41:3 113:11 152:14 160:23 161:8
**beginning**
62:11 140:25
**begins**
4:3
**behalf**
87:3 108:8
**believe**
51:18 52:14 55:21 78:8 152:18
**Ben**
3:4 27:19 28:17 29:9 59:14 90:12 91:6 115:3,6,9,20,23 116:20 117:9 120:22 162:8,11
**beneficiaries**
29:11,17 54:23 55:3 55:13 60:6,7 80:15 80:15 151:23 181:13,23 182:12
**beneficiary**
60:11 61:2 105:22 127:5 131:9,17 134:12 161:4 180:9
**benefit**
60:5
**benefits**
103:24 104:23
**best**
6:24 23:20,22,25 80:14 84:16 117:22 164:10 181:12,21 182:11,17
**better**
60:25 94:8 102:12
**beyond**
26:3 48:2,20 49:23 93:15 120:8 173:3

**bill**
157:8
**bind**
137:10 141:16 142:3 142:14,24 143:10
**binding**
175:21
**binds**
178:13
**Bird**
35:19,20,24 53:2 97:17 132:14,16 135:21
**bit**
87:20 99:17 103:9 113:19,24 120:7,8 139:4 144:12 168:15 176:17
**board**
15:5,7 17:3,16 19:15 21:12 22:7 42:14 45:3,6 59:15 109:10 110:13,18,25 113:12 115:13,16 117:17,20 118:10 119:4 120:25 121:12,15 122:2 123:7,21 124:13,16 124:19 125:7 126:2 126:4,7,21,24 127:2 127:15 128:22 129:6,24 137:21 138:6 142:25 143:11 149:22 150:13,18 152:20 153:5 154:10,18 155:19 157:7,19,23 158:25 160:8,20 164:18 166:19 167:14 178:14 179:6 180:5,20,23 181:11,18 182:7,9 182:20
**Boies**
2:8 4:10
**borrower**
102:2
**borrowing**
70:13,16 79:3,18
**bottom**
22:5 33:6,19 64:12
**bound**
175:11 180:14
**Brands**
1:7 4:5 13:24 14:2,8 18:5,16 20:18,25 21:6 150:13 152:21 153:22 154:2 155:20
**breach**
105:20
**break**
7:3,5 40:7,12 52:4 61:24 91:21 92:9 140:17 175:2
**breaks**
6:25 177:21
**briefly**
143:21
**BRILLIANT**
3:7 176:16
**bring**
40:6
**broad**
8:9
**Bryant**
3:5
**budget**
168:19
**budgeting**
86:2,22 87:9,19
**bullet**
153:3,4 154:12
**burden**
153:6
**business**
8:24,25 12:16 13:10 14:3,4,8,13 15:4,21 153:24 154:4 179:3
**businesses**
9:5,7,9 13:25
**buyer**
98:9 101:23 102:12 103:16 105:11,12 105:23 108:21 131:3,21 133:21

**C**

**C**
2:2 3:2 5:16
**called**
5:16
**calling**
39:2 107:18
**calls**
12:24 47:22 87:2
**cancelled**
20:8
**cap**
77:20,22,24 78:3,22
**capable**
42:16
**capacity**
16:15 17:17 74:13 79:4,18 172:21
**Capital**
2:8 31:16,19 184:16
**CAROLYN**
2:11
**carve-outs**
50:13
**case**
1:7 27:6 46:23 47:10 47:16 48:9 49:2 57:15 100:19 114:10,17 148:2 151:24 165:5
**cash**
20:4 82:2
**catch**
114:7
**caution**
18:7 24:5,14 28:12 29:5 30:19 34:24 35:13 45:16 59:22 66:3 70:21 72:8 76:17 85:21,24 93:14,17,24 94:10 99:2,16 101:15 105:15 108:6,11 111:19 121:5 122:14,21 123:24 131:24 133:3 137:3 138:11 139:12,24 141:21 142:7 161:18 171:5
**caveat**
56:6 157:7
**certain**
12:15 94:25 104:20
**Certainly**
151:2
**CERTIFICATE**
187:2
**certification**
187:10
**certify**
187:3 188:3
**certifying**
187:12
**cetera**
179:8
**chain**
21:19,21,25 22:3 23:6 26:4,8 44:5 112:22 113:2 148:23 150:2,3 156:17,22 184:14 185:8,12,13
**change**
38:18 39:8 189:3
**changes**
29:25 30:22 188:5
**characterize**
15:18 57:9 170:16
**Chat**
40:14,17,18,20 144:4
**Cheatle**
1:12 3:5 4:4 5:1,22 6:1 7:1 8:1 9:1 10:1

11:1,16 12:1 13:1
14:1 15:1 16:1 17:1
17:6,9,10,11 18:1
19:1 20:1 21:1,13
21:24 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1,25 34:1
35:1 36:1 37:1,8
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1,13
53:1 54:1 55:1 56:1
57:1,7 58:1 59:1
60:1 61:1 62:1 63:1
63:22 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1,18 76:1
77:1 78:1 79:1 80:1
80:22 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1,9 93:1
94:1 95:1 96:1 97:1
98:1,6 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
112:23 113:1,2
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1,3
126:1 127:1 128:1
128:18 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1,5 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1,18
157:1 158:1 159:1
160:1 161:1 162:1
162:13 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1,7 179:1
179:24 180:1 181:1
182:1 183:1 184:6
185:7,9,14 187:4
188:8

**check**
28:5

**circumstances**
50:15

**Citadel**
3:4,12 9:16,18,20
14:5,9 17:7,12,13
19:4,7,8,9,16 20:2
22:11 25:18,25
30:23 32:4 33:12,15
33:18,23 34:2,9,19
37:5,12,14,20,23
41:24 44:17 45:21
54:24 55:4,8,14,16
55:17,20,25 56:8
59:13,14 87:24
88:11,22 89:14
93:16 96:4 97:5
99:5 101:4,5 104:11
104:19 105:9,10,17
107:14,20 108:3,8
108:13 111:8,15
139:25 148:13,15
148:15 150:15
152:5 153:7,23
154:3,11 155:3
160:25 161:9,21
162:15,19 163:4,14
167:24 175:10,21
184:18

**Citadel's**
14:17,21 15:24 40:4
96:18 102:21
104:23 112:4

**claim**
30:4 105:21

**claims**
30:15

**clarification**
141:6

**clarified**
20:19

**clarify**
17:15 22:22 112:20
120:10 148:3 178:4

**clarifying**
20:20 115:8 174:25

**clarity**
76:22 98:18

**cleaner**
60:6,9

**clear**
84:8

**client**
119:2

**closely**
87:21

**clunky**
7:9

**cognizant**
66:11

**Cohen**
25:8,14 29:24 30:9
30:18 59:24 111:25
125:23 126:6 148:6
165:8

**coincidence**
156:11

**colleague**
7:15

**colleagues**
15:21 150:12 152:19
155:18 156:13
158:3,22

**colloquy**
127:23

**come**
13:23 19:16 61:2
62:3 91:23 169:10

**comfort**
86:2 87:8

**comfortable**
10:12,15,20 11:3,17
124:6

**commencing**
1:13

**commentary**
137:18

**comments**
97:9

**commercial**
99:12,18 100:14
102:8 108:2,14,17

**commission**
188:12

**commitment**
65:13,23 66:16

**committed**
69:13

**committee**
89:7 137:24 138:8,20
139:20 140:4 164:2

**common**
27:9,15,17,22,23
58:7 60:23 61:3
109:17 114:19,20
117:23,25 118:6,8
119:15,21

**communicate**
35:23 36:9

**communicated**
24:23 25:13 27:5
31:8 96:4,9 148:18
162:11

**communicating**
59:23

**communication**
61:11 70:23 99:4
107:19 119:9

**communications**
12:25 27:25 28:9,23

29:7,19 35:2,15 43:14 46:7,20 49:10 49:17 50:5,8,21 51:6,22 54:11 71:5 72:11 77:12,18 85:23 89:22 90:9 94:12 114:14 115:16,19,22 118:25 120:6 133:14
**complete** 6:8
**compliance** 182:21
**complicated** 81:22
**complied** 117:15 131:21
**complies** 133:22
**comply** 44:18
**component** 9:2
**components** 109:16
**compromise** 27:22
**computer** 7:19
**concerned** 42:6 52:2
**concerning** 163:24 179:2
**concluded** 36:12 95:24 126:3
**Concluding** 183:8
**conclusion** 36:10,17 46:18 47:23 122:8,11,13 123:14 132:21 161:16 163:5
**conditioned** 182:17
**conducted** 109:25
**conducting** 96:12
**conference** 1:12
**confidential** 116:18
**confidentiality** 117:5
**confirmation** 62:17,20 63:2 184:22
**confirmed** 18:5,16 20:17
**conflict** 134:10 167:3,21 168:6 177:5,13
**conflicted** 51:19 52:16 53:14
**conflicts** 167:6,18
**conformed** 81:3,6
**congratulations** 113:11
**connecting** 165:22
**connection** 14:24 17:3,16 19:5 19:11 43:22 44:12 53:6 55:7 58:21 66:6 85:19 91:15 92:11 96:17 119:3 119:10 121:10 160:22 161:2 167:23
**connectivity** 91:22 94:3
**consent** 23:17,19 32:8,14,16 33:3 42:13 79:3,18
**consequence** 19:18 38:15,25 39:9
**consider** 42:23 43:7 44:14 55:10 80:9 121:2,10 121:16 122:3 123:5 131:18 132:5 161:7 163:22 165:11 171:3,9
**consideration** 149:10,19
**considered** 42:4 72:21 121:21 123:9 124:5 132:3 149:9,18 164:19,22 167:17
**considering** 23:22 42:20 161:17 163:21 164:17 166:2 170:23
**consistent** 166:6
**constituents** 13:20
**constitute** 78:3
**constrain** 78:5
**constraint** 80:2
**constraints** 46:10 80:6 99:19
**construct** 111:12
**constructed** 105:8
**consult** 24:11,12 51:24 52:5 60:22 98:9 103:16 104:19 105:11 106:22 111:24 131:3,20 133:21 179:7
**consultation** 103:2,6,8,21 104:5 104:10,14 105:5 106:5,13 127:6 131:10 136:13,19 137:7 141:14,25 142:12,22 143:8 178:11 179:7,10 180:22
**consulted** 177:15
**consulting** 179:2
**contemplated** 70:18 71:13,21 73:21 73:24 101:13 102:15
**content** 34:25 85:22
**contents** 28:13 35:15
**context** 41:16,18 42:4 51:18 52:15 53:14 59:9 60:25 64:3 139:18 174:22
**continue** 102:20 160:19
**continues** 175:20
**contractual** 80:2 163:10,12
**contribute** 50:17 51:2
**control** 182:8,10,20 187:12
**controlling** 12:10
**Cont'd** 3:2
**conversation** 30:17 59:11 96:13 145:25
**conversations** 23:24 25:6,7 27:21 111:10,16 113:25 119:18 135:20 145:24 168:21,24
**conversion** 75:3,5 81:16,19 82:4 82:5,14,18,24 83:3

83:16,18,24,25 84:3 84:11,12,21
**converted** 19:24
**conveyed** 148:7 182:7
**conveying** 111:20
**copy** 40:8
**Cornell** 2:8 31:16,19 184:16
**Cornell's** 143:22
**corner** 22:6
**corollary** 140:3
**correct** 17:17,19 22:12,13,17 23:4,5 25:14 28:2 32:21 33:13 34:20 44:7 49:24 53:16,23 54:15 55:8,15 58:3 58:22 61:6,7 67:3 69:5 72:5 73:8,24 74:5,11,15,21 79:4 79:19 81:4 82:5 84:5,6 89:11 97:18 103:4,25 104:15,16 104:24 105:24 107:5,10 123:12 124:8 126:8,25 133:25 137:11,17 141:17 143:11 149:6 160:4 167:25 175:22 188:4
**corrections** 188:5
**correctly** 48:6 110:7 111:4
**correlated** 73:22 74:4
**correlates** 8:3 69:14
**cost** 20:2 153:5
**counsel** 4:16 5:8 6:9,11 8:20 8:23 9:19,24 10:5 11:14 14:15 15:3,3 15:20 22:21,24 24:24 35:2 43:4 45:20 52:11 59:25 62:13 63:20 66:8,9 77:13 92:7 94:4 97:14,16 99:5 105:18 111:21 116:22 125:24 141:3 144:17 145:24 148:6,10,11 149:14 165:6,9 171:7,13,18 177:23 179:8
**counterparty's** 78:16,21 79:3,17
**couple** 56:17 176:25
**course** 6:15
**court** 1:2,14 4:13,19 6:16 54:24 55:4,12 63:6 72:20 149:21 171:4 171:23
**court's** 149:9,19
**cover** 9:5,7 13:25 83:20
**coverage** 8:24,25
**created** 60:5
**creates** 38:9 57:14
**credit** 14:4,8 18:24 33:8 66:12 68:21 69:3 70:7 71:2,8,10,19 72:3,13,15,17,21 73:3,14,19,21 74:9 74:15 75:8 77:9,19 78:9 79:6,11,20,23 80:20,25 81:2 82:3 82:11 83:7 85:18 155:6 156:9,12 184:23
**creditor** 144:22
**creditors** 89:7 137:25 138:9,20 139:21 164:2
**crisp** 169:13
**crossing** 52:21
**cuff** 75:9
**current** 55:20

**D**

**D** 184:3
**DANAHER** 3:12
**date** 21:20 31:17 37:7 39:17 56:24 62:19 73:16 75:19 112:25 148:24 155:17 156:20 159:9 170:2 171:25 173:11 175:9 188:8
**dated** 23:8 112:23 113:6 150:3,8 155:8,14 156:18 157:2 159:7 159:23 160:5 169:24 170:6 185:10,14,17,19 187:7
**DAVIS** 2:15
**day** 89:4 156:14 188:11
**days** 112:8
**deal** 13:15,17 60:7 170:19
**dealings** 117:16
**deals** 121:6
**deal-related** 13:14
**Debra** 24:13,17,24 25:7 30:18 59:24 111:24 125:23 148:11
**debt** 19:19 20:8 58:12 61:5 175:15,22
**debtor** 15:24
**Debtors** 1:8
**DECHERT** 3:4
**deciding** 12:11
**decisionmaking** 173:4
**decisions** 114:9,16
**decline** 86:6,15,23 87:17,25 88:12
**Defendant** 2:8
**DEFENDANTS** 2:14,18
**deferred** 121:8
**define** 10:10 83:18
**defined** 39:23 69:11 100:8
**definition** 65:7 82:13,23 83:16

84:11
**denial**
96:18
**denied**
99:23
**DENTONS**
2:17
**depend**
182:4,16
**depends**
103:5
**DEPONENT**
188:2
**deposed**
6:2
**deposition**
1:12 4:4,9,25 5:2,3 6:5,16 64:5 177:22 183:8 186:3 187:4
**depositions**
7:8 21:9
**derived**
127:19
**describe**
8:12 77:25 109:9
**described**
12:15 57:13 59:16 87:23 101:17 111:11,17 115:4,10 120:9 155:4
**describing**
103:22
**description**
117:23
**designate**
145:8,14,22 146:6,25 148:8 149:3 163:25 164:3
**designation**
110:3,5
**designee**
89:6 137:25 138:9,21 139:20,21 145:10 164:3
**designees**
88:24
**detail**
75:10
**different**
7:24 13:19 65:3 99:9 105:7 123:3 140:10
**differently**
43:16 101:19 137:5
**difficult**
87:3 122:20 134:17 161:22 163:7 166:16
**Dipesh**
22:21,24 157:5
**Dipesh's**
157:8
**direct**
7:22 38:24 60:10 124:2 168:23 187:12
**directing**
12:10 107:21
**directly**
58:10 125:14
**DIRECTORS**
2:13
**directs**
6:11
**disagreed**
36:9
**disagreement**
34:21 149:2,6
**Disappointed**
170:18
**disbursing**
86:4 87:10
**disclose**
18:10 24:16 28:12 29:6 34:25 35:15 85:21 127:18 128:3 133:9 134:4 160:24 166:13 168:5,8 177:4,7
**disclosed**
177:18
**disclosing**
28:16,22 29:18 43:13 46:6,19 49:15 50:7 50:20 51:5,21 52:18 71:4 72:10 77:17 89:21 90:8 108:15 114:13,22 116:9 118:25 119:8 120:20 132:19,22 153:14,19 154:24
**disclosure**
24:7 116:17 133:13
**discovery**
143:23
**discretion**
65:15 66:21
**discuss**
24:4,21 26:13,15 89:14,23 92:17,21 95:5 110:23 119:24 120:4 146:12 177:22
**discussed**
25:17 32:19 43:4 75:25 76:20 89:19 89:19 90:12 95:17 108:23 110:20 111:3 118:10,16,18 120:15 134:6 151:3 167:10 171:16 174:19 177:16
**discusses**
33:12
**discussing**
83:12 90:23 115:25 116:9 144:14,14 146:9 152:22 169:7 171:12,17 177:17
**discussion**
26:12,14 92:23 95:9 95:11,14 97:12 99:19 119:14 120:19,20 145:7,13 145:15 146:5,18 152:12
**discussions**
25:10,12,24 61:15 87:13,15 90:7 94:13 97:15 111:5 114:15 114:24 116:2 118:22 145:21 146:20 150:19 155:4 158:18,20 169:19 171:15
**disproportionate**
100:8 101:13
**distinction**
12:6 38:5 103:19 143:6
**DISTRICT**
1:3
**DIVISION**
1:4
**Dobrava**
174:4,8,21 176:7
**doc**
40:6
**document**
7:15,21 22:6 37:9,11 40:24 41:2 49:12,15 58:12 63:5,6,23,25 64:4 65:5 66:7 85:3 85:8 126:17 141:7 159:18 164:13 168:10 170:3 171:22 173:15 177:9 178:17 181:7
**documents**
7:12,22,23 13:20 20:11 96:16 112:16 186:5
**doing**
127:22 140:17
**download**
40:4,18 144:5
**Dozens**
10:6
**drafting**
18:4,15,20,24
**draw**

132:21
**drawing**
12:7 38:6 103:20
**Drell**
2:11 7:15
**drew**
46:19
**dropped**
40:15
**due**
82:2
**DUKE**
2:6 10:22 11:6 13:3,8 14:10 15:8 16:2,23 17:18,23 19:6,12 20:13 22:16 24:5,25 28:11 33:2 34:5,24 35:13 36:18 38:21 39:10,25 40:14 42:25 43:19 45:15 46:8,21 47:21 48:13 48:23 49:6,20 50:22 51:7,23 53:17,24 54:7,16 55:2 57:2 60:13 64:25 66:2 67:9,24 68:7 69:6 70:6,12,19 71:7,16 71:25 72:6 74:6,22 75:13 76:22,25 77:4 77:10,23 78:4,18,24 79:5,13 80:13 81:10 81:21 83:23 85:20 86:18,24 88:2 89:16 90:3,10,21 95:20 96:20,24 98:17 99:15 100:2,16 102:10,17,22 104:8 104:25 105:25 106:14,24 107:6,11 107:16 109:4 113:23 115:2 116:3 116:11,19 117:21 118:5,12,17,23 119:7 120:13 121:4 121:18 122:9,18 126:9 127:16 128:2 128:9,14,23 129:7 129:20,25 133:2 134:16 135:7,18 136:16 137:4,12 138:10 139:2,10,22 141:18 142:5,16 143:3,12 149:11,23 152:2,24 154:19 155:24 157:20 159:3,25 161:5,11 162:22 164:21 165:19 166:8,11 167:4 168:2 169:5 170:14 171:10 172:15,23 174:15 175:12,16 176:8 181:2,24 182:13,23 183:5
**duly**
5:17 187:4
**duty**
29:10,16
**dynamic**
78:20

**E**

**E**
2:2,2 3:2,2 5:16,16 184:3,11 185:3 189:2
**earlier**
11:16 23:6 42:23 43:18 56:16 57:7,14 57:18 58:3,24 59:12 59:16 60:24 81:17 83:12 87:7 90:12 95:23 143:16 151:11 155:4 168:11 177:3,9,16 178:7
**earliest**
22:2
**earn**
94:24
**Eastern**
4:8 11:10 176:20 183:9
**easy**
156:5
**economic**
37:15,21,24 38:10 57:14,19
**economics**
34:16,18 38:3,7,12 163:19
**effect**
68:4,6
**effectuate**
43:25
**effectuated**
45:13 46:4
**effectuating**
44:18
**effort**
105:11 106:19 113:10,21
**efforts**
98:9 101:23 103:16 103:23 104:19,24 107:2,5,10 131:2,20 133:20
**either**
98:21 157:15 171:13 174:20
**elements**
109:12
**elevated**
58:8
**elevation**
34:13 38:25 39:2,5 58:2,6,21,24 61:5
**Elsberg**
2:4 171:20
**email**
21:19,21,22,25 22:2 22:9 23:7 26:4,8 27:8 29:24 32:18 40:10 44:5 75:17,22 76:24 109:25 110:23 112:22 113:2 114:19 148:23 150:2,3,8,11 152:5,8 155:17,22 156:17,22 157:12 157:24 158:3,6,8,11 158:13 160:10 170:4 184:14 185:6 185:8,12,13
**emailing**
40:8
**emails**
96:23
**embedded**
70:23
**embodied**
57:10
**employee**
19:14 88:22 140:10 144:24
**employees**
34:2
**employment**
140:7
**empowers**
70:16
**ended**
86:11
**ends**
57:21 176:2
**enforce**
105:13,24 107:4,9
**ensure**
181:21
**entail**
118:16
**entered**
32:4 97:5 132:6
**entering**
54:24
**entities**
22:12 55:18 102:15 134:20
**entitled**
26:16 27:2 34:3,23

35:8,12 36:11 45:3 128:4
**entity** 42:17
**equivalent** 38:10
**Errata** 188:6
**ESQUIRE** 2:6,10,10,11,15,16 2:19 3:6,7,7
**essential** 98:11 99:20,22 105:12
**established** 50:3
**establishes** 20:24
**establishing** 66:15,20
**estimate** 56:4
**et** 1:7 4:6 179:8
**events** 144:14
**everybody** 13:6 72:24
**exactly** 33:14
**EXAMINATION** 5:20 178:5 179:20
**examined** 5:18
**example** 39:4 51:14,16 57:5 58:9
**examples** 12:18,20 13:9
**exceeded** 74:17
**exception** 7:3 46:12,17 51:9
**excess** 65:12,22 67:7,22
70:5,17 71:13,21 83:19,20 84:13
**exchange** 32:18 157:11
**exclude** 24:8 108:7 133:4 138:12 139:24 149:13 161:20
**excluding** 35:3 77:12 120:5 135:20 145:23 165:23
**executed** 33:15 160:15
**execution** 81:2
**exercised** 58:21 59:2 61:4
**exercising** 98:10
**exhibit** 7:24 21:18,19 31:14 31:15 37:3,4 39:14 39:15,21,22 56:20 56:22 61:23 62:16 62:17,22 68:10 73:13,14 75:16,17 80:19 97:3,23 112:15,19,21,22 126:14 130:11,19 141:6 143:15,24,24 148:22,23 149:25 155:5,23,25 156:16 156:17 158:14 159:5,6,12,14,15 164:12 169:24 173:8,9 184:13,14 184:15,17,20,21,22 184:23 185:5,6,8,11 185:12,13,16,19,20
**exhibits** 7:23 112:17
**existence** 127:14 128:21 129:5 129:23
**existing** 150:14
**exit** 64:6
**expand** 19:20
**expanded** 73:5
**expect** 96:15
**expedited** 143:23
**experience** 8:7,12,16 10:10,11 16:8,13 58:5 173:22 174:3,9,13
**experienced** 10:8 28:25 29:15
**expires** 188:12
**explanation** 158:21
**explicit** 53:19,25 54:2,20 68:3,6
**explicitly** 84:15,17
**express** 34:21 59:10,18 86:13 99:21
**expressed** 61:16
**expressly** 33:8
**extensive** 178:18
**extent** 12:24 24:6 30:16 35:3 43:3 45:17 46:24 59:23 66:10 70:21 99:3 105:16 111:19 118:24 119:7 121:6 122:19 131:25 137:9 141:16 166:14
171:6
**external** 14:15 97:14,16
**ex-officio** 103:3,10 109:10 110:13,18,25 112:5 112:6 113:12 114:25 115:13,16 115:19 116:13 117:16,20 118:3,10 119:19,25 120:12 120:25 121:11,15 122:2,24 123:7,12 123:17,21 124:8,12 124:16,18 125:7 126:2,4,7 127:15 128:22 129:6,11,13 129:18,24 150:22 160:20

**F**

**facilitate** 27:24
**facilitating** 23:11,13
**facility** 64:19 69:11
**fact** 63:7 78:2 122:15 163:8
**factor** 75:3,6 82:19,24 83:16,19,25 84:2,4 84:11,13,21
**factors** 83:3
**Fagin** 1:13 4:14 187:6
**failed** 105:10
**fair** 136:15 157:13,15
**fairly** 73:10
**faith**

98:9 101:23 103:16 103:23 104:19,24 105:10 106:18,25 107:5,10 131:2,20 133:20
**familiar**
21:13 40:23 75:2
**far**
115:21
**faster**
130:8
**favor**
110:17
**February**
89:10 159:7,23 160:2 160:5 185:17
**feel**
7:2 10:12 21:24
**fiduciary**
174:22
**figure**
56:5
**file**
7:11,21 8:3 40:2
**filed**
171:23
**filing**
172:2
**filings**
112:17
**fill**
140:10
**Filled**
186:13
**financed**
64:14,18
**financial**
33:21,24 34:10 102:4 160:24 162:18
**financing**
55:14,18,25 64:18 65:7,12,13,17,22,23 65:25 66:16,23 67:3 67:7,22 69:10,14,18 69:19 70:5,18 71:12 71:20 73:6,20,22,23 74:4,14 77:8 78:13 78:22 83:11 84:4,13
**finding**
153:6
**findings**
63:7
**fine**
91:25 140:19 144:8
**firm**
24:13 111:24 171:20
**firms**
172:17
**first**
15:23 22:2 57:4 65:10 68:18,20 81:6 90:23 95:5,17 112:3 137:19 152:23 153:3 159:11 164:15,20 165:15 165:16 166:6 175:7 175:20
**five**
62:4,5
**five-minute**
61:24 140:17
**flat**
56:5
**Flexner**
2:8 4:11
**flip**
63:11 130:6
**Flipping**
156:4
**Floor**
2:5
**flow**
94:3
**Focusing**
141:11
**folder**
7:20
**folk**
108:17
**follow**
142:18
**following**
29:24 142:21 144:21
**follows**
5:19
**follow-up**
123:13 179:18
**footnote**
33:17
**foregoing**
187:10 188:3
**form**
10:22 14:10,19 15:8 16:2,23 17:18,23 19:6 20:3,13 26:7 33:2 34:5 36:18 38:19 39:10 43:11 43:19 45:15 46:8,21 47:21 48:13 49:6,8 49:20 50:22 51:7,23 53:17,24 54:16 55:2 59:3 60:13 64:25 66:2 67:9,24 68:7 69:6,21 70:6,12,19 70:20 71:7,16,25 72:6,7 74:6,22,23 76:16 77:10,23 78:4 78:17,24 79:5,13 80:8,13 81:21 82:8 83:23 84:22 85:20 86:18,19,24,25 88:14 89:16 90:3,10 90:21 95:8,20 96:6 96:20,24 98:17 99:15 100:2,3,16 102:10,17,22 104:2 104:9,25 105:25 106:7,14,23 107:6,7 107:11,12,16,17 109:4 113:17,23 115:2 116:3,11,19 117:21 118:5,12,17 120:13 121:4,18 122:7,9,11,18 123:16,23 124:17 126:9 127:16 128:23 129:7,8,20 129:25 132:17,24 133:2,24 134:16 135:7,17 136:16 137:2,12 138:10 139:2,10,11,22,23 140:12 141:18 142:5,16 143:3,4,12 147:2,9,12 149:11 149:12,23 152:2,24 152:25 154:19 157:20 158:10 159:3 161:5,11 162:22 163:16 164:4,21 165:13,19 166:4,8,10,11 167:4 168:2 169:5 170:14 171:10 172:15,23 175:12,16,23 176:8 180:16 181:2,3 182:2,13,14,23,24 188:5
**formation**
64:6
**formed**
36:16 50:3 124:7 125:2,4 133:18 134:2 162:13 166:21
**FORMER**
2:13
**formulate**
72:14
**forth**
68:22,24 69:4,9 74:18 108:3 127:8 127:24 131:12 176:2
**FOUNDER**
2:18
**free**
7:2 21:24
**Friday**
4:7 156:6

**frog**
110:10
**fruit**
109:7
**full**
21:25 65:10 67:16 89:9,14,25 90:6,17 150:21 151:8,18 152:10,14 154:16 154:22 160:23 161:8 162:20 165:17 166:5
**fully**
32:6,12
**full-time**
164:18
**function**
7:17 50:14
**functioning**
119:3,11
**fund**
19:8,9 28:25 29:15 55:16,17 101:4,5 104:11
**funding**
18:25 57:15 68:17 77:6
**funds**
19:13 56:14 59:7 99:21 103:7 151:12 151:16 163:11,13 167:9,24,24 175:21
**further**
5:5,9 177:25 179:17 183:3
**furtherance**
181:14

**G**

**G**
67:14
**Gary**
3:6 49:25 51:24
**gather**
176:2
**general**
13:17 29:20 70:13,16 105:20 129:12,17
**generally**
8:12 13:2 15:2 26:18 26:20 30:20 49:12 57:9 79:11,22 80:12 100:18 111:9,16
**generated**
96:16
**getting**
29:21 106:8 169:18 172:13,21
**give**
12:18,20 46:22 47:9 85:25 87:8 93:4,5,9 93:19 95:25 102:11 104:14 105:4 106:5 128:5,6 182:20
**given**
47:19 101:16 108:7 108:16 128:19 129:2 138:13 187:5 188:4
**giving**
93:16 179:10
**go**
31:22 35:5 40:10 63:12 85:2 87:5 116:23 130:8 139:17 145:18 155:22
**goes**
69:8 90:11 131:3
**going**
11:9 17:4 21:25 52:6 62:6 63:15 67:10 78:15 85:5 92:2 93:13 94:10,20 106:3 126:17 128:3 128:14 140:20 144:5 150:12,17 152:20 155:19 174:15 176:19 182:3 183:6
**Goldman**
9:21,22
**good**
5:22,23,24 13:5 73:10 88:10 98:9 101:23 103:15,22 104:19,24 105:10 106:18,25 107:4,10 131:2,20 133:20 169:21
**gotten**
149:14
**govern**
20:11
**governing**
13:21 136:4
**governs**
20:25 70:8
**grab**
40:15
**grant**
134:19 180:6,21
**granted**
181:18
**Great**
8:7 21:16 40:23 68:16
**greatest**
139:6
**GREENBERG**
2:13
**ground**
122:22
**grounds**
48:18
**group**
55:20
**guess**
5:24 76:5,7
**guidance**
28:19,21 29:22 59:16 90:14
**guided**
124:21
**guys**
62:2 75:20 160:5

**H**

**H**
5:16 184:11 185:3
**Halperin**
23:8,25 24:4,21,23 25:11,14,17,23 26:15 43:24 90:19 95:12,13,17 111:20 114:2 119:19 146:5 146:19 147:5 156:18,23 168:25 169:4,8,11,15 170:22 185:14
**Halperin's**
111:13 168:13
**handful**
114:4
**handled**
8:18 171:8
**hands**
21:10
**happened**
31:2 33:14 115:11 170:10
**happening**
145:4
**happens**
82:4
**happy**
7:3 36:13 40:9 67:15 114:7
**hard**
77:20
**head**
6:18
**header**
64:9
**heard**
134:5 157:5
**held**
1:12 14:2,9 100:19 100:24 101:6,9 180:14

**help**
108:24 109:2
**helped**
23:16
**helpful**
6:16 90:13
**Herculean**
113:10
**hesitating**
87:20
**Hi**
23:11 75:20
**higher**
74:24
**hold**
19:14 61:13 118:23 121:19
**holder**
16:16 19:16 58:9 93:7,11,21 94:7 151:25
**holders**
30:11 59:7 151:13,16
**holdings**
1:7 4:6 19:19
**holds**
19:9
**HOLDWAY**
2:16
**honestly**
148:12
**hop**
28:11
**Houston**
1:4 171:3
**Howard**
31:4
**Hudson**
2:9
**hypothetical**
10:23 11:5 181:25 182:4,15

**I**

**identification**
21:20 31:17 37:6 39:16 56:23 62:18 73:15 75:19 112:25 148:24 156:20 159:8 169:25 173:11
**identified**
167:22 172:12
**identifies**
173:18
**identify**
53:12 54:12 67:5,20 70:2 127:13 128:20 129:3 167:2,7
**identifying**
84:12
**imagine**
76:10 122:20
**immediately**
82:22 98:7 103:14
**impact**
163:19
**implicates**
166:17
**important**
109:15
**impose**
77:20
**imposes**
77:21 78:21
**impression**
147:7
**incentivized**
151:22
**include**
80:11
**included**
98:15 110:15
**includes**
71:8
**including**
65:2 69:13 98:23 99:6,13 100:15 102:3,9 117:11 179:7
**Incorporated**
4:6
**increase**
73:17 78:15
**incremental**
65:16,25 66:22 69:18 69:19 73:6,18 74:3 74:4,10 75:6 76:8 78:11 84:4,18,21,23
**independent**
132:15,24 134:14 147:13 165:10 166:3
**INDEX**
186:3
**indicated**
157:18 160:7,14
**indirectly**
125:16,22 126:5 165:4,7
**individual**
28:4 142:14
**infer**
12:9
**influence**
46:15
**information**
18:11 24:8 28:14 58:10 94:3,19 115:24 116:18 117:4 127:20 128:4
**informed**
140:8 145:9 163:14
**initial**
83:11,21
**initially**
32:4 144:23
**input**
110:22
**inserted**
85:15
**insightful**
29:21
**insights**
28:18,21
**InstaLit**
37:5,13 57:15 97:4 184:18
**instance**
42:2 173:5
**Instant**
1:7 4:5 13:24 14:2,7 18:5,16 20:18,25 21:6 150:13 152:21 153:22 154:2 155:20
**institution**
176:10
**Institutional**
173:19,23 174:13,21 176:5
**institutionally**
19:7
**instruct**
119:4,11
**instructed**
124:20
**instructing**
124:22
**instruction**
25:2 128:5,7
**intelligent**
29:21
**interest**
14:17 15:24 16:16 27:9,15,18,22,23 30:3,3,10,13,14 33:22,24 34:10 37:15,21,24 38:10 57:14,19 60:23 61:3 80:14 93:7,10,21 94:7 108:22 109:18 112:4 114:19,20 117:24,25 118:6,8 119:15,21 139:14 140:5 151:20 162:16,19 163:4 167:3,7,19,22 168:6 177:5,13 182:11
**interests**

19:9,14,17,23,24,25 30:23 32:7,13 37:6 37:13 38:11 42:15 57:17 58:14,18 59:8 61:14 81:25 87:18 100:19,21,24 101:2 101:3,4,5 109:7 138:25 139:6,7,15 151:14,17 160:25 161:10 163:15 167:8 168:10 177:8 181:12,22 182:18 184:19

**internal**
8:20,22 9:24 10:5 15:3,20

**interpretation**
106:9

**interrupt**
80:16 110:9 139:16 145:17

**interrupted**
47:7

**invite**
90:19 101:23

**involve**
111:6

**involved**
8:20 10:4 12:13 13:12,23 15:23 25:13 87:21 149:6 172:18

**involvement**
12:3,5,8 16:19 173:2

**involves**
24:6

**issuance**
64:19

**issue**
22:14,18,23 23:4 26:10,16 27:2 35:18 35:21,25 36:4 44:7 45:21 52:23 54:9 66:10 91:12,16,22 92:12,17 114:3 118:14 120:11,16 121:10 125:13,16 132:2,10,13,17,24 133:19 138:13 140:2 146:5 147:9 147:13 148:14,18 149:9,19 152:22 158:9 161:14,17,21 161:25 162:4,7,13 164:24 165:3,8,11 166:2 167:17 171:9 171:13,18 177:19

**issues**
104:20

**J**

**J**
5:1,16 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1

**job**
8:23 169:21

**John**
3:13 4:12 28:18,20 28:24 29:14,14 59:15 89:12 90:13 103:9 110:22 111:11 120:23 151:22 152:6 159:21

**join**
38:21 78:18 106:24 112:4 135:18 150:12,17 152:20 155:19

**joinder**
159:7,13,17 185:17

**joined**
88:20

**joining**
90:25 91:9,17 92:13 156:8,13 157:17 158:4,23

**Jonny**
1:12 3:5 4:4 17:6,9 17:10,11 113:11 114:6 184:6 187:4 188:8

**JOSEPH**
2:15

**July**
169:24 170:6 171:23 185:19

**June**
76:5

**K**

**KATHERINE**
2:10

**Katie**
31:12 36:22

**keep**
6:19 66:5 86:3 87:9 94:21 130:4

**key**
15:10 109:18

**know**
7:2 10:6,23,25 13:19 17:22,24 18:2 25:3 25:6,11 31:4 36:12 36:15 49:25 75:2,11 88:16 94:11 115:3,9 115:21 120:21 147:21 148:20 149:24 153:17 156:10 159:2 168:17 172:5 174:2 174:24 177:15

**knowledge**
16:7,9,11,12 17:20 30:24 31:9 55:5,9 58:20 118:4 153:23 154:3,6,8 156:14,15 162:24 173:25 174:6,7,8,12,20

**L**

**L**
5:16
**Lane**
30:4,14,24 56:16
**language**
53:13 54:12 65:20 66:15,19 67:5,20 70:2 85:9 103:17 104:13 127:13 128:20 129:4,22 130:25 131:19 134:23 135:4,12 137:17 138:15 163:23 175:11
**late**
95:21,22
**law**
24:13 45:7 111:24
**lawyer**
8:24,25
**leading**
144:14
**LEANNE**
2:19
**learn**
169:10
**learned**
158:24
**legal**
1:23 3:13 4:13,14 35:11,22,23 36:4 44:16 47:23 52:23 99:10 100:12 102:3 102:6 106:8 107:24 120:10 122:6,12 123:4 124:2 125:8 125:12,15,20 126:5 128:19 129:2 131:25 132:9,12,15 132:23,25 133:9,15 134:14 147:13,16 147:20,22 148:5 161:13,25 162:4,6 162:10,25 164:23 165:2,10,23 166:3 166:22
**lender**
19:8 55:20
**lenders**
56:9,12,15 65:15 66:21 80:3,7 81:24 86:4,6,15,22 87:10 87:17 88:25 137:23 138:7,17 139:5 156:11 163:25
**lending**
56:10
**lengthy**
127:22
**lent**
56:17
**Leslie**
1:13 4:14 21:8 187:6
**letter**
169:24 170:9,24 171:2 172:4,8,8 185:19
**let's**
40:5 62:3 67:17 68:9 73:9 77:20 80:18 81:8 84:7 97:2 112:14 126:13,16 130:3 140:14 148:21 155:5 159:4 169:22 173:7 175:4
**level**
13:18
**liaise**
14:14
**lieu**
5:6
**light**
122:15
**limit**
67:12 78:13 79:25 84:7 135:14
**limited**
102:3
**limiting**
116:12
**limits**
134:24 135:5 136:12
**line**
52:21 81:4 186:5,5,5 186:8,8,8,11,11,11 186:13,13,13 189:3
**lines**
111:23
**link**
59:17
**linked**
59:13
**list**
39:25
**litigation**
8:8,18 9:2,4,6,11 10:8,13,16,21 11:3 11:18,23 12:13 13:11 14:18,22,25 16:8,13,20 18:20 19:2,5,17 20:22,24 20:25 21:4,6,11 28:2,10,25 29:15 31:15,18 37:5,13 39:15,19,24 42:5,10 42:14,15 44:10 45:2 45:5,7 50:17 51:3 53:23 56:2 61:2 64:14,18 65:7,11,13 65:14,23 66:15,20 68:11,17 69:9,10,12 70:3 71:14,23 72:4 74:20 89:20,24 90:15 94:14 101:25 102:13 116:5,8 121:17 122:3 123:5 126:20,24 127:2,5,8 127:9 129:4 130:4 131:6,9,12,13,16,22 134:11 135:9,13 136:8,21 137:9,15 137:20 138:6 141:16 142:3,13,24 142:25 143:10,11 143:16,21 148:2,9 148:11 150:14 151:13,17 152:21 154:24 155:20 161:3 163:23 165:9 171:18 173:10,14 174:10,14,23 178:10,12,13 179:2 179:14 180:5,7,8,19 180:25 181:10,11 181:13,14,17,22 182:6,8,11,19 184:15,19,20 185:21
**litigations**
8:11,13,14 10:3 16:17,18
**litigation-related**
89:22 90:7 114:14,23 169:19
**litigator**
8:19 9:25 12:19
**little**
7:9 37:19 81:22 87:20 99:17 113:19 113:24 139:4 144:12 153:7 168:15 176:17
**LLC**
2:8
**LLP**
2:8,13,17 3:4 4:11
**loan**
57:16 58:13 88:25 137:23 138:7,17 139:5
**loans**
58:7 69:12 70:17 83:19 84:18,21,23 84:24
**locally**
7:18
**long**
9:14 47:24 112:2 136:23,23

**longer**
39:4,6 176:17
**look**
7:12,16 42:9 44:24 75:7 85:4,10 98:5 101:20 126:13,17 130:3,23 134:22 144:7 179:22
**looked**
41:11 46:12 65:25 66:14,19 69:15,20 143:15 158:6 160:10
**looking**
41:14,17 57:11 63:2 63:8,10 80:24 114:18 135:3 164:8 179:23
**looks**
58:4 81:13
**loose**
176:2
**lost**
79:14
**LTA**
50:16 51:2 70:10 122:24 123:11,17 123:21 124:11,17 125:6 126:3,6,13,15 130:13,16 134:10 136:3 141:8
**LTAB**
21:10 27:14,20 32:8 32:14,17 41:3 43:24 45:18 47:2,20 50:14 51:19 52:16 53:15 54:5,13 60:22 88:19 88:21 89:3,10,14 90:2,6,18,25 91:10 91:17 92:13 93:9,15 93:20,22 95:7,19 96:18 99:23 103:4 109:16,20 110:2,12 110:22 111:9,15 114:25 115:12,17 119:4,11 124:7 135:2,6,16 136:2,15 136:25 137:11 138:16 139:9 140:11 141:17 142:4,10,14 143:2 144:15 150:21 151:8,19 152:10,15 154:16,22 156:8,13 157:17 158:4,23 159:22 160:17,23 161:9 162:20,24 165:18 166:5,15,25 167:16 168:4 177:4 178:25 180:13 181:20
**LTAB's**
22:10
**LTI**
58:16,17,22 175:14 175:17
**LTIs**
22:11 25:18,25 33:12 34:19 41:7,24 42:7 42:22 43:23 44:13 45:12 46:3 53:4 55:7 151:25 167:23
**L-T-A-B**
21:11

**M**

**made/are**
114:9
**Magna**
1:23 3:13 4:13,14
**maintain**
182:21
**majority**
48:8
**manage**
11:23 16:21
**managed**
16:24 111:3
**management**
12:3,6,7,9 127:7 131:11 135:12 136:7,20 137:8,14 141:15 142:2,13,23 143:9 178:12 180:7 180:24
**manager**
11:23
**managing**
8:13,14,15 9:2 10:8 10:12,15,20 11:3,17 16:8
**mandate**
138:5
**manner**
5:14
**Marc**
2:10 3:11 6:5 13:4 47:24 49:21 140:16 158:11 165:21
**March**
21:22 23:8 112:24 113:6 185:10
**mark**
21:18 31:13 37:2 62:15 73:13
**marked**
21:19 31:16 37:6 39:16 56:23 62:18 73:15 75:18 112:24 148:23 156:19 159:8 169:25 173:10 186:10
**marks**
62:7,11 140:21,25 183:7
**Martin**
22:20,23 26:24 88:21 89:8
**MARURI**
2:4
**materials**
116:7,10,15
**matter**
24:20 36:25 77:14 79:7,12,20,23 108:3 108:14 114:18 153:23 154:3 177:22
**matters**
9:4,7 11:24 12:14 13:12 28:25 29:4,15 89:15,18 90:8 154:11,17,23,25
**maximize**
29:10,17 151:23
**maximizing**
139:14
**MAYA**
3:12
**McMULLIN**
3:7
**mean**
8:15 11:20,25 12:2 12:10 13:18 14:12 23:14 25:9 60:9,10 64:24 80:16 84:16 98:18 103:6 110:9 116:4,5 117:8 136:2 136:5 139:16 145:17
**means**
30:12 76:21 77:24 155:2 187:11
**meant**
23:15
**measures**
116:17,20,25
**mechanic**
81:23
**mechanical**
77:14
**mechanically**
79:24
**mechanics**
24:18
**media**
62:7,12 140:21 141:2 183:7
**meet**
90:19

**meeting**
45:4
**meetings**
101:25 102:15 108:23 115:13
**member**
15:5,7 19:15 41:3 45:18 47:2 48:7 51:20 52:17 53:15 53:21 54:3,6,14,21 89:10,14 90:2,5,6 90:18 93:15,23 103:3,11 109:11 110:13,19,25 112:5 112:6 113:12 114:25 115:13,16 115:19 117:17,20 118:10 120:25 121:12,16 122:2 123:7,22 124:13,17 124:19 125:7 126:2 126:4,7 127:15 128:22 129:6,11,14 129:18,24 142:24 143:10 150:21,22 151:8,19 152:10,14 154:16,22 160:23 161:9 162:21,25 164:18 165:18 166:5,15 178:13 180:6,13,15,20 181:18,20 182:7,9 182:10,20
**members**
22:8 27:20 45:2 47:6 47:12,17,20 48:11 49:4,19 50:19 51:4 51:19 52:15 53:14 88:19 89:4 110:2,6 110:8,12,22 111:8 111:15 126:25 127:3 137:21,22 138:5 142:4,14 167:17 178:25 179:6 180:23
**member's**
181:19
**memorialized**
118:3
**Menezes**
47:7
**Mennitt**
3:6 12:23 14:19 17:4 18:7 20:3 24:14 29:5 30:16 36:5 38:19 39:23 40:3,19 43:2 45:16 46:9,24 47:4,22 48:5,17 49:21 50:9 52:2 54:8 59:3,22 61:22 62:3,20 63:4 66:3 68:2,11 69:21 70:20 72:7 74:23 76:16 77:11 78:17 80:8 82:8 84:22 85:24 86:9,19,25 88:14 91:20,25 93:13,24 95:8 96:6 97:21,25 99:2 100:3 101:15 104:2,6 105:15 106:7,23 107:7,12 107:17,23 108:5,11 111:18 113:17 116:12 121:5,19 122:14 123:23 124:24 129:8 131:24 133:3 135:17,19 137:2 138:11 139:11,23 140:12,16 141:19 142:6,17 143:4 145:23 147:2 149:12 152:25 158:10 161:18 162:23 163:16 164:4 166:12 171:5 175:23 178:2,6 179:16 180:16 181:3 182:2,14,24 184:8
**mentioned**
16:10
**mere**
38:13
**Messrs**
33:25
**method**
23:21 25:24 36:13
**methods**
25:16
**Michael**
2:6 77:3 127:21 156:3
**million**
56:3,11 64:20 65:16 65:23,24 66:17,22 67:2,8,23 69:13,14 69:17,19 70:5,17 71:13,21 73:7,7,18 73:23 74:3,5,10,15 74:17 75:25 76:19 83:10,21
**mind**
60:3 61:20 66:5 73:12 105:4 106:4 106:12 144:11 173:17
**minutes**
40:13 62:4,4,5 176:13,18
**missed**
114:8
**modified**
74:9
**money**
86:3 87:9
**Monroe**
56:14,14
**month**
158:2,23
**months**
112:12 160:6
**morning**
5:22,23
**motion**
143:22
**moving**
61:22
**multiple**
146:20

**N**

**N**
2:2 3:2 5:16,16 184:3
**name**
6:5 7:21 8:4 31:6
**named**
140:10
**narrows**
133:5
**nature**
15:12,18
**need**
4:21 6:25 22:19 27:9 27:17 40:10 78:15 94:18 127:22 128:11
**needing**
78:20 79:2,17
**needle**
134:18 135:8
**negotiated**
109:5
**negotiation**
18:4,13,15,20,24 91:5,8,15 92:11 96:11 99:24 109:8 151:2
**never**
17:2,16 31:7 61:18
**new**
1:14 2:5,5,9,9,15,15 2:19,19 3:6,6 143:24 145:10
**Ni**
150:3
**nice**
153:7
**nine**
39:25

**nod**
153:7
**noncontractual**
80:5
**nonlitigation**
180:23
**nonLTAB**
180:15
**nontrivial**
151:13,16
**notary**
1:14 5:10,12,18 188:14
**note**
88:8
**noted**
4:17 88:5 183:10 188:6
**notes**
145:20
**notice**
37:4,12,17 38:2,7,13 38:16 39:9 54:22 55:6,11 173:13 184:17
**Noticed**
55:3
**notices**
33:16
**notified**
144:17
**notify**
171:3
**notional**
75:3,5 81:15,19 82:5 82:14,17,18,23 83:2 83:16,18 84:11,12 84:20
**notwithstanding**
98:7 103:14 180:4,20
**number**
8:3,3,10,10 39:21 62:22 81:10
**numbers**
7:20,24,25 22:5

**O**

**O**
5:16
**oath**
5:6,7
**object**
6:10 17:4 48:17 104:8 174:15
**objection**
5:13 10:22 12:23 13:5 14:10,19 15:8 16:2,23 17:18,23 19:6,12 20:3,13 22:16 24:25 31:16 31:19 33:2 34:5,24 36:18 38:19 39:10 42:25 43:19 45:15 46:8,21 47:21,22 48:13,23 49:6,20 50:22 51:7,23 53:17 53:24 54:7,8,16 55:2 59:3 60:13 64:25 66:2 67:9,24 68:7 69:6,21 70:6 70:12,19,20 71:7,16 71:25 72:6,7 74:6 74:22,23 75:13 76:16 77:10,23 78:4 78:17,24 79:5,13 80:8,13 81:21 82:8 83:23 84:22 85:20 86:9,18,19,24,25 88:3,6,14 89:16 90:3,10,21 95:8,20 96:6,20,24 98:17 99:15 100:2,3,16 102:10,17,22 104:2 104:25 105:25 106:7,14,23 107:6,7 107:11,12,16,17 108:5 109:4 111:18 113:17,23 115:2 116:3,11,19 117:21 118:5,12,17 120:13 121:4,18 122:9,18 123:23 126:9 127:16 128:23 129:7,8,20,25 133:2 134:16 135:7,17 136:16 137:2,4,12 138:10 139:2,10,11 139:22,23 140:12 141:18,19 142:5,16 142:17 143:3,4,12 143:17,22 147:2 149:11,12,23 152:2 152:24,25 154:19 157:20 158:10 159:3,25 161:5,11 162:22 163:16 164:4,21 165:19 166:8,11 167:4 168:2 169:5 170:14 171:10 172:15,23 175:12,16,23 176:8 180:16 181:2,3,24 182:2,13,14,23,24 184:16
**objective**
29:12
**obligate**
136:24
**obligated**
6:7
**obligates**
104:18
**obligating**
131:19
**obligation**
103:23 104:5,23 105:8,9,14,21,24 106:20 107:4,9 117:15
**obligations**
13:22 38:18 39:7 80:10,11 120:14,18
**observer**
119:16
**observers**
154:9
**obtain**
44:16 125:12,15 132:9,12 165:2
**obtained**
35:24
**obtaining**
102:25
**obviously**
18:9 43:5 45:19 77:11 135:20 145:23 158:12
**October**
150:4 156:19 157:2 158:12 160:9,10 185:15
**odd**
153:2
**offer**
92:23 93:2
**offered**
99:11 100:13
**offhand**
75:11
**OFFICERS**
2:13
**official**
137:24 138:8,20 139:20 140:4
**okay**
17:14 21:15 24:19 29:8 40:21 48:2 50:9,9,11 62:14 67:17 70:25 85:6 97:25 98:4 130:19 144:8 155:13 156:5 163:7 183:3
**Olson**
22:20,24 26:9 44:6,6 88:21 89:8 140:6 144:23 146:4 149:4
**Olson's**
26:24 32:20 140:11 144:17,24
**Once**
114:20

**open**
7:18 40:14 63:5 112:17 130:13 178:17
**opened**
40:2
**operates**
135:14
**operating**
9:15
**operation**
20:11 51:9 127:7 131:11 135:13 136:5,7,21 137:8,15 141:15 142:3,13,23 143:9 178:12 180:7 180:24
**operative**
106:19
**opinion**
46:23,25,25 47:9 90:15
**opportunities**
153:9,13,15,19,20 164:9
**opportunity**
102:12
**opposed**
6:18 142:25
**opposite**
31:25
**ordeal**
113:9,16,20
**order**
43:25 62:17,20 63:3 117:5 184:22
**organized**
109:17,21
**original**
73:19,21
**ought**
8:18
**outcome**
14:14
**outline**
81:13
**outright**
59:7
**outside**
66:9 70:10 117:25 118:8 153:22 154:2
**out-of-state**
5:12
**overall**
83:11
**oversight**
157:7
**owner**
38:14
**ownership**
30:22

**P**

**P**
2:2,2 3:2,2
**page**
20:21 22:3 23:7 31:23 33:5,7,20 42:10 44:9 57:21 64:8,12 65:4,5,11 68:13 81:8 82:9,10 82:15 83:5,6,17 84:10 85:11 97:19 98:2 126:16 130:20 131:7 144:10 159:11 164:12 173:18 175:5 181:6 184:6,13 185:5 186:5,5,5,8,8,8,11 186:11,11,13,13,13 189:3
**pages**
188:3
**paid**
157:8
**Parabellum**
19:10,13,15 22:11 25:19,25 27:21,25 28:4 32:5,7,13 33:13,15,25 34:19 41:23,25 42:22 43:23 44:14,17 45:12 46:3 53:4,8 54:25 55:8 58:20 59:2,6 61:4 89:9 90:24,25 91:9,12,17 92:13 96:5 99:20 100:7 102:14,21 103:3,7,20,24 104:20,22 107:3,8 134:20 150:12,20 151:7,12,16,18 154:5 162:20 163:11,13 167:9,24
**Parabellum's**
96:17
**paragraph**
31:24 32:3 33:6,11 64:13 65:10 141:12 144:9,21 157:4
**parameters**
117:19,22 118:2,9,15 119:25 120:12
**Park**
3:5
**part**
15:21 16:17 29:9 64:2 72:15 87:21 111:3 159:22
**participate**
18:3,12,14,19,23 101:24 102:15 115:15
**participated**
58:13,17,22 61:6 109:7 175:15,18,22
**participating**
4:24
**participation**
32:5 38:4,8,9,17 39:3 39:7 41:19,21,22 42:21 44:13 53:7 54:25 55:4 56:22,25 57:6,11,18 61:14 91:6,8,16 92:12 96:21 97:6 98:15,24 100:20,25 101:7 130:12 132:6 133:22 134:9,19 151:3 184:21
**participations**
163:20
**particular**
85:9
**particularly**
178:19
**parties**
4:17 5:8 38:17 39:6 60:8 74:8 132:6 136:9 150:15
**partner**
24:12,13 111:24
**parts**
51:10,11 64:4 109:19
**party**
5:13 58:8 117:11 153:6 179:13 182:7
**passage**
102:13
**Patel**
22:21,24 32:22 157:5
**pause**
11:6 40:6 88:2
**paused**
125:10
**payment**
20:4
**PDF**
39:23 63:5 64:9 65:6 81:10
**PDFs**
62:25 63:9
**pecuniary**
33:22,24 34:10 37:15 37:21,24 160:25 162:15,19
**pending**
7:4
**Penn**
2:5

**people**
134:5,6
**perceive**
177:12
**period**
116:13 160:13 172:7
**permits**
33:9
**person**
5:6 7:10 22:23 42:16
**personally**
176:7
**perspective**
94:7
**Peter**
88:21 89:4
**phrase**
64:23 103:21
**phrased**
66:5
**physically**
5:2
**piece**
33:3 75:24 76:19
**place**
27:24 116:17,21
**plain**
137:17
**Plaintiff**
2:4
**plan**
18:4,13,15 19:23 20:6,14,16,16 62:18 62:21 63:3 65:21 67:6,15,21 68:22,22 68:25,25 69:4,4,11 69:15,20 71:14,22 72:4,16,16,18 73:23 74:5,18 121:2 127:10 129:23 131:14 184:22
**play**
106:22
**Plaza**
2:5
**please**
4:19 5:14 19:21 29:25 35:6 36:23 73:12 109:14 145:18
**plus**
67:4
**point**
56:15 106:11 118:13 135:9 141:5 151:12
**portion**
19:24 98:19 140:4
**position**
71:12,20 109:6 136:25 148:13,16 148:17
**positions**
14:2,7
**possibility**
74:3
**possible**
71:3,6 183:2
**potential**
43:22 94:9,13,17 153:5,9,13,18 167:2 167:5,6,18,21 168:5 177:5,13
**Potentially**
95:4
**preceding**
98:8 103:15
**precise**
89:17
**preclude**
141:14,25 142:11,22 143:8 178:10,24
**precluded**
179:9
**precludes**
137:7 180:13
**preference**
59:6,10,19 60:4,14 60:17,19 61:13
**prepaid**
86:7,16,23
**prepared**
157:6,18,22 158:24 160:7,14
**prepayment**
85:15 87:18 88:12
**prepayments**
85:16
**prepetition**
19:19 88:25 137:23 138:7,17 139:5 163:25
**presence**
4:16
**present**
3:10 45:3,5
**pressures**
6:24
**presumably**
66:9
**previous**
56:12
**previously**
56:10 141:21
**price**
82:5,14,18
**prior**
16:19 98:10 150:25 154:15,21 170:23
**prism**
46:14
**privilege**
24:16 52:3,19,20 66:10 120:8 122:22 127:17 128:7
**privileged**
12:24 18:10 28:14 29:7 30:18 60:2 70:23 99:4 107:19 127:20 128:4
**privy**
113:9
**probably**
7:13 16:3 40:7 41:11 49:12 112:11 117:23
**problem**
77:4
**procedure**
7:9 59:12
**proceed**
11:14 52:11 62:13 63:20 92:7 141:3
**proceeding**
5:14
**process**
7:10 23:16,19 44:4 45:11 46:2 71:3,9 109:9,22 112:2 163:9 172:11,13,19 177:16
**procure**
107:2 108:24 109:3
**product**
82:17 109:8
**Production**
186:5
**professional**
8:16 187:7
**progress**
119:19
**prohibit**
122:24 123:12 124:8 126:4
**prohibition**
85:15 136:12,22
**pronounced**
16:4
**properly**
125:11
**proportionally**
30:5,15
**proposal**
26:3,5
**proposed**
23:21 36:14 44:4 144:24
**proposition**
105:20
**propounded**
188:5

**prospect**
42:21 90:24 91:9 95:6,18 110:24 150:20 157:17 163:21 164:17 165:17
**protect**
116:17
**protection**
100:7
**protocol**
47:5,11,16 48:10 49:3,18
**provide**
6:7 36:3 51:18 52:15 55:18 65:15 66:21 69:12 80:4,7 90:13 97:9 162:6
**provided**
45:7 46:14 54:23 56:2,8 77:8 125:19 133:15 134:15 162:3 172:24
**provides**
18:25 53:13 55:14 64:19 68:21 86:6,15 100:7
**providing**
55:10 103:7 130:25
**proving**
156:5
**provision**
42:24 43:8,12,22,25 70:10 74:18 86:5,14 88:13 98:14,19,24 99:7 102:9 123:25
**provisions**
41:6,14,17 42:5 67:13 100:18 166:17,18
**public**
1:14 5:18 172:9 188:14
**pull**
130:9 164:6
**pulling**
57:3
**purchase**
154:12
**purpose**
34:15 85:25 87:8 89:2 98:23 99:6,12 99:18 100:14 102:8 115:4,10 138:4,24 139:3,4,19 181:14
**purposes**
86:22
**put**
7:15 21:17 31:13 35:13 36:23 43:17 56:20 62:15 77:20 88:2,6 94:17 137:5 141:21
**putting**
61:21 73:12
**p.m**
23:9 176:23 183:9,10

**Q**

**question**
6:11 7:4 8:9 10:18 11:2 14:23 17:12 18:8,17 29:8 35:5 35:10 43:3,17 45:24 48:21,25 49:23 50:23 52:13 54:3 66:4,13 67:14,19 79:14 84:8 86:10,12 88:7 93:18,23 94:21 103:12 104:9,11 106:3 108:10,13 121:12,22,24 122:25 123:3,13 124:25 128:8,13,17 129:16 132:4 133:6 134:3 138:14 142:18 162:17 165:20,22 174:25 178:3,8,15,23 179:19
**questioning**
174:16 178:19
**questions**
6:7 17:11 176:25 177:25 183:4 186:10 188:4
**quick**
141:5 174:25 176:25
**quickly**
140:14
**quite**
161:23
**quorum**
45:4
**quote**
34:3

**R**

**R**
2:2 3:2 189:2,2
**raise**
54:9
**raised**
43:23 84:13 91:12,17 92:14 112:3
**raising**
149:9,18
**rationale**
27:4 34:12 59:19,21 61:16
**Ravago**
95:6,6,18,18 140:9 144:22 145:8,16 147:8 148:19 149:2 157:5,18,22 158:24 160:6,14
**Ravago's**
144:15 145:8,14,22 146:6,24,25 148:8
**reach**
161:16
**reaction**
111:13 170:12,17
**read**
8:10 22:19 49:11,14 50:12 67:10,15,17 86:5,14 103:7 106:9 137:13 175:13 188:3
**reading**
76:23,24 86:17 108:12 137:16 149:5
**ready**
130:18 141:9
**reality**
31:25
**really**
24:10 59:5 61:10 101:17 111:2 120:7
**realtime**
11:8 77:2 88:4,8
**reask**
45:22,23 48:24 86:13 128:8,13,16
**reason**
152:18
**reasonable**
50:12,13 60:16,16,19
**reasons**
60:20 110:20 151:11 168:13
**recall**
15:11 25:5 26:17,18 26:20 27:7 28:3 31:2 36:2,20 41:13 41:16 44:20,21 54:22 64:3 66:24 73:2 85:8 90:23 92:15 109:25 110:6 111:4 116:16 117:3 130:24 140:6,8,9 145:4,13,21 146:4,9 146:14,15,18,20 149:8,17 150:19 151:5 152:16 157:11,21,22 158:5 158:15,16,17,19 162:2 169:7 170:8 170:10,12 172:3

173:2 178:7,21
**recap**
66:13
**receipt**
123:25
**receive**
58:9 107:4 147:17 161:13,24 164:23
**received**
52:22 53:11 99:11 100:13 101:16 102:7 104:7 105:18 107:25 108:7,16 111:21 121:7 122:7 122:13 123:4 125:21 126:5 128:19 129:3 131:25 132:16,23 133:10 134:14 138:13 140:4 147:14,20 157:23 165:7 166:3,23
**receiving**
170:8,13,24 171:2
**Recess**
62:9 92:4 140:23 176:21
**recognize**
31:6 37:8 63:22 159:18 170:3 173:15
**recollection**
73:10 115:18 126:12 148:25 158:7 168:22 169:13
**recommendations**
172:16,25
**reconsider**
169:4,8,11
**record**
4:3,18,22 11:10,11 11:13 13:4,5 17:15 52:7,8,10 58:9 62:7 62:11 63:12,16,17 63:19 76:23 88:9 92:2,6 112:20 140:21,25 155:24 176:19,23 183:7 187:4
**recusal**
51:13
**red**
81:4
**reduce**
30:2,13
**reduces**
153:5
**refer**
8:2 20:15,21 41:20 52:20 84:15,17 116:25
**reference**
54:2,20 81:25 82:2 83:24 129:10,13,17
**referenced**
101:6,9
**references**
74:5 113:16
**referred**
42:23 46:13,18 51:8 56:13,16 60:24 67:13 100:23 106:15 109:20
**referring**
20:16,23 21:5 27:13 27:16 30:9,21 41:22 51:12,15 53:20 57:6 58:2 76:3,8 101:2 109:23 113:16 117:2 120:19 134:11 164:15
**refers**
21:11 58:12,13,16,17 67:23 69:18 81:15 136:8
**reflect**
30:22 119:20 139:5
**reflected**
37:16,25 38:6,16 44:5 88:4,12 119:15 119:21
**reflects**
57:25
**regard**
10:7,9 18:11 92:21 109:23 111:6 120:5 122:8 147:6 151:21
**regarding**
27:25 28:9 61:12 114:3 167:8
**register**
30:2,10,21
**registered**
38:14 187:7
**regulates**
180:10
**reiterating**
145:19
**related**
38:25 89:24 102:14 126:11 154:11,14 154:18,23
**relates**
93:22 136:6 142:9 166:17
**relating**
41:6 166:18
**relation**
4:5 99:20,22 109:6 167:13 181:5
**relationship**
13:21 15:13,19 29:13 60:11 91:7 93:8,19 102:21 151:15 153:24 156:7 165:14
**relationships**
154:4
**relay**
147:5
**relayed**
147:4
**relevant**
9:10,11 13:20 39:4,6 46:18 60:12 94:15 139:8
**remain**
169:15,20
**remainder**
76:11,15
**remedies**
98:10
**remember**
21:9 95:21 98:14 125:10 148:12 157:12 171:12,17 177:10 178:15
**remind**
174:19
**reminding**
120:21
**remote**
7:8
**remotely**
1:12 4:10 5:4,7
**reorganization**
20:17
**Reorganized**
1:8
**repaid**
81:24
**repeat**
54:17
**replacement**
149:3 172:12 173:19 176:4
**replacements**
166:19
**report**
15:13,16
**reported**
158:3
**reporter**
1:14 4:14,19,21 6:17 187:7,12
**reporting**
5:3
**representing**
29:14
**represents**

28:24
**reproduction**
187:11
**request**
4:10 26:6 48:18 59:13 61:5 78:6,9 87:24 88:11 96:17 96:19 109:24 110:2 186:5
**requested**
167:14,16
**require**
26:23,24 69:3
**required**
6:10 45:6 113:21
**requirement**
45:14 46:5 47:18
**requirements**
165:15
**requires**
65:12
**reside**
38:12
**resign**
157:6,19,23 158:25 160:7,14
**resignation**
144:15 168:13,25
**resigning**
95:7,19 169:4,12 170:23
**respect**
8:21 12:12 13:11 14:7,17,22 15:24 38:18 39:8 61:5 93:17 98:11 101:16 127:7 131:11 135:9 135:12 136:7,20 137:8,14 141:15 142:2,12,23 143:9 161:2 175:14,21 178:11 180:6,24 181:19
**respective**
13:22
**respects**
38:22
**respond**
119:5,13
**responsibilities**
8:23 9:3,8 14:6,16,21 14:24 15:6
**restate**
67:19
**result**
105:21 118:24 119:8
**resulted**
26:4
**retiring**
140:6 146:4
**return**
29:11,17 151:23
**reveal**
166:21
**revealing**
53:10 54:10 166:22 171:14
**review**
21:25 29:25 41:2,9 97:6
**reviewed**
41:5 63:25 74:19,21
**reviewing**
64:4 85:8
**revised**
151:6
**right**
22:15 31:21 33:10 38:25 39:5 48:12 57:7 58:4,6,14,18 58:21 59:2 69:15,20 70:13,16 72:14 79:25 81:17,20 86:6 86:15,23 87:17,25 88:12 94:20 99:25 103:20 104:4,5,10 104:14,20 105:5,6,7 105:7,13,23 106:6 106:13 107:3,8,13 110:14 117:13 136:20,23,23 138:17,21 143:13 146:7 149:3 152:10 159:24 160:2,8 161:23,25 163:3,24 171:24 175:15 176:5,12 179:10 180:25 181:4 182:8
**rights**
13:22 38:18 39:7 41:22 42:21 44:13 58:2,13,17,22 61:6 81:16 94:24,25 95:2 98:10 103:2,6,8,21 127:6 131:10 134:20,24 135:5,15 136:13,14 137:7,10 141:14 142:2,12,22 143:9 175:15,18,22 178:11 179:7 180:6 180:14,22 181:19 181:20
**right-hand**
22:6
**rise**
104:14 105:4 106:5
**road**
120:22
**role**
8:17,22 9:15 10:4,14 10:17 11:19,21,22 12:3,4,6,7,11,12 15:3 16:21 60:15 66:6 93:15,22 106:21 113:22 117:20 118:10,16 119:16,20,25 120:12 122:24 123:12,17,22 124:8 129:6 140:11 160:16,18,20
**roles**
19:4,10
**room**
5:2
**ROSEN**
3:11
**rules**
120:22
**run**
136:22

**S**

**S**
2:2 3:2
**Sachs**
9:21,23
**sale**
64:10 109:6
**Saratoga**
55:21,25 56:9
**sat**
17:2,16
**satisfied**
45:13 46:4
**satisfy**
42:24 43:12,24
**save**
72:24 148:3 164:9
**saw**
43:21 44:5
**saying**
22:22 36:20 78:12 124:6 148:4 165:21
**says**
32:12 33:23 64:9 76:10 103:14 113:8 127:4 131:8 135:9 135:12 136:6 144:22 152:4 159:11,15
**schedule**
101:24
**Schiller**
2:8 4:11
**scope**
84:7 134:24 135:5,14 174:16
**screen**
7:16,17 40:5 144:7

**scrolling**
144:11 173:17
**seat**
93:9,20 94:15,22,23 96:18 99:24 138:19 144:25 145:8,14,22 146:6,25 148:7,8 164:3
**seats**
93:4 94:15,18 95:25 138:16,25 139:9,19 164:2
**second**
11:7 44:25 94:21,23 98:6 99:13 103:9,13 106:4 118:23 121:19 130:24 154:12 173:18
**section**
42:9 44:14,18 46:5 52:14 54:5,13 57:22 65:21 67:6,14,21 68:16 70:3,10,18 71:14,22 74:19 81:16 83:10 98:5 99:14 100:7 101:14 101:20 102:16 103:2,13 106:5 107:15 108:4,10 126:17,20,23 127:14 128:20 130:21,24 131:7,19 131:22 133:21,23 134:23 135:4,15 136:12 137:6,20 163:23 164:16,20 165:15,16 166:6 175:8 178:9,23 179:11,22,23 180:4 180:13,21 181:7,10
**Sections**
102:19
**see**
23:10 26:7 27:11 30:2,6 32:3 33:6,11 33:16,19 40:19,21 42:18 45:9 64:13,15 64:21 65:18,20 68:3 68:5,18,20 69:24 72:24 76:12 81:4 82:13,20,22 83:9,13 83:22 84:12 85:14 98:6,12 100:10 103:17 113:4,13 114:11 126:20 127:11 130:7,9,21 131:4,8,15 138:2 143:18 144:13,16 145:2,11 150:5,7,9 150:16 153:7,10 154:13 155:10,14 155:21 156:24 157:9 170:6 175:7 179:25 181:9
**seeing**
144:3
**seek**
35:7,11,17,21 59:15 145:10
**seeking**
22:10 23:17,19 80:3 80:6
**seen**
8:10
**seller**
2:18 98:8 101:22,24 103:15,23 106:18 108:24 109:2 131:2 131:19
**seller's**
107:9 133:19
**sense**
6:21 8:5 20:4,7,9 94:9
**sent**
172:4,8
**sentence**
44:25 68:18,20 69:2 98:6,8,20 99:13 100:6,15 103:13,15 106:4,12,22 127:4 130:24 131:8,21 133:23 134:23,24 135:3,4,15 136:11 136:22 137:17,19 141:11,13,25 142:21 143:7 144:6 145:6 164:16,20 165:16 166:6 175:7 175:20 178:20,24 179:11,23 180:4,12 180:21 181:9 182:22
**separate**
122:19
**September**
1:13 4:7 145:9 150:8 150:23,24,25 155:9 155:15 156:6 187:7
**serve**
160:16
**served**
174:22
**Services**
1:23 3:13 4:13,15
**serving**
110:13,24 174:9,14 177:18
**set**
15:9 68:22,24 69:4,9 74:17 108:3 127:8 131:12 164:19
**sets**
83:2 85:9 138:15
**setting**
99:10 100:12 102:6 104:6 122:6,12 123:3 128:18,25
**settlement**
175:9
**seven**
62:4 176:12
**shakes**
6:18
**Shams**
31:4,8
**share**
7:17 115:23 116:7 117:6,8,10 139:6
**shared**
7:11
**Sheet**
188:6
**short**
21:10
**shortly**
32:6 103:9
**show**
88:7
**shows**
76:25
**shut**
40:11
**sides**
182:18
**signed**
114:21
**significant**
93:6,10,21 94:25 139:14
**simply**
11:22 134:3
**single**
54:6,14,21
**Sinna**
28:6,9 61:12 75:17 75:22 89:12,13,15 89:23 90:5,17,19 91:12 96:14 103:9 109:10 110:12,18 110:24 111:11,17 112:4,6,23 113:3,22 114:16,24 115:12 115:20,23 116:8,18 117:8,12,16 120:23 120:24 121:11,15 121:25 124:12,16 125:25 150:7 152:4 152:7,9,13,19 153:12,18 154:7,15

155:18 156:8,12 157:14,16 158:3,9 158:22 159:21 160:15,16,23 161:8 164:18 165:17 172:18 185:6,9
**Sinna's** 59:15 110:22 117:20 118:2 120:12 154:21 163:22 166:4
**sitting** 53:12 54:11 84:19 85:7 128:25 172:6
**situation** 47:19
**situations** 47:6,11,17 48:11 49:4,18 50:18 51:4
**six** 9:16
**skipped** 185:11
**slightly** 43:15 123:2
**soft** 77:22,24 78:3,21
**solely** 72:2,9 134:6 161:3
**somebody** 90:24 91:9,16 92:13 96:4,5
**sorry** 11:7 37:19 43:7 50:23 54:2 63:14 71:17 79:14 80:16 83:25 110:8 116:23 121:22 133:6 139:16 142:19 143:19 144:3 145:17,19 153:4,24 155:12 156:2 168:24 175:25
**sort** 6:19 13:15 58:10 86:11 95:21
**sounder** 60:25
**SOUTHERN** 1:3
**speak** 78:22
**speaking** 7:25
**specific** 42:2 48:20 57:2 129:10
**specifically** 15:4 26:17 30:20 103:10 166:18 178:16,24
**specificity** 25:20
**specifies** 83:25
**specify** 84:3
**speculate** 76:18
**speculating** 99:17 139:4
**speculation** 87:2
**spoke** 43:17 57:18 58:23 115:3,9 158:9 172:17
**spoken** 157:16
**squarely** 93:22
**stamp** 22:4 57:22 81:5,9 82:10 85:12 97:20 98:3 130:21
**stamps** 22:5
**standard** 128:7
**standing** 49:22 50:2
**start** 118:19
**starting** 22:3 33:6 64:13
**starts** 21:22 33:18 63:6
**state** 1:14 5:10,14 124:4
**statement** 4:22 32:10,15,25 34:4,8
**states** 1:2 42:10 44:24 64:17 65:11 68:19 69:8 98:7 101:22 126:23 137:20 181:10
**stating** 53:20
**stenographic** 1:14 4:18
**stipulate** 5:11 47:24 48:4
**stipulation** 48:19 49:22
**Stipulations** 186:8
**stop** 43:20
**straight-away** 169:23
**strategy** 89:20,25
**stray** 24:15 93:14
**strike** 23:23
**structure** 13:14,17
**struggling** 148:12
**subject** 16:17 24:20 27:14 28:22 71:2 100:20 100:24 114:18 117:4 141:20 142:7 177:22
**Subscribed** 188:10
**subsequent** 41:23 122:16
**substance** 25:13 29:18 43:13 46:6,19 49:16 50:20 51:5,21 52:18 71:4 72:10 77:17 89:21 90:8 94:11 108:15 114:13,23 115:25 116:9 118:21 119:20 120:20 132:20,22 133:9 153:14,20 154:24 162:10 169:18 171:14 172:13,22 188:5
**substantive** 101:25
**substantively** 173:12
**successor** 147:8 173:10,14 185:20
**SUNDERLAND** 2:19
**supervise** 15:11 16:21
**supervision** 187:12
**supplement** 68:23,25 69:5
**support** 151:18 152:9,14,17 186:3
**supportive** 151:7
**suppose** 20:8 49:13 65:2 89:20
**sure**

6:17 8:14 10:10 20:21 50:25 56:7,17 66:14 75:8 76:20,21 79:16 84:6 85:3 87:22 88:15 91:2,13 91:23 92:22 112:7,7 113:19 114:4,5 116:15 118:19 121:24 125:12 128:3,6 133:8 135:23 147:18,19 147:24 149:5 155:2 155:23 164:6,9 165:20 171:25 172:10 174:11,18 176:13
**surprised**
170:20
**swear**
4:20
**switch**
175:25
**switching**
164:10
**sworn**
5:11,17 187:4 188:10
**synthetic**
38:10

**T**

**T**
5:16 184:11 185:3 189:2
**tab**
7:20,25 8:2 21:18 31:13,18 36:23 39:14,18,24 56:20 61:21 62:15,24 68:9 73:11 75:16 80:18 91:19 97:2,21,22 112:14,21 126:14 130:3,11,16,19 140:15 141:6 143:14,23,25 148:21 149:25

155:6,7,23 156:5,16 159:4,10,11 164:10 164:12 169:22 173:7 175:4
**take**
7:3,5 25:8 31:7 52:4 52:22 61:23 65:22 67:7,22 70:4,17 71:12,20 76:7 78:14 78:23 91:20 97:17 115:8 123:10 140:16 144:24 147:24 148:13 162:3 175:2 176:11 176:12
**taken**
4:9
**talked**
13:3
**talking**
13:16 81:17 84:9 158:12 164:7
**tell**
128:11 152:19 168:17
**telling**
158:22
**tells**
155:18
**tenure**
166:25 168:4 177:4
**term**
21:4 34:14 65:3 75:3 88:25 129:15 137:23 138:7,17 139:5 163:25
**terms**
16:9 29:20 68:22,24 69:4,10 72:3,4,12 107:14 108:3 182:5 182:16
**TESS**
3:7
**testified**
5:18 92:10 95:23

127:17 133:24 161:24
**testify**
43:5
**testimony**
10:25 34:17 37:14,20 37:23 47:13 72:17 72:20 104:12 110:11 117:14 123:10 125:18 127:23 128:9 135:11 136:11 141:13 142:15 167:15 178:8 180:3 187:5
**TEXAS**
1:3
**thank**
23:15 40:22 48:5 77:3 101:11 144:12 160:4
**Thanks**
13:8 23:11,12 50:11 156:2
**thing**
6:19 13:15 58:11 67:11 106:25 108:19 164:7 178:3 182:4
**things**
29:22,23 57:16,20 64:7 101:18 103:5 130:8
**think**
7:19 12:25 16:24 19:13 20:6,10 24:10 24:12,15,18 25:21 25:22 28:3,20 29:7 29:22 30:25 31:3 34:9 39:11,12 40:3 49:2,17 50:2 51:25 53:18 54:8,17 56:15 56:15 65:6 66:14 70:7 79:6,16,19,25 81:23,23 84:16

85:25 87:2,7 90:4 90:14,22 92:23,25 93:21 95:22 99:18 100:17 102:18,23 103:10 104:18 105:6,7 107:13,18 108:9 109:12,15,24 109:25 111:7,22,23 112:13 115:17 122:10,16 123:18 124:4,24 125:9,11 127:17,24 136:8 137:14 139:3 141:22 142:8 143:5 143:7,13,15 144:4 145:25 146:22 147:23,25 148:10 148:15 154:20 155:25 160:9 161:15,23 162:23 163:3 168:18 169:6 169:14 171:8,16,19 172:24 175:2,17 178:9 179:4,9,12 180:10,11,18 181:4 182:25
**thinking**
41:18,20 48:16
**third**
60:8 117:11 136:9 182:7
**third-party**
181:18
**thought**
23:20 28:17 46:13,23 47:10,15 48:9 75:11 84:23,25 90:12 110:21 124:20 142:9 147:8 149:21 167:12,12 170:18
**thoughts**
114:8
**thread**
134:17 135:8
**three**

47:20 73:20,22 110:6,8,11 126:25 127:3 137:21

**throat**
110:10

**tidying**
176:14

**time**
4:8,8 6:9,9,23 11:10 53:3 61:25 63:13 64:6 66:7 72:25 87:13 88:23 92:18 112:5 113:20 120:24 121:14,25 124:11,15 125:25 130:7 132:5 146:3 146:13 147:24 148:4,5 149:18 150:22 152:4,7 154:15 160:15 161:8 164:9 167:15 172:7 176:20 183:9 183:10

**timeline**
95:22

**title**
9:17 63:4

**titled**
68:16

**titles**
62:24 63:8

**today**
4:7 6:5,24 7:13 17:10 21:14 53:12 54:12 84:19 85:7 128:25 172:6 175:11 177:21

**today's**
183:8

**told**
24:17 152:5,8,13 156:13 169:14

**top**
21:22 64:10 65:8 82:14 85:14 150:2 155:14

**topic**
26:21 61:12 96:23 120:18 146:9,12,19 146:21 147:17,20 151:5

**topics**
89:23

**total**
55:24 56:10 67:2 72:15 74:13

**track**
79:14

**tranche**
75:12,14,21,24 76:4 76:6 83:3,11 84:24

**tranches**
73:20,22 78:10 83:9 83:20 84:2,14

**transaction**
14:13 38:6 57:10 64:10

**transactions**
44:19 55:11

**transcript**
187:11

**transcription**
188:4

**transfer**
22:10 24:22 25:18,25 26:7,23 32:16 33:12 33:16,25 34:11,15 34:18 37:4,12,16,16 37:18,25,25 38:7,11 38:13,14,15,16,24 39:9 41:24 42:6,22 43:23 44:13 45:12 46:3 53:4 55:7 58:23 59:12 167:9 167:23 168:9 177:7 184:17

**transferred**
32:6,12 42:16

**transferring**
41:7

**transfers**
34:3,23 35:9 36:11 41:19,21 44:2

**TRAURIG**
2:13

**treat**
101:18

**treated**
84:24 100:21

**treatment**
100:19,23

**tricky**
46:10 48:22 120:21

**true**
53:22 79:6,9,11,20 79:22 187:4

**trust**
14:18,22,25 15:5,7,9 16:20 17:3,17 18:21 19:2,5,8,9,11,14,17 19:25 20:12,14,22 20:24 21:2,5,6,12 28:2,10 29:12,18 30:10 32:7,13 37:5 37:13 38:11 39:15 39:20,24 42:5,10,14 42:15 44:10 45:3,8 50:18 51:3 53:23 54:23 55:3,15,19 56:2,11 57:17,17 59:7 60:5,6,7,10 61:2 64:7,14,18 65:7,11,13,14,21,23 66:15,20,23 67:7,22 68:12,17 69:9,10,12 70:3,4,11,16 71:12 71:14,20,23 72:4 73:7 74:14,20 77:8 78:14,23 79:18 80:10,15 81:25 86:3 87:10 89:24 90:20 93:6,10,21 94:7,14 101:3,4,5 115:24 116:4,6 121:17 122:3 123:5 126:21 126:24 127:2,5,8,9 129:4 130:4 131:7,9 131:12,13,16,22 134:11,21,25 135:6 135:10,13,16 136:2 136:5,8,15,21,24 137:9,10,15,20 138:6 139:7 140:5 141:16,17 142:3,9 142:14,24,25 143:10,11 148:9 150:14 151:14,17 152:21 155:20 157:6 161:4 163:24 167:8 168:18 171:18 173:19,23 174:10,13,14,21 176:5 177:8 178:10 178:13,14 179:3,14 180:5,8,8,19,23,25 181:11,13,15,17,22 182:6,9,11 184:19 184:20

**trustee**
15:11 16:22,25 22:7 27:14 29:10,16 32:4 35:25 36:3,9,16 59:6,9,18,25 60:15 60:21 70:14 78:6,8 80:2,6 86:2,21 87:4 87:8,16 94:4 102:2 111:2 116:21 118:18 125:17,19 125:22 134:21,25 135:5,16,25 136:14 136:24 137:10 141:17 142:10 144:18 145:6,9 146:2 148:2 165:5,5 167:14,16 168:14 168:24 169:16,20 172:12 173:10,14 173:20 174:9,14 176:4 177:18 179:12,13 181:10

185:21
**Trustees's**
31:15,19 184:15
**trustee's**
34:22 87:18 94:4 116:21 125:23 143:16,22 144:13 148:6
**trust's**
79:3 168:9
**trust-related**
89:15,18
**truthful**
6:8
**try**
6:19 8:2 46:11 57:13 148:3 176:13
**trying**
125:10 176:2
**turn**
31:23 33:5 39:13 44:9 57:21 64:8 65:4 68:9,13 73:9 75:10,15 80:18 81:8 82:9 83:5,15 85:11 91:19 97:2,19 112:14 126:16 130:20 131:6 144:9 148:21 155:5 169:22 175:4,4 181:6
**turning**
112:21 143:14
**two**
19:13 23:15 40:13 45:2 48:8,11 49:4 49:19 50:19 51:4,18 52:15 53:14 57:15 57:17,19 67:12 94:15,18 101:18 103:5 109:15,18 126:11 130:17 137:22 138:5,16,25 150:14 163:25
**two-vote**
47:18
**type**
111:10,17
**types**
12:21 13:9,12
**typically**
13:13

**U**

**uh-huhs**
6:19
**ultimately**
65:12 171:22
**unable**
48:7
**unclear**
37:19
**understand**
6:13,23 7:6 20:15,23 21:5 30:12 45:11 46:2 47:8 60:18 64:23 69:2 94:8,16 101:8 102:12,19 104:13,17 106:19 106:21 113:15 125:21 133:11,16 133:18 136:10 141:12,13 148:4,17 175:10 176:9
**understanding**
19:22 30:8 31:10 45:18 46:15 58:25 60:21 61:8 70:15,25 72:22 76:2,14 87:11 87:16,22 91:11,14 91:18 92:10 95:16 96:3 99:12 100:14 101:12 102:8 108:2 122:23 123:11 127:19 134:18 135:24 136:17 137:6 141:24 142:20 146:23 166:15 168:12,16 168:20 175:19
**understood**
16:10 22:25 48:6 60:15 101:11 104:12
**undertook**
53:8 113:10
**unit**
15:21
**UNITED**
1:2
**unlimited**
79:4,19
**unsecured**
137:25 138:9,20 139:21 144:22
**unsurprising**
108:19,20,21
**update**
109:17
**updating**
30:21
**use**
12:9 21:4,10,14 34:14,14 98:8 101:22 103:15 104:19,23 105:10 106:18 107:9 129:15 131:2,20 133:20
**useful**
28:18,18,19,21,21 90:15 110:21
**utility**
58:6

**V**

**valuable**
95:3
**value**
94:9,13,17 139:15
**Vanderbilt**
2:14
**variables**
82:6
**version**
81:2 82:11
**versus**
134:20,25 135:5,25
**video**
1:12
**videographer**
3:13 4:2,12 11:9,12 52:6,9 62:6,10 63:15,18 92:2,5 140:20,24 176:19 176:22 183:6
**videotape**
4:3
**view**
26:22 34:22 43:11 49:8 50:4,6,17 51:2 58:24 61:16 71:6,10 71:18 72:2,12 77:5 77:7,15,16,21 79:8 79:10,21 87:18 103:22 105:12 123:16,20 124:7,17 125:2,4,5 132:17,23 133:19,24 134:2,4,7 134:8,13 138:4,24 139:18 146:24 147:9,12,13 162:13 162:14 163:14 165:13 166:4,10,21 182:19
**views**
29:3 99:21
**vis**
120:23
**Vitale**
4:12
**VITALI**
3:13
**voice**
94:25
**vote**
22:14,18 26:9,16 27:2 32:20 34:3,23 35:8,12 36:11 44:25 45:4 48:7,11 49:4

49:19 50:19 51:4,20 52:17 53:15 54:6,14 54:21 58:10 110:17 160:22 161:3,8 167:16 182:8,21
**voted**
22:23 23:3 44:6 47:6 47:12,17 110:4,12
**voting**
46:4 47:5,10,16 48:10 49:3,18 51:13 51:19 52:16 181:19

**W**

**waiver**
47:25 48:20 49:22
**want**
27:20 28:8 43:20 60:23 62:2 63:12,13 86:22 93:4,5 94:11 94:21 95:25 128:2 130:4,6,13 144:5,7 169:15,20
**wanted**
27:23 87:17 88:4,8 94:2 178:3
**wanting**
93:9,19
**wasn't**
87:21 91:2,3 96:9,11 113:20
**waste**
63:13
**way**
6:6 7:2,10 17:24 18:3 18:14,19,23 25:11 36:15 40:4 44:21 53:19 66:5 71:11,19 72:15 77:20,25 78:7 86:12 88:16 99:9 100:22 111:8,14 146:15 158:16 176:15
**ways**
24:3,21 38:23
**week**
41:11
**weeks**
112:10,11 172:4
**welcome**
7:18 85:4
**went**
168:10 177:8
**weren't**
96:7,23 100:20,24 101:6 117:5,7,9
**we've**
50:3 141:21
**whatsoever**
127:6 131:10
**willing**
80:3,7
**withdraw**
45:25 48:24 99:8 128:8,12,15,17 165:24
**withdrawn**
26:13 37:22 68:19 69:25 73:20 77:6 79:9 107:8 120:16 125:19 132:21 149:16 152:6 153:25 157:14
**witness**
4:20,23 5:9,11,17 17:8 18:8 24:5,15 28:12 29:6 34:25 40:12 47:3 62:5 63:10 66:4 70:21 76:17,23 93:14 99:3 105:16 107:20 108:6 111:19 123:24 124:24 187:3,5
**word**
68:3 106:22
**wording**
68:5 134:9,10
**words**
6:20 25:5 43:21 49:11,15 50:16,25 51:8,17 52:14 53:19 54:4,5 78:12 106:11 106:15,17 136:10 136:19 166:20 180:11
**work**
175:3
**worked**
9:21 126:12 153:12 153:17
**working**
11:8 15:12,19 66:8 153:8 154:10,17,22 155:3,12 173:22 174:3
**works**
91:24
**worth**
40:7
**wouldn't**
94:18 101:18
**wrap**
177:2
**wrapping**
175:3
**write**
23:12 27:8
**writes**
29:25 32:4 114:6 145:7 150:11 152:7 153:3,4 154:9 157:5
**written**
33:15 42:13 115:15
**wrote**
150:8 152:5
**www.MagnaLS.com**
1:24

**X**

**x**
1:5,9 184:3,11 185:3
**Xie**
3:4 15:13,25 16:3,5,5 16:6,7,12 17:20 26:15,25 34:2 75:18 75:23 90:18 92:18 92:20 95:24 96:14 97:13,16 112:23 113:3,8,15 114:6,15 115:20,23 117:15 119:24 120:4,11,15 146:13 152:8,22 153:17 154:17,23 157:16 158:8 160:24 168:21 169:3,8,11 171:13 173:25 174:6 178:25 185:7,9

**Y**

**Y**
5:16
**Yards**
2:9
**yeah**
6:14,22 8:6 9:5,13 16:24 19:22 21:23 22:7,25 23:2 25:9,9 26:11 27:3 28:7 30:7,25 32:23 33:16 33:21 34:20 36:20 37:18 38:3 41:15,15 42:3,19 45:10 46:22 47:3,9,14 48:14 51:16,16 53:5,5,9 55:16 57:13,24 58:4 58:15,19 60:4 64:16 65:9,19 66:12,18,25 67:4,4,10 68:25 69:7,16 72:22,23 73:25 74:7,12,16,24 74:24,25 75:4,20,20 76:9,13 77:15 78:19 78:19,25 79:7,21,24 79:24 80:21,23 81:7 81:14,18 82:7,16,21 82:21,25 83:4,8,14 85:13,17 86:8 89:12 89:12 91:18 92:16

92:19,19 95:4 98:13 98:22 99:5,5,8 100:5,11,17,17 101:21 102:5,11,11 102:23,23 103:18 104:3,3,16,17,21 105:2,2,19,19 109:12 110:14 113:5,7,14,24,24 115:11,21,21 117:13 123:18 124:4 125:9,9,11 126:15,19,22 130:18,22 131:5,17 131:17 134:2 135:24 136:18 137:13,13,18,18 138:3,18,22 141:8 141:10,22,23 143:13 145:3 146:8 148:9 150:10,18 154:14 155:7,16 156:15,21,25 157:3 157:10,12,12,21 158:6 159:17,19 160:12 162:2,18 164:14 165:9 166:17,24 168:15 168:15,22,22 169:6 169:6 170:7,15,21 171:19,19,21 174:18 175:6 176:6 176:9 177:11,20 178:15,22 181:4,8 181:16 182:3 183:2

**year**
89:10

**years**
8:11 9:16

**York**
1:14 2:5,5,9,9,15,15 2:19,19 3:6,6

**Z**

**ZHANG**
2:10

**ZIP**
7:11 40:2

**Zoom**
1:12 2:2 3:6,7,7

**Zuckerman**
88:22 89:5

**$**

**$10**
67:2,8,23 70:5,17 71:13,21 74:17

**$11**
74:15

**$4**
65:16,24 66:22 69:17 69:19 73:7 74:3,5

**$5**
73:7 74:10

**$6**
64:20 65:22 66:17 69:13,14 73:23 83:10,21

**$9**
56:3,11

**0**

**02**
39:24

**1**

**1**
2:5 4:3 21:18,19 57:15 61:21 62:7,15 62:24 83:3,9,20 84:2,14,24 97:4 150:4 169:24 170:6 184:14 185:19

**1.06**
70:18 71:14,22 74:19

**10**
82:10 156:16 176:18 181:6 185:11

**10(a)**
98:5 99:14 102:20 103:2,7,14 106:5 107:15 108:4 130:25 131:19 133:21 175:8,20

**10(b)**
101:20 102:16,20 108:10

**10-minute**
91:21

**10:45**
140:22

**10:53**
141:2

**10001**
2:9

**10017**
2:15

**10020**
2:19

**10036**
3:6

**101**
65:6

**10119**
2:5

**11**
112:19 143:15 148:22,23 149:25 156:2 185:12

**11th**
30:4,14,24 56:15

**11:50**
176:20

**112**
185:8

**1121**
2:18

**12**
112:24 113:6 156:16 156:17 158:14 169:22 185:10,13

**12:13**
176:23

**12:22**
183:9,10

**13**
33:5 83:6 159:5,6 185:16

**14**
33:20 169:24 185:19

**148**
185:12

**15**
173:8,9 185:20

**156**
185:13

**158**
185:16

**16**
31:13,18 57:22 143:14,23,25

**16(a)**
57:25

**169**
185:19

**17th**
21:22

**173**
185:20

**177**
184:8

**179**
184:7

**18**
1:13 4:7 73:11 80:18 155:6,7 187:7

**2**

**2**
31:14,15 39:14,18 62:12 68:9 83:3,9 83:20 84:2 126:14 140:22 141:6 143:24 157:4 164:12 184:15

**2.01**
83:10

**2.05(b)**
42:9

**2.07**
81:16

**20**
140:15
**2024**
31:3 159:23
**2025**
23:8 95:22 112:24 113:6 150:4,8,23,25 155:9,15 156:19 157:2 185:10,15
**2026**
1:13 4:8 76:5 159:8 160:3,5 169:25 170:6 171:23 185:18,19 187:7 188:11
**21**
184:14
**22**
21:18 126:16 131:7 164:12
**23**
44:9 75:16 159:8 160:2,5 185:17
**23-90716(MI)**
1:7
**24**
144:9 173:7
**26**
159:4,10,11
**264**
81:5
**27**
81:13 159:23
**277**
82:10 83:17 84:10
**280**
83:6
**281**
85:12,12
**282**
81:9

**3**

**3**
3:5 31:23 37:3,4 75:24 76:19 83:3,10 83:20 84:2,14 141:2 156:19 157:2 183:8 184:17 185:15
**3rd**
158:13
**3.01**
181:7,8
**30**
171:23
**31**
184:15
**37**
184:17
**375**
23:7
**376**
22:4
**39**
184:20

**4**

**4**
39:14,15,22 56:20 67:4 68:10 74:10 75:12,14,21,24 76:4 76:6 126:14 130:3 141:6 155:23,25 164:12 184:20
**4(a)**
97:2,22 130:11,19 175:4
**4.01**
126:18 128:20 131:7 131:22 133:23 134:23 135:4,15 136:12 163:23 164:20 165:16 166:7 178:9,20,24 179:11,22,23 180:5 180:13,21
**4.05**
44:14,18
**4.05(a)**
44:24 46:5
**4.05(c)**
51:15,17 52:14 53:13
**4.06**
53:22 54:5,13
**40th**
2:5
**44**
65:5
**45**
33:6

**5**

**5**
23:8 31:24 36:23 56:21,22 68:13 73:18 97:3,23 130:11,19 150:8 155:9,15 184:7,21
**5th**
156:6
**5(a)**
36:24,25
**5(b)**
36:24
**55**
2:9
**56**
184:21

**6**

**6**
62:16,17 67:4 184:22
**6:25**
23:9
**62**
184:22
**624-6221**
1:23

**7**

**7**
73:13,14 80:19 91:19 97:20 98:3 130:21 148:21 149:25 155:5,23 156:5 175:5 184:23
**7:05**
1:13 4:8
**7:12**
11:10
**7:14**
11:13
**73**
184:23
**75**
185:6

**8**

**8**
33:17 42:10 75:16,17 112:14,21 144:10 159:12,14,15 185:6
**8:06**
52:7
**8:09**
52:10
**8:23**
62:8
**8:31**
62:12
**8:34**
63:16
**8:35**
63:19
**866**
1:23

**9**

**9**
57:22 112:15,21,22 185:8
**9:14**
92:3
**9:23**
91:24
**9:34**
92:6
**99**
64:8