# Exhibit 28

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CORELLE BRANDS ACQUISITION HOLDINGS LLC, *et al*., | ) | Case No. 23-90716 (MI) |
| Reorganized Debtors. | ) | (Jointly Administered) |

**JOINDER IN LITIGATION TRUSTEE'S OBJECTION TO**
**CORNELL CAPITAL LLC'S MOTION FOR EXPEDITED DISCOVERY**
**AND RESPONSE TO ORDER TO SHOW CAUSE**

DLA Piper LLP (US) ("DLA Piper"), as former counsel for the Official Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases,[1] files this Joinder (the "Joinder") in the *Litigation Trustee's Objection to Cornell Capital LLC's Motion for Expedited Discovery and Response to Order to Show Cause* (the "Litigation Trustee Objection"). In support of this Joinder and opposition to Cornell Capital LLC's Emergency Motion for Expedited Discovery and an Order to Show Cause (the "Motion"), DLA Piper respectfully represents as follows:

1 The Committee was appointed by the Office of United States Trustee on June 27, 2023 [Dkt. No. 177], retained DLA Piper as its counsel on August 30, 2023 [Dkt. No. 485], and played a significant role in the Chapter 11 Cases, including with respect to the establishment of the Litigation Trust under the chapter 11 plan (the "Plan") confirmed by this Court by Order dated February 23, 2024 (the "Confirmation Order"). Pursuant to the terms of the Plan, the Committee was dissolved when the Plan went effective on February 27, 2024 (the "Effective Date"), other than for purposes of prosecuting fee applications and appearing in connection with appeals of the Confirmation Order [Dkt. No. 1161]. The Committee remained active for such purposes until June 2025, but it is now fully dissolved.

.

## JOINDER

1. DLA Piper joins in the arguments advanced by the Litigation Trustee in the Litigation Trustee Objection. It does so for three primary reasons.

### A. DLA Piper's Unique Standing to Support Litigation Trustee Objection

2. As a threshold matter, DLA Piper is uniquely positioned to support the Litigation Trustee Objection. Unlike Cornell, or even the Litigation Trustee, DLA Piper, as counsel to the Committee, participated directly and extensively in the establishment of the Litigation Trust. It assisted in the selection of the Litigation Trustee, played a role in the negotiation of the Litigation Trust Agreement (the "LTA")—especially insofar as its terms affected the rights and recoveries of the Committee and its constituents—and explored, together with the Committee's financial advisor and Citadel Advisors LLC ("Citadel"), the Litigation Trust's funding needs and all available sources to satisfy those needs.

3. The agreements that were reached as to all such matters and reflected in the Plan, the Confirmation Order and the LTA were the product of extensive, arm-length negotiation. The Committee, as a body appointed by statute to protect the interests of unsecured creditors, had a degree of leverage, but it had to accommodate the prerogatives of a number of other constituencies, including the Prepetition Term Lenders, a group of products liability claimants and a numbers of regulators, with the result that the Committee did not obtain all of the benefits, with respect to, among other things, the Litigation Trust, that it initially undertook to obtain for unsecured creditors.

### B. Third LTAB Seat Was Not Permanently Assigned to Committee

4. In light of all the foregoing, DLA Piper concurs in the Litigation Trustee's view that the LTA was in no way violated when—upon Martin Olson's resignation from the Litigation

Trust Advisory Board (the "LTAB") due to his retirement—the remaining members of the LTAB named John Sinna of Parabellum Capital, LLC ("Parabellum") to take the vacant seat.

5. Nothing in the LTA prohibits an LTAB member from resigning (and certainly not from retiring from a pre-Petition Date position, as Mr. Olson did). And the Agreement expressly authorizes the "remaining members of the Litigation Trust Advisory Board" to "appoint[]" a replacement "by unanimous consent." (Mot. Ex. 5 (LTA) § 4.07(d).) Contrary to Cornell's contention, the LTA did not permanently reserve a seat for a member of the Committee, nor require that the occupant of such seat hold "unsecured" claims against the Debtors. Nor could it have done so due to, among other reasons, the fact that the Committee was set to be "dissolved" on the Effective Date, and it would not have been available to appoint such a successor and would no longer have "members."

6. As the Litigation Trustee further observes, the procedure to replace a member upon resignation depends on whether it is a "designee of the Prepetition Term Loan Lenders" or not. (Mot. Ex. 5 (LTA) § 4.07(d).) If the LTAB member who resigned had been a designee of the Prepetition Term Loan Lenders, the "Litigation Trust Beneficiaries that h[e]ld a majority in amount of the Litigation Trust Interests issued on account of the Prepetition Term Loans [would] have the right to appoint a successor member of the [LTAB] to replace such designee." *Id.* If the LTAB member who resigned was not a designee of the Prepetition Term Loan Lenders, "a new member [would] be appointed to fill such position by unanimous consent of the remaining members of the [LTAB]." *Id.* Neither the Plan, the Confirmation Order, nor the LTA imposed any additional requirements on the replacement of an LTAB member, such as Mr. Olson, who is not a designee of the Prepetition Term Loan Lenders.

## C. No Permanent Limit on Sources and Uses of Funding

8. DLA Piper also joins in the Litigation Trustee's view that the LTA and the Confirmation Order placed no permanent limits on the sources and amount of funding that could be used to fund the Trust. (Obj. ¶¶ 58-60; Mot. ¶¶ 2, 10-12.) The Committee and its advisors expended substantial time and effort seeking to optimize the amount and terms of the funding that would be available to the Litigation Trustee. Apart from negotiations with Citadel, the Committee engaged in discussions with several other prospective litigation funders and, in this connection, obtained the right to propose alternative financing up to the commencement of the Confirmation Hearing on February 22, 2024. However, the Committee's diligence never yielded an actionable financing proposal that offered terms that were better than those offered by Citadel, in whose Litigation Trust Financing Facility, the Committee ultimately acquiesced.

9. However, in thus acceding to the Litigation Trust Financing Facility, the Committee never conceded that future funding for the Litigation Trust would be limited to the lenders supporting or the amount to be advanced under that facility. In fact, the Committee and its advisors always assumed that additional funding would be required and that neither the LTA, the Confirmation Order, nor the Credit Agreement would preclude efforts to obtain such funding.

10. Indeed, as the Litigation Trustee points out, nothing in those documents limits future lenders to the Litigation Trust to a specific set of initial lenders. To the contrary, the Credit Agreement is expressly stated to be between the Trust and any "lender from time to time party hereto"—not between the Trust and a specific set of lenders—and the LTA and the Credit Agreement expressly permit both the transfer of interests in the Trust and the assignment of interests in a Lender's Commitments or Loans. (Mot. Ex. 5 (LTA) § 2.05(a); Plan Supplement [Dkt. No. 1029] Ex. F (Credit Agreement) § 10.03.)

11. Nor was the amount that the Litigation Trustee could borrow to fund the Litigation Trust's efforts intended to be capped in any way. Cornell's suggestion that the Trust is limited in perpetuity to "$6 million in committed financing . . . and an additional $4 million of incremental financing" is plainly wrong. (Mot. ¶¶ 2, 10-12.) Any doubt as to the conclusion that additional funding was contemplated is dispelled by the fact that the Credit Agreement provided that its terms could be amended at any time "in writing signed by the Administrative Agent, Required Lenders, and the Borrower."[2] (Plan Supplement [Dkt. No. 1029] Ex. F (Credit Agreement) § 10.01.) The Credit Agreement could thus be amended to increase both the Incremental Amount and other related terms and conditions, if necessary.

12. The purpose of the Trust, as the Litigation Trustee observes, is to "maximize the value of the Litigation Trust Assets, including to pursue the Litigation Trust Recovery Actions." (Obj. ¶ 60; Plan Art. iv, § G.) The Committee itself spent many hundreds of thousands of dollars conducting a preliminary investigation of potential claims against Cornell and the other defendants, knew that the issues were complex, and projected that the cost of assembling the requisite proof would be significant. Nothing in the Plan documents or the Credit Agreement stood in the way of the Litigation Trustee doing what it needed to do to obtain the requisite funding to maximize Trust recoveries by aggressively pursuing Cornell and other well-resourced defendants.

**D. <u>Cornell Is Not Acting in the Best Interests of Unsecured Creditors.</u>**

13. Cornell's contention that it is acting in the best interests of unsecured creditors and that, without its intervention, unsecured creditors would be left "without the representation the Plan requires" lacks all credibility.

---

[2] The Credit Agreement identifies certain provisions that cannot be amended, but it does list the Incremental Amount definition as one of those provisions. (Credit Agreement § 10.01.)

14. The Committee was appointed by the U.S. Trustee to be the primary guardian of unsecured creditors' rights—a charge that it pursued throughout the Chapter 11 Cases and which it passed to the Litigation Trustee under the Plan and the LTA. These controlling documents, in turn, required the Litigation Trustee to act in the best interests of the Litigation Trust Beneficiaries, which were comprised of two separate but related constituencies—(i) holders of a range of general unsecured claims; and (ii) holders of unsecured deficiency claims under the Prepetition Term Loan.

15. This last point is important and entirely unacknowledged by Cornell in its insistence on drawing a bright line between secured and unsecured creditors. Citadel and the other Prepetition Term Lenders hold their Litigation Trust Interests and their seats on the LTAB not as holders of fully secured claims, but rather as holders of unsecured deficiency claims. The value of the Prepetition Term Loan collateral came nowhere close to satisfying the full amount of the Prepetition Term Loan—the sale of the Debtors' assets yielded (based upon contemporaneous Committee advisor analyses) only a $34.2 million paydown of the Prepetition Term Loan, leaving those lenders with an unsecured deficiency claim of $368.1 million. The other unsecured creditors, in turn, held claims estimated to total only approximately $34 million, resulting in the 85%/15% litigation proceeds split, the 2/1 LTAB seat allocation, and other terms that were more favorable for the Prepetition Term Loan unsecured creditors than for other unsecured creditors.

16. Thus, contrary to Cornell's contentions, the interests of unsecured creditors have been—and can continue to be—fully protected by the combined oversight of the Litigation Trustee and the current members of the LTAB, all of whom, by virtue of their deficiency claim holdings, are highly motivated to maximize unsecured creditor recoveries. By contrast, Cornell—out of whose pocket or insurance coverage any such recoveries would come—has a diametrically opposed set of incentives. Having already taken more than $300 million out of the Debtors'

prepetition enterprise—and draining millions more from the Litigation Trust every month in terms of litigation expense—Cornell has no desire to see any value returned to the Litigation Trust Beneficiaries. Its sole objective is to shut down or severely hobble the Trust's recovery efforts and, thus, shield its past malfeasance from further scrutiny or challenge.

**Conclusion**

WHEREFORE, DLA Piper respectfully requests that the Court deny the Motion and/or grant any relief requested in the Objection, as well as such other and further relief as the Court deems just and proper.

Dated: August 29, 2026

Respectfully Submitted,

*/s/ Dennis O'Donnell*

Dennis O'Donnell (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Email: dennis.odonnell@us.dlapiper.com

*Former Counsel to the Dissolved Official Committee of Unsecured Creditors*

**Certificate of Service**

I certify that on August 29, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Dennis O'Donnell*
Dennis O'Donnell