**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | § **Chapter 7** |
| | § **(Previously Chapter 11)** |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § |
| | § **Case No. 25-90399 (CML)** |
| **Debtors.**[1] | § |
| | § **Jointly Administered** |

**TRUSTEE'S OBJECTION TO THE EMERGENCY MOTION OF EVOLUTION CREDIT PARTNERS TO COMPEL TURNOVER AND DEPOSIT OF DISPUTED POST-PETITION ACCOUNTS RECEIVABLE PROCEEDS INTO THE COURT REGISTRY**

[Relates to Docket Nos. 3792 & 3799]

Eva S. Engelhart, the chapter 7 Trustee (the "Trustee") of the jointly administered bankruptcy estates of First Brands Group, LLC, First Brands Group Holdings, LLC's direct and indirect subsidiaries, and Viceroy Private Capital, LLC (collectively, the "FBG Debtors"),[2] in the above-styled jointly administered chapter 7 cases (the "Bankruptcy Cases"), respectfully files this objection (the "Objection") to the *Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry* [Docket No. 3792] (the "Motion") filed by Evolution Credit Opportunity Master Fund II-B, L.P. (the "Evolution Inventory Lender" and, together with its affiliated lending entities, Evolution Credit Partners Trade Finance Master, L.P., Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds, collectively, "Evolution") as well as the

[1] A complete list of the "Debtors" in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 7 cases is Eva Engelhart, Chapter 7 Trustee c/o Porter Hedges LLP, Joshua W. Wolfshohl, 1000 Main St., 36th Floor, Houston, Texas 77002.

[2] The FBG Debtors do not include the sixteen additional SPV debtors in the Carnaby Capital Holdings SPV silo or the Previously Converted Debtors.

*Joinder of Chapter 7 SPV Debtors' Trustee Ronald Sommers in Evolution Credit Partners' Emergency Motion to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry* [Docket No. 3799] filed by Ronald J. Sommers, as the Chapter 7 Trustee (the "SPV Trustee") of Debtors Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC (collectively, the "Evolution SPV Debtors"). In support of this Objection, the Trustee respectfully states as follows.

**PRELIMINARY STATEMENT**

1. It is clear from the Motion that Evolution does not like the deal it struck at the beginning of these cases under the Adequate Protection Stipulation or the Court's definitive January 20 Ruling regarding its rights under that stipulation.[3] This is a familiar refrain. Evolution has been making the same complaint since January, when it told the Court that the Debtors were "out collecting accounts receivable and spending it" and that "[s]omething's got to stop." The Court addressed that complaint by issuing the January 20 Ruling prohibiting the further use of the asserted Evolution collateral. The Trustee, like the Debtors before her, continues to comply with the Court's January 20 Ruling and has maintained segregated accounts holding all funds collected after January 20, 2026, that are even arguably subject to Evolution's interests—amounting to approximately $1.9 million—and those funds are currently held in separate stand-alone accounts.[4]

2. If the relief requested in the Motion is intended to ensure compliance with the Court's January 20 Ruling, there is no need for an evidentiary hearing. The *only* funds that could

---

[3] Capitalized terms in this Preliminary Statement carry the meanings ascribed to them in the remainder of this Objection.

[4] *See Declaration of Daniel Jerneycic in Connection with Trustee's Objection to the Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry*, attached hereto as **Exhibit 1**.



18743363

possibly be subject to Evolution's interests, which are already segregated, can be placed in the Court's registry.

3. To the extent, however, that Evolution is asking the Court to reconsider its January 20 Ruling and/or "unwind" the Adequate Protection Stipulation, which appears to be the case, such relief is entirely inappropriate. Evolution cannot have its cake and eat it too. It agreed to the Adequate Protection Stipulation, which allowed the Debtors to (i) sell Evolution's alleged inventory, (ii) use receipts collected from that inventory, and (iii) replenish such inventory with replacement inventory of equal value. Attempting to completely unwind what occurred under the Adequate Protection Stipulation would be entirely inequitable and, as the Court previously found, is *not* permitted under the stipulations themselves. And to make matters worse, Evolution asks for $21.2 million of gross receipts to address at most an approximately $5 million decline in the value of the inventory allegedly constituting Evolution's collateral.

4. Moreover, other than the already segregated funds, the estates are not holding any traceable proceeds of alleged Evolution inventory. Rather, all unrestricted funds in the estates are subject to first liens in favor of the DIP Lenders pursuant to the Final DIP Order. Evolution and the SPV Trustee have not, and cannot, point to any prior Court order or statutory support for the proposition that Evolution's interests are superior in priority to the DIP Lenders with respect to cash currently held by the estates.

5. The Motion is nothing more than a re-packaging of prior rejected arguments, has no merit and should be summarily denied.

## BACKGROUND

### I. The Chapter 7 Cases

6. On September 28, 2025 (the "Petition Date"), First Brands Group, LLC and its debtor affiliates filed the jointly administered chapter 11 cases (the "Chapter 11 Cases"). The

Debtors operated their business and managed their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7. On October 9, 2025, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee"). *See The United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 313]. On January 9, 2026, the Court entered an *Order Approving the Appointment of Examiner* [Docket No. 1260], pursuant to which the Court approved the appointment of Martin De Luca as an examiner in the Chapter 11 Cases.

8. On August 24, 2026, the Court entered its *Order Denying Plan Confirmation* [Docket No. 3710] by which the Court denied confirmation of the Debtors' *Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3448], and separately issued an oral ruling that the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code.

9. On September 1, 2026 (the "Conversion Date"), the Court entered the *Order (I) Converting Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* [Docket No. 3748] (the "Conversion Order"), which converted the FBG Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (collectively, the "Chapter 7 Cases").

10. On September 1, 2026, the U.S. Trustee appointed Eva S. Engelhart as the interim chapter 7 trustee for the FBG Debtors,[5] as reflected in the notices of chapter 7 bankruptcy case. *See, e.g., Notice of Chapter 7 Bankruptcy Case* [Docket No. 3753]. The U.S. Trustee also

[5] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Conversion Order.

appointed Ronald J. Sommers as the interim chapter 7 trustee for the remaining Converting Debtors (as defined in the Conversion Order) other than the FBG Debtors.[6]

## II. The Debtors' Operations and the Evolution Facilities

11. Prior to the Conversion Date, the Debtors operated as a global manufacturer and distributor of aftermarket automotive parts. *See* Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions ¶¶ 8–10 [Docket No. 22] (the "First Day Declaration"). Through Brake Parts Inc. LLC ("BPI"), the Debtors warehoused brake-parts inventory at BPI facilities, including McHenry, Patterson, and City of Industry, within a broader distribution network known as the Midwest Distribution Center (the "MDC") and the West Coast Distribution Centers (the "WDC" and together with the MDC, the "Distribution Centers"), and sold that inventory, invoiced customers, and collected the resulting receivables in the ordinary course. *See, e.g.*, *id.* ¶¶ 8–10, 19–29; Transcript of January 13, 2026 Hearing at 165:25–166:3, 167:21–168:3, 190:10–15 [Docket No. 1356] [hereinafter, the "Jan. 13 Tr."].

12. The Evolution facilities were one of several off-balance-sheet financing structures supporting that business. *See* First Day Declaration ¶¶ 34–35, 59–63. Patterson Inventory, LLC ("Patterson") and Starlight Inventory I, LLC ("Starlight" and together with Patterson, the "Evolution Borrowers") entered into separate uncommitted inventory finance agreements with Evolution: the Patterson agreement dated November 9, 2023, and the Starlight agreement dated March 28, 2024, each of which provided for up to $150 million in advances (together, the "Evolution Facilities"). *See Stipulation and Agreed Order Regarding Adequate Protection Among*

[6] Pursuant to Federal Rule of Bankruptcy Procedure 2008(b)(1), Ronald J. Sommers rejected the appointment as it relates to the following estates: Eagle Casting Holdings, LLC, Case No. 25-90490 (CML); Carnaby Inventory Holdings IV, LLC, Case No. 25-90464 (CML); Carnaby Inventory IV, LLC, Case No. 25-90466 (CML); Carnaby FA Holdings, LLC, Case No. 25-90468 (CML); Carnaby FA, LLC, Case No. 25-90473 (CML); and Carnaby Capital, LLC, Case No. 25-90460 (CML). Catherine Curtis currently serves as chapter 7 trustee administering these estates.

*Debtors and Evolution Credit Partners* at 2–4 [Docket No. 609] (the "Adequate Protection Stipulation"). Under each Evolution Facility, the applicable Evolution Borrower could buy inventory from FBG and its subsidiaries under purchase orders, using the value of such inventory to set a borrowing base, and establishing a lien on the assets of the applicable Evolution Borrower. First Day Declaration ¶ 61. Approximately $230 million in principal was outstanding as of the Petition Date. Adequate Protection Stipulation at 4.

13. As of the Petition Date, the inventory allegedly subject to the Evolution Facilities was held at 1100 and 1380 Corporate Drive, McHenry, Illinois (the "McHenry Warehouses"); 2701 Keystone Pacific Parkway, Patterson, California (the "Patterson Warehouse"); and 14528 Bonelli St., City of Industry, California (the "City of Industry Warehouse" and together with the McHenry Warehouses and the Patterson Warehouse, the "Warehouses"). *Id.* at 4 n.4. From the outset of the Chapter 11 Cases, the Debtors cautioned that inventory subject to a security interest under the Evolution Facilities may have been commingled with collateral securing the ABL Facility. First Day Declaration ¶ 95.

14. In practice, the Evolution SPV Debtors simply functioned as "way stations" for in-transit cash. *See Declaration of Charles M. Moore in Support of Confirmation of FBG Debtors' Chapter 11 Plan* ¶ 116 [Docket No. 3188]. The Evolution SPV Debtors had no employees of their own and apparently did not hold board meetings, with their limited functions being carried out by the FBG Debtors' employees. *Id.* ¶ 133. Patterson and Starlight purportedly agreed to buy inventory for about $180.2 million and $185.8 million, respectively, but "the SPVs held no inventory with which to make an in-kind exchange, no subordinated note was ever located,"[7] and

[7] Specifically, no form of promissory note has been located in respect to the Patterson SPV, and, for Starlight, the only form promissory note located was signed only by Starlight, does not specify a dollar amount owed, promises only to pay the outstanding principal of loans which may be made "from time to time" by the Seller (FBG), and states any loan amount should be specified in the books and records of Seller (FBG), but none ever was. Additionally, the form

the FBG Debtors received only about $119.8 million and $105 million, respectively. *Id.* ¶ 132. Put simply, Evolution financed inventory that the FBG Debtors bought, sold, shipped, invoiced, and collected on, and whose carrying costs the FBG Debtors bore. *See, e.g.*, Jan. 13 Tr. at 190:10–193:9.

## III. The Evolution Adequate Protection Stipulations

15. Apparently recognizing the Debtors could not simply stop selling BPI inventory immediately, Evolution agreed to a *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 216] (the "Initial AP Stipulation"). The Initial AP Stipulation permitted the Debtors to continue using the "Evolution Collateral" (defined to include the products and proceeds thereof) and required the Debtors to segregate cash "to the extent such property is identified as Evolution Collateral," with A&M to "exercise good faith efforts to identify" the same. *See* Initial AP Stipulation ¶¶ 1, 3. The parties did not specify any remedies for a violation of this (or any other) provision. *See id.*

16. Although Evolution had initially filed a number of objections (including to the Debtors' proposed postpetition financing),[8] these were withdrawn and the parties negotiated the Adequate Protection Stipulation, replacing and superseding the Initial AP Stipulation, which the Court entered on November 9, 2025. The Adequate Protection Stipulation allowed the Debtors to continue using the asserted Evolution collateral subject to the negotiated conditions therein. *See* Adequate Protection Stipulation ¶ 1. Specifically, the Debtors could use the asserted Evolution

note contemplated the payment of regular interest if any outstanding principal ever existed on account of the note, but there are no records of any payments, interest or otherwise, on account of such principal.

[8] *See, e.g.*, *Evolution Inventory Lender's Limited Objection to Debtors' Cash Collateral Motion* [Docket No. 459] (the "Evolution Cash Collateral Objection"); *Limited Objection of Evolution Inventory Lender to Application of Debtors for Authority to Retain and Employ Weil, Gotshal & Manges LLP as Attorneys for Debtors Effective as of Petition Date* [Docket No. 462].

Collateral but were required to comply with the "Collateral Maintenance Covenant" by maintaining the "Collateral Maintenance Threshold." The Adequate Protection Stipulation set the total Collateral Maintenance Threshold for the asserted Evolution Collateral at $335 million (with $170 million allocated to the Patterson Collateral and $165 million allocated to the Starlight Collateral (each as defined in the Adequate Protection Stipulation)). *See* Adequate Protection Stipulation ¶ 4(B). The Collateral Maintenance Covenant required the Debtors to maintain the asserted Evolution Collateral such that the "Collateral Value"—defined as "the sum of (A) the cost value of the Evolution Collateral that is inventory, plus (B) all cash deposited in the Segregated Accounts"—would equal or exceed $335 million on any applicable True-Up Date, meaning the end of each week. *Id.* Importantly, the Adequate Protection Stipulation expressly granted Evolution the right to terminate this arrangement *as the sole remedy* for the Debtors' uncured material breach. *See id.* ¶ 11.

**IV. The Adversary Proceedings**

17. Evolution's substantive claims to the inventory and its proceeds are the subject of two adversary proceedings. *See Evolution Credit Opportunity Master Fund II-B, L.P. v. First Brands Group, LLC et al.*, Adversary No. 25-03800 (CML) (Bankr. S.D. Tex.) (the "Inventory Adversary") and *Evolution Credit Opportunity Master Fund II-B, LP et al. v. First Brands Group, LLC et al.*, Adversary No. 26-03006 (CML) (Bankr. S.D. Tex.) (the "Receivables Adversary").

18. **The Inventory Adversary**. On October 31, 2025, Evolution sued the Debtors, and later the ABL Agent and the prepetition term loan agents, seeking a declaration that it holds perfected, first-priority liens on the SPV Debtors' assets, including the Warehouse inventory and its proceeds, and that the SPV Debtors, not BPI, own that inventory. *See* Adv. No. 25-03800, Docket No. 1. Motions to dismiss Evolution's First Amended Complaint were filed and are fully briefed. *See* Adv. No. 25-03800, Docket Nos. 1, 27, 32, 33, 46, 50, 51. On July 22, 2026, the SPV

Trustee and Evolution filed the *Joint Motion of Evolution and SPV Debtors' Trustee Ronald J. Sommers for an Order Amending the Case Caption and Authorizing the Filing of a Second Amended Complaint* [Adv. No. 25-03800, Docket No. 56], by which they seek to realign the SPV Debtors as plaintiffs and to file a second amended complaint. On September 25, 2026, Evolution moved for a Rule 16 scheduling conference. *See* Adv. No. 25-03800, Docket No. 60.

19. **The Receivables Adversary**. Separately, Evolution claims a lien on the non-factored receivables of eight FBG Debtors, including BPI, under a March 2023 receivables purchase agreement. *See, e.g.*, Adequate Protection Stipulation at 2–3. After an appeal (Civil Action No. 4:26-cv-00073) and remand, the Court entered the *Order Granting Evolution's Emergency Motion for Adequate Protection* [Docket No. 2127] requiring the Debtors to deposit $25.7 million into the factored receivables account. This was completed on March 19, 2026. *See Disclosure Statement for Joint Chapter 11 Plan of First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3020] (the "Disclosure Statement"). On May 29, 2026, the Court granted summary judgment in part against Evolution, holding that its financing statements did not perfect a security interest in the non-purchased receivables with priority over the DIP Lenders' perfected lien on those receivables, with priority as against the prepetition lenders being left for trial. *See* Summary Judgment Order [Adv. No. 26-03006, Docket No. 67]. In seeking leave to appeal, Evolution represented that, absent reversal, its remaining priority dispute with the prepetition lenders would be "academic." *See* Adv. No. 26-03006, Docket No. 73 ¶¶ 5, 10, 37, 53. The District Court denied leave to appeal and dismissed Evolution's appeal for lack of jurisdiction. *See* Adv. No. 26-03006, Docket No. 92.

## V. The Motion to Enforce and the January 20 Ruling

20. On December 23, 2025, Evolution filed its *Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution*

*Credit Partners* [Docket No. 1076] (the "Motion to Enforce"), contending that the Debtors had breached the Collateral Maintenance Covenant. Evolution sought an order from the Court compelling the Debtors to take the "Curative Actions" identified in the Adequate Protection Stipulation and, if the Debtors failed to do so, preventing the Debtors from making any further use of the asserted collateral. *See, e.g.*, Motion to Enforce ¶ 2.

21. The Debtors responded by filing the *Debtors' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Emergency Request for Use of Alleged Cash Collateral* [Docket No. 1280] (the "Cross Motion"), by which they challenged Evolution's characterization of events while making a cross motion for use of cash collateral generated from the Disputed Collateral.

22. The Court conducted two hearings on the Motion to Enforce and Cross Motion, one on January 13, 2026 and one on January 20, 2026. *See* Jan. 13 Tr.; Transcript of January 20, 2026 Hearing [Docket No. 1672] [hereinafter, the "Jan. 20 Tr."]. At the conclusion of the January 20, 2026 hearing, the Court ruled from the bench, finding in relevant part, that (i) the Debtors had breached the Collateral Maintenance Covenant and had not cured; and (ii) Evolution's sole remedy was termination of the Adequate Protection Stipulation. *See* Jan. 20 Tr. at 42:22–46:2, 51:20–52:3. Specifically, the Court stated that the Adequate Protection Stipulation contained "no remedy or specific performance," meaning that the Debtors "would not be required to . . . exercise any curative actions or kind of put any money in or put any segregated . . . any kind of cash in a segregated account." *Id.* at 45:4–22. The Court explained that, "just looking at the four corners" of the Adequate Protection Stipulation, the parties had agreed to "breach and termination," and that the stipulation had already expired by its terms on January 5. *Id.* at 46:1–2, 51:20–52:3. As a

result, "the Debtors are prohibited from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court." *Id.* at 46:1–7. The Court also pushed the lenders and Evolution to work together on formulating a path forward because the Court would not "accept . . . later on arguments that the Debtors somehow allowed this collateral to diminish on their watch." *Id.* at 50:21–51:3. Ultimately, the Court declined to require the Debtors to take *any actions* with respect to past breaches of the Adequate Protection Stipulation but simply clarified the Adequate Protection Stipulation was now terminated. Rather, as the Court summarized, "everything freezes now until subject to further order of the Court." *Id.* at 52:22–25.

23. No written order was entered; the docket reflects only that the Motion to Enforce was "resolved on the terms stated on the record." Courtroom Minutes [Docket No. 1405]. And as set forth above, the Court did not order the Debtors to identify, segregate, or restore any proceeds collected on or before January 20, 2026, but instead considered the Adequate Protection Stipulation terminated, meaning that the Debtors could not continue to use the disputed collateral (the "January 20 Ruling"). Evolution has not sought reconsideration of, or appealed, the January 20 Ruling.

**VI. The Segregation Motion**

24. On July 8, 2026, Evolution filed its *Emergency Motion to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3144] (the "Segregation Motion"), seeking an order requiring the Debtors to transfer at least $21.5 million (later conceded to be $21.2 million, of which $19.5 million was collected on or before January 20, 2026) "into a segregated account for Evolution's sole benefit, free and clear of any and all liens." Segregation Motion ¶ 21; *see also* Ex. A ¶ 11. The next day, the SPV Trustee filed the *Joinder of SPV Debtors' Trustee Ronald Sommers in Evolution's Emergency Motion to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3151]. In the Segregation Motion,



18743363

Evolution made many of the same arguments and misstatements that it does in the present Motion, but requested the segregation of $21.5 million rather than the deposit of that amount in the Court's registry.

25. On July 16, 2026, the Debtors filed the *Debtors' Objection to Emergency Motion of Evolution Credit Partners to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3218] (the "Debtors' Objection"), which is incorporated as if fully set forth herein. As the Debtors correctly explained, the January 20 Ruling "did not require the Debtors take . . . curative actions or post cash collateral," required only that they stop purchasing and using the asserted Evolution collateral, and thus imposed no obligation "to retroactively identify and segregate past proceeds." Importantly, the Debtors made clear that they had identified and segregated all proceeds from alleged Evolution collateral received after January 20, 2026, in full compliance with the Court's ruling. Debtors' Objection ¶¶ 4–5, 16–17. The Debtors further showed that the Segregation Motion sought injunctive relief that requires an adversary proceeding; that Evolution, as a lender only to the Evolution Borrowers, could not invoke section 363 against the FBG Debtors' cash as if it held traceable cash collateral of those estates; and that, given the FBG Debtors' cash burn, it was "highly unlikely that any cash receipts received between late September and January still exist." *Id.* ¶¶ 2, 5, 28.

26. As the Debtors also explained, the FBG Debtors replenished most inventory transferred to them with replacement inventory of equal value. *Id.* ¶ 29. Indeed, according to Evolution, the inventory in which it asserts an interest was worth approximately $300 million as of October 3, 2025. *See* Evolution Cash Collateral Objection ¶ 27. But as of January 20, 2026, the value of this collateral had only fallen to approximately $295 million. *See* Ex. 1 ¶ 11.

## VII. The Motion

27. Since the January 20 Ruling, the Debtors had segregated, and the Trustee continues to segregate, all proceeds of the asserted Evolution collateral and are holding $1.9 million in a segregated account as of October 2, 2026. Debtors' Objection ¶ 22; *see also* Ex. 1 ¶ 10.

28. Despite the January 20 Ruling and the Debtors' subsequent compliance, on September 3, 2026, days into the Trustee's tenure, the SPV Trustee wrote to the Trustee's counsel demanding that $21.2 million be deposited into the Court's registry. *See* Motion at Ex. B. Twelve days later, Evolution filed the Motion, which the SPV Trustee then joined.

29. At its core, the Motion is asking the Court to ignore the Adequate Protection Stipulation and reconsider its January 20 Ruling. Even if the Court were inclined to engage in such an exercise, which it clearly should not, the only funds held by the chapter 7 estates that are traceable to Evolution's disputed collateral are already segregated and being held in accordance with the Court's January 20 Ruling. *See* Ex. 1 ¶¶7–11. The Trustee has no issue with placing those funds (approximately $1.9 million) in the registry of the Court pending the outcome of the Evolution adversary proceedings. *See id.* ¶ 10. However, all remaining estate unrestricted cash held by the estates is DIP Collateral under paragraph 4(D) of the Adequate Protection Stipulation and the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "Final DIP Order"). *See also* Ex. 1 ¶ 11.

30. Accordingly, other than with respect to the $1.9 million in segregated funds (which is the entirety of the alleged Evolution collateral received after January 20, 2026), the Motion has no merit and should be denied. *See* Ex. 1 ¶¶ 7–11.

## ARGUMENT AND AUTHORITIES

### I. The Motion Is Procedurally Flawed as Evolution Seeks Relief for Which an Adversary Proceeding Is Required

31. By the Motion, Evolution seeks to (i) require the Trustee to transfer no less than $21.2 million into the Court's registry pending resolution of the Inventory Adversary, (ii) require the Trustee to provide an accounting, including on a weekly basis, and (iii) prohibit the Trustee from using any funds collected on account of post-petition accounts receivable from the Warehouses. *See* Motion ¶ 7. In other words, Evolution requests both mandatory and prohibitory injunctive relief on a preliminary basis. *See, e.g.*, *RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 2021 WL 1318008, at *2 (W.D. Tex. Apr. 8, 2021) (observing that a "prohibitory injunction" is "one that 'restrains'" action while a "mandatory injunction" is "one that orders a responsible party to 'take action'" (citation omitted)).

32. Bankruptcy Rule 7001(g) labels "a proceeding to obtain an injunction or other equitable relief" as an adversary proceeding. This Court's precedent treats that rule as prohibiting injunctive requests sought by contested motions. *See In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 290 (Bankr. S.D. Tex. 2021) (Rodriguez, J.) ("This Court will not entertain a request for injunctive relief in a contested matter . . . because contested matters, as opposed to adversary proceedings, 'require fewer procedural protections' and 'are generally designed for the adjudication of simple issues.'" (citation and footnote omitted)); *see also In re Zale Corp.*, 62 F.3d 746, 762 (5th Cir. 1995) ("Under Rule 7001, an injunction requires an adversary proceeding."); *accord In re Realty Sw. Assocs.*, 140 B.R. 360, 365 (Bankr. S.D.N.Y. 1992) (holding that a return of cash collateral cannot be accomplished through a contested motion under section 363 but instead requires an adversary proceeding).



18743363

33. Although the Motion seeks relief that lasts until the resolution of the Inventory Adversary, it was not filed there but instead seeks both mandatory and prohibitory injunctive relief as a contested matter. Evolution has offered no justification for that decision. The Motion does not actually suggest that funds in which Evolution asserts an interest have been, or are being, dissipated on the Trustee's watch post-conversion. *Cf.* Ex. 1 ¶¶ 7–11. Rather, Evolution insists that it needs emergency injunctive relief simply because the Trustee did not respond to Evolution's demands as quickly as it would have preferred. That does not justify relief on the current timeline or cleanse the Motion of its procedural flaws.

34. Separately, in seeking to dictate what is done with the Debtors' cash collateral, the Motion also presumes what Evolution has yet to establish: that it holds a valid, first priority interest in the funds it seeks. Bankruptcy Rule 7001(b) requires, with exceptions not relevant here, that every determination of the "validity, priority, or extent of a lien or other interest in property" be made in an adversary proceeding. Fed. R. Bankr. P. 7001(b). The validity, priority, and extent of that interest are the subject of the Inventory Adversary, where motions to dismiss remain pending, and competing liens on the same collateral are asserted by, among others, the DIP Lenders and the ABL Agent. *See supra* ¶¶ 18–19. Indeed, the Motion itself asserts that Evolution is "the sole secured creditor" with respect to these assets. *See* Motion ¶ 1. That issue remains to be seen pending its resolution in the Inventory Adversary, where it belongs. Until that happens, Evolution cannot act as though it has. *See, e.g.*, *In re Cone Constructors, Inc.*, 265 B.R. 302, 311 (Bankr. M.D. Fla. 2001) (finding it was inappropriate to presume a creditor's first priority security interest rather than making that determination in an adversary proceeding).

## II. The Motion Fails on Its Merits

### A. The January 20 Ruling Is Fatal to the Motion

35. The January 20 Ruling determined that Evolution's only remedy with respect to proceeds collected under the Adequate Protection Stipulation was the termination of the stipulation. Evolution cannot use the Motion to obtain the backward-looking remedy the Court declined to award on January 20.

36. Evolution admits that the January 20 Ruling did not require anything from the Debtors with respect to proceeds received or spent prior to the January 20 Ruling: "To be clear, the FBG Debtors were not required to segregate or refrain from using post-petition accounts receivable of Evolution Collateral—the accounts receivable that are the subject of the instant dispute—while the Adequate Protection Stipulation was active." Motion ¶ 18. Evolution has thus characterized the invocation of the January 20 Ruling as a "straw man" because Evolution's request "does not rest on a theory that the January 20 Ruling imposed a freestanding, backward-looking segregation obligation." *See Evolution Credit Partners' Reply in Support of Motion to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3464] (the "Evolution Segregation Reply"). But that is precisely what the Motion does.

37. Initially, the Debtors used the alleged Evolution collateral and its proceeds pursuant to the Initial AP Stipulation , which authorized the use of "Evolution Collateral and the proceeds thereof in the ordinary course of business." Initial AP Stipulation ¶ 1. The subsequently entered Adequate Protection Stipulation continued that ordinary course use through the Interim Period. Adequate Protection Stipulation ¶ 1. It also required the Debtors to replenish inventory levels at the Warehouses or post cash collateral into a segregated account to the extent of any inventory level deficit. *Id.* ¶ 4. The Adequate Protection Stipulation did not require the Debtors to proactively segregate any and all collections related to Evolution's alleged inventory. And prior to the January

20 Ruling, the Debtors in fact collected and used receipts pursuant to the agreements set forth in the Adequate Protection Stipulation, in the ordinary course of business, including to replenish Evolution's alleged inventory. Debtors' Objection ¶ 29. The Motion does not genuinely dispute this. *See, e.g.*, Motion ¶ 18.

38. The situation for the Debtors fundamentally changed on January 20, 2026, when the Court ruled that "the Debtors are prohibited from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court." Jan. 20 Tr. at 46:1–7. After that point, the Debtors stopped all movement of the asserted Evolution Collateral and took steps to segregate any proceeds generated therefrom. Disclosure Statement at 65; *see also* Ex. 1 ¶¶ 7–10. However, at the time, neither the Debtors nor the SPV Debtors tracked collections at the Warehouse level (i.e., below the business unit (BPI) level). Debtors' Objection ¶¶ 18, 21; *see also* Ex. 1 ¶ 8.

39. Accordingly, the Debtors and Evolution agreed to determine what collections were proceeds of Evolution's alleged collateral by tracking 100% of cash proceeds of all postpetition sales of inventory sourced from the MDC or WDC as an overinclusive proxy for inventory coming from the Warehouses. Debtors' Objection ¶¶ 18, 21; *see also* Ex. 1 ¶ 9. Using that agreed methodology, the Debtors segregated approximately $1.9 million collected after January 20, 2026. *See* Ex. 1 ¶¶ 9–10. The Trustee has held those funds since conversion and continues to hold them. *See* Ex. 1 ¶ 10. In other words, Evolution overlooks that both the Debtors and the Trustee have abided by the Court's warning at the January 20 hearing that it would not accept later arguments that the Debtors "allowed this collateral to diminish on their watch." Jan. 20 Tr. at 50:21–51:3.

40. The remaining $19.5 million of the $21.2 million was collected on or before January 20, 2026 (*collected before the January 20 Ruling)*, which is subject to the Motion, as both the Initial AP Stipulation and the Adequate Protection Stipulation permitted, and is no longer in

the FBG Debtors' possession. *See* Ex. 1 ¶ 11. Evolution acknowledges this. Motion ¶ 38. Nevertheless, Evolution asks the Court to look instead to the "more than sufficient cash on the FBG Debtors' balance sheet." Motion ¶ 2. But apart from the funds segregated under the January 20 Ruling, the estates' cash is entirely comprised of DIP Collateral, both under the Final DIP Order and under paragraph 4(D) of the Adequate Protection Stipulation. *See* Ex. 1 ¶ 11. Evolution has failed to establish (or even attempted to establish) otherwise.

41. Even on Evolution's own theory, a $21.2 million deposit bears no relationship to any harm. Evolution's protected interest (to the extent it exists) is the value of its collateral, and adequate protection compensates only for diminution in that value. Proceeds that were recycled into replacement inventory at the Warehouses did not diminish Evolution's position. They became the inventory Evolution still claims in accordance with the Adequate Protection Stipulation. Requiring the estate to post the gross receipts on top of the replenished inventory would credit Evolution twice for the same value. At most, the net decline of approximately $5 million as of June 26, 2026, is the measure of any diminution claim, and the Adequate Protection Stipulation transforms that claim into liens on assets of the Evolution Borrowers, not the FBG Debtors. *See* Adequate Protection Stipulation ¶ 5; Debtors' Objection ¶¶ 14, 29; Ex. 1 ¶ 11.

42. Accordingly, even if the Court were inclined to order a deposit into the registry, any deposit should be limited to the approximately $1.9 million the Debtors segregated under the January 20 Ruling, which the Trustee continues to hold pending resolution of the Receivables Adversary. *See* Ex. 1 ¶ 10. Nothing in the record or under any applicable law supports a deposit of any other estate funds—especially funds encumbered by superior lien rights.

### B. Evolution Has Not Established a Factual or Legal Basis to Order the Trustee to Deposit *Any* Amount in the Court's Registry

#### 1. Section 363(c) Requires Nothing More Than What the Trustee Is Already Doing

43. Evolution invokes section 363(c)(2) and section 363(c)(4), but neither supports the relief it seeks. Section 363(c)(2) provides that the trustee "may . . . not use, sell, or lease cash collateral" absent consent or court authorization. 11 U.S.C. § 363(c)(2). Section 363(c)(4) requires the trustee to "segregate and account for any cash collateral in the trustee's possession, custody, or control." *Id.* § 363(c)(4). But as set forth above, the Trustee is already complying with both of these provisions in accordance with the Court's January 20 Ruling. Section 363 requires nothing more with respect to the $1.9 million that is already sitting unused in segregated accounts.

44. To the extent Evolution asks for anything beyond that, it is not grounded in section 363(c), the Initial AP Stipulation, or the Adequate Protection Stipulation. *See Realty Sw. Assocs.*, 140 B.R. at 365 (noting that section 363 does not authorize a court to compel return of a creditor's cash collateral" and that "[t]he return of cash collateral is relief that is properly brought by an adversary proceeding"). Section 363, like the Adequate Protection Stipulation, is forward-looking, not restorative. Moreover, other than the funds that have been segregated pursuant to the Court's January 20 Ruling, the only cash collateral left in these estates is subject to the liens created by the Final DIP Order. "Nothing in the Bankruptcy Code, however, appears to authorize a bankruptcy court to prime a secured creditor as a kind of adequate protection for the use of cash collateral." *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 758 (S.D. Fla. 2010).

45. Nor can Evolution carry its burden on the threshold question of whose property generated these proceeds. Evolution's claim depends on the premise that the Evolution Borrowers, not BPI, owned the Warehouse inventory. That is a central disputed question in the Inventory Adversary. *See supra* ¶ 18. If BPI owned the inventory, as the Debtors have maintained, then the

inventory and its proceeds were property of an FBG Debtor, subject to the liens of the DIP Lenders and the prepetition lenders, and were never Evolution's collateral at all. Evolution bears the burden of proof on the validity, priority, and extent of its asserted interest, 11 U.S.C. § 363(p)(2), and it cannot carry that burden by assuming the answer to the very question the Inventory Adversary has yet to decide. *See* 11 U.S.C. § 363(p)(2); *see also* Fed. R. Bankr. P. 7001(b).

46. Section 363 simply cannot justify the rather extraordinary relief the Motion seeks.

**2. The Equities Weigh Heavily Against the Motion**

47. In addition to section 363, the Motion invokes section 105 based on what it alleges are violations of the Adequate Protection Stipulation, the January 20 Ruling, and the Conversion Order. These arguments are not persuasive.

48. First, the Court has already decided the consequence of the Debtors' breach of the Adequate Protection Stipulation with its January 20 Ruling. As discussed above, the breach was not over the Debtors' failure to segregate proceeds of Evolution's alleged collateral—that was not required under the Adequate Protection Stipulation. It was for failure to maintain the Collateral Maintenance Threshold and the Court prescribed a remedy based on the record before it and the "four corners" of the Adequate Protection Stipulation. Since the January 20 Ruling, the Debtors (and after the conversion, the Trustee) have complied with the Court's ruling and the Conversion Order. *See* Ex. 1 ¶¶ 7–10. Invoking section 105 does not make Evolution's position any more compelling.

49. Moreover, setting aside that the January 20 Ruling precludes the relief sought by the Motion, the case relied upon by Evolution, *Four Seasons*, illustrates why the relief it seeks is particularly inappropriate here. *See* Motion ¶ 33 (citing *In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764 (Bankr. E.D. Tex. 2001)). In that case, after a conversion to chapter 7, a creditor asked for a replacement lien on all unencumbered estate assets and a superpriority administrative

claim because the debtor in possession "wholly failed to segregate or to account for the sales proceeds." *Four Seasons*, 263 B.R. at 769. While the court recognized its power to rectify a misuse of collateral, it noted that "the efficacy of any particular remedy . . . must be influenced by the current posture of the case." *Id.* at 770. In a chapter 7 liquidation, where unsecured creditors "may look solely to a limited pool of assets" and a trustee has been appointed, the requested relief "punishes the wrong parties" and "would impose the burden for such restitution upon parties who are wholly innocent of any wrongdoing." *Id.* at 771. The court explained that "[t]he misappropriation of one creditor's property cannot serve as a proper justification for the redistribution of unrelated assets to the detriment of innocent parties" as "two wrongs do not make a right," and it declined "to punish unsecured creditors and unsuspecting administrative claimants in a liquidation case for the sins of a former debtor-in-possession." *Id.* at 771.

50. Indeed, stripped of its labels, Evolution effectively seeks a prejudgment freeze of $21.2 million of estate assets for a creditor whose claimed interest in those assets has not been adjudicated, and in most instances has not even been asserted. Notably, the only adjudicated ruling on any of Evolution's asserted liens found it unperfected and primed by the DIP Lenders. *See supra* ¶ 19. The Supreme Court has squarely held that federal courts lack this equitable authority. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 323, 333 (1999) (holding that a federal court lacks the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien exists and which an alleged equitable interest is not the subject of the dispute). And while Evolution may have been secured in a greater amount, those proceeds are no longer held by the estates and Evolution has no secured interest in what remains—all of which is encumbered by the superior lien of the DIP Lenders. *See Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 160–63 (2d Cir. 2026)

(vacating an asset freeze under *Grupo Mexicano* where the movant sought a substitute for lost collateral rather than specific property); *see also* Ex. 1 ¶ 11. To be clear, Evolution simply cannot trace anything beyond the segregated funds, and it appears to be asking the Court to impound estate cash as security for a damages claim, which is strictly forbidden by *Grupo Mexicano*.

## RESERVATION OF RIGHTS

51. The Trustee reserves all rights, claims, and defenses with respect to Evolution's asserted interests in property of the FBG Debtors' estates, including, without limitation, under sections 544, 550, and 551 of the Bankruptcy Code, and nothing herein shall be construed as a concession of the validity, priority, or extent of any interest asserted by Evolution or any other party.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order denying the Motion and granting the Trustee relief as is equitable and just.

Houston, Texas
October 12, 2026

Respectfully submitted,

By: */s/ Joshua W. Wolfshohl*

**PORTER HEDGES LLP**
Joshua W. Wolfshohl (TX 24038592)
Eric M. English (TX 24062714)
M. Shane Johnson (TX 24083263)
Grecia V. Sarda (TX 24132092)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 226-6248
jwolfshohl@porterhedges.com
eenglish@porterhedges.com
sjohnson@porterhedges.com
gsarda@porterhedges.com

**PROPOSED COUNSEL FOR THE CHAPTER 7 TRUSTEE, EVA S. ENGELHART**

**CERTIFICATE OF SERVICE**

I certify that on October 12, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl