**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 7** |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**THE AD HOC GROUP'S OBJECTION TO EVOLUTION'S EMERGENCY MOTION TO COMPEL TURNOVER AND DEPOSIT OF DISPUTED POST-PETITION ACCOUNTS RECEIVABLE PROCEEDS INTO THE COURT REGISTRY**

The ad hoc group represented by the undersigned counsel (the "Ad Hoc Group") hereby files this objection (the "Objection") to the *Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry* [Docket No. 3792] (the "Motion").[2] This Objection also incorporates by reference the objection filed by the Ad Hoc Group (at Docket No. 3208) to the Segregation Motion.[3] The Ad Hoc Group also joins the *Trustee's Objection to the Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry* [Docket No. 3879] (the "FBG Trustee's Objection"), filed contemporaneously herewith by Eva S. Engelhart, the chapter 7 trustee for the FBG Debtors (the

---

[1] A complete list of the Debtors in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 7 cases is Eva Engelhart, Chapter 7 Trustee c/o Porter Hedges LLP, Joshua W. Wolfshohl, 1000 Main St., 36th Floor, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the FBG Trustee's Objection (as defined below), the Evolution AP Stipulation (as defined below), or the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 608] (the "Final DIP Order"), as applicable.

[3] *Emergency Motion of Evolution Credit Partners to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3144] (the "Segregation Motion").

"FBG Trustee") and incorporates by reference the background and arguments set forth therein, which it does not repeat here. In support thereof, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Motion is the latest of Evolution's serial filings in these cases. This time, Evolution's emergency request is directed at the same underlying dispute that was previously resolved in January and is nearly identical to *another* emergency motion Evolution filed in July. In each of these motions, Evolution seeks to tie up assets in which it has no property interest, reverse a prior order of this Court, and intercept cash belonging to the DIP Secured Parties that will fund the prosecution of claims against Evolution and other parties that facilitated the fraud precipitating these cases. Evolution may regret its agreements in this case, including agreeing to the Evolution AP Stipulation[4] and Final DIP Order, but such regret is not sufficient cause to take the DIP Secured Parties' property. As such, Evolution's Motion lacks merit and should be denied.

2. In the Motion, Evolution attempts to seize the Remaining DIP Cash Collateral (defined *infra*), which sits in the FBG Debtors' bank accounts that are subject to the DIP Secured Parties' automatically perfected, first-priority liens. But the Court should deny the Motion for several reasons. *First*, Evolution has no property interest in the Remaining DIP Cash Collateral. *Second*, the Court has already rejected the backward-looking segregation requirement in its January 20 Ruling that underlies Evolution's theories—the FBG Debtors have complied fully with the January 20 Ruling by segregating cash that is arguably proceeds of the disputed inventory collateral collected since the January 20 Ruling. *Third*, the Evolution AP Stipulation allowed inventory to be transferred to the FBG Debtors free and clear of Evolution's interests, inalterably cutting off Evolution's interests in the transferred inventory (and its proceeds). *Fourth*, even if

---

[4] *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 609] (the "Evolution AP Stipulation").

Evolution has an interest in that transferred inventory (it does not), Evolution offers no tracing evidence to the Remaining DIP Cash Collateral in the FBG Debtors' accounts, and *Grupo Mexicano* bars the asset freeze it requests.

3. While the Motion is meritless, the Ad Hoc Group cannot risk continued attempts by purported creditors to seize the DIP Secured Parties' property. Defending against these attempts is both time-consuming and expensive for estates with clear liquidity constraints. As a result, and as authorized by the Final DIP Order and the Forbearance Stipulation,[5] the DIP Lenders intend to seek relief from the automatic stay in a forthcoming pleading to obtain possession of their cash collateral.[6] Recognizing the FBG Debtors' need for cash to fund wind-down activities and prosecute estate claims, and based on the parameters of the Forbearance Stipulation, the Ad Hoc Group anticipates that the FBG Trustee will consent to that relief by stipulation as part of a broader case settlement that has been under negotiation since the Conversion Date. The Ad Hoc Group further anticipates that the settlement will include the FBG Trustee seeking approval of additional financing provided by certain members of the Ad Hoc Group. That new capital would be held in new, separate, and segregated accounts to avoid these nuisance disputes going forward.

4. For the reasons stated in the FBG Trustee's Objection and herein, the Ad Hoc Group respectfully asks the Court to deny the Motion and to use its inherent authority to prevent further abuses of adequate process.

---

5 *Stipulation and Agreed Order Regarding Forbearance from the Exercise of Remedies Arising from the Occurrence of the Maturity Date Under the DIP Credit Agreement* [Docket No. 3506] (the "Forbearance Stipulation").

6 *See* Final DIP Order ¶ 12(f) (providing for DIP Secured Parties to seek modification of the automatic stay on limited notice to, among other things, freeze account balances and enforce their rights against DIP Collateral).

## OBJECTION

### A. Evolution Does Not Have a Property Interest in the Remaining DIP Cash Collateral

5. The cash Evolution seeks to intercept unequivocally belongs to the FBG Debtors and is subject to DIP Liens. It sits in a concentration account held by First Brands Group LLC at Bank of America, N.A. (account ending in 6975) (the "FBG Concentration Account"), which is an FBG Debtor account that is subject to automatically perfected, first-priority liens in favor of the DIP Secured Parties under the terms of the Final DIP Order. *See Declaration of Daniel Jerneycic in Connection with Trustee's Objection to the Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds into the Court Registry* [Docket No. 3879-1] (the "Jerneycic Declaration") ¶ 7; Final DIP Order ¶ 11 (providing for automatically and properly perfected DIP Liens on all property of the Debtors, including the Parent Guarantors). Given the breadth of the Final DIP Order, a Debtor bank account or cash under the Debtors' control can, by agreement, be carved out from DIP Liens, but only with the DIP Secured Parties' express consent. *Id.* Certain other parties in these cases negotiated for similar relief, including the segregation of certain factored receivables under the Cash Management Order.[7] Evolution did not here.

6. Further, the Final DIP Order and corresponding DIP Credit Agreement unequivocally required $50 million in minimum liquidity to be maintained by the Debtors at all times. DIP Credit Agreement [Docket No. 289-1] § 7.14; Final DIP Order ¶ 2(a). In connection with the chapter 11 plan process, that minimum liquidity requirement was reduced to $25 million on or around April 2026 (the "Remaining DIP Cash Collateral"). *See Joint Chapter 11 Plan of*

[7] The Cash Management Order [Docket No. 604] directed the Debtors to segregate certain collections, subject to an important carve-out that Evolution conveniently fails to acknowledge: "provided that the Debtors shall not be required to segregate any funds received on account of any ***postpetition sale*** and related invoice." Cash Management Order ¶ 6 (emphasis added).

*First Brands Group, LLC and Certain Affiliated Debtors* [Docket No. 3019] § 2.3(d). The $25 million minimum liquidity requirement remains in effect today and can only be modified with the consent of the DIP Secured Parties. The Remaining DIP Cash Collateral currently sits in several of the FBG Debtors' bank accounts, including the FBG Concentration Account. *See* Jerneycic Declaration ¶ 7. Each of those bank accounts is subject to DIP Liens that automatically attach to and perfect on the cash itself, and the FBG Debtors are expressly prohibited from opening accounts on any other terms. *See* Final DIP Order ¶¶ F, 11, 22(n)–(o) (defining Cash Collateral to include all cash of DIP Loan Parties "wherever located and held, including cash in deposit accounts," granting DIP Liens on all DIP Collateral, subjecting all cash receipts to DIP Liens, and prohibiting DIP Loan Parties from opening any deposit account not subject to DIP Liens). The Remaining DIP Cash Collateral is therefore subject to the DIP Secured Parties' first-priority liens. *Id.* ¶ 11. No party other than Evolution has disputed this reality.

7. At bottom, Evolution's theory is that it ***should*** have access to the Remaining DIP Cash Collateral, despite the fact that: (i) Evolution consented to the terms of the Final DIP Order and the Evolution AP Stipulation, (ii) Evolution's claims to inventory (which are disputed and subject to an ongoing adversary complaint initiated by Evolution) are held by a sham entity that was used to perpetrate the prepetition First Brands fraud, and (iii) the assets held in the Starlight and Patterson estates may ultimately be insufficient to repay Evolution's purported claims (which are also subject to forthcoming estate claim litigation). If the Court were to adopt Evolution's faulty position, it would functionally make the DIP Secured Parties ***nonconsensual postpetition guarantors of Evolution's prepetition claims against the Starlight and Patterson Debtors.*** Evolution's argument should be wholly rejected.

**B. Evolution Is Trying to Re-Litigate This Court's January 20 Ruling**

8. Attempting to seize the Remaining DIP Cash Collateral, Evolution argues that the Court previously required the FBG Debtors to identify and segregate inventory sale proceeds retroactively from the Petition Date to January 20, 2026, as a remedy for breaching the Evolution AP Stipulation. *See* Motion ¶¶ 2, 30, 35(a). That is wrong.

9. The Court held the opposite. At a hearing on January 20, Evolution argued, as they do here, that the Debtors should be required to segregate any amounts generated from any sales of any Brake Parts Inc. LLC's ("**BPI**")[8] inventory going back to the Petition Date as a remedy for breaching the Evolution AP Stipulation. *See* Jan. 20, 2026 Hr'g Tr. [Docket No. 1672] (the "Jan. 20 Tr.") at 30:25–31:6, 34:1–6, attached hereto as **Exhibit A**. The Court rejected that argument, stating that "[t]here is no remedy for specific performance in [the Evolution AP Stipulation] so that the Debtor is not required itself to provide any kind of curative action." Jan. 20 Tr. at 45:4–8. Further, the Debtors "would not be required to . . . exercise any curative actions . . . or put . . . any kind of cash in a segregated account." *Id.* at 45:15–19. Therefore, nothing in the Court's ruling required the Debtors to retroactively identify and segregate past proceeds collected that may have been generated from inventory previously located at the relevant Warehouses. *See Debtors' Objection to Emergency Motion of Evolution Credit Partners to Compel Segregation and Turnover of Post-Petition Accounts Receivable Collected* [Docket No. 3218] (the "Debtors' July Objection") ¶¶ 4, 17, 20 (explaining that the January 20 Ruling imposed no retroactive segregation obligation); *see also* FBG Trustee's Objection ¶¶ 22–23, 35–36 (*same*).

10. Instead, the Debtors were only required to (a) following the decision, cease selling the inventory at the Warehouses and (b) *going forward*, segregate any proceeds from prior sales

---

[8] BPI is an FBG Debtor entity.

of BPI's inventory in the Warehouses in a separate account until the adversary proceeding styled *Evolution Credit Opportunity Master Fund II-B, L.P. v. First Brands Group, LLC*, Adv. No. 25-03800 (CML) (Bankr. S.D. Tex.) (the "Inventory Adversary"), determines who owns those amounts. They did so. Following the January 20 Ruling, the Debtors and Evolution agreed on a methodology under which the Debtors would track, on a go-forward basis, 100% of the cash proceeds of all postpetition accounts receivable related to inventory sold from the Distribution Centers, a necessarily overinclusive approach because the Distribution Centers include facilities in addition to the Warehouses. *See* Jerneycic Declaration ¶ 9; Debtors' July Objection ¶¶ 17, 21, 22. Using that methodology, the Debtors deposited all such receipts collected after January 20, 2026 into segregated accounts (the "Post-January Cash"), which have not been used or commingled with other estate funds and which the FBG Trustee has maintained since conversion. Jerneycic Declaration ¶ 10. The Post-January Cash totals approximately $1.9 million today. *Id.*; *see also* FBG Trustee's Objection ¶¶ 1, 39.[9] That segregated Post-January Cash is wholly separate and apart from the Remaining DIP Cash Collateral. Jerneycic Declaration ¶ 10.

11. The January 20 Ruling makes legal and logical sense. As the FBG Debtors explained, the majority of the $21.2 million cash Evolution claims (approximately $19.5 million) was "collected while the [Evolution AP Stipulation] was in place, and the FBG Debtors replenished most inventory transferred to them with replacement inventory of equal value. By operation of the [Evolution AP Stipulation], that replenished inventory therefore transferred to the FBG Debtors free and clear of any interests." *See* Debtors' July Objection ¶ 29; Jerneycic Declaration ¶ 11; *see also* Evolution AP Stipulation ¶ 4(E) (providing that transfers of inventory to FBG Debtors were "free and clear of any and all liens, claims, or encumbrances"). If Evolution

---

[9] The Ad Hoc Group does not object to the Post-January Cash remaining segregated or being deposited into the Court's registry.

were given the right to collect against ***both*** the proceeds of the disputed inventory that it agreed could be transferred (free and clear of its or anyone else's interests) to the FBG Debtors under the Evolution AP Stipulation ***and*** the replacement inventory, Evolution would essentially double dip on such amounts. More egregiously, the replacement inventory was undoubtedly ***funded by the proceeds of the $1.1 billion DIP Facility***, the same proceeds it now seeks to intercept.

## C. The Final DIP Order and Evolution AP Stipulation's Plain Language Defeat Evolution's Arguments

12. Evolution's arguments regarding the Final DIP Order and the Evolution AP Stipulation are belied by those agreements' plain language.

13. Despite the affirmative statements in the Motion alleging otherwise, Evolution was not, under any provision of the Evolution AP Stipulation, entitled to "segregate[d] collections of accounts receivable generated from sales of Evolution's inventory." *See* Motion ¶ 12. Instead, the use of Segregated Accounts (as defined in the Evolution AP Stipulation) was an ***optional*** election whereby the FBG Debtors—in exchange for taking the inventory free and clear of all liens or interests—could either (i) place cash in a Segregated Account ***or*** (ii) use replacement inventory to meet their collateral maintenance requirements under the stipulation. Evolution AP Stipulation ¶ 4(A). This option is expressly and solely made "at the FBG Debtors' Election." *Id.* ¶ 4(C). The FBG Debtors elected to use replacement inventory, not segregated cash. The moment inventory was transferred[10] to the FBG Debtors, the Evolution Borrowers' and Evolution's interests in the collateral were cut off and Evolution could look solely to the replacement inventory to recover on its claims. And as this Court previously ruled, the sole remedy for failing to replace inventory or breaching the Evolution AP Stipulation was the prohibition from further use of BPI's inventory.

[10] Whether any transfer was required *ex ante* is, of course, the subject of the Inventory Adversary. But even assuming the inventory did not already belong to the FBG Debtors, the Evolution AP Stipulation cut off any disputed interest upon transfer to the FBG Debtors in accordance with paragraph 4.

*See id.* ("In the event the Debtors fail to [replace inventory within 5 business days], the Debtors shall be prohibited from continuing to purchase Evolution Collateral.").

14. Any inventory previously transferred remained the FBG Debtors' property free and clear of Evolution's or the Evolution Borrowers' interests. Paragraph 4(E) of the Evolution AP Stipulation makes that clear:

> Evolution's right, title, and interest in, to, and under such Evolution Collateral (including the Excess Cash) that is inventory shall be transferred to the applicable FBG Debtor ***free and clear*** of any and all liens, claims, or encumbrances. Transfers of Evolution Collateral (including the Excess Cash) pursuant to this Stipulation to a FBG Debtor shall constitute a legal, valid, binding, and effective transfer of such Evolution Collateral, and ***no such transfer shall be subject to avoidance under any provision of the Bankruptcy Code or otherwise***. Each FBG Debtor, pursuant to a sale under this Stipulation, shall be deemed to be a good faith purchaser of the Evolution Collateral. Pursuant to section 363(m) of the Bankruptcy Code, if this Stipulation is reversed or modified on appeal, such reversal or modification shall not affect the validity of any transfer of Evolution Collateral or Excess Cash to the FBG Debtors pursuant to this paragraph 4(E).

Evolution AP Stipulation ¶ 4(E) (emphasis added). Free and clear means free and clear. See, *e.g.*, 11 U.S.C. § 363(f)(2) (authorizing sale of property free and clear of an entity's interest if "such entity consents"); *Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011) (explaining that free and clear bankruptcy sale eliminates both *in rem* property rights in transferred property and *in personam* claims against the purchaser); *see also Sherwin Pipeline, Inc. v. Sherwin Alumina Co. (In re Sherwin Alumina Co.)*, 952 F.3d 229, 234 (5th Cir. 2020) (explaining that free and clear sale eliminates all encumbrances on sold property and is not subject to collateral attack). And those transfers are final and unassailable by appeal or modification of this Court's order approving the Evolution AP Stipulation, including by

virtue of section 363(m). Thus, Evolution simply has no property interest in inventory (or its proceeds) transferred on or before January 20, 2026.

15. Evolution argues that paragraph 5 of the Evolution AP Stipulation somehow requires a different result. But paragraph 5 is in accord:

> Subject to the Evolution Collateral Review and reservations set forth in paragraph 6 herein, Evolution will retain, and the Bankruptcy Court hereby grants, a first-priority, automatically perfected lien on any Evolution Collateral and the proceeds thereof ***(other than Evolution Collateral and Excess Cash transferred pursuant to paragraph 4 herein)***, including, without limitation, cash collateral, and will receive, and the Bankruptcy Court hereby grants, as adequate protection of the interests of Evolution in the Evolution Collateral ***(other than Evolution Collateral and Excess Cash transferred pursuant to paragraph 4 herein)*** against any diminution in value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition first-priority security interests in and ***liens on all*** of the presently owned or hereafter acquired property and ***assets of the Evolution Borrowers***.

Evolution AP Stipulation ¶ 5 (emphasis added). Thus, property transferred to the FBG Debtors under the Evolution AP Stipulation is expressly carved out from any of Evolution's liens—Evolution holds liens only on "property and assets of the Evolution Borrowers." *Id.* In other words, Evolution's property rights under paragraph 5 (i) are expressly limited to Evolution Collateral that was ***not*** transferred pursuant to paragraph 4 of the Evolution AP Stipulation and (ii) extend ***only*** to presently owned or hereafter acquired property of the ***Evolution Borrowers***, which do not include the FBG Debtors.[11]

[11] Because the Evolution AP Stipulation doesn't provide any lift stay relief in favor of Evolution to allow it to perfect any security interest against the FBG Debtors, Evolution's secured interests are limited to those set forth in paragraph 5 of the Evolution AP Stipulation. As noted herein, once inventory moved to the FBG side of the ledger, the DIP Liens under the Final DIP Order attached.

16. Evolution simply wishes the words in the agreements were different. The Motion's convenient exclusion of key clauses highlights this problem. For example, Evolution argues that paragraph 22(p) of the Final DIP Order grants no DIP Liens on the SPV Debtors' assets. *See* Motion ¶ 13. But Evolution inexplicably omits the end of paragraph 22(p) which provides:

> Nothing in this Final Order or any of the DIP Documents shall grant any liens or claims against any of the SPV Debtors or any assets of SPV Debtors or the proceeds thereof, ***except to the extent set forth in any separate order of this court or stipulation between the SPV Debtors and SPV Lenders***.

Final DIP Order ¶ 22(p) (emphasis added). The Evolution AP Stipulation, of course, acknowledges and grants DIP Liens on, for example, "Evolution Collateral" if the Court invalidates Evolution's liens against the Evolution Borrowers (Evolution AP Stipulation ¶ 3),[12] on any "Excess Cash" (*id.* ¶ 4(D)), ***and*** on transferred "Evolution Collateral." *Id.* ¶ 4(E).

17. Evolution, by contrast, has no lien on the FBG Debtors' property or accounts. Evolution points to no financing statement, UCC-1 filing, or other evidence of a security interest in the Remaining DIP Cash Collateral that sits in the FBG Debtor accounts. And the Court has already rejected another of Evolution's purported security interests as unperfected. *See* Summary Judgment Order, *Evolution Credit Opportunity Master Fund II-B, LP v. First Brands Group, LLC*, Adv. No. 26-03006 (CML) (Bankr. S.D. Tex. May 29, 2026) [Docket No. 67]. Nothing in the Final DIP Order or the Evolution AP Stipulation grants Evolution a present, automatically, or otherwise perfected security interest on the Remaining DIP Cash Collateral.

---

[12] Under the Evolution AP Stipulation, the DIP Lenders have DIP Liens on the Evolution Collateral to the extent that Evolution is not a secured lender. *See* Evolution AP Stipulation ¶ 3. There is no deadline under the Final DIP Order or Evolution AP Stipulation to bring a challenge to Evolution's liens.

### D. Evolution Offers No Tracing or Other Evidence Connecting Its Interests to the FBG Debtors' Cash

18. Further, Evolution has not and cannot prove that the Remaining DIP Cash Collateral is the same cash that constituted proceeds of its disputed, pre-January collateral that was sold free and clear to the FBG Debtors, as is its burden. *See* 11 U.S.C. § 363(p)(2) (placing burden of proof on entity asserting interest in property "on the issue of the validity, priority, or extent of such interest"); *In re Aircomm Commc'ns, Inc.,* 2010 WL 5014000, at *2 (Bankr. S.D. Tex. Dec. 2, 2010) ("Movant has not met its burden of proof to establish that any of Debtor's cash is its cash collateral."). Thus, even assuming, *arguendo*, that Evolution is right that—

i. The disputed inventory originally belonged to the Evolution Borrowers;
ii. Evolution held a perfected, unavoidable prepetition lien on such inventory;
iii. The inventory was not transferred free and clear to the FBG Debtors under the Evolution AP Stipulation;
iv. The inventory was not replaced with additional inventory under the Evolution AP Stipulation; ***and***
v. The inventory was then sold and the proceeds were collected by the FBG Debtors;

—Evolution would ***still*** need to be able to trace the alleged $21.2 million in proceeds to identifiable cash in the FBG Debtors' accounts and, specifically, to the Remaining DIP Cash Collateral. Evolution makes no such showing. Neither Evolution nor the Evolution Borrowers have any interest in the Remaining DIP Cash Collateral, and Evolution offers no evidence otherwise.

19. Evolution's claims ultimately derive from its disputed claims to inventory in certain Warehouses owned by BPI. Before January 20, proceeds of inventory sold from the Warehouses were deposited only into four BPI collection accounts and then swept into either the FBG Concentration Account or an FBG Debtor investment account at Bank of America ending in 9852 (the "<u>FBG Investment Account</u>"). Jerneycic Declaration ¶ 7. Those amounts, approximately $19.5 million, were swept into the FBG Concentration Account (approximately $17.5 million) and either the FBG Concentration Account or the FBG Investment Account (approximately $2.0 million),

each of which held funds from many different sources, and were used in the ordinary course of the Debtors' business. *Id.* ¶ 11. After the January 20 Ruling, the FBG Debtors stopped selling the disputed inventory and segregated all related receipts, which now total approximately $1.9 million. *Id.* ¶¶ 10–11; Debtors' July Objection ¶¶ 17, 21, 22. The BPI Collection Accounts now hold nothing. Jerneycic Declaration ¶ 10. The balances of the FBG Concentration Account and the FBG Investment Account thereafter fluctuated significantly as funds from other sources, including the DIP credit facility, were deposited, reaching lowest balances of $3,357,925 in June 2026 and $363,152 in February 2026, respectively. *Id.* ¶ 11. Every dollar deposited into those accounts after those low points necessarily came from sources ***other*** than Evolution's alleged collateral and is unquestionably subject to the DIP Liens.

20. Accordingly, even under the most generous view of Evolution's position, the most Evolution could possibly trace is the sum of the lowest intermediate balances of the FBG Concentration Account and the FBG Investment Account, or $3,721,077. *Id.* ¶ 11. Evolution is not entitled to that amount, but it plainly has no interest in the Remaining DIP Cash Collateral or its alleged $21.2 million of cash proceeds.

21. Instead, what Evolution essentially asks for is a freezing injunction over the Remaining DIP Cash Collateral to preserve its unsecured claim for an alleged breach of the Evolution AP Stipulation. Indeed, Evolution egregiously asserts that "there exists more than sufficient cash on the FBG Debtors' balance sheet to reserve such amount pending the instant dispute." Motion ¶ 2. While that is unequivocally false,[13] such injunctive relief is also barred by *Grupo Mexicano*.[14] *See Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308,

[13] The beneficial interest in that cash belongs to the DIP Secured Parties and the FBG Debtors' estates have no ability to access those amounts without the DIP Agent's consent. *See* Final DIP Order ¶ 16 (enjoining DIP Loan Parties from using Cash Collateral except on terms of Final DIP Order); Conversion Order ¶ 3.

[14] It is also procedurally improper. *See* Fed. R. Bankr. P. 7001(a), (b), (g) (requiring adversary proceeding to recover

333 (1999) (holding that federal court lacked power to issue preliminary injunction restraining transfer of assets in which no lien or equitable interest was claimed). By seeking to restrain assets in which it has no bona fide property interest to collect on claims against different assets allegedly owned by different entities (or for breach of a stipulation), Evolution seeks relief this Court simply cannot grant. Because Evolution lacks a pre-existing property right in the FBG Debtors' accounts, which include the Remaining DIP Cash Collateral, the Court should also deny the Motion. *See also Leadenhall Cap. Partners LLP v. Advantage Cap. Holdings LLC*, 171 F.4th 155, 160–63 (2d Cir. 2026) (denying asset restraint under *Grupo Mexicano* where movant had no lien or interest); *In re Trs. of Conneaut Lake Park, Inc.*, 554 B.R. 100, 109 (Bankr. W.D. Pa. 2016) (same). While Evolution may or may not have an interest in the *inventory* held in the Warehouses today, there is "clear evidence" and "legal precedent" that Evolution has no lien on cash in any FBG Debtor account. *Cf. Evolution Credit Partners v. First Brands Grp., LLC*, No. 4:26-cv-00073, ECF No. 28, at 8 (S.D. Tex. Jan. 31, 2026) (holding that claimant is entitled to adequate protection "absent clear evidence or legal precedent that refutes the claimant's right to an asserted property interest").

22. Simply put, Evolution has no property right in the specific cash it seeks to restrain. The Motion should be denied.

**Reservation of Rights**

23. The Ad Hoc Group files this Objection without prejudice to, and with full reservation of, all rights, claims, defenses, and remedies available to the Ad Hoc Group under applicable law, contract, or otherwise. The Ad Hoc Group expressly reserves the right to (i) supplement, amend, or modify this Objection; (ii) raise additional objections at or before any

---

money or property, to determine validity, priority, or extent of interest in property, or to obtain injunction or other equitable relief); *In re Zale Corp.*, 62 F.3d 746, 762 (5th Cir. 1995) ("Under Rule 7001, an injunction requires an adversary proceeding."); *In re RGV Smiles by Rocky L. Salinas D.D.S. P.A.*, 626 B.R. 278, 290 (Bankr. S.D. Tex. 2021) (declining to entertain request for injunctive relief in contested matter).

hearing on the Motion; (iii) introduce evidence, including by declaration or testimony, or arguments regarding any aspect of the relief sought in the Motion; and (iv) assert all claims or objections as necessary or appropriate in response to further developments or pleadings filed in this case or any other related case.

[*signature page follows*]

Dated: October 12, 2026
Houston, Texas

Respectfully submitted,

*/s/ Tom A. Howley*
Tom A. Howley (Texas Bar No. 24010115)
Eric Terry (Texas Bar No. 00794729)
HOWLEY LAW PLLC
700 Louisiana Street, Suite 4220
Houston, TX 77002
Telephone: 713-333-9125
Email: tom@howley-law.com, eric@howley-law.com

Scott J. Greenberg (admitted *pro hac vice*)
C. Lee Wilson (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Telephone: 212-351-4000
Email: sgreenberg@gibsondunn.com
clwilson@gibsondunn.com

-and-

AnnElyse Scarlett Gains (admitted *pro hac vice*)
S. Robert Marsters, Jr. (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street N.W.
Washington, D.C. 20036-3504
Telephone: 202-955-8500
Email: agains@gibsondunn.com
rmarsters@gibsondunn.com

*Counsel to the Ad Hoc Group*

**Certificate of Service**

I certify that on October 12, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Tom A. Howley*
Tom A. Howley