**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>FIRST BRANDS GROUP, LLC, *et al.*,<br><br>Debtors. [1] | Chapter 7<br><br>Case No. 25-90399 (CML)<br><br>(Jointly Administered) |

**NOTICE OF FILING EXHIBIT TO EVOLUTION'S JOINDER TO THE OBJECTIONS OF THE UCC AND KATSUMI SERVICING, LLC TO THE EXCESS ABC INSURERS' MOTION FOR CLARIFICATION OR, ALTERNATIVELY, RELIEF FROM THE AUTOMATIC STAY**

**PLEASE TAKE NOTICE THAT** attached hereto as **Exhibit A** is the exhibit to the *Joinder to the Objections of the UCC and Katsumi Servicing, LLC to the Excess ABC Insurers' Motion for Clarification or, Alternatively, Relief from the Automatic Stay* filed at Docket No. 3893 by Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master, L.P., Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution-affiliated funds.

[*Remainder of page intentionally left blank*]

[1] A complete list of the Debtors in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 7 cases is 127 Public Square, Suite 5300, Cleveland, Ohio 44114.

Respectfully submitted this 13th day of October, 2026,

**GRAY REED**

By: */s/ Jason S. Brookner*
Jason S. Brookner
Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com

- and -

**ELSBERG BAKER & MARURI PLLC**
Michael Duke (admitted *pro hac vice*)
David Elsberg (admitted *pro hac vice*)
Vivek Tata (admitted *pro hac vice*)
Garrett Gerber (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
Ella Epstein (admitted *pro hac vice*)
350 Fifth Avenue, 38th Floor
New York, NY 10018
Telephone: (212) 597-2600
Email: mduke@elsberglaw.com
delsberg@elsberglaw.com
vtata@elsberglaw.com
ggerber@elsberglaw.com
aparks@elsberglaw.com
eepstein@elsberglaw.com

- and -

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: vindelicato@proskauer.com
mkoch@proskauer.com

- and -

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

- and -

Jordan E. Sazant (admitted *pro hac vice*)
70 West Madison St., Ste. 3800
Chicago, IL 60602
Telephone: (312) 962-3500
Email: jsazant@proskauer.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of October, 2026, the undersigned caused a true and correct copy of the foregoing document to be served upon all parties via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason Brookner*
Jason Brookner

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FIRST BRANDS GROUP LLC, et al.) Debtor. | CASE NO: 25-90399 (CML) Houston, Texas Wednesday, January 7, 2026 9:03 a.m. to 3:28 p.m. |
| FIRST BRANDS GROUP LLC, et al.) Plaintiffs, Vs. PATRICK JAMES, THE PATRICK JAMES TRUST, ALBION REALTY LLC ALESTER TECHNOLOGIES LLC, BATTERY PARK HOLDINGS LLC, LARCHMONT LLC, PEGASUS AVIATION LLC, JOHN AND JANE DOE(S) 1-100 and ABC CORPORATION(S) 1-100, Defendants. | CASE NO: 25-03803 (CML) ADVERSARY |

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtors: | SUNNY SINGH<br>ROBERT NILES-WEED<br>Weil Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153 |
| For Onset Financial, Silverpoint Capital: | ANTHONY S. FIOTTO<br>Morrison & Foerster<br>200 Clarendon Street, Floor 21<br>Boston, MA 02116 |
| For Onset Financial: | BRYAN KOTLIAR<br>Morrison & Foerster<br>250 West 55th Street<br>New York, NY 10019 |

| | |
|---|---|
| For Defendants: | ERICA WEISGERBER<br>Debevoise & Plimpton LLP<br>66 Hudson Boulevard<br>New York, NY 10001 |
| For SPV Entities: | MICHAEL FISHEL<br>Fishel Law Group<br>602 Sawyer, Suite 400<br>Houston, TX 77007 |
| For SPV Entities: | BRYCE L. FRIEDMAN<br>DAVID ZYLBERBERG<br>NICHOLAS BAKER<br>425 Lexington Avenue<br>New York, NY 10017 |
| For Edward James: | JAMES TECCE<br>CAMERON KELLY<br>Quinn Emmanuel Urquhard & Sullivan<br>51 Madison Avenue, 22nd Fl.<br>New York, NY 10010 |
| For Ad Hoc Group of DIP Lenders: | ANNELYSE GAINS<br>Gibson Dunn & Crutcher LLP<br>1050 Connecticut Avenue NW<br>Washington, DC 20036 |
| For Committee: | ROBERT J. STARK<br>JEFF JONAS<br>MICAEL WINOGRAD<br>STEVEN A. TYRELL<br>JASNOOR HUNDAL<br>7 Times Square<br>New York, NY 10036 |
| For Carnaby II and II: | MEGAN YOUNG-JOHN<br>JOHN F. HIGGINS, IV<br>1000 Main Street, 36th Floor<br>Houston, TX 77002 |
| | ALLAN S. BRILLIANT<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036 |
| For Evolution Credit Partners: | VINCENT INDELICATO<br>Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036 |

| | |
|---|---|
| For Katsumi Servicing: | SEAN SCOTT<br>KYLE J. TUMSUDEN<br>Mayer Brown LLP<br>71 South Wacker Drive, Ste 3900<br>Chicago, IL 60606 |
| For Edward James: | MARK DENDINGER<br>Bracewell LLP<br>31 W. 52nd Street, Ste 1900<br>New York, NY 10019 |
| For Stephen Graham: | DANIEL J. SAVAL<br>Kobre and Kim LLP<br>800 Third Avenue<br>New York, NY 10022 |
| For David Parker: | SARAH PATRICIA SANTOS<br>HARRY JAY HULINGS<br>Davis & Santos PC<br>719 S. Flores Street<br>San Antonio, TX 78204 |
| For Laurie Stein: | MARGARITA K. O'DONNELL<br>Zuckerman Spaeder LLP<br>2100 L Street NW, Ste 400<br>Washington, DC 20037 |
| For Michael Baker: | PETER MENZ<br>Morvillo Abramowitz Grand<br>Iason & Anello PC<br>565 Fifth Avenue<br>New York, NY 10017 |
| Court Reporter: | Yesenia Lila |
| Courtroom Deputy: | Yesenia Lila |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; WEDNESDAY, JANUARY 7, 2026; 9:03 AM

(Call to Order)

CLERK: All rise.

THE COURT: Please be seated. Good morning, everyone. Happy New Year.

ALL: Happy New Year, Your Honor.

THE COURT: All right. Let's see. Good morning. And Happy New Year, everyone. This is Judge Lopez. Today is January 7th. I'm going to call First Brands. Sounds like we're here all morning. I'm going to start with the adversary proceeding, 25-03803. I'll take appearances on that one first. Good morning.

MR. SINGH: Good morning, Your Honor. Sunny Singh, Weil, Gotshal, on behalf of the Debtors.

MR. FIOTTO: Good morning, Your Honor. Tony Fiotto on behalf of Onset, also on behalf of Silver Point Capital.

THE COURT: Good morning.

MR. FIOTTO: Good morning.

MS. WEISGERBER: Good morning, Your Honor. Erica Weisgerber from Debevoise on behalf of the defendants in the adversary.

THE COURT: Good morning.

MR. FISHEL: Good morning, Your Honor. Michael Fishel, Fishel Law Group, with my colleagues at Simpson

Thacher, Bryce Friedman, David Zylberberg, and Nick Baker on behalf of the SPV entities.

THE COURT: Welcome.

MR. NILES-WEED: Also Robert Niles-Weed, from Weil, on behalf of the Debtors with respect to the adversary.

THE COURT: Good morning.

MR. TECCE: Good morning, Your Honor. James Tecce of Quinn Emanuel on behalf of Mr. James. I'm joined by Cameron Kelly, and Happy New Year.

THE COURT: Good morning.

MS. GAINS: Your Honor, AnnElyse Gains, of Gibson, Dunn, on behalf of the HAC Group of DIP Lenders.

THE COURT: Good morning. Good morning, Mr. Stark.

MR. STARK: Good morning, Your Honor. Robert Stark with Jeff Jonas, Mike Winograd, Steve Tyrrell, and Jasnoor Hundal, from Brown Rudnick, on behalf of the committee. We are not -- actually, we have not intervened in the adversary proceedings. So I don't think we're going to have anything to say.

THE COURT: No. I know, you want to preserve. I got it.

MR. STARK: We might. Thank you, Your Honor.

MS. YOUNG-JOHN: Good morning, Your Honor. Megan

Young-John of Porter Hedges on behalf of the Carnaby II and III secured parties. I'm also joined on the phone by John Higgins from my firm and co-counsel from Dechert, Allan Brilliant who will be taking the lead. We are likewise not involved in the adversary, but I understand there's a status conference that will be involving us.

THE COURT: Got it.

MS. YOUNG-JOHN: I'm going ahead and making our appearance.

THE COURT: Okay.

MS. YOUNG-JOHN: Thank you.

THE COURT: Good morning. Let's see. Let me just unmute a few lines here on the phone. There's a (212) number. I should hit the unmute button if I call.

MR. INDELICATO: Your Honor, good morning. Vincent Indelicato, Proskauer Rose LLP, on behalf of Evolution Credit Partners. While Evolution, Your Honor, has not intervened in this adversary proceeding, we noted on the agenda that the Debtors filed with the court late yesterday that the Debtors anticipate making a status update. To the extent that status pervades the adversary, and involves macro issues, we very much would like Your Honor's indulgence to provide our perspective on what really has become an emergency in these cases.

THE COURT: Okay.

MR. INDELICATO: Thank you.

THE COURT: Let's see. There's another; I've got two more. Mr. Singh, I've got -- let's see, another (212) number.

MR. BRILLIANT: Your Honor, Allan Brilliant on behalf of Carnaby II and Carnaby III secured lenders. As, you know, Ms. John said, we're appearing solely in connection with the status conference this morning.

THE COURT: All right. Thank you. And a (312) number. A (312) 701 number? All right. I'll try another one.

MR. SCOTT: Good morning, Your Honor.

THE COURT: Yes.

MR. SCOTT: Sean Scott of Mayer Brown on behalf of Katsumi Servicing LLC. I'm joined by my colleague Kyle TumSuden, who was the other number, but maybe was unable to unmute it. We will be dealing with the D&O issues, but like the -- many of the other parties here, given the status conference, I did want to raise our appearance at this point in time. Thank you, Your Honor.

THE COURT: Good morning. All right. Mr. Singh, I'm going to turn it over to you. For the lines that I have unmuted, if you would please just keep your phone on mute. I'm going to keep your line unmuted on this end just so we can all hear each other. Good morning.

MR. SINGH: Good morning, Your Honor. Thank you. Again for the record, Sunny Singh, Weil, Gotshal, on behalf of the Debtors. Your Honor, as we noted in the agenda and as just mentioned by some of the parties, we thought it would be helpful for the Court and for parties in interests to provide a status update of the cases this morning and obviously, answer any questions Your Honor may have.

Your Honor, we have one slide that we did file this morning. It's at docket 1216. If you could give authorization to my colleague, Jason George, he can put it up for those not --

THE COURT: All right.

MR. SINGH: -- in the courtroom.

THE COURT: I'm getting faster. All right. Mr. George, you should be the presenter if I did this right. Okay. Whenever you're ready.

MR. SINGH: It looks like it's -- I didn't see it on the screen.

THE COURT: Oh.

MR. SINGH: But it looks like it's okay.

THE COURT: Yep. Let me -- let's see. Am I -- let's just proceed.

MR. SINGH: Yeah. I don't mean to test your technical skills, Your Honor.

THE COURT: Yeah. No.

MR. SINGH: I was just saying I couldn't see it. That's all. I'm fine to proceed. Sorry.

THE COURT: You said it's on the docket, right?

MR. SINGH: It's on the docket. Yes.

THE COURT: On the docket. All right.

MR. SINGH: Yes. Yes. Yes. It's on the docket.

THE COURT: All right.

MR. SINGH: And I can sort of see it on that computer over here. So I think we're probably good to go.

THE COURT: All righty.

MR. SINGH: Okay. Thank you, Judge. So Your Honor, as summarized on this slide, you know, really before the month of January, we've been focused on what we would describe as Phase 1 of these cases, focused on stabilizing the situation. You know assess the business, assess the situation, get our financing in. Secure our first day relief, and start to stabilize the operations, and work on a business plan and a strategy forward with all of our stakeholders.

That's been going on, Your Honor, for the better part of the last three months. And I think where we are now is really, we have moved into Phase 2 of these Chapter 11 cases, which is focused on negotiations going forward. So we can pursue asset sales and/or orderly wind-down of certain assets. You know really negotiate a path to exit

from Chapter 11, and deal with issues we need to deal with like securing remaining case funding, finishing, or continuing the investigation, and pursuing potential claims, and then addressing value allocations.

So Your Honor, you know, we are at a critical juncture. And as I mentioned moving into the second phases of these cases, right now January is essential. We are focused on case funding. We are focused on negotiating a path from out of Chapter 11 with respect to the businesses through a sale process. And you know we'd like to do it with as much consensus as possible with our stakeholders. We really think now is the time for everyone to come together.

You know that, of course, includes the DIP Lenders, the UCC, all of our SPV and ABL counterparties. And we've, you know, commenced discussions with many of them, in particular, the DIP Lenders and the UCC, our state fiduciaries.

Your Honor, currently, we have approximately $190 million in unrestricted cash as of the beginning of this week. That's sufficient liquidity to allow us to operate through the January -- you know we're working through all of our options to enhance liquidity and the runway for sale process in this case.

And in that regard, Your Honor, we're really

looking for all sources of liquidity to preserve our businesses and run a good sale process. That includes our current DIP Lenders, but it also includes, and we'll need to work with ABL and SPV lenders on the use of cash collateral during this process.

And as I mentioned, Your Honor, you know, we're talking, of course, to the UCC about all of this. You know January, I can't stress enough really is a critical month for this estate or these estates.

We did receive a term sheet, Your Honor, from our DIP Lenders earlier this week for an injection of capital. We're evaluating that and we are going to need to negotiate it. But other steps are also in motion. And as I mentioned, Judge, we're going to need support of all of our stakeholders, you know, customers, lenders to really give us a shot here to maximize value for everyone's benefit here.

As I mentioned, Judge, we're moving forward with the sale process, some informal outreach began earlier this week by Lazard. Your Honor, we'll see by the end of this week on the docket bidding procedures motion that we will file and seek approval for from the court.

Your Honor, given the liquidity position that I mentioned, we unfortunately, don't have a lot of time to run an extended sale process. Admittedly, it will be short. Likely concluding -- proposing that it conclude by the end

of this month, unless we can find a way to enhance our liquidity and extend our runway. And the timing, of course, will also depend on the level of support that we get from our stakeholders in this process.

Your Honor, we recognize that we're asking the parties to move quickly, but we really do believe that this timeline is necessary and warranted under the circumstances. The Debtors, frankly -- and you'll hear more about this in connection with our bid procedures motion when we're finally before you and with evidence. But the Debtors really do need to get as many of these business lines out of Chapter 11 as soon as possible to maximize value, to save jobs, and to keep their going concern.

We appreciate and acknowledge, Your Honor, that there's many disputes about who is entitled to the value at the end of the day that will be generated, which of course, we plan to address. But we -- in order to maximize the value, in order to have those disputes, Your Honor, in a way that, you know, we're talking about maximum proceeds that people are arguing about, or hopefully settling about, but we'll see.

But in order to do that, we really do need to focus right now on getting these businesses out of Chapter 11 so we can normalize and firm up relationships with our customers, with vendors, with suppliers, financing parties,

et cetera.

Your Honor, we anticipate that the DIP Lenders will participate in the sale process. You know their term sheet that we received does contemplate that. They are bidding for certain of the Debtors' assets. But a lot TBD, Your Honor, we just got that, I think, a day ago.

Judge, there's a lot more work to be done. We're encouraged, though, by our recent conversations and discussions, and we think an optimized path forward here to maximize value is an expedited sale process, which you'll hear more about.

So Your Honor, we expect to be back in front of you later this month for consideration of our bid procedures that I mentioned, hopefully incremental funding and outline our path forward from Chapter 11. I think to the extent able, we'll also provide, and subject, of course, to your availability updates if we can along the way. I think there's a couple of hearings where we can certainly update the court with respect to that.

Your Honor, as I mentioned, we're trying to build as much consensus as possible and minimize the fighting. So there's two updates that I have. One is with respect to the factoring procedures motion, Your Honor, that's scheduled for the 13th. This relates to the debtor's motion for procedures to authorize release of additional cash. Your

Honor, we had a status conference on the 30th.

Nothing has changed yet in terms of that hearing. But we are in discussions with the third-party factors in our attempt to try to reach an agreement on the scope of relief that we would be seeking at the January 13th hearing, including to try to delay or postpone, I should say, with people's consent, any litigation or discovery related to that motion, at least until the examiner is finished with their work, I would say.

Again, as I mentioned, Your Honor, nothing final. We made a proposal out to those parties about the January 13th hearing. If possible, and we can get there, our goal is to be in a position to file a revised proposed order reflecting an agreement with the factors in advance of the hearing. And of course, we can provide you an update. I think Friday, there's a hearing as well related to the examiner. We can provide you an update on status as well as obviously on the 13th itself.

Another update, Your Honor, relating to the investigation and the examiner. As I think Your Honor knows, you know the special committee is continuing to progress its investigation. You know we're doing that in coordination with the creditors committee. I think we are now in a position to start to commence additional litigation against parties potentially this week, more to come on that,

Your Honor.

And what I would say is we've also met now the examiner has been selected by The U.S. Trustee. We've met with the examiner on the debtor side, his professionals that, you know, he intends to retain to kick off that conversation, the flow of information. I believe Friday, this Friday, there is a motion to formally approve the appointment of the examiner. So they'll probably give you a little bit more of their perspective then. But I just wanted to let you know, we have had that meeting and kickoff and follow-up, et cetera. It's all in the works.

Your Honor, finally, with respect to the Carval motion or motions that are on for this Friday right now, there's the hearing relating to our proposal for adequate protection, fair stay relief, and motion for, I think it's to either dismiss or appoint a trustee.

Your Honor, you know we've had constructive conversations this week with Mr. Brilliant and his team and the Carval team. And we've agreed that in light of the current situation that I just described, with the sale process and January being a critical month to see where we really are in these cases, that we would put off that hearing.

So I think we've agreed, if Your Honor is amenable, to adjourn the hearing. I think we did check with

Your Honor's chambers that we could agree to put that hearing on for January 22nd, you might have availability, but that we would have a status conference, Your Honor, on January 13th, which is that other hearing for the factoring motion that I mentioned.

So we can give you an update where we are with Carval on the 13th. And right now as a placeholder, I'm hoping we don't need it. But if we do, the 22nd would be that date.

THE COURT: Would that adjourn all the matters?

MR. SINGH: Yes.

THE COURT: So far?

MR. SINGH: All of the matters on the 9th related to Carval. So there would -- the only hearing, I think, you would have on Friday then, Your Honor, is to appoint the examiner formally. That would be the only thing left for Friday.

Your Honor, one thing we did agree to with Carval, which is if we can't -- you know the goal is we've adjourned, we're going to work with them now, and have already started to, to come up with an arrangement over use of collateral, you know, for the next 30-ish so relating to the sale process, et cetera.

Ideally, we'd be reporting that to you on the 13th or before. If we can't, then we have agreed that the

Debtors would no longer use the Carval collateral, including their cash collateral, beyond the 13th without Carval's consent or further order of the Court. So we would have to come back.

THE COURT: Okay.

MR. SINGH: If that really became an issue. So with that, Your Honor, unless you have any questions for me, that's the update we wanted to provide you, and we can obviously --

THE COURT: Now, just subject to what Mr. Brilliant, and I just wanted to confirm the dates, I think the 22nd you mentioned.

MR. SINGH: Yes. The 22nd is the holding date for the motions that are currently --

THE COURT: Yeah. I'm just saying --

MR. SINGH: -- on the 9th.

THE COURT: -- I'm looking at my calendar and if it looks good to me, if Rosario tells you it works, then I've got no issues with that and keeping the 13th as a status conference.

MR. SINGH: Yes. And I think we confirmed all that with Mr. Brilliant, and said it works with him.

THE COURT: Okay.

MR. SINGH: And so if you're okay, we will file the various notices.

THE COURT: And I've got no issues with that.

MR. BRILLIANT: Your Honor, I can confirm that the dates work. We had discussed them with the Weil firm yesterday. They had checked with chambers that it was available, and we checked with the witnesses, and that does work for all the parties.

THE COURT: Okay. All right. Thank you.

MR. SINGH: Thank you, Your Honor.

MR. STARK: May I have a moment, Your Honor?

THE COURT: Yeah. Of course.

MR. STARK: Good morning, Honor. I won't be long. Following Mr. Singh, I always find myself jogs a lot of good thoughts and so I figured I'd share just a few.

THE COURT: All right.

MR. STARK: If I can just take one step back and go back a couple of months, but I won't belabor it too much, Your Honor. Obviously, this is a very newsworthy, observed, and important case, and it's fascinating. Fraud cases are usually fascinating, but this one, at least for me, is an unusual fraud case.

And I want to pause it this way because it's a phrase that I've been using a bunch. We didn't know, and I don't think we still know whether or not this case is at its heart, a business with a fraud attached, or is a fraud with a business attached. And think about that for a moment if

you will, Your Honor. Because I've been doing a lot of thinking about that over the last couple of months.

Because if it's one, you have a certain set of logical agenda items that you have to deal with. If it is the other, you have a different set of logical agenda items, and they compete. The DNA of a fraud case is it wants to devolve into litigation. And we've seen it here. It's chaotic at times. The last status conference was chaotic and trying to find order out of the chaos is tough.

When on the one hand, the debtor is quite rightfully trying to preserve and enhance reorganization value assuming that this is a business case with a fraud attached when the litigation, inter nascent litigation and third-party litigation has its own agendas that compete with those that the debtor is pursuing. The poor DIP Lenders are sitting there having to fund both, and not really sure what to do and how to do it.

Those competing agendas have played out quite a bit in the court and out of the court. And we haven't really figured out what this case is yet in terms of one versus the other. What we do know is we're out of money. It just is too much. This case fell into bankruptcy, and I give purple hearts all around for the Debtors professionals who by the way been constructive and transparent and worked with us and talked with us daily and worked us through.

That's not only the lawyers but the financial advisors and the bankers. It's just a tough case, and we've run out of money.

When it files and everyone said we need an examiner, that makes all the sense in the world. We were supportive of that. It takes a little while and get going and now we're out of cash. I want to make sure because I completely agree with Mr. Singh, as usual, when he gets up and make a presentation about where we're going, is we got to talk.

And Ms. Gains and my good friends from Gibson Dunn, we had the similar scenario in Ascend not so very long ago where it looked like it wasn't going to work, and we sat in a room and some coffee and late nights, and we figured it out. And I think we're going to figure it out here too. And I'm very much looking forward to sitting down with my friends and colleagues and trying to see what we can figure out.

As Mr. Singh's presentation laid itself out, focusing on that value, that business value, that enterprise value, they're doing all the right things, and we intend to meet them halfway in the middle to try to get there.

We also have the litigation piece, and we cannot allow -- because we don't know what it is yet. We cannot allow that -- well, let me say it differently. This informs

that. The litigation informs the restructuring.

The restructuring informs the litigation because they compete with one another, and we have to create rationality and order. We knew it might come, and you'll hear about this a little bit later in the contested matters for today. We knew it might come that we'd run out of money in January. That was the big D Day in the DIP. And we're now at D Day and it's not looking like hopes are going to be achieved. We got going and we're close to ready, but we're not done yet.

And so as we move forward with the agenda for the rest of the day, and I don't want to port that into this, but I don't want to lose sight of the other piece of what this case may be because we have to finish that as part of this process in January. I wish there was time for an examiner to -- and we can all sit back and allow them to do it, but I don't think that's where we are. And so we'll talk about that more today.

THE COURT: Okay. Thank you.

MR. STARK: Thank you, Your Honor.

THE COURT: Mr. Indelicato?

MR. INDELICATO: Your Honor, can you hear me?

THE COURT: I can hear you just fine.

MR. INDELICATO: Thank you, Your Honor. Good morning and Happy New Year. Again for the record, Mr.

Indelicato, Proskauer Rose LLP, on behalf of Evolution Credit Partners. Your Honor, we certainly do not oppose Mr. Singh's desire for speed, but speed, Your Honor, certainly cannot abrogate parties' legal rights and violate this court's orders.

And I want to make it clear upfront because I know our client has myriad ongoing relationships with these Debtors. I rise today not to address, Your Honor, the AR and factoring issue that the Elsberg firm has appeared before you on, but rather to talk about a very simple issue, which is the brake parts inventory.

Inventory that had so much criticality to these estates, Your Honor, that the Debtors requested the ability to use and sell that inventory in the ordinary course of these cases. And you may recall when we talked early on at the first day hearing about the three buckets of Evolution exposure, the most significant, the most material began and ended with the inventory financing, $230 million to finance brake parts inventory that the Debtors have been using and selling throughout the cases.

And Your Honor will recall, they've been doing that pursuant to an adequate protection order that Your Honor entered in exchange for allowing them to use the inventory to provide us, Your Honor, with adequate protection in the form of collateral maintenance thresholds.

They had to maintain a minimum threshold of collateral throughout the case so that, Your Honor, if the cases should pivot to a wind-down or liquidation, Evolution or Bank of America, whoever is on first, if you'll recall, with respect to that inventory collateral, will have ample cushion so it can look to its recovery in those alternative recovery scenarios.

And so we heard it from Mr. Singh loud and clear. We heard it from Mr. Stark. We certainly read the pleading that the statutory creditors committee filed in earnest last week. Here we stand several months later on the brink of a wind-down or liquidation.

And not only have the Debtors, Your Honor, conceded that Mr. Singh will not dispute this, he conspicuously omitted it from his status update that the Debtors right here, right now, today are in violation of that adequate protection maintenance covenant threshold by at least $43 million of a deficit.

But remarkably, Your Honor, the Debtors have also confirmed, and Mr. Singh cannot deny, that they are continuing to use and sell our inventory collateral in brazen violation of Your Honor's order. And so, Your Honor, we need an emergency hearing. Court orders matter. We need an emergency hearing. Because every day that goes by with the Debtors willfully violating Your Honor's order is

another day that our client, or whoever ends up being on first with respect to this inventory, suffers diminution and degradation.

The inventory gets sold, poof, it's gone. And the people that have a first lien on that inventory can never look to it for recovery again. And so not only, Your Honor, do we need your assistance with scheduling an emergency hearing, but more importantly, Judge, we don't see how you can allow the Debtors to continue to violate the Court's order and continue to sell the inventory, which they told us as recently as last night, they're doing right now until either you've ruled on that matter or they and we and the other parties have reached the consensual agreement.

THE COURT: Has anyone filed a motion requesting an emergency hearing?

MR. INDELICATO: Yes. Yes. We filed a motion, Judge. I want to say shortly after we learned of this substantial deficiency and noncompliance with that order, it may have been the week of Christmas or the week before Christmas.

THE COURT: Got it.

MR. INDELICATO: And quite frankly, since we're all putting our cards on the table in a very candid and dispassionate way, we and the Debtors had refrained from pressing Your Honor for a hearing. Because the Debtors had

assured us that they would be providing us with adequate protection, and that a proposal from their DIP Lenders was forthcoming.

And what do you know, Judge? Day after day after day, holiday, New Year passes, we got nothing. And we got nothing because they don't have money. And that's okay. But they can't continue to use our collateral to fund the optionality of their case. It flies right in the face of your order. Orders have to have meaning, Judge.

THE COURT: So you -- I am looking at --

MR. INDELICATO: I've looked -- I've never seen anything like it. They told us we're violating your order. We know it. We know we have to give you -- like your protection. We don't have anything to give you, but we're going to keep violating the court's order.

THE COURT: So why don't I set it --

MR. INDELICATO: It's astounding, Judge.

THE COURT: -- for the 13th at 1:00? We're already going to be here on that day. Why don't we set it for the 13th at 1:00?

MR. INDELICATO: But, Your Honor, respectfully, again, timing is one consideration. And I appreciate Your Honor's accommodation in the short term.

THE COURT: But what -- no. No.

MR. INDELICATO: But we need Your Honor right now

--

THE COURT: I guess what I'm saying is, you asked relief by January 9th. I'm giving you -- that's a Friday. I'm giving you a hearing on the following Tuesday.

MR. INDELICATO: I don't quarrel with the timing, Judge. I appreciate Your Honor's accommodation. But we just learned late last night for the first time that they're continuing to diminish and degrade and deplete our collateral. So we need you to say until that hearing, they have to stop doing that.

THE COURT: I don't -- Mr. Singh is going to have to -- I need Mr. Singh to come talk to me about what's going on.

MR. INDELICATO: I think Mr. Singh --

THE COURT: In other words, people put stuff on paper and sometimes people take different perspectives and different views on it. I'm just -- I saw that you filed a motion on December 23rd.

MR. INDELICATO: I think what Your Honor --

THE COURT: Yeah.

MR. INDELICATO: -- respectfully, what Mr. Singh ought to address is, one, are the Debtors currently in violation of the court order that you entered by at least $43 million. Number 2, are they --

THE COURT: Mr. Indelicato, I --

MR. INDELICATO: -- continuing to use our collateral?

THE COURT: Mr. Indelicato, I get the -- I got it.

MR. INDELICATO: Thank you.

THE COURT: Thank you. Mr. Singh?

MR. SINGH: Yeah. Thank you, Your Honor.

THE COURT: Tell me what's going on.

MR. SINGH: Your Honor, I'm going to say just a couple of things. We're happy to go forward on the 13th if that's the date. I don't disagree that we've got an issue with respect to the cash collateral order that we've trying to work it out. We are trying to work out with them. But these are difficult facts and circumstances. I don't agree with a lot of what he said in terms of, oh, is it 43 million, et cetera? I don't think we've said that. I don't think we've said we're blatantly violating a court order.

What we said is we've got a very challenging situation. We don't have additional funding. We need you to work with us. Yes. We are continuing to sell inventory in the ordinary course to date. In our view, that is frankly, you can't just shut down a massive operation overnight and say you're not shipping. That's going to destroy the entire value of the business.

We made a proposal to them as early as this morning. We are in ongoing conversations. I'm hopeful that

we'll get to some sort of resolution under the circumstances. But I wasn't prepared to argue these issues this morning. And I think we should defer that for the right time. And if you want to -- I think if it's the 13th, that's fine with us, Your Honor.

It's not like he's not -- Mr. Indelicato and his client are not going to hear from us. I believe we're scheduling a call later this afternoon. I don't think it's in his interest or frankly -- one thing I would clarify is, Mr. Indelicato made a very impassioned speech about it's their collateral. Well, no, it's disputed whether or not it's their collateral.

Frankly, in our investigation, we've come to a view as to whether or not it's their collateral, and we don't believe they're going to be senior. But that's not the issue for today. The ABL lenders, who are the other party who are not here, do not have an objection. And I frankly believe it is value maximizing. So there's a lot more that Your Honor needs to hear on this. I'm happy to do it on the 13th if he wants. It's all subject to Your Honor's availability if we need to come back sooner.

But we can't sit here today based on no evidence and just a speech that frankly --

THE COURT: No.

MR. SINGH: -- I have a lot of disagreements with

stop using inventory.

THE COURT: What I will say is, we're going to hold a hearing. I appreciate the fact that we're having --

MR. STARK: Your Honor, may I --

THE COURT: -- the conversation.

MR. STARK: -- briefly respond to --

THE COURT: No.

MR. STARK: I don't want to go tit for tat.

THE COURT: I don't -- well, that's what we're going end up doing. So I don't want to do it either.

MR. STARK: I hear you.

THE COURT: So what I'm going to do is set a hearing on the 13th at 1:00. And what I am going to tell -- I mean the last thing I want is to hold a hearing on the 13th and something got really worse between today and the time that we get the hearing. And everybody can just read it for what it is there. I don't like surprises. So if to the extent -- but I got it, you can't shut down between now and then.

MR. SINGH: Yeah.

THE COURT: But what I can say is I don't like -- it's not a -- I'm just saying this so that I don't want to kind of get into it. But to the extent, we can get to the 13th without any new moves, or any additional moves or any -- we'll get to the 13th, and I'll be prepared to rule on

that day on the issues. The parties work something out, great. If not, I got it. I got to make a call on that day. And we'll --

MR. SINGH: We understand, Your Honor.

THE COURT: -- take it for what it is.

MR. SINGH: We understand, Your Honor, and I can assure you and Mr. Indelicato, we are doing nothing but moving forward --

THE COURT: No. I got it.

MR. SINGH: -- in good faith.

THE COURT: And just to be --

MR. SINGH: So we'll continue to do that.

THE COURT: -- so the hearing was filed on the -- motion was filed on the 23rd. Emergency relief was requested by the 9th. We're going to hold a hearing on that following Tuesday. So I'm glad we're having the conversation now so we can schedule a date and, quite frankly, give notice to other parties who may want to be involved in the hearing one way or the other. So we'll pick it up on the 13th at 1:00 and be ready to go.

If there's any witness and exhibit list, I would ask on that one, you know, I'll just call it Friday. I'd like to just come in on Saturday and just get really geared up for it.

MR. SINGH: That's fine, Your Honor. We also have

--

THE COURT: To the extent have we can avoid -- I'm just going tell you. To the extent we can avoid, and I'll just tell you. I'll say it more bluntly. Tuesday is a busy day for me, so I'm going to prepare a lot of it over the weekend. So any replies or any other responsive pleadings, the more to the point, the better shot you got me of really kind of comprehending what you're saying.

MR. SINGH: Understood, Your Honor. We will --

THE COURT: For anyone.

MR. SINGH: We haven't had a chance to respond to the motion because it wasn't scheduled. So if we -- we'll file ours by Friday along with any witness and exhibit List and if that works for the court.

THE COURT: Okay.

MR. SINGH: Thank you, Your Honor.

THE COURT: And I got it. I got it. Like witness and exhibits list can move and --

MR. SINGH: Yeah. But we'll have you have the --

THE COURT: -- I got that. But just a response and then if there's going to be any kind of reply or anything, I think more to the point of the meat of it. And then if on Tuesday, I got to make a call, then I'll make it on Tuesday.

MR. SINGH: Understood, Your Honor.

THE COURT: Okay.

MR. SINGH: I'm hopeful we won't need the hearing and we can work something out. But if not, we understand the schedule.

THE COURT: Okay.

MR. SINGH: Thank you.

THE COURT: Thank you. Anything else we need to talk about in connection with the status conference? One other point I meant is if we're not going to go forward on Friday, then I think that hearing can be, to the extent necessary, virtual. I think I don't need the examiner flying in.

MR. SINGH: Okay. Thank you, Your Honor.

THE COURT: Or any other party that might -- we'll keep it hybrid. But to me, if somebody is already in Houston, they can come in. But if they're already -- parties want to -- to me, if it's just to -- when we can get started right at 9:00 a.m., take that issue up. But I don't want a bunch of folks flying in to just have that hearing.

MR. SINGH: Okay.

THE COURT: I want to be as efficient as possible in connection with that.

MR. SINGH: Your Honor, we will follow your lead. And if it's helpful to you, I can probably give you an update at least where we are on some of the issues we talked

about on the 9th. Not a formal status update, but just so you can plan, but up to you.

THE COURT: No. I want you all to -- are you talking about with the --

MR. SINGH: Well, just where we are with Evolution and talking to Mr. Indelicato about whether we're going to go forward, et cetera.

THE COURT: No. No.

MR. SINGH: Don't do anything like that. Okay.

THE COURT: That opens doors for me.

MR. SINGH: You're right. You're right. I regretted it as soon as I suggested it, so.

THE COURT: If there's positive news, I'll take it on the 9th. If not, I'll just gear up.

MR. SINGH: Your Honor, I'll see you on the 13th.

THE COURT: All right.

MR. SINGH: Your Honor, that's it for our status conference then.

THE COURT: Yeah. Thank you.

MR. SINGH: Thank you.

THE COURT: I'm just going to take five minutes, see if we can get these monitors on, and then we'll take up the motion to intervene. It should -- I'm sure there's a button that I just haven't pushed that I'd rather have someone else to do it. Thank you.

(Off the record.)

CLERK: Please be seated.

THE COURT: All right. I'm dying to know what button she hit. Dying to know. Okay. Let's take up a motion to intervene.

MR. FIOTTO: Good morning, Your Honor.

THE COURT: Good morning.

MR. FIOTTO: Tony Fiotto on behalf of Onset. Earlier, I did not introduce my colleagues, Bryan Kotliar, Brian Michael, and Deborah Perry. I'd like to do that. My New Year's resolution is to be more mindful of that sort of stuff. Thank you, Your Honor. Onset moves for intervention as a matter of right and also in the alternative for permissive intervention.

As you know, Your Honor, in the adversary proceeding here, Debtors alleged that Mr. James and nondebtor affiliates pilfered hundreds of millions of dollars from the Debtors' estate. And more specifically, they alleged that Mr. James engaged in transactions with the special purpose vehicles. I'll refer to those as SPVs. We've been referring to them that way before. And he used the SPVs to incur about $2.3 billion in debt. Much of it, according to the Debtors, has been diverted, diverted, and pilfered.

More specifically, and featured in the complaint,

in the Debtors complaint, is that Carnaby IV and Carnaby V, two of the SPV Debtors that Onset had provided funding to, were specific targets of Mr. James' and the Debtors, the affiliates pilfering. Now Onset provided funding through FPV to the tune of billions of dollars.

And as I said, the complaint alleges that repeatedly monies that Onset provided were specifically pilfered. So Onset in its motion, and I think we're quite clear about that, and I'm going to talk about that a little bit more, specifically said that we want to appear on behalf of Onset, but also in the same interest that the Debtors are pursuing the return of the pilfered funds.

Now, there's little dispute, Your Honor, about what the elements of mandatory intervention are. They're very simple. Timely motion, no question we were timely. Nobody disputes that we were timely. We were about ten days after the adversary proceeding. And interest related to the property or transaction, we are overwhelmingly, we have an interest. In fact, we're featured in the complaint. We're mentioned a dozen times. Onset's mentioned a dozen times.

Seven or eight paragraphs go on in the life of the day of the fraud of Mr. James and the Debtors. And Onset is the entity that's featured. Hundreds of millions of dollars of Onset's funds are being -- were being pilfered.

The other test is -- under mandatory is whether

the disposition and the action may as a practical matter, may as a practical matter impair Onset's ability to protect that interest. And I'm going to talk a lot about that test. Because it's very different from the old test, which is what the Debtors seem to be encouraging the court to adopt.

And the final element is that Onset's interest, whether Onset's interests are adequately protected or represented by the current parties. Again, nobody disputes timeliness. Nobody disputes interest.

And I want to say, Your Honor, the interest of Onset is overwhelming. I stated already that in the complaint, it is Onset's funds featured in the day of the life of the pilfering of the debtor's estate. Many, many paragraphs are devoted to that.

But the interest here is more wide reaching. Because what Debtors had suggested in the adversary proceeding is that, is this pilfering that has directly affected the title to over a billion dollars of collateral that belongs to Onset? And what they argue is that because Mr. James pilfered money from or in connection with the Onset funding, the funding went to the Carnaby debtor entities, are under the Viceroy entities, Carnaby debtor entities, money was to be delivered under the applicable agreements of Onset's transactions to an FBG subsidiary, which will least -- release the inventory and the equipment

and the title to the SPV entity. And that title was in turn released to Onset.

And according to the Debtors, as a result of the pilfering that went on, there is a question about that collateral belonging to Onset. Because of the James -- Mr. James's and the defendant's pilfering of the cash. That's a wide-ranging interest more than simply that our money was involved in this fraud.

Now, Onset's interest, I think, Your Honor, are unique and singular in many other respects. Onset is the only creditor to the Carnaby defendants, which as illustrated in the complaint, were a major source of the James' and the defendants' pilfering.

A year before the petition date, Onset was the largest funder of First Brands, over a billion dollars injected into the entity. And that year is critical, Your Honor. That year is very critical. Because during that year, I suspect that the defendants, Mr. James and others, saw the wheels coming off, the fraudulent scheme and that was an intense year during which we were being -- we were funding the most amount of money. The fraud was intensifying during the last year as these sorts of frauds always do.

Additionally, Your Honor, another singular point, we in the four months leading up to the petition date, Onset

had entered into three forbearance agreements.

Basically on the fraud, the fraud that was the centerpiece or that is the centerpiece of the Debtors complaint.

Now, we're also singular, Your Honor, in another way. Both Debtors and defendants have staked in positions about Onset in the pleading. We are featured in the pleading. The Debtors have said, well, you know, there's concern about Onset's collateral as a result of the pilfering. Not only that, there's concern about the books and records of Carnaby which may not support Onset's interest and Onset's collateral.

On top of that, although we disagree, the Debtors have suggested that well, Onset may not have been the only creditor to the Carnaby entities. This is a new fact that's been introduced in this case.

So not only do we have a singular identity here, we're featured in the complaint, but already both parties on both sides are not -- I wouldn't call it taking hits, although the defendants are taking hits. The defendants naturally are trying to deflect blame by saying that Onset, in fact, was in some respects predatory and Onset was a contributor to the bankruptcy. Don't look at us, say the defendants, but Onset was there as well. So both parties have my client in the middle of a lawsuit.

Now, the one issue that the parties seem to fight about are the defendants and the Debtors, adequacy of representation, and I want to focus on that. Now, adequacy of representation in the opposition, the Debtors took the position that provided the parties have the same ultimate objective, then we're adequately representative.

The Debtors want to get the money back from Mr. James and his cohorts. But that's not the test, Your Honor. And we point out in our reply brief numerous cases, including the very case cited by both defendants, the MT Technologies case, and by the Debtors, the Texas case, that the standard is even if both parties have the same objective, and we do, we admit, we do, we want to get that money back.

Even if there's the same objective, where the parties' interests diverge from the putative representatives' interest in a manner germane to the case, then there is a divergence of interest and inadequate representation.

Now, I want to focus a little bit before I talk about exactly how the divergent interests exist here. Some language that I think is instructive from Fifth Circuit. There has been some suggestion by both defendants and Debtors that in the Fifth Circuit, intervention is disfavored, that it's a very hard test, it's impossible to

get to. But that's not the case.

The Fifth Circuit is very clear that, "Rule 24 should be liberally construed." The Fifth Circuit also says we have a, "broad policy favoring intervention." In fact, the statement is so broad is that the court says that "where no one would be hurt and the greater justice could be attained, intervention mandatory should be allowed."

So let's focus on that test. The interest being, do the interest diverge in a manner germane to the case because that is the test we are here to discuss. And the Fifth Circuit teaches us ways in which we analyze that. The La Union case in 2022, we cited in our reply.

The court found that interests diverged -- reversing the trial court. Interests, in fact, diverged where the intervenor's interest was narrower than the broader interest of the existing party, here the debtor.

The Sierra Club case, 1994, it taught there, reversing the trial court, that there could be a distinct economic interest that the intervenor has that is not absolutely and consistently shared by the existing party.

Another case, Your Honor, just briefly in American Traffic Solutions, we talk about that case as well in the reply, the court reversed the trial court, and observed that existing party motivations are something the court should consider when thinking about letting Onset, letting an

intervener in the case.

And finally, Bergam, Your Honor, just recently in 2025, that Burgum case observed that divergence exists when the intervener may have "distinct evidence it wished to introduce" and "distinct legal arguments it intended to make." And it referred to that those are situations where the court should deeply consider a mandatory intervention.

Now, these principles, Your Honor, apply very much here. Onset has a distinct economic interest that is narrower than the Debtors. The Debtors' complaint takes the return of asks for the return of funds to the Debtors' estate. And if you go through the complaint, you see the language is returning the funds to First Brands, returning the funds to the Debtors.

Onset has a narrower interest here, Your Honor, and it seeks to make distinct evidence or introduce distinct evidence and distinct legal arguments to ensure that, in fact, the Carnaby interests -- because we are the only debtor to Carnaby -- the Carnaby interests are the ones that are protected.

And not only that, Your Honor, the legal arguments, and evidence that's different that Onset would be introducing really relates to where this money went. Right? Did James and the defendants take the money right out of Onset's pocket the moment it left, essentially fleecing it

before it got to the debtor's estate?

Did Onset or did defendants take the money after it reached the FBG subsidiary? And that's a key issue.

THE COURT: Isn't that -- wouldn't that come up in the context of a fraudulent transfer case, where the money went to determine --

MR. FIOTTO: It would certainly come up, Your Honor, but the way the record is created is very important. For example, if the record is created such that, well, we think Mr. James diverted funds between Onset and the Carnaby entity or we think funds were diverted between the Carnaby entity and the FBG subsidiary. That would mean that the FBG subsidiary never received the cash, the fair market value and therefore, title did not go to Carnaby and therefore did not go to Onset.

THE COURT: So let me ask you a question, just so I understand the scope of what you're asking for. Intervene as to what in the case?

MR. FIOTTO: Intervene, Your Honor, as a co-plaintiff.

THE COURT: Well, you can't pursue fraudulent transfer actions, right? So I'm going to ask you a little bit more.

MR. FIOTTO: We can pursue. And, Your Honor, we've identified the equitable --

THE COURT: Well, let me just --

MR. FIOTTO: I'm sorry. Didn't mean to interrupt you.

THE COURT: Yes. No. Yeah. Just the equitable one. You're not going to get me on. So what do you really want to intervene on?

MR. FIOTTO: We really want to intervene, Your Honor, to establish and make the legal arguments and present the evidence.

THE COURT: But what does that mean in the context of what? So you want to intervene as a plaintiff and then what, assert your own causes of action or? Or just in other words, I let you intervene on what grounds, right? Because there are certain causes of action that are just derivative to the estate, and it's going to be really hard to get me to move off of that. So there are others.

On accounting, do you want to intervene on the accounting or do you want to intervene on constructive trust?

MR. FIOTTO: Constructive trust, Your Honor, accounting. We have identified, in fact, equitable remedies that we would like to show that that money belongs to the Carnaby entities or belongs even to Onset, so.

THE COURT: But that's a different -- that's not equitable, right? That's not an equitable remedy to

determine who owns the money.

MR. FIOTTO: Well, but, Your Honor, the way the evidence is going to be shaped is going to be very, very critical. Let's take another example. The evidence, for example, on the Debtors alleged is that the books and records of the Carnaby entities are not sufficiently clear enough to establish Onset's title. We don't know that transaction occurred.

Now, okay, well, if Onset is in that case, we have the right to develop the legal arguments and the evidence that, in fact, that is not the case. That, in fact, the records do clearly show or that for example, the parties were all on notice about the transfers, including the SBL.

We have the right, Your Honor, to develop the record, for example, that maybe Patrick James was an agent -- excuse me -- of the ultimate FBG subsidiary, so that whenever he took Onset's money, title was already -- money was constructively received --

THE COURT: Right. That's a different adversary proceeding is what I'm saying.

MR. FIOTTO: Well, Your Honor --

THE COURT: That's the concern that I have, is that we're not -- in other words, you don't want to intervene, you want to add causes of action.

MR. FIOTTO: Well --

THE COURT: Right? You want to determine the nature and extent of the debtor's interest in property and ultimately determine -- I get it, which makes -- you know I understand it from your client's perspective that you believe that that's your money, right?

So if it's Onset's money, you want the opportunity to develop that record so that if the money comes back, it goes directly into your clients and not back into the estate for the determination. But that's why I'm asking, intervene. Intervene how?

MR. FIOTTO: Well, we don't necessarily -- Your Honor, we would not issue or we would not submit a claim that contradicted the Debtors.

THE COURT: You would have to, though. That's what I'm saying. You would have to because you keep calling it Onset's money, right? And the debtor is going to take the perspective, right, that this is -- it should come into the estate, right? And so that's the question that I've got for you. It's more of a you want to intervene, but what are you really asking me for?

MR. FIOTTO: Well, the Debtors are going to take the position that it comes into the state and we don't really care where it goes. That's the position. We want to take the position that the evidence should be shaped. What the Debtors have argued is that, look, let's just figure out

where the money gets back from.

THE COURT: How do I then prevent another 15 of these to get filed the next week?

MR. FIOTTO: Well, Your Honor, I think the same thing --

THE COURT: Because everybody is going say, I got a very unique interest. I just have my own SPV debtor. It's coming.

MR. FIOTTO: Well, Your Honor, I think that --

THE COURT: Evolution is certainly coming. The other folks are coming as well, right? They're already indicating. Everybody believes that it's their money. Katsumi. There are others who believe that it's their money, and they're all doing a bunch of investigations. So what makes -- I'm not saying it's not a valid legal argument. But the question is, should it be handled -- are you really arguing the same things?

In other words, you want to come in as a plaintiff or are you going to essentially create your own lawsuit within the lawsuit? That's the question that I have in my mind.

MR. FIOTTO: And I understand that, Your Honor. And I don't see --

THE COURT: I got questions for them, I'm just trying to work --

MR. FIOTTO: And I don't --

THE COURT: -- legally through exactly --

MR. FIOTTO: I don't --

THE COURT: -- what I'm being asked.

MR. FIOTTO: -- see it that way. The way -- Debtors have argued that there's no collateral or res judicata effect on what's going to go on in the adversary proceeding. I'm not necessarily sure that's true, and I can talk about that. But what's going to be developed in that adversary proceeding are streams of the diversion, are the clarity of the records that demonstrate Onset's title, are whether Onset is, in fact, the only creditor.

We're not necessarily going to argue or make a claim against the Debtors that you've got it wrong. But sitting at the table, creating, and helping that record, we all know how an evidentiary record is put together. It depends who's sitting at the table. It depends who the parties are. It depends what questions get asked at depositions, what questions don't get asked, what documents are introduced.

We would like the opportunity to shape that record instead of after the record gets completely calcified, we're down the road or in another proceeding trying to chisel away at them. And I don't think that's what the test contemplates. Because remember, it is whether the interest

may be impaired in a practical way.

And that's the thinking that we have here, Your Honor. We're not going to be at sword points with the Debtors. That is not our intent here. But being able to be involved in demonstrating or influencing the record. See, motivation is important. The Debtors do not necessarily have the motivation that we do to introduce evidence about the clarity of the records that support our transactions, about when and where the Onset money was fleeced. These are matters that are largely indifferent to the Debtors.

And so with our unique narrow economic interest and the singularity of our position, Your Honor, I think distinguishes us from other would-be interveners. I know the idea of floodgates is a common argument used that if you have it here, we're going to be dealing with interveners down the road. I don't see it that way, Your Honor.

First of all, no one else in this case has sought to intervene, and I think they've got a timeliness problem at this point. I think timeliness in the Fifth Circuit is like that. You've got to get involved and get really involved.

We're also -- by the way, we understand the scheduling order. We're prepared to proceed.

THE COURT: I agree with that too, by the way. Go ahead.

MR. FIOTTO: We're proceed -- we're willing to proceed with that scheduling order, substantial production of documents by February 23rd. We've already produced 180,000 documents to the Debtors.

But the Debtors position, Your Honor, that we should not be involved because it doesn't have res judicata or collateral estoppel effect on us. I pointed out, we pointed out in our reply brief, Your Honor, that was a 1968 test where the --

THE COURT: It seems like what you're really trying to do is establish -- get in here to establish a record that -- to create a record that Onset to the funds that it believes it's entitled to.

MR. FIOTTO: I'm sorry, Your Honor?

THE COURT: It seems like you're trying to, through the intervention, essentially create the record to then ultimately come back and argue that the money that comes -- if any money comes back into the estate. I want to be really clear. These are just allegations and a complaint. We don't even have an answer yet. That some of those funds, that if certain funds come back, that they should go to Onset, right? That's -- you're essentially trying to --

MR. FIOTTO: We want to not --

THE COURT: -- create the record through --

MR. FIOTTO: -- to be --

THE COURT: -- this adversary proceeding.

MR. FIOTTO: We want to not be impaired by that.

THE COURT: Your concern is that somehow there could be a record in the adversary proceeding that you would then have to come back and then argue against different findings of fact that the court may make or something?

MR. FIOTTO: Correct, Your Honor.

THE COURT: Okay.

MR. FIOTTO: And back in April, Your Honor, in the DRF Trilogy case, you had an intervention question. It was a status conference. It was a trial court. It was a transcript ruling. But there was the guarantor who wanted to intervene. And the way the court -- the way I read the transcript is essentially, and I quote there, you said, "Look, those interests are going to be affected one way or the other in this case," the guarantor's interest.

Even though the guarantor may not be formally precluded because it was not involved in the case, but the evidence is going to be developed, legal arguments are going to be made, and the guarantor should have a seat at that table because it's so directly involved.

And I think, Your Honor, Onset is fundamentally involved here as well. And if I may briefly, Your Honor, touch on standing.

THE COURT: Sure.

MR. FIOTTO: Standing, Your Honor, we don't think that's a matter that the court should spend much time on, frankly. As the Supreme Court said, and we pointed out, that unless -- if the intervener is seeking essentially the same relief that the existing party is seeking, there is no grounds or need to establish independent standing.

But also Your Honor, we do talk about Section 1109(b). Now, that doesn't give us automatic right. The fuel oil case says, no, that doesn't mean just because you've got an interest in the case, you're automatically in. What it said was that if you can prove the Rule 24 elements, that is to say inadequacy of representation, then the court should consider that as a matter of mandatory intervention.

And frankly, if we had to establish standing, I mean, standing requires us to show that we were injured. It was traceable to the defendant and ruling by the court could redress that. Well, it was Onset's money that Mr. James took. It was Onset's recipient of that money that Mr. James prevented, and it was Onset's title that is now being jeopardized at least according to the Debtors. So if we had to establish Article III standard, we think we could.

Let me just end, Your Honor, on permissive intervention. I think obviously that's in the discretion of the court. But we don't see, Your Honor -- and there's no

dispute, I think, by anybody that there are common interests of fact and law involved in Onset's claims and in the debtor's claims.

There's no efficiencies, Your Honor, as we see it, to be gained by Onset filing a separate litigation. I think we agree with our colleagues earlier, debtor and the committee that said, look, Your Honor, we want to minimize litigation. Having Onset go off and sparking its own litigation, having this court deal with multiple rounds of depositions, dispute hearings, things like that, doesn't seem to us to be the best way economically or for this estate to proceed. There's no delay, as I said, Your Honor. We're signed on to the scheduling order. We're ready to proceed all the way.

And again, Your Honor, on the flood gates argument, again, I think there's a timeliness issue. No one has suggested they wanted to intervene in this. But also --

THE COURT: So let me come -- just see if I -- I agree with you. Timeliness, Fifth Circuit cases, two weeks, three weeks, this is two months in, right, on a well-publicized litigation that's already had, you know, TRO hearings. So it's, I think, Prong 1 on anyone is an issue and especially under the case law. So I think you're there.

I'm just summarizing your arguments, but I agree with you there on timeliness of --

MR. FIOTTO: Thank you, Your Honor. And --

THE COURT: And an interest in the property, you're arguing that you believe some of the -- that you may have an interest -- well, you're alleging that you do have an interest in the property and the transactions that took place in connection therewith. And that you think essentially, that your interest, that the plaintiffs may not be able to adequately represent that interest. Because your interest is unique, one debtor, I should say, one entity and kind of the determination as to ownership of the cash.

MR. FIOTTO: That's correct, Your Honor. And three -- if I may end on just three very quick points.

THE COURT: Yeah. Yeah.

MR. FIOTTO: One is that, Your Honor, in all of the cases in the Fifth Circuit that we have spent time reading and maybe my colleagues will correct me on this, but I suspect they won't. It is not the case where the intervenor is centrally featured in the complaint. Usually, an intervener comes out, you know, some citizens group or whatever comes out that's not really mentioned, but here our assets, our title, our name is in the middle of this.

And my second point, Your Honor, is just as a sense of fundamental fairness, I mean we are the ones being talked about in this case and both parties have staked the position. Debtors have staked the position that our title

may be questionable as a result of the pilfering. Defendants are going to come at us hammer and tongs, we know that, in this litigation to try to deflect blame.

And my last point is, Your Honor, what's the harm? As the Fifth Circuit said, look, our approach is an open intervention policy, and we think that intervenors should be there if it could enhance the justice, it can enhance the ultimate ruling in the case.

Onset is two strong arms willing to row with the Debtors. We don't see why we wouldn't be embraced. They've got a formidable, well-funded adversary on the other side, and we're prepared to start immediately to adhere to the scheduling order and to proceed. Unless the court has any questions, Your Honor.

THE COURT: Just tell me your best arguments for -- I went through kind of the mandatory. Tell me your best argument for permissive.

MR. FIOTTO: Well, permissive, Your Honor, I think that I haven't heard a single party say that we do not have common interests. We do not have common interests of law, that is to say, were the Onset cash, were the Onset funds pilfered? Legal issues, was the diversion of funds illegal, fraudulent? Legal issues regarding to whether fair market value reached the ultimate FBG subsidiary and perfected our title. So there are common legal issues we think, Your

Honor, for intervention.

And also, I think the one question that the court thinks, as I read the intervention, the permissive intervention cases, I think the court is most concerned about delay. And again, I don't think there is going to be delay because we have signed on, willing to go with the scheduling order, and to move forward expeditiously.

THE COURT: Thank you.

MR. FIOTTO: Thank you, Your Honor.

MR. NILES-WEED: Good morning, Your Honor.

THE COURT: Good morning.

MR. NILES-WEED: Robert Niles-Weed from Weil for the Debtors. I'll start with a bit of housekeeping. I want to introduce my other colleagues who are with me today, Nili Moghaddam.

MS. MOGHADDAM: Good morning, Your Honor.

MR. NILES-WEED: And Hira Baig, who are on the adversary with me. And in terms of the run of show, I'm going to go first for the Debtors and then Mr. Friedman, on behalf of the independent director, Ben Duster, with respect to the SPV entities wants to say a few words, and then Ms. Weisgerber for the defendants.

THE COURT: Okay.

MR. NILES-WEED: So I want to begin with a bit of a table setting about what this adversary proceeding is

actually about and what it's not about.

THE COURT: Okay.

MR. NILES-WEED: And that will lay the groundwork for the intervention arguments. This case has a very narrow and focused scope. We are here to recover hundreds of millions, if not billions of dollars, defendants misappropriated and bring as much money back into the estates as efficiently as possible. As a state fiduciary, that's our job. We want to maximize the value of the estates for the benefit of the estates and all of their creditors.

Our claims make clear that this is all we're trying to do in this action, no more and no less. As you mentioned, they're classic claims that belong to the bankruptcy estates, turnover, fraudulent transfer, and the like. We're trying to restore money that was misappropriated from the estates back to the estates.

Importantly, none of the claims we're bringing relate to creditor priority or distribution. Those issues will be resolved elsewhere in these proceedings, among all parties of interest, probably in connection with the plan process or as you suggested, other adversary proceedings.

As the court is aware, it's a complicated case with many creditors, many debtor entities with competing claims to a limited pool of funds. But none of those

disputes are relevant to this adversary proceeding. Everybody, including Onset, and including hundreds of other putative creditors, will have their chance to pursue their claims against whatever we recover.

Against that backdrop, it's somewhat straightforward to see why Onset has no good reason to intervene. We are pursuing the interests of all of the estates and their creditors in a unified way without fear or favor to particular putative creditors in this proceeding. Onset has no interest in that effort, the focus of this proceeding, different from generally maximizing the property of the estate.

If that interest were enough for Onset to intervene, we would see a line out the door of potentially hundreds of other interveners at least filing motions seeking to intervene who would want their rights to be similarly adjudicated in this adversary proceeding, or at least who don't want to allow Onset to transform this proceeding in a way that would secure Onset an unfair advantage in future fights.

The dispute in this adversary proceeding are binary between defendants who misappropriated estate funds and us who want them back. What happens to those funds after we get them back, which is where Onset's concerns seem to be, is a problem for another day.

And it's notable our table is crowded today. We and defendants disagree about virtually everything in this case, but not on this. This is a binary dispute, and to resolve it efficiently and effectively, it is these two parties that should be at the table.

Turning to the intervention --

THE COURT: Go ahead.

MR. NILES-WEED: -- standard itself, I want to start with 24(c), which is a procedural requirement, but it has substantive purpose. 24(c) is clear. It requires interveners to attach a pleading that "sets out the claim for defense for which intervention is sought." Onset hasn't done that. If this were something Onset could do, it would have been straightforward. We put them on notice over a month ago that they didn't have a pleading, and we still haven't seen a pleading.

Still today, it's not clear to me, and I think this was Your Honor's question, intervene as to what, what Onset's claims are. I heard a lot about legal arguments and evidence, not claims, concerns about the way the record is created, wanting a seat at the table, but it's not clear what their claims are as the rule requires.

I think the reply, which they filed late Monday night, is revealing. On some points of the reply, they seem to say they're bringing the same claims and seeking the same

relief as us. You know at Paragraph 27, they say Onset seeks the same relief at Debtors.

But then at other times, in the same reply, they say they're bringing different claims and seeking different relief. At one point, they say their claims align closely with ours, which I read to mean are not the same at Paragraph 31. And then in the replying again today, there was talk about different remedies, constructive trust with respect to Onset's right to the funds, which is not the remedy we're seeking in this case.

Rule 24(c), and its mandatory pleading requirement, is designed precisely to avoid exactly this sort of ambiguity and uncertainty. It forces them to articulate their claims so that we and the court can understand what they are trying to do here, and we could oppose it appropriately.

Onset's inability or unwillingness to articulate their claims, much less step them down in a pleading, feels, to me, indicative that it's somewhat revealing that they perhaps lack standing or know they lack standing to bring those claims. The claims we're bringing, as you said, are estate claims.

Onset may have claims against the estate that they can assert in connection with the plan process, but they don't have standing to bring those claims against third

parties who misappropriated funds from the Debtors. And if they have other claims that don't belong to the estate, we don't know what they are, and we haven't seen them in a pleading.

I just want to touch on 1109, which came up in Onset's reply. At times in the reply, they suggest that 1109 provides them withstanding and confers them a right to intervene in the adversary. And this is straightforward. The Fifth Circuit and the fuel oil supply case made very clear that 1109 does not confer an unconditional right to intervene in adversary proceedings and that Rule 24 sets the standard.

And Rule 24 requires a claim, it requires a pleading, and they don't have one. That alone is reason to deny the motion. And I'll add a point that was made in the opposition brief by the defendants. If the court is inclined to potentially allow intervention, even to some degree, we would ask that the court require them to comply with the rule and submit a pleading, and we'll reserve all rights to address that pleading as necessary if and when we get there.

THE COURT: And the issue with 1109, I'll lay it out there, and then -- that they're not relying heavy on it, but I know they threw it out there, is it just says you have a right to be heard, right? It doesn't mean participate in

any manner. And theoretically, that would mean, right, that just any general unsecured creditor could show up in this adversary and be heard on an issue, right?

And so you kind of get into the specific rules. When you have an adversary proceeding, you proceed under the applicable rules and contested matters and general matters. So if there's a fee application, folks can be heard, right? That's 1109. It's in the main case. If you have an adversary proceeding, then the federal rules of that -- you know then the 7001 Rules kind of kick in, and you participate in that.

So I think they're not heavily relying on it, but I do understand. It just gives you standing to be heard, right? To make a point, people can address the court. It's access to the court. You're an unsecured creditor. You want to be heard on an issue in the case. I agree with the cases that say that this does not confer.

You know and there's a difference between being heard and participating. It's just that -- but there's a reason that the specific rule plays into it here. But I agree with that, but.

MR. NILES-WEED: I think that's exactly right, Your Honor, and aligns with what the Fifth Circuit said in fuel oil. And the rule itself says case.

THE COURT: That's comforting.

MR. NILES-WEED: Got it. It's always nice when binding precedent is also right. So maybe I'll move on to the substance having hit the 24(c) issue.

And so Rule 24 sort of has two paths to intervention. There's mandatory and permissive. But together, they're setting up a system that allow parties whose rights will be materially affected by the disposition of a case and who are standing to bring or defend a lawsuit in their own right to intervene.

For mandatory intervention, they have to show an interest in the property or transaction of the action that is so situated that disposing of the action is a practical matter and impair or impede their interest unless there's adequate representation.

And on the permissive side, again, that rule, that portion of the rule says they have to have a claim or defense that shares with the main action a common question or a lot of fact. And then the permissive intervention standard is entirely discretionary, and it can be denied if there's prejudice or delay.

So on the mandatory side, with respect to Onset's interest, my friend on the other side quoted the language about requiring an interest that is germane to the case. And I think that's exactly the problem with their motion, which is they articulate a number of wide-ranging interests

in the status of collateral with respect to the Carnaby Debtors.

Those may be interests that will be argued about elsewhere. But again, those are not interests that will be directly affected by this case. Again, we're not asking the court to adjudicate any rights of creditors to proceeds we recover in this action. We're not seeking a determination of how the proceeds will be distributed. Those determinations will happen elsewhere.

Onset focuses extensively on the fact that it's the sole -- or claims to be the sole creditor of the Carnaby debtor entities and the victim of the defendant's misconduct. Those facts, if true, and if proven, may ultimately be relevant to ultimate allocation disputes among the few of creditors.

They're not going to be resolved in this proceeding where the question here is what happened to the money when it left the estates and was misappropriated by the Debtors. We will prove that misappropriation was improper and that the fund should be restored to the estates for the benefit of the estates and all of their creditors.

Onset's main concern seems to be that the factual record in this case will somehow develop in a way that harms them later. Rule 24 doesn't allow concerns about the development of the factual record to justify intervention,

and those speculative concerns can be addressed later if and when necessary, when the record that they are concerned about developing becomes relevant to interest they are asserting in other parts of this bankruptcy case.

They also speak a lot about how they're mentioned in their complaint. But I'd point the court to Paragraph 72 of the complaint, where we use the word illustrative to describe how we are using Onset in the complaint. Again, the fact that they are featured in the complaint does not satisfy the Rule 24 standard.

Just a bit on adequate representation, the other side of the mandatory intervention calculus. Again, interests have to diverge in a way that is germane to the case. So while they may have other interests that diverge from us on other issues, with respect to the goal of this adversary proceeding to recover from defendants as much as possible, our interests are exactly aligned.

And they say that. They say Onset and First Brands, and this is at 55 of their motion, have aligned interests in pursuing claims against Mr. James and the other defendants seeking recovery of funds misappropriated through deceit.

In his presentation, my friend on the other side cited a number of cases purporting to show the nature of divergent interest. But I think a close look at those cases

actually undermines their position. So if you take the Sierra Club case, I think this is a good example.

In that case, the Fifth Circuit found that there was adversity of interest allowing intervention where you had the party, who was the Forest Service, who agreed to an injunction to stop selling lumber. And you had lumber companies who wanted to intervene in that action after the Forest Service agreed to stop selling timber to advocate for them to continue allowing the sale of timber.

That is a direct adversity of interest with respect to the matter in dispute and germane to the case that would be decided by the court, and then intervention may be allowed.

Again, what we have here, which appear to be concerns, speculative concerns about the development of a future factual record, it's just not the sort of direct adversity that undermines adequate representation.

And the rest of the cases are similar. The American Traffic Solutions case, the court mentioned that the intervener's interest was unique because the main party might be inclined to preserve an adverse ruling in the case. Again, it would have been directly adverse to the interest of the would-be interveners.

And in this court's DRF bench ruling, as I read it, the guarantor there was concerned because the court, in

the proceeding, was going to determine the true nature of a guarantee. There's a possibility of recharacterization, and that directly impacted the rights of the guarantor.

So again, the concerns that are finding inadequate representation are ones where the subject of the action, the claims to be decided are directly adverse as between the parties. That's just not the case here. The claims that are going to be decided are whether or not the misappropriated funds will come back into the estates for the benefit of whoever has legitimate entitlement to those claims, which will be determined elsewhere.

THE COURT: And if the money comes back into the estate, am I making a determination of the ownership?

MR. NILES-WEED: No. Ultimately, of course, there may be -- there will be competing claims to that, those funds, and that will probably happen in connection with the plan process or other proceedings in this case. But for the purposes of this proceeding, all the court -- all we're asking the court to order is the funds to be returned to the Debtors' states as a whole.

THE COURT: Okay.

MR. NILES-WEED: All right. And then just a few words about permissive intervention.

THE COURT: Yes. Your best argument on permissive or against permissive, I should say.

MR. NILES-WEED: Yes. And then I'll turn it over. I've been going on for a bit, apologies. So on the permissive side, here too, they fail at the threshold. The rule itself requires a claim or defense that shares a common question of law or fact with the original case. So it's not just abstract questions of law and fact in which both parties may be interested. They actually have to have a claim that they are trying to bring in this proceeding that is overlapping with ours. And again, for all the reasons I mentioned earlier, they fail right at the threshold there.

And then with respect to delay and prejudice, I wish it were the case that having another party asking questions at every deposition and participating in document discovery, filing briefs, arguing a trial presumably wouldn't delay or prejudice us, but I think that's just not realistic. I think we're here, at sword points already, and that has characterized our relationship throughout this proceeding so far, and I don't expect that intervention would change that.

It would increase costs. It could risk delay. It will complicate discovery and motion practice, multiply filings. And turn what should be a very focused proceeding into a much broader and more complicated dispute about how proceeds should be distributed among the Debtors' creditors.

And worse still, if Onset is allowed to bring

those issues into this case, which don't belong here, we can expect that a bunch of other creditors who have different views from Onset about their entitlement to the proceeds will also want to show up and be heard in some form. And you know at best, there will be a lot of intervention motions.

At worst, what Onset wants is to turn this adversary proceeding and have it subsume the entire bankruptcy case. But the court -- the code has a process for the bankruptcy case. That's the plan process. That's not what this adversary proceeding is for.

So the court should deny the motion, allow us to vigorously and efficiently prosecute this action to recover the hundreds of millions or billions of dollars defendants misappropriated for the benefit of the estates and all of the putative creditors, including but far, far from limited to Onset.

THE COURT: Thank you.

MR. NILES-WEED: And unless the Court has any further questions, I'll turn it over.

THE COURT: No questions. Thank you.

MR. FRIEDMAN: Good morning, Your Honor.

THE COURT: Good morning.

MR. FRIEDMAN: Bryce Friedman, Simpson Thacher & Bartlett. I'm relatively new to this proceeding, so I --

THE COURT: I just want to say welcome.

MR. FRIEDMAN: Thank you. I wanted to take a moment now to introduce myself, and more importantly, my client, and offer a few points of information to the court that may be relatively new to the court and may help the court evaluate the motion to intervene and how to exercise its discretion.

In particular, I think it's important that the presence of our client addresses Onset's articulated concern that the interests of Onset's borrowers, the so called SPV entities, won't be protected appropriately in this case going forward.

My client is Benjamin Duster as the independent manager of Viceroy Private Capital, which is the controlling equity holder of the various SPV entities, the entities that everybody has been calling the SPV entities. He was appointed on December 5, 2025.

His primary responsibility is to deal with any conflict matters that may arise between the SPV entities that have been alleged and the FBG entities in this case. He has responsibility for any transaction agreement or arrangement in which a conflict exists or is reasonably likely to exist between the Viceroy SPV entities and an FBG entity.

He's a 30-year veteran of Wall Street. He works

in the restructuring and reorganization industry. He served as an independent director in the Expand Energy Group case, which was Chesapeake Energy, in the Weatherford International case, in the Republic First Bancorp case. Those were all public company cases.

He was retained again at the beginning of December. And over the last month, he's retained my firm, Simpson Thacher, as proposed counsel. There's a January 26th objection deadline to our retention. He's conducted meetings with each of the SPV lenders and their professionals. He's requested -- including Onset.

He's requested documents from the Debtors and the SPV lenders. And to the extent we've received them, we're looking at them. He's reviewing and analyzing the already extensive litigation record in this case. And he's requested evaluations of the value and ownership, or I should say alleged value and alleged ownership of all the assets, in dispute in this case.

With respect to Onset's intervention motion before the court, there's no conflict at this time between the SPV entities and the meaning the Onset borrowers and the FBG entities. We're aligned. But the relief sought in the complaint on behalf of all the Debtors includes relief sought on behalf of the SPV entities, including the Onset borrowers.

And I think this goes to the question you just asked. Any question of allocation of any money that is received will be dealt with later after the litigation reserved, and Mr. Duster will vigorously represent the interests of the SPV entities and make sure that they receive their fair share.

Going forward, we will assure that Mr. Duster is vigilant in protecting SPV entities' rights and positions in this very adversary proceeding litigation that Onset is asking to intervene in. And Mr. Duster may involve himself in discovery and hearings and other matters. It will certainly involve continued and ongoing coordination with Weil in representing the SPV entities in the adversary proceedings.

For example, the complaint was filed before Mr. Duster was appointed and Mr. Duster is going through all the allegations in the complaint, looking at the backup, evaluating those, and engaging with Weil where we think there may be -- need to be new or additional or less or other information or allegations made.

I want to flag something that Onset's counsel said. He said he wants to show that the money at issue in this case belongs to him, Onset. That's incorrect. With respect to the SPV entities, that money belongs to us, not Onset. And to the extent Onset is entitled to it, that will

be dealt with separately.

I submit that Mr. Duster is uniquely and properly situated to do this job as an independent fiduciary for the SPV entities, and I believe that should also inform the court's decision and exercise of his discretion in this case.

I do want to conclude with something very important, and again, Your Honor hit on it as well. I'm a little concerned that the Onset Intervention Motion is a disguised effort to assert the SPV entities as state causes of action. And there are a number of places in the reply that suggest that might be what's going on.

And again, I flagged that Onset counsel said to Your Honor, they're looking at -- I think he said earlier, the funding belongs to Onset. And again, I don't think that's true. The funding belongs to the SPV entered entities.

So I think Mr. Duster clearly objects to the usurpation of any of the SPV entities that state causes of actions by Onset, and any order should be crystal clear in Mr. Duster's view that those estate causes of action belong to the SPV entities themselves.

So with that, I thank you, and I look forward to working with the parties in interest in moving this case forward.

THE COURT: And if I were to summarize your argument, one of the points that you're making is that if money is recovered, and again, if - I want to just be really clear, that money would come back to an entity and not go directly to an Onset or --

MR. FRIEDMAN: That's correct.

THE COURT: That's your argument, right? And so there could be cause of actions that could be asserted, but you think that they would be derivative of the cause of action that you all may or may not assert?

MR. FRIEDMAN: As the complaint is currently constructed, that is true, Your Honor. Those are our causes of action.

THE COURT: Understood. Okay.

MR. FRIEDMAN: Thank you, Your Honor.

THE COURT: I'm not saying I agree or disagree with anyone. I'm just making sure that before the folks leave the podium that I've at least understood the argument.

MS. WEISGERBER: Good morning, Your Honor. Erica Weisgerber of Debevoise on behalf of the defendants. As Mr. Niles -- we've pointed out, we very rarely agree on anything and we, obviously on behalf of my clients, I vigorously dispute the allegations that are being litigated in this adversary proceeding.

But what we are in violent agreement on is that

Onset does not belong in this case. And I want to start with a critical point for context here. Onset took 30 days to file its reply in support of intervention. By my count, that was 23 days after the deadline.

But putting that aside, what's particularly important here, Your Honor, is that notwithstanding the fact that both the Debtors and defendants raised Onset's failure to attach a pleading to its motion to intervene, on December 5th, as of January 7th, we're standing here without a pleading. Well, why not?

Well, by not filing a pleading, Onset can shift its arguments in whatever manner benefits it when discussing the elements of intervention. And I'll provide some examples.

First, Onset, at times, argues that it's merely seeking the same relief from the claims as the Debtors in this action. But at other times, it argues it's seeking unique relief and to assert its own claims. Therefore, it can shift its arguments as to standing by saying, for example, as counsel did this morning, it doesn't need to establish its own standing because "it seeks to pursue the same relief as the party invoking the court's jurisdiction," here, the Debtors.

But there are several impediments to Onset asserting those claims, and I think the court pointed out

some of those, and Mr. Niles-Weed covered those at length, so I won't dwell on them.

But for similar reasons, Onset lacks constitutional standing, which requires Onset to articulate, among other things, how its injury would be redressed by a favorable decision. In his intervention motion, Onset explains that its interest is "Any subsequent allocation of recoveries among the various Debtors and their related entities."

And as we're hearing this morning, that interest cannot and will not be redressed by adjudication of the Debtors' claims because allocation of any recoveries by the Debtors would be addressed separately.

So then perhaps recognizing that it might be called out on the fact that it's not seeking the same relief as the Debtors, Onset says it can demonstrate its own standing because it might have unique remedies and claims that the Debtors may not.

So Onset is telling us both it doesn't need its own standing, but actually, simultaneously still telling us I have standing over my own claims with my own unique remedies. But because there's no pleading, once again, we're left wondering what exactly are Onset's unique claims? Who are those claims against? Are Onset's claims against the Debtors relating to Onset's ownership rights? Are they

about the Carnaby Debtors' ownership rights? Are they claims against my clients?

Or are they claims against other personnel at First Brands who Onset spends much of its time in its pleadings discussing other individuals who it purports are maybe the John Doe dependents in this case? But we don't know. Onset's motion doesn't make any of this clear. By avoiding a pleading identifying its actual claims, Onset avoids having to articulate its actual interests and motivations.

Next, Onset shifts its articulation of which protectable property interests it has at stake here. It repeatedly says its injury is that its money was diverted. It also says a favorable decision will redress its industry -- its injury by determining where the funds are returned.

But again, this relates to that interest about its subsequent allocation of recoveries. And the case law makes clear, Your Honor, you have to look at what relief is actually being sought. The Debtors' claims here don't seek to adjudicate whether -- where specific funds are being returned. And to the contrary the Debtors are telling us if they succeed, which is disputed hotly, those issues will be adjudicated separately.

Now, despite repeatedly articulating its interest in its money that it invested, when we get to Page 15 of

Onset's reply papers, Onset seemingly recognizes that an economic interest might sufficient for Prudential's standing here based on the way that it invested this money, and it claims that for purposes of Section 1109(d), its property interest relates to the collateral that it claims was committed in connection with its transaction.

But the Debtors' claims aren't focused on recovery of ownership, or ownership of equipment and inventory. There's no allegation that Mr. James pilfered equipment or inventory from the company.

And similarly, contrary to Onset's arguments, the Debtors aren't focused on whether Onset was the only creditor of the Carnaby Debtors or whether Onset had a valuable valid or enforceable financing arrangement with the Debtors.

So for these reasons, Onset can't meet the standard for mandatory intervention to show how the claims in this case will impair or impede its ability to protect its interests. While Onset's belatedly filed reply brief cites several new cases that a claim supports its position, it's very important because they're all distinguishable for one critical reason.

Those cases all allowed interveners to intervene where their interests were going to be directly affected by the adjudication of the specific claims in the litigation

that were already -- that was already pending. It wasn't about influencing the record in that underlying litigation.

Mr. Niles-Weed touched on a couple of these cases, but for example, in Brumfield v. Dodd, the claim at issue could directly affect the proposed interveners because the issue was a potential injunction to pause a voucher program that benefited the proposed intervener's children. That was what was being adjudicated, whether or not the voucher program was permissible.

In La Union, the issue was permissibility of amendments to the Texas Election Code, which amendments directly the interveners' interests as committees that trained poll watchers under those elections that were going to be affected by the election code.

In Turbovic v. United Mine Workers, the court allowed intervention where the primary plaintiff, was litigating the specific claims first raised by the proposed intervener relating to the election of officers in the intervener's union.

In DRF, there was a right to intervene because the issue in the litigation was determining the nature of a financing arrangement for which the intervener was a guarantor. You could see how these interveners were directly affected by the specific ruling of the claims in that case.

Similarly, in the Texas case that Onset have brought up today, the issue was whether a deferred action immigration program should be invalidated, and the proposed interveners were immigrants who might lose their opportunity to obtain status under that program that might be invalidated.

But here, as far as the claims that are actually being asserted in the adversary proceeding, you heard Onset this morning say they fully support the Debtors in succeeding on the merits of their claims. They do not have a different interest with respect to the claims that are actually avert -- being asserted here.

So turning then to permissive intervention, because I think all of those facts really explain why mandatory intervention is not necessary. On common issues of law or fact, again, we don't have a pleading here. It's not clear to me how Onset has claims against the defendants in this case as a legal matter or a factual matter, frankly, Your Honor. We don't go pleading articulating what those claims are.

We do have a filing saying that Onset primarily interacted with an entirely different person at First Brands other than my client. And I don't know if there are common issues of law or fact there because, again, we don't have a pleading.

As far as the question of whether there would be undue delay or prejudice, we believe the answer is unequivocally yes, it would cause both. Onset's intervention motion makes -- does make clear that it will massively expand the issues in this case by whatever claims perhaps it may be asserting and by the relevant facts that it thinks needs to be explored.

It also appears to me that they might add new parties, new defendants to the action that will certainly expand the discovery record, the facts, and cause delay. So I join in the other arguments made by Debtors counsel on this issue.

As far as delay, we also don't have a pleading crystallizing what alleged claims Onset has. We just have Onset's say so that it will be efficient to the extent its interests align with the Debtors, while Onset, of course, is simultaneously arguing repeatedly in its pleadings that its interests do not align with the Debtors.

So for those reasons, and the ones in our papers, we believe the motion to intervene should be denied.

THE COURT: Thank you. Let me just see if anyone -- I think those were the three. I'll certainly give you an opportunity to respond. Thank you.

MR. FIOTTO: Thank you, Your Honor. I'll be very, very brief. I really didn't touch on 24(c), because

frankly, the law in the Fifth Circuit is very clear. There is no obligation for a pleading, provided that the party seeking intervention provides notice. And we cite the Diotto case, Fifth Circuit 2021, Liberty Surplus. It says this loud and clear.

And we have surpassed, as we demonstrated I think in the reply brief, all of the requirements of providing that notice. Motion at Paragraph 55, we bring claims "against defendants and recover against James and affiliates funds misappropriated through deceit." Forty-vie, our remedies include, and we list our remedies. There's no lack of clarity about what we want to do in these proceedings.

THE COURT: I don't necessarily agree with that. Because I had to ask you what you wanted to intervene on. I understand you put parties. I think there's an argument that maybe you put -- I need to think about that a little bit more. I'm going be honest with you. I'm going give you an opportunity to explain it to me. I could not read, as what you were asking for, what you were looking for in connection with this adversary proceeding.

I could not understand whether you were seeking to establish to step into a fraudulent transfer action and it's kind of sign of seek derivative standing to pursue cause of -- in other words, I'm asking these questions because I couldn't tell from the pleading. I got it. The Fifth

Circuit says it's not -- and this case is out there. Judge Rosenthal said it's not fatal, right?

But it doesn't mean that we just overlook it. And this one's a little different than those other cases because, right, in those instances, what you told me was you were thinking about trying to almost step into a lawsuit that could only be brought by the estate, right, 542, 548? And there, there's usually standards for when you can kind of step into those.

And so I was trying to find the angle that you all were trying to pursue, and I couldn't read it in the pleadings. And that's why I needed to understand it. And that's why I'm asking for clarity as to exactly what you're seeking to intervene in connection with. Like what does a complaint look like?

MR. FIOTTO: A complaint would look like, Your Honor, us asserting that the defendants diverted hundreds of millions of dollars of state funds that also included Onset funds. And we would proceed to seek that through equitable remedies, constructive trust, accountings, things like that, directly against the defendants. That's what we would be seeking. And I think we made that clear, and we point out in our reply the various paragraphs. We said it, I believe, repeatedly.

And the notice standards under Liberty Surplus,

for example, as an example. Liberty Surplus, the intervenor did there was say, we think we've got a serious interest here, and our interests are not satisfied adequately by the proposed party or the existing party, and we intend to adopt some of the legal theories presented in the original complaint.

THE COURT: So here's a question for you. In the case Judge Rosenthal in Liberty Surplus ends by saying, in the present case, the motion to intervene that Jacobs filed does put the parties on notice of his grounds for intervention. The motion is timely filed. The motion is filed. Liberty Insurance does not contend that it would be prejudiced by the intervention. How do I read that in connection with 24(c)?

MR. FIOTTO: You're suggesting, Your Honor, that the other side --

THE COURT: But you can't just --

MR. FIOTTO: -- didn't say it was prejudice.

THE COURT: -- flaunt and just not put it -- did you really put parties on notice? Because they're alleging that -- I mean they are alleging prejudice. You had three different folks kind of step up there. So what's the answer to the noncompliance with 24? I got it in terms of the putting on the notice because they're saying they are prejudiced because they don't know what you would allege in

the complaint.

MR. FIOTTO: But I'm not sure I follow that lack of knowledge. It's quite clear to -- it seems quite clear to me that since we are featured in the complaint, and that most of the money or many hundreds of millions of dollars of the diverted funds were taken from Onset.

THE COURT: I get the argument you're --

MR. FIOTTO: We're seeking back --

THE COURT: -- saying, yeah, I am named -- your client is named in the complaint. Part of establishing the record is establishing what happened to your client according to the complaint.

MR. FIOTTO: That's correct, Your Honor. That's correct. And that's why we think -- that's why the language may as a practical matter be impaired is very, very different from cannot intervene unless collateral estoppel or res judicata impacts it.

Our ability, Your Honor -- and this court, make no mistake, the adversary proceeding, whether anybody stipulates or whether anybody agrees that there will be no absolute preclusive effect down the road, the Court is going to make findings of fact and conclusions of law after this trial in June. And those findings of fact are going to make statements presumably based upon the record that was established by the existing parties.

And without us, without Onset contributing the distinct evidence and distinct legal arguments that the Fifth Circuit has recognized as divergent, we will be left to having to accept those or chisel away at them impossibly, I submit, sometime down the road.

Now, the other thing I just want to point out, if I may, Your Honor, unless you have another question on 24(c).

THE COURT: No. No, no other questions. I'm just making sure I'm flushing all the issues out.

MR. FIOTTO: Is that -- you know we're very happy about the independent director who did not submit any papers and objection or anything like that. But I think the fact that the independent director stood up here and said, I'm here to protect, and I'm going to be looking, we have two issues with that, although we are very grateful for the existence of the independent director and we look forward to working with the independent director.

The two issues I have, Your Honor, is that, to me, it just highlights the conflict. It highlights the conflict here and the lack and divergence of motivations between what the debtor is doing and what is going -- what Onset would like to do. That's Point 1.

Point 2 is that why is it that instead of Onset protecting its rights, who has obviously the singular

economic motivation to do that, the independent director would somehow be able to intervene or participate or be involved in protecting Onset's rights or the SPV rights, I'll be more general and that was to be fair to the independent director, I believe that's what he was saying.

So think, Your Honor, there's actually -- and the third point I want to make about that is litigation that's going on right now, and it's a firestorm of litigation, right? You know they've got four months to trial. I'm sure it's going to be a knife fight in a phone booth. That's what I would imagine that case is going to be like.

But in connection with that, Your Honor, the need for Onset to be involved in shaping that record, and to have the motivation to be involved in dealing with the issues that they are going to be talking about concerning Onset, is critical.

Now, I may have misunderstood, but when I heard my colleague, I believe the first gentleman who stood up and pointed to the table and said, we are already at sword points, I heard him to say that he, in fact, and Onset are at sword points and perhaps I misunderstood. Perhaps he was speaking of another committee, but I thought what my colleague said is that, in fact, we are already at sword points, and Onset that is, and the Debtors.

And then I heard defendants say that we are at

sword points with them as well. And so we are now -- I mean I see my client. I have this image of my client gagged and tied to a chair in the middle of a boxing ring. And both parties are talking about Onset's rights throughout.

We're not talking, Your Honor, about trying to go in on a conflict and trying to fight with the Debtors at this point. As I said, we're going in there really to protect our rights, to row in the same way, in the same direction that the debtor is rowing and proceed on that point.

And lastly, I just want to point out, there seems to be a conflation of when the question was asked, where are you bringing the money back to? And then I heard the estate. Well, isn't an acknowledgment that there are really two parts of this estate. There's the Viceroy side and then there's the FBG side.

So it's a little hard for me to understand how just saying, well, it's going back to the estate answers the question that our interests, which are solely devoted to the SPV side, totally devoted to two feature Carnaby SPVs are going to be protected. Thank you, Your Honor.

THE COURT: Thank you very much. I'm going to just take the matter under advisement. I think I can give you an answer by Friday. I just want to take a look at some cases. So parties who in this matter, if you could -- as a

matter of fact, by tomorrow, early afternoon, I'll let you know if I am -- if I can give you an answer.

And if I can give you an answer, just want to go back and look at some cases. I can give you an answer on Friday morning, I'll do it. Parties can dial in, and I'll just rule on this issue. If not, by no later than the 13th, you'll have the answer on this. But I think I can give you an answer by Friday. But I want to give myself a little bit of flexibility. But if I do, I'll let you know so that it's no surprise as to what I'll do on Friday. Okay. Where do we go next?

Maybe I should ask. Do folks want a five-minute break or?

MR. TECCE: Yes, Your Honor.

THE COURT: Okay. How much time do you think you need?

MR. TECCE: Your Honor, I rise because I -- we filed a motion to quash. My argument is quite short actually. It's not very involved, so.

THE COURT: Okay. Let's see. All right. Let's just take five to seven minutes, somewhere around there, and then we'll get started. Thank you.

(Off the record.)

CLERK: All rise.

THE COURT: Please be seated. All right. We are

back on the record in First Brands. Why don't we make -- let me just make sure I got my docket numbers right.

MR. TECCE: Your Honor?

THE COURT: Yes.

MR. TECCE: There are three quash motions, one from myself on behalf of Mr. James, one from Onset, and one from Mr. Crighton. And we discussed, if it's okay with you, we would argue the three of them together, and then the committee would respond at once unless you'd prefer to do them seriatim.

MR. FIOTTO: That's fine with us, Your Honor, for the committee.

THE COURT: That works for me.

MR. TECCE: Is that okay?

THE COURT: That works for me. Yep. But I want to take up insurance first.

MR. TECCE: Okay. That's fine. I just was next on the agenda.

THE COURT: Yeah.

MR. TECCE: But that's fine.

THE COURT: No. No. No. No. Oh, got it. No. No. Let's --

MR. TECCE: If you want to take up insurance, we'll take up insurance. That's --

THE COURT: No. Let me think about this. No. It

makes more sense to take this one up. You're right. I think it makes more sense to just follow the order and let's take up the quash.

MR. TECCE: Your Honor, you know I'll speak very quickly and get through this very quickly. I don't have much to add beyond what's on our papers, but I just want to respond to a couple of the arguments that came in and just to highlight a couple of points.

So again, for the record, my name is James Tecce. I'm here on behalf of Mr. James and the related entities. We filed a motion to quash the subpoenas at ECF 914. We have a reply at 1034. The committee objected at ECF 938.

And, Your Honor, I respectfully submit that there is no legal justification for the committee to pursue Rule 2004, discovery of Mr. James, and the related entities. Because Rule 2004 affirmatively does not apply given the existence of an ongoing adversary proceeding against our clients, even if it's only a subset of the entities that have been subpoenaed.

And separately, but equally compellingly, rule 2004 discovery should not be available given the examiner's forthcoming investigation of the very same topics. And so that means that the discovery that's been proposed promises duplication, and not much more at this point.

And so as you're well aware, Your Honor, on the

3rd of November, the Debtors initiated an adversary proceeding against Mr. James and four related entities at ECF -- or at Adversary 25-03803. And that adversary alone has several obstacles to the Rule 2004.

First, Your Honor, the purpose of Rule 2004 has been spent. And this is not a pending proceeding rule argument. This is before we get to pending proceeding rule. This is first principles of Rule 2004. If you examine the case law, it's pretty clear, that the complaint is a pre-complaint discovery tool that exists to identify estate assets and litigation targets. It's to obtain preliminary information. It's to determine whether or not litigation should be filed. That's the purpose of the rule. and that set forth in the cases that we cite.

And at this point, Your Honor, the Debtors have identified what they believe are estate assets. They've identified the litigation targets, which would include our client and entities that are named in that suit. And so the purpose of rule 2004 has passed.

Section 1103 of the code doesn't help the committee here either. That is something that authorizes them to look into the location of estate assets, supposedly concealed assets, assets of the debtor.

But again, the committee doesn't get 1103 given the filing of the adversarial proceeding as it relates to

Mr. James. Mr. James and the related entities take issue with the legal sufficiency of that complaint, but it does cover a significant amount of real estate, including purported transfers among the Debtors in those entities, factoring arrangements and supposed issues involving special purpose financing lenders, or SPV lenders rather. So 1103 doesn't help the committee either.

So another basic Rule 2004 tenant, before we even get to pending proceeding rule, is that Rule 2004 discovery cannot be duplicative of other discovery. And here, the committee is pretty transparent. They basically would like to shadow the Debtors. They want to bring the same avoidance claims that the Debtors do. They would be estate claims that they get by derivative standing, and their discovery duplicates that of the Debtors.

And to that end, Your Honor, I would just refer to, and I have copies of these documents, if you want them, ECF 1034-1, which is the Debtors' very broad discovery requests of our clients in the adversary proceeding, and ECF A 21-1, which is just one of the subpoenas that the creditors' committee has propounded.

And if you compare the two documents, you'll see that there's just a significant overlap in the topics. They both want to take discovery about management materials, about acquisitions, investments, transfers, sales,

disposition, planning of collateral, any account, asset liability, any and all holdings, investments, transfers from January 21, 2018 to present, documents concerning assets, liabilities, and bank accounts, documents concerning special purpose vehicles, documents concerning invoice factoring, transactions, and practices.

Both of those at ECF 1034-1 and ECF A 21-1, they're both looking for the same materials, Your Honor. That's a high-level analysis. I think if you drill down on that, you see that there's a lot of overlap.

The committee insists that its requests are different because they focus on SPV lenders. But again, the Debtors' complaint asserts claims relating to those financing arrangements, its off-balance sheet financing arrangements. And the Debtors' discovery requests are correspondingly directed at SPV lenders.

The committee claims that it focuses more on insiders and related entities that haven't been named in the complaint. But again, the Debtors' discovery takes -- asks questions about several insiders.

And as for the related entities, Your Honor, these are companies that are related to Mr. James. There's nothing unique about the committee trying to bring them into discovery. There are four of these companies that have already been named as defendants in the adversary

proceeding.

And those have been selected as four. And for what it's worth, Your Honor, we do in our motion to dismiss highlight that there are really no substantive allegations about those entities. But the committee doesn't identify any allegations about those entities either.

But the larger point, Your Honor, is that if the committee looks to improve the complaint or add defendants, that's not a basis for Rule 2004 discovery given that the lawsuit is on file. It's clearly related to what's being alleged in the lawsuit, and it's clearly the province of the Debtors at this point.

Quickly on the pending proceeding rule, Your Honor, separate and apart from Rule 2004 principles, the pending proceeding rule does apply. And that means that Rule 24 applies on intervention. That means that Rule 26 applies on proportionality.

And the argument that the committee makes is that the rule only applies to requests made by a party. And since they're not a party, therefore, the pending proceeding rule does not apply to them.

And it's true that one of the purposes of the pending proceeding rule is that if you're a party to an adversary proceeding, you have to comply with the rules of civil procedure. You can't seek Rule 2004 discovery of

another party. But it also ensures that parties to an existing adversary proceeding are not themselves the recipient of nonparty Rule 2004 discovery.

And so to that end, I also think, Your Honor, that the party argument proves too much because the committee is a statutory fiduciary. It's a uniquely situated entity here. Any claims it would bring or claims that it would obtain derivative standing to bring.

And to that end, if we're bringing claims, it's bringing estate claims. And if it's bringing the eight counts in the complaint, it's bringing the estate's counts. And so they'd be identically situated to the estate in any event. And so they're not necessarily your typical non-party.

But again, also in the authorities, Your Honor, the pending proceeding rule is not that narrow. It doesn't just make distinctions based on party or non-party. What matters is whether the target and the discovery topics will be affected by the proceeding, whether they're being addressed in the proceeding, and whether they're related to the proceeding.

And that's the Bennett Funding case, that's Washington Mutual, and that's even the Buick case that the committee relies on. Duplicate discovery of the needs and activities of other interested parties is not a proper

subject of 2004. On the point of the examiner, Your Honor, also a level of duplication here that would militate against discovery.

And Your Honor, I have a copy of the examiner order. I don't know if I can hand it to you, but I think it's important to take a look at it, the one in the pointing exam, if I may.

THE COURT: Which paragraph do you want me to look at?

MR. TECCE: It's 726, Your Honor. It's also Exhibit 2 on our --

THE COURT: I know. I've read it so much, I probably have it memorized.

MR. TECCE: So many times.

THE COURT: But go ahead.

MR. TECCE: And you wrote it, so I think -- so I just if you wanted to have it in front of Your Honor, but I think it's important to look at what the examiner is looking at. I think what you're going to see here is a significant level of overlap in addition to between what's in the adversary proceeding, but also what is the subject of the creditors committee's discovery.

The examiner in Paragraph 3 of this order, and I'm reading from ECF 726, is to investigate the facts and circumstances, including the general corporate practices

concerning the debtor's pre-petition factoring processes and factoring transactions, related to allegations that the debtor's pre-petition third-party factoring transactions included fraudulent or inaccurate invoices in the related accounts receivable in the debtor's books and records and order reports, accounts receivable factored more than once, and in each case of A and B, the persons or entities responsible for any of the factoring transactions.

Same in Paragraph 2, transfers between the Debtors, insiders, and affiliates of the Debtors, entities owned or controlled by an insider or affiliate, unaffiliated third-party factors, little three in the whole, any accounting with respect to the proceeds of factoring transactions. And four, investigating the facts and circumstances, including general corporate practices concerning off-balance sheet transactions.

So the examiner's scope overlaps with what the committee is seeking in discovery, particularly from our client. Again, I refer the court to 812-1 as just one example of the subpoenas that have been propounded, but they certainly track and copy those topics.

I just want to be very clear, Your Honor, that we -- there's an allegation that we destroyed documents. We strongly dispute that. We use pretty strong language in our pleading, and I don't want it to go unmentioned, but we --

no one has accused us of that. To date, we've already had a preliminary injunction hearing with documents prosecuted by the Debtors. This issue has never been alleged before, and I just don't want to leave that unanswered.

At this point, Your Honor, the committee's remedy is to seek intervention in the adversary. I'm not inviting that. I'm not inviting any other intervention request in the adversary. We have enough as it is.

But that is, the rule applies, Rule 24 applies because the rules of civil procedure apply. And the committee can't satisfy that standard. They don't really even try to satisfy that standard, Your Honor. The Debtors are adequately representing their interests in the adversary. And so that's their remedy at this point.

And so I conclude, Your Honor, with a few points. First, here the circumstances are just what they are. The Debtors have already brought claims and causes of action occupied the territory as it relates to our clients. The examiner is a separate work stream that will do the same and look into the same transactions.

We have two fiduciaries already occupying the space as it relates to our clients. There's a total of 53 subpoenas or 55, 38 already and more on the way. It's burdensome to require us to respond to each one of those on an entity-by-entity basis, given that we're already being

sued under those two -- under the adversary proceeding, the examiner's already been appointed.

And this is basically a fourth probe that would be open against our clients that we don't think it's appropriate. So unless you have any questions, Your Honor, that's my presentation. I'd like to come back if there's anything else to add at the end.

THE COURT: Thank you. No questions.

MR. LEVINSON: Good morning, Your Honor.

THE COURT: Good morning.

MR. LEVINSON: Jeffrey Levinson on behalf of Nigel Crighton.

THE COURT: Good morning.

MR. LEVINSON: We are also a move-in with respect to the quash relief. We joined basically everything that's just been said. I would add, though, that this morning is an excellent example of why it's a good idea to come to court early. Because we learned or heard that the Debtors will be filing soon, adversaries are adding defendants to the 100 John Doe's very soon. And that is probably relevant to why we are here this morning, both with respect to this motion to quash and with respect to the D&O motion.

I don't want to get too far ahead, but I think that's significant. Because while Mr. Crighton has not yet been named specifically as a defendant in the case, he

stands otherwise in the exact same position as James, the James party.

So I also think that it's important to note that the intervention points, separate and apart from the pending proceeding rule here, where the Debtors have commenced, an adversary proceeding relating to virtually all of the areas covered in the committee's 2004. And the Committee doesn't have, and it really can't establish standing. With respect to such areas, the committee's redundant 2004s should be quashed.

I adopt again the arguments made with respect to the pending proceeding rule, both in our papers and as articulated by prior counsel. Our papers, I think, lay out the breadth and redundancy of the discovery itself and the undue burden that it's going to put on Mr. Crighton.

And all of that coupled with the fact that Mr. Crighton would be unduly prejudiced by the likely adverse inference in the adversary proceeding because of having to assert his Fifth Amendment privilege against self-incrimination, it's very prejudicial to him and -- because the committee can access this information elsewhere primarily through the Debtors, which is most appropriate here, there's no need to put Mr. Crighton through that.

So unless the court has any questions, again, we join in the arguments that were just made. Thank you, Your

Honor.

THE COURT: Thank you.

MR. KOTLIAR: Good morning, Your Honor. For the record, Bryan Kotliar of MoFo on behalf of Onset Financial. Your Honor, I'm in a very weird spot because even though I'm the third --

THE COURT: It's the podium.

MR. KOTLIAR: Even though I'm the third, and I'm not used to being at the podium, Your Honor, I'm used to having to click through the phone, so it's nice to be here in person. Even though I'm the third quash, there's two important differences, and then a host of other ones.

THE COURT: Okay.

MR. KOTLIAR: The first most important difference is that I basically disagree with everything that was just said, with the exception of the words examiner and examiner order. We support the committee's efforts to get as much discovery as possible.

THE COURT: Okay.

MR. KOTLIAR: Including from the targets of those motions. We're different because --

THE COURT: Can you explain to me what you mean by that?

MR. KOTLIAR: Sure. So let me get into my presentation.

THE COURT: Oh, I'm sorry. I apologize.

MR. KOTLIAR: So for Onset Financial, we filed a motion to quash two deposition subpoenas that served by the committee. We're different than all the other parties that filed motions to quash today or any other motions in this case. And that's first and most importantly, we're cooperating fully with the committee's investigation. We've not said to anyone that we will not produce documents or that we will not sit for depositions. And that's because we're innocent.

And second, the only issue for me today is about depositions. A lot of people like to start these hearings by saying, oh, Your Honor, we hate to bring a discovery dispute before the court. I personally like being here on this. For one, I appreciate the opportunity to speak with Your Honor. Happy New Year, by the way.

But also these discovery disputes are a symptom of a bigger case issue that needs to be resolved for this case to operate. In fact, for this case to continue at all, as you heard this morning, which the committee recognized this morning, and it lengthened their objection.

This case is at a very real risk of running out of money while the patient, the debtor is on the operating table. Victims like Onset do not want that to happen. Onset absolutely does not want the investigations to fall

short of getting to the bottom of the truth, especially in light of what I would call the highly defamatory and baseless objection that the committee filed, which I'll get into at the end.

There are many duplicative investigations, nearly all of them paid for by this estate. There's an investigation by the Debtors. That includes document requests to Onset with which we're cooperating. There's another investigation by the committee. That includes document requests to Onset with which we're cooperating.

Both of these investigations for Onset cover precisely what is in the examiner's mandate, which is to review the off-balance sheet transactions with SPV lenders, that includes Onset. The third investigation is that examiner.

Fourth, there are well-documented and publicized governmental investigations, including criminal investigations. We are cooperating fully with the committee and the Debtors, and we will cooperate fully with the examiner. We have already produced more than 5,500 documents to the Debtors and the committee, comprising more than 188,000 pages, the vast majority of which come from emails.

That includes thousands of documents and hundreds of thousands of pages produced the day after Christmas and

the day after New Year's. The Debtors and the committee requested more email communications that, including search terms, includes hundreds of thousands of documents, and we've not said no to any of those documents.

We're working hard to get our arms around that and to continue to make productions on a rolling basis. I think it's very telling that there's very little of what we produced to the committee that's in the objection that they filed despite the grave allegations in there.

The committee preordained Onset being a criminal mastermind before they started their investigation. There are time entries in their fiat filed on Monday night that reflect starting work on litigation against Onset starting on December 9th.

December 9th, Your Honor, is not so coincidentally the day before the committee reached out to us suddenly demanding documents at a faster pace. But we're not here to talk about documents. We're here to talk about depositions. So why are we talking about that?

We have not said no to any documents, and we've not said no to any depositions. We only have one issue, which is the examiner impact and the burdensome argument. We said, let's be efficient about these depositions and schedule them together with the examiner whose mandate is precisely the issues that the committee is seeking to

explore.

We're not saying no, never. We're just saying, hey, not right now. Let's wait a little bit, let's be efficient. The committee can point to no prejudice whatsoever in waiting a little bit to do that. There's no challenge deadline. There's no deadlines requiring the committee to move quickly.

The committee says, yes, right now. And if not now, then it will never happen, and everyone gets off the hook. The committee's entire argument is premised on the estate potentially running out of money before the examiner can make it to the exam room.

I'm a little confused by that because if the estate's running out of money, they want to supercharge the estate with discovery costs now, that's a self-fulfilling prophecy. If they have their way, then it makes it more likely the examiner won't get the chance to do its job.

Your Honor, for the very first time in my career, I used AI in a courtroom. And this is what AI told me is the definition of self-fulfilling prophecy, and I think it's true. A self-fulfilling prophecy is a belief or expectation that causes itself to come true because people act in ways that make the expected outcome happen.

If you have to drive 100 miles on a single tank of gas, Your Honor, you shouldn't start by pouring out half the

tank of gas. The committee has it backwards. If the estate is running out of money, it should be more efficient, not less. This is quickly moving to a bankruptcy case. Rushing to take depositions before document productions are complete is not wise, especially given the pleading that they filed that I'll get into in a minute.

Targeting those depositions at the most senior Onset personnel, the CEO and founder and the CFO, when the committee clearly has no understanding of basic facts, is not wise. Plus they create a risk that later when the examiner goes to do its job, the examiner says, hey, I've run out of time and money because there are all these depositions that were taken before I could get involved.

In terms of the case law, the committee cites nothing relevant to the issues before the court today. Every case is different. What matters is the facts and circumstances of this case. The committee says the most important fact and circumstance, in this case, on this issue, is that the estate is running out of money.

The committee doesn't cite a single case where that was present. The committee cites a bunch of general case law that says, yeah, courts can and have authorized expedited duplicative discovery, but no cases where that was authorized because the estate was running out of money.

Here's just one example. In one of the Enron

cases they cite, the court authorized discovery duplicative of the examiner because there was a court order that precluded other parties from sharing discovery with the examiner.

I think what's really going on here is that the committee was a little unhappy with the speed with which we were producing documents. Parties have a remedy for that. It's coming to the court. They didn't do that. To put it mildly, they chose harassment. They chose to harass my clients by disposing process servers to their homes where they were greeted by their wife and kids. They chose harassment when they filed that hit piece objection on Monday.

Your Honor, on this next part, I had a substantially different presentation prepared, but every time I practiced it, I ended up screaming in the mirror. So I'm taking a different approach with a little less adverbs. The committee filed what I would describe as a highly defamatory, highly inaccurate, misleading, and flat-out untrue objection. And the court need look no further than the four corners of that document to reach that conclusion.

The objection proves our point that the committee is in no position to take depositions now. Because they don't know what they're talking about because they haven't done their homework.

The entire objection says either one, we don't know if what we're saying is true because we're still looking into it, or two, we don't have any evidence that Onset did anything, so Onset must have known or should have known. Both are a far cry from any evidence that Onset was part of the fraud. Because there's no such evidence that exists because it never happened.

So what do they say in their objection? They say, well, first, here's some unflattering things that the Debtors' employees have said about Onset. That has nothing to do with Onset. To make matters worse, we've asked the committee and the Debtors to provide Onset with all the documents that the Debtors are providing to the committee, and neither of them have given us anything.

Second, they say the fact that Patrick James stole money from Onset's obligors. That Patrick James stole money from Onset's obligors. This is Onset's money that we put in. Somehow, Onset was in on the fraud. They throw words around like concert and conspiracy, but nothing showing either.

In fact, after saying that in the beginning of their brief, buried later in Paragraph 23 of their objection, they admit they don't know if Onset knew about any of Patrick James' theft of almost $250 million. Of course, Onset didn't know. These allegations were shocking

and heartbreaking to read in the pleadings in this case, which is when we learned about this massive fraud.

The Debtors, by the way, have said those actions resulted in Onset losing its property, losing its collateral, security, and ownership rights in its property, and is at risk of losing billions of dollars in property and liens and claims. How could Onset have possibly been involved in that is completely absurd.

The evidence is that in the summer when the company was in default, Onset was lied to by the company to prevent it from exercising remedies. There's nothing in the objection about that.

THE COURT: And I don't need to get into the merits of kind of -- I got what you have to do, and I understand why you're doing it. I'm just telling you, I don't give that -- I don't -- there are allegations in a complaint, or I should say in a pleading, and I got it, your side vigorously disagrees with them. I don't give them any weight one way or the other.

MR. KOTLIAR: Understood, Your Honor. I think what I'm getting at is that the committee wants to investigate Onset, and we're cooperating fully with that investigation, but they have never had a substantive conversation with Onset or us at MoFo or Perella, our investment bankers.

Not one conversation with potentially the estate's largest creditor and largest victim. Yet they want to get on with depositions because the estate's running out of money? There are so many other things this committee can be doing to investigate Onset and get to the truth in an efficient manner before costly depositions.

We are fully available, doors open, waiting by the phone. They clearly have no interest in doing that. I mentioned the time records earlier. They have been working on litigation against Onset since the very beginning before they did very little analysis before we made any productions to them.

And again, in light of all of the allegations that were made and their objection that was filed, we have still said yes to making the right people available for depositions at the right time. Instead, they've said, let's pick this up faster by trying to argue motions to quash and serve harassing deposition subpoenas.

The committee says this case is running out of money, but is also trying to supercharge it with expenses. They're arguing a self-fulfilling prophecy. This estate should have some discipline over how it spends money before it runs out. Thank you.

THE COURT: Thank you.

MR. JONAS: Good morning, Your Honor.

THE COURT: Good morning.

MR. JONAS: Jeff Jonas from Brown Rudnick for the Official Committee of Unsecured Creditors. Your Honor, the committee opposes each of the three motions to quash being heard today. But before I get to those in particular, and I might regret reminding you, but at the last hearing, you told us that you were inclined to delay further committee discovery pending, the examiner appointment, but that you'd give the committee an opportunity to change your mind.

So I want to take on that challenge because I think it's critically important. And I'll try and explain why it's critically important to the committee as well. And then I'll also address, in a general way, the particular motions to quash.

Your Honor, again, I want to be mindful of your comments at the last hearing, and I won't reiterate everything that's in our papers, which I incorporate by reference. But I hope you'll indulge me for a few minutes because we believe that these motions and whether the committee can continue its ongoing discovery could, at least for the committee, be among the most important rulings in this case. And again, I'll get to explain that.

We believe that allowing these motions and/or delaying discovery by the committee could dramatically limit and perhaps eliminate any recovery by unsecured creditors.

So I appreciate while it may seem somewhat of a procedural matter, that's our view. I'll explain it, Your Honor. And it's why we feel so strongly about it. So let me explain that a little bit.

And as Mr. Stark did, I think we have to take a little bit of a step back briefly. As the court is aware, the case began under a cloud of suspicion. The board uncovered what appeared to be a corporate fraud of massive scale. Billions of dollars in factored AR were just plain missing. And by the petition date, the board had ousted Patrick and Edward James and the Debtors were beginning to publicly disclose what they were learning in the aftermath.

And the case became a matter of public fascination likened to another Enron cautionary tale, no lesser than Wall Street personas like Jamie Dimon characterized this as a cockroach, this case. Within weeks of the Chapter 11 filings came a powerful call for an examiner and the Debtors launched massive litigation against Patrick James and others.

The court will recall that months back, we had a contest over the DIP financing. And that contest almost went to trial. We settled that contest on the courthouse steps, actually in the courthouse. I remember sitting right there getting ready, looking forward to trial and then it didn't happen. And it was a remarkably balanced settlement.

It brought new liquidity to the case, which was needed.

It -- and there was a reward to the lenders for that liquidity. But critically, the case procedure was going to be fast-tracked and with relatively near-term milestone covenants. And those milestones served as a sort of litmus test for the case. We were going to learn, because the DIP mandated that we learn, of the value, whether the value here was chiefly in the business or in the litigation or some mixture of both. And those milestone covenants required us to dig in as a committee.

Immediately and with all deliberate effort, we endeavored to figure out where did the billions go, how did they do what they did, who could be held responsible and could we get it back. Despite the call for an examiner, we had no time to waste. Because there was a looming deadline of January 31, 2026, which was a milestone.

And back in late October and early November, we circled that on the calendar. We knew we had to get ready and we had to get very smart by that date. Because come January 26, this company could be out of cash. The committee urgently undertook Rule 2004 discovery to advance the ball as much as possible before that date.

We issued 2004 requests, we participated in many, many meet and confers. And I'll tell you, Your Honor, in doing so, as we always try and do, we did try to reduce the

burden on recipients of the request by agreeing to accept productions that the recipients previously had made to others, including the Debtors.

And as of now, the committee has collected approximately 6.8 million documents. We've run more than 100 targeted searches, and identified and reviewed more than 100,000 relevant documents as a result of those searches. We've also scoured various public databases and found additional probative evidence.

And I'm not telling you this just for the sake of telling you this, Your Honor, although I want the court to be informed of the work we've done. I'm telling you this because it's going to come to my argument and be important to the argument of why we shouldn't be put, if you will, on a standstill or in abeyance while the examiner begins to gear up, and I'll get to that in a minute.

Your Honor, our effort was fruitful. We learned more than a lot, an awful lot. We are now beginning to understand what transpired, who acted wrongfully, how they did what they did, and importantly, how to bring order out of the chaos of this case.

At this moment, we have significant momentum. We've worked quickly. We've tried to be efficient. Of course, there's always inefficiencies in something of this scale. But we really are well down the road to figuring

this out. And frankly, Your Honor, in light of the many aspects of the case you're already aware, we think that these claims and causes of action might be the only source of recovery for unsecured creditors. And that's why it's so important to us.

And we're happy -- so let me say this. We're happy to actually be here today because as it turns out, the company is almost out of cash, and the Debtors are going to start a quick M&A process and there's neither funding nor time to let this all play out much longer.

And with that, I do want to tell you a little bit about what we've learned and I appreciate, Your Honor, these are, if you want to call them allegations, we're not here, we're not having a trial on any fraud today. But it's important because there's been lots of talk of fraud in this case, but I'm not sure the court has ever actually seen or touched or smelled anything in terms of evidence, or at least in this case, it's documents we've received so that you understand the work that we've done.

And I think it goes to the heart of why putting us on the shelf and letting the examiner start from scratch, even with our cooperation, why that doesn't make any sense, and why, in fact, that would be a more chaotic approach than a more ordered approach, and I'll get to that.

But I do think, just indulge me, it'll only be a

minute or two, but I want to explain it, and some of it was in our papers. And it will be truncated, but again, I think it's important.

While the court is aware of certain claims the Debtors have brought, at least in a general sense, again, Patrick James, the committee has uncovered additional areas of fraud, we believe, committed by Onset, Edward James, who's not a defendant, by the way, Your Honor, in the existing complaint at this time, and other parties.

We believe Onset extended purportedly secured financing, often disguised as leases, but in economic reality they were loans to the company that is the SPVs. We believe, Your Honor, our financial advisor has done work on this. And by the way, I don't think the court would be interested, but if it is, we actually brought them today, and would be prepared to have them take the stand.

But the average rate of internal return on Onset's loans exceeded 300 percent. In fact, we believe certain loans may have had an IRR in excess of 1,000 percent. Onset advanced financing of approximately $2.5 billion. The company paid Onset $2.9 billion. And based on our discussions with the Debtors, we believe Onset likely will assert another $1.9 billion in claims against the Debtors. No borrower, no borrower could sustain borrowing at this price or this pace.

So the question is, in part, Your Honor, how did Onset get away with, we call it, pillaging the company? Maybe you can't blame a lender who can charge as much as they want, but you have to ask the question, why, and it's easy. They had an inside man, Your Honor.

Edward James, Patrick James' younger brother, was executive vice president and was working with Onset. He approved and authorized the company's transactions with Onset, and for his efforts, Onset handsomely rewarded Edward James. It allowed him to personally invest in the Onset financing to the company, ultimately providing him with hundreds of millions of dollars by way of fees and these exorbitant returns on the Onset loans, all at the company's expense.

A simple example, Edward James received, or was scheduled to receive, more than 25 million dollars for negotiating and approving Onset's financing. Whether you call those kickbacks or something else, they were wrong. Edward James was on both sides of these transactions. To his personal benefit and the company and its creditors' detriment.

Additionally, as we note in our response, hundreds of millions of dollars of Onset financing proceeds also appear to have been diverted to Patrick James personally. Edward James made his alleged investments and received fee

payments through various shell companies, Optimist Private Capital, LLC, and JCMC, which appear to have been managed by his family members.

Your Honor, I'd like to -- I'm actually going to hand -- I can hand up and around copies, but I'd also like to, if we could put it up on the screen, our Committee Exhibit B, which is -- and I'll explain what that is. And I see Mr. Int-Hout on the screen, Your Honor. If he could be made the organizer, he could put that up. And may I approach you, Your Honor, with a hard copy?

THE COURT: Sure. You can just give it to one of my law clerks.

MR. JONAS: Okay.

THE COURT: Thank you.

MR. JONAS: And if we just turn the page.

MR. TECCE: I'd ask what this document is.

MR. JONAS: I'm going to explain.

THE COURT: Well --

MR. TECCE: But what is it?

THE COURT: Why don't we just take it down first and then parties can --

MR. JONAS: Sure.

THE COURT: -- have a discussion about it. Why don't you flip through it and see if there's anything?

MR. TECCE: I can't tell what it is because it was

prepared by Brown Rudnick.

THE COURT: No. No. I understand that. What I'm saying is parties can flip through it and then he can --

MR. JONAS: May I explain, Your Honor?

THE COURT: -- provide a short explanation, but parties can flip through it and just before we put it up. Go ahead.

MR. JONAS: Sure. Your Honor, this is a document -- and again, I want to just be clear, Your Honor, I'm not here to prove a case. But I do have to explain to the court because the court has told me it thinks or it's inclined to let the examiner proceed. But I think it's critically important for the court to understand what we've -- some of what we have uncovered, and why it's critically important we've been allowed to complete the exercise and why we'd be allowed to do that now.

And to that end, this particular document, for example, I don't 00 I'm not one, I think you know, Your Honor, to stand up here and make allegations. So to do that, to support what I've already told you, this is a document which was produced to us. We know from the metadata that Edward James was custodian of this document.

And in it, he summarizes, among other things, his Onset investments since 2022. And it evidences relevant payments to him in excess of $200 million. And that's why

I'm showing it today, Your Honor.

THE COURT: What does that have to do with the --

MR. JONAS: What's that?

THE COURT: I got it.

MR. JONAS: I just want to support what I said, Your Honor.

THE COURT: No. I understand the point. I understand the point. And I don't want to put sealed stuff up on a screen.

MR. JONAS: I would not do that, Your Honor. I didn't intend to. I was -- let me turn to that next, and I'm not going to put it up on the screen. You're looking at Committee Exhibit G. This is a May 6th, 2025, Ed James email to Remington Atwood at Onset.

And the email demonstrates Edward James' efforts to enrich himself at the company's expense. Here, he's confirming his sharing arrangements with Onset, including a 50 percent share of forbearance fees and late fees.

He actually was incentivized to have the company default so that he could achieve larger payments. And Your Honor, you don't have to believe me. Just look at the company's internal emails.

If you look at Committee Exhibit A, which is the next slide, you'll see here, the company -- these are First Brands employees, amazed at how much Onset was charging the

company when one employee, Mr. Reminsky, told it like it was. It was Ed taking whatever he could get.

So, Your Honor, and again, this -- I am not -- I said this would be a truncated presentation. Again, I'm not here to make the case for the fraud, but it's important that the court understand some of the work we've done and what we've uncovered.

To that end, Your Honor, there's other pieces of fraud and other parts of fraud. As described in our papers, we have identified other fraudulent contact by Edward James, including his retaining an entity known as Helios, or Helios, to arrange financings for the company.

It appears Helios sourced financing from two other SPV lenders, Aequum and Evolution, and the company paid Helios a substantial fee, and it kicked back money to Mr. James and his family. Like with Onset, it appears he also co-invested in a Helios investment fund, which provided financing to the company.

Your Honor, like most massive frauds, getting to the bottom of what happened here is not easy, and it requires digging and skill. While I've only described certain matters involving Edward James, Onset, and Helios, based on the work we've done, we are focused on other fraudulent activities, which could give rise to substantial claims and recoveries for unsecured creditors.

MR. BEREZIN: Your Honor, if I may. Mark Berezin of Bracewell. I represent Edward James. I don't know what this has to do with any of the committee's presentation. This is all hearsay. We have our own 2004 discovery served upon us by the committee. We filed our own motion to quash. It's not set for hearing today.

I understand what they're trying to do, which is to create a record as to why they should go before the examiner, but I find all of this wholly inappropriate.

THE COURT: Okay. Your objection is noted.

MR. JONAS: I'm done with that part of my presentation, Your Honor.

THE COURT: Okay.

MR. JONAS: In any event, Your Honor, the -- just to highlight why this is only part of the work we've done and are doing, there remain many questions. What about non-Onset-related SPV financing? What do those lenders know or should have known? Who else aided and abetted these frauds? And we've requested discovery on these questions as well.

Your Honor, the good news, in my view, is the committee has made great progress in discovery. The bad news, and it's not the synchronon of our case at all, as was suggested. But the bad news is that the company is running out of liquidity.

And if you look, it's part of our slide

presentation. I don't think there'll be any issues with these, Your Honor. There's two demonstratives. There's J, which is the debtor. This is work that our FA did relating to the debtor's latest cash flow forecast, which was provided to us on January 3rd. And you'll see that the Debtors are, as has already been put forth by the Debtors, that we'll run out of cash by the first week of February, four weeks from now.

And the next slide is another demonstrative which our FA put together indicating the trading levels of the DIP loan, which are now at around 20 cents, confirming lack of confidence in the reorganization prospects.

So with that, Your Honor, let me turn to some of the arguments. First, the examiner and what that means to our ongoing discovery. Your Honor, the committee has made tremendous progress in a relatively short period of time under difficult circumstances.

Likely the only hope for recovery lies in the discovery and what will result from that we're doing. In less than a month, we think we can get much of what we need. But, Judge, we need this month and believe it would be detrimental for us to be shut down now. Waiting for the examiner will prejudice us, and I'll explain.

When weeks or months from now, the examiner who first must get appointed, then have a work plan approved by

the court, begins seeking discovery, the Debtors likely will be out of cash. Maybe the cases -- I'm not suggesting the cases will be converted, but if they were, should we be relying on a Chapter 7 trustee for recoveries?

THE COURT: Wouldn't the committee cease to exist at that point as well?

MR. JONAS: I agree, but unsecured -- where will unsecured creditors be, Your Honor? That's my point.

THE COURT: Understood.

MR. JONAS: And, Your Honor, the committee's continued discovery need not be duplicative of anything the examiner is doing. The committee will cooperate with the examiner who can participate in and receive the documents we've collected, can participate, and sit side by side with us at depositions.

It's -- and this is why I say, Your Honor, I know, I think the effort here, in some way, is to say it will be chaotic for the committee to continue. I think it's quite the opposite. I think the committee, willing to work with the examiner, helping the examiner get up to speed, who can jump in with us, to the extent the examiner is obviously interested in doing that, we're already way up the learning curve.

Why start with someone who is new to the case, I'm sure quite good at what he does, but new to the case, has a

huge learning curve, it will be weeks before he can even -- it's not even in place, weeks before he can begin his discovery. I just think it's a much more ordered approach to let us -- and we can do it in short order, Your Honor.

Let us complete our discovery. We'll work with the examiner. We'll share every -- we're not hiding anything. We're not trying to husband it. We'll share everything with the examiner.

And I'll just -- last in this particular regard, Your Honor, as stated in Enron, with respect to discovery sought by a creditor's committee and an examiner. "The two serve different functions. The creditor's committee owes a fiduciary duty to creditors, but examiners are information seekers who remain neutral parties."

Let me just quickly address the inconvenience factor, or argument, in its objection Onset, as it mentioned, is only opposing two depositions, it's -- again, its primary legal argument is, we don't want to sit for more than one deposition.

Again, Your Honor, we can -- you know the examiner will be in place in a week, or less than a week. We'll work on scheduling that deposition, but again, it won't be in -- it may not be the case to have to sit for more than one deposition. And I don't think there'll be an inconvenience in that regard.

And, Your Honor, they relied on MF Global. I think the case was different. It involved private party discovery, not an official committee who has a statutory right and fiduciary duty to conduct discovery.

Pending proceeding rule, Your Honor, the opposing parties cite the pending proceeding rule in support of denying the committee discovery, but the committee is not a party to the debtor's adversary proceeding versus Patrick James.

Accordingly, the pending proceeding rule is not applicable. Even if the committee was a party, which it's not, application of that rule is discretionary, and under the facts and circumstances as I've described, we don't think it should be applied.

Generally, there's an argument that because there are other pending proceedings and investigations, that fact should -- the opposing parties argue that aside from whether the committee is a party, the fact that there is another proceeding and another investigation means the court should not permit the committee to go forward.

We think that's nonsense, Your Honor. We've cited numerous cases where a court permitted discovery, notwithstanding pending proceedings, or investigations by others, such as Debtors and trustees.

Again, Enron, 281 B.R. 836, at 843 n.7. The fact

that an investigation by a creditor's committee, debtor, examiner, or trustee is ongoing does not preclude the use of Rule 2004 by a party in interest.

Your Honor, in conclusion and in sum, the committee has made great progress in getting to the bottom of the fraud here, and if you permit us, we will continue to do so, and we think we can complete that in short order.

We've made this progress even though eight former company executives, including Patrick James, Edward James, and others, have refused to comply with any 2004 requests. We have done so despite delays on the part of nearly every other third-party recipient of a 2004 request, including Onset in some respects. It's obvious that these parties' goal is to run off the clock for their strategic advantage.

This should not be countenanced by the Court. They and other recipients of the committee's 2004 request should be required to comply with the committee's discovery so the committee can rapidly complete its investigation and further construct the foundation of claims and causes of action, which will serve to provide a recovery to unsecured creditors, likely the only recovery.

The committee's investigative authority should not be abrogated such the committee -- such that the committee cannot perform its statutory duties.

Judge, on behalf of the committee and unsecured

creditors, and I don't use the word lightly, I implore you to deny the motions to quash, and permit the committee a limited period of time to complete its work. The committee will cooperate with the examiner. This will be the more ordered approach.

With the company running on fumes, the committee fears that any hope of recovery for unsecured creditors will be lost if it is not permitted to complete its discovery. As you heard, there'll be ongoing negotiations about resolution of this case. We feel we'll be disadvantaged if we are not able to, if you will, have something to negotiate, have value, and we -- to get to that value, we need to complete our investigation.

And unless you have any questions, Your Honor, I appreciate you giving me the time. Thank you very much.

THE COURT: No. Thank you very much. Held before the court are several motions to quash 2004 examinations filed by the -- as I say, requested by the official committee of unsecured creditors. Improper notice and service of all these required motions the court set for today to take up the various motions to quash. Parties have made their arguments and I'm going to grant the three motions to quash.

I'm going to note a couple of points. The applicable rule here is 2004, and it says "On motion of any

party in interest, the court may order the examination of any entity. That's all it says.

The court may order the examination of any entity once the court, if the court grants it, then B gets into what the scope of the examination is. So may is the applicable word here. There are no limitations, no limiting principles upon which the court can grant or not grant 2004 as they are, by practice, routinely granted. But the court retains absolute discretion as to what to grant one in any particular case and parties have the right to seek to quash a 2004 exam.

I'm quashing each of these because I find that, again, I can do it. I have absolute discretion within it. And I'm granting them and I -- one of the reasons that I felt earlier about the examiner.

And let me just note a couple of things, too. I think you look through the bankruptcy rules. I think, you know, the rules use may, shall, and must, right? So in other words, there's a difference between the three. Must is used over 160 times. Shall is used about 39 times. May is used about 173 times.

So there's a difference between them, and you've got to respect what they are, so. But I should provide a reason in this case because it's incredibly important issues.

I'll note this case started in September, late September of 2025. On October the 8th, Raistone filed the first motion seeking appointment of an examiner. A week later, on October 15th, the UST moved for appointment of an examiner. I set the hearing out, in part, to allow a committee to get formed, and to have the opportunity to provide input there.

And they've been great. And they've done exactly what they're supposed to be doing in order appointing the examiner, an agreed order, quite frankly, with committee input, which was exactly what I hoped in the office of the United States trustee and other parties.

That order was entered on December -- excuse me -- on November 19th. So just about a month after the motion was filed, an order signed by me, was entered to appoint. I don't need to get into kind of what happened between November and December, but I think with incredible effort, the Office of the United States trustee appointed an examiner on December 16th. Two days later, filed the application.

And from December 18th, I'm now going to consider that order two days from now to appoint the examiner. There've been minor comments filed, I think, Katsumi filed something, but there's no serious challenge as to who the examiner is. It sounds like the examiner has been getting

up and working.

The bankruptcy code mandates the appointment of an examiner. That's just the way it's written. I don't have a whole lot of flexibility on that. The examiner is ordered to conduct an investigation. The statute mandated the appointment of an examiner in this case, because it was requested.

And the scope, I do have some say in scope, and the parties worked on that, and I got comfortable with the scope. The examiner has to have the opportunity to do its -- the examiner has to have the opportunity to do the job, which means that they have the opportunity to present to the court a scope of work, have that scope of work approved by the court.

And there's no question that, you know, a good amount of what is being -- no, virtually all of what's being requested here is duplicative of what the examiner would seek to do. And the examiner, by code required appointment on it, and now has an order for me ordering the examiner to do the job.

And the examiner is to do and conduct an investigation, hire professionals, get involved, there's a budget set out and provide a report. The examiner and the scope of work has to go first here. And that doesn't mean that the -- I'm not saying no forever. I'm just saying no

for now.

I don't know what the scope of work is -- the exact scope of work that I will approve is. Maybe there's -- but the examiner has to have the opportunity to put forth. Yeah. And he's entitled to get up to speed, and it sounds like he's already doing that, but he's got to have the opportunity to comply with the court's order.

And we'll talk on the 9th, two days from now. I know that -- I don't think I'm conflicting with the committee's fiduciary duties. 1103 talks about what the committee may do, which includes investigate, which also includes seek appointment of an examiner so that the two don't necessarily conflict.

But certainly, the committee has every right to go seek an investigation. I'm just saying I want to pause for a moment and allow the examiner to take the lead on some issues. And it sounds like he's going to be off to a great start in terms of what the scope of information that has been retained.

In terms of kind of the state of affairs, I would call it, with respect to kind of where the Debtors are, it seems to me the examiner should start doing the examiner work. I'm really encouraging parties to start, and I'm sure they are. And I'm encouraging it from my viewpoint to coalesce about what the next 90 days or so, it looks like.

It sounds like the Debtors have a plan, and I'm encouraging them to reach out and talk to anyone else who's interested in talking to see where this goes. But I think the fact that, you know, potentially the state runs out of money in the next 30 days isn't a reason enough to start granting and work.

It's not like the work is going to go anywhere. The work will be completed, and I'm not saying no forever. I'm just saying no for now. And the court has discretion to do so. There will be inevitably duplication of effort and I'm trying to minimize that.

But maybe once the examiner is appointed, meets with the committee, meets with other professionals, maybe there's not so much of it. I don't know. But whatever the examiner feels like the examiner needs to do, the examiner gets to put forth the scope of work, and that is mandated by statute, mandated by the order.

I got it. There could be multiple 2004s and work that the examiner is working at simultaneously. But I got to see what the examiner wants to do. I got to see what the examiner feels, wants the opportunity and the examiner is not here yet. And I've got to give the examiner that opportunity.

So I think we just put the 2004s on ice for now, and we maybe, maybe not, take it up later. But for now,

they're quashed. I'll enter a short order. I don't want to get into -- let me back up for a second.

I'm not -- I'm intentionally not addressing merits in the issues. I think I've said on numerous occasions that there are really serious red flags in this case. I'm hoping the examiner can provide a public report that sheds light on a number of these issues and -- but certainly within the order, hopefully, we'll allow the opportunity to do so.

So I'm cautioning them for now. I reserve the right later in time. And it's without prejudice to revisit one or more of these 2004s, but for now, they are quashed. We'll see where this goes. But I'm really -- it's just, I think all energy needs to be on the case.

And I know that there are multiple moving pieces, but it sounds like folks are already doing it. I'm just encouraging parties to put as much energy as they can on, that doesn't necessarily mean agree. It just means energy on the issue.

It's about 12:10. Do we -- someone give me a sense of timing on what I would call the D&O insurance proceeds stay relief motion. Can someone just give me a sense of timing on that? I don't know if we should take lunch, come back, or see if we can get it done.

MR. STARK: Your Honor, if I may.

THE COURT: Yes.

MR. STARK: It's Robert Stark on behalf of the committee. First of all, we thank you for your ruling. We respect it, and we will honor it.

THE COURT: Thank you.

MR. STARK: Both in letter and in spirit. With respect, we do have a presentation to make. We do have demonstratives. I don't think there's a big evidentiary record. I think we need to walk through the policies and talk about them. But I think it -- I sort of envision for myself maybe 15, 20 minutes. I don't know how others -- we haven't had much colloquy.

THE COURT: I understand.

MR. SAVAL: Your Honor.

THE COURT: Yeah.

MR. SAVAL: Good to be here. Daniel Saval from Kobre & Kim. On behalf of Stephen Graham, one of the movements, I'm going to be taking the lead on the motion.

THE COURT: Okay.

MR. SAVAL: I have a presentation that will probably go maybe 15, 20, 25 minutes at most.

THE COURT: Why don't we just -- can we come back at 1:00?

MR. SAVAL: It works for us.

THE COURT: Yes. I -- my 1:00 just earlier got adjourned to something else. So I've got a -- it's not an

open invitation to take -- go from 1:00 to 3:00, but I certainly, I think there's time. I don't want to rush it. Let's just come back at 1:00, and I'll give everyone a full and fair opportunity to take up the motion at that time. Just in terms of who will be presenting, I know both of you. Is someone else?

MR. DENDRINGER: Yes, Your Honor. Mark Dendinger of Bracewell for Edward James. As Mr. Saval said, he's going be taking the lead for the movements. We are a movement. I may have five minutes of remarks depending on what's said and would want to reserve time for --

THE COURT: okay.

MR. DENDRINGER: -- rebuttal.

THE COURT: Is there anyone else who thinks they may?

MR. DENDRINGER: Your Honor, there were a number of joiners to the motion as well. I don't know whether they plan to speak or which of them plan to speak, but that is a possibility.

THE COURT: Okay. So --

MS. DWOSKIN: Some of them are on the line. I think folks who may have comments are going to be brief.

THE COURT: Yeah. So maybe I'll just -- yeah. So it just makes sense. Let's just take the time, come back at 01:00, and then just -- I'll give everyone -- the line will

be open. We'll give everyone an opportunity.

But I'll take -- I'll listen to presentation in the court, right? You'll take lead. You'll put on your -- and then I'll hear from anyone who supports the relief requested in support of it. I'll turn to the committee and then anyone on the line.

That will be the order of flow, but we'll start right back at 1:00. Thank you very much.

CLERK: All rise.

(Recess)

THE COURT: All right. Good afternoon. This s Judge Lopez. We're back on the record in First Brands. Let's proceed.

Actually, before you do, if you think or know you may wish to comment in connection with this motion, why don't you hit five-star now and I will unmute your line. I apologize, Counsel. I thought about this last moment. I'm just going to -- it's a 312 number.

MR. TUMSUDEN: Good morning, Your Honor. Kyle TumSuden of Mayer Brown on behalf of Katsumi Servicing. And I believe I am joined on the line by my colleague, Sean Scott.

THE COURT: Okay. Good afternoon. A 210 number. A 210 number. San Antonio. You're up.

MS. SANTOS: Your Honor, good morning. Sarah

Santos and Jay Hulings on behalf of David Parker.

THE COURT: All right. A 202 number.

MS. O'DONNELL: Good afternoon, Your Honor. Margarita O'Donnell from Zuckerman Spaeder on behalf of Laurie Stein.

THE COURT: Okay. Good afternoon. A 212 number.

MR. MENZ: Peter Menz, Morvillo Abramowitz Grand Iason & Anello, on behalf of Michael Baker. My colleague, Tim Kasulis is also on the line.

THE COURT: Good afternoon. A 646 number. A 646 number.

MR. KASULIS: That's Tim Kasulis from Morvillo Abramowitz for Mr. Baker. Hello, Your Honor.

THE COURT: Good afternoon. And a 212 number is the last one.

MR. SHARGEL: Your Honor, David Shargel from (indiscernible) on behalf of Edward James. My colleague is in the courtroom, Mr. Dendinger. It's unlikely I'll need to become involved, but I just unmuted just in case.

THE COURT: All right. If I have unmuted you, can you just mute yourselves on your end and I will give you opportunity to speak. I just want to make sure we can all hear each other. Thank you.

Counsel, if you can state your name for the record and we'll get started.

MR. SAVAL: Good afternoon, Your Honor. Daniel Saval from Kobre & Kim. Our firm represents Mr. Stephen Graham, who is the Debtor's former chief financial officer. As I mentioned before the break, I am going to take the lead for the movants in connection with this motion. Some of the other movants and/or joiners may chime in, but I am going to, as I mentioned, take the lead.

Your Honor, the movants and joiners are both former and current executives that are covered by the Debtor's director and officer insurance policies. Some of them are actually still employed by the company and actively and diligently working for the Debtors. We are here today seeking authorization to access coverage under the applicable D&O policies and to the extent applicable, relief from the stay to allow for such access. Although to be clear, our position, as you will have seen from our papers, is that the proceeds of the relevant policies that provide coverage are not property of the estate.

Before I get into the substance of the motion and as noted in our reply brief, we have reached a resolution with both the Debtors, represented by Weil, and the Ad Hoc Group of DIP Lenders, represented by Gibson Dunn with respect to the terms of a revised proposed order that reflects some concessions from the movants that they weren't required to make, but decided to make in a good faith effort

to try and make this motion uncontested. That revised proposed order is at Docket Number 1150. And I'm happy to just walk through briefly the changes in that order that reflect the compromise between the parties if Your Honor would like me to do so.

THE COURT: It's up to you.

MR. SAVAL: Yeah. So I'll just say briefly in paragraphs 6 and 7 there has been an agreement on behalf of the movants to provide certain reporting of the amounts that are being accessed from the D&O policies and a requirement to make monthly reporting of the amounts that were advanced or paid under the relevant D&O policy. That's both the Side A and then the main ABC tower policy.

I would note, Your Honor, for the record, that the Official Committee of Unsecured Creditors is included in that order. We understand that they were part of the initial discussions to try and reach consensus but decided to walk away from those discussions and raise an objection. But to be clear, they are in this order notwithstanding their objection today.

THE COURT: Okay.

MR. SAVAL: We have two objections, one from Katsumi and one from the Committee. I will get through the substance of those objections. But just to summarize them at a high level, I would just say at the outset we don't

view them as based on applicable law, we don't view them as based on the fact. In fact, the arguments that have been raised by the objectors fly in the face of the applicable law and standards in this area. And moreover, many of the objections raised have been squarely rejected and are inconsistent with cases that have been decided under similar facts.

Indeed, one could argue the Committee's objection is simply a freewheeling appeal to equity. And I'd say that's a charitable characterization, the reason being that, as I said before, the objection isn't based on fact or law, it's based on innuendo and unproven allegations, not based on evidence. And even if it was, that would be irrelevant to the issues before this Court in connection with this motion.

I think if there's anything that was said today that bears on this motion in the prior statements and proceedings is that there's a lot of litigation going on in this case. You've heard from Mr. Singh earlier today that the Debtors are going to name additional parties in their adversary proceeding. There are investigatory activity going on outside of this Court by government agencies. So we think it's clear that there's a need for the movants to get access to the D&O policies and there's a need to get access to those policies now.

In addition to what you've already heard and as mentioned by Your Honor previously, the examiner will surface very soon and undoubtedly will want to talk to the various folks that have moved and sought relief under the D&O policies.

Before getting to the objections, I think it's important to level set and briefly go over the policies. Because that's really what drives the analysis here. And to be clear, there's no dispute here about what the policies say, what the terms are, and how those terms apply.

First, Your Honor, we have the ABC primary policy, or the tower policy that was issued to non-debtor Mayfair Enterprises, but it does cover the Debtors as a subsidiary of Mayfair. There are there layers of coverage. Side A for non-indemnified losses of directors and officers. That includes defense costs. That is really what's driving this motion. Side B is for company indemnification. On that, Your Honor, as we set forth in our papers, requests have been made to the Debtors for indemnification. The Debtors have declined to indemnify the movants. The Debtors can confirm that position, but that is undisputed.

There is Side C entity coverage for the Debtors for any claims against the Debtors. Well, not any claims. The claims have to be asserted as a so-called "wrongful act" as defined in the policies. And, Your Honor, with respect

to that, obviously any of those claims would be stayed.

Critically, Your Honor -- and this really goes to the heart of the analysis and why the relief should be granted in full -- is the policy includes an order of payments clause. The clause prioritizes Side A coverage for individuals over Side B and C. That means that the directors and officers are first in line for the insurance proceeds under the tower policy.

Second, Your Honor, there are multiple layers of Side A execs policies. Those execs policies provide for additional D&O coverage exclusively for individual insureds and do not provide coverage to the Debtors. The Side A policies are designed to follow form to the ABC primary policy and function as a backstop to ensure continuity of individual defense coverage when primary coverage is unavailable or delayed.

Importantly, Your Honor, because the Side A execs policies (indiscernible) only to the individuals who -- or are directors and officers and not the Debtors. We understand it's undisputed today that the proceeds of the -- what I'll call the pure Side A separate policies are not property of the estate. And we haven't seen any argument to that effect in either the objections of Katsumi or the Committee.

Your Honor, going into the analysis here, you

know, as you are aware and as the papers articulate, it's really a two-step analysis, are the policies or the proceeds of the policies, assets of the estate. If the answer is no, that ends the matter. If they are, then the Court needs to proceed with a cause analysis.

Your Honor, as I said before, the Side A policy only provides coverage to the directors and officers, the insured persons. Does not provide coverage to the Debtors. It may be true that the policies are considered property of the estate. And I know the objectors cite to law for the proposition that policies are property of the estate, but that isn't the analysis. Certainly not the analysis in the Fifth Circuit, which creates a key distinction between who owns the policies versus who owns the proceeds. And as the Fifth Circuit said in Edgeworth, where the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

So if we're looking at the tower policy, we submit that, similar to the Side A, the conclusion should be that these are not property of the estate. I'd be relying on the order of payments provision which contractually prioritizes the Side A claims over any entity coverage. And courts consistently hold that where such priority exists, D&O proceeds to not become property simply because the policy also provides Side B or Side C coverage.

As I mentioned before, the Side B indemnification coverage is indeed either hypothetical, speculative, or nonexistent based on the Debtor's position that they will not indemnify the directors and officers seeking coverage. And then with respect to Side C entity coverage, that's also we would submit it is just not existent based on the stay.

One of the objectors, Katsumi, suggests the ABC policy is a wasting one. Even if it were, courts have repeatedly held that wasting policies can still fall outside estate property where the debtor's claim to the proceeds is speculative, hypothetical, or stayed. I would cite for that among other cases In re Downey Financial Corp., bankruptcy court in Delaware of 2010. The structure of the D&O policies matters here. There's no dispute in terms of how the policies work, how the priority works. Side A coverage provides for the directors and officers to obtain defense costs and other coverage that is given priority over Side B and Side C.

So, Your Honor, I think on that basis alone the Court should grant the relief. But we don't believe the Court would need to even reach a decision on that question because we think there's ample cause for relief under the stay -- relief from stay because the movants indisputably face active litigation investigations right now. And denying them defense costs would cause irreparable harm. As

Your Honor is obviously aware, Mr. James is subject to the adversary proceeding. The Debtors have indicated that they're going to add additional parties. There has been a flurry of Rule 2004 subpoenas that have been issued by the Committee. Notwithstanding Your Honor's ruling today, there's already been substantial costs that have been incurred by a number of the movants and having to respond to those. There's a government investigation.

So there really isn't any factual or legal basis to deny coverage here. The cases fully support that position.

So turning to what I'll refer to as the equitable arguments raised primarily by the Committee, there are a few themes here. A complaint about alleged policy depletion and unclean hands argument and what's been referred to as a wait and see approach that somehow all this needs to wait until there's been an adjudication either at Mr. James' trial or a trial of other parties. It's not clear exactly that that proposal is. However, it's viewed -- it's irrelevant, does not move the needle, and the position should be rejected.

Courts do not deny advancement or stay relief based on speculative depletion on proven allegations of misconduct or the suggestion that insured individuals must await the outcome of litigation before accessing defense coverage. That position has been repeatedly rejected

because that would undermine the core purpose of D&O insurance and rewrite the parties' bargain.

I note, Your Honor, that several decisions, including those by Judge Glenn in Silicon Valley Bank and in MF Global Holdings, it was stated that the fact that there are allegations of wrongdoing is precisely why such insurance exists. It's not a basis to deny the insureds access to the policies.

There's also a "war of attrition" argument raised by the Committee that somehow by accessing the policies, we're depleting assets of the estate. This is really just an impermissible, backhanded attempt to regulate defense costs. That argument has been squarely rejected by courts. In particular I think the Allied Digital Technologies case, a bankruptcy decision from Delaware in 2004, addresses this in a very apt way. A quote from the decision where the trustee was opposing access to D&O insurance, and I'll read from the decision at Page 513.

"The Trustee's real concern is that payment of defense costs may affect his rights as a plaintiff seeking to recover from the D&O policy rather than as a potential defendant seeking to be protected by the D&O policy. In this way, the trustee is no different than any third-party plaintiff suing defendants covered by a wasting policy. No one has suggested that such a plaintiff would be entitled to

an order limiting the covered defendant's rights to reimbursement of their defense costs."

In other words, what the Committee is really asking this Court to do is precisely what the caselaw forbids; rewrite the policies to earmark them for some future hypothetical judgement or settlement at the expense of the insured's bargained-for right to defense and cost advancement.

Similarly, Your Honor, there's an unclean hands argument. I don't think that there's really much to say about that. Alleged wrongdoing is not a basis to deny coverage. As I said before, the cases squarely support the position that it's precisely because of allegations of wrongdoing that access to insurance should be provided. As I mentioned before, the cases from Judge Glenn and Silicon Valley Bank, MF Global Holdings, and other cases squarely support that position.

Next, Your Honor, the Committee raises an argument that there's been a -- or will be an improper profiting by the movants in accessing their D&O coverage. Movants certainly are not profiting. What they were doing is seeking funds to defend themselves, just as any litigant would. And in this case, the access to those proceeds is governed by contracted clear terms, which are undisputed.

The wait and see approach also should be rejected

out of hand. There's really no basis and there's no case cited for the proposition that the movants should have to defend legal proceedings without getting access to coverage and await the determination of a court of competent jurisdiction.

Ultimately, Your Honor, the Committee asks this Court to use equity to override an unambiguous insurance contract. That is not what equity permits. Equity cannot rewrite bargained-for insurance contracts.

Yes, Justice Douglas noted in Pepper v. Litton, a 1939 Supreme Court decision that was cited by the Committee to the effect that equity prevents fraud. But here, enforcing the policy terms is not fraud; it is honoring contractual rights. So that covers the Committee's objections.

Next, Your Honor -- and I'm close to being finished with my presentation -- Katsumi raises a number of proposed revisions to the order that it's seeking to compel on the movants without their consent. We don't believe there's any legal or contractual basis for that.

As I noted before, there is a resolution to the estate fiduciaries. That would include the third estate fiduciary, the Committee, for reporting and transparency. There's no need to broaden the recipients who get that reporting. If Katsumi is going to get it, then we're going

to have floodgates of all sorts of parties potentially showing up and say they should get this information, too. And we think the provisions of reporting is more than fair and reflects a good faith compromise that doesn't compromise the movants' rights under their policies.

Second, Katsumi is requesting some type of a cap, a soft cap, however you want to call it. That would override the bargained-for contracts. They had cited the MF Global decision, saying it was instituted in that case. Actually what happened was in a subsequent case, the court revisited the issue, concluded the D&O proceeds were not estate property, relying in part on the priority provisions, which are essentially the same as what you have here, and did not impose any cap going forward. Similarly, Your Honor, the demands for (indiscernible) alerts or court oversight are equally unsupported. The policies contain no such provisions. Fiduciaries will already receive reporting. That's enough, more than enough.

And finally, Your Honor, the jurisdictional or claw back conditions are unnecessary, unwarranted, and not supported by applicable law. The ABC policy already supplies a dispute resolution framework for any issues with advances.

In sum, Your Honor, with the concessions that have been made, there should be no issue from any estate party or

any party generally that this isn't appropriate relief within the context of this case, and we would ask the Court to enter the revised proposed order without imposing any further restrictions by Katsumi or any other party.

Finally, Your Honor, as requested in our motion, we have sought a waiver of the 14-day stay requirement to the extent that waiver is applicable. As set forth in the papers, the movants requested that waiver because legal fees are accruing now in active proceedings, investigations. Mr. James is a defendant in the adversary proceeding. Others may soon be named. There were Rule two-thousand -- subpoenas that as Your Honor is aware were the subject of extensive motion practice. And any delay in getting this relief we submit would cause immediate prejudice by depriving the movants of the ability to defend themselves by having access to the policies.

So unless Your Honor has any questions for me, that concludes my presentation.

THE COURT: No questions. Thank you.

MR. DENDINGER: Good afternoon, Your Honor. For the record, Mark Dendinger of Bracewell for Edward James, otherwise known as the other Mr. James, I suppose. Perhaps I should clarify with Your Honor for purposes of the record how I should refer to Mr. James. Because I refer to him as Mr. James. Should I call him Edward James?

THE COURT: You can call him what you like.

MR. DENDINGER: Okay. Sounds good. Thank you, Your Honor. I represent Edward James, one of the movants here. I echo the comments of Mr. Saval. And I just have a few things I would like to say in connection with our request to enter the revised proposed form of order that's been on the docket for about a week now.

This morning I was listening acutely to the status conference, and it sounds like litigation has already been brought in this case, as we know. And it sounds like from Mr. Singh perhaps there will be other litigants who are named as soon as this week. I think that that could include some of the movants for the joinder parties. And so I think time is of the essence to get a ruling from Your Honor on this issue, because I expect additional litigation to come.

Mr. Stark also made comments to the Court this morning about litigation. I think he said this is either a business with fraud attached or a fraud with a business attached, echoing the comments that there will probably be additional litigation that's brought soon enough. But even if there isn't additional litigation brought, Your Honor, my client and some if not all of the other movants and joinder parties are already being investigated on several fronts. From the Debtor's Special Committee, from the UCC's 2004 examinations up to this point, requiring parties to file

motions to quash, from the SEC, from the DOJ, from what it sounds like soon to be as of this Friday, the examiner. And all of these costs are compensable to the Ds and the Os that are entitled contractually to the proceeds of this policy.

To reiterate, if the Court were to rule that the proceeds of the Ds and Os policies were not -- were property of the bankruptcy estate such that proceeds of those policies could be utilized to distribute monies to creditors as part of this bankruptcy, I think it really is unworkable and would turn D&O insurance law on its head. I'm not certain a D or an O that would be wanting to serve in a capacity as in a special committee role, on a board of directors heading into a bankruptcy proceeding if by the simple filing of a complaint in the bankruptcy process, the D or the O therefore couldn't access the insurance proceeds to defend himself or herself in the bankruptcy proceeding. That just seems to be unworkable as a practical matter.

And particularly here, the Committee cited largely equitable concerns. That's unsurprising because of the binding Fifth Circuit precedent that says that proceeds of D&O policies are not property of the bankruptcy estate. So they had to cite to something, the unclean hands arguments, and the like.

But that also -- to cite some equity back in response if the Court might indulge me, the Committee is

already off to the races. They've said so this morning. Now, perhaps they'll have to pump the brakes a bit with the 2004, but they certainly have as estate fiduciaries many other things to do in these cases that are going to be adjacent to investigative work of the various parties, including the examiner. Counsel this morning just said that he would like to work in tandem alongside and help the examiner with the work product that's been generated.

And thus far the Brown Rudnick firm just filed fee applications, and that's cost the estate $12 million in a 75-day period. And that's not including the fees of local counsel. And if Brown Rudnick would have its way or the objectors would have their way, they would be asking us to have zero dollars to defend ourselves in a contract that we believe is not part of the bankruptcy estate. The proceeds of the contract are not part of the bankruptcy estate. And that seems to be unworkable. How could we be asked to comply? How could we be asked to properly defend ourselves? How could we ask to be cooperative with the Committee, with Katsumi, with the Debtors if we don't have access to the proceeds to help us do that?

And the last thing I would say, Your Honor, is it's obviously hopefully not lost on the Court that the Debtors themselves support the relief requested in the revised proposed form of order. The DIP lender as the only

financing party in these cases support the relief requested, the revised proposed form of order. I don't -- we didn't draw any opposition papers from any of the SPV lenders. Really, we're here today because we were unable, although we tried, to work out the form of a consensual form of order with the case parties. And that included the Committee. They were in initially and they elected to pursue a path of opposition. They are in the order. We are prepared to keep them in the order as an estate fiduciary. And we do think by having them as an estate fiduciary, they do speak for all unsecured creditors in the case. That's their statutory role. And that would include Katsumi. So I do agree that by opening up the flood gates and allowing Katsumi the same information rights, it could be that other parties in interest ask for the same treatment.

Unless Your Honor has questions for me, that's the end of my presentation. Thank you.

THE COURT: No questions. Thank you very much.

Anyone else in the courtroom support the relief requested, or that wish to be heard? Let me just turn to the phone line. Is there someone who wishes to be heard who supports the relief requested? Ms. Santos?

MS. SANTOS: Your Honor, this is Sarah Santos.

THE COURT: Ms. Santos, I'll start with you.

MS. SANTOS: Thank you, Your Honor. We represent

David Parker. He is the current Executive Vice President of Global Special Projects and Integrations for the Debtor. And as the movant's counsel -- we have filed a joinder to what the movants filed to their motion, their reply. And we're in agreement with the arguments that they have presented to the Court in their briefings and today at this hearing.

One important factor that I wanted to add to what they've already stated. Yes, movant's counsel recognized there are directors and officers who are seeking coverage for both former and current employees. Our client is one of those current employees. And he is performing his day-to-day job, his duties as an executive vice president. And not just performing his day-to-day duties, Your Honor, but also helping with restructuring of the Debtor in a variety of tasks which we can provide more light on.

Then separately he is also being asked to respond to inquiries to cooperate with interviews, with requests for documents. And currently he is paying out of pocket, which is certainly not what any director or officer who takes on a role like this bargained for when they become an executive vice president of a company such as this.

One added point that I wanted to make. There's caselaw as well such as In re SVB financial Group case out of the Southern District of New York that talks about

situations where current employees look to protections from the D&O policy for reasons such as the ones we're describing here today. Right? In the absence of such a policy, their attention would be diverted. They would be paying out of pocket funds just to defend and to be able to cooperate and assist with all the inquiries and investigations that are undergoing in this case. And that in fact would be detrimental to the estate.

In the In re SVB Financial Group case, the Court says, you know, the movants reasonable argue that absent the assurance that the D&O policies are protecting them in the various lawsuits and investigations. Their attention would be diverted from the Debtor's operations to the detriment of the estate. And that's the situation where our client and various other current employees are in as well.

And so to prevent him access to the D&O insurance proceeds so that he can have defense costs certainly is a harm to him. But not only a harm to him as a current employee, but also to the estate.

And so that's the only added point that we wanted to make, Your Honor. Unless there's any questions for us, we ask that the Court grant the relief sought.

THE COURT: Thank you very much. Anyone else? Yes, Mr. Kasulis?

MR. KASULIS: Yes, thank you. This is Tim Kasulis

from Morvillo. We represent Stephen Baker, who is the former chief corporate strategy officer at First Brands. Thank you for the opportunity to speak, Your Honor. I will be very brief.

We join all the arguments of the other movants. It seems very much that they are consistent with the principles and precedent dealing with these issues in this Court and across the country.

I wanted to be heard separately only to respond or address the allegations on the Committee that they may be bringing more claims in the future of an enormous scale, according to their response.

I agree with Mr. Saval that that cannot possibly be an impediment to the relief granted here. It can't amount to saying that if you need to be able to file a claim under the D&O policy, you are barred from doing so. That cannot be the way the law works. And I think they cite no caselaw to support that proposition because there is none.

But moreover, uniquely to Mr. Baker, Your Honor, there are no allegations that I am aware of filed literally anywhere in the country, in this court or otherwise, asserting misconduct against him. He was a highly-respected lawyer before he went to First Brands. He was a partner at both the Shearman & Sterling and Paul Hastings law firms. And when you take a job, as Your Honor knows, to be a

director or officer at a company, having the availability of the D&O policy is a substantial employee benefit. It's something employees rely upon in taking the job and they accrue value in it while working there. So not only is this exactly why the relief is needed, Your Honor, it's why the relief is needed right now for the reasons stated by all the other counsel. Thank you.

THE COURT: Thank you very much. Let's see. Ms. O'Donnell?

MS. O'DONNELL: Thank you, Your Honor. We represent Laurie Stein. Ms. Stein is the Chief Legal Risk and Administrative Officer at First Brands and has been there for some time.

Like other current employees, she is also assisting the Debtors in the restructuring work and attending to her daily duties. And in her role, she has received a request for an interview from the Debtors, and she has received requests for involvement with law enforcement proceedings. And so we don't want to add much, but just to join what the other movants have said. Thank you.

THE COURT: thank you very much.

MS. O'DONNELL: Oh, I'm sorry. The only other thing is there are no allegations of misconduct against Ms. Stein. She wasn't referenced in any of -- we've been here

for hours. She wasn't referenced once. And we haven't heard any allegations of misconduct against her. Thank you.

THE COURT: Thank you. Let's see. Mr. TumSuden, do you wish to be heard? Anyone else wish to be heard? Let's see. Anyone else? Going once. Let's see.

Mr. TumSuden, are you trying to -- do you wish to be heard?

MR. TUMSUDEN: Yeah. Thank you, Your Honor. For the record, Kyle TumSuden, Mayer Brown, on behalf of Katsumi Servicing.

THE COURT: Yes.

MR. TUMSUDEN: Apologies. You still wanted to hear from those in support of the motion, but I'm happy to --

THE COURT: Oh, that's -- no, no, no. I was just -- I still am going. I'm just making sure. I forgot you represent Katsumi. I apologize. I was just calling names on boxes. Apologize.

Let me hear from the Committee.

MR. STARK: May I bring this up?

THE COURT: Yeah, absolutely. Absolutely.

MR. STARK: I have agreements with judges around the country; if I break it, I buy it.

I have a demonstrative that I'd ask if I can --

THE COURT: Yes, of course.

MR. STARK: May I approach?

THE COURT: Yes, absolutely. Thank you.

MR. STARK: Thank you.

THE COURT: Thank you.

MR. STARK: I have to do two things, Your Honor. First, forgive me, my old colleague and former partner, and it's the first time that I've been across the table from him. So it's an honor for me to be able to talk to Mr. Saval, number one.

Number two is I think we did not put anything into evidence, and we should probably just do that.

THE COURT: Okay.

MR. STARK: There's Exhibits 26 and 27 on the Committee's list. It's just the insurance policies. We listed a bunch of other things, but I think given the earlier hearing, we can probably put them off. And I don't believe we have any dispute from --

THE COURT: If you can just give me the docket number.

MR. STARK: Apologies. It's my exhibit number -- the witness exhibit binder for the Committee.

THE COURT: Committee Exhibit 26 and 27?

MR. STARK: Yes, Your Honor.

THE COURT: Okay. Any objection to the admission of 26 and 27?

MR. SAVAL: (indiscernible) the same policies into the record as well.

THE COURT: Okay, 26 and 27 are admitted.

(Committee Exhibits 26 and 27 admitted into evidence)

MR. STARK: Okay. Thank you, Your Honor. If Your Honor will walk through the slide deck with me.

THE COURT: Okay.

MR. STARK: I think we've got to just understand the policies first. Because we're talking really high-level and lots of stuff. And I'm at fault for that, too. I was trained to start with Pepper v. Litton for almost everything. So that's sort of how I think about the world. And then I kind of move in from there.

Maybe we should retract and look at the policies holistically.

THE COURT: Okay.

MR. STARK: So let's get real basic. We've got two towers of policy. We have what we call the Berkshire Hathaway tower, which is $100 million, and we have a second tower, which is the AIG tower, for another $100 million. The first tower has Berkshire Hathaway as the lead primary insurer. The second one has AIG as the lead primary insurer. There are ten entities in each tower. Each of them have supplied $10 million to make a hundred million in

both. Okay?

The Berkshire tower is Side A, Side B, Side C. The AIG tower is just Side A. And that's magical. Let's talk about what that is. Side A means that directors and officers, to the extent that a loss is visited upon them individually can look to the policy to reimburse them for the losses or to satisfy those losses, right?

The second is Side B, which is that there are losses visited on the company. Because the company has to pay indemnification or other reasons for those Ds and Os.

The third is that the claims are made against the company qua the company and they're covered losses and then they get paid, the estate gets paid or the creditors get paid from the policy. Okay?

So Berkshire Hathaway is sort of more along the lines of what a lot of the caselaw talks about where the Debtor and the Ds and Os are co-insured. We have two more sides than they do, but we are coinsured. The AIG is just them. We are not coinsured. Okay?

Now, had those conversations that they were chatting about earlier before we got into this contested matter actually migrated the conversation towards the AIG tower and not the Berkshire Hathaway Tower, we might not have this problem. But they didn't do that. They want $200 million of defense availability. Not for a lawyer, not for

two, but for what seems to be mushrooming dozens of lawyers. We now even have a legal administrator who has hired a law firm with three lawyers sitting on a box watching our proceedings. Not for now, but for the whole day. Right? How many administrators do we have? How many executives, present and former, do we have? $200 million. Would have been different if they only focused on the hundred. Let's go to the next slide.

An important part of this policy, of both policies which make them different than many of the policies is there's no insured versus insured exclusion. Right? So to add some understanding of that phraseology, the Debtor can't sue the Ds and Os and the policy won't pay if they get a judgement against the Ds and Os because we are both insured, except neither tower has that very common exclusion.

With respect to the Berkshire tower, they had it originally, but they did an override. I guess they knew the estates would be coming. With respect to the Side A, there never was the exclusion to begin with.

So those policies pay to the estates as well on claims to the extent that we have claims that would go to losses, like breaches of fiduciary duty. And oh, do we have breaches of fiduciary duty. Okay?

One last slide on just getting our context right and then I'll delve into the polices more specifically so

you really understand it. Okay?

Our jurisprudence talks about an adverse effect. Does allowing stay relief as the movants requested create an adverse effect on the estates? Sort of an easy call with respect to the Berkshire Hathaway tower. Side A, Side B, Side C were coinsured. Two of the three sides are for us for the estate, not for them. But okay.

If they use up the $200 million, right, we don't get paid on claims. And importantly, creditors who have claims that are losses assertible against the company, and oh, are we going to have creditors asserting claims for losses against this company that would be covered by the policy. They don't get paid, which means our claim burden goes up. Exhausting it by lots and lots and lots of lawyers, right, makes it dollar for dollar reduced about the claims that get taken care of that become dollar for dollar increases in the claim burden of the estates. That's what all the cases talk about. Okay? And we have that insured versus insured exclusion. So it also erodes asset value that is discernible. And if you haven't noticed, Your Honor, we have a shortage of liquidity in this case. These are important things when we have claims that are being asserted amongst others in a present adversary proceeding against Patrick James going to trial in June. Having access to that policy is probably something that we would like at

least to talk about with the carrier.

But now let's go over to the AIG. Because this is the harder one, because it's much more indirect. Right?

You could have bowled me over with a feather when counsel to Mr. Edward James gets up and wants to talk to you about equitable principles and policy about what honest Ds and Os should get. But leaving his colloquy aside for the moment, right, claims that are -- if the policies are absorbed by all of these lawyers, right, there are going to be, and in fact there may even be on the Hollywood Squares lawyers representing less culpable, more good faith people. But in the zeal to go after the James brothers and the people close to the James brothers and their battery of big-time expensive lawyers, there may not be anything left for them. And then they have indemnity claims against us. Indirect, I got it. I understand. And I understand what the case is about, estate value and estate asset. But that is an adverse effect that is palpable in the particulars of this case. And I'm going to come back to that. Okay?

Let's go a little bit further if we can because I want to make sure that Your Honor really understands these policies and really understands what they gloss over the top and then don't get down into the weeds. Okay? So we'll talk about the Berkshire Hathaway tower. If you go to slide six, this is the cover sheet. Just so we're orienting

ourselves. Why we call it the Berkshire Hathaway tower. Okay.

On slide seven you actually see the cutaway from the policy that defines Side A, Side B, Side C. Again, Side A, the Ds and Os get losses, they go to the policy and they say pay on them. B, if we the estate have to pay indemnity, then the policy pays us to reimburse us. And C of course is if the policy pays on creditors who otherwise would have claims against us.

There is no argument under any of the cases -- I understand we all agree that the policies themselves are assets of the estate. But there is no capacity to argue that the proceeds of the Berkshire Hathaway policy is not an asset of the estate. It says it directly, it pays to the estates. And there's no ambiguity under any of the cases. And we could start with Louisiana World if you would like.

Another point about these policies. I'm going to just do a couple points about each policy and make sure Your Honor understands it. If you go to slide eight. Okay.

They make it sound like if Kobre & Kim has an invoice for work they did last month and they tender it to Berkshire Hathaway, Berkshire Hathaway then cuts them a check for the work. That is not how it works. There is no covenant in there to pay Kobre & Kim's invoices.

What there is is a payment priority provision,

which says before we, Berkshire Hathaway, pay for any other law -- any other less, excuse me, we must then pay their invoices to the extent that it's reasonable and fits within the other sort of things. There is no obligation by the insurer immediately to pay on this. Okay? So this need, this we've got to get our bills out, we're going to get paid, that is not reality under this agreement. There is no deprivation of a contractual entitlement. It doesn't exist as they've presented it to Your Honor. And this is the heart of their motion.

Then these costs might never get paid. It's not only that they may not get paid immediately, they may never get paid because there is a wrongful act exclusion that says that if the losses arose from doing really, really, really bad things, you don't get paid your defense costs for them. Okay?

Now, it is true, I acknowledge it, it says that this exclusion only comes into bear if there is a final non-appealable order to that effect. But I've been around bankruptcy cases long enough to know that insurers sometimes say I'm going to wait and see on that sort of stuff. Because there's a permeating allegations and admissions by the Debtor of a lot of bad stuff, including thank you people who have lawyers, who are standing at this podium saying I am entitled as if I was honest as the day is long access to

this policy.

But I will tell you, Your Honor, if you go to slide ten, whereas their entitlement is very inchoate and may never actually achieve anything, right, creditors will most assuredly be asserting claims to get to this policy. That is without a doubt. Because this -- this is really, really important, Your Honor. Right? We've talked all this morning about allegations by the Committee. And nothing is proven and there's no merits trial. Okay? This is not a widget company. This is not business as normal in Chapter 11 land. This is cockroach land. The allegations are more than allegations. These are admissions by the Debtor through sophisticated professionals, a lot of which is under oath. And in the record of this case not only is declarations and affidavits in the pleadings, but in adversary proceedings. This is not a fly-by-night set of people who are making statements to Your Honor as representations of truth about what they actually found when then went into the room after the James' were gone and what they saw, oh my god. These are not people who are flimsy when they make these statements to Your Honor. This permeates every attribute of this case. Right? There will be lots of creditors, and they've already shown up in this case. They were the ones who started moving for the examiner, for example, saying where did $2.3 billion go,

right? and that's just the beginning. Statements from the company itself by respectable people who don't file pleadings unless they have basis to do so say things like the 2.3 was procured through nonexistent or doctored invoices and double-pledging of assets. Conversion, embezzlement, misappropriation of hundreds of millions of dollars.

I did not make these up. These are not my allegations. These are representations from the Debtor, and they know what they're doing. And it goes beyond the James brothers.

If you read the complaint further and you read the pleadings further, there was a coterie of people around them that helped them, that received instructions and directions to effectuate the things that now we're around chasing our tails trying to figure out how to get the money back. And many of them have since resigned. Not all of them. I acknowledge from the Hollywood Squares, not all of them. Some are there and they're helping, and maybe we need to consider that in this situation. But there clearly is a camp that is not of that variety. But in the end from a legal analysis perspective, every dollar of claim that is paid by the policy is one less dollar of claim that is assertable and payable by the estate. And that under our jurisprudence in this circuit should be the beginning and

the ending of the question of whether or not cause needs to be established for relief from stay.

I'll go on slide 11 and the little gilding. Here is your override. Just so that Your Honor sees it. Okay. And this is not normal. This is not a usual thing. This is Endorsement 12 that says if the Debtor sues -- and look at the -- what debtor? Any claim brought or maintained on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator, rehabilitator, or creditor's committee is payable as a loss under the policy. Did they see it all coming?

Slide 12, Your Honor. Okay? And this is just the final point with respect to this. Because Mr. Saval, my good friend, I saw it in the papers on the first line and reiterated it here. It talks about this settlement that was achieved. In New York where I'm from, we call that fugazi, Your Honor. There was no settlement. There was a debtor who did not advance the objection because the debtor contractually obligated itself not to do so and doesn't want to breach the agreement. Because there are other people that have D&O coverage that they are particularly protective of right now. And the lenders didn't do it because this isn't what lenders do; this is what creditors' committees do. So they left it for us because that's what the contract says they are supposed to do, and that's how the process

works.

With that, Your Honor, can we turn to the AIG tower? I just want to make sure we understand that.

THE COURT: Mm-hmm.

MR. STARK: Slide 14 gives you the cover, so you can see why we call it the AIG Tower.

This is Side A. I don't run from that fact. There is no payable directly to the estates, or to the company I should say. It goes only to the Ds and Os. Okay?

If it is consumed in its totality, there will be very little left. If you are the James brothers and the world is coming after you and you know they're coming after you, you gird yourself with Quinn and with Bracewell and with Debevoise and with every other lawyer you can find on the street to build that fortress and hide in it. And then there ain't nothing left for everybody else.

Now, this is an important point, Your Honor. And this is a point that we had some colloquy about. Right? It's on slide 16, the really important point. The Berkshire Hathaway tower, that $100 million tower --

THE COURT: You're on 16 -- yeah.

MR. STARK: I'm sorry, Your Honor?

THE COURT: Yes.

MR. STARK: Okay. $100 million tower is sort of, for lack of a better word, the primary tower. Right? Lots

of excess in there. This is another tower that seems to kind of be another execs tower. But it ain't, but it ain't.

Had they said, again, we're going to exert our focus on the AIG tower and not touch the Berkshire tower, we might not have had this contested matter. So they don't want to do that. They want the extra $100 million. Lots of lawyers. But importantly, they don't have a problem if they only focus their efforts on the AIG tower. It is what we call a dropdown clause, which says that if I call up Berkshire and say here is my Kobre & Kim invoice for last month, would you please pay it. And they say I'm not feeling like it today. Okay? That doesn't mean that the AIG tower can't receive the same invoice and in fact pay it. Right? The dropdown clause says if it's denied by Berkshire, come back to us at AIG and we'll pay it there. And if the dropdown clause is there and it's pretty clear, why are we having this contested matter? Why do you not focus your efforts on the tower that's set up for you? Why do you got to take the estate's tower?

Next slide, Your Honor.

You will try in vain to look through the guide at the top of this tower, the table of contents. You will not find an insured-versus-insured exclusion because it doesn't exist. When the estates sue and they get judgement, the tower pays so long as it's a loss within the exclusions that

are there.

Hopefully Your Honor has a better orientation towards the policies now. So it takes me to conclusions.

I end where I began, or I begin my conclusions with where I began, which is when I graduated from law school and there were dinosaurs still walking down the street, we talked about Pepper v. Litton. It was a north star. This is a court of equity because it has been framed for over a hundred years as a court of equity. Because we have to do in summary fashion what other courts do in five years. Right? We have to move quickly. We have to think about things. So we have to look at things with an equitable notion of what is there. And of course Justice Douglas's famous phrase about being -- judges have to look behind what's going on, feel what's going on, and be able to rely upon those equitable senses to get to the right outcome. To use Judge Learned Hand's famous quote, bankruptcy cases not only must be right; they must seem right. That's all what that's about.

This case stinks. It stinks so much that everybody is talking about, watching it. Jamie Dimon is giving it names. Right? You cannot walk away from any contested matter with the permeation, the stench of what's happened here. As the data becomes brought to the court's attention, to the public's attention. And that was what a

lot of today was about, was to start bringing attention to where the money went, because we think we know where the money went and how it got there. We still have a ways to go, but we're going to get there.

You can't walk away from it. And you can't stand up here as Mr. Saval did and quote from some cases that says Ds and Os are entitled to the benefit of their bargain, which is a Fifth Circuit phraseology and the two cases that we have on point the benefit of their bargain, because counsel was correct on the screen when they said it's important for Ds and Os around the country to know that they have insurance when they come in here. Except Your Honor heard it yourself, which is the James' brothers were on both sides of the transaction and the money was swiped. You can't ignore it. It's part of everything. It's all over the record.

And maybe you can't avoid analysis from contractual purposes or assets of the estate purposes by applying equitable principles, but it permeates areas of judicial discretion. Here, the requests are excessive. Focus on AIG, Berkshire Hathaway alone because that covers the estate. You're consistent with the caselaw, you're consistent. It's a little Solomonic. Don't ask for too much. Don't reach into places where we shouldn't. Not on this record. And don't have your lawyers stand up here and

plead that you're innocent when we know you're not, and you're going to be asserting policy issues all over the place for benefits of the bargain that they sat on both sides of the transaction.

I gather -- I know that there's room for debate on AIG. I appreciate that. I read Louisiana World. I read Vitech. I understand what those cases say about assets of the estate and when proceeds are and are not.

And I would posit this to Your Honor, if you will. Louisiana World was decided in the late 1980s. Vitech was decided 30 years ago. The world has changed an awful lot since those small opinions happened. And the facts at issue in those cases don't look anything like our facts.

THE COURT: They don't look like 1939 either when Pepper v. Litton was decided.

MR. STARK: Fair point. Fair point.

THE COURT: Let's just stick to what we've got.

MR. STARK: Very, very fair. I only go back to chestnuts as north stars. You can go to precedent and say this is binding precedent on us --

THE COURT: Still binding. I get it.

MR. STARK: It is binding. But the analysis may very well be distinguishable for facts of the case that are not before the Fifth Circuit.

I can see five different ways to read those two

decisions from the Fifth Circuit and say under the facts of those cases, right, it looked very different than the facts of this case as the record itself has presented itself. I gather we have another trial, I understand.

THE COURT: No, no, I've got it. But I'm just ask you, on the AIG policy, what would be the legal basis to argue that it's property of the estate?

MR. STARK: Because there are two -- remember our standard, if you can call it that. There's not a lot of caselaw. There's --

THE COURT: No, just statute, code. How is it property of the estate?

MR. STARK: Yes, exactly right. But what Judge Sontchi did, what a few other --

THE COURT: I'm asking you. I don't -- but I don't want you to focus on what other judges and what other courts did. We've got a policy here in front of me.

MR. STARK: Yeah.

THE COURT: It's AIG. It's all Side A.

MR. STARK: Yeah.

THE COURT: You've got Louisiana World. You've got 541.

MR. STARK: Right.

THE COURT: Tell me how it's property of the estate.

MR. STARK: I actually endorse the adverse effect concept. It permeates other parts of the bankruptcy code. So --

THE COURT: And where do you find the concept of adverse effect under 541?

MR. STARK: Oh, those particular words?

THE COURT: Yeah.

MR. STARK: That was the interpretation -- this is -- as you sort of read through the cases, courts are struggling. And they talk about that there's like --

THE COURT: They don't struggle on this point though.

MR. STARK: Well, they struggle on the notion of how does one deal with a -- the policy is property of the estate. We know that money that seems to have been --

THE COURT: And a non-debtor owns it, right? It gets more complicated in this case.

MR. STARK: It does. It does. I understand that point. Right? I don't have an easy answer to that, and I --

THE COURT: I got it. I'm waiting on them to come back so I can ask them about the Berkshire Hathaway policy and that stuff. I wanted them to kind of get it all out. But I just -- I appreciate the distinction. There is a distinction I think in my mind between the AIG and Berkshire

Hathaway. One is -- they're different. I'll just leave it there.

MR. STARK: And I agree with that. And it's the right question to ask me, Your Honor. and I wish I had an easy answer. I read Louisiana World. I know it's very dated. I know the world is very different. And I know that the lawsuit that was prosecuted by the creditors' committee in that case was a busted LBO fraudulent transferee kind of a claim. This ain't that case. Not by a long shot. This is tort. This is really bad in a way that I have a lawyer making a presentation on behalf of one of the people involved here, says that if he's put into a deposition, he's going to take the Fifth. I heard that -- and again, another moment where I almost rolled out -- fell out of my seat. Right? you have former officers and directors who are telling Your Honor in court, open representation, that if put in a deposition scenario, they're likely to take the Fifth. Is that Louisiana World? Far from it. Right?

On the facts of this case as the Court is aware of today where nobody knows whose money it was that was purchased, but we know who bought it, and we know who bought it for what purpose. And that the end result, they're standing here right now saying I need $200 million of value so that I can protect myself from the onslaught that's coming. That is not Louisiana World. That is

distinguishable from our circumstances.

And back to Your Honor's point about 541, two things I said on the adverse effect. One is the estates have claims that might pay on these facts. I appreciate that some of the case didn't like that analysis. But those are out of the circuit. And on these facts, it may be very different. And again, look at what's happening.

Look at what Judge Glenn did in MF Global at least initially where he said we need a little restraint. Because there are going to be people who are going to be big-time targets for attack, and they might absorb all the money. And then there will be people like a legal administrator who might not have access to the money. And that is something that I do believe, Your Honor, from a property of the estate perspective -- I grant you it's a flexible approach, I grant you it's not easily found in the precedent. But it feels right under the facts of our particular circumstances that in fact our law might recognize it as such. Okay?

That takes me to my last point, Your Honor.

THE COURT: Answer this question for me, because I know that this is a point they're going to make on (indiscernible). How do I think about the argument -- let's just put Berkshire Hathway...

MR. STARK: Yeah.

THE COURT: Before you get to B, you've got to

cover A. So it may be a timing issue. The Side A -- before you -- there may be claims for Side B and Side C --

MR. STARK: Oh you mean in terms -- because of the priority of payment entitlement that (indiscernible)?

THE COURT: Am I -- how do I think about that?

MR. STARK: Well, one way to think about it -- and I'm extrapolating from a different concept -- is sort of a marshaling. There is a $100 million tower that is set up for you, Ds and Os. Right? Make your claim. You don't have to wait on the other one. You don't have to go there first. You've got your dropdown. Go do it. Okay? If you do that, you sort of marshaled the resources. $100 million is still a lot of money, even in today's day and age, for all these lawyers. One would think that would be enough. Why do you got to have 200?

If you're going into the situation of, well, I need to figure out how to marshal vis-á-vis $200 million stack, I still think you go to the hundred first and then you see what you can do. And if they say I'm not prepared to do that, Judge, I want unfettered right wo sue up the Berkshire piece first if I choose, which is implicitly what they're saying, right, then that is most assuredly dangerous to the estate, violates the automatic stay, and should not be allowed. Because you have ample access over there. At least come back at a later date if you find yourself three

months from now having used up $100 million.

And that gets me to my -- I don't know if I addressed Your Honor's point.

THE COURT: No, no, no, that's --

MR. STARK: But let me give you my last point and then whatever questions Your Honor may have for me.

No one ever likes a lawyer to get up and say, hey, let's do this tomorrow. Right? Sometimes I find myself having to sit in the courtroom and hear, well, not today, but maybe tomorrow. And that even happened today. And that's okay. That's our process. Because bankruptcy is getting to something. We're not litigating from something, right? We're trying to get ourselves to a solution in this case. And as we talked about this morning, we are going to be working awfully hard now to try to get quickly to a solution to this case because circumstances necessitate that. Right?

I can't propound 2004 anymore. At least not now. Right? An examiner is going to take over after he gets appointed, after he puts a work plan together, and after Your Honor approves that work plan. (indiscernible) a couple weeks, right?

There is a litigation right now against one person, Patrick James. Not Edward, not any of these people, not anybody but him. Okay? Sort of the last person to get

up at the podium and ask for equitable dispensation. But none of those other people right now, other than the lawyers chomping at the bit to go do something and bill for it, really at this moment is yet doing something. Because I can't go forward and the examiner is not yet ready to go forward. The only one that does not find themselves in that position right now is Patrick James. Pause on that one for a minute. Okay? Because that's the only one that has active litigation.

Now, there's discovery, that's true. Right? Is it discovery to a point where our legal administrator has to have three lawyers sitting in here to respond to document productions? I don't know. I don't know what happened, where that legal administrator is going through files to deliver them to the lawyer, but I'm assuming Weil Gotshal is involved in that sort of stuff. Right? that's what happens in these types of situations. Everybody girds for the battle that hasn't happened. They all get white collar criminal law firms and they all sit with lots of lawyers waiting for the subpoena to come, and then they churn and then they bill.

We ain't doing that right now. Your Honor told me we're not doing that. And I know from the examiner we're not doing that. And I also know from the case context that we're going to go start negotiating. Maybe that arises in

the months ahead. Maybe it arises in the weeks ahead if the examiner gets this proposal up and running again. But it's not today.

The trial for Patrick James I believe is June. He may be different. But he's also very unusual to be asking this Court for dispensation in these regards.

So with that, Your Honor, if Your Honor has any questions for me. But I think we can probably wait, at least for a lot of this.

THE COURT: Thank you. May I hear from Katsumi?

MR. TUMSUDEN: Thank you, Your Honor. Again for the record Kyle TumSuden, Mayer Brown, on behalf of Katsumi. I'll keep it short, Your Honor, given we agree with a lot of the positions advanced by the Committee. We don't have much more than what we asserted in our objection, which is on file at ECF 1145.

As a threshold matter, we don't dispute that the policies under Side A tower are not property of the estate. So we're not going to get into that back and forth. However, all other policies, including the primary Berkshire policy, are property of the estate, and so are their proceeds.

IN the Fifth Circuit, insurance policies and proceeds constitute estate property where, as here with the Berkshire policy, available coverage would serve to reduce claims against the estate.

The estates, as Committee council pointed out, and so did counsel for the movant, the estates and the directors and officers here are coinsureds under the primary Berkshire policy. Moreover, the primary policy is a wasting policy. Any defense costs advanced would reduce on a dollar-for-dollar basis the amount of proceeds available to either the estates for Side C losses or to the creditors with claims against the estates.

For these reasons, we think that the risk of prejudice to the estate and stakeholders arising from any advancement at this point is concrete and substantial. Allowing defense advancements under the primary policy would reduce coverage available for Side C losses and could force the estates to bear significant uninsured losses to the detriment of all their stakeholders. That risk is especially acute here given the number of claim notices, the number of movants, the allegations at plan in the adversary proceeding that's already been filed, the number of law firms already retained, and the numerous investigations that are already underway.

Now to address the conditions and the safeguards that we kind of plugged into our objection. You know, despite all these concerns, should the Court be inclined to lift the stay, we propose that any relief should be conditioned on a few what we consider reasonable safeguards.

First, we believe that the reporting obligations agreed to by the movants, the Debtors, and the Ad Hoc Group shouldn't be limited solely to estate figures and should be extended to Katsumi.

With respect to Katsumi, we are a party to the protective order and we receive similar reporting and information rights from the Debtors on that basis in connection with other matters in this case. Katsumi is also one of the largest if not the largest unsecured creditor in these cases. And given that the policies may be a source of recovery for its claims, we think we should know -- you know, we should be kept up to date on what's going on with those policies.

Further, the movants have already agreed to the contents of the reporting obligations. So we don't see how tagging on an additional recipient to that reporting would impose any undue hardship on the insureds.

There's really no reason to limit it to just the estate fiduciaries.

Second, one of the primary safeguards that we lopped into our objections, we think it would be prudent to require any movant benefitting from stay relief today to consent to jurisdiction of this Court as a condition to accessing any proceeds.

The Court -- I mean, it's supported by caselaw. I

don't -- I know that nothing is -- you know, that nothing in the Code per se. The court in Celsius had enforced that as a reasonable requirement. And that's because in Celsius, like here, the policies contained customary excluded conduct provisions that are only triggered upon a final, non-appealable adjudication. And as a result, the insureds may end up advancing defense costs under the Berkshire policy that are ultimately excluded from coverage. And then, you know, the insurers are going to have to go out and try and recuperate those payments. Notwithstanding the Berkshire policy's dispute resolution clause, we think that require the movants to consent to jurisdiction, would ensure that any dispute that arises after today concerning any advance defense costs would be heard and determined by this Court. And we think that condition is supported by the facts that the Court heard just this morning from the Committee. Some of the directors and officers in these cases (indiscernible) accept service of 2004s. And just earlier statements from counsel to a current director and officer of the Debtors provided that it an exercise (indiscernible) rights.

With respect to Katsumi's discovery efforts in particular, we've reached out to Patrick James' counsel to try and set up a deposition and they said no. So, you know, I think in order to avoid any frustration of an insurer's efforts to try and recruit payments that should be down to

the estate, any movant benefitting from stay relief today should consent to jurisdiction. And that's all we have.

THE COURT: Thank you. I will give a brief reply.

MR. SAVAL: Thank you, Your Honor. First of all, I want to thank Mr. Stark for his kind remarks, even though I disagree with everything else he said. And it's good to be in the case --

THE COURT: You didn't disagree with that, huh?

MR. SAVAL: A few things, Your Honor. Whether you call it wait and see, whether you call it marshaling or anything else, what the Committee is asking for Your Honor to do is two things. Number one, rewrite the terms of the insurance policies. And number two, have this Court regulate how those policies operate and how parties perform under those contracts. And --

THE COURT: I'll give you the counterargument to that. Because I gave counterargument to a question for Mr. Stark. So they're not really asking me to regulate. They're just saying there's one that's probably an easier call for you to go to. There's one that the Debtors may have an interest in. And -- right? There is a property interest in there. What the extent is we don't know yet. But the fact that the Debtors just have refused to indemnify at this point, may mean something, may not. But the Debtor still has an interest in it. So what they're saying is let

them go use a hundred million first. Don't let them drain this one. Let them drain AIG first. Or not drain it, seek to assert claims against that first because this Berkshire Hathaway one, there's an interest in there and, Your Honor, that brings in cause in there. So what's the answer to that?

MR. SAVAL: Yeah. So perhaps we can go back to the slides that Mr. Stark was using just to go through that --

THE COURT: Just give me the answer. What do you think? It's a legal question, right? It's more of a cause question.

MR. SAVAL: yeah. I do believe that it would be putting the Court in a position to regulate how parties that have entered into this agreement that are going to be --

THE COURT: I don't think so. Because there's one that I'll tell you, I don't think -- I think AIG, it's just not property of the estate. Right?

MR. SAVAL: Yeah.

THE COURT: So I'm not regulating. I'm just saying one isn't. And I'm asking you to help me think about the other one.

MR. SAVAL: Yeah. Well, our position is that --

THE COURT: So in other words, I'm not regulating, because I'm saying I really don't have anything to do with

the first one. So now the question is what do I do with the one here.

MR. SAVAL: Yeah. So maybe we'll start with the argument that the Berkshire Hathaway policy is property of the estate. Because I think that the presentation from Mr. Stark and perhaps from Katsumi conflated the terms about why the Debtor has an interest. Because the focus as I understand the Committee to be is that if this money gets used up by defense costs, then there won't be money left over if, as the Committee says, there will be lawsuits against the movants and it will deplete the estate that way. That's what I understand the argument to be.

THE COURT: Or the interest that the estate has.

MR. SAVAL: Yeah, the interest the estate has. But the cases are clear, you don't look at hypothetical, speculative interests. You look at real interests.

THE COURT: You look at state law.

MR. SAVAL: Yes. yes. And that was the Fifth Circuit --

THE COURT: In other words, but doesn't the contract itself provide that there's coverage?

MR. SAVAL: Well, so yeah, that's exactly the point where I was going to, Your Honor.

THE COURT: Okay.

MR. SAVAL: It provides coverage under Side C --

THE COURT: I'm trying to get you there. Go ahead.

MR. SAVAL: Yeah. To the Debtor it provides coverage under Side C for a claim made against the insured entity, meaning claim against the Debtors, not claims by the Debtors. That's what the Committee is talking about.

THE COURT: And who is the insured entity under the policy?

MR. SAVAL: That would be the Debtors, it would be the non-debtors that are subject to --

THE COURT: In other words, who is the defined insured party under C?

MR. SAVAL: It is -- just give me a moment, Your Honor.

MS. WEISGERBER: It's Mayfair Enterprises, Your Honor.

MR. SAVAL: And every sub underneath it. it's every --

THE COURT: It's the non-debtor and each of the subs, right?

MR. SAVAL: It's every debtor. It's the -- if a claim is made --

THE COURT: No, I'm asking. Hold on. That's the question that I've got.

MR. SAVAL: Yes. so it's Mayfair and its

subsidiaries, which includes the Debtors.

THE COURT: And the subsidiaries are...

MR. SAVAL: Are debtors.

THE COURT: Of Mayfield. So the debtors are covered under C, right?

MR. SAVAL: Yeah. So as an initial matter, the UCC represent creditors of the estate. They don't represent the -- yeah.

THE COURT: Let's just stick with 541 analysis.

MR. SAVAL: Yeah. And so what we're talking about is, for example, a securities claim against the Debtor based on a wrongful act. Those actions are stayed. No one has come forward and said what those claims may be. No one has said they've been asserted or --

THE COURT: Sixty days into a case or 90 days into a case.

MR. SAVAL: I understand, Your Honor. We have objectors that are very, you know, not only competent, but excellent counsel.

THE COURT: No, I'm just saying we don't have a bar date yet, right? So in other words, that's --

MR. SAVAL: But even if there were let's say a securities claim, that's likely going to be subordinated. And so I think Your Honor has to take that into account, as I believe the other cases have, in considering whether the

estate's interest is real or if it's interest that's hypothetical and theoretical. But I just wanted to -- if you will indulge me for a moment, Your Honor.

THE COURT: Of course.

MR. SAVAL: The Side C coverage is not for the claims that the estate has against potentially the movants.

THE COURT: Correct.

MR. SAVAL: That would be Side A coverage.

THE COURT: Correct.

MR. SAVAL: That comes within the definition of loss. And if you look at the definition of loss, it's not just defense costs. It includes -- and I'm no page 3 of the policy. I don't have a docket number or page of a docket on the PDF. Perhaps someone can let me know. But I will just read from it that the definition of loss includes compensatory, punitive, exemplary, and multiple damages as well as settlement and judgements including costs and fees awarded. And then it includes defense costs. So how I perceive the argument from the Committee is they want Your Honor to sort of splice up what the meaning of loss is and say, well, the only loss that should be payable here is the loss from a lawsuit against my client or one of the other -- but they shouldn't get the benefit of the other part of the loss, which is defense costs.

And so no case that I am aware of has ever held

that this Side A coverage that allows for losses to be recovered in claims against the Ds or Os is estate property unless and until that money is actually funded from a settlement or a judgment. And that's exactly the point that was made in the Allied decision where the Court flatly rejected that argument.

And I don't have the case right here. Here we go.

And as I -- I said this before. The trustee's concern is that the payment of defense costs may affect his rights as a plaintiff in seeking to recover from the D&O policy. That is Side A coverage. That's coverage for the benefit of the movants, not for the benefit of the estate. It just may so happen that if there is a judgment or there is a settlement, it would get paid out via Side A. But that doesn't turn it into an estate interest. And there's no case that I'm aware of, no case that's been cited that takes the position that because those settlement proceeds may ultimately sort of come in the door, that that should be considered as part of the analysis.

THE COURT: I agree with you. Let's just say someone shows up five months from now -- or someone has already sought to lift the stay to proceed against the company, maybe there's insurance (indiscernible). But let's just say more people come. Let's just say people file proofs of claim seeking claims against the company. Maybe

somebody wants to assert an action against an entity that may be covered by the Side C, if we ever get there. Right? So you've got to kind of still work through the terms of the policy. But someone assertively makes it there. I've got it that Side A isn't -- but what about the potential proceeds that the estate would have?

And I think your point is that you never really get there because the Side A has to go first.

MR. SAVAL: Side A has to go first. Side C as to the Debtors are stayed. Side C, it's non-debtors, is not relevant for the purposes of these proceedings.

THE COURT: But your point is that the -- let's just assume for purposes of where we are -- this is what I'm trying to flesh out. Let's just say you have Side A, and let's just call it defense costs, keep it simple, $50 million. And you have a claim that the estate is liable to for $5 million, right? And let's just say -- just using a big number, but let's just assume that you've got two claims at the same time, right? One that would be covered by Side A, one that would be covered by Side C. They both go to Berkshire Hathaway.

I think your argument, if I understand it correctly -- and I'm not agreeing or disagreeing, I'm just fleshing out -- is that the $50 million is going to have to get paid before the five.

MR. SAVAL: Absolutely.

THE COURT: right?

MR. SAVAL: Your Honor, I'm just going to cede the podium to other counsel.

MS. WEISGERBER: Your Honor, Erica Weisgerber for Patrick James. I'd actually like to make a point that speaks to this Side C issue quite poignantly, actually. And I think it's going to clarify everyone's thinking on this. The Side C coverage applies not only to the debtors as entities, it applies to non-debtor entities like Mayfair and the other non-debtor entities that are subsidiaries of Mayfair. That actually includes several of the defendants in the adversary proceeding that I represent who are entities.

However, Your Honor, I'm not standing here today making claims under that Side C coverage for those entities even though a basis for it has been triggered by the fact that they have been sued. There is real lawsuit on those entities.

And the reason why I'm not standing here to make claims under a Side C for those entities is because of the waterfall provision that applies contractually that says that the Side A has to come first. There's no basis for the outcome that the UCC seeks under the contract, the policies, or under the law. And if the Court did want to reserve the

Side C policies for entity claims, I don't see how the Court gets to decide between reserving Side C for the Debtors versus non-debtor entities that have been sued under Side C. So I think that argument just simply doesn't work.

While I'm up here, I guess just a couple of other points that I would like to...

Uh-oh, did you roll your eyes?

THE COURT: No.

MS. WEISGERBER: Your Honor, it just feels like there are certain things to respond to from what Mr. Stark had to say.

First, it's not clear to me, separate and apart from what I just discussed, how the objectors contemplate the insurance policies paying out claims that are filed against the D&Os without the D&Os -- those policies of paying coverage costs. I am not aware of any insurer that would gladly open its coffers to pay a claim that was not defended against by capable counsel with the money that those insurance policies retain in order to pay defense costs.

THE COURT: You're going to the point as to look how many lawyers are here.

MS. WEISGERBER: Exactly, Your Honor.

THE COURT: Okay.

MS. WEISGERBER: Second, you know who will be

certain to be policing these policies and whether or not the claims they are under are appropriate; the insurers. In my experience, insurers spare no expense in ensuring that every single claim that they are going to pay is well-documented and there's a basis for it.

In addition, Your Honor, there's no policy here at issue that has any exclusion to covering criminal claims. That's not an issue here. So the fact that there are criminal allegations in this case or investigations that Mr. Stark seems to be alluding to, again, not a basis for any kind of different outcome from the well-established precedent on these policies and what ought to be paid and what is and is not property of the estate.

This is in our papers, but there's actually no fraud exclusion for defense costs under the Side A AIG policy. So this notion of insurers waiting to pay defense costs until there's a final non-appealable claim actually does not apply at all in the Side A policy.

In addition, obviously there's lots of accusations being made against my client. We sat through a six-hour hearing here where there was no showing of my client actively engaging in fraud. And Mr. Stark put on no evidence today in support of his argument that this feels like the type of case where the Court should reach a different outcome from well-established precedent about

insurance policies.

In addition, just a couple of other points. The Fifth Amendment argument by Mr. Stark, the Fifth Amendment is a constitutional right. And by the way, there's actually a wealth of caselaw that says that you can't draw inferences of guilt from someone pleading the Fifth Amendment. But that's not a basis to deny someone insurance coverage. There's no insurance policy here that excludes coverage for defense costs for a defendant or an investigation subject who has pled the Fifth Amendment. That's simply not relevant to the inquiry that the Court is looking at.

Finally, I think, Your Honor, we would be creating new caselaw here to determine that pleading the Fifth Amendment results in a denial of coverage. And as for the Berkshire tower versus the AIG tower, as I explained, the waterfall provision controls. There's tons of cases that hold that it's not property of the estate because of that waterfall provision. As I explained, the Side C, we're not making a claim under it because of that waterfall provision that controls. And in the case of my client certainly there is an adversary proceeding. There are active legal costs and it is contractually entitled to those defense costs.

Nothing further, Your Honor.

THE COURT: Thank you. Mr. Stark, I'll give you a brief response. I'm going to take about 15 minutes. I just

want to look at something. And I'll give you an answer shortly.

Oh, come on up.

MR. STARK: I really don't have much. She's not going after C because there's no judgement yet for C.

MS. WEISGERBER: Defense costs.

MR. STARK: Right. That's A. Your argument was I'm not making a claim under C because I have to defer to A. There's no claim under C because you don't have a judgment yet. That's a red herring.

THE COURT: I'm going to give you the same hypothetical.

MR. STARK: Sure.

THE COURT: Let's just say there are two competing claims, one under A, one under C.

MR. STARK: The $50 million and the five?

THE COURT: Yeah.

MR. STARK: Yeah.

THE COURT: Does the $50 million have to get paid before the five?

MR. STARK: Yes. That is the payment priority provision that I cited in here.

THE COURT: So let's just say under the hypothetical they run up $200 million bucks. Everyone runs up $200 million. Right?

MR. STARK: Right.

THE COURT: What was the cause? In other words, what's different? Are we just affecting timing of payments?

MR. STARK: Yeah. The estates just got screwed is what happened there.

THE COURT: In other words, if the costs are still going to get incurred, they still have the right to the hundred million under the Berkshire --

MR. STARK: Well, yeah.

THE COURT: You're saying that they should go first under one and let's see -- don't drain one and then deplete the other.

MR. STARK: That's my Solomonic suggestion, for lack of being entitled to make Solomonic suggestions, but I'll so it anyway, right? A hundred million dollars, even in today's day and age, is an awful lot of money. Right?

Your Honor, I understand exactly where you're coming from about one is estate. That's sort of an easy-ish call. The one that's not, that's sort of an easy-ish call. I understand that. But I think that was sort of your phraseology, right?

THE COURT: Yeah.

MR. STARK: And then I don't know why we're here, why we're having this big argument. Channel your claims against AIG. If you find yourself in a situation where $98,

$99 million has gone out the door, I think Your Honor is easy to come back to, right? But if Your Honor is sitting there and positing the situation where they do 590 and they say I'm not feeling generous today, today I'm feeling like I'd really like to hurt the estates. So what I'm going to do is instead of going to AIG, I'm going to tender it to Berkshire and see how much of that one I can erode. Because this war of attrition thing I keep talking about, it's kind of sort of real. It is sort of how these things work.

So instead of doing the thing that marshals value for the benefit of the estate, they intentionally don't. And it's the only reason why we're even -- I don't understand why we're here. Why did you file a motion saying not only do I have to have the 100, I also have to have the two, and I have to have unfettered right to choose how it is I do it so that if I'm $5 million below the 50, I can intentionally go there if I want. And that's the piece, Your Honor, at the end of the day that you just can't really square.

THE COURT: Thank you.

MR. STARK: Your Honor, I do have one last thing.

THE COURT: Go ahead.

MR. STARK: And I appreciate that by doing this, I may be opening up my own can of worms. But counsel raised a very good point. She said where's all of the evidence.

Notice that neither party put in any evidence other than the two policies. Why didn't we?

THE COURT: I don't know.

MR. STARK: Well, there's a reason. None of us know who bears the burden of proof on this one. It's the weirdest part of the law.

502(g), is that where you know was going to go? Right? If you read the SVB decision, it says the movant has to establish cause. And that seems the normal thing of bankruptcy. 502(g) talks about shifting burdens, but it seems by its words to apply -- and if you read Colliers, you literally walk away and you have no idea what any of it means --

THE COURT: Agreed.

MR. STARK: -- about the context of stay relief to foreclose on collateral. And that's what 502(g) really sort of talks about. That ain't us here. Its words don't seem to fit. And you try in vain to figure it out.

So I don't know, counsel, who should be the one here who said your client is a good person or a bad person. Should I have submitted a trial subpoena and had him sit in the box and answer questions or not? Or are you going to sit here and say, well, it was my burden. It was not your burden as movant, it's my burden or not.

And so what I did, Your Honor, is I said you don't

need to go there. The case itself, even though we've only been here for a little while, it's pretty thick. It permeates what's going on. Maybe Your Honor finds that insufficient to rely on age-old chestnuts like Pepper v. Litton. Right? But in the end of the day, Your Honor, neither side of the aisle knows exactly who bears the burden here, because it ain't clear in the law. I understand what the statute says, but it doesn't make a lot of sense here. And the only case that seems to address it -- they all seem to avoid it -- is SVB that says that is the movant's burden to establish cause. Granted that's Berkshire Hathaway, probably less likely AIG. But it's interesting that counsel said where is the evidence, and I turn back to her and say where is the evidence.

MR. SAVAL: Your Honor, I'm sorry, may I just add -- take two minutes and add just a couple of points?

THE COURT: Yeah, of course. I think you're referring to 362(g) though, Counsel.

MR. STARK: 362(g). Did I say --

THE COURT: You said 502(g). I just wanted to --

MR. STARK: They all merge in my mind.

THE COURT: I know what you meant. I was just making sure we had a clean record.

MR. SAVAL: Just very briefly, Your Honor. the first is that with respect to the movant's ability to make

claims under either policy, the policy is structured so that the movants, in order to access the Side A coverage under the AIG policy first needs to make a claim under the Berkshire Hathaway ABC policy. The movants can't go directly to the Side A policy. They work in tandem. When one coverage is denied by the ABC carrier, then the Side A takes it --

THE COURT: That's correct.

MR. SAVAL: And I think it's also important for the Court to recognize that once the Side A coverage drops down, (indiscernible) covers different conditions that might be -- where recoveries might not be available under the ABC policy. Once it becomes effective and drops down, it drops down and essentially becomes the primary policy in the tower of insurance. There aren't really two towers of insurance; there's one tower of insurance. And this policy comes out of its place in the say $100 million range and drops down to the first layer.

And once that happens, there's a couple of important things. One of them being that the conduct exclusion that Mr. Stark has been talking about, all the bad conduct, the parade of horribles that we've been talking about simply doesn't apply to defense costs. And that's primarily what's at issue here, is defense costs.

THE COURT: I don't have any evidence of that.

Right? No one has brought any of these issues up, right?

MR. SAVAL: Evidence that the conduct exclusion could apply? Evidence? No. There's been a lot of allegations. So that doesn't matter under these policies. Not only do --

THE COURT: No, no. but I'm just saying the effects of it as to the reason why one should lift a stay for cause if there is -- if the Berkshire Hathaway -- no one has made these arguments. Everybody has just made the argument -- that's what I've got to rule on today. That's where we are.

MR. SAVAL: I'm just making the point that that is -- right. I'm just saying that once the Side A policy applies, the conduct exclusion simply (indiscernible) doesn't apply to defense costs. That's all (indiscernible).

THE COURT: Understood. Okay. Give me about -- give me about ten minutes. Thank you.

CLERK: All rise.

(Recess)

CLERK: All rise.

THE COURT: Please be seated. all right. Just give me one moment.

Sorry, folks. I'll be right back. I forgot my glasses. And you don't want me reading without them. So I'll be right back.

CLERK: All rise.

(Recess)

CLERK: All rise.

THE COURT: Thank you. Please be seated. All right. Now, okay. Okay.

So before the Court is a motion filed by certain -- and there's a number of joinders filed by what I would call generally a D&O lift stay or want to confirm that two policies are not property of the estate and to confirm that the estate to the extent something is property of the estate, to the extent necessary to modify the automatic stay, to allow the use of proceeds of these Ds and Os and their liability insurance policies issued to Mayfair, which is a non-debtor, for defense costs. I find that there's been proper notice and service, and the Court certainly has jurisdiction under 28 U.S.C. 1334. And this is a core proceeding under 28 U.S.C. 157.

The Court has considered the arguments of the parties and here's the Court's ruling. I would just note that there are two policies here. Well, really two towers. One can consider them towers. Each provide for Side A coverage. But I'll just note that there are two towers and each -- a hundred million dollars each. There is a Berkshire Hathaway tower. That's an ABC tower. Side A is for the D&O losses that are not indemnifiable by the

Debtors. That's a pure -- that's pure D&O. Side B, which is typical, is for company losses that are not -- for not indemnifying the D&Os. And Side C, which is also typical Side C coverage. It's for company losses for claims asserted against the company.

I would note that the insured under this policy is Mayfair, which is a non-debtor. But it includes -- coverage includes as part of the insured parties' subsidiaries and the debtors are subsidiaries. Not all the subsidiaries covered are debtors, but there certainly are debtors here who are covered by this policy under Side C.

There's also an AIG tower, one primary policy for $10 million, nine additional policies for $10 which provides an additional $10 million each. So you get to $100 million there. The insured party is Mayfair. But again, this one is different than the Berkshire Hathaway policy because it is pure what we would call Side A for the benefit of Ds and Os. So I'm going to kind of take them separately as I consider the motion and the arguments raised by the parties.

I would note that the evidence that has been presented to the Court is in the form of three insurance -- excuse me, not three insurance, but just the insurance policies themselves were admitted into the record. The Court considered no testimony; just insurance policies and arguments. And I would note for the record to the extent

something is property of the estate, you make a determination as to one seeks to then lift the automatic stay. The automatic stay would only come into effect if something is property of the estate. Section 541 of the Bankruptcy Code says that all legal and equitable interests of the debtor are property of the estate upon the commencement of a bankruptcy case.

The United States Supreme Court in -- I'll give you an older case. Not old, not that -- '83 case, but going back. This is post Code, United States v. Whiting Pools said you -- you construe it broadly to include -- the Fifth Circuit echoed that sentiment. And in a case called In Re Kemp, 52 F.3d 546, 550 (5th Cir. 1995), here's what it said. "The scope of property rights and interest included in a bankruptcy estate is very broad. The conditional, future speculative, or equitable nature of an interest does not prevent it from being property of the estate."

There's another case called In re Equinox Oil Company, 300 F.3d 614, 618 (5th Cir. 2002) that Section 541 is read broadly and is interpreted to include all kinds of property, including tangible or intangible property and causes of action.

I would note that (indiscernible) but it's this line of reasoning was again mentioned in the Briar Capital Working Fund v. Remmert case. That's the Fifth Circuit case

that was entered in January of 2024 and talked about selling estate causes of action, preference stuff, but talks about Section 541 there and the use there.

You've got to look at two other cases there. And that's the case that have been mentioned today, (indiscernible) and Louisiana World Expedition. There the Court held that a debtor could certainly have an ownership interest in the policy itself, the debtor could own. But the proceeds of those policies may not be property of the estate. You've got to look. And in those cases when there were -- certainly in Louisiana World Expedition, if there is pure D&O insurance, that is not property of the estate. The proceeds are not property of the estate.

I'll start with AIG because I think it's the easier answer.

AIG policy is owned by a non-debtor and the proceeds are pure Side A, only cover D&O insurance. That's -- and I know that counsel for the Committee said, well, you can look at the facts of those cases and the world has changed. But I am still bound by precedent. And the holding of that case is at -- and you've got pure (indiscernible) that are going just to the Ds and Os that is not property of the estate. I know in this case the policy is owned by a non-debtor. So the debtor doesn't even own it. So you don't have to kind of get into the distinction

between the ownership and then the use of the proceeds. This is pure ownership. So in that case, I am just confirming that that's not property of the estate, the AIG is not property of the estate. And I've heard no argument that would contradict that. There's nothing that comes -- there's no legal equitable interest that the Debtor has to some of those proceeds. That goes purely to Ds and Os. And that's what you look to.

The Berkshire Hathaway tower I think does bring into kind of -- you've got to look at it differently a 541, 362 analysis there. Because when you look at the caselaw, even speculative -- we kept talking about speculative interests, right? But 541 says all legal or equitable interest that a debtor has in property, the debtor has an interest in policy proceeds.

Now, it comes within the plain meaning of the text. All means all. I know that there's a bunch of cases there, and certainly I think Whiting Pools and Fifth Circuit cases that I cite certainly provide color and reaffirm. But all means all. And you look to underlying state law to determine the nature and the extent of the interest. But it is property of the estate. The side -- potential to Side C is property of the estate. Speculative, even contingent claims, right, come into property of the estate. It comes in. It's property. It is property of the estate. The

extent of it is determined by the contract. Right? And so the question is how does one look to that and what does one do.

The D&Os come in and they have a right to seek for the purposes of making a claim against that policy because they get paid first. And if there's two competing claims, Side A gets paid first. It is what is considered a wasting policy. In other words, when you've got to kind of deplete A before you get to B, before you get to C. That's all true. And I've looked at the policy, and that's consistent with the language. And it is property of the estate, so we've got to look to 362.

362(d) says that the automatic stay may be lifted for cause. And 362(g) says that in a hearing under (d) the party requesting relief has the burden of proof on the issue when it comes to equity and property. Right? And so that doesn't really apply here. But 362(d) says that upon notice, right, on request of a party in interest, the court may lift it for cause. So it's the party in interest who is moving has to establish cause to lift the automatic stay. Cause is -- Bankruptcy Code I should say gives one example. There's not a single definition of cause. It goes one example, but it's a non-inclusive list. It says for cause, including lack of adequate protection. So there's certainly for cause.

The Fifth Circuit has said in cases like Matter of Little Creek that there's flexibility for courts in determining whether cause exists. 779 F.2d 1068 (5th Cir. 1986). Whether cause exists is a fact of inquiry that must be determined on a case-by-case basis. Henry Mosher, 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017) case.

I would also note a matter of Reitnauer, 152 F.3d 341 n.4 (5th Cir. 1998) determining whether cause exists. Cases indicate, and I agree, because you've got to determine whether cause is, you've got to look on a case-by-case basis so there's no kind of neat analysis here. You've got to look on a case-by-case basis to determine whether cause exists. And the cause that is given to me is we have the right under Side A and Side C is speculative, right? But that's just not cause. What's the harm to using $100 million under AIG before you come back and ask to use the Berkshire Hathaway in which the estate has an interest? No evidence of any harm to anybody. I don't have a single piece of evidence to indicate we conducted an analysis based on -- but certainly harm to the estates potentially if it all gets depleted, one could speculate. But I don't have evidence one way or the other.

So it comes down to who has the burden upon request of the notice and a party-in-interest after a notice and hearing. We are here on the notice and hearing. What's

the harm in going to use the $100 million that you have and then coming back to see if you can use -- I think there's a short hearing.

I think arguments about -- well, let me say this. I think it's a short hearing if they have to use the money because that's cause under the policies. To me that's cause. You have access to D&O insurance and you have a right to do it. And I think that becomes a very short, very direct hearing. I think if there is a party, and they certainly made their cases here, that need access to the Berkshire Hathaway policy for whatever reason, I think it becomes a short hearing. But I've got to have cause. And what parties asked me to do was to confirm that it either doesn't exist or to modify the stay to permit it. Modification requires cause. Cause requires evidence. And I've heard of no evidence today to say that they can't use the $100 million first. Just come back if you need it. Again, need more.

I don't think there needs to be any restrictions on the ability to -- you know, with AIG, because I don't think AIG is property of the estate as a matter of law. I think parties get to use it. and if there's any issues -- and there can be. That could arise in connection with the AIG tower. I think you've got to go there first. And then we can have another hearing.

So it's not no, it's not never, it's just you haven't established cause today. And today was the day everybody decided to come in here and have a hearing. Evidence -- I don't -- the extent of company losses for claims asserted against the company in a case 90 days in, in a case like this in which we haven't -- don't have a bar date, I don't know. But 541 covers potential interests in those proceeds. And however remote, however speculative it is, that's 541. So it's without prejudice to coming back, anyone coming back. I'm not making findings in any way -- and I don't have the evidence for it, but I am certainly not making findings based upon who has done what or the extent of what has happened and who is to blame for that. I think that's a whole other day. That's what trials are for. That's what the judicial system is for. People will have their day in court to make arguments and assert claims, and parties will have every right to assert their defenses. And we'll deal with those. But I'm not here to prejudge any litigation before me or to make findings one party is worse than the other or that this person is to blame for that. I just think today I'm just ruling on 541, Louisiana World, 362 and 362(d) and the standards that are given to me by the courts as to how I consider those statutes and the application of 541 based upon binding Supreme Court and Fifth Circuit and text, precedent from the Supreme Court and

the Fifth Circuit (indiscernible).

So I think -- I don't know what that does to the order, but I probably don't need to sign that version of it. I was going to -- even without it, I still think what I've set up is a stopping point where one can ask the question. Right? Like what's going on with the AIG policy, has it been depleted one way or the other. And then we can see where we are.

So I think the reporting requirements are good. I think they all make sense. I hope they stay in the order. But I still think I've got a backup just in case. Because parties will just have to come back and ask for the relief. But I don't -- I want to be really clear that I think arguments about kind of cause to lift the stay, I think they really come down to, you know, do you have access to it and do you need it. My understanding based upon the evidence that was presented in court is that folks have -- folks can make a $100 million issue. And I don't have any evidence or expert testimony telling me otherwise. So that's the Court's ruling on that.

If the parties want to get me an order or think about it, I'll sign it and we can talk about it more on Friday. I think I'm going to be in a position -- well, no. Let me think about this. I don't want to -- I will call parties tomorrow about the motion to intervene. They're not

fair, and I think that would be unfair for me to make a statement on the record about what I can do. So I'll rule on that just today or tomorrow. Just let me know what you all want to do in terms of orders. I can draft one. I can come up with it.

I think by my ruling today, I think the Katsumi objection is kind of rendered moot, if you will. Because I don't need to put restrictions because one just isn't property of the estate and the other one, I'm not lifting the stay on. But everybody's rights are preserved for future hearings on any issue. Everybody's rights are preserved.

Yes, sir, Mr. Stark.

MR. STARK: Your Honor, if it would please the Court, we can confer. And I would assume we would be able -- I think Your Honor's ruling is very clear. I think we would be able to figure out an order and propose one if that works for the Court.

THE COURT: Okay. I'm not on the -- I'm going to be really clear on the -- I think there was one question about the 14-day. On AIG it's not -- my finding is that it's not property of the estate and I don't -- I'm not giving anyone 14-day -- I'm just saying I'm not giving anyone 14-day notice of the ruling that it's not property of the estate. That's in effect right away.

MR. STARK: To the extent, Your Honor --

THE COURT: Mr. Tecce?

MR. TECCE: Your Honor, I was just going to propose to make everyone's life easier, if you were to so order the transcript today, I think that would satisfy it if AIG is not estate property. Because that's sufficient.

MR. STARK: We have no objection.

THE COURT: In other words, that goes into effect. I can -- I can -- what was your proposal again, Mr. TumSuden?

MR. TECCE: Just -- we're talking about negotiation an order, right? I mean, we could probably do that. But if you could so order the transcript, and that would -- because AIG -- the finding is that AIG is not estate property. So...

THE COURT: Yeah. But what I was planning on doing for that is just stating for the reasons stated on the record. And I was going to say the AIG policy is not property of the estate and then you all can, you know, kind of say that, you know, the parties are to submit an order as to something -- I think you all can submit an order on the other one, or I can just write it. But I can write something today saying the AIG policy is not property of the estate. And I can just enter an order. So you've got an order from me saying it and I'm not waiving any -- any 14-

day application is waived on that today.

MR. TECCE: Thank you very much, Your Honor.

MR. STARK: So just to be clear, would Your Honor like us to write the order with respect to the other cases?

THE COURT: On the...

MR. STARK: The submission of invoices and all that, the other stuff.

THE COURT: I don't -- well, because I only think it applies to Berkshire Hathaway in other words. So I think --

MR. STARK: (indiscernible).

THE COURT: That's where I'm going. I think the other one is just -- well, no. No. I thought about this. I'm going to submit an order, one saying for the reasons -- I'll do it today. Just -- I've got a couple more hearings to get through. But sometime today it will hit the docket. For the reasons stated on the record at the January 7th, the AIG policy is not property of the estate and the other -- and the Court denies -- the Court -- and I will say something that I am denying stay relief with respect to the Berkshire Hathaway. It will be clean and my ruling will be the ruling for the reasons stated on the record. And I'm kind of waiving any 14-day application of the order. And just kind of clean, to the point. It will be for the record. Parties will have whatever rights they have. Okay?

MR. STARK: Thank you, Your Honor.

THE COURT: All right, folks. I've got to -- I'll see some of you on Friday I guess virtually or in-person. I thank everyone for their time. Thank you.

(Proceedings adjourned at 3:28 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: January 9, 2026