EXHIBIT 8

*Debtors' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Emergency Request for Use of Alleged Cash Collateral [Docket No. 1280]*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Docket Nos. 609, 1076** |

**DEBTORS' (I) OBJECTION TO**
**EVOLUTION'S EMERGENCY MOTION**
**TO ENFORCE STIPULATION AND AGREED**
**ORDER REGARDING ADEQUATE PROTECTION**
**AMONG DEBTORS AND EVOLUTION CREDIT PARTNERS AND**
**(II) EMERGENCY REQUEST FOR USE OF ALLEGED CASH COLLATERAL**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (PREVAILING CENTRAL TIME) ON JANUARY 13, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**THE DEBTORS HAVE REQUESTED THAT A HEARING BE CONDUCTED ON THIS MATTER ON JANUARY 13, 2026, AT 1:00 P.M. (PREVAILING CENTRAL TIME).**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ." CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

First Brands Group, LLC ("**FBG**") and certain of its subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and together with the Debtors' non-debtor affiliates, the "**Company**"),[2] file this objection and cross motion (this "**Objection and Cross Motion**") in response to the Motion[3] filed by Evolution.[4] The Debtors respectfully represent as follows:

## Preliminary Statement

1. The Motion should be denied for a number of reasons. First, Evolution's bald assertion that the Debtors have not complied with the Stipulation and Order[5] is groundless. Evolution is correct only that the Stipulation and Order required the Debtors to maintain a combined $335 million (*i.e.*, the Collateral Maintenance Threshold) at four warehouses. The Stipulation and Order, however, is silent about what reporting data would be used to demonstrate the then current value of collateral at these four warehouses. At the time the parties negotiated the Stipulation and Order, and for many weeks thereafter, neither party knew what the value of the inventory at these four warehouses was at any given time, including at the Petition Date. That is

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Stipulation and Order (each, as defined herein) as applicable.

Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Charles M. Moore in Support of Debtors' Chapter 11 Petitions* (Docket No. 22) (the "**First Day Declaration**").

[3] "**Motion**" refers to *Evolution's* Emergency *Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 1076).

[4] "**Evolution**" refers to, collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[5] "**Stipulation and Order**" refers to the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* (Docket No. 609).

because the Debtors' advisors had determined that the "borrowing base certificates" prepared by former management for the four locations did not comport with the Company's inventory reporting systems and appeared to be unreliable (in fact, they turned out to be essentially made up). Both parties to the Stipulation and Order explicitly acknowledged this fact before it was executed. In other words, the $335 million threshold was nothing more than a proxy for what the value might have been at the Petition Date, if the parties had reliable data.

2. Having selected $335 million as a proxy, the next question was which reporting data would be used as a proxy for the four warehouses. The Debtors provided Evolution with reporting data using codes that included the four warehouses, and also aggregated data from certain other warehouses (the coding in the Debtors' systems, as explained to Evolution's advisors prior to the Stipulation and Order, were "WDC" and "MDC"). Those were the best available reports the Company could run at the time. And it was precisely these reports that were used to comply with weekly reporting requirements to Evolution for weeks after the Stipulation and Order was entered. Using the WDC and MDC reports that the parties agreed to use, the inventory value from the first day of the Stipulation and Order until the Debtors' use of collateral thereunder expired on January 5, 2026 exceeded the $335 million requirement. In other words, there has never been a violation of the Stipulation and Order.

3. Evolution's argument to the contrary only works if the agreed-upon rules to determine if the four warehouses have at least $335 million are completely re-written *ex post*, after the parties already established a course of performance of using the WDC and MDC reports. Evolution now wants the benefit of the $335 million proxy—which the parties recently discovered turned out to be $37 million higher than the actual book value of relevant inventory as of the Petition Date—and more accurate data reporting developed by the Debtors—for Evolution's

benefit—showing more precisely the value of inventory at the four relevant locations, which currently is only $9 million less than the actual Petition Date book value.

4. To be sure, the Petition Date value of the collateral has declined by $9 million. But it does not create a violation of the Stipulation and Order because compliance with the Stipulation and Order is based on the agreed-upon reporting data used to determine whether the $335 million proxy was satisfied or not. And here, at all times, based on the agreed upon reporting, the Collateral Value of the inventory was substantially higher than the $335 million Collateral Maintenance Threshold.

5. However, the Debtors submit that the $9 million decline in value is of no moment because Evolution cannot meet its burden to demonstrate an entitlement to adequate protection. Rather, its alleged collateral was not owned by its SPV borrowers (and thus was not subject to Evolution's liens) and, even if it was, it had been double pledged, and the Debtors' ABL Lenders (as defined in the Final DIP Order[6]) and Term Loan Lenders[7] hold collectively $6 billion of claims secured by senior liens on that inventory. At the same time, the ABL Lenders and Term Loan Lenders holding such senior liens continue to consent to the use of the disputed collateral in which Evolution asserts an interest (such collateral, the "**Disputed Collateral**") to preserve value in connection with the sale process. Consistent with applicable case law in the Fifth Circuit and others, this Court should authorize the Debtors to continue selling the Disputed Collateral in the ordinary course, based on a preliminary determination that Evolution has not met its burden under

---

6 "**Final DIP Order**" refers to the *Final Order (i) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (ii) Granting Adequate Protection to Prepetition Secured Parties; (iii) Modifying the Automatic Stay; and (iv) Granting Related Relief* (Docket No. 608).

7 "**Term Loan Lenders**" means, collectively, (i) the First Lien Term Loan Lenders, (ii) the Second Lien Term Loan Lenders, and (iii) the Sidecar Term Loan Lenders (each, as defined in the Final DIP Order).

section 363(p)(2) of the Bankruptcy Code to establish a secured interest in the Disputed Collateral that would be entitled to adequate protection.[8]

6. And in any event, Evolution is not entitled to destroy value by freezing inventory sales and crippling the sale process before it begins when the ordinary course of business will benefit Evolution and all parties. Evolution's demand to immediately shut down operations would only ***ensure*** diminution in value of the Disputed Collateral and the overall Brake Parts Inc. ("**BPI**") business by causing a forced liquidation that would result in selling the inventory at a substantially lower sale price. Instead, a few more weeks of ordinary course sales will preserve value for Evolution (to the extent it can prove it holds a valid and senior interest in the Disputed Collateral), the ABL Lenders, and Term Loan Lenders, along with all other constituents. Accordingly, the Debtors' cross motion for use of cash collateral generated from the Disputed Collateral should be granted.

## Background

7. The Stipulation and Order permitted the Debtors to continue using the Disputed Collateral so long as, among other things, the Debtors complied with the Collateral Maintenance Covenant (as defined below). Stipulation and Order ¶ 4(B). The Collateral Maintenance Threshold in the Stipulation and Order served as a metric to ensure that the asserted

---

[8] Courts have recognized that certain proceedings in bankruptcy cases necessarily require a ***preliminary determination*** of the nature of such interests, even where discovery is ongoing. *See, e.g.*, *In re Placid Oil Co.*, 102 B.R. 538, 542 (Bankr. N.D. Tex. 1988) (finding that the nature of litigation under section 363 requires an "an informal examination" of the validity of the party's liens on the collateral subject to a 363 motion); *In re MF Glob. Holdings Ltd.*, No. 11-15059 MG, 2011 WL 6210374, at *1 (Bankr. S.D.N.Y. Dec. 14, 2011) (making a preliminary determination in the context of a section 363 motion that the objectors failed to meet their burden to prove the validity, priority, and extent of their asserted interest); *In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 327 (Bankr. N.D.N.Y. 1995) (same); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–99 (2d Cir. 1993) (making a preliminary determination of the debtor's business judgment in the context of a motion to assume under section 365).

Evolution Collateral was maintained at certain levels (the requirement to do so, the "**Collateral Maintenance Covenant**").

8. The Stipulation and Order set the total Collateral Maintenance Threshold for the asserted Evolution Collateral at $335 million (with $170 million allocated to the Patterson Collateral and $165 million allocated to the Starlight Collateral (each, as defined in the Stipulation and Order)). *See* Stipulation and Order ¶ 4(B). The Collateral Maintenance Covenant required the Debtors to maintain the asserted Evolution Collateral such that the "Collateral Value"—defined as "the sum of (A) the cost value of the Evolution Collateral that is inventory, *plus* (B) all cash deposited in the Segregated Accounts"—would equal or exceed $335 million on any applicable True-Up Date, meaning the end of each week. *Id.*

9. "Evolution Collateral," as defined in the Stipulation and Order included the Patterson Collateral, the Starlight Collateral, and "such other property in which Evolution has asserted an ownership or security interest, including, without limitation, accounts, accounts receivable (including all receivables covered by the Evolution Receivables Facility), and inventory, together with the products and proceeds (including cash proceeds) of each of the foregoing[.]" Stipulation and Order at 4. Footnote 4 of the Stipulation and Order ("**Footnote 4**") further stated that:

> As of the Petition Date, the Starlight Collateral was located at the BPI – 1100 Corporate Drive, McHenry, IL 60050 facility and the BPI – 1380 Corporate Drive, McHenry, IL 60050 facility, and the Patterson Collateral was located at the BPI – 2701 Keystone Pacific Parkway, Patterson, CA 95363 facility and the BPI – 14528 Bonelli St., City of Industry, CA 91746 facility.

Stipulation and Order at 4 n.4. Footnote 4 lists locations of Starlight Collateral and Patterson Collateral, which among other inventory comprise the asserted Evolution Collateral. Evolution

Collateral is relevant for determining the Collateral Value that is measured against the pre-determined Collateral Maintenance Threshold.

10. Additional factual background is set forth in the Jerneycic Decl.,[9] which is incorporated herein by reference.

## Argument

### I. Debtors Maintained Compliance with the Stipulation and Order

11. Between the Petition Date and mid-December, the Debtors provided Evolution with reporting on the Disputed Collateral based on the Debtors' internal reporting, which includes the four "Approved Warehouse Locations" identified in the Motion, as well as certain other warehouses that were part of the BPI business and coded as "WDC" and "MDC" (collectively the "**BPI Facilities**"). This was the best information available to the Debtors. It was how the Debtors provided reporting in the ordinary course and is what the parties used to peg the $335 million Collateral Maintenance Threshold as of the Petition Date and the Collateral Value on subsequent reporting dates.

12. The BPI Facilities inventory sitting at facilities within the WDC and MDC networks, as of today, has a gross valuation at cost of $370 million, at least $35 million in excess of the $335 million Collateral Maintenance Threshold. Evolution's interpretation of the Stipulation and Order—which changed in mid-December—leads to the absurd conclusion that the Debtors were in violation of the Collateral Maintenance Covenant from the moment it was entered. Under the circumstances and consistent with the reporting provided to Evolution and its course of dealing, the Debtors' interpretation is far more reasonable.

[9] "**Jerneycic Decl.**" refers to the *Declaration of Daniel Jerneycic in Support of Debtor' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Emergency Request for Use of Alleged Cash Collateral* that the Debtors anticipate filing on January 10, 2026.

13. But even if the testing is applied solely as to the locations listed in Footnote 4, the actual diminution Evolution could have suffered (if it could prove it holds a senior secured lien, which it cannot) is approximately $9 million.

**A. *Stipulation and Order is Silent as to the Reporting That Would be Used to Determine Compliance and Therefore is Ambiguous***

14. Evolution correctly notes that the Stipulation and Order set the Collateral Maintenance Threshold at $335 million, but it is silent regarding the agreed-upon reporting that would be used to determine the current value of inventory at the four facilities listed in Footnote 4. Extrinsic evidence must be considered here because without it, the Debtors would have no ability to determine the reporting required to comply with the Stipulation and Order. This silence concerning how the Debtors should conform their conduct in accordance with the Stipulation and Order constitutes a latent ambiguity.

15. "Latent ambiguities occur when, although the words of the contract appear on their face to have a clear meaning, the evidence shows that they could apply to different facts, objects, or circumstances."[10] A court may consider evidence beyond the terms of a contract to resolve a latent ambiguity.[11] In reviewing extrinsic evidence, courts may look to "negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms."[12] "The review of the surrounding facts and circumstances may also include consideration of industry custom and practice . . . and any relevant course of performance or course of dealing[.]"[13] A course of dealing is "a sequence of previous conduct between the

[10] *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023) (internal citation omitted).

[11] *Id.* ("Latent ambiguities present an exception to the rule that courts must look within the four corners of a document to determine ambiguity.").

[12] *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 277 (S.D.N.Y. 2022) (internal citations omitted).

[13] *Id.* (internal citations omitted).

parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."[14] A course of dealing may be shown through "a party's awareness of and consent to intended contractual terms" and the analysis must include "an indication of the common knowledge and understanding of the parties."[15]

### B. *Debtors' Interpretation is Consistent with the Parties' Intent as Evidenced by the Parties' Mutual Understanding of the Facts and Evolution's Course of Dealing*

16. The evidence clearly shows that the Collateral Value should be calculated based on inventory located at all the BPI Facilities using the reporting that then existed and was used to provide Evolution information in the weeks prior to and after the Stipulation and Order was executed. That approach was consistent with the parties' communications, intent, and course of dealing.

17. The Debtors' advisors explained to Evolution's advisors in the weeks leading up to the entry of the Stipulation and Order that the Company's systems prior to the Petition Date and reported inventory levels that aggregated values not only at these four locations but certain other facilities. *See* Nov. 5, 2025 Proskauer Email. At the same time, it was also understood by both parties that the borrowing base certificates supposedly reflecting inventory levels at each specific location prepared by the Debtors' former management were inaccurate and inconsistent with the Company's inventory tracking system data.

18. This is precisely why Evolution's advisors told the Debtors they would agree only to include the four locations in the stipulation, but not the inventory values at each facility as of the Petition Date because they could not verify their accuracy. *Id.* As a result, the

---

[14] *Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F.Supp.3d 329, 343–44 (S.D.N.Y. 2019) (quoting *Choice Money Transfer, Inc. v. Societe Int'l de Change, Arimec, LLC*, 17 Civ. 2639 (JSR), 2017 WL 6507108, at *4 (S.D.N.Y. Dec. 18, 2017)) (internal quotation marks omitted).

[15] *Id.* (internal quotation marks and citations omitted).

$335 million "Collateral Maintenance Threshold" was just an estimate of Petition Date value, as were the values presented in the then available reporting for the four facilities. *See* Nov. 3, 2025 Proskauer Email. That reporting showed values in excess of the $335 million threshold and hence that threshold was acceptable to the Debtors. Thus, the Debtors agreed to the $335 million Collateral Maintenance Threshold proposed by Evolution with the assumption that go-forward reporting would continue to include inventory that had been reported in the past.

19. And, the reporting the Debtors had provided to Evolution after the Petition Date consistently included all BPI Facilities, and consistently showed inventory levels well above the Collateral Maintenance Threshold.

20. It was not until mid-December that Evolution changed its tune, and then still only after the Debtors had developed the capability to report values at the four facilities specifically, without picking up any others. Crucially, the Petition Date collateral value according to the updated reporting was more than $30 million lower than the $335 million maintenance threshold that the parties had used as a proxy—$304 million. Yet, Evolution insisted on measuring compliance using the $335 million yardstick based on the recent and more accurate reports that neither party contemplated would be used to determine compliance under the Stipulation and Order. The parties clearly did not intend to enter a stipulation that would, immediately upon entry, put the Debtors in default of the Collateral Maintenance Threshold by a magnitude of $37 million.

21. This is made clear by the Debtors' willingness to enter the Stipulation and Order at all and by Evolution's failure to raise the issue of non-compliance when the Stipulation and Order was entered. Instead, the behavior of the parties clearly shows that the $335 million Collateral Maintenance Threshold was not intended to be a measure the Debtors' compliance under the Stipulation and Order.

22. Following the reasonable interpretation that the Collateral Value included inventory located at the BPI Facilities, the Debtors complied with the Stipulation and Order. The Collateral Maintenance Threshold was $335 million and the gross value of inventory at cost using the values at the same facilities included in the original reporting available at the time of the Stipulation and Order was $370 million as of mid-December 2025, when Evolution first raised this issue.

### C. *Actual Diminution is at Most $9 Million, but any Diminution has yet to be Realized by Evolution*

23. Nonetheless, the Debtors recognized that using the improved and more accurate reporting, there had been a decrease in the value of the Disputed Collateral since the Petition Date of $9 million. Fortunately, being notified of Evolution's position, no further depletion of the Collateral Value has occurred by any measure, and in fact the Collateral Value increased since that time.

24. As of January 9, 2026, the gross cost value of the inventory listed in the four facilities is approximately $295 million compared to the $304 million gross cost value as of the Petition Date, representing a net decrease of approximately $9 million.

25. But as discussed, Evolution has a disputed interest in the asserted Evolution Collateral and has not met its burden of proof on adequate protection. Accordingly, any diminution that has occurred has not been realized by Evolution.

26. It is also not practicable to expect that the Debtors could immediately cease selling the Disputed Collateral—particularly where the Debtors disagreed with both Evolution's interpretation of the Stipulation and Order, and its assertions of a secured interest. To do so would cause immediate and irreparable harm to not only Evolution's interests, but other secured lenders, creditors, and the Debtors' entire BPI business. *See* Jerneycic Decl.

## II. Evolution Cannot Meet its Burden of Proving that it Holds an Interest in the Disputed Collateral

27. Evolution's interests in the Disputed Collateral are disputed by the Debtors, ABL Lenders, and Term Loan Lenders. Based on their investigation, the Debtors believe that (i) Evolution does not hold a valid lien in the Disputed Collateral and (ii) even if it does, the inventory was double-pledged and Evolution's liens would be junior to the liens of the ABL Lenders and the Term Loan Lenders (collectively securing over $6 billion of funded debt). Evolution has not met its burden of proving otherwise for purposes of the Debtors' use of the Disputed Collateral.

### A. *Evolution Has Not Met its Burden of Proving that it Holds a Senior Interest in the Disputed Collateral Such That it Is Entitled to Adequate Protection*

28. Under section 363(p)(2) of the Bankruptcy Code, the creditor asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of its interests. 11 U.S.C. § 363(p)(2). "A creditor also carries the burden of proving the value of collateral securing its purported lien." *Northstar Offshore Grp., LLC v. Acadiana Coating & Supply, Inc. (In re Northstar Offshore Grp., LLC)*, No. 16-34028 (MI), 2024 WL 4177957, at *3 (Bankr. S.D. Tex. Sept. 12, 2024); *see also In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) ("The creditor thereafter bears the ultimate burden of persuasion . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim.") (internal quotation marks and citation omitted); *In re Solis*, 576 B.R. 828, 832 (Bankr. W.D. Tex. 2016) ("It makes sense that if the creditor has the burden of proving the amount of the creditor's allowed secured claim, the creditor should also have the burden of proving the value of the collateral from which that amount is determined."). After a creditor meets their burden to establish an asserted interest, the debtor has the burden of proving adequate protection of that interest. 11 U.S.C. § 363(p)(1).

29. In the first instance, Evolution cannot show the validity of its interest in the property. Evolution's liens are against property of the SPV Debtors, Patterson Inventory, LLC ("**Patterson**") and Starlight Inventory I, LLC ("**Starlight**"). FBG purported to sell the initial inventory to Patterson and Starlight in March and November 2023. But the Debtors' investigation and analysis to date has shown that these purported sales were just that: purported and not actual valid transfers of interests in property. Only a portion of the purchase price was ever paid pursuant to these "sales." Critically, the inventory remained on FBG's books and records ***and*** FBG remained in physical possession of the inventory. Further, in the following years, replacement inventory arriving in the four locations owned by BPI were purchased and owned by BPI, not the SPV Debtors. The Debtors have not found evidence that any of the replacement inventory flowing into these locations since 2023 was acquired by the SPV Debtors. This inventory is therefore not subject to any Evolution liens granted by those SPV Debtors. The transactions were thus "sales" in name only. Without a sale transferring an interest in the inventory to Patterson and Starlight, the SPV entities could not have granted a valid lien on the Disputed Collateral to Evolution.

30. Moreover, even if Evolution's interests were valid, Evolution cannot meet its burden under section 363 to show its senior priority. At the time FBG sold the inventory, it was subject to the ABL Lenders' and the Term Loan Lenders' liens. For the ABL Liens (as defined in the Final DIP Order) to be released, the disposition of the collateral had to meet certain conditions that included but were not limited to: the inventory being sold for at least 75% cash consideration or exchange in-kind; and that the ABL Borrowing Base Certificate (as defined in the ABL Credit Agreement) be delivered to the ABL Agent at the time of the transfer and updated accordingly. Evolution has not, and cannot, produce evidence showing that the ABL Liens were properly released under the ABL Credit Agreement under the circumstances. FBG received less

than 75% of the stated book value of the inventory in cash. And the inventory purportedly sold by FBG was part of the ABL Borrowing Base and remained on the ABL Borrowing Base Certificates. Accordingly, Evolution cannot meet its burden of showing its senior interest in the Disputed Collateral—any Evolution liens sit behind over $6 billion in funded debt.

31. Evolution's property interests may need to be fully litigated in the context of an adversary proceeding, but courts have recognized that certain proceedings in bankruptcy cases necessarily require a ***preliminary determination*** of the nature of such interests, even where discovery is ongoing.[16] In proceedings under section 363, such a preliminary determination of the validity, priority, or extent of such interest is not only permissible, but required by the plain language of the Bankruptcy Code because section 363 places the burden of proving the nature of an interest in property on the party asserting such interest.[17] Without such a preliminary examination of a property interest in the main case, vital value maximizing efforts by the estates could be stalled to fully litigate speculative and uncertain interests in property to the detriment of all creditors.[18] Such preliminary determinations do not prejudice the purported lienholder's ability to prove the extent or validity of their interests in the context of an adversary proceeding.[19]

---

[16] *See, e.g.*, *In re MF Glob. Holdings Ltd.*, No. 11-15059 (MG), 2011 WL 6210374, at *1 (Bankr. S.D.N.Y. Dec. 14, 2011) (making a preliminary determination in the context of a section 363 motion that the objectors failed to meet their burden to prove the validity, priority, and extent of their asserted interest); *In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 327 (Bankr. N.D.N.Y. 1995) (same); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–99 (2d Cir. 1993) (making a preliminary determination of the debtor's business judgment in the context of a motion to assume under section 365).

[17] 11 U.S.C § 363(p)(2) ("[T]he entity asserting an interest in property has the burden of proof on the issue of validity, priority, or extent of such interest."); *see In re Placid Oil Co.*, 102 B.R. 538, 542 (Bankr. N.D. Tex. 1988); *In re Megan-Racine Assocs., Inc.*, 192 B.R. at 327.

[18] *See In re MF Glob. Holdings Ltd.*, No. 11 15059 MG, 2011 WL 6210374, at *3 (Bankr. S.D.N.Y. Dec. 14, 2011) ("Whether [the objectors'] have any priority on recovery from the Chapter 11 estate raises important issues that will have to be determined later in the case. But all creditors benefit from maximizing the value of the estate.").

[19] *See, e.g.*, *id.*; *see also In re Megan-Racine Assocs., Inc.*, 192 B.R. at 325 (recognizing that, notwithstanding its preliminary determination, the underlying issue still needed to be resolved in the adversary proceeding "on a full plenary trial record.").

32. The Debtors are not asking for a final determination of Evolution's interests as of today—the Court will make any such determinations in due course in the adversary proceeding Evolution initiated.[20] But the Court may find that Evolution has not met its burden at this stage and that therefore the Debtors do not require Evolution's consent to use its alleged collateral and do not have to provide Evolution with any adequate protection.

### B. *Even Assuming Evolution has Senior Secured Interests, Evolution Is Adequately Protected*

33. To the extent Evolution can meet its burden of demonstrating that it has an interest in the Disputed Collateral and therefore is entitled to adequate protection, the Debtors will adequately protect those interests by segregating cash proceeds realized from the sale of such collateral, minus any amounts that may be properly surcharged for preserving and disposing of such collateral pursuant to section 506(c) of the Bankruptcy Code. The Debtors propose to continue selling the Disputed Collateral in the ordinary course of business while simultaneously pursuing a sale process which may result in a going concern sale of the Debtors' business and assets, including the Disputed Collateral. That approach will maximize the value generated from the Disputed Collateral for the benefit of any party determined to hold valid, senior interests in such collateral. Notably, the ABL Lenders and Term Loan Lenders holding senior liens in the Disputed Collateral have consented to the Debtors' use and sale of such inventory.

34. Here, the Debtors' ongoing use and sale of the Disputed Collateral will generate proceeds and additional liquidity. On the other hand, if the Debtors immediately halted operations and are forced into a fire sale, it will be value destructive. If forced to stop selling the Disputed Collateral, the Debtors would likely have to cease a large amount of sales from BPI,

[20] *See Evolution Credit Opportunity Master Fund II-B, L.P. v. Debtor Entities Listed on Schedule 1* (Adv. Pro. 25-03800).

which would harm any lender with an interest in the Disputed Collateral or other BPI assets. *See* Jerneycic Decl.

**Emergency Consideration**

35. Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of the Debtors' Cross Motion. As described herein, the relief requested is essential for the Debtors' ability to continue their efforts to commence a value maximizing sale process for the benefit of all creditors at this critical juncture in these cases.

**Conclusion**

36. Evolution has failed to demonstrate that the relief it seeks is warranted, and the Debtors will demonstrate that Evolution is not entitled to any adequate protection, or alternatively is adequately protected.

For the foregoing reasons, the Debtors respectfully request that the Court deny the Motion and grant the Debtors Cross Motion to use collateral.

Dated: January 10, 2026
Houston, Texas

*/s/ Clifford W. Carlson*

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: gabriel.morgan@weil.com
clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Robert S. Berezin (admitted *pro hac vice*)
Andriana Georgallas (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: matt.barr@weil.com
sunny.singh@weil.com
robert.berezin@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
jason.george@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Certificate of Service**

I hereby certify that on January 10, 2026, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Clifford W. Carlson*
Clifford W. Carlson