EXHIBIT 20

*Deposition Transcript Excerpts of Charles M. Moore (pp. 760–61)*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | \| | Chapter 11 |
| | \| | |
| FIRST BRANDS GROUP, LLC, et al., | \| | Case No. 25-90399 (CML) |
| | \| | |
| Debtors. | \| | (Jointly Administered) |

*******************************************

ORAL AND VIDEOTAPED DEPOSITION OF
CHARLES MOORE
JULY 26, 2026
VOLUME 2

*******************************************

ORAL AND VIDEOTAPED DEPOSITION of CHARLES MOORE, produced as a witness at the instance of the Creditors, and duly sworn, was taken in the above-styled and numbered cause on July 26, 2026, from 12:18 p.m. to 10:03 p.m., before Mendy A. Schneider, CSR, RPR, in and for the State of Texas, recorded by machine shorthand, at the offices of Weil Gotshal & Manges, 700 Louisiana Street, Suite 3700, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto; that the deposition shall be read and signed.

APPEARANCES

ON BEHALF OF DEBTORS:
ROBERT BEREZIN
KYLE FERRIER (Remote)
LISA LAUKITIS (Remote)
WEIL GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, New York 10153
robert.berezin@weil.com

ON BEHALF OF EVOLUTION:
MICHAEL DUKE
ELSBERG BAKER & MARURI
350 Fifth Avenue, 38th Floor
New York, New York 10118
212.597.2605
mduke@elsberglaw.com

FOR KATSUMI SERVICING, LLC:
CHARLES S. KELLEY
RICHARD STIEGLITZ
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002
ckelly@mayerbrown.com

ON BEHALF OF ONSET:
ERIN DEXTER
ELLIOT O'BRIEN
JASON KESTECHER (Remote)
MILBANK LLP
55 Hudson Yards
New York, New York 1000
edexter@milbank.com
eobrien@milbank.com

ON BEHALF OF CARNABY SECURED LENDERS:
GARY MENNITT
ERIC HILMO
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
gary.mennitt@dechert.com
eric.hilmo@dechert.com



APPEARANCES (CONTINUED)

ON BEHALF OF THE LAM PARTIES:
MICHAEL H. CASSEL
ANGELA HERRING
THEODORE FURCHTGOTT
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
212.403.1000
MHCassel@wlrk.com

ON BEHALF OF EVOLUTION CREDIT PARTNERS:
JORDAN SAZANT
PROSKAUER
70 West Madison, Suite 3800
Chicago, Illinois 60602
Jsazant@proskauer.com

ON BEHALF OF AD HOC GROUP:
ROBERT MARSTERS
GIBSON DUNN
202.955.8502
Rmarsters@gibsondunn.com

ALSO PRESENT:
DANIEL ALPIZAR, The Videographer
SAM HIMMELFARB



REMOTE APPEARANCES

ON BEHALF OF PATRICK JAMES AND RELATED ENTITIES:
JESSICA WU
ANIL MAKHIJANI
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 Fifth Avenue
New York, New York 10016
212.849.7000
Jessicawu@quinnemanuel.com

EMILY MORGAN
ERICA WEISGERBER
DEBEVOISE & PLIMPTON
66 Hudson Boulevard
New York, New York 10001
212.909.6000
Elmorgan@debevoise.com

ON BEHALF OF EDWARD JAMES, OPTIMUS PRIVATE CAPITAL LLC AND JCMC INVESTMENT GROUP LLC:
JACLYN KUNDRAT
BRACEWELL LLP
31 W. 52nd Street, Suite 1900
New York, New York 10019
212.508.6100
Jaclyn.kundrat@bracewell.com

ON BEHALF OF EVOLUTION CREDIT PARTNERS:
ANDREW PARKS
ELSBERG BAKER & MARURI PLLC
212.597.2642
Aparks@elsberglaw.com

ON BEHALF OF EVOLUTION ENTITIES:
ELLA EPSTEIN
VICTORIA KLEVAN
ELSBERG BAKER & MARURI PLLC
212.597.2611
Eepstein@elsberglaw.com



REMOTE APPEARANCES (CONTINUED)

ON BEHALF OF BANK OF AMERICA, N.A.:
MICK BORCHERT
WINSTON TAYLORE
312.558.8302
mick.borchert@winstontaylor.com

ON BEHALF OF AEQUUM CAPITAL FINANCIAL II, LLC:
MATT KASLOW
BLANK ROME
215.569.5455
Matt.kaslow@blankrome.com

ALSO PRESENT:
ILAYNA GUEVREKIAN
MORRISON FOERSTER
212.336.4305
Iguevrekian@mofo.com

MARK WULFE
BRACEWELL PATTERSON
31 W. 52nd Street, Suite 1900
New York, New York 10019
212.508.6170
Mark.wulfe@bracewell.com

ON BEHALF OF AEQUUM CAPITAL FINANCIAL II, LLC:
MATT KASLOW
BLANK ROME
215.569.5455
Matt.kaslow@blankrome.com

MATTHEW SORENSON
MELANIE WESTOVER YANEZ
MICHAEL WINOGRAD
NICK HAUGHEY
SEAN SCOTT
VIANEY GARZA
ANNELYSE GAINS
BENNETT SILVERBERG

REMOTE APPEARANCES

ALSO PRESENT:
BRIAN MICHAEL
BRYAN KOTLIAR
CAMERON LAKIN
CHARLES MOORE
CLIFFORD CARLSON
DAVE KATZ
DOUG DEUTSCH
ALLY CHEN, BRG Financial Advsior
MICHELLE TRAN



EXAMINATION INDEX


WITNESS: CHARLES MOORE

| EXAMINATION | PAGE |
|---|---|
| BY MR. CASSEL | 390 |
| BY MS. DEXTER | 481 |
| BY MR. DUKE | 608 |
| BY MR. MENNITT | 766 |
| SIGNATURE REQUESTED | 813 |
| REPORTER'S CERTIFICATION | 814 |


EXHIBIT INDEX


| | PAGE |
|---|---|
| MOORE EXHIBIT 27 Excel File | 401 |
| MOORE EXHIBIT 28 Excel File | 401 |
| MOORE EXHIBIT 29 Excel File | 403 |
| MOORE EXHIBIT 30 Katsumi Nomination File | 410 |
| MOORE EXHIBIT 31 Katsumi Matching File | 410 |
| MOORE EXHIBIT 32 Screenshot | 414 |
| MOORE EXHIBIT 33 E-mail Chain | 420 |
| MOORE EXHIBIT 34 E-mail | 422 |
| MOORE EXHIBIT 35 Attachment | 422 |
| MOORE EXHIBIT 36 E-mail | 424 |





| EXHIBIT INDEX (CONTINUED) | PAGE |
|---|---|
| MOORE EXHIBIT 37 E-mail | 426 |
| MOORE EXHIBIT 38 E-mail wit Attachment FBG_LAM_00736034 | 427 |
| MOORE EXHIBIT 39 E-mail | 427 |
| MOORE EXHIBIT 40 List of Materials Considered | 445 |
| MOORE EXHIBIT 41 Kirschner Declaration | 472 |
| MOORE EXHIBIT 42 30(b)(6) Topics from Onset | 481 |
| MOORE EXHIBIT 43 Plan Excerpts of Litigation Trust Economic Terms | 486 |
| MOORE EXHIBIT 44 E-mail | 504 |
| MOORE EXHIBIT 45 E-maill | 589 |
| MOORE EXHIBIT 46 Subordinated Note FBG_EVL_00001316 | 661 |
| MOORE EXHIBIT 47 Sale Agreement | 724 |
| MOORE EXHIBIT 48 Financial Statements | 738 |


(REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)



THE VIDEOGRAPHER: Today's date is July 26, 2026. This is the video deposition of Charles Moore. The time is 12:18. We are on the record.
The court reporter may now swear in the witness.
CHARLES MOORE,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. CASSEL:
Q. Good afternoon, Mr. Moore.
A. Good afternoon.
Q. I'm Michael Cassel. Nice to see you again.
A. And you.
Q. Since we last spoke, have you had discussions with anyone other than counsel about your testimony?
A. No conversations with anyone about my testimony.
Q. What did you do to prepare for this continued deposition after the previous one ended?
A. Reviewed my declaration again.

I reviewed the summary of findings again. And I reviewed some of the plan documents, plan disclosure statement and plan supplement.

Q. Any other documents?

A. No.

Q. Did you meet with counsel?

A. On a different topic, I've had a couple of conversations with counsel since Friday.

Q. But not related to the testimony you're about to give today?

A. That's correct.

Q. So, Mr. Moore, you just spoke about the summary of findings April 2026 presentation, which we discussed in your previous deposition.

I'm not going to mark it since it was marked as an exhibit, but this was previously marked as Moore Exhibit 8.

And, Mr. Moore, while we're handing that out, did you have any discussions regarding Mr. Kirschner's testimony?

A. I did not.



Q. Thank you. So, Mr. Moore, you see this is the April 2026 summary of findings presentation in front of you.

Could you please turn with me to Page 39 of that presentation, which is a Bates number ending in 6978.

A. Okay. I have it.

Q. And you'll see, Mr. Moore, on Page 39 that there's a statement saying, Evidence shows that FBG created fake invoices to nominate to the factoring counterparties to utilize full capacity.

See that statement?

A. I do.

Q. You agree that statement is accurate?

A. I do.

Q. Turn to Page 41, which is a Bates number ending in 6980. And you'll see there is a statement there saying that, quote, at times Jefferies and Katsumi requested samples of invoices, bank statements, and remittance relating to the factoring program at FBG.

Do you see that?



A. I do.

Q. And you agree that statement is accurate?

A. Yes.

Q. And then on this page are excerpts from two e-mail threads.

Do you see that?

A. I do.

Q. And on the left side of the page, there's an e-mail from a Mr. John Nesci.

Do you see that?

A. Yes.

Q. And do you see Mr. Nesci's signature, e-mail signature in the middle of the e-mail on the left of this page?

A. I do.

Q. It says he's head of operations at Leucadia Asset Management Trade Finance Group.

Do you see that?

A. Yes.

Q. And so you agree he appears to be a Leucadia Asset Management employee, correct?



A. Yes.

Q. And in this e-mail thread on the left, he is requesting invoice samples from Mr. Brumbergs, correct?

A. Yes.

Q. And then on the right e-mail on this page, there's an e-mail where Mr. Brumbergs writes to Mr. Nesci enclosing documentation, correct?

A. Yes.

Q. And that documentation appears to include what were represented to be copies of invoices, correct?

A. Yes.

Q. And what was represented to be copies of cash remittance detail, right?

A. Yes.

Q. What was represented to be copies of bank statements, right?

A. Yes.

Q. If you turn with me to the next page, which is Page 42, Bates number ending 6981.

The top line here says, quote, Our team has seen evidence that FBG falsified

the invoices sent in reply to factor sample requests.
Is that an accurate statement?
A. Yes.
Q. And the "our team" in that statement refers to A&M, correct?
A. That's correct.
Q. And on this page on the left is an e-mail chain between Andy Brumbergs and Silvia Avalos Ballato, correct?
A. Yes.
Q. And in the top three e-mails on the left, they are discussing responding to a request by Jefferies for invoice samples, right?
A. Yes.
Q. And then on the right on this -- right of this page is a example of how invoices would be doctored, correct?
A. Yes. That's right.
Q. Turn with me to the next page, which is Page 43, Bates number ending 6982. And the top of this page says, Also in response to Jefferies and Katsumi requests for verification, evidence shows that FBG



falsified bank statements to show internal cash movements as collection from customers.
Do you see that?
A. I do.
Q. And you agree that's an accurate statement?
A. Yes.
Q. Do you have any reason to believe that Leucadia knew at the time that the invoices they received in response to sampling requests had been fabricated?
A. In our dialogue that we had on Thursday in January of 2023, there were inquiries made by Leucadia.
And I use Leucadia and Jefferies interchangeable, so if I say one or the other, I'm -- I'm referring to either one, the party that was providing third-party factoring.
That raised a number of questions, specifically their lack of comfort around things.
So they were looking to gain more comfort. So I don't know exactly what they knew at this time, but this is about two



years after the exchange that we were talking about on Thursday.
Q. Do you recall in 2023 Leucadia requested and received invoice samples?
Do you recall that?
A. I don't know what Leucadia received at that time. I do know that Leucadia was uncomfortable enough that they were inquiring about a whole host of things, including on balance sheet and what they referred to as off balance sheet liabilities.
Q. I just want to focus on, do you have any basis to assert that Leucadia knew that invoices it received in response to sampling requests were fabricated?
A. So I've never said that Leucadia knew anything. What I have highlighted and what our investigation really focused on was identifying questionable items and what we referred to as red flags. And that's what I've highlighted in my declaration.
Q. Understood.
But do you have any basis to assert that Leucadia actually uncovered



concrete samples of fabricated invoices that it knew were fabricated?
A. That has not -- that's -- that's really going to be, I think, figured out through litigation through full discovery. This has not been a process where full discovery has been taken.
So all I can tell you is based on this investigation, we've identified a number of items that were questionable and what we referred to as red flags.
And I'm sure this is all going to get figured out through litigation in terms of who knew what and when.
Q. Sitting here today, you have no basis to assert that Leucadia knew that any invoices it had received in response to sampling requests were fabricated, correct?
A. That was not an exercise that we undertook and I don't have discovery or information that would allow me to make a -- and have an opinion on that.
Q. Do you have any reason to believe that Leucadia knew at the time that bank statements that it received in response

A. Raistone is in Chapter 7 liquidation.
Q. And are they a specified release party?
A. I don't recall.
Q. Are they --
A. Well, first of all, the description is specified nonrelease party.
Q. Right. Sorry. Specified nonrelease.
Are they on the UCC?
A. They were.
Q. Okay. There are no other factoring counterparties is your testimony for third-party factoring?
A. I am not aware of any others of the material level. There may have been one-offs that fall under this category of third-party factoring as we use it, but there are really just the four.
Q. Do you have any evidence that you've seen that Evolution did not provide reasonably equivalent value in connection with the financing transaction -- or the factoring transactions?



MR. BEREZIN: Objection; form.
Legal conclusion.
Go ahead and answer.
A. I -- not that I can think of offhand.
(BY MR. DUKE)
Q. Okay. I want to quickly turn to the supply chain financing.
You -- I want to go to Paragraph 96.
A. Okay.
Q. It's actually the next one, so that's great.
You see you list -- I believe they're platforms. So NextProcess, VERCYFi, Raistone, LiquidX, Yieldstreet, Interface, Orbian, and BAML?
A. Yes.
Q. And then -- by the way, is Bank of America NA, they're the same as -- they're a party to the ABL agreement, correct?
A. Correct.
Q. Do you know whether they're getting a release in their capacity as a supply chain financing provider?



A. They are.
Q. So they just get a global release even though they participated in supply chain financing?
A. Their supply chain financing is actually secured because it is a cash management product under the ABL arrangement.
So they're in a different position than the other supply chain finance providers.
Q. Are they fully secured?
A. They are.
Q. They have -- they don't have a deficiency at all?
A. That will -- we have to wait and see --
Q. Well --
A. -- the final amounts.
Q. Sir, I asked if they are fully secured, and you told me they are.
So do they have a deficiency?
MR. BEREZIN: Objection; form.
A. Yet to be determined.
(BY MR. DUKE)
Q. So you don't know whether



they're fully secured?
A. At this point that's correct.
Q. So for all you know, they may have an unsecured claim, right?
A. They may have a deficiency claim.
Q. And then if you go to Paragraph 101, this is where you have "Evidence Concerning 'Red Flags' to SCF Counterparties."
Do you see that?
A. Yes.
Q. The only red flag you identify is for PrimeRevenue, correct?
A. Correct.
Q. And if you go to the chart, the only "On Notice - Total Paid" relates to PrimeRevenue, correct?
A. Yes.
Q. Have you identified any red flags with any of the other supply chain factors?
A. Not --
MR. BEREZIN: Object to form.

(BY MR. DUKE)
Q. Or sorry, excuse me. Let me withdraw the question.
Have you identified any other red flags with respect to the supply chain financing parties?
A. Not so far, but, again, same comment that I've said many times. I'm sure at some point there will be full discovery on all of this.
Q. Are you aware that there is a dispute between Evolution and the First Brands Group over roughly $21.2 million?
A. I am generally aware of that.
Q. Is that amount of money being treated as disputed money under the plan?
MR. BEREZIN: Objection to form.
A. I'm not sure we treat any money as disputed money under the plan.
(BY MR. DUKE)
Q. So is -- let me ask that question differently.
You testified on day one about how disputed assets are not being transferred

Page 759

to trusts.
Do you recall that?
A. Yes.
Q. Is cash being transferred to trusts?
A. No.
Q. So all cash is staying on First Brands' balance sheet?
A. Let me take that back. The $25 million of DIP cash, so they have a minimum $25 million cash balance. That is getting transferred into the litigation trust.
That's the only cash that is getting transferred into a trust.
Q. Once the $25 million is transferred to the litigation trust, how much will remain on the balance sheet assuming the plan is confirmed and the trust comes into existence?
A. If the plan is confirmed by the end of this coming week, there will probably be single digit million dollars, maybe $5 million or so. Maybe a little less.
Q. And what's happening with the

Page 760

$5 million that will remain with First Brands Group debtors?
A. It is used by the wind-down administrator.
Q. It's not being segregated pending resolution of that dispute over the $21.2 million?
A. That cash -- other than 1.5 or whatever the amount is, that cash is long gone. The 1.5 is in our restricted account.
Q. Sir, you said 1.5.
What do you mean by that?
A. There's a portion -- the dispute relates to sales or collections that happened after a certain date. And collections after I think it was around January 20 or so, collections for sales that happened after that time, I think it is, have been set aside.
The dispute is collections on sales before that.
Q. So only the 1.5 is being segregated, correct?
A. Yes.
Q. And the plan doesn't deal with

Page 761

the balance of that dispute, correct?
A. That is going to end up getting litigated. That's correct.
Q. For the disputed assets, who is determining whether an asset is disputed or not?
MR. BEREZIN: Objection; form.
A. Any asset in which multiple parties have asserted interests is not getting transferred.
(BY MR. DUKE)
Q. What's happening to those assets pending resolution of those disputes?
A. They remain with the estates. They are being liquidated by Hilco. But we require parties -- we give notice to parties before any sale. And any party with an interest in those assets is able to say that they're not consenting to it.
Q. For the specified nonrelease parties we spoke about earlier, what's the basis for distinguishing between who is a specified nonrelease party and who isn't?
A. The -- it starts off with the -- one of the primary purposes of putting

Page 762

that list together was to give people notice so that if you're on that list, you're not getting a release. If you're not on that list, it doesn't mean that you're getting a release.

So it's really meant to address comments that have come in through this plan process about wanting to have some visibility if they're on this list or not.

Q. I understand that. What's the basis for determining who is on the specified nonrelease party's list?

A. Yeah, there's five criteria that are identified in the plan. And if you meet any one of those five criteria, you're on the list.

Q. What are they?

A. I don't recall offhand, but we can look at in the plan.

(Discussion off the record.)

MR. DUKE: I'll pass the witness.

MR. MARSTERS: Before we go off the record, I just want to deal with a couple of document issues.



You asked a number of questions, again, about the highly confidential lender list.

I'm going to designate all of that testimony that discusses the items in this list as highly confidential.

MR. DUKE: I'll say I disagree with that. We can deal with that later, though.

MR. MARSTERS: Okay. There's a procedure, I believe, under --

THE VIDEOGRAPHER: The time is --

MR. MARSTERS: Sorry, I don't want to go off the record yet.

There's a procedure under the protective order. We can deal with it later, but I'm designating it highly confidential.

The other documentary issue is this document. I just noticed it doesn't have a Bates number. So I wasn't sure if you guys have produced it -- have produced it or where this



document came from.

MR. DUKE: Okay.

MR. MARSTERS: Do you guys plan to produce it?

MR. DUKE: It's in this deposition as an exhibit. We don't have any document requesting --

MR. MARSTERS: So you're not going to produce it? Just want to get the record clear.

MR. DUKE: You have it.

MR. MARSTERS: I'm making a request -- I'm making a request to produce it. Because it's not the full document, right. We -- I thought we went over this.

MR. DUKE: It's on the exhibit list, but, sure, we can --

MR. MARSTERS: I don't think you've served those on us either.

MR. DUKE: Well, they were served on the docket, but I'll -- I hear your request. We can talk about it later.

MR. BEREZIN: Are we off now?



THE VIDEOGRAPHER: I can't hear. Are we done? The time is 9:02. We're off the record.

(Break from 9:01 p.m. to 9:09 p.m.)

THE VIDEOGRAPHER: The time is 9:09. Back on the record.

EXAMINATION

BY MR. MENNITT:

Q. Mr. Moore, I'm Gary Mennitt of Dechert, and I represent the CarVal -- what you call the CarVal lenders.

Do you understand that?

A. I do.

Q. And those are the lenders to Carnaby II and Carnaby III, correct?

A. Yes.

Q. In your declaration, you estimate that the administrative claims will be approximately 222 million; is that correct?

A. Yes. That includes a cushion.

Q. That includes a 20 percent cushion; is that right?

A. That's right.

Q. And that is as of July 6 of