EXHIBIT 21

*Declaration of Daniel Jerneycic [Docket No. 1285]*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**DECLARATION OF DANIEL JERNEYCIC**

I, Daniel Jerneycic, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director at Alvarez & Marsal North America LLC ("**A&M**"). On September 5, 2025, A&M was retained by the Company to, among other things, assist with liquidity management and forecasting, identifying cost-reduction opportunities, and contingency preparations for a potential chapter 11 filing. On September 24, 2025, Global Assets LLC and twelve of the Debtors each filed with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and commencing on September 28, 2025 (as applicable, the "**Petition Date**"), First Brands Group LLC and the remaining Debtors each filed with the Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Debtors**," and together with the other debtors and non-debtor affiliates, the "**Company**" or "**FBG**").

2. On October 23, 2025, I was appointed co-Chief Restructuring Officer of First Brands Group, LLC and its debtor affiliates. From the outset of A&M's retention, we have worked

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

in coordination with the Debtors' other advisors on numerous activities to support the Debtors' restructuring efforts. As a result of A&M's work with the Debtors, their affiliates, and the Debtors' other advisors, I have become familiar with the Company's day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.

3. I have nearly twenty-five years of experience as an advisor to large organizations, assisting them with analyzing and stabilizing their financial condition, and focused on financial analysis, operational turnarounds, and restructurings. I have experience in the automotive industry, specifically, where I have advised both OEMs and suppliers. My experience includes liquidity management and cash forecasting, financial modeling, cost reductions, customer and labor negotiations, strategic planning, and business plan development.

4. Prior to joining A&M, I was a Partner in Ernst & Young's Turnaround and Restructuring practice, where I served in a similar capacity. I earned a bachelor's degree from the University of Michigan, and a master's in accounting from University of Michigan's Ross business school. I am a Certified Public Accountant, Certified Insolvency Restructuring Advisor, and certified in Financial Forensics.

5. I submit this declaration (the "**Declaration**") in support of the *Debtors' (I) Objection to Evolution's Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners and (II) Cross-Motion for Use of Cash Collateral* (Docket No. 1280).[2]

6. Except as otherwise indicated, all statements in this Declaration are based on (i) my personal knowledge of the Debtors' operations and finances, (ii) my review of relevant documents,

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objections, as applicable.

(iii) information provided to me by A&M employees working directly with me or under my supervision, (iv) information provided to me by, or discussions with, the members of the Debtors' management team, or the other advisors to the Debtors, and/or (v) my experience as a restructuring professional. I will receive no compensation in exchange for my testimony. If called to testify, I could and would testify to each of the facts set forth herein on the foregoing bases. I am authorized to submit this declaration on behalf of the Debtors.

*A. The Debtors' Advisors Review of the Evolution Credit Facilities*

7. Commencing prior to and continuing after the Petition Date, the Debtors' advisors, under the guidance of the Debtors' special committee (the "**Special Committee**"), reviewed documents and conducted diligence related to (i) certain credit facilities and arrangements (the "**Patterson Credit Facility**") between Patterson Inventory, LLC ("**Patterson**") and Evolution Credit Opportunity Master Fund II-B, L.P. ("**Evolution**"), as lender; and (ii) certain credit facilities and arrangements (the "**Starlight Credit Facility**," and together with the Patterson Facility, the "**Evolution Credit Facilities**") between Starlight Inventory I, LLC ("**Starlight**," and together with Patterson, the "**Evolution Borrowers**" and each an "**SPV**") and Evolution, as lender.

8. The Debtors' counsel, Weil, Gotshal & Manges LLP ("**Weil**") has reviewed documentation related to the asserted liens purportedly granted under the Evolution Credit Facilities. A&M has reviewed the flow of funds between First Brands entities, the Debtors' books and records, transaction documents, and inventory reports. The Debtors' investment banker, Lazard Frères & Co. LLC ("**Lazard**"), has analyzed the commercial transaction structure of each credit facility and various documents.

9. I have reviewed and have a business understanding of Evolution's loan agreements, security agreements, and borrowing base certificates. True and correct copies of these debt

documents, kept in the ordinary course of the Debtors' business, are attached hereto as Exhibits A-F.

10. The Evolution Credit Facilities are made up of uncommitted asset-based revolving credit facilities with maximum aggregate advances of $150 million under the Starlight Credit Facility and $150 million under the Patterson Credit Facility, secured by liens on the assets of Starlight or Patterson, respectively. The outstanding amount due under the Evolution Credit Facilities as of the Petition Date is approximately $230 million, $110 million under the Starlight Credit Facility and $120 million under the Patterson Credit Facility.

11. On November 9, 2023, Patterson entered into the uncommitted inventory finance agreement attached hereto as **Exhibit A** (the "**Patterson Loan Agreement**") with Evolution as lender. Further, on the same day, Patterson entered into the security agreement attached hereto as **Exhibit B** (the "**Patterson Security Agreement**"), whereunder Evolution was granted a security interest over Patterson assets. Under the Patterson Credit Facility, Evolution provided an uncommitted asset-based revolving credit facility with maximum aggregate amount of advances of $150 million to Patterson as borrower. Patterson's obligations under the facility are (i) guaranteed by Debtor Patterson Inventory Holdings, LLC, (ii) secured by a pledge of 100% equity of Patterson that Patterson's parent owns, and (iii) secured by a lien on all assets of Patterson (the "**Patterson Collateral**").

12. On March 28, 2024, Starlight entered into the uncommitted inventory finance agreement attached hereto as **Exhibit C** (the "**Starlight Loan Agreement**") with Evolution. Further, on the same day, Starlight entered into a security agreement attached hereto as **Exhibit D** (the "**Starlight Security Agreement**"), whereunder Evolution was granted a security interest over Starlight assets. Under the Starlight Facility, Evolution provided an uncommitted asset-based

revolving credit facility with maximum aggregate amount of advances of $150 million to Starlight as borrower. Starlight's obligations under the facility are (i) guaranteed by Starlight Inventory Holdings I, LLC, (ii) secured by a pledge of 100% equity of Starlight that Starlight's parent owns, and (iii) secured by a lien on all assets of Starlight (the "**Starlight Collateral**," and, together with the Patterson Collateral, the "**Evolution Collateral**").

13. The liens asserted by Evolution were granted by Starlight and Patterson over Starlight and Patterson's inventory and other assets**, not those of First Brands Group, LLC or its direct or indirect subsidiaries**. I further understand that, under the Starlight Credit Facility and Patterson Credit Facility, each SPV Debtor's purported inventory would be located at one of four warehouses **owned and operated by First Brands Group, LLC** – for Starlight: 1100 Corporate Drive, McHenry, IL 60050; 1380 Corporate Drive, McHenry, IL 6050; for Patterson 2701 Keystone Pacific Highway, Patterson, CA 95363; and 14528 Bonelli St., City of Industry, CA 91746. *See* Starlight Loan Agreement at p. 2, Schedule 1.1A; Patterson Loan Agreement at p. 2, Schedule 1.1A, (together the "**Evolution Locations**").

14. Because Evolution's claimed liens are only against the inventory actually owned by Patterson and Starlight, which owned no assets in November 2023 and March 2024 at the time of the loan agreements with Evolution, and given that the inventory would be kept at warehouses owned and operated by First Brands Group, LLC, the Starlight and Patterson Credit Facilities required a mechanism for the SPV Debtors to buy inventory, to sell it (to generate proceeds to service debt and buy replacement inventory) and to buy replacement inventory to maintain a borrowing base.

15. To accomplish this, each of the Patterson and Starlight Credit Facilities relied on the same forms of agreements that would need to be used repeatedly by Patterson or Starlight and

First Brands Group, LLC (or an affiliate thereof) to repeat the cycle of buying, selling and buying inventory. The form of agreement for the Patterson and Starlight SPVs to use for their inventory purchases was the "Master Origin Sale and Exchange Agreement" (and schedules thereto). *See* **Exhibit E** (the form "**Starlight Sale Agreement**") and **Exhibit F** (the form "**Patterson Sale Agreement**").

16. The form of agreement for the Patterson and Starlight SPVs to sell their inventory was the "Destination Sale Agreement" (and schedules thereto), each attached to the Master Origin Sale and Exchange Agreements. *See* **Exhibits E (Exhibits), F (Exhibits)**.

17. The Debtors, however, have located only two Master Origin Sale Agreements (one for Patterson and one for Starlight), two associated sale schedules (one for the Patterson Master Origin Sale Agreement and one for Starlight Master Origin Sale Agreement), and one executed Destination Sale Agreement between Starlight and Brake Parts, Inc ("**BPI**").

18. With respect to the initial acquisition of inventory by the SPVs, I understand that Patterson and Starlight agreed to purchase inventory from the FBG Debtors in exchange for the stated purchase prices of $180,164,116.91 and $185,807,103.00, respectively. Under the purchase agreements, the purchase price was required to be paid on the execution date in one or more of the following forms: cash, an in-kind exchange of inventory, or a subordinated note. My team and I have identified no evidence that a subordinated loan was ever issued or exchanged in connection with the Patterson or Starlight transactions. In addition, because the Patterson and Starlight entities had no inventory balances prior to the initial transactions, they lacked inventory with which to effectuate any in-kind exchange. Accordingly, based on the available information, I would have expected the entire stated purchase price for each transaction to have been paid in cash on the applicable transaction date.

19. The available records, however, reflect that First Brands Group received $119,756,684 in November 2023 in connection with Patterson's purported purchase of inventory, not $180 million. Similarly, First Brands Group received only $105,000,000 in March 2024 in connection with Starlight's purported purchase, not $185 million. These payments fall materially short of the stated purchase prices set forth in the applicable agreements.

20. These substantial underpayments alone call into question whether the initial inventory purchases by Patterson and Starlight were properly effectuated and, if so, whether Patterson or Starlight obtained an interest in the full inventory they purportedly purchased. This is particularly the case based on subsequent events described below.

21. Initial inventory continued to be sold by First Brands from the November 2023 and March 2024 transaction dates to the September 2025 Petition Date. My team investigated whether Starlight and Patterson sold the inventory it initially supposedly purchased back to First Brands and whether Starlight and Patterson used the proceeds to pay Evolution and to purchase replacement inventory. These transactions do not appear to have occurred. For example, in terms of First Brands purchasing inventory back from an SPV, only one executed asset purchase agreement has been located between Starlight and Brake Parts, Inc., and none has been located for Patterson.

22. As far as agreements that were to be used when the SPV bought replacement inventory from First Brands, we have not identified even one such purchase agreement. Nor have we located invoices evidencing purchases of replacement inventory by Patterson or Starlight. Furthermore, the books and records of First Brands and Patterson and Starlight do not reflect purchase or sales of replacement inventory to or from each other. No adjustments were made to the inventory balances of BPI or any other potential inventory seller in connection with

replacement inventory transactions involving Patterson or Starlight, and there were no corresponding increases in inventory balances at Patterson or Starlight since their initial transactions.

23. The inventory at the Evolution Locations is predominantly, if not entirely, finished good inventory for BPI. The BPI business had estimated net sales of approximately $698 million in 2024 and approximately $524 million in 2025. The raw material portion of cost of goods sold at BPI is estimated at ~65% of net sales (i.e., ~$454 million in 2024, and ~$341 million in 2025), meaning total cost of goods sold for the inventory would be even higher with capitalized manufacturing costs (in fact, estimated at approximately 100% of net sales). Given that the vast majority of BPI customer sales are derived from finished good inventory that flows through the Evolution Locations (or at least through MDC and WDC locations, as described below), this would suggest that the original inventory alleged to be purchased by Starlight and Patterson (i.e., ~$365 million of inventory at the time of the transactions in November 2023 and March 2024) would have turned over several times since the inception of the transactions based on this level of sales activity. In other words, the inventory originally purchased is no longer there (using the Company's FIFO accounting methodology) or, if it is somehow still there, then the inventory is clearly excess, obsolete, or has zero demand, rendering it valueless (or at best it has only scrap value). Accordingly, the inventory as it exists today would be almost entirely, if not entirely made up of replacement inventory for which no purchase records exist for Patterson or Starlight.

24. The flow of funds between the SPVs and First Brands also was highly unusual. First Brands entities never made direct transfers of cash to Patterson or Starlight, and neither Patterson nor Starlight made any direct transfers to First Brands entities. The Debtors have learned that significant efforts were made by former management to prevent auditors and lenders of First

Brands from learning about the SPVs. Instead, invoices were issued by a different Patrick James controlled entity to BPI, and cash was paid through a payment processor to Patterson or Starlight, then only to have Patterson or Starlight round-trip essentially the same funds back to BPI, through another James controlled entity (Bowery) usually on the same date. These round-trip transfers do not appear to correspond to the inventory levels shown on Evolution borrowing base certificates. These round tripping transactions appear to have been undertaken solely to generate bank statements activity for disclosure under the Evolution Credit Facilities, and do not correspond to any bona fide financial transactions between the parties.

25. My team and I have analyzed the borrowing base certificates routinely provided to Evolution and determined they are unreliable and do not reflect actual business activity actually recorded through the Debtors' business systems. For example, an audit was conducted in May/June 2025 for Evolution's purported net inventory balances as of the end of April 2025 (fiscal month ending May 3, 2025). My team analyzed the inventory data utilized by the audit firm and compared it to the corresponding borrowing base certificate data that had been provided to Evolution during this period. We have determined that nearly all of the SKU level quantity and pricing has been altered from what is reported in the Companies' books and records. My team further determined that the data utilized in the audit was consistent with the data utilized by the Company in its perpetual inventory reporting system.

26. In light of the above, I believe that Evolution does not hold a lien on most, if any, current inventory as of the Petition Date. And, if it does, there still is the matter of whether such liens are junior to pre-existing creditors – the ABL and Term Loan Lenders.

27. It is my business understanding that the four warehouses purportedly holding Patterson and Evolution's inventory are owned by First Brands Group, LLC/Brake Parts, Inc.,

along with the inventory located therein. First Brands Group, LLC and BPI are loan parties under the ABL and Term Loans. True and correct copies of these debt documents, kept in the ordinary course of the Debtors' business, are attached hereto as **Exhibits G-L**. I understand that, since well before 2023 and continuing to today, the inventory in the four facilities was part of the Eligible Inventory included in the ABL Lenders' applicable borrowing base certificates.

28. My business understanding is that, under the ABL Facility, the first lien loan agreements, and the second lien loan agreements, the respective liens (the "**ABL/Term Loan Liens**") may be released under certain conditions. For example, if a valid sale for fair market value for inventory in which at least up to 75% the purchase price is paid for in cash (or an in-kind exchange) and a revised borrowing base certificate is provided that removes the inventory that has been sold. That does not appear to have occurred as explained above.

*B. The Unresolved Questions Concerning the Correct Value of Evolution's Claimed Inventory On the Petition Date and Thereafter At the Time of the Stipulation and Order*

29. Following the Petition Date, the Debtors engaged with Evolution to achieve a consensual resolution that would preserve the value of their potential collateral for the benefit of whichever party ultimately was determined to hold a valid interest therein, while the underlying facts and lien priorities were investigated. On November 9, 2025, the Debtors and Evolution entered into a stipulation and agreed order regarding adequate protection (the "**Stipulation and Order**") that authorized and permitted the Debtors to continue using Evolution's purported collateral in the ordinary course of business through and including January 5, 2026. *See* ECF 609.

30. As part of the negotiation of the Stipulation and Order, a key unresolved question concerned the value of Evolution's asserted inventory collateral, including on the Petition Date. That remained an open question when the Stipulation and Order was executed – neither party could ascertain the Petition Date value of the claimed inventory. *See* **Exhibit M** (email filed under seal

dated November 5, 2025 from Proskauer stating that they would in the Stipulation and order "specify facility locations but **we have no way to verify amounts**"). Specifically, we did not know whether the claimed inventory was only located at the four warehouses specified in the Starlight and Patterson Loan Agreements or whether some of that inventory had been moved to other locations and therefore also should be counted.

31. For example, the last Borrowing Base Certificate provided by former management to Evolution was from July 2025, and it showed a combined value of about **$376** million for Patterson and Starlight. In contrast, when my team ran reports using the Debtors' perpetual inventory systems for the four warehouses in October, the inventory value was materially lower. For example, a report run on October 24, 2025 showed a value of about **$287** million - $89 million less than the July Borrowing Base Certificate. These reports were shared with Evolution's advisors in October.

32. My team then discussed the discrepancy between the Borrowing Base Certificate and the perpetual inventory report for the four warehouses prior to the Stipulation and Order, and explained that it was possible additional inventory was in transit or potentially Evolution's inventory was also stored at other locations.

33. My team then ran a report that included not only the four warehouses, but certain other Brake Parts, Inc. warehouses that totaled inventory values of **$374** million, which was much closer to the $376 million listed in July 2025 Borrowing Base Certificate. *See* **Exhibit N** (excerpts of BPI weekly perpetual inventory report dated October 31, 2025, reflecting organization codes MDC and WDC). The 10/31 report was BPI's weekly perpetual inventory reports utilizing organization codes including MDC (Midwest Distribution Center, which included the two McHenry locations) and WDC (West Distribution Center, which included the Patterson and City

of Industry ("**COI**") locations). The meaning of the MDC and WDC designations had been explained to Evolution's advisors. *See* **Exhibit O** (email under seal dated October 23, 2025, from my team to BRG).

34. I believed that this report (which included more than the four warehouses) was the best reporting available at the time of the Stipulation and Order given that it aligned with both the Debtors' perpetual inventory reporting system and approximated the inventory values included in the Borrowing Base Certificate provided to Evolution in July.

35. In early November, Evolution's advisors suggested a "Collateral Maintenance Threshold" which I understood was intended to be the book value of the inventory at the Petition Date of **$335 million**. This was obviously much more than the October 24, 2025 report for the four warehouses of **$287 million**, which I did not at the time believe was an completely accurate figure as I believed inventory may have been moved to other locations as an explanation as to why the July 2025 Borrowing Base Certificate was so much higher. Instead, I believed that the most accurate information available was reflected in the report that included more than the four warehouses (showing a $374 million value). My team provided this report to Evolution on November 7, 2025, two days before the Stipulation and Order was signed, and believed it would be used as the basis for weekly reports to determine compliance with the Stipulation and Order. After the Stipulation and Order was entered, my team provided weekly reports that included values for more than just the four warehouses. During that time period, Evolution's advisors did not raise any issue with me as to why the reports included more than the four warehouses in the Starlight and Patterson Loan Agreements.

36. Using this reporting data, at no time has the book value of inventory fallen below the maintenance thresholds, and therefore I did not believe (and do not believe) the Debtors were

out of compliance with the Stipulation and Order before it expired. Also, as discussed below, since we were notified of Evolution's asserted inventory diminution and associated noncompliance with the Stipulation and Order in mid-December, inventory levels have increased, not decreased.

*C. Improved Detailed Perpetual Inventory Reports by Location*

37. Meanwhile, the Debtors' investigation continued. The Debtors' professionals had already determined that management did not maintain separate and distinct perpetual inventories for the SPVs, and that First Brands' inventory tracking systems were not set up to support the type of inventory financing structures put in place at each of the SPV Debtors. For example, the perpetual inventory reports did not uniquely identify or track particular items of inventory such that one could assign ownership of it to a particular legal entity (e.g., an SPV borrower of Evolution or an FBG borrower under the ABL Facility). Moreover, due to the sheer number of different perpetual inventory systems used by First Brands and lack of coherent integration of these systems, it was very challenging to obtain regular reporting of even general inventory levels by SKU at particular facilities or warehouses.

38. In addition, at the request of Evolution and other SPV lenders, the Debtors worked for weeks to improve the inventory system reporting to align it further with the specific inventory locations applicable to each lender. Beginning in December 2025, the Debtors began generating "by-location" perpetual inventory reports for the MDC and WDC locations that included specific address identifications. The first such report shared with Evolution as part of the Debtors' weekly reporting is attached hereto as **Exhibit P** (the December 5, 2025 Perpetual Inventory Report by Location). This by-location perpetual inventory report reflected substantially the same aggregate inventory values as prior reports, but disaggregated those values across nine locations: McHenry (which includes both McHenry addresses of the Evolution Locations), MDC Philadelphia, MDC Offsite, Patterson, COI, WDC Harlingen, WDC Offsite, 1600, and SBI. The McHenry, MDC

Philadelphia, MDC Offsite, and 1600 locations correspond to organizational code MDC in the perpetual inventory reports, while Patterson (an Evolution Location), COI (an Evolution Location), WDC Harlingen, WDC Offsite, and SBI correspond to organizational code WDC. As reflected in the December report, the combined book value of MDC and WDC inventory was approximately $371 million, exceeding the applicable Collateral Maintenance Threshold.

39. Reports also were generated to show the value of the inventory at the Petition Date at the four Evolution Locations, as well as current book values. Instead of the $335 million Collateral Maintenance Threshold used as a proxy for the Petition Date value in the Stipulation and Order, the book value of inventory at the four Evolution Locations was more than $30 million lower, or approximately $303,980,231 as of the Petition Date.

40. In terms of current values, as of early December, 2025, the book value at the Evolution Locations totaled $286,222,762, a decrease compared to the Petition Date of approximately $17.8 million. Since Evolution filed its motion, however, **the value has substantially increased**. As of January 2nd, inventory at the Evolution Locations had an aggregate book value of approximately $294,750,117, reflecting a net decline of just over $9 million, or just over 3%, from the Petition Date. The amount at the Evolution Locations has increased further to approximately $296,662,364 as of January 9, 2026, **reflecting a net decline of just over $7 million, or just over 2%** since the Petition Date.

41. I understand that Evolution claims that their purported inventory has fallen below the maintenance threshold by $44 million. That is incorrect as long as the reporting used and available prior to and at formation of the Stipulation and Order is referenced. Specifically, my team and I developed by location perpetual inventory reports for the Petition Date, attached hereto

as **Exhibit Q**, and for the beginning of this year, attached hereto as **Exhibit R**.[3] Below are relevant summaries of those reports.

| BPI US | | Book Value of Inventory | | | |
|---|---|---|---|---|---|
| Location | | Sep-25 | 12/5/2025 | 1/2/2026 | 1/9/2026 |
| McHenry | ** | $ 153,290,539 | $ 141,889,095 | $ 151,138,538 | $ 152,791,399 |
| 1600 | | 21,998,443 | 13,361,152 | 13,384,935 | 15,100,976 |
| MDC Philadelphia | | 13,987,100 | 14,767,681 | 14,824,834 | 14,698,224 |
| MDC Offsite | | 45,472,538 | 43,699,590 | 38,289,381 | 38,328,389 |
| Patterson | ** | 67,034,864 | 62,811,206 | 63,646,625 | 64,006,009 |
| COI | ** | 83,654,828 | 81,522,460 | 79,964,954 | 79,864,955 |
| WDC Harlingen | | 10,246,668 | 10,231,941 | 10,232,529 | 10,232,201 |
| WDC Offsite | | 5,273,143 | 735,530 | 244,122 | 216,606 |
| SBI | | 3,401,955 | 2,065,052 | - | - |
| **Total BPI US** | | **$ 404,360,079** | **$ 371,083,708** | **$ 371,725,919** | **$ 375,238,760** |
| **Memo - Evolution Facilities** | ** | **$ 303,980,231** | **$ 286,222,762** | **$ 294,750,117** | **$ 296,662,364** |

42. As reflected in these reports, the aggregate value of the WDC and MDC inventory, the applicable inventory when setting the Collateral Maintenance Threshold, exceeded the agreed threshold (i.e. $335 million) at all times and remains in excess of $375 million.

*D. The Debtor's Proposal to Sell Evolution's Collateral*

43. I believe that these cases are at a cross roads. The Debtors believe that all parties will benefit if the Debtors continue operating in the ordinary course for a limited period while a value-maximizing sale process is pursued. I believe the alternative is a value destructive forced liquidation. To pursue the value-maximizing alternative, the Debtors will need to continue to sell inventory claimed to be collateral, in this case by, for example, Evolution. My team and I have undertaken an extensive analysis to determine the impact on Evolution (assuming it has a valid first lien on the inventory located at the Evolution Locations) if the Debtors continue to operate

[3] Debtors are also attaching the January 2, 2025 report as **Exhibit S** for reference.

the business over the coming six to eight weeks compared to a near-term liquidation. As part of that analysis, we analyzed current and forecasted inventory levels at the Evolution Locations as part of a going-concern while the sale process is pursued. During that period, inventory will be sold to customers at much higher prices than in a forced or rushed liquidation scenario, and work-in-process inventory (WIP) will be completed and sold in the same manner, as will inventory in-transit. Even if the proceeds of such sales are used to fund the ongoing business, A&M's analysis shows higher recoveries related to the purported Evolution collateral under the value-maximizing sale process than under a forced liquidation, which would likely result from the Debtors not having access to the collateral. That benefit holds notwithstanding that there could be a diminution in the gross book value of inventory between now and eight weeks hence and even assuming an orderly liquidation is necessary at that point.

44. I thus understand that the Debtors propose to preserve the value of the inventory by (1) selling the inventory that includes Evolution's purported collateral in the ordinary course of business and (2) simultaneously pursuing a wider sale process that could include a market sale of, among other things, Evolution's asserted collateral.

45. I also understand that Evolution has demanded that the Debtors immediately cease selling any of Evolution's purported collateral. Based on my analysis described above and understanding of the Debtors' business, Evolution's request is not reasonable. Even a short pause in use of the collateral would have dramatic negative impacts on the Debtors' estates and the value of Evolution's purported collateral. If forced to stop selling the inventory at the Evolution Locations, it would disrupt the Debtors' ability to continue with sales from BPI. I believe that, in the event of such a disruption, customers would likely seek alternative suppliers in the near term, devaluing the BPI inventory collateral. Accordingly, even if the Debtors were later granted

continued access to the inventory, they would be unable to monetize that inventory at comparable rates. As a result, the same inventory that constitutes Evolution's purported collateral would immediately suffer a material diminution in value if Evolution's request were granted.

46. Granting Evolution's demand would leave the Debtors, the ABL Lenders and Term Loan Lenders, and even Evolution itself materially worse off. The inventory comprising Evolution's purported collateral yields its greatest value when sold by the Debtors in the ordinary course of business or in an orderly wind-down or orderly liquidation process. If the Debtors are prevented from selling that inventory in the ordinary course, they would likely be forced to pursue an immediate forced liquidation of the collateral. Based on my experience, inventory sold through forced liquidation channels realizes values that are materially lower than those achieved through ordinary-course operations.

47. Additionally, as discussed above, based on our analysis to date, even if Evolution holds a valid lien against the Disputed Collateral, I believe that the ABL Lenders and Term Loan Lenders hold senior liens on such inventory. Under these circumstances, Evolution's request that the Debtors cease selling Evolution's purported collateral threatens to erase the value of inventory that is likely subject to first-priority liens of the ABL Lenders and second-priority liens of the Term Loan Lenders, with Evolution holding (at best) third-priority liens on such inventory. In contrast, I believe the Debtors' proposal to maximize the value generated from Evolution's asserted collateral for the benefit of whichever party is ultimately deemed to have a senior interest.

48. The Debtors' ability to utilize inventory and to sell it in the ordinary course of business is also critical to preserving the value of the Debtors' estates. The Debtors' proposal to continue selling the inventory is aimed at maximizing the value of the inventory to create the largest possible cash pool for whichever party is deemed to have a senior interest in the collateral.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: January 11, 2026
Birmingham, Michigan

*/s/ Daniel Jerneycic*
Daniel Jerneycic, Managing Director
Alvarez & Marsal North America LLC