EXHIBIT 31

*Order Extending Wind Down Order to Chapter 7 Trustee and Related Relief [Docket No. 61]*

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
July 09, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| PATTERSON INVENTORY, LLC, et. al.[1] | § | Case No. 25-90392 (CML) |
| | § | |
| Debtor. | § | Chapter 7 |
| | § | (Jointly Administered) |

**ORDER EXTENDING WIND DOWN ORDER TO
CHAPTER 7 TRUSTEE AND RELATED RELIEF**
(Relates to Docket No. 51)

The Court considered the *Emergency Motion Extending Authority Granted to Chapter 11 Debtors in Wind Down Order Entered in Chapter 11 Cases to Chapter 7 Trustee in Chapter 7 Cases* (the "Motion")[2] filed by Ronald J. Sommers, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estates of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC (collectively, the "Converted Debtors"). The Court finds that (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(a),(c),(k),(m) and (o); (iii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) due and proper notice of the Motion has been given and that no other or further notice need be provided; (v) emergency consideration of the Motion was warranted; (vi) the Trustee has exercised reasonable business judgment in seeking the relief set forth in the Motion; (vii) the relief requested in the Motion is consistent with the Trustee's exercise of his duties; (viii) the Trustee has demonstrated that good cause exists under 11 U.S.C. §§ 105, 348, 363, and 554 to grant the relief requested in the Motion; and (ix) it is in the best

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number, are: Patterson Inventory, LLC (2872) (Case No. 25-90392); Patterson Inventory Holdings, LLC (0079) (Case No. 25-90393); Starlight Inventory I, LLC (6698) (Case No. 25-90394); and Starlight Inventory Holdings I, LLC (6472) (Case No. 25-90395). The Debtors' mailing address is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Any terms not defined herein shall have the same meaning as in the Motion.

interests of the estates of the Converted Debtors to grant the relief requested in the Motion. It is therefore

**ORDERED that:**

1. The Motion is GRANTED for the reasons stated on the record at the hearing held on July 9, 2026.

2. The authority granted to the Chapter 11 Debtors in the Wind Down Order (attached hereto as **Exhibit A**) is extended to the Trustee in these jointly administered Chapter 7 Cases.

3. The Trustee is authorized to take all steps necessary to effectuate the transactions contemplated by the Wind Down Order, including execution of documents necessary to effectuate the transfer or disposition of any Wind Down Assets.

4. The Trustee is authorized without further order to pay any reasonable, necessary and customary costs of sale or fees, including but not limited to any compensation due to consultants retained by the Trustee to assist in the sale of Wind Down Assets (consistent with the terms of any employment order entered by this Court) from property of the Converted Debtors' estates and/or by agreement from sales proceeds

5. Notwithstanding any dispute over ownership or lien rights with respect to Wind Down Assets, the Chapter 11 Debtors remain authorized to compensate Hilco from the proceeds of any sale transaction pursuant to its Consulting Agreement and the Wind Down Order and to treat Net Proceeds and Gross Proceeds (each as defined in the Wind Down Order) in a manner consistent with the Wind Down Order.

6. The Trustee is authorized to waive any surcharge rights to the extent of the Trustee's interest in property of the estate pursuant to sections 506(c) and/or 552 of the Bankruptcy Code with respect to the sale of any Wind Down Assets.

Signed: July 09, 2026

Christopher Lopez
United States Bankruptcy Judge

# EXHIBIT A

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
April 16, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**ORDER PURSUANT TO SECTION 363**
**OF THE BANKRUPTCY CODE (I) APPROVING AND**
**AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM**
**UNDER THE CONSULTING AGREEMENT; (II) AUTHORIZING**
**THE SALE OF WIND DOWN ASSETS FREE AND CLEAR OF ALL**
**LIENS, CLAIMS, AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

Upon the emergency motion (the "**Motion**")[2] of First Brands Group, LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order (this "**Order**"), pursuant to sections 105(a), 363, and 554 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Bankruptcy Local Rules 1075-1 and 9013-1, (a) authorizing the Debtors to enter into and perform under the Consulting Agreement, attached hereto as **Exhibit 1**, and the Debtors' engagement of the Consultant to serve as the Debtors' exclusive agent with respect to the Inventory Services, the Receivables Services, and the Advisory Services; (b) approving the sale and/or abandonment of certain Wind Down Assets; (c) waiving any otherwise applicable Liquidation Sale Laws and approving the Side Letters (as defined below) related to such proposed waivers; (d) authorizing the sale or disposition of the Wind Down Assets free and clear of all liens, claims, encumbrances,

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

and other interests (collectively, "**Encumbrances**"); and (e) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction and authority to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon any hearing held on the Motion; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A. The Debtors' decision to enter into, perform under, and make payments required by the Consulting Agreement, a copy of which is attached hereto as **Exhibit 1**, is a reasonable exercise of the Debtors' sound business judgment, consistent with their fiduciary duties, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

B. The Consulting Agreement, and the consideration to be paid thereunder, was negotiated, proposed, and entered into by the Consultant and the Debtors without collusion, in good faith, and from arm's-length bargaining positions. The terms and conditions set forth in the

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Consulting Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying or defrauding the Debtors or their creditors under any applicable laws.

C. The Wind Down will provide an efficient means for the Debtors to liquidate and dispose of the Wind Down Assets as quickly and effectively as possible, and is in the best interests of the Debtors' estates.

D. The Debtors and the Consultant are authorized to sell, abandon, or monetize the Wind Down Assets;[4] *provided*, that absent the prior written consent (email being sufficient) of the Ad Hoc Group, (i) DIP Collateral (other than ABL Priority Collateral), regardless of whether the validity of the DIP Secured Parties' security interest and/or the Debtors' ownership thereof is disputed, shall not constitute "Wind Down Assets" as that term is used in this Order; (ii) the Debtors and Consultant shall not sell DIP Collateral (other than ABL Priority Collateral), regardless of whether the validity of the DIP Secured Parties' security interest and/or the Debtors' ownership thereof is disputed; and (iii) this Order shall not apply to or be construed to modify the DIP Collateral (other than ABL Priority Collateral), regardless of whether the validity of the DIP Secured Parties' security interest and/or the Debtors' ownership thereof is disputed. For the avoidance of doubt, absent prior written consent from Onset or further order of this Court, this Order shall not authorize the Debtors to sell any equipment in which Onset asserts an interest ("**Onset Equipment**").[5]

---

4 Wind Down Assets shall not include, and this Order does not authorize any compromise or disposition of, causes of action belonging to the estate of any Debtor.

5 Solely with respect to any Property described in the Schedule (each as defined in the *Emergency Motion to Recognize Interests under and to Enforce Stipulation and Order, and/or to Compel Performance under Equipment Lease, and/or for Adequate Protection, and for Relief from the Automatic Stay* [Docket No. 1702]), "Onset" as used in this Order shall also refer to Planters Bank.

E. The Debtors and the Consultant are authorized to sell the Wind Down Assets free and clear of all Encumbrances as provided for herein because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code have been satisfied. Those holders of any such Encumbrances on Wind Down Assets who did not object, or who withdrew their objections, to the entry of this Order are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of any such Encumbrances on Wind Down Assets who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having such Encumbrances attach to the Debtors' share of proceeds from the sale of the applicable Wind Down Assets with the same validity and priority and to the same extent and amount that any such Encumbrances had with respect to such Wind Down Assets.

F. The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

G. The Consultant is not an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling shareholders exists between the Consultant and the Debtors.

H. Purchasers of the Wind Down Assets are presumed to have acted in good faith and are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with such Wind Down sales.

I. The entry of this Order is in the best interests of the Debtors and their estates, creditors, and all other parties in interest herein.

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as provided herein.

2. All objections to entry of this Order, to the extent not withdrawn or settled, are overruled.

3. In the event of any conflict between this Order and the Consulting Agreement, this Order shall control.

4. Notwithstanding Bankruptcy Rule 6004(h), this Order shall take effect immediately upon its entry.

5. The Debtors are authorized, but not directed, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct the Wind Down at the Locations in accordance with this Order and the Consulting Agreement.

6. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

**I. Authority to Enter into and Perform under the Consulting Agreement**

7. Subject to the terms of this Order, the Debtors are authorized to enter into and perform under the Consulting Agreement, including making payments to the Consultant required under the Consulting Agreement (including, without limitation, payment of the Inventory Fee, Receivables Fee, and Monthly Fee), reimbursements of the Expenses, and, subject to the provisions contained herein, payments of indemnification amounts (if any, with such payments requiring prior Court approval after notice and a hearing), in each case, as required by the Consulting Agreement. Further, Hilco shall not be required to maintain time records or file monthly, interim, or final fee applications, except as provided herein.

8. Consultant's Inventory Fee and Receivables Fee shall be payable from the Net Proceeds or Gross Proceeds, as applicable, generated from the sale of Inventory and/or collection of Receivables and the Consultant may, without further order of the Court, withhold such fees

from Net Proceeds or Gross Proceeds, as applicable, in each case, without adherence to any weekly, monthly or aggregate limitation in a DIP financing or cash collateral budget entered in connection with these chapter 11 cases. Expenses shall be reimbursable and payable from the Net Proceeds or Gross Proceeds of the Wind Down, as applicable, subject to the terms of the Consulting Agreement, and the Consultant may, without further order of the Court, withhold such Expenses from Net Proceeds or Gross Proceeds, as applicable. The Monthly Fee shall be due and payable in advance upon the first business day of each calendar month, except with respect to the first Monthly Fee, which shall be due and payable upon execution of the Consulting Agreement.

9. Notwithstanding the foregoing, the Consultant may also, without further order of the Court, withhold the Monthly Fee from Net Proceeds or Gross Proceeds, as applicable, generated from the sale of Inventory or collection of Receivables without adherence to any weekly, monthly or aggregate limitation in a DIP financing or cash collateral budget entered in connection with these chapter 11 cases. All Fees and Expenses payable to Hilco under the Consulting Agreement and this Order shall be free and clear of any Encumbrances.

10. To the extent any Net Proceeds or Gross Proceeds, as applicable, are deposited in an account outside of the custody or control of the Debtors, that third-party (including the Debtors' lenders) with custody or control over such account shall, within two (2) business days, remit the Inventory Fee, Receivables Fee, and Monthly Fee (as applicable) to the Debtors for payment to the Consultant. For the avoidance of doubt, any Inventory Fee or Receivables Fee payable to the Consultant may be paid only from Net Proceeds or Gross Proceeds, as applicable, of the particular Wind Down Sale from which such Net Proceeds or Gross Proceeds, as applicable, arose.

11. Subject to the terms of this Order, the Debtors and the Consultant hereby are authorized to take any and all actions as may be reasonably necessary to implement the Consulting

Agreement and Wind Down; and each of the transactions contemplated by the Consulting Agreement, and any actions taken by the Debtors and the Consultant reasonably necessary to implement the Consulting Agreement and/or the Wind Down prior to the date of this Order, hereby are approved and ratified.

12. Subject to the terms of this Order, the Debtors and the Consultant are authorized to either (i) amend the Consulting Agreement or (ii) enter into additional agreements consistent with, and subject to, this Order, without further order of the Court, in each case, subject to the Debtors providing the proposed amended Consulting Agreement or additional agreement by email to counsel to the Amendment Notice Parties, *provided*, that no amendment or additional agreement shall modify the rights of the Ad Hoc Group, the ABL Lenders, or Onset under this Order without the prior written consent (email being sufficient) of the Ad Hoc Group, the ABL Lenders, or Onset, as applicable; *provided, further*, that any such proposed amendment or additional agreement which seeks to add any Inventory subject to any Asserted SPV Interests by the Aequum Secured Parties, the Carnaby II and III Secured Parties, Evolution, or the UMB Lenders shall require the consent of such affected party, as applicable, or further Court order. If the Debtors and the Consultant desire to amend the Consulting Agreement as to, or enter into an additional agreement which affects, the Consultant's Fees and Expenses, the Debtors shall provide the proposed amended Consulting Agreement or such additional agreement by email to counsel to the Amendment Notice Parties, and each of the Amendment Notice Parties shall have two (2) business days to object to such proposed amendment to the Consulting Agreement or additional agreement (the "**Amendment Objection Period**") by email to counsel to the Debtors. If no Amendment Notice Party objects to such proposed amendment or additional agreement received during the Amendment Objection Period, such proposed amendment or additional agreement shall become

immediately effective without further action of the Court; *provided*, that any such proposed amendment or additional agreement which seeks to add any Inventory subject to any Asserted SPV Interests by the Aequum Secured Parties, the Carnaby II and III Secured Parties, Evolution, or the UMB Lenders shall require the consent of such affected party, as applicable, or further Court order. If any Amendment Notice Party objects to such proposed amendment or additional agreement during the Objection Period pursuant to this paragraph, and such objection (a "**Modification Objection**") cannot be resolved consensually, the Debtors and the Consultant shall not execute such modification of the Consulting Agreement or such additional agreement absent a further order of the Court approving the modification or additional agreement. Any Modification Objection that cannot be consensually resolved may, subject to the Court's availability, be scheduled for a hearing within five (5) business days of the Debtors' request for such hearing.

13. Notwithstanding anything to the contrary in the Consulting Agreement, including in Section N.1 thereof, the Debtors and their estates shall not indemnify the Consultant for any damages arising out of the Consultant's fraud, willful misconduct, gross negligence, violation of this Order, or material breach of the Consulting Agreement by the Consultant.

14. No later than ten (10) business days after the entry of this Order, the Consultant shall file a declaration (the "**Consultant Declaration**") disclosing any connections to the Debtors, their creditors, and other parties in interest in these chapter 11 cases.

15. If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in any of these chapter 11 cases (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing any of these chapter 11 cases, the Consultant believes that it is entitled to the payment of any amounts by any of the Debtors on account of such Debtor's indemnification, contribution, and/or reimbursement obligations under the Consulting Agreement

(as modified by this Order), including the advancement of defense costs, the Consultant must file an application with the Court seeking relief from such Debtor for whom its services were provided, and such Debtor may not pay any such amounts to the Consultant before the entry of an order of the Court approving such payment. The liability, if any, of the Debtors to the Consultant under the Consulting Agreement shall be several and not joint and no Debtor shall have any liability to the Consultant or under the Consulting Agreement unless and except to the extent that such Debtor is the direct recipient of the Consultant's services.

## II. Conduct of the Wind Down

16. Subject to the terms of this Order, the Debtors and Consultant are hereby authorized to take such actions as may be reasonably necessary to implement the Consulting Agreement and to conduct the Wind Down without necessity of further order of the Court as provided in the Consulting Agreement.

17. All entities that are presently in possession of some or all of the Wind Down Assets that constitute Inventory or other tangible personal property (collectively, the "**Personal Property**"), are hereby directed to surrender possession of such Personal Property to the Debtors or the Consultant.

18. Nothing herein shall either impair the rights or alter the obligations of any parties (i) under sections 542(b) or 553 of the Bankruptcy Code or (ii) under any applicable contract or other applicable non-bankruptcy law regarding any Factored Receivables or Non-Factored Receivables (each as defined in the Factoring Procedures Motion),[6] including, without limitation, common law or other rights of recoupment or setoff, if any. To the extent that any Gross Proceeds

---

[6] "**Factoring Procedures Motion**" means the *Motion of Debtors for Order (I) Establishing Third-Party Factoring Procedures for (A) the Review and Reconciliation of the Debtors' Receipts, and (B) the Release of Funds to the Debtors' Estates and the Third-Party Factors; (II) Authorizing Customers to Remit Receivables Without Liability; and (III) Granting Related Relief* [Docket No. 807].

on account of prepetition Receivables are collected by the Consultant, then, in accordance with the Cash Management Order,[7] all such Gross Proceeds shall be transferred directly into the Factored Receivables Account (as defined in the Cash Management Order).

19. Subject to the terms of this Order, pursuant to section 363(f) of the Bankruptcy Code, the Consultant, on behalf of the Debtors, is authorized to sell the Wind Down Assets, and all sales of the Wind Down Assets, whether by the Consultant or the Debtors, shall be free and clear of any and all Encumbrances, whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which these chapter 11 cases were commenced; *provided*, *however*, that any such Encumbrances shall attach solely to the Net Proceeds or Gross Proceeds, as applicable, of the sale of the Wind Down Assets (net of the Consultant's Fees and Expenses) with the same validity, in the amount, with the same priority as, and to the same extent that any such Encumbrances have with respect to the Wind Down Assets. For the avoidance of doubt, the Consultant is granted power of attorney with respect to the Wind Down Assets and the Consultant and the Debtors are hereby authorized to execute and file statements, instruments, releases of any Encumbrances and other documents on behalf of the person or entity asserting the same in any required jurisdiction and the Debtors and the Consultant are authorized to file a copy of this Order which, upon filing, shall be conclusive evidence of the release and termination of such interest. Each and every federal, state, and local Governmental Unit (as defined in Bankruptcy Code section 101(27)) is hereby directed to accept any and all documents and instruments necessary or appropriate to give effect to the Wind Down.

[7] "**Cash Management Order**" means the *Final Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System and Bank Accounts, (B) Implement Ordinary Course Changes to Cash Management System, and (C) Honor Certain Related Prepetition Obligations, (II) Granting Administrative Expense Priority for Postpetition Intercompany Claims, (III) Extending Time to Comply with Requirements of 11 U.S.C. § 345(b), and (IV) Granting Related Relief* [Docket No. 604].

20. All newspapers and other advertising media in which the Wind Down may be advertised, and all parties with interests in the Wind Down Assets, are directed to accept this Order as binding authority so as to authorize the Debtors and the Consultant to conduct the Wind Down pursuant to this Order and the Consulting Agreement, including, without limitation, to conduct and advertise the sale of the Wind Down Assets in the manner contemplated by and in accordance with this Order and the Consulting Agreement.

21. Nothing nullifies or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order. Nothing contained in this Order shall in any way (a) diminish the obligation of any entity to comply with environmental laws, or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Nothing herein shall be construed to be a determination that the Consultant is an operator with respect to any environmental law or regulation. Moreover, the sale of the Wind Down Assets shall not be exempt from, and the Debtors and the Consultant shall be required to comply with, laws and regulations of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**"). Nothing in this Order shall alter or affect the Debtors' and the Consultant's obligations to comply with all applicable federal safety laws and regulations. Nothing in this Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' or the Consultant's respective

rights to assert in that forum or before this Court that any such laws are not, in fact, General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order, or otherwise. Notwithstanding any other provision in this Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Order shall be deemed to have made any rulings on any such issues.

22. The Debtors and/or the Consultant (as the case may be) are authorized and empowered to transfer Wind Down Assets among the Locations; *provided*, that, prior to moving any Wind Down Assets among the Locations, the Debtors shall implement a reasonable protocol to track the movement of such Wind Down Assets and shall provide reasonable reporting regarding the movement of such Wind Down Assets upon request of a party asserting an interest in such assets; *provided, further*, that, if any such Wind Down Assets are moved out of any Location, the Net Proceeds received from such moved Wind Down Assets shall, as to the landlords for such Locations (the "**Landlords**"), first be made available for payment of any past-due amounts owed by the Debtors on account of postpetition rent, taxes, utilities, or other occupancy expenses for a particular Location (the "**Location Expenses**"); *provided, further, however*, that the Debtors and/or the Consultant (as the case may be) shall be prohibited from moving hazardous materials from one Location to another Location absent the consent of the applicable Landlord.

23. The Debtors and the Consultant are hereby authorized to take such actions as may be necessary and appropriate to implement the Consulting Agreement and to conduct the Wind Down without the need for a further order of this Court, in accordance with this Order and the Consulting Agreement.

24. Other than as required pursuant to the terms of this Order, neither the Debtors nor the Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third-party to conduct the Wind Down and to take the related actions authorized herein. Except with respect to any Governmental Unit (as to which paragraphs 21, 23, and 44 of this Order shall apply), no person or entity shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder the continuation of the Wind Down or the sale of the Wind Down Assets, or the advertising and promotion of such sales, and all such parties and persons of every nature and description are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Wind Down and/or (ii) instituting any action or proceeding in any court (other than in this Court) or administrative body seeking an order or judgment against, among others, the Debtors, the Consultant, or the Landlords that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the Wind Down or the sale of the Wind Down Assets, including the Consultant's performance of the Services, and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein; *provided, however*, that, subject to section 362 of the Bankruptcy Code, nothing herein shall prevent Landlords from enforcing any rights and remedies under their applicable leases while in effect in accordance with the terms of such leases and section 365(d)(4) of the Bankruptcy Code. Nothing in this Order shall affect (a) any party's rights to seek relief in this Court or (b) *Onset Financial Inc.'s Emergency Motion (1) for Relief from the Automatic Stay, and (2) to Enforce the Onset AP Order* [Docket No. 2015].

25. At least two (2) days prior to consummating any Wind Down Sale (the "**Notice Period**"), the Debtors shall serve a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties.[8]

26. Each Wind Down Sale Notice shall (i) identify the Wind Down Assets being sold, transferred, or otherwise disposed of (including the business unit and legal entity with which the Wind Down Assets are associated), (ii) identify the purchaser of the assets, (iii) state the purchase price, (iv) indicate whether the Wind Down Assets being sold constitute Overlapping Collateral, and (v) include any other significant terms of the Wind Down Sale. If any Wind Down Sale Notice Party objects to the proposed Wind Down Sale before the end of the Notice Period, then such Wind Down Sale will not proceed until any issues raised by the Wind Down Sale Notice Parties have been consensually addressed or have been addressed by further order of this Court.

27. Any contrary provision hereof notwithstanding, no Inventory or Receivables that are Aequum Collateral, Carnaby II and III Collateral, Holdings Collateral, Evolution Collateral, or Global Assets Collateral shall be sold without the consent of such affected party, as applicable, or further Court order.[9]

28. Any Wind Down Sales of the Wind Down Assets to insiders (as defined in the Bankruptcy Code) are prohibited.

29. Unless otherwise agreed by the Debtors, all sales of Wind Down Assets if any, shall be "as is" and final. However, all state and federal laws relating to implied warranties for latent

[8] In addition to those parties listed in the Motion, the following parties shall be considered Wind Down Sale Notice Parties: (i) the Third-Party Factors with respect to any potential Wind Down Sale of prepetition Receivables and (ii) the Landlord for the applicable Location with respect to any potential Wind Down Sale of Inventory.

[9] For the avoidance of doubt, pursuant to the Wind Down Sale Notice, if any Wind Down Sale Notice Party objects to the proposed Wind Down Sale before the end of the Notice Period, then such Wind Down Sale will not proceed until any issues raised by the Wind Down Sale Notice Parties have been consensually addressed or have been addressed by further order of this Court.

defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

30. Nothing in this Order or the Consulting Agreement, and none of the Consultant's actions taken in respect of the Wind Down shall be deemed to constitute an assumption by the Consultant of any of the Debtors' obligations relating to any of the Debtors' employees. Moreover, the Consultant shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

31. The Consultant shall not be liable for sales taxes except as otherwise expressly provided in the Consulting Agreement. Including pursuant to section 506(c) of the Bankruptcy Code, the Debtors may withhold and remit sales, transfer, or similar taxes arising from the sale or disposition of Wind Down Assets hereunder from any Net Proceeds or Gross Proceeds, as applicable; *provided*, that the Debtors reserve all rights to assert any surcharge claims pursuant to section 506(c) of the Bankruptcy Code with respect to any Net Proceeds or Gross Proceeds, as applicable, deposited into the SPV-ABL Wind Down Account or the SPV-DIP Wind Down Account, and all defenses to such claims are preserved. This Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

32. To the extent that the Debtors propose to sell Wind Down Assets that may contain any personal and/or confidential information about the Debtors' employees and/or customers (the "**Confidential Information**"), the Debtors and the Consultant shall use commercially reasonable efforts to remove all such Confidential Information from such Wind Down Assets before they are sold.

33. During the Term, the Consultant shall be granted a limited license and right to use the trade names, logos, e-mail lists, mailing lists, customer lists, and e-commerce sites (including, without limitation, websites and social media sites) solely for the purpose of advertising the Wind Down in accordance with the terms of the Consulting Agreement and this Order.

34. At the earlier of (i) the conclusion of the Wind Down at each Location (the "**Termination Date**") or (ii) the rejection of the applicable lease for each Location, the Consultant shall vacate such Location; *provided*, that Consultant is hereby authorized to sell the Debtors' Wind Down Assets and abandon Wind Down Assets that are property of a Debtor and deemed "Burdensome Property" not sold or otherwise disposed of in the Wind Down of such Location, without cost or liability of any kind to the Consultant. The Debtors will have the option to remove the Burdensome Property prior to the Termination Date. Consultant shall not be responsible for the removal or disposition of any hazardous materials or substances.

35. Notwithstanding anything to the contrary in this Order or the Consulting Agreement, the Debtors and the Consultant shall not sell or abandon any property that is not owned by a Debtor and, for any property not owned by a Debtor that is located in property leased by the Debtors, the Debtors or any successors-in-interest to the Debtors, as applicable, will work in good faith with the owner of any such property to arrange for the return of the property to the owner and the Debtors shall not be responsible for the removal and/or costs of removal of such property; *provided*, that the Debtors and the Consultant may abandon property owned by the applicable Landlord in accordance with the terms of this Order; *provided, further*, that the Debtors shall not abandon any property in which a party has an Asserted Interest without providing advance written notice to such party; *provided, further*, that, with respect to any Burdensome Property or hazardous materials or substances, nothing herein shall relieve the Debtors of their obligations under the

*Order (I) Approving Procedures to (A) Assume or Assume and Assign or (B) Reject, Unexpired Leases and Executory Contracts, (II) Approving Abandonment of Property in Connection with Rejection of Unexpired Leases, and (III) Granting Related Relief* [Docket No. 1244].

36. Notwithstanding this or any other provision of this Order, nothing shall prevent or be construed to prevent the Consultant (individually, as part of a joint venture, or otherwise) or any of its affiliates from bidding on the Debtors' assets not subject to the Consulting Agreement, pursuant to a consulting agreement, or otherwise.

37. With respect to any Wind Down Assets sold pursuant to this Order that are subject to any Asserted SPV Interests and any Asserted ABL Priority Collateral Interests, the Net Proceeds or Gross Proceeds, as applicable, of the sale of such assets, net of (i) Fees and Expenses, (ii) sales, transfer, or similar taxes, and (iii) any other applicable surcharges, including pursuant to section 506(c) of the Bankruptcy Code, as determined by further order of this Court or by agreement between the Debtors and the applicable secured lender(s), shall be deposited into the SPV-ABL Wind Down Account; *provided*, that the Debtors reserve all rights to assert any surcharge claims pursuant to section 506(c) of the Bankruptcy Code with respect to any Net Proceeds or Gross Proceeds, as applicable, and all defenses to such claims are preserved. The Asserted SPV Interests and Asserted ABL Priority Collateral Interests of any holder shall attach to the funds in the SPV-ABL Wind Down Account to the same extent and with the same priority as the holders now have against such Wind Down Assets. All parties' rights to object to the priority, validity, amount, and extent of the Asserted SPV Interests and Asserted ABL Priority Collateral Interests asserted by any holder are fully preserved. Funds in the SPV-ABL Wind Down Account may not be distributed without further Court order.

38. With respect to any Wind Down Assets sold pursuant to this Order that are subject to any Asserted SPV Interests and any Asserted DIP Collateral Interests, the Net Proceeds or Gross Proceeds, as applicable, of the sale of such assets, net of (i) Fees and Expenses and (ii) any other applicable surcharges, including pursuant to section 506(c) of the Bankruptcy Code, as determined by further order of this Court or by agreement between the Debtors and the applicable secured lender(s), shall be deposited into the SPV-DIP Wind Down Account; *provided*, that the Debtors reserve all rights to assert any surcharge claims pursuant to section 506(c) of the Bankruptcy Code with respect to any Net Proceeds or Gross Proceeds, as applicable, and all defenses to such claims are preserved. The Asserted SPV Interests and Asserted DIP Collateral Interests of any holder shall attach to the funds in the SPV-DIP Wind Down Account to the same extent and with the same priority as the holders now have against such Wind Down Assets. All parties' rights to object to the priority, validity, amount, and extent of the Asserted SPV Interests and Asserted DIP Collateral Interests asserted by any holder are fully preserved. Funds in the SPV-DIP Wind Down Account may not be distributed without further Court order.

39. With respect to any Wind Down Assets sold pursuant to this Order that are undisputed DIP Collateral (other than ABL Priority Collateral), the Net Proceeds or Gross Proceeds, as applicable, of the sale of such assets, net of Fees and Expenses, shall be deposited into the Escrow Account. The interests of the DIP Secured Parties shall attached to the funds in the Escrow Account to the same extent and with the same priority as the DIP Secured Parties now have against such Wind Down Assets. Other than in connection with payment of Fees and Expenses pursuant to the terms of this Order, funds in the Escrow Account may not be distributed without the prior written consent of the Ad Hoc Group (email being sufficient) or further Court order.

40. Notwithstanding anything to the contrary in this Order, any Net Proceeds deposited into the SPV-ABL Wind Down Account or the SPV-DIP Wind Down Account pursuant to paragraphs 37 and 38 of this Order, as applicable, shall be made available for payment of any Location Expenses with respect to a Wind Down Sale of Wind Down Assets at the applicable Location.

41. To the extent Hilco's Fees and Expenses are not already paid or are inadvertently deposited in any of the Wind Down Accounts, as applicable, the Debtors shall seek the release of the Fees and Expenses to the Consultant and, until such time, the Consultant shall be granted a first-priority security interest and lien upon the Net Proceeds or Gross Proceeds, as applicable, which security interest shall be deemed perfect upon entry of this Order without the requirement of filing financing statements or providing notifications to any prior secured parties.

42. Any Overlapping Collateral Sales with respect to Wind Down Assets shall require either (i) the consent of all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of such Wind Down Assets or (ii) further order of this Court. Any party asserting an Overlapping Collateral Interest shall receive a Wind Down Sale Notice as it pertains to such party's Overlapping Collateral Interest and shall have the benefit of the Notice Period prior to being asked to consent to such proposed Overlapping Collateral Sale.

43. Notwithstanding anything to the contrary in the Motion, the Consulting Agreement, or this Order, this Order shall not be expanded to impact, or otherwise permit the sale by the Consultant of, the property of Global Assets LLC ("**Global Assets US**") and Global Assets GmbH

(together with Global Assets US, the "**Global Assets SPVs**")[10] absent (i) further Court approval or (ii) the consent of the UMB Parties.[11]

44. Notwithstanding anything to the contrary provided in the Motion, the Consulting Agreement, or this Order, this Order does not authorize or permit any of the Debtors, the Consultant, or any other party to manage, market, sell, liquidate, or otherwise dispose of the Aequum Collateral, including with respect to the Inventory located at 3000 East Pioneer Pkwy, Ste. 190, Arlington, TX 76010, and nothing in this Order authorizes the use, sale, impairment, or other disposition of the Aequum Collateral. For the avoidance of doubt, the Aequum Collateral is expressly excluded from the scope of the Consulting Agreement and the services to be performed thereunder.

45. Notwithstanding anything to the contrary in the Motion, the Consulting Agreement, or this Order, this Order does not authorize or permit any of the Debtors, the Consultant, or any other party to (i) sell or use any assets over which the Carnaby II and III Secured Parties assert a security interest or (ii) consummate any sale (including any sale of intellectual property) or take any other action that would impede or prevent in any way the sale or use of any assets over which the Carnaby II and III Secured Parties assert a security interest, in each case (i) and (ii), absent the consent of the Carnaby II and III Secured Parties. Nothing in the Motion, the Consulting

---

[10] For the avoidance of doubt, the inventory of the Global Assets SPVs is located at (a) Partyzancka 66/72 Street, 95-200 Pabiance, Poland, (b) Philisstrasse 8, 52068 Aachen, Germany, and (c) 14225 W. Warren Ave., Dearborn, MI 48126.

[11] "**UMB Parties**" means UMB Bank, N.A., in its capacity as administrative agent for FB Pierogi LLC and the other financial institutions party thereto from time to time under a revolving credit facility to the Global Assets SPVs.

Agreement, or this Order shall impact or modify in any way the force and effect of the Carnaby II and III Secured Parties Interim AP Order.[12]

46. Notwithstanding anything to the contrary in the Motion, the Consulting Agreement, or this Order, the provisions of this Order relating to payment or withholding of Location Expenses (including those of paragraphs 22, 40, and 57 shall not apply with respect to any expenses incurred that relate in any way to Carnaby Inventory II, LLC or Carnaby Inventory III, LLC, or the collateral of the Carnaby II and III Secured Parties.

47. Notwithstanding anything to the contrary, nothing in this Order shall be construed to prime or subordinate any postpetition claims of Terra Worldwide Logistics, LLC d/b/a American Global Logistics ("**AGL**") or otherwise affect any right of AGL to assert a priority claim status or maritime lien with respect to any of its postpetition claims, which liens shall be unaltered by this Order with respect to all applicable postpetition amounts owed to AGL, and AGL's, the Debtors', the DIP Secured Parties', and the Prepetition Secured Parties' (as defined in the Final DIP Order) rights and remedies based on applicable non-bankruptcy law are explicitly preserved.

48. Before the Consultant or any buyer of Wind Down Assets shall dispose of any books and records that relate to the Debtors' prepetition Third-Party Factoring (as defined in the Factoring Procedures Motion), the Consultant or such buyer, as applicable, shall give at least ninety (90) days' prior written notice to the Third-Party Factors of its intention to dispose of such books and records, and if the Consultant or such buyer decline to do so in accordance herewith, the Third-Party Factors shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

12 "**Carnaby II and III Secured Parties Interim AP Order**" means the *Stipulation and Agreed Interim Order Regarding Adequate Protection Among Debtors and Carnaby Inventory II, LLC and Carnaby Inventory III, LLC* [Docket No. 230], as amended from time to time.

49. Within twenty (20) days following the consummation of all Wind Down Sales, Hilco shall prepare: (a) a summary report of the Wind Down process that will include the Net Proceeds and Gross Proceeds from the Wind Down Assets sold and the total receivables collected; and (b) a report showing payment of the Consultant's Fees and Expenses, setting forth detail and information regarding the calculation of such Fees and Expenses, if any, reimbursed to the Consultant; *provided*, *however*, that the foregoing shall not require the Debtors, their professionals, or the Consultant to prepare or undertake to prepare any additional or new reports not otherwise being prepared. The Debtors shall (on a confidential basis) provide such notice and report to the U.S. Trustee, the Creditors' Committee, the Ad Hoc Group, the ABL Lenders, and Onset.

## III. Wind Down of Additional Wind Down Assets

50. To the extent that the Debtors determine in their business judgment that winding down additional brands, business units, and/or asset classes, including, without limitation, intellectual property, machinery and equipment, and real estate, is warranted, the Debtors are authorized to either (i) amend or supplement the list of Wind Down Assets and/or amend Exhibits A and B of the Consulting Agreement or (ii) enter into additional agreements governed by this Order; *provided*, that no amendment or additional agreement shall modify the rights of the Ad Hoc Group, the ABL Lenders, or Onset under this Order without the prior written consent (email being sufficient) of the Ad Hoc Group, the ABL Lenders, or Onset, as applicable; *provided, further*, that any such proposed amendment or additional agreement which seeks to add any Inventory subject to any Asserted SPV Interests by the Aequum Secured Parties, the Carnaby II and III Secured Parties, Evolution, or the UMB Lenders shall require the consent of such affected party, as applicable, or further Court order; *provided, further*, absent prior written consent from Onset or further order of this Court, this Order shall not authorize the Debtors to sell any Onset

Equipment; *provided, further*, that (a) the Third-Party Factors shall be considered Amendment Notice Parties solely to the extent that any such proposed amendment or additional agreement seeks to add any prepetition Receivables on account of winding down additional brands, (b) the Landlords shall be considered an Amendment Notice Party solely to the extent that any such proposed amendment or additional agreement implicates any properties relating to a particular Landlord, and (c) the Brownsville Independent School District ("**Brownsville**") shall be considered an Amendment Notice Party solely to the extent that any such proposed amendment or additional agreement implicates any properties located in Brownsville. Upon such written consent, such additional assets shall be designated "Wind Down Assets" and the Wind Down thereof shall be conducted pursuant to the terms of this Order and the Consulting Agreement including with respect to the applicable party or parties asserting a senior security or ownership interest in the Wind Down Assets. For the avoidance of doubt, DIP Collateral (other than ABL Priority Collateral), regardless of whether the validity of the DIP Secured Parties' security interest and/or the Debtors' ownership of such DIP Collateral is disputed, shall not be sold or marketed unless and until such DIP Collateral (other than ABL Priority Collateral) has been designated as "Wind Down Assets" in accordance with this Order.

51. If any proposed amendment or agreement seeks to expand Hilco's scope to include additional legal entities, the Debtors shall file a notice on the Court's docket detailing the additional legal entities to be included as Wind Down Brands. If any party objects to such notice within seven (7) days, the Debtors shall not consummate such proposed amendment or agreement until such objection has been resolved with the consent of such objecting party or by further order of this Court.

## IV. Liquidation Sale Laws

52. Any Liquidation Sale Laws, including any federal, state or local statute, ordinance, rule, or licensing requirement directed at regulating "going out of business," "store closing," or similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and use of sign-walkers solely in connection with the sale of the Wind Down Assets, including ordinances establishing license or permit requirements, waiting periods, time limits, or bulk sale restrictions that would otherwise apply solely to the sale of the Wind Down Assets, are hereby waived.

## V. Miscellaneous Provisions

53. The Consultant and the Debtors are authorized to enter into agreements ("**Side Letters**") with applicable Landlords, licensors, service providers, utilities, other creditors, and other contract counterparties (each such party, a "**Side Letter Counterparty**") modifying the Consulting Agreement without further order of this Court, and such Side Letters shall be binding as among the Consultant and any such Side Letter Counterparty. Three (3) business days prior to entry into any Side Letter, counsel to the Debtors shall provide copies of any such Side Letter to the Wind Down Sale Notice Parties. In the event of any conflict between this Order and any Side Letter, the terms of such Side Letter shall control. In the event that a Wind Down Sale Notice Party objects to a Side Letter, such Side Letter shall not take effect unless otherwise agreed among the applicable Wind Down Sale Notice Parties or until approved by subsequent order of the Court.

54. The Consultant shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against the Consultant, in each case, other than as expressly provided for in the Consulting Agreement, as modified by this Order.

55. The Debtors and all other parties in interest reserve all rights to bring claims against the Aequum Secured Parties, the Carnaby II and III Secured Parties, Evolution, Onset, or the UMB

Lenders for necessary costs and expenses of preserving, disposing of, or liquidating property securing an allowed secured claim pursuant to section 506(c) of the Bankruptcy Code or the section 552 "equities of the case" exception. All such parties in interest reserve their rights to object to any such requests for surcharges to be applied pursuant to section 506(c) of the Bankruptcy Code or the section 552 "equities of the case" exception.

56. For the avoidance of doubt, nothing in this Order or in the Consulting Agreement shall relieve the Debtors, the Consultant, other applicable third-parties, such as contractors and moving companies, and the buyers with respect to Wind Down Sales, as applicable, of any obligation under section 365 of the Bankruptcy Code, including with respect to (i) if such lease has been rejected by the Debtors, including with respect to any party's right to utilize the premises of any Locations after the applicable lease has been rejected; (ii) any obligations under the Debtors' property insurance policies, including with respect to licensees and the maintenance of such policies in accordance with the applicable leases; (iii) any indemnification obligations of (a) the Debtors under such leases, including with respect to, among others, agents, employees, contractors, invitees, or licensees, and (b) the Consultant, other applicable third-parties, such as contractors and moving companies, and the buyers with respect to Wind Down Sales under their applicable insurance policies; and (iv) any damages that may be caused by the Debtors, the Consultant, or any party entering into any premises leased by the Debtors in connection with a Wind Down Sale, including any contractors, riggers, or other third-party vendors employed by any buyers to assist in the removal of certain purchased Wind Down Assets. The Landlords expressly reserve all rights with respect thereto.

57. Without modifying any of the Debtors' obligations to make rental payments in accordance with leases at the applicable Locations, and notwithstanding anything to the contrary

herein, to the extent that there are any Location Expenses that have not been paid by the Debtors in the ordinary course prior thereto, all such Location Expenses under the applicable leases for each of the Locations shall be paid using Net Proceeds from any Wind Down Sale occurring at such applicable Location; *provided, however*, that, to the extent any Location Expenses are advanced by any secured lenders, any such amounts shall be recouped from Net Proceeds after payment of the Consultant's Fees and Expenses but prior to distribution of Net Proceeds to the secured party ultimately entitled to receive such Net Proceeds. In the event that Wind Down Assets which constitute both DIP Collateral and ABL Priority Collateral are sold at such Locations, the allocation of such Net Proceeds shall either be determined by the Ad Hoc Group, the ABL Lenders, and, to the extent it is asserting an interest in such Wind Down Assets, Onset, or by further order of the Court, with any recoupment for Location Expenses to be effectuated in accordance with such allocation.

58. Until the earlier of (i) the Termination Date, (ii) the rejection of the applicable lease for each Location, or (iii) the expiration of the period within which the Debtors may assume or reject unexpired leases of nonresidential real property pursuant to section 365 of the Bankruptcy Code, the applicable Landlord, subject to any applicable Side Letter, shall not interfere with quiet use and occupancy of the applicable Location by Hilco and/or its designees; *provided*, that, for the avoidance of doubt, subject to section 362 of the Bankruptcy Code, the Landlords reserve the right to enforce any remedies they may have in accordance with section 365(d)(3) of the Bankruptcy Code for failure to pay the Location Expenses.

59. The Debtors have withdrawn their request for authority to sell any Wind Down Assets at the premises located at 3108 Highway 76 East, Marion, South Carolina 29751 (the "**Marion Facility**"), which is leased by Debtor Strongarm, LLC from ARC CGMARSC001,

LLC ("**ARC**"). Accordingly, no sale, liquidation, or other disposition of Wind Down Assets shall be conducted at the Marion Facility pursuant to the Consulting Agreement or otherwise. The Debtors, the Consultant, and their agents and representatives shall not utilize the Marion Facility for the storage, staging, advertising, or display of Inventory or Wind Down Assets in connection with any Wind Down Sale conducted at other Locations. Hilco is not granted a license to the Marion Facility pursuant to the terms of the Consulting Agreement or otherwise. Nothing in this Order shall be deemed to waive, limit, or otherwise prejudice ARC's rights and remedies under the lease, applicable law, or the Bankruptcy Code, all of which are expressly preserved.

60. Notwithstanding any provision to the contrary in this Order, the Consulting Agreement, or any other document related to the Wind Down, nothing shall:

(i) release, nullify, preclude or enjoin the enforcement of any police or regulatory power of, or any liability owed to, the United States that any entity would be subject to as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the date of entry of this Order;

(ii) affect the setoff or recoupment rights of the United States;

(iii) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(iv) authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers,

(q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "**Federal Interests**") (and excluding, for the avoidance of doubt, the Wind Down Assets) without compliance by the Debtors and any buyer of Wind Down Assets with all terms of the Federal Interests and with all applicable non-bankruptcy law;

(v) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests;

(vi) waive, alter or otherwise limit the United States' property rights except for claims and interests related to the Wind Down Assets; or

(vii) expand the scope of 11 U.S.C. § 525.

61. In the event of an inconsistency or conflict between any provision of the Consulting Agreement and any provision of this Order, as to the United States, the provisions of this Order and federal law shall govern.

62. Except with respect to Hilco and claims arising from the Consulting Agreement, nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors or the validity of any Asserted Interests in any property of the Debtors' estates, including the Wind Down Assets, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of

any claims or causes of action that may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any executory contract or unexpired lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve all of their rights with respect to the foregoing matters. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

63. This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Wind Down Assets.

64. This Order and the Consulting Agreement shall be binding in all respects upon all creditors (whether known or unknown) and interest holders of the Debtors, the Consultant, all non-Debtor parties to any real property leases for the Locations, the Creditors' Committee, all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons," or other fiduciaries appointed in the chapter 11 cases or upon a conversion of the Debtors' cases to cases under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee; and the Consulting Agreement shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order

and the rights granted to the Consultant hereunder shall remain effective and, notwithstanding such dismissal or conversion, shall remain binding on parties-in-interest.

65. The Court shall retain jurisdiction with regard to all issues or disputes relating to this Order and the Consulting Agreement, including, but not limited to, (a) any claim of the Debtors, the Landlords and/or the Consultant for protection from interference with the Wind Down; (b) any other disputes related to the Wind Down, and (c) protecting the Debtors and/or the Consultant against any assertions of any liens, claims, Encumbrances, and other interests. The Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

66. The Debtors are authorized and empowered to take all actions necessary or appropriate to effectuate the relief granted in this Order.

Signed: April 16, 2026

Christopher Lopez
United States Bankruptcy Judge

**Exhibit 1**

**Consulting Agreement**

*Execution Version*

**AMENDED AND RESTATED CONSULTING AND MARKETING SERVICES AGREEMENT**

This Amended and Restated Consulting and Marketing Services Agreement (this "Agreement") is dated March 13, 2026 and effective as of February 13, 2026 ("Effective Date") by and among Hilco Merchant Resources, LLC, Hilco Receivables, LLC, and Hilco Global Professional Services, LLC (collectively, "Hilco") and First Brands Group, LLC (together with its affiliates and subsidiaries, the "Company"). Hilco and the Company are each a "Party" and, together, the "Parties".

**Recitals:**

WHEREAS, Company is the owner of (i) inventory located at Company's owned and/or leased facilities, warehouses, distribution centers, and/or fulfillment centers identified on Exhibit A attached hereto (each a "Location", and collectively, the "Locations"), including, but not limited to, the inventory listed on Exhibit B attached hereto (the "Inventory") and (ii) outstanding trade accounts receivable for which Company has the exclusive right to collect (the "Receivables"), and seeks to engage Hilco to provide certain advisory, marketing, collection, and disposition services in connection therewith;

WHEREAS, Hilco is in the business of marketing and selling assets and collecting receivables on behalf of its clients and performing advisory services in connection therewith and is willing to serve as Company's exclusive agent to perform the services described herein; and

WHEREAS, this Agreement amends and restates in its entirety that certain Consulting and Marketing Services Agreement entered into as of February 13, 2026, by and among the Parties.

**Agreement:**

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and Hilco agree as follows:

**I. Exclusivity**. Company hereby appoints Hilco, and Hilco hereby agrees to serve, as Company's exclusive agent with respect to the Inventory Services, the Receivables Services, and the Advisory Services (each as defined herein and collectively, the "Services"). All communications and inquiries regarding the Services, the sale or other disposition of the Inventory, or collection of the Receivables, whether directed to Company, or their counsel, accountants, or other professionals, shall be redirected to Hilco.

**II. Term**. Hilco shall commence providing the Services on the Effective Date and shall continue for a period of six (6) months therefrom unless terminated in accordance with this Agreement (the "Term"); unless further extended by mutual written agreement of the Parties. Company acknowledges that Hilco or its affiliated entities may be engaged to sell or market similar assets or provide similar services by other persons or entities, and that any such engagement shall not constitute or be deemed to be a violation of this Agreement.

**III. Inventory Services**. With respect to the Inventory, Hilco and Company agree as follows:

A. Services. Hilco will perform the following services (collectively, the "Inventory Services"):

1. mutually agree with the Company with respect to a strategic plan to maximize the value of the Inventory (the "Strategy");

2. market the Inventory for sale on Company's behalf in accordance with the Strategy, negotiate the terms of sales of the Inventory in whole or in part and implement any such agreements reached with purchasers;

3. to the extent reasonably practicable and upon mutual written agreement of the Parties, provide supervisors ("Supervisors") and/or source additional labor personnel to assist with the marketing and sale of the Inventory;

4. Company and Hilco shall jointly establish pricing parameters for the sale of the Inventory within which Hilco shall be authorized to sell Inventory without Company's consent;

5. provide such other services as Company and Hilco may agree in writing to carry out the Inventory Services; and

6. collect all gross proceeds generated from the sale of Inventory on behalf of Company and remit such proceeds to Company (less any amounts due to Hilco hereunder on account of the Inventory Services).

B. Company Undertakings. During the Inventory sales, Company shall (collectively, the "Company Undertakings"):

1. be the employer of all Company employees (if any) and any additional labor personnel utilized to complete the sales and fulfillment of all Inventory and cause such persons to finish assembling Inventory to prepare for sale, package Inventory for sale, accurately fulfill all sale orders of Inventory, including (without limitation) picking, sorting, and packing the Inventory according to each sale order, preparing packing slips and bills of lading, loading the Inventory onto purchasers' trucks, and shipping the Inventory according to each sale order, all at no cost or expense to Hilco, and otherwise cooperate with Hilco in connection with the sale of the Inventory;

2. pay all taxes, costs, expenses, accounts payable, royalties, license fees, customs duties, applicable tariffs, and other amounts and liabilities relating to the Locations, Company employees, and additional labor personnel utilized by Company in connection with Company Undertakings (if any), the Inventory, and the sale of the Inventory;

3. execute all agreements, including but not limited to asset purchase agreements and purchase orders, determined by Company and Hilco to be necessary or desirable for the sale of the Inventory;

4. to the extent applicable, at the written direction of Hilco, Company agrees that it shall, at Company's sole cost and expense, deliver samples (as directed by Hilco) to various third-parties identified by Hilco;

5. ensure that Hilco, its employees, subcontractors, agents, and representatives have access to current real-time information regarding inventory availability and sales and any other information or documentation necessary for Hilco's performance of the Inventory Services and obligations under this Agreement, including access to Company employees and systems to confirm invoicing;

6. provide central administrative services necessary for the sale of the Inventory, including (without limitation), sales audit, accounting, and payroll processing for Company employees, real time Inventory tracking, sales and availability, handling, fulfillment, and shipping, and copies of all invoices and purchase orders related to the Inventory, all at no cost to Hilco;

7. maintain and provide access to inventory management systems and material handling equipment, including (without limitation) all forklifts, flat bed carts, pallet jacks, and lifts, in each case if any and if present at the Location(s); and

8. provide Hilco with (1) all Inventory information and, upon reasonable request, evidence of all Inventory testing and compliance reports, including those relating to the State of California, USA's Safe Drinking Water and Toxic Enforcement Act of 1986/Proposition 65 ("Prop 65") and the results thereof; (2) documents evidencing title to all of the Inventory; (3) information on prospect interest and evidence of all Inventory inquiries, to the extent Company possesses such information and evidence; and (4) upon Hilco's request, provide a release letter on Company letterhead confirming Hilco's authorization to sell the Inventory without restriction in accordance with the terms hereof.

C. No Sale Restrictions. The Inventory may be sold without any restrictions. All sales of the Inventory shall be final and free and clear of all liens, claims, and encumbrances. Hilco and all third party purchasers of the Inventory are authorized to market and sell the Inventory with all logos, brand names, and other intellectual property on the Inventory intact.

**IV. Receivables Services.** With respect to the Receivables, Company and Hilco agree as follows:

A. Services. Hilco will perform the following services (collectively, the "Receivables Services"):

1. in consultation with Company, collect, service, settle, and otherwise resolve the Receivables on Company's behalf and otherwise in compliance with applicable law;

2. in consultation with Company, direct the obligors on the Receivables to make payment to Hilco or through a lock box arrangement mutually agreed by the Company and Hilco;

3. (a) receive cash, drafts, checks, wire transfers, credit cards, and money orders on account or in satisfaction of the Receivables; and (b) endorse and negotiate any of the foregoing received by Hilco, as the agent for Company; and

4. if Company requests, identify and oversee third party collection attorneys to collect those Receivables Hilco is otherwise unable to collect.

B. Minimum Amounts. Company and Hilco shall jointly establish settlement parameters for the collection of the Receivables within which Hilco shall be authorized to collect, service, settle, and otherwise resolve the Receivables without Company's consent.

**V. Advisory Services.** In connection with the Company's evaluation of potential asset dispositions, Company and Hilco agree as follows:

A. Services. Hilco will perform the following services (collectively, the "Advisory Services"):

1. peer-review any liquidation analyses prepared by the Company and/or its advisors;

2. prepare liquidation models for certain underlying assets to help inform Company's disposition strategy; and

3. provide guidance on personnel that may be necessary to execute Company's disposition strategy.

**VI. General Terms and Conditions.**

A. Compensation. In connection with the Services, Hilco shall be entitled to the following fees:

1. Inventory Services. As a fee for the Inventory Services, Hilco shall be paid a commission equal to 5% of the Net Proceeds generated from the sale of Inventory (the "Inventory Fee"). For purposes of this Agreement, "Net Proceeds" shall mean the total cash or non-cash consideration paid or received from the sale of Inventory under this Agreement, less any applicable (a) tariffs and duties (not to exceed $20 million), sales tax, and outbound freight paid by the Company for the sale of Inventory hereunder and (b) amounts required to be paid by the Company to secure the release of Inventory to be sold under this Agreement from freight providers, not to exceed $15 million in the aggregate, and in the case of both (a) and (b), to the extent supported by reasonable documentation provided by the Company. For the avoidance of doubt, any in-bound freight charges paid by the Company to acquire and receive the Inventory shall not be factored into the calculation of Net Proceeds hereunder.

2. Receivables Services. As a fee for the Receivables Services, Hilco shall be paid a commission equal to 3% of the Gross Proceeds generated from the collection of Receivables (the "Receivables Fee"). "Gross Proceeds" shall mean the total cash or non-cash consideration paid or received from the collection of the Receivables.

3. Advisory Services. As a fee for the Advisory Services, the Company shall pay Hilco a monthly fee of $200,000 (the "Monthly Fee"). Each Monthly Fee shall be due and payable in advance upon the first business day of each calendar month, except with respect to the first Monthly Fee, which shall be due and payable upon execution of this Agreement. Each Monthly Fee shall be earned in full when due and nonrefundable; provided that each Monthly Fee paid to Hilco hereunder shall be credited against and subtracted from any Inventory Fee or Receivables Fee that becomes payable pursuant to this Agreement (but such subtraction shall in no event result in a fee of less than zero and each Monthly Fee shall be credited no more than once).

4. Expenses. Company shall be responsible for all expenses incurred by Hilco in connection with the Services, including (without limitation) advertising, promotion and sales costs, travel expenses, reasonable attorneys' fees and costs, and other miscellaneous costs and expenses, including costs and expenses related to the costs of supervision (including (without limitation) Supervisors' reasonable and documented wages, deferred compensation, travel, and bonus payments, if any) and advertising costs (including signage and the shipping, freight, and sales tax related thereto where applicable) (collectively, the "Expenses"); provided that Hilco's Expenses shall not exceed the aggregate budget established and mutually agreed by Company and Hilco.

5. Reimbursement. If and to the extent any party receives any amounts that would be due to Consultant under this Agreement, the Company shall, within five (5) business days of the Company's receipt of written demand by Consultant against such party, use commercially reasonable best efforts to assist the Consultant in obtaining such amounts.

Notwithstanding anything to the contrary herein, the Company agrees that Hilco may withhold all fees and expenses due to Hilco hereunder from proceeds collected by Hilco from the sale of Inventory and/or collection of Receivables.

B. Survival of Services. If, within ten (10) days after expiration of the Term, Hilco delivers to the Company a written list of prospects for the Inventory (the "Prospect List"), and within one hundred and twenty (120) days after expiration of the Term or earlier termination of the Term pursuant to Section VI.E, the Company consummates a sale or other disposition of Inventory to any prospect set forth on the Prospect List, Hilco shall be entitled to Hilco's fee in accordance with this Agreement as if the sale or other disposition of any such Inventory had been agreed to or consummated during the Term. For the avoidance of doubt, if a transaction with respect to any Inventory is pending as of the expiration of the Term, Hilco shall be entitled to Hilco's fee in accordance with this Agreement upon closing of the transaction despite the fact that the closing occurred after the Term.

C. Access and License. Company hereby grants Hilco a license to use the name "First Brands" and similar derivations thereof, and all intellectual property in all its advertising and promotional activities related to this Agreement. Hilco's license to use such names shall continue until the end of the Term. Additionally, Company hereby grants Hilco a license to allow Hilco to enter and occupy the Locations 24 hours a day, seven days a week. Specifically, Hilco shall have the right to enter and occupy the Locations during the Term solely for the purposes of performing its obligations under this Agreement, including (without limitation) taking photographs and preparing the marketing material for the Inventory, and selling and overseeing the removal of the Inventory. To the extent reasonably within the Company's control, Hilco shall have quiet enjoyment of the Locations (as applicable) during its occupation of the Locations with no interference from any labor unions or any other third parties. Hilco will occupy the Locations as licensee and shall not be obligated to pay any rent, taxes, utilities, or other charges therefore. Company agrees to continue to provide and pay for all utilities during the course of Hilco's occupancy. Company acknowledges that Hilco is not an insurer of the Inventory. Hilco shall have the right to abandon at the Locations any Inventory not sold.

D. Free and Clear. All fees payable to Hilco hereunder shall be free and clear of any liens, claims and encumbrances, including the liens of any secured parties.

E. Termination. Either Party shall have the right to terminate this Agreement for cause upon written notice to the other Party. Termination for cause shall mean any termination as a result of a Party's fraud, misrepresentation, gross negligence, willful misconduct, or material breach of any of the terms of this Agreement. For the avoidance of doubt, failure to pay any fees and expenses to Hilco hereunder shall constitute a material breach of this Agreement. In addition, the Company may terminate this Agreement upon forty-five (45) days' prior written notice, subject to payment of all fees and Expenses accrued through the effective date of termination. Upon termination of this Agreement, Hilco shall: (i) immediately discontinue all Services; and (ii) deliver to Company all information, reports, papers, and other materials prepared or obtained by Hilco in performing the Services, whether completed or in process. Upon termination, Company shall be liable for payment of all accrued and unpaid fees and Expenses of Hilco as of the effective date of the termination. Notwithstanding any of the foregoing Section VI.B. shall survive any termination of this Agreement.

F. Insurance. Company agrees to procure and maintain, during the Term, comprehensive general liability, products liability, and property insurance in appropriate amounts in respect of Company's operations at the Locations and with respect to all Inventory until sold and removed from the Locations until title passes.

G. Bankruptcy. The Company shall promptly file in the Company's bankruptcy cases currently pending in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") a motion, in form and substance reasonably acceptable to Hilco, authorizing the Company's entry into this Agreement and utilize best efforts to ensure that such motion is approved by an order that provides, among other things, as follows: (i) the payment of all fees and reimbursement of expenses to Hilco under this Agreement related to the Services is approved without further order of the court free and clear of all liens, claims, and encumbrances; (ii) all such payments of fees and reimbursement of expenses to Hilco related to the Services shall be made without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) the payment of all fees and reimbursement of expenses to Hilco related to the Services shall be included in any approved debtor-in-possession, cash collateral, or other post-petition financing budget; (iv) that Hilco may withhold all fees and expenses due to Hilco hereunder from proceeds collected by Hilco from the sale of Inventory and/or collection of Receivables; (v) that such order shall be enforceable against and binding upon any chapter 7 trustee appointed in the Company's bankruptcy cases; (vi) the authority to sell the Inventory without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, bulk sale restrictions and permitting and licensing requirements, that could otherwise govern the sale of such Inventory; (vii) the authority to sell the Inventory notwithstanding restrictions in leases, reciprocal easement agreements, or other contracts that purport to restrict the sale of the Inventory or the necessity of obtaining any third party consents; (viii) Hilco is not required to maintain time records or file fee applications with respect to the Services; and (ix) authority to take all further actions as are necessary or appropriate to carry out the terms and conditions of this Agreement.

H. Sales on Behalf of Company. All sales of Inventory shall be made on behalf of Company. Hilco does not have, nor shall it have, any right, title, or interest in the Inventory.

I. Abandonment. Hilco shall have the right to abandon at the applicable Location any Inventory not sold.

J. No Guaranty. Hilco has not guaranteed, and is not hereby guaranteeing by this Agreement or otherwise, any specific result, including with respect to the sale or other disposition of the Inventory or any other asset or the collection of any Receivable.

K. Access to Information. Company hereby agrees to use commercially reasonable efforts to provide Hilco with any information reasonably requested to perform the Services hereunder, including (without limitation) books, records, data related to Receivables, Inventory, machinery and equipment, and other Company assets, trade payments, all related systems, and any other information that Hilco may reasonably request.

L. Information and Deliverables.

1. In connection with this engagement, Hilco (the "Receiving Party") may come into the possession, whether orally or in writing, of Confidential Information (as defined below) of the other party (the "Disclosing Party"). Hilco hereby agrees that it will not disclose, publish, or distribute such Confidential Information to any third party without the Disclosing Party's consent, which consent shall not be unreasonably withheld, other than: (i) to the Receiving Party's affiliates and its and their employees, officers, directors, auditors, and advisors; (ii) if such disclosure is requested or required by a governmental agency having regulatory authority or other authority over the Receiving Party; (iii) pursuant to court order, subpoena or legal process requiring disclosure, *provided* that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice (if legally permissible) of any disclosure under clauses (ii) or (iii), in each case, so

that Disclosing Party can seek a protective order or other measures to protect such Confidential Information; or (iv) to tax advisors regarding the tax treatment or tax structure of any transaction, *provided* that such advisors are informed of the confidential obligations hereunder.

2. "Confidential Information" means any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include information that: (i) was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; or (iv) is independently developed without use of or reference to any Confidential Information.

3. Company acknowledges and confirms that, in rendering the Services, Hilco will be using and relying on, and assuming the accuracy of, without any independent verification, data, material, and other information (collectively, the "Information") furnished to Hilco by or on behalf of Company or other third parties (including their agents, counsel, employees, and representatives). Company represents and warrants that it shall not provide any Information to Hilco in violation of any confidentiality obligations it may have. Company understands that Hilco will not be responsible for independently verifying the accuracy of the Information and shall not be liable for inaccuracies in any such Information. Company will cooperate with Hilco in all phases of Hilco's performance of the Services. Hilco assumes no responsibility to revise or update any information contained in any report or deliverable prepared in connection with the Services (each, a "Deliverable"). Our performance of the Services will be dependent upon Company providing us with accurate and timely information, as applicable. The contents of any Deliverable, as well as all documents and information provided by Hilco to Company, are to be considered confidential and for the use of Company only and shall not be transmitted to any third party without the express written consent of Hilco. The Services and any Deliverable may not be relied upon by any person or entity other than Client. Hilco makes no representations or warranties of any kind regarding the Services or any Deliverable.

M. Representations and Warranties of Company.

1. Company represents and warrants to Hilco and covenants that: (i) Company has all legal right and authority to sell the Inventory and collect the Receivables, (ii) Company has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby, and no further consent or approval is required for Company to enter into and deliver the Agreement and to perform its obligations under the Agreement, (iii) except as otherwise provided in Section VI.G., no court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Company's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore, (iv) Company has the authority to grant the license to Hilco to utilize the Locations and to use the names "First Brands" and similar derivations thereof as provided for under this Agreement, (v) Hilco shall have access to the Inventory and Receivables, all related information, and the Locations in accordance with this Agreement; (vi) the Inventory representations and descriptions in the Exhibits are accurate, true, and complete

to the best of Company's knowledge; (vii) all Inventory is, or will be as of closing for the sale or other disposition of such Inventory, free and clear of all liens, claims, and encumbrances of any kind whatsoever; (viii) Company has not placed any restrictions on the sales of the Inventory, including but not limited to restricting sales of Inventory within certain geographic areas, to certain purchasers or through any e-commerce channels; (ix) the Inventory has been produced and labeled in accordance with the requirements of all applicable federal, state and local laws, rules and regulations and neither the Inventory, nor any part thereof, including labeling and packaging violates Prop 65 or any federal, state or local law, rule or regulations; and (x) any amounts due and payable hereunder to Hilco shall be free and clear of any liens, claims, or encumbrances of any kind whatsoever.

2. Hilco represents and warrants to Company that (i) each entity comprising Hilco is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation and (ii) Hilco has taken all necessary actions required to authorize the execution, delivery and performance of this Agreement and the related documents contemplated hereby, and no further consent or approval is required for Hilco to enter into and deliver the Agreement and to perform its obligations under the Agreement.

N. Indemnification.

1. Hilco's Indemnification. Hilco shall indemnify, defend, and hold the Company and its affiliates, and their respective officers, directors, principals, shareholders, affiliates, members, consultants, advisors, agents, and employees (collectively, the "Company Indemnified Parties") harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the gross negligence (including omissions), willful misconduct, or fraud of Hilco, its affiliates, directors, officers, employees, agents, contractors, consultants, or representatives; and (b) the material breach of any provision of, or the failure to perform any obligation under this Agreement by Hilco, including any representation, warranty, or covenant.

2. Company's Indemnification. Company shall indemnify, defend, and hold Hilco and its officers, directors, principals, shareholders, affiliates, members, consultants, advisors, and employees (collectively, "Hilco Indemnified Parties") harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the negligence, intentional or unlawful acts or omissions of Company or its consultants, advisors, employees, representatives and principals (other than Hilco Indemnified Parties); (b) the material breach of any provision of, or the failure to perform any obligation under this Agreement by the Company; (c) the failure by Company to promptly pay any taxes to the proper taxing authorities in connection with the Services and/or sale of any Inventory and/or the failure by Company to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities; (d) any liability or other claims asserted by Company's previous brokers, consultants, advisors, employees, representatives, and principals; (e) any claims, violation notices, recalls, damages, fines, penalties and other expenses relating to hazardous or toxic component materials (including, without limitation, those relating to any violation or alleged violation of the State of California, USA's Safe Drinking Water and Toxic Enforcement Act of 1986/Proposition 65 laws or any other laws, rules or regulations); and (f) improper or incomplete labeling or warnings with respect to any of the Inventory.

3. Carve-Out and Court Oversight in Chapter 11. Notwithstanding anything to the contrary herein, during the pendency of any chapter 11 case of the Company or any of its affiliates: (i) the Company shall have no obligation to indemnify any Hilco Indemnified Party for any claim or expense that is judicially determined (the determination having become final) to have arisen from the gross negligence, willful misconduct, or fraud of such Hilco Indemnified Party; (ii) with respect to contractual disputes in which the Company alleges the breach of Hilco's contractual obligations, indemnification, contribution, or reimbursement shall be permitted only to the extent permissible under applicable law; and (iii) if any Hilco Indemnified Party believes it is entitled to payment of any amounts on account of indemnification, contribution, or reimbursement (including advancement of defense costs), such party must file an application with the Bankruptcy Court, and no such amounts shall be paid before entry of an order approving such payment after notice and a hearing. Any advancement of defense costs shall be subject to an undertaking by the recipient to repay such amounts to the extent a court of competent jurisdiction ultimately determines the recipient is not entitled to indemnification.

O. No Liability for Employee Wages/Benefits. The Parties expressly acknowledge and agree that Hilco shall have no liability to Company for any employee for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Company's employment, hiring or retention of its employees, and such employees shall not be considered employees of Hilco.

P. Good Faith. Company and Hilco shall deal with each other in good faith so as to allow both Parties to perform their duties and earn the benefits of this Agreement.

Q. Notice. Any correspondence or required notice shall be addressed as follows and shall be deemed given (a) when received if hand delivered, (b) three (3) business days after depositing in the United States mail if sent by first-class certified mail, (c) on the next business day if sent by overnight mail, or (d) on the same date on which it is sent if sent by email.

If to Hilco:
c/o Hilco Trading, LLC d/b/a Hilco Global
5 Revere Drive, Suite 206
Northbrook, Illinois 60062
Email: legal@hilcoglobal.com
Attn: Office of the General Counsel

If to Company:
First Brands Group, LLC
127 Public Square, Suite 5300, Cleveland, OH 44114
Email: cmoore@alvarezandmarsal.com
djerneycic@alvarezandmarsal.com
wjohnston@alvarezandmarsal.com
Attn: Charles Moore
Daniel Jerneycic
Wade Johnston

With copy to:

Weil, Gothsal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Email: matt.barr@weil.com

sunny.singh@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
clifford.carlson@weil.com
jason.george@weil.com
Attn: Matthew S. Barr
Sunny Singh
Andriana Georgallas
Kevin Bostel
Clifford W. Carlson
Jason H. George

R. Construction. This Agreement shall be deemed drafted by both Parties hereto, and there shall be no presumption against either Party in the interpretation of this Agreement. By executing or otherwise accepting this Agreement, Company and Hilco acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein. All headings and captions in this Agreement are for convenience only and shall not be interpreted to enlarge or restrict the provisions of this Agreement.

S. Independent Contractor. Hilco will be providing the Services to Company as an independent contractor. For greater certainty, this Agreement does not create any relationship of employer and employee, principal and agent, or of joint ventures between Company and Hilco. The Company acknowledges and agrees that the Services may be performed by an affiliate of Hilco.

T. Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect, and the invalid or unenforceable provision shall be reformed to the minimum extent required to render it valid and enforceable and to effect the intent of this Agreement.

U. Assignment. Neither this Agreement nor any of the rights hereunder may be transferred or assigned by either Party without the prior written consent of the other Party; *provided,* however, that Hilco may syndicate this transaction with one or more third parties upon notice to, but not consent of Company. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors, and permitted assigns.

V. Modifications. No modification, amendment or waiver of any of the provisions contained in this Agreement, or any future representation, promise or condition in connection with the subject matter of this Agreement, shall be binding upon any Party to this Agreement unless made in writing and signed by a duly authorized representative or agent of such Party. The failure by either Party to enforce, or the delay by either Party in enforcing, any of said Party's rights under this Agreement shall not be construed as a continuing waiver of such rights, and said Party may, within such time as is provided by the laws established by any government with applicable jurisdiction, commence appropriate suits, actions or proceedings to enforce any or all of such rights. A waiver by either Party of a default in one or more instances shall not be construed as a waiver in other instances.

W. Nature of Services. The Services provided by Hilco pursuant to this Agreement are, in general, transactional in nature, and Hilco will not be billing Company by the hour nor maintaining time records. It is agreed that Hilco is not requested or required to maintain such time records and that its compensation will be paid in accordance herewith.

X. Entire Agreement. This Agreement, together with all additional schedules and exhibits attached hereto, constitutes a single, integrated written contract expressing the entire agreement of the Parties concerning the subject matter hereof. No covenants, agreements, representations or warranties of any kind whatsoever have been made by any Party to this Agreement except as specifically set forth in this Agreement. All prior agreements, discussions and negotiations are entirely superseded by this Agreement.

Y. Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without reference or regard to choice of law provisions. THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR PROCEEDING RELATED TO OR ARISING OUT OF THE SERVICES, ANY TRANSACTION OR CONDUCT IN CONNECTION THEREWITH OR THIS AGREEMENT.

**[Signatures on the following page]**

*Execution Version*

IN WITNESS WHEREOF, Company and Hilco have executed and delivered this Agreement as of the date first above written.

**COMPANY**

FIRST BRANDS GROUP, LLC
on behalf of itself and its affiliates

Name: Charles M. Moore

By: Signed by: Charles M. Moore 57E1F72D8F63482...

Title: Interim Chief Executive Officer

Date: March 13, 2026

**HILCO**

HILCO MERCHANT RESOURCES, LLC
HILCO RECEIVABLES, LLC
HILCO GLOBAL PROFESSIONAL SERVICES, LLC

Name: Benjamin Nortman

By: DocuSigned by: [signature] F628491333964BA...

Title: Chief Commercial Officer

Date: March 13, 2026

**Exhibit A**

**Locations**

**Exhibit A:**
Schedule of Locations (Facilities, Warehouses, Distribution Centers and Fulfillment Centers)

| Country | BU | Facility | Type | Location | State |
|---|---|---|---|---|---|
| USA | Brakes | COI | DC | City of Industry, California | CA |
| USA | Brakes | Cardone CDC | DC | Philadelphia, Pennsylvania | PA |
| USA | Brakes | Eagle Machining | Man | Fayette, Ohio | OH |
| USA | Brakes | Eagle Castings | Man | Hanover, Pennsylvania | PA |
| USA | Brakes | Cardone Harlingen | Man | Harlingen, Texas | TX |
| USA | Brakes | Dalton Stryker | Man | Stryker, Ohio | OH |
| USA | Brakes | Dalton Warsaw | Man | Warsaw, Indiana | IN |
| USA | Brakes | IBI-US | DC | South Bend, Indiana | IN |
| Mexico | Brakes | Cardone | Man | Matamoros, Tamaulipas, Mexico | MX-TM |
| Mexico | Brakes | BPI Calipers | Man | Juarez, Chih, Mexico | MX-CH |
| Mexico | Brakes | BPI Friction | Man | Juarez, Chih, Mexico | MX-CH |
| Mexico | Brakes | BPI AEMSA | Man | Los Reyes, Mexico City, Mexico | MX-CM |
| Mexico | Brakes | BPI JST | Man | Juarez, Chih, Mexico | MX-CH |
| Mexico | Brakes | IBI | Man | Monterrey, Nuevo Leon, Mexico | MX-NL |
| Mexico | Plugs | Autolite | Man | Mexicali, Baja California, Mexico | MX-BC |
| Mexico | Hopkins | Hopkins JRZ | Man | Juarez, Chih, Mexico | MX-CH |
| USA | Brakes | MDC McHenry | DC | McHenry, Illinois | IL |
| USA | Brakes | WDC Patterson | DC | Patterson, California | CA |
| USA | Hopkins | Hopkins AKC | | Edgerton, Kansas | KS |
| USA | Hopkins | Hopkins Emporia | | Emporia, Kansas | KS |
| USA | Hopkins | Hopkins Miami | | Miami, Oklahoma | OK |
| USA | AVM | AVM | | Marion, South Carolina | SC |
| USA | Filters | Champ DC | | Albion, Illinois / Fairfield, Illinois | IL |
| USA | Filters | Champ Oil and Air | | Albion, Illinois | IL |
| USA | Filters | Fram Hebron | | Hebron, KY | KY |
| USA | Filters | Fram Greenville | | Greenville, OH | OH |
| Mexico | Brakes | JPP | | Juarez, Mexico | MX |
| Mexico | Brakes | CDMX DC (BPI) | | Mexico City, Mexico | MX |
| Mexico | Filters & Plugs | CDMX DC (FRAM) | | Mexico City, Mexico | MX |

Docusign Envelope ID: 0B3FACEB-3D6C-4B53-B798-8DD8D857ADF2


**Exhibit B**

**Inventory**

**List of Perpetual Inventory Files Shares with Hilco team as of February 13, 2026**

1. BPI - Perpetual Inventory by Location - 2026-02-06.xslx
2. FRAM - Perpetual Inventory by Location - 2026-02-06.xslx
3. Hopkins - Perpetual Inventory by Location 2026-02-06.xslx
4. IBI - Perpetual Inventory by Location - 2026-02-06.xslx
5. Hopkins - Perpetual Inventory by Location 2026-02-13
6. AVM Strongarm - Perpetual Inventory by Location - 2026-02-13
7. Champ - Perpetual Inventory by Location - 2026-02-13
8. FRAM - Perpetual Inventory by Location - 2026-02-13
9. BPI - Perpetual Inventory by Location - 2026-02-13
10. E516 BPI MX DC Inventory Listing 13 Feb 26
11. E710 Fram Mexico – Inventory Listing – 02.13.26