# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | CASE NO: 25-90399-cml |
| FIRST BRANDS GROUP, LLC AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) | Houston, Texas |
| | ) | Tuesday, January 13, 2026 |
| Debtors. | ) | 1:01 p.m. to 6:47 p.m. |

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For First Brands Group, LLC: | SUNNY SINGH<br>ROBERT S. BEREZIN<br>Weil Gotshal and Manges<br>700 Louisiana Street<br>Houston, TX 77002 |
| For Official Committee of Unsecured Creditors: | JEFFREY L. JONAS<br>Brown Rudnick<br>7 Times Square<br>New York, NY 10036 |
| For Ad Hoc Prepetition Lenders and the DIP Lenders: | ANNELYSE SCARLETT GAINS<br>Gibson Dunn & Crutcher<br>200 Park Avenue<br>New York, NY 10166 |
| For Katsumi Servicing, LLC: | CHARLES STEPHEN KELLEY<br>RICHARD A. STIEGLITZ<br>SEAN T. SCOTT<br>Mayer Brown LLP<br>700 Louisiana Street<br>Houston, TX 77002 |

Case 25-90399 Document 393-6 Filed in TXSB on 01/15/26 Page 3 of 232

| | |
|---|---|
| For Onset Financial, Inc.: | BENJAMIN BUTTERFIELD<br>Morrison Foerster LLP<br>250 W. 55th Street<br>New York, NY 10019 |
| For Carnaby Secured Lenders: | ALLAN S. BRILLIANT<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036 |
| | MEGAN N. YOUNG-JOHN<br>JOHN F. HIGGINS, IV<br>Porter Hedges LLP<br>1000 Main Street<br>Houston, TX 77002 |
| For Bank of America, N.A.: | DANIEL J. MCGUIRE<br>Winston & Strawn LLP<br>800 Capitol Street<br>Houston, TX 77002 |
| For Leucadia Asset Management, LLC: | EMIL A. KLEINHAUS<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019 |
| | PAUL E. HEATH<br>Vinson & Elkins<br>845 Texas Avenue<br>Houston, TX 77002 |
| For Raistone Capital, LLC: | LAURA D. METZGER<br>EMANUEL GRILLO<br>Orrick Herrington & Sutcliffe LLP<br>51 West 52nd Street<br>New York, NY 10019 |
| For ING Bank: | DOUGLAS DEUTSCH<br>Clifford Chance<br>375 9th Avenue<br>New York, NY 10001 |
| For Arab Banking Corporation B.S.C.: | JOHN R. DODD, II<br>Baker McKenzie LLP<br>830 Brickell Plaza<br>Miami, FL 33131 |

For Evolution Credit Partners: VINCENT INDELICATO
CHARLES A. DALE
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036

Court Reporter: YESENIA LILA

Courtroom Deputy: YESENIA LILA

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

INDEX


| DEBTORS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANIEL JERNEYCIC | | 157 | | |

| DEBTORS' EXHIBITS | RECEIVED |
|---|---|
| Exhibit 6-24 and 26-30 | 142 |
| Exhibits 5 and 6 | 204 |

HOUSTON, TEXAS; TUESDAY, JANUARY 13, 2026; 1:01 PM

(Call to Order)

THE COURT: Good afternoon. This is Judge Lopez. Today is January 13th. I'm going to call the 1:00 p.m., First Brands. I'll take appearances in the courtroom. Anyone on the line, why don't you hit 5, star, and I will unmute your line. Mr. Singh, good afternoon.

MR. SINGH: Good afternoon, Your Honor. Sunny Singh, Weil, Gotshal, on behalf of the Debtors, joined by some of my colleagues, including Robert Berezin, who's going to be handling one of the matters today.

THE COURT: All right. Good afternoon. Not everyone at once.

MR. KLEINHAUS: Good afternoon, Your Honor. Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz, on behalf of the Leucadia parties.

THE COURT: Good afternoon.

MR. KLEINHAUS: I'm here with Paul Heath of Vinson & Elkins.

MR. GRILLO: Good afternoon, Your Honor. Emanuel Grillo, Orrick, Herrington & Sutcliffe LLP, with my partner, Laura Metzger here in the courtroom, and other colleagues on the line, on behalf of Raistone Purchasing Series XXXII LLC.

THE COURT: Good afternoon.

MR. KELLEY: Good afternoon, Your Honor. Charles

Kelley, of Mayer Brown, on behalf of Katsumi Services. I'm joined online by my colleague and law partner, Sean Scott, who will be handling our legal argument on our objection today.

THE COURT: Thank you.

MR. KELLEY: And I'll be in the courtroom covering everything else. Rich Stieglitz is also on the line covering.

THE COURT: Thank you.

MS. YOUNG-JOHN: Good afternoon, Your Honor. Megan Young-John, of Porter Hedges, also joined by my partner, John Higgins, on the line, on behalf of the Carnaby II and III Secured Parties. We also have co-counsel from the Dechert firm, Allan Brilliant, who is also appearing virtually.

THE COURT: Okay. Thank you.

MR. DALE: Good afternoon, Your Honor. Charles Dale and together with me today, my partner, Vincent Indelicato from Proskauer Rose. We're joined by co-counsel, Emily Shanks, from the Gray Reed firm, and we represent Evolution Credit Partners.

THE COURT: Good afternoon.

MR. DALE: Thank you.

THE COURT: Let me just turn to the phone line. Okay, here's a (212) number.

MR. BRILLIANT: Good afternoon, Your Honor. Allan Brilliant, on behalf of the Carnaby II and III Secured Lenders.

THE COURT: Good afternoon. A (312) number.

MR. DODD: Good afternoon, Your Honor. John Dodd, from Baker McKenzie, on behalf of Arab Banking Corporation.

THE COURT: Another (312) number. Good afternoon, sir.

MR. MCGUIRE: Good afternoon, Your Honor. Dan McGuire, Winston & Strawn, on behalf of Bank of America's ABL Group.

THE COURT: Okay. Good afternoon. A (212) number.

MR. DUKE: Good afternoon, Your Honor. Michael Duke, from Elsberg Baker & Maruri, on behalf of the Evolution entities.

THE COURT: Good afternoon. A (312) number.

MR. SCOTT: Good afternoon, Your Honor. This is Sean Scott of Mayer Brown. As Mr. Kelley said, I'll be presenting the argument on the issues related to the procedures motion. Good to see you again.

THE COURT: Good afternoon. A (617) number.

MR. JONAS: Good afternoon, Your Honor. Jeff Jonas, Brown Rudnick, for the committee.

THE COURT: Good afternoon. A (347) number. I've

got two more.

MR. DEUTSCH: Good afternoon, Your Honor. Doug Deutsch, from Clifford Chance, on behalf of ING Belgium.

THE COURT: An (847) number.

MS. GAINS: Good afternoon, Your Honor. AnnElyse Gains, of Gibson Dunn, on behalf of the Ad Hoc Group of DIP Lenders.

THE COURT: Good afternoon. And a (510) number.

MR. BUTTERFIELD: Good morning, Your Honor. Ben Butterfield, of Morrison & Foerster, for Silver Point Capital.

THE COURT: All righty. Anyone else, please hit 5, star, and I will unmute your line. All righty. Okay.

MR. SINGH: Okay.

THE COURT: Good afternoon.

MR. SINGH: Thank you, Your Honor. Again, for the record, Sunny Singh, Weil, Gotshal, on behalf of the Debtors. Your Honor, we filed an amended agenda with respect to today's hearings. We have a couple of matters on. The first one is just a status update and conference with respect to the CarVal matters.

THE COURT: Okay.

MR. SINGH: CarVal is represented by Mr. Brilliant and the team at Dechert. Your Honor, you'll recall we had a hearing scheduled for January 9th with respect to CarVal's

motion for relief from the stay and to dismiss. That was all adjourned, remains adjourned to January 22nd while the parties continue to talk.

But pending that agreement, we had agreed to come back, report status on Your Honor -- to Your Honor today on where we are. And we had also agreed that absent an agreement of the parties or in order of the Court, the Debtors would no longer use CarVal's asserted collateral beyond January 13th and beyond today.

And Your Honor, we've been talking and have agreed that January 13th deadline to no longer use collateral has been extended by agreement of the parties through this Friday, January 16th. And so I just wanted to give you that report. We are documenting this and we'll have an order for Your Honor to sign that just lays this all out. But that's the current status.

So if we need it, we'll be back on the 22nd to hear their motions. But ideally, we will be able to get something done.

THE COURT: Okay. Thank you. Mr. Brilliant?

MR. BRILLIANT: Your Honor, Allan Brilliant. May I be heard?

THE COURT: Yes, of course. Yes.

MR. BRILLIANT: Thank you, Your Honor. What Mr. Singh, you know, accurately reflects the conversations we've

been having since last week. Obviously, there's no assurance that we're going to reach an agreement, although all the parties I think are trying very hard to do so.

In the meantime, you know, the Debtors continue to use our collateral, subject to article -- the protection stipulation in the order that was previously agreed to, and entered by the Court. You know like with respect to some of the other lenders, they are in default under that agreement. You know and we reserve all of our rights with respect there, too. Hopefully, we'll be able to resolve everything prior to the 22nd. But if not, we have the hearing scheduled then.

At the last hearing, Your Honor, although you scheduled the continued -- the hearing to the 22nd, we never set a start time. So we would ask that, Your Honor, do that at this point so parties can plan. You know 9:00 or 9:30 would be preferred by us. Our team will all come in the night before. But it's obviously up to Your Honor as to what's most convenient for the Court.

THE COURT: Can you give me the date one more time? I'm just pulling up my calendar now.

MR. BRILLIANT: The 22nd, Your Honor, which I believe is a Thursday.

THE COURT: It is. Which time did you say you preferred?

MR. BRILLIANT: Oh, 9:00 or 9:30, whatever works best for the court.

THE COURT: Why don't we do the 22nd at 9:00 a.m.?

MR. BRILLIANT: Thank you, Your Honor.

THE COURT: Okay.

MR. BRILLIANT: And as Mr. Singh said, you know, our agreement to extend the use of our collateral, including our cash collateral, to Friday will be embodied in a formal stipulation, which hopefully will be presented to the Court this afternoon.

THE COURT: Okay. Thank you. Okay.

MR. BRILLIANT: Thank you, Your Honor.

MR. SINGH: Thank you, Judge. That takes us to the second matter that's on for today's hearing, Your Honor. This relates to the Debtors factoring procedures motion, including our request to release certain cash that, you know, we describe as trapped cash that's being maintained in our segregated account per Your Honor's prior court orders.

Your Honor, today's hearing was scheduled by you to consider procedural issues with respect to the remaining relief requested, and in particular, you know, I think whether we need an adversary proceeding. You didn't limit it to those issues, but that's one of the main issues that I think the parties have a disagreement about.

So, Your Honor, we appreciate and heard you at the

December 13th -- excuse me, December 30th status conference, and with that guidance, we've been working with the factoring counterparties to see if we can carve out a path forward that either resolves everything or at least tries to narrow and limit the issues that Your Honor has to consider.

So I'm happy to report that we've got an agreement with some of the factoring counterparties on how to proceed, but unfortunately, not all of them. My understanding, and this is not intended to bind anybody, but just of the current state of play, I believe the Leucadia parties and Raistone are okay with the proposed order that's been filed, although they may want to be heard this afternoon.

But in that as of now, Katsumi Evolution and ABC Bank are not consenting to the revised proposed order. I may have left out Mr. Deutsch's client who I think. ING. Thank you. ING is also on board with the order. Sorry. Thank you. Your Honor, basically, just to outline where we are, and then we can obviously have the procedural issues heard by Your Honor.

So currently, following Your Honor's order that allowed the release of cash going back on December 30th, that was about $55 million. So currently, in the segregated account, there's 65.3 million approximately. Of that amount, Judge, we are now only seeking relief with respect to approximately $18.1 million to be released pursuant to

the agreed terms and conditions that are set forth in the revised order, and I'll go into that a little bit.

But importantly, the balance, which is about 47 million as of today, you know and money continues to come in there, that 47 million, Your Honor, we agree. And that's, if you recall the categories, that's Category 3, where people were asserting we've got an interest, you know and need more time.

And so we've agreed where we've got a dispute about whether or not that -- those funds are estate funds or factored funds, that the Debtors are adjourning that piece of the motion indefinitely to allow the examiner to do his work. And, Your Honor, if we, at some point, decide, we the Debtors, decide that we do want to proceed, and go forward with respect to the release of those funds, we would proceed by adversary proceeding with respect to those disputed amounts.

So Judge, that leaves the 18.1 million that we're seeking now to -- well, I should say still seeking, not today that it would be released. Because today's just about procedure and whether we need an adversary or not. In our view, we don't need an adversary proceeding. People will be heard today about that issue, and Your Honor will tell us.

But there's really three categories of costs, and, Your Honor, we did file a declaration by Mr. Jerneycic, a

supplemental declaration. The purpose of that is not to have evidence before you today, but we thought it would be helpful for Your Honor to just know what the current dollars are, and what we're actually moving forward on so you can see it on a piece of paper.

Again, I don't need that, you know, submitted today for procedural issues. It's really just to guide the Court, and frankly, the parties on the current amounts that are there and what we're seeking. So, Your Honor, at the end of his declaration, and again, I don't need to have it admitted, but just for Your Honor's reference, there is a chart, and I'm just going to explain to you some of the numbers in that chart. We may have extra copies. We have some extra copies if that's helpful.

MR. KELLEY: Judge, I'm loathe to interrupt someone's statement, but the Court's position on the hearing today was less than procedural. It was only going to be legal arguments, and we were going to oppose, and our statement reflects our intent to try to oppose any sort of backdooring of factual evidence.

The parties do not agree with the Debtor's characterization or categories, and so, fundamentally, I think I just need to lodge an objection for the record that we're opposed to any submission of any declaration, including the last-minute one that hasn't been vetted.

It certainly hasn't been run by our financial advisors. Those are disputed facts with all due respect to Your Honor, because I know you will know how to cabin those off. I have to lodge an objection to their attempt to backdoor a declaration before a hearing that's purely legal.

THE COURT: No, I'm not accepting the declaration as evidence, or I'm just taking it from Mr. Singh telling me what he thinks is Category 1, 2, and 3. It will have no weight in terms of evidentiary foundation. It's just what someone thinks the numbers are.

MR. KELLEY: I'm confident you'll be able to --

THE COURT: Yeah.

MR. KELLEY: -- cabin it off as appropriate, but I just --

THE COURT: No, understood.

MR. KELLEY: -- full disclosure to give the Court an understanding of where things stand.

THE COURT: No, I got it. I got it. Okay.

MR. SINGH: Thank you, Your Honor. Your Honor, I have a copy just of the blown-up chart, if that would be helpful, just to see the.

THE COURT: I got it.

MR. SINGH: Oh, you've got it.

THE COURT: I've got it.

MR. SINGH: If the parties need a copy, I've got

extras here. So, Your Honor, really, if you look at it, we're only moving forward. Yeah, thank you. We're only moving forward with respect to Categories 1 and 2, and 2 is really 2A and 2B at this point. One is post -- this is the Debtor's view, right? You're not being asked to consider the evidence, but just what we believe or what we're trying to seek release of.

One is receivables, prepetition receivables, but that relates to invoices from post-September 12th, when the Debtor stopped factoring. 2A are receivables related to the TMD business, which again, when we get to the evidentiary hearing in the future, but from the Debtor's perspective, that business purchased in 2024, never part of the factoring program, doesn't relate to.

There's no agreement with any party that business. You know there's no contractual agreement, would ever have its invoices factored. And so, in our view, there's no bona fide dispute. But again, not asking you to make that determination today.

And then Category 2A relates to invoices that, based on information we've gotten from the factors in our own, we don't believe they're matches. So it's not as if those businesses were never factored, but there's no matches with respect to the customers and the particular Debtors on the particular invoices. So those, we believe there's no

bona fide dispute.

And from our perspective, that's all that we're going to be moving forward with respect to today and at a subsequent near-term hearing, Your Honor may set. And again, we don't believe that an adversary proceeding is required with respect to those.

So basically, Judge, if I could summarize our position and where I think we've landed with the settling parties, it's, if there's no bona fide dispute as to ownership, and we'll figure out whether there's a bona fide dispute, but these three categories from the Debtors' perspective, there's no bona fide dispute, but everybody needs to confirm and let us know, then the Debtors believe they don't require an adversary proceeding to move forward. We think we can move forward, parties are free to object, et cetera, but we don't need an adversary proceeding.

The other end is, if there's a bona fide dispute, you know, the Category 3, we've agreed that we will move by adversary proceeding. And, Your Honor, if there's a dispute about whether there's a bona fide dispute, right, if there -- you know, this is bona fide or this is not, depending on the invoices that'll get reviewed, then we'll have to come back before Your Honor to tell us which sort of bucket they fall into.

And that dispute may be, from their perspective,

that they may not have enough information, right, to assert a bona fide dispute or not, but we'll kind of have to deal with those one-off issues. Hopefully, we don't, because the parties can sort of look at the information, do the diligence, and do what they need to do in order to move this forward.

Your Honor, we've also agreed that, you know, consistent with some of Your Honor's guidance, that at least with respect to the settling parties, right, they've agreed that discovery, you know, sort of formal discovery requests will be adjourned or deferred, and instead, we will voluntarily share information that's not privileged.

It's all specified in the order that we're going to give to the examiner. We'll give it to them as well, and, you know, continue to informally cooperate, but depositions, et cetera, will not go forward. Your Honor, we're hopeful others will agree to that as well, just to give them the efficiencies, but if not, and we have a dispute about discovery, we may have to come back to Your Honor with respect to, you know, anybody that doesn't agree there, but that's really the issue.

So Judge, just, you know, I'll be brief on why I don't think, or the Debtors don't believe an adversary proceeding is required with respect to the Category 1 and 2 invoices, or at least, you know, where there's not a bona

fide dispute, I should say.

You know we've cited a bunch of cases in our brief, but really, if you look at Judge Glenn's decision in MF Global, we think that is really on point here. There, you had Debtors and lenders that were agreed on cash collateral, you know, being used.

It was in a particular account, and a customer of the Debtor was complaining that, hey, some of my cash, due to some conduct, may have been moved. May have been moved from, you know, my segregated account into this account, and now it's being allowed to go out as cash collateral. Judge Glenn made a number -- we think that's right on par with what you're dealing with here, Your Honor, and he made a number of important findings.

One, the entity that's asserting the interest, right, they've got the burden of proof that there's actually a bona fide dispute or an issue here. And he was very clear that speculation, that customer funds may have been transferred into the account now that there's a stipulation, that's not enough. It can't be speculative. They need to have something specific in order for Your Honor to consider that issue.

And he also gave significant weight to the fact that the cash collateral determination, right, was being decided without prejudice to ultimately whether or not what

the merits of that dispute may have been, which is exactly what we're asking Your Honor to do. And frankly, we're going even one step further because we've agreed to provide protection for that future determination.

So this is not a we'll see you in a couple of months in your adversary proceeding, and they're going to stand up and say, well, we may not have a basis for actual relief, right? I mean, admin claims, et cetera, put that aside. We're actually going to leave the remaining cash, right, in the 45 million that I described in Category 3.

And if you remember from the order, the way that works is everybody gets sort of a claim or an opportunity to assert a claim against that disputed cash. That was what Your Honor relied on with respect to Evolution's claim. You know that staying, that 45 million, and it's not just 45. If you look at Mr. Jerneycic's chart that he includes, there's 45 we've collected.

There's 90 million sitting with customers that's overdue, right, that we're trying to get in the door that will go through the same process. If it's bona fide dispute, you know, we're going to park it. If it's clear that it belongs to us, we'll talk to the parties, and we'll try to get it released.

But there's plenty of cushion here, is the point, Judge, that doesn't even include the roughly $140 million

that, you know, just isn't become due yet with respect to the customer agreement. So we think this is not just -- you know, we're not just offering sort of, you know, ice in winter here, Your Honor. This is real protection for any future determination in the event these remaining entities are right. And so that's why you don't need to proceed by adversary proceeding in our view today.

You can do what Judge Glenn did in his case, where in the context of a cash collateral sort of, you know, cash use motion, he determined that he had enough there. And we'll be back to Your Honor if we can't get parties to agree on the 26th, or whatever date Your Honor gives us, to make sure that you see from our perspective, and the evidence, that there's enough there to protect the parties and that we don't need to proceed by adversary proceeding where there's not a modified dispute.

Your Honor, I think Evolution, the last thing I would say, falls into the same boat. Evolution is slightly different from the other factors. Because remember, they're saying they actually have a secured interest in the -- not only in the receipts that they purchased, but also in the receipts of those Debtors that they didn't purchase, so all the other receipts or invoices that they were entitled to receive.

And so they're saying, look, we've got a security

interest here, as opposed to just an ownership dispute, and that requires an adversary proceeding. Now, they've commenced their adversary proceeding, which is fine. We'll deal with that adversary proceeding. They've also taken an appeal of Your Honor's last ruling. We'll deal with that appeal as well.

But that doesn't mean that Your Honor has to wait for that adversary proceeding or that appeal to play out, because Judge Glenn has made it clear, and as of other courts that we've cited, including the Second Circuit and Orion Pictures, that we can proceed without an adversary proceeding. There's adequate protection to any future determination that we need, that Your Honor may make, even if it's adverse to us.

Now, we don't think it will be, and you can take that into account, right? You can take potential merits into account. It's a preliminary ruling, and conclude that we can let this cash out.

Your Honor, the last thing I'd say is your own decision in PosiGen, which I think the facts were a little bit different, and I went back and reviewed again this morning the transcript. I think the issue in PosiGen, and of course, Your Honor is much closer to it than I am, was that the Debtors were trying to use all of the cash that was sitting in an account, and there was no determination, and

an adversary proceeding had been commenced with respect to all of that cash.

A non-Debtor party said, look, that's all mine, and it was very unclear whether or not there was any adequate protection or anything to say, look, if you actually went and used all of that, I can't remember the dollar amount, but $20 million or something, if you used all of that, then the non-Debtor party would commence an adversary proceeding and raise the bona fide dispute, would have no remedy.

I don't think that's the case here, Your Honor, with all the built-in protections that we've got. There is a remedy, and so under these facts and circumstances, I think it's different than PosiGen. It falls more in the MF Global sphere. And again, with the limited and narrow relief that we're seeking today, I think Your Honor can grant us that relief at a subsequent hearing, whenever that's determined, without the requirement for an adversary proceeding.

Your Honor, I'm happy to answer any questions. Otherwise, I'll see the podium.

THE COURT: Just give me a second. I'm just going to go through my notes. Yeah. The authority I have to grant a release to a customer who wants to submit the funds, Paragraph 11.

MR. SINGH: Yes.

THE COURT: -- of the order.

MR. SINGH: So Judge, we are not compelling customers, right? We've sort of changed our approach on that. I think following your guidance last week, you have authority to take money in where the Debtor has an asserted property interest. And so should that money come in, it will go into this process, and the Court will determine sort of which category it falls into, where the money goes.

And so what we're not doing is providing a release to the customer of any claims that the factors may have directly against that customer. All we're saying, look, if you submit this payment, right, the customer is not submitting the payment to the Debtor. They're depositing the money into the court. It's like an interpleader action, if you think about it.

They're depositing the money in the court, and then the court will decide, or the parties will agree, and the court will have to approve some sort of settlement as to whose money it is. This is giving the customers comfort that they won't be held responsible twice. But we're not releasing the claim of one of the factors against the customer.

What we're saying is, with respect to that invoice, your claim is against the invoice itself, and now

you get to come and prove it up. But what people don't get to do, which I think would be bad for everybody, is go against the customer twice. So your jurisdiction, in our view, lies from two things.

One, the asserted interest of the Debtors in that particular property, that money will come in. And two, you're not going beyond your jurisdiction and provide a third-party release by one of the factors against that customer with respect to that particular invoice, because they continue to have the claim against the cash that invoice satisfied. You're going to have the cash, right, or you're going to be overseeing the cash, I should say.

And so we're not giving a third-party release to the customer. We're just saying you won't have to pay twice in order to encourage them to submit the cash.

THE COURT: I think that it comes in two different scenarios in my head, and clarify this for me. There were some instances in which the Debtor was still the servicer. There were some in which the Debtor, or a Debtor entity, was -- a letter was sent out --

MR. SINGH: Yeah.

THE COURT: -- replacing them as the servicer. So how do I -- how does this order cover, does it cover both of these situations, or one or the other?

MR. SINGH: I think it covers both of these

situations, because basically where an account Debtor letter was sent, so pre-petition, some of the factors sent the customer a notice saying, you know, the factoring had been terminated, including the Debtors being a subservicer, and you need to, you know, send the cash to us, right?

I think even in that situation, the issue is even though we were terminated with respect to generally the factoring arrangement, that doesn't mean that invoices that weren't factored may not be property of the estate. And that's the factual determination, I think, that Your Honor has to make. And so just like they've asserted a bona fide interest in that cash, so have the Debtors, right? We're asserting that is property of the estate.

Your Honor will have to make that determination if we all can't agree, but we're still asserting an interest in that. And it -- what -- all that was terminated is us acting as subservicer for them, and they can continue to collect those accounts. Practically speaking, what's happening is, as you've seen, right, the customers are just holding the cash because they don't know who to pay.

And so as a practical matter, we think it's much better for all of us that that money come in, right? The customer shouldn't have to pay twice for that particular invoice. We're not releasing any other claims or anything like that against them.

And we can fight about the particular invoice once it's in Your Honor's sort of, you know, jurisdiction and clearly within the court.

THE COURT: Okay. Thank you.

MR. SINGH: Thank you, Judge.

THE COURT: I'm going to take -- I know that some folks may want to speak on the phone, and just for the parties that are in the courtroom, I'll let you go first. And then, Mr. Duke, I see you there. I'll kind of get you after when everybody's done, but.

MR. KLEINHAUS: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. KLEINHAUS: Emil Kleinhaus, Wachtell Lipton for the Leucadia parties. Your Honor I'm in a little bit of an awkward position in the sense that we, the Leucadia parties, objected to this relief. I think we objected in a vigorous way. We filed an initial objection. We filed a supplemental objection. And we came to Court today understanding that we had a resolution of the objection and that the resolution was essentially a reservation of rights in which the exact issue that Mr. Singh just argued would not actually be resolved.

So what I'd like to do with Your Honor's permission, and I'll try to do it very efficiently, is explain what I think the resolution is, and then just

briefly touch on the legal issue in the event Your Honor has to --

THE COURT: Okay.

MR. KLEINHAUS: -- resolve it. Your Honor, we've been working, I think, cooperatively with the Debtors for a number of weeks in trying to figure out where there's a dispute and where there's not a dispute. And that negotiation and discussion, I think, was productive in the sense that a number of us agreed on an initial release of the 55 million, subject to a number of protections.

And then the Debtors came to us a few days ago and said there's a portion of this property which they're not going to seek to release right now, then there's a portion that they do want to release, and that's the 16 million or so is what they're saying they do want to release. That's really 2A and 2B, and the Debtors said at the same time Category 3, for various reasons, they're willing to hold back for now and pursue an adversary proceeding. So --

THE COURT: Let me --

MR. KLEINHAUS: Yeah.

THE COURT: Just to make sure that we're all -- we may be talking -- we may be saying the same thing. My understanding is that there's like 1.8 million, which they call Category 1.

MR. KLEINHAUS: Right.

THE COURT: Which they believe, kind of, the post-September 12, and kind of 2A are kind of perceivable that the only thing kind of applies to any entity which they don't have. And then kind of 2B is kind of a subset, like, kind of an additional subset, but maybe --

MR. KLEINHAUS: It's a lack of --

THE COURT: -- kind of 1A.

MR. KLEINHAUS: I am sorry, Your Honor.

THE COURT: I should say 1 is about 1.8. The other one's about 8, and then 2B kind of falls in line with part of their reconciliation, which I know that there were some disputes about that.

MR. KLEINHAUS: Right.

THE COURT: And that's, like, the additional seven-and-a-half. So I think they're -- my understanding is that all that adds up to, like, 18.1, and lawyer math will kind of get you there, but it's like 1.88, and like, a little bit over 7.

MR. KLEINHAUS: Right. So those subcategories, 1, 2A, 2B there are some nuanced differences, but generally speaking, those are the subcategories that Debtors came to us a few days ago and said, we believe these can be released similar to the 55 million.

THE COURT: Right.

MR. KLEINHAUS: And we want to persuade you of

that.

THE COURT: Got it.

MR. KLEINHAUS: So they've also been providing some documents. So the resolution, to be extremely clear, that we reached on Category -- well, Category 1, our client has agreed to release, in part, because it doesn't really relate to customers that are a client factor.

THE COURT: Got it.

MR. KLEINHAUS: And that's the 1.8. But 2A and 2B, what the agreement is, and it's reflected in Paragraph 6 of the proposed order it is not that there's going to be a judicial resolution today of this question of whether an adversary is needed. It's actually the -- quite to the contrary.

What we've agreed is, because we've gotten a bunch of information in recent days, and in general, we've so far been able to work at least somewhat cooperatively to decide what to litigate or what not to litigate. We were going to get a certain amount of time, a few weeks, to figure out, do we dispute this or not? And if there's no dispute, the money will get let out without an adversary proceeding.

THE COURT: That's the January 25th, February 2nd.

MR. KLEINHAUS: Exactly.

THE COURT: Okay. Okay.

MR. KLEINHAUS: And if there is a dispute, what

Paragraph 6 says is, rather than this general kind of pause that can go on for the whole examiner process, as to these particular subcategories, the Debtors can come back and say, Your Honor, we can release these funds without an adversary proceeding.

And what the order says is, we can then come in and say, we think an adversary proceeding is necessary to release these funds. That's the language in Paragraph 6, which says, at the very last line of Page 6, with the third-party factors reserving all rights with respect to such hearing, including all arguments that an adversary proceeding is necessary and all arguments regarding discovery.

And on Page 4 of their reply, the Debtors, I think, have laid out quite accurately what the deal is, in terms of saying, if there's no bona fide dispute, the cash can be released by consent. If there's a lack of an agreement as to whether there's a bona fide dispute, then, including because a factor argues there's not enough information to determine whether there's a bona fide dispute, the Debtors reserve the right to come back, and we can contest on any ground, including the need for an adversary proceeding.

And then the last point, if there is a bona fide dispute, then there's going to be an adversary proceeding.

And I think the Debtors have concluded that Category 3 requires an adversary proceeding, so.

THE COURT: So if I'm understanding you correctly, you read Paragraph 6. I'm not saying I disagree or agree.

MR. KLEINHAUS: Yeah.

THE COURT: I'm just, you know, laying it out. You're saying today, the way this proposed order would work is Categories 1 and 2A, kind of what we call the 8.1 and the 1.8. Parties have until January 25th to kind of figure out if there's agreement. If there's no agreement, then somebody can -- then I take up the issue about whether there's an adversary proceeding or not.

And with respect to 2B, you go to February 2nd, a little bit more time on that one, and whether --

MR. KLEINHAUS: Yeah.

THE COURT: So really, I'm just not making a determination. I'm setting a time frame, which parties -- but if somebody agrees, if there's agreement with one or more funds, then it drops into the operating account, and then you get an admin claim to the extent that you don't. But if not, then I've got to take the call at some point after somebody would reach out to us after January 25th.

MR. KLEINHAUS: That's right, Your Honor. The basic deal here is as to Category 3, the Debtors have agreed. They haven't agreed on the substance, on the

merits, but as a process matter, the Debtors have agreed they're going to bring an adversary proceeding.

And as Your Honor said, as to 1 and 2, the trade is essentially, rather than having a whole fight today about whether an adversary proceeding is needed, we're going to take some agreed period of time to decide whether we need to have the entirety of the litigation, or alternatively, whether as to the 55 million, there's a willingness just to consent.

And part of the motivation here is there's been a lot of argument about process, which is understandable because this is a very complicated set of facts. But the goal here was to try to put aside for a few days the argument about process and figure out whether there's really a dispute with our client reserving all of its rights, including its rights as stated in Paragraph 6 to argue an adversary proceeding is necessary.

So that's my understanding of the deal. I think Mr. Singh went into the merits maybe because there are some other parties that are not on board with the deal. So I'll just very briefly state what our position is if the court decides to reach the merits of this, because I don't want to have a situation where we thought we were punting that argument and it gets decided today.

I mean, our position, in short, Your Honor, is

that to the extent there is a bona fide dispute, or in a situation where there's a factual vacuum, and we just don't have enough information to know whether we have a basis to dispute, an adversary proceeding absolutely is necessary. And it's the Debtors who have to bring it.

And I think that really boils down to Section 363(a) of the Bankruptcy Code. And what that section says is that cash collateral is cash or a cash equivalent in which the estate and an entity other than the estate have an interest, right? You need to have the estate and an entity other than the estate having an interest.

In probably 99 percent of the cases that Your Honor has, or a really high percent, there's no question the Debtors have an interest or at least an arguable interest in cash. They have a bank account when the case starts. It's a commingled account. And they're saying, I want to use that cash. And somebody else is saying, I have a security interest. This is the 1 percent. This is a completely different case.

And the reason it's a completely different case is that as a result of the factoring process, and what appears to be a very significant fraud, there's a fundamental question as to whether the Debtors have any interest in the collections of receivables.

And Your Honor, the whole point of the segregated

account that was set up in the cash management order, in the DIP order, was to ensure that the proceeds of receivables remain segregated in a way that would preserve our ability to argue that the estate has no interest in that cash.

And we would argue that for one of multiple reasons. One is because there were true sales of receivables, so that unlike proceeds of Debtor property, those are true sales so that the proceeds would not be Debtor property because they didn't own the underlying property.

Or alternatively, because to the extent the property was stolen, or there's a constructive trust, or any of the remedies that might be available in a case of fraud, there are a variety of arguments that would be available to us to say the Debtor has no interest in that cash. That is nothing like MF Global, where that case, like many cases, the Debtors start the case with a bank account, and then they want to use the pre-existing cash in that account.

This is a situation where the whole reason we set up on the first day of the case, and then at the final orders, the segregated cash was to preserve this argument that the Debtors have no interest. Now, in a context where the Debtors may have no interest at all, saying that it's cash collateral doesn't work.

To the contrary, what you have is a situation

where you have a dispute as to who has an interest, and what Rule 7001(b) says is that has to be resolved by an adversary. And then what the TMT case from the Fifth Circuit says, and I'll quote, is that, "The party seeking to include property in the estate bears the burden of showing that the item is property of the estate."

Now I can go on for a while as to why it matters whether there's an adversary. The only point I'll make is that in an adversary proceeding, it's very clear under Rule 8(b)(5), that if there's just an informational vacuum, which so far has been the case to a large extent as to how this fraud works, a defendant can say, we lack knowledge or information sufficient to form a belief about the truth.

So until we know what actually happened with this fraud, at least an adversary proceeding protects us in being able to say, we don't know enough either to admit or deny your allegation.

So all of this to say that if in a context where this issue were fully litigated, we would argue that as to any of the categories, to the extent either we have a bona fide dispute or there's a factual vacuum, Fifth Circuit law and Rule 7001 do require an adversary.

But the point of this resolution, Your Honor, was our client's interest is not in holding -- preventing the Debtors from accessing cash as to which there's no bona fide

dispute or in which we don't have an apparent basis subject to protections like the ones we negotiated in the order. We don't have an apparent basis to dispute.

So the whole idea behind this resolution, similar to the first resolution that we reached, was that let's see if there's a way to resolve this without this litigation. But if the issue has to be litigated, including the adversary proceeding issue that we thought was being punted, Your Honor can decide that.

And the Debtors reserve all of their rights to come in here and say no adversary is needed as to Buckets 1 and 2. So why don't I stop there? And if Your Honor has any questions, I'm happy to answer them.

THE COURT: No. No questions. Thank you.

MR. SINGH: Can I just make one clarification? Because it might inform the other parties.

THE COURT: Okay.

MR. SINGH: Thank you. Again, Sunny Singh for the Debtors. Your Honor, so I appreciate Mr. Kleinhaus is in an awkward position because we're stipulating with some of the factors, we're not the others. I'm similarly in the same awkward position. But everything he said in terms of what the deal is, I completely agree with, Your Honor.

I think the issue really turns on just if there's no bona fide dispute, then the Debtors' view -- and I think

the agreement with the other factors is, if there's no bona fide dispute or there's no information vacuum issue, then an adversary proceeding is not required. If there is a bona fide dispute or they have information gaps, then the information gaps -- hang on a second, let me strike that.

If there is a bona fide dispute, then an adversary proceeding is required, and we are agreeing to proceed by that, which is Category 3. If there is an information gap or dispute about whether or not we have a bona fide dispute, which is the process that will play out over the next two or three weeks under the timeline with respect to Category 1 and 2, then depending on which bucket that falls into, either as agreed to by the parties, bona fide dispute or no bona fide dispute, or determined by Your Honor, will dictate whether or not we need an adversary proceeding.

Our view, and I have to take this view because there's a number of parties who are saying, even if we all agree that there's no bona fide dispute, that all of this needs to proceed by adversary proceeding, our view is subject to Your Honor agreeing or the other parties that we're consenting to agreeing that there's no bona fide dispute, that they've got the information, we don't need to proceed by adversary proceeding.

So I just wanted to clarify that I don't -- we're not trying to do something inconsistent with the deal, and

give them the time that they negotiated for and that we've agreed to figure out whether we've got a dispute. But if at the end of that timeline, we all agree that there's no bona fide dispute, or we can't come to agreement, but Your Honor orders that there's no bona fide dispute, then an adversary proceeding is not required. I think that's the agreement.

And I wish everybody was just agreeing so we don't have to sort of argue the point at the same time as settling the point. But I wanted to clarify that I don't think anything I'm saying or how the Debtors intend to proceed is inconsistent with how Mr. Kleinhaus described the actual terms of the deal as it relates to his client, Raistone and ING.

THE COURT: Thank you.

MR. SINGH: Thank you.

THE COURT: Mr. Grillo.

MR. GRILLO: Good afternoon, Your Honor. Again, Emanuel Grillo, Orrick, Herrington & Sutcliffe, on behalf of Raistone. Your Honor, the reason I wanted to get up after Mr. Kleinhaus is that because we settled along, you know, and agreed to the stipulation and the consented order along with Mr. Kleinhaus' client.

And I think a really -- you know, and I'm not going to repeat the arguments and everything else, but I just really want to make one point.

THE COURT: Okay.

MR. GRILLO: Which is that if you take a look at the order and Mr. Singh laid it out, Mr. Kleinhaus laid it out, is that there's no prejudice to anybody. And it effectively renders this hearing not ripe for today. Because the bottom line is, is that there are a series of deadlines that start on January 25th, February 2nd. I don't think there's really anything that the court really needs to decide today.

We can -- what we're trying to do is to figure out if there's some common ground between now and then. And then if not, everyone's rights are reserved. Anyone on this side of the room can certainly bring or come back to Your Honor and say, we need an adversary proceeding. And Mr. Singh and everyone on this side of the room could say that we don't.

And the whole point of the order, I think, was to give people one time, two information, right? And we didn't talk about it in detail exactly what that information is, but that's all laid out in Paragraph 3 of the order. You know I had to make for myself, Your Honor, and I have an appreciation for the Court's sense, a chart kind of laying all of this out.

Because it's clear that when you take a look at Category 1, Category 2A or Category 2B, everyone's rights

are reserved. Mr. Singh and his clients have taken --

THE COURT: The only reason I --

MR. GRILLO: -- three and four off the table.

THE COURT: -- was going to say there's a footnote here that says that you've already consented to the 1.8. So one is off the table.

MR. GRILLO: Yes, no, some of us have. What I'm mostly talking about, Your Honor, is that yes, we have consented to the 1.8. But I'm saying to the extent that others have not, if they get on board, you know, or if Your Honor says --

THE COURT: Got it.

MR. GRILLO: -- I think this order makes sense at the end of the day, then they'll have a window within which to do that. And most importantly, you know, we'll also be getting information over this time period in order to do that. Look, obviously, from a legal point of view, we filed an objection. We have some of the same comments that the other parties have as far as that goes. And Mr. Kleinhaus, you know, did an excellent job sort of summarizing what all of those points are.

But I think for today's purposes, if Your Honor is inclined to consider the order, there's really nothing where anyone can come up and say, Judge, if I don't get relief today, I'm going to be prejudiced. And that's really, I

think, the key, is that we can walk out of this courtroom today. It may be January 25th. It may be February 2nd. But the bottom line is that I don't know that there's anything that we really have to do today.

Last point, Your Honor, with respect to what's referred to as Paragraph 11. That's, you know, the rights, Your Honor made the point of, well, do I have to decide anything with respect to, you know, third parties, be it the customers and the factors? And we were one of the factors that did also issue notices pre-petition.

All we're saying is that for purposes of this hearing, anything that comes in on an invoice, we're just saying, look, if it's been paid into the company as far as it goes, we're not requiring or we would deduct that amount from anything else that's otherwise owing.

So all we're trying to do, I think, is set up a mechanism so that they can go back to the customers as far as that goes and get money. Customers don't have to feel that they're going to get double-charged. Obviously, with respect to everything else, doesn't matter.

But the bottom line is that for purposes of being here today, what we're trying to establish is that, look, you're not going to get charged twice. We're not going to come after you for anything that you pay in on a post-order basis.

And that was really important because none of the factors were interested today in withdrawing their notices. At the same time, we understood that Debtors are trying to collect money. And so, especially because some are pre -- and post-petition customers, and so we don't want them holding up the post-petition amounts, which we obviously have not factored, because there's pre-petition amounts outstanding.

So what we tried to do collectively is work for Debtors to establish that. So, Your Honor, I'm not going to take up any more time with additional argument. I know people have different positions, but because ours was the same as Mr. Kleinhaus', we wanted to sort of jump in behind him and sort of share that view with the Court.

THE COURT: Perfect. Thank you. Anyone else in the Katsumi? Are you interested in speaking or anyone, Evolution, anyone interested in addressing the Court one way or the other?

MR. KELLEY: We are and I will on other issues, but Mr. Scott will.

THE COURT: Oh, Mr. Scott, you got it. Okay. I was just -- I may be the better way of saying it. Anyone else in the courtroom?

MR. KELLEY: That's what I thought you would.

THE COURT: No, I should have. That would have

been the smart way to do it. I apologize.

MR. KELLEY: No worries. I just --

THE COURT: Okay.

MR. KELLEY: -- the navigation of mutual presence in video make these somewhat challenging.

THE COURT: Anyone on the line who wishes to make an appearance -- or not an appearance, who wishes to address the court, whose line -- Mr. Duke, why don't we start with you, sir?

MR. DUKE: Thank you, Your Honor. Michael Duke, from Elsberg Baker & Maruri, on behalf of Evolution. We received this new proposed order at 1:00 a.m. last night and I was reading through the --

THE COURT: That makes two of us.

MR. DUKE: motion. And that makes two of us. And I was reading through their brief and what they stated is that we haven't cooperated, we haven't been dealing with them. Your Honor, I haven't received any invitation to participate in any of these discussions. My client hasn't been offered to participate.

The first time I saw this order was last night when it came through at 1:00 a.m. in the morning. We haven't been shown the reconciliation report that came through again at 1:06 a.m. Eastern time. That was the first time it came in. They are trying to rush through this

order. It's completely new relief, and it is completely inappropriate.

And I'll just point out a few issues from what has resulted from this. I heard Mr. Singh get up and say, you know, this isn't an evidentiary hearing, he's not presenting evidence. And then he goes through category by category and how we're adequately protected by the amounts that remain in the account. And those amounts that he listed are completely wrong.

According to the declarations they put in, the amounts in Category 3 are $35 million. Not 45, which you just told, Your Honor, $35 million. Again, that is significantly below the $60.5 million claim that we have.

And again, this is all issues that they are trying to jam through without any type of process whatsoever, which is exactly why we filed an adversary proceeding. We need to have our rights actually determined as opposed to getting briefing on, for reasons I can't tell at all, at the very last minute, where they push through new substantive arguments for why we are not adequately protected or for why they have provided adequate protection to us, and for why we don't have priority, and we don't have validity.

This is exactly why we need the adversary process to avoid these types of issues. What they want to push through is $18 million more, which, again, will reduce down

the amount that were in the account that we were relying on in order to satisfy our claim. We have rights to Category 1. We have rights to Category 2B. That's $9.1 million, according to their declaration. They can't just jam this through.

I want to point out a couple of additional issues, Your Honor. If you look at Paragraph 22, of their brief that came in at 1:00 a.m.

THE COURT: The --

MR. DUKE: What it states is that --

THE COURT: Well, just a minute. Let me get there. Are you referring to the brief or the proposed -- the reply?

MR. DUKE: Well, we can actually -- at the reply, but just to point out a couple additional issues with the order --

THE COURT: Oh, and --

MR. DUKE: -- the proposed order, and we filed a competing one on the docket, right before this.

THE COURT: Mr. Duke, I apologize. I was just trying to -- I didn't know if you were referring me to the reply or the order when you said Paragraph 22. That's all I was just trying to get to so I could follow you.

MR. DUKE: Apologies. The reply, but I think if we start with the order, actually, I want to point out a

couple of different issues.

THE COURT: Okay.

MR. DUKE: Because I'm very confused as to what the Debtors are attempting to do here.

THE COURT: Okay.

MR. DUKE: I had the same confusion with respect to Category 1 of whether the Debtors are attempting to release that today or not, and if you look at Paragraph 10.

THE COURT: Okay.

MR. DUKE: Excuse me. Paragraph 6 of the proposed order.

THE COURT: Okay.

MR. DUKE: What it states at the top is that the 1.8 million, they relate to the Category 1 invoices, and then I'll skip over the other two categories. It says may be released from the factored receivables account into the Debtor's operating accounts without further court order, and shall then be deemed to be collateral as defined in the final DIP order.

That doesn't have the parenthetical that follows Categories 2A or 2B. It's a subject to agreement from each of the third-party factors and the Debtors. So again, this is, as I read it, just an attempt to release those funds. Okay.

If you go to Paragraph 10, I believe this is

another attempt to substantively affect our rights, and what it states there in the middle of that paragraph, it's on Page 8, Paragraph 10.

THE COURT: Hold on. Let me walk through this. Let's see. I'm just going to -- I just want to make sure I'm following the point here. Paragraph 6, except as set forth in 7, subject to -- you're saying that they're not providing reasonable -- your point is that they're not providing reasonable diligence with respect to the 1.8, as opposed to the 2A and 2B?

I'm just making sure I'm following.

MR. DUKE: Your Honor, slightly different. So if you look at the second clause where it states up to 8,679,000 for Category 2A invoices, it has a parenthetical following that says, subject to agreement from each of the third-party factors and the Debtors. That parenthetical, which also is included in the next clause on 2B invoices, is wholly absent from Category 1.

THE COURT: You're saying --

MR. DUKE: So as I read it --

THE COURT: -- that that clause --

MR. DUKE: -- what this states --

THE COURT: -- applies to just Category 2A, and not paragraph -- not 1 and 2A. You think it just applies to 2A, as you read it?

MR. DUKE: Well, as I read it, they put it in 2A, and then they put it also following 2B.

THE COURT: Following 2B.

MR. DUKE: But did not include it on Category 1.

THE COURT: Okay. That's a good question.

MR. DUKE: And so as it is written, it states that they're going to release Category 1 -- or they may release Category 1 invoices upon entry in this order.

THE COURT: Got it. Got it. Okay.

MR. DUKE: And again, Your Honor, these shouldn't be issues that we're having to issue spot-on with, I don't -- I would say, about six hours' notice during the actual waking hours, though I know lawyer waking hours are sometimes a little bit different than normal.

But in any event, this shouldn't be something that is jammed through this way where we're having to issue spot on communicate with our clients at the very last minute. There was no reason for this to be filed the way that it was filed.

Paragraph 10, I'll also note, it states in the middle of that paragraph that following entry of this order, the Debtors, with consent of the capitalized consenting third-party factors, which is the defined group that does not include us, that filed objections to the motion may seek to release additional amounts received on account of

Category 1 invoices, or Category 2 invoices, upon entry of a further court order without renewing the motion via a notice of hearing.

So they're just trying to do away with the notice of hearing for Category 1 and Category 2 invoices as long as certain of the factors, but not all of them, consent to it.

THE COURT: You're concerned --

MR. DUKE: Which again, is a change from our settlement rights.

THE COURT: Mr. Duke, your concern to this paragraph -- and tell me if -- I'm just trying to make sure that I'm articulating it to following it. That your concern is that Evolution may not be a consenting third-party, but you will have filed an objection. And so therefore, perhaps the funds would be released without a hearing even though you never had an opportunity to object. Would that be the --

MR. DUKE: Correct, Your Honor, and it's not just that we may not be a consenting third-party --

THE COURT: Or that you are not one.

MR. DUKE: We aren't.

THE COURT: Yeah. Got it.

MR. DUKE: If you look at Footnote 4, it's defined to include entities that are not us because we were never asked to participate in any of the discussions that the

Debtors had. They just decided they wanted to do it unilaterally without us.

And this brings me to the other issue. So if you do go to Footnote 4, which is on Page 4, I can't understand why this proposed order would include the language that it does here where the Debtors are fine providing a bunch of discovery. But it has a clause that states provided further that the Debtor shall be required under this order to provide the foregoing only to the third-party factors, they consent to entry of this order.

So they're not even going to provide the discovery that they say they're going to provide to everybody else for an unknown reason just because we didn't consent, which we never had the opportunity to do under this order. Again, I think that that's entirely inappropriate. This is not something that should be decided with six hours' notice.

With that, Your Honor, I'll note that we put in a competing order. We raised issues with this. We put in a competing proposed order. We're fine with a lot of the provisions in here, but these provisions in particular cause us a lot of concern, and it should not be jammed through the way that it's being attempted to be jammed through.

I heard Mr. Singh -- or with that, I'll pause. I want to turn to a separate issue that Mr. Singh raised, but I'll pause --

THE COURT: Well --

MR. DUKE: -- there in case the Court has any questions.

THE COURT: The only question I have is I have not had an opportunity to review, but I will. I'll take a moment and look at it. Is there anything you want to highlight for me in your version of the proposed order, or is it --

MR. DUKE: Your Honor, we've attempted to solve for some of these issues. We saw this as an attempt to just release the Category 1 fund, so we've struck that entirely.

THE COURT: Got it.

MR. DUKE: We've done it in red line, so it'll be easy to track, but we've -- the core issues are what I've walked through here.

THE COURT: Okay.

MR. DUKE: I also want to turn to the adequate protection arguments that I heard Mr. Singh making. I'm, again, a bit confused here because, as I understood, this was a procedural motion. And then I received that filing early in the hours this morning and saw numerous substantive arguments for why we're not entitled to any adequate protection, and they're allowed to reduce down the accounts further than they had after Your Honor's last order, where you required them to keep additional funds in and reduce the

amount they're receiving by $3 million.

Now, what they state, and this is at Paragraph 22, this is where I was heading a minute ago, of their brief, is that Evolution is not entitled to adequate protection for its speculative, unproven, and undetermined security interest to an extent greater than which the Court already determined was sufficient.

So as I just noted, it's less. We're getting less money under this proposed order than we had following the last hearing, so that's just completely wrong. And the idea that this is speculative or undetermined, I want to address both those. Because it's undetermined because it should be determined under a 7001 proceeding. That's exactly where it should be determined, and I agree with them. It is undetermined. We need to have a 7001 proceeding, and the case law is absolutely clear on this.

The statute, the congressional mandate is absolutely clear that this needs to be a 7001 proceeding, and what they've instead stated is, well, Your Honor, you can give them the worst effects, as though you had decided the 7001 proceeding, by just assuming that they don't have a valid security interest. Don't give them adequate protection, or give them adequate protections that they didn't have a valid security interest, valid first lien security interest, and then you should be fine.

That is not how it works. That would be the easiest end run around 7001 that could ever exist. You just never rule on it. Just never rule on it, and then just continue to diminish it to where we just have a worthless administrative priority claim. That is not how it can work.

What we are entitled to is to have our first lien perfected security interest treated as one, and if there is an adverse ruling on it has to be through an adversary proceeding. They also spent a few pages talking about how the adequate protection here, which again is their burden under 363(o), is just whatever Your Honor wants to fashion, and that's not correcting the statute.

I also have been racking my brain to try to understand what it is that where they would reach a point where they would determine that actually there aren't enough funds for us to be adequately protected. They continue to reduce it down, and they continue to drop it, but they never stated what actually constitutes adequate protection for us.

And what 363 -- or sorry, excuse me, 361(3) states is what we are entitled to is the indubitable equivalent of our security interest, and our security interest is in the funds that are being released. They are not providing us anything in exchange for that. They are just continuing to draw it down, and they say, well, you have an administrative priority claim that you can assert at the end of the case.

361(3) could not be clearer. What it states is that you can grant such other relief other than entitling such entity to compensation allowable under Section 503(b)(1) of this title as an administrative expense. That is what Your Honor cannot do, is give us an administrative expense claim as adequate protection. The statute is absolutely clear on that.

Now, Your Honor, they went into this at length, so I'm going to address it unless Your Honor tells me to stop doing it. But they've also challenged our -- the extent of our claim, and they've gone into, again, to re-argue the transfer point, the definition under UCC-1 and transfer.

THE COURT: Well, I don't think you -- I want to stay away from that one. But I understand that they raised it, and I'm not going to go there one way or the other. But I do understand that --

MR. DUKE: And, Your Honor --

THE COURT: -- they're challenging the claim.

MR. DUKE: All that I'll say on that is to the extent that it factors in the definition of transfer and what they are seeking in terms of adequate protection, it has to come out in our favor. It can't be, again, that we are treated as not having a valid first lien priority interest for purposes of determining adequate protection.

Because they just say, well, it's not a strong

enough claim. It's not a good enough claim. That needs to be decided in 7001. It can't be decided just on papers that they submit during this contested process on an expedited basis, at 1:00 a.m. in the morning, the day of the hearing.

Your Honor, I'll just note that, again, the math in their order, even if you look at -- even if you accept, like, go past the 45 million versus $35 million issue, it just doesn't add up. From what I can tell, the categories add up to a total of 57.757 million. So it doesn't reach the 65 million threshold.

I can't understand how they get there. This is something that I would have liked to have discussed with them, but we never received the proposed order. They never tried to discuss it with us. We never received the reconciliation report until this morning, despite, as you can see in Paragraph 4 of the proposed order, they provided it to everybody else. It just -- it doesn't work. And the process that they're attempting to do doesn't work.

I request respectfully that Your Honor deny their proposed order and put in ours instead.

THE COURT: Just one clarifying question, and then I'll turn to Mr. Scott. And then I'll turn to Mr. Deutsch. So I'll go to his -- just going through my notes here. And I don't want to get into the substance of it -- well. I don't want to kind of get into kind of rulings in prior

hearings, obviously, because there's an appeal going on.

But my understanding was that Evolution was -- had a claim against receivables by some Debtors, but not all the Debtors, right? And so I think -- is my understanding correct? In other words, that -- I got it. Your argument may be that the 1.8, some portion of it may relate to something that you're alleging -- your client is alleging a security interest in. And seeking a determination of under -- in an adversary proceeding.

But there may be some portion of it -- and again, you haven't seen anything. But that may or may not relate to a Debtor in which has a receivable that your client may not have an interest in. Is that right?

MR. DUKE: Your Honor, that's exactly right. And that's why I started off the top with noting that out of the 18 million they're intending to release, I believe our issue is with 9.1. Because those are the amounts where we're not able to determine at this point whether they are our Debtors or not. So it's -- and I'll just briefly state it.

I understand -- I believe Your Honor has it correct where -- but just to state the issue, is that we have a security interest in the receivables sold by our receivable sellers, which are the eight Debtors under our agreement. And Category 2A, and my team will keep me honest, but I believe that's correct.

Category 2A is represented by the Debtors to not include any of the Debtors for -- under the factoring agreements, which would include ours. So we're not taking issue with the 2A receivables. But we are taking issue with Category 1 and Category 2B, which include our receivable sellers.

THE COURT: Do you have a ballpark on what the -- I won't hold you to it. It's not evidence. I'm just trying to get a sense of like with respect to the one -- I can just do the math. But with respect to the one, do you have a sense between 1 and 2B, kind of a back-of-the-envelope split as to what you think? Or do you just not have enough information?

MR. DUKE: It would be -- Your Honor, unfortunately, we don't.

THE COURT: Okay.

MR. DUKE: This is something that we had hoped to receive a reconciliation report early enough to be able to engage in those discussions. Debtors didn't want to provide it. That was their choice.

THE COURT: No, I understand.

MR. DUKE: We're not able to deal with that.

THE COURT: Understood. I was just curious. I'll just note some questions here. Thank you very much, Mr. Duke. I don't have any further questions. Is there

anything else you wish to tell me? If not, I'll turn to Mr. Scott. Thank you, though.

MR. DUKE: No, thank you, Your Honor. I just -- Mr. Singh brings up additional issues. I just respectfully request that I --

THE COURT: No. I got it.

MR. DUKE: -- come back up. Thank you.

THE COURT: Got it. Thank you.

MR. DUKE: Appreciate it.

THE COURT: Mr. Scott.

MR. SCOTT: Good afternoon, Your Honor. Again, for the record, Sean Scott, of Mayer Brown, on behalf of Katsumi Servicing, LLC. As Your Honor knows from our prior appearances in this case and our various filings, Katsumi is the buyer's representative under various receivables purchase agreements, pursuant to which buyers purchased receivables from various First Brands obligors, which as of the petition date, aggregated approximately $1.7 billion.

And I'll come back to this a bit later, but the sheer magnitude of the third-party factor claims and the Debtors' own admissions as to the scope and extent of the fraud here, I think, make the MF Global precedent inefficacy. But I do want to expand on a few points that you heard from Mr. Kleinhaus.

Importantly, as Your Honor knows from other cases

where you've encountered these types of factoring arrangements, the receivables transfer agreements here or the receivables purchase agreements here were structured to be true sales that were bankruptcy remote. And what that means is that the purchasers of the receivables didn't intend to take the credit risk of the First Brands sellers.

Instead, they believed they were really only taking the credit risk of the underlying obligors to pay on those receivables, and that while the First Brands sellers would collect and distribute the proceeds, that would never become property of the bankruptcy estate. Those funds were not to be used by the First Brands sellers, period.

In that way, the third-party factors here, at the outset of this case, were in a fundamentally different position than the ABL, the term lenders, the DIP lenders. In a very real sense, the third-party factors are involuntary creditors in the context of these Chapter 11 cases.

But from Day 1, Katsumi in particular, for the benefit of all the third-party factors, has sought to preserve the status quo to make sure that collections on prepetition receivables are properly allocated among staying purchasers or third-party factors versus the Debtors.

As Your Honor recalls, we raised issues on Day 1 to ensure that cash collections on the prepetition

receivables were segregated. We objected to DIP liens on those proceeds on causes of action. We negotiated in the context of the final DIP hearing and the final cash management order the continuation of that process. All of the parties, including the Debtors and the DIP lenders, agreed to the establishment of that segregated receivables collection account.

So again, targeting back to MS Global, distinguishing factors. This was meant to give the Debtors breathing time, space to do their investigation. They indicated that they needed time to investigate the third-party factoring arrangement. We heard on Day 1 about the sheer magnitude of the fraud here, and the Debtors have taken months to continue to investigate that.

The expectation was that with respect to receivables collection, either those would be consensually agreed in terms of what belongs to the estate and what does not, or need to be the subject of further dispute resolution.

At its most basic level, the through-line to these cases from the factors' standpoint is that there needs to be a proper court process to determine what is or what is not estate property, and until that occurs, the prepetition receivables should be segregated and held in escrow. There are literally billions of dollars of competing claims. Your

Honor knows that.

Now, one of the hallmarks of Chapter 11 often is to substitute a more speedy and structured bargaining process for what would have been drawn-out civil litigation. But, as I think you've heard from the objectors, Rule 7001 is meant to protect rights when rights of sufficient magnitude are at stake. In that case, the bankruptcy rule provides for full civil litigation-style procedure. And ultimately, following filing of complaints, discovery, pretrial practice, ultimately a trial on the merits if there are disputed issues of fact and law.

What the Debtors are trying to do today, Your Honor, through this order, which obviously we object to the entry of, we are not a consenting factor, we didn't think it is the subject of the hearing today, is to seek a selective release of certain buckets of receivables in a way that doesn't comport with due process with federal rules of bankruptcy procedures.

And I just want to take a step back because it's important to remember those buckets were part of a construct that we negotiated. It was part of a compromise at a very fundamentally different time in these cases with a variety of puts and takes that the factors agreed to allow the release of certain funds.

Now that order is essentially being turned back

upon us and is attempted to be used as a coercive construct to tell the factors either you'll agree or you'll be excluded from discovery. You'll be excluded from the opportunity to weigh in on whether an adversary proceeding is needed.

And, Your Honor, I want to go back to -- again, I want to be mindful this is not meant to be an evidentiary hearing. But I do need to preview for Your Honor, because I think it's very important. We believe there will be material disputes as to potentially all of the buckets that are described in the reply.

We sought discovery. We sought meetings and interviews with the Debtors. We saw months where no discovery was proffered. And then last week when we threatened to file a motion to compel, we were able to obtain additional discovery over the weekend.

But our own advisors tell us that there are situations where sellers' names are replaced in spreadsheets, where customers' names are replaced in spreadsheets. This is a fraud case. You heard it from Mr. Stark last week which one it is. We certainly know it is a fraud case. So this is not a simple situation where you will pick the Debtor's representation that they don't believe there is a bona fide dispute.

I think our position, Your Honor, is there is and

our advisors have uncovered evidence that there are circumstances where the pre-petition Debtors did change seller names, did change underlying obligor names.

And so fundamentally, which bucket we're talking about doesn't matter. This is a question about ownership. Who owns the proceeds of those receivables? We cited the Chait Properties case in our brief, Your Honor. I think that's a very material case. Because the parties had a dispute over ownership of the Debtor's stock at the time of filing. Pretty fundamental to Chapter 11. Was the Chapter 11 properly authorized?

And even there, the Court noted that while the dispute was effectively outcome determinative, the Court said the determination of ownership must be resolved in an adversary proceeding. And the cite for that is 278 B.R. 744.

The same is true here. This is about determination of property interests. I also want -- and I know Your Honor knows this, but I want to spend a little time with the rule itself because I think it's important as we're thinking about this construct of a bona fide dispute. Rule 7001 tells us what are adversary proceedings. It includes proceedings to determine the validity, priority, or extent of a lien or other interest in property, except for proceeding under Rule 3012 or Rule 4003(d).

Your Honor knows those are pretty limited exceptions. 3012 deals with determination of the amount of a secured or priority claim. 4003(d) deals with proceedings to avoid a lien or other transfer of debt of property. Not applicable here.

So the Debtors have said, well, we think that the real question is whether there's a bona fide dispute. Your Honor, first of all, I would say two points. The presence or absence of a bona fide dispute is not the legal standard. There are other sections in the code where Congress elected to use that standard.

Section 303 of the code, creditors can't force a Debtor into involuntary if their claim is subject to a bona fide dispute as a liability or amount. Section 363, as you know, you can sell property free and clear if, among other conditions, the interest is in a bona fide dispute.

That's not the standard. But even if that were the case, to determine if a dispute is bona fide, courts use an objective test. They assess whether there's a legal or factual dispute as an objective matter. That's an evidentiary issue, Your Honor. The only -- as I said, we would not agree to the admission of the declaration and would object to it.

But the Debtor's reply basically tells you there's no bona fide dispute because we say there's no bona fide

dispute. That's circular. We do expect that there will be bona fide disputes around that. I do agree with Mr. Kleinhaus that if you look to TMT procurement, it is the estate's burden to show that an item is property of the estate.

This is not cash collateral. This is a situation where likely something is or is not estate property. It will be a binary outcome. And, Your Honor, we submit that in a case like this, Rule 7002 provides that an adversary proceeding must govern that adjudication.

At its root, a Debtor cannot take and use property of a non-Debtor. That's a constitutional principle. There's a plethora of decisions that Your Honor is aware of, but the bankruptcy laws are subordinate to the takings clause and the requirements of the Fifth Amendment. The Debtors are, at bottom, asking to sacrifice our procedural rights at the altar of expediency.

And, Your Honor, we submit that regardless of the bucket, if there is a dispute, that needs to be resolved in an adversary proceeding. If the parties agree to the release of the funds, you heard from some of the consenting factors, that can be done. We don't see the necessity of the order today, other than to try and short circuit some of the protections that should be available for the factors.

THE COURT: Mr. Scott, just one question. I know

it's been raised in -- by Katsumi in some other context, and I just -- with respect to the proposed kind of dates, what I will call Paragraph 6 dates, the January 25th, and the February 3rd, are there any concerns that you have there? I know that there were some questions about getting information, and I know you've mentioned it earlier. Any thoughts on that?

MR. SCOTT: The short answer is yes, Your Honor. Your Honor, we do have concerns about that. And that was -- again, I'm trying to be mindful of not delving too far into our discussions with the Debtors and various compromises. But a big concern for us has been those deadlines. We did see nearly a month of -- or at least three weeks of no productions.

The productions that we received over the course of this weekend into yesterday were extremely voluminous, gigabytes of material. I believe the number was in the order of magnitude of 800 spreadsheets. We have 200,000 receivables for which Katsumi acted as buyer representative. So the Debtors have had, in our view, almost four months to investigate this.

There is much information needed to validate this, to understand how the fraud occurred. We have taken testimony of that during those depositions. We have learned that the Debtors, at least at that point in time, were not

able to disclose how the fraud occurred.

I come back to, yes, timing is a significant concern here. That is -- it is not just process here. We do think the benefit of an adversary, or at least a much lengthier timeline, is to ensure that the parties' substantive rights to the receivables are protected.

THE COURT: Last question. With respect to Katsumi, I know that you said you may disagree with some of the way the categories are structured. But just using them for now, just for references, do you believe Katsumi falls in all three, one, two, or three? Or is it still kind of too early to know?

MR. SCOTT: We don't -- I don't think we can answer that, Your Honor. What I would say is we continue to press for information. We are continuing to try and validate that. A lot of that may relate to information that we received, as I said, over this weekend. And with our -- partners, we are working as expeditiously as possible. Obviously, all parties' interests are in getting the right amount of police to the right parties as soon as possible. But it needs to be a fair process.

THE COURT: Is there any category? And I know that, again, we're just using it as a proxy. Just is there any category in which you think Katsumi just won't have any kind of Debtor-receivable issues as you sit here today? In

other words, is it --

MR. SCOTT: As I sit here today, Your Honor, I can't answer that.

THE COURT: Okay. No. Fair enough.

MR. SCOTT: I don't think we've been given enough information to be able to answer that for Your Honor.

THE COURT: No, understood. Thank you. Those were all my questions. Thank you. Mr. Deutsch.

MR. SCOTT: Thank you, Your Honor.

MR. DEUTSCH: Good afternoon again, Your Honor. Doug Deutsch for ING Belgium. I'll be quick. I try not to reiterate what others say, but I find myself doing so at least in part today, so I apologize. We're also a settlement party. You know that. We're also in an awkward position.

We had a settlement. Sounded out probably hours ago that we don't have any settlement. Found out probably hours ago that we don't have any settlement. The settlement was consistent with, I think, the old adage that everybody was unhappy with it at the end of the day, which is the nature of the beast.

But now I understand it's not on the table, and I just wanted to stand up to say we did file an objection also. I don't know where we end up with this at the end. The objection is on the docket. We join Mr. Grillo's and

Mr. Kleinhaus' comments in that regard.

And I'll leave it at that today, Your Honor.

THE COURT: Mr. Deutsch, just so I'm clear, are you -- is there anything in the proposed order that you disagree with as it sits today?

MR. DEUTSCH: Your Honor, yeah, it's a settlement. And there are things that I guess I would say I don't like when you say I don't agree with them.

THE COURT: Oh, no.

MR. DEUTSCH: Actually --

THE COURT: In other words, I got it. Let me ask a better question.

MR. DEUTSCH: Yes.

THE COURT: I take it you agree with Mr. Kleinhaus' kind of interpretation of the way Paragraph 6 works and the deal works. Is that fair?

MR. DEUTSCH: Yeah.

THE COURT: Or is it a different understanding?

MR. DEUTSCH: That's fair, Your Honor.

THE COURT: Okay.

MR. DEUTSCH: No. That's fair, Your Honor. And I think, you know, again, that was a lot of effort by a lot of parties, and I think we came pretty close. But there are and continue to be warts with this order. But it's part of a probable settlement. I think our client thought it was

slightly better to settle than not to settle, if that's to go forward.

THE COURT: Understood.

MR. DEUTSCH: It's not a homerun for anybody.

THE COURT: So when you say you think you had a deal, it was based on kind of what the statements Mr. Kleinhaus was saying?

MR. DEUTSCH: Correct.

THE COURT: Okay. Got it. I just want to make sure that I understood it. Thank you.

MR. DEUTSCH: Thank you, Your Honor.

THE COURT: Anyone else wish to address the Court? Please hit 5, star, or unless I've already unmuted your line. Mr. Dodd?

MR. DODD: Your Honor, thank you. John Dodd for Arab Banking Corporation, also referred to as Bank ABC. I appear just to join Katsumi's objection. I'll be very brief. We are just joining that objection and rest on the -- with Mr. Scott.

THE COURT: Can you tell me the name of your client again? I missed it.

MR. DODD: Arab Banking Corporation. In the papers, it's also referred to as Bank ABC --

THE COURT: Oh.

MR. DODD: -- as in Alpha, Bravo, Charlie.

THE COURT: Yeah, I got it. Thank you. That's what I needed to know. Thank you.

MR. KELLEY: If you're having trouble hearing it, it's Arab Banking Corporation.

THE COURT: Yeah. That's -- but it's ABC, right?

MR. KELLEY: Yes.

THE COURT: Yeah. Okay. No. No. Got it. I thought so, but I wanted to make sure it wasn't someone separate. Okay. Anyone else wish to be heard who I have not had the opportunity to hear from? Yeah. Just please hit 5, star, and I will unmute your line. Anyone whose line I have already unmuted that wishes to be heard. Mr. Singh, why don't I give you an opportunity to respond?

MR. SINGH: Thank you, Your Honor. Again, for the record, Sunny Singh on behalf of the Debtors. Your Honor, it's been a confusing hearing, and I'm hopefully going to be able to offer some clarity. I'll do my best, at least.

Your Honor, with the settling parties, and I heard Mr. Deutsch's comments, you know, from the Debtors' perspective, we still have a deal, right? We have a deal as reflected in the order, as clarified by my comments following Mr. Kleinhaus' presentation. And as I think Mr. Grillo put it well, this is sort of how we're proceeding with those who agree.

Your Honor, I think for today, there's a real

simple question that's before you that we're trying to address.

THE COURT: Can I ask you, I should ask you. Mr. Singh, before you kind of go into it, just the clarification on the point about the -- Mr. Duke, I believe, raised it, about the $1.8 million.

MR. SINGH: We're not asking for that to be released today, Judge.

THE COURT: Okay. And so how do you read the clause, the subject to?

MR. SINGH: I think there's probably one, we just missed a parenthetical to include that there. But if you go further down that order, Paragraph 6 --

THE COURT: Just give me one moment.

MR. SINGH: It's at the bottom of Page 6 and 7 in our version. It starts, if the Debtors and the third-party factors, doesn't say consenting, are unable to reach agreement regarding the release of the above-referenced Category 1 or 2A, by January 25th, the Debtors may seek relief from the court on an emergency basis with the third-party factors reserving all rights.

So I think we just missed the parenthetical that says subject to agreement of each of the parties that was behind 2A and 2B. But we are not asking for, Your Honor, today to say that we could have access to any of the cash.

THE COURT: Got it.

MR. SINGH: That's not what today's about. And that's what, you know, hopefully I can clarify. What today's about is the Debtors are requesting that Your Honor schedule two hearings, one on the 26th of January, where without an adversary proceeding, the Debtors are going to request approval of any Category 1 and 2A invoices that are not subject to a bona fide dispute.

If we agree with Mr. Kleinhaus or Mr. Grillo or Mr. Deutsch that they're subject to a bona fide dispute, then they get kicked, okay? Because then we've got our deal that says, look, we need an adversary proceeding if you've got a bona fide dispute.

THE COURT: Where does Evolution fit into this?

MR. SINGH: So I'm going to get to --

THE COURT: Oh, okay.

MR. SINGH: -- Evolution in just a second --

THE COURT: Okay.

MR. SINGH: -- right? So that's where you are saying, look, give us that January 26th hearing where we agree with parties. And then I think it's a subsequent hearing date that we'd have to schedule for 2B because we agreed to a longer reconciliation.

But if you don't agree, Your Honor, we can't just take the cash if I just get, for example, Evolution and

Katsumi, right, and ABC Bank. If I just agree, for example, with Mr. Grillo's client or Mr. Kleinhaus' client that, you know, we don't have a dispute with respect to Category 1, still got to come back to court, right? Can't get that cash released without coming back to court.

And so everyone's fundamental protection in this order is no further cash can be released unless Your Honor enters an order or they actually consent. And I need the consent of all of the factors to get any cash released without an order.

So Evolution, we understand Evolution's position. And this will probably explain why they didn't get a copy of the order. But Evolution's position, to my understanding, is no further cash should be released from the account. It's fine. They're entitled to that position.

And so every time I want a dollar of this cash released from this account, I have to come back to Your Honor to schedule a hearing. The first one we're asking to be scheduled is January 26th, right? And Evolution will be heard then on all the evidence if Your Honor agrees.

But what they're saying today, right? So come back to the simple issue for today, is can the Debtors have that hearing on the 26th, or do we adopt Evolution's or Katsumi's position today that everything at this point forward requires an adversary proceeding? Which is what

they're saying, right? So then I don't even get my hearing on the 26th.

THE COURT: I'm not sure I -- and maybe it just works out that way. My understanding is that Evolution is saying with respect to their Debtors, so that's like 9 million out of the 18 million, one way or the other. Someone hold me -- from Evolution, hold me to it if I got it right.

And then Katsumi and Mr. Deutsch's client are -- and ABC, are saying with respect to theirs. So does that kind of -- at the end of the day, if all the -- if I get ABC, Evolution, and Katsumi all objecting --

MR. SINGH: Right.

THE COURT: -- is that basically the all 18 million or is there --

MR. SINGH: No.

THE COURT: Or is there some -- but if effectively, does it kind of take out?

MR. SINGH: No. No. But if they're all objecting, right? I think the way it would work is, Your Honor, if Your Honor said everything needs an adversary, everything needs an adversary proceeding because they're objecting.

THE COURT: But let's say -- but let me back up for a second. Let's just say I think the portions. And I'm

not saying I do or don't. I'm just trying to carve it out. But there can be something that doesn't require an adversary proceeding, right? Like let's just say the --

MR. SINGH: Right.

THE COURT: -- and after everybody goes to the reconciliation period, I'm just using this as a hypothetical for everyone. That there is something that no one disputes is not subject to. It's not part of one of the Evolution eight Debtors.

MR. SINGH: Correct.

THE COURT: It's not part of Katsumi's. Somewhere or the other, I don't think that -- I don't think anybody's going to say that portion needs an adversary proceeding. The question is, when you start factoring in, even assuming, you know, the Evolutions, the Katsumis, the ABCs, at what point does that mingle things so much that we're essentially going to have one?

MR. SINGH: Well, I don't think it's -- I think the point is, and that's the sort of fine line that we've drawn, is at the 18.1 number, essentially, right? The Category 1 and 2, we think it leaves enough in the bucket that we're not going to take out, and I don't have to go through the numbers. Obviously, I disagree with what Mr. Duke said, but this isn't a numbers exercise for today, that there's enough for people to fight about, right?

And everybody's going to get information that says, here's what we're releasing from Category 1 or 2, what we propose to release. And if there's a bona fide dispute, we'll put it into an adversary proceeding.

And what I'm asking Your Honor to prove today is to say, if there's no bona fide dispute, then I can have a hearing on the 26th, without the need to file an adversary proceeding. As long as there's no bona fide dispute, Your Honor may rule at that hearing, you know what? I've taken a look at this information through the evidence, and I find there's a bona fide dispute, we're going to have to take that to an adversary proceeding. That's fair.

I think what Evolution is saying, what I'm hearing them say is, they've asserted a security interest as to everything, right, as to their Debtors. And they don't know what's theirs and what's not theirs at this point, because frankly, a lot of us don't know that information, right? And so they're saying, at this point forward, we have to proceed by everything by adversary proceeding. I think that's what they're saying.

And so Your Honor, I think the simple issue before you today is, can the Debtors schedule a hearing, right, for the 26th and subsequently for whatever that date would be?

THE COURT: That February 3rd.

MR. SINGH: Yeah. Right. Whatever the date would

be in February that says, we don't need -- again, if there's no bona fide dispute. And part of that hearing may be, Your Honor, determining whether there was a bona fide dispute, right? And so that's the issue.

And I think we've got two arguments in response to that. One is from Evolution saying, no, I've got a security interest, and I filed an adversary proceeding, right, to determine my security interest. And so therefore, everything from this point forward, with respect to any more cash, needs to proceed by adversary proceeding.

And I think there was a little bit of confusion in some of the comments that were made. And it might have stemmed from my comments originally, so I'm not casting blame on anybody. But they're asserting a lien, right? And so that is a cash collateral dispute, in our view. I'm not saying that if somebody's asserting ownership, that's cash collateral.

But they're asserting a lien, right? They have a different argument. Your Honor's heard all about that. It's been briefed. And their argument is, I am a secured lender with respect to the other account receivables. I'm also a buyer, but I'm a secured lender with respect to the other.

And what I'm submitting to Your Honor is that you can hear that dispute and argument in the context of a cash

collateral dispute. And you don't have to adopt their position that just because they filed an adversary proceeding, that we can't even proceed on the 26th with respect to those matters, or whatever the date will be in February.

I think the others are saying, I may have a bona fide dispute, right? And you know there's actually not a lot of disagreement. If there is a bona fide dispute as to the ownership of a particular invoice, we're going to kick that to an adversary proceeding.

But if there's not, and on this issue, I think we do disagree, it's their burden. They can't just speculate that I may have an issue. I think that is MF Global, right? Notwithstanding that was cash collateral. But people can't just stand here, Your Honor, and say, well, I may have an interest in this particular thing. I don't know enough.

And I'm going to get into some of the discovery we've actually produced here. Because you know we've heard a lot that people haven't gotten information, et cetera. I mean, we really have bent over backwards to try to cooperate and get people information. That includes, Your Honor, we've received over 115 total document requests from the factoring parties. We've produced 11,300 documents in the context of discovery or voluntary information. That includes almost 4,300 documents just to Katsumi alone.

As Katsumi indicated, they took a deposition of Mr. Jerneycic on the 19th, asked him whatever they wanted to ask him. We have had over 20 formal individual meetings with the factors. We've had two group meetings with the factors. I can't even count how many countless phone calls and information sessions we've had with the factors.

We've given them the Visian dataset, which is our internal dataset. They can run their own analyses. They've all retained their own FAs, et cetera. They can run all their own analyses. We're not holding back information.

The one area where we drew a line was the subject of the examiner's investigation, the subject of the special committees. How did all of the fraud actually occur? And we have to be a little bit more careful there. And now we're working to get people additional information around that. But that was the area of dispute.

So you know and that was to try to be consistent with Your Honor's guidance at earlier hearings, et cetera, that the examiner should go first on these issues. And we're not trying to litigate all of this stuff. But fine, we're getting them more information with respect to that. So it's really not fair for people to say that they haven't been getting information. There's a lot of information to get through. We've been bending over backwards to get people information.

But again, Your Honor, all you have to decide today is can we have a hearing with respect to this motion? Your Honor, the other thing on the -- you know, some people are getting discovery, some people are not getting discovery under this order.

Your Honor, there's two paths, right? Very simple. Path A is you can settle with the Debtors, and agree to these reconciliation timelines, agree how we're going to deal with adversary proceedings and not adversary proceedings. And by the way, the deal in the order is if you agree to stop your 2004 discovery, and stop your depositions, in exchange we are going to provide this voluntary information that we're going to provide.

If Evolution wants to sign up for that and Katsumi wants to sign up for that, that's great. But they're not, right? They are continuing to serve discovery on us through 2004. Nothing in this order requires them to stop. Your Honor is not entering an order that says, you know, with respect to the contested matters or adversary proceedings, they can't get discovery. Of course they're going to get discovery.

So why would we voluntarily over disclose or provide information to a party who's not settling their baseline rights? Anyone who's not settling has baseline rights, a dollar does not get released unless they get a

hearing before Your Honor on whether -- or excuse me -- we get a hearing, and they get a chance to object before Your Honor that additional information will go out. And they have their discovery rights reserved.

If I come back before Your Honor in the future and say I have a motion to quash or something like that, then they can argue about, you know, voluntary discovery versus involuntary discovery. But they pick the path, Your Honor. There's got to be a consequence for not wanting to settle with the Debtor. If you don't want to settle with the Debtors, that's fine. You don't have to settle with the Debtors. Send us your discovery request. We'll continue to address them.

But Mr. Kleinhaus and Mr. Grillo and Mr. Deutsch are agreeing to settle with us. And so they're agreeing to put their guns down in discovery. And in exchange for that, we're going to provide them voluntary information that's going to be less expensive for all of us. I would love for Evolution and Katsumi to join in that boat.

Your Honor, I think the other -- again, I wanted to clarify, we're not seeking to remove cash today. That will have to be dealt with at a hearing. And there will be evidence. And Your Honor will consider that evidence, including Mr. Jerneycic's declaration. So there's nothing to really talk to Evolution about and share orders about

because their position is no more cash can come out.

If we hear differently, that'd be great, right? Then I think we can pick up conversations. But their position clearly in their appeal and in their adversary proceeding and in their briefing has been no additional cash. So my working assumption is for everything with respect to Evolution, we're going to have to come back to court and convince Your Honor to release that cash over their objection.

If there's a different tone or path that they want to take, we're all ears. But we were up late working out with the parties that actually do want to settle or try to settle it. As soon as we settled, finalized the papers and got them on file. But Mr. Duke and his clients are not prejudiced today because this order does not let out a single dollar without a further court order of Your Honor, does not say he needs to stop discovery because he's not a consenting party. So he can continue with his rights. And he'll be heard on the 26th. And that evidence will be introduced.

What is happening is we're asking Your Honor to overrule the objection that says we can't even get a hearing on the 26th because everything needs to go to adversary proceeding at this point.

THE COURT: Thank you.

MR. SINGH: Thank you, Your Honor.

THE COURT: Any --

MR. KELLEY: Your Honor, we bifurcated our approach to the court for an important reason. Mr. Scott was going to address the legal issues. This court set a proceeding. I think you couldn't have been more clear. The only thing you didn't say was, read my lips. The only thing to be raised today was legal arguments. Non evidentiary. No evidentiary hearing.

On the past hearing, we negotiated. I even stood before Your Honor, and you allowed me to make a presentation where I said all of our rights are reserved. This is about process. We're letting certain money go out the door under the order the court previously entered. That was carefully negotiated.

I'm very sensitive to what I'm about to say next because this court has been very clear. It wants to encourage settlements. But settlements shouldn't have a punitive effect. That order that we -- that Your Honor entered into was carefully negotiated to provide protection. Debtors are trying to turn that settlement into a process. They're trying to cram down our throats through the order they're asking Your Honor to read, in which parties have belabored in front of Your Honor, look at this, look at this, you can enter this.

That is a partial settlement. But your question told me you recognize the fundamental issue. It's any one party that objects. Katsumi, with the largest of all receivables outstanding, is objecting to this. There is no way to let any money go out the door while our objection and our insistence under the rights under 7001 continue to sit.

That order that they're asking you to enter, Your Honor, expressly includes facts that the Debtors have been espousing that we firmly dispute, including the categorization. So it is unclear to me how the Court can enter what is effectively a partial settlement with a number of parties, and how the court can then try to turn around and avoid -- not Your Honor, excuse me. Retract that.

How the Debtors can ask Your Honor to enter that order and then say, but adversary and no one's prejudiced by not entering that order today. We have just argued, it has cost our clients a lot of money to get the 7001 argument before Your Honor. We set today specifically to address that. Your Honor will decide that when Your Honor decides that. But we have now teed that issue up.

We are insisting on our rights, and we continue to have the ability to engage in discovery on contested matters, as Your Honor noted previously. And we will have our discovery under adversary.

We negotiated with the Debtors in 2004 months ago.

We haven't served additional requests on the Debtor. We've just been waiting for them to comply with their production obligations. They ceased producing documents to us on December 18th. We -- they want to approach us and negotiate money going out the door without giving us adequate information while letting us know, oh, we've discovered some information on computers.

And we said, short of us filing a motion to compel, we can't move forward. We need information. All of a sudden, we got three quick productions. We're ingesting it in relativity. As I've told you before, we have AlixPartners as our financial advisor. They have posed questions to the Debtors.

As part of this settlement conversation, we asked, is it even viable that we would know enough information to even have a meaningful hearing on the 26th? AlixPartners says Debtors won't produce the sampling data we've asked for. There is a reason for that. We're going to try to work through that.

But fundamentally, our protections exist only in an adversary where we have the rights to file the motion to file discovery targeted with relevance as the boundaries. That doesn't allow us to interfere with what the examiner is doing.

That allows us to pursue what we set out at the

very first day of the case, Your Honor, which was when we put these receivables in these separate accounts, we will pursue data so that we can determine the scope of where we can't agree and where we can agree. And that is the reason we have -- the Debtors attempt to take what was a settlement that was reached in the prior order, trying to work with other parties and get Your Honor to sign that, causes me to hesitate as we go forward about what our future settlements look like if they become tools that are used against us.

Katsumi has a valid position here that this should be resolved by an adversary proceeding. And we find an order is being used to try to make an end run around the adversary. It has facts in it we dispute. I am concerned about the consequence if the Court signs that order. Because you have no record either at the prior hearing, there was no evidence submitted, or this hearing. Because this wasn't intended to be an evidentiary hearing.

And I want to urge to the extent I'm able to, Your Honor, caution on this. I think that order is a trap, and we do not support its entry. We do think the adversary is the path to go here, Your Honor.

THE COURT: Thank you, Mr. Duke. I'll give you a brief opportunity to say something.

MR. DUKE: Thank you, Your Honor. It's just three very quick points. It won't take long at all. First, I

just want to clarify what our position is, is that we are entitled to adequate protection if our collateral is released. I hope that clarifies what our issue is here. It's not that we're trying to block everything. It's that we're entitled to adequate protection, which has been denied us.

Second, we weren't offered any ability to participate in these settlement negotiations, yet they're trying to impose an order. And I believe this is what Mr. Kelley just addressed, but he implies even more to us because we weren't able to participate. They're trying to impose an order on us that other settlement parties reach. They get benefits under it. We don't. That's not the way that this should operate.

And then the third point is just an administrative point. I mentioned that we had filed a competing order. I believe we're going to make one correction to it. We'll get it in very soon after this hearing ends.

THE COURT: Well, why don't you just tell me what it is? Because I was going to go back and read your order now. I haven't read it. And I think in fairness to everything, I should read it.

MR. DUKE: My team has notified me that we have to make one correction. Let me figure out what it is real quick. Yeah. We can just pull it up on the screen. Ella,

would you --

THE COURT: Why don't you just tell me?

MR. DUKE: If you're -- would you mind? Ella, can you give me the -- one second. Sorry. I'm just getting it from my team.

THE COURT: I may have filed something.

MR. DUKE: Apologies. I just got an -- I received a redline. It's a change to Paragraph 8. And where it states it is determined by order of the court.

THE COURT: Let me -- hold on, let me just get there.

MR. DUKE: Of course, Your Honor.

THE COURT: Yep, hold on. Paragraph 8.

MR. DUKE: And midway down, we're just putting in an additional correction to our proposed order that states, where it states, if it is determined by order of this court or agreement by and between the Debtors on one hand, any objecting third-party factor on the other hand, that --

And we're going to add the language, a third-party factor has an interest in, and then collections on any Category 1 or Category 2 invoice, and then strike should have been or should be paid to a third-party factor. Such third-party factor shall be entitled to assert a super-priority administrative expense claim.

So this just covers the fact that we have a

security interest versus the --

THE COURT: Can you just say the language one more time?

MR. DUKE: Sure, Your Honor. If you have it in front of you, I'll just tell you where the additional --

THE COURT: Yeah. No. I see it.

MR. DUKE: -- will be if that's useful.

THE COURT: I've got it up. I just want you to repeat it one more time.

MR. DUKE: Sure. So it will say if it is determined by order of this court or agreement by and between the Debtors on one hand, and any objecting third-party factor on the other hand, that -- and then this is the insert. A third-party factor has an interest in, and it goes on, collections on any Category 1 invoice or Category 2 invoice. And then strike should have been or should be paid to a third-party factor, and then the rest of it would continue as written.

THE COURT: So give me the clean sentence as you read it, just so I'm all clear.

MR. DUKE: If it is determined by order of this court or agreement by and between the Debtors on one hand, and any objecting third-party factor on the other hand, that a third-party factor has an interest in collections on any Category 1 or Category 2 invoice, such third-party factor

shall be entitled to assert a super-priority administrative expense claim, and then it goes on.

THE COURT: Okay. I just wanted to understand --

MR. DUKE: Thank you, Your Honor.

THE COURT: -- the change. I didn't want to -- I just wanted to make sure I knew what the additional tweak was.

MR. SINGH: Your Honor, if I could just rise to make a clarification, and some others may too. You know the language of this order is carefully negotiated between us and the settling factors, in particular the paragraph that Your Honor was just looking at. I think if that changed, that may alter --

THE COURT: Right. It'll affect everybody else's.

MR. SINGH: It'll affect everybody else. But really, look, the way we think about it from the Debtor's perspective, if you're not in the settling parties, then you get all rights -- and we can add this -- you get all rights to object to any future amounts being released. You can continue your discovery as against the Debtors. Everyone's rights are reserved as to that issue.

And I think that's it, right?

THE COURT: Okay. But what's the effect of Evolution asserting an adversary proceeding and saying, I assert a -- I have an interest in 1A, 2A, and 2B? And

Katsumi's saying, I have an interest in 1A, 2A, and 2B. What is the --

MR. SINGH: The effect of that, Your Honor, will be --

THE COURT: So what does the hearing look like on the 26th?

MR. SINGH: So the 26th will be two things. One, with respect to Evolution, we will be arguing about whether or not they're adequately protected, assuming that they are -- right, assuming that they actually have an interest in these funds.

THE COURT: So when do I make the determination as to whether they have a lien?

MR. SINGH: Ultimately, in the adversary proceeding. And the question that you'll have to address is, do I have enough today to find that cash collateral should be -- you know should be permitted?

THE COURT: How do I make a determination as to whether -- I would be assuming that they have a full lien on all the assets?

MR. SINGH: You could do that, or you could actually take into account. I mean, Your Honor, take into account how you might ultimately rule, right? You can take that into account. But Your Honor, you don't even have to get into all of that. Because what we're going to put

forward before you, and this is partly why the updated numbers were important. We're going to show that there's adequate protection because there's remaining funds in the account, right?

And so it's not as if Your Honor is making a determination that if you turn out to be wrong and all the money is spent that you authorized to go out, and you can effectuate your remedy this way, just like you did with respect to the $55 million, if you turn out to be wrong, then that's the adequate protection, and we'll deal with the merits of their issue in the adversary proceeding that they filed.

THE COURT: As to whether they have an --

MR. SINGH: Correct.

THE COURT: -- whether they have a security interest at all?

MR. SINGH: Correct. Exactly --

THE COURT: And what about --

MR. SINGH: Your Honor.

THE COURT: -- Katsumi, who's claiming ownership?

MR. SINGH: Katsumi's claiming ownership, but that'll be addressed with respect to whether or not there is a bona fide dispute. If they stand up here, and show you that there is a bona fide dispute with respect to the funds that we're asking to be released, then we can't have those

released unless there's an adversary proceeding.

But there needs to be some baseline, Your Honor, for them to say, yeah, like, I actually have an interest in these funds, and I need to prove it to the Court.

THE COURT: But what they're saying is they just got eight reams and reams of paper and don't -- are not going to be ready to go in 13 days.

MR. SINGH: Your Honor, what I would say with respect to that, I've heard Mr. Kelley stand up at a number of hearings now and make statements about what's been produced and what's not. If he -- if their position is that they have not had adequate information, Your Honor, I'd submit that they need to put in a declaration of a witness, if it's AlixPartners or whoever, we should be able to cross on what information they've been provided and not and put that on before, Your Honor, before we can't get our day heard in court.

Because my position is, Your Honor, we have provided a ton of documents. We've provided a lot. And as we get more information, because we're doing an investigation, we're continuing to provide information. But that's an issue Your Honor can consider at the hearing. They should put in evidence, not just statements from Mr. Kelley on what he believes he's received and not received. And we get our day in court with respect to that issue.

THE COURT: Okay.

MR. SINGH: Thank you, Judge.

THE COURT: Mr. Kleinhaus?

MR. KLEINHAUS: I'll let Ms. Metzger go first. I'll respond after.

MS. METZGER: Thank you. Good afternoon, Your Honor. Laura Metzger, from Orrick, Herrington & Sutcliffe, on behalf of Raistone Purchasing Series XXXII. I just want to make two really quick points. One, to just reiterate Mr. Singh's statement to the extent there are any changes in the order to confirm our consent. Obviously, we would need an opportunity to review them and would consider them in good faith.

The second comment I just want to make and bring to the Court's attention, there's -- the silence on the part of other factors to the notion that Evolution has a lean on all of the receivables, and all the funds being collected, should in no way be an agreement or acknowledgment that they do or any way have priority over the other factors who might have ownership rights or security --

THE COURT: No. No. No.

MS. METZGER: -- interests in those assets.

THE COURT: Agreed.

MS. METZGER: So we will address that in the context of that adversary proceeding if that's where it

needs to be addressed. But I just want to go on record that others might have interest in exactly what they are.

THE COURT: No. No. No. Agreed. I understand. I understand. Okay.

MS. METZGER: Thank you, Your Honor.

THE COURT: Mr. Kleinhaus?

MR. KLEINHAUS: Thank you, Your Honor. First of all, I joined in and agree with the comments that Ms. Metzger just made, and I won't repeat them. The irony of this hearing, or at least the part that's hard to fully get my head around is, I mean, I -- my client and I disagree with Mr. Singh on the law, as was made clear earlier.

We also disagree with the comments that my friend Mr. Singh made about discovery. Our perspective is that, I mean, we started out here with a motion to release a very large amount of cash on very short notice. Our position, which we articulated as strongly as we could, is we need to know how this fraud worked before that could happen.

And over time, I think the Debtors, to their credit, while they haven't changed their position on the merits, have recognized that maybe there's some merit in slowing down and getting the facts here. And we have -- we took a deposition where we got next to no information on how this fraud worked.

We're finally getting some documents which we

would submit -- it's not for today, but we would submit are quite inconsistent with this very, what we think is an overly rigid approach where you just compare invoice number to invoice number. We think the facts are much more involved than that.

So we disagree on the law. I disagree on discovery with Mr. Singh. But what we came here today to do is not to resolve the legal issue or the discovery issue. And I've heard comments today like, you know, we're acquiescing in the Debtors' statement of the facts.

I mean, we required, at the beginning of Paragraph 5, the words, according to the Debtors. And throughout the entire order, we tried to make very clear, we certainly don't acquiesce in their statement of the facts. And to be certain, to be very clear, my clients, Leucadia parties, likewise have not -- as to Category 3, we think it's quite likely, nearly certain there's going to be disputes.

And I think the Debtors, and we, although we disagree on how those disputes might come out, have agreed there needs to be an adversary proceeding. On Categories 1 and 2, we haven't agreed any more than Katsumi has that there's no dispute on those.

The point here was to lay out a process. And that's where the give and take was. The Debtors have said, we want to go faster. And we came up with a process on

that. But to be super clear on this, and this is in Paragraph 6 again, at the hearing on January 26th or February 2nd, assuming we don't reach agreement before that, our arguments are preserved not only on whether there should be an adversary proceeding, but if we believe there needs to be more discovery, we wrote this into the order.

It says, with the third-party factors reserving all rights with respect to such hearing, including all arguments that an adversary proceeding is necessary, and all arguments regarding discovery. So the door is open for us to argue we haven't gotten enough discovery.

Moreover, as I said earlier, if we believe that there's a factual vacuum that makes it impossible to assess yet whether or not there's a real dispute, we are perfectly entitled to argue it's the Debtor's burden, and they need to bring an adversary proceeding.

So I don't intend to be repetitive here. What I want to really just do is emphasize that the point of this order was certainly not to move the ball on the substance and the merits in a direction against the factors. It was to come up with a framework with all parties reserving rights with respect to that hearing.

THE COURT: Thank you.

MR. KLEINHAUS: Thank you.

THE COURT: Let me just -- I need to just go back

and think about something with the notes and read. Just give me about 15 minutes, and I'll come back out. We'll -- before we continue, I just wanted to give a little housekeeping. I have a hearing in another matter. It should take 20, 25 minutes at 4:00 p.m., and I know that there's another issue we've got to take up. That's not to say that we're not going to take it up. I just wanted to make sure that we may have to take a break at 4:00 just for a quickie. Parties are more than welcome to stay here.

With respect to that matter, one question I don't want to forget. Do the parties agree or disagree? Well, let me just ask that. Do the parties agree that the real issue comes down to Footnote 4, and whether it's construed as your footnote -- your famous Footnote 4 about where the -- in other words, whether the collateral, the inventory in the true up mechanism, whether the Court can only consider where Footnote 4 says Starlight and Patterson Property was located as of the petition date?

I read the papers to read that the Debtors are saying, well, there's some more other inventory located in other places, and if you add that inventory, then it adds up to a bigger number. I didn't know if you all agreed with that or if what you're saying is, yeah, that all may be true, but the true up mechanism kind of requires you to look at the inventory in these locations.

I just -- it's more of a clarification point for me as I think about these issues, because I'll be thinking about that in a second.

MR. DALE: And, Your Honor, thank you again.

THE COURT: Just to kind of tee up the issues. And everybody will have the full right to argue.

MR. DALE: Of course.

THE COURT: It's just a question that I've been meaning to ask about Footnote 4. And we will take this up again. Just a preview for me.

MR. DALE: And Charles Dale from Proskauer Rose for Evolution, Judge. No, I don't think there's actually any disagreement. The Evolution Inventory Collateral is located in four -- at four addresses. Footnote 4 identifies those four addresses, and the loan documents make clear that's it. The fact that the Debtor was reporting additional Brake Parts inventory at locations other than those four addresses is irrelevant, in my view.

THE COURT: But that's what I'm saying. That's the disagreement, right? Is that you're saying --

MR. DALE: That seems to be part of it, Your Honor.

THE COURT: But in other words, if the inventory is limited to the inventory at these -- and I'm not saying I agree. I'm just trying to crystallize the issue. You're

saying everybody agreed that this was the -- that this was where the stuff was located. And so this is -- when you do the true up mechanism, you look at the inventory at these locations, because that's where you think it is. And if there's some other inventory that you think applies elsewhere, it's irrelevant.

MR. DALE: Precisely.

THE COURT: The Debtors say you've got to look to it as well, right?

MR. DALE: I think that's their argument. I think they think there's an ambiguity that we don't think exists.

THE COURT: And if -- do the parties -- and I'm just trying to crystallize -- do the parties agree that if we just look to these four locations, you win, but if I extend it, then they win? Or you don't win? Or is there still a math question we've got to take up? That's the real question.

In other words, if I limit it here, it sounds like I don't think anybody disputes that you win, that there's been a breach.

MR. DALE: I think that's the answer. I realize my --

THE COURT: But what happens if I expand? Then -- I know you'll disagree with that, but does that number -- do we still need to do a math number, or is it more of a binary

decision that the Court just has to construe the order?
MR. DALE: It's a fair question. I think the answer is that they breached this collateral maintenance covenant, and the math is agreed to. I think if Your Honor decided that you would aggregate locations that don't represent our collateral to achieve that threshold, they still have a problem that they cannot solve, and I think we'll create that record for Your Honor today.
THE COURT: You're saying that even if I include other collateral, they still have a --
MR. DALE: They do.
THE COURT: Okay. That's what I was trying to --
MR. DALE: Indeed.
THE COURT: -- clarify. So it's not just a binary -- do you expand or not expand beyond Footnote 4 locations. There's -- even if one -- even if I just limit it to four, the answer's over. The answer is --
MR. DALE: I think so.
THE COURT: There's a breach. If I decide to -- if I think that the order -- not that I decide. If I think the order includes other locations, do you still think there's another breach out there?
MR. DALE: There is.
THE COURT: Okay. That's what I needed to make sure that I understood. Okay. Thank you.

MR. DALE: Thank you, Judge.

THE COURT: Now, will that require evidence?

MR. DALE: It will, Your Honor. I think we've streamlined the process. I think we've got agreement on exhibits and witnesses. I think we'll hear only from one witness, the Debtor CRO today, but Mr. Berezin may have other ideas.

THE COURT: Mr. Berezin, just -- I'm just trying to get a sense of -- it gets to the point where we have to start doing AC checks, so I need to -- which is important for everyone.

MR. BEREZIN: Yes, Your Honor. Robert Berezin on behalf of the Debtors. I --

THE COURT: That's why I'm asking. This is more of an AC issue.

MR. BEREZIN: I have just a slightly different understanding. I do think that Issue 1 is a textual issue. I think it goes beyond Footnote 4, and we'll talk about that. But I do think you've got to get through that textual issue.

Once you do, I did not believe that there's any -- there's a $335 million hurdle, that there's no facts in dispute that if you include the additional warehouses that we were counting during the stip, that we're well above that threshold, but we can understand that as we go in the

hearing.

THE COURT: Can you all just -- I just want to make sure that I understand what the issue is -- what the issues are teed up.

MR. BEREZIN: Your Honor, I think the issue is this. The stipulation is terminated, January 5th, it expired. The Debtor says --

THE COURT: That was Question 2.

MR. BEREZIN: I'm glad we can get through the list.

THE COURT: Do I still have a stip that's in effect? Okay.

MR. BEREZIN: Judge, the -- we believe it's obvious that they missed this collateral maintenance threshold.

THE COURT: No, I got it.

MR. BEREZIN: Even if they didn't do that, even if that's not true, they can see that the degradation in collateral value here is somewhere in the 7 to $9 million range. They have that problem as well. And --

THE COURT: Even including the extra stuff that they say is like another -- if I include the other inventory that they're saying, you're saying if I agree that I include this other inventory, that everything -- that they're going to stipulate that everything is so degradated that we don't

get there?

MR. BEREZIN: It's --

THE COURT: That's the part that I couldn't figure out through the papers.

MR. BEREZIN: Fair enough. It's a separate problem, Your Honor. If you add in all that other inventory, then they've satisfied that collateral maintenance covenant. What they've admitted in their papers, however, is that there's been a decline in the value of inventory that we're not adequately protected for. That is a separate breach.

THE COURT: But does that -- okay, that's what I'm trying to figure out. And then -- no. No. We'll just talk about this later. Then do you agree or disagree that the other inventory at other locations is subject to your client's collateral?

MR. BEREZIN: It's not.

THE COURT: It's -- so it's --

MR. BEREZIN: It never was. It isn't today. Perhaps we wish it was, but it isn't --

THE COURT: How do I --

MR. BEREZIN: -- and wasn't.

THE COURT: How do I then -- how do I find that out?

MR. BEREZIN: It's a stipulated fact, Your Honor.

It's in Mr. Jerneycic's declaration.

THE COURT: You're saying that they've already conceded?

MR. BEREZIN: Paragraph 13, Your Honor.

THE COURT: Okay. No. No. No. That's all I needed to know. That's helpful for me to know. That kind of helps me think about the issues. Thank you.

MR. BEREZIN: Thank you, Judge.

(Off the record.)

THE COURT: This is Judge Lopez. I'm going back on the record in First Brands. I've unneeded a (713) number. Can you identify yourself? Just it may have been someone's line, (713) 725 number? All right. There is a (510) number.

MR. BUTTERFIELD: Good afternoon. Your Honor. This is Ben Butterfield, for Morrison & Foerster, just dialing back in.

THE COURT: Oh. All righty. Okay. I note. Okay. I will try to get to the point here take out the legal jargon. I -- the Court entered and did as a filed motion originally seeking authority to use authorizing the release of certain funds of the Debtors claiming an ownership interest in I'll call it the factoring motion.

The court has held numerous hearings on that. I'll take judicial notice of the record of those hearings

There been a number of objections filed related to, among other things, the ownership of factored receivables, whether the Debtor actually has an interest in some of these are all any of the funds.

There have been allegations and perhaps one or more parties may claim an ownership interest to the same set of funds. The Debtors have also claimed that there are certain funds based upon their analysis that isn't subject to anyone's either ownership or lien rights under any agreement.

The Court has entered one order what I call an initial order authorizing the release of some funds that order is subject to an appeal. I'm not stating it for purposes of substance, just for stating that I entered the order on that date.

There was an adjournment of a hearing, and we set today as the date upon which the court could consider a number of issues. Among other things, the substantive one was whether the court could proceed by motion in a contested matter or whether the court would need to proceed in connection with an adversary proceeding to determine issues related to the factored receivables.

One of the -- important to note that there is an amount of cash. I won't say the amounts because I know that that's subject to dispute. But there is cash that the

Debtors have received that are sitting in what we would call segregated accounts that everybody has rights to. There are also customers who have not remitted funds to either the Debtors or to another party who they may be required to.

Because there's confusion about -- at least this is what I'm -- the court is -- I don't have any evidence of that, but it would make sense that there are some customers that have not remitted funds as they don't want to submit in one way, and then be subject to kind of a double payment or getting in a lawsuit about double payments.

So today was about adversary proceeding versus contested matter. The Debtors working with some other parties have submitted a proposed order. And that proposed order provides for a Process in which the Debtors would submit -- excuse me -- would provide some information. There are three categories.

One we would call Category 1 which are funds remitted after the date, a September date in which the Debtor alleges that there are not subject to any kind of post-factoring period. These are just receivables. There's a Category 2A in which the Debtors believe that the factors receivables there are not subject to any of the claims the third -- what we would call the third-party factors who have been present. They're just not -- no one would have -- none of the folks who are objecting would have an interest in

those funds.

The Debtors claim is about 1.8 million. And Category 1 is a little over kind of 8 to 10 million in this Category 2A. And then there's a Category 2B in which the Debtors, through their reconciliation process, can't match a kind of what their books and records show is an invoice with a matched customer Invoice. Those, 2B, is the one that is the one of greatest dispute, I would argue, among the parties. This is just the Court's assessment.

So there's a proposed order that would provide for a process in which the Debtors would provide certain information to parties who have agreed to this order. There would be a hearing. I should say they'd be at the until January 25th, to see if anything can be worked out in terms of no agreement with any third-party factor with respect to the 1 or the 2A.

And then with respect to 2 -- that would occur by no later than January 25th. And if there was any disputes, then the Court would hold a hearing. So we're not really -- I would not be making a determination today as to kind of 1 or 2A, whether there would be an adversary proceeding required or not. That would be until a little bit later in time.

And then with respect to 2B, there'd be a February, early February date to determine with respect to

the 2B funds. Paragraph 11 would allow customers to submit payments to the Debtors. And the Court would provide them -- have a release from any liability associated. But submitting it to the court and -- or did the Debtors, I should say, under the order.

There are a number of parties, Katsumi, who claims an ownership interest in a large number of factored receivables of checks. Evolution Partners also claims an ownership interest in some factored receivables, but also a lien Based upon their documents on receivables in other. With respect to kind of non-factored receivables within an eight Debtor, a group of eight Debtors, in which whom they had conduct -- transacted business with.

There are other parties who are referred to as the consenting third parties in which are the consenting third parties of the parties who have agreed to this form of proposed order submitted to the Court. Consenting meaning consenting to the order, but not consenting necessarily to the -- that they don't have an ownership interest on any of the funds or that they don't believe that their rights -- they believe that they can still come in.

And this order would preserve their ability to come in on contested matter with respect 2A and 2B, they have consented to the use of cash on Category 1, which is just about 1.8 million, a very controversial.

Here's -- here are my concerns and here's what I'm going to do. This is Essentially an agreed order with consenting third parties, but I don't think other parties, quite frankly, had enough time to fully kind of review this and consider the effects of it all the way.

There's just no -- and I don't cast any fault on anyone. Probably folks that were working late into the night. But I don't -- this order makes certain factual findings, and it requires acts by third -- other some third parties. And today was just supposed to be about the adversary proceeding or not adversary proceeding.

I think a lot of what's in this order makes sense, but it is certainly requiring some parties to go along with it who have not had an opportunity to review this or may not have had a full and fair opportunity to kind of vet it with their clients. And I'm concerned about process, due process and notice to third parties.

That being said, I think tweaking the order and saying what I would enter and changing things also kind of changes the fundamental deal between these third parties. And so I think that is a full and fair concern for it for what who are the consenting third parties.

I'm also concerned about today granting relief to third parties whom are not before me who I have no evidence of. I'm sure they are concerned about double payment and

concerns about it, but I don't have any evidence of any of that. And I think I don't think I could order and grant someone relief without a solid evidentiary foundation to do so.

So and I couldn't enter Paragraph 11 today. And I'm concerned about entering a process about 2B today. I just think there's a lot of moving pieces and a lot of folks are objecting to that. You know whether that requires an adversary proceeding or not, I don't know. But I don't think I can rely solely on the Debtors' analysis there when I just appointed an examiner to go out there and go review to make -- not to say that they would double or disagree with what the Debtors have done.

But I think there's going to hopefully, a lot more comes to light about kind of what happened and I -- there's a lot about who, but I'm -- for purposes of where I am in the factoring motion, I think the what happened, I think, is kind of as important. Because it would provide clarity to parties about, you know, if something was factored twice or things of that nature.

I think we would have a lot more clarity from an independent third party. But that's not the second guess what the Debtors have done. I just I feel a lot more comfortable with the 2B process with parties who are still reviewing information and kind of, in a lot of ways,

drinking from the fire hose on information that's coming their way.

So what I am comfortable doing, and I'm going to do is I'm going to set my own hearing on February 2nd at 9:00 a.m. Then if you think about what I am doing with respect to the 1 and the 2A Categories, I just think I'm going to hold a hearing on 1 or 2A. The Debtor can give the information, whatever information it -- if it wants to give more to some parties, I got it.

Evolution is in the midst of an adversary proceeding. So that gets at least consideration about what can be produced here or not. But I just think, at a minimum, the Debtors are going to have to provide information. And maybe it's in the second reconciliation report as defined in the order, in the proposed order.

It may provide information as to what's in Category 1 and in Category 2A. If it does, then fine. If it doesn't, then I think I want to know. And it seems to me that if there is note, I make -- if there's a bucket of funds, let's just call it 1 or 2A, or some combination, in which no party alleges a bona fide dispute, right?

So Evolution, it's not one of the Evolution eight Debtors. Katsumi doesn't have an invoice on it. There's -- and whatever that number is, I don't think that needs an adversary proceeding, and I don't think anyone would

question that.

That would just be the Debtors having -- the Debtors are claiming an interest in cash in which no one else is claiming or no one else has a bona fide dispute I said that cash. I can't see how that would need to proceed by an adversary proceeding. And I would want to know if there's dispute, if there is a bona fide dispute. And some of it may relate to the extent of a security interest. Some of it may relate to just flat-out ownership.

We'd need to know if it's a dispute about ownership. I think that requires an adversary proceeding, but if someone's going to have to really I think tell me there where there's a real -- either parties -- either someone's going to start an adversary proceeding and now that started, if someone is just saying, we think we have an interest, then I think you're going to have to show up at the hearing and put on some evidence as to why you think you have an ownership interest in it.

I don't think Evolution Partners has to do it because they're -- they've started an adversary proceeding on some of this. So I just think that already worked. But for other parties with respect to the -- but Evolution Partners may not be a may not have an interest in 1A. Not 1A; 1 or 2A funds. I don't know. So that they may not -- other parties may or may not.

There may be a bucket of cash that may not be subject to it. But essentially, the hearing we were going to have today that is contemplated by the parties. I'm just going to set the hearing, and I want to know if there's agreement there.

And if there's not agreement, I'm going to make a call whether I think there needs to be an adversary proceeding or whether it needs to be a dispute. The parties should be prepared to put on their evidence on that day if they think there's a bona fide dispute.

I just think Leucadia and other parties and Raistone will have the information they want. And if there's a bona fide dispute, then I think I'll make the call as to them as well. But no cash will be spent on Category 1 or 2A until I resolve those issues.

But I plan on resolving at least the procedural hurdle on February 2nd. I'll just set the hearing it's going to happen anyway. We're just going to set it, and we'll just know what the extent of it is. Then in there and everybody's rights are preserved.

But the Debtor can give whatever information it has. And the parties want to agree that the Debtor will turn over additional stuff subject to a protective order. I'll sign it right away. But I'm not going to order the parties to do it and give it to some, and not others. And I

don't have to get into all that.

I can just -- you all can just agree to it. If that's your deal, I'll honor your deal. I'll sign an order. But you all will stick to it amongst yourselves whatever funds you want to do. And we'll show up on the -- what I'm really trying to get at is, I'm -- still don't have a clear grasp of if there's -- I don't know -- 10 million that's really at issue in 1 in 1A. Well, excuse me, I keep saying 1; 1 and 2A, how much parties are really fighting about.

Is it three million? Is it five million? Is it nine million? Are parties really fighting about the 1.8? I don't know, but I'd like to get a real sense as to what is really -- what the fight is really about and how much. Katsumi couldn't tell me what they think the interest is.

I said I'm hoping that by the 8th -- excuse me, by February 2nd, they'll have a much better understanding as to what it is. I know they've -- they're digesting reams of paper, according to them. And we'll see where we are. After I decide that, we'll talk about 2B.

But I don't want to talk about 2B yet I think to be is too complicated. And if the parties want to show up on -- if customers want to show up or I get evidence about customers remitting, I'm going to have to hear it. Or someone can just start an interpleader, and we can just do it the old way. And someone can start something and then

they can put it in.

The concern that I have for parties who are not going to -- between now and then, is that if you're -- I think everybody ought to just be really careful, both sides, both Debtors and third-party factors. I don't know what interest the Debtors had in the cash. That's for them to kind of put forward. And maybe they're going to have to start an adversary to provide the extent of it, right?

If you look at 7001(b), it talks about an adversary proceeding to determine the extent, all right, of an interest in property. 363 talks about, assuming that there is an interest in what you do, can it be done consensual or not consensual? So one is kind of determining whether you have an interest. The other one is assuming you do, what do we do with the interest? Are you adequately protected?

So I think if parties think about -- yes, I think Forcing customers to send money from -- unless you -- ought to be rock-solid sure, maybe with agreement. I would hate for someone to violate the automatic say. We don't -- 362 doesn't talk about intent. It just talks about acts to obtain possession of the estate.

If it turns out that the Debtor had an interest in some of this, and you violated the automatic stay, I just think I'll have to have one of those hearings. At the same

time, I think parties should really be thinking about what is a practical solution to the problem that you have. Because I don't know what a customer is to do, and I'm not sure customers are going to be interested in starting interpleaders.

Maybe they are. Maybe there's enough that they want to. And if they do, I welcome it, and they'll get relief. Maybe somebody wants to start one, and they'll get don't get granted to relief, too. But I think parties ought to think carefully about 362.

I also don't think I can bind third parties, two third parties to submit to the jurisdiction of this Court based upon something that -- unless the Debtor has an interest in the cash. And maybe they do. Maybe they don't.

But February 2nd, unless there's real agreement between the parties, I'm going to make a call as to what the Debtor needs to do. Because this case has got to get past this stage at least in terms of where we are.

So February 2nd is going to be a real hearing. One way or the other, I'm going to make a decision. And 9:00 in the morning, parties be prepared. Katsumi, be prepared to tell me what you think the interest is you have bona fide dispute.

Evolution what I'm going to need to know from Evolution is kind of an assessment, I think, as to I -- you

know, whether you think within 1 and 2A.

And I'm not going to hold you to the number, but we got a kind of -- I got to get I got to get a sense as to whether you think you're in or out of 1 and 2A, and I think it's unfair to ask you to do it now. And I think it's unfair to ask Katsumi now. But maybe all this is just academic to a certain amount that parties can live with. And maybe they're not. Maybe parties can continue to talk, but I'll make that decision on February 2nd.

The other thing that I would note is if there's going to be a hearing, at some point, and if I have to have a hearing on Evolution and some funds, and I'll let Evolution tell me otherwise. Not today because they've got until -- figure out what you think you have an interest in and then you can come back and tell me whether it's worth or not.

But you know if I were to hold a hearing maybe February -- later that week, I think that's February 2nd to Monday. Maybe that February 6 that Friday February 9th. I'm going to take a look at my schedule. Which is the equivalent of having the emergency hearing that was contemplated on the order.

If one were to assume, for purposes of adequate protection, then I think I may be able to hold a hearing that would say assuming Evolution has an interest in all the

cash it says it does, it has a first priority in all it says it does, then what does adequate protection look like?

If the answer to that question is that if there's a number that works there, then I think one could hold the hearing. And then kind of preserve whatever that adequate protection is, and I got it. It's a moving piece.

Because there was already some adequate protection afforded and whether if there's some use of funds, what does it look like? I think the calculus changes. But maybe it does. And maybe it doesn't. But I do think the numbers would naturally change. So the analysis would have to change as well one way or the other. I don't want to touch the initial order, but I just think one would have to provide that.

Evolution, tell me whether they think a hearing like that would work. Because I think if I have to have a hearing, where I'm determining whether Evolution has a lien, the extent of that lien, and then also the priority within that lien, I think that's the adversary proceeding that they're asking to have, and I don't think I can do it absolutely adversary.

They think they're -- they think they have a lien on X, and they think they sit in first position, and they may want to have a deck action on that. I think the only way I could hold a hearing on them is if I assumed all those

things, then it's almost like adequate protection to the extent of any diminution in that value, then there would be something there. Maybe it works. Maybe it doesn't. Maybe I'm not thinking it through and -- but it's a thought.

But I think that's -- I think I'm not signing this order. I'm just going to hold my own hearing on February 2nd, at 10:00 a.m. It's a long -- at 9:00 a.m. February 2nd, at 9 a.m., where I make the call as to 1 and 2A. And at that hearing I'll talk -- give some thought to a hearing about 2B.

And I'm asking the parties to really think about the process about what to do with these customers. Because I don't -- one that's practical. And if it comes to an interpleading, maybe it does, but maybe -- there's got to be a more practical way where parties can have the cash somewhere, and it's not a customer isn't frozen especially someone holding millions.

It just seems to me, that there's a way to establish this. But if the Debtor were to start an adversary proceeding I would freeze all that cash, right, I wouldn't -- I would have to be -- they'd be in the same position, the same type of adversary proceeding that Evolution would be claiming, and I wouldn't know the answer to any of it.

We have to figure this one out. But there's

really smart lawyers, and I think parties can get together and come up with something in a way that everybody's rights are preserved. I don't want any cash. Now I guess at that February either 6th hearing, there's agreement.

And at that, I think I can enter a bunch of this other stuff in the order about the use of the cash and adequate protection if there's agreement between the parties. Which is really what's contemplated with the third-party factors. But I don't think I can enter this order based upon the time that it was filed, the amount of time that was provided to parties.

And I am making substantive findings in this order. And I understand why even if it's the Debtors' allegations, I still think I would need to provide parties more as today was just about adversary proceeding, and not adversary proceeding and I want to preserve everyone's right.

So I've given an unsatisfactory answer to all of you, which means I probably got it right -- no or got it wrong, depending on how you look at it. But that's what I'm going to do. I'm going to set my own evidentiary hearing on 1 and 2A. Everything will be adjourned with respect 2B, but we can talk about 2B at that time. I don't need to sign anything.

You know can if there are stips with respect to

discovery, I'm more than happy to sign it. But I don't want to carve up disorder and take out Paragraph 11, take out a couple of factual findings. Make the Debtors give discovery to some other parties. That's just going to change everything. And that's not the deal that everybody signed up to.

So I think the smartest thing for me to do is just to say thumbs up or thumbs down on the order. But still give you what you were looking for which was an opportunity to potentially use the cash in early February which is what -- where this was headed no matter what. So February 2nd at 9:00 a.m., be ready for a hearing, and I'm going to be waiting on --

It'll be an evidentiary hearing because I'll need to hear from Katsumi. I'll need to hear from -- maybe from Evolution. Maybe from the Debtors, maybe from Raistone maybe from Leucadia, maybe from others, ABC as well. I don't think it needs to be terribly long. It's really just, is there a bona fide dispute. And we'll see where things go.

But hopefully the parties are talking between now and then so that's my ruling on that. I need to take up another hearing if you all can give me about 30 minutes, and I can take it up.

MR. KELLEY: Can I ask you a question, Your Honor?

THE COURT: If you're asking me to remember what I just said no, I'm just kidding. What's up? What?

MR. KELLEY: I understand what the Court is looking for. The Court is looking to see if there's -- you use the phrase bona fide. I'm trying to understand if there's supposed to be some legal threshold or if whether we have -- contend we have an issue. And the reason I'm asking just to give the court a little bit more information, preliminary looks at some of the documents that have come in suggested that the fraud that was conducted involved changing the names of the --

THE COURT: No. I got it. That's what I'm saying. I'm not asking for --

MR. KELLEY: And we just --

THE COURT: -- bona fide within a UCC standpoint or anything. Just is there a --

MR. KELLEY: Is there a claim?

THE COURT: Yeah. Or are you just --

MR. KELLEY: Or we just trying to hold things up for hostage? Yes. I get it.

THE COURT: And I think there's a difference. I don't -- not everything is hostage. Sometimes you just -- as you sit here today, you don't -- like you never did business with this customer.

MR. KELLEY: But if under many state law claims,

even if we didn't, but that was the receivable that was purportedly sold to us because they changed the --

THE COURT: I agree with you.

MR. KELLEY: -- number, we have a claim.

THE COURT: I'm just saying that --

MR. KELLEY: Yeah.

THE COURT: -- but maybe there's a right. I got it. Because if somebody changed the invoice, but you're just --

MR. KELLEY: We're seeing signs of that. But the question is how comprehensive is the documents that we have? Does that allow us to target on a particular seller? I don't know. But that's what we're going to be --

THE COURT: Right.

MR. KELLEY: -- dealing with.

THE COURT: And dates would matter, and I think there's a -- I think You're digesting a bunch of information. I just need to understand whether --

MR. KELLEY: I also --

THE COURT: -- where you are.

MR. SINGH: I also heard the Court carefully that, you know, the party should continue to talking and think about it, but I hear you on all aspects of what you said. I just am trying to understand what that hearing looks like on the 2nd.

THE COURT: Just the hearing on the 2nd? The hearing on the 2nd will be essentially, what the hearing would look like on --

MR. KELLEY: You said it was an evidentiary one is what I'm --

THE COURT: Well, evidentiary you're going to have to tell me if --

MR. KELLEY: We'll present evidence.

THE COURT: -- you think --

MR. KELLEY: We'll present evidence.

THE COURT: Yeah. I mean, you'll have to tell me that you actually think that there's a bona fide dispute. I suppose someone standing up there saying, here's why we think we have an ownership interest in X, Y, and Z. We looked at this. We looked at this, and a lot of this could -- you know, we -- someone have to tell me if we need to seal parts of what's going on or not seal it.

But you'll have to -- someone's going to have to submit something --

MR. KELLEY: I -- you --

THE COURT: -- to then give me a sense that there's a fight or you can start an adversary proceeding. You're going to have to figure out. But what I'm not going to do is just have somebody stand up and say I'm still looking, but I think I do, don't use it.

MR. KELLEY: You --

THE COURT: That's Mr. Singh's concern.

MR. KELLEY: No. I get that. And I understand the Court will want some evidence. What I'm trying to figure out is you're not making -- you're not asking the parties, which I think you just clarified for me --

THE COURT: Not having a trial.

MR. KELLEY: -- laying out all your cards that you'd be dealing with in an adversary. Just show me that there's a foundation for why you contend you have a --

THE COURT: Which is what I think Leucadia and those guys and those folks agree to. Like we're not going to -- if we're -- if we think that we have a disagreement, I'm going to want to know. And it's getting basic. If we think that there's a disagreement and maybe parties can -- just be prepared.

I'm not saying you have to have evidence. Maybe the parties can just agree. I got it. Katsumi's involved. Leucadia is involved. But to the extent -- if the Debtor's coming in here saying they have no way, there's no way any of this is involved, I'm going to want to know what.

To make a determination one way or the other, I'm going to need somebody to get me over the hump one way or the other.

MR. KELLEY: I understand.

THE COURT: And that's not a full-blown evidence. That's not a full-blown, did you look at these docs? Did you look at these docs? It's just enough to kind of -- I don't want to call the prima facie, but you're going to have to establish something to get me that --

If they're saying, after September date, we never did business with any of these, and they, Katsumi wasn't even involved in any of these things, then you're going to have to tell me why you think that they are.

MR. KELLEY: Understood. We agreed to procedures in the first order that gave us 45 days to deal with, you know, the money that did go out the door. So we're within that time frame. We're engaging in discovery. We're trying to do our analysis. The 2A bucket is the one that concerns me given some of the documents we're seeing. And that's why --

THE COURT: No. It concerns --

MR. KELLEY: I'm trying to --

THE COURT: I think everybody's right to preserve. I think Leucadia's -- I think Raistone is reserving their rights. I think that was their whole purpose of six was to say I'm not agreeing to anything today.

MR. KELLEY: No. No. No. I understand. I -- that's why I just stepped up to try to understand in particular what you were looking for on the 2nd so I

understood what to prepare for. That's all.

THE COURT: Okay.

MR. KELLEY: Thanks.

THE COURT: All right. So if the parties will just give me -- I just need to call Pine Gate. by the Pine Gate boat building here I Mean I just step off the I'm going to give everyone a five-minute break. I'm going to call Pine Gate at -- just give me three minutes. Maybe we can -- folks, you're more than welcome to stay on the line. You're more than welcome. It doesn't look like anyone's here. I'm just going to turn off my camera, and just allow parties to get scheduled. It's 4:10. I'm going to start at 4:12. I'll come back.

(Off the record.)

THE COURT: Sorry, folks. This is judge Lopez. I'm going to call Pine Gate. Who is on the line, if you hit 5, star, I will unmute it. All right. There's a (312) number.

MR. GOTT: Good afternoon, Your Honor. Jason Gott, from Latham & Watkins, for the Debtors.

THE COURT: All righty. A (646) number.

MR. BRITTON: Good afternoon, Your Honor. Bob Britton, Paul, Weiss, on behalf of Glenfield.

THE COURT: All right. Another (646) number.

MR. ABELSON: Good afternoon, Your Honor. Phil

Abelson, White & Case, on behalf of the committee.

THE COURT: A (713) number.

MR. GUFFY: Philip Guffy, Hunton Andrews Kurth, on behalf of the Debtors.

THE COURT: All aright. A (312) number.

MR. GORDON: Good afternoon, Your Honor. Jonathan Gordon, of Latham & Watkins, on behalf of the Debtors.

THE COURT: Okay. A -- Mr. Jimenez. This may be you, a (202) number.

MR. JIMENEZ: Good afternoon, Your Honor Andrew Jimenez for the United States Trustee. Your Honor, I just want to make you aware that I'm not able to see you on the camera.

THE COURT: Oh, that's cause I haven't turned it on. That's a good backdoor way. There you are. Sorry about that. Thank you. A (713) number.

MS. QUEJADA: Good afternoon, Your Honor. Maegan Quejada, Sidley Austin, for Fundamental.

THE COURT: All righty. And a (602) number.

MR. HARMEYER: Good afternoon, Your Honor. Andrew Harmeyer of Milbank, and I'm here today for Carlisle.

THE COURT: All righty. All right. Where are we, folks?

MR. GOTT: Your Honor, Jason Gott, Latham & Watkins, for the Debtors. We are picking up where we left

off yesterday in our discussion about the release constructs that are contemplated by our solicitation process.

We filed an updated form of ballot last night overnight at docket number 1130, that incorporates the answer the new bifurcated relief principles. And our best attempt at including language that is as clear as possible to ensure that creditors who receive that ballot and receive the instructions understand how the ballot works, how the form is expected to be completed.

You know everything from very clear, plain language in the ballot items themselves to, we added a chart up at the top of the ballot that sort of breaks down in summary fashion how the two elections would work. And so just to reiterate what we're picturing how the elections would work are the third party releases are generally opt-out releases and consistent with precedent and typical procedures for the Southern District of Texas.

We have taken one category of released parties, that is the purchase companies, the entities that are being sold out of Chapter 11 in our primary sales process.

Those entities would not receive third party releases unless a claimant opts in to give those releases to those purchased companies.

THE COURT: So here's my question. I know I've read everything and here's the question that I have, and

it's really basic. I want to -- not, it's not a basic question, but I'm going to try to take it at a very rudimentary --

So I've approved sales of assets and some equity in companies. Those orders say what they say. At the same time, the purchased entities will be those cases in which they are Debtors, they're going to be dismissed. And the claims that were filed against those Debtors, like if there was a proof of claim, those are going to be -- and I knew I figured the language was coming.

So they're going to be withdrawn and expunged. And claims against the Debtors are going to -- those parties are going to be dismissed. Debtors are going to be unaffected. So now there's someone else's company, someone else's property. How do they get an opt-in? How does the opt-in work?

Which is how do how does -- a normal release party is either an affiliate or a sub of the Debtor or an entity affiliated with the Debtor. If you are neither of those things on the day that solicitation happens, how do I have jurisdiction over a company to solicit a release of a another third party in which I don't have jurisdiction over? I get the --

MR. GOTT: Sure.

THE COURT: In other words, I get the opt-outs

because opt-outs say affiliates. You're still kind of affiliated with the Debtors. Here, you're not anymore and that's the disconnect that I couldn't figure out yesterday. But now I understand, at least I understand the issue. I just don't understand how it works or how I can do that.

MR. GOTT: So, Your Honor, to clarify, the purchase companies are -- today, they are affiliates of the Debtors. They are subsidiaries of our Debtors, mostly project companies and other related entities.

So at the start of solicitation, they are affiliates. Yes. We're not exactly sure when sales are going to close. We're waiting on FERC approval, et cetera. So it's unclear at what point, between now and when the plan goes effective, that those entities would cease to be affiliates of the Debtors.

It's also possible that conditions precedent to effectiveness of the plan get waived, and a sale transaction closes after the effective date. It's possible that some of these entities even could be affiliates of the Debtors as of the plan effective date or when we get the confirmation to move that timeline forward a little bit.

So just to be clear, those entities are all in the corporate family today. Anyone who would be the beneficiary of --

THE COURT: But on the -- but on a certain time,

they're going to be dismissed, and those claims are going to flow. They're going to be unaffected. And so the back door is to get them through an opt-in. I just can't do it. I don't have jurisdiction over. I don't have authority to do that. It's I don't have -- I'm just telling you now. I don't have authority to do it, and I think everybody needs to rethink it.

If somebody wants me to dismiss a Debtor and argue that those claims are not subject, and they'll be expunged and treated, then those claims go with the dismissed Debtor and if they're a dismissed Debtor, and they are no longer part of the family, at some point, as contemplated by the orders that folks want me to sign, I don't know how you get a third -- we're expanding third-party releases to a place that I'm not comfortable going. I'm just telling everyone. I don't think I have authority to do it.

Under -- I don't think I have authority to do it under the law. And I think I'm binding two third parties. And what we're playing is the -- not playing. What we are assuming is that at some point, they're going to be Debtors but not Debtors anymore in the Debtor tree, but not the Debtor tree. And that's not -- it's a place that I'm not comfortable going, and it's confusing in the ballot.

The ballot -- it's because you have your claim gets expunged, but now you may be giving -- you may be asked

to give a release under a plan in which you may not even be a Debtor anymore as of the day that the plan gets solicit -- gets -- someone votes on it.

I'm not -- I can't do it. And it's with all due respect to the parties. That's -- we've to stay within our -- I don't have authority to do that under the code. Parties can brief it if you want, but I don't see how I can do that. I'm just trying to be as transparent --

MR. GOTT: Your Honor --

THE COURT: I'm just trying to be as transparent as possible. I don't like getting in the way of large, agreed deals, but I now understand all the paperwork and I understand how everything works. I'm just telling everyone I -- with all due respect, I don't think I have the legal authority to certainly then bring somebody in who -- it's -- I don't think I can do it, and I'm just asking the parties to just think about it.

MR. GOTT: Your Honor, yeah, Your Honor, we hear you, all the lenders and their representatives on the phone hear you. We will need to take this away. You know we don't have a solution sitting here on the spot.

THE COURT: No. I understand.

MR. GOTT: But you know, we hear the message, and we'll figure out a path forward very quickly once this hearing breaks. I do believe there was -- there may be

another, you know, follow-up matter from yesterday to be resolved. Although, it may have been solved in the meantime since the hearing began. So I don't know either Mr. Gordon or Mr. Abelson has anything to raise that were rumblings of things earlier in the day, but I'll check and make sure before we break.

THE COURT: Let me just ask. There's a proposed order dismissing at 1145, can -- with the changes, can I sign that?

MR. JIMENEZ: Your Honor and Andrew Jimenez for the U.S. Trustee. Yes, Your Honor, with respect to Order 1145 the U.S. Trustee has previewed and also added some comments. And we are in agreement with the proposed order at 1145.

THE COURT: Okay. And I know that there's some --

MR. GUFFY: And, Your Honor.

THE COURT: Go ahead.

MR. GUFFY: For the Debtors as well. Yeah. Sorry. Phil Guffy for the Debtors. Yes. We're -- we reached agreement with the U.S. Trustee and the order at 1145 is the final order.

THE COURT: Okay. I'll get that signed and on the docket. I know parties need to talk, and I won't waste any time. Just reach out to Ms. Saldana you when you're ready. If you need to talk to me over the next two days, it would

have to be kind of -- I'm traveling to a place. I don't -- I got to figure out the time zones and all that stuff. So maybe it would make sense for tomorrow for parties to just reach out to Ms. Saldana. And then if you need to reach me, if not, we can talk on Monday.

But I know you got to make -- we got to move fast. I get it. I'll make myself available. Even if we have to go old-school on the phone.

MR. GUFFY: Your Honor the one other order was the assignment procedures that we talked about yesterday. We added some edits based on comments from the UCC and Milbank. That's at 1140 with a red line.

THE COURT: I'll sign those and I saw some CNO's kind of professional apps, and I'll sign. I'll get those, they will hit the docket before I leave.

MR. GUFFY: Thank you, you know,.

THE COURT: Okay. Thank you. All right. We're adjourned.

(Off the record.)

THE COURT: Good afternoon or good early evening. This is Judge Lopez. I'm going to call First Brands. I'm going to turn on my camera. I didn't do so good of a job on that last time. We are now going to take up the emergency motion filed by Evolution Partners regarding a, I should say the stipulation. We'll just call it the stipulation motion.

Counsel, if you can just state your name for the record, just so we can officially begin.

MR. DALE: I will. Thank you, Your Honor. Charles Dale, and together with me, my partner, Vincent Indelicato from Proskauer Rose, our co-counsel, Emily Shanks. And, Your Honor, our declarant today, who you may or may not be hearing from, is from Berkeley Research Group, John Schlundt.

THE COURT: Okay.

MR. DALE: Your Honor, first some housekeeping. I think by agreement with my friends from Weil, we've agreed that there will be three declarations admitted into evidence today, Mr. Carlson's declaration, Mr. Jerneycic's declaration, and Mr. Schlundt's declaration, each subject, of course, to cross-examination.

THE COURT: Do you have the ECF numbers for those just so I can make sure?

MR. DALE: Your Honor, I --

THE COURT: There's been a few Jerneycics out there. I want to make sure we got -- I got the right one.

MR. BEREZIN: I don't have yours, but I can give you ours.

MR. DALE: Please go ahead.

MR. BEREZIN: Your Honor, the declaration of Daniel Jerneycic is at Docket Number 1316-5, and the

declaration of Cliff Carlson is at ECF Number 1316-25. And we have exhibits that I think we're both going to introduce as well, but.

THE COURT: Okay. perfect. Thank you.

MR. DALE: And, Your Honor, for identified in our amended witness list that we filed on the 11th, the stipulation is at Docket 609. That would be our first exhibit. Mr. Schlundt's declaration, Judge, is identified as Number 2 on our amended witness list at Docket 1077. I realize some of these documents have been filed in different --

THE COURT: They've already been filed.

MR. DALE: -- pieces.

THE COURT: Yea. No. No. But you're referring to your witness and exhibit list, the one that you filed on the docket that had kind of the stip, and a couple of other, like seven docs.

MR. DALE: It did, indeed.

THE COURT: Yeah. Okay. Let me just make sure. Are you moving for admission of just your -- the stip and the declaration or any of the other documents?

MR. DALE: Because I think Mr. Jerneycic's declaration, Judge, I think his testimony will be treated as direct, will cover much of what else was identified in our amended witness and exhibit list.

THE COURT: Okay. Do you intend to cross him?

MR. DALE: I do.

THE COURT: Okay. All right. We'll have to get the witness cam on. Just -- okay. And anything, any other housekeeping?

MR. DALE: Your Honor, I think the one other point I would make is that I'd ask the Court to take notice of the adversary proceeding that we filed on October 31st at adversary proceeding Number 25-03800.

THE COURT: Just note that it was filed or note that there's an adversary proceeding seeking a deck action? That kind of -- what exactly are you asking me to take judicial notice of?

MR. DALE: Just the fact of its filing, Your Honor, on October 31st, I think is sufficient.

THE COURT: I don't think that's a problem. Okay. So noted.

MR. BEREZIN: Your Honor, the Debtors just move into evidence aside from the declarations of Mr. Jerneycic and Mr. Carlson. There's some exhibits that we've submitted. Exhibits 6 through 24 are at ECF Numbers 1316-6 to 1316-24. Exhibits 26 and 27 are at 1316-26 and 1316-27. And then the final two are Exhibits 28 through 30. I guess there are three. Exhibits 28 through 30, those are at ECF Number 1316-28 to 1316-30.

THE COURT: Okay.
MR. DALE: No objection, Your Honor.
THE COURT: Okay. They are admitted.
(Exhibits 6-24 and 26-30 were admitted into evidence.)
MR. DALE: And, Your Honor, I think to be efficient, probably the right way for us to proceed would be to call Mr. Jerneycic for his cross-examination.
THE COURT: Okay. But before you do, can you give me -- I know I asked a couple of questions up front. Just can you lay out for me the basis upon which you -- I know they're in your papers, just so it's clear for me so I can follow. I know that you have mentioned some kind of other potential breaches there.
I think I know exactly what you're referring to, but if you can just really briefly just kind of lay out what you think the case for the breach is and --
MR. DALE: Of course.
THE COURT: -- under the stipulation.
MR. DALE: Of course. So, Your Honor, on November 9th, as you know, we entered into what I'll refer to as the stipulation or the stipulation and order. Your Honor so ordered that on the 9th. That stipulation looks a lot like stipulations, adequate protection stipulations that you've seen with other lenders, with Aequum and CarVal, and others.

It had very simple provisions in it.

It had adequate protection liens and claims. It had replacement liens. It had reporting. It had, importantly in this case, it had a collateral maintenance covenant.

Now, that collateral maintenance covenant only applies, of course, to Evolution's collateral. That collateral is located in only four locations. There was no confusion or misunderstanding about that. So we expected them to honor that commitment. They didn't.

Starting in December, we pointed out to them that they were about $44 million short of that maintenance covenant. And I'll put it nicely. We got the runaround. And we're not the first to complain about this problem, Your Honor. Onset's complained about it. They filed a statement the other night. We've heard from Aequum on this point. Carvel's made this point.

So we were surprised on Friday when the Debtor said, we don't know what you're talking about. What you should be doing is adding the other locations that are identified in reporting to the inventory that you do have a lien on. And we satisfy the maintenance covenant.

Well, Your Honor, I don't know any other word than silly to describe that response. That's a non-response. The stipulation is clear. We only have inventory against

which we assert a lien and claim in four locations. That was the point of Footnote 4.

And in Paragraph 13 of Mr. Jerneycic's declaration, he admits it. He says, yeah, their collateral was located in only those four locations. And then he goes on later in his declaration, I think, in Paragraphs 35 and 36 to say, but we weren't sure, right? There was a lot going on. We weren't really sure.

And ultimately, they say that because they weren't sure and because the reporting they gave us was over inclusive in terms of Brake Parts inventory, because one of the facts that's also not in dispute is we're talking about Brake Parts inventory, finished goods, Brake Parts. We didn't have all of the Brake Parts inventory. We had most of it, but not all of it. Just in those four locations, as I said.

So our feeling is this is a simple decision for you to make. There is a breach. The numbers are known. Paragraph 41 of Mr. Jerneycic's declaration will tell you exactly what the math is. And we need a remedy. So part of the remedy, Judge, was spelled out in the stipulation itself.

First and foremost, they can no longer sell Evolution inventory. Secondly, they're given an opportunity to take one of two curative actions. That's how it's

defined in the stipulation, which is either to post cash to one of the segregated accounts that you were talking about earlier, that would then serve as collateral for our liens and claims, or to replace the shortfall with new like-kind eligible inventory.

They did neither. And in their response from Friday evening, basically what they say is they can't. I think what they'll tell you today is they're not in a position to do that. They don't have the money. I mean, I think there should be no confusion about the status of this case. It's in trouble, real trouble.

So what do they say? They say, well, we've now completed our investigation, and you guys don't have a prayer anyway. The court should rule preliminarily that you don't have liens or claims. That, too, is not a response. And that's why I asked you to take judicial notice of the adversary proceeding that we filed to create a vehicle back in October to have this dispute as between, I think, us and the ABL lenders over who's on first relative to this inventory collateral.

We believe very strongly that we are. Have it decided. We're trying to be constructive, Judge. Get that process started early, and I think you'll recall a discussion where we talked about having the examiner be involved in that analysis.

And so now, having not filed a single piece of paper in the adversary proceeding, they'd like you to make a ruling on the case. Your Honor, that's offensive. That cuts across all notions of due process. So what we would establish for you today, Judge, is they breached the stip. It needs to be enforced.

We believe the enforcement is to force them to do one of the two things they're required to do. And they can't sell this collateral anymore. And I recognize now that stipulation has expired, there's a but to that sentence. The but is, unless they provide you adequate protection.

THE COURT: What is the effect, in your mind, of the termination now? Kind of where do things stand? Can they -- do you think the Debtor can -- I don't think I need to decide it today, but I'm just trying to understand. Do you think the Debtor can sell the inventory now?

MR. KELLEY: Only if they provide us adequate protection, Judge. I think that honestly is --

THE COURT: In other words, that would need to be either -- if I agree with you, they would need to cure this or they would need to come back another day and argue, we think we're in -- we think we're out of -- because in other words, if the stip is gone, then --

MR. KELLEY: Sure.

THE COURT: -- they're going to have to go -- and I'll ask the Debtor just the same, just to try to get a sense.

MR. KELLEY: I think, Your Honor, there's two timeframes. There's the period from the petition date through January 5th. We're entitled to a remedy for the breach of the stipulation in your order, and they're willfully disregard of it, frankly. They've just continued to sell inventory with impunity. We think there's a remedy for that through the 5th.

THE COURT: No. NO. No. I got it. I got it. Yeah. Yeah. Yeah.

MR. KELLEY: And then there's January 6th going forward, and what they're proposing to do is to continue selling that inventory, and we're entitled to adequate protection of that, too.

THE COURT: Do I have to decide that in the context of your emergency motion?

MR. KELLEY: Well, they've cross-moved for the use of that collateral, and I think that requires them to establish adequate protection. And I think to do justice to these two time periods, Your Honor, I think you need to understand where this case is today. It's in a terrible spot.

THE COURT: I got it. I'm just thinking, but in

terms of deciding, if I think that the Four Corners answers -- the Four Corners of the order answers the question in your favor, that's one thing. If I think the Four Corners answers the question in their direction, and there's -- I find that the stip doesn't say what you say it says, and I'm just playing devil's advocate. I'll ask them the same question, but what am I deciding then at this point?

MR. KELLEY: Well, I think --

THE COURT: Or has the stip terminated on its own, or has the stip terminated because there was a breach, and you terminated?

MR. KELLEY: No, it's terminated. It has expired on its own.

THE COURT: But that was in 90 days.

MR. KELLEY: Our rights were preserved until January 5th, and now they're in a period where it's like a cash collateral order has expired. They need to come back to you and say we want to continue to use cash. In this case, it's inventory. And here's our proposal for adequate protection. I think those are the two things.

The only thing we've asked you to do is to enforce the stipulation, but because the response came coupled with a motion --

THE COURT: I know.

MR. KELLEY: -- to continue using, we think it's

incumbent upon them to establish adequate protection. We could --

THE COURT: I don't think I scheduled that hearing. I think I scheduled your emergency motion. So I've got to think about procedurally --

MR. KELLEY: Understood.

THE COURT: -- what I was asked to do. But maybe I can give guidance on -- I'm just trying to be as transparent.

MR. KELLEY: Of course.

THE COURT: I'm trying to keep it down the line. But maybe we can tee the whole thing up right now, and I can just give you an answer as to whether I think it would work or not.

MR. KELLEY: Your Honor, I think that would probably be most efficient. Because I think what you would hear from Mr. Berezin is if they can't sell this inventory, they have a broader problem. It has a broader impact on the entire business. When customers call and want to buy Brake Parts --

THE COURT: No. I got it.

MR. KELLEY: -- and windshield, you know, wipers, they want to get both in one place.

THE COURT: Okay. I'll try to. I'll see what I can do. Okay. So how do you -- before you put on the

witness, walk me textually through the breach and the -- through the step. And then obviously, if you need -- in other words --

MR. KELLEY: Sure.

THE COURT: -- get me there through the Four Corners first. And then I got it. They cross moved, so we're going to have evidence, but walk me through. And there's docs in it. I think the parties agree that if I can decide this on the Four Corners, I should decide this on the Four Corners without taking any evidence.

In other words, if the order answers the question, that's step one. Step two is if there's ambiguity, then I step out, and consider other evidence, in connection with the breach piece, not the adequate protection. That's --

MR. KELLEY: Of course.

THE COURT: Okay. Walk me through textually.

MR. KELLEY: So, Your Honor, what I would start with is just a summary of what's in the loan documents. We both asked for the admission of and have admitted the --

THE COURT: All right. I just want you to walk me through the text.

MR. KELLEY: -- loan document.

THE COURT: In other words, the words got to get you there. On this order, get me there. I'm not saying you do or don't, but everybody agree there are words and there

are defined terms, and walk me through how you get there.

MR. KELLEY: All right.

THE COURT: And I'll ask the Debtor the same question.

MR. KELLEY: And can I briefly summarize three points about the loan docs? They're the same points in both docs, same provisions.

THE COURT: It won't influence. Like anything in a loan doc won't influence how I read this order.

MR. KELLEY: Very good.

THE COURT: I don't think it can if I'm going to stay within the Four Corners.

MR. KELLEY: So, Your Honor, we've --

THE COURT: You can tell me afterwards, but just walk me through it.

MR. KELLEY: Understood.

THE COURT: If I were just kind of do the analysis.

MR. KELLEY: Of course. In the recitals, starting at the bottom of Page 2.

THE COURT: All right.

MR. KELLEY: We lay out the loan documents, and we define terms. Functionally, the way these facilities worked is that First Brands, I think, Brake Parts Inc., sold inventory to special purpose vehicles in which we maintained

equity pledges and first leads, right?

The two facilities are described as Patterson --

THE COURT: And Starlight.

MR. KELLEY: -- and Starlight. And they're set up very similarly, Judge. As of -- I'm now on Page 4.

THE COURT: Okay.

MR. KELLEY: We define the Evolution Collateral as the Starlight and the Patterson collateral, of course, as well as proceeds including accounts receivable in cash. That's Evolution collateral. And to make clear what we're talking about, we went to -- we dropped in Footnote 4.

Footnote 4 identifies the Starlight collateral as being located in two places, 1100 Corporate Drive, McHenry, Illinois, and 1380 Corporate Drive, McHenry, Illinois. That's the Starlight facility.

The Patterson facility, two locations, 2701 Keystone Pacific Parkway, Patterson, California, and 14528 Benelli Street, City of Industry, California. That is the Starlight and Patterson collateral, full stop. Whatever's in those buildings, that's it, plus accounts receivable in cash and cash collected on account of the sale of those assets.

THE COURT: Okay.

MR. KELLEY: In Paragraph 1, we agreed on an interim period for the continued use of that collateral

through January 5th or 90 days. January 5th came first. In Paragraph 2, the Debtor agreed to give us adequate protection and replacement liens, very typical of an arrangement like this.

I'm going to skip over to Paragraph 5 where the Court, Your Honor, gave us adequate protection and super priority liens and claims to secure diminution, post-petition diminution. And then Paragraph 4B is where we find the collateral maintenance threshold.

What it requires is that the cost value of Evolution collateral would be 170 -- maintained at $170 million at Patterson and $165 million at Starlight.

THE COURT: Okay.

MR. KELLEY: Failing that, Subpart C, Page 7, gives the Debtors five days to take one of two curative actions. They can either transfer cash in immediately available funds, in the amount by which the collateral maintenance threshold exceeds the collateral value into one or more segregated accounts, or two, purchasing and transferring to the Evolution borrowers free and clear of any liens, new eligible inventory, which is a defined term in the loan documents, with a gross value that would eliminate the shortfall.

It goes on to say, that if the Debtors exercise one of those two options within five days, they are

continued -- they are permitted to continue purchasing without disruption that inventory.

The last sentence says, importantly, in the event the Debtors fail to exercise curative actions prior to the expiration of the five-business-day period, the Debtors shall be prohibited from continuing to purchase the Evolution collateral.

Probably one point worth making here, Your Honor, is Paragraph 10, which requires that we get a variety of reporting, including the reporting that's given to the ABO and term lenders. That's the text, Your Honor. We were protected, as all secured creditors are protected, in their own collateral.

I don't believe you need to look at anything else other than Mr. Jerneycic's own direct testimony that he understood that the collateral was located in these four places and that they failed to meet. At Paragraph 41, you will see the math. They failed to meet that collateral threshold.

And today, forgive me, Your Honor, as of December 5th, the shortfall against the threshold was $48,777,000. As of January 2nd, it was $40,249,000. As of January 9th, only a few days ago, $38,337,000. It's not a close call.

THE COURT: Okay.

MR. KELLEY: How would you like me to proceed,

Judge?

MR. SINGH: Your Honor, may I have an opportunity to address the text?

THE COURT: Just the text, and then we'll get into the evidence, and I'll give you an opportunity in just a bit. I'm considering this. No. No. I'm going to let them put on their case in chief, and then I'm going to let you kind of just walk through the text, however you want. I'll give you a full and fair opportunity to address the text. I'm just going to let them put on their case in chief.

MR. SINGH: Including the costs?

THE COURT: Yeah.

MR. SINGH: Okay. Yeah.

MR. SINGH: Okay.

THE COURT: Yeah. Yep. Yep. I'm just going to give them the opportunity. And then, so who are we? It's just one witness? You're just -- who are you crossing?

MR. KELLEY: Just one witness, just Mr. Jerneycic. And if Your Honor would like, I can confine the examination to just --

THE COURT: No. No. No.

MR. KELLEY: -- the effect of the --

THE COURT: I want you to put on your full and fair opportunity. I'm -- I've listened to your side. I need to listen to their side to understand if I stay within

the four bounds, I can make a call. I don't need to go outside of it. But I can then distinguish, you know, in a ruling, I consider the evidence. But I'm still going to have to consider probably Jerneycic for purposes of the cross motion. So I think it just makes sense that just whatever you want to --

MR. KELLEY: I agree with you, Your Honor.

THE COURT: Okay.

MR. KELLEY: Mr. Jerneycic.

THE COURT: Mr. Jerneycic, can you raise your right hand? Do you swear to tell the truth, the whole truth, and nothing but the truth?

MR. JERNEYCIC: I do.

WHEREUPON,

DANIEL JERNEYCIC,

called as a witness, and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE COURT: All righty. Well, let the record reflect the witness has answered in the affirmative. If you can, just do a mic check. Just state your name for the record and spell your last name for the record.

THE WITNESS: My name is Daniel Jerneycic. My last name is spelled J-E-R-N-E-Y-C-I-C.

THE COURT: Okay.

CROSS-EXAMINATION OF DANIEL JERNEYCIC

BY MR. DALE:

Q Mr. Jerneycic, when did you become co-CRO of the Debtors?

A I believe it was end of October on or around the 23rd.

Q Have you ever served as a financial advisor or CRO to a company where the fraud was as extensive as it is in this case?

A No.

Q Difficult case, right?

A Yes.

Q Company's records have been falsified?

A Could you be more specific?

Q Have you identified any records of the company that were falsified?

A There is a lot of irregularities in the company's books and records. Yes.

Q Fair enough. In your role as financial advisor before becoming co-CRO, and now as CRO, were you involved in financial forecasting for the company?

A I have been involved in cash flow forecasting for the company.

Q Projecting sales?

A Not exactly, no.

Q Did you, as CRO, supervise the preparation of amended

debt budgets?
A Yes.
Q Okay. Again, projecting sales?
A We used a lot of inputs to project cash flow forecasts, including sales forecasts provided by management.
Q Okay. Projecting cash receipts?
A Yes.
Q Projecting inventory purchases?
A Yes. Projecting purchases, payments to vendors based on inventory needs.
Q Understood. And projecting professional fees?
A Yes, correct.
Q Okay. And the culmination of that exercise results in a DIP budget. Yes?
A That is correct. Yes.
Q Okay. And based on the company's DIP budget, whether prior to your time as co-CRO, and you were just a financial advisor as CRO, some DIP lenders have committed $1.1 billion of new money to this business. Is that right?
A Yes, that is correct.
Q Okay. And those funds were supposed to be sufficient to stabilize the business and to support these Chapter 11 proceedings?
A Not necessarily. They were estimated to get to a certain point of time, subject to roll forward in future

subsequent budgets.
Q And what was that certain point in time, Mr. Jerneycic?
A I believe the most recent --
Q No. I'm sorry. Let me be clear. Originally, what was that point in time?
A Well, the DIP budgets to which you are referring are 13-week cash flow forecasts, and those are produced once a month. And so depending on which DIP budget you're talking about, it would go out 13 weeks from the date it's issued.
Q All right. Let's discuss, Mr. Jerneycic, the company's actual financial performance against the DIP budgets based on your weekly reporting and monthly operating reports. Is it fair to say that customer receipts were below projections in these DIP budgets by about $230 million through the end of December?
A I'd have to look at something specifically to corroborate what you're saying.
Q Does that sound about right?
A It doesn't. I recall that in connection with the DIP budgets, we are required to provide variance reporting to DIP lenders. And the variance reporting that is provided to the DIP lenders, and others, does a variance test on both the receipts and the disbursements. And we have not failed a receipt or disbursement test to date.
Q Is it fair to say that receipts were materially below

what was projected back at the inception of these proceedings?
A No. You'd have to be more specific to what numbers and what weeks that you're referring to.
Q Okay. How about professional fees? Is it accurate that about $177 million has been spent thus far on professional fees?
A What do you mean by spent?
Q Set aside in the professional fee reserve.
A I don't have the exact number right now.
Q Is that close?
A I would feel more comfortable having the actual data in front of me to confirm.
Q All right. Well, feel less comfortable. Is it close?
A I don't know for sure. It's over $100 million.
Q Okay. In your latest budget, you're projecting about another 130 professional fees before the end of February?
A I don't remember the exact number. Sorry. What period of time are you talking about when you say through February?
Q Between now and the end of February 2026.
A So starting this is week one, going through the end of February?
Q Start with January 1st.
A So you're referring to a nine-week period? I don't know. That sounds a little high, but I don't have the

document in front of me, so I don't know for sure.
Q Okay. Is the company burning about $60 million of cash each week?
A I think it's hard to make that generalization. It depends what period of time you're talking about.
Q This week.
A Can you define what you mean by burn cash?
Q You're the chief restructuring officer. You're not Mr. Jerneycic?
A I am a co-chief restructuring officer.
Q Are you not constantly aware of the amount of cash being spent by your business each week?
A I follow closely the financial activities and the ins and outs of the cash.
Q But you can't tell us how much money is being spent this week over and above what's coming in the door?
A I don't have the cash flow forecast in front of me, so I don't exactly know. It is Tuesday. There are a lot of things that are in flux right now. And so the amount of cash that we disperse this week will depend largely on, frankly, how things turn out today, how things turn out with SPV lenders in general, how things turn out in terms of receipts that we are struggling to get access to, which was heard earlier today.
So there's a lot of different factors, Mr. Dale. And I

think it's hard for me to generalize and speculate, you know, what's going to happen without knowing what those numbers are.

Q Okay. I think you said you update the DIP budget each month. Is that right?

A We are required to provide a revised DIP budget on, I believe it's the first Thursday of each month.

Q Okay. So did you do that the first week of December 2025?

A We did.

Q Did you do it the first week of January 2026?

A Yes. We did.

Q And did your budget change the amount of customer receipts projected over 13 weeks by $241 million?

A Between the December budget and the January budget?

Q Yeah.

A I don't recall.

Q The performance within the Brake Parts business has been particularly bad, hasn't it?

A What do you mean by it's been particularly bad?

Q Brake parts business consumed $120 million of cash in October and November alone. Isn't that correct?

A What is that based on?

Q Your financial reporting, Mr. Jerneycic, and I'm curious to know why you don't know anything about your own

financial reporting.

A I just don't know what report you're talking about. Could you be more specific in terms of?

Q I was very specific. Did the Brake Parts business lose $120 million in October and November?

A I don't know.

Q You don't know. Has the company decided to run an orderly wind down of the Brake Parts business?

A Not to my knowledge.

Q What would you say the gross sales are of Brake Parts on an ongoing basis from the petition date forward?

A I would say that the Brake Parts business does approximately 10 million a week. So from the petition date, that would be about $130 million through the end of December.

Q Okay. Maybe I can ask you a more general question about the financial performance of the business overall. As you sit here today, when will this business run out of cash? Let me withdraw that question, and ask it differently. It's true, is it not, that you're expecting the business to run out of cash in the first week of February?

A Based on the current assumptions in, I would say, a non-public scenario cash flow forecast, we are projecting if things continue the way that we've modeled them in the next couple of weeks, we could run out of cash as soon as the

first week in February. Yes.
Q Okay. Let's talk a little bit about the sale process that I think was proposed on Friday. Are you familiar with that?
A Yes.
Q Okay. Under the sale process you proposed, Mr. Jerneycic, February 6th is the date by which you will determine, or the company will determine, with your assistance, whether Qualified Bids have been submitted for groups of assets, business lines, or the company overall, correct?
A I believe the bid deadline is January 30th, not February 6th.
Q I'm referring to the date by which you determine whether those bids that are submitted are Qualified Bids.
A Oh.
Q Capital Q, capital B.
A It could be. Yeah.
Q Okay.
A The Lazard team is leading the sale process.
Q Fair enough. That's all right. And if you have more than one qualified bid for the same set of assets or for business segments, you'll run an auction on February 9th, correct?
A That is the current timeline. Yes.

Q And you expect to close, subject to Judge Lopez's approval, successful sale transactions by the end of February?
A Yes. That's right.
Q Okay. But since you're expecting, as you sit here today, to run out of money by the first week of February, then certainly extraordinary initiatives must be underway to extend that runway, correct?
A Yeah. I would say there's mitigating activities to avoid that.
Q Let's talk about some of those mitigating activities, Mr. Jerneycic. Selling inventories to customers on cash or near cash terms is one of them, right?
A Accelerating payment terms with our customers is one of the key mitigating activities.
Q Okay. So I want to be clear. Go-forward purchases of inventory, including Evolution Inventory Collateral, you're proposing to sell those to customers for cash or near cash terms, right, like seven-day terms?
A We are in discussions with customers to accelerate, Number 1, payables that are outstanding that are owed to First Brands Group. And Number 2, we are asking them to provide cash on delivery or cash in advance or cash on delivery payment terms for go-forward sales as well.
Q Got it. All right. So you're trying to collect

outstanding accounts receivable from customers at the same time that you agreed to sell them new inventory for cash?
A    Correct.
Q    Do you plan to spend the money you collect from this initiative to support operations through the end of February, or do you plan to set those aside for lenders like my client who have a lien on those proceeds?
A    It depends on the magnitude of and the success of our, you know, efforts to accelerate receivables.  So it would depend on how much cash would be available.  And then disbursements would be prioritized in connection with the amount of cash that we are able to collect.
Q    So in other words, if you aren't sufficiently successful in liquidating receivables and inventory, you'll spend all of the cash?
A    I mean, it's possible that if we are unsuccessful, that the company could run out of cash.  Sure.
Q    And if and when that happens, you will have spent every dollar of the new cash generated from inventory sales going forward and collections of accounts?
A    Well, I think we would be evaluating the current state each day and each week, and we would be pursuing other mitigating activities to ensure that we do our best to not run out of cash, so that we don't just wake up one day and have spent it all.

Q Mr. Jerneycic, you became aware in December of the claim by my client that you had missed this collateral maintenance covenant, right?
A Yeah. I became made -- I was made aware sometime in December that this was the assertion, that this was what Evolution, and its advisor had communicated to our advisors.
Q Okay. And did you put cash in an account to shore up the alleged shortfall?
A No. We did not. Frankly, I was surprised when I heard it, because we had been watching the inventory values and I did not see a diminution based on my understanding of the agreement.
Q Okay. Did you buy -- so the answer to my question was no.
A Well, since I didn't think that we had fallen below the threshold, there would have been no need to put cash aside. So no, cash was not put aside.
Q Got it. And no new inventory was purchased to shore up the difference between the threshold and the then current amount at the four approved warehouse locations.
A I would disagree with that statement. The company has been purchasing inventory on a daily, and weekly basis, including inventory for Brake Parts. There is inventory that is manufactured in Mexico and China, and also some U.S. locations, that is transferred to and is in the process of

being transferred to and has been transferred to the BPI warehouse facilities at McHenry, as well as Patterson and City of Industry.

Q And those are reported each week?

A To whom? I'm not sure what reporting is provided. What reporting are you referring to?

Q Well, your declaration talks at length about the reporting.

A Can you point me to the specific place that you're talking about?

Q I'd be happy to.

MR. KELLEY: Your Honor, may I approach?

THE COURT: Yes, of course.

MR. KELLEY: I'm going to hand him his declaration and the stipulation.

THE WITNESS: Was there somewhere in the declaration that you wanted me to?

MR. KELLEY: Give me one second.

THE WITNESS: Oh, yeah. Sure.

BY MR. DALE:

Q Paragraph 13 of your declaration, if you don't mind.

A That doesn't talk extensively about reporting.

Q We're getting there.

A Okay.

Q You agree, do you not, that Evolution only asserts

liens and claims against inventory located in the four addresses that you refer to collectively as the Evolution locations in Paragraph 13 of your declaration?
A I don't think that's what I acknowledge in that paragraph. No.
Q I think you said you were familiar with the Evolution loan documents. Is that true?
A I have reviewed them. Yeah. I've reviewed them. I don't know that I'm super familiar with them.
Q Okay. Are you aware that the Evolution loan documents require that all Evolution collateral be maintained in one of those four locations?
A I recall seeing an exhibit that listed these four facilities in that document, but I don't remember the specific language.
Q Okay. And those four addresses are the very same addresses identified in Footnote 4 of the stipulation and order, correct?
A I think that's right. Maybe I could double check them just to make sure, but I think that's right. Yes. Yeah. Those are the same ones.
Q Okay. If you would look at the stipulation, and I'm going to direct you to Paragraph 2 in a second, but I want to get a frame of reference from you, Mr. Jerneycic. Are you familiar with the stipulation and order?

A I am. Yes.
Q Are you familiar generally with the concept of adequate protection under the Bankruptcy Code?
A Yes.
Q Okay.
A I have a business understanding of it.
Q What's your understanding of what adequate protection is?
A Well, it depends on the context, but in this context, as it relates to the inventory, you know, this is consistent with what Mr. Singh has said on other occasions, as well as -- excuse me -- as well as other stipulations that are out there with other parties, including other SPV lenders. There has been a desire or at least an intent or an agreement to maintain what we've been referring to as the status quo.
In other words, maintain where things are at. And if things go below where they are at, then we'll talk about how to fix them. And if they go above, that's fine. Then that becomes sort of cushioning, if you will, until it comes back down. So there has been a desire and an intent to maintain, again, the status quo, which is to keep inventory balances, in this case, at the same place that they're at the time of the stipulation.
Q So if I could summarize what you just said, your

understanding of adequate protection is to protect against a decrease in the status quo in terms of collateral value for a secured party.
A A decrease in the balance as it is today or at the time, you know, that the agreement is being discussed and negotiated.
Q Okay. And at the petition date, is it about right that the collateral value, the aggregate collateral value in those four locations was about $304 million?
A Yes. That's what the company's books and records and perpetual inventory system would say.
Q Okay. Paragraph 2 of the stipulation, do you understand that to be the Debtors agreeing that Evolution would get a replacement lien to the same extent in the same collateral that it had going into the case?
A That may require a legal conclusion, but --
Q I'm just looking for your understanding. I realize you're not the lawyer here, Mr. Jerneycic.
A Yeah. I mean, it sounds like there's some pre-petition stuff, too. I don't know. I'm not sure what Evolution may have had in terms of liens on pre-petition and accounts receivable, but.
Q Okay. That's fair enough. And do you understand that Evolution's lien extends, not only to the inventory, but to the proceeds of inventory, which would include accounts

receivable from the sale and cash collected from those accounts?
A Yeah. Again, that might require a legal conclusion. I don't know for sure, but from a business perspective, I would think that could only be true if there was, in fact, diminution or if there wasn't replacement inventory provided --
Q Okay.
A -- in place.
Q All right. So let's turn then to Paragraph 4, specifically Subpart B on Page 6 of the stipulation. Is it true that the company agreed in this stipulation to maintain the cost value of Evolution collateral that is inventory, equal to, or in excess of, $170 million at the Patterson facility?
A That's what Paragraph 4B says. Yes.
Q And the same at $165 million for the Starlight facilities?
A It doesn't say Starlight or Patterson facilities. It says collateral.
Q True. That's true.
A But otherwise.
Q I stand corrected. Otherwise, you agree.
A Yeah.
Q Okay. And in your declaration at Paragraph 41, you may

remember these figures, even though you couldn't remember others. On December 5th, the aggregate collateral value at those four facilities was 286,222,762.
A December 5th at -- sorry, at what facilities?
Q This is in -- if it's helpful.
A I'm looking at it.
Q Paragraph 41 of your declaration.
A I'm looking at it. I just didn't process it.
Q Yeah. The four facilities, all of the Evolution collateral, December 5th, 286,222,762.
A So I would say the four facilities, and it looks like three, but really it's four because McHenry is combining two different facilities. So those four facilities sum up to that, but it's unclear. I don't think I could say exactly what the Evolution collateral is because I don't know if any of it was moved between any of these facilities, since these facilities interact as a distribution network.
And so there's -- unless one was to say that once an item leaves a facility, it's no longer, there's no longer a lien on it.
Q So Mr. Jerneycic, that was an interesting answer. Because you understand that your declaration is your direct testimony, yes?
A I do.
Q Okay. See that little memo at the bottom of the chart

in Paragraph 41, at the very bottom? What does it say?
A Evolution facilities.
Q Okay. And bear with me. There's two asterisks there, and those two asterisks are also next to the lines McHenry, Patterson, and COI, which is the City of Industries, correct?
A Correct.
Q Those are the Evolution facilities, right?
A That is how the Evolution --
Q Okay. So let me then stop you. So if the answer to that is yes, on December 5th --
A Well, I didn't answer yet, but.
Q -- was the aggregate value of the collateral at those facilities, the Evolution facilities, per your direct testimony, 286,222,762?
A In my declaration, I defined the Evolution facilities as four facilities that had specific addresses.
Q Which is precisely where Evolution's collateral was located. Yes?
A What I'm saying is I don't know if that collateral was only at these facilities or not. I don't know what -- I saw purchase agreements that had specific inventory items, and so one could argue that is the collateral because you bought specific inventory. And if it's located at one of the corresponding network of distribution centers, I could see

somebody making an argument that it's still your collateral even though it moved from one to another.
So I don't know exactly where Evolution collateral might be across this network, but --
Q So do you want to change Paragraph 41 in your declaration? You don't want that to be your testimony anymore?
A I don't think Paragraph 41 says that, so I don't feel the need to change it. No.
Q Is the sum -- the aggregate value on January 2, 2026 of the inventory located at the McHenry, Patterson, and City of Industry sites, $294,750,117 or not?
A Yes.
Q Okay. And is that number $40,249,883 less than 335,000 -- forgive me, $335 million?
A You're testing my math a little bit here on the fly. It's about $40 million less.
Q Okay. And the same question is relative to January 9th. Was the aggregate collateral value at the Evolution facilities, per your testimony, Paragraph 41, $296,662,364 on January 9th?
A Yes.
Q And is that $38,337,636 below the agreed-upon collateral maintenance threshold of $335 million?
A It's less than 335 million, but that's not what the --

that's not what my business understanding of the stipulation is or was.

Q Who represents you in this case? Who represents the company? Forgive me.

A Weil Gotshal.

Q Sophisticated lawyers?

A I think they're great.

Q I'm sorry. Did you say you do agree?

A I said I think they're great.

Q Oh, all right. Thank you.

MR. DALE: I thought he said he didn't agree. Forgive me, Your Honor.

MR. SINGH: Your Honor, I think the -- of law -- it's not relevant. I will gladly stipulate.

MR. DALE: There's no question. No question is there, Judge.

BY MR. DALE:

Q Mr. Jerneycic, a couple of final questions. What's the difference between the book value of about 305 million -- about $304 million, forgive me, that was your testimony, on the petition date of the Evolution Inventory Collateral and the value of that collateral today?

A The -- as it pretty clearly shows in Paragraph 41 in the table, it is down by -- for those, what I'm calling the Evolution facilities, in my declaration, the inventory

balance has decreased by $7 million.
Q Okay.
A Over those time periods.
Q And let's go back to the sale process. You say about $296 million today, that cost. About $296 million that cost today. Yes?
A Of the four, of those four facilities?
Q Yes, sir.
A Yeah. Closer to 297, but yes.
Q Okay. And I think your declaration goes on at some length about having done an investigation and concluded, made conclusions about Evolution's liens and claims. So is it your belief today that Evolution's liens and claims extend beyond those four facilities, after your investigation?
A I would not say that I have performed an investigation in this regard.
Q Okay. The sale process that I think you testified would conclude sometime at the end of February if it's successful. Do you project a decrease in the value of the Evolution collateral? And let me be precise. Do you project a decrease in the value of the inventory collateral?
A I would expect that the inventory across all of these facilities in Paragraph 41, including the three here that we're calling Evolution facilities, to -- yeah, I would

expect those to decrease between now and the end of February, based on the current assumptions that we're using in liquidity forecasting.

Q Okay. By how much? More than 10 million?

A It depends on a variety of assumptions, but it could be somewhere in that range.

Q More than 20 million?

A That would surprise me based on the assumptions that I'm using, but you know, there's different scenarios you could run, and you could show a scenario where it goes down more if you sold a lot of inventory quickly in bulk outside of normal run rates.

You could show a scenario that shows it not going down if, to the extent we're successful in collection of accounts receivable, where there would be more money to invest into inventory in the supply chain that could actually prop this balance up more, so.

Q Let's go back to the sale process. I asked you earlier. You hesitated, I think. Has the company made a decision to pursue an orderly wind down of the Brake Parts business?

A No. Not yet. No.

Q Is it under discussion?

A It is something that's being contemplated. I referred to mitigating activities or actions earlier. That's one of

the things that we have to think about very seriously because of how tight liquidity is right now. I think there is a lot of value in trying to preserve the value in the customer relationships of these businesses. Weil, not Weil, Gotshal, but Weil, the Lazard team is pursuing the sale process.

Because I think the value-maximizing path here is to sell these businesses as a going concern and -- or at a minimum, maintaining the relationships with the customers so that you have commitments from them to advance receivables, and in return, they can continue to receive product.

Q You didn't answer my question about the Brake Parts business. Is the Brake Parts segment of the overall business a laggard? Is it one of the worst segments in the franchise?

A The analysis that we've seen, and that we've performed, suggests that the Brake Parts business is losing money.

Q Okay. So not likely to get a going concern bid, right?

A Not necessarily. You know I think there are strategic buyers who there might be assets here that are interesting to them.

Q So there's a maybe on a going concern bid for Brake Parts?

A Yeah. I think that's -- the whole point is pursuing that process, and I'm a step removed for that. So the

Lazard team will be a lot closer to the specifics there in terms of the inbounds and how those conversations are going.
Q Okay. So let me just summarize that. You're projecting a decrease in Brake Parts inventory of approximately $10 million or more between now and the end of February. Yes?
A I would say ballpark. Yeah. We've done some analysis on it. I don't have it in front of me, and I don't remember the exact numbers, but I think that's a reasonable ballpark.
Q And you're expecting, between now and the end of February, to sell Brake Parts inventory to customers for cash. Yes?
A Yeah. That's the goal.
Q And you're also trying to get customers to pay up on their accounts receivable, which may have been generated by the sale of Brake Parts from the petition date or even before the petition date. Yes?
A Yeah. I would say yes. That is the goal. I would say all of this stuff is interrelated. So you're -- you know, it's hard to get one without the other. And I think the leverage that the company has hinges on, you know, the ability to continue to sort of perform. But, yeah, we're trying to do all of those things that you mentioned.
Q But you're not able, as you sit here today, to say that you will set aside any amount of that money for secured

creditors?
A I would actually disagree with that. We actually shared a proposal with the Evolution parties as recently as I believe it was Sunday that actually did have -- it showed a scenario of cash flow forecast that did some of these things that you're talking about, including, Mr. Dale, acceleration of customer AR, acceleration of payment terms for go-forward sales, continued vendor payments and supply chain, you know, circular inventory movements between Mexico, China in these facilities as well as some sales outgoing.
And then based on that set of assumptions, there was what we referred to as excess cash or diminution funds. And actually, we went as far as to illustratively allocate those to specific pools of collateral, including Evolution.
Q So you mentioned a proposal that you made on Sunday, so let's be very precise. Sunday was two days ago. In your proposal on Sunday two days ago, you projected a loss of collateral value to Evolution, specifically to Evolution of $20 million. Did you not?
A I don't have it in front of me, but.
Q Would you like to see a copy?
A It would help refresh my memory if you want me to confirm the numbers.
Q I'll give you my copy.

MR. DALE: May I approach you, Your Honor?
THE COURT: Of course.
THE WITNESS: Yeah. I think you referred to this as a proposal. It's called discussion materials. So I don't know if it's a proposal, but.
BY MR. DALE:
Q You raised it.
A Yeah. So this -- sorry, could you repeat your question?
Q Yeah. What did you project as recently as Sunday would be the diminution in the value of the Evolution collateral between now and the end of February 2026?
A Yeah. We have it in here as $20 million.
Q Okay. And how much money did you say you thought you might be able to eke out and set aside for lenders? What percentage? There were actually two percentages in there. What percentage of those dollars did you say you might be able to preserve for the benefit of secure creditors?
MR. BEREZIN: Objection to form, Your Honor. He's putting a lot --
THE COURT: Yeah. That was a lot of -- why don't you rephrase the question?
MR. DALE: Let me break it down.
BY MR. DALE:
Q Your proposal included percentage recoveries on cash

generated between now and the end of February. Did it not?
A Not exactly. So again, these are discussion materials, not a proposal. But what we showed in here was we showed projected diminution across -- I'll focus on the Evolution piece. We showed estimated diminution for Evolution as of two points in time. One point in time was through the auction date, which was mid-February, and one through the end of February, which would be the proposed sale closure date.
And at each of those dates, we estimated, based on some of the action items that I was talking about, that you and I were both talking about earlier, how much cash we would have at those points in time. And then what we did was, as I mentioned before you provided me this document, was we did an illustrative sort of allocation of that cash across the diminution of all the parties.
And we just did it in a pro-rata fashion so that it was kind of equal, so, like, everybody got the same percentage relative to what their diminution is, so.
Q Right. And I think if I've got it, and it's in front of you, so you can correct me if I'm wrong. You thought that you would need to spend 73 percent of every dollar coming in the door through the middle of February, that auction date that you mentioned. Yes?
A That's not the way that the math is set up. But what I

can say is that as of the auction date, we had estimated a $12 million diminution. We had estimated a $12 million diminution in the Evolution collateral, although the starting point was actually low. Because we now know that the balance is higher, so it would technically be less.

But we had, based on the amount of cash we expected to have at the end, would have been 7 million that could be set aside for that 12. So again, if that 12 is really more like 10 because the balance is higher now, there would be $7 million set aside. So there would be 70 percent of the diminution would be covered by cash as of the auction date, if that's what you're -- I think you're asking auction date, right?

Q So my memory of your proposal, which you have in front of you, you have my only copy.

A Here, you can have it.

Q Okay. Was you thought by mid-February, you'd be able to essentially set aside 27 percent of the cash. And if we went all the way to the end of February, which would presume that there was some successful transaction, 11 percent of the cash. Yes?

A No. I don't think that's right. It's again, it was -- even if we stay with the 12 million, 7 million would have been set aside to cover the 12, so that's more than 50 percent. So I don't know where the 20 is that you're coming

from. And then by the end, it would have been 6 million on the 20, which would be, I guess, more like 30 percent.

MR. DALE: Your Honor, I'd like a minute at the end of the hearing to decide whether we should have this admitted so the Court can read it, because I'm not even -- I'm not sure I even understand that answer. I think the numbers on the page speak for themselves. So if I could just reserve on that issue and give some thought while Mr. Berezin is putting on his case. I do have just a couple more questions.

THE COURT: The admission of the doc that he's looking at?

MR. DALE: This document here.

THE COURT: Okay. I just wanted to make sure I understood. Okay.

BY MR. DALE:

Q You mentioned earlier that you had generated about $130 million of accounts receivable from the sale of Brake Parts, not necessarily Evolution, but Brake Parts generally from the beginning of the case. Yes?

A That was a rough estimate based on some sales data. That's in my head, but yeah.

Q Okay. So if inventory value could decline $20 million, Evolution's inventory value could decline by $20 million between now and the end of February, you will have collected

and spent the vast majority of the $130 million of receivables, generated by the sale of Brake Parts post-petition.

And done the same thing when you sell off inventory for cash between now and February 28th. I want to ask you, your business understanding, does that sound like adequate protection to you?

A What you're saying is inaccurate. Those numbers are not correct.

Q Okay. But you are collecting AR and spending the cash. Yes? That's your proposal?

A I don't -- there's not a proposal. Again, this -- what proposal?

Q In the ordinary course of your business going forward, you've already testified to this, are you talking to customers about collecting out accounts receivable?

A Yes. Again, we're trying to accelerate --

Q Okay.

A -- collection of accounts receivable.

Q And using that to sustain operations?

A Yes.

Q Okay. And selling existing inventory for cash. Yes?

A The goal is to, again, get customers to pay us more quickly. Right now, it's on terms, so.

Q And to use the proceeds of the sale of that inventory

to sustain operations. Yes?
A Amongst other things.
MR. DALE: All right. Your Honor, I have no further questions for this witness.
THE COURT: Thank you.
MR. DALE: Thank you, Mr. Jerneycic.
MR. BEREZIN: Your Honor, just on that document, that was a proposal that was distributed under 408. The witness had raised it, so I allowed the questioning, but we would prefer strongly that that not be put into the record. We have a lot of discussions that are ongoing.
THE COURT: I don't think anybody's moved it into evidence, so I don't --
MR. BEREZIN: Okay. So we won't address it unless --
THE COURT: I mean, you certainly can raise it, but nothing's in -- it hasn't been admitted.
MR. DALE: No. Your Honor, I wouldn't have raised it but for the fact that the witness raised it in response to one of my questions. So I do want to consider it, and I appreciate the --
THE COURT: Yeah. Got it.
MR. BEREZIN: Okay. Just some questions for the witness, Your Honor, if it's acceptable.
THE COURT: Okay.

BY MR. BEREZIN:

Q First of all, speaking about adequate protection, and so let's talk about the period after the stipulation. If today -- I want you to compare, based on your business understanding, the analysis you've done, compare the consequences to Evolution. Let's assume it's Evolution's collateral in those four facilities, full stop. What are the consequences to Evolution if that collateral is turned over to Evolution tomorrow, compared to the scenario that you've been discussing, where for six to eight weeks the collateral is being sold, and it diminishes in value as a result? And then let's assume at the end of that six to eight weeks that's when Evolution gets the collateral and then they can do what they want with it.

The question -- do you have that understanding in mind?

A I do.

Q Okay. So is Evolution better off getting the collateral today or in six to eight weeks under the proposal you've been discussing?

A I think it's clearly much more valuable under the second scenario you described, which is to do it, to transfer and sell the inventory and the collateral in an orderly fashion. My experience is that when -- if Alternative 1 is, you know, shut things down today, and enter into a forced liquidation, you lose all leverage with

your customers. And the value of the inventory goes down significantly because you can only recover below typical sale prices, contractual sale prices, and there's a cost associated with doing so.

So my experience is that moving towards maintaining customer relationships, understanding what the customer's transitional needs are, even if the business is not sold, is much more valuable than trying to do a forced liquidation.

Q And so based on your business understanding of adequate protection, if Evolution's collateral inventory is sold over the next six to eight weeks, and then they obtain it in a liquidation because there's no going-concern sale, to what extent are they adequate protected, given your business understanding of the terms you discussed on your direct?

A Well, I would say that the value of the inventory is preserved. Because you're maintaining the status quo of a going-concern business while a sale process is pursued. And you're having conversations with customers to understand what their needs are, their interest in the inventory, negotiating sale of that inventory at a certain price, based on their business needs as well as collection of the outstanding AR.

So I think not only would the owner of the inventory fare better, I think all other parties involved would fare better as well.

Q Okay. Thank you. Now I want to try to clarify a few things about the period during the stipulation, and so from November 9th approximately, until the January 5th expiration date. What was your understanding, your business understanding, of what Evolution collateral was? What is it that you were, in your mind, measuring against that 335 threshold? The stipulation talks about Evolution collateral, so what were you in those each week measuring against that 335?

A We were measuring the inventory against what the company refers to as MDC and WDC, which stands for Midwest Distribution Center and West or West Coast Distribution Center, which is the broader network of BPI U.S., which interacts with those main facilities at McHenry as well as City of Industry and Patterson.

Q So the MDC and WDC, that you described, that was your business understanding of where the Evolution collateral was during the period of the stipulation. Explain to the Court why you had that understanding.

A Yeah. I felt that way because we learned, I learned, in late September through conversations with management that they had transferred or -- and/or were in the process of transferring Evolution inventory back to First Brands Group. That's what the management team told me.

We later learned that the company used a variety of

different terms and nomenclature with regard to those facilities. Sometimes McHenry was used as a term that included Midwest Distribution Center. And we learned that the company used more than just those four facilities to manage this inventory.

That they actually had a distribution or a network of warehouses and locations to manage this, and they referred to some of it as off-site or other locations.

Some of the reporting that we got would sometimes include it, sometimes not. So there was a little bit of confusion early on in terms of when somebody said McHenry, what they meant by it.

We later then, this is sometime in October, tried to tie back. There was questions coming from Evolution, and its advisors as to why the inventory at certain facilities was lower. We looked at the bar.

Q Let me pause you for a second.

A Sure.

Q The questions you were getting from Evolution, that the inventory was lower. Lower, are you referring, first of all, to the value in the reporting as to what was in the four facilities?

A I think it was relative to what their expectations were, and their expectation was the levels that it was at prior to the filing. And the latest document that we had

for that would have been the July borrowing base. And so I recall the July borrowing base being somewhere in the $370 million range across those four facilities.

And this would be borrowing bases that management at the company would have sent to Evolution. When we stacked that up against the -- only the four facilities in late October, we saw that was around 290 million. I think it was a little less than that, but it was, you know, 80 to $90 million lower than what the borrowing base showed.

And when we included the, I'll call them ancillary. So if we ran the report using the Midwest Distribution Center network as well as the West Coast Distribution Center, we got a figure that was $370 plus million. So it was a lot closer.

Now, the borrowing base data that Evolution had, and that the company used to provide them at the time, did not provide like sufficient level of detail to show, you know, what facilities, if any, were on there. It just broke it out between Patterson and Starlight Collateral. So there was no way to tell if it was just McHenry or if it was the ancillary facility as well.

We shared all of these reports with the Evolution team, including its advisors, in late October before the stipulation was signed. So they would have been aware that the four facilities were somewhere in the $290 million

range, and the broader network was in the $370 million range.

So you know when they came up with a number of $335 million, somewhere in between, you know, they must have been assuming, or at least I expected they were including other collateral outside of the four facilities. Because there's no way I would have agreed to, nor do I think the Weil team would have agreed to, a $50 million or $45 million diminution at the time of the stipulation filing.

Q Okay. So let me just back up and make sure that it's clear in the record. So you had, on the one hand, the last borrowing-based certificate that was given to Evolution, July of 2025, showing about 376-ish million. Is that correct?

A 370-something. I don't remember the exact number, but yeah.

Q Okay, 370-something. And then you had a report that you ran in late October, for just the four warehouses, and that was in the 280-290 range.

A Yes.

Q So an 80-$90 million negative delta to what Evolution had been told in July. Is that right?

A That is correct. Yes.

Q Okay. Now, the report that you ran that included these satellite facilities, how did that report, in terms of the

value, compare to the July borrowing base that Evolution had received?
A It was much closer. It was -- I recall it being within 2 or $3 million. It was very close. It was 370-something.
Q Okay. Now, before the stipulation was signed, was Evolution provided with a report that showed the four locations were at this 280-something number? Were they given that report?
A Yes. They would have been given that report.
Q Okay. And were they provided the report that was much closer to the July borrowing base, the one that was in the 370s?
A Yes.
Q And they were provided that before the stipulation was signed?
A Correct.
Q Okay. And remind the court, what was the collateral maintenance threshold that was selected by Evolution and agreed to in the stipulation?
A It was 335 million. They were round numbers.
Q Okay. So when the stipulation was entered, the day after that stipulation was entered, if you were only counting the four facilities, what would the immediate diminution have been compared to that 335, based on the late October report?

A It would have been over $45 million.
Q Okay. And can you describe the communications you received from Evolution demanding that the Debtors post-cash of around 48, $50 million, or come -- bring in an additional $48 million of inventory?
A There was none. The first I heard of it was when -- I can't remember if it was Mr. Singh or somebody from the Weil team, reached out sometime in mid- to late December, saying that there was an issue, that Evolution thought there was an issue with the diminution.
Q Okay. Now, there are weekly reports required by the stipulation. Counsel went through that section. You had to judge Evolution. You had to value where you thought the Evolution collateral was to the 335. So that first week, was the report limited to the four locations, or did it include the satellite locations as well?
A No. Again, so we had provided the four-facility report first in, like the late October time frame, right before the stip was signed. And then, subsequently, we provided the broader report, and then the number came out.
So we -- my business understanding was that we had agreed to use the broader warehouse network. Because they must have thought they had liens on something, or some of their inventory may have been moved, or you know, between these other facilities, or these were used for overflow, and

things moved back and forth in some fashion.

So we continued to report the broader MDC-WDC, and we did that week after week, and we never heard anything.

Q And I just want to be clear. In your mind, during the period of the stipulation, did you believe it was reasonable to consider more than the four warehouses in determining the value of the Evolution collateral and that 335?

A Yes. And in fact, I think it was consistent with the behavior with other SPVs as well. I mean, everybody thinks, claims to own more than, you know, their documents may report.

Q But just focusing on the similarity between the July borrowing base and when you ran the report for all of those additional facilities, how -- to what extent did that inform your belief that it was reasonable to believe the Evolution collateral may well be in these other locations?

A Yeah. On the surface, without having any more detail, you know, just looking at it and saying how, you know, it either went down by 90 million, or maybe the starting point was different. And so, it seemed reasonable at the time to say it was probably more reasonable that the starting point was different versus, you know, versus that it would have decreased by that much at those facilities.

Q Now, did there come a point in time where you were able to analyze, your team was able to analyze, the SKU level

data in the July borrowing base against the SKU level data in these four sites, these four warehouses, to make a determination of whether the July borrowing base was a reliable document or just wasn't?

A I don't know if we've done the analysis on July, but I can tell you that we did the analysis on the May borrowing base. And, in fact, there wasn't -- we recently learned that there was an audit performed on, an inventory audit that was performed on the Evolution collateral as of May 3rd of this year.

And we obtained the audit work papers from that, and we compared it against the May 3rd borrowing base certificate that was submitted to Evolution by the former management team. And we found that there were some concerning differences. In fact, the borrowing base SKU level data seems to have been completely manipulated or fabricated or untethered from the company's records and systems, including the perpetual inventory.

Q And was that something you knew during the stipulation, which expired on January 5th?

A No. I just learned this as recently as last Friday.

Q So based on that information, when you were asked by counsel whether the Evolution collateral is limited to these four locations, to what extent was that understanding informed by this new information you obtained?

A Could you ask that again?
Q Sure. To what extent, is your understanding today that the Evolution collateral is limited to the four locations informed by the analysis that was done that you described and that you learned about just last week?
A I think it's very difficult to tell what the Evolution collateral is, quite frankly, but based on what I learned on Friday and over the weekend.
Q But in terms of where it is located, do you continue to believe that Evolution collateral is located not only in the four warehouses, but in other locations as well?
A I still don't know for sure.
MR. BEREZIN: Okay. Nothing further, Your Honor.
THE COURT: Thank you.
MR. DALE: I'm going to try to be quick. I realize it's late. We appreciate your indulgence.
BY MR. DALE:
Q When you report under the stip, what day of the week, do you know what day of the week you report?
A I think we report Fridays.
Q Is it one week in arrears?
A Yeah. So if we reported this Friday, it would be as of end of the day last Friday.
Q Okay. And we've been through this before, but the -- I think you've agreed that the Evolution collateral under the

loan documents, under the stipulation, is limited to four locations. Yes?

MR. BEREZIN: Your Honor, objection. Legal conclusion. We can argue about that.

MR. DALE: We will.

THE WITNESS: I believe what I said in my declaration is that my business understanding is that this collateral, and I use the word, would, be at these locations. Because I think that was what some of the documents said, although the documents -- a lot of things have happened that is different than what the documents dictated. So it wouldn't surprise me if there was a deviation from the documents.

BY MR. DALE:

Q Sure. You mean if management commits the fraudulent act of moving inventory that's in one of the Patterson or Starlight locations to Puerto Rico, for example, that is not permitted by the documents. That's one of the things that I think you've been describing, is it not?

MR. BEREZIN: Your Honor, objection to the word fraud. That's a breach of contract, not a fraud. He's not a lawyer.

MR. DALE: Forgive me. I'm not trying to use legally-charged terms.

THE COURT: I'll sustain the objection.

MR. DALE: Mr. Jerneycic, I withdraw the question. Thank you, Mr. Berezin.

BY MR. DALE:

Q If in order to borrow some more money, the company took inventory that was in one of those four facilities and moved it, for example, to Puerto Rico outside of the Four Corners of the documents, that might be a breach of the agreement. Would that change what's inside the Four Corners of the agreement? That's a bad question. Let me try it differently.

What about the reporting of additional locations where you thought maybe someone had moved Evolution's collateral? What about that reporting changes the words in the stipulation?

A I don't know if I understand the question.

MR. BEREZIN: Yeah. I'm sorry.

BY MR. DALE:

Q Well, you -- Paragraph 41, of your declaration, clearly denotes where Evolution's collateral is, right? Three lines, which I think we've agreed, represent four different addresses.

A You know this is -- you've asked this a number of different times, and again, again, I do not say anywhere in Paragraph 41 Evolution collateral. What I say is I refer to Evolution facilities, which earlier in the document, I

define as four facilities with this address. That is nothing -- that is a different terminology than collateral, so that's not the same thing.

So I don't stipulate anything in Paragraph 41 about Evolution collateral.

Q Okay. Your declaration, though, said you were familiar with Evolution's loan documents, didn't it?

A Yes. I believe you asked me, and I said I am familiar with them.

Q Okay. And if you're familiar with them, you know that approved warehouse locations is the only place where Evolution maintains collateral, right?

MR. BEREZIN: Objection. It's best evidence. Let's look at the legal documents.

THE COURT: Yeah.

MR. BEREZIN: And I'd also -- lacks foundation.

MR. DALE: We will, Your Honor, but I think I'm entitled to an answer there, given the amount of time this witness spent in his declaration.

THE WITNESS: I don't know. I can't come to that conclusion. I don't know.

THE COURT: Yeah. I think he can answer if he knows or he doesn't know.

MR. DALE: Okay.

THE WITNESS: Yeah.

THE COURT: Can I ask a question, just one clarification question? When you said you don't know if there's additional Evolution collateral, what did you mean by that? Just generally, or maybe I can ask you what you meant by that.

THE WITNESS: In which part? When --

THE COURT: It was one of the last questions that was asked.

THE WITNESS: By Mr. Berezin?

THE COURT: By Mr. Berezin. What's your understanding of -- I don't think people dispute that there's collateral held at these four locations, and I know that there's a disagreement about whether it is held at other places. But do you think there's Evolution collateral held in other locations?

THE WITNESS: So to me, the documents are confusing because --

THE COURT: No. Just -- not the docs, just whether you think there kind of is or isn't in other locations, just what your understanding is.

THE WITNESS: Yeah. I just don't know because I don't know what was moved out of what facility and when, and I don't know if the inventory that was at a certain location had a --

THE COURT: Kind of gone somewhere --

THE WITNESS: Was specifically --

THE COURT: -- and then went to someplace else?

THE WITNESS: -- tagged to somebody. Well, I don't know. Like there's purchasing agreements that purchase specific inventory items, and so if those items were moved across the street, does that mean that somebody no longer owns them anymore? You know it's not as clear as everything in this facility is owned by Evolution. It's more we bought stuff. It's supposed to be here.

THE COURT: Right.

THE WITNESS: And we expected it to be there, but it's also possible it got moved.

THE COURT: That it got moved to another location.

THE WITNESS: And so because -- like some of the inventory reporting data, you know, had some anomalies that were not intuitive, and so we were trying to be more inclusive here to give benefit of the doubt, and you know, we communicated this to the advisors, and so that was the business understanding that --

THE COURT: Yeah.

THE WITNESS: -- you know, we were trying to be more inclusive.

THE COURT: Understood.

MR. DALE: Your Honor, just another housekeeping item. I think these documents already came in through the

exhibits that we've consented to from the Weil team, but Item 5, and Item 6 are the two inventory finance agreements for Patterson and Starlight.

THE COURT: Item 5, and Item 6 where?

MR. DALE: On our amended --

THE COURT: On your amended exhibit list?

MR. DALE: Yes, sir.

THE COURT: Okay. I just wanted to make sure.

MR. DALE: Docket 4, both are at Docket 4, Judge, and I'd like to move their admission.

THE COURT: For 5 and 6. Any objection?

MR. DALE: I think by agreement.

THE COURT: Okay. They're admitted.

(Exhibits 5 & 6 were admitted into evidence.)

MR. DALE: Because we'll get back to them.

BY MR. DALE:

Q Mr. Jerneycic, you made a mistake, didn't you?

A Excuse me?

Q The stipulation in the order, you entered into the stipulation order on the mistaken belief that Evolution's collateral may have been broader than it was. Is that fair?

A No. I wouldn't say I made a mistake. I would say that my business understanding, through conversations with my team and with Evolution's advisors was that, you know, we

were going to use the Midwest Distribution Center and the West Coast Distribution Center.

Q And where in the stipulation does it say that those would be included within the Evolution collateral?

A Again, this is my business understanding. I don't think it says that in the document.

Q So it doesn't say that in the document? If it does, maybe you could point it out to me.

A I think I just said I don't think it says it in there.

Q Okay.

MR. DALE: All right. Your Honor, I don't have any further questions for the witness. Thank you.

THE COURT: Thank you. Mr. Berezin?

MR. BEREZIN: Nothing further, Your Honor.

THE COURT: All right. Thank you very much for your time.

THE WITNESS: Okay. Thank you.

THE COURT: Folks, let me kind of tell you where you are. I have -- I'll deal kind of with the emergency motion seeking to enforce the stipulation that we've been discussing today, and to provide adequate protection. This motion was filed by Evolution late December. It was raised, again, at an early hearing, and I very much appreciate it. And the Court set an evidentiary hearing for today.

The parties on November, I want to make sure I got

this right, I signed it on November 9th. It was submitted to the Court on November 7th of 2025. It was signed, stipulated, and agreed to by the Debtors and counsel, let's just say counsel at the time, proposed counsel for the Debtors, which are now counsel for the Debtors, counsel for Evolution.

It was -- I signed it on November 9th, 2025. I note that the Bankruptcy Court in Paragraph 19, retained sole and exclusive jurisdiction over all matters related to the stipulation. And to the extent this stipulation was inconsistent with anything in any other DIP, Debtor and possession orders, the interim, final, or any other order approving the use of cash collateral, or any other first day related, the terms of the stipulation controlled.

The stipulation was the product of an agreement that resolved certain objections by Evolution Partners to -- at the time there was an objection about, regarding appointment of an examiner was listed at the time, and there was also just a good old objection to the use of cash collateral.

And I would note that it's kind of two forms of adequate protection being contemplated in this order. One is the use of kind of cash and the use of inventory. And Section 363 of the Bankruptcy Code allows parties to use property that may be subject to a lien. And upon the

request of a party, the Court has to fashion a remedy subject to adequate protection.

If there's going to be use of -- this really focuses on the replenishment of inventory, which is really what the focus is. And I would note, you know, courts, when, especially in the Fifth Circuit, certainly this is a stipulation in agreed order, signed by both parties, so the court will enforce this order, which is my order.

Reading it to give full effect to every word in the stipulation in agreed order, so as to render no part null and void, to give it its best reading, but also a very literal reading. I note that the term -- what we get to are two definitions under the Patterson facility and Starlight facility. For more purposes of where we are, Paragraph 3 of -- excuse me, Page 3 includes the definition of Patterson property, excuse me, Patterson collateral. And I'll kind of walk my way through this.

Patterson collateral is defined as all assets of the Patterson borrower, including, without limitation, inventory, right? So it's all assets, including, without limitation, inventory, accounts, equipments, and investment property. But for my purposes, all assets, including, without limitation, inventory.

Page 4 defines Starlight collateral, which is, again, including, without limitation, all assets of the

Starlight borrower, including, without limitation, all inventory. So you have all inventory of the Starlight borrower, all inventory of the Patterson borrower.

The definition of Evolution collateral says you take a look at, and I'm looking at Page 4, the whereas clause defines is you take the Starlight collateral together with the Patterson collateral. And then you add on top of that such other property in which Evolution has asserted an ownership interest or security interest, including, without limitation, accounts receivable, and inventory.

And that is the definition of Evolution collateral. So you look at Starlight borrower collateral, you look at Patterson collateral, and any other property in which Evolution has asserted an ownership interest.

There's a Paragraph 4 in the Patterson Evolution collateral that says as of the petition date, the Starlight collateral was located, and it provides two locations, and for the Patterson collateral, there are two locations. I'd note this is -- it makes sense that as of the petition date, it's in one location.

You're dealing with adequate protection, but I would note that the stipulation was entered at least a month-and-a-half after the petition date, but. So now you then turn to.

AUTOMATED VOICE: Our system will end this

conference in five minutes. To extend this call for one hour, please enter the moderator pin now. Your conference has been extended for 60 minutes.

THE COURT: Thank you. So we go to Paragraph 4, which, 4B, that says from and after the applicable petition date, with respect to the Evolution inventory facilities, the Debtor shall maintain the Evolution collateral, which again is Starlight, Patterson, plus any other claimed interest, such that on any true-up date, the sum of the Evolution collateral that is inventory. So you've got to look at the Evolution collateral that is inventory.

So the question is, where does it say that Evolution inventory -- Evolution collateral that is inventory must be located at these four locations, and it just doesn't do it? It doesn't say Evolution inventory that is located at the Starlight or Patterson, because that would render the definition of it.

In other words, Evolution could have asserted inventory somewhere else, and that would have been included in the definition of Evolution collateral. But if we just take a look at what Evolution is arguing, the very point they could have asserted a lien in another location, right. Because you're looking at Patterson plus Starlight, plus any other interest, and there's no geographic limitation to what that is.

It would have rendered the definition of Evolution collateral that is inventory. It would have wiped out the extra additional including without limitation anything else that they could have alleged. So that's not the most accurate reading of the definition that is Evolution collateral.

And I do note that Evolution collateral that is located at the Starlight, it could have referenced Paragraph 4 in that footnote. They could have called it Evolute parties. Both the parties could have called it Evolution collateral has to locate it at these locations, but we can't render any part of this null and void.

So I think the definition, well, I know the definition of paragraph -- of Evolution collateral, that is inventory, has to, by definition, include Evolution inventory. And there is no strict requirement that that's where it has to be. There's no specific reference to that, and I reject on the term just on the plain language of this agreement that it has to be there.

That may have been what the parties understood. It may have been what the parties intended, but that's not what the parties drafted. And textualism tells me you've got to read it just straight up as to what it is. And this definition of Evolution collateral expressly contemplates that there could have been an ownership interest in some

other inventory that could have been held somewhere else, so.

And it also contemplates that this is where it is as of the petition date. That's where it's located. But there's no reference to an agreement saying that that's where it has to be. That's reading outside of the docs within the Four Corners.

So based on the definition, I think it can contemplate additional inventory. The problem that we have today is what is the value of that additional collateral? And the witness has told me they don't know if there's any additional collateral and where it's held and what it's worth. So I don't know how to do a true-up calculation based upon that analysis.

And I think I appreciate his honesty, and I think he's answered to the best of his ability. But to do a true-up, one would then have to then determine what is the inventory, where is it, and where it's worth to then do the true-up. I don't know today, as we sit, here whether there's been a breach or not.

Because I think I don't know where all the inventory is based upon the Four Corners of the document. And I don't know what that means. But I don't think I can declare a breach today, but it very well may be one. If there isn't, based upon what evidence that I've heard, if I

just look at the inventory held at these four locations that are not indicated in Footnote 4, it looks like there would be a breach based upon the evidence before me.

But there could be other inventory, and I agree with the witness that there's stuff that could have just been moved. And there's a likelihood that it very well may have been. And I think, but I don't know, what it's worth or where it is. So I don't -- I think I would need more evidence to then make a factual determination as to whether there's been a breach based upon the evidence, based upon the true-up day.

But I think it's the Debtor's burden to show me what -- if there is additional inventory, what it is. But I think, I don't think they got there today, but I don't know. But what parties were asking me to do was to determine, based on the Four Corners, whether there was a breach today. And I don't think there has been, based upon the Four Corners of this, if we're just limited to these four.

But I don't think I have enough evidence to make a factual determination one way or the other. So I think the Debtor is going to have to tell me really quickly, but today's not the day, whether there is any other inventory that's out there, that they can tell me, and tell me a value that is unequivocally Evolution collateral. Because Evolution isn't claiming any other inventory.

As I sit here today, that's their inventory. They think it's just the four stuff. But there's stuff that could have been in there on the petition date that just got moved. And it sounds like it very well could have. And I don't think the witness was -- I think the witness is trying to be as -- based upon the systems that he has, I don't know where that leaves us.

But I think, without more evidence, there's a breach. But the Debtor's going to have to tell me where the inventory is, and I'm not sure. I think I can give the Debtor a little bit of time, but without it, maybe a week or so to tell me what it is. But as of the true-up date -- and that's going to have to be as of the true-up date, not anything new.

As of whatever date that was, you're going to have -- come up with something that tells me that there's additional. I hear that there's some additional funds, additional inventory that's held elsewhere, but I don't know. I don't have any evidence of it based upon the evidence that I have before me.

On a go-forward basis, I think what makes sense is to come back maybe Monday or Tuesday, and maybe the Debtor can kind of tell me and point to me, and then I can run the calculations. I don't think it's going to be that difficult to do once we get there.

But I think the Debtor -- and I think Evolution's going to have to tell me what it wants. If Evolution is really just asking for the Debtor to just dump the collateral, and let it go for its collateral value, the 506 will be what it is.

But I think if they're trying to work constructively -- in other words, I think what Evolution is asking me to do is just tell the Debtors to just take it out of wherever it's held, and just essentially abandon it, dump it on the side of the road, and let somebody come pick it up. And I'm not sure that's the highest and best use of Brake Parts.

But if that's liquidation value is what they're after, I'm not sure. I think the Debtor can tell me, but I think the Debtor is going to have to give me a little bit more comfort that there's going to be adequate protection. But the adequate protection itself may be for that inventory, for the extra inventory that's out there.

Quite frankly, liquidating it at a higher amount. But giving an admin claim can't be -- that's the answer. But I think Evolution is asking me to do something. I'm not really sure it's really asking me to do it.

MR. DALE: Your Honor?

THE COURT: No. I'm hoping that just to say nothing, and let you all tell me what you think.

MR. DALE: I think --

THE COURT: You can come back early next week. But I think at an initial -- I think they've got to come back and tell me where the stuff is. If it's located somewhere, and then what that stuff is worth. Because I think that informs, has there been a breach? And I think that then may inform what people do with the stuff that's there.

MR. DALE: Understood.

THE COURT: But it's as of a true-up date, right? It's as of the date, whatever that true-up date was asked for, where stuff is.

MR. DALE: And I think, Your Honor, maybe this dovetails with the Debtor's cross motion to continue using it. Because our principal concern, at this point, is they're now out collecting accounts receivable and spending it. They're now out selling inventory for cash and spending it.

Something's got to stop, Judge. So I think the sooner we can get back in front of you --

THE COURT: No. No.

MR. DALE: -- to deal with that issue --

THE COURT: I agree. I think --

MR. DALE: -- would be great.

THE COURT: I was just looking on Monday, but I

think Monday the courts are closed on Monday.

MR. DALE: As a holiday.

THE COURT: It's a federal holiday.

MR. DALE: Yes, sir.

THE COURT: So I think I just need to get with my case manager, but find some time on Tuesday.

MR. DALE: Okay.

THE COURT: And we see where things are, but I'm really, I don't like any of the scenarios that any of you are opposing to me, but I'll make the call. If that's what you want me to do.

MR. DALE: Very good. And I think that will be good, Your Honor.

THE COURT: But maybe there's a way that you all can talk about this. And I understand everybody's concerns. I have to tell you, though, I think discussions about kind of what February looks like, I think I've got to stay within the Four Corners of what's being argued in terms of has there been a breach? Can you use cash collateral?

I'm going to kind of keep it there, and not bring in other stuff into the analysis. Because I think it's certainly, one could argue it's relevant, but I'm going to try to stay within just kind of Code 363, adequate protection. Are you adequately protected? Is there evidence as of the true-up date, the stip in order of

information.

And if -- and I will go back, and I promise I will go back and look at what has been admitted in terms of evidence, and maybe that informs other information. And if it is, I'm going to just comb through it, and maybe I'll -- we'll all be a lot smarter next Tuesday. But I think it expands. The question is, but what else is in there that I can look to?

MR. BEREZIN: Your Honor, can I, because I didn't have a chance to make an argument on the breach issue within the Four Corners, and if I could have the --

THE COURT: Yeah. No.

MR. BEREZIN: -- opportunity.

THE COURT: No. I certainly will. I just want to tell people, I -- in other words, I think you don't have to convince me that it's expanded. The question is, is there a breach one way or the other?

MR. BEREZIN: And the point I'd like to make that it was part of my argument, and I think it's very important.

THE COURT: Yeah. I totally stole your thunder, not took your thunder, but took --

MR. BEREZIN: Not --

THE COURT: -- didn't allow you to kind of --

MR. BEREZIN: Not at all, Your Honor. So I mean, most of the way that you worked through it, that is my --

that was what I was going to argue. That where I think we parted company is that the stipulation does not address, as you said, it does not limit Evolution collateral to particular locations.

It is appropriate, and I think necessary, to consider at the time that the stipulation was entered into, what did the parties reasonably believe the Evolution collateral was located at, at that time and during the stipulation?

So if the parties believed, reasonably believed, both parties based on objective theory of contract, that the Evolution collateral, the most accurate reporting of where it was not just the four facilities, but the broader group, whether factually after the analysis that's been done after the stipulation was over, where it looks like, well, gee, we don't think that understanding was correct, the -- to use the knowledge that no one had at the time to then judge whether there is a breach, I don't think is the right way to look at this stipulation.

THE COURT: How do I do that? So in other words, as of a true-up date, someone wants to do a true-up, right?

MR. BEREZIN: Yes.

THE COURT: How then do -- how then does --

MR. BEREZIN: I think --

THE COURT: How then does one provide the

analysis?

MR. BEREZIN: One looks at what the parties reasonably believed.

THE COURT: That's what I'm saying, but how do you run the math? In other words, what --

MR. BEREZIN: We have reporting. We provided reports every week, and it was always over the 335, because we --

THE COURT: But does it include -- in other words, the question that I have, and that's what I'm saying, if it's in the evidence, then I can go back and look at it.

MR. BEREZIN: Yes.

THE COURT: And make a determination. But is what you're pointing collateral or just collateral that is inventory? That's the part that I just don't -- didn't get a firm answer. Because the true-up is Evolution inventory that is collateral, and that's the part that I need to just go back and analyze it, and that's what I'm saying.

Maybe parties can point me to it. I just need to kind of go back and study it, but I think it's broader, but I think it's the true-up is limited to Evolution collateral that is inventory, and that's kind of what I need to kind of go back and look at.

MR. BEREZIN: I --

THE COURT: And I don't know whether that --

MR. BEREZIN: I agree with --

THE COURT: -- the bigger amounts that you're saying. I just don't know if there's any.

MR. BEREZIN: think that there's two different issues. One is, as a factual matter, after the stipulation is done, where were the pieces of collateral that Patterson and Starlight allegedly bought? Where were they located? Were any of those pieces located outside?

I think that's a fundamentally different question than at the time the parties entered the stipulation, and picked 335, which was $50 million above what everyone understood to be in those four locations. I mean, what they're saying is that the Debtors believe that Evolution collateral was limited to those four locations, and agreed on Day 1 to post $48 million of cash that it did not have.

THE COURT: No. I'm with you on that. I'm not -- I don't know about the money, but I'm just saying I'm with you that I think it's more expansive for the reasons that I stated textually.

MR. BEREZIN: More expansive, and I think the testimony in the declaration and that was provided on the redirect was going to what the parties understood the testing to consist of. Where is the Evolution collateral from everyone's perspective, at that time, given what they knew? And we gave them the report that said, well, the four

facilities, it's $48 million less than the peg.

We don't think that's accurate, and you don't think that's accurate, given this July borrowing base, which no one at the time knew was completely fabricated. So the July borrowing base was up at 376. So our guys did the math and said, well, wait, just what if you include these ancillary facilities? Oh, it's 374.

THE COURT: No. I'm with you.

MR. BEREZIN: Right?

THE COURT: But I guess the question is, can you point me? I don't know the answer to this. I'm not -- this isn't more argument. This is more I don't know what those reports show or what the party's understanding is. That's what I'm asking in terms of giving a week to kind of figure it out.

MR. BEREZIN: Yeah.

THE COURT: When one looks at the report, I can't -- I don't know -- like I don't know, like I don't know, literally. I don't know whether that report, what is Evolution collateral, that is inventory and what that means. And I'm hoping, you know, the folks who understood or prepared the reports can kind of provide that.

Because then I can do -- that would be at least a data point that I could then understand as opposed to kind of broader collateral. I just don't know what the answer to

that is, and I'm trying to get a better understanding/

MR. BEREZIN: Right.

THE COURT: But I don't think we're going to get it tonight is what I mean.

MR. BEREZIN: Yes. I think that the fundamental difference is that what folks understood Evolution collateral to be, and where it was located, at the time of the stipulation, is dramatically different than it is today after all of this work has been done, to realize that the borrowing-based certificate that everyone was anchoring on was complete fabrication. No one knew that.

So aren't we getting a complete gotcha with a stipulation that had a target threshold, maintenance threshold, that everyone knew was way above 50 million, 48 million, above what was in those four facilities.

Obviously, both parties agreed that there was more, and the more, the best more that we had was this ancillary facility. So now we're changing the rules of the game post hoc, to say, okay, you've got to post $42 million. I mean, that's game over for us, and no one, neither party could reasonably say that was the understanding of where they thought Evolution collateral was during the stipulation.

That's what I think is a major problem. I mean, if that's what it is, and it's like, no, forensically you

need to take information that you did not have at the time of the stipulation, and that Evolution didn't have at the time of the stipulation, and just tell me where that collateral is.

Well, we know right now that there's a $48 million diminution that existed when we signed it, but no one thought that was where Evolution collateral was only located, or otherwise we never would have signed it.

THE COURT: The other question I have for the parties is, what is the remedy for breach under the agreement?

MR. BEREZIN: Can you say that again, Your Honor?

THE COURT: If there is a breach, right, what's the remedy for the breach under the agreement? It's -- because, again, this is more of a Tuesday question for the party. I still need to kind of understand what that language means. And parties can argue, and I want to be fair, parties can argue to me that Evolution collateral, that's inventory, everybody understood it meant blah, blah, blah. Well, I'm more than happy for people to say that.

I'm just kind of reading this thing literally. It also says if the Debtors exercise these curative actions that we've been kind of describing, within five days you're permitted to continue purchasing without disruption, right? If you fail, then you're prohibited from continuing to

purchase Evolution collateral, right?
So is the answer you just can't purchase any more collateral, or is the answer I've got to go back and force you to go do this? I don't see in the stip, and maybe parties can point me to it, where it says if you don't do this within five days, you can go to Lopez, and Lopez will make you do it.
MR. BEREZIN: I agree with that.
THE COURT: I think you have a termination right.
MR. BEREZIN: I don't think we would have ever signed something.
THE COURT: I don't know whether you would have. I just --
MR. BEREZIN: Right, but we didn't.
THE COURT: I'm saying you all can tell me, but I think I just need to kind of --
MR. BEREZIN: Yeah.
THE COURT: -- go into the Part B.
MR. BEREZIN: Yes.
THE COURT: What is the remedy if I'm viewing it? Whether specific performance is the remedy.
MR. BEREZIN: Right. And --
THE COURT: As the curative action for it, or whether it's just you can't use anything. But then again, it leads to a different question. I just want parties to --

MR. BEREZIN: Right.
THE COURT: -- think about these things, and --
MR. BEREZIN: I agree, Your Honor.
THE COURT: -- maybe we can talk.
MR. BEREZIN: If there is a breach, they're asking for specific performance. The contract says that's not what happens. What happens is you stop, and that's practically what will happen. They'll pick up their inventory, and there will be fights among all of the parties about who actually owns it. But that will be the consequence, because there's certainly not going to be a posting.
This doesn't require us to post unless we want to continue using. And we're not going to use this collateral, because we absolutely cannot post $40-something million.
THE COURT: But the question is, do you have to post, or does it just mean --
MR. BEREZIN: I don't --
THE COURT: -- you can't use anything more?
MR. BEREZIN: I don't read the stipulation as requiring that.
THE COURT: No. No. I'm just --
MR. BEREZIN: Okay. I think it poses a choice. It gives us a choice.
THE COURT: But I think you're going to -- I think they have to tell me what happens upon a breach, kind of

whether the specific performance -- I don't want to call it specific performance. But what you're asking to enforce the order is one thing.

I think you'll have to tell me kind of the math that you're seeking to -- that you think you can get above it or what those -- what that Evolution Inventories collateral means to you all. And maybe we can just talk on Tuesday. Because once I do that, then I can then make a call on breach. I can then talk about remedy. I can then talk about future use of cash collateral.

MR. BEREZIN: Understood, Your Honor.

THE COURT: Yeah. Future use of collateral, I should say.

MR. DALE: And, Your Honor, if I may just briefly respond to that.

THE COURT: Which part?

MR. DALE: A couple of the points. First of all, Your Honor, there's been kind of an after-the-fact revision of what our collateral is, and it isn't. I think when Your Honor has the opportunity to look through the loan documents, you'll find very simply, there's a definition of approved warehouses. There's a schedule that identifies them. That's it. That's the extent of our collateral.

THE COURT: I don't think I -- but you all are not telling me to go do that in this step.

MR. DALE: Understood. And so I think --

THE COURT: But I got it. If I open the door to then go further out, then to add in --

MR. DALE: Sure.

THE COURT: -- additional, what the parties understood, then I then have to go back and look at the docs. Because that would have been part of what the parties understood.

MR. DALE: Sure. And I think if you get an opportunity to take a second look at Mr. Jerneycic's direct evidence.

THE COURT: Yeah.

MR. DALE: You will find that there was no mistake about what he thought our collateral was and was not. And, you know, what's happened here, Your Honor, is they feel like they made a mistake. Mr. Berezin has said that they never would have entered into this stipulation, because they would have been in breach the very first day. That's not true.

Your Honor, there's was a lot going on November 9th. On November 9th, people thought this might be a successful business. Obviously, that's changed. On November 9th, they may have been going out to gather up inventory that was transferred out of locations covered by Evolution's loan facilities, and bringing it back to where

they started so that you hit those numbers. It's a 10 percent cushion, Your Honor. It's not a complicated concept, and you see it all the time.

The other thing that I think -- and Tuesday is a good date, Your Honor, and thank you for that. What we're concerned about is what the record makes clear. They continue to sell this stuff with impunity. They're now liquidating the receivables that they generated that are also our adequate protection, and spending the money.

And now they're taking the inventory that there is today, and spending it down, and spending the cash proceeds of it. So as soon as we can get a remedy, and I think you have broad discretion to fashion one, certainly on a go-forward basis. I think as to the stip, we'll be ready to discuss that with you on Tuesday. But we really appreciate your time today.

THE COURT: Yeah. Let's -- I think we just have to check on one hearing. I'll have Rosario reach out to folks tomorrow kind of early. I just need to check on a --

MR. DALE: Of course.

THE COURT: -- kind of status of a hearing. And it can be done -- I think what we're talking about can be done virtually. I don't want anybody just to fly in just for this if you don't have to. I think 2:00, 2:30 in the afternoon, sometime around there. I just got to kind of

figure out kind of how long the hearing. I have a 1:00.

MR. DALE: Got it.

THE COURT: And I just don't know how long it's going to go.

MR. DALE: No. Thank you for the time.

THE COURT: All right, folks. Thank you very much for your time.

ALL: Thank you, Your Honor.

THE COURT: Your excused, I'm just going to -- we're just going to fold up. And everybody, if you want to leave stuff, you can. So pick up tomorrow. We won't be -- yeah, I won't be here tomorrow. So you're more than welcome. Thank you.

(Proceedings adjourned at 6:47 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: January 15, 2026

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In Re: First Brands Group, LLC and Official Committee of Unsecured Creditors<br>Debtor | Case No.: 25−90399<br><br>Chapter: 11 |

---

## NOTICE OF FILING OF OFFICIAL TRANSCRIPT

An official transcript has been filed in this case and it may contain information protected under the E-Government Act of 2002, and Fed. R. Bank. P. 9037.

Transcripts will be electronically available on PACER to the public 90 days after their filing with the court. To comply with privacy requirements of Fed. R. Bank. P. 9037, the parties must ensure that certain protected information is redacted from transcripts prior to their availability on PACER.

If redaction is necessary, the parties must file a statement of redaction listing the items to be redacted, citing the transcript's docket number, the item's location by page and line, and including only the following portions of the protected information. This statement must be filed within 21 days of the transcript being filed. A suggested form for the statement of redaction is available at https://www.txs.uscourts.gov/.

- the last four digits of the social security number or taxpayer identification number;
- the year of the individual's birth;
- the minor's initials;
- the last four digits of the financial account number; and
- the city and state of the home address.

Any additional redaction requires a separate motion and Court approval.

A party may review the transcript at the Clerk's Office public terminals or purchase it by following the instruction on our website at https://www.txs.uscourts.gov/ or by calling (713) 250−5500 . A party is only responsible for reviewing the:

- opening and closing statements made on the party's behalf;
- statements of the party;
- testimony of any witness called by the party; and
- any other portion of the transcript as ordered by the court.

Redaction is your responsibility. The Clerk, court reporter, or transcriber will not review this transcript for compliance.

Nathan Ochsner
Clerk of Court