# EXHIBIT 16

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*, | ) | Case No. 25-90399 (CML) |
| Debtors.[1] | ) | Jointly Administered |

**EVOLUTION'S EMERGENCY MOTION FOR ADEQUATE PROTECTION**

**Emergency relief has been requested. Relief is requested not later than February 13, 2026. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Evolution Credit Partners ("Evolution")[2] hereby files this emergency motion (the "Motion") for adequate protection in accordance with the memorandum opinion and order of the U.S. District Court for the Southern District of Texas issued on January 31, 2026 ("District Court Order") in connection with the Debtors' Factoring Procedures Motion [Docket No. 807].[3] Evolution requests that the Court order the Debtors to provide Evolution with adequate protection for its $60.5 million dollar claim, along with interest and attorneys' fees and expenses, and respectfully states as follows:

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] "Evolution" means, collectively, Evolution Credit Opportunity Master Fund II-B, L.P., Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds.

[3] *See Evolution Credit Partners v. First Brands Group, LLP et al.*, Civil Action No. H-26-73 [Docket No. 28] (Jan. 31, 2026 S.D. Tex.) (attached as Exhibit 1).

## PRELIMINARY STATEMENT[4]

1. Evolution has a first-priority, validly perfected secured claim against certain of the Debtors' prepetition receivables. Evolution will prove the validity, priority, and extent of its lien in its pending adversary proceeding, in accordance with Federal Rule of Bankruptcy Procedure 7001(b). *See* Adv. Pro. No. 26-03006 (the "Adversary"). In the interim, as an oversecured creditor, Evolution has a statutorily guaranteed right to adequate protection, including for (1) the full amount of its claim against the Debtors ($60.5 million), and (2) fees and interest on that claim.

2. This Court previously assumed Evolution held a first-priority lien in $60.5 million of the Debtors' receivables but nevertheless authorized the Debtors to use cash collateral from the Factored Receivables Account—cash collateral that secured Evolution's claim. *See* Docket No. 1133 (the "December 31 Order"). On appeal of that Order, the District Court confirmed that as a result, "at the time Evolution appealed, its interest was not adequately protected," and that, "absent clear evidence or legal precedent that refutes [Evolution's] right to an asserted property interest, [Evolution] is entitled to adequate protection until an adversary proceeding determines the validity, extent, and priority of the asserted property interest." District Court Order at 8, 10. As Evolution has shown repeatedly, there is no "clear evidence or legal authority" that "refutes" Evolution's asserted property interest, so the issue must be determined in an adversary proceeding.

3. The District Court Order is clear: pending a final determination in the Adversary, Evolution is entitled to adequate protection for its claim, interest, and fees. Despite that Order, the Debtors have failed to provide any information on what is currently in the Factored Receivables

---

[4] Capitalized terms not otherwise defined have the meanings set forth in Docket No. 1032 (*Evolution's Objection and Reservation of Rights to Debtors' Motion for Order (I) Establishing Third-Party Factoring Procedures; (II) Authorizing Customers to Remit Receivables Without Liability, and (III) Granting Related Relief*) ("Initial Objection") (public version filed at Docket No. 1031).

Account, even though Evolution has repeatedly requested the same. Evolution respectfully requests that the Court enter an order compelling the Debtors to either set aside cash in escrow in an amount at least sufficient to cover Evolution's claim, plus fees and interest or, if that is impossible, to provide Evolution with the "indubitable equivalent" of that amount of cash.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are Sections 361, 363, 506, and 105(a) of the Bankruptcy Code, as well as Rule 9013-1(i) of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

## FACTUAL BACKGROUND

### A. Evolution Enters into a Factoring Agreement That Creates a Security Interest in Receivables

6. The Court is already familiar with the history between Evolution and the Debtors, as Evolution set out the basis for its first-priority security interest in its initial objection [Docket No. 1032] (the "Initial Objection") and again in its Adversary complaint [Adv. Pro. No. 26-03006, Docket No. 1]. Evolution will therefore only briefly summarize the prepetition relationship between the parties.

7. On March 28, 2023, Evolution entered into its Factoring Agreement with the Receivables Sellers, pursuant to which Evolution purchased what the Receivable Sellers held out to be real receivables. *See* Docket Nos. 1032-1, 1032-2. In exchange, the Receivables Sellers made express representations, warranties, and covenants regarding the authenticity and validity of the receivables and the invoices underlying them. Docket No. 1032-1 § 2, Exhibit B-1. If any of

the (i) representations and warranties were breached, (ii) covenants were not performed, or (iii) Eligibility Criteria were not met, then the Receivable Sellers were obligated to indemnify Evolution or repurchase the receivables at face value from Evolution and provide for attorney's fees and expenses. *Id.* §§ 5(b)(i)–(iii), 5(c), 5(g).

8. Pursuant to Section 5(g) of the Factoring Agreement, each of the receivables Sellers' "existing and future obligations hereunder, due or to become due"—including, but not limited to, their obligations to indemnify Evolution or repurchase the receivables—were secured by each Receivables Seller granting Evolution "a lien on and security interest in" "all of the Receivables now or hereafter owned or held by such Seller to the extent not sold and purchased" by Evolution*.* *Id.* § 5(g). Section 5(g) thereby protects Evolution from the Receivable Sellers' breaches of the Factoring Agreement by granting Evolution a security interest in ***all*** the Receivables Sellers' prepetition receivables that were not sold to Evolution.

9. Evolution filed UCC-1 financing statements on March 31, 2023, and April 3, 2023, perfecting Evolution's security interest in "[a]ny and all present and future Receivables transferred or purported to be transferred to the Secured Party pursuant to that certain Master Receivables Purchase Agreement [the Factoring Agreement] . . . dated as March 28, 2023" for each of the eight Receivables Sellers. *See* Docket No. 1032-3.

10. As of the Petition Date, the Receivable Sellers owed Evolution approximately $60.5 million on so-called receivables Evolution had purchased pursuant to the Factoring Agreement. *See* Exhibit 2 at 5 (Brief for Appellees). The Debtors have since claimed that ***all*** of the receivables Evolution purchased were fabricated. *Id.*

11. The Debtors' revelations about their factoring fraud shed light, for the first time, on the Receivable Sellers' breaches of the Factoring Agreement, including the representations,

warranties, and Eligibility Criteria. To take just one example of many breaches of the representations and warranties in the Factoring Agreement, the Receivables Sellers represented and warranted that the invoices underlying each Receivable were valid and authentic. Docket No. 1032-1 § 2; *see also id*. at Exhibits A-3, D. The Debtors now claim this was false.[5]

**B. Debtors Use Evolution's Cash Collateral Without Consent and Without Providing Adequate Protection**

12. The Debtors have been collecting payments on prepetition receivables, including those generated by the Receivables Sellers, and segregating the cash into a Factored Receivables Account. On December 1, 2025, the Debtors filed a motion [Docket No. 807] (the "Factoring Procedures Motion") seeking authorization to implement procedures that would enable them to use tens of millions of dollars in the Factored Receivables Account. The Debtors supplemented their Factoring Procedures Motion on December 12 with a request for emergency relief [Docket No. 931], and followed up on December 21 with a proposed order [Docket No. 1082] identifying the specific funds the Debtors sought to release from the Factored Receivables Account—specifically, invoices which were never factored ("Category 1 Invoices" and "Category 2 Invoices").

13. Based on the second "Reconciliation Report" the Debtors sent Evolution on January 13, 2026, which purports to show the amount of cash in the Factored Receivables Account as of December 19, 2025, Evolution had a lien pursuant to Section 5(g) of its Factoring Agreement in $21.1 million of Category 1 receivables[6] and $9.6 million of Category 2 receivables, combining to $30.7 million. *See* Exhibit 3 (January 13, 2026 email from Joshua Winograd); Exhibit 10 (Second

---

[5] For a more complete, but inexhaustive, list of the Debtors' breaches of the Factoring Agreement, see paragraphs 10-12 of the Initial Objection.

[6] This number excludes $4.66 million of receivables generated by the Receivable Sellers through transactions with Walmart. The Debtors set aside these Walmart receivables for another factor.

Reconciliation Report); Exhibit 11 (Second Reconciliation Report, filtered to show only amounts from those receivables generated by the Receivables Sellers). The Second Reconciliation Report's month-and-a-half old data is the most up-to-date record provided to Evolution of what the Debtors claim is in the Factored Receivables Account.

14. On December 19, 2025, Evolution filed its Initial Objection to the Factoring Procedures Motion, which set forth the bases for its first-priority perfected secured claim and asserted that the Debtors could not release Evolution's cash collateral without providing adequate protection. Initial Objection ¶¶ 6-14, 32-40, 53. Evolution explained that it had perfected its Section 5(g) security interest and that this security was carved out of the collateral pool under the ABL Credit Agreement and certain first- and second-lien and sidecar term loan agreements, as well as from the collateral secured by the DIP loans pursuant to the DIP Order. *Id.* ¶¶ 14-19, 39, 41-46.

15. On December 22, Evolution joined the objections of certain other factors, arguing that "Bankruptcy Rule 7001(b) requires that 'a proceeding to determine the validity, priority or extent of a lien or other interest in property' be an adversary proceeding" and that the Factoring Procedures Motion, if granted, would have run roughshod over Rule 7001(b). *See* Docket No. 1056.

16. The Debtors replied to Evolution's Initial Objection on December 22, 2025 [Docket No. 1054], shortly before the first hearing on the Factoring Procedures Motion on the same day. In their reply, the Debtors conceded the existence of Evolution's lien and only raised arguments regarding the validity and relative priority of Evolution's claim in the receivables. *Id.* at 5-20. The Debtors also claimed that "[a]s of the Petition Date, the Debtors held approximately $188 million of prepetition account receivables related to the Evolution Sellers, in the aggregate." *Id.* at 4.

17. The Court overruled Evolution's Initial Objection and permitted the Debtors to release up to $60 million in funds from the Factored Receivables Account. *See* December 31 Order. That release allowed the Debtors to draw $60 million out of the Factored Receivables Account, tens of millions of which were Evolution's cash collateral.

18. The Debtors claimed they ultimately withdrew $55 million from the Factored Receivables Account. Because Evolution only has an interest in receivables issued by certain Debtors—the Receivables Sellers—Evolution was ***not*** protected by the full amount of cash remaining in the Factored Receivables Account. Based on the stale data in the Second Reconciliation Report, Evolution had an interest in approximately $29.8 million of the cash remaining in the Factored Receivables Account after the release of funds. *See* Exhibit 11. Accordingly, Evolution went from being oversecured by the funds in the Factored Receivables Account to undersecured by those funds by $30.7 million. *See id.*

19. Evolution appealed the December 31 Order on January 5, 2026, asserting that the December 31 Order denied Evolution the adequate protection to which it is entitled under the Bankruptcy Code as an oversecured creditor. Docket No. 1158; Civil Action No. H-26-73 (S.D. Tex. Jan. 31, 2026) [Docket No. 2]. Days later, on January 9, 2026, Evolution initiated the Adversary, seeking a declaratory judgment establishing the validity, priority, and extent of its lien in the Receivables Sellers' prepetition receivables.

**C. District Court Finds That Evolution Was Not Adequately Protected and Remands for Further Proceedings on Adequate Protection**

20. The District Court Order was issued on January 31, 2026. Therein, the District Court determined that, "[a]t the time Evolution appealed, its interest was not adequately protected because the Factored Receivables Account did not include enough to cover Evolution's $60.5 million interest." District Court Order at 10.

21. The District Court took note of the Debtors' representation that additional payments on receivables had come into the Factored Receivables Account since December 31, 2025, and in light of those "genuine factual disputes material to determining whether Evolution has adequate protection," remanded to this Court. *Id.* at 10. The District Court further held that this Court, "[i]n determining whether Evolution is adequately protected . . . may consider . . . the amount of funds remaining in the segregated account, the likelihood that additional funds may enter the account, as well as other potential sources of recovery for Evolution," and that this Court, if it finds that Evolution is adequately protected, "must state specifically what funds or other property . . . adequately protect Evolution." *Id.* at 11.

22. The District Court rejected the Debtors' argument that a bankruptcy court could "bypass the adequate-protection analysis (or to permit some hybrid, expected-value analysis) based on tentative doubts about whether an asserted security interest could otherwise be shown prima facie to be valid, without adhering to the specific rules and procedures for preliminary determinations." *Id.* at 7 n.1. The District Court also rejected the Debtors' proposed "[w]eighing [of] the likelihood of success on the merits of establishing a secured interest against the likelihood of success in showing that available cash collateral could adequately protect that interest." *Id.* at 7-8.

23. Instead, the District Court held that, if a debtor wishes to challenge the validity of the creditor's lien, Rule 7001 requires "that parties must challenge lien validity through an adversary proceeding, not an adequate-protection hearing," and otherwise, "absent clear evidence or legal precedent that refutes the claimant's right to an asserted property interest, the claimant is entitled to adequate protection until an adversary proceeding determines the validity, extent, and priority of the asserted property interest." *Id.* at 7-8.

24. Following entry of the District Court Order, Evolution and the Debtors attempted to resolve Evolution's adequate protection issues consensually. On February 5, 2026, however, the negotiations failed.

25. The most recent information Evolution has received about the funds in the Factored Receivables Account was provided by the Debtors on January 13, 2026. *See* Exhibit 3. The data in the Second Reconciliation Report is over a month and a half old, as it reflects the funds held in the Factored Receivables Account as of December 19, 2025. *See* Docket No. 1314 ¶ 6. Evolution requested an updated reconciliation report matching the receivables by the legal name of the seller, breaking out the balances in each category of receivable (Categories 1, 2, 2A, 2B, 3, and 4, according to the Debtors' own definitions) remaining in the account after the $55 million distribution, and updating the reconciliation report with data that is not stale by a month and a half. Exhibit 4 (February 2, 2026 email from Ella Epstein to Joshua Winograd). Evolution also served discovery requests for this information. Docket No. 1317.

26. As of this filing, the Debtors have not responded to those requests or produced information in connection with them.

**ARGUMENT**

27. This Court has properly deferred a determination of the validity, priority, or extent of Evolution's security interest to the pending adversary proceeding. The District Court has now confirmed that Evolution is accordingly "entitled to adequate protection" pending the resolution of that proceeding. *See* District Court Order at 8-10.[7]

---

[7] The District Court also noted that bankruptcy courts may require a "prima facie" showing of a property interest, but that "absent clear evidence or legal precedent that refutes the claimant's right to an asserted property interest, the claimant is entitled to adequate protection until an adversary proceeding determines the validity, extent, and priority of the asserted property interest." *Id.* at 8-9. The Debtors have never challenged that Evolution has a "property interest" in the Receivable Sellers' unsold Receivables. Rather, the Debtors have challenged only the validity (*i.e.*

28. The Debtors have "the burden of proof on the issue of adequate protection." 11 U.S.C. § 363(p)(1). Section 361 of the Bankruptcy Code recognizes three forms of adequate protection that may apply to the debtor's use of property in which a secured creditor has an interest: "[1] cash payments to the extent the collateral has declined in value, [2] extra collateral to compensate for such a decline, or [3] other relief 'as will result in the realization by [the secured party] of the indubitable equivalent of such entity's interest in such property.'" *Perez v. Peake*, 373 B.R. 468, 483 (S.D. Tex. 2007) (quoting 11 U.S.C. § 361). The third method is "a catch-all provision." *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1986).

29. "[T]he standard of adequate protection to be afforded a creditor when its cash collateral is being used should be a high one." *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985). Adequate protection "must not be illusory and, particularly in the context of the use of cash collateral, must be of the most indubitable equivalence." *In re Goode*, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) (internal quotation marks omitted). It is also "plain that 'adequate protection' must be completely compensatory." *In re Cage*, 357 B.R. 99, 101 (Bankr. S.D. Tex. 2004) (quoting *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (Hand, J.)).

30. Evolution received nothing in exchange for the December 31 Order's release of tens of millions of dollars of its collateral. That is not adequate protection for the use of Evolution's collateral, and Evolution remains without adequate protection. With the release of $55 million from the Factored Receivable Account, Evolution was rendered undersecured by the

---

whether the Debtors may set aside the lien under Section 544(a) of the Code) and the priority of the interest. Even if those follow-on issues were relevant here (they are not), the Debtors have not put forward "clear evidence or legal precedent" that would "refute[]" Evolution's claim, and Evolution has detailed its validity and priority arguments repeatedly, including in its Initial Objection, its subsequent objections to the Factoring Procedures Motion and the Debtors' related motions, at multiple hearings, and on appeal, more than satisfying any *prima facie* burden. *See* Docket Nos. 1032, 1056, 1188; Exhibits 5 (December 22, 2025 Hearing Transcript), 6 (January 13, 2026 Hearing Transcript), 7 (Brief of Appellant), 8 (Reply Brief of Appellant). Evolution expressly incorporates those arguments by reference.

cash in the Account, as Evolution had, *at most*, a right to some subset of the funds in the Account, which funds are subject to further diminution in the event that another Third-Party Factor establishes a superior interest in one of the Receivables Sellers' receivables. Moreover, Evolution's collateral is still intermingled with the other funds in the Factoring Receivables Account. And while the Debtors have contended that the Factored Receivables Account now contains "over $67 million," the Debtors have not provided any information in response to Evolution's repeated requests for information about that account. *See* Exhibit 2 at 11. As a result, Evolution cannot ascertain whether it has a right to any of the new money, or whether that new money is all due to receivables actually factored to other Third-Party Factors (in which case, the other Third-Party Factors would assert claims to it).

31. The Debtors cannot evade their adequate protection obligations by claiming that Evolution is adequately protected because customers might pay receivables in the future into the Factored Receivables Account, for at least two reasons.

32. *First*, the extent of additional receivables that will be transferred into the Factored Receivables Account is far from certain. According to the Debtors themselves, "[d]espite countless requests and even demands, customers … simply were not willing to pay money that was owed to the company," which "has been a huge problem." *See* Docket No. 1807 (audio recording of January 29, 2026 hearing at 8:39-9:09 (Debtors' Counsel)). And it is not clear whether Evolution or another factor will have a superior right to the unspecified funds that may eventually be transferred to the Factored Receivables Account. As a party guaranteed adequate protection by statute, Evolution cannot be forced to bear the risk that additional cash may not come into the Factored Receivables Account. *See In re Geijsel*, 480 B.R. 238, 271 (Bankr. N.D. Tex. 2012) ("The Debtors' assurances that [a secured creditor] will be paid in full under the Plan and



4899-0479-1693

that the Debtors will continue to honor their security agreements with [that creditor] regarding future cash are not an 'indubitable equivalent.'"); *id.* ("The Debtors have proposed no means of compensating Lone Star for Lone Star's potential loss of collateral (the cash) except for the prospect that the Plan will work-out in the end. A court cannot so ignore the rights of a secured creditor.").

33. *Second*, "[w]here there is a specific assignment of cash collateral given as security, a diversion of any portion of the cash to a party other than the secured party is clearly a diminution of the secured party's interests in the assignment of the cash portion of the security," so "the use of future cash to replace the expenditure of the prior months" does not "provide[] adequate protection for the secured party." *Id.* at 272 n.27 (cleaned up) (quoting *In re River Oaks Ltd. P'ship*, 166 B.R. 94, 99 (E.D. Mich. 1994)). Thus, even if additional funds do enter the Factored Receivables Account, any additional cash in which Evolution already has an interest is ***not*** adequate protection for the improper taking of Evolution's cash collateral.

34. Evolution is entitled to adequate protection for the use of its cash collateral. Because the Debtors have not carried their burden to show that Evolution is adequately protected, this Court should order the Debtors to segregate unencumbered cash (or the "indubitable equivalent" of unencumbered cash)—like the $55 million Debtors improperly used without providing Evolution adequate protection—exclusively for Evolution in the amount of Evolution's claim, plus the fees and interest to which it is entitled under the governing documents and law.[8]

---

[8] *See In re Pan Am. Gen. Hosp., LLC*, 385 B.R. 855, 862 (Bankr. W.D. Tex. 2008) (discussing "the statutory basis for an award of post-petition fees and costs to a creditor on account of its [over]secured claim"); *In re Bramham*, 38 B.R. 459, 464 (Bankr. D. Nev. 1984) ("Whenever an oversecured creditor's claim has been increased by operation of § 506(b) the total amount of the claim, including the increase, is entitled to adequate protection."); *In re Vest Assocs.*, 217 B.R. 696, 705 (Bankr.S.D.N.Y.1998) (permitting oversecured creditor to "allocate adequate protection payments to postpetition interest to the extent of its oversecurity"). Evolution is separately entitled to fees under Section 5(c) of the Factoring Agreement, which states that the Receivables Sellers will indemnify Evolution for, among other things, reasonable attorneys' fees arising from the Agreement. *See* Docket No. 1032-1 § 5(c).

This segregated account will ensure that Evolution's collateral is not commingled with collateral or property belonging to other claimants over which Evolution does assert a claim, that the Debtors cannot use Evolution's collateral, and that Evolution's collateral can be monitored. This remedy is especially necessary in light of the Debtors' prior breaches of the Court-ordered stipulation and order granting Evolution adequate protection in connection with its inventory facility in exchange for Evolution permitting the Debtors to use inventory collateralizing another of Evolution's loans. *See* Exhibit 9 (transcript of January 20, 2026 bench ruling finding that the Debtors had breached the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 609]).

**EMERGENCY CONSIDERATION**

35. Pursuant to Bankruptcy Local Rule 9013-1, Evolution respectfully requests emergency consideration of this Motion on or before February 13, 2026. Evolution has made repeated attempts to come to an agreement with the Debtors on adequate protection in light of the District Court Order which recognizes Evolution's right to adequate protection, to no avail.

36. The Debtors are clearly in severe financial distress. Evolution understands the situation is dire, but that is no excuse for denying a secured creditor its statutory right to adequate protection—indeed, the very *reason* for adequate protection is to ensure that a secured creditor is protected in the event a debtor runs out of cash. But the Debtors have thus far left Evolution in the lurch. If the Debtors are allowed to continue their financial tailspin without granting Evolution adequate protection at least until the resolution of its adversary proceeding, Evolution risks being completely wiped out, despite its status as a first-priority secured creditor. Evolution thus requires emergency relief.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, Evolution respectfully requests that the Court enter an order (a) requiring the Debtors to set aside $60.5 million in unencumbered cash (for example, the Category 1 and Category 2 invoices to which no factor has asserted a claim) exclusively for Evolution to provide adequate protection for Evolution's $60.5 million first priority secured claim, plus the interest and fees which Evolution is entitled, or granting the indubitable equivalent of unencumbered cash; and (b) granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

Respectfully submitted this 9th day of February 2026.

**GRAY REED**

By: */s/ Jason S. Brookner*
Jason S. Brookner
Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com

- and -

**ELSBERG BAKER & MARURI PLLC**
David Elsberg (admitted *pro hac vice*)
Michael Duke (admitted *pro hac vice*)
Vivek Tata (admitted *pro hac vice*)
Garrett Gerber (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
Ella Epstein (admitted *pro hac vice*)
350 Fifth Avenue, 38th Fl.
New York, NY 10118
Telephone: (212) 597-2600
Email: delsberg@elsberglaw.com
mduke@elbserglaw.com
vtata@elsberglaw.com
ggerber@elsberglaw.com
aparks@elsberglaw.com
eepstein@elsberglaw.com

- and -

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Email: vindelicato@proskauer.com
mkoch@proskauer.com

- and -

Case 25-90399 Document 38-9 Filed in TXSB on 02/09/26 Page 16 of 16

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

*Counsel to Evolution*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 9th day of February 2026, he caused a true and correct copy of the foregoing document by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

# Exhibit 1

United States District Court
Southern District of Texas

**ENTERED**

January 31, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE FIRST BRANDS GROUP, LLC | § | |
| | § | |
| EVOLUTION CREDIT PARTNERS, | § | |
| | § | |
| Appellant, | § | CIVIL ACTION NO. H-26-73 |
| v. | § | BANKRUPTCY CASE NO. 25-90399 |
| | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | |
| | § | |
| Appellees. | § | |

**MEMORANDUM OPINION AND ORDER**

Evolution appeals a bankruptcy court order allowing First Brands to use up to $60 million in cash collateral in which Evolution claims a first-lien security interest. This case is remanded to the bankruptcy court for further proceedings consistent with the following opinion, which rules: (1) under § 363, bankruptcy courts may inquire into the validity of an asserted property interest only to see if the creditor can establish a prima facie or colorable claim to that property interest; (2) the bankruptcy court did not rule that Evolution lacked a security interest in the $60 million cash collateral; (3) Evolution likely was not adequately protected when the bankruptcy court allowed First Brands to use the cash collateral; (4) new facts have created a genuine factual dispute material to determining whether Evolution is currently adequately protected; and (5) the parties may, on remand, litigate whether Evolution is currently adequately protected or, through appropriate procedures, whether it has a first-lien security interest.

**I. Background**

First Brands Group, LLC is a supplier of aftermarket automotive parts, including brakes, filters, wipers, lights, pumps, and towing solutions. (Bankr. Docket Entry No. 22 ¶ 8). On September 24, 28, and 29, 2025, the various First Brands entities filed for bankruptcy. When they did so, First Brands reported approximately $11.5 billion in financing obligations but about $12 million in its corporate bank accounts. (*Id.* ¶¶ 34–35). About $2.3 billion of First Brands's liabilities relate to accounts receivable factoring. (*Id.*).

Accounts receivable factoring is a commonsense business arrangement. When First Brands sells parts to customers, those sales may include long-dated payment terms, allowing the customers to pay First Brands several months later. The generous terms may attract customers, but First Brands suffers a period without cash and without inventory of commensurate value. To maintain its cash flow, First Brands sells the rights to those receivables at a discount to a third party. First Brands receives immediate cash, and the third party receives the full value of the receivables when the customer pays. This dispute concerns First Brands sale of the right to the receivables to Evolution.

After the sale, First Brands declared bankruptcy. Evolution is concerned that it will not recover the full value of the receivables it believes it is entitled to. (Docket Entry No. 16 at 3–5). Evolution asserts a first-lien security interest on approximately $60.5 million worth of First Brands's receivables. (*Id.* at 3). First Brands argues that Evolution does not have a right to these receivables because of significant irregularities in First Brands's previous factoring practices. (Docket Entry No. 21 at 4–5). First Brands claims that its forensic expert "uncovered that the $60.5 million claim of unpaid factored receivables asserted by Evolution does not match to *any* valid invoices in First Brands' records." (*Id.* at 5).

This dispute arose when First Brands moved for permission to draw on funds from the Factored Receivables Account, the account in the bankruptcy estate that has collected the receivables recently paid back to First Brands. (Bankr. Docket Entry No. 807). The Factored Receivables Account had somewhere between $105.9 million and $109 million when the parties litigated the motion in the bankruptcy court. (*See* Docket Entry No. 16 at 10 (including a table depicting the categories of cash in the account)). First Brands asked the bankruptcy court's permission to spend $63 million representing certain categories of receivables in the Factored Receivables Account. (Bankr. Docket Entry No. 1046-1 at 3). Evolution objected, arguing that First Brands was going to use the cash to which it was entitled under its first-priority security interest; if First Brands burned through $63 million, then the Factored Receivables Account would not have enough funds that Evolution could claim priority to that would satisfy Evolution's interest. (Bankr. Docket Entry No. 1031).

The bankruptcy court ruled that First Brands could draw up to $60 million from the Factored Receivables Account. (Bankr. Docket Entry No. 1133). Although the bankruptcy court did not definitively rule on the validity or nature of Evolution's interest, (Docket Entry No. 17-4 at 588), and cautioned that its assessment was preliminary, it explained that it was not convinced that Evolution had priority over other creditors, (*id.* at 588–90). The bankruptcy court authorized the release of the funds because, whoever held the priority interest, that interest was adequately protected. (*Id.* at 591–92, 598, 658–59). If First Brands drew up to the amount permitted by the order, about $49 million would remain in the Factored Receivables Account.

Evolution appealed on the ground that the $49 million left in the Account would leave Evolution's lien underprotected by approximately $20 million. (Docket Entry No. 1; *see* Docket Entry No. 17-4 at 693 (explaining that Evolution cannot assert a right to all $49 million left in the

Account)). This court expedited the appeal because the record showed that First Brands is likely to burn through the collateral by early February. (Docket Entry No. 14). Evolution argues that the bankruptcy court erred in ruling that its interest was adequately protected; in its view, the $49 million does not adequately secure its right to $60.5 million. (Docket Entry No. 16 at 11–12). First Brands responds that the bankruptcy court did not err, for two reasons: (1) the Factored Receivables Account has, during the pendency of this appeal, collected enough receivables to adequately protect Evolution's interest; and (2) even if the bankruptcy court authorized First Brands to withdraw and spend an amount greater than Evolution's lien, the bankruptcy court appropriately did so after balancing how much cash remained in the account against the likelihood that Evolution could establish a first-priority security interest. (Docket Entry No. 21 at 11–12).

**II. Analysis**

"Secured creditors are entitled to 'adequate protection' where the debtor retains use or possession of collateral during the pendency of a proceeding." *In re Triplett*, 87 B.R. 25, 26 (Bankr. W.D. Tex. 1988). Section 363 of the Bankruptcy Code prohibits debtors from using cash collateral without the consent of "each entity that has an interest in such cash collateral," unless the bankruptcy court, "after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) then mandates that the bankruptcy court "prohibit or condition such use . . . as is necessary to provide adequate protection." *Id.* § 363(e). "[R]estriction of the use of cash collateral should only occur where the facts show that failure to restrict use may 'impair' the creditor and deny the creditor adequate protection." *In re Triplett*, 87 B.R. at 27. "The protection afforded a creditor whose cash collateral is permitted by the court to be used by a debtor in possession is whatever condition is deemed

necessary to provide adequate protection of the creditor's interest." *In re Quality Beverage Co., Inc.*, 181 B.R. 887, 896 (Bankr. S.D. Tex. 1995).

The parties dispute: (1) whether Evolution has a secured interest in the cash collateral; and (2) whether Evolution is adequately protected in its alleged secured interest.

**A. The Assessment of Property Interests**

First Brands frames the issue on appeal as a review of the bankruptcy court's assessment of the likelihood that Evolution can establish its priority interest against the amount of collateral remaining. It frames the question as a holistic assessment of whether the expected value of Evolution's interest is adequately protected. Evolution raises two problems: whether the bankruptcy court erred in not holding an adversary proceeding; and whether the court failed to apply the correct standard for finding adequate protection.

Bankruptcy courts may conduct preliminary hearings on the use of cash collateral. After a preliminary hearing, "the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under" § 363(e). 11 U.S.C. § 363(c)(3). "Bankruptcy Rule 4001(b)(2) provides that a court may conduct a preliminary hearing on a motion for authorization to use cash collateral, 'but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.'" *In re Premier Ent. Biloxi LLC*, No. 06-50975 ERG, 2006 WL 2884541, at *2 (Bankr. S.D. Miss. Oct. 10, 2006) (quoting FED. R. BANKR. P. 4001(b)(2)). The bankruptcy court did not consider its ruling authorizing First Brands to use up to $60 million in funds to be an "interim" determination. (Bankr. Docket Entry No. 1133; Docket Entry No. 17-4 at 591 ("It's not interim, but just granting relief to allow the debtors to use the cash.")). Nor did the bankruptcy court make findings that allowing First Brands to use the funds was necessary to avoid immediate and

irreparable harm to the estate pending a final hearing. (*See* Bankr. Docket Entry No. 1133). The ruling allowing First Brands to spend up to $60 million in cash collateral was a final determination under § 363(e).

First Brands is correct that bankruptcy courts ruling under § 363(e) may conduct some examination of lien validity. Section 363(p) provides that "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2). Courts appear to resolve some disputes under § 363(e) on the ground that the entity asserting a property interest could not bear its burden of proving that interest. *See, e.g.*, *In re TM Vill., Ltd.*, No. 18-32770-BJH, 2019 WL 1004571, at *6 (Bankr. N.D. Tex. Feb. 28, 2019) (authorizing the sale of property without providing adequate protection because the parties asserting a property interest could not meet their burden of proof but declining to expunge their lis pendens without an adversary proceeding); *In re Aircomm Commc'ns, Inc.*, No. 10-80444-G3-11, 2010 WL 5014000, at *2 (Bankr. S.D. Tex. Dec. 2, 2010) ("Movant has not met its burden of proof to establish that any of Debtor's cash is its cash collateral."); *In re TWL Corp.*, No. 08-42773-BTR-11, 2008 WL 5246069, at *5 (Bankr. E.D. Tex. Dec. 15, 2008) ("Skill Ventures failed to sustain its burden of proof as required by Section 363(p)(2) as to the existence, validity priority, and extent of the interest entitled to such protection, and, accordingly, no adequate protection by the Debtors or the Buyer shall be required in order for the Sale to proceed free and clear of the Distribution Agreement.").

This is in tension with the Bankruptcy Rules and other case law, which suggest that, in the absence of an adversary proceeding, bankruptcy courts addressing requests for relief that raise questions about an asserted property interest should assess only whether the party asserting the

interest has made a prima facie showing of the validity and scope of that interest.[1] Consistent with this limited burden, courts may consider whether there is evidence that "clearly refutes a creditor's claim to the property." *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 34 (1st Cir. 1994). But "the substantive consideration of such evidence should stop as soon as it appears that the" party asserting the property interest "has a 'colorable claim' to the property in question." *In re Montgomery*, 262 B.R. 772, 775 (B.A.P. 8th Cir. 2001) (quoting *Grella*, 42 F.3d at 32); *see also In re Keen*, No. 13-71705, 2014 WL 6871867, at *6 (Bankr. W.D. Va. Dec. 3, 2014) ("Most courts require that, in the summary nature of stay proceedings, the movant show at least a 'colorable' claim to property of the estate." (quoting *In re Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir. 1990)).

Permitting a broader or deeper inquiry into the validity of an asserted property interest at a preliminary hearing on the use of cash collateral would bypass Rule 7001(b)'s general requirement that parties must challenge lien validity through an adversary proceeding, not an adequate-protection hearing. *See* FED. R. BANKR. P. 7001(b). Weighing the likelihood of success on the merits of establishing a secured interest against the likelihood of success in showing that available

---

[1] First Brands relies heavily on *Collier on Bankruptcy* for the proposition that § 363(e)'s requirement "of adequate protection may have to be applied in a flexible manner to meet emergencies in which prompt authorization to use collateral, particularly cash collateral, is necessary," and "permit[s] some examination of lien validity." 3 Collier on Bankruptcy ¶ 363.05 (16th ed. 2026). But the cases *Collier* cites do not seem to permit the approach that First Brands asks the court to take, which is to bypass the adequate-protection analysis (or to permit some hybrid, expected-value analysis) based on tentative doubts about whether an asserted security interest could otherwise be shown prima facie to be valid, without adhering to the specific rules and procedures for preliminary determinations. *See, e.g.*, *In re Placid Oil Co.*, 102 B.R. 538, 542 (Bankr. N.D. Tex. 1988) (holding that the asserted liens were prima facie valid); *In re Collins*, 180 B.R. 447, 452 & n.8 (Bankr. E.D. Va. 1995) (addressing the debtor's motion for authority to sell property, but not addressing the issue of the validity or priority of the asserted lien on the property because that had to be addressed in an adversary proceeding); *In re K-Fabricators, Inc.*, 135 B.R. 654, 658 (Bankr. W.D. Wash. 1992) ("A sale pursuant to 11 U.S.C. § 363(f) does not establish the validity of a claimed lien, which requires an adversary proceeding."); *cf. In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 326 (Bankr. N.D.N.Y. 1995) (ruling that § 363(e) does not apply to contingent property interests); *In re Wright Grp., Inc.*, 443 B.R. 795, 806–07 (Bankr. N.D. Ind. 2011) (ruling that the parties implicitly waived their right to an adversary proceeding).

cash collateral would adequately protect that interest would also bypass § 363(c)(3)'s and Rule 4001(b)(2)'s rules and regulations for preliminary hearings on the use of cash collateral. Preliminary rulings, tied to the irreparable harm the estate might suffer, may allow for more of an assessment of an interest's validity, similar to the one First Brands thinks that the bankruptcy court employed here, until a full adversary proceeding and § 363(e) hearing can take place. The parties did not address this issue in the context of preliminary relief under § 363. Otherwise, the court is persuaded that, absent clear evidence or legal precedent that refutes the claimant's right to an asserted property interest, the claimant is entitled to adequate protection until an adversary proceeding determines the validity, extent, and priority of the asserted property interest.

The court offers this guidance because it may prove helpful on remand; the resolution of this legal question is ultimately unnecessary to determining this appeal. Although the bankruptcy court doubted that Evolution would ultimately prevail on the validity and scope of its asserted first-priority security interest, the record shows that the bankruptcy court reserved ruling on the issue. (Docket Entry No. 17-4 at 587–88). Instead, the court focused on whether Evolution—or any other creditor—would still be adequately protected. (*Id.*). This court will not affirm on the basis that Evolution lacks a property interest; the bankruptcy court assumed, without deciding, that it did and moved to determine adequate protection. The present record requires this court to take the same approach.

**B. Adequate Protection**

The question squarely presented on appeal is whether Evolution's assumed interest in $60.5 million was adequately protected. The Debtors represent that the Factored Receivables Account now includes over $67 million, (Docket Entry No. 21 at 11 (Debtors' representation))—allegedly more than enough to adequately protect Evolution's asserted first-priority security interest. The

Debtors represent that the estate is owed about $230 million in outstanding prepetition receivables, "which, if and when received, would be transferred to the segregated account and held pending further order of the Bankruptcy Court." (*Id.* at 11). The Debtors also "agreed not to seek the release of any further funds from the Factored Receivables Account before February 19, 2026, which is the date of an evidentiary hearing on" a related "matter set by the Bankruptcy Court." (*Id.* at 10 (citing Bankr. Docket Entry No. 1681)). The Debtors argue that, under these conditions, Evolution's interest is adequately protected.

Evolution responds that this court should not consider facts outside the appellate record and that, even taking this additional information about forthcoming funds into account, Evolution would lack adequate protection because these receivables may match invoices owed to other entities and because vendors may have offsetting credits that make the collection of these receivables uncertain. (Docket Entry No. 22 at 5 n.4).

Evolution's arguments are persuasive, in part. The court must consider the updated facts and cannot confine itself to the appellate record. The parties disputed whether to expedite this appeal. First Brands resisted an expedited appeal in part because the record in the bankruptcy court was likely to continue to develop rapidly during the pendency of the appeal. Evolution assumed the risk of a developing record when it moved to expedite the appeal. (*See* Docket Entry No. 14 at 2 ("Developments in the bankruptcy court may moot the appeal or materially alter the record as the briefs are filed.")). But without a firmer determination on the validity of Evolution's asserted first-priority security interest—or at least adherence to the procedures for the preliminary use of cash collateral or a ruling that Evolution did not make a prima facie showing of its first-priority interest—Evolution is entitled to adequate protection.

At the time Evolution appealed, its interest was not adequately protected because the Factored Receivables Account did not include enough to cover Evolution's $60.5 million interest. The bankruptcy court thought there was an equivalent amount—around $56 to 59 million, (Docket Entry No. 17-4 at 592)—but that was likely a miscalculation, (Docket Entry No. 16 at 9–13, 20–21 (explaining the miscalculation)).[2] The Factored Receivables Account did not have enough cash to completely compensate Evolution. *In re Cage*, 357 B.R. 99, 101 (Bankr. S.D. Tex. 2004) (quoting *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2nd Cir. 1935)). But additional receivables have since come into the Factored Receivables Account, which may afford Evolution adequate protection. There are genuine factual disputes material to determining whether Evolution has adequate protection. This court is not in a position to resolve them. Nor is this court in the position to make the first ruling on the validity of Evolution's asserted security interest, which it would do without the aid of either an evidentiary or adversary proceeding.

## III. Conclusion

For these reasons, the appeal is remanded to the bankruptcy court for additional proceedings consistent with this opinion. The parties may litigate, through appropriate procedures,

[2] At the hearing held by this court, First Brands stated that the bankruptcy court's adequate-protection finding was supported by the court's consideration of the amount of receivables that was expected to continue to flow into the estate. But the bankruptcy court's ruling appears closely tied to the amount of cash already in the Factored Receivables Account. (Docket Entry No. 17-4 at 591–92). It is unclear how much evidence the bankruptcy court had before it on the projected incoming receivables. The bankruptcy court made a passing reference, in its discussion of adequate protection, to the fact that the dollar amounts would change and that the adequate-protection analysis would have to change with them. (Docket Entry No. 17-6 at 1037). But it is not clear what evidence allowed the bankruptcy court to find that the incoming receivables would change the numbers in the Factored Receivables Account to give Evolution adequate protection. *See Endrex Expl. Co. v. Pampell*, 97 B.R. 316, 321 (N.D. Tex. 1989) ("Notwithstanding the considerable deference due the bankruptcy court's fact-finding function, the bankruptcy judge is required to make findings of fact that are sufficiently comprehensive to enable appellate review."). Evolution asserted at oral argument that it had a superior security interest only in the funds already in the estate and would not have the same priority position on new, incoming receivables. The parties' briefs do not squarely address that distinction, and the record in the bankruptcy court does not offer sufficient additional insight. As stated above the line, there are too many open factual issues that this court is not in a position to resolve.

whether Evolution has a first-priority security interest. They may also litigate whether Evolution is adequately protected by the receivables that may flow into the estate in the coming weeks or months. In determining whether Evolution is adequately protected, the bankruptcy court may consider, consistent with the applicable law and in addition to other relevant facts, the amount of funds remaining in the segregated account, the likelihood that additional funds may enter the account, as well as other potential sources of recovery for Evolution. If the bankruptcy court finds that Evolution is adequately protected, it must state specifically what funds or other property, whether currently in the estate or projected to be in the estate (and on what basis), adequately protect Evolution.

The bankruptcy court may grant the release of additional funds in a manner consistent with this opinion, or with the agreement of the directly affected parties. This court retains jurisdiction over the appeal if the bankruptcy court rules on the adequate-protection issue.

The court recognizes that this resolution does not offer either party a final resolution on an important issue in this difficult reorganization. But the record is too infirm to support a more definitive ruling. The validity of Evolution's security interest is not before this court, and the factual determination of adequate protection is still in dispute based on developing facts, a risk taken when Evolution moved to expedite the appeal. The court thanks the parties' counsel and the bankruptcy court for their quick, thorough, and excellent work.

**REMANDED**.

SIGNED on January 31, 2026, at Houston, Texas.

Lee H. Rosenthal
Senior United States District Judge

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | CIVIL ACTION NO. 4:26-cv-00073 |
| Debtors.[1] | § | BANKRUPTCY CASE NO. 25-90399 |
| EVOLUTION CREDIT PARTNERS, | § | |
| Appellant, | § | |
| v. | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | |
| Appellees. | § | |

**BRIEF FOR APPELLEES**

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the Federal Rules of Bankruptcy Procedure, undersigned counsel for Appellees state as follows:

- First Brands Group Holdings, LLC is 66% owned by Viceroy Private Capital, LLC, 33% owned by Brake Parts Holdings, Inc., and 1% owned by Aztec Corporation.
- First Brands Group Intermediate, LLC is a wholly owned subsidiary of First Brands Group Holdings, LLC.
- First Brands Group, LLC is a wholly owned subsidiary of First Brands Group Intermediate, LLC.
- APC Parent, LLC, BPI Acquisition Company, LLC, Carter Fuel Systems, LLC, FRAMAuto Holdings, LLC, Heatherton Holdings, LLC, KTRI Holdings, Inc., PHNX Acquisition Corp., Specialty Pumps Group, Inc., Strongarm, LLC, and UCI International Holdings Parent, Inc. are wholly owned subsidiaries of First Brands Group, LLC.
- APC Intermediate Holdings, LLC and Toledo Molding & Die, LLC are wholly owned subsidiaries of APC Parent, LLC.
- CWD Intermediate Holdings I, LLC is a wholly owned subsidiary of APC Intermediate Holdings, LLC.
- CWD Holding, LLC is a wholly owned subsidiary of CWD Intermediate Holdings I, LLC.
- CWD Intermediate Holdings II, LLC is a wholly owned subsidiary of CWD Holding, LLC.
- CWD, LLC is a wholly owned subsidiary of CWD Intermediate Holdings II, LLC.
- Qualis Enterprises, LLC is a wholly owned subsidiary of CWD, LLC.
- Qualis Automotive, L.L.C. is a wholly owned subsidiary of Qualis Enterprises, LLC.

- BPI Holdings International LLC, Brake Parts Inc LLC, Cardone Industries, Inc., Dalton Corporation, Eagle Machining, LLC, Eagle Casting, LLC, and Viper Acquisition I, Inc. are wholly owned subsidiaries of BPI Acquisition Company, LLC.
- BPI EC, LLC is a wholly owned subsidiary of Brake Parts Inc LLC.
- Brake Parts Inc India LLC and Brake Parts Inc China LLC are wholly owned subsidiaries of BPI Holdings International, LLC.
- Global Reman Ventures, LLC, Reman Management International LLC, SDC TX, LLC, Smart Choice, LLC, and Tridonex USA LLC are wholly owned subsidiaries of Cardone Industries, Inc.
- Dalton Corporation, Ashland Manufacturing Facility, Dalton Corporation, Kendallville Manufacturing Facility, Dalton Corporation, Stryker Manufacturing Facility Co., and Dalton Corporation, Warsaw Manufacturing Facility are wholly owned subsidiaries of Dalton Corporation
- TAE Brakes, LLC is a wholly owned subsidiary of Viper Acquisition I, Inc.
- International Brake Industries, Inc. is a wholly owned subsidiary of TAE Brakes, LLC.
- IBI International Holding Company, Inc. and Qualitor Automotive, LLC are wholly owned subsidiaries of International Brake Industries, Inc.
- Carter Carburetor Holdings, LLC and Carter Fuel Export, Inc. are wholly owned subsidiaries of Carter Fuel Systems, LLC.
- Carter Carburetor, LLC and Walbro Midco LLC are wholly owned subsidiaries of Carter Carburetor Holdings, LLC.
- WEM US Co. is a wholly owned subsidiary of Walbro Midco LLC.
- Walbro LLC is a wholly owned subsidiary of WEM US Co.
- Autolite Operations LLC, FRAM Group IP LLC, FRAM Group Operations LLC, and Jasper Acquisition Corp. are wholly owned subsidiaries of FRAMAuto Holdings, LLC.

- Jasper Rubber Products, Inc. is a wholly owned subsidiary of Jasper Acquisition Corp.
- KTRI Offshore Holdings, LLC, Trico Products Corporation, and Viper Acquisition, Inc. are wholly owned subsidiaries of KTRI Holdings, Inc.
- Trico Holding Corporation is a wholly owned subsidiary of Trico Products Corporation.
- Trico Technologies Corporation is a wholly owned subsidiary of Trico Holding Corporation.
- Qualitor Acquisition Inc. is a wholly owned subsidiary of Viper Acquisition, Inc.
- Qualitor, Inc. is a wholly owned subsidiary of Qualitor Acquisition Inc.
- Transportation Aftermarket Enterprise, LLC is a wholly owned subsidiary of Qualitor, Inc.
- Longman Enterprises, Inc., Qualitor Subsidiary H, Inc., Qualitor Subsidiary S, Inc., and TAE China Holdings, Inc. are wholly owned subsidiaries of Transportation Aftermarket Enterprise, LLC.
- Pylon Manufacturing Corp. is a wholly owned subsidiary of Longman Enterprises, Inc.
- Pylon South Bend, Inc. is a wholly owned subsidiary of Pylon Manufacturing Corp.
- Hopkins Acquisition, Inc. and Horizon Global Corporation are wholly owned subsidiaries of PHNX Acquisition Corp.
- Hopkins Manufacturing Corporation is a wholly owned subsidiary of Hopkins Acquisition, Inc.
- Carrand Companies, Inc. is a wholly owned subsidiary of Hopkins Manufacturing Corporation.
- Horizon Global Company LLC is a wholly owned subsidiary of Horizon Global Corporation.

- Horizon Global Americas Inc. is a wholly owned subsidiary of Horizon Global Company LLC.
- Horizon International Holdings LLC is a wholly owned subsidiary of Horizon Global Americas Inc.
- Horizon Euro Finance LLC is a wholly owned subsidiary of Cequent Nederland Holdings B.V.
- ASC Industries, Inc. is a wholly owned subsidiary of Specialty Pumps Group, Inc.
- Premier Marketing Group, LLC is a wholly owned subsidiary of Strongarm, LLC.
- AVM Export, Inc. is a wholly owned subsidiary of Premier Marketing Group, LLC.
- UCI International Holdings, Inc. is a wholly owned subsidiary of UCI International Holdings Parent Inc.
- UCI International, LLC is a wholly owned subsidiary of UCI International Holdings, Inc.
- United Components, LLC is a wholly owned subsidiary of UCI International, LLC.
- UCI Acquisition Holdings (No. 4) LLC is a wholly owned subsidiary of United Components, LLC.
- Champion Laboratories, Inc., UCI-Airtex Holdings, Inc., and UCI Pennsylvania, Inc. are wholly owned subsidiaries of UCI Acquisition Holdings (No. 4) LLC.
- Fuel Filter Technologies, Inc. and Universal Auto Filter LLC are wholly owned subsidiaries of Champion Laboratories, Inc.
- Airtex Industries, LLC is a wholly owned subsidiary of UCI-Airtex Holdings, Inc.
- Airtex Products, LP is 99% owned by UCI-Airtex Holdings, Inc. and 1% owned by Airtex Industries, LLC.

- Viceroy Private Capital, LLC is a wholly owned subsidiary of Mayfair Enterprises, LLC.
- Carnaby Capital Holdings, LLC and Eagle Casting Holdings, LLC are wholly owned subsidiaries of Viceroy Private Capital, LLC.
- Carnaby Capital, LLC, Global Assets GmbH, and Global Assets LLC are wholly owned subsidiaries of Carnaby Capital Holdings, LLC.
- Broad Street Financial Holdings, LLC, Carnaby FA Holdings, LLC, Carnaby Inventory Holdings II, LLC, Carnaby Inventory Holdings III, LLC, Carnaby Inventory Holdings IV, LLC, Global Lease Assets Holdings, LLC, Patterson Inventory Holdings, LLC, and Starlight Inventory Holdings I, LLC are wholly owned subsidiaries of Carnaby Capital, LLC.
- Broad Street Financial, LLC is a wholly owned subsidiary of Broad Street Financial Holdings, LLC.
- Carnaby FA, LLC is a wholly owned subsidiary of Carnaby FA Holdings, LLC.
- Carnaby Inventory II, LLC is a wholly owned subsidiary of Carnaby Inventory Holdings II, LLC.
- Carnaby Inventory III, LLC is a wholly owned subsidiary of Carnaby Inventory Holdings III, LLC.
- Carnaby Inventory IV, LLC is a wholly owned subsidiary of Carnaby Inventory Holdings IV, LLC.
- Patterson Inventory, LLC is a wholly owned subsidiary of Patterson Inventory Holdings, LLC.
- Starlight Inventory I, LLC is a wholly owned subsidiary of Starlight Inventory Holdings I, LLC.
- No publicly owned corporation has an ownership interest in 10% or more of any of the Appellee’s stock.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF THE ISSUE PRESENTED ......................................................3

STATEMENT OF THE CASE ..........................................................................3

SUMMARY OF THE ARGUMENT ..................................................................11

STANDARD OF REVIEW ..............................................................................12

ARGUMENT ..................................................................................................13

I. The Bankruptcy Court did not abuse its discretion in finding that Evolution was not denied adequate protection. ..........................................13

A. The Bankruptcy Court correctly determined as a preliminary matter that Evolution likely did not have a first-priority lien. ............14

B. The Bankruptcy Court did not abuse its discretion in concluding that Evolution was adequately protected. ..........................................17

II. Evolution's argument defies law, fact, and common sense and would cause significant harm if adopted. ..................................................19

A. On appeal, Evolution has abandoned the principal argument it made to the Bankruptcy Court.. ..................................................20

B. The Bankruptcy Court appropriately (and correctly) assessed the validity of Evolution's lien. ..................................................21

C. Accepting Evolution's novel argument would cause significant harm. ..................................................................................25

CONCLUSION ..............................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akuna Matata Invs., Ltd. v. Tex. Nom Ltd. P'ship*,
814 F.3d 277 (5th Cir. 2016) ....................21

*In re Chama, Inc.*,
265 B.R. 662 (Bankr. D. Del. 2000) ....................16

*In re Claar Cellars LLC*,
No. 20-00044 (WLH), 2020 WL 1238924 (Bankr. E.D. Wash. Mar. 13, 2020) ....................23

*In re Columbia Gas Sys., Inc.*,
1992 WL 79323 (Bankr. D. Del. Feb. 18, 1992) ....................13

*In re Eads*,
417 B.R. 728 (Bankr. E.D. Tex. 2009) ....................22

*In re Griego*,
No. 18-52983 (CAG), 2021 WL 4839891 (Bankr. W.D. Tex. Oct. 14, 2021) ....................22

*ITT Commer. Fin. Corp. v. Bank of the W.*,
166 F.3d 295 (5th Cir. 1999) ....................14

*KLX Energy Servs., LLC v. Sommers*,
No. H-22-2599 (LHR), 2023 WL 5511201 (S.D. Tex. Aug. 25, 2023) ....................22

*Loan Syndications & Trading Ass'n v. SEC*,
882 F.3d 220 (D.C. Cir. 2018) ....................15

*In re MF Glob. Holdings Ltd.*,
No. 11-15059 (MG), 2011 WL 6210374 (Bankr. S.D.N.Y. Dec. 14, 2011) ....................23

*In re N.J. Affordable Homes Corp.*,
No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ....................12

*In re Peach State Distributing Co.*,
58 B.R. 873 (N.D. Ga. 1986) .......... 12

*In re Placid Oil Co.*,
102 B.R. 538 (Bankr. N.D. Tex. 1988) .......... 22, 23

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552 (3d Cir. 1994) .......... 18

*United States v. Roney*,
No. 24-cr-113 (REP), 2025 WL 2533193 (E.D. Va. Sept. 3, 2025) .......... 15

*In re Whitehall Jewelers Holdings., Inc.*,
No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) .......... 22

*Zink v. Vanmiddlesworth*,
300 B.R. 394 (N.D.N.Y. 2003) .......... 12

**Statutes & Rules**

11 U.S.C. § 363 .......... *passim*

11 U.S.C. § 506 .......... 8

11 U.S.C. § 1104 .......... 4

Fed. R. Bankr. P. 7001 .......... 21

Fed. R. Bankr. P. 8015 .......... 27

U.C.C. § 9-108 .......... 14

U.C.C. § 9-504 .......... 14

## PRELIMINARY STATEMENT

The Bankruptcy Court did not abuse its discretion in resolving the limited, preliminary inquiry before it and its ruling should be affirmed. Appellant Evolution Credit Partners raises a narrow question: Whether Evolution was denied adequate protection of its claimed (but unproven and hotly contested) first-priority security interest when the Bankruptcy Court released certain funds for Appellee First Brands' business-critical needs, while requiring First Brands to maintain a segregated pool of funds—a pool that now contains more than Evolution's claimed interest.[1] In finding that Evolution was adequately protected under these complex circumstances, the Bankruptcy Court did exactly what bankruptcy courts do best: it engaged in a holistic assessment of the facts before it by undertaking a preliminary evaluation of the strength of Evolution's claimed interest and weighing that interest against the funds available and the interests of other competing claimants, and it concluded that Evolution's protection was at least "adequate," which is all the Bankruptcy Code requires. The Bankruptcy Court's ruling was correct; it certainly was not an abuse of that court's wide discretion.

Unable to challenge the Bankruptcy Court's reasonable exercise of its discretion, Evolution's brief on appeal hinges on a radical position that is contrary

---

[1] "First Brands" refers to all Appellees, namely, First Brands Group, LLC and its debtor affiliates in these chapter 11 proceedings.

to law and deeply harmful. Specifically, Evolution contends that the Bankruptcy Court "assumed—and indeed, it ***had*** to assume—that Evolution holds a perfected, first priority secured interest," and could not consider the strength of Evolution's claimed interest in resolving the immediate question of whether that claimed interest was adequately protected. Br. at 16. Evolution's entire appeal hinges on this proposition: Evolution does not defend the validity or priority of its interest, and Evolution nowhere argues that the Bankruptcy Court erred if it could take the strength of Evolution's claim into account in its holistic assessment. *Id.* at 17–24.

But Evolution's sole argument is contrary to law, fact, and common sense. The Bankruptcy Code puts the burden on the party seeking adequate protection to prove that its interest merits protection. 11 U.S.C. § 363(p)(2). This requires a bankruptcy court to make a preliminary determination of the strength of the claimed interest. This is exactly what the Bankruptcy Court did here—and what bankruptcy courts must do all the time. The bankruptcy system could not function otherwise. Under Evolution's rule, parties asserting meritless security interests could hold debtors' property hostage under the guise of seeking adequate protection. But the Bankruptcy Code is not a suicide pact. Just the opposite: The Code vests bankruptcy courts with wide discretion to balance the competing interests of debtors and creditors to facilitate reorganization. That is what the Bankruptcy Court did below and there is no reason to disrupt its reasonable—indeed, correct—ruling.

## STATEMENT OF THE ISSUE PRESENTED

Whether the Bankruptcy Court abused its discretion in concluding that authorizing First Brands to use a limited portion of collected receivables (which all relevant parties other than Evolution agreed should be permitted), while maintaining a segregated reserve exceeding $60 million, did not deny Evolution adequate protection of its meritless claim to a $60.5 million first-priority secured interest.

## STATEMENT OF THE CASE

### A. First Brands' Bankruptcy

First Brands is a supplier of aftermarket automotive parts with operations worldwide. Bankr. Ct. Doc. No. 22 at ¶ 8. First Brands' products include brakes, filters, wipers, lights, pumps, and towing solutions. *Id.* As of September 2025, First Brands employed approximately 26,000 individuals globally, including almost 6,000 in the United States. *Id.* On September 24, 28 and 29, 2025, each of the entities comprising First Brands filed for bankruptcy. At the time of filing, First Brands reported approximately $11.5 billion in financing obligations—including approximately $2.3 billion in liabilities relating to accounts receivable factoring—and just approximately $12 million in its corporate bank accounts. *Id.* ¶¶ 34–35.

In the months since filing, First Brands' bankruptcy has proven to be unprecedented in terms of its size, speed, contentiousness, and complexity. The bankruptcy has significant financial implications for creditors asserting billions of dollars in claims and asserting competing interests, often in the same property. The

Bankruptcy Court has been intimately involved in overseeing the administration of First Brands' bankruptcy, including holding three hearings so far relating to First Brands' prepetition accounts receivable factoring practices. The Bankruptcy Court also appointed an examiner under section 1104(c) of the Bankruptcy Code, to, among other things, "investigate the facts and circumstances … concerning the Debtors' prepetition factoring processes and factoring transactions." Bankr. Ct. Doc. No. 726.

**B. First Brands' Third-Party Factoring Practices**

Before its bankruptcy, First Brands used various factoring arrangements to provide liquidity. Under "third-party factoring" arrangements, First Brands would sell inventory to a customer with long-dated payment terms—meaning that the customer's payment would often not be due for six months or more—and subsequently sell the associated receivable of that inventory sale to a third-party factor, like Evolution. App. Vol. 1 at 262. The factor would purchase the Company's receivable at a discount to face value and remit cash to the Company. *Id.* Typically, the customer would remit payment to First Brands once the receivable became due and the Company would then transfer the amount owed to the Third-Party Factor related to that particular receivable. *Id.*

An investigation undertaken by First Brands' advisors, including its financial advisor, Alvarez & Marsal ("**A&M**"), has revealed significant improprieties and

irregularities in connection with First Brands' historical factoring practices. Specifically, A&M has identified instances where invoices provided to third party factors were (i) fabricated, (ii) inflated (*i.e.*, the invoice amount provided to the factor was significantly inflated from the invoice values in First Brands' records), or (iii) provided to more than one factor, creating the potential for more than one factor to assert a claim to the same invoice. *Id.* at 266–68. These issues were widespread. In total, based on analysis to date, A&M has been unable to match over $2 billion of factored invoices to actual invoices for inventory sold to customers, either because there is no record of a particular invoice or because the actual matched invoice number has amounts that have been substantially altered. *Id.* As relevant here, A&M's forensic analysis has uncovered that the $60.5 million claim of unpaid factored receivables asserted by Evolution does not match to *any* valid invoices in First Brands' records. Shortly after discovering potential issues with the factoring programs, First Brands, at A&M's direction, immediately discontinued all of its third-party factoring practices and have not factored any receivables since around September 12, 2025. *Id.* at 263.

### C. The Factoring Procedures Motion

Since First Brands' bankruptcy filing, the Bankruptcy Court has closely and actively managed issues relating to First Brands' prepetition factoring practices—and continues to do so. The Bankruptcy Court ordered First Brands to segregate all

collections received from customers in connection with prepetition sales, including receipts from both receivables that were factored and those that were not. *See* App. Vol. 1 at 203–224. First Brands established a new bank account to hold these funds, which cannot be accessed or disbursed except by order of the Bankruptcy Court. *Id*.

In connection with the Bankruptcy Court's efforts to carefully manage these funds, on December 1, 2025, First Brands filed the "Factoring Procedures Motion," *id.* at 225–249, which sought, among other relief, an order (i) establishing procedures for First Brands to complete an orderly, efficient, and fair reconciliation of all collections, and (ii) authorizing First Brands to use funds that were not factored, following notice to and an opportunity to be heard by prepetition third-party factors. *Id.* at 232. First Brands supplemented its motion on December 12, 2025, asking for, among other relief, the release of certain receivables that had not been factored. *Id.* at 274–75.

Evolution vigorously objected to the Factoring Procedures Motion. *See id.* at 315–340. Specifically, Evolution's principal argument was that "**EVOLUTION HAS A FIRST-PRIORITY SECURED INTEREST IN THE NON-FACTORED RECEIVABLES**," and Evolution supported that argument with eight pages of briefing explaining why "Evolution has a Perfected Security Interest" and "Evolution's Security Interest is First in Line," as well as a raft of exhibits. *Id.* at 329–336, 341–407. Evolution's claimed first-priority secured interest covered a

wide swath of prepetition receivables sold by any of the Evolution Sellers,[2] including many that were never sold (or even purported to have been sold) to Evolution and were instead either pledged to various other creditors with perfected liens or not sold by First Brands at all. *Id.* at 320–22. Evolution insisted that its purported security interest should preclude the release of *any* of the segregated funds and demanded that First Brands provide adequate protection for the use of Evolution's purported collateral to the extent any such funds were released.

Evolution stood alone in categorically opposing the release of any of the segregated funds. Notably, every third-party factor other than Evolution agreed to permit the release of approximated $63 million from the segregated account—funds that First Brands had determined as a result of A&M's thorough reconciliation were associated with receivables that were never sold to a third-party factor, and which were urgently needed for the operation of the business. *Id.* at 467–489. All of the third-party factors other than Evolution further agreed to adjourn the scheduled hearing relating to the release of additional funds to a later date.

But, because Evolution opposed the (otherwise undisputed) release of these funds, First Brands responded in detail to Evolution's argument that it had a first-priority lien and would be denied adequate protection if this limited set of funds was

[2] "Evolution Sellers" refers to all of the Debtors who are party to Evolution's master receivables agreement.

to be released. *See id.* at 467–489. Specifically, First Brands explained to the Bankruptcy Court that: (i) Evolution's alleged liens were not perfected and were thus unenforceable; (ii) First Brands' prepetition credit agreements did not provide a carve-out such that Evolution would have a first-in-line priority lien even if perfected; (iii) Evolution failed to meet its burden to prove that it is a secured creditor under section 506(a) of the Bankruptcy Code in light of the mountain of prepetition senior secured debt—approximately $6 billion—that was senior in priority to Evolution; and (iv) notwithstanding the problems with Evolution's claim, the limited release of funds sought would not deprive Evolution of adequate protection.

### D. The Bankruptcy Court's Ruling

At a hearing held on December 22, 2025, the Bankruptcy Court heard argument from multiple parties in interest—including Evolution's argument, made through three different attorneys with reference to deposition testimony and financing statements (among other evidence), that it had a perfected first-priority lien, *see* App. Vol. 1 at 563–577—and overruled Evolution's objection to the release of the limited pool of funds.

The Bankruptcy Court explained that "the question … before the Court" was "whether I think it's true that [Evolution is] entitled to have a superior lien over everyone else, and if they are, is there adequate protection for it." *Id.* at 587. But the Bankruptcy Court was clear that it did not need to finally determine whether

Evolution's lien was valid and superior to everyone else's, only whether Evolution would be adequately protected if the funds were released in light of the strength of its claimed interest. *Id.* at 588. The Bankruptcy Court accordingly analyzed the evidence Evolution had submitted to support its claimed lien and explained its preliminary view that Evolution does not have the first-priority lien it claimed. *Id.* at 589 ("I'm not convinced"). The Bankruptcy Court emphasized that its determination was preliminary and that further proceedings would follow to finally determine these complex questions of security and priority: "It's not an open-and-shut case that Evolution … [is] superior to every other factor party here. … [E]very body else is going to have their day in court …." *Id.* at 590. The Bankruptcy Court emphasized that the remaining funds in the segregated account would provide adequate protection "for whoever's won" the security and priority disputes when they are resolved, "if they're entitled to it at all. And maybe the answer is no one." *Id.* at 592. "[R]egardless of . . . whoever's money it is, if it's anyone's, they're adequately protected." *Id.* at 598.

The Bankruptcy Court reaffirmed its ruling at a status conference on December 30, 2025, explaining that "everyone's getting adequate protection," including Evolution. *Id.* at 659. The Bankruptcy Court again made clear the preliminary nature of its determination, but the Bankruptcy Court was unequivocal about its preliminary finding with respect to Evolution: "I don't think that you're

first." *Id.* On December 31, 2025, the Court entered an Order, authorizing the release of $55 million from the segregated account into the First Brands' operating accounts. *Id.* at 705–711. This left approximately $62.8 million in the segregated account. *Id.* at 912. Evolution appealed.

**E. Ongoing Proceedings in the Bankruptcy Court**

Several subsequent developments in the Bankruptcy Court are relevant to this appeal. *First*, First Brands voluntarily agreed to adjourn indefinitely a hearing on the Factoring Procedures Motion, pending the results of the examiner's investigation into prepetition factoring arrangements. *See* App. Vol. 1 at 877–904. *Second*, First Brands agreed not to seek the release of any further funds from the Factored Receivables Account before February 19, 2026, which is the date of an evidentiary hearing on this matter set by the Bankruptcy Court. *See id.* at 1032; Bankr. Ct. Doc. No. 1681. The Bankruptcy Court contemplated ruling on Evolution's adequate protection with respect to the further releases of a limited subset of additional funds at a hearing shortly after this evidentiary hearing. *See id.* at 1032, 1036–37. *Third*, on January 9, 2026, Evolution initiated an adversary proceeding against First Brands and certain of First Brands' secured lenders, seeking a declaratory judgment that it has a perfected, first-priority lien and security interest in the relevant collateral. *Id.* at 860.

*Fourth* and finally, the funds in the segregated account have continued to grow

as additional collections are received by First Brands. To date, the segregated account includes over $67 million. Moreover, there are still approximately $230 million in outstanding prepetition receivables, which, if and when received, would be transferred to the segregated account and held pending further order of the Bankruptcy Court.

## SUMMARY OF THE ARGUMENT

**I.** The Bankruptcy Court did not abuse its discretion. Evolution claimed that it has a first-priority lien on *all* of the Evolution Sellers' prepetition receivables (even receivables that were never purportedly sold to Evolution). Evolution thus had the burden to establish that its lien was valid. 11 U.S.C. § 363(p)(2). Evolution could not satisfy this burden, because Evolution's financing statements do not establish that it had a first-priority lien. The Bankruptcy Court recognized this fundamental problem in its preliminary assessment of the evidence before it. Considering the totality of the circumstances, including the apparent weakness of Evolution's underlying claim, the court rationally concluded that leaving tens of millions of dollars in the segregated account—an account that was expected to grow and now includes an amount of money greater than Evolution's claimed interest—would not deprive Evolution of adequate protection. This determination is the sort on which bankruptcy courts exercise wide discretion. Here, not only was the decision not an abuse of discretion, it was correct.

**II.** Evolution's appeal hinges on the meritless claim that the Bankruptcy Court was precluded from preliminarily assessing the strength of Evolution's claimed interest. Notably, Evolution does not challenge the merits of the Bankruptcy Court's preliminary conclusion that it lacked a first-priority secured interest, or the Bankruptcy Court's ultimate conclusion that Evolution was not denied adequate protection when taking the strength of its claim into account. As the Bankruptcy Code makes clear, however, and as courts have long recognized, courts *must* make a preliminary determination about the strength of a purported property interest in assessing adequate protection. That is exactly what the Bankruptcy Court did below. Evolution's alternative would be devastating to the bankruptcy system, as any creditor could hold up the time-sensitive bankruptcy process by asserting a frivolous property interest, freezing a debtor's ability to use its property pending an ultimate adjudication and final judgment on the strength of the claim.

## STANDARD OF REVIEW

"[A]dequate protection is a matter within [the] bankruptcy court's discretion." *Zink v. Vanmiddlesworth*, 300 B.R. 394, 402 (N.D.N.Y. 2003); *In re Peach State Distributing Co.*, 58 B.R. 873, 876 (N.D. Ga. 1986) ("what constitutes adequate protection is a question of fact 'best left to the discretion of the bankruptcy judge'") (citation omitted). This discretion necessarily reflects the fact that "[t]he term 'adequate protection' is intended to be a flexible concept." *In re N.J. Affordable*

*Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (quoting 3 *Collier on Bankruptcy* ¶ 363.05 (15th ed. rev. 2005)). "[W]hat interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis." *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992).

## ARGUMENT

### I. The Bankruptcy Court did not abuse its discretion in finding that Evolution was not denied adequate protection.

The Bankruptcy Court appropriately exercised its discretion here. To resolve the immediate question of whether Evolution would be deprived of adequate protection if funds were released from the segregated account, the Bankruptcy Court (at Evolution's urging) engaged in a preliminary evaluation of the strength of Evolution's claimed first-priority security interest and found it lacking. Given the weakness of this claimed interest, considered along with all of the relevant facts on the ground and the exigencies of the case, the Bankruptcy Court concluded that Evolution would be adequately protected if tens of millions of dollars were retained in the segregated account pending further litigation of Evolution's and other parties' competing claims. This judgment was a paradigmatic application of discretion.

Evolution's claim—that it alone had a first-priority lien on *all* of the Evolution Sellers' receivables in question—is implausible. As the Bankruptcy Court recognized in its preliminary assessment of Evolution's interest, Evolution's UCC

financing statements did not describe this security interest and, accordingly, it was not perfected. Moreover, the Bankruptcy Court was doubtful that, even if Evolution had a perfected interest, it would take priority over other parties' secured interests. The Bankruptcy Court thus reasonably determined that Evolution's marginal claim would be adequately protected by the funds that remained in the (continuously growing) account—which now total more than Evolution's claimed interest.

### *A. The Bankruptcy Court correctly determined as a preliminary matter that Evolution likely did not have a first-priority lien.*

As an "entity asserting an interest in property" and seeking adequate protection, Evolution "has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2). The Bankruptcy Court correctly concluded, as a preliminary matter subject to further proceedings, that Evolution failed to establish that it had validly perfected a first-priority security interest.

In order to perfect its purported security interest, Evolution was required to file a financing statement comporting with the Uniform Commercial Code. That statement in turn had to provide a description of the collateral that "reasonably identifies what is described" or gives "an indication that the financing statement covers all assets or all personal property." U.C.C. §§ 9-108(a), 9-504(2). The "purpose of the filing system is to give notice to creditors and other interested parties that a security interest exists in property of the debtor." *ITT Commer. Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 302 (5th Cir. 1999) (internal quotation marks and

citation omitted). Here, Evolution's UCC financing statements each stated that Evolution had a claim secured by collateral described as "[a]ny and all present and future Receivables transferred or purported to be transferred" to Evolution. *E.g.*, App. Vol. 1 at 348. The financing statements thus encompassed only those Receivables that were "transferred" to Evolution, *i.e.*, Receivables that were factored to Evolution (or that were purported to be factored to Evolution). The financing statements do not encompass other receivables that were never transferred to Evolution. They thus do not touch any of the funds at issue in this dispute.

Before the Bankruptcy Court, Evolution advanced the argument that the reference to Receivables "transferred" to Evolution encompassed not only the Receivables that would actually be transferred to Evolution to be factored, but also *all* other Receivables (of the Evolution Sellers), on the theory that Evolution's purported lien over other Receivables constituted a "transfer." But—as the Bankruptcy Court recognized, *see* App. Vol. 1 at 589—this argument cannot be squared with the plain meaning of the word "transfer," which "ordinarily implies that a person with control over an asset via possession or ownership gives it or conveys it by sale to a transferee." *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 224 (D.C. Cir. 2018); *see also United States v. Roney*, No. 24-cr-113 (REP), 2025 WL 2533193, at *7 (E.D. Va. Sept. 3, 2025) (concluding that "to 'transfer' means to convey or give an object from one person to another"). And it is

inconceivable that third parties would infer from Evolution's financing statements that Evolution had a security interest in *all* prepetition receivables, rather than those receivables that had literally been transferred to Evolution.

Had Evolution wished to perfect a lien on *all* prepetition receivables, it could have attempted to do so in the financing statements—such as by describing "any and all present and future Receivables." Instead, Evolution expressly decided to include the qualifier "transferred or purported to be transferred." The financing statements thus fail to give a reasonable person the necessary notice that Evolution had a security interest in receivables that were never conveyed to Evolution. Because its unperfected security interest is avoidable, Evolution is "not entitled to *any* adequate protection." *In re Chama, Inc.*, 265 B.R. 662, 669 (Bankr. D. Del. 2000).

The Bankruptcy Court recognized this problem. As the court explained, "the question" before it was whether Evolution's interpretation of the financing statements "textually works." App. Vol. 1 at 589. The court concluded: "I'm not convinced that it does, to be honest," as "you've got to read words for what they are." *Id.* And, in the court's view, this conclusion was reinforced by the language used in the master receivables agreement that the financing statement referenced: That agreement used both the words "transfer" and "grant," but in different ways. *Id.* at 589–90. The word "grant" was used "to grant a security interest," whereas the word "transfer" "refer[red] to what was sold or specifically assigned" to Evolution.

*Id.* at 590. Evolution has not shown (or even argued) that this analysis was wrong.

*B. The Bankruptcy Court did not abuse its discretion in concluding that Evolution was adequately protected.*

Although the Bankruptcy Court determined that Evolution likely had not perfected a security interest, it nonetheless recognized that there would be an ultimate and final adjudication of that question. The Bankruptcy Court also recognized the very serious possibility that other creditors might have higher priority claims on the funds in the segregated account. Accordingly, the court authorized First Brands to use up to $60 million, rather than the $63 million it had requested, to preserve "additional adequate protection for whoever it is on the day that we show up" for a final determination of these competing claims. App. Vol. 1 at 592.

Evolution is thus wrong to suggest that the Bankruptcy Court's order was framed as finding adequate protection for Evolution's purported security interest in $60 million of receivables. *E.g.*, Br. at 20. The court was explicit on this point: "It's not all granted adequate protection for Evolution. It's for whoever's won, if they're entitled to it at all. And maybe the answer is no one." App. Vol. 1 at 592; *see also id.* at 593 ("[I]t's not … tied to Evolution. It's just tied to whoever is entitled to it."). The Bankruptcy Court's conclusion was that the remaining balance in the segregated account—which would continue to grow over time and from which no funds could be released without the court's authorization—would provide Evolution with adequate protection for the speculative and unlikely claim that it had raised. As the

Bankruptcy Court explained, the protection was adequate in part because Evolution had failed to establish a first-priority perfected interest: "I think everyone's getting adequate protection, because I don't think that you're first." *Id.* at 659.

None of this was an abuse of discretion. The Bankruptcy Court confronted a complex situation. First Brands urgently needed funding from a segregated account and multiple claimants asserted competing interests to the other funds that would remain in this account. Evolution alone asserted a claim in the funds to be released, and the Bankruptcy Court found it unlikely that Evolution would be able to prove that it had the first-priority secured interest it claimed. Still, given the uncertainty posed both by Evolution and other creditors, the Bankruptcy Court concluded that releasing $60 million for First Brands' urgent needs while preserving a still-growing amount in the account (now exceeding $65 million) would ensure adequate protection of Evolution's claimed $60.5 million interest. And the Bankruptcy Court recognized the preliminary nature of its determination and the growing amount of funds in the segregated account, observing that the quantum of adequate protection required will necessarily "change … one way or another" as the "numbers" in the segregated account "naturally change." App. Vol. 1 at 1037.

In coming to this conclusion, the Bankruptcy Court engaged in exactly the "case by case" discretionary exercise of determining adequate protection that courts are reluctant to disturb on review. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552,

564 (3d Cir. 1994). In exercising its discretion to determine the question of adequate protection, the bankruptcy court "must balance the needs of a debtor seeking to reorganize with the adequate protection of the non-consenting secured creditor." 3 Collier on Bankruptcy ¶ 363.05 (16th 2026). Here, that involved considering Evolution's likelihood of success on its first-priority lien claim, the amount of money in the account, and the need for protection against further depletion. The Bankruptcy Court's determination was *correct*, not an abuse of discretion.

## II. Evolution's argument defies law, fact, and common sense and would cause significant harm if adopted.

Unable to contend with the Bankruptcy Court's reasonable exercise of its broad discretion to assess adequate protection, Evolution tries to rewrite the facts and the law. As Evolution sees it, the Bankruptcy Court was obligated to (and did) take Evolution's claim of a first-priority lien at face value, and *any*, even preliminary, assessment of the validity or priority of Evolution's lien had to wait until the conclusion of an adversary proceeding. *See* Br. at 16. Evolution's appeal hinges entirely on this legal proposition—that the Bankruptcy Court was required to "assume that Evolution's lien was first in priority and secured." *Id.* at 17. Evolution makes no argument whatsoever in its opening brief that its lien actually is valid or first priority; it simply asserts that the Bankruptcy Court was obligated to take that as a given. And Evolution makes no argument whatsoever in its opening brief that, if the Bankruptcy Court appropriately considered the validity and priority of its lien,

Evolution was denied adequate protection.

And Evolution's centerpiece argument—the basket into which it has placed all of its eggs on appeal—is dead wrong. The Bankruptcy Court could, and did, consider the strength of Evolution's claimed interest in concluding that Evolution would not be denied adequate protection.

*A. On appeal, Evolution has abandoned the principal argument it made to the Bankruptcy Court.*

In its opening brief, Evolution never discusses the issue that was central to the dispute below: whether Evolution did in fact have a valid, first-priority interest in property that would entitle it to $60.5 million worth of adequate protection. This is so even though the bulk of Evolution's briefing and argument to the Bankruptcy Court in connection with the order on appeal was an effort to prove this very point. *See* App. Vol. 1. at 329–36. And this is so even though the bankruptcy court heard oral argument on the merits and addressed this very issue at length, before concluding that Evolution's financing statements likely had failed to perfect a first-priority interest in receivables that were not factored to Evolution. Nor does Evolution argue that, if the Bankruptcy Court was permitted to take the strength of its claimed first-priority interest into account, the Bankruptcy Court erred in finding that Evolution was adequately protected.

This alone dooms Evolution's appeal, assuming this Court rejects Evolution's argument that the Bankruptcy Court was forbidden from even preliminarily

considering the strength of Evolution's claimed interest. Having failed in its opening brief to address the Bankruptcy Court's preliminary assessment that Evolution's interest was unperfected and may not be first in line, Evolution has forfeited any such challenge on appeal. *See Akuna Matata Invs., Ltd. v. Tex. Nom Ltd. P'ship*, 814 F.3d 277, 282 n.6 (5th Cir. 2016) ("Generally, issues not raised in the appellant's opening brief are considered abandoned."). So, too, Evolution has forfeited any argument that it did not receive adequate protection if the strength of its claimed interest could be taken into account. *See id.*

Evolution now pins its hopes on the very opposite of its main argument below. On appeal, Evolution argues that, despite its strenuous efforts to prove the validity and priority of its claim to the Bankruptcy Court, that court was *forbidden* from considering that issue at all. This bizarre reversal all but admits the weakness of Evolution's position, and its about-face smacks of gamesmanship and desperation.

*B. The Bankruptcy Court appropriately (and correctly) assessed the validity of Evolution's lien.*

Rather than defend its claimed first-priority security interest, Evolution hinges its argument on the proposition that the validity of a lien may never be addressed outside of an adversary proceeding. While Evolution may be correct that a *final* evaluation of this question must occur in an adversary posture, *see* Bankruptcy Rule 7001, it does not follow that a court cannot make a preliminary determination when evaluating what protection is adequate under Section 363. To the contrary, such a

rule is inconsistent with the Bankruptcy Code, which places the burden of proof on the party asserting an interest in property to prove its interest when seeking adequate protection and requires the Bankruptcy Court to assess adequate protection within the context of the main bankruptcy case when the issue arises. *See* 11 U.S.C. § 363(p)(2). As the leading bankruptcy treatise states in no uncertain terms: "The section 363(e) requirement of adequate protection may have to be applied in a flexible manner to meet emergencies in which prompt authorization to use collateral, particularly cash collateral, is necessary," and "permit[s] some examination of lien validity." 3 Collier on Bankruptcy ¶ 363.05 (16th 2026). It is unsurprising that Evolution fails to cite a single case supporting the rule it asks this Court to adopt.[3]

Courts have consistently taken this approach, recognizing that the "informal nature of the litigation" under Section 363 "will permit informal examination of lien validity," even if it does not allow for "extensive litigation of counterclaims." *In re Placid Oil Co.*, 102 B.R. 538, 542 (Bankr. N.D. Tex. 1988) (citation omitted).

---

[3] The cases cited by Evolution (at 16, n.13) for the proposition that a determination can be made only through an adversary proceeding involved a final merits determination, not a preliminary assessment like the one here. *See KLX Energy Servs., LLC v. Sommers*, No. H-22-2599 (LHR), 2023 WL 5511201, at *2 (S.D. Tex. Aug. 25, 2023) (merits determination that party was not an additional insured); *In re Griego*, No. 18-52983 (CAG), 2021 WL 4839891, at *4 (Bankr. W.D. Tex. Oct. 14, 2021) (order requiring party to release lien); *In re Eads*, 417 B.R. 728, 739 (Bankr. E.D. Tex. 2009) (debtor's merits objection to a secured claim combined with challenge to lien); *In re Whitehall Jewelers Holdings., Inc.*, No. 08-11261 (KG), 2008 WL 2951974, at *6 (Bankr. D. Del. July 28, 2008) (debtor's motion to sell goods despite contested ownership interest).

Courts regularly come to a preliminary assessment as to whether a party's lien is valid. *See In re Placid Oil Co.*, 102 B.R. at 542 ("This type of litigation is on a fast track, and upon informal examination of the Banks' lien claims, the Court finds that the Banks have valid and perfected liens on proceeds of oil and gas.") (citation omitted); *In re MF Glob. Holdings Ltd.*, No. 11-15059 (MG), 2011 WL 6210374, at *1 (Bankr. S.D.N.Y. Dec. 14, 2011) ("[T]he objectors argue that they *may* have an interest (indeed, a superior interest) in the cash collateral and they object[,]" but "[s]peculation … is not sufficient to carry the customers' burden of proof").

Indeed, as courts have explained, it is commonplace in the bankruptcy context to make preliminary assessments without requiring that "an adversary proceeding … be completed to determine the extent of [a] lien." *In re Claar Cellars LLC*, No. 20-00044 (WLH), 2020 WL 1238924, at *7 (Bankr. E.D. Wash. Mar. 13, 2020). This is because the "formalistic requirement" that Evolution advances "would be antithetical to the speed and flexibility that are among bankruptcy law's first principles[,]" and "would place undue influence over the timely resolution of … issues in the hands of an objecting party who has near complete temporal and tactical control regarding the filing, prosecution, and appeal of any adversary action." *Id.*

And this is exactly what the Bankruptcy Court did here. Evolution is wrong to suggest that the Bankruptcy Court never addressed the validity of Evolution's lien. *See* Br. at 16. To the contrary, as described above, the Bankruptcy Court discussed

at length its preliminary assessment of Evolution's interest. *See* App. Vol. 1 at 586–91. The Bankruptcy Court recognized that "the question … before the Court today [is] whether I think it's true that [Evolution is] entitled to have a superior lien over everyone else, and if they are, is there adequate protection for it." *Id.* at 587; *see also id.* at 589 ("the question is whether [Evolution's theory] textually works"). The court concluded that it was "not convinced" that Evolution had validly perfected a security interest, *id.* at 589, a question on which Evolution bore the burden of proof, *see* 11 U.S.C. § 363(p)(2). A week later, the court was again explicit on the point: "I don't think you're first." App. Vol. 1 at 659. And none of this should be surprising to Evolution, because Evolution affirmatively chose to brief and argue the issue at length before the Bankruptcy Court. *Id.* at 329–36.

At the same time, the Bankruptcy Court appropriately recognized that this determination was not a *final* one, just a preliminary one. As the court recognized, while Evolution had not shown that "they're superior to every other factor party here," there would still be a point at which "everybody else is going to have their day in court and we just need to figure it out." App. Vol. 1 at 590–91; *see also id.* at 590 (recognizing that "we're not making final calls"). As the court later explained, it had not "definitively ruled on" the extent of Evolution's interest but had addressed the issue "preliminarily." *Id.* at 658. The Bankruptcy Court's determination was appropriate and it was correct—and it certainly was not an abuse of discretion.

*C. Accepting Evolution's novel argument would cause significant harm.*

If adopted, Evolution's radical argument that a Bankruptcy Court adjudicating a dispute over adequate protection cannot even preliminarily consider the strength of a creditor's claimed interest would cause significant harm in this case and many others. Under Evolution's rule, a putative creditor could bring bankruptcy proceedings to a halt by asserting a weak or frivolous security interest and demanding adequate protection until the validity of the interest is finally evaluated. As a practical matter, this could allow objecting creditors to tie up the entirety of a debtor's assets with meritless claimed security interests.

The upshot for First Brands could be devastating, as Evolution's argument risks tying up critical funds pending a distant adversary proceeding. And Evolution's rule would work to the detriment of debtors and creditors in all cases, who would face the risk that an obstructing creditor would wield adequate protection to prevent the productive use of a debtor's property. This flies in the face of the Bankruptcy Code's objective of allowing continued use of debtor property to protect and preserve enterprise value and facilitate reorganization for the benefit of all stakeholders. This Court should not be the first to accept Evolution's radical position and bless the harm it would cause.

**CONCLUSION**

For the foregoing reasons, this Court should affirm.

Case 4:26-cv-00073 Document 21 Filed 01/23/26 in TXSD Page 35 of 37

Respectfully submitted this 23rd day of January 2026.

/s/ *Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: gabriel.morgan@weil.com
clifford.carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Matthew S. Barr (*pro hac vice* forthcoming)
Sunny Singh (*pro hac vice* forthcoming)
Andriana Georgallas (*pro hac vice* forthcoming)
Kevin Bostel (*pro hac vice* forthcoming)
Robert B. Niles-Weed (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: matt.barr@weil.com
sunny.singh@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
robert.niles-weed@weil.com

*Attorneys for Appellees*

**Certificate of Compliance with Page Limit, Typeface Requirements, and Type-Style Requirements**

I hereby certify that the foregoing brief complies with the page limitation of Fed. R. Bankr. P. 8015(a)(7)(A) because this brief contains 25 pages, excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g).

This brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type style requirements of Fed. R. Bankr. P. 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: January 23, 2026

*/s/ Clifford W. Carlson*
Clifford W. Carlson

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 23, 2026, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system. In addition, a copy of the foregoing was served via electronic mail on the Appellant.

/s/ *Clifford W. Carlson*
Clifford W. Carlson

# Exhibit 3

**From:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Sent:** Tuesday, January 13, 2026 1:09 AM
**To:** Indelicato, Vincent; Koch, Matthew R.; Dale, Charles A.; Bettwy, Andrew; Andrew Parks; David Elsberg; Vivek Tata; Michael Duke; Garrett Gerber; Ella Epstein
**Cc:** Singh, Sunny; Bostel, Kevin; Carlson, Clifford; Findlay, Loren; Falk, Jessica; Rhine, Fredrick; Howard, Natalie; Project Overdrive Factoring Rx Associates
**Subject:** FBG - Proposed Order and Second Recon Report
**Attachments:** 2026-01-12 Notice [dckt 1312_1].pdf; Cash Mgmt Reporting - Dec 19 260108 BucketsvF.xlsb

**External Sender** - From: ("Winograd, Joshua" <Joshua.Winograd@weil.com>)
This message came from outside your organization.
Learn More

Proskauer and EBM team,

Please find attached a courtesy copy of the Debtors' proposed order, as filed at Docket No. 1312-1, which reflects an agreement between the Debtors and certain factors with respect to the hearing tomorrow. Also attached is the second reconciliation report that is referred to in the proposed order.

Best,

Weil

**Josh Winograd**
Associate

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
joshua.winograd@weil.com
+1 305 577 3186 Direct
+1 929 977 4936 Mobile
+1 305 374 7159 Fax

# Exhibit 4

**From:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Sent:** Wednesday, February 4, 2026 9:27 PM
**To:** Michael Duke
**Cc:** Andrew Parks; Ella Epstein; David Elsberg; Vivek Tata; Bostel, Kevin; Findlay, Loren
**Subject:** RE: FBG - Second Recon Report

**External Sender** - From: ("Winograd, Joshua" <Joshua.Winograd@weil.com>)
This message came from outside your organization.

Learn More

Hi Michael, confirming receipt. A&M is working on it.

Best,

Weil

**Josh Winograd**
Associate

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
joshua.winograd@weil.com
+1 305 577 3186 Direct
+1 929 977 4936 Mobile
+1 305 374 7159 Fax

---

**From:** Michael Duke <mduke@elsberglaw.com>
**Sent:** Wednesday, February 4, 2026 6:58 PM
**To:** Winograd, Joshua <Joshua.Winograd@weil.com>; Bostel, Kevin <Kevin.Bostel@weil.com>
**Cc:** Andrew Parks <aparks@elsberglaw.com>; Ella Epstein <eepstein@elsberglaw.com>; David Elsberg <delsberg@elsberglaw.com>; Vivek Tata <vtata@elsberglaw.com>
**Subject:** RE: FBG - Second Recon Report

Hi Kevin and Josh—we need to move this along. We are trying to resolve our rights to adequate protection without having to burden the Court, but if we do not have the information we requested, it becomes much more difficult. We plan to file a motion for adequate protection, consistent with the District Court's decision, if we do not have an agreement in place by this Friday. Thanks.

**Michael Duke**
Partner [Bio]

**ELSBERG BAKER & MARURI PLLC** [Web]
212.597.2605 (o)
901.870.6975 (m)
(he/him/his)

**From:** Ella Epstein <eepstein@elsberglaw.com>
**Sent:** Tuesday, February 3, 2026 2:47 PM
**To:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Cc:** Andrew Parks <aparks@elsberglaw.com>; Michael Duke <mduke@elsberglaw.com>
**Subject:** RE: FBG - Second Recon Report

Hi Josh, thank you. Can you please let us know when we should expect an update? Thanks!

**Ella Epstein**
Associate [Bio]

**ELSBERG BAKER & MARURI PLLC** [Web]
212.597.2611 (o)
347.472.2272 (m)
(she/her/hers)

**From:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Sent:** Monday, February 2, 2026 7:32 PM
**To:** Ella Epstein <eepstein@elsberglaw.com>
**Cc:** Andrew Parks <aparks@elsberglaw.com>
**Subject:** RE: FBG - Second Recon Report

Hi Ella, confirming receipt. We'll review and revert.

Weil

**Josh Winograd**
Associate

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
joshua.winograd@weil.com
+1 305 577 3186 Direct
+1 929 977 4936 Mobile
+1 305 374 7159 Fax

**From:** Ella Epstein <eepstein@elsberglaw.com>
**Sent:** Monday, February 2, 2026 5:25 PM
**To:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Cc:** Andrew Parks <aparks@elsberglaw.com>
**Subject:** RE: FBG - Second Recon Report

Hi Josh,

Thanks – we have previously received this report and need additional information beyond what it supplies.

First, this reconciliation report does not identify with specificity the debtors/suppliers which sold the receivables, as it uses abbreviations instead of legal names. For example:

- "Carter" could refer to Carter Fuel Systems, LLC or Carter Fuel Export, Inc, Carter Carburetor, LLC or Carter Carburetor Holdings, LLC.
- "Trico NA" could refer to Trico Technologies Corp., Trico Products Corp., or Trico Holding Corp.

- “Fram” could refer to FRAM Auto Holdings, LLC; Fram Group Operations LLC; or FRAM Group IP LLC.
- “BPI” could refer to Brake Parts Inc LLC, Brake Parts Inc India LLC, or Brake Parts Inc China LLC.

To resolve this ambiguity, would you please provide a key that specifies which legal entity each name in the debtor/seller column refers to? If the names in the debtor/seller column refer to multiple entities, if possible, could you please provide a breakdown of receivables by legal name?

Second, this report does not break out the balances in each category after giving effect to the distribution of $55 million – it merely shows the $55 million as a deduction to the overall amount without showing what categories of receivables were drawn down and without specifying what remains in each bucket. Can you please update the report accordingly?

Third, the report shows the amount in the factored receivables account as of December 19 – a month and a half ago. Can you update it to today’s date?

Thank you.

Best,
Ella

**Ella Epstein**
Associate [Bio]

**ELSBERG BAKER & MARURI PLLC** [Web]
212.597.2611 (o)
347.472.2272 (m)
(she/her/hers)

---

**From:** Winograd, Joshua <Joshua.Winograd@weil.com>
**Sent:** Monday, February 2, 2026 3:51 PM
**To:** Andrew Parks <aparks@elsberglaw.com>; Ella Epstein <eepstein@elsberglaw.com>
**Subject:** FBG - Second Recon Report

Drew, Ella,

I hope all is well. I understand from Kevin Bostel that Michael Duke requested a version of the second recon report that is easily sortable by debtor/supplier. Attached is the version we shared with you all on 1/13. Every tab besides the summary is organized by “Supplier Name”, which is the selling entity, and there’s an arrow in the title that allows further sorting.

Do you mind letting me know if there is further detail I’m missing? Happy to help with any issues.

Thank you,

Weil

**Josh Winograd**
Associate

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368

joshua.winograd@weil.com
+1 305 577 3186 Direct
+1 929 977 4936 Mobile
+1 305 374 7159 Fax

# Exhibit 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

| | |
|---|---|
| IN RE: | Case No. 25-90399 |
| | Chapter 11 |
| FIRST BRANDS GROUP, LLC, | |
| | 515 Rusk Street |
| | Houston, TX 77002 |
| Debtor. | |
| | Monday, December 22, 2025 |
| | 9:03 a.m. |

TRANSCRIPT OF ECF 807 MOTION OF DEBTORS FOR ORDER (I) ESTABLISHING THIRD-PARTY FACTORING PROCEDURES FOR (A) THE REVIEW AND RECONCILIATION OF THE DEBTORS' RECEIPTS, AND (B) THE RELEASE OF FUNDS TO THE DEBTORS ESTATES AND THE THIRD-PARTY FACTORS; (II) AUTHORIZING CUSTOMERS TO REMIT RECEIVABLES WITHOUT LIABILITY; AND (III) GRANTING RELATED RELIEF
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtor: | Weil Gotshal and Manges<br>By: CLIFFORD WILLIAM CARLSON, ESQ.<br>700 Louisiana Street, Suite 3700<br>Houston, TX 77002<br>(713) 546-5248 |
| | Weil Gotshal and Manges<br>By: SUNNY SINGH, ESQ.<br>KEVIN BOSTEL, ESQ.<br>LOREN FINDLAY, ESQ.<br>JESSICA L. FALK, ESQ.<br>767 5th Avenue<br>New York, NY 10153<br>(212) 310-8000 |

APPEARANCES CONTINUED.

| | |
|---|---|
| Audio Operator: | Yesenia Lila, ERO |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (Continued):

| | |
|---|---|
| For the Ad Hoc Group of Lenders: | Gibson Dunn & Crutcher LLP<br>By: ANNELYSE SCARLETT GAINS, ESQ.<br>1700 M St NW<br>Washington, DC 20036<br>(202) 955-8500 |
| For Evolution Credit Partners: | Proskauer Rose<br>By: VINCENT INDELICATO, ESQ.<br>Eleven Times Square<br>New York, NY 10036<br>(212) 969-3000 |
| | Elsberg Baker & Maruri PLLC<br>By: MICHAEL DUKE, ESQ.<br>DAVID ELSBERG, ESQ.<br>GARRETT GERBER, ESQ.<br>ELLA EPSTEIN, ESQ.<br>1290 Avenue of the Americas<br>Suite 4015<br>New York, NY 10104<br>(212) 390-9000 |
| For Onset Financial, Inc.: | Morrison & Foerster LLP<br>By: BRYAN KOTLIAR, ESQ.<br>250 W 55th Street<br>New York, NY 10019<br>(212) 468-8000 |
| | Morrison & Foerster LLP<br>By: BRIAN R. MICHAEL, ESQ.<br>Aon Center<br>707 Wilshire Blvd Suite 6000<br>Los Angeles, CA 90017<br>(213) 892-5200 |
| | Morrison & Foerster LLP<br>By: ANTHONY S. FIOTTO, ESQ.<br>200 Clarendon St Floor 20<br>Boston, MA 02116<br>(617) 648-4700 |
| For LKQ Corporation: | Connolly Gallagher LLP<br>By: CHRISTINA M. THOMPSON, ESQ.<br>1201 North Market Street, 20th Floor<br>Wilmington, DE 19801<br>(302) 884-6592 |

APPEARANCES (Continued):

| | |
|---|---|
| For BPP Shiraz Park A LP: | Singer & Levick, P.C.<br>By: WILLIAM DORWARD, ESQ.<br>16200 Addison Rd<br>Addison, TX 75001<br>(972) 380-5533 |
| For Raistone Capital, LLC; Raistone Purchasing LLC-Series XXXII, Raistone Purchasing LLC-Series XXVIII: | Orrick Herrington & Sutcliffe LLP<br>By: EMANUEL GRILLO, ESQ.<br>LAURA METZGER, ESQ.<br>51 W 52nd Street<br>New York, NY 10019<br>(212) 506-5000 |
| For Katsumi Servicing, LLC: | Mayer Brown LLP<br>By: CHARLES KELLEY, ESQ.<br>700 Louisiana Street<br>Houston, TX 77002<br>(713) 238-3000 |
| | Mayer Brown LLP<br>By: SEAN T. SCOTT, ESQ.<br>71 South Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600 |
| | Mayer Brown LLP<br>By: RICHARD A. STIEGLITZ, ESQ.<br>1221 6th Avenue<br>New York, NY 10020<br>(212) 506-2500 |
| For Carnaby II and III Secured Parties: | Dechert LLP<br>By: ALLAN BRILLIANT, ESQ.<br>1095 6th Avenue<br>New York, NY 10036<br>(212) 698-3500 |
| | Porter Hedges LLP<br>By: MEGAN YOUNG-JOHN, ESQ.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>(713) 226-6000 |
| For UMB Bank, N.A.: | Alston & Bird<br>By: STEPHEN BLANK, ESQ.<br>90 Park Avenue<br>New York, NY 10016<br>(212) 210-9400 |

APPEARANCES (Continued):

| | |
|---|---|
| For Bank of America: | Winston & Strawn LLP<br>By: DANIEL MCGUIRE, ESQ.<br>GREGORY GARTLAND, ESQ.<br>35 W Wacker Driver<br>Chicago, IL 60601<br>(312) 558-5600 |
| For ING Belgium S.A./N.V.: | Clifford Chance US LLP<br>By: DOUGLAS DEUTSCH, ESQ.<br>SARAH CAMPBELL, ESQ.<br>ANTHONY CANDIDO, ESQ.<br>KAITLYN BEYER, ESQ.<br>375 9th Avenue<br>New York, NY 10001<br>(212) 878-8000 |
| For ARC CGMARSC001, LLC and ARC CGLGNIN001, LLC: | Loeb & Loeb LLP<br>By: BETHANY D. SIMMONS, ESQ.<br>345 Park Avenue<br>New York, NY 10154<br>(212) 407-4000 |
| For Patrick James: | Quinn Emanuel Urquhart & Sullivan, LLP<br>By: JAMES C. TECCE, ESQ.<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7199 |
| For the Official Committee of Unsecured Creditors: | Brown Rudnick LLP<br>By: MICHAEL WINOGRAD, ESQ.<br>JASNOOR HUNDAL, ESQ.<br>BENNETT S. SILVERBERG, ESQ.<br>7 Times Square<br>New York, NY 10036<br>(212) 209-4917 |
| For FCA US LLC: | Dickinson Wright PLLC<br>By: ASHLEY JERICHO, ESQ.<br>2600 W Big Beaver Rd #300<br>Troy, MI 48084<br>(248) 433-7200 |
| For the Proposed Counsel to the Examiner: | Boies Schiller Flexner LLP<br>By: ROBERT GORDON, ESQ.<br>55 Hudson Yards, 20th Floor<br>New York, NY 10001<br>(212) 446-2372 |

APPEARANCES (Continued):

| | |
|---|---|
| For Polaris: | Barnes & Thornburg LLP<br>By: CONNIE A. LAHN, ESQ.<br>225 South 6th Street Suite 2800<br>Minneapolis, MN 55402<br>(612) 367-8706 |
| For the United States Trustee: | Office of the United States Trustee<br>By: JAYSON RUFF, ESQ.<br>VIANEY GARZA, ESQ.<br>515 Rusk Street, Ste. 3516<br>Houston, TX 77002<br>(713) 718-4650 |
| For AutoZone Parts, Inc.: | Baker Donelson<br>By: DANIEL FERRETTI, ESQ.<br>1301 McKinney St<br>Ste 3700<br>Houston, TX 77010<br>(713) 650-9700 |
| For Leucadia Asset Management LLC: | Wachtell, Lipton, Rosen & Katz<br>By: MICHAEL H. CASSEL, ESQ.<br>51 W 52nd Street<br>New York, NY 10019<br>(212) 403-1000 |
| | Vinson & Elkins<br>By: PAUL E. HEATH, ESQ.<br>845 Texas Avenue<br>Suite 4700<br>Houston, TX 77002<br>(713) 758-3313 |
| Also Present: | Grace Yeh<br>Matthew Kleissler<br>Sebastian Rayon<br>Adam Johnson<br>Bernadine Odom |

(Proceedings commence at 9:03 a.m.)

THE COURT: Good morning. This is Judge Lopez. Today is December 22nd. I'm going to call the 9 a.m. case, First Brands.

I'll take appearances in the courtroom. Anyone wish to make an appearance on the line, please hit "five star," and I will unmute your line.

Mr. Carlson, good morning.

MR. CARLSON: Good morning, Your Honor. Cliff Carlson of Weil Gotshal on behalf of the debtors. Joined with me is Sunny Singh, Kevin Bostel, Jessica Falk, and Loren Findlay.

THE COURT: Alrighty. Good morning.

MR. WINOGRAD: Good morning, Your Honor. Michael Winograd from Brown Rudnick on behalf of the committee. And with me is Bennett Silverberg, also from Brown Rudnick on behalf of the committee, Your Honor. Thank you.

THE COURT: Good morning.

MR. GRILLO: Good morning, Your Honor. Emanuel Grillo, Orrick, Herrington, & Sutcliffe on behalf of the Raistone Partnerships. A couple of my colleagues are on the phone as well.

THE COURT: Good morning

MR. CASSEL: Good morning, Your Honor. Michael Cassel, Wachtell, Lipton, Rosen & Katz for the Leucadia

parties.

THE COURT: Good morning.

MR. CASTLE: And I have Paul Heath with me in the courtroom from Vinson & Elkins.

THE COURT: Good morning.

MS. GAINS: Good morning, Your Honor. AnnElyse Gains of Gibson Dunn on behalf of the Ad Hoc Group of Lenders.

THE COURT: Good to see you. Good morning.

MS. YOUNG-JOHN: Good morning, Your Honor. Megan Young-John of Porter Hedges on behalf of the Carnaby II and III secured lenders.

THE COURT: Good morning.

MR. KELLEY: Good morning, Judge.

THE COURT: Good morning.

MR. KELLEY: How are you?

THE COURT: Well, I'm about to find out --

MR. KELLEY: Charles -- sorry. I'm sorry?

THE COURT: I said, you asked me how I'm doing. I said, we're going to find out.

MR. KELLEY: Hope you had a good weekend. Charles Kelley from Mayer Brown on behalf of Katsumi Servicing. I'm joined via video and on the calls by two of my colleagues, Sean Scott and Rich Stieglitz, both who are active in working on this matter with me. Good morning, Your Honor.

THE COURT: Good morning. All right. Let me unmute

Case 25-90999 Document 3180-15 Filed in TXSB on 01/19/26 Page 83 of 421



a few lines. Here's a 901 number.

MR. DUKE: Good morning, Your Honor. Michael Duke from Elsberg Baker & Maruri. I'm on with a couple of my colleagues, Garrett Gerber and David Elsberg as well, on behalf of the Evolution party.

THE COURT: Good morning. A 917 number.

MR. DUKE: Good morning.

MR. ELSBERG: Your Honor, David Elsberg from Elsberg Baker & Maruri. I just wanted to note that we also have a co-counsel, Vincent Indelicato, from Proskauer.

THE COURT: I see him there. Good morning. A 212 number.

MR. BLANK: Good morning, Your Honor. Stephen Blank, from Alston & Bird on behalf of the UMB, as agent -- as UMB, DIP agent.

THE COURT: Good morning. And a 312 number.

MR. DUKE: Good morning, Your Honor. Dan McGuire on behalf of Bank of America, the ABL agent.

THE COURT: Okay. Anyone else wish to make an appearance, please hit "five star," and I will unmute your line. Here's a 609 number.

MR. GERBER: Garrett Gerber from Elsberg Baker & Maruri. My colleagues, Mr. Duke and Mr. Elsberg, have already introduced me --

THE COURT: Good morning.

MR. GERBER: -- for Evolution.

THE COURT: Good morning. A 347 number.

MR. DEUTSCH: Good morning, Your Honor. Doug Deutsch from Clifford Chance on behalf of ING Belgium Bank.

THE COURT: Okay. Good morning. Okay. For the lines who -- that I have unmuted, I ask that you just monitor yourselves. Keep yourselves on mute until it's time to address the Court, just so we can all hear each other.

I'll turn things over to the debtors, and you tell me where we are.

Mr. Singh, good morning.

MR. SINGH: Good morning, Your Honor. Sunny Singh, Weil Gotshal, on behalf of the debtors. Your Honor, we have one matter before you today. It's the debtor's request for approval of procedures related to the release of funds that we've been maintaining in our segregated account. I refer to these as the trapped funds.

A lot of paper filed, including overnight, Your Honor. So maybe I'll start with the status of just where we are, what's going forward for today, what's been adjourned.

And I'm pleased to report, Your Honor, that generally speaking, we've got agreement with the factoring counterparties with the exception of Evolution. But I'll get into that in my opening remarks, and then we can address the Evolution objection.

So, Your Honor, if you'll recall, in connection with our DIP motion and cash collateral motion, the debtors had agreed to segregate prepetition account receivables pending further order of this Court. And that was really, at the time, done to allow us to address the issues that were being raised by our third-party factoring counterparties as to, you know, they may have purchased some of these receivables.

So what we did was we froze all the cash other than post-petition receivables, which, you know, we've been able to use. So the prepetition had been sitting there.

And since that time, the debtors, led by A&M and Weil under the direction of our special committee, we've been working on the reconciliation of those dollars and the receipts and information, as well as investigating generally the debtors' prepetition third-party factoring programs.

And unfortunately, Your Honor, as has been previously reported, and as I think you know, what we've learned is that the prepetition factoring program was largely fabricated and falsified. The vast majority of the factored amounts don't really tie to any of the actual invoices on the company's books and records. But in any case, we've been reviewing that information.

A&M has, led by Mr. Jerneycic, and providing that information to the UCC, in particular the M3 team on behalf of the creditors' committee to help us, you know, take a look at

this information and provide feedback. We've been providing the information as well to the third-party factors themselves and had a number of meetings and helpful conversations with them to try to sift through the information.

Your Honor, on December 1, we filed our motion for approval of procedures to try to untrap these trapped funds and kind of go through a process. And on the 12th of December, we supplemented that motion.

That supplement included basically two things. We asked Your Honor, in that supplement, to release the segregated cash that we had identified in our first reconciliation report. We sent out that report to the factoring counterparties, as well as the UCC. That totaled about $109 million that was trapped that we, you know, wanted to kick off the procedures.

And number two, we asked for the Court to consider the approval of the procedures and the release of that 109 million on an emergency basis, requesting this hearing, which Your Honor authorized.

So since the supplement's been filed, we've continued to work with our stakeholders, including the factoring counterparties, to try to limit the issues for today's hearing. And as I said, you know, very pleased to report that with the exception of Evolution, which I'll talk about a little bit more, you know, we've agreed on a form of order with the other factoring counterparties. That form of order was uploaded on

the docket yesterday, Your Honor. I think you should have a copy of that.

Basically, through this resolution, the factoring counterparties, again, with the exception of Evolution, do not oppose the debtor's access to what is about $63 million, subject to the terms and conditions of the order, of course. And I'll explain how I get to that 63.

But basically, the balance of the motion as supplemented, right, so approval of the actual procedures themselves and the difference of the amounts in our first report and the 63 -- or what will be released, if Your Honor grants today's motion, is what is being deferred.

And we -- the debtors, intend to come back at a hearing in January. I think we have January 9th tentatively scheduled. It won't be earlier than January 9th, and we're going to work out with the parties when the date will be. And where we will request the debtor's approval of the procedures, release of the remaining funds in our first reconciliation report, and everybody's rights are reserved. They can argue whatever they want with respect to that hearing.

Of course, we're going to try to work constructively with all the counterparties to see if we can, again, try to come up with a resolution and see if we can minimize issues that we have to dispute or fight about.

Your Honor, there's -- what we did with that 109,

just to give you a sense of what, you know, some of the terminology you might hear, and that's referred to in the agreed order in some of the papers. You can kind of split that 109 into four categories. Category 1, you know, those are invoices that were dated September 12th, 2025 forward. And that is a period of time when the debtors stopped factoring altogether, third-party factoring, right? The debtors at that point, the special -- it was shortly before the filing, special committee had been appointed, A&M had been appointed. And once we learned of the factoring irregularities, we immediately stopped any further factoring. And so that's about $43 million, Your Honor, that sort of is in that category.

Category 2 is invoices that were dated prior to September 12th, 2025, for customers that were not identified on any of the factoring receivable that were provided by third-party factors. So they were customers that none of the third-party factors actually purchased receipts for, right? That's about another $25 million.

And then you get to Category 3 and 4, which are basically funds not in those amounts. They were factored pre-September 12th, 2025, and did relate to customers that one or more of the factoring counterparties purchased. So it's that Category 3 and 4 that were sort of kicking for the future hearing. And really Category 1 and 2, which I think, you know, somewhat low-hanging fruit, Your Honor, in terms of, you know,

clearly this could not have been factoring cash, that I think, you know, pleased to report that the factoring counterparties, again, with the exception of Evolution, have agreed with us. And so that's what we're really going forward with respect to today.

And so the other thing I would note, Your Honor, some of the factoring counterparties had requested additional time to diligence some Walmart-related invoices. And so we're okay with that. We're going to -- even though they may have been in Category 1 or 2, we're okay to put that aside. It's about another $5 million, Your Honor. And that gets me to roughly $63 million that we're asking to be released today.

What I will mention, Your Honor, is we're going to -- even on the 63, the UCC, we're working with M3 daily. They had some questions as early as this morning. We're going to have everybody take another look, make sure that we're comfortable with Category 1 and 2. And so the amount may go down slightly, but it's not going to go up, obviously. We're going to ask for Your Honor to enter the order.

But I just -- we want to make sure people are comfortable with what's going out and what's not going out. And so we're happy to do that afterwards, including to address some of the questions that were raised by the M3 team. Again, trying to do this, Your Honor, as consensual as possible from our perspective.

So that's where we are today. We're really just going forward with respect to the release of Category 1 and 2. Evolution is objecting to the release of even that cash. And that's where we are today.

Your Honor, we filed a reply last night. Again, I -- or not again, first time, I really do apologize. It was a late filing. You know, but Evolution filed their papers Friday evening. I'm not faulting or picking on them for that. And we thought, Your Honor, it's a very technical argument. We thought it'd be better for us to have something written to give you a chance to at least see what we have on paper rather than me try to do it orally.

So, you know, with that, Your Honor, that's where we are today. I'm prepared to address the Evolution objection. I think at this point, it might be helpful -- I don't know if other parties intend to say something, or how Your Honor moves forward. I have evidence we'd like to introduce before the Evolution objection, and I'll have some remarks with respect to Evolution. And then obviously, they'll want to be heard themselves.

THE COURT: Okay. Let me just -- just give me one second. And so if approved today, just the cash that would be released would become DIP collateral. And will it be used between now and the next hearing day?

MR. SINGH: I expect it will be, Your Honor.

THE COURT: Can you connect the dots between the DIP, the funds that were released in connection with the DIP, and then the need for additional funds --

MR. SINGH: Sure.

THE COURT: --now.

MR. SINGH: Sure, Your Honor. So basically, if you -- the DIP proceeds that came in, we're allowed to use those. You know, these additional funds were contemplated to be used as part of the DIP budget. We haven't accessed them. So both combined were sort of the debtor's operating cash. And so the DIP sort of -- I have to double-check with Mr. Jerneycic, but I think we're down to our last DIP draw or second DIP draw. We're getting pretty close. And so these funds are critical for us to continue to operate basically through the end of January in order to get these, and frankly, the next slug that will be back sometime during January.

And so that's the dots, you know, sort of connecting the dots. It's -- we're sort of at a point, as reflected in our emergency motion, where we can't sit with these funds sitting to the sideline anymore without them having a negative impact on the debtor's operations. And so that's why we were okay to narrow it and do it in two pieces because we're not going to spend necessarily, you know, the full 109, should Your Honor have granted that relief between now and the next January, but we can do it in two steps and manage in a way that

works. And so that's the idea, Your Honor.

Plus, you know, it's important. You know, there is a narrative with our customers and vendors that they're not seeing our access to cash. We believe this cash is ours. And so from an operational perspective, getting access to this cash will reinforce to our counterparties that we actually have the funds we need to operate over the next, you know, few weeks, months, et cetera.

So that's part of the issue, Your Honor. A big part, I should say. You know, we need to reinforce the stability of the business here. And so that's where we're going forward. And so yeah, that's the way I connect the dots, Your Honor.

THE COURT: Got it. Okay. Thank you.

MR. SINGH: Okay. So should I wait to -- should I let other parties?

THE COURT: Yeah, yeah.

MR. SINGH: I think they want to be heard before we go to evidence.

THE COURT: If anyone wishes to address the Court. And then, yeah, let me -- and just so the -- before we get into the evidence, just let me just hear preliminarily from any other party. And then Evolution, I'm going to ask that you go last. So I'm going to just allow everyone that wishes to speak kind of in support or based on the agreement and then let Evolution go last so I can kind of hear their perspective.

Thank you.

MR. SINGH: Sounds good, Your Honor. Okay. Thank you.

MR. KELLEY: Your Honor, I think the factor community is what -- is coming up next.

THE COURT: Ah, perfect.

MR. KELLEY: So the next few of us are the factors.

THE COURT: Perfect.

MR. KELLEY: Your Honor, again, for the record, Charles Kelly on behalf of Katsumi Servicing. I always struggle when I hear someone characterize what we think and what we believe, which I heard Mr. Singh do from the podium. I want to be very clear. This order is a limited procedural order. It's not a substantive one.

Our objection is on file. We stand by every objection that's still within there and we may supplement with additional. The core of it, as you probably read, was that we insist that these matters should be dealt with by an adversary proceeding.

We all have claims to this money, even those that the estate has been somewhat dismissive about, notwithstanding that those claims have to be resolved in the adversary. We have served 2004s, so we have made requests for production on the debtor. To say that the debtor's cooperation in producing materials is -- suffices would be a far stretch. It's been

inadequate by all stretch. We put that in our objection.

We find ourselves going into a hearing that should be an adversary where the procedural protections of an adversary of discovery, the ability to produce information is critical. We've heard the debtors characterize to this Court many times about the what occurred prepetition with prepetition management based on work of Alvarez & Marsal. We take issue with a lot of it.

And to be clear, the debtors aren't claiming they can prove it from their records. What they say is we've gone to look and we can't find things. It's not a question of the debtors being able to affirmatively meet their burden of proof. It's a question of the debtor saying what they're unable to locate.

That is a problem for us for a number of reasons. Parties often characterize the purchase of receivables as sort of a singular transaction. They're anything but that. They're complicated. And when you look at how these transactions operate, there are claims these receivable counterparties have to what was characterized, whether correctly or incorrectly, by debtors and their poor records, which this Court has heard significant information about on day one and what we call day two, the final hearings, about the debtor's lack of adequate records.

We have also learned a lot about what has not been

done by the debtor's professionals to reach these conclusions. Those are issues this Court deserves to hear about, and we believe the Court deserves to hear about them in the form of an adversary proceeding.

We are not alone. You've probably seen multiple objections by the various parties who contend that is the case. Notwithstanding the limited discovery, we did conduct a thorough deposition of Mr. Jerneycic, who we understood might be a witness. We learned a couple things at that deposition, such as what Mr. Singh referred to, the debtor's dire straits for cash, which they need by January 2nd. These are issues that caused the parties to try to broker a compromise with the absolute preservation of all of our rights. We waived nothing.

I heard the Court's question to Mr. Singh talking about whether or not the debtor's DIP liens attach. Whatever the debtor's -- DIP lender's rights attached to the cash that come out of here, our rights still continue to attach to them. The debtors may take the cash. They may use it. They're not required to keep them in this segregated account.

But if the production of discovery from debtors does not improve, we have a 45-day period to file objections to that use of cash. I imagine there's going to be an onslaught of objections if we don't have adequate information. That's why one of the key features in this order is we want this Court, and begging the Court's indulgence, I don't want to ever tell

you what to do. We would like a status conference 30 days roughly from the entry of this so we can discuss a number of things, not the least of which is the status of discovery. That is baked into the order with a blank for Your Honor to put it in there.

There are other components of the order we wish that, you know, greater attention had paid to. For example, we don't have an agreement if the Court intends to schedule a hearing -- their hearing on this the week of January 2nd through January 9th. We had to move things around. A number of us did, and that week is no longer available. I think the debtors in drafting said the hearing couldn't be scheduled any earlier than January 9th. The 9th is a Friday. Just to avoid any misconstruction of that language, it cannot be the 9th if -- in order to continue to have the party's agreement for that. There's been some pretty absolute disclosures of that to the debtors. I think that may have been a drafting error.

But in any event, that can be dealt with by when the Court sets the hearing the debtors are requesting on their motion. To be clear, we don't agree the hearing should be set other than they get the right to have the hearing date and set it with Your Honor because we think it should be an adversary proceeding.

We also intend to challenge, as we get adequate discovery, what Mr. Singh called Buckets 1 and 2, unless we can

get adequate information to satisfy ourselves.

At this point in time, A&M's conclusions are largely unchecked, and the parties here have hired substantial and respected financial advisors to try to help us get answers there. Katsumi has hired AlixPartners, Your Honor, in case there's any concern about who we're bringing to bear to look at these issues. I know that, for example, the Leucadia parties have hired BRG. These are parties who are struggling to get the requisite information to be able to validate what the debtors are saying.

This hearing should not have gone forward with these kinds of issues, but we elected before the holidays not to burden Your Honor with robust discovery hearings. We're trying to stretch things out to see if the debtors can improve the tables on what they're producing.

A couple things I'd like to be clear about, too. The procedures that apply to Buckets 1 and 2, the money that's going to go out now, was intended to allow us to continue to assert every claim we have. The order has, with a bunch of lawyers on here you might imagine, very robust protections of other receivable counterparty's rights. It's all embedded in the order.

THE COURT: How do you read the order? What do you construe the order does what -- in terms of protection of rights?

MR. KELLEY: It does give us certain administrative claims. It gives us rights against the remaining funds that remain in the account, notwithstanding the monies that are coming out. In other words, debtors contend not all the monies that remain in the account belong to the receivables counterparties.

Again, while we don't necessarily have the ability to validate that, we hope there is excess funds there. And to the extent we have rights against Buckets 1 and 2, and would prove that to Your Honor in an adversary proceeding, we would expect the money to come there. We also have put in language that allows us to go against the administrative claims bucket that's been reserved under the DIP.

So we believe those protections are afforded in there. But to be honest, Your Honor, this was an effort by the receivables parties not to blow anything up, but to try to accommodate what appeared to be needs of the estate. We thought given their cash constraints, we didn't want form over substance arguments that, gee, the procedural requirements of an adversary would prevent them from getting much needed cash.

So this was, I will honestly say, an attempt by the receivables counterparties to be constructive, to allow the debtors to live another day. But at the same point in time, we are not any less focused on our rights in and against that cash.

I read some of the replies that were filed this morning, and I've seen some characterizations of the parties' positions. We have interests in the cash that's going out the door, whether it's ours outright by virtue of a sale or by the backstop liens that these parties have filed to protect the true sale nature of their claims. We still have claims, and we're prepared to vigorously defend those, including we've properly filed UCC-1s as required for sales, which also establish a number of rights we possess. And we're prepared to do that, Your Honor, but what we really want is to try to get the financial advisors to take a look at this and see if there's a lot we can do to avoid burdening the Court.

So I wanted the Court to see a little bit of our intent and our mindset, and that's the purpose of why I stood up to speak today, Your Honor.

THE COURT: Thank you.

MR. KELLEY: Thank you for allowing me the opportunity.

MR. CASSEL: Good morning, again, Your Honor. Michael Cassel, Wachtell Lipton, for the Leucadia parties. Over the weekend, we filed an objection to the factoring procedures motion. That was at Dockets 1740 through 1742.

As Your Honor heard from Mr. Singh, we've worked constructively with the debtors and with the other factoring counterparties to try to narrow the disputes for the purposes

of today's hearing, and which will hopefully narrow the disputes going forward at future hearings.

As we explained in our papers, particularly the declaration of Mr. Dery of BRG, we think that the debtor's method to determine ownership of the receivables is flawed. Their method abounds to just comparing invoice numbers between one and the other, and if those don't match, then the debtor's on the money. We disagree with that.

We also disagree with the buckets the debtors have laid out. We're not so sure it's clear under New York law, which applies to our agreement, that this date range --

THE COURT: Are you referring to the old 1, 2, 3, 4, 5, or are you referring to the current 1, 2, 3, 4?

MR. CASSEL: I'm referring to the buckets Mr. Singh said about the -- Mr. Singh laid out today about the September 12th to the 28th period.

THE COURT: Ah, yep, yep, yeah, yep.

MR. CASSEL: We don't think New York law is so clear to write about that, and that's one of the reasons why we have this Walmart set aside, which is the substantial --

THE COURT: Oh.

MR. CASSEL: -- bulk of our September 12th to 28th receivables. And we also think that, as Mr. Kelley noted, we do think this needs to be an adversary proceeding after real factual development on the connections between the debtor's

records and the real receivables.

At the core of today's resolution is that all of those issues, both the merits issues and the procedural points, are meant to be fully preserved. That was the deal, was that we'd be entitled to be heard on the adversary proceeding issue. We'd be entitled to be heard on these merits points at a future hearing, and we can at least get through today.

Hopefully, we can use the next few weeks to make some progress on the fact development front. As you heard from Mr. Kelley, the debtors at the moment really don't know. They just don't know how they did their fraud. They don't know how they fabricated receivables. They don't know who manipulated the spreadsheets. And hopefully, over the next few weeks, we can make some real progress on that front.

And hopefully, when we do have disputes, Your Honor, we can tee them up in an organized way and with a real record instead of a bunch of I don't knows.

So unless Your Honor has any further questions.

THE COURT: Thank you.

MR. CASSEL: Thanks.

THE COURT: Before I forget, and I don't want to -- this is unrelated, but I did notice that the Office of the United States Trustee identified who they want as the examiner. To the extent parties have any comment on the proposed examiner or wish to say anything, I'd ask that you please file it. I'll

get some notice out by December 30th. I know that there's a hearing scheduled on the 9th, but if there's some concerns, I'd like to know sooner rather than later about kind of -- and maybe there are, and may -- just I want to make sure that there's due process and that parties have opportunity for notice on that. But I would certainly appreciate kind of hearing anything around that time just so that we can all kind of have an open discussion about it.

THE COURT: So please, go ahead.

MR. GRILLO: Sure. Thank you, Your Honor. Again, Emanuel Grillo, and Your Honor just kind of stole my thunder. I was trying to say something different than what everyone else has said to this point, and I was going to talk to the examiner for just a moment because, obviously, based on Mr. Cassel's remarks, you know, that's a component of what it is that gets wrapped up into all of this at the end of the day.

On behalf of Raistone Purchasing as well, we have the same objections. We worked with the parties over the weekend to effectively strike a balance, really. That's what's occurred between, I think, you know, last week and this week. And I think everybody, including Raistone, is reserving all of our rights. You know, the hearing is being pushed out. So this way, you know, if there are more objections to be filed, including ours, we'll do that.

But the bottom line is I just want to spend one more

Case 25-90999 Document 399-10 Filed in TXSB on 02/09/26 Page 29 of 121



minute on understanding sort of the balancing because I think this was the question that Your Honor raised, right? So this cash there's being distributed out, approximately 63 million or so, give or take. And, you know, we're not, I think, as my colleagues have said, giving up our rights even to challenge that. But what we did do is say, okay, well, if you take those funds, we do need potentially an administrative expense claim in the event that the remaining funds are not sufficient.

So if there's a mistake, right, no one's waiving their rights to challenge any part of the 63 million that is being put out. But if there is a mistake that we all agree on, it could be a $5 mistake, it could be a $5 million mistake, it'll go first to the remaining funds in the segregated account in the first instance, right? That'll be the first form of relief.

And then as the parties indicated, the second form of relief would be an administrative expense claim. So I think where we all got comfortable as factors or representing factoring parties in the first instance is because we had some backup. It wasn't -- even though this money is being turned over, we're not giving up anything with respect to our ability to challenge, you know, whether those funds were ours or not. We're saying, though, we understand you need that money. We understand that there's a high probability -- a higher probability, I should say, that there -- you know, you'll have

access and rights to those funds. We're not conceding that yet, but we do have something in place to protect the factors if something has to change.

And also, frankly, to protect the estates, right? They get access to the money today. There's still more in the pot, obviously, to pull from. And then also, there's the potential for an administrative expense claim.

So the bottom line is, as everyone has said, we continue to look at these issues. We're probably going to continue to litigate them. Everyone's got the same views about what the right way to litigate these issues are, as well as the substance, right? So we've got legal issues and structural issues that we're all going to have to work out over some period of time. But this is the balance, I think, that's been struck between the factors on the one hand and the estates on the other hand.

I think it's a good deal for the moment in order to be able to get through this, get the debtors some of the money, and then to protect the parties in the event that there was a mistake that was made.

THE COURT: Thank you.

MS. YOUNG-JOHN: Good morning, again, Your Honor. Megan Young-John of Porter Hedges on behalf of the Carnaby II and III secured parties. I rise really today just in defense of the January 9th dates. We do have our motion for relief

from stay and motion to dismiss also scheduled for that day.

It sounds like for Mr. Kelley that that may be an obsolete thing that I'm raising right now. But to advise the Court, we anticipate that that's going to be a full-day hearing. We currently have five witnesses scheduled for that date. So to the extent at all possible, we would request --

THE COURT: And it's on your motion to lift the stay.

MS. YOUNG-JOHN: As to the Carnaby debtors.

THE COURT: And then the motion to dismiss the Carnaby debtors.

MS. YOUNG-JOHN: The Carnaby debtors.

THE COURT: Okay. Okay. And do the Carnaby debtors claim a right to any cash of which is subject to --

MS. YOUNG-JOHN: No, we didn't file an objection today. We don't think that we're implicated by the factoring motion today. I'm simply --

THE COURT: Are you implicated by any of the cash?

MS. YOUNG-JOHN: I'm sorry?

THE COURT: Is your client affected by any of the allegations?

MS. YOUNG-JOHN: Regarding the full DIP in cash?

THE COURT: Mm-hmm.

MS. YOUNG-JOHN: Yes. And we've negotiated reservations of rights in all the relevant orders to date.

THE COURT: So you all want to go forward on a motion

to lift the stay in light of everything that I don't know?

MS. YOUNG-JOHN: In light of everything that you don't know?

THE COURT: That none of us know?

MS. YOUNG-JOHN: I don't have authority to move that date.

THE COURT: Oh, I'm not asking that. I'm just making sure. But essentially, you all are asking to lift the stay to go proceed against something of which none of us know what exactly and who belongs to what. I get -- I understand you want to dismiss the cases. I get that part.

MS. YOUNG-JOHN: Yeah.

THE COURT: I don't understand the motion to lift stay. But you can certainly have the right to do it. I'm just -- and I'm not saying you won't win. What I am saying is I just need to understand how much clarity you all have that if the stay gets lifted, that it doesn't belong to anyone else other than the Carnaby parties.

MS. YOUNG-JOHN: Right. Well, I think that's part of our arguments is that they're -- the Carnaby debtors are special purpose vehicles. We should be the only collateralized secured party for those debtors. And so that's part of the basis of the motion to dismiss and kind of as a fallback, the lift stay motion.

THE COURT: Okay.

MS. YOUNG-JOHN: But really, I just rise to defend --

THE COURT: Yeah, but you --

MS. YOUNG-JOHN: -- kind of defend that date as far as we expect that to go.

THE COURT: But your point is regardless of what happens here, you all have a full day scheduled on January 9th. So I think you probably need to pick another date is what you're telling me.

MS. YOUNG-JOHN: That's what I'm hoping.

THE COURT: You got it.

MS. YOUNG-JOHN: Thank you, Your Honor.

THE COURT: Got it. No, that makes sense. That makes sense. Because you all are going forward on your motions and you want to be able to have your full opportunity. And this seems like it would not -- you can't -- you couldn't get done all in one day.

MS. YOUNG-JOHN: That's correct.

THE COURT: Okay. That makes sense to me. Thank you.

MS. YOUNG-JOHN: Thank you.

MS. GAINS: Your Honor, for the record, AnnElyse Gains of Gibson Dunn on behalf of the Ad Hoc Group of Lenders. I'm not going to reiterate. We filed a short joinder last night. It's Docket Number 1055.

I saw you had a question about the DIP collateral.

So I just wanted to raise one point from the DIP lender perspective. We believe that the order, the proposed order that the debtors filed last night, we're supportive of you entering that order. We believe it coexists with the DIP order, but both align. The DIP order is a shared collateral order between ABL priority collateral and Term 1 priority collateral. The receivables at issue today are ABL priority collateral. So the DIP takes liens where it does under the final DIP order, depending on the various adjudication.

So from our perspective, these orders work in tandem and the reservation of rights that the parties have to, you know, the challenge deadline, all of that, we agree that those are preserved. But we fully support the debtors' use of this cash. We came into these cases. We agree that there could be a segregation.

But now we want to make sure that the debtors have the ability to fund these cases through that cash instead of continuing to have them segregated while parties work through all of the legal issues because they do have the corresponding remedies. I think the factoring counterparties talked about that. I won't reiterate. They are protections, but that is why the ad hoc group is supportive of the proposed order. So unless you have any questions for me, I'll --

THE COURT: No, no, that makes perfect sense. Your point is that the DIP liens are what they are and --

MS. GAINS: Correct.

THE COURT: -- they're attached to what they attach to.

MS. GAINS: Correct.

THE COURT: So you think that these orders just kind of work in tandem?

MS. GAINS: That's exactly right.

THE COURT: Yeah, I got it. Thank you.

MS. GAINS: Perfect. Thank you.

MR. WINOGRAD: Good morning, Your Honor. Michael Winograd from Brown Rudnick on behalf of the committee.

THE COURT: Good morning.

MR. WINOGRAD: Your Honor, I just wanted to point out that the committee supports the relief requested. There's obviously a need for cash in the short term. And our professionals, M3, have worked closely with the debtors. They continue to work with them. They've gotten the information that they've requested, in particular on cash receipts.

And we agree that the use of Category 1 and 2, as Mr. Singh described, so either cash that was obtained after the factoring stopped or cash that was received before the factoring stopped, but with respect to customers that are not on the factoring lists, we agree that that's appropriate to use that. We've been working with the debtors to confirm their actual numbers, and we're pretty close on that $63 million. We

expect to get there on a number by the end of the day.

And M3 is here. They're available to help, and as I said, they have been working with the debtors and will continue to do so to make sure that we get this right, Your Honor.

THE COURT: Thank you.

MR. WINOGRAD: Thank you, Your Honor.

THE COURT: Anyone on the line wish to be heard?

MR. MCGUIRE: Yes, Your Honor. Yeah, this is Dan McGuire with Winston and Strawn on behalf of Bank of America, Your Honor.

THE COURT: Yes.

MR. MCGUIRE: Very briefly, Your Honor, just want to say that the ABL agent also supports the release of this cash. We are the party with the actual first lien on these proceeds, and we recognize and agree that the debtor has a need for this cash to fund these cases. They've narrowed this down to the cash that is, you know, clearly identified and appropriate at this point to be used, and we fully support the granting of relief here today, Your Honor. We think it's critical to keep these companies funded and keep them operating in the ordinary course.

THE COURT: Thank you. Does anyone else who supports the relief request that wish to be heard?

Okay. Let me hear from Evolution.

MR. ELSBERG: Thank you, Your Honor. This is David

Elsberg from Elsberg, Baker, and Maruri. And as I mentioned earlier, I'm here with my colleagues Michael Duke and Garrett Gerber, and also we have co-counsel Vincent Indelicato from Proskauer. If Your Honor permits, Mr. Duke, Mr. Gerber, and I will be dividing up the argument.

And before diving in, I'll just give Your Honor a roadmap of how we plan to divide it up and where we plan to go. Your Honor, Evolution has a $60.5 million claim. It paid about $60.5 million to eight debtors who sold or purported to sell receivables to Evolution, and I'll refer to those eight debtors as the sellers.

First, Your Honor, I'll briefly demonstrate that Evolution has a lien and security interest in all of the receivables held by the sellers, and I'll refer to that -- those receivables as Evolution's collateral.

THE COURT: Okay.

MR. ELSBERG: Then my associate, Garrett Gerber, will demonstrate that Evolution filed UCCs that perfected its security interest in Evolution's collateral. My colleague, Mike Duke, will then demonstrate that the debtors do not, in fact, have a security interest in Evolution's collateral. And finally, Mr. Gerber will demonstrate that even if the debtors did have priority, and they don't, their motion should still be denied because while the debtors have asserted that nothing will be left for Evolution after the other creditors are paid,

Case 25-90999 Document 39-2 Filed in TXSB on 01/09/26 Page 38 of 121



that's a hotly contested issue that the debtors would need to try to prove at a valuation hearing under Section 507(a).

Your Honor, with that in place, I'd ask --

THE COURT: Well, let me ask you, what is the ask today, just to outright deny the relief requested?

MR. ELSBERG: Your Honor, no. The remedy that we're seeking is adequate assurance. And what we want is at a minimum $60.5 million of cash collateral should be maintained in the factor receivables account. And the debtors should be fashioning --

THE COURT: But they're asking me for 63. That's what I'm saying. So I'm trying to figure out what the ask is. In other words, you're asking that the debtor be allowed to use 3 million and then not the 60? Is that what you're saying?

MR. ELSBERG: Yes, whatever the remainder, but the 60.5 million should be kept in the factor receivables account, and the debtors should be fashioning adequate protection acceptable to Evolution, which they refuse to do. And also, Your Honor, I would say that we agree with the --

THE COURT: And again, I'm still not clear. In other words, is the adequate protection the withholding of the 60 million? So essentially, you're asking for denial of the motion.

MR. ELSBERG: Essentially, yes, Your Honor.

THE COURT: Okay. You said no earlier, and you said

no, but just tell them to hold back 60 of the 63 that they want to use. So -- but how do I then -- just so -- I get the ask, how do I reconcile the Evolution position with everyone else who's saying that they have probably equal right to that cash and no one is -- in other words, what makes your position superior, if at all, to the lien --

MR. ELSBERG: Yeah, that --

THE COURT: -- than anyone else's disposition?

MR. ELSBERG: Yeah, that's what I'd like to explain. I think that we may have different language in our contract, which I'd like to go through with Your Honor.

THE COURT: Got it. You want to walk through it. And is your language subject to 552(b), 552 of the bankruptcy code? I didn't hear any argument on that. I just -- as the roadmap kicks in, I want to make sure parties at least answer my question. At least -- I just want to make sure I understand, because it feels like an after-acquired clause and makes me have to start thinking about 552 of the Code. And I just need to make sure that at least the debtors and other parties start thinking about that provision as we think about it, because I got it. There's some prepetition kind of receivable collectibles. And then there are some that I think were collected post-petition.

And if you're asserting a lien on that, then I need to obviously --

MR. ELSBERG: Yeah.

THE COURT: -- go to the UCC and then understand how 552 may or may not apply to it. It's just a thought. I didn't see anyone talk about it. But I want to make sure that I understood kind of how the parties were thinking about this in connection with the roadmap. And that's a debtor question. And that's an Evolution question as well.

But in other words, if I understand the ask, it's that adequate protection has to be the full amount, the full 60 million, because you think you have a lien on the full 60 million. And so adequate --

MR. ELSBERG: Yes. Yes, Your Honor.

THE COURT: -- protection would mean that, the full 60 -- so it's --

MR. ELSBERG: Yes.

THE COURT: -- essentially an up or down bill for me today. I can do that.

MR. ELSBERG: Okay. And, Your Honor, this is -- these were applied prepetition. We're not talking about post-petition.

THE COURT: Everything that's been trapped is prepetition?

MR. ELSBERG: Yes. So we only have an interest in prepetition receivables.

THE COURT: But in other words, is the cash that is

going to be released, is there any post-petition trapped cash?

MR. SINGH: Your Honor, just to clarify, these are cash that relates to prepetition receivables that were received post-petition. So the --

THE COURT: Got it.

MR. SINGH: -- receivable was prepetition. The cash came in post-petition.

THE COURT: Right. But in other words, if the -- okay. Okay.

MR. SINGH: Does that make sense, Your Honor?

THE COURT: Yeah.

MR. SINGH: Post --

THE COURT: Yeah.

MR. SINGH: If we generated a post-petition receivable --

THE COURT: Then 552 may kick in. But --

MR. SINGH: Well, and we're just using that, because clearly we weren't factoring. So they're not -- I believe nobody's raising an issue.

THE COURT: Got it. So this is all kind of --

MR. SINGH: I think it's a --

THE COURT: -- you know, with some prepetition receivables that were received post-petition. And --

MR. SINGH: So it would be a product of --

THE COURT: Got it.

Case 25-90999 Document 3989-10 Filed in TXSB on 02/09/26 Page 116 of 421



MR. SINGH: -- the prepetition --

THE COURT: Got it, got it.

MR. SINGH: -- proceeds --

THE COURT: Got it.

MR. SINGH: -- of the prepetition receivable.

THE COURT: Got it. Got it. Because you stopped factoring. Well, but you had -- okay. That clarifies things for me a little bit.

MR. SINGH: Yeah.

THE COURT: That's helpful.

MR. SINGH: Sure.

THE COURT: I know you're all still doing business post-petition, and I couldn't tell whether Evolution was claiming a lien on some of the post-petition receivables as well, and whether that was some of the cash that was intended --

MR. SINGH: No, I mean --

THE COURT: -- subject to the trap kind.

MR. SINGH: No, my understanding is that they are only claiming a lien on prepetition accounts receivable that have still since been collected post-petition.

THE COURT: Post-petition that's been trapped.

MR. SINGH: That's been -- that we've segregated in the account. Correct.

THE COURT: Got it. Okay.

MR. KELLEY: If it's helpful, Your Honor, some of these receivables have payment terms that run anywhere from 45 days up to 12 months.

THE COURT: To 12 months, right?

MR. KELLEY: Yeah.

THE COURT: Yeah. Okay. Got it. Okay. No, no, that's helpful. So we don't have to deal with that. We can just -- I would say a lot -- okay.

MR. ELSBERG: And if I may, Your Honor, just to clarify, my understanding is that what the debtors are trying to do is release $63 million today from Bucket 1 and 2, and that means the remaining cash will be 46 million in Buckets 3 and 4. So what we're asking for really is the denial releasing $14.5 million from Buckets 1 and 2, not the entirety of the amount.

THE COURT: Got it. So that the aggregate amount that is still trapped would equal $60 million.

MR. ELSBERG: Yes.

THE COURT: Got it. Oh, got it. Got it. Got it. Okay. Understood.

MR. ELSBERG: Your Honor, if I may, I'd like my associate to put something up on the screen if that acceptable.

THE COURT: We're not there yet, because I haven't had the debtors put their intro in. I just wanted to make sure that I kind of understood what -- I didn't -- I wanted to make

sure I understood what Evolution was asking for today and kind of where things were --

MR. ELSBERG: Understood.

THE COURT: -- as we started. But I'm going to certainly give you a full and fair opportunity to get started with respect to that.

In terms of evidence that would be presented today, before we start, I've got a ten o'clock hearing that I think shouldn't last very long, that I think maybe we can just take -- maybe we could probably -- Mr. Davidson, how long do you think we'll go?

MR. DAVIDSON: About ten minutes, Your Honor.

THE COURT: Yeah. Maybe we could go from kind of -- really kind of start this up around 10:15 with evidence, if that would work for the parties.

But just in terms of just general, in terms of presentation of evidence before the Court, what -- Mr. Singh, how do you intend to proceed? And then I'll turn to Evolution.

MR. SINGH: Sure, Your Honor. We filed our witness and exhibit list. You know, generally speaking -- why don't I come up here and address Your Honor? Sorry.

THE COURT: Got it. Got it.

MR. SINGH: You know, we do have Mr. Jerneycic in the courtroom, his declarations, he's got two that relate to today's hearing. And then we've got a number of exhibits,

which are really the UCC-1s that were filed. You know, not only -- Evolution has theirs, we've filed for the Court, the ones filed by the ABL and the prepetition term loan lenders. And then we've got the credit agreements.

I don't know if Evolution is planning to cross Mr. Jerneycic. If not, I think we can quickly move in all the evidence that we have and they have now before 10, break, and then come back for arguments. I think we've got about ten minutes.

THE COURT: Let me hear from --

MR. SINGH: Just a suggestion, Your Honor. I'm happy to proceed --

THE COURT: Yep, yep.

MR. SINGH: -- however you want, but it depends on whether they intend to cross. I'm not sure.

THE COURT: Let me just hear from Evolution in terms of -- and I guess others may have evidence that they wish to submit and all that stuff, but from --

MR. KELLEY: We just want a little procedural protection, Your Honor. Given the order that's before the Court, we don't intend to cross-examine, challenge, object to evidence, but we want to make sure that the Court's acceptance of evidence is limited to this issue between these two parties and we have full rights to challenge and attack it --

THE COURT: No, no.

MR. KELLEY: -- at whatever adversary or other hearing comes up.

THE COURT: I think that's right.

MR. KELLEY: And so I just wanted -- all the receivables counterparts want to make sure that I lodge that.

THE COURT: I think that's right. I think that's right. This is just between these two parties, but the question is do I -- essentially, approving this motion does one thing. Agreeing with the objection does something completely different. And I think everybody's rights would have to then figure out. If I agreed with Evolution, for example, then I think everybody's rights are then preserved and you all will have an opportunity --

MR. KELLEY: We'll have our day to address whatever impact that has on us --

THE COURT: Yeah.

MR. KELLEY: -- is all I care about.

THE COURT: Yeah.

MR. KELLEY: And that we're not barred because of the evidence that's introduced.

THE COURT: I think that's right.

UNIDENTIFIED: We don't have an objection.

MR. KELLEY: With your confirmation, Judge, we're comfortable.

THE COURT: Okay.

MR. KELLEY: Thank you.

THE COURT: Thank you. From Evolution's perspective, how do you intend to proceed today?

MR. ELSBERG: Your Honor, if the witness testifies consistent with his definition, I doubt that we'll need to do any cross-examination.

THE COURT: And in terms of presenting your own evidence?

MR. ELSBERG: In terms of our own evidence, we had put seven exhibits. We've listed seven exhibits, and I doubt they're going to be controversial. They're basically the agreements and the UCC that was filed.

THE COURT: Okay. Okay. Do you want to try to just --

MR. SINGH: Yeah.

THE COURT: -- get the docs in now? We can just continue --

MR. SINGH: Yeah.

THE COURT: -- to work now?

MR. SINGH: Yeah.

THE COURT: If there's no --

MR. SINGH: Your Honor, so our amended witness and exhibit list is filed at Docket Number 1052. And Your Honor, on that exhibit list, we have Exhibit Numbers 1 through, I'm going to stop at 28, which is the UCC statements that I

mentioned.

Two of those exhibits, Exhibit Number 2 and Exhibit Number 5, are the declaration of Daniel Jerneycic in support of the motion and the supplemental declaration of Daniel Jerneycic in support of the motion. Mr. Jerneycic is here in the courtroom. He's available for live cross. His testimony would be as submitted in the declaration.

THE COURT: As submitted in the declaration.

MR. SINGH: Nothing additional, Your Honor. And so if okay, I'd like to move in all of those exhibits. Again, Docket 1052, Exhibit Numbers 1 through 28, which include those two declarations for Your Honor.

THE COURT: Any objection? Okay. They're admitted.

(ECF 1052-1 through ECF 1052-28 admitted into evidence)

MR. SINGH: Thank you, Your Honor.

THE COURT: Let me ask Evolution, do you have any -- I think you have a couple of exhibits. Can you just identify them on the docket?

MR. ELSBERG: Yes. So the public versions are Docket 1016. The sealed versions are at 1017.

THE COURT: Any objection to the admission of the Evolution?

MR. SINGH: No objection, Your Honor.

THE COURT: Okay. And Mr. Elsberg, okay, they are admitted.

(ECF 1016 and ECF 1017 admitted into evidence)

THE COURT: Any -- do you intend to present any witnesses or are you just going to rely on kind of the argument based upon the evidence that's submitted?

MR. ELSBERG: Only the argument based on the evidence submitted, Your Honor.

THE COURT: Okay. Is there -- there's someone else. A 347 number, I just unmuted.

MS. EPSTEIN: Your Honor, Ella Epstein, also from Elsberg Baker & Maruri. (Indiscernible) my apologies.

THE COURT: Okay. No worries. Thank you. I'm glad I got your line unmuted.

So when we come back -- let's just come back at 10:15.

MR. SINGH: Sure.

THE COURT: Mr. Singh, I'll let you kind of start, present your argument, assuming all the docs are in evidence.

MR. SINGH: Thank you.

THE COURT: And then, Mr. Elsberg, just -- can you just confirm for me, based on the declarations, do you intend to cross-examine any witness?

MR. ELSBERG: No, Your Honor.

THE COURT: Okay. So then, I'll turn to Mr. Singh and then I'll turn to you. Or I guess, I know it's going to be handled in multiple parts. And is there someone -- I think you

wanted me to give someone presenter roles. Just, can you identify who that person is? Because once Mr. Singh is done, I'll turn to and give that person the presenter role.

MR. ELSBERG: Yes. It's Ella Epstein.

THE COURT: Alrighty. Now, let me see if I can find you.

Ms. Epstein, can you turn your camera on? I'm really -- I'm telling you, I'm notoriously bad at this. Oh, I see you there --

MS. EPSTEIN: Okay. Good morning.

THE COURT: -- Ms. Epstein. Okay. When it's time, can you -- if you can just turn on your camera, I promise I will -- I'll find you and just give you the presenter role at the appropriate time.

All right, folks, why don't we just -- then just take a break? I'll come back on in five minutes and we'll start. You're more than welcome to stay where you are. Thank you.

MR. SINGH: Thank you, Judge.

(Recess taken at 9:54 a.m.)

(Proceedings resumed at 10:23 a.m.)

THE CLERK: All rise.

THE COURT: Please be seated. Okay. Thank you very much. We are back on the record in First Brands. I'll give everyone an opportunity to get back on. I believe I've kept all the lines unmuted. I believe I have. If there's someone

whose line got accidentally muted, can you please just hit "five star." I will unmute your line. A 901 number.

MR. DUKE: Thank you, Your Honor. It's Michael Duke from Elsberg Baker & Maruri again.

THE COURT: Perfect. Okay. For folks on the line, if you can keep your line on mute, I'm going to focus on the argument in front of me and then I will turn to Evolution.

Good morning.

MR. SINGH: Good morning again, Your Honor. Sunny Singh, Weil Gotshal, on behalf of the debtors. Again, Your Honor, just to address really the Evolution arguments that are raised.

So, Your Honor, just to take a step back, Evolution is asserting that they have factored $60 million total receivables under their factoring agreements with the debtors. And generally speaking, the form of their factoring agreement is sort of consistent with other factoring agreements. They sell the receivable -- excuse me, the debtor sells a receivable to Evolution in exchange for a discount, which usually is the sort of calculated return on that and, you know, they're supposed to collect the invoice when it comes in. The debtor continues to do that work on the collection points.

The receivable agreement, master purchase agreement, I should say, includes what is referred to as a backup lien. These are all consistent. Generally speaking, it basically

Case 25-90999 Document 1989-16 Filed in TXSB on 01/09/26 Page 52 of 142



says if for any reason the transaction is not treated as a sale or is somehow recharacterized, then the factor is treated as a lender and is granted a lien against that specifically sold receivable.

And so, Your Honor, I'm going to be very careful, as I was in the brief, to differentiate between sold receivables and unsold receivables with respect to Evolution. So the sold receivables, the 60 million or so, they get a backup lien with respect to that sold receivable.

Evolution also has another relevant clause in their agreement. It's referred to as -- it's Section 5(g) of their contract, and that provision basically says -- and this is unique. This is -- you know, you asked earlier why is Evolution different? I think this is what they're relying on to say why they're different. We don't think it works, and I'll go through why. But this is their argument for why they're unique and different.

That provision says that for any breach of the debtors under this agreement, and that includes generally there's an obligation to repurchase or indemnify for, quote, "bad receivables" that were sold. Evolution has a breach of contract claim for that, just like other factors would. But Evolution's contract claim under 5(g) is asserted to be secured by other receivables owned by these account debtors. So unsold receivables, you get a lien for your breach of contract claim.

So that's the difference between sold receivables versus unsold receivables.

And the other point I would note, Your Honor, Evolution only purchased from eight account debtors. So if you're just thinking of the numbers prepetition, we had somewhere in the neighborhood of, you know, $400 million of total account receivables. These eight debtors is about $188 million of total account receivables that were existing on the debtor's books and records, and so it's a limited set of debtors. It's not all the debtor's account receivables.

THE COURT: All right. But within the cash that you intend to -- that you would want to use, how much of the cash is held by these account debtors?

MR. SINGH: It's roughly $36 million, Your Honor. So of the 63-ish that we're asking for you to use, these account debtors, it's roughly $36 million of their, quote, "receipts" that are now cash that we would be using.

THE COURT: Okay.

MR. SINGH: So Your Honor is going straight to the point. I am, but it's just a little bit later in my argument as to --

THE COURT: I'm sorry.

MR. SINGH: No, no, no, no, it's totally fine. But I think you're thinking of, okay, if I have to adequately protect them, what am I actually using? It's $36 million if we get to

that point. But, Your Honor, I don't -- I think you can determine today that they actually don't have an interest based on the pleadings that we filed. And it comes down to a couple of issues.

I mean, first, they didn't perfect their security interest in the unsold receivables, Your Honor. And we go through this in our reply brief, but if you look at the UCC-1s that Evolution did file.

THE COURT: Okay, I've got one.

MR. SINGH: Their language, Your Honor, it's on the -- it's in the paragraph that describes -- Paragraph 4, which is the -- and then they attach a schedule, right, the collateral. And if you look at that, the key language there is, it starts "What is the collateral?" It says, "Any and all present and future receivables transferred or purported to be transferred to the secured party pursuant to the master receivable agreement."

It's that "transferred or purported to be transferred" language that we believe is key. And so in our view, Your Honor, that only covers the sold receivables, right? Those are the only receivables that we actually transferred or purported to transfer. The unsold receivables were never transferred or purported to be transferred to Evolution. Those provide a claim with respect to a breach claim in the event something goes wrong with the ones that we actually sold to

Evolution.

And if you look at even 5(g) of the master purchase agreement, which is this relevant provision, Your Honor, it says that the lien is granted on all of the receivables. And here's the relevant language: "To the extent not sold or purchased pursuant to Section 1."

So itself 5(g) says we're only granting a lien on things that weren't sold or purchased. And then their UCC statement says that I'm only filing a UCC statement with respect to those receivables that were transferred or purported to be transferred. And so, by definition, Your Honor, they simply didn't record in their UCC-1 with respect to these unsold receivables.

Now, Evolution, and you'll hear about it and, you know, in their brief they say, well, it's a receivable. And they basically just stop reading there, right? They read out the words transferred or purported to be transferred, which they themselves put into the UCC-1, and they also read out the words in the contract not sold and purchased pursuant to Section 1 and Section 5(g) of the master purchase agreement, Your Honor. That's incorrect under basic canons of construction of contract interpretation, but also, as we say under UCC-1 law, which the whole point is you're supposed to put parties on notice with respect to what liens and what assets you are asserting an interest in, and we don't think

they've done that.

Your Honor, compare and contrast that with one of the UCC statements that we -- you can look at any one of them. They're the same for the ABL lenders or the term lenders. And in their financing statements, it says in Section 4, "All assets of the debtor, whether now owned or hereafter acquired."

Your Honor, the other point I would make with respect to Evolution's UCC-1, Your Honor -- I'm just finding the relevant section -- they voluntarily -- if you look at Section 7, right --

THE COURT: 7 of?

MR. SINGH: Of the UCC-1.

THE COURT: Okay.

MR. SINGH: Evolution's.

THE COURT: Yeah.

MR. SINGH: If you just scroll down, it's on the cover page. They have voluntarily selected seller/buyer, right, which implies to you and applies -- implies, excuse me, that they are again reinforcing that this UCC-1 relates to those that were sold and purchased, those receipts. Not everything, because they could have left it blank, Your Honor, and it could have been a debtor/creditor relationship, but it's not. And again, if you compare and contrast with respect to the other ones, they don't check that box, right? So this is a voluntary sort of designation by Evolution.

So right there, Your Honor, in our view, we don't think they've properly perfected. We think you can make that determination under 544 this is clearly an avoidable interest. It doesn't need to be protected, and therefore they have unsecured claims, and they're not entitled to any further relief today or basis to object.

But let's keep going, Your Honor, because I think there are a number of other ways that, you know, the debtors prevail today. Let's assume for a second that we accept their language, or their argument I should say, that they did properly perfect in these unsold receivables. Well, then they've got a mountain of prepetition secured debt that's ahead of them, right? You've got the ABL, you've got the prepetition first lien term loan, the sidecar, and the second lien term loan. That totals almost $6 billion.

And so Evolution sits behind all of them, and they can only be a secured creditor to the extent -- under 506(a), to the extent all of that debt is, you know, in the money, right? It's their burden to prove, Judge, by the way, that they are secured, right? They call us out in their papers to say, well, you don't have any evidence in the valuation. Well, I'm not the one who needs evidence, Your Honor. It's their burden to prove that they're secured. They've put in no evidence on this point into the record today. They haven't crossed our witness on this issue. And so they've offered you

no evidence to say, well, hang on a second, I'm secured.

And it's just basic simple facts, Your Honor, 6 billion of prepetition debt ahead of them, right, and we're only looking to release about $63 million. And the other point I'd note, Your Honor, you can't look to the other assets that the ABLs and the term loans have an interest in to say, well, those guys are going to get paid somewhere else.

There's no marshaling required under the DIP order with respect to, hey, we're not going -- we're going to marshal away from cash or anything like -- you know, or account receivables. I mean, to the contrary, I think you're going to hear them say, and we have heard them say, no, these are sort of the best receipts and -- excuse me, the best collateral we have, we're going to take from that first.

So, you know, an argument that, well, wait a minute, those guys have so much more collateral, maybe they'll recover from there. Well, that doesn't matter. There's no marshaling. They can first look to this cash. So, Your Honor, I don't think it's a huge leap to say Evolution is unsecured based on the evidence you have in the record. And you certainly don't have any evidence from Evolution to say that they're secured and therefore entitled to an interest here.

Now, instead where they go in their papers is to say, well, hang on a second, we are senior to the ABLs and to the prepetition creditors because those documents, including the

security agreements, sort of carved us out as permitted transactions. And not only did they carve out in those documents the sold receivables to say, yeah, if you sell a receivable under a permitted factoring agreement, then you can have a lien, somebody can have a senior lien against that collateral, right? And that's what the ABLs and term loans are saying.

But they never said that with respect to the unsold receivables. Evolution says, wait, well, this is an excluded asset, right? The unsold receivable is an excluded asset. But excluded assets only carve out accounts that are disposed of pursuant to a permitted factoring transaction and any related assets. This is not disposed of, right? Remember, these unsold receivables, they were never sold, transferred. Nothing happened between that -- on that with Evolution. The sold receivables did, but these unsold are just sort of sitting there, right? They were not disposed of. They were not transferred.

And all of these words, Your Honor, transferred, sold, disposed of, they're generally talking about a transfer or a change in ownership interest, a change in -- you know, from the debtor over to somebody else because that's the point of the factoring agreement, and that's the intent of the parties as to what they were talking about when they were saying, okay, this lien I'll give you on a senior basis, but

not any other lien.

Your Honor, they're also not related assets under their agreement, right? The excluded assets definition says accounts disposed of pursuant to a permitted factoring transaction and any related asset. Evolution says, well, we may be a related asset. They're not tying it back to, you know, dispose of pursuant to a permitted factor. It's saying we may just be an independent related asset. Well, that's not right, right, because related assets are defined in the prepetition credit documents as contract rights, guarantees, or other obligations in respect of such accounts. Again, such accounts going back to and referring back to the sold accounts.

Your Honor, every which way you cut it, they end up back at the fact, which is consistent with the intent, which is consistent with how factoring agreements work, is that you're getting a senior lien with respect to accounts that were actually sold. It's a sale interest. You're getting a backup lien with respect to those accounts to the extent you need it. You're not picking up other collateral, other accounts that were never sold and transferred and somehow shoehorning them into your UCC-1 and saying, now all of a sudden I've got a lien. That's just not how it works, Your Honor.

And finally they say, well, we're substitutions or replacements because under the ABL credit agreement and under the term loan, another way you can be senior to those liens is

say you're a substitution or replacement, but of the excluded asset. That's the part they keep failing to take into account. The excluded asset is the sold account. It's not the unsold accounts, and so there was no substitution of the unsold.

The agreement doesn't say, hey, if you have a sold account, and for some reason it doesn't work, you can then take one of these unsold accounts and plop them in and move them over to the sold. What it says is if there's a sold account, if for some reason that sale doesn't work, you get a lien for -- against that particular sold account. Then you come to the other side of the house under 5(g) and it says, look, if there's any breach, if there's a buyback, et cetera, here's the other assets you can look to in order to collect.

Your Honor, one hypothetical, or just an example, I think it gets a little confusing because they're all accounts. They're receivables, so it's easy to say, well, you know, they're all accounts. Let's just bundle them together. If you were to separate them, and we said these are accounts, and on this side of the house, with respect to 5(g), you get a security interest in a real property that was owned by the debtors, we may as well have said that, right? It could have said that. And the point is you don't get to substitute the real property over and say, oh, well, that was a sold account. And if you just take it with that, I appreciate it's an extreme hypothetical, but that's the point. They were serving two

different points, these pools of collateral, and one of them was actually secured and perfected, and the other one, unfortunately for Evolution, was not.

So, Your Honor, we think you've got enough under the documents to decide this issue today in the debtor's favor and shut this argument down. But if Your Honor was inclined to not rule on the merits on this issue today, then I think our alternative relief is applicable and we still get to walk out of here with the use of this cash, which is we have sought nonconsensual use of, you know, quote, "cash collateral."

I think, Your Honor, a fair construction and sort of the best-case scenario that they can get is they've got a fourth or fifth lien behind $6 million of prepetition debt. And in that situation, because Your Honor can take into account with respect to cash collateral the likelihood of success that they actually have in interest. And so they have two things that we've offered them, Your Honor, as adequate protect -- or one the bankruptcy code provides and one we've offered.

They're getting a lien -- or, excuse me, not a lien, they get a right if, within this 45-day period, let's say we're wrong, including on this Evolution issue, right? They can assert their claim or lien against the remaining cash.

And so you were asking about this question earlier. Let me just give some numbers. As of, I think it's December 11th, there's $117 million of cash in the trapped

account, right? We've sought to move out 63-. I think that number will probably come down based on some conversations we've had with the M3 team, but we've sought to move out $63 million. We're just going to leave it at that number just to avoid confusion.

And so, Your Honor, that means that there is $54 million, if I did my math correctly there, right, that's still sitting in the account that under Paragraph 8 of the agreed order, if we got this all wrong, right, which we don't think we do, but let's just say Evolution was right on every single point, then they could look to $54 million and say I'm going to assert my claim over there. I think I have that number right. Maybe it's 64-. No, no, it's 54-. Sorry. Right.

They can look there, and as I said earlier, Your Honor, 36 million is the account debtor cash that we're releasing. So how much of their cash are we actually using? It's 36 million, so they're covered by the 54-, if Your Honor wanted to go down this line of thinking. I don't think you'd need to, but, you know, I think they're protected. They also get an administrative expense claim generally against the debtors that they're -- that they had contract relationships with, including, Your Honor, you'll recall from the DIP hearing, there's a $200 million administrative expense reserve that sort of sits ahead of the prepetition debt, not the

post-petition, that applies in certain, you know, sort of downside scenarios.

Now, I'm not conceding today that they get to assert any adequate protection there, but that is available to the extent, you know, somebody stood up and said, well, you know, it's just an admin claim. Who knows what happens in this case? Well, we really did try to address that issue early on with the UCC. Again, not conceding that anybody would have a right to those assets, but they certainly could assert their claim, and Your Honor can take that into account.

And then finally, Your Honor, they've got a 507(b) claim under the bankruptcy code, right, if there is a diminution in value. And I think that would only apply if you satisfied all of the senior debt first. And then we said, well, we used some more of your cash without your consent and now you've suffered a loss, they get a super priority administrative expense claim under the bankruptcy code, so we think it's proportionate there.

Again, Your Honor, I don't think -- I think we can just say they don't have an interest, or you can conclude based on the record before you that they don't have an interest. But to the extent Your Honor was inclined to, you know, not address that issue today or give them further relief there or further opportunity to be heard, Your Honor can find that certainly cash collateral use should be permitted here based on the facts

Case 25-90399 Document 3989-16 Filed in TXSB on 02/09/26 Page 65 of 142



and circumstance and the adequate protection that we're providing.

Your Honor, the final point is the joinder that was filed just right before this hearing by Evolution, you know, essentially joining in the other parties to say this needs to be determined by an adversary proceeding and therefore we can't proceed today. And when I say this, Your Honor, it's really not the issues that relate to what we're talking about with respect to the other factors that are kept, right? The other factors, my understanding their general argument is the procedures we've proposed for release of the cash are insufficient and they should be done by an adversary proceeding, and we'll address that issue in the future.

I think the issue that Evolution is raising is saying my interest that I've asserted in this cash being released based on the pleadings before you should be asserted in adversary proceedings. So it's slightly different, Your Honor, and that's their basis for the objection. And I think I would say a couple of things. One, they're joining into objections that are actually not before you today, right? Those objections have all been deferred and frankly relate to a different issue about the procedures and whether those should go forward in an adversary proceeding or by motion and don't relate to Evolution's asserted interest.

The other point I'd make is, Your Honor, Evolution

had every opportunity to raise this argument and this issue earlier. It's really form over substance at this point in our view, and we think they've waived either directly or implicitly the right to raise this argument. Your Honor, they filed a 25-page objection that raised a number of issues relating to their property interest, right and what they're asserting they have an interest in and why they're different.

They filed that on Friday. We respond. We engage, right? They didn't file an adversary proceeding. They filed an objection. We respond. They actually participate in deposition. Then we respond and we say, well, wait a minute, you don't have an interest, and here's all the reasons why. And then they say, well, wait, hang on a second, the path we chose to address this issue by motion practice, that's actually not the right path, so let's switch over to the adversary path.

It's too late, Your Honor. We engaged in the path that they chose. They could have done it another way. We've responded. They're having their day in court. And so, Your Honor, to say that we need to now go to an adversary proceeding would be unfair and extremely prejudicial to the debtors.

And again, Your Honor, even if you were inclined to address that issue or take them up on their argument that, you know, they have an interest or they need an adversary proceeding, worst case the debtor should still get to use this cash because at best it's cash collateral. You don't need an

adversary proceeding to permit the debtors to use cash collateral. You've got evidence in the record. You've got a proposal from us on adequate protection, and so we should be permitted to use cash collateral, and we don't need to file an adversary proceeding to do that. And that's their best-case scenario.

So again, Your Honor, you know, that's our view of the Evolution objection. We think you should make a determination today that they don't have an interest based on what they filed, including in their UCC-1 or that they're junior and therefore they're unsecured under 506(a). And to the extent Your Honor was not prepared to make those findings today, then, Your Honor, in the alternative, we request that you authorize the use of cash collateral under the terms that I described.

THE COURT: Thank you.

MR. SINGH: Thank you, Your Honor.

THE COURT: Okay. I'll hear from Evolution.

MR. ELSBERG: Thank you, Your Honor. David Elsberg. It sounds as if the debtors are conceding that we do in fact have a lien and security interest in all of the receivables held by the seller. So I'll be very brief on that point and then I'll turn it over to my colleague, Mr. Gerber.

So, Ella, if we can have permission for Ella to put something up on the screen.

THE COURT: Yeah, you got it.

MR. ELSBERG: Thank you, Your Honor. Okay. Ella, if you're able to enlarge it a little bit.

Your Honor, the language that I was referring to earlier that gives us -- if you can scroll down, Ella, to show 5(g).

The language that gives us the security interest in all of the debtor's receivable is the language we're looking at now in Section 5(g). You can see in the blue, the plain language says that we have a lien and security interest in, and then in Item 1, all of the receivables now or hereafter owned or held by such seller. That includes the receivables that are real legitimate receivables that the debtors say were not factored.

And you can see that lien and security interest is to secure the seller's existing and future obligations under the factoring agreement. And of course when they, according to the debtors, sold us fake receivables, they breached all sorts of their obligations under the agreement.

And with that, I'll now hand it over to my colleague, Garrett Gerber, who will address the perfection of this lien security interest by the filing of UCCs. And then my colleague, Mr. Duke, will demonstrate that contrary to the debtor's assertion that they have a security interest in Evolution's collateral, they actually do not. So with that,

I'll hand it over to Mr. Gerber.

THE COURT: Go ahead. Thank you. Mr. Gerber.

MR. GERBER: Thank you, Your Honor. Garrett Gerber for Evolution, and my colleague, Ms. Epstein, has pulled up a demonstrative on the screen, and I want to go right to the language of the UCC financing statement that Evolution filed and counsel for the debtors discussed.

So as Mr. Elsberg just said, debtors do not dispute that Section 5(g) grants a lien and security interest broadly in what they call the unsold receivables. As you can see in the yellow highlighted language, debtors also do not dispute that the language "any and all present and future receivables" is broad enough to cover the security interest under Section 5(g), nor could they contest its broad language, which provides notice to third parties that there is a security interest in seller's receivables. It doesn't limit it to a list of customers or a specific subset.

The only question that counsel for debtors raise with respect to this language is the transfer to -- transfer or purported to be transferred, and in their view limits the description of the collateral to only what they call the sold receivables or purchased receivables under the factoring agreement.

That's not what this collateral description says. If you look at the plain language of the financing statement, it

doesn't use the word "receivables purchased." It doesn't use the receivables sold -- the term "receivables sold." They use the term "receivables transferred," and this is important because transfer covers more than just a purchase of receivables.

So, Ms. Epstein, if you can scroll down a bit.

So I put on the screen here, this is the definition of transfer from the bankruptcy code, and we can see transfer means --

THE COURT: Why are we using bankruptcy code definitions?

MR. GERBER: I think it's informative just to show the broad definition of transfer and showing that it can mean to --

THE COURT: No. Why aren't we using the dictionary then, or the -- in other words, are you referring -- the definition of transfer has specific meaning, and it's given multiple meanings within that because you're using -- that's what Congress said it means in this statute. I don't --

MR. GERBER: Understood, Your Honor. We -- in the specialized context here, the creation --

THE COURT: Are you just using it just generally just to describe what the word "transfer" could mean is broad?

MR. GERBER: Right.

THE COURT: Understood.

MR. GERBER: Exactly. We're just using it as a way to show that the word "transfer" has a broad meaning, and this is one way of showing that.

And then we can also see that -- and I'll ask Ms. Epstein to put up a section from the UCC comment -- that the UCC itself contemplates that transfer is broader than just a purchase. And this is Section 9-332, and it's Comment 2(a) there on the meaning of transfer. "A transfer of property occurs when the transferee has obtained a property interest in the relevant property." And then the second highlight, "Although the term transferer and transferee are not defined in the UCC, the term transfer is broader in scope than just purchase."

So we can take that down, Ms. Epstein, and put back up the first demonstrative.

So we can see that the UCC also, if we're looking at the broad definition of transfer, draws the distinction between transfer and purchase. And then going back to the plain text of the collateral description that covers all receivable transfers or purported to be transferred under the RPA, that's broad enough. The transfers that are purported to be transferred language covers both of the liens granted under the RPA.

So it's both the sold receivables that counsel for debtors mentioned where a purchase is not considered a true

sale and there's a backup lien. And then there's also the second way to do it, and that's 5(g) in all of seller's unsold receivables. So that's exactly what happened here. There was two grantings of a lien. There's two grants of a lien under the RPA, and this broad language covers both.

Accordingly, we submit that Evolution has perfected its security interest in those receivable. And unless there's anything further, I'll pass it to Mr. Duke, who's going to cover the next topic.

THE COURT: Okay. Thank you.

MR. DUKE: Thank you, Your Honor. Michael Duke. I wanted to start with the procedural point that Mr. Singh raised earlier. We do submit that this should be under an adversary proceeding pursuant to Rule 7001(b). And I think this is absolutely clear. So if you look at Paragraph --

THE COURT: Why didn't you argue that when -- in your initial motion? In other words, if you're joining on a joinder and no one is prosecuting the joinder, why do you get to raise it now? Why aren't you get --

MR. DUKE: Sorry, Your Honor. We're --

THE COURT: No, I'm asking you -- I get the procedural point. I'm asking you the procedural point about the procedure, just why do you get to argue it?

MR. DUKE: Understood. Your Honor, we put in the objection in advance of the deadline --

THE COURT: Objection of --

MR. DUKE: -- which was today.

THE COURT: No, I got it.

MR. DUKE: The objection that we put in, and then within zero business days, we filed a joinder that says that, you know what, the debt -- the other factors are correct. If you look at the plain language of 7001(b), what it states is a proceeding to determine the validity, priority, or extent of a lien is an adversary proceeding. Again, this is before the deadline to put in an objection to their motion.

THE COURT: No, I got it. It's an emergency motion. They asked for the date, and so you get to come in at the prior time. I think that's the -- I think that's what you're saying, that you still had time to file something else.

MR. DUKE: Correct. And all we're attempting to do is just to say that 7001(b) is the correct process here. I don't think that there's any waiver. This is zero business days after our motion or our objection was filed on Friday.

THE COURT: Uh-huh, yeah.

MR. DUKE: We're moving quickly here. We put it in as quickly as we could. I don't believe that there's any waiver with respect to that, and I believe the rule is abundantly clear. But here, Your Honor, I'm going to turn to the substance here. I'm going to have Ms. Epstein put some language up on the screen.

There's one provision in particular that I think is critical to focus on, and this is from the ABL agreement, the security agreement to the ABL credit agreement, which are all substantively identical across the ABL and the term loans.

But if you go to the excluded assets definition, Ella, if you wouldn't mind, and just highlight at the top excluded assets.

It's a very long provision, and what it does is it specifies assets that are excluded from the collateral pool for the ABL and for the term loans, so this is a long list of excluded assets. I want to focus on two of them which are down at the bottom.

So, Ella, if you can scroll down and highlight Q and S. Just give it a second to orient. All right, great. Thank you.

So the first provision says any accounts disposed of pursuant to a permitted non-recourse factoring transaction in any related assets in respect thereof. That is one category of excluded assets. And then S, what it does is it has what I'll call two different parts to it. The first part says that an excluded asset is any proceeds, substitutions, or replacements of any of the foregoing. So that's Part 1. Part 2 is that the language that follows it states, "But only to the extent such proceeds, substitutions, or replacements would otherwise constitute excluded assets."

And I take it from Mr. Singh's presentation and from their reply brief that what they're taking issue with is that second part of S. What they say is, well, the accounts are not separately excluded assets, the real accounts that we're putting in through 5(g) to substitute for the fake accounts. And I thought the example he used was (f), the real property example, because I think that's exactly what this provision is doing.

What this provision does is it says, yeah, you can substitute in other assets that are going to be construed as being excluded assets. But what you can't do is go say, okay, well, I have a lien in accounts. Now I want to replace it with a liening of a real property, for example. That liening of the real property would not otherwise be an excluded asset, but an account for an account is an excluded asset. Both of those accounts are excluded.

But even if you disagree with that, I think that we'd still have the same result here, which is that we have priority. So if you look at they've raised the argument on the disposed of definition and what that means.

Ella, if you wouldn't mind just scrolling down in this to the disposition definition.

And they cite to this in Paragraph 26 of their reply brief, saying that this is the relevant language for what it means to dispose of something. So what it states is that

disposition or dispose means, "A sale, transfer, license, lease, or other disposition of any asset or property by a person" -- skip the parenthetical -- "including any sale, assignment, transfer, or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith."

It is absolutely clear that at the very least we were transferred a security interest in accounts receivable. That's exactly what this is covering. It says accounts receivable or any rights or claims associated therewith, and we were transferred that. There's no debate that we have -- that we had accounts that were transferred pursuant to the permitted non-recourse factoring transaction.

Now, we also have a related assets argument. They focus more on that. I'll go through it quickly. And the argument that they've raised is that the 5(g) contract rights do not relate to sold accounts. You can see this in Paragraph 26 of their reply brief, and that is just straightforwardly incorrect. The only reason that we have rights under 5(g), that we have a lien under 5(g) is the sale of these fake accounts. If there are no fake accounts sold, we don't have a lien on those assets. It's because they breach their reps and warranties with respect to those accounts that we have associated contract rights.

And you can look at the ordinary meaning, as Your

Honor referenced earlier, of related to. So there's a number of cases out of the Fifth Circuit dealing with this. I'm going to focus on the Latiolais v. Huntington Ingalls case. So that's 951 F.3d 286. And what it states clearly is, quote, "The ordinary meaning of the words 'relating to' is a broad one, to stand in some relation, to have bearing or concern, to pertain, refer, to bring into association with or connection with."

There is absolutely no doubt that our contract rights relate to, they have some association with, they pertain to, they have bearing or concern the accounts that were sold to us that were fake. These are related assets, which that defeats -- I didn't hear it from Mr. Singh today, but in their reply brief, they raised 701(mm). I'll just briefly address that. If it were a related asset, they just don't have an argument under that provision. 701(mm) is also -- that's an obligation on the debtors. It's just if we're an excluded asset, you don't have to get there at all.

And then you can also read those provisions together because all we're doing is saying that you substitute in accounts, the fake accounts, you get rid of those, and you substitute in the real accounts.

With that, unless Your Honor has any questions or anything further that you'd like me to address, I'll pass it back over to my colleague, Mr. Gerber.

MR. GERBER: Thank you.

THE COURT: Thank you. No questions.

MR. GERBER: Your Honor, I'm going to brief -- I apologize, Your Honor. Thank you. I'm just going to briefly address the point that counsel for debtor made in the case that if Evolution doesn't have a first priority security interest, and as Mr. Duke just explained, it does. At a high level, debtors are claiming that once other higher priority claims are satisfied, Evolution is so far behind in the payment waterfall, there won't be any value left.

And our position is simple. This is a fact question. It's hotly disputed, and it's something that really can't be decided on this current motion. So on Friday, I think a few of the counsel here, as mentioned, Mr. Jerneycic of A&M and the Co-Chief Restructuring Officer was disclosed, and a few portions of his testimony I think show precisely why at this stage --

UNIDENTIFIED: Your Honor, his deposition is not in evidence. This is absolutely inappropriate. We object to this discussion.

THE COURT: Okay. You've got to stick within the stuff I can see.

UNIDENTIFIED: He's been available here for cross-examination and they passed.

THE COURT: What else do you wish to tell me,

Mr. Gerber?

MR. GERBER: Okay. I understand. I believe it is in other factors evidence, but that is correct. I don't think we put it in. So if you will allow me to briefly touch on it. If not, I can move on.

THE COURT: I don't think you can touch on it. If you can find me a doc that's in the record, I'm more than happy to let you. But if not, I think you've got to move on to something else.

MR. GERBER: Okay. Understood, Your Honor. And as we -- so basically the point that we just want to make is the -- there's been a wide-open question of what the assets of the company are. We at Evolution have not seen a reliable value of what those are. And that question is especially important here, and we've heard about it.

We've heard about it today where there's allegations of fraud, and no one knows precisely how that occurred or exactly what happened. And, you know, on this motion, the debtors have admitted that certain receivables are fabricated and inflated, so we think it's just entirely premature to say that there won't be sufficient assets to cover Evolution's secured claim if it is indeed behind other secured creditors.

Lastly, counsel for debtors briefly touched on marshaling, and I'll read the quote from Paragraph 30 of their reply, which says, "The prepetition secured parties may first

seek to recover on their claim from any collateral, including accounts receivable securing that claim." And the key point here is debtors use the word "may," and that's because, just going back to this, no one knows what assets will be used to pay down debt, the prepetition debt first.

So even if the debtors are right that other secured parties may in theory go to their receivable first, we just can't say that will happen one way or another at this point. So our position is it's just a mere assertion that there won't be enough assets, and we need a valuation hearing to fully determine that under 506 and 30 -- Rule 3012. Thank you.

And I'll pass it back to Mr. Elsberg, I think, unless there's anything else.

THE COURT: Mr. Elsberg? You may have muted yourself, Ms. Elberg. I apologize.

MR. ELSBERG: Oh, no. I'm sorry. I'm sorry, Your Honor.

THE COURT: No, no worries.

MR. GERBER: I have nothing to -- I'm sorry, can you hear me?

THE COURT: I can hear you just fine now. Perfect. Thank you.

MR. ELSBERG: Yes, I'm sorry, Your Honor. Thank you. I have nothing to add except for one very quick point. So earlier you were asking about the amount that we're asking to

withhold. I said 14 million. I think that's actually incorrect. The number keeps changing.

So Mr. Singh today said that there's 54 million in the factored receivables account. That's different from the 36.5 million figure that the debtors put into their reply. I would just say that in all events, the Court should deny any request to release an amount that would leave less than 60.5 million in the factored receivables account.

THE COURT: Just why do you think you're entitled to the kind of amounts that would relate to a debtor upon which your client didn't transact with?

MR. ELSBERG: Because of the language that's in 5(g).

THE COURT: 5(g)? Got it.

MR. GERBER: Yes.

THE COURT: Okay. Got it. Got it.

MR. DUKE: But if I may just very briefly on that point, just that there --

THE COURT: I just want to understand. So you're saying that, like, for example, break parts can -- in other words, these debtors could bind other parties and grant receivables in other parties?

MR. DUKE: Your Honor, sorry. I just wanted to make sure that we're talking about the same issues. This is Michael Duke again. What we were saying that we have an interest in, it's the eight debtors, it's their receivables, but it's with

all of their customer base, so it's the way the factoring --

THE COURT: Yeah, I got it. I got it. That makes sense to me. So it's not just -- maybe just the receivables. So you're disagreeing with Mr. Singh and saying this applies to any receivable in which these eight debtors hold. 5(g) gives you the language and you get the lien based on the UCC-1 that you filed which relates to the master agreement, and therefore 5(g) kicks in and you've got a lien on all receivables.

MR. ELSBERG: Yes, Your Honor.

MR. DUKE: Correct. So we're not going after debtor's receivables that are, you know, like debtors that we never entered into or signed on to or a factoring agreement.

THE COURT: I get it.

MR. DUKE: (Indiscernible) those debtors, but their customer base.

THE COURT: Got it. No, no, it's just broader than the sold/unsold portion. Got it.

MR. ELSBERG: Yes, Your Honor.

THE COURT: Got it. Folks, thank you very much. There's a lot that has been filed, and I want to take my time and read this. I'm going to ask the parties to come back at 2:30 today. I'm going to -- there's some things I want to look up. I think I can pro -- I may be able to provide an answer, or some answer to some of this. I'm going to -- I've got -- I need to take some time and read this for the next couple of

hours.

But I've got a hearing at 2 that my understanding should last 20, 30 minutes, and maybe we can come back at 2:30 or three o'clock, whatever is easier for the parties, and I can just give you some answers to at least either tell you I can answer it or tell you I can't. But I want to kind of go back and read, take a look at this language carefully, and give it some careful consideration.

MR. SINGH: Happy to do that, Your Honor. Would it be -- I wanted to address some of the points they raised, and just because of the way this has been briefed, if I could take five minutes.

THE COURT: Yeah, I'll give you five minutes and kind of close it out.

MR. SINGH: I'll be quick, Your Honor. Just really not to rehash.

THE COURT: Yeah, no worries.

MR. SINGH: And I may just go a little bit out of order, Judge, but just to hit some of the key issues that were raised. Oh, sorry, Your Honor. One second.

THE COURT: No worries.

MR. SINGH: Okay. Just to hit on a couple of the points that were raised. You know, first there's, you know, discussion about the definition of transfer. And for all the reasons Your Honor indicated, I -- the bankruptcy code

definition is not the right definition to use because at the time we're just talking about UCC-1. So if you look at Webster's definition of transfer, which I'm just going to read from here, it defines transfer, verb or noun, as "Moving something like property, data, or a person from one place, person, or situation to another. It also means conveying rights or ownership or a device ticket for such movement, like bus transfer. Key meanings involve conveying ownership, moving physically, or the carrying of learning feelings from one context to another, such as in psychology or education."

That's Webster's definition, Your Honor, and that clearly does not pick up the unsold receivables. And it makes sense, Your Honor, if you think of it in the context of the UCC and not the bankruptcy code. You know, they read a comment from the UCC, but the overall purpose of the UCC and the relevant standard is you're supposed to file something that reasonably identifies the collateral so that other parties, such as the ABL lenders here, the term lenders, or new future financing parties, can read it and take away from it what you're asserting an interest in.

And you have to read this in context, Your Honor. And by the way, the UCC statement is not something that's negotiated. They chose to file it. They chose the words that they chose. And so, you know, they're the draftsmen of -- you know, draftspersons of that document. That's not something

that gets negotiated. And they refer to a transfer or that were transferred or purported to be transferred. And then pursuant to the master purchase agreement, anybody reasonably looking at that document and saying, oh, this is a factoring receivable agreement would not have picked up based on how factoring receivable agreements and purchase agreements -- excuse me -- work, that there would be this unique provision of 5(g) in there.

And so if they wanted to have that be secured, it should have been called out. And that would have been consistent with the purpose of the UCC, but it wasn't. And so that should be -- work against them in their favor, Your Honor, in terms of contract construction.

Your Honor, the other thing I would just note, the excluded asset and the arguments around disposed of. Evolution's arguments continue to be only focused on the generic definition of disposed of, and they're not looking at how it was used in the context of the agreement. In the particular sections that we're talking about, it all refers back to disposed of pursuant to that actual master purchase agreement. Not just generally disposed of, not a general receivable per the UCC-1, but in the context of the master purchase agreement.

And 5(g) is a unique provision that, interestingly, you don't have the other factors raising that argument because

it doesn't exist in their contracts. And so this should have been called out and is not what anybody intended. And at the end of the day, Your Honor is being asked to interpret the meaning on the page -- the words written on the page for the purpose of figuring out the parties' intent. And so you would have expected, Your Honor, that if they had this unique right, it would have been called out.

Your Honor, on the cash collateral point, again valuation, Your Honor, that's entirely their burden, 100 percent. There could be no debate that it is their burden to prove that they have an interest in this property that they properly perfected, that they're ahead in time, and if they're last in line to prove that under 506(a), they actually have an interest that they're supposed to be protecting.

So they continue to come back to the debtors have not put in anything. Well, first, that's not true. Mr. Jerneycic has put in plenty of testimony to allow Your Honor to rule today. But on the valuation point, Your Honor, that's their deficiency. The other point they made is that in our brief, we say, well, you know, notwithstanding the no marshaling language, we may -- or, excuse me, the secured lenders may look to cash.

Your Honor, I think that's inconsistent with how the bankruptcy code itself is set up. You can use collateral under the code, and there are extra protections and requirements for

the use of cash collateral. Why is that? Because everybody uses cash first to satisfy their collateral, Your Honor. And so the bankruptcy code, its intent, and Your Honor I think can read into that and say, well, of course people are going to look to use cash collateral. That's what we always fight about. What's happening with the cash, right?

You've got a liquid asset, and I think Your Honor can take into account, given your experience on the bench, and the whole fact that the bankruptcy code itself calls out use of cash collateral separate and apart from other use of collateral, shows that parties intend to use cash collateral first.

But, Your Honor, again, you don't even have to get to all of these issues for us to be -- to prevail here today. But I think you've got everything you need, Your Honor, in our view, to overrule this objection and find that they did not have an interest in it. And even if they did, they're adequately protected.

THE COURT: Thank you very much. Let's come back at -- I know I said 2:30. Let me just give myself a little cushion. Can we do 2:45 p.m.?

MR. SINGH: Of course, Your Honor.

THE COURT: 2:45 p.m. Central. You're more than free to dial in if you wish. I've got a two o'clock. I just want to give a little bit of grace to the two o'clock. Let's come

back at 2:45, and I'll tell you what I can do and let you know where we are. Thank you very much.

MR. SINGH: Thank you, Your Honor.

THE CLERK: All rise.

(Recess taken at 11:16 a.m.)

(Proceedings resumed at 3:00 p.m.)

THE COURT: Good afternoon, this is Judge Lopez. I'm going to recall First Brands. I'm going to turn on my camera and just give a moment for parties to hit on the line. Let's see if I have some of the Evolution parties, if you can hit "five star," I will unmute your line just so you can hear what I say and ask any questions about kind of what we're doing.

Whatever appearance parties have made, they will continue, just the continuation of the hearing. I'm just unmuting lines here. Just ask that you please -- one moment. Okay.

Mr. Elsberg, can you just give me a thumbs up if you can hear me? All right, perfect. Thank you. Okay. Just give me one second.

Okay. So I note that on December 1st the debtors filed a motion for an order establishing certain third-party factoring procedures for review and reconciliation of the debtor's receipts, release of funds for the debtor's estates, and the third-party factors. And the part of the procedures required would have authorized customers to remit receivables

without liability. There was some additional related relief there.

There was a supplement filed at ECF Number 931 which kind of tweaked a little bit of the -- excuse me -- nine -- I think it was nine. It was nine. Where was the supplement? I think it was 931. Yeah, it was a supplement at 931 filed on December 12th for the requested relief. The original procedures contemplated -- initially requested use of about 100 million that the debtors alleged a property interest in. There were certain proposed procedures which we're not going to take up today, but I just outlined for the purposes of kind of where we are.

The procedures were set -- according to the debtors were intended to facilitate kind of use of cash, but also to kind of provide some comfort to customers who are holding cash and they don't know who to pay because there are multiple parties alleging that they are the proper recipients. There was a notice in some of these papers about assignments being sent to certain customers under those procedures. I do know that some of the factors had the right to kind of take a step back.

The reason the debtors were requesting some of those funds is under the -- some of the third-party factoring, the debtors also served as the servicer. So the money -- debtors would sell the receivable but then the. The customer would pay

the debtors and the debtors would then remit the payments to the third-party factor. And so there's -- as the debtors have alleged -- indicated, there are some instances that have come out and it played out in connection with the adversary proceeding. And a lot of the evidence, and I don't need to go into it, but there was some cash that the debtors believed was not subject to any factoring because it was after the date in which the debtors stopped factoring. There was some cash that was subject to kind of a factoring agreement, or they were sold under a factoring agreement. But sometimes the invoice, in terms of what was sold, doesn't line up exactly with kind of the invoice that the factor party may hold. And so there was some question about whether there was alignment there.

Sometimes there's allegations that some of these receivables have been sold to multiple parties. And so there were procedures to try to get the money to come in and then kind of let the debtors, under their proposed procedure, sort it out. There were objections to that proposed procedure. The debtors have come forth now and asked essentially for -- kind of to release and be able to use what has been referred to as "trapped cash," money that has come into the estate in which the debtors have been holding in a segregated account related to invoices dated September 12th through September 28th, which it refers to as Category 1, and then funds related to invoices have not -- debtors believe is not associated with any

third-party factors, which they refer to as Category 2.

I do note that the relief requested under Category 1 and 2 is substantially less than what was initially requested. Debtors are seeking to use -- I think -- just want to use months. It's a little bit more than 60 million, 63 million and hold back 46 mil. The debtors have reached agreement in a proposed form of order with many of the factor parties here. Everybody's rights are reserved. And I'm not taking up the validity of anyone's argument today, which was the intent of that agreement, but many of the factor parties have allowed limited use of this cash, subject to the rights that are preserved in the proposed agreed order.

There was one objecting party, Evolution. And again, everybody has certainly expressed concern. So I'm going to talk a little bit about Evolution. But that's not to say that Katsumi and other parties haven't come in and expressed frustration and concern about cash. Evolution sold about 60 million, 60.5 million in factored funds. And according to their papers, the concern is that they're at least being told that potentially all of those funds that were sold -- the receivables that were sold maybe are subject to one or more issues. Maybe it's -- maybe double pledged, maybe it doesn't line up with where it is, but there's a lot of concern about maybe all of the 60.5 million.

They claim they have a lien on all the cash and the

receivables that are held by certain parties that they did business with. And they claim that the master factor agreement, master receivables purchase agreement that they have, gives them rights that are far superior than any other factor party.

So the question then becomes before the Court today whether I think it's true that they're entitled to have a superior lien over everyone else, and if they are, is there adequate protection for it. I think that's kind of really where we are. I don't think any of the cash that is proposed today is something that is subject to a receivable that was sold. Right? This is to any of these parties. So the question is, what do you do with the Evolution claim?

Evolution believes that -- joined in a joinder by many of the parties saying these issues should be resolved in connection with an adversary proceeding. I do agree, if everybody was getting -- all this was getting teed up and I was going to have to decide who has a superior lien between all the factor parties, that very well may trigger an adversary proceeding to determine the extent, in the interest of everyone's rights, to determine who's first, who's second with respect to certain accounts as they come in.

But here, if you really distill what's really being asked, the debtors are asking to use certain trapped cash, and they believe that there's adequate protection and the other

parties are being adequately protected. So that really this comes down to just, since we're not talking about sold accounts, really just the use of cash collateral and whether a party is adequately protected and whether this party is entitled to full, kind of, greater adequate protection than maybe even the other parties have bargained for soon, I don't think today I need to determine whether Evolution's lien is superior to everyone else's. I don't think that's the purpose of today.

The question is, even if they are, are they adequately protected? That's really what this comes down to. But I do want to make a couple of points about what I saw for parties to consider. And I kind of want to focus on Evolution's arguments in terms of where they are today.

Section 5 of the master receivables agreement says that First Brands, quote, Grants a lien on and security interest in, kind of, one, all the receivables now or hereinafter owned or held by essentially First Brand. So it's the now or here, whoever owned by First Brands. And they think that that was perfected through the UCC-1 financing statement. And when you look at any one of the UCC-1 financing statement, the collateral description says any and all present or future receivables transferred or purported to be transferred to the secured party, which is Evolution pursuant to the master receivable purchases agreement.

So as I understand, Evolution's argument is that any and all future receivables transferred or purported to be transferred to them under the master receivables agreement, what was transferred to them, they would then look to 5(g), which grants a lien on all receivables now or hereinafter held by the applicable debtor. So the question is whether that textually works. I'm not convinced that it does, to be honest.

I think you've got to read words for what they are. And I think textually, any and all present future receivables transferred are purported to be transferred under the master receivables agreement, you then determine what does it mean to transfer something, what was transferred under the master receivables agreement, if it's transferred or purported to be transferred. And looking up the definition of the word "purported," it's intended to be transferred, right?

I think the word "transferred" is used multiple times under the master receivables purchase agreement. But it's different than the use of the word "grant." The word "grant" is used in 5(g). The word "transfer" is used multiple times in the Master Receivable Purchase Agreement. But "transfer" and "grant" are used differently, which means they can't mean the same thing. And I think textually you've got to give every word the effect that it has under the relevant agreement. So what is transferred under -- to the secured party under the Master Receivable Purchase Agreement is when you kind of go

through and you look at sections like, you know, 4(g), 5, excuse me, (d), lowercase J, Exhibit D, lowercase 5 of the master receivables are going -- you get a feel for what "transfer" means, and it really refers to what was sold or specifically assigned to them, which is different than grant. And grant is only used to grant a security interest.

So something could have been transferred, but not granted textually under this agreement. That being so -- I don't know -- and certainly one can make arguments differently. I think they have every right to argue that they're entitled to every bit of the cash, the 60 million, although only 36 million, is really at issue today, based upon the amount of cash that debtors want to use. The question is -- let's assume they are today, since we're not making final calls on text. I only note that it's not an open-and-shut case in terms of just using the word "transfer" and the word "grant."

You would have to textually do an analysis and the term "purport to transfer," although it seems like a legal term of art, is not defined in Article 9 under New York law. The courts look at cases that I saw are really kind of applying the plain language meaning of what you purport to transfer, purporting to transfer in the grammatical sense as it's used there. It's only to say it's not an open-and-shut case that Evolution has that they have that they're superior to every other factor party here. I think everybody else is going to

have their day in court and we just need to figure it all out.

And I don't know what the other security agreements say and I don't know if this language is better than the other -- everyone else's language. I don't know. I don't know. We don't need to make the determination as to whether the DIP liens trump or the ABL trump. Real question is whether one is adequately protected and if debtors are purporting to use -- want to use 63 million but then want to leave back, like, 56 million. I've read the proposed terms of the adequate protection package and I think -- the concern I have with the proposed procedure in the order is that it's not like everyone agrees that it's set in stone that the debtors' analysis is sacrosanct and that no one can come -- no one -- that no one will come back and challenge whether Category 1 is really Category 1 or Category 2 is really Category 2. That's been made clear to me. That's not to say that this hasn't been a good-faith effort and folks haven't really tried or that there'll ever be a dispute about it. I just know that it remains a dispute.

That being said, I think I would feel more comfortable have granting interim -- it's not interim, but just granting relief to allow the debtors to use the cash. I think the debtors want to use 63-. I think the debtors' using 60- and three of it just stays back. Gets me a lot more comfortable in kind of where we are and it just means that the

debtor may have to come back sooner than it wants. But I think it's adequate for protection for anyone, and not -- just not Evolution. It just gets me more comfortable that if there is a mistake or well-intentioned that there's you know, 59 million as opposed to 56-, it gets me a lot more comfortable when you start thinking about adequate protection and what's really on the other side of that cash and the value of an adequate protection claim, whether there'll be fights about that or debtor cash.

I think the debtor -- I'd feel a lot more comfortable if the debtor were to use 59- and I would authorize the debtors to be able to use 60 million. But 3- of it doesn't get used and maybe it just stays right where it is and everybody's rights are what they are, but it's just additional adequate protection for whoever it is on the day that we show up. And it is what it is. It's not all granted adequate protection for Evolution. It's for whoever's won, if they're entitled to it at all. And maybe the answer is no one.

I think also we need to have a status conference to kind of understand where we are sometime next year, which is really soon. I'd like to set a status conference. And I know that there are some hearings set maybe for January 9th, and I don't want to take them up on those days. Those days -- those issues will be those issues, and I agree that Carnaby just needs to have -- that's their day. Maybe January -- the 19th

Case 25-90999 Document 319-10 Filed in TXSB on 01/09/26 Page 98 of 121



is a federal holiday. Maybe the -- January 20th or the 21st, somewhere around there. That's -- I don't know, 22nd somewhere around there. That's roughly -- that's rough justice, 30 days just to kind of see where we are, if the debtor needs to come back.

I've looked at the debtor's DIP budget. I think what I'm proposing would still work. I do. I did study the budget. I do know that it's close, but I feel a lot more comfortable with what I'm being asked to do today, which is really not make the call, allow the use. Even if the parties agree to it, by just having a little bit extra cushion I think gets me comfortable with where it is. But it's not, kind of, tied to Evolution. It's just tied to whoever is entitled to it. And it may be Evolution. Maybe Evolution has a greater right to all the cash on the other side, plus this cash, I don't know. But I think there needs to be a day where everyone can lay all their cards on the table.

And if the Court needs to make that decision, then the Court will. And maybe the DIP liens trump everything. It's just there's a day for it all. That day is not today, but one is going to use cash and allow it. I feel more comfortable with that getting there, unless maybe the debtors need to come in sooner than that. Then maybe we can talk January 13th, if you had to. But if the parties wanted to kind of take 30 days, and, I don't know, just kind of play around with it and just --

I'm fine either the 13th in the afternoon, subject to what -- if Rosario tells me otherwise, or the 22nd. I know that the 20th, 21st, those days seem to be open and we could just pick a date.

It could be a status conference. We could tee certain things up on those days. But at a minimum, I can get a better understanding as to kind of what February would look like, in light of discussions now in connection with January. An examiner will be up and running. There's other issues that we've got to take care of in connection with the adversary that I need to kind of talk about. Not today, but I think I'd feel a lot more comfortable. But that's where we are.

So, Mr. Singh, maybe you can kind of tell me what your thoughts are.

MR. SINGH: Thank you, Your Honor. Sunny Singh, for the record, Weil Gotshal, on behalf of the debtors. Thank you, Your Honor, for that.

You know, one update that, as I mentioned earlier, the debtors and the creditors' committee, they -- primarily A&M and M3, were working through the numbers. And I think sort of somewhat coincidentally, but conveniently with the numbers you described, in Category 2, I think there's additional reductions that M3 and A&M have agreed would be appropriate to make for now, which would reduce the number -- I don't have the exact number, but in the ballpark of $3 million.

So, Your Honor, what we were going to propose is actually language, and we've shown it to the other factoring counterparties in the room, that just says Category 2 is a number it is, you know, parenthetical subject to reductions agreed by the debtors and UCC. And obviously we would show the other factors, the results. And we're happy to add in that, you know, total, we're not going to take out more than 60-, consistent with your ruling, Your Honor. But I think the number would have gotten us to right about that ballpark anyway. So we're perfectly comfortable with that.

Just on the hearing, Judge, you know, from the debtor's perspective -- and I do want to give it some thought, but we were contemplating -- we had understood you had some time on January 13th.

THE COURT: I probably do. If you talk -- I'm sure --

MR. SINGH: We checked with your --

THE COURT: Oh. Well, then the answer is yes.

MR. SINGH: Yeah.

THE COURT: In the afternoon, it looks like.

MR. SINGH: Yeah, in the afternoon. I mean, we were contemplating going forward with our procedures and the request for the release of the sort of, you know, category, you know, whatever is left.

THE COURT: I'm fine with that.

MR. SINGH: Okay.

THE COURT: I'm fine with -- but, again --

MR. SINGH: Okay. And obviously they could all --

THE COURT: -- subject to all objections.

MR. SINGH: Sure.

THE COURT: All procedural objections to take everything up.

MR. SINGH: Yeah. And what I'll do, Your Honor, is we will go back -- if we can hold that date. It seems to work for the motion, obviously subject to everyone's rights. But we'll go back and think about your comments today and confer with the other parties. And if the date needs to move, it needs to move. But right now we'd like to press forward on the 13th. And, Your Honor, I know that the 9th is a full day for Carnaby, which we understand, but if Your Honor would be willing to carve out a quick status conference at the beginning of that hearing so we can update you on where we are, you know, ahead of the 13th date, that might be -- and people can do it virtually or they're here, just to give you an update of where things stand.

THE COURT: I don't think Carnaby is going to mind if we took from 9 to 9:30 for a status update and then kind of started with they're hearing.

MR. SINGH: Yeah. So if we could proceed with that, I think, Judge, that would make a lot of sense, from our

perspective, and we can have a little bit of a better plan after we've had an opportunity to confer.

THE COURT: Let's just call it -- but let's just call it a 30 minute because --

MR. SINGH: Yeah.

THE COURT: Yeah, I want to be respectful to the folks who came in and so -- but we could have just a general status conference from 9 to 9:30, kind of really targeted.

MR. SINGH: Yeah.

THE COURT: Right to the point.

MR. SINGH: Yeah. And we'll make sure we confer with the counterparties in advance to try to have, you know, the sort of issues that we need to address with you. And Your Honor, obviously it's your court. I'm going to be here in person, but if others wanted to appear virtually for that 30-minute conference, the debtors would have no objection.

THE COURT: No, if you're just here for the status conference, I've got no issues with appearing virtually. And I also want to be really clear about -- I mean, Evolution can have really strong arguments to say, look, you missed X, you missed Y. And I'm open to all of that. And so this is -- it's just -- the purpose of me kind of just going through that is I think one can look at adequate protection kind of holistically like who -- regardless of whose priority it is, it's still preserving everyone's right as opposed to saying they -- this

party is the clear winner and they're entitled to full adequate protection, full stop. And they trump the ABL, they trump everybody. It's just to kind of just indicate that it's not a clear answer just based upon the words, but there may be very -- they may trump everyone. Maybe someone has better, you know, has better papers.

I just -- what I'm saying is I don't want anyone to read what I did today and say that this means that they have no security interest. It's not that. It's just to say it's a more difficult question. So I think adequate -- let me not make the choice as to who it -- whose money it is. It's just regardless of what it is, whoever's money it is, if it's anyone's, they're adequately protected based upon kind of the 60 million slip.

MR. SINGH: Understood, Your Honor.

THE COURT: That was the purpose of it. And I want to just give Evolution some comfort on that, and anyone else. I don't think anyone ought to kind of quote me as making a final ruling on that. It was just to kind of highlight the complexities of it and that it's not that easy of an answer.

MR. SINGH: Understood, Your Honor, and appreciated. The one thing, you know, our order does propose an objection deadline, and just so we can have, you know, a little more formality and order to whenever we are before you. I think we had proposed January 2nd.

THE COURT: That's cruel.

MR. SINGH: Well, they had selected -- I think we're okay, but I'm happy to push it a couple of days if we need to. But if we could just set a deadline so that the debtors know what they're shooting at, that would be much appreciated. If it's not the 2nd, that's not the end of the world, from my perspective.

THE COURT: Yeah. If we're going to do the 13th, I'm going to give parties to the 6th at noon Central.

MR. SINGH: Thank you. Okay, so we'll adjust the order.

MR. CASSEL: Can we hear from other parties on these dates before we start locking things down, please?

THE COURT: No, no, no. I'm just saying from the -- if -- but if they want to go forward, I think -- oh, you're saying --

MR. CASSEL: (Indiscernible)

THE COURT: Oh. All right. Let me -- that's a fair point. I should.

MR. SINGH: Sorry, Your Honor, I thought --

THE COURT: No.

MR. SINGH: -- we had checked with the other parties.

MR. CASSEL: You might not have seen emails or emails going around.

MR. SINGH: Can I let Mr. Cassel speak to their

issues on timing? We've been --

THE COURT: No, no, no, go ahead. I apologize. I Should have --

MR. CASSEL: Good afternoon, Your Honor. Cassel of Wachtell for the Leucadia parties. The 14th or the 15th works better for us if the Court has availability that day.

THE COURT: I am gone the 14th through the 16th. I won't be around in person. So that's why I was looking at, like, the 13th or the 20th. That's the thought on my end. I'm the problem that Wednesday, Thursday, or Friday.

MR. CASSEL: Fair enough, Your Honor. The only other point I'll note just substantively is the disputes that'll be coming your way. It's not quite adequate protection. The argument that the factors are making is they purchased --

THE COURT: No, no, no. I got you. You're exactly right.

MR. CASSEL: -- these receivables, so it's not property of the estate, would be the argument.

THE COURT: With respect to the other --

MR. CASSEL: With respect to the funds in the factor receivables account, one of the arguments --

THE COURT: 1, 2, 3, or 4, you're still reserving the right to argue this is -- we purchased this, this is our money.

MR. CASSEL: It's our money, not property of the estate.

THE COURT: Yep, yep, yep, yep.

THE COURT: So it's not quite an adequate protection issue so much as it's an owner -- who owns particular property issue.

THE COURT: I agree. No, no, no. I think you're. I think those arguments are preserved.

MR. CASSEL: Yep. I think they're preserved by this order. I just wanted to clarify. It's not just how we're thinking about it.

THE COURT: Well, I was just thinking about for purposes of the matter that I had in front of me.

MR. CASSEL: Yeah, of course. Of course.

THE COURT: Yeah. Because they were arguing UCC stuff.

MR. CASSEL: Precisely.

THE COURT: Yep.

MR. CASSEL: That's a lien issue. It's -- their argument, to the extent that exists, it's a lien on property of the estate. The issues for the other factors are about ownership as opposed to whether they have a lien on it.

THE COURT: If you purchase a receivable.

MR. CASSEL: If we purchased it, if we validly purchased it, then we own it. And so that's sort of the distinction there.

THE COURT: Yep, yep, yep.

MR. CASSEL: Thank you, Honor.

THE COURT: No, no, I got it. In other words, you're still preserving the argument that within Category 2, it -- there -- you may still want to make the argument that you have found evidence that you purchased a certain receivable that is -- that they've designated as Category 1 or Category 2.

MR. CASSEL: Correct. And it's a different argument than the one they're making, which is they have a lien on this stuff. We -- our position is we own it outright.

THE COURT: Correct. Correct. No, no, no. I got it.

MR. CASSEL: Thank you.

THE COURT: Yep. Yep.

MR. KELLEY: Your honor, I appreciate the Court's availability in making -- going through your calendar. I just want to make sure the concept of status conferences didn't get blended from what I was raised earlier this morning to what the Court's thinking now. In the order that we submitted to Your Honor to review, there is a 45-day deadline by which the receivables parties must raise an objection as to Category 1 and Category 2, which can have a dispositive effect on our rights.

So the status conference we are focusing on, particularly as it relates there was 30 days out from when the Court enters that order to allow us to bring to your attention

adequacies, inadequacies of discovery, of exchange of information before our rights were cut off. Or else the receivables parties are going to file claims as to all of Buckets 1 and 2. That seems inefficient to me. And so we were hoping a status conference would allow us to address shortcomings in discovery before these were cut off.

THE COURT: Yeah, we're going to have to figure that out because I think if I -- maybe I'm disconnected.

Mr. Singh, you want to go forward on the whole thing?

MR. SINGH: That's correct, Your Honor.

THE COURT: So in other words, they're trying to tee it up.

MR. KELLEY: And we're going to be arguing, obviously, why we think the need for an adversary is critical for that, for the various discovery issues that we've already flagged for the Court. So I get it, if we're going to go forward. I understand that the 13th is problematic for a couple of parties. 14th and 15th work for us, but I understand the Court's unavailable.

THE COURT: Yeah, if it's going to be the -- if the 13th doesn't work, then I'm going to look at -- ask parties to think about the 20th.

MR. KELLEY: That -- which is fine for us. We can make that work on those days. The concern I have, Your Honor, was to accommodate some discovery disputes we had going on

about availability of deposition. I personally have locked up the 9th. I had to move an entire mediation. So doing the status conference on the 9th, it's counter to what we were trying to.

THE COURT: No, no, there's a trial on the 9th and I'm not moving that.

MR. KELLEY: I thought I heard you say you were going to do a status conference that day.

THE COURT: Oh, just a -- one could do from 9 to 9:30, just a general status conference where I just listen, on what's going on and --

MR. KELLEY: Okay. And that's related to whatever date for the upcoming hearing, whether it's the 13th or the 20th. Is that what you were contemplating?

THE COURT: But if that may move -- yeah, that may move if it's not the --

MR. KELLEY: And I have a number of people who've been texting me saying given the dates we're looking at, please do not make the deadline on the objection January 2nd for many reasons that I think you can forecast.

THE COURT: No.

MR. KELLEY: And we'd like it to slip more than a couple of days. Happy to have that conversation with the debtors, but I think we need to resolve when the hearing's going to be so the debtors aren't put in a bind.

THE COURT: Now, I had to file Something on December 31st at 8 o' clock at night one night and I vowed to never do that to anyone again. Yeah.

MR. KELLEY: I remember. I'm old enough to remember when we had to do the Dropbox and drive up here and punch it.

THE COURT: You had to punch it so -- Mr. Singh, I think we've got to figure out --

MR. SINGH: Yep. And, Your Honor, again, I ordinarily would be happy to accommodate schedules, but we kind of have got to see if we're going to get this cash or not. It's critical. And so I would respectfully ask Your Honor that we do the hearing on the 13th. I think Your Honor mentioned an objection deadline of was it the 6th at noon? Which is fine from our perspective.

I mean, this motion's been out there now since December 1st. We filed it. Right? And even the supplement was on the 12th with that information. So people -- it's not like they're getting the information after today's hearing. It's already out there. That'll give people roughly 36 days with the information.

And on the 9th, all I wanted to do, Your Honor, was to -- we don't even have to have it, or it can be on the 8th. There's no magic to the 9th, but since people are here, the point was just to give you an update based on our -- you know, we're going to confer with each of the parties after this on

can we narrow the issues for the 13th or exactly what will go forward on the 13th. To give you an update on that was kind of what I was suggesting.

If the factoring counterparties want to have a further conference before that 45-day period is up, you know, sure. You know, or we could just take that up on the 13th, kind of where they are with respect to the 45 days and, you know, reconciliation of information. But I think, Your Honor, the simplest thing, from the debtor's perspective, would be a hearing on all of the motion and the supplement on the 13th with an objection deadline as you proposed.

THE COURT: What am I teeing up on the 13th, whether we need an adversary proceeding or not?

MR. SINGH: Well, that's one of the issues. I think they're going to raise all objections because we want to get that sort of, you know, the remaining Bucket 3 released, and then the procedures themselves.

THE COURT: Okay.

MR. SINGH: Right. So they may have actual, you know, additional objections to the release of Bucket 3, including, you know, their procedural objection of whether or not this needs to proceed through an adversary proceeding.

THE COURT: And the debtors are still proceeding with the request to allow customers to deposit the money.

MR. SINGH: Yes, and Your Honor, thank you for

bringing that up because, look, that is another critical piece of this motion that we've deferred. You know, customers are holding about $150 million at the time we filed a motion because they don't know who to pay. I mean, one of the reasons, like, we have other issues we're dealing with the customers. But we really would like to clear this up sooner rather than later so that those receipts can start coming in to the debtors, go through the same process of reconciliation that we're talking about, work with the factors, you know, to the extent they relate to the prepetition receipts. Right?

But, you know, so we got to get that money released, Judge. And so the difference between the 13th and 20th or beyond really is significant, from our perspective, because that is another critical portion of the relief that we are seeking. And so again, Judge, I don't want to ruin anyone's holidays, certainly not in Your Honor's, but it's really that important for the estate.

THE COURT: No holiday on the 13th.

MR. SINGH: Well, you know, over the Christmas break, so --

THE COURT: Let me just hear from other parties about scheduling and timing.

MR. KELLEY: I'm sorry, Judge, I'm just confused about a couple things. Charles Kelley for the Katsumis. Our objection is loaded with our concerns about what's been

produced to date, whether it's Bucket 1, 2, 3 or 4. Unless there's a dramatic change in the discovery productions that come from the debtors, and it's hard to explain the volume of materials that's at stake here, they dump them all on us tomorrow, we're still killing holidays trying to get people up to speed and it's a tall order to say, but we want to go into something that otherwise we have the benefit of discovery from an adequate protect -- from an adversary proceeding on January 13, so --

THE COURT: Right. I'm saying but I suspect you'll then file something and then tell me.

MR. KELLEY: Well, we were hoping to do that in the status conference, and we'd talk and arrive at something reasonable, but if the Court would like us to file objections or discovery --

THE COURT: Don't put it on me. I --

MR. KELLEY: We are happy to deal with it in whatever way Your Honor prefers.

THE COURT: Oh, I just think it -- we're going to have to pick a date, and the question is whether the date works or not in light of, kind of --

MR. KELLEY: I just don't want people to lose sight of the fact that even production of information still has to be processed. And that's the issue that I wanted to just flag. Sorry, Your Honor.

THE COURT: No, let me hear from any other party online or --

I need to give this some thought a little bit. The concern that I have is that that hearing could go long based upon everything that I'm hearing. And it may just be legal argument if I think there needs to be an adversary or that I don't have authority to do some of the -- it can get really short, but it can also go really long. I need to just think about the dates. Give me -- I just need to -- I need to check with my case manager on some stuff. I'll get back with the parties by the end of the day and give you an answer on this. I need to -- let me just hear from the parties. If we -- I get the debtor's concern about the 20th. Let me hear the concerns about the 13th. Aside from that someone's going to file a motion saying we don't have enough information to go forward on this date, and we've done that. So what other concerns do the parties have and how long does -- how long of a proceeding do we contemplate, if one were to have this hearing? Guess it just depends on what you got.

MR. SINGH: Yeah, I think it would easily take up, you know, that afternoon, Your Honor, if it's going forward, contested, and probably longer, is my understanding.

THE COURT: Here's the -- and unfortunately, I can't move, and I'm traveling on the 14th in the morning. So, like, we would have to finish on the 13th in the afternoon. And

that's what I'm trying to get a sense of, kind of. I need to just think about it.

Yes, Counsel.

MR. CASSEL: Judge, just in terms of what would be contested, if we were to go forward on a contested hearing on the 13th, there'd be the adversary proceeding issue. Do we need to have an adversary proceeding? There'd be a legal argument over the customer injunctions, as we called them in our pleadings, whether those work under the bankruptcy code and the adversary proceeding rules as well. And then there are various merits issues that we were going to tee up. If we're going forward and they're talking about --

THE COURT: Some various what? Excuse me.

MR. CASSEL: Merits issues.

THE COURT: Oh, got it.

MR. CASSEL: If we're going forward on releasing receivables, we have arguments to the effect that we should be the rightful owner of some of the receivables that they claim they own. Their position is if the invoice number doesn't match, then --

THE COURT: Under the procedure.

MR. CASSEL: Under their construct, if the invoice number doesn't match, they own the money. We disagree with that, both just on a straight legal basis, but also we think factually there are things that we could -- like, if we can

demonstrate there are connections between -- maybe the invoice number is wrong, but everything else about the invoice is a dead ringer for ours.

THE COURT: Right.

MR. CASSEL: We think we own that in that kind of scenario. And that's part of the reason why we need factual development is to, like, understand how, if any, there were connections between the fake invoices and the real ones. So part of the argument is going to be, you can't do this because we don't have the facts yet. Part of it may also be, as of some of these receivables, we own them because the information we have is enough to say we own them. So it could be a pretty contested hearing if we -- and that's why we need the discovery, is to see if there's --

THE COURT: What is the status of discovery on your end? And I know Mr. Kelley has a position on it, but what is your position on the status of discovery?

MR. CASSEL: Very incomplete, Your Honor. They've produced very limited information.

THE COURT: When did it start, from your perspective?

MR. CASSEL: Pretty much the second -- well, we filed 2004 requests, you know, very early, you know, November we started informal discovery before that. When they served this motion on December 1st, we filed discovery, we filed document requests, we filed interrogatories. We did a 30(b)(6). The

information at the 30(b)(6) deposition, if you read the transcript, the debtors responded to almost every question about how the fraud was conducted, how the invoices were connected with, I don't know, we have no idea, that's under ongoing investigation.  So the discovery is very, very much in its infancy.

THE COURT:  Let me give it some thought.  The real question in my mind, and I want parties to think about it, is if one had four to five hours on the 13th, do you just tee up the legal issues and see where you are?  Because they may be -- I'm not sure that this is the right thing to do.  I'm just thinking about a bunch of things in my mind in terms of -- as I got it, there are procedural --

MR. CASSEL:  Right.  There are fewer issues of law that maybe could be decided, although, again, our position is those have -- some of those would have to be decided within an adversary proceeding.  And then there's -- but the question of whether it needs to be an adversary proceeding, I suppose --

THE COURT:  That's what I mean, whether you would need an adversary and to what extent.  What I think I'm comfortable doing under the procedures, as a matter of law, when we're -- what you all argue -- what they argue in terms of what I have authority to do one way or the other in terms of the customer issue.

MR. CASSEL:  Right.  And of course, part of that is

our view is they're seeking various forms of injunctive relief, like we have to withdraw notices that we sent prepetition. They say we have to withdraw notices. They have to -- they say that --

THE COURT: I understand.

MR. CASSEL: -- direct customer -- we think that's equitable relief. We think the rules say that's an adversary proceeding. So there's sort of two questions there. One is, does it need to be an adversary proceeding? And then there's also the substantive question of, okay, even if it were an adversary proceeding, can I do that? Because our view, under the UCC, is we have direct claims against customers. Once we become -- we're the assignee of their receivable, we think we have a direct claim. And so they're saying, pay someone else. We think that's a third-party release.

THE COURT: No, I got it.

MR. KELLEY: Thank you, Your Honor.

THE COURT: Thank you.

MR. SINGH: Your Honor, as you're thinking through the issue -- sorry. Sorry, Your Honor. As you're thinking through the issue, I mean, just one suggestion, from my perspective. If we could start on the 13th, right, with the debtors' understanding that, you know, we're not going to go beyond whatever time in the afternoon Your Honor is available, I think that alone would be very helpful. Right? And it's

sort of on us to get as much done as possible on the 13th, use it as most efficiently, ideally finish on the 13th, but even, you know, clearing out some of the issues that Your Honor's been raising and talking about would be very helpful, because then, you know, what I don't want to have happen, and then the 20th is we're starting, and then it's sort of, you know, but if we can start on the 13th and Your Honor is reserving the 20th, I think that would be fine, from the debtors' perspective.

And we'll work with the parties to make sure we're using all of the Court's time as efficiently as possible, you know, but this will give us something to focus on. And Your Honor, I'm not standing to respond to the discovery comments.

THE COURT: Yeah, I got it.

MR. SINGH: Your Honor will hear about that, you know, later. That's not really for today. But I think that way we've got something we're aiming for. You know, we're focused on when we're going to get cash in. We can work with the parties on, you know, is there another efficient resolution like we had today or is there not, or should we just get started?

THE COURT: Thank you. Let me --

MR. SINGH: So with that, Your Honor, obviously you're going to think about it, but I wanted to just let you know we would be fine with that.

THE COURT: Okay. Let me ask if anyone else wishes

to be heard on timing on any of these issues, either in the court or online.

Mr. Singh, one way or the other -- and just -- and maybe it can get rolled into the actual, kind of, hearing itself, just kind of what -- and maybe the answer is -- maybe I need to answer this question before I can get the answer to the question that I'm looking for is kind of what February and March look like from a cash standpoint.

MR. SINGH: Yes.

THE COURT: But I suspect I need to answer these questions first to then allow you to kind of answer those questions.

MR. SINGH: Yes. And Your Honor, I think, you know, we can give you a better sense of that either at this hearing, the status conference, et cetera.

THE COURT: Today's not the day for it. It's just that --

MR. SINGH: Yeah, today's -- you know, there's a lot going on in the labs, I would say, Judge, and there's a lot of work and conversations that are happening. And so I think we will definitely be able to report back to you in the January time frame so that you have a sense of it going forward.

THE COURT: Okay.

MR. SINGH: Yeah, that makes a lot of sense.

THE COURT: Thank you very much for your time,

everyone. Thank you.

MR. SINGH: Thank you, Your Honor. Your Honor, we'll upload a modified order just with the changes I discussed with you.

THE COURT: Okay. Thank you very much. And happy holidays. Thank you.

MR. KELLEY: Happy holidays, Judge.

MR. SINGH: Thank you, Your Honor.

(Proceedings concluded at 3:46 p.m.)

## CERTIFICATION

I, Ilene Watson, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

ILENE WATSON, AAERT NO. 447 DATE: December 24, 2025

ACCESS TRANSCRIPTS, LLC

# Exhibit 6

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | CASE NO: 25-90399-cml |
| | ) | |
| FIRST BRANDS GROUP, LLC | ) | Houston, Texas |
| AND OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS, | ) | Tuesday, January 13, 2026 |
| | ) | |
| Debtors. | ) | 1:01 p.m. to 6:47 p.m. |
| ------------------------------ | ) | |

HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For First Brands Group, LLC: | SUNNY SINGH<br>ROBERT S. BEREZIN<br>Weil Gotshal and Manges<br>700 Louisiana Street<br>Houston, TX 77002 |
| For Official Committee of Unsecured Creditors: | JEFFREY L. JONAS<br>Brown Rudnick<br>7 Times Square<br>New York, NY 10036 |
| For Ad Hoc Prepetition Lenders and the DIP Lenders: | ANNELYSE SCARLETT GAINS<br>Gibson Dunn & Crutcher<br>200 Park Avenue<br>New York, NY 10166 |
| For Katsumi Servicing, LLC: | CHARLES STEPHEN KELLEY<br>RICHARD A. STIEGLITZ<br>SEAN T. SCOTT<br>Mayer Brown LLP<br>700 Louisiana Street<br>Houston, TX 77002 |

| | |
|---|---|
| For Onset Financial, Inc.: | BENJAMIN BUTTERFIELD<br>Morrison Foerster LLP<br>250 W. 55th Street<br>New York, NY 10019 |
| For Carnaby Secured Lenders: | ALLAN S. BRILLIANT<br>Dechert LLP<br>1095 Avenue of the Americas<br>New York, NY 10036 |
| | MEGAN N. YOUNG-JOHN<br>JOHN F. HIGGINS, IV<br>Porter Hedges LLP<br>1000 Main Street<br>Houston, TX 77002 |
| For Bank of America, N.A.: | DANIEL J. MCGUIRE<br>Winston & Strawn LLP<br>800 Capitol Street<br>Houston, TX 77002 |
| For Leucadia Asset Management, LLC: | EMIL A. KLEINHAUS<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY 10019 |
| | PAUL E. HEATH<br>Vinson & Elkins<br>845 Texas Avenue<br>Houston, TX 77002 |
| For Raistone Capital, LLC: | LAURA D. METZGER<br>EMANUEL GRILLO<br>Orrick Herrington & Sutcliffe LLP<br>51 West 52nd Street<br>New York, NY 10019 |
| For ING Bank: | DOUGLAS DEUTSCH<br>Clifford Chance<br>375 9th Avenue<br>New York, NY 10001 |
| For Arab Banking Corporation B.S.C.: | JOHN R. DODD, II<br>Baker McKenzie LLP<br>830 Brickell Plaza<br>Miami, FL 33131 |

For Evolution Credit Partners: VINCENT INDELICATO
CHARLES A. DALE
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036

Court Reporter: YESENIA LILA

Courtroom Deputy: YESENIA LILA

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

INDEX

| DEBTORS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DANIEL JERNEYCIC | | 157 | | |

| DEBTORS' EXHIBITS | RECEIVED |
|---|---|
| Exhibit 6-24 and 26-30 | 142 |
| Exhibits 5 and 6 | 204 |

HOUSTON, TEXAS; TUESDAY, JANUARY 13, 2026; 1:01 PM

(Call to Order)

THE COURT: Good afternoon. This is Judge Lopez. Today is January 13th. I'm going to call the 1:00 p.m., First Brands. I'll take appearances in the courtroom. Anyone on the line, why don't you hit 5, star, and I will unmute your line. Mr. Singh, good afternoon.

MR. SINGH: Good afternoon, Your Honor. Sunny Singh, Weil, Gotshal, on behalf of the Debtors, joined by some of my colleagues, including Robert Berezin, who's going to be handling one of the matters today.

THE COURT: All right. Good afternoon. Not everyone at once.

MR. KLEINHAUS: Good afternoon, Your Honor. Emil Kleinhaus, Wachtell, Lipton, Rosen & Katz, on behalf of the Leucadia parties.

THE COURT: Good afternoon.

MR. KLEINHAUS: I'm here with Paul Heath of Vinson & Elkins.

MR. GRILLO: Good afternoon, Your Honor. Emanuel Grillo, Orrick, Herrington & Sutcliffe LLP, with my partner, Laura Metzger here in the courtroom, and other colleagues on the line, on behalf of Raistone Purchasing Series XXXII LLC.

THE COURT: Good afternoon.

MR. KELLEY: Good afternoon, Your Honor. Charles

Kelley, of Mayer Brown, on behalf of Katsumi Services. I'm joined online by my colleague and law partner, Sean Scott, who will be handling our legal argument on our objection today.

THE COURT: Thank you.

MR. KELLEY: And I'll be in the courtroom covering everything else. Rich Stieglitz is also on the line covering.

THE COURT: Thank you.

MS. YOUNG-JOHN: Good afternoon, Your Honor. Megan Young-John, of Porter Hedges, also joined by my partner, John Higgins, on the line, on behalf of the Carnaby II and III Secured Parties. We also have co-counsel from the Dechert firm, Allan Brilliant, who is also appearing virtually.

THE COURT: Okay. Thank you.

MR. DALE: Good afternoon, Your Honor. Charles Dale and together with me today, my partner, Vincent Indelicato from Proskauer Rose. We're joined by co-counsel, Emily Shanks, from the Gray Reed firm, and we represent Evolution Credit Partners.

THE COURT: Good afternoon.

MR. DALE: Thank you.

THE COURT: Let me just turn to the phone line. Okay, here's a (212) number.

MR. BRILLIANT: Good afternoon, Your Honor. Allan Brilliant, on behalf of the Carnaby II and III Secured Lenders.

THE COURT: Good afternoon. A (312) number.

MR. DODD: Good afternoon, Your Honor. John Dodd, from Baker McKenzie, on behalf of Arab Banking Corporation.

THE COURT: Another (312) number. Good afternoon, sir.

MR. MCGUIRE: Good afternoon, Your Honor. Dan McGuire, Winston & Strawn, on behalf of Bank of America's ABL Group.

THE COURT: Okay. Good afternoon. A (212) number.

MR. DUKE: Good afternoon, Your Honor. Michael Duke, from Elsberg Baker & Maruri, on behalf of the Evolution entities.

THE COURT: Good afternoon. A (312) number.

MR. SCOTT: Good afternoon, Your Honor. This is Sean Scott of Mayer Brown. As Mr. Kelley said, I'll be presenting the argument on the issues related to the procedures motion. Good to see you again.

THE COURT: Good afternoon. A (617) number.

MR. JONAS: Good afternoon, Your Honor. Jeff Jonas, Brown Rudnick, for the committee.

THE COURT: Good afternoon. A (347) number. I've

got two more.

MR. DEUTSCH: Good afternoon, Your Honor. Doug Deutsch, from Clifford Chance, on behalf of ING Belgium.

THE COURT: An (847) number.

MS. GAINS: Good afternoon, Your Honor. AnnElyse Gains, of Gibson Dunn, on behalf of the Ad Hoc Group of DIP Lenders.

THE COURT: Good afternoon. And a (510) number.

MR. BUTTERFIELD: Good morning, Your Honor. Ben Butterfield, of Morrison & Foerster, for Silver Point Capital.

THE COURT: All righty. Anyone else, please hit 5, star, and I will unmute your line. All righty. Okay.

MR. SINGH: Okay.

THE COURT: Good afternoon.

MR. SINGH: Thank you, Your Honor. Again, for the record, Sunny Singh, Weil, Gotshal, on behalf of the Debtors. Your Honor, we filed an amended agenda with respect to today's hearings. We have a couple of matters on. The first one is just a status update and conference with respect to the CarVal matters.

THE COURT: Okay.

MR. SINGH: CarVal is represented by Mr. Brilliant and the team at Dechert. Your Honor, you'll recall we had a hearing scheduled for January 9th with respect to CarVal's

motion for relief from the stay and to dismiss. That was all adjourned, remains adjourned to January 22nd while the parties continue to talk.

But pending that agreement, we had agreed to come back, report status on Your Honor -- to Your Honor today on where we are. And we had also agreed that absent an agreement of the parties or in order of the Court, the Debtors would no longer use CarVal's asserted collateral beyond January 13th and beyond today.

And Your Honor, we've been talking and have agreed that January 13th deadline to no longer use collateral has been extended by agreement of the parties through this Friday, January 16th. And so I just wanted to give you that report. We are documenting this and we'll have an order for Your Honor to sign that just lays this all out. But that's the current status.

So if we need it, we'll be back on the 22nd to hear their motions. But ideally, we will be able to get something done.

THE COURT: Okay. Thank you. Mr. Brilliant?

MR. BRILLIANT: Your Honor, Allan Brilliant. May I be heard?

THE COURT: Yes, of course. Yes.

MR. BRILLIANT: Thank you, Your Honor. What Mr. Singh, you know, accurately reflects the conversations we've

Case 25-90999 Document 3189-1 Filed in TXSB on 01/09/26 Page 10 of 421



been having since last week. Obviously, there's no assurance that we're going to reach an agreement, although all the parties I think are trying very hard to do so.

In the meantime, you know, the Debtors continue to use our collateral, subject to article -- the protection stipulation in the order that was previously agreed to, and entered by the Court. You know like with respect to some of the other lenders, they are in default under that agreement. You know and we reserve all of our rights with respect there, too. Hopefully, we'll be able to resolve everything prior to the 22nd. But if not, we have the hearing scheduled then.

At the last hearing, Your Honor, although you scheduled the continued -- the hearing to the 22nd, we never set a start time. So we would ask that, Your Honor, do that at this point so parties can plan. You know 9:00 or 9:30 would be preferred by us. Our team will all come in the night before. But it's obviously up to Your Honor as to what's most convenient for the Court.

THE COURT: Can you give me the date one more time? I'm just pulling up my calendar now.

MR. BRILLIANT: The 22nd, Your Honor, which I believe is a Thursday.

THE COURT: It is. Which time did you say you preferred?

MR. BRILLIANT: Oh, 9:00 or 9:30, whatever works best for the court.

THE COURT: Why don't we do the 22nd at 9:00 a.m.?

MR. BRILLIANT: Thank you, Your Honor.

THE COURT: Okay.

MR. BRILLIANT: And as Mr. Singh said, you know, our agreement to extend the use of our collateral, including our cash collateral, to Friday will be embodied in a formal stipulation, which hopefully will be presented to the Court this afternoon.

THE COURT: Okay. Thank you. Okay.

MR. BRILLIANT: Thank you, Your Honor.

MR. SINGH: Thank you, Judge. That takes us to the second matter that's on for today's hearing, Your Honor. This relates to the Debtors factoring procedures motion, including our request to release certain cash that, you know, we describe as trapped cash that's being maintained in our segregated account per Your Honor's prior court orders.

Your Honor, today's hearing was scheduled by you to consider procedural issues with respect to the remaining relief requested, and in particular, you know, I think whether we need an adversary proceeding. You didn't limit it to those issues, but that's one of the main issues that I think the parties have a disagreement about.

So, Your Honor, we appreciate and heard you at the

Case 25-90999 Document 3980-10 Filed in TXSB on 02/09/26 Page 208 of 421



December 13th -- excuse me, December 30th status conference, and with that guidance, we've been working with the factoring counterparties to see if we can carve out a path forward that either resolves everything or at least tries to narrow and limit the issues that Your Honor has to consider.

So I'm happy to report that we've got an agreement with some of the factoring counterparties on how to proceed, but unfortunately, not all of them. My understanding, and this is not intended to bind anybody, but just of the current state of play, I believe the Leucadia parties and Raistone are okay with the proposed order that's been filed, although they may want to be heard this afternoon.

But in that as of now, Katsumi Evolution and ABC Bank are not consenting to the revised proposed order. I may have left out Mr. Deutsch's client who I think. ING. Thank you. ING is also on board with the order. Sorry. Thank you. Your Honor, basically, just to outline where we are, and then we can obviously have the procedural issues heard by Your Honor.

So currently, following Your Honor's order that allowed the release of cash going back on December 30th, that was about $55 million. So currently, in the segregated account, there's 65.3 million approximately. Of that amount, Judge, we are now only seeking relief with respect to approximately $18.1 million to be released pursuant to

the agreed terms and conditions that are set forth in the revised order, and I'll go into that a little bit.

But importantly, the balance, which is about 47 million as of today, you know and money continues to come in there, that 47 million, Your Honor, we agree. And that's, if you recall the categories, that's Category 3, where people were asserting we've got an interest, you know and need more time.

And so we've agreed where we've got a dispute about whether or not that -- those funds are estate funds or factored funds, that the Debtors are adjourning that piece of the motion indefinitely to allow the examiner to do his work. And, Your Honor, if we, at some point, decide, we the Debtors, decide that we do want to proceed, and go forward with respect to the release of those funds, we would proceed by adversary proceeding with respect to those disputed amounts.

So Judge, that leaves the 18.1 million that we're seeking now to -- well, I should say still seeking, not today that it would be released. Because today's just about procedure and whether we need an adversary or not. In our view, we don't need an adversary proceeding. People will be heard today about that issue, and Your Honor will tell us.

But there's really three categories of costs, and, Your Honor, we did file a declaration by Mr. Jerneycic, a

supplemental declaration. The purpose of that is not to have evidence before you today, but we thought it would be helpful for Your Honor to just know what the current dollars are, and what we're actually moving forward on so you can see it on a piece of paper.

Again, I don't need that, you know, submitted today for procedural issues. It's really just to guide the Court, and frankly, the parties on the current amounts that are there and what we're seeking. So, Your Honor, at the end of his declaration, and again, I don't need to have it admitted, but just for Your Honor's reference, there is a chart, and I'm just going to explain to you some of the numbers in that chart. We may have extra copies. We have some extra copies if that's helpful.

MR. KELLEY: Judge, I'm loathe to interrupt someone's statement, but the Court's position on the hearing today was less than procedural. It was only going to be legal arguments, and we were going to oppose, and our statement reflects our intent to try to oppose any sort of backdooring of factual evidence.

The parties do not agree with the Debtor's characterization or categories, and so, fundamentally, I think I just need to lodge an objection for the record that we're opposed to any submission of any declaration, including the last-minute one that hasn't been vetted.

It certainly hasn't been run by our financial advisors. Those are disputed facts with all due respect to Your Honor, because I know you will know how to cabin those off. I have to lodge an objection to their attempt to backdoor a declaration before a hearing that's purely legal.

THE COURT: No, I'm not accepting the declaration as evidence, or I'm just taking it from Mr. Singh telling me what he thinks is Category 1, 2, and 3. It will have no weight in terms of evidentiary foundation. It's just what someone thinks the numbers are.

MR. KELLEY: I'm confident you'll be able to --

THE COURT: Yeah.

MR. KELLEY: -- cabin it off as appropriate, but I just --

THE COURT: No, understood.

MR. KELLEY: -- full disclosure to give the Court an understanding of where things stand.

THE COURT: No, I got it. I got it. Okay.

MR. SINGH: Thank you, Your Honor. Your Honor, I have a copy just of the blown-up chart, if that would be helpful, just to see the.

THE COURT: I got it.

MR. SINGH: Oh, you've got it.

THE COURT: I've got it.

MR. SINGH: If the parties need a copy, I've got

extras here. So, Your Honor, really, if you look at it, we're only moving forward. Yeah, thank you. We're only moving forward with respect to Categories 1 and 2, and 2 is really 2A and 2B at this point. One is post -- this is the Debtor's view, right? You're not being asked to consider the evidence, but just what we believe or what we're trying to seek release of.

One is receivables, prepetition receivables, but that relates to invoices from post-September 12th, when the Debtor stopped factoring. 2A are receivables related to the TMD business, which again, when we get to the evidentiary hearing in the future, but from the Debtor's perspective, that business purchased in 2024, never part of the factoring program, doesn't relate to.

There's no agreement with any party that business. You know there's no contractual agreement, would ever have its invoices factored. And so, in our view, there's no bona fide dispute. But again, not asking you to make that determination today.

And then Category 2A relates to invoices that, based on information we've gotten from the factors in our own, we don't believe they're matches. So it's not as if those businesses were never factored, but there's no matches with respect to the customers and the particular Debtors on the particular invoices. So those, we believe there's no

bona fide dispute.

And from our perspective, that's all that we're going to be moving forward with respect to today and at a subsequent near-term hearing, Your Honor may set. And again, we don't believe that an adversary proceeding is required with respect to those.

So basically, Judge, if I could summarize our position and where I think we've landed with the settling parties, it's, if there's no bona fide dispute as to ownership, and we'll figure out whether there's a bona fide dispute, but these three categories from the Debtors' perspective, there's no bona fide dispute, but everybody needs to confirm and let us know, then the Debtors believe they don't require an adversary proceeding to move forward. We think we can move forward, parties are free to object, et cetera, but we don't need an adversary proceeding.

The other end is, if there's a bona fide dispute, you know, the Category 3, we've agreed that we will move by adversary proceeding. And, Your Honor, if there's a dispute about whether there's a bona fide dispute, right, if there -- you know, this is bona fide or this is not, depending on the invoices that'll get reviewed, then we'll have to come back before Your Honor to tell us which sort of bucket they fall into.

And that dispute may be, from their perspective,

that they may not have enough information, right, to assert a bona fide dispute or not, but we'll kind of have to deal with those one-off issues. Hopefully, we don't, because the parties can sort of look at the information, do the diligence, and do what they need to do in order to move this forward.

Your Honor, we've also agreed that, you know, consistent with some of Your Honor's guidance, that at least with respect to the settling parties, right, they've agreed that discovery, you know, sort of formal discovery requests will be adjourned or deferred, and instead, we will voluntarily share information that's not privileged.

It's all specified in the order that we're going to give to the examiner. We'll give it to them as well, and, you know, continue to informally cooperate, but depositions, et cetera, will not go forward. Your Honor, we're hopeful others will agree to that as well, just to give them the efficiencies, but if not, and we have a dispute about discovery, we may have to come back to Your Honor with respect to, you know, anybody that doesn't agree there, but that's really the issue.

So Judge, just, you know, I'll be brief on why I don't think, or the Debtors don't believe an adversary proceeding is required with respect to the Category 1 and 2 invoices, or at least, you know, where there's not a bona

fide dispute, I should say.

You know we've cited a bunch of cases in our brief, but really, if you look at Judge Glenn's decision in MF Global, we think that is really on point here. There, you had Debtors and lenders that were agreed on cash collateral, you know, being used.

It was in a particular account, and a customer of the Debtor was complaining that, hey, some of my cash, due to some conduct, may have been moved. May have been moved from, you know, my segregated account into this account, and now it's being allowed to go out as cash collateral. Judge Glenn made a number -- we think that's right on par with what you're dealing with here, Your Honor, and he made a number of important findings.

One, the entity that's asserting the interest, right, they've got the burden of proof that there's actually a bona fide dispute or an issue here. And he was very clear that speculation, that customer funds may have been transferred into the account now that there's a stipulation, that's not enough. It can't be speculative. They need to have something specific in order for Your Honor to consider that issue.

And he also gave significant weight to the fact that the cash collateral determination, right, was being decided without prejudice to ultimately whether or not what

the merits of that dispute may have been, which is exactly what we're asking Your Honor to do. And frankly, we're going even one step further because we've agreed to provide protection for that future determination.

So this is not a we'll see you in a couple of months in your adversary proceeding, and they're going to stand up and say, well, we may not have a basis for actual relief, right? I mean, admin claims, et cetera, put that aside. We're actually going to leave the remaining cash, right, in the 45 million that I described in Category 3.

And if you remember from the order, the way that works is everybody gets sort of a claim or an opportunity to assert a claim against that disputed cash. That was what Your Honor relied on with respect to Evolution's claim. You know that staying, that 45 million, and it's not just 45. If you look at Mr. Jerneycic's chart that he includes, there's 45 we've collected.

There's 90 million sitting with customers that's overdue, right, that we're trying to get in the door that will go through the same process. If it's bona fide dispute, you know, we're going to park it. If it's clear that it belongs to us, we'll talk to the parties, and we'll try to get it released.

But there's plenty of cushion here, is the point, Judge, that doesn't even include the roughly $140 million

that, you know, just isn't become due yet with respect to the customer agreement. So we think this is not just -- you know, we're not just offering sort of, you know, ice in winter here, Your Honor. This is real protection for any future determination in the event these remaining entities are right. And so that's why you don't need to proceed by adversary proceeding in our view today.

You can do what Judge Glenn did in his case, where in the context of a cash collateral sort of, you know, cash use motion, he determined that he had enough there. And we'll be back to Your Honor if we can't get parties to agree on the 26th, or whatever date Your Honor gives us, to make sure that you see from our perspective, and the evidence, that there's enough there to protect the parties and that we don't need to proceed by adversary proceeding where there's not a modified dispute.

Your Honor, I think Evolution, the last thing I would say, falls into the same boat. Evolution is slightly different from the other factors. Because remember, they're saying they actually have a secured interest in the -- not only in the receipts that they purchased, but also in the receipts of those Debtors that they didn't purchase, so all the other receipts or invoices that they were entitled to receive.

And so they're saying, look, we've got a security

interest here, as opposed to just an ownership dispute, and that requires an adversary proceeding. Now, they've commenced their adversary proceeding, which is fine. We'll deal with that adversary proceeding. They've also taken an appeal of Your Honor's last ruling. We'll deal with that appeal as well.

But that doesn't mean that Your Honor has to wait for that adversary proceeding or that appeal to play out, because Judge Glenn has made it clear, and as of other courts that we've cited, including the Second Circuit and Orion Pictures, that we can proceed without an adversary proceeding. There's adequate protection to any future determination that we need, that Your Honor may make, even if it's adverse to us.

Now, we don't think it will be, and you can take that into account, right? You can take potential merits into account. It's a preliminary ruling, and conclude that we can let this cash out.

Your Honor, the last thing I'd say is your own decision in PosiGen, which I think the facts were a little bit different, and I went back and reviewed again this morning the transcript. I think the issue in PosiGen, and of course, Your Honor is much closer to it than I am, was that the Debtors were trying to use all of the cash that was sitting in an account, and there was no determination, and

an adversary proceeding had been commenced with respect to all of that cash.

A non-Debtor party said, look, that's all mine, and it was very unclear whether or not there was any adequate protection or anything to say, look, if you actually went and used all of that, I can't remember the dollar amount, but $20 million or something, if you used all of that, then the non-Debtor party would commence an adversary proceeding and raise the bona fide dispute, would have no remedy.

I don't think that's the case here, Your Honor, with all the built-in protections that we've got. There is a remedy, and so under these facts and circumstances, I think it's different than PosiGen. It falls more in the MF Global sphere. And again, with the limited and narrow relief that we're seeking today, I think Your Honor can grant us that relief at a subsequent hearing, whenever that's determined, without the requirement for an adversary proceeding.

Your Honor, I'm happy to answer any questions. Otherwise, I'll see the podium.

THE COURT: Just give me a second. I'm just going to go through my notes. Yeah. The authority I have to grant a release to a customer who wants to submit the funds, Paragraph 11.

MR. SINGH: Yes.

THE COURT: -- of the order.

MR. SINGH: So Judge, we are not compelling customers, right? We've sort of changed our approach on that. I think following your guidance last week, you have authority to take money in where the Debtor has an asserted property interest. And so should that money come in, it will go into this process, and the Court will determine sort of which category it falls into, where the money goes.

And so what we're not doing is providing a release to the customer of any claims that the factors may have directly against that customer. All we're saying, look, if you submit this payment, right, the customer is not submitting the payment to the Debtor. They're depositing the money into the court. It's like an interpleader action, if you think about it.

They're depositing the money in the court, and then the court will decide, or the parties will agree, and the court will have to approve some sort of settlement as to whose money it is. This is giving the customers comfort that they won't be held responsible twice. But we're not releasing the claim of one of the factors against the customer.

What we're saying is, with respect to that invoice, your claim is against the invoice itself, and now

you get to come and prove it up.  But what people don't get to do, which I think would be bad for everybody, is go against the customer twice.  So your jurisdiction, in our view, lies from two things.

One, the asserted interest of the Debtors in that particular property, that money will come in.  And two, you're not going beyond your jurisdiction and provide a third-party release by one of the factors against that customer with respect to that particular invoice, because they continue to have the claim against the cash that invoice satisfied.  You're going to have the cash, right, or you're going to be overseeing the cash, I should say.

And so we're not giving a third-party release to the customer.  We're just saying you won't have to pay twice in order to encourage them to submit the cash.

THE COURT:  I think that it comes in two different scenarios in my head, and clarify this for me.  There were some instances in which the Debtor was still the servicer. There were some in which the Debtor, or a Debtor entity, was -- a letter was sent out --

MR. SINGH:  Yeah.

THE COURT:  -- replacing them as the servicer.  So how do I -- how does this order cover, does it cover both of these situations, or one or the other?

MR. SINGH:  I think it covers both of these

Case 25-90999 Document 3980-10 Filed in TXSB on 02/09/26 Page 22 of 421



situations, because basically where an account Debtor letter was sent, so pre-petition, some of the factors sent the customer a notice saying, you know, the factoring had been terminated, including the Debtors being a subservicer, and you need to, you know, send the cash to us, right?

I think even in that situation, the issue is even though we were terminated with respect to generally the factoring arrangement, that doesn't mean that invoices that weren't factored may not be property of the estate. And that's the factual determination, I think, that Your Honor has to make. And so just like they've asserted a bona fide interest in that cash, so have the Debtors, right? We're asserting that is property of the estate.

Your Honor will have to make that determination if we all can't agree, but we're still asserting an interest in that. And it -- what -- all that was terminated is us acting as subservicer for them, and they can continue to collect those accounts. Practically speaking, what's happening is, as you've seen, right, the customers are just holding the cash because they don't know who to pay.

And so as a practical matter, we think it's much better for all of us that that money come in, right? The customer shouldn't have to pay twice for that particular invoice. We're not releasing any other claims or anything like that against them.

And we can fight about the particular invoice once it's in Your Honor's sort of, you know, jurisdiction and clearly within the court.

THE COURT: Okay. Thank you.

MR. SINGH: Thank you, Judge.

THE COURT: I'm going to take -- I know that some folks may want to speak on the phone, and just for the parties that are in the courtroom, I'll let you go first. And then, Mr. Duke, I see you there. I'll kind of get you after when everybody's done, but.

MR. KLEINHAUS: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. KLEINHAUS: Emil Kleinhaus, Wachtell Lipton for the Leucadia parties. Your Honor I'm in a little bit of an awkward position in the sense that we, the Leucadia parties, objected to this relief. I think we objected in a vigorous way. We filed an initial objection. We filed a supplemental objection. And we came to Court today understanding that we had a resolution of the objection and that the resolution was essentially a reservation of rights in which the exact issue that Mr. Singh just argued would not actually be resolved.

So what I'd like to do with Your Honor's permission, and I'll try to do it very efficiently, is explain what I think the resolution is, and then just

briefly touch on the legal issue in the event Your Honor has to --

THE COURT: Okay.

MR. KLEINHAUS: -- resolve it. Your Honor, we've been working, I think, cooperatively with the Debtors for a number of weeks in trying to figure out where there's a dispute and where there's not a dispute. And that negotiation and discussion, I think, was productive in the sense that a number of us agreed on an initial release of the 55 million, subject to a number of protections.

And then the Debtors came to us a few days ago and said there's a portion of this property which they're not going to seek to release right now, then there's a portion that they do want to release, and that's the 16 million or so is what they're saying they do want to release. That's really 2A and 2B, and the Debtors said at the same time Category 3, for various reasons, they're willing to hold back for now and pursue an adversary proceeding. So --

THE COURT: Let me --

MR. KLEINHAUS: Yeah.

THE COURT: Just to make sure that we're all -- we may be talking -- we may be saying the same thing. My understanding is that there's like 1.8 million, which they call Category 1.

MR. KLEINHAUS: Right.

Case 25-90999 Document 3189-10 Filed in TXSB on 01/09/26 Page 225 of 421



THE COURT: Which they believe, kind of, the post-September 12, and kind of 2A are kind of perceivable that the only thing kind of applies to any entity which they don't have. And then kind of 2B is kind of a subset, like, kind of an additional subset, but maybe --

MR. KLEINHAUS: It's a lack of --

THE COURT: -- kind of 1A.

MR. KLEINHAUS: I am sorry, Your Honor.

THE COURT: I should say 1 is about 1.8. The other one's about 8, and then 2B kind of falls in line with part of their reconciliation, which I know that there were some disputes about that.

MR. KLEINHAUS: Right.

THE COURT: And that's, like, the additional seven-and-a-half. So I think they're -- my understanding is that all that adds up to, like, 18.1, and lawyer math will kind of get you there, but it's like 1.88, and like, a little bit over 7.

MR. KLEINHAUS: Right. So those subcategories, 1, 2A, 2B there are some nuanced differences, but generally speaking, those are the subcategories that Debtors came to us a few days ago and said, we believe these can be released similar to the 55 million.

THE COURT: Right.

MR. KLEINHAUS: And we want to persuade you of

that.

THE COURT: Got it.

MR. KLEINHAUS: So they've also been providing some documents. So the resolution, to be extremely clear, that we reached on Category -- well, Category 1, our client has agreed to release, in part, because it doesn't really relate to customers that are a client factor.

THE COURT: Got it.

MR. KLEINHAUS: And that's the 1.8. But 2A and 2B, what the agreement is, and it's reflected in Paragraph 6 of the proposed order it is not that there's going to be a judicial resolution today of this question of whether an adversary is needed. It's actually the -- quite to the contrary.

What we've agreed is, because we've gotten a bunch of information in recent days, and in general, we've so far been able to work at least somewhat cooperatively to decide what to litigate or what not to litigate. We were going to get a certain amount of time, a few weeks, to figure out, do we dispute this or not? And if there's no dispute, the money will get let out without an adversary proceeding.

THE COURT: That's the January 25th, February 2nd.

MR. KLEINHAUS: Exactly.

THE COURT: Okay. Okay.

MR. KLEINHAUS: And if there is a dispute, what

Paragraph 6 says is, rather than this general kind of pause that can go on for the whole examiner process, as to these particular subcategories, the Debtors can come back and say, Your Honor, we can release these funds without an adversary proceeding.

And what the order says is, we can then come in and say, we think an adversary proceeding is necessary to release these funds. That's the language in Paragraph 6, which says, at the very last line of Page 6, with the third-party factors reserving all rights with respect to such hearing, including all arguments that an adversary proceeding is necessary and all arguments regarding discovery.

And on Page 4 of their reply, the Debtors, I think, have laid out quite accurately what the deal is, in terms of saying, if there's no bona fide dispute, the cash can be released by consent. If there's a lack of an agreement as to whether there's a bona fide dispute, then, including because a factor argues there's not enough information to determine whether there's a bona fide dispute, the Debtors reserve the right to come back, and we can contest on any ground, including the need for an adversary proceeding.

And then the last point, if there is a bona fide dispute, then there's going to be an adversary proceeding.

And I think the Debtors have concluded that Category 3 requires an adversary proceeding, so.

THE COURT: So if I'm understanding you correctly, you read Paragraph 6. I'm not saying I disagree or agree.

MR. KLEINHAUS: Yeah.

THE COURT: I'm just, you know, laying it out. You're saying today, the way this proposed order would work is Categories 1 and 2A, kind of what we call the 8.1 and the 1.8. Parties have until January 25th to kind of figure out if there's agreement. If there's no agreement, then somebody can -- then I take up the issue about whether there's an adversary proceeding or not.

And with respect to 2B, you go to February 2nd, a little bit more time on that one, and whether --

MR. KLEINHAUS: Yeah.

THE COURT: So really, I'm just not making a determination. I'm setting a time frame, which parties -- but if somebody agrees, if there's agreement with one or more funds, then it drops into the operating account, and then you get an admin claim to the extent that you don't. But if not, then I've got to take the call at some point after somebody would reach out to us after January 25th.

MR. KLEINHAUS: That's right, Your Honor. The basic deal here is as to Category 3, the Debtors have agreed. They haven't agreed on the substance, on the

Case 25-90999 Document 3989-10 Filed in TXSB on 02/09/26 Page 229 of 421



merits, but as a process matter, the Debtors have agreed they're going to bring an adversary proceeding.

And as Your Honor said, as to 1 and 2, the trade is essentially, rather than having a whole fight today about whether an adversary proceeding is needed, we're going to take some agreed period of time to decide whether we need to have the entirety of the litigation, or alternatively, whether as to the 55 million, there's a willingness just to consent.

And part of the motivation here is there's been a lot of argument about process, which is understandable because this is a very complicated set of facts. But the goal here was to try to put aside for a few days the argument about process and figure out whether there's really a dispute with our client reserving all of its rights, including its rights as stated in Paragraph 6 to argue an adversary proceeding is necessary.

So that's my understanding of the deal. I think Mr. Singh went into the merits maybe because there are some other parties that are not on board with the deal. So I'll just very briefly state what our position is if the court decides to reach the merits of this, because I don't want to have a situation where we thought we were punting that argument and it gets decided today.

I mean, our position, in short, Your Honor, is

that to the extent there is a bona fide dispute, or in a situation where there's a factual vacuum, and we just don't have enough information to know whether we have a basis to dispute, an adversary proceeding absolutely is necessary. And it's the Debtors who have to bring it.

And I think that really boils down to Section 363(a) of the Bankruptcy Code. And what that section says is that cash collateral is cash or a cash equivalent in which the estate and an entity other than the estate have an interest, right? You need to have the estate and an entity other than the estate having an interest.

In probably 99 percent of the cases that Your Honor has, or a really high percent, there's no question the Debtors have an interest or at least an arguable interest in cash. They have a bank account when the case starts. It's a commingled account. And they're saying, I want to use that cash. And somebody else is saying, I have a security interest. This is the 1 percent. This is a completely different case.

And the reason it's a completely different case is that as a result of the factoring process, and what appears to be a very significant fraud, there's a fundamental question as to whether the Debtors have any interest in the collections of receivables.

And Your Honor, the whole point of the segregated

account that was set up in the cash management order, in the DIP order, was to ensure that the proceeds of receivables remain segregated in a way that would preserve our ability to argue that the estate has no interest in that cash.

And we would argue that for one of multiple reasons. One is because there were true sales of receivables, so that unlike proceeds of Debtor property, those are true sales so that the proceeds would not be Debtor property because they didn't own the underlying property.

Or alternatively, because to the extent the property was stolen, or there's a constructive trust, or any of the remedies that might be available in a case of fraud, there are a variety of arguments that would be available to us to say the Debtor has no interest in that cash. That is nothing like MF Global, where that case, like many cases, the Debtors start the case with a bank account, and then they want to use the pre-existing cash in that account.

This is a situation where the whole reason we set up on the first day of the case, and then at the final orders, the segregated cash was to preserve this argument that the Debtors have no interest. Now, in a context where the Debtors may have no interest at all, saying that it's cash collateral doesn't work.

To the contrary, what you have is a situation

where you have a dispute as to who has an interest, and what Rule 7001(b) says is that has to be resolved by an adversary. And then what the TMT case from the Fifth Circuit says, and I'll quote, is that, "The party seeking to include property in the estate bears the burden of showing that the item is property of the estate."

Now I can go on for a while as to why it matters whether there's an adversary. The only point I'll make is that in an adversary proceeding, it's very clear under Rule 8(b)(5), that if there's just an informational vacuum, which so far has been the case to a large extent as to how this fraud works, a defendant can say, we lack knowledge or information sufficient to form a belief about the truth.

So until we know what actually happened with this fraud, at least an adversary proceeding protects us in being able to say, we don't know enough either to admit or deny your allegation.

So all of this to say that if in a context where this issue were fully litigated, we would argue that as to any of the categories, to the extent either we have a bona fide dispute or there's a factual vacuum, Fifth Circuit law and Rule 7001 do require an adversary.

But the point of this resolution, Your Honor, was our client's interest is not in holding -- preventing the Debtors from accessing cash as to which there's no bona fide

dispute or in which we don't have an apparent basis subject to protections like the ones we negotiated in the order. We don't have an apparent basis to dispute.

So the whole idea behind this resolution, similar to the first resolution that we reached, was that let's see if there's a way to resolve this without this litigation. But if the issue has to be litigated, including the adversary proceeding issue that we thought was being punted, Your Honor can decide that.

And the Debtors reserve all of their rights to come in here and say no adversary is needed as to Buckets 1 and 2. So why don't I stop there? And if Your Honor has any questions, I'm happy to answer them.

THE COURT: No. No questions. Thank you.

MR. SINGH: Can I just make one clarification? Because it might inform the other parties.

THE COURT: Okay.

MR. SINGH: Thank you. Again, Sunny Singh for the Debtors. Your Honor, so I appreciate Mr. Kleinhaus is in an awkward position because we're stipulating with some of the factors, we're not the others. I'm similarly in the same awkward position. But everything he said in terms of what the deal is, I completely agree with, Your Honor.

I think the issue really turns on just if there's no bona fide dispute, then the Debtors' view -- and I think

the agreement with the other factors is, if there's no bona fide dispute or there's no information vacuum issue, then an adversary proceeding is not required. If there is a bona fide dispute or they have information gaps, then the information gaps -- hang on a second, let me strike that.

If there is a bona fide dispute, then an adversary proceeding is required, and we are agreeing to proceed by that, which is Category 3. If there is an information gap or dispute about whether or not we have a bona fide dispute, which is the process that will play out over the next two or three weeks under the timeline with respect to Category 1 and 2, then depending on which bucket that falls into, either as agreed to by the parties, bona fide dispute or no bona fide dispute, or determined by Your Honor, will dictate whether or not we need an adversary proceeding.

Our view, and I have to take this view because there's a number of parties who are saying, even if we all agree that there's no bona fide dispute, that all of this needs to proceed by adversary proceeding, our view is subject to Your Honor agreeing or the other parties that we're consenting to agreeing that there's no bona fide dispute, that they've got the information, we don't need to proceed by adversary proceeding.

So I just wanted to clarify that I don't -- we're not trying to do something inconsistent with the deal, and

give them the time that they negotiated for and that we've agreed to figure out whether we've got a dispute. But if at the end of that timeline, we all agree that there's no bona fide dispute, or we can't come to agreement, but Your Honor orders that there's no bona fide dispute, then an adversary proceeding is not required. I think that's the agreement.

And I wish everybody was just agreeing so we don't have to sort of argue the point at the same time as settling the point. But I wanted to clarify that I don't think anything I'm saying or how the Debtors intend to proceed is inconsistent with how Mr. Kleinhaus described the actual terms of the deal as it relates to his client, Raistone and ING.

THE COURT: Thank you.

MR. SINGH: Thank you.

THE COURT: Mr. Grillo.

MR. GRILLO: Good afternoon, Your Honor. Again, Emanuel Grillo, Orrick, Herrington & Sutcliffe, on behalf of Raistone. Your Honor, the reason I wanted to get up after Mr. Kleinhaus is that because we settled along, you know, and agreed to the stipulation and the consented order along with Mr. Kleinhaus' client.

And I think a really -- you know, and I'm not going to repeat the arguments and everything else, but I just really want to make one point.

THE COURT: Okay.

MR. GRILLO: Which is that if you take a look at the order and Mr. Singh laid it out, Mr. Kleinhaus laid it out, is that there's no prejudice to anybody. And it effectively renders this hearing not ripe for today. Because the bottom line is, is that there are a series of deadlines that start on January 25th, February 2nd. I don't think there's really anything that the court really needs to decide today.

We can -- what we're trying to do is to figure out if there's some common ground between now and then. And then if not, everyone's rights are reserved. Anyone on this side of the room can certainly bring or come back to Your Honor and say, we need an adversary proceeding. And Mr. Singh and everyone on this side of the room could say that we don't.

And the whole point of the order, I think, was to give people one time, two information, right? And we didn't talk about it in detail exactly what that information is, but that's all laid out in Paragraph 3 of the order. You know I had to make for myself, Your Honor, and I have an appreciation for the Court's sense, a chart kind of laying all of this out.

Because it's clear that when you take a look at Category 1, Category 2A or Category 2B, everyone's rights

are reserved. Mr. Singh and his clients have taken --

THE COURT: The only reason I --

MR. GRILLO: -- three and four off the table.

THE COURT: -- was going to say there's a footnote here that says that you've already consented to the 1.8. So one is off the table.

MR. GRILLO: Yes, no, some of us have. What I'm mostly talking about, Your Honor, is that yes, we have consented to the 1.8. But I'm saying to the extent that others have not, if they get on board, you know, or if Your Honor says --

THE COURT: Got it.

MR. GRILLO: -- I think this order makes sense at the end of the day, then they'll have a window within which to do that. And most importantly, you know, we'll also be getting information over this time period in order to do that. Look, obviously, from a legal point of view, we filed an objection. We have some of the same comments that the other parties have as far as that goes. And Mr. Kleinhaus, you know, did an excellent job sort of summarizing what all of those points are.

But I think for today's purposes, if Your Honor is inclined to consider the order, there's really nothing where anyone can come up and say, Judge, if I don't get relief today, I'm going to be prejudiced. And that's really, I

Case 25-90399 Document 3189-1 Filed in TXSB on 01/09/26 Page 43 of 121



think, the key, is that we can walk out of this courtroom today. It may be January 25th. It may be February 2nd. But the bottom line is that I don't know that there's anything that we really have to do today.

Last point, Your Honor, with respect to what's referred to as Paragraph 11. That's, you know, the rights, Your Honor made the point of, well, do I have to decide anything with respect to, you know, third parties, be it the customers and the factors? And we were one of the factors that did also issue notices pre-petition.

All we're saying is that for purposes of this hearing, anything that comes in on an invoice, we're just saying, look, if it's been paid into the company as far as it goes, we're not requiring or we would deduct that amount from anything else that's otherwise owing.

So all we're trying to do, I think, is set up a mechanism so that they can go back to the customers as far as that goes and get money. Customers don't have to feel that they're going to get double-charged. Obviously, with respect to everything else, doesn't matter.

But the bottom line is that for purposes of being here today, what we're trying to establish is that, look, you're not going to get charged twice. We're not going to come after you for anything that you pay in on a post-order basis.

And that was really important because none of the factors were interested today in withdrawing their notices. At the same time, we understood that Debtors are trying to collect money. And so, especially because some are pre -- and post-petition customers, and so we don't want them holding up the post-petition amounts, which we obviously have not factored, because there's pre-petition amounts outstanding.

So what we tried to do collectively is work for Debtors to establish that. So, Your Honor, I'm not going to take up any more time with additional argument. I know people have different positions, but because ours was the same as Mr. Kleinhaus', we wanted to sort of jump in behind him and sort of share that view with the Court.

THE COURT: Perfect. Thank you. Anyone else in the Katsumi? Are you interested in speaking or anyone, Evolution, anyone interested in addressing the Court one way or the other?

MR. KELLEY: We are and I will on other issues, but Mr. Scott will.

THE COURT: Oh, Mr. Scott, you got it. Okay. I was just -- I may be the better way of saying it. Anyone else in the courtroom?

MR. KELLEY: That's what I thought you would.

THE COURT: No, I should have. That would have

Case 25-90999 Document 3189-10 Filed in TXSB on 02/09/26 Page 240 of 421



been the smart way to do it. I apologize.

MR. KELLEY: No worries. I just --

THE COURT: Okay.

MR. KELLEY: -- the navigation of mutual presence in video make these somewhat challenging.

THE COURT: Anyone on the line who wishes to make an appearance -- or not an appearance, who wishes to address the court, whose line -- Mr. Duke, why don't we start with you, sir?

MR. DUKE: Thank you, Your Honor. Michael Duke, from Elsberg Baker & Maruri, on behalf of Evolution. We received this new proposed order at 1:00 a.m. last night and I was reading through the --

THE COURT: That makes two of us.

MR. DUKE: motion. And that makes two of us. And I was reading through their brief and what they stated is that we haven't cooperated, we haven't been dealing with them. Your Honor, I haven't received any invitation to participate in any of these discussions. My client hasn't been offered to participate.

The first time I saw this order was last night when it came through at 1:00 a.m. in the morning. We haven't been shown the reconciliation report that came through again at 1:06 a.m. Eastern time. That was the first time it came in. They are trying to rush through this

Case 25-90999 Document 3989-10 Filed in TXSB on 02/09/26 Page 241 of 421



order. It's completely new relief, and it is completely inappropriate.

And I'll just point out a few issues from what has resulted from this. I heard Mr. Singh get up and say, you know, this isn't an evidentiary hearing, he's not presenting evidence. And then he goes through category by category and how we're adequately protected by the amounts that remain in the account. And those amounts that he listed are completely wrong.

According to the declarations they put in, the amounts in Category 3 are $35 million. Not 45, which you just told, Your Honor, $35 million. Again, that is significantly below the $60.5 million claim that we have.

And again, this is all issues that they are trying to jam through without any type of process whatsoever, which is exactly why we filed an adversary proceeding. We need to have our rights actually determined as opposed to getting briefing on, for reasons I can't tell at all, at the very last minute, where they push through new substantive arguments for why we are not adequately protected or for why they have provided adequate protection to us, and for why we don't have priority, and we don't have validity.

This is exactly why we need the adversary process to avoid these types of issues. What they want to push through is $18 million more, which, again, will reduce down

the amount that were in the account that we were relying on in order to satisfy our claim. We have rights to Category 1. We have rights to Category 2B. That's $9.1 million, according to their declaration. They can't just jam this through.

I want to point out a couple of additional issues, Your Honor. If you look at Paragraph 22, of their brief that came in at 1:00 a.m.

THE COURT: The --

MR. DUKE: What it states is that --

THE COURT: Well, just a minute. Let me get there. Are you referring to the brief or the proposed -- the reply?

MR. DUKE: Well, we can actually -- at the reply, but just to point out a couple additional issues with the order --

THE COURT: Oh, and --

MR. DUKE: -- the proposed order, and we filed a competing one on the docket, right before this.

THE COURT: Mr. Duke, I apologize. I was just trying to -- I didn't know if you were referring me to the reply or the order when you said Paragraph 22. That's all I was just trying to get to so I could follow you.

MR. DUKE: Apologies. The reply, but I think if we start with the order, actually, I want to point out a

Case 25-90399 Document 398-10 Filed in TXSB on 02/09/26 Page 243 of 421



couple of different issues.

THE COURT: Okay.

MR. DUKE: Because I'm very confused as to what the Debtors are attempting to do here.

THE COURT: Okay.

MR. DUKE: I had the same confusion with respect to Category 1 of whether the Debtors are attempting to release that today or not, and if you look at Paragraph 10.

THE COURT: Okay.

MR. DUKE: Excuse me. Paragraph 6 of the proposed order.

THE COURT: Okay.

MR. DUKE: What it states at the top is that the 1.8 million, they relate to the Category 1 invoices, and then I'll skip over the other two categories. It says may be released from the factored receivables account into the Debtor's operating accounts without further court order, and shall then be deemed to be collateral as defined in the final DIP order.

That doesn't have the parenthetical that follows Categories 2A or 2B. It's a subject to agreement from each of the third-party factors and the Debtors. So again, this is, as I read it, just an attempt to release those funds. Okay.

If you go to Paragraph 10, I believe this is

another attempt to substantively affect our rights, and what it states there in the middle of that paragraph, it's on Page 8, Paragraph 10.

THE COURT: Hold on. Let me walk through this. Let's see. I'm just going to -- I just want to make sure I'm following the point here. Paragraph 6, except as set forth in 7, subject to -- you're saying that they're not providing reasonable -- your point is that they're not providing reasonable diligence with respect to the 1.8, as opposed to the 2A and 2B?

I'm just making sure I'm following.

MR. DUKE: Your Honor, slightly different. So if you look at the second clause where it states up to 8,679,000 for Category 2A invoices, it has a parenthetical following that says, subject to agreement from each of the third-party factors and the Debtors. That parenthetical, which also is included in the next clause on 2B invoices, is wholly absent from Category 1.

THE COURT: You're saying --

MR. DUKE: So as I read it --

THE COURT: -- that that clause --

MR. DUKE: -- what this states --

THE COURT: -- applies to just Category 2A, and not paragraph -- not 1 and 2A. You think it just applies to 2A, as you read it?

MR. DUKE: Well, as I read it, they put it in 2A, and then they put it also following 2B.

THE COURT: Following 2B.

MR. DUKE: But did not include it on Category 1.

THE COURT: Okay. That's a good question.

MR. DUKE: And so as it is written, it states that they're going to release Category 1 -- or they may release Category 1 invoices upon entry in this order.

THE COURT: Got it. Got it. Okay.

MR. DUKE: And again, Your Honor, these shouldn't be issues that we're having to issue spot-on with, I don't -- I would say, about six hours' notice during the actual waking hours, though I know lawyer waking hours are sometimes a little bit different than normal.

But in any event, this shouldn't be something that is jammed through this way where we're having to issue spot on communicate with our clients at the very last minute. There was no reason for this to be filed the way that it was filed.

Paragraph 10, I'll also note, it states in the middle of that paragraph that following entry of this order, the Debtors, with consent of the capitalized consenting third-party factors, which is the defined group that does not include us, that filed objections to the motion may seek to release additional amounts received on account of

Category 1 invoices, or Category 2 invoices, upon entry of a further court order without renewing the motion via a notice of hearing.

So they're just trying to do away with the notice of hearing for Category 1 and Category 2 invoices as long as certain of the factors, but not all of them, consent to it.

THE COURT: You're concerned --

MR. DUKE: Which again, is a change from our settlement rights.

THE COURT: Mr. Duke, your concern to this paragraph -- and tell me if -- I'm just trying to make sure that I'm articulating it to following it. That your concern is that Evolution may not be a consenting third-party, but you will have filed an objection. And so therefore, perhaps the funds would be released without a hearing even though you never had an opportunity to object. Would that be the --

MR. DUKE: Correct, Your Honor, and it's not just that we may not be a consenting third-party --

THE COURT: Or that you are not one.

MR. DUKE: We aren't.

THE COURT: Yeah. Got it.

MR. DUKE: If you look at Footnote 4, it's defined to include entities that are not us because we were never asked to participate in any of the discussions that the

Case 25-90999 Document 3189-10 Filed in TXSB on 01/09/26 Page 54 of 421



Debtors had. They just decided they wanted to do it unilaterally without us.

And this brings me to the other issue. So if you do go to Footnote 4, which is on Page 4, I can't understand why this proposed order would include the language that it does here where the Debtors are fine providing a bunch of discovery. But it has a clause that states provided further that the Debtor shall be required under this order to provide the foregoing only to the third-party factors, they consent to entry of this order.

So they're not even going to provide the discovery that they say they're going to provide to everybody else for an unknown reason just because we didn't consent, which we never had the opportunity to do under this order. Again, I think that that's entirely inappropriate. This is not something that should be decided with six hours' notice.

With that, Your Honor, I'll note that we put in a competing order. We raised issues with this. We put in a competing proposed order. We're fine with a lot of the provisions in here, but these provisions in particular cause us a lot of concern, and it should not be jammed through the way that it's being attempted to be jammed through.

I heard Mr. Singh -- or with that, I'll pause. I want to turn to a separate issue that Mr. Singh raised, but I'll pause --

THE COURT: Well --

MR. DUKE: -- there in case the Court has any questions.

THE COURT: The only question I have is I have not had an opportunity to review, but I will. I'll take a moment and look at it. Is there anything you want to highlight for me in your version of the proposed order, or is it --

MR. DUKE: Your Honor, we've attempted to solve for some of these issues. We saw this as an attempt to just release the Category 1 fund, so we've struck that entirely.

THE COURT: Got it.

MR. DUKE: We've done it in red line, so it'll be easy to track, but we've -- the core issues are what I've walked through here.

THE COURT: Okay.

MR. DUKE: I also want to turn to the adequate protection arguments that I heard Mr. Singh making. I'm, again, a bit confused here because, as I understood, this was a procedural motion. And then I received that filing early in the hours this morning and saw numerous substantive arguments for why we're not entitled to any adequate protection, and they're allowed to reduce down the accounts further than they had after Your Honor's last order, where you required them to keep additional funds in and reduce the

amount they're receiving by $3 million.

Now, what they state, and this is at Paragraph 22, this is where I was heading a minute ago, of their brief, is that Evolution is not entitled to adequate protection for its speculative, unproven, and undetermined security interest to an extent greater than which the Court already determined was sufficient.

So as I just noted, it's less. We're getting less money under this proposed order than we had following the last hearing, so that's just completely wrong. And the idea that this is speculative or undetermined, I want to address both those. Because it's undetermined because it should be determined under a 7001 proceeding. That's exactly where it should be determined, and I agree with them. It is undetermined. We need to have a 7001 proceeding, and the case law is absolutely clear on this.

The statute, the congressional mandate is absolutely clear that this needs to be a 7001 proceeding, and what they've instead stated is, well, Your Honor, you can give them the worst effects, as though you had decided the 7001 proceeding, by just assuming that they don't have a valid security interest. Don't give them adequate protection, or give them adequate protections that they didn't have a valid security interest, valid first lien security interest, and then you should be fine.

Case 25-90399 Document 3189-10 Filed in TXSB on 02/09/26 Page 55 of 421



That is not how it works. That would be the easiest end run around 7001 that could ever exist. You just never rule on it. Just never rule on it, and then just continue to diminish it to where we just have a worthless administrative priority claim. That is not how it can work.

What we are entitled to is to have our first lien perfected security interest treated as one, and if there is an adverse ruling on it has to be through an adversary proceeding. They also spent a few pages talking about how the adequate protection here, which again is their burden under 363(o), is just whatever Your Honor wants to fashion, and that's not correcting the statute.

I also have been racking my brain to try to understand what it is that where they would reach a point where they would determine that actually there aren't enough funds for us to be adequately protected. They continue to reduce it down, and they continue to drop it, but they never stated what actually constitutes adequate protection for us.

And what 363 -- or sorry, excuse me, 361(3) states is what we are entitled to is the indubitable equivalent of our security interest, and our security interest is in the funds that are being released. They are not providing us anything in exchange for that. They are just continuing to draw it down, and they say, well, you have an administrative priority claim that you can assert at the end of the case.

361(3) could not be clearer. What it states is that you can grant such other relief other than entitling such entity to compensation allowable under Section 503(b)(1) of this title as an administrative expense. That is what Your Honor cannot do, is give us an administrative expense claim as adequate protection. The statute is absolutely clear on that.

Now, Your Honor, they went into this at length, so I'm going to address it unless Your Honor tells me to stop doing it. But they've also challenged our -- the extent of our claim, and they've gone into, again, to re-argue the transfer point, the definition under UCC-1 and transfer.

THE COURT: Well, I don't think you -- I want to stay away from that one. But I understand that they raised it, and I'm not going to go there one way or the other. But I do understand that --

MR. DUKE: And, Your Honor --

THE COURT: -- they're challenging the claim.

MR. DUKE: All that I'll say on that is to the extent that it factors in the definition of transfer and what they are seeking in terms of adequate protection, it has to come out in our favor. It can't be, again, that we are treated as not having a valid first lien priority interest for purposes of determining adequate protection.

Because they just say, well, it's not a strong

enough claim. It's not a good enough claim. That needs to be decided in 7001. It can't be decided just on papers that they submit during this contested process on an expedited basis, at 1:00 a.m. in the morning, the day of the hearing.

Your Honor, I'll just note that, again, the math in their order, even if you look at -- even if you accept, like, go past the 45 million versus $35 million issue, it just doesn't add up. From what I can tell, the categories add up to a total of 57.757 million. So it doesn't reach the 65 million threshold.

I can't understand how they get there. This is something that I would have liked to have discussed with them, but we never received the proposed order. They never tried to discuss it with us. We never received the reconciliation report until this morning, despite, as you can see in Paragraph 4 of the proposed order, they provided it to everybody else. It just -- it doesn't work. And the process that they're attempting to do doesn't work.

I request respectfully that Your Honor deny their proposed order and put in ours instead.

THE COURT: Just one clarifying question, and then I'll turn to Mr. Scott. And then I'll turn to Mr. Deutsch. So I'll go to his -- just going through my notes here. And I don't want to get into the substance of it -- well. I don't want to kind of get into kind of rulings in prior

hearings, obviously, because there's an appeal going on.

But my understanding was that Evolution was -- had a claim against receivables by some Debtors, but not all the Debtors, right? And so I think -- is my understanding correct? In other words, that -- I got it. Your argument may be that the 1.8, some portion of it may relate to something that you're alleging -- your client is alleging a security interest in. And seeking a determination of under -- in an adversary proceeding.

But there may be some portion of it -- and again, you haven't seen anything. But that may or may not relate to a Debtor in which has a receivable that your client may not have an interest in. Is that right?

MR. DUKE: Your Honor, that's exactly right. And that's why I started off the top with noting that out of the 18 million they're intending to release, I believe our issue is with 9.1. Because those are the amounts where we're not able to determine at this point whether they are our Debtors or not. So it's -- and I'll just briefly state it.

I understand -- I believe Your Honor has it correct where -- but just to state the issue, is that we have a security interest in the receivables sold by our receivable sellers, which are the eight Debtors under our agreement. And Category 2A, and my team will keep me honest, but I believe that's correct.

Case 25-90399 Document 918-2 Filed in TXSB on 01/09/26 Page 59 of 421



Category 2A is represented by the Debtors to not include any of the Debtors for -- under the factoring agreements, which would include ours. So we're not taking issue with the 2A receivables. But we are taking issue with Category 1 and Category 2B, which include our receivable sellers.

THE COURT: Do you have a ballpark on what the -- I won't hold you to it. It's not evidence. I'm just trying to get a sense of like with respect to the one -- I can just do the math. But with respect to the one, do you have a sense between 1 and 2B, kind of a back-of-the-envelope split as to what you think? Or do you just not have enough information?

MR. DUKE: It would be -- Your Honor, unfortunately, we don't.

THE COURT: Okay.

MR. DUKE: This is something that we had hoped to receive a reconciliation report early enough to be able to engage in those discussions. Debtors didn't want to provide it. That was their choice.

THE COURT: No, I understand.

MR. DUKE: We're not able to deal with that.

THE COURT: Understood. I was just curious. I'll just note some questions here. Thank you very much, Mr. Duke. I don't have any further questions. Is there

Case 25-90399 Document 1989-10 Filed in TXSB on 02/09/26 Page 255 of 421



anything else you wish to tell me? If not, I'll turn to Mr. Scott. Thank you, though.

MR. DUKE: No, thank you, Your Honor. I just -- Mr. Singh brings up additional issues. I just respectfully request that I --

THE COURT: No. I got it.

MR. DUKE: -- come back up. Thank you.

THE COURT: Got it. Thank you.

MR. DUKE: Appreciate it.

THE COURT: Mr. Scott.

MR. SCOTT: Good afternoon, Your Honor. Again, for the record, Sean Scott, of Mayer Brown, on behalf of Katsumi Servicing, LLC. As Your Honor knows from our prior appearances in this case and our various filings, Katsumi is the buyer's representative under various receivables purchase agreements, pursuant to which buyers purchased receivables from various First Brands obligors, which as of the petition date, aggregated approximately $1.7 billion.

And I'll come back to this a bit later, but the sheer magnitude of the third-party factor claims and the Debtors' own admissions as to the scope and extent of the fraud here, I think, make the MF Global precedent inefficacy. But I do want to expand on a few points that you heard from Mr. Kleinhaus.

Importantly, as Your Honor knows from other cases

Case 25-90399 Document 1989-10 Filed in TXSB on 02/09/26 Page 256 of 421



where you've encountered these types of factoring arrangements, the receivables transfer agreements here or the receivables purchase agreements here were structured to be true sales that were bankruptcy remote. And what that means is that the purchasers of the receivables didn't intend to take the credit risk of the First Brands sellers.

Instead, they believed they were really only taking the credit risk of the underlying obligors to pay on those receivables, and that while the First Brands sellers would collect and distribute the proceeds, that would never become property of the bankruptcy estate. Those funds were not to be used by the First Brands sellers, period.

In that way, the third-party factors here, at the outset of this case, were in a fundamentally different position than the ABL, the term lenders, the DIP lenders. In a very real sense, the third-party factors are involuntary creditors in the context of these Chapter 11 cases.

But from Day 1, Katsumi in particular, for the benefit of all the third-party factors, has sought to preserve the status quo to make sure that collections on prepetition receivables are properly allocated among staying purchasers or third-party factors versus the Debtors.

As Your Honor recalls, we raised issues on Day 1 to ensure that cash collections on the prepetition

Case 25-90999 Document 3989-10 Filed in TXSB on 02/09/26 Page 257 of 421



receivables were segregated. We objected to DIP liens on those proceeds on causes of action. We negotiated in the context of the final DIP hearing and the final cash management order the continuation of that process. All of the parties, including the Debtors and the DIP lenders, agreed to the establishment of that segregated receivables collection account.

So again, targeting back to MS Global, distinguishing factors. This was meant to give the Debtors breathing time, space to do their investigation. They indicated that they needed time to investigate the third-party factoring arrangement. We heard on Day 1 about the sheer magnitude of the fraud here, and the Debtors have taken months to continue to investigate that.

The expectation was that with respect to receivables collection, either those would be consensually agreed in terms of what belongs to the estate and what does not, or need to be the subject of further dispute resolution.

At its most basic level, the through-line to these cases from the factors' standpoint is that there needs to be a proper court process to determine what is or what is not estate property, and until that occurs, the prepetition receivables should be segregated and held in escrow. There are literally billions of dollars of competing claims. Your

Honor knows that.

Now, one of the hallmarks of Chapter 11 often is to substitute a more speedy and structured bargaining process for what would have been drawn-out civil litigation. But, as I think you've heard from the objectors, Rule 7001 is meant to protect rights when rights of sufficient magnitude are at stake. In that case, the bankruptcy rule provides for full civil litigation-style procedure. And ultimately, following filing of complaints, discovery, pretrial practice, ultimately a trial on the merits if there are disputed issues of fact and law.

What the Debtors are trying to do today, Your Honor, through this order, which obviously we object to the entry of, we are not a consenting factor, we didn't think it is the subject of the hearing today, is to seek a selective release of certain buckets of receivables in a way that doesn't comport with due process with federal rules of bankruptcy procedures.

And I just want to take a step back because it's important to remember those buckets were part of a construct that we negotiated. It was part of a compromise at a very fundamentally different time in these cases with a variety of puts and takes that the factors agreed to allow the release of certain funds.

Now that order is essentially being turned back

Case 25-90399 Document 389-10 Filed in TXSB on 02/09/26 Page 259 of 421



upon us and is attempted to be used as a coercive construct to tell the factors either you'll agree or you'll be excluded from discovery. You'll be excluded from the opportunity to weigh in on whether an adversary proceeding is needed.

And, Your Honor, I want to go back to -- again, I want to be mindful this is not meant to be an evidentiary hearing. But I do need to preview for Your Honor, because I think it's very important. We believe there will be material disputes as to potentially all of the buckets that are described in the reply.

We sought discovery. We sought meetings and interviews with the Debtors. We saw months where no discovery was proffered. And then last week when we threatened to file a motion to compel, we were able to obtain additional discovery over the weekend.

But our own advisors tell us that there are situations where sellers' names are replaced in spreadsheets, where customers' names are replaced in spreadsheets. This is a fraud case. You heard it from Mr. Stark last week which one it is. We certainly know it is a fraud case. So this is not a simple situation where you will pick the Debtor's representation that they don't believe there is a bona fide dispute.

I think our position, Your Honor, is there is and

our advisors have uncovered evidence that there are circumstances where the pre-petition Debtors did change seller names, did change underlying obligor names.

And so fundamentally, which bucket we're talking about doesn't matter. This is a question about ownership. Who owns the proceeds of those receivables? We cited the Chait Properties case in our brief, Your Honor. I think that's a very material case. Because the parties had a dispute over ownership of the Debtor's stock at the time of filing. Pretty fundamental to Chapter 11. Was the Chapter 11 properly authorized?

And even there, the Court noted that while the dispute was effectively outcome determinative, the Court said the determination of ownership must be resolved in an adversary proceeding. And the cite for that is 278 B.R. 744.

The same is true here. This is about determination of property interests. I also want -- and I know Your Honor knows this, but I want to spend a little time with the rule itself because I think it's important as we're thinking about this construct of a bona fide dispute. Rule 7001 tells us what are adversary proceedings. It includes proceedings to determine the validity, priority, or extent of a lien or other interest in property, except for proceeding under Rule 3012 or Rule 4003(d).

Your Honor knows those are pretty limited exceptions. 3012 deals with determination of the amount of a secured or priority claim. 4003(d) deals with proceedings to avoid a lien or other transfer of debt of property. Not applicable here.

So the Debtors have said, well, we think that the real question is whether there's a bona fide dispute. Your Honor, first of all, I would say two points. The presence or absence of a bona fide dispute is not the legal standard. There are other sections in the code where Congress elected to use that standard.

Section 303 of the code, creditors can't force a Debtor into involuntary if their claim is subject to a bona fide dispute as a liability or amount. Section 363, as you know, you can sell property free and clear if, among other conditions, the interest is in a bona fide dispute.

That's not the standard. But even if that were the case, to determine if a dispute is bona fide, courts use an objective test. They assess whether there's a legal or factual dispute as an objective matter. That's an evidentiary issue, Your Honor. The only -- as I said, we would not agree to the admission of the declaration and would object to it.

But the Debtor's reply basically tells you there's no bona fide dispute because we say there's no bona fide

Case 25-90399 Document 3189-10 Filed in TXSB on 02/09/26 Page 66 of 421



dispute. That's circular. We do expect that there will be bona fide disputes around that. I do agree with Mr. Kleinhaus that if you look to TMT procurement, it is the estate's burden to show that an item is property of the estate.

This is not cash collateral. This is a situation where likely something is or is not estate property. It will be a binary outcome. And, Your Honor, we submit that in a case like this, Rule 7002 provides that an adversary proceeding must govern that adjudication.

At its root, a Debtor cannot take and use property of a non-Debtor. That's a constitutional principle. There's a plethora of decisions that Your Honor is aware of, but the bankruptcy laws are subordinate to the takings clause and the requirements of the Fifth Amendment. The Debtors are, at bottom, asking to sacrifice our procedural rights at the altar of expediency.

And, Your Honor, we submit that regardless of the bucket, if there is a dispute, that needs to be resolved in an adversary proceeding. If the parties agree to the release of the funds, you heard from some of the consenting factors, that can be done. We don't see the necessity of the order today, other than to try and short circuit some of the protections that should be available for the factors.

THE COURT: Mr. Scott, just one question. I know

it's been raised in -- by Katsumi in some other context, and I just -- with respect to the proposed kind of dates, what I will call Paragraph 6 dates, the January 25th, and the February 3rd, are there any concerns that you have there? I know that there were some questions about getting information, and I know you've mentioned it earlier. Any thoughts on that?

MR. SCOTT: The short answer is yes, Your Honor. Your Honor, we do have concerns about that. And that was -- again, I'm trying to be mindful of not delving too far into our discussions with the Debtors and various compromises. But a big concern for us has been those deadlines. We did see nearly a month of -- or at least three weeks of no productions.

The productions that we received over the course of this weekend into yesterday were extremely voluminous, gigabytes of material. I believe the number was in the order of magnitude of 800 spreadsheets. We have 200,000 receivables for which Katsumi acted as buyer representative. So the Debtors have had, in our view, almost four months to investigate this.

There is much information needed to validate this, to understand how the fraud occurred. We have taken testimony of that during those depositions. We have learned that the Debtors, at least at that point in time, were not

able to disclose how the fraud occurred.

I come back to, yes, timing is a significant concern here. That is -- it is not just process here. We do think the benefit of an adversary, or at least a much lengthier timeline, is to ensure that the parties' substantive rights to the receivables are protected.

THE COURT: Last question. With respect to Katsumi, I know that you said you may disagree with some of the way the categories are structured. But just using them for now, just for references, do you believe Katsumi falls in all three, one, two, or three? Or is it still kind of too early to know?

MR. SCOTT: We don't -- I don't think we can answer that, Your Honor. What I would say is we continue to press for information. We are continuing to try and validate that. A lot of that may relate to information that we received, as I said, over this weekend. And with our -- partners, we are working as expeditiously as possible. Obviously, all parties' interests are in getting the right amount of police to the right parties as soon as possible. But it needs to be a fair process.

THE COURT: Is there any category? And I know that, again, we're just using it as a proxy. Just is there any category in which you think Katsumi just won't have any kind of Debtor-receivable issues as you sit here today? In

other words, is it --

MR. SCOTT: As I sit here today, Your Honor, I can't answer that.

THE COURT: Okay. No. Fair enough.

MR. SCOTT: I don't think we've been given enough information to be able to answer that for Your Honor.

THE COURT: No, understood. Thank you. Those were all my questions. Thank you. Mr. Deutsch.

MR. SCOTT: Thank you, Your Honor.

MR. DEUTSCH: Good afternoon again, Your Honor. Doug Deutsch for ING Belgium. I'll be quick. I try not to reiterate what others say, but I find myself doing so at least in part today, so I apologize. We're also a settlement party. You know that. We're also in an awkward position.

We had a settlement. Sounded out probably hours ago that we don't have any settlement. Found out probably hours ago that we don't have any settlement. The settlement was consistent with, I think, the old adage that everybody was unhappy with it at the end of the day, which is the nature of the beast.

But now I understand it's not on the table, and I just wanted to stand up to say we did file an objection also. I don't know where we end up with this at the end. The objection is on the docket. We join Mr. Grillo's and

Case 25-90999 Document 3989-10 Filed in TXSB on 01/09/26 Page 266 of 421



Mr. Kleinhaus' comments in that regard.

And I'll leave it at that today, Your Honor.

THE COURT: Mr. Deutsch, just so I'm clear, are you -- is there anything in the proposed order that you disagree with as it sits today?

MR. DEUTSCH: Your Honor, yeah, it's a settlement. And there are things that I guess I would say I don't like when you say I don't agree with them.

THE COURT: Oh, no.

MR. DEUTSCH: Actually --

THE COURT: In other words, I got it. Let me ask a better question.

MR. DEUTSCH: Yes.

THE COURT: I take it you agree with Mr. Kleinhaus' kind of interpretation of the way Paragraph 6 works and the deal works. Is that fair?

MR. DEUTSCH: Yeah.

THE COURT: Or is it a different understanding?

MR. DEUTSCH: That's fair, Your Honor.

THE COURT: Okay.

MR. DEUTSCH: No. That's fair, Your Honor. And I think, you know, again, that was a lot of effort by a lot of parties, and I think we came pretty close. But there are and continue to be warts with this order. But it's part of a probable settlement. I think our client thought it was

Case 25-90999 Document 1989-10 Filed in TXSB on 02/09/26 Page 267 of 421



slightly better to settle than not to settle, if that's to go forward.

THE COURT: Understood.

MR. DEUTSCH: It's not a homerun for anybody.

THE COURT: So when you say you think you had a deal, it was based on kind of what the statements Mr. Kleinhaus was saying?

MR. DEUTSCH: Correct.

THE COURT: Okay. Got it. I just want to make sure that I understood it. Thank you.

MR. DEUTSCH: Thank you, Your Honor.

THE COURT: Anyone else wish to address the Court? Please hit 5, star, or unless I've already unmuted your line. Mr. Dodd?

MR. DODD: Your Honor, thank you. John Dodd for Arab Banking Corporation, also referred to as Bank ABC. I appear just to join Katsumi's objection. I'll be very brief. We are just joining that objection and rest on the -- with Mr. Scott.

THE COURT: Can you tell me the name of your client again? I missed it.

MR. DODD: Arab Banking Corporation. In the papers, it's also referred to as Bank ABC --

THE COURT: Oh.

MR. DODD: -- as in Alpha, Bravo, Charlie.

Case 25-90999 Document 3189-10 Filed in TXSB on 01/09/26 Page 268 of 421



THE COURT: Yeah, I got it. Thank you. That's what I needed to know. Thank you.

MR. KELLEY: If you're having trouble hearing it, it's Arab Banking Corporation.

THE COURT: Yeah. That's -- but it's ABC, right?

MR. KELLEY: Yes.

THE COURT: Yeah. Okay. No. No. Got it. I thought so, but I wanted to make sure it wasn't someone separate. Okay. Anyone else wish to be heard who I have not had the opportunity to hear from? Yeah. Just please hit 5, star, and I will unmute your line. Anyone whose line I have already unmuted that wishes to be heard. Mr. Singh, why don't I give you an opportunity to respond?

MR. SINGH: Thank you, Your Honor. Again, for the record, Sunny Singh on behalf of the Debtors. Your Honor, it's been a confusing hearing, and I'm hopefully going to be able to offer some clarity. I'll do my best, at least.

Your Honor, with the settling parties, and I heard Mr. Deutsch's comments, you know, from the Debtors' perspective, we still have a deal, right? We have a deal as reflected in the order, as clarified by my comments following Mr. Kleinhaus' presentation. And as I think Mr. Grillo put it well, this is sort of how we're proceeding with those who agree.

Your Honor, I think for today, there's a real

simple question that's before you that we're trying to address.

THE COURT: Can I ask you, I should ask you. Mr. Singh, before you kind of go into it, just the clarification on the point about the -- Mr. Duke, I believe, raised it, about the $1.8 million.

MR. SINGH: We're not asking for that to be released today, Judge.

THE COURT: Okay. And so how do you read the clause, the subject to?

MR. SINGH: I think there's probably one, we just missed a parenthetical to include that there. But if you go further down that order, Paragraph 6 --

THE COURT: Just give me one moment.

MR. SINGH: It's at the bottom of Page 6 and 7 in our version. It starts, if the Debtors and the third-party factors, doesn't say consenting, are unable to reach agreement regarding the release of the above-referenced Category 1 or 2A, by January 25th, the Debtors may seek relief from the court on an emergency basis with the third-party factors reserving all rights.

So I think we just missed the parenthetical that says subject to agreement of each of the parties that was behind 2A and 2B. But we are not asking for, Your Honor, today to say that we could have access to any of the cash.

THE COURT: Got it.

MR. SINGH: That's not what today's about. And that's what, you know, hopefully I can clarify. What today's about is the Debtors are requesting that Your Honor schedule two hearings, one on the 26th of January, where without an adversary proceeding, the Debtors are going to request approval of any Category 1 and 2A invoices that are not subject to a bona fide dispute.

If we agree with Mr. Kleinhaus or Mr. Grillo or Mr. Deutsch that they're subject to a bona fide dispute, then they get kicked, okay? Because then we've got our deal that says, look, we need an adversary proceeding if you've got a bona fide dispute.

THE COURT: Where does Evolution fit into this?

MR. SINGH: So I'm going to get to --

THE COURT: Oh, okay.

MR. SINGH: -- Evolution in just a second --

THE COURT: Okay.

MR. SINGH: -- right? So that's where you are saying, look, give us that January 26th hearing where we agree with parties. And then I think it's a subsequent hearing date that we'd have to schedule for 2B because we agreed to a longer reconciliation.

But if you don't agree, Your Honor, we can't just take the cash if I just get, for example, Evolution and

Case 25-90999 Document 3189-10 Filed in TXSB on 02/09/26 Page 76 of 102



Katsumi, right, and ABC Bank. If I just agree, for example, with Mr. Grillo's client or Mr. Kleinhaus' client that, you know, we don't have a dispute with respect to Category 1, still got to come back to court, right? Can't get that cash released without coming back to court.

And so everyone's fundamental protection in this order is no further cash can be released unless Your Honor enters an order or they actually consent. And I need the consent of all of the factors to get any cash released without an order.

So Evolution, we understand Evolution's position. And this will probably explain why they didn't get a copy of the order. But Evolution's position, to my understanding, is no further cash should be released from the account. It's fine. They're entitled to that position.

And so every time I want a dollar of this cash released from this account, I have to come back to Your Honor to schedule a hearing. The first one we're asking to be scheduled is January 26th, right? And Evolution will be heard then on all the evidence if Your Honor agrees.

But what they're saying today, right? So come back to the simple issue for today, is can the Debtors have that hearing on the 26th, or do we adopt Evolution's or Katsumi's position today that everything at this point forward requires an adversary proceeding? Which is what

Case 25-90999 Document 3189-10 Filed in TXSB on 02/19/26 Page 272 of 421



they're saying, right? So then I don't even get my hearing on the 26th.

THE COURT: I'm not sure I -- and maybe it just works out that way. My understanding is that Evolution is saying with respect to their Debtors, so that's like 9 million out of the 18 million, one way or the other. Someone hold me -- from Evolution, hold me to it if I got it right.

And then Katsumi and Mr. Deutsch's client are -- and ABC, are saying with respect to theirs. So does that kind of -- at the end of the day, if all the -- if I get ABC, Evolution, and Katsumi all objecting --

MR. SINGH: Right.

THE COURT: -- is that basically the all 18 million or is there --

MR. SINGH: No.

THE COURT: Or is there some -- but if effectively, does it kind of take out?

MR. SINGH: No. No. But if they're all objecting, right? I think the way it would work is, Your Honor, if Your Honor said everything needs an adversary, everything needs an adversary proceeding because they're objecting.

THE COURT: But let's say -- but let me back up for a second. Let's just say I think the portions. And I'm

Case 25-90399 Document 3980-10 Filed in TXSB on 02/09/26 Page 78 of 421



not saying I do or don't. I'm just trying to carve it out. But there can be something that doesn't require an adversary proceeding, right? Like let's just say the --

MR. SINGH: Right.

THE COURT: -- and after everybody goes to the reconciliation period, I'm just using this as a hypothetical for everyone. That there is something that no one disputes is not subject to. It's not part of one of the Evolution eight Debtors.

MR. SINGH: Correct.

THE COURT: It's not part of Katsumi's. Somewhere or the other, I don't think that -- I don't think anybody's going to say that portion needs an adversary proceeding. The question is, when you start factoring in, even assuming, you know, the Evolutions, the Katsumis, the ABCs, at what point does that mingle things so much that we're essentially going to have one?

MR. SINGH: Well, I don't think it's -- I think the point is, and that's the sort of fine line that we've drawn, is at the 18.1 number, essentially, right? The Category 1 and 2, we think it leaves enough in the bucket that we're not going to take out, and I don't have to go through the numbers. Obviously, I disagree with what Mr. Duke said, but this isn't a numbers exercise for today, that there's enough for people to fight about, right?

Case 25-90399 Document 918-1 Filed in TXSB on 01/09/26 Page 79 of 121



And everybody's going to get information that says, here's what we're releasing from Category 1 or 2, what we propose to release. And if there's a bona fide dispute, we'll put it into an adversary proceeding.

And what I'm asking Your Honor to prove today is to say, if there's no bona fide dispute, then I can have a hearing on the 26th, without the need to file an adversary proceeding. As long as there's no bona fide dispute, Your Honor may rule at that hearing, you know what? I've taken a look at this information through the evidence, and I find there's a bona fide dispute, we're going to have to take that to an adversary proceeding. That's fair.

I think what Evolution is saying, what I'm hearing them say is, they've asserted a security interest as to everything, right, as to their Debtors. And they don't know what's theirs and what's not theirs at this point, because frankly, a lot of us don't know that information, right? And so they're saying, at this point forward, we have to proceed by everything by adversary proceeding. I think that's what they're saying.

And so Your Honor, I think the simple issue before you today is, can the Debtors schedule a hearing, right, for the 26th and subsequently for whatever that date would be?

THE COURT: That February 3rd.

MR. SINGH: Yeah. Right. Whatever the date would

Case 25-90399 Document 3189-10 Filed in TXSB on 01/09/26 Page 80 of 421



be in February that says, we don't need -- again, if there's no bona fide dispute. And part of that hearing may be, Your Honor, determining whether there was a bona fide dispute, right? And so that's the issue.

And I think we've got two arguments in response to that. One is from Evolution saying, no, I've got a security interest, and I filed an adversary proceeding, right, to determine my security interest. And so therefore, everything from this point forward, with respect to any more cash, needs to proceed by adversary proceeding.

And I think there was a little bit of confusion in some of the comments that were made. And it might have stemmed from my comments originally, so I'm not casting blame on anybody. But they're asserting a lien, right? And so that is a cash collateral dispute, in our view. I'm not saying that if somebody's asserting ownership, that's cash collateral.

But they're asserting a lien, right? They have a different argument. Your Honor's heard all about that. It's been briefed. And their argument is, I am a secured lender with respect to the other account receivables. I'm also a buyer, but I'm a secured lender with respect to the other.

And what I'm submitting to Your Honor is that you can hear that dispute and argument in the context of a cash

collateral dispute. And you don't have to adopt their position that just because they filed an adversary proceeding, that we can't even proceed on the 26th with respect to those matters, or whatever the date will be in February.

I think the others are saying, I may have a bona fide dispute, right? And you know there's actually not a lot of disagreement. If there is a bona fide dispute as to the ownership of a particular invoice, we're going to kick that to an adversary proceeding.

But if there's not, and on this issue, I think we do disagree, it's their burden. They can't just speculate that I may have an issue. I think that is MF Global, right? Notwithstanding that was cash collateral. But people can't just stand here, Your Honor, and say, well, I may have an interest in this particular thing. I don't know enough.

And I'm going to get into some of the discovery we've actually produced here. Because you know we've heard a lot that people haven't gotten information, et cetera. I mean, we really have bent over backwards to try to cooperate and get people information. That includes, Your Honor, we've received over 115 total document requests from the factoring parties. We've produced 11,300 documents in the context of discovery or voluntary information. That includes almost 4,300 documents just to Katsumi alone.

As Katsumi indicated, they took a deposition of Mr. Jerneycic on the 19th, asked him whatever they wanted to ask him. We have had over 20 formal individual meetings with the factors. We've had two group meetings with the factors. I can't even count how many countless phone calls and information sessions we've had with the factors.

We've given them the Visian dataset, which is our internal dataset. They can run their own analyses. They've all retained their own FAs, et cetera. They can run all their own analyses. We're not holding back information.

The one area where we drew a line was the subject of the examiner's investigation, the subject of the special committees. How did all of the fraud actually occur? And we have to be a little bit more careful there. And now we're working to get people additional information around that. But that was the area of dispute.

So you know and that was to try to be consistent with Your Honor's guidance at earlier hearings, et cetera, that the examiner should go first on these issues. And we're not trying to litigate all of this stuff. But fine, we're getting them more information with respect to that. So it's really not fair for people to say that they haven't been getting information. There's a lot of information to get through. We've been bending over backwards to get people information.

Case 25-90999 Document 3189-10 Filed in TXSB on 01/09/26 Page 83 of 121



But again, Your Honor, all you have to decide today is can we have a hearing with respect to this motion? Your Honor, the other thing on the -- you know, some people are getting discovery, some people are not getting discovery under this order.

Your Honor, there's two paths, right? Very simple. Path A is you can settle with the Debtors, and agree to these reconciliation timelines, agree how we're going to deal with adversary proceedings and not adversary proceedings. And by the way, the deal in the order is if you agree to stop your 2004 discovery, and stop your depositions, in exchange we are going to provide this voluntary information that we're going to provide.

If Evolution wants to sign up for that and Katsumi wants to sign up for that, that's great. But they're not, right? They are continuing to serve discovery on us through 2004. Nothing in this order requires them to stop. Your Honor is not entering an order that says, you know, with respect to the contested matters or adversary proceedings, they can't get discovery. Of course they're going to get discovery.

So why would we voluntarily over disclose or provide information to a party who's not settling their baseline rights? Anyone who's not settling has baseline rights, a dollar does not get released unless they get a

hearing before Your Honor on whether -- or excuse me -- we get a hearing, and they get a chance to object before Your Honor that additional information will go out. And they have their discovery rights reserved.

If I come back before Your Honor in the future and say I have a motion to quash or something like that, then they can argue about, you know, voluntary discovery versus involuntary discovery. But they pick the path, Your Honor. There's got to be a consequence for not wanting to settle with the Debtor. If you don't want to settle with the Debtors, that's fine. You don't have to settle with the Debtors. Send us your discovery request. We'll continue to address them.

But Mr. Kleinhaus and Mr. Grillo and Mr. Deutsch are agreeing to settle with us. And so they're agreeing to put their guns down in discovery. And in exchange for that, we're going to provide them voluntary information that's going to be less expensive for all of us. I would love for Evolution and Katsumi to join in that boat.

Your Honor, I think the other -- again, I wanted to clarify, we're not seeking to remove cash today. That will have to be dealt with at a hearing. And there will be evidence. And Your Honor will consider that evidence, including Mr. Jerneycic's declaration. So there's nothing to really talk to Evolution about and share orders about

because their position is no more cash can come out.

If we hear differently, that'd be great, right? Then I think we can pick up conversations. But their position clearly in their appeal and in their adversary proceeding and in their briefing has been no additional cash. So my working assumption is for everything with respect to Evolution, we're going to have to come back to court and convince Your Honor to release that cash over their objection.

If there's a different tone or path that they want to take, we're all ears. But we were up late working out with the parties that actually do want to settle or try to settle it. As soon as we settled, finalized the papers and got them on file. But Mr. Duke and his clients are not prejudiced today because this order does not let out a single dollar without a further court order of Your Honor, does not say he needs to stop discovery because he's not a consenting party. So he can continue with his rights. And he'll be heard on the 26th. And that evidence will be introduced.

What is happening is we're asking Your Honor to overrule the objection that says we can't even get a hearing on the 26th because everything needs to go to adversary proceeding at this point.

THE COURT: Thank you.

MR. SINGH: Thank you, Your Honor.

THE COURT: Any --

MR. KELLEY: Your Honor, we bifurcated our approach to the court for an important reason. Mr. Scott was going to address the legal issues. This court set a proceeding. I think you couldn't have been more clear. The only thing you didn't say was, read my lips. The only thing to be raised today was legal arguments. Non evidentiary. No evidentiary hearing.

On the past hearing, we negotiated. I even stood before Your Honor, and you allowed me to make a presentation where I said all of our rights are reserved. This is about process. We're letting certain money go out the door under the order the court previously entered. That was carefully negotiated.

I'm very sensitive to what I'm about to say next because this court has been very clear. It wants to encourage settlements. But settlements shouldn't have a punitive effect. That order that we -- that Your Honor entered into was carefully negotiated to provide protection. Debtors are trying to turn that settlement into a process. They're trying to cram down our throats through the order they're asking Your Honor to read, in which parties have belabored in front of Your Honor, look at this, look at this, you can enter this.

Case 25-90999 Document 3180-1 Filed in TXSB on 01/09/26 Page 87 of 421



That is a partial settlement. But your question told me you recognize the fundamental issue. It's any one party that objects. Katsumi, with the largest of all receivables outstanding, is objecting to this. There is no way to let any money go out the door while our objection and our insistence under the rights under 7001 continue to sit.

That order that they're asking you to enter, Your Honor, expressly includes facts that the Debtors have been espousing that we firmly dispute, including the categorization. So it is unclear to me how the Court can enter what is effectively a partial settlement with a number of parties, and how the court can then try to turn around and avoid -- not Your Honor, excuse me. Retract that.

How the Debtors can ask Your Honor to enter that order and then say, but adversary and no one's prejudiced by not entering that order today. We have just argued, it has cost our clients a lot of money to get the 7001 argument before Your Honor. We set today specifically to address that. Your Honor will decide that when Your Honor decides that. But we have now teed that issue up.

We are insisting on our rights, and we continue to have the ability to engage in discovery on contested matters, as Your Honor noted previously. And we will have our discovery under adversary.

We negotiated with the Debtors in 2004 months ago.

We haven't served additional requests on the Debtor. We've just been waiting for them to comply with their production obligations. They ceased producing documents to us on December 18th. We -- they want to approach us and negotiate money going out the door without giving us adequate information while letting us know, oh, we've discovered some information on computers.

And we said, short of us filing a motion to compel, we can't move forward. We need information. All of a sudden, we got three quick productions. We're ingesting it in relativity. As I've told you before, we have AlixPartners as our financial advisor. They have posed questions to the Debtors.

As part of this settlement conversation, we asked, is it even viable that we would know enough information to even have a meaningful hearing on the 26th? AlixPartners says Debtors won't produce the sampling data we've asked for. There is a reason for that. We're going to try to work through that.

But fundamentally, our protections exist only in an adversary where we have the rights to file the motion to file discovery targeted with relevance as the boundaries. That doesn't allow us to interfere with what the examiner is doing.

That allows us to pursue what we set out at the

very first day of the case, Your Honor, which was when we put these receivables in these separate accounts, we will pursue data so that we can determine the scope of where we can't agree and where we can agree. And that is the reason we have -- the Debtors attempt to take what was a settlement that was reached in the prior order, trying to work with other parties and get Your Honor to sign that, causes me to hesitate as we go forward about what our future settlements look like if they become tools that are used against us.

Katsumi has a valid position here that this should be resolved by an adversary proceeding. And we find an order is being used to try to make an end run around the adversary. It has facts in it we dispute. I am concerned about the consequence if the Court signs that order. Because you have no record either at the prior hearing, there was no evidence submitted, or this hearing. Because this wasn't intended to be an evidentiary hearing.

And I want to urge to the extent I'm able to, Your Honor, caution on this. I think that order is a trap, and we do not support its entry. We do think the adversary is the path to go here, Your Honor.

THE COURT: Thank you, Mr. Duke. I'll give you a brief opportunity to say something.

MR. DUKE: Thank you, Your Honor. It's just three very quick points. It won't take long at all. First, I

just want to clarify what our position is, is that we are entitled to adequate protection if our collateral is released. I hope that clarifies what our issue is here. It's not that we're trying to block everything. It's that we're entitled to adequate protection, which has been denied us.

Second, we weren't offered any ability to participate in these settlement negotiations, yet they're trying to impose an order. And I believe this is what Mr. Kelley just addressed, but he implies even more to us because we weren't able to participate. They're trying to impose an order on us that other settlement parties reach. They get benefits under it. We don't. That's not the way that this should operate.

And then the third point is just an administrative point. I mentioned that we had filed a competing order. I believe we're going to make one correction to it. We'll get it in very soon after this hearing ends.

THE COURT: Well, why don't you just tell me what it is? Because I was going to go back and read your order now. I haven't read it. And I think in fairness to everything, I should read it.

MR. DUKE: My team has notified me that we have to make one correction. Let me figure out what it is real quick. Yeah. We can just pull it up on the screen. Ella,

would you --

THE COURT: Why don't you just tell me?

MR. DUKE: If you're -- would you mind? Ella, can you give me the -- one second. Sorry. I'm just getting it from my team.

THE COURT: I may have filed something.

MR. DUKE: Apologies. I just got an -- I received a redline. It's a change to Paragraph 8. And where it states it is determined by order of the court.

THE COURT: Let me -- hold on, let me just get there.

MR. DUKE: Of course, Your Honor.

THE COURT: Yep, hold on. Paragraph 8.

MR. DUKE: And midway down, we're just putting in an additional correction to our proposed order that states, where it states, if it is determined by order of this court or agreement by and between the Debtors on one hand, any objecting third-party factor on the other hand, that --

And we're going to add the language, a third-party factor has an interest in, and then collections on any Category 1 or Category 2 invoice, and then strike should have been or should be paid to a third-party factor. Such third-party factor shall be entitled to assert a super-priority administrative expense claim.

So this just covers the fact that we have a

security interest versus the --

THE COURT: Can you just say the language one more time?

MR. DUKE: Sure, Your Honor. If you have it in front of you, I'll just tell you where the additional --

THE COURT: Yeah. No. I see it.

MR. DUKE: -- will be if that's useful.

THE COURT: I've got it up. I just want you to repeat it one more time.

MR. DUKE: Sure. So it will say if it is determined by order of this court or agreement by and between the Debtors on one hand, and any objecting third-party factor on the other hand, that -- and then this is the insert. A third-party factor has an interest in, and it goes on, collections on any Category 1 invoice or Category 2 invoice. And then strike should have been or should be paid to a third-party factor, and then the rest of it would continue as written.

THE COURT: So give me the clean sentence as you read it, just so I'm all clear.

MR. DUKE: If it is determined by order of this court or agreement by and between the Debtors on one hand, and any objecting third-party factor on the other hand, that a third-party factor has an interest in collections on any Category 1 or Category 2 invoice, such third-party factor

Case 25-90999 Document 3986-10 Filed in TXSB on 01/09/26 Page 288 of 421



shall be entitled to assert a super-priority administrative expense claim, and then it goes on.

THE COURT: Okay. I just wanted to understand --

MR. DUKE: Thank you, Your Honor.

THE COURT: -- the change. I didn't want to -- I just wanted to make sure I knew what the additional tweak was.

MR. SINGH: Your Honor, if I could just rise to make a clarification, and some others may too. You know the language of this order is carefully negotiated between us and the settling factors, in particular the paragraph that Your Honor was just looking at. I think if that changed, that may alter --

THE COURT: Right. It'll affect everybody else's.

MR. SINGH: It'll affect everybody else. But really, look, the way we think about it from the Debtor's perspective, if you're not in the settling parties, then you get all rights -- and we can add this -- you get all rights to object to any future amounts being released. You can continue your discovery as against the Debtors. Everyone's rights are reserved as to that issue.

And I think that's it, right?

THE COURT: Okay. But what's the effect of Evolution asserting an adversary proceeding and saying, I assert a -- I have an interest in 1A, 2A, and 2B? And

Katsumi's saying, I have an interest in 1A, 2A, and 2B. What is the --

MR. SINGH: The effect of that, Your Honor, will be --

THE COURT: So what does the hearing look like on the 26th?

MR. SINGH: So the 26th will be two things. One, with respect to Evolution, we will be arguing about whether or not they're adequately protected, assuming that they are -- right, assuming that they actually have an interest in these funds.

THE COURT: So when do I make the determination as to whether they have a lien?

MR. SINGH: Ultimately, in the adversary proceeding. And the question that you'll have to address is, do I have enough today to find that cash collateral should be -- you know should be permitted?

THE COURT: How do I make a determination as to whether -- I would be assuming that they have a full lien on all the assets?

MR. SINGH: You could do that, or you could actually take into account. I mean, Your Honor, take into account how you might ultimately rule, right? You can take that into account. But Your Honor, you don't even have to get into all of that. Because what we're going to put

forward before you, and this is partly why the updated numbers were important. We're going to show that there's adequate protection because there's remaining funds in the account, right?

And so it's not as if Your Honor is making a determination that if you turn out to be wrong and all the money is spent that you authorized to go out, and you can effectuate your remedy this way, just like you did with respect to the $55 million, if you turn out to be wrong, then that's the adequate protection, and we'll deal with the merits of their issue in the adversary proceeding that they filed.

THE COURT: As to whether they have an --

MR. SINGH: Correct.

THE COURT: -- whether they have a security interest at all?

MR. SINGH: Correct. Exactly --

THE COURT: And what about --

MR. SINGH: Your Honor.

THE COURT: -- Katsumi, who's claiming ownership?

MR. SINGH: Katsumi's claiming ownership, but that'll be addressed with respect to whether or not there is a bona fide dispute. If they stand up here, and show you that there is a bona fide dispute with respect to the funds that we're asking to be released, then we can't have those

Case 25-90999 Document 3198-10 Filed in TXSB on 01/09/26 Page 291 of 421



released unless there's an adversary proceeding.

But there needs to be some baseline, Your Honor, for them to say, yeah, like, I actually have an interest in these funds, and I need to prove it to the Court.

THE COURT: But what they're saying is they just got eight reams and reams of paper and don't -- are not going to be ready to go in 13 days.

MR. SINGH: Your Honor, what I would say with respect to that, I've heard Mr. Kelley stand up at a number of hearings now and make statements about what's been produced and what's not. If he -- if their position is that they have not had adequate information, Your Honor, I'd submit that they need to put in a declaration of a witness, if it's AlixPartners or whoever, we should be able to cross on what information they've been provided and not and put that on before, Your Honor, before we can't get our day heard in court.

Because my position is, Your Honor, we have provided a ton of documents. We've provided a lot. And as we get more information, because we're doing an investigation, we're continuing to provide information. But that's an issue Your Honor can consider at the hearing. They should put in evidence, not just statements from Mr. Kelley on what he believes he's received and not received. And we get our day in court with respect to that issue.

THE COURT: Okay.

MR. SINGH: Thank you, Judge.

THE COURT: Mr. Kleinhaus?

MR. KLEINHAUS: I'll let Ms. Metzger go first. I'll respond after.

MS. METZGER: Thank you. Good afternoon, Your Honor. Laura Metzger, from Orrick, Herrington & Sutcliffe, on behalf of Raistone Purchasing Series XXXII. I just want to make two really quick points. One, to just reiterate Mr. Singh's statement to the extent there are any changes in the order to confirm our consent. Obviously, we would need an opportunity to review them and would consider them in good faith.

The second comment I just want to make and bring to the Court's attention, there's -- the silence on the part of other factors to the notion that Evolution has a lean on all of the receivables, and all the funds being collected, should in no way be an agreement or acknowledgment that they do or any way have priority over the other factors who might have ownership rights or security --

THE COURT: No. No. No.

MS. METZGER: -- interests in those assets.

THE COURT: Agreed.

MS. METZGER: So we will address that in the context of that adversary proceeding if that's where it

Case 25-90999 Document 3189-10 Filed in TXSB on 02/09/26 Page 293 of 421



needs to be addressed. But I just want to go on record that others might have interest in exactly what they are.

THE COURT: No. No. No. Agreed. I understand. I understand. Okay.

MS. METZGER: Thank you, Your Honor.

THE COURT: Mr. Kleinhaus?

MR. KLEINHAUS: Thank you, Your Honor. First of all, I joined in and agree with the comments that Ms. Metzger just made, and I won't repeat them. The irony of this hearing, or at least the part that's hard to fully get my head around is, I mean, I -- my client and I disagree with Mr. Singh on the law, as was made clear earlier.

We also disagree with the comments that my friend Mr. Singh made about discovery. Our perspective is that, I mean, we started out here with a motion to release a very large amount of cash on very short notice. Our position, which we articulated as strongly as we could, is we need to know how this fraud worked before that could happen.

And over time, I think the Debtors, to their credit, while they haven't changed their position on the merits, have recognized that maybe there's some merit in slowing down and getting the facts here. And we have -- we took a deposition where we got next to no information on how this fraud worked.

We're finally getting some documents which we

would submit -- it's not for today, but we would submit are quite inconsistent with this very, what we think is an overly rigid approach where you just compare invoice number to invoice number. We think the facts are much more involved than that.

So we disagree on the law. I disagree on discovery with Mr. Singh. But what we came here today to do is not to resolve the legal issue or the discovery issue. And I've heard comments today like, you know, we're acquiescing in the Debtors' statement of the facts.

I mean, we required, at the beginning of Paragraph 5, the words, according to the Debtors. And throughout the entire order, we tried to make very clear, we certainly don't acquiesce in their statement of the facts. And to be certain, to be very clear, my clients, Leucadia parties, likewise have not -- as to Category 3, we think it's quite likely, nearly certain there's going to be disputes.

And I think the Debtors, and we, although we disagree on how those disputes might come out, have agreed there needs to be an adversary proceeding. On Categories 1 and 2, we haven't agreed any more than Katsumi has that there's no dispute on those.

The point here was to lay out a process. And that's where the give and take was. The Debtors have said, we want to go faster. And we came up with a process on

that. But to be super clear on this, and this is in Paragraph 6 again, at the hearing on January 26th or February 2nd, assuming we don't reach agreement before that, our arguments are preserved not only on whether there should be an adversary proceeding, but if we believe there needs to be more discovery, we wrote this into the order.

It says, with the third-party factors reserving all rights with respect to such hearing, including all arguments that an adversary proceeding is necessary, and all arguments regarding discovery. So the door is open for us to argue we haven't gotten enough discovery.

Moreover, as I said earlier, if we believe that there's a factual vacuum that makes it impossible to assess yet whether or not there's a real dispute, we are perfectly entitled to argue it's the Debtor's burden, and they need to bring an adversary proceeding.

So I don't intend to be repetitive here. What I want to really just do is emphasize that the point of this order was certainly not to move the ball on the substance and the merits in a direction against the factors. It was to come up with a framework with all parties reserving rights with respect to that hearing.

THE COURT: Thank you.

MR. KLEINHAUS: Thank you.

THE COURT: Let me just -- I need to just go back

and think about something with the notes and read. Just give me about 15 minutes, and I'll come back out. We'll -- before we continue, I just wanted to give a little housekeeping. I have a hearing in another matter. It should take 20, 25 minutes at 4:00 p.m., and I know that there's another issue we've got to take up. That's not to say that we're not going to take it up. I just wanted to make sure that we may have to take a break at 4:00 just for a quickie. Parties are more than welcome to stay here.

With respect to that matter, one question I don't want to forget. Do the parties agree or disagree? Well, let me just ask that. Do the parties agree that the real issue comes down to Footnote 4, and whether it's construed as your footnote -- your famous Footnote 4 about where the -- in other words, whether the collateral, the inventory in the true up mechanism, whether the Court can only consider where Footnote 4 says Starlight and Patterson Property was located as of the petition date?

I read the papers to read that the Debtors are saying, well, there's some more other inventory located in other places, and if you add that inventory, then it adds up to a bigger number. I didn't know if you all agreed with that or if what you're saying is, yeah, that all may be true, but the true up mechanism kind of requires you to look at the inventory in these locations.

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Civil Action No. 4:26-cv-00073 |
| Debtors.[1] | § | Bankruptcy Case No. 25-90399 |
| Evolution Credit Partners, | § | |
| Appellant, | § | |
| v. | § | |
| First Brands Group, LLC, *et al.*, | § | |
| Appellees. | § | |

**BRIEF FOR APPELLANT**

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012(a), Appellant Evolution Credit Partners ("Evolution")[2] hereby states that:

- Evolution Credit Opportunity Master Fund II-B, LP does not have any parent or holding corporation, as it is a limited partnership made up of a single general partner and limited partners. This fund does not have any partner that is a publicly held corporation holding more than a 10% economic interest.
- Evolution Credit Partners Trade Finance Master L.P. does not have any parent or holding corporation, as it is a limited partnership made up of a single general partner and limited partners. This fund does not have any partner that is a publicly held corporation holding more than a 10% economic interest.
- Evolution Credit Opportunity Master Fund III-B, LP does not have any parent or holding corporation, as it is a limited partnership made up of a single general partner and limited partners. This fund does not have any partner that is a publicly held corporation holding more than a 10% economic interest.

---

[2] "Evolution" means, collectively, Evolution Credit Opportunity Master Fund II-B, LP, Evolution Credit Partners Trade Finance Master L.P. (as successor in interest to Evolution Credit Partners Trade Finance L.P.), and Evolution Credit Opportunity Master Fund III-B, LP.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... ii

TABLE OF AUTHORITIES ........................................................................iv

NATURE AND STAGE OF PROCEEDING ........................................................1

JURISDICTIONAL STATEMENT ....................................................................1

ISSUE PRESENTED.........................................................................................2

PRELIMINARY STATEMENT ........................................................................2

STATEMENT OF THE CASE...........................................................................6

A. Evolution and Receivable Sellers Enter a Factoring Arrangement. ........................................................................6

B. First Brands Sells Rights to Receivables Based on Fake Invoices. .........................................................................7

C. The Debtors Seek Immediate Release of $63 Million. .........................8

D. The December 22 Hearing and December 30 Status Conference......................................................................11

E. The Order Authorizes the Release of $60 Million To Debtors...........14

SUMMARY OF ARGUMENT ........................................................................14

STANDARD OF REVIEW ..............................................................................15

ARGUMENT ...................................................................................................15

I. THE ORDER DENIED EVOLUTION ADEQUATE PROTECTION........15

CONCLUSION ...............................................................................................24

CERTIFICATE OF COMPLIANCE..................................................................27

CERTIFICATE OF SERVICE ..........................................................................28



4927-7915-6873

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*First Bank of Miller, Miller, S.D. v. Wieseler*,
45 B.R. 871 (D.S.D. 1985) .................... 18, 22

*In re AMR Corp.*,
490 B.R. 470 (S.D.N.Y. 2013) .................... 2, 5

*In re Cage*,
357 B.R. 99 (Bankr. S.D. Tex. 2004) .................... 20

*In re Eads*,
417 B.R. 728 (Bankr. E.D. Tex. 2009) .................... 16, 17

*In re Energy Partners, Ltd.*,
409 B.R. 211 (Bankr. S.D. Tex. 2009) .................... 18

*In re Goode*,
235 B.R. 584 (Bankr. E.D. Tex. 1999) .................... 18, 19, 22

*In re Griego*,
Case No. 18-52983-cag, 2021 WL 4839891
(Bankr. W.D. Tex. Oct. 14, 2021) .................... 16

*In re Kizzee-Jordan*,
626 F.3d 239 (5th Cir. 2010) .................... 2

*In re Mantachie Apartment Homes, LLC*,
488 B.R. 325 (Bankr. N.D. Miss. 2013) .................... 20

*In re Mosello*,
195 B.R. 277 (Bankr. S.D.N.Y. 1996) .................... 21, 22

*In re Murel Holding Corp.*,
75 F.2d 941 (2d Cir. 1935) .................... 20

*In re Pearl Res., LLC*,
622 B.R. 236 (Bankr. S.D. Tex. 2020) .................... 19



4927-7915-6873

*In re Renaissance Hosp. Grand Prairie, Inc.*,
713 F.3d 285 (5th Cir. 2013)....................15

*In re Safeguard Self-Storage Tr.*,
2 F.3d 967 (9th Cir. 1993)....................2

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552 (3d Cir. 1994)....................18

*In re Timbers of Inwood Forres Assocs., Ltd.*,
793 F.2d 1380 (5th Cir. 1986).................... 18, 19, 24

*In re Whitehall Jewelers Hldgs., Inc.*,
No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. 2008)....................16

*KLX Energy Servs., LLC v. Sommers*,
Civil Action No. H-22-2599,
2023 WL 5511201 (S.D. Tex. Aug. 25, 2023)....................16

*Matter of T-H New Orleans Ltd. P'ship*,
10 F.3d 1099 (5th Cir. 1993)....................2

*Matter of Webb*,
954 F.2d 1102 (5th Cir. 1992)....................15

*Perez v. Peake*,
373 B.R. 468 (S.D. Tex. 2007) ....................19

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988)....................19

*Whitehouse Hotel Ltd. P'ship v. Comm'r*,
615 F.3d 321 (5th Cir. 2010)....................15

**Statutes**

11 U.S.C. § 361(3) .................... 5, 19, 22, 25

11 U.S.C. § 363(c)(2).................... 14, 16, 17

11 U.S.C. § 363(e).................... 14, 16, 17

11 U.S.C. § 363(p)(1).........................................................................................19

28 U.S.C. § 157(b)(2)(M) .......................................................................................1

**Rules**

Fed. R. Bankr. P 7001(b)................................................................... 14, 16, 23

**Other Authorities**

H.R. Rep. No. 95-595 .........................................................................................18

**NATURE AND STAGE OF PROCEEDING**

This opening brief relates to an appeal from a bankruptcy court order which permitted the Debtors to use Evolution's cash collateral without providing it adequate protection. App. Vol. 1, at 705.[3]

**JURISDICTIONAL STATEMENT**

The bankruptcy court had jurisdiction over the Debtors' chapter 11 cases under 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b) because the order from which Evolution appeals "approv[ed] the use or lease of property, including the use of cash collateral." 28 U.S.C. § 157(b)(2)(M).

The bankruptcy court entered the *Order (i) Authorizing Release of Certain Funds to the Debtors' Estates (ii) Adjourning Hearing on Remaining Portions of Factoring Procedures Motion and Supplement; and (iii) Granting Related Relief* ("Order") on December 31, 2025. App. Vol. 1 at 706. Evolution timely appealed from that Order on January 5, 2026. *Id.* at 713.

This Court has jurisdiction over Evolution's appeal under 28 U.S.C. § 158(a)(1). *First*, the Order's authorization to release $60 million to the Debtors

---

[3] References to "App." are to the *Appendix Accompanying Appellant's Opening Brief*, filed contemporaneously herewith. Volume 1 of the Appendix is submitted publicly. Volume 2 of the Appendix is submitted under seal, accompanied by a motion to seal. Unless otherwise indicated, all emphases herein have been added and internal citations omitted.

constitutes a final order granting the Debtors use over cash collateral. *See, e.g.*, *In re Safeguard Self-Storage Tr.*, 2 F.3d 967, 969 (9th Cir. 1993) ("Given [the] possibility of irreparable harm, an order granting a debtor use over funds alleged to be cash collateral requires immediate appellate review."). *Second*, the Order's release of $60 million denied Evolution adequate protection, which is also "final and therefore appealable." *See, e.g.*, *In re AMR Corp.*, 490 B.R. 470, 475-76 (S.D.N.Y. 2013); *accord Matter of T-H New Orleans Ltd. P'ship*, 10 F.3d 1099, 1101 (5th Cir. 1993) (appealing decision on motion for adequate protection).[4]

## ISSUE PRESENTED

Did the bankruptcy court err by releasing cash collateral to the Debtors without providing Evolution adequate protection, in violation of 11 U.S.C. §§ 363(c)(2)(B) and 363(e)?

## PRELIMINARY STATEMENT

The bankruptcy court released to the Debtors tens of millions of dollars' worth of cash collateral in which Evolution holds a perfected, first-priority security

[4] The bankruptcy court expressly stated that its decision "to allow the debtors to use the cash" was "***not interim***." App. Vol. 1 at 591. This easily satisfies the Fifth Circuit's "flexible" approach for determining whether a bankruptcy order is appealable. *See, e.g.*, *In re Kizzee-Jordan*, 626 F.3d 239, 242 (5th Cir. 2010). While the Debtors have suggested that this appeal is premature, *see* App. Vol. 1 at 793, that is wrong because the resolution of any further disputes before the bankruptcy court will have no effect on the Order's release of $60 million to the Debtors.

interest, *without* providing Evolution statutorily required adequate protection. That decision was a clear legal error and must be reversed.

The Debtors sell automobile-related parts and accessories to various customers. Evolution was a "factor" for eight of the Debtors (the "Receivable Sellers"). Factors grant liquidity to companies by providing immediate cash in exchange for their receivables—the rights to payments to be made on invoices by the Receivable Sellers' customers.

Pursuant the factoring arrangement Evolution entered with the Receivable Sellers (the "Factoring Agreement"), the Receivable Sellers sold to Evolution what they claimed was the right to $60.5 million of Receivables.[5] They also made representations, warranties, and covenants relating to the authenticity of the Receivables and invoices giving rise to them.

The Debtors now state that the $60.5 million in Receivables sold to Evolution never existed. According to the Debtors, nearly all the invoices sold to factors like Evolution were either entirely fabricated or heavily inflated. The Debtors asserted, in effect, that First Brands' pre-bankruptcy factoring arrangements and records were

[5] The Factoring Agreement defines "Receivable" to cover "any right to payment of a monetary obligation" from "the obligor thereof." App. Vol. 2 at 1075, 1109.

fraudulent and entirely unreliable—and that Evolution should be left with a likely worthless unsecured claim.

But even if the Receivables Evolution purchased never existed, the Factoring Agreement obligated the Receivable Sellers to indemnify Evolution or repurchase the Receivables. Crucially, each of the foregoing obligations under the Factoring Agreement were secured by the Receivable Sellers' grant to Evolution of a "lien on and security interest in" "***all of the Receivables now or hereafter owned or held by such Seller***" to the extent they were not already sold to a factor. App. Vol. 2 at 1094.

The Debtors' prepetition Receivables have been categorized into a segregated account (the "Factored Receivables Account"), which was set up to reconcile hundreds of millions of dollars' worth of prepetition Receivables sold to factors or owed to Debtors. On December 1, 2025, the Debtors filed a motion (the "Factoring Procedures Motion") seeking the immediate release of certain "non-factored" funds, claiming these funds are property of the Debtors' respective estates. But this position ignores Evolution's first-priority security interest in ***all*** the Receivable Sellers' ***non-factored*** prepetition Receivables.

Despite Evolution's security interest in these prepetition Receivables, and over its objection to the Factoring Procedures Motion, the bankruptcy court authorized the Debtors to invade the Factored Receivables Account—without providing adequate protection to Evolution for its $60.5 million claim—in violation



4927-7915-6873

of section 363(c) and 363(e) of the Bankruptcy Code. Specifically, the Order permitted the release of up to $60 million to the Debtors from funds associated with "Category 1" and "Category 2" invoices (invoices identified by the Debtors as not being sold to factors)—leaving only approximately $49 million in the Factored Receivables Account as security for *all* factors (not just Evolution).[6] This resulted in Evolution going from being *over*secured by the funds in the Factored Receivables Account, to *under*secured by approximately $20.9 million (assuming, at best, that no other factors assert an interest in the remaining funds).

The Order violates the rule of adequate protection: to protect the secured creditor from diminution in the value of its interest in collateral. To be adequately protected, Evolution must receive the ***full*** value of its interest in the collateral, or its "indubitable equivalent." *See* 11 U.S.C. § 361(3). Not only did the Order decrease the value of Evolution's collateral, but it rendered Evolution undersecured.

Accordingly, Evolution respectfully requests that the Court reverse the Order and remand to the bankruptcy court, with instructions that it must segregate at least $60.5 million as adequate protection for Evolution's claim.

---

[6] Although the Bankruptcy Court stated it intended to hold back ***$59 million***, *see* App. Vol. 1 at 592, the Order's release of $60 million to the Debtors left only ***$49 million*** in the Factored Receivables Account because, at the time of the Order, the account contained $109 million. *See id.* at 507-09.

## STATEMENT OF THE CASE

### A. Evolution and Receivable Sellers Enter a Factoring Arrangement.

On March 28, 2023, Evolution entered a Factoring Agreement with the Receivable Sellers, whereby Evolution purchased what was represented to be $60.5 million worth of Receivables from the Receivable Sellers. App. Vol. 1 at 319, 532.

In exchange, the Receivable Sellers made express representations, warranties, and covenants relating to the authenticity and validity of the Receivables and the underlying invoices.[7] If any of the (i) representations and warranties were breached, (ii) covenants were not performed, or (iii) Eligibility Criteria were not met, then the Receivable Sellers were obligated to indemnify Evolution or repurchase the purchased Receivables. App. Vol. 2 at 1063-64, 1092-94.

Section 5(g) of the Factoring Agreement protects Evolution from any breach of the Receivable Sellers' "existing and future obligations [under the Factoring Agreement]" by granting Evolution "a lien on and security interest in" ***all*** the unsold Receivables "now or hereafter owned or held by such [Receivable] Seller." App.

[7] For example, the Receivable Sellers represented that each of the invoices giving rise to the Receivables "constitutes the legal, valid and binding obligation of such Person." App. Vol. 2 at 1089, 1113. They also represented and warranted that "each Proposed Receivable is an Eligible Receivable"—meaning that the Receivable met certain "Eligibility Criteria" confirming its validity and authenticity. *Id.* at 1089-90

Vol. 2 at 1094. Thus, Evolution has a security interest in ***all*** the Receivable Sellers' Receivables that are not otherwise factored. *Id.* at 1075-76.

Evolution filed UCC-1 Financing Statements perfecting its security interest in "[a]ny and all present and future Receivables transferred or purported to be transferred to the Secured Party pursuant to [the Factoring Agreement]" for each of the Receivable Sellers. App. Vol. 1 at 321-22, 347-99.

Although certain other lenders previously filed UCC-1 Financing Statements to perfect their security interests in certain of the Debtors' collateral—pursuant to (i) a February 2, 2018 ABL Credit Agreement ("ABL Credit Agreement" or "ABL"), and (ii) certain first- and second-lien term loan agreements, as well as a sidecar term loan agreement (together, the "Term Loans")—Evolution's collateral is expressly carved out from the definition of "Collateral" under the ABL and Term Loans, and it is also carved out from the collateral secured by the DIP loans pursuant to the DIP Order. *See* App. Vol. 2 at 1065-68, 1077-79.

**B. First Brands Sells Rights to Receivables Based on Fake Invoices.**

The Debtors contend they discontinued all third-party factoring on September 12, 2025, just weeks before filing for chapter 11, "after learning of irregularities in the Company's Third-Party Factoring practices." App. Vol. 1 at 228.

The Debtors have admitted that a significant number of receivables sold to third-party factors (including Evolution) were "secretly factored multiple times

contrary to express representations, were inflated or were simply ***fabricated out of whole cloth***," and that the third-party factors were "induced to enter into seemingly profitable factoring transactions" based on "invoices [that] were factored multiple times or ***entirely fabricated***." *See* App. Vol. 1 at 810.

**C. The Debtors Seek Immediate Release of $63 Million.**

On December 1, 2025, the Debtors filed a motion (the "Factoring Procedures Motion") seeking authorization to release tens of millions of dollars from the Factored Receivables Account for use in operation of their business. *See* App. Vol. 1 at 226, 230-31. The Debtors claim these funds are "property of [their] estate[s]," based solely on the contention that the receivables associated with those funds apparently did not match the invoice number, customer, and supplier in the Debtors' records of factored receivables. *See id.* at 229, 238-39.

On December 12, the Debtors supplemented the Factoring Procedures Motion and requested emergency relief. App. Vol. 1 at 298. According to the Debtors, they needed emergency relief because they required "immediate access" to certain funds from invoices they deem "non-factored." *Id.* at 310. That same day, the Debtors served their first Reconciliation Report, which they used to identify factored and/or non-factored receivables (the "First Reconciliation Report"). *See id.* at 327, 329.

On December 19, Evolution filed its Objection to the Factoring Procedures Motion (the "Objection"). App. Vol. 2 at 1058.[8] Evolution objected to the release of funds on the grounds that it "has a first-priority security interest in ***all*** prepetition receivables of certain Debtors—the Receivable Sellers—***including*** those receivables which the Debtors claim were never factored." *Id.* at 1060. Evolution's Objection made clear that the Factoring Procedures Motion should be denied because, *inter alia*, "all receipts are subject to Evolution's lien until its security interest is satisfied or it receives adequate protection." *Id.* at 1081.

On December 21—the day before the bankruptcy court's hearing on the Factoring Procedures Motion—the Debtors submitted a Proposed Order granting their motion (the "December 21 Proposed Order"), where, for the first time, the Debtors set forth the specific funds they sought to release from the Factored Receivables Account. *See* App. Vol. 1 at 430-32. The Debtors explained that their First Reconciliation Report divided the invoices into four categories:

- "Category 1 Invoices" and "Category 2 Invoices" are receivables that the Debtors represent were never factored. App. Vol. 1 at 432.
- "Category 3 Invoices" relate to customers whose receivables were factored but do not match with a factored invoice, according to the Debtors. *Id.*

[8] The public version of Evolution's Objection is included at App. Vol. 1 at 315.



4927-7915-6873

- "Category 4 Invoices" relate to customers whose receivables were factored and "generated a match with at least one factored invoice." *Id.*

According to the Debtors, the following amounts were collected and held in the Factored Receivables Account:

| Invoice Category | Amount in Factored Receivables Account |
|---|---|
| Category 1 Invoices | ~$42.8 million, *see* App. Vol. 1 at 432. |
| Category 2 Invoices | ~$25.2 million, *see* App. Vol. 1 at 432. |
| Category 3 Invoices | ~$36.5 million, *see* App. Vol. 1 at 487. |
| Category 4 Invoices | ~$4.4 million, *see* App. Vol. 1 at 265. |
| **Total:** | **~$109 million** |

Through the December 21 Proposed Order, the Debtors sought $63 million from Categories 1 and 2 to be "immediately released from the Factored Receivables Account into the Debtors' operating accounts."[9] App. Vol. 1 at 432.

On December 22, Evolution joined the objections of certain other factors, arguing that "Bankruptcy Rule 7001(b) requires that 'a proceeding to determine the validity, priority or extent of a lien or other interest in property' be an adversary proceeding," and that the Debtors' proposed procedures "violate Rule 7001(b) because the Debtors seek to challenge the 'validity, priority, or extent of' 'lien[s]'—

[9] This $63 million figure represents $42.8 million related to Category 1 Invoices and $25.2 million related to the Category 2 Invoices, "minus collections from Walmart Inc. . . . which is approximately $5 million." App. Vol. 1 at 470. Based on Evolution's understanding, the Walmart receipts are earmarked for another factor.

including Evolution's lien—without the procedural protections afforded by an adversary proceeding." App. Vol. 1 at 492-93.[10]

**D. The December 22 Hearing and December 30 Status Conference.**

The bankruptcy court heard Evolution's objection to the Factoring Procedures Motion on December 22. During the hearing, Evolution argued it has a $60.5 million secured claim and expressly sought adequate protection. App. Vol. 1 at 533 ("[T]he debtors should be fashioning adequate protection acceptable to Evolution, which they refuse to do."). Its counsel expressly stated that "in all events, the [bankruptcy court] should deny any request to release an amount that would leave less than $60.5 million in the factored receivables account." *Id.* at 576.

The bankruptcy court declined to rule on Evolution's lien, explaining: "I don't think today I need to determine whether Evolution's lien is superior to everyone else's." App. Vol. 1 at 588. Instead, the bankruptcy court asked, "even if they are [superior], are they adequately protected?" *Id.*

Ruling against Evolution, the bankruptcy court authorized the Debtors to use $60 million from Category 1 and 2 Invoices. App. Vol. 1 at 591-92. But the

---

[10] The Debtors have since ***conceded*** that any "determination as to whether [Evolution has] a lien" must be made "in [an] adversary proceeding" and that, until then, the bankruptcy court would need to "assum[e] that they actually have an interest in these funds." *See* App. Vol. 1 at 1009. Thus, the only issue for this Court to determine is whether the Order afforded adequate protection to Evolution.

bankruptcy court did not explain how it arrived at these figures. At one point, it acknowledged that the Debtors wanted to use "63 million and hold back 46 mil[lion]," *see id.* at 586, but moments later stated that the "[r]eal question is whether one is adequately protected and if debtors . . . want to use 63 million but then leave back, like, ***56 million***," *id.* at 591. (That math would assume the Factored Receivables Account contained $119 million, not $109 million.)

Rather than give the Debtors their requested $63 million, the bankruptcy court authorized the release of up to $60 million, leaving just $49 million in the Factored Receivables Account.[11] It stated it would "feel more comfortable . . . granting relief to allow the debtors to use the cash" and that the remaining money in the account would be "additional adequate protection for whoever it is on the day that we show up" and "not all granted adequate protection for Evolution." App. Vol. 1 at 591-92. Confirming its arithmetic mistake, the bankruptcy court stated that this arrangement "gets me more comfortable that if there is a mistake or well-intentioned that there's you know, ***59 million*** as opposed to ***56 -***, it gets me a lot more comfortable when you start thinking about adequate protection." *Id.* at 592.

[11] *See* App. Vol. 1 at 708. While the Debtors have stated that the Order "requir[ed] the Debtors to keep $57 million in the Factored Receivables Account to adequately protect Evolution's and the other Third-Party Factors' interest (whatever those might be) in the funds," *see id.* at 793, it is unclear how the Debtors arrive at the figure $57 million. It is stated nowhere in the Order.

Following the hearing, the Debtors revised their Proposed Order (as revised, the "December 23 Proposed Order") to limit the release of funds from Category 1 and 2 Invoices to "no more than $60 million in the aggregate." App. Vol. 1 at 625.

At a December 30 status conference, Evolution sought clarity on the bankruptcy court's ruling, pointing out that the amount remaining in the Factored Receivables Account would be "less than the $60.5 million that would cover Evolution's claim." App. Vol. 1 at 669. The bankruptcy court responded: "I'm confused by that, I've got to be honest with you." *Id.* Nevertheless, the bankruptcy court stated: "The record is the record, the ruling was the ruling." *Id.* at 670.

Evolution then submitted a Competing Proposed Order, noting the release of $60 million would "leave[] only approximately $39.6 million of cash in the [Factored Receivables] Account which could constitute adequate protection for Evolution," resulting in it facing "a shortfall of $20.9 million" on the $60.5 million obligation secured by those receivables. App. Vol. 1 at 693.[12]

[12] Only $39.6 million (at most) would be available to Evolution because releasing $60 million would leave only approximately $49 million in the Factored Receivables Account, and "[o]f that $49 million, Evolution cannot assert a right to the $4.4 million from Category 4 receivables, nor can it assert a right to the $5 million from Walmart-related receivables." App. Vol. 1 at 693.

### E. The Order Authorizes the Release of $60 Million To Debtors.

On December 31, the bankruptcy court adopted the Debtors' proposal, entered the Order, and authorized the immediate release of up to $60 million to Debtors of the Category 1 and 2 Invoices. App. Vol. 1 at 706, 708. This appeal followed.

Since the Order's entry, the Debtors have stated that, "if things continue the way that we've modeled them in the next couple of weeks, we could run out of cash as soon as the first week in February." *See, e.g.*, App. Vol. 1 at 1055-56.

## SUMMARY OF ARGUMENT

The Order denied Evolution adequate protection. *First*, the bankruptcy court correctly assumed that Evolution holds a perfected, first-priority secured interest in all the Receivable Sellers' unsold prepetition Receivables. Were it otherwise, the bankruptcy court would have violated Federal Rule of Bankruptcy 7001 by determining the "validity, priority, or extent of [Evolution's] lien" outside of an adversary proceeding, *see* Fed. R. Bankr. P 7001(b), which the Debtors agree is required, *see* App. Vol. 1 at 1009. Because the bankruptcy court could not bypass Evolution's rights, it had to assume that Evolution had a perfected, first-priority lien in the funds held the Factored Receivables Account.

*Second*, despite Evolution's status as a first-priority secured creditor, the Order allowed the Debtors to use Evolution's collateral without affording Evolution statutorily required adequate protection. *See* 11 U.S.C. § 363(c)(2), (e). Adequate



4927-7915-6873

protection is required to protect a secured creditor from the diminution in the value of its collateral. But here, the Order immediately decreased the value of Evolution's collateral (without providing any commensurate value or security), resulting in Evolution going from being ***oversecured*** by the funds in the Factored Receivables Account to ***undersecured*** by at least $20.9 million. That constitutes reversable error.

**STANDARD OF REVIEW**

"When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as an appellate court and applies the standard of review generally applied in federal court appeals." *In re Renaissance Hosp. Grand Prairie, Inc.*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Matter of Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). The question presented is a mixed question of law and fact. Thus, the "'factual premises' are reviewed for clear error but the ultimate 'legal conclusion' is reviewed de novo." *Id.* at 294 (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 333 (5th Cir. 2010)).

**ARGUMENT**

**I. THE ORDER DENIED EVOLUTION ADEQUATE PROTECTION**

This Court should reverse the Order because it violates the express requirements of the Bankruptcy Code. Specifically, the bankruptcy court released to the Debtors $60 million worth of cash collateral in which Evolution holds a

perfected, first-priority security interest, without providing it statutorily required adequate protection. *See* 11 U.S.C. §§ 363(c)(2), 363(e).

As an initial matter, in issuing the Order, the bankruptcy court correctly assumed—and indeed, it ***had*** to assume—that Evolution holds a perfected, first-priority secured interest in the Receivable Sellers' unsold Receivables. App. Vol. 1 at 588 ("I don't think today I need to determine whether Evolution's lien is superior to everyone else's. . . . The question is, ***even if they are***, are they adequately protected?").

To be sure, Rule 7001(b) makes clear that a determination as to the "validity, priority, or extent" of Evolution's lien ***must*** be done through an adversary proceeding. *See* Fed. R. Bankr. P. 7001(b).[13] The bankruptcy court could not bypass this requirement (and treat Evolution as though it did ***not*** have a perfected, first-priority secured interest) and also deprive Evolution of adequate protection. If it

---

[13] *See also KLX Energy Servs., LLC v. Sommers*, Civil Action No. H-22-2599, 2023 WL 5511201, at *2 (S.D. Tex. Aug. 25, 2023) (vacating bankruptcy court's order because "[n]o adversary proceeding was held before the bankruptcy court issued its merits determination on Great White's interest in the proceeds"); *In re Griego*, Case No. 18-52983-cag, 2021 WL 4839891, at *4 (Bankr. W.D. Tex. Oct. 14, 2021) (holding that the trustee was required to file an adversary proceeding because the "determination of the 'validity, priority, or extent of a lien . . . can be accomplished only through an adversary proceeding"); *In re Eads*, 417 B.R. 728, 739 (Bankr. E.D. Tex. 2009) ("[A]n adversary proceeding is required for an action challenging the validity, priority or extent of a lien."); *accord In re Whitehall Jewelers Hldgs., Inc.*, No. 08-11261 (KG), 2008 WL 2951974, at *6 (Bankr. D. Del. 2008) (same).

could, then secured creditors could be precluded from any opportunity to prove the existence of their security interests ***and at the same time*** be rendered undersecured by the debtors' use of cash collateral. That is not the law, and indeed, even the Debtors have conceded that an adversary proceeding is required to determine the validity, priority, and extent of Evolution's lien.[14]

Despite correctly assuming that Evolution's lien was first in priority and secured, the bankruptcy court erred by denying Evolution adequate protection. As a first-priority, secured interest holder in cash collateral—*i.e.*, Receivables held in the Factored Receivables Account—Evolution is entitled to the protections of Section 363 of the Bankruptcy Code. Section 363 prohibits the Debtors from using cash collateral without the consent of "each entity that has an interest in such cash collateral," unless the bankruptcy court, "after notice and a hearing, authorizes such use . . . ***in accordance with the provisions of this section***." 11 U.S.C. § 363(c)(2). Section 363(e) then mandates that the bankruptcy court "***shall*** prohibit or condition such use . . . as is ***necessary to provide adequate protection***." *Id.* § 363(e).

Courts do not let debtors-in-possession use cash collateral lightly: "[T]he standard of adequate protection to be afforded to a creditor when its cash collateral

---

[14] While the Debtors have challenged the perfection and priority of Evolution's lien, *see e.g.*, App. Vol. 1 at 470-71, they have conceded that such a determination would be required to be made pursuant to an adversary proceeding, *see id.* at 1009.



4927-7915-6873

is being used should be a high one." *See, e.g.*, *First Bank of Miller, Miller, S.D. v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985); *accord In re Goode*, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) (explaining that adequate protection "must not be illusory and, particularly in the context of the use of cash collateral, must be 'of the most indubitable equivalence'").[15] The failure to provide adequate protection constitutes reversable error. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 567 (3d Cir. 1994) (affirming district court's reversal of bankruptcy court's order and explaining that, "even under the clearly erroneous standard, the district court correctly rejected the bankruptcy court's finding that there was adequate protection justifying the superpriority financing").

The focus of adequate protection "is to protect the secured creditor . . . from diminution in the value of its interest in collateral during the reorganization process." *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) (collecting cases). Congress codified the adequate protection requirement because "secured creditors should not be deprived of the benefit of their bargain." *In re Timbers of Inwood Forres Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986) (quoting H.R.

---

[15] The Debtors' supposed dire need for cash is not a sufficient reason to release Evolution's cash collateral. *See In re Goode*, 235 B.R. at 590 ("While the . . . ramifications of failing to get [authorization to use creditor's cash collateral] can be devastating to a debtor's case, that fact alone ***simply cannot suffice as the sole means by which to justify the use of a creditor's cash collateral***.").

Rep. No. 95-595, at 6295 (1977)), *aff'd sub nom. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988). Congress recognized that, while "the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for." *Id.*

The Debtors bear the burden of proving that the secured creditor is adequately protected by a preponderance of the evidence. 11 U.S.C. § 363(p)(1); *In re Goode*, 235 B.R. at 589. Section 361 of the Bankruptcy Code recognizes three forms of adequate protection that may apply to the debtor's use of property in which a secured creditor has an interest: "[1] cash payments to the extent the collateral has declined in value, [2] extra collateral to compensate for such decline, or [3] other relief 'as will result in the realization by [the secured party] of the indubitable equivalent of such entity's interest in such property." *Perez v. Peake*, 373 B.R. 468, 483 (S.D. Tex. 2007) (citing 11 U.S.C. § 361). The third method is "a catch-all provision." *In re Timbers*, 793 F.2d at 1388.

Here, because neither of the first two methods apply, the Debtors bore the burden of proving that the funds that will remain available to Evolution in the Factored Receivables Account constitute the "indubitable equivalent" of the value of Evolution's collateral (*i.e.*, all the Receivable Sellers' unsold prepetition receivables, a portion of which were released). *See In re Pearl Res., LLC*, 622 B.R.



4927-7915-6873

236, 271 (Bankr. S.D. Tex. 2020) ("[I]n the bankruptcy context, the indubitable equivalent means that the treatment afforded to the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim, and also insure the integrity of the creditor's collateral position."); *see also In re Cage*, 357 B.R. 99, 101 (Bankr. S.D. Tex. 2004) ("It is plain that 'adequate protection' must be ***completely compensatory***" (quoting *In re Murel Holding Corp*., 75 F.2d 941, 942 (2d Cir. 1935) (Hand, J.))).

The Debtors did not (and cannot) meet their burden. Before the Order, there was approximately $109 million in the Factored Receivables Account—a significant portion of which constituted the Receivable Sellers' unsold Receivables—and Evolution's $60.5 million claim was *oversecured*. Of that $109 million, the Order authorized the release of up to $60 million from Category 1 and 2 Invoices, *see* App. Vol. 1 at 708, which would leave only approximately $49 million as security shared among all other factors. Not only does that represent an ***immediate diminution in the value of Evolution's collateral***, but Evolution cannot even draw upon or realize that $49 million (which the bankruptcy court stated is not exclusively for Evolution) because $9.4 million is already committed elsewhere: $4.4 million for factored invoices that have been matched with factors other than Evolution, and $5 million associated with sales to Walmart that are earmarked for another factor. *Id.* at 693.



4927-7915-6873

Thus, of the $109 million in the Factored Receivables Account,[16] Evolution would be able to draw against only, at most, $39.6 million to satisfy its $60.5 million claim if no new funds enter the Factored Receivables Account. This is (at least) a $20.9 million shortfall. That is obviously not adequate protection: it falls far short of the "indubitable equivalent" of Evolution's oversecured rights to collateral before the Order, *see* 11 U.S.C. § 361(3), and it renders Evolution ***undersecured***. Moreover, whatever amounts remain in the account will be shared among *all* factors with valid claims to the prepetition Receivables—which matters because the other factors also contest the Debtors' claim to the remaining Receivables. *See, e.g.*, App. Vol. 1 at 409, 442. Denying Evolution adequate protection requires reversal.

Although depriving Evolution of adequate protection is, by itself, more than sufficient to reverse the Order, the bankruptcy court also erred by failing to provide an adequate explanation (much less a proper calculation) for its conclusion that Evolution would be adequately protected. Courts have recognized that findings of adequate protection "should be premised on facts, or on projections grounded on a firm evidentiary basis." *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996).

---

[16] This figure has since been updated as the Debtors continue to submit Reconciliation Reports. The $109 million figure is based on the representations made at the December 22 hearing, allegations made in connection with the Factoring Procedures Motion, and figures represented in the Order.

Without "hard facts on which to base a finding of adequate protection," determining that a proposal provides adequate protection is improper. *See id.*; *cf. First Bank of Miller*, 45 B.R. at 875 ("With so much at stake for the creditor, it seems incumbent on the bankruptcy court to make a specific value determination [regarding the value of the creditor's interest] before permitting [the] debtor to spend cash collateral.").[17]

During the hearing on Evolution's Objection, the Debtors made clear that the Factored Receivables Account contained $109 million. App. Vol. 1 at 507-09. At one point, the bankruptcy court acknowledged the Debtors wanted to use "63 million and hold back 46 mil[lion]." *Id.* at 586. Moments later, however, the bankruptcy court stated that the "[r]eal question is whether one is adequately protected and if debtors . . . want to use $63 million but then leave back, like, ***56 million***," *id.* at 591. But releasing $63 million and "leav[ing] back . . . 56 million" would assume the Factored Receivables Account contained ***$119 million***, not $109 million.

Rather than give the Debtors their requested $63 million, the bankruptcy court released $60 million to the Debtors. App. Vol. 1 at 591. It stated that that arrangement "gets me more comfortable that if there is a mistake or well-intentioned that there's you know, ***59 million*** as opposed to ***56 -***, it gets me a lot more

---

[17] As noted above, to the extent the bankruptcy court had doubts about the validity, extent, or priority, of Evolution's lien, that must be determined pursuant to an adversary proceeding. *See* Fed. R. Bankr. P. 7001(b).

comfortable when you start thinking about adequate protection." *Id.* at 592. Again, it appears that the Bankruptcy Court believed there would remain ***$59 million*** in the Factored Receivables Account if it released $60 million. That belief was mistaken.[18]

Even if that were not the case, the bankruptcy court did not explain why the release of $63 million did not provide adequate protection, but the release of $60 million, in its view, would. In either case, the release of funds would diminish the value of Evolution's collateral and render Evolution undersecured.

Finally, the Debtors' arguments that Evolution would somehow be adequately protected anyway fail. They have argued that the Order "granted all Third-Party Factors (including Evolution) adequate protection in the form of a dollar for dollar reimbursement from the remaining funds in the Factored Receivables Account and an administrative expense claim if it is determined that any of the Released Funds should have been paid to a Third-Party Factor." App. Vol. 1 at 794. That is wrong. As the Order itself acknowledges, there may not be "sufficient funds in the Factored Receivables Account to satisfy such reimbursement," *see id.* at 709—an exceedingly likely scenario as the Debtors continue to seek the release of funds in the Factored

[18] The bankruptcy court also did not consider that certain of the funds would be unavailable to adequately protect Evolution. Evolution's Competing Proposed Order explained that the release of $60 million would "leave[] only approximately $39.6 million of cash in the Account which could constitute adequate protection for Evolution", *see* App. Vol. 1 at 693, but the bankruptcy court did not adopt it.

Receivables Account, and recent filings suggest that the Debtors "project they will run out of cash by the first week of February, 2026, absent additional funding (which to date no party has agreed to provide)," *see id.* at 729.

Moreover, Section 361(3) also makes clear that an administrative-expense claim is ***not*** adequate protection. *See* 11 U.S.C. § 361(3); *see also In re Timbers*, 793 F.2d at 1388 ("Section 361(3) expressly states . . . that providing a creditor with an administrative priority claim as a form of adequate protection is precluded."). And, even if such an administrative-priority claim were given to Evolution, the Order expressly states that it would be "subordinate to the Carve-Out . . . and the approved superpriority administrative expense claims provided for under the Final DIP Order." App. Vol. 1 at 709. Leaving Evolution with what is likely to be a worthless administrative claim is not (and cannot be) adequate protection.

Accordingly, the Debtors fell far short of meeting their burden to show that Evolution has been adequately protected under the Order.

## CONCLUSION

For the reasons herein, Evolution respectfully requests that the Court reverse and remand the Order, with instructions to the bankruptcy court that at least $60.5 million is segregated exclusively for Evolution as adequate protection for its claim.

Case 25-90399 Document 313-20 Filed in TXSB on 02/09/26 Page 32 of 35



Respectfully submitted this 16th day of January 2026.

**GRAY REED**

By: */s/ Jason S. Brookner*
Jason S. Brookner
Texas Bar No. 24033684
Emily F. Shanks
Texas Bar No. 24110350
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
eshanks@grayreed.com

- and –

**ELSBERG BAKER & MARURI PLLC**
David Elsberg (admitted *pro hac vice*)
Michael Duke (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
1 Penn Plaza, Suite 4010
New York, NY 10119
Telephone: (212) 597-2600
Email: delsberg@elsberglaw.com
mduke@elsberglaw.com
aparks@elsberglaw.com

- and –

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:(212) 969-3000
Email: vindelicato@proskauer.com
mkoch@proskauer.com

- and -

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

*Counsel to Evolution*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(A) and Hon. Rosenthal's Individual Rule 9(A) because, excluding the portions exempted by Federal Rule of Bankruptcy 8015(g), this document contains 24 pages.

The undersigned further certifies that the foregoing brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirement of Fed. R. Bankr. P. 8015(a)(5)(A) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jason S. Brookner*
Jason S. Brookner



4927-7915-6873

**Certificate of Service**

The undersigned hereby certifies that on the 16th day of January 2026, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system. In addition, a copy of the foregoing was served via electronic mail on the other parties to this appeal, as set forth below.

*/s/ Jason S. Brookner*
Jason S. Brookner

Gabriel A. Morgan
Clifford W. Carlson
**WEIL, GOTSHAL & MANGES LLP**
609 Main Street, Suite 2900
Houston, TX 77002
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Email: gabriel.morgan@weil.com
clifford.carlson@weil.com

Matthew S. Barr
Sunny Singh
Andriana Georgallas
Kevin Bostel
Jason H. George
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Email: matt.barr@weil.com
sunny.singh@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
jason.george@weil.com

*Counsel to the Debtors*



4927-7915-6873

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| FIRST BRANDS GROUP, LLC, *et al.*, | § | Civil Action No. 4:26-cv-00073 |
| Debtors.[1] | § | Bankruptcy Case No. 25-90399 |
| Evolution Credit Partners, | § | |
| Appellant, | § | |
| v. | § | |
| First Brands Group, LLC, *et al.*, | § | |
| Appellees. | § | |

**REPLY BRIEF FOR APPELLANT**

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

STANDARD OF REVIEW ..... 3

ARGUMENT ..... 4

I. THE ORDER DENIED EVOLUTION ADEQUATE PROTECTION ..... 4

II. THE BANKRUPTCY COURT COULD NOT RULE ON EVOLUTION'S LIEN WITHOUT AN ADVERSARY PROCEEDING ..... 6

A. The Bankruptcy Court Did Not Preliminarily Determine that the Strength of Evolution's Claimed Security Interest Was Lacking ..... 7

B. The Bankruptcy Court Could Not Release Cash Collateral to the Debtors Upon a Preliminary Determination of Evolution's Lien ..... 9

C. Evolution's Lien Is Perfected and First Priority, but That Issue Is Not on Appeal ..... 14

III. THE DEBTORS' POLICY CONCERNS ARE MISPLACED ..... 19

CONCLUSION ..... 21

CERTIFICATE OF COMPLIANCE ..... 23

CERTIFICATE OF SERVICE ..... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Hensel Phelps Constr. Co.*,
909 F.3d 723 (5th Cir. 2018) ....................13

*All About Prop., LLC v. Midland Mort.*,
Civil Action No. 4:22-cv-1684, 2024 WL 1079226 (S.D. Tex. Feb. 8, 2024) ......6

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ....................8

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co. L.P.*,
94 F.4th 492 (5th Cir. 2024) ....................13

*Esteras v. United States*,
606 U.S. 185 (2025) ....................9

*In re Burd*,
202 B.R. 590 (N.D. Ohio 1996) ....................14

*In re Claar Cellars LLC*,
Case No. 20-00044-WLH11,
2020 WL 1238924 (Bankr. E.D. Wash. Mar. 13, 2020) ....................11, 12

*In re Goode*,
235 B.R. 584 (Bankr. E.D. Tex. 1999) ....................19

*In re King-Porter Co.*,
446 F.2d 722 (5th Cir. 1971) ....................18

*In re MF Glob. Holdings Ltd.*,
No. 11-15059 (MG), 2011 WL 6210374 (Bankr. S.D.N.Y. Dec. 14, 2011) ........12

*In re Patriot's Point Assocs., Ltd.*,
902 F.2d 1566, 1990 WL 64718 (4th Cir. May 2, 1990) ....................14

*In re Placid Oil Co.*,
102 B.R. 538 (Bankr. N.D. Tex. 1988) ....................12

*In re Railyard Co., LLC*,
572 B.R. 766 (Bankr. D.N.M. 2017)....................................................................13

*In re Renaissance Hosp. Grand Prairie, Inc.*,
713 F.3d 285 (5th Cir. 2013)..............................................................................3

*In re Scott*,
Case No. 10-69733, 2011 WL 13394235 (E.D. Mich. June 29, 2011)................20

*In re Tex. Pig Stands, Inc.*,
No. SA-08-CA-0533-OG, 2008 WL 4872058 (W.D. Tex. Aug. 27, 2008).........10

*In re Timbers of Inwood Forest Assocs., Ltd.*,
793 F.2d 1380 (5th Cir. 1986)............................................................................20

*In re Young*,
No. 7-11-12554 JS, 2011 WL 3799245 (Bankr. D.N.M. Aug. 29, 2011)............11

*Loan Syndications & Trading Ass'n v. SEC*,
882 F.3d 220 (D.C. Cir. 2018)............................................................................16

*Meuers Law Firm, P.L. v. Reasor's, LLC*,
796 F. App'x 472 (10th Cir. 2019).....................................................................17

*Nat. Oilwell Varco, L.P. v. Elite Coil Tubing Sols., LLC*,
2014 WL 12619323 (S.D. Tex. Oct. 17, 2014).....................................................6

*Palmer v. Travelers Ins. Co.*,
319 F.2d 296 (5th Cir. 1963)..............................................................................10

*S.E.C. v. Stanford Int'l Bank, Ltd.*,
112 F.4th 284 (5th Cir. 2024)...............................................................................4

*Sindhi v. Raina*,
905 F.3d 327 (5th Cir. 2018)................................................................................8

*Sixth Angel Shepherd Rescue Inc. v. Pa. SPCA*,
No. Civ. A. 10-3101, 2011 WL 605697 (E.D. Pa. Feb. 15, 2011).......................17

*Tex. v. Dep't of Labor*, 929 F.3d 205, 209 (5th Cir. 2019) ,
929 F.3d 205, 209 (5th Cir. 2019)........................................................................4

Case 25-90999 Document 3913-8 Filed in TXSB on 02/09/26 Page 337 of 421



*United States v. Crittenden*,
600 F.2d 478 (5th Cir. 1979) .......... 18

*United States v. Roney*,
Case No. 3:24-cr-113, 2025 WL 2533193 (E.D. Va. Sept. 3, 2025) .......... 16

*Vasudevan v. Adm'rs of Tulane Edu. Fund*,
706 F. App'x 147 (5th Cir. 2017) .......... 5

**Statutes**

11 U.S.C. § 363 .......... passim

U.C.C. § 9-332 .......... 17

U.C.C. § 9-108 .......... 18

**Rules**

Fed. R. Bankr. P. 4003(d)(1) .......... 9

Fed. R. Bankr. P. 7001(b) .......... passim

## PRELIMINARY STATEMENT

The Debtors[2] do not address the central issue in this appeal: Assuming (as the bankruptcy court did) that Evolution holds a perfected, first-priority security interest, did the Order deny Evolution adequate protection, in violation of 11 U.S.C. §§ 363(c)(2)(B) and 363(e)? As to this question, the Debtors do not even dispute the point. That alone requires reversal.

Instead of addressing the issue on appeal, the Debtors attempt to rewrite the record, arguing that the bankruptcy court conducted a preliminary assessment of the strength of Evolution's claimed security interest, preliminarily determined that it was lacking, and decided that such a determination did not require an adversary proceeding. *See* Appellees' Br. at 13. Thus, according to the Debtors, the bankruptcy court was entitled to release tens of millions of dollars of cash collateral—in which Evolution claimed a perfected, first-priority security interest—without affording Evolution adequate protection or holding an adversary proceeding to litigate its lien. The Debtors are wrong on all fronts.

*First*, the bankruptcy court ***did not*** make any preliminary determination about the strength of Evolution's security interest. It expressly did the opposite, stating at

[2] Capitalized terms in this brief have their same meaning as in Appellant's Opening Brief. [Docket No. 16.]

the December 22 hearing: "***I don't think today I need to determine whether Evolution's lien is superior to everyone else's.*** I don't think that's the purpose of today. ***The question is, even if they are, are they adequately protected?*** That's really what this comes down to." App. Vol. 1 at 588.[3] In other words, the bankruptcy court properly started its analysis by assuming Evolution held a first-priority lien. The Debtors ignore these clear statements and misleadingly highlight statements the bankruptcy court made ***before*** clarifying that it was assuming Evolution had a first-priority lien, or ***later*** in the hearing when the bankruptcy court said it was making observations only "for the parties to consider." *See id.* at 588.

*Second*, Rule 7001 forecloses the Debtors' argument that the bankruptcy court could make a "preliminary determination" of the validity of Evolution's lien. That rule clearly states that a proceeding to determine the validity, priority, or extent of a lien must be an adversary proceeding. *See* Fed. R. Bankr. P. 7001(b). It contains no exception allowing a bankruptcy court to issue relief outside an adversary proceeding based on a "preliminary determination." Moreover, Sections 363(c)(2) and 363(e) are clear that the requirement of adequate protection is mandatory, and if the court cannot afford a claimant adequate protection, then it must prohibit the

[3] References to "App." are to the Appendix submitted at Docket Nos. 17 and 18. Unless otherwise indicated, all emphases herein have been added and internal citations omitted.

release of cash collateral. Aware of these rules, the bankruptcy court assumed, for purposes of the Order, that Evolution did in fact have a perfected, first-priority lien, but it erred by denying Evolution adequate protection.

*Finally*, the Debtors' arguments are beside the point because, even if the bankruptcy court ***could*** make a "preliminary determination" of Evolution's lien, that is not what the bankruptcy court did. Likewise, even if Evolution were ***incorrect*** that the bankruptcy court was required to assume Evolution had a first-priority, perfected security interest, that is in fact what the bankruptcy court did assume. All that remains is whether the Order denied Evolution adequate protection. It did, and the Debtors do not (and cannot) contest this point.

## STANDARD OF REVIEW

The question presented—whether the bankruptcy court erred by releasing cash collateral to the Debtors without providing Evolution adequate protection, in violation of 11 U.S.C. §§ 363(c)(2)(B) and 363(e)—is a mixed question of law and fact. Thus, the "'factual premises' are reviewed for clear error but the ultimate 'legal conclusion' is reviewed de novo." *In re Renaissance Hosp. Grand Prairie, Inc.*, 713 F.3d 285, 294 (5th Cir. 2013). While the Debtors argue that the standard is abuse of discretion, *see* Appellees' Br. at 12–13, they ignore that "[i]n the context of reviewing legal questions"—such as whether the release of cash collateral violated 11 U.S.C. §§ 363(c)(2)(B), (e)—"the abuse of discretion standard 'is effectively *de*

*novo*, because a district court by definition abuses its discretion when it makes an error of law.'" *See S.E.C. v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 291–92 (5th Cir. 2024); *see also Tex. v. Dep't of Labor*, 929 F.3d 205, 209 (5th Cir. 2019) (under the "abuse of discretion" standard, "underlying findings of fact are reviewed for clear error" and "underlying conclusions of law reviewed de novo").

Under either standard, the Order should be reversed.

## ARGUMENT

### I. THE ORDER DENIED EVOLUTION ADEQUATE PROTECTION

Because the bankruptcy court had to—and did—assume that Evolution holds a first-priority lien in the cash collateral, it violated 11 U.S.C §§ 363(c)(2) and (e) by authorizing the collateral's release without providing Evolution adequate protection. By authorizing the release of this collateral, the bankruptcy court essentially gave the Debtors what they would have received if Evolution did *not* have a first-priority lien in the collateral—violating Evolution's right to adequate protection against its diminution in value. *See* Appellant Br. [Docket No. 16.]

The Debtors simply do not address this issue. They do not dispute, if Evolution holds a perfected, first-priority security interest in the Receivable Sellers' unsold Receivables, or if the bankruptcy court was required to assume that was the case, that the bankruptcy court denied Evolution adequate protection in violation of 11 U.S.C. §§ 363(c)(2), (e). *See* Appellant Br. at 14–15, 17. Nor do the Debtors

dispute that they bore the burden of proving Evolution is adequately protected, *id.* at 19, or that the failure to afford Evolution adequate protection constitutes reversible error, *id.* at 18. Nor do the Debtors contest that providing Evolution with an administrative-expense claim is ***not*** adequate protection. *Id.* at 24. Nor do the Debtors dispute that Evolution went from being oversecured by the factored receivables account to undersecured by at least $20.9 million. *Id.* at 5. The Debtors also do not dispute that the bankruptcy court erred in its calculations with respect to assessing adequate protection, whereby the bankruptcy court assumed that $119 million was in the Factored Receivables Account (rather than $109 million) when releasing funds to the Debtors. *Id.* at 21–23.[4]

Instead of addressing these key issues (*i.e.*, the ones at issue in this appeal), the Debtors misstate the record and argue that the bankruptcy court "engaged in a

---

[4] The Court should disregard the Debtors' unsupported assertion of facts outside the record that "there are still approximately $230 million in outstanding prepetition receivables, which, if and when received, would be transferred to the segregated account." *See* Appellees' Br. at 11. Debtors' say-so is not evidence, and the statement appears to be an effort to inject post-appeal fact disputes into this proceeding. That is flatly improper. *See Vasudevan v. Adm'rs of Tulane Edu. Fund*, 706 F. App'x 147, 150 n.3 (5th Cir. 2017) ("This court generally may not consider evidence outside the record on appeal."). In any event, the Debtors do not even argue that any such funds would suffice as adequate protection for, or even be available to, Evolution—including because such receivables may match with invoices owed to other factors, and because many of the vendors may have offsetting credits (making the collectability of the receivables uncertain), among other reasons.

preliminary evaluation of the strength of Evolution's claimed first-priority security interest and found it lacking." Appellees' Br. at 13. But that is flatly wrong. As explained below: (1) the bankruptcy court did not make any such preliminary determination of Evolution's lien, (2) the bankruptcy court did not say it was making a preliminary determination (indeed, it expressly stated that it was ***not*** making such a determination), and (3) the Debtors never argued below that the bankruptcy court could or should make such a preliminary determination. *See infra* Argument II(A).

Without Debtors' reinvention of the proceedings, they have no arguments because they have waived them. *See, e.g.*, *All About Prop., LLC v. Midland Mort.*, Civil Action No. 4:22-cv-1684, 2024 WL 1079226, at *5 (S.D. Tex. Feb. 8, 2024) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue.") (collecting cases); *Nat. Oilwell Varco, L.P. v. Elite Coil Tubing Sols., LLC*, Civil Action NO. H-13-0374, 2014 WL 12619323, at *6 n.6 (S.D. Tex. Oct. 17, 2014) ("By failing to oppose this argument in its briefing [the defendant] is deemed to have conceded this argument."). This Court should reverse and remand.

## II. THE BANKRUPTCY COURT COULD NOT RULE ON EVOLUTION'S LIEN WITHOUT AN ADVERSARY PROCEEDING

Rather than contesting that Evolution was denied adequate protection by the bankruptcy court's actual ruling, the Debtors engage in an exercise of rewriting and ignoring the record. Specifically, the Debtors argue that the bankruptcy court "engaged in a preliminary evaluation of the strength of Evolution's claimed first-

priority security interest and found it lacking." Appellees' Br. at 13; *id.* at 8–9 (claiming that the bankruptcy court's determination concerned "whether Evolution would be adequately protected if the funds were released ***in light of the strength of its claimed interest***" and asserting that the bankruptcy court explained "its preliminary view that Evolution does not have the first-priority lien in claimed"). This position fails for multiple reasons.

### A. The Bankruptcy Court Did Not Preliminarily Determine That the Strength of Evolution's Claimed Security Interest Was Lacking

The Debtors' characterization of the December 22 hearing is demonstrably false. The bankruptcy court did not make any preliminary determination that the strength of Evolution's first-priority security interest was lacking; to the contrary, the bankruptcy court expressly stated it was *not* doing that: "***I don't think today I need to determine whether Evolution's lien is superior to everyone else's.*** I don't think that's the purpose of today. ***The question is, even if they are, are they adequately protected?*** That's really what this comes down to." App. Vol. 1 at 588.

Ignoring this language, the Debtors cherry-pick misleading quotes from other parts of the transcript. For example, they rely on the bankruptcy court's statement that "the question . . . before the Court" is "whether I think it's true that [Evolution is] entitled to have a superior lien over everyone else, and if they are, is there adequate protection for it." Appellees' Br. at 8 (quoting App. Vol. 1 at 587). But even a cursory review of the transcript reveals that this statement came ***before*** the

bankruptcy court clarified its view that "I don't think today I need to determine whether Evolution's lien is superior to everyone else's. I don't think that's the purpose of today." App. Vol. 1 at 588. In other words, the bankruptcy court made clear it was *not* deciding the validity or priority of Evolution's lien.

The Debtors also rely on the bankruptcy court's statement that it was "not convinced" that Evolution's lien was perfected. Appellees' Br. at 9 (quoting App. Vol. 1 at 589). But again, even a cursory review of the record shows this was the bankruptcy court confirming that it was not deciding in either party's favor. App. Vol. 1 at 588. Indeed, the Debtors' cherry-picked quotes came ***before*** the bankruptcy court again clarified that Evolution "ha[s] every right to argue that they're entitled to every bit of the cash," and with respect to whether Evolution's lien was perfected, the bankruptcy court said, "***let's assume they are today***, since we're not making calls on text." App. Vol. 1 at 590.

Not only did the bankruptcy court not make the "preliminary determination" the Debtors imagine, but the Debtors did not even argue that it could or should make such a determination in its briefing below. *See* App. Vol. 1 at 226–46, 468–87. As the Fifth Circuit has "consistently held, 'arguments not raised before the . . . court [below] are [forfeited] and cannot be raised for the first time on appeal.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 336 n.103 (5th Cir. 2024) (quoting *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) (third alteration in original)).

### B. The Bankruptcy Court Could Not Release Cash Collateral to the Debtors Upon a Preliminary Determination of Evolution's Lien

The Debtors wrongly assert that the bankruptcy court could preliminarily rule on Evolution's lien outside an adversary proceeding, and that such determination permitted the bankruptcy court to release cash collateral to the Debtors—treating Evolution as if it were unsecured—without affording Evolution adequate protection. *See* Appellees' Br. at 21–24. That position is untenable.

*First*, Rule 7001(b) is straightforward: an adversary proceeding is necessary for "determin[ing] the validity, priority, or extent of a lien." Fed. R. Bankr. P. 7001(b). This rule has only two exceptions. It expressly carves out (1) "a proceeding under Rule 3012" (proceedings to determine the amount of a secured claim); and (2) a proceeding under "Rule 4003(d)" (a proceeding "under § 522(f) to avoid a lien," brought by "filling a motion under Rule 9014," *see* Fed. R. Bankr. P. 4003(d)(1)). Rule 4001—concerning the use of cash collateral and the provision of adequate protection—is not mentioned. By expressly listing two exceptions to the requirement of an adversary proceeding, Rule 7001(b) implicitly excludes all others. *See Esteras v. United States*, 606 U.S. 185, 194 (2025) (applying the canon of *expression unius est exclusio alterius*, under which "expressing one item of an associated group or series excludes others left unmentioned").

Rule 7001(b) covers proceedings to "***determine*** the validity, priority, or extent of a lien." *See* Fed. R. Bankr. P. 7001(b). It does not say "***finally*** determine," and

it does not carve out "preliminary" determinations. Thus, all "determinations" of the "validity, priority, or extent" of Evolution's lien in connection with the use of cash collateral and the determination of adequate protection—including a so-called "preliminary" determination—must be done through an adversary proceeding.[5]

*Second*, the bankruptcy court cannot do implicitly what it is forbidden from doing explicitly—that is, "determin[ing] the validity, priority, or extent of a lien" outside of an adversary proceeding. *See id.*; *see also Palmer v. Travelers Ins. Co.*, 319 F.2d 296, 298 (5th Cir. 1963) ("It should be obvious that if the court cannot directly determine the merits of a controversy between the trustee and a third party, it ought not be able to do so indirectly."). "Rule 7001 clearly states that a proceeding to determine the validity, priority or extent of a lien or other interest in property is an adversary proceeding. A bankruptcy court's failure to proceed by adversary proceeding when one is required is reversible error." *In re Tex. Pig Stands, Inc.*, No.

[5] The Debtors misleadingly assert that the cases Evolution cites "involved a final merits determination, not a preliminary assessment like the one here." *See* Appellees' Br. at 22, n.3. But that confuses the issue. Each case concerned an effort to obtain final determination on a motion that embedded issues concerning the validity, priority, or extent of a lien. Each of those cases held that the bankruptcy court could not rule against the creditor based on the embedded lien validity issue. A bankruptcy court cannot circumvent that prohibition by calling its determination on the lien "preliminary."

SA-08-CA-0533-OG, 2008 WL 4872058, at *3 (W.D. Tex. Aug. 27, 2008) (citation omitted); *see also* Appellant Br. at 16 (collecting cases).

Courts cannot side-step this clear requirement by calling a determination of lien validity or priority "preliminary"—while depriving the putative lien holder of its constitutional property rights without adequate protection based on that "preliminary" determination. *See*, *e.g.*, *In re Young*, No. 7-11-12554 JS, 2011 WL 3799245, at *7 & n.11 (Bankr. D.N.M. Aug. 29, 2011) ("The concept of adequate protection is derived from the property interest protections found in the Fifth Amendment's prohibition against taking private property without just compensation.") (collecting cases). Given the constitutional rights at issue, Rule 7001(b) requires an adversary proceeding.[6]

*Third*, while the Debtors cite to *In re Claar Cellars LLC*, Case No. 20-00044-WLH11, 2020 WL 1238924 (Bankr. E.D. Wash. Mar. 13, 2020), that case helps

---

[6] The Debtors suggest that 11 U.S.C. § 363(p)(2) "requires a bankruptcy court to make a preliminary determination of the strength of [the creditor's] claimed interest." Appellees' Br. at 2. But section 363(p)(2) says nothing of the sort. It merely provides that "[i]n any hearing under this section . . . the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p)(2). The Debtors have already ***conceded*** that any "determination as to whether [Evolution has] a lien" must be made "in [an] adversary proceeding," *see* App. Vol. 1 at 1009, at which Evolution will have the burden. Until then, the Debtors concede that the bankruptcy court could "assum[e] that they [Evolution] actually have an interest in these funds." *Id.*

Evolution, not the Debtors. *See* Appellees' Br. at 23. There, the court authorized adequate protection payments to a secured creditor, rejecting the notion that "an adversary proceeding must be completed to determine the extent of [the creditor's] lien before [the debtor] can make any period payments to [the creditor]"—that is, adequate protection payments. *In re Claar Cellars, LLC*, 2020 WL 1238924, at *7. That is what Evolution requests: adequate protection pending the resolution of the adversary proceeding. The Debtors' remaining authorities are similarly inapposite.[7]

*Finally*, comparing section 363(f) of the Bankruptcy Code, which provides debtors the ability to sell property, to sections 363(c)(2) and 363(e),which govern the use of cash collateral, demonstrates that the Debtors cannot use cash collateral in which Evolution arguably has a secured interest without affording it adequate protection or resolving that interest through an adversary proceeding. Relevant here,

---

[7] For example, the Debtors rely on *In re Placid Oil Co.*, 102 B.R. 538, 542 (Bankr. N.D. Tex. 1988) for the position that courts may conduct a "preliminary assessment as to whether a party's lien is valid." Appellees' Br. at 22–23. But in that case, the court awarded substantial adequate protection to the secured creditor, *see In re Placid*, 102 B.R. at 542, which suggests that, if anything, a preliminary analysis is permissible to protect the creditor's interest, *not* so that debtors may use funds in which creditors claim an interest without protecting those creditors. The Debtors also cite to *In re MF Glob. Holdings Ltd.*, No. 11-15059 (MG), 2011 WL 6210374, at *1 (Bankr. S.D.N.Y. Dec. 14, 2011), but there, unlike here, the creditors had "no proof to support their assertion that some or all of the [cash collateral] derives from 'customer property'" in which they had an interest. *See id.* at *1. Here, by contrast, the Debtors cannot dispute that a significant amount of the funds in the Factored Receivables Account is associated with receipts to Evolution's Receivable Sellers.

section 363(f) provides that debtors "may sell property . . . free and clear of any interest in such property of an entity other than the estate" in various circumstances, including if "***such interest is in bona fide dispute.***" 11 U.S.C. § 363(f)(4). By contrast, sections 363(c)(2) and (e) contain no such "bona fide dispute" language, suggesting that, even if, as here, the Debtors ***do*** dispute the creditor's interest in cash collateral, such cash collateral ***cannot*** be released to the Debtors without providing adequate protection. *See Cheapside Mins., Ltd. v. Devon Energy Prod. Co. L.P.*, 94 F.4th 492, 501 (5th Cir. 2024) ("When Congress includes particular language in one section of a statute but omits it in another, this court presumes that Congress intended a difference in meaning." (cleaned up)); *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 732 (5th Cir. 2018) (similar).

This difference between the statutory sections makes sense. A *sale of property* may be permissible even if there is a bona fide dispute regarding the creditor's interest in that collateral because, "[t]o the extent of the validity of any asserted interest, it attaches to the proceeds of a § 363(f) sale," which would serve to protect the creditor. *See In re Railyard Co., LLC*, 572 B.R. 766, 773 (Bankr. D.N.M. 2017). By contrast, if cash collateral is released (even if the Debtors dispute the creditor's claimed interest), there would be nothing left to attach upon the release of such cash collateral. Thus, the creditor is entitled to an adversary proceeding to determine the validity, extent, and priority of its lien before such cash collateral is

released. *See, e.g.*, *In re Burd*, 202 B.R. 590, 594 (N.D. Ohio 1996) ("[A]bsent the filing of an adversary proceeding, the Court shall not execute any orders approving the distribution of the ***sale proceeds***." (collecting cases)).

The Debtors' reimagining of the rules—treating Evolution as unsecured but without determining the validity, extent, or priority of its lien through an adversary proceeding—is improper, and in any event is inconsistent with what the bankruptcy court actually did. *See In re Patriot's Point Assocs., Ltd.*, 902 F.2d 1566, 1990 WL 64718, at *2, 7 (4th Cir. May 2, 1990) (district court approved a sale "without establishing that creditor's priority through an adversary proceeding" and "[f]or this reason alone," the Fourth Circuit "must reverse the district court's approval . . . and remand the case to allow the parties adequate opportunity to conduct a sale pursuant to 11 U.S.C. § 363").

### C. Evolution's Lien Is Perfected and First Priority, but That Issue Is Not on Appeal

After mischaracterizing the record, the Debtors wrongly assert that Evolution "abandoned the principal argument it made to the Bankruptcy Court," which Debtors claim is that "Evolution did in fact have a valid, first-priority interest in property that would entitle it to $60.5 million worth of adequate protection." *See* Appellees' Br. at 20. Wrong again.

The validity, priority, and extent of Evolution's lien are not at issue in this appeal. As discussed above, the bankruptcy court assumed (for purposes of the

Order) that Evolution had a first-priority lien. *See supra* Argument § II(A). And following the Order, Evolution commenced an adversary proceeding seeking a declaration that "Evolution has a perfected, first-priority lien and security interest" in "[a]ny and all present and future Receivables transferred or purported to be transferred to [Evolution] pursuant to [the Factoring Agreement]." App. Vol. 1 at 871, 874.[8] Evolution has not abandoned any arguments; it is pressing them in the appropriate forum. There is no basis to jump in front of the bankruptcy court on that issue in this appeal.[9]

---

[8] The Debtors ignore that Evolution has argued from the outset that Rule 7001(b) requires any determination of its lien to be resolved in an adversary proceeding. *See* App. Vol. 1 at 567 ("I wanted to start with the procedural point . . . that this should be under an adversary proceeding pursuant to Rule 7001(b)."). The Debtors also misleadingly omit from their retelling of the "facts" that Evolution joined in other factors' objections and argued in that joinder that "Bankruptcy Rule 7001(b) requires that 'a proceeding to determine the validity, priority or extent of a lien or other interest in property' be an adversary proceeding" and that attempting to make that determination through a contested matter "violate[s] Rule 7001(b)." *See* App. Vol. 1 at 492; *see* Appellees' Br. at 5-8 (omitting reference to joinder).

[9] While the Debtors half-heartedly argue that Evolution's liens sit behind "a "mountain of prepetition senior secured debt," *see* Appellees' Br at 8, that is simply not true. Evolution's opening brief clearly set forth Evolution's position that (i) Evolution's Factoring Agreement granted Evolution "a lien on and security interest in" ***all*** the unsold Receivables; (ii) Evolution's UCC-1 Financing Statements "perfect[ed] its security interest" in those receivables; and (iii) Evolution's collateral "is expressly carved out from the definition of 'Collateral' under the ABL and Term Loans," and from the DIP loans, rendering Evolution first in priority. *See* Appellant Br. at 6–7, 9. This is both because the Evolution's lien constitutes a "substitution[] or replacement[]" for the fake accounts sold to Evolution pursuant to the Factoring

Case 25-90399 Document 136-10 Filed in TXSB on 02/09/26 Page 253 of 321


Even if the issue ***were*** in dispute in this appeal, the Debtors' arguments fail. They wrongly assert that Evolution's UCC statements did not perfect its lien, arguing that their use of the word "transferred" means that they encompassed only those "Receivables that were factored to Evolution," and not those transferred via a lien pursuant to Evolution's Factoring Agreement. Appellees' Br. at 15. In other words, the Debtors argue that the word "transferred" does not encompass the creation of a lien. That is wrong.

The Debtors cite to two cases—*Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 224 (D.C. Cir. 2018) and *United States v. Roney*, Case No. 3:24-cr-113, 2025 WL 2533193, at *7 (E.D. Va. Sept. 3, 2025)—to argue that "transfer" means the conveyance of an object from one person to another. *See* Appellees' Br. at 15. Neither case helps them. *Loan Syndications* makes clear that a transfer includes the "conveyance of a right, title, ***or interest*** in real or personal property"—and a lien is an interest in property. *Loan Syndications*, 882 F.3d at 224. *Roney*, on the other hand, construed the statutory phrase "the actual, constructive, or attempted transfer of a controlled substance"—not a financial instrument, in which interests in property are routinely conveyed. *Roney*, 2025 WL 2533193, at *6–7.

---

Agreement, and because it falls within "any Accounts disposed of pursuant to a Permitted Non-Recourse Factoring Transaction and any Related Assets in respect thereof." *See* App. Vol. 2 at 1078–79.

Debtors ignore that the meaning of "transfer" ***also*** plainly includes the creation of a lien. *See, e.g.*, *Meuers Law Firm, P.L. v. Reasor's, LLC*, 796 F. App'x 472, 480 (10th Cir. 2019) ("[W]e give the term 'transfer' its plain, ordinary meaning. A 'transfer' is '[a]ny mode of disposing of or parting with an asset or an interest in an asset, including . . . [the] creation of a lien or other encumbrance.'" (quoting Transfer, *Black's Law Dictionary* (10th ed. 2014)); *Sixth Angel Shepherd Rescue Inc. v. Pa. SPCA*, No. Civ. A. 10-3101, 2011 WL 605697, at *8 (E.D. Pa. Feb. 15, 2011) (quoting Black's Law Dictionary definition of "transfer" for its "common and approved usage," which includes the "creation of a lien").[10] Likewise, they ignore that the official UCC commentary explains that "[a] 'transfer' of property occurs when the transferee has obtained a property interest" and the "term 'transfer' is broader in scope than 'purchase.'" *See* U.C.C. § 9-332, Official Comment 2A.

Additionally, the use of "transfer" in Evolution's Factoring Agreement indicates that it includes the act of "providing something as security for a debt or

---

[10] Although the Debtors previously pointed to dictionary definitions of "transfer," *see* App. Vol. 1 at 579 (citing Merriam-Webster's definition of "transfer"), they appear to have retreated from that argument, as the relevant dictionaries define "transfer" to include creating a lien or granting a security interest. *See, e.g.*, Transfer, *Black's Law Dictionary* (12th ed. 2024) (defining "transfer" to include the "creation of a lien"); *Transfer*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/transfer (defining transfer to include the "conveyance of right, title or interest in . . . property").

obligation." *See* App. Vol. 2 at 1117 (using "transferred" as synonymous with "pledged"); *see also* Pledge, *Black's Law Dictionary* (12th ed. 2024) (defining "pledge" as "[t]he act of providing something as security for a debt or obligation").[11]

Given the plain meaning of "transfer," Evolution's UCC financing statements easily suffice to provide third parties reasonable notice that Evolution's security interest encompassed the Receivables conveyed pursuant to Section 5(g) of its Factoring Agreement. *See, e.g.*, *United States v. Crittenden*, 600 F.2d 478, 480 (5th Cir. 1979) (explaining that under U.C.C. § 9-108, which states the requirements for a UCC description, it is not even "wholly necessary that the physical description appearing of record be sufficient in itself to identify the property" as long as it "raise[s] a warning flag, as it were, providing a key to the identity of the property"); *In re King-Porter Co.*, 446 F.2d 722, 729 (5th Cir. 1971) (explaining that financing statements need only disclose "sufficient information to enable any concerned creditor to contact [the necessary parties for further information]," and that "[t]he Code helps only those who help themselves").

---

[11] With respect to the bankruptcy court's observations of the word "transferred," the Debtors wrongly assert that "Evolution has not shown (or even argued) that this analysis was wrong." Appellees' Br. at 16–17. Wrong. Evolution has, *see* Bankr. Docket No. 1188 at ¶¶ 4–5, and it has filed an adversary complaint because that is what Rule 7001(b) commands as the process for "show[ing]" and "argu[ing]" a lien's validity or priority.

But again, this Court need not (and should not) address that issue, as the validity, priority, and extent of Evolution's security interest will be resolved in an adversary proceeding, which is already underway.

## III. THE DEBTORS' POLICY CONCERNS ARE MISPLACED

The Debtors suggest a parade-of-horribles will result from Evolution's supposed "radical argument." *See* Appellees' Br. at 25. They worry that, if Evolution's position is correct, "a putative creditor could bring bankruptcy proceedings to a halt by asserting a weak or frivolous security interest and demanding adequate protection until the validity of the interest is finally evaluated," which "could allow objecting creditors to tie up the entirety of a debtor's assets with meritless claimed security interests." *Id.* But it is the Debtors that seek to turn bankruptcy practice on its head.

As an initial matter, the Debtors' need for cash is not a sufficient reason to release cash collateral. *See In re Goode*, 235 B.R. 584, 590 (Bankr. E.D. Tex. 1999) ("While the . . . ramifications of failing to get [authorization to use creditor's cash collateral] can be devastating to a debtor's case, that fact alone ***simply cannot suffice as the sole means by which to justify the use of a creditor's cash collateral***."); *see also id.* (explaining that "[c]ash collateral is a precious commodity," and its use "can be granted only when the creditor's interest in those funds can be adequately protected").

The Debtors' position is the "radical" one: it would permit bankruptcy courts to release cash collateral in which secured creditors have a valid interest. The very *purpose* of the adequate protection statute is to avoid this result; the objective of Section 363 is to provide creditors with protection that is "adequate" to protect their interests while the bankruptcy process winds its way through court. The concept of "adequate protection" "is derived from the fifth amendment protection of property interests," and is grounded in the belief that "[s]ecured creditors should not be deprived of the benefit of their bargain." *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1396 (5th Cir. 1986), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988). These "important substantial and procedural rights cannot be sacrificed [at the] altar" of expediency. *In re Scott*, Case No. 10-69733, 2011 WL 13394235, at *3 (E.D. Mich. June 29, 2011) (declining to enter a sale order that would "decide the merits of" a dispute over a lien and requiring "an adversary proceeding . . . to determine the validity, priority or extent of a lien").

But if the Debtors had their way, a creditor could see its cash collateral used up without any protections whatsoever if a court makes a "preliminary determination" that its interest was subordinated or invalid outside of an adversary proceeding. And because companies in bankruptcy by definition have limited assets, there is a substantial risk that nothing would be left to protect that creditor if that "preliminary determination" was wrong or otherwise improper. That turns "adequate protection" on its head.

The Debtors' actions also belie their sky-is-falling argument. Evolution's adversary proceeding has been pending for weeks. Nothing has prohibited the Debtors from moving to dismiss that proceeding immediately, or requesting that the bankruptcy court put the adversary proceeding on an expedited track. But rather than do that, they sat on their hands. In every case, there are readily available solutions for the Debtors' claimed problems—including scheduling orders and motion practice—that do not require trampling on creditors' rights to have the validity, priority, and extent of a lien decided in an adversary proceeding.

## CONCLUSION

Evolution respectfully requests that the Court reverse and remand the Order, with instructions to the bankruptcy court that at least $60.5 million is segregated exclusively for Evolution as adequate protection for its claim.

Respectfully submitted this 26th day of January 2026.

**GRAY REED**

By: *<u>/s/ Jason S. Brookner</u>*
Jason S. Brookner
Texas Bar No. 24033684
Emily F. Shanks
Texas Bar No. 24110350
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
eshanks@grayreed.com

- and –

**ELSBERG BAKER & MARURI PLLC**
David Elsberg (admitted *pro hac vice*)
Michael Duke (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
1 Penn Plaza, Suite 4010
New York, NY 10119
Telephone: (212) 597-2600
Email: delsberg@elsberglaw.com
mduke@elsberglaw.com
aparks@elsberglaw.com

- and –

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:(212) 969-3000
Email: vindelicato@proskauer.com
mkoch@proskauer.com

- and -

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

*Counsel to Evolution*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing document complies with the type-volume limit of Fed. R. Bankr. P. 8015(a)(7)(A) and Hon. Rosenthal's Individual Rule 9(A) because, excluding the portions exempted by Federal Rule of Bankruptcy 8015(g), this document contains 5,406 words.

The undersigned further certifies that the foregoing brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirement of Fed. R. Bankr. P. 8015(a)(5)(A) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Jason S. Brookner*
Jason S. Brookner

Case 25-90399 Document 913-8 Filed in TXSB on 02/09/26 Page 30 of 31



**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 26th day of January 2026, he caused a true and correct copy of the foregoing document to be served via the Court's CM/ECF system. In addition, a copy of the foregoing was served via electronic mail on the other parties to this appeal, as set forth below.

*/s/ Jason S. Brookner*
Jason S. Brookner

Gabriel A. Morgan
Clifford W. Carlson
**WEIL, GOTSHAL & MANGES LLP**
609 Main Street, Suite 2900
Houston, TX 77002
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Email: gabriel.morgan@weil.com
clifford.carlson@weil.com

Matthew S. Barr
Sunny Singh
Andriana Georgallas
Kevin Bostel
Jason H. George
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Email: matt.barr@weil.com
sunny.singh@weil.com
andriana.georgallas@weil.com
kevin.bostel@weil.com
jason.george@weil.com

*Counsel to the Debtors*

# Exhibit 9

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | CASE NO: 25-90399-cml |
| FIRST BRANDS GROUP, LLC AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) | Houston, Texas |
| | ) | Tuesday, January 20, 2026 |
| Debtors. | ) | 3:03 p.m. to 4:20 p.m. |
| ------------------------------ | ) | |

CONTINUED HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For First Brands Group, LLC: | CLIFFORD WILLIAM CARLSON<br>ROBERT S. BEREZIN<br>Weil Gotshal and Manges<br>700 Louisiana Street<br>Houston, TX 77002 |
| For Official Committee of Unsecured Creditors: | ANDREW M. CARTY<br>Brown Rudnick<br>7 Times Square<br>New York, NY 10036 |
| For Evolution Credit Partners: | VINCENT INDELICATO<br>CHARLES A. DALE<br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036 |
| | EMILY F. SHANKS<br>Kurtzman Carson Consultants<br>1300 Post Oak Boulevard, Ste 2000<br>Houston, TX 77056 |
| For Ad Hoc Prepetition Lenders and the DIP Lenders: | ANNELYSE SCARLETT GAINS<br>Gibson Dunn & Crutcher<br>200 Park Avenue<br>New York, NY 10166 |

| | |
|---|---|
| For Bank of America, N.A.: | DANIEL J. MCGUIRE<br>Winston & Strawn LLP<br>800 Capitol Street<br>Houston, TX 77002 |
| Court Reporter: | YESENIA LILA |
| Courtroom Deputy: | YESENIA LILA |
| Transcribed by: | Veritext Legal Solutions<br>330 Old Country Road, Suite 300<br>Mineola, NY 11501<br>Tel: 800-727-6396 |

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

Case 25-90399 Document 1289 Filed in TXSB on 02/09/26 Page 345 of 521



HOUSTON, TEXAS; TUESDAY, JANUARY 20, 2026; 3:03 PM

(Call to Order)

THE COURT: All righty, good afternoon. This is Judge Lopez. Today is January 20th. I'm going to call the 3:00 p.m. case of First Brands, 25-90399 on a continued hearing. Why don't I take appearances? And if anyone on the line wishes to make one, please hit five star and I will unmute your line.

MR. CARLSON: Good afternoon, Your Honor. Cliff Carlson, Weil, Gotshal & Manges for the Debtors.

THE COURT: Okay.

MR. CARLSON: Joining with me is Robert Berezin.

THE COURT: Good afternoon. Here. Nice. I'll just go in the order. The 646 number.

MR. BEREZIN: Your Honor, this is Robert Berezin, Weil, Gotshal and Manges on behalf of the Debtors.

THE COURT: All right, good afternoon. A 914 number? A 914 number? 914-844, if that's you? All right. How about a 617 number?

MR. CARTY: Yes, Your Honor, can you -- apologies, Your Honor. Can you hear me?

THE COURT: Yes, sir. Good afternoon.

MR. CARTY: Sorry. This is the 914 number, Your Honor. Andrew Carty from Brown Rudnick on behalf of the Official Creditor Committee.

THE COURT: Good afternoon. A 617 number?

MR. DALE: Good afternoon, Your Honor. It's me, Charles Dale, together with me, Vincent Indelacato, and our co-counsel, Emily Shanks. We're here for Evolution Credit Partners. Good afternoon, Judge.

THE COURT: All right, good afternoon. Good afternoon. 847 number.

MS. GAINS: Good afternoon, Your Honor. This is AnnElyse Gains on behalf of the Ad Hoc Group.

THE COURT: Good afternoon. And a 312 number.

MR. MCGUIRE: Good afternoon, Your Honor. Dan McGuire from Bank of America, the (indiscernible) agent.

THE COURT: Afternoon. Does anyone else wish to make an appearance? All right. Mr. Berezin, maybe it makes sense for me to turn things over to you, and you can kind of tell me where you think we are.

MR. BEREZIN: Sure, Your Honor. So I think where the Debtors are is we would like an opportunity to explain why we believe there's been no reason for stipulation. And then, in the event the court disagrees, to discuss as a remedy.

THE COURT: Okay.

MR. BEREZIN: And to provide the information Your Honor asks for.

THE COURT: Okay. And then, let me take your

position with respect to the, I guess the affirmative request to use the -- trying to sell the inventory and (indiscernible) what kind of I guess the part B of the --

MR. BEREZIN: Yes, Your Honor --

THE COURT: -- hearing.

MR. BEREZIN: Yes. The part B of the hearing is a bit odd, Your Honor. The Debtors are working with the ADL lenders and Evolution to try and reach an agreement that would permit the Debtors to use the inventory under certain circumstances. Absent an agreement, the Debtors do not intend to continue to utilize the inventory at these four locations.

THE COURT: So, and if you don't use the inventory, it just sits there, okay?

MR. BEREZIN: I -- in terms of (indiscernible), Your Honor, between the ADL lenders to Claimant interests, in that inventory -- excuse me -- and Evolution.

THE COURT: Okay. Mr. Dale and then Mr. McGuire, and then I'll turn things back over to Mr. Berezin. Just thoughts about kind of where you think we are.

MR. DALE: Sure. Your Honor, there is no agreement between us and the ABL lenders. In fact, the only proposals we've made to the ABL lenders have gone unresponded to. There's no agreement here, Your Honor. I don't think, I'm afraid to say there will be one. And I'm

Case 25-90999 Document 893689-9 Filed in TXSB on 01/09/26 Page 376 of 541



happy to address the remedy when Your Honor's prepared to hear it.

THE COURT: So, okay. And if you can tell me, Mr. Dale, when it's time, and I'll turn to Mr. McGuire as well, kind of remedy with respect to the step, and then remedy kind of assuming -- I think we'd have to address kind of the go-forward anyway, because the stip is expired on its own terms. The question is, was there a breach of it? And then, kind of what -- on a go-forward, what parties think about it, if they're -- but it sounds like I'm not ruling on kind of part B today. Is -- Mr. Berezin, is that right?

MR. BEREZIN: That is correct, Your Honor.

THE COURT: Okay. Go. Mr. McGuire? I love giving guidance. I'm more than -- not really, but not really, but go ahead.

MR. MCGUIRE: Yes, Your Honor. Yeah, I do believe there are points, depending on how this unfolds relative to, you know, what the remedy would be. There have been some discussions about a possible resolution here. And you know, I disagree with what Mr. Dale so far has informally told them about the -- we would come out with respect to their proposal over the weekend, term sheet has gone back and forth over the last two days.

And I think the vast majority of those points I think are probably things we would agree with. There's a

couple that, one we need more information to agree with. But another one that is challenging for us at the levels they asked. But I haven't given up hope on that. We may not get there. It's quite possible that we will not get to an agreement with Evolution with respect to this, but you know, our view is that this -- you know, we have an agreement with the Debtors relative to the use of this collateral pursuant to the final (indiscernible).

And as long as they're in compliance with that, they're in compliance with what we have, you know, agreed to in the case. We're not here to try to re-trade on that agreement at this point in time.

As to the remedy for a violation of stip, if you find there is one, and we (indiscernible) have a long discussion about that now, but we do have thoughts on, you know, on a (indiscernible) precedent how that has to work and how it should work in a way that, you know, we think maximizes the value of the collateral for whoever has first position on it, is really the goal is, you know, the remedy should be one that is, you know -- it's kind of easy we have two parties, right, it's a litigation, you know, A versus B. And if you think B's right, you create, you know, a remedy and, oh, A, the one that's heard, the bankruptcy case, of course may be different.

And we have competing interests in collateral

here, perhaps different meaning as to what should happen, too, in the meantime. And you know, the violation for a stip -- of a stipulation isn't necessarily specific performance, unless that (indiscernible) has to be something that's compensatory, which means you have to show damages.

So, if we go down that road and get to that point, Your Honor, we can talk about what the appropriate remedy is for this, but I think that there's going to be, you know, a lot of agreement on this, a couple points where we might disagree. And like I said, could we get some consensual remedy in a week? We could. But I'm not hearing that yet, because there's still a couple big open points.

THE COURT: Okay. Mr. Berezin, I will turn things over to you, sir.

MR. BEREZIN: Thank you, Your Honor. So, again, I'm focused at first on the question of breach. And I think the first question for the Court is, does the stipulation online permit inventory before warehouses to be valued? I think that's the threshold question.

And the clear answer based on the plain text in our view is no. This does not only permit inventories that are for their (indiscernible) to be valued. And I think it begins in Section 4. That's really the operative section of the stipulation that says Document Number 609, Page 6.

And it -- 4(b) in particular requires maintenance

of inventory that is Evolution collateral. And so, it is focused on inventory component of Evolution collateral. That's clear from the text in 4(b). And then, as far as what Evolution collateral is, that is defined on Pages 2 and 4 of the stipulation, "and whereas" clauses. And it seems very straightforward. It's defined in reference to a security interest in all of Starlight and all of Patterson's assets, including inventory.

So there's a security interest in all of Starlight and Patterson's assets, including inventory. There's not, say, inventory at the four locations. It just says inventory. And in fact, if you look at the parties' agreement, the security agreement, which is really that -- that's the agreement that actually grants the lien that is referenced in the stipulation and that defines Evolution collateral. And the security agreements are at -- (indiscernible) Exhibit 1302-7 and 1302-9.

And when you look at the security agreements on Page 3, it has a very helpful definition of collateral. And that definition includes all Starlight and Patterson and both agreements are identical. Starlight and Patterson inventory "no matter where located."

So at the end of the day, we know from the stipulation that you have to look to the lien granted in Evolution/Patterson assets, including specifically

inventory. I would say that it's -- has to be -- it is located at any particular place.

And then, look at the security agreement on Page 3, and it says, as long as it's Evolution and Patterson's inventory, it doesn't matter where it's located. It is collateral.

So that leaves us with Footnote 4, which is where Evolution really hangs its extra hat. And they say, look, Footnote 4, it says that as the petition date, which is September 24th, 2025, this stipulation was November 9th. It says, at the petition date, the Starlight and Patterson collateral was, past tense, located at the four warehouses. Not that it's still there in November. Not that it would still be there or only be there during the pendency of the stipulation, which is November 9th to January 5th.

So the stipulation clearly does not require the -- does not limit the inventory at these four particular locations. And so that brings us to question two, which is, does the plain language of the stipulation tell us where Starlight and Patterson's inventory is located so that it can be counted or not counted towards the maintenance threshold?

So does the stipulation tell us? Okay, if it's not limited at the four locations, where does one look for that inventory? And the stipulation does not answer the

question. It just tells us the value of the inventory of Starlight and Patterson. The security agreement tells us it's wherever that's located. And the Footnote 4 just says at the petition date, that's where it was.

Nothing in the stipulation tells us where it is as of the date of the stipulation or during the pendency of it. So because it doesn't answer the question, but it leaves it wide open to value of that inventory wherever located, then the question is, well, what was the party's reasonable understanding of what inventory locations to be valued to see if the threshold, the $335 million was (indiscernible)?

And on that score, Your Honor, there is only one source of evidence in the record. It's from Mr. Jerkovic. It's in his declaration. And it's in his testimony from the January 12th hearing. There literally is no other testimony aside from Mr. Jerkovic on this -- Jerkovic -- on this issue of what the parties reasonably understood.

And specifically, I point the Court to Paragraph 31, 32, 34, and 35 of Mr. Jerkovic's declaration, which I will summarize. That's in Document Number 1315-20. And it's hearing testimony specifically at Pages 190, 191, 193, 194 and 195. In that testimony, it is unrebutted that he believes at the time of the stipulation that the Patterson and Starlight inventory included not only the four warehouses, but also warehouses which -- with which they

interacted the function of distribution centers.

And he was asked on direct -- re-direct, pardon me -- why was that your understanding? And he explained it. First, the company's former management in September told him inventory had been moved from the four warehouses. Second, the company's records used different naming conventions when referring to the four locations.

Third, he testified that inventory reports were run during October for just the four locations, from literally the five, with each one of the four warehouses, and it was around $70 million less than the value that appeared in the last (indiscernible) certificate the company provided to Evolution.

Fourth, from reports that included not just the four warehouses, but the other warehouses that functioned with those warehouses, those values were only $2 million off the last borrowing dates. That borrowing date July 25, he testified that he had $376 million, but inventory reports showing $374 million for the other ones.

THE COURT: So let me ask you a question, Mr. Berezin. How do I know that the inventory in the inventory is their collateral?

MR. BEREZIN: I think that's a different question, Your Honor, I think the question is, at the time --

THE COURT: No, it is a different question. And

Case 25-90309 Document 389-20 Filed in TXSB on 10/09/25 Page 314 of 521



I'm trying to get to the heart of the issue.

MR. BEREZIN: Yes. Yes. Today, all we have is the best evidence of where their collateral is. And we do not know other than the four warehouses. Today, knowing what we know after the stipulation expired, we cannot show that there is collateral -- we just don't know.

So we know that there's collateral in the four warehouses. We do not know if that -- if some of that collateral was moved or not.

THE COURT: Okay.

MR. BEREZIN: Today. And I'll explain how we got there after the stipulation expired, but going -- I just want to go back to the intent of the parties and understanding at the time, where we have the four reports, very specific for each warehouse, which is $70, $80 million less than the borrowing base.

And then, we've got a report that shows -- that includes more than the four, which is only $2 million off the borrowing base. Here, Your Honor, this would discuss with Evolution's advisors. They were provided the inventory reports with the four locations, which showed values under $300 million, and which is much less than your $330 million threshold. That's in the stipulation. The one example given is the October 24th report. It shows $287 million, and that's the last report -- the second to last report that

Evolution received before the stipulation.

And then, they were given another report, Your Honor, days before the stipulation was signed. That report did not list the four locations. It used the broader designators WDC and MDC, which is discussed in Mr. Jerkovic's declaration.

It showed $274 million of value. $2 million less than the borrowing date certificate, and certainly well more than the $335 million proposed at that time threshold for the collateral value. So that report was given to Evolution two days before. And again, it didn't even list the four locations.

So Evolution's advisors should've reasonably understood that the value of Evolution collateral that was inventory would be measured based on the parties' understanding at that time by more than the four locations.

Seventh, that makes the $335 million threshold, this evidence of the reports that were shared between the parties, showing that's more sensible. Evolution had in-hand a report for late October that showed the Debtors would get in default day one by like, $40 million.

On the other hand, they had a report given to them two days before that showed we were far in compliance. Which one made sense? Obviously, it made sense that the Debtors would not agree to be in default, and the Debtors in

the course of performance. Because if in fact Evolution thought that it was the four locations and only the four locations, that was everything, and that would determine the value of the $335 threshold.

And on the second day of the stipulation, they should've been banging down our doors. We did not hear from them in November. We did not hear from them until early -- I think around the 5th, or say of December.

More -- and the same is true, Your Honor, when we gave them our weekly reports. We gave them a weekly report on November 14th. We gave them a weekly report on 11/21. Those weekly reports did not even list the four locations. They used the broader definitions WDC, MDC is what they believe, if it was so unreasonable for the parties to believe at the time that it was more than four locations that should be measured that should've been banging on our door at 11/15, that should've been banging on our door at 11/22, they did not.

We didn't hear from them until early December. So the last question is, did the Debtors breach the collateral maintenance threshold based on what the parties reasonably understood their inventories for Evolution collateral, where that was reasonably located during the pendency of this stipulation? And undisputed, undisputed that every single test of every single week of this stipulation exceeded $335.

Case 25-90399 Document 313-9 Filed in TXSB on 10/10/26 Page 17 of 54



That, Your Honor, is the gist of why we believe there is no breach. And with that, I can address remedy, if you'd like?

THE COURT: Please.

MR. BEREZIN: And then turn it over to Mr. Dale. Okay. So if the Court decides this agreement (indiscernible), there is a breach, then our view is that we could look to Evolution's motion. Are they -- both in their motion and their reply brief, they requested specifically that the Debtors either perform curative actions in two business days. Curative actions would mean (indiscernible), or inventory or both to get to the $335 threshold. Or, if the Debtors fail within those two business days to cease using, selling, or transferring the Evolution collateral.

So, the Debtors' view is if the Court had decided that there was a breach, we're not going to need two business days, the Debtors will simply stop. We're not -- we know we cannot provide those curative actions, so we will stop using the collateral with all (indiscernible) certainly before two business days run.

THE COURT: Okay. Mr. Dale?

MR. DALE: Your Honor, can you hear me?

THE COURT: Just fine.

MR. DALE: Thank you. I'm sorry, Your Honor, I'm a little hoarse today, so you'll have to forgive me. I think we've gone a little bit backwards here. When we left

Case 25-90309 Document 389-19 Filed in TXSB on 10/09/25 Page 379 of 421



your courtroom last Tuesday, what Your Honor had ruled was that the Debtors now had the burden of establishing that there was collateral beyond the four approved warehouse locations.

They're not even attempting to do that today, Your Honor, and I'll get to that. Absent that evidence, Your Honor, I think we've all agreed on the math, and the Debtors' deficiency relative to the collateral maintenance threshold.

So with your indulgence, Judge, I'd like to go back to the beginning, which starts with the Evolution loan documents. I think we've -- I had sent this to Weil, Gotshal an hour or so ago, and with Your Honor's permission, I'd like to share a screen with you just to look at the operative provisions of the loan docs?

THE COURT: Okay. Let's see... Mr. Dale.

MR. DALE: All right. Let's see how this might work, Judge. I think -- can you see that, Your Honor?

THE COURT: Yes, just fine. Thank you.

MR. DALE: Okay. It doesn't appear very large on my screen, so (indiscernible).

THE COURT: Yeah. I can see it just fine.

MR. DALE: You see it?

THE COURT: If --

MR. DALE: Very well. So, okay, Your Honor, we

start with the definition of approved warehouse locations. The second column identifies where in the evidentiary records you would find it. So approved warehouse locations means each warehouse, storage building or other facility owned or operated by First Brands or a third-party warehouseman acceptable to the lender in sole discretion. We've emphasized the words, "in which eligible inventory is located in each case located in the United States as set forth on Schedule 1.1(a)."

Eligible inventory, Judge, is defined as, "finished with inventory consisting of after-market auto parts and accessories similar to finished goods of the borrowers, in each case valued in (indiscernible) market value. And in all instances, it has to reach the following requirement shall have been fulfilled to the satisfaction of the lender," A.

Such inventory is owned by the borrower. Remember, these were special purpose vehicles setup to buy inventory from the First Brand Debtors. B, "The borrower has (indiscernible) qualified right to assign and grant lien on such inventory." E, E says, "Such inventory is located in approved warehouse locations, which is set forth on Schedule 1.1(a) on the effective date."

At the very bottom of that definition, Judge, is the following, "Any inventory, which is at any time eligible

inventory, but which subsequently fails to meet any of the foregoing requirements shall forthwith cease to be eligible inventory until such time as such inventory meets all of the foregoing requirements." What does that mean?

It means that (indiscernible) to four locations, it's no longer collateral. That's what it means. 5.8 in both the Patterson and Starlight agreement says that the borrower shall maintain all eligible inventory, approved warehouse locations.

And lastly, is the schedule attached to each one of these agreements, Schedule 1.1(a), and they identify only those four addresses that are contained in Footnote 4 of the stipulation.

So let's talk briefly, Your Honor -- and I know I've got to stop herein -- about the stipulation. Paragraph 3 and 4 of the stipulation, as Your Honor correctly pointed out last week contained the phrase, "and such other property in which Evolution has asserted an ownership interest or security interest."

We just resolved that problem. Only in those four locations has -- could Evolution assert a security interest. That's it. The Debtor has done nothing, not a thing, to establish collateral outside of those four locations. In fact, my -- Mr. Berezin referred to it as unrebutted. I think Mr. Jerkovic rebutted himself.

Your Honor, he said, "I define the Evolution facilities as four facilities that have specific addresses." That was in the transcript at Page 174, Lines 16 and 17. He said, "I believe that I said in my declarations that my business understanding is that all this collateral, I used the word, would be at these four locations," transcript, Page 199, Lines 6 through 13.

It's not a close call, Your Honor. They haven't -- even if they could establish collateral beyond those four addresses, they haven't and they can't. Pages 2 -- in Paragraphs 2 and 5 of the stipulation, we reviewed these last week, the Debtors granted us replacement liens in Evolution collateral. The Court granted us adequate protection liens in Evolution collateral, which included inventory and proceeds that would include accounts receivable and cash. And we'll come back to that.

So that gets us to the heart of the matter, Your Honor. It's Section 4, starting with 4(a), that provides, "During the term of the stipulation, the Debtors shall not sell or transfer any inventory or otherwise use any assets, including without limitation cash collateral that is Evolution collateral, except as provided in the stipulation."

Paragraph 4(b), you've all talked about, is where we find the collateral maintenance covenant. It says, "The

Debtors shall maintain the Evolution collateral, such that at any true update, the sum of the cost value of the Evolution collateral that is inventory plus all cash deposited in segregated accounts equals or exceeds $170 million, with respect to the Patterson collateral, and $165 million with respect to the Starlight collateral."

That is the defined term collateral maintenance threshold. Paragraph 4(c) establishes that the true updates, Your Honor asked us about true updates last week, on the end of each week. We stipulated to the math, Judge. As of December 5th, this is from -- the inputs are taken from Mr. Jerkovic's declaration at Paragraph 41, the outputs are my own, but Your Honor, can do your own math.

As of December 5th, the true update, the collateral value shortfall, when measured against the threshold, $48,777,238. January 2nd, the collateral value shortfall, $40,249,883. More recently, January 9th, $38,337,636.

So Your Honor, with respect to the breach, the Debtors appear to be saying that the CRL's confusion about the extent of Evolution's inventory informed the phrase that he used often in his testimony last week, his business understanding. That the value of collateral in places beyond approved warehouse locations, would somehow satisfy the collateral maintenance covenant.

Pause on that for one second, Your Honor. What he's saying is that reporting the value of some other lender's collateral would somehow adequately protect Evolution, and would satisfy a covenant that was expressly defined by reference only to a property that Evolution claimed a security interest in.

That, Your Honor, is an unsensible -- to use Mr. Berezin's term -- it's absurd. And the record clearly reflects, Judge, the collateral maintenance covenant found in Paragraph 4(b) can only be understood by the plain words on the page. The Debtors needed to maintain Evolution's collateral in $335 million, nothing less.

I think what the Debtors are really offering here, Judge, as a defense to its breach, they're not putting this label on it, is if they made a mistake. The business people and the lawyers didn't harmonize their thoughts on the implications of the agreement and the words on the page don't match what the CRO told you he understood.

I don't believe there was a mistake here, Your Honor. Go back to November. The Debtors entered in this stipulation early in these proceedings, at a time when the future was bright. There was plenty of money available to buying inventory. I think we can all agree the case hasn't turned out as anyone had hoped. That's not a reason to excuse this breach.

Case 25-90309 Document 398-20 Filed in TXSB on 10/09/26 Page 34 of 52



Besides, and although it's purely circumstantial, Judge, we dropped a footnote in our reply, it's no coincidence that every other SPV inventory lender in this case is complaining about the very same problems. We cited complaints about the collateral maintenance and breaches of post-petition adequate protection orders, (indiscernible) onset and carve-out.

There's no question there was a breach here, Your Honor. There's no question what the shortfall was. I think the question is only about remedy. And so, Your Honor, we're happy to address remedy. I think Mr. Berezin had given you his thoughts. I'd like to lay out our thoughts, if you'd indulge me another minute or two.

THE COURT: Absolutely.

MR. DALE: Thank you, Your Honor. The stipulation gives the Debtors three choices, Judge -- find new inventory, deposit cash into a separate account, or stop using the Evolution collateral. The Debtors chose none of the above. And they simply continued to use Evolution's collateral even after we filed our emergency motion almost a month ago.

Now Mr. Berezin made the argument last week and he makes it again today. He says, we're not going to use the collateral because we absolutely cannot post $40-something million dollars. We appreciate that.

Case 25-90399 Document 389-19 Filed in TXSB on 12/09/25 Page 35 of 52



So in our reply, knowing that that was the answer, we proposed an alternative, an alternative to the come pick it up idea. We proposed that if they can't post additional cash, but want to continue using the Evolution collateral, that they be directed to escrow 65 percent of every dollar collected on receivables and inventory sold through the completion of the sale.

That would give them 35 percent to cover the costs of operations, which is consistent with their historical margins. And I'll get in a minute to what that doesn't cover.

THE COURT: I'm sorry, can you --

MR. DALE: And --

THE COURT: Mr. Dale, can you repeat that, just that segment? I was writing it down, and I -- can you repeat the --

MR. DALE: We --

THE COURT: Go ahead.

MR. DALE: I understand that the 35 percent is their historical cost of sales. So we would help them cover the cost of running these cases for another six weeks or so.

THE COURT: And you're saying 35 percent from what starting point, from -- in terms of the inventory that's left in there right now?

MR. DALE: Well, Judge, I think 35 percent of

every dollar collected on post-petition AR, and on inventory (indiscernible) -- monies coming in the door and it's going out the door. I mean, they should have to account for it. That money that -- we understand that they had long-dated terms with customers, who Mr. Jerkovic, it looks it's dated as (indiscernible) last week.

And so, now they're dialing for dollars with customers asking them both to buy inventory in cash or close to cash-like terms, seven-day terms, I think he said. And they want people to pay up on their accounts receivable. So to the extent they have success on that, they should have to escrow 65 percent of every dollar collected, because that is the proceeds of the adequate protection that Your Honor gave us last fall.

Now Your Honor, I have to say, the trouble even with our own proposal and the reply with the testimony is Mr. Jerkovic gave you last week. He testified as follows -- "The company's going to run out of money in 10 days to two weeks, and will have exhausted its DIP financing."

He testified to what I just said, which is to help mitigate that problem and to extend the Debtor's runway, give it a chance to run some kind of a sale process. They're going to try to collect about $130 million in post-petition accounts receivable generated by the sale of brake parts inventory, including Evolution inventory. That's one

of three ways that he testified the Debtors are currently (indiscernible) Evolution's position in this case.

He also testified they're asking people to buy brake parts for cash. And they don't propose to escrow any of these dollars, Judge. You heard Mr. Jerkovic say they'd like to save some of that money, but they're going to spend what they need to. And then finally, oh, I had to show him his own proposal to elicit the information.

He conceded that they project Evolution's collateral will decline in value over the next six weeks by $10 to $20 million. So on that factual record, Judge, I respectfully submit that it's really only one remedy here, and that is to prohibit them from using Evolution's collateral, including at inventory, accounts receivable or cash.

Now Judge, I don't want to (indiscernible) -- the comment that you made last week, which we did in fact take to heart. Your Honor mentioned what would happen if the Evolution collateral went out on the sidewalk, the proverbial sidewalk. And believe me, we've actually thought long and hard about that.

And I think you might be surprised at the conclusion we drew, which is this -- this case is one of those rare cases, very rare indeed, where every stakeholder's better off if the assets at First Brands were

liquidated in Chapter 7.

Now why is conversion a better outcome? They have to tell you that was the client's reaction. The answer's simple. It's professional fees. This case is drowning in professional fees, and that is not intended as a shot at the professionals in this case, all of whom have been working very hard to try to accomplish a positive outcome here.

But this case in this company are not what anybody thought only a few months ago. The potential recovery for virtually every stakeholder in this case is now bogged down in professional fees. You have independent directors and their accounts. You have an examiner and his professionals. You have a committee and a full suite of legal and financial advisors. DIP lender and their advisors. TBL lender and their advisors, the Debtor, and his professionals.

Judge, if these cases were converted to Chapter 7, you could have one, possibly two fiduciaries appointed, who hire a single, maybe two sets of professionals to do what the Debtors are currently doing, which is liquidating this business. All talk of additional financing, Judge, that you were hearing about only a few weeks ago from the DIP lenders, there's no talk of that anymore.

This is a liquidation. So the bottom line from our perspective, Your Honor, is that the Debtor should be prohibited from using Evolution collateral. It sounds like

they're willing to do that. You know, Mr. McGuire says that term sheet's going back and forth. We -- let me be clear. I don't like digging -- delving into settlement discussions.

We have not had a response from the ABL lenders. Not one. Now, Mr. McGuire's kind enough to take my phone calls over the weekend, but we had no response, Your Honor. Now if they want to continue using Evolution's collateral, they should have to escrow the money. All of it. Thank you, Your Honor.

THE COURT: Thank you.

MR. BEREZIN: Your Honor, may I have a moment?

THE COURT: You mean in response, or just a moment like we --

MR. BEREZIN: In response, sorry.

THE COURT: Yeah, no, no, no worries.

MR. BEREZIN: In response.

THE COURT: Sure. I'll give you two minutes.

MR. BEREZIN: Thank you, Your Honor. So quickly, on the issue of whether the credit agreement limits the -- Evolution's collateral to eligible inventory, which has to be located in the four locations, that is clearly incorrect.

Eligible inventory is about the borrowing date. It's just whether it's going to be counted towards lended. Period. It doesn't speak to the liens. The liens are in security agreement. And the security agreement is crystal

clear that it's the inventory (indiscernible) wherever located. Full stop.

So there is no way to anchor the stipulation to the credit agreement definition of the eligible inventory. The parties will use that term. They could -- they used Evolution collateral, they lent it to the security agreement and the liens. And that's that. So it is a far broader definition.

Mr. Jerkovic (indiscernible) testimony about Evolution facilities is crystal clear. Evolution facilities is not Evolution collateral. He explained that there's nothing that contradicts what he said in his testimony versus his declaration.

The -- to the extent -- I don't think there's any agreement -- the Debtors are not seeking to sell, transfer, or assign the collateral that Evolution claims to have in those four locations, full stop. Okay? We're going to stop and we're going to stop as soon as we possibly can. That has nothing to do with whether or not we believe the stipulation was violated.

We do vehemently deny that it has been. It has to do with the fact that where these cases are, and we're not going to be doing things unless we have consensus. We hope that we'll have it. But there is no cause for anything else. I cannot tell if Counsel is asking for cash to be

escrowed or not. I would just say that if that were granted, that would put them in a better position than they could've possibly been in under the stipulation.

And that's clear, Your Honor, if you look at 4(c), it says, "If there's a breach and you don't provide the curative actions, then you have to stop selling." That -- the breach they allege is on 12/5, five different (indiscernible) after that is 12/12. Everyone agrees on what the value was at 12/12. It was about $291 million. And the current inventory is $291 million.

So they're in the position they would've been in having just stopped on 12/12. And that's exactly what we're going to do now. So there's no basis, no (indiscernible) basis, whatever for posting cash and doing anything else, even assuming there was a breach, which for all the reasons I said, Your Honor, we do not believe there was.

MR. DALE: Your Honor, let me briefly respond?

THE COURT: Sure.

MR. DALE: Okay, thank you. I don't think there's any doubt, they're offering you no evidence of collateral anywhere else. So even if Mr. Berezin were right, there is no evidence and Your Honor found so (indiscernible) last week. No evidence of collateral anywhere under those four facilities. That's number one.

Number two, we've since stopped using the

Case 25-90399 Document 336-9 Filed in TXSB on 10/07/25 Page 32 of 54



collateral. It must mean, and don't be collecting up the $130 million or so post-petition accounts, because that's part of the collateral. And don't be spending it. And don't be selling out the inventory, expending that cash, either. Not using it means not using any of it. Not part of it. Not any of it.

MR. BEREZIN: And Your Honor, if I could, that would put them in a better position than they could ever hope to have been on the stipulation. The stipulation did not give them a lien on inventory that was sold during the pendency of the stipulation. If there is a breach, you have five days, you have to stop. That's it. You -- there's no provision for turning over inventory that was sold during stipulation, especially before there was a breach. It doesn't even make any sense.

So that is an -- unsupported by the terms of the stipulation and it would put them in a far better position at -- to the detriment of all the other stakeholders, especially because, Your Honor, this is (indiscernible), it's our least profitable business. There is no excess money. So we have been selling at our cost, not at Evolution's cost not at Starlight's cost or Patterson's cost.

The Debtors have been saying that its cost, in the (indiscernible) surcharge, even if we went down

(indiscernible), we -- it would vastly overwhelm any residual amount that would exist once we take those costs into account. So there's the record over there, we did not ask for this relief. And it should --

THE COURT: Wait, Mr. Berezin --

MR. BEREZIN: -- we shouldn't be (indiscernible) --

THE COURT: Mr. Berezin, can you just -- I'm sorry, I was looking at one thing and -- can you repeat the point about not granting liens, one more point. Just want to make sure I was following it.

MR. BEREZIN: Yes, of course. So under the stipulation, it says, if there is a breach -- and this is under 4(c), then you have five business days to take those curative actions, and if you don't, padlock your doors. It's end of story.

So the value of the inventory, when we padlock the doors, if we had (indiscernible) with the stipulation that they interpreted, that inventory equals the inventory as of the 18th. So they're in exactly the same position.

If it's not, then go further to say, oh, and by the way, during the stipulation, and actually starting from the first day of the case, which is what I'm hearing Counsel say, starting from the first day of the case until today, every single piece of Evolution's inventory sold out of that

facility, we've (indiscernible). We get the cash. Where does that -- where is that in the stipulation?

MR. DALE: Your Honor --

MR. BEREZIN: Where is that in the -- where is that in their motion? Where is that in --

MR. DALE: (Indiscernible) -- Judge, that's essentially --

MR. BEREZIN: (Indiscernible) the proposed order. Look at the proposed order, Your Honor. It absolutely says two things and two things only. It says, and I -- I'll quote it, "The Debtors are directed to provide Evolution proof of satisfaction of the curative actions no later than two business days on entry of this quarter, with such proof they reasonably (indiscernible) Evolution. If the Debtor fails to perform the curative action in accordance herewith, the stipulation and order shall be deemed automatically and immediately terminated, and the Debtor shall have no further right or authorization to use that or otherwise transfer any of the Evolution collateral, including the (indiscernible) collateral assets for the order of the Court."

That's prospective. That's not retrospective to the beginning of the petition date, which is where Counsel is right now. We're fine locking those doors. If we sell a piece of collateral tomorrow, that's different. And what he's saying is, let's go back to September.

MR. DALE: Your Honor, this is adequate protection 101. We have a lien that you grant us and the Debtors gave us replacement on, both in the inventory and then in what the inventory becomes. In this case, $130 million in post-petition accounts. What Mr. Berezin is saying is a little bit of a sleight of hand, Judge.

Because he's saying, okay, we won't use the inventory, but we're going to collect (indiscernible), which is your collateral. And we're going to spend it. And we're going to do that without asking for cash collateral use. That's not what's on today.

THE COURT: Well --

MR. DALE: They can't do that, Judge. They can't do that under the Bankruptcy Code or your court's order. It's not a close call.

THE COURT: So --

MR. DALE: I mean, the CRO testified, Judge, they want to spend that money and they want to sell the inventory. And the value of the inventory that we're talking about will decline by as much as $20 million in the next six weeks. There's simply no way for them to offer adequate protection, which is why they've offered us nothing.

THE COURT: So I --

MR. DALE: We agree entirely with what Mr. Berezin

said prospectively, not retrospectively.

THE COURT: Let me -- well, let me just kind of tell you what's -- just give me one moment. Okay. So at Docket Number 1076, Evolution Partners filed an emergency motion seeking -- as two forms of relief, but it was titled, "A motion to enforce the stipulation and agreed order regarding adequate protection among the Debtors and Evolution Credit Partners." It was filed on December 23rd.

The Court recently conducted an initial hearing on this motion, and heard evidence between the parties about the motion. Separately, the Debtors, in their response to the motion also filed a request for authority to continue to sell collateral and to certain cash, have on a go-forward basis.

This -- that's where we are. I would note for the record that on November 9th, 2025, the Court approved a stipulation and agreed order regarding adequate protection among the Debtors and Evolution Credit Partners. And the parties stipulated to a few points regarding certain -- it was their entry of a DIP order. And we'll get into more specifics, certain facilities, Debtor borrowers and stipulated agreed terms to the use of their collateral or argument, at least a collateral that is alleged by Evolution Partners during the kind of stipulation period.

And the order permitted Evolution -- excuse me --

the use of the Evolution collateral in the ordinary course through the earlier of January 5th, 2026, and the date that's 90 days after entry of the stipulation by the Bankruptcy Court.

So this stipulation has expired on its own terms on January 5th, 2026. Evolution claims that there was a breach of this stipulation and agreed order. And in the proposed order, seeks the following forms of relief -- asked the Court to direct the Debtors to provide Evolution proof of satisfaction of the -- what is defined terms as the curative actions no later than two days after entry of an order, with such proof being reasonably acceptable as to Evolution.

And, if the Debtors fail to perform the curative actions in accordance with the stipulation, an order will be deemed automatically and immediately terminated, and the Debtors will have no right to use, sell, or otherwise transfer any of the Evolution collateral, including their cash collateral absent further order of the Court.

And I note that this -- the way the motion was filed, it was filed on December 23rd. So as of right now, the stipulation has expired on its own terms. But at the time, Evolution was seeking for immediate termination of the order. So you got to have read -- take that in (indiscernible) context.

But the two forms of relief requested were to require the Debtors to provide satisfaction of the curative actions or to immediately stop the use of cash collateral -- of collateral and cash collateral. There is a number of disputes -- one, as to where -- how one determines whether there was a breach under the disagreement, whether there was a breach.

And then, once the remedy for the breach -- I'd note the Court has jurisdiction, and this is certainly a core proceeding under the Bankruptcy Code. The Court accepts a bit -- a number of documents, but I am -- I'd note just for the record that Fifth Circuit guidance, and there are plenty of cases, I'll cite matter of PFO Global Incorporated 26 F.4th 245, 254, (5th Cir. 2022) case for the proposition.

And it said there, and we're -- it basically says that an order must be enforced, and (indiscernible) the US order must be enforced according to its terms irrespective of the parties' subjective intent. And that is 5th Circuit guidance, but it's also taking that from the Supreme Court Travelers v. Bailey, the pin site for this case would be 557 U.S. -- if the pin site is at 151, 152, it's a -- I think a Supreme Court case, but the Fifth Circuit case is right on point, and it's citing the Supreme Court case, the -- it's 1550 -- 557 U.S. 137, it's the Supreme Court case.

So I turn first, the question is whether the terms of this order are unambiguous. And if they are, I am to enforce them according to their terms, irrespective of the parties' subjective intent. I do find that this order is unambiguous, and I will construe it as such.

I'll note, this one threshold question is to determine the cooperative language is determining whether there was a breach, one must look to the parties at issue, is Paragraph 4(b), which says, "From and after the applicable petition date with respect to what is defined as Evolution inventory facilities, the Debtors shall maintain the Evolution collateral, which is a defined term such that on any true update, which is a defined term, the sum of the cost of the value of the Evolution collateral that is inventory plus all cash segregated -- deposited in segregated accounts, and must equal or exceed $170 million with respect to the Patterson collateral and $165 million with respect to the Starlight collateral." And that's the collateral maintenance covenant.

So 4(c) says that at the end of each week, before the termination of the stip, which is a true update, the Debtors were required to test the collateral value against the collateral maintenance threshold, which is the Starlight collateral and the Patterson collateral that we were just talking about, those numbers, which add up to about $350

million.

If, on the true update, the collateral value is less than the maintenance threshold, the Debtors would be committed -- permitted to cure a deficiency within five business days of the applicable true update by any combination of transferring cash and immediate funds in which the amount of the collateral maintenance threshold exceeds the collateral value into one or more segregated accounts.

However, they could purchase a transfer to the Evolution borrowers free and clear of all liens, new, eligible inventory. Those are determined as the curative actions. So, and if the Debtors exercise that, then the Debtors will be permitted to continue without disruption using the actual -- the collateral.

4(c) also says, "In the event that the Debtors fail to exercise curative actions before the expiration of the five business day period, the Debtors shall be prohibited from continuing to purchase Evolution collateral."

So on the one hand, there's a question about whether this has been satisfied. I'll note a couple of points. There was disagreement between the parties as to how one then determines what the -- one construes the definition of Evolution collateral according to Evolution

Case 25-90399 Document 3138-19 Filed in TXSB on 10/09/26 Page 41 of 54



Partners.

The focus should be on what is Footnote 4 in the stipulation, where the definition of Evolution collateral is defined and identifies four locations to -- for the Starlight collateral, and two, for the Patterson collateral. And it says -- Footnote 4 says that, "As of the petition date, the Starlight collateral was located" -- and it gives two locations -- "and the Patterson collateral was located at" -- and it provides two locations.

But the definition itself is Evolution collateral. So the question is, initially whether, as the Starlight collateral and definition of Evolution collateral, which includes what is defined as Starlight collateral, and Patterson collateral is limited to these four locations. I'll incorporate my findings from the other prior hearing that I do not believe that it is limited to those four locations.

I would note that the definition of Patterson collateral and Starlight collateral all use the defined term as with respect to any property in which Evolution has asserted an ownership interest, including without limitation inventory. So it really goes to, as defined here, the collateral is defined as any -- as inventory. And they define it here in the stipulation.

So the definition -- the stipulation itself

defines its own terms, and it is referring to any inventory that is asserted under by the Starlight parent and with respect to Patterson, with respect to the Patterson parent. But it includes that collateral and any other property in which Evolution has asserted a security interest.

So it does not -- it refers to a reference as to where this collateral was located on the petition date, but it doesn't indicate where it is located on the date of the stipulation. Therefore, it is possible that there is some Patterson collateral or Starlight collateral, which constitutes Evolution collateral that may have gone -- moved to one location, to another between the petition date and the date of the stipulation.

That would still constitute Evolution collateral because it is just defined as all inventory in which the Starlight parent has a security interest in. And so, it's not limited to geography. The parties, both parties, in one way or another, asked me to look to outside documents, and the actual credit agreements to provide additional light on that. But I don't find that it is necessary, nor do I think it falls within the four corners of this document.

The parties could've easily incorporated those defined terms from one or more credit agreements to define Evolution collateral, Starlight collateral, Patterson collateral. They chose not to. They (indiscernible) chose

Case 25-90309 Document 389-19 Filed in TXSB on 10/09/26 Page 403 of 452



to define their own terms, and I'm going to enforce this stipulation as written.

So the question then becomes, at any inventory in which the Starlight -- there could constitute Starlight collateral or Patterson collateral, wherever located is the better reading of this stipulation. It also -- we then have to turn to then Paragraph 4(b).

So Paragraph 4(b) says that the collateral value that has to be determined for the purposes of a true (indiscernible) is the cost of the value of the Evolution collateral that is inventory, plus all cash deposited in the segregated account that equals or exceeds $170 million with respect to the Patterson collateral, and $165 million with respect to the Starlight collateral.

4(c) says that the Debtors are required to test the collateral value against the collateral maintenance threshold, and it is their burden to then true it up, right? And so, the Evolution parties have -- (indiscernible) that there was a breach of this true-up provision because the Debtors could not satisfy the collateral maintenance at this threshold.

It is clear, based upon the evidence, that the value of the collateral at the four locations that are referenced in Footnote 4 would not -- even including the segregated cash -- would not satisfy the collateral

Case 25-90399 Document 386-20 Filed in TXSB on 10/09/25 Page 405 of 421



maintenance threshold, right? So the collateral value is -- would not equal or exceed the collateral maintenance threshold, if you just look at those four locations.

Based upon the testimony before the Court, I was open to hearing additional testimony, whether there was additional inventory located. But it's the Debtor's burden, right, under 4(b) and 4(c) to then come up with additional inventory to satisfy the collateral maintenance threshold because that's their burden. And I don't have any additional evidence to show that they did satisfy that burden.

As a matter of fact, the evidence shows that they were -- basically, if you just look at the evidence and all the inventory that was provided to the Court at which the parties agree is inventory that is Evolution collateral then satisfy the collateral maintenance threshold. I gave the Debtors a few more days to see if they could determine whether there was some additional inventory located somewhere else that could constitute this additional inventory that is Evolution collateral. And the Debtors weren't able to do so.

So there has been a breach of the stipulation. So the question then becomes -- and, I would note that the Debtors at no point have been satisfied any of it, what we would call curative actions. So that's never happened,

either, and it didn't happen within the five days, if they were required to do so.

So there has been a breach of -- under 4(c), which is the true-up, under the stipulation. The question is, what's the remedy under the stipulation? What -- it's been requested of the Court by Evolution was to prohibit them from -- either make them cure, provide evidence, or terminate.

They haven't provided any cure and it's too late for them to provide the cure. So the question is, are they prohibited from using Evolution collateral, from continuing to purchase Evolution collateral. Are the Debtors prohibited from continuing to purchase Evolution collateral?

Now we're using it. 4(c) says, "In the event the Debtors fail to exercise curative actions before the expiration of the five-day cure period, five business day cure period, the Debtors are prohibited from continuing to purchase Evolution collateral. That is what the stipulation as provided, and that's a remedy.

Paragraph 11, I would note says that Evolution in its option may terminate the stipulation if the Debtors have materially breached any provision under the stipulation and the breach is not cured within five business days of the breach.

So it's already terminated on its own. But the

Case 25-90399 Document 386-20 Filed in TXSB on 12/09/25 Page 46 of 52



two remedies that are provided in this agreement are Debtors can't use Evolution, can't purchase Evolution collateral. And the -- and it's (indiscernible) the stipulation could terminate. There is no remedy for specific performance in this agreement so that the Debtor is not required itself to kind of provide the curative action. It just gives them the option to kind of have five day -- business days to try to cure.

And if they don't cure five -- 4(c) says that the Debtors are prohibited from continuing to purchase Evolution collateral. Paragraph 11, give Evolution the option to terminate the stipulation. So, and none of that would've required court order. But the stipulation has now terminated.

So I do find that there is a breach. The Debtors would not be required to -- by specific performance, have any cure -- to kind of exercise any curative actions or kind of put any money in or put any segregated -- any kind of cash in a segregated account or purchase or transfer to the Evolution partners, new eligible inventory, with the amount that exceeds the collateral maintenance threshold. There was a breach, and they can't use it. And there was -- I do find that there was also a material breach of that provision. And it was not cured within five business days of the breach.

So we have -- both the parties agreed to in the stipulation, just looking at the four corners was the breach and termination. But I do note some other things. So I don't think -- I think the answer to this is that the stipulation is over and the Debtors are prohibited from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court.

It sounds like that's what they're going to do anyway. I do note a couple of other points. And I think it's important to note just so that we're all kind of clear. Paragraph 6 -- excuse me -- Paragraph 5 is the stipulation. It says that, "Evolution, subject to the reservation of rights," because they're still kind of a determination as to a challenge by the Debtors, the DIP secured parties, the pre-petitioned secured parties, the committees and other parties, and interest as to the nature and extent of Evolution's liens in the collateral. That's preserved.

But at the same time, Evolution was granted by court order, right? A first priority automatically perfected lien on any Evolution collateral and the proceeds thereof, subject to the challenge, right? Including without limitation, cash collateral. And the Court granted as adequate protection of those interests in the collateral, but it granted it automatically post -- perfected post-petition, first priority security interests in all of the

presently owned or after acquired property or assets of the Evolution borrowers.

And to the extent of any post-petition diminution in those -- in the interests of that collateral, I also granted and allowed super priority expense claim under 503, 507(a) and 507(b). And it's going to be an allowed claim against the Evolution borrowers with priority over any other admin expenses and any other claims against the Evolution borrowers of any kind. And overall, other admin claims.

So I know that there's a reservation of rights. But the adequate protection is the adequate protection package. And so, there is a post-petition -- there is an adequate protection lien that was granted and a 507(b) admin, super priority admin claim. That just happens.

And now, the nature and the extent of that, whether -- the amount of the diminution and interest and all of that as of particular dates, that's another story for another day. But the Debtors are prohibited from using Evolution, what is constituted here as Evolution collateral without further order of the Court.

And if the parties can agree on something, that would be great because then I hope they do, because this sounds like this collateral, which I understand maybe break parts in some other inventory is going to continue to depreciate.

Case 25-90399 Document 3136-9 Filed in TXSB on 11/19/25 Page 49 of 52



And I know that there was talk of Chapter 7. I don't want to get into Chapter 7, but what I will say is under any circumstance, I couldn't turn this collateral over to anyone right now until I kind of knew -- resolve the reservation of rights issue, whether someone would come in.

So whoever sells this is going to have to sell it, and it would have to be at a cost. But any assets that -- and what is considered inventory, and we'll just call it what is alleged as Evolution inventory, just for the purposes of what we're talking about now, that -- the proceeds of that cash, until I can determine whether something gets used, absent stipulation of the parties to me is going to have to kind of get parked somewhere in a way that it doesn't get comingled with anything else, that then I can then determine (indiscernible) priority and your priority, one.

Now, I do think that the Debtors were to sell it because they have the best ability to do it, there would be some -- what one would call surcharge rights that kind of get it and sold. And I do think -- I guess what was proposed seemed reasonable to me. It sounds like it'd be a lot more expensive in another Chapter, but based on my experience, but I understand the concern that someone could just sell it and then comingle the cash, and then it's really hard to then make the determination later on as to

whose cash it is and where the cash is.

So I think if the parties are going to agree on it -- if you want to get me comfortable with it, it's going to have to be by agreement of the parties, or the cash is going to have to get parked somewhere where it gets really clear that it's -- that the reservation of rights, in other words, that Evolution Partners can assert their super priority post-petition liens and their super priority claims, and that, you know, Bank of America and others can challenge it, but it's -- but we don't get to do the -- kind of the procedural or more substantive hurdle as to kind of, you know, where is the cash and which exactly was the cash. What cash was it and where are the proceeds that ought to be parked somewhere, where it's really clean for me to make a determination and then someone will get it.

That's really kind of where I am. And I'm not sure that means lock box. I'm not sure that means somewhere, but it -- it's got to stay somewhere, where everybody gets comfortable that the cash is somewhere, and then everybody can assert liens, and then I can kind of make the call at the right time, unless the parties kind of agree to something.

But at the same time, the Debtors aren't going to sell this for free. And I'm not going to give it over to anyone. I do think there's a framework for the party -- for

the parties with an interest in this collateral to have this sold and to make the determination later. But I got it -- until this gets resolved, I think the Debtors would be entitled to what one would call I think a surcharge, if they were the ones that were going to sell it.

But then, the rest of the cash kind of gets parked, and it's not subject to a carveout or a super priority if someone else just kind of drops out. It's just parked somewhere, where I can make a determination, but things get sold. That's kind of the floor. I think the parties can agree on a ceiling, if you will in terms of where we are.

But I think the Debtor has kind of really reached out and prohibit the use immediately until there's further agreement within the parties. And that's going to have a potential harmful diminutae in and of itself. So if there are proposals going back and forth, I think now is the time to really kind of put your cards on the table. And I'm looking at the lenders and Evolution to kind of figure out where we go.

Because you know, what I'm not going to accept is later on arguments that the Debtors somehow allowed this collateral to diminish on their watch. Because I think we're at the point where the parties have to agree on something, or the Debtor can come in and have a -- you know,

a really contested cash collateral fight, but that would be another issue for another day. But I don't think in the first instance it would be on them.

I think Mr. Berezin, I think the -- what you all are planning on doing, it just makes sense to me, to see if the parties can agree. But I think that's going to require you -- your side to then take some action to slow it down. But that's going to have an effect, and I suspect once you slow it down, it's really hard to pick it back up, which is always the case.

And I'm hoping someone calls you and says, before you do that, hold on. Let's see if we can work something out. But as of right now, I think the two pieces of relief requested, quite frankly, were satisfied in connection with this stipulation. And in terms of what the relief -- what Evolution requested, I don't think the stip requires you to put up any curative actions because it just says, if you don't, then you stop, but the stipulation itself has stopped on its own terms.

So I think, just looking at the four corners of the agreement, I don't need to consider anything else. I can just look at the four corners, plus the additional evidence of the -- whether there was any additional inventory, which I don't believe was satisfied based upon the evidence that I heard. So I do think that there was a

breach of the agreement. But that means the termination or stopping. And I think that’s where we are. Now that's the ruling I can -- any --

MR. MCGUIRE: Your Honor, this is Dan McGuire. May I ask one just clarifying question?

THE COURT: Sure.

MR. MCGUIRE: Yeah, thank you. Just to be clear, I think I understood that, you know, in terms of cash, that that would be an agreement of the parties. Sale of collateral, it sounded like that could happen with further order of the Court. In other words, we don't want to leave it by the side of the road, you're not going to give it to the ABL lenders to (indiscernible) Evolution to (indiscernible) of the Debtors (indiscernible) the sale because some of this collateral that is their judgment by maximizing, they can bring that to the Court while the proceeds might be parked.

They can seek authority to sell the collateral by the value maximizing they're able to get all (indiscernible) the proceeds (indiscernible). Is my understanding correct, Your Honor?

THE COURT: Yeah, I think that's right. I think somebody can always come to court and ask me for authority to do it. They just -- but everything freezes now until subject to further order of the Court.

Case 25-90399 Document 836-9 Filed in TXSB on 12/19/25 Page 54 of 54



MR. MCGUIRE: Very good. Thank you, Your Honor.

THE COURT: All right. Anything else we need to talk about today?

MR. BEREZIN: I don't think so.

THE COURT: All right, folks. Thank you very much.

MR. DALE: Yeah, thank you, Your Honor.

THE COURT: Have a good afternoon.

MAN: Your Honor, thank you.

THE COURT: Thank you.

MAN: Thank you.

(Proceedings adjourned at 4:20 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: January 22, 2026

# Exhibit 10

FILED UNDER SEAL

# Exhibit 11

FILED UNDER SEAL

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FIRST BRANDS GROUP, LLC, *et al.*, | ) | Case No. 25-90399 (CML) |
| Debtors.[1] | ) | Jointly Administered |

**ORDER GRANTING EVOLUTION'S**
**EMERGENCY MOTION FOR ADEQUATE PROTECTION**

Upon Evolution's *Emergency Motion for Adequate Protection* [Docket No. __] (the "Motion");[2] and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and that notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion and the record of the hearing on such motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED** as follows:

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

1. The Motion is granted as set forth herein.

2. In Adversary No. 26-03006, Evolution has asserted a perfected first-priority lien in certain cash collateral (the "Asserted Lien"). The Debtors are directed to put the following amounts in a separate bank account (the "Evolution Account"), within five (5) business days of entry of this Order:

a. No less than $60,500,000 in unencumbered cash (such as the Category 1 and Category 2 receivables to which the other factors do not claim an interest) as adequate protection for the Asserted Lien;

b. Cash sufficient to compensate Evolution for postpetition interest on its $60,500,000 claim, at the non-default rate set out in the Factoring Agreement, incurred from the Debtors' petition date through the date of entry of this Order; and

c. Cash sufficient to cover attorneys' fees and expenses incurred by Evolution in connection with the Factoring Agreement through the date of entry of this Order, which amount is to be provided by Evolution to the Debtors upon entry of this Order.

3. The Debtors are further required to pay into the Evolution Account on a monthly basis the following amounts as they come due as adequate protection:

a. Cash sufficient to compensate Evolution for postpetition interest on its $60,500,000 claim, at the non-default rate set out in the Factoring Agreement, incurred beginning on the date of entry of this Order; and

b. Cash sufficient to cover attorneys' fees and expenses incurred by Evolution in connection with the Factoring Agreement beginning on the date of entry of this Order, subject to a $500,000 per month cap.

The Debtors shall continue to fund the Evolution Account pursuant to this Paragraph, and the funds therein shall not be released, until the later of (i) entry of a final order by this Court in Adversary No. 26-03006 or (ii) the time the Court orders otherwise upon motion and after notice and hearing.

4. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: ________, 2026

__________________________________
Christopher López
United States Bankruptcy Judge

Submitted by:

**GRAY REED**

By: */s/ Jason S. Brookner*
Jason S. Brookner
Texas Bar No. 24033684
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com

\- and -

**ELSBERG BAKER & MARURI PLLC**
David Elsberg (admitted *pro hac vice*)
Michael Duke (admitted *pro hac vice*)
Vivek Tata (admitted *pro hac vice*)
Garrett Gerber (admitted *pro hac vice*)
Andrew Parks (admitted *pro hac vice*)
Ella Epstein (admitted *pro hac vice*)
350 Fifth Avenue, 38th Fl.
New York, NY 10118
Telephone: (212) 597-2600
Email: delsberg@elsberglaw.com
mduke@elbserglaw.com
vtata@elsberglaw.com
ggerber@elsberglaw.com
aparks@elsberglaw.com
eepstein@elsberglaw.com

\- and -

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Email: vindelicato@proskauer.com
mkoch@proskauer.com

\- and –

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

*Counsel to Evolution*