# EXHIBIT 19

Case 26-03006 Document 67 Filed in TXSB on 05/29/26 Page 1 of 15

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
May 29, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 25-90399** |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | |
| | § | **CHAPTER 11** |
| **Debtors.** | § | |
| | § | |
| **EVOLUTION CREDIT OPPORTUNITY MASTER FUND II-B, LP, *et al.*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 26-03006** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | |
| | § | |
| **Defendants.** | | |

## SUMMARY JUDGMENT ORDER

Evolution Credit Opportunity Master Fund II-B and certain affiliates ("**Evolution**")[1] seek declaratory summary judgment on two points.[2] First, that it holds a perfected security interest in certain First Brands Debtors' receivables that were not sold to Evolution.[3] Second, that its security interest in these receivables is superior to any interest held by the pre- and postpetition lender defendants.[4]

Defendants also seek declaratory summary judgment.[5] They argue that Evolution does not have a perfected security interest in the non-purchased receivables.[6] And, if it does, that interest is subordinate to the perfected security interests held by the pre- and post-petition lenders.[7]

---

[1] Evolution Credit Partners Trade Finance Master L.P. and Evolution Credit Opportunity Master Fund III-B, LP.
[2] ECF No. 47.
[3] ECF No. 47 ¶ 1.
[4] ECF No. 47 ¶ 1.
[5] ECF Nos. 32; 34; 36; 45; 48.
[6] ECF No. 48.
[7] ECF No. 48 ¶¶ 1–8.

For the reasons below, Evolution's motion is denied in part. The defendants' motions are granted in part and denied in part. Evolution does not have a perfected security interest in the non-purchased receivables with priority over the postpetition debtor-in-possession financing lenders' interest in those receivables. Summary judgment is denied with respect to Evolution's security interest in relation to the prepetition lenders' security interests. There are material fact disputes about whether Evolution's security interest is a permitted lien under the relevant prepetition credit agreements and whether the prepetition lenders' interests were released as to Evolution.

## Background

### I. Prepetition Credit Agreements

In 2018, First Brands entered into an ABL Credit Agreement with certain lenders.[8] The ABL facility is secured by a continuing lien on substantially all of the Debtors' assets and property.[9] Before March 2023, the ABL Agent filed UCC-1 financing statements describing the collateral as "[a]ll assets of the Debtor, whether now owned or hereafter acquired."[10] In the final DIP order, the Debtors stipulated that about $446.33 million remained outstanding as of the petition date.[11]

First Brands also entered into a First Lien Term Loan Agreement with certain lenders.[12] The loan is secured by a continuing lien on substantially all of the Debtors' assets and property.[13] Before March 2023, the First Lien Agent filed UCC-1 financing statements describing the collateral as "[a]ll assets of the Debtor, whether now owned or hereafter acquired."[14] In the final DIP order, the Debtors stipulated that about $4.62 billion remained outstanding as of the petition date.[15]

In February 2019, First Brands entered into a Second Lien Term Loan Agreement with certain lenders.[16] The loan is secured by a continuing lien on substantially all of the Debtors' assets and property.[17] Before March 2023, the Second Lien Agent filed UCC-1 filing statements describing the collateral as "[a]ll assets of the Debtor, whether now owned or hereafter acquired."[18] In the final DIP

[8] ECF No. 49-1.
[9] ECF No. 49-16.
[10] ECF Nos. 49-2–49-9.
[11] Case No. 25-90399, ECF No. 608 ¶ G(viii).
[12] ECF No. 49-12.
[13] ECF No. 49-17.
[14] ECF Nos. 49-2–49-9.
[15] Case No. 25-90399, ECF No. 608 ¶ G(ix).
[16] ECF No. 49-13.
[17] ECF No. 49-18.
[18] ECF Nos. 49-2–49-9.

order, the Debtors stipulated that about $540 million remained outstanding as of the petition date.[19]

Section 7.01 of each of these credit agreements ("**Credit Agreements**") identifies categories of permitted liens on "Collateral" from which the lenders' security interests are released.[20] Section 7.01(u) then permits additional liens not otherwise permitted under § 7.01 so long as the aggregate outstanding principal amount of the obligations secured does not exceed stated amounts.[21]

## II. Master Receivables Purchase Agreement

In March 2023, Evolution and certain First Brands Debtors ("**Receivable Sellers**")[22] executed a factoring facility called the "Master Receivables Purchase Agreement" (the "**Purchase Agreement**").[23] Under the Purchase Agreement, Evolution purchased accounts receivable owed to the Receivable Sellers.[24] All receivables sold and purchased—or purported to be sold and purchased—were defined as the "Purchased Receivables."[25] If the Receivable Sellers breached any representations, warranties, or covenants, they were required to repurchase the receivables.[26] If any Purchased Receivables are not characterized as "true sales," § 1 of the Agreement says the Receivable Sellers are deemed to have granted Evolution a first priority security interest in "any and all present and future Purchased Receivables and the proceeds thereof to secure all obligations of such Seller arising in connection with" the Purchase Agreement.[27]

Section 5(g) of the Purchase Agreement separately provides Evolution with a broader security interest in all the Receivable Sellers' receivables, including Purchased Receivables, as collateral security for the Receivable Sellers' obligations under the Agreement.[28] It provides:

> As collateral security for the Sellers' existing and future obligations hereunder, due or to become due, direct or indirect, absolute or contingent, each Seller hereby grants to each Purchaser a lien on and security interest in, and the right of set-off against (i) ***all of the Receivables now or hereafter owned or held by such Seller*** to the extent

[19] Case No. 25-90399, ECF No. 608 ¶ G(x).
[20]ECF Nos. 49-1 § 7.01; 49-12 § 7.01; 49-13 § 7.01.
[21] ECF Nos. 49-1 § 7.01(u); 49-12 § 7.01(u); 49-13 § 7.01(u).
[22] The Receivable Sellers are (1) Strongarm, LLC, (2) Carter Fuel Systems, LLC, (3) Trico Products Corporation, (4) ASC Industries, Inc., (5) Fram Group Operations LLC, (6) Brake Parts Inc. LLC, (7) First Brands Group, LLC, and (8) Champion Laboratories, Inc.
[23] ECF Nos. 50-1−50-2.
[24] ECF No. 50-1 § 1(e).
[25] ECF No. 50-1§ 1(a).
[26] ECF No. 50-1 § 5(b).
[27] ECF No. 50-1 § 1(g).
[28] ECF No. 50-1 § 1(g).

> not sold and purchased pursuant to Section 1 hereto (including all Receivables purported to constitute Purchased Receivables but have been deemed for any reason to not constitute Purchased Receivables by a court of competent jurisdiction), (ii) all Related Assets in connection with such Receivables and (iii) all Collections and proceeds of the foregoing.[29]

In March and April 2023, Evolution filed UCC-1 financing statements in Ohio, Delaware, and New York.[30] The financing statements select a "Seller/Buyer" designation and describe the collateral as:

> Any and all present and future Receivables transferred or purported to be transferred to the Secured Party pursuant to that certain Master Receivables Purchase Agreement (as may be amended, restated or otherwise modified from time to time, the "**Receivables Purchase Agreement**"), dated as March 28, 2023, by and among, inter alia, the Debtor, as Seller/Debtor, and the Secured Party, as Purchaser/Secured Party, (collectively, the "**Purchased Receivables**" and each, a "**Purchased Receivable**"), all Related Assets in connection thereto and all Collections and proceedings of the forgoing.[31]

"Receivable" means

> any right to payment of a monetary obligation, whether or not earned by performance, owed to Debtor or Secured Party (as assignee of Debtor) by an Account Debtor, whether constituting an account, instrument, document, contract right, chattel paper, payment intangible or other general intangible, in each instance arising in connection with the sale of goods that have been or are to be sold or for services rendered or to be rendered, and includes, without limitation, the obligation of such Account Debtor to pay any finance charges, fees and other charges with respect thereto, together with the Related Assets with respect thereto, and with respect to each of the foregoing, all Collections and proceeds thereof.[32]

---

[29] ECF No. 50-1 § 5(g) (emphasis added).
[30] *See* ECF No. 49-24.
[31] ECF No. 49-24 (emphasis in original).
[32] ECF No. 49-24.

## III. Sidecar Term Loan Agreement

In June 2025, First Brands entered into a Sidecar Term Loan Agreement with certain lenders.[33] The Sidecar Term Loan is secured by a properly perfected continuing lien on substantially all of the Debtors' assets.[34] In the final DIP order, the Debtors stipulated that about $250 million remained outstanding as of the petition date.[35] Like the other prepetition Credit Agreements, the Sidecar Agreement also allows for permitted liens.[36]

## IV. Bankruptcy, DIP Financing, and the Adversary Proceeding

In September 2025, the First Brands Debtors filed for chapter 11. During the case, the Court granted interim and final approval of a senior secured superpriority and priming DIP Facility.[37] The DIP facility provides for $1.1 billion of new money term loans and a roll up of $3.3 billion in first lien obligations held by the participating DIP lenders.[38] The final DIP order grants the DIP agent, for itself and for the DIP lenders, "valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all DIP Collateral."[39] DIP Collateral includes the Receivables Sellers' receivables.[40] The final DIP order also preserves the position of any factoring party with a valid, binding, enforceable, properly perfected, and non-avoidable lien, and provides that nothing in the order grants the DIP lenders senior or equal priority in such collateral.[41]

From the outset of the bankruptcy there have been allegations of fraud related to the Debtors' prepetition factoring transactions. In November 2025, the Court appointed an examiner to investigate these allegations.[42] The extent of the fraud and the participants involved has not been fully determined.

In December 2025, the Debtors filed a factoring procedures motion.[43] The motion disclosed that the Debtors' financial advisor uncovered instances where the Debtors sold receivables that were nonexistent, heavily inflated, or sold to more than one party.[44] And that some factors sent customers prepetition notices to remit payments directly to the factor, which caused customers confusion and led to

---

[33] ECF No. 49-19.
[34] ECF No. 49-20; *see also* ECF Nos. 49-2–49-9.
[35] Case No 25-90399, ECF No. 608 ¶ G(x).
[36] ECF No. 49-19 § 7.01.
[37] Case No. 25-90399, ECF Nos. 217; 608.
[38] Case No. 25-90399, ECF No. 608 at 2–3.
[39] Case No. 25-90399, ECF No. 608 ¶¶ 2, 8, 11(a).
[40] Case No. 25-90399, ECF No. 608 ¶¶ 2, 8, 11(a).
[41] Case No. 25-90399, ECF No. 608 ¶ 45.
[42] Case No. 25-90399, ECF No. 726.
[43] Case No. 25-90399, ECF No. 807.
[44] Case No. 25-90399, ECF No. 807 ¶¶ 2–3.

customers withholding payment.[45] The Debtors segregated postpetition collections received from customers, including receipts of non-factored receivables.[46] The Debtors asked the Court to release over $100 million of non-factored receivables from the segregated account into the Debtors' operating account.[47]

Evolution objected, arguing that the motion ignored its first-priority security interest in all the prepetition receivables of the Receivable Sellers.[48] The Debtors responded that Evolution did not hold a perfected, first-priority lien in non-purchased receivables of the Receivable Sellers because Evolution failed to perfect its security interest in them.[49] The Debtors also argued that Evolution was subordinate to billions of dollars of properly perfected secured debt held by the prepetition and DIP lenders.[50]

After a bankruptcy court ruling, an appeal, and remand from the District Court, this Court granted Evolution's motion for adequate protection consistent with the District Court's instructions.[51] Evolution claims a first priority perfected security interest in $60.5 million of non-purchased receivables of the Receivable Sellers currently held in a segregated account. The agents for the pre- and post-petition lenders claim that their interests in the funds are superior to Evolution's interest.

In this adversary proceeding, First Brands and other defendants moved to dismiss under Federal Rule 12(b)(6).[52] By stipulation of the parties, the motions to dismiss were converted to summary judgment motions and Evolution had a right to cross-move for summary judgment.[53]

## Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). The parties' express and implied consent also provides this Court constitutional authority to enter a final judgment. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 678–83 (2015); *Kingdom Fresh Produce, Inc. v. Stokes Law Off., L.L.P. (In re Delta Produce, L.P.)*, 845 F.3d 609, 617 (5th Cir. 2016).

---

[45] Case No. 25-90399, ECF No. 807 ¶ 4.
[46] Case No. 25-90399, ECF No. 807 ¶ 5.
[47] Case No. 25-90399, ECF No. 807 ¶ 21.
[48] Case No. 25-90399, ECF No. 1032 ¶ 1.
[49] Case No 25-90399, ECF No. 1054 ¶¶ 7−14.
[50] *See* Case No 25-90399, ECF No. 1054 ¶ 2(iii).
[51] Case No. 25-90399, ECF No. 2127.
[52] ECF Nos. 32; 34; 36.
[53] ECF No. 45.

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also* FED. R. BANKR. P. 7056. A fact is material if it "might affect the outcome of the suit under the governing law." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). A dispute on a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views all facts and evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). On cross-motions for summary judgment, "each motion must be considered separately because each movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law." *Playa Vista Conroe v. Ins. of the W.*, 989 F.3d 411, 414 (5th Cir. 2021) (internal citation omitted).

Federal courts may declare the rights and legal relations of a party seeking a declaration under 28 U.S.C. § 2201(a). *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007); *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). An actual controversy exists. So the Court has authority to grant declaratory relief and will exercise its discretion accordingly.

## Analysis

The Court must determine whether Evolution's financing statements identified the non-purchased receivables as collateral and whether Evolution's security interest has priority over the defendant lenders' interest. Both questions are answered below.

Article 9 of the Uniform Commercial Code applies here.[54] The relevant state law is Delaware, New York, and Ohio. In these states the relevant provisions of Article 9 are substantially identical.[55] These states also recognize the Official Comments to the UCC as persuasive guidance. *See Cannon v. Romeo Sys., Inc.*, Case No. 2021-0171, 2025 WL 2848069, at *22 n.171 (Del. Ch. Oct. 7, 2025); *Worthy Lending LLC v. New Style Contractors, Inc.,* 201 N.E.3d 783, 787 (N.Y. 2022); *Casserlie v. Shell Oil Co.*, 902 N.E.2d 1, 4 (Ohio 2009).

---

[54] Article 9 applies to "a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." N.Y. U.C.C. § 9-109(a)(1); Del. Code Ann. tit. 6, § 9-109(a)(1); Ohio Rev. Code Ann. § 1309.109(a)(1). Article 9 also applies to the sale of accounts. N.Y. U.C.C. § 9-109(a)(3); Del. Code Ann. tit. 6, § 9-109(a)(3); Ohio Rev. Code Ann. § 1309.109(a)(3).

[55] At times, for ease of reference, the Court will cite only to the NY UCC.

## I. Perfection

Evolution's financing statements do not identify the non-purchased receivables as collateral under applicable law. Thus, Evolution did not perfect its security interest in them.

Generally, to perfect a security interest—i.e., to make a security interest effective against third parties—a secured party must file a financing statement.[56] A financing statement must: (1) provide the name of the debtor; (2) provide the name of the secured party or a representative of the secured party; and (3) indicate the collateral covered by the financing statement.[57] The primary purpose of a financing statement is to put the public on notice that a secured party may have a security interest in the collateral described. *Comprehensive Rev. Tech., Inc. v. Star Bank, Cent. Ohio*, 138 B.R. 195, 200 (Bankr. S.D. Ohio 1992); *see also* U.C.C. § 9-502 cmt. 2.

UCC § 9-504, titled "Indication of Collateral," says that a financing statement sufficiently indicates collateral if it: (1) describes the collateral under UCC § 9-108; or (2) provides an indication that the financing statement covers all assets or all personal property.[58] Official Comment 2 to § 9-504 explains that:

> a financing statement must "indicate" the collateral it covers. A financing statement sufficiently indicates collateral claimed to be covered by the financing statement if it satisfies the purpose of conditioning perfection on the filing of a financing statement, i.e., if it provides notice that a person may have a security interest in the collateral claimed.[59]

Evolution did not use the "all assets" safe harbor under § 9-504(2). So it must rely on § 9-504(1), which in turn requires satisfying § 9-108. Section 9-108 says a description "is sufficient, whether or not it is specific, if it reasonably identifies what is described."[60] Section 9-108(b) provides examples of descriptions of collateral that reasonably identify the collateral. These include identification by (1) specific listing; (2) category; (3) a type of collateral as defined in Article 9; (4) quantity; (5) computational or allocational formula or procedure; or (6) any other method, if the identity of the collateral is objectively determinable.[61]

---

[56] N.Y. U.C.C. § 9-310(a).
[57] N.Y. U.C.C. § 9-502(a)(1)−(3).
[58] N.Y. U.C.C. § 9-504.
[59] U.C.C. § 9-504 cmt. 2.
[60] N.Y. U.C.C. § 9-108.
[61] N.Y. U.C.C. § 9-108(b)(1)−(6).

Evolution focuses on the purpose of financing statements and relies on the Official Comments to § 9-502, which provide:

> This section adopts the system of "notice filing." What is required to be filed is not, as under pre-UCC chattel mortgage and conditional sales acts, the security agreement itself, but only a simple record providing a limited amount of information (financing statement). . . . The notice itself indicates merely that a person may have a security interest in the collateral indicated. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs."[62]

As noted above, Evolution's financing statements describe the collateral as:

> Any and all present and future Receivables transferred or purported to be transferred to the Secured Party pursuant to that certain Master Receivables Purchase Agreement (as may be amended, restated or otherwise modified from time to time, the "**Receivables Purchase Agreement**"), dated as March 28, 2023, by and among, inter alia, the Debtor, as Seller/Debtor, and the Secured Party, as Purchaser/Secured Party, (collectively, the "**Purchased Receivables**" and each, a "**Purchased Receivable**"), all Related Assets in connection thereto and all Collections and proceedings of the forgoing.[63]

Evolution argues that creditors reviewing the financing statements would understand and be on notice that Evolution has an interest in "any and all" of the Receivable Sellers' receivables.[64] In its view, describing its collateral as any and all "[r]eceivables transferred or purported to be transferred . . . pursuant to that certain Master Receivables Purchase Agreement" includes those receivables pledged in the Purchase Agreement as collateral security for the Receivable Sellers' obligations.[65] And Evolution contends that if creditors wanted to learn more, it was their obligation to inquire further.[66]

Evolution stresses that the threshold for sufficiently indicating collateral is low and argues that the Court's inquiry is whether a reasonably prudent creditor looking at the financing statements would have been on notice that the secured

[62] U.C.C. § 9-502 cmt. 2.
[63] ECF No. 49-24 (emphasis in original).
[64] ECF No. 47 ¶ 33.
[65] ECF No. 47 ¶ 36.
[66] ECF No. 47 ¶ 33.

Case 26-03006 Document 39 Filed in TXSB on 05/29/26 Page 10 of 15

party "may have" an interest in the non-purchased receivables.[67] Evolution also argues that the phrase "transferred or purported to be transferred" in its financing statements tracks § 5(g) of the Purchase Agreement, which grants it a security interest in non-purchased receivables.[68] Evolution argues that a reasonably prudent creditor who reads "purported to be transferred" should understand that the collateral includes receivables that were never purchased.[69] All of these arguments fail, however, when one reads the entire description of the collateral in the financing statements. The financing statements don't say what Evolution wants them to say.

Evolution described its collateral as "[a]ny and all present and future Receivables transferred or purported to be transferred" under the Purchase Agreement and elected to define everything—which by definition includes Receivables—as Purchased Receivables.[70] A reasonably prudent creditor cannot be expected to be on notice that Evolution's description of "Purchased Receivables" also includes non-purchased receivables. Much less that its security interest covers breaches of warranties and other obligations under the Purchase Agreement.

Evolution argues that the opening words "[a]ny and all present and future Receivables" are broad enough to cover all of the Receivable Sellers' receivables, and that the following words are just a reference to the agreement that created the interest.[71] That is not textually accurate. The words "any and all" don't operate in isolation. They introduce the noun "Receivables," which is modified by the phrase "transferred or purported to be transferred" under the Purchase Agreement, and then are defined as the "Purchased Receivables." A reasonably prudent creditor sees a defined term—Purchased Receivables.[72] The phrase "purported to be transferred" is not a textual back door that expands a collateral description that Evolution elected to limit by including a defined term. Evolution wants to now treat its collateral description as meaning all receivables. But it doesn't say that. Words matter.

The Court finds additional support from Evolution selecting the optional "Seller/Buyer" designation in the financing statements.[73] The "Seller/Buyer" designation tells a searching creditor that the filing reflects a purchase transaction. That designation is inconsistent with the proposition that Evolution also holds a security interest in receivables it did not buy. Evolution cannot elect to

---

[67] ECF No. 47 ¶ 29 (citing *Gulf Forge Co. v. Ellwood Quality Steels Co.*, 202 B.R. 238, 241–43 (S.D. Tex. 1996); *In re Torgerson Co.*, 114 B.R. 899, 901–03 (Bankr. W.D. Tex. 1990); *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809, 812 (8th Cir. 2009)).
[68] ECF No. 47 ¶¶ 38, 40.
[69] ECF No. 47 ¶¶ 38, 40.
[70] ECF No. 49-24.
[71] ECF No. 47 ¶ 33.
[72] Evolution's other argument is that the term "transfer" in the financing statements includes the creation of a lien. But this also fails based on the defined term Purchased Receivables.
[73] ECF No. 49-24.

communicate in its financing statements that it is a buyer of receivables and at the same time now argue that reasonably prudent creditors would be on notice that it may hold a security interest in receivables it did not purchase. The Seller/Buyer designation reinforces this point. Accepting Evolution's reading would likely mean that every factoring arrangement puts creditors on notice of a potential security interest in all receivables the seller owns, whether or not the financing statement references them.

Another court in this Circuit also found where a secured party chooses to describe its collateral more narrowly than in the security agreement, the financing statements are insufficient as a matter of law to give a reasonably prudent person inquiry notice of the broader security interest held by the secured party. *See, e.g.*, *CERx Pharm. Partners, LP v. Provider Meds, LP (In re ProvideRX of Grapevine, LLC)*, 507 B.R. 132 (Bankr. N.D. Tex. 2014).

In *ProvideRX*, the bankruptcy court found that CERx had a security interest in all of Provider Meds' intellectual property assets, but it only had a ***perfected*** security interest in Provider Meds' patent applications. *See id.* at 164. The financing statements described the collateral as three specific patent applications that were titled, numbered, and dated, and

> all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations, and certificates issuing therefrom (collectively, the "***Patent Applications***").

*Id.* at 163.

CERx argued that the phrase "all other intellectual property protection" in the financing statement could be read as providing inquiry notice that it had a security interest in all Provider Meds' intellectual property assets. *Id.* The court disagreed. *Id.* at 164. The court held that the collateral description in the UCC-1 was insufficient to give a reasonable person inquiry notice about the alleged nature of "CERx's security interest in PM's IP Assets, other than the Patent Applications." *Id.* Here, like in *ProvideRX*, the financing statements do not say or imply that Evolution has a security interest in all the Receivable Sellers' receivables, much less the non-purchased ones.[74] And like the secured party in that case, Evolution elected

---

[74] ECF No. 49-24.

to use a narrow defined term and define its collateral as the "Purchased Receivables."[75]

Evolution argues, however, that the notice-filing system is designed to prompt inquiry, and that a diligent creditor who pulled the Purchase Agreement after seeing the financing statements would have discovered § 5(g) and the security interest in non-purchased receivables.[76] Evolution is wrong.

The UCC's notice-filing system is not designed to require third parties to obtain, read, and parse the underlying agreement to determine the scope of a secured party's collateral. The financing statement itself must provide inquiry notice. As the Official Comments to § 9-502 explain, a financing statement "indicates merely that a person may have a security interest in the collateral indicated." The operative word is "indicated." A third party can be prompted only to inquire further about collateral the financing statement has indicated. Evolution's financing statements indicate purchased receivables. They do not indicate non-purchased ones.

There is more. Even if a third party was able to procure a copy of the Purchase Agreement, which by its own terms is designated as confidential,[77] the Purchase Agreement defines "Purchased Receivables" as "all such Proposed Receivables, once sold and purchased, or purported to be sold and purchased."[78] "Proposed Receivables" means receivables proposed by the Receivable Sellers to be sold to Evolution.[79]

Section 1(g) of the Purchase Agreement provides Evolution with a security interest in Purchased Receivables only if they are not characterized as sales.[80] A reasonably prudent creditor may reasonably conclude that the term "Purchased Receivables" used in both the financing statements and the Purchase Agreement refer to the same receivables and would conclude that the "Purchased Receivables" in which Evolution has a security interest only include those that it purchased or intended to purchase. Finally, § 5(g) uses materially different language than the financing statement, it grants a lien on "all of the Receivables now or hereafter owned or held by such Seller," not receivables "transferred or purported to be transferred." Those are different descriptions. Thus, a reasonably prudent creditor would not be on notice of Evolution's security interest in receivables Evolution did not buy and would have no reason to look for them because they are not described in the financing statements.

---

[75] ECF No. 49-24.
[76] ECF No. 47 ¶ 30.
[77] ECF No. 50-1 § 13(n).
[78] ECF No. 50-1 § 1(a).
[79] ECF No. 50-1 at 24.
[80] ECF No. 50-1 § 1(g).

Evolution next argues that, at worst, it is ambiguous whether its collateral description includes all the Receivable Sellers' receivables.[81] Evolution relies on *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809 (8th Cir. 2009) for the proposition that when a collateral description can reasonably be interpreted both to include and exclude certain collateral, notice filing has served its purpose, and the burden falls on subsequent creditors to inquire further.[82]

*ProGrowth* is easily distinguishable. In that case, the financing statements described the collateral as "[a]ll of Debtor's right, title, and interest in and to, assets and rights of Debtor, wherever located and whether now owned or hereafter acquired or arising, and all proceeds and products in that certain Annuity Contract No.: LE900015 [or L9E00016] issued by Lincoln Benefit Life in the name of Debtor." *Id.* at 813 (emphasis omitted). This description contained an error because the correct annuity contract number was **L9E**00015, not **LE9**00015. *Id.* at 811 (emphasis added). The policies also incorrectly listed the wrong issuer of the policy. *Id.* The district court held that this collateral description was insufficient to perfect the creditor's interest in all the debtor's assets. *Id.* at 812.

On appeal, the Eighth Circuit reversed and held that the collateral description sufficiently described a security interest in all the debtor's assets notwithstanding the error because the first clause indicated that all the debtor's assets may be covered, including rights arising out of annuity contracts. *Id.* at 813. The court noted that it was necessary to analyze the financing statements "in their entirety" and that individual provisions in financing statements could not be read in isolation. *Id. ProGrowth* applies where a description is genuinely susceptible to two reasonable readings, which is not the case here. Unlike in *ProGrowth*, the collateral description cannot be reasonably interpreted to include the non-purchased receivables. The description of "all Debtor's right, title, and interest in and to, assets" was not limited and part of a defined term in *ProGrowth*. And that is a key distinction. The Evolution financing statements are more like *ProvideRX* described earlier, not *ProGrowth*.

Finally, Evolution argues that the UCC has a "broad policy of leniency,"[83] and cites § 9-506, which provides that "[a] financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions make the financing statement seriously misleading."[84] This does not change the answer here. The financing statements say what they say. There is no mistake and, if read as Evolution wants, they are seriously misleading. This is not like *ProGrowth,* which stated an interest in a contract but entered the contract number incorrectly (L9E v. LE9). The financing

[81] ECF No. 47 ¶ 34.
[82] ECF No. 47 ¶ 34.
[83] ECF No. 47 ¶ 27 (quoting *In re Tri-State Equip., Inc.*, 792 F.2d 967, 971 (10th Cir. 1986)).
[84] N.Y. U.C.C. § 9-506(a).

statements remain effective to perfect Evolution's security interest in any receivables the Receivable Sellers sold or purported to sell to Evolution, which are the Purchased Receivables.

## II. Priority

Evolution does not have a perfected security interest in the non-purchased receivables. The DIP order grants the DIP lenders a perfected security interest in all of the Receivable Sellers' receivables.[85] Thus, the DIP lenders' perfected security interest has priority over Evolution's unperfected security interest in the Receivable Sellers' non-purchased receivables.[86] For this reason, Evolution's motion for summary judgment is denied and the defendants' motions are granted regarding the issue of priority over non-purchased receivables between Evolution and the DIP lenders.

Priority between the prepetition secured lenders and Evolution requires a different analysis and includes material fact disputes that preclude summary judgment. The Credit Agreements granted the prepetition lenders liens on substantially all the Receivable Sellers' assets but also include a carveout for permitted liens. Section 7.01(u) permits liens on collateral so long as the aggregate outstanding principal amount of the obligations secured does not exceed the greater of $150 million and 25% of Consolidated Adjusted EBITDA of the First Brands Debtors.[87] Any such lien securing indebtedness for borrowed money on collateral assets must be secured on a junior basis and subject to an intercreditor agreement acceptable to the Administrative Agent.[88] This provision previously featured a lower cap of $10 million,[89] but was amended in the Credit Agreements to include the higher cap on March 28, 2023—the same day that the Purchase Agreement was executed.[90] The breadth of § 7.01(u) could permit Evolution's lien on non-purchased receivables the Receivable Sellers granted it under § 5(g) of the Purchase Agreement.

Evolution argues that its security interest falls within the limits prescribed by § 7.01(u) of the Credit Agreements and thus is a permitted lien. Evolution also argues that the clause in § 7.01(u) that requires liens to be secured on a junior basis and be subject to an intercreditor agreement does not apply because its lien does not

---

[85] *See* Case No. 25-90399, ECF No. 608 ¶ 11.
[86] N.Y. U.C.C. § 9-322(a)(2) ("A perfected security interest . . . has priority over a conflicting unperfected security interest.").
[87] ECF No. 51-24 § 7.01(u).
[88] ECF No. 51-24 § 7.01(u).
[89] *See* ECF No. 49-1 § 7.01(u).
[90] *Compare* ECF No. 51-24 at 4, *with* ECF No. 50-1 at 1; *see* also ECF No. 51-25 § 7.01(u). The Second Lien Term loan features a higher cap of the greater of (x) $187,500,000 and (y) 31.0% of Consolidated Adjusted EBITDA of the Borrower and the other Restricted Subsidiaries on a Pro Forma Basis. ECF No. 51-26 § 7.01(u).

secure indebtedness for borrowed money.[91] Instead, Evolution argues its security interest covers obligations to indemnify or repurchase receivables if the Receivable Sellers breached their representations or warranties—not the Receivable Sellers' obligation to repay indebtedness for borrowed money.[92] And because its lien falls within § 7.01(u), the security interests granted under the credit agreements were released as to Evolution lien under §§ 7.05 and 11.10.[93]

Several factual disputes preclude summary judgment. First, whether Evolution's lien on non-purchased receivables falls within the monetary limits of § 7.01(u) of the Credit Agreements, considering the agreements were amended on the same day the Purchase Agreement was executed. Second, §§ 7.01(u), 7.05, and 11.10 require the "Administrative Agent" to take affirmative action to effect a release of liens on disposed collateral. The record does not establish that the Administrative Agent took any such action here. Whether a release occurred, or could have occurred without agent action, cannot be resolved at summary judgment. Summary judgment on priority between Evolution and the prepetition lenders is denied.[94]

**Order**

For the reasons explained above, Evolution's motion for summary judgment is denied in part. The defendants' motions for summary judgment are granted in part and denied in part. Evolution does not have a perfected security interest in the non-purchased receivables with priority over the DIP lenders' interest in those receivables. Factual issues preclude summary judgment on whether Evolution's security interest in relation to the prepetition lenders' security interests.

Signed: May 29, 2026

Christopher Lopez
United States Bankruptcy Judge

---

[91] ECF No. 47 ¶ 68 n.27.
[92] ECF No. 47 ¶ 68 n.27.
[93] ECF No. 47 ¶ 71.
[94] Evolution and the prepetition lenders raised other arguments regarding priority. All rights and defenses with respect to those arguments are reserved.