# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FIRST BRANDS GROUP, LLC AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | CASE NO: 25-90399-cml |
| | Houston, Texas |
| | Tuesday, January 20, 2026 |
| Debtors. | 3:03 p.m. to 4:20 p.m. |

CONTINUED HEARING

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For First Brands Group, LLC: | CLIFFORD WILLIAM CARLSON<br>ROBERT S. BEREZIN<br>Weil Gotshal and Manges<br>700 Louisiana Street<br>Houston, TX 77002 |
| For Official Committee of Unsecured Creditors: | ANDREW M. CARTY<br>Brown Rudnick<br>7 Times Square<br>New York, NY 10036 |
| For Evolution Credit Partners: | VINCENT INDELICATO<br>CHARLES A. DALE<br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036 |
| | EMILY F. SHANKS<br>Kurtzman Carson Consultants<br>1300 Post Oak Boulevard, Ste 2000<br>Houston, TX 77056 |
| For Ad Hoc Prepetition Lenders and the DIP Lenders: | ANNELYSE SCARLETT GAINS<br>Gibson Dunn & Crutcher<br>200 Park Avenue<br>New York, NY 10166 |

For Bank of America, N.A.: DANIEL J. MCGUIRE
Winston & Strawn LLP
800 Capitol Street
Houston, TX 77002

Court Reporter: YESENIA LILA

Courtroom Deputy: YESENIA LILA

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

HOUSTON, TEXAS; TUESDAY, JANUARY 20, 2026; 3:03 PM

(Call to Order)

THE COURT: All righty, good afternoon. This is Judge Lopez. Today is January 20th. I'm going to call the 3:00 p.m. case of First Brands, 25-90399 on a continued hearing. Why don't I take appearances? And if anyone on the line wishes to make one, please hit five star and I will unmute your line.

MR. CARLSON: Good afternoon, Your Honor. Cliff Carlson, Weil, Gotshal & Manges for the Debtors.

THE COURT: Okay.

MR. CARLSON: Joining with me is Robert Berezin.

THE COURT: Good afternoon. Here. Nice. I'll just go in the order. The 646 number.

MR. BEREZIN: Your Honor, this is Robert Berezin, Weil, Gotshal and Manges on behalf of the Debtors.

THE COURT: All right, good afternoon. A 914 number? A 914 number? 914-844, if that's you? All right. How about a 617 number?

MR. CARTY: Yes, Your Honor, can you -- apologies, Your Honor. Can you hear me?

THE COURT: Yes, sir. Good afternoon.

MR. CARTY: Sorry. This is the 914 number, Your Honor. Andrew Carty from Brown Rudnick on behalf of the Official Creditor Committee.

THE COURT: Good afternoon. A 617 number?

MR. DALE: Good afternoon, Your Honor. It's me, Charles Dale, together with me, Vincent Indelacato, and our co-counsel, Emily Shanks. We're here for Evolution Credit Partners. Good afternoon, Judge.

THE COURT: All right, good afternoon. Good afternoon. 847 number.

MS. GAINS: Good afternoon, Your Honor. This is AnnElyse Gains on behalf of the Ad Hoc Group.

THE COURT: Good afternoon. And a 312 number.

MR. MCGUIRE: Good afternoon, Your Honor. Dan McGuire from Bank of America, the (indiscernible) agent.

THE COURT: Afternoon. Does anyone else wish to make an appearance? All right. Mr. Berezin, maybe it makes sense for me to turn things over to you, and you can kind of tell me where you think we are.

MR. BEREZIN: Sure, Your Honor. So I think where the Debtors are is we would like an opportunity to explain why we believe there's been no reason for stipulation. And then, in the event the court disagrees, to discuss as a remedy.

THE COURT: Okay.

MR. BEREZIN: And to provide the information Your Honor asks for.

THE COURT: Okay. And then, let me take your

position with respect to the, I guess the affirmative request to use the -- trying to sell the inventory and (indiscernible) what kind of I guess the part B of the --

MR. BEREZIN: Yes, Your Honor --

THE COURT: -- hearing.

MR. BEREZIN: Yes. The part B of the hearing is a bit odd, Your Honor. The Debtors are working with the ADL lenders and Evolution to try and reach an agreement that would permit the Debtors to use the inventory under certain circumstances. Absent an agreement, the Debtors do not intend to continue to utilize the inventory at these four locations.

THE COURT: So, and if you don't use the inventory, it just sits there, okay?

MR. BEREZIN: I -- in terms of (indiscernible), Your Honor, between the ADL lenders to Claimant interests, in that inventory -- excuse me -- and Evolution.

THE COURT: Okay. Mr. Dale and then Mr. McGuire, and then I'll turn things back over to Mr. Berezin. Just thoughts about kind of where you think we are.

MR. DALE: Sure. Your Honor, there is no agreement between us and the ABL lenders. In fact, the only proposals we've made to the ABL lenders have gone unresponded to. There's no agreement here, Your Honor. I don't think, I'm afraid to say there will be one. And I'm

happy to address the remedy when Your Honor's prepared to hear it.

THE COURT: So, okay. And if you can tell me, Mr. Dale, when it's time, and I'll turn to Mr. McGuire as well, kind of remedy with respect to the step, and then remedy kind of assuming -- I think we'd have to address kind of the go-forward anyway, because the stip is expired on its own terms. The question is, was there a breach of it? And then, kind of what -- on a go-forward, what parties think about it, if they're -- but it sounds like I'm not ruling on kind of part B today. Is -- Mr. Berezin, is that right?

MR. BEREZIN: That is correct, Your Honor.

THE COURT: Okay. Go. Mr. McGuire? I love giving guidance. I'm more than -- not really, but not really, but go ahead.

MR. MCGUIRE: Yes, Your Honor. Yeah, I do believe there are points, depending on how this unfolds relative to, you know, what the remedy would be. There have been some discussions about a possible resolution here. And you know, I disagree with what Mr. Dale so far has informally told them about the -- we would come out with respect to their proposal over the weekend, term sheet has gone back and forth over the last two days.

And I think the vast majority of those points I think are probably things we would agree with. There's a

couple that, one we need more information to agree with. But another one that is challenging for us at the levels they asked. But I haven't given up hope on that. We may not get there. It's quite possible that we will not get to an agreement with Evolution with respect to this, but you know, our view is that this -- you know, we have an agreement with the Debtors relative to the use of this collateral pursuant to the final (indiscernible).

And as long as they're in compliance with that, they're in compliance with what we have, you know, agreed to in the case. We're not here to try to re-trade on that agreement at this point in time.

As to the remedy for a violation of stip, if you find there is one, and we (indiscernible) have a long discussion about that now, but we do have thoughts on, you know, on a (indiscernible) precedent how that has to work and how it should work in a way that, you know, we think maximizes the value of the collateral for whoever has first position on it, is really the goal is, you know, the remedy should be one that is, you know -- it's kind of easy we have two parties, right, it's a litigation, you know, A versus B. And if you think B's right, you create, you know, a remedy and, oh, A, the one that's heard, the bankruptcy case, of course may be different.

And we have competing interests in collateral

here, perhaps different meaning as to what should happen, too, in the meantime. And you know, the violation for a stip -- of a stipulation isn't necessarily specific performance, unless that (indiscernible) has to be something that's compensatory, which means you have to show damages.

So, if we go down that road and get to that point, Your Honor, we can talk about what the appropriate remedy is for this, but I think that there's going to be, you know, a lot of agreement on this, a couple points where we might disagree. And like I said, could we get some consensual remedy in a week? We could. But I'm not hearing that yet, because there's still a couple big open points.

THE COURT: Okay. Mr. Berezin, I will turn things over to you, sir.

MR. BEREZIN: Thank you, Your Honor. So, again, I'm focused at first on the question of breach. And I think the first question for the Court is, does the stipulation online permit inventory before warehouses to be valued? I think that's the threshold question.

And the clear answer based on the plain text in our view is no. This does not only permit inventories that are for their (indiscernible) to be valued. And I think it begins in Section 4. That's really the operative section of the stipulation that says Document Number 609, Page 6.

And it -- 4(b) in particular requires maintenance

of inventory that is Evolution collateral. And so, it is focused on inventory component of Evolution collateral. That's clear from the text in 4(b). And then, as far as what Evolution collateral is, that is defined on Pages 2 and 4 of the stipulation, "and whereas" clauses. And it seems very straightforward. It's defined in reference to a security interest in all of Starlight and all of Patterson's assets, including inventory.

So there's a security interest in all of Starlight and Patterson's assets, including inventory. There's not, say, inventory at the four locations. It just says inventory. And in fact, if you look at the parties' agreement, the security agreement, which is really that -- that's the agreement that actually grants the lien that is referenced in the stipulation and that defines Evolution collateral. And the security agreements are at -- (indiscernible) Exhibit 1302-7 and 1302-9.

And when you look at the security agreements on Page 3, it has a very helpful definition of collateral. And that definition includes all Starlight and Patterson and both agreements are identical. Starlight and Patterson inventory "no matter where located."

So at the end of the day, we know from the stipulation that you have to look to the lien granted in Evolution/Patterson assets, including specifically

inventory. I would say that it's -- has to be -- it is located at any particular place.

And then, look at the security agreement on Page 3, and it says, as long as it's Evolution and Patterson's inventory, it doesn't matter where it's located. It is collateral.

So that leaves us with Footnote 4, which is where Evolution really hangs its extra hat. And they say, look, Footnote 4, it says that as the petition date, which is September 24th, 2025, this stipulation was November 9th. It says, at the petition date, the Starlight and Patterson collateral was, past tense, located at the four warehouses. Not that it's still there in November. Not that it would still be there or only be there during the pendency of the stipulation, which is November 9th to January 5th.

So the stipulation clearly does not require the -- does not limit the inventory at these four particular locations. And so that brings us to question two, which is, does the plain language of the stipulation tell us where Starlight and Patterson's inventory is located so that it can be counted or not counted towards the maintenance threshold?

So does the stipulation tell us? Okay, if it's not limited at the four locations, where does one look for that inventory? And the stipulation does not answer the

question. It just tells us the value of the inventory of Starlight and Patterson. The security agreement tells us it's wherever that's located. And the Footnote 4 just says at the petition date, that's where it was.

Nothing in the stipulation tells us where it is as of the date of the stipulation or during the pendency of it. So because it doesn't answer the question, but it leaves it wide open to value of that inventory wherever located, then the question is, well, what was the party's reasonable understanding of what inventory locations to be valued to see if the threshold, the $335 million was (indiscernible)?

And on that score, Your Honor, there is only one source of evidence in the record. It's from Mr. Jerkovic. It's in his declaration. And it's in his testimony from the January 12th hearing. There literally is no other testimony aside from Mr. Jerkovic on this -- Jerkovic -- on this issue of what the parties reasonably understood.

And specifically, I point the Court to Paragraph 31, 32, 34, and 35 of Mr. Jerkovic's declaration, which I will summarize. That's in Document Number 1315-20. And it's hearing testimony specifically at Pages 190, 191, 193, 194 and 195. In that testimony, it is unrebutted that he believes at the time of the stipulation that the Patterson and Starlight inventory included not only the four warehouses, but also warehouses which -- with which they

interacted the function of distribution centers.

And he was asked on direct -- re-direct, pardon me -- why was that your understanding? And he explained it. First, the company's former management in September told him inventory had been moved from the four warehouses. Second, the company's records used different naming conventions when referring to the four locations.

Third, he testified that inventory reports were run during October for just the four locations, from literally the five, with each one of the four warehouses, and it was around $70 million less than the value that appeared in the last (indiscernible) certificate the company provided to Evolution.

Fourth, from reports that included not just the four warehouses, but the other warehouses that functioned with those warehouses, those values were only $2 million off the last borrowing dates. That borrowing date July 25, he testified that he had $376 million, but inventory reports showing $374 million for the other ones.

THE COURT: So let me ask you a question, Mr. Berezin. How do I know that the inventory in the inventory is their collateral?

MR. BEREZIN: I think that's a different question, Your Honor, I think the question is, at the time --

THE COURT: No, it is a different question. And

I'm trying to get to the heart of the issue.

MR. BEREZIN: Yes. Yes. Today, all we have is the best evidence of where their collateral is. And we do not know other than the four warehouses. Today, knowing what we know after the stipulation expired, we cannot show that there is collateral -- we just don't know.

So we know that there's collateral in the four warehouses. We do not know if that -- if some of that collateral was moved or not.

THE COURT: Okay.

MR. BEREZIN: Today. And I'll explain how we got there after the stipulation expired, but going -- I just want to go back to the intent of the parties and understanding at the time, where we have the four reports, very specific for each warehouse, which is $70, $80 million less than the borrowing base.

And then, we've got a report that shows -- that includes more than the four, which is only $2 million off the borrowing base. Here, Your Honor, this would discuss with Evolution's advisors. They were provided the inventory reports with the four locations, which showed values under $300 million, and which is much less than your $330 million threshold. That's in the stipulation. The one example given is the October 24th report. It shows $287 million, and that's the last report -- the second to last report that

Evolution received before the stipulation.

And then, they were given another report, Your Honor, days before the stipulation was signed. That report did not list the four locations. It used the broader designators WDC and MDC, which is discussed in Mr. Jerkovic's declaration.

It showed $274 million of value. $2 million less than the borrowing date certificate, and certainly well more than the $335 million proposed at that time threshold for the collateral value. So that report was given to Evolution two days before. And again, it didn't even list the four locations.

So Evolution's advisors should've reasonably understood that the value of Evolution collateral that was inventory would be measured based on the parties' understanding at that time by more than the four locations.

Seventh, that makes the $335 million threshold, this evidence of the reports that were shared between the parties, showing that's more sensible. Evolution had in-hand a report for late October that showed the Debtors would get in default day one by like, $40 million.

On the other hand, they had a report given to them two days before that showed we were far in compliance. Which one made sense? Obviously, it made sense that the Debtors would not agree to be in default, and the Debtors in

the course of performance. Because if in fact Evolution thought that it was the four locations and only the four locations, that was everything, and that would determine the value of the $335 threshold.

And on the second day of the stipulation, they should've been banging down our doors. We did not hear from them in November. We did not hear from them until early -- I think around the 5th, or say of December.

More -- and the same is true, Your Honor, when we gave them our weekly reports. We gave them a weekly report on November 14th. We gave them a weekly report on 11/21. Those weekly reports did not even list the four locations. They used the broader definitions WDC, MDC is what they believe, if it was so unreasonable for the parties to believe at the time that it was more than four locations that should be measured that should've been banging on our door at 11/15, that should've been banging on our door at 11/22, they did not.

We didn't hear from them until early December. So the last question is, did the Debtors breach the collateral maintenance threshold based on what the parties reasonably understood their inventories for Evolution collateral, where that was reasonably located during the pendency of this stipulation? And undisputed, undisputed that every single test of every single week of this stipulation exceeded $335.

That, Your Honor, is the gist of why we believe there is no breach. And with that, I can address remedy, if you'd like?

THE COURT: Please.

MR. BEREZIN: And then turn it over to Mr. Dale. Okay. So if the Court decides this agreement (indiscernible), there is a breach, then our view is that we could look to Evolution's motion. Are they -- both in their motion and their reply brief, they requested specifically that the Debtors either perform curative actions in two business days. Curative actions would mean (indiscernible), or inventory or both to get to the $335 threshold. Or, if the Debtors fail within those two business days to cease using, selling, or transferring the Evolution collateral.

So, the Debtors' view is if the Court had decided that there was a breach, we're not going to need two business days, the Debtors will simply stop. We're not -- we know we cannot provide those curative actions, so we will stop using the collateral with all (indiscernible) certainly before two business days run.

THE COURT: Okay. Mr. Dale?

MR. DALE: Your Honor, can you hear me?

THE COURT: Just fine.

MR. DALE: Thank you. I'm sorry, Your Honor, I'm a little hoarse today, so you'll have to forgive me. I think we've gone a little bit backwards here. When we left

your courtroom last Tuesday, what Your Honor had ruled was that the Debtors now had the burden of establishing that there was collateral beyond the four approved warehouse locations.

They're not even attempting to do that today, Your Honor, and I'll get to that. Absent that evidence, Your Honor, I think we've all agreed on the math, and the Debtors' deficiency relative to the collateral maintenance threshold.

So with your indulgence, Judge, I'd like to go back to the beginning, which starts with the Evolution loan documents. I think we've -- I had sent this to Weil, Gotshal an hour or so ago, and with Your Honor's permission, I'd like to share a screen with you just to look at the operative provisions of the loan docs?

THE COURT: Okay. Let's see... Mr. Dale.

MR. DALE: All right. Let's see how this might work, Judge. I think -- can you see that, Your Honor?

THE COURT: Yes, just fine. Thank you.

MR. DALE: Okay. It doesn't appear very large on my screen, so (indiscernible).

THE COURT: Yeah. I can see it just fine.

MR. DALE: You see it?

THE COURT: If --

MR. DALE: Very well. So, okay, Your Honor, we

start with the definition of approved warehouse locations. The second column identifies where in the evidentiary records you would find it. So approved warehouse locations means each warehouse, storage building or other facility owned or operated by First Brands or a third-party warehouseman acceptable to the lender in sole discretion. We've emphasized the words, "in which eligible inventory is located in each case located in the United States as set forth on Schedule 1.1(a)."

Eligible inventory, Judge, is defined as, "finished with inventory consisting of after-market auto parts and accessories similar to finished goods of the borrowers, in each case valued in (indiscernible) market value. And in all instances, it has to reach the following requirement shall have been fulfilled to the satisfaction of the lender," A.

Such inventory is owned by the borrower. Remember, these were special purpose vehicles setup to buy inventory from the First Brand Debtors. B, "The borrower has (indiscernible) qualified right to assign and grant lien on such inventory." E, E says, "Such inventory is located in approved warehouse locations, which is set forth on Schedule 1.1(a) on the effective date."

At the very bottom of that definition, Judge, is the following, "Any inventory, which is at any time eligible

inventory, but which subsequently fails to meet any of the foregoing requirements shall forthwith cease to be eligible inventory until such time as such inventory meets all of the foregoing requirements." What does that mean?

It means that (indiscernible) to four locations, it's no longer collateral. That's what it means. 5.8 in both the Patterson and Starlight agreement says that the borrower shall maintain all eligible inventory, approved warehouse locations.

And lastly, is the schedule attached to each one of these agreements, Schedule 1.1(a), and they identify only those four addresses that are contained in Footnote 4 of the stipulation.

So let's talk briefly, Your Honor -- and I know I've got to stop herein -- about the stipulation. Paragraph 3 and 4 of the stipulation, as Your Honor correctly pointed out last week contained the phrase, "and such other property in which Evolution has asserted an ownership interest or security interest."

We just resolved that problem. Only in those four locations has -- could Evolution assert a security interest. That's it. The Debtor has done nothing, not a thing, to establish collateral outside of those four locations. In fact, my -- Mr. Berezin referred to it as unrebutted. I think Mr. Jerkovic rebutted himself.

Your Honor, he said, "I define the Evolution facilities as four facilities that have specific addresses." That was in the transcript at Page 174, Lines 16 and 17. He said, "I believe that I said in my declarations that my business understanding is that all this collateral, I used the word, would be at these four locations," transcript, Page 199, Lines 6 through 13.

It's not a close call, Your Honor. They haven't -- even if they could establish collateral beyond those four addresses, they haven't and they can't. Pages 2 -- in Paragraphs 2 and 5 of the stipulation, we reviewed these last week, the Debtors granted us replacement liens in Evolution collateral. The Court granted us adequate protection liens in Evolution collateral, which included inventory and proceeds that would include accounts receivable and cash. And we'll come back to that.

So that gets us to the heart of the matter, Your Honor. It's Section 4, starting with 4(a), that provides, "During the term of the stipulation, the Debtors shall not sell or transfer any inventory or otherwise use any assets, including without limitation cash collateral that is Evolution collateral, except as provided in the stipulation."

Paragraph 4(b), you've all talked about, is where we find the collateral maintenance covenant. It says, "The

Debtors shall maintain the Evolution collateral, such that at any true update, the sum of the cost value of the Evolution collateral that is inventory plus all cash deposited in segregated accounts equals or exceeds $170 million, with respect to the Patterson collateral, and $165 million with respect to the Starlight collateral."

That is the defined term collateral maintenance threshold. Paragraph 4(c) establishes that the true updates, Your Honor asked us about true updates last week, on the end of each week. We stipulated to the math, Judge. As of December 5th, this is from -- the inputs are taken from Mr. Jerkovic's declaration at Paragraph 41, the outputs are my own, but Your Honor, can do your own math.

As of December 5th, the true update, the collateral value shortfall, when measured against the threshold, $48,777,238. January 2nd, the collateral value shortfall, $40,249,883. More recently, January 9th, $38,337,636.

So Your Honor, with respect to the breach, the Debtors appear to be saying that the CRL's confusion about the extent of Evolution's inventory informed the phrase that he used often in his testimony last week, his business understanding. That the value of collateral in places beyond approved warehouse locations, would somehow satisfy the collateral maintenance covenant.

Pause on that for one second, Your Honor. What he's saying is that reporting the value of some other lender's collateral would somehow adequately protect Evolution, and would satisfy a covenant that was expressly defined by reference only to a property that Evolution claimed a security interest in.

That, Your Honor, is an unsensible -- to use Mr. Berezin's term -- it's absurd. And the record clearly reflects, Judge, the collateral maintenance covenant found in Paragraph 4(b) can only be understood by the plain words on the page. The Debtors needed to maintain Evolution's collateral in $335 million, nothing less.

I think what the Debtors are really offering here, Judge, as a defense to its breach, they're not putting this label on it, is if they made a mistake. The business people and the lawyers didn't harmonize their thoughts on the implications of the agreement and the words on the page don't match what the CRO told you he understood.

I don't believe there was a mistake here, Your Honor. Go back to November. The Debtors entered in this stipulation early in these proceedings, at a time when the future was bright. There was plenty of money available to buying inventory. I think we can all agree the case hasn't turned out as anyone had hoped. That's not a reason to excuse this breach.

Besides, and although it's purely circumstantial, Judge, we dropped a footnote in our reply, it's no coincidence that every other SPV inventory lender in this case is complaining about the very same problems. We cited complaints about the collateral maintenance and breaches of post-petition adequate protection orders, (indiscernible) onset and carve-out.

There's no question there was a breach here, Your Honor. There's no question what the shortfall was. I think the question is only about remedy. And so, Your Honor, we're happy to address remedy. I think Mr. Berezin had given you his thoughts. I'd like to lay out our thoughts, if you'd indulge me another minute or two.

THE COURT: Absolutely.

MR. DALE: Thank you, Your Honor. The stipulation gives the Debtors three choices, Judge -- find new inventory, deposit cash into a separate account, or stop using the Evolution collateral. The Debtors chose none of the above. And they simply continued to use Evolution's collateral even after we filed our emergency motion almost a month ago.

Now Mr. Berezin made the argument last week and he makes it again today. He says, we're not going to use the collateral because we absolutely cannot post $40-something million dollars. We appreciate that.

So in our reply, knowing that that was the answer, we proposed an alternative, an alternative to the come pick it up idea. We proposed that if they can't post additional cash, but want to continue using the Evolution collateral, that they be directed to escrow 65 percent of every dollar collected on receivables and inventory sold through the completion of the sale.

That would give them 35 percent to cover the costs of operations, which is consistent with their historical margins. And I'll get in a minute to what that doesn't cover.

THE COURT: I'm sorry, can you --

MR. DALE: And --

THE COURT: Mr. Dale, can you repeat that, just that segment? I was writing it down, and I -- can you repeat the --

MR. DALE: We --

THE COURT: Go ahead.

MR. DALE: I understand that the 35 percent is their historical cost of sales. So we would help them cover the cost of running these cases for another six weeks or so.

THE COURT: And you're saying 35 percent from what starting point, from -- in terms of the inventory that's left in there right now?

MR. DALE: Well, Judge, I think 35 percent of

every dollar collected on post-petition AR, and on inventory (indiscernible) -- monies coming in the door and it's going out the door. I mean, they should have to account for it. That money that -- we understand that they had long-dated terms with customers, who Mr. Jerkovic, it looks it's dated as (indiscernible) last week.

And so, now they're dialing for dollars with customers asking them both to buy inventory in cash or close to cash-like terms, seven-day terms, I think he said. And they want people to pay up on their accounts receivable. So to the extent they have success on that, they should have to escrow 65 percent of every dollar collected, because that is the proceeds of the adequate protection that Your Honor gave us last fall.

Now Your Honor, I have to say, the trouble even with our own proposal and the reply with the testimony is Mr. Jerkovic gave you last week. He testified as follows -- "The company's going to run out of money in 10 days to two weeks, and will have exhausted its DIP financing."

He testified to what I just said, which is to help mitigate that problem and to extend the Debtor's runway, give it a chance to run some kind of a sale process. They're going to try to collect about $130 million in post-petition accounts receivable generated by the sale of brake parts inventory, including Evolution inventory. That's one

of three ways that he testified the Debtors are currently (indiscernible) Evolution's position in this case.

He also testified they're asking people to buy brake parts for cash. And they don't propose to escrow any of these dollars, Judge. You heard Mr. Jerkovic say they'd like to save some of that money, but they're going to spend what they need to. And then finally, oh, I had to show him his own proposal to elicit the information.

He conceded that they project Evolution's collateral will decline in value over the next six weeks by $10 to $20 million. So on that factual record, Judge, I respectfully submit that it's really only one remedy here, and that is to prohibit them from using Evolution's collateral, including at inventory, accounts receivable or cash.

Now Judge, I don't want to (indiscernible) -- the comment that you made last week, which we did in fact take to heart. Your Honor mentioned what would happen if the Evolution collateral went out on the sidewalk, the proverbial sidewalk. And believe me, we've actually thought long and hard about that.

And I think you might be surprised at the conclusion we drew, which is this -- this case is one of those rare cases, very rare indeed, where every stakeholder's better off if the assets at First Brands were

liquidated in Chapter 7.

Now why is conversion a better outcome? They have to tell you that was the client's reaction. The answer's simple. It's professional fees. This case is drowning in professional fees, and that is not intended as a shot at the professionals in this case, all of whom have been working very hard to try to accomplish a positive outcome here.

But this case in this company are not what anybody thought only a few months ago. The potential recovery for virtually every stakeholder in this case is now bogged down in professional fees. You have independent directors and their accounts. You have an examiner and his professionals. You have a committee and a full suite of legal and financial advisors. DIP lender and their advisors. TBL lender and their advisors, the Debtor, and his professionals.

Judge, if these cases were converted to Chapter 7, you could have one, possibly two fiduciaries appointed, who hire a single, maybe two sets of professionals to do what the Debtors are currently doing, which is liquidating this business. All talk of additional financing, Judge, that you were hearing about only a few weeks ago from the DIP lenders, there's no talk of that anymore.

This is a liquidation. So the bottom line from our perspective, Your Honor, is that the Debtor should be prohibited from using Evolution collateral. It sounds like

they're willing to do that. You know, Mr. McGuire says that term sheet's going back and forth. We -- let me be clear. I don't like digging -- delving into settlement discussions.

We have not had a response from the ABL lenders. Not one. Now, Mr. McGuire's kind enough to take my phone calls over the weekend, but we had no response, Your Honor. Now if they want to continue using Evolution's collateral, they should have to escrow the money. All of it. Thank you, Your Honor.

THE COURT: Thank you.

MR. BEREZIN: Your Honor, may I have a moment?

THE COURT: You mean in response, or just a moment like we --

MR. BEREZIN: In response, sorry.

THE COURT: Yeah, no, no, no worries.

MR. BEREZIN: In response.

THE COURT: Sure. I'll give you two minutes.

MR. BEREZIN: Thank you, Your Honor. So quickly, on the issue of whether the credit agreement limits the -- Evolution's collateral to eligible inventory, which has to be located in the four locations, that is clearly incorrect.

Eligible inventory is about the borrowing date. It's just whether it's going to be counted towards lended. Period. It doesn't speak to the liens. The liens are in security agreement. And the security agreement is crystal

clear that it's the inventory (indiscernible) wherever located. Full stop.

So there is no way to anchor the stipulation to the credit agreement definition of the eligible inventory. The parties will use that term. They could -- they used Evolution collateral, they lent it to the security agreement and the liens. And that's that. So it is a far broader definition.

Mr. Jerkovic (indiscernible) testimony about Evolution facilities is crystal clear. Evolution facilities is not Evolution collateral. He explained that there's nothing that contradicts what he said in his testimony versus his declaration.

The -- to the extent -- I don't think there's any agreement -- the Debtors are not seeking to sell, transfer, or assign the collateral that Evolution claims to have in those four locations, full stop. Okay? We're going to stop and we're going to stop as soon as we possibly can. That has nothing to do with whether or not we believe the stipulation was violated.

We do vehemently deny that it has been. It has to do with the fact that where these cases are, and we're not going to be doing things unless we have consensus. We hope that we'll have it. But there is no cause for anything else. I cannot tell if Counsel is asking for cash to be

escrowed or not. I would just say that if that were granted, that would put them in a better position than they could've possibly been in under the stipulation.

And that's clear, Your Honor, if you look at 4(c), it says, "If there's a breach and you don't provide the curative actions, then you have to stop selling." That -- the breach they allege is on 12/5, five different (indiscernible) after that is 12/12. Everyone agrees on what the value was at 12/12. It was about $291 million. And the current inventory is $291 million.

So they're in the position they would've been in having just stopped on 12/12. And that's exactly what we're going to do now. So there's no basis, no (indiscernible) basis, whatever for posting cash and doing anything else, even assuming there was a breach, which for all the reasons I said, Your Honor, we do not believe there was.

MR. DALE: Your Honor, let me briefly respond?

THE COURT: Sure.

MR. DALE: Okay, thank you. I don't think there's any doubt, they're offering you no evidence of collateral anywhere else. So even if Mr. Berezin were right, there is no evidence and Your Honor found so (indiscernible) last week. No evidence of collateral anywhere under those four facilities. That's number one.

Number two, we've since stopped using the

collateral. It must mean, and don't be collecting up the $130 million or so post-petition accounts, because that's part of the collateral. And don't be spending it. And don't be selling out the inventory, expending that cash, either. Not using it means not using any of it. Not part of it. Not any of it.

MR. BEREZIN: And Your Honor, if I could, that would put them in a better position than they could ever hope to have been on the stipulation. The stipulation did not give them a lien on inventory that was sold during the pendency of the stipulation. If there is a breach, you have five days, you have to stop. That's it. You -- there's no provision for turning over inventory that was sold during stipulation, especially before there was a breach. It doesn't even make any sense.

So that is an -- unsupported by the terms of the stipulation and it would put them in a far better position at -- to the detriment of all the other stakeholders, especially because, Your Honor, this is (indiscernible), it's our least profitable business. There is no excess money. So we have been selling at our cost, not at Evolution's cost not at Starlight's cost or Patterson's cost.

The Debtors have been saying that its cost, in the (indiscernible) surcharge, even if we went down

(indiscernible), we -- it would vastly overwhelm any residual amount that would exist once we take those costs into account. So there's the record over there, we did not ask for this relief. And it should --

THE COURT: Wait, Mr. Berezin --

MR. BEREZIN: -- we shouldn't be (indiscernible) --

THE COURT: Mr. Berezin, can you just -- I'm sorry, I was looking at one thing and -- can you repeat the point about not granting liens, one more point. Just want to make sure I was following it.

MR. BEREZIN: Yes, of course. So under the stipulation, it says, if there is a breach -- and this is under 4(c), then you have five business days to take those curative actions, and if you don't, padlock your doors. It's end of story.

So the value of the inventory, when we padlock the doors, if we had (indiscernible) with the stipulation that they interpreted, that inventory equals the inventory as of the 18th. So they're in exactly the same position.

If it's not, then go further to say, oh, and by the way, during the stipulation, and actually starting from the first day of the case, which is what I'm hearing Counsel say, starting from the first day of the case until today, every single piece of Evolution's inventory sold out of that

facility, we've (indiscernible). We get the cash. Where does that -- where is that in the stipulation?

MR. DALE: Your Honor --

MR. BEREZIN: Where is that in the -- where is that in their motion? Where is that in --

MR. DALE: (Indiscernible) -- Judge, that's essentially --

MR. BEREZIN: (Indiscernible) the proposed order. Look at the proposed order, Your Honor. It absolutely says two things and two things only. It says, and I -- I'll quote it, "The Debtors are directed to provide Evolution proof of satisfaction of the curative actions no later than two business days on entry of this quarter, with such proof they reasonably (indiscernible) Evolution. If the Debtor fails to perform the curative action in accordance herewith, the stipulation and order shall be deemed automatically and immediately terminated, and the Debtor shall have no further right or authorization to use that or otherwise transfer any of the Evolution collateral, including the (indiscernible) collateral assets for the order of the Court."

That's prospective. That's not retrospective to the beginning of the petition date, which is where Counsel is right now. We're fine locking those doors. If we sell a piece of collateral tomorrow, that's different. And what he's saying is, let's go back to September.

MR. DALE: Your Honor, this is adequate protection 101. We have a lien that you grant us and the Debtors gave us replacement on, both in the inventory and then in what the inventory becomes. In this case, $130 million in post-petition accounts. What Mr. Berezin is saying is a little bit of a sleight of hand, Judge.

Because he's saying, okay, we won't use the inventory, but we're going to collect (indiscernible), which is your collateral. And we're going to spend it. And we're going to do that without asking for cash collateral use. That's not what's on today.

THE COURT: Well --

MR. DALE: They can't do that, Judge. They can't do that under the Bankruptcy Code or your court's order. It's not a close call.

THE COURT: So --

MR. DALE: I mean, the CRO testified, Judge, they want to spend that money and they want to sell the inventory. And the value of the inventory that we're talking about will decline by as much as $20 million in the next six weeks. There's simply no way for them to offer adequate protection, which is why they've offered us nothing.

THE COURT: So I --

MR. DALE: We agree entirely with what Mr. Berezin

said prospectively, not retrospectively.

THE COURT: Let me -- well, let me just kind of tell you what's -- just give me one moment. Okay. So at Docket Number 1076, Evolution Partners filed an emergency motion seeking -- as two forms of relief, but it was titled, "A motion to enforce the stipulation and agreed order regarding adequate protection among the Debtors and Evolution Credit Partners." It was filed on December 23rd.

The Court recently conducted an initial hearing on this motion, and heard evidence between the parties about the motion. Separately, the Debtors, in their response to the motion also filed a request for authority to continue to sell collateral and to certain cash, have on a go-forward basis.

This -- that's where we are. I would note for the record that on November 9th, 2025, the Court approved a stipulation and agreed order regarding adequate protection among the Debtors and Evolution Credit Partners. And the parties stipulated to a few points regarding certain -- it was their entry of a DIP order. And we'll get into more specifics, certain facilities, Debtor borrowers and stipulated agreed terms to the use of their collateral or argument, at least a collateral that is alleged by Evolution Partners during the kind of stipulation period.

And the order permitted Evolution -- excuse me --

the use of the Evolution collateral in the ordinary course through the earlier of January 5th, 2026, and the date that's 90 days after entry of the stipulation by the Bankruptcy Court.

So this stipulation has expired on its own terms on January 5th, 2026. Evolution claims that there was a breach of this stipulation and agreed order. And in the proposed order, seeks the following forms of relief -- asked the Court to direct the Debtors to provide Evolution proof of satisfaction of the -- what is defined terms as the curative actions no later than two days after entry of an order, with such proof being reasonably acceptable as to Evolution.

And, if the Debtors fail to perform the curative actions in accordance with the stipulation, an order will be deemed automatically and immediately terminated, and the Debtors will have no right to use, sell, or otherwise transfer any of the Evolution collateral, including their cash collateral absent further order of the Court.

And I note that this -- the way the motion was filed, it was filed on December 23rd. So as of right now, the stipulation has expired on its own terms. But at the time, Evolution was seeking for immediate termination of the order. So you got to have read -- take that in (indiscernible) context.

But the two forms of relief requested were to require the Debtors to provide satisfaction of the curative actions or to immediately stop the use of cash collateral -- of collateral and cash collateral. There is a number of disputes -- one, as to where -- how one determines whether there was a breach under the disagreement, whether there was a breach.

And then, once the remedy for the breach -- I'd note the Court has jurisdiction, and this is certainly a core proceeding under the Bankruptcy Code. The Court accepts a bit -- a number of documents, but I am -- I'd note just for the record that Fifth Circuit guidance, and there are plenty of cases, I'll cite matter of PFO Global Incorporated 26 F.4th 245, 254, (5th Cir. 2022) case for the proposition.

And it said there, and we're -- it basically says that an order must be enforced, and (indiscernible) the US order must be enforced according to its terms irrespective of the parties' subjective intent. And that is 5th Circuit guidance, but it's also taking that from the Supreme Court Travelers v. Bailey, the pin site for this case would be 557 U.S. -- if the pin site is at 151, 152, it's a -- I think a Supreme Court case, but the Fifth Circuit case is right on point, and it's citing the Supreme Court case, the -- it's 1550 -- 557 U.S. 137, it's the Supreme Court case.

So I turn first, the question is whether the terms of this order are unambiguous. And if they are, I am to enforce them according to their terms, irrespective of the parties' subjective intent. I do find that this order is unambiguous, and I will construe it as such.

I'll note, this one threshold question is to determine the cooperative language is determining whether there was a breach, one must look to the parties at issue, is Paragraph 4(b), which says, "From and after the applicable petition date with respect to what is defined as Evolution inventory facilities, the Debtors shall maintain the Evolution collateral, which is a defined term such that on any true update, which is a defined term, the sum of the cost of the value of the Evolution collateral that is inventory plus all cash segregated -- deposited in segregated accounts, and must equal or exceed $170 million with respect to the Patterson collateral and $165 million with respect to the Starlight collateral." And that's the collateral maintenance covenant.

So 4(c) says that at the end of each week, before the termination of the stip, which is a true update, the Debtors were required to test the collateral value against the collateral maintenance threshold, which is the Starlight collateral and the Patterson collateral that we were just talking about, those numbers, which add up to about $350

million.

If, on the true update, the collateral value is less than the maintenance threshold, the Debtors would be committed -- permitted to cure a deficiency within five business days of the applicable true update by any combination of transferring cash and immediate funds in which the amount of the collateral maintenance threshold exceeds the collateral value into one or more segregated accounts.

However, they could purchase a transfer to the Evolution borrowers free and clear of all liens, new, eligible inventory. Those are determined as the curative actions. So, and if the Debtors exercise that, then the Debtors will be permitted to continue without disruption using the actual -- the collateral.

4(c) also says, "In the event that the Debtors fail to exercise curative actions before the expiration of the five business day period, the Debtors shall be prohibited from continuing to purchase Evolution collateral."

So on the one hand, there's a question about whether this has been satisfied. I'll note a couple of points. There was disagreement between the parties as to how one then determines what the -- one construes the definition of Evolution collateral according to Evolution

Partners.

The focus should be on what is Footnote 4 in the stipulation, where the definition of Evolution collateral is defined and identifies four locations to -- for the Starlight collateral, and two, for the Patterson collateral. And it says -- Footnote 4 says that, "As of the petition date, the Starlight collateral was located" -- and it gives two locations -- "and the Patterson collateral was located at" -- and it provides two locations.

But the definition itself is Evolution collateral. So the question is, initially whether, as the Starlight collateral and definition of Evolution collateral, which includes what is defined as Starlight collateral, and Patterson collateral is limited to these four locations. I'll incorporate my findings from the other prior hearing that I do not believe that it is limited to those four locations.

I would note that the definition of Patterson collateral and Starlight collateral all use the defined term as with respect to any property in which Evolution has asserted an ownership interest, including without limitation inventory. So it really goes to, as defined here, the collateral is defined as any -- as inventory. And they define it here in the stipulation.

So the definition -- the stipulation itself

defines its own terms, and it is referring to any inventory that is asserted under by the Starlight parent and with respect to Patterson, with respect to the Patterson parent. But it includes that collateral and any other property in which Evolution has asserted a security interest.

So it does not -- it refers to a reference as to where this collateral was located on the petition date, but it doesn't indicate where it is located on the date of the stipulation. Therefore, it is possible that there is some Patterson collateral or Starlight collateral, which constitutes Evolution collateral that may have gone -- moved to one location, to another between the petition date and the date of the stipulation.

That would still constitute Evolution collateral because it is just defined as all inventory in which the Starlight parent has a security interest in. And so, it's not limited to geography. The parties, both parties, in one way or another, asked me to look to outside documents, and the actual credit agreements to provide additional light on that. But I don't find that it is necessary, nor do I think it falls within the four corners of this document.

The parties could've easily incorporated those defined terms from one or more credit agreements to define Evolution collateral, Starlight collateral, Patterson collateral. They chose not to. They (indiscernible) chose

to define their own terms, and I'm going to enforce this stipulation as written.

So the question then becomes, at any inventory in which the Starlight -- there could constitute Starlight collateral or Patterson collateral, wherever located is the better reading of this stipulation. It also -- we then have to turn to then Paragraph 4(b).

So Paragraph 4(b) says that the collateral value that has to be determined for the purposes of a true (indiscernible) is the cost of the value of the Evolution collateral that is inventory, plus all cash deposited in the segregated account that equals or exceeds $170 million with respect to the Patterson collateral, and $165 million with respect to the Starlight collateral.

4(c) says that the Debtors are required to test the collateral value against the collateral maintenance threshold, and it is their burden to then true it up, right? And so, the Evolution parties have -- (indiscernible) that there was a breach of this true-up provision because the Debtors could not satisfy the collateral maintenance at this threshold.

It is clear, based upon the evidence, that the value of the collateral at the four locations that are referenced in Footnote 4 would not -- even including the segregated cash -- would not satisfy the collateral

maintenance threshold, right? So the collateral value is -- would not equal or exceed the collateral maintenance threshold, if you just look at those four locations.

Based upon the testimony before the Court, I was open to hearing additional testimony, whether there was additional inventory located. But it's the Debtor's burden, right, under 4(b) and 4(c) to then come up with additional inventory to satisfy the collateral maintenance threshold because that's their burden. And I don't have any additional evidence to show that they did satisfy that burden.

As a matter of fact, the evidence shows that they were -- basically, if you just look at the evidence and all the inventory that was provided to the Court at which the parties agree is inventory that is Evolution collateral then satisfy the collateral maintenance threshold. I gave the Debtors a few more days to see if they could determine whether there was some additional inventory located somewhere else that could constitute this additional inventory that is Evolution collateral. And the Debtors weren't able to do so.

So there has been a breach of the stipulation. So the question then becomes -- and, I would note that the Debtors at no point have been satisfied any of it, what we would call curative actions. So that's never happened,

either, and it didn't happen within the five days, if they were required to do so.

So there has been a breach of -- under 4(c), which is the true-up, under the stipulation. The question is, what's the remedy under the stipulation? What -- it's been requested of the Court by Evolution was to prohibit them from -- either make them cure, provide evidence, or terminate.

They haven't provided any cure and it's too late for them to provide the cure. So the question is, are they prohibited from using Evolution collateral, from continuing to purchase Evolution collateral. Are the Debtors prohibited from continuing to purchase Evolution collateral?

Now we're using it. 4(c) says, "In the event the Debtors fail to exercise curative actions before the expiration of the five-day cure period, five business day cure period, the Debtors are prohibited from continuing to purchase Evolution collateral. That is what the stipulation as provided, and that's a remedy.

Paragraph 11, I would note says that Evolution in its option may terminate the stipulation if the Debtors have materially breached any provision under the stipulation and the breach is not cured within five business days of the breach.

So it's already terminated on its own. But the

two remedies that are provided in this agreement are Debtors can't use Evolution, can't purchase Evolution collateral. And the -- and it's (indiscernible) the stipulation could terminate. There is no remedy for specific performance in this agreement so that the Debtor is not required itself to kind of provide the curative action. It just gives them the option to kind of have five day -- business days to try to cure.

And if they don't cure five -- 4(c) says that the Debtors are prohibited from continuing to purchase Evolution collateral. Paragraph 11, give Evolution the option to terminate the stipulation. So, and none of that would've required court order. But the stipulation has now terminated.

So I do find that there is a breach. The Debtors would not be required to -- by specific performance, have any cure -- to kind of exercise any curative actions or kind of put any money in or put any segregated -- any kind of cash in a segregated account or purchase or transfer to the Evolution partners, new eligible inventory, with the amount that exceeds the collateral maintenance threshold. There was a breach, and they can't use it. And there was -- I do find that there was also a material breach of that provision. And it was not cured within five business days of the breach.

So we have -- both the parties agreed to in the stipulation, just looking at the four corners was the breach and termination. But I do note some other things. So I don't think -- I think the answer to this is that the stipulation is over and the Debtors are prohibited from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court.

It sounds like that's what they're going to do anyway. I do note a couple of other points. And I think it's important to note just so that we're all kind of clear. Paragraph 6 -- excuse me -- Paragraph 5 is the stipulation. It says that, "Evolution, subject to the reservation of rights," because they're still kind of a determination as to a challenge by the Debtors, the DIP secured parties, the pre-petitioned secured parties, the committees and other parties, and interest as to the nature and extent of Evolution's liens in the collateral. That's preserved.

But at the same time, Evolution was granted by court order, right? A first priority automatically perfected lien on any Evolution collateral and the proceeds thereof, subject to the challenge, right? Including without limitation, cash collateral. And the Court granted as adequate protection of those interests in the collateral, but it granted it automatically post -- perfected post-petition, first priority security interests in all of the

presently owned or after acquired property or assets of the Evolution borrowers.

And to the extent of any post-petition diminution in those -- in the interests of that collateral, I also granted and allowed super priority expense claim under 503, 507(a) and 507(b). And it's going to be an allowed claim against the Evolution borrowers with priority over any other admin expenses and any other claims against the Evolution borrowers of any kind. And overall, other admin claims.

So I know that there's a reservation of rights. But the adequate protection is the adequate protection package. And so, there is a post-petition -- there is an adequate protection lien that was granted and a 507(b) admin, super priority admin claim. That just happens.

And now, the nature and the extent of that, whether -- the amount of the diminution and interest and all of that as of particular dates, that's another story for another day. But the Debtors are prohibited from using Evolution, what is constituted here as Evolution collateral without further order of the Court.

And if the parties can agree on something, that would be great because then I hope they do, because this sounds like this collateral, which I understand maybe break parts in some other inventory is going to continue to depreciate.

And I know that there was talk of Chapter 7. I don't want to get into Chapter 7, but what I will say is under any circumstance, I couldn't turn this collateral over to anyone right now until I kind of knew -- resolve the reservation of rights issue, whether someone would come in.

So whoever sells this is going to have to sell it, and it would have to be at a cost. But any assets that -- and what is considered inventory, and we'll just call it what is alleged as Evolution inventory, just for the purposes of what we're talking about now, that -- the proceeds of that cash, until I can determine whether something gets used, absent stipulation of the parties to me is going to have to kind of get parked somewhere in a way that it doesn't get comingled with anything else, that then I can then determine (indiscernible) priority and your priority, one.

Now, I do think that the Debtors were to sell it because they have the best ability to do it, there would be some -- what one would call surcharge rights that kind of get it and sold. And I do think -- I guess what was proposed seemed reasonable to me. It sounds like it'd be a lot more expensive in another Chapter, but based on my experience, but I understand the concern that someone could just sell it and then comingle the cash, and then it's really hard to then make the determination later on as to

whose cash it is and where the cash is.

So I think if the parties are going to agree on it -- if you want to get me comfortable with it, it's going to have to be by agreement of the parties, or the cash is going to have to get parked somewhere where it gets really clear that it's -- that the reservation of rights, in other words, that Evolution Partners can assert their super priority post-petition liens and their super priority claims, and that, you know, Bank of America and others can challenge it, but it's -- but we don't get to do the -- kind of the procedural or more substantive hurdle as to kind of, you know, where is the cash and which exactly was the cash. What cash was it and where are the proceeds that ought to be parked somewhere, where it's really clean for me to make a determination and then someone will get it.

That's really kind of where I am. And I'm not sure that means lock box. I'm not sure that means somewhere, but it -- it's got to stay somewhere, where everybody gets comfortable that the cash is somewhere, and then everybody can assert liens, and then I can kind of make the call at the right time, unless the parties kind of agree to something.

But at the same time, the Debtors aren't going to sell this for free. And I'm not going to give it over to anyone. I do think there's a framework for the party -- for

the parties with an interest in this collateral to have this sold and to make the determination later. But I got it -- until this gets resolved, I think the Debtors would be entitled to what one would call I think a surcharge, if they were the ones that were going to sell it.

But then, the rest of the cash kind of gets parked, and it's not subject to a carveout or a super priority if someone else just kind of drops out. It's just parked somewhere, where I can make a determination, but things get sold. That's kind of the floor. I think the parties can agree on a ceiling, if you will in terms of where we are.

But I think the Debtor has kind of really reached out and prohibit the use immediately until there's further agreement within the parties. And that's going to have a potential harmful diminutae in and of itself. So if there are proposals going back and forth, I think now is the time to really kind of put your cards on the table. And I'm looking at the lenders and Evolution to kind of figure out where we go.

Because you know, what I'm not going to accept is later on arguments that the Debtors somehow allowed this collateral to diminish on their watch. Because I think we're at the point where the parties have to agree on something, or the Debtor can come in and have a -- you know,

a really contested cash collateral fight, but that would be another issue for another day. But I don't think in the first instance it would be on them.

I think Mr. Berezin, I think the -- what you all are planning on doing, it just makes sense to me, to see if the parties can agree. But I think that's going to require you -- your side to then take some action to slow it down. But that's going to have an effect, and I suspect once you slow it down, it's really hard to pick it back up, which is always the case.

And I'm hoping someone calls you and says, before you do that, hold on. Let's see if we can work something out. But as of right now, I think the two pieces of relief requested, quite frankly, were satisfied in connection with this stipulation. And in terms of what the relief -- what Evolution requested, I don't think the stip requires you to put up any curative actions because it just says, if you don't, then you stop, but the stipulation itself has stopped on its own terms.

So I think, just looking at the four corners of the agreement, I don't need to consider anything else. I can just look at the four corners, plus the additional evidence of the -- whether there was any additional inventory, which I don't believe was satisfied based upon the evidence that I heard. So I do think that there was a

breach of the agreement. But that means the termination or stopping. And I think that's where we are. Now that's the ruling I can -- any --

MR. MCGUIRE: Your Honor, this is Dan McGuire. May I ask one just clarifying question?

THE COURT: Sure.

MR. MCGUIRE: Yeah, thank you. Just to be clear, I think I understood that, you know, in terms of cash, that that would be an agreement of the parties. Sale of collateral, it sounded like that could happen with further order of the Court. In other words, we don't want to leave it by the side of the road, you're not going to give it to the ABL lenders to (indiscernible) Evolution to (indiscernible) of the Debtors (indiscernible) the sale because some of this collateral that is their judgment by maximizing, they can bring that to the Court while the proceeds might be parked.

They can seek authority to sell the collateral by the value maximizing they're able to get all (indiscernible) the proceeds (indiscernible). Is my understanding correct, Your Honor?

THE COURT: Yeah, I think that's right. I think somebody can always come to court and ask me for authority to do it. They just -- but everything freezes now until subject to further order of the Court.

MR. MCGUIRE: Very good. Thank you, Your Honor.
THE COURT: All right. Anything else we need to talk about today?
MR. BEREZIN: I don't think so.
THE COURT: All right, folks. Thank you very much.
MR. DALE: Yeah, thank you, Your Honor.
THE COURT: Have a good afternoon.
MAN: Your Honor, thank you.
THE COURT: Thank you.
MAN: Thank you.
(Proceedings adjourned at 4:20 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: January 22, 2026