**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| FIRST BRANDS GROUP, LLC, *et al.*, | Case No. 25-90399 (CML) |
| Debtors.[1] | (Jointly Administered) |

**REPLY IN SUPPORT OF EMERGENCY MOTION OF EVOLUTION CREDIT PARTNERS TO COMPEL TURNOVER AND DEPOSIT OF DISPUTED POST-PETITION ACCOUNTS RECEIVABLE PROCEEDS INTO THE COURT REGISTRY**

Evolution Credit Opportunity Master Fund II-B, L.P. (the "Evolution Inventory Lender" and, together with its affiliated lending entities, Evolution Credit Partners Trade Finance Master, L.P., Evolution Credit Opportunity Master Fund III-B, LP, and certain other Evolution affiliated funds, collectively, "Evolution"), hereby files this reply (the "Reply") to the Objections[2] filed to the *Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds Into the Court Registry* [Docket No. 3792] (the "Motion").[3] In support of this Reply, Evolution respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Objections confirm that Evolution is entitled to emergency relief to address the FBG Debtors' brazen violations of this Court's orders and Section 363 of the Bankruptcy Code.

[1] A complete list of the FBG Debtors in these chapter 7 cases may be obtained on the website of the FBG Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The FBG Debtors' service address for these chapter 11 cases is 127 Public Square, Suite 5300, Cleveland, OH 44114.

[2] The "Objections" refers collectively to (a) the *Trustee's Objection to the Emergency Motion of Evolution Credit Partners to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds Into the Court Registry* [Docket No. 3879] (the "FBG Trustee Objection") and (b) *The Ad Hoc Group's Objection to Evolution's Emergency Motion to Compel Turnover and Deposit of Disputed Post-Petition Accounts Receivable Proceeds Into the Court Registry* [Docket No. 3880] (the "DIP Lender Objection").

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

As the FBG Trustee recounts the tale, the Debtors and Evolution entered into an adequate protection stipulation, that stipulation was indisputably violated, the Court ordered the Debtors to refrain from using any of Evolution's collateral, and the Debtors complied. But that is not the truth.

2. Rather, after this Court ordered the FBG Debtors on January 20, 2026 not to use Evolution Collateral, including cash collateral generated by inventory sales, the FBG Debtors immediately drew down the account holding those funds from $42 million to under $4 million by January 23, 2026.

3. That was a brazen violation of this Court's directive. Contrary to the strawman the Objections attack, this Motion is not a relitigation of the dispute that led this Court to prohibit the FBG Debtors "from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court." Jan. 20, 2026 Hr'g Tr. at 46:4-7. Instead, the Motion addresses the FBG Debtors' blatant disregard of the Court's directive and seeks to ensure that such conduct does not again harm Evolution and irreversibly decimate its property interests.

4. Evolution held liens on proceeds (including cash proceeds) from inventory sales. Under the Court's so-ordered Adequate Protection Stipulation, those liens would be released only "***to the extent*** Evolution Collateral that is inventory ***is purchased and transferred pursuant to the procedures set forth herein***." Stipulation, 4.E.

5. But the FBG Debtors did not comply with the "procedures set forth" in the Stipulation. The Stipulation authorized sales of "Evolution Collateral" by the Evolution SPVs "to the FBG Debtor purchasers" at 102% of cost—and only if the Evolution Collateral value exceeded $335 million.

6. The FBG Debtors now concede, in an interrogatory response served just days ago, that "no purchases, sales, or transfers of inventory occurred between any Evolution SPV Debtor and any FBG Debtor during the Relevant Period, including under paragraph 4.A of the Adequate Protection Stipulation." *See* Exhibit A, Response to Interrogatory No. 8. It is also clear that the Evolution Collateral value never reached the $335 million threshold. Since the FBG Debtors concede no sales compliant with the Stipulation occurred, Evolution's liens were never released, including its liens in the proceeds of inventory sales.

7. On January 20, 2026, this Court confirmed that the Stipulation had been violated. It ordered that "the [FBG] Debtors are prohibited from using or purchasing Evolution cash collateral or Evolution collateral absent further order of the court" and that "the [FBG] Debtors are prohibited from using … what is constituted as Evolution collateral," which unequivocally included the proceeds of inventory sales Jan. 20, 2026 Hr'g Tr. at 46:4-7; 47:18-20. Evolution promptly contacted the FBG Debtors through counsel to determine the amount of Evolution Collateral that had been collected so that those amounts could be segregated, as the Court had directed. *See id.* at 48:9-16 (directing that Evolution Collateral, including the inventory collateral and "the proceeds of that cash, until [the Court] can determine whether something gets used, absent stipulation of the parties to me is going to have to kind of get parked somewhere in a way that it doesn't get commingled with anything else …."). Although the FBG Debtors' counsel represented that the FBG Debtors had not been able to collect receivables from the Warehouses, that proved to be false.

8. According to the FBG Trustee, the FBG Debtors complied with the Court's prohibitions against using Evolution Collateral because "the [FBG] Debtors segregated approximately $1.9 million collected after January 20, 2026." FBG Trustee Objection ¶ 39. But

the Court did not require the FBG Debtors only to segregate ***future*** collections on account of sales of inventory that constitute Evolution Collateral. The Court ordered the FBG Debtors that "***everything*** freezes now until subject to further order of the Court." Jan. 20, 2026 Hr'g Tr. at 52:22-25 (emphasis added). That included "Evolution ***cash collateral***." *Id.* at 46:4-7 (emphasis added). The FBG Trustee speaks only to amounts collected following the Court's hearing but says nothing of the Evolution Collateral the FBG Debtors were then holding.

9. As of January 20, 2026, the account into which the FBG Debtors had deposited inventory-sale proceeds contained over $42 million. Rather than stop transfers from that account and segregate the Evolution Collateral—as the Court ordered—the FBG Debtors promptly depleted it, draining the account to under $4 million over the next three days. Notably, from the Petition Date until January 20, the account had maintained an average daily balance of approximately $83 million.

10. The FBG Debtors' actions were patently improper, and Evolution should not lose its collateral because the FBG Debtors blatantly breached a Court order and the Bankruptcy Code. While the DIP Lenders resist the relief Evolution seeks, refusing to grant it would provide the DIP Lenders a windfall. It is the DIP Lenders—not Evolution—that authorized the use of their cash collateral to fund the FBG Debtors, including their multiple failed attempts at Chapter 11 plans. But rather than use DIP cash, the FBG Debtors used Evolution's cash without its consent or knowledge. As a result, the DIP Lenders' collateral improperly increased, dollar-for-dollar, at Evolution's expense.

11. It is these violations that Evolution has sought to address since it first discovered the collected and withheld Evolution Collateral—***not*** the violation of the Stipulation, as the Objections claim. *See* FBG Trustee Objection ¶ 1; DIP Lender Objection ¶ 1 (both

mischaracterizing this dispute as duplicative of the Court's January 20 Order the FBG Debtors have violated). The Court has the authority to segregate the disputed amount to remedy this egregious breach of its January 20 Order and the Bankruptcy Code. It should grant the Motion so that the proceeds of Evolution Collateral are finally "parked somewhere in a way that it doesn't get commingled with anything else" until the Court can determine the parties' rights to those amounts.

## REPLY

### A. The FBG Debtors Never Complied With the Stipulation, and Evolution's Liens on Evolution Collateral Were Never Released.

12. On November 9, 2025, this Court entered the *Stipulation and Agreed Order Regarding Adequate Protection Among Debtors and Evolution Credit Partners* [Docket No. 609] (the "Stipulation"), governing the FBG Debtors' consensual use of Evolution's inventory collateral, stating that it could be used in the "ordinary course of business through and including … January 5, 2026," but only "subject to the terms and conditions set forth" in the Stipulation. Stipulation ¶ 1. The Stipulation detailed the terms and conditions required for the use of Evolution Collateral.

13. Pursuant to the Stipulation, (a) this Court granted Evolution a first-priority automatically perfected lien on Evolution Collateral and the proceeds thereof (subject to the Evolution Collateral Review), and (b) the FBG Debtors were permitted to use Evolution Collateral subject to certain specific restrictions. *See id.* ¶¶ 2, 4-5; Jan. 20 Hr'g Tr. 46:18-47:2.

14. Evolution Collateral is defined to include all of the assets of the relevant borrowers, "including, without limitation, accounts, accounts receivable (including all receivables covered by the Evolution Receivables Facility), and inventory, together with the products and proceeds (***including cash proceeds***) of each of the foregoing." *Id.* at 4 (emphasis added). The Stipulation

reiterated that except for "true sales or cash sweeps in paragraph 4[,] …. Evolution shall … retain its asserted ownership interest, first-priority liens, and/or other rights with respect to any Evolution Collateral, including, without limitation, pre- and ***postpetition accounts receivable generated from the sale by any Debtor at any time of any Evolution Collateral and any cash collections in respect of Evolution Collateral***." *Id.* ¶ 2 (emphasis added).

15. The Stipulation made clear that "the [FBG] Debtors shall not sell or transfer any inventory, or otherwise use any other assets (***including, without limitation cash collateral***) that is Evolution Collateral, except as provided in this Stipulation." *Id.* ¶ 4.A (emphasis added).

16. On the same date, this Court entered the Final DIP Order, which expressly excludes the SPV Debtors and all of their assets from the DIP collateral package: "For the avoidance of doubt, and notwithstanding anything to the contrary herein or in the DIP Documents, none of the SPV Debtors are DIP Guarantors. Nothing in this Final Order or any of the DIP Documents shall grant any liens or claims against any of the SPV Debtors or any assets of SPV Debtors or the proceeds thereof …." Final DIP Order ¶ 22(p).

17. The FBG Debtors concede that they never complied with the Stipulation. *See* Exhibit A, Response to Interrogatory No. 8. As a result, Evolution's liens on the Evolution Collateral—which includes "the proceeds (including cash proceeds)" from inventory in which Evolution claimed an interest—were never released. Stipulation at 4; *see also supra* ¶¶ 3-8, *infra* ¶¶ 24, 34.

18. Section 4.E of the Stipulation states that "***to the extent*** Evolution Collateral that is inventory is ***purchased and transferred pursuant to the procedures set forth herein***, all of Evolution's right, title, and interest in, to, and under such Evolution Collateral … shall be transferred to the applicable FBG Debtor free and clear of any and all liens, claims, or

encumbrances."[4] Sections 4.A and 4.C establish two requirements for purchases and transfers pursuant to the Stipulation. Section 4.A authorizes sales of "Evolution Collateral" by the "Evolution Borrowers"—i.e. the Evolution SPVs—"to the FBG Debtor purchasers for 102% of the cost value of the Evolution Collateral," in either cash or in Eligible Inventory (as defined under the Evolution SPV financing documents). Under Section 4.C, "the [FBG] Debtors shall be prohibited from continuing to purchase Evolution Collateral" if the Evolution Collateral value fell below $335 million.

19. The FBG Debtors now concede that "no purchases, sales, or transfers of inventory occurred between any Evolution SPV Debtor and any FBG Debtor during the Relevant Period, including under paragraph 4.A of the Stipulation." *See* Exhibit A, Response to Interrogatory No. 8. They also previously made clear that the Evolution Collateral value never met or exceeded $335 million. Jan. 20 Hr'g Tr. at 13:2-6; Docket No. 1285. As a result, no inventory was "purchased and transferred pursuant to the procedures" of the Stipulation, there was no consent to use Evolution Collateral, including cash collateral, and Evolution's liens on the proceeds of its inventory collateral were never released.

20. On December 23, 2025, Evolution filed its *Emergency Motion to Enforce Stipulation and Agreed Order Regarding Adequate Protection Among the Debtors and Evolution Credit Partners* [Docket No. 1076], alleging the FBG Debtors had breached the collateral maintenance covenant in the Stipulation. At that time, Evolution made clear that it objected to the

[4] Although the DIP Lenders (DIP Lender Obj. at ¶ 16) claim that "Evolution simply wishes the words in the agreements were different," the DIP Lenders purport to quote Section 4.E of the Stipulation while omitting, without indication, the words "[t]o the extent Evolution Collateral that is inventory is purchased and transferred pursuant to the procedures set forth herein." That clause makes clear that inventory is transferred "free and clear" only *to the extent* it is transferred *in compliance* with the Stipulation, which it was not. *Compare* Stipulation 4.E *with* [Docket No. 3880 ¶ 14].

use of Evolution Collateral, including cash collateral. [Docket No. 1076] ¶ 14. Additionally, the Stipulation terminated on its own terms on January 5, 2026. Stipulation ¶ 1.

21. Whether the Stipulation's paths for use of Evolution Collateral terminated on November 21 as a result of the immediate failure to cure the Collateral Maintenance Threshold breach (*see supra* ¶ 19), December 23 (*supra* ¶ 20), or January 5 (*id.*), there is no dispute that the FBG Debtors had no consent to use Evolution Collateral by the Court's January 20 hearing and should already have been segregating Evolution cash collateral. Section 363(c)(2) of the Bankruptcy Code prohibits the use of cash collateral unless "each entity that has an interest in such cash collateral consents" or "the court, after notice and a hearing, authorizes such use." 11 U.S.C. § 363(c)(2). The statutory prohibition is absolute, as is the requirement to segregate any such prohibited cash collateral. Section 363(c)(4) expressly requires a debtor in possession to "segregate and account for any cash collateral in [its] possession, custody, or control," unless Section 363(c)(2) applies.

**B. <u>The FBG Debtors Admit They Continued to Use Evolution Collateral Without Consent in Violation of the Bankruptcy Code and Court Orders</u>.**

22. The Stipulation provided a path to allow the FBG Debtors to convert Evolution Collateral comprising inventory into cash that the FBG Debtors could use: they could buy the inventory from the Evolution SPVs at 102% of the cost of the inventory, in exchange for either cash (which would be segregated) or Eligible Inventory, Stipulation § 4.A, and they could do so only so long as the Evolution Collateral exceeded $335 million, *id.* § 4.C. Without those requirements satisfied, the inventory was not "transferred to the applicable FBG Debtor free and clear of any and all liens, claims, or encumbrances," *id.* § 4(E), and Evolution retained a lien on the transferred inventory and the proceeds of any sales of such inventory, *id.* at 4; *see* U.C.C. § 9-315(a)(1) (a security interest "continues in collateral notwithstanding sale, exchange, or other

disposition thereof unless the secured party authorized the disposition free of the security interest"); *id.* § 9-315(a)(2) (a security interest "attaches to any identifiable proceeds of collateral").

23. The FBG Debtors unquestionably never followed that path. They concede they never transferred any collateral pursuant to Section 4.A, and there is no dispute the Evolution Collateral never met or exceeded $335 million. *See supra* ¶ 19. As a result, Evolution retained its lien in "the proceeds (including cash proceeds)" of any inventory sales. Stipulation at 4. The FBG Debtors, however, continued to sell inventory without complying with the Stipulation, and used the proceeds of those sales without Evolution's consent, in clear violation of Section 363(c)(2). Exhibit A, Response to Interrogatory No. 8. That is now beyond dispute.

24. At the January 20 hearing, the Court determined that the FBG Debtors violated the Stipulation. *See* Jan. 20, 2026 Hr'g Tr. at 43:22-45:6. To protect Evolution's interests in the Evolution Collateral, the Court prohibited the FBG Debtors from "using … Evolution cash collateral … absent further order of the Court." *Id.* at 46:3-7. The Court reiterated that "the [FBG] Debtors are prohibited from using … what is constituted here as Evolution collateral without further order of the Court," *id.* at 47:18-20—collateral which, again, expressly includes "the proceeds (including cash proceeds)" of inventory sales. Stipulation at 4.

25. The FBG Debtors did not follow the Court's January 20 Order. As they now concede, the account holding those proceeds contained $42,172,393 on January 20, 2026. Exhibit A, Response to Interrogatory No. 3. Identifying those proceeds should have been easy; the Cash Management Order required the FBG Debtors to "maintain … accurate and current records with respect to all transfers of cash and non-cash setoffs (including Intercompany Transactions) so that all prepetition and postpetition transfers and transactions, including Intercompany Transactions,

may be readily ascertained, traced, and recorded properly." Cash Management Order [Docket No. 604] ¶ 10. But rather than obey the Court's directive "prohibit[ing]" them "from using … what is constituted here as Evolution collateral," the FBG Debtors drew down that account to $3,825,502 over the next three days. Exhibit A, Response to Interrogatory No. 3. That is egregious.

26. On January 24, when Evolution and the FBG Debtors were able to meet, the FBG Debtors told Evolution they had not collected any material amount of Evolution Collateral. Thereafter, they continued to draw down the account, which reached a low of $3,357,925 on June 3, 2026. Only once they had drained the account did the Debtors, in response to repeated requests by the Evolution SPV Trustee, finally provide Evolution with reporting detailed enough to uncover their earlier deception.

27. The FBG Debtors' conduct is inexcusable in any context, but especially so here. On December 23, 2025, Evolution made its position absolutely clear: "Evolution ***does not consent*** to the use of the Evolution Collateral (including cash collateral) if the Debtors are not in compliance with the terms of the Stipulation," and "[a]ny unauthorized use would constitute a clear violation of Section 363(c) and (e) of the Bankruptcy Code." Docket No. 1076 ¶ 14 (emphasis added). The FBG Debtors continued to use the cash anyway. Even after the Stipulation terminated by its own terms on January 5, 2026, the FBG Debtors continued to use Evolution Collateral, collecting (and then using) $8.5 million in receivables after that date and, it appears, continuing to sell inventory without any consent stipulation or other protection being in place or other protections as required by the Bankruptcy Code. *See* Exhibit B (Columns titled MDC and WDC); *see also* Jerneycic Declaration [Docket No. 3879-1] ¶ 10.

28. The Objectors contend that the FBG Debtors complied with the January 20 Order because they "identified and segregated all proceeds from alleged Evolution collateral received

after January 20, 2026." FBG Trustee Objection ¶ 25; *see also* DIP Lender Objection ¶ 10 (same). But the Evolution Collateral held by the Debtors was not limited to ***future*** receipts—it also included all "proceeds (including cash proceeds)" the FBG Debtors were holding from past inventory sales that did not comply with the Stipulation or occurred when the Stipulation was not in effect. Millions of dollars improperly disappeared as a result. The Court cannot have meant to protect only post-January 20 collections, the Court was implementing a remedy which should already have been in place. *See* Jan 20 Hr'g Tr. at 51:16-19 ("I don't think the stip requires you to put up any curative actions because it just says, if you don't, then you stop, but the stipulation itself has stopped on its own terms."). Nowhere did the Court authorize the FBG Debtors to spend nearly $20 million of Evolution's collateral proceeds that they had already collected—including millions collected following the indisputable termination of any vestige of consensual collateral use—without a clear order authorizing such use.

29. The Objectors' attempts to evade responsibility fail.

30. *First*, the FBG Debtors argue (FBG Trustee Obj. at ¶¶ 34, 45) that the Motion "presumes what Evolution has yet to establish: that it holds a valid, first priority interest in the funds it seeks," and that Evolution "cannot carry that burden by assuming the answer to the very question the Inventory Adversary has yet to decide." The DIP Lenders likewise contend (DIP Lender Obj. at ¶¶ 5, 17) that the cash at issue is subject to the DIP Secured Parties' "automatically perfected, first-priority liens," and that Evolution "has no lien on the FBG Debtors' property or accounts."

31. Both arguments misstate Evolution's burden and ignore this Court's prior ruling. As a matter of law, Evolution does not have to ***establish*** it has the superior lien. As Judge Rosenthal held, "bankruptcy courts addressing requests for relief that raise questions about an

asserted property interest should assess only whether the party asserting the interest has made a prima facie showing of the validity and scope of that interest." *In re First Brands Grp., LLC*, 2026 WL 253634, at *3 (S.D. Tex. Jan. 31, 2026). Moreover, this Court already held that "Evolution was granted by court order … a first priority automatically perfected lien on any Evolution collateral and the proceeds thereof, subject to the challenge, …. [i]ncluding, without limitation, cash collateral." Jan. 20 Hr'g Tr. 46:18–47:2. Evolution has more than carried its burden at this stage.

32. *Second*, the Objectors argue that *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999) and Rule 7001(g) bar Evolution's requested relief, construing it as a request for a preliminary injunction. Not so. Evolution simply requests compliance with the Bankruptcy Code, which prohibits the use of cash collateral without consent or adequate protection. 11 U.S.C. § 363(c)(2), (e); *see also In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764, 768 (Bankr. E.D. Tex. 2001) ("A debtor-in-possession is absolutely prohibited from using cash collateral unless it obtains the consent of the affected secured creditor or an authorization from the bankruptcy court."). Because the FBG Debtors have shown they have no qualms about ignoring this fundamental restriction, Evolution has requested that the funds be placed in the Court's registry pending resolution of the ownership dispute. That does not concern *Grupo Mexicano* or Rule 7001(g), but rather basic bedrock principles of cash management.

33. Regardless, "courts generally consider themselves unrestrained by *Grupo Mexicano* when the plaintiff asserts a security interest in the property at issue," which is precisely the case here. *Matrix Partners VIII, LLP v. Nat. Res. Recovery, Inc.*, 2009 WL 175132, at *4 (E.D. Tex. Jan. 23, 2009); *see also Turnkey Offshore Project Servs., LLC v. JAB Energy Sols., LLC*, 2021 WL 3509677, at *7 (E.D. La. Aug. 10, 2021) ("If a plaintiff asserts a lien or equitable claim in the

particular assets it seeks to freeze[,] … the court may enter a preliminary injunction freezing a defendant's assets pending judgment."); *City of Alexandria v. Cleco Corp.*, 2010 WL 5256346, at *3 (W.D. La. Dec. 16, 2010) (noting that *Grupo* does not apply when a party asserts "an equitable lien on the property" at issue).

34. *Third*, the FBG Debtors argue (at FBG Trustee Obj. ¶ 33) that emergency relief is not appropriate because Evolution has not shown that the receivables "have been, or are being, dissipated on the Trustee's watch post-conversion." But the FBG Debtors are currently seeking authority to use an unspecified amount of cash under the motion for authority to operate, ECF No. 3796—which is precisely why both parties requested a status conference on the outstanding motions. Moreover, the DIP Lenders have already announced their intent, with the FBG Trustee's apparent consent, to sweep the FBG Debtors' remaining assets for themselves so that no other creditors may assert their rights. *See* DIP Lender Obj. ¶ 1.

35. *Finally*, the FBG Debtors argue that Evolution has no recourse for the FBG Debtors' violation of the Court's orders and the Bankruptcy Code, because the Court "'did not require the Debtors take … curative actions or post cash collateral,' [but] required only that they stop purchasing and using the asserted Evolution collateral." FBG Trustee Objection ¶ 25. This is a complete red herring. The Court may not have required the FBG Debtors to go back and generate new cash collateral to replenish Evolution Collateral, but it did not hold that the FBG Debtors' improper sales somehow released Evolution's lien on the proceeds of those sales. Those liens remained, and the Court ordered the FBG Debtors not to use "what is constituted here as Evolution collateral," Tr. at 47:18-20, which unequivocally includes "proceeds (including cash proceeds)" from inventory sales. Stipulation at 4. Moreover, the Court plainly did not authorize the use of Evolution cash collateral collected subsequent to the Stipulation's termination.

### C. <u>Tracing Cannot Operate as a Bar to Evolution's Requested Relief</u>.

36. The Objections argue that Evolution's requested relief cannot be obtained because Evolution has failed to adequately trace the Evolution Collateral from the FBG Debtors' collections bank accounts to the FBG Debtors' existing cash on hand, which both Objectors claim is entirely comprised of DIP Collateral. *See* FBG Trustee Objection ¶ 40; DIP Lender Objection ¶ 18. Evolution did not have the records to conduct any tracing until the FBG Debtors finally produced them on October 16, 2026, and is still missing documents sufficient to complete a full tracing analysis, despite having demanded production. And in any event, the Objectors inappropriately shift the burden to Evolution, when it is in fact their burden to demonstrate protection of Evolution's interests.

37. The FBG Debtors argue that "Bankruptcy Rule 7001(b) requires, with exceptions not relevant here, that every determination of the 'validity, priority, or extent of a lien or other interest in property' be made in an adversary proceeding" and that "in seeking to dictate what is done with the Debtors' cash collateral, the Motion also presumes what Evolution has yet to establish: that it holds a valid, first priority interest in the funds it seeks." [Docket No. 3879 ¶ 34]; *see also id.* ¶ 45 (stating that Evolution cannot "carry its burden on the threshold question of whose property generated these proceeds"). But the FBG Debtors already lost this argument twice.

38. *First*, as explained above, Evolution need not ***establish*** that it has the superior lien. As Judge Rosenthal held, "bankruptcy courts addressing requests for relief that raise questions about an asserted property interest should assess only whether the party asserting the interest has made a prima facie showing of the validity and scope of that interest." *First Brands Grp.*, 2026 WL 253634, at *3.

39. *Second*, this Court has already determined that Evolution's lien is valid and senior in priority (subject to the Evolution Collateral Review). The Court affirmatively granted

Evolution's liens post-petition, and the FBG Debtors stipulated to the validity of those liens under the Stipulation. *See, e.g.*, Jan. 20 Hr'g Tr. 46:18-47:2 ("Evolution was granted by court order … a first priority automatically perfected lien on any Evolution collateral and the proceeds thereof, subject to the challenge, right? Including, without limitation, cash collateral. And the Court granted as adequate protection of those interests in the collateral … automatically perfected post-petition, first priority security interests in all of the presently owned or after acquired property or assets of the Evolution borrowers."). Evolution has already carried its burden on these questions.

40. It is the FBG Trustee, not Evolution, that has failed to meet its burden. The Objectors ignore the FBG Debtors' burden to demonstrate that Evolution's interests were adequately protected—a burden they cannot meet, because Evolution Collateral was dissipated without Evolution's consent. And while they argue that "Evolution asks for $21.2 million of gross receipts to address at most an approximately $5 million decline in the value of the inventory allegedly constituting Evolution's collateral," they ignore that the Evolution Collateral should have increased rather than diminished (as the Evolution Collateral Maintenance Threshold makes clear), Stipulation ¶ 4.B, and that the FBG Debtors now concede that they used the proceeds for purposes other than acquiring additional inventory. *See* Exhibit A, Response to Interrogatory No. 3.

41. Regardless, Evolution is not arguing about diminution but instead that the FBG Debtors converted Evolution Collateral without consent after the Stipulation terminated, and against this Court's explicit direction. Evolution's liens are still attached to the proceeds of inventory sales, as made clear by the Stipulation. Stipulation at 4, ¶¶ 2, 4.E. Even if that were not the case, it is the FBG Trustee's burden to demonstrate appropriate protections against unauthorized use of cash collateral, which it has not attempted to do. *See Four Seasons*, 263 B.R. at 769-70 ("The Bankruptcy Code could not be more explicit as to the duty imposed upon a debtor-

in-possession to account for a creditor's cash collateral. A debtor-in-possession is absolutely prohibited from using cash collateral unless it obtains the consent of the affected secured creditor or an authorization from the bankruptcy court. In the absence of such consent or authorization, a debtor-in-possession is under an absolute obligation to segregate and to account for all such cash collateral. These principles are not subject to dispute.").

**D. <u>The Equities Weigh in Favor of Evolution's Requested Relief</u>.**

42. Cash is fungible. Pursuant to the budget the DIP Lenders approved, the FBG Debtors spent cash. Docket No. 608 ¶ 16. That cash should not have included Evolution Collateral because Evolution never provided consent. Instead, it should have consisted only of DIP collateral. The DIP Lenders should not receive a windfall by authorizing the release of cash to which they had no right while preserving the cash in which they claim an interest. Doing so would improperly increase the DIP Lenders' collateral—which they were willing to deplete under their authorized budget—at Evolution's expense. Nothing prevents the Court from unraveling that transaction. *See, e.g.*, *Four Seasons*, 263 B.R. at 769-71 (noting that § 105 "allows the court to fashion an appropriate remedy where the Code is silent," including for "misuse of cash collateral"); *In re Q-C Cirs. Corp.*, 231 B.R. 506, 513-14 (E.D.N.Y. 1999) (ordering disgorgement of money by unauthorized recipient of cash collateral to secured creditor which did not consent to use of cash collateral); *see also In re Visicon S'holders Tr.*, 478 B.R. 292, 318 (Bankr. S.D.Oh. 2012) (unwinding transaction and ordering the return of fees paid to an attorney because the payment was made in violation of the secured lender's cash collateral agreement).

43. To illustrate, assume a Consenting Lender and an Objecting Lender each has $10 of cash collateral. The Consenting Lender authorizes the debtor to use its $10, which would leave it with $0. If the debtor instead uses the Objecting Lender's $10, it would make no sense to give

the Consenting Lender a windfall by protecting its $10 while the Objecting Lender is improperly harmed.

44. Beyond basic common sense, the Bankruptcy Code provides tools to claw back improperly disbursed funds. An increase to the amount the DIP Lenders have as collateral at the expense of Evolution is a "transfer" of property to the DIP Lenders "that is not authorized under this title or by the court" and can thus be set aside. 11 U.S.C. §§ 549, 550(a)(1); *see also* 11 U.S.C. § 101(54) (defining transfer to include "the creation of a lien" and "each mode, direct ***or indirect***, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property" (emphasis added)). Because Evolution asserts an interest in that cash, it cannot be used until that dispute is resolved. *First Brands Grp.*, 2026 WL 253634, at *3 (explaining that "the substantive consideration of … evidence" on a creditor's claimed interest "should stop as soon as it appears that the party asserting the property interest has a colorable claim to the property in question" (cleaned up)).[5]

45. For these reasons, the FBG Debtors' reliance on *Four Seasons* and *Fontainebleau* is misplaced. In *Four Seasons*, the court acknowledged its equitable authority to rectify a misuse of collateral but declined to do so because, in that chapter 7 liquidation, restoring the secured creditor's position would harm uninvolved unsecured creditors and would "punish[] the wrong parties." *Four Seasons*, 263 B.R. at 771. That is not the case here. The DIP Lenders are the only parties that benefited: having authorized the use of cash, they received a windfall of extra cash collateral to which they are not entitled.

[5] Citing *In re Realty Sw. Assocs*., 140 B.R. 360 (Bankr. S.D.N.Y. 1992), the FBG Debtors argue (FBD Debtor Obj. at ¶ 44) that "section 363 does not authorize a court to compel return of a creditor's cash collateral," but that is irrelevant. Evolution contends in the Motion that its cash collateral remains with the Debtors and should not be spent, which is precisely what Section 363(c)(2) is designed to prevent.

46. In *Fontainebleau*, the term loan lenders demanded a priming lien on another creditor's collateral as a condition for the use of the term lenders' cash collateral. *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 725 (S.D. Fla. 2010). Evolution is not demanding a priming lien. It is instead asserting its interest in the cash that remains in the FBG Debtors' estates, and to which the DIP Lenders do not validly have an entitlement.

47. At a minimum, the FBG Debtors concede that $3,721,077 was the lowest intermediate balance for the accounts that contained Evolution Collateral, and Evolution is entitled to that amount. *See* Exhibit A, Response to Interrogatory No. 5. The "lowest intermediate balance" tracing method, as applied by this Court, assumes that the funds being traced are used by the account holder only after funds from other sources have been exhausted. *In re Brown Med. Ctr., Inc.*, No. AP 15-3229, 2017 WL 8677359, at *3 (S.D. Tex. Aug. 25, 2017). As a result, a creditor's lien on cash deposited into a commingled account survives to the extent of the lowest balance in the account at any time after the deposit. *In re Martin*, 25 B.R. 25, 28 (Bankr. N.D. Tex. 1982). The balance never fell below $3,721,077, so Evolution holds a lien on at least that amount. While the DIP Lenders stated (DIP Lender Obj. at ¶ 20) that "Evolution is not entitled to that amount," they provide no explanation for that position, and the law is to the contrary.

## CONCLUSION

48. For the reasons set forth herein, Evolution respectfully requests that the Court overrule the Objections to the Motion, grant the Motion, and grant such other and further relief as the Court deems appropriate under the circumstances.

Respectfully submitted this 19th day of October 2026.

**GRAY REED**

By: *<u>/s/ Jason S. Brookner</u>*
Jason S. Brookner
Texas Bar No. 24033684
Emily F. Shanks
Texas Bar No. 24110350
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
eshanks@grayreed.com

- and -

**PROSKAUER ROSE LLP**
Vincent Indelicato (admitted *pro hac vice*)
Matthew R. Koch (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: vindelicato@proskauer.com
mkoch@proskauer.com

- and -

Charles A. Dale (admitted *pro hac vice*)
One International Plaza
Boston, MA 02110-2600
Telephone: (617) 526-9600
Email: cdale@proskauer.com

- and -

Jordan E. Sazant (admitted *pro hac vice*)
70 W Madison St., Ste. 3800
Chicago, IL 60602
Telephone: (312) 962-3800
Email: jsazant@proskauer.com

*Counsel to the Evolution Inventory Lender*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 19th day of October 2026, he caused a true and correct copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jason S. Brookner*
Jason S. Brookner

# EXHIBIT A

## Interrogatory Responses

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| FIRST BRANDS GROUP, LLC, *et al* | ) | Case No. 25-90399 (CML) |
| | ) | Jointly Administered |

**FIRST BRANDS GROUP, LLC'S OBJECTIONS AND ANSWERS**
**TO EVOLUTION CREDIT PARTNERS' FIRST SET OF INTERROGATORIES**

To: Evolution Credit Partners, c/o Elsberg Baker & Maruri PLLC, Gray Reed, Proskauer Rose LLP

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable by Rules 7026, 7033, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), Eva S. Engelhart, solely in her capacity as chapter 7 trustee (the "Trustee") of the estates of First Brands Group, LLC and its affiliated debtors (collectively, the "FBG Debtors"), by and through her undersigned counsel, submits these responses and objections (the "Responses") to Evolution's First Set of Interrogatories to First Brands Group, LLC dated October 1, 2026 (the "Interrogatories," and each, an "Interrogatory"), served by Evolution Credit Opportunity Master Fund II-B, L.P. and its affiliates (collectively, "Evolution") in connection with Docket Nos. 3144, 3792, and 3796 (the "Contested Matters").

Dated: October 16, 2026.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*

Joshua W. Wolfshohl
Texas Bar No. 24038592
Eric M. English
Texas Bar No. 24062714
Shane M. Johnson
Texas Bar No. 24083263
Grecia V. Sarda
Texas Bar No. 24132092
1000 Main Street, FL 36
Houston, Texas 77002
(713) 226-6000 - telephone
jwolfshohl@porterhedges.com
eenglish@porterhedges.com
sjohnson@porterhedges.com
gsarda@porterhedges.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of October, 2026, he caused a true and correct copy of the foregoing document to be served upon the following counsel via email:

David Elsberg (delsberg@elsberglaw.com)
Michael Duke (mduke@elsberglaw.com)
Vivek Tata (vtata@elsberglaw.com)
Andrew Parks (aparks@elsberglaw.com)
Ella Epstein (eepstein@elsberglaw.com)
Jason S. Brookner (jbrookner@grayreed.com)
Emily F. Shanks (eshanks@grayreed.com)
Vincent Indelicato (vindelicato@proskauer.com)
Matthew R. Koch (mkoch@proskauer.com)
Charles A. Dale (dale@proskauer.com)

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

## PRELIMINARY STATEMENT

The Trustee was appointed on September 1, 2026, upon conversion of the FBG Debtors' chapter 11 cases to chapter 7. The Trustee has no personal knowledge of the FBG Debtors' pre-conversion operations, accounting, cash management, or reporting. These Responses are based on the FBG Debtors' books and records and on information provided by the FBG Debtors' former professionals, including Alvarez & Marsal North America, LLC ("A&M"). The Trustee's investigation is ongoing, and the Trustee reserves the right to supplement or amend these Responses. Where the Trustee elects to answer by reference to business records under Federal Rule 33(d), she will specify those records by Bates number.

## GENERAL OBJECTIONS

1. The Trustee objects to the demand that answers be served by 5:00 p.m. Eastern Time on October 12, 2026, eleven days after service. Federal Rule 33(b)(2) provides 30 days to respond. The Trustee will serve these Responses, and any supplementation, on a schedule to be agreed among counsel.

2. The Trustee objects to the Interrogatories to the extent they are overbroad, unduly burdensome, vague, ambiguous, or not proportional to the needs of the Contested Matters under Federal Rule 26(b)(1).

3. The Trustee objects to the Interrogatories to the extent that, including discrete subparts, they exceed the 25 interrogatories permitted by Federal Rule 33(a)(1). The Trustee reserves the right to decline to answer interrogatories in excess of that limit.

4. The Trustee objects to the Interrogatories to the extent they require the Trustee to create new analyses, compilations, or tracings not maintained in the ordinary course of business, or to perform a dollar-by-dollar tracing of commingled funds through the FBG Debtors' cash management system.

5. The Trustee objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the work-product doctrine, the common-interest privilege, or any other privilege or protection, including the substance of communications between the Trustee, her counsel, and her advisors.

6. The Trustee objects to the Interrogatories to the extent they incorporate disputed allegations, including that any Receivables or Warehouse Receipts constitute Evolution's collateral or property of the Evolution SPV Debtors. Nothing in these Responses is an admission that Evolution holds any interest in any funds of the FBG Debtors' estates.

7. The Trustee objects to the Interrogatories to the extent they seek information already provided to Evolution, including reporting delivered under the Adequate Protection Stipulation and documents produced in Adversary Proceeding No. 25-03800.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. The Trustee objects to the definitions of **"you," "your,"** and **"FBG Debtors"** to the extent they include A&M, Hilco, and other advisors and representatives, and the Trustee herself. The Trustee answers on behalf of the FBG Debtors' estates based on information reasonably available to her.

2. The Trustee objects to the definitions of **"Receivables," "Warehouse Receipts,"** and **"Warehouses"** as vague and premised on disputed facts. At the time of the January 20, 2026 hearing, the FBG Debtors did not track collections on account of inventory sourced from the Warehouses, or at any level below the BPI business unit. *See* Declaration of Daniel Jerneycic **[**Docket No. 3879-1] (the "Jerneycic Declaration") ¶ 8.

3. The Trustee will construe "Receivables" to mean accounts receivable generated by post-petition sales of inventory sourced from BPI's Midwest Distribution Center ("MDC") and West Coast Distribution Center ("WDC"), and "Warehouse Receipts" to mean collections on those Receivables. This over-inclusive construction is not an admission that any such Receivable arose from inventory located at a Warehouse.

4. The Trustee objects to the definition of **"Petition Date"** as September 24, 2025. The FBG Debtors filed their chapter 11 petitions on September 28, 2025, and the Trustee will use that date.

5. The Trustee objects to the definition of **"Identify"** to the extent it requires the identification of Bates numbers for documents not yet produced, or home addresses of current or former employees. The Trustee will identify persons by name, employer, and title, and may be contacted through counsel.

6. The Trustee objects to Instruction Nos. 4 and 6 through 8 to the extent they impose obligations beyond those of Federal Rule 33, and to Instruction No. 9 to the extent it requires a privilege log for communications with counsel after the Petition Date or after the Trustee's appointment.

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1: Identify every bank account that received customer payments on the Receivables during the Relevant Period. For each bank account, Identify the account holder, bank, account number, and the role or purpose of the bank account (e.g., concentration, disbursement, Factored Receivables Account, etc.).**

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory to the extent it seeks full account numbers, which are identified below by their last four digits and will be provided in full only subject to the Protective Order (ECF No. 408).

Subject to and without waiving these objections, the Trustee states that, based on the FBG Debtors' books and records and information provided by A&M, customer payments on Receivables, as construed above, were received into the following four collection accounts (the "BPI Collection Accounts"):

(a) Brake Parts Inc LLC (Lockbox) — Account holder: Brake Parts Inc LLC; Bank: Bank of America, N.A.; Account number ending: 7312; Role: lockbox collection account.

(b) Brake Parts Inc LLC (Master Account) — Account holder: Brake Parts Inc LLC; Bank: Bank of America, N.A.; Account number ending: 7294; Role: collection account.

(c) Centric Collection Account — Account holder: Bowery Finance, LLC; Bank: Wells Fargo Bank, N.A.; Account number ending: 0667; Role: collection account.

(d) Brake Parts — Account holder: Bowery Finance, LLC; Bank: Wells Fargo Bank, N.A.; Account number ending: 3518; Role: collection account.

Funds received into the Lockbox and the Master Account were transferred to the FBG Debtors' main concentration account held by First Brands Group LLC at Bank of America, N.A. (Account number ending 6975) (the "Concentration Account"). Funds received into the Centric Collection Account were transferred to the Concentration Account, and funds in the Brake Parts account were transferred to the Concentration Account through November 2025 and, beginning in December 2025, to the FBG Debtors' investment account held by First Brands Group LLC at Bank of America, N.A. (Account number ending 9852) (the "Investment Account"). Collections on Receivables received on and after January 21, 2026 were placed in two segregated accounts with account numbers ending 1438 and 8871, one designated for Starlight and one for Patterson (the "Segregated Accounts"). The Segregated Accounts were opened as the segregated accounts contemplated by paragraph 4.C of the Adequate Protection Stipulation but were not used until the FBG Debtors began segregating collections after the January 20, 2026 hearing. *See* Jerneycic Declaration ¶¶ 7, 10–11.

**<u>INTERROGATORY NO. 2:</u> Identify the date of receipt, amount, invoice date, source, and receiving bank account of each Warehouse Receipt.**

**<u>ANSWER:</u>**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as seeking information not maintained in the ordinary course of business and as unduly burdensome to the extent it requires a narrative listing of each of the tens of thousands of individual receipts.

The Trustee states that from the Petition Date through June 5, 2026, approximately $21.2 million of receipts on Receivables were collected. Of that amount, approximately $19.5 million was collected before the January 20, 2026 ruling, of which approximately $17.5 million was received into the Lockbox and the Master Account and approximately $2.0 million into the Centric Collection Account and the Brake Parts account. *See* Jerneycic Declaration ¶ 11. Receipts on Receivables collected on and after January 21, 2026 are held in the Segregated Accounts, which held approximately $1.9 million as of October 9, 2026. *See id.* ¶ 10.

**<u>INTERROGATORY NO. 3:</u> Identify whether any portion of the Warehouse Receipts has been spent, disbursed to non-FBG Debtor third parties, or otherwise no longer exists in a bank account that the FBG Debtors control. For each such portion, state the amount and the date(s) of disbursement, the account(s) from which Warehouse Receipts were disbursed, the payee(s), and the purpose of each payment.**

**<u>ANSWER:</u>**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as unduly burdensome and not proportional to the extent it requires the Trustee to trace individual dollars through a commingled concentration account to specific payees, which is not possible from the FBG Debtors' records and would require the creation of an analysis not maintained in the ordinary course of business.

Subject to and without waiving these objections, the Trustee states as follows. As to collections on Receivables received before January 21, 2026, Warehouse Receipts were not disbursed from the BPI Collection Accounts to third parties. They were transferred to the Concentration Account or, for the Centric Collection Account and the Brake Parts account beginning in December 2025, to the Investment Account, where they were commingled with collections from the FBG Debtors' other business units, debtor-in-possession financing proceeds, and other funds. As to collections on Receivables received on and after January 21, 2026, those funds were placed in the Segregated Accounts, which held approximately $1.9 million as of October 9, 2026; those funds have not been spent, disbursed to third parties, or commingled with other estate funds. *See* Jerneycic Declaration ¶¶ 7, 10–11.

Funds in the Concentration Account were used in the ordinary course of the FBG Debtors' business, including transfers to business-unit disbursement accounts for vendor payments, payroll,

and insurance; funding of the employee-liability reserve; funding of the professional fee escrow and other escrow accounts; transfers to and from the FBG Debtors' interest-bearing accounts; and transfers to the Factored Receivables Account, including approximately $25.7 million transferred on March 19, 2026 pursuant to the Court's order at Docket No. 2127. The Concentration Account balance declined from approximately $42,172,393 on January 20, 2026 to approximately $3,825,502 on January 23, 2026, and to approximately $3,357,925 on June 3, 2026. Of the decline between January 20 and January 23, 2026, approximately $23 million was used on January 23, 2026 to fund payroll-related expenses.

The Trustee further answers pursuant to Federal Rule 33(d) by reference to the bank statements for the BPI Collection Accounts and the Concentration Account produced alongside these Objections and Answers.

**INTERROGATORY NO. 4: For each portion of the Warehouse Receipts that was transferred from the initial receiving account to any other FBG Debtor account, Identify**:

a. The date and amount of each such transfer;

b. The account holder, financial institution, and account number of both transferor and transferee;

c. The identity of the person who authorized the transfer, or whether it was an automatic sweep;

d. Whether the transfer moved the entire balance of the transferor account; and

e. For each subsequent transfer of funds out of the transferee account to another account of any FBG Debtor, the information requested in subparts (a) through (d), continuing until the funds were disbursed to a person or entity other than an FBG Debtor or remained on deposit as of the date of your response.

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as containing multiple discrete subparts, and objects to subpart (e) as unduly burdensome, not proportional, and impossible to answer to the extent it presumes that commingled funds can be traced dollar-for-dollar through successive transfers.

Subject to and without waiving these objections, the Trustee states that funds in the BPI Collection Accounts identified in response to Interrogatory No. 1 were transferred as follows: funds in the Lockbox and the Master Account were transferred to the Concentration Account (First Brands Group LLC, Bank of America, N.A., Account number ending 6975), funds in the Centric Collection Account were transferred to the Concentration Account and funds in the Brake Parts account were transferred to the Concentration Account through November 2025 and, beginning in December 2025, to the Investment Account (First Brands Group LLC, Bank of America, N.A., Account number ending 9852). *See* Jerneycic Declaration ¶ 7. The Lockbox, the Centric Collection Account, and the Brake Parts account were swept daily: on each day those accounts received

deposits, the deposits were transferred out the same day. From September 29, 2025 through January 23, 2026, transfers from the BPI Collection Accounts totaled approximately $47,179,549, which includes collections on BPI receivables other than Receivables. As of January 23, 2026, the Lockbox, the Centric Collection Account, and the Brake Parts account had zero balances, and the Master Account held approximately $2,906,303.

As to collections on Receivables received before January 21, 2026, once in the Concentration Account, funds were commingled and were not thereafter separately identifiable as Warehouse Receipts. As to collections on Receivables received on and after January 21, 2026, funds transferred to the Concentration Account were identified and transferred from the Concentration Account to the Segregated Accounts, where they remain on deposit. The Trustee further answers pursuant to Federal Rule 33(d) by reference to the bank statements produced alongside these Objections and Answers, which reflect the date and amount of each transfer.

**INTERROGATORY NO. 5: Identify the amount of Warehouse Receipts, if any, that remain on deposit in any account under the control of the FBG Debtors and Identify each such account. If no Warehouse Receipts remain, state the facts supporting that conclusion.**

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory to the extent it presumes that any funds held by the FBG Debtors' estates are traceable to Warehouse Receipts or subject to any interest of Evolution.

Subject to and without waiving these objections, the Trustee states that approximately $1.9 million, representing collections on Receivables on and after January 21, 2026, remained on deposit in the Segregated Accounts as of October 9, 2026. *See* Jerneycic Declaration ¶ 10.

As to collections before January 21, 2026, the following facts limit the amount of any Warehouse Receipts that could remain on deposit. Customer payments on Receivables were received only into the four BPI Collection Accounts, and funds in those accounts were transferred to the Concentration Account, or, beginning in December 2025, from the Brake Parts account to the Investment Account. As of January 23, 2026, the Lockbox, the Centric Collection Account, and the Brake Parts account each had a zero balance. The Master Account held approximately $2,906,303, but only approximately $26,384 of Receivables was ever deposited into that account, so no more than that amount of its balance could derive from Receivables. The Concentration Account balance fell to approximately $3,825,502 on January 23, 2026. Moreover, subsequent to January 23, 2026, as of June 3, 2026, the Concentration Account balance dipped to approximately $3,357,925, the lowest balance reflected in the daily balance records through September 1, 2026. Because funds that leave an account are not replaced by later deposits from other sources, any Warehouse Receipts that reached the Concentration Account could not exceed that balance.

On and after January 21, 2026, collections on Receivables were segregated as described above, so no later deposits into the Concentration Account were Warehouse Receipts. The Investment Account, which received transfers from the Brake Parts account beginning in December 2025, reached a low balance of approximately $363,152 in February 2026. *See* Jerneycic Declaration ¶

11. Accordingly, even assuming, contrary to fact, that every dollar remaining in those accounts at their lowest balances derived from Receivables, no more than approximately $3.75 million (approximately $3,357,925 in the Concentration Account, $363,152 in the Investment Account, and $26,384 in the Master Account) in the FBG Debtors' accounts could derive from collections on Receivables before January 21, 2026. The Trustee does not concede that any portion of that amount derives from Receivables. All other funds in the Concentration Account were derived from other sources.

**<u>INTERROGATORY NO. 6:</u> For each account that received any Warehouse Receipts, and for the FBG Debtors' cash on a consolidated basis, identify whether the balance fell below $21.2 million at any time after the first Warehouse Receipt was deposited, and if so, Identify each date on which it did so and the lowest balance reached.**

**<u>ANSWER:</u>**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as overbroad and not relevant to the extent it seeks the FBG Debtors' consolidated cash balances, which include accounts that never received Warehouse Receipts, debtor-in-possession financing proceeds, and restricted funds. The Trustee further objects to identifying "each date" in narrative form as unduly burdensome, and answers that portion pursuant to Federal Rule 33(d).

Subject to and without waiving these objections, the Trustee states that the balance of each BPI Collection Account was below $21.2 million at all times from September 29, 2025 through September 1, 2026**.** The highest balance in any BPI Collection Account during that period was approximately $4,300,053, in the Master Account on March 3, 2026. Through January 23, 2026, the highest balance in the Master Account at any point was approximately $2,906,303. The Lockbox, the Centric Collection Account, and the Brake Parts account were swept daily, and as of January 23, 2026 each had a zero balance. Each BPI Collection Account had a zero balance on September 1, 2026.

The Concentration Account balance fell below $21.2 million on numerous dates after September 29, 2025, including approximately $6,412,330 on December 10, 2025; approximately $3,825,502 on January 23, 2026; and approximately $3,357,925 on June 3, 2026, which is the lowest balance reflected in the daily balance records through September 1, 2026. The lowest balance through January 23, 2026 was approximately $3,825,502 on that date.

The Investment Account began receiving transfers from the Brake Parts account in December 2025, and its lowest balance was approximately $363,152 in February 2026. *See* Jerneycic Declaration ¶¶ 7, 11.

The Trustee further answers pursuant to Federal Rule 33(d) by reference to the daily cash balance records and bank statements produced alongside these Objections and Answers.

**INTERROGATORY NO. 7: Identify each person with knowledge of the receipt, deposit, transfer, or use of the Warehouse Receipts, and describe the subject of each person's knowledge.**

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as overbroad and not proportional to the extent it seeks the identity of every person with any knowledge, and will identify the persons she understands to have principal knowledge. The Trustee further objects to the extent it seeks the identity of counsel or the substance of privileged communications. The Trustee has no personal knowledge of these matters and has identified the persons below based on the FBG Debtors' records and information from A&M; her investigation is ongoing.

Subject to and without waiving these objections, the Trustee identifies the following persons.

(a) Christopher Moffatt, Senior Director, A&M — the FBG Debtors' cash management system, the BPI Collection Accounts and Concentration Account, sweeps, and daily cash balances.

(b) Matt Uhrin, Director, A&M — the cash-application analysis matching receipts to MDC- and WDC-sourced inventory and the segregation of collections on and after January 21, 2026.

(c) Daniel Jerneycic, Managing Director, A&M, and former co-Chief Restructuring Officer of the FBG Debtors (October 23, 2025 through conversion) — the BPI Collection Accounts and their transfers, the methodology agreed with Evolution's advisors after the January 20, 2026 ruling, the Segregated Accounts, and the June 2026 retroactive analysis identifying approximately $21.2 million in receipts.

(d) Charles M. Moore, Managing Director, A&M, and former Chief Restructuring Officer of the FBG Debtors — the FBG Debtors' post-petition cash position and use of cash.

(e) BPI treasury and accounts receivable personnel responsible for receipt and application of customer payments during the Relevant Period, including Joe Salvia, Vice President of Finance, and members of his team.

**INTERROGATORY NO. 8: Identify each transaction, from the Petition Date through January 20, 2026, in which any FBG Debtor purchased inventory from any Evolution SPV Debtor pursuant to paragraph 4.A of the Adequate Protection Stipulation. For each such transaction, state:**

**a. The date of the transaction and the FBG Debtor and Evolution SPV Debtor involved;**

**b. The SKUs, quantities, and cost value of any inventory purchased from the Evolution SPV Debtor;**

c. **The form and amount of any consideration provided to the Evolution SPV Debtor, including (1) for cash, the Segregated Account into which it was deposited and the amount, and (2) for inventory, the SKUs, quantities, cost value, and how the FBG Debtor designated the inventory as owned by the Evolution SPV Debtor;**

d. **Whether the consideration equaled at least 102% of the cost value of the inventory purchased; and**

e. **Each document recording the transaction, including but not limited to, invoices and other transaction documents.**

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as containing multiple discrete subparts and as unduly burdensome to the extent it requires a narrative, SKU-level description of each transaction. The Trustee further objects to the extent it presumes that the Evolution SPV Debtors owned any inventory, and notes that paragraph 4.A of the Adequate Protection Stipulation permitted purchases only during the Interim Period, which ended January 5, 2026.

Subject to and without waiving these objections, the Trustee states that no purchases, sales, or transfers of inventory occurred between any Evolution SPV Debtor and any FBG Debtor during the Relevant Period, including under paragraph 4.A of the Adequate Protection Stipulation. The inventory at issue was recorded on BPI's books. As BPI inventory was sold to third-party customers, it was replaced with like-kind Eligible Inventory purchased or manufactured by the FBG Debtors, and the FBG Debtors focused on compliance with the Collateral Maintenance Covenant. Although the Segregated Accounts were opened, no cash was deposited into them until the FBG Debtors began segregating collections after the January 20, 2026 hearing.

**INTERROGATORY NO. 9: For each week during the Relevant Period, Identify the level of inventory held at each Warehouse (or, if Warehouse-level data does not exist, at the WDC or MDC facility), stating the week-ending date, quantity and cost value by SKU, and whether the quantity and cost value of any inventory was designated as owned by an Evolution SPV Debtor or as collateral of Evolution.**

**ANSWER:**

Subject to and without waiving the foregoing General Objections, Objections to Definitions, and Objections to Instructions, all of which are incorporated herein by reference, the Trustee objects to this Interrogatory as unduly burdensome and not proportional to the extent it requires a narrative, SKU-level listing for every week of the Relevant Period, and to the extent such data was not maintained weekly in the ordinary course.

Subject to and without waiving these objections, the Trustee states that, based on BPI's inventory sub-ledger, the inventory at the Warehouses had a book value of approximately $293 million as of

January 20, 2026 and approximately $295 million as of June 26, 2026. *See* Jerneycic Declaration ¶ 11.

The Trustee further answers pursuant to Federal Rule 33(d) by reference to both the weekly inventory reports for the Warehouses and other BPI locations produced alongside these Objections and Answers, and to those previously produced to Evolution, including but not limited to the following:

FBG_EVL_AP_00040915
FBG_EVL_AP_00040916
FBG_EVL_AP_00040919
FBG_EVL_AP_00040922
FBG_EVL_AP_00040934
FBG_EVL_AP_00040936
FBG_EVL_AP_00040938
FBG_EVL_AP_00040940
FBG_EVL_AP_00040942
FBG_EVL_AP_00040945
FBG_EVL_AP_00040946
FBG_EVL_AP_00040949
FBG_EVL_AP_00040950
FBG_EVL_AP_00040952
FBG_EVL_AP_00040953
FBG_EVL_00026865
FBG_EVL_00026866
FBG_EVL_00026867
FBG_EVL_00026868
FBG_EVL_00026869
FBG_EVL_00026870
FBG_EVL_00026871
FBG_EVL_00026872
FBG_EVL_00026873
FBG_EVL_00026874
FBG_EVL_00026875
FBG_EVL_00026876
FBG_EVL_00026877
FBG_EVL_00026878
FBG_EVL_00026879

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| FIRST BRANDS GROUP, LLC, *et al* | ) | Case No. 25-90399 (CML) |
| | ) | Jointly Administered |

**VERIFICATION IN SUPPORT OF FIRST BRANDS GROUP, LLC'S OBJECTIONS AND ANSWERS TO EVOLUTION CREDIT PARTNERS' FIRST SET OF INTERROGATORIES**

I, Eva S. Engelhart, declare as follows:

1. "I am the duly appointed chapter 7 trustee (the "Trustee") of the estates of First Brands Group, LLC and its affiliated debtors (collectively, the "FBG Debtors") in the above-captioned jointly administered chapter 7 cases. I was appointed on September 1, 2026, upon conversion of the FBG Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. I make this verification solely in my capacity as Trustee and not in any individual capacity.

2. I have read the foregoing First Brands Group, LLC's Objections and Answers to Evolution Credit Partners' First Set of Interrogatories (the "Answers").

3. I do not have personal knowledge of the facts stated in the Answers, including those concerning the FBG Debtors' operations, accounting, cash management, bank accounts, inventory, or reporting before my appointment. In preparing the Answers, I have relied on the FBG Debtors' books and records and on information provided by persons who do have personal knowledge or who maintained or reviewed those records. These persons include the FBG Debtors' former professionals, including Alvarez & Marsal North America, LLC and its personnel, and my counsel. As Trustee, I am entitled to rely on such records,

persons, and professionals in administering the FBG Debtors' estates, and I believe that reliance to be reasonable.

4. Based on that reliance, the factual statements in the Answers are true and correct to the best of my knowledge, information, and belief. Approximate figures stated in the Answers are stated as reflected in the FBG Debtors' records and in information provided to me, and are subject to revision as additional records are reviewed. My investigation is ongoing, and I reserve the right to supplement or amend the Answers.

5. The objections stated in the Answers were made by my counsel, and this verification does not extend to them."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

____________________________________
Eva S. Engelhart

SUBSCRIBED and SWORN to before me, the undersigned notary public, on this 16 day of October, 2026

CHRISTINE ESCAMILLA
Notary ID #125482119
My Commission Expires
October 31, 2029

____________________________________
Notary Public in and for the State of Texas

# EXHIBIT B

## Post-Petition Accounts Receivable Collections by Location

**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER (DKT. 408)]**