# **Exhibit 1**

## Purchase Agreement

# REAL ESTATE PURCHASE AGREEMENT

705 N Fayette Street, Fayette, Ohio 43521

This Real Estate Purchase Agreement (this "Agreement") is made as of the 15th day of October, 2026 (the "Effective Date"), by and between EVA ENGELHART, Chapter 7 Trustee, solely in her capacity as Chapter 7 Trustee of the bankruptcy estate of In re First Brands Group, LLC, et al., Case No. 25-90399 (CML), pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") ("Seller" or the "Trustee"), and VENTURES IN SPACE FAYETTE, LTD., an Ohio limited partnership, whose address is 11495 State Route 15, Montpelier, Ohio 43543 ("Buyer"). Seller and Buyer are referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

**A.** Seller holds, as property of the estate, the real property and improvements located at 705 N Fayette Street, Fayette, Fulton County, Ohio 43521, identified as Parcel No. 19-039072-00.000 on the records of the Fulton County Auditor;

**B.** On April 16, 2026, the Bankruptcy Court entered the Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter into and Perform under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief [Case No. 25-90399, Docket No. 2454] (the "Wind Down Order"), which, among other things, authorizes the sale contemplated by this Agreement, free and clear of liens, claims and encumbrances, subject to the notice and other procedures set forth in it;

**C.** On September 1, 2026, the Bankruptcy Court entered the Order (I) Converting Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief [Case No. 25-90399, Docket No. 3748];

**D.** Seller desires to sell, and Buyer desires to purchase, that property on the terms set forth in this Agreement, pursuant to the Wind Down Order; and

**E.** Buyer has inspected the Real Property (as defined herein), is familiar with its physical condition and with the operations historically conducted there, and is purchasing on an as-is basis, without representation or warranty of any kind, subject only to this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth below and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## 1. PROPERTY

**1.1 Real Property.** Seller shall sell and convey to Buyer, and Buyer shall purchase from Seller, all of the estate's right, title and interest in and to the real property identified as Parcel No. 19-039072-00.000 on the records of the Fulton County Auditor, commonly known as 705 N Fayette Street, Fayette, Ohio 43521, and as more particularly described on Exhibit A, together with the estate's right, title and interest in and to all buildings, structures and improvements located thereon, and all rights, privileges, easements, appurtenances and hereditaments related thereto (collectively, the "Real Property").

**1.2 Fixtures and Building Systems.** The Real Property includes, to the extent physically present on the Effective Date on the land legally described on Exhibit A, and the Purchase Price is paid for, the estate's right, title and interest in and to all fixtures and building systems, whether or not readily

removable, including without limitation: the roof, structural steel, columns, framing, foundations and slabs; exterior walls, windows, doors and overhead doors; electrical service entrances, transformers, switchgear, panels, bus duct, conduit and permanently installed wiring; lighting fixtures; overhead cranes, crane rails, runways, bridges and hoists; heating, ventilating, air-conditioning and make-up air units; compressed air lines and piping; plumbing, water, sewer and gas lines and equipment; fire suppression systems, sprinkler mains, risers, pumps and alarm systems; dock levelers, dock seals, bumpers and restraints; exhaust and dust collection systems attached to the improvements; fencing, paving, lighting and site improvements; and all similar items affixed to or serving the improvements (collectively, the "Fixtures"). The Fixtures are part of the Real Property and are not subject to removal under Section 9.

**1.3 Remaining Personal Property.** In addition to the Real Property, Seller shall convey to Buyer at Closing, pursuant to Section 3.4, all personal property of the estate that is physically present at the Real Property as of the Closing (the "Remaining Personal Property"). The allocation of the Purchase Price to the Remaining Personal Property is set forth in Section 2.1. Seller makes no representation or warranty as to the existence, quantity, condition, value or title of any Remaining Personal Property, and Buyer accepts all Remaining Personal Property AS IS, WHERE IS, WITH ALL FAULTS. The Remaining Personal Property shall be conveyed subject to Section 11.1.

**1.4 Free and Clear.** The Real Property and the Remaining Personal Property (collectively, the "Property") shall be conveyed free and clear of all liens, claims, encumbrances and other interests (collectively, "Encumbrances," as such term is defined in the Wind Down Order) pursuant to Section 363(f) of the Bankruptcy Code, solely to the extent provided in the Sale Authority, subject only to the Permitted Exceptions (as defined herein), with all such Encumbrances attaching to the net proceeds of sale with the same validity and priority, and to the same extent, as provided in the Wind Down Order.

## 2. PURCHASE PRICE AND DEPOSIT

**2.1 Purchase Price.** The aggregate purchase price for the Property is THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (the "Purchase Price"), payable in cash or immediately available funds at Closing, subject to the prorations and adjustments in Section 7. Of the Purchase Price, TWO MILLION NINE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($2,950,000.00) is allocated to the Real Property and FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) is allocated to the Remaining Personal Property.

**2.2 Deposit.** Within two (2) Business Days after the Effective Date, Buyer shall deposit THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($300,000.00) (the "Deposit") with The Title Company of Northwest Ohio, LLC, 117 W. Maple Street, Bryan, Ohio 43506, Attn: Mike Shaffer, mshaffer@nssblawoffice.com (the "Escrow Agent"), to be held in a non-interest-bearing account pending Closing. The Deposit shall be applied to the Purchase Price at Closing. The Escrow Agent shall also act as the title insurance agent issuing the Title Commitment and the owner's policy of title insurance contemplated by Section 3.3 (in such capacity, the "Title Agency"). TIME IS OF THE ESSENCE WITH RESPECT TO BUYER'S OBLIGATION TO DELIVER THE DEPOSIT. BUYER'S FAILURE TO TIMELY DELIVER THE DEPOSIT SHALL CONSTITUTE A MATERIAL DEFAULT HEREUNDER, and Seller may terminate this Agreement upon twenty-four (24) hours' written notice to Buyer, whereupon Buyer shall have no further right to acquire the Property pursuant to this Agreement.

**2.3 Return of Deposit.** The Deposit shall be returned to Buyer in full within two (2) Business Days after the Escrow Agent's receipt of written notice of any termination described below, and without further order of the Bankruptcy Court, upon any termination of this Agreement under Sections 3.3, 5.6,

6.1, 6.3, 8.4, 9.3 or 10.1, or upon any termination other than a termination by Seller under Section 11.2 on account of Buyer's default. The Deposit is not property of the estate unless and until this Agreement is terminated by Seller under Section 11.2 on account of Buyer's default, at which time the Deposit shall become property of the estate and shall be released to Seller in accordance with Section 11.2. Buyer's right to the return of the Deposit shall be preserved in the Sale Authority. Upon receipt of a written demand from either Buyer or Seller for disbursement of the Deposit, the Escrow Agent shall promptly deliver a copy of such demand to the other Party. If the other Party objects in writing within two (2) Business Days after receipt of such demand, the Escrow Agent shall continue to hold the Deposit and shall not disburse it to either Party unless and until the Escrow Agent receives joint written instructions from Buyer and Seller or a final order of the Bankruptcy Court directing the disposition thereof. If the other Party does not timely object, the Escrow Agent may disburse the Deposit in accordance with the demand.

**2.4 No Financing Contingency.** Buyer acknowledges that Seller has entered into this Agreement in reliance upon Buyer's representation that it has the financial capacity to consummate the transaction contemplated hereby. Buyer's obligations under this Agreement are not subject to any financing contingency, and neither Buyer nor any assignee of Buyer shall have any right to terminate this Agreement, delay Closing, or obtain the return of the Deposit by reason of the unavailability of financing from any source.

## 3. TITLE INSURANCE CONTINGENCY

**3.1 Title Commitment and Survey.** No later than two (2) Business Days following the Effective Date of this Agreement, Buyer shall order, at its expense, a commitment for an ALTA owner's policy of title insurance from the Title Agency (the "Title Commitment") in the amount of the Purchase Price, together with legible copies of all recorded exceptions, and may obtain, at its expense, an ALTA/NSPS Land Title Survey (the "Survey"). Buyer shall deliver to Seller a copy of the written order confirmation for the Title Commitment promptly after placing the order, but in no event later than the expiration of such two (2) Business Day period. TIME IS OF THE ESSENCE WITH RESPECT TO BUYER'S OBLIGATIONS TO TIMELY ORDER THE TITLE COMMITMENT AND DELIVER THE WRITTEN ORDER CONFIRMATION TO SELLER. BUYER'S FAILURE TO TIMELY SATISFY EITHER OBLIGATION SHALL CONSTITUTE A MATERIAL DEFAULT HEREUNDER, and Seller may terminate this Agreement upon twenty-four (24) hours' written notice to Buyer if Buyer has not cured such failure before the expiration of the notice period, whereupon Buyer shall have no further right to acquire the Property pursuant to this Agreement.

**3.2 Intentionally Deleted.**

**3.3 Contingency.** Buyer's obligation to close is expressly contingent upon the Title Agency being willing, at Closing, to issue an ALTA owner's policy of title insurance in the amount of the Purchase Price, insuring fee simple title in Buyer, subject only to the Permitted Exceptions and in reliance upon the Sale Authority. "Permitted Exceptions" means (i) real estate taxes and assessments not yet due and payable, (ii) governmental easements, utility easements, easements, rights-of-way, covenants, conditions, restrictions, reservations, declarations, licenses, appurtenances, encroachments, matters of record, building lines, setback lines, zoning ordinances, land use regulations, governmental requirements and restrictions, and other non-monetary title matters affecting the Real Property, whether or not disclosed by the Title Commitment or Survey, (iii) all matters disclosed by the Title Commitment or Survey (other than mortgages, mechanics' and materialmen's liens of record, judgment liens and other monetary Encumbrances, which shall attach to the net proceeds of sale as provided in Section 1.4), and (iv) any other matters accepted by Buyer in writing. Notwithstanding the foregoing, any Encumbrance removed, released, discharged or otherwise extinguished pursuant to the Sale Authority

shall not constitute a Permitted Exception. Seller shall deliver a certified copy of the Wind Down Order in accordance with Section 5.1. Buyer shall promptly notify Seller in writing if Buyer or the Title Agency determines that the certified Wind Down Order or other Sale Authority may be insufficient to permit the issuance of the policy required by this Section and shall promptly provide Seller with copies of any written determination, objection or underwriting requirement received from the Title Agency concerning the sufficiency of the Sale Authority. If, after Seller has had the opportunity to obtain any Confirmatory Order pursuant to Section 5.4, the Title Agency is unwilling to issue such policy solely because the Sale Authority is insufficient to authorize the transfer free and clear of Encumbrances that are not Permitted Exceptions, Buyer may terminate this Agreement by written notice to Seller, and the Deposit shall be returned to Buyer in accordance with this Agreement. Buyer shall have no right to terminate based upon any matter constituting a Permitted Exception or any endorsement, affirmative insurance, survey coverage, other coverage or underwriting requirement not expressly required by this Section.

**3.4 Conveyance.** At Closing, Seller shall execute and deliver to Buyer a trustee's deed, without recourse or warranty, in recordable form, conveying all of the estate's right, title and interest in and to the Real Property to Buyer subject to the Permitted Exceptions and otherwise free and clear of all Encumbrances to the extent provided by the Sale Authority, including Section 363(f) of the Bankruptcy Code. The Remaining Personal Property shall be quitclaimed and transferred automatically to Buyer at Closing pursuant to Section 1.3, and this Agreement shall constitute the bill of sale and assignment for the Remaining Personal Property, without any separate bill of sale, assignment or other instrument of transfer. Seller shall also deliver to the Escrow Agent a certified copy of the Wind Down Order and any Confirmatory Order not previously delivered, together with such customary ministerial affidavits as the Title Agency reasonably requires and as Seller can provide based solely upon Seller's actual knowledge, without representation, warranty, recourse or personal liability, and all keys, access codes and available plans, permits, manuals and warranties relating to the Real Property that are actually in Seller's possession or control. Seller shall not be required to provide any owner's affidavit or analogous document, indemnity, guaranty, escrow, surety, letter of credit or other credit support, any certification or affidavit concerning matters outside Seller's actual knowledge, or any post-Closing undertaking or liability, in each case as a condition to Closing or the issuance of the title insurance policy contemplated by Section 3.3.

## 4. ENVIRONMENTAL CONTINGENCY

**4.1 Phase I.** Buyer has completed, at its sole cost, a Phase I Environmental Site Assessment of the Real Property (the "Phase I") and has delivered a copy of the Phase I to Seller. Buyer acknowledges that it has completed its environmental diligence, has elected not to conduct a Phase II Environmental Site Assessment or other invasive testing, and shall have no further environmental inspection, diligence or termination right under this Agreement.

**4.2 No Further Testing.** Buyer shall not conduct any subsurface investigation, drilling, boring, sampling, Phase II Environmental Site Assessment or other invasive testing at the Real Property. Seller, the estate and the Trustee shall have no obligation to investigate, monitor, remove, remediate or otherwise address any condition identified in the Phase I or to incur any cost or liability in connection therewith, except for Seller's express obligations under Section 8. Any entry upon the Real Property by Buyer or its consultants, including any inspection under Section 8.4 or Section 9.2, shall be non-invasive, and Buyer shall maintain commercial general liability insurance in commercially reasonable amounts naming Seller and the estate as additional insureds (a copy of which shall be provided to Seller), shall repair any physical damage caused by its activities, shall keep the Real Property free of liens arising from its activities, and shall indemnify Seller and the estate against claims for personal

injury, property damage and mechanics' liens caused by the negligence or willful misconduct of Buyer or its consultants.

**4.3 Confidentiality of Results.** The Phase I and all reports, data, laboratory results and analyses generated by or for Buyer are confidential. Buyer may disclose such materials only to its lender, counsel, consultants, insurers and their respective advisors on a confidential and need-to-know basis, and to any governmental authority solely to the extent required by applicable law. Buyer shall not disclose such materials to any other person or use them for any purpose other than consummating the transaction contemplated by this Agreement. Seller's receipt of the Phase I is solely for informational purposes, does not constitute an adoption of or agreement with any finding, conclusion or recommendation contained therein, and does not create any representation, warranty, duty or liability of Seller, the estate or the Trustee. Buyer shall not make any voluntary report or disclosure to a governmental authority concerning any environmental condition at the Real Property without Seller's prior written consent, except to the extent required by applicable law.

**4.4 Environmental Contingency Satisfied.** Buyer's environmental contingency is satisfied and waived. Buyer shall proceed to Closing without any reduction in the Purchase Price, extension of the Closing Date, remediation obligation of Seller or claim against Seller, the estate, the Trustee, the Debtors or any of their respective professionals, agents or representatives arising from the Phase I or any environmental condition, except for Seller's express obligations under Section 8.

**4.5 Survival.** Buyer's obligations under this Section 4 shall survive any termination of this Agreement and Closing.

## 5. SALE AUTHORITY

**5.1 Existing Authority.** Seller represents to Buyer that the Wind Down Order is in full force and effect, has not been stayed, vacated, amended or modified in any respect that would impair the sale contemplated by this Agreement, and authorizes Seller to sell the Real Property and the Remaining Personal Property to Buyer on the terms of this Agreement, free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code, as and to the extent provided in the Wind Down Order, with such Encumbrances attaching to the net proceeds of sale as provided in the Wind Down Order. Buyer acknowledges that the authority described in this Section 5.1 applies only to the extent the Property constitutes Wind Down Assets (as defined in the Wind Down Order) and is subject to any consent, notice or other requirement of the Wind Down Order applicable to the Property, and Seller makes no representation regarding the scope or effect of the Wind Down Order beyond its express terms. Within three (3) Business Days after the Effective Date, Seller shall deliver to Buyer a certified copy of the Wind Down Order together with any related notice, procedures or bidding procedures order applicable to the sale.

**5.2 Compliance with Procedures.** Seller shall comply with all notice, service, objection, reporting and other procedures required by the Wind Down Order with respect to the sale contemplated by this Agreement, and shall do so promptly and in a manner that permits Closing on or before the Closing Date. The Parties acknowledge that Seller served a Wind Down Sale Notice with respect to the sale contemplated by this Agreement on or about October 8, 2026. Seller shall serve any further notice of the proposed sale required by the Wind Down Order promptly after such notice becomes required, shall provide Buyer's counsel a copy of any such notice contemporaneously with service, and shall promptly notify Buyer of any objection, reservation of rights, request for adjournment or competing offer received.

**5.3 Sale Authority Defined.** As used in this Agreement, "Sale Authority" means, collectively, the Wind Down Order, the satisfaction of all procedures required by it with respect to this sale, and any Confirmatory Order obtained under Section 5.4.

**5.4 Confirmatory Order.** If the Title Agency requires a supplemental or confirmatory order of the Bankruptcy Court in order for the Title Agency to issue the owner's title insurance policy contemplated by Section 3.3, including an order expressly confirming the sale contemplated by this Agreement and attaching any mechanics' liens of record to the net proceeds of the sale, Seller shall promptly seek entry of such order (the "Confirmatory Order") at the estate's expense. Seller shall cooperate with Buyer and the Title Agency regarding the form of the Confirmatory Order and shall seek expedited consideration to the extent reasonably necessary to facilitate Closing. Seller shall not, however, be required to commence contested litigation, appeal any ruling of the Bankruptcy Court, or incur any liability other than the cost of seeking entry of the Confirmatory Order.

**5.5 Required Protections.** The Sale Authority must, whether by operation of the Wind Down Order or by a Confirmatory Order: (a) authorize the sale of the Real Property and the Remaining Personal Property to Buyer on the terms of this Agreement; (b) authorize the transfer free and clear of all Encumbrances under Section 363(f) and to the extent provided for in the Wind Down Order, with such Encumbrances attaching to the net proceeds of sale as provided in the Wind Down Order; (c) afford Buyer the protections of Section 363(m) of the Bankruptcy Code as a good-faith purchaser; (d) provide that Buyer is not a successor to the debtor and assumes no liability of the debtor or the estate except as expressly assumed in this Agreement; (e) intentionally deleted; (f) intentionally deleted; and (g) not be subject to any stay, including any stay under Bankruptcy Rule 6004(h) that has not expired or been waived.

**5.6 Condition to Closing.** Buyer's obligation to close is expressly conditioned upon: (a) the Wind Down Order remaining in full force and effect and not stayed, vacated or modified in any respect that impairs the sale; (b) expiration of any objection or notice period required by the Wind Down Order with respect to this sale, with no objection remaining unresolved; (c) if required under Section 5.4, entry of a Confirmatory Order and expiration or waiver of any applicable stay; and (d) the willingness of the Title Agency to issue the policy described in Section 3.3 in reliance on the Sale Authority. If any of these conditions is not satisfied on or before the Closing Date, Buyer may terminate this Agreement by written notice to Seller and the Deposit shall be returned to Buyer in full.

**5.7 Authority to Execute.** Seller represents that she has full authority, under the Wind Down Order and her appointment as Chapter 7 Trustee, to execute and deliver this Agreement and, subject to Section 5.2, to perform its terms. Seller executes this Agreement solely in her capacity as Chapter 7 Trustee and shall have no personal liability under it.

## 6. CLOSING

**6.1 Closing Date.** The closing of the transaction (the "Closing") shall occur on or before November 1, 2026 (the "Closing Date"). Closing shall occur at the offices of the Escrow Agent or by mail and wire in escrow, on a date designated by Buyer upon not less than two (2) Business Days' prior written notice following satisfaction of the conditions in Sections 3, 5, 8 and 9. Time is of the essence. Notwithstanding the foregoing, if the Title Agency reasonably requires entry of the Confirmatory Order before the Title Agency will issue the owner's policy contemplated hereby, the Closing Date shall be automatically extended for the period reasonably necessary to obtain the Confirmatory Order and satisfy any related title underwriting requirement. Notwithstanding anything to the contrary in this Section 6.1 or Section 6.3, in no event shall the Closing Date be extended beyond November 15, 2026 (the "Outside Date"), and if Closing has not occurred on or before the Outside Date for any reason other

than a Party's default, either Party may terminate this Agreement by written notice to the other, whereupon the Deposit shall be returned to Buyer in accordance with Section 2.3.

**6.2 Possession.** Seller shall deliver exclusive possession of the Real Property to Buyer at Closing, free of all tenants, occupants, lessees, licensees, auctioneers, liquidators, contractors and other parties in possession.

**6.3 Failure to Close by the Closing Date.** If Closing has not occurred on or before the Closing Date for any reason other than Buyer's default, Buyer may, at its election, (a) terminate this Agreement by written notice to Seller, in which case the Deposit shall be returned to Buyer in full, or (b) extend the Closing Date for up to ten (10) Business Days, subject to Seller's prior written consent, which consent may be granted or withheld in Seller's sole and absolute discretion. Buyer's election to extend on one occasion shall not waive its right to terminate thereafter. Notwithstanding the foregoing, Buyer shall not have the right to terminate this Agreement pursuant to this Section, and the Closing Date shall instead be automatically extended for such period as is reasonably necessary (but not beyond the Outside Date), if Closing has not occurred solely due to (i) any requirement, delay, objection, underwriting condition or other matter relating to the issuance of the title insurance policy contemplated by this Agreement, including, without limitation, any requirement of the Title Agency for a Confirmatory Order or other order of the Bankruptcy Court, or (ii) any delay in obtaining the Sale Authority, a Confirmatory Order, any other order of the Bankruptcy Court, or any other court-related delay affecting the consummation of the transaction contemplated hereby.

## 7. PRORATIONS AND CLOSING COSTS

**7.1 Real Estate Taxes.** Real estate taxes and special assessments affecting the Real Property shall be prorated as of the Closing Date on a due-date basis in accordance with Fulton County custom. All delinquent real estate taxes and special assessments affecting the Real Property, together with any penalties and interest thereon, shall be paid from Seller's proceeds at Closing. Seller shall be responsible only for installments of special assessments due and payable on or before the Closing Date, and Buyer shall be responsible for all installments due and payable after the Closing Date, regardless of when the assessment was imposed, certified or levied. Notwithstanding anything herein to the contrary, Seller shall have no obligation under this Agreement to pay any personal property taxes or any fees, assessments, charges, penalties or interest relating thereto.

**7.2 Conveyance Fee and Transfer Taxes.** Seller shall pay the Ohio real property conveyance fee and all transfer taxes in full from Seller's proceeds at Closing. The Parties acknowledge that the exemption under 11 U.S.C. § 1146(a) applies only to transfers under a confirmed plan and is not available in a sale under Section 363.

**7.3 Buyer's Costs.** Buyer shall pay the premium for its owner's title policy and any lender's policy and endorsements, the cost of its survey, its environmental assessments, recording fees for the deed, and all costs of its lender.

**7.4 Shared and Separate Costs.** Escrow and closing fees charged by the Escrow Agent shall be shared equally. Each Party shall bear its own attorneys' fees and professional costs.

**7.5 Utilities and Operating Costs.** Utility charges and other operating costs shall be prorated as of the Closing Date, with Seller responsible for all such charges attributable to the period before Closing. Seller shall cause final meter readings to be taken as of the Closing Date. To the extent utility service and property insurance are in effect as of the Effective Date and remain within Seller's control, Seller shall use commercially reasonable efforts to cause to be maintained such utility service, including heat

sufficient to prevent freezing, and to maintain such property insurance through Closing; provided, however, that Seller shall not be required to reinstate any discontinued utility service or insurance coverage or incur any extraordinary cost or liability.

**8. SELLER'S REMOVAL OF ENVIRONMENTALLY SENSITIVE MATERIALS**

**8.1 Seller's Obligation.** Prior to Closing, and at the sole cost of the estate, Seller shall remove from the Real Property and lawfully dispose of all paint, paint supplies, coatings, thinners and solvents; all oils, lubricants, hydraulic fluids, cutting fluids, coolants, greases and fuels; all acids, caustics, plating solutions and process chemicals; all compressed gas cylinders; all batteries, lamps, ballasts and universal waste; and all other hazardous substances, hazardous waste, petroleum products and environmentally sensitive products located at the Real Property, together with all drums, totes, containers and above-ground tanks, whether located inside or outside the improvements (collectively, the "Environmental Materials"). Environmental Materials do not include any condition in, on, under or migrating from the Real Property, any conditions contained within, incorporated into, affixed to or constituting any building material, floor tile, mastic, drywall, insulation, roofing material, Fixture or improvement, any property owned by a third party, or de minimis quantities of customary cleaning and maintenance supplies ordinarily used in the operation of commercial property.

**8.2 Manner of Removal.** All removal and disposal of Environmental Materials shall be performed in compliance with applicable law by a licensed and insured contractor. Any manifests, bills of lading or disposal documentation shall be issued in the name of Seller or the debtor as generator, and not in the name of Buyer. Seller shall deliver copies of all such documentation actually received by Seller to Buyer at or before Closing.

**8.3 Buyer Takes All Other Items.** Except for the Environmental Materials, Buyer shall accept all items physically present at the Real Property at Closing in their then-existing condition and location. Seller shall have no obligation to remove, clean, sort, dispose of or pay any cost of removal or disposal of any item other than the Environmental Materials, and Seller shall bear no other removal or disposal cost of any kind.

**8.4 Confirmation and Remedy.** Buyer may inspect the Real Property not more than three (3) Business Days before Closing to confirm compliance with this Section, upon not less than twenty-four (24) hours' prior written notice to Seller. Seller and its representatives may accompany Buyer during the inspection, and the inspection shall otherwise be subject to the insurance, indemnity, lien-prevention and damage-repair requirements of Section 4.2. If a material quantity of Environmental Materials required to be removed under Section 8.1 remains at the Real Property, Seller shall either (i) remove such Environmental Materials before Closing or (ii) provide Buyer with a credit at Closing equal to the reasonable cost to remove and lawfully dispose of such Environmental Materials after Closing, as set forth in a written estimate from a licensed and insured contractor delivered to Seller before Closing. If Seller does not remove such Environmental Materials or provide the required credit, Buyer may terminate this Agreement and receive a return of the Deposit in accordance with Section 2.3, which shall be Buyer's sole remedy with respect to such Environmental Materials. Except as otherwise provided in the immediately preceding sentences, Buyer shall proceed to Closing, and no holdback, additional credit, price reduction or post-Closing claim shall apply unless expressly agreed in writing by Seller.

**9. EQUIPMENT REMOVAL AND PROTECTION OF THE IMPROVEMENTS**

**9.1 Completion of Removal.** Any removal of personal property or equipment from the Real Property by Seller, by any auctioneer or liquidation agent engaged by Seller, or by any purchaser at any sale

conducted by or on behalf of Seller (each, together with their respective contractors, a "Removal Party") shall be completed no later than five (5) Business Days before Closing. Seller shall notify Buyer promptly upon completion of the removal operations.

**9.2 Final Inspection.** Promptly following Seller's notice under Section 9.1, and in any event before Closing, Buyer may conduct one final, non-invasive physical inspection of the Real Property upon not less than twenty-four (24) hours' prior written notice to Seller. Seller and its representatives may accompany Buyer during the inspection, and the inspection shall otherwise be subject to the insurance, indemnity, lien-prevention and damage-repair requirements of Section 4.2. The inspection shall be solely to determine whether the removal operations caused material physical damage to the structural components, roof, exterior walls, foundation or principal building systems of the improvements ("Material Removal Damage").

**9.3 Termination Right.** If Buyer reasonably determines that Material Removal Damage has occurred, Buyer shall deliver written notice to Seller no later than twenty-four (24) hours after the inspection and before Closing, describing the Material Removal Damage in reasonable detail. Seller may elect, in Seller's sole and absolute discretion, to (i) repair or otherwise address the Material Removal Damage before Closing, or (ii) agree in writing to a credit or escrow on terms determined by Seller in its sole and absolute discretion. Seller shall have no obligation to make either election. If Seller does not so elect, Buyer may terminate this Agreement and the Deposit shall be returned to Buyer, and neither Party shall have any further obligation under this Agreement except those obligations that expressly survive termination. If Buyer does not timely deliver a termination notice, Buyer shall be deemed to have waived the Material Removal Damage and shall proceed to Closing.

**9.4 As-Is Condition; Exclusive Remedy.** Buyer acknowledges that the inspection and termination right provided in this Section 9 is Buyer's sole and exclusive right and remedy with respect to the condition of the Real Property following the removal operations. If Buyer does not timely terminate this Agreement pursuant to Section 9.3, Buyer shall be deemed to have approved the condition of the Real Property following completion of the removal operations and shall proceed to Closing. Upon Closing, the condition of the Real Property, including any condition resulting from the removal operations, shall be governed exclusively by Section 11.1, and Buyer shall have no right to any reduction in the Purchase Price, credit, escrow, holdback or other claim against Seller, the estate, the Trustee or any Removal Party arising from the removal operations.

**9.5 Intentionally Deleted.**

**9.6 Intentionally Deleted.**

## 10. CASUALTY AND CONDEMNATION

**10.1 Casualty and Condemnation.** If, before Closing, the improvements are damaged by fire or other casualty and the reasonable estimated cost of repair exceeds TWO HUNDRED NINETY-FIVE THOUSAND AND 00/100 DOLLARS ($295,000.00), or if a governmental authority commences a condemnation proceeding that would result in a material taking of the Real Property, Buyer may terminate this Agreement by written notice delivered to Seller within twenty-four (24) hours after Seller notifies Buyer of the casualty or proceeding, and the Deposit shall be returned in accordance with Section 2.3. If Buyer does not timely terminate, Buyer shall proceed to Closing and Seller shall assign to Buyer, without representation, warranty or recourse, Seller's right to any insurance proceeds or condemnation award actually payable, net of amounts applied by Seller to stabilization or repair and subject to the rights of any secured party. Seller shall have no obligation to repair the casualty damage or fund any deductible.

**11. AS-IS SALE; NO REPRESENTATIONS; REMEDIES**

**11.1 As-Is.** EXCEPT FOR SELLER'S EXPRESS OBLIGATIONS UNDER SECTIONS 3.4, 7, 8, 9 AND 10, AND EXCEPT AS EXPRESSLY SET FORTH IN THE DEED DELIVERED AT CLOSING, THE PROPERTY IS SOLD AS IS, WHERE IS, WITH ALL FAULTS, AND SELLER MAKES NO REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING AS TO TITLE, POSSESSION, QUIET ENJOYMENT, CONDITION, EXISTENCE, QUANTITY, QUALITY, OPERATION, ENVIRONMENTAL CONDITION, COMPLIANCE WITH LAW, ZONING, DEVELOPMENT POTENTIAL, SUITABILITY, MARKETABILITY, VALUE, FUTURE PERFORMANCE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. ANY WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE ARE EXPRESSLY DISCLAIMED. THE PROPERTY IS BEING CONVEYED WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN, LATENT OR PATENT. Buyer acknowledges that Buyer has been afforded the opportunity to conduct such inspections and investigations as Buyer deems necessary and is relying solely on Buyer's own review, inspections, investigations and judgment. Buyer further acknowledges that neither Seller, the Trustee, the Debtors nor any of their respective professionals, agents or representatives has made any representation concerning the operation, profitability, development potential, suitability or value of the Property. Buyer assumes the risk of all matters affecting the Property, including conditions that may not have been discovered prior to Closing. No representation, warranty, covenant or agreement shall survive Closing except as expressly provided in Section 12.6. Except to the extent expressly provided in Section 12.6, Buyer shall have no recourse after Closing against Seller, the estate, the Trustee, any Debtor or any of their respective professionals, agents or representatives with respect to the Property.

**11.2 Buyer Default.** If Buyer fails to close in material breach of this Agreement, and all conditions to Buyer's obligations have been satisfied or waived, Seller's sole and exclusive remedy shall be to terminate this Agreement and retain the Deposit as liquidated damages, and not as a penalty, the Parties acknowledging that actual damages would be difficult to ascertain and that the Deposit is a reasonable estimate of such damages.

**11.3 Seller Default.** If Seller fails to close in breach of this Agreement, and Buyer is not then in default under this Agreement, Buyer may elect either (a) to terminate this Agreement and receive a return of the Deposit, or (b) to seek specific performance of Seller's obligation to convey the Property pursuant to this Agreement. Buyer shall not be entitled to recover consequential, special, punitive, speculative or indirect damages arising from Seller's failure to close.

**11.4 Attorneys' Fees.** In any action to enforce or interpret this Agreement, each Party will bear its own attorneys' fees and costs.

**12. MISCELLANEOUS**

**12.1 Assignment.** Buyer may assign this Agreement to an entity affiliated with Buyer or designate an entity affiliated with Buyer to take title to the Property at Closing upon twenty-four (24) hours' prior written notice to Seller and without Seller's consent, provided such assignee or designee assumes Buyer's obligations under this Agreement and Buyer remains liable through Closing.

**12.2 Agency Acknowledgment.** The purchase and sale of the Real Property hereunder is being made through Hilco Real Estate, LLC or its affiliates (collectively, "Agent"), in their capacity as agent for Seller pursuant to (i) that certain Amended and Restated Consulting and Marketing Services

Agreement, dated as of March 13, 2026; (ii) that certain Machinery and Equipment Marketing Agreement, dated as of May 27, 2026; and (iii) that certain Intangible Assets, Real Estate, and Other Assets Marketing Agreement, dated as of May 28, 2026, each by and between First Brands Group, LLC and Agent (each as amended, restated, or modified from time to time), as approved pursuant to the Wind Down Order. For the avoidance of doubt, in its capacity as agent to Seller, Agent is not taking title to the Real Property prior to sale.

**12.3 Notices.** All notices shall be in writing and given by nationally recognized overnight courier, or electronic mail with confirmation of delivery, to the addresses set forth on the signature page. Notice is effective upon receipt or refusal of delivery.

**12.4 Governing Law; Jurisdiction.** Except to the extent governed by the Bankruptcy Code or other applicable federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts-of-law principles. The Parties consent to the jurisdiction of the Bankruptcy Court with respect to all matters arising out of or relating to this Agreement. The Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by law to interpret, implement, enforce and resolve disputes arising under or relating to this Agreement and the transactions contemplated hereby, including any escrow arrangement expressly agreed to pursuant to Section 9.3.

**12.5 Entire Agreement; Amendment; Counterparts.** This Agreement, together with Exhibit A, constitutes the entire agreement of the Parties with respect to its subject matter and supersedes all prior understandings, whether oral or written. No amendment or waiver is effective unless in writing and signed by both Parties and, if required, approved by the Bankruptcy Court. This Agreement may be executed in counterparts and delivered electronically. If any provision is held invalid, the remaining provisions continue in effect. This Agreement has been negotiated by the Parties and shall not be construed against either as drafter.

**12.6 Survival.** Except as expressly provided in this Agreement, all representations, covenants, obligations and agreements of the Parties shall merge into and be superseded by the documents delivered at Closing and shall not survive Closing. Notwithstanding the foregoing, Sections 4.3, 5.7, 11, 12.2, 12.4 and 12.7 shall survive Closing.

**12.7 No Waiver; Limited Recourse.** Seller is executing this Agreement solely in her capacity as Chapter 7 Trustee of the bankruptcy estate and not individually or personally. Buyer acknowledges that any recourse arising under this Agreement shall be limited solely to the assets of the bankruptcy estate. No waiver, consent, approval or election by Seller shall be deemed to create any personal liability of Seller or otherwise expand Buyer's remedies beyond the assets of the bankruptcy estate.

**12.8 Business Day; Time Periods.** For purposes of this Agreement, "Business Day" means any day other than a Saturday, Sunday or legal holiday (state or federal) in the State of Ohio. If any date for performance, approval, delivery or Closing falls on a day that is not a Business Day, the time therefor shall be extended to the next Business Day.

*[balance of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER:**
EVA ENGELHART,
solely in her capacity as Chapter 7 Trustee of the
bankruptcy estate of In re First Brands Group, LLC,
et al., Case No. 25-90399 (CML)

DocuSigned by:
Eva Engelhart
17AE566F8087446...
________________________
Eva Engelhart, Chapter 7 Trustee

Address: Ross, Banks, May, Cron and Cavin, PC
Attn: Eva Engelhart, Chapter 7 Trustee
7700 San Felipe, Suite 550
Houston, TX 77063
Email: eengelhart@rossbanks.com

with a copy to:

Katten Muchin Rosenman LLP
Attn: Grace A. Thompson and Cindi Giglio
50 Rockefeller Plaza
New York, NY 10020-1605
Email: grace.thompson@katten.com
cgiglio@katten.com

**BUYER:**
VENTURES IN SPACE FAYETTE, LTD.,
an Ohio limited partnership

By: ________________________________
Name: Sean Rupp________________________
Title: General Partner____________________

Address: Ventures in Space Fayette, LTD.
Attn: Sean Rupp
11495 State Route 15
Montpelier, Ohio 43543
Email: sean@ruppenterprises.com

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER:**
EVA ENGELHART,
solely in her capacity as Chapter 7 Trustee of the
bankruptcy estate of In re First Brands Group, LLC,
et al., Case No. 25-90399 (CML)

_____________________________________
Eva Engelhart, Chapter 7 Trustee

Address: Ross, Banks, May, Cron and Cavin, PC
Attn: Eva Engelhart, Chapter 7 Trustee
7700 San Felipe, Suite 550
Houston, TX 77063
Email: eengelhart@rossbanks.com

with a copy to:

Katten Muchin Rosenman LLP
Attn: Grace A. Thompson and Cindi Giglio
50 Rockefeller Plaza
New York, NY 10020-1605
Email: grace.thompson@katten.com
cgiglio@katten.com

**BUYER:**
VENTURES IN SPACE FAYETTE, LTD.,
an Ohio limited partnership

DocuSigned by:
By: Sean Rupp
7A0B21548B9C494...
Name: Sean Rupp
Title: General Partner

Address: Ventures in Space Fayette, LTD.
Attn: Sean Rupp
11495 State Route 15
Montpelier, Ohio 43543
Email: sean@ruppenterprises.com



306213083v5_404528-00003 10/14/2026 4:14 PM

Exhibit A – Legal Description

Situated as being part of John Gamber's Addition (Lots 66-74 and vacated portions) to the Village of Fayette in the Northeast Quarter of Section 19, Town 9 South, Range 1 East, Village of Fayette, Fulton County, Ohio as being part of tracts of land as recorded in Official Record Volume 325, Page 2620, Official Record Volume 322, Page 3697, Official Record 221, Page 3344 and Deed Volume 238, Page 981 and more particularly described as follows;

Also being all of Auditor's Parcel 146, 147 and Part of 148 in said Village.

Beginning at a 1/2 inch rebar with ID cap found marking the intersection of the South right-of-way of West Industrial Parkway and the East right-of-way line of Gorham Street and marking the Northwest corner of a tract of land as recorded in Official Record Volume 322, Page 3697 of the Fulton County Deed of Records and being the POINT OF BEGINNING;

Thence South 89°57'23" East along said South right-of-way line of West Industrial Parkway a distance of 578.35 feet to a point referenced by a 5/8 inch rebar with ID cap set 1.00 feet South of said point;

Thence South 00°55'37" East along the West right-of-way line of Fayette Street a distance of 576.85 feet to a 5/8 inch rebar with ID cap set and marking the Northeast corner of a tract of land (Lot 65 of John Gamber's Addition) as recorded in Official Record Volume 71, Page 811 of the Fulton County Deed Records;

Thence South 63°11'52" West along the North boundaries of Lots 57-60 and Lot 65 of John Gamber's Addition (also being the South line of a former railroad right-of-way) a distance of 641.99 to a capped metal surveyors stake being on the East right-of-way of Gorham Street and marking the Northwest corner of a tract of land (Lot 57 of John Gamber's Addition) and passing a point at 293.07 feet marked by a 2 inch bent pipe 0.92 feet North and 0.86 feet West of said point;

Thence North 00°58'10" West along said East right-of-way line of Gorham Street a distance of 866.82 to the POINT OF BEGINNING, passing a point at 418.13 feet referenced by a 5/8 inch rebar found 0.12 feet South and 0.24 feet West of said point; said tract containing 9.578 acres of land, more or less.

Subject to all legal highways, easements and restrictions of use whether apparent and/or of record and is from an actual field survey performed in May 2015 under the supervision of Ohio Professional Surveyor Gregory A. Bockrath, Ohio Survey No. 8306.

Note: The bearings used in this description are on an assumed meridian assuming the South right-of-way line of West Industrial Parkway to the South 89°57'23" East and are for the purpose of angle determination only.

Commonly known as: 705 North Fayette Street, Fayette, Ohio 43521
Parcel Numbers: Tax Parcel No.: 19-039072-00.000
Prior Deed Reference: OR Volume 359 Page 2100 of the Fulton County, OH Records

*[end of legal description]*