# **Exhibit 2**

**Proposed Order in Furtherance of the Wind Down Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 7** |
| | § | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | § | **Case No. 25-90399 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

**ORDER IN FURTHERANCE OF THE WIND DOWN ORDER REGARDING SALE OF CERTAIN ASSETS OF EAGLE MACHINING, LLC TO VENTURES IN SPACE FAYETTE, LTD.**

Upon the request of Eva Engelhart, the chapter 7 trustee (the "**Chapter 7 Trustee**") for First Brands Group, LLC, First Brands Group Holdings, LLC's direct and indirect subsidiaries, and Viceroy Private Capital, LLC (collectively, the "**Debtors**") for entry of an order (this "**Order**") in furtherance of the Wind Down Order and in connection with the sale of the Transferred Assets to Ventures in Space Fayette, Ltd. ("**Buyer**"); and the Court having considered the Notice of Proposed Order, the Purchase Agreement, the Wind Down Motion, the Wind Down Order, the Declaration of Charles M. Moore in support of the Wind Down Motion [Docket No. 2217], and the record before it; and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Sale and the Order having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and all objections, if any, to the Sale having been withdrawn or resolved; and it appearing that the relief granted herein is in the best interests of the

1 A complete list of the "**Debtors**" in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The Debtors' service address for these chapter 7 cases is Eva Engelhart, Chapter 7 Trustee c/o Porter Hedges LLP, Joshua W. Wolfshohl, 1000 Main St., 36th Floor, Houston, Texas 77002.

Debtors and their respective estates and creditors; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. On September 24, 2025, Global Assets LLC and twelve (12) debtor affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). Commencing on September 28, 2025, First Brands Group, LLC and the remaining Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

B. On September 1, 2026, the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code [Docket No. 3748] (the "**Conversion Order**"), and the Chapter 7 Trustee was appointed as the trustee for the Debtors.

C. The Debtors' chapter 7 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

D. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E. On January 8, 2026, the Debtors filed the *Emergency Motion of Debtors for Order (I) Approving (A) Bidding Procedures for Sale of Assets of the Debtors, (B) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (C) Assumption and Assignment Procedures, (II) Authorizing Designation of Stalking Horse Bidders, (III) Scheduling Auction and Sale Hearing, and (IV) Granting Related Relief* [Docket No. 1253] (the "**Bidding Procedures Motion**"), which

sought Court approval of an expedited timeline and auction procedures for the Debtors' sale process. The Debtors filed the *Notice of Sale Transactions, Bidding Procedures, Auction, and Sale Hearing* [Docket No. 1324] (the "**Initial Notice**"), which provided all interested parties with notice of the Debtors' intent to sell all their assets pursuant to one or more sale transactions. On January 13, 2026, the Initial Notice was served on all potential bidders for the Debtors' assets, all parties that had expressed interest in purchasing any of the Debtors' assets within the last twelve months, all parties listed on the Debtors' creditor matrix, and the Sale Notice Parties (as defined in the Bidding Procedures Motion). *See Affidavit of Service* [Docket No. 1718]. The Debtors subsequently published the Initial Notice in the national edition of The New York Times on January 16, 2026, as reflected in the *Certificate of Publication* [Docket No. 1645] (the "**Initial Notice Publication**").

F. On March 23, 2026, the Debtors filed the *Emergency Motion of the Debtors for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2216] (the "**Wind Down Motion**"), which disclosed the Debtors' intention to wind down certain brands and asset classes. On March 24, 2026, the Wind Down Motion was served on the Debtors' Master Service List [Docket No. 2239].

G. On April 16, 2026, the Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter Into and Perform Under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens,*

*Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2454] (the "**Wind Down Order**").[2]

H. On May 15, 2026, the Debtors filed the *Notice of Expansion of Wind Down Brands* [Docket No. 2686] (the "**Notice of Expansion of Wind Down Brands**"), which was served on the Debtors' Master Service List. *See* Docket No. 2761. On May 28, 2026, the Debtors filed the *Second Notice of Expansion of Wind Down Brands* [Docket No. 2829] (the "**Second Notice of Expansion of Wind Down Brands**"), which was served on the Debtors' Master Service List (*see* Docket No. 2877) and expanded the Wind Down to First Brands Holdings, LLC and all Debtor subsidiaries.

I. In accordance with the Wind Down Order, on May 27, 2026, the Debtors and Hilco Merchant Resources, LLC entered into a Machinery and Equipment Agreement under which Hilco Merchant Resources, LLC serves as the exclusive agent for the Debtors and, following entry of the Conversion Order, for the Chapter 7 Trustee (as successor to the Debtors) with respect to specified machinery and equipment.

J. In accordance with the Wind Down Order, on May 28, 2026, the Debtors and Hilco IP Services, LLC, Hilco Real Estate, LLC, and Hilco Global Mexico, S. de R.L. de C.V. entered into an Intangible Assets, Real Estate and Other Assets Marketing Agreement under which those entities serve as the exclusive agents for the Debtors and, following entry of the Conversion Order, for the Chapter 7 Trustee (as successor to the Debtors) with respect to specified intangible assets, real estate, and other assets.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Wind Down Order or the Purchase Agreement, as applicable.

K. In accordance with the Wind Down Order, the Chapter 7 Trustee selected Buyer as the purchaser of certain Wind Down Assets owned by Eagle Machining, LLC, as more particularly described in the Purchase Agreement (the "**Transferred Assets**").

L. On October 15, 2026, the Chapter 7 Trustee and Buyer entered into that certain *Real Estate Purchase Agreement* (as may be amended, restated, supplemented, or otherwise modified, the "**Purchase Agreement**"), attached hereto as **Exhibit 1**, under which Buyer agreed to purchase the Transferred Assets for $3,000,000 in cash, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order, free and clear of all Liens, Liabilities, claims, and interests other than the Assumed Liabilities (the "**Sale**").

M. In accordance with the Wind Down Order, on October 8, 2026, proposed counsel for the Chapter 7 Trustee served a Wind Down Sale Notice by email on the Wind Down Sale Notice Parties comprising: the U.S. Trustee, the Ad Hoc Group, and the known parties with an Asserted Interest with respect to the Transferred Assets. The Wind Down Sale Notice: (a) identified the Transferred Assets (including the real estate, other assets, and legal entities with which the Transferred Assets are associated); (b) identified Buyer as the purchaser of the Transferred Assets; (c) stated the $3,000,000 purchase price; (d) confirmed that the Buyer is not an insider of the Debtors; (e) stated that the Transferred Assets constitute Overlapping Collateral; (f) confirmed that the Transferred Assets do not contain personal or confidential information; and (g) described the other significant terms of the Sale. The Notice Period has expired, and the Chapter 7 Trustee obtained the consent of all parties with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets. *See* Wind Down Order ¶¶ 25-26, 42.

N. In furtherance of the Wind Down Order, on October 30, 2026, the Chapter 7 Trustee filed the *Notice Regarding Proposed Order in Furtherance of the Wind Down Order Regarding Sale of Certain Assets of Eagle Machinery, LLC to Ventures in Space Fayette, Ltd.* (the "**Notice of Proposed Order**").

O. Entry of this Order is necessary and appropriate to approve the Purchase Agreement and the Sale, authorize the transfer of the Transferred Assets, and grant Buyer the protections set forth herein.

**IT IS HEREBY ORDERED THAT:**

**A. <u>Jurisdiction and Statutory Predicates</u>**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b). Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

2. The statutory predicates for the relief granted herein are sections 105(a), 363, and 541 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004. This Order is a final and appealable order. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014.

3. As evidenced by the Initial Notice, the Wind Down Motion, the Notice of Expansion of Wind Down Brands, the Second Notice of Expansion of Wind Down Brands, the related affidavits and certificates of service, the Initial Notice Publication, service of the Notice of Proposed Order on the Master Service List and the known parties asserting an interest in the Transferred Assets, the Wind Down Sale Notice, notice of the Sale and the relief granted herein was good, sufficient, and appropriate under the circumstances and complied with the Bankruptcy

Code, the Bankruptcy Rules, the Local Rules, the Wind Down Order, and all other applicable orders of this Court.

**B. Background, Business Justification, and Notice**

4. Under the Purchase Agreement, Buyer will pay a cash purchase price of $3,000,000 for the Transferred Assets, subject to any adjustments, allocations, or other terms expressly set forth in the Purchase Agreement and this Order.

5. The purchase and sale of the Transferred Assets was marketed, brokered, and facilitated by the Consultant solely in the Consultant's capacity as agent for the Chapter 7 Trustee pursuant to the Wind Down Order. For the avoidance of doubt, the Consultant is not taking title to the Transferred Assets before the Sale.

6. The Chapter 7 Trustee, in consultation with the Consultant and her advisors, reasonably determined in her business judgment that the Purchase Agreement represents the highest or otherwise best actionable transaction available for the Transferred Assets under the circumstances and is in the best interests of the Debtors, their estates, creditors, and parties in interest.

7. The Sale is a Wind Down Sale under the Wind Down Order. The Transferred Assets are Wind Down Assets under the Wind Down Order or are otherwise authorized to be sold under this Order, the Bankruptcy Code, the Purchase Agreement, and any other applicable orders. All requirements under the Wind Down Order, including any required notice, consent, asset designation, asset-class or legal-entity addition, objection-period expiration, or further-order requirement has been satisfied, waived, resolved, or approved by this Order.

8. The Chapter 7 Trustee has noticed the Sale through the (i) Wind Down Sale Notice on all parties required to receive notice under the Wind Down Order, and (ii) Notice of Proposed

Order on the Debtors' Master Service List and the known parties asserting an interest in the Transferred Assets. The Wind Down Sale Notice and Notice of Proposed Order each identified the Transferred Assets, the applicable business units and legal entities, Buyer, the purchase price, whether the Transferred Assets constitute Overlapping Collateral, and the other significant terms of the Sale. The applicable notice period has expired, and all objections, if any, have been resolved, withdrawn, waived, or are overruled by this Order. The Chapter 7 Trustee has obtained consent to the Sale from all known creditors with an Overlapping Collateral Interest in the Net Proceeds or Gross Proceeds, as applicable, of the Transferred Assets.

9. The notice provided in connection with the Sale, the Purchase Agreement, and this Order, including the Wind Down Sale Notice served on the Wind Down Sale Notice Parties and the Notice of Proposed Order served on the Master Service List and the known parties asserting an interest in the Transferred Assets, is good, sufficient, and adequate under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Wind Down Order, and the circumstances of these chapter 7 cases. No other or further notice is required.

**C. <u>Transferred Assets and Property of the Estate</u>**

10. The Transferred Assets constitute property of the Debtors' estates within the meaning of section 541 of the Bankruptcy Code or otherwise consist of transferable interests held by one or more Debtors. Those assets and interests may be sold under sections 363(b) and 363(f) of the Bankruptcy Code, and the transfer approved by this Order shall vest Buyer with the Debtors' right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims and interests, subject only to the Permitted Exceptions.

11. The Chapter 7 Trustee is authorized to sell, transfer, convey, assign, and deliver to Buyer or one or more controlled affiliates or designees designated by Buyer under the Purchase

Agreement (each, a "**Buyer Designee**") all of the Debtors' right, title, and interest in and to the Transferred Assets, subject only to the Permitted Exceptions.

12. Any Lien, Liability, claim, or interest in the Transferred Assets other than the Permitted Exceptions shall attach solely to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that it had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and all rights, claims, objections, defenses, and challenges of the Chapter 7 Trustee, the Debtors, their estates, and any other person.

**D. <u>Approval of the Purchase Agreement and Sale</u>**

13. The Purchase Agreement and all other ancillary documents, including any other documents contemplated by the Purchase Agreement or that are necessary or appropriate to complete the transactions provided for in the Purchase Agreement, and all of the terms and conditions thereof, and the Sale and related transactions contemplated therewith, are hereby incorporated herein by reference and approved in all respects. The failure specifically to include any particular terms of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement and the Sale be authorized and approved in their entireties.

14. The Chapter 7 Trustee is authorized to sell, transfer, assign, convey, and deliver the Transferred Assets to Buyer or any Buyer Designee, and Buyer and any Buyer Designee are authorized to purchase and accept the Transferred Assets.

15. Pursuant to section 363 of the Bankruptcy Code, entry by the Chapter 7 Trustee into the Purchase Agreement is hereby authorized and approved as a valid exercise of the Chapter 7 Trustee's business judgment. Pursuant to sections 105 and 363 of the Bankruptcy Code, the

Chapter 7 Trustee and her agents are authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the sale of the Transferred Assets to the Buyer pursuant to and in accordance with the terms and conditions of the Purchase Agreement, (b) enter into all other agreements contemplated by the Purchase Agreement and consummate all other transactions contemplated by the Purchase Agreement, (c) consummate the Sale as contemplated in the Purchase Agreement and this Order, (d) continue performance under and make all payments required by the Purchase Agreement, and (e) execute and deliver, perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and ancillary documents that may be reasonably necessary or desirable to implement the Sale, or as may be reasonably necessary or appropriate to implement or perform any of the obligations contemplated by the Purchase Agreement and any other documentation relating to the Sale, all without further order of the Court.

16. The transfer of the Transferred Assets to Buyer or any Buyer Designee shall vest Buyer or such Buyer Designee, as applicable, with all right, title, and interest in and to the Transferred Assets free and clear of all Liens (including liens recorded in O.R. Volume 370, Page 2972, O.R. Volume 370, Page 3620, O.R. Volume 370, Page 3622, O.R. Volume 385, Page 3562 and O.R. Volume 387, Page 3309), Liabilities, claims, and interests, except solely for the Permitted Exceptions.

17. Each Buyer Designee shall be entitled to the protections of this Order with respect to the Transferred Assets acquired by such Buyer Designee.

18. Buyer and any Buyer Designee are good-faith purchasers for value within the meaning of section 363(m) of the Bankruptcy Code and are entitled to the full protections of section 363(m) with respect to the Sale and the Transferred Assets. Buyer is not an “insider” of

any Debtor within the meaning of section 101(31) of the Bankruptcy Code. The consideration to be paid by the Buyer under the Purchase Agreement was negotiated at arm's length, in good faith and without collusion pursuant to section 363(m) of the Bankruptcy Code and is fair and reasonable under the circumstances. The Sale contemplated by the Purchase Agreement is undertaken by the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

19. Neither the Chapter 7 Trustee, the Debtors, Buyer, nor any Buyer Designee has engaged in any conduct that would permit the Sale, the Purchase Agreement, or any transaction contemplated thereby to be avoided, set aside, or otherwise challenged under section 363(n) of the Bankruptcy Code.

20. Except as expressly provided in the Purchase Agreement or this Order, Buyer is purchasing the Transferred Assets on an "as is, where is" basis as to their physical condition, location, completeness, operability, merchantability, fitness for any particular purpose, and quality, and the Sale is final. This paragraph does not limit, modify, or impair: (a) the Chapter 7 Trustee's obligation to transfer the Debtors' right, title, and interest in the Transferred Assets free and clear of Liens, Liabilities, claims, and interests as provided in this Order; (b) Buyer's no-successor-liability, excluded-liability, environmental, free-and-clear sale, and other protections under this Order; (c) Buyer's express rights, representations, warranties, covenants, or remedies under the Purchase Agreement or this Order; or (d) any non-waivable state or federal law relating to implied warranties for latent defects.

21. All persons and entities, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce any Liens, Liabilities, claims, or interests against Buyer, Buyer's affiliates, Buyer's designees, the Transferred Assets, or any of Buyer's successors or assigns, except solely with respect to the Permitted Exceptions.

22. The Chapter 7 Trustee, the Debtors, the Consultant, any warehouseman, bailee, custodian, agent, affiliate, employee, representative, or other person or entity in possession, custody, or control of any Transferred Assets shall surrender such Transferred Assets to Buyer or the applicable Buyer Designee on the Closing Date.

23. No executory contract or unexpired lease of any Debtor is being assumed or assigned to Buyer under section 365 of the Bankruptcy Code or this Order, and Buyer shall not assume or be liable for any obligations thereunder. Nothing in this paragraph limits Buyer's acquisition of rights that constitute Transferred Assets and are transferable without assumption and assignment under section 365 of the Bankruptcy Code; *provided*, that, notwithstanding anything to the contrary in this Order, Purchase Agreement, or any document or agreement related to the foregoing, the Debtors' insurance policies (and/or any agreements or documents related thereto), and any rights, proceeds, benefits, claims, rights to payments and/or recoveries thereunder and/or any claims handling service agreements do not be constitute Transferred Assets and will not be transferred without the express prior written consent of the applicable insurer and/or third-party administrator.

24. No warehouseman, bailee, custodian, secured party, lienholder, contract counterparty, or other person may interfere with Buyer's rights under this Order or assert any Lien, Liability, claim, right of possession, right of setoff, right of recoupment, storage charge, rent claim, warehouse charge, carrier charge, or similar right against Buyer, any Buyer Designee, or the Transferred Assets to delay, preclude, or condition access or transfer of the Transferred Assets.

25. Taxes, fees, transaction costs, utilities, and similar costs shall be allocated as between the Debtors and Buyer or Buyer Designee in accordance with the Purchase Agreement.

**E. Section 363(f) Findings**

26. The transfer of the Transferred Assets free and clear of all Liens, Liabilities, claims, and interests (other than Permitted Exceptions) satisfies section 363(f) of the Bankruptcy Code because one or more of the following standards is satisfied with respect to each such Lien, Liability, claim or interest: (a) applicable nonbankruptcy law permits sale of the Transferred Assets free and clear of such Lien, Liability, claim, or interest; (b) the holder of such Lien, Liability, claim or interest has consented, failed to object after receiving adequate notice, or is deemed to have consented; (c) to the extent such Lien, Liability, claim, or interest constitutes a lien, the purchase price for the Transferred Assets is greater than the aggregate value of all liens on the Transferred Assets; (d) such Lien, Liability, claim, or interest is in bona fide dispute; or (e) the holder of such Lien, Liability, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Lien, Liability, claim, or interest.

27. The holders of Liens, Liabilities, claims, and interests will be adequately protected because any valid, enforceable, and non-avoidable Lien, Liability, claim, or interest other than an Permitted Exception shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale to the same extent and with the same validity, priority, force, and effect that such Lien, Liability,

claim, and interest had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Chapter 7 Trustee, the Debtors, their estates, and any other person.

**F. No Successor Liability and No Assumed Liabilities**

28. Buyer is not a successor to any Debtor or any Debtor's estate by reason of the Sale or the transfer of the Transferred Assets.

29. Buyer shall not be deemed, as a result of the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the ownership, operation or removal of the Transferred Assets, or the consummation of the transactions approved by this Order, to: (a) be a successor to any Debtor or its estate; (b) be a continuation or substantial continuation of any Debtor or any Debtor's business; (c) have merged with any Debtor; (d) be part of a de facto merger with any Debtor; (e) be a mere continuation of any Debtor; (f) be a successor employer; (g) be a joint employer; (h) have common identity or continuity of enterprise with any Debtor; (i) be liable under any product-line, substantial-continuity, continuity-of-enterprise, successor-liability, transferee-liability, de facto merger, alter ego, veil-piercing, agency, vicarious liability, or similar theory; or (j) be liable for any Lien, Liability, claim, or interest arising from or relating to the Transferred Assets, the Debtors, the Debtors' businesses, or the Debtors' ownership, operation, shutdown, use, sale, transfer, removal, or disposition of the Transferred Assets before the Closing Date, except solely for the Permitted Exceptions.

30. Without limiting the foregoing, except solely for the Permitted Exceptions, if any, Buyer shall not assume or be liable for any Liens, Liabilities, claims, or interests arising under, relating to, or based upon:

(a) any lien, mortgage, deed of trust, pledge, security interest, charge, hypothecation, conditional sale right, title retention right, mechanic's lien, materialman's lien, warehouse lien, carrier lien, judgment lien, tax lien, statutory lien, possessory lien, or similar interest;

(b) any debt, claim, obligation, or liability of any Debtor or any Debtor's estate;

(c) any executory contract or unexpired lease of any Debtor;

(d) any cure cost or default, claim, liability, or obligation under any executory contract or unexpired lease of any Debtor;

(e) any collective bargaining agreement, memorandum of understanding, side letter, grievance, arbitration, labor agreement, union agreement, or obligation to any labor organization;

(f) any claim under the Worker Adjustment and Retraining Notification Act, any state WARN Act, or any similar plant-closing, mass-layoff, wage, notice, severance, or employee-protection statute;

(g) any wage, salary, payroll, commission, bonus, incentive, vacation, paid-time-off, severance, retention, change-in-control, workers' compensation, unemployment, employee-benefit, retiree-benefit, health, welfare, medical, life insurance, disability, COBRA, pension, retirement, withdrawal-liability, multiemployer-plan, defined-benefit-plan, defined-contribution-plan, ERISA, PBGC, controlled-group, fiduciary, funding, termination, premium, contribution, or benefit claim;

(h) any claim under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, the National Labor Relations Act, the Labor Management Relations Act, the Occupational Safety and Health Act, ERISA, COBRA, or any other federal, state, or local labor, employment, employee-benefit, pension, workplace, health, safety, discrimination, wage, hour, leave, retaliation, or similar law;

(i) any successor-liability, successor-employer, single-employer, joint-employer, de facto merger, substantial-continuity, mere-continuation, continuity-of-enterprise, product-line, alter-ego, agency, veil-piercing, transferee-liability, vicarious liability, or similar claim or theory;

(j) any product liability, warranty, recall, customer claim, personal injury, property damage, tort, negligence, strict liability, indemnity, contribution, reimbursement, or similar claim arising from or relating to any Debtor's ownership, operation, design, manufacture, sale, distribution, repair, service, warranty, or use of any product, asset, equipment, inventory, tooling, or property;

(k) any tax, bulk sale, bulk transfer, unclaimed property, escheat, sales, use, transfer, recording, stamp, documentary, value-added, excise, property, franchise, income, payroll, withholding, or similar claim, except as expressly allocated to Buyer under the Purchase Agreement;

(l) any liability arising from any litigation, arbitration, administrative proceeding, investigation, audit, notice of violation, regulatory action, enforcement action, consent order, settlement, judgment, decree, or claim against any Debtor or relating to any Debtor's conduct before the Closing Date; and

(m) any liability arising from or relating to the Debtors' operation, ownership, use, possession, shutdown, storage, removal, abandonment, rejection, sale, transfer, disposition, or wind-down of any assets, facilities, properties, contracts, leases, businesses, or operations before the Closing Date.

31. All persons and entities holding Liens, Liabilities, claims or interests of any kind or nature against the Chapter 7 Trustee, any Debtor, any Debtor's estate, the Transferred Assets, or the proceeds thereof, including all debt holders, equityholders, governmental units, tax authorities, regulatory authorities, employees, labor organizations, pension funds, benefit plans, contract counterparties, landlords, lessors, secured parties, lienholders, litigation claimants, and any other persons or entities, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, enforcing, collecting, or attempting to enforce any such Liens, Liabilities, claims or interests against Buyer, Buyer's affiliates, the Transferred Assets, or any of Buyer's or its affiliates' successors or assigns, except solely with respect to Permitted Exceptions as against Buyer as expressly set forth in the Purchase Agreement.

**G. Liens, Proceeds, and Recording**

32. All Liens, Liabilities, claims, and interests released from the Transferred Assets shall attach to the Net Proceeds or Gross Proceeds, as applicable, of the Sale with the same validity, priority, force, and effect, if any, that such Liens, Liabilities, claims, and interests had against the Transferred Assets immediately before the Closing Date, subject to the Wind Down Order and any rights, claims, defenses, objections, or challenges of the Chapter 7 Trustee, the Debtors, their estates, and any other person.

33. This Order shall be effective as a determination that, as of the Closing Date, all Liens, Liabilities, claims, and interests against the Transferred Assets have been unconditionally

released, discharged, and terminated as to Buyer and the Transferred Assets, except solely for the Permitted Exceptions.

34. This Order is binding upon and shall govern the acts of all filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities. All such persons, agencies and entities are authorized and directed to accept this Order, the Purchase Agreement, any agreement, assignment, certificate, or other transfer document as conclusive evidence of the release, discharge, and termination of all Liens, Liabilities, claims, and interests against Buyer or the Transferred Assets and as authority to record, file, or register the transfer of the Transferred Assets to Buyer free and clear of all Liens, Liabilities, claims and interests, except solely for the Permitted Exceptions.

35. If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Liens, Liabilities, claims, or interests against or in the Transferred Assets does not deliver appropriate termination statements, instruments of satisfaction, releases, or other documents, Buyer and the Chapter 7 Trustee are authorized to execute and file such termination statements, releases, satisfactions, or other instruments on behalf of such person or entity solely with respect to the Transferred Assets.

36. At the Closing and notwithstanding anything to the contrary in the DIP Order,[3] the Buyer shall pay the Purchase Price to the Wind Down deposit account maintained by Consultant for funds flow purposes only and without the Consultant obtaining any legal interest therein other than in respect of such amounts payable to the Consultant pursuant to the Wind Down Order. Consultant shall, with the consent of the DIP Secured Parties and Onset Parties (collectively, the

[3] "**DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Docket No. 597].

"**Creditor Consenting Parties**" and, with the Chapter 7 Trustee, the "**Sale Consenting Parties**") deposit the Net Proceeds or Gross Proceeds, as applicable, net of Consultant's Fees and Expenses (the "**Distributable Proceeds**") in the SPV-DIP Wind Down Account, for further distribution subject to the terms of the Wind Down Order, the Stipulation and Agreed Order Regarding Proceeds Subject to the Wind Down Order [Docket No. 3683], and the value allocation schedule attached hereto as **Exhibit 2** (the "**Value Allocation Schedule**"). The Consultant shall use commercially reasonable efforts to distribute such funds as promptly as practicable. For the avoidance of doubt, none of the Distributable Proceeds may be used to fund the Carve-Out (as defined in the DIP Order) and none of the escrowed proceeds shall be released from the Escrow Account in violation hereof.

**H. Bulk Sales, Transfer Taxes, and Resale Certificates**

37. No bulk sales, bulk transfer, bulk notice, successor-liability tax notice, or similar law shall apply to the Sale, the Purchase Agreement, the transfer of the Transferred Assets, or any transactions authorized by this Order.

38. The transfer of the Transferred Assets shall not be subject to any stamp, transfer, recording, documentary, sales, use, or similar tax, fee, assessment, or charge.

39. Buyer and the Chapter 7 Trustee are authorized to provide and execute any resale certificate, exemption certificate, direct-pay permit, manufacturing exemption certificate, tax-exemption certificate, or similar document available under applicable law in connection with the Sale or transfer of the Transferred Assets.

40. All filing agents, filing officers, title agents, title companies, recorders, registrars, administrative agencies, governmental departments, and similar persons and entities are authorized and directed to accept this Order and any resale certificate, exemption certificate, direct-pay

permit, manufacturing exemption certificate, tax-exemption certificate, or similar document as sufficient evidence of any applicable exemption.

**I. United States**

41. Notwithstanding any provision to the contrary in this Order, the Purchase Agreement, or any other document related to the Sale, nothing shall:

(a) release, nullify, preclude or enjoin the United States from enforcing its police or regulatory powers under applicable non-bankruptcy law against Buyer or any Buyer Designee with respect to Buyer's or such Buyer Designee's post-Closing acts or omissions or, to the extent applicable, obligations first arising and accruing after the date of entry of this Order

(b) affect the setoff or recoupment rights of the United States against the Debtors or their estates; provided, however, that any such rights shall not be asserted against Buyer, any Buyer Designee, or the Transferred Assets except solely to the extent arising from a Permitted Exception, Buyer's or such Buyer Designee's post-Closing acts or omissions, or Buyer's or such Buyer Designee's post-Closing ownership or operation of the Transferred Assets under applicable non-bankruptcy law;

(c) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(d) authorize the assumption, assignment, sale or other transfer of any federal grants, grant funds, contracts, agreements, awards, task orders, property, intellectual property, patents, leases, certifications, applications, registrations, billing numbers, national provider identifiers, provider transaction access numbers, licenses, permits, covenants, inventory, guarantees, indemnifications, data, records, or any other interests belonging to the United States (collectively, "**Federal Interests**") without compliance by the Chapter 7 Trustee, Buyer, and any Buyer

Designee with all terms of the Federal Interests and with all applicable non-bankruptcy law; provided, however, that nothing in this clause (d) shall limit the transfer of the Transferred Assets free and clear of Liens, Liabilities, claims, and interests under this Order, except to the extent such Transferred Assets constitute property of the United States or are nontransferable without federal consent under applicable non-bankruptcy law;

(e) be interpreted to set cure amounts or to require the United States to novate, approve, or otherwise consent to the sale, assumption, assignment, or other transfer of any Federal Interests;

(f) waive, alter, or otherwise limit the United States' property rights, except for claims and interests related to the Transferred Assets that are released, discharged, or otherwise addressed by this Order; or

(g) expand the scope of 11 U.S.C. § 525.

42. In the event of an inconsistency or conflict between any provision of the Purchase Agreement and any provision of this Order, as to the United States, the provisions of this Order and applicable federal law shall govern.

**J. <u>Additional Provisions</u>**

43. Notwithstanding anything to the contrary in this Order or the Purchase Agreement, or in connection with any actions taken in connection herewith or therewith, nothing shall, on behalf of the Sale Consenting Parties in connection with the Sale, the consent of the Sale Consenting Parties to the Sale or the Value Allocation Schedule, as a result of the Order or Purchase Agreement: (a) constitute, or be deemed to constitute, an admission, determination, or finding as to the validity, enforceability, priority, perfection, amount, or extent of any claim, lien, security interest, encumbrance, or other interest held by any Sale Consenting Party or any affiliate, designee, or transferee thereof; (b) constitute, or be deemed to constitute, a waiver, release,

compromise, settlement, relinquishment, determination, or finding with respect to any rights, claims, defenses, causes of action, or remedies against any Sale Consenting Party or any affiliate, designee, or transferee thereof, whether arising under the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; or (c) have any preclusive effect (including res judicata, collateral estoppel, judicial estoppel, law of the case, or otherwise) or be used or admitted as evidence in any proceeding, contested matter, adversary proceeding, or other litigation or negotiation (other than in connection with the enforcement of this Order) for any purpose, including, without limitation, as evidence of liability, wrongdoing, or the validity, priority, or extent of any claim or lien, or to impute any adverse inference; *provided*, *however*, that this Order shall constitute a final settlement and release of all claim, lien, ownership, and priority disputes between and among the Chapter 7 Trustee, the Debtors, and the Creditor Consenting Parties solely and exclusively in relation to the Transferred Assets and any allocation or payment of the Purchase Price pursuant to this Order and the Value Allocation Schedule. Such release shall not extend to any other collateral, property, equipment, assets, proceeds, replacements, or products thereof, nor shall it affect, limit, or prejudice any other rights, claims, or defenses of the Creditor Consenting Parties, the Chapter 7 Trustee, the Debtors, or any Debtor affiliate, including in any pending or future lawsuit, Successor Case (as defined in the DIP Order) (including that may be brought by the Chapter 7 Trustee or any trustee acting as successor-in-interest to the bankruptcy estate, or adversary proceedings including, without limitation, in the adversary proceeding captioned Adv. Pro. No. 26 03005 (CML)).

44. This Order and the Purchase Agreement shall be binding upon the Chapter 7 Trustee, the Debtors, their estates, Buyer, all creditors, all holders of Liens, Liabilities, claims, and interests, all contract counterparties, all governmental units, all landlords, all employees, all labor organizations, all benefit plans, all pension funds, all successors and assigns, any subsequently

appointed chapter 7 trustee, examiner, responsible person, estate representative, liquidating trustee, collateral trustee, or other fiduciary, and all other parties in interest.

45. No subsequent chapter 7 trustee, examiner responsible person, estate representative, liquidating trustee, collateral trustee, or other fiduciary appointed in these chapter 7 cases or any Successor Case shall have authority to reject, avoid, unwind, rescind, revoke, modify, or otherwise impair the Purchase Agreement, the Sale, the transfer of the Transferred Assets, or Buyer's rights under this Order.

46. To the extent this Order conflicts with any prior order of this Court, including any order governing rejection, abandonment, assignment, disposition, wind-down, sale, transfer, liens, collateral, cash collateral, or adequate protection, this Order shall govern solely with respect to the Sale, the Transferred Assets, Buyer, and the transactions approved herein.

47. No access agreement, utility agreement, landlord agreement, service-provider agreement, licensor agreement, creditor agreement, contract-counterparty agreement, or other agreement entered into under or in connection with the Wind Down Order shall modify, impair, condition, or limit Buyer's rights under the Purchase Agreement or this Order, or impose any liability or obligation on Buyer, unless Buyer is a party to such agreement or expressly agrees in writing to be bound by it.

48. To the extent of any conflict between this Order and the Purchase Agreement, this Order shall govern.

49. The Chapter 7 Trustee, the Buyer, and any Buyer Designee are authorized and directed to take all actions necessary or appropriate to implement and effectuate the relief granted in this Order, including executing and delivering any further instruments of sale, transfer, conveyance, assignment, confirmation, or correction reasonably necessary to transfer, convey, and

assign to Buyer or any Buyer Designee all Transferred Assets and any additional assets or properties that should have been transferred or assigned to Buyer or any Buyer Designee as Transferred Assets under the Purchase Agreement.

50. The requirements of Bankruptcy Rule 6004(h) are waived. This Order is effective and appealable immediately upon entry, without any stay.

51. The Court retains exclusive jurisdiction to interpret, implement, enforce, and resolve any disputes arising under or related to this Order, including, without limitation, the Purchase Agreement, the Sale, the transfer of the Transferred Assets, the Permitted Exceptions, the liabilities excluded under the Purchase Agreement or this Order, access to the Transferred Assets, transfer documents, and any related documents, claims, disputes, or proceedings.

Signed: [_], 2026

CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Purchase Agreement**

# REAL ESTATE PURCHASE AGREEMENT

705 N Fayette Street, Fayette, Ohio 43521

This Real Estate Purchase Agreement (this "Agreement") is made as of the 15th day of October, 2026 (the "Effective Date"), by and between EVA ENGELHART, Chapter 7 Trustee, solely in her capacity as Chapter 7 Trustee of the bankruptcy estate of In re First Brands Group, LLC, et al., Case No. 25-90399 (CML), pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") ("Seller" or the "Trustee"), and VENTURES IN SPACE FAYETTE, LTD., an Ohio limited partnership, whose address is 11495 State Route 15, Montpelier, Ohio 43543 ("Buyer"). Seller and Buyer are referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

**A.** Seller holds, as property of the estate, the real property and improvements located at 705 N Fayette Street, Fayette, Fulton County, Ohio 43521, identified as Parcel No. 19-039072-00.000 on the records of the Fulton County Auditor;

**B.** On April 16, 2026, the Bankruptcy Court entered the Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter into and Perform under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief [Case No. 25-90399, Docket No. 2454] (the "Wind Down Order"), which, among other things, authorizes the sale contemplated by this Agreement, free and clear of liens, claims and encumbrances, subject to the notice and other procedures set forth in it;

**C.** On September 1, 2026, the Bankruptcy Court entered the Order (I) Converting Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief [Case No. 25-90399, Docket No. 3748];

**D.** Seller desires to sell, and Buyer desires to purchase, that property on the terms set forth in this Agreement, pursuant to the Wind Down Order; and

**E.** Buyer has inspected the Real Property (as defined herein), is familiar with its physical condition and with the operations historically conducted there, and is purchasing on an as-is basis, without representation or warranty of any kind, subject only to this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth below and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## 1. PROPERTY

**1.1 Real Property.** Seller shall sell and convey to Buyer, and Buyer shall purchase from Seller, all of the estate's right, title and interest in and to the real property identified as Parcel No. 19-039072-00.000 on the records of the Fulton County Auditor, commonly known as 705 N Fayette Street, Fayette, Ohio 43521, and as more particularly described on Exhibit A, together with the estate's right, title and interest in and to all buildings, structures and improvements located thereon, and all rights, privileges, easements, appurtenances and hereditaments related thereto (collectively, the "Real Property").

**1.2 Fixtures and Building Systems.** The Real Property includes, to the extent physically present on the Effective Date on the land legally described on Exhibit A, and the Purchase Price is paid for, the estate's right, title and interest in and to all fixtures and building systems, whether or not readily

removable, including without limitation: the roof, structural steel, columns, framing, foundations and slabs; exterior walls, windows, doors and overhead doors; electrical service entrances, transformers, switchgear, panels, bus duct, conduit and permanently installed wiring; lighting fixtures; overhead cranes, crane rails, runways, bridges and hoists; heating, ventilating, air-conditioning and make-up air units; compressed air lines and piping; plumbing, water, sewer and gas lines and equipment; fire suppression systems, sprinkler mains, risers, pumps and alarm systems; dock levelers, dock seals, bumpers and restraints; exhaust and dust collection systems attached to the improvements; fencing, paving, lighting and site improvements; and all similar items affixed to or serving the improvements (collectively, the "Fixtures"). The Fixtures are part of the Real Property and are not subject to removal under Section 9.

**1.3 Remaining Personal Property.** In addition to the Real Property, Seller shall convey to Buyer at Closing, pursuant to Section 3.4, all personal property of the estate that is physically present at the Real Property as of the Closing (the "Remaining Personal Property"). The allocation of the Purchase Price to the Remaining Personal Property is set forth in Section 2.1. Seller makes no representation or warranty as to the existence, quantity, condition, value or title of any Remaining Personal Property, and Buyer accepts all Remaining Personal Property AS IS, WHERE IS, WITH ALL FAULTS. The Remaining Personal Property shall be conveyed subject to Section 11.1.

**1.4 Free and Clear.** The Real Property and the Remaining Personal Property (collectively, the "Property") shall be conveyed free and clear of all liens, claims, encumbrances and other interests (collectively, "Encumbrances," as such term is defined in the Wind Down Order) pursuant to Section 363(f) of the Bankruptcy Code, solely to the extent provided in the Sale Authority, subject only to the Permitted Exceptions (as defined herein), with all such Encumbrances attaching to the net proceeds of sale with the same validity and priority, and to the same extent, as provided in the Wind Down Order.

## 2. PURCHASE PRICE AND DEPOSIT

**2.1 Purchase Price.** The aggregate purchase price for the Property is THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) (the "Purchase Price"), payable in cash or immediately available funds at Closing, subject to the prorations and adjustments in Section 7. Of the Purchase Price, TWO MILLION NINE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($2,950,000.00) is allocated to the Real Property and FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) is allocated to the Remaining Personal Property.

**2.2 Deposit.** Within two (2) Business Days after the Effective Date, Buyer shall deposit THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($300,000.00) (the "Deposit") with The Title Company of Northwest Ohio, LLC, 117 W. Maple Street, Bryan, Ohio 43506, Attn: Mike Shaffer, mshaffer@nssblawoffice.com (the "Escrow Agent"), to be held in a non-interest-bearing account pending Closing. The Deposit shall be applied to the Purchase Price at Closing. The Escrow Agent shall also act as the title insurance agent issuing the Title Commitment and the owner's policy of title insurance contemplated by Section 3.3 (in such capacity, the "Title Agency"). TIME IS OF THE ESSENCE WITH RESPECT TO BUYER'S OBLIGATION TO DELIVER THE DEPOSIT. BUYER'S FAILURE TO TIMELY DELIVER THE DEPOSIT SHALL CONSTITUTE A MATERIAL DEFAULT HEREUNDER, and Seller may terminate this Agreement upon twenty-four (24) hours' written notice to Buyer, whereupon Buyer shall have no further right to acquire the Property pursuant to this Agreement.

**2.3 Return of Deposit.** The Deposit shall be returned to Buyer in full within two (2) Business Days after the Escrow Agent's receipt of written notice of any termination described below, and without further order of the Bankruptcy Court, upon any termination of this Agreement under Sections 3.3, 5.6,

6.1, 6.3, 8.4, 9.3 or 10.1, or upon any termination other than a termination by Seller under Section 11.2 on account of Buyer's default. The Deposit is not property of the estate unless and until this Agreement is terminated by Seller under Section 11.2 on account of Buyer's default, at which time the Deposit shall become property of the estate and shall be released to Seller in accordance with Section 11.2. Buyer's right to the return of the Deposit shall be preserved in the Sale Authority. Upon receipt of a written demand from either Buyer or Seller for disbursement of the Deposit, the Escrow Agent shall promptly deliver a copy of such demand to the other Party. If the other Party objects in writing within two (2) Business Days after receipt of such demand, the Escrow Agent shall continue to hold the Deposit and shall not disburse it to either Party unless and until the Escrow Agent receives joint written instructions from Buyer and Seller or a final order of the Bankruptcy Court directing the disposition thereof. If the other Party does not timely object, the Escrow Agent may disburse the Deposit in accordance with the demand.

**2.4 No Financing Contingency.** Buyer acknowledges that Seller has entered into this Agreement in reliance upon Buyer's representation that it has the financial capacity to consummate the transaction contemplated hereby. Buyer's obligations under this Agreement are not subject to any financing contingency, and neither Buyer nor any assignee of Buyer shall have any right to terminate this Agreement, delay Closing, or obtain the return of the Deposit by reason of the unavailability of financing from any source.

## 3. TITLE INSURANCE CONTINGENCY

**3.1 Title Commitment and Survey.** No later than two (2) Business Days following the Effective Date of this Agreement, Buyer shall order, at its expense, a commitment for an ALTA owner's policy of title insurance from the Title Agency (the "Title Commitment") in the amount of the Purchase Price, together with legible copies of all recorded exceptions, and may obtain, at its expense, an ALTA/NSPS Land Title Survey (the "Survey"). Buyer shall deliver to Seller a copy of the written order confirmation for the Title Commitment promptly after placing the order, but in no event later than the expiration of such two (2) Business Day period. TIME IS OF THE ESSENCE WITH RESPECT TO BUYER'S OBLIGATIONS TO TIMELY ORDER THE TITLE COMMITMENT AND DELIVER THE WRITTEN ORDER CONFIRMATION TO SELLER. BUYER'S FAILURE TO TIMELY SATISFY EITHER OBLIGATION SHALL CONSTITUTE A MATERIAL DEFAULT HEREUNDER, and Seller may terminate this Agreement upon twenty-four (24) hours' written notice to Buyer if Buyer has not cured such failure before the expiration of the notice period, whereupon Buyer shall have no further right to acquire the Property pursuant to this Agreement.

**3.2 Intentionally Deleted.**

**3.3 Contingency.** Buyer's obligation to close is expressly contingent upon the Title Agency being willing, at Closing, to issue an ALTA owner's policy of title insurance in the amount of the Purchase Price, insuring fee simple title in Buyer, subject only to the Permitted Exceptions and in reliance upon the Sale Authority. "Permitted Exceptions" means (i) real estate taxes and assessments not yet due and payable, (ii) governmental easements, utility easements, easements, rights-of-way, covenants, conditions, restrictions, reservations, declarations, licenses, appurtenances, encroachments, matters of record, building lines, setback lines, zoning ordinances, land use regulations, governmental requirements and restrictions, and other non-monetary title matters affecting the Real Property, whether or not disclosed by the Title Commitment or Survey, (iii) all matters disclosed by the Title Commitment or Survey (other than mortgages, mechanics' and materialmen's liens of record, judgment liens and other monetary Encumbrances, which shall attach to the net proceeds of sale as provided in Section 1.4), and (iv) any other matters accepted by Buyer in writing. Notwithstanding the foregoing, any Encumbrance removed, released, discharged or otherwise extinguished pursuant to the Sale Authority

shall not constitute a Permitted Exception. Seller shall deliver a certified copy of the Wind Down Order in accordance with Section 5.1. Buyer shall promptly notify Seller in writing if Buyer or the Title Agency determines that the certified Wind Down Order or other Sale Authority may be insufficient to permit the issuance of the policy required by this Section and shall promptly provide Seller with copies of any written determination, objection or underwriting requirement received from the Title Agency concerning the sufficiency of the Sale Authority. If, after Seller has had the opportunity to obtain any Confirmatory Order pursuant to Section 5.4, the Title Agency is unwilling to issue such policy solely because the Sale Authority is insufficient to authorize the transfer free and clear of Encumbrances that are not Permitted Exceptions, Buyer may terminate this Agreement by written notice to Seller, and the Deposit shall be returned to Buyer in accordance with this Agreement. Buyer shall have no right to terminate based upon any matter constituting a Permitted Exception or any endorsement, affirmative insurance, survey coverage, other coverage or underwriting requirement not expressly required by this Section.

**3.4 Conveyance.** At Closing, Seller shall execute and deliver to Buyer a trustee's deed, without recourse or warranty, in recordable form, conveying all of the estate's right, title and interest in and to the Real Property to Buyer subject to the Permitted Exceptions and otherwise free and clear of all Encumbrances to the extent provided by the Sale Authority, including Section 363(f) of the Bankruptcy Code. The Remaining Personal Property shall be quitclaimed and transferred automatically to Buyer at Closing pursuant to Section 1.3, and this Agreement shall constitute the bill of sale and assignment for the Remaining Personal Property, without any separate bill of sale, assignment or other instrument of transfer. Seller shall also deliver to the Escrow Agent a certified copy of the Wind Down Order and any Confirmatory Order not previously delivered, together with such customary ministerial affidavits as the Title Agency reasonably requires and as Seller can provide based solely upon Seller's actual knowledge, without representation, warranty, recourse or personal liability, and all keys, access codes and available plans, permits, manuals and warranties relating to the Real Property that are actually in Seller's possession or control. Seller shall not be required to provide any owner's affidavit or analogous document, indemnity, guaranty, escrow, surety, letter of credit or other credit support, any certification or affidavit concerning matters outside Seller's actual knowledge, or any post-Closing undertaking or liability, in each case as a condition to Closing or the issuance of the title insurance policy contemplated by Section 3.3.

## 4. ENVIRONMENTAL CONTINGENCY

**4.1 Phase I.** Buyer has completed, at its sole cost, a Phase I Environmental Site Assessment of the Real Property (the "Phase I") and has delivered a copy of the Phase I to Seller. Buyer acknowledges that it has completed its environmental diligence, has elected not to conduct a Phase II Environmental Site Assessment or other invasive testing, and shall have no further environmental inspection, diligence or termination right under this Agreement.

**4.2 No Further Testing.** Buyer shall not conduct any subsurface investigation, drilling, boring, sampling, Phase II Environmental Site Assessment or other invasive testing at the Real Property. Seller, the estate and the Trustee shall have no obligation to investigate, monitor, remove, remediate or otherwise address any condition identified in the Phase I or to incur any cost or liability in connection therewith, except for Seller's express obligations under Section 8. Any entry upon the Real Property by Buyer or its consultants, including any inspection under Section 8.4 or Section 9.2, shall be non-invasive, and Buyer shall maintain commercial general liability insurance in commercially reasonable amounts naming Seller and the estate as additional insureds (a copy of which shall be provided to Seller), shall repair any physical damage caused by its activities, shall keep the Real Property free of liens arising from its activities, and shall indemnify Seller and the estate against claims for personal

injury, property damage and mechanics' liens caused by the negligence or willful misconduct of Buyer or its consultants.

**4.3 Confidentiality of Results.** The Phase I and all reports, data, laboratory results and analyses generated by or for Buyer are confidential. Buyer may disclose such materials only to its lender, counsel, consultants, insurers and their respective advisors on a confidential and need-to-know basis, and to any governmental authority solely to the extent required by applicable law. Buyer shall not disclose such materials to any other person or use them for any purpose other than consummating the transaction contemplated by this Agreement. Seller's receipt of the Phase I is solely for informational purposes, does not constitute an adoption of or agreement with any finding, conclusion or recommendation contained therein, and does not create any representation, warranty, duty or liability of Seller, the estate or the Trustee. Buyer shall not make any voluntary report or disclosure to a governmental authority concerning any environmental condition at the Real Property without Seller's prior written consent, except to the extent required by applicable law.

**4.4 Environmental Contingency Satisfied.** Buyer's environmental contingency is satisfied and waived. Buyer shall proceed to Closing without any reduction in the Purchase Price, extension of the Closing Date, remediation obligation of Seller or claim against Seller, the estate, the Trustee, the Debtors or any of their respective professionals, agents or representatives arising from the Phase I or any environmental condition, except for Seller's express obligations under Section 8.

**4.5 Survival.** Buyer's obligations under this Section 4 shall survive any termination of this Agreement and Closing.

## 5. SALE AUTHORITY

**5.1 Existing Authority.** Seller represents to Buyer that the Wind Down Order is in full force and effect, has not been stayed, vacated, amended or modified in any respect that would impair the sale contemplated by this Agreement, and authorizes Seller to sell the Real Property and the Remaining Personal Property to Buyer on the terms of this Agreement, free and clear of all Encumbrances pursuant to Section 363(f) of the Bankruptcy Code, as and to the extent provided in the Wind Down Order, with such Encumbrances attaching to the net proceeds of sale as provided in the Wind Down Order. Buyer acknowledges that the authority described in this Section 5.1 applies only to the extent the Property constitutes Wind Down Assets (as defined in the Wind Down Order) and is subject to any consent, notice or other requirement of the Wind Down Order applicable to the Property, and Seller makes no representation regarding the scope or effect of the Wind Down Order beyond its express terms. Within three (3) Business Days after the Effective Date, Seller shall deliver to Buyer a certified copy of the Wind Down Order together with any related notice, procedures or bidding procedures order applicable to the sale.

**5.2 Compliance with Procedures.** Seller shall comply with all notice, service, objection, reporting and other procedures required by the Wind Down Order with respect to the sale contemplated by this Agreement, and shall do so promptly and in a manner that permits Closing on or before the Closing Date. The Parties acknowledge that Seller served a Wind Down Sale Notice with respect to the sale contemplated by this Agreement on or about October 8, 2026. Seller shall serve any further notice of the proposed sale required by the Wind Down Order promptly after such notice becomes required, shall provide Buyer's counsel a copy of any such notice contemporaneously with service, and shall promptly notify Buyer of any objection, reservation of rights, request for adjournment or competing offer received.

**5.3 Sale Authority Defined.** As used in this Agreement, "Sale Authority" means, collectively, the Wind Down Order, the satisfaction of all procedures required by it with respect to this sale, and any Confirmatory Order obtained under Section 5.4.

**5.4 Confirmatory Order.** If the Title Agency requires a supplemental or confirmatory order of the Bankruptcy Court in order for the Title Agency to issue the owner's title insurance policy contemplated by Section 3.3, including an order expressly confirming the sale contemplated by this Agreement and attaching any mechanics' liens of record to the net proceeds of the sale, Seller shall promptly seek entry of such order (the "Confirmatory Order") at the estate's expense. Seller shall cooperate with Buyer and the Title Agency regarding the form of the Confirmatory Order and shall seek expedited consideration to the extent reasonably necessary to facilitate Closing. Seller shall not, however, be required to commence contested litigation, appeal any ruling of the Bankruptcy Court, or incur any liability other than the cost of seeking entry of the Confirmatory Order.

**5.5 Required Protections.** The Sale Authority must, whether by operation of the Wind Down Order or by a Confirmatory Order: (a) authorize the sale of the Real Property and the Remaining Personal Property to Buyer on the terms of this Agreement; (b) authorize the transfer free and clear of all Encumbrances under Section 363(f) and to the extent provided for in the Wind Down Order, with such Encumbrances attaching to the net proceeds of sale as provided in the Wind Down Order; (c) afford Buyer the protections of Section 363(m) of the Bankruptcy Code as a good-faith purchaser; (d) provide that Buyer is not a successor to the debtor and assumes no liability of the debtor or the estate except as expressly assumed in this Agreement; (e) intentionally deleted; (f) intentionally deleted; and (g) not be subject to any stay, including any stay under Bankruptcy Rule 6004(h) that has not expired or been waived.

**5.6 Condition to Closing.** Buyer's obligation to close is expressly conditioned upon: (a) the Wind Down Order remaining in full force and effect and not stayed, vacated or modified in any respect that impairs the sale; (b) expiration of any objection or notice period required by the Wind Down Order with respect to this sale, with no objection remaining unresolved; (c) if required under Section 5.4, entry of a Confirmatory Order and expiration or waiver of any applicable stay; and (d) the willingness of the Title Agency to issue the policy described in Section 3.3 in reliance on the Sale Authority. If any of these conditions is not satisfied on or before the Closing Date, Buyer may terminate this Agreement by written notice to Seller and the Deposit shall be returned to Buyer in full.

**5.7 Authority to Execute.** Seller represents that she has full authority, under the Wind Down Order and her appointment as Chapter 7 Trustee, to execute and deliver this Agreement and, subject to Section 5.2, to perform its terms. Seller executes this Agreement solely in her capacity as Chapter 7 Trustee and shall have no personal liability under it.

## 6. CLOSING

**6.1 Closing Date.** The closing of the transaction (the "Closing") shall occur on or before November 1, 2026 (the "Closing Date"). Closing shall occur at the offices of the Escrow Agent or by mail and wire in escrow, on a date designated by Buyer upon not less than two (2) Business Days' prior written notice following satisfaction of the conditions in Sections 3, 5, 8 and 9. Time is of the essence. Notwithstanding the foregoing, if the Title Agency reasonably requires entry of the Confirmatory Order before the Title Agency will issue the owner's policy contemplated hereby, the Closing Date shall be automatically extended for the period reasonably necessary to obtain the Confirmatory Order and satisfy any related title underwriting requirement. Notwithstanding anything to the contrary in this Section 6.1 or Section 6.3, in no event shall the Closing Date be extended beyond November 15, 2026 (the "Outside Date"), and if Closing has not occurred on or before the Outside Date for any reason other

than a Party's default, either Party may terminate this Agreement by written notice to the other, whereupon the Deposit shall be returned to Buyer in accordance with Section 2.3.

**6.2 Possession.** Seller shall deliver exclusive possession of the Real Property to Buyer at Closing, free of all tenants, occupants, lessees, licensees, auctioneers, liquidators, contractors and other parties in possession.

**6.3 Failure to Close by the Closing Date.** If Closing has not occurred on or before the Closing Date for any reason other than Buyer's default, Buyer may, at its election, (a) terminate this Agreement by written notice to Seller, in which case the Deposit shall be returned to Buyer in full, or (b) extend the Closing Date for up to ten (10) Business Days, subject to Seller's prior written consent, which consent may be granted or withheld in Seller's sole and absolute discretion. Buyer's election to extend on one occasion shall not waive its right to terminate thereafter. Notwithstanding the foregoing, Buyer shall not have the right to terminate this Agreement pursuant to this Section, and the Closing Date shall instead be automatically extended for such period as is reasonably necessary (but not beyond the Outside Date), if Closing has not occurred solely due to (i) any requirement, delay, objection, underwriting condition or other matter relating to the issuance of the title insurance policy contemplated by this Agreement, including, without limitation, any requirement of the Title Agency for a Confirmatory Order or other order of the Bankruptcy Court, or (ii) any delay in obtaining the Sale Authority, a Confirmatory Order, any other order of the Bankruptcy Court, or any other court-related delay affecting the consummation of the transaction contemplated hereby.

## 7. PRORATIONS AND CLOSING COSTS

**7.1 Real Estate Taxes.** Real estate taxes and special assessments affecting the Real Property shall be prorated as of the Closing Date on a due-date basis in accordance with Fulton County custom. All delinquent real estate taxes and special assessments affecting the Real Property, together with any penalties and interest thereon, shall be paid from Seller's proceeds at Closing. Seller shall be responsible only for installments of special assessments due and payable on or before the Closing Date, and Buyer shall be responsible for all installments due and payable after the Closing Date, regardless of when the assessment was imposed, certified or levied. Notwithstanding anything herein to the contrary, Seller shall have no obligation under this Agreement to pay any personal property taxes or any fees, assessments, charges, penalties or interest relating thereto.

**7.2 Conveyance Fee and Transfer Taxes.** Seller shall pay the Ohio real property conveyance fee and all transfer taxes in full from Seller's proceeds at Closing. The Parties acknowledge that the exemption under 11 U.S.C. § 1146(a) applies only to transfers under a confirmed plan and is not available in a sale under Section 363.

**7.3 Buyer's Costs.** Buyer shall pay the premium for its owner's title policy and any lender's policy and endorsements, the cost of its survey, its environmental assessments, recording fees for the deed, and all costs of its lender.

**7.4 Shared and Separate Costs.** Escrow and closing fees charged by the Escrow Agent shall be shared equally. Each Party shall bear its own attorneys' fees and professional costs.

**7.5 Utilities and Operating Costs.** Utility charges and other operating costs shall be prorated as of the Closing Date, with Seller responsible for all such charges attributable to the period before Closing. Seller shall cause final meter readings to be taken as of the Closing Date. To the extent utility service and property insurance are in effect as of the Effective Date and remain within Seller's control, Seller shall use commercially reasonable efforts to cause to be maintained such utility service, including heat

sufficient to prevent freezing, and to maintain such property insurance through Closing; provided, however, that Seller shall not be required to reinstate any discontinued utility service or insurance coverage or incur any extraordinary cost or liability.

**8. SELLER'S REMOVAL OF ENVIRONMENTALLY SENSITIVE MATERIALS**

**8.1 Seller's Obligation.** Prior to Closing, and at the sole cost of the estate, Seller shall remove from the Real Property and lawfully dispose of all paint, paint supplies, coatings, thinners and solvents; all oils, lubricants, hydraulic fluids, cutting fluids, coolants, greases and fuels; all acids, caustics, plating solutions and process chemicals; all compressed gas cylinders; all batteries, lamps, ballasts and universal waste; and all other hazardous substances, hazardous waste, petroleum products and environmentally sensitive products located at the Real Property, together with all drums, totes, containers and above-ground tanks, whether located inside or outside the improvements (collectively, the "Environmental Materials"). Environmental Materials do not include any condition in, on, under or migrating from the Real Property, any conditions contained within, incorporated into, affixed to or constituting any building material, floor tile, mastic, drywall, insulation, roofing material, Fixture or improvement, any property owned by a third party, or de minimis quantities of customary cleaning and maintenance supplies ordinarily used in the operation of commercial property.

**8.2 Manner of Removal.** All removal and disposal of Environmental Materials shall be performed in compliance with applicable law by a licensed and insured contractor. Any manifests, bills of lading or disposal documentation shall be issued in the name of Seller or the debtor as generator, and not in the name of Buyer. Seller shall deliver copies of all such documentation actually received by Seller to Buyer at or before Closing.

**8.3 Buyer Takes All Other Items.** Except for the Environmental Materials, Buyer shall accept all items physically present at the Real Property at Closing in their then-existing condition and location. Seller shall have no obligation to remove, clean, sort, dispose of or pay any cost of removal or disposal of any item other than the Environmental Materials, and Seller shall bear no other removal or disposal cost of any kind.

**8.4 Confirmation and Remedy.** Buyer may inspect the Real Property not more than three (3) Business Days before Closing to confirm compliance with this Section, upon not less than twenty-four (24) hours' prior written notice to Seller. Seller and its representatives may accompany Buyer during the inspection, and the inspection shall otherwise be subject to the insurance, indemnity, lien-prevention and damage-repair requirements of Section 4.2. If a material quantity of Environmental Materials required to be removed under Section 8.1 remains at the Real Property, Seller shall either (i) remove such Environmental Materials before Closing or (ii) provide Buyer with a credit at Closing equal to the reasonable cost to remove and lawfully dispose of such Environmental Materials after Closing, as set forth in a written estimate from a licensed and insured contractor delivered to Seller before Closing. If Seller does not remove such Environmental Materials or provide the required credit, Buyer may terminate this Agreement and receive a return of the Deposit in accordance with Section 2.3, which shall be Buyer's sole remedy with respect to such Environmental Materials. Except as otherwise provided in the immediately preceding sentences, Buyer shall proceed to Closing, and no holdback, additional credit, price reduction or post-Closing claim shall apply unless expressly agreed in writing by Seller.

**9. EQUIPMENT REMOVAL AND PROTECTION OF THE IMPROVEMENTS**

**9.1 Completion of Removal.** Any removal of personal property or equipment from the Real Property by Seller, by any auctioneer or liquidation agent engaged by Seller, or by any purchaser at any sale

conducted by or on behalf of Seller (each, together with their respective contractors, a "Removal Party") shall be completed no later than five (5) Business Days before Closing. Seller shall notify Buyer promptly upon completion of the removal operations.

**9.2 Final Inspection.** Promptly following Seller's notice under Section 9.1, and in any event before Closing, Buyer may conduct one final, non-invasive physical inspection of the Real Property upon not less than twenty-four (24) hours' prior written notice to Seller. Seller and its representatives may accompany Buyer during the inspection, and the inspection shall otherwise be subject to the insurance, indemnity, lien-prevention and damage-repair requirements of Section 4.2. The inspection shall be solely to determine whether the removal operations caused material physical damage to the structural components, roof, exterior walls, foundation or principal building systems of the improvements ("Material Removal Damage").

**9.3 Termination Right.** If Buyer reasonably determines that Material Removal Damage has occurred, Buyer shall deliver written notice to Seller no later than twenty-four (24) hours after the inspection and before Closing, describing the Material Removal Damage in reasonable detail. Seller may elect, in Seller's sole and absolute discretion, to (i) repair or otherwise address the Material Removal Damage before Closing, or (ii) agree in writing to a credit or escrow on terms determined by Seller in its sole and absolute discretion. Seller shall have no obligation to make either election. If Seller does not so elect, Buyer may terminate this Agreement and the Deposit shall be returned to Buyer, and neither Party shall have any further obligation under this Agreement except those obligations that expressly survive termination. If Buyer does not timely deliver a termination notice, Buyer shall be deemed to have waived the Material Removal Damage and shall proceed to Closing.

**9.4 As-Is Condition; Exclusive Remedy.** Buyer acknowledges that the inspection and termination right provided in this Section 9 is Buyer's sole and exclusive right and remedy with respect to the condition of the Real Property following the removal operations. If Buyer does not timely terminate this Agreement pursuant to Section 9.3, Buyer shall be deemed to have approved the condition of the Real Property following completion of the removal operations and shall proceed to Closing. Upon Closing, the condition of the Real Property, including any condition resulting from the removal operations, shall be governed exclusively by Section 11.1, and Buyer shall have no right to any reduction in the Purchase Price, credit, escrow, holdback or other claim against Seller, the estate, the Trustee or any Removal Party arising from the removal operations.

**9.5 Intentionally Deleted.**

**9.6 Intentionally Deleted.**

## 10. CASUALTY AND CONDEMNATION

**10.1 Casualty and Condemnation.** If, before Closing, the improvements are damaged by fire or other casualty and the reasonable estimated cost of repair exceeds TWO HUNDRED NINETY-FIVE THOUSAND AND 00/100 DOLLARS ($295,000.00), or if a governmental authority commences a condemnation proceeding that would result in a material taking of the Real Property, Buyer may terminate this Agreement by written notice delivered to Seller within twenty-four (24) hours after Seller notifies Buyer of the casualty or proceeding, and the Deposit shall be returned in accordance with Section 2.3. If Buyer does not timely terminate, Buyer shall proceed to Closing and Seller shall assign to Buyer, without representation, warranty or recourse, Seller's right to any insurance proceeds or condemnation award actually payable, net of amounts applied by Seller to stabilization or repair and subject to the rights of any secured party. Seller shall have no obligation to repair the casualty damage or fund any deductible.

**11. AS-IS SALE; NO REPRESENTATIONS; REMEDIES**

**11.1 As-Is.** EXCEPT FOR SELLER'S EXPRESS OBLIGATIONS UNDER SECTIONS 3.4, 7, 8, 9 AND 10, AND EXCEPT AS EXPRESSLY SET FORTH IN THE DEED DELIVERED AT CLOSING, THE PROPERTY IS SOLD AS IS, WHERE IS, WITH ALL FAULTS, AND SELLER MAKES NO REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING AS TO TITLE, POSSESSION, QUIET ENJOYMENT, CONDITION, EXISTENCE, QUANTITY, QUALITY, OPERATION, ENVIRONMENTAL CONDITION, COMPLIANCE WITH LAW, ZONING, DEVELOPMENT POTENTIAL, SUITABILITY, MARKETABILITY, VALUE, FUTURE PERFORMANCE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. ANY WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE ARE EXPRESSLY DISCLAIMED. THE PROPERTY IS BEING CONVEYED WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN, LATENT OR PATENT. Buyer acknowledges that Buyer has been afforded the opportunity to conduct such inspections and investigations as Buyer deems necessary and is relying solely on Buyer's own review, inspections, investigations and judgment. Buyer further acknowledges that neither Seller, the Trustee, the Debtors nor any of their respective professionals, agents or representatives has made any representation concerning the operation, profitability, development potential, suitability or value of the Property. Buyer assumes the risk of all matters affecting the Property, including conditions that may not have been discovered prior to Closing. No representation, warranty, covenant or agreement shall survive Closing except as expressly provided in Section 12.6. Except to the extent expressly provided in Section 12.6, Buyer shall have no recourse after Closing against Seller, the estate, the Trustee, any Debtor or any of their respective professionals, agents or representatives with respect to the Property.

**11.2 Buyer Default.** If Buyer fails to close in material breach of this Agreement, and all conditions to Buyer's obligations have been satisfied or waived, Seller's sole and exclusive remedy shall be to terminate this Agreement and retain the Deposit as liquidated damages, and not as a penalty, the Parties acknowledging that actual damages would be difficult to ascertain and that the Deposit is a reasonable estimate of such damages.

**11.3 Seller Default.** If Seller fails to close in breach of this Agreement, and Buyer is not then in default under this Agreement, Buyer may elect either (a) to terminate this Agreement and receive a return of the Deposit, or (b) to seek specific performance of Seller's obligation to convey the Property pursuant to this Agreement. Buyer shall not be entitled to recover consequential, special, punitive, speculative or indirect damages arising from Seller's failure to close.

**11.4 Attorneys' Fees.** In any action to enforce or interpret this Agreement, each Party will bear its own attorneys' fees and costs.

**12. MISCELLANEOUS**

**12.1 Assignment.** Buyer may assign this Agreement to an entity affiliated with Buyer or designate an entity affiliated with Buyer to take title to the Property at Closing upon twenty-four (24) hours' prior written notice to Seller and without Seller's consent, provided such assignee or designee assumes Buyer's obligations under this Agreement and Buyer remains liable through Closing.

**12.2 Agency Acknowledgment.** The purchase and sale of the Real Property hereunder is being made through Hilco Real Estate, LLC or its affiliates (collectively, "Agent"), in their capacity as agent for Seller pursuant to (i) that certain Amended and Restated Consulting and Marketing Services

Agreement, dated as of March 13, 2026; (ii) that certain Machinery and Equipment Marketing Agreement, dated as of May 27, 2026; and (iii) that certain Intangible Assets, Real Estate, and Other Assets Marketing Agreement, dated as of May 28, 2026, each by and between First Brands Group, LLC and Agent (each as amended, restated, or modified from time to time), as approved pursuant to the Wind Down Order. For the avoidance of doubt, in its capacity as agent to Seller, Agent is not taking title to the Real Property prior to sale.

**12.3 Notices.** All notices shall be in writing and given by nationally recognized overnight courier, or electronic mail with confirmation of delivery, to the addresses set forth on the signature page. Notice is effective upon receipt or refusal of delivery.

**12.4 Governing Law; Jurisdiction.** Except to the extent governed by the Bankruptcy Code or other applicable federal law, this Agreement shall be governed by and construed in accordance with the laws of the State of Ohio, without regard to conflicts-of-law principles. The Parties consent to the jurisdiction of the Bankruptcy Court with respect to all matters arising out of or relating to this Agreement. The Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by law to interpret, implement, enforce and resolve disputes arising under or relating to this Agreement and the transactions contemplated hereby, including any escrow arrangement expressly agreed to pursuant to Section 9.3.

**12.5 Entire Agreement; Amendment; Counterparts.** This Agreement, together with Exhibit A, constitutes the entire agreement of the Parties with respect to its subject matter and supersedes all prior understandings, whether oral or written. No amendment or waiver is effective unless in writing and signed by both Parties and, if required, approved by the Bankruptcy Court. This Agreement may be executed in counterparts and delivered electronically. If any provision is held invalid, the remaining provisions continue in effect. This Agreement has been negotiated by the Parties and shall not be construed against either as drafter.

**12.6 Survival.** Except as expressly provided in this Agreement, all representations, covenants, obligations and agreements of the Parties shall merge into and be superseded by the documents delivered at Closing and shall not survive Closing. Notwithstanding the foregoing, Sections 4.3, 5.7, 11, 12.2, 12.4 and 12.7 shall survive Closing.

**12.7 No Waiver; Limited Recourse.** Seller is executing this Agreement solely in her capacity as Chapter 7 Trustee of the bankruptcy estate and not individually or personally. Buyer acknowledges that any recourse arising under this Agreement shall be limited solely to the assets of the bankruptcy estate. No waiver, consent, approval or election by Seller shall be deemed to create any personal liability of Seller or otherwise expand Buyer's remedies beyond the assets of the bankruptcy estate.

**12.8 Business Day; Time Periods.** For purposes of this Agreement, "Business Day" means any day other than a Saturday, Sunday or legal holiday (state or federal) in the State of Ohio. If any date for performance, approval, delivery or Closing falls on a day that is not a Business Day, the time therefor shall be extended to the next Business Day.

*[balance of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER:**
EVA ENGELHART,
solely in her capacity as Chapter 7 Trustee of the
bankruptcy estate of In re First Brands Group, LLC,
et al., Case No. 25-90399 (CML)

DocuSigned by:
Eva Engelhart
17AE566F8087446...
______________________________
Eva Engelhart, Chapter 7 Trustee

Address: Ross, Banks, May, Cron and Cavin, PC
Attn: Eva Engelhart, Chapter 7 Trustee
7700 San Felipe, Suite 550
Houston, TX 77063
Email: eengelhart@rossbanks.com

with a copy to:

Katten Muchin Rosenman LLP
Attn: Grace A. Thompson and Cindi Giglio
50 Rockefeller Plaza
New York, NY 10020-1605
Email: grace.thompson@katten.com
cgiglio@katten.com

**BUYER:**
VENTURES IN SPACE FAYETTE, LTD.,
an Ohio limited partnership

By: ______________________________
Name: Sean Rupp
Title: General Partner

Address: Ventures in Space Fayette, LTD.
Attn: Sean Rupp
11495 State Route 15
Montpelier, Ohio 43543
Email: sean@ruppenterprises.com

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER:**
EVA ENGELHART,
solely in her capacity as Chapter 7 Trustee of the
bankruptcy estate of In re First Brands Group, LLC,
et al., Case No. 25-90399 (CML)

______________________________________
Eva Engelhart, Chapter 7 Trustee

Address: Ross, Banks, May, Cron and Cavin, PC
Attn: Eva Engelhart, Chapter 7 Trustee
7700 San Felipe, Suite 550
Houston, TX 77063
Email: eengelhart@rossbanks.com

with a copy to:

Katten Muchin Rosenman LLP
Attn: Grace A. Thompson and Cindi Giglio
50 Rockefeller Plaza
New York, NY 10020-1605
Email: grace.thompson@katten.com
cgiglio@katten.com

**BUYER:**
VENTURES IN SPACE FAYETTE, LTD.,
an Ohio limited partnership

DocuSigned by:
By: Sean Rupp ______________________
7A0B21548B9C494...
Name: Sean Rupp______________________
Title: General Partner______________________

Address: Ventures in Space Fayette, LTD.
Attn: Sean Rupp
11495 State Route 15
Montpelier, Ohio 43543
Email: sean@ruppenterprises.com



306213083v5_404528-00003 10/14/2026 4:14 PM

Exhibit A – Legal Description

Situated as being part of John Gamber's Addition (Lots 66-74 and vacated portions) to the Village of Fayette in the Northeast Quarter of Section 19, Town 9 South, Range 1 East, Village of Fayette, Fulton County, Ohio as being part of tracts of land as recorded in Official Record Volume 325, Page 2620, Official Record Volume 322, Page 3697, Official Record 221, Page 3344 and Deed Volume 238, Page 981 and more particularly described as follows;

Also being all of Auditor's Parcel 146, 147 and Part of 148 in said Village.

Beginning at a 1/2 inch rebar with ID cap found marking the intersection of the South right-of-way of West Industrial Parkway and the East right-of-way line of Gorham Street and marking the Northwest corner of a tract of land as recorded in Official Record Volume 322, Page 3697 of the Fulton County Deed of Records and being the POINT OF BEGINNING;

Thence South 89°57'23" East along said South right-of-way line of West Industrial Parkway a distance of 578.35 feet to a point referenced by a 5/8 inch rebar with ID cap set 1.00 feet South of said point;

Thence South 00°55'37" East along the West right-of-way line of Fayette Street a distance of 576.85 feet to a 5/8 inch rebar with ID cap set and marking the Northeast corner of a tract of land (Lot 65 of John Gamber's Addition) as recorded in Official Record Volume 71, Page 811 of the Fulton County Deed Records;

Thence South 63°11'52" West along the North boundaries of Lots 57-60 and Lot 65 of John Gamber's Addition (also being the South line of a former railroad right-of-way) a distance of 641.99 to a capped metal surveyors stake being on the East right-of-way of Gorham Street and marking the Northwest corner of a tract of land (Lot 57 of John Gamber's Addition) and passing a point at 293.07 feet marked by a 2 inch bent pipe 0.92 feet North and 0.86 feet West of said point;

Thence North 00°58'10" West along said East right-of-way line of Gorham Street a distance of 866.82 to the POINT OF BEGINNING, passing a point at 418.13 feet referenced by a 5/8 inch rebar found 0.12 feet South and 0.24 feet West of said point; said tract containing 9.578 acres of land, more or less.

Subject to all legal highways, easements and restrictions of use whether apparent and/or of record and is from an actual field survey performed in May 2015 under the supervision of Ohio Professional Surveyor Gregory A. Bockrath, Ohio Survey No. 8306.

Note: The bearings used in this description are on an assumed meridian assuming the South right-of-way line of West Industrial Parkway to the South 89°57'23" East and are for the purpose of angle determination only.

Commonly known as: 705 North Fayette Street, Fayette, Ohio 43521
Parcel Numbers: Tax Parcel No.: 19-039072-00.000
Prior Deed Reference: OR Volume 359 Page 2100 of the Fulton County, OH Records

*[end of legal description]*

# Exhibit 2

## Value Allocation Schedule

**Project Overdrive – Fayette Transaction Sources & Uses** 10/28/2026

**Preliminary Confidential Draft - Subject to Material Change**

**Transaction Sources & Uses**

| **Sources** | | **Uses** | |
|---|---|---|---|
| Purchase price | $3,000,000.00 | Distribution to DIP lenders | $2,619,500.00 |
| | | Deposit to SPV-DIP Wind-Down Account (AHG/DIP 50%)[1] | 20,833.33 |
| | | Deposit to SPV-DIP Wind-Down Account (Onset 50%)[1] | 20,833.33 |
| | | Hilco Commission | 155,833.33 |
| | | Hilco Expense Reimbursement | 8,000.00 |
| | | Payment of seller closing costs & RE taxes[2] | 175,000.00 |
| **Total Sources** | **$3,000,000.00** | **Total Uses** | **$3,000,000.00** |

1. Per the Wind Down Order (the "Order"), Net Proceeds deposited into the SPV-ABL Wind Down Account or the SPV-DIP Wind Down Account pursuant to paragraphs 37 and 38 of the Order, as applicable, shall be made available for payment of any Location Expenses with respect to a Wind Down Sale of Wind Down Assets at the applicable Location. To the extent any Location Expenses are advanced by any secured lenders, any such amounts shall be recouped from Net Proceeds after payment of the Consultant's Fees and Expenses but prior to distribution of Net Proceeds to the secured party ultimately entitled to receive such Net Proceeds.

2. Good faith estimate of required seller closing charges and accrued real estate taxes, both of which must be paid to transfer clean title and close. Reflects an 11/2/26 settlement date, plus a contingency for a later closing. To be funded solely from the real property allocation of Net Proceeds. The final amount will be provided to the lenders prior to closing.