**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | (Previously Chapter 11) |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | ) | Case No. 25-90399 (CML) |
| Debtors.[1] | ) | (Jointly Administered) |

**ORDER IN FURTHERANCE OF THE WIND DOWN ORDER APPROVING BIDDING PROCEDURES AND AUCTION FOR MCHENRY WIND DOWN SALE**
[Related to Docket Nos. 3933, 2454]

Upon the request of Eva S. Engelhart, the chapter 7 trustee (the "FBG Trustee")[2] of the jointly administered estates of First Brands Group, LLC and its affiliated debtors (the "FBG Debtors")[3] for entry of an order (the "Order") in furtherance of the Wind Down Order and in connection with the sale of inventory, machinery, and equipment located at the FBG Debtors' McHenry, Illinois facilities (the "McHenry Wind Down Assets") (i) approving the proposed Bidding Procedures attached hereto as **Exhibit A**; (ii) designating JessCo Brakes Inc. as the Stalking Horse Bidder; and (iii) approving and authorizing payment of the Bid Protections for the Stalking Horse Bidder; and the Court having considered the Notice of Proposed Bidding Procedures, the McHenry Wind Down Sale Motion and declarations of Eva Engelhart and Alexander McKeown attached thereto, the Wind Down Motion, the Wind Down Order, the Declaration of Charles M. Moore in support of the Wind Down Motion [Docket No. 2217], and the record before it; and it appearing that venue

[1] A complete list of the Debtors in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The FBG Debtors' service address for these chapter 7 cases is Eva Engelhart, Chapter 7 Trustee c/o Porter Hedges LLP, Joshua W. Wolfshohl, 1000 Main St., 36th Floor, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined in this Order have the meanings given in the Notice of Proposed Order, the Wind Down Order, the Stalking Horse Bill of Sale, or the Bidding Procedures, as applicable.

[3] "FBG Debtors" includes First Brands Group Holdings, LLC, First Brands Group Holdings, LLC's direct and indirect Debtor subsidiaries, and Viceroy Private Capital, LLC.

is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Bidding Procedures and the Order having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and all objections, if any, to the Bidding Procedures having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is in the best interests of the FBG Debtors and their respective estates and creditors; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. On April 16, 2026, the Court entered the Wind Down Order and on July 9, 2026, the Court entered the Extension Order.

B. The Wind Down Order authorizes the Debtors (and the FBG Trustee and their successor) to sell or otherwise dispose of the Wind Down Assets.

C. On November 1, 2026, the FBG Trustee executed the bill of sale attached hereto as Exhibit 1 to the Bidding Procedures (the "Stalking Horse Bill of Sale"), pursuant to the authority granted under the Wind Down Order.

D. The FBG Trustee has articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances, are designed to maximize realizable value of the McHenry Wind Down Assets, and are consistent with the Wind Down Order.

E. The Stalking Horse Bill of Sale (a) provides a baseline of value, which the FBG Trustee believes will increase the likelihood of competitive bidding at the auction thereby increasing, in the FBG Trustee's view, the likelihood that the FBG Debtors will receive the best

possible price and terms for the McHenry Wind Down Assets; (b) facilitates participation of other bidders in the sale process; and (c) is a benefit to the FBG Debtors' estates.

F. The Break-Up Fee and Expense Reimbursement, as set forth in the Stalking Horse Bill of Sale are (a) reasonably tailored to avoid discouraging or hampering bidding for the McHenry Wind Down Assets; (b) reasonable and appropriate, and within the sound exercise of the FBG Trustee's business judgment; (c) a material inducement for the Stalking Horse Bidder and ensures that the FBG Trustee will have a binding bid at the commencement of the auction; and (d) reasonable in relation to the Stalking Horse Bidder's efforts and to the magnitude of the sale of the McHenry Wind Down Assets and the Stalking Horse Bidder's lost opportunities resulting from the time spent pursuing such transaction.

**ACCORDINGLY, IT IS HEREBY ORDERED THAT:**

1. The Bidding Procedures attached hereto as **Exhibit A** and incorporated by reference, are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of bids relating to the proposed McHenry Wind Down Sale, and any party desiring to submit an offer for McHenry Wind Down Assets must comply with the terms of the Bidding Procedures and this Order. The Bidding Procedures also shall govern the terms on which the FBG Trustee will proceed with any Auction or the McHenry Wind Down Sale.

2. All objections to the Bidding Procedures or the relief requested that have not been withdrawn, waived, resolved, or settled, are overruled.

3. The FBG Trustee is authorized to solicit additional bids and conduct an auction, if necessary, in each case pursuant to the terms and conditions set forth in the Bidding Procedures, and to take all actions as are necessary or appropriate to implement the Bidding Procedures.

4. JessCo Brakes Inc. is hereby approved as and deemed the Stalking Horse Bidder.

5. The Stalking Horse Bidder is deemed a Qualified Bidder and the Stalking Horse Bill of Sale, together with the Stalking Horse Lease Assignment (the "Stalking Horse Bid") is deemed a Qualified Bid for all purposes; *provided,* that, for the avoidance of doubt, approval and consummation of the transactions contemplated by the Stalking Horse Bid shall be subject to the terms and conditions therein, the Bidding Procedures, and the entry of an order approving the sale of the McHenry Wind Down Assets at a Sale Hearing.

6. The Bid Protections are hereby approved on the terms set forth in the Stalking Horse Bill of Sale. The FBG Trustee is authorized to pay the Stalking Horse Bidder the Break-Up Fee and Expense Reimbursement, if and to the extent they become due and payable under the Stalking Horse Bill of Sale, solely from the Gross Proceeds of the McHenry Wind Down Sale or any Alternative Transaction, as applicable; *provided*, that no Bid Protections shall be payable to the Stalking Horse Bidder if the Stalking Horse Bidder is in material breach of the Stalking Horse Bill of Sale. No further or additional order from the Court shall be required to give effect to such provisions relating to the terms of payment of the Bid Protections as set forth in the Stalking Horse Bill of Sale and the Bidding Procedures.

7. The FBG Trustee or Hilco shall serve this Order and the Bidding Procedures by email on (i) the Office of the United States Trustee; (ii) the Wind Down Sale Notice Parties; (iii) the SPV Trustee; (iv) the Stalking Horse Bidder; (v) the Landlord; (vi) U.S. Customs and Border Protection; and (vii) all parties known to have expressed an interest in acquiring the McHenry Wind Down Assets.

8. Except as expressly set forth herein and in the Bidding Procedures, the Wind Down Order shall govern the McHenry Wind Down Sale and the Wind Down Order, the Consulting Agreement, and the Extension Order shall remain in full force and effect. For the avoidance of

doubt, each of the Wind Down Sale Notice Parties shall maintain their notice and consent rights with respect to the McHenry Wind Down Sale. Nothing in this Order or the Bidding Procedures shall (i) determine or affect any party's rights regarding ownership of the McHenry Wind Down Assets or interest in the Net Proceeds of the McHenry Wind Down Sale; or (ii) waive any party's right to object to the sale of the McHenry Wind Down Assets at the Sale Hearing, all of which rights are fully reserved and shall be determined in accordance with the Wind Down Order.

9. The Court shall retain exclusive jurisdiction regarding this Order, the Bidding Procedures, and all matters related to the McHenry Wind Down Sale.

10. Notwithstanding Bankruptcy Rule 6004(h) or any Local Bankruptcy Rule, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

Dated: ________________, 2026

______________________________
Christopher M. Lopez
United States Bankruptcy Judge

# Exhibit A

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | (Previously Chapter 11) |
| | ) | |
| **FIRST BRANDS GROUP, LLC, *et al.*,** | ) | Case No. 25-90399 (CML) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**BIDDING PROCEDURES**

On April 16, 2026, the U.S. Bankruptcy Court for the Southern District of Texas (the "Court") entered the Wind Down Order, authorizing the Debtors (and the FBG Trustee, as successor) to sell Wind Down Assets (as defined in the Wind Down Order) pursuant to certain enumerated notice and sale procedures.

On October 18, 2026, the FBG Trustee filed the *Chapter 7 Trustee of the FBG Debtors' Emergency Motion for Entry of Order (A) Authorizing Consummation of McHenry Wind Down Sale Pursuant to the Wind Down Order and (B) Granting Related Relief* [Case No. 25-90399, Docket No. 3933] (the "McHenry Wind Down Sale Motion") seeking, among other things, approval of a sale of inventory, machinery, and equipment located at the FBG Debtors' McHenry, Illinois facilities (the "McHenry Wind Down Assets"), along with the assumption and assignment of the two unexpired real property leases for the McHenry facilities (the "Leases") and certain potential estate liabilities to U.S. Customs and Border Protection ("CBP"), pursuant to the process set forth in the Wind Down Order (the "McHenry Wind Down Sale").

On November [●], 2026, the Court entered the *Order in Furtherance of the Wind Down Order Approving Bidding Procedures and Auction for McHenry Wind Down Sale* [Docket No. [●]] (the "Bidding Procedures Order"), whereby the Court approved an auction and sale process, to be led by Hilco as consultant under the Wind Down Order, for the sale of the McHenry Wind Down Assets in accordance with these Bidding Procedures.

Set forth below are the bidding procedures (the "Bidding Procedures") to be used with respect to a proposed sale of the McHenry Wind Down Assets. The sale contemplated by these Bidding Procedures is subject to competitive bidding as set forth herein and approval by the Court.

The Bidding Procedures set forth herein describe, among other things, the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined below), respectively, the receipt and negotiation of bids received, the conduct of any Auction (as defined herein), the

[1] A complete list of the Debtors in these chapter 7 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/firstbrands. The FBG Debtors' service address for these chapter 7 cases is Eva Engelhart, Chapter 7 Trustee c/o Porter Hedges LLP, Joshua W. Wolfshohl, 1000 Main St., 36th Floor, Houston, Texas 77002.

ultimate selection of the Successful Bidder (as defined herein) and the Court's approval thereof (collectively, the "Bidding Process").

Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Bidding Procedures Order or the Wind Down Order, as applicable.

## A. Wind Down Order

Except as expressly set forth in these Bidding Procedures and the Bidding Procedures Order, the Wind Down Order shall govern the McHenry Wind Down Sale and the Wind Down Order, the Consulting Agreement, and the Extension Order shall remain in full force and effect. For the avoidance of doubt, each of the Wind Down Sale Notice Parties (as defined in the Wind Down Order) shall maintain their notice and consent rights with respect to the McHenry Wind Down Sale. Nothing in this Bidding Process shall determine or affect any party's rights regarding ownership of the McHenry Wind Down Assets or interest in the Net Proceeds of the McHenry Wind Down Sale, all of which rights are fully reserved and shall be determined in accordance with the Wind Down Order.

## B. Marketing Process

Hilco shall lead the marketing and sale process described in these Bidding Procedures on behalf of the FBG Trustee, as exclusive agent under the Wind Down Order. Hilco and the FBG Trustee may also consult with (i) CBP regarding matters within its jurisdiction, including with respect to potential tariff liabilities and free trade zones; and (ii) the landlord under the Leases (the "Landlord") regarding the assumption and assignment of the Leases.

Promptly upon entry of the Bidding Procedures Order, (i) the FBG Trustee will file a notice of sale on the docket; and (ii) Hilco will contact potentially interested bidders, informing such parties of these Bidding Procedures and inviting them to submit Qualified Bids.

To participate in the Bidding Process or otherwise be considered for any purpose hereunder, a person or entity interested in the McHenry Wind Down Assets or part thereof (other than the Stalking Horse Bidder (defined below)) (a "Potential Bidder") should contact Hilco, consultant for the Wind Down Sales: FirstBrandsLiquidation@Hilcoglobal.com, with copy to proposed special counsel to the FBG Trustee: Cindi M. Giglio (cgiglio@katten.com) and Grace A. Thompson (grace.thompson@katten.com).

## C. Key Dates

The key dates and deadlines for the Bidding Process are as follows:

| Proposed Date and Time | Event or Deadline |
|---|---|
| November 2, 2026 at 1:00 p.m. (prevailing Central Time) | Status Conference |
| November 5, 2026 at 4:00 p.m. (prevailing Central Time) | Bid Deadline |
| November 5, 2026 at 9:00 p.m. (prevailing Central Time) | Notifications to Qualified Bidders |

| | |
|---|---|
| November 6, 2026 at 8:00 a.m. (prevailing Eastern Time) | Auction (if applicable) in person in NYC and via Zoom |
| By the later of: (i) 10:00 a.m. (prevailing Central Time) on November 9, 2026; and (ii) 24 hours after the conclusion of the Auction. | Deadline to:<br>(i) file Notice of Successful Bidder; and<br>(ii) serve Wind Down Sale Notice |
| As soon as reasonably practicable following conclusion of the Auction, subject to Court availability. | Sale Hearing |

**D. "As Is, Where Is"**

The McHenry Wind Down Sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by (i) Hilco; (ii) the Debtors; (iii) the FBG Trustee; (iv) Ronald J. Sommers, the chapter 7 trustee (the "SPV Trustee") of the jointly administered estates of Patterson Inventory, LLC and its affiliated debtors; and (v) the agents, representatives, or estates of each of the foregoing, except as may be set forth in a Proposed Bill of Sale or Proposed Lease Assignment with a Successful Bidder, as approved by the Court.

**E. Free of Any and All Encumbrances**

The McHenry Wind Down Sale will be free and clear of all liens, claims, interests, and encumbrances (collectively, the "Encumbrances"), with such Encumbrances attaching to the Net Proceeds of the McHenry Wind Down Sale.

**F. Bid Requirements**

Any Potential Bidder who wishes to participate in the Bidding Process must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver the following documents via email to Hilco and proposed special counsel to the FBG Trustee at the addresses set forth below, no later than the Bid Deadline (as defined below):

a. Evidence of the Potential Bidder's financial ability to close the McHenry Wind Down Sale. Such evidence may take the form of, among other things, current audited financial statements, bank statements, evidence of a non-contingent financing commitment, or such other documentation as Hilco may accept in its sole discretion;

b. A letter stating that the Potential Bidder's offer is irrevocable until the conclusion of the Auction or, if the Potential Bidder is selected as the Successful Bidder or the Back-Up Bidder, until the time provided in Sections K and L, as applicable;

c. (i) a binding, executed, and definitive Bill of Sale that the Potential Bidder proposes, including the purchase price in U.S. dollars for each asset or group of assets subject to the applicable bid (the "Proposed Bill of Sale"); and (ii) a copy marked to show changes to the Stalking Horse Bill of Sale (attached hereto as **Exhibit 1**) and all schedules thereto;

d. A good faith earnest money cash deposit (the "Deposit"), to be held by Hilco, in an amount equal to 10% of the total cash consideration of the proposed McHenry Wind Down Sale; *provided* that if the bidder increases its bid at the Auction and is the Successful Bidder or Back-Up Bidder, such bidder must increase its Deposit to be equal to 10% of the proposed cash consideration submitted at the Auction within three business days after the Auction;

e. Information providing adequate assurance of future performance under the Leases if proposed to be assumed and assigned to the Potential Bidder, including (i) information about the Potential Bidder's financial condition, such as federal tax returns, a current financial statement, or bank account statements; (ii) the identity and exact name of the Potential Bidder; and (iii) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include, which information may be disseminated to the Landlord in the event Hilco determines such bid to be a Qualified Bid;

f. If the Leases are proposed to be assumed and assigned to the Potential Bidder, (i) a binding Lease Assignment and Assumption Agreement executed by the Potential Bidder (the "Proposed Lease Assignment"); and (ii) a copy marked to show changes to the Stalking Horse Lease Assignment (attached hereto as **Exhibit 2**);

g. Evidence of corporate authority to enter into the McHenry Wind Down Sale;

h. A statement, under penalty of perjury, that the Potential Bidder and its representatives have not engaged in any collusion with any other party in interest, including any Potential Bidder, the FBG Trustee, any current or former employee of the Debtors, or any representatives of the foregoing; and

i. Any additional information reasonably requested by Hilco.

Friction One (as defined below), the designated Stalking Horse Bidder (defined below), is deemed to be a Qualified Bidder and the Stalking Horse Bid (defined below) is deemed to be a Qualified Bid. As such, Friction One need not comply with the requirements of this Section F and Section G, below.

## G. Qualified Bidders and Qualified Bids

A Potential Bidder (i) who delivers the documents described in Section F above; (ii) whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the McHenry Wind Down Sale if selected as the Successful Bidder; (iii) who the FBG Trustee determines is likely (based on availability of financing, experience, and other considerations) to consummate the McHenry Wind Down Sale within the time frame provided by the Stalking Horse Bill of Sale; and (iv) whose bid otherwise constitutes a "Qualified Bid" pursuant to these Bidding Procedures, shall be deemed a "Qualified Bidder." The FBG Trustee will determine whether a Potential Bidder is a Qualified Bidder after consulting with Hilco. By November 5, 2026 at 9:00 p.m. (prevailing Central Time), Hilco will notify Potential Bidders whether they are Qualified Bidders.

A bid (other than the Stalking Horse Bid) that contemplates a McHenry Wind Down Sale will be deemed a "Qualified Bid" and considered by Hilco only if the bid satisfies the following requirements:

a. is on terms and conditions (other than the amount of the consideration) that are substantially similar to, and are not materially more burdensome or conditional to the Debtors' estates than those contained in the Stalking Horse Bill of Sale;

b. is for all or a portion of the McHenry Wind Down Assets and clearly identifies (i) whether the bid is for substantially all or a smaller portion of the McHenry Wind Down Assets, including the proposed consideration and the liabilities (if any, including potential tariff liabilities applicable to the McHenry Wind Down Assets) to be assumed; (ii) any excluded assets or liabilities; and (iii) the structure and financing of the sale (including, but not limited to, the sources of financing);

c. either (a) is for a sale "in-place" with assumption and assignment of the Leases; or (b) contemplates removal of the McHenry Wind Down Assets; *provided*, that in the case of a bid contemplating removal, the bidder shall be responsible for all removal costs, including shipping, loading, and personnel, and the bid shall state the estimated time period for removal; *provided*, *further*, that if the purchased McHenry Wind Down Assets are not removed by December 31, 2026, the bidder shall be responsible for all Location Expenses effective January 1, 2027;

d. clearly sets forth the purchase price to be paid for the McHenry Wind Down Assets to be purchased by asset class, and proposes a purchase price in cash equal to or greater than $14,500,000 (comprising no less than $12,500,000 allocated to inventory and $2,000,000 allocated to machinery and equipment), *plus* the amount of the Bid Protections;

e. clearly sets forth whether the Leases are to be assumed and assigned and, if so, includes a Proposed Lease Assignment on terms no less favorable than the Stalking Horse Lease Assignment, including with respect to payment of cure costs;

f. contains no contingencies of any type, other than Court approval;

g. is not conditioned upon any bid protections (such as a topping fee, termination fee, expense reimbursement, or similar type of payment);

h. contains an acknowledgement and representation that the bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the McHenry Wind Down Assets in making its bid; and (ii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the McHenry Wind Down Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Proposed Bill of Sale or the Proposed Lease Assignment;

i. identifies each regulatory and third-party approval required for the bidder to consummate the McHenry Wind Down Sale, if any, and the time period within which the bidder expects to receive such regulatory and third-party approvals;

j. fully discloses the identity of each entity or person that will be bidding for or purchasing the McHenry Wind Down Assets, including all material equity holders (i.e., parties that own at least 10% of the equity of the bidder) in the case of a Potential Bidder that is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such bid, and the complete terms of any such participation, including any agreements, arrangements, or understandings concerning collaborative or joint bids or any other combination concerning the proposed bid. The bid must also fully disclose any connection with or participation by any "insider" (as defined by section 101(31) of the Bankruptcy Code) of the Debtors or any relative or any affiliate of any "insider" of the Debtors, and any connection with or participation by any current creditor or equity holder of the Debtors; and

k. is received by the Bid Deadline.

***All bids for the McHenry Wind Down Sale must contemplate payment in cash, equal to or greater than $14,500,000 (comprising no less than $12,500,000 allocated to inventory and $2,000,000 allocated to machinery and equipment) plus the amount of the Bid Protections. Any bid (other than the Stalking Horse Bid) that is not for cash, and does not otherwise comply with the above requirements, shall not be deemed to be a Qualified Bid.***

Notwithstanding the foregoing, the FBG Trustee shall have the right to entertain bids that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids, and to discuss bids with Potential Bidders to ensure that Potential Bidders satisfy the requirements herein; *provided*, *however*, that the requirements set forth in Section G(d) of these Bidding Procedures shall not be modified. A Qualified Bid will be valued, among other things, based upon factors such as the net value provided by such bid (including the cash purchase price and assumed liabilities), the likelihood and timing of consummating the transaction in question, and any other factors relevant to the sale, as determined by the FBG Trustee in her reasonable business judgment.

Between the time a Potential Bidder is notified that it is a Qualified Bidder and the Auction, Hilco may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. A Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by the Qualified Bid, or otherwise enhance the terms of the Qualified Bid.

If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Auction shall be canceled, the FBG Trustee will file a notice with the Court canceling the Auction, the Stalking Horse Bidder shall be deemed the Successful Bidder, and the Stalking Horse Bid shall be submitted to the Bankruptcy Court for approval at the Sale Hearing.

By submitting a bid, a Potential Bidder warrants and represents that it is a principal acting on its own behalf, and not as a broker, finder, or agent acting on another's behalf. Such Potential Bidder

acknowledges that it will not look to Hilco, the FBG Trustee, or the Debtors' estates for the payment of any fee or commission. In addition, each Potential Bidder agrees to be responsible for the payment of any fee, commission, or other compensation payable to any broker, finder, or agent who alleges it has dealt with or through such Potential Bidder.

## H. Bid Deadline and Bid Recipients

A Potential Bidder (other than the Stalking Horse Bidder) who desires to make a bid shall deliver written copies of its bid via email to each of the following **no later than 4:00 p.m. (prevailing Central Time) on November 5, 2026** (the "Bid Deadline"):

**Hilco**

FirstBrandsLiquidation@Hilcoglobal.com

**Proposed Special Counsel to the FBG Trustee**

Katten Muchin Rosenman LLP
Cindi M. Giglio (cgiglio@katten.com)
Grace A. Thompson (grace.thompson@katten.com)

---

## I. Stalking Horse Designation

JessCo Brakes Inc. (as designee of Friction One Brake Technology (Xiantao) Co., Ltd.) ("Friction One") shall serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant to the terms of the Bill of Sale dated October 18, 2026, as amended and restated on November 1, 2026 (the "Stalking Horse Bill of Sale") and the Lease Assignment and Assumption Agreement, dated October 18, 2026 (the "Stalking Horse Lease Assignment" and the bid embodied by the Stalking Horse Bill of Sale and Stalking Horse Lease Assignment, together, the "Stalking Horse Bid"). The Stalking Horse Bid shall be binding only through the applicable deadlines set forth in Section 1.09(e) of the Stalking Horse Bill of Sale. No Successful Bid or Back-Up Bid submitted by the Stalking Horse Bidder shall remain binding beyond those deadlines without the Stalking Horse Bidder's prior written consent.

If the Stalking Horse Bidder is selected as the Successful Bidder (whether pursuant to the Stalking Horse Bid or any increased bid), the Stalking Horse Bid shall be binding and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Central Time) on the date which is five days after the order approving the sale to the Successful Bidder becomes final, and (ii) the closing of the sale with the Successful Bidder.

If the Stalking Horse Bidder is not selected as the Successful Bidder, then the Stalking Horse Bid shall not be binding on the Stalking Horse Bidder following the Auction (other than to the extent it is deemed a Back-Up Bid in accordance with the below). In the event the Stalking Horse Bidder is not selected as the Successful Bidder (or if selected as the Back-Up Bidder but not ultimately chosen to close the sale), the Stalking Horse Bidder shall be entitled to (i) an expense reimbursement for the Stalking Horse Bidder's reasonable and documented out-of-pocket costs and expenses incurred in connection with the Bidding Process up to a maximum amount of $100,000 (the "Expense

Reimbursement"); and (ii) a break-up fee of 2% of the aggregate cash purchase price of the Stalking Horse Bid (the "Break-Up Fee" and, together with the Expense Reimbursement, the "Bid Protections"), which shall be payable from Gross Proceeds of the McHenry Wind Down Sale. No Qualified Bidder, other than the Stalking Horse Bidder, shall be entitled to Bid Protections.

Following entry of the Bidding Procedures Order, the Expense Reimbursement shall also be payable if the Sale Order approving the Stalking Horse Bidder as the Successful Bidder has not been entered on or before November 25, 2026, unless such failure results primarily from the Stalking Horse Bidder's uncured material breach of the Stalking Horse Bill of Sale. If Gross Proceeds are not then available, the Expense Reimbursement shall remain payable from the first Gross Proceeds of any subsequent sale or disposition of all or a material portion of the McHenry Wind Down Assets.

If, before or within ninety (90) days after the expiration or termination of the Stalking Horse Bid, any Seller enters into a definitive agreement with respect to, or consummates, a sale or other disposition to any person or entity other than Buyer, its affiliate, or its designee of all or a material portion of the Acquired Assets (an "Alternative Transaction"), and such Alternative Transaction is thereafter consummated, Buyer shall be entitled to the Break-Up Fee and, to the extent not previously paid, the Expense Reimbursement, in each case payable from the Gross Proceeds of such Alternative Transaction. Expiration or termination of the Stalking Horse Bid shall not affect the Stalking Horse Bidder's right to any Bid Protections that accrued before expiration or termination or that thereafter become payable under the Stalking Horse Bill of Sale.

## J. Auction

If more than one Qualified Bid (including the Stalking Horse Bid) is received, an auction (the "Auction") will be conducted, upon notice to all Qualified Bidders who have submitted Qualified Bids, at 8:00 a.m. (prevailing Eastern Time) on November 6, 2026 at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, NY 10020, with remote dial-in accommodations provided via Zoom, in accordance with the following procedures:

a. Only the following persons shall be entitled to attend the Auction: (i) representatives of Hilco; (ii) the FBG Trustee, the SPV Trustee, and their respective advisors and representatives; (iii) professionals and principals or members of the Stalking Horse Bidder; (iv) professionals and principals or members of any Qualified Bidder who has timely submitted a Qualified Bid; (v) representatives of CBP; and (vi) the applicable Wind Down Sale Notice Parties and their respective advisors. Only Qualified Bidders will be entitled to make any Subsequent Bids (as defined below) at the Auction.

b. At the commencement of the Auction, Qualified Bidders in attendance will be informed which Qualified Bid or combination of Qualified Bids that Hilco believes (in consultation with the FBG Trustee) is the highest or otherwise best offer(s), and from which bidding will begin (the "Baseline Bid").

c. All Qualified Bidders shall be entitled to be present for all Subsequent Bids (as defined below) with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid shall be fully disclosed to all Qualified Bidders throughout the entire Auction.

d. Hilco may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and after consulting with the FBG Trustee regarding the same.

e. Bidding at the Auction shall begin with the Baseline Bid. Thereafter, the minimum bidding increment for each additional bid (the "Subsequent Bids" and each a "Subsequent Bid") shall be the amount of the Bid Protections, plus $500,000 (which increments may be increased or decreased by Hilco, in its discretion, in consultation with the FBG Trustee).

f. A Subsequent Bid must comply with the requirements for a Qualified Bid set forth above, including allocation of the Subsequent Bid by asset class. Any Subsequent Bid must remain open and binding on the bidder unless and until a higher or otherwise better Subsequent Bid is submitted.

g. The Auction shall continue in one or more rounds of bidding. During each round of bidding, each Qualified Bidder will be given one opportunity to submit a Subsequent Bid. To qualify for the next round of bidding, each Qualified Bidder, with full knowledge and written confirmation of the then existing highest bid or bids, must submit a Subsequent Bid within the time allotted by Hilco to do so. Hilco may, in consultation with the FBG Trustee, increase or decrease time limitations as necessary to facilitate the highest and best value for the Debtors' estates.

Hilco may, in its discretion or at the direction of the FBG Trustee, adjourn the Auction at one or more times to, among other things (i) facilitate discussions with Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and/or (iii) allow Qualified Bidders the opportunity to provide the FBG Trustee and Hilco with such additional information or evidence, as each may require.

Hilco shall maintain a transcript of the proceedings at the Auction, including the Baseline Bid, all Subsequent Bids, and the Successful Bid (as defined below).

## K. Closing of Auction and Selection of Successful Bid

The Auction shall continue until there is only one bid or combination of bids that the FBG Trustee determines is the highest or otherwise best Qualified Bid(s) for the McHenry Wind Down Assets, after taking into account factors such as the speed and certainty of consummating the transaction and the impact on the Debtors' estates (such bid being the "Successful Bid," and the bidder making such bid, the "Successful Bidder"). The FBG Trustee shall file a notice of Successful Bidder (the "Notice of Successful Bidder") by the later of: (i) 10:00 a.m. (prevailing Central Time) on November 9, 2026; and (ii) 24 hours after the conclusion of the Auction. The Notice of Successful Bidder shall include, at a minimum: (a) the identity of the Successful Bidder and the Back-Up Bidder, if any; (b) the final form of the Proposed Bill of Sale to be consummated among the FBG Trustee, the SPV Trustee, and the Successful Bidder; (c) the final form of the Proposed Lease Assignment to be consummated among the FBG Trustee, the Successful Bidder, if applicable, and the Landlord; and

(d) a proposed form(s) of sale order, if required by the Successful Bidder. Contemporaneously with filing the Notice of Successful Bidder, the FBG Trustee will serve a Wind Down Sale Notice on the applicable Wind Down Sale Notice Parties.

All bidders will be deemed to have consented to the core and exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from, or connected with the Auction, the marketing process, the McHenry Wind Down Sale, and the construction and enforcement of any purchase agreement.

Notwithstanding anything to the contrary herein, if the Stalking Horse Bidder is selected as the Successful Bidder, its bid shall remain binding only through the applicable deadlines set forth in Section 1.09(e) of the Stalking Horse Bill of Sale, unless extended with the Stalking Horse Bidder's prior written consent.

## L. Back-Up Bid

If there is an Auction, the Qualified Bidder that submits the second-highest or otherwise best bid at the Auction shall be required to serve as the back-up bidder (the "Back-Up Bidder") and keep such Back-Up Bidder's last bid (the "Back-Up Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Central Time) on the date which is five days after the order approving the sale to the Successful Bidder becomes final, and (ii) the closing of the sale with the Successful Bidder (the "Outside Back-Up Date").

If, after the Sale Hearing (defined below) but prior to the Outside Back-Up Date, the Successful Bidder fails to consummate or proceed with the McHenry Wind Down Sale for any reason, the Back-Up Bidder will be deemed to be the Successful Bidder on the terms of the Back-Up Bid without any further order of the Court, and the FBG Trustee may pursue any and all available remedies against the Successful Bidder in connection with its failure to consummate the McHenry Wind Down Sale. The FBG Trustee will provide notice to the Court, the U.S. Trustee, the Stalking Horse Bidder, CBP, and the applicable Wind Down Sale Notice Parties of any failure by the Successful Bidder to close the McHenry Wind Down Sale and the election to proceed to close a McHenry Wind Down Sale with the Back-Up Bidder.

Notwithstanding anything to the contrary herein, no Back-Up Bid submitted by the Stalking Horse Bidder shall remain binding beyond the applicable deadlines set forth in Section 1.09(e) of the Stalking Horse Bill of Sale without the Stalking Horse Bidder's prior written consent. Expiration of such Back-Up Bid shall not affect the Stalking Horse Bidder's rights to the Bid Protections.

## M. The Sale Hearing and Returning Deposits

In the event one or more bids for the McHenry Wind Down Assets or a portion thereof are accepted by the FBG Trustee a hearing (the "Sale Hearing") to approve the McHenry Wind Down Sale(s) will take place before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, on **[November [●], 2026, at [●]:00 a/p.m. (prevailing Central Time),]**[2] in the United States

---

2 Subject to Court availability. The Sale Hearing shall be scheduled sufficiently in advance of November 25, 2026 to permit entry of the Sale Order on or before that date. No adjournment or rescheduling of the Sale Hearing shall extend the period during which the Stalking Horse Bid remains binding without the Stalking Horse Bidder's prior written consent.

Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Courtroom 402, Houston, TX 77002. The Sale Hearing may be adjourned or rescheduled by the FBG Trustee without notice other than by an announcement made at the Sale Hearing or a notice filed with the Court.

A Successful Bid approved by the Court shall be binding on the FBG Trustee, the SPV Trustee, and the respective estates of each.

The Deposit (together with interest, if any, thereon) of the Back-Up Bidder will not be returned until two (2) business days following the closing of the McHenry Wind Down Sale to the Successful Bidder. The Deposit (together with interest, if any, thereon) of all other Qualified Bidders will be returned as soon as practicable following the conclusion of the Auction. The Deposit of the Successful Bidder (together with interest, if any, thereon) shall be applied against the payment of the purchase price upon the closing of the McHenry Wind Down Sale.

Deposits made by Potential Bidders who are not determined to be Qualified Bidders will be returned as soon as practicable after the closing of the sale of the McHenry Wind Down Assets.

## N. Modifications

The FBG Trustee may modify these Bidding Procedures in her reasonable business judgment in any manner that will best promote the goals of these Bidding Procedures. All such modifications and additional rules will be communicated to each of the Potential Bidders, Qualified Bidders, and applicable Wind Down Sale Notice Parties; *provided*, *however*, that no modification, adjournment, or extension of these Bidding Procedures pursuant to this Section N shall alter the Stalking Horse Bidder's status as a Qualified Bidder, the Stalking Horse Bid's status as a Qualified Bid, the Bid Protections, or the period during which any bid submitted by the Stalking Horse Bidder remains binding, without the Stalking Horse Bidder's prior written consent.

# Exhibit 1

## <u>Stalking Horse Bill of Sale</u>

This Amended and Restated ASSIGNMENT AND BILL OF SALE (this "**Bill of Sale**"), dated as of November 1, 2026, is made by and among Brake Parts Inc LLC, a limited liability company organized and existing under the laws of Delaware ("**BPI**"), Starlight Inventory I, LLC, a Delaware limited liability company (each a "**Seller**", and collectively, "**Sellers**"), and JessCo Brakes Inc., a Texas corporation ("**Buyer**" and, collectively with Sellers, the "**Parties**"), and amends, restates, and supersedes in its entirety the Original Bill of Sale (defined below).

**RECITALS**

On or about September 24, 2025, and September 28, 2025, Sellers and certain of their affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**" and such cases, the "**Bankruptcy Cases**");

On April 9, 2026, the Bankruptcy Court entered the *Order (I) Converting Chapter 11 Cases of Evolution SPV Debtors to Cases Under Chapter 7; and (II) Granting Related Relief* [Docket No. 2396] and Ronald Sommers was appointed as the chapter 7 trustee of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC [Case No. 25-90392, Docket No. 11; Case No. 25-90393, Docket No. 11; Case No. 25-90394, Docket No. 11; Case No. 25-90395, Docket No. 11];

On April 16, 2026, the Bankruptcy Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter into and Perform under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2454] (the "**Wind Down Order**");

On July 9, 2026, the Bankruptcy Court entered the *Order Extending Wind Down Order to the Chapter 7 Trustee and Related Relief* [Case No. 25-90392, Docket No. 61] (the "**Starlight Patterson Extension Order**");

On September 1, 2026, the Bankruptcy Court entered the *Order (I) Converting Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* [Docket No. 3748] (the "**FBG Conversion Order**") and Eva Engelhart was named as the chapter 7 trustee (the "**FBG Trustee**") of the Debtors whose cases were converted pursuant thereto;

The FBG Trustee and Buyer previously entered into that certain Assignment and Bill of Sale, dated as of October 18, 2026 (the "**Original Bill of Sale**"), and the Parties desire to amend and restate the Original Bill of Sale in its entirety as set forth in this Bill of Sale; and

Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, all of the Acquired Assets (defined below) on the terms and subject to the conditions set forth in this Bill of Sale, pursuant to the Wind Down Order and Starlight Patterson Extension Order, and free and clear of any and all Encumbrances, as that term is used in the Wind Down Order.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Bill of Sale, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound as of the execution of this Agreement (the "**Effective Date**"), agree as follows:

## ARTICLE I
## PURCHASE AND SALE

Section 1.01. Purchase and Sale of Acquired Assets. Subject to the entry by the Bankruptcy Court of a final order, in form and substance satisfactory to Buyer (the "**Sale Order**"), each Seller hereby sells, conveys, assigns, transfers to Buyer, and Buyer hereby purchases, acquires and accepts from each such Seller, all of such Seller's right, title and interest in, to and under all inventory, machinery, and equipment located at 1380 Corporate Drive, McHenry, IL 60050; 4400 Prime Parkway, McHenry, IL 60050; and 1100 Corporate Drive, McHenry, IL 60050 (such premises subject to the Leases (defined below), together, the "**Leased Property**" and, such assets, collectively, the "**Acquired Assets**") free and clear of any and all Encumbrances, as that term is used in and to the extent provided in the Wind Down Order. Buyer shall purchase the Acquired Assets "in place" at the Leased Property and shall be responsible for all costs, expenses, taxes, duties, tariffs, imposts, tolls, customs, fees, charges, or other assessments levied or billed to the Buyer to transfer the Acquired Assets to Buyer (collectively, the "**Transfer Expenses**"). No Seller will be responsible for any Transfer Expenses.

Section 1.02. Assignment of Leases; Cure Costs. Subject to entry of the Sale Order, as a material inducement to Buyer's agreement to enter into this Bill of Sale, BPI shall assume its leases with respect to the Leased Property (the "**Leases**") and assign them to Buyer, and Buyer shall take assignment of the Leases from BPI pursuant to the terms and conditions of the Lease Assignment and Assumption Agreement executed contemporaneously herewith (the "**Lease Assignment and Assumption Agreement**"). For the avoidance of doubt, the Buyer's agreement to enter into and close on the transactions contemplated by this Bill of Sale is expressly conditional upon the Bankruptcy Court's approval of the Lease Assignment and Assumption Agreement. As set forth in the Lease Assignment and Assumption Agreement, in full and final satisfaction of all cure costs in connection with the assumption, assignment, or transfer of the Leases (collectively, the "**Cure Costs**"), (i) landlord of the Leased Property (the "**Landlord**") will apply the full amount of the proceeds from the remainder of the proceeds available from drawing on the letter of credit issued respecting the 4400 Prime Parkway Lease; (ii) the FBG Trustee shall relinquish and abandon to Landlord BPI's right, title and interest in and to the remaining balance of any security deposit held under or with respect to either of the Leases; and (iii) Buyer shall make a one-time cash payment to the Landlord of $210,336.26, which amount shall be in addition to the purchase price owed by Buyer to Sellers pursuant to Section 1.04 of this Bill of Sale. Except as expressly set forth in this section, the Sellers and Buyer shall have no other obligations for Cure Costs.

Section 1.03. Bankruptcy Court Approval. The FBG Trustee shall seek Bankruptcy Court approval of the Sale Order. Each Seller agrees and acknowledges that, from the Effective Date until the earlier of the closing and expiration or termination of the Stalking Horse Bid, the Acquired Assets shall not be sold or transferred to any other entity or person, removed, or otherwise disposed of from the Leased Property except pursuant to the Bidding Procedures Order or with Buyer's prior written consent.

Section 1.04. Purchase Price. The aggregate consideration to be paid by Buyer on the Closing Date, by wire transfer, for the sale of all of the Acquired Assets and obligations of Sellers set forth in this

Bill of Sale shall be an amount in cash equal to Fourteen Million Five Hundred Thousand U.S. Dollars ($14,500,000), of which amount (i) Two Million U.S. Dollars ($2,000,000) shall be allocated to machinery and equipment Acquired Assets, and (ii) Twelve Million Five Hundred Thousand U.S. Dollars ($12,500,000) shall be allocated to inventory Acquired Assets (the "**Purchase Price**"). The Purchase Price shall not be subject to any adjustment.

Section 1.05. Seller Cooperation. From and after the Effective Date until the completion of the Wind Down, each Seller shall use commercially reasonable efforts to reasonably cooperate with Buyer and execute, acknowledge, and deliver such further instruments, assignments, conveyances, declarations, affidavits, and other documents, and take such further actions, as Buyer may reasonably request to evidence, perfect, record, confirm, or otherwise effectuate the transfer, assignment, vesting, and ownership of the Acquired Assets in Buyer or its designee.

Section 1.06. Debtors' Books and Records. The Debtors maintain certain physical books and records at the Leased Property (the "**Books and Records**"), which shall not constitute Acquired Assets. Buyer shall provide the FBG Trustee and her agents, contractors, riggers, other third-party vendors or representatives (collectively, the "**Removal Personnel**") access to the Leased Property through and including December 31, 2026, during normal business hours or at such other times as Buyer may reasonably approve (such approval not to be unreasonably withheld, conditioned, or delayed), solely as reasonably necessary to inspect, rig, load, remove, and transport the Books and Records; *provided*, *however*, that the Debtors and the Removal Personnel shall not remove or transport any Books and Records that include any information (a) relating to any free trade zone or foreign trade zone at which the Acquired Assets are located or (b) that may be relevant to the Buyer's potential future liability for Transfer Expenses (such Books and Records, the "**FTZ Records**"). The Debtors and all Removal Personnel shall use commercially reasonable efforts to reasonably cooperate with Buyer to maintain in place and segregate the FTZ Records. The FBG Trustee and the Removal Personnel shall coordinate all access and removal activities with Buyer on reasonable advance notice (email notice being sufficient) and all Removal Personnel shall conduct all such activities in a safe, workmanlike, and commercially reasonable manner, and in a manner that does not unreasonably interfere with any of Buyer's activities at the Leased Property. The FBG Trustee shall ensure that all Removal Personnel engaged by or on her behalf in connection with such activities are properly licensed and insured, to the extent required by applicable law, and, upon Buyer's or the Leased Property's Landlord's reasonable request, shall provide reasonable evidence of such insurance before any such Removal Personnel enter the Leased Property. The Debtors shall be responsible, at their sole cost, expense, and risk, for all costs and expenses of the pickup, disconnection, disassembly, rigging, loading, removal, crating, packing, storage, shipment and transportation of the Books and Records, including all labor, equipment, contractor, carrier, permit, and removal costs, solely to the extent such costs are related to removal activities conducted by or on behalf of the Debtors. The Debtors shall be responsible for liabilities arising from the Removal Personnel or the Removal Personnel's access to the Leased Property or removal activities to the extent caused by the acts or omissions of the Removal Personnel.

Section 1.07. No Buyer Responsibility for Pre-Closing Claims. Buyer will not assume any responsibility or liability arising out of or resulting from claims (including, without limitation, product liability, warranty, returns, recall, litigation, or customer claims) to the extent such claims arise out of the sale of products manufactured and sold by any Seller to third-party customers prior to closing of the transactions contemplated by this Bill of Sale (the "**Closing Date**"). For the avoidance of doubt, (a) Buyer shall be solely responsible for any claims arising out of or resulting from Buyer's own sale, marketing,

distribution, storage, handling, or modification of any Acquired Assets or products following the Closing Date, and (b) nothing in this Section 1.07 shall create any obligation on the part of any Seller to indemnify Buyer or any third party with respect to any claims arising after the Closing Date solely from Buyer's acts or omissions.

Section 1.08. No Seller Responsibility for Post-Closing Tariffs. Buyer will assume sole responsibility and liability for any tariffs, duties, customs, fees, imposts, or other charges arising from (i) the removal of the Acquired Assets from any free trade zone or foreign trade zone at which the Acquired Assets are located as of the Closing Date; or (ii) the entry of the Acquired Assets into the customs territory of the United States following the Closing Date.

Section 1.09. Stalking Horse Bidder; Bid Protections; Termination.[1]

(a) Notwithstanding anything to the contrary in Section 1.03, upon approval by the Bankruptcy Court of bidding procedures governing the bidding and auction process for the Acquired Assets (the "**Bidding Procedures**," and the order approving such procedures, the "**Bidding Procedures Order**"), Buyer shall be designated as the "Stalking Horse Bidder" and this Bill of Sale (including the Purchase Price) and the Lease Assignment and Assumption Agreement shall together constitute the stalking horse bid (the "**Stalking Horse Bid**"). Notwithstanding anything to the contrary in this Bill of Sale, the Stalking Horse Bid and this Section 1.09 shall be binding on Buyer upon Buyer's execution and delivery of this Bill of Sale, subject in all respects to Section 1.09(e). While the Stalking Horse Bid remains binding and before entry of the Bidding Procedures Order, Sellers may continue to market the Acquired Assets and solicit competing bids; *provided*, *however*, that, without Buyer's prior written consent, no Seller shall (i) designate or seek authority to designate any other person or entity as a stalking horse or initial bidder for the Acquired Assets, (ii) enter into a definitive agreement with respect to an Alternative Transaction (as defined below), (iii) withdraw or materially modify its request for approval of Buyer as the Stalking Horse Bidder or the Bid Protections, or (iv) support or seek approval of any sale of the Acquired Assets other than pursuant to the process contemplated by the proposed Bidding Procedures Order. Any action described in clauses (i) through (iv) shall cause the Stalking Horse Bid to automatically expire and cease to be binding.

(b) Subject in all respects to Section 1.09(e), if Buyer is selected as the Successful Bidder (whether pursuant to the Stalking Horse Bid or any increased bid), the Stalking Horse Bid shall be binding and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Central Time) on the date which is five (5) days after the order approving the sale to the Successful Bidder is entered, and (ii) the closing of the sale with the Successful Bidder.

(c) If Buyer is not selected as the Successful Bidder, then the Stalking Horse Bid shall not be binding on Buyer or Seller following the Auction (other than to the extent it is deemed a Back-Up Bid in accordance with the Bidding Procedures). In the event Buyer is not selected as the Successful Bidder (or if selected as the Back-Up Bidder but not ultimately chosen to close the sale), Buyer shall be entitled to (i) an expense reimbursement for Buyer's reasonable and documented out-of-pocket costs and expenses incurred in connection with the Bidding Process up to a maximum amount of $100,000 (the "**Expense Reimbursement**"); and (ii) a break-up fee of two percent (2%) of the aggregate cash purchase price of the Stalking Horse Bid (the "**Break-Up Fee**" and, together with the Expense

[1] Capitalized terms used but not defined in this Section 1.09 shall have the meanings given to them in the Bidding Procedures.

Reimbursement, the "**Bid Protections**"), which shall be payable from Gross Proceeds of the sale. Following entry of the Bidding Procedures Order, the Expense Reimbursement shall also be payable if the Sale Order approving Buyer as the Successful Bidder has not been entered on or before November 25, 2026, unless such failure results primarily from Buyer's uncured material breach of this Bill of Sale. If, before or within ninety (90) days after the expiration or termination of the Stalking Horse Bid, any Seller enters into a definitive agreement with respect to, or consummates, a sale or other disposition to any person or entity other than Buyer, its affiliate, or its designee of all or a material portion of the Acquired Assets (an "**Alternative Transaction**"), and such Alternative Transaction is thereafter consummated, Buyer shall be entitled to the Break-Up Fee and, to the extent not previously paid, the Expense Reimbursement, in each case payable from the Gross Proceeds of such Alternative Transaction. The expiration or termination of the Stalking Horse Bid shall not affect Buyer's right to receive any Bid Protections that accrued before such expiration or termination or that thereafter become payable pursuant to this Section 1.09(c).

(d) For the avoidance of doubt, Buyer shall be a Qualified Bidder and the Stalking Horse Bid shall be a Qualified Bid under the Bidding Procedures.

(e) The Stalking Horse Bid shall automatically expire and cease to be binding at 5:00 p.m. prevailing Central Time on the date that is fourteen (14) calendar days after Buyer's execution and delivery of this Bill of Sale unless, on or before such time, the Bankruptcy Court has entered the Bidding Procedures Order designating Buyer as the Stalking Horse Bidder, deeming Buyer a Qualified Bidder and the Stalking Horse Bid a Qualified Bid, and approving the Bid Protections on the terms set forth in Section 1.09(c). If the Bidding Procedures Order is timely entered, the Stalking Horse Bid shall automatically expire and cease to be binding if a Sale Order approving Buyer as the Successful Bidder has not been entered on or before November 25, 2026. Any extension of either deadline shall require Buyer's prior written consent. Upon such expiration, Buyer shall have no further obligation under the Stalking Horse Bid, whether as Stalking Horse Bidder, Successful Bidder, or Back-Up Bidder; *provided*, *however*, that Buyer's rights to the Bid Protections under Section 1.09(c) shall survive.

## ARTICLE II
## "AS IS, WHERE IS" TRANSACTION

Section 2.01. "As Is, Where Is"; No Representations or Warranties. **EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS BILL OF SALE, BUYER UNDERSTANDS AND AGREES THAT THE ACQUIRED ASSETS ARE BEING TRANSFERRED "IN PLACE" ON A "WHERE-IS" AND, AS TO CONDITION, "AS-IS" BASIS, SUBJECT ONLY TO THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 3.07, WITH ALL FAULTS AND DEFECTS, WHETHER KNOWN OR UNKNOWN, LATENT OR PATENT, AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE**. Without limiting the foregoing, no Seller makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyer regarding the probable success, profitability or value of the Acquired Assets or with respect to compliance of the Acquired Assets with industry standards or any other safety standards, and Buyer acknowledges that Sellers and Sellers' agent have made no such representations or warranties. Without limiting the foregoing, no Seller or Sellers' agent makes any representation or warranty as to whether any Acquired Assets have been manufactured, packaged, labeled, marked, stored, or distributed, in compliance with, or may be lawfully distributed, marketed, labeled, sold, or resold under applicable laws, rules, or regulations. **SELLERS HEREBY EXPRESSLY DISCLAIM, AND BUYER HEREBY**

**EXPRESSLY WAIVES, ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR ANY PURPOSE OR FOR A PARTICULAR PURPOSE, THE IMPLIED WARRANTY OF CONFORMITY TO MODELS OR SAMPLES, QUIET ENJOYMENT, TITLE, POSSESSION OR OTHERWISE AND ANY WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE.**

## ARTICLE III
## MISCELLANEOUS

Section 3.01. Expenses. Except as otherwise specified in this Bill of Sale, each Party will pay its own costs and expenses, including legal, consulting, financial advisor, accounting and other fees and expenses, incurred in connection with this Bill of Sale, irrespective of when incurred or whether or not the Closing Date occurs.

Section 3.02. Assignment. This Bill of Sale will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. No Party may assign (whether by operation of law or otherwise) this Bill of Sale or any rights, interests or obligations provided by this Bill of Sale without the prior written consent of the other Parties; *provided, however*, that any Seller may assign any of its rights or obligations under this Bill of Sale to any of its controlled affiliates or to any plan administrator, liquidator, liquidating trust, "wind down" vehicle, examiner, receiver, trustee or similar party appointed on its behalf following that Effective Date or in accordance with any order approved by the Bankruptcy Court, and the Buyer may assign any of its rights or obligations under this Bill of Sale to any of its controlled affiliates or designees; *provided, further*, that no such assignment by any Seller or Buyer pursuant to the foregoing clauses shall release any other Party from any liability under this Bill of Sale. Any attempted assignment in violation of this Section 3.02 shall be void *ab initio*.

Section 3.03. Entire Agreement. This Bill of Sale (and all schedules hereto), the Wind Down Order, the Starlight Patterson Extension Order, the FBG Conversion Order (solely to the extent it extends the Wind Down Order to the converted cases and conveys authority to the FBG Trustee to execute this Bill of Sale), the Lease Assignment and Assumption Agreement (and all schedules thereto), and the Sale Order collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

Section 3.04. Amendments; Waiver. This Bill of Sale (including the schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by Buyer and each Seller. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Bill of Sale shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 3.05. Governing Law. This Bill of Sale, and any action or proceeding or claim that may be based upon, arise out of or relate or be incidental to any transaction, this Bill of Sale, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into

the foregoing, whether for breach of contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied. The Bankruptcy Court is the exclusive venue for conducting any legal action, suit or proceeding with respect to this Bill of Sale, including any proceedings to enforce or interpret this agreement, which rights are expressly preserved.

Section 3.06. Counterparts. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, email transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Section 3.07. Representations and Warranties. Each Party hereby represents and warrants to the other Party that: (a) it is an entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the laws of its jurisdiction of incorporation, formation or organization; (b) it has the requisite corporate or other appropriate power to execute, deliver and perform its obligations under this Bill of Sale; (c) it has the requisite corporate or other power to operate its business, that it owns as now conducted and is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to its business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had and would not reasonably be expected to have, a material adverse effect; and (d) subject to the authorizations described in this Bill of Sale and as may be required by the Bankruptcy Court, this Bill of Sale has been duly executed and delivered by such Party, and upon execution and delivery thereof, this Bill of Sale constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms. Buyer further represents and warrants that it is not an "insider" of the Debtors, as such term is defined in Section 101(31) of the Bankruptcy Code. Sellers further represent and warrant, solely with respect to the Acquired Assets and subject to the Wind Down Order, that each and all of the Acquired Assets are Wind Down Assets under the Wind Down Order.

Section 3.08. Agency Acknowledgement. The purchase and sale of the Acquired Assets hereunder is being made through Hilco Merchant Resources, LLC, Hilco Receivables, LLC, Hilco Global Professional Services, LLC or their affiliates (collectively, "**Agent**"), in their capacity as agent for the Sellers pursuant to that certain Amended and Restated Consulting and Marketing Services Agreement, dated as of March 13, 2026, by and between First Brands Group, LLC and Agent (as amended, restated, or modified from time to time), as approved pursuant to the Wind Down Order and extended by the Starlight Patterson Extension Order and the FBG Conversion Order. For the avoidance of doubt, in its capacity as agent to the Sellers, Agent is not taking title to the Acquired Assets prior to sale.

Section 3.09. Indemnification. Buyer shall indemnify and hold Sellers and their respective members, managers, officers, directors, employees, agents (including the Agent), and other representatives, including, but not limited to, advisors, consultants, attorneys, financial advisors (collectively, "**Seller Indemnified Parties**") harmless from and against all losses, liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or grossly negligent acts or omissions of Buyer, (b) any bodily injury to any person or damage to any real or personal property of any Seller or any third party, in each case to the extent caused by or resulting from the acts or omissions of Buyer or its representative in connection with the transfer of

the Acquired Assets pursuant to this Bill of Sale; *provided*, *however*, that Buyer shall have no obligation to indemnify, defend, or hold harmless any Seller Indemnified Party to the extent any such losses, liabilities, claims, demands, damages, costs, or expenses are caused by the acts or omissions of any Seller Indemnified Party, and (c) the material breach of any material provision of this Bill of Sale by Buyer and/or any third party purchaser to whom Buyer re-sells the Acquired Assets.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, Sellers and Buyer have caused this Bill of Sale to be executed by their respective duly authorized officers.

**SELLERS:**

**BRAKE PARTS INC LLC**

By: DocuSigned by: Eva Engelhart 17AE566F8087446...
Name: Eva Engelhart
Title: Chapter 7 Trustee

**STARLIGHT INVENTORY I, LLC**

By: ______________________________
Name: Ron Sommers
Title: Chapter 7 Trustee

**BUYER:**

**JESSCO BRAKES INC.**

By: ______________________________

Name: Eric Zhang

Title: VP of Corporate Development

# Exhibit 2

## Stalking Horse Lease Assignment

**Parcel Numbers:** **McHenry, Illinois**
14-10-201-009 & 14-10-227-009
14-10-202-004 & 14-10-252-004 & 14-10-252-002 & 14-10-252-001

# LEASE ASSIGNMENT AND ASSUMPTION AGREEMENT

This Lease Assignment and Assumption Agreement (this "**Assignment**") dated as of October 18, 2026, is made by and between Brake Parts Inc LLC, a Delaware limited liability company ("**Assignor**"), and JessCo Brakes Inc., a Texas corporation ("**Assignee**") (each of Assignor and Assignee, a "**Party**" and, together, the "**Parties**").

## RECITALS

On or about September 24, 2025 and September 28, 2025, Assignor and certain of its affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (such court, the "**Bankruptcy Court**" and such cases, the "**Bankruptcy Cases**");

On April 9, 2026, the Bankruptcy Court entered the *Order (I) Converting Chapter 11 Cases of Evolution SPV Debtors to Cases Under Chapter 7; and (II) Granting Related Relief* [Docket No. 2396] and Ronald Sommers was appointed as the chapter 7 trustee of Patterson Inventory, LLC, Patterson Inventory Holdings, LLC, Starlight Inventory I, LLC, and Starlight Inventory Holdings I, LLC [Case No. 25-90392, Docket No. 11; Case No. 25-90393, Docket No. 11; Case No. 25-90394, Docket No. 11; Case No. 25-90395, Docket No. 11];

On April 16, 2026, the Bankruptcy Court entered the *Order Pursuant to Section 363 of the Bankruptcy Code (I) Approving and Authorizing the Debtors to Enter into and Perform under the Consulting Agreement; (II) Authorizing the Sale of Wind Down Assets Free and Clear of All Liens, Claims, and Encumbrances; and (III) Granting Related Relief* [Docket No. 2454] (the "**Wind Down Order**");

On July 9, 2026, the Bankruptcy Court entered the *Order Extending Wind Down Order to the Chapter 7 Trustee and Related Relief* [Case No. 25-90392, Docket No. 61] (the "**Starlight Patterson Extension Order**");

On September 1, 2026, the Bankruptcy Court entered the *Order (I) Converting Chapter 11 Cases to Cases Under Chapter 7, (II) Establishing Deadline for Filing Final Chapter 11 Fee Applications and Setting a Hearing Thereon, and (III) Granting Related Relief* [Docket No. 3748] (the "**FBG Conversion Order**") and Eva Engelhart was named as the chapter 7 trustee (the "**FBG Trustee**") of the Debtors whose cases were converted pursuant thereto; and

The FBG Trustee, on behalf of Assignor, desires to assign, transfer, convey, and deliver to Assignee all of Assignor's right, title and interest in and to the two leases described in <u>Schedule I</u> attached hereto (together with all amendments, modifications, and supplements thereto, the "**Leases**" and the premises subject to the Leases, the "**Leased Property**"), and subject to Assignee and KITKAT (IL) LLC ("**Landlord**"), the landlord under both Leases, entering into certain amendments to the Leases contemporaneously herewith in form and substance agreed to between

Assignee and Landlord (the "**Lease Amendments**"), Assignee desires to assume Assignor's right, title and interest in and to such Leases (as amended by the Lease Amendments) in accordance with the terms hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**ASSIGNMENT**

1. <u>Bankruptcy Court Approval; Effective Date</u>. As soon as reasonably practicable following execution of this Assignment, the FBG Trustee shall file a motion with the Bankruptcy Court seeking entry of an agreed order approving (i) the sale of the inventory and equipment located at the Leased Property pursuant to a bill of sale executed contemporaneously herewith (the "**Bill of Sale**"); and (ii) this Assignment. This Assignment shall not have any force or effect until the Bankruptcy Court enters a final and unappealable order, in form and substance satisfactory to Assignee, approving and authorizing the transactions contemplated by: (i) this Assignment; and (ii) the Bill of Sale (the "**Sale Order**" and, the date on which the Sale Order becomes final and unappealable, the "**Effective Date**").

2. <u>Assignment and Assumption of Leases</u>. For and in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, as of the Effective Date, Assignor shall assign, transfer, convey, and deliver to Assignee all of Assignor's estate, right, title and interest as tenant of the leasehold estate described under the Leases, and Assignee shall accept the assignment, transfer, conveyance and delivery of Assignor's estate, right, title and interest in, to and under such leasehold estate. Assignee and Landlord shall enter into the Lease Amendments on the Effective Date. For the avoidance of doubt, the Assignee's agreement to enter into and close on the transactions contemplated by this Assignment is expressly conditional upon the Bankruptcy Court's approval of the Bill of Sale.

3. <u>Cure Costs</u>. In full and final satisfaction of all cure costs in connection with the assumption, assignment, or transfer of the Leases (collectively, the "**Cure Costs**"), (i) Landlord will apply the full amount of the proceeds from the remainder of the proceeds available from drawing on the letter of credit issued respecting the 4400 Prime Parkway Lease; (ii) the FBG Trustee shall relinquish and abandon to Landlord the Assignor's right, title and interest in and to the remaining balance of any security deposit held under or with respect to either of the Leases; and (iii) Assignee shall make a one-time cash payment to the Landlord of $210,336.26, which amount shall be in addition to the purchase price owed by Assignee to Assignor under Section 1.04 the Bill of Sale. Except as expressly set forth in this section, Assignor and Assignee shall have no other obligations for Cure Costs.

4. <u>Pre-Effective Date Location Expenses</u>. If the Effective Date has not occurred on or before October 31, 2026, the FBG Trustee shall pay the daily prorated base rent, taxes, and insurance associated with the Leased Property (the "**Location Expenses**") from November 1, 2026 through the earlier of (i) November 30, 2026; or (ii) the Effective Date; *provided*, that, if the Effective Date does not occur by November 30, 2026, the Landlord may terminate the Leases and Location Expenses for the month of November 2026 shall become due and payable by the FBG

Trustee within five (5) business days of such termination. The terms of this Section 4 may be amended by mutual email agreement of the Parties at any time until the Effective Date. The FBG Trustee shall have no obligation to fund Location Expenses following the Effective Date.

5. Assumed Liabilities; Accrued and Unasserted Liabilities. As of the Effective Date, Assignor shall assign, and Assignee shall assume and agree to pay, discharge, or perform when due, after such date, the Assumed Liabilities (as defined herein) related to the Leases. Assignee shall be responsible for all obligations under the Leases, *cum onere*, solely to the extent those obligations arise or accrue after the Effective Date (collectively, the "**Assumed Liabilities**"). For the avoidance of doubt and the sake of clarity, nothing set forth in this Assignment shall require Assignee to assume or otherwise become responsible for any obligations arising or accruing prior to the Effective Date, including, without limitation, any of the Cure Costs, or any obligations that accrued prior to the Effective Date, but that have not been billed, invoiced, asserted, noticed or otherwise claimed as of the Effective Date, including for royalties, rents, utilities, taxes, insurance, indemnification, fees, common area or other maintenance charges, promotional funds, and percentage rent; *provided*, *however*, that to the extent, if any, an obligation arises under a Lease on or before the Effective Date, but relates to amounts accruing after, or an occurrence after, the Effective Date, Assignee shall be responsible for such obligation. Nothing herein shall impact Landlord's ability to recover a claim under a Lease to the extent, if any, such recovery would be available under Assignor's insurance coverage.

6. No Abandonment. Neither Assignor nor its affiliated Debtors shall abandon any property on the Leased Property in connection with this Assignment, including, without limitation, any inventory, machinery, or equipment. The Debtors' property remaining on the Leased Property at the time of this Assignment shall either be (a) be conveyed to and become the property of Assignee, to the extent and in the manner as set forth in the Bill of Sale; or (b) promptly removed from the Leased Property by the Assignor.

7. Binding Agreement. Prior to the Effective Date, this Assignment shall not be assigned to any other party without the expressed written consent of each of the Parties. From and after the Effective Date, this Assignment shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns, including the FBG Trustee.

8. Notices. All notices and other communications under or by reason of this Assignment shall be in writing and shall be deemed to have been duly given or made: (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section):

| | |
|---|---|
| If to Assignor, to: | Eva Engelhart<br>Chapter 7 Trustee of First Brands Group Holdings, LLC<br>Email: eengelhart@rossbanks.com |
| With a copy (which will not constitute notice) to each of: | Porter Hedges LLP<br>1000 Main St, 36th Floor<br>Houston, TX 77002 |

| | |
|---|---|
| | Attn: Joshua W. Wolfshohl, Eric English<br>Email: jwolfshohl@porterhedges.com<br>eric.english@porterhedges.com<br><br>AND<br><br>Katten Muchin Rosenman LLP<br>50 Rockefeller Plaza<br>New York, NY 10020-1605<br>Attn: Cindi M. Giglio, Grace A. Thompson<br>Email: cgiglio@katten.com<br>grace.thompson@katten.com |
| If to Assignee, to: | Eric Zhang<br>Friction One<br>E-mail: eric.zhang@friction1.us |
| With a copy (which will not constitute notice) to each of: | Foley & Lardner LLP<br>321 North Clark Street, Suite 3000<br>Chicago, IL 60654<br>Attn: Ann Marie Uetz, Emil P. Khatchatourian<br>Email: auetz@foley.com<br>ekhatchatourian@foley.com |
| If to Landlord, to: | W.P. Carey Inc.<br>One Manhattan West<br>395 9th Avenue 58th Floor<br>New York, NY 10001<br>Attn: Sam Rubenstein<br>Email: Srubenstein@WPCAREY.COM |
| With a copy (which will not constitute notice) to: | Chaffetz Lindsey LLP<br>1700 Broadway<br>New York, NY 10019<br>Attn: Alan Lipkin<br>Email: a.lipkin@chaffetzlindsey.com |

9. Severability. If any term or provision of this Assignment is held invalid, illegal or unenforceable in any respect under any applicable law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Assignment will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other government authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10. Amendments. This Assignment may be amended, restated, supplemented, or otherwise modified, only by written agreement duly executed by each Party. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Assignment shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

11. Further Assurances. Each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other party to carry out the transactions contemplated by this Assignment.

12. Counterparts. This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, email transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

13. Governing Law. This Assignment, and any action, dispute or claim that may be based upon, arise out of or relate or be incidental to this Assignment, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied. The Bankruptcy Court is the exclusive venue for conducting any legal action, suit or proceeding with respect to this Assignment including any proceedings to enforce or interpret this agreement, which rights are expressly preserved.

14. No Other Third-Party Beneficiaries. The parties agree that Landlord shall be a third-party beneficiary of this Assignment. Other than Landlord, nothing in this Assignment shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any affiliates of any Party.

15. Entire Agreement. This Assignment (and all schedules hereto), the Wind Down Order, the Starlight Patterson Extension Order, the FBG Conversion Order (solely to the extent it extends the Wind Down Order to the converted cases and conveys authority to the FBG Trustee to execute this Assignment), the Bill of Sale (and all schedules thereto), and the Sale Order collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**Assignor**:

**BRAKE PARTS INC LLC, a Delaware limited liability company**

DocuSigned by:
By: Eva Engelhart
17AE566F8087446...
Name: Eva Engelhart
Title: Chapter 7 Trustee

**Assignee:**

**JESSCO BRAKES INC., a Texas corporation**

By: ____________________________
Name: Eric Zhang
Title: VP of Corporate Development

**Subject to receipt of the Lease Amendments, acknowledged and agreed:**

**KITKAT (IL) LLC,**
**a Delaware limited liability company**

By: WPC HOLDCO LLC, a Maryland limited liability company, its sole member

By: W. P. Carey Inc., a Maryland corporation, its sole member

By:____________________________
Name: Sam Rubenstein
Title: Senior Vice President

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**Assignor**:

**BRAKE PARTS INC LLC, a Delaware limited liability company**

By: ___________________________
Name: Eva Engelhart
Title: Chapter 7 Trustee

**Assignee:**

**JESSCO BRAKES INC., a Texas corporation**

By: ___________________________
Name: Eric Zhang
Title: VP of Corporate Development

**Subject to receipt of the Lease Amendments, acknowledged and agreed:**

**KITKAT (IL) LLC,**
**a Delaware limited liability company**

By: WPC HOLDCO LLC, a Maryland limited liability company, its sole member

By: W. P. Carey Inc., a Maryland corporation, its sole member

By:___________________________
Name: Sam Rubenstein
Title: Senior Vice President

# SCHEDULE I

## **1100 Corporate Drive Lease**

Lease, dated November 13, 1998, as amended five times (including pursuant to the Lease Amendments), for approximately 378,380 square feet of space, located at 1100 Corporate Drive, McHenry, IL 60050.

## **4400 Prime Parkway Lease**

Lease, dated September 16, 2013, as amended five times (including pursuant to the Lease Amendments), for approximately 288,000 square feet of space located at 4400 Prime Parkway, McHenry, IL 60050 and 1380 Corporate Drive, McHenry, IL 60050.