# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| First Brands Group, LLC | ) CASE NO: 25-90399 |
| | ) Houston, Texas |
| | ) |
| Debtors. | ) Monday, |
| | ) August 24, 2026 |
| | ) 1:02 PM to 2:32 PM |
| ------------------------------) | |

ENTIRE
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Court Reporter:

Courtroom Deputy: Yesenia Lila

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

HOUSTON, TEXAS; Monday, AUGUST 24, 2026

(Call to Order)

THE COURT: Okay, good afternoon. This is Judge Lopez. Today is August 24th. I'm going to call the 1 p.m. case in First Brands. I'm just going to read.

I'll let parties log in -- I won't take appearances. I'd ask parties to please make an electronic appearance on the line. Just log into the Southern District of Texas webpage. You'll find my homepage. You'll find a place to make an appearance in complex cases, and you'll find the First Brands case.

Let's see, Ms. Garza, can you hear me? You can just give me a thumbs up. I'll just get started. Okay, Mr. T, can you hear me? Okay, perfect. Okay. I'm going to get started. I was giving it a little bit of time. We've got, yeah, just about a little over 300 people on the line. So I'm going to get started.

I will tell parties, I have 26 single-space pages to read. So, here we go. Yesenia, we're good? Okay.

Today, the Court considers the FBG Debtors' request for final approval of the disclosure statement of their Chapter 11 plan and confirmation of the plan.

The Court has jurisdiction, under 28 U.S.C. § 1334, and these matters are core proceedings under 28 U.S.C. § 157.

The Court finds that all required notices relating to the disclosure statement and plan confirmation, including notice of the related evidentiary hearings, were proper. Solicitation, voting, all the notices required there were proper as well.

Before getting into the decision, I'm overruling a motion by the LAM parties to strike a portion of the testimony in these cases, based on certain responses to interrogatories submitted by the FBG Debtors.

I think the answers to the questions presented to the witness do not directly conflict with the answers to any of the Debtors' interrogatories.

I'll now turn to the decision. Before these Chapter 11 cases started, First Brands Group, LLC and its affiliated Debtors were one of the largest automotive aftermarket parts suppliers in the world.

First Brands was integrated into the fabric of the auto industry. If you've gone to an auto parts store, you undoubtedly passed by or purchased a First Brands product.

Not only did First Brands company employ thousands of employees around the world, its products helped employ people who work in places like auto parts stores and automotive factories too.

Despite its stature in the industry, the First Brands Debtor Chapter 11 cases, arrived in bankruptcy, full of

financial problems, billions of cash unaccounted for, and books and records with questionable entries. Allegations of massive fraud were asserted on day one.

First Brands started these Chapter 11 cases in late September '25. As of the petition date, First Brands had over $9 billion, that's with a B, in total debt obligations, and about $14 million in cash. That's million with an M.

Just let that sink in as I continue with this ruling. Based on a report from an examiner appointed in these cases, First Brands incurred billions in accounts receivable, factoring liabilities based on invoices that were fabricated or inflated.

And First Brands incurred billions in additional financing through a web of special purpose vehicles, in part, by pledging the same collateral more than once. Some people have been indicted, and certain insiders have admitted to providing parties, misleading financial statements.

The Debtors have also started adversary proceedings against various individuals and some non-Debtor entities, seeking recovery of billions of dollars based on alleged fraudulent and preferential transfers.

I do not resolve the merits of those claims today, and nothing in this ruling should be read to do so. I'm just stating undisputed facts about where we find ourselves

today, in the incredible task the Debtors' professionals and affected parties had to confront.

As a result of the massive financial obstacles, First Brands professionals and certain secured parties tried to keep the Debtors alive, and tried to stabilize the company and its operations.

The Debtors' financial advisors worked hard to make sense of the books and records and started investigating what went wrong. First Brands also secured $1 billion in new money DIP financing.

And with the assistance of professionals, launched the process to maximize value by selling all or substantially all of their businesses, as a going concern.

The Official Committee of Unsecured Creditors at the same time was investigating claims and working with the Debtors to determine if there was any value for unsecured creditors.

At the same time, many SPV financiers and factor parties were also working hard to understand the status of receivables they believed they purchased and had a right to receive.

Customers who were required to pay First Brands were also understandably concerned about paying one party, still being subject to claims by another party alleging they were the rightful owner of the receivables.

Starting all of this required significant time and expertise by all professionals involved. All of these issues I described were happening at the same time. Unfortunately, time was not on the Debtors' side, and the sales process did not render the types of sales prices I'm sure everybody wanted.

The Debtors' liquidity position deteriorated further. Additional financing was not available. And by late January of 2026, First Brands concluded that a whole company sale was no longer feasible on any workable timeline.

So, with the support of their original equipment manufacturer customers, the Ad Hoc Group of Secured Lenders, the Creditors' Committee, the ABL Secured Parties, First Brands executed a series of going concerned sales of individual business lines, while winding down the businesses that could not be sold.

By the time the Chapter 11 plan before the Court was negotiated with certain stakeholders, First Brands no longer operated any business, had terminated the substantial majority of its workforce, and had no ongoing operations left to reorganize.

A giant in the automotive industry would no longer exist like it did when it entered bankruptcy. And for purposes of this case, all of these events created what Debtors' counsel aptly coined a mismatch.

The mismatch is that the remaining viable assets of First Brand's estate were litigation claims. And that includes estate causes of actions like preference and fraudulent transfer claims.

It's a mismatch because the sales did not generate as much as parties hoped for. And effectively, all of the DIP financing has been spent.

But to confirm a Chapter 11 plan, the Bankruptcy Code requires administrative creditors get paid in full on the effective date.

Thus, the Chapter 11 plan before the Court is one to wind down what is left of the First Brands Group Debtors, which are referred to as the FBG Debtors, monetize a set of litigation claims and residual assets through three trusts, and distribute whatever those trusts eventually collect.

The plan reflects a settlement primarily among the FBG Debtors, the Ad Hoc Group of DIP lenders, and the Creditors Committee.

The plan settlement is the result of months-long mediation between parties about the wind-down of the FBG Debtors' estates and the formulation of the plan.

Several parties took issue that the mediation was closed to a certain group of parties, and that they were not invited to the mediation table.

There were also statements at plan confirmation that by

not being part of the mediation, they were put on the table to be negatively impacted by the plan.

The Court certainly understands that more parties wanted to be part of the mediation, but based on the record, I don't believe they were unfairly targeted or isolated as a result of it.

Again, this is one of the most complicated bankruptcy cases filed in recent history, especially with the way it started with billions unaccounted for.

The FBG Debtors negotiated with its largest prepetition secured lenders, DIP lenders, and the Official Committee of Unsecured Creditors. That is in no way uncommon.

More importantly, the Chapter 11 plan remains subject to scrutiny and objection by every party and interest. Parties retained the right to test the merits of that settlement and to object to plan confirmation.

Due process was afforded to every party in interest. The compromises and settlements included in this plan settlement, including, among other things, credit bid transactions, a preference settlement, an administrative expense claims consent program, are each integrated with and dependent on all other compromises and settlements contemplated in connection with the plan, and necessary and integral to the plan.

The plan itself is also a motion to approve the

compromises and settlements contained in the plan. Entry of the confirmation order would constitute approval of the compromises and settlements of all claims, interests, and controversies.

And a finding by this Court, that the compromises and settlements are in the best interests of the FBG Debtors, the estates, and holders of such claims in interest, and is fair, equitable, and reasonable.

Before I describe the plan itself, one important point to highlight. This plan is proposed only by the FBG Debtors, First Brand Groups Holdings, LLC, its direct and indirect debtor subsidiaries, and Viceroy Private Capital, LLC.

It is not a plan for the First Brands Debtors who are special purpose vehicles, which are known as the SPV Debtors. The SPV Debtors are separate Debtors in these jointly administered cases, tied to First Brands through financing and factoring arrangements. They are not FBG Debtors.

Some SPV Debtors are no longer even in Chapter 11. The Court has converted the Chapter 11 cases of several SPV Debtors to cases under Chapter 7. The FBG and SPV distinction is an important one that will come into play later in this decision.

The FBG Debtors' plan, which is the one before the

Court, contemplates winding down First Brands through three trusts that will hold and monetize what remains of the estates, prosecutes litigation, and makes distributions over time.

There's a litigation trust, a DIP collateral trust, and an ABL collateral trust. The plan recognizes that the DIP financing secured parties have super priority liens on all prepetition and post-petition property of the FBG Debtors, and all proceeds of the property, including all estate claims.

Estate claims includes all proceeds of avoidance actions, but excludes avoidance actions themselves. The DIP secured parties also have super priority liens on additional unencumbered property and all prepetition collateral, other than what is referred to as ABL priority collateral, on which they hold a junior lien to those held by the ABL secured parties.

The plan settlement recognizes that the DIP secured parties have alleged that events of default occurred and are continuing, and that the Debtors don't have sufficient funds to indefeasibly pay the DIP in full in cash.

The DIP approved by the Court under a final order included a rollup of prepetition debt and a new money component.

The plan distinguishes between the rollup, which it

calls the rollup claims, and the remaining portion, which it calls DIP A claims.

To be clear, the roll-up claims and DIP A claims are all part of one allowed debtor-in-possession financing under the final DIP order approved in these cases.  But under the plan, they are treated in different sections.

The roll-up claims are treated in a class and deemed impaired and eligible to vote, and the DIP A claims are not classified.

The plan settlement incorporates a consensual arrangement to permit DIP secured parties to accelerate the DIP obligations and enforce remedies against the FBG Debtors, but without the cost, expense, and risks of related litigation, and to provide recovery to junior creditors of the FBG Debtors that will allow creditors to participate in recovery before satisfaction of the DIP in full.

Under the plan, to make all of this work, there are these transactions to move nearly all the remaining estate value out of First Brands Debtors and into these trusts.

The plan contemplates that all three will occur on the confirmation date or as soon as reasonably practical thereafter.

The effective date, when administrative creditors get paid, would occur in late 2028.  This is one of the points of contention about the plan.  But back to the trust for

now.

First, the ABL secured parties will be deemed to have foreclosed on their ABL priority collateral, and those asset transfer, invest in the ABL collateral trust, free and clear of liens, claims, and interest.

Second, the DIP securities acquire what is referred to as the DIP collateral trust assets through a certain DIP collateral credit bid transaction.

Third, the DIP secured parties will acquire what is referred to as the litigation trust assets, including the estate claims themselves through a credit bid transaction.

The consideration includes a credit bid of allowed DIP A claims, together with other consideration the Debtors described in the disclosure statement and plan, including funding commitments to a litigation trust and waterfall in governing concessions to junior creditors.

According to the record, that process resulted in a few executed non-disclosure agreements, one of which was later withdrawn, and no alternative bid was submitted.

Whether that process was adequate and whether the transaction properly credit bids collateral subject to the DIP lenders' liens, are disputed questions I take up later in this ruling.

As part of the plan settlement, the DIP secured parties then contribute the litigation trust assets to a litigation

trust, overseen by an appointed litigation Trustee.

The DIP secured parties would be paid on account of the remaining DIP claim, based on an agreed waterfall recovery.

The plan also contemplates a preference settlement. Trade creditors, supply chain financiers, and factors who receive prepetition transfers may elect to opt in, contribute their own direct claims against the Debtors to the litigation trust, and they are granted releases in exchange for a waiver of preference exposure. This is for trade creditors. Or for the benefit of modified new value defense for supply chain financiers and factors.

The modified new value defense effectively lets settling parties aggregate alleged new value defenses and assert them against the FBG Debtors.

Even though the SPV Debtors are not part of the plan, the records show that the preference settlement and the related proposed sale to the DIP lenders under the estate claims credit bid, would transfer certain claims, including preference claims held by the SPV Debtors too.

And would permit parties to assert their modified new value defense based on payments made to non-plan SPV Debtors.

Eligibility for the preference settlement is subject to exclusion for parties determined to have engaged in adverse conduct, or otherwise designated specified non-release

parties.

So basically, if the Trustee alleges a party engaged in wrongful conduct, whatever that may mean, and even if unrelated to the preferences, then that party is not eligible, even if they've already opted in.

Understanding who gets paid, and in what order, and from what recoveries requires an understanding of the litigation trust waterfall and the plan classification of DIP loans, because it's where several of the disputes before me converge.

The DIP lenders again hold what is classified as DIP A claims and roll-up claims. The plan does not classify the DIP A claims and they form the basis of the estate claims credit bid.

The plan settlement incorporates an agreed waterfall for distributions allowed to DIP lenders. For purposes of the waterfall, the plan fixes the allowed amount of roll-up claims at about $3.3 billion.

The plan caps DIP A claim for waterfall purposes only, at the amount outstanding as of the confirmation date, estimated at a little over a billion.

The plan pools recoveries. Holders of roll-up claims, first lien claims, second lien claims, and general unsecured claims, will share, at some point, pro rata in the same distribution tier under the waterfall.

Preference settlement electing creditors who contribute their direct claims to the litigation trust receive treatment under the waterfall that differs from general unsecured creditors held by creditors who do not elect to participate in the settlement.

The litigation's initial funding is 75 million, consisting of 25 million in otherwise restricted cash from the Debtors' balance sheet, and 50 million in new committed funding backstopped by certain holders of DIP A claims, with an option to obtain over 30 million in additional funding if needed.

Under the waterfall, the litigation trust funders, who are, again, a subset of DIP secured parties, receive all distribution until their first return threshold, which is about 90 million, is reached.

Next, DIP A claims receive about 85 distributions, and the litigation trust fund receives 15% until about 350 million is distributed.

After that, admin and priority claims begin receiving distributions out of their share allocated to class three, ahead of other parties that share in the same tier, until admin and priority claims are paid in full.

The Debtors'' liquidation analysis prepared in connection with the best interest test under the plan assumes that, in a hypothetical Chapter 7 conversion,

holders of DIP A claims would foreclose on or purchase the estate claims outright, with no obligation to share proceeds with any other creditor.

And that every other class of claims and interest, including admin expense claims, general unsecured claims, would receive zero in a Chapter 7 liquidation.

On the confirmation date, or as soon as reasonably practical thereafter, again, a great deal happens. The ABL foreclosure is deemed to occur. All litigation trust assets, DIP collateral trust assets, and ABL collateral trust assets vests in the applicable trust, free and clear of liens, claims, and encumbrances.

The litigation Trustee, the DIP collateral Trustee, and the ABL collateral Trustee assume management of those assets. Distributions to DIP lenders and ABL lenders under the credit agreement transaction start. The Debtor releases to parties, and the plan exculpation provisions become operative. And the plan terms become binding and immediately effective as of the confirmation date.

The effective date is a different later event. The plan does not fix a date certain for when it will occur. The plan sets out conditions precedent that must be satisfied before the effective date occurs. But again, virtually all of those conditions are expected to be satisfied at or near the confirmation date.

There is one that is different in kind. It's section 12(1)(n). It requires the litigation -- Section 12(1)(n). It requires that litigation trust and the other DIP collateral trusts have sufficient cash on hand to pay all allowed administrative expense claims and priority tax claims or other priority claims required to be paid on the effective date in full, and to reserve for all disputed admin and priority claims timely asserted.

Payment in full of admin and priority claims is the one main thing held back, and it's also held back until the trusts have actually raised enough money to pay for it.

I should also note, however, that the plan contains third-party releases between creditors who opted into these releases, and those won't become effective until the effective date either.

The FBG Debtors project that the effective date will occur by the end of 2028. Whether the trust will have raised sufficient funds to satisfy to pay admin and priority creditors depends on the success of litigation that the Debtors have filed against certain parties. Some litigation that is yet to be filed.

Litigation that has been filed is against some defendants who are also facing a criminal trial that is not scheduled to begin until February 2027.

According to the record and the illustrative recovery

waterfall, administrative expense and priority creditors are not projected to be repaid in full until the litigation trust has recovered its about 1.9 billion through litigation, 1.9, 1.95, through litigation.

In June of 2026, the Court entered an order conditionally approving the disclosure statement and establishing solicitation and voting procedures. Most of the FBG Debtors, the Debtors reported multiple impaired classes in favor of the plan.

The two entities stand apart, First Brands Group Holdings, LLC and Viceroy Capital, LLC. Those two Debtors, the only voting class of claims voted to reject the plan. The only asserted impaired accepting class at Holdings and Viceroy is the DIP roll-up claims.

The plan was objected to primarily by the Office of the United States Trustee, the James Defendants, Katsumi, the LAM parties, Onset Financial, Evolution, the Carnaby parties, and Aequum. There were others as well.

Because this ruling ultimately turns on a subset of those objections, I'm going to summarize the principal grounds. Katsumi and the LAM parties, and other parties, argue that the DIP roll-up claims cannot supply the impaired accepting class required by Section 1129, a tenet holdings in Viceroy because those claims did not exist prepetition, and because Viceroy, in particular, the vote fails the

numerosity requirement of 1126, once the roll-up ballot is counted out.

Multiple parties argue that the estate claims credit bid transaction improperly credit bids, not just the proceeds of avoidance actions, over which the DIP secured parties hold a lien under the final DIP order, but the avoidance actions themselves, which the final DIP order expressly excludes from DIP collateral, and that that violates Section 363(k) of the Bankruptcy Code.

Parties like Onset, the Carnaby secured parties, and Evolution, and others, argue that the plan itself is problematic because nearly every consequent of confirmation, the foreclosure, the credit bid transaction, commencement of distributions and releases, occurs at or near the confirmation date. And that they're calling that effectively the effective date.

Feasibility. Apart from what I just made, objecting parties argue that the Debtors cannot show a reasonable assurance of feasibility, given that the plan depends on hundreds of millions to billions of dollars in recovery from litigation against defendants, and alleged uncertainty over the true scope of administrative expense claims in this case.

Onset and others argue the preference settlement provides disparate, non-code based treatment among similarly

situated general unsecured claims. Some creditors are permitted to settle preference exposures and retain enhanced claims, and others are excluded without a market test, and in a manner that they argue runs afoul of the Fifth Circuit Serta decision.

Katsumi and the LAM party separately argue that the plan's classification scheme improperly separates claims with materially similar rights in a manner designated to manufacture accepting classes.

The U.S. Trustee and certain objecting parties challenged the scope of the third-party releases, the exculpation, and the related gatekeeper injunction. The U.S. Trustee also objected to the administrative expense consent program.

The U.S. Trustee also reiterated its request to convert these Chapter 11 cases as administratively insolvent and incapable of confirming a Chapter 11 plan.

Certain objectors also argue that -- Parties like Onset argue that the plan's definition of estate claims improperly sweeps in claims and property that belong to individual creditors rather than to the estates.

And that the plan improperly purports to grant one class of creditors control over the prosecution and disputes concerning non-estate property.

Many of these objections were narrowed or resolved

through changes to the proposed confirmation orders, but many remained heavily contested.

The FBG Debtors, the Committee, the Ad Hoc Group of secured lenders, and the ABL lenders believed these objections should be overruled. They implied that the objecting creditors are mainly targets of potential actual litigation asserted by the estates, and that's what's really driving their objections.

First Brands solicited acceptances from holders of the claims in the voting classes to approve a solicitation of votes to accept or reject the plan. The Court must determine that such solicitation complied with Sections 1125 of the Bankruptcy Code.

This Court previously entered an order conditionally approving the disclosure statement. Now the parties seek final -- the FBG Debtors seek final approval.

Under Section 1125 of the Bankruptcy Code, a plan proponent must provide voting creditors with adequate information about a debtor's proposed plan. Disclosure statement must provide sufficient information to permit an informed judgment by creditors entitled to vote on the plan.

The disclosure statement satisfies the standard here. The disclosure statement described a summary of the administrative consent program, the preference settlement, each of the proposed trusts to be formed in connection with

confirmation of the plan.

The global settlement, including the credit bidding of estate causes of action and the deemed foreclosure of the ABL collateral, a summary of plan classification and treatment of claims, an estimate of recoveries to all creditors, including those entitled to vote on the plan.

An estimate of the projected effective date. An overview of operations. A description of the Debtors' capital structure. Significant events leading to the start of the Chapter 11 cases. Events during the Chapter 11 cases, including the examiner investigation and report.

Risk factors to be considered U.S. federal income tax consequences of the plan, requirements for plan confirmation.

There were some parties who objected to final approval of the disclosure statement. The Office of the United States Trustee argued that the disclosure statement does not contain sufficient information about when an administrative expense creditor can expect to be paid.

Where they're opting into an administrative expense claims consent program, will result in significantly different return timelines.

The concern is that the plan provides a two-year gap between confirmation approval and the effective date.

This Court overrules this objection and those similar

to it. The disclosure statement provides all the information the Debtors can accurately state.

The Debtors propose to initiate or continue litigation and recover from a variety of estate causes of action, and have provided an illustrative waterfall, showing when a party can expect to be paid as amounts are collected.

What is unknown with precision is the timing of the payments and if the Debtors can meet the target of collecting around 2 billion.

But a Debtor can't be held to a standard to provide certainty about information when it is not possible to do so.

The code requires adequate information, and adequate information is what the Debtors did provide. Which is an estimate to the best of their ability as to when they believe parties will be paid and the numbers they must hit in terms of recovery to permit a payment in full to these parties.

The Court also overrules disclosure statement objections about whether the preference settlement provides the Trustee with flexibility to modify, or adjust, or provide less than the full benefit of the modified new value.

The concern raised by some parties that the disclosure statement is unclear about whether the Trustee will have the

flexibility to amend once a party opted into the settlement. The Court overrules this objection too.

The answer is the preference settlement, as I read it, gives the Trustee the flexibility on who engages in adverse conduct, and then flexibility to adjust the modified new value. That's what it says. That's the deal.

The objectors, as the Court understands it, are in some ways hoping this wasn't the deal, but it is. That's the deal on the table. And the text, as I read it, answers that question.

Parties could therefore accept or reject the plan, but that was the proposed settlement. The Court also overrules all other objections to the adequacy of the disclosure statement. It contains adequate information that enable eligible voters to make an informed decision about whether to vote or reject the plan.

The objectors, aside from the U.S. Trustee, are parties who have been fully involved in the plan confirmation fight, and they know exactly what this disclosure statement says, and their objections to plan confirmation confirm this.

The record established to support confirmation of the plan included documents included on a joint exhibit list, too numerous to name here.

The plan disclosure statement, plan supplement,

declaration of Kroll, including the voting and tabulation report, the trial testimony of Charles Moore, the trial testimony of Mr. Kirschner, designations of deposition transcripts.

The Debtors bear the burden of establishing that the plan satisfies the relevant sections of the code by a preponderance of the evidence. The plan also includes a settlement that must be analyzed under Bankruptcy Rule 9019 and Section 363 of the code.

The Court has carefully considered all the evidence and finds that the plan cannot be confirmed for several primary reasons.

First, a global settlement cannot be approved because the DIP lenders' bid for the estate causes of action are limited to what they have liens on in accordance with Section 363(k). And the remaining consideration is really not part of an estate credit bid, and was not subject to a full and robust sales process.

Second, the plan is not feasible. Third, the votes of Viceroy and FBG Holdings did not satisfy the Bankruptcy Code voting requirement. And I would also note, I wouldn't approve the preference settlement with the adverse conduct requirement.

I'm not going to address every other single remaining objection because these make the plan unconfirmable under

any circumstance.

I'm going to start with the plan settlement. Section 1123(b)(3)(a) of the Bankruptcy Code provides that a Chapter 11 plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.

The standard under 1123 is similar to the standard used to consider settlements under Bankruptcy Rule 919. And the approval of that is whether it is fair, equitable, in the best interests of the estate.

Look to cases like the Official Committee of Unsecured Creditors v. Moeller (AGE Refining, Inc.), 801 F.3d 530 (5th Cir. 2015).

In determining whether a settlement is fair and equitable, the Court applies several tests to considering the probability of success in litigating a claim, subject to the settlement, with due consideration for the uncertainty in fact and law, the complexity and likely duration of litigation at any attendant expense, inconvenience and delay.

And all other factors bearing on the wisdom, the compromise, including the best interests of creditors, proper deference to their reasonable views. And the extent to which the settlement is truly the product of arm's length bargaining and not of fraud or collusion.

Bankruptcy Courts don't have to conduct a mini trial to

determine the probable outcome of any claims waived in a settlement.

You can look to the In re Cajun Electric Power Co-op, 119 F.3d 349-356 (5th Cir. 1997).

Instead, the Courts must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision. Same case. Approval of a settlement agreement is in a matter within the sound discretion of the bankruptcy Court, right?

That's the In re Aweco case, 725 F.2d (5th Cir. 1984).

As I said earlier, the plan proposes a series of transactions whereby the FBG Debtors transfer their assets to three newly created trusts. The creation of the litigation trust is premised on a sale to the DIP lenders by a credit bid.

The credit bid is for all estate claims, and certain other assets of the FBG Debtors as set forth in the plan. Collectively, everything vested in the litigation trust is referred to as litigation trust assets.

The litigation trust assets include certain aspects the SPV Debtors may have rights into, such as books and records and work product.

And while the Debtors are trying to work out and accommodate issues, including those related to privilege, the transaction affects SPV related assets without an

express agreement with the SPV Debtors.

Debtors co-CEO, Mr. Moore, stated he did not discuss these issues with the SPV Debtors' conflicts counsel. But regardless, based on the record, there are SPV estate assets that will be transferred.

A good example, the FPG Debtors asked the Court to find that the estate claims credit bid transaction is in exchange for good and valuable consideration in the best interests of the FBG Debtors' estates, fair and equitable, reasonable and free and clear. And that the effected have to do a notice and that the relevant parties are afforded the protections under Section 363(m) of the Bankruptcy Code. And the credit bid is sought using 363(k).

Based on the illustrative waterfall, administrative, again, priority claims will not be paid until there's about 2 billion in aggregate distributable proceeds. That's assuming no additional litigation trust funding that would further dilute recoveries available to pay administrative creditors, assuming it's needed or obtained.

Thus the effective date of the plan is conditioned upon the litigation trust and/or the DIP collateral trust having enough cash on hand to satisfy all out administrative expense and priority claims.

Under Section 5.2 of the plan, is where FBG ask the Debtors to find that the estate credit bid transaction is

supported by good and valuable consideration, and was affected after due notice and opportunity for a hearing, and for the good faith findings under 363(m).

363(b) permits a Debtor to sell property outside of the ordinary course, with Court approval. At closing argument, counsel for the Debtors confirmed that the credit bidding of the DIP A loans was under Section 363(k).

363(k) permits a secured creditor to credit bid on the property that is subject to its lien. And all of this makes sense.

A debtor may sell assets under 363, under a plan, but if a party wants Section 363(m), good faith findings, and it wants to sell assets free and clear under Section 363(f), the debtor must proceed entirely under Section 363.

Under the final DIP financing order, the DIP lenders have a lien on causes of action that recover parts of the litigation against the James parties and Onset. But there are parts of that litigation that are not covered by its DIP liens.

That's because the DIP lenders have super priority liens on pre and post assets of the FBG Debtors, excluding avoidance actions themselves.

The DIP lenders have liens on the proceeds of avoidance actions, but not the claims themselves. And there's a difference. Those who own the claim control the litigation.

Those who have the rights to proceeds have liens on any recovery on those claims up to the value of their collateral.

Here, the estate claims credit bid is in consideration used to purchase the avoidance actions themselves. The problem is, as I said earlier, the DIP lenders only have liens covering the proceeds of avoidance action.

Thus, the credit bid goes beyond Section 363(k) and allows a credit bid for assets on which the DIP lenders do not hold a lien.

The DIP lenders can't credit bid on assets that are not their collateral. Plan supporters argue that the practical reality is that the DIP lenders have the right to the proceeds of such collateral, and no one's going to want to buy claims, pay for the litigation, and then turn over proceeds to the DIP lender.

But that puts form over substance and doesn't change the fact that 363(k) doesn't allow it. There is no statutory authority permitting a secured creditor, prepetition or post-petition, to credit bid for more than the value of its liens and collateral.

Plan supporters also argue that the answer is still not so simple, and that the Court must look at the credit bid in the greater context of what the DIP lenders have agreed to give up as part of the plan settlement.

Under the estate claims credit bid, the DIP lenders have agreed to credit bid 75 million. Twenty five million of that comes in the form of restricted funds held by the Debtors that was initially funded by the DIP lenders. And the 50 million comes from the litigation class one funding contributors. Again, which are certain of the DIP secured parties.

The Court finds that the 50 million is not a credit bid under 363(k). In exchange for funding the litigation trust with cash, the cash funders would receive class one litigation trust interest carrying a preferred return equal to the greater of 20% internal rate of return or a 1.75 multiple on investing capital.

That's not the language of a purchase price. It's an investment made to fund litigation. Twenty percent IRRs and 1.75 MOIC structure is the language of financing. It's of a lender or an investor being compensated for the risk of putting capital at risk in a venture that it does not yet know will succeed, not the language in the sale.

So, in sum, 50 of the 75 million is not a credit bid under 363(k). The remaining 25 is different. It's described as coming from the FBG Debtors' own balance sheet rather than from a new source to the DIP secured cash -- from the DIP secured parties.

That cash was, based on the record, part of the

original DIP. It's restricted cash, and it was subject to the DIP secured parties as lien or right of set off.

So treating it kind of its redirection into the litigation trust as consideration paid as arguably a credit bid when you consider the overall movement in cash.

I want to recognize here that Evolution objects and argues that the cash should not be moved or recognized as such because they have certain interest in the FBG debt as remaining cash.

I'm only focused here, however, on the theoretical construct of the 25 million as the credit bid. Applying the 25 million credit bid, we're still kind of left where we started, though.

363(k) limits bids to property subject to the lien, and avoidance actions are not part of the DIP lenders' liens. And remember too that the sale of these claims excludes causes of actions held by the SPV Debtors, who are also plaintiffs in claims against, for example, Onset litigation.

The release of the DIP lenders' liens on restricted cash can only be used as a credit bid for other assets subject to the liens if it's going to be a 363 credit bid, and those liens exclude avoidance actions.

And the FBG Debtors can't sell what they don't own, and what is the SPV Debtors' property of the estate.

All of this means that avoidance actions are

technically sold potentially for no established value under the estate claims credit bid, or for some portion of 25 million.

I don't have evidence or sufficient evidence that the 25 million is for assets outside of that lien base, which would be something outside of a 363(k) credit bid.

But it may mean, however, that the actual sale for causes of action that the Debtors then say are worth billions, were potentially sold for 25 million.

Plant supporters would disagree with that and argue that such a conclusion fails again to recognize other consideration, like the DIP lenders agreeing to take less under the waterfall to permit admin and priority creditors to receive a payment well before they would be entitled to, if the DIP lenders exercised their right under the DIP order.

And one cannot overlook that a subset of them have agreed to fund millions so that the litigation Trustee can pursue claims and potentially recover billions that will go, hopefully, to pay unsecured creditors too.

And I totally get it. This is an integral part of the grand compromise under the plan. The subset of DIP lenders have agreed -- Well, the DIP lenders have agreed to take much less sooner, and somebody has to fund the litigation. All valid points.

There are real concessions embedded in the broader plan settlement. And whether that broader package can independently support the transaction under a settlement adequacy standard, rather than a sales price standard, is a sale versus settlement issue.

And I don't want to suggest that a bid with concessions permitting value to float unsecured creditors could never be the highest or otherwise best offer.

But this one, as proposed under the plan as a credit bid, and this Court cannot grant 363(m) good faith protections to lenders for assets that they can't buy as proposed.

I'm not implying in any way that there's anything improper at all by the DIP lenders. To the contrary, I find that this offer was made in good faith based on the record before me.

I just can't approve it using 363(k), and then authorize a sale of those assets free and clear under 363(f). And the sale is also problematic and couldn't be approved because of a process issue two.

Based on the record, there's not sufficient evidence that the market had a real chance to buy these assets or the litigation funding option.

Nothing suggests that the Debtors, their professionals, or the DIP secured parties acted in bad faith or engaged in

collusion. The record doesn't support that inference at all.

The record instead supports folks trying to put together the very best option that they could negotiate in mediation under the circumstances.

Recall, the DIP lenders had the right to seek Court approval to foreclose on the collateral based on alleged DIP defaults. And people shouldn't lose sight of that.

Instead, what the record does show is a narrower -- and for purposes of confirmation, is the Court can't approve the sale based on a process issue.

Start with the materials the bidders actually received, the initial marketing document, the teaser, as it was described, described claims against Patrick James and Onset at a level of detail already available from public filings.

And then referred generally to unspecified avoidance actions. More confirmed on cross-examination that the teaser contained no discussion of potential defendants beyond James and Onset, and no information showing the total amount of the transfers the Debtors were claiming supported estate claims.

He confirmed that the first time anyone received information about the total amount was when his declaration was filed.

And he also confirmed that the data room made available

to prospective bidders was, in the contemporaneous words of Debtors' counsel in an email, fairly limited, containing only the publicly filed examiner report, public pleadings, and certain Onset financing documents that were public or shared with certain other DIP A holders.

That description was accurate when it was written in May of 2026. Moore confirmed that the data room was not meaningfully altered between that date and July 14 for nearly two months, during which any prospective bidder attempting to evaluate the claims had by the Debtors' own account was already public.

On July 14th, the Moore and Kirschner declarations were filed in support of plan confirmation. This would have been the first point in which any third party saw the transfer analysis underlying the Debtors' valuation of estate claims, which was a figure in the range of 25 billion.

No new marketing materials were prepared. The Debtors emailed previously contacting parties. And then around July 18th or 19th, they were told they had to submit a final bid.

The underlying documentation supporting the valuation, what the reflected report says, the Moore supporting documents were not supported to the data room until July 20th, right? Which would have been after the July 18th or 19th deadline.

It was also -- Excuse me. The 20th. July 20th was

also the deadline for any prospective bidder to submit a proposed bid structure.

Let me get that right, 18th or 19th, they're told they have to submit final bids. And then the final documents are added on July 20th, which is also the deadline for any prospective bidder to submit a revised proposed bid.

Moore confirmed the two events occurred on the same day. So the Court finds that the evidentiary basis for a multi-billion-dollar valuation around the same day could not have been enough time to review.

The litigation funding component is also an issue. Moore testified directly that the Debtors did not go to the market with the opportunity to raise funding for the litigation trust.

That no analysis was performed comparing the funding terms to other market-based litigation funding arrangements.

And that matters because the funding terms aren't trivial. As the illustrative recovery scenarios show, litigation trust funders, if the Debtors were to hit their numbers in the recovery, would make potentially hundreds of millions of dollars in return.

And I recognize the response to this because it's a fair one as it goes. No third party ultimately submitted a bid, even after receiving fuller information. And it was unsurprising, given the DIP secured parties' existing rights

over much what was sold.

There may be something to that as a matter of raw economics. And I don't need to resolve here how much value a rational third party could have realistically expected to extract.

I also recognize, based upon at least allegations and information that was provided, the DIP A loans are not trading at a very high number at least as of the date that was shown.

So I completely understand that DIP lenders who put in a billion dollars in new money in connection with this case, and then at the same time agreed to concessions where potentially even administrative creditors and other creditors who do not have liens on those, would receive recovery before the DIP A claims in full.

That they would want to be the parties who have the exclusive right to provide the litigation financing. I got it, right? But that argument cuts both ways. And the process is inextricable from any Court finding about what is the highest or otherwise best offer in any 363 sale.

So, for these reasons, I find that the estate claims marketing process didn't work.

Let me give you another way to understand the ruling. If the proposed sale was a standalone motion under 363(b) to sell assets outside of a Chapter 11 plan process.

And at the sale hearing, the sale evidence showed that material information was added to the data room the day before bidders were required to submit final bids, and that a funding opportunity was not shopped, and that the debtor was proposing to allow a DIP lender to credit bid avoidance actions and not just proceeds, as is typical in the DIP order, right?

That sale's not getting approved. It's just not an extraordinary result when viewed through that lens. That's not to make light of the compromises under this. But just looking at it through a pure 363 lens.

The only reason the consequent looks different here is that the transaction is not severable from the plan, the way a standalone sale motion would be severable.

The estate claims credit bid is woven into the plan's classification structure, its waterfall, the preference settlement, and the releases. But the underlying result is the same. Any Section 363 sale would face on this record.

An additional reason this Court cannot confirm the plan, and it's not feasible based on the record, that the FBG Debtors will not be able to pay administrative creditors in full on the effective date.

Section 1129(a)(9) requires administrative creditors to be paid in full on the effective date. Section 1129 requires confirmation not likely to be followed by

liquidation or for the need for further financial reorganization of the debtor, or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan. There need not be a guarantee of success. Only a reasonable assurance is required.

You can look to the Briscoe Enterprises Holdings case. I'll just cite that case. 994 F.2d 1160. It's a Fifth Circuit 1993 case.

The plan contemplates the liquidation of the FBG Debtors' estates. I reiterate here what I said in other cases. I don't ascribe that there is no need for finding a feasibility.

There's nothing in the Bankruptcy Code that permits overlooking code sections. I agree with Courts who strictly look at the text and provide that in a liquidating plan, the liquidating itself must be feasible.

In this case, that means that the question is whether the liquidation itself can be accomplished. Is there evidence to establish a realistic chance that you can accomplish what you propose to accomplish?

No one disputes that the plan must pay admin expense and priority claims in full. And the FBG Debtors cannot pay everyone in full on the proposed confirmation date.

That is because the remaining assets are litigation claims against third parties, either in the form of Chapter

5 causes of action, state law claims like breach of contract, breach of fiduciary duty, and tort claims.

The Debtors put forth to witnesses to show that they can pay admin creditors in full. Moore, the co-CEO, testified as a fact witness. And Kirschner, who has a long distinguished career as a liquidating Trustee, testified as an expert based on his experience as a liquidation Trustee.

No witness offered evaluation of claims, and there's no claims bar date or administrative bar date in these cases to use as a basis to establish a basis for the amount of potential admin claims.

Moore testified, however, that he and his A&M team, who are the financial advisors, have a firm handle on the amount of prepetition claims and have been managing the Debtors' financial operations since these cases started.

And that the A&M team Moore is supervising has been paying admin claims, hundreds of millions. Moore says that he has a firm understanding of the total amount of admin claims that can be asserted against the FBG Debtors' estate.

And to provide additional comfort, he added a 20% cushion on top of what he considers a conservative figure.

Moore testified that there's about $25 billion in transfers that support litigation claims. The Court admitted a summary of these transfers at DX-235. That exhibit shows that payments made to, among other things, to

Leucadia and Katsumi, during a multi-year period, totaled over 15 billion.

Payments to supply chain financiers total about 4.7 billion. Payments to Onset total about 2.3 billion. Payments to insiders, about 989 million. And other payments are about 1.92 billion.

This equals about 25 billion, and there's some other money in there, by the FBG Debtors during the period, which Moore believes the estate could assert claims.

Looking at the 25 billion in assertable claim, the waterfall shows the FBG Debtors need about 2 billion, approximately 8% to recover to satisfy the estimate of outstanding admin expense and priority claims.

They look to this Court's ruling, among other things, in Steward Healthcare, for example, where the Court confirmed the Chapter 11 plan and found the plan was feasible.

The FBG Debtors also correctly note that this isn't the time for a mini trial, and this isn't an assessment of the measure of a guarantee of success. This is a confirmation hearing, not an evidentiary trial on the merits of litigation.

The Debtors then turn to the expert testimony of Kirschner. Kirschner has over 50 years' experience as a bankruptcy practitioner and a litigation Trustee. He has

served as a litigation Trustee in some of the biggest fraud and restructuring cases in history.

Kirschner worked for 10 or more hours a day for a period of time between June 20th and July 14th, reviewing pleadings, case law, and investigative reports.

He also reviewed the disclosure statement, the plan, the examiner report, criminal indictments, ensuing certain public guilty pleas, the complaints filed in the adversary proceedings against the James parties and Onset, for example.

He concluded, based on his review, that it's a reasonable probability that a litigation Trustee could recover 2 billion by the end of 2028.  He testified he reached his conclusions independently.

Kirschner also testified about emails provided by Debtors' counsel for him to review, that showed red flags with Katsumi and the LAM parties.

Kirschner also noted that certain parties, which are litigation targets of the FBG Debtors, are billion-dollar organizations, so the FBG Debtors can collect on potential judgments.

The objectors focused on the basis for Kirschner's opinions, argue that he considered a small amount of information, what they characterized as cherry-picked fragments for the record.

Objectors argue that Kirschner did not independently investigate to learn more. He was shown emails, made opinions about what those emails implied as to potential claims, but he did not know that there were responses to certain emails that he found as red flags.

He also didn't ask for additional diligence requests and relied on what was given to him to study. As to the 25 billion in gross transfers identified by Moore, he accepted that number, but made no adjustments for potential defenses.

He did testify that he assumed there would be defenses, but he didn't analyze potential defenses. He also did not take a position as to whether the federal government, in certain litigation affecting parties and other criminal matters, would assert forfeiture and also seek to collect on the same funds that were addressed as potential targets for litigation collection.

And aside from his belief that the litigation could collect because many of these targets had liquidity, there was no real analysis about whether those claims could be litigated and collected by the proposed effective date in 2028.

Analyzing these objections and the Debtors as burden requires an assessment of two points. First, the Bankruptcy Code requires administrative creditors be paid in full in cash on the effective date. It's mandatory.

And there was much debate in the plan confirmation hearing about what is the meaning of effective date. It's not a defined term in the Bankruptcy Code.

The ordinary meaning of the word, according to Black's dictionary, is the date on which the plan takes effect. Right?

Every Chapter 11 plan provides for different effective dates depending on the circumstances of the case. Some plans can go effective right away because there are sufficient funds to enact the transactions and pay under the plan.

Others require additional time to collect sufficient funds or establish regulatory approval. There's no hard fast date required under the code.

I do not read the code as imposing a fixed outer limit on how long a runway a Debtor may propose. But the length of a runway bears directly on the Court's feasibility review.

And on this record, where recovery depends on litigation against defendants, some of whom face pending criminal charges, a runway extending into late 2028 calls for careful scrutiny about what the Debtors have actually shown.

In this case, the FBG Debtors propose late 2028. And they believe, based on the 25 billion in assertable claims,

they believe they can recover about 2 million in that period.

In this case, there's a real argument that the matters that lock in the plan economics and plan transactions all occur on the confirmation date, really making the confirmation date, the date the plan goes effective.

The winddown budget confirms that all the main transaction, except litigation and related collection of efforts, occur on the confirmation date.

Under the plan, on the confirmation date, the trust in governance goes into effect. State claims are transferred to the litigation trust. The litigation trusts are funded. The DIP collateral credit bid occurs. The deemed foreclosure under the ABL occurs.

The parties would implement the administrative expense claims program. T&Os would be terminated. A winddown administrator would be appointed. A winddown reserve would be funded. The UCC would be dissolved.

The debtor releases and relating injunctions go into effect. The plan exculpations go into effect. And all of that is irreversible if I signed the confirmation order.

It also appears the Debtors would begin making payments under the preference plan to eligible participants before the effective date.

So all of this happens on the confirmation date, and

it's locked in, final, and irreversible. What's left for the effective date is the payment of admin and priority creditors, and the effectiveness of third-party releases for those who opted into them.

Based upon that record, it appears that the true effective date is the plan confirmation date because it locks in irreversible economics under the plan, based on the confirmation order, and releases and establishes trust and payments to creditors.

But even accepting the Debtors' proposal later in 2028, I still don't think the plan is feasible. First, the 25.4 billion figure Moore relies on, reflects the aggregate amount of payments the FBG Debtors made to third parties.

It doesn't net out payments the FBG Debtors receive back from those parties, which were substantial. And the record contains no analysis of potential setoff rights, at least not an in-depth one. This record contains no analysis of potential additional defenses parties may have to claims.

This matter is in particular for preference actions where the Bankruptcy Code requires that a party have considered a defendant's available good faith defenses before pursuing such a claim. That analysis does not appear to have been done in depth.

Third, pending the adversary proceeding against the James parties, those remain at the initial pleading stage

before this Court. And nothing will happen in them until at least the conclusion of the James trials that are pending in the Southern District of New York, which are currently scheduled to begin in February 2027.

And at the request of both the government and the Debtors, this Court stayed those proceedings to not have dual tracking of civil and criminal matters. What happens after February 2027, and on what timeline any resumed litigation would proceed is not something within this Court's current knowledge.

Parties may resolve certainly matters in New York before trial, but I'm evaluating a reasonable probability that the administrative creditors will actually be paid in full. In this timeline, I don't have the reasonable assurance of that.

Fourth, admin claims pool may be understated. The estimate was of July 6, and additional parties have already filed administrative claims since that date.

Again, I don't have a bar date here yet, and there are additional estimates. There are potential WARN Act claims that could be asserted.

And the litigation trust has reserved your right to incur additional funding on a priming basis, which would potentially further dilute payment of administrative claims.

Fifth, I don't see a detailed analysis over the

collectability of asserted litigation claims. Moore didn't express an opinion on collectability.

Moore testified that he analyzed collectability and believed there were collectible claims, but not to a specific dollar amount.

He also testified that a litigation Trustee could and often does work with the government to split funds in the event the government seeks forfeiture. And I don't I do't know where that takes and leads everyone.

The question is then, what distinguishes this case from Steward, where I extended an effective date runway of two years on a plan that likewise depended on recovering litigation assets.

First, in Steward, an administrative bar date had expired several months before plan solicitation. And there were already omnibus objections the claims were already pending.

The Debtors provided the Court examples of claims they believed were overstated or improperly classified as administrative, which allowed me to review the claims pool on a prima facie basis myself.

No comparable bar date, admin or general, has been set in this case. And I don't have any comparable basis to independently test the reliability of the administrative claims estimate here.

I would also note that there were trusts established independent of plan confirmation before plan confirmation. And it's an important point.

The witnesses supporting feasibility in Steward had independently investigated the claims they testified about. CRO had prepared his own analysis of estimated recoveries. And a member of the independent committee was around when these claims were investigated and the causes of action were filed.

He was present when the underlying complaints were drafted. And he told me directly, based on his own independent analysis, that the claims had merit.

The CEO had also separately itemized claims he believed the estate could pursue. Like, commercial payer claims, insurance claims, fraudulent transfer claim tied to trial, over 300 million in preference actions, and a large separate insurance dispute.

There wasn't a single aggregate percentage across the portfolio of unasserted claims. There was individually identified transactions in dispute, each with its own record support.

The 25.4 billion here, by contrast, is built by applying an assertable value estimate without that same kind of claim by claim development. And that's certainly no criticism of anyone, right?

First Brands is a much different case than Steward. The books and records in Steward were much more reliable based on the record. And I do not make light of the seriousness of the allegations in this case, the examiner's findings, or criminal charges.

I focus only on the weight that an opinion can bear before me. I believe Kirschner testified to what he honestly believes. And that includes his belief about a Ponzi scheme presumption.

But that one cuts both ways, right? Because if there's going to be allegations of one, it has to be subject to scrutiny, and there's not a given presumption or a strong presumption that it will or will not apply, including what percentages of alleged transfers would be under such a presumption.

Finally, in Steward, I was able to condition confirmation on a periodic check-ins to verify the plan remained on track towards its effective date. I can't provide the same safeguards here because everything happens under the confirmation date itself. And everything would be irreversible.

And I understand why parties ask for that. In confirming the plan in Steward, I also referenced the American Airlines case as a case where the effective date was extended.

But this case isn't like American either. There, the Debtor's plan was confirmed, subject to impending regulatory clearance of the merger with U.S. Airways, that had not yet been resolved at the time. And I said at the time, no one knew how long that was going to take.

But nothing in that case of material substance occurred between confirmation and the effective date. The automatic stay remained in place. No discharge, no permanent injunction, no distributions.

And had the merger been blocked, the case would have returned to Judge Lane for additional proceedings. This plan is structured differently.

In this case, the plan crosses essentially the point of no return at confirmation. And only afterwards, would find out where the assumption it was built on holds.

I also find that the Class Three DIP roll-up claims are not a proper voting class. Class three was deemed impaired under the plan, so that class was solicited and voted to accept.

The Bankruptcy Code requires at least one impaired voting class to accept. For two plan Debtors, Viceroy and First Branch Group Holdings, class three is the only impaired accepting class.

The DIP credit agreement and the final DIP order established that roll-up claims are allowed administrative

expense claims, under Section 503 of the Bankruptcy Code.

For example, paragraph H6 in the whole of the final DIP order says, that first lien obligations held by DIP lenders were automatically deemed exchanged via assignment on a cashless basis into and were deemed to constitute DIP obligations.

Paragraph eight of the DIP order says that DIP obligations shall, for purposes of the Bankruptcy Code, be considered administrative expenses allowed under Section 503 of the Bankruptcy Code. Roll-up loans are DIP obligations under paragraph H6 in the whole too.

Finally, paragraph 25E confirms that roll-up claims are super priority administrative expense claims. Thus, Class three's roll-up claims are post-petition administrative expense claims allowed under Section 503 and for purposes of Section 1129(a)(9).

I would note that the Bankruptcy Code -- that section says that unless a party agrees to a different treatment, a plan must provide for payment in full and cash on the effective date.

Claims of a kind specified under Section 507(a)(2) are administrative expense claims allowed under 503. Here, arguably, the DIP lenders agreed to different treatment than payment in full on the effective date. That doesn't mean they're allowed to vote on the plan.

And that is because the Bankruptcy Code also says that a plan must designate classes of claims other than claims specified in, among others, 507(a)(2).

Admin expense creditors are excluded from plan classification altogether. They receive their statutory required treatment without a vote.

So even if they agree to a different treatment, that different treatment doesn't give rise to a vote. And it makes sense for admin creditors because they're unimpaired and don't vote, since 1129(a)(9) says you got to pay them in full.

The Fifth Circuit has confirmed as much in the Greystone case, 995 F.2d 1274 (5th Cir. 1993) case. Under this plan, however, roll-up claims are improperly treated as a plan class entitled to vote. And the code permits such a voting class.

The FBG Debtors don't dispute the statutory framework, but they point to paragraph 25E of the DIP order that allows roll-up claims to vote under the plan. But 25E doesn't change the answer.

Paragraph 25E doesn't establish that roll-up claims satisfy 1129(a)(10) by its own term. Holders of roll-up obligations are barred from objecting on three grounds, that their claims are not being impaired, repaid in full in cash, that the Debtors are seeking 1129(b) treatment, or that

their roll-up claims are classified as a voting class.

That's a waiver of the DIP lenders' own objections. It's not and cannot be an adjudication of whether classifying a super priority administrative claim as a voting class satisfies 1129.

1129(a)(10) exists to protect non-insider creditors. None of them waived anything by its terms. I would also note a DIP order cannot resolve in advance a statutory requirement for plan confirmation.

Standards in Sections 1123, 26, 29 always apply under Chapter 11 plans, and including this one. The final DIP order does not dictate the outcome of plan confirmation.

Granted, liens, priorities, and adequate protection under 362, 363, 364, 503, and 507, matter squarely within the Court's authority to approve at the DIP financing stage, and reserve confirmation questions later.

The Court disagrees with the FBG Debtors' attempt to use paragraph 25E for this purpose. The Court retained the right to construe the final DIP order. And its reading is consistent with the text of the final DIP order and the Bankruptcy Code.

So we don't have any sub rosa plan problems, any plan dictating problems, any plan dictating under other orders' plan problems. I don't have Braniff issues. I don't have Serta issues. I don't have other Fifth Circuit case-related

issues where Courts are trying to dictate in a order, what will happen under a plan or rights under a plan.

25E is an avenue for assessing whether claims consent. You get to ask, but it doesn't mean that it satisfies 1129. Here, they asked, and it failed.

For these reasons, the Court finds that the Bankruptcy Code was not complied with as to Viceroy and First Brands groups.

Finally, multiple parties objected to the preference settlement on multiple grounds. The preference settlement permits some parties to be excluded if the litigation Trustee determines that a party engaged in adverse conduct.

And adverse conduct can just be based on alleged wrongful conduct. And it may be based on matters unrelated to a preference. So just the allegation to get a party out of a settlement, even if they opted into the settlement.

The adverse conduct may have nothing to do with a preference claim, but it could serve as the basis to remove someone from a preference settlement. And parties won't know in advance whether they've been deemed to engage in adverse conduct either.

So that means, arguably, an opt-in to the settlement could be solicited and then later repudiated. The procedures are accordingly not fair for all parties and not in the best interests of creditors. I don't approve the

preference settlement as part of the global settlement either.

So, for the reasons I've stated, this plan cannot be confirmed. And there's no non-material change that can be proposed to obtain confirmation.

The FBG Debtors work with the senior secured creditors to try and put forth the best plan. And I reject any argument that the debt is professional put their own interest above the estate's interest. There were some allegations about that, and I just reject that.

They tried their best, and they put forth their best proposal that they could do to muster, based upon the consensus that they were trying to reach.

The plan just does not satisfy the relevant provisions of the Bankruptcy Code, so these cases must convert to Chapter 7.

Section 1112 of the code says that on the request of a party in interest and after notice in a hearing, the Court shall convert a case under this case to Chapter 7, or dismiss, whichever is in the best interest of creditors for cause, and the estate for cause.

There are 16 examples of cause under 1112(b)(4). Assuming there is cause, Section 1112(b)(2) provides for a mandatory inquiry that may result in not converting or dismissing.

Even when there is cause, it says that the Court may not convert or dismiss a case if the Court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors and the estate.

In addition to unusual circumstances, the Court must also find that there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time, together with reasonable justification, or in a timely cure of the act or omission that gave rise to cure.

This Court previously denied a motion to convert. And at the same time, also before that, denied conditional approval of a disclosure statement.

When the Court denied a motion to convert, it gave the Debtors an opportunity to solicit votes on this plan.

And after an evidentiary hearing, and for the reasons I'm stating today, it doesn't satisfy the requirements for confirmation. This time, there is no doubt that there is cause to convert, and it's in the best interest of the creditors and the estate.

There is a substantial and continuing loss to or diminution of the estate in the absence of a reasonable likelihood of rehabilitation.

I would note that there's a substantial and continuing loss and diminution of the estate, and there's an absence of

a reasonable likelihood of rehabilitation.

As I've said in prior decisions, the first prong is a present factual inquiry based on the condition of the estate. Is the estate suffering a substantial or continuing loss diminution? That is, is present value presently being lost, presently mountain, right?

In this case, the answer -- And the second one asks, is the loss likely to continue? Right? Is there a reasonable likelihood of rehabilitation? Textually. The first prong identifies a loss or diminution. The second prong asks whether that loss or diminution is reasonably likely to be stopped. Right?

When there's a substantial or continuing loss, rehabilitation is about whether something is reasonably likely to happen that ends the losses.

The first prong is easily satisfied today. There was a billion-dollar DIP, and it's basically gone. The Debtors have had to sell, sometimes with the assistance of the proposed buyer.

There are hundreds of millions of unpaid administrative expense claims. The Debtors have no operating businesses. They're administratively insolvent. And an overwhelming amount has to be paid.

Several cases have already converted. Professional fees continue to accrue. And there's nothing left to

reorganize.

The second question, whether there's a reasonable likelihood of rehabilitation. The answer is no. The Debtors have now proposed an initial Chapter 11 plan and have now proposed a plan that was denied conditional approval at the disclosure statement phase, and then earned the right to solicit votes on the current plan.

And that plan and the global settlement contained are not approved. There's not a reasonable likelihood of rehabilitation. And there's no new evidence of new available funding. The sale process would have to get extended significantly and rerun.

The current plan can't be tweaked to provide a viable path. Admin creditors are not paid. There's no approved litigation funding. The DIP lenders have all of their rights under the DIP order. And so do the ABL lenders under their documents.

No party has argued, and I do not find, regardless, that any unusual circumstances exist that would make conversion or dismissal, quite frankly, contrary to the best interests of creditors in the estate.

Even if such an argument had been raised, the absence of any committed financing, the absence of any viable amended plan, the continued accrual of fees with no operating business left to preserve, would defeat it.

These are incredibly complicated cases. And who may serve as a Chapter 7 Trustee will certainly not be an easy decision.

I'm going to enter an order shortly denying confirmation for the reasons stated on the record today. The Debtors should submit a proposed confirmation order by this Wednesday at 5 p.m. Central.

To give you an example of what I think works, I went looking for some examples, and I actually think there's a November 2025 conversion order in Big Lots that I think has a good template for Rule 1090. (indiscernible) committee effect, professional fee application process, and the Chapter 11 orders remaining effect language.

There's some language about claims agent process in there, but I think the Kroll retention order in the Southern District, actually addresses what needs to happen already.

There's an admin expense reserve section and some paragraphs that don't apply. I intend to enter the order by Friday. I still see people filing stuff on the docket, and I get it. And I'll take matters up after I convert the cases.

I want to express my sincere appreciation to everyone involved in these Chapter 11 cases, Debtors, Debtors professionals.

Starting a case with $2 billion missing is really hard.

And then finding that the books and records aren't what everyone had even hoped to be, on top of funds missing, the sales process, having to work with OEMs.

These cases are converting. There are a number of affected parties who, by -- nobody, none of these professionals were involved when allegations of double counting and alleging double counting collateral, and taking money in one place and giving it to another place, and funneling money, and all the allegations that were raised in the examiner report.

Nobody was around. None of these professionals that were hired were here. And they had to deal with all that. I get it, affected parties are going to remain not happy. Customers may not be happy. Admin creditors, professionals, may not be happy with today's result.

I say all that, but I also know that there's a bunch of folks working today who are going to get a paycheck on September 1, because people really worked hard to make sure that product lines were sold, and were sold to people who could pick right up and get to work.

A lot of people were laid off, and I'm not making light of this. It's just really hard and mixed. But I don't want to discount the work and the efforts that were put here.

I want to thank everyone for their time. I think that's enough for me today. We need to set a time to talk.

Let's do it. But that's enough for me today. Thank you. We're adjourned.

(Proceedings adjourned.)

CERTIFICATION

I, Victor Mwendwa Musau, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Victor Mwendwa Musau

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: August 27, 2026