# EXHIBIT 1

erpa HR

# CONTRACT DE PRESTĂRI SERVICII – ECHIPĂ DEDICATĂ

## *SERVICES AGREEMENT – DEDICATED TEAM SERVICES*

Nr. 169 din data de 12.11.2026 / *No. 169 dated 12.11.2026*

| ROMÂNĂ | ENGLISH |
|---|---|
| **PĂRȚILE:** | **THE PARTIES:** |
| **S.C. ERPA PREMIUM VISION S.R.L.**, persoană juridică română, cu sediul social în localitatea Chitorani, Str. Iuliu Maniu, nr. 102, com. Bucov, Județul Prahova, având declarat și înregistrat punct de lucru în loc. Ploiești, Str. Ștefan cel Mare, nr. 4, etaj 1, office 3, jud. Prahova, România, înregistrată la Registrul Comerțului Prahova cu nr. **J29/1480/2019**, cod unic de înregistrare **RO 40933661**, contul **IBAN RO86INGB0000999909033749 (cont în RON)**, deschis la Sucursala Ploiești Victoriei, cont în USD **IBAN ……………**, deschis la ……………, reprezentată de Dna **Pătrașcu Laura Ancuța**, având funcția de **Administrator**, denumită în continuare **Prestator**, | **ERPA PREMIUM VISION S.R.L.**, a Romanian legal entity, with its registered office in Chitorani, 102 Iuliu Maniu Street, Bucov Commune, Prahova County, with a declared and registered secondary office in Ploiești, 4 Ștefan cel Mare Street, 1st floor, office 3, Prahova County, Romania, registered with the Prahova Trade Register under no. **J29/1480/2019**, sole registration code **RO 40933661**, bank account **IBAN RO86INGB0000999909033749 (RON account)**, opened with the Ploiești Victoriei Branch, USD account **IBAN ……………**, opened with ……………, represented by Mrs. **Pătrașcu Laura Ancuța**, in her capacity as **Administrator**, hereinafter referred to as the **Provider**, |
| **și** | **and** |
| **Eva Engelhart**, în calitate de lichidator (chapter 7 trustee) în dosarul nr. 25-90399 și în dosarele administrate în comun cu acesta, aflate pe rolul Tribunalului de Faliment al Statelor Unite pentru Districtul de Sud al statului Texas (United States Bankruptcy Court for the Southern District of Texas), denumită în continuare **Beneficiar**, | **Eva Engelhart**, in her capacity as the chapter 7 trustee in Case No. 25-90399 and the jointly administered cases, pending in the United States Bankruptcy Court for the Southern District of Texas, hereinafter referred to as the **Client**, |
| Prestatorul și Beneficiarul fiind denumiți în continuare, individual, „Partea" și, împreună, „Părțile". | The Provider and the Client being hereinafter referred to, individually, as a "Party" and, collectively, as the "Parties". |
| **PĂRȚILE PREZENTULUI CONTRACT AU CONVENIT URMĂTOARELE:** | **THE PARTIES TO THIS AGREEMENT HAVE AGREED AS FOLLOWS:** |
| **1. OBIECTUL CONTRACTULUI** | **1. SUBJECT MATTER OF THE AGREEMENT** |
| 1.1. Prezentul contract are ca obiect prestarea de **servicii prin echipă dedicată** („Serviciile de Echipă Dedicată" sau „Serviciile"), constând în angajarea în nume propriu de către Prestator, în baza unor contracte individuale de muncă încheiate conform legislației române, și administrarea unui număr de persoane desemnate de Beneficiar, pe diverse funcții („Personalul Dedicat"), care vor desfășura activitate exclusiv pe teritoriul României, în beneficiul Beneficiarului, pentru pozițiile, în numărul și la nivelurile salariale detaliate în Anexa nr. 1. | 1.1. The subject matter of this Agreement is the provision of **dedicated team services** (the "Dedicated Team Services" or the "Services"), consisting of the employment by the Provider in its own name, under individual employment contracts concluded in accordance with Romanian law, and the administration of a number of persons designated by the Client, in various roles (the "Dedicated Personnel"), who will perform their activity exclusively within the territory of Romania for the benefit of the Client, for the positions, in the number and at the salary levels detailed in Annex no. 1. |
| 1.2. Datele de identificare ale Beneficiarului și adresa de facturare sunt următoarele: | 1.2. The Client's identification details and billing address are the following: |
| a) **Eva Engelhart**, în calitate de lichidator (chapter 7 trustee) în dosarul nr. 25-90399 și în dosarele administrate în comun cu acesta, aflate pe rolul | a) **Eva Engelhart**, in her capacity as the chapter 7 trustee in Case No. 25-90399 and the jointly administered cases, pending in the United States |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| Tribunalului de Faliment al Statelor Unite pentru Districtul de Sud al statului Texas (United States Bankruptcy Court for the Southern District of Texas), **Beneficiar**; | Bankruptcy Court for the Southern District of Texas, the **Client**; |
| **b) Adresa de facturare:** Eva Engelhart, Ross, Banks, May, Cron & Cavin, P.C., 7700 San Felipe, Suite 550, Houston, Texas 77063, Statele Unite ale Americii, e-mail pentru facturi: eengelhart@rossbanks.com. | **b) Billing address:** Eva Engelhart, Ross, Banks, May, Cron & Cavin, P.C., 7700 San Felipe, Suite 550, Houston, Texas 77063, United States of America, e-mail for invoices: eengelhart@rossbanks.com. |
| **2. DURATA ȘI INTRAREA ÎN VIGOARE** | **2. TERM AND EFFECTIVENESS** |
| 2.1. Prezentul **Contract** este încheiat pentru o perioadă inițială de **4 (patru) luni** de la data semnării lui de către ambele Părți și a aprobării de către Tribunalul de Faliment și se prelungește automat cu perioade succesive de câte 4 (patru) luni, dacă niciuna dintre Părți nu trimite în scris o notificare de încetare cu cel puțin 30 (treizeci) de zile înainte de data expirării. | 2.1. This **Agreement** shall be for an initial term of **4 (four) months** from the date of its signature by both Parties and approval by the Bankruptcy Court, and shall be automatically extended for successive periods of 4 (four) months, unless either Party sends a written notice of termination at least 30 (thirty) days before the expiry date of this Agreement. |
| 2.2. Prezentul contract intră în vigoare la data la care Tribunalul de Faliment pronunță o hotărâre, cu o formă și un conținut rezonabil acceptabile pentru Prestator, care nu este suspendată („Hotărârea de Aprobare”), prin care: (a) aprobă prezentul contract și autorizează Beneficiarul să îl execute; (b) autorizează Beneficiarul să plătească Depozitul de Garanție și toate facturile emise în temeiul prezentului contract la scadență, fără o altă hotărâre a Tribunalului de Faliment; (c) stabilește că toate sumele datorate Prestatorului în temeiul prezentului contract sunt cheltuieli administrative admise ale patrimoniilor debitoare, conform 11 U.S.C. § 503(b)(1); și (d) autorizează Prestatorul să dețină, să utilizeze și să compenseze Depozitul de Garanție conform art. 5, cu ridicarea suspendării automate (automatic stay) în măsura necesară. Prestatorul nu are obligația de a angaja Personalul Dedicat sau de a începe Serviciile înainte de pronunțarea Hotărârii de Aprobare și de încasarea integrală a Depozitului de Garanție. | 2.2. This Agreement shall become effective on the date on which the Bankruptcy Court enters an order, in form and substance reasonably acceptable to the Provider, that is not stayed (the “Approval Order”), which: (a) approves this Agreement and authorizes the Client to perform it; (b) authorizes the Client to pay the Security Deposit and all invoices issued under this Agreement when due, without further order of the Bankruptcy Court; (c) provides that all amounts payable to the Provider under this Agreement are allowed administrative expenses of the estates under 11 U.S.C. § 503(b)(1); and (d) authorizes the Provider to hold, apply and set off the Security Deposit in accordance with Article 5, with relief from the automatic stay to the extent necessary. The Provider shall not be obliged to employ any Dedicated Personnel or to start the Services before the Approval Order is entered and the Security Deposit is received in full. |
| **3. SERVICIILE DE ECHIPĂ DEDICATĂ** | **3. DEDICATED TEAM SERVICES** |
| **3.1. Statutul Personalului Dedicat** | **3.1. Status of the Dedicated Personnel** |
| 3.1.1. Personalul Dedicat este angajat exclusiv al Prestatorului, în baza unor contracte individuale de muncă încheiate în conformitate cu legislația muncii din România. Prestatorul are calitatea de angajator și îndeplinește toate obligațiile legale aferente: încheierea și înregistrarea contractelor de muncă (inclusiv în REVISAL), plata salariilor, calculul, reținerea și virarea impozitelor și contribuțiilor sociale, securitatea și sănătatea în muncă, medicina muncii, evidența timpului de lucru și a concediilor. | 3.1.1. The Dedicated Personnel are employed exclusively by the Provider, under individual employment contracts concluded in accordance with Romanian labour law. The Provider acts as employer and fulfils all related legal obligations: concluding and registering the employment contracts (including in the REVISAL register), paying salaries, calculating, withholding and remitting taxes and social contributions, occupational health and safety, occupational medicine, and recording working time and leave. |
| 3.1.2. Între Beneficiar și membrii Personalului Dedicat nu se naște niciun raport de muncă. Prerogativele de | 3.1.2. No employment relationship arises between the Client and the members of the Dedicated Personnel. The |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| angajator, inclusiv cea disciplinară, aparțin exclusiv Prestatorului. | employer's prerogatives, including disciplinary authority, belong exclusively to the Provider. |
| **3.2. Organizarea și coordonarea activității** | **3.2. Organisation and coordination of the activity** |
| 3.2.1. Beneficiarul va transmite cerințele, prioritățile și sarcinile aferente serviciilor prin persoanele de contact desemnate în Anexa nr. 1. Prestatorul desemnează un coordonator care răspunde de organizarea activității Personalului Dedicat, de evidența timpului de lucru și de comunicarea cu Beneficiarul. | 3.2.1. The Client shall communicate the requirements, priorities and tasks related to the services through the contact persons designated in Annex no. 1. The Provider shall appoint a coordinator responsible for organising the activity of the Dedicated Personnel, recording working time and communicating with the Client. |
| 3.2.2. Concediile de odihnă și celelalte absențe ale Personalului Dedicat se aprobă de Prestator, în cazurile în care legea română prevede aprobarea, cu informarea prealabilă a Beneficiarului, astfel încât să se asigure continuitatea serviciilor. | 3.2.2. The annual leave or any other absences of the Dedicated Personnel shall be approved by the Provider, where approval is required under Romanian law, with prior notice to the Client, so as to ensure the continuity of the services. |
| 3.2.3. Beneficiarul va semnala în scris Prestatorului orice nemulțumire privind activitatea unui membru al Personalului Dedicat, iar Prestatorul va lua măsurile necesare în conformitate cu legislația muncii, inclusiv, după caz, înlocuirea persoanei respective. | 3.2.3. The Client shall notify the Provider in writing of any dissatisfaction regarding the activity of a member of the Dedicated Personnel, and the Provider shall take the necessary measures in accordance with labour law, including, where appropriate, replacing the respective person. |
| **3.3. Locul și programul de lucru** | **3.3. Place of work and working schedule** |
| 3.3.1. Personalul Dedicat își desfășoară activitatea exclusiv pe teritoriul României, la locația/locațiile prevăzute în Anexa nr. 1 (sediul/punctul de lucru al Prestatorului, telemuncă sau o altă locație agreată). Orice deplasare sau detașare în afara României este posibilă numai în baza unui act adițional semnat de ambele Părți, iar costurile aferente sunt suportate de Beneficiar. | 3.3.1. The Dedicated Personnel perform their activity exclusively within the territory of Romania, at the location(s) set out in Annex no. 1 (the Provider's registered or secondary office, remote work or another agreed location). Any travel or posting outside Romania is possible only under an addendum signed by both Parties, and the related costs shall be borne by the Client. |
| 3.3.2. Programul normal de lucru este de 8 ore pe zi și 40 de ore pe săptămână, de luni până vineri, cu respectarea legislației române privind timpul de muncă și de odihnă. Programul zilnic poate fi corelat cu fusul orar al Beneficiarului, în limitele legii și conform Anexei nr. 1. | 3.3.2. The normal working schedule is 8 hours per day and 40 hours per week, Monday to Friday, in compliance with Romanian law on working and rest time. The daily schedule may be aligned with the Client's time zone, within the limits of the law and in accordance with Annex no. 1. |
| 3.3.3. Orele suplimentare, munca de noapte și munca în zilele de repaus săptămânal sau de sărbătoare legală se efectuează numai cu acordul scris prealabil al Beneficiarului și se facturează cu sporurile prevăzute în Anexa nr. 1, dar nu mai puțin decât sporurile prevăzute de legislația muncii. | 3.3.3. Overtime, night work and work on weekly rest days or public holidays shall be performed only with the Client's prior written consent and shall be invoiced with the premiums set out in Annex no. 1, but not less than the premiums required by labour law. |
| **3.4. Comenzi, modificări și înlocuiri** | **3.4. Orders, changes and replacements** |
| 3.4.1. Personalul Dedicat este identificat și desemnat de Beneficiar. Pentru fiecare persoană, Beneficiarul comunică în scris Prestatorului poziția, fișa postului, salariul brut lunar și data de începere, precum și datele necesare încheierii contractului individual de muncă. | 3.4.1. The Dedicated Personnel are identified and designated by the Client. For each person, the Client shall communicate to the Provider in writing the position, the job description, the monthly gross salary and the start date, as well as the information required to conclude the individual employment contract. |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| 3.4.2. Orice modificare privind numărul de persoane, pozițiile sau salariile se face prin actualizarea Anexei nr. 1, semnată de ambele Părți, și produce efecte de la data prevăzută în anexa actualizată. | 3.4.2. Any change regarding the number of persons, the positions or the salaries shall be made by updating Annex no. 1, signed by both Parties, and shall take effect from the date set out in the updated annex. |
| 3.4.3. În cazul încetării contractului de muncă al unui membru al Personalului Dedicat sau al absenței de lungă durată a acestuia, Beneficiarul poate desemna o persoană înlocuitoare, conform art. 3.4.1. La cererea scrisă a Beneficiarului, Prestatorul poate recruta înlocuitorul, în condiții financiare agreate separat în scris. | 3.4.3. If the employment contract of a member of the Dedicated Personnel ends or if such member is absent for a long period, the Client may designate a replacement in accordance with Article 3.4.1. At the Client's written request, the Provider may recruit the replacement on financial terms agreed separately in writing. |
| 3.4.4. Beneficiarul confirmă că raporturile de muncă anterioare ale Personalului Dedicat cu Trico Romania (sau cu orice altă entitate afiliată Beneficiarului) au încetat înainte de angajarea de către Prestator. Prestatorul nu preia nicio obligație a angajatorului anterior. Orice sume sau pretenții ale Personalului Dedicat rezultate din raporturile de muncă anterioare, inclusiv cele întemeiate pe transferul întreprinderii, sunt suportate de Beneficiar și pot fi reținute din Depozitul de Garanție conform art. 5.6. | 3.4.4. The Client confirms that the previous employment relationships of the Dedicated Personnel with Trico Romania (or with any other entity affiliated with the Client) were terminated before their employment by the Provider. The Provider does not assume any obligation of the previous employer. Any amounts or claims of the Dedicated Personnel arising from their previous employment, including claims based on a transfer of undertaking, shall be borne by the Client and may be retained from the Security Deposit in accordance with Article 5.6. |
| **3.5. Obligațiile suplimentare ale Beneficiarului** | **3.5. Additional obligations of the Client** |
| Pentru Serviciile de Echipă Dedicată, Beneficiarul se obligă: | With respect to the Dedicated Team Services, the Client undertakes: |
| a) să pună la dispoziție, în timp util, informațiile, accesele la sisteme, licențele și, dacă Anexa nr. 1 prevede astfel, echipamentele necesare desfășurării activității;<br>b) să confirme în scris (inclusiv prin e-mail) situația lunară a orelor (pontajul) în termen de 5 (cinci) zile lucrătoare de la primire; în lipsa unor obiecții scrise și motivate în acest termen, pontajul se consideră acceptat;<br>c) să nu transmită Personalului Dedicat instrucțiuni contrare legii române sau prezentului contract;<br>d) să achite facturile și Depozitul de Garanție în termenele prevăzute la art. 4 și 5. | a) to provide, in a timely manner, the information, system access, licences and, where Annex no. 1 so provides, the equipment necessary to carry out the activity;<br>b) to confirm in writing (including by e-mail) the monthly statement of hours (timesheet) within 5 (five) business days of receipt; in the absence of written and reasoned objections within this period, the timesheet shall be deemed accepted;<br>c) not to give the Dedicated Personnel any instructions contrary to Romanian law or to this Agreement;<br>d) to pay the invoices and the Security Deposit within the deadlines set out in Articles 4 and 5. |
| **3.6. Costurile la încetarea colaborării** | **3.6. Costs upon termination of the collaboration** |
| În cazul încetării sau expirării prezentului contract ori al reducerii numărului de persoane din Personalul Dedicat, din orice motiv, cu excepția încălcării grave a contractului de către Prestator, Beneficiarul va suporta costurile aferente încetării contractelor individuale de muncă ale persoanelor în cauză, limitate la: (i) costurile salariale (salariul brut și contribuțiile angajatorului) aferente perioadei de preaviz legal de 20 (douăzeci) de zile lucrătoare; și (ii) compensarea concediului de odihnă neefectuat. Aceste costuri se facturează separat și pot fi reținute din Depozitul de Garanție conform art. 5. | In the event of termination or expiry of this Agreement or a reduction in the number of Dedicated Personnel, for any reason other than a material breach of this Agreement by the Provider, the Client shall bear the costs related to the termination of the individual employment contracts of the persons concerned, limited to: (i) the salary costs (gross salary and employer contributions) for the statutory notice period of 20 (twenty) working days; and (ii) compensation for untaken annual leave. These costs shall be invoiced separately and may be retained from the Security Deposit in accordance with Article 5. |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| **4. VALOAREA CONTRACTULUI ȘI MODALITĂȚI DE PLATĂ** | **4. CONTRACT VALUE AND PAYMENT TERMS** |
| **4.1. Tariful orar** | **4.1. Hourly rate** |
| 4.1.1. Serviciile de Echipă Dedicată se facturează pe bază de tarif orar („Tariful Orar”), stabilit pentru fiecare poziție în Anexa nr. 1, pe baza salariului brut lunar comunicat de Beneficiar. Tariful Orar include salariul brut, contribuția asiguratorie pentru muncă și celelalte costuri legale ale angajatorului, precum și onorariul Prestatorului. | 4.1.1. The Dedicated Team Services are invoiced on an hourly rate basis (the “Hourly Rate”), set for each position in Annex no. 1, based on the monthly gross salary communicated by the Client. The Hourly Rate includes the gross salary, the employment insurance contribution and the other statutory employer costs, as well as the Provider’s fee. |
| 4.1.2. Se facturează orele lucrate, precum și orele aferente concediului de odihnă, zilelor de sărbătoare legală și celorlalte absențe plătite de Prestator în calitate de angajator conform legii („Orele Facturabile”), conform pontajului lunar confirmat potrivit art. 3.5 lit. b). | 4.1.2. The hours worked shall be invoiced, as well as the hours corresponding to annual leave, public holidays and other absences paid by the Provider as employer under the law (the “Billable Hours”), according to the monthly timesheet confirmed under Article 3.5(b). |
| 4.1.3. Tariful Orar se ajustează proporțional, de la data producerii efectelor, în cazul: (i) modificării salariilor la solicitarea sau cu acordul Beneficiarului; (ii) modificării legislației privind salariul minim, contribuțiile sociale, impozitele sau alte costuri obligatorii ale angajatorului. Prestatorul va notifica Beneficiarul și va transmite Anexa nr. 1 actualizată. | 4.1.3. The Hourly Rate shall be adjusted proportionally, from the effective date, in the event of: (i) a change in salaries at the Client’s request or with its consent; (ii) a change in legislation regarding the minimum wage, social contributions, taxes or other mandatory employer costs. The Provider shall notify the Client and send the updated Annex no. 1. |
| 4.1.4. Prestatorul emite lunar, până în a 5-a zi lucrătoare a lunii următoare, factura aferentă Orelor Facturabile din luna anterioară. | 4.1.4. The Provider shall issue a monthly invoice, by the 5th working day of the following month, for the Billable Hours of the previous month. |
| **4.2. Dispoziții comune privind plata** | **4.2. Common payment provisions** |
| 4.2.1. Facturile se transmit Beneficiarului prin e-mail, la adresa prevăzută la art. 1.2 lit. b), și se consideră primite la data transmiterii. | 4.2.1. Invoices shall be sent to the Client by e-mail, to the address set out in Article 1.2(b), and shall be deemed received on the date they are sent. |
| 4.2.2. **Termenul de plată a facturilor este de 30 (treizeci) de zile calendaristice de la data emiterii.** Plata se efectuează în contul în USD al Prestatorului indicat în preambul. | 4.2.2. **The payment term for invoices is 30 (thirty) calendar days from the date of issue.** Payment shall be made into the Provider’s USD account indicated in the preamble. |
| 4.2.3. Tarifele se stabilesc în RON. Facturile se emit în dolari americani (USD), la cursul de schimb comunicat de Banca Națională a României (BNR) valabil în ziua facturării. Dacă, la data încasării, cursul BNR diferă cu mai mult de 2% față de cel din ziua facturării, diferența se regularizează pe factura următoare. | 4.2.3. Rates are set in RON. Invoices are issued in US dollars (USD), at the exchange rate published by the National Bank of Romania (NBR) on the invoice date. If, on the date of collection, the NBR rate differs by more than 2% from the rate on the invoice date, the difference shall be adjusted on the next invoice. |
| 4.2.4. Plățile se efectuează integral, fără deduceri, rețineri sau compensări. Comisioanele băncii Beneficiarului și ale băncilor intermediare sunt suportate de Beneficiar. | 4.2.4. Payments shall be made in full, without any deduction, withholding or set-off. The fees of the Client’s bank and of any intermediary banks shall be borne by the Client. |
| 4.2.5. Beneficiarul fiind o persoană impozabilă stabilită în afara Uniunii Europene, serviciile se consideră prestate la locul stabilirii Beneficiarului, conform art. 278 alin. (2) din Codul fiscal, iar facturile se emit fără TVA | 4.2.5. As the Client is a taxable person established outside the European Union, the services are deemed supplied at the place where the Client is established, in accordance with Article 278(2) of the Romanian Fiscal Code, and |

erpa HR

| ROMÂNĂ | ENGLISH |
| --- | --- |
| românească, cu excepția cazului în care legislația aplicabilă prevede altfel. | invoices shall be issued without Romanian VAT, unless applicable law provides otherwise. |
| 4.2.6. Pentru orice nerespectare a termenelor de plată agreate se vor aplica penalități de întârziere de 0,10% pe zi, calculate la suma datorată. | 4.2.6. Any failure to meet the agreed payment terms shall incur late payment penalties of 0.10% per day, calculated on the amount due. |
| 4.2.7. În cazul în care o factură nu este achitată în termen de 15 zile de la scadență, Prestatorul poate suspenda prestarea serviciilor, după notificarea prealabilă scrisă a Beneficiarului. Pe durata suspendării, Beneficiarul rămâne obligat la plata costurilor salariale ale Personalului Dedicat. | 4.2.7. If an invoice is not paid within 15 days of its due date, the Provider may suspend the provision of the services, after prior written notice to the Client. During the suspension, the Client remains liable to pay the salary costs of the Dedicated Personnel. |
| **5. DEPOZITUL DE GARANȚIE** | **5. SECURITY DEPOSIT** |
| 5.1. Pentru garantarea obligațiilor sale, Beneficiarul constituie în favoarea Prestatorului un depozit de garanție („Depozitul de Garanție") egal cu contravaloarea a **4 (patru) luni de cost salarial** al întregului Personal Dedicat prevăzut în Anexa nr. 1. Costul salarial lunar cuprinde salariul brut, contribuția asiguratorie pentru muncă și celelalte costuri legale ale angajatorului. Valoarea Depozitului de Garanție este stabilită în Anexa nr. 1. | 5.1. To secure its obligations, the Client shall provide the Provider with a security deposit (the "Security Deposit") equal to **4 (four) months of salary costs** of all the Dedicated Personnel set out in Annex no. 1. The monthly salary cost comprises the gross salary, the employment insurance contribution and the other statutory employer costs. The amount of the Security Deposit is set out in Annex no. 1. |
| 5.2. Depozitul de Garanție se plătește integral, în avans. Prestatorul emite factura aferentă imediat după intrarea în vigoare a contractului conform art. 2.2. **Termenul de plată a Depozitului de Garanție este de 5 (cinci) zile calendaristice de la data emiterii facturii.** | 5.2. The Security Deposit shall be paid in full, in advance. The Provider shall issue the related invoice immediately after this Agreement becomes effective under Article 2.2. **The payment term for the Security Deposit is 5 (five) calendar days from the invoice date.** |
| 5.3. Prestatorul nu are obligația de a începe angajarea Personalului Dedicat sau prestarea Serviciilor înainte de încasarea integrală a Depozitului de Garanție. Termenele asumate de Prestator se prelungesc corespunzător. | 5.3. The Provider is not obliged to start hiring the Dedicated Personnel or providing the Services before collecting the Security Deposit in full. The deadlines undertaken by the Provider shall be extended accordingly. |
| 5.4. În cazul creșterii numărului de persoane sau a salariilor, Depozitul de Garanție se majorează proporțional, pe baza unei facturi emise de Prestator, cu termen de plată de 5 (cinci) zile calendaristice. În cazul reducerii, Depozitul de Garanție se reduce proporțional, iar diferența, după deducerea sumelor datorate conform art. 3.6 pentru persoanele în cauză, se restituie în termen de 15 (cincisprezece) zile calendaristice de la achitarea acestor sume. | 5.4. If the number of persons or the salaries increase, the Security Deposit shall be increased proportionately, based on an invoice issued by the Provider, with a payment term of 5 (five) calendar days. In the event of a reduction, the Security Deposit shall be reduced proportionately and the difference, less any amounts due under Article 3.6 for the persons concerned, shall be refunded within 15 (fifteen) calendar days after such amounts have been settled. |
| 5.5. Depozitul de Garanție nu este purtător de dobândă și se menține pe toată durata contractului, inclusiv pe durata prelungirilor acestuia. Depozitul de Garanție nu poate fi utilizat de Beneficiar pentru plata facturilor curente, cu excepția facturii finale, a facturii finale de regularizare și a costurilor prevăzute la art. 3.6. | 5.5. The Security Deposit does not bear interest and shall remain in place throughout the term of this Agreement, including any extensions. The Security Deposit may not be used by the Client to pay current invoices, except for its final invoice, the final adjustment invoice and the costs under Article 3.6. |
| 5.6. Prestatorul are dreptul, după notificarea scrisă a Beneficiarului, să rețină din Depozitul de Garanție orice sume datorate și neachitate la scadență, inclusiv facturi, penalități de întârziere și costurile prevăzute la art. 3.6. În | 5.6. The Provider is entitled, after written notice to the Client, to retain from the Security Deposit any amounts due and unpaid at maturity, including invoices, late payment penalties and the costs provided for in Article |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| acest caz, Beneficiarul va reîntregi Depozitul de Garanție în termen de 5 (cinci) zile calendaristice de la notificare. | 3.6. In such case, the Client shall replenish the Security Deposit within 5 (five) calendar days of the notice. |
| 5.7. La încetarea prezentului contract, Prestatorul restituie soldul Depozitului de Garanție, după reținerile prevăzute la art. 5.5 și 5.6, în termen de 30 (treizeci) de zile calendaristice de la stingerea tuturor obligațiilor Beneficiarului, emițând documentele fiscale corespunzătoare. | 5.7. Upon termination of this Agreement, the Provider shall refund the remaining balance of the Security Deposit, after the retentions provided for in Articles 5.5 and 5.6, within 30 (thirty) calendar days after final settlement of all the Client's obligations, issuing the corresponding tax documents. |
| 5.8. Neplata Depozitului de Garanție sau neîntregirea acestuia în termen dă dreptul Prestatorului să suspende Serviciile sau să rezilieze contractul conform art. 10.3. | 5.8. Failure to pay or replenish the Security Deposit on time entitles the Provider to suspend the Services or to terminate the Agreement in accordance with Article 10.3. |
| **6. FORȚA MAJORĂ** | **6. FORCE MAJEURE** |
| 6.1. Forța majoră reprezintă orice eveniment imprevizibil sau inevitabil, care nu poate fi controlat de Partea care îl invocă, aceasta fiind în imposibilitate de a-și executa integral sau parțial obligațiile asumate prin prezentul contract. Ea poate consta în orice cataclism natural, inundație, furtună, incendiu, explozie, tulburări politice, modificări legislative, grevă, pandemie, violență cauzatoare de distrugeri care prezintă caracterele mai sus menționate. | 6.1. Force majeure means any unforeseeable or unavoidable event, beyond the control of the Party invoking it, which makes it impossible for that Party to perform, in whole or in part, its obligations under this Agreement. It may consist of any natural disaster, flood, storm, fire, explosion, political unrest, legislative changes, strike, pandemic, or destructive violence having the characteristics mentioned above. |
| 6.2. Forța majoră exonerează de răspundere Partea care o invocă, cu condiția ca aceasta să notifice celeilalte Părți existența unui caz de forță majoră în termen de 5 zile de la apariția acestuia. Partea care invocă forța majoră va înmâna celeilalte Părți certificarea emisă de autoritatea competentă în termen de 48 de ore de la obținere, dar nu mai târziu de 5 zile de la intervenția cazului de forță majoră invocat. Încetarea evenimentului de forță majoră va fi notificată în același termen. | 6.2. Force majeure releases the invoking Party from liability, provided that it notifies the other Party of the force majeure event within 5 days of its occurrence. The Party invoking force majeure shall deliver to the other Party the certificate issued by the competent authority within 48 hours of obtaining it, but no later than 5 days from the occurrence of the invoked force majeure event. The end of the force majeure event shall be notified within the same term. |
| 6.3. Forța majoră nu exonerează Beneficiarul de plata sumelor devenite scadente anterior apariției evenimentului. | 6.3. Force majeure does not release the Client from paying amounts that fell due before the occurrence of the event. |
| **7. CONFIDENȚIALITATE** | **7. CONFIDENTIALITY** |
| 7.1. Toate informațiile, indiferent de forma fizică în care se prezintă, comunicate de Beneficiar Prestatorului în legătură cu negocierea, încheierea și executarea acestui contract vor fi păstrate de către acesta ca strict confidențiale. | 7.1. All information, regardless of its physical form, communicated by the Client to the Provider in connection with the negotiation, conclusion and performance of this Agreement shall be kept strictly confidential by the Provider. |
| 7.2. Pe parcursul derulării contractului, este posibil ca fiecare Parte să primească sau să aibă acces la informații confidențiale ale celeilalte Părți, denumite generic „Informații". Prin informație confidențială se înțelege orice informație transmisă între Părți – indiferent de suportul pe care este transmisă – sau accesată de către una dintre Părți în cadrul prezentului contract, fără a se limita la acele informații de natură comercială, tehnică, financiară, analize, studii care pot fi transmise în scris sau | 7.2. During the performance of the Agreement, each Party may receive or have access to confidential information of the other Party, generically referred to as "Information". Confidential information means any information transmitted between the Parties – regardless of the medium – or accessed by either Party under this Agreement, including but not limited to commercial, technical and financial information, analyses and studies, which may be transmitted in writing or may refer to any |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| se pot referi la orice acte care conțin, se bazează pe sau sunt generate total/parțial de aceste informații. | documents containing, based on or generated in whole or in part from such information. |
| 7.3. Partea care primește informația: | 7.3. The Party receiving the information: |
| – va menține confidențialitatea informației primite și va restrânge dezvăluirea ei doar la salariații Părții primitoare care au nevoie să cunoască această informație și, de asemenea, nu o va dezvălui unei terțe părți;<br>– va înștiința salariații care primesc informația despre obligația de confidențialitate menționată în acest contract;<br>– va folosi și va cere salariaților să folosească aceeași atenție care este folosită pentru protecția propriilor informații de natură similară pentru a proteja Informația definită în prezentul contract;<br>– va folosi informația pe care o primește doar în legătură cu serviciile pe care le efectuează sau cu îndeplinirea obligațiilor ca urmare a prezentului contract. | – shall keep the information received confidential and restrict its disclosure only to those employees of the receiving Party who need to know it, and shall not disclose it to any third party;<br>– shall inform the employees receiving the information of the confidentiality obligation set out in this Agreement;<br>– shall use, and require its employees to use, the same degree of care used to protect its own information of a similar nature to protect the Information defined in this Agreement;<br>– shall use the information received only in connection with the services it performs or with the fulfilment of its obligations under this Agreement. |
| 7.4. Fac excepție de la aceste prevederi informațiile care:<br>– sunt publice în momentul transmiterii lor sau devin publice ulterior, altfel decât din vina Părții primitoare; sau<br>– au fost legal obținute de la o terță parte și nu fac obiectul obligației de confidențialitate; sau<br>– a căror dezvăluire este impusă de legislația în vigoare sau prin ordinul autorităților competente, numai dacă Partea primitoare va notifica imediat asemenea solicitări Părții transmițătoare și o va sprijini să participe în orice manieră legală și legitimă pentru a preveni astfel de dezvăluiri. | 7.4. The following information is exempted from these provisions:<br>– information that is public at the time of its transmission or subsequently becomes public, other than through the fault of the receiving Party; or<br>– information lawfully obtained from a third party and not subject to a confidentiality obligation; or<br>– information whose disclosure is required by applicable law or by order of the competent authorities, only if the receiving Party immediately notifies the disclosing Party of such requests and assists it in participating in any lawful and legitimate manner to prevent such disclosure. |
| 7.5. Prezentul articol se aplică pe toată durata derulării acestui contract și după expirarea acestuia pe o perioadă de 2 ani. | 7.5. This Article applies throughout the term of this Agreement and for a period of 2 years after its expiry. |
| **8. PROTECȚIA DATELOR ȘI PROPRIETATE INTELECTUALĂ** | **8. DATA PROTECTION AND INTELLECTUAL PROPERTY** |
| 8.1. Părțile vor prelucra datele cu caracter personal ale candidaților și ale Personalului Dedicat cu respectarea Regulamentului (UE) 2016/679 (GDPR) și a legislației române aplicabile. Orice transfer de date cu caracter personal către Beneficiar, în Statele Unite ale Americii, se efectuează numai în baza unui mecanism de transfer valabil conform art. 44–49 GDPR (de exemplu, clauze contractuale standard aprobate de Comisia Europeană), pe care Părțile se obligă să îl încheie anterior primului transfer. | 8.1. The Parties shall process the personal data of candidates and of the Dedicated Personnel in compliance with Regulation (EU) 2016/679 (GDPR) and applicable Romanian law. Any transfer of personal data to the Client in the United States of America shall take place only on the basis of a valid transfer mechanism under Articles 44–49 GDPR (for example, standard contractual clauses approved by the European Commission), which the Parties undertake to conclude before the first transfer. |
| 8.2. Drepturile patrimoniale de proprietate intelectuală asupra rezultatelor activității Personalului Dedicat, create | 8.2. The economic intellectual property rights in the results of the Dedicated Personnel's activity, created |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| exclusiv pentru Beneficiar în executarea prezentului contract, se transmit Beneficiarului odată cu plata integrală a facturilor aferente perioadei în care au fost create. Prestatorul se obligă să includă în contractele de muncă ale Personalului Dedicat clauzele necesare în acest sens și să încheie orice acte suplimentare necesare transferului acestor drepturi către Beneficiar, pe cheltuiala Beneficiarului. | exclusively for the Client in the performance of this Agreement, shall be transferred to the Client upon full payment of the invoices for the period in which they were created. The Provider undertakes to include the necessary clauses to this effect in the employment contracts of the Dedicated Personnel, and shall execute any additional agreements necessary to transfer ownership to the Client, at the Client's cost. |
| **9. ÎNCETAREA CONTRACTULUI** | **9. TERMINATION OF THE AGREEMENT** |
| Încetarea Contractului poate interveni: | The Agreement may be terminated: |
| a) prin acordul Părților;<br>b) în caz de forță majoră cu o durată mai mare de 90 de zile;<br>c) în caz de reziliere pentru neexecutare, conform art. 10 din prezentul Contract;<br>d) la expirarea duratei prezentului contract;<br>e) prin denunțarea unilaterală de către Beneficiar, cu notificarea prealabilă a Prestatorului, cu condiția acordării unui preaviz de 30 de zile calendaristice și cu suportarea costurilor prevăzute la art. 3.6;<br>f) prin denunțarea unilaterală de către Prestator, cu notificarea prealabilă a Beneficiarului, cu condiția acordării unui preaviz de 30 de zile calendaristice;<br>g) cu efect imediat, prin notificare scrisă a Prestatorului, dacă: (i) Hotărârea de Aprobare este desființată, anulată, modificată fără acordul Prestatorului sau suspendată; (ii) procedurile de faliment (chapter 7) sunt respinse sau închise, ori lichidatorul este revocat sau înlocuit, iar succesorul său nu confirmă în scris, în termen de 10 (zece) zile, că va continua executarea prezentului contract; sau (iii) Beneficiarul notifică, ori rezultă în alt mod, că patrimoniile debitoare nu dispun de fonduri suficiente pentru plata integrală a cheltuielilor administrative. În acest caz, Beneficiarul suportă costurile prevăzute la art. 3.6. | a) by agreement of the Parties;<br>b) in the event of force majeure lasting more than 90 days;<br>c) in the event of termination for non-performance, in accordance with Article 10 of this Agreement;<br>d) upon expiry of the term of this Agreement;<br>e) by unilateral termination by the Client, with prior notice to the Provider, provided that a notice period of 30 calendar days is given and the costs provided for in Article 3.6 are borne;<br>f) by unilateral termination by the Provider, with prior notice to the Client, provided that a notice period of 30 calendar days is given;<br>g) with immediate effect, by written notice from the Provider, if (i) the Approval Order is reversed, vacated, modified without the Provider's consent or stayed; (ii) the chapter 7 cases are dismissed or closed, or the trustee is removed or replaced and the successor does not confirm in writing, within 10 (ten) days, that it will continue to perform this Agreement; or (iii) the Client notifies, or it otherwise becomes apparent, that the estates do not have sufficient funds to pay administrative expenses in full. In such case, the Client shall bear the costs provided for in Article 3.6. |
| Încetarea contractului, indiferent de motiv, nu afectează obligațiile deja scadente între Părți la data încetării și nici eventualele despăgubiri datorate celeilalte Părți de către Partea care nu și-a îndeplinit obligațiile. Prevederile art. 3.6, 5, 7, 8 și 11 rămân în vigoare după încetarea contractului. | The termination of the Agreement, for whatever reason, shall not affect the obligations already due between the Parties at the date of termination, nor any compensation owed to the other Party by the Party that failed to perform its obligations. The provisions of Articles 3.6, 5, 7, 8 and 11 shall survive the termination of the Agreement. |
| **10. REZILIEREA** | **10. TERMINATION FOR BREACH** |
| 10.1. În cazul în care Prestatorul își încalcă obligațiile asumate prin prezentul contract și nu remediază respectiva încălcare în termen de 20 (douăzeci) de zile de la data la care Beneficiarul i-a trimis notificarea privind încălcarea obligațiilor asumate, contractul încetează, fără | 10.1. If the Provider breaches its obligations under this Agreement and fails to remedy the breach within 20 (twenty) days from the date on which the Client sent it the notice of breach, the Agreement shall terminate, without formal notice of default and without any other formalities, including without the intervention of a court. |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| punere în întârziere și fără alte formalități, inclusiv fără intervenția instanței de judecată. | |
| 10.2. În cazul în care Beneficiarul își încalcă obligațiile asumate prin prezentul contract și nu remediază respectiva încălcare în termen de 20 (douăzeci) de zile de la data la care a primit notificarea privind încălcarea obligațiilor asumate, contractul încetează, fără punere în întârziere și fără alte formalități, inclusiv fără intervenția instanței de judecată. | 10.2. If the Client breaches its obligations under this Agreement and fails to remedy the breach within 20 (twenty) days from the date on which it received the notice of breach, the Agreement shall terminate, without formal notice of default and without any other formalities, including without the intervention of a court. |
| 10.3. Prin excepție, în cazul neplății sau neîntregirii Depozitului de Garanție la scadență ori al neplății unei facturi în termen de 30 (treizeci) de zile de la scadență, Prestatorul poate rezilia contractul printr-o notificare scrisă, cu efect la 10 (zece) zile de la comunicare, dacă suma nu a fost achitată în acest interval. Beneficiarul rămâne obligat la plata costurilor prevăzute la art. 3.6. | 10.3. By way of exception, if the Security Deposit is not paid or replenished when due, or if an invoice remains unpaid 30 (thirty) days after its due date, the Provider may terminate the Agreement by written notice, effective 10 (ten) days after its communication if the amount has not been paid within this period. The Client remains liable for the costs provided for in Article 3.6. |
| **11. LEGEA APLICABILĂ ȘI LITIGII** | **11. GOVERNING LAW AND DISPUTES** |
| 11.1. Prezentul contract este guvernat de legea statului Texas. Prin excepție, relațiile de muncă cu Personalul Dedicat, impozitele și contribuțiile sociale aferente salariilor, securitatea și sănătatea în muncă și prelucrarea datelor cu caracter personal sunt guvernate de legea română, iar Beneficiarul ia act că, prin urmare, costurile facturate în temeiul prezentului contract sunt determinate conform legii române. | 11.1. This Agreement is governed by Texas law. Notwithstanding the foregoing, the employment relationships with the Dedicated Personnel, payroll taxes and social contributions, occupational health and safety and the processing of personal data shall be governed by Romanian law, and the Client acknowledges that the costs invoiced under this Agreement are determined in accordance with Romanian law. |
| 11.2. Orice litigii între Părți decurgând din prezentul contract și care nu vor putea fi soluționate pe cale amiabilă vor fi supuse spre soluționare Tribunalului de Faliment al Statelor Unite pentru Districtul de Sud al statului Texas (United States Bankruptcy Court for the Southern District of Texas). | 11.2. Any disputes between the Parties arising from this Agreement that cannot be settled amicably shall be submitted to the United States Bankruptcy Court for the Southern District of Texas. |
| **12. NOTIFICĂRI** | **12. NOTICES** |
| Toate notificările ce vor fi făcute în condițiile acestui contract vor fi date în scris, la adresa Părții corespunzătoare așa cum apare mai jos, cu excepția situației în care Partea a notificat în scris o schimbare a adresei. | All notices to be given under this Agreement shall be made in writing, to the address of the relevant Party as set out below, unless that Party has notified a change of address in writing. |
| Orice notificare se va considera făcută în mod corespunzător când a fost înmânată personal, trimisă prin e-mail sau printr-un serviciu de curierat recunoscut. | Any notice shall be deemed duly given when delivered personally, sent by e-mail or by a recognised courier service. |
| **Pentru Prestator:** ERPA PREMIUM VISION SRL<br>În atenția: Pătrașcu Ovidiu Florentin<br>Adresa: Str. Rahovei, nr. 48, Ploiești, Prahova, România<br>E-mail: ovidiu.patrascu@erpahr.ro | **For the Provider:** ERPA PREMIUM VISION SRL<br>Attention: Pătrașcu Ovidiu Florentin<br>Address: 48 Rahovei Street, Ploiești, Prahova, Romania<br>E-mail: ovidiu.patrascu@erpahr.ro |
| **Pentru Beneficiar:** Eva Engelhart, lichidator (chapter 7 trustee) | **For the Client:** Eva Engelhart, chapter 7 trustee<br>Attention: Joshua Wolfshohl / Eric English, Porter Hedges LLP (counsel) |

erpa HR

| ROMÂNĂ | ENGLISH |
|---|---|
| În atenția: Joshua Wolfshohl / Eric English, Porter Hedges LLP (avocați)<br>Adresa: 1000 Main St., 36th Floor, Houston, Texas 77002, Statele Unite ale Americii<br>Telefon: 713-226-6695<br>E-mail: jwolfshohl@porterhedges.com și eenglish@porterhedges.com<br>Cu copie la: eengelhart@rossbanks.com | Address: 1000 Main St., 36th Floor, Houston, Texas 77002, United States of America<br>Phone: 713-226-6695<br>E-mail: jwolfshohl@porterhedges.com and eenglish@porterhedges.com<br>With a copy to: eengelhart@rossbanks.com |
| **13. DISPOZIȚII FINALE** | **13. FINAL PROVISIONS** |
| 13.1. Prezentul contract este redactat în limbile română și engleză. În caz de neconcordanță între cele două versiuni, prevalează versiunea în limba engleză. | 13.1. This Agreement is drafted in Romanian and English. In the event of any inconsistency between the two versions, the English version shall prevail. |
| 13.2. Orice modificare a prezentului contract se face numai prin act adițional sau anexă semnată de ambele Părți. Anexa face parte integrantă din contract. | 13.2. Any amendment to this Agreement shall be made only by an addendum or annex signed by both Parties. The Annex forms an integral part of the Agreement. |
| 13.3. Părțile convin că semnarea contractului, a anexei și a actelor adiționale se poate realiza și prin semnătură electronică, aceasta având aceeași valoare juridică precum semnătura olografă. | 13.3. The Parties agree that this Agreement, its annex and addenda may also be signed by electronic signature, which shall have the same legal value as a handwritten signature. |
| Contractul conține:<br>– **Anexa nr. 1** – Personal Dedicat, Tarife Orare și Depozit de Garanție | The Agreement contains:<br>– **Annex no. 1** – Dedicated Personnel, Hourly Rates and Security Deposit |

**SEMNĂTURI / *SIGNATURES***

**PRESTATOR / PROVIDER**
**S.C. ERPA PREMIUM VISION S.R.L.**
Laura Ancuța Pătrașcu
Administrator

Semnătura / Ștampila – *Signature / Stamp*:
………………………………

Data / *Date*: 12.11.2026

**BENEFICIAR / CLIENT**
**Eva Engelhart**
Lichidator / *Chapter 7 trustee*
Dosar nr. / *Case No.* 25-90399 (Bankr. S.D. Tex.)

Semnătura / *Signature*:
………………………………

Data / *Date*: 12.11.2026

erpa HR

**ANEXA NR. 1 la Contractul nr. 169 / 12.11.2026**
***ANNEX NO. 1 to Agreement no. 169 / 12.11.2026***

Personal Dedicat, Tarife Orare și Depozit de Garanție / *Dedicated Personnel, Hourly Rates and Security Deposit*

| **Nr.** *No.* | **Poziție** *Position* | **Nr. persoane** *Headcount* | **Salariu brut lunar / persoană (RON)** *Monthly gross salary / person (RON)* | **Cost salarial lunar / persoană (RON)** *Monthly salary cost / person (RON)* | **Tarif Orar (RON)** *Hourly Rate (RON)* |
|---|---|---|---|---|---|
| 1 | AR Director | 1 | 68,000 | 69,530 | 475.95 |
| 2 | Finance Manager | 1 | 29,125 | 29,780 | 203.85 |
| 3 | AR Analyst | 2 | 17,000 | 17,383 | 118.99 |
| 4 | Finance Supervisor | 1 | 20,125 | 20,578 | 140.86 |
| | **TOTAL** | **5** | **151,250** | **154,654** | – |

| | |
|---|---|
| 1. **Tariful Orar** = costul total lunar al angajatorului pentru poziția respectivă × 1,15 (onorariul Prestatorului de 15%) ÷ 168 ore lucrătoare pe lună. | 1. **Hourly Rate** = total monthly employer cost for the position × 1.15 (Provider's fee of 15%) ÷ 168 working hours per month. |
| 2. **Salarii și beneficii:** salariile brute lunare din tabel includ, conform confirmării Beneficiarului, contravaloarea celui de-al 13-lea salariu și a bonusului de performanță. Nu se acordă beneficii suplimentare (tichete de masă, abonament medical sau altele) și nu se datorează alte plăți variabile. Orice beneficiu sau bonus suplimentar solicitat de Beneficiar se adaugă prin actualizarea prezentei anexe, cu ajustarea Tarifului Orar conform art. 4.1.3. | 2. **Salaries and benefits:** as confirmed by the Client, the monthly gross salaries in the table include the value of the 13th salary and of the performance bonus. No additional benefits (meal vouchers, medical subscription or other) are provided and no other variable pay is due. Any additional benefit or bonus requested by the Client shall be added by updating this Annex, with the Hourly Rate adjusted in accordance with Article 4.1.3. |
| 3. **Sporuri** (art. 3.3.3): ore suplimentare – 75%; muncă în zilele de repaus săptămânal sau de sărbătoare legală – 100%; muncă de noapte – 25% din Tariful Orar. | 3. **Premiums** (Article 3.3.3): overtime – 75%; work on weekly rest days or public holidays – 100%; night work – 25% of the Hourly Rate. |
| 4. **Locul de desfășurare a activității:** telemuncă, exclusiv pe teritoriul României, pentru toate pozițiile. **Program de lucru:** luni – vineri, 10:30 – 19:00 (ora României), cu o pauză de masă de 30 de minute, respectiv 8 ore de muncă pe zi. **Echipamentele de lucru** (calculator și accesele necesare) sunt asigurate de Beneficiar, conform art. 3.5 lit. a); dacă vor fi asigurate de Prestator, costul acestora se adaugă la Tariful Orar. | 4. **Place of work:** remote work, exclusively within the territory of Romania, for all positions. **Working schedule:** Monday – Friday, 10:30 – 19:00 (Romanian time), with a 30-minute lunch break, i.e. 8 working hours per day. **Work equipment** (computer and necessary access) shall be provided by the Client, in accordance with Article 3.5(a); if provided by the Provider, its cost shall be added to the Hourly Rate. |
| 5. **Data de începere:** după intrarea în vigoare a contractului conform art. 2.2 și încasarea Depozitului de Garanție, la data comunicată de Beneficiar conform art. 3.4.1. | 5. **Start date:** after the Agreement becomes effective under Article 2.2 and the Security Deposit is received, on the date communicated by the Client under Article 3.4.1. |
| 6. **Depozitul de Garanție** = Total cost salarial lunar × 4 = 154,654 × 4 = **618,616 RON**, facturat în USD la cursul BNR din ziua facturării, cu **termen de plată de 5 zile calendaristice**. Facturile lunare au **termen de plată de 30 de zile calendaristice**. | 6. **Security Deposit** = Total monthly salary cost × 4 = 154,654 × 4 = **618,616 RON**, invoiced in USD at the NBR rate on the invoice date, with a **payment term of 5 calendar days**. Monthly invoices have a **payment term of 30 calendar days**. |
| 7. **Persoane de contact:** Prestator (coordonator) – Ovidiu Pătrașcu, ovidiu.patrascu@erpahr.ro; Beneficiar – Eva Engelhart, eengelhart@rossbanks.com. | 7. **Contact persons:** Provider (coordinator) – Ovidiu Pătrașcu, ovidiu.patrascu@erpahr.ro; Client – Eva Engelhart, eengelhart@rossbanks.com. |

**PRESTATOR / PROVIDER**
**S.C. ERPA PREMIUM VISION S.R.L.**
Laura Ancuța Pătrașcu
Administrator
Semnătura / *Signature*: ……………………
Data / *Date*: 12.11.2026

**BENEFICIAR / CLIENT**
**Eva Engelhart**
Lichidator / *Chapter 7 trustee*
Dosar nr. / *Case No.* 25-90399 (Bankr. S.D. Tex.)
Semnătura / *Signature*: ……………………
Data / *Date*: 12.11.2026